1

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 2 of 261
PageID: 44940
**Abernathy v. Church of God, Not Reported in Fed. Supp. (2011)**

2011 WL 13135285
Only the Westlaw citation is currently available.
United States District Court,
N.D. Alabama, Middle Division.

Robert Glenn ABERNATHY, et al., Plaintiffs,

v.

CHURCH OF GOD a/k/a Church
of God, Inc., et al., Defendants.

Case No.: 4:11-CV-2761-VEH
|
Signed 11/28/2011

**Attorneys and Law Firms**

Bradley W. Cornett, H. Edgar Howard, Ford Howard &
Cornett PC, Gadsden, AL, for Plaintiffs.

David W. McDowell, Harriet Thomas Ivy, Baker Donelson
Bearman Caldwell & Berkowitz PC, William H. McKenzie,
IV, Thomas A. Kendrick, Norman Wood Kendrick & Turner,
Birmingham, AL, V. Van Johnson, III, Denner Pellegrino
LLP, Springfield, MA, for Defendants.

## MEMORANDUM OPINION AND ORDER

VIRGINIA EMERSON HOPKINS, United States District
Judge

### I. Introduction

**\*1** Plaintiffs initiated this loan-related lawsuit arising under
state law on August 2, 2011. (Doc. 1). Pending before the
court is Church of God's Motion To Dismiss Pursuant to Fed.
R. Civ. P. 12(b)(6) and Motion for More Definite Statement
Pursuant to Fed. R. Civ. P. 12(e) (Doc. 15) (the "Motion")
filed on September 12, 2011.

Plaintiffs filed their opposition (Doc. 22) to the Motion on
October 6, 2011. On October 13, 2011, Church of God
followed with its reply. (Doc. 24). Accordingly, the Motion is
now under submission and, for the reasons explained below,
is **GRANTED IN PART** and is otherwise **DENIED**.

### II. Standard

A Rule 12(b)(6) motion attacks the legal sufficiency of the
complaint. *See* Fed. R. Civ. P. 12(b)(6). The Federal Rules
of Civil Procedure require only that the complaint provide "

'a short and plain statement of the claim' that will give the
defendant fair notice of what the plaintiff's claim is and the
grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41,
47 (1957), *abrogated by Bell Atlantic Corp. v. Twombly*, 550
U.S. 544, 545 (2007); *see also* Fed. R. Civ. P. 8(a).

While a plaintiff must provide the grounds of his entitlement
to relief, Rule 8 does not mandate the inclusion of "detailed
factual allegations" within a complaint. *Twombly*, 550 U.S. at
545 (quoting *Conley*, 355 U.S. at 47). However at the same
time, "it demands more than an unadorned, the-defendant-
unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129
S. Ct. 1937, 1949 (2009). "[O]nce a claim has been stated
adequately, it may be supported by showing any set of facts
consistent with the allegations in the complaint." *Twombly*,
550 U.S. at 563.

"[A] court considering a motion to dismiss can choose to
begin by identifying pleadings that, because they are no
more than conclusions, are not entitled to the assumption of
truth." *Iqbal*, 129 S. Ct. at 1950. "While legal conclusions can
provide the framework of a complaint, they must be supported
by factual allegations." *Iqbal*, 129 S. Ct. at 1950. "When there
are well-pleaded factual allegations, a court should assume
their veracity and then determine whether they plausibly
give rise to an entitlement to relief." *Id.* (emphasis added).
"Under *Twombly's* construction of Rule 8 ... [a plaintiff's]
complaint [must] 'nudge[ ] [any] claims' ... 'across the line
from conceivable to plausible.' *Ibid.*" *Iqbal*, 129 S. Ct. at
1950-51.

A claim is plausible on its face "when the plaintiff pleads
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged." *Iqbal*, 129 S. Ct. at 1949. "The plausibility standard
is not akin to a 'probability requirement,' but it asks for more
than a sheer possibility that a defendant has acted unlawfully."
*Id.* (quoting *Twombly*, 550 U.S. at 556).

### III. Analysis

In its Motion, Church of God seeks to dismiss counts I, III,
IV, V, and VI of Plaintiffs' complaint. (Doc. 16 at 1). Counts
I and IV are for breach of contract (Doc. 1 ¶¶ 51-55, 67-71),
count III is for unjust enrichment/restitution (*id.* ¶¶ 60-66),
and counts V and VI are for negligence. (*Id.* ¶¶ 72-85).

**\*2** Church of God also seeks clarification as to whether
counts II, VII, and VIII of the complaint are asserted against
it. (Doc. 15 at 1). Plaintiffs have confirmed in their opposition

Case 1:19-md-02875-RMB-SAK   Document 1748-28   Filed 11/10/21   Page 3 of 261
PageID: 44941
Abernathy v. Church of God, Not Reported in Fed. Supp. (2017)

that these counts are not brought against Church of God. (Doc. 22 at 18). Accordingly, the Motion is **GRANTED** as to Counts II, VII, and VIII.

### A. Counts I and IV

Church of God seeks a dismissal of these two counts on the basis that it is not a borrower obligated under the promissory notes and that it never merged with co-defendant, Celestial Praise Church of God, Inc. ("Celestial Praise"). Plaintiffs respond that "[a]t the heart of this case is the relationship between Church of God and Celestial Praise" (Doc. 22 at 12) and "[i]t is not entirely clear at this early stage" (*id.* at 13), the exact nature of the relationship that these defendants have and whether breach of contract liability can be established by piercing the corporate veil or under some other legal theory that could "confer[ ] liability on the Church of God as stated in the plaintiffs' complaint." (*Id.*). Plaintiffs also urge that the court "should not dismiss these allegations without discovery." (*Id.*).

The court agrees with Plaintiffs that they have pled sufficient facts to plausibly support their breach of contract claims against Church of God and further that to dismiss them now would not only be premature, but also potentially legal error on such an underdeveloped record. The court finds particularly problematic Church of God's position that the court should find in its favor on its statute of frauds defense at the pleadings stage and in the absence of considering whether any exceptions to such a defense may apply. Accordingly, for all these reasons, the Motion is **DENIED** as to counts I and IV.

### B. Count III

"To prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation." *Portofino Seaport Village, LLC v. Welch*, 4 So. 3d 1095, 1098 (Ala. 2008) (citing *Am. Family Care, Inc. v. Fox*, 642 So. 2d 486, 488 (Ala. Civ. App. 1994)). In its Motion, Church of God primarily relies upon *Danny Lynn Elec. & Plumbing, LLC v. Veolia ES Solid Waste Southeast, Inc.*, No. 2:09cv192–MHT, 2011 WL 2893629 (July 19, 2011, M.D. Ala.), to support dismissal of Plaintiffs' unjust enrichment claim on the basis that they have not alleged a "direct benefit" conferred upon Church of God.

While the *Veolia* decision does employ "direct benefit" language, 2011 WL 2893639, at *6, the court is puzzled

by Church of God's parenthetical "quoting" reference to *Hancock–Hazlett General Const. Co., Inc. v. Trane Co.*, 499 So. 2d 1385, 1387 (Ala. 1986). (Doc. 16 at 16). The court has studied the *Hancock-Hazlett* opinion, and nowhere within that decision does the Supreme Court of Alabama use either the word "direct" or the word "benefit," much less the phrase "direct benefit." Therefore, any notion that *Hancock-Hazlett* requires proof of a direct benefit in order to sustain an unjust enrichment claim under Alabama law is misplaced at best.

Moreover, in *Hancock-Hazlett*, the court found dismissal to be appropriate because the "complaint affirmatively discloses that defendants do not hold any amount of money paid to them by mistake or otherwise" and because "Trane retained only the sum of money actually owed to it by McCullough, and returned the overpayment to McCullough." 499 So. 2d at 1387. No similar allegations are contained in Plaintiffs' complaint. Therefore, the court concludes that Church of God has not met its burden as the movant, and Plaintiffs have pled sufficient facts to plausibly support their unjust enrichment claim against Church of God. Accordingly, the Motion is **DENIED** as to count III.

### C. Count V

**\*3** Church of God seeks a dismissal of count V on the basis that any negligence claim premised upon an equitable mortgage is barred by the statute of frauds. (Doc. 16 at 18-19). However, none of the cases cited by Church of God involve a claim of negligence. Also, as stated above, the court is not persuaded to rely upon an underdeveloped statute of frauds defense (and any possible exceptions) at this early stage of the litigation.

Further, the duty to control doctrine (discussed below) may potentially trigger tort liability regardless of whether an actionable equitable mortgage exists between Plaintiffs and Church of God. In particular, Plaintiffs have clarified in their opposition that in this count they are not seeking "to foreclose an equitable interest in the property" (Doc. 22 at 18), but rather to impose liability for Church of God's alleged negligent conduct relating to the property. Therefore, the Motion is **DENIED** as to count V.

### D. Count VI

Church of God contends that count VI should be dismissed because it owed Plaintiffs no duty and did not proximately cause them any damages. (Doc. 16 at 19). In support of its position, Church of God relies primarily on the answer by the

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 4 of 261
PageID: 44942
Abernathy v. Church of God, Not Reported in Fed. Supp. (2011)

Supreme Court of Alabama to a certified question regarding the so-called duty to control doctrine. *See In re Birmingham Asbestos Litigation*, 997 F.2d 827, 830 (11th Cir. 1993) ("We therefore hold that, under Alabama law, the 'duty to control' doctrine may not be applied to hold a parent corporation liable for the acts of its subsidiary.").

The court agrees with Church of God that *Birmingham Asbestos* makes it clear that a duty to control theory [1] is not cognizable as a matter of Alabama law in the context of a parent/subsidiary corporate relationship. Therefore, to the extent that Plaintiffs seek to impose liability on Church of God as a parent corporation of Celestial Praise under the duty to control doctrine, the Motion is **GRANTED**, and that limited claim is **DISMISSED**.

However, at the same time, the exact nature of the relationship shared between Church of God and Celestial Praise has yet to be determined. In fact, Church of God insists that it "and Celestial Praise are not legally merged." (Doc. 24 at 3-4).

Moreover, *Birmingham Asbestos* does not answer the question of whether the duty to control doctrine is applicable to an affiliation that arises outside of a parent/subsidiary one. *Cf. id.* at 828 ("Whether under Alabama law the tort doctrine of 'duty of control' could be applied to hold a parent corporation liable for the acts of its subsidiary?" (internal quotation marks omitted)); *id.* at 829 ("It is well settled that a parent corporation, even one that owns all the stock of a subsidiary corporation is not subject to liability for the acts of its subsidiary unless the parent so controls the operation of the subsidiary as to make it a mere adjunct, instrumentality, or alter ego of the parent corporation." (citing *First Health, Inc. v. Blanton*, 585 So. 2d 1331 (Ala. 1991))). Additionally, Church of God has cited to no controlling authority which establishes that the duty to control can only arise in the context of a parent/subsidiary corporate structure.

**\*4** Therefore, due to the underdeveloped nature of the record and Church of God's failure to carry its burden as the movant, the court is not persuaded to dismiss count VI on a Rule 12(b)(6) basis to the extent that Plaintiffs seek to use the duty

to control doctrine outside of a parent/subsidiary affiliation. Accordingly, the Motion is **DENIED** as to count VI in all respects other than a parent/subsidiary relationship.

#### E. Shotgun Nature of Plaintiffs' Complaint

The court agrees with Church of God that Plaintiffs should be ordered to replead their complaint. Instead of pleading each claim against each defendant as separately numbered counts, Plaintiffs' complaint is lumpily pled and in its present form violates the Eleventh Circuit's admonishment against shotgun pleading. Therefore, the court will require Plaintiffs to restate their complaint consistent with the Eleventh Circuit's anti-shotgun rule as explained in *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955 (11th Cir. 2008) and the related cases cited to therein. *See Davis*, 516 F.3d at 979 ("The complaint is a model 'shotgun' pleading of the sort this court has been roundly, repeatedly, and consistently condemning for years, long before this lawsuit was filed.").

In repleading, Plaintiffs also should be mindful of the pleading requirements of *Twombly* and *Iqbal*, *supra*, and ensure that all claims are stated in a plausibly supportable manner. Accordingly, Plaintiffs are **ORDERED** to replead their complaint within 15 days of the entry date of this order clarifying which counts are asserted against which defendants and also specifying in the heading the nature of each claim alleged in each specific count.

#### IV. Conclusion

Accordingly, for the reasons explained above, the Motion is **GRANTED IN PART** and is otherwise **DENIED**. Further, the deadline for Plaintiffs to file their amended pleading is no later than 15 days from the entry date of this order. Defendants shall have 20 days to answer or otherwise respond to the amended complaint.

**DONE** and **ORDERED**.

#### All Citations

Not Reported in Fed. Supp., 2011 WL 13135285

#### Footnotes

1    The duty to control provides:

Abernathy v. Church of God, Not Reported in Fed. Supp. (2011)

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct.

*Birmingham Asbestos*, 997 F.2d at 828 (quoting Restatement (Second) of Torts § 315(a) (1965)).

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2

Coyle v. Hornell Brewing Co., Not Reported in F.Supp.2d (2010)

72 UCC Rep.Serv.2d 230

2010 WL 2539386

United States District Court, D. New Jersey.

Lauren COYLE, on behalf of herself and
all others similarly situated, Plaintiff,

v.

HORNELL BREWING CO.; Ferolito Vultaggio
& Sons; Arizona Beverage Company LLC; and
Beverage Marketing USA, Inc., Defendants.

Civil No. 08–02797 (JBS).

|

June 15, 2010.

West KeySummary

1    Food     Purity and quality

The doctrine of primary jurisdiction precluded
the court from determining whether high fructose
corn syrup (HFCS) qualified as a natural product.
The class action claim alleged that beverage
companies deceptively advertised that their
products were "100% natural" despite containing
HFCS, but the Food and Drug Administration
(FDA) was the appropriate body for deciding the
issue. Determining whether HFCS qualified as
natural was a complex chemical consideration
beyond the scope of a federal judge. Use
of the term "natural" was within the FDA's
discretion, and allowing the issue to be resolved
by federal judges instead of the FDA could lead
to inconsistent judgments. Additionally, the FDA
had not been asked to determine whether HFCS
qualified as natural.

8 Cases that cite this headnote

**Attorneys and Law Firms**

Lynne M. Kizis, Esq., Daniel R. Lapinski, Esq., Philip A.
Tortoreti, Esq., Wilentz, Goldman & Spitzer, Woodbridge,
NJ, Michael D. Halbfish, Esq., Tunney & Halbfish,
Woodbridge, NJ, for Plaintiff.

Robert P. Donovan, Esq., McElroy, Deutsch, Mulvaney &
Carpenter, LLP, Newark, NJ, for Defendants.

*OPINION*

SIMANDLE, District Judge.

**I. INTRODUCTION**

 **\*1**  This matter comes before the Court on the motion
of Hornell Brewing Company, Ferolito Vultaggio & Sons,
Arizona Beverage Company, LLC, and Beverage Marketing
USA, Inc. (collectively, "Defendants") to dismiss Plaintiff's
claim. [Docket Item 93]. Plaintiff Lauren Coyle ("Plaintiff")
filed this putative class action suit against Defendants on
behalf of herself and others similarly situated claiming that
Defendants wrongfully labeled their beverages as "100%
NATURAL" when the beverages contained high fructose
corn syrup ("HFCS").

Defendants first ask the Court to dismiss Plaintiff's claim
pursuant to the doctrine of primary jurisdiction, arguing that
the case should be referred to the United States Food and
Drug Administration ("FDA") given the agency's unique
expertise and experience in the field. Second, Defendants
assert that Plaintiff is precluded from seeking restitution under
an unjust enrichment theory due to an available remedy at law.
Third, Defendants contend that Plaintiff's breach of express
and implied warranty claims should be dismissed because
Plaintiff failed to provide Defendants with notice of breach
before filing suit. Defendants lastly argue that any portion of
the claim based on actions occurring more than four years
before the filing of Plaintiff's complaint is barred by the statute
of limitations.

For the reasons set forth below, the Court denies Defendants'
motion to dismiss under the doctrine of primary jurisdiction,
but will stay this action for a period of six months and refer
the question of whether HFCS qualifies as "natural" to the
FDA. The Court also denies Defendants' motion to dismiss
Plaintiff's claims for unjust enrichment and breach of express
and implied warranty of merchantability, but will dismiss any
claim arising out of purchases made before April 21, 2004
under the applicable statute of limitations.

**II. BACKGROUND**

**A. Factual Allegations in First Amended Complaint**

Plaintiff brings this proffered class action suit against Defendants, who are responsible for manufacturing, brewing, distributing, and selling Arizona Iced Tea beverages, alleging that Defendants should not have labeled their products as "100% NATURAL" because they contain the ingredient HFCS. Plaintiff claims that over the six years prior to bringing suit, she purchased Arizona Iced Tea products because she believed them to contain only natural ingredients, which according to Plaintiff excludes anything containing artificial colors, flavors, preservatives, chemicals, or highly processed materials. Plaintiff also claims that because of the "100% NATURAL" label, she and others were willing to and did pay a premium price for the beverages.

Plaintiff argues that because HFCS is a "highly processed sugar substitute" manufactured using artificial enzymes and acids, HFCS is not natural and thus Defendants' beverages, which contain HFCS, cannot be labeled as "100% NATURAL." Based on the above allegations, Plaintiff brings four claims for relief for herself and the proposed injured class: violation of the New Jersey Consumer Fraud Act ("NJCFA") (Count I); unjust enrichment and common law restitution (Count II); breach of express warranty (Count III); and breach of implied warranty of merchantability (Count IV).

### B. Procedural History
**\*2** Plaintiff originally filed suit on April 21, 2008, in the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L–1294–08. On June 8, 2008, Defendants removed the action to this Court pursuant to 28 U.S.C. §§ 1332 and 1453, the Class Action Fairness Act of 2005. On July 7, 2008, Plaintiff filed a motion to remand the case to state court but withdrew the motion by a letter dated August 26, 2008.

On September 12, 2008, Defendants filed a motion to dismiss Plaintiff's complaint on the basis that Plaintiff's claims were preempted by the FDA's regulatory scheme. On June 9, 2009, Defendants' motion was dismissed without prejudice pending a decision by the Third Circuit Court of Appeals in *Holk v. Snapple Beverage Co.,* 575 F.3d 329 (2009). In *Holk,* the Court of Appeals held that plaintiff's claims that the label on defendant Snapple's iced tea beverages representing them to be "All Natural" are deceptive because the beverages contain HFCS are not preempted by federal statute or FDA regulation. *Id.* at 342. Plaintiff subsequently filed a First Amended Complaint on July 31, 2009, joining Beverage Marketing USA, Inc. as a defendant.

On January 28, 2010, Defendants filed the present motion to dismiss, and briefing concluded on March 19, 2010, when Plaintiff filed a sur-reply with the Court's consent. On May 17, 2010, Plaintiff filed a motion for an order certifying the action as a class action, which remains pending.

### C. Federal Regulatory Scheme for Labeling Food and the FDA's Consideration of HFCS as "Natural"
In 1938, Congress passed the Federal Food, Drug, and Cosmetic Act ("FDCA"), Pub.L. No. 75–717, 52 Stat. 1040 (1938), which in turn established the FDA within the Department of Health and Human Services, 21 U.S.C. § 393 (2009). Under the FDCA, the FDA is authorized to regulate food safety and labeling. *Fellner v. Tri–Union Seafoods, LLC,* 539 F.3d 237, 251 (3d Cir.2008). In 1990, Congress then passed the Nutrition Labeling and Education Act ("NLEA"), Pub.L. No. 101–535, 104 Stat. 2353 (1990) (codified at 21 U.S.C. § 343), which reformed and standardized the requirements for nutrition labeling and health claims on nearly all food products, *Holk,* 575 F.3d at 332.

For years there has been much debate over the term "natural" as it pertains to food and beverage labeling. In 1993, after soliciting comments from the general public on the issue, the FDA stated the following:

> After reviewing and considering the comments, the agency continues to believe that if the term "natural" is adequately defined, the ambiguity surrounding use of this term that results in misleading claims could be abated. However, as the comments reflect, there are many facets of this issue that the agency will have to carefully consider if it undertakes a rulemaking to define the term "natural." Because of resource limitations and other agency priorities, FDA is not undertaking rulemaking to establish a definition for "natural" at this time. The agency will maintain its current policy (as discussed in the general principles proposal (56 FR 60421 at 60466)) not to restrict the use of the term "natural" except for added color, synthetic substances, and flavors as provided in § 101.22. Additionally, the agency will maintain its policy (Ref.32) regarding the use of "natural," as meaning that nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food. Further, at this time the agency will continue to distinguish between natural and artificial flavors as outlined in § 101.22.

*3 58 Fed.Reg. 2302, 2407 (Jan. 6, 1993).

Although the agency has recognized that "the use of the term 'natural' on the food label is of considerable interest to consumers and industry" and that "it believed that if the term 'natural' is adequately defined, the ambiguity in the use of this term, which has resulted in misleading claims, could be abated", *id.,* the agency nonetheless maintains a policy of qualifying individual ingredients as "natural" on a case-by-case basis, Letter from Geraldine A. June, Center for Food Safety and Applied Nutrition to Audrae Erickson, President, Corn Refiners Association, [Docket Item 93]. The FDA has implemented only one regulation concerning the use of the term "natural," distinguishing natural flavoring from artificial flavoring for the "labeling of spices, flavorings, colorings, and chemical preservatives." 21 C.F.R. § 101.22 (2010). Although an informal letter from an FDA officer suggested that the agency has recognized that the particular process used to manufacture HFCS may affect its qualification as natural, the FDA has yet to make any formal classifications. *See* Letter from Geraldine A. June, *supra.*

## III. DISCUSSION

### A. Motion to Dismiss First Amended Complaint Pursuant to the Doctrine of Primary Jurisdiction

The doctrine of primary jurisdiction is applicable when an action that is otherwise within the court's jurisdiction raises some issue of fact that falls within the expertise and experience of an administrative agency. *Reiter v. Cooper,* 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). It serves to maintain uniformity and consistency, uphold the integrity of a regulatory scheme, and establish a "workable relationship between the courts and administrative agencies." *MCI Telecomms. v. Teleconcepts, Inc.,* 71 F.3d 1086, 1105 (3d Cir.1995). Although no fixed formula exists for applying the doctrine, *United States v. Western Pac. R.R.,* 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956), courts will generally consider four factors in determining whether the doctrine applies:

(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

(2) whether the question at issue is particularly within the agency's discretion;

(3) whether there exists a substantial danger of inconsistent rulings;

(4) whether a prior application to the agency has been made.

*Clark v. Actavis Group HF,* 567 F.Supp.2d 711, 714 (D.N.J.2000) (quoting *IPCO Safety Corp. v. WorldCom, Inc.,* 944 F.Supp. 352, 355 (D.N.J.1996)).

If judicial abstention is the appropriate course, the doctrine requires that a court "refer" the particular issue to the proper agency before proceeding, allowing the parties reasonable opportunity to seek an administrative ruling. *Reiter,* 507 U.S. at 268 n. 3; *Business Edge Group, Inc. v. Champion Mortgage Co.,* 519 F.3d 150, 154 (3d Cir.2008). It is within the court's discretion to stay the case or dismiss without prejudice should the former unjustly disadvantage the parties. *Reiter,* 507 U.S. at 268. For example, in *Weinberger v. Bentex Pharm., Inc.,* 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973), the Supreme Court affirmed a district court's decision to refer the issues of which drugs qualified as "new drugs" and which were "grandfathered" to the FDA. The Court found that these "threshold questions" involving "complex chemical and pharmacological considerations" were particularly suited for the FDA given the agency's unique expertise and experience in the field, and "not a matter well left to a court without chemical or medical background." *Id.* at 655; *see also Sandoz Pharm. v. Richardson–Vicks, Inc.,* 902 F.2d 222, 231–232 (3d Cir.1990) (finding that the issue of whether an ingredient was correctly labeled as "inactive" under FDA standards was not a matter that could be properly decided by the court).

*4 The present case meets all four factors. First, categorizing HFCS as either natural or artificial for the purpose of food and beverage labeling does not fall within the conventional experiences of judges. Similar to the issues presented in *Weinberger,* the process for manufacturing HFCS is a technical matter involving complex chemical considerations, and a federal judge normally would be unfamiliar [1] with how a particular enzyme or fixing agent affects a substance's qualification as "natural." Such an understanding may lie at the heart of determining whether HCFS is "natural." Although Plaintiff contends that she is not asking the Court to define the term "natural," the entire claim—that Defendants improperly labeled their beverages as "100% NATURAL" despite containing HFCS—rests on an initial determination of whether HFCS is a "natural" substance. This question lies

within the FDA's particular field of expertise regarding food chemistry and the labeling of food and beverage products.[2]

Second, the use of the term "natural" as it pertains to food and beverage labeling falls within the FDA's discretion.[3] The FDA employs food technicians, chemists, nutritionists, and numerous other specialists in order to address public health and safety issues relating to foods and medicines. *About FDA,* http://www.fda.gov/AboutFDA/CentersOffices/CFSAN/default htm. Given both the FDA's purpose and resources, the question of qualifying HFCS as "natural" is appropriately left to the discretion of the FDA, not the Court, in the first instance.

Third, and perhaps most critical, is the danger that this Court's classification of HFCS as either natural or artificial will be inconsistent with that of other courts or with the FDA itself. Defendants are currently the subject of another pending putative class action suit[4] with the same underlying claim—that HFCS is artificial and Defendants therefore should not have labeled their beverage products as "100% NATURAL." Additionally, there are at least three other proposed class action suits filed in federal courts challenging the use of the term "natural" on beverage products containing HFCS.[5] Should this Court independently decide whether HFCS is a natural ingredient, it is possible that other federal courts or the FDA will come to a different conclusion, resulting in inconsistent outcomes for essentially identical claims and affecting food and beverage purveyors with nationwide businesses. The prospect that different labels would be permissible in different jurisdictions would impose a burden on this industry that may be alleviated if the FDA chooses to speak directly to the question.

Fourth, neither this particular Plaintiff nor the Court has made a prior application to the FDA on this issue. The Court should not decide whether HFCS qualifies as "natural" before attempting to seek guidance from the FDA, the administrative agency with expertise on this matter. The FDA has the capacity to address and resolve the present dispute through the administrative determination process. *See* 21 C.F.R. § 10.25.[6]

**\*5** Therefore, the Court will stay the case for six months from entry of this Order.[7] Should the FDA fail to address the question within the given time frame, the Court will consider extending the time period if the FDA indicates an intention to promptly resolve the issue.[8]

**B. Motion to Dismiss for Failure to State a Claim**

*1. Standard of Review*

To survive a motion to dismiss for failure to state a claim upon which relief may be granted under Fed.R.Civ.P. 12(b)(6), a complaint must contain more than mere labels and conclusions. *See Ashcroft v. Iqbal,* ——U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The assumption of truth is inapplicable to legal conclusions or to "[t]hreadbare recitals of the elements of a cause of action supported by mere conclusory statements." *Iqbal,* 129 S.Ct. at 1949. When determining whether dismissal is appropriate, the Court conducts a two-part analysis. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009). First, the factual and legal elements of a claim are separated. *Id.* The Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. *Id.* at 210–11. Second, the Court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 211. In other words, the complaint must do more than allege plaintiff's entitlement to relief; rather it must "show" such an entitlement with its facts. *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than a mere possibility of misconduct, the complaint has alleged —but it has not shown—that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1949 (quoting Fed.R.Civ.P. 8(a)(2)).

*2. Unjust Enrichment*

Defendants argue that Plaintiff's claim for unjust enrichment must be dismissed on the grounds that Plaintiff has a legal remedy under the NJCFA. Defendants offer no argument that Plaintiff has failed to plead the requisite elements of an unjust enrichment claim.

It is true that restitution for unjust enrichment is an equitable remedy that is unavailable when a plaintiff has an adequate remedy at law. *Goadby v. Philadelphia Elec. Co.,* 639 F.2d 117, 122 (3d Cir.1981). However, it is equally true that plaintiffs are permitted to plead alternative theories of recovery. *E.g., In re K–Dur Antitrust Litig.,* 338 F.Supp.2d 517, 544 (D.N.J.2004). At this stage in the proceedings, it would be premature to dismiss Plaintiff's unjust enrichment claim, pled as an alternate theory of recovery, based on the mere presence of possible legal remedies. *See id.*

Coyle v. Hornell Brewing Co., Not Reported in F.Supp.2d (2010)

72 UCC Rep.Serv.2d 230

Accordingly, Defendants' motion to dismiss Plaintiff's claim for unjust enrichment is denied.

### 3. *Breach of Express and Implied Warranty*

Defendants argue that Plaintiff has failed to state a claim for breach of express warranty and implied warranty of merchantability and is precluded from seeking any remedy because she failed to provide notice of breach to Defendants before filing suit. The Court disagrees. The notice requirement under N.J. Stat. Ann. § 12A:2–607(3)(a) provides:

> **\*6** "Where a tender has been accepted the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."

The Official Comments further provide:

> "The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched ... [t]he notification which preserves the buyer's rights under this Article need only be one that informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation."

N.J. Stat. Ann. 12A:2–607, Comment 4.

As recognized in *Strzakowlski v. General Motors Corp.,* No. 04–4740, 2005 U.S. Dist. LEXIS 18111, at \*10, 2005 WL 2001912 (D.N.J. Aug. 16, 2005), this Court has predicted more than once that the New Jersey Supreme Court would not require a buyer to give notice of breach of warranty to a remote manufacturer who is not the immediate seller under Section 2–607 before commencing suit.[9] In *Strzakowlski,* defendant GMC argued that the plaintiff failed to provide GMC with sufficient notice before filing suit and therefore

failed to state a claim for breach of warranty. *Id.* at \*9. This Court denied GMC's motion to dismiss, finding that a buyer is not required to provide pre-suit notice to a manufacturer who is not the immediate seller in an express warranty case. *Id.* at \*15. The *Strzakowlski* decision also interpreted Official Comment 4 as establishing the purpose of the notice requirement to "spearhead settlement through negotiation" but that "negotiation and simultaneous litigation are [not] mutually exclusive." *Id.* at \*14.

We agree with the reasoning in *Strzakowski* and find that notice of breach of either express or implied warranty is not required in an action against a remote manufacturer who is not the immediate seller of a product. Plaintiff's failure to provide Defendants notice of breach before commencing suit therefore does not preclude her from seeking a remedy before this Court. We further agree with the *Strzakowski* decision in that should the New Jersey Supreme Court require a buyer to notify a remote seller of breach of warranty, notice-by-lawsuit may suffice so long as it is brought within a "reasonable" time —a question that must be answered by the jury.[10] The Court will therefore decline to dismiss Plaintiff's breach of warranty claims based on lack of sufficient notice.

### 4. *Statute of Limitations*

Defendants' final contention is that Plaintiff's action for breach of express and implied warranty of merchantability, based on her alleged purchases over the six-year period prior to the date of filing the complaint, is in part barred by the four-year statute of limitations. Plaintiff offers no argument in response. In accordance with N.J. Stat. Ann. § 12A:2–725, Plaintiff's claims for breach of warranty for purchases predating April 21, 2004 must be dismissed under the applicable statute of limitations.

**\*7** Under N.J. Stat. Ann. § 12A:2–725(1), an action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. N.J. Stat. Ann. § 12A:2–725(2). In the context of warranties, a breach occurs when tender of delivery is made. *Id.* In the present case, Plaintiff filed suit on April 21, 2008, claiming breach of express and implied warranty of merchantability for the beverages allegedly purchased during the six-year period prior to filing suit. However, Plaintiff's claim for breach of warranty must have been commenced within four years of when tender of delivery was made, which occurred here

Coyle v. Hornell Brewing Co., Not Reported in F.Supp.2d (2010)

72 UCC Rep.Serv.2d 230

when Plaintiff purchased the beverages. Therefore, Plaintiff's claims for breach of warranty based on purchases predating April 21, 2004 must be dismissed under the statute of limitations.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Defendants' motion to dismiss under the doctrine of primary jurisdiction, but will stay this action for a period of six months and refer to the FDA the question of whether HFCS qualifies as a "natural" ingredient in Defendants' beverages. The Court likewise will deny Defendants' motion to dismiss Plaintiff's claims for unjust enrichment and breach of express and implied warranty of merchantability, except that the Court will dismiss any claim for breach of express or implied warranty arising out of purchases made before April 21, 2004. The accompanying Order will be entered. Further, counsel shall confer and submit to the Court a suitable Order for Referral within ten (10) days hereof.

## All Citations

Not Reported in F.Supp.2d, 2010 WL 2539386, 72 UCC Rep.Serv.2d 230

## Footnotes

1      Federal judges are capable of making determinations grounded in technical or scientific principles in many varied and complex contexts, and this case would present no exception. Such adjudication is aided by the parties' expert witnesses and sometimes by court-appointed experts under Rule 706, Fed.R.Evid. For example, in patent cases the judge may have the benefit of a "tutorial" presented by counsel and the parties' experts regarding the technical or scientific field occupied by the particular invention, so as to prepare the judge to construe the claims of the patent. *See, e.g.,* L. Pat. R. 2.1(a)(4) (D.N.J.). Such procedures prepare the judge to adjudicate matters in an unfamiliar field, and the same could be done in a case like this one. The issue for this aspect of primary jurisdiction, therefore, is not whether a judge would be incapable of applying specialized scientific or technical concepts to the question at hand, but whether the federal agency with expertise and some regulatory experience with this issue is more likely to address the task with competence and knowledge arising from its customary duties and experience.

2      Although the FDA undeniably has expertise in the technical, scientific, and public policy aspects of food and beverage labeling, its authority to determine the question herein is not preemptive, whether through express preemption, implied field preemption, or implied conflict preemption, as determined in *Holk, supra,* 575 F.3d at 342.

3      While the FDA will not hear cases regarding the truth or falsity of advertising claims, *Sandoz,* 902 F.2d at 230, the Court is not referring the entire case to the FDA, but rather only the issue of whether HFCS is a "natural" ingredient in Defendants' beverages.

4      *Covington v. Hornell Brewing Co., et al.,* No. 08–21894 (S.D. Fla. filed July 3, 2008).

5      *Von Koenig v. Snapple Beverage Corp.,* No. 09–00606 (E.D. Cal. filed Mar. 4, 2009); *Weiner v. Snapple Beverage Corp.,* No. 07–08742 (S.D.N.Y. filed Oct. 10, 2007); *Holk v. Snapple Beverage Corp.,* No. 07–03018 (D.N.J. filed June 29, 2007), *rev'd,* 575 F.3d 329 (3d Cir.2009).

6      The FDA regulations provide for an administrative review process.

        The Commissioner will institute a proceeding to determine whether to issue, amend, or revoke a regulation or order, or take or refrain from taking any other form of administrative action whenever any court, on its own initiative, holds in abeyance or refers any matter to the agency for an administrative determination and the Commissioner concludes that an administrative determination is feasible within agency priorities and resources.

        21 C.F.R. § 10.25.

7      Plaintiff has voiced concern that because the FDA has not yet taken any concrete steps to resolve the issue at hand, referral to the FDA would essentially leave the case unresolved. It is for this reason that the Court is

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 13 of 261
PageID: 44951
Coyle v. Hornell Brewing Co., Not Reported in F.Supp.2d (2010)
72 UCC Rep.Serv.2d 230

setting a time frame to ensure Plaintiff's claim is resolved in a timely manner. This six-month stay period can be enlarged for good cause shown. Likewise, the stay will be terminated and the Court will decide the issue if the FDA declines the Court's referral for an administrative determination.

8    Counsel are directed to confer regarding the procedure for judicial referral of the question to the FDA for administrative determination and submit an appropriate Order for Referral for this Court's approval within ten (10) days, consistent with this Opinion. Further, the parties herein are directed to cooperate in expediting the presentation of this question to the FDA, including assembling all material information and briefing as required by the FDA. Finally, this Court requests that the FDA act upon this referral with a decision, or a timetable for future decision, within the six-month period of this stay.

9    *See also Cipollone v. Liggett Group, Inc.* 683 F.Supp. 1487, 1498 (D.N.J.1988) (denying Defendant's motion to dismiss where Plaintiff's only notice was the filing of a complaint), *rev'd on other grounds,* 893 F.2d 541 (3d Cir.1990), *rev'd in part on other grounds and aff'd in part on other grounds,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); *Duall Bldg. Restoration, Inc. v. 1143 E. Jersey Ave. Ass'n,* 279 N.J.Super. 346, 652 A.2d 1225, 1230 (N.J.Super.Ct.App.Div.1995) (explaining that "[a] party harmed by breach of implied warranty will frequently not have the information necessary to enable it to give a prompt warning of the breach to a remote manufacturer or distributor" and that "[i]nterpreting N.J.S.A. 12A:2–607(3)(a) to impose that requirement would materially reduce the availability of a remedy for the breach").

10   An additional consideration for a motion to dismiss for failure to provide notice for breach of warranty, though not required, is whether the defendant has been prejudiced by the alleged lack of notice. *See Pritchard v. Liggett & Myers Tobacco Co.,* 295 F.2d 292, 298 (3d Cir.1961); *Boyes v. Greenwich Boat Works,* 27 F.Supp.2d 543, 551–552 (D.N.J.1998). Here, Defendants argue that the prejudice is "self-evident" from Plaintiff filing a class action suit without first having notified Defendants of the breach and thus denying them the opportunity to cure. Such prejudice, if any, is not sufficiently substantial to justify granting Defendants' motion to dismiss on this ground. Defendants were presumably still in a position to cure after Plaintiff filed suit, thereby rendering this claim moot.

**End of Document**                                   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

3

64 Conn. L. Rptr. 521

2017 WL 2764752

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Hartford at Hartford.

DICIN ELECTRIC COMPANY, INC.
v.
O & G INDUSTRIES, INC. et al.

HHDCV166070813S
|
May 25, 2017

Opinion

ELGO, J.

*1 This action, filed by the plaintiff, Dicin Electric Company, Inc., against the co-defendants, O & G Industries, Inc. ("O & G"), and the town of Rocky Hill ("the defendant"), arises from a contract entered into between the plaintiff and O & G for the plaintiff to provide electrical services during the construction and renovation of Rocky Hill High School. Before this court is the motion filed by the defendant, Town of Rocky Hill, seeking to strike counts five and six of the plaintiff's complaint on the ground that the plaintiff failed to allege sufficient facts to support equitable causes of action.

The plaintiff alleges six counts in its complaint, filed on August 26, 2016. Counts one through four are asserted against O & G and allege unjust enrichment, quantum meruit, and breach of contract claims. Count five, alleging unjust enrichment, and count six, alleging quantum meruit, are asserted against the defendant.

Specifically, the plaintiff alleges the following facts. The contract between the plaintiff and O & G required the plaintiff to install an addressable lighting system in the school's natatorium, hallways, and building exterior, and a standard line voltage system in the remainder of the school. After the plaintiff and O & G executed the contract, the defendant revised the scope of work to require a fully addressable lighting system throughout the entire school. The defendant and/or O & G did not formally modify the contract to reflect these changes, but urged the plaintiff to complete the work in good faith. Despite the changes in the scope of work, the defendant failed to offer the plaintiff consideration for the

benefit of their additional labor and materials, which is worth approximately $800,000 more than the value of the work represented in the contract documents.

DISCUSSION

"[A] motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court ... [The court] construe[s] the complaint in the manner most favorable to sustaining its legal sufficiency ... Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied." (Internal quotation marks omitted.) *Geysen v. Securitas Security Services USA, Inc.,* 322 Conn. 385, 398, 142 A.3d 227 (2016).

In the defendant's memorandum in support of its motion to strike, the defendant advances two arguments. First, the defendant argues that absent facts alleging that the plaintiff has no adequate remedies available at law, the plaintiff cannot allege unjust enrichment or quantum meruit, which it characterizes as equitable remedies. Specifically, the defendant argues that the plaintiff has several legal remedies available under General Statutes § 49–41 et seq. against the project's payment bond surety, the general contractor, and also against political subdivisions such as the defendant if they fail to ensure that the general contractor obtained a payment bond. The defendant argues the plaintiff has failed to allege facts in its complaint that these remedies are inadequate and thus is precluded from alleging equitable remedies. Second, the defendant alleges that the legislature intended General Statutes § 49–41 et seq. to be the exclusive remedy for subcontractors.

*2 In opposition, the plaintiff argues that it has sufficiently alleged facts to support each individual element of its claims for unjust enrichment and quantum meruit. Further, it argues that General Statutes § 49–42 is not an adequate remedy at law because a payment bond is not intended to cover the cost of additional work completed outside the scope of a contract. The plaintiff also claims that the damages sought in the present action exceed the amount available from the defendant's payment bond.

"Quantum meruit and unjust enrichment are noncontractual means of recovery in restitution. Quantum meruit is a theory of recovery permitting restitution in the context of an otherwise unenforceable contract. In contrast, recovery under a theory of unjust enrichment applies in the absence

64 Conn. L. Rptr. 521

of a quasi-contractual relationship ... Because both doctrines are restitutionary, the same equitable considerations apply to cases under either theory." (Citation omitted.) *Walpole Woodworkers, Inc. v. Manning,* 307 Conn. 582, 587 n.9, 57 A.3d 730 (2012).

The defendant's first argument incorrectly assumes that the plaintiff's particular claims of unjust enrichment and quantum meruit are equitable and therefore require the absence of an adequate remedy at law. "This assumption ignores the fact that the jurisdictions of law courts and equity courts have always overlapped with respect to restitution ..." (Internal quotation marks omitted.) *Gagne v. Vaccaro,* 80 Conn.App. 436, 442, 835 A.2d 491 (2003), cert. denied, 268 Conn. 920, 846 A.2d 881 (2004). "Although [the] description of quasi contract as 'equitable' has been repeated many times, this refers merely to the way in which a case should be approached, since it is clear that the action is at law and the relief given is a simple money judgment." 1 G. Palmer, The Law of Restitution (1978) § 1.2, p. 9.

Our appellate courts, with at least one exception, [1] have continued to characterize restitution claims seeking monetary relief as actions at law. "In *Misisco v. La Maita,* 150 Conn. 680, 684, 192 A.2d 891 (1963), our Supreme Court, consonant with the Restatement [of Restitution] view, explained: [An unjust enrichment claim] is an action in quasi contract, i.e. an obligation, arising by law, on which the same remedy is given as would be given if the obligation arose out of contract ... Although the right of recovery is based on equitable principles, it is nevertheless an action at law, the purpose of which is to prevent unjust enrichment ... The only remedy is in an award of money damages. There is no merit to the claim of the defendant that the plaintiff's only right of action was in equity and that equitable relief had to be sought." *Gagne v. Vaccaro, supra,* 80 Conn.App. 441. At least one recent Superior Court decision has explicitly held that the requirement of an adequate remedy at law is inapplicable to unjust enrichment because it is an action at law. *Rapoport v. Southfield Point Assn.,* Superior Court, judicial district of Stamford–Norwalk, Docket No. CV–02–0188888–S (September 2, 2004, Grogins, J.) [37 Conn. L. Rptr. 806]. See also 1 Restatement (Third), Restitution and Unjust Enrichment, Restitution May Be Legal or Equitable or Both § 4, Reporter's Note (e), p. 40 (2010) ("Quantum meruit is not an equitable doctrine, it is a form of action developed in courts of law").

**\*3** In the present action, the plaintiff alleges that the defendant, despite promising to amend its contract with O & G, failed to do so and received the benefit of over $800,000 in additional goods and services. The plaintiff's claims of unjust enrichment and quantum meruit seek monetary relief for goods and services provided to the defendant in the absence of a contract with the defendant. Consequently, these claims seek remedies at law, not equity, and therefore, the outcome of this motion does not depend on the availability of adequate remedies at law.

In the alternative, the defendant argues that the common-law claims of unjust enrichment and quantum meruit are precluded by § 49–41 et seq. The defendant asserts that the legislature intended § 49–41 et seq. to be the exclusive remedy for subcontractors. The defendant's argument is twofold. First, it asserts that because § 49–41 et seq. was modelled after the federal Miller Act, which provided an exclusive remedy against the otherwise immune federal government, the Connecticut legislature had a similar intent with respect to municipalities. Second, the defendant asserts that the legislature intended § 49–41 et seq. to be the exclusive remedy because it provided a complete scheme under which subcontractors could sue the surety, the general contractor, and the municipality. Under this scheme, according to the defendant, a right of action is only available against the municipality when it fails to ensure that the general contractor secured a bond. In light of this comprehensive set of remedies, the defendant claims that allowing common-law remedies against the town would frustrate the purpose of the statutes.

The defendant's first argument fails because state municipalities, unlike the federal government, do not have sovereign immunity. Though our courts have concluded that the General Assembly intended § 49–41 and § 49–42 to operate in general conformity with the federal Miller Act; *American Masons' Supply Co. v. F.W. Brown Co.,* 174 Conn. 219, 223, 384 A.2d 378 (1978); "[c]are must be taken when relying on decisions under, or relating to ... the Miller Act. Most of the cases ... involve the United States government as a party. The United States, however, can only be sued when it consents to be sued, much as the State of Connecticut can only be sued when it consents to be sued (in State court). Municipalities, on the other hand, do not have sovereign immunity but rather a more limited immunity, commonly referred to as governmental immunity." *M & L Construction, Inc. v. Darien,* Superior Court, judicial district of Stamford, Docket No. CV–13–6022914–S (March 5, 2015, Povodator, J.) [59 Conn. L. Rptr. 823]. Given the limited immunity

Dicm Electric Company, Inc. v. O & G Industries, Inc., Not Reported in Atl. Rptr. (2017)

64 Conn. L. Rptr. 521

granted to state municipalities as compared to the broad immunity of the federal government, one cannot conclude, simply by analogy, that the legislature intended § 49–41(d) to be the exclusive remedy against municipalities.

The defendant's second argument fails because the Connecticut Supreme Court has already established in *Cecio Brothers, Inc. v. Greenwich,* 156 Conn. 561, 244 A.2d 404 (1968) that such a claim for unjust enrichment could lie against a municipality. In *Cecio Brothers, Inc.,* the court examined "whether the facts support the conclusion that the town will be unjustly enriched unless it is required to pay the [subcontractor] for furnishing 10,000 cubic yards of borrow fill in excess of the ... specifications of the prime contract." *Id.,* 564. The court reached the merits of the unjust enrichment claim, even though, under the circumstances, it held that the plaintiff could not recover. See also *Vertex, Inc. v. Waterbury,* 278 Conn. 557, 576, 898 A.2d 178 (2006) (citing *Cecio* for the general proposition that municipalities can be liable for unjust enrichment if acting within the scope of their corporate powers).

 **\*4** Critically, *Cecio* held that unjust enrichment claims could lie against municipalities at a time when the statutes already afforded subcontractors a right of action against the payment bond. General Statutes (Rev. to 1958) § 49–42(a) stated in relevant part: "Every person who has furnished labor or material in the prosecution of the work provided for in such contract in respect of which a payment bond is furnished ... shall have the right to sue on such payment bond for the amount ... unpaid ..." Furthermore, the *Cecio* court was aware that the statutes were modelled on the Miller Act. Connecticut revised the statutes in conformity with the Miller Act in 1941 long before *Cecio* was decided. *International Harvester Co. v. L.G. DeFelice & Son, Inc.,* 151 Conn. 325, 332, 197 A.2d 638 (1964) (noting that during the 1941 legislative session the General Assembly used the Miller Act as its model for legislation that ultimately became § 49–41 and § 49–42). Notably, the *Cecio* defendant explicitly raised this issue, arguing that the 1941 revisions were intended to preclude unjust enrichment claims against municipalities. *Cecio Brothers, Inc. v. Greenwich,* Conn. Supreme Court Records & Briefs, May Term, 1968, Town of Greenwich's Brief, pp. 10–14. Nevertheless, the *Cecio* court reached the merits of the plaintiff's unjust enrichment claim.

Despite the implications of *Cecio,* several trial courts have concluded that the presence of a payment bond precludes a subcontractor from bringing a claim for unjust enrichment

against a municipality. In its memorandum, the defendant cites two such cases: *York Hill Rock Quarry Co. v. Conn–Strux, Inc.,* Superior Court, judicial district of New Haven, Docket No. CV–10–6001360–S (February 10, 2012, Markle, J.), and *Kerite Co. v. Norwalk,* 32 Conn.Sup. 168, 344 A.2d 364 (1975). Though both cases were decided after 1968, neither acknowledge the court's ruling in *Cecio.* Rather, they rely on the fact that the statutes were modelled on the Miller Act and also on the basis of later amendments to the statutes. Comparisons between § 49–41 et seq. and the Miller Act are unhelpful because, as discussed previously, municipalities lack sovereign immunity, and as will be discussed, the later legislative amendments to the statutes are not dispositive. Therefore, the court declines to follow these decisions.

Moreover, since the *Cecio* decision, there have been no amendments to § 49–41 et seq. that abrogate subcontractors' common-law rights against municipalities for unjust enrichment and quantum meruit. "[T]he legislature is always presumed to have created a harmonious and consistent body of law ... [and] to be aware of prior judicial decisions involving common-law rules." *R.C. Equity Group, LLC v. Zoning Commission,* 285 Conn. 240, 257 n.20, 939 A.2d 1122 (2008). "In determining whether or not a statute abrogates or modifies a common law rule the construction must be strict ... Although the legislature may eliminate a common law right by statute, the presumption that the legislature does not have such a purpose can be overcome only if the legislative intent is clearly and plainly expressed." (Internal quotation marks omitted.) *Chadha v. Charlotte Hungerford Hospital,* 272 Conn. 776, 789, 865 A.2d 1163 (2005). For subcontractors, the relevant amendments to § 49–41 et seq. since 1968 have given them additional statutory remedies. In 1969, the legislature enacted General Statutes § 49–41a, which added a cause of action against the general contractor if payment was not made to a subcontractor within forty-five days of the general contractor receiving payment from the municipality. The Connecticut Supreme Court concluded that the addition of § 49–41a did not affect the remedy already available to subcontractors under § 49–42, stating "§ 49–41a(b) and § 49–42 ... are separate and distinct statutes designed by the legislature to accomplish separate and distinct ends and to afford separate and distinct remedies to subcontractors." *Nor'easter Group, Inc. v. Colossale Concrete, Inc.,* 207 Conn. 468, 477, 542 A.2d 692 (1988). In 2005, § 49–41 was amended to include subsection (d), granting subcontractors "the same legal right of action against such political subdivision of the state as such person would have had against a surety under the provisions of section

Dicm Electric Company, Inc. v. O & G Industries, Inc., Not Reported in Atl. Rptr. (2017)
64 Conn. L. Rptr. 521

49–42" if a municipality "fails to obtain delivery from the contractor of the bond."

 **\*5** None of the amendments since 1968 overcome the presumption that the legislature does not intend to abrogate subcontractors' common-law rights. Though subcontractors have additional remedies, including one against a municipality for failing to ensure a bond is provided, subcontractors already had a statutory remedy when *Cecio* was decided. The fact that more remedies now exist does not demonstrate a clear intent that the remedies should be exclusive. Moreover, the legislature is presumed to be aware of existing judicial decisions such as *Cecio,* and the amendments do not demonstrate that the legislature intended

to supersede it. Accordingly, the plaintiff's quantum meruit and unjust enrichment claims are not abrogated by these statutes.

CONCLUSION

The motion to strike counts four and five are denied.

**All Citations**

Not Reported in Atl. Rptr., 2017 WL 2764752, 64 Conn. L. Rptr. 521

## Footnotes

1    In *United States Fidelity & Guaranty Co. v. Metropolitan Property & Liability Ins. Co.,* 10 Conn.App. 125, 521 A.2d 1048, cert. denied, 203 Conn. 806, 525 A.2d 521 (1987), the Appellate Court held that the statutory subrogation procedures available at the time were adequate legal remedies that precluded the equitable remedy of unjust enrichment. The holding that unjust enrichment is equitable is inconsistent with *Misisco* and *Gagne,* and this court declines to follow it.

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

4

2013 WL 5658790
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

GE DANDONG et al., Plaintiffs,

v.

PINNACLE PERFORMANCE
LTD. et al., Defendants.

No. 10 Civ. 8086(JMF).
|
Oct. 17, 2013.

*OPINION AND ORDER*

JESSE M. FURMAN, District Judge.

**\*1** In this action, a group of Singapore investors assert various claims against Morgan Stanley & Co. and certain of its affiliates related to a series of credit—linked notes (the "Pinnacle Notes" or "Notes") issued by Defendant Pinnacle Performance Limited. Before the Court are two motions. First, named Plaintiffs—Ge Dandong, Loh Tuck Woh Peter, the Singapore Government Staff Credit Cooperative Society, Ltd. ("SGSCCS"), Ni Yan Amy, Ang Soo Cheng, Choh Gek Hong Johnson, Ng Shook Phin Susan, and Zhao Yuzheng —move, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for certification of a proposed class. Second, Defendants move, pursuant to Rule 702 of the Federal Rules of Evidence, to exclude the declarations of Plaintiffs' proffered experts Ilya Eric Kolchinsky and Craig A. Wolson. For the reasons that follow, Plaintiffs' motion to certify the class is GRANTED, and Defendants' motion to exclude the expert declarations is DENIED in part as moot and in part on the merits.

## BACKGROUND

The background of this action is complex and summarized in greater detail in prior opinions of this Court and the Court of Appeals, familiarity with which is assumed. *See, e.g., Ge Dandong v. Pinnacle Performance Ltd.* (*Dandong I* ), No. 10 Civ. 8086(LBS), 2011 WL 5170293 (S.D.N.Y. Oct.31, 2011); *Ge Dandong v. Pinnacle Performance Ltd.* (*Dandong II* ), No. 10 Civ. 8086(LBS), 2011 WL 6156743 (S.D.N.Y. Dec.12, 2011), *aff'd sub nom. Lam Yeen Leng v. Pinnacle Performance Ltd.,* 474 F. App'x 810, 814 (2d Cir.2012) (summary order); *Ge Dandong v. Pinnacle Performance Ltd.* (*Dandong III* ), ——F.Supp.2d. ——, 2013 WL 4482509, at *13 (S.D.N.Y. Aug.22, 2013).

Plaintiffs are retail investors who purchased the Notes from various distributor banks based in Asia between August 2006 and December 2007. The Notes are a type of credit derivative known as a credit-linked note ("CLN"), which Defendants structured and issued in seven series during 2006 and 2007. (*See* McNeela Decl. (Docket No. 143) Ex. 3 at ii; *id.* Ex. 4 at ii; *id.* Ex. 5 at ii; *id* . Ex. 6 at SING0003533; *id.* Ex. 7 at SING0000964). Credit-linked notes shift the credit risk associated with certain Reference Entities ("REs") from a "protection buyer" (typically the bank arranging the CLNs) to a "protection seller" (the CLN investors). As Judge Sand —to whom this case was previously assigned—explained in his October 31, 2011 opinion, CLNs are typically created as follows:

First, the bank arranging the CLNs creates a Special Purpose Vehicle ("SPV") to issue the CLNs. The SPV is generally ... an orphan company owned by a trustee that will not appear on the balance sheet of any party to the transaction. The bank then buys protection from the SPV in the amount of the CLNs that will be issued to investors insuring it against the possibility that the REs would experience a credit event, such as a default. The name given to this particular transaction is a credit default swap, and this is, in effect, a derivative contract that functions like a form of insurance. Second, the SPV sells the CLNs to investors and uses the principal it receives therefrom to purchase highly-rated securities, or underlying assets, which serve as collateral in the event the REs default.... Third, in return for assuming the risk, investors receive interest in the form of (i) credit protection payments from the sponsoring bank and (ii) any interest generated by

the underlying assets. Assuming that no credit event occurs, investors will receive the redemption value of the Note.

**\*2** *Dandong I,* 2011 WL 5170293, at \*1 (internal quotation marks and citations omitted).

As Judge Sand also explained, "[g]enerally ... from the perspective of the investor, the single most important risk exposure in a CLN is the credit risk associated with the reference entities." *Id.* at \*2 (internal quotation marks and alterations omitted). Yet, Plaintiffs contend, "[r]ather than invest [their] principal in low-risk underlying assets, [Defendants] invested in high-risk synthetic collateralized debt obligations," *id.,* that they themselves issued (the "ACES CDOs"). Even worse, Plaintiffs argue, Defendants "shorted"—that is, bet against—the ACES CDOs that were to serve as the underlying assets for the Notes (Compl. ¶ 77 (Docket No. 1)), creating a situation in which Defendant "MS Capital stood to profit in the event that the pool of assets performed poorly, while the investors suffered losses." *Dandong I,* 2011 WL 5170293, at \*2.

Plaintiffs commenced this action on October 25, 2010. (Compl. (Docket No. 1)). At bottom, they allege that each series of Pinnacle Notes was sold pursuant to a set of documents (the "Offering Documents") that failed to reveal the true nature of the financial arrangement. The Offering Documents for each series comprised (1) a Base Prospectus common to all the Pinnacle Notes; (2) a Pricing Statement specific to the series; and (3) a two-page Brochure purporting to provide a "Summary of Terms" with respect to the series. (Compl.¶ ¶ 247–51). According to the Complaint, these documents were materially false and misleading in various ways, including "by portraying the synthetic CDOs as one choice ... for the Underlying Asset," when "in truth investment in the Synthetic CDOs was certain" (Compl.¶ 254), and by failing to disclose that Defendant "Morgan Stanley created the synthetic CDOs to be used as Underlying Assets and ... possessed opposed interests ... to those of Plaintiffs." (Compl. ¶ 266).

Defendants filed a motion to dismiss the Complaint and, in October 2011, Judge Sand granted in part and denied in part their motion. The Court allowed the Plaintiffs' claims for, *inter alia,* fraud, fraudulent inducement, and breach of the implied covenant of good faith and fair dealing to proceed.

*See Dandong I,* 2011 WL 5170293, at \*16. Defendants subsequently sought an anti-suit injunction from the High Court of the Republic of Singapore; in response, Judge Sand issued an anti-anti-suit injunction, preventing Defendants from further prosecuting their injunction application in Singapore, *see Dandong II,* 2011 WL 6156743, at \*1. Judge Sand's injunction was affirmed by the Second Circuit on interlocutory review, but the Court of Appeals nonetheless remanded the case because it found that Judge Sand had erred in not addressing whether there was personal jurisdiction over Defendant Pinnacle Performance Limited. *See Lam Yeen Leng,* 474 F. App'x 810. The Circuit did not address whether Judge Sand had properly ruled on Defendants' motion to dismiss. *See id.*

**\*3** On remand, Plaintiffs filed an Amended Complaint (Docket No. 109), which Defendants again moved to dismiss. This time, Defendant Morgan Stanley moved to dismiss on the grounds, among others, that "subsequent developments render[ed] the Amended Complaint's core fraud allegation implausible as a matter of law" and that the "Plaintiff[s] ... testified that they did not read or could not remember reading the Pinnacle Notes offering documents that the Amended Complaint alleges Plaintiffs relied on." (Morgan Stanley Mem. in Supp. Mot. To Dismiss 1 (Docket No. 122)). The Court granted Morgan Stanley's motion to dismiss with respect to Plaintiffs' claim of aiding and abetting breach of the implied covenant of good faith and fair dealing, but otherwise denied the motion. *See Dandong III,* 2013 WL 4482509, at \*13. That is, Plaintiffs' claims for fraud, aiding and abetting fraud, fraudulent inducement, aiding and abetting fraudulent inducement, and breach of the covenant of good faith and fair dealing all survived. (Am.Compl.¶¶ 289–330).

As noted, there are now two motions pending before this Court. First, Plaintiffs move pursuant to Rule 23 of the Federal Rules of Civil Procedure to certify the following class:

> All persons who purchased Pinnacle Notes Series 1, 2, 3, 6, 7, 9, and 10 or their successors in interest and thereby suffered damages, excluding: the Defendants named herein; any of Defendants' Officers or Directors or their immediate family members; or any firm trust, partnership, corporation, or entity in which a Defendant or its Officers or Directors

or their immediate family members, has a controlling interest.

(Plaintiffs' Memorandum of Law in Support of their Motion for Class Certification ("Pls.' Cert. Mem.") 1 (Docket No. 142)). Plaintiffs also seek the appointment of the named Plaintiffs as class representatives, as well as the appointment of Kirby McInerney LLP as lead class counsel. (*Id.*) Second, Defendants move pursuant to Rule 702 of the Federal Rules of Evidence to exclude two expert declarations filed by Plaintiffs in support of their motion for class certification, namely the declarations of Craig A. Wolson (Docket No. 146), and Ilya Eric Kolchinsky (Docket No. 147). (*See* Memorandum of Law in Support of Defendants' Motion to Exclude the Declarations of Plaintiffs' Experts Ilya Eric Kolchinsky and Craig A. Wolson ("Defs.' Exclusion Mem.") (Docket No. 155)). The Court will address the two motions in turn.

### DISCUSSION

#### A. Class Certification

Rule 23 governs class certification. A party seeking class certification must first meet the requirements of Rule 23(a), namely: numerosity, commonality, typicality, and adequacy of representation. *See* Fed.R.Civ.P. 23(a). If those threshold requirements are met, the proposed class must also fit within one of the subdivisions of Rule 23(b). *See* Fed.R.Civ.P. 23(b); *see also, e.g., Brown v. Kelly,* 609 F.3d 467, 475–76 (2d Cir.2010). Here, Plaintiffs propose a Rule 23(b)(3) damages class (Pls .' Cert. Mem. 16), which means that it must meet Rule 23(b)(3)'s requirements that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

**\*4** In evaluating a motion for class certification, a district court is required to evaluate compliance with each of Rule 23's requirements, even if that requires considerations of merits issues. *See, e.g., Levitt v. J.P. Morgan Sec.,* 710 F.3d 454, 465 (2d Cir.2013). In making such determinations, however, a district judge "should not assess any aspect of the merits unrelated to a Rule 23 requirement." *In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24, 40 (2d Cir.2006); *see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* ––– U.S. ––––, –––– – –––, 133 S.Ct. 1184, 1194–95, 185 L.Ed.2d 308 (2013) ("Rule 23 grants courts no license to

engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent— but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."). "The burden of proving compliance with all of the requirements of Rule 23 rests with the party moving for certification. *Levitt,* 710 F.3d at 465, and Rule 23 "does not set forth a mere pleading standard." *Comcast Corp. v. Behrend,* ––– U.S. ––––, ––––, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013) (internal quotation marks omitted). Instead, the party seeking certification must "satisfy through evidentiary proof" compliance with the Rule. *Id.* In evaluating whether the moving party has done so, the Court must engage in a "rigorous analysis" in which it is permitted to "probe behind the pleadings before coming to rest on the certification question." *Id.* (internal quotation marks omitted). The party seeking certification meets its burden by establishing that the requirements have been met by a preponderance of the evidence. *See Levitt,* 710 F.3d at 465.

#### 1. The Rule 23(a) Prerequisites

##### i. Numerosity

The first requirement for class certification is that the class "is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). The Second Circuit has held that "numerosity is presumed at a level of 40 members." *Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995). Plaintiffs' counsel has been retained by more than 200 Notes investors (McNeela Decl. ¶ 2), and Defendants do not contest the numerosity requirement. (Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("Defs.' Cert. Mem.") (Docket No. 152) 27 n. 22). The Court thus concludes that the class meets the numerosity requirement of Rule 23(a)(1).

##### ii. Commonality

The second requirement for class certification is that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). Members of the class must have claims that "depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores, Inc. v. Dukes,* ––– U.S. ––––, ––––, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011). The test for commonality, however, "is not demanding and is met so long as there is at least one issue common to the class." *Linsley v. FMS Inv.*

Ge Dandong v. Pinnacle Performance Ltd., Not Reported in F.Supp.2d (2013)

*Corp.,* 288 F.R.D. 11, 15 (D.Conn.2013) (internal quotation marks omitted).

**\*5** Plaintiffs have met this burden. They have put forth numerous issues that are common to the class including, *inter alia,* "[w]hether Defendants withheld information regarding the Pinnacle Notes' Underlying Assets ... from the investors" (Pls.' Cert. Mem. 19); "whether Defendants acted with scienter when they omitted material facts" (*id.*); and whether Defendants engaged in behavior that they argue constitutes bad faith. (Pls.' Mem. 20). *See also Dandong I,* 2011 WL 5170293 at *10–16. These issues, which can be resolved on a class-wide basis, are indeed central to the validity of the claims in this litigation. Defendants do not contest the commonality requirement except "to the extent it affects whether Plaintiffs satisfy Rule 23(b)(3)'s predominance requirement" (Defs.' Cert. Mem. 27 n. 22), an issue addressed separately below. The commonality requirement has thus been met.

### iii. Typicality

The third Rule 23(a) requirement is that "the claims or defenses of the representative parties are typical of [those] of the class." Fed.R.Civ.P. 23(a)(3). The Supreme Court has observed that "the commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). More specifically, typicality "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Sykes v. Mel Harris & Assocs., LLC,* 285 F.R.D. 279, 287 (S.D.N.Y.2012) (quoting *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 155 (2d Cir.2001)).

Here, Plaintiffs argue that typicality is satisfied because the named Plaintiffs, "like all Class members, purchased the Notes pursuant to a uniform application procedure and allege that they were defrauded and suffered damages due to Defendants' undisclosed self-dealing." (Pls.' Cert. Mem. 20–21). Defendants counter that the named Plaintiffs are not typical because they are exposed to "unique defenses." (Defs.' Cert. Mem. 27). In particular, Defendants claim that the named Plaintiffs are exposed to unique defenses because (1) they "did not read (or could not recall reading) the Pinnacle Notes Offering Documents" (Defs.' Cert. Mem. 28); and (2) of the named Plaintiffs' "individual experiences when investing in" the Notes. (*Id.*). These arguments do not survive scrutiny.

Reformulated, Defendants' first challenge to the typicality requirement is that because the named Plaintiffs did not read the Offering Documents, their claims are subject to the unique defense that they cannot establish the reliance element required for a common law fraud claim. *See, e.g., Wynn v. AC Rochester,* 273 F.3d 153, 156 (2d Cir.2001) (noting that a common law fraud claim requires, *inter alia,* "a misrepresentation or omission of material fact ... upon which the plaintiff reasonably relied"). Defendants point out that none of the named Plaintiffs could recall reading the Base Prospectus or the Pricing Statements (Defs.' Cert. Mem 5–6) and argue that "if putative class members had—unlike the [named Plaintiffs]—actually *read* the Pinnacle Notes Offering Documents," the named Plaintiffs would be subject to unique defenses. (*Id.* 28).

**\*6** Ultimately, this argument fails. First, although it is true that each of the named Plaintiffs appears to have admitted failing to review both the Base Prospectus and the Pricing Statements,[1] Defendants have not established that this failure is unique to the named Plaintiffs. That is, it may well be that *none* of the class members— be they class representatives or not—reviewed the Base Prospectus and the Pricing Statements. Second, it appears that Plaintiffs can establish reliance on another document: the Brochures. Each named Plaintiff appears to have reviewed the Brochures,[2] and the Brochures all contained one of the allegedly misleading statements, namely that "[t]he Notes will be secured by, *amongst other assets,* (i) *Underlying Assets which may include* AA-rated or higher rated U.S. Dollar denominated portfolio credit-linked securities (i.e. Synthetic CDO securities), and (ii) the Swap Arrangements)." (Am.Compl.¶ 154) (emphasis in Am. Compl.); *see also* McNeela Decl. Ex. 3 at iii; *id.* Ex. 4 at iii; *id.* Ex. 5 at iii; *id.* Ex. 6 at SING0003534; *id.* Ex. 7 at SING0000965.

Defendants counter that, as a matter of law, Plaintiffs cannot establish reasonable reliance on sales brochures (Defs.' Cert. Mem. 19), but this argument is unavailing, at least at this stage of the litigation. Defendants point to three cases to support their position: *Hunt v. Alliance North American Government Income Trust,* 159 F.3d 723 (2d Cir.1998), *McCoy v. Goldberg,* 883 F.Supp. 927 (S.D.N.Y.1995), and *Independent Order of Foresters v. Donaldson, Lufkin & Jenrette Inc.,* 919 F.Supp. 149 (S.D.N.Y.1996). Yet these cases merely stand for the proposition that when an investor relies on misrepresentations in a sales brochure but could have discovered the true nature of the product being

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 24 of 261
PageID: 44962
Ge Dandong v. Pinnacle Performance Ltd., Not Reported in F.Supp.2d (2013)

advertised by looking at other documents, reliance on the sales brochure is unreasonable. *See Hunt,* 159 F.3d at 730 ("Minimal diligence in this case would have included consulting the prospectuses, ... which contained disclosures broad enough to cover [the alleged omissions from the sales brochures.]"); *McCoy,* 883 F.Supp. at 935 ("[A]n investor [can]not justifiably rely on optimistic statements concerning the risk and profitability of an investment, whether made in a summary brochure or orally, when the total mix of information adequately disclosed the investment's riskiness." (internal quotation marks omitted)). [3] Here, as Judge Sand found, "[d]efendants have proffered nothing to suggest that investors ... were 'practically faced with the facts,' or that they had 'access to truth-revealing information." *Dandong I,* 2011 WL 5170293, at *14; *see also Dandong III,* 2013 WL 4482509, at *12. The named Plaintiffs, in other words, could not have discovered the nature of the alleged fraud by consulting other documents. At this class certification stage, Defendants have submitted no additional information to call this finding into question. The named Plaintiffs can, therefore, establish reliance by virtue of their review of the Brochures.

**\*7** Defendants' second challenge to the typicality requirement also falls short. Without specifying what, exactly, the defenses are, Defendants claim that "several [named Plaintiffs] are exposed to different unique defenses based on their individual experiences when investing in Pinnacle Notes." (Defs.' Mem. 28). For example, Defendants contend that (1) Plaintiff Ang Soo Cheng is subject to unique defenses based on his prior investment experience; (2) Plaintiff Ge Dandong tried, but was ultimately unable, to cancel her investment before the offer period for Series 1 had closed; and (3) Plaintiff Ng Shook Phin Susan was coached by her financial advisor on what to say to receive compensation. (*Id.*) But while such experiences may ultimately subject these three named Plaintiffs to defenses not available against other class members, unique defenses defeat the typicality requirement only when they "threaten to become the focus of the litigation." *In re Livent, Inc. Noteholders Sec. Litig.,* 211 F.R.D. 219, 224 (S.D.N.Y.2002) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990)). These defenses are far too idiosyncratic to meet that standard. Because "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability," *Sykes,* 285 F.R.D. at 287, the Court finds the typicality requirement satisfied.

### iv. Adequacy of Representation

Finally, Rule 23(a)(4) requires a certifying court to determine that the class representatives will "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). In particular, the Court must inquire as to whether "(1) the plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 99 (2d Cir.2007)

Plaintiffs satisfy both conditions. Although Defendants contend that Plaintiffs fail the first inquiry because the named Plaintiffs "are not involved in this case" (Defs.' Mem. 29), the extent of the named Plaintiffs' involvement is sufficient here, particularly given the nature of the case. *See, e.g., In re Omnicom Grp., Inc. Sec. Litig.,* 02 Civ. 4483(RCC), 2007 WL 1280640, at *6 (S.D.N.Y. Apr. 30, 2007) ("[I] n 'complex securities litigation, named plaintiffs are not expected to possess expert knowledge of the details of the case and must be expected to rely on expert counsel.' " (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 61 (2d Cir.2000))). The named Plaintiffs have demonstrated a basic understanding of the nature of their claims (*see, e.g.,* McNeela Decl. Ex. 52 at 188:25–189:6; Ex. 53 at 169:14–24), the case's procedural posture (*see, e.g., id.* Ex. 52 at 228:10–17; Ex. 56 at 195:3–12), their duties as class representatives (*see, e.g., id.* Ex. 52 at 210:11–23; Ex. 54 at 185:10–15; Ex. 55 at 161:11–20), and they have remained at least somewhat active in monitoring the litigation (*see, e.g., id.* Ex. 52 at 206:24–207:8; Ex. 54 at 176:9–19). The fact that some of them exhibited confusion about the case (*see, e.g.,* Cattell Decl. Ex. 10 at 205:25–206:7; Ex. 12 at 182:16–24) and admitted to relying on their lawyers (*see, e.g., id.* Ex. 9 at 168:11–13; Ex. 11 at 121:11–122:8) does not render them so ignorant as to be "unable or unwilling to protect the interests of the class." *In re Vivendi Universal, S.A. Sec. Litig.,* 242 F.R.D. 76, 88 (S.D.N.Y.2007) (quoting *Baffa,* 222 F.3d at 61).

**\*8** As to the second inquiry, there is no question that counsel is qualified to conduct the litigation. Defendants do not challenge Kirby McInerney's competence, and the firm has a demonstrated history of success in commercial class litigation. (*See* McNeela Decl. Ex. 51 at 27–32). Accordingly, Plaintiffs have met their burden under Rule 23(a)(4).

### 2. The Rule 23(b) Requirements

As noted above, a class action must not only meet the four prerequisites of Rule 23(a); it must also satisfy the requirements of Rule 23(b). Here, as noted also, Plaintiffs proceed under Rule 23(b)(3), which requires a showing that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The Court will address each requirement in turn.

### i. Predominance

The requirement that common questions predominate over individual ones is similar to, but more demanding than, the commonality prerequisite of Rule 23(a). *See, e.g., Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002). The predominance inquiry asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), and it is satisfied if "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues," *In re U.S. Foodservice Inc. Pricing Litig.,* 729 F.3d 108, 2013 WL 4609219, at *7 (2d Cir. Aug.30, 2013) (quoting *UFCW Local 1776 v. Eli Lilly & Co.,* 620 F.3d 121, 131 (2d Cir.2010)). For common questions to predominate over individual ones, it is not necessary for "each element of plaintiff['s'] claims [to be] susceptible to classwide proof," but only for "common questions [to] predominate over any questions affecting only individual class members." *Amgen,* 133 S.Ct. at 1210 (internal quotation marks and alterations omitted).

As discussed in the context of the commonality requirement, Plaintiffs posit a number of common questions that could be resolved if these case proceeded on a class-wide basis. Some of these questions relate to Plaintiffs' fraud and fraudulent inducement claims, while others relate to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing. Accordingly, the Court evaluates the predominance requirement in two parts: first, with respect to the fraudbased claims, and second, with respect to the implied covenant claims.

### a. Fraud and Fraudulent Inducement

To state a claim for common law fraud or fraudulent inducement under New York law, a plaintiff must demonstrate: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn,* 273 F.3d at 156 (citing *Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.S.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)); *see State v. Indus. Site Servs., Inc.,* 52 A.D.3d 1153, 862 N.Y.S.2d 118, 121–22 (3d Dep't 2008) (reciting these same elements for a fraudulent inducement claim); *Petrello v. White,* 412 F.Supp.2d 215, 226–27 (E.D.N.Y.2006) (same); *see also Twin Holdings of Del. LLC v. CW Capital, LLC,* No. 005193/09, 2010 WL 309022, at *9 (N.Y.Sup.Ct. Jan.19, 2010) (stating that the elements for fraudulent inducement are the same as those required for fraud). Plaintiffs put forth three common questions relevant to their fraud-based claims: (1) "[w]hether Defendants withheld information regarding the Pinnacle Notes' Underlying Assets, including conflicts of interest, from the investors" (Pls.' Cert. Mem. 19); (2) "[w]hether the omitted information was material and whether Defendants acted with scienter when they omitted material facts" (*id* ); and (3) "[w]hether Defendants' misconduct injured Plaintiffs." (*Id.*). Noting that reliance cannot be presumed in this case, however, Defendants contend that these questions are overwhelmed by individual questions of reliance—in other words, that these questions do not predominate with respect to Plaintiffs' fraud-based claims. (Defs.' Cert. Mem. 13–14).

*9 Defendants are certainly correct that reliance cannot be presumed here. The fraud-on-the-market presumption of reliance that applies in federal securities claims under Rule 10b–5 does not apply to a common law fraud action. *See, e.g., Secs. Investor Protection Corp. v. BDO Seidman, LLP,* 222 F.3d 63, 72 (2d Cir.2000). Likewise, courts in this district have refused to import the so-called *Affiliated Ute* presumption —a presumption of reliance for misleading omissions—into common law fraud claims. *Int'l Fund Mgmt. S.A. v. Citigroup, Inc.,* 822 F.Supp.2d 368, 387 (S.D.N.Y.2011) (collecting cases discussing *Affiliated Ute Citizens of the State of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)). Instead, "the requisite reliance is actual reliance." *Id.* And in order to prove such reliance, each individual Plaintiff must demonstrate that the misrepresentation or omission was a "substantial factor in inducing [him or her] to act the way that [he or she] did." *Curiale v. Peat, Matwick, Mitchell & Co.,* 214 A.D.2d 16, 27, 630 N.Y.S.2d 996 (1st Dep't 1995);

*see also* Abu Dhabi Commercial Bank v. Morgan Stanley & Co., 269 F.R.D. 252, 261 (S.D.N.Y.2010).

It does not follow, however, that individual issues "predominate as a matter of law," as Defendants argue. (Defs.' Mem. 15). To be sure, "[c]ertification is inappropriate where 'reliance is too individualized to admit of common proof.' " In re U.S. Foodservice Pricing Litig., 729 F.3d 108, 2013 WL 4609219, at *8 (quoting McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 224–25 (2d Cir.2008), abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co., 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008)). But the obverse of that statement is also true. That is, the Second Circuit has made clear that "fraud-based claims" are not "entirely beyond the reach of Rule 23," and that where each plaintiff can prove reliance " 'through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue)," " certification may well be appropriate. Id. (quoting Klay v. Humana, Inc., 382 F.3d 1241, 1259 (11th Cir.2004), abrogated on other grounds by Bridge, 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012). As that Court put it in McLaughlin, "proof of reliance by circumstantial evidence may be sufficient under certain conditions." 522 F.3d at 225. For example, in the context of a financial transaction—which "does not usually implicate the same type or degree of personal idiosyncratic choice as does a consumer purchase"—payment alone "may constitute circumstantial proof of reliance upon a financial representation." Id. at 225 n. 7.

In light of this case law, many courts in this Circuit and beyond have held that reliance may be proved through circumstantial evidence that plaintiffs would not have purchased a product but for a defendant's uniform misrepresentations and omissions about that product. See, e.g., Seekamp v. It's Huge, 09 Civ. 00018 (LEK/DRH), 2012 WL 860364, at *10 (N.D.N.Y. Mar. 13, 2012) (reliance could be proved through purchase of product where "every plaintiff would have relied on the [allegedly misleading] ... representation of the [product's] legality and beneficialness in deciding whether to purchase it"); Spencer v. Hartford, 256 F.R.D. 284, 301–303 (D.Conn.2009) (reliance could be proved through plaintiffs' acceptance of structured settlements where quotation documents were alleged to be misleading); Klay v. Humana, Inc., 382 F.3d 1241, 1259 (5th Cir.2004) (reliance could be proved through doctors' entrance into HMO contracts when defendant HMOs allegedly misrepresented that they would reimburse doctors for medically necessary services provided to insureds).

**\*10** Defendants argue that these cases are "no longer good law" in light of the Supreme Court's decision last February in Amgen. (Defs.' Cert. Mem. 20). The Amgen Court did observe that, in a suit not subject to the fraud-on-the-market presumption, "[i]ndividualized reliance issues would predominate" and "[t]he litigation, therefore, could not be certified under Rule 23(b)(3) as a class action." 133 S.Ct. at 1199. But that observation was dictum and, read in context, is little more than an acknowledgement of the uncontroversial proposition that, absent a fraud-on-the-market presumption, individual reliance issues often preclude class certification in fraud cases. See also id. at 1193 ("Absent the fraud-on-the-market theory, the requirement that [securities fraud] plaintiffs establish reliance would ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class." (emphasis added)). There is thus no basis to read the passing remark as abrogating widespread circuit court precedent. And were there any doubt on that score, it would be resolved by the Second Circuit's more recent decision in In re U.S. Foodservice Pricing Litigation, which expressly reaffirmed that the mere fact that class members have to show causation "by establishing reliance on a defendant's misrepresentations ... does not place fraud-based claims entirely beyond the reach of Rule 23, provided that individualized issues will not predominate." 729 F.3d 108, 2013 WL 4609219, at *8 (citing McLaughlin, 522 F.3d at 224–25).

The question, then, is whether Plaintiffs in this case can prove reliance on a class-wide basis through common, circumstantial evidence. For purposes of class certification, the Court concludes that they can. Like the misrepresentations in Seekamp, Spencer, and Klay, the alleged misrepresentations and omissions here were so fundamental to the value of the Notes that it is hard to imagine a reasonable investor purchasing them if the Offering Documents had revealed their true nature. If Plaintiffs had known that Morgan Stanley would select the ACES CDOs—a risky asset whose depreciation would benefit a Morgan Stanley affiliate—as the source of funds that Plaintiffs would receive in the absence of a Reference Entity credit event, it stands to reason that Plaintiffs would not have purchased the Notes in the first place. (See Wolson Decl. ¶¶ 2.07, 5.01, 5.02). The Notes were not the type of product that individuals purchase for "any number of reasons," McLaughlin, 522 F.3d at 225; they were financial investments that Plaintiffs made in hopes that they

would prove profitable. Further, the Brochures, which failed to disclose Defendants' conflict of interest and included an allegedly misleading description of the Underlying Assets, contained the same allegedly misleading language across all seven series, (McNeela Decl. Ex. 3 at iii; *id.* Ex. 4 at iii; *id.* Ex. 5 at iii; *id.* Ex. 6 at SING0003534; *id.* Ex. 7 at SING0000965), were provided to all class members, (McNeela Decl. Ex. 13 ¶¶ 1–3), and were reviewed by each of the Plaintiffs making their purchasing decisions (see *supra* n. 2).

 **\*11**  This is not, as Defendants contend, "just a version of the fraud created the market presumption." (Defs.' Cert. Mem. 24). The Court cannot—and does not—presume, as a matter of *law,* that the element of reliance is satisfied for each putative class member. Instead, the Court concludes, based on the evidence in the record at this stage of the proceedings, that "a reasonable factfinder [could] conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' [uniform] representations." *Klay,* 382 F.3d at 1259. That is, "while each plaintiff must prove reliance, he or she may do so"—in *this* case—"through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue)." *In re U.S. Foodservice Pricing Litig.,* 729 F.3d 108, 2013 WL 4609219, at \*8 (quoting *Klay,* 382 F.3d at 1259).

*Abu Dhabi Commercial Bank,* upon which Defendants rely (Defs.' Cert. Mem. 17–18, 22), is therefore distinguishable. In that case, the Court refused to certify a common law fraud class action on behalf of three institutional investors who had acquired certain notes issued by a structured investment vehicle. *See* 269 F.R.D. at 253–54. But there, unlike here, "the record evidence reveal[ed] material differences among investors with regard to their decision making processes, investment guidelines, due diligence inquiries, and communications with those involved in selling the Rated Notes." *Id.* at 261. Indeed, there was concrete evidence that some investors "chose not to rely—or relied only minimally —on the [alleged misrepresentations in] credit ratings prior to investing in the Rated Notes." *Id.* at 265; *see also id.* at 262. In fact, some investors made their investment decisions *"before* the ratings were issued ..., rendering it unlikely that any rating played a substantial role in those investors' decisions to invest." *Id.* at 261 (emphasis in original). Additionally, the "information memoranda and marketing materials" that were the source of the misrepresentations in *Abu Dhabi* varied between the different notes, and they were modified over time. *See id.* at 263. Furthermore, Defendants "prepared no less than fifty-six individualized memoranda to potential ...

investors answering questions and due diligence inquiries by these investors." *Id.* In short, individualized reliance issues plainly predominated in that case given the facts. Not so here.

Finally, while Defendants point to some "non-uniform" conversations putative class members had about the Notes with the Distributors (*see* Defs.' Mem. 7–9; 17) and with the putative class members' own personal financial advisors (*see* Defs.' Mem. 9–10; 17), none of these conversations— either alone or taken together—demonstrates that Plaintiffs cannot establish reliance through common, circumstantial evidence. New York law does not require Defendants' misrepresentations and omissions to have been the only considerations that Plaintiffs relied upon in deciding to purchase the Notes. *See, e.g., Phillips v. Better Homes Depot, Inc.,* No. 02–CV–1168 (ERK), 2003 WL 25867736, at \*12 (E.D.N.Y. Nov.12, 2003) (" 'In fraud actions, the fraudulent representations complained of need not be the sole consideration or inducement moving a plaintiff ....' " (alteration omitted) (quoting 37 Am.Jur.2d Fraud and Deceit § 245)). Instead, the misrepresentation or omission need only have been a "substantial factor in inducing [Plaintiffs] to act the way that [they] did." *Curiale v. Peat, Matwick, Mitchell & Co.,* 214 A.D.2d 16, 27, 630 N.Y.S.2d 996 (1st Dep't 1995). At most, the conversations Defendants point to demonstrate that some putative class members had more than one reason for purchasing the Notes; they do not, however, contradict the notion that putative class members relied on Defendants' alleged misrepresentations and omissions as well. *See Seekamp,* 2012 WL 860364, at \*10 (finding predominance met in fraud action even where "each proposed class member may have opted to purchase the [product in question] for different reasons"); *Spencer,* 256 F.R.D. at 303 (finding predominance met fraud action notwithstanding that "each plaintiff may have accepted his or her [allegedly fraudulent] settlement for somewhat different reasons"). Accordingly, the Court finds that common questions of law and fact with respect to Plaintiffs' fraud and fraudulent inducement claims will predominate over any individual issues of reliance that may exist.

### b. Implied Covenant of Good Faith and Fair Dealing

 **\*12**  New York law implies a covenant of good faith and fair dealing in all contracts, which "embraces a pledge that neither party shall do anything which shall have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada,* 374 F.3d 158, 169 (2d Cir.2004) (citation omitted). In the Amended

Complaint, Plaintiffs alleged that all Defendants other than Morgan Stanley & Co. violated the covenant in various ways (Am.Compl.¶¶ 105, 325–330), and they now posit at least four common questions relevant to alleged violations of the implied covenant, namely: (1) "[w]hether Defendants utilized their unilateral authority over the Underlying Assets to select CDOs that they created and shorted," (Pls.Cert.Mem.20); (2) "[w]hether Defendants utilized their unilateral control over the Underlying Assets to select REs highly susceptible to a downturn in the housing and financial markets" (*Id.*); (3) "[w]hether Defendants played ratings arbitrage and selected Fitch in order to create the riskiest possible Underlying Collateral still capable of garnering an AA rating" (*Id.*); and (4)"[w]hether Defendants lowered their internal underwriting criteria in order to approve riskier Underlying Assets," (*Id.*)

Defendants object to certification of implied covenant claim on two grounds. First, they claim that Plaintiffs' attempt to certify an implied covenant class is an impermissible attempt to "re-package a defective common law securities fraud class" as an implied covenant class. (Defs.Cert.Mem.26). But the cases upon which Defendants rely concern the "re-packaging" of *defective* fraud claims. *See, e.g., Permasteelisa S.p.A. v. Lincolnshire Mgmt. Inc.,* 16 A.D.3d 352, 793 N.Y.S.2d 16, 17 (1 st Dep't 2005) ("The claim for breach of the implied covenant of good faith ... merely duplicated the insufficient contract claim," which itself "was essentially duplicative of the insufficient fraud claim."); *Sutton Assocs. v. Lexis–Nexis,* 196 Misc.2d 30, 761 N.Y.S.2d 800, 804 (N.Y.Sup.Ct. Apr.29, 2003) (holding that the implied covenant claim "[was] duplicative of and merely recast[ed] [plaintiff's] unavailing fraud theory"). Here, Plaintiffs have stated a *valid* fraud claim, as Judge Sand and this Court previously determined. *See Dandong I,* 2011 WL 5170293, at *14; *Dandong III,* 2013 WL 4482509, at *11. Accordingly, Defendants' argument is without merit.

Second, Defendants argue that Plaintiffs cannot satisfy the predominance requirement with respect to the implied covenant claim because they rely on a "common course of conduct" theory that was rejected by the Second Circuit in *Moore v. PaineWebber,* 306 F.3d 1247 (2d Cir.2002). (Defs.Cert.Mem.26). But the holding in *Moore* was simply that, in the context of a fraudulent misrepresentation claim, proving a common course of conduct could not, by itself, establish predominance because "each plaintiff must prove that he or she personally received a material misrepresentation, and that his or her reliance on this misrepresentation was the proximate cause of his or her

loss." *Moore,* 306 F.3d at 1255. That principle is irrelevant to Plaintiffs' implied covenant claims, as liability for an implied covenant claim does not require reliance on any sort of misrepresentation. *See, e.g., ABN AMRO Bank, N.V. v. MBIA Inc.,* 17 N.Y.3d 208, 228–29, 928 N.Y.S.2d 647, 952 N.E.2d 463 (2011) (holding that insureds stated a claim against insurer for breach of the implied covenant when insurer allegedly transferred assets to its parent company for no consideration); *Forman v. Guardian Life Ins. Co. of Am.,* 76 A.D.3d 886, 908 N.Y.S.2d 27, 30 (1st Dep't 2010) (holding that insurance auditor adequately stated a claim for breach of the implied covenant against insurer where insurer allegedly provided auditor with claims to audit but entered into agreement that prevented auditor from recovering funds on those claims), Accordingly, common issues predominate with respect to Plaintiffs' implied covenant claims as well. *See, e.g., In re Checking Account Overdraft Litig.,* 281 F.R.D. 667, 681 (S.D.Fla.2012) ("[B]reach of the duty [of] good faith and fair dealing may be shown by class-wide evidence of a defendant's subjective bad faith or objectively unreasonable conduct ."); *Nat'l Seating & Mobility, Inc. v. Parry,* No. 10 Civ. 2782(JSW), 2012 WL 2911923, at *1, *10 (N.D.Cal. July 16, 2012) (certifying implied covenant class based on employer's allegedly inaccurate calculation of employees' compensation); *Denney v. Jenkens & Gilchrist,* 230 F.R.D. 317, 321 (S.D.N.Y.2005) (certifying class and approving settlement predicated on breach of, *inter alia,* duty of good faith and fair dealing), *aff'd in part, vacated in part,* 443 F.3d 253 (2d Cir.2006).

### ii. Superiority

**\*13** In addition to mandating the predominance of common factual and legal issues, Rule 23(b)(3) also requires the Court to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). Four factors are "pertinent" to this inquiry:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the

claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.* Courts have held that class actions are particularly appropriate in federal securities actions, *see, e.g., Green v. Wolf Corp.,* 406 F.2d 291, 296 (2d Cir.1968) ("[A] class action in a federal securities action may well be the appropriate means for expeditious litigation of issues, because a large number of individuals may have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf."); *see also In re Vivendi Universal, S.A.,* 242 F.R.D. at 91 (collecting cases), and these considerations apply with equal force here. Further, Plaintiffs have put forth evidence that a class action judgment would likely be enforced in a Singapore court (*see* Furmston Decl. (Docket No. 144) ¶¶ 11–12), and Defendants do not appear to contest the superiority requirement. Accordingly, the Court finds that it is satisfied, and Plaintiffs' motion to certify the class is therefore GRANTED. Additionally, the Court appoints Kirby McInerney LLP as class counsel, and approves the named Plaintiffs as class representatives.

## B. The Admissibility of Expert Reports

The second motion before the Court is one brought by Defendants to exclude the declarations of Plaintiffs' experts Craig A. Wolson (the "Wolson Declaration") and Ilya Eric Kolchinsky (the "Kolchinsky Declaration"), pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Daubert* requires that an expert's testimony "both rest[ ] on a reliable foundation and [be] relevant to the task at hand." *Id.* at 597. When a motion to exclude expert testimony is made at the class certification stage, the *Daubert* standard applies, but the inquiry is "limited to whether or not the [expert reports] are admissible to establish the requirements of Rule 23." *In re NYSE Specialists Sec. Litig.,* 260 F.R.D. 55, 66 (S.D.N.Y.2009). In other words, "[t]he question is not ... whether a jury at trial should be permitted to rely on [the expert's] report to find facts as to liability, but rather whether [the Court] may utilize it in deciding whether the requisites of Rule 23 have been met." *In re Visa Check/Mastermoney Antitrust Litig.,* 192 F.R.D. 68, 77 (S.D.N.Y.2000). Defendants challenge the Declarations as both irrelevant and unreliable.

**\*14** Defendants' arguments with respect to the Kolchinsky Declaration have some force, but they are moot because the Court did not consider the Kolchinsky Declaration in reaching its decision on Plaintiffs' motion to certify. Defendants' arguments with respect to the Wolson Declaration, on the other hand, fail to persuade. First, as the discussion above makes clear, the Wolson Declaration is plainly relevant insofar as it has a "valid connection to the pertinent inquiry." *In re Rezulin Prods. Liab. Litig.,* 309 F.Supp.2d 531, 540 (S.D.N.Y.2009). That is, the Wolson Declaration is relevant to the predominance inquiry under Rule 23(b)(3) because it speaks to whether and how investors would have reacted differently if Defendants had provided the omitted information or had they not made the allegedly misleading statements on the documents provided to Plaintiffs. (Wolson Decl. ¶¶ 5.01, 5.02).

The fact that the Wolson Declaration refers to the omitted information as "material" does not render it an inadmissible legal opinion. The Court does not understand any of Mr. Wolson's statements—particularly that the "offering materials omitted information that would have been material to any reasonable investor" (Wolson Decl. ¶ 5)—as "encompass[ing] an ultimate legal conclusion." *United States v. Jacques Dessange, Inc.,* No. S2 99 Cr. 1182(DLC), 2000 WL 294849, at *2 (S.D.N.Y. Mar. 21, 2000). Whether the omitted information and misrepresentations were material is an issue for the factfinder at trial, and is not before the Court at this stage of the litigation. The question presently before the Court is simply whether common questions predominate—or, alternatively, whether individual questions of reliance overwhelm them—and the importance of the omitted information and allegedly misleading statements has some bearing on that question. Of course, if Wolson were to testify regarding materiality at trial, the Court might well instruct him to "recast his testimony by using terminology that does not express legal conclusions." *Crown Cork & Seal Co., Inc. Master Ret. Trust v. Credit Suisse First Bos. Corp.,* Nos. 12 Civ. 5803(JLG) et al., 2013 WL 978980, at *8 (S.D.N.Y. Mar.12, 2013). The risk of jury confusion inherent in a witness's use of a legal term is not relevant at this stage, however.

Defendants' reliability objections to the Wolson Declaration are also unconvincing. *See* Fed.R.Evid. 702 (providing that expert testimony must be "based on sufficient facts or data," be "the product of reliable principles and methods," and that "the expert reliably applied the principles and methods to the facts of the case"); *see also Daubert,* 509 U.S. at

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 30 of 261
PageID: 44968
Ge Dandong v. Pinnacle Performance Ltd., Not Reported in F.Supp.2d (2013)

593–94 (listing factors to use in assessing the reliability of expert testimony). Defendants' principal objection appears to be that Wolson failed to account for the geographical location of Plaintiffs. In particular, they assert that Wolson "has no understanding of either the Singapore securities marketplace or Singapore investors" and that he did not conduct any investigation about the Singapore financial markets. (Defs.' Exclusion Mem. 6–7, 14–15). But Defendants fail to identify any reason that information would be relevant to investors in United States markets—markets with which Wolson is indisputably familiar (*see* Wolson Decl. ¶¶ 1.04, 1.05; Cattell Decl. (Docket No. 156) Ex. 2 136:24–137:9)—but not to investors in the Singapore marketplace. Defendants also contend that the Wolson Declaration represents nothing more than Wolson's subjective opinion, unmoored from any verifiable methodology. (Defs.' Exclusion Mem. 15–16). But Wolson's opinion regarding the importance of the omitted or allegedly misleading information is based on his experience in the structured finance industry, and experts are permitted to provide such experiential testimony so long as they "explain how [their] experience leads to the conclusion reached and how [their] experience is reliably applied to the facts." *Israel v. Spring Indus., Inc.,* 2006 WL 3196956, at *2 (E.D.N.Y. Nov.3, 2006); *see also Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.,* 2011 WL 6288415, at *4 (S.D.N.Y. Dec.15, 2011). Wolson has done so here. (Wolson Decl. ¶ 1.07).

**\*15** Ultimately, Defendants' objections to the Wolson Declaration go more to weight than to admissibility. *See, e.g., Bacardi & Co. v. N.Y. Lighter Co.,* No. 97–CV–7140 JS VVP, 2000 WL 298915, at *2 (E.D.N.Y. Mar.15, 2000) ("Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so

unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." (quoting *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996)); *see also Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir.2002) (describing the "liberal admissibility standards of the federal rules" and explaining that "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible"); *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir.1995) ("Disputes as to the strength of [an expert's] credentials, faults in his use of different etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility of his testimony."). Accordingly, Defendants' motion is DENIED.

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification is GRANTED. Defendants' motion to exclude the declarations of Plaintiffs' experts is DENIED as moot with respect to the Kolchinsky Declaration and DENIED on the merits with respect to the Wolson Declaration. The Clerk of the Court is directed to terminate Docket Numbers 141 and 154.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5658790

### Footnotes

1    See Cattell Decl. (Docket No. 153) Ex. 11 [Ge Dandong] 39:5–7, 78:14–16; Ex. 7 [Loh Tuck Woh Peter] 40:14–17, 39:19–22; Ex. 12 [Singapore Government Staff Credit Cooperative Society, Ltd. ("SGSCCS") ] 87:21–24, 88:9–12; Ex. 13 [Ni Yan Amy] 92:8–12, 145:11–14; Ex. 8 [Ang Soon Cheng] 46:7–11; 77:18–20; Ex. 9 [Choh Gek Hong Johnson] 185:21–23, 185:24–186:2; Ex. 14 [Ng Shook Phin Susan] 49:3–5, 49:6–8; Ex. 10 [Zhao Yuzheng] 51:17–20; 52:8–11.

2    See Cattell Decl. Ex. 11 [Ge Dandong] 35:14–23; Ex. 7 [Loh Tuck Woh Peter] 44:12–45:50; Ex. 12 [SGSCCS] 59:17–20; Ex. 13 [Ni Yan Amy] 65:19–22, 68:19–69:19–25; Ex. 8 [Ang Soo Cheng] 18:7–9; Ex. 9 [Choh Gek Hong Johnson] 41:18–24; Ex. 14 [Ng Shook Phin Susan] 44:15–22; Ex. 10 [Zhao Yuzheng] 31:9–22.

3    *Foresters* did not explicitly condition its holding on the fact that offering materials contained the undisclosed information. See *Foresters,* 919 F.Supp. at 155 ("A sales brochure, in and of itself, in a highly regulated

industry where voluminous contracts detailing the securities at issue are created and filed with governmental agencies, such as the SEC, is not a document, on which someone trading securities worth millions of dollars, would reasonably rely."). But the Court specifically noted that the plaintiff challenged only the sales brochures, not the actual contracts or offering circulars, *id.* at 151–52, and none of the cases cited by the *Foresters* court supports the proposition that reliance on sales brochures is unjustifiable in all circumstances, *see, e.g., Cong. Fin. Corp. v. John Morrell & Co.,* 790 F.Supp. 459, 471 (S.D.N.Y.1992) ("Where sophisticated businessmen engaged in major transactions *enjoy access to critical information but fail to take advantage of that access,* New York courts are particularly disinclined to entertain claims of justifiable reliance ." (emphasis added and internal quotation marks omitted)).

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

5

2020 WL 6938351
Only the Westlaw citation is currently available.
<u>NOT FOR PUBLICATION</u>
United States District Court, D. New Jersey,
Camden Vicinage.

Bernard HEINZ, Plaintiff,

v.

DUBELL LUMBER CO., Defendant.

Civil No. 19-8778 (RBK/KMW)
|
Signed 11/23/2020
|
Filed 11/25/2020

**Attorneys and Law Firms**

Morgan J. Zucker, Rachel Rebecca Stevens, Michael P. Murphy, Murphy Law Group, LLC, Philadelphia, PA, for Defendant.

# OPINION

KUGLER, United States District Judge:

 **\*1**  Presently before the Court is Plaintiff Bernard Heinz Renewed Motion for Class Certification (Doc. No. 11) and Motion for Default Judgment (Doc. No. 12). This motion is unopposed. For the reasons set forth below, Plaintiff's Motion for Class Certification is **GRANTED**, and Motion for Default Judgment is **DENIED**.

## I. BACKGROUND

Plaintiff, a former employee of Defendant Dubell Lumber Company, contends he and at least 157 other employees were terminated without timely notice as required under the Worker Adjustment and Retraining Notification Act ("WARN Act"), 9 U.S.C. § 2101 et seq., and the New Jersey Millville Dallas Airmotive Plant Job Loss Notification Act ("New Jersey WARN Act"), N.J.S.A. 34:21–1 et seq.

### A. Factual Background

Defendant Dubell Lumber Company, a Medford-based maker and supplier of retail lumber and building materials, maintained facilities throughout New Jersey, including locations in Cherry Hill, Millville, Winslow, Vineland, and Pleasantville. (Doc. No. 1, Compl. at ¶ 4). Plaintiff and at least 100 similarly situated, full time workers were employed by Defendant up until February 9, 2019. (*Id.* at ¶ 14). Defendant's employees, in the aggregate, worked more than 4,000 hours per week. (*Id.* at ¶ 28).

On February 6, 2019, Defendant notified Plaintiff and the similarly situated employees that it would be closing its operations and laying off employees at the facilities. (*Id.* at ¶ 13). Presumably, this notice was sent by mail.[1] (Doc. No. 11-2, Brief at 11). Plaintiff was terminated on February 9, 2019. (*Id.* at ¶ 15). Within thirty days of February 9, 2019, Defendant laid off approximately one hundred and fifty-seven full-time employees. (*Id.* at ¶ 14).

On March 20, 2019, Plaintiff initiated this action by filing his Complaint. (Doc. No. 1). On May 7, 2019, a John Bambach executed a waiver of service of the summons on behalf of Defendant. (Doc. No. 4). Despite executing this waiver, Defendant never filed an answer or other responsive pleading. As such, May 28, 2019, the Clerk entered default against Defendant at Plaintiff's request. (Doc. No. 5). On July 8, 2019, Plaintiff filed a Motion for Class Certification and Motion for Default Judgment. (Doc. No. 7).

This Court denied Plaintiff's motion for class certification because his brief was devoid of any mention of "ascertainability"—an implicit requirement for class certification that the Plaintiff bears the burden of establishing. (Doc. No. 9). Plaintiff's motion for default judgment was also denied because entering default judgment against Defendant would prevent certification of the proposed classes. (*Id.*). Both motions were denied without prejudice and on March 24, 2020, Plaintiff filed the present, renewed motions for class certification and default judgment. (Doc. No. 11, 12).

## II. LEGAL STANDARD

### A. Federal Rule of Civil Procedure 23
 **\*2**  It is a plaintiff's burden to demonstrate that a class action is a proper vehicle for a lawsuit. *Hayes v. Wal–Mart Stores, Inc.*, 725 F.3d 349, 354 (3d Cir.2013) (citing *Comcast Corp. v. Behrend*, U.S., 133 S.Ct. 1426 (2013)). "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." To obtain class certification, plaintiffs must satisfy all four requisites for Rule 23(a) and at least one part of Rule 23(b). *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994). Under

Heinz v. Dubell Lumber Co., Slip Copy (2020)

Rule 23(a), the party seeking certification must demonstrate, first, that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345(2011). As is relevant here, class certification is permissible under Rule 23(b)(3) when the court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

Rule 23(b)(3) includes a non-exhaustive list of factors pertinent to a court's "close look" at the predominance and superiority criteria:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Id.* at 616.

A plaintiff must show that these requirements are met by a preponderance of the evidence, and a court "must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 306 (3d Cir. 2008). Thus, a court should certify a class only if it finds, after a "rigorous analysis," that Rule 23's requirements are met. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982). Further, courts must analyze each of Rule 23's requirements separately, rather than conflating

two or more requirements together. *See Byrd v. Aaron's, Inc.*, 784 F.3d 154, 172 (3d Cir. 2015) (emphasizing that "[p]recise analysis of relevant Rule 23 requirements will always be necessary.").

**B. WARN Act**

The purpose of the Worker Adjustment and Retraining Notification Act is to protect workers and their families by providing them with advance notice of a layoff. 20 C.F.R. § 639.1(a). To that end, the WARN Act mandates that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" to each affected employee. 29 U.S.C. § 2102(a)(1). This 60-day notice requirement is the minimum. 20 C.F.R. § 639.2.

The WARN Act's requirements only apply to certain types of employers. Specifically, those who employ: (1) 100 or more employees, part-time employees; and (2) 100 or more employees who in the aggregate work at least 4,000 hours per week [exclusive of overtime]. 29 U.S.C. § 2101(a)(1)(A), (B).

**\*3** If an employer fails to give the requisite notice, the employees may sue for backpay for each day of the violation. *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 545–546 (1996). Likewise, employers who violate the WARN Act are liable for benefits under certain employee benefit plans and for the cost of certain medical expenses incurred during the employment loss. 29 U.S.C. § 2104(a)(1)(B).

**C. New Jersey WARN Act**

The New Jersey WARN Act was modeled after its federal counterpart and they only diverge in the type of damages available. *DeRosa v. Accredited Home Lenders, Inc.*, 420 N.J. Super. 438, 453 (App. Div. 2011). The Act provides if an employer conducts a mass layoff, it shall provide not less than 60 days' notice of the termination to each employee who is being terminated. N.J. Stat. Ann. § 34:21–2(a) (2007). If the employer does not provide the required 60 days' notice, the employee must receive severance pay equal to one week of pay for each full year of employment. N.J. Stat. Ann. § 34:21–2(b) (2007).

Because they share the same purpose—protecting workers and communities by requiring employers to provide notice of plant closings and mass layoffs—New Jersey courts often look to the federal WARN Act regulations and case law for

guidance in interpretation the New Jersey Act. *DeRosa*, 420 N.J.Super. 438, 22 A.3d at 36.

**III. DISCUSSION**

Before considering Rule 23(a) and Rule 23(b)(3), we must address two preliminary matters: (1) the class definition and claims to be given class treatment; and (2) whether the class is currently and readily ascertainable based on objective criteria.

**A. Preliminary Matters**

**i. Class Definition and Claims
to be Given Class Treatment**

An order that certifies a class action must define the class and the class claims, issues or defenses. Fed.R.Civ.P. 23(c)(1)(B). Specifically, "the text of the order or an incorporated opinion must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues, or defenses to be treated on a class basis." *Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179, 187 (3d Cir.2006).

Plaintiff seeks to certify two classes—one under the federal WARN Act and the other under the NJ WARN Act. Under the federal WARN Act, the class definition is:

> all persons who worked at or reported to one of Defendant's Facilities and were terminated without cause on or within thirty (30) days of February 9, 2019, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs and/or plant closings by Defendant on or within 30 days of February 9, 2019.

For the NJ WARN Act, the class definition is:

> all persons who worked at or reported to one of Defendant's Facilities and

were terminated without cause on or about February 9, 2019.

These proposed class definitions set forth readily discernible, clear, and precise parameters for determining class membership. In fact, a substantially similar class definition was approved in *Ramcharan v. A.F.L. Quality, Inc.*, No. 1:12-CV-07551, 2014 WL 4388579, at *8 (D.N.J. Sept. 5, 2014), on reconsideration in part, No. CIV. 12-7551 RMB/AMD, 2015 WL 4275534 (D.N.J. Apr. 14, 2015).

The claims to receive class treatment are:

**\*4** a. A claim for violation of the WARN Act, 29 U.S.C. § 2104, for failure to provide at least 60 days' advance notice of termination; and

b. A claim for violation of the NJ WARN ACT, N.J. Stat. Ann. § 34:21–2(a), for failure to provide at least 60 days' advance notice of termination

**ii. Ascertainability**

On the initial motion for class certification, Plaintiff faltered by failing to show that class membership was ascertainable. Because this implicit requirement was not even mentioned, we denied Plaintiff's motion without prejudice. Now Plaintiff argues both proposed classes are based on objective criteria and there is a reliable and practical method for identifying whether putative class members fall within the class definition. We agree.

An essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria. *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 354 (3d Cir. 2013). There are two important elements for ascertainability: (1) the class must be defined with reference to objective criteria; and (2) there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 439 (3d Cir. 2017).

While these general principles are easily stated, the decisions of this circuit suggest this branch of law is something less than a seamless web. The first requirement of ascertainability,

objective criteria, is not difficult to satisfy. It simply requires that the inverse not be true. That is, a class cannot be defined with reference to subjective criteria. *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.,* 867 F.3d 434, 439 n.3 (3d Cir. 2017) (noting a class definition that depends on subject criteria, like a class members' state of mind, will not satisfy the objective criteria requirement); *see also Chiang v. Veneman,* 385 F.3d 256, 271 (3d Cir.2004) (holding that "defining a class by reference to those who 'believe' they were discriminated against undermines the validity of the class by introducing a subjective criterion into what should be an objective evaluation"), abrog. on other grounds by *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 318 n.18 (3d Cir. 2008), as amended (Jan. 16, 2009). Thus, a plaintiff does not need to establish an objective way of determining class membership at the certification stage, only that there is "objective criteria" for class membership. *City Select Auto Sales Inc.,* 867 F.3d at 441. [2]

Courts seem to be mired down by the second requirement —the need for a reliable and administratively feasible mechanism to determine class membership. At a surface level, the mechanism proposed is not reliable if it is based on the mere "say so of putative class members." *Hayes v. Wal-Mart Stores, Inc.,* 725 F.3d 349, 356 (3d Cir. 2013). In other words, the putative class members' affidavits, by themselves, are not enough to demonstrate there is a reliable mechanism to determine class membership. These affidavits need to be combined with other reliable indicia in order to satisfy this requirement. *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.,* 867 F.3d 434, 441 (3d Cir. 2017). Similarly, the mechanism is not administratively feasible "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials.' " *Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 593 (3d Cir. 2012). This implicit requirement does not mean, however, that a plaintiff must be able to identify all class members at class certification— instead, a plaintiff need only show that "class members *can* be identified." *Byrd v. Aaron's Inc.,* 784 F.3d 154, 163 (3d Cir. 2015), as amended (Apr. 28, 2015). Accordingly, there is no records requirement at the class certification stage. *Id.* at 164; *see also City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.,* 867 F.3d 434, 441 (3d Cir. 2017) (noting that a plaintiff "need not, at the class certification stage, demonstrate that a single record, or set of records, conclusively establishes class membership.").

**\*5** On several occasions the Third Circuit has expounded on the meaning of ascertainability. *See generally Hargrove*

*v. Sleepy's LLC.* 974 F.3d 467, 470 (3d Cir. 2020). While an exposition of *Marcus* and its progeny is beyond the scope of this opinion, an examination of the factual circumstances in *Byrd* will help establish the contours of the ascertainability requirement. *Byrd v. Aaron's Inc.,* 784 F.3d 154, 161 (3d Cir. 2015), as amended (Apr. 28, 2015). *Byrd* involved class certification under the Electronic Communications Privacy Act for individuals who purchased or leased computers with spyware that was subsequently installed and activated without their consent. *Id.* at 160. The class definition included both the purchasers/lessees and their household members. *Id.* Ascertainability was not an issue for the purchasers/lessees because the defendants kept detailed records enabling identification. *Id.* at 169. The Third Circuit concluded the household members were ascertainable, even though no evidence as to them had been submitted, because the plaintiffs could identify them by matching addresses in the public records with that of an owner or lessee that had already been identified. *Id.*

Plaintiff has demonstrated the class is defined with reference to objective criteria. The proposed class consists of those persons: (1) who worked at or reported to one of Defendant's facilities; and (2) were terminated without cause on or within 30 days of February 9, 2019. Put more generally, Plaintiff's proposed class consists of former employees of Defendant Dubell who worked at specific locations during a definite time period and were terminated within a definite time period. These are objective inquiries and the proposed means of determining membership involve objective evidence, specifically Defendant's business records.

Likewise, Plaintiff has shown there is a reliable and administratively feasible mechanism to determine class membership. Plaintiff has pointed to two types of evidence which can identify class membership. First, Plaintiff points to Defendant's roster of full-time employees which will show the employees that were still with the company on February 6, 2019—the day they were notified of their impending terminations. Second, Plaintiff notes there is likely a mailing list within Defendant's records pursuant to which the February 6, 2019 notice of termination was sent. While the mailing list would be more than sufficient to satisfy this requirement, its absence is not fatal. Plaintiff could supply affidavits from the purported class members and compare them to Defendant's payroll list as of February 6, 2019. This comparison would be no different from the one in *Byrd*. Just as the household members could be identified through matching their addresses in the public records with the lessees

already identified, the class members here can be identified by matching those employees who submitted affidavits with the employees who appear on the payroll records for February 6, 2019. This would allow Plaintiff to verify which employees were terminated on February 9 or within 30 days thereafter. The Third Circuit has countenanced this approach as it noted in *City Select Auto Sales* that "[a]ffidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard." 867 F.3d 434, 441 (3d Cir. 2017).

These records would allow Plaintiff to identify class members without relying on the putative members "say so" and also provide Defendant with a suitable and fair method of challenging purported membership in the class—a right Defendant is absolutely entitled to. Moreover, the business records would obviate the need for a series of mini trials or extensive, individualized findings of fact. Accordingly, Plaintiff has satisfied the ascertainability requirement.

## B. Rule 23(a) Requirements

### i. Numerosity

Rule 23(a)(1) requires that a class be so numerous that joinder of all its members is impracticable. Fed.R.Civ.P. 23(a)(1). The impracticability of joinder does not simply relate to the sheer number of class members, but also the impracticability of plaintiffs filing suit when the individual stakes in the action are relatively small. *In re Paulsboro Derailment Cases*, No. CIV. 12-7586 RBK/KMW, 2014 WL 1371712, at *6 (D.N.J. Apr. 8, 2014) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226–227 (3d Cir.2001).

\*6 Plaintiff alleges in the Complaint that approximately 157 employees were terminated by Defendant on February 9, 2019, or within 30 days thereof. By Defendant's default, Plaintiff's allegation regarding the approximate number of members is deemed admitted. Given the number of prospective class members involved, approximately 157, the Court is satisfied that joinder would be impracticable in this case. *In re Spring Ford Indus., Inc.*, No. 02-15015DWS, 2004 WL 231010, at *6 (Bankr. E.D. Pa. Jan. 20, 2004) (finding

the "numerosity" requirement had been met when the class members ranged from 150 to 270); *In re Kaiser Group Int'l, Inc.*, 278 B.R. 58, 64 (Bankr.D.Del.2002) (certifying class of 47 members). Therefore, the proposed class as defined satisfies Rule 23(a)(1).

### ii. Commonality

Under the "commonality" requirement, the plaintiff must demonstrate "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). Because commonality will be satisfied if the named plaintiff shares *at least* one question of fact or law with the grievances of the prospective class, it is easily met. *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir.1994). For instance, if all class members are subject to the same harm or a defendant has acted pursuant to a common design, the "commonality" requirement is met. *Fry v. Hayt, Hayt & Landau*, 198 F.R.D. 461, 467 (E.D. Pa 2000). This makes WARN Act claims particularly amendable to class action treatment as allegations of mass layoffs almost invariably involve common questions of law or fact.

Here, Plaintiff alleges common conduct by the Defendant and a common harm suffered by the class members: Plaintiff and the putative class members were terminated by Defendant without proper notice as required by the WARN Act and NJ WARN Act. Thus, the liability determination will necessarily entail consideration of the following common issues:

(1) whether Defendant employed more than 100 employees;

(2) whether the class members are protected by the WARN Act;

(3) whether Defendant issued notice to its employees on February 6, 2019, informing them that they would terminated on or around February 9, 2019;

(4) whether those terminations occurred within 30 days of February 9, 2019;

(5) whether the class members were "affected employees";

(6) whether the class members were terminated without cause;

(7) whether the class members were terminated without 60 days advance notice;

(8) whether Defendant failed to pay the class members 60 days wages and benefits; and

(9) whether Defendant paid any severance to the class members.

Therefore, the commonality requirement of Rule 23(a)(2) has been met.

### iii. Typicality

Typicality requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). To some extent typicality overlaps with commonality. "Both criteria seek to assure that the action can be practically and efficiently maintained and that the interests of the absentees will be fairly and adequately represented." *Stewart v. Abraham*, 275 F.3d at 227 (citation omitted). Generally, in cases in which the commonality element is satisfied, the typicality element will also be satisfied. *Id.* The focus of the typicality inquiry is on whether the interests of the class representative are sufficiently aligned with the interests of the absent class members, i.e., that the named plaintiffs do not have markedly different factual circumstances or present a legal theory different from the rest of the class. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001), as amended (Oct. 16, 2001).

\*7 Based on the allegations in the Complaint, Plaintiff is typical of the class he purports to represent. His claim, like the claims of the rest of the class members, is based on the same underlying event—the February 9, 2019 terminations and those within 30 days thereafter. Plaintiff claims that neither he nor any of the putative class members received 60 days advanced notice of the terminations or wages and benefits to which they were entitled. While there is a difference between Plaintiff's claim and those of the putative class in the amount of damages recoverable based on wages, years of service and benefits, this does not preclude a finding of typicality. A claim is not atypical if there are some factual difference, as long as the "claim arises from the same event ... that gives rise to the claims of the class members, and ... is based on the same legal theory." *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994). Plaintiff's claim is based on the same legal theory as the class's, namely, that such firing violates the provisions of the federal WARN Act and the New Jersey WARN Act. Accordingly, Plaintiff has met his

burden of demonstrating typicality. *In re A-P-A Transp. Corp. Consol. Litig.*, No. CIV. 02-3480 WGB, 2005 WL 3077916, at \*4 (D.N.J. Nov. 16, 2005) (concluding typicality requirement was met where representatives' claims under the WARN Act were based on the same set of operative facts as the putative class members, namely, termination without the proper 60 day written notice).

### iv. Adequacy

The final requirement under Rule 23(a) is the adequacy of representation. The named representative of the class must fairly and adequately represent the interests of the absent class members. Fed.R.Civ.P. 23(a)(4). This diverges into a two-fold inquiry. First the court must examine the qualifications of the counsel that represents the class. *In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d 283, 312 (3rd Cir.1998). When class counsel is competent, experienced in class action lawsuits, and vigorously represents the interests of the class, the first prong of the adequacy of representation test is satisfied. *Id.* at 313. Second, the court must ensure there is no conflict of interest between the named representatives and the rest of the class. *Id.* at 312.

Plaintiff contends and this Court agrees that class counsel is well qualified to represent a WARN Act class. Lead counsel regularly litigates federal court matters, including class and collective actions pursuant to Fair Labor Standards Act and the Pennsylvania Minimum Wage Act. Likewise, associate attorney Mr. Zucker has sufficient experience both prosecuting and defending against class actions in federal courts. Thus, this Court finds Plaintiff's counsel to be qualified, experienced, and generally able to conduct this litigation.

Moreover, this Court is satisfied that the named representative will fairly and adequately represent the interests of the absent class members. Plaintiff is a former employee of Defendant Dubell and seeks to assert a class action on behalf of similarly situated employees. As represented in the Complaint and by counsel, Plaintiff has the same claim as the putative class members, and therefore his claim does not conflict with the class. Accordingly, the requirements of Rule 23(a)(4) have been met.

### C. Rule 23(b)(3) Requirements

### i. Predominance and Superiority

In addition to satisfying the four requirements of Rule 23(a), Plaintiff must meet the requirements of Rule 23(b)(3). Rule 23(b)(3) mandates that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

Predominance measures whether the class is sufficiently cohesive to warrant certification. *Amchem*, 521 U.S. at 623, 117 S.Ct. 2231. Unlike commonality, predominance is significantly more demanding, requiring more than a common claim. *Id.* "Issues common to the class must predominate over individual issues." Id. (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 313–14 (3d Cir.1998)). "In the context of alleged WARN Act violations, common issues will almost always predominate. After all, liability depends upon a single employer terminating large groups of employees." *In re Spring Ford Indus., Inc.*, 2004 WL 231010, at *8.

**\*8** Superiority tests whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). The court must "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Community Bank of Northern Virginia*, 418 F.3d 277, 309 (3d Cir.2005)

In this WARN Act litigation, all of the claims stem from the same set of operative facts and Plaintiff and the prospective class members proceed on one theory of liability: violation of the WARN Act for failure to give proper notice of the terminations that occurred on February 9, 2019, and within 30 days thereafter. While there are questions affecting only individual members, namely the disparate damage calculations, these issues are subordinate to the far larger, common issue of employer liability. Thus, this identity of claims shows that no individual class member has an interest in controlling the prosecution. Additionally, this Court is not aware of any lawsuits initiated by potential class members involving the present matter. Further, a class action is a superior method of adjudicating this dispute. This case involves approximately 157 class members with relatively low-dollar value claims. Declining to certify the class may result in 157 separate actions on essentially the same facts

with inconsistent outcomes or, perhaps, far more likely, many of the claims not being brought. Lastly, there is little to no perceived difficulty in litigating this matter as a class action because the putative class only seeks monetary relief which should easily be computed by the parties. As such, this Court finds that the requirements of Rule 23(b)(3) have been met.

### D. Notice to Potential Class Members

Federal Rule of Civil Procedure 23(c)(2)(B) provides that for "any class certified under Rule 23(b)(3) ... the court must direct to class members the best notice that is practicable under the circumstances." Plaintiff should submit a proposed form of notice to the class within 30 days.

### E. Appointment of Class Counsel

Rule 23(g)(1) requires the Court to appoint class counsel. As previously mentioned, this Court finds that Plaintiff's counsel is qualified and experienced enough to conduct the proposed litigation. Accordingly, the Court will appoint them as class counsel.

### F. Default Judgment

Although Plaintiff has alleged facts sufficient to sustain a class action, the Court will deny Plaintiff's motion for default judgment. Plaintiff moved for default judgment on behalf of himself and the other members of the class. In a Rule 23(b)(3) class action, class members may opt-out or they are bound by the judgment. Fed. R. Civ. P. 23. As such, Courts typically direct "to class members the best notice that is practicable under the circumstances," which includes adequate notice of the case and their right to request exclusion. *Id.*; *see also Fayun Luo v. Qiao Xing Universal Resources,* Civ. No. 12-0045, 2017 WL 2470248, *4 (D.V.I. Jun. 6, 2017) (denying a motion for default judgment where class had not been notified and given the opportunity to opt out yet).

Here, Plaintiff has not sent notice to the proposed class members, and therefore by entering a default judgment, this Court would be binding persons whose rights are at issue without first giving them proper notice. Accordingly, the motion for default judgment will be denied without prejudice and Plaintiff may re-file after the opt-out period has closed.

### IV. CONCLUSION

**\*9** Plaintiff has demonstrated by a preponderance of the evidence that the proposed class, as defined herein, satisfies

all four factors under Rule 23(a) and meets the requirements of Rule 23(b)(3). Therefore, class certification is appropriate, and Plaintiff's motion will be **GRANTED**. However, the motion for default judgment will be **DENIED** for the reasons stated above. An order will follow.

**All Citations**

Slip Copy, 2020 WL 6938351

## Footnotes

1    It is not clear from Plaintiff's brief whether the February 6, 2019 notice was issued by mail. But they seem to suggest as much by the statement that "[t]here is likely even a mailing list within those records pursuant to which the February 6, 2019, notice was issued." (Doc. No. 11-2, Brief at 11).

2    The two requirements of ascertainability often coalesce because even when there is objective criteria to determine class membership, if the proposed method to identify class members is based on subjective information, like affidavits, it is unreliable and presumably administratively infeasible. *See Stewart v. Beam Glob. Spirits & Wine, Inc.*, No. CIV. 11-5149 NLH/KMW, 2014 WL 2920806, at *7 (D.N.J. June 27, 2014); *see also*

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

6

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 42 of 261
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...
PageID: 44980

2010 WL 2813788
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

In re FORD MOTOR CO. E–350 VAN
PRODUCTS LIABILITY LITIGATION (NO. II).

Civil Action No. 03–4558 (GEB).
|
MDL No. 1687.
|
July 9, 2010.

**Attorneys and Law Firms**

Keven Hal Friedman, Kevin Peter Roddy, Daniel R. Lapinski, Wilentz Goldman & Spitzer, Woodbridge, NJ, Lawrence Jay Sass, West Orange, NJ, Randall K. Berger, Kirby McInerney LLP, New York, NY, for Plaintiff.

C. Scott Toomey, Campbell, Campbell, Edwards & Conroy, PC, Wayne, PA, James Demosthenes Smith, Lawrence G. Scarborough, Meridyth M. Andresen, Bryan Cave LLP, Phoenix, AZ, Stephen Bradley Perkins, O'Melveny & Myers, LLP, Washington, DC, for Defendants.

*MEMORANDUM OPINION*

BROWN, Chief Judge.

*TABLE OF CONTENTS*

Background ........................ 4

Analysis ........................ 7

I.    California ........................ 9

      A.    Material Facts ..................... ........................ 9

            1.    Greater All Nation............................................................ 9

            2.    First United............................................................ 11

      B.    Express Warranty ..................... ....................... 12

            1.    Plaintiffs' Express Warranty Theory............................................ 12

            2.    California Plaintiffs' Express Warranty Claims........................................ 16

      C.    Implied Warranty ..................... ....................... 20

            1.    Plaintiffs' Implied Warranty Theory............................................ 20

            2.    Privity............................................................ 21

      D.    California Statutory Consumer Fraud Claims .......... ....................... 25

      E.    Unjust Enrichment ................... ....................... 32

            1.    Plaintiffs' Unjust Enrichment Theory.................................... 32

            2.    California Plaintiffs' Restitution Claims.................................... 33

      F.    Summary ..................... ....................... 35

II.   Illinois ..................... 36

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 43 of 261
PageID: 44981
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

| | A. | Material Facts ...................... | ...................... 36 |
| | B. | ICFA ...................... | ...................... 38 |
| | | 1. Statute of Limitations............................................................... | 38 |
| | | 2. Actual Deception..................................................................... | 43 |
| | C. | Unjust Enrichment ...................... | ...................... 45 |
| | D. | Summary ...................... | ...................... 48 |
| III. | | New Jersey ...................... | 48 |
| | A. | Material Facts ...................... | ...................... 49 |
| | | 1. Macedonia........................................................................... | 49 |
| | | 2. Faith Tabernacle................................................................... | 49 |
| | | 3. Social Clubhouse.................................................................. | 50 |
| | | 4. Bethany Baptist.................................................................... | 51 |
| | B. | NJCFA ...................... | ...................... 52 |
| | | 1. Motion for Summary Judgment............................................... | 52 |
| | | 2. Motion to Strike................................................................... | 54 |
| | C. | Express Warranty .................... | ...................... 58 |
| | D. | Implied Warranty .................... | ...................... 60 |
| | E. | Unjust Enrichment ...................... | ...................... 61 |
| | F. | Summary ...................... | ...................... 63 |
| IV. | | Georgia ...................... | 64 |
| | A. | Material Facts ...................... | ...................... 64 |
| | B. | Express and Implied Warranty .................... | ...................... 64 |
| | C. | Georgia FBPA ...................... | ...................... 67 |
| | D. | Unjust Enrichment ...................... | ...................... 70 |
| | E. | Summary ...................... | ...................... 72 |
| V. | | Pennsylvania ...................... | 72 |
| | A. | Material Facts ...................... | ...................... 73 |
| | | 1. Bethel............................................................................... | 73 |
| | | 2. Hickman Temple................................................................... | 74 |

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 44 of 261
PageID: 44982
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

      3.    Mt. Airy.................................................................................    74

   B.    Express Warranty and Implied Warranty: Notice ...............    .......................74

   C.    Express Warranty ...................    .......................77

   D.    Implied Warranty ...................    .......................78

   E.    Pennsylvania UTPCPL ...................    .......................81

   F.    Unjust Enrichment ...................    .......................83

   G.    Summary .......................    .......................86

VI.    Florida .........................    87

   A.    Material Facts ...................    .......................87

      1.    Blandon................................................................    87

      2.    Diaz.....................................................................    88

      3.    Mestre.................................................................    89

   B.    *Kia Motors* ...................    .......................90

   C.    Express Warranty ...................    .......................91

   D.    Implied Warranty ...................    .......................92

   E.    FDUTPA .......................    .......................93

   F.    Unjust Enrichment .......................    .......................97

   G.    Summary .........................    .......................98

VII.    Texas .........................    99

   A.    Material Facts .......................    .......................99

   B.    *Inman* .........................    .......................99

   C.    Express and Implied Warranty .........................    ...................10 2

   D.    DTPA .......................    ...................103

   E.    Unjust Enrichment .........................    ...................107

   F.    Summary .........................    ...................108

VIII.    Missouri .........................    108

   A.    Material Facts .......................    ...................109

   B.    *Briehl* and *O'Neil* .......................    ...................110

   C.    Express and Implied Warranty ...................    ...................11 5

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 45 of 261
PageID: 44983
In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

| | | | |
|---|---|---|---|
| | D. | MMPA ........................ | ..................... 116 |
| | E. | Unjust Enrichment ...................... | ..................... 117 |
| | F. | Summary ........................ | ..................... 118 |
| IX. | | Michigan ........................ | 119 |
| | A. | Material Facts ........................ | ..................... 119 |
| | B. | *Hendricks* and *Henry* ...................... | ..................... 121 |
| | C. | Express Warranty ........................ | ..................... 123 |
| | D. | Implied Warranty ........................ | ..................... 125 |
| | E. | MCPA ........................ | ..................... 127 |
| | F. | Unjust Enrichment ........................ | ..................... 130 |
| | G. | Summary ........................ | ..................... 132 |
| X. | | New York ........................ | 132 |
| | A. | Material Facts ...................... | ..................... 132 |
| | | 1. | Bishop Anderson.................................................................... | 132 |
| | | 2. | Barrett.................................................................... | 133 |
| | B. | *Frank* as Applied to Bishop Anderson .................... | ..................... 136 |
| | C. | *Frank* as Applied to Barrett ...................... | ..................... 139 |
| | D. | Bishop Anderson's Express and Implied Warranty Claims: Notice .......... | ..................... 141 |
| | E. | Bishop Anderson's Express Warranty Claim .................... | ..................... 142 |
| | F. | Bishop Anderson's Implied Warranty Claim .................... | ..................... 143 |
| | G. | Bishop Anderson's GBL Claims ...................... | ..................... 14 5 |
| | H. | Bishop Anderson's Unjust Enrichment Claim .................... | ..................... 146 |
| | I. | Summary ........................ | ..................... 147 |
| XI. | | Massachusetts ........................ | 147 |
| | A. | Material Facts ........................ | ..................... 147 |
| | B. | *Iannacchino* ...................... | ..................... 149 |
| | C. | Express Warranty ...................... | ..................... 153 |
| | | 1. | Notice.................................................................... | 153 |
| | | 2. | No Express Warranty.................................................................... | 155 |

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 46 of 261
PageID: 44984

D.    Unjust Enrichment ........................    ..................... 156

E.    Summary ..........................    ..................... 157


Conclusion ..........................    157

**\*1** This matter comes before the Court on the motions for summary judgment filed by Defendant Ford Motor Company ("Ford") in this multidistrict litigation. Ford has filed a total of 21 summary judgment motions in this putative class action. This Court previously granted two of these motions. In the remaining 19 motions, Ford requests that summary judgment be granted in its favor with respect to all 20 remaining named Plaintiffs, pursuant to the laws of the 11 states wherein Plaintiffs reside. This Opinion will address all of Ford's remaining summary judgment motions, with respect to Plaintiffs from California (Doc. No. 188), Illinois (Doc. No. 226), New Jersey (Doc. Nos. 210, 212, 214, and 216), Georgia (Doc. No. 221), Pennsylvania (Doc. Nos. 228, 230, and 232), Florida (Docs. No. 190, 194, and 197), Texas (Doc. No. 219), Missouri (Doc. No. 202), Michigan (Doc. No. 223), New York (Docs. No. 204 and 206), and Massachusetts (Doc. No. 208). In this Opinion, this Court will also decide Ford's motion to strike Plaintiffs' August 7, 2009 letter and affidavit (Doc. No. 272).

For the following reasons, Ford's remaining motions for summary judgment will be granted in part, granted without prejudice in part, and denied in part. Ford's motion to strike the August 7, 2009 letter and affidavit will be granted.

### Background

On June 16, 2005, the Judicial Panel on Multidistrict Litigation transferred five actions[1] to this Court for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *In re Ford Motor Co. E–350 Van Prods. Liab. Litig. (No. II),* 374 F.Supp.2d 1353 (J.P.M.L.2005). Following the transfer to this Court, Plaintiffs filed a Consolidated Amended Class Action Complaint ("Complaint"). In the Complaint, Plaintiffs allege that their Ford E–350 "15–passenger" vans were defectively designed due to a high center of gravity that leads to an unusually high rollover rate and, consequently, an increased risk of death or injury. No Plaintiffs or members of the proposed class have actually suffered a rollover. Plaintiffs claim economic harm because the alleged defect purportedly makes the E–350 vans unsuitable and unfit for

transporting 15 passengers. The Complaint asserts claims on behalf of Plaintiffs and a putative nationwide class that includes: "all persons and entities who purchased or otherwise lawfully acquired E350 '15–passenger' vans (a/k/a E350 Super Club Wagons, Econoline '15–passenger' vans, or E350 Super Duty Extended Length passenger vans) manufactured by Defendant Ford Motor Company ... model years 1991–2005, and who reside in the fifty states and/or the District of Columbia." (Compl.¶ 1.) This class includes persons or entities who purchased new or used model years 1991–2005 Ford E–350 vehicles between January 1, 1991 and the date of the filing of the Complaint, inclusive. The proposed class, however, specifically excludes those who claim damages for personal injury as a result of purchasing or leasing a Ford E–350 van. (Compl.¶ 63.)

**\*2** Each named Plaintiff asserts four causes of action: (1) breach of express warranty; (2) breach of implied warranty; (3) unjust enrichment; and (4) violation of the state consumer fraud statutes applicable to each Plaintiff. Specifically, Plaintiffs seek damages for the alleged diminution in value of their vehicles as a result of the vehicles' alleged defects; the cost of purchasing or leasing additional vehicles and of training drivers; equitable relief requiring Ford to correct the alleged defect and enjoining Ford from distributing any E–350 van until the alleged defect is corrected; restitution; disgorgement of revenues; and applicable statutory damages.

The Complaint initially asserted claims on behalf of various named Plaintiffs from five states: Alabama, Arkansas, California, Illinois, and New Jersey. Ford moved to dismiss the entire Complaint. In an Opinion and Order dated September 2, 2008, Senior United States District Judge Harold A. Ackerman granted in part and denied in part Ford's motion.[2] *In re Ford Motor Co. E–350 Van Prods. Litig. (No. II),* No. 03–4558, MDL No. 1687, 2008 WL 4126264, at \*29 (D.N.J. Sept.2, 2008) (hereinafter "MTD Opinion") .[3] Judge Ackerman applied the law of the Plaintiffs' home states to their respective claims, except where no material difference existed between the various states' laws. *Id.* at \*3. The court granted Ford's motion to the extent that Judge Ackerman: 1) dismissed the Alabama, Arkansas, and Illinois

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 47 of 261
PageID: 44985
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Plaintiffs' express warranty claims; 2) dismissed the Alabama, Arkansas, and Illinois Plaintiffs' implied warranty claims; 3) dismissed the Alabama and Arkansas Plaintiffs' respective state consumer fraud statutory claims; and 4) dismissed one of the three state consumer fraud statutory claims advanced by the California Plaintiff. *Id.* at \*29–30. Judge Ackerman denied the remainder of Ford's motion. In the previous summary judgment opinion, this Court granted summary judgment in Ford's favor on the sole remaining claim of unjust enrichment asserted by the Alabama and Arkansas Plaintiffs (Doc. No. 286). Therefore, the following claims brought by the initially named Plaintiffs in the Complaint remain pending: 1) the California and New Jersey Plaintiffs' express warranty claims; 2) the California and New Jersey Plaintiffs' implied warranty claims; 3) the California, New Jersey, and Illinois Plaintiffs' unjust enrichment claims; 4) the Illinois and New Jersey Plaintiffs' respective state consumer fraud statutory claims; and 5) two of the California Plaintiff's state consumer fraud statutory claims. *Id.*

After Judge Ackerman resolved Ford's motion to dismiss, the parties in November 2008 agreed to the joinder of newly named Plaintiffs from many new jurisdictions. (Doc. No. 150.) Following extensive discovery, Ford filed 21 separate motions for summary judgment, seeking judgment against all named Plaintiffs on all claims. This Court previously granted two of Ford's motions. At present, this case includes 20 named Plaintiffs from 11 states. These states include the three remaining initial states—California, Illinois, and New Jersey—and eight additional states: Georgia, Pennsylvania, Florida, Texas, Missouri, Michigan, New York, and Massachusetts.[4]

### Analysis

**\*3**  A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hersh v. Allen Prods. Co.,* 789 F.2d 230, 232 (3d Cir.1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). An

issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.*

The substantive law will identify which facts are "material." *Anderson,* 477 U.S. at 247–48. Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Peters v. Del. River Port Auth. of Pa. & N.J.,* 16 F.3d 1346, 1349 (3d Cir.1994). It is inappropriate for a district court to resolve factual disputes or make credibility determinations at the summary judgment stage. *Big Apple BMW, Inc. v. BMW of N. Am., Inc. .,* 974 F.2d 1358, 1363 (3d Cir.1992).

This does not mean, however, that a district court may ignore the weight of the evidence. *Id.* "[I]f the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly probative,' the court should enter summary judgment in favor of the moving party." *Peterson v. AT & T,* No. 99–4982, 2004 WL 190295, at \*3 (D.N.J. Jan.9, 2004) (quoting *Anderson,* 477 U.S. at 249). To raise a genuine issue of material fact, the summary judgment opponent " 'need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.,* 998 F.2d 1224, 1230 (3d Cir.1993); *see also Anderson,* 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].").

As Judge Ackerman did in the MTD Opinion, this Court will apply the law of each Plaintiff's home state to that Plaintiff's claims. MTD Opinion at \*3.

### I. California
This Court will first address Ford's motion for summary judgment as to the two California Plaintiffs in this action, Greater All Nation Pentecost Church of Jesus Christ ("Greater All Nation") and First United Methodist Church of Santa Barbara ("First United"). In the MTD Opinion, the Court dismissed Greater All Nation's claim under California's Consumers Legal Remedies Act for lack of standing, but

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 48 of 261
PageID: 44986

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

allowed the remainder of Greater All Nation's claims—express warranty, implied warranty, unjust enrichment, and claims under two other California consumer fraud statutes—to proceed. The parties added California Plaintiff First United to this case after the Court's resolution of the motion to dismiss, and therefore the Court has not yet addressed any of the claims asserted by First United. For the following reasons, this Court will grant Ford's motion in its entirety as to Greater All Nation. Ford's motion as to First United will be granted with regard to the warranty claims and granted without prejudice with regard to the statutory and unjust enrichment claims.

### A. Material Facts

#### 1. Greater All Nation

**\*4**  James P. Jennings, Jr., a deacon at Greater All Nation, testified at deposition on behalf of Greater All Nation that he personally purchased a used 1996 model E–350 van with his own funds in 1999, with the intention to donate the van to the church. (Jennings Dep. at 41:13, 53:2–23.) [5] The church did not ask Deacon Jennings to donate the van, and while Jennings consulted with officials at Greater All Nation (*id.* at 53:10–25), those officials offered no guidance "because it wasn't their money" (*id.* at 57:10). Deacon Jennings purchased the vehicle from Fox Leasing for $11,687.15, which included an optional $1,100 extended service agreement. (*Id.* at 82:12–83:8.) At the time of purchase by Deacon Jennings, the Greater All Nation vehicle had traveled 154,486 miles. (*Id.* at 81:9–14.)

Deacon Jennings testified that in buying a van to donate to the church, he "was looking to fill like 15 people in a van that we can go around [and] just pick up." (*Id.* at 54:25–55:1.) When he purchased the E–350 van from Fox Leasing, he asked for a 15–passenger van, and the salesperson represented to Deacon Jennings that the E–350 was a 15–passenger van. (*Id.* at 117:17–22.) Aside from this representation, however, no one at Fox Leasing or the other dealerships Deacon Jennings visited made any statements about steering, handling, or stability, and no one presented Deacon Jennings with any materials or brochures issued by Ford or anyone else. (*Id.* at 58:22–25; 60:7–13.) Deacon Jennings also had not viewed any Ford or government websites regarding 15–passenger vans, seen any press releases, advertisements, or media coverage regarding E–350 vans, or had any discussions with Ford officials. (*Id.* at 63:9–64:6.) Deacon Jennings purchased the E–350 based on price, stating that he got "the best deal." (*Id.* at 56:17.)

Greater All Nation's E–350 has traveled approximately 20,000 miles over an eight-year period, transporting members to and from church. (*Id.* at 105:15–106:5.) Deacon Jennings testified that the church has never carried more than 12 passengers in the van because the seats are too small for more than 12 people. (*Id.* at 45:14–22; 110:24–111:12.) He further testified that on two occasions, while he was driving the van, he felt the van might roll over, but he maintained control and did not actually roll over. (*Id.* at 69:7–72–17.) Deacon Jennings stated at deposition that he had some difficulty obtaining automobile insurance on Greater All Nation's behalf for the E–350, but he ultimately secured insurance connected to his personal insurance policy. (*Id.* at 77:17–80:22 .) Deacon Jennings conceded that the church can presently fit as many people into the van as it could when he first purchased it (*id.* at 110:4–6), and that the church has not sought to sell the van (*id.* at 110:7–8). When asked why Greater All Nation has not sold the van, he explained, "It's serving the purpose of—I won't say it's serving the purpose but it's doing the job that we need [it] to do. It's transporting people." (*Id.* at 110:10–12.)

#### 2. First United

**\*5**  Sue Zilotto, chair of First United's Board of Trustees, testified at deposition on behalf of First United. Ford alleges that Boy Scout Troop 1 (the "Troop") purchased a new 1995 model E–350 in 1995 for approximately $26,000 from the Mel Clayton Ford dealership, and that the Troop sold the van to the church for $1.00 with the understanding that the Troop could use the van as needed. (Ford's Statement of Undisputed Material Facts ("SUMF") No. 2 at ¶¶ 23, 29.) Zilotto conceded these facts as stated in Plaintiffs' Responses to Interrogatories. (Zilotto Dep. at 28:3–29:14.) However, Plaintiffs now contend that First United purchased the van directly from the Ford dealership, as supported in the record by the Retail Buyers Order for the church's E–350. (Lapinski Certif., Ex. 34 at FUM000004.) Zilotto agreed at deposition that First United purchased the van, after previously stating that the Troop did.

Zilotto asserted that the church believed, based on the van's window sticker, that the van was safe for carrying 15 passengers, but was unsure whether church officials had viewed other materials regarding the van. Zilotto further stated that the church acted based on advertisements that Ford sent directly to many churches. (Zilotto Dep. at 33:1–35:17; 111:3–5.) Zilotto claimed that the church purchased the van because it was safe to carry 15 passengers. (*Id.*

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 49 of 261
PageID: 44987

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

at 33:1–5.) The church used the van to transport up to 15 passengers at a time from 1995 until approximately January 2003, when the church, after learning through the news media of rollover issues, followed the advice of its automobile insurer to remove the last row of seats from the van. (Pls.' Supp. Statement of Disputed Material Facts ("Pls.' Supp. Statement") at ¶¶ 445–451; Ford's SUMF No. 2 at ¶¶ 31–35.) First United's insurer did not *require* this change as a condition of continued coverage. (Zilotto Dep. at 61:4–20.) First United also adopted other recommendations made by its insurer, including that the van not be driven in excess of 60 miles per hour, that only trained, Class 2–licensed drivers be used, and that heavy baggage not be piled in the back area of the van. (*Id.* at 24:15–21.) Zilotto testified that the removal of the back row of seating limited First United's use of the van by restricting the number of people it could transport to retreats or out-of-town meetings. (*Id.* at 26:17–22.)

### B. Express Warranty

#### 1. Plaintiffs' Express Warranty Theory

As do the other Plaintiffs, Greater All Nation and First United (collectively the "California Plaintiffs") allege in their First Causes of Action a breach of express warranty by Ford under Section 2–313 of the Uniform Commercial Code ("UCC"), as codified under California law by Cal. Com.Code § 2313. In the Complaint, Plaintiffs assert that Ford "expressly warranted by its representations, advertisements and statements, including Ford's labeling the E350 as a '15–passenger' van, that the E350 van was fit to safely accommodate and transport '15 passengers,' and that the E350 could legally and practically be used for that purpose." (Compl.¶ 78.) Ford allegedly breached this express warranty by distributing a "defective vehicle which could not be safely, legally, or practically used to accommodate and safely transport 15 passengers." (*Id.* ¶ 79.) Before addressing the express warranty claims of the individual Plaintiffs, this Court will first consider the general express warranty theory asserted by all Plaintiffs.

**\*6** As discussed in the MTD Opinion, UCC § 2–313 recognizes that a seller may create an express warranty by three general classes of statements or representations:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

*See, e.g.,* Cal. Com.Code § 2313(1); 810 Ill. Comp. Stat. § 5/2–313(1); N.J.S.A. § 12A:2–313(1). The UCC stipulates that, to create an express warranty, a seller need not "use formal words such as 'warrant' or 'guarantee' " or "have a specific intention to make a warranty." Cal. Com.Code § 2313(2); *see also, e.g.,* 810 Ill. Comp. Stat. § 5/2–313(2); N.J.S.A. § 12A:2–313(2). However, "affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Cal. Com.Code § 2313(2); *see also, e.g.,* 810 Ill. Comp. Stat. § 5/2–313(2); N.J.S.A. § 12A:2–313(2).

Judge Ackerman held in the MTD Opinion that at that stage of this litigation, all Plaintiffs sufficiently alleged the existence of an express warranty, and breach thereof, in claiming Ford's "core description" of the E–350 van as a 15–passenger van constituted an express warranty.[6] MTD Opinion at \*4. The Court reasoned that "accepting Plaintiffs' allegations as true, Ford's representation that the E–350 van was capable of transporting 15 people was not a subjective statement relating to the good's value, but rather an objective representation warranting the van's design and safety." *Id.* The court ultimately determined that several factual issues precluded a ruling as a matter of law on the merits of all Plaintiffs' express warranty claims at the motion to dismiss stage, including "whether Ford's description of the E350 van as a '15–passenger' van or Ford's outfitting the vans with seats for 15 passengers independently supports an express warranty; if so, whether any such warranty was the basis of the bargain between Plaintiffs and Ford; and whether Ford breached any such warranty." *Id.* at \*5.

In opposing Ford's motions for summary judgment, Plaintiffs evince significant confusion regarding the basis for their express warranty claims. In one passage in their brief, Plaintiffs appear to disclaim any reliance on an *express* warranty of safety:

> Although Ford attempts to paint Plaintiffs' express warranty claims

Case 1:19-md-02875-RMB-SAK   Document 1748-28   Filed 11/10/21   Page 50 of 261
PageID: 44988

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

as grounded in representations of 'safety,' Plaintiffs do not claim that Ford *expressly* represented that its vehicles were safe. Instead, Plaintiffs allege, and Ford cannot deny, that Ford affirmatively represented and described the vehicle as being able to transport 15–passengers. While Ford expressly warranted the vehicle as being capable of transporting 15 passengers, it is *implied* in Ford's representation that the vehicle is able to do so safely.

*7 (Pls.' Omnibus Br. at 50 (emphases added).) The Court construed Plaintiffs' express warranty claim in the MTD Opinion as alleging that Ford made an "objective representation warranting the van's design and safety" in describing the E–350 van in its advertisements and on its labels as a "15–passenger van." MTD Opinion at *4. Yet in the above-quoted argument, Plaintiffs now appear to discard this theory that Ford *expressly* warranted the safety of the E–350 van in carrying 15 passengers, and instead assert that Ford only expressly warranted the E–350 van as being *capable* of transporting 15 passengers, and that any representation of safety in that capability is merely implied. As Ford contends, Plaintiffs appear to argue that Ford breached an "implied express" warranty of safety. By legal definition, an express warranty must be express; an implied warranty might give rise to a claim for breach of implied warranty, a claim which each Plaintiff also pursues. Therefore, based on this rendition of Plaintiffs' argument, this Court would be inclined to conclude that all of Plaintiffs' express warranty claims fail as a matter of law.

The Court cannot rely entirely on Plaintiffs' apparent concession, however, due to Plaintiffs' shifting descriptions of its express warranty theory. In the paragraph immediately preceding the above-quoted language, Plaintiffs state that "[i]t is obvious from the evidence presented to this Court that Plaintiffs were induced to purchase E–350 vans based upon the *express* warranty that the vehicles were capable of *safely* transporting 15 passengers." (Pls.' Omnibus Br. at 49 (emphases added).) Thus, in one breath Plaintiffs contend that Ford *expressly* warranted safety in the carrying of 15 passengers, but in the next breath Plaintiffs argue that such safety was only *implied* by Ford. Because on these motions, this Court must view the underlying facts and

draw all reasonable inferences in the light most favorable to Plaintiffs as the non-moving parties, *see Matushita,* 475 U.S. at 587, this Court will not summarily conclude that Plaintiffs have foresworn an actionable express warranty theory. This Court must examine the record relevant to each Plaintiff and consider the law regarding express warranty in each relevant jurisdiction, beginning with the California Plaintiffs. For the following reasons, this Court will grant Ford's motion for summary judgment as to the California Plaintiffs' express warranty claims.

*2. California Plaintiffs' Express Warranty Claims*

Determining whether a statement by a seller constitutes an express warranty under California law involves three inquiries:

First, the court must determine whether the seller's statement constitutes an "affirmation of fact or promise" or "description of the goods" under [§ 2313(1)(a) or (b)], or whether it is rather "merely the seller's opinion or commendation of the goods" under [§ 2313(2) ]. Second, assuming the court finds the language used susceptible to creation of a warranty, it must then be determined whether the statement was "part of the basis of the bargain." Third, the court must determine whether the warranty was breached.

*8 *Keith v. Buchanan,* 173 Cal.App.3d 13, 220 Cal.Rptr. 392, 395 (Cal.Ct.App.1985).

Under California law, an express warranty arises only from "specific and unequivocal" statements or "explicit guarantees." *See Maneely v. General Motors Corp.,* 108 F.3d 1176, 1181 (9th Cir.1997) (citing *Hauter v. Zogarts,* 14 Cal.3d 104, 120 Cal.Rptr. 681, 534 P.2d 377, 379 (Cal.1975); *Keith,* 220 Cal.Rptr. at 396–97). For example, in *Hauter,* the Supreme Court of California construed a label on a golf training device "COMPLETELY SAFE BALL WILL NOT HIT PLAYER" as a statement of fact creating an express warranty of complete safety from the ball hitting the user. 120 Cal.Rptr. 681, 534 P.2d at 380–383 & n. 10. Similarly, in *Keith,* the descriptions of a sailboat in sales brochures as "a picture of sure-footed seaworthiness" and "a carefully well-equipped and very seaworthy vessel" constituted an express warranty of seaworthiness. 220 Cal.Rptr. at 396–97. The Ninth Circuit in *Maneely,* applying California law, concluded that a visual depiction of people sitting in the cargo bed of pickup trucks did not create an express warranty because "no reasonable jury could find that GMC promised that riding

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 51 of 261 PageID: 44989

in the back of a moving truck was safe simply by depicting people in the beds of pickup trucks." 108 F.3d at 1181.

Here, Ford's description of the E–350 van as a "15–passenger van" goes beyond the mere visual depictions at issue in *Maneely,* but does not rise to the level of an express warranty of safety as found in *Hauter* and *Keith.* As Plaintiffs ultimately appear to recognize, the statement that the E–350 is a "15–passenger van" does not explicitly, specifically, and unequivocally include a representation of safety. California law does not allow for an express warranty claim in the absence of such a specific "affirmation or promise made by the seller to the buyer which ... becomes part of the basis of the bargain." Cal. Com.Code § 2313(1)(a); *see Pisano v. Am. Leasing,* 146 Cal.App.3d 194, 194 Cal.Rptr. 77, 79–80 (Ct.App.1983). It is undisputed that no Ford representative, let alone any other person involved in the sale of the vehicles to the California Plaintiffs, made an express representation of *safety* with regard to the transport of 15 passengers. While the precise understandings of the sellers and exactly what the California Plaintiffs knew about the safety risks of the E–350 van remain in dispute, Ford has established that no one *explicitly* represented to the California Plaintiffs that the E–350 van was safe for carrying 15–passengers. After extensive discovery, Plaintiffs point to no evidence to the contrary, nor do they identify any specific, unequivocal statement made to the California Plaintiffs, or those affiliated with them, regarding safety. Plaintiffs allege in their Complaint that in promotional materials and press releases, Ford made certain representations regarding safety, such as that the E–350 van was "very safe" or "America's Most Trustworthy." (Compl.¶¶ 48–55.) However, as the Court ruled in the MTD Opinion, these statements and similar allegations in the Complaint are non-actionable opinion, or puffery, and cannot constitute an express warranty. MTD Opinion at *4. Plaintiffs do not pursue any such theory in opposing Ford's motion for summary judgment, and instead rely on Ford's "core description" that lacks any specific, explicit reference to safety.

**\*9** A description of goods that becomes part of the basis of the bargain "creates an express warranty that the goods shall conform to the description," Cal. Com.Code § 2313(1)(b), but the only description alleged and supported in the record here is that the E–350 van is a "15–passenger van." This bare description, while it certainly can be interpreted to *imply* that the van can safely carry 15 passengers, does not contain the explicit guarantee found in cases such as *Hauter* and *Keith.* Plaintiffs argue that an "express warranty by description not only promises that the product is that it is

described to be, but also that the product works as described." (Pls.' Omnibus Br. at 49.) However, the cases Plaintiffs cite in support of this proposition involve clear statements that make their promises explicit, and are dissimilar to the purported express warranty here. For example, one case cited by Plaintiffs involved a defendant's description of a camera as an "electronic color camera." *See Metowski v. Traid Corp.,* 28 Cal.App.3d 332, 104 Cal.Rptr. 599, 600–01 (Ct.App.1972) (reversing trial court's dismissal of express warranty claim). The court in *Metowski* reversed the trial court's dismissal of the express warranty claim without analysis of the content of the express warranty, and instead based its holding on its finding that plaintiff had provided timely notice of its claim. *Id.* at 602–04. In any event, the description amounting to an express warranty in *Metowski* stipulated only that the camera took color pictures, and did not warrant anything further. Similarly, another case cited by Plaintiffs concerned a seller's description of a gear as a "36–tooth gear." *See Square Deal Mach. Co. v. Garrett Corp.,* 128 Cal.App.2d 286, 275 P.2d 46, 49 (Cal.Ct.App.1954). That case, however, involved a claim for *implied* warranty, not express warranty. *Id.* at 51. Even accepting Plaintiffs' description of that case that a " '36–tooth gear' promises gear with 36 teeth," " such a warranty says nothing affirmatively about safety or any other characteristic.

Just as defendant only expressly promised a 36–tooth gear in *Square Deal,* Ford here explicitly promised only a 15–passenger van. Plaintiffs do not dispute that the E–350 van can hold 15 passengers, and based upon this undisputed record, Ford has not breached any warranty that the vehicle can transport 15–passengers. [7] Plaintiffs instead contend that the E–350 van cannot transport 15–passengers safely, and is not fit for such a purpose. On these facts, such a contention might lie in implied warranty, but not in express warranty. As Plaintiffs ultimately concede, "Ford expressly warranted the vehicle as being capable of transporting 15 passengers," and it is only "implied in Ford's representation that the vehicle is able to do so safely." (Pls.' Omnibus Br. at 50.) Based on the undisputed record and pursuant to California law, Ford's statement that the E–350 van is a "15–passenger van" does not create an express warranty of the safety of the vehicle in transporting 15 passengers. This Court will grant summary judgment in favor of Ford on the California Plaintiffs' claims for breach of express warranty.

*C. Implied Warranty*

**\*10** Ford moves for summary judgment on the California Plaintiffs' Second Causes of Action, breach of implied

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Case 1:19-md-02875-RMB-SAK   Document 1748-28   Filed 11/10/21   Page 52 of 261
PageID: 44990

warranty, on two grounds. First, Ford contends that California law requires that a plaintiff asserting a breach of implied warranty must stand in privity with the defendant, and that here the California Plaintiffs are not in privity with Ford. Second, Ford renews the argument first made on its motion to dismiss that the California Plaintiffs have not shown actual injury sufficient to maintain an implied warranty claim. This Court agrees with Ford's privity argument and will grant Ford's motion for summary judgment as to the California Plaintiffs' implied warranty claims.

### 1. Plaintiffs' Implied Warranty Theory

As do the other Plaintiffs, the California Plaintiffs in their Second Causes of Action assert that Ford breached the implied warranty of merchantability pursuant to UCC § 2–314, as codified under California law by Cal. Com.Code § 2314. Before addressing the implied warranty claims of the individual Plaintiffs, this Court will first consider the general implied warranty theory asserted by all Plaintiffs. Plaintiffs allege that Ford impliedly warranted "that the E350 vans were merchantable and was [*sic* ] fit for the ordinary purposes for which a 15–passenger van is used." (Compl.¶ 83.) Plaintiffs contend that Ford breached this implied warranty because the vehicles were "totally unfit to accommodate and safely transport 15 passengers." (Compl.¶ 84.)

Section 2–314 of the UCC provides generally that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." *See, e.g.,* Cal. Com.Code § 2314; 810 Ill. Comp. Stat. § 5/2–314; N.J.S.A. § 12A:2–314. To be merchantable, goods must, among other things, be "fit for the ordinary purposes for which such goods are used" and "conform to the promises or affirmations of fact made on the container or label if any." Cal. Com.Code § 2314(2)(c), (f); *see also, e.g.,* 810 Ill. Comp. Stat. § 5–214(2)(c), (f).

### 2. Privity

With regard to the California Plaintiffs, Ford first argues that these Plaintiffs cannot maintain an implied warranty claim against Ford because discovery has established that they do not stand in vertical contractual privity with Ford. Unlike courts in some other jurisdictions, California courts have retained the traditional privity requirement. *See, e.g., Cardinal Health 301, Inc. v. Tyco Elecs. Corp.,* 169 Cal.App.4th 116, 87 Cal.Rptr.3d 5, 23 (Cal.Ct.App.2008) ("Vertical privity is a prerequisite in California for recovery on a theory of breach of the implied warranty of fitness, unless

an exception applies."); *see also Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1023–24 (9th Cir.2008) (applying California law). "Vertical privity means that the buyer and seller were parties to the sales contract." *Cardinal Health,* 87 Cal.Rptr.3d at 23. To stand in privity, a buyer and seller must be "in adjoining links of the distribution chain." *Clemens,* 534 F.3d at 1023; *see also Osborne v. Suburu of Am., Inc.,* 198 Cal.App.3d 646, 243 Cal.Rptr. 815, 820 n. 6 (Cal.Ct.App.1988) (quoting Clark and Smith, The Law of Product Warranties (1984) ¶ 10.01[1], p. 10–3). Therefore, an "end consumer ... who buys from a retailer is not in privity with a manufacturer." *Clemens,* 534 F.3d at 1023.

**\*11** Here, Deacon Jennings purchased a used E–350 van with his own funds from Fox Leasing, and Deacon Jennings donated the van to Greater All Nation. Disputed facts exist regarding from whom First United acquired its vehicle. At one point during her deposition, in accordance with Plaintiff's Responses to Interrogatories, Zilotto testified that Troop 1 purchased the van from the Mel Clayton Ford dealership and sold the vehicle to First United for $1.00. Later in her deposition, Zilotto asserted, based on the Retail Buyers Order for the van, that First United purchased the van directly from Mel Clayton Ford. In the cases of both California Plaintiffs, however, it undisputed that neither church, let alone a church member or other affiliated group, acquired its vehicle directly from the manufacturer, Ford. The vans were purchased from an independent leasing company and a retail Ford dealership, respectively. Because the California Plaintiffs are separated from Ford by at least one link in the chain of distribution, they are not in privity with Ford. *See, e.g., Osborne,* 243 Cal.Rptr. at 820 n. 6 ("For example, the distributor is normally in vertical privity with the manufacturer, and the ultimate retail buyer is normally in vertical privity with the dealer. But if the retail buyer seeks warranty recovery against a manufacturer with whom he has no direct contractual nexus, the manufacturer would seek insulation via the vertical privity defense." (quoting Clark and Smith, The Law of Product Warranties (1984) ¶ 10.01[1], p. 10–3)). Therefore, unless an exception to the privity requirement applies, the California Plaintiffs cannot establish implied warranty claims against Ford because they do not stand in the requisite privity with Ford.

The California Plaintiffs do not contest that they fail to meet the strict requirements of vertical privity. Instead, they argue that the privity requirement does not apply to their implied warranty claims. The California Plaintiffs point to an exception referenced by the Ninth Circuit in *Clemens,* namely

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 53 of 261
PageID: 44991

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

"when the plaintiff relies on written labels or advertisements of a manufacturer." *Clemens,* 534 F.3d at 1023 (citing *Burr v. Sherwin Williams Co.,* 42 Cal.2d 682, 268 P.2d 1041, 1048–49 (Cal.1954)). Here, the California Plaintiffs contend that they relied on the van's window sticker and other written labels identifying the E–350 van as a "15–passenger van." However, the California Plaintiffs ignore *Burr,* the Supreme Court of California case cited by the Ninth Circuit in *Clemens. Burr* makes clear that this exception only excuses the privity requirement for *express* warranty claims. *Burr,* 268 P.2d at 1048–49. This Court has already concluded that Ford is entitled to summary judgment on the California Plaintiffs' express warranty claims, therefore this exception to the privity requirement does not save their implied warranty claims. Other exceptions to the privity requirement, such as where the case involves "foodstuffs, pesticides, and pharmaceuticals," or "where the end user is an employee of the purchaser" also do not apply. *Clemens,* 534 F.3d at 1023 (collecting cases).

**\*12** The California Plaintiffs further contend that the privity requirement does not apply to their implied warranty claims based on *Atkinson v. Elk Corp. of Texas,* 142 Cal.App.4th 212, 48 Cal.Rptr.3d 247, 257–58 (Cal.Ct.App.2006). In *Atkinson,* the court acknowledged that generally, privity must be established to maintain an implied warranty claim, but commented that the privity rule "should be relaxed" based in the case before it. *Id.* at 257. The implied warranty of quality at issue in *Atkinson* derived from a express warranty with specific terms of guarantee and duration contained in the defendant manufacturer's brochure for the goods. *Id.* at 258. The *Atkinson* court concluded that the defendant "brought itself into privity of contract with the ultimate consumer, [plaintiff], by extending this express warranty." *Id.; see also id.* ("It would be inconsistent to recognize privity existing for breach of express quality warranties under Magnuson–Moss and to reach the opposite conclusion in the same transaction for breach of the implied warranty of merchantability.").

*Atkinson* has no applicability here for several reasons. First, as discussed above, no express warranty may be found here, and therefore any rationale for relaxing the privity requirement in *Atkinson* is wholly absent here. *See Zabit v. Ferretti Group, USA,* No. 06–1252, 2006 WL 3020855, at \*6 (N.D.Cal. Oct.23, 2006) (distinguishing *Atkinson* in case where defendant did not issue written express warranty because "[t]he *Atkinson* court's holding was based upon the fact that the manufacturer had issued a written warranty on the product in question ... and based upon the fact that the plaintiff

relied on that warranty"). More broadly, several courts have deemed the *Atkinson* court's discussion of privity to be *dicta* both because the court ultimately dismissed the implied warranty claim as time-barred, and because those claims arose under the federal Magnuson–Moss act and did not directly involve state implied warranty law. *See Hartless v. Clorox Co.,* No. 06–2705, 2007 WL 3245260, at \*2 (S.D.Cal. Nov.2, 2007) ("The *Atkinson* case provides no support for plaintiff's contention because the court merely indicated, in *dicta,* that the privity requirement might be relaxed if the dismissed implied warranty claim were brought alongside a related express warranty claim."); *see also Ward v. IPEX, Inc.,* No. 08–6370, 2009 WL 2634842, at \*4 (C.D.Cal. Feb.4, 2009). Courts have consistently rejected *Atkinson*-based challenges to California's privity requirement for implied warranty claims and, without fail, have recognized the continued viability of the privity requirement as established in Burr. *See, e.g., Wolph v. Acer Am. Corp.,* No. 09–1314, 2009 WL 2969467, at \*3 (N.D.Cal. Sept.14, 2009). "*Atkinson* appears to be an anomaly in that it contravenes the well-established principle under California law that privity is required in cases alleging breach of an implied warranty." *Postier v. Louisiana–Pacific Corp.,* No. 09–3290, 2009 WL 3320470, at \*6 (N.D.Cal. Oct.13, 2009) (citing *Burr,* 268 P.2d at 1048; *Blanco v. Baxter Healthcare Corp.,* 158 Cal.App.4th 1039, 70 Cal.Rptr.3d 566, 582 (Cal.Ct.App.2008)).

**\*13** While the Ninth Circuit observed in *Clemens* that other states have discarded the privity requirement for implied warranty claims, and that the requirement "may be an archaism in the modern consumer marketplace," the court concluded that "California courts have painstakingly established the scope of the privity requirement under California Commercial Code section 2314, and a federal court sitting in diversity is not free to create new exceptions to it." *Clemens,* 534 F.3d at 1024 (citations omitted). This Court agrees. Because the undisputed facts demonstrate that the California Plaintiffs do not stand in privity with Ford, this Court must grant summary judgment in Ford's favor on the California Plaintiffs' breach of implied warranty claims.

Because the lack of privity requires this Court to rule in favor of Ford on the California Plaintiffs' implied warranty claims, this Court need not address Ford's contention that the undisputed facts show that the California Plaintiffs have not suffered sufficient actual injury to prove a breach of any implied warranty.

*D. California Statutory Consumer Fraud Claims*

Case 1:19-md-02875-RMB-SAK   Document 1748-28   Filed 11/10/21   Page 54 of 261
PageID: 44992

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

In the Complaint, Greater All Nation asserts in its Fourth Cause of Action [8] claims under three California consumer fraud statutes: the California Unfair Competition Law ("California UCL"), Cal. Bus. & Prof.Code § 17200, *et seq.;* the California False Advertising Law ("California FAL"), Cal. Bus. & Prof.Code § 17500, *et seq.;* and the California Consumers Legal Remedies Act ("California CLRA"), Cal. Civ.Code § 1750, *et seq.* In the MTD Opinion, the Court dismissed Greater All Nation's California CLRA claim, but denied Ford's motion to dismiss as to the California UCL and the California FAL. Ford now moves for summary judgment on all California state consumer fraud statute claims brought by both California Plaintiffs.

At the outset, this Court will grant summary judgment in favor of Ford on First United's California CLRA claim for the same reasons that it dismissed Greater All Nation's CLRA claim. The Court has not formally addressed First United's California CLRA claim because First United was added to this matter after the MTD Opinion. As Judge Ackerman held in the MTD Opinion, the California CLRA applies only to individuals who seek or acquire goods or services for personal, family, or household purposes; commercial entities and nonprofit organizations do not qualify as "consumers" with standing to sue under the California CLRA. MTD Opinion at *26 (citing Cal. Civ.Code §§ 1770(a), 1761(d)). Like Greater All Nation, First United is a nonprofit church organization and, therefore, lacks standing to assert a California CLRA claim.

Ford advances two theories as to why the California Plaintiffs' California UCL and FAL claims fail, but both rely on the same underlying assertion: that the California Plaintiffs did not suffer any injury or lose any money or property because they did not pay (or only paid nominally) for their E–350 vans. In their first argument, Ford contends that although the California Plaintiffs state that they seek restitution as their remedy for the statutory violations, they actually seek a form of legal damages because Ford took no money or property from the California Plaintiffs. Because the California UCL and FAL only allow for equitable relief, Ford concludes that the California Plaintiffs cannot recover such legal damages under these statutes. Ford additionally argues that the California Plaintiffs lack standing to assert these statutory claims because they have not suffered injury-in-fact or lost money or property due to any proscribed unfair competition. As support, Ford again relies upon the assertion that neither Greater All Nation nor First United paid any

substantial value for their vans and, therefore, cannot be deemed to have lost any money due to Ford's alleged conduct.

**\*14** Ford correctly states that the California UCL and FAL do not allow for recovery of legal damages. Both the California UCL and FAL authorize injunctive relief, along with "such orders or judgments" that "may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of" the statutory violation. Cal. Bus. & Prof.Code §§ 17203(UCL); 17535(FAL). California courts have held that legal damages may not be awarded under the California UCL. *See Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1144, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003); *Cortez v. Purolator Air Filtration Prods. Co.,* 23 Cal.4th 163, 96 Cal.Rptr.2d 518, 999 P.2d 706, 712 (Cal.2000); *see also, e.g., Stearns v. Select Comfort Retail Corp.,* No. 08–2746, 2009 WL 1635931, at *17 (N.D.Cal. June 5, 2009). "A plaintiff may not recover non-restitutionary disgorgement of profits under the UCL." *Trew v. Volvo Cars of N. Am., LLC,* No. 05–1379, 2006 WL 306904, at *2 (E.D.Cal. Feb.8, 2006). Similarly, the California FAL only allows for equitable relief, i.e. injunction and restitution. *See Buckland v. Threshold Enterps., Ltd.,* 155 Cal.App.4th 798, 66 Cal.Rptr.3d 543, 558 (Cal.Ct.App.2007).

Assuming that the California Plaintiffs may prove a violation of the California UCL and/or FAL, they cannot recover if the damages they seek are purely legal in nature. Ford concedes that the California Plaintiffs nominally seek restitution, but Ford argues that such restitution in this case would be compensatory and therefore legal, not equitable. The object of equitable restitution is "to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Korea Supply,* 29 Cal.4th at 1149, 131 Cal.Rptr.2d 29, 63 P.3d 937. If the plaintiff "does not have an ownership interest in the money it seeks to recover from [a] defendant[ ]," the remedy that plaintiff seeks is not restitutionary under the California consumer fraud statutes. *Id.* In the alternative, restitution encompasses the recovery of money or property in which the plaintiff has a "vested interest." *Id.* To qualify as equitable restitution under this theory, the money sought by the plaintiff must be "identified as belonging in good conscience to the plaintiff [which can] clearly be traced to particular funds or property in the defendant's possession." *Id.* at 1150, 131 Cal.Rptr.2d 29, 63 P.3d 937 (quoting *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 213, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002)).

Case 1:19-md-02875-RMB-SAK   Document 1748-28   Filed 11/10/21   Page 55 of 261
PageID: 44993
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

In contending that the restitution the California Plaintiffs seek as remedies for the alleged California UCL and FAL violations amounts to disgorgement of profits and not equitable restitution, Ford seizes upon the Supreme Court of California's reasoning in *Korea Supply* that "[a]ny award that plaintiff would recover from defendants would not be restitutionary as it would not replace any money or property that defendants took *directly* from plaintiff." *Korea Supply,* 29 Cal.4th at 1149, 131 Cal.Rptr.2d 29, 63 P.3d 937 (emphasis added). Subsequent courts have construed *Korea Supply* to permit restitutionary recovery by a plaintiff who paid a defendant only indirectly, as "it was clear in Korea Supply that the plaintiff did not pay any money, even indirectly, to the defendant." *In re Ditropan XL Antitrust Litig.,* 529 F.Supp.2d 1098, 1103 (N.D.Cal.2007). Thus, *Korea Supply* may be read to preclude recovery under the California UCL and FAL if the plaintiff did not pay any money, directly or indirectly, to the defendant.

 **\*15** The undisputed record shows that Greater All Nation did not pay any money to Ford. Deacon Jennings donated a used E–350 van to Greater All Nation. Deacon Jennings purchased that van with his own money from Fox Leasing. Thus, Greater All Nation had no ownership interest in any money Ford might have made by its allegedly unfair business practices in selling the E–350 vans. The California Plaintiffs argue that restitution under the California UCL includes an order compelling a defendant to return money to those persons "who had an ownership interest in the property *or those claiming through that person." Kraus v. Trinity Mgmt. Servs., Inc.,* 23 Cal.4th 116, 96 Cal.Rptr.2d 485, 999 P.2d 718, 725 (Cal.2000) (emphasis added). The California Plaintiffs thus seem to contend that Greater All Nation claims restitution through Deacon Jennings, even though the undisputed record shows that Greater All Nation paid no money directly or indirectly to Ford. (Pls.' Omnibus Br. at 13.) However, the California Plaintiffs undermine any such theory one page later, where they simply assert that they need not trace their funds to Ford and that they "have a vested or ownership interest in the restitutionary relief sought." (*Id.* at 14, 96 Cal.Rptr.2d 485, 999 P.2d 718.) Neither in their Complaint nor elsewhere do Plaintiffs seek to recover restitution on behalf of another (as opposed to other prospective class members similarly situated).

Under the California UCL and FAL, a plaintiff may only recover restitution if it can trace its lost money or property to the defendant. *See, e.g., Ditropan,* 529 F.Supp.2d at 1105 (concluding that "as long as Indirect Purchaser Plaintiffs are ultimately able to prove traceability, California law authorizes this Court to award them restitution under the UCL"). Here, Greater All Nation cannot do so, as Deacon Jennings donated the van to the church, and no funds of Greater All Nation were paid directly or through intermediaries to Ford. The California Plaintiffs concede that the Supreme Court of California held in *Korea Supply* that plaintiff in that case could not recover because it never had any possession or ownership interest in the money sought to be restored, regardless of to whom the money was paid. (Pls.' Omnibus Br. at 14 n. 9.) Here too, Greater All Nation paid no money to Ford or an intermediary, and has no vested interest or prior ownership interest in any funds Ford might have ultimately obtained from the purchase of the van by Deacon Jennings. Furthermore, Greater All Nation has not alleged or presented any evidence to support the implication that Fox Leasing was an agent of Ford, and Greater All Nation has not otherwise shown that Ford received money from anyone with regard to the purchase of the Greater All Nation vehicle. Even if Greater All Nation had bought the vehicle itself, the undisputed record lacks any evidence that Ford received any funds from the Greater All Nation vehicle transaction. Greater All Nation's damages claims under the California UCL and FAL, therefore, depend upon precluded legal damages, rather than equitable restitution. For these reasons, this Court will grant Ford summary judgment on Greater All Nation's California UCL and FAL claims.

 **\*16** First United stands in a different position than Greater All Nation. It is *not* undisputed that First Nation paid no money directly or indirectly to Ford for its vehicle. The record contains evidence supporting either that Troop 1 purchased the van from the Mel Clayton Ford dealership and sold the vehicle to First United for $1.00, or that First United purchased the van directly from Mel Clayton Ford. If First United can prove the latter theory, it could show that Ford, through the intermediary dealership, ultimately took money at least indirectly from First United. However, First United points to no evidence in the record showing that even if First United purchased the vehicle, that the money it paid to Mel Clayton Ford ultimately made its way to Defendant Ford. While "[g]enerally, the existence of an agency relationship and the extent of the authority of an agent are questions of fact," the party asserting an agency relationship bears "the burden of proving agency." *Inglewood Teachers Ass'n v. Public Employment Relations Bd.,* 227 Cal.App.3d 767, 278 Cal.Rptr. 228, 234 (Cal.Ct.App.1991).

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 56 of 261
PageID: 44994

In their Complaint, Plaintiffs state that Ford "manufactures and sells motor vehicles, including cars, vans and trucks, through retail dealers throughout North America" and appear to allege that the dealers are agents of Ford. (Compl. ¶ 13.) Plaintiffs—the California Plaintiffs and all other individual Plaintiffs—bear the burden of producing some evidence sufficient to at least create a dispute of material fact in opposing Ford's motion for summary judgment. In its brief, Plaintiffs contend that the Ford dealerships are agents of Ford as a matter of law, but do not support their assertion with any evidence. Plaintiffs observe in their brief that Ford generally "does not sell its vehicles directly to the general public," "relies exclusively upon its dealer network to sell vehicles," "distributes its literature relating to E–350 vehicles through its dealerships," and "advertises its vehicles with the intent that sales will occur through the dealerships." (Pls.' Omnibus Br. at 61.) These assertions in their argument are not supported by any evidence in the record. Plaintiffs argue that if their "inability to prove a transfer of money from Ford dealerships to Ford, alone, were sufficient to dismiss a claim against Ford, the extension of this doctrine would prevent any actions against manufacturers who sell their products primarily through retail outlets or other such agents; such an outcome is anathematic to both statutory and common law principles." (*Id.* at 62, 278 Cal.Rptr. 228.)

Even if this may be true, those statutory and common law principles still require some proof of the relationship between the dealers and Ford beyond mere assertion in their brief. Without some evidence of the relationship between the dealer and Ford, this Court declines to take judicial notice of the relationship such that it will assume that Ford benefits every time one of its dealers sells a new or used vehicle. Furthermore, many courts have strongly suggested that "automobile dealerships generally are not agents of automobile manufacturers regarding the selling of vehicles." *Zeno v. Ford Motor Co., Inc.,* 480 F.Supp.2d 825, 845 (W.D.Pa.2007) (collecting cases). Although a plaintiff seeking to show such an agency relationship faces an "uphill battle," the inquiry is fact-specific and no per se rule bars such a finding on an appropriate factual basis. *Id.* at 846. Here, Plaintiffs have presented no such factual basis whatsoever.

**\*17** Under the California UCL and FAL, a plaintiff may only recover restitution if it can trace its lost money or property to the defendant. *See, e.g., Ditropan,* 529 F.Supp.2d at 1105. First United does not do so here, either with regard to the money it might have paid or more generally with regard to the financial relationship between the dealers and Ford.

This Court will grant Ford's motion for summary judgment without prejudice on First United's California UCL and FAL claims. First United shall have until August 13, 2010 to show cause to cure this evidentiary deficiency and demonstrate that summary judgment should not be granted in Ford's favor on the California UCL and FAL claims. Ford shall have until September 13, 2010 to file a response to First United's submission.

### *E. Unjust Enrichment*

Finally, Ford next seeks summary judgment on the California Plaintiffs' unjust enrichment claims. Ford contends that the California Plaintiffs cannot show either that Ford received a benefit from them or that any benefit Ford received was unjust or at the expense of the California Plaintiffs.

#### *1. Plaintiffs' Unjust Enrichment Theory*

Plaintiffs allege generally in their Third Causes of Action that Ford "extracted significant payments" from individual Plaintiffs "who would not have purchased the E350 vans or who would only have agreed to purchase the E350 vans at greatly reduced prices" if they knew of the potential rollover problems. (Compl. ¶ 88.) Essentially, all Plaintiffs contend that their vans suffered diminution in value relative to their purchase prices due to the alleged defect and Ford's conduct. Plaintiffs further assert that Ford secured additional payment for necessary repairs to E–350 vans after the expiration of the "90–day 'Limited Warranty.' " (Compl. ¶ 89.) Thus, all Plaintiffs claim that "Ford has been unjustly enriched, having retained the benefits of its sales of defective E350 vans and payment for repair services," and all Plaintiffs seek restitution and disgorgement of "all sums by which Ford has been unjustly enriched." (Compl. ¶¶ 90, 91.)

#### *2. California Plaintiffs' Restitution Claims*

In the MTD Opinion, the Court acknowledged the uncertainty that exists regarding whether California law recognizes an independent claim for unjust enrichment. MTD Opinion at \*21 (citing *Nordberg v. Trilegiant Corp.,* 445 F.Supp.2d 1082, 1100 (N.D.Cal.2006)). The Court agreed with the district court in *Nordberg* that a claim for unjust enrichment under California law may be understood as a claim for restitution. *Id.* As the court in *Nordberg* concluded, it is clear that California Plaintiffs seek restitution. (Compl. ¶ 91 (seeking remedies of "rescission, *restitution,* and disgorgement of all sums by which Ford has been unjustly enriched").) The semantic difference between "unjust enrichment" and

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 57 of 261
PageID: 44995

"restitution" does not foreclose California Plaintiffs' claim as a matter of law. *See Nordberg,* 445 F.Supp.2d at 1100; *RaceRedi Motorsports, LLC v. Dart Machinery, Ltd.,* 640 F.Supp.2d 660, 667 (D.Md.2009) ( "Generally, a party asserting a claim of unjust enrichment is simply seeking the remedy of restitution, and that is certainly the case here."); *see also Lauriedale Assocs., Ltd. v. Wilson,* 7 Cal.App.4th 1439, 9 Cal.Rptr.2d 774, 780 (Cal.Ct.App.1992) ("The phrase' Unjust Enrichment' does not describe a theory of recovery .... What appellants actually seek is restitution." (citations omitted)).

**\*18** "Generally, to claim unjust enrichment, a plaintiff must allege that' (1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it.' " MTD Opinion at \*21 (quoting *In re K–Dur Antitrust Litig.,* 338 F.Supp.2d 517, 544 (D.N.J.2004)). The elements for showing unjust enrichment under California law mirror this general standard. *See Ghirardo v. Antonioli,* 14 Cal.4th 39, 57 Cal.Rptr.2d 687, 924 P.2d 996, 1003 (Cal.1996); *County of Solano v. Vallejo Redevelopment Agency,* 75 Cal.App.4th 1262, 90 Cal.Rptr.2d 41, 52 (Cal.Ct.App.1999). The benefit received by the defendant may be "any form of advantage." *County of Solano,* 90 Cal.Rptr.2d at 52 (quoting Restatement of Restitution § 1 cmt. (b), p. 12)). While "[f]or a benefit to be conferred, it is not essential that money be paid directly to the recipient by the party seeking restitution," the benefit must nonetheless be received at the expense of the plaintiff. *California Fed. Bank v. Matreyek,* 8 Cal.App.4th 125, 10 Cal.Rptr.2d 58, 62 (Cal.Ct.App.1992).

This Court will grant summary judgment in Ford's favor on Greater All Nation's restitution claim. Greater All Nation points to no evidence whatsoever in the record that Ford received any benefit at their expense. Rather, the California Plaintiffs contend that their *"predecessors in interest* were parted with their money due to Ford's conduct and Ford was unjustly enriched as a result." (Pls.' Omnibus Br. at 64 (emphasis added).) As support for this theory, the California Plaintiffs only state that "[i]t is *axiomatic* that Ford ultimately received the victims' money for the unsafe E–350 vans which Ford illegally marketed in California." (*Id.* (emphasis added).) This purported "axiom" is mere assertion, not evidence. Furthermore, if the "victims" from whom Ford allegedly received an unjust benefit were the California Plaintiffs' predecessors in interest, then any restitution claim belongs to those parties, not the California Plaintiffs. Money need not be paid directly to a defendant by a plaintiff seeking restitution, but that money must still have been received by a

defendant at a plaintiff's expense. The record is devoid of any evidence that Ford derived any benefit from the Greater All Nation vehicle that was purchased used from Fox Leasing, and it is undisputed that Greater All Nation did not pay any money for the vehicle because the vehicle was donated to the church by Deacon Jennings. In opposing summary judgment, an unsupported "axiom" does not exceed the mere scintilla standard. The record also contains no evidence that Greater All Nation made any other payments to Ford, such as payment for repair services.

With regard to First United, while a factual dispute exists regarding who purchased the First United vehicle, there is no evidence in the record that if First United indeed purchased the vehicle, Ford ultimately received First United's payment. As with First United's statutory claims, this Court declines to take judicial notice of any "axiomatic" agency or other relationship between Mel Clayton Ford and Ford in the absence of even a mere scintilla of evidence produced by Plaintiffs to show that the Ford ultimately benefitted from the purchase of the van from the Ford dealership. This Court will grant Ford's motion for summary judgment without prejudice on First United's unjust enrichment claim. First United shall have until August 13, 2010 to show cause to cure this evidentiary deficiency and demonstrate that summary judgment should not be granted in Ford's favor on the unjust enrichment claim. Ford shall have until September 13, 2010 to file a response to First United's submission.

*F. Summary*

**\*19** For the foregoing reasons, this Court will grant Ford's motion for summary judgment on all claims brought by Greater All Nation. This Court will grant Ford's motion for summary judgment on the express and implied warranty claims and California CLRA claims asserted by First United, and grant the motion without prejudice with regard to First United's California UCL, California FAL, and unjust enrichment claims. First United shall have until August 13, 2010 to show cause to cure the evidentiary deficiency regarding the relationship between Mel Clayton Ford and Ford and demonstrate that summary judgment should not be granted in Ford's favor on the California UCL, California FAL, and unjust enrichment claims. Ford shall have until September 13, 2010 to file a response to First United's submission.

**II. Illinois**

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 58 of 261
PageID: 44996
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

In the MTD Opinion, the Court dismissed the express and implied warranty claims brought by Illinois Plaintiff Pentecostal Temple Church of God in Christ ("Pentecostal Temple"). The Court denied Ford's motion to dismiss as to Pentecostal Temple's statutory consumer fraud claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. § 505/1, et seq., and Pentecostal Temple's unjust enrichment claim. Ford now moves for summary judgment on these remaining claims. For the following reasons, the Court will grant Ford's motion.

*A. Material Facts*

Pastor Samuel Edwards gave deposition testimony on behalf of Pentecostal Temple. The Illinois Plaintiff purchased two Ford E–350 vans and, therefore, asserts an ICFA and unjust enrichment claim on each of its vehicles. Pentecostal Temple first purchased a new 1994 model vehicle sometime in 1993 or 1994 from Currie Motors, a Ford dealership. (Edwards Dep. at 55:7–24.) Pastor Edwards could not recall how much Pentecostal Temple paid for the 1994 van. (*Id.* at 60:21–24, 10 Cal.Rptr.2d 58.) Pentecostal Temple sold the 1994 van in or about 1998 due to mechanical difficulties with the engine and other issues not involving the handling-related claims in this litigation. (*Id.* at 57:20–58:5, 10 Cal.Rptr.2d 58.) Pastor Edwards also had no recollection regarding how much Pentecostal Temple received when it sold the 1994 van, although he did state that "we ended up just kind of almost giving it away" due to the mechanical problems unrelated to this litigation. (*Id.* at 28:21–22, 10 Cal.Rptr.2d 58.) Pastor Edwards expressed no concerns regarding the handling of the 1994 van. (*Id.* at 80:24–81:3, 10 Cal.Rptr.2d 58.) On April 10, 1999, Pentecostal Temple purchased its second E–350 van, a used 1998 model, for $24,227. (Andresen Certif. No. 3, Ex. 1 at 1.) It continues to use this vehicle.

Prior to purchasing both vehicles, Pentecostal Temple did not receive any representations from Ford regarding the vehicle as a 15–passenger van, either by way of Ford brochures, salesperson statements, advertisements, media reports, or other written or verbal information. (Edwards Dep. at 79:4–11; 93:2–9; 95:20–97:1; 98:16–99:6.) As Ford stresses, Pastor Edwards conceded that Pentecostal Temple did not observe that the vans purported to be 15–passenger vehicles. (*Id.* at 95:5–8, 10 Cal.Rptr.2d 58.) According to Pastor Edwards, when purchasing the vehicles, Pentecostal Temple was looking for "something that would take more than four or five members at a time" and that would have ease of access for seniors and young people. (*Id.* at 56:16–17, 10 Cal.Rptr.2d 58; 57:1–19.)

**\*20** Pentecostal Temple contests Ford's reading of Pastor Edwards's testimony, and contends that it purchased the vehicles "in reliance on Ford's representations concerning the safety and 15–passenger capacity of the E350." (*See, e.g.,* Pls.' Supp. Statement ¶ 333.) However, the deposition excerpts upon which the Illinois Plaintiff relies simply do not support its reading of the undisputed facts in the record. None of the excerpts referenced by Pentecostal Temple, or any other portion of the transcript provided to the Court, discusses any purported misrepresentation that Pentecostal Temple received from Ford, or any recognition by Pentecostal Temple that Ford advertised or represented the vehicles to be 15–passenger vans. Pastor Edwards stated that the church sought to transport "10 to 15" people in the vans, but knew the vehicle would be too crowded to fit 15 full-size adults. (Edwards Dep. at 59:20–60:10.) Pentecostal Temple first noticed difficulties with the handling of the 1998 vehicle in 1999 or 2000 (*id.* at 85:10–21, 10 Cal.Rptr.2d 58), and those issues caused it to decrease the number of trips it made with the van and forced its drivers to operate the vehicles more carefully (*id.* at 84:4–87:11, 10 Cal.Rptr.2d 58). No one observed any handling problems with the 1994 van that Pentecostal Temple sold sometime in 1998. (*Id.* at 85:22–24, 10 Cal.Rptr.2d 58.) According to Pastor Edwards, Pentecostal Temple's automobile insurance carrier indicated that it would no longer provide insurance for E–350 vans after the policy in effect at the time of the deposition expired in January 2007. (*Id.* at 23:14–24:7, 10 Cal.Rptr.2d 58.) Pastor Edwards testified that Pentecostal Temple was encountering difficulties in securing insurance on the van from another company. (*Id.* at 26:4–14, 10 Cal.Rptr.2d 58.)

*B. ICFA*

Pentecostal Temple asserts two ICFA claims arising from its two purchases of E–350 vans. The ICFA provides protection against deceptive acts or practices in the conduct of trade or commerce, including the use of any "misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact." 815 Ill. Comp. Stat. § 505/2.

*1. Statute of Limitations*

Ford first contends that this Court should grant summary judgment in its favor on Pentecostal Temple's ICFA claims because they run afoul of the ICFA's statute of limitations. An action under the ICFA must be brought within three years after

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 59 of 261
PageID: 44997

the cause of action accrues. 815 Ill. Comp. Stat. § 505/10a(e). Ford asserts that a cause of action "generally" accrues when the plaintiff suffers injury, and assumes without providing authority that Pentecostal Temple's claims accrued here at the time of purchase of each van. (Ford Br. No. 3 at 3–4.) If true, Pentecostal Temple's claims would be untimely. Pentecostal Temple filed its initial class action complaint in this matter in state court on January 27, 2005. It purchased its first vehicle sometime in 1993 or 1994, and its second vehicle in 1999. Both purchases lie well outside the ICFA's three-year limitations period.

**\*21** However, Illinois state and federal courts have consistently applied a version of the discovery rule to ICFA claims. An ICFA claim accrues "when the plaintiff' knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused.' " *Highsmith v. Chrysler Credit Corp.,* 18 F.3d 434, 441 (7th Cir.1994) (quoting *Knox College v. Celotex Corp.,* 88 Ill.2d 407, 58 Ill.Dec. 725, 430 N.E.2d 976, 980 (Ill.1982)); *see also, e.g., Kopley Group V., L.P. v. Sheridan Edgewater Props., Ltd.,* 376 Ill.App.3d 1006, 315 Ill.Dec. 218, 876 N.E.2d 218, 231 (Ill.App.Ct.2007); *Bradley v. Alpine Constr. Co.,* 224 Ill.App.3d 432, 166 Ill.Dec. 695, 586 N.E.2d 653, 655 (Ill.App.Ct.1991) (collecting cases). [9]

Instead of discussing when Pentecostal Temple's causes of action accrued under the discovery rule, the parties focus primarily on whether Ford fraudulently concealed Pentecostal Temple's causes of action such that the statute of limitations should be tolled. Pentecostal Temple insists that the Court already rejected Ford's statute of limitations defense in the MTD Opinion, where, in a footnote, the Court stated that Ford's limitations argument "lack[s] merit" because Plaintiffs alleged a viable theory of fraudulent concealment. MTD Opinion at \*26 n. 14. However, that ruling arose in the context of a Rule 12(b)(6) motion on which the Court assumed the truth of Pentecostal Temple's allegations. Indeed, the Court denied Ford's motion with regard to the statute of limitations "because 7Fthe bar is not apparent on the face of the [C]omplaint.' " MTD Opinion at \*19 (quoting *Robinson v. Johnson,* 313 F.3d 128, 135 (3d Cir.2002)). At this summary judgment stage, where the Court assesses undisputed facts based on the extensive record developed during discovery, the Court's prior ruling on a motion to dismiss that Pentecostal Temple sufficiently *alleged* fraudulent concealment to defeat Ford's limitations defense does not automatically preclude a conclusion, based on the undisputed record, that Pentecostal Temple's ICFA claims are time-barred.

Pursuant to 735 Ill. Comp. Stat. § 5/13–215, if a defendant fraudulently conceals a cause of action from the plaintiff, the statute of limitations is tolled until the plaintiff "discovers that he or she has such cause of action" and runs for five years from that discovery. To constitute fraudulent concealment under § 5/13–215, a defendant's conduct must consist of "affirmative acts or representations calculated to lull or induce a claimant into delaying filing of his or her claim, or to prevent a claimant from discovering a claim. Mere silence on the part of the defendant is insufficient." *Orlak v. Loyola Univ. Health Sys.,* 228 Ill.2d 1, 319 Ill.Dec. 319, 885 N.E.2d 999, 1009 (Ill.2007). Here, a finding of fraudulent concealment would extend the statute of limitations under the ICFA from three years to five years, but determination of whether Pentecostal Temple timely filed its claims still depends upon when it discovered or reasonably should have discovered that it had causes of action, i.e. that it was injured and that such injury was wrongfully caused. Pentecostal Temple's ICFA claims did not necessarily accrue when its alleged injuries actually occurred—the date of purchase of the vehicles—but when Pentecostal Temple knew or reasonably should have known of the injuries and that they were wrongfully caused by Ford's allegedly deceptive practices.

**\*22** In a footnote, Ford argues that even if the discovery rule applies, Pentecostal Temple knew or reasonably should have known of its alleged injury before January 27, 2002, three years before it filed its claim. Ford lists various events recited in the Complaint that occurred prior to January 2002 and that should had given Pentecostal Temple actual or constructive knowledge of its cause of action, including government agency reports and media reports regarding the dangers of E–350 vans. (Ford Br. No. 3 at 4 n. 3.) Pentecostal Temple labels Ford's chosen " 'should have known' date" as "fictional" and "untenable." (Pls.' Omnibus Br. at 21 n. 12.) Yet Pentecostal Temple fails to respond substantively to the notion that before January 27, 2002, it knew that its 1998 van had handling difficulties, and had adjusted its usage accordingly.

Pastor Edwards testified at deposition that he and others at Pentecostal Temple first recognized issues with the handling of its 1998 van when filled to capacity in 1999 or 2000. No one noticed any rollover-related difficulties with regard to the 1994 vehicle. Pentecostal Temple's ICFA claims arise from Ford's alleged misrepresentations and omissions that "deceive[d] consumers into believing that they were purchasing a vehicle that could be used safely, legally and practically to accommodate and transport 15

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 60 of 261
PageID: 44998

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

passengers." (Compl.¶ 93.) Its cause of action accrued with regard to the 1998 van when it first discovered, after purchasing the vehicle, problems regarding its ability to transport 15 passengers. Viewing the undisputed facts in the light most favorable to Pentecostal Temple, this discovery date occurred by December 31, 2000, at the latest, because Pastor Edwards testified that the handling issue was first brought to his attention in "'99, [or] 2000." (Edwards Dep. at 85:18.) Pentecostal Temple filed its initial complaint in this matter in January 2005, more than three years past this latest discovery date. With regard to the claim based on the purchase of the 1994 vehicle, Pentecostal Temple sold that van in 1998 due to mechanical problems unrelated to the rollover-related concerns at issue in this matter (*id.* at 57:20– 58:5, 319 Ill.Dec. 319, 885 N.E.2d 999), and Pastor Edwards testified that no one at the church had observed any problems regarding driving the 1994 fully loaded with passengers (*id.* at 85:22–24, 319 Ill.Dec. 319, 885 N.E.2d 999). If Pentecostal Temple suffered any injury arising from its purchase of the 1994 van, it reasonably should have discovered that injury at the latest when it sold the vehicle in 1998. Therefore, both of Pentecostal Temple's ICFA claims are time-barred as they accrued under the discovery rule more than three years prior to its filing of the initial complaint.

Furthermore, Pentecostal Temple cannot establish fraudulent concealment sufficient to toll or extend the statute of limitations. To constitute fraudulent concealment, Ford's conduct must have consisted of affirmative acts or representations that caused Pentecostal Temple to delay filing its claims or prevent it from discovering its claims; mere silence or omissions are not enough. *Orlak,* 319 Ill.Dec. 319, 885 N.E.2d at 1009. Furthermore, "fraudulent misrepresentations which form the basis of the cause of action do not constitute fraudulent concealment under section 13– 215 in the absence of a showing that the misrepresentations tended to conceal the cause of action." *Foster v. Plaut,* 252 Ill.App.3d 692, 192 Ill.Dec. 238, 625 N.E.2d 198, 203 (Ill.App.Ct.1993). To do so, Pentecostal Temple must show that Ford's misrepresentations were made with the intent to deceive Pentecostal Temple and, crucially, that Pentecostal Temple detrimentally relied upon such misrepresentations. *Id.* at 203. Here, Pastor Edwards testified that before, during, and after the church purchased the vehicles, no one at Pentecostal Temple received any representations from Ford, saw any Ford marketing materials or media reports, or even observed that the E–350 purported to be a 15–passenger van. (Edwards Dep. at 79:4–11; 93:2–9; 95:5–8; 95:20–97:1; 98:16–99:6.) Even if Ford made the misrepresentations Plaintiffs allege, the undisputed record establishes that Pentecostal Temple did not detrimentally rely on any of these representations.

**\*23** While Pentecostal Temple satisfactorily alleged fraudulent concealment sufficient to withstand a motion to dismiss, there is no genuine dispute of material fact at this stage, based on the full record, regarding the lack of detrimental reliance by Pentecostal Temple. Nor does equitable estoppel aid Pentecostal Temple. Equitable estoppel "comes into play if the defendant takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations." *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 450–51 (7th Cir.1990). Pentecostal Temple presents no evidence of any actions taken by Ford specifically to prevent Pentecostal Temple from filing a timely claim; indeed, Pentecostal Temple received no representations from Ford and did not rely on any statements or conduct of Ford. For these reasons, Pentecostal Temple cannot avail itself of the tolling afforded by fraudulent concealment or equitable estoppel, and its ICFA claims are barred by that statute's three-year statute of limitations.

*2. Actual Deception*

Even if Pentecostal Temple's ICFA claims were timely filed, they fail on the merits because Pentecostal Temple cannot show that it was actually deceived by Ford's conduct. Under the ICFA, a plaintiff must establish "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 296 Ill.Dec. 448, 835 N.E.2d 801, 850 (Ill.2005); *see also First Midwest Bank, N.A. v. Sparks,* 289 Ill.App.3d 252, 257, 224 Ill.Dec. 812, 682 N.E.2d 373 (Ill.App.Ct.1997) ("Concealment is actionable where it is employed as a device to mislead and the concealed fact must be such that had the other party been aware of it, he would have acted differently."). Reliance is not an element of an ICFA claim, because "the Act is intended to provide broader consumer protection than the common law action of fraud." *Harkala v. Wildwood Realty, Inc.,* 200 Ill.App.3d 447, 146 Ill.Dec. 232, 558 N.E.2d 195, 199 (Ill.App.Ct.1990). Still, "a valid claim must show that the consumer fraud proximately caused plaintiff's injury." *Connick v. Suzuki Motor Co.,* 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 593 (Ill.1996). The Supreme Court of Illinois has held that "to maintain an action under the Act, the plaintiff must actually be deceived by a statement or omission that is made by the defendant. If a

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 61 of 261
PageID: 44999
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

consumer has neither seen nor heard any such statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause." *De Bouse v. Bayer,* 235 Ill.2d 544, 337 Ill.Dec. 186, 922 N.E.2d 309, 316 (Ill.2009); *see also Avery,* 296 Ill.Dec. 448, 835 N.E.2d at 861.

As discussed above, the undisputed record shows that Pentecostal Temple never received or observed any misrepresentations by Ford. "If plaintiff never saw the alleged misrepresentations, he cannot have been deceived by them and any misrepresentation cannot have proximately caused him injury." *Gredell v. Wyeth Labs., Inc.,* 367 Ill.App.3d 287, 305 Ill.Dec. 160, 854 N.E.2d 752, 757 (Ill.App.Ct.2006). Thus, any Ford misrepresentations cannot form the basis for Pentecostal Temple's ICFA claims. The same principle applies to Ford's alleged omissions. With regard to Ford's omissions regarding the safety of E–350 vehicles when fully loaded with 15 passengers, Pentecostal Temple could not have been deceived by such omissions because it did not observe the vans to be 15–passenger vehicles. At most, Pastor Edwards acknowledged that Pentecostal Temple sought to transport "10 to 15" people in the vans (Edwards Dep. at 59:20–22), but did not state that Pentecostal Temple purchased the vans because they were advertised or represented to be capable of carrying 15 passengers. As the Supreme Court of Illinois has observed, "in a consumer fraud action, the plaintiff must actually be deceived by a statement or omission. If there has been no communication with the plaintiff, there have been no statements and no omissions. In such a situation, a plaintiff cannot prove proximate cause." *De Bouse,* 337 Ill.Dec. 186, 922 N.E.2d at 316. Even if Pentecostal Temple's ICFA claims were timely filed, there is no genuine issue of material fact with regard to actual deception and proximate cause, and Ford is entitled to judgment as a matter of law on those claims. This Court will grant Ford's motion for summary judgment with regard to Pentecostal Temple's ICFA claims.

### C. Unjust Enrichment

**\*24** Under Illinois law, to state a claim of unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (Ill.1989). Where a plaintiff did not give money directly to a defendant, but that benefit was transferred by plaintiff to defendant by a third-party, retention of the benefit would be unjust if

"(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant." *Id.* at 161–62, 137 Ill.Dec. 19, 545 N.E.2d 672 (internal citations omitted); *see also Independent Trust Corp. v. Fidelity Nat'l Title Ins. Co. of N.Y.,* 577 F.Supp.2d 1023, 1047–48 (N.D.Ill.2008).

Here, Pentecostal Temple purchased its two E–350 vans from Currie Motors, a Ford dealership. Just as California Plaintiff First United presented no evidence regarding the relationship between the dealer-seller and Ford, here Pentecostal Temple can point to no evidence in the record even suggesting that the money it paid to Currie Motors ultimately made its way to Ford. Even if it could be described as "axiomatic" that Ford would receive money paid to a dealer for the purchase of a new Ford vehicle, this does not satisfy a party's evidentiary burden. Nor has Pentecostal Temple shown any agency relationship between Ford and Currie Motors, thus establishing some relationship whereby benefits conferred upon Currie Motors may be considered to be conferred upon Ford. As discussed with regard to the California Plaintiffs, Pentecostal Temple has not pointed to any evidence in the record whatsoever that would permit this Court to find any kind of agency relationship. Ford contends that Pentecostal Temple has not shown the essential element of Ford's retention of a benefit to Plaintiff's detriment, and Pentecostal Temple has not met its burden to produce evidence in support of its position.

Furthermore, even if Pentecostal Temple could raise a genuine issue of material fact as to whether Ford has retained a benefit to Pentecostal Temple's detriment, its unjust enrichment claim fails for the same substantive flaw that dooms its ICFA claim: it cannot show deception or other wrongful conduct directed at Pentecostal Temple. Of the three types of indirect unjust enrichment discussed above, only the second—"the defendant procured the benefit from the third party through some type of wrongful conduct"—applies here. Under Illinois law, unjust enrichment of this type "is not descriptive of conduct that, standing alone, will justify an action for recovery. Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct." *Alliance Acceptance Co. v. Yale Ins. Agency, Inc.,* 271 Ill.App.3d 483, 208 Ill.Dec. 49, 648

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 62 of 261
PageID: 45000

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

N.E.2d 971, 977 (Ill.Ct.App.1995) (quoting *Charles Hester Enters., Inc. v. Ill. Founders Ins. Co.,* 137 Ill.App.3d 84, 91 Ill.Dec. 790, 484 N.E.2d 349, 354 (Ill.App.Ct.1985)). "It is not enough to show that the defendant, at some point in time, behaved 'wrongly'; rather, the plaintiff must show that the defendant' procured the benefit ... through some type of wrongful conduct.' " *Indep. Trust Corp.,* 577 F.Supp.2d at 1051 (quoting *HPI,* 137 Ill.Dec. 19, 545 N.E.2d at 679). Pentecostal Temple's unjust enrichment claim cannot stand where it depends upon improper conduct but cannot show such conduct.

**\*25** It is undisputed, based on Pastor Edwards's deposition testimony, that no one at Pentecostal Temple received any representations from Ford, saw any Ford marketing materials, or even observed that the E–350 purported to be a 15–passenger van. Pentecostal Temple sold its first E–350 van for reasons unrelated to the handling issues giving rise to this litigation, and it purchased the 1998 van based on the desire for "something that would take more than four or five members at a time" and that would have ease of access for seniors and young people. (Edwards Dep. at 56:16–17; 57:1–19.) While other Plaintiffs in this action might have acquired their E–350 vans based on Ford's representations or labeling of the vehicles as 15–passenger vans, the undisputed record shows that Pentecostal Temple did not. Pentecostal Temple cannot show the required "causal link between the wrongful conduct and the acquisition by the defendant of the benefit." *Indep. Trust Corp.,* 577 F.Supp.2d at 1051.

Pentecostal Temple attempts to distinguish *HPI and Independent Trust Corp.* by observing that "each of those cases concern the transfer of money by a third party to the defendant, not payments by Plaintiffs that benefit the third-party (Ford dealers) and Defendant Ford." (Pls.' Omnibus Br. at 63.) However, this is a distinction without a difference. The additional element of wrongful conduct required under these circumstances applies where "someone other than the plaintiff transfers the benefit to the defendant." *Independent Trust Corp.,* 577 F.Supp.2d at 1047 (citing *HPI,* 137 Ill.Dec. 19, 545 N.E.2d at 679). Pentecostal Temple recognizes that Currie Motors is a "third-party," and contends that this third-party transferred the payments by Pentecostal Temple to Ford. On these undisputed facts, the wrongful conduct requirement outlined in *Independent Trust* and *HPI* applies. "[I]n the absence of any deception on the part of the defendant[ ], the requisite violation of 'fundamental principles of justice, equity, and good conscience' is not present." *Bober v. Glaxo Wellcome PLC,* 246 F.3d 934, 943 (7th Cir.2001) (dismissing

unjust enrichment claim because plaintiff did not state a claim under ICFA or other cause of action) (citing *Alliance Acceptance Co.,* 208 Ill.Dec. 49, 648 N.E.2d at 976–77). Because there is no genuine issue of material fact with regard to any deception of Pentecostal Temple by Ford, this Court will grant Ford's motion for summary judgment on Pentecostal Temple's unjust enrichment claim.

### D. Summary

For the foregoing reasons, this Court will grant Ford's motion for summary judgment on the ICFA and unjust enrichment claims brought by Pentecostal Temple. None of Pentecostal Temple's claims remain in this matter. Therefore, this Court will dismiss Pentecostal Temple as a party in this case.

## III. New Jersey

In the MTD Opinion, the Court denied Ford's motion to dismiss the claims brought by New Jersey Plaintiffs Macedonia Free Will Baptist Church ("Macedonia"), Faith Tabernacle Church ("Faith Tabernacle"), and Social Clubhouse, Inc ("Social Clubhouse"). New Jersey Plaintiff Bethany Baptist Church ("Bethany Baptist") was added to this litigation after Judge Ackerman decided Ford's motion to dismiss. Ford now moves for summary judgment as to all of the New Jersey Plaintiffs' claims: violation of the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8–1 *et seq.,* breach of express warranty, breach of implied warranty, and unjust enrichment. Ford also moves to strike a letter and affidavit filed by Plaintiffs on August 7, 2009.

### A. Material Facts

#### 1. Macedonia

**\*26** Macedonia purchased two new 2002 E–350 vans from Dayton Ford in Dayton, New Jersey on February 18, 2002, for $21,878.30 each. (Andresen Certif. No. 4, Ex. 1 at 10; Phillips Dep. (3/27/07) at 36:2–7.) Roy Phillips, a deacon at Macedonia, was responsible for purchasing the 2002 vans. (Phillips Dep. (3/27/07) at 32:16–24.) Phillips recalled seeing brochures for the E–350 van that stated that the E–350 van was a 15–passenger van with an 8–cylinder engine. (*Id.* at 30:8–16, 208 Ill.Dec. 49, 648 N.E.2d 971.) Phillips did not recall looking at any other materials from Ford regarding the vans. (*Id.* at 36:21–25, 208 Ill.Dec. 49, 648 N.E.2d 971.) Phillips stated that the salespeople at Dayton Ford told him the vans were "good for what [he] need[ed] it for" and that "a lot of people [were] buying them for church." (*Id.* at 34:6–13,

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 63 of 261
PageID: 45001
In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

208 Ill.Dec. 49, 648 N.E.2d 971.) Phillips could not remember anything else about the conversations with the salespeople at Dayton Ford. (*Id.* at 34:14–16, 208 Ill.Dec. 49, 648 N.E.2d 971.) Macedonia continues to use both 2002 vans (Ford's SUMF No. 4 at ¶ 2); however, Phillips stated that he "tr[ies] not to put more than ten" in the vans because he "just feel[s] less people it's safer" (Phillips Dep. (3/27/07) at 73:24–74:5).

### 2. Faith Tabernacle

Faith Tabernacle purchased a used 2000 E–350 van on August 30, 2001, from Giant Liccardi Auto Group in Green Brook, New Jersey for $23,521. (Andresen Certif. No. 5, Ex. 1 at 9; Bright Dep. at 17:23–18:23.) Bishop Herbert Bright testified that Faith Tabernacle was specifically seeking a vehicle that could carry 15 passengers. (Bright Dep. at 20:10–12.) Bright did not recall hearing any statements from Ford regarding the safety of the E–350 vans (*id.* at 95:14–24, 208 Ill.Dec. 49, 648 N.E.2d 971), and testified that Faith Tabernacle "ha[d] no direct contact with Ford regarding th[e] vehicle" (*id.* at 103:4–12, 208 Ill.Dec. 49, 648 N.E.2d 971). Faith Tabernacle ceased using the van to transport members because members began using alternative methods of transportation and because of increases in the cost of gasoline. (*Id.* at 63:3–17, 208 Ill.Dec. 49, 648 N.E.2d 971.) After learning of the alleged safety concerns, the church continued to use the van "without filling it to capacity." (*Id.* at 58:20–22, 208 Ill.Dec. 49, 648 N.E.2d 971.) Faith Tabernacle continues to use the van to "pick up the food from the food bank. And once, maybe, per month may use it to take the kids out." (*Id.* at 60:24–61:2, 208 Ill.Dec. 49, 648 N.E.2d 971.)

### 3. Social Clubhouse

Social Clubhouse purchased a total of five used E–350 vans from 1995 through 2003, which were all subsequently sold in 2003. (Ford's SUMF No. 6 at ¶ 1; Andresen Certif. No. 6, Ex. 1 at 8–9.) Prior to August 1999, Social Clubhouse purchased a used 1993 E–350 van and a used 1994 E–350 van, which were both later sold by Social Clubhouse in 2003. (Andresen Certif. No. 6, Ex. 1 at 8.) Social Clubhouse has not identified where the 1993 and 1994 vans were purchased or to whom they were sold. (*Id.*) In November 2001, Social Clubhouse purchased a used 1997 E–350 van from Craig Auto Sales in Brooklyn, New York, and in June 2002, Social Clubhouse purchased a second used 1997 E–350 van from an unidentified used auto dealer in Philadelphia, Pennsylvania. (*Id.* at 9.) In 2003, Social Clubhouse sold both of the 1997 E–350 vans to M & R Auto Sales in Plainfield, New Jersey. (*Id.*) In April 2003, Social Clubhouse purchased a used 2002

E–350 van from Autoland in Springfield, New Jersey. (*Id.* at 8.) Social Clubhouse sold the 2002 Van four months later to Williamsburg Leasing of Brooklyn, New York. (*Id.* at 8–9.) Michael Samet, a vice-president of Social Clubhouse, did not recall reading any brochures or viewing any advertisements prior to purchasing any of the vans, nor did he recall any representations made by salespersons relating to van characteristics other than that they were 15–passenger vans that held 15 people. (Samet Dep. at 20:12–14; 64:6–66:10; 75:8–76:2.) Samet testified that, when purchasing the vans, he only knew that a 15–passenger van "was the largest vehicle that [Social Clubhouse] could purchase to carry the most amount of people without having a CDL license." (*Id.* at 69:8–19.) Social Clubhouse used the vans to "provide door to door transportation to its facilities and transportation for social/recreational services including bi-weekly outings and trips." (Andresen Certif. No. 6, Ex. 1 at 13.)

### 4. Bethany Baptist

**\*27** Bethany Baptist purchased a new 2001 van in 2001 from Holman Ford in Stratford, New Jersey for approximately $28,000. (Andresen Certif. No. 11, Ex. 1 at 2; Ford's SUMF No. 11 at ¶ 1.) Bethany Baptist purchased a new 2003 van in 2003 from Princeton Ford in New Jersey for approximately $28,000. (Andresen Certif. No. 11, Ex. 1 at 2; Ford's SUMF No. 11 at ¶ 1.) Bethany Baptist also owns a 1993 van and a 1994 van, but it has not provided any information regarding the purchases of those vehicles. (Congleton Dep. at 16:3–19; 49:17–50:9; Ford's SUMF No. 11 at ¶ 1.) Bethany Baptist does not know if anyone at the Ford dealerships made any statements concerning the vans at the time of purchase and does not know if it looked at any advertising material. (Congleton Dep. at 32:21–33:2, 35:14–17, 59:4–9.) James Congleton, the director of the transportation ministry at Bethany Baptist, testified that around 2006 he began limiting the number of passengers in the vans to ten or eleven people "[b]ecause [the church] heard that they became unsafe for carrying more people or a lot of cargo, that they were top heavy." (*Id.* at 18:14–19:6.) Prior to that time, the church typically carried the full capacity on Sundays, but did not do so for services during the week. (*Id.* at 45:8–23.)

### B. NJCFA

#### 1. Motion for Summary Judgment

Ford contends that this Court should grant summary judgment with respect to the New Jersey Plaintiffs' NJCFA claims because the New Jersey Plaintiffs have failed to establish an

Case 1:19-md-02875-RMB-SAK     Document 1748-28     Filed 11/10/21     Page 64 of 261
PageID: 45002
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

"ascertainable loss" as required by N.J. Stat. Ann. § 56:8–19. This Court agrees and will grant summary judgment with respect to those claims. The NJCFA provides that

> [a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction.

N.J. Stat. Ann. § 56:8–19. The New Jersey Supreme Court has held that to give effect to the "ascertainable loss" requirement of the NJCFA, "a private plaintiff must produce evidence from which a factfinder could find or infer that the plaintiff suffered an actual loss." *Thiedemann v. Mercedes–Benz USA, LLC,* 183 N.J. 234, 248, 872 A.2d 783 (2005). "To raise a genuine dispute about such a fact, the plaintiff must proffer evidence of loss that is not hypothetical or illusory," and in order to avoid summary judgment, the evidence "must be presented with some certainty demonstrating that it is capable of calculation." *Id.* "The certainty implicit in the concept of an 'ascertainable' loss is that it is quantifiable or measurable." *Id.; see also Arcand v. Brother Int'l Corp.,* 673 F.Supp.2d 282, 300 (D.N.J.2009) (stating that plaintiff must, "[a]t the very least, ... be able to quantify or measure what loss he has suffered or will suffer"). Furthermore, "by the time of a summary judgment motion, it is the plaintiff's obligation to be able to make such a demonstration or risk dismissal of the cause." *Thiedemann,* 183 N.J. at 249, 872 A.2d 783.

**\*28** The Court in *Thiedemann* recognized that "[t]he ascertainable loss requirement operates as an integral check upon the balance struck by the NJCFA between the consuming public and sellers of goods." *Id.* at 251, 872 A.2d 783. The Court acknowledged the importance of that balance by noting that "[d]efects can, and do, arise," and that "[t]he mere fact that [a] ... defect arises does not establish, in and of itself, an actual and ascertainable loss to the ... purchaser." *Id.; see also Solo v. Bed Bath & Beyond, Inc .,* Civ. No. 06–1908, 2007 WL 1237825, at \*3 (D.N.J. Apr. 26, 2007) (holding that plaintiff, alleging that a sheet set purchased from defendant contained a thread count less than half of what was

advertised, nonetheless failed to set forth a measurable loss sufficient to satisfy the ascertainable loss requirement). Thus, even though a product may be defective, a subjective assertion of a diminution in value or loss of a benefit-of-the-bargain will be insufficient to support a quantifiable loss; rather, the plaintiff must produce specific proofs. *Thiedemann,* 183 N.J. at 252, 872 A.2d 783; *see also Parker v. Howmedica Osteonics Corp.,* Civ. No. 07–02400, 2008 WL 141628, at \*4 (D.N.J. Jan.14, 2008) ("When a plaintiff fails to give particulars regarding their ascertainable loss, and when they offer broad and conclusory allegations, the ascertainable loss requirement has not been met.").

In this case, the New Jersey Plaintiffs have failed to establish an ascertainable loss. The New Jersey Plaintiffs repeatedly assert that they have suffered various losses, but fail to establish any of those losses with any degree of certainty. The allegations set forth by the New Jersey Plaintiffs are replete with generalized statements concerning loss; however, the evidence submitted by the New Jersey Plaintiffs contains no specific proofs such that the losses could be quantified or measured. It was the New Jersey Plaintiffs' obligation to show an ascertainable loss in opposition to Ford's motion for summary judgment, and because the New Jersey Plaintiffs have failed to provide particularized evidence of such calculable losses, this Court will grant Ford's motions for summary judgment with respect to the New Jersey Plaintiffs' NJCFA claims.

### 2. Motion to Strike

Ford filed its motions for summary judgment on March 24, 2009. The New Jersey Plaintiffs filed their opposition brief on May 22, 2009, and Ford filed its reply brief on July 10, 2009. Nearly one month later, on August 7, 2009, Plaintiffs submitted a letter to the court expressing several additional arguments in opposition to Ford's summary judgment motion with respect to the New Jersey Plaintiffs, along with an affidavit pursuant to Federal Rule of Civil Procedure 56(f) requesting additional time for discovery. On August 21, 2009, Ford filed a motion to strike Plaintiffs' August 7 letter and affidavit as improper sur-replies and as insufficient to comply with Rule 56(f). For the following reasons, this Court will grant Ford's motion to strike.

**\*29** Local Rule 7.1(d)(6) provides that "[n]o sur-replies are permitted without permission of the Judge or Magistrate Judge to whom the case is assigned." A court may strike a party's sur-reply if filed without permission from the court. *See, e.g., Hailstalk v. Antique Auto Classic Car Storage, LLC,*

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 65 of 261
PageID: 45003

Civ. No. 07–5195, 2008 WL 4192275, at *8 (D.N.J. Sept.9, 2008); *Niyogi v. Intersil Corp.,* Civ. No. 05–4685, 2006 WL 1128725, at *3 (D.N.J. Apr.27, 2006). This Court finds that Plaintiffs' letter and affidavit, filed without permission from the Court, constitute improper sur-replies. *See Cooper v. Cape May County Bd. of Soc. Servs.,* 175 F.Supp.2d 732, 741– 42 (D.N.J.2001) (concluding that letter submitted by plaintiff after conclusion of summary judgment briefing constituted improper sur-reply). Therefore, this Court will grant Ford's motion to strike Plaintiffs' August 7 letter and affidavit.

Even if the Court were to consider the arguments raised in Plaintiffs' letter and accompanying affidavit, Plaintiffs' arguments are nonetheless unavailing. As discussed above, Ford argued, and this Court agrees, that the New Jersey Plaintiffs have failed to submit any evidence, such as expert testimony, that would establish an ascertainable loss with regard to the New Jersey Plaintiffs' NJCFA claims. In their August 7 letter, Plaintiffs contend that the Court should deny Ford's summary judgment motion because Plaintiffs are not yet required to submit such expert testimony. Plaintiffs base their argument on the contention that the Fifth Amended Pretrial Scheduling Order, filed on April 19, 2007, did not require the parties to disclose experts until 45 days after the Court issued a ruling on class certification. Plaintiffs' argument is without merit. The Fifth Amended Pretrial Scheduling Order has been inconsistent with subsequent scheduling orders since October 18, 2008, when the Eighth Amended Pretrial Scheduling Order was adopted. That Order provided a January 12, 2009 deadline for Ford's summary judgment motions and a March 13, 2009 deadline for Plaintiffs ' motion for class certification. The deadlines regarding depositions of experts in that Order relate to the experts Plaintiffs would rely on for their class certification motion.

Plaintiffs contend, however, that the Eighth Amended Pretrial Scheduling Order contemplates that experts would be disclosed, and expert testimony taken, after a decision on Plaintiffs' motion for class certification, which was after the deadline set for Ford's summary judgment motions. Plaintiffs rely on a clause in the fourth paragraph of the Eighth Amended Pretrial Scheduling Order that provides that "[p]laintiffs will not waive any arguments that expert discovery is required precluding summary judgment." Plaintiffs, however, fail to quote the entire sentence, which provides more context to the clause. The sentence in its entirety reads: "Plaintiffs will not waive any arguments that expert discovery is required precluding summary judgment,

*but plaintiffs will continue bearing the burden under Federal Rule of Civil Procedure 56(f) in this regard."* (emphasis added). Thus, the Eighth Amended Pretrial Scheduling Order explicitly provides that although Plaintiffs did not waive their arguments regarding expert discovery, the Plaintiffs were still required to comply with the requirements of Rule 56(f) with regard to Ford's motions for summary judgment.

**\*30** Pursuant to Rule 56(f), if a party cannot at the time of a summary judgment motion present facts essential to justify its opposition to the summary judgment motion, and the party believes that additional time for discovery is needed, that party must file an affidavit setting forth why the additional time is needed and what information is sought. *Pastore v. Bell Tel. Co.,* 24 F.3d 508, 510–11 (3d Cir.1994). The Third Circuit has made clear that "in all but the most exceptional cases, failure to comply with Rule 56(f) is fatal to a claim of insufficient discovery." *Bradley v. United States,* 299 F.3d 197, 207 (3d Cir.2002). [10]

It is undisputed that Plaintiffs did not file a Rule 56(f) affidavit in response to Ford's motions for summary judgment. Plaintiffs, however, contend that their brief in opposition to Ford's summary judgment motions is sufficient to meet the affidavit requirement of Rule 56(f). The Third Circuit has expressly rejected that argument. In *Pastore,* the Third Circuit held that

> Rule 56(f) clearly requires that an affidavit be filed. The purpose of the affidavit is to ensure that the nonmoving party is invoking the protection of Rule 56(f) in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition. An unsworn memorandum opposing a party's motion for summary judgment is not an affidavit.

24 F.3d at 511 (citation omitted). Thus, this Court will not accept Plaintiffs' brief in opposition to the summary judgment motions as a replacement for Rule 56(f)'s affidavit requirement. Moreover, Plaintiffs' failure to submit a Rule 56(f) affidavit is fatal to the arguments in their August 7 letter that they should be allowed additional time to submit expert testimony to oppose Ford's summary judgment motions.

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 66 of 261
PageID: 45004

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

In an attempt to remedy their failure to submit a timely Rule 56(f) affidavit, Plaintiffs included a Rule 56(f) affidavit with their August 7 letter to the Court. This affidavit, like the letter, constitutes an improper sur-reply. Even if the Court were to consider the Rule 56(f) affidavit, it fails to meet the substantive content requirements of Rule 56(f). In order for an affidavit to comply with requirements of Rule 56(f), the affidavit must "identify[ ] 'with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.' " *Bradley,* 299 F.3d at 206–07 (quoting *St. Surin v. V.I. Daily News, Inc.,* 21 F.3d 1309, 1314 (3d Cir.1994)). A court need not grant a Rule 56(f) request "when the party opposing the [summary judgment] motion simply relies on vague assertions that additional discovery will produce needed, but unspecified facts, particularly when 'ample time and opportunities for discovery have already lapsed." *SEC v. Chester Holdings, Ltd.,* 41 F.Supp.2d 505, 517 (D.N.J.1999) (citation omitted).

Plaintiffs' August 7 affidavit simply contains a portion of the procedural history of the case and then states that "[b]ecause Plaintiffs are not scheduled to disclose experts to be relied upon until forty-five (45) days after the Court's ruling on Plaintiffs' Motion for Class Certification, Plaintiffs cannot present expert facts essential to justify its Opposition to Ford's Motions for Summary Judgment." Plaintiffs' affidavit does not specify what information the Plaintiffs are seeking or how that information, if uncovered, would preclude summary judgment. Thus, not only have Plaintiffs failed to timely file a Rule 56(f) affidavit, but the untimely affidavit, filed as an improper sur-reply, does not even meet the requirements that would allow the Court to grant a Rule 56(f) request.

**\*31** In summary, this Court will grant Ford's motion to strike Plaintiffs' August 7 letter and affidavit. These documents constitute improper sur-replies, and moreover, the arguments presented in the letter and affidavit are without merit and are insufficient to satisfy the requirements of Rule 56(f).

### C. Express Warranty

Ford also contends that this Court should grant its summary judgment motions with respect to the New Jersey Plaintiffs' express warranty claims. Under New Jersey law, an express warranty can be created by the following:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

N.J. Stat. Ann. § 12A:2–313. Thus, "an express warranty is created when a promise is made by a seller to a buyer which relates to a good and becomes the basis of the bargain." *Liberty Lincoln–Mercury, Inc. v. Ford Motor Co.,* 171 F.3d 818, 824 (3d Cir.1999).

In *Simmons v. Stryker Corp.,* the defendants were manufacturers of a device referred to as a "pain pump" that delivered infusions of anesthetics to surgical patients. Civ. No. 08–3451, 2008 WL 4936982, at \*1 (D.N.J. Nov. 17, 2008). The plaintiff alleged that the manufacturer expressly warranted that the pain pump was fit and safe for the purpose for which it was to be used. *Id.* The plaintiff argued that the manufacturer breached the express warranty because the pain pump was not safe and caused injuries to users. *Id.* The court concluded that the plaintiff's breach of warranty claim was "devoid of any 'factual matter' to support the existence of an express warranty," and the court dismissed the plaintiff's claims because the plaintiff "identifie[d] no source whatsoever of any alleged warranty." *Id* . at \*2.

In this case, the New Jersey Plaintiffs have failed to identify a source for the alleged warranty regarding the safety level of transporting 15 passengers in the E–350 van. Although the van was marketed as a "15–passenger" van, New Jersey Plaintiffs have not submitted any evidence that Ford or any Ford representatives made any representations concerning the "safety" of transporting 15 passengers. Ford's advertisements and brochures described the E–350 van as a "15–passenger van." Although that description could be interpreted to *imply* a certain level of safety with regard to carrying 15 passengers, the description alone does not form the basis for an express warranty. Thus, the New Jersey Plaintiffs have failed to establish that Ford made an express representation regarding the safety of the E–350 vans and, therefore, this Court will grant Ford's motions for summary judgment with respect to the New Jersey Plaintiffs' express warranty claims.

Case 1:19-md-02875-RMB-SAK   Document 1748-28   Filed 11/10/21   Page 67 of 261
PageID: 45005

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

### D. Implied Warranty

**\*32** Ford also seeks summary judgment on the New Jersey Plaintiffs' implied warranty claims, arguing that summary judgment is required because the New Jersey Plaintiffs cannot show an actual injury or ascertainable loss. Ford's argument is based on the assertion that the New Jersey Supreme Court's decision in *Thiedemann,* discussed above with regard to the New Jersey Plaintiffs' NJCFA claims, also applies to warranty claims. Ford repeatedly asserts simply that Thiedemann requires summary judgment on the New Jersey Plaintiffs' "CFA and warranty claims," but Ford fails to offer any explanation as to how Thiedemann applies to warranty claims. In Thiedemann, the Court focused only on the plaintiffs' claims brought under the NJCFA. The Court expressly noted that the "appeal focus[ed] on the [NJCFA's] enigmatic requirement of an 'ascertainable loss,' " and that certification was granted "to review whether plaintiffs had made out a case that could withstand defendant's motion for summary judgment in respect of the issue of ascertainable loss." *Thiedemann,* 183 N.J. at 238, 240, 872 A.2d 783. Ford has not cited any authority to support its contention that the NJCFA's "ascertainable loss" requirements apply equally to claims involving breaches of an implied warranty, and this Court is unaware of any case that extends the Court's holding in *Thiedemann* to such claims. Absent any other argument from Ford to support its motions for summary judgment on this issue, this Court will deny Ford's motions with respect to the New Jersey Plaintiffs' implied warranty claims.

### E. Unjust Enrichment

In New Jersey, "[t]o establish a claim for unjust enrichment, 'a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust.' " *Iliadis v. Wal–Mart Stores, Inc.,* 191 N.J. 88, 110, 922 A.2d 710 (2007) (quoting *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554, 641 A.2d 519 (1994). "That quasi-contract doctrine also 'requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.' " *Id.* (quoting *VRG Corp.,* 135 N.J. at 554, 641 A.2d 519). Moreover, "[a] claim of unjust enrichment also requires that the plaintiff allege a sufficiently direct relationship with the defendant to support the claim." *Nelson v. Xacta 3000 Inc.,* Civ. No. 08–5426, 2009 WL 4119176, at \*7 (D.N.J. Nov.24, 2009) (citing *Maniscalco v. Brother Int'l Corp.,* 627 F.Supp.2d 494, 505–06 (D.N.J.2009). Furthermore, "it is the plaintiff's (as opposed

to a third party's) conferral of a benefit on defendant which forms the basis of an unjust enrichment claim." *Eli Lilly and Co. v. Roussel Corp.,* 23 F.Supp.2d 460, 496 (D.N.J.1998). For example, in *Cooper v. Samsung Electronics America, Inc.,* the plaintiff filed a claim for unjust enrichment against Samsung Electronics after purchasing an allegedly defective Samsung television from a retailer, Ultimate Electronics. Civ. No. 07–3853, 2008 WL 4513924, at \*10 (D.N.J. Sept. 30, 2008). The court concluded that despite the fact that the television was manufactured by Samsung, there was no relationship conferring any direct benefit on Samsung through the plaintiff's purchase from the retailer, and that therefore plaintiff failed to establish unjust enrichment. *Id.*

**\*33** Here, several of the New Jersey Plaintiffs purchased used vehicles. Faith Tabernacle purchased its used 2000 van from Giant Liccardi Auto Group. Social Clubhouse purchased a used 2002 van from Autoland, a used 1997 van from Craig Auto Sales, a used 1997 van from an unidentified used car dealer in Philadelphia, Pennsylvania, and failed to identify where the 1993 and 1994 used vans were purchased. Bethany Baptist has not identified from whom it purchased its 1993 and 1994 Ford vans. With respect to the sale of these eight vans, the New Jersey Plaintiffs have failed to establish any relationship between these dealers and Ford. They point to no evidence that Ford received any benefit from the sales at the New Jersey Plaintiffs' expense. Therefore, this Court will grant Ford's motions for summary judgment with respect to the unjust enrichment claims of Faith Tabernacle and Social Clubhouse, and with respect to the unjust enrichment claims of Bethany Baptist that are based on the 1993 and 1994 Ford vans.

The remaining unjust enrichment claims are based on new van purchases from Ford dealerships. Macedonia purchased two new 2002 vans from Dayton Ford, and Bethany Baptist purchased a new 2001 van from Holman Ford and a new 2003 van from Princeton Ford. Like other Plaintiffs in this matter, these New Jersey Plaintiffs point to no evidence in the record regarding the relationship between these dealerships and Ford and whether money paid to these dealerships was ultimately conferred upon Ford. This Court will not take judicial notice of an agency relationship based solely upon conclusory assertions that such a relationship is "axiomatic." *See Westerdale v. Kaiser–Frazer Corp.,* 6 N.J. 571, 574, 80 A.2d 91 (1951) ("While courts will take judicial notice of facts of common knowledge relating to business and occupations, such as the general course of business and the usual method of transacting it, we are unable to agree ... that

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 68 of 261 PageID: 45006

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

it is common knowledge that a manufacturer of automobiles supervises and controls its dealers ...."). These New Jersey Plaintiffs, by failing to present any evidence of a sufficiently direct relationship between Ford and the dealerships such that Ford received a benefit from these New Jersey Plaintiffs' purchases, have failed to satisfy their evidentiary burden. This Court will grant Ford's motions for summary judgment, without prejudice, with respect to the unjust enrichment claims of Macedonia and those of Bethany Baptist that are based on the vans purchased from the Ford dealerships. Macedonia and Bethany Baptist shall have until August 13, 2010 to show cause to cure this evidentiary deficiency and demonstrate that summary judgment should not be granted in Ford's favor on these unjust enrichment claims. Ford shall have until September 13, 2010 to file a response to Macedonia's and Bethany Baptist's submissions.

*F. Summary*

For the foregoing reasons, this Court will grant Ford's motions for summary judgment with regard to the New Jersey Plaintiffs' NJCFA and express warranty claims and deny Ford's motions for summary judgment with regard to the implied warranty claims. The Court will grant Ford's motion for summary judgment with respect to the unjust enrichment claims of Faith Tabernacle and Social Clubhouse, and with respect to the unjust enrichment claims of Bethany Baptist that are based on the 1993 and 1994 vans. The Court will grant Ford's motions for summary judgment without prejudice with respect to the unjust enrichment claims of Macedonia and those of Bethany Baptist that are based on the vans 2001 and 2003 vans purchased from the Ford dealerships. Macedonia and Bethany Baptist shall have until August 13, 2010 to show cause to cure the evidentiary deficiency identified by the Court and demonstrate that summary judgment should not be granted in Ford's favor on the implicated unjust enrichment claims. Ford shall have until September 13, 2010 to file a response to Macedonia's and Bethany Baptist's submissions. Finally, this Court will grant Ford's motion to strike the New Jersey Plaintiffs' August 7 letter and affidavit.

## IV. Georgia

**\*34** Georgia Plaintiff Allen Temple AME Church ("Allen Temple") was added to this litigation after Judge Ackerman decided Ford's motion to dismiss. Ford now moves for summary judgment as to all of Allen Temple's claims: breach of express warranty; breach of implied warranty; violation of the Georgia Fair Business Practices Act ("Georgia FBPA"), Ga.Code Ann. § 10–1–392 *et seq.;* and unjust enrichment.

*A. Material Facts*

Allen Temple purchased two Ford E–350 vans. It purchased a new 2001 vehicle in June 2001 for $27,834.25 from Beaudry Ford. (Andresen Certif. No. 8, Ex. 3 at ATA0003.) In July 2002, Allen Temple bought a new 2002 E–350 from Lou Sobh Ford for $27,771 through a no-interest financing agreement with Ford Motor Credit. (*Id.* at ATA0005–06.) At deposition, Henry Adams testified on behalf of Allen Temple and responded in the affirmative to the question "Is it your understanding that Ford represented to you that this was a safe 15–passenger vehicle?" (Adams Dep. at 124:12– 15.) Yet, Adams earlier testified that Allen Temple had no communication with Ford prior to its purchases (*id.* at 29:16– 20, 80 A.2d 91; 43:17–19) and saw no advertisements by Ford "that had to deal with the reliability and safety of the vehicle" (*id.* at 96:21–24, 80 A.2d 91). Allen Temple continues to use the vehicles, but has elected to not carry more than 12 persons at one time in each vehicle since 2002 or 2003, after it purchased the second van, based on media reports about the van's rollover propensity. (*Id.* at 26:7–23, 80 A.2d 91.)

*B. Express and Implied Warranty*

Ford argues that this Court should grant summary judgment in its favor on Allen Temple's warranty claims because Allen Temple did not give notice of its claims as required by UCC § 2–607(3)(a). As codified under Georgia law, as a prerequisite to an express or implied warranty claim, "[t]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Ga.Code Ann. § 11–2–607(3)(a). Allen Temple contends that notice need not be given prior to filing suit, but only must be given "at some point in time." (Pls.' Omnibus Br. at 45.) Therefore, Allen Temple asserts that filing suit—here, by joining this litigation after resolution of the motion to dismiss—satisfied the notice requirement. While notice is a condition precedent to recovery for breach of warranty, Georgia courts have concluded that under appropriate circumstances, "[s]ervice of the original suit" can be reasonable notice. *See Hudson v. Gaines,* 199 Ga.App. 70, 403 S.E.2d 852, 854 (Ga.Ct.App.1991). However, in *Hudson* the court emphasized that the plaintiff filed suit eight months after the event giving rise to the warranty claims. *Id.* Here, Allen Temple joined this litigation in November 2008, more than six years after Allen Temple's purchases of its E–350 vehicles and approximately five years after Allen Temple discovered potential handling problems with the vehicles. Ford argues that this lengthy delay was unreasonable as a

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 69 of 261
PageID: 45007

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

matter of law and therefore insufficient under § 11–2–607(3)(a).

**\*35** In determining whether notice is reasonable, courts look to the purpose of the rule: facilitation of settlement negotiations and minimization of prejudice by allowing the seller the early opportunity to cure the defect or reduce damages. *See, e.g., Great Western Press, Inc. v. Atlanta Film Converting Co.,* 223 Ga.App. 861, 479 S.E.2d 143, 145 (Ga.Ct.App.1996). "Generally, whether notice has been reasonably given presents a question of fact, but summary adjudication is appropriate if the uncontroverted facts establish that notice was unreasonable as a matter of law." *Wal–Mart Stores, Inc. v. Wheeler,* 262 Ga.App. 607, 586 S.E.2d 83, 85 (Ga.Ct.App.2003). Here, this Court cannot resolve the reasonableness question because, as the Georgia Court of Appeals held in *Wal–Mart,* for a consumer or retail breach of warranty claim, "delay alone without prejudice caused by such delay is insufficient to bar relief to the plaintiff under § 11–2–607(3)(a)." *Id.* at 86. [11] Even if Ford could establish based on undisputed facts that Allen Temple's delay in providing notice was unreasonable under the circumstances, this Court cannot preclude Allen Temple's warranty claims absent any evidence of prejudice to Ford from the delay. In *Wal–Mart,* the Georgia Court of Appeals affirmed the trial court's denial of defendant's motion for summary judgment because defendant did not present any evidence of prejudice to the trial court. *Id.* at 87. Ford likewise fails to present any evidence of prejudice. It fails even to mention the prejudice requirement and points to no evidence whatsoever in the record regarding any prejudice it might have suffered from Allen Temple's delay. Therefore, this Court cannot grant summary judgment in Ford's favor on Allen Temple's warranty claims on the basis of lack of notice.

While in many of its other summary judgment motions, Ford presents various other meritorious arguments against Plaintiffs' warranty claims, it relies solely on the notice theory in moving for summary judgment against Allen Temple. Absent any other argument from Ford to support its motion for summary judgment on Allen Temple's warranty claims, this Court will deny Ford's motion with regard to these claims.

### C. Georgia FBPA

The Georgia FBPA bars "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce." Ga.Code Ann. § 10–1–393(a). The FBPA defines "consumer acts or practices" as "acts or practices intended to encourage consumer transactions," Ga.Code Ann. § 10–1–392(a)(7), and defines "consumer transactions" as "the sale, purchase, lease, or rental of goods, services, or property, real or personal, primarily for personal, family, or household purposes," Ga.Code Ann. § 10–1–392(a)(10). Any "person" who suffers injury or damage from violation of the Georgia FBPA may bring a claim under the statute. Ga.Code Ann. § 10–1–399(a). Allen Temple asserts FBPA claims with regard to the two E–350 vehicles it purchased.

**\*36** Ford argues that Allen Temple lacks standing to assert a claim under the Georgia FBPA because it is not a "natural person" and it did not purchase the vans "primarily for personal, family, or household purposes." In the MTD Opinion, Judge Ackerman dismissed other state consumer fraud statute claims because the churches were not natural persons and did not purchase the vehicles for these consumer purposes. Allen Temple argues that the purchases took place "in the conduct of consumer acts or practices" and that a business may assert a Georgia FBPA claim if it acted as a consumer. (Pls.' Omnibus Br. at 19.) Ford responds that Allen Temple did not act as a consumer here because it did not purchase its vehicles for personal, family, or household purposes.

Both parties fail to cite the statutory definition of "person." The statute defines "person" as "a natural person, corporation, trust, partnership, incorporated or unincorporated association, or any other legal entity." Ga.Code Ann. § 10–1–392(a)(24). As opposed to other states' consumer fraud statutes (such as California), the Georgia FBPA extends standing to corporations and does not limit standing to natural persons. Ga.Code Ann. § 10–1–399(a) ("Any person who suffers injury or damage as a result of a violation ... may bring an action."). Therefore, Allen Temple has standing to bring its Georgia FBPA claim as long as it complains of deceptive business practices "intended to encourage consumer transactions."

Allen Temple contends that Ford's selling of the E–350 vans to the public and its advertising representations were intended to encourage consumer transactions. Ford argues that Allen Temple produced no evidence that the alleged injury suffered by Allen Temple stemmed from activity intended to encourage transactions for personal, family, or household purposes in that Ford marketed the vans to churches and other community groups. The Court of Appeals of Georgia has held that in determining whether

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 70 of 261
PageID: 45008

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

a defendant's actions took place within the context of the consumer marketplace under the Georgia FBPA, "two factors are determinative: (a) the medium through which the act or practice is introduced into the stream of commerce; and (b) the market on which the act or practice is reasonably intended to impact." *State ex rel. Myles v. Meredith Chevrolet, Inc.,* 145 Ga.App. 8, 244 S.E.2d 15, 18 (Ga.Ct.App.1978). Deceptive advertisements to the general public triggers the protections of the Georgia FBPA, while those "even though in a public medium, addressed to the nonconsuming public are not in contravention of the Act if such advertisements cannot be said to reasonably tend to encourage consumer transactions." *Id.* (stating that such advertisements "would not be violative if the medium chosen reasonably restricted the audience (i.e., market) to nonconsumers, even though the product so advertised were eventually to reach the hands of consumers").

Caselaw applying these standards is scarce. In *Meredith Chevrolet,* defendant allegedly rolled back the odometers on vehicles sold at a *private* auction to retail car dealers. The court concluded that while the deceptive act itself "can reasonably be said to tend to encourage a consumer transaction (thus supplying the market impact factor), the medium chosen to introduce that act into the stream of commerce, i.e., a private sale limited to nonconsumers, is outside the context of consumer commerce." *Id.* at 19. Non-consumers also may not bring suit under the Georgia FBPA for misrepresentations made by their competitors to the general consuming public. *Friedlander v. PDK Labs, Inc.,* 266 Ga. 180, 465 S.E.2d 670, 671 (Ga.1996).

**\*37** Here, although Ford allegedly made misrepresentations to the public, Allen Temple cannot maintain suit because Ford's purported conduct with regard to Allen Temple did not occur in a consumer context. Allen Temple did not purchase the vans primarily for personal, family, or household use. The court in *Meredith Chevrolet* stated that "[o]ffering a product for sale by opening one's doors to the general public would trigger the prohibitions of the Act if some deceptive act or practice were involved." 244 S.E.2d at 18–19. This principle would seem to apply here, as Ford did not limit sales of the E–350 vans to "private offers for sale, communicated between merchants." *Id.* However, *Friedlander* instructs that the identity and nature of the plaintiff also matters. The competitor-plaintiff in *Friedlander* was not a consumer, and neither is Allen Temple here under the statutory definition of "consumer transaction." While a "person" with standing under the statute includes an unincorporated association,

such a plaintiff still must bring a claim alleging injury to itself based on consumer acts or transactions, and Allen Temple cannot do so here. All Plaintiffs allege that Ford marketed the E–350 to church groups and other organizations (Compl.¶ 16), and there is no evidence in the record that Ford engaged in similar campaigns promoting the E–350 for "personal, family, or household use." Thus, the deceptive acts in which Allen Temple alleges Ford engaged did not involve consumer transactions as defined by the Georgia FBPA or promote such transactions. It is undisputed that Allen Temple did not purchase the vans for any particular parishioner's or employee's personal, family, or household use. Rather, it bought the vans for use in the course of church business, even though that business might have additionally benefitted individual members personally. Therefore, Allen Temple lacks standing to assert its Georgia FBPA claims.

For these reasons, this Court will grant Ford's motion for summary judgment as to Allen Temple's FBPA claims.

### D. Unjust Enrichment
Under Georgia law, an unjust enrichment claim may lie in the absence of a contract "when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for." *Wachovia Ins. Servs., Inc. v. Fallon,* 299 Ga.App. 440, 682 S.E.2d 657, 665 (Ga.Ct.App.2009) (citations and quotations omitted). "Inherent in the theory of unjust enrichment is the requirement that the receiving party knew of the value being bestowed upon him by another and failed to stop the act or to reject the benefit prior to its conferment." *Hollifield v. Monte Vista Biblical Gardens, Inc.,* 251 Ga.App. 124, 553 S.E.2d 662, 670 (Ga.Ct.App.2001).

Allen Temple purchased its vehicles from Ford dealers, but just as other Plaintiffs have failed to produce evidence regarding the relationship between the dealer and Ford, Allen Temple presents no evidence to establish any such relationship by which Ford could have been unjustly enriched by Allen Temple's purchases. However, Ford does not raise this issue as a basis for awarding it summary judgment, although it argues for summary judgment on unjust enrichment claims brought by other Plaintiffs on this rationale. Ford also fails to assert that Allen Temple cannot recover under an unjust enrichment theory because it had contractual relationships with the Ford dealers. Instead, Ford only contends that Allen Temple cannot show that it purchased its vans at higher than actual, fair market value,

and therefore could not have conferred an undue benefit on Ford. (Ford Reply Br. at 52 ("Allen Temple purchased its two vans new from Ford dealers. Ford's only argument as to Allen Temple's unjust enrichment claim was that Allen Temple could not prove that Ford was unjustly enriched at Ford's expense because it could not prove that it purchased its van at an artificially inflated price.").) Ford argues that Allen Temple cannot show that it paid more than the fair market value for its vehicles and therefore cannot show that it conferred a benefit on Ford. In the Complaint, Plaintiffs allege that various events occurring before June 2001 led to a "diminution in the value" of E–350 vans. (Compl.¶ 61.) Ford alleges that Allen Temple purchased its first van after these events and therefore cannot prove that its sale price did not already reflect the actual value of the van. Additional events between June 2001 and July 2002 also allegedly diminished the vans' value, and Ford claims that Allen Temple's unjust enrichment claim as to its second van suffers from the same infirmity. Plaintiffs' Response Brief does not specifically address Allen Temple's unjust enrichment claim. Still, this Court cannot resolve Allen Temple's unjust enrichment claim as a matter of law because disputed facts exist regarding the actual market value of the vehicles. While some of the events listed in the Complaint might have occurred before Allen Temple purchased either its first or second vehicle, there are disputes regarding when Allen Temple learned of the problems with the vehicles and what, if any, representations Allen Temple received from Ford. Under the equitable theory of unjust enrichment, this Court cannot conclude based on speculation that because certain facts regarding the vehicles might have been made public prior to Allen Temple's purchases, the price paid by Allen Temple necessarily reflected fair market value and no unjust enrichment. [12] This Court will deny Ford's motion with regard to the unjust enrichment claim.

### E. Summary

**\*38** For the foregoing reasons, this Court will deny Ford's motion for summary judgment with respect to Allen Temple's breach of express warranty, breach of implied warranty, and unjust enrichment claims. This Court will grant Ford's motion for summary judgment as to Allen Temple's Georgia FBPA claims.

## V. Pennsylvania

Pennsylvania Plaintiffs Bethel AME Church ("Bethel"), Hickman Temple AME Church ("Hickman Temple"), and Mount Airy Baptist Church ("Mt.Airy") were added to this litigation after Judge Ackerman decided Ford's motion

to dismiss. Ford now moves for summary judgment as to all of the Pennsylvania Plaintiffs' claims: breach of express warranty; breach of implied warranty; violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania UTPCPL"), 73 Pa. Cons.Stat. § 201–1 *et seq.;* and unjust enrichment.

### A. Material Facts

#### 1. Bethel

Bethel owns two E–350 vans. Its first vehicle, a new 2000 model, was purchased from Parkway East Ford by Amoore Health Systems, Inc. ("Amoore") in June 2000 for $30,800. Bethel effectively purchased the vehicle from Amoore by paying the salaries of handicapped drivers provided by Amoore. The salaries "were equivalent to what it would have been to make a monthly payment." (Miott Dep. at 33:12–14.) Thus, Bethel "financed [the vehicle] through Amoore ... [a]nd it was a criteria that after we reached the amount paid for the van, that the van would become Bethel's." (*Id.* at 32:14–19, 553 S.E.2d 662.) While Amoore negotiated the purchase price of the van, representatives of Bethel were present and consulted on the purchase. (*Id.* at 37:3–9, 553 S.E.2d 662.) Bethel representatives indicated at deposition that Ford salespeople discussed the features of the E–350 van, but could not recall precisely what Bethel might have been told about its 15–passenger capacity. (Ford SUMF No. 12 ¶¶ 4–10; Pls .' Responsive Statement of Material Facts for Bethel ¶¶ 4–10.)

Bethel purchased its second E–350 van, a new 2001 model, directly from Parkway East Ford in November 2001 for $29,530. [13] Bethel has never instructed its drivers to not fill the vehicles to capacity, and Bethel sometimes uses the vans filled to capacity (Ingram Dep. at 110:14–24), but it has also experienced some difficulties in handling when driven with capacity seating (*see, e .g.,* Miott Dep. at 97:7–98:23; 101:19–102:4; 105:24–106:23). Bethel has had no difficulties procuring insurance for its vehicles. It has not sold the vehicles and has no intention of doing so.

#### 2. Hickman Temple

Hickman Temple purchased a used 2001 E–350 van from Springfield Ford in 2003 for $17,133.87. Hickman Temple does not recall viewing any Ford advertisements or other materials (Feaster Dep. at 32:5–14), but does recall that the salesman at the Ford dealership discussed the safety of the vehicle. According to Johnnie W. Feaster, who testified on

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...
Case 1:19-md-02875-RMB-SAK     Document 1748-28     Filed 11/10/21     Page 72 of 261
PageID: 45010

behalf of Hickman Temple, the salesman at Springfield Ford "talked about how safety was, that this would be the vehicle that you want to do the job because it was safe and it would deliver." (*Id.* at 31:4–7, 553 S.E.2d 662). Hickman Temple still uses the vehicle for transporting members, and does not limit the capacity of its vehicle and often drives it with 15 passengers. (*Id.* at 59:14–19, 553 S.E.2d 662; 40:14–44:18.)

### 3. Mt. Airy

**\*39** Mt. Airy purchased a used 2004 E–350 van from Chapman Ford Sales for $19,998 in August 2005. Mt. Airy does not recall if it viewed any Ford materials or relied on any Ford representations when buying the vehicle. (W. Brown Dep. at 29:22–30:3; 56:5–11.) The church requires qualified drivers to operate the vehicle and, based on requirements by its insurance company, requires that drivers take defensive driving courses. (*Id.* at 51:21–52:1, 553 S.E.2d 662; 48:15–19.) It has placed no limits on capacity, and it operates the vehicles fully-loaded on occasion. (*Id.* at 38:17–19; 39:6–12, 553 S.E.2d 662; 42:11–14.) It has experienced some stability and handling problems when operating the vehicle filled to capacity. (*Id.* at 11:1–13, 553 S.E.2d 662.)

### B. Express Warranty and Implied Warranty: Notice

Ford contends that the Pennsylvania Plaintiffs' express and implied warranty claims are barred by those Plaintiffs' failure to give notice within a reasonable time. UCC § 2–607, as codified in Pennsylvania, provides that, to assert a warranty claim post-tender, "[t]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." 13 Pa. Cons.Stat. § 2607(c)(1). The Pennsylvania Plaintiffs argue that filing suit—here, by joining this litigation after resolution of the motion to dismiss—satisfied the notice requirement. The Pennsylvania Supreme Court has not definitively addressed whether the filing of a complaint constitutes sufficient notice under § 2607. However, a court in the Middle District of Pennsylvania has held that "nothing in section 1201 or 2607 ... specifically prohibits a civil complaint from serving as notice of a breach of warranty." *Bednarski v. Hideout Homes & Realty, Inc.,* 709 F.Supp. 90, 93 (M.D.Pa.1988). The court in *Bednarski* relied upon a prior ruling by the Pennsylvania Superior Court that the filing of a complaint was sufficient for notice of rejection of goods, and reasoned that there was no indication that the Pennsylvania Supreme Court would rule otherwise with regard to notice of breach of warranty. *Id.* at 93–94 (discussing *Yates v. Clifford*

*Motors, Inc.,* 283 Pa.Super. 293, 423 A.2d 1262, 1269–70 (Pa.Super.Ct.1980)).

Ford attempts to distinguish *Bednarski* by pointing to the Illinois Supreme Court's treatment of that case in applying Pennsylvania law. In *Connick v. Suzuki Motor Co.,* the Illinois Supreme Court reasoned that Pennsylvania law allows the filing of a complaint to satisfy the notice requirement only where the plaintiff suffered personal injuries. 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 590–91 (Ill.1996). The *Connick* court distinguished *Bednarski* because *Bednarski* involved a plaintiff who suffered personal injuries, and Ford here similarly argues that, because the Pennsylvania Plaintiffs did not suffer any personal injury, the Pennsylvania Supreme Court would hold that the filing of the complaint fails to fulfill the notice requirement. While Ford's interpretation of *Bednarksi* holds some appeal, two cases from the Pennsylvania Court of Common Pleas expressly reject Ford's theory. In *Solarz v. DaimlerChrysler Corp.,* the court followed *Bednarski* and found defendant's reliance on *Connick* to distinguish *Bednarski* to be "misplaced." No.2033, 2002 WL 452218, at *12 (Pa.Com.Pl. Mar.13, 2002). The court in *Solarz* stated that "[n]owhere in the *Bednarski* opinion does the court expressly carve out an exception to the notice requirement for 'consumer buyers who suffer personal injury.' In fact, the holding in Bednarski, based on Pennsylvania law, is quite clear and unambiguous." *Id.* Several months later, another opinion from the Court of Common Pleas similarly held, relying on *Bednarski,* that "[t]he filing of a complaint has been held to satisfy the notice requirement for a breach of warranty claim." *Precision Towers, Inc. v. Nat–Com, Inc.,* No. 2143, 2002 WL 31247992, at *5 (Pa.Com.Pl. Sept.23, 2002).

**\*40** In the absence of any contrary authority from the Pennsylvania Supreme Court, and in light of the approval of the federal court's holding by lower Pennsylvania courts, this Court will follow *Bednarski*. The addition of the Pennsylvania Plaintiffs' to this litigation by joining the Complaint constitutes sufficient notice under Pennsylvania law for breach of warranty claims. The reasonableness of the time within which the Pennsylvania Plaintiffs gave notice, on this disputed record, is a question of fact and cannot be resolved on this motion. *Rad Servs., Inc. v. Am. Refining Group, Inc.,* 330 Pa.Super. 308, 479 A.2d 565 (Pa.Super.Ct.1984) ("Whether a buyer discovers a breach and gives notice of it within a reasonable time is normally a jury question. Only under the situation where the facts are undisputed and the buyer clearly ought to have known

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 73 of 261
PageID: 45011

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

of the alleged defect does the question of reasonableness become one for the court." (citations omitted)); *see also Bednarski,* 709 F.Supp. at 94. Therefore, this Court will not grant summary judgment in Ford's favor on the Pennsylvania Plaintiffs' warranty claims for lack of notice.

### C. Express Warranty

For the same reasons discussed previously with regard to other Plaintiffs, Ford's statement that the E–350 van is a "15–passenger van" does not create an express warranty of the safety of the vehicle in transporting 15 passengers. According to Pennsylvania law, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." 13 Pa. Cons.Stat. § 2313(a) (1). "Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." 13 Pa. Cons.Stat. § 2313(a) (2). The Pennsylvania Plaintiffs assert that Ford made an express warranty of safety, but Ford's core description of the vehicle "contain [s] no language of promise, description, or affirmation of fact that conceivably could constitute an express warranty as to product safety." *Kenepp v. Am. Edwards Labs.,* 859 F.Supp. 809, 817 (E.D.Pa.1994). It is undisputed that no Ford representative, let alone any other person involved in the sale of the vehicles to the Pennsylvania Plaintiffs, made an express representation of *safety* with regard to the transport of 15 passengers to the Pennsylvania Plaintiffs. After extensive discovery, Plaintiffs point to no evidence to the contrary, and do not identify any specific, unequivocal statement made to these Plaintiffs, or those affiliated with them, regarding safety in the transport of 15 passengers.

With regard to the testimony of Hickman Temple's representative that the Springfield Ford salesman stated generally that the van was "the vehicle that you want to do the job because it was safe and it would deliver" (Feaster Dep. at 31:6–7), Hickman Temple has not met its burden to show that the salesman acted as Ford's agent such that his statements could be attributable to Ford. Even if this Court could find that these statements could be attributed to Ford, the statements amount at most to non-actionable puffery. 13 Pa. Cons.Stat. § 2313(b) ("[A] statement purporting to be merely the opinion of the seller or commendation of the goods does not create a warranty."); *County of Mercer v. UniLect Corp.,* 612 F.Supp.2d 638, 650 (W.D.Pa.2009) ("Opinion statements do not create express warranties."). In other contexts, courts

in Pennsylvania have concluded that non-specific statements regarding the general safety of a product were mere puffing. *See Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893, 903 (Pa.1975) (in misrepresentation tort action, finding that statements in brochure that "you are assured of a safe, dependable helicopter" was non-actionable puffing); *see also Hoffman v. A.B. Chance Co.,* 339 F.Supp. 1385, 1388 (M.D.Pa.1972) (in misrepresentation tort action, concluding that "[t]he general representation that a product 'offered unprecedented safety' is a statement of opinion and is in the nature of seller's 'puffing' "). As a matter of law, the Pennsylvania Plaintiffs' express warranty claims must fail.

**\*41** Accordingly, this Court will grant Ford's motion for summary judgment with respect to the Pennsylvania Plaintiffs' express warranty claims.

### D. Implied Warranty

Pennsylvania courts have not directly addressed whether a plaintiff can recover under a UCC implied warranty theory for an allegedly defective product that has not actually malfunctioned or caused personal injury. Ford asks this Court to predict that Pennsylvania courts would apply the rule followed by other states that a plaintiff cannot recover under such circumstances. Ford contends that under UCC § 2–314, codified in Pennsylvania at 13 Pa. Cons.Stat. § 2314, the Pennsylvania Plaintiffs' vehicles are "merchantable" because they are fit for their ordinary purpose, and further argues that Plaintiffs' description of the vehicle as defective is not based on an objective, legally recognizable standard.

Pennsylvania law imposes an implied warranty of merchantability on all contracts for the sale of goods if the seller is a merchant. 13 Pa. Cons.Stat. § 2314(a). To be merchantable, the UCC as codified in Pennsylvania provides that the goods, in relevant part, must "pass without objection in the trade under the contract description" and be "fit for the ordinary purposes for which such goods are used." 13 Pa. Cons.Stat. § 2314(b). The Pennsylvania Supreme Court has held that "[t]he concept of merchantability does not require that the goods be the best quality or the best obtainable but it does require that they have an inherent soundness which makes them suitable for the purpose for which they are designed, that they be free from significant defects, that they perform in the way that goods of that kind should perform, and that they be of reasonable quality within expected variations and for the ordinary purpose for which they are used." *Gall v. Allegheny Cty. Health Dep't,* 521 Pa. 68, 555 A.2d 786, 789–90 (Pa.1989) (internal citations omitted).

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 74 of 261
PageID: 45012
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Ford devotes much of its argument with regard to the Pennsylvania Plaintiffs' implied warranty claims to an extended discussion of the potential policy repercussions of allowing Plaintiffs to proceed with their claims for purely economic injury while lacking a consistently expressed, internally consistent theory of the "defect" of the E–350 van. Ford bemoans the possibility that "defect" could mean different things to different juries in different cases in different states. (*See* Ford Br. No. 19 at 14 ("And it also follows that a product is not unmerchantable simply because that plaintiff's lawyer, on a particular day before a particular jury opposed by particular defense lawyer, can actually prevail on such a claim, because on another day before another jury opposed by a different defense lawyer he or she could also lose.").) Because no governmental entity has declared the vehicles to be defective, Ford contends that no objective standard for defect exists. Ford urges this Court to conclude that Pennsylvania courts would follow the reasoning of the Supreme Judicial Court of Massachusetts in *Iannacchino v. Ford Motor Co.* that an implied warranty claim grounded solely on economic injury based on overpayment, not personal injury, cannot lie under such circumstances. *See Iannacchino v. Ford Motor Co.,* 451 Mass. 623, 888 N.E.2d 879, 888 (Mass.2008) ("When the standard that a product allegedly fails to meet is not one legally required by and enforced by the government, a claim of economic injury based on overpayment lacks the premise that the purchase price entitled the plaintiffs to a product that met that standard.").

**\*42** While the Pennsylvania Supreme Court might adopt *Iannacchino* in the future, it has not yet done so, and Ford points to no caselaw from lower courts in Pennsylvania suggesting any trend in that direction.[14] Rather, Ford's emphasis on the contingent nature of the Pennsylvania Plaintiffs' claims only highlights that many disputed issues of fact exist that prevent this Court from being able to decide these Plaintiffs' implied warranty claims as a matter of law. Ford notes that the risk-utility approach often applied by Pennsylvania courts requires balancing of many factors that "cannot be known with precision," and "in the typical case, reasonable people can and do disagree about whether a design related risk of harm renders a product defective." (Ford Br. No. 19 at 13.) Ford later reiterates that "[n]othing in plaintiffs' complaint suggests that this is anything other than a typical case where the issue of 'defect' is reasonably debatable. *i.e.,* where reasonable people can reach different conclusions on the issue." (*Id.* at 14, 888 N.E.2d 879.) This Court agrees, and absent definitive guidance from any Pennsylvania court that

plaintiffs asserting economic harm and not personal injury must allege a defect based on a governmentally-required standard, the question of defect is reserved for the jury.

Ford raises no other alternative arguments against the Pennsylvania Plaintiffs' implied warranty claims. This Court will deny Ford's motion for summary judgment with respect to the Pennsylvania Plaintiffs' implied warranty claims.

*E. Pennsylvania UTPCPL*

The Pennsylvania UTPCPL grants standing to sue to "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful." 73 Pa. Cons.Stat. § 201–9.2(a). Ford contends that the Pennsylvania Plaintiffs lack standing to bring its Pennsylvania UTPCPL claim here because they purchased their vehicles for church purposes, not for personal, family, or household use. Plaintiffs rely upon *Valley Forge Towers South Condominium v. Ron–Ike Foam Insulators, Inc.,* in which the Superior Court held that a non-profit association had standing to sue on behalf of its member condominium residents in a representative capacity with regard to the roof of the condominium building. 393 Pa.Super. 339, 574 A.2d 641, 645 (Pa.Super.Ct.1990). The court in *Valley Forge* focused on the Pennsylvania UTPCPL's statutory definition of "person," which includes "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." 73 Pa. Cons.Stat. § 201–2(2). The Pennsylvania Plaintiffs, presumably as unincorporated associations, and the incorporated association plaintiff in *Valley Forge* all qualify as a person under the statute.

However, the condominium association in *Valley Forge* was empowered by separate, specific statutory authority to act in a representative capacity on behalf of its members to sue, enter into contracts, and regulate the maintenance of common elements of its members' condominium homes. *Valley Forge,* 574 A.2d at 645. The court recognized that even in the absence of statutory authority, before Pennsylvania law clarified the representative standing of condominium associations, such condominium associations had such standing. *Id.* (citing *1000 Grandview Ass'n, Inc. v. Mt. Washington Assocs.,* 290 Pa.Super. 365, 434 A.2d 796, 797–98 (Pa.Super.Ct.1981)). However, these cases deal with the unique context of residential condominium associations suing on behalf of their members with regard to purchases related to

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 75 of 261
PageID: 45013

common areas of its members homes, and thus the purchases undoubtedly were for "personal, family, or household use." *See In re TFT–LCD (Flat Panel) Antitrust Litig.,* 586 F.Supp.2d 1109, 1128–29 (N.D.Cal.2008) (recognizing "the unusual facts of *Valley Forge*," and "not[ing] that it would be the rare exception that a business entity would have standing under the Pennsylvania statute"). Here, the Pennsylvania Plaintiffs have no recognized statutory or other authority to sue on behalf of its members, and did not purchase the van for the personal, family, or household use of any of its members . [15] The Pennsylvania Plaintiffs lack standing to assert Pennsylvania UTPCPL claims. This Court will grant Ford's motion for summary judgment as to these claims.

### F. Unjust Enrichment

**\*43** To assert a claim of unjust enrichment under Pennsylvania law, a plaintiff must show that "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Williams Twp. Bd. of Supervisors v. Williams Twp. Emerg. Co.,* 986 A.2d 914, 923–24 (Pa.Commw.Ct.2009) (citations omitted). Ford points out that none of the Pennsylvania Plaintiffs have produced any evidence that they conferred a benefit on Ford. All of the vehicles at issue were purchased from Ford dealerships. As discussed previously in this Opinion, Plaintiffs have presented no evidence regarding the relationships between Ford and any of the Ford dealers at issue and whether money paid to a dealership was ultimately conferred upon Ford. "The burden of establishing an agency relationship rests with the party asserting the relationship." *Basile v. H & R Block, Inc.,* 563 Pa. 359, 761 A.2d 1115, 1120 (Pa.2000). Pennsylvania courts (as well as those in many other states) have strongly suggested that automobile dealerships are generally not agents of automobile manufacturers in the selling of vehicles, and that the inquiry is a fact-specific one that must be supported by sufficient evidence in the record. *See, e.g., Zeno,* 480 F.Supp.2d at 845–46. The Pennsylvania Plaintiffs, like other Plaintiffs in this matter, have failed to satisfy their evidentiary burden. Ford contends that the Pennsylvania Plaintiffs have not shown the essential elements of a benefit conferred upon and retained by Ford, and the Pennsylvania Plaintiffs have not met their burden to produce evidence in support of their position.

Bethel claims unjust enrichment based on its two E–350 vans. With respect to its second vehicle, the 2001 model, this Court will grant Ford's motion for summary judgment on the unjust enrichment claim without prejudice and allow Bethel until August 13, 2010 to show cause to cure the evidentiary deficiency regarding the relationship between Parkway East Ford and Ford and demonstrate that summary judgment should not be granted in Ford's favor on this unjust enrichment claim. Ford shall have until September 13, 2010 to file a response to Bethel's submission. However, Bethel's first vehicle, the new 2000 model, was not purchased by Bethel, but rather by Amoore. The van was purchased for Bethel's benefit essentially under a financing arrangement whereby Bethel would pay for the van over a period of time by paying the salaries of handicapped drivers provided by Amoore. Still, Amoore purchased the vehicle, and Bethel did not confer any benefit upon Ford or even a Ford dealership in the acquisition of the 2000 van. Therefore, this Court will grant Ford's motion with regard to Bethel's unjust enrichment claim on the 2000 van.

Hickman Temple purchased a *used* E–350 van from Springfield Ford. This Court has already declined to take judicial notice of any benefit conferred upon Ford by the purchase of a new vehicle from a Ford dealership. Even if this Court could somehow conclude that Ford necessarily derives some benefit from the sale of new cars by its dealers, the record is devoid of any evidence that used car sales benefit Ford. This Court will grant Ford's motion for summary judgment on Hickman Temple's unjust enrichment claim without prejudice and allow Hickman Temple until August 13, 2010 to show cause to cure the evidentiary deficiency and demonstrate that summary judgment should not be granted in Ford's favor on the unjust enrichment claim. Ford shall have until September 13, 2010 to file a response to Hickman Temple's submission.

**\*44** Finally, Mt. Airy's unjust enrichment claim fails not only due to the lack of evidence regarding conferral of a benefit on Ford from a purchase from Chapman Ford Sales, a Ford dealership, but due to Plaintiffs' admissions regarding the allegedly inflated value of E–350 vans. Plaintiffs assert unjust enrichment based on 1) Ford's extraction of payments from Plaintiffs who would not have purchased the vehicles, or would have done so at reduced prices; and 2) Ford's revenues on repairs outside Ford's 90–day limited warranty. (Compl.¶¶ 88–89.) Mt. Airy has pointed to no evidence of money paid to Ford for repairs, and therefore its unjust enrichment claim rests upon the inflated value Ford allegedly

received from Mt. Airy for the allegedly defective vehicle. Even if Mt. Airy could show a sufficient agency relationship between Chapman Ford Sales and Ford, or produce other evidence showing that Mt. Airy conferred a benefit upon Ford, all Plaintiffs admitted in their Responses and Objections to Ford's Second Set of Written Interrogatories that "[t]he artificial demand for the E–350 15 passenger vans, as referred to in the Complaint, is believed to have eroded fully by April, 2004, when the [National Highway Traffic Safety Administration] reissued a safety warning concerning 15–passenger vans." (Andresen Certif No. 19, Ex. 5 at 22; *see also, e.g.,* Pls.' Responsive Statement of Material Facts for Blandon ¶ 24.) Although the Complaint references this claimed artificial demand in its pleadings regarding Plaintiffs' statutory consumer fraud claims (Compl.¶ 98), the same theory underlies Plaintiffs' unjust enrichment claims: Ford received an unjust benefit in excess of the value of the "defective" vehicle received by Plaintiffs. Mt. Airy purchased its used van in August 2005, well after Plaintiffs believed the claimed "artificial demand" leading to artificially inflated prices "eroded fully." To determine whether a defendant in an unjust enrichment claim "enjoyed an appreciation of the benefits which were conferred ... the issue is whether the value of the benefit conferred exceeds the value of the consideration he paid for the benefits." *Bouriez v. Carnegie Mellon Univ.,* No. 02–2104, 2005 WL 3006831, at *12 (W.D.Pa. Nov.9, 2005). Here, if the claimed "artificial demand" for the vehicles fully eroded by April 2004, the market value of the vans similarly eroded, and the price paid for a van after this date could not reflect unjust gain based on inflated value for a defective vehicle. Mt. Airy purchased its vehicle in August 2005, and therefore, on Plaintiffs' own admission, could not have paid an inflated, unjust value for its van. Therefore, this Court will grant Ford's motion for summary judgment as to Mt. Airy's unjust enrichment claim.

### G. Summary

For the foregoing reasons, this Court will grant Ford's motion for summary judgment with respect to the Pennsylvania Plaintiffs' express warranty and Pennsylvania UTPCPL claims. This Court will deny Ford's motion with respect to the Pennsylvania Plaintiffs' implied warranty claims. With regard to the Pennsylvania Plaintiffs' unjust enrichment claims, this Court will: 1) grant Ford's motion as to Bethel's claim based on its 2000 vehicle, and grant Ford's motion without prejudice as to Bethel's claim based on its 2001 van; 2) grant Ford's motion without prejudice as to Hickman Temple's claim; and 3) grant Ford's motion as to Mt. Airy's claim. For Bethel's unjust enrichment claim based on its 2001 van and Hickman

Temple's unjust enrichment claim, these Plaintiffs shall have until August 13, 2010 to show cause to cure the evidentiary deficiencies identified by the Court and demonstrate that summary judgment should not be granted in Ford's favor. Ford shall have until September 13, 2010 to file a response to Bethel's and Hickman Temple's submissions.

### VI. Florida

**\*45** Florida Plaintiffs Martha Blandon, Tania Diaz, and Jose Mestre were added to this litigation after Judge Ackerman decided Ford's motion to dismiss. Ford now moves for summary judgment as to all of the Florida Plaintiffs' claims: breach of express warranty; breach of implied warranty; violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 *et seq.;* and unjust enrichment.

### A. Material Facts

#### 1. Blandon

Blandon worked for Maya's Carpool from 2004 to 2006, transporting students to and from school in Ford E–350 vans. During that time, Blandon and her co-workers discussed the stability problems they experienced with driving Ford E–350 vans, and Blandon herself lost control of a Ford E–350 vehicle on one occasion. (*See* Ford's SUMF No. 13 at ¶ 3.) At deposition, Blandon acknowledged that she knew that the vehicles were unstable, but she stated that she "did not know that it was a factory defect that they had." (Blandon Dep. at 31:23–24.) In 2006, Blandon stopped working at Maya's Carpool and opened her own business transporting students. It is undisputed that in connection with this business, in June 2006, Blandon purchased a used, gold-colored 2000 Ford E–350 van (the "Gold Van") "from a dealership not affiliated with Ford." (*Id.* at 6:19–7:5; Pls.' Responsive Statement of Material Facts for Blandon ¶ 4.) She paid $8,500 for the Gold Van. Blandon did not view any Ford advertising material or talk to any Ford representatives before purchasing the Gold Van. (Blandon Dep. at 17:6–24.) Blandon purchased an E–350 because she wanted a van for 15 passengers, and she asserted that she knew Ford E–350 vehicles from her time with Maya's Carpool. Blandon encountered some handling problems with the Gold Van, and restricted the capacity of the van to 13 passengers by limiting usage of the last row of seats. (*Id.* at 29:15–24.)

After experiencing engine problems with the Gold Van, Blandon sold it in 2008 for $3,800; she had hoped to sell it

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 77 of 261
PageID: 45015
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

for as much as $6,000, but thought that the engine problems limited her ability to sell at that price. (*Id.* at 36:6–38:3.) In August 2008, Blandon bought a used, blue-colored 2000 Ford E–350 van (the "Blue Van"). She bought the Blue Van for $3,000 from a private individual. (*Id.* at 56:2–13.) At deposition, Blandon stated that she bought a second E–350 van despite the problems she encountered with her first vehicle because "it was good, and [she] liked the comfort that they offer." (*Id.* at 42:17–18.) She removed the back seat from the Blue Van to address disciplinary problems resulting from many students wanting to sit in the back seat, but also testified that she would not reinstall the back seat due to the risk of "accident or tip over." (*Id.* at 65:5–66:3.)

### 2. Diaz

Until approximately 2005, Diaz worked for a company that used Ford E–350 vans to transport children to and from school. Diaz and her coworkers discussed handling problems with the vehicles (Diaz Dep. at 6:9–11:3), but according to Diaz, no one told her that Ford vans were dangerous (*id.* at 11:4–6.) Diaz started her own school transportation business in 2005, and purchased for use in this business a used 1993 Ford E–350 van for $2,000. Diaz purchased her 1993 vehicle from a private individual named "Manolo" or "Manuel." (*Id.* at 13:16–22.) Diaz could not remember the individual's last name. Diaz did not view any Ford advertising material or talk to any Ford representatives before purchasing the 1993 vehicle. (*Id.* at 27:3–13.) Diaz limited the capacity of her 1993 van to 13 passengers, but she would have filled it to capacity if she had enough paying customers to do so. (*Id.* at 26:17–22.) Diaz subsequently sold the 1993 van for $1,000 in 2006. In March 2007, Diaz purchased a used 2003 Ford E–350 van from Maroone Chevrolet, a Chevrolet dealer. (*Id.* at 37:8.) Again, Diaz viewed no Ford advertising material and did not talk to any Ford representatives before making this purchase. (*Id.* at 39:3–12.) Diaz does not operate this vehicle at capacity because she does not have sufficient paying customers to do so, although she testified that she has noticed some handling issues when the van is close to full and obtained insurance coverage at rates perceived to be high. (*Id.* at 52:14–53:5.)

### 3. Mestre

**\*46** For a commercial business transporting students to and from school, Mestre purchased a used 2000 Ford E–350 van in 2004. He purchased this vehicle for $9,115 from Bonanza Auto Sales, a used car dealership not affiliated with Ford. (Mestre Dep. at 55:22–23.) Mestre did not speak to any Ford representatives or view any Ford advertising

before the purchase. (*Id.* at 55:25–56:5.) Before purchasing the 2000 van, Mestre spoke to a potential customer for his driving services who told Mestre that 15–passenger vans were dangerous if they lacked additional stabilizers. (*Id.* at 31:20–34:12.) Mestre operates the 2000 vehicle filled to capacity, although he has encountered some handling and stability problems, including one occasion where the wheels came off the ground when turning. (*Id.* at 35:4–9.) Mestre purchased a second E–350 vehicle to be used by three other drivers working for him. Mestre bought the second vehicle, a used 2001 van, in approximately 2006 from the Belen School, for whom Mestre worked, for $10,500. Again, Mestre did not speak to any Ford representatives or view any Ford promotional materials before buying the 2001 van. (*Id.* at 34:13–18.) The drivers filled the 2001 van to capacity almost every day during the school year. Mestre sold the 2001 van in approximately 2007 or 2008 for $7,000.

### B. Kia Motors

As a general matter, the Florida District Court of Appeal has disapproved of claims involving alleged defects that have not yet manifested and caused personal injury, and where plaintiffs seek damages in the form of "risk of failure" and diminished resale value. *See Kia Motors Am. Corp. v. Butler,* 985 So.2d 1133, 1139 (Fla.Dist.Ct.App.2008) (denying class certification in case asserting claims for breach of express and implied warranty claims and for violation of FDUTPA). The court stated that it aligned itself with the "majority jurisprudence" on this issue. *Id.* Ford relies upon *Kia Motors* to contend that because none of the Florida Plaintiffs experienced a rollover, they may not recover on any of their claims in this action.

However, the court in *Kia Motors* rejected class certification primarily because of factual differences in the performance of the vehicles at issue that precluded the finding of a faulty common design and prevented proof of a defect on a class-wide basis. *Id.* at 1138. The court relied upon the inclusion in the class of those whose vehicles had performed satisfactorily and thus caused no injury as one of two "additional, readily apparent reasons" to deny class certification. *Id.* No court has applied the reasoning of the appellate court in *Kia Motors* to flatly preclude recovery for diminished resale value and other economic damages where personal injury has not occurred. However, this Court need not apply *Kia Motors* as a blanket prohibition against the maintenance of any of the Florida Plaintiffs' claims, because each of their claims all fail under established Florida law governing those claims.

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 78 of 261
PageID: 45016

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

### C. Express Warranty

**\*47** Ford contends that this Court should grant it summary judgment on the Florida Plaintiffs' express warranty claims because the Florida Plaintiffs did not provide requisite notice to Ford pursuant to Fla. Stat. § 672.607(3)(a), and because they did not engage in any justifiable reliance upon Ford's affirmations or representations. With regard to the notice argument, Fla. Stat. § 672.607(3)(a) indeed codifies the UCC's requirement of notice by the buyer to the seller to maintain a breach of warranty claim. It is undisputed that none of the Florida Plaintiffs gave actual notice to Ford prior to joining this litigation. However, Florida law appears silent on whether the filing of a complaint satisfies the notice requirement, and the parties do not address this issue in their briefing on any of the Florida Plaintiffs. This Court need not explore this issue, as the Florida Plaintiffs express warranty claims fail for other reasons.

"Under Florida law, an express warranty may arise only where justifiable reliance upon assertions or affirmations is part of the basis of the bargain." *Hobco, Inc. v. Tallahassee Assocs.,* 807 F.2d 1529, 1533 (11th Cir.1987). None of the Florida Plaintiffs purchased their vehicles from Ford or even from those affiliated with Ford, and they had no interaction with any Ford representatives and viewed no Ford materials. Therefore, no express statements by Ford to these Plaintiffs formed the basis of the bargain between the Florida Plaintiffs and their sellers. Furthermore, under Florida law, "an express warranty is generally considered to arise only where the seller asserts a fact of which the buyer is ignorant prior to the beginning of the transaction, and on which the buyer justifiably relies as part of the 'basis of the bargain.' " *Thursby v. Reynolds Metals Co.,* 466 So.2d 245, 250 (Fla.Dist.Ct.App.1984) (internal citations omitted). In *Thursby,* the court held that plaintiff did not rely on any affirmation of particular fact because defendant "refus[ed] to make any specific factual guarantee regarding the [product]'s performance." *Id.* Similarly here, Ford made no explicit factual representation regarding the E–350 van's performance; as discussed above with regard to other Plaintiffs, any representation of safety was implied in Ford's description of the E–350 as a 15–passenger van. In addition, all of the Florida Plaintiffs testified that they were familiar with the Ford E–350 van and its potential problems, either from prior work experience (Blandon and Diaz) or a conversation with a potential customer (Mestre). These Plaintiffs nonetheless purchased the vehicles, and cannot be said to have relied upon an assertion of fact by Ford of which they were ignorant prior to the transaction. For these reasons,

this Court will grant Ford's motion for summary judgment as to the Florida Plaintiffs' express warranty claims.

### D. Implied Warranty

"Under Florida law, privity of contract is required to maintain an action for breach of an implied warranty." *Ocana v. Ford Motor Co.,* 992 So.2d 319, 325 (Fla.Dist.Ct.App.2008). None of the Florida Plaintiffs purchased their vehicles from Ford or even any dealer arguably affiliated with Ford: Blandon purchased used vehicles from a non-Ford dealership and a private individual; Diaz purchased used vans from a private individual and a Chevrolet dealer; and Mestre bought used E–350 vans from a non-Ford dealership and a school. Because none of the Plaintiffs are in privity with Ford, their implied warranty claims must all fail.

**\*48** The Florida Plaintiffs contend that an older ruling by the Florida Supreme Court abolished the privity requirement for implied warranty claims. *See Manheim v. Ford Motor Co.,* 201 So.2d 440, 441–42 (Fla.1967). However, the Florida Supreme Court later held that "the doctrine of strict liability in tort supplants all no-privity, breach of implied warranty cases." *Kramer v. Piper Aircraft Corp.,* 520 So.2d 37, 39 (Fla.1988). In the absence of privity, Florida law no longer recognizes a breach of implied warranty claim. *Indemnity Ins. Co. of N. Am. v. Am. Aviation, Inc. .,* 891 So.2d 532, 539 (Fla.2004). A federal court in Florida observed that "[u]nder Florida law, to recover for breach of implied warranty, the plaintiff must be in privity of contract with the defendant" and rejected any reliance on *Manheim* because *Manheim* only applies to cases involving a disclaimer in a contract between a manufacturer and a dealer. *Powers v. Lazy Days RV Ctr., Inc.,* No. 8:05–cv–1542T17EAJ, 2006 WL 373011, at \*2 (M.D.Fla. Feb.16, 2006) (describing "limited scope" of *Manheim* ). Because none of the Florida Plaintiffs have privity with Ford, this Court will grant Ford's motions for summary judgment as to the Florida Plaintiffs' claims for breach of implied warranty.

### E. FDUTPA

The elements of a claim for damages under the FDUTPA are: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Kia Motors,* 985 So.2d at 1140. Ford contends that the Florida Plaintiffs have suffered no damages because they have not experienced a rollover and the FDUTPA does not allow for recovery of "consequential damages, such as repair damages or resale damages." *Id.* However, Ford misconstrues the meaning of "actual

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 79 of 261
PageID: 45017

damages" under the FDUTPA, Fla. Stat. § 501.211. Under this section, a consumer plaintiff may recover damages "attributable to the diminished value of the goods or services received, but does not authorize recovery of consequential damages to other property attributable to the consumer's use of such goods or services." *Schauer v. Morse Operations, Inc.,* 5 So.3d 2, 7 (Fla.Dist.Ct.App.2009) (quotations and citations omitted); *see also Rollins, Inc. v. Heller,* 454 So.2d 580, 585 (Fla.Dist.Ct.App.1984) ("[T]he measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties."). While the Florida Plaintiffs cannot recover damages associated with repair costs, if they can show diminution in value due to deception or fraud, they may recover. The defect need not have actually manifested itself in the form of a rollover; indeed, the FDUTPA does not apply to personal injury claims. *Schauer,* 5 So.3d at 6.

Ford further argues that the Florida Plaintiffs cannot prove that they suffered any losses "as a result of" any allegedly deceptive Ford practice or act. Central to an FDUTPA action in this context is whether the purchaser "had knowledge of the alleged [ ] defect and purchased the vehicle despite such knowledge." *Kia Motors,* 985 So.2d at 1140 (denying class certification in part because common question of law did not predominate). If the purchaser did so, she could not show she was actually deceived, or that any actual deception caused her damages. *See Pop's Pancakes, Inc. v. NuCO2, Inc.,* 251 F.R.D. 677, 685 (S.D.Fla.2008) (rejecting class certification on FDUTPA claim because some class members who knew of the allegedly deceptive inclusion of an administrative fee in invoices for property taxes could not reasonably assert that they were likely to be deceived by the invoice).

**\*49** The Florida Plaintiffs argue that even if they knew of the rollover risk of the vehicles, such knowledge is only relevant when obtained from the defendant, and their knowledge here was not derived from Ford. The Florida Plaintiffs rely on *Pop's Pancakes* for this proposition, noting that the court in *Pop's Pancakes* stated that consumers could not assert they were deceived by the inclusion of an administrative charge in an invoice where they were told about it by a defendant's representative or by reading the invoice itself. 251 F.R.D. at 685. However, the court in *Pop's Pancakes* did not limit its holding that certain class members could assert an FDUTPA claim to where those members learned of the fee from defendant; rather, the factual context of that case dictated

that such knowledge could only come from the defendant. Here, the Florida Plaintiffs had experience with Ford E–350 vans not limited to interactions with Ford itself, a scenario unavailable in *Pop's Pancakes.* In any event, the court in *Pop's Pancakes* explicitly stated that the deceptiveness of the invoice "depends, in part, on the knowledge and/or understanding of each [defendant] customer." *Id.* at 686. Limiting the relevance of knowledge to that derived from the defendant would obviate the causation element for an FDUTPA claim; a defendant's deceptive practice must cause a plaintiff's injury, and if a plaintiff knew of the safety issues that Ford's allegedly deceptive sales practices attempted to conceal, her injuries could not have been caused by those practices.

Blandon and Diaz both drove Ford E–350 vehicles before starting their own transportation businesses and purchasing Ford E–350 vans themselves. They asserted that they knew of the alleged handling problems with the vehicles and admitted experiencing those problems themselves. They nonetheless purchased the vans, and never viewed any Ford promotional materials or had any discussions with Ford representatives. Under these circumstances, Ford argues that any loss they have suffered, as a matter of law, could not have been the result of an allegedly deceptive Ford act. With regard to Blandon, this Court agrees. Blandon testified that while working at Maya's Carpool, the drivers discussed the propensity of Ford vans to rollover "everyday" and that they warned each other to "be careful that you will—not to tip over because these vans are not stable." (Blandon Dep. at 14:19–15:9.) Blandon's supervisor at Maya's Carpool, after Blandon reported her loss of control of an E–350 van, told her to be careful "because these vans were not safe ." (*Id.* at 14:4–5.) Thus, Blandon asserts that she knew not only that the vehicles could potentially have handling problems, but that they were not safe. With regard to Blandon, Plaintiffs appear to contend that while she knew of the problems with some Ford vans, she did not know that the problems stemmed from an alleged "factory defect." (Blandon Dep. at 31:23–24.) This attempt to create a dispute of material fact does not negate the undisputed fact that Blandon assertedly knew that the vehicles were unsafe but nonetheless purchased two vehicles. This Court will grant summary judgment in Ford's favor on Blandon's FDUTPA claims.

**\*50** With regard to Diaz and Mestre, the record is not as clear. Diaz drove Ford E–350 vans before purchasing his own vehicles, and discussed the vans' handling problems with his coworkers, but testified that no one ever told him that the vans

were dangerous. She did not explicitly acknowledge that she knew that the vehicles were unsafe. Mestre did not operate any Ford vehicles before he purchased his first van, the 2000 van. Mestre testified that he knew of some "swaying" problems with the vehicles before buying his second van, but bought the second van anyway because he "like[d] the vehicle." (Mestre Dep. at 27:18–22.) On the record before the Court, the degree of Mestre's knowledge regarding the safety of the vehicles is disputed and his feelings about the vans does not exclude the possibility that Ford's alleged omissions could have caused his injury. [16] Because the nature and extent of Diaz's and Mestre's knowledge is disputed, this Court will deny Ford's motion for summary judgment on their FDUTPA claims.

### F. Unjust Enrichment

This Court will grant summary judgment in Ford's favor on the Florida Plaintiffs' claims for unjust enrichment because none of the Florida Plaintiffs purchased their vehicles from Ford or any entity arguably affiliated with Ford. Under Florida law, "[t]he essential elements of a claim for unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Rollins, Inc. v. Butland,* 951 So.2d 860, 876 (Fla.Dist.Ct.App.2006) (quoting *Swindell v. Crowson,* 712 So.2d 1162, 1163 (Fla.Dist.Ct.App.1998)). The Florida Plaintiffs have not met their burden to produce evidence showing that the Florida Plaintiffs conferred any benefit upon Ford. Rather, it is undisputed that none of the Florida Plaintiffs conferred a benefit upon Ford.

Furthermore, as discussed above, a defendant enjoys the appreciation of the benefits which were conferred if the value of that benefit exceeds the value of the consideration given for that benefit. The Florida Plaintiffs point to no evidence of money paid to Ford for relevant repairs, and therefore their unjust enrichment claims rest upon the inflated value Ford allegedly received from them for the allegedly defective vehicles. As Plaintiffs concede, the claimed "artificial demand" for Ford E–350 vehicles fully eroded by April 2004, the market value of these post-April 2004 vans similarly eroded, and the price paid for a van after this date could not reflect unjust gain based on inflated value for a defective vehicle. Here, even if the Florida Plaintiffs had conferred a benefit upon Ford—which, based on the undisputed record, they did not—they cannot maintain

most of their unjust enrichment claims because they stem from purchases made after April 2004, when the claimed artificial demand had eroded and the prices they therefore paid were not unjustly inflated. Blandon and Diaz purchased their vehicles after April 2004, and Mestre purchased his 2001 van in 2006. Therefore, unjust enrichment claims based on these vehicles fail. While Mestre purchased his 2000 van in 2004, it is unclear when in 2004 he made that purchase. In any event, even if he purchased the 2000 van prior to the full erosion of the purported artificial demand, this Court must enter summary judgment in Ford's favor on the unjust enrichment claim based on that purchase due to the fundamental evidentiary deficiency: that Mestre did not confer any benefit upon Ford in purchasing the 2000 van from a used car dealership not affiliated with Ford. For these reasons, this Court will grant Ford's motions for summary judgment on the Florida Plaintiffs' unjust enrichment claims.

### G. Summary

**\*51** For the foregoing reasons, this Court will grant Ford's motion for summary judgment with respect to the Florida Plaintiffs's claims for breach of express warranty, breach of implied warranty, and unjust enrichment, and with respect to Florida Plaintiff Blandon's FDUTPA claim. The Court will deny Ford's motion with regard to the FDUTPA claims of Florida Plaintiffs Diaz and Mestre. Florida Plaintiff Blandon shall be dismissed from this matter.

## VII. Texas

Texas Plaintiff St. Luke's Community United Methodist Church ("St.Luke's") was added to this litigation after Judge Ackerman decided Ford's motion to dismiss. Ford now moves for summary judgment as to all of St. Luke's claims: breach of express warranty; breach of implied warranty; violation of the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA"), Tex. Bus. & Com.Code § 2.313 *et seq.;* and unjust enrichment.

### A. Material Facts

St. Luke's purchased two new model year 2001 Ford E–350 vans on April 28, 2001 from Village Ford, a Ford dealership, for $25,000 each. St. Luke's testifying representative, Evelyn Kelly, was unaware whether St. Luke's viewed any Ford promotional materials or statements prior to the purchase, but thought that Ford promised a 15–passenger van based on the van's name and product specification. (Kelly Dep. at 124:13–124:5.) In approximately 2004, the church started limiting the

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 81 of 261
PageID: 45019

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

capacity of its vans to 12 passengers by removing the back seat. (Kelly Dep. at 34:10–35:19.) The church has had no reports of actual handling or stability problems, and it asserts that it has avoided those problems by not overloading its vans, although St. Luke's representative also did not remember any incidents during the period prior to when the church began limiting the number of passengers in the vans. (*Id.* at 64:13–65:19.) It is undisputed that St. Luke's encountered no difficulties in obtaining insurance on the vans. (Ford SUMF No. 21 ¶ 14; Pls.' Responsive Statement of Material Facts for St. Luke's ¶ 14.)

*B. Inman*

Ford argues that the decision of the Supreme Court of Texas in *DaimlerChrysler Corp. v. Inman,* 252 S.W.3d 299 (Tex.2008) dictates that St. Luke's lacks standing to bring its claims under Texas law and therefore this Court should grant summary judgment in Ford's favor. Plaintiffs in *Inman* asserted, in a purported class action, that certain vehicles manufactured by defendant and employing a particular model of seatbelt buckle were defective because the buckles were "dangerously subject to accidental release ." *Id.* at 302. None of the named plaintiffs had suffered personal injury from accidental buckle unlatching; two had never experienced any problem related to the buckle, and a third could not be sure. Just as Plaintiffs do in the instant case, plaintiffs in *Inman* asserted claims of breach of express and implied warranty, and violations of the DTPA, among other claims. The lower court in Texas certified the purported class. As Plaintiffs here concede, the Supreme Court of Texas reversed and "dismissed plaintiffs['] claims for lack of standing because the plaintiffs themselves could not prove that they had ever experienced buckle unlatching, but had only offered evidence documenting instances in which other people experienced unlatching." (Pls.' Omnibus Br. at 43 (citing *Inman,* 252 S.W.3d at 302).) The court concluded that the plaintiffs could not show "more than the merest possibility of injury to themselves," and that to find that they had standing "would drain virtually all meaning from the requirements that a plaintiff must be 'personally aggrieved' and that his injury must be 'concrete' and 'actual or imminent'." *Inman,* 252 S.W.3d at 307. The court did not exclude the possibility that some owners of the vehicles with the allegedly defective seatbelt buckle could assert concrete injury, but found that the plaintiffs at issue could not. *Id.*

**\*52** Ford argues that the facts here are virtually identical to *Inman,* and therefore this Court should find that St. Luke's lacks standing. If the Court did find a want of standing, it could not render judgment in Ford's favor, but could only

dismiss St. Luke's claims. *Inman,* 252 S.W.3d at 307–08. St. Luke's responds that unlike the *Inman* plaintiffs, it has asserted evidence of actual injury in that it removed the back seats of its vans and had to rent additional vehicles due to the capacity limitations. (Pls.' Omnibus Br. at 43.) With regard to the latter contention, examination of the deposition testimony of St. Luke's representative reveals that St. Luke's occasionally rented additional vehicles to transport additional passengers to confirmation class. However, St. Luke's in those instances sought to transport somewhere between 40 to 60 people at a time. (Kelly Dep. at 70:8–17.) If St. Luke's imposed no limitations on the capacity of its Ford E–350 vans, it could only carry 30 total passengers in the two vans, so additional vehicles would have been necessary nonetheless. Still, St. Luke's points to evidence of some injury from its removal of the back seat.

Ford contends that Judge Ackerman, in applying Arkansas law, rejected "loss of use" and diminution in value as cognizable actual damage under Arkansas's consumer fraud statute, and contends that the same interpretation should apply here. (MTD Opinion at \*23 (citing *Wallis v. Ford Motor Co.,* 362 Ark. 317, 208 S.W.3d 153 (Ark.2005).) Judge Ackerman's rejection of the Arkansas consumer fraud statute claim pursuant to *Wallis* does not directly control here, and Inman did not explicitly hold, as did the court in *Wallis,* that "actual damage or injury is sustained when the product has actually malfunctioned or the defect has manifested itself." *Wallis,* 208 S.W.3d at 161. Indeed, the *Inman* court stated that "[w]e do not decide the degree to which a defect must manifest itself in a product before a warranty is breached," and based its holding solely on standing, concluding that plaintiffs' asserted injury was "extremely remote." *Inman,* 252 S.W.3d at 307.

Plaintiffs in *Inman* presented no plausible theory of actual injury at all. As the Supreme Court of Texas noted, the *Inman* plaintiffs did *not* contend that the allegedly defective "buckles made their vehicles worth less than they paid for them." *Inman,* 252 S.W.3d at 302. Rather, they only sought damages for repair costs. *Id.* Here, St. Luke's seeks damages based on diminution in value and loss of use, and the *Inman* court did not have this kind of potential injury before it. Ford asserts that "[n]othing in *Inman* suggests that the Court would have found standing had the plaintiffs alleged that their 'fear of possible injury' led them to limit the use of their vehicles." (Ford Reply Br. at 77.) This might be true, and the Supreme Court of Texas could so rule in a subsequent case, but nothing in *Inman* expressly suggests that the Court would

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...
Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 82 of 261
PageID: 45020

not have found standing under a different theory of injury and damages. This Court will decline to conclude that St. Luke's lacks standing.

### C. Express and Implied Warranty

**\*53** Ford argues that St. Luke's express and implied warranty claims are barred for its failure to give notice within a reasonable time. UCC § 2–607, as codified in Texas, provides that, to assert a warranty claim post-tender, "[t]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Tex. Bus. & Com.Code § 2.607(c)(1). St. Luke's concedes that it did not provide any pre-litigation notice, but contends that filing suit by joining this litigation satisfied the notice requirement. However, under Texas law the filing of a complaint does not constitute sufficient notice; notice must be given pre-suit. *See, e.g., Martin v. Home Depot U.S.A., Inc.,* 369 F.Supp.2d 887, 893 (W.D.Tex.2005) (granting summary judgment in favor of defendant because plaintiff did not provide "pre-suit notice as required by Texas law"); *U.S. Tire–Tech, Inc. v. Boeran, B.V.,* 110 S.W.3d 194, 202 (Tex.App.2003) ( "Neither did the commencement of litigation satisfy this notice requirement."). St. Luke's failure to provide pre-suit notice is fatal both to its express and implied warranty claims. *U.S. Tire–Tech,* 110 S.W.3d at 201 ("The notice requirement for both breach of implied warranty and breach of express warranty springs from the same source—section 2.607(c)(1) of the Texas Business and Commerce Code."). Any generic notice Ford might have had regarding problems with E–350 vans generally does not suffice under Texas law. "The manufacturer must be made aware of a problem with a particular product purchased by a particular buyer." *Id.* at 202. This Court will grant Ford's motion for summary judgment as to St. Luke's express and implied warranty claims based on lack of notice.

### D. DTPA

The DTPA bars "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com.Code § 17.46(a), and provides a "laundry list" of examples of such acts or practices, Tex. Bus. & Com.Code § 17.46(b). St. Luke's claims that Ford misrepresented or concealed certain facts regarding the safety of Ford E–350 vans potentially falls under several provisions of the laundry list. *See, e.g.,* Tex. Bus. & Com.Code § 17.46(b)(5), (7), and (9) (misrepresentations in advertising), and (24) (omissions leading consumer to enter into transaction she would not have

entered into had the information been disclosed). Reliance is an essential element of a DTPA claim under any of these theories. Tex. Bus. & Com.Code § 17.50(a)(1)(B); *see Morgan Bldgs. and Spas, Inc. v. Humane Society of S.E. Texas,* 249 S.W.3d 480, 490 (Tex.App.2008) (citing *Henry Schein, Inc. v. Stromboe,* 102 S.W.3d 675, 693 (Tex.2002)). Ford contends that St. Luke's could not have relied upon any Ford misrepresentation or omission to its detriment, as its only testifying representative did not recall whether anyone at St. Luke's viewed any advertisements or other materials issued by Ford. St. Luke's, based on Kelly's testimony, argues that St. Luke's observed the "packaging" of the Ford E–350 van as a 15–passenger van and perceived those specifications as a promise of a safe 15–passenger van, one upon which St. Luke's relied by purchasing the vehicles.

**\*54** Whether Ford's representation of the vehicle as a 15–passenger van constitutes a deceptive trade practice under the DTPA requires consideration of whether the representation was mere puffing or too vague to be actionable. In *Chandler v. Gene Messer Ford, Inc.,* 81 S.W.3d 493 (Tex.App.2002), plaintiff asserted a violation of § 17.46(b)(5) of the DTPA, which defines a deceptive trade practice as "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have," Tex. Bus. & Com.Code § 17.46(b)(5). Plaintiffs in *Chandler* asserted that Ford's advertisements represented that air bags improve overall vehicle safety, and that a salesperson with the defendant Ford dealership told plaintiff that the Ford car they ultimately purchased was safer than a competitor's because it had dual air bags. After plaintiffs' child was injured while riding in the front seat, plaintiffs sought recovery under the DTPA based on these representations. The court in *Chandler* held that the salesperson's statements were mere puffery and therefore not actionable under the DTPA, and the advertisements were "too vague to support [plaintiffs'] claim of a misrepresentation under the DTPA." 81 S.W.3d at 501.

Here, Ford's description of the vehicles as 15–passenger vans, as previously discussed, does not include an express representation of safety. Even the misrepresentations at issue in *Chandler* and found insufficient to serve as the basis for a DTPA violation expressly included representations of safety. Nonetheless, the Texas court found them wanting for vagueness. "Although general or indefinite statements may support recovery under the DTPA, they must be examined in light of the particular facts of the case." *Humble Nat'l Bank v. DCV, Inc.,* 933 S.W.2d 224, 230 (Tex.App.1996). An imprecise or vague representation amounts to mere opinion or

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 83 of 261
PageID: 45021

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

puffing. *Id.* Here, under the particular undisputed facts of this case, Ford's description of the E–350 van as a 15–passenger van did not include any representation of safety, and does not rise to the level required for a violation of § 17.46(b)(5).

St. Luke's also asserts violations of §§ 17.46(b)(7) and (9). Section 17.46(b)(7) bars the representation "that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and § 17.46(b)(9) covers "advertising goods or services with intent not to sell them as advertised." Ford limits its argument on St. Luke's DTPA misrepresentation theory to § 17.46(b)(5) and *Chandler,* which only involved § 17.46(b)(5). However, the principles applied in *Chandler* apply equally to the other implicated misrepresentation provisions, and Texas courts often discuss these provisions together. *See, e.g., Douglas v. Delp,* 987 S.W.2d 879, 886 (Tex.1999) (analyzing §§ 17.46(b) (5) and (7) together); *Humble,* 933 S.W.2d at 229–30 (same). This Court will grant summary judgment in Ford's favor on St. Luke's DTPA claims to the extent that the claims are based on misrepresentations by Ford in its description of the E–350 van.

 **\*55** Section § 17.46(b)(24) of the DTPA prohibits the failure "to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed." A claim for failure to disclose under the DTPA requires that a plaintiff show that "(1) the defendant knew information regarding the goods or services, (2) the information was not disclosed, (3) there was an intent to induce the consumer to enter into the transaction through the failure to disclose, and (4) the consumer would not have entered into the transaction had the information been disclosed." *Patterson v. McMickle,* 191 S.W.3d 819, 827 (Tex.App.2006). St. Luke's presents claims under this section based on Ford's alleged omission of information regarding the stability of the vehicles. Ford argues that because St. Luke's presented no evidence that it ever viewed any Ford promotional materials or other communications, it also cannot prove that it would have seen any disclosure Ford would have made, and therefore "it has no evidence that it would have relied upon any such unseen disclosure." (Ford Br. No. 21 at 8.)

However, the deposition testimony of St. Luke's representative only demonstrates that she was not aware whether St. Luke's had seen any Ford materials prior to its

purchases, and cannot be read to establish, as a matter of law, that St. Luke's would not have seen a disclosure regarding safety. The elements of a non-disclosure claim under pursuant to § 17.46(b)(24) do not require St. Luke's essentially to prove a negative by showing that it would have seen a disclosure that never happened. Rather, to satisfy the reliance element for an omission, a plaintiff must show that defendant had intent to induce a transaction through failure to disclose, and that plaintiff would not have entered into the transaction if the information had been disclosed. The record is not undisputed on these questions, and Ford has not conclusively shown, based on undisputed facts, that St. Luke's would have purchased the vehicles regardless of any disclosure Ford might have made. This Court will deny Ford's motion with regard to St. Luke's DPTA claims to the extent they assert a violation based on non-disclosure.

### E. Unjust Enrichment

In Texas "[u]njust enrichment, itself, is not an independent cause of action but rather 'characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay.' " *R.M. Dudley Constr. Co. v. Dawson,* 258 S.W.3d 694, 703 (Tex.App.2008) (quoting *Friberg–Cooper Water Supply Corp. v. Elledge,* 197 S.W.3d 826, 832 (Tex.App.2006)). To recover under a theory of unjust enrichment in Texas, a party must prove that "one person has obtained a benefit from another by fraud, duress, or the other taking of an undue advantage." *City of The Colony v. N. Tx. Mun. Water Dist.,* 272 S.W.3d 699, 731 (Tex.App.2008).

 **\*56** Just as other Plaintiffs in this matter who purchased vehicles from a Ford dealership failed to present evidence that their purchase benefitted Ford, St. Luke's points to no evidence that Ford benefitted from the purchases from Village Ford. "Under Texas law, an agency relationship must be affirmatively established, it may not be presumed." *Coffey v. Fort Wayne Pools, Inc.,* 24 F.Supp.2d 671, 677 (N.D.Tex.1998) (citing *Karl Rove & Co. v. Thornburgh,* 39 F.3d 1273, 1296 (5th Cir.1994)). Moreover, "[i]n Texas, the general rule is that a retailer or wholesaler is not an agent of a manufacturer." *Coffey,* 24 F.Supp.2d at 678. St. Luke's, in response to Ford's motion for summary judgment, has failed to meet its burden to come forward with facts supporting its agency theory, and St. Luke's "burden is not satisfied by assertions unsupported by facts or a scintilla of evidence." *Id.* at 679 (footnotes omitted). Therefore, this Court will grant Ford's motion for summary judgment on St. Luke's unjust

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 84 of 261
PageID: 45022

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

enrichment claims without prejudice and allow St. Luke's until August 13, 2010 to show cause to cure the evidentiary deficiency regarding the relationship between Village Ford and Ford and demonstrate why summary judgment should not be granted in Ford's favor. Ford shall have until September 13, 2010 to file a response to St. Luke's submission.

### F. Summary

For the foregoing reasons, this Court will grant Ford's motion for summary judgment as to St. Luke's claims for breach of express warranty and implied warranty, and for violation of the DTPA under a misrepresentation theory. This Court will deny Ford's motion with respect to St. Luke's DTPA claims to the extent that they are based upon non-disclosure. This Court will grant Ford's motion without prejudice with regard to St. Luke's unjust enrichment claim. [17] St. Luke's shall have until August 13, 2010 to show cause to cure the evidentiary deficiency identified by the Court and demonstrate that summary judgment should not be granted in Ford's favor on the unjust enrichment claims. Ford shall have until September 13, 2010 to file a response to St. Luke's submission.

### VIII. Missouri

Missouri Plaintiff St. James United Methodist Church ("St.James") was added to this litigation after Judge Ackerman decided Ford's motion to dismiss. Ford now moves for summary judgment as to all of St. James's claims: breach of express warranty; breach of implied warranty; violation of the Missouri Merchandising Practices Act ("MMPA"), Mo.Rev.Stat. § 407.010 *et seq.;* and unjust enrichment.

### A. Material Facts

Randy Hall, Chairman of St. James's Board of Trustees, purchased a used 1997 Ford E–350 van on behalf of St. James in February 1998. Hall purchased the used 1997 vehicle from South Town Ford, a Ford dealership. (Andresen Certif. No. 20, Ex. 2 at 2.) In August 2001, St. James purchased another Ford E–350 van, a used 2000 model, for approximately $23,000. Hall, who testified at deposition on St. James's behalf, could not remember from whom St. James purchased the 2000 van. (Hall Dep. at 96:17–97:2.) St. James purchased both vehicles because they could carry 15 passengers, and James testified with regard to the 2000 van that the church viewed Ford brochures that stated that the van could carry 15 passengers. (*Id.* at 79:4–80:4.) The church purchased the vehicles to transport church members to and from services and events, and in connection with

other church functions and programs. St. James continues to use both vans. At one time, St. James operated the vans with 15 passengers, but now limits capacity to 12 by not using the back row of seats. (*Id.* at 66:15–67:18.) St. James has driven each van approximately 13,000 miles per year. (*Id.* at 97:17–98:9.) While St. James has heard reports about the handling problems with the Ford E–350 van, Hall testified that St. James's drivers had only reported brake issues and other minor problems. (*Id.* at 138:11–17.) James did not testify that any drivers reported any handling problems. (*Id.*) Hall testified that he believed that St. James's insurance carrier alerted it to the reported handling problems with Ford E–350 vans and recommended that St. James use drivers with commercial drivers' licences for the vehicles. (Hall Dep. at 34:17–35:10; 101:2–12.) However, St. James never encountered any difficulty procuring insurance for the vehicles, and it reduced its rates when it switched carriers in approximately 2008. (*Id.* at 35:23–37:23.) St. James intends to sell the vehicles, but has made no plans and conducted no research into a potential future sale. (*Id.* at 113:22–114:25.)

### B. Briehl and O'Neil

**\*57** Ford primarily contends that the decision of the Eighth Circuit in *Briehl v. General Motors Corp.,* 172 F.3d 623 (8th Cir.1999), dictates that under Missouri law, St. James's claims must be dismissed for failure to adequately plead damages because the alleged defect in its vans has not manifested itself. In *Briehl,* the Eighth Circuit affirmed the dismissal by a district court in Missouri of a purported class's claims in multidistrict litigation for breach of implied and express warranties and various state consumer fraud statutes. Plaintiffs in *Briehl* asserted that the anti-locking brake system in their vehicles were defective and that the defect resulted in diminution in value and lower resale value. Just as here, the *Briehl* plaintiffs did not seek recovery for any personal injury or property damage. *Briehl,* 172 F.3d at 626. The Eighth Circuit agreed with the district court in Eastern District of Missouri that "[w]here, as in this case, a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies." *Id.* at 628. Because plaintiffs "failed to allege any manifest defect and their vehicles perform in a satisfactory manner," the Eighth Circuit affirmed the dismissal of all of plaintiffs' claims. *Id.* The court in *Briehl* did not limit its holding to Missouri law, and cited cases from several jurisdictions holding that a plaintiff in product liability cases cannot sufficiently plead damages if the alleged defect did not manifest itself. *Id.* at 627–28 (collecting cases). Ford concedes that the Missouri state courts have not spoken on this issue with regard to the types of claims asserted by St.

James, although it points to a Missouri Court of Appeals decision that dismissed claims for strict liability and negligent failure to warn on similar reasoning that the product did not actually malfunction or fail. *See Spuhl v. Spiley, Inc.,* 795 S.W.2d 573, 580–81 (Mo.Ct.App.1990).

Curiously, St. James ignores *Briehl* in responding to Ford's motion. Plaintiffs argue generally that they have suffered "actual injury due to a present inability to use the E–350 for its ordinary purpose," and contend that other cases similar to *Briehl* that required manifestation of the defect are distinguishable because in those cases, the products served their ordinary purposes. (Pls.' Omnibus Br. at 9.) To show actual injury, Plaintiffs rely generally on various Plaintiffs' limitations on use and capacity of their vans and evidence that some Plaintiffs have incurred out-of-pocket costs associated with responding to handling problems, such as repair and insurance costs. (*Id.* at 6–7.)

In *Briehl,* the plaintiffs did not assert such limitations on use or other out-of-pocket damages, and instead only sought damages for "(1) lost resale value and (2) overpayment for the vehicles at the time of purchase." *Briehl,* 172 F.3d at 626. With regard to the *Briehl* plaintiffs' claim for reduced resale value, the court commented that no plaintiff or purported class member actually sold their vehicle at a reduced value. *Id.* at 628–29. Here, St. James has not sold its vehicles, has no specific plan to do so, and has not identified any reduced resale value. More fundamentally, St. James of course has not suffered a rollover, and did not produce evidence even of any significant handling complaints. It is not clear how the *Briehl* court would have approached the plaintiffs' claims if plaintiffs also sought economic damages based on limitations on use, but the court's firm rejection of any claimed damages as too speculative absent manifestation of defect strongly suggests that an alternate theory would not have made a difference.

**\*58** Subsequent application of *Briehl* confirms that the limitation-on-use theory does not provide the basis for a no-injury case to proceed. In *O'Neil v. Simplicity, Inc.,* plaintiffs alleged that "they paid for a drop-side crib and now they do not use the crib because the drop-side is not safe .... Thus, they contend that they have suffered an economic injury, and they seek to recover the difference in price between a crib with a functional drop-side and a crib without." 574 F.3d 501, 502 (8th Cir.2009). The Eighth Circuit affirmed the dismissal of plaintiffs' claims by a district court in Minnesota because plaintiffs' cribs had "not exhibited the alleged defect," and

therefore "they have necessarily received the benefit of their bargain." *Id.*

Plaintiffs in *O'Neil* limited their use of the crib, but the alleged defect never manifested itself and did not result in personal injury or other injury. The Eighth Circuit affirmed the dismissal of all their claims, which included all the claims asserted by St. James here: breach of express and implied warranty, violation of the relevant state's consumer fraud statute, and unjust enrichment. [18] While *O'Neil* concerned Minnesota law, it relied upon general principles propounded by the Eighth Circuit and did not refer to any doctrine specific to Minnesota law. The reasoning of *Briehl* and *O'Neil* applies equally here. St. James has elected to limit its use of its vehicles by limiting capacity, but the defect has not manifested itself and therefore they have received the benefit of their bargain. As in *O'Neil,* the manifestation of the alleged defect in vehicles purchased by others does not translate into a cognizable injury for a plaintiff whose product did not malfunction. *See O'Neil,* 574 F.3d at 504 ("[Plaintiffs] purchased a crib with a functioning drop-side and that crib continues to have a functioning drop-side. Their bargain with [defendants] did not contemplate the performance of cribs purchased by other consumers.").

A district court in Missouri recently distinguished *Briehl* and *O'Neil* and declined to dismiss certain claims brought by plaintiffs who purchased baby products and later learned that they contained Bisphenol–A (BPA), a chemical which has potentially negative health effects, and either still retained the goods or replaced or disposed of them. *In re Bisphenol–A (BPA) Polycarbonate Plastic Prods. Liab. Litig.,* 687 F.Supp.2d 897 (W.D.Mo.2009). The district court concluded that unlike in *Briehl* and *O'Neil,* where only a "potential defect" existed and had not yet manifested itself, the products at issue in *BPA* definitely contained BPA. Thus, the key for the *BPA* court was "not that someone was injured, but that consumers were not told of BPA's presence and the corresponding health risks. Perhaps no physical injuries resulted—but a fraud claim does not depend on a showing of physical injury." *Id.* at 911. The court concluded that for the plaintiffs whose claims survived, those claims "do not depend on proving the products are defective," and thus the no-injury line of products liability cases do not apply. *Id.* at 912. The court accepted these plaintiffs' benefit-of-the-bargain argument, reasoning that they "purchased a product they allege they would not have purchased had they known the true facts. Now that they know the true facts, they are unwilling to risk allowing their children to use the product.

Case 1:19-md-02875-RMB-SAK Document 1748-28 Filed 11/10/21 Page 86 of 261 PageID: 45024

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

They cannot obtain the intended bargain or benefit from the goods, so they incurred damages." *Id* . In a subsequent opinion, the court clarified that "[a] person who buys a product and is later told there is a substance in the product that might cause personal injury has a claim for breach of implied warranty of merchantability; the consumer need not suffer personal injury in order to assert a breach of contract/ warranty claim." *In re Bisphenol–A (BPA) Polycarbonate Plastic Prods. Liab. Litig.,* No. 08–1967, 2010 WL 286428, at *1 (W.D.Mo. Jan.19, 2010). By the same token, "a person who buys a product and is not told that the product contains a substance that might cause personal injury when the product is used has a claim for fraud by omission; a personal injury is not required." *Id.*

**\*59** This Court concludes that the instant case bears closer resemblance to *Briehl* and *O'Neil* than *BPA*. Whereas the products in *BPA* undisputedly contained the chemical which could cause negative health effects, the vans at issue here, like the anti-lock braking system in *Briehl* and the cribs in *O'Neil,* only contain a potential defect in handling. Just like plaintiffs in *O'Neil,* St. James here no longer uses the vehicle to carry 15 passengers and thus claims that it did not receive the benefit of its bargain. However, absent manifestation of the defect, the vehicles "perform[ ] just as [they were] intended, and thus there is no injury and no basis for relief." *O'Neil,* 574 F.3d at 505.

The court in *BPA* relied upon *Coghlan v. Wellcraft Marine Corp.,* in which plaintiffs were promised an all-fiberglass boat but received a boat made of fiberglass and plywood, as an example of a case alleging loss of benefit-of-the-bargain that did not depend on manifestation of actual injury because the injury was the misrepresentations made to the buyer. 240 F.3d 449, 455 n. 4 (5th Cir.2001). Because the claims in *Coghlan* were "rooted in basic contract law rather than the law of product liability" and the damages sought were "not rooted in the alleged defect of the product as such, but in the fact that they did not receive the benefit of their bargain," the *Goghlan* court allowed the claims to proceed, and the *BPA* court used *Coghlan* to distinguish *O'Neil.* However, as the *BPA* court recognized, *O'Neil* cited *Coghlan* approvingly, and acknowledged the difference between a no-injury suit and benefit-of-the-bargain suit. *O'Neil,* 574 F.3d at 504–05. The Eighth Circuit in *O'Neil* concluded that the plaintiffs before it "attempted to refashion what is at its core a no-injury products liability suit into a suit based in contract" but could not succeed because defendants "ha[d] not failed to deliver what was promised." *Id.* at 504. Plaintiffs in *O'Neil* paid for

a drop-side crib and limited their use of the crib because the drop-side was not safe; St. James here paid for 15–passenger vans and limited their use of the vehicles because use at full capacity allegedly is not safe. While St. James's claims do not depend on products liability law, they still depend upon a showing that its vans did not perform as promised, and like the plaintiffs in *Briehl* and *O'Neil,* it cannot do so. In the absence of definitive guidance from the Missouri state courts, this Court will follow the guidance of the Eighth Circuit's rulings under Missouri and other states' laws. This Court will grant summary judgment in Ford's favor on all of St. James's claims because it has suffered no injury and no damages.

### C. Express and Implied Warranty

While summary judgment is warranted for the reasons discussed above, Ford is entitled to summary judgment on some of St. James's claims for additional reasons. Ford contends that St. James's warranty claims as to its 1997 vehicle, purchased in 1998, are barred by Missouri's four-year statute of limitations for breach of contract actions. Mo.Rev.Stat. § 400.2–725(1). A cause of action under this statute accrues when the breach occurs; a breach of warranty generally occurs when tender of delivery is made. Mo.Rev.Stat. § 400.2–725(2). [19] Plaintiffs filed this action in 2003, and St. James joined this action in 2008. Even based on the initial filing of this action in 2003, St. James's claims are time-barred because they are outside the four-year limitations period, unless the doctrine of fraudulent concealment applies to toll the statute.

**\*60** "To constitute concealment of a cause of action within the general rule tolling the statute of limitations on that ground the concealment must be fraudulent or intentional and, ... there must be something of an affirmative nature designed to prevent, and which does prevent, discovery of the cause of action." *Owen v. General Motors Corp.,* 533 F.3d 913, 919–20 (8th Cir.2008) (quoting *Hasenyager v. Bd. of Police Comm'rs of Kansas City,* 606 S.W.2d 468, 471 (Mo.Ct.App.1980) (internal marks omitted)). The fraudulent concealment must involve "more than mere silence on defendant's part" and usually requires the use of "some means or device to prevent discovery." *Owen,* 533 F.3d at 920 (quoting *Gilliam v. Gohn,* 303 S.W.2d 101, 107 (Mo.1957)). Although Illinois Plaintiff Pentecostal Temple contends that the statute of limitations here was tolled by the doctrine of fraudulent concealment, St. James does not present any such argument, or oppose Ford's motion with regard to the timeliness of the 1997 vehicle warranty claims in any way. Under Missouri law, the burden

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 87 of 261
PageID: 45025

of proving fraudulent concealment rests with the plaintiff. *See Tayborn v. Burstein,* 748 S.W.2d 824, 826 (Mo.Ct.App.1988); *see also Nitro Distributing, Inc. v. Alticor, Inc.,* 565 F.3d 417, 427 (8th Cir.2009); *Hasenyager,* 606 S.W.2d at 471–72. St. James has failed to meet its burden here; indeed, it has failed even to raise an argument as to why the warranty claims for the 1997 van should not be time-barred.

### D. MMPA

As it has with regard to other Plaintiffs' state consumer fraud statute claims, Ford contends that St. James may not assert a claim under Missouri's consumer fraud statute, the MMPA, because it did not purchase its vans for personal, family, or household use. The MMPA allows "any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss" as a result of an unlawful sales practice to bring suit. Mo.Rev.Stat. § 407.025(1). While St. James qualifies as a "person" under the statutory definition, *see* Mo.Rev.Stat. § 407.010(5), it purchased the vehicles for church purposes and not primarily for personal, family, and household use. As this Court previously held with regard to Georgia Plaintiff Allen Temple, St. James did not purchase the vans for any particular parishioner's or employee's personal, family, or household use. Rather, it bought the vans for use in the course of church business, even though that business might have additionally benefitted individual members personally. *See Se. Mo. Hosp. v. C.R. Bard, Inc.,* No. 07–31, 2008 WL 199567, at *9 (E.D.Mo.2008) (dismissing MMPA claim for purchases of catheters by hospital); *Saey v. CompUSA, Inc.,* 174 F.R.D. 448, 450 (E.D.Mo.1997) (holding that plaintiff who purchased computer for business lacked standing under MMPA). In addition to its failure to assert cognizable injury under *Briehl* and *O'Neil,* St. James lacks standing to assert its MMPA claims.

### E. Unjust Enrichment

**\*61** Under Missouri law, a plaintiff asserting a claim for unjust enrichment must show "(1) that the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff; [and] (3) that it would be unjust to allow the defendant to retain the benefit." *Beeler v. Martin,* 306 S.W.3d 108, 112 (Mo.Ct.App.2010) (quoting *Miller v. Horn,* 254 S.W.3d 920, 924 (Mo.Ct.App.2008)). To establish unjust enrichment, a plaintiff must show the "conferral of a benefit on the defendant by the plaintiff." *McCormick v. Cupp,* 106 S.W.3d 563, 568 (Mo.Ct.App.2003).

Here, St. James purchased its first vehicle used from a Ford dealership, and cannot recall from whom it purchased its second vehicle. With regard to the first vehicle, for the same reasons as discussed above with regard to other Plaintiffs who purchased used vehicles from a Ford dealership, the record is devoid of any evidence that used car sales benefit Ford, and St. James does not point to any evidence whatsoever suggesting that Ford received any benefit from the sale of the used car by a Ford dealer to St. James. Under Missouri law, a party relying on an agency relationship bears the burden of proof, *Elam v. Dawson,* 216 S.W.3d 251, 254 (Mo.Ct.App.2007), and as discussed previously with regard to other Plaintiffs, St. James has utterly failed to meet its burden to show an agency relationship here. With regard to the second vehicle, in opposing summary judgment St. James has not pointed to any evidence regarding from whom it purchased the vehicle, and therefore has not met its burden to produce more than a mere scintilla of evidence to support a finding that St. James conferred a benefit upon Ford. Therefore, in addition to the reasons stated above, Ford is entitled to summary judgment in its favor on St. James's unjust enrichment claims. In light of this Court's conclusion that St. James cannot maintain its action pursuant to *Briehl* and *O'Neil,* this Court sees no cause for St. James to be granted leave to cure its evidentiary deficiency regarding the 1997 van.

### F. Summary

For the foregoing reasons, this Court will grant Ford's motion for summary judgment on all of St. James's claims. St. James shall be dismissed from this matter.

## IX. Michigan

Michigan Plaintiff Conant Avenue United Methodist Church ("Conant Avenue") was added to this litigation after Judge Ackerman decided Ford's motion to dismiss. Ford now moves for summary judgment as to all of Conant Avenue's claims: breach of express warranty; breach of implied warranty; violation of the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws § 445.901 *et seq.;* and unjust enrichment.

### A. Material Facts

Elaine Hopkins, a Conant Avenue member and chairperson of the church's Administrative Board, was employed by Ford in its Fleet Services Department and held the responsibility to provide transportation to those doing business with Ford.

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 88 of 261
PageID: 45026

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Hopkins learned that Ford Fleet Services was selling a used 2000 Ford E–350 van, looked at the van, and told Conant Avenue about it. (Totty Dep. at 18:12–25.) The church purchased the vehicle in February 2001 for $21,404.58. (*Id.* at 24:6–25; Andresen Certif. No. 15, Ex. 3 at CAUM 003.) As a Ford representative, Hopkins told Conant Avenue that it was the largest capacity van and would hold 15 passengers. (Totty Dep. at 21:3–7.) Conant Avenue believed that Ford promised that the vehicle "would carry 15 passengers," (*id.* at 119:20) based on Hopkins's statements (*id.* at 19:13–23) and the VIN number indicating that it was a 15–passenger van (*id.* at 119:24–120:1). However, Pastor Darryl Eugene Totty also testified on behalf of Conant Avenue that he was not aware of any Ford marketing or other printed materials, other than that which might have been provided by Hopkins. (*Id.* at 108:21–109:11.) The church purchased the vehicle to transport members to and from church events, and bought the van because it needed to carry a large number of people and the E–350 was "the maximum size van that they could get at the time." (*Id.* at 18:4–8.) Totty stated that in selling the van, Ford falsely represented that the van could carry 15 people safely. (*Id.* at 115:2–4.) Yet Totty also testified that Ford did not have the "intent at that time ... to mislead or defraud the church in any way" (*id.* at 115:5–6), and that Ford did not conceal any information from the church when it sold the church the van (*id.* at 115:10–13).

**\*62**  The Retail Installment Contract for the vehicle lists Riverside Ford Sales, Inc. ("Riverside Ford"), a Ford dealership, as the seller. (Andresen Certif. No. 15, Ex. 3 at CAUM 003.) However, according to Totty, Riverside Ford was just a "pickup location," because one could not purchase the van "directly from the corporation," and Ford's policies dictated that "it had to go through a dealer." (Totty Dep. at 38:25–39:3.) Conant Avenue negotiated price and other terms of the contract with Ford Fleet Services, and the vehicle was delivered via Riverside Ford. (*Id.* at 39:5–15.) At deposition, Totty acknowledged that Conant Avenue had a direct contract with Ford for the purchase of its van. (*Id.* at 119:2–9.)

Conant Avenue still owns its used 2000 Ford E–350 van. Until October 2008, Conant Avenue often filled the vehicle to capacity with 15 passengers. (Totty Dep. at 115:7–9.) In October 2008, after reading the government report regarding the safety of the Ford E–350, the church removed the last row of seats to limit capacity to 12 passengers. (*Id.* at 44:3–17.) Conant Avenue never experienced a rollover (*id.* at 115:14–17), but Totty and others reported some swaying when the van was filled to capacity (*id.* at 52:22–53:16; 56:3–19).

Sometime in 2008, after a driver reported to the church that she had some concerns about the stability of the vehicle, Conant Avenue took its van to Jorgensen Ford to "check the tires and to check the vehicle out and just to make sure that it was safe." (*Id.* at 56:23–24.) The Ford dealership found no problems with the vehicle, and merely rotated the tires and gave the van an oil change. (*Id.* at 57:1–2.) Conant Avenue has driven its vehicle over 57,000 miles. (Andresen Certif. No. 15, Ex. 1 at 2 .)

*B. Hendricks and Henry*

Ford first asks this Court to predict that the Supreme Court of Michigan would follow the rulings of other state courts in holding that a plaintiff cannot recover under breach of warranty or the MCPA where its claim is based upon an alleged product defect that has not manifested itself in personal injury or property damage. A court in the Western District of Michigan has stated that it was "aware of no Michigan authority which recognizes, as injury in an action under the MCPA, recovery for a potential future loss which has not actually occurred." *Hendricks v. DSW Shoe Warehouse, Inc.,* 444 F.Supp.2d 775, 782 (W.D.Mich.2006). In *Hendricks,* plaintiff claimed that she suffered identity and data theft at the hands of the defendant, and only sought damages for "expenses which she has made to purchase a credit monitoring product, which she alleges will prevent future unauthorized use of her personal data." *Id.* at 779. The court in Hendricks rejected plaintiff's claims, holding that "[t]here is no existing Michigan statutory or case law authority to support plaintiff's position that the purchase of credit monitoring constitutes either actual damages or a cognizable loss." *Id.* at 783. Ford asks this Court to grant summary judgment in Ford's favor on all of Conant Avenue's claims based on the same reasoning.

**\*63**  Ford concedes that Michigan state courts have not yet directly addressed this issue, and relies also upon a decision of the Supreme Court of Michigan in a negligence case that refused to allow liability for potential future injury. *Henry v. Dow Chemical Co.,* 473 Mich. 63, 701 N.W.2d 684, 688–89 (Mich.2005). The court in *Henry* rejected tort liability where plaintiffs suffered no present physical injury from a chemical allegedly released by the defendant, but where plaintiffs sought damages for economic losses they had suffered and would continue to suffer by monitoring their health condition for symptoms based on exposure to defendant's chemical. *Id.* at 77. Ford concedes that "*Henry* involved a claim based on negligence, and the holding of the supreme court is by its terms limited to tort cases" (Ford. Br. No. 15 at 6) and thus

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 89 of 261
PageID: 45027

not controlling here. However, Ford argues that extending this rationale would best serve the underlying policy concerns that guided the *Henry* court. The federal court in *Hendricks* relied upon *Henry* in dismissing contract and MPCA claims, reasoning that "there is reason to believe that Michigan's highest court would reject a novel legal theory of damages which is based on a risk of injury at some indefinite time in the future." *Hendricks,* 444 F.Supp.2d at 783 (citing *Henry,* 701 N.W.2d at 692). Conant Avenue argues that this Court should distinguish *Hendricks* because Conant Avenue does not seek recovery "for the cost of protecting [itself] against future injury," but asks for damages based on "the current loss of full use of [its] vehicle[ ]," acknowledging that "reduced likelihood of future injury resulting from a rollover" would be a 'secondary benefit." (Pls.' Omnibus Br. at 10–11.) In *Henry,* the Supreme Court of Michigan held with regard to plaintiffs' tort claims that their asserted economic losses for medical monitoring "are wholly derivative of a possible, future injury rather than an *actual, present* injury." *Henry,* 701 N.W.2d at 691 (emphasis in original). Still, Ford itself concedes that *Henry* is limited to tort claims, and this Court declines to extend *Henry* to the contract and MCPA claims at issue here. The court's reasoning in *Henry* does not allow this Court to conclusively predict that the Supreme Court of Michigan would categorically rule that a plaintiff in a non-tort case involving economic injury arising from loss of full use such as that asserted by Conant Avenue here could not recover.

## C. Express Warranty

In addition to its broad argument that *Henry* should be extended to preclude Conant Avenue's claims, Ford asserts that it should win summary judgment on Conant Avenue's claims for breach of express warranty because Ford's description of the E–350 van does not amount to an actionable express warranty of safety in transporting 15 passengers. Michigan has adopted the UCC's express warranty provisions. "An affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Mich. Comp. Laws § 440.2313(1)(a). In addition, "[a] description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Mich. Comp. Laws § 440.2313(1)(b). This Court concludes, for the same reasons as discussed earlier with regard to other Plaintiffs, that Ford's statement that the E–350 van is a 15–passenger van does not create an express warranty of the safety of the van in carrying 15 passengers. Similarly, Hopkins's statements on behalf of Ford that the van

could carry 15 passengers and was the largest van they could get did not amount to an express warranty of safety.

**\*64** Michigan courts have required that an express warranty include a specific promise or description with the intention that the goods conform to that specific promise. For example, in *Guaranteed Constr. Co. v. Gold Bond Prods.,* the defendant represented a product as "corner bead," and plaintiff sued for breach of express warranty when this product suffered corrosion. 153 Mich.App. 385, 395 N.W.2d 332, 334–35 (Mich.Ct.App.1986). The Court of Appeals of Michigan concluded that the defendant had supplied "corner bead" as promised, and that plaintiff had not pointed to any express representation by the seller that the corner bead would not rust. *Id.* at 335. The court noted that if defendant's packaging had stated "noncorrosive corner bead," then plaintiff might have had a valid breach of express warranty claim. *Id.* Similarly here, Ford described the vehicle as a 15–passenger van, and Plaintiffs do not dispute that the E–350 van can transport 15 passengers; therefore, as a matter of law Ford has not breached any express warranty. Any representation of safety in carrying 15 passengers, if actionable, is only an implied warranty and not an express warranty based on the undisputed record. Indeed, the court in *Guaranteed Construction* observed that under plaintiff's theory of the case, to recover under warranty the plaintiff had to rely upon implied warranty. *Id.* Another court in Michigan found that a label on a water heater stating "SET DIAL D TO DESIRED TEMPERATURE" did not constitute an express warranty that dial could be *safely* set at the maximum temperature. *Ledesma ex rel. Hoffman v. Rheem Mfg. Co.,* No. 175457, 1997 WL 33354494, at *1 (Mich.Ct.App. Jan.21, 1997). The court concluded that defendant's "instruction to set the dial to the desired temperature cannot be read as a warranty that any temperature setting would be safe for bathing." *Id.* The same reasoning applies here: Ford's description of the vehicle as a 15–passenger van and Hopkins's comments about the van's large capacity cannot be read to create an express warranty of safety.

An action for express warranty must rely upon express representations or statements made by defendant, and not on any understandings on plaintiff's part or mere implications. *Latimer v. William Mueller & Son, Inc.,* 149 Mich.App. 620, 386 N.W.2d 618, 622 (Mich.Ct.App.1986); *see also Heritage Resources, Inc. v. Caterpillar Financial Servs. Corp.,* 284 Mich.App. 617, 774 N.W.2d 332, 342 n. 11 (Mich.Ct.App.2009) (citing *Latimer,* 386 N.W.2d at 622). Because Conant Avenue does not point to any express,

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 90 of 261
PageID: 45028

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

actionable representations of safety in transporting 15 passengers made by Ford, this Court will grant summary judgment in Ford's favor on Conant Avenue's claim for breach of express warranty.

### D. Implied Warranty

Beyond its general arguments pursuant to *Henry* and *Hendricks,* Ford moves for summary judgment on Conant Avenue's breach of implied warranty claim only based on lack of sufficient notice. Ford does not present any other argument on the merits of Conant Avenue's implied warranty claim. Michigan has adopted the UCC's notice standard: "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Mich. Comp. Laws § 440.2607(3) (a). As do the other Plaintiffs, Conant Avenue argues that its joining of this lawsuit constitutes sufficient notice. Michigan law is silent on the precise question of whether the filing of a complaint satisfies the requirements of § 440.2607(3)(a). *See, e.g., In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.,* 155 F.Supp.2d 1069, 1110 (S.D.Ind.2001) (noting that no Michigan court has addressed whether filing suit, at least in some instances, could satisfy the notice requirement). In a case involving a commercial transaction, the Court of Appeals of Michigan concluded, based upon an extensive examination of undisputed facts and consideration of the purposes for the UCC's notice requirement, [20] that a merchant plaintiff failed to provide sufficient notice where plaintiff notified defendants of a problem but never notified defendants that they were in breach until it filed suit. *American Bumper & Mfg. Co. v. Transtechnology Corp.,* 252 Mich.App. 340, 652 N.W.2d 252, 256 (Mich.Ct.App.2002). However, the court's reasoning in *American Bumper* depended upon a commercial standard of reasonableness and involved consideration of plaintiff's subsequent investigation of the problem that exonerated defendant. *Id.* The court declined to resolve whether Michigan applies a "strict" or "lenient" standard with regard to the adequacy of notice, but determined under either approach, plaintiff's purported notice did not serve the purposes of the notice requirement. *Id.* at 255–56.

**\*65** What constitutes reasonable notice and reasonable time for such notice "is to be determined under the facts of each case." *Eaton Corp. v. Magnavox Co.,* 581 F.Supp. 1514, 1531 (E.D.Mich.1984); Mich. Comp. Laws § 440.1204(2). Michigan courts have only required that notice of breach "inform the seller that there are outstanding problems with the transaction" and that the transaction must be watched.

*See Mich. Sugar Co. v. Jebavy Sorenson Orchard Co.,* 66 Mich.App. 642, 239 N.W.2d 693, 696 (Mich.Ct.App.1976); *see also Natron Corp. v. Hamilton/Avnet Elecs. of Ariz., Inc.,* No. 5:90–CV–60, 1991 WL 303604, at *2 (W.D.Mich. Nov.1, 1991). One federal court concluded that nothing in Michigan law suggests that the Supreme Court of Michigan would hold that "the filing of a lawsuit can never satisfy the notice of breach requirement." *In re Bridgestone/Firestone,* 155 F.Supp.2d at 1110. That court further reasoned that the policies underlying the UCC notice requirement—those policies analyzed by the Michigan state court in *American Bumper*—are not necessarily frustrated by if notice is given by filing suit. *Id.* at 1110–11 (stating that notice by filing suit promotes the protection of defendants from stale claims and does not impede settlement negotiations because the prospect of going to trial presents a powerful incentive, and considering factor that defendants had ample actual notice of breach well before lawsuit was filed). This Court agrees, and concludes that the Supreme Court of Michigan would not hold that notice by filing or joining suit does not constitute notice at all. Disputed facts exist regarding such issues as Ford's actual notice, both of the potential handling problem with Ford E–350 vans generally and difficulties with Conant Avenue's vehicle specifically based on Conant Avenue's bringing of the vehicle to a Ford dealer for service. Whether Conant Avenue gave notice by joining suit within a reasonable time is also a question of fact. Because Ford presents no additional argument for granting summary judgment on Conant Avenue's implied warranty claim, this Court will deny Ford's motion with regard to that claim.

### E. MCPA

The MCPA makes various "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce" unlawful. Mich. Comp. Laws § 445.903(1). The act defines "trade or commerce" as "the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes." Mich. Comp. Laws § 445.902(g). Michigan state courts and most Michigan federal courts have held that under this statutory definition, "if an item is purchased primarily for business or commercial rather than personal purposes, the MCPA does not supply protection." *Slobin v. Henry Ford Health Care,* 469 Mich. 211, 666 N.W.2d 632, 634–35 (Mich.2003); *Zine v. Chrysler Corp.,* 236 Mich.App. 261, 600 N.W.2d 384, 393 (Mich.Ct.App.1999); *see also Robertson v. State Farm Fire & Cas. Co.,* 890 F.Supp. 671, 680–81 (E.D.Mich.1995). The Court of Appeals in Michigan in *Zine* agreed with the federal court in *Robertson* that "the proper focus was on the use to

which the goods or services were put by the plaintiffs." *Zine,* 600 N.W.2d at 393 (citing *Robertson,* 890 F.Supp. at 680).

**\*66** Here, Conant Avenue used its vehicle for church purposes, and not for personal, family, or household use, as this Court has held with regard to other church Plaintiffs in this action. Conant Avenue seizes upon the MCPA's definition of a "person" who can bring suit as including a corporation or unincorporated association. Mich. Comp. Laws § 445.902(d). Thus, according to Conant Avenue, the statute contemplates a suit by a church organization. While this statutory definition indeed does not bar an association from bringing a claim under the MCPA, that claim must still meet the standing requirement that the purchase be for a personal purpose. As the court in *Robertson* observed, and as quoted with approval by the Court of Appeals of Michigan in *Zine,*

> "Person" is used in the MCPA in reference to those bringing actions (i.e., plaintiffs) and to those against whom actions will be brought (i.e., defendants). Since defendant sellers will often be businesses and corporations, the Act would have to include such entities in its definition of "person" as long as the Act continued to refer to potential defendants as "persons." Accordingly, inclusion of corporations and other business entities in the definition of "person" serves a broader purpose and does not really aid the definition of "personal."

*Robertson,* 890 F.Supp. at 679–680; *see also Zine,* 600 N.W.2d at 392.

Conant Avenue notes that the court in *Robertson* conceded that "[t]he only scenario the court can envision is one where a corporation would buy its employees products as a holiday bonus, e.g ., televisions, stereos, etc., which will be used by the employees in their respective homes. In such a scenario, it is arguable that the corporation is buying goods for personal, family, or household purposes." *Robertson,* 890 F.Supp. at 679. Here, however, the church did not purchase the vehicle for personal use by its members, but to be used by the church for church business: to transport its members to and from church functions. Such use is not actionable under the

MCPA. *See German Free State of Bavaria v. Toyobo Co.,* 480 F.Supp.2d 958, 969 (W.D.Mich.2007) (holding that purchase by German states of bulletproof vests to be worn personally by police officers was a purchase for public police business, not personal, family, or household purposes). The inclusion of corporations and other associations in the statutory definition of "person" allows suit if the purchase is primarily intended for personal purposes

Some federal courts have rejected *Robertson* and held that, particularly in a false advertising case, a plaintiff need not have purchased the product primarily for personal, family, or household purposes as long as defendant generally was engaging in trade or commerce when it made the representations at issue. *Florists' Transworld Delivery, Inc. v. Fleurop–Interflora,* 261 F.Supp.2d 837, 848–850 (E.D.Mich.2003); *Action Auto Glass v. Auto Glass Specialists,* 134 F.Supp.2d 897, 899–901 (W.D.Mich.2001). However, these cases did not cite *Zine,* which reflects the opinion of the Michigan courts on this question under Michigan law, and Michigan courts have reaffirmed *Zine* on many occasions and have held that the MCPA does not apply to transactions intended primarily for business or commercial, rather than personal, purposes. *See, e.g., Slobin,* 666 N.W.2d at 634–35; *Computer Network, Inc. v. AM General Corp.,* 265 Mich.App. 309, 696 N.W.2d 49, 59–60 (Mich.Ct.App.2005); *Jackson Cty. Hog Producers v. Consumers Power Co.,* 234 Mich.App. 72, 592 N.W.2d 112, 117–118 (Mich.Ct.App.1999). Federal courts have also followed the approach of *Zine* and *Robertson. See, e.g., German Free State of Bavaria,* 480 F.Supp.2d at 968–69; *Watkins & Son Pet Supplies v. Iams Co.,* 107 F.Supp.2d 883, 892–93 (S.D.Ohio 1999); *Cosmetic Dermatology & Vein Centers of Downriver, P.C. v. New Faces Skin Care Ctrs., Ltd.,* 91 F.Supp.2d 1045, 1060 (E.D.Mich.2000); *see also, e.g., McKay v. Thane Int'l, Inc.,* No. 06–11209, 2007 WL 4287552, at \*2–\*3 (E.D.Mich. Dec.5, 2007).

**\*67** This Court will adhere to the rulings of the Michigan state courts and the majority interpretation of the Michigan federal courts. Because Conant Avenue did not purchase the vehicle primarily for personal, family, or household purposes, it lacks standing to bring its MCPA claim. This Court will therefore grant summary judgment in Ford's favor on Conant Avenue's MCPA claim.

### F. Unjust Enrichment
In Michigan, "[t]he elements of a claim for unjust enrichment are: (1) receipt of a benefit by the defendant from the

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 92 of 261 PageID: 45030

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant. In such instances, the law operates to imply a contract in order to prevent unjust enrichment. However, a contract will be implied only if there is no express contract covering the same subject matter." *Barber v. SMH (US), Inc.,* 202 Mich.App. 366, 509 N.W.2d 791, 796 (Mich.Ct.App.1993). Ford argues that although the Retail Installment Contract for Conant Avenue's vehicle lists Riverside Ford as the seller, Conant Avenue concedes that it formed a direct contract with Ford through Ford Fleet Services, and that Riverside was only listed as the pickup location. Therefore, because Conant Avenue formed an express contract with Ford by its own admission pertaining to the purchase of the vehicle, it cannot maintain an action for unjust enrichment. [21] This Court agrees. Conant Avenue's claim for unjust enrichment arises from its purchase of its Ford E–350 van, and the sales contract governed this purchase and covers the same subject matter as Conant Avenue's unjust enrichment claim. Therefore, this Court may not imply a contract to prevent any unjust enrichment. [22]

Conant Avenue dismisses Ford's argument based on a direct contract as "disingenuous" because with regard to many other Plaintiffs who purchased their vehicles through Ford dealers, Ford asks this Court to grant summary judgment on unjust enrichment and other claims for lack of privity, and cannot now be heard to argue the opposite—a contractual relationship—for the same result. (Pls .' Omnibus Br. at 61 n. 26.) Yet Conant Avenue ignores the crucial difference between it and the other Plaintiffs: Conant Avenue concedes that although its sales contract lists a Ford dealer, it entered into a direct contract with Ford, not a dealer. Other Plaintiffs have not met their burden to point to evidence in the record establishing that Ford benefitted from the sales by dealers. Here, Plaintiffs have met their evidentiary burden but face a bar to recovery for unjust enrichment by virtue of their contractual relationship. These alternative results are not mutually exclusive.

### G. Summary

For the foregoing reasons, this Court will grant Ford's motion for summary judgment with respect to Conant Avenue's claims for breach of express warranty, violation of the MCPA, and unjust enrichment. This Court will deny Ford's motion as to Conant Avenue's claim for breach of implied warranty.

### X. New York

**\*68** New York Plaintiffs Bishop Winston R. Anderson and Gladstone Barrett were added to this litigation after Judge Ackerman decided Ford's motion to dismiss. Ford now moves for summary judgment as to all of the New York Plaintiffs' claims: breach of express warranty; breach of implied warranty; violation of New York General Business Law ("GBL") §§ 349 and 350; and unjust enrichment.

### A. Material Facts

#### 1. Bishop Anderson

Bishop Anderson purchased a used 1999 Ford E–350 van in the summer of 2002. He bought the vehicle from a motor vehicle dealership located on Flatbush Avenue in Brooklyn, New York. At deposition, Anderson recalled that the dealership sold new and used cars, including Ford cars, but could not remember the name of the dealership, and could not recall whether it was a Ford dealership. (Anderson Dep. at 58:17–59:8.) Anderson also could not remember how much he paid for the vehicle. (*Id.* at 62:2–3, 509 N.W.2d 791.) Anderson stated that his records relating to the vehicle's purchase and subsequent service were lost in a fire in the van. (*Id.* at 27:3–5, 509 N.W.2d 791.) Anderson told the salesperson at the dealership on Flatbush Avenue that he was looking for a van that carried 15 passengers (*id.* at 59:13–16, 509 N.W.2d 791), and the salesperson told him that the Ford E–350 was a 15–passenger van (*id.* at 62:4–7, 509 N.W.2d 791). Anderson purchased the vehicle to transport members of his congregation to other churches. (*Id.* at 63:6–25, 509 N.W.2d 791.)

After a deacon in Bishop Anderson's church who drove the van reported in 2004 that the vehicle "swayed" to the right when fully loaded with 15 passengers, and Bishop Anderson later experienced this "swaying," Bishop Anderson took the van to Gordon Auto Service ("Gordon Auto") to address what Bishop Anderson thought was a mechanical problem. Gordon Auto worked on the vehicle for two days, replaced some parts, and worked on the vehicle's "front end." (*Id.* at 25:10–21, 509 N.W.2d 791.) The mechanic at Gordon Auto advised Bishop Anderson that the van had a problem with swaying in the front end that he could not fix. (*Id.* at 76:12–77:14, 509 N.W.2d 791.) At deposition, Bishop Anderson agreed with the proposition that a mechanic at Gordon Auto advised him that driving with 15 passengers would "cause problems on the highway." (*Id.* at 75:12–17, 509 N.W.2d 791.) Bishop Anderson never raised these concerns with the dealer on Flatbush Avenue from whom he purchased the vehicle (*id.* at 122:6–8, 509 N.W.2d 791), or with Ford or any Ford dealer

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

prior to this litigation (*id.* at 56:9–10, 509 N.W.2d 791; 99:13–18). After the service on the front end proved unsuccessful, Bishop Anderson decided to drive the vehicle with less than 15 passengers. (*Id.* at 79:7–8, 509 N.W.2d 791; 81:1–17.) Bishop Anderson now drives the vehicle with less than 15 passengers, and "trie[s] to leave the back seat empty" so that only the van only contains 12 passengers (*id.* at 81:9–14, 509 N.W.2d 791), and stated that the church sometimes rents an additional van when it needs to transport more than 12 people (*id.* at 82:8–20, 509 N.W.2d 791). However, Bishop Anderson sometimes carries more than 12 but less than 15 passengers on shorter trips. (*Id.* at 117:6–25, 509 N.W.2d 791.)

### 2. Barrett

**\*69** Gladstone Barrett owns and operates Yours and Mine Transportation Service, Inc., a company that provides transportation services to the subways in Queens, New York. He has owned this business for over 10 years, and has utilized Ford E–350 vans for this business the entire time. From 1995 to 1998, he used a 1995 Ford E–350 van leased by his wife, and he gave the van to a junk yard after the lease expired. He does not seek recovery based on this 1995 van. In 1998, Barrett purchased a used 1997 Ford E–350 from Park Inn Ford for $18,000, negotiated down from the asking price of $20,000. The salesperson at Park Inn Ford assured Barrett that the 1997 vehicle could be used to transport 15 people safely. (Barrett Dep. at 106:16–23.) Barrett himself expressly told the salesman that these vehicles should not be driven by an inexperienced driver, and stated that a friend of his had a roll over with a Ford van. (*Id.* at 48:11–49:13, 509 N.W.2d 791.) Barrett testified that after the salesman assured him, he told the salesman that "I said I had experience with the Ford van and it's not a problem to me in driving it but I would not purchase it and give to the next man to drive unless they have the experience that I have." (*Id.* at 49:9–13, 509 N.W.2d 791.)

After driving the 1997 van, Barrett felt that he did not pay a fair price for the vehicle because of problems with the transmission and "a lot of noise in the rear end section." (*Id.* at 44:19–45:5, 509 N.W.2d 791.) He used the 1997 van until 2006 when he gave the vehicle to another driver. In October 2006, Barrett purchased a used 2001 Ford E–350 van for $5,500 from Start Up Management Solutions, a rental car business. (*Id.* at 17:1–22, 509 N.W.2d 791.) Start Up Management Solutions offered this 2001 van, which had 167,000 miles on it at the time of Barrett's purchase, for $8,500 and Barrett decided to buy it when the price dropped to $5,500. Barrett saw no Ford advertisements and received no representations from Ford in connection with the purchase of

the 2001 vehicle. (*Id.* at 25:9–26:6; 107:22–25, 509 N.W.2d 791; 127:24–128:25.) According to Barrett, at the time of the purchase of the 2001 vehicle, he had heard news of other accidents with Ford E–350 vans, but not about the "tendency to rollover." (*Id.* at 33:14–34:4, 509 N.W.2d 791.) He stated at deposition that he learned of the alleged defect in Ford E–350 vans just a few months before his deposition. (*Id.* at 110:10–25, 509 N.W.2d 791.)

Barrett still owns and uses the 2001 Ford E–350 vehicle, has no plans to sell it, and continues to fill it to capacity when he has enough passengers to do so. (*Id.* at 59:2–19; 84:19–25, 509 N.W.2d 791; 126:7–11 .) Barrett asserts losses from repairs to his vans for issues unrelated to this litigation, and also asserts that, based on conversations with his insurance broker, he paid higher insurance rates on his Ford E–350 vehicles. (Pls.' Responsive Statement of Material Facts for Barrett ¶ 32; Ford SUMF No. 10 ¶ 32.) Barrett never suffered a rollover in his vehicles and has never been unable to transport his passengers safely to their destination when the vans were filled to capacity. (Barrett Dep. at 80:4–10.)

**\*70** At deposition, Barrett testified that if he had heard the news reports regarding the Ford E–350 van's tendency to rollover before he purchased the used 2001 van in October 2006, he still would have bought the van because he and his customers like Ford vehicles and he trusted his driving abilities. (*Id.* at 26:10–19; 35:2–14, 509 N.W.2d 791; 127:19–23.) Barrett stated that "the public tend to like Ford vans. Even with the risk I would go ahead and purchase the van because I would feel comfortable purchasing the van because I am the person driving the van." (*Id.* at 35:18–22, 509 N.W.2d 791; *see also id.* at 120:6–11, 509 N.W.2d 791 ("I have some fantasy about the vans but regardless of the problem, I still would purchase the van because I alone drive the van. I take extra caution in driving it. I am aware of the problem and I didn't let it trouble me."); *id.* at 58:10–15, 509 N.W.2d 791 ("I didn't let that worry me. Let the problem of the van be front worry. I didn't worry about that. I just like the van and I was assured that they can carry fifteen passengers safely."). Despite his testimony that he would have bought the vehicle even if he had full information about the rollover potential, Barrett also stated that "I put my [faith] in the van and what the dealer said to me about the van. I put me faith there." (*Id.* at 59:10–12, 509 N.W.2d 791.) Barrett said that the Ford van "is the van that I like. All I like to see is improvement. If Ford can improve on them to make them safer and make more comfortable as being a Ford addict to Ford van. I will

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 94 of 261 PageID: 45032

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

be more comfortable. Tomorrow morning I would still by the next Ford van." (*Id.* at 105:9–14, 509 N.W.2d 791.)

*B. Frank as Applied to Bishop Anderson*

In *Frank v. Daimler Chrysler Corp.,* the Supreme Court of New York, Appellate Division, affirmed the dismissal of proposed class plaintiffs' claims based upon an alleged defect in certain vehicles' front seat backrests that were "susceptible to rearward collapse in the event of a rear-end collision." 292 A.D.2d 118, 741 N.Y.S.2d 9, 11 (App.Div.2002). Like the New York Plaintiffs here, Plaintiffs in *Frank* did not suffer any rearward collapse or other personal injury from the alleged defect. Two of plaintiffs' claims in *Frank* are asserted here: breach of implied warranty and violation of N.Y. GBL §§ 349 and 350. The *Frank* plaintiffs also brought claims for negligence, strict liability, negligent concealment and misrepresentation, and fraud. The court concluded:

> In sum, plaintiffs have not been involved in any accidents and have not suffered any personal injuries or property damage. Moreover, plaintiffs do not allege that any seat has failed, been retrofitted or repaired, nor have plaintiffs attempted to sell, or sold an automobile at a financial loss because of the alleged defect. We find, therefore, that the motion court properly dismissed the first through sixth causes of action as the result of plaintiffs' failure to plead any actual injury.

*Id.* at 17.

Ford argues that *Frank* dictates that this Court should grant summary judgment in its favor on the New York Plaintiffs' implied warranty and statutory consumer fraud claims. The New York Plaintiffs seek to distinguish *Frank* by arguing generally that Plaintiffs have limited their use of their vehicles due to the handling problems and have incurred expenses in renting additional vehicles and other out-of-pocket costs. Bishop Anderson testified that he brought his vehicle to Gordon Auto to attempt to fix the "swaying" problem, that after the problem was not resolved by the service, he decided to limit his use of the van by carrying less than 15 passengers,

and that on occasion, his church rents an additional van when it needs to carry more than 12 passengers. These asserted injuries suffice to remove Bishop Anderson's claims from the scope of *Frank*. With regard to his alleged out-of-pocket repair costs, Ford contends that he presents no evidence whatsoever that he paid for these repairs, or how much he might have paid. Yet for a claim under GBL § 349, any injured person may bring an action "to recover his actual damages or fifty dollars, whichever is greater." GBL § 349(h). GBL § 350 similarly allows any person injured by false advertising to bring "an action to recover his or her actual damages or five hundred dollars, whichever is greater." GBL § 350–e(3). Thus, a plaintiff asserting a claim for deceptive business practices under GBL §§ 349 and 350 may recover without proving a specific amount of damages. *See* McDonald v. North Shore Yacht Sales, Inc., 134 Misc.2d 910, 513 N.Y.S.2d 590, 593 (N.Y.Sup.Ct.1987) (stating that under § 350, "[t]he dollar amount of injury involved in such a claim is not relevant"). Ford next argues that Bishop Anderson has not shown that the "swaying" issue that was the subject of the repairs was related to the alleged rollover propensity that forms the basis of this litigation because Gordon Auto replaced the "front end" of the vehicle, while Plaintiffs generally allege that the handling problems stem from issues with the "rear axle" of the vans. (Pls.' Omnibus Br. at 2, 4 n. 4.) While Gordon Auto might not have focused on the area of the van Plaintiffs later identified as the location of the alleged problem, this Court rejects Ford's attempt to parse the difference between "swaying" and "unsafe tendency to rollover." A genuine dispute exists regarding the nature of the repairs and whether the issues addressed by Gordon Auto were related to the handling issues in this litigation.

**\*71** In *Frank,* the court listed repair costs as one form of actual injury that plaintiffs did not allege. 741 N.Y.S.2d at 17. Here, Bishop Anderson has asserted cognizable injury based on his attempt to repair. Similarly, Bishop Anderson's claim that he rents additional vehicles, while not supported by an actual dollar amount, presents a disputed issue of fact sufficient to withstand summary judgment and avoid the actual injury bar of *Frank*. Ford contends that Bishop Anderson's claim of injury based on limitation of use does not suffice based on Judge Ackerman's reliance on the decision of the Arkansas Supreme Court in *Wallis* that actual injury for a consumer fraud statute claim may be found only where the alleged defect has manifested itself. (MTD Opinion at \*23 (citing *Wallis v. Ford Motor Co.,* 362 Ark. 317, 208 S.W.3d 153 (Ark.2005).) As this Court has stated above, however, Judge Ackerman's rejection of the Arkansas consumer fraud

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 95 of 261
PageID: 45033

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

statute claim pursuant to *Wallis* does not directly control here, even though *Wallis* relied upon *Frank* in reaching its conclusion. *Wallis* not only concerns only Arkansas law, but expands upon *Frank* to require manifestation of the alleged defect. The court in *Frank* did not limit actual injury to personal injury or property damage from malfunction or manifestation of defect, but expressly stated that plaintiffs in *Frank* also failed to allege any repair or sale at diminished value. *Frank,* 741 N.Y.S.2d at 17. Thus, the court in *Frank* contemplated that actual injury could be asserted under circumstances where the alleged defect might not have manifested itself to cause injury. For these reasons, this Court concludes that *Frank* does not operate to preclude Bishop Anderson's claims for lack of actual injury.

### C. Frank as Applied to Barrett

While Bishop Anderson asserts limitation of use and repair costs as actual injury, New York Plaintiff Barrett 1) did not allege any out-of-pocket repair or rental costs; 2) fills his vehicle to capacity when he has sufficient passengers; and 3) stated that he has no plans to sell his van. The only cognizable actual injury pursuant to *Frank* that this Court can locate stems from Barrett's assertion that his insurance carrier told him that his premiums were higher for the Ford E–350 than for other vans. However, closer examination of Barrett's deposition testimony reveals that any higher rates, even if true, did not constitute actual injury. Barrett stated that he never had any problem obtaining insurance coverage. (Barrett Dep. at 96:6–8.) He testified that his broker at Lincoln General Insurance Company told him that he paid higher insurance premiums on his Ford van than did those who own GMC or other vans. (*Id.* at 97:15–98:2, 741 N.Y.S.2d 9.) Yet Barrett stated that this statement by his broker came in the context of Barrett telling the broker that "I [was] never interested in the GMC" (*id.* at 97:24–25, 741 N.Y.S.2d 9), and when asked at deposition whether he ever contemplated buying other vans such as GMC, he responded "I don't like them. I never think about it" (*id.* at 26:16–19, 741 N.Y.S.2d 9). Furthermore, at deposition Barrett never linked the purported higher premiums with the rollover issues with Ford E–350 vans. Indeed, Plaintiffs base their case on studies and reports that claim that Ford E–350 vans and other 15–passenger vans have an increased tendency to rollover. (*See, e.g.,* Pls.' Supp. Statement at ¶¶ 17–37; 41–47.) Barrett has not presented evidence that his broker's statements regarding increased premium costs stemmed from the alleged higher rollover potential of Ford E–350 vans. The court in *Frank* also did not explicitly recognize increased insurance premiums as a form of actual injury sufficient to allege a breach of

implied warranty or consumer fraud statute claim. This Court concludes that Barrett has not presented evidence of an actual injury under *Frank* and therefore cannot state a claim for breach of implied warranty or violation of GBL §§ 349 and 350. This Court will grant summary judgment in Ford's favor on these claims brought by Barrett.

**\*72**  Ford asks this court to extend the reasoning of *Frank* to bar the New York Plaintiffs' express warranty and unjust enrichment claims even though those claims were not presented in *Frank*. According to Ford, the court in *Frank* 1) affirmed the dismissal of all of plaintiffs' claims for lack of actual injury without distinction or separate analysis of each individual claim, and 2) relied on cases, such as the Eighth Circuit's decision in *Briehl,* that used the same reasoning to dismiss express warranty and other claims. The court in *Frank* did not assess each claim separately, but the court began its analysis by stating that "plaintiffs must plead actual injuries or damages, resulting from defendants' conduct, as an essential element of each of the first six causes of action" and cited cases supporting an actual injury requirement for each of the claims. *Id.* at 12–13. Barrett's claim for breach of express warranty requires proof of actual injuries or damages. *See Promuto v. Waste Mgmt., Inc.,* 44 F.Supp.2d 628, 642 (S.D.N.Y.1999) (citing *CBS, Inc. v. Ziff–Davis Publ'g Co.,* 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997, 1000–01 (N.Y.1990); *Ainger v. Michigan Gen. Corp.,* 476 F.Supp. 1209, 1220–21 (S.D.N.Y.1979)); *Gusmao v. GMT Group, Inc.,* No. 06–5113, 2008 WL 2980039, at *4 (S.D.N.Y. Aug.1, 2008). "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000) (citing *Dolmetta v. Uintah Nat'l Corp.,* 712 F.2d 15, 20 (2d Cir.1983)). As one court has held, to prevail on an unjust enrichment claim, a plaintiff must establish that the benefit received was less than what that purchaser bargained for. *In re Canon Cameras,* 237 F.R.D. 357, 359–60 (S.D.N.Y.2006) (quotations and citations omitted). Where a plaintiff purchases a product that "never malfunctions over its ordinary period of use," that plaintiff "cannot be said to have received less than what he bargained for when he made the purchase." *Id.* at 360. This reasoning reflects the analysis in *Frank* where, after reviewing cases that rejected claims regarding products that never manifested an alleged defect, the court concluded a plaintiff has not pled actual injury where the product never failed or no personal injury or property damage has been alleged. *Frank,* 741 N.Y.S.2d at 13–17. This Court concludes that the actual

Case 1:19-md-02875-RMB-SAK   Document 1748-28   Filed 11/10/21   Page 96 of 261 PageID: 45034

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

injury requirement as articulated in *Frank* applies to Barrett's claims for breach of express warranty and unjust enrichment. Because Barrett has not presented evidence of cognizable actual injury, this Court will grant summary judgment in Ford's favor on all of Barrett's claims. [23]

### D. Bishop Anderson's Express and Implied Warranty Claims: Notice

In addition to arguing that *Frank* dictates that all of Bishop Anderson's claims must fail, Ford presents several additional grounds for why summary judgment should be granted in its favor on these claims. Ford contends that Bishop Anderson's express and implied warranty claims must fail for lack of notice, based on New York's codification of the familiar UCC standard for notice: "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." N.Y. UCC 2–607(3)(a). Bishop Anderson contends that the notice requirement may be satisfied by the filing of a complaint or, as here, the joining of litigation. This Court agrees that under New York law, the filing of a complaint could constitute sufficient notice. *See Panda Capital Corp. v. Kopo Int'l, Inc.,* 242 A.D.2d 690, 662 N.Y.S.2d 584, 586 (App.Div.1997) ("This argument overlooks the fact that the complaint and subsequent amended complaint in this action themselves constituted such notice ...."); *Silverstein v. R.H. Macy & Co.,* 266 A.D. 5, 40 N.Y.S.2d 916, 920 (App.Div.1943) ("[T]he commencement of this action would seem to afford sufficient notice of breach of warranty."). Whether notice was given within a reasonable time constitutes a question of fact. *Panda Capital,* 662 N.Y.S.2d at 587. This Court rejects Ford's lack of notice argument with regard to Bishop Anderson's warranty claims.

### E. Bishop Anderson's Express Warranty Claim

**\*73** For the same reasons the Court expressed with regard to the express warranty claims presented by other Plaintiffs, this Court concludes that Bishop Anderson's claim for breach of express warranty must fail because Ford's description of the vehicle as a 15–passenger van does not constitute an express warranty of safety. Anderson did not view any other representations or materials issued by Ford; indeed, he testified at deposition that he could not remember whether the dealership from which he purchased his vehicle was even a Ford dealership at all. (Anderson Dep. at 58:17–59:8.) Under New York's version of the UCC, "a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." N.Y. U.C.C. § 2–313(2). The

description of the vehicle as a 15–passenger van, while a description of a particular characteristic, makes no reference to safety or quality. *See Hubbard v. General Motors Corp.,* No. 95–4362, 1996 WL 274018, at \*7 (S.D.N.Y. May 22, 1996) (dismissing express warranty claim because purported warranty statements "ma[de] no reference whatsoever to the type or quality of the vehicles' braking system"); *cf. Anderson v. Bungee Int'l Mfg. Corp.,* 44 F.Supp.2d 534, 541 (S.D.N.Y.1999) (granting summary judgment to defendants on express warranty claim because purported warranty statements were "generalized statements of salesmanship" and not "descriptions of particular characteristics of the goods"). Under New York law, "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." N.Y. U.C.C. § 2–313(1)(b). Here, Ford expressly described the vehicle as a 15–passenger van, but made no explicit representation regarding safety in carrying 15 passengers that rose above the level of mere puffery. This Court will grant Ford's motion for summary judgment as to Barrett's claim for breach of express warranty.

### F. Bishop Anderson's Implied Warranty Claim

Ford asserts that Bishop Anderson cannot maintain his claim for breach of implied warranty because he lacks contractual privity with Ford. Based on his deposition testimony, it is undisputed that Bishop Anderson did not purchase his used vehicle from Ford, and it is not clear whether he even purchased it from a Ford dealer. Under New York law, "[i]t is now settled that no implied warranty will extend from a manufacturer to a remote purchaser not in privity with the manufacturer where only economic loss and not personal injury is alleged." *Lexow & Jenkins, P.C. v. Hertz Commercial Leasing Corp. .,* 122 A.D.2d 25, 504 N.Y.S.2d 192, 193–94 (App.Div.1986). However, an exception to the privity requirement for economic loss exists under New York law where the product is a "thing of danger." As one federal court in New York explained,

> "However, New York recognizes an exception to this principle where the product in question is a 'thing of danger.' " *Hubbard v. Gen. Motors Corp.,* 95–CV–4362, 1996 WL 274018, at \*5 (S.D.N.Y. May 22, 1996); *Goldberg v. Kollsman Instr. Corp.,* 12 N.Y.2d 432, 436,

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 97 of 261
PageID: 45035
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

240 N.Y.S.2d 592, 191 N.E.2d 81 (N.Y.1963). More specifically, "where an article is of such a character that when used for the purpose for which it is made it is likely to be a source of danger to several or many people if not properly designed and fashioned, the manufacturer as well as the vendor is liable, for breach of law-implied warranties, to the persons whose use is contemplated." *Hubbard,* 1996 WL 274018, at \*5 (quoting *Goldberg,* 12 N.Y.2d at 436, 240 N.Y.S.2d 592, 191 N.E.2d 81) (other citation omitted).

**\*74** *Wade v. Tiffin Motorhomes, Inc.,* 686 F.Supp.2d 174, 191 (N.D.N.Y.2009). Distinguishing other cases involving transportation vehicles where implied warranty claims were dismissed for lack of privity, the court in *Hubbard* concluded that "plaintiff's claim alleging a defective braking system is qualitatively different from claims against an automobile manufacturer alleging the use of inferior transmissions or the design of defective air conditioners, in that a vehicle with defective brakes is a thing of danger." 1996 WL 274018, at \*5 n. 7. Here, a vehicle with an alleged increased propensity to rollover is likely to be a thing of danger to foreseeable drivers and passengers. *See Wade,* 686 F.Supp.2d at 191. Ford points out that some courts have not always invoked this exception even where arguably applicable. *See, e.g., Fanok v. Carver Boat Corp.,* 576 F.Supp.2d 404, 413 (E.D.N.Y.2008) (alleged defect in yacht where yacht caught fire). However, under the facts of this case, this Court concludes that the exception to the privity requirement applies, and this Court will not grant summary judgment on Bishop Anderson's implied warranty claim for lack of privity. Because Ford presents no additional arguments with regard to Barrett's implied warranty claim, this Court will deny Ford's motion for summary judgment as to Barrett's claim for breach of implied warranty.

### G. Bishop Anderson's GBL Claims

With regard to Bishop Anderson's New York consumer fraud statute claims, Ford contends that these claims must fail because Bishop Anderson did not prove that he suffered actual injury based on out-of-pocket loss. Ford relies upon an Appellate Division decision stating that "[i]n order to state a cause of action pursuant to General Business Law §§ 349 and 350, the plaintiffs were required to plead and prove that

the deceptive act caused actual injury." *Canario v. Gunn,* 300 A.D.2d 332, 751 N.Y.S.2d 310, 312 (App.Div.2002) (citing *Hazelhurst v. Brita Prods. Co.,* 295 A.D.2d 240, 744 N.Y.S.2d 31, 33 (App.Div.2002); *Frank,* 741 N.Y.S.2d at 12–13). In *Canario,* plaintiffs sought damages based on allegedly false advertising by real estate agents regarding property purchased by plaintiffs. Plaintiffs alleged that their downpayment on the property was the proper measure of damages, but the court concluded that because the property was worth "many times that amount" and plaintiffs retained the property, plaintiffs' "claim of actual harm is without merit on its face." *Canario,* 751 N.Y.S.2d at 312. Here, Ford observes that Bishop Anderson cannot even establish his original purchase price for the van, let alone any injury, and therefore cannot show that the van is now worth less than what he paid for it. However, the court's reasoning regarding the nature of actual injury in *Canario* appears to have been dicta, as the court first held that plaintiffs could not maintain their GBL claims because they were private transactions regarding a unique piece of property and without impact on consumers or the public at large. *Id.* at 311–12. Moreover, *Canario* is distinguishable, because plaintiffs' sole measure of damages for their injury in that case was their downpayment. Here, Bishop Anderson alleges out-of-pocket costs based on his limitation on use of the vehicle and alleged repair costs. These asserted injuries suffice to remove his claims from the ambit of *Frank,* and *Canario* similarly does not preclude his GBL claims. Ford presents no other argument against Bishop Anderson's statutory claims. Therefore, this Court will deny Ford's motion for summary judgment as to Bishop Anderson's GBL claims.

### H. Bishop Anderson's Unjust Enrichment Claim

**\*75** To prove an unjust enrichment claim under New York law, a plaintiff must show "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." *Kaye,* 202 F.3d at 616 (2d Cir.2000) (citing *Dolmetta,* 712 F.2d at 20. Here, Bishop Anderson purchased a used van from an unknown dealer. He has not presented any evidence that Ford benefitted at his expense from the purchase of the vehicle; he cannot even recall whether the unknown dealer was a Ford dealer. In any event, even if he could do so, he could not recover for unjust enrichment based on the diminution in value of his vehicle because, as discussed above with regard to *Frank,* he would have to show that any benefit he received was less than that for which he bargained. Because his vehicle did not malfunction, he "cannot be said to have received less than what he bargained for when he made the purchase." *In re Canon,* 237

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 98 of 261 PageID: 45036

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

F.R.D. at 360. Bishop Anderson cannot show what he paid for the vehicle, let alone that he received less value than what he paid. Bishop Anderson also cannot maintain an unjust enrichment action based on his asserted out-of-pocket costs. He brought his vehicle to a private mechanic at Gordon Auto for service; no evidence in the record suggests any affiliation or connection between Gordon Auto and Ford. This Court will grant Ford's motion for summary judgment on Bishop Anderson's claim for unjust enrichment.

*I. Summary*

For the foregoing reasons, this Court will grant Ford's motion for summary judgment with respect to all of Barrett's claims. With regard to Bishop Anderson, this Court will grant Ford's motion for summary judgment as to his claims for breach of express warranty and for unjust enrichment. This Court will deny Ford's motion with regard to Bishop Anderson's claims for breach of implied warranty and for violation of GBL §§ 349 and 350.

**XI. Massachusetts**

Massachusetts Plaintiff Charles St. AME Church ("Charles St. AME") was added to this litigation after Judge Ackerman decided Ford's motion to dismiss. Ford now moves for summary judgment as to all of Charles St. AME's claims: breach of express warranty; breach of implied warranty; violation of Massachusetts's consumer protection act, Mass. Gen. Laws ch. 93A, § 9 *et seq.;* and unjust enrichment.

*A. Material Facts*

In 2005, Charles St. AME entered into a contract with Salem Ford Hyundai to purchase a new 2005 Ford E–350 van for approximately $28,000. Charles St. AME still owns the vehicle, has not attempted to sell the vehicle, and according to its representative at deposition, church trustee Albert Kinnitt, Jr., has no intention to sell the van. (Kinnitt Dep. at 132:15–17; 152:8–11.) While no one at Charles St. AME viewed any Ford advertisements prior to purchasing the van (*id.* at 139:6–8; 144:24–145:10), Kinnitt testified that he specifically asked the salesman at Salem Ford Hyundai for a 15–passenger van and told him about the church's need for a vehicle to transport seniors and youth for church purposes (*id.* at 48:14–17; 50:22–53:4). Kinnitt, who had responsibility for purchasing the van and supervising its drivers, stated that the salesman told him that the van was "capable of servicing 15 passengers in it." (*Id.* at 51:3–13.) According to Kinnitt, the salesman told him that the vehicle was a 15–passenger van, but when

asked at deposition whether the salesman told him that the van "was safe to carry 15 passengers," Kinnitt responded, "He say it was a 15–passenger van." (*Id.* at 176:15–22.) Earlier at deposition, Kinnitt stated that when the church purchased the vehicle, he thought that Ford represented that it would be safe because Ford repeatedly stated that the van was "the best vehicle going." (*Id.* at 135:1–23.)

**\*76** According to Kinnitt, Charles St. AME decided to limit the capacity of its van to approximately 9 passengers for out-of-state trips after learning from articles about the van's rollover propensity. (*Id.* at 31:2–24; 114:3–23; 117:20–118:24.) Such long trips occur approximately once per year. (*Id.* at 101:13–17.) Kinnitt testified that the church has had to make double trips for these long journeys to make up for the limited capacity or ask members to use their own vehicles (*id.* at 122:1–22; 147:20–24), and he mentioned at deposition, without elaboration, that "[w]e had to rent buses" (*id.* at 34:20–21). For trips within the Boston area, however, the church still fills the vehicle to capacity with 15 passengers (*id.* at 31:11–19), and the church has continued to make such trips on a weekly basis since the church learned of the van's rollover propensity (*id.* at 101:4–102:15; 104:6–13). The van has never suffered a rollover, and has been involved in only two minor accidents, neither of which involved handling or stability issues. Various drivers, including Kinnitt, reported some issues with swaying and shifting. (*Id.* at 25:13–27:21.) Charles St. AME does not seek damages related to its procurement of insurance for the van. (Kinnitt at 153:2–10.)

*B. Iannacchino*

Ford argues that the decision of the Supreme Judicial Court in *Iannacchino v. Ford Motor Co.,* 451 Mass. 623, 888 N.E.2d 879 (Mass.2008), compels that summary judgment be granted in Ford's favor on Charles St. AME's claims for breach of implied warranty and violation of ch. 93A, § 9, and further contends that the rationale of *Iannacchino* should apply to Charles St. AME's express warranty and unjust enrichment claims as well. This Court agrees that under *Iannacchino,* Charles St. AME's implied warranty and ch. 93A claims must fail. The Court need not decide whether the Massachusetts courts would extend *Iannacchino* to encompass Charles St. AME's express warranty and unjust enrichment claims because those claims fail for independent reasons.

Plaintiffs in *Iannacchino* brought a purported class action in which they alleged that certain Ford vehicles had outside door handle systems that did not comply with federal safety standards and were defective and unsafe. Plaintiffs alleged

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 99 of 261 PageID: 45037

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

that due to noncompliance and defect, the doors on the vehicles could open accidentally in certain kinds of collisions, putting the occupants at risk of serious injury or death. *Id.* at 883. At issue in the appeal in *Iannacchino* were plaintiffs' claims for breach of implied warranty and violation of ch. 93A, § 9, and "whether the plaintiffs ... have adequately alleged an 'injury' or 'loss' for purposes of stating a claim under § 9." *Id.* at 885. As here, the class in *Iannacchino* did not include those who had suffered personal injury, but only encompassed those who suffered economic loss by owning vehicles worth less than a vehicle that complied with all relevant safety standards. Plaintiffs alleged that Ford knew the outside door latches were defective because they failed to comply with Federal Motor Vehicle Safety Standard 206 ("FMVSS 206"), a standard promulgated by the National Highway Traffic Safety Administration (NHTSA), and Ford's internal safety guidelines. The Supreme Judicial Court of Massachusetts concluded that plaintiff's theory of regulatory noncompliance failed because they conceded that the door latches complied with NHTSA standards. *Iannacchino,* 888 N.E.2d at 887. The court therefore affirmed the dismissal of plaintiff's ch. 93A claims for failure to plead adequate "injury" or "loss" under ch. 93A, § 9. [24] With regard to the implied warranty claim, the court observed that such a claim requires the same showing of injury as does a ch. 93A claim, and stated that "[a]n implied warranty claim and a c. 93A claim are based on the same economic theory of injury and the same set of alleged facts, they should survive or fail under the same analysis." *Id.* at 889. Because the two claims were "interconnected ... the reasons that call for the dismissal of the c. 93A claim also warrant dismissal of the breach of implied warranty claim." *Id.*

 **\*77** Charles St. AME here seeks to limit *Iannacchino* to this context of allegations of non-compliance with federal standards, and claims that the court in *Iannacchino* recognized that a ch. 93A claim could lie where not premised on noncompliance with government standards. Indeed, the court did not erect a total bar on claims asserting economic loss from an allegedly defective product; the court stated at the outset that it did "not consider the lack of accident-related injury or manifested defect a bar to recovery under G.L. c. 93A, § 9, in this case." *Id.* at 882. [25] Charles St. AME points out that no explicit federal safety standard applied to Ford E–350 vans. Despite citing many NHTSA reports, Plaintiffs have not alleged that the NHTSA made an explicit determination that the vans fail to comply with a federal standard or that they contain a defect. Instead, Charles St. AME appears to argue that Ford represented the vans to meet

the unspecified standard of transporting 15 passengers safely, all the while knowing that the vehicles did not comply with that standard. (Pls.' Omnibus Br. at 26.)

However, the court in *Iannacchino* also addressed plaintiffs' claims to the extent they did not rely on regulatory noncompliance, and imposed a requirement of some allegation of violation of a legally required standard for diminution in value claims. The court stated:

> But to the extent the plaintiffs have attempted to allege that the door handles are defective independently of any issue with FMVSS 206, we add the following.

> Because the term "defect" is conclusory and can be subjective as well, a bare assertion that a defendant, while representing the opposite, has knowingly manufactured and sold a product that is "defective," or suffers from "safety-related defects," does not suffice to state a viable claim. *Where, as in this case, there is no allegation that the plaintiffs—or indeed anyone else—have suffered personal injury or property damage, the complaint must identify a legally required standard that the vehicles were at least implicitly represented as meeting, but allegedly did not.* When the standard that a product allegedly fails to meet is not one legally required by and enforced by the government, a claim of economic injury based on overpayment lacks the premise that the purchase price entitled the plaintiffs to a product that met that standard.

*Iannacchino,* 888 N.E.2d at 888 (footnote and citations omitted) (emphasis added).

*Iannacchino* requires that where no personal injury has been alleged, a claim for economic loss based on diminution in value must depend upon noncompliance with some legally required standard. The court further rejected injury based on noncompliance with nonspecific internal safety standards akin to the vague "standard" of safety alleged by Charles St. AME: "In any event, in the absence of any allegation of personal injury or even injury to property, we decline to adopt a rule that would expose a company to liability for failing to meet self-imposed standards that may in fact be aspirational goals conducive to the development and implementation of improved safety measures that exceed regulatory requirements." *Id.* at 888.

 **\*78** Charles St. AME cites pages 886–887 of *Ianncchino* as "contemplat[ing] that a plaintiff *may* maintain a cause of action under Ch. 93 § 9, independent of government

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 100 of 261
PageID: 45038
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

standards, despite the fact that its plaintiffs had not." (Pls.' Omnibus Br. at 26 (citing *Iannacchino,* 888 N.E.2d at 886– 87 & n. 13).) Yet as Ford emphasizes, these very pages of the decision in *Iannacchino* reject any claim for purely economic injury independent of a violation of some governmental, legally required standard. Under Massachusetts law as propounded in *Iannacchino,* mere allegations of a "defect" unmoored to a violation of a legally required standard does not suffice to state a claim for injury based on purely economic loss under ch. 93A, § 9. Here, *Iannacchino* compels this Court to conclude that Charles St. AME's implied warranty and Massachusetts state consumer fraud statute claims must fail for failure to show cognizable injury. [26] Therefore, this Court will grant summary judgment in Ford's favor on these claims.

The *Iannacchino* court did not expressly address the viability of claims for breach of express warranty and unjust enrichment under the court's analysis of cognizable injury. Plaintiffs in *Iannacchino* had initially brought claims for breach of express warranty and unjust enrichment. The court noted that the trial judge "dismissed the plaintiffs' breach of express warranty claim, finding that they had not alleged that they had seen or relied on the labels certifying compliance with Federal safety regulations, as well as their unjust enrichment claim, concluding that '[t]he alleged facts in this case do not lend themselves to such a cause of action.' " *Id.* at 885. Plaintiffs did not challenge the dismissal of these counts on appeal to the Supreme Judicial Court. *Id.* at 885 n. 11. To this Court's knowledge, no court has extended the principles of *Iannacchino* regarding injury to claims for breach of express warranty or unjust enrichment. But this Court need not predict whether the Supreme Judicial Court would extend *Iannacchino* beyond ch. 93A and implied warranty claims because Charles St. AME's express warranty and unjust enrichment claims fail for reasons independent of the rationale of *Iannacchino.*

## C. Express Warranty

### 1. Notice

Ford additionally contends that Charles St. AME's express warranty claim is barred because it did not give sufficient notice under Massachusetts's version of U.C.C. § 2–607(3) (a), which states that "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Mass. Gen. Laws. ch. 106, § 2–607(3)(a). Charles St. AME did not provide any pre-litigation notice to Ford, and Plaintiffs

generally contend that by joining this litigation, it provided sufficient notice.

To the court's knowledge, no Massachusetts court has explicitly held that notice by way of filing a complaint or joining litigation is insufficient. Courts have focused on the purposes behind the notice requirement and reasoned that notice would be sufficient if it allows for settlement through negotiation and "allows the seller to infer that the buyer is asserting its legal rights." *Delano Growers' Co-op. Winery v. Supreme Wine Co.,* 393 Mass. 666, 473 N.E.2d 1066, 1072 (Mass.1985). Regardless of whether notice by litigation could or could not constitute adequate notice under this standard, Massachusetts law dictates that "[f]ailure to give notice shall not bar recovery under this section unless the defendant proves that he was prejudiced thereby." Mass. Gen. Laws ch. 106, § 2–318; *see also Swartz v. General Motors Corp.,* 375 Mass. 628, 378 N.E.2d 61, 63 (Mass.1978) (stating that under Massachusetts law, "the defense of failure to give notice [has been] limited to cases where the defendant proved prejudice"). One court in Massachusetts implicitly recognized that notice by commencement of an action might not suffice but any lack of notice would not bar recovery unless the defendant proves prejudice: "General Laws c. 106, § 2–318, is explicit that the burden is on the defendant to prove prejudice in cases such as the present, in which there was no notice of any breach of warranty prior to the commencement of the action." *Henrick v. Coats Co.,* 17 Mass.App.Ct. 976, 458 N.E.2d 773, 775 (Mass.App.Ct.1984) (citing *Swartz,* 378 N.E.2d at 63). In most cases, prejudice arises where "evidence which may reasonably have been developed by prompt investigation has been lost." *Castro v. Stanley Works,* 864 F.2d 961, 964 (1st Cir.1989) (quotation and citations omitted). Massachusetts law treats the defense of lack of notice as a jury issue, *Sacramona v. Bridgestone/Firestone, Inc.,* 106 F.3d 444, 449 (1st Cir.1997), and summary judgment may only be appropriate on the issue if "a reasonable jury would ... have been compelled to find prejudice," *Smith v. Robertshaw Controls Co.,* 410 F.3d 29, 36 (1st Cir.2005) (quoting *Sacramona,* 106 F.3d at 449).

**\*79** Ford has not met its burden to prove prejudice based on undisputed facts such that a reasonable jury would have been compelled to find prejudice. It notes that Charles St. AME's failure to give pre-litigation notice deprived Ford of the chance to negotiate settlement (Ford Reply Br. at 37), but does not address the form of evidence-based prejudice discussed in the Massachusetts caselaw. This Court rejects

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 101 of 261
PageID: 45039

Ford's lack of notice argument with regard to Charles St. AME's breach of express warranty claim.

### 2. No Express Warranty

Under Massachusetts's version of the UCC, an express warranty may be created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" or "[a]ny description of the goods which is made part of the basis of the bargain." Mass. Gen. Laws ch. 106, § 2–313(1)(a), (b). Puffing or other sales talk does not create an express warranty. Mass. Gen. Laws ch. 106, § 2–313(2); *Hannon v. Original Gunite Aquatech Pools, Inc.,* 385 Mass. 813, 434 N.E.2d 611, 617 (Mass.1982). To maintain a breach of express warranty claim, "the plaintiff must demonstrate that the defendant promised a specific result." *Anthony's Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc.,* 396 Mass. 818, 489 N.E.2d 172, 175 (Mass.1986). Under the UCC's general principles of express warranty discussed previously, and under Massachusetts law, Ford's description of the E–350 as a 15–passenger van does not constitute an express warranty of safety in transporting 15–passengers. The description does not promise a specific result of safety, and any warranty of safety is merely implied. *Cf. Roth v. Ray–Stel's Hair Stylists, Inc.,* 18 Mass.App.Ct. 975, 470 N.E.2d 137, 138 (Mass.App.Ct.1984) (affirming jury's verdict of breach of express warranty where hair bleach package stated "Doesn't creep or swell," plaintiff relied on representation, and product "swell[ed] rapidly"). The statement of the Salem Ford Hyundai salesman to Kinnitt that the van was the "best vehicle going" was puffery that does not create an express warranty. Mass. Gen. Laws ch. 106, § 2–313(2). This Court will grant Ford's motion for summary judgment on Charles St. AME's claim for breach of express warranty.

### D. Unjust Enrichment

As in many other states, to prove a claim for unjust enrichment under Massachusetts law, "a plaintiff must prove (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention of the benefit by the defendant under circumstances which make such acceptance or retention inequitable." *Stevens v. Thacker,* 550 F.Supp.2d 161, 165 (D.Mass.2008); *see also Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,* 552 F.3d 47, 57 (1st. Cir.2009).

Plaintiffs assert unjust enrichment based on 1) Ford's extraction of payments from Plaintiffs who would not have purchased the vehicles, or would have done so at reduced prices; and 2) Ford's revenues on repairs outside Ford's 90–day limited warranty. (Compl.¶¶ 88–89.) Charles St. AME does not allege that it paid any money to Ford for repairs, and its unjust enrichment claim depends solely upon the inflated value Ford allegedly received for Charles St. AME's vehicle. Setting aside the evidentiary problems common to many Plaintiffs in this action regarding purchases from a Ford dealer (here, Salem Ford Hyundai), Charles St. AME cannot maintain its unjust enrichment claim because it purchased its vehicle in 2005, after the April 2004 period in which Plaintiffs concede that the claimed artificial demand for Ford E–350 vans fully eroded. (Andresen Certif No. 14, Ex. 3 at 22; Pls.' Responsive Statement of Material Facts for Charles St. AME ¶ 25.) As discussed previously, a defendant enjoys the appreciation of the benefits conferred upon it if the value of that benefit exceeds the value of the consideration given for that benefit. As Plaintiffs concede, the purported "artificial demand" for Ford E–350 vehicles fully eroded by April 2004, the market value of van purchased after April 2004 similarly eroded, and the price paid for a van after this date could not reflect unjust gain based on inflated value for a defective vehicle. Here, even if Charles St. AME could show that it has conferred a benefit upon Ford, its unjust enrichment claim fails for the same reason that claims of certain Pennsylvania and Florida Plaintiffs failed: it did not pay an unjustly inflated price for the vehicle because it purchased the vehicle after the claimed artificial demand had eroded. Therefore, this Court will grant Ford's motion for summary judgment as to Charles St. AME's unjust enrichment claim.

### E. Summary

**\*80** For the foregoing reasons, this Court will grant Ford's motion for summary judgment on all of Charles St. AME's claims. Charles St. AME shall be dismissed from this matter.

### Conclusion

For the foregoing reasons, this Court will grant Ford's motions for summary judgment in part, grant them without prejudice in part, and deny them in part, as follows:

| State Plaintiff | Doc. No. | Express Warranty | Implied Warranty | Consumer Fraud Statute(s) | Unjust Enrichment |
|---|---|---|---|---|---|

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

| | | | | | | |
|---|---|---|---|---|---|---|
| | Greater All Nation | 188 | Grant. | Grant. | Grant. | Grant. |
| CA | First United | 188 | Grant. | Grant. | California CLRA: Grant.<br><br>California UCL and California FAL: Grant without prejudice. | Grant without prejudice. |
| IL | Pentecostal Temple | 226 | Previously dismissed. | Previously dismissed. | Grant. | Grant. |
| | Macedonia | 214 | Grant. | Deny. | Grant. | Grant without prejudice. |
| | Faith Tabernacle | 210 | Grant. | Deny. | Grant. | Grant. |
| NJ | Social Clubhouse | 216 | Grant. | Deny. | Grant. | Grant. |
| | Bethany Baptist | 212 | Grant. | Deny. | Grant. | Grant as to 1993 and 1 994 vans.<br><br>Grant without prejudice as to 2001 and 2003 vans. |
| GA | Allen Temple | 221 | Deny. | Deny. | Grant. | Deny. |
| | Bethel | 230 | Grant. | Deny. | Grant. | Grant as to 2000 van.<br><br>Grant without prejudice |
| PA | | | | | | |

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 103 of 261
PageID: 45041

In re Ford Motor Co. E-350 Van Products Liability...    Not Reported in...

| | | | | | | as to 2001 van. |
|---|---|---|---|---|---|---|
| | Hickman Temple | 228 | Grant. | Deny. | Grant. | Grant without prejudice. |
| | Mt. Airy | 232 | Grant. | Deny. | Grant. | Grant. |
| | Blandon | 190 | Grant. | Grant. | Grant. | Grant. |
| FL | Diaz | 194 | Grant. | Grant. | Deny. | Grant. |
| | Mestre | 197 | Grant. | Grant. | Deny. | Grant. |
| TX | St. Luke's | 219 | Grant. | Grant. | Grant as to misrepresentation theory. Deny as to nondisclosure theory. | Grant without prejudice. |
| MO | St. James | 202 | Grant. | Grant. | Grant. | Grant. |
| MI | Conant Avenue | 223 | Grant. | Deny. | Grant. | Grant. |
| NY | Bishop Anderson | 204 | Grant. | Deny. | Deny. | Grant. |
| | Barrett | 206 | Grant. | Grant. | Grant. | Grant. |
| MA | Charles St. AME | 208 | Grant. | Grant. | Grant. | Grant. |

For the claims on which summary judgment will be granted without prejudice, Plaintiffs shall have until August 13, 2010 to show cause to cure the evidentiary deficiencies identified by the Court and demonstrate that summary judgment should not be granted in Ford's favor. Ford shall have until September 13, 2010 to file a response.

This Court will also grant Ford's motion (Doc. No. 172) to strike Plaintiffs' August 7, 2009 letter and affidavit. Appropriate forms of order accompany this Memorandum Opinion.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2813788

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 104 of 261
PageID: 45042

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

## Footnotes

1   *New Bethlehem Baptist Church v. Ford Motor Co.,* No. 2:05–519 (N.D.Ala.); *Eleventh Street Baptist Church v. Ford Motor Co.,* No. 4:05–4020 (W.D.Ark.); *Greater All Nation Pentecost Church of Jesus Christ v. Ford Motor Co.,* No. 2:05–1765 (C.D.Cal.); *Pentecostal Temple Church of God in Christ v. Ford Motor Co. .,* No. 1:05–1340 (N.D.Ill.); *Social Clubhouse, Inc. v. Ford Motor Co.,* No. 2:03–4558 (D.N.J.).

2   In August 2009, this matter was reassigned to the undersigned.

3   Judge Ackerman issued an Amended Opinion and Order on September 3, 2008 (Doc. No. 142) that made no substantive revisions to the initial Opinion and Order issued one day earlier.

4   On April 8, 2010, Ford filed a Notice of Supplemental Authority Regarding Summary Judgment Motions. Plaintiffs ask this Court to strike this filing, or allow them to file a response. Plaintiffs note that several of the cases cited by Ford in this filing were decided prior to the filing of Ford's reply brief. While the Court takes note in its own research and analysis of any relevant cases recently decided, it has not relied upon Ford's Notice of Supplemental Authorities, and will not allow Plaintiffs to file any response to that Notice.

5   Differing portions of Deacon Jennings's deposition transcript are attached as exhibits to Ford's Certification of Meridyth M. Andresen No. 2 (Ex. 1) and Plaintiffs' Certification of Daniel R. Lapinski (Ex. 35). For simplicity, the Court will cite to the deposition transcript without reference to which party's exhibit contains the specific lines discussed. The Court will adhere to the same practice with regard to other depositions referenced in this Opinion.

6   The Court dismissed the Alabama, Arkansas, and Illinois Plaintiffs' express warranty claims not because Plaintiffs failed to allege the existence of an express warranty sufficiently, but for lack of pre-litigation notice under the laws of those jurisdictions.

7   First United used its vehicle to transport up to 15 passengers from 1995 to January 2003, and Zilotto agreed at deposition that the van could accommodate 15 passengers based on its seating capacity. (Ford's SUMF No. 2 at ¶¶ 31–35; Pls.' Supp. Statement at ¶¶ 445–451; Zilotto Dep. at 103:19–23.) Greater All Nation never used its van to carry more than 12 passengers because the seats were too small (Jennings Dep. at 45:14–22; 110:24–111:12), but Plaintiffs do not allege breach of an express warranty of comfort or seat size based on the description of the vehicle as a "15–passenger van."

8   Although Plaintiffs style their state consumer fraud claims as the "Fourth Cause of Action," the parties address these claims third in their respective briefs. This Court will follow the parties' example.

9   In *Hermitage Corp. v. Contractors Adjustment Co.,* the Supreme Court of Illinois recognized that for most tort claims, the cause of action accrues when the plaintiff suffers injury. 166 Ill.2d 72, 209 Ill.Dec. 684, 651 N.E.2d 1132, 1135 (Ill.1995). Ford cites *Hermitage Corp.* as its sole authority for the notion that this general rule applies to ICFA claims. However, the *Hermitage* court ultimately rejected the general rule for the claims before it, and instead applied the discovery rule. *Id.* at 1135–1140.

10  An example of an exceptional case can be found in *Miller v. Beneficial Management Corp.,* 977 F.2d 834, 846 (3d Cir.1992), where the magistrate judge issued an order that a formal Rule 56(f) affidavit would not be required. Thus, in that case, the failure to file a Rule 56(f) affidavit was not fatal to plaintiff's claim of insufficient discovery. This case presents no similar exceptional circumstances to warrant relaxing the Rule 56(f) requirements.

11  In so concluding, the court in *Wal–Mart* "disapproved" of a prior ruling that suggested that "a delay of two years, without more, is unreasonable as a matter of law." *Wal–Mart,* 586 S.E.2d at 86 (citing *Buford v. Toys R' Us, Inc.,* 217 Ga.App. 565, 458 S.E.2d 373, 375 (Ga.Ct.App.1995)).

12  In their Responses and Objections to Ford's Second Set of Written Interrogatories, Plaintiffs stated that the purported "artificial demand" for E–350 vans that led to artificially inflated prices being paid by Plaintiffs "is believed to have fully eroded by April, 2004, when the [National Highway Traffic Safety Administration] reissued a safety warning concerning 15–passenger vans." (*See, e.g.,* Andresen Certif No. 19, Ex. 5 at 22.) Allen Temple purchased its vehicles before this date, and not after the time Plaintiffs concede that the claimed

artificial demand eroded such that Ford could not have been unjustly enriched by artificially high sales prices for E–350 vans.

13    Bethel has also contended that it purchased a new 2005 vehicle, but now does not dispute that this third vehicle is not owned by Bethel but by an independent, non-profit organization.

14    Similarly, Ford contends that Pennsylvania courts would follow the decision of the Supreme Court of New Jersey in *Thiedemann* and conclude that the Pennsylvania Plaintiffs have presented no cognizable proof of their damages. However, this Court has already held that *Thiedemann* does not apply to implied warranty claims, and Ford similarly fails to point to any Pennsylvania caselaw suggesting that Pennsylvania courts would adopt *Theidemann* even if applicable.

15    For example, in an internal document describing the purpose of the church's Ford vans, Bethel stated *"Church vans will not be used for PERSONAL use!!!!!!!"* (Andresen Certif. No. 12, Ex. 4 at BAME0011.)

16    Ford does not move for summary judgment on the grounds of lack of actual reliance, and while reliance does not appear to be an express element of an FDUTPA claim, *see Cold Stone Creamery, Inc. v. Lenora Foods I, LLC,* 332 F. App'x 565, 567 (11th Cir.2009), Florida courts have not spoken clearly on the topic and particularly regarding whether the causation requirement incorporates some notion of reliance, *Fitzpatrick v. General Mills, Inc.,* 263 F.R.D. 687, 694–95 (S.D.Fla.2010). Generally, "to satisfy the FDUTPA's causation requirement, each plaintiff is required to prove only that the deceptive practice would—in theory—deceive an objective reasonable consumer." *Fitzpatrick,* 263 F.R.D. at 695. Ford does not frame its argument for summary judgment based on the knowledge of the Florida Plaintiffs in these terms, and the Florida Plaintiffs do not oppose Ford's motion by arguing that their subjective knowledge is irrelevant; rather, they advance that the *source* of the knowledge makes the difference. This Court will decide Ford's motion on the arguments advanced by the parties.

17    Ford also asks for summary judgment in its favor on any claims by St. Luke's with regard to two additional Ford E–350 vans it purchased, a 1990 model year and a 1991 model year. St. Luke's has excluded these vehicles from this suit, and indeed the 1990 van is outside Plaintiffs' purported class definition. Therefore, St. Luke's does not present any claims on the 1990 or 1991 vehicles, and only asserts claims based on the two 2001 vans in this litigation.

18    In the opinion of the district court affirmed by the Eighth Circuit in *O'Neil,* the court concluded "[i]t is simply not enough for a plaintiff to allege that a product defect suffered by others renders his or her use of that same product unsafe; the plaintiff must instead allege an actual manifestation of the defect that results in some injury in order to state a cognizable claim for breach of warranty, unfair trade practices, or unjust enrichment." *O'Neill v. Simplicity, Inc.,* 553 F.Supp.2d 1110, 1115 (D.Minn.2008).

19    Section 400.2–725(2) provides for an exception to the rule that a breach of warranty occurs upon tender where the warranty expressly extends to future performance, a situation not present here.

20    These purposes include: "(1) to prevent surprise and allow the seller the opportunity to make recommendations how to cure the nonconformance, (2) to allow the seller the fair opportunity to investigate and prepare for litigation, (3) to open the way for settlement of claims through negotiation, and (4) to protect the seller from stale claims and provide certainty in contractual arrangements." *American Bumper & Mfg. Co. v. Transtechnology Corp.,* 252 Mich.App. 340, 652 N.W.2d 252, 256 (Mich.Ct.App.2002).

21    In its Responsive Statement of Material Facts, in one paragraph Conant Avenue disputes Ford's contentions that Conant Avenue had a direct contract with Ford, claiming that Conant Avenue purchased its vehicle from Riverside Ford. (Pls.' Responsive Statement of Material Facts for Conant Avenue ¶ 2.) However, in the very next paragraph, Conant Avenue responds "Undisputed" to Ford's statement that "Conant Avenue admits that the purchase agreement was a direct contract with Ford." (*Id.* ¶ 3, 652 N.W.2d 252.) This Court concludes that no genuine issue of material fact exists, as Conant Avenue conceded that it had a direct contract with Ford. Conant Avenue's dispute with itself as to the nature of its contract does not create a disputed fact; Totty clearly testified at deposition that the church had a direct contract with Ford for the purchase of the van (Totty Dep. at 119:2–9), and Conant Avenue does not dispute that this testimony amounts to an admission that its contract was with Ford directly.

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 106 of 261
PageID: 45044
In re Ford Motor Co. E-350 Van Products Liability.., Not Reported in...

22    Indeed, while Conant Avenue may not maintain its breach of express warranty claim because Ford did not expressly warrant the safety of the vehicle, this Court will deny summary judgment to Ford as to Conant Avenue's breach of implied warranty claim. Therefore, Conant Avenue may effectively proceed with its claim of breach of an implied contract term, but not under the guise of unjust enrichment.

23    With regard to unjust enrichment, even if Barrett has sufficient cognizable actual injury, this Court would grant Ford's motion for summary judgment as to that claim without prejudice. As with other Plaintiffs who purchased their vehicles from Ford dealers, Barrett has not met his evidentiary burden to establish that Ford benefitted from his purchase of the used van.

24    Ch. 93A, § 9 requires that a consumer "must have 'been injured by another person's use or employment of' an unfair or deceptive act or practice." *Iannacchino,* 888 N.E.2d at 885 (quoting Mass. Gen. Laws Ch. 93A, § 9).

25    Rather, according to the court, if plaintiffs had adequately pled noncompliance with a federal standard, and that after learning of the noncompliance, defendant failed to initiate a recall and pay for remediation, "the plaintiffs would have paid for more (viz., safety regulation-compliant vehicles) than they received. Such an overpayment would represent an economic loss—measurable by the cost to bring the vehicles into compliance—for which the plaintiffs could seek redress under G.L. c. 93A, § 9." *Iannacchino,* 888 N.E.2d at 886–87.

26    *Iannacchino* arose in the context of a motion to dismiss, and the court in *Iannacchino* allowed plaintiffs to amend their complaint to cure their pleading defects on the nature of their injury. 888 N.E.2d at 889. Here, after extensive discovery, Charles St. AME has not identified any cognizable, legally required standard that Ford represented its E–350 vans as meeting but knew that they did not. Therefore, *Iannacchino* applies with equal force at the summary judgment stage.

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   65

7

In re Lidoderm Antitrust Litigation, Not Reported in Fed. Supp. (2017)
2017-1 Trade Cases P 79,907

2017 WL 679367
United States District Court, N.D. California.

IN RE LIDODERM ANTITRUST LITIGATION

Case No. 14-md-02521-WHO
|
Signed 02/21/2017

ORDER GRANTING MOTIONS
FOR CLASS CERTIFICATION AND
DENYING *DAUBERT* MOTIONS

WILLIAM H. ORRICK, United States District Judge

## INTRODUCTION

*1  The Direct Purchaser Plaintiffs ("DPPs") and End Purchaser Plaintiffs ("EPPs") in this multidistrict litigation move for class certification of their antitrust claims challenging defendants' "reverse payment" patent litigation settlement that they contend led to inflated costs for the brand name and generic versions of lidocaine patches. Defendants oppose, arguing that the highly stratified distribution chain for pharmaceutical drugs means that the DPPs and EPPs cannot show injury or damages through classwide proof. Instead, defendants assert that individual questions centered around each DPP's or EPP's place in the purchasing chain create a multitude of individualized issues that swamp any common ones. Defendants also seek to exclude plaintiffs' experts' opinions as based on inherently unreliable assumptions.

Plaintiffs' alleged antitrust injury is, fundamentally, that defendants were allowed to overcharge for their brand and generic lidocaine patches. Under plaintiffs' well-supported theory, with which defendants disagree but cannot effectively undercut at this stage because it depends on disputed facts that will be resolved at the merits stage, the lidocaine patches were sold by defendants at higher prices than would have existed in the but-for world.

Defendants' oppositions to the motions for class certification boil down to the following:

● The distribution chain in the prescription drug market is very stratified and complex.

● The direct purchasers and various types of end purchasers have numerous, different agreements between themselves so that determining whether any particular plaintiff was injured and how to apportion damages between the plaintiffs necessarily involves individualized questions that are undeniably complex.

Both statements are true. But common questions predominate. Did defendants engage in anticompetitive conduct? Did that conduct lead to overcharges for brand and generic lidocaine patches? What aggregate damages resulted from the overcharges? This case is more appropriate for class certification than not.

Defendants' arguments against certification would result in certification of very few antitrust cases as a class actions, despite repeated direction from the Supreme Court that the class device is particularly useful in the antitrust context. Plaintiffs' experts (and indeed, defendants' experts) have presented reliable, statistically-sound methods to determine not only classwide injury but also proof of aggregate damages. The disputes about what the but-for price should have been absent the anticompetitive conduct and when the generic lidocaine patches would have entered the market but-for that conduct *will be* resolved largely through common proof at summary judgment or trial. Once those issues are resolved, the experts have shown how to determine aggregate damages—carving out purchases made by entities or individuals who are not included within the class definitions—with classwide proof. That there may *then* be a need to conduct individualized analysis to determine which plaintiffs were injured and how much in damages they should receive does not negate the significant common and predominant legal and factual questions that will have been resolved previously. The motions for class certification are GRANTED.

## BACKGROUND

### I. LIDODERM PATENT LITIGATION AND SETTLEMENT

*2  This case concerns the alleged antitrust and anticompetitive impact of a July 2012 settlement agreement ("Agreement") between defendants Endo Pharmaceuticals Inc. ("Endo"), Teikoku Seiyaku Co., Teikoku Pharma USA (collectively "Teikoku") and Watson Pharmaceuticals, Inc. [1] (all collectively, "defendants"). The Agreement terminated

ongoing patent litigation alleging invalidity of Teikoku's patents covering Lidoderm patches [2] in exchange for giving brand-name Lidoderm patches to Watson, as well as a period of exclusivity to market its generic version of lidocaine patches without competition from Endo's generic patch. [3]

The primary terms of the Agreement were these. First, Watson agreed to delay launching its generic Lidoderm until September 15, 2013, about a year after the Food and Drug Administration's ("FDA") 30-month stay on Watson's Abbreviated New Drug Application ("ANDA") expired, a year before one of Teikuku's patents covering Lidoderm was to expire and two years before another of Teikuku's patents was due to expire. Second, Endo/Teikoku agreed to drop the pending patent infringement lawsuits and not to further amend their Citizen Petition ("CP") pending with the FDA that asked the FDA to not approve ANDAs for Lidoderm unless they met more stringent scientific standards. Third, Endo/Teikoku agreed to give Watson $96 million worth of brand name Lidoderm patches to distribute or sell, on the condition that Watson honor Endo/Teikoku's existing price-related contracts. Fourth, Endo/Teikoku agreed not to release their authorized generic ("AG") lidocaine patch until seven and one half months after Watson began selling its generic version; during this "exclusivity period," Watson agreed to pay Endo/Teikoku a twenty-five percent royalty on the Gross Profit for sales of its generic. [4]

Plaintiffs filed suit, arguing that defendants' Agreement violated federal antitrust and related state laws. They assert that it harmed consumers because, absent the Agreement, Watson would have entered the market substantially before September 2013 with a generic lidocaine patch that was much less expensive than brand Lidoderm, that the Agreement allowed Endo/Teikoku to charge supracompetitive prices for their brand drug for longer and that the period of exclusivity allowed Watson to charger higher prices for its generic.

## II. CLASSES SOUGHT TO BE CERTIFIED

The DPPs are pharmaceutical wholesalers, pharmacies, hospitals, and retail stores that purchased brand and generic Lidoderm patches directly from defendants and supplied the product to others. [5] Expert Report of Gregory K. Leonard, Ph.D. (Dkt. No. 563-2) ¶¶ 8, 25 (characterizing the DPPs as falling into five different classes of trade—national wholesalers, regional wholesalers, mail order wholesalers, hospitals, and retail pharmacies. The DPPs seek to certify the following class:

**\*3** All persons or entities in the United States, including its territories, possessions, and the Commonwealth of Puerto Rico, who purchased brand or generic Lidoderm directly from any of the Defendants at any time during the period August 23, 2012 through May 1, 2014 (the "Class").

DPP Mot. 2-3. The end date of May 1, 2014, was chosen because that is the day before Endo launched its own authorized generic Lidoderm and it provides a "clear" cut-off date for class membership. Excluded from the class are defendants (and their officers, directors, management, employees, subsidiaries, and affiliates) and all federal government entities. DPP Mot. 3.

Under that definition, there are 55 DPP Class Members who are widely geographically dispersed across the United States. Leitzinger Decl., Exs. 4, 5. [6] The DPP entities purchase drugs directly from the brand or generic (when available) manufacturers and provide them to hospitals, pharmacies, and retailers or re-sell the drugs to other wholesalers. Leonard Rep. ¶ 25.

The EPPs are employee health and welfare benefit plans, municipal corporations, employee unions, and individuals who purchased brand or generic Lidoderm from third parties, not from defendants directly. [7] They seek to certify the following class:

(a) All persons and entities in the United States and its territories who, in Arizona, California, Florida, Kansas, Maine, Massachusetts, Minnesota, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia, or Wisconsin ("Class States") for consumption by themselves or their family member, or by their insureds, plan participants or beneficiaries, paid and/or provided reimbursements for some or all of the purchase price of:

i. Branded Lidoderm for the time period August 23, 2012 through September 14, 2013; and/or

2017-1 Trade Cases P 79,907

ii. AB-rated generic Lidoderm for the time period September 15, 2013 through August 1, 2014;

—and—

> **\*4** (b) Third-party payors CVS Caremark, Cigna, Envision Pharmaceutical Services, MedImpact Healthcare Systems, Inc., Comprehensive Health Management, Inc. Part D, and Express Scripts Senior Care to the extent they provided, under their Medicare Part D plans, reimbursements for some or all of the price of branded Lidoderm purchased in Class States for the time period September 15, 2013 through August 1, 2014.

Excluded from the Class are:

(a) Defendants and their officers, directors, management, employees, subsidiaries, and affiliates;

(b) Those who, after September 15, 2013, paid and/or provided reimbursements for branded Lidoderm and did not purchase or reimburse for generic Lidoderm, except third-party payors CVS Caremark, Cigna, Envision Pharmaceutical Services, MedImpact Healthcare Systems, Inc., Comprehensive Health Management, Inc. Part D, or Express Scripts Senior Care for their Part D insurance.

(c) Government entities, other than government-funded employee benefit plans;

(d) Fully insured health plans (*i.e.*, plans that purchased insurance that covered 100 percent of the plan's reimbursement obligations to all of its members);

(e) "Single flat co-pay" consumers who purchased Lidoderm or generic Lidoderm only via a fixed dollar co-payment that does not vary on the basis of the purchased drug's status as branded or generic (*e.g.*, $20 for both branded and generic drugs);

(f) "Flat generic co-pay" consumers who, after September 15, 2013, purchased generic Lidoderm via a fixed dollar co-payment (*e.g.* $10 for generic drugs) regardless of the co-payment applicable to branded drugs;

(g) Consumers who purchased or received Lidoderm or its AB-rated generic equivalent through a Medicaid program only;

(h) Pharmacy benefit managers; and

(i) The judges in this case and members of their immediate families.

EPP Mot. 1-2.

## III. PHARMACEUTICAL DISTRIBUTION CHAIN

The class certification motions, and defendants' oppositions to them, turn in part on the roles the DPPs and other entities play in the pharmaceutical distribution chain. Neither side disputes that pharmaceutical manufacturers sell their drugs directly to wholesalers and other DPPs (hospitals, pharmacies, and retailers), typically at the wholesale acquisition cost ("WAC") minus discounts. EPP Mot. 11-12. The wholesalers, as their name implies, resell the drugs to pharmacies which sell the drugs to consumers. *Id.* 12.[8] The WAC—as the first price in the chain—acts as a benchmark for all subsequent sales and purchases. *Id.* The EPPs assert—and defendants' experts do not challenge—that the higher the WAC the more the DPPs and the EPPs pay for the drugs. *Id.*

End consumers do not typically pay the entire purchase price of the drug. Many consumers are covered by health insurance plans provided by third party payors ("TPPs").[9] The TPPs and the consumers are, unless they fall within the exclusions discussed above, both EPPs. That is because consumers often pay a portion of the purchase price at the point of purchase and the remainder is paid by the TPP. Expert Report of Hal J. Singer Ph.D. [Dkt. No. 524-1] ¶¶ 86, 127. The consumers and TPPs together pay the full price and neither passes the amount they paid onto the other. EPP Mot. 12; Singer Rep. ¶ 127.

**\*5** There are typically two types of payment arrangements for consumers with insurance: percentage of purchase price, where the consumer pays a set percentage of the price ("coinsurance"); and fixed copay, where the consumer pays a set amount for each drug purchased ("copay"). Expert Report of Robert Navarro [Docket No. 550-35] ¶ ¶ 16d,

In re Lidoderm Antitrust Litigation, Not Reported in Fed. Supp. (2017)

2017-1 Trade Cases P 79,907

28. How much a particular insured consumer will pay for a drug is governed by the specific design of their insurance coverage, including various annual deductible amounts as well as benefit or out of pocket maximums. Expert Report of James W. Hughes Ph.D. [Dkt. No. 550-34] ¶¶ 36, 45; Navarro Rep. ¶ 24. [10] The amount of a copay or coinsurance payment may also depend on the particular drug's "formulary and tier structure" which often, but not always, results in higher co-payments for brand drugs than generic ones. Navarro Rep. ¶¶ 16g, 24c. Some plans allow consumers to choose brand name drugs over less expensive generics. Hughes Rep. ¶¶ 85-89 (describing behavior of "brand loyalists" who continue to purchase brand by choice, even after generics enter the market). Where a consumer does not have insurance coverage or a particular drug is not covered by the consumer's insurance, the consumer will pay 100% of the cost. [11]

Generally two entities are involved in providing health care coverage to consumers: plan sponsors (employers or self-funded employee health and welfare plans) and health plans (typically commercial insurers who the plan sponsors contract with). The extent to which the plan sponsor bears some portion of the cost of providing drugs to its participants varies. Plan sponsors contract with a health plan and/or a pharmacy benefits manager ("PBM") to administer prescription drug plans. Some plan sponsors contract with health plans or PBMs for "administrative services only" ("ASO") and there, the plan sponsor bears the full cost of claims for prescription drugs. Navarro Rep. ¶ 24h; DeBree Decl. ¶ 36. Under a "fully insured" contract, a plan sponsor pays premiums to a health plan and the health plan pays the prescription drug costs. Narvarro Rep. ¶ 24h. Plan sponsors may also contract to share with the health plans the costs of prescription drugs. *Id.* ¶ 16a. Plan sponsors who pay for prescriptions are TPPs and included in the EPP class. Health plans (typically commercial insurers) collect premiums from consumers and/or plan sponsors designed to cover the provision of prescription drugs (and health care more generally). *Id.* Health plans are TPPs and are included in the EPP class definition.

Many TPPs use a PBM to administer prescription drug benefits. Hughes Rep. ¶ 23; DeBree Decl. ¶ 3. PBMs who were involved in the lidocaine transactions covered by this case include Prime Therapeutics, OptumRX, Caremark, and Express Scripts. PBMs pay the pharmacies who provide the drugs to the end-consumers and then collect an agreed-to payment from the plan sponsor or health plan. Navarro Rep. ¶ 21i. Both sides agree that PBMs use "spread pricing" and "rebates" as part their business operations.

**\*6** PBMs typically negotiate prices for drugs directly with retail pharmacies and earn profits on the "spread" between the prices they pay the pharmacies and the price they charge their TPP customers. Navarro Rep. ¶¶ 15, 24i. Defendants allege that PBMs may, if their estimates and negotiations are not on target and there is no "spread" on a particular transaction, end up bearing the cost of the drug transaction (*e.g.*, they end up charging their customers less than what they paid the pharmacies for a particular prescription). Navarro Rep. ¶¶ 15, 24i, 75-78. Defendants do not, however, identify any instances of this happening with respect to the 5% lidocaine patches (brand or generic) at issue, much less how much of a real risk it represents to PBMs. Plaintiffs cite evidence from PBMs that they "do not suffer losses" on their contracts with TPPs to argue that the PBMs bear no real risk of harm from their spread pricing practices. DeBree Decl. ¶¶ 39-42.

PBMs (and some health plans) also negotiate rebates from drug manufacturers for formulary placement (*e.g.*, the PBM's ability to offer preferential formulary placement to drug manufacturers) and other concessions favorable to manufacturers. Navarro Report ¶ 16g; Hughes Rep. ¶ 44; DeBree Decl. ¶ 38. [12] Those rebates are apportioned between the PBMs and health plans or plan sponsors depending on how their contracts are structured, and can be a percentage of the rebate received by the PBM from the drug manufacturer or a fixed dollar rebate per prescription. In any event, the rates of rebates passed through to the health plan and plan sponsors differ widely and depend upon the specific deal agreed to by the PBM and individual plan or sponsor. Navarro Rep. ¶¶ 16f, 16g, 32-36. Some PBMs may "guarantee" rebates to plan sponsors at a fixed amount.

Defendants assert that, as with spread pricing, if PBM's estimates and negotiations are not on target (*e.g.*, they could not secure as big a rebate from a manufacturer as they thought they could), the PBMs may end up taking a loss on particular drug sales if the rebates from the manufacturers are not as large as they estimated. Navarro Rep. ¶¶ 24f, 32-34, 75-76. The EPPs' expert DeBree agrees that it is possible, although "exceptionally unlikely," that a PBM could enter into an unprofitable contract because it promised too high a contractually guaranteed rebate to a TPP, a situation he has never seen happen. DeBree Decl. ¶ 39; *see also* Declaration of Brian Hansen (Dkt. No. 524-5) ¶ 7 (PBM Prime Therapeutics has not had to "perform" on a guarantees rebate since 2012); *see also* Sharp Supp. Decl., Ex. K (Response No. 13) ("OptumRx does not ... incur losses on guaranteed

2017-1 Trade Cases P 79,907

rebates"). DeBree explains that as additional "insulation" for PBMs, their contracts with TPPs provide that the PBM can "equitably adjust" rates, administrative fees and rebates if unforeseen contingencies (like the availability of a generic) occur. DeBree Decl. ¶¶ 41, 53 (asserting that a PBM's failure to meet contractual guaranteed rebates promised to a TPP are paid for out of the PBM's contract expenses and not related to consumers' purchase of a specific drug like a 5% lidocaine patch).

 **7** As with spread pricing, defendants identify a general, theoretical risk without substantiating the true impact (if any) of that risk. Defendants' experts (Navarro and Hughes) each identify one example of a purported disparity between the rebate the PBM received from the manufacturer (none, according to defendants) and the contractual rebate amount promised by the PBM to the plan sponsor. Navarro Rep. ¶ 79; *see also* Hughes Rep. ¶ 26. Singer responds that this particular TPP may have been receiving rebates through a different PBM during the relevant timeframe. Singer Reply Decl. ¶¶ 55-56. PBMs are excluded from the EPP class, yet defendants argue that the EPPs damages model is overinclusive because it has not "removed" these theoretical PBM damages that resulted from the PBMs' theoretical failures to negotiate and accurately estimate their spread and rebates.

Another problem raised by defendants is that there is no reliable method to exclude the government's Part D damages from plaintiffs' aggregate damages calculations. Medicare Part D is the federal government's prescription drug benefit under Medicare ("Part D"). Part D contracts with private insurers to provide drug plans to participants. Navarro Rep. ¶ 72. According to the EPPs' expert Singer, 42% of lidocaine 5% patches at issue were procured through Part D. Singer Rep., Table 4.2. The government subsidizes premiums for Part D plans and provides the cost of Part D prescriptions for certain low income participants and participants who exceed their out of pocket threshold. Hughes Rep. ¶¶ 25, 121; Navarro Rep. ¶ 73. The EPP class definition includes Medicare Part D plans (the private insurance companies), but excludes government entities from membership.

A final issue, particularly relevant to the DPP's motion for certification, involves Group Purchasing Organizations ("GPOs"), which are membership organizations who negotiate on behalf of EPPs with manufacturers to secure contract prices on behalf of the EPP members. Leonard Rep. ¶ 15. Four GPOs—OptiSource Premier, Topco, Pharmacy Value Alliance, and Econdisc Contracting Solutions—

negotiated prices on behalf of 29 of the EPPs. *Id.* ¶¶ 17-22. The GPOs, however, do not purchase any drugs and are not involved in payments between EPPs and manufacturers.

## LEGAL STANDARD

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs bear the burden of showing that they have met each of the four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014) (citing *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001)). The plaintiff "must actually prove—not simply plead —that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2412 (2014) (citing *Comcast Corp v. Behrend*, 133 S.Ct. 1426, 1431-32 (2013); *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551-52 (2011)).

The court's "class certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S.Ct. 1184, 1194 (2013) (quoting *Dukes*, 131 S.Ct. at 2551 (internal quotation marks omitted)). These analytical principles govern both Rule 23(a) and 23(b). *Behrend*, 133 S.Ct. at 1342. However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 133 S.Ct. at 1194-95. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Id.*

As the Ninth Circuit clarified in *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011), simply because an expert opinion clears the "scientifically reliable and relevant" hurdle of *Daubert* does not mean it passes the "rigorous analysis" required by Rule 23 to support class certification. At class certification, a court must determine whether the expert's evidence supporting certification is persuasive following a rigorous analysis of the same. *Id.* at 983-84. As part of that rigorous analysis, a court may be required to resolve factual disputes between the plaintiffs' and defendants' experts if those disputes go to whether or not the injury at issue can be shown on a classwide basis. *Id.*

 **8** Under Rule 23(a), the class may be certified only if: (1) the class is so numerous that joinder of all members

2017-1 Trade Cases P 79,907

is impracticable, (2) questions of law or fact exist that are common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a). A plaintiff must also establish that one or more of the grounds for maintaining the suit are met under Rule 23(b): (1) that there is a risk of substantial prejudice from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) that common questions of law or fact predominate and the class action is superior to other available methods of adjudication. *See* Fed. R. Civ. P. 23(b).

### DISCUSSION

## I. DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

The DPPs rely primarily on the declaration of their expert, Dr. Leitzinger, to support class certification. Leitzinger declares that common proof shows that the alleged suppression of generic competition by defendants resulted in classwide antitrust injury in the form of overcharges. In doing so, Leitzinger relies on: (i) economic and governmental studies on the market-wide effects of generic competition and delayed generic entry; (ii) defendants' own documents analyzing the projected and actual market-wide effects of generic entry and delayed generic entry; (iii) the actual pricing and sales experience of lidocaine 5% patches once generic patches finally entered the market; and (iv) the direct purchasers' role in the distribution chain. Leitzinger Decl. ¶ 22; *see also* ¶¶ 23-36. DPPs also rely on a "Trial Plan" (Dkt. No. 523-7), where they identify the common questions they intend to address as:

 a) Whether the alleged reverse payment settlement and license agreement (the Agreement) violates the antitrust rule of reason;

 b) Whether, by and through the Agreement, defendants conspired to suppress generic competition to Lidoderm;

 c) Whether, pursuant to the Agreement, Watson agreed to, and did, delay its entry into the market with generic Lidoderm in exchange for large reverse payments from Endo and/or Teikoku;

 d) Whether, pursuant to the Agreement, Endo and Teikoku made large reverse payments to Watson, and the magnitude of each such payment;

 e) Whether the reverse payments suppressed generic competition to Lidoderm by delaying Watson's generic launch and Endo and Teikoku's authorized generic launch, and thereby preventing prices for lidocaine patch 5% from falling;

 f) When, absent the reverse payments, Watson would have launched its generic version of Lidoderm and Endo would have launched authorized generic Lidoderm;

 g) Whether the reverse payments Endo and Teikoku made to Watson are explained by purposes other than delaying Watson's entry into the lidocaine patch 5% market, and, if so, what those explanations are;

 h) Whether Endo and Teikoku's reverse payments to Watson were for a procompetitive purpose, and, if so, whether a reverse payment was reasonably necessary to achieve (and/or the least restrictive means of achieving) that procompetitive purpose;

 i) Whether, on balance, the reverse payments harmed competition in the lidocaine patch 5% market;

 j) Whether, by the reverse payments, defendants conspired or attempted to maintain Endo's market and/or monopoly power in the lidocaine patch 5% market;

 k) Whether Endo had market or monopoly power in the lidocaine patch 5% market;

 l) To the extent a relevant market or markets must be defined, what that definition is or those definitions are;

 m) Whether the activities of Defendants substantially affected interstate commerce;

 n) Whether, and to what extent, the challenged conduct caused antitrust injury to the business or property of Plaintiffs and the Class in the nature of overcharges; and

 **\*9**  o) The quantum of overcharges paid by the Class in the aggregate.

DPPs' Trial Plan at 2-3. DPPs contend that common evidence to answer these questions includes testimony by defense witnesses and testifying experts, as well as internal documents

In re Lidoderm Antitrust Litigation, Not Reported in Fed. Supp. (2017)
2017-1 Trade Cases P 79,907

from defendants, all of which will be evidence common to the Class as a whole. *Id.* at 3.

With respect to damages, as explained and supported by Leitzinger's declaration, the DPPs intend to establish damages in the aggregate using classwide evidence and to quantify the aggregate overcharge damages using a methodology that utilizes a "before and after" benchmark for generic Lidoderm prices based on actual generic rates and "backcasted" to calculate what the Class's expenditures would have been if generic Lidoderm entry had occurred earlier. Using that benchmark, EPP damages will be calculated by modeling the extent of generic substitution and the prices of generic and branded Lidoderm that would have occurred earlier but-for the paid-for delay in generic competition. These estimates will then be subtracted from the known quantities of Lidoderm actually purchased at known prices during the relevant time period to arrive at aggregate damages.

Plaintiffs intend to use the following types of common-to-the-class evidence:

a) Transactional data from Endo, Watson, and Endo's authorized generic seller Qualitest, showing unit and dollar sales, pricing, discounts, rebates, chargebacks, administrative fees, and other unit and/or dollar adjustments, for branded and generic Lidoderm;

b) Defendants' internal generic penetration models and forecasts, and the forecasts of generic manufacturers;

c) The extensive body of economic literature and empirical evidence regarding the effects of generic competition; and

d) Expert analysis and opinion.

DPP Trial Plan at 3-4. Under Leitzinger's preliminary analysis—using the backcast method described above and calculating a "Delay Period" as the time between March 31, 2013 and September 15, 2013, as well a longer "Overcharge Period" [13]—the DPPs estimate that the Class suffered $295 million in overcharges due to the delayed generic entry. Leitzinger Decl. ¶ 45.

Defendants challenge the DPPs' showing on the following grounds: (i) common questions of fact do not predominate and a class proceeding is not superior because given the differences between market position, purchasing power, and actual purchasing history of the DPPs, injury and damage

questions cannot be resolved on a classwide basis; (ii) the number of DPPs in the class is small, relatively few DPPs control the vast majority of the market, and joinder is not impracticable under Rule 23(a)(1), so the DPP class fails the numerosity requirement; and (iii) because of the nature of the market and the different roles and contracts negotiated by the DPPs, conflicts between the DPPs preclude a finding of representativeness under Rule 23(a)(4). [14]

### A. Predominance of Common Questions and Superiority

**\*10** Defendants do not dispute that significant and numerous questions of law and fact identified by DPPs as to defendants' liability for anticompetitive conduct can be shown by common evidence. *See* DPP Trial Plan at 2-3. Instead, they argue that the DPPs cannot rely on their expert's model to establish classwide injury because it is flawed and cannot be used reliably to prove classwide damages from the alleged delay of generic introduction and inflated generic prices upon the Watson generic entry. Defendants obscure that the DPPs rely on Leitzinger's model to show a methodology of determining classwide aggregate damages, not to show classwide injury.

As to injury, neither the defendants nor their experts adequately address the academic and industry studies relied on by Leitzinger to support a showing of classwide impact. Those sources explain that, generally, the introduction of generic drugs creates significant cost savings for consumers at most levels of the distribution chain. Rebuttal Declaration of Jeffrey J. Leitzinger [Dkt. No. 591-1] ¶ 8; Leitzinger Decl. ¶¶ 22-27. Defendants simply dismiss those studies because they do not discuss what happened in this case. Oppo. to DPP Mot. 9. Defendants likewise do not persuasively rebut Leitzinger's reliance on defendants' own internal forecasts about the impact of generic entry in the Lidoderm market, predicting lower costs for both the brand after the generic entered the market, and for the generics, once more than one generic entered the market. Leitzinger Decl. ¶¶ 28-31. At most, defendants emphasize those forecasts do not exactly match "what actually happened." Oppo. to DPP Mot. 9.

Given the well-researched market at issue and the well-recognized type of antitrust injury alleged, this evidence is persuasive and supports the DPPs' argument that injury in this case can be and will be shown on a classwide basis. *See, e.g.*, *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1215 (N.D. Cal. 2013) (relying on defendants' internal

2017-1 Trade Cases P 79,907

documents and economic literature); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *9 (N.D. Cal. June 5, 2006) (relying on actual publication, market, and sales data). [15]

Impermissible Aggregation. Defendants' main focus is to attack Leitzinger's aggregate damages model. Defendants argue that the model is unreliable because it fails to consider the "actual experience" of particular DPPs since it is based on aggregated purchases—combining brand only, generic and brand, and then generic only purchases to create aggregated purchasing figures—and then estimates damages flowing from the aggregated purchases based on Leitzinger's estimated "but-for" price (as opposed to actual prices). Oppo. to DPP Mot. 10-11. However, given the well-established academic and industry-accepted evidence of the swift and significant (in volume) switch to generic drugs mandated by state laws and the economic realities upon generic entry, that Leitzinger takes an aggregate approach to damages is not problematic here. [16]

 *11 Defendants point out that the DPP class encompasses different types of entities (pharmacies vs. wholesalers) and that the economic circumstances and incentives vary between those different types of entities to argue that individual analyses of damages is necessary. Leonard Rep. ¶ 25. It is true that the different DPPs ultimately paid different prices for their brand and generic lidocaine patches because of their different sizes, purchase histories, and negotiating strength. But simply because they were injured in different amounts does not undermine the fact that they were injured.

Contrary to defendants' assertion, even though the DPPs may have incurred significantly different amounts of damages, damages issues will not overwhelm the common liability questions. As a general matter, differences in damages will rarely suffice to defeat class certification. *See, e.g., Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016) ("We have repeatedly confirmed ... that the need for individualized findings as to the amount of damages does not defeat class certification."). Under the DPPs' trial plan, aggregate damages can be determined using Leitzinger's backcasted model and then damages can be apportioned between the DPPs using on a pro rata formula based on each DPP's purchase of brand or generic. *Cf. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131 (9th Cir. 2017) (discussing the common techniques used for individualized claim determinations after a classwide finding of liability).

Uninjured DPPs. Defendants argue the unreliability of Leitzinger's model is demonstrated by reviewing the actual purchasing data that shows three of the putative DPP class members were not harmed. Two (Cesar Castillo, Inc. and DMS Pharmaceutical) were uninjured, according to defendants, because they purchased only branded Lidoderm post-generic release at higher prices than pre-release. The third, Drogueria Central, was uninjured because it did not purchase any Lidoderm after the generic entry date. Def. Oppo. to DPP Mot. 11.

As to these allegedly "false positives," plaintiffs argue that it is premature to exclude them from the class because they may have purchased generic product from other wholesalers or distributors, even if they did not purchase generics from *defendants* once they were available. Leitzinger Reb. Decl. ¶ 20. And simply because these three did not purchase any generic Lidoderm after generic entry (or for Drogueria Central, did not purchase Lidoderm after February 2013), plaintiffs point out that each of them may well have purchased generics if they had been available before the actual entry date, something which can be determined at the damages stage. *Id.*

Moreover, even if defendants could definitively show at this juncture that there are DPPs who were not harmed yet are included within the DPP class definition—and I do not find defendants have made that showing here—such overinclusiveness would not defeat class certification as long as the uninjured parties represent a *de minimis* portion of the class. *See Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1136-37 (9th Cir. 2016) (presence of uninjured class members in class did not preclude predominance finding); *In re: Lenovo Adware Litigation*, No. 15-md-02624-RMW, 2016 WL 6277245, *15 (N.D. Cal. Oct. 27, 2016) (certifying a class of computer purchasers over defendants' objections that some class members were uninjured); *Bernstein v. Virgin America, Inc.*, No. 15-cv-02277-JST, 2016 WL 6576621, *13 (N.D. Cal. Nov. 7, 2016) (certifying off-the-clock claims even though some class members may not have worked off-the-clock); *see also In re Nexium Antitrust Litig* 777 F.3d 9, 30–31 (1st Cir. 2015) (affirming certification in reverse-payment antitrust class action where *de minimis* number of uninjured end-payor plaintiffs included in the class, and defining *de minimis* as a "number of uninjured members ... so large as to render the class impractical or improper, or to cause non-common issues to predominate."); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 615 (N.D. Cal. 2015) ("Even if some individuals are thus able to join the class and

2017-1 Trade Cases P 79,907

then are later determined to not have valid claims against a proper defendant, this does not preclude class certification.").

 **\*12** Defendants do not dispute that there was impact to 52 DPPs and only challenge the injury as to three others. Even if these three are not properly included in the class, their inclusion at most has a *de minimis* impact and does not preclude certification.

Wrong Inputs. Defendants' expert Leonard attempts to show the weaknesses in Leitzinger's model by altering it in two respects. First, Leonard uses Leitzinger's estimated Aggregate Purchaser generic price but applies it to the actual DPP purchasing history after generic entry (as opposed to the but-for estimated purchases used by Leitzinger) and backcasts that to the Delay Period. Under that analysis, the aggregate damages would have been $49 million less; $245 million as opposed to $294 million. Leonard Rep. ¶ 51. Second, Leonard takes his analysis a step further and recalculates the overcharge per unit for branded and generic Lidoderm using the real world prices applied after actual generic entry and then aggregates the damages across the proposed class members' actual purchase history and ends up with an aggregate damage total of $218 million, or $76 million less than Leitzinger's. *Id.* ¶ 53.

These alterations, of course, do not show that some or any significant portion of the DPP class members suffered no injury or no damages. Instead, Leonard argues that the wide differences in aggregate damages resulting when Leonard's inputs are used in Leitzinger's model bolster his general argument that "internal inconsistencies" pervade Leitzinger's model, undermining its reliability. What the generic conversion rate would have been "but for" defendants' conduct is a matter of dispute between the experts. Same too for what the prices of brand and generic lidocaine patches would have been but for defendants' conduct. Those disputes are not appropriately resolved at this juncture; that the experts dispute what the appropriate inputs should be does not undermine the approach or the reliability of Leitzinger's model.

Defendants make additional arguments about Leitzinger's "incorrect factual assumptions," such as challenging Leitzinger's assumption on the date generic entry would have occurred but-for the antitrust conduct, and also argue that Leitzinger failed to address the effect of Watson's subsidiary Anda's sales of the free brand product as well as the effect of assignments in his damages model. *See,*

*e.g.,* Oppo. to DPP Mot. 13-19; Leonard Rep. ¶¶ 62, 65, 67, 73-75. Defendants assert that these issues require impact and damages to be assessed individually, undermining the commonality and predominance assertions of plaintiffs. I disagree. If further analysis or refinement of who is in the class and what purchases are relevant to the aggregate damages determination is necessary—because it becomes clear that some proposed DPP class members were not injured *or* they decide opt out—that can be readily managed. *See, e.g.,* Leitzinger Decl. ¶ 19 n.57 (model can be "readily adjusted" to account for decreased volumes due to opt-outs); ¶ 47 (model can be adjusted to account for "bypass"); ¶ 49 (model can be adjusted for different generic entry dates).

At base, the criticisms of Leitzinger's model challenge the amount of damages suffered by the class (depending upon how the facts are determined), but those criticisms do not undermine Leitzinger's methodology to show aggregate damages or his conclusion that the vast bulk of class members *were injured* by overcharges. With respect to the amount of aggregate damages, Leonard's criticisms can be accommodated by Leitzinger's model depending on how facts are further developed, what questions are resolved on summary judgment, and the findings of the trier of fact (*e.g.*, absent the agreement (i) when Watson would have entered the market, (ii) whether Watson would have been able to meet supply or when that ability would have been achieved, (iii) when Endo would have entered the market with its AG, and (iv) whether Endo would have charged higher prices for its branded drug if it had entered the market with an AG at same time as Watson). [17]

 **\*13** The DPPs have shown that common questions as to injury and damages are sufficiently predominant and that resolution of these questions through a class action is superior. That Leitzinger has made a number of assumptions at this stage of the proceedings in order to show how he can (at summary judgment and trial) calculate classwide aggregate damages does not undermine that he has made a solid preliminary showing of impact *and* demonstrated a reliable method that can accommodate future judicial rulings, findings of fact, and changes to class membership or damages depending on opt-outs and assignments to prove aggregate damages on a common and classwide basis.

### B. Numerosity and Practicality of Joinder
Defendants also argue that the DPPs fail to show that the class is sufficiently numerous to make joinder impractical under

2017-1 Trade Cases P 79,907

Rule 23(a)(1). Generally, a "class of 41 or more is usually sufficiently numerous." 5-23 Moore's Federal Practice—Civil § 23.22 (2016). "Although the absolute number of class members is not the sole determining factor, where a class is large in numbers, joinder will usually be impracticable." *Jordan v. Cty. of L.A.*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds*, 459 U.S. 810 (1982); *see also id.* (court "inclined to find the numerosity requirement in the present case satisfied solely on the basis of the number of ascertained class members, *i.e.*, 39, 64, and 71"). "Where the class is not so numerous, however, the number of class members does not weigh as heavily in determining whether joinder would be infeasible. In the latter situation, other factors such as the geographical diversity of class members, the ability of individual claimants to institute separate suits, and whether injunctive or declaratory relief is sought, should be considered in determining impracticability of joinder." *Id.*; *see also Pa. Pub. Sch. Emples. Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2nd Cir. 2014) ("the numerosity inquiry is not strictly mathematical but must take into account the context of the particular case, in particular whether a class is superior to joinder based on other relevant factors including: (i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, (iv) their ability to sue separately, and (v) requests for injunctive relief that would involve future class members.").

The DPPs contend that there are 55 Class Members who are widely geographically dispersed across the United States. Leitzinger Decl., Exs. 4, 5. According to defendants' expert, there are at most 54 DPPs in the class as defined (but more likely 53), and because GPOs negotiated prices for some of the DPPs as a group, those GPO/DPPs should be considered to be one entity, reducing the number of class members to less than 30 entities. Leonard Rep. ¶ 8.

With respect to the number of class members, whether 55 or 54 or 53, the DPP class is sufficiently numerous to make joinder impracticable. [18] As to defendants' GPO-members equal one entity argument, I am not persuaded. Leonard agrees that GPOs are merely membership organizations that negotiate prices and secure contract guarantees with manufacturers for smaller DPPs, and do not actually buy or pay for the drugs. Leonard Rep. ¶ 15. Simply because 29 of the Class Members belong to five different GPOs in order to secure better prices from defendants, that does not mean that the individual DPPs were not the ones to suffer the impact and harm of the alleged overcharges. The DPPs who were members of GPOs still made their own purchasing decisions

(*i.e.*, how much to purchase) and were the ones who *paid* the overcharges. That the smaller DPPs used GPOs in an effort to match the purchasing and negotiating power of the larger DPPs does not mean that they are not separate and independent members of the DPP class. [19]

**\*14** Even though the number of class members—52 at a minimum—makes joinder impracticable, other relevant factors support this conclusion. One is the judicial economy from proceeding as a class action, which is especially true since 44 DPPs have claims worth less than it would realistically cost to litigate an expert– and discovery-intensive case like this one. Leitzinger Reb. Rep. ¶ 32. These smaller DPPs also may not have the market-power security to challenge defendants when they need to negotiate to purchase drugs from these same entities in the future. The wide geographic dispersion of the DPPs also weighs against joinder. Finally, that the "Big Three" DPP class members (McKesson, Cardinal Health, and AmerisourceBergen) account for 86% of the purchases only heightens the conclusion as to impracticality of joinder given the smaller-size of the other DPPs' claims. Leonard Rep. ¶¶ 8, 14.

In a notice of recent authority, Watson points to a decision from the Third Circuit in *In re Modafinil Antitrust Litigation*, 837 F.3d 238 (2016). There, the Third Circuit reversed the trial court's order certifying a DPP class because there were only 22 putative class members and the district court did not adequately explain why joinder of that few entities—three of which accounted for 97% of the total value of class claims—would be impracticable under Rule 23(a)(1). *Modafinil* does not control and is not persuasive. There are far more DPP class members here than in that case (53 versus 22) and the market concentration of the larger players is less significant (97% versus 86%). And, as explained above, both judicial economy *and* the geographic distribution of the DPPs support a finding that joinder is impractical (a showing that was missing from the district court's analysis in *Modafinil* according to the Third Circuit). The DPP class is adequately numerous. Joinder is impracticable.

### C. Representativeness, Conflicts, and Superiority

Rule 23(a)(4) covers "adequacy of representations" and requires that the class representatives will fairly and adequately protect the interests of other members of the class. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011). "Adequate representation depends

In re Lidoderm Antitrust Litigation, Not Reported in Fed. Supp. (2012)

2017-1 Trade Cases P 79,907

on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Id.* at 985. Defendants argue that because the class includes brand only, generic only, and brand/generic purchasers, there is an inherent conflict between class members. They assert that this means that the named DPP plaintiffs are not representative and that a class cannot be certified covering all the types of DPPs given their various market positions.

As one source of alleged conflict, defendants contend that actual entry of generic Lidoderm caused some DPPs to lose sales volume as a consequence of "generic by-pass," where customers shift to purchasing generic product from the generic manufacturer instead of from other wholesalers who formerly supplied them brand drugs.[20] According to defendants, generic by-pass means that some of the DPPs would have lost sales earlier in a but-for world where defendants did not delay competition and, therefore, some of the DPPs benefitted from the generic delay creating intra-class conflicts precluding certification. Def. DPP Oppo. 23; Leonard Rep. ¶¶ 77-78. However, the majority of courts to consider the issue have found that the "generic by-pass" theory does not create conflicts precluding certification. *See, e.g., In re Niaspan Antitrust Litig.*, 2015 WL 4197590, at *1-2 (E.D. Pa. July 9, 2015) (generic bypass is "irrelevant as a matter of law"); *Meijer, Inc. v. Abbott Labs.*, 2008 WL 4065839 (N.D. Cal. August 27, 2008) ("answering this question [whether it would be in the interest of some class members to operate under allegedly illegal pricing structure] would require a great deal of speculation. This fact alone negates the possibility that there is a present and apparent fundamental conflict between class members."); *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 304 (D.D.C. 2007) (generic bypass phenomenon does not create a conflict).[21]

**\*15** Defendants and Leonard also posit that some class members "have characteristics that suggest that they were harmed by generic entry and thus would have benefited economically from the alleged delay in generic entry," and therefore "might" prefer a lost profit measure of damages as opposed to overcharges. Leonard Decl. ¶¶ 84-86. However, these hypothetical class members could protect any such interest by opting out of the class. That the DPPs are presently relying on the widely-accepted "overcharge" method of damages calculation to prove aggregate damages on behalf of the class does not create an inherent conflict precluding certification. *See, e.g., Meijer, Inc. v. Abbott Labs.*, No. C

07-5985 CW, 2008 WL 4065839, at *7 (N.D. Cal. Aug. 27, 2008) (recognizing that while "it is theoretically possible that some class members may wish to pursue damages for lost profits rather than for overcharges, given the difficulties of proof involved and the consequent potential that a class member would be denied recovery, it is not likely" and rejecting "conflict" based on fact plaintiffs class sought overcharge damages).

Relatedly, defendants argue that because the country's three largest pharmacy chains (taking their assignments from the Big Three and covering 29.5% of the DPP class purchases) have opted-out, the DPP class suffers from "fragmentation" showing both that proceeding as a class action is not superior and that individual class members will be interested in controlling their own claims. Def. DPP Oppo. 21-22. Assuming that the DPPs with smaller claims and fewer resources to litigate their claims on their own remain, the possibility that a number of additional "large claim" DPPs might opt out to control their own cases or seek lost profits damages only increases the *utility* of the class device.

Finally, defendants challenge the ability of two DPPs, ASC and Betances, to act as named representatives because they lack standing to pursue their own claims. The dispute over ASC depends on to whom McKesson assigned the relevant claims, ASC or its parent corporation, Ahold USA. *Compare* Def. DPP Oppo. 24-25 (arguing McKesson assigned its rights to Ahold, not ASC) *with* DPP Reply 15 (arguing Watson's contracts and communications were with ASC). Defendants do not dispute that either ASC *or* Ahold is an appropriate DPP, and plaintiffs ask for leave to substitute Ahold in as necessary. DPP Reply 5. That request will be granted, if necessary, if ASC agrees that the claims were assigned to Ahold USA and that Ahold USA should be substituted in as a named DPP.

With respect to Betances, defendants argue that because Betances is organized under the laws of Puerto Rico (a territory, not a state) and antitrust conduct in a territory is not actionable under the Sections 1 and 2 Sherman Act claims, Betances does not have any claims and cannot act as a named DPP. Def. DPP Oppo. 25. The First Circuit, however, has repeatedly recognized that the Sherman Act applies to Puerto Rico. *See, e.g., United States v. Peake*, 804 F.3d 81, 86 (1st Cir. 2015), *cert. denied*, 137 S. Ct. 36 (2016) ("First, it is well-settled that, for purposes of the Sherman Act, Puerto Rico is "to be treated like a state and not like a territory.").[22] Absent persuasive circuit authority to the contrary, Betances may pursue its claims under the Sherman Act. Defendants'

2017-1 Trade Cases P 79,907

standing challenges do not undermine the named plaintiffs' representativeness under Rule 23(a).

The DPPs have shown that they have a reliable methodology for proving classwide injury and damages through Leitzinger (in addition to their other sources of evidence of classwide injury). The DPPs have also shown that the class is numerous, a class action is a superior method to litigate the Sherman Act claims, and the named DPPs are adequate representatives of the DPP class. Therefore, the DPPs' motion for class certification is GRANTED. The Named Plaintiffs Betances, RDC, and ASC are hereby appointed as representatives of the Class. Faruqi & Faruqi LLP, Garwin Gerstein & Fisher, LLP, and Hagens Berman Sobol Shapiro LLP are appointed as Co-Lead Counsel and Hagens Berman Sobol Shapiro LLP is appointed as Liaison Counsel for the Certified Class.

## II. END PAYOR PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**\*16** Defendants make many of the same attacks on the EPPs' motion for class certification as leveled against the DPPs' motion. I will not go in depth to dispel identical arguments that have similar impact—in reality no or limited impact—as to the EPPs. But there are a number of differences in chain of distribution position of the different EPPs, stark differences in damages (both as to amount and calculation methods)and a much more complex class definition (with multiple layers of exclusions) that require further analysis and discussion.

Similar to the DPPs, the EPPs submit a Trial Plan where in Phase I liability would be determined as to an antitrust violation by using common proof to show: (i) defendants intended for their Agreement to prevent the risk of competition from less expensive generic versions of Lidoderm; (ii) Watson was ready and able to launch generic Lidoderm as early as August 23, 2012; (iii) Watson agreed to, and did in fact, delay the launch of its generic Lidoderm product; (iv) defendants' Agreement has no countervailing procompetitive justifications; (v) any proffered procompetitive justifications were not reasonable necessary to accomplish their goals; and (vi) the relevant market is Lidoderm and AB-rated generic versions of Lidoderm. EPP Trial Plan (Dkt. No. 526-15) at 2.

The EPPs propose to show antitrust impact and injury by common proof that: (i) generic drugs are significantly less expensive than the branded version of the same drug product; (ii) purchasers pay significantly less for generic drugs than they do for branded drugs; (iii) the presence of a second generic drug product on the market—such as an authorized generic—further drives down branded and generic drug prices; (iv) state laws and health benefit plans promote or require the substitution of less expensive generic drugs for branded versions once the generic drug products are on the market; (v) defendants' Agreement delayed the availability of, and competition from, generic Lidoderm; (vi) defendants understood that Watson could have launched its generic Lidoderm product at a significantly lower price than that of Endo's and Teikoku's branded product; (vii) defendants' conduct impacted all or nearly all Class members; and (viii) the pricing of Lidoderm and generic Lidoderm once Watson launched its generic Lidoderm product confirm the impact of defendants' Agreement. Id. at 3. The EPPs argue that the special verdict form submitted to the jury will track Section 1 of the Direct Purchasers' Sherman Act claims and will encompass all of the elements of plaintiffs' state law claims, allowing the jury to make findings that will be equally applicable to all plaintiffs' claims. Id.[23]

In Phase II, the EPPs propose to prove class-wide aggregate damages based on the answers provided in Phase I, and evidence including: (i) the rate at which Watson's generic Lidoderm product and Endo's and Teikoku's authorized generic would have taken market share from branded Lidoderm; (ii) the prices of generic and branded Lidoderm that would have prevailed in the absence of defendants' anticompetitive Agreement; (iii) the number of units of Lidoderm purchased during the Class period; (iv) the percentage of purchases made by uninjured class members, if any; (v) that plaintiffs and class members paid more for their Lidoderm purchases or reimbursements than they would have in the absence of defendants' anticompetitive Agreement; and (vi) what plaintiffs and class members would have been charged in the absence of defendants' anticompetitive Agreement. Id. at 5.

**\*17** In Phase III, damages would be allocated through an administrative process and claims form where class members would verify their generic and/or branded Lidoderm purchases during the class period and what their intent would have been if generic Lidoderm had been on the market earlier (to exclude Brand Loyalists). TPPs would also submit claims data showing the reimbursements for purchases made by their members to pharmacies or through PBMs. Id. at 6.

Defendants oppose the EPPs motion and contest the EPPs' ability to prove injury on a classwide basis, arguing that the model proposed by Singer is overinclusive and includes

In re Lidoderm Antitrust Litigation, Not Reported in Fed. Supp. (2012)
2017-1 Trade Cases P 79,907

consumers who were not injured, specifically: (i) Brand Loyalists who would have stuck with brand Lidoderm even if generic was available earlier, and those Brand Loyalists cannot be identified with common proof; (ii) EPPs who purchased generic Lidoderm at costs above the brand costs, and were not injured; (iii) consumers who reached out of pocket maximums (and therefore were not injured); and (iv) consumers whose plans would not allow them to purchase generic if available. Those consumers, according to defendants, cannot be identified and excluded from the class with common proof.

Defendants similarly argue the model proposed by Singer is overinclusive as to TPPs because: (i) TPPs may have received rebates from Endo that exceeded their payments for brand Lidoderm; (ii) TPPs with "high consumer contributions" were not injured (although their members were); and (iii) the TPPs passed on the costs of any overcharges to their members through premiums. These TPPs likewise cannot be identified and excluded with common proof.

Defendants further argue that classwide proof cannot be used to show that the six Medicare Part D ("Part D") EPPs were injured because of government contributions. As to common questions and predominance, defendants challenge Singer's model as inherently unreliable under *Daubert*. And under Rule 23(a)'s other inquiries, defendants contend that the EPP class is not readily ascertainable without significant individualized inquiries, the consumer plaintiffs are inadequate class representatives, there are conflicts between the TPPs, consumers, and Part D plans that preclude certification, and differences in the applicable state laws make the case unmanageable.[24]

### A. Dueling Expert Approaches and Assumptions

But-For Price. In general, EPP expert Singer's approach is to rely on internal documents produced by defendants (as well as academic literature and research) to estimate the but-for prices generic and branded Lidoderm would have had in the "but-for" world of earlier generic entry. Singer Decl. ¶¶ 96-101. Defendants challenge Singer's but-for price because it is significantly lower than the actual prices EPPs paid after generic entry occurred, according to PBM data produced in this case. Defendants also attack Singer's but-for price because it allegedly does not accurately account for Watson's expected or actual production costs, or what happened in the "real world" after Watson introduced its generic.

**\*18** Defendants' expert, Hughes, uses a different method to determine the but-for price. He takes the actual prices charged to EPPs after Watson's generic entry and "backcasts" them to the purchases made in the Delay Period.[25] Hughes Decl. ¶ 13. Singer criticizes Hughes' approach, arguing that the actual prices are "tainted" by the antitrust conduct and were higher than they would have been in the immediate post-generic entry and post-AG entry periods because of that conduct. Singer Reply Decl. ¶ 2.

As above, however, what the but-for price should have been is not appropriately resolved on this motion. It is sufficient at this juncture to note that both Singer's and Hughes' methods for determining but-for price are plausible approaches based on classwide proof, and do not rely or implicate individualized questions that would predominate over common ones. What, in the end, the but-for price is determined to be is subject to further merits-based determinations and findings by the trier of fact.

Watson's Entry. In addition to the disputed assumptions underlying the competing but-for prices, the parties dispute other assumptions in each expert's model, including when Watson would have been able to enter the but-for market and whether Watson would have had sufficient product to meet demand or would have needed to "ration" product between purchasers. The resolution of these disputes is appropriately reserved for the trier of fact (or possibly resolution on summary judgment depending on what the facts show). The existence of these disputes at this juncture does not mean that any of the experts' models are inherently unreliable. The disputes simply highlight that common proof can be used in the competing economic models to show both impact (or lack of impact) and aggregate damages (or that aggregate damages are inflated).

### B. Classwide Proof of Injury and Damages

Defendants argue that the EPPs cannot prove injury from the alleged antitrust agreement on a classwide basis and, therefore, that common questions do not predominate and the class mechanism is not a superior method to resolve the antitrust claims. As with the DPPs' motion, defendants contend that some of the individual consumers and TPPs were not injured and those uninjured EPPs cannot be identified with common proof.

2017-1 Trade Cases P 79,907

### 1. Uninjured Consumers

#### a. Brand Loyalists

"Brand Loyalists" are consumers who continue to purchase brand by choice, even after generics enter the market. *See, e.g.*, Hughes Rep. ¶¶ 85-89. A Brand Loyalist would not be injured because she would continue to purchase the brand drug despite the entry of a lower-priced generic. Both sides admit that Brand Loyalists exist and are not possible to identify individually through common evidence so that they can be individually excluded from the EPP class. According to defendants, that makes the class fatally overbroad and uncertifiable because identifying them will create predominant individualized issues. *See, e.g., Wellbutrin SR*, 2010 WL 3855552, at *25 (E.D. Pa. Sept. 30, 2010) (rejecting certification of EPP class in part because plaintiffs did not provide "a method for identifying which individual purchasers would remain brand loyal through analysis of common information" and therefore failed to demonstrate that common proof is available to show that supra-competitive prices passed through to purchasers of both branded and generic purchasers); *Provigil*, 2015 WL 4737288 (E.D. Pa. Aug. 4, 2015) (where plaintiffs did not identify "a class-wide methodology for identifying those persons who purchased" the brand or generic drug but who fall within the brand loyalist exclusion from the class definition, they failed to show that common issues will predominate).

 **\*19**  Here, however, the EPPs and their expert have developed a method for approximating the number of Brand Loyalists in the class using common evidence. Singer defines Brand Loyalists as consumers who voluntarily choose to buy the brand after generic entry (excluding those whose health plans forced them to continue to purchase the brand post-generic entry). He estimates that Brand Loyalists account for 6.1% of the EPP class purchases, and excludes those purchases from his aggregate damages model. Singer Reply Decl. ¶¶ 30, 82; Singer Sur-Reply Decl. ¶ 10. [26] Hughes estimates that Brand Loyalists account for 24% of the EPP class. Hughes Reply Rep. ¶ 39.

The experts disagree over which consumers are *uninjured* Brand Loyalists who should not be in the class and whether Singer appropriately included Medicare Part D purchases and TPP payments on behalf of insureds with a "flat generic co-pays" among those injured, despite the fact that some of these consumers—according to defendants and Hughes—were Brand Loyalists and continued to purchase branded Lidoderm after generic entry. Singer explains that he continues to count the Medicare Part D consumers as *injured* members of the class (and did not exclude them as Brand Loyalists) because under his theory, they were injured in their pre-generic entry purchases because of the delay in brand prices moving to a more preferred/cheaper copay tier (which is what happened after generic entry when Endo renegotiated their contracts with the Part D entities). Singer points out that these Part D consumers are in fact excluded from the post-generic entry class (because they continued to purchase brand under their Medicare D plans) and those post-generic entry purchases are not included in the aggregate damages. Singer Sur-Reply Decl. (Dkt. No. 619) ¶ 3. Correcting for this "error" by Hughes, Singer argues that Hughes' own estimate of uninjured class members drops from 24% to 9.3%. *Id.* ¶¶ 4-7. Singer also points out that Hughes attempted to inflate the number of Brand Loyalists by excluding transactions made between September 2013 and July 2014 by consumers with flat generic copayments for brand purchases. Singer contends that while many of these transactions may have been made by flat copayors consumers (who were uninjured), the TPPs are still injured on these transactions and it is appropriate to include *them* in the calculation. *Id.* ¶ 8. In the end, Singer sticks with his 6.1% Brand Loyalist estimate after "double-checking" that figure by reviewing actual purchase data from OptumRX PBM. *Id.* ¶¶ 9-10.

I find that, at this juncture, Singer has appropriately accounted for Brand Loyalists in his model by excluding 6.1% of purchases from his aggregate damages estimate. While Hughes believes that the number of Brand Loyalists is higher (or the amount of Brand Loyalist purchases is higher), that dispute does not undermine the fact that both experts rely on common proof (as opposed to individualized proof) to estimate the impact Brand Loyalists have on the aggregate damages number under both of their models. Estimating the number of Brand Loyalist purchases (using a common proof methodology) is a sufficiently reliable method to remove purchases from the aggregate damages award. At the claims administration stage (if the jury finds liability and awards aggregate damages), there are a number of ways that Brand Loyalists can be identified and excluded from the damages distribution process.

In re Lidoderm Antitrust Litigation, Not Reported in Fed. Supp. (2017)

2017-1 Trade Cases P 79,907

### b. Consumers Who Had No Cost Savings from Purchasing Lidoderm

Defendants also argue that plaintiffs' class improperly includes consumers whose health plans provided access to generic Lidoderm at the same copay tier or a less expensive copay tier as branded Lidoderm because these consumers were not injured and cannot be identified with common proof, but can only be identified by looking to the terms of individual plans.

**\*20** The EPPs respond by relying on Singer's findings that only 2.92% of consumers in the class period had this type of copay structure, and within that 2.92% are many EPPs who have already been excluded from the class as "flat copayors." Singer Reb. Decl. ¶ 15. In addition, plaintiffs cite to OptumRX's data that shows when faced with a choice of whether to buy generic or brand at the same copay tier, only 25% of consumers still purchased branded. Therefore, at most 25 percent of the 2.92% (or 1.19% as adjusted) of consumers faced with identical copays are effectively Brand Loyalists, who according to Singer are either already accounted for in his uninjured Brand Loyalists estimate or, if their purchase was post-generic entry, excluded from the Class. Singer Reb. Decl. ¶ 16. That low figure is fairly consistent, according to Singer, with his initial estimate based on OptumRx data that only 1% of actual transactions for generic Lidocaine were of the same or higher price as branded Lidoderm, a figure which Singer already included in the 6.1% class-carve-out discussed above. Id. At most, therefore, and assuming that Singer's prior calculations do not already adequately account for these purchasers, Singer's 6.1% carve-out could be revised upward by another 1.19% to 7.2%. Id. No matter; Singer has articulated a sound evidence-based methodology by which the "no cost savings" and Brand Loyalist purchases can be excluded from aggregate damages using common proof, ranging from 6% to 7% of the class purchases.[27]

### c. Impact of Noninjured Consumers in the Class

Defendants argue that Singer's admission that the class includes uninjured purchasers (who made the 6% to 7% of the purchases) prevents certification. This does not show overinclusiveness or predominance of individualized uninjured or Brand Loyalist issues. Instead, that figure represents at most a *de minimis* portion of the EPP class. It is a figure that has a basis in the data regarding actual sales

of Lidoderm and is arrived at by *common proof.* As such, and under the case law discussed above with respect to the DPPs' motion, the class is certifiable despite their inclusion in the EPP class definition. *See supra* at 18.

The EPPs have a classwide method to "account" for their existence, so that the 6-7% purchases are excluded from the aggregate damage award. As already noted, various methodologies can be employed at the damages allocation phase to ensure that uninjured brand loyalists are not allocated any damages. Use of those methodologies at allocation will not overwhelm the common proof issues already discussed.[28]

### 2. Uninjured TPPs

Defendants also assert that the EPP class is overinclusive and that injury cannot accurately be determined through common proof because various TPPs have not been injured by defendants' alleged conduct.

### a. TPP Rebates

Both sides agree that TPPs received rebates provided by drug manufacturers and secured and paid through PBMs. Defendants argue that the terms of the rebates vary across the board and require individualized review depending on the size of the TPP, the type of TPP (retail or mail order pharmacy), and the TPP plan (*e.g.*, rebates depend on at what tier a brand or generic drug is offered). Defendants posit that these rebates "may have caused" TPPs to pay less for generic Lidoderm than branded and point out two examples where named TPPs were not injured because they paid less per patch "on average" for generic than branded Lidoderm. Def. EPP Oppo. at 13; Hughes Rep. ¶¶ 100–108.

**\*21** Plaintiffs respond, first, by noting that whether a TPP suffered damage "on average" is irrelevant because the TPP need only suffer damage on one purchase to be injured. *See, e.g., In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) (where class member paid one overcharge, injury established even if suffered no damage because injury later offset); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, No. CV 1:09-MD-2089-TCB, 2016 WL 3770967, at \*7 (N.D. Ga. July 12, 2016) (the "Court concludes that a person suffers a cognizable injury and is impacted by a price-fixing conspiracy at the moment he pays an antitrust overcharge,

Case 1:19-md-02875-RMB-SAK   Document 1748-28   Filed 11/10/21   Page 123 of 261
PageID: 45061

In re Lidoderm Antitrust Litigation, Not Reported in Fed. Supp. (2017)
2017-1 Trade Cases P 79,907

even if the anticompetitive conduct at issue also results in offsetting benefits.").[29] That is not to say that the rebates are irrelevant; they are relevant to damages and, if large enough, to class membership. But the rebates have been addressed through a common method of proof by the EPPs' expert, who determined the existence of overcharges on all purchases after determining a but-for price and after taking into account rebates.

Defendants criticize Singer's analysis on a number of grounds. First, he assumes that PBMs uniformly pass on 100% of the rebates to TPPs. Def. EPP Oppo. 14. But this approach is merely a conservative one that cannot result in an overestimation of impact or damages, but only an under-estimation. Second, defendants object to his determination of the but-for price of branded and generic Lidoderm and, instead, rely on Hughes's higher but-for price which results (not surprisingly) in a finding that at least four TPPs paid more for Lidoderm after generic entry than net of rebates. *See, e.g.*, Hughes Rep., Ex. 10c. But Hughes was only able to make that showing by using a significantly higher but-for price. As described elsewhere, Singer's but-for estimated price is based on academic research, defendants' own forecasts about the Lidoderm market, and analysis of what actually happened when a generic was introduced. Based on Singer's but-for price, all named TPPs were injured. Singer Reply Decl. ¶¶ 42-43. Hughes' but-for price is based on a different set of assumptions. The parties dispute the appropriate but-for price in this case; the determination will likely have to be made by the jury.

Singer's analysis suffices for purposes of the class certification motion and can (if necessary) be altered based on further legal rulings or jury determinations as to disputed facts.

### b. TPPs with High Consumer Copayments

Similar to the argument above, Hughes applied his higher but-for price to the OptumRX data and determined that 26% of TPPs and one opt-out EPP GEHA "escaped injury" because even before rebates were factored in, their members' high copayments offset any cost difference between a brand and generic prescription. After rebates are factored in, 90% of TPPs would have paid more for generic after Endo's AG entry. Hughes Rep. ¶¶ 110, 111. Not surprisingly, Singer finds Hughes' analysis faulty because it is based on Hughes' inflated but-for price. Based on Singer's but-for price and analyzing

the OptumRX data, every one of the TPPs paid more for branded Lidoderm on at least one transaction and overpaid on 90% of total purchases per month (after considering rebates and copays). Singer Reply Decl. ¶¶ 47, 67, 68.[30] Obviously, these analyses depend upon disputed facts that underlie the determination of the but-for price. But both of these analyses also rely on common methodologies, even if the inputs of each differ based on disputed assumptions.

### c. TPPs Could "Pass On" Costs of Branded Lidoderm Through Premiums

**\*22** Defendants, supported by the expert declaration of John F. Fritz (which plaintiffs seek to exclude under *Daubert*, discussed below), argue that the health insurance and welfare plan TPPs were not harmed because they could "pass on" and otherwise avoid injury by setting and resetting their premiums to cover prescription drug overcharges. While defendants seem to recognize that the pass on defense is not viable under federal law,[31] they argue it is viable under the state laws at issue because TPP plaintiffs "absorbed" the overcharges. Def. EPP Oppo. 15-17. Fritz opines that the TPP insurance and welfare plans are able to recoup overcharge costs through premium adjustments and argues that the parties will be forced to analyze a myriad of individualized inquiries to determine the extent of the overcharge absorption, making class certification inappropriate. *Id.* 16.

However, the class as defined here is an end-payor class —by definition it only includes members who were at the end of the distribution chain and who did not resell the product to another. The cases relied on by defendants recognizing that the premiums might shield health plans from incremental costs caused by unlawful behavior are inapposite because in the antitrust or end payor context, the alleged harm is unexpected overcharges. *See, e.g., Serv. Employees Int'l Union Health & Welfare Fund v. Philip Morris Inc., 249 F.3d 1068, 1075 (D.C. Cir. 2001)* (plaintiffs could not recover costs of providing smoking-related health care costs from tobacco companies on RICO and fraud claims because costs of providing medical coverage generally were offset by premiums); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc., 196 F.3d 818, 824 (7th Cir. 1999)* (same and noting health care premiums for smokers were set higher); *see also In re Methionine Antitrust Litig., 204 F.R.D. 161, 165 (N.D. Cal. 2001)* (plaintiffs failed to show how they intended to show that the *indirect* purchaser

2017-1 Trade Cases P 79,907

*resellers* did not pass on the overcharge; there are no resellers in the EPP class here). [32]

**\*23** Even if the pass-on defense could apply to these end-payor health insurance and welfare plan TPPs, there is no evidence that premiums are calculated either to account for antitrust overcharges or prices of specific drugs. Instead, the evidence is that the premiums are set to cover *future* (not past) costs based on what actuaries determine those future costs will be and known market dynamics. Fritz Rep. ¶ 1 (premiums set to cover "future" and "projected" or "expected" costs). Here the EPP health plans and welfare funds were injured as of the date they *paid* the overcharges; that these plans and funds may have—as part of their annual premium setting—increased premiums to cover for *future* health care and prescription drugs for their members in general does not show that these plans and funds did not bear the risk of or actual damage from the overcharges at issue here. For purposes of the class certification analysis, the premium-setting and recoup issues posited by defendants do not create individualized issues that undermine the predominance of the legal questions identified above.

### 3. Medical Part D

The proposed class includes six Medical Part D providers with whom Endo renegotiated contracts to preclude them from providing generic coverage when Watson entered. Defendants argue that this portion of the class creates more significant individualized issues, requiring analysis of each of these providers' contracts to figure out what the providers and Endo *might have* agreed to if Watson had entered earlier in the but-for world. Defendants' argument, again, depends on disputed factual assumptions—*e.g.*, the date of early entry, whether Endo would have agreed to enhanced rebates in the but-for world, etc. The damages for these providers, according to Singer, is established similarly to the other EPPs (calculating each of the provider's actual purchase quantity multiplied by the eventual rebate differential and as applied to the Delay Period). Singer Rep. Decl. ¶ 138; Singer Reply Reb. ¶ 72. The jury may or may not accept the factual assumptions underlying Singer's analysis; at this stage, the theory is appropriate and supports certification as to the Part D providers.

### 4. Predominance

As discussed above, Singer's model—and some of the factual assumptions it relied on—are sufficient at this stage to support class certification as to commonality *and predominance*. If Singer's model needs to be adjusted based on summary judgment or findings at trial, it can be. Plaintiffs point to *In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015), a case that affirmed certification of a similar EPP class. Defendants argue that there was no "real world" data regarding the generic in *Nexium,* as there is here and which, according to defendants, shows that the EPP class is fatally overinclusive. But as discussed above, Singer's estimation that the EPP class at most is 6-7% overinclusive is evidence-based and does not defeat certification.

I will not determine the impact of that "real world" data on a motion for class certification. A rigorous review of Singer's (and Hughes') opinions and their reasoning, as required under recent Supreme Court precedent, establishes that the concepts and designs of their models are solid. What facts and assumptions are appropriate to include in those models (and which model is preferred) are not issues I can or should resolve on *this* motion.

To be clear, I am not relying on a presumption of antitrust injury. I am concluding that plaintiffs have shown that they can attempt to prove classwide impact through common evidence, including defendants' own forecasts, academic research applicable to the generic/brand drug pricing market, *and* Singer's model. Whether they succeed depends in large part on assumptions and facts to be tested on summary judgment or by the trier of fact. While defendants and Navarro assert that individual determinations of actual injury can be based on documentary evidence, that does not mean individual injury determinations *are* required. If it did, few if any antitrust class actions would be permissible. [33]

### C. Damages Not Attributed to the Class

**\*24** Similar to their overinclusiveness argument as to injury, defendants argue that certification should be denied because the damages model includes damages not "attributable to the class." They rely heavily on the Supreme Court's decision in *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013). There, plaintiffs initially relied on four theories of antitrust liability and calculated aggregate damages based on each of the four theories. 133 S.Ct. at 1434. However, the district court certified the class based on only one of the four theories, and plaintiffs did not provide a damages calculation for that one theory standing alone. *Id.* Because the plaintiffs relied on

In re Lidoderm Antitrust Litigation, Not Reported in Fed. Supp. (2012)

2017-1 Trade Cases P 79,907

"a methodology that identifies damages that are not the result of the wrong" alleged, they did not establish that "damages are capable of measurement on a classwide basis," failing to meet the Rule 23(b)(3) requirement. *Id.* at 1433-34.

*Comcast* presents no problem to plaintiffs. They have one theory of injury and one consistent theory of damages as explained by Singer. *See also In re Nexium Antitrust Litig.,* 777 F.3d 9, 19 (1st Cir. 2015) (rejecting challenge under *Comcast* where "the plaintiffs' theory and model for damages would only require that the defendants pay aggregate damages equivalent to the injury that they caused."); *In re Urethane Antitrust Litig.,* 768 F.3d 1245, 1258–59 (10th Cir. 2014) (explaining the expert's benchmarks in *Comcast* became "useless" upon a ruling that three of the liability theories could not be used); *In re Deepwater Horizon,* 739 F.3d 790, 815 (5th Cir. 2014) (explaining that *Comcast* stands for the proposition that formulas for classwide measurement of damages should not be "incompatible" with liability theories); *Butler v. Sears,* 727 F.3d 796, 799 (7th Cir. 2013) (A damages model must "measure only those damages attributable to [the liability] theory. If the model does not even attempt to do that, it cannot" meet the requirements of Rule 23(b)(3) (citing *Comcast,* 133 S.Ct. at 1433)), *cert. denied,* 134 S.Ct. 1277 (2014); *Leyva v. Medline Indus. Inc.,* 716 F.3d 510, 514 (9th Cir. 2013) ("[P]laintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." (citing *Comcast,* 133 S.Ct. at 1435)). [34]

Also, as noted above, in estimating aggregate damages plaintiffs have shown *how* purchases attributable to class members who were not damaged can be excluded on a classwide basis (*e.g.,* aggregate damages reduced by 6-7%), and therefore avoid any Rule 23 or Rules Enabling Act problem. As to apportioning the aggregate damages, it bears repeating that the need for individualized determinations concerning damages generally does create a lack of predominance. *See, e.g., In re Nexium Antitrust Litig.,* 777 F.3d 9, 21 (1st Cir. 2015) ("the Supreme Court in *Amgen* and the circuits in other cases have made clear that the need for some individualized determinations at the liability and damages stage does not defeat class certification.").

Aside from the overinclusiveness arguments discussed and rejected above, defendants also claim that aggregate damages cannot be adequately shown using Singer's model because it does not reliably distinguish between EPP purchases in the states included in the class from purchases in non-included

states. Def. EPP Oppo. 24. These issues do not preclude class certification. Singer opines that while any one state may be a net exporter of Lidoderm, other states will be net importers and the differences are likely to even out. Singer Reply Decl. ¶ 60. Moreover, the issues Hughes attempts to identify as *possibly* occurring (*i.e.*, resellers may have resold Lidoderm outside of their respective states and the large and arguably anomalous amount of sales in Arizona) are factors that can be accommodated by altering the inputs to the experts' models.

**\*25** Defendants also challenge Singer's alleged failure to account for damages attributable to the federal government for payments to Part D providers under the low-income subsidy ("LIS"). Hughes Rep. ¶¶ 122-23. If, on summary judgment or at trial, facts are shown that TPPs were reimbursed for these overcharges by the federal government (facts currently in dispute), Singer calculates that the maximum government payment under the LIS amounts to only 1.1% of class damages; like the damages attributed to the Brand Loyalists, these can be excluded from the aggregate damages. Singer Reply Decl. ¶¶ 53-54.

Finally, defendants criticize Singer's model for its failure to exclude damages born by the PBMs that resulted from the speculated failure of the PBMs to effectively negotiate rebates and set spread prices. However, as discussed above, there is *no evidence* either of these scenarios actually occurred to PBMs with respect to lidocaine patches. Defendants' speculation cannot defeat certification.

### D. Ascertainability

Defendants argue that given the very complex class definitions at issue, including the numerous exceptions, as well as the lack of reliable data to identify EPPs, plaintiffs have not shown that the EPP class is "administratively ascertainable." However, the class definition—while somewhat complex—is based on objective criteria that allow potential class members to determine whether they are included in the class. *See, e.g., Philips v. Ford Motor Co.,* No. 14-CV-02989-LHK, 2016 WL 7428810, at \*12 (N.D. Cal. Dec. 22, 2016).

As the Ninth Circuit recently explained, ascertainability (much less "administrative ascertainability") is not a requirement under Rule 23. *Briseno v. ConAgra Foods, Inc.,* 844 F.3d 1121, 1125 (9th Cir. 2017). [35] Concerns about illegitimate claims and manageability, such as those expressed by defendants here, are accounted for by other provisions of Rule

In re Lidoderm Antitrust Litigation, Not Reported in Fed. Supp. (2017)

2017-1 Trade Cases P 79,907

23; that consumers may not have documentation to support their claims of injury or damages does not mean a class of consumers cannot be certified. *Briseno,* 844 F.3d at 1129-30; *see Kumar v. Salov N. Am. Corp.,* No. 14-CV-2411-YGR, 2016 WL 3844334, at *6 (N.D. Cal. July 15, 2016) (finding class members ascertainable despite defendant's arguments that class members would have to self-identify and show "what they paid, where they purchased it, and how many times, plus whether they saw and were deceived" by a product's label). Post-judgment claims forms and other tools can be used to allow defendants to test a class member's purported entitlement to damages and to apportion damages appropriately between class members. *Id.* at *7; *see also Briseno,* 844 F.3d at 1131 (at "the claims administration stage, parties have long relied on 'claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court' to validate claims").

### E. Adequacy

According to defendants, the individual consumer plaintiffs are inadequate class representatives. Ms. Gallotto (the only class representative with standing under Massachusetts law) is inadequate because: (a) she purchased branded Lidoderm during the class period only in May 2013; (b) she could not confirm or prove that her purchase was through Medicare Part D and not Part B (which is excluded from class); (c) she could not recall or produce records to show what her copay or co-insurance was for the purchase; and (d) her ill health prevented her from sitting for a deposition. Plaintiffs respond that Gallotto provided purchase price details that established the cost to her TPP and her 25% co-pay (standard for Part D coverage), along with documents demonstrating it was a "MPD" copay. While she did not sit for a deposition, her interrogatory responses confirm that she is adequate (she did not have a flat co-pay structure, she is not a Brand Loyalist), and her interrogatory responses in lieu of a deposition do not undermine her adequacy. In these circumstances, I find that Gallotto is an adequate class representative.

**\*26**  Defendants allege that Mr. Roller, the other individual EPP plaintiff, is inadequate because he is undamaged: he purchased Lidoderm with cash, lacked insurance in December 2013, and used a coupon which resulted in a payment lower than the generic price that month. Plaintiffs do not dispute that Roller is undamaged, but argue that the allegedly "unique" defense that could be applied to Roller (comparing actual purchase price to but-for price) is not an individualized defense because that comparison will be performed for all

EPP class members. Plaintiffs also argue that Roller's interests remain aligned with the class because he was injured if not damaged. It appears to me that Roller is not an adequate class member because there is no evidence that he was injured, given his use of the coupon that lowered the price he paid to below the but-for price estimated by Singer. There is no evidence that Roller would have bought more lidocaine patches had the prices been lower or other theory of injury. In this circumstance, he is subject to a unique defense that makes him inadequate as a class representative. [36]

At oral argument, plaintiffs' counsel asked for leave to substitute in a new class representative if I were to find one or both of them inadequate. That request is granted and plaintiffs may substitute in a new class representative for Roller with 45 days of the date of this Order. [37]

### F. Representativeness and Conflicts

Because the TPPs and consumers are in different positions in the distribution chain—and make different choices along the way—defendants assert that TPPs may be "in conflict" over fact of injury and amount of damages in any given transaction. The specific conflicts asserted are that: (i) the amount of overcharge damages will need to be assigned between TPPs and end consumers, putting the parties into conflict over who gets what recovery; and (ii) some of the Part D plans and other TPPs would prefer different legal theories about what would have happened in the but-for world, creating conflicts.

As to the first theory of conflicts, defendants have not shown that the alleged conflict would permeate the aggregate damages calculation. Instead, it arises at the time damages are allocated. And at that juncture, claims mechanisms (which rely on EPP documentation or sworn affidavits) may be employed to resolve any theoretical disputes between, for example, an end payor consumer and her health insurance plan over how their overcharge damages should be split. This does not create a type of conflict that precludes certification. [38]

As to the second theory of conflicts, defendants argue that because some Part D and other TPPs may have actually benefitted if Endo had employed a "discounted brand" strategy instead of immediately launching an AG, those EPPs are incentivized to pursue different but-for theories to calculate aggregate damages, creating a conflict. This is not a case where there were two major segments of the class, one segment who were harmed by defendants' conduct and the

In re Lidoderm Antitrust Litigation, Not Reported in Fed. Supp. (2012)

2017-1 Trade Cases P 79,907

others who benefitted. *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 177 (C.D. Cal. 2007). Instead, it is a case where EPPs have chosen one damages theory over another. If this is a real concern (and I am not finding it is), EPPs who wanted to pursue different damage theories could opt-out to do so. At this juncture, however, the theoretical conflict identified by defendants does not preclude certification.

### G. State Law Claims

**\*27** Finally, the defendants argue that variations among the state laws invoked by the EPPs bar class certification because of material differences in those laws. *See* Declaration of Daniel B. Asimow, Exs. 24 & 26 [Dkt. Nos. 550-25, 550-27]. The material differences identified by defendants in their Opposition are: (i) impact on intrastate commerce (statutes use different phrasing or it is not a requirement); (ii) when enhanced damages apply (flagrant conduct, willful or knowing conduct); and (iii) differences in statutes of limitations. Plaintiffs respond that most of the state laws at issue are interpreted consistently with federal antitrust law (and therefore will rise and fall with the DPPs' Sherman Act claims) and any differences are not really material because the core elements of the state laws in play are identical.

Numerous courts in this District have certified cases involving indirect purchaser claims under different state laws. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 608 (N.D. Cal. 2010), *amended in part*, No. M 07-1827 SI, 2011 WL 3268649 (N.D. Cal. July 28, 2011); *In re Static Random Access memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603 (N.D. Cal. 2009); *see also In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 176 (D. Mass. 2013), *aff'd sub nom. In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) (variance in state laws and statutes of limitations do not bar class certification under Rule 23(b)(3)); *see also In re Terazosin Hydrochloride*, 220 F.R.D. 672, 701 (S.D. Fla. 2004) ("the Court acknowledges that management of the several state classes will raise numerous challenges. However, these challenges are ones that routinely arise in complex litigation, and they are insufficient to overcome the innumerable advantages that class treatment will afford.").

The differences in the applicable state laws identified by defendants do not appear to be material or even significant. But if they are, those differences can be readily accommodated on a special verdict form or through other

mechanisms routinely employed in complex litigations like this one. [39]

For the foregoing reasons, the EPPs motion for class certification is GRANTED. Girard Gibbs LLP, Cohen Milstein Sellers & Toll PLLC, and Heins Mills & Olson PLC are appointed as Co-Lead Counsel; the Joseph Saveri Law Firm, Inc. is appointed as Interim Liaison Counsel; and the following firms are approved as the Executive Committee Hilliard & Shadowen LLP, Miller Law LLC, Motley Rice LLC, Robbins Geller Rudman & Dowd LLP, and The Dugan Law Firm, APLC.

## III. MOTIONS TO EXCLUDE

### A. Legal Standard

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Expert testimony is admissible under Rule 702 if it is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (internal quotation marks omitted).

Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. To ensure reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* These factors are "helpful, not

2017-1 Trade Cases P 79,907

definitive," and a court has discretion to decide how to test reliability "based on the particular circumstances of the particular case." *Id.* (internal quotation marks and footnotes omitted). "When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

**\*28** The inquiry into the admissibility of expert testimony is "a flexible one" where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010). The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 Advisory Cttee. Notes.

### B. Expert Opinion of Dr. Hal Singer

Endo moves to exclude in full the expert report of Dr. Hal Singer (and presumably his rebuttal and sur-reply declarations), and his opinion that antitrust impact and aggregate damages may be established with common proof under *Daubert* and Federal Rule of Evidence 702. Endo argues that Singer's opinions are without actual support and his model is inherently unreliable because: (1) Singer's impact model (showing how much a generic Lidoderm would have cost but-for the delay in its release) is based on a wholly hypothetical generic Lidoderm price created by "projecting forward" based on estimates of cost generated before Lidoderm was actually on the market, whereas a more "reliable" method is like the one employed by the DPPs' expert Leitzinger, which is to work backwards from the actual prices Watson and Endo charged once their generic versions were on the market; (2) Singer's aggregate damages model is inherently unreliable because: (a) it includes data from entities that are not part of the class and purportedly but not actually excluded (*e.g.*, PBMs and certain government payors); (b) he uses an unreliable method to attempt to exclude damages for purchased made in 33 states that are not part of the class; and (3) Singer's model does not differentiate between allegedly elevated prices paid by TPPs and consumers, so his damages

model conveys "nothing about whether all or nearly all class members are impacted." Dkt. No. 522.

The motion is DENIED. Singer's calculation of but-for date and but-for prices for his model are based on reasonable assumptions and evidence, and supported by reasoned principles as well as academic scholarship. That some of those assumptions are disputed does not make Singer's reliance on them improper. The trier of fact will ultimately weigh some of these fact disputes and determine but-for dates and but-for prices, and those determinations can be input into Singer's model. As discussed above, a *de minimis* overstatement of class members within his aggregate damages calculations does not fatally undermine the model's utility or Singer's opinions at this juncture. Overinclusiveness (*e.g.*, for Brand Loyalists, excluded states) can be dealt with by further refinement of the class or by reasoned deductions from the aggregate damages sought. Apportionment of the aggregate damages can be managed after the liability phase and with readily available tools that ensure the damages are provided only to those who have been injured by defendants' conduct. The attacks against Singer's model are relevant, and may be persuasive to a finder of fact, but they do not make his opinions so inherently unreliable that they should be excluded under *Daubert*.

### C. Expert Opinion of W. Paul DeBree

Defendants also move to exclude the expert report of W. Paul DeBree under *Daubert* and Federal Rule of Evidence 702. Defendants argue that DeBree fails to provide reliable, relevant, and admissible evidence to support his opinions. Dkt. No. 554. DeBree is relied on by plaintiffs as an expert regarding PBMs. Defendants contend that he has "limited relevant experience" with PBMs, he only performed minimal case-specific analysis in support of his opinions, and his opinions lack foundation. Dkt. No. 554.

**\*29** More specifically, defendants challenge DeBree's opinion that PBMs never pay any portion of the cost of drugs. Defendants rely on their expert, Navarrao, who opines that PBM's bear "risk" if they fail to negotiate well and might be harmed if negative spreads or unfunded guaranteed rebates to TPPs occur. As discussed above, defendants fail to identify any instance of these scenarios actually happening to any PBM in the class period, much less that it happened with respect to Lidoderm sales.[40] Instead, admissible evidence shows that PBM did not suffer from these theoretical risks during the relevant class period. *See, e.g.*, Sharp Supp. Decl.,

In re Lidoderm Antitrust Litigation, Not Reported in Fed. Supp. (2017)
2017-1 Trade Cases P 79,907

Ex. K (Response No. 13) ("OptumRx does not ... incur losses on guaranteed rebates"); Declaration of Brian Hansen (Dkt. No. 524-5) ¶ 7 (PBM Prime Therapeutics has not had to "perform" on a guarantees rebate since 2012).

Defendants also challenge DeBree's opinion that "pharmacy records" together with "claim processing records from PBMs" provide plaintiffs a feasible method for ascertaining class members. Defendants argue that the court in *In re Wellbutrin XL Antitrust Litig.*, 308 F.R.D. 134 (E.D. Pa. 2015) has criticized prior similar testimony from DeBree as being too conclusory and inadequate to support class certification. Dkt. No. 554. [41] Defendants contend that DeBree's opinion as to what the PBM records might show or their utility should be disregarded because he did not attempt to develop a list of class members identifiable from the action PBM records at issue, was unable to explain discrete examples of information from the PBM records secured from OptumRX, and could not show how PBM records could be used to identify individuals and TPPs that have been excluded from the proposed class definition.

The record in this case is starkly different than it was in *Wellbutrin*. A significant amount of PBM records *have been secured* and reviewed by DeBree and the other experts. He also relies on statements by PBMs themselves, as well as identified PBM documents, to support his opinions. He explained his extensive experience working for and advising clients regarding PBMs. His experience is sufficient to meet the *Daubert* threshold and allow him to give his expert opinions. Although DeBree may have overstated his position (*e.g.*, "PBMs *never* pay for a portion of the drugs" as opposed to "evidence shows that PBMs bear some theoretical but rarely practical risk with respect to a particular drug"), that does not mean his opinions are without any weight. Finally, DeBree's failure to decipher all categories of PMB data at his deposition without more explanation or context does not fatally undermine his opinion that PBM records can be used to ascertain class members. [42]

**\*30** In sum, defendants do not put forth evidence showing that PBMs—despite their spread pricing and rebates—have actually borne injury from poor negotiating or overpromising rebates to TPPs on Lidoderm. At summary judgment and trial, defendants will be free to argue that DeBree's over-statements undermine his opinions. [43] But for purposes of a solid evidentiary basis and persuasive showing on class certification, DeBree's opinions are admissible and defendants' motion is DENIED.

**D. Expert Opinion of John F. Fritz**

The EPPs move to exclude the September 2, 2016 Report of John F. Fritz ("Fritz Report," Dkt. No. 550-33), arguing that Fritz does not meet the requirements in Federal Rule of Evidence 702 and *Daubert*. The EPPs argue that Fritz is not qualified to provide his opinion that no "health insurer" members of the EPP class "suffered any economic harm because of the alleged delay in the availability of generic alternative(s) for brand Lidoderm" because of the insurers' collection of premiums to cover their costs and because they can recoup any prescription overcharges when they reset premiums annually. Fritz Rep. ¶ 1; Dkt. No. 588. They also contend that his opinion is unreliable and irrelevant. Dkt. No. 587.

More specifically, plaintiffs object to Fritz's "no harm" opinion because: (1) Fritz bases it solely on his personal employment as an actuary and his purported awareness of general premium setting processes, and not on any evidence in this case and not based on any recognized methodology or professional publications; (2) it is unreliable as it is not based on evidence regarding a class member, but instead is based on an analysis of information provided or alleged by former (but now opted-out) class member GEHA, and his opinion is disproved by the only Lidoderm-specific document he considered; and (3) it is based in part on the impact of premiums and contributions collected by third-party payors ("TPPs"), but that evidence shows that plaintiffs and class members do not pass-on the overcharges they paid through premiums or contributions, and premium setting dynamics are irrelevant to injury in this type of case. *See* Dkt. No. 435 (denying premium-setting discovery based on lack of relevance). [44]

**\*31** The motion is DENIED. The weight to be given Fritz's opinion (based on his experience, or lack thereof, and based on the information he did or did not review) is more appropriately challenged at summary judgment or trial. Moreover, while the relevance of Fritz's opinion has not been fully briefed or finally determined (although I have expressed skepticism that the "pass-on" defense will be allowed in this case at least with respect to the federal claims), as explained above, the opinion is not persuasive in my determination of the EPPs' certification motion.

In re Lidoderm Antitrust Litigation, Not Reported in Fed. Supp. (2017)
2017-1 Trade Cases P 79,907

## CONCLUSION

The DPP and EPP motions for class certification are GRANTED. The *Daubert* motions are DENIED.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 679367, 2017-1 Trade Cases P 79,907

## Footnotes

1    Watson became part of Actavis, Inc., which became associated with Allergan, plc, and Watson then became part of Teva Pharmaceuticals Industries, Ltd. The defendant will be referred to here as Watson.

2    Lidoderm is the brand name for lidocaine 5% patches that are used to relieve the pain of post-herpetic neuralgia (also known as "after-shingles" pain). Declaration of Jeffrey J. Leitzinger (Dkt. No. 522-1) ¶ 18.

3    At the time of the patent litigation, Endo had an exclusive license from Teikoku to manufacture and sell the Lidoderm patches and subsequently manufactured and sold the authorized generic version of Lidoderm as well.

4    A more detailed explanation of the factual background of this case, including the regulatory obligations of the FDA and patent litigation under the Hatch-Waxman Act (21 U.S.C. § 355(a)), is explained in my prior Orders, including Dkt. No. 117.

5    The three named DPP plaintiffs are Drogueria Betances ("Betances"), Rochester Drug Co-Operative, Inc. ("Rochester"), and American Sales Company, LLC ("ASC").

6    The EPPs acknowledge that some wholesaler Class Members may have assigned some or all of their entitlement to overcharges to Retailer Plaintiffs. Leitzinger Decl. ¶ 19 n.57. The EPPs' expert contends he can "readily adjust Class volumes to reflect the assigned volumes." *Id.* I do not in this Order determine whether Retailer Plaintiffs can opt-out or, if allowed to opt-out, whether those separate actions will proceed in conjunction with the certified classes. *See* Dkt. No. 231 at 10-12.

7    The named EPPs are: (i) Allied Services Division Welfare Fund, (ii) City of Providence, (iii) International Union of Operating Engineers Local 49 Health and Welfare Fund, (iv) International Union of Operating Engineers Local 132 Health and Welfare Fund, (v) Iron Workers District Council of New England Welfare Fund, (vi) NECA-IBEW Welfare Trust Fund, (vii) United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund, (viii) Welfare Plan of the International Union of Operating Engineers Locals 137, 137A, 137B, 137C, 137R, (ix) Letizia Gallotto, and (x) Steven Roller. EPP Mot. 1.

8    The other EPPs, including retailers, hospitals, and pharmacies, sell or provide the products to end consumers and (generally) not to entities who intend to pass them along to end users. "Consumers" or "end-users" as used in this Order refer to the individual end-users who the drugs were prescribed to.

9    These TPPs are insurers, health and welfare plans, plan sponsors, and self-insured employers. DeBree Decl. ¶ 3. As described somewhat simplistically by the EPPs, Lidoderm is offered in three end-payor markets: to cash payors, to commercial insurers, and to Part D Medicare insurers. EPP Mot. 9.

10    Defendants' expert Navarro states that in studies conducted in 2013-2014, health plan copayments for brand name drugs ranged from $7 to $300 and deductibles ranged from $500 to $2000. Navarro Rep. ¶ 26.

11    The EPPs assert that in no-insurance situations, pharmacies have records of consumers' prescription drug purchases. Declaration of W. Paul DeBree [Dkt. No. 524-2] ¶ 24.

12    Drug formularies are the list of approved drugs accepted by the various TPPs, and created and administrated through the PBMs. DeBree Decl. ¶ 36; Singer Decl. ¶ 105; Hughes Decl. ¶¶ 11, 16, 20. They can be open or closed, with open formularies allowing access to more drugs. The formularies also have various tiers, typically 3 or 4 but up to 7, with Tier One typically including generic drugs and having the lowest amount of copay or

In re Lidoderm Antitrust Litigation, Not Reported in Fed. Supp. (2017)

2017-1 Trade Cases P 79,907

coinsurance. For example, named EPP plaintiff Iron Workers District Council of New England Welfare Fund's plan had three formulary tiers where the copay was $15 for generic drugs (Tier 1), $30 for preferred brand drugs (Tier 2), and $45 for non-preferred brand drugs (Tier 3). Navarro Rep. ¶ 27. If the member used a mail order pharmacy, the copays rose to $30/$60/$90 and if the member went to an out-of-network pharmacy, they were required to pay in advance and then apply for reimbursement through the Fund's PBM. *Id.*

13   The Delay Period used by Leitzinger starts on the *assumed* March 31, 2013 entry date (but-for defendants' Agreement) and ends on the actual Watson entry date of September 15, 2013. The Overcharge Period is the period of time beginning on March 31, 2013 but extending until the point in time where according to Leitzinger the generic entry produced the full savings associated with generic competition. Leitzinger Decl. ¶¶ 38, 39.

14   Defendants do not challenge DPPs' motion as to the adequacy of interim class counsel. On May 20, 2014, I appointed Faruqi & Faruqi LLP, Garwin, Gerstein & Fisher LLP, and Hagens Berman Sobol Shapiro LLP, as Interim Co-Lead Counsel for the proposed Direct Purchaser Class, and Hagens Berman Sobol Shapiro LLP as Interim Liaison Counsel for the proposed DPP class, based on a showing of experience and adequacy. Dkt. No. 60. Those firms have ably and vigorously litigated this case, and nothing has occurred to undermine my initial determination of their experience and adequacy.

15   In addition, defendants' expert testified that he could not recall and could not identify any instance where DPPs paid less for generic Lidoderm than for brand after generic entry and paid less for generic Lidoderm after Endo's AG entry. Declaration of Peter Kohn ISO DPP Reply [Dkt. No. 592], Ex. 52, Transcript of October 13, 2016 Deposition of Gregory Leonard at 91-93, 96, 108, 290.

16   The cases defendants rely on that disapprove the use of averaged or aggregate approaches addressed *materially different* antitrust theories in materially different markets. *See, e.g., In re Optical Disk Drive Antitrust Litig.,* 303 F.R.D. 311, 321 (N.D. Cal. 2014) (price-fixing conspiracy to prevent trending decline in prices); *Food Lion, LLC v. Dean Foods Co.,* 312 F.R.D. 472, 489 (E.D. Tenn. 2016) (rejecting averaging approach to determining injury from alleged conspiracy to inflate prices of milk where model assumed price impact across areas where no impact was found); *see also In re Celexa & Lexapro Mktg. & Sales Practices Litig.,* 315 F.R.D. 116, 128 (D. Mass. 2016) (rejecting plaintiffs' attempt to rely on aggregate statistical evidence to prove "but for causation" in an off-label promotion case because of flaws in the statistical analysis).

17   For example, with respect to the generic entry date issue, defendants argue individualized inquiry is necessary because the date of entry—and how much generic Watson had on hand at the various possible earlier entry dates—impacts whether DPPs would be able to buy sufficient generic stock to fulfill their needs; if the supply from Watson was limited, price might well have increased or led to "rationing" by Watson. Def. DPP Oppo. at 14-15. The DPPs respond that Leonard's testimony and Watson's own documents support a factual finding that supply and rationing would not have been an issue. Leitzinger Reb. Decl. ¶¶ 28–30; DPP Reply at 6-9. With respect to Anda sales—Watson's subsidiary selling brand product it received from Endo during the Delay Period at a discount below other distributors—and defendants' argument that Leitzinger's model fails to account for those sales, the DPPs respond that: (i) the Anda sales occurred *because* of the settlement (and so are not relevant to a but-for world); (ii) the discounts offered by Anda were smaller than the discounts offered by Endo during the same period, so that the class did not receive greater price concessions; and (iii) those Anda sales were excluded in any event from Leitzinger's damages model. Def. DPP. Oppo. at 17; DPP Reply at 9; Leitzinger Reb. Decl. ¶¶ 24-25. With respect to assignments, the Big Three DPPs (AmerisourceBergen, Cardinal Health and McKesson) have allegedly assigned one-third of their claims to opt-out plaintiffs. Defendants argue that those assignments and exclusions mean that individualized inquiry into the terms of the assignments and underlying contracts is required to assure the correct numbers are put into Leitzinger's model. Def. DPP Oppo. at 18-19. However, Leitzinger's model can be adjusted to account for opt-outs and related assignments. Leitzinger Reb. Decl. ¶ 31, DPP Reply at 10. That type of inquiry does not undermine the superiority of proceeding as a class action or call into question the methodology behind or reliability of Leitzinger's aggregate damages model.

18   There is a factual dispute over whether Cedardale Distributors is a part of Cardinal Health or a separate legal entity. *Compare* Leonard Rep. Decl. ¶ 12 *with* Leitzinger Reb. Decl. at 12 n.39. The status of Cedardale

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 132 of 261
PageID: 45070
In re Lidoderm Antitrust Litigation, Not Reported in Fed. Supp. (2017)

2017-1 Trade Cases P 79,907

Distributors is not determinative to this motion. Leonard also argues that if you take March 31, 2013 as the entry date—which is what Leitzinger did for his primary analysis—then Drogueria Central is likewise not a class member. Leonard Rep. ¶ 13. Leitzinger responds that simply because Drogueria Central stopped buying Lidoderm as of February 2013, should not be excluded from the class since the start date may end up being earlier than March 2013. Leitzinger Reb. Decl. ¶ 20. At this stage of the proceedings, Drogueria Central should not be excluded from the class.

19    The purchases by the 29 DPPs who used GPO-secured prices account for *under* 10% of defendants' sales to direct purchasers during the relevant time frame.

20    As Leonard explains it "[b]randed drug manufacturers are more likely to use wholesalers, while generic drug manufacturers are more likely to eliminate intermediaries and sell directly, *e.g.,* to retailers. Thus, after generic entry, direct purchasers that purchased and resold the branded drug from the branded manufacturer prior to generic entry may find that their volumes had declined, with the losses flowing to other direct purchasers (such as retailers or other generic-only direct purchasers)." Leonard Decl. ¶ 78; *see also* Leitzinger Decl. ¶ 46 ("the circumstance in which, following generic entry, some Class members' customers buy generics directly from generic manufacturers and 'bypass' the wholesaler").

21    In support of their by-pass theory, defendants admit that they rely on *Valley Drug Co. v. Geneva Pharm., Inc.,* 350 F.3d 1181, 1189 (11th Cir. 2003), a case which has been widely rejected by courts, including courts in this District. *See, e.g., Braintree Laboratories, Inc. v. McKesson Corp.,* No. 11-80233 MISC JSW (JSC), 2011 WL 5025096 (N.D. Cal. Oct. 20, 2011) ("whether McKesson and other class members somehow benefitted from the delay of the introduction of generics to the market is irrelevant to the merits of the underlying action" and denying discovery into whether DPP profited from antitrust conduct). Courts have also rejected attempts to decrease damages under that theory. *See, e.g., In re Prograf Antitrust Litig.,* 2014 WL 7641156, at *4 (D. Mass. Dec. 23, 2014) ("reducing damages to plaintiff wholesalers under a bypass defense is inconsistent with *Hanover Shoe*") (quotation and citations omitted); *In re Skelaxin (Metaxalone) Antitrust Litig.,* 2014 WL 2002887, at *4-6 (E.D. Tenn. May 15, 2014) (same); *cf. Wellbutrin XL,* 2011 WL 3563385, at *16 (noting that Leitzinger could account for bypass if necessary in aggregate damages model).

22    The fact that the Supreme Court recently reemphasized that Puerto Rico is not a "separate sovereign" for purposes of the double jeopardy clause does not undermine the First Circuit's case law interpreting the Sherman Act. Def. DPP Oppo. at 25 n.110 (citing *Puerto Rico v. Sanchez Valle,* 136 S. Ct. 1863 (2016)).

23    Examples of the special verdict questions proposed by the EPPS include: (i) did defendants reach an agreement delaying competition in the Lidoderm market? (ii) Did defendants' Agreement have the effect of artificially maintaining and inflating the price of Lidoderm and generic Lidoderm? (iii) Did defendants' Agreement impact plaintiffs and members of the class by forcing them to pay more for Lidoderm and generic Lidoderm than they would have in the absence of defendants' Agreement? (iv) Absent the Agreement, would a generic version of Lidoderm have come to the market before September 15, 2013? (v) If so, what is a reasonable estimate as to when? (vi) Would an authorized generic have entered at or about the same time? *Id.*

24    While defendants challenge the adequacy of the named EPP plaintiffs, they do not challenge the adequacy of the counsel I appointed on an interim basis to prosecute the EPPs claims; Girard Gibbs LLP, Cohen Milstein Sellers & Toll PLLC, and Heins Mills & Olson PLC as Interim Co-Lead Counsel; Joseph Saveri Law Firm, Inc. as Interim Liaison Counsel; and an Executive Committee comprised of Hilliard & Shadowen LLP, Miller Law LLC, Motley Rice LLC, Robbins Geller Rudman & Dowd LLP, and The Dugan Law Firm, APLC. Dkt. No. 63. These firms have ably and vigorously litigated this case, and nothing has occurred to undermine my initial determination of their experience and adequacy.

25    As discussed above, the DPPs' expert Dr. Leitzinger takes a third approach and uses the purchase ratios between generic and brand Lidoderm after Watson's entry and applies that ratio to determine his but-for cost.

26    Purchasers who purchased brand Lidoderm after generic entry are excluded from the class as Brand Loyalists.

27    Defendants also argue that consumers who reached their out of pocket maximums could not have been harmed whether or not generic Lidoderm had been available earlier. Def. EPP Oppo. at 11-12. Plaintiffs point

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 133 of 261
PageID: 45071

In re Lidoderm Antitrust Litigation, Not Reported in Fed. Supp. (2017)

2017-1 Trade Cases P 79,907

out that if that type of consumer purchased Lidoderm even once before hitting the maximum, the consumer would be injured and appropriately included in the class. In any event, if a consumer paid nothing for the Lidoderm in this situation, the consumer would not be injured by that transaction, but the TPP who actually paid the costs would and the aggregate damages award would be unaffected.

28   It is also possible, depending on the facts found by the jury, that in absence of the Agreement and if Watson entered at risk earlier than it eventually did, Endo could have implemented a "discount brand" strategy contemplated in some of Endo's documents (Endo would have discounted its brand drug to compete with Watson's generic) and these Brand Loyalists would have been injured and properly considered part of the class. In reality, Endo did not implement that strategy and instead followed a profit maximizing strategy where it increased its prices on Watson's entry.

29   Defendants rely on *In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, 140 F. Supp. 3d 339, 349 (D. Del. 2015), but the section of the decision relied on by defendants addresses alleged conflicts and inadequacy of class representatives, and is not otherwise persuasive.

30   Singer also finds that even using Hughes' but-for price, GEHA paid more for brand Lidoderm in some of its transactions. Singer Reply Decl. ¶ 46.

31   *See, e.g., In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) ("defendants incorrectly assume that if a class member offsets an overcharge through later savings attributable to the same or related transaction, there is no injury. But antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset.... Here, if a class member is overcharged, there is an injury, even if that class member suffers no damages." (internal citations and quotations omitted)).

32   Defendants rely on *Ironworkers Local Union 68 v. AstraZeneca Pharm., LP*, 634 F.3d 1352, 1364 (11th Cir. 2011), a RICO and fraud case based on the manufacture's promotion of off-label drug uses. The court concluded that because "the insurers assumed the risk of paying for all prescriptions of drugs covered by their policies, including medically unnecessary or inappropriate prescriptions—even those caused by fraudulent marketing" the premiums were adequate to compensate for that "known risk." *Id.* at 1364. Not only is this case outside the antitrust/end-payor context, but it has also been disagreed with by more recent cases. *See In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633, 641 (3d Cir. 2015), cert. *denied sub nom. GlaxoSmithKline LLC v. Allied Servs. Div. Welfare Fund*, 136 S. Ct. 2409 (2016); *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, 159 F. Supp. 3d 898, 920 (N.D. Ill. 2016); *In re Neurontin Mktg. & Sales Practices Litig.*, 799 F. Supp. 2d 110, 120 (D. Mass. 2011), *aff'd*, 712 F.3d 21 (1st Cir. 2013). Defendants' reliance on pay-for-delay cases were the injured parties were not ascertainable by common proof (based a legal standard that has been rejected by the Ninth Circuit in *Briseno*) are not persuasive. *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 571 (E.D. Tenn. 2014), *reconsideration denied*, No. 1:12-MD-2343, 2014 WL 1623705 (E.D. Tenn. Apr. 23, 2014); *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1833, 2015 WL 3623005, at *12 (E.D. Pa. June 10, 2015), *reconsideration denied*, No. 2:06-CV-1833, 2015 WL 4737288 (E.D. Pa. Aug. 4, 2015).

33   Navarro asserts that to determine whether EPPs were injured, he needed to consult PBM records, TTP-PBM agreements, and PBM-manufacturer agreements. If that analysis indeed showed no injury to a significant portion of the EPPs, it could undermine certifiability. However, he does not attempt to conduct that sort of analysis and does not show that there is a wide swath of EPPs who were uninjured. Instead, his actual analysis of a discrete number of documents relevant to a few EPPs essentially shows that the *apportionment of damages* will require analysis of individual PBM and health plan contracts and purchase records. *See, e.g.*, Navarro Rep. ¶¶ 45, 47, 52. That issue is not in dispute and does not preclude certification.

34   Defendants argue that *In re Wellbutrin XL Antitrust Litig.*, 308 F.R.D. 134 (E.D. Pa. 2015), the court relied on *Comcast* to find the class was not ascertainable. Def. EPP Oppo. at 23. However, the *Wellbutrin* court recognized that case did not present "a pure *Comcast* problem" and actually cited favorably *Comcast's* finding that at the class certification stage, damages "[c]alculations need not be exact." *Id.* at 149. In *Skelaxin*, the court noted the ongoing dispute over how far courts should stretch *Comcast* and simply noted (but did not

In re Lidoderm Antitrust Litigation, Not Reported in Fed. Supp. (2017)

2017-1 Trade Cases P 79,907

rest on) that "[g]iven *Comcast's* requirement that the damages model and the theory of liability match, [an overinclusive damages mode] *could* be problematic." 299 F.R.D. at 575 (emphasis added).

35    Therefore, the cases defendants rely on rejecting certification because the class sought was not administratively ascertainable are inapposite. *See, e.g., In re Skelaxin (Metaxalone) Antitrust Litig.,* 299 F.R.D. 555, 572 (E.D. Tenn. 2014), reconsideration denied, No. 1:12-MD-2343, 2014 WL 1623705 (E.D. Tenn. Apr. 23, 2014) (denying class certification because of lack of ascertainability of EPPs, given role of PBMs and others in the distribution and payment chains).

36    As noted above, defendants do not challenge the adequacy of the counsel appointed to represent the EPP class on an interim basis, and nothing since that time has undermined that finding.

37    Defendants will be allowed to take limited fact discovery to test the adequacy of any proposed additional named class representative.

38    Defendants rely on *In re Skelaxin (Metaxalone) Antitrust Litig.,* 299 F.R.D. 555, 577 (E.D. Tenn. 2014), where the court found that there were conflicts precluding a finding of adequacy. There, PBMs were *included* in the class definition (unlike here) and the district court found that because PBMs bore some-price risk in the transaction (which I have rejected here) and that price-risk was not accurately accounted for in the plaintiffs' expert's modeling. That is not so here. Moreover, this is an apportionment case, not a case where "each class member will have to offer proof that necessarily will involve arguing that a threshold number of other [class members] would not have gotten" damages. *See In re NCAA I-A Walk-On Football Players Litig.,* No. C04-1254C, 2006 WL 1207915, at *8 (W.D. Wash. May 3, 2006).

39    Presumably, defendants will also move for summary judgment on some of these state law claims, which could reduce the number of state laws at issue.

40    At most, defendants identify a general risk (which DeBree explains can be contained by contractual provisions in the PBM agreements) and point to one instance where a PBM gave a TPP sponsor a rebate of $11 per Lidoderm transaction, while Endo's own records show no rebates given to that PBM during that time frame. Plaintiffs challenge that assertion, arguing that the PBM at issue likely received rebates through another PBM.

41    In *In re Wellbutrin XL Antitrust Litig.,* 308 F.R.D. 134 (E.D. Pa. 2015), the court granted a motion to decertify a class of indirect purchasers (here called end payors) because under Third Circuit precedent which is not regularly followed in the Ninth Circuit, the indirect purchaser class was not "administratively feasible" to ascertain. In reaching that decision, with respect to DeBree and another expert's testimony, the court noted: "Neither expert, however, examined or analyzed these pharmaceutical records, or the Aetna data analyzed by [defense expert], to show that they could be used to ascertain PBMs and individual consumers. The Court is not persuaded by these experts' conclusory statements. Even if it were established that such records exist, the IPC has not introduced any evidence showing that such records are obtainable or can be used in an administratively feasible fashion to ascertain class members. The IPC's own expert testified that it could be difficult to obtain purchase data from PBMs. DeBree Dep. 286:22–288:16. Indeed, the IPC served subpoenas on several PBMs during the recent discovery period, but did not obtain any records from those PBMs. This heightens the Court's concern that such pharmaceutical records may not be obtainable for use in the ascertainability inquiry." *Id.* at 150. The *Wellbutrin* court did not exclude DeBree. Here significant PBM records (covering 16% of the class) have been secured from OptumRX and those records support plaintiffs' ascertainability argument.

42    Of course, post-*Briseno*, acertainability is no longer the hurdle it might have been at the class certification stage.

43    Navarro points to the conclusion of the FTC that "PBMs do bear some risk of their plan client's drug spending," because spread pricing may not cover the total cost of any particular prescription. (Navarro Rep. ¶¶ 15, 24(i), 75-78) That is not evidence that PBM records will not be able to provide a reliable source of proof about class ascertainability and a source of common proof on damages.

44    Defense counsel had sought premium-related discovery from specific EPP class members. I denied them access to that discovery because: "the requests are more burdensome than probative and not proportional. The application of the pass-on defense does not appear to be appropriate in this context. For example,

2017-1 Trade Cases P 79,907

defendants have not cited any testimony from the 30(b)(6) of Local 49 (Johnson), despite having taken that deposition, that Local 49 was able to "recoup" amounts spent in the past on prescription drugs when setting employer contribution rates for the future. As to premium and prescription benefits plan structures, defendants have deposed the 30(b)(6) representative from Local 49 regarding the structure and design of the prescription drug benefit plans actually adopted. Additional discovery concerning alternative plans which may have been considered is overbroad, not directly relevant, and not proportional." Dkt. No. 435.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

8

2019 WL 3214257
United States District Court, D. Rhode Island.

IN RE LOESTRIN 24 FE ANTITRUST LITIGATION
This Document Relates To: All Actions

MDL No. 13-2472-WES-PAS
|
Master File No. 1:13-md-2472
|
Signed 07/02/2019

**OPINION AND ORDER**

WILLIAM E. SMITH, Chief Judge

**\*1** In this putative class action, the Direct Purchaser Plaintiffs ("DPPs") allege that Defendants Warner Chilcott (US), LLC, Warner Chilcott Sales (US), LLC, Warner Chilcott Company LLC, Warner Chilcott plc, and Warner Chilcott Limited (collectively, "Warner Chilcott") and Defendants Watson Pharmaceuticals, Inc. and Watson Laboratories, Inc. (together, "Watson", [1] and collectively, with Warner Chilcott, "Defendants") violated federal law through a series of actions intended to delay and suppress generic competition for the oral contraceptive Loestrin 24 Fe ("Loestrin 24"). [2] This decision resolves the DPPs' pending Motion for Class Certification. [3] See generally Direct Purchaser Class Pls.' Mot. for Class Certification, ECF No. 513. For the reasons discussed below, the DPPs' Motion for Class Certification is GRANTED, and Defendants' Motion to Exclude the Opinions and Testimony of Dr. Leitzinger, ECF No. 570, is DENIED.

I. Background
The Court constrains its recitation to the factual and procedural background relevant to the Motion for Class Certification. [4]

The DPPs are corporate entities that purchased brand and/or generic Loestrin 24 directly from Warner Chilcott or a non-defendant generic manufacturer. Direct Purchaser Class Pls.' Third Am. Consolidated Class Action Compl. and Jury Demand ("DPP Compl.") ¶¶ 16-18. They allege that Warner Chilcott committed fraud on the Patent and Trademark Office in securing the patent for Loestrin 24 and proceeded to file

sham litigation to enforce its patent against potential generic competitors. Loestrin, 261 F. Supp. 3d at 318-21. Plaintiffs further allege that Warner Chilcott then settled its sham patent lawsuits against Watson and Lupin Pharmaceutical, Inc. and/or Lupin Ltd. ("Lupin") by making large and unjustified payments in exchange for their agreement to stay out of the Loestrin 24 market. Id. at 321-23. Right before generic entry was set to occur, Warner Chilcott introduced a drug, Minastrin 24 (a chewable version of Loestrin 24 with added sweetener on the reminder days), to erode the brand Loestrin 24 prescription base. Id. at 323-24. This product hop allowed Warner Chilcott to retain branded sales (in Minastrin 24) once generic Loestrin 24 entered and state automatic-substitution laws kicked in. Id.

This order of events has consequences for the Court's ability to determine – as antitrust law requires – what the world would have looked like but for Defendants' alleged anticompetitive conduct. [5] Because Defendants executed the product hop and pulled brand Loestrin 24 from the market before automatic substitution laws could take hold, there is a dearth of evidence reflecting how the market would have responded to generic entry in a but-for world. See Feb. 11, 2019 DPPs' Mot. for Class Certification Hr'g Tr. ("DPP Hr'g Tr.") 18-20, ECF No. 806. This dearth of evidence means that the DPPs and Defendants, and their respective experts, do not agree on the best methodology to use to construct the contours of the but-for world.

II. Defendants' Motion to Exclude Dr. Leitzinger
**\*2** Defendants have moved to exclude the opinions and testimony of the DPPs' proposed expert, Jeffrey J. Leitzinger, Ph.D. [6] They argue that (1) Dr. Leitzinger's opinions are based on "unsupported assumptions provided to him by counsel" rather than scientific method; (2) he improperly assumes that generic drug prices decrease with additional generic entrants, ignoring evidence specific to Loestrin 24 suggesting otherwise; and (3) his methodology for calculating the alleged aggregate overcharge due to generic delay and related calculations is unreliable. Defs.' Mem. of Law in Supp. of Mot. to Exclude the Opinions and Testimony of DPPs' Expert Jeffrey J. Leitzinger ("Defs.' Mot. to Exclude Leitzinger") 1-3, ECF No. 581.

Before dealing with the DPPs' Rule 23 Motion for Class Certification, the Court must address Defendants' challenge to some of the expert analysis that underpins the DPPs' claims

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 138 of 261
PageID: 45076
In re Loestrin 24 Fe Antitrust Litigation, Not Reported in Fed. Supp. (2019)
2019-2 Trade Cases P 80,849

regarding what the but for world would look like, who was damaged, and to what extent.

Rule 702 of the Federal Rules of Evidence sets forth the criteria a party must satisfy in order to proffer expert opinion. Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Court "serves as the gatekeeper for expert testimony by 'ensuring that [it] ... both rests on a reliable foundation and is relevant to the task at hand.' " Milward v. Rust-Oleum Corp., 820 F.3d 469, 473 (1st Cir. 2016) (quoting Daubert v. Merrell Dow Pharm., 509 U.S. 579, 597 (1993)). The evidence's proponent "has the burden of establishing both its reliability and its relevance." Id. (citing Daubert, 509 U.S. at 593 n.10; Fed. R. Evid. 702, advisory committee's note). The First Circuit has advised that "Daubert neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance." Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998). Instead, "[i]t demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." Id.

Counsel for the DPPs provided Dr. Leitzinger four baseline scenarios to consider. They assume that: two generic Loestrin 24 products (one manufactured by Watson, the other an authorized generic manufactured by Warner Chilcott) enter the market in September 2009; Minastrin either enters the market in July 2013 (which it did in the actual world) or never enters at all; and Lupin launches its generic Loestrin 24 in either July 2013 or, as it did in the real world, January 2016. See Decl. of Jeffrey J. Leitzinger, Ph.D. ¶ 26 (July 30, 2018)

("Leitzinger Report"), ECF No. 518-3. He made sixteen additional calculations applying his damages model to the four baseline scenarios but assuming later generic entry dates. Ex. 7 to Leitzinger Report, ECF No. 518-3. Dr. Leitzinger did not independently verify the scenarios provided by counsel. Leitzinger Dep. 48:6-50:1, 56:12-63:23 (Aug. 30, 2018), ECF No. 621-34.

**\*3** In his report, Dr. Leitzinger concludes that there is evidence common to the proposed class that demonstrates "with high likelihood" that all DPP class members were injured by Defendants' alleged wrongdoing. Leitzinger Report ¶¶ 9(b), 27, 50. This common evidence includes: literature showing that generic competition converts upwards of 90% of the brand prescription base to generics at prices substantially below the brand price, and increasingly so as more generics enter; Defendants' and generic manufacturers' forecasts predicting that Loestrin 24 generic competition would lead to high rates of generic substitution at well below the brand price; evidence of the actual market following generic entry in 2014; and that DPP class members serve a wide range of prescription needs. Id. ¶ 27.

The DPPs can be broken into three subgroups of direct purchasers: (1) brand Loestrin 24 purchasers that later bought generic Loestrin 24 once it entered the market ("Brand-Generic Purchasers"); (2) brand Loestrin 24 purchasers that never ultimately purchased generic Loestrin 24 during the class period, even after it became available ("Brand-Only Purchasers"); and (3) generic Loestrin 24 purchasers that never purchased brand Loestrin 24 from Defendants during the class period, and made all their relevant purchases from generic-manufacturer Amneal [7] ("Generic-Only Purchasers"). With respect to Brand-Generic Purchasers, Dr. Leitzinger concludes that the high rate of generic penetration that would have taken hold if generic Loestrin 24 had entered earlier, coupled with the discount on the wholesale acquisition cost ("WAC") [8] that generic purchasers enjoy, would have led Brand-Generic Purchasers to substitute more of their brand purchases with lower-priced generic Loestrin 24. Leitzinger Report ¶ 50. As a result, Defendants' anticompetitive conduct caused them to incur overcharges. Id.

Dr. Leitzinger similarly concludes that the Brand-Only Purchasers were injured. In his view, they suffered antitrust injury because, had there been sustained, robust generic competition in the Loestrin 24 market, these purchasers would have responded to their customers' demands and substituted

Case 1:19-md-02875-RMB-SAK Document 1748-28 Filed 11/10/21 Page 139 of 261 PageID: 45077

In re Loestrin 24 Fe Antitrust Litigation, Not Reported in Fed. Supp. (2019)

2019-2 Trade Cases P 80,849

some of their brand Loestrin purchases for cheaper generic Loestrin. Id. ¶¶ 28-32, 50-51; Rebuttal Decl. of Jeffrey J. Leitzinger, Ph.D. ("Leitzinger Rebuttal Report") ¶¶ 28-29, ECF No. 621-1.

Generic-Only Purchasers, in Dr. Leitzinger's view, also suffered antitrust injury at Defendants' hands. In forming this opinion, he uses the benchmark experiences of Minastrin and Ovcon-35 (another oral contraceptive) to demonstrate that as the number of generic competitors increase, the generic discount off the brand WAC increases over time as the market starts to operate more effectively. Leitzinger Rebuttal Report ¶¶ 8, 15, 27; DPP Hr'g Tr. 118-19. Dr. Leitzinger concludes that, in the but-for world, generic Loestrin would have cost less and thus its purchasers were injured by overcharges caused by Defendants' unlawful conduct. Leitzinger Rebuttal Report ¶¶ 25-27; DPP Hr'g Tr. 118-19. In reaching this conclusion, he determines the brand WAC at each point in time along with the generic discount expected based on forecasts, actual experience, and the number of generic competitors presumed to have been in the market at the time. DPP Hr'g Tr. 118-20; Dr. Jeffrey Leitzinger Slides from DPP Hr'g 9-13, ECF No. 987-3.

### A. Dr. Leitzinger's Methodology and Reliance on DPP Counsel's Scenarios

**\*4** The First Circuit has held that "[t]he use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself." In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 197 (1st Cir. 2009). Indeed, Dr. Leitzinger's proffered methodology has been accepted as reliable for proving class-wide impact by many courts. See Leitzinger Report ¶ 53 (citing his extensive past work analyzing aggregate overcharges associated with delayed generic entry for direct purchaser plaintiff classes); see also Direct Purchaser Class Pls.' Opp'n to Defs.' Mot. to Exclude the Opinions & Testimony of Jeffrey J. Leitzinger, Ph.D. ("DPPs' Opp'n") 1 n.3, ECF No. 620 (listing cases in which Dr. Leitzinger provided expert opinion). The Court is satisfied that here, as in other cases, Dr. Leitzinger's methodology calculates damages using common evidence and analysis that does not vary by class member, and leaves room for a range of jury findings. See infra Part III.E.2.

Nor is the Court troubled by Dr. Leitzinger's reliance on but-for scenarios provided by counsel. "Objections [to] the

factual underpinnings of an expert's investigation[ ] often go to the weight of the proffered testimony, not to its admissibility." Crowe v. Marchand, 506 F.3d 13, 18 (1st Cir. 2007) (citing Microfinancial, Inc. v. Premier Holidays Int'l., Inc., 385 F.3d 72, 81 (1st Cir. 2004); Int'l Adhesive Coatings Co. v. Bolton Emerson Int'l, Inc., 851 F.2d 540, 545 (1st Cir. 1988)). Dr. Leitzinger opines that the DPPs were all impacted by Defendants' alleged anticompetitive conduct, that this impact resulted in antitrust damages, and that both may be proven with evidence common to the class. Leitzinger Report ¶¶ 9, 50. In reaching that opinion, Dr. Leitzinger relied upon class counsel's but-for scenarios, which in turn, class counsel will venture to establish at trial with their fact witnesses and merit experts' reports and testimony. See DPPs' Opp'n 7 ("Dr. Leitzinger concludes that if the jury finds that Defendants unlawfully delayed and suppressed generic competition as Plaintiffs allege, then there is a high likelihood that all Class members suffered antitrust injury in the form of overcharges."). The Court discerns no reason to throw out Dr. Leitzinger's opinion and testimony on the basis that he has relied upon scenarios based upon facts and opinions elicited from other witnesses; it is common for experts to rely on such in formulating their opinions, and Defendants may probe their quality and reliability on cross-examination.

What is more, Dr. Leitzinger's model can be adjusted to account for a variety of jury findings during the liability phase – for example, a jury determination that Warner Chilcott would have launched Minastrin 24 earlier in the but-for world can be incorporated into the model and reflected in the damages calculation. See Leitzinger Rebuttal Report ¶ 56 (explaining that his models may be adjusted to respond to various findings by a jury). At this juncture, however, Defendants have not demonstrated that any of Dr. Leitzinger's assumptions are sufficiently problematic to render his opinions and testimony unreliable. Defendants' criticisms, instead, go to the weight of the evidence. See Crowe, 506 F.3d at 18.

### B. Dr. Leitzinger's Impact Analysis

Defendants take issue with Dr. Leitzinger's conclusion that additional generic entrants would have driven down prices because, in their words, Dr. Leitzinger "relies on generalized evidence and averages" and his opinion "is not grounded in the facts of the case." Defs.' Mot. to Exclude Leitzinger 11. Defendants contend that the Generic-Only and Brand-Only

Case 1:19-md-02875-RMB-SAK   Document 1748-28   Filed 11/10/21   Page 140 of 261
PageID: 45078

In re Loestrin 24 Fe Antitrust Litigation, Not Reported in Fed. Supp. (2019)
2019-2 Trade Cases P 80,849

Purchasers were not injured by Defendants' alleged unlawful actions. Id. at 10-16.

In pressing this argument as to the Generic-Only Purchasers, Defendants say there "is no proof that Amneal's generic would have had a lower price in a but-for world where generic competitors entered earlier." Id. at 13 (quoting Cremieux Report ¶ 11). Indeed, the analysis of Defendants' rebuttal expert, Dr. Pierre-Yves Cremieux, suggests that the Generic-Only Purchasers experienced flat prices in the actual world after generic entry, and the actual prices paid by many Generic-Only Purchasers did not decline with additional generic entrants. Cremieux Report ¶¶ 11, 53. Because of this, he says, one must look at individualized evidence (the underlying contract, for example) to determine how each purchaser's price reacts to generic entry in the oral contraceptive space where branded generics abound. DPP Hr'g Tr. 221, 245 (testimony of Dr. Cremieux); Defs.' Mot to Exclude Leitzinger 12.

**\*5** With respect to the Brand-Only Purchasers, Defendants argue that Dr. Leitzinger's opinion that common evidence can be used to demonstrate injury is "fundamentally flawed." Defs.' Mot. to Exclude Leitzinger 14. They reason that, in the actual world, none of the six [9] Brand-Only Purchasers in fact purchased generic Loestrin 24 – or any other Loestrin product - after it became available in January 2014. Id. at 14-15. At least in part, this can be attributed to wholesalers choosing not to carry generic drugs because many of their retailer customers purchase generics directly from the generic manufacturers. [10] Id. at 14 (citing Cremieux Report ¶ 69 n.92).

In response, the DPPs marshal Dr. Leitzinger's analysis to argue that Dr. Cremieux, along with other missteps, "ignores that, in the but-for world, more generics would have been on the market earlier, and the years of robust competition would have driven prices down." DPPs' Opp'n 14. Also, they contend, even if a jury determines there are some uninjured class members, Dr. Leitzinger's model allows for the exclusion of those class members from the aggregate damages calculation. See Leitzinger Rebuttal Report ¶ 56.

The DPPs, through Dr. Leitzinger, have set forth sufficient, reliable evidence supporting the conclusion that Generic-Only and Brand-Only Purchasers would have purchased cheaper generic Loestrin 24 in a but-for world with sustained and robust generic competition. See id. ¶¶ 28-29. While Defendants fashion a colorable argument on this score, the

DPPs have satisfied their burden to produce a "scientifically sound and methodologically reliable" opinion. Ruiz-Troche, 161 F.3d at 85. It will be up to the jury to determine which party's theory wins the day.

### C. Dr. Leitzinger's Damages Analysis

Defendants argue that aggregate damages cannot be accurately and readily calculated without reliance on individualized inquiry as to each class member. Specifically, they take issue with Dr. Leitzinger's reliance on unreliable forecasts; failure to account for the effects of generic bypass; inclusion of uninjured purchasers in his calculation of damages; and disregard for what Defendants term "key facts." Defs.' Mot. to Exclude Leitzinger 16.

**\*6** Dr. Leitzinger's reliance on pre-launch forecasts of generic manufacturers does not render his damages analysis unreliable. Dr. Leitzinger determined that the forecasts were reliable because the "internal documents were used, among other things, for strategic planning and budgeting, and for production planning[,]" and, additionally, because they "predicted the same type of market-wide impact from AB-rated generic competition described in the literature." Leitzinger Report ¶ 33. It goes without saying that industry manufacturers have a lot of interest in maintaining the accuracy of their forecasts, and such forecasts reflect their "own study of the ... market and analogous experiences of other drugs." In re Namenda Direct Purchaser Antitrust Litig., 331 F. Supp. 3d 152, 181-82 (S.D.N.Y 2018) ("Namenda"); see also id. at 182 ("The use of Defendants' own forecasts to model a but-for world has been held to be a sound economic methodology."); In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. CV 14-MD-02503, 2017 WL 4621777, at \*8-9 (D. Mass. Oct. 16, 2017) ("Solodyn") (rejecting Daubert challenge to Dr. Leitzinger's reliance on forecasts in an antitrust pharmaceutical case). Moreover, Dr. Cremieux acknowledged that he has no reason to believe that the twenty-two forecasts Dr. Leitzinger considered were cherry-picked to skew the analysis in the DPPs' favor. See DPPs' Opp'n Ex. 5 at 94-95, ECF No. 620-5.

As discussed above, consistent with the Supreme Court's pronouncement in Hanover Shoe, generic bypass does not affect the DPPs' damages award. See In re Niaspan Antitrust Litig., No. 13-MD-2460, 2015 WL 4197590, at \*1 (E.D. Pa. Jul. 9, 2015) (holding that damages award should not be "offset by the amount of any purchases ... that would not have

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 141 of 261
PageID: 45079

In re Loestrin 24 Fe Antitrust Litigation, Not Reported in Fed. Supp. (2019)

2019-2 Trade Cases P 80,849

been made in a 'but for' world"); In re Lidoderm Antitrust Litig., No. 14-MD-2521-WHO, 2017 WL 679367, at *14 n.21 (Feb. 21, 2017) ("Courts have also rejected attempts to decrease damages under [a generic bypass] theory."); In re Prograf Antitrust Litig., No. 11-md-2242-RZW, 2014 WL 7641156, at *4 (D. Mass. Dec. 23, 2014) (holding that "reducing damages to plaintiff wholesalers under a bypass defense is inconsistent with Hanover Shoe"); In re Skelaxin (Metaxalone) Antitrust Litig., No. 12-md-2343, 2014 WL 2002887, at *4-5 (E.D. Tenn. May 15, 2014) ("Skelaxin") (rejecting generic bypass theory for offsetting damages).

As discussed above, that Dr. Leitzinger's damages model may include a purchaser that was uninjured does not render his analysis unsound. It is for the jury to determine whether the Generic-Only and Brand-Only Purchasers were injured, and if so, to what extent; and if the jury concludes they were not, these subgroups will be extracted from Dr. Leitzinger's damages model. See Leitzinger Rebuttal Report ¶ 56 (explaining that his models may be adjusted to respond to various findings by the jury); see also Leitzinger Report ¶ 67 (noting that, to the extent the Court or jury renders legal or factual determinations inconsistent with the assumptions underlying his calculations, an "adjustment can be readily incorporated within the class-wide overcharge formulas, and such an adjustment will be class-wide in nature").

Finally, the key facts with which Defendants take issue are all within the realm of facts the jury may or may not accept during trial and, accordingly, Defendants' criticisms go to the weight, and not the admissibility, of Dr. Leitzinger's opinion. However, the jury is free to accept, based on Dr. Leitzinger's robust analysis based on sound methodology, that the actual world was too tainted by Defendants' unlawful conduct to give credence to how prices in this market responded to generic entry. See DPPs' Opp'n 14.

Plaintiffs have satisfied their burden by demonstrating that Dr. Leitzinger's opinions and testimony "rest[ ] on a reliable foundation and [are] relevant to the task at hand." Milward, 820 F.3d at 473 (quoting Daubert, 509 U.S. at 597). Now it is for the trier of fact to weigh the DPPs' evidence, with the aid of cross-examination and Defendants' rebuttal expert evidence. Accordingly, the Court DENIES Defendants' Motion to Exclude the Opinions and Testimony of Dr. Leitzinger, ECF No. 570.

III. DPPs' Motion for Class Certification

A. Legal Standard for Class Certification

 *7  To certify a class, the Court "must undertake a 'rigorous analysis' to determine whether" the putative class satisfies each of the four prerequisites set forth in Rule 23(a) of the Federal Rules of Civil Procedure: numerosity, commonality, typicality, and adequacy of representation. In re Nexium Antitrust Litig., 777 F.3d 9, 17 (1st Cir. 2015) ("Nexium III") (quoting Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013); Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011); Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982)). In addition, the putative class must also demonstrate that it satisfies one of the requirements set forth in Rule 23(b), Nexium III, 777 F.3d at 18; in this case, the putative class argues that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To meet this requirement, the putative class must demonstrate "that 'the fact of antitrust impact can[ ] be established through common proof' and that 'any resulting damages would likewise be established by sufficiently common proof.' " Nexium III, 777 F.3d at 18 (quoting In re New Motor Vehicles Can. Exp. Antitrust Litig., 522 F.3d 6, 20 (1st Cir. 2008) ("New Motor Vehicles")).

The Supreme Court has explained that "Rule 23 does not set forth a mere pleading standard" but rather, a plaintiff "must affirmatively demonstrate [its] compliance with the Rule." Dukes, 564 U.S. at 350. To do so, a plaintiff has the burden to demonstrate by a preponderance of the evidence that Rule 23's prerequisites to class certification are satisfied. Nexium III, 777 F.3d at 27. "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Conn. Ret. Plans and Tr. Funds, 133 S. Ct. 1184, 1195 (2013); see also Comcast, 569 U.S. at 35 (stating that the Court must determine whether the plaintiff's burden is satisfied under Rule 23 "even when that requires inquiry into the merits of the claim").

The DPPs move to certify a class of 47 members,[11] as defined as:

All persons or entities in the United States and its territories who purchased brand or generic Loestrin 24 directly from Warner [Chilcott] or Amneal at any time during the period from September 1, 2009, through and until June 3, 2015,

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 142 of 261
PageID: 45080

In re Lostrin 24 Fe Antitrust Litigation, Not Reported in Fed. Supp. (2019)
2019-2 Trade Cases P 80,849

and all persons or entities in the United States and its
territories who purchased brand Minastrin 24 directly from
Warner at any time during the period from September
1, 2009, through and until March 14, 2017 (the "Class
Period").

Excluded from the Class are defendants, and their
officers, directors, management, employees, subsidiaries,
or affiliates, and, all federal governmental entities. Also
excluded from the class are educational institutions such as
universities and colleges.

DPPs' Mem. of Law in Supp. of Mot. for Class Certification
("DPPs' Mot. for Class Cert.") 4, ECF No. 518-1.

### B. Numerosity

Under Rule 23(a)(1), to certify a class, a court must determine
that "the class is so numerous that joinder of all members
is impracticable." Fed. R. Civ. P. 23(a)(1). While there is no
strict minimum number of plaintiffs required to demonstrate
impracticability, there is a general presumption that "if the
named plaintiff demonstrates that the potential number of
plaintiffs exceeds 40, the first prong of Rule 23(a) has been
met." García-Rubiera v. Calderón, 570 F.3d 443, 460 (1st Cir.
2009) (quoting Stewart v. Abraham, 275 F.3d 220, 226-27 (3d
Cir. 2001)); see also In re Relafen Antitrust Litig., 218 F.R.D.
337, 342 (D. Mass. 2003) ("Relafen"); Solodyn, 2017 WL
4621777, at *4. [12]

**\*8** In determining whether joinder would be impracticable,
district courts may consider the following non-exhaustive
factors, in addition to the size of the class: "judicial economy,
the claimants' ability and motivation to litigate as joined
plaintiffs, the financial resources of class members, the
geographic dispersion of class members, the ability to identify
future claimants, and whether the claims are for injunctive
relief or for damages." In re Modafinil Antitrust Litig., 837
F.3d 238, 253 (3d Cir. 2016), as amended Sept. 29, 2016
("Modafinil") (citing 5 Moore's Federal Practice § 23.22; 5
Newberg on Class Actions § 3.12); accord Solodyn, 2017 WL
4621777, at *4 ("The Court may also take into account such
'subjective factors' as the 'geographic location of proposed
class members, the nature of the action, and matters of judicial
economy.' " (quoting In re Nexium (Esomeprazole) Antitrust
Litig., 296 F.R.D. 47, 52 (D. Mass. 2013) ("Nexium II")).
Moreover, "courts have certified smaller classes in generic
suppression cases where judicial economy favors proceeding
as a class action." Solodyn, 2017 WL 4621777, at *4 (citing
Nexium II, 296 F.R.D. at 53 (certifying class of twenty-

four or twenty-nine); Dale Elecs., Inc. v. R.C.L. Elecs., Inc.,
53 F.R.D. 531, 535-36 (D.N.H. 1971) (certifying class of
thirteen)).

The DPPs contend they satisfy the numerosity requirement
under Rule 23, arguing that their proposed class comprises
forty-seven members, for which they have adduced common
evidence of injury, and that joinder would be impractical.
DPPs' Mot. for Class Cert. 20-21; Reply in Further Supp.
of Direct Purchaser Class Pls.' Mot. for Class Certification
("DPPs' Further Supp. for Class Cert.") 3 & n.7. Defendants
counter that, at most, the DPPs' class is made up of 16
members. Defs.' Opp'n to Class Cert. 11-12. First, they argue
that 27 members of the proposed class (viz., the Brand-Only
and Generic-Only Purchasers) must be excluded because they
lack standing and/or a plausible claim of injury-in-fact. Id. at
12. Second, they argue that nine putative class members (or
five more [13] ) must be consolidated because they are no longer
stand-alone companies, but rather corporate affiliates of other
class members. Id.

#### 1. Generic-Only and Brand-Only Purchasers

Defendants argue that the Generic-Only Purchasers lack
antitrust standing under Illinois Brick v. Illinois, 431 U.S.
720, 724 (1977), and its progeny, because they never directly
purchased brand or generic Loestrin 24 and/or Minastrin
from Defendants during the class period. Defs.' Opp'n to
Class Cert. 13-17. Illinois Brick, however, is inapposite. See
Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An
Analysis of Antitrust Principles and Their Application ¶ 347
(3d & 4th eds. 2019 Cum. Supp.). Illinois Brick holds that
an indirect purchaser – one who purchases product from a
defendant's customer rather than the defendant itself (like an
End-Payor Plaintiff in this case) – may not recover antitrust
damages under federal antitrust law. 431 U.S. at 724. But
these Generic-Only Purchasers did not purchase indirectly –
or otherwise - from Defendants. [14]

Instead, the DPPs' theory of injury for the Generic-Only
Purchasers is that Defendants, by delaying and suppressing
generic competition, caused the Generic-Only Purchasers to
pay more for generic Loestrin from non-Defendant Amneal
than they would have absent Defendants' anticompetitive
conduct. Leitzinger Rebuttal Report ¶ 25. To this point,
the DPPs offer evidence of class-wide injury, including:
studies observing that generic prices decline after generic
entry; business planning documents of Defendants and

Loestrin 24 generic manufactures predicting that inter-generic competition would lower prices; and the actual experience of class savings once the first generic entered the market, with additional savings as competition increased. Leitzinger Report ¶¶ 9(a), 29, 39, 49, 60.

**\*9**  The Generic-Only Purchasers also have established that they have antitrust standing under the considerations set forth by the Supreme Court and enumerated by the First Circuit as:

> (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ...; (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages.

Sullivan v. Tagliabue, 25 F.3d 43, 46 (1st Cir. 1994) (citing Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 537-45 (1983)). As to the first three factors, Dr. Leitzinger's analysis plainly demonstrates that the overcharges incurred by the Generic-Only Purchasers were the result of Defendants' unlawful conduct aimed at suppressing generic competition; an inference can readily be drawn that Defendants intended both to suppress generic competition and to cause prices to increase market-wide; and the Generic-Only Purchasers' injury (overcharges from an anticompetitive scheme) is the type the Sherman Act intends to redress.

The crux of Defendants' argument is that their alleged conduct did not directly cause the Generic-Only Purchasers' injury and, therefore, the damages calculation would be too speculative. But the Court is unconvinced. Defendants' alleged unlawful conduct is plainly the proximate cause of the Generic-Only Purchasers' alleged antitrust injury. While Amneal could have charged less for generic Loestrin 24 than the market would have dictated absent robust and sustained generic competition, where Defendants have foreclosed an entire market from additional generic competition, this

purported break in causation is not sufficient to save Defendants from liability. See Areeda & Hovenkamp, Antitrust Law ¶ 347 ("[W]e should allow recovery by the umbrella plaintiff purchasing the 'self-same' product the defendants sold in the same clearly defined ... market."). The Generic-Only Purchasers' alleged injuries are "the direct result of the asserted antitrust violation – they allege they paid higher prices for generic [Loestrin 24] because Defendants intentionally restricted and manipulated generic competition." See Namenda, 331 F. Supp. 3d at 213; see also In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1168-69 (3d Cir. 1993) (stating, in a market-exclusion case, where there are "no missing links in the causation chain," plaintiffs have standing); Modafinil, 837 F.3d at 264-65 (permitting recovery in a pharmaceutical antitrust case where defendants have engaged in "market exclusion, as it concerns conduct that prevents a competitive market from forming at all"); Solodyn, 2017 WL 4621777, at \*10 (certifying a class in a reverse payment and product hop case that included generic purchasers). But see Mid–West Paper Prods. Co. v. Cont'l Grp., 596 F.2d 573, 583-84 (3d Cir. 1979) (holding that a non-conspiring competitor of a defendant supplier did not have antitrust standing because of the "tenuous line of causation between [the] defendants' price-fixing and the prices paid by [the plaintiff]").

**\*10**  And, finally, as to the sixth consideration, the Generic-Only Purchasers, as direct purchasers vis-à-vis Amneal, do not present issues of "apportionment" or "burdens of duplicative recovery," in the way indirect purchasers may. Areeda & Hovenkamp, Antitrust Law ¶ 347. [15] The Generic-Only Purchasers are the only purchasers in a position to prove injury and recover damages for the alleged overcharges on their purchases of generic Loestrin 24 from Amneal during the class period under federal antitrust law.

### 2. Corporate Subsidiaries

Defendants also argue that nine putative class members should not be treated as separate entities for purposes of the numerosity analysis because other members of their corporate families are also direct purchasers. Defs.' Opp'n to Class Cert. 19-20. This argument gets no traction. The entities are separately incorporated companies, are separately listed in Warner Chilcott's transactional sales data, and are distinct from their corporate affiliates. DPPs' Further Supp. for Class Cert. Exs. 37-44. Because they each suffered independent injury, as reflected in their separately tracked purchases

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 144 of 261
PageID: 45082

In re Loestrin 24 Fe Antitrust Litigation, Not Reported in Fed. Supp. (2019)
2019-2 Trade Cases P 80,849

of brand and/or generic Loestrin 24, they are separate for purposes of this analysis. See Solodyn, 2017 WL 4621777, at *4; Namenda, 331 F. Supp. 3d at 207; Celebrex, 2017 WL 3669604, at *8.

Defendants' remaining attempts to exclude the Generic-Only Purchasers and the Brand-Only Purchasers [16] are intertwined with their attacks on Dr. Leitzinger's methodology and analysis, as well as on whether the DPPs have established that common issues predominate under Rule 23(b). As discussed in more detail above and below, the Court concludes that all forty-seven members are properly included in this class, and thus, the class presumptively satisfies Rule 23(a)(1)'s numerosity requirement. García-Rubiera, 570 F.3d at 460. Moreover, the Court is further satisfied that joinder is impracticable after considering the non-exhaustive list of considerations, especially judicial economy; the class members' incentives to bring suit individually against their supplier(s); and the geographic dispersion of class members. See Solodyn, 2017 WL 4621777, at *4 (citing Nexium II, 296 F.R.D. at 52). Thus, Rule 23(a)(1) is satisfied.

### C. Commonality

**\*11** Under Rule 23(a)(2), "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury[.]' " Dukes, 564 U.S. at 349–50 (quoting Falcon, 457 U.S. at 157). A plaintiff's "claims must depend upon a common contention ...." Id. at 350. And, "that common contention ... must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. The Court concludes that commonality under Rule 23(a)(2) is easily met for this putative class. Each putative class member alleges that Defendants caused overcharges by engaging in an anticompetitive scheme to delay and suppress generic competition.

### D. Typicality and Adequacy

Under Rule 23(a)(3), a court may certify a class only where "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). Courts have noted some uncertainty as to the independent significance of Rule 23's typicality requirement. See 7A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1764 (rev. 4th ed. 2018). "[M]any courts have found typicality if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." Id. (citations omitted). Other courts have used Rule 23(a)(3) "to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." Id. (citations omitted).

Moreover, Rule 23(a)(4) provides for certification only where "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The moving party is tasked with demonstrating that "the interests of the representative party will not conflict with the interests of any of the class members ...." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985). But interests need not be identical; only fundamental conflicts that "go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement." Matamoros v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012).

Defendants argue that the DPPs do not satisfy Rule 23's typicality and adequacy of representation prerequisites. Defs.' Opp'n to Class Cert. 27-34. Specifically, Defendants challenge the DPPs' class representative Ahold USA, Inc.'s ("Ahold") typicality and ability to adequately represent the class on the basis that: Ahold has no stake in the product hop allegations; Ahold's partial assignment from McKesson only gives it an interest in proving a generic entry date back to March 2011, while other class members' interest reaches back to September 2009; Ahold's purchasing habits are affected differently by the entry of generic products because it is a retailer and not a wholesaler; and Ahold is the only member of the class with an assignment. Id. at 27-29.

Here, as noted above, the putative class members' claims plainly stem from a unitary course of conduct. Ahold's status as a retailer with an assignment does not render its interest in pursuing these claims "markedly different." See Modafinil, 837 F.3d at 251 (holding that, "no matter how intuitively appealing this argument may be, it lacks legal support" and "partial assignees are appropriately considered to be members of a class"); Meijer, Inc. v. Warner Chilcott Holdings Co. III, 246 F.R.D. 293, 296 (D.D.C. 2007) (noting that the defendants, including Warner Chilcott, admitted that "an assignee stands in the shoes of his assignor, deriving the same but no greater rights and remedies than the assignor then possessed." (quoting Fox–Greenwald Sheet Metal Co. v. Markowitz Bros., 452 F.2d 1346, 1358 n.69 (D.C. Cir. 1971)). Moreover, the assignment gives Ahold a stake in the

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 145 of 261
PageID: 45083
In re Lestrin 24 Fe Antitrust Litigation, Not Reported in Fed. Supp. (2019)
2019-2 Trade Cases P 80,849

product hop allegations and purchases of Minastrin 24, as it encompasses "claims [that] relate to those acts alleged against Warner Chilcott" in litigation "to recover allegedly illegal overcharges imposed on purchasers of Loestrin 24." Defs.' Opp'n to Class Cert. Ex. 4; see also DPPs' Further Supp. for Class Cert. 64; DPP Compl. ¶¶ 257-96 (setting forth product hop allegations).

**\*12** Establishing an earlier generic entry date is also plainly in Ahold's interest: the earlier the entry date for generic Loestrin, "the longer the delay period established, the sooner generic competition ensues, and the lower prices would have been at the start of Ahold's assignment and at the time of Ahold's direct purchases of generic Loestrin 24." DPPs' Further Supp. for Class Cert. 68. Ahold has already filed a Third Amended Complaint that covers the full class period (back to 2009), see DPP Compl. ¶ 297, and it has filed expert reports addressing and seeking damages for the full class period. See Leitzinger Report ¶ 5 n.4. In blunt, strategic terms, counsel for the DPPs explained that it is in Ahold's individual interest to pursue the whole claim period "[b]ecause the bigger the claim, the bigger the leverage on [Defendants] and hopefully the bigger the settlement [the DPPs will] try to get out of them before we go to trial or while we're in trial". DPP Hr'g Tr. 95:8-12. The Court sees how this would be motivating.

In sum, the Court concludes that Ahold's claims and defenses are typical of the class and is confident Ahold will fairly and adequately protect the interests of the class. Its status as a retailer pursuing claims with an assignment does not render it "markedly different" from the other class members, does not create a conflict with the class, and does not impair its ability to adequately represent the putative class. Indeed, Ahold has been named class representative in many pharmaceutical antitrust class actions, and no court has ever found Ahold to be atypical or inadequate due to its status as an assignee or for any other reason. See, e.g., Solodyn, 2017 WL 4621777; Nexium II, 296 F.R.D. 47; Meijer, Inc., 246 F.R.D. 293. Ahold satisfies Rule 23's typicality and adequacy requirements.

**E. Rule 23(b)(3)**
As stated above, the DPPs seek certification under Rule 23(b)(3), which requires a putative class to demonstrate that "the questions of law or fact common to class members predominate over any questions affecting only individual members ...." Fed. R. Civ. P. 23(b)(3). This "inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods. Inc. v.

Windsor, 521 U.S. 591, 623 (1997). To meet this requirement, the putative class must demonstrate "that 'the fact of antitrust impact can[ ] be established through common proof' and that 'any resulting damages would likewise be established by sufficiently common proof.' " Nexium III, 777 F.3d at 18 (quoting New Motor Vehicles, 522 F.3d at 20)). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016) (internal quotation marks omitted).

**1. Predominance: Common Proof of Injury-in-Fact**

In order to satisfy Rule 23(b)(3)'s predominance requirement, the DPPs must "include some means of determining that each member of the class was in fact injured." New Motor Vehicles, 522 F.3d at 28; see also In re Asacol Antitrust Litig., 907 F.3d 42, 51 (1st Cir. 2018) ("Asacol") ("Proof of injury, also called 'injury-in-fact,' is a required element of a plaintiff's case in an action such as this one." (quoting New Motor Vehicles, 522 F.3d at 19 n.18). At this stage, "plaintiffs must only show that 'antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual members." Nexium III, 777 F.3d at 24 n.20 (quoting In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008)).

DPPs' common theory of injury is that "every Class member would have purchased at least some lower-priced generic Loestrin [24] instead of higher-priced branded Loestrin 24, Minastrin 24 or generic Loestrin 24 that it did buy." DPPs' Mot. for Class Cert. 16 (quoting Leitzinger Report ¶ 50). Accordingly, in order to prevail on their motion for class certification, the DPPs must satisfy the Court that Dr. Leitzinger's model demonstrates, using common evidence, that each of the DPPs would have substituted some of their purchases of brand Loestrin 24 or Minastrin from Warner Chilcott, or generic Loestrin 24 from Amneal, for cheaper generic Loestrin 24 but for Defendants' allegedly unlawful generic suppression efforts.

**\*13** Defendants, in turn, argue that individualized inquiry is required for twenty-seven of the forty-eight members of the proposed class to determine injury-in-fact. Defs.' Opp'n to Class Cert. 3. They take issue, specifically, with Dr.

2019-2 Trade Cases P 80,849

Leitzinger's model establishing injury-in-fact for the Generic-Only and Brand-Only Purchasers. Id. at 3-4. They say that Dr. Leitzinger improperly relies on aggregate trends and averages that do not account properly for the facts of this case and hide the need for individualized inquiry. Id. at 36.

### a. Assumptions Regarding Early Minastrin Entry and an Authorized Generic

Defendants challenge Dr. Leitzinger's assumptions relating to whether Warner Chilcot would have launched Minastrin 24 earlier and/or an authorized generic in the but-for world. Defs.' Opp'n to Class Cert. 37-39; Cremieux Report ¶¶ 101-04. [17] But as discussed above, Dr. Leitzinger's sound methodology and analysis cannot be otherwise faulted for accepting reasonable assumptions supported by Plaintiffs' other experts and fact witnesses. See supra Part II.A. Whether Warner Chilcott would have launched Minastrin earlier and/or whether Warner Chilcott would have launched an authorized generic if generics had entered earlier goes to the heart of the merits of this case and is a classic fact question best suited for decision by a jury. See Solodyn, 2017 WL 4621777, at *10 (holding that whether the product hop led the plaintiffs to purchase more of the expensive brand product over the cheaper generic product was a fact question for the jury, not to be determined on class certification).

### b. Brand-Only Purchasers

Defendants argue that the DPPs cannot demonstrate that the Brand-Only Purchasers incurred overcharges, because they did not purchase generic Loestrin 24, even after it became available. Defs.' Opp'n to Class Cert. 17-18. The DPPs counter that Dr. Leitzinger's analysis clearly demonstrates that most brand purchases would have been converted to generic Loestrin 24 purchases after generic entry. This, coupled with evidence that the Brand-Only Purchasers are wholesalers in the business of responding to their retail customers' demands, is strong evidence that most Brand-Only Purchasers would have converted at least one brand prescription into a generic prescription in the but-for world. See DPPs' Further Supp. for Class Cert. 33; Leitzinger Rebuttal Report ¶ 29.

The Court acknowledges that the Brand-Only Purchasers' failure to purchase generic Loestrin 24 once it was available "casts doubt on the fact that these entities would have purchased the generic earlier had it been available to them[;]"

however, Defendants have not earned "the benefit of the doubt when the very reason we cannot know the answer to that question is because of their alleged wrongdoing." Namenda, 331 F. Supp. 3d at 209 (citing In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 689 (2d Cir. 2009)). The Court reiterates the discussion on this score in relation to Defendants' Motion to Exclude Dr. Leitzinger's Report. See supra Part II.B. The Court is fully satisfied that Dr. Leitzinger's report and testimony establish that the Brand-Only Purchasers each likely would have purchased at least a single prescription of generic Loestrin 24 during the class period in a market with robust, sustained generic competition, given their business interests in meeting their customers' demand. As noted above, it will be for the jury to decide whether Dr. Leitzinger's theory wins the day, in whole or in part; but for present purposes – class certification – his theory more than suffices.

### c. Generic-Only Purchasers

**\*14** Defendants further argue that there is no common proof of injury for the Generic-Only Purchasers, and thus, individual issues predominate. Defs.' Opp'n to Class Cert. 39. Twenty-one of the putative class members purchased generic Loestrin 24 from non-defendant generic manufacturer Amneal and made no brand Loestrin 24 purchases from Defendants. Defs.' Opp'n to Class Cert. 13, 39. The DPPs allege that Defendants' conduct created market conditions that allowed other sellers, like generic-manufacturer Amneal, to charge higher prices than the market would have allowed absent the unlawful conduct. Leitzinger Report ¶ 49. Dr. Leitzinger's model demonstrates that purchasers obtained greater discounts relative to brand WAC as more generics entered the market. Leitzinger Rebuttal Report ¶¶ 25-27. In reaching this conclusion, Leitzinger relies upon economic literature regarding sustained generic entry; Defendants' and generic manufactures' own forecasts; market-wide sales data showing that prices fell substantially when generic entry finally occurred; and evidence that class members supply brand and generic Loestrin 24 to a broad cross-section of customers. DPPs' Further Supp. for Class Cert. 19-20 (citing Leitzinger Report ¶¶ 28-52).

Defendants retort that branded generics compete differently than generics generally and the actual data demonstrate "meaningful variation in generic prices and no common injury-in-fact/impact as to" the Generic-Only Purchasers. Defs.' Opp'n to Class Cert. 39-42. First, Defendants argue that

2019-2 Trade Cases P 80,849

the price for generic Loestrin 24 did not uniformly decline as additional generics entered the market. Instead, "the average prices paid for the generic products continued to vary" as generic competition became more robust later in the class period. Id. at 40 (quoting Cremieux Report ¶ 41 & Ex. 5).

But the DPPs do not dispute that the generic Loestrin 24 market did not respond in unison as additional generics entered. To the contrary, Dr. Leitzinger's methodology incorporates the "variation across Class members in the actual prices they paid and in the prices they would have paid", providing averages that "correctly summarize the combined effects of all of these Class members in a single classwide overcharge measure." Leitzinger Rebuttal Report ¶ 45. As discussed throughout, aggregating damages in this way is well accepted.

Second, Defendants argue that the data reveal that generic purchasers showed brand loyalty to their branded generics and did not just shift to the cheapest option. Defs.' Opp'n to Class Cert. 41. But this does not undercut DPPs' allegation that Generic-Only Purchasers would have paid less for the generics they were purchasing. Dr. Leitzinger's model demonstrates that Generic-Only Purchasers would have paid less for their purchases in a but-for world with robust, sustained generic competition; it does not purport to show that they shifted to the cheapest generic available. Leitzinger Rebuttal Report ¶¶ 25-27.

Third, Defendants point to individual data suggesting that some purchasers that bought generic Loestrin 24 from Amneal did not pay less once additional generic manufactures entered. Defs.' Opp'n to Class Cert. 42. Defendants' analysis, however, focuses in on the actual price a few months following generic entry with two and three generic competitors on the market, thereby failing to consider the effect of sustained, robust generic competition. Leitzinger Rebuttal Report ¶¶ 9-12. In particular, Dr. Leitzinger explains, the effects of manufacturer price concessions (viz., chargebacks and rebates) are often recorded in the data later than the original sale transitions. Id. As a result, Dr. Cremieux's data arguably overstates generic prices by understating the generic discounts. Id.; see also id. ¶ 13 (noting that some of the pricing data used by Dr. Cremieux did not provide any data on manufacturer price concessions). To combat this concern, Dr. Leitzinger uses a combination of transactional data and manufacturers' forecasts to predict prices in the but-for world. Leitzinger Report ¶ 27; see also id. ¶ 61; Table 1, Leitzinger Rebuttal Report (calculating

discount off WAC with one through five generic entrants in the market). At trial, the jury will sort out the details, but for now, the Court is satisfied that the DPPs have evidence common to the class that the Generic-Only Purchasers sustained injury-in-fact.

*15 In sum, the DPPs have sufficiently shown that damages may be "demonstrated by a 'common methodology' applicable to the class as a whole." In re Nexium (Esomeprazole) Antitrust Litig., 297 F.R.D. 168, 182 (D. Mass. 2013) ("Nexium I"), aff'd sub nom. Nexium III, 777 F.3d 9 (quoting Comcast 569 U.S. at 30)). While it may be borne out through the evidence at trial that there are a couple uninjured members of the DPP class, it would be a "very small absolute number of class members ... picked off in a manageable, individualized process at or before trial." Asacol, 907 F.3d at 53-54. The prospect that a handful of identifiable class members may be uninjured is not a barrier to class certification. Cf. id. (holding that class should not be certified in pharmaceutical antitrust case where "any class member may be uninjured, and there are apparently thousands who in fact suffered no injury").

## 2. Predominance: Common Proof of Damages

Rule 23(b)(3) carries with it the additional requirement that a putative class demonstrate that damages can be calculated on a class-wide basis. Comcast, 569 U.S. at 35. The damages model must be "consistent with [the putative class's] liability case," id.; that is, "the defendants cannot be held liable for damages beyond the injury they caused." Nexium III, 777 F.3d at 18. That said, "it is well-established that '[t]he individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3).' " Id. at 21 (quoting Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 40 (1st Cir. 2003)). Rather, "where ... common questions predominate regarding liability, ... courts generally find the predominance requirement to be satisfied even if individual damages issues remain." Id. (quoting Smilow, 323 F.3d at 40).

In his Declaration and Rebuttal Report, Dr. Leitzinger establishes a "formulaic approach to class-wide overcharges [that] does not require individualized analysis for each Class member." Leitzinger Report ¶ 67. Dr. Leitzinger develops a benchmark demonstrating (1) the prices that direct purchasers would have paid in a but-for world, and (2) the number of Loestrin 24 and Minastrin 24 purchases that would have instead been generic Loestrin 24 purchases in a but-for world.

Id. ¶¶ 54, 57, 62. This allows him to calculate overcharges or, the "difference between the amounts actually paid for [generic and brand] Loestrin 24 ... and Minastrin 24, and the amounts that would have been paid absent illegal conduct." Leitzinger Report ¶ 57.

Dr. Leitzinger's approach to calculating class-wide overcharges using evidence common to the class involves: (1) using generic manufacturers' own forecasts predicting the effect of generic Loestrin 24 entry, along with the literature on the pharmaceutical industry, to calculate a generic entry rate, id. ¶¶ 58-59; (2) using pricing data from the actual experience of generic Loestrin 24 entry, coupled with the forecasts from generic Loestrin 24 manufacturers to calculate the discount off the brand price (i.e., discount off WAC) that would have been available in a but-for world, id. ¶¶ 60-61; (3) calculating the but-for volumes of Loestrin 24, Minastrin 24, and generic Loestrin 24 using generic penetration rates over time applied to actual purchase volumes over time, id. ¶¶ 62-64; and (4) multiplying the per unit overcharge by the actual sales volume to determine the aggregate class-wide overcharges incurred by the DPPs, id. ¶ 66, Table 1. Importantly, Dr. Leitzinger's calculations can be adjusted to account for whichever (if any) anticompetitive conduct the jury finds Defendants liable for, as well as when and how many generic competitors would have entered earlier in the but-for world. Id. ¶¶ 26, 66, 71-72. He further notes that additional adjustments could be made to account for additional or different determinations altering the calculations used in his model (e.g., generic entry dates). Id. ¶ 67.

 **\*16**  Defendants contend that the DPPs, using Dr. Leitzinger's methodology and analysis, fail to establish that "damages are capable of measurement on a classwide basis." Defs.' Opp'n to Class Cert. 43 (quoting Comcast, 569 U.S. at 34-35). They argue that Dr. Leitzinger's model is "highly aggregated" and thus inaccurate and unreliable; it ignores Brand-Only and/or Generic-Only Purchasers that may not be injured; and it fails to separate out overcharges from the alleged generic delay and the alleged product hop. Id. at 43-45. In addition, they continue to take issue with Dr. Leitzinger's assumptions regarding Minastrin entry and his failure to account for decreased volume caused by generic bypass in his damages calculation. Id. at 45-47.

Most of these arguments have been addressed above at length. As stated, the DPPs have satisfied the Court that Dr. Leitzinger's analysis is based on sound and reliable methodology. For this reason, the Court is satisfied that

Dr. Leitzinger's damages model does not ignore uninjured purchasers, nor does it improperly assume facts about the Minastrin entry. Moreover, as discussed, see supra Part II.C., the Court sides with the weight of authority in holding that a direct purchasers' damages model need not – and, indeed, should not – offset its damages calculation with any anticipated decrease in volume that may have occurred in a but-for world due to changes in buying practices.

Moreover, the Court rejects Defendants' plaint that Dr. Leitzinger's aggregated model of damages is unreliable. In an attempt to undermine Dr. Leitzinger's model, Dr. Cremieux disaggregated Dr. Leitzinger's calculations and determined that it yielded purchases of Minastrin for class members that never purchased Minastrin and, when the disaggregated overcharges were added back together for one but-for scenario, the result was $56 million less than Dr. Leitzinger's class-wide estimate of $625.2 million. Defs.' Opp'n to Class Cert. 44; see also Leitzinger Rebuttal Report ¶ 43. Dr. Leitzinger's methodology, as discussed above, involves calculating class-wide averages (including those of actual prices paid, but-for generic penetration rates, but-for brand prices, and but-for generic prices) and plugging them into his aggregate overcharge model. The output is a "single classwide overcharge measure." Id. ¶ 45. This methodology is widely accepted and does not purport to calculate individual damages for any one purchaser. See, e.g., Solodyn, 2017 WL 4621777, \*9-10 (certifying a class of direct purchasers based upon Dr. Leitzinger's aggregated damages model). But it is nonsensical to disaggregate the model by taking the class-wide averages for certain measures and applying them to each class member.

This is easily illustrated by considering the application of the average generic penetration rate to Generic-Only Purchasers. By definition, Generic-Only Purchasers should have a one-hundred-percent generic penetration rate in the actual and but-for worlds. Leitzinger Rebuttal Report ¶ 47. If one were to disaggregate Dr. Leitzinger's model and apply the average generic penetration rate to the Generic-Only Purchasers, it results in the assignment of Minastrin 24 purchases to class members who never purchased a brand product. Id. The Court remains confident in Dr. Leitzinger's model sufficient to send it to a jury – indeed, Dr. Cremieux's alternative calculation, even with its weaknesses, produced a total overcharge damages number that is only 9% lower than Dr. Leitzinger's. Id. ¶ 44.

2019-2 Trade Cases P 80,849

The DPPs have satisfied the Court that "damages may be demonstrated by a 'common methodology' applicable to the class as a whole." See Solodyn, 2017 WL 4621777, at *10 (quoting Nexium I, 297 F.R.D. at 182) (internal quotation omitted).

### 3. Superiority

**\*17** To earn certification, a putative class must establish that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In undertaking this analysis, the Court examines four factors:

> (A) The class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Id.

Defendants do not seriously dispute that superiority is met here, but rather regurgitate their arguments that joinder is not impracticable and common issue do not predominate. See Defs.' Opp'n to Class Cert. 48-50. The Court disagrees, for the reasons stated above, and concludes that a class action is the superior method for fairly and efficiently adjudicating this matter. With that, the DPPs have carried their burden in establishing that their proposed class should be certified under Rule 23(a)(1) and (b)(3) under the Federal Rules of Civil Procedure.

### IV. Conclusion

For the reasons stated above, the DPPs' Motion for Class Certification (ECF No. 513) is GRANTED and Defendants' Motion to Exclude (ECF No. 570) is DENIED. The Court further APPOINTS as class representative Ahold USA, Inc., and APPOINTS Hagens Berman Sobol Shapiro LLP, Berger & Montague, P.C., Faruqi & Faruqi LLP, and Kessler Topaz Meltzer & Check LLP as Co-Lead Counsel for the DPP Class.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3214257, 2019-2 Trade Cases P 80,849

---

### Footnotes

1    Warner Chilcott and Watson are part of the multinational corporation, Allergan plc. See Direct Purchaser Class Pls.' Third Am. Consolidated Class Action Compl. and Jury Demand ("DPP Compl.") ¶¶ 18-28, ECF No. 380.

2    Loestrin 24 is an oral contraceptive with 24 tablets containing 1 mg norethindrone acetate and 20 mcg ethinyl estradiol and 4 placebo tablets with iron. DPP Compl. ¶ 109.

3    A separate decision on the End-Payor Plaintiffs' Motion for Class Certification, ECF No. 526, is forthcoming.

4    The curious reader may refer to In re Loestrin 24 Fe Antitrust Litig., 261 F. Supp. 3d 307, 314-25 (D.R.I. 2017) ("Loestrin"), to put more flesh on the bones of the following summary.

5    Reference to the "but-for world" throughout this decision connotes a hypothetical world in which Defendants did not engage in any of the anticompetitive conduct alleged by the DPPs.

6    Dr. Leitzinger has worked as an economist for over forty years and is the president of Econ One Research, Inc., an economic research and consulting firm. He holds master's and doctoral degrees in economics from the University of California Los Angeles and a bachelor's degree in economics from Santa Clara University. Decl. of Jeffrey J. Leitzinger, Ph.D. ("Leitzinger Report") ¶¶ 1-2, ECF No. 518-3. He has testified in many

Case 1:19-md-02875-RMB-SAK   Document 1748-28   Filed 11/10/21   Page 150 of 261
PageID: 45088

In re Loestrin 24 Fe Antitrust Litigation, Not Reported in Fed. Supp. (2019)
2019-2 Trade Cases P 80,849

pharmaceutical antitrust cases in federal court, id. ¶ 2 & n.2, and the Court gleans no dispute over his qualifications to provide an opinion in this matter.

7  Watson divested its Loestrin Abbreviated New Drug Application ("ANDA") to Amneal when it acquired Warner Chilcott. Defs.' Mem. of Law in Opp'n to Direct Purchaser Class Pls.' Mot. for Class Certification ("Defs.' Opp'n to Class Cert.") 14, ECF No. 582. As a result, Amneal agreed to delayed entry of generic Loestrin 24 per Watson's alleged unlawful reverse payment to Warner Chilcott. See Reply in Further Supp. of Direct Purchaser Class Pls.' Mot. for Class Certification ("DPPs' Further Supp. for Class Cert.") Ex. 14 ¶ 2.4, ECF No. 621-3.

8  The wholesale acquisition cost ("WAC") of a prescription drug refers to the list price of the branded drug. Leitzinger Report 28 n.83; see also DPP Hr'g Tr. 16. As discussed below, Dr. Leitzinger conceptualizes generic drug price in terms of its discount from the brand's WAC. See Leitzinger Rebuttal Report ¶ 15 ("While generic suppliers compete with one another, they are also engaged collectively in competing with and diverting sales from the brand. The key metric in this regard is the level of the generic price relative to brand prices, often summarized as the generic discount from brand WAC."); see also Expert Report of Pierre-Yves Cremieux ("Cremieux Report") ¶ 32 n.41, ECF No. 582-1 ("The WAC is the manufacturer's list price to wholesalers before considering discounts, rebates, and other price concessions.").

9  One of the six Brand-Only Purchasers, King Drug Company of Florence, Inc., went out of business in November 2010, and has submitted a declaration stating that, considering its business model, it would have purchased generic Loestrin 24 had it been available earlier. Leitzinger Rebuttal Report ¶¶ 28-29; Decl. of Keith Elmore (Nov. 23, 2018), ECF No. 621-25.

10  This phenomenon is referred to as "generic bypass". Following generic entry, some wholesalers' customers shift their buying practices to purchase the generic drug directly from generic manufacturers, thereby "bypassing" the wholesaler. Leitzinger Report ¶ 68. As a result, wholesalers may lose volume in their sales. Id. ¶¶ 68-70.

The weight of the authority on this issue sides with the DPPs, and the Court adopts those courts' reasoning that, consistent with Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481 (1968), purchasers are injured at the point in time they incur the overcharge. Thus, even if generic bypass may have occurred in a but-for world, this does not negate injury. See Illinois Brick v. Illinois, 431 U.S. 720, 724 (1977) (holding that direct purchasers may recover the full amount of overcharges (citing Hanover Shoe, 392 U.S. at 494)); see also In re Nexium (Esomeprazole) Antitrust Litig., 296 F.R.D. 47, 55 (D. Mass. 2013) ("Nexium II")("The Supreme Court has 'long recognized [overcharges] as the principal measure of damages for plaintiffs injured as customers.' ") (quoting In re Relafen Antitrust Litig., 218 F.R.D. 337, 344 (D. Mass. 2003)).

11  In the DPPs' Further Support for Class Certification Memorandum, they adjust the putative class from comprising 48 to 47 members. DPPs' Further Supp. for Class Cert. 3 & n.7, ECF No. 621.

12  As a general matter, a class of 20 or fewer tends to carry the presumption that it is not sufficiently numerous; a class of 41 or more carries a presumption that it is sufficiently numerous; and "[c]lasses with between 21 and 40 members are given varying treatment," depending on the facts of the specific case. Modafinil, 837 F.3d at 250 (quoting 5 James Wm. Moore, et al., Moore's Federal Practice § 23.22)).

13  Four of these overlap with parties that Defendants allege have no direct injury. Defs.' Opp'n to Class Cert. 19.

14  Indeed, but for the no-authorized-generic agreement between Warner Chilcott and Watson, the DPPs' theory posits, Generic-Only Purchasers would have made their generic purchases directly from Warner Chilcott. Only because Warner Chilcott had agreed not to market an authorized generic did generic purchasers need to look elsewhere. DPPs' Further Supp. for Class Cert. 13, 15-16.

15  This Court respectfully disagrees with the conclusion reached on this issue in Skelaxin, 2014 WL 2002887, at *11. There, the court held that the plaintiffs did not have standing to pursue antitrust damages for "generic overcharges". Id. at *1, 11. It reasoned that the causal connection between the defendant's alleged antitrust violation and the plaintiff-generic purchaser's harm was too attenuated. See id. at *11 (citing In re Vitamins Antitrust Litig., No. 99CIV5134, 2001 WL 855463, at *4 (D.D.C. July 2, 2001)). Moreover, the Court reasoned that, because it was satisfied that the defendants did not intend the plaintiff's harm, they had not satisfied

In re Loestrin 24 Fe Antitrust Litigation, Not Reported in Fed. Supp. (2019)
2019-2 Trade Cases P 80,849

the standing inquiry set forth by the Supreme Court in <u>Assoc. Gen. Contractors of Cal., Inc.,</u> 459 U.S. at 537-45. <u>Skelaxin,</u> 2014 WL 2002887, at 8-9. The Court, consistent with its reading of Areeda & Hovenkamp, concludes that in a market exclusion case like the one at bar, as opposed to a price fixing case, intervening pricing decisions of the non-defendant manufacturer do not require the same level of searching inquiry into causation.

16    Defendants argue that the Brand-Only Purchasers should be excluded from the class because there is no proof that they would have purchased generic Loestrin had it been available. <u>See</u> Defs.' Opp'n to Class Cert. 17-18. For the reasons stated above, <u>see</u> <u>supra</u> Part II.B. (discussing this argument in connection with Defendants' Motion to Exclude Dr. Leitzinger's Expert Report), this argument fails.

17    For what it's worth, as the kids say, Dr. Leitzinger has now performed, in response to Defendants' criticisms, the calculations necessary for jury findings that the product hop was lawful, that the product hop was unlawful, and that the product hop occurred six months before a non-delayed Watson generic entry. <u>See</u> Leitzinger Report ¶¶ 62-65; Leitzinger Rebuttal Report ¶¶ 35-41.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

9

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 153 of 261
PageID: 45091
In re Neurontin Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2011 WL 286118
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

In re NEURONTIN ANTITRUST LITIGATION.
This Document Relates to:
Louisiana Wholesale Drug Company,
Inc., Meijer Inc. and Meijer Distribution,
Inc., on behalf of themselves and all
others similarly situated, Plaintiffs,
v.
Pfizer, Inc. and Warner–Lambert Co., Defendants.

MDL No. 1479.
|
Master File No. 02–1390.
|
Civil Action Nos. 02–1830 (FSH), 02–2731(FSH).
|
Jan. 25, 2011.

**Attorneys and Law Firms**

Jonathan D. Clemente, Esq., Clemente Mueller, P.A., Cedar Knolls, NJ, for Direct Purchaser Class Plaintiffs.

Robert N. Kaplan, Esq., Richard Kilsheimer, Esq., Kaplan, Fox & Kilsheimer LLP, Bruce Gerstein, Esq., Garwin, Gerstein & Fisher, LLP, New York, NY, for Direct Purchaser Class Plaintiffs.

John J. Francis, Jr., Esq., Michael C. Zogby, Esq., Drinker Biddle & Reath LLP, Florham Park, NJ, Clifford H. Aronson, James A. Keyte, Karen Hoffman Lent, Skadden, Arps, Slate, Meagher & Flom LLP,New York, NY, for Defendants Pfizer, Inc. and Warner–Lambert Company LLC.

## *OPINION*

HOCHBERG, District Judge.

**\*1** This matter comes before the Court upon the Motion for Class Certification [Docket # 226] filed by Louisiana Wholesale Drug Company, Inc., Meijer, Inc., and Meijer Distribution, Inc., et al. (collectively, "Plaintiffs") pursuant to Federal Rule of Civil Procedure 23. The Court has considered the submissions of the parties, including their memoranda of law and the exhibits attached thereto; all expert reports submitted by the parties, including the merits report of Plaintiffs' expert, Dr. French; [1] Plaintiffs' Trial Plan and Defendants' response thereto; and the parties' proposed findings of fact and conclusions of law. The Court heard oral argument on the motion on April 13, 2010 and September 13, 2010.

## I. *BACKGROUND* [2]

Plaintiffs in the instant action each directly purchased Neurontin, a brand-name version of the drug compound gabapentin anhydrous ("gabapentin"), from Defendants Pfizer, Inc. and Warner–Lambert Company, LLC (collectively, "Warner–Lambert"). [3] In their Amended Complaint, Plaintiffs allege that Warner–Lambert engaged in an overarching anticompetitive scheme to acquire and maintain monopoly power in the market for gabapentin products in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Warner–Lambert is alleged to have carried out this scheme by:

(1) procuring two additional patents that it improperly listed in the Orange Book; (2) manipulating the patent approval process so that a third patent with claims so limited that they are impossible to accurately measure or distinguish from the prior art enabling the patent to be used to delay generic entry; (3) filing and prosecuting multiple sham lawsuits on these patents that no reasonable litigant could have expected to succeed; and (4) engaging in fraudulent off-label promotion to convince doctors to prescribe Neurontin for uses for which it was not approved. DPNC Complaint ¶ 29. Plaintiffs claim that these actions were designed to, and did in fact, delay the entry of generic gabapentin into the market until late 2004. Plaintiffs allege that but for Warner–Lambert's anticompetitive scheme, generic manufacturers would have entered the market at lower prices as early as 2000. As a result of this delayed entry, Plaintiffs contend that they and other direct purchasers of Neurontin were foreclosed from the opportunity of purchasing lower-priced generic versions of the drug for years, and were accordingly compelled to pay noncompetitive prices for gabapentin. Plaintiffs seek damages for this overcharge pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. Plaintiffs now move for certification of a class of similarly situated entities (the "Class") under Federal Rule of Civil Procedure 23(a) and (b)(3) defined as follows:

All persons or entities in the United States that purchased Neurontin from [Warner–Lambert] at any time during the period of December 11, 2002 through August 31, 2008. Excluded from the Class are Defendants, and each of their respective parents, employees, subsidiaries, affiliates, and franchisees, and all governmental entities. [4]

**\*2** Plaintiffs also request that this Court designate the Plaintiffs as Class Representatives, and that proposed Class Counsel be appointed pursuant to Federal Rule of Civil Procedure 23(g). [5]

## II. *DISCUSSION*

### A. *Standard Governing Class Certification*

To obtain certification, Plaintiffs must demonstrate that the proposed class satisfies all four prerequisites of Federal Rule of Civil Procedure 23(a), as well as one of the three sets of criteria set out in Rule 23(b). *See, e.g., Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 624 (3d Cir.1996); *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994). Class certification cannot be presumed and must only be entered after a "rigorous analysis" that the requirements of Rule 23 are met. *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). As part of this rigorous analysis, the Court "must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties." *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 307 (3d Cir.2008). In making these inquiries, "the Court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits —including disputes touching on elements of the cause of action." *Id.* Any "[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence." *Id.* at 320. "In other words, to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." *Id.*

### B. *Rule 23(a) Requirements*

Rule 23(a) requires Plaintiffs to show that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *Amchem,* 521 U.S. at 613. These prerequisites are commonly known as numerosity, commonality, typicality, and adequacy. *Baby Neal,* 43 F.3d at 55. They are "meant to assure both that class action treatment is necessary and efficient and that it is fair to absentees under the particular circumstances." *Id.*

Warner–Lambert does not contest that that these prerequisites are satisfied here. [9/13/10 Tr. 23.] Nonetheless, consistent with its own duty to conduct a rigorous analysis of the Rule 23 requirements, the Court will consider each in turn.

#### 1. Numerosity

"Satisfaction of the first prerequisite, numerosity, does not require evidence of the exact number or identification of the members of the proposed class, but rather that the proposed class is so 'numerous that joinder of all members is impracticable.' " *In re Linerboard Antitrust Litig.,* 203 F.R.D. 197, 205 (E.D.Pa.2001) (citing Fed.R.Civ.P. 23(a)(1)). Although "[n]o minimum number of plaintiffs is required ... generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir.2001). Numerosity is not, however, determined solely by the size of the class; the geographic location of class members is also considered in determining whether joinder would be impracticable. *See, e.g., Mardsen v. Select Med. Corp.,* 246 F.R.D. 480, 484 (E.D.Pa.2007); *Marian Bank v. Elec. Payment Servs., Inc.,* Civ. No. 95–614, 1997 WL 811552, at \*15 (D.Del. Dec. 30, 1997).

**\*3** Here, it is undisputed that the proposed Class consists of more than 40 geographically dispersed members. Plaintiffs' expert estimates that the Class consists of more than 100 geographically dispersed entities; Warner–Lambert's expert puts the number at between 100 and 130. Given the number of potential Class Members throughout the United States, the Court finds that joinder of all members is impracticable. *See, e.g., Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985) ("The allegation of more than 90 geographically dispersed plaintiffs met the numerosity requirement of Fed.R.Civ.P. 23(a)(1).").[6] The proposed Class therefore satisfies the numerosity requirement.

### 2. Commonality

Rule 23(a)'s second prerequisite, commonality, requires Plaintiffs to demonstrate that there are questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2). This test is "satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Stewart,* 275 F.3d at 227. Because only one issue must be in common, "the burden for meeting this requirement is low," *In re Wellbutrin SR Direct Purchaser Antitrust Litig.,* No. 04–5525, 2008 WL 1946848, at \*2 (E.D.Pa. Mar.2, 2008) (citing *Baby Neal,* 43 F.3d at 56), and is routinely found to be satisfied in antitrust cases alleging monopolization. *See, e.g., K–Dur,* 2008 WL 2699390, at \*4; *see generally* Antitrust Law Developments, 3d at 314 (the commonality requirement "rarely has resulted in the denial of class certification in an antitrust action").

In this case, Plaintiffs allege a common course of conduct by Warner–Lambert which, they contend, had the general effect of delaying the entry of generic gabapentin to the market, thereby allowing Warner–Lambert to maintain its monopoly. Warner–Lambert does not dispute that Plaintiffs' antitrust claims raise numerous common questions of law and fact, including, inter alia, (i) whether Warner–Lambert engaged in an anticompetitive scheme to delay generic entry, and if so, whether the scheme as a whole or portions of it constitute antitrust violations; (ii) whether Warner–Lambert maintained monopoly power by delaying generic entry; (iii) whether direct proof of monopoly power is available, and if available, whether it is sufficient to prove Warner–Lambert's monopoly power without the need to define a relevant market; (iv) to the extent a relevant market must be defined, what that definition is; and (v) whether, and to what extent, Warner–Lambert's conduct caused antitrust injury to the business or property of Plaintiffs and Class Members, and if so, the appropriate

measure of damages. *See* DPNC Compl. 28(a)-(e). Given these numerous common questions, the Court finds that the commonality requirement is satisfied.[7]

### 3. Typicality

The third prerequisite, typicality, requires that "the claims ... of the representative parties are typical of the claims ... of the class." Fed.R.Civ.P. 23(a)(3). The typicality inquiry "evaluates the sufficiency of the named plaintiff." *Hassine v. Jeffes,* 846 F.2d 169, 177 n. 4 (3d Cir.1988). It is intended to assess "whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal,* 43 F.3d at 57. It does so by "requiring that the common claims are comparably central to the claims of the named plaintiffs as to the claims of the absentees." *Id.* Named plaintiffs' claims are generally found to be typical if they "arise from the same alleged wrongful conduct" and are based upon the "same general legal theories" of those of the class. *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 5332 (3d Cir.2004); *see also Newton v. Merrill Lynch,* 259 F.3d 154 183–84 n. 28 (3d Cir.2001) ("[c]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement"). This is the case even where there are factual differences among plaintiffs. *Baby Neal,* 43 F.3d at 58.

**\*4** Here, the claims of the Named Plaintiffs and absent Class Members rely on the same legal theories and arise from the same alleged course of conduct by Warner–Lambert; namely, Warner–Lambert's alleged misuse of the patent process and filing of frivolous lawsuits in order to delay generic entry and maintain its monopoly of the gabapentin market. This conduct affected Named Plaintiffs and Class Members in the same way, as all direct purchasers allegedly paid higher prices for gabapentin because generic manufacturers were prevented from competing with Warner–Lambert for years. While individual damages may differ, the Court finds that Named Plaintiffs' claims are typical of the claims of the Class.[8] *See Linerboard,* 203 F.R.D. at 207 ("in instances it is alleged that the defendants engaged in a common scheme relative to all members of the class," typicality is generally satisfied).

### 4. Adequacy

Under Rule 23(a)'s fourth prerequisite, both the class representatives and their attorneys must "fairly and

adequately protect the interests of the class." Rule 23(a)(4). Adequacy is, therefore, a two-part inquiry "designed to ensure that absentees' interests are fully pursued." *Warfarin,* 391 F.3d at 532. First, "the court must determine whether the representatives' interests conflict with those of the class." *Johnston v. HBO Film Mgmt., Inc.,* 265 F.3d 178, 185 (3d Cir.2001). Second, the Court must assess the qualifications of class counsel to determine "whether the class attorney is capable of representing the class." *Id.* at 185.

Here, Warner–Lambert does not dispute that both prongs of the adequacy inquiry are satisfied. First, each Named Plaintiff has the same interest as each Class Member in establishing that Warner–Lambert's conduct violated the antitrust laws, and that but for the violation, Warner–Lambert would not have been able to sustain its monopoly of the gabapentin market. Further, each seeks to recover for the same type of injury-the overcharges it paid for Neurontin. Accordingly, "because all class members have the right to pursue overcharge damages, they have the same incentive to do so, and there is no conflict among class members allegedly harmed by the same antitrust violation." *Wellbutrin,* 2008 WL 1946848, at *6. [9]

Second, proposed Class Counsel are highly qualified to represent the Class. Counsel have submitted resumes demonstrating that they have extensive experience and expertise in antitrust, class action, and complex civil litigation, including actions similar to the instant case involving delayed generic entry. *See In re NASDAQ Market Makers Antitrust Litig.,* 169 F.R.D. 493, 515 (S.D.N.Y.1996) (noting that counsel's experience in litigating similar matters is a key factor in assessing adequacy). Further, there is "no indication that Plaintiffs' counsel is incapable of litigating vigorously on behalf of the putative class." *In re Rubber Chems. Antitrust Litig.,* 232 F.R.D. 346, 351 (C.D.Cal.2005). Rather, to date, counsel have zealously and capably prosecuted this action, conducting appropriate discovery and presenting comprehensive and intelligent analyses in their briefs and oral argument. Accordingly, the Court finds that the adequacy requirement is satisfied with respect to both Named Plaintiffs and proposed Class Counsel. [10]

## C. *Rule 23(b)(3) Requirements*

**\*5** Having satisfied the requirements of Federal Rule of Civil Procedure 23(a), Plaintiffs must next demonstrate that the proposed class is maintainable under one of the three

subsections of Federal Rule of Civil Procedure 23(b). In the instant case, Plaintiffs seek certification under Rule 23(b)(3), and, as such, must show that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and that (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b) (3). These twin requirements are known as predominance and superiority. The Court will consider each in turn.

### 1. Predominance

Predominance demands that "[i]ssues common to the class [ ] predominate over individual issues." *In re Prudential Ins. Co. Am. Sales Practice Litig.,* 148 F.3d 283, 313–14 (3d Cir.1998). This inquiry "measures whether the class is sufficiently cohesive to warrant certification." *Newton,* 259 F.3d at 187. It is a standard "far more demanding" than the commonality requirement of Rule 23(a), because it requires more than a single common claim. *Hydrogen Peroxide,* 552 F.3d at 311 (quoting *Amchem,* 521 U.S. at 623). Instead, "[p]redominance requires that common issues be both numerically and qualitatively substantial in relation to issues peculiar to individual class members." *In re Mercedes–Benz Antitrust Litig.,* 213 F.R.D. 180, 186 (D.N.J.2003). While "[i]ndividual issues do[ ] not necessarily defeat certification," they must "have less overall significance than the issues common to the class." *K–Dur,* 2008 WL 2929390, at *11.

"Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Hydrogen Peroxide,* 552 F.3d at 311 (internal quotations and citations omitted); *see also Sandwich Chef, Inc. v. Reliance Nat'l Indem. Ins. Co.,* 319 F.3d 205, 218 (5th Cir.2003) (Rule 23(b)(3) requires the court to "consider how a trial on the merits would be conducted if a class were certified"). This inquiry requires an examination of the elements of a plaintiff's claim "through the prism of Rule 23." *Hydrogen Peroxide,* 552 F.3d at 311. That is, the court must consider the substantive elements of a plaintiff's claims and the type of proof that plaintiff plans to proffer to establish those elements in order to determine whether common issues predominate. In doing so, "[t]he relevant question is not whether each element can be proved but whether such proof will require evidence individual to class members." *McDonough v. Toys R Us, Inc.,* No. 06–0242,

In re Neurontin Antitrust Litigation, Not Reported in F.Supp.2d (2009)

2009 U.S. Dist. LEXIS 60684, at *58–59, 2009 WL 2055168 (E.D.Pa. July 15, 2009) (citing *Hydrogen Peroxide,* 552 F.3d at 311–12).

**\*6** In the instant case, the elements of Plaintiffs' claim are: (i) a violation of the applicable antitrust law-here, Section 2 of the Sherman Act; (ii) individual injury to Class Members as a result of that violation (also known as "impact," "fact of damage," or "injury-in-fact"); and (iii) measurable damages. *See Hydrogen Peroxide,* 552 F.3d at 311. To be certified as a class under Rule 23(b)(3), Plaintiffs must show that common or generalized proof will predominate at trial with respect to each of these essential elements. *Linerboard,* 203 F.R.D. at 214; *see also Meijer,* 246 F.R.D. at 369 (predominance satisfied "when there exists generalized evidence which proves or disproves an element [of plaintiff's claim] on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position"). The Court will assess the nature of the proposed proofs with respect to each of these elements in turn.

### a. Violation of Antitrust Law

To prove a violation of Section 2 of the Sherman Act, Plaintiffs must establish that: (i) Warner–Lambert possessed monopoly power in the relevant market; and (ii) Warner–Lambert willfully acquired or maintained that power. *U.S. v. Grinnell Corp.,* 384 U.S. 564, 570–71 (1966). Courts have routinely found that proof of this violation focuses on the defendant's conduct, not on the conduct of individual class members, and is therefore well suited for class treatment. *See, e.g., Warfarin,* 391 F.3d at 528 (allegations of violations of Section 2 "naturally raise several questions of law and fact common to the entire class and which predominate over any issues related to individual class members"); *Tricor,* 252 F.R.D. at 227 (same); *see also* 6 Newberg on Class Actions § 18.25 ("common liability issues such ... monopolization have, almost invariably, been held to predominate over individual issues").

Here, Warner–Lambert has "never contested that common proof would apply to these elements of [Plaintiffs'] claim." Defs. Response to Trial Plan 3. As in other monopolization cases, Class Members' claims focus only on the allegedly anticompetitive conduct of Warner–Lambert. Had they pursued their claims individually, each Class Member would have been required to prove identical facts, such as Warner–Lambert's monopoly power [11] and its alleged misuse of the patent process and initiation of sham litigation to perpetuate

its exclusivity scheme, without resort to evidence regarding Class Members' individual behaviors. Indeed, Warner–Lambert's own expert conceded that proving "whether or not [Warner–Lambert] engaged in various efforts to delay generic entry would not vary by class member." Hughes Dep. 55–57. Accordingly, the Court finds that common evidence will predominate with respect to whether Warner–Lambert violated antitrust law.

### b. Antitrust Impact

The critical disputed issue here concerns whether common questions predominate with respect to antitrust impact. As noted above, "impact" or "fact of damage" is an essential element of Plaintiffs' claim, and requires proof that Plaintiffs suffered some injury that was caused by Warner–Lambert's antitrust violation. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). At the class certification stage, the Court's concern is only whether Plaintiffs could prove impact through predominately class-wide evidence; not whether, in fact, they have. *Hydrogen Peroxide,* 522 F.3d at 311; *Linerboard,* 305 F.3d at 152.

**\*7** In the instant case, Plaintiffs assert that Warner–Lambert's scheme delayed the market entry of generic gabapentin, in turn delaying the ability of Class Members to substitute purchases of Neurontin with purchases of a generic alternative. Plaintiffs contend that their injury stems from the higher prices they paid for Neurontin as a result of being foreclosed from buying lower-priced generics (the "overcharge"). [12] To show this injury, Plaintiffs plan to demonstrate that, absent Warner–Lambert's anticompetitive conduct, Class Members would have purchased the lower-priced generic in place of Neurontin. Warner–Lambert has conceded that this is a cognizable theory of injury, recognizing that "class members suffered damages to the extent that each entity would have substituted generic gabapentin for its purchases of Neurontin." Defs. Proposed Findings 37.

There are two components to proving this injury, each of which Plaintiffs argue they can establish with class-wide proof. First, Plaintiffs must show that the price of generic gabapentin would have been lower than Neurontin absent Warner–Lambert's anticompetitive conduct (e.g., that Class Members would have paid less for generic gabapentin). Second, Plaintiffs must show that all or nearly all Class Members would have substituted at least some generic

gabapentin for Neurontin (e.g., that they would have paid the overcharge on at least one purchase).

With respect to the first component of this theory of injury, Plaintiffs have offered the expert opinion of Dr. French, an economist who has studied the structure of the pharmaceutical industry and the price effects of generic drugs on brand drug markets. French Aff. 5. Based on his research, as well as his review of materials relevant to this case— including deposition testimony, pleadings, and documents and data produced by the parties—Dr. French has opined that proving that generic prices would have been lower absent Warner–Lambert's alleged conduct can be accomplished with class-wide evidence. This common evidence includes: (1) government studies, scholarly economic literature, and empirical evidence analyzing the market-wide effects of unfettered generic competition on the prices of brand and generic drugs, which generally conclude that where there is unfettered generic competition, prices for a drug product are lower;[13] (2) Warner–Lambert's and generic manufacturers' analyses of the effect of generic competition for Neurontin forecasting that the generic would be sold at significantly reduced prices relative to Neurontin;[14] and (3) transactional data reflecting that the generics' actual market entry did in fact reduce the cost of gabapentin dramatically.[15] See Pl. Trial Plan 3–6. Warner–Lambert does not appear to challenge Plaintiffs' ability to make use of this common evidence. The use of this type of evidence is well established,[16] and it is reasonable to proffer it here. Importantly, this evidence will not vary by Class Member. The Court finds that Plaintiffs have shown generalized evidence exists that will prove the first component of their injury.

**\*8** With respect to the second component, Plaintiffs again offer the expert report of Dr. French, opining that common evidence is available to show that Class Members would have purchased generic gabapentin in the "but for" world. This common evidence includes: (1) economic literature and governmental studies of empirical generic competition on market shares of both brand and generic drugs, which generally conclude that when less expensive generics are introduced, they are rapidly substituted for their branded counterparts;[17] (2) Warner–Lambert's and generic manufacturers' analyses forecasting that generics would be aggressively substituted for Neurontin upon entry;[18] (3) transactional data reflecting that after the generics entered the market in 2004, they were, in fact, rapidly substituted

for Neurontin;[19] and (4) Dr. French's analysis of the nature and economic function of the pharmaceutical wholesaler business, which concludes that wholesalers must stock and sell some generics to fulfill customer needs.[20] As noted above, precisely this type of generalized evidence has been found sufficient to satisfy the predominance requirement with respect to proof of impact in analogous cases alleging delayed generic entry.[21]

Warner–Lambert does not appear to contest the availability or import of this common evidence, but argues that it cannot show that *each and every* Class Member would have made the requisite substitution on a generalized basis. Warner–Lambert emphasizes that because of "generic bypass" some Class Members would not have purchased *any* generic gabapentin after generic entry and therefore could not have been injured. Generic bypass refers to the phenomenon in which retail pharmacies buy their brand drugs from wholesalers (like Class Members here), but purchase some or all of their generic drugs directly from generic manufacturers, thereby "bypassing" the wholesaler. In such a situation, the wholesalers lose sales volume, and thus do not need to stock the generic drug at the same inventory level as the brand. At its most extreme, generic bypass may result in a wholesaler not making any purchases of the generic. According to Warner–Lambert's expert, individualized inquiry into the customer base and purchasing practices of each Class Member will be necessary to determine which Class Members were not completely bypassed, and instead made the requisite substitution, thereby suffering an injury.

In response to Warner–Lambert's concern regarding generic bypass, Plaintiffs have proposed narrowing their Class Definition to include only those entities that purchased Neurontin directly from Warner–Lambert during the class period *and* that purchased generic gabapentin after it became available.[22] Pls. Second Motion to Supplement Class Definition 5 [Docket # 239]. This definitional change moots Warner–Lambert's argument that Plaintiffs cannot show with common proof that *every* Class Member was injured[23] as Warner–Lambert has effectively conceded that any Class Member who bought both the brand and the generic suffered an antitrust injury. *See* Defs. Proposed Findings 37 ("class members suffered damages to the extent that each entity would have substituted generic gabapentin for its purchases of Neurontin"); *see also* Hughes Dep. at 179–81 ("[i]f they [would have] bought one unit [of generic] in a properly

In re Neurontin Antitrust Litigation, Not Reported in F.Supp.2d (2011)

specified but-for world, yes, they would have suffered injury").

 **\*9** Under the modified class definition, each Class Member substituted at least some purchases of Neurontin with that of a generic alternative after generics entered the market. As Warner–Lambert recognizes, "[w]hether an individual entity actually purchased a generic drug when it became available is recognized as a proxy for whether it would have substituted the generic drug for the branded version in the 'but for' world." Defs. Proposed Findings 28. A post-entry generic purchase is a reasonable "proxy" because it is well supported by the common evidence Dr. French cites in his expert report; namely, academic studies as well as documents and data from this case indicating that when generics are introduced, they are rapidly substituted for their branded counterparts. In this way, evidence that a Class Member substituted a generic product for some of its Neurontin purchases after generic entry gives rise to a reasonable inference that it similarly would have done so in the but-for world, and therefore suffered an injury. *Accord Cardizem,* 200 F.R.D. at 320; *K–Dur,* 2008 WL 2699390, at \*15. [24]

In light of the modified Class Definition, the Court finds that Plaintiffs have met their burden of showing that impact is susceptible to class-wide proof. That is, Plaintiffs have demonstrated that common evidence is available to show that, but for Warner–Lambert's alleged anticompetitive conduct, (1) generic gabapentin would have been priced less than Neurontin; and (2) Class Members would have purchased at least some of the lower-priced generic in place of Neurontin. Together, this common evidence supports Plaintiffs' theory that generic entry caused Class Members to overpay for at least some units of gabapentin, and thereby suffered injury.

### c. Damages

The final element of Plaintiffs' antitrust claim is proof of damages; to wit, the extent to which Class Members have been overcharged for their purchases of gabapentin. At the class certification stage, plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class. Instead, they need only show that a "viable method" is available to prove damages on a class-wide basis. *In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 268 (D.D.C.2002); *see also Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.,* 100 Fed. App'x 296, 299–300 (5th Cir.2004) (plaintiffs must have a "reliable method" capable of measuring antitrust damages).

Here, Plaintiff's expert, Dr. French, has identified and employed a "before-during-after" method to calculate damages attributable to Warner–Lambert's alleged anticompetitive scheme. First, Dr. French determined the rate at which generics were substituted for Neurontin by month after generic entry. He then shifted that rate back in time to August 2000 (the date Plaintiffs contend generics would have entered the market absent Warner–Lambert's challenged conduct) to determine the total units of Neurontin that would have been sold as generic in a "but for" world. Next, to assess price, Dr. French subtracted the price of gabapentin that would have prevailed "but for" Warner–Lambert's anticompetitive conduct from the price of gabapentin that actually was charged. Finally, Dr. French multiplied the total units that would have been generic by the differential between the actual and "but for" price to arrive at the total class overcharge. To make these calculations, Dr. French relied on the pricing and sales data produced by Warner–Lambert and the generic manufacturers as well as industry-wide market share data—evidence that is common to the class.

 **\*10** As noted by Plaintiffs, Dr. French's proposed methodology is "judicially recognized" and "commonly accepted." *K–Dur,* 2008 WL 2699390, at \*19–20. Indeed, it has been found to satisfy the predominance requirement in numerous analogous delayed generic entry cases. *See Wellbutrin,* 2008 U.S. Dist. LEXIS 36719, at \*37–38 (finding that Dr. French's "before-andafter" damages methodology satisfied the predominance requirement); *Relafen,* 218 F.R.D. at 344 (same); *Cardizem,* 200 F.R.D. at 323 (same); *see also Meijer,* 246 F.R.D. at 307–12 (approving use of benchmark method); *Buspirone,* 210 F.R.D. at 58 (same).

Nonetheless, Warner–Lambert argues that this damages model is inappropriate because it aggregates damages and fails to account for individual issues concerning, *inter alia,* the extent to which each Class Member would have switched to a generic in the but-for world; the extent to which Warner–Lambert's off-label promotional activities inflated demand for Neurontin, and thereby affected substitution rates; the extent of any generic bypass; and the extent to which Class Members may have benefitted from delayed generic entry. Warner–Lambert presses that a proper damages model would "pair" each Class Member's purchases of Neurontin with its purchases of generic gabapentin, and demonstrate damages for each Class Member individually.

Warner–Lambert is, in essence, arguing for a level of individualized damages calculation that is not required at this stage of the litigation. As noted above, at class certification, Plaintiffs need only demonstrate that they have a "viable method" for calculating damages that is common to the class, not that their method is the best or most accurate. *Tricor,* 252 F.R.D. at 231; *Nifedipine,* 246 F.R.D. at 369. Plaintiffs have met this burden: they have offered a reasonable, judicially recognized methodology for calculating damages and have shown that the data needed to make these calculations is available and common to the class. Moreover, despite Warner–Lambert's claims to the contrary, the use of an aggregate approach to measure class-wide damages may be appropriate. *See* 2 Newberg on Class Actions, Chapter 10, § 10.05 (3d ed.1992) (noting that "[a]ggregate computation of class monetary relief is lawful and proper"); *NASDAQ,* 169 F.R.D. at 525 (observing that "aggregate judgments have been widely used in antitrust, securities, and other class actions"); *Nifedipine,* 246 F.R.D. at 312 (approving aggregate damages methodology); *Cardizem,* 200 F.R.D. at 324 (same). Further, to the extent individual issues need to be accounted for, it is well-established that such individualized issues with respect to damages calculations do not defeat Rule 23(b)(3) certification if the predominance requirement is otherwise met. *Bogosian,* 561 F.2d at 456; *see also In re General Motors,* 55 F.3d 768, 817 (3d Cir.1995) ("because separate proceedings can, if necessary be held on individualized issues such as damages ... such individual questions do not ordinarily preclude the use of the class action device"); *Chiang v. Veneman,* 385 F.3d 256, 273 (3d Cir.2004) (same). [25]

**\*11** Finally, Warner–Lambert's "pairing" formulation of damages [26] raises a question best left for the merits stage of the litigation. While the parties agree that overcharges are an appropriate measure of damages here, the parties disagree as to the volume of purchases on which the Class can properly claim to have paid overcharges. Plaintiffs seek to compute overcharges on all units of Neurontin actually purchased at monopoly prices—damages they argue reflect the societal harm of the alleged antitrust violation, rather than the net loss to claimants. Warner–Lambert would calculate overcharges only on purchases that Class Members would have made absent its challenged conduct. Warner–Lambert argues that Plaintiffs' method inflates Class Members' damages, while Plaintiffs argue that Warner–Lambert's method improperly allows Warner–Lambert to keep a portion of its ill-gotten gains. This dispute implicates broader legal theories and principles of recovery, deterrence, and equity, and does not need to be resolved at this stage of the litigation.

*See NASDAQ,* 169 F.R.D. at 521. It does not defeat class certification because Plaintiffs have offered a viable common method for calculating damages, and that is all that is required at this stage.

In summary, the Court concludes that Plaintiffs have successfully demonstrated that generalized evidence exists on which Plaintiffs could prove each element of their antitrust claim on a simultaneous, class-wide basis. The Court therefore finds that common questions predominate over individual ones.

### 2. Superiority

Finally, the Court must consider whether the class action device is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). This "requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative methods of adjudication." *Prudential,* 148 F.3d at 316. It is meant to ensure that resolution by class action will "achieve economies of time, effort, and expense, and promote ... uniformity of decision without sacrificing procedural fairness or bringing about other undesirable results." *Amchem,* 521 U.S. at 615 (quoting Advisory Committee's Note on Fed.R.Civ.P. 23).

The Court finds that the superiority requirement is satisfied here. This action involves the resolution of numerous complex issues of law and fact common to all putative class members. Denying certification would require each direct purchaser to file suit individually to prove the same operative facts in scores of separate trials at the expense of judicial economy and litigation costs for all parties. *See, e.g., In re Carbon Black Antitrust Litig.,* No. 03–10191, 2005 U.S. Dist. LEXIS 660 (D.Mass. Jan. 18, 2005) ("[a]ntitrust class actions are expensive endeavors and joining forces with other similarly situated plaintiffs is often the only way to effectuate a case"). Moreover, litigating all claims together avoids the risk of inconsistent rulings regarding, for example, Warner–Lambert's liability or the appropriate benchmark for direct purchasers' damages. "Resolution by class action would instead promote uniform treatment of class members—similarly situated direct purchasers who allege similar injuries resulting from the same conduct." *Relafen,* 218 F.R.D. at 347; *accord Meijer,* 246 F.R.D. at 313 ("The class action mechanism ... avoids the specter of inconsistent adjudications."). As class certification provides an opportunity for the efficient resolution of the entire class

in a single forum, the Court finds that the class action mechanism is a superior litigation approach. [27]

### III. *CONCLUSION*

**\*12**  For the reasons discussed above, the Court finds that all of the requirements of Rule 23(a) and Rule 23(b)(3) are satisfied. Accordingly, the Court will grant Plaintiffs' motion for class certification. An appropriate Order will issue.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 286118

---

### Footnotes

1   Warner–Lambert does not oppose the Court's consideration of Dr. French's merits report, (9/13/10 Hearing Tr. 34), and, in light of the Third Circuit's directives in *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305 (3d Cir.2008), the Court has determined that it is appropriate to consider the report at this stage, only as it related to the certification of a class.

2   The facts and allegations underlying this consolidated action were discussed extensively in this Court's Opinion dated August 27, 2009 denying Warner–Lambert's motion to dismiss. *In re Neurontin Antitrust Litig.,* No. 02–1390, 2009 U.S. Dist. LEXIS 77475, 2009 WL 2751029 (D.N.J. Aug. 27, 2009). The Court presumes familiarity with that Opinion, as well as with the abbreviations and acronyms used therein.

3   Warner–Lambert Company LLC, formerly Warner–Lambert Company, became a wholly-owned subsidiary of Pfizer Inc. on or about June 19, 2000.

4   After briefing on their Motion for Class Certification was complete, Plaintiffs requested the right to amend the class definition proposed therein. [Docket # 301]. Specifically, Plaintiffs proposed that the starting date for the class period be revised from July 16, 2000 to December 11, 2002, and the ending date be revised from September 25, 2009 to August 31, 2008, so to conform to the record evidence as it developed after briefing was complete. Warner–Lambert does not oppose this request. [9/13/10 Hearing Tr. 24.] Because "Plaintiffs are entitled to define the class period as broadly as their evidence supports," *In re Hydrogen Peroxide Antitrust Litig.,* 240 F.R.D. 163, 177 (E.D.Pa.2007), *rev'd on other grounds,* 552 F.3d 305 (3d Cir.2008), for purposes of this Motion, the Court will consider Plaintiffs' amended class definition. *See also* 7 Newberg on Class Actions § 22:76 (4th ed.) ("Courts have either redefined the classes themselves or permitted the plaintiffs to redefine the classes.").

5   By Order dated March 14, 2003 [Docket # 27], this Court appointed interim Liaison Counsel, Co–Lead Counsel, and an Executive Committee ("Interim Class Counsel"). Plaintiffs are seeking to have these same firms, in the same leadership structure, appointed as Class Counsel under Federal Rule of Civil Procedure 23(g). Plaintiffs also seek the appointment of Berger & Montague, P.C. as additional Class Counsel.

6   Notably, courts in analogous cases-similarly alleging that a drug manufacturer engaged in anticompetitive conduct to prevent generic drugs from entering the market-certified classes similar in size and composition to the one proposed here. *See In re Buspirone Patent & Antitrust Litig.,* 210 F.R.D. 43, 57 (S.D.N.Y.2002) (certifying class of approximately 100 direct purchasers in delayed generic entry case); *In re Nifedipine Antitrust Litig.,* 246 F.R.D. 365, 368–69 (D.D.C.2007) (certifying class of approximately 85 direct purchasers in delayed generic entry case); *In re K–Dur Antitrust Litig.,* No. 01–1652, 2008 WL 2699390, at *4 (D.N.J. Apr.14, 2008) (certifying class of approximately 45 direct purchasers in delayed generic entry case); *Meijer, Inc. v. Warner Chilcott Holdings Co. III,* 246 F.R.D. 293, 300 (D.D.C.2007) (certifying class of approximately 30 direct purchasers in delayed generic entry case).

    Warner–Lambert has argued that the decisions in these similar delayed generic entry cases have limited precedential value, as they precede the Third Circuit's decision in Hydrogen Peroxide. The Court has

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 162 of 261
PageID: 45100
In re Neurontin Antitrust Litigation, Not Reported in F.Supp.2d (2011)

conducted a thorough, independent analysis of the facts and holdings of these analogous cases. While many recite standards that Hydrogen Peroxide has since clarified, the courts nonetheless conducted the "rigorous analysis" of the proofs that *Hydrogen Peroxide* demands. In this way, these cases remain persuasive authority, and the Court has considered them as such.

7    This conclusion is consistent with the findings of other courts in analogous delayed generic entry cases. *See Meijer,* 246 F.R.D. at 300 ("[Plaintiffs'] claims raise numerous common issues of fact and law, including ... whether Defendants' activities have substantially affected interstate commerce ... whether, and to what extent, Defendants' conduct caused direct purchasers to pay more for Ovcon 35 Products than they would have absent Defendants' conduct; and ... the appropriate measure of damages."); *In re Relafen Antitrust Litig.,* 218 F.R.D. 337, 342 (D.Mass.2003) ("The factual questions common to the class members' claims include whether SmithKline engaged in the alleged anticompetitive conduct and whether and to what extent this conduct resulted in overcharges.... The legal questions common to the class members' clams include whether SmithKline's conduct violated Section 2 of the Sherman Act."); *Buspirone,* 210 F.R.D. at 57 ("There are also numerous common questions of fact and law at issue among the members of the proposed class concerning whether BMS engaged in the anticompetitive conduct alleged, the scope of this conduct, and whether this conduct resulted in any overcharges in the market for buspirone.").

8    This determination is consistent with courts' findings in analogous delayed generic entry cases. *See Buspirone,* 210 F.R.D. at 57 (finding that the typicality requirment was satisfied. where plaintiff "alleges that it was injured in the same general way and by the same general course of conduct that allegedly injured other members of the class."); *Meijer,* 246 F.R.D. at 300 ("Each plaintiff made some purchases of [the drug] during the class period," thus, "the Court concludes that Plaintiffs claims arise from the same course of events that led to, and rely on the same legal arguments as, the claims of absent class members."); *Nifedipine,* 246 F.R.D. at 369 (finding the typicality requirement satisfied where "[e]ach potential class member's claim arises from the same alleged conspiracy ..."); *Relafen,* 218 F.R.D. at 343 (finding the typicality requirement satisfied where plaintiff bases claims on the same "core pattern of alleged anti-competitive conduct" giving rise to all class members' claims.").

9    Additionally, the Named Plaintiffs—Louisiana Wholesale and Meijer—have been found to be adequate class representatives in multiple prior analogous delayed entry cases. *See Ovcon,* 246 F.R.D. at 302–05 (finding Meijer and Louisiana Wholesale are adequate class representatives); *In re Tricor Antitrust Litig.,* 252 F.R.D. 213, 226–27 (D.Del.2008) (same); *Relafen,* 218 F.R.D. at 343 (same); *Nifedipine,* 246 F.R.D. at 369 (finding Meijer adequate); *Wellbutrin,* 2008 WL 1946848, at *3–7 (same); *K–Dur,* 2008 WL 2699390, at *6–11 (finding Louisiana Wholesale adequate); *Buspirone,* 210 F.R.D. at 57–58 (same); *Cardizem,* 200 F.R.D. at 305–06 (same).

10   In light of Interim Class Counsel's experience in these types of cases and capable prosecution of this action to date, and there being no opposition to their request for appointment as counsel, the Court will appoint the same firms, in the same leadership structure, as Class Counsel under Federal Rule of Civil Procedure 23(g). The Court will also appoint Berger & Montague, P.C. as additional Class Counsel.

11   As set forth in their Trial Plan, Plaintiffs' common evidence of Warner–Lambert's monopoly power will consist of, *inter alia,* Warner–Lambert's pricing records for Neurontin; the pricing records of Warner–Lambert's generic subsidiary for generic gabapentin; pricing data from generic competitors; academic studies regarding the market effects of generic competition; government studies regarding the same; and facts regarding what happened to prices and sales after the generic gabapentin entered the market. Plaintiffs will also rely on the expert testimony of Dr. Keith Leffler, who will testify that Warner–Lambert possessed market power in a well-defined relevant market consisting of Neurontin and its generic equivalents.

12   Warner–Lambert makes much of the fact that the price of Neurontin increased after the entry of generic gabapentin to the market. However, as Plaintiffs argue, this fact is irrelevant to Plaintiffs' theory of injury: the overcharge pursued by Plaintiffs is the difference in price between Neurontin and the generics that dominated the market soon after generic entry, not the difference between the prices of Neurontin pre- and post-generic entry. In other words, Plaintiffs' overcharge analysis does not depend on a finding that brand prices decreased

after generic entry. *Accord Meijer,* 246 F.R.D. at 310 ("the effect of generic entry on the price of [the brand] appears to be irrelevant to Plaintiffs' ability to demonstrate proof of impact through common evidence").

13    For example, government research shows that generic equivalents are initially priced between 20 and 30% lower than their branded counterparts, and that the generic price falls substantially as additional generic competitors enter. Pls. Proposed Findings of Fact B(1)(a) (citing French Aff. 27 (collecting sources)) [Docket # 348].

14    For example, John Marion, Pfizer's Neurontin World Wide Team Leader, stated in a Declaration that the price of gabapentin subsequent to generic entry would be "significantly reduced over time ... and that the price would continue to decrease with the entry of each new generic manufacturer." Pls. Proposed Findings of Fact B(1)(c) (citing Decl. of John Marino) [Docket # 348].

15    For example, in October 2004, generic gabapentin sold, on average, at a 37% discount off of the price of Neurontin 300 mg capsules. By December 2008, the generic 300 mg capsule price had fallen to a 95% discount off of Neurontin's pre-generic entry price. Pls. Proposed Findings of Fact B(1)(d) (citing French Aff. 45) [Docket No. 348].

16    *See, e.g., Relafen,* 346 F.Supp.2d at 343 (finding predominance requirement met where direct purchasers relied on "governmental and academic studies, projections and analyses described in [defendant's] and its competitors' internal documents, and price and sales data for Relafen and its generic equivalents"); *Wellbutrin,* 2008 WL 1946848, at *8 (approving Dr. French's use of literature examining impact of generic entry into pharmaceutical market and analysis of public data collected on dispensation and purchases of prescription drugs to prove common impact); *Cardizem,* 200 F.R.D. at 308 (approving the use of academic studies, defendants' internal sales documents, and marketplace sales data, to prove common impact); *Nifedipine,* 246 F.R.D. at 370 (noting that plaintiffs' expert explained that common impact could be proved by studies of generic entry on the pharmaceutical industry, evidence obtained from defendants, and publicly available sales data, and concluding that "plaintiffs have offered a sufficient colorable method of proving class-wide impact with common evidence as to the issue of causation"); *Tricor,* 252 F.R.D. at 229 (same); *Meijer,* 246 F.R.D. at 308 (same); *K–Dur,* 2008 WL 2669390, at *15 (same).

17    For example, government and academic research shows that, due to institutional features of the pharmaceutical marketplace—including state generic substitution laws and third-party payor requirements—when less expensive generic equivalents are sold, they are rapidly substituted for their branded counterparts. Pls. Proposed Findings of Fact B(2)(b)-(c) (citing French Aff. 27 (collecting sources)) [Docket # 348].

18    For example, one of Warner–Lambert's documents notes that the generic would "make an immediate and substantial incursion into Warner–Lambert's exclusive market share." Pl. Proposed Findings of Fact B(2)(d) (citing Marino Decl. 17) [Docket # 348].

19    For example, by December 2004, branded Neurontin sales accounted for only 20% of the total sales for gabapentin 300 mg capsules, while generic gabapentin accounted for 80%. By December 2008, branded Neurontin sales accounted for only 2% of 300 mg sales by volume. Pl. Proposed Findings of Fact B(2)(e) (citing French Aff. 44) [Docket # 348].

20    Pl. Proposed Findings of Fact B(3)(a)-(b) (citing French Reb. 12 and Hughes Report 33) [Docket # 348].

21    *See* cases cited *supra* note 16.

22    This revision of the Class Definition follows analogous precedent. *See K–Dur,* 2008 WL 2699390, at *1, *18 ("excluded are persons or entities who have neither purchased generic versions of [the branded product], nor obtained increased discounts on [the branded product], after the introduction of generic versions"); *Meijer,* 246 F.R.D. at 310 n. 17 ("if the evidence ultimately suggests that a putative class member has neither purchased a generic version of [the drug] nor received a discount on [the] branded [product] since the entry of [the] generic [product], the Court can accommodate by amending the class definition to exclude such putative class members"); *see also Wellbutrin,* 2008 U.S. Dist. LEXIS 36719, at *41–43 (referring to court's ability to remove any possible uninjured class members who did not buy generic prior to trial).

23    The parties dispute whether Plaintiffs must, at this stage, show that their adduced common proof will demonstrate injury to "every" Class Member. Plaintiffs highlight cases indicating that common proof of

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 164 of 261
In re Neurontin Antitrust Litigation, Not Reported in F.Supp.2d (2011)
PageID: 45102

"widespread injury" to the Class is sufficient. *See, e.g., Meijer,* 246 F.R.D. at 309–10 ("courts have routinely observed that the inability to show injury to a few does not defeat class certification where the plaintiffs can show widespread injury to the class"); *K–Dur,* 2008 WL 2699390, at *18 (same); *Cardizem,* 200 F.R.D. at 307 ("Plaintiffs are not required to show that fact of injury actually exists for each class member"); *see also Kohen v. Pac. Inv. Mgmt. Co.,* 571 F.3d 672, 677 (7th Cir.2009) ("a class will often include persons who have not been injured by the defendant's conduct.... Such a possibility or indeed inevitability does not preclude class certification.") Warner–Lambert argues that *Hydrogen Peroxide* changed this legal landscape, and requires Plaintiffs to show that impact can be established for every class member through common proof. The Court notes, however, that the passage from *Hydrogen Peroxide* that Warner–Lambert cites for this proposition relates to Plaintiffs' burden at the merits stage of the litigation: "to prevail on the merits, every class member must prove at least some antitrust impact resulting from the alleged violation." 552 F.3d at 311 (emphasis added). Regardless, the definitional change proposed by Plaintiffs obviates the need to resolve this question. *See Flast v. Cohen,* 392 U.S. 83, 96, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (courts should not decide questions that have been mooted by subsequent developments).

24    Any arguments regarding the variable rates at which Class Members substituted generic gabapentin for Neurontin relate to the quantum of injury, rather than the fact of injury, and therefore do not defeat predominance with respect to the impact element. *See Zenith Radio Corp.,* 395 U.S. at 114 n. 9 (the "burden of proving the fact of damage ... is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damages").

Likewise, Warner–Lambert's argument that Dr. French's damages model must account for Warner–Lambert's alleged off-labeling marketing conduct also goes to quantum of damages, not fact of damages. This argument relates to the volume of purchases on which the Class could properly claim to have paid overcharges, not to whether the Class in fact suffered injury. It therefore does not defeat predominance with respect to the impact element of Plaintiffs' claim.

25    In any event, Dr. French has proposed reasonable methods for accounting for generic bypass and off-label marketing.

26    Warner–Lambert suggests that a proper damages model would "pair" each Class Member's purchases of Neurontin with its purchases of generic gabapentin, resulting in an individual damages determination.

27    This finding of superiority is consistent with the findings of other courts in analogous delayed generic entry cases. *See In re Nifedipine,* 246 F.R.D. 371–72; *Meijer,* 246 F.R.D. at 313; *Relafen,* 218 F.R.D. at 346; *Wellbutrin,* 2008 WL 1946848, at *9–10.

---

**End of Document**                                        © 2021 Thomson Reuters. No claim to original U.S. Government Works.

10

In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation, Not Reported in Fed....

2017-2 Trade Cases P 80,170

2017 WL 4621777
United States District Court, D. Massachusetts.

IN RE SOLODYN (MINOCYCLINE
HYDROCHLORIDE) ANTITRUST LITIGATION

Civil Action No. 14-md-02503
|
Filed 10/16/2017

**MEMORANDUM AND ORDER**

Denise J. Casper, United States District Judge

**I. Introduction**

 *1   This is a putative class action in which the Direct Purchaser Plaintiffs ("DPPs" or "direct purchasers") allege that Defendants Medicis Pharmaceutical Corporation ("Medicis"), Impax Laboratories, Inc. ("Impax"), Sandoz Inc. ("Sandoz") and Lupin Limited and Lupin Pharmaceuticals, Inc. (collectively, "Lupin") (collectively, "Defendants"), violated Section 1 of the Sherman Act, 15 U.S.C. § 1. D. 91. Additionally, putative class representatives of End-Payor Plaintiffs ("EPPs" or "end-payors") allege that Defendants have violated various state laws. D. 92. EPPs have moved for class certification, D. 569, and DPPs have also moved for class certification, D. 574. For the reasons set forth below, the Court ALLOWS DPPs' motion for class certification under Fed. R. Civ. P. 23(b)(3) and ALLOWS EPPs' motion for class certification under Fed. R. Civ. P. 23(b)(3), but DENIES EPPs' motion for certification under Fed. R. Civ. P. 23(b)(2).

**II. Factual Background**

Solodyn is a drug—a minocycline hydrochloride extended release tablet—that treats inflammatory lesions resulting from acne in patients age twelve and older, and is manufactured, marketed and sold by Medicis. See, e.g., D. 570 at 11; D. 575 at 10; D. 576-1 ¶ 6; D. 577 ¶ 7; D. 611 at 6. Medicis received a patent on the brand Solodyn from the FDA in 1999, and in 2006, the FDA approved Medicis's New Drug Application ("NDA") for three dosages of Solodyn: 45mg, 90mg and 135mg ("Legacy Strengths"). D. 570 at 11; D. 576-2 ¶ 14; D. 611 at 6. In October 2007, Impax submitted an Abbreviated New Drug Application ("ANDA") to the FDA, seeking to market generic versions of Legacy Strength Solodyn. D. 570 at 11. On November 26, 2008, Medicis and Impax entered into two agreements, by which Impax agreed

to abandon its challenge to Medicis's patent, and Medicis paid Impax approximately $40 million. D. 570 at 12; D. 575 at 11. On February 3, 2009, Impax received FDA approval on its ANDA. D. 570 at 12; D. 575 at 13. Impax did not begin selling generic Solodyn until November 2011. D. 570 at 13; D. 575 at 13.

In the interim, Teva, Sandoz and Mylan launched generic Solodyn "at risk"—without having received FDA approval—for brief periods. D. 570 at 12; D. 575 at 13; D. 598 at 7; D. 611 at 7. "[W]ithin days" of launching, each generic manufacturer entered into an agreement with Medicis and stopped selling generic Solodyn. D. 575 at 13; see D. 570 at 12; D. 598 at 7; D. 611 at 7. The generic manufacturers then re-launched sales of generic Legacy Strength Solodyn in November 2011. D. 570 at 13; D. 575 at 14.

Between March 2009, when Teva launched its generic Solodyn at-risk, and November 2011, Medicis also launched a series of promotion programs including co-pay card and coupon programs, in which patients participated "at high rates." D. 598 at 8. In 2009 and 2010, Medicis launched sales of additional dosages of Solodyn: 55mg, 65mg, 80mg, 105mg and 115mg ("Add-On Strengths"). D. 575 at 16. Medicis ceased sale of Legacy Strengths in July 2011. Id. According to their respective agreements with Medicis, generic manufacturers will delay launch of generic Add-On Strength Solodyn until at least February 2018. D. 570 at 12.

**III. Procedural History**

 *2   In July 2013, DPPs, direct purchasers of Solodyn, brought the first antitrust suit against Defendants in the United States District Court for the Eastern District of Pennsylvania. Rochester Drug Co-Operative, Inc. v. Medicis Pharm. Corp., No. 2:13-cv-04270-JCJ (E.D. Pa. July 23, 2013). Shortly thereafter, various EPPs, consumers and third-party payors who indirectly purchased, paid for or provided reimbursement for Solodyn other than for resale, filed suit. See D. 2. On February 25, 2014, the Judicial Panel on Multidistrict Litigation ordered all Solodyn antitrust actions centralized and transferred those and two subsequent actions to this Court. D. 2; D. 153; D. 156. The DPPs and EPPs filed their respective consolidated amended complaints on September 15, 2014. D. 91; D. 92. On August 14, 2015, this Court allowed in part and denied in part Defendants' motion to dismiss, D. 110. D. 184; D. 203. EPPs have now filed a motion for class certification, D. 569. DPPs have also filed a motion for class certification, D. 574. The Court heard the parties on

2017-2 Trade Cases P 80,170

the pending motions and took the matters under advisement. D. 645.

## IV. Discussion

### A. Burden of Proof and Standard of Review

A class action may be certified only if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed R. Civ. P. 23(a); In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 18 (1st Cir. 2008). Where, as here, both putative classes have moved to certify the class under Fed. R. Civ. P. 23(b)(3), the Court must also determine whether "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); New Motor Vehicles, 522 F.3d at 18-19. "[T]he district court must undertake a 'rigorous analysis' to determine whether plaintiffs me[e]t the four threshold requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) and Rule 23(b)(3)'s two additional prerequisites." In re Nexium Antitrust Litig., 777 F.3d 9, 17 (1st Cir. 2015) ("Nexium III")[1] (quoting Comcast Corp. v. Behrand, 569 U.S. 27, 33, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013)).

EPPs also move for class certification under Rule 23(b)(2). D. 570 at 28. To certify the class under Rule 23(b)(2), the Court must determine whether defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); see New Motor Vehicles, 522 F.3d at 12 n.8. This form of class certification "ordinarily is used when broad, class-wide injunctive or declaratory relief is appropriate." McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 427 (1st Cir. 2007). It "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendment; see DeRosa v. Mass. Bay Commuter Rail Co., 694 F.Supp.2d 87, 95 (D. Mass. 2010).

**\*3** The plaintiffs bear the burden of showing that all the prerequisites for a class action have been met. Makuc

v. Am. Honda Motor Co., Inc., 835 F.2d 389, 394 (1st Cir. 1987). Plaintiffs "need not make that showing to a degree of absolute certainty. It is sufficient if each disputed requirement has been proven by a preponderance of the evidence." Nexium III, 777 F.3d at 27 (quoting Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 811 (7th Cir. 2012)) (internal quotation marks omitted). The "rigorous analysis" required under Rule 23(b) does not "require raising the bar for plaintiffs higher than they would have to meet in individual suits." Id. at 20 (emphasis in original). "Once plaintiffs have made their initial showing, defendants have the burden of producing sufficient evidence to rebut the plaintiff's showing." Id. at 27. The Court will address each putative class in turn.

### B. The Direct Purchasers

DPPs allege that the Defendants have unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by perpetuating reverse-payment settlements. D. 91. For such claims, guided by FTC v. Actavis, Inc., 570 U.S. 136, 133 S.Ct. 2223, 186 L.Ed.2d 343 (2013), courts apply the "rule-of-reason" analysis to determine "whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition," Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 343, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). The rule-of-reason analysis is a burden-shifting test: first, the plaintiff must show "that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market"; if shown, the defendant must then show "that the agreement was formed for legitimate business purposes which outweigh any anti-competitive effects"; and if that is shown, the plaintiff must then show "that the legitimate ends of the agreement could have been accomplished through less restrictive alternatives." Addamax Corp. v. Open Software Found., Inc., 888 F.Supp. 274, 279 (D. Mass. 1995) (emphasis in original).

DPPs seek to certify a class with forty-eight members,[2] defined as follows:

> All persons or entities in the United States and its territories, including Puerto Rico, who purchased (a) 45mg, 55mg, 65mg, 80mg, 90mg, 105mg, 115mg, and/or 135mg brand or generic Solodyn tablets directly from any Defendant or other manufacturer at

2017-2 Trade Cases P 80,170

any time during the period July 23, 2009 through and including November 25, 2012 and/or (b) 55mg, 65mg, 80mg, 105mg, and/or 115mg brand Solodyn tablets directly from Medicis at any time from November 26, 2012 until November 30, 2015. Excluded from the Class are Defendants, and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal government entities.

D. 575 at 9.[3] The DPPs argue that the putative class meets all of the required factors established by Rule 23. D. 575 at 19-31. The Defendants do not dispute that the DPPs meet Rule 23's requirements of typicality, commonality and adequate representation.[4] See D. 598; D. 611. Rather, Defendants argue only that this putative class is not "so numerous that joinder would be impractical," Fed. R. Civ. P. 23(a)(1), and that even if numerosity is satisfied, the Plaintiffs have failed to show that issues common to the class predominate over individual questions, as required by Rule 23(b)(3). D. 611 at 10-28. The Court thus focuses on those factors in dispute.

### 1. Numerosity Is Satisfied Here

**\*4**  To certify a class action, the class must b] so numerous that joinder of all members would be "impracticable." Fed. R. Civ. P. 23(a)(1). " 'Impracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." Advert. Specialty Nat. Ass'n v. FTC, 238 F.2d 108, 119 (1st Cir. 1956). "No minimum number of plaintiffs is required" to demonstrate impracticability, "but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Garcia-Rubiera v. Calderón, 570 F.3d 443, 460 (1st Cir. 2009) (quoting Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001)); see In re Relafen Antitrust Litig., 218 F.R.D. 337, 342 (D. Mass. 2003). The Court may also take into account such "subjective factors" as the "geographic location of proposed class members, the nature of the action, and matters of judicial economy." Nexium II, 296 F.R.D. at 52. Impracticability is a matter of discretion for the Court, see Advert. Specialty, 238 F.2d at 119, and courts have certified smaller classes in generic suppression cases where judicial economy favors

proceeding as a class action, see, e.g., Nexium II, 296 F.R.D. at 53 (certifying class of twenty-four or twenty-nine); Dale Elecs., Inc. v. R.C.L. Elecs., Inc., 53 F.R.D. 531, 535-36 (D.N.H. 1971) (certifying class of thirteen).

DPPs propose a class of forty-eight members and argue joinder is impracticable due to both the size of the class and the geographic dispersion of the members. D. 575 at 19-20. Defendants argue that DPPs' calculations of class membership at forty-eight members does not account for corporate ownership structure, which—by limiting class members to their common parent—results in a class of less than forty, namely thirty-nine members. D. 598 at 25-26; D. 598-1 at 66-156 ("Dr. Johnson Report") ¶ 35; D. 611 at 25. For one example, Defendants point to a press release stating that HD Smith, a putative class member, acquired Valley Wholesale Drug, another putative class member, in 2012. Dr. Johnson Report ¶ 35 n.48. Additionally, Defendants argue that the class should also exclude "five purchasers who have manifested, through filing individual lawsuits, their intention to opt out of the proposed class," resulting in a direct purchasers class that is "more appropriately viewed as having 34 members." D. 598 at 26; D. 611 at 26.

The Court rejects Defendants' consolidation of class members based upon corporate structure. Defendants have provided no legal support for their argument that class members with common corporate parents should not be considered distinct entities for class certification purposes. On the other hand, DPPs argue that separately incorporated companies are distinct entities that should be treated as separate class members to vindicate their own antitrust injuries. D. 631 at 24 (citing Nichols & Co. v. Sec'y of Agric., 131 F.2d 651, 655 (1st Cir. 1942), vacated on rehr'g on other grounds, 136 F.2d 503 (1943)). They argue that here, the putative class members are separately incorporated companies that each suffered injury. D. 631 at 24. For example, using one but-for scenario prepared by DPPs' expert—and the jury will ultimately decide which but-for scenario is appropriate, as is explained in further detail below—Valley Wholesale Drug suffered $95,600 in overcharges and H.D. Smith Wholesale suffered $15,147,800 in overcharges. D. 632 at 59. Dr. Leitzinger identified putative class members by using transactional sales data, in which each member appeared as separate direct purchasers. D. 632 ¶ 30. Other courts have held that absent evidence that the putative class is attempting to inflate the number of plaintiffs by including corporate subsidiaries, "subsidiaries should be considered as potential class members to vindicate their own antitrust injury." Am. Sales Co., LLC

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 169 of 261
PageID: 45107
In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation, Not Reported in Fed....

2017-2 Trade Cases P 80,170

v. Pfizer, Inc., No. 2:14-cv-361, 2017 WL 3669604, at *8, 2017 U.S. Dist. LEXIS 137222, at *25 (E.D. Va. July 28, 2017). The Court finds this analysis persuasive, particularly in light of the DPPs' expert's showing of individual injury sustained by each member of the class. The Court thus holds that their corporate relationship does not defeat their status as individual class members here.

*5  The Court also declines to adopt Defendants' position that five purchasers' filing separate complaints compels the conclusion that they would opt-out of the class, if certified. Regardless, even if these putative class members ultimately do opt out of the class, the remaining class of forty-three would still satisfy the numerosity requirement. After all, "[n]umerosity is established if the size of a proposed class, even if inexactly determined, is sufficiently large as to make joinder impracticable." Overka v. Am. Airlines, Inc., 265 F.R.D. 14, 17 (D. Mass. 2010) (quoting Relafen, 221 F.R.D. at 266) (internal quotation marks omitted). The size of this class alone demonstrates that joinder would be impracticable here.

Moreover, the "subjective" factors in the numerosity inquiry weigh in favor of certifying the DPP class, showing that joinder, even if not impossible, is impracticable here, even where the class includes corporate entities, certain of which share common corporate parents. Defendants rely upon In re Modafinil Antitrust Litig., 837 F.3d 238 (3d Cir. 2016) and King Drug Co. of Florence, Inc. v. Cephalon, Inc., No. 2:06-cv-1797, 2017 WL 3705715, 2017 U.S. Dist. LEXIS 137601 (E.D. Pa. Aug. 28, 2017), in support of their argument that joinder would not be impracticable here. D. 611 at 28; D. 638. Neither case compels the conclusion Defendants seek. In Modafinil, the Third Circuit focused on the impracticability inquiry regarding a putative class consisting of far less than forty members, stating that under those circumstances, the inquiry is "particularly rigorous." Modafinil, 837 F.3d at 250. In King Drug, the putative class consisted of only twenty-two to twenty-four direct purchasers, and the small class size played a key part of the court's analysis of the "subjective" impracticability factors. King Drug, 2017 WL 3705715, at *5-12, 2017 U.S. Dist. LEXIS 137601, at *23-40. [5]

DPPs have demonstrated that joinder would be impracticable here. First, geographic dispersion suggests joinder is impracticable, even when putative class members are corporate entities. See Lidoderm, 2017 WL 679367, at *13-14, 2017 U.S. Dist. LEXIS 24097, at *72; Am. Sales Co., 2017 WL 3669604, at *10, 2017 U.S. Dist. LEXIS 137222 at *31; Nexium II, 296 F.R.D. at 52; see also 5-23 James

Wm. Moore et al., Moore's Federal Practice § 23.22(1)(a) (3d ed. 2017). As DPPs have shown, putative class members are based throughout the country. D. 576-1 at 53; D. 632 at 54. Defendants do not dispute that the proposed class is geographically dispersed. See D. 611 at 27.

Second, judicial economy and the ability and motivation to litigate as joined plaintiffs—the two factors of "primary importance" in Modafinil, 837 F.3d at 253—weigh in favor of class certification here. Here, a class action serves judicial economy because all putative class members seek damages stemming from the same allegedly illegal activity. See Am. Sales Co., 2017 WL 3669604, at *9-10, 2017 U.S. Dist. LEXIS 137222 at *30; Wilson, 2017 WL 56064, at *6, 2017 U.S. Dist. LEXIS 572, at *15; Nexium II, 296 F.R.D. at 53. Even accepting the Third Circuit's definition of judicial economy—focused on "the administrative burden that multiple or aggregate claims place upon the courts," which "primarily involves considerations of docket control," Modafinil, 837 F.3d at 254, 257—the factor weighs in DPPs' favor due to the difficulty of coordinating attorneys, scheduling and docketing for forty-eight clients. See Wilson, 2017 WL 56064, at *5-6, 2017 U.S. Dist. LEXIS 572, at *14-15.

*6  Finally, the Court is persuaded that the ability and motivation of these putative class members to litigate as joined plaintiffs supports class certification. DPPs argue that Defendants' assertions that all direct purchasers here would join in a common suit "ignore the formidable business realities and legal hurdles standing in the way of such a strategy." D. 631 at 26. The competitive relationship among some class members serves "as a significant business obstacle" to joinder. D. 631 at 26; see Am. Sales Co., 2017 WL 3669604, at *10, 2017 U.S. Dist. LEXIS 137222, at *31. To illustrate this, DPPs conducted an empirical analysis of approximately 20,000 federal case filings from the last fifteen years involving one or more members of this class, finding that in only five cases—were these members plaintiffs in pharmaceutical antitrust cases that were not class actions. [6] DPPs explain that such cases are so infrequent because the nature of the litigation makes ascertaining damages difficult at the outset and many cases mirror this one, where DPPs have demonstrated that approximately half of the putative class members have negative value claims. D. 631 at 27; see Lidoderm, 2017 WL 679367, at *13-14, 2017 U.S. Dist. LEXIS 24097, at *72; Applegate v. Formed Fiber Techs., LLC, No. 2:10-cv-00473-GZS, 2012 WL 3065542, at *5 n.6, 2012 U.S. Dist. LEXIS 105264, at *15 n.6 (D. Me.

In Re Solodyn (Minocycline Hydrochloride) Antitrust Litigation, Not Reported in Fed....
2017-2 Trade Cases P 80,170

July 27, 2012) (explaining that the "relatively small size of each plaintiff's claim would discourage many" putative class members from pursuing claims individually). Such cases are the reason why the class action mechanism exists: there is no incentive for these parties to join in light of the litigation costs as compared to the damages at stake. See Amchem Prods. v. Windsor, 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

The Court thus finds that the DPPs have met their burden of proving numerosity under Rule 23(a)(1).

### 2. Rule 23(b)(3) *Predominance*

Rule 23(b)(3) requires the Court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). [7] The focus of the predominance inquiry is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623, 117 S.Ct. 2231. When conducting such Rule 23(b)(3) analysis, the Court must determine whether there is "reason to think that [individualized] questions will overwhelm common ones and render class certification inappropriate." Halliburton Co. v. Erica P. John Fund, Inc., —— U.S. ——, 134 S.Ct. 2398, 2412, 189 L.Ed.2d 339 (2014). A district court must "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000). This may "entail some overlap with the merits of the plaintiff's underlying claim," Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011), but "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 466, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013).

In antitrust actions, "[p]redominance is a test readily met." Amchem, 521 U.S. at 625, 117 S.Ct. 2231; see Comcast, 569 U.S. at 41, 133 S.Ct. 1426 (Ginsburg, J., dissenting). Nevertheless, the Court must conduct a thorough analysis of the facts and expert opinions provided to ensure predominance has been shown here. See Nexium III, 777 F.3d at 21. "To meet the predominance requirement, the party seeking certification must show that 'the fact of antitrust impact can[ ] be established through common proof' and that 'any resulting damages would likewise be established

by sufficiently common proof.' " Id. at 18 (quoting New Motor Vehicles, 522 F.3d at 20) (emphasis and alteration in original). DPPs argue that questions of law and fact predominate because proof of violation of Section 1 of the Sherman Act, the unlawful conduct alleged here, will not vary among class members. D. 575 at 25-26. Defendants do not dispute, however, that proof of illegal activity will not vary among class members; they instead argue that individual questions will overwhelm common ones with respect to common impact and damages. D. 611 at 11-25. The Court thus takes each question in turn.

### a) *Common Proof of Antitrust Impact*

**\*7** "[A]t class certification, plaintiffs must only show that 'antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual members.' " Nexium III, 777 F.3d at 24 n.20 (quoting In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008)).

DPPs allege injury in the form of overcharges. D. 575 at 26-27. As the First Circuit recently reaffirmed, "antitrust injury occurs the moment the purchaser incurs an overcharge." Nexium III, 777 F.3d at 27; see Hanover Shoe, Inc. v. United Mach. Corp., 392 U.S. 481, 489, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). DPPs argue that "were it not for the unlawful Medicis-Impax Agreement, unimpaired generic Solodyn competition would have begun in 2009, and all or nearly all Class members would have paid less for their requirements of minocycline hydrochloride extended release tablets by substituting less-expensive generic minocycline hydrochloride extended release tablets for more-expensive brand Solodyn." D. 575 at 27. DPPs allege that they will be able to provide "mostly or exclusively common" proof at trial, "including testimony from Defendants' employees, Defendants' business records, and expert testimony" to show antitrust impact common to class members. D. 575 at 24-25.

DPPs proffer the opinion of Dr. Jeffrey Leitzinger, an economist with a career focus on industrial organization, D. 576-1 ¶¶ 1-2, to argue common injury or impact among class members. [8] Dr. Leitzinger concludes that "Medicis and Impax's allegedly unlawful conduct, if proven, had a direct, market-wide effect on minocycline hydrochloride extended release tablet prices generally (*i.e.*, maintaining prices above the level that would have occurred absent Medicis and Impax's allegedly unlawful conduct)," and that "absent that conduct and unimpaired generic competition

2017-2 Trade Cases P 80,170

beginning in 2009, all or nearly all Class members would have paid less for their purchases of minocycline hydrochloride extended release tablets." D. 575 at 27. Dr. Leitzinger bases his conclusions upon: (1) "extensive empirical economic research demonstrating that generics are substantially cheaper than and rapidly substituted for their brand counterparts," D. 575 at 27, including a 2010 FTC study stating that generics account for ninety percent of the prescription base one year after entry onto the market; (2) "contemporaneous forecasting documents, prepared for business purposes by Medicis, Impax, Teva, Sandoz, Mylan and Lupin, which conclude that, with unimpaired generic competition, generic Solodyn would be priced lower than brand Solodyn, and would quickly capture most Solodyn sales"; and (3) "what happened during the abbreviated 2009 and 2010 launches of generic Solodyn, and after generic entry allowed under the challenged agreements, starting November 26, 2011," during which times the "[c]lass paid less for generic Solodyn than for brand Solodyn." D. 575 at 27-29; D. 576-1 ¶¶ 22-34. Dr. Leitzinger concludes that given that the putative class members are "nearly all wholesalers or retailers supplying product to broad cross-sections of the patient community," and that approximately ninety percent of Solodyn prescriptions would have converted to generics under competitive conditions at a fraction of the branded price, "if the jury concludes there was meaningful impairment of generic competition" here, "the only plausible inference is that all (or nearly all) Class members paid inflated prices for (at least some of) their minocycline hydrochloride extended release tablets as compared to what they would have paid" otherwise. D. 576-1 ¶¶ 35-38.

**\*8** Defendants argue that DPPs' evidence is insufficient to establish predominance because it is "generalized" and does not show actual injury of any members of the class. D. 598 at 12-14; D. 611 at 12-14. Defendants distinguish this case from other reverse payment cases where academic literature and forecasts provided the appropriate evidence because here, unusually, there was at least some time during the class period during which generics were on the market. D. 598 at 12-14. They argue that actual data showing prices and sales of those generics and brand Solodyn during that time is thus the better measure of whether the class members suffered any antitrust injury. Id. To support their arguments, Defendants submit the opinion of John H. Johnson, IV, the President and CEO of Edgeworth Economics LLC, a consulting firm that provides "economic and financial analysis for complex litigation and public policy debates." Dr. Johnson Report ¶ 5. Dr. Johnson argues "there was no actual delay in generic

entry" in this case because generic Legacy Strength Solodyn was introduced through three at-risk entries and, "as a result, was continuously available to consumers throughout the class period." Dr. Johnson Report ¶ 1 (emphasis in original).

This argument serves as the basis for several attacks on Dr. Leitzinger's—and DPPs'—contentions. First, Defendants argue that Dr. Leitzinger's methodology is flawed because it ignores actual data about purchasers' rate of conversion to generic Solodyn during this period in favor of inaccurate forecasts and generalized economic literature. D. 598 at 13; D. 611 at 13. Second, Defendants argue that Dr. Leitzinger's conclusions depend upon a hypothetical world in which putative class members purchased more generic Solodyn than they actually did without providing a methodology showing that to be true. D. 598 at 16-17; D. 611 at 16-17. Third, Defendants argue that Dr. Leitzinger's report fails to account for "case-specific supply and demand factors" such as Medicis marketing and promotion programs (e.g., coupon programs) that made the brand less expensive than the generic for many patients and Medicis's launch of the Solodyn Add-On Strengths. D. 598 at 17-18; D. 611 at 17-18. Defendants argue that these factors, and not restricted competition resulting from the Medicis-Impax agreement, explain the low demand of generic Solodyn during that time. D. 598 at 17-18.

Dr. Leitzinger responds by explaining that the "actual data" here is not "representative of what would have occurred in the but-for world" of unrestrained competition. D. 576-1 ¶ 44. He explains that he was "not able to make use of the actual generic experience for purposes of estimating generic penetration in the but-for world" because the "initial abbreviated Legacy Strength generic launches were limited to just a few days and therefore do not provide a meaningful window as to the likely generic penetration from a sustained generic presence in the market," and the "post-November 2011 launches occurred at a time when Medicis was no longer selling Solodyn in Legacy Strengths." Id. DPPs argue that the relevant comparison is not what happened in the actual world with brief generic launches, but rather the conversion rate and price assuming "sustained, full-fledged generic competition." See D. 631 at 11. With that understanding in mind, DPPs argue that all or nearly all class members paid overcharges on their purchases and thus experienced antitrust impact. D. 631 at 21.

Moreover, predictive evidence and methodologies often serve as the basis for a showing of predominance in antitrust cases.

In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation, Not Reported in Fed....
2017-2 Trade Cases P 80,170

See, e.g., Lidoderm, 2017 WL 679367, at *10, 2017 U.S. Dist. LEXIS 24097, at *61 (accepting DPPs' arguments for classwide proof of injury "[g]iven the well-researched market at issue and the well-recognized type of antitrust injury alleged"); Relafen, 218 F.R.D. at 343-45. The Court declines to reject DPPs' reliance, at least in part, upon forecasts or predictions, even here, where there was some data regarding the impact of generics on the market, because the limits of the latter data do not serve as an appropriate proxy for the but-for market.

Furthermore, the Court is persuaded that these forecasts serve as a better proxy for unconstrained competition than the "actual" data of generic and brand Solodyn sales. First, DPPs argue that the brief generic entry during 2009 and 2010 did not establish unfettered competition between generics and brand Solodyn. D. 631 at 14-15. Dr. Leitzinger points out that each generic seller separately entered the market for only a few days in each case before entering into agreements with Medicis, at which point they each announced that they were leaving the market. D. 632 ¶ 10. At the start of each brief launch there was "rapid growth in retail prescriptions filled by generics," but after each generic seller announced it would be ending sales, "the growth in generic prescription levels halted, turning sharply downward." D. 632 ¶¶ 11-12. Dr. Leitzinger also presents evidence that generic Solodyn was not accessible by many direct purchasers or registered on large health insurers' formularies until after the generics' sustained launch in 2011. D. 632 ¶¶ 15-17. Second, Dr. Leitzinger explains that Medicis's couponing during this period does not account for differences between actual sales and forecasted sales of generics during this time because, among other things, "the primary process which drives generic penetration is automatic substitution at the pharmacy level," which is not impacted by any coupon or copay programs for consumers.[9] D. 632 ¶ 24. Third, DPPs argue that post-2011 generic sales are not a valid proxy because by November 2011, Medicis had taken "advantage of the generic delay it had purchased to shift the majority of Solodyn prescriptions from the Legacy to the Add-On Strengths." D. 631 at 15-16. Additionally, Dr. Leitzinger did take the actual data into account in forming his conclusions, noting that even during the points of limited entry, the generic was priced at approximately fifty percent of the brand minocycline, and prices dropped even further after full generic entry in November 2011. D. 576-1 ¶¶ 22, 34. To the extent Defendants further dispute whether the Medicis-Impax agreement stifled competition and the date of sustained generic entry absent the Medicis-Impax agreement, these are questions for the jury to resolve, not the Court at class certification. The Court is thus persuaded that Dr. Leitzinger's methodology is sufficiently reliable to show common impact at this juncture.

b) Damages Methodology

**\*9** Rule 23(b)(3) also places a burden on a putative class to present a damages model demonstrating "that damages are capable of measurement on a classwide basis." Comcast, 569 U.S. at 35, 133 S.Ct. 1426. This model must be "consistent with [the class's] liability case, particularly with respect to the alleged anticompetitive effect of the violation," id. (quoting ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010)(internal quotation marks omitted)), meaning it must be "limited to and reflecting only the theories of liability accepted by the Court." Nexium II, 296 F.R.D. at 54. "In other words, the defendants cannot be held liable for damages beyond the injury they caused." Nexium III, 777 F.3d at 18. Even if there are some disparities, "the need for some individualized determinations at the liability and damages stage does not defeat class certification." Nexium III, 777 F.3d at 21; see New Motor Vehicles, 522 F.2d at 28.

DPPs argue that "aggregate damages to the Class can be reliably measured using Class-wide evidence," D. 575 at 29, and present Dr. Leitzinger's "formulaic model" that establishes aggregate overcharges incurred by the putative class as between $1.79 billion and $2.98 billion. D. 576-1 ¶ 10(c). Dr. Leitzinger provides twelve "but-for" scenarios, assuming that the jury finds the Medicis-Impax agreement unlawful, providing that Impax would have launched either at risk or within a range of dates that Medicis and Impax would have negotiated absent the agreement. D. 576-1 ¶¶ 38, 40; D. 576-1 at 54. For the reasons addressed above, Dr. Leitzinger relied upon forecasts of the generic penetration that likely would have occurred with unimpaired generic competition, created by Medicis, Impax, Lupin, Mylan, Sandoz and Teva. D. 576-1 ¶ 45. Using these forecasts, Dr. Leitzinger calculated an average generic penetration rate for each company, which served as the basis for a single average but-for generic penetration rate series. Id. He then used "the i) average quarterly forecasts for generic penetration rates (dating from the first date of generic entry), ii) actual brand prices, and iii) but-for generic discount rates applicable to the assumed number of generic competitors in the market, to calculate an average price for minocycline hydrochloride extended-release tablets that would have been used to fill Solodyn

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 173 of 261
PageID: 45111
In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation, Not Reported in Fed....

2017-2 Trade Cases P 80,170

prescriptions under competitive conditions," explaining that "[b]y comparing that price to the actual average price paid by Class members, one can then calculate the per unit overcharge." D. 576-1 ¶ 47. Dr. Leitzinger then multiplied this difference by the actual unit sales volumes from July 23, 2009 through the end of the available sales data, November 2015. D. 576-1 ¶ 57. Within the range of aggregate overcharges, if all scenarios are equally likely, the expected value of class-wide damages would be the range's average, at $2.46 billion. D. 576-1 ¶ 58.

Defendants argue that Dr. Leitzinger's damages model is unreliable because "it is not properly limited or causally linked to the Medicis-Impax settlement." D. 611 at 19. First, Defendants argue that Dr. Leitzinger's damages model improperly relies upon a "product hopping" liability theory this previously Court dismissed, D. 203 at 29. D. 598 at 19-23; D. 611 at 19-23. When resolving the Defendants' motion to dismiss, the Court ruled that DPPs had failed to allege plausibly that "product hopping" limited consumer choice for establishing a Section 2 monopolization claim. D. 184 at 28-29; D. 203 at 28-29. Dr. Leitzinger argues here that overcharges also occurred for purchases of brand Solodyn at Add-On Strength volumes because had full competition for Legacy Strengths existed, "some part of the actual conversion to the Add-On Strengths would not have occurred." D. 576-1 ¶ 49. This prediction is acknowledged and adopted by Medicis and Impax in their respective forecasts. D. 576-1 ¶¶ 54-56.

*10 This, however, is not a resurrection of the now dismissed product hopping claim. Rather, in regard to Legacy Strength, DPPs are explaining how their theory of damages involves calculating overcharges on Legacy and Add-On Strength Solodyn that would have been purchased but for the Medicis-Impax agreement that delayed and suppressed generic entry into the market. That is, the theory present here is one of illegal reverse-payment settlements —specifically, the Medicis-Impax agreement—the impact of which is overcharges. See D. 631 at 19-20. If the jury finds the Medicis-Impax agreement was unlawful and that class members would have purchased lower-priced generic Solodyn rather than brand Add-On Strength Solodyn, then these class members who purchased brand Add-On Strength Solodyn were overcharged. See id. As Plaintiffs explain, "[w]hether a delay in full-fledged generic competition for the Legacy Strengths caused Class members to buy more high-priced brand Add-On instead of lower-priced generic Legacy is a factual dispute that will be resolved by the jury—yea or nay—based on classwide evidence." D. 631 at 20. This

theory is thus a basis for calculating overcharges caused by the Medicis-Impax agreement and is not foreclosed by the Court's Memorandum and Order on the motion to dismiss.

Second, Defendants argue that Dr. Leitzinger's model provides for damages beyond the liability theory because it fails to isolate the alleged impact attributable to the Medicis-Impax settlement from that resulting from settlement agreements between Medicis and other generic manufacturers. D. 598 at 19-21; D. 611 at 19-21. Dr. Leitzinger's model, however, provides for twelve but-for scenarios, contemplating the different possible points of sustained generic entry absent the Medicis-Impax agreement and the varying competitive conditions that would have followed. D. 576-1 ¶ 10; D. 631 at 16. The jury will need to resolve the disputes regarding the appropriate but-for scenario to apply here, so that the impact is appropriately tailored to the liability theory used. At this stage, any disagreement in this respect does not overcome the Plaintiffs' showing that damages will be substantially shown by common proof.

Third, Defendants argue that Dr. Leitzinger's model is unreliable because it fails to control for "underlying supply and demand conditions" that caused generic penetration and purchase price to vary widely among class members. D. 598 at 24; D. 611 at 24. The need for some individualized damages determinations will not defeat class certification. See Nexium III, 777 F.3d at 21; see also Lidoderm, 2017 WL 679367, at *11, 2017 U.S. Dist. LEXIS 24097, at *63. The use of averages to develop the aggregate amount of damages does not suggest Plaintiffs will be unable to ensure recovery is only for injured parties. See Nexium III, 777 F.3d at 21. "Apportioning damages ought wait until liability is decided upon the merits," Nexium I, 297 F.R.D. at 183, and although Plaintiffs bear the burden to establish predominance, uncertainties regarding damages should be resolved against the wrongdoer, and not those who have allegedly been injured, see In re Cardizem CD Antitrust Litig., 200 F.R.D. 326, 348 (E.D. Mich. 2001); In re Sumitomo Copper Litig., 182 F.R.D. 85, 92-93 (S.D.N.Y. 1998). This is particularly true in antitrust cases because uncertainty regarding damages is generally the result of the defendants' alleged wrongdoing. See Cardizem, 200 F.R.D. at 348 (explaining "[a]ntitrust plaintiffs have a limited burden with respect to showing that individual damages issues do not predominate" because of the "equitable notion that the wrongdoer should not be able to profit by insistence on an unattainable standard of proof" (quoting In re Potash Antitrust Litig., 159 F.R.D. 682, 697 (D. Minn. 1995))). Dr. Leitzinger has thus sufficiently

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 174 of 261
PageID: 45112
In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation, Not Reported in Fed....
2017-2 Trade Cases P 80,170

shown that damages may be "demonstrated by a 'common methodology' applicable to the class as a whole." See Nexium I, 297 F.R.D. at 182 (quoting Comcast, 569 U.S. at 30, 133 S.Ct. 1426).

c) Uninjured Plaintiffs

Finally, Defendants argue that predominance has not been established because more than a *de minimis* number of class members were uninjured here. D. 598 at 14-18; D. 611 at 14-18. A class may be certified even if it contains "a de minimis number of potentially uninjured parties," Nexium, 777 F.3d at 25, as long as the Court is "satisfied that, prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members" that will be " 'administratively feasible,' and protective of defendants' Seventh Amendment and due process rights," id. at 14, 19 (quoting Carrera v. Bayer Corp., 727 F.3d 300, 307 (3d Cir. 2013)). The First Circuit defines "*de minimis*" in "functional terms," explaining that "if common issues 'truly predominate over individualized issues in a lawsuit, then the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of the evidence offered.' " Id. at 30 (quoting Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1270 (11th Cir. 2009)) (alteration in original) (citation omitted). Defendants argue that the number of uninjured parties is too great here to be considered *de minimis*. D. 598 at 14-18; D. 611 at 14-18.

**\*11** As to allegedly uninjured class members, Defendants argue that eight putative class members did not purchase any generic Solodyn during the period in question and ten members purchased only generic Solodyn during this time, thus suffering no overcharges. D. 598 at 15; D. 611 at 15. But these arguments do not account for the but-for world consistent with DPPs' liability theory. If Defendants are found liable on that theory, then these putative class members would have also been injured by overcharges, as the prices of both generic Solodyn and brand Solodyn during that time would have been affected by Defendants' illegal conduct. [10] DPPs have thus sufficiently proven that if a jury finds Defendants liable, DPPs will be able to show impact for at least the vast majority of putative class members.

For all of these reasons, Defendants' contentions regarding lack of injury for some class members are not sufficient to destroy predominance for class certification purposes.

**C. The End-Payors**

The EPPs have also filed a motion for class certification. D. 569. Their claims arise under state law and include violations of state statutes prohibiting monopolization, attempted monopolization, conspiracy and combination in restraint of trade, unfair competition and deceptive trade practices and unjust enrichment. D. 92. In the Court's Memorandum and Order resolving Defendants' motion to dismiss, the Court dismissed several state-specific claims. D. 184 at 34-46; D. 203 at 34-46. EPPs now seek certification as a damages class and an injunctive relief class under Rule 23(b)(3) and (b)(2), respectively, for the remaining state law claims. D. 570 at 9. They define their class as follows:

> All persons or entities in the United States and its territories and possessions, including the Commonwealth of Puerto Rico, who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Solodyn 45mg, 55mg, 65mg, 80mg, 90mg, 105mg, 115mg and/or 135mg tablets and/or generic versions of one or more of these dosages in Alabama, Alaska, Arizona, Arkansas, California, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Washington, West Virginia, Wisconsin, Wyoming, the District of Columbia and Puerto Rico, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, other than for resale, at any time from July 23, 2009 until the anticompetitive effects of Defendants' unlawful conduct cease.

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 175 of 261
PageID: 45113

In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation, Not Reported in Fed....

2017-2 Trade Cases P 80,170

D. 570 at 9 n.1. This class excludes seven categories of persons, including "[f]ully insured health plans (plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members") and "[f]lat co-payers (consumers who paid the same co-payment amount for brand and generic drugs)." D. 571-1 ¶ 282. [11]

**\*12**  As with the DPPs, the EPPs have detailed how their putative class satisfies all four factors of Rule 23(a) and the requisite factor under Rule 23(b). D. 570 at 15-28. Of the Rule 23(a) factors, Defendants challenge only adequacy of representation, Fed. R. Civ. P. 23(a)(4), D. 599 at 36-38; D. 609 at 36-38, and they dispute that EPPs have satisfied the specific requirements for Rule 23(b)(2) and Rule 23(b)(3) certification, D. 599 at 18-36; D. 609 at 18-36. The Court takes each disputed factor in turn. [12]

### 1. Rule 23(a)(4) Adequacy of Representation

Of the four Rule 23(a) factors, Defendants challenge only Rule 23(a)(4)'s requirement of adequacy of representation. Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This factor requires Plaintiffs to establish an absence of potential conflict and an assurance of vigorous prosecution. [13]  See Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985). The class representatives must be part of the class, possess the same interest and suffer the same injury as class members. See Amchem 521 U.S. at 625-26, 117 S.Ct. 2231. "[P]erfect symmetry of interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable." Matamoros v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012). Rather, the inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent," Amchem, 521 U.S. at 625, 117 S.Ct. 2231, and focuses on conflicts that are "fundamental to the suit and that go to the heart of the litigation," Matamoros, 699 F.3d at 138 (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:58 (5th ed. 2012)) (internal quotation marks omitted). "[S]peculative conflict should be disregarded at the class certification stage." Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd., 247 F.R.D. 253, 265 (D. Mass. 2008) (quoting In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 145 (2d Cir. 2001), overruled on other grounds by In re Initial

Pub. Offering Sec. Litig., 471 F.3d 24 (2d Cir. 2006)) (internal quotation marks omitted).

Defendants first argue that EPPs have not shown adequacy of representation because third-party insurers and consumers are two fundamentally different groups who at minimum require separate representation. D. 609 at 36-37. This argument has been rejected by this Court and others certifying end-payor classes consisting of both consumers and third-party purchasers. See, e.g., Lidoderm, 2017 WL 679367, at *27-21, 2017 U.S. Dist. LEXIS 24097, at *109-10; Nexium I, 297 F.R.D. at 172; In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 533 (3d Cir. 2004). EPPs argue that the class's and class representatives' incentives align here because all putative members seek to show that they were injured in the same way—overcharges—through the same illegal conduct by Defendants. D. 570 at 18-19; D. 641 at 30. This alignment of incentives is generally sufficient to overcome a challenge on conflict of interest grounds. See, e.g., Lidoderm, 2017 WL 679367, at *26-27, 2017 U.S. Dist. LEXIS 24097, at *109-10; Nexium I, 297 F.R.D. at 172; Cardizem, 200 F.R.D. at 337 (explaining that "[e]ach class member 'has the same interest in maximizing the aggregate amount of classwide damages' ") (quoting In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 512 (S.D.N.Y. 1996)).

**\*13**  Second, Defendants argue that there are conflicts among class members because some class members, such as brand loyalists and insurers, benefitted from a delay in generic entry. D. 609 at 37. EPPs do not address this argument in their reply beyond a general argument that all members of the putative class "have identical interests in proving liability" and aggregate damages. D. 641 at 30. Nevertheless, the Court is not persuaded that the conflicts between those allegedly uninjured class members and putative EPP representatives destroy class certification here. Defendants' reliance upon Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181 (11th Cir. 2003), D. 609 at 37, is misplaced. In Valley Drug, the Eleventh Circuit reversed certification of a class of direct purchasers where the putative class did not challenge the defendants' "assertions that the three national wholesalers, whose transactions with [a defendant] constitute over fifty percent of the plaintiffs' total claims, experienced a net gain from the absence of generic drugs in the market." Valley Drug, 350 F.3d at 1190. Here, however, Defendants have not provided a similar percentage of uninjured—or conflicted—members of the putative class, nor have they quantified the conflict. Cf. D. 599 at 37; D. 609 at 37. "[D]efeating [the] adequacy requirement of Rule 23 requires a conflict that is

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 176 of 261
PageID: 45114

In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation, Not Reported in Fed....

2017-2 Trade Cases P 80,170

'more than merely speculative or hypothetical.' " Nexium III, 777 F.3d at 21 (quoting Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 430 (4th Cir. 2003)). Additionally, as detailed below, the Court is not convinced that the number of uninjured class members here is greater than *de minimis* such that predominance is not met. Adequacy of representation under Rule 23(a)(4) focuses on "fundamental" conflicts between class representatives and members. The Court thus hold that the presence of a *de minimis* number of uninjured members also does not defeat adequacy of representation.

Finally, Defendants argue that there is a conflict among class members sufficient to defeat adequacy here because they will be in competition with each other for damages shares. D. 609 at 37. Even if Defendants are correct that some conflict exists in damages allocation between third-party insurers and consumers in this putative class, however, such conflict fails to defeat class certification. Hypothetical conflicts, particularly regarding damages allocation, are insufficient to defeat a showing of adequacy under Rule 23(a)(4). See, e.g., Natchitoches, 247 F.R.D. at 266-69; Cardizem, 200 F.R.D. at 337. Defendants have not shown that alleged conflicts among putative class members would "permeate the aggregate damages calculation" and not merely arise at the time damages are allocated, see Lidoderm, 2017 WL 679367, at *26-27, 2017 U.S. Dist. LEXIS 24097, at *110, which can be addressed then. See id. (explaining that the court can employ claims mechanisms to resolve damages disputes at that time); Nexium I, 297 F.R.D. at 173.

### 2. Rule 23(b)(3) *Predominance*

EPPs seek certification as a class under Rule 23(b)(3), in their pursuit of monetary damages. To succeed, EPPs must show that common issues of law or fact predominate over any questions affecting only individual members, Fed. R. Civ. P. 23(b)(3). In Nexium III, the First Circuit outlined three principles guiding the predominance inquiry that must be met before a class is certified under Rule 23(b)(3): (1) "the theory of liability is limited to the injury caused by defendants"; (2) "the definition of the class must be 'definite,' that is, the standards must allow the class members to be ascertainable"; and (3) "where an individual claims process is conducted at the liability and damages stage of the litigation, the payout of the amount for which the defendants were held liable must be limited to injured parties." Nexium III, 777 F.3d at 18-19. As with DPPs, Defendants challenge EPPs' theory of common impact and damages model. D. 599 at 19-30; D.

609 at 19-30. Additionally, Defendants argue that EPPs fail the predominance inquiry because EPPs have failed to show the class is sufficiently ascertainable, D. 599 at 19-27; D. 609 at 19-27, and because variation among state law claims overwhelm common issues in the case, D. 599 at 30-33; D. 609 at 30-33.

#### a) Ascertainability

Defendants argue that EPPs have failed to propose a definite class in which the members of the class are ascertainable. D. 609 at 19-20. Rule 23(b)(3)'s "implied" ascertainability requirement focuses on whether the class is defined in terms of an "objective criterion." See Nexium III, 777 F.3d at 19; Matamoros, 699 F.3d at 139; see also Lidoderm, 2017 WL 679367, at *25, 2017 U.S. Dist. LEXIS 24097, at *105; Carrera v. Bayer Corp., 727 F.3d 300, 306 (3d Cir. 2013). EPPs argue that they "can identify class members by reference to the objective criteria in the class definition: (1) Solodyn purchases not for resale (2) in certain states (3) during a discrete time period," while excluding "several categories of purchasers who did not pay overcharges." D. 570 at 19-20. EPPs also proffer the opinion of their expert, Paul DeBree, with extensive experience in the Pharmacy Benefit Manager industry, D. 577-1 ¶¶ 1-4, who explains that "in the pharmaceutical industry, data is collected and maintained at every level of the transaction," making ascertaining class membership here administratively feasible. D. 629 at 26.

*14 Defendants argue that the class definition is not ascertainable because it includes more than a *de minimis* number of uninjured members because EPPs' class definition is broader than EPPs' expert's definition of a class that was harmed. D. 599 at 20-21; D. 609 at 20-21. This argument goes to common proof of injury and not whether the class is ascertainable. See Nexium III, 777 F.3d at 19. EPPs have provided objective criteria for defining the class, which is sufficient to show that the class is ascertainable, and therefore, "definite" for purposes of the predominance inquiry. See id.

#### b) Common Proof of Impact

As with the putative direct purchaser class, the Court must determine whether the putative end-payor class is sufficiently cohesive. See Amchem, 521 U.S. at 623, 117 S.Ct. 2231. This requires the Court to examine EPPs' proposals of common proof of class-wide injury. See Nexium III 777 F.3d at 15.

In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation, Not Reported in Fed....

2017-2 Trade Cases P 80,170

"At the class certification stage, the court must be satisfied that, prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members." Nexium III, 777 F.3d at 19. The First Circuit has recognized, however, that in the certification context, "[a]t worst the inclusion of some uninjured class members is inefficient, but this is counterbalanced by the overall efficiency of the class action mechanism." Id. at 22.

EPPs submit the opinion and conclusions of their expert, Dr. Richard Frank, professor of health economics, D. 577 ¶ 1, to demonstrate class-wide antitrust impact. D. 570 at 23. They explain that their expert testimony will focus on the characteristics of the "but-for" world, and that "if the generic would have sold for less than the brand during the Class Period, all class members who would have bought the generic were injured." D. 570 at 23; D. 629 at 9. Dr. Frank proposes three but-for scenarios: the first assumes all generic companies would have launched at-risk in 2009, and Solodyn Add-On strengths would not have launched; the second mirrors the first except it assumes that the Add-On Strengths launched as in the actual world; and the third contemplates a later date of true generic competition. D. 577 ¶ 48.

Defendants proffer the opinion of their expert, Dr. Cremieux, President of Analysis Group, Inc., an economics research consulting firm, and an adjunct economics professor, D. 599-1 ¶ 1 [14], to support their argument that Plaintiffs' putative class contains a greater than *de minimis* number of consumer and institutional end-payor members who were not injured by Defendants' conduct, should they be found liable. D. 599 at 20; D. 609 at 20. The Court addresses Defendants' arguments regarding uninjured groups in turn, noting that the First Circuit recently affirmed class certification in a similar class of end-payors despite similar arguments regarding uninjured parties. See Nexium III, 777 F.3d at 14.

(1) Uninjured Consumers

Defendants rely upon Dr. Cremieux's report, identifying several groups of consumers that are likely to be unharmed and arguing that no class-wide data or method could distinguish between these unharmed consumers and those that could have suffered harm under Plaintiffs' allegations. D. 599 at 21-22. Dr. Cremieux states that determining whether a consumer would have switched to a generic in a fully-competitive market requires looking at several individualized factors. D. 599 at 23.

 **\*15** First, Defendants argue that EPPs' putative class includes a number of brand loyalists. D. 599 at 21. Brand loyalists would not be injured by suppressed competition because generic entry often actually raises the price of the brand drug for the consumer—as it did here, in November 2011—and brand loyalists continue to purchase the brand drug despite entry of a lower-priced generic. See D. 599 at 21-22. The parties do not dispute that this group exists, but they dispute the group's size. See D. 599 at 21; D. 629-3 ¶ 20. Defendants argue that seventy percent of Solodyn purchasers during this time were brand-loyal and unharmed by alleged delayed entry because they continued to purchase brand Solodyn after November 2011, despite paying the same or more to do so. D. 599 at 21-22. On the other hand, Dr. Frank relies upon Medicis documentation and industry studies to ascertain a much smaller percentage of brand loyalists: as low as five percent of overall prescriptions, depending on the but-for scenario selected by the jury. D. 629-3 ¶ 20. [15] Dr. Frank has also excluded the corresponding percentage of prescriptions from aggregate overcharge calculations for each but-for scenario. D. 577 ¶¶ 59-60; D. 629-3 ¶ 20.

The Court does not accept Defendants' assertions that the presence of brand loyalists destroys predominance here. Defendants' argument assumes that all prescriptions for brand Solodyn after 2011 were by brand loyalists, but this conclusion does not necessarily follow. For instance, EPPs argue that Medicis was able to "switch a large segment of the market to the brand Add-On Strengths" prior to full generic entry, undercutting the typical conversion rate to generics after November 2011. D. 629 at 17. Moreover, for reasons explained in greater detail with respect to the DPP class, the Court accepts EPPs' argument that forecasts and academic literature serve as a better proxy for the but-for world of unrestrained competition here. Finally, the Court heeds the guidance of the First Circuit, noting both that "the number of prescriptions is not a necessary surrogate for the number of consumers," and that "a consumer was injured if he or she would have purchased generic [Solodyn] even once during the class period." Nexium III, 777 F.3d at 30. The Court is thus persuaded at this point that the amount of brand loyalists does not "cause non-common issues to predominate." See id. at 31.

Second, Dr. Cremieux estimates that at least 378,000 consumers were uninjured even if Defendants are found liable

for antitrust violations as a result of coupon and voucher programs. D. 599 at 22-23; D. 599-1 ¶¶ 15, 77-89. EPPs first argue that consumers who never paid for brand or generic Solodyn—due to coupons, reimbursements, or any other means—are explicitly excluded from the class. D. 641 at 15. Next, EPPs argue that Defendants are confusing antitrust impact with individual damages here. D. 641 at 12. They explain that even if putative class members were reimbursed for overcharges through insurance plans or coupons, they still experienced antitrust injury in the form of an overcharge, although the amount of damages may require adjustment. Id.; see Nexium III, 777 F.3d at 28 n.23. Further, Dr. Frank has excluded prescriptions with no co-payments from his aggregate damages calculations. D. 629-3 ¶¶ 31. Finally, EPPs argue that Defendants are again inflating the number of purportedly uninjured consumers by ignoring the rule that a consumer need only incur one overcharge to have experienced antitrust injury and by confusing numbers of prescriptions with numbers of putative class members. D. 641 at 8; D. 629-3 ¶¶ 31, 34; see Nexium III, 777 F.3d at 30. For these reasons, the Court will not decline to certify this class on this basis.

*16 Third, Defendants point to consumers who purchased Solodyn after meeting an annual out-of-pocket maximum or deductible as uninjured consumers because they would not have paid anything for the prescription regardless of price. D. 599 at 21; D. 599-1 ¶ 15. Again, EPPs note that these consumers are already excluded from the class. D. 629 at 10-11; D. 641 at 10-11. To the extent that any remain, however, for the same reasons addressed above, their number is overstated by Defendants, and there is no reason to believe their remaining presence is not de minimis. Furthermore, EPPs point out that even if the consumer would be uninjured in this situation, the third-party insurer who actually paid the costs would have been overcharged, and the aggregate damages award would remain the same, so there is no prejudice to Defendants at this time. D. 629 at 14; D. 641 at 14; see Lidoderm, 2017 WL 679367, at *20, 2017 U.S. Dist. LEXIS 24097, at *92. Finally, EPPs propose that a mechanism [16] can be developed to exclude them prior to judgment, which is all that is required at this time. D. 629 at 10-11 (citing Nexium, 777 F.3d at 19-21).

Fourth, Defendants lists those who had access to generic Solodyn during the delay period as uninjured consumers. D. 599 at 21; D. 599-1 ¶ 15. According to his review of Solodyn sales and prescription data, "more than 360,000 prescriptions of generic minocycline ER were filled during the Plaintiffs' alleged period of delay." D. 599 at 22; D. 59-1 ¶¶ 15, 51. EPPs criticize Defendants' arguments for inflating the number of allegedly uninjured parties by conflating prescriptions with consumers, failing to isolate those who purchased exclusively generic minocycline during these years, and disregarding that a consumer need only be overcharged once to be injured here. D. 629 at 18; D. 641 at 18; see Nexium III, 777 F.3d at 30. More fundamentally, however, as the Court explained with respect to direct purchaser injury, mere access to generic Solodyn during this period does not ensure lack of injury. Consistent with EPPs' liability theory, in a "but-for" world of unfettered generic competition, the generic minocycline prices would have been lower during this time. D. 629 at 18. Indeed, EPPs argue that "the price of the generic did not fall to a fully competitive (equilibrium) price at any point during the Class Period." Id. (emphasis omitted). Thus, if the jury finds that Defendants' actions unlawfully restricted competition, those who purchased generic Solodyn during this time at a price greater than the equilibrium "but-for" price experienced antitrust injury in the form of overcharges.

Defendants rely upon Vista Healthplan, Inc. v. Cephalon, Inc., No. 2:06-cv-1833, 2015 WL 3623005, 2015 U.S. Dist. LEXIS 74846 (E.D. Pa. June 10, 2015), for the proposition that EPPs' failure to provide a methodology to identify uninjured class members defeats predominance here. [17] D. 599 at 26-27; D. 609 at 26-27. In Vista, the court denied end-payors' motion for class certification because "every potential class member would need to be subject to individualized inquiries" to determine that they were not brand loyalists or insured consumers with flat copays, and the plaintiffs had not provided a class-wide methodology for identifying uninjured class members. Vista, 2015 WL 3623005, at *18-21, 2015 U.S. Dist. LEXIS 74846, at *58-66. Defendants' reliance on Vista is misplaced. In Nexium III, the First Circuit explained that the putative class need not propose the specific mechanism to exclude uninjured consumers at the time of class certification, as long as a court is confident that such a mechanism does exist. [18] Nexium III, 777 F.3d at 19-20. In Vista, the court specifically rejected the standards outlined in Nexium III, explaining that the Third Circuit imposes greater standards of proof at the time of class certification than does the First Circuit. Vista, 2015 WL 3623005, at *10-11, 2015 U.S. Dist. LEXIS 74846, at *37-38. EPPs argue here that at the damages allocation phase, mechanisms such as affidavits and presumptions may be employed for the entire class, and that even if details of individual purchases and plans are relevant to calculating individual damages, they do not impact the class certification analysis here. [19] D. 629 at 10-11; see Nexium III, 777 F.3d at 20. The Court thus rejects Defendants'

argument that individual issues predominate over common questions of antitrust impact on this basis.

 **\*17**  In sum, the Court is not persuaded that the presence of any of these consumer groups would cause individualized issues to predominate in this case. Many of the categories of consumers Defendants assert are uninjured here would have experienced injury if the jury accepts EPPs' liability theory. Others rely on abnormalities in the "actual data" of generic conversion here, which the Court has explained is an imperfect proxy for the "but-for" world of unfettered competition here. [20]  For the groups of uninjured parties that remain—such as brand loyalists—Defendants have not presented a credible estimate of the group's size to suggest the group is greater than *de minimis*. Additionally, EPPs have sufficiently shown that to the extent uninjured consumers remain in the class, their presence will be accounted for in an aggregate damages calculation and a mechanism may be developed to distinguish them prior to judgment. The Court thus declines to deny certification on this basis.


(2) Uninjured Third-Party Payors

Defendants also argue that many uninjured institutional, or third-party, payors fall within EPPs' class definition. D. 599 at 24. They list as examples institutional payors that insured brand-loyal consumers; only covered generic Solodyn; provided access to generic Solodyn during the alleged delay period; or would have recouped costs of overcharges. Id. Dr. Cremieux identifies seven individual factors that would need to be addressed to determine whether and to what degree an institutional payor was injured by Defendants' alleged misconduct here. D. 599 at 25; D. 599-1 ¶¶ 99-115.

The argument that these groups are uninjured, however, contains many of the same flaws as with consumers. Defendants' third-party arguments rely heavily upon anomalies in actual data for their argument that institutional payors that covered only generic Solodyn or whose members purchased generic Solodyn between 2009 and 2011 were uninjured. See D. 599 at 24; D. 599-1 ¶¶ 99, 101. Again, assuming the jury finds liability here, forecasts and academic literature become the better proxy for the "but-for" scenarios, and on that basis, it is far more likely that third-party payors and their members experienced overcharges in their purchases of generic Solodyn during this time. Moreover, as EPPs point out, to the extent institutional payors did not pay for any

Solodyn purchases, they are excluded from the class. D. 629 at 22; D. 641 at 22. [21]

 **\*18**  Furthermore, the likelihood that Defendants' arguments are inflating the number of uninjured members is even greater here than with respect to consumer class members. Third-party payors, like all antitrust plaintiffs, "need only suffer damage on one purchase to be injured." Lidoderm, 2017 WL 679367, at \*20-21, 2017 U.S. Dist. LEXIS 24097, at \*93; see Nexium III, 777 F.3d at 27. That is, an insurer with brand-loyal members is only uninjured here if every one of its members would have been brand-loyal for all Solodyn purchases in each "but-for" scenario. See D. 641 at 19. It is highly unlikely, therefore, that institutional payors were uninjured even if some of their members are brand-loyal or purchased the generic during the period in question. D. 629 at 19-20.

Defendants also argue that third-party payors are uninjured because they would have recouped the costs of overcharges through higher premiums or co-pay amounts. D. 599 at 24; D. 599-1 ¶ 113. EPPs explain that "premiums and plan contributions are forward-looking," based on projected costs. D. 641 at 21; D. 629-3 ¶ 51. Thus, even to the extent that institutional payors can offset overcharges through later increases in premiums, the institutional payors experienced antitrust impact at the time of the initial overcharge. See Nexium III, 777 F.3d at 27. Additionally, Dr. Frank points out that there is no evidence "that plans adjust premium rates due to the increased cost of Solodyn or any *single* drug"; rather, they adjust rates to cover all expenses. D. 629-3 ¶ 51 (emphasis in original); see Lidoderm, 2017 WL 679367, at \*22-23, 2017 U.S. Dist. LEXIS 24097, at \*98.

Finally, Defendants argue that institutional payors that received rebates through pharmacy benefit managers were uninjured here. D. 599 at 24-25; D. 599-1 ¶¶ 107-12. Defendants argue that "many TPPs benefited from the $664 million in Medicis rebate payments associated with Solodyn prescriptions between March 2009 and December 2015." D. 599 at 25. First, as with coupons and vouchers for consumers, however, rebates provided after purchase are a "damages setoff and do not affect the fact of injury." See Nexium III, 777 F.3d at 28 n.23. Second, Dr. Cremieux's conclusions rely upon generic pricing in the real world as the "but-for" generic price—priced at $525—as opposed to Dr. Frank's calculated "but-for" generic price as low as $206. D. 599-1 ¶¶ 111-12; D. 629-3 ¶ 49. Finally, the Court reiterates that each institutional payer "need only suffer damage on one purchase

In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation, Not Reported in Fed....

2017-2 Trade Cases P 80,170

to be injured." Lidoderm, 2017 WL 679367, at *20-21, 2017 U.S. Dist. LEXIS 24097, at *93. Thus, even accepting that "many TPPs" received rebates, Defendants have not shown that this group was not injured. See D. 629-3 ¶ 50; cf. Nexium III, 777 F.3d at 28.

The Court is thus persuaded that the putative class will be able to show antitrust impact through common proof: if the jury finds Defendants' conduct violated the state laws in question here, the vast majority of EPPs who purchased generic or brand Solodyn during this period and experienced injury in the form of overcharges. The Court is not persuaded that any of the subgroups identified by Defendants as uninjured class members create individualized issues that undermine the predominance of the legal questions here. See Lidoderm, 2017 WL 679367, at *23, 2017 U.S. Dist. LEXIS 24097, at *99.

### c) Damages Methodology

"The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself." In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 197 (1st Cir. 2009). Although the predominance inquiry requires plaintiffs to show they will be able to provide a damages model on a class-wide basis, see Comcast, 569 U.S. at 35-36, 133 S.Ct. 1426, "it is well-established that '[t]he individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3),' " Nexium III, 777 F.3d at 21 (quoting Smilow v. Sw. Bell Mobile Sys., 323 F.3d 32, 40 (1st Cir. 2003)).

**\*19** Dr. Frank presents three "but-for" scenarios, contemplating at-risk entry and no launch of Solodyn Add-On Strengths; at-risk entry and Add-On Strength launch; and a range of alternative settlement agreements. D. 577 ¶ 48. He begins accruing damages at the start of the class period, July 23, 2009, and he excludes uninjured parties such as estimated percentages of brand loyalists, from each aggregate damages calculation. D. 577 ¶¶ 48(a), 70. He relies upon publicly available data, data available for purchase—IMS Health data—and Defendants' data to implement his damages methodology. D. 577 ¶ 53. Using a yardstick approach, Dr. Frank concludes that overcharge damages for the putative EPP class range from $523.4 million to $790.3 million depending on the "but-for" scenarios at play. D. 577 at ¶¶ 55, 67-69. Additionally, he calculates unjust enrichment

damages by calculating the difference between actual profits earned by Medicis and what they would have earned absent allegedly unlawful restraints on competition. D. 577 ¶ 72. He calculates the aggregate unjust enrichment damages to range from $557.9 million to $803.3 million for the relevant states. [22] D. 577 ¶¶ 77-79.

Defendants argue that EPPs have not provided a damages model that shows that common issues predominate. D. 599 at 28-30; D. 609 at 28-30. Their arguments repeat many they made in the antitrust context: that Dr. Frank's model includes too many "false positives" to be reliable and valid. D. 599 at 28-30; D. 609 at 28-30. As the Court has acknowledged, however, because the putative class contains both consumers and third-party payors, even the presence of some uninjured consumers—such as those insured consumers whose co-pays would have remained the same in the "but-for" world—does not affect the aggregate damages calculation, as those overcharges were incurred by those consumers' insurers. See Lidoderm, 2017 WL 679367, at *20, 2017 U.S. Dist. LEXIS 24097, at *92 Dr. Frank has established several "but-for" scenarios, however, and in all of them he excludes uninjured parties when possible. See D. 577 ¶¶ 63-70. At the class certification stage, "[c]alculations need not be exact," but they "must be consistent with [the class's] liability case, particularly with respect to the alleged anticompetitive effect of the violation." Comcast, 569 U.S. at 35, 133 S.Ct. 1426. The Court is thus persuaded that remaining issues in damages are not sufficient to defeat class certification here. See Nexium III, 777 F.3d at 23.

### d) State Laws

Finally, Defendants argue that the Court should deny class certification because the differences among state antitrust and unjust enrichment laws would overwhelm the case and individualized issues would thus predominate. D. 609 at 30-33. They point out that the remaining state law claims EPPs assert here total over fifty distinct claims, under the laws of forty different jurisdictions and argue that the state laws at issue here "vary so widely, and in some instances conflict with each other, that individualized issues would predominate." D. 609 at 31.

"[F]ederal appellate courts have viewed class actions governed by the law of multiple states with serious skepticism." Relafen, 221 F.R.D. at 276; see In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1015 (7th Cir.

In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation, Not Reported in Fed....

2017-2 Trade Cases P 80,170

2002); In re Am. Med. Sys., 75 F.3d 1069, 1085 (6th Cir. 1996). The need to apply multiple states' laws, however, does not necessarily defeat class certification. See Relafen, 221 F.R.D. at 278; Waste Mgmt. Holdings, 208 F.3d at 296 (rejecting "any per se rule" that the presence of state statutory variations is "an automatic disqualifier" for class certification). Indeed, courts in this Circuit and elsewhere have certified classes in antitrust actions like this one despite the need to apply numerous states' laws. See, e.g., Nexium I, 297 F.R.D. at 176 (certifying class where twenty-six state laws were at issue); Relafen, 221 F.R.D. at 278-94 (certifying end-payor class where twelve states' antitrust laws were at issue); see also Lidoderm, 2017 WL 679367, at *27, 2017 U.S. Dist. LEXIS 24097, at *111-12 (seventeen states). EPPs argue that the differences in the applicable state laws are not material or significant and can thus be accommodated on a special verdict form or through other mechanisms routinely employed in complex litigation. D. 641 at 26-27; see Lidoderm, 2017 WL 679367, at *27, 2017 U.S. Dist. LEXIS 24097, at *111. The Court proceeds to consider whether variations in state law are sufficiently significant to negate predominance. See Relafen, 221 F.R.D. at 278-87.

*20 EPPs argue that variation among states does not defeat predominance because proof of anticompetitive conduct establishes a violation of each state's laws, which is sufficient for Phase I of their proposed trial plan. D. 641 at 27; D. 571-7 at 2-3.

Certain of Defendants' arguments, however, go beyond mere variations in the state statutes that could be remedied by juror forms. For instance, Defendants argue that the Montana's and Utah's consumer protection statutes prohibit class actions. D. 609 at 31. Montana's consumer protection statute allows consumers to "bring an individual, but not a class action." Mont. Code Ann. § 30-14-133(1). The Court now holds that Montana's consumer protection prohibition of class actions is "so intertwined with a state right or remedy that it functions to define the scope of the state-created right." Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co., 559 U.S. 393, 423, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010) (Stevens, J., concurring in part and in the judgment); see In re Target Corp. Customer Data Sec. Breach Litig., 66 F.Supp.3d 1154, 1165 (D. Minn. 2014); but see Wittman v. CB1, Inc., No. 15-105-BLG-BMM, 2016 WL 3093427, at *5-6, 2016 U.S. Dist. LEXIS 71383, at *13-14 (D. Mont. June 1, 2016) (holding that the class action prohibition in Montana's consumer protection statute is preempted by Rule 23, rejecting Justice Stevens's concurrence and relying only on Justice Scalia's

Shady Grove opinion). Consistent with this Court's earlier opinions on this matter, D. 203 at 37-38, the Court concludes that Montana's class action prohibition is similar to Illinois law on the matter and is, therefore, not preempted by Rule 23. See Nexium, 968 F.Supp.2d at 409. The Court, therefore, excludes Montana's consumer protection statute from this putative class's claims.

Defendants also argue that Utah consumer protection law prohibits class actions, D. 609 at 31, although this seems contrary to their exhibits, D. 599 at 205 (stating that the "unique aspect" of Utah's consumer protection statute is that "[c]lass certification waives statutory damages"). Utah consumer protection law provides that class members waive statutory damages; it does not bar class actions. Utah Code Ann. §§ 13-11-19 et seq. The Court thus declines to exclude Utah class members on this basis.

Defendants' remaining state law arguments do not rise to the level necessary to defeat predominance here. EPPs have provided a compilation of state laws at issue here, D. 571-4, and highlighted the substantial similarities in the language among states and between state and federal antitrust provisions. D. 570 at 22; see Nexium I, 297 F.R.D. at 175-76. Issues regarding state law variations regarding damages, for instance, are not sufficiently material to defeat class certification. Rather, to the extent these damages questions or other issues are significant, they may be addressed at summary judgment and/or accommodated on a special verdict form during Phase I, as suggested by Plaintiffs, D. 571-7 at 2-3. See Lidoderm, 2017 WL 679367, at *27, 2017 U.S. Dist. LEXIS 24097, at *111; Overka, 265 F.R.D. at 20.

In sum, the Court excludes Montana consumer protection claims from the class, but otherwise holds that the variation in state laws does not overcome class certification and the remaining state law claims may proceed at this time.

### 3. *Rule 23(b)(3) Superiority*

*21 A putative class seeking certification under Rule 23(b) (3) also bears the burden of showing that a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3). See, e.g., Nexium III, 777 F.3d at 18. The Court considers four factors within the superiority inquiry:

In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation, Not Reported in Fed....

2017-2 Trade Cases P 80,170

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). The Court here considers the alternatives to class action, conscious that "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." Amchem, 521 U.S. at 617, 117 S.Ct. 2231 (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (1997)) (internal quotation marks omitted). The superiority inquiry thus ensures that litigation by class action will "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Amchem, 521 U.S. at 615, 117 S.Ct. 2231 (quoting advisory committee's note on Fed. R. Civ. P. 23). EPPs argue here that a "class action is the only practical means of adjudicating class members' claims while providing them with their day in court." D. 570 at 26.

Defendants reiterates its predominance arguments, contending class litigation would be unmanageable and potentially violate Defendants' rights, emphasizing the burden the Court would face when fashioning jury instructions, in light of the vast differences among the many states' laws at issue. D. 609 at 33-35. Defendants have not persuaded the Court that this case will be unmanageable. But even accepting that there will be certain manageability obstacles in this case's future, such is true of "most multi-state class actions." See Relafen, 221 F.R.D. at 288.

Moreover, both fairness and efficiency support class certification, where otherwise "the numerous individual class members would be forced to file suit individually, producing numerous identical issues in each case that would waste

judicial resources and leave all parties vulnerable to unfair inconsistencies." In re Flonase Antitrust Litig., 284 F.R.D. 207, 234 (E.D. Pa. 2012); see Cardizem, 200 F.R.D. at 351. Indeed, the consolidation of several related claims, from multiple districts and consisting of DPPs as well, within this court suggests "consistency would be best served by 'concentrating the litigation' in this forum." Relafen, 221 F.R.D. at 288 (quoting Fed. R. Civ. P. 23(b)(3)(C)). To the extent that trial management difficulties arise in the future, they can and will be addressed by the Court through the structuring of the trial in this matter.

### 4. *Rule 23(b)(2) Certification*

EPPs also seek certification under Rule 23(b)(2) on the basis that the harm putative members face is ongoing, as generic competition for certain strengths of Solodyn will not begin until February 2018. D. 570 at 28. Under Rule 23(b)(2), the Court considers two additional factors: whether the Defendants' actions were "on grounds generally applicable to the class" and whether injunctive relief is "appropriate ... with respect to the class as a whole." See Fed. R. Civ. P. 23(b)(2); New Motor Vehicles, 522 F.3d at 12 n.8. "[A]ctions in the civil-rights field" are considered paradigmatic Rule 23(b)(2) class actions, although the subdivision is not limited to such cases. Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendment. Defendants argue that certification under Rule 23(b)(2) is impermissible where, as here, Plaintiffs primarily seek monetary damages. D. 609 at 16, 38; see Nexium I, 297 F.R.D. at 173.

**\*22** Class certification under Rule 23(b)(2) is "not appropriate when money damages are the predominant relief that the plaintiffs seek." DeRosa, 694 F.Supp.2d at 95; see New Motor Vehicles, 522 F.3d at 12 (explaining the district court certified the class under Rule 23(b)(2) noting that "a national injunction was the only relief available to" the class); Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendment. [23] The EPPs argue that "monetary relief alone cannot remedy [the] harm" that Defendants' anticompetitive conduct has caused. D. 641 at 31. When the primary relief sought is monetary, however, certification under Rule 23(b)(2) is inappropriate. See, e.g., In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Practices Litig., No. 12-md-2320-PB, 2015 WL 7282543, at *8-9, 2015 U.S. Dist. LEXIS 154602, at *26-27 (D.N.H. Nov. 16, 2015) (certifying Rule 23(b)(2) class because injunctive relief was the only form of damages available to the class);

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 183 of 261
PageID: 45121

In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation, Not Reported in Fed....

2017-2 Trade Cases P 80,170

Nexium I, 297 F.R.D. at 173-74; Kottaris v. Whole Foods Mkt., Inc., 281 F.R.D. 16, 27 (D.D.C. 2012). In Nexium I, the court denied certification under Rule 23(b)(2) for a class of end-payors because, even though the assumption of antitrust injury incurred with every brand overcharge established "continuing harms," the injunctive relief sought was "merely incidental to seeking monetary damages." Nexium I, 297 F.R.D. at 174.[24] Likewise, in this case, EPPs seek over one billion dollars in damages from Defendants. See D. 577 at 2; supra Part C(2)(c). At no point do they assert that injunctive relief is their primary remedy sought. Cf. D. 641 at 31. The Court thus concludes that injunctive relief is merely incidental to the vast monetary damages EPPs seek, rendering certification under Rule 23(b)(2) inappropriate here.

## V. Conclusion

For the foregoing reasons, the Court ALLOWS DPPs' motion for class certification, D. 574, and ALLOWS EPPs' motion for class certification, D. 569, under Fed. R. Civ. P. 23(b)(3), excluding Montana consumer protection claims, and DENIES EPPs' motion for class certification, D. 569, under Fed. R. Civ. P. 23(b)(2).

**So Ordered.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4621777, 2017-2 Trade Cases P 80,170

## Footnotes

1    The Court relies upon three opinions from the Nexium litigation and, for clarity's sake, hereafter refers to them as follows: the district court's opinion certifying a class of EPPs, In re Nexium (Esomeprazole) Antitrust Litig., 297 F.R.D. 168 (D. Mass. Nov. 14, 2013), as Nexium I; the district court's opinion certifying the class of DPPs, In re Nexium (Esomeprazole) Antitrust Litig., 296 F.R.D. 47 (D. Mass. Dec. 11, 2013) as Nexium II; and the First Circuit's opinion affirming end-payor class certification, Nexium, 777 F.3d 9, as Nexium III.

2    DPPs initially listed forty-nine entities as putative members but state in their reply brief that the correct count is forty-eight. D. 631 at 23 n.62.

3    DPPs also move to designate the following parties as class representatives: Ahold USA, Inc. and Rochester Drug Co-Operative, Inc. (collectively, "putative DPP representatives"). D. 574 at 1.

4    Although not disputed, the Court still finds that the requirements of typicality, commonality, and adequacy of representation are met here. Commonality is readily met here, where DPPs allege injury from the same misconduct: the allegedly unlawful Medicis-Impax agreement. D. 575 at 21. DPPs argue that the putative DPP representatives' claims arise from the same unlawful conduct by the Defendants, satisfying the typicality requirement. D. 575 at 22. DPPs have also satisfied the adequacy of representation requirement, Fed. R. Civ. P. 23(a)(4), by explaining that the putative DPP representatives' interests will not conflict with that of other class members and showing that counsel is qualified and will vigorously prosecute the case. D. 575 at 22-23.

5    Notably, most of the district courts that have applied Modafinil's impracticability guidelines were, like King Drug, those facing putative classes of fewer than forty members. See, e.g., Am. Sales Co., 2017 WL 3669604, at *9-10, 2017 U.S. Dist. LEXIS 137222, at *29-32 (holding class of thirty-two members satisfied numerosity inquiry); Wilson v. Anthem Health Plans of Ky., Inc., No. 3:14-cv-743-TBR, 2017 WL 56064, at *5-7, 2017 U.S. Dist. LEXIS 572, at *12-18 (W.D. Ky. Jan. 3, 2017) (holding same for class of twenty-seven); Bland v. PNC Bank NA., No. 2:15-cv-01042-AJS, 2016 U.S. Dist. LEXIS 189220, at *28-34 (W.D. Pa. Dec. 15, 2016) (holding same for subclasses of twenty-seven, thirty-six and thirty-nine members apiece). But see In re Lidoderm Antitrust Litig., 14-md-02521-WHO, 2017 WL 679367, at *13-14, 2017 U.S. Dist. LEXIS 24097, at *72-73 (N.D. Cal. Feb. 21, 2017) (addressing Modafinil's holding for class of fifty-two or more and finding joinder impracticable).

6    Of the 20,000 cases in which these members appeared, only approximately 1,000 included them as plaintiffs, 288 of which were pharmaceutical antitrust cases, only five of which were not class actions. D. 628 ¶¶ 7-8;

D. 631 at 27 n.88. Each of those five cases was filed alongside a class action concerning the same drug, "purportedly to opt out" of the class action. D. 628 ¶ 8; see D. 631 at 27 n.88.

7    Rule 23(b)(3) also requires a putative class to show that a class action is superior to other methods of adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). Although undisputed, the Court finds that the superiority requirement of Rule 23(b)(3) has been met here. As DPPs argue, a class action here avoids inconsistent results, allows members with small claims to participate in the case and promotes judicial economy. D. 575 at 31; see Amchem, 521 U.S. at 617, 117 S.Ct. 2231.

8    DPPs also provide the opinions of the following experts in support of their motion: Dr. Thomas G. McGuire, a Professor of Health Economics at Harvard Medical School, D. 576-2 ¶ 7; Dr. Meredith Rosenthal, a Professor of Health Economics and Policy at the Harvard School of Public Health and an Academic Affiliate of Greylock McKinnon Associates, a consulting and litigation support firm, D. 576-3 ¶ 1; John R. Tupman, Jr., a consultant with 284 Partners LLC, a professional services firm, D. 576-4 at 6; and John Thomas, Esq., a Professor of Law at Georgetown University with a focus on patent law, D. 576-5 ¶ 2. They do not, however, rely on these opinions in their arguments regarding common injury to class members, see D. 575 at 26-31, so the Court likewise focuses on Dr. Leitzinger's report here. Defendants moved to strike a rebuttal expert opinion supporting DPPs' reply memorandum by Dr. Stephen W. Schondelmeyer as untimely. D. 642. Regardless, the Court has not relied upon this report within this Memorandum and Order. Accordingly, the Court declines to strike Dr. Schondelmeyer's report at this time. D. 642.

9    Additionally, Dr. Leitzinger explains that couponing does not generally prevent large scale conversion to generic competitors, but rather addresses brand-to-brand competition, and it is unlikely that couponing alone could have impacted the market the way Defendants suggest. D. 632 ¶¶ 21-26. The Court is wary of venturing further into this question, as it is closely intertwined with the merits of Defendants' liability here. It is for the jury to decide whether the Solodyn market was impacted during this time by Medicis's marketing strategies or unlawful agreements restricting generic competition.

10   DPPs argue that if unconstrained competition had begun in 2009, "all or nearly all Class members who purchased brand Solodyn would have substituted some less-expensive generic for higher priced brands" and the price of generic Solodyn would have been substantially lower during this time. D. 631 at 14; see Relafen, 218 F.R.D. at 345 (including plaintiffs who only purchased brand Relafen during the period in question within the certified class, explaining that net prices of the brand drug later decreased when competition grew and "additional class members might have been induced to purchase generic substitutes" during the relevant period).

11   EPPs further move to designate the following parties as class representatives: United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund, the City of Providence, Rhode Island, Fraternal Order of Police, Fort Lauderdale 31 Insurance Trust Fund, International Union of Operating Engineers Local 132 Health and Welfare Fund, International Union of Operating Engineers Stationary Engineers Local 39 Health & Welfare Trust Fund, Painters District Council No. 30 Health and Welfare Fund, Plumbers & Pipefitters Local 178 Health & Welfare Trust Fund, Heather Morgan, Man-U Service Contract Trust Fund, Sheet Metal Workers Local No. 25 Health & Welfare Fund, Local 274 Health & Welfare Fund, and Allied Services Welfare Fund (collectively, "putative EPP representatives"). D. 569 at 1.

12   The Court concludes on this record that numerosity, commonality and typicality have been shown here. As to numerosity, millions of prescriptions are estimated to be involved, D. 570 at 16; D. 577 ¶ 66, establishing impracticability of joinder here. See Relafen, 221 F.R.D. at 267. Even a single common question can suffice to show commonality under Rule 23(a)(2), Wal-Mart, 564 U.S. at 359, 131 S.Ct. 2541, and EPPs' claims all stem from the same alleged anticompetitive conduct. D. 570 at 16; see D. 196 ¶ 288 (listing questions of law and fact common to putative class). As to typicality, EPPs argue that the putative EPP representatives' claims arise from the same unlawful conduct by the Defendants as absent class members and they suffered the same injury in the form of overpayments, D. 570 at 17-18, satisfying the typicality requirement.

In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation, Not Reported in Fed....
2017-2 Trade Cases P 80,170

13    Defendants are not challenging the adequacy of legal representation here, and the Court finds Motley Rice LLC, Hilliard & Shadowen LLP and Berman DeValerio have adequately prosecuted the interests of the class since the Court ordered them as interim co-lead counsel, D. 73 at 6, and will continue to do so.

14    Defendants filed Dr. Cremieux's report and other exhibits within the same document as their memorandum in opposition to EPPs' motion, D. 599. For the sake of clarity and specificity, the Court refers to Dr. Cremieux's report, D. 599 at 46-192, as D. 599-1.

15    Dr. Frank's second and third but-for scenarios contemplate a brand loyalist percentage of around nineteen and thirty-seven percent, respectively. D. 577 ¶ 59. The third scenario contains a higher market share for Add-On Strength Solodyn "due to the fact that in this scenario the legacy generics launched much closer in time with respect to the Add-On Solodyn launch and therefore did not have as much time to capture market share." Id.

16    EPPs provide, as an example of such mechanisms, "a claims process that requires members of the Class to submit an affidavit." D. 629 at 11.

17    At oral argument, Defendants also submitted a supplemental memorandum with excerpts of their depositions of Dr. Frank and Dr. DeBree. D. 648. In the excerpts provided, Dr. Frank admits he has not reviewed personal information of consumers or individual claims data for third-party payors, and Dr. DeBree acknowledges that further documentation would be necessary to identify purchasers, co-payment amounts and coupons. D. 648 at 1-4. EPPs argue that their experts' statements were taken out of context. D. 640 at 1-5. Regardless, even if their supposed concessions display that some "individualized review" will be required, D. 648 at 4, such arguments pertain to damages allocation and not proof of antitrust impact or aggregate damages.

18    In Nexium III, the First Circuit explained that outside the class action context, the plaintiff could establish injury in two ways: (1) by arguing "for a presumption that consumers would purchase the generic if it were available, i.e., a presumption that economically rational consumers faced with two identical products would purchase the less expensive alternative"; and (2) "through testimony by the consumer that, given the choice, he or she would have purchased the generic." Nexium III, 777 F.3d at 20. The First Circuit then declared "[t]here cannot be a more stringent burden of proof in class actions than in individual actions." Id. This is especially true at the class certification stage.

19    The First Circuit held that class certification on such basis would not implicate Defendants' Seventh Amendment or due process rights. Nexium III, 777 F.3d at 19-20. The Court does not perceive any additional threat to Defendants' due process or Seventh Amendment rights where, here, uninjured parties have been excluded from aggregate damages estimates, see D. 577 ¶¶ 59-60; D. 629-3 ¶ 20, and EPPs have proposed a trial plan including jury consideration of evidence and special verdict questions at the damages phase, D. 571-7.

20    This is also true for consumers "who would have been prescribed (and thus purchased) an entirely different drug" and those "whose insurers placed generic Solodyn on the same formulary tier that [brand] Solodyn occupied prior to generic entry," who Defendants argue "would pay the same co-payment for generic Solodyn as they did for [brand] Solodyn and would therefore not be injured." D. 599 at 21-22; D. 599-1 ¶¶ 68-69, 94. Dr. Frank argues, however, that Dr. Cremieux's suggestion that these groups would exist in a "but-for" scenario is based on "actual data." D. 629-3 ¶¶ 27, 39. EPPs argue that there is no basis for the conclusion that generic entry in 2009 would have caused more consumers to receive prescriptions for different drugs, and that any suggestion otherwise is "[s]heer speculation." D. 629 at 19. Additionally, they argue that in the "but-for" scenarios they propose, "the generic would have been placed on formulary tiers with lower co-payments to encourage consumers to switch to the generic." D. 629 at 19.

21    This applies, for instance, to third-party payor health plans that are fully reimbursed by their own insurance. See D. 599 at 24; D. 609 at 24. Defendants argue that even though these putative class members are excluded from the class, "[i]dentifying which health plans are fully insured will require examining the specific terms and contracts for each insurer." D. 599 at 25; D. 609 at 25; D. 599-1 ¶ 142. Dr. Frank argues, however, that IMS Xponent data, which tracks retail sales across mail order and retail channels, D. 577 ¶ 56, and upon which he relies for his damages calculations, "captures the entity that paid for the prescription at the

In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation, Not Reported in Fed....
2017-2 Trade Cases P 80,170

pharmacy," and that "a fully-insured plan, by definition, did not pay for the prescription at the pharmacy," D. 629-3 ¶ 70. The Court is persuaded that fully-insured plans will be excluded from the class on this basis.

22   Dr. Frank also provides totals broken down by state for each calculation. D. 577 ¶¶ 56 n.92, 67.

23   In Wal-Mart, the Supreme Court expressed skepticism as to whether class certification under Rule 23(b)(2) is ever appropriate to a class seeking monetary damages. See Wal-Mart, 564 U.S. at 362, 131 S.Ct. 2541 (explaining "individualized monetary claims belong in Rule 23(b)(3)").

24   The Nexium I court also noted in support of its conclusion that enjoining the reverse payment agreement after trial would provide "but little relief when the reverse payment agreements are set to expire just three months later." Nexium I, 297 F.R.D. at 174. Here, EPPs seek an injunction for harm continuing up to full competition that by their admission is set to begin in February 2018. D. 570 at 28. The trial in this case is set to begin in March 2018. D. 353.

---

**End of Document**                                  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

11

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 188 of 261
PageID: 45126
Isofoton, S.A. v. Giremberk, Not Reported in F.Supp.2d (2006)

2006 WL 1516026
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

ISOFOTON, S.A., Plaintiff,
v.
Ygal GIREMBERK d/b/a Corporate International
Operations, a sole proprietorship, Defendant.

No. CV–04–0798–PHX–ROS.
|
May 30, 2006.

**Attorneys and Law Firms**

Benjamin G. Chew, Catherine Sun, Patton Boggs LLP,
Washington, DC, Christopher Anthony Coury, John Michael
Fry, Ryley Carlock & Applewhite PA, Phoenix, AZ, for
Plaintiff.

Richard Glenn Himelrick, Salvador Ongaro, Tiffany & Bosco
PA, Phoenix, AZ, for Defendant.

ORDER

SILVER, J.

*1 On April 4, 2005 the Court issued a short order denying
Defendant Giramberk's Motion To Dismiss Count IV of
Complaint with a written opinion to follow (Doc. # 15). This
is that opinion.

Plaintiff Isofoton is suing Giramberk on a variety of theories
for allegedly failing to pay for Isofoton's products pursuant
to a Commission Agreement between the parties. Giramberk
has two principle arguments for dismissal of the unjust
enrichment claim. First, he claims that Isofoton's breach of
contract allegation in Count I precludes the unjust enrichment
allegation in Count IV. Second, he argues more generally that
unjust enrichment is inappropriate because the Commission
Agreement governs the dispute. For the reasons stated below
the Court denies the Motion to Dismiss.

I. Background
The following is accepted as true for the purposes of this
Motion to Dismiss. On November 19, 1993, Defendant
Giramberk contracted to sell Plaintiff Isofoton's photovoltaic
solar cells and modules. [Doc. # 1 (Compl.) ¶ 6.] Under

the Commission Agreement, Isofoton set a base price for
each product, which was deducted from the price Giramberk
received from customers to arrive at his commission. [*Id.*]
Giramberk received payment directly from his customers,
ordered the product from Isofoton before paying the base
price to Isofoton and reserved the excess as his commission.
[*Id.* at 7.]

Each party performed its duties under the Commission
Agreement between the date of formation and June 2002.
[*Id.* at 8.] Between June 12, 2002 and January 20, 2003,
Giramberk ordered Isofoton products totaling $284,377.03 in
seven separate orders, but made only one $80,000.00 partial
payment. [*Id.* ¶¶ 9–10.] With the exception of the $80,000.00
payment, Giramberk has neither paid for, returned, nor
complained about any of the products ordered, resulting in an
outstanding balance of $214,377.03. [*Id.* at 11.]

II. Procedural History
Isofoton filed its Complaint on April 23, 2004 alleging breach
of contract, breach of the implied covenant of good faith
and fair dealing, unjust enrichment, and breach of fiduciary
duty. [Doc. # 1.] It sought $214,377.03 in compensatory
damages, an order terminating the Commission Agreement,
or alternatively declaring it non-exclusive, attorney fees, and
pre-judgment and post-judgment interest. [*Id.*] Giramberk
filed this Motion to Dismiss on May 24, 2004. [Doc. # 4.]
Isofoton filed a Response (Doc. # 5) on June 9, 2004 followed
by Giramberk's Reply (Doc. # 9) on June 30, 2004.

III. Jurisdiction
The Court has diversity jurisdiction pursuant to 28 U.S.C.
§ 1332. Plaintiff is a resident of Spain. Defendant is a
resident of Arizona. The amount in controversy exceeds
$75,000.00. Although Giramberk's admission regarding the
Court's subject matter jurisdiction is not controlling, his
admission regarding venue and personal jurisdiction is
controlling; thus, venue and personal jurisdiction are proper.
*See Mitchell v. Maurer,* 293 U.S. 237, 244, 55 S.Ct. 162,
79 L.Ed. 338 (1934) (finding that diversity jurisdiction was
improper despite apparent acquiescence of parties to the
Court's jurisdiction).

IV. Choice of Law
*2 In a diversity action, federal courts must apply the
choice of law rules of the state in which it sits. *See Fields v.
Legacy Health Sys.,* 413 F.3d 943, 950 (9 th Cir.2005). Thus,

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 189 of 261
PageID: 45127
Isofoton, S.A. v. Giramberk, Not Reported in F.Supp.2d (2006)

this Court must apply Arizona's choice-of-law rules. Arizona courts apply the Restatement to determine the applicable law in a contract action. *See Swanson v. The Image Bank, Inc.,* 206 Ariz. 264, 77 P.3d 439, 441 (Ariz.2003). The parties' contract does not contain a choice of law provision, so the contractual rights and duties of the parties are governed by the law of the state having "the most significant relationship to the parties and the transaction." *Cardon v. Cotton Lane Holdings, Inc.,* 173 Ariz. 203, 841 P.2d 198, 202 (Ariz.2002) (citing Restatement (Second) Conflict of Laws § 188 (1971). Here, formation and performance took place partially in California and partially in Arizona. Following an order requiring further briefing on the choice of law issue (Doc. # 13), the parties stipulated that Arizona law controls the litigation. [Doc. # 14.]

Under Ninth Circuit law, choice of law stipulations during litigation are acceptable, provided they do not attempt to stipulate how the court should apply the law substantively. [1] *See Dimidowich v. Howell,* 803 F.2d 1473, 1477 n. 1 (9th Cir.1986) (accepting the parties' stipulation that California law governs, but rejecting their attempt to stipulate which precedent applies in determining substantive issues of California law). Giramberk lives and performed part of the contract in Arizona, which is the stipulated choice of law. The stipulation does not assert how Arizona law must be applied. Thus, the parties' choice of law stipulation is reasonable, and the Court will follow Arizona law.

V. Discussion

A. Legal Standard

A motion to dismiss will be granted where the plaintiff fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). For the purposes of a Rule 12(b)(6) motion, "[r]eview is limited to the contents of the complaint." *Clegg v. Cult Awareness Network,* 18 F.3d 752, 755 (9th Cir.1994). A complaint should not be dismissed "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Van Buskirk v. CNN,* 284 F.3d 977, 980 (9 th Cir.2002) (citation omitted).

When analyzing a complaint for failure to state a claim, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the non-moving party." *Smith v. Jackson,* 84 F.3d 1213, 1217 (9th Cir.1996). In addition, the district court must assume that all general allegations "embrace whatever specific facts might be necessary to

support them." *Peloza v. Capistrano Unified Sch. Dist.,* 37 F.3d 517, 521 (9th Cir.1994) (citations omitted). The district court need not assume, however, that the plaintiff can prove facts different from those alleged in the complaint. *See Associated Gen. Contractors of Cal. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

B. Analysis

1. Pleading in the Alternative

**\*3** Giramberk claims that Isofoton's breach of contract claim in Count I precludes it from setting forth an unjust enrichment claim as an alternative theory because the claims contradict each other. Isofoton argues that Fed.R.Civ.P. 8(e) 2 permits it to plead inconsistent claims as alternative theories of the case. [2]

Under Arizona law, the doctrine of unjust enrichment is a "flexible, equitable remedy available whenever the court finds that 'the defendant .... is obliged by the ties of natural justice and equity' to make compensation for the benefits received." *Arnold & Assocs., Inc. v. Misys Healthcare Systems,* 275 F.Supp.2d 1013, 1024 (D.Ariz.2003). An unjust enrichment recovery is barred when the plaintiff has *received* the benefit of its bargain. *See US Life Title Co. of Arizona v. Gutkin,* 152 Ariz. 349, 732 P.2d 579, 585 (Ariz.Ct.App.1986) (emphasis added) (rejecting plaintiff's unjust enrichment claim where it has already received the quitclaim deed for which it had bargained); *Brooks v. Valley Nat. Bank,* 113 Ariz. 169, 548 P.2d 1166, 1171 (Ariz.1976) (holding that a party is not entitled to compensation on grounds of unjust enrichment if the party receives that which it was agreed it would receive by contract). However, "[t]he mere existence of a contract governing the dispute does not automatically invalidate an unjust enrichment alternative theory of recovery." *Arnold,* 275 F.Supp.2d at 1030. Rather, unjust enrichment is warranted when the plaintiff has conferred a benefit upon the defendant in reliance upon an agreement which is unenforceable. *See id.* at 1025.

Indeed, Fed.R.Civ.P. 8(e) permits a plaintiff to alternatively plead, and there is no requirement that the Plaintiff include the magic words "in the alternative" in making alternative claims. *Id.* at 1029. An unjust enrichment count should not be dismissed unless it is insufficient apart from its inconsistency with the other counts. *See id.* at 1030–31; *Adleman v. Christy,* 90 F.Supp.2d 1034, 1045 (D.Ariz.2000) (finding on cross-motions for summary judgment that

because the plaintiff properly pled in the alternative, an unjust enrichment claim was not precluded by the undisputed fact that one of two possible contracts governed the payment of royalties at issue).

Girambaek argues that "... [Isofoton's Response] mistakenly contends that pleading unjust enrichment in the alternative permits the claim to survive where Isofoton has admitted that a contract exists between the parties." [Doc. # 9 (Reply), p. 1.] Defendant cites to *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.,* 971 F.2d 401, 408 (9 th Cir.1992), in which the Ninth Circuit held that under Arizona law a party "cannot recover on its claim [ ] of unjust enrichment" where the parties' dispute is "governed by a valid express contract." The Ninth Circuit noted that because the plaintiff "accepted the benefits of the agreement for almost four years," it was barred from challenging the validity of the [ ] agreement...." *Id.* at 409 n. 7. That is not the case here where Plaintiff does not question the validity of the contract, but rather, seeks relief pursuant to the terms of the contract, or if it is deemed unenforceable, Plaintiff seeks equitable relief.

**\*4** Further, Defendant alleges that despite Isofoton's contention, Isofoton did receive the benefit of the bargain under the contract, and misinterprets Arizona law on this point. Isofoton relies on *Adelman* and *Arnold* as support for the assertion that a party may plead breach of contract and unjust enrichment so long as the party bringing both claims did not receive the benefit of its bargain. *See* Response p. 2. Defendant argues that Isofoton received the benefit of its bargain over the course of many transactions since they signed the Agreement over ten years ago. *See* Reply p. 4. Defendant further contends that *Adelman* incorrectly applied the Arizona case law, which states only that "an unjust enrichment claim for restitution can be pursued when a party has not received the benefit of his bargain because a party is *not seeking a double recovery in those circumstances.*" Reply p. 5 (emphasis added), citing *Us Life Title Co. of Arizona v. Gutkin,* 152 Ariz. 349, 732 P.2d 579, 583–85 (Ariz.Ct.App.1986). The Court need not determine whether *Adelman* correctly applied Arizona law, because both *Adelman* and *Us Life* address the issue of whether a party is precluded from pleading in the alternative after a determination has been made as to the validity of the contract and not on a motion to dismiss. Based on the pleadings, the Court cannot make such a finding at this time.

2. Unjust Enrichment

Girambaek argues that unjust enrichment is improper, regardless of whether it is pled in the alternative, because there is a binding contract governing the parties' dealings. Isofoton responds that the Court has not yet decided whether a binding contract is in effect, and, therefore, that its unjust enrichment claim should stand.

The elements of unjust enrichment are met under Arizona law. In *US Life* the court of appeals stated that a successful unjust enrichment claim must establish that, "(1) plaintiff conferred a benefit upon the defendant; (2) the defendant's benefit is at plaintiff's expense; and (3) it would be unjust to allow the defendant to keep the benefit." Isofoton's Claim IV meets these elements. The seven shipments of goods, accepted and not returned or paid for, constitute Girambaek's benefit at Isofoton's expense. There is no reason on the face of the Complaint to believe the goods were shipped gratuitously or to doubt that Girambaek knew he was expected to pay for them. But assuming Plaintiff cannot establish the *validity of the contract,* he still may be able to prove unjust enrichment.

Defendant relies on *US Life,* 732 P.2d at 584, as support for its argument that an unjust enrichment claim can be undone by an enforceable contract governing the parties' specific rights. In that case, the court conclusively found that because U.S. Life entered a binding agreement with the defendant and accepted delivery of the quitclaim deed for which it bargained, further unjust enrichment was barred. *See id.* at 584–85. Similarly, in *Brooks,* 548 P.2d at 1171, the Arizona Supreme Court found that a mortgagor had no cause of action for unjust enrichment against his mortgagee for two reasons. First, again the court conclusively found an express contract between the parties which made any quasi-contractual remedy impossible. *See id.* Second, because the mortgagor had already received what was directed by the contract, any restitution was precluded by Restatement of Restitution § 107, comment 1(a). *See id.* Both of these cases are distinguishable, however, because the court made findings about the existence of a binding agreement and whether the benefit of the bargain had been received.

**\*5** The Ninth Circuit has addressed this issue in *Sutter Home,* 971 F.2d at 409, in which it granted judgment on the pleadings for Sutter Home on Vintage's counterclaim. Vintage claimed that Sutter Home's discontinuance of its business relationship with Vintage was wrongful and in bad faith. *Id.* at 405. As a result of Sutter Home's actions, Vintage alleged several statutory violations, a tort claim, and unjust enrichment. *See id.* The Ninth Circuit found that the distributor agreement between the parties was valid and

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 191 of 261
PageID: 45129
Isofoton, S.A. v. Giremberk, Not Reported in F.Supp.2d (2006)

controlling, thereby precluding the unjust enrichment claim. *See id.* at 408. Significantly, however, this decision was based on a judgment on the pleadings and not a motion to dismiss.

On cross motions for summary judgment, not a motion to dismiss, the Arizona district court distinguished *US Life, Brooks* and *Sutter Home* and held that where the plaintiff does not attempt to recover beyond the bounds of the contract, an unjust enrichment claim is still proper because the plaintiff has not received the benefit of the bargain. *See Adelman v. Christy,* 90 F.Supp.2d 1034, 1045 (D.Ariz.2000). Plaintiff had the option of either a breach of contract or an unjust enrichment claim. *Id.*

It is clear that if Isofoton is found on summary judgment or at trial to have acted under a valid Commission Agreement, Plaintiff could not recover under an unjust enrichment theory. However, Isofoton is merely seeking one recovery through two alternate claims.

If Defendant's argument was accepted, Fed.R.Civ.P. 8(e)(2) would be rendered meaningless. The phrase, "A party may also state as many separate claims or defenses as the party has regardless of consistency," is unambiguous. The breach of contract and unjust enrichment claims are separate and inconsistent, as contemplated by Rule 8(e) 2. As in *Arnold,* unless Count IV is insufficient apart from its inconsistency with Count I, it withstands a motion to dismiss.

Accordingly,

IT IS ORDERED that Defendant Ygal Giramberk d/b/a Corporate International Operations' Motion to Dismiss Count IV of Complaint (Doc. # 4) is DENIED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1516026

## Footnotes

1    The Fifth and Third Circuits have found that stipulations to choice of law during ongoing litigation are improper. *See, e.g., Ezell v. Hayes Oilfield Construction Co., Inc.,* 693 F.2d 489, 492 n. 2 (5th Cir.1983) (en banc) (deciding that the parties' stipulation to Mississippi law "[was] no more binding on us than any pretrial stipulation as to the content of Louisiana law."); *Consolidated Water P. & P. Co. v. Spartan Aircraft Co.,* 185 F.2d 947, 949 (3d Cir.1950) (noting that the court had not seen, and never expected to see, a choice of law stipulation made after the start of litigation). The Court is not bound by the law of these circuits.

2    Fed.R.Civ.P. 8(e)(2) provides that "[a] party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses ... A party may also state as many separate claims or defenses as the party has regardless of consistency."

---

**End of Document**                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

12

2018 WL 4144683
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Dave KEARNEY, James Barr,
and Robin Schoene, Plaintiffs,
v.
BAYERISCHE MOTOREN WERKE
AKTIENGESELLSCHAFT, and BMW
of North America, LLC, Defendants.

Civ. No. 17-13544 (WHW-CLW)
|
Signed 08/29/2018

**Attorneys and Law Firms**

Joseph H. Meltzer, Peter A. Muhic, Kessler Topaz Meltzer & Check, LLP, Radnor, PA, James E. Cecchi, Carella Byrne Cecchi Olstein Brody & Agnello, P.C., Roseland, NJ for Plaintiffs.

Douglas Harry Amster, Lewis Brisbois Bisgaard & Smith, LLC, Newark, NJ, for Defendants.

**OPINION**

William H. Walls, Senior United States District Court Judge

**\*1** In this putative class action involving allegedly defective sunroofs, Defendant BMW of North America ("BMW NA") moves to dismiss the Amended Complaint under Federal Rules of Civil Procedure 8, 9, and 12(b)(6). ECF No. 12. Plaintiffs Dave Kearney, James Barr, and Robin Schoene (collectively, "Plaintiffs") oppose. ECF No. 15. Decided without oral argument under Federal Rule of Civil Procedure 78, the motion is granted in part and denied in part.

**FACTUAL AND PROCEDURAL BACKGROUND** [1]

**1. Overview**
Plaintiffs initiated this action with a December 22, 2017 class-action complaint. ECF No. 1. An Amended Class Action Complaint (the "Amended Complaint") followed on March 13, 2008. ECF No. 7. The Amended Complaint alleges that BMW NA and Bayerische Motoren Werke Aktiengesellschaft

("BMW AG") (together, "Defendants") violated common and statutory law by selling and leasing vehicles equipped with defective sunroofs and moonroofs (the "Defective Sunroofs") that are prone to sudden, unexpected explosion or shattering. Am. Compl. ¶¶ 1–3, ECF No. 7. Specifically, it alleges that Defendants "wrongfully and intentionally concealed" problems with the Defective Sunroofs, exposing Plaintiffs and class members to "a shower of glass ... and forcing them to incur out of pocket costs to repair or replace the Defective Sunroofs" and other vehicle parts. *Id.*

The Amended Complaint is based in part on an October 2017 *Consumer Reports* investigation detailing "complaints of exploding sunroofs across numerous brands, including BMW." *Id.* ¶ 4. Many of those complaints relate to panoramic sunroofs, which have grown in popularity over the past decade; Defendants began installing them in 2004. *Id.* ¶¶ 5–6. One month after the *Consumer Reports* investigation, two United States Senators requested information from BMW and others regarding sunroof safety. *Id.* ¶ 7.

Affected vehicles include the following model years when equipped with a sunroof or moonroof:

• model year ("MY") 2005–2018 BMW 3 series;

• MY 2005–2018 BMW 5 series;

• MY 2004–2018 BMW X5s;

• MY 2005–2018 X3s;

• MY 2009–2018 BMW Xls;

• MY 2008–2018 MINI Clubmans;

• MY 2006–2018 MINI Coopers;

• MY 2011–2018 MINI Countrymans;

• MY 2009–2018 MINI Hardtops; and

• MY 2013–2018 MINI Pacemans.

(collectively, the "Class Vehicles"). *Id.* ¶ 10. Panoramic sunroofs and moonroofs are not standard features in Defendants' base models; they are featured as part of an upgrade. *Id.* ¶ 16. Defendants have neither warned Class Vehicle owners about the defect, nor agreed to cover replacement of the Defective Sunroofs under the Class Vehicles' applicable warranties. *Id.* ¶¶ 11–12, 15.

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 194 of 261
PageID: 45132
Kearney v. Bayerische Motoren Werke Aktiengesellschaft, Not Reported in Fed. Supp....

### 2. The Parties and Proposed Classes

Plaintiff Dave Kearney is a California resident and owner of a panoramic sunroof-equipped 2012 BMW X5, which he purchased on July 21, 2015. *Id.* ¶ 24. Plaintiff James Barr is a Texas resident and owner of a panoramic sunroof-equipped 2017 Mini Cooper Hardtop. *Id.* ¶ 26. Plaintiff Robin Schoene is a Maryland resident, former owner of a panoramic sunroof-equipped BMW X3, and current owner of a panoramic sunroof-equipped 2013 BMW 328i. *Id.* ¶¶ 28–31. BMW AG is a German company with its principal place of business in Munich. *Id.* ¶ 36. BMW NA is a Delaware corporation with its corporate headquarters in New Jersey. *Id.* ¶ 37. MINI USA is an unincorporated division of BMW NA that markets and sells vehicles under the MINI brand name. *Id.*

**\*2** Plaintiffs bring this action on behalf of themselves and members of the following proposed class and sub-classes:

- **Nationwide Class:** All persons or entities in the United States that purchased, leased, own, or owned a Class Vehicle (the "Nationwide Class" or "Class");

- **California Sub-Class:** All persons or entities that purchased or leased a Class Vehicle in the State of California and all persons or entities in the State of California that purchased, leased, own, or owned a Class Vehicle;

- **Song-Beverly Sub-Class:** All persons or entities that purchased or leased a Class Vehicle in the State of California;

- **Texas Sub-Class:** All persons or entities that purchased or leased a Class Vehicle in the State of Texas and all persons or entities in the State of Texas that purchased, leased, own, or owned a Class Vehicle; and

- **Maryland Sub-Class:** All persons or entities that purchased or leased a Class Vehicle in the State of Maryland and all persons or entities in the State of Maryland that purchased, leased, own, or owned a Class Vehicle. *Id.* ¶ 85.

### 3. Factual Allegations

While driving his vehicle on January 26, 2017, Plaintiff Barr heard a loud sound and "noticed a hole in his sunroof," which he replaced for approximately $1,274. *Id.* ¶ 27. The sunroof in Schoene's X3 shattered on some unspecified date, causing

glass to fall "on top of her and throughout her vehicle." *Id.* ¶ 28. In January 2018, the sunroof of her 2013 BMW 328i "exploded." *Id.* ¶¶ 30–31. For now, it appears that Kearney's sunroof remains intact. *Id.* ¶¶ 24–25. Defendants never warned any of the Plaintiffs of the Defective Sunroofs and the corresponding safety hazards associated with their Class Vehicles. *Id.* ¶¶ 25, 27, 31. Plaintiffs paid higher purchase prices for their Class Vehicles than they would have for a vehicle not equipped with a Defective Sunroof, and Barr and Schoene incurred damages related to repair costs, lost time, lost use of their Class Vehicles, and expenses associated with obtaining alternative transportation. *Id.* ¶¶ 25, 27–28, 31. Defendants have "refused to repair or replace the Defective Sunroofs free of charge" for Class Members and have "not recalled the Class Vehicles to replace the Defective Sunroofs." *Id.* ¶ 49. Had there been adequate disclosure, Plaintiffs and Class Members would not have purchased their vehicles, would have paid less for them, or would not have purchased an upgrade that included a Defective Sunroof. *Id.* ¶ 32.

Plaintiffs claim that the Class Vehicles are equipped with Defective Sunroofs, exposing Class Members to the risk of sudden explosion or shattering. *Id.* ¶ 41. "Incidents involving exploding sunroofs"—including those installed in BMW NA's vehicles—"have occurred in every month of the year in every part of the country." *Id.* ¶ 42. American consumers have filed over 850 related complaints with the federal government, although it is unclear what portion of these relate to the Class Vehicles. *Id.* ¶ 46. Part of the problem appears to stem from the "panoramic" nature of the Defective Sunroofs; " 'the bigger the expanse of glass, the harder to ensure it won't shatter.' " *Id.* ¶ 45 (quoting Jeff Plungis and Thomas Germain, *Exploding Sunroofs: Danger Overhead*, Consumer Reports at 2 (Oct. 12, 2017) ).

**\*3** The shattering and/or exploding sunroofs have attracted federal-government attention. In April 2016, the National Highway Traffic Safety Administration ("NHTSA") commenced an investigation of BMW and other auto manufacturers regarding sunroof issues, requiring the manufacturers to provide the NHTSA with various categories of related information. *Id.* ¶ 51. Senators Blumenthal and Markey made similar requests for information in November 2017. *Id.* ¶ 52. Consumers who purchased Class Vehicles have filed a number of complaints with the NHTSA. *Id.* ¶¶ 62, 65.

Defendants provided warranty coverage for the Class Vehicles, including under a New Vehicle Limited Warranty

Kearney v. Bayerische Motoren Werke Aktiengesellschaft, Not Reported in Fed. Supp....

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 195 of 261
PageID: 45133

("NVLW"), which covers "defects in materials or workmanship to the first retail purchaser and each subsequent purchaser for 4 years or 50,000 miles, whichever occurs first." *Id.* ¶ 13. The NVLW promised to repair or replace covered defective parts at no cost. *Id.* "These warranties were provided in Class Vehicle window labels, owner's manuals and brochures, and advertised on Defendants' websites." *Id.* ¶ 14.

Plaintiffs claim that Defendants failed to warn consumers of the risks associated with the Defective Sunroofs, and that Defendants concealed the Class Vehicles' defect even though they knew or should have known about it as early as 2002. *Id.* ¶¶ 57, 69. That knowledge came from pre-production testing and analysis, "early consumer complaints," "aggregate warranty data compiled from" and "repair order and parts data received from" dealers, consumer complaints to NHTSA, and "testing performed in response to consumer complaints." *Id.* ¶ 58. Defendants became aware of the defect "shortly after production of the Class Vehicles commenced ... through sources not available to Plaintiffs and members of the classes." *Id.* ¶ 60.

Despite knowing the risks associated with the Defective Sunroofs, Defendants "failed to inform Class Vehicle owners and lessees prior to purchase or lease ... or during the express warranty period that the Defective Sunroofs were defective and may explode or shatter," and that they had been inadequately tested. *Id.* ¶¶ 67–68. "None of the advertisements reviewed or representations received by Plaintiffs and members of the Classes contained any disclosure relating to the Defective Sunroofs and associated safety risk." *Id.* ¶ 32. Further, Defendants are "not acknowledging or resolving the issue," and continue to include the Defective Sunroofs as a "premium feature in the Class Vehicles." *Id.* ¶¶ 43, 61. Because Defendants "profit significantly from upselling these" Defective Sunroofs as part of their upgraded or luxury packages, they are "incentivized to sell vehicles containing the Defective Sunroofs." *Id.* ¶ 44. BMW and other carmakers "have tried to explain away and conceal the defect, by informing consumers that the exploding sunroofs are caused by a rock or some other foreign object," but this explanation has been met with skepticism by at least one mechanical engineer who assessed the claim. *Id.* ¶ 47.

Plaintiffs assert claims for:

    (i) fraud (Count 1);

    (ii) negligent misrepresentation (Count 2);

    (iii) breach of express warranty (Count 3);

    (iv) breach of implied warranty (Count 4);

    (v) violation of the Magnuson-Moss Warranty Act ("MMWA") (Count 5);

    (vi) unjust enrichment (Count 6);

    (vii) violation of California's Consumers Legal Remedies Act ("CLRA") (Count 7);

    (viii) violation of California's Unfair Competition Law ("UCL") (Count 8);

    (ix) violation of California's Song-Beverly Consumer Warranty Act (Count 9);

    (x) violation of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTP A") (Count 10);

    **\*4** (xi) violation of Maryland's Consumer Protection Act ("MCPA") (Count 11); and

    (xii) violation of New Jersey's Consumer Fraud Act ("NJCFA") (Count 12).

## STANDARD OF REVIEW

Rule 12(b)(6) allows for dismissal where the non-moving party fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief." *Id.* at 679.

In assessing a plaintiff's claims, a district court may consider the allegations of the complaint, as well as documents

Kearney v. Bayerische Motoren Werke Aktiengesellschaft, Not Reported in Fed. Supp....

attached to or specifically referenced in the complaint. *See Sentinel Trust Co. v. Universal Bonding Ins. Co.*, 316 F.3d 213, 216 (3d Cir. 2003); Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1357 at 299 (3d ed. 2014). "A 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.' " *Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 256 n.5 (3d Cir. 2004) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ).

## DISCUSSION

### 1. Choice of Law

BMW NA first argues that Plaintiffs cannot pursue a nationwide class under New Jersey law because they are not New Jersey residents, did not purchase or drive their cars here, and did not sustain any injury here. ECF No. 12-1 at 5–7. According to BMW NA, this affects Plaintiffs' NJCFA claim as well as their claims for fraud, negligent misrepresentation, breach of express warranty, breach of implied warranty, and unjust enrichment claims on behalf of the Nationwide Class, because those claims do not invoke the laws of any particular state and must be construed as claims under New Jersey law. *Id.* at 5. Thus, under a choice-of-law analysis, Plaintiffs' fraud, negligent misrepresentation, and consumer-protection claims can be brought only under the laws of their home states. *Id.* at 7. Plaintiffs respond that a choice-of-law analysis is premature at this stage, particularly because "discovery is needed to further develop facts relevant to the analysis." ECF No. 15 at 6–7.

A choice-of-law analysis is not necessarily premature. This Court has engaged in choiceof-law analyses at the motion-to-dismiss stage in similar cases. *See, e.g., Sheen v. BMW of N. Am.*, Civ. No. 13-1531, 2014 WL 283628, at *4 (D.N.J. Jan. 24, 2014); *Majdipour v. Jaguar Land Rover N. Am., LLC*, Civ. No. 12-7849, 2013 WL 5574626, at *6 (D.N.J. Oct. 9, 2013). While courts in this district have, in certain circumstances, found choice-of-law analyses premature at the motion-to-dismiss stage, they have done so where either (i) the defendant failed to explain why there was a conflict between the laws of different relevant jurisdictions, or (ii) key facts relevant to a choice-of-law analysis were not available. *See, e.g., In re Volkswagen Timing Chain Prod. Liab. Litig.*, Civ. No. 16-2765, 2017 WL 1902160, at *10 (D.N.J. May 8, 2017) (refusing to conduct choice-of-law analysis where "Defendant has failed to explain how Plaintiffs' common law

claims conflict among their home states"); *Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, Civ. No. 12-6590, 2013 WL 1431680, at *5 (D.N.J. April 9, 2013) (noting that the court "will benefit from acquiring further details regarding" the location of certain actions and discussions relevant to plaintiffs' claims). Here, by contrast, BMW NA devotes much of its briefing to choice-of-law analyses, including the issue of whether New Jersey laws conflict with those of Plaintiffs' home states, and Plaintiffs fail to identify any additional facts this Court needs to conduct its own analysis. The Court concludes that a choice-of-law analysis is appropriate now.

**\*5** When sitting in diversity, a district court applies the choice-of-law rules of its forum state—here, New Jersey—to determine which law controls. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941); *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 206 (3d Cir. 2013). "New Jersey has adopted the 'most significant relationship' test set forth in the Restatement (Second) of Conflict of Laws. This is a two-part test." *Maniscalco*, 709 F.3d at 206 (citing *P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 142–3 (2008) ). "[T]he first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether 'there is a distinction' between them." *Camp Jaycee*, 197 N.J. at 143 (quoting *Lebegern v. Forman*, 471 F.3d 424, 430 (3d Cir. 2006) ) (further citation omitted). "If there is not an actual conflict, the inquiry is over and, because New Jersey would apply its own law in such a case, a federal court sitting in diversity must do the same." *Lebegern*, 471 F.3d at 428. "If, however, an actual conflict is found to exist, the inquiry proceeds to the second step." *Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 254 (3d Cir. 2010).

"Under the second part of the inquiry, the court must determine which jurisdiction has the 'most significant relationship' to the claim." *Maniscalco*, 709 F.3d at 207 (quoting *Camp Jaycee*, 197 N.J. at 144). To make that determination, courts look to the Second Restatement, which "provides specific guidance for resolving particular types of cases." *Camp Jaycee*, 197 N.J. at 140; *see also Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 446 (D.N.J. 2012) (court "must weigh the factors set forth in the Restatement section that corresponds to Plaintiffs' cause of action"). "The Second Restatement assessment takes place on an issue-by-issue basis. It is qualitative, not quantitative." *Camp Jaycee*, 197 N.J. at 143 (citations omitted). "[I]n balancing the relevant elements of the most significant relationship test,"

courts should "apply the law of the state that has the strongest connection to the case." *Id.* at 155.

Plaintiffs do not specify in the Amended Complaint what particular law applies to Counts 1–4, while BMW NA claims that the Court should apply the laws of Plaintiffs' home states. Given that a federal court sitting in diversity will apply the law of its forum state, *see Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985), the states with potentially applicable laws for Counts 1–4 include New Jersey, California, Maryland, and Texas. *See Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 659 (3d Cir. 1998) (citation omitted) ("Until the putative class is certified, the action is one between the [named plaintiffs] and the defendants. Accordingly, the First Amended Complaint must be evaluated as to these particular plaintiffs."). The Court must determine whether the laws of California, Maryland, and Texas conflict with those of New Jersey regarding Counts 1–4 and, if so, which states have "the strongest connection to the case." *Camp Jaycee*, 197 N.J. at 155.

a. Common-law fraud (Count 1)

BMW NA contends that New Jersey law conflicts with that of California, Texas, and Maryland regarding Plaintiffs' common-law fraud claims. A common-law fraud claim under New Jersey law has five elements. Those are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Stockroom, Inc. v. Dydacomp Dev. Corp.*, 941 F. Supp. 2d 537, 546 (D.N.J. 2013) (citing *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997) ).

The first step in the choice-of-law inquiry is to determine whether the "substance of the potentially applicable laws" conflict. *Camp Jaycee*, 197 N.J. at 143. Under California law, "[t]he elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004). "To prevail on a cause of action for common law fraud under Texas law, a plaintiff must prove that the defendant (1) made a misstatement or omission (2) of material fact (3) with the intent to defraud (4) on which the plaintiff relied, and (5) which proximately caused the plaintiff

injury." *In re Enron Corp. Secs. Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 759, 770 (S.D. Tex. 2007). And "[i]n order to state a claim for common law fraud in Maryland, a plaintiff must allege (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation." *Legore v. One West Bank, FSB*, 898 F. Supp. 2d 912, 919 (D. Md. 2012).

**\*6** While a common-law fraud action under New Jersey law requires "reasonable reliance" by the plaintiff, *see Stockroom*, 941 F. Supp. 2d at 546, under Texas law "a plaintiff's reliance on the defendant's fraudulent conduct must be justifiable as well as actual." *Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1025 (5th Cir. 1990) (overruled on other grounds). In cases alleging fraudulent concealment—i.e., nondisclosure in the face of a duty to disclose—Maryland requires "justifiable reliance" as well. *See Blondell v. Littlepage*, 413 Md. 96, 119 (2010). As does California. *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Assn.*, 55 Cal. 4th 1169, 1183 (2013) ("showing of justifiable reliance" required for "all forms of fraud").

That difference in the "reliance" element is material, as " '[j]ustifiable reliance' represents a lesser burden on fraud plaintiffs that what 'reasonable reliance' might imply." *Beijing Metals & Minerals Imp./Exp. Corp. v. Am. Bus. Ctr., Inc.*, 993 F.2d 1178, 1186 (5th Cir. 1993) (citation omitted); *see also Voilas v. GMC*, 170 F.3d 367, 377 (3d Cir. 1999) (noting that "justifiable reliance generally connotes a subjective standard, while 'reasonable reliance' usually suggests an objective standard and, possibly, some measure of a duty to investigate on the part of the claimant") (citing *Field v. Mans*, 516 U.S. 59, 70–75 (1995) ); Restatement (Second) of Torts § 545A (1977). Regarding Count 1, there is an actual conflict between New Jersey law and the laws of California, Texas, and Maryland.

Turning to the second step of the analysis, the Court must look to the applicable section of the Second Restatement to determine which state has the "most significant relationship" to this case with respect to the consumer fraud allegations. *Maniscalco*, 709 F.3d at 207; *Camp Jaycee*, 197 N.J. at 140. "Where a fraud or misrepresentation claim has been alleged, the court looks to the factors found in § 148 of the

Restatement (Second) of Conflict of Laws." *Maniscalco, 709 F.3d at 207*. Subsection (2) applies because "[P]laintiff[s'] action[s] in reliance took place in whole or in part in a state other than that where the false representations" are alleged to have been made. Restatement (Second) of Conflict of Laws § 148(2) (1971); *see Maniscalco,* 709 F.3d at 207–08. Under this subsection, the Court considers the following factors:

(1) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(2) the place where the plaintiff received the representations,

(3) the place where the defendant made the representations,

(4) the domicile, residence, nationality, place of incorporation and place of business of the parties,

(5) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(6) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(2). "The relative importance of each of the factors in a given case 'should be determined in light of the choice-of-law principles stated in § 6 [of the Restatement].' " *Maniscalco,* 709 F.3d at 207 (quoting Restatement (Second) of Conflict of Laws § 148 cmt. e). Those principles are "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." *Camp Jaycee,* 197 N.J. at 147 (internal citation and quotation marks omitted).

**\*7** Plaintiff Kearney is a California resident, and purchased his Class Vehicle in California in July 2015. Am. Compl. ¶ 24. Factors 1, 2, and 5 clearly weigh in favor of California having the "most significant relationship" to Plaintiff Kearney's fraud claim. Factor 4 is neutral and factor 6 is irrelevant. Only the third factor weighs in favor of New Jersey, assuming BMW NA can be said to have made representations from its principal place of business. Regardless, the balance of factors weighs clearly in favor of applying California law.

The Court reaches the same conclusion regarding Plaintiffs Barr and Schoene. New Jersey has virtually no connection

to Barr's and Schoene's claims, while Barr and Schoene are residents of Texas and Maryland, respectively, and Schoene purchased her Class Vehicle in Maryland. Am. Compl. ¶¶ 26–29. While the Amended Complaint does not specify where Ban purchased his Class Vehicle, the Court concludes nonetheless that, between Texas and New Jersey, Texas has the "most significant relationship" to Barr's claim.

#### b. Negligent Misrepresentation (Count 2)

BMW NA next argues that New Jersey negligent-misrepresentation law is in conflict with that of California, Texas, and Maryland. To establish a claim for negligent misrepresentation, a plaintiff must show "[a]n incorrect statement, negligently made and justifiably relied on, which results in economic loss." *Konover Const. Corp. v. East Coast Const. Servs. Corp.,* 420 F. Supp. 2d 366, 370 (D.N.J. 2006) (citations omitted). BMW NA claims that while New Jersey law permits negligent-misrepresentation claims in cases involving omissions, California requires a positive assertion. ECF No. 12-1 at 9. It further argues that California, Texas, and Maryland all have shorter limitations periods applicable to negligent-misrepresentation claims. *Id.* at 10.

*i. New Jersey and California law conflict, and California has the "most significant relationship" to Kearney's negligent-misrepresentation claim,*

The Court agrees that New Jersey and California law are in conflict. "Under California law, a negligent misrepresentation claim requires a positive assertion, not merely an omission. An implied assertion or representation is not enough." *In re Vizio, Inc., Consumer Privacy Litig.,* 238 F. Supp. 3d 1204, 1230 (CD. Cal. 2017) (citations omitted). In contrast, New Jersey law permits negligent-misrepresentation claims that are "based on the defendant's silence or suppression of truth than on some affirmative misrepresentation," and "the required duty of disclosure may ... arise in any situation called for by good faith and common decency." *Highlands Ins. Co. v. Hobbs Group, LLC,* 373 F.3d 347, 355 (3d Cir. 2004).

Having found that New Jersey and California law conflict, the Court must determine which state has the "most significant relationship" to Plaintiff Kearney's claim. As already discussed, that state is California.

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 199 of 261
PageID: 45137

Kearney v. Bayerische Motoren Werke Aktiengesellschaft, Not Reported in Fed. Supp....

    ii. *BMW NA has not shown that New Jersey law conflicts with that of Texas and Maryland.*

BMW NA's only argument regarding conflict between New Jersey law and that of Texas and Maryland is that the states apply different limitations periods—New Jersey's is six years, while Texas's is two years and Maryland's is three years. ECF No. 12-1 at 10; *see Milestone Properties, Inc. v. Federated Metals Corp.*, 867 S.W.2d 113, 119 (Tex. App. 1993); *G&M Oil Co. v. Glenfed Fin. Corp.*, 782 F. Supp. 1085, 1088 (D. Md. 1991). Maryland's limitations period runs from the date "when the claimant in fact knew or reasonably should have known of the wrong." *Booth Glass Co. v. Huntingfield Corp.*, 304 Md. 615, 619 (1985). A similar discovery rule exists in Texas and New Jersey. *See Quigley v. Bennett*, 256 S.W.3d 356, 360 (Tex. App. 2008) (stating that discovery rule can "defer accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action"); *RTC Mortg. Trust 1994 N-1 v. Fidelity Nat'l Title Ins. Co.*, 58 F. Supp. 2d 503, 543 (D.N.J. 1999) (noting that "the accrual of a cause of action is delayed until the injured party discovers, or by the exercise of reasonable diligence and intelligence should have discovered, that he may have a basis for an actionable claim"). Each state therefore applies an identical or near-identical discovery rule to negligent-misrepresentation claims.

 **\*8**  While there is a facial conflict between the applicable statutes of limitations in New Jersey, Maryland, and Texas, that does not automatically trigger step two of the choice-of-law analysis; it is settled that "where the application of either state's law would yield the same result, no conflict exists to be resolved." *High v. Balun*, 943 F.2d 323, 325 (3d Cir. 1991); *see also McCarrell v. Hoffman-La Roche, Inc.*, 227 N.J. 569, 585 (2017) ("When application of the forum state's or another state's statute of limitations results in the same outcome, no conflict exists, and the law of the forum state governs.").

Plaintiffs filed the initial complaint in this action on December 22, 2017 and have specifically pled tolling of applicable statutes of limitations based on, among other things, the discovery rule. Am. Compl. ¶¶ 78–84. Plaintiff Barr's sunroof shattered in January 2017 and, although the Amended Complaint does not specify the date of purchase, it cannot have been long before January 2017 because his Class Vehicle was a 2017 model year. *Id.* at 27. The Amended Complaint claims that Plaintiff Schoene has owned at least two BMWs with sunroof problems; an X3 that she purchased in 2003,

and a 328i that she purchased in June 2017. *Id.* ¶¶ 28–31. But only the second vehicle is a Class Vehicle that is the subject of this lawsuit. *Id.* ¶ 10. That vehicle's sunroof "exploded" in January 2018. *Id.* ¶ 31.

Based on the facts alleged in the Amended Complaint, there is no statute-of-limitations conflict because Plaintiffs Barr and Schoene purchased their Class Vehicles less than two years before riling this action, and thus complied with even the shortest of the potentially applicable limitations periods. Even if BMW NA made some earlier misrepresentations, based on the facts alleged the discovery rule would bring Plaintiffs Barr and Schoene within any applicable statute of limitations. Because there is no statute-of-limitations conflict, the Court will apply New Jersey law to Plaintiffs' negligent-misrepresentation claim.

    c. NJCFA (Count 12)

Plaintiffs assert a violation of the NJCFA in Count 12 on behalf of the Nationwide Class. Am. Compl. ¶¶ 279–294. BMW NA argues that Plaintiffs cannot pursue an NJCFA claim on behalf of the Nationwide Class because none of the named Plaintiffs have any connection to New Jersey. ECF No. 12-1 at 5–7. It further argues that the NJCFA conflicts with the consumer-fraud statutes of California, Texas, and Maryland, and that the Court should apply the laws of Plaintiffs' home states instead. *Id.* at 11.

Defendant is correct that the NJCFA conflicts with the consumer-fraud statutes of Plaintiffs' home states. *See Majdipour*, 2013 WL 5574426, at *7 (concluding NJCFA conflicts with California's Unfair Competition Law and Consumer Legal Remedies Act because the California statutes both require a showing of reliance); *Durso v. Samsung Elecs. Am., Inc.*, Civ. No. 12-5352, 2013 WL 5947005, at *7 (D.N.J. Nov. 6, 2013) (concluding NJCFA conflicts with DTPA for the same reason); *Avram v. Samsung Elecs. Am., Inc.*, Civ. No. 11-6973, 2013 WL 3654090, at *19 (D.N.J. July 11, 2013) (concluding NJCFA conflicts with Maryland's Consumer Protection Act because the latter requires scienter). As already discussed, Plaintiffs' home states bear the "most significant relationship" with each Plaintiff's claim. Because the consumer-fraud statutes of Plaintiffs' home states will apply to the allegations in Count 12, and because Counts 7, 8, 10, and 11 allege violations of those statutes, Count 12 is dismissed.

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 200 of 261
PageID: 45138

Kearney v. Bayerische Motoren Werke Aktiengesellschaft, Not Reported in Fed. Supp....

#### d. Plaintiffs' New Jersey Warranty Claims (Counts 3–4)

**\*9** BMW NA argues that the laws of Plaintiffs' home states should apply to Plaintiffs' breach-of-warranty claims. Instead of offering a state-by-state analysis, BMW NA simply cites a few cases noting that state warranty laws often vary. ECF No. 12-1 at 13–14; *see Payne v. FujiFilm USA, Inc.,* Civ. No. 07-385, 2010 WL 2342388, at \*9 (D.N.J. 2010). None of these cases compare New Jersey law to that of California, Texas, or Maryland. Mere reference to inapplicable cases is insufficient to establish that a conflict of law exists. *See Dal Ponte v. Am. Mortg. Exp. Corp.,* Civ. No. 04-2152, 2006 WL 2403982, at \*5 (D.N.J. Aug. 17, 2006) (stating that "[w]here the parties fail to point out or establish any difference in the laws of the various jurisdictions involved in a particular case, it is proper for the court to apply the law of the forum"). The Court will apply New Jersey law to Plaintiffs' warranty claims.

#### 2. **Lumping**

BMW NA argues that the Amended Complaint should be dismissed because it improperly "lumps" the two Defendants together in violation of Federal Rules of Civil Procedure 8 and 9(b). ECF No. 12-1 at 19–21. Specifically, BMW NA accuses Plaintiffs of failing to differentiate among the two Defendants when laying out their allegations. The Court is not persuaded. While Plaintiffs do use the terms "Defendants" and "BMW" throughout the Amended Complaint to refer to BMW NA and BMW AG collectively, they make sufficiently particularized allegations against each entity.

The Amended Complaint clearly sets out the corporate structures of and relationships between Defendants BMW NA and BMW AG. Specifically, regarding BMW NA, Plaintiffs allege that it has its headquarters in Woodcliff Lake, New Jersey, from which it "advertises, markets and sells automobiles under the BMW brand name throughout the United States," and that "MINI USA is an unincorporated division of BMW NA" that "advertises, markets and sells" MINI-brand vehicles throughout the United States. Am. Compl. ¶ 37. BMW NA's parent company, Defendant BMW AG, is headquartered in Munich, Germany, and "designs, develops, manufactures, [and] sells luxury automobiles under the BMW and MINI brand names." *Id.* ¶ 36. In addition, "BMW NA and MINI acted as authorized agents, representatives, servants, employees and/or alter egos of BMW AG." *Id.* ¶ 38. Plaintiffs also make specific allegations

regarding BMW NA. As example, "BMW NA and MINI made decisions related to advertisement, marketing, sales, warranties, and recalls of vehicles under the BMW and MINI brand names ...." *Id.* ¶ 40.

From Plaintiffs' pleading, it is understood that BMW AG is BMW NA's corporate parent; that the former is located in Munich; that the latter is located in New Jersey; that the former is generally responsible for the design and manufacture of the Class Vehicles; and that the latter advertises and distributes those Class Vehicles in the United States. Plaintiffs have therefore achieved some level of differentiation among Defendants by specifying their corporate relationship, location, and respective responsibilities.

By identifying the Defendants' respective roles in designing, producing, marketing, and selling the Class Vehicles, Plaintiffs have avoided the pleading deficiency at issue in *Certain Underwriters at Lloyd's, London v. U-Line Corp.,* Civ. No. 13-3203, 2013 WL 5503672, at \*6 (D.N.J. Oct. 1, 2013), on which BMW NA primarily relies. In that product-liability case, the plaintiff failed to identify the respective roles of the two defendants in producing the refrigerator/freezer at issue; as the court put it, plaintiffs "must at least plead, in some minimal capacity, how [the two defendants] are involved with this particular product." *Id.* Plaintiffs have done so here. This ruling accords with the Third Circuit's recognition that further pre-discovery differentiation among related defendants is difficult when, as here, "factual information is peculiarly within the defendant's knowledge or control," and that courts have accordingly "relaxed" their applications of Rule 9(b) in these circumstances. *Craftmatic Secs. Litig. v. Kraftsow,* 890 F.2d 628, 645 (3d Cir. 1989).

#### 3. **Unjust Enrichment (Count 6)**

**\*10** BMW NA argues next that Count 6, alleging unjust enrichment, must be dismissed because Plaintiffs did not purchase their Class Vehicles directly from BMW NA, and thus did not confer any pecuniary benefit on it. ECF No. 12-1 at 15–16. In response, Plaintiffs stipulate to the voluntary dismissal of this claim. ECF No. 15 at 34. Count 6 is dismissed.

#### 4. **Statutory Consumer-Protection Claims (Counts 7, 8, 10, 11)**

BMW NA argues that Plaintiffs' remaining statutory consumer-protection claims fail because (i) they make

Kearney v. Bayerische Motoren Werke Aktiengesellschaft, Not Reported in Fed. Supp....

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 201 of 261
PageID: 45139

insufficient allegations regarding BMW NA's knowledge of the defect at issue; (ii) generic statements and "puffery" cannot support these claims; (iii) Plaintiffs have pled neither reliance nor a misrepresentation or omission; and (iv) Plaintiffs have not alleged facts demonstrating "active concealment." ECF No. 12-1 at 21–28.

Federal Rule of Civil Procedure 9(b) governs Plaintiffs' fraud-based claims. It provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The purpose of Rule 9(b) is to place defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against specious charges. *Seville Industrial Machinery Corp. v. Southmost Co.*, 742 F.2d 786, 791 (3d Cir. 1984). "To satisfy this heightened standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). "Further, the plaintiff must allege who made the purported misrepresentations and what specific misrepresentations were made." *Id.* In other words, to satisfy Rule 9(b), a plaintiff must "plead the who, what, when, where and how: the first paragraph of any newspaper story." *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (internal quotation marks omitted).

Plaintiffs plead a fraud-by-omission case, and "in cases where the fraud alleged is the fraudulent omission of information within the exclusive control of the Defendant, the [Rule 9(b)] standard is relaxed." *Gray v. BMW of N. Am., LLC*, 22 F. Supp. 3d 373, 385 (D.N.J. 2014). That is because "a plaintiff in a fraud by omission suit will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim." *Falk v. Gen. Motors Corp.*, 496 F.Supp.2d 1088, 1098–99 (N.D. Cal. 2007).

a. BMW NA's Knowledge

Under both the CLRA and UCL, "a manufacturer is not liable for a fraudulent omission concerning a latent defect ... unless the omission is 'contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose.' " *Wilson v. Hewlett–Packard Co.*, 668 F.3d 1136, 1141 (9th Cir. 2012) (quoting *Dougherty v. Am.*

*Honda Motor Co., Inc.*, 51 Cal. Rptr. 3d 118, 126 (Cal. Ct. App. 2006) ). A duty to disclose can arise in four ways: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins*, 60 Cal. Rptr. 2d 539, 543 (Cal. Ct. App. 1997). The latter three possibilities are at issue here, as Plaintiffs have not alleged any fiduciary relationship. All three scenarios presuppose that BMW NA had knowledge of the defect. [2]

**\*11** BMW NA argues that the Amended Complaint fails to adequately allege that it knew of the purported defect in the Defective Sunroofs, because Plaintiffs only cite to twelve anonymous consumer complaints lodged with NHTSA; unspecified blogs and websites on which consumers discussed their experiences with Defective Sunroofs; and assertions that "[b]ased on pre-production testing, pre-production design or failure mode analysis, ... early consumer complaints made to Defendants' network of exclusive dealers, aggregate warranty data compiled from those dealers, consumer complaints to dealers and NHTSA, and testing performed in response to consumer complaints," BMW NA knew or should have known of the problems posed by their Defective Sunroofs. Plaintiffs respond that they "specifically allege that despite long having knowledge of the defect involving the sunroofs, as evidenced by multiple sources, [BMW NA] withheld such information from Plaintiffs." ECF No. 15 at 12.

Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Although Rule 9(b) permits knowledge to be averred generally, plaintiffs must still plead the events which they claim give rise to an inference of knowledge." *Devaney v. Chester*, 813 F.2d 566, 568 (2d Cir. 1987).

Here, Plaintiffs allege that "[b]ased on pre-production testing, pre-production design or failure mode analysis, ... early consumer complaints made to Defendants' network of exclusive dealers, aggregate warranty data compiled from those dealers, consumer complaints to dealers and NHTSA, and testing performed in response to consumer complaints," BMW NA knew or should have known of the problems posed by their Defective Sunroofs. Am. Compl. ¶ 58. They list twelve specific consumer complaints filed with NHTSA between 2002 and 2017, all but one of which involved a

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 202 of 261
PageID: 45140
Kearney v. Bayerische Motoren Werke Aktiengesellschaft, Not Reported in Fed. Supp....

Class Vehicle, *id.* ¶ 65, and assert that BMW NA "regularly monitor[s] the NHTSA website and complaints filed therein," *id.* ¶ 63. By the time Plaintiff Kearney purchased his Class Vehicle, eight of the twelve NHTSA complaints listed in the Amended Complaint had been made. Am. Compl. ¶ 65. Plaintiffs Barr and Schoene purchased their vehicles later. According to the Amended Complaint, "there are multiple blogs and websites where consumers have complained about" Defective Sunroofs in the Class Vehicles. *Id.* ¶ 66. Plaintiffs do not specify the names of those blogs or websites or provide dates of consumers' posts. *Id.*

Plaintiffs' knowledge-related allegations are sufficient to withstand BMW NA's motion. Plaintiffs plead that BMW NA monitored the NHTSA complaint log and became aware of numerous sunroof-related complaints being made well before Plaintiffs purchased their vehicles; that both pre-sale and post-complaint testing revealed the problem; and that BMW NA's dealer network supplied additional information about the Defective Sunroofs. Courts have found similar knowledge-related allegations sufficient. *Compare Cirulli v. Hyundai Motor Co.*, Civ. No. 08-0854, 2009 WL 5788762, at *4 (CD. Cal. June 12, 2009) (finding knowledge adequately pled based on allegation that defendant tracked NHTSA complaint database and therefore became aware of problem with its vehicles); *with Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, Civ. No. 11-4429, 2012 WL 1574301, at *18 (D.N.J. May 3, 2012) (finding insufficient allegations of knowledge where NHTSA complaints filed after plaintiff purchased vehicle at issue); *and David v. Volkswagen Group of Am., Inc.*, Civ. No. 17-11301, 2018 WL 1960447, at *7 (D.N.J. April 26, 2018) ("Plaintiff's allegations that Defendant was on notice of defects because of consumer complaints, a letter to the [NHTSA], and a recall of the Volkswagen Beetle ... fail to support his claim because these events do not involve the 2014 Touareg and/or occurred after Plaintiff made his purchase.").

### b. Generic Statements and Puffery

BMW NA next argues that "generic statements and 'puffery' cannot form the basis of a misrepresentation claim." ECF No. 12-1 at 24–25. True enough. But Plaintiffs have pled a fraud-by-omission case, not a fraud-by-affirmative-misrepresentation case. *See* Am. Compl. ¶¶ 32–33. The relevant question is whether BMW NA had a duty to disclose the information Plaintiffs claim they omitted, not whether its statements qualify as "generic" or "puffery." *See Johnson v.*

*Nissan N. Am., Inc.*, 272 F. Supp. 3d 1168, 1183–84 (N.D. Cal. 2017) (declining to dismiss action under CLRA and CLA despite lack of "any specific affirmative misrepresentation or misleading advertisement" where plaintiff alleged that defendant concealed information it had a duty to disclose); Md. Code. Ann. Com. Law § 13-301(9) (MCPA claim includes "omission of any material fact"); Tex. Bus. & Com. Code Ann. § 17.46(b)(24) (Texas DPTA covers "omission of any material fact"). BMW NA's citations to cases involving affirmative-misrepresentation claims are inapposite.

### c. Reliance

**\*12** Plaintiffs allege that they relied on the expectation that "the Class Vehicles would be equipped with a sunroof/moonroof that was free from defects and safe to operate" and that they and the Class Members would have (i) declined to purchase the Class Vehicles; (ii) paid less for them; or (iii) had the Defective Sunroofs replaced during their applicable warranty periods had they known about the defect. Am. Compl. ¶¶ 33, 74, 104. BMW NA contends that these allegations are insufficient to state consumer fraud claims because Plaintiffs "do not allege exposure to specific representations regarding their vehicles' sunroofs," and therefore "cannot plausibly claim they would have even been aware of the allegedly omitted information ...." ECF No. 12-1 at 27.

BMW NA primarily relies on (i) 9th Circuit cases stating that Plaintiffs must show both that, had the omitted information been disclosed, they would have been aware of it and behaved differently; and (ii) a District of New Jersey case dismissing a plaintiff's California consumer-protection claims for failure to plead reliance. ECF No. 12-1 at 27; ECF No. 16 at 4–5; *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015); *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 452–53 (D.N.J. 2012). BMW NA does not address Texas or Maryland law.

Regarding Plaintiffs' California-law claims, reliance may be shown by alleging "that, had the omitted information been disclosed, one would have been aware of it and behaved differently." *Daniel*, 806 F.3d at 1225 (citation omitted). Regarding the second prong, "[t]hat one would have behaved differently can be presumed, or at least inferred, when the omission is material," and "[a]lleged defects that create unreasonable safety risks are considered material." *Id.* BMW NA does not dispute that a reasonable consumer would find

Kearney v. Bayerische Motoren Werke Aktiengesellschaft, Not Reported in Fed. Supp....

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 203 of 261
PageID: 45141

exploding sunroofs to "create unreasonable safety risks" and be considered material. It does dispute that Plaintiffs have pled that they would have been aware of the information BMW NA allegedly withheld.

Plaintiffs allege that they received BMW NA's misrepresentations "prior to and at the point of their Class Vehicle purchase or lease, including [via] advertising, the owner's manual and the New Vehicle Limited Warranty pamphlet." Am. Compl. ¶ 74. This allegation is sufficient to plead the first reliance prong in *Daniel*. *See In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1169 (declining dismissal of UCL claim on reliance grounds where plaintiffs alleged that they viewed advertisements in multiple formats). In the cases cited by BMW NA, by contrast, it appears that the plaintiffs failed to allege this exposure. *See Montich*, 849 F. Supp. 2d at 452–53 (dismissing for failure to plead reliance where plaintiff neither alleged that she saw any pre-purchase advertisements or representations or that she would have behaved differently if she had been aware of the defect); *Resnick*, 2016 WL 9455016 at \*10 (dismissing where "Plaintiffs fail[ed] to plead sufficient facts indicating that they were aware of these online representations or advertisements"); *see also Ehrlich*, 801 F. Supp. 2d at 920 (dismissing for failure to plead reliance where the complaint was "devoid of allegations that Plaintiff would have plausibly been aware" of the defect before purchase).

#### d. Fraudulent Concealment

Next, BMW NA argues that "Plaintiffs' summary claims of fraudulent concealment are easily dispensed" because "they do not allege facts showing anything other than nondisclosure." ECF No. 12-1 at 27. BMW NA again addresses only California law. It refers to *Gray v. Toyota Motor Sales, U.S.A.* for the proposition that "[a] claim of fraudulent concealment requires an affirmative act seeking to suppress information in the public domain or obscure consumers' ability to discover it." Civ. No. 08-1690, 2012 WL 313703, at \*3 (CD. Cal. Jan. 23, 2012). In so arguing, BMW NA misapprehends the *Gray* court's analysis.

**\*13** As discussed, under California law "a failure to disclose can constitute actionable fraud in four circumstances: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant has exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff;

and (4) when the defendant makes partial representations but also suppresses some material facts." *Id.* In other words, in those four circumstances a party has a duty to disclose. *Id.* Defendants' quote from *Gray* refers only to the fourth circumstance. *Id.* at \*10 ("At best, these allegations suggest only that when customers expressed dissatisfaction with their mileage, Toyota's customer service representatives suggested ways in which it could be improved. Plaintiffs do not allege that Toyota sought to suppress information in the public domain or obscure consumers' ability to gauge their own mileage."). Plaintiffs here primarily allege that the second circumstance is at issue, and BMW NA's quotation from *Gray* is irrelevant. *See, e.g.*, Am. Compl. ¶ 57 ("Knowledge and information regarding the defect in the Defective Sunroofs were in the exclusive and superior possession of Defendants and their dealers."). Because Plaintiffs allege nondisclosure *and* BMW NA's exclusive possession of information regarding the defect, their Amended Complaint satisfies at least the second duty-to-disclose circumstance described in *Gray*.

BMW NA's motion to dismiss Counts 7, 8, 10, and 11 is denied.

#### 5. Common-Law Fraud (Count 1)

Regarding Count 1, BMW NA again contends that Plaintiffs fail to satisfy Rule 9(b)'s "heightened pleading standards." ECF No. 12-1 at 16–20. BMW NA claims that the Amended Complaint "merely recites conclusions and parrots statutory language," "fails to allege basic details as to Plaintiffs' vehicle purchases," and makes "conclusory allegations on information and belief; BMW NA does not, however, tie any of these claimed deficiencies to any particular element of Plaintiffs' fraud claims. *Id.* Plaintiffs respond that their pleading satisfies Rule 9(b), particularly in light of the fact that its requirements are relaxed in cases alleging fraudulent omissions. ECF No. 15 at 10–16. The Court has already detailed the elements of California's, Texas's, and Maryland's applicable common-law fraud actions.

To begin with, BMW NA's contention that Plaintiffs' conclusory state-of-mind allegations are insufficient ignores that, under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). It is true that "[a]lthough Rule 9(b) permits knowledge to be averred generally, plaintiffs must still plead the events which they claim give rise to an inference of knowledge." *Devaney*, 813 F.2d at 568. But as already discussed, Plaintiffs do so here—they allege that BMW NA

Kearney v. Bayerische Motoren Werke Aktiengesellschaft, Not Reported in Fed. Supp....

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 204 of 261
PageID: 45142

knew of the problems posed by their Defective Sunroofs long before Plaintiffs purchased their vehicles and chose to conceal those problems from Plaintiffs.

BMW NA points out that Plaintiff Schoene does not state the model year for her BMW X3, whether the BMW X3 was new or used at the time of purchase, where she purchased the BMW X3, or the date when her sunroof allegedly shattered," and that Plaintiff "Barr does not state whether he purchased a new or used vehicle or when and where he purchased his vehicle." ECF No. 12-1 at 17. The Court agrees that, absent a clarifying amendment, Plaintiff Schoene's BMW X3 cannot be a Class Vehicle because she purchased it in 2003, and it is only BMW X3s that are model year 2005 or later that are part of Plaintiffs' Class Vehicles definition. Am. Compl. ¶ 28. But Plaintiff Schoene's 2013 BMW 328i is indisputably a Class Vehicle, and so her claim survives. *Id.* ¶ 29. Regarding Plaintiff Barr's fraud claim, the Court is not convinced that he must plead the precise date and location of his Class Vehicle purchase in order to state a fraud claim under Rule 9(b), as those facts would do little to illuminate for BMW NA the misconduct with which it is charged.

Finally, pleading upon information and belief is undoubtedly permissible. *McDermott v. Clondalkin Group, Inc.*, 649 Fed. Appx. 263, 267–68 (3d Cir. 2016). And where the plaintiff "does not rely on boilerplate and conclusory allegations and he accompanies his legal theory with allegations that make his theoretically viable claim plausible," those allegations can survive a Rule 12(b)(6) motion to dismiss. *See id.* at 268 (reversing dismissal where plaintiff's allegations "do not paraphrase in one way or another the pertinent ... elements of the claims" but instead "explain *how* [defendant] allegedly breached the contract") (emphasis in original). That is the case here, and BMW NA fails to identify any elements of Plaintiffs' fraud claims that are unmet as a result of this claimed pleading deficiency.

**\*14**  BMW NA's motion to dismiss Count 1 is denied.

### 6. **Negligent Misrepresentation (Count 2)**

BMW NA contends that the economic-loss rule, which precludes recovery in tort of pecuniary losses, bars Plaintiffs' negligent-misrepresentation claims. ECF No. 12-1 at 28–30. Plaintiffs respond that their claims fall into recognized exceptions to the economic-loss rule. ECF No. 15 at 34–7. As discussed, California law will apply to Plaintiff Kearney's negligent-misrepresentation claim, and New Jersey law will

apply to Plaintiffs Barr's and Schoene's claims. Plaintiffs do not claim any injuries other than those to their Class Vehicles.

Under California law, the economic-loss rule applies to negligent-misrepresentation claims. *Shahinian v. Kimberly-Clark Corp.*, Civ. No. 14-8390, 2015 WL 4264638, at *8-9 (CD. Cal. July 10, 2015). "Generally, under the 'economic loss' rule, a plaintiff who suffers only pecuniary injury as a result of the conduct of another cannot recover those losses in tort. Instead, the claimant is limited to recovery under the law of contract." *Apollo Grp., Inc. v. Avnet, Inc.*, 58 F.3d 477, 479 (9th Cir. 1995). One exception to the economic-loss rule applies in products-liability cases, where "the rule may be overcome by allegations of personal injury or damages to other property besides the defective product." *United Guar. Mortg. Indent. Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1181 (C.D. Cal. 2009) (citations omitted).

Plaintiffs claim that a third exception exists "where the threat of physical harm to the plaintiff is sufficiently grave." ECF No. 15 at 35 (citing *Strumlauf v. Starbucks Corp.*, 192 F. Supp. 3d 1025, 1035–36 (N.D. Cal. 2016) ). That assertion is based on a California Supreme Court case called *Robinson Helicopter Co., Inc. v. Dana Corp.*, in which that court held that a helicopter parts supplier who knowingly provided false certifications to a helicopter manufacturer certifying that its parts complied with strict specifications could be sued under a fraud theory notwithstanding the economic-loss rule. 34 Cal. 4th 979 (2004). But the *Robinson Helicopter* court noted that its holding was "narrow in scope and limited to a defendant's affirmative misrepresentations on which a plaintiff relies *and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss.*" *Id.* at 993 (emphasis added). That is not the case here, and the economic-loss rule will bar Plaintiff Kearney's negligent-misrepresentation claim.

New Jersey also recognizes that "[g]enerally speaking, tort principles are better suited to resolve claims for personal injuries or damages to other property," and that "[c]ontract principles more readily respond to claims for economic loss caused by damage to the product itself." *Alloway v. Gen. Marine Indus., L.P.*, 149 N.J. 620, 627 (1997). Accordingly, "a tort cause of action for economic loss duplicating the one provided by the U.C.C. is superfluous and counterproductive." *Id.* at 641. Plaintiffs assert that, in New Jersey, the economic-loss rule does not bar tort actions under theories of fraud or negligent misrepresentation. They are correct. *See Coastal Group v. Dryvit Sys.*, 274 N.J. Super.

Kearney v. Bayerische Motoren Werke Aktiengesellschaft, Not Reported in Fed. Supp....

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 205 of 261
PageID: 45143

171, 177 (App. Div. 1994) (noting that the economic loss doctrine "only precludes claims brought under tort principles which are inconsistent with the remedies authorized under the UCC" and that "the UCC expressly preserves a buyer's right to maintain an action for fraud and misrepresentation"). Plaintiffs Barr's and Schoene's negligent-misrepresentation claims under New Jersey law survive.

### 7. Express Warranty Claim (Count 3)

**\*15** BMW NA contends that Plaintiffs' express-warranty claims fail because (i) the NVLW does not cover design defects; (ii) Plaintiffs did not present their vehicles for repair; and (iii) Plaintiffs have not pled that BMW NA created or breached a warranty by representation. ECF No. 12-1 at 30–34. As discussed, the Court will apply New Jersey law to the express-warranty claims at this stage. Under New Jersey law, "to state a claim for breach of express warranty, Plaintiffs must properly allege: (1) that Defendant made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description." *Francis E. Parker Memorial Home, Inc. v. Georgia–Pacific LLC*, 945 F. Supp. 2d 543, 568 (D.N.J. 2013).

According to BMW NA, the NVLW covers only "defects in materials or workmanship," and not design defects, whereas the language of the Amended Complaint routinely refers to design defects and is only "sprinkle[d]... with conclusory 'materials and workmanship' verbiage." *Id.* at 31; *see* Am. Compl. ¶ 13. Plaintiffs correctly note in response that courts in this District routinely refuse to distinguish between design defects and defects in materials or workmanship at the pleading stage, particularly where, as here, the plaintiff asserts both and alleges facts supporting both explanations. *E.g., In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at \*12; *Alin v. Am. Honda Motor Co.*, Civ. No. 16-2765, 2010 WL 1372308, at \*6 (D.N.J. Mar. 31, 2010) ("At the pleading stage, where the distinction between defect in design and defect in materials or workmanship is a matter of semantics, and sufficient facts are alleged to assert both, the defendant's characterization of the nature of the claim prediscovery should not control whether the complaint survives."); *Cox v. Chrysler Grp., LLC*, Civ. No. 14-7573, 2015 WL 5771400, at \*6 (D.N.J. Sept. 30, 2015).

Next, BMW NA claims that it cannot have breached the NVLW if it upheld its obligations thereunder, and that

Plaintiffs must have presented their vehicles to BMW NA in order for it to have failed to honor the NVLW. ECF No. 12-1 at 32–33. Plaintiffs respond by pointing to language in the Amended Complaint asserting that Plaintiffs Barr and Schoene incurred repair and/or replacement costs after their sunroofs shattered; they also note that Plaintiff Kearney's sunroof has not yet shattered. ECF No. 15 at 25-26. Plaintiffs do not dispute that the warranty at issue is one of repair. *See* Am. Compl. ¶ 13 ("Defendants promised to repair or replace covered defective parts arising out of defects in materials and/or workmanship, including the Defective Sunroofs ...."). But none of Plaintiffs' allegations claim that they presented their vehicles to *BMW NA* for repair. BMW NA cannot have breached the NVLW if it never had the opportunity to comply with it. *See Herbstman v. Eastman Kodak Co.*, 68 N.J. 1, 12 (1975) ("We do not agree ... that Kodak's express 'warranty' was that the camera would be free of mechanical defects. Rather, the language used contemplated that such defects might occur and, if so, Kodak would repair them."). Similarly, Plaintiff Kearney's express-warranty claim must be dismissed because he does not claim to have experienced any sunroof-related issues with his Class Vehicle. BMW NA's motion to dismiss Count 3 is granted.

### 8. Implied Warranty Claim (Count 4)

Regarding Plaintiffs' implied-warranty claims, BMW NA contends that (i) Plaintiff Barr's vehicle remains merchantable; (ii) Plaintiff Schoene's claim is time-barred; and (iii) Plaintiff Kearney's claim must fail because he is not in privity with BMW NA and his vehicle has never malfunctioned. ECF No. 12-1 at 34–36. In New Jersey, the implied warranty that comes with the purchase of a car "is simply a guarantee that [it] will operate in a safe condition and substantially free of defects and, therefore, where a car can provide safe, reliable transportation, it is generally considered merchantable." *Henderson v. Volvo Cars of N. Am., LLC*, Civ. No. 09-4146, 2010 WL 2925913, at \*9 (D.N.J. July 21, 2010).

**\*16** *Plaintiff Barr*. BMW NA makes much of Plaintiff Barr's allegation that he "heard a large pop and noticed a hole in his sunroof," Am. Compl. ¶ 27, and the difference in nature between an "exploding" or "shattering" sunroof and one which has a hole in it. The Court declines to attach the same significance to this semantic distinction, as a sudden "loud pop" and "hole in [a] sunroof undoubtedly affects whether a vehicle is safe for ordinary use, which is a key determinant of merchantability. *Green v. BMW of N. Am.*, Civ. No. 11-4220, 2013 WL 5287314, at \*2 (D.N.J. Sept. 17, 2013). BMW NA's argument that Barr's vehicle continues to "fulfill[ ] the

Kearney v. Bayerische Motoren Werke Aktiengesellschaft, Not Reported in Fed. Supp....

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 206 of 261
PageID: 45144

ordinary purpose of a car" and thus remains merchantable simply because Barr continues to own the vehicle is similarly unavailing. ECF No. 12-1 at 35–36. That Barr continues to own his Class Vehicle does not necessarily mean that it is fit for ordinary use.

*Plaintiff Schoene.* Regarding Schoene, BMW NA argues that she did not experience any sunroof-related issues with her Class Vehicle until after the NVLW expired, and therefore cannot state an implied-warranty claim. ECF No. 12-1 at 36. Plaintiffs respond that Schoene's claims should survive because the implied-warranty limitation period is unconscionable. ECF No. 15 at 29–32; Am. Compl. ¶ 132. Relevant allegations include that BMW NA was aware that its sunroofs were defective by the time Plaintiffs purchased their vehicles and had exclusive knowledge of the defect; that there was a "gross disparity in bargaining power" between Plaintiffs and Defendants; and that the time limitations were determined by Defendants, not Plaintiffs. *Id.*

Implied warranties of merchantability are limited to the same term as any express warranty. N.J. Stat. Ann. § 12A:2-317. Where the alleged breach involves a latent defect that manifests outside the period covered by the warranty, a plaintiff may sometimes state a claim if he alleges that the warranty was unconscionable. *Henderson v. Volvo Cars of N. Am., LLC,* Civ. No. 09-4146, 2010 WL 2925913, at *7 (D.N.J. July 21, 2010). In New Jersey, the question whether a contractual provision is unconscionable is a matter of law for the Court. *Collins v. Uniroyal, Inc.,* 64 N.J. 260, 267 (1974). But if a court thinks a contractual clause may be unconscionable, "the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect." N.J.S.A. 12A:2-302(2).

Unconscionability may be either "substantive" or "procedural." In New Jersey, courts will find a contract term to be substantively unconscionable if the term is "excessively disproportionate," involving an "exchange of obligations so one-sided as to shock the court's conscience." *Delta Funding Corp. v. Harris,* 189 N.J. 28, 55 (2006) (Zazzali, J., concurring in part and dissenting in part) (citing *Sitogum Holdings, Inc. v. Ropes,* 352 N.J. Super. 555, 565 (Ch. Div. 2002). They will find it procedurally unconscionable depending on various "inadequacies," including "lack of sophistication," "bargaining tactics, and the particular setting existing during the contract formation process." *Id.* In New Jersey, if the contract at issue is a contract of adhesion, the court should consider four factors: "the subject matter of the contract, the

parties' relative bargaining positions, the degree of economic compulsion motivating the 'adhering' party, and the public interests affected by the contract." *Id.*

Courts in this District have declined to resolve similar unconscionability claims at the motion-to-dismiss stage. *See, e.g., Henderson,* 2010 WL 2925913, at *9 (permitting unconscionability claim to proceed on allegations that the manufacturer knew a part would fail after warranty expiration and that plaintiffs "had no meaningful choice in determining" time limitations due to a "gross disparity in bargaining power"); *In re Ford Motor Co. E-350 Van. Prods. Liab. Litig,* MDL No. 03-4558, 2008 WL 4126264, at *20 (D.N.J. Sept. 2, 2008); *Skeen,* 2014 WL 283628, at *14 (permitting plaintiff's claim of unconscionability to proceed past the motion-to-dismiss stage where they "claim[ed] that Defendants knew the timing chain tensioners would fail and manipulated the warranty terms to avoid paying for it"). The Court concurs and will not dismiss Plaintiff Schoene's implied-warranty claim.

**\*17** *Plaintiff Kearney.* Applying California law, BMW NA argues that Kearney's implied-warranty claim must fail because Kearney purchased a used Class Vehicle and thus is not in privity with BMW NA. Because the Court applies New Jersey law to Plaintiffs' implied-warranty claims on this motion, and because New Jersey does not require privity between a plaintiff and defendant in implied-warranty claims, this argument fails. *Spring Motors Dist., Inc. v. Ford Motor Co.,* 98 N.J. 555, 561 (1985).

Next, BMW NA insists that Kearney's implied warranty claim must be dismissed because his sunroof has not malfunctioned. Am. Compl. ¶¶ 24–25. Plaintiffs offer no authority permitting a warranty claim to proceed where the plaintiff had not yet manifested some injury; they cite only cases where latent defects manifested outside the time period of the applicable warranty, but before initiating litigation. *E.g., In re Volkswagen Timing Chain,* 2017 WL 1902160, at *15. An allegation that Kearney's sunroof is likely defective is insufficient to sustain his warranty claims. *See Yost v. Gen. Motors Corp.,* 651 F. Supp. 656, 658 (D.N.J. 1986) (dismissing warranty claim where plaintiff only alleged that a "potential leak is 'likely' to cause damage and 'may' create potential safety hazards"). This rationale provides an alternative basis for dismissing Plaintiff Kearney's express warranty claim, discussed earlier. It also requires dismissal of Kearney's Song-Beverly Consumer Warranty Act claim because he offers no indication that his Class Vehicle is not

Kearney v. Bayerische Motoren Werke Aktiengesellschaft, Not Reported in Fed. Supp....

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 207 of 261
PageID: 45145

"fit for the ordinary purposes for which such" vehicle is used. Cal. Civ. Code § 1791.1.

Accordingly, Count 4 is dismissed as to Plaintiff Kearney, and Count 9 is dismissed.

### 9. **MMWA Claim (Count 5)**

Count 5 of Plaintiffs' Amended Complaint pleads a violation of the MMWA. "Magnuson–Moss is a remedial statute designed to protect the purchasers of consumer goods from deceptive warranty practices." *Robinson v. Kia Motors Am., Inc.*, Civ. No. 13-006, 2015 WL 5334739, at *14 (D.N.J. Sept. 11, 2015). BMW NA contends that Plaintiffs' MMWA claim fails because (i) their state-law warranty claims fail, and (ii) there are fewer than 100 named plaintiffs. ECF No. 12-1 at 38–39.

As Plaintiffs point out, courts routinely permit putative class actions with fewer than 100 named plaintiffs to proceed with MMWA claims where, as in this case, the court has jurisdiction under some other statute. *See, e.g., Kia Motors*, 2015 WL 5334739, at *14 (allowing MMWA claims to proceed with five named plaintiffs); *see also Smith v. Vanguard Dealer Srvcs., LLC*, Civ. No. 09-031, 2009 WL 2152096, at *3 (D.N.J. July 14, 2009) (describing 100-plaintiff requirement as a "jurisdictional provision").

Here, because the Court denies BMW NA's motion to dismiss Plaintiffs Barr's and Schoene's implied-warranty claims, their MMWA claims survive as well. But because the Court grants BMW NA's motion to dismiss all of Plaintiff Kearney's warranty claims, Kearney's MMWA claim must fail as well. Count 5 is dismissed as to Plaintiff Kearney.

### 10. **DTPA Claim (Count 10)**

Finally, BMW NA claims that Count 10 must be dismissed because Plaintiff Barr failed to give written notice to BMW NA at least 60 days before filing suit, as required by the Texas DTPA. ECF No. 12-1 at 39. Barr sent a letter to Defendants on the same day that Plaintiffs filed the Amended Complaint. Am. Compl. ¶ 253. Plaintiffs respond that the "consequence for not complying with the notice requirement is not dismissal, but abatement of the action during the statutory notice period." ECF No. 15 at 37. Plaintiffs are correct. *See Hines v. Hash*, 843 S.W.2d 464, 468–69 (Tex. 1992) (concluding that "it is not necessary to the purpose of notice ... to dismiss plaintiff's action if notice is not given" and "that if a plaintiff files an action for damages under the DTPA without first giving the required notice, and a defendant timely requests an abatement, the trial court must abate the proceedings for 60 days"). BMW NA's motion to dismiss Count 10 is denied.

### CONCLUSION

**\*18** BMW NA's motion to dismiss is granted as to Counts 3, 6, 9, and 12 in their entirety, and as to Counts 2, 4, and 5 regarding Plaintiff Kearney only. The remainder is denied. Plaintiffs are granted 45 days from the date of this opinion to seek leave to amend the Amended Complaint if they wish. An appropriate order follows.

### All Citations

Not Reported in Fed. Supp., 2018 WL 4144683

---

### Footnotes

1    Unless stated otherwise, all facts are drawn from the Amended Complaint, ECF No. 7.

2    Texas and Maryland law also contain a knowledge requirement in omission cases. *See Resnick v. Hyundai Motor Am., Inc.*, Civ. No. 16-593, 2017 WL 1531192, at *20 (CD. Cal. April 13, 2017) ("Under the Texas DTPA, there is no duty to disclose if the defendant did not know the material information at the time of the transaction.") (citation omitted); *Amata v. Toyota Motor Sales, U.S.A., Inc.*, Civ. No. 12-168, 2013 WL 12248140, at *6 (CD. Cal. April 29, 2013) (dismissing MCPA claim where plaintiffs failed to allege defendant was aware of defect at time of sale).

---

**End of Document**                © 2021 Thomson Reuters. No claim to original U.S. Government Works.

13

McDermott v. Cummins, Inc., Not Reported in Fed. Supp. (2016)

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 209 of 261
PageID: 45147

2016 WL 3287335
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

T.J. MCDERMOTT Transportation Co., Inc.,
DeMase Warehouse Systems, Inc., Heavy
Weight Enterprises, Inc., P&P Enterprises
Co., LLC, Young's Auto Transport, Inc.,
Allen Hardwick, and Jose Vega, Plaintiffs,
v.
CUMMINS, INC., Cummins Emission
Systems, Inc., and Paccar, Inc. d/b/
a Peterbilt Motor Company, Defendants.

Civ. No. 14-4209 (WHW) (CLW)
|
Signed 06/07/2016

**Attorneys and Law Firms**

James E. Cecchi, Lindsey H. Taylor, Carella Byrne Cecchi Olstein Brody & Agnello, P.C., Roseland, NJ, James Michael Mulvaney, Jennifer Marie Bennett, McElroy, Deutsch, Mulvaney & Carpenter, LLP, Morristown, NJ, Ryan P. Mulvaney, McElroy, Deutsch, Mulvaney & Carpenter, LLP, Newark, NJ, James C. Shah, Natalie Finkelman Bennett, Shepherd, Finkelman, Miller & Shah, LLP, Collingswood, NJ, Eileen T. Burns, Kohn Swift & Graf PC, Philadelphia, PA, for Plaintiffs.

Craig R. Tractenberg, Nicole F. Mastropieri, Nixon Peabody, LLP, New York, NY, Anthony M. Pisciotti, Danny Charles Lallis, Pisciotti Malsch & Buckley PC, Florham Park, NJ, for Defendants.

**OPINION**

Walls, Senior District Judge

**\*1** Plaintiff T.J. McDermott Transportation Co. filed this action on July 2, 2014, invoking this Court's diversity jurisdiction and alleging that tractors it purchased from Defendants had defective engines. T.J. McDermott filed an amended complaint on September 2, 2014. ECF No. 17. Defendants moved to dismiss that complaint, and this Court partially granted and partially denied that motion on March 11, 2014. ECF Nos. 37, 38. On December

29, 2015, Magistrate Judge Waldor granted Plaintiff leave to file a Second Amended Complaint, ECF No. 69, and Plaintiff did so on January 8, 2016. The Second Amended Complaint added Plaintiffs DeMase Warehouse Systems, Heavy Weight Enterprises, Inc., P&P Enterprises, Co., Young's Auto Transport, Inc., Allen Hardwick, and Jose Vega. *Id.* They seek to certify classes on behalf of purchasers in New Jersey, California, Florida, Georgia, Michigan, and Connecticut. Defendant PACCAR now moves to partially dismiss that complaint. Decided without oral argument under Fed. R. Civ. Pr. 78, the motion is granted in part and denied in part.

**FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are drawn from the Second Amended Complaint ("SAC"), ECF No. 69, unless otherwise noted. Plaintiffs allege that Defendants PACCAR and Cummins formed a partnership in 2001 for the "development, design, manufacture, assembly, marketing and sale of" tractors that used Cummins's ISX15 engine. *Id.* ¶ 14. According to Plaintiffs, PACCAR's vehicles equipped with the ISX15 engine from model years 2007 through 2009 experienced failures due to various problems relating to "exhaust gas recirculation ('EGR'), the EGR valves, diesel particulate filter ('DPF') systems and other sensors, and other piping and containment components for the Aftertreatment system." *Id.* ¶ 24. Plaintiffs assert that Defendants were aware of these failures in part because the vehicles' onboard diagnostics systems "store trouble or fault codes and provide data to Defendants' and/or their authorized service providers' diagnostic computers." *Id.* ¶ 19.

Despite these problems with earlier ISX15 models, Cummins "designed, manufactured, marketed, assembled and sold" a 2010 ISX15 model (the "subject engines"). *Id.* ¶ 16. Plaintiffs allege that Cummins designed these engines without "correcting the known problems with the 2007 through 2009 model year ... engines." *Id.* ¶ 25. PACCAR then designed and marketed tractors equipped with the 2010 ISX15 engine (the "subject vehicles"). *Id.* ¶ 18. Plaintiffs assert that Cummins "warranted to Plaintiffs that the 2010 ISX15 engines would be free from defects in material and workmanship and that in the event a defect manifested, Cummins was obligated to correct the defect." *Id.* ¶ 26.

According to the complaint, Defendants "intentionally concealed" defects with the subject vehicles, including

McDermott v. Cummins, Inc., Not Reported in Fed. Supp. (2016)

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 210 of 261
PageID: 45148

persistent problems with (1) the engines' gas recirculation system, (2) the aftertreatment system's diesel particulate filters, (3) the aftertreatment system's hydrocarbon doser, (4) several of the engines' sensors, and (5) other components in the aftertreatment system's piping and containment system. *Id.* ¶ 27. Owners of the subject vehicles experienced various problems "often before the 200,000 mile interval, at a high rate." *Id.* ¶ 28. Their tractors "repeatedly and frequently broke down, failed to function properly, and failed to function reliably and dependently." *Id.* ¶ 32. Cummins issued seventeen technical service bulletins listing problems with the subject engines from 2011 through 2014. *Id.* ¶ 29. Plaintiffs allege that these defects were known to Defendants at the time of sale and that Defendants failed to disclose them. *Id.* ¶¶ 30-34.

**\*2** Plaintiffs are companies and individuals that purchased the subject vehicles. Plaintiff T.J. McDermott, a New Jersey corporation, purchased five subject vehicles between 2010 and 2011. *Id.* ¶¶ 1, 36. Plaintiff DeMase, also a New Jersey corporation, purchased four subject vehicles in 2011. *Id.* ¶¶ 2, 37. Plaintiff Heavy Weight Enterprises, a Michigan corporation, bought one subject vehicle in 2010. *Id.* ¶¶ 3, 38. Plaintiff P&P, a Connecticut corporation, also bought one subject vehicle in 2010. *Id.* ¶¶ 4, 39. Plaintiff Young's Transport, a Florida corporation, bought two subject vehicles in 2012. *Id.* ¶¶ 5, 40. Plaintiff Hardwick, a Georgia resident, purchased a subject vehicle in 2010. *Id.* ¶¶ 6, 41. Plaintiff Vega, a California resident, purchased a subject vehicle in 2013. *Id.* ¶¶ 7, 42. These Plaintiffs experienced problems with the subject engines that they claim resulted in "out-of-pocket costs of repair, towing and lodging costs, rental costs of replacement vehicles, diminished value of Subject Vehicles, lost revenue, lost profit, and goodwill" as well as "substantially diminished resale value and intrinsic value." *Id.* ¶¶ 47, 48.

Plaintiffs also seek to certify several classes and sub-classes. They propose a New Jersey class consisting of all persons and entities in New Jersey who are "users, purchasers, subsequent purchasers, owners, subsequent owners, and lessors" of a vehicle powered by a 2010 ISX15 engine, with a New Jersey subclass specifically relating to those whose vehicle was made by PACCAR. *Id.* ¶ 50. They also seek to certify identical classes and subclasses for persons and entities in the states of California and Florida. *Id.* Finally, Plaintiffs propose classes of 2010 ISX15 engine owners, without related subclasses for the states of Georgia, Michigan, and Connecticut. *Id.*

On behalf of themselves and the putative classes, Plaintiffs assert (1) one count under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, against Cummins on behalf of the New Jersey Class and against PACCAR on behalf of the New Jersey sub-class, *id.* ¶¶ 62-71, (2) one count of breach of express warranty under New Jersey law against Cummins on behalf of the New Jersey Class, *id.* ¶¶ 72-86, (3) one count of breach of express warranty under California law against Cummins on behalf of the California Class, *id.* ¶¶ 87-100, (4) one count for violation of the California Unfair Competition Law, Cal. Business and Professions Code § 17200, against Cummins on behalf of the California Class and against Cummins and PACCAR on behalf of the California sub-class, *id.* ¶¶ 101-109, (5) one count of breach of express warranty under Florida law against Cummins on behalf of the Florida Class, *id.* ¶¶ 110-124, (6) one count for violation of Florida's Unfair and Deceptive Trade Practices Act, § 501.201, Florida Statutes, against Cummins on behalf of the Florida Class and against PACCAR on behalf of the Florida sub-class, *id.* ¶¶ 125-132, (7) one count for breach of express warranty under Georgia law against Cummins on behalf of the Georgia class, *id.* ¶¶ 133-147, (8) one count for breach of express warranty under Michigan law against Cummins on behalf of the Michigan class, *id.* ¶ 148-162, (9) and finally one count of breach of express warranty under Connecticut law against Cummins on behalf of the Connecticut Class, *id.* ¶¶ 163-177. On March 9, 2016, the parties stipulated to a dismissal without prejudice of the claims against Cummins, subject to Cummins's agreement to participate in discovery and toll the statute of limitations for claims asserted against it in the Second Amended Complaint. *See* ECF No. 91.

PACCAR moves to dismiss (1) DeMase's claim under the New Jersey Consumer Fraud Act, (2) Vega's claim under the California Unfair Competition Law, (3) Young's Transport's claim under the Florida Deceptive and Unfair Trade Practices Act, and (4) all claims for consequential and incidental damages under these laws. Mot. to Dismiss, ECF No. 77 at 8-13.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement. *Id.* (internal quotations and alterations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief." *Id.* at 679.

**\*3** Federal Rule of Civil Procedure 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The purpose of the heightened pleading standard is to require the plaintiff to "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). "To satisfy this heightened standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200. Normally, "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations ... with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (citations and quotation marks omitted). "Courts should, however, apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998) (citation omitted).

## DISCUSSION

In its March 11, 2015 opinion addressing Defendants' original motion to dismiss, the Court held that choice of law analysis would be premature, noting that "the present factual record is insufficient for choice of law analysis." *See T.J. McDermott Transp. Co. v. Cummins, Inc.*, No. 14-4209, 2015 WL 1119475 at \*4 (D.N.J. Mar. 11, 2015). This remains true, and the Court will analyze each of Plaintiffs' state law claims under the laws of that state for this motion. *See id.*

### 1. DeMase has adequately pled a claim under the NJCFA.

To state a claim under New Jersey's Consumer Fraud Act, a plaintiff must allege (1) a defendant's unlawful conduct, (2) an ascertainable loss by the plaintiff, and (3) a causal connection between the two. *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 192 N.J. 372, 389 (N.J. 2007). The NJCFA is to be "liberally construed in favor of protecting consumers." *Barry v. Arrow Pontiac, Inc.*, 100 N.J. 57, 69 (N.J. 1985). In light of this, motions to dismiss NJCFA claims are to be "approached with hesitation." *N.J. Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 13 (N.J. Ct. App. 2003). Fed. R. Civ. Pr. 9(b)'s heightened pleading standard applies to fraud claims under the NJCFA. *Frederico v. Home Depot, 507* F.3d 188, 200 (3d Cir. 2007).

PACCAR argues that DeMase has not pled facts with sufficient particularity to show an ascertainable loss. Mot. to Dismiss at 11. This Court previously analyzed Plaintiff T.J. McDermott's claims and found that it "establishe[d] ascertainable loss by stating that it incurred over $80,000 in post-warranty repair costs." *T.J. McDermott*, 2015 WL 1119475 at \*7. Defendant argues that "no such similar facts have been provided" by DeMase. Mot. to Dismiss at 12. Plaintiffs first respond that DeMase is not obligated to independently plead ascertainable losses because "McDermott's allegations already establish that losses from purchasing the Subject Vehicles are ascertainable." Opposition Brief ("Opp. Br."), ECF No. 82 at 16-17. They also argue that DeMase has independently established that its losses are ascertainable, because it has alleged that it would not have purchased the subject vehicles if it had been aware of the defects. Opp. Br. at 16-17.

The "viability of a CFA claim ... 'often turns on the question of whether a plaintiff is able to provide sufficient evidence of an ascertainable loss.' " *Mickens v. Ford Motor Co.*, No. l0-cv-5842, 2015 WL 5310755 at \*6 (D.N.J. Sept. 10, 2015) (quoting *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99, 105 (N.J. Ct. App. 2006)). The requirement that a plaintiff prove an ascertainable loss "has been broadly defined as embracing more than a monetary loss." *Union Ink Co. v. AT&T Corp.*, 352 N.J. Super. 617, 646 (N.J. Ct. App. 2002). An ascertainable loss occurs "when a consumer receives less than what was promised." *Id.*

**\*4** The Second Amended Complaint alleges that the subject vehicles' "problems and defects resulted in warnings, deratings, and shutdowns, requiring expensive repairs in an

effort to remediate the faults and frequent and excessive down times ...." SAC ¶ 32. It also specifically alleges that T.J. McDermott's "out-of-pocket expenses for post-limited warranty repairs" exceeded $80,000. *Id.* ¶ 71. Although there is no equivalent allegation specifying DeMase's losses in a dollar amount, the defects in DeMase's tractors allegedly caused engine shutdowns and required expensive repairs. This adequately alleges an ascertainable loss. "[B]y the time of a summary judgment motion," DeMase will be obligated to provide an estimate of damages and show that its losses were "quantifiable or measurable," but it is entitled to discovery in order to make that showing. *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 249 (N.J. 2005); *see also Mickens*, 2015 WL 5310755 at *6.

**2. Vega had adequately pled a California UCL claim.**

**a. Unfair Competition Law Claims**

The California Unfair Competition Law prohibits business practices that are "unlawful, unfair, or fraudulent." Cal. Bus. & Prof. Code § 17200. Plaintiff Vega alleges that PACCAR's conduct violated all types. SAC ¶¶ 102-105. Unlawful practices are those that violate another law; "the UCL 'borrows' violations of other laws and treats them as unlawful practices independently actionable under the UCL." *Saldate v. Wilshire Credit Corp.*, 268 F.R.D. 87, 102 (E.D. Cal. 2010) (citing *Farmers Ins. Exchange v. Superior Court*, 2 Cal 4th 377, 383 (1992)). A practice is unfair if "the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided." *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 838 (Cal. Ct. App. 2006). To state a claim under the UCL, a plaintiff must plead that "(1) defendant engaged in one of the practices prohibited by the statue; and (2) plaintiff suffered actual injury in fact as a result of defendant's actions." *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1003 (N.D. Cal. 2009). The UCL allows a plaintiff to recover injunctive relief and restitution, but not damages. *E.g. Asghari v. Volkswagen Group of America, Inc.*, 42 F. Supp. 3d 1306, 1324 (C.D. Cal. 2013).

**b. Vega has not adequately alleged unlawful conduct.**

PACCAR first argues that Plaintiffs have failed to plead unlawful business practices because they have not identified

which statute, regulation, or ordinance was violated by their conduct. Mot. to Dismiss at 9. Count Four alleges violations of each prohibition of the UCL. With respect to the unlawful assertion, it states that "Defendants have violated the unlawful prong of § 17200 by its violations as set forth below," SAC ¶ 103, but does not identify any specific law that PACCAR is alleged to have violated. A "violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong." *Graham v. Bank of America, N.A.*, 172 Cal. Rptr. 3d 218, 231 (Cal App. Div. 2014) (quotations omitted). In their opposition to the motion to dismiss, Plaintiffs state that "PACCAR's argument overlooks the breach of warranty count in the SAC. Such an allegation would satisfy [the unlawful] prong." Opp. Br. at 23, fn. 8. But the breach of warranty claim brought by Vega on behalf of the proposed California class is brought only against Cummins, while the UCL violation is brought against PACCAR. SAC ¶¶ 87-100. And even if Cummins's alleged breach of expressed warranty could support a UCL claim against PACCAR, the breach of warranty claim was dismissed by the Court according to the parties' March 9 stipulation. Stipulation, ECF No. 91. Finally, Plaintiffs' other claims against PACCAR that are brought under the laws of other states cannot be used to support a claim under California's UCL. *See Hilton v. Apple Inc.*, No. 13-7674, 2014 WL 10435005 at *3-*4 (C.D. Cal. April 18, 2014). PACCAR is correct that Vega has failed to state a UCL violation under the unlawful prong.

**c. Vega adequately alleges a violation
based on PACCAR's omission.**

**\*5** PACCAR next argues that Vega's UCL claim does not meet the requirements for pleading a violation based on an omission. Mot. to Dismiss at 9. Under California law, an omission is actionable if it is "contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Daugherty*, 144 Cal. App. 4th at 835-36; *see also Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1141 (9th Cir. 2012). PACCAR argues that Vega has failed to show that it was obligated to disclose the alleged defects and so its failure to disclose any such defects is not an actionable omission in the absence of a contrary representation. Mot. to Dismiss at 9.

Relying on *Ostreicher v. Alienware Corp.*, PACCAR argues that a manufacturer is only obligated to disclose a defect if there has been "an affirmative misrepresentation or a safety issue." 322 Fed.Appx. 489, 493 (9th Cir. 2009). *Ostreicher*

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 213 of 261
PageID: 45151

McDermott v. Cummins, Inc., Not Reported in Fed. Supp. (2016)

relied on *Daugherty*, a decision of the California Court of Appeals for the Second District, which held that the defendants had no duty to disclose an alleged defect because the plaintiff's complaint "is devoid of factual allegations showing any instance of physical injury or any safety concerns posed by the defect." 144 Cal. App. 4th at 836. Plaintiffs respond that "[s]uch a limited duty to disclose only arises when the defect manifests after the warranty period expired, as was the case in *Ostreicher.*" Opp. Br. at 24 fn 11. They point to *Decker v. Mazda Motor of America, Inc.*, where the Central District of California held that a "proper reading of *Daugherty* reveals a two-step duty to disclose analysis" under which a manufacturer has a duty to disclose (1) any defects that would have "caused the consumer to not purchase the [product] if they had been disclosed" during the warranty period and (2) defects relating to safety after the end of the warranty period. No. 11-873, 2011 WL 5101705 at *4 (C.D. Cal. Oct. 24, 2011). The year after *Decker* was decided, the Ninth Circuit stated that "California federal courts have generally interpreted *Daugherty* as holding that '[a] manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue,' " without citing *Decker*. *Wilson*, 668 F.3d at 1141.

This Court need not decide between these two conflicting interpretations of *Daugherty*, because the complaint's allegations raise a safety issue, which explicitly gives rise to a duty to disclose under California law. *Daugherty*, 144 Cal. App. 4th at 836

The Second Amended Complaint asserts that the Subject Vehicles' onboard diagnostic systems "monitor and control all aspects of safety, emissions and performance" of the Subject Engines. SAC ¶¶ 19, 69. The complaint alleges that, when "there are problems with the Subject Engine or Aftertreatment Systems that require the Subject Vehicle to be brought to one of Defendants' authorized service providers," warning lights would be illuminated and "after a short de-rated operating time, the Subject Engine is shut down by the on-board diagnostic system." *Id.* ¶ 20. The complaint also alleges that these "on-board diagnostic systems had problems." *Id.* ¶ 70. These assertions, along with the allegation that the subject engines experienced "clogging" and "plugging" and would cause the tractors to shut down during use, *id.* ¶¶ 20, 29, raise the issue of safety. The existence of a defect that caused a safety risk would trigger a duty to disclose and allow Vega to plead a UCL violation based on an omission. *Compare Marsikian v. Mercedes Benz USA, LLC*, No. 8-4876, 2009

WL 8379784, at *6-7 (C.D. Cal. May 4, 2009) (safety issue adequately alleged because "it is not implausible that [air intake clogging] would cause 'catastrophic engine ... failure' while the car is on the road") *and Wilson*, 668 F.3d at 1144 (no safety issue alleged where "it is difficult to conceive (and the complaint does not explain) how [laptops sold by defendant] could ignite if [the alleged defect renders them] 'unable to receive an electrical charge.' ").

### d. Vega adequately alleges reliance.

**\*6** PACCAR further argues that Vega fails to allege reliance, noting that he "fails to state that he viewed any promotional materials or advertisements from PACCAR prior to his purchase." Mot. to Dismiss at 10. A claim for fraud under the UCL requires a showing of actual reliance. *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (Cal. 2009). Reliance may be established by showing that, in the "absence [of a defendant's misrepresentation] the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing conduct." *Id.* at 327 (internal citation omitted). A plaintiff need not show "individualized reliance on specific misrepresentations," and the misrepresentation need not be "the sole or even the predominant or decisive factor" in influencing a plaintiff's conduct. *Id.* at 326-27. A "presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material," and "materiality is generally a question of fact." *Id.* "Alleged defects that create 'unreasonable safety risks' are considered material." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015).

Plaintiffs argue that reliance has been adequately pled because Vega alleges that he "would not have purchased the Subject Vehicle ... or not have paid as much for the Subject Vehicle" if "defendants [had] disclosed the defect with the Subject Engine." SAC ¶ 107. Plaintiffs also argue that the alleged defects should be considered material because they created unreasonable safety risks. In its reply, PACCAR contends that the complaint fails to plead any facts "related to Vega's transaction and/or experiences" or any unreasonable safety risk. Reply Br., ECF No. 85 at 7-9.

Materiality of a misrepresentation is "a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." *In re Tobacco II Cases*, 46 Cal. 4th at 327 (internal quotations omitted). The alleged defects led to repeated engine shutdowns that rendered the tractors

unusable until they were repaired at a service provider. A defect that repeatedly renders a product unusable is unlikely to be "obviously unimportant" to the consumer. Materiality can also be inferred here because, as discussed, the Second Amended Complaint raises a safety issue. The facts alleged in the Second Amended Complaint, taken as true for the purpose of a motion, raise a question of fact as to materiality and an inference of materiality based on the issue of safety. *Cf. McVicar v. Goodman Global, Inc.*, No. 13-1223, 2015 WL 4945730 at *11 (C.D. Cal. Aug. 20, 2015) (In "some cases, for example, those involving automobile safety, it is fair to assume that *all* of the purchasers of automobiles read some marketing materials regarding the product."). PACCAR's motion to dismiss Vega's UCL claim based on failure to plead reliance is denied.

**e. Vega's claim for restitution has been adequately pled.**

Finally, PACCAR argues that Plaintiffs fail to make a valid claim for restitution because Vega does not allege that he bought his vehicle directly from Defendant. PACCAR relies on *Asghari v. Volkswagen Group of America, Inc.*, where the Central District of California dismissed a UCL claim for restitution because the plaintiff had bought an allegedly defective vehicle from a third party and could not show that defendants obtained her money or property. 42 F. Supp. 3d 1306, 1324 (C.D. Cal. 2013). *Asghari* is distinguishable because the plaintiffs in that case purchased their vehicles used, *id.* at 1318, while Vega alleges that he purchased his tractor new. SAC ¶ 42. To recover on a claim for restitution, Vega will have to produce "evidence that supports the amount of restitution necessary to restore to the plaintiff any money ... which may have been acquired by means of ... unfair competition." *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 697 (Cal. Ct. App. 2006). The allegation that Vega purchased a new, rather than a used, tractor is sufficient to entitle him to discovery in order to locate evidence that PACCAR is in possession of money acquired by means of unfair competition.

**3. Young's Transport fails to allege conduct in the state of Florida.**

*\*7* The Florida Unfair and Deceptive Trade Practices Act prohibits "unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of [Florida]." *Millennium Commc'n & Fulfillment, Inc. v. Office of Attorney Gen.*, 761 So. 2d 1256, 1262 (Fla. Dist. Ct.

App. 2000); *Five for Entm't S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1330 (S.D. Fla. 2012). A "consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006). PACCAR argues that Plaintiff's claim fails because it has not shown that it suffered actual damages and it has not specified that the alleged purchase took place in Florida. Mot. to Dismiss at 12-13. Young's Transport has alleged that its vehicles suffered a "diminution in value" and stated that it is a Florida corporation with its principal place of business in Fort Myers, Florida. SAC ¶¶ 5, 132.

Young's Transport has adequately alleged actual damages. The FDUTPA "allows for recovery of the difference between the value of the defective ... goods provided and the value of non-defective ... goods...." *Orkin Exterminating Co. v. DelGuidice*, 790 So. 2d 1158, 1162 (Fla Dist. Ct. App. 2001). Young's Transport alleges that the subject vehicles had defective engines, identifies specific mechanical defects in the engines, and claims that these defects diminished the value of the subject vehicles. SAC ¶¶ 27,131-132. In short, it alleges that the value of its defective tractors was less than the value of non-defective tractors would have been. The allegation of these specific defects contain sufficient factual content to withstand a motion to dismiss.

Next, PACCAR argues that Plaintiffs fail to allege sufficient activity within the state of Florida to proceed under the FDUTPA. Plaintiffs assert that the claim is sufficiently pled because the Second Amended Complaint "provides that Plaintiff Young's Transport is a Florida corporation ... and that Defendants knowingly and intentionally concealed their knowledge of the problems and defects when the trucks were placed into the stream of commerce." Opp. Br. at 18. They argue that "it is reasonable to infer that Defendants' misconduct reached Florida because any decision to purchase the trucks and subsequent injury occurred in Florida, which would not have occurred had Defendants not concealed the material information in their marketing campaign." *Id.*

Plaintiffs cite four cases where courts have declined to dismiss FDUTPA claims on the ground that injuries took place outside of Florida, *id.*, but in each of these cases the plaintiffs alleged that at least some of defendants' activities occurred within the state. *Solyom v. World Wide Child Care Corp.*, 14-80241-CIV, 2015 WL 6167411 at *2-*3 (S.D. Fla. Oct 15, 2015) (Defendants' principal place of business was in Florida, and they were alleged to have hired "unlicensed

Case 1:19-md-02875-RMB-SAK Document 1748-28 Filed 11/10/21 Page 215 of 261 PageID: 45153

McDermott v. Cummins, Inc., Not Reported in Fed. Supp. (2016)

sales people" who made material misrepresentations while selling securities.); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 538 (E.D. Pa. 2010) (Plaintiffs alleged that "their purchases and/or reimbursements of" defendants' medicine took place in Florida.); *Carnival Corp. v. Rolls-Royce PLC*, No. 8-23318-CIV, 2009 WL 3861450 at *6 (S.D. Fla. Nov. 17, 2009) ("Plaintiffs' Amended Complaint has alleged numerous actions that occurred in Florida ..."); *Millennium Commc'n*, 761 So. 2d at 1262 ("the allegations in this case reflect that the offending conduct occurred entirely within this state"). The mere assertion that Young's Transport is a Florida company that purchased Defendant's tractors is insufficient to allege that the "unfair, deceptive and/or unconscionable practices ... transpired within the territorial boundaries" of Florida. *Millennium Commc'n*, 761 So. 2d at 1262. As the Southern District of Florida has explained, "pertinent question ... is not the citizenship of the [p]laintiff, but rather the connection of the [d]efendants' alleged activities with Florida." *Solyom*, 14-80241-CIV, 2015 WL 6167411 at *2-*3. Alleging that Plaintiff, rather than Defendant, is a Florida company, on its own, does not establish a connection between a defendant's activities and that state. And alleging that Young's Transport's principal place of business is in Florida is not equivalent to alleging that the decision to purchase PACCAR tractors, or the purchase itself, took place in Florida.

**\*8** Where FDUTPA complaints have failed to specify which actions occurred in Florida, courts have granted motions to dismiss "with leave to re-plead to specify the location of the conduct to make certain it occurred within the territorial boundaries of Florida." *Five for Entm't S.A.*, 877 F. Supp. 2d at 1331. Because Plaintiffs have not pled that any of the subject vehicles were purchased by Young's Transport in Florida, Young's Transport's FDUTPA claim is dismissed without prejudice. Plaintiffs are granted leave to file an amended complaint that pleads the specific location of the conduct alleged in Young's Transport's FDUTPA claim within 90 days of the date of this order.

### 4. Plaintiffs' claims for consequential and incidental damages are partially dismissed.

Defendant argues that all claims for consequential damages against PACCAR should be dismissed because (1) PACCAR's warranties included a damages limitation that is valid under New Jersey law and (2) consequential damages are not available under either the UCL or FDUTPA. Mot. to Dismiss at 13.

Under New Jersey law, consequential damages may be limited by a disclaimer, and PACCAR disclaimed consequential damages in its express warranties. *See Chatlos Sys., Inc. v. Nat'l Cash Register Corp.*, 635 F.2d 1081, 1083 (3d Cir. 1980); *see also Kearney & Trecker Corp. v. Master Engraving Co., Inc.*, 107 N.J. 584, 600 (NJ. 1987); Warranty, ECF No. 15-3. A disclaimer of consequential and incidental damages may be invalidated "when the circumstances of the transaction, including the seller's breach [of warranty], cause the consequential damage exclusion to be inconsistent with the intent and reasonable commercial expectations of the parties ...." *Kearney*, 107 N.J. at 600. Previously, the Court found that this issue was prematurely raised because it could not rule on whether PACCAR's disclaimer was invalidated without deciding the merits of T.J. McDermott's claim for breach of express warranty. *T.J. McDermott*, 2015 WL 1119475 at *15. Defendant now claims that, because there is no longer any "breach of warranty cause of action alleged against PACCAR," the "damages limitation should be enforced, and all claims for consequential damages against PACCAR should be dismissed." Reply Br. at 11.

This issue remains premature. Although Plaintiffs no longer bring a claim against PACCAR for breach of express warranty, the Court cannot make a determination as to the "circumstances of the transaction," including the "seller's breach" and the "intent ... of the parties." *Kearney*, 107 N.J. at 600. These are disputed questions of fact that cannot be decided on a motion to dismiss.

PACCAR is correct that consequential damages are not available under the FDUTPA or the UCL. "Florida courts specifically reject the recovery of consequential damages under FDUTPA." *Eclipse Medical, Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1357 (S.D. Fla. 1999) (citing *Urling v. Helms Exterminators, Inc.*, 468 So.2d 451, 454 (Fla. Dist. Ct. App. 1985)). Similarly, "[r]elief under the UCL is limited to injunction and restitution." *Marolda*, 672 F. Supp. 2d at 1004; *see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (Cal. 2003) (quotations and alternations omitted). Plaintiffs' claims for consequential damages under the FDUTPA and UCL are dismissed. Defendant's motion to dismiss Plaintiffs' claims for consequential damages under the NJCFA is denied.

### CONCLUSION

**McDermott v. Cummins, Inc., Not Reported in Fed. Supp. (2016)**

Defendant PACCAR's motions to dismiss are granted in part and denied in part. Plaintiff Vega's claim under the UCL, brought in Count Four, is dismissed only to the extent that it relies on the "unlawful" prong of that statute. Plaintiff Young's Transport's claim under FDUTPA, brought in Count Six, is dismissed without prejudice, and Plaintiffs are granted leave to amend their complaint to specify the location of the activity alleged in that Count within 90 days of the date of this order. Plaintiffs' claims for consequential damages under the FDUTPA and UCL are dismissed. The remainder of Defendant's motion is denied. An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3287335

---

**End of Document**  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

14

PB Property Management, Inc. v. Goodman Manufacturing..., Not Reported in Fed....
Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 218 of 261
PageID: 45158

2014 WL 12640371
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Jacksonville Division.

PB PROPERTY MANAGEMENT, INC., Janet
Helm, Jimmy Jewell, Deborah L. Wagner,
and Stanley H. Wagner, individually and on
behalf of all others similarly situated, Plaintiffs,
v.
GOODMAN MANUFACTURING
COMPANY, L.P., Goodman Global, Inc.,
and Goodman Company, L.P., Defendants.

Case No. 3:12–cv–1366–HES–JBT
|
Signed 08/13/2014
|
Filed 08/14/2014

**Attorneys and Law Firms**

April Goodwin, Law Offices of April S. Goodwin, P.A.,
Largo, FL, Christopher Craig Casper, James, Hoyer,
Newcomer & Smiljanich, PA, Tampa, FL, Elizabeth Lin,
Pro Hac Vice, The Lin Law Firm, PLC, Brea, CA, Jay P.
Dinan, Parker Waichman, LLP, Bonita Springs, FL, Jordan L.
Chaikin, Chaikin Law Firm PLLC, Fort Myers, FL, Kevin F.
Ruf, Pro Hac Vice, Marc L. Godino, Pro Hac Vice, Lionel Z.
Glancy, Pro Hac Vice, Glancy, Binkow & Goldberg, LLP, Los
Angeles, CA, William M. Audet, Audet & Partners, LLP, San
Francisco, CA, for Plaintiffs.

Charles M. Trippe, Jr., David Clifford Reeves, Jeffrey Alan
Yarbrough, Robert B. Parrish, Moseley, Prichard, Parrish,
Knight & Jones, Jacksonville, FL, Dana Baiocco, Pro Hac
Vice, Boston, MA, Elizabeth G. Myers, Pro Hac Vice,
Houston, TX, Louis A. Chaiten, Pro Hac Vice, Richard J.
Bedell, Jr., Pro Hac Vice, Cleveland, OH, Sharyl A. Reisman,
Pro Hac Vice, Theodore M. Grossman, Pro Hac Vice, New
York, NY, for Defendants.

**ORDER**

HARVEY E. SCHLESINGER, UNITED STATES
DISTRICT JUDGE

**\*1** Before this Court is Plaintiffs' "First Consolidated Class
Action Complaint" (Dkt. 48, filed Feb. 28, 2014); Defendants'
"Motion to Dismiss and Accompanying Memorandum of
Law" (Dkt. 53, filed Mar. 31, 2014); and Plaintiffs'
"Memorandum of Points and Authorities in Opposition to
Defendants' Motion to Dismiss the First Consolidated Class
Action Complaint" (Dkt. 57, filed Apr. 30, 2014). This Court
held a hearing on Defendants' motion on August 6, 2014
(Dkt. 58, filed July 10, 2014). Defendants move to have the
Complaint dismissed pursuant to Rule 12(b)(6) of the Federal
Rules of Civil Procedure. Dkt. 53 at 1. Having considered
both parties' filings and the arguments made at the hearing,
this Court determines the following.

**I. BACKGROUND**

On December 19, 2012, Plaintiff PB Property Management
filed its original Complaint, a putative class action diversity
lawsuit alleging breach of express warranty, breach of
implied warranty of merchantability, violations of the Florida
Deceptive and Unfair Trade Practices Act ("FDUTPA"),
Fla. Stat. §§ 501.201 et seq., and unjust enrichment. Dkt.
1. Defendants filed their "Motion to Dismiss" the original
Complaint on April 12, 2013. Dkt. 18. Plaintiff then filed its
response in opposition thereto on May 23, 2013. Dkt. 26. On
August 28, 2013, this Court entered an order granting in part
and denying in part Defendant's motion. Dkt. 30.

In this Court's previous order, this Court denied Defendants'
motion as to Plaintiff's express warranty claim under a
theory of unconscionability, but granted Defendants' motion
as to Plaintiff's express warranty claim under a theory of
failure of essential purpose. Dkt. 30 at 7–10. This Court also
granted Defendant's motion as to Plaintiff's FDUTPA claim,
dismissing said claim without prejudice to allow Plaintiff to
plead the claim with particularity, as it is grounded in fraud.
*Id.* at 11–14. Lastly, this Court granted Defendants' motion as
to Plaintiff's implied warranty and unjust enrichment claims,
both of which were dismissed with prejudice. *Id.* at 11, 14–16.

Plaintiff PB Property Management filed its "First Amended
Class Action Complaint" on September 11, 2013, and
Defendants filed their "Motion to Dismiss" on September 30,
2013. Dkts. 31 and 32. Then, on October 21, 2013, the parties
filed a "Joint Motion to Stay Proceedings Pending JPML
Ruling on Request for Transfer of Actions for Coordinated
or Consolidated Pretrial Proceedings Pursuant to 28 U.S.C.
§ 1407" (Dkt. 35), which this Court granted on October
23, 2013, thus staying the case until the Judicial Panel
on Multidistrict Litigation made its decision. Dkt. 36. On

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 219 of 261
PageID: 45157

PB Property Management, Inc. v. Goodman Manufacturing..., Not Reported in Fed....

December 13, 2013, the JPML denied Plaintiff's motion to transfer, and this Court lifted the stay shortly thereafter. Dkt. 37. On January 14, 2014, Plaintiff filed a "Consent Motion Re: Consolidation of Related Cases, Filing a Consolidated Amended Class Action Complaint, and Responses Thereto," with no objection from Defendants. Dkt. 40. This Court granted the motion on January 30, 2014 (Dkt. 43), and this case became consolidated with another case originally filed in the Middle District of Florida, Tampa Division. Plaintiffs then filed their "First Consolidated Class Action Complaint" ("FCCAC") on February 28, 2014 (Dkt. 48), Defendants subsequently filed their "Motion to Dismiss" on March 31, 2014, and Plaintiffs filed their response in opposition thereto on April 30, 2014.

 *2  The basic facts alleged in the FCCAC are similar to those alleged in Plaintiff PB Property Management's original complaint and recited in this Court's previous order. Defendants "are in the business of engineering, manufacturing, distributing and marketing heating, ventilation and air conditioning ("HVAC") products for residential and light commercial use" under the Goodman or Amana brand names. Dkt. 48 ¶¶ 1–2. Plaintiffs in this consolidated case all purchased Goodman or Amana air conditioning units between 2007 and 2009. *Id.* ¶¶ 56, 61, 67, 74, 81. Each Plaintiff subsequently spent hundreds or thousands of dollars in detection and repairs due to allegedly defective copper evaporator coils (an important part of the air conditioning unit) manufactured by Defendants. *Id.* ¶¶ 55–89.

Plaintiffs allege that Defendants had knowledge that the copper evaporator coils in their air conditioning units were defective either in manufacturing or design due to the fact that they eroded quickly and required repeated repair, yet Defendants knowingly advertised these air conditioning units' high quality, performance, and reliability and sold these units to consumers. *Id.* ¶¶ 33–43. Plaintiffs assert that the defects were latent, widespread, and known by Defendants at the time of sale. *Id.* ¶¶ 109–11, 117–18. The air conditioning units manufactured by Defendants came with a limited warranty, which stated that Defendants would pay for the price of any replacement parts, but would not pay for the costs of shipping, labor associated with detection and repairs, or the cost of replacing refrigerant that had leaked. *Id.* ¶¶ 48–49. Therefore, based on Defendants' alleged knowledge of the manufacturing or design defect and subsequent sale of these air conditioning units with a limited warranty, Plaintiffs argue that this renders the limited warranty unconscionable and that the warranty failed in its essential purpose. *Id.* ¶¶ 50, 106–13.

Plaintiffs also allege that Defendants' "express affirmations, statements, assertions, and representations concerning the Products' quality and durability in their marketing and advertising materials ... constitute express warranties" in addition to the limited warranty. *Id.* ¶ 107.

Further, Plaintiffs allege that Defendants violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.* Plaintiffs must plead a violation of the FDUTPA with particularity, as it is "grounded in fraud." *See, e.g., D.H.G. Props., LLC v. Ginn Cos., LLC*, No. 3:09–cv–735–J–34JRK, 2010 WL 5584464, at *5 & n.9 (M.D. Fla. Sept. 28, 2010)* ("The Court need not determine the extent to which FDUTPA claims in other contexts may or may not be subject to the heightened pleading requirements of Rule 9(b); it suffices to recognize that the allegations of misrepresentation comprising Plaintiff's FDUTPA claim in this action are grounded in fraud and, thus, required to be plead with particularity."). Plaintiffs have attempted to plead their FDUTPA claim with particularity in the FCCAC by pleading additional, more specific facts regarding Defendants' alleged fraudulent misrepresentations about the quality of the product. Dkt. 48 ¶¶ 115–25.

Plaintiff PB Property Management proposed July 1, 2006, as the date from which the proposed class should begin (Dkt. 1 ¶ 16), and Plaintiffs propose the same date in their FCCAC. Dkt.48 ¶ 21. As in Defendants' original Motion to Dismiss, Defendants again argue that Plaintiffs' have failed to state a claim upon which relief may be granted. Dkt. 53 at 1–2. Specifically, Defendants argue that Plaintiffs have alleged no plausible breach of the limited warranty under either theory put forth by Plaintiffs–unconscionability or failure of essential purpose-because, most importantly, Plaintiffs have not sufficiently alleged facts that demonstrate Defendants' knowledge of the alleged defect beginning on July 1, 2006. *Id.* Defendants also allege that any statements made in their marketing or advertising materials do not constitute additional express warranties, and in any event, that all other warranties are disclaimed in the limited warranty. *Id.* at 1. Furthermore, Defendants argue that Plaintiffs have failed to state a claim under the FDUTPA with the requisite level of specificity as required by Federal Rule of Civil Procedure 9(b). *Id.* at 2.

## II. STANDARD OF REVIEW

 *3  In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the District Court is required to construe the complaint broadly, *Levine v. World Fin. Network*

PB Property Management, Inc. v. Goodman Manufacturing..., Not Reported in Fed....

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 220 of 261
PageID: 45158

*Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006), and the allegations in the complaint must be viewed in the light most favorable to the plaintiff. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). However, as the Supreme Court has ruled, "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although Rule 12(b)(6) allows "a well-pleaded complaint [to] proceed even if it strikes a savvy judge that actual proof of those facts is improbable," the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555, 556.

The Supreme Court teaches in *Twombly* that a complaint must contain "enough factual matter (taken as true) to suggest" the required element. *Twombly*, 550 U.S. at 556. The rule "does not impose a probability requirement at the pleading stage," but "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. *Id.* It is adequate if the complaint succeeds in "identifying facts that are suggestive enough to render [the element] plausible." *Id.*

## III. DISCUSSION

Defendants advance various reasons to dismiss Plaintiff's first and second claims for relief. This Court will address these arguments in turn.

### A. Breach of Express Warranty

Count I of Plaintiffs' FCCAC alleges breach of express warranty. Plaintiffs argue three theories of recovery under breach of express warranty: 1) unconscionability; 2) failure of the limited warranty's essential purpose; and 3) expansion of the scope of the warranty. In this Court's previous order (before this case was consolidated), this Court held that Plaintiff PB Property Management alleged facts sufficient to state a claim for unconscionability, but that Plaintiff did not plead facts sufficient to support a claim of failure of essential purpose. Dkt. 30 at 7–11. The third theory of recovery was not alleged in Plaintiff PB Property Management's original complaint. In Defendants' current Motion to Dismiss, Defendants argue that Plaintiffs have not sufficiently alleged facts to support each theory. Dkt. 53 at 8–15. In Plaintiffs' response to Defendants' motion, Plaintiffs argue that this Court already held that Plaintiffs sufficiently stated a claim based on unconscionability, and that new facts alleged in the FCCAC state a claim for failure of essential purpose. Dkt. 57 at 6–11.

### 1. Unconscionability

A plaintiff must demonstrate both substantive and procedural unconscionability when bringing a claim for breach of warranty on the theory of unconscionability. *See Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1134 (11th Cir. 2010). Additionally, in order to maintain a claim for breach of warranty, each plaintiff must have satisfied the notice requirement as set forth in the Florida Statutes. Defendants argue that Plaintiffs have failed to demonstrate both substantive and procedural unconscionability, and that three of the five Plaintiffs did not satisfy the notice requirement. Dkt. 53 at 13–17.

#### a. *Notice*

As a condition precedent to recovery for breach of warranty, "[t]he buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach." Fla. Stat. § 672.607(3)(a). Defendants' argue in their Motion to Dismiss that only two of the Plaintiffs notified Defendants of the problem (PB Property Management and Mr. Jewell) and that Ms. Helm and Mr. and Mrs. Wagner did not properly notify Defendants.[1] Dkt. 53 at 16–17. Plaintiffs' response explains that "the provision only require[s] notice to the 'seller' " and that Ms. Helm and Mr. and Mrs. Wagner did so by notifying the respective third-party sellers of the problem. Dkt. 57 at 11–14.

**\*4** Plaintiffs are correct in their assertion that notice is required to be given to the *seller*, not the manufacturer, under Florida law. In *Federal Insurance Co. V. Lazzara Yachts of North America, Inc.*, No. 8:09–cv–607–T–27MAP, 2010 WL 1223126 (M.D. Fla. Mar. 25, 2010), the court noted that the Florida Statutes define "seller" as "a person who sells or contracts to sells goods" and held that "the plain language of the statute therefore does not require notice to a manufacturer, such as [Defendants]." *Id.* at \*5 (quoting Fla. Stat. § 672.103(1)(d)). *Lazzara* describes further the difference between a "remote manufacturer" and a "manufacturer [that] was not remote but was 'in effect a direct seller to the plaintiffs,' " explaining that notice has been required to be given to the latter. *Id.* (quoting *Cooley v. Big Horn Harvestore Sys., Inc.*, 813 P.2d 736, 742 (Colo. 1991)) (construing an identical provision in Colorado's Uniform Commercial Code). Here, Defendants have not argued that they were in effect the "direct seller" to Ms. Helm or Mr. and

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 221 of 261
PageID: 45159

PB Property Management, Inc. v. Goodman Manufacturing..., Not Reported in Fed....

Mrs. Wagner, and Plaintiffs' FCCAC alleges that Ms. Helm and Mr. and Mrs. Wagner contacted the third-party sellers from whom they purchased their respective air conditioning units upon failure of the units. Therefore, for purposes of the motion to dismiss stage, each Plaintiff has satisfied the notice requirement.

### b. *Procedural Unconscionability*

Defendants argue in their Motion to Dismiss that Plaintiffs have failed to demonstrate procedural unconscionability. Dkt. 53 at 15–16. In this Court's previous order, this Court explained that under Florida law, "[a] central question to which courts turn when examining procedural unconscionability is whether the consumer had a 'meaningful choice in whether to accept the contract terms.' " Dkt. 30 at 10 (quoting *Pendergast*, 592 F.3d at 1135). Further, courts consider:

> (1) the manner in which the contract was entered into; (2) the relative bargaining power of the parties and whether the complaining party had a meaningful choice at the time the contract was entered into; (3) whether the terms were merely presented on a "take-it-or-leave-it" basis; and (4) the complaining party's ability and opportunity to understand the disputed terms of the contract.

*Pendergast*, 592 F.3d at 1135 (citing *Powertel, Inc. v. Bexley*, 743 So.2d 570, 574 (Fla. 1st DCA 1999); *Murphy v. Courtesy Ford, L.L.C.*, 944 So.2d 1131, 1134 (Fla. 3d DCA 2006)). The above are all factors a court may consider in determining procedural unconscionability; they are not required elements. At the motion to dismiss stage, Plaintiffs' "[f]actual allegations" of procedural unconscionability "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And as *Pendergast* notes, "Each [decision discussing procedural unconscionability] depends highly on the particular facts of the case." *Pendergast*, 592 F.3d at 1137.

This Court previously found Plaintiffs' allegations of procedural unconscionability sufficiently plausible to overcome Defendants' motion, and this Court finds as such again. While Defendants are correct in pointing out that Plaintiffs have made no allegations that they did not understand the terms of the limited warranty or that the limited warranty was unclear, and while this factor is important in determining procedural unconscionability or lack thereof, Defendants focus too narrowly on this factor as being dispositive. Dkt. 53 at 16. Here, the relative bargaining power of the parties and whether Plaintiffs had a meaningful choice on whether to accept the warranty limitation are also important factors. Plaintiffs almost certainly had no ability to negotiate around or waive the provisions of the limited warranty, and the terms were presented on a "take-it-or-leave-it" basis. Thus, Plaintiffs have satisfactorily alleged procedural unconscionability at this stage in the proceedings.

### c. *Substantive Unconscionability*

To prevail over Defendants' Motion to Dismiss, Plaintiffs must sufficiently "identify[ ] facts that are suggestive enough to render [the element] plausible." *Twombly*, 550 U.S. at 556. As applied to this case, Plaintiffs must plausibly allege substantive unconscionability, which means that Plaintiffs must sufficiently demonstrate that Defendants had knowledge of the manufacturing or design defect at the time each Plaintiff purchased their respective air conditioning units. Furthermore, Plaintiffs' proposed class consists of:

> **\*5** All persons and/or entities in Florida who purchased air conditioners, air handlers and heat pumps (collectively, the "Goodman Products") under the Goodman or Amana brand names since July 1, 2006, or who own a home or other structure in which the Goodman Products are installed since July 1, 2006, and who incurred damages as a result of having to repair and/or replace their Goodman Products due to leakage of refrigerant.

Dkt. 48 ¶ 21. Therefore, Plaintiffs' FCCAC must allege facts that render Defendants' knowledge of the alleged defect since July 1, 2006 plausible in order for this Court to certify Plaintiffs' proposed class.

As this Court previously noted, "[u]nder Florida law, a warranty limitation may be unconscionable when a defect is latent and the manufacturer knows that the product's effectiveness is questionable." Dkt. 30 at 10 (citing *Monsanto Agric. Prods. Co. V. Edenfield*, 426 So.2d 574, 579 (Fla. 1st DCA 1982); *see also Barnext Offshore, Ltd. V. FerrettiGrp. USA, Inc.*, No. 10–23869–CIV, 2012 WL 1570057, at *10 (S.D. Fla. May 2, 2012)). After reviewing the original pleadings, this Court previously held that Plaintiff PB Property Management sufficiently alleged that Defendants knew of the defective copper evaporator coils at the time of sale. Dkt. 30 at 9–10.

This time around, Defendants argue that Plaintiffs' FCCAC is wholly insufficient in regards to Plaintiffs' allegations of Defendants knowledge or lack thereof beginning on July 1, 2006. Defendants highlight that the FCCAC is scarce in facts that support Plaintiffs' theory that Defendant had knowledge beginning on July 1, 2006. Dkt. 53 at 14–15. Specifically, Defendants allege that "almost all of the complaints and statements that Plaintiffs point to occurred after Plaintiffs purchased and installed their units. Each of the Plaintiffs purchased their units in 2009 or before." *Id.* at 14. According to Defendants, the vast majority of the statements to which Plaintiffs' cite in support of their claim occurred in 2010 or later. *See id.* Further, Defendants note that the only fact alleged by Plaintiffs that dates back to July 1, 2006, is that of a newspaper article published on July 1, 2009, which describes a petition drive that was started by residents in one subdivision who had purchased Goodman air conditioning units in 2003 and 2004 and had complained about defective evaporator coils since 2003. Dkt. 48 ¶ 94; Dkt. 53 at 15.

Defendants are correct that Plaintiffs have not alleged much to support their claim that Defendants had knowledge of the alleged defect beginning July 1, 2006. However, the pleading standard is low at this stage in the proceedings. As the Supreme Court explained in *Twombly*, "Asking for plausible grounds to infer [a fact] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [said fact]." *Twombly*, 550 U.S. at 556. This Court finds the quoted passage helpful in articulating the proper standard to apply in this case; Plaintiffs' FCCAC is replete with facts that plausibly demonstrate that Defendants had knowledge of the alleged defect at some point. The question is when, precisely, did Defendants obtain knowledge of the alleged defect such that continued use of the limited

warranty could be considered unconscionable? It is true that most of Plaintiffs' factual allegations relating to Defendants' alleged knowledge are dated 2009 or later. Dkt. 48 ¶¶ 91, 95–98. However, as previously mentioned, Plaintiffs do cite one article that would suggest knowledge on Defendants' part by July 1, 2006. *Id.* ¶ 94.

**\*6** Having considered the parties' pleadings, this Court still maintains that Plaintiffs have made sufficient factual allegations as to Defendants' knowledge of the alleged defect to surmount the procedural hurdle of Rule 12(b)(6). Nevertheless, this Court declines to certify Plaintiffs' proposed class at this time. The parties shall engage in discovery to more precisely discern a proper date from which the proposed class should begin, and at that time, this Court will consider class certification. In addition, if discovery leads to the conclusion that any of the individual named Plaintiffs in this case do not fit within the proposed class, this Court will address the matter at that time as well.

## 2. Failure of Essential Purpose

In this Court's previous order, this Court held that Plaintiffs failed to demonstrate failure of the limited warranty's essential purpose. Dkt. 30 at 7–9. Nevertheless, Plaintiffs bring this claim again in their FCCAC. Dkt. 48 at 110. Specifically, Plaintiffs state that "[t]he defects in the Goodman Products are latent and not discoverable on reasonable inspection. As such, Goodman's express warranty fails in its essential purpose." *Id.* As previously explained, Florida courts do not support this theory of failure of essential purpose. Dkt. 30 at 9 ("This Court can find no Florida court opinions supporting the contention that a repair and replacement limited warranty fails of its essential purpose merely because a defect is latent, and this Court declines to make such a pronouncement of law in the absence of such authority."). An alternative theory of failure of essential purpose, which Florida courts do recognize, "typically has been limited to circumstances involving repeated (unsuccessful) efforts to repair a product that completely fails in its intended use." *David v. Am. Suzuki Motor Corp.*, 629 F. Supp. 2d 1309, 1319 n.11 (S.D. Fla. 2009); *Parsons v. Motor Homes of Am., Inc.*, 465 So.2d 1285, 1292 (Fla. 1st DCA 1985).

This Court held that Plaintiff PB Property Management failed in its original complaint to "allege a single failed effort, let alone a series of repeated failed efforts, by Defendants to

PB Property Management, Inc. v. Goodman Manufacturing..., Not Reported in Fed....

remedy any alleged coil leakage by providing a replacement coil." Dkt. 30 at 8. Likewise, there do not exist facts to support this theory as to PB Property Management in Plaintiffs' FCCAC. Furthermore, Plaintiffs Ms. Helm, Mr. Jewell, and Mr. and Mrs. Wagner also do not allege a series of repeated failed efforts by Defendants to remedy any alleged coil defect by providing a replacement evaporator coil. *See* Dkt. 48 ¶¶ 55–89. It is true that Plaintiffs quote many consumer complaints in the FCCAC, some of which may plausibly support a claim for failure of essential purpose due to repeated failure of Defendants to remedy these particular consumers' problems with allegedly defective evaporator coils and leaking refrigerant. *See id.* ¶ 91. However, the individual Plaintiffs who seek to represent the class cannot sufficiently plead this claim, and this theory is too individualized for it to be part of a class action. Therefore, this Court again grants Defendants' motion as to the theory of failure of essential purpose.

### 3. Expansion of Scope of Express Warranty

Plaintiffs argue in their FCCAC that "Defendants' made the previously described express affirmations, statements, assertions, and representations concerning the Products' quality and durability in their marketing and advertising materials. Such affirmations constitute express warranties." Dkt. 48 ¶ 107. Essentially, Plaintiffs argue that Defendants' statements on their website and in other advertising material expanded the scope of the warranty, but Defendants argue that these "extra-contractual statements" do not constitute express warranties. Dkt. 53 at 10–12. Defendants also note that the limited warranty "explicitly disclaims 'all other express warranties,' including any that might have been displayed on websites." *Id.* at 11. Defendants correctly point out that " 'Florida law authorizes sellers to exclude warranties, both express and implied, in the sale of goods.' " *Id.* (quoting *Drew v. Boaters Landing Inc. of Fort Myers*, No. 2:07–cv–252–FtM–29DNF, 2007 WL 2700987, at *2 (M.D. Fla. Sept. 13, 2007)). In addition, the Florida Statutes allow the exclusion or modification of express or implied warranties. *See* Fla. Stat. § 672.316. In *Drew*, the court found that the section in the sales contract regarding exclusion of warranties was "conspicuous," and thus held that the defendant "effectively disclaimed any express or implied warranties" located therein. *Drew*, 2007 WL 2700987, at *3. In this case, the provision disclaiming all other express warranties in the limited warranty is set off as its own paragraph and is written in plain language. This limitation

is thus "conspicuous." Therefore, this Court holds that Defendants' marketing and advertising statements-whether or not they are considered additional express warranties-are properly disclaimed in the limited warranty, and Defendants' motion as to this theory of breach of warranty is granted.

### B. Florida Deceptive and Unfair Trade Practices Act

**\*7** Count III of Plaintiffs' FCCAC alleges a violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes §§ 501.201 *et seq.* The claim is "grounded in fraud" and thus must be described with particularity in the complaint. *See, e.g., D.H.G. Props., LLC*, 2010 WL 5584464, at *5 & n.9. To satisfy the particularity requirement of Federal Rule of Civil Procedure 9(b), "the complaint [must] allege facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (internal quotations marks omitted). This Court previously dismissed without prejudice Plaintiff PB Property Management's FDUTPA claim, as it had not alleged facts to support it with the requisite particularity. Dkt. 30 at 11–14. In Plaintiffs' FCCAC, they have alleged additional and more specific facts in regards to their FDUTPA claim in an attempt to cure this jurisdictional defect.

To state a claim for damages under the FDUTPA, a plaintiff must describe "(1) a deceptive or unfair practice; (2) causation; and (3) actual damages." *Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1292 (M.D. Fla. 2009). Further, "[t]he conduct considered to be deceptive or unfair for the purposes of an FDUTPA claim may be defined by 'any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive or unconscionable acts or practices.' " *Id.* (quoting Fla. Stat. § 501.203(3)(c)). The FDUTPA does not define "a deceptive or unfair practice," and courts have held that this term should be broadly construed. *See, e.g., Citibank (S.D.) N.A. v. Nat'l Arbitration Council, Inc.*, No. 3:04–cv–1076–J–32MCR, 2006 WL 2691528, at *3 (M.D. Fla. Sept. 19, 2006). An act is "unfair" under the FDUTPA if it offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *Suris v. Gilmore Liquidating, Inc.*, 651 So.2d 1282, 1283 (Fla. 3d DCA 1995)). Further, an act or practice is "deceptive" if it is "likely to mislead consumers." *Davis v. Powertel*, 776 So.2d 971, 974 (Fla. 1st DCA 2000) (internal quotation marks omitted).

PB Property Management, Inc. v. Goodman Manufacturing..., Not Reported in Fed....

With these standards in mind, this Court turns to the pleadings before it in this case. There are two issues that need to be addressed regarding this claim: 1) whether Plaintiffs have sufficiently alleged knowledge by Defendants since July 1, 2006, such that it is plausible that Defendants knew they were deceptively misrepresenting the quality of their product on the website and in other advertising materials, and 2) whether the factual allegations in the FCCAC are pled with sufficient particularity to overcome the procedural hurdle of Rule 9(b). The first issue is similar to the issue discussed above in relation to Plaintiffs' breach of warranty claim. The FCCAC contains specific facts that plausibly demonstrate Defendants' alleged knowledge at some point in time; the question is precisely when did Defendants obtain this knowledge?

First, this Court previously noted that Plaintiff PB Property Management's original complaint "failed to allege with specificity the time at which [Defendants' alleged misrepresentations] occurred." Dkt. 30 at 13. Now, this Court finds that Plaintiffs have alleged with particularity "details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Medco Health Solutions, Inc.,* 671 F.3d at 1222. For example, the FCCAC details when a number of the alleged misrepresentations occurred in the form of statements made on Defendants' website, and the FCCAC includes quotes of statements made on the website and the dates by which these statements were present. Dkt. 48 ¶¶ 41–44 (listing specific statements and dates). Some of the Plaintiffs also allege that they relied on representations made by third-party sellers and Defendants' advertising materials as to the superior quality of Defendants' product. *Id.* ¶¶ 67, 75, 81. Defendants also claim that Plaintiffs failed to identify with specificity the identity of consumers who may have viewed the website and made a decision to buy Defendants' products based thereon. Dkt. 53 at 19 n.6. However, the relevant test is not whether a particular plaintiff actually relied on statements made, but whether a reasonable consumer would have been deceived under the circumstances. *Davis,* 776 So.2d at 974. Therefore, individual identities of consumers who did, in fact, rely on Defendants' alleged misrepresentations are not necessary to maintain a claim under the FDUTPA.

**\*8** In addition, Defendants argue that Plaintiffs' have not sufficiently demonstrated a causal link between Defendants' statements and Plaintiffs' reliance or lack thereof. Dkt. 53 at 18–19. However, Plaintiffs "need not plead actual reliance on the alleged deceptive trade practice, but merely must allege that the practice 'was likely to deceive a consumer acting reasonably in the same circumstances.' " Dkt. 30

at 12 (quoting *Davis,* 776 So.2d at 974). The FCCAC is replete with statements that Plaintiffs relied to their detriment on Defendants' alleged misrepresentations, and at the least, that the practice was likely to deceive a consumer acting reasonably in the same circumstances. *See* Dkt. 48 ¶¶ 45, 53, 66, 73, 80, 89, 123. Therefore, Plaintiffs have sufficiently demonstrated a causal link.

Lastly, Defendants argue that "Plaintiffs have failed to plausibly allege that any unfair act or deceptive practice caused them damage." Dkt. 53 at 18–19 (citing cases). To the contrary, Plaintiffs allege that they "would not have purchased the Goodman Products, or at least would have paid less for them, had they known of the defects in the Goodman Products." Dkt 48 ¶ 53; *see also id* ¶¶ 45, 66, 73, 80, 89, 123. Plaintiffs thus allege damages in the purchase or purchase price of Defendants' product, as well as the expenses associated with diagnosing and repairing the problem.

Thus, having considered the parties' pleadings, this Court holds that Plaintiffs have cured the jurisdictional defects previously noted and have made sufficiently specific factual allegations as to the time, place, and substance of Defendants' alleged misrepresentations and to Defendants' alleged knowledge of the alleged defect to surmount the procedural hurdles of Rule 12(b)(6) and 9(b). However, as with the breach of warranty claim, this Court declines to certify Plaintiffs' proposed class at this time. The parties shall engage in discovery to more precisely discern a proper date from which the proposed class should begin, and at that time, this Court will consider class certification. In addition, if discovery leads to the conclusion that any of the individual named Plaintiffs in this case do not fit within the proposed class, this Court will address the matter at that time as well.

### IV. CONCLUSION

In light of the foregoing discussion, it is **ORDERED AND ADJUDGED:**

1. Defendants' "Motion to Dismiss and Accompanying Memorandum of Law" (Dkt. 53, filed Mar. 31, 2014) is **GRANTED IN PART AND DENIED IN PART**, as follows:

2. The Motion is **DENIED** as to Plaintiffs' express warranty claim under the theory of unconscionability;

3. The Motion is **GRANTED** as to Plaintiffs' express warranty claim under the theories of failure of essential purpose and expansion of the scope of the warranty;

4. The Motion is **DENIED** as to Plaintiffs' Florida Deceptive and Unfair Trade Practices Act claim; and

5. With regard to the issue of class certification, the Court is going to allow the parties to conduct discovery on that issue. The issue may be more properly resolved in a motion for summary judgment than on a motion to dismiss. The Court **DENIES without prejudice** Defendants' motion and will not rule on Defendants' request at this juncture concerning the class action date.

**DONE AND ORDERED** at Jacksonville, Florida, this <u>13th</u> day of August, 2014.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 12640371

## Footnotes

1    Defendants also challenge the sufficiency of Plaintiff PB Property Management and Mr. Jewell's notification to Defendants, but they concede that this Court already ruled that sufficiency of notice is a question of fact and is not to be determined at the motion to dismiss stage. Dkt. 53 at 17 n.5.

End of Document                                     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

15

2013 WL 1849279
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Stamford–Norwalk.

Paul TUZINKIEWICZ

v.

Kevin M. STECKEL et al.

No. FSTCV126016035S.
|
April 10, 2013.

TAGGART D. ADAMS, Judge.

## I. FACTS

**\*1** The defendants, Kevin Steckel, Roberta L. Riess (seller defendants), Kathryn Adams and Sotheby's International Realty, Inc. (broker defendants), move to strike various counts of the plaintiff's revised complaint for the stated reason that those counts fail to adequately state a claim upon which relief can be granted. The plaintiff, Paul Tuzinkiewicz, alleges that he purchased a property located in Darien, Connecticut (the property) for $1.65 million from the seller defendants, who had purchased the property three months earlier for $1.5 million. He claims he purchased it under the mistaken belief that the garage on the property, which contained an apartment with functioning bathroom and kitchen, could be rented out as a residence. He further alleges that the seller defendants had received a notice from the town zoning board stating that the garage was not zoned for residential use. Despite this notice, they signed a sales agreement with the plaintiff containing a paragraph stating that they did not know about any zoning violations. The plaintiff finally alleges that the broker defendants, who brokered the deal on behalf of the seller defendants, knew or should have known about the zoning problem but failed to disclose it and misrepresented why the seller defendants were selling it, claiming that the seller defendants were moving abroad.

The seller defendants move to strike count two of the amended complaint, alleging misrepresentation, count three, alleging fraud, and count four, alleging violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42–110a et seq. (CUTPA). They also move to strike the associated prayers for relief. The broker defendants move to strike counts seven and eight, alleging CUTPA violations against Adams (seven) and Sotheby's (eight).

## II. DISCUSSION

"The purpose of a motion to strike is to contest ... the legal sufficiency of the allegations of any complaint ... to state a claim upon which relief can be granted." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC v. Alves,* 262 Conn. 480, 498, 815 A.2d 1188 (2003). "Whenever any party wishes to contest (1) the legal sufficiency of the allegations of any complaint ... or of any one or more counts thereof, to state a claim upon which relief can be granted ... that party may do so by filing a motion to strike the contested pleading or part thereof." Practice Book § 10–39(a). "It is well established that a motion to strike must be considered within the confines of the pleadings and not external documents ... We are limited ... to a consideration of the facts alleged in the complaint." (Internal quotation marks omitted.) *Zirinsky v. Zirinsky,* 87 Conn.App. 257, 268 n. 9, 865 A.2d 488, cert. denied, 273 Conn. 916, 871 A.2d 372 (2005). "A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC v. Ganim,* 303 Conn. 205, 213, 32 A.3d 296 (2011). "[P]leadings must be construed broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Connecticut Coalition for Justice in Education Funding, Inc. v. Rell,* 295 Conn. 240, 253, 990 A.2d 206 (2010). The court will take "the facts to be those alleged in the [complaint] ... and ... construe the [complaint] in the manner most favorable to sustaining its legal sufficiency." (Internal quotation marks omitted.) *New London County Mutual Ins. Co. v. Nantes,* 303 Conn. 737, 747, 36 A.3d 224 (2012). Further, "[w]hat is necessarily implied [in an allegation] need not be expressly alleged." (Internal quotation marks omitted.) *Connecticut Coalition for Justice in Education Funding, Inc. v. Rell, supra,* at 252, 990 A.2d 206.

I

## COUNTS TWO AND THREE: RECKLESS AND FRAUDULENT MISREPRESENTATION

**\*2** The seller defendants move to strike the second and third counts, alleging reckless misrepresentation and fraudulent misrepresentation, claiming that they do not allege recklessness or intent to defraud. In addition, the seller defendants claim that they could not have induced the plaintiff to purchase the property through their statements at the closing because he had already decided to purchase the property. The plaintiff responds that he properly alleged that the seller defendants intended to induce him to buy the property and that he would not have proceeded with the sale had they disclosed the zoning violation.

"The essential elements of an action in common law fraud, as we have repeatedly held, are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury ... In contrast to a negligent representation, [a] fraudulent representation ... is one that is knowingly untrue, or made without belief in its truth, or recklessly made and for the purpose of inducing action upon it." (Citations omitted, internal quotation marks omitted.) *Sturm v. Harb Development, LLC,* 298 Conn. 124, 142, 2 A.3d 859 (2010). "Because specific acts must be pleaded, the mere allegation that a fraud has been perpetrated is insufficient." *Whitaker v. Taylor,* 99 Conn.App. 719, 730, 916 A.2d 834 (2007).

The elements of common-law fraud include the possibility that the false representation was made recklessly, therefore counts two and three may be considered together.[1] In the present case, the plaintiff alleges that the seller defendants made a misrepresentation of fact when they signed the sales agreement which stated, in paragraph 6(c), that they had no knowledge of any zoning violations. The plaintiff also alleges that they knew he believed that the garage apartment could be rented out and failed to disclose that it could not. The plaintiff then relied on this misrepresentation because even though he wanted to buy the property prior to their signing of the contract, he made that decision based on the mistaken belief that it was zoned for a garage apartment and he would not have purchased the property had he known about the zoning restrictions. Finally, he is damaged because he paid $1.65 million for the property believing he could rent out the garage and is unable to rent out the property as planned.

These allegations state a cause of action for fraud, and the motion to strike the second and third counts is denied.

### II

### COUNT FOUR: CUTPA

The seller defendants finally move to strike the plaintiff's CUTPA claim against them on two grounds, first that they are not engaged in the trade or business of selling homes and second, that the plaintiff fails to adequately allege an unfair trade practice. The plaintiff responds that the seller defendants are engaged in the trade or business of selling homes and that his allegations are sufficient to allege an unfair trade practice under CUTPA.

**\*3** General Statutes § 42–110b(a) states that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." "Trade" and "commerce" are defined as "advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42–110a(4). A single transaction can give rise to a CUTPA claim. *Johnson Electric Co. v. Salce Contracting Associates, Inc.,* 72 Conn.App. 342, 353, 805 A.2d 735, cert. denied, 262 Conn. 922, 812 A.2d 854 (2002). CUTPA does not, however, extend to conduct that is merely incidental to the defendant's primary line of business. *McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.,* 93 Conn.App. 486, 523, 890 A.2d 140, cert. denied, 277 Conn. 928, 895 A.2d 798 (2006) (CUTPA not applicable to automobile dealership's sale of real estate); *Biro v. Matz,* 132 Conn.App. 272, 289, 33 A.3d 742 (2011) (CUTPA not applicable to commercial sale of warehouse by warehouse owners). "[T]he majority of recent trial court decisions have found that CUTPA does not apply to the single sale of a personal residence by a seller not in the business of selling houses ." (Internal quotation marks omitted.) *Silva v. Aparo,* Superior Court, judicial district of New Britain, Docket No. CV 05 4007640 (January 8, 2007, Shapiro, J.) (42 Conn. L. Rptr. 345, 346).[2] "[T]he essence of [CUTPA] is its effort to provide a remedy for the unfair practices ... of an existing or continuing enterprise, not misconduct that might occur in the course of a one-time transaction by a

private individual." (Internal quotation marks omitted.) *Silva v. Aparo, Id.*

In the present case, the plaintiff alleges that the seller defendants were in the business of buying and selling real property for a profit. Fourth Count, ¶ 23. This allegation is sufficient to overcome a motion to strike on the issue of whether the seller defendants are in the trade or business of selling homes.

"[I]n determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1)[W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons] ... All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) *Naples v. Keystone Building & Development Corp.,* 295 Conn. 214, 227–28, 990 A.2d 326 (2010). "We are unpersuaded that there is any special requirement of pleading particularity connected with a CUTPA claim, over and above any other claim." *Macomber v. Travelers Property & Casualty Corp.,* 261 Conn. 620, 644, 804 A.2d 180 (2002). "Fraudulent misrepresentation is a sufficient basis for a valid CUTPA claim." *Schrage v. Israel,* Superior Court, complex litigation docket at Stamford, Docket No. X08 CV 05 4006596 (January 8, 2009); see also *Meyers v. Cornwell Quality Tools, Inc.,* 41 Conn.App. 19, 34–35, 674 A.2d 444 (1996). "Intentional misrepresentation, or fraud, is unquestionably a practice that offends public policy." *Leonard–Anthony Assoc., LLC v. Sherman Gardens, LLC,* Superior Court, judicial district of New Haven, Docket No. CV 08 5018651 (June 29, 2009, Cronan, J.). In real property misrepresentations, CUTPA has been applied when "the representations made to [the plaintiffs] were material and deceptive. *Tanpiengco v. Tasto,* 72 Conn.App. 817, 820, 806 A.2d 1080 (2002). "[T]o award punitive or exemplary damages [under CUTPA], evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights." *Id.,* at 821, 806 A.2d 1080.

**\*4** The plaintiff's complaint sufficiently alleges an unfair trade practice. Fraud is contrary to public policy when conducted as part of the defendant's business. The plaintiff alleges that the seller defendants did not merely fail to disclose a zoning defect; rather, they affirmatively held the property out as having a rentable garage apartment, and they affirmatively signed the sales agreement stating that they had no knowledge of any zoning violations. These misrepresentations would be immoral if proven. Finally, if as the plaintiff alleges, he would not have paid $1.65 million for the property had he known about the zoning status, he was clearly damaged by the misrepresentation. The complaint therefore alleges that the seller defendants committed acts which offend public policy, are immoral, and damaged the plaintiff.

The court denies the motion to strike count four.

### III

### COUNTS SEVEN AND EIGHT: CUTPA AGAINST BROKER DEFENDANTS

The broker defendants move to strike count seven, alleging CUTPA violations by Adams, and count eight, alleging CUTPA violations by Sotheby's under the doctrine of respondeat superior. The broker defendants claim that the allegations fail to meet any of the prongs of the cigarette rule because they do not say how Adams' actions were contrary to public policy, how the nondisclosure of a non-material fact rises to the level of a CUTPA violation, or how the plaintiff was damaged by the non-disclosure. The plaintiff responds that the conduct violated public policy because it violated a statute, that the fact was indeed material because he would not have purchased the property had he known about the zoning violation and that he was damaged for the same reason. The plaintiff also provides support for his claim that the doctrine of respondeat superior applies, but the broker defendants do not appear to question the applicability of the doctrine, therefore the court need not consider whether or not it is applicable.

The CUTPA law discussed in the previous section is relevant here as well. In addition, under General Statutes § 20–320 licensed real estate brokers may be fined or suspended for: "(1) Making any material misrepresentation; (2) making any false promise of a character likely to influence, persuade or induce; ... (11) any act or conduct which constitutes dishonest, fraudulent or improper dealings ..." Section 20–328–5a of

the Regulations of Connecticut State Agencies provides: "Misrepresentation, disclosure and advertising. (a) A licensee shall not misrepresent or conceal any material facts in any transaction ... (c) A real estate broker shall exercise diligence at all times in obtaining and presenting accurate information in the broker's advertising and representations to the public." "Section 20–328–5a contains no language that a violation of this regulation is a CUTPA violation. See Gen.Stat. § 35–1 that creates a per se CUTPA violation when Gen.Stat. § 35–1 is violated. No appellate authority in Connecticut has held that a violation of Connecticut Regulations Section 20–328–5a(c) is also a CUTPA violation." *Forrest v. Sotheby's International Realty, Inc.,* Superior Court, judicial district of Stamford–Norwalk at Stamford, Docket No. CV 11 6010200 (January 9, 2013, Tierney, J.T.R.).

**\*5** The plaintiff alleges two actions by Adams which might amount to a CUTPA violation: that she misrepresented the reason the seller defendants were selling the property, and that she failed to ascertain the zoning status of the garage. Paragraph 12 of the First Count, which is incorporated into the Seventh and Eighth Counts alleges that within days of Steckel and Riess finding out that the garage apartment was not a legal dwelling unit, their broker, Adams, contacted plaintiff's broker to say that her clients were relocating to London, and the property was for sale. Paragraph 13 of the First Count, also incorporated into the Seventh and Eighth Counts, alleges that Steckel, Riess and Adams knew that the property had been marketed as having two dwelling units not one of the defendants, including Adams, disclosed to the plaintiff that

the garage apartment could not be so used. These allegations and others included in the Seventh Count do not specifically allege that Adams knew the garage apartment was not legal, and they allege only on "information and belief" that Adams knew, or should have known, that the representation about the sellers leaving for London was false. See ¶ 23, Fifth Count. While it is a close question, the court concludes that the allegations of the Seventh Count do not rise to the level of a CUTPA violation. Had the allegations stated Adams knew the apartment was not legal or directly alleged that Adams had knowledge that the sellers were not leaving for London, the result might be different.

The broker defendant's motion to strike counts seven and eight should be granted because the plaintiff has not sufficiently alleged that Adams violated CUTPA, therefore the CUTPA claims against both her and through the doctrine of respondeat superior, her employer should be stricken, along with the associated prayers for relief.

### III. CONCLUSION

The seller defendant's motion to strike is denied, and the broker defendant's motion to strike is granted.

**All Citations**

Not Reported in A.3d, 2013 WL 1849279

## Footnotes

1   The court does not believe that reckless misrepresentation and fraud are separate causes of action. The court will allow the counts to stand because the seller defendants have not moved to strike the second count on the grounds that it is not a proper cause of action separate from fraud.

2   Prior to the Appellate Court's decision in *McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.,* 93 Conn.App. 486, 890 A.2d 140, cert. denied, 277 Conn. 928, 895 A.2d 798 (2006), there was a Superior Court split regarding whether CUTPA applied to private residential home sales; see *Baker v. Cheshire,* Superior Court, judicial district of New Haven, Docket No. CV 07 5013602 (April 24, 2008, Robinson, J.) (45 Conn. L. Rptr. 452); *Silva v. Aparo,* Superior Court, judicial district of New Britain, Docket No. CV 05 4007640 (January 8, 2007, Shapiro, J.) (42 Conn. L. Rptr. 345); *Wardak v. Wierzbicki,* Superior Court, judicial district of Hartford, Docket No. CV 04 4002711, 2006 WL 1230049 (April 17, 2006, Keller, J.); *McCormick v. McCormick,* Superior Court, judicial district of Stamford–Norwalk at Stamford, Docket No. CV 03 0196643, 2005 WL 469055 (January 19, 2005, Wilson, J.); but see *Horowitz v. Cottle,* Superior Court, judicial district of New Haven, Docket No. CV 9104–4378, 1992 WL 209615 (July 9, 1992, Vertefeuille, J.); *Piscatelli v. Hird,* Superior Court, judicial district of New Haven, Docket No. CV 90 296245 (March 14, 1991,

Tuzinkiewicz v. Stecker, Not Reported in A.3d (2013)

McKeever, J.) [3 Conn. L. Rptr. 351] (6 C.S.C.R. 370); *Oat v. Whittle,* Superior Court, judicial district of New London at Norwich, Docket No. CV 09 3417, 1991 WL 27992 (January 22, 1991, Austin, J.); with the majority holding that it did not. It seems likely that after *McCann,* the proper view is that CUTPA does not apply to residential home sales unless the sellers are in the business of selling homes.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

16

Utesch v. Lannett Company, Inc., Slip Copy (2021)
Fed. Sec. L. Rep. P 101,207

2021 WL 3560949
United States District Court, E.D. Pennsylvania.

John UTESCH, et al., Plaintiffs,
v.
LANNETT COMPANY, INC., Arthur P.
Bedrosian, Martin P. Galvan, Defendants.

CIVIL ACTION NO. 16-5932
|
Filed 08/12/2021

**Attorneys and Law Firms**

Francine Friedman Griesing, Griesing Law LLC,
Philadelphia, PA, Jacob A. Goldberg, The Rosen Law Firm,
Jenkintown, PA, Tamar A. Weinrib, Pomerantz LLP, New
York, NY, David M. Promisloff, Promisloff Law, P.C.,
Michael J. Hynes, Hynes Keller & Hernandez, Malvern, PA,
for Plaintiffs.

Ian M. Comisky, Matthew David Lee, Nathan Huddell, Fox
Rothschild LLP, Philadelphia, PA, Byron Pacheco, Carrie J.
Bodner, Jordan D. Peterson, Matthew Osborn Solum, Daniel
R. Cellucci, Jay D. Lefkowitz, Pro Hac Vice, Kirkland & Ellis
LLP, New York, NY, for Defendant Lannett Company, Inc.

Ian M. Comisky, Matthew David Lee, Nathan Huddell, Fox
Rothschild LLP, Philadelphia, PA, Byron Pacheco, Carrie J.
Bodner, Jordan D. Peterson, Matthew Osborn Solum, Daniel
R. Cellucci, Haley S. Stern, Pro Hac Vice, Jay D. Lefkowitz,
Kirkland & Ellis LLP, New York, NY, for Defendant Arthur
P. Bedrosian.

Ian M. Comisky, Matthew David Lee, Nathan Huddell, Fox
Rothschild LLP, Philadelphia, PA, Byron Pacheco, Carrie J.
Bodner, Jordan D. Peterson, Matthew Osborn Solum, Daniel
R. Cellucci, Jay D. Lefkowitz, Kirkland & Ellis LLP, New
York, NY, for Defendant Martin P. Galvan.

**OPINION**

Wendy Beetlestone, J.

**\*1** In this proposed securities fraud class action against
Defendants Lannett Company, Inc., Arthur P. Bedrosian
(Lannett's former chief executive officer) and Martin P.
Galvan (its former chief financial officer) (collectively,
"Defendants"), Lead Plaintiff University of Puerto Rico

Retirement System ("UPRRS") and Plaintiffs Ironworkers
Locals 40, 361, and 417 Union Security Funds (collectively
"Plaintiffs") assert securities fraud claims under Section 10(b)
of the Securities Exchange Act of 1934 ("the Exchange Act")
and Rule 10b-5 against all Defendants, and claims against the
individual defendants under Section 20(a) of the Exchange
Act. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; 15 U.S.C.
§ 78t(a).

Plaintiffs now move to certify a class pursuant to Federal
Rules of Civil Procedure 23(a) and (b)(3), to be appointed
class representatives, and for the appointment of class
counsel. Both Plaintiffs and Defendants seek to exclude the
opposing party's expert report for failure to comply with the
standard of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). For
the following reasons, the motions to exclude will be denied
and the class certification motion will be granted.

**I. BACKGROUND AND PROCEDURAL HISTORY**
During the presented class period – July 15, 2014, to October
31, 2017 – Plaintiffs allege that they purchased Lannett's
common stock at prices that were artificially inflated because
of Defendants' false and misleading statements concerning
the pricing of generic drugs and investigations into price-
fixing in the generic drug market.

Plaintiffs allege that anticompetitive conduct among Lannett's
competitors caused price increases for five generic drugs
which together accounted for most of Lannett's total annual
sales from 2013 to 2016. Lannett publicly disclosed that it
received a subpoena and interrogatories from the Connecticut
Attorney General in connection with an investigation of
anticompetitive conduct in the generic drug industry at
the start of the class period in July 2014, and grand jury
subpoenas in connection with a federal investigation in
November and December 2014. However, say Plaintiffs,
"[e]ven as it began to be revealed during the Class Period
that several of Lannett's competitors were implicated in
illegal price-fixing and anti-competitive conduct, Defendants
assured investors that Lannett's past financial results were the
product of competitive market forces; and, that the Company's
pricing strategy and future results would not be impacted
by regulatory scrutiny of anticompetitive conduct in the
industry, or the threat of being implicated in any price-fixing
or anticompetitive scheme." More specifically, Plaintiffs
contend that Defendants' statements during the class period in
public regulatory filings, press releases, and by the individual
defendants during earnings calls and other public events

Utesch v. Lannett Company, Inc., Slip Copy (2021)

Fed. Sec. L. Rep. P 101,207

were materially false or misleading in that: (1) "Defendants misrepresented to Class members that Lannett's growth was the result of competitive market forces that afforded an opportunity for Lannett's aggressive pricing campaign," whereas Lannett's price increases in actuality were caused by "extensive price-fixing schemes and anticompetitive conduct throughout that generic drug industry that directly implicated Lannett's competitors in markets for key Lannett products"; (2) "[a]s regulatory scrutiny into price-fixing and anticompetitive conduct increased, Defendants issued a series of misleading statements and omissions of material fact that misled Plaintiffs and Class members regarding the risk that Lannett would be implicated in price-fixing and anticompetitive conduct"; and, (3) Defendants' statements that the company had complied with the law in the pricing of its products "created the false impression that [ ] Lannett ... had conducted a complete and thorough investigation as to whether Lannett engaged in anticompetitive conduct, and the risk that Lannett would be implicated in an action alleging anticompetitive conduct," but in actuality Lannett's "internal investigation was no[t] completed, and had a limited focus."

**\*2** Throughout the class period, Lannett's stock price fell as information became public that revealed potential anticompetitive conduct in the generic drug industry and Lannett's potential exposure to liability. Plaintiffs allege that Lannett's stock value fell 13% in December 2014 after Lannett disclosed that it had received the federal grand jury subpoenas, and fell 26% following the publication of a *Bloomberg* article in November 2016 describing the possibility that criminal charges would be filed against pharmaceutical companies, including Lannett. At the close of the class period, on October 31, 2017, Lannett's stock price dropped 14% after the Connecticut Attorney General filed a complaint alleging a conspiracy among generic drugs makers, including Lannett, to engage in anticompetitive conduct and price-fixing.

Plaintiffs now move to certify the following damages class:

> All persons and entities who purchased or acquired the publicly traded common stock of Lannett Company, Inc. ... during the period from July 15, 2014 and October 31, 2017,

inclusive[,] ... and who were damaged thereby.... [1]

## II. LEGAL STANDARDS

"The class-action device is an exception to the rule that litigation is usually conducted by and on behalf of the individual named parties only. Accordingly, the party proposing class-action certification bears the burden of affirmatively demonstrating by a preponderance of the evidence her compliance with the requirements of Rule 23." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (quotation marks and citations omitted). To proceed as a certified class action, "every putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012) (citation omitted). Failure to satisfy any of these requirements precludes certification. *Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 147 (3d Cir. 2008).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). "Rather, a party must not only be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)," but "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013) (quotation marks and citation omitted). "A party's assurance to the court that it intends or plans to meet the requirements is insufficient." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008) (citations omitted).

"Class certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." *Id.* at 309 (quotation marks and citation omitted). In conducting this analysis, "the court cannot be bashful." *Marcus*, 687 F.3d at 591. "[T]he district court must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties." *Hydrogen Peroxide*, 552 F.3d at 307 (citations omitted).

Accordingly, the evaluation of whether a plaintiff has satisfied the requirements of Rule 23 can, as necessary, "delve beyond

Fed. Sec. L. Rep. P 101,207

the pleadings" to the factual record, *id.* at 316 (quotation
marks and citation omitted), and it is appropriate to "resolve
all factual or legal disputes relevant to class certification,
even if they overlap with the merits – including disputes
touching on elements of the cause of action," *Marcus,* 687
F.3d at 591 (quotation marks and citation omitted). Indeed,
as "class determination generally involves considerations that
are enmeshed in the factual and legal issues comprising the
plaintiff's cause of action," rigorous analysis "frequently ...
entail[s] some overlap with the merits of the plaintiff's
underlying claim." *Wal-Mart,* 564 U.S. at 351, 131 S.Ct.
2541 (quotation marks and citation omitted). The merits of
a plaintiff's claims may be considered, however, "only to the
extent ... that they are relevant to determining whether the
Rule 23 prerequisites for class certification are satisfied."
*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S.
455, 466, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013) (citations
omitted); *see also Sullivan v. DB Invs., Inc.,* 667 F.3d 273,
305 (3d Cir. 2011) ("[A] district court has limited authority
to examine the merits when conducting the certification
inquiry").

**\*3** In this case, as we shall see *infra,* there is some need to
look into the merits of Plaintiffs' claims – specifically, the
reliance element of a Section 10(b) and Rule 10b-5 claim
– thus, the prima facie elements of those claims are set
forth here: [2] To recover damages for violations of Section
10(b) and Rule 10b-5, "a plaintiff must prove (1) a material
misrepresentation or omission by the defendant; (2) scienter;
(3) a connection between the misrepresentation or omission
and the purchase or sale of a security; (4) reliance upon the
misrepresentation or omission; (5) economic loss; and (6)
loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*
("*Halliburton II*"), 573 U.S. 258, 267, 134 S.Ct. 2398, 189
L.Ed.2d 339 (2014) (quotation marks and citation omitted).

### III. DISCUSSION

#### A. Rule 23(a) Pre-Requisites

"The requirements of Rule 23(a) are meant to assure both that
class action treatment is necessary and efficient and that it is
fair to the absentees under the particular circumstances." *Baby
Neal for and by Kanter v. Casey,* 43 F.3d 48, 55 (3d Cir. 1994).
To satisfy Rule 23(a), the proponent of class certification must
establish that (1) "the class is so numerous that joinder of
all members is impracticable" (numerosity); (2) "there are
questions of law or fact common to the class" (commonality);

(3) "the claims or defenses of the representative parties are
typical of the claims or defenses of the class" (typicality);
and, (4) "the representative parties will fairly and adequately
protect the interests of the class" (adequacy of representation).
Fed. R. Civ. P. 23(a). Defendants do not dispute that Plaintiffs
have established numerosity and commonality, but do argue
that Plaintiffs have failed to establish typicality and adequacy.
Nevertheless, in the interests of completion, each requirement
is considered below.

##### i. Numerosity

Although "[t]here is no minimum number of members needed
for a suit to proceed as a class action," generally the
numerosity requirement is satisfied if the named plaintiff
demonstrates greater than 40 potential plaintiffs. *Marcus,*
687 F.3d at 595 (citation omitted). "Mere speculation is
insufficient," however, and "Rule 23(a)(1) requires the
examination of the specific facts of each case." *Id.* at 595-96
(quotation marks and citations omitted). The plaintiff need not
"offer direct evidence of the exact number and identities of
the class members[, b]ut in the absence of direct evidence,
a plaintiff must show sufficient circumstantial evidence
specific to the products, problems, parties, and geographic
areas actually covered by the class definition to allow a district
court to make a factual finding." *Id.* at 596. Here, Lannett's
common stock traded on the New York Stock Exchange, there
were a minimum of 35.6 million shares of Lannett's common
stock outstanding during the class period, and an average
of approximately 12% of Lannett's outstanding shares were
traded on a weekly basis during the class period. This is
sufficient to establish by a preponderance of the evidence that
there are greater than 40 persons in the proposed class who
"purchased or acquired the publicly traded common stock
of Lannett Company" during the class period, and therefore
that "the class is so numerous that joinder of all members is
impracticable." Fed. R. Civ. P. 23(a)(1).

##### ii. Commonality

**\*4** The commonality requirement of Rule 23(a)(2) demands
that class members' claims "depend upon a common
contention ... of such a nature that it is capable of classwide
resolution – which means that determination of its truth or
falsity will resolve an issue that is central to the validity
of each one of the claims in one stroke." *Wal-Mart,* 564
U.S. at 350, 131 S.Ct. 2541. Rule 23(a)(2) "does not require

Fed. Sec. L. Rep. P 101,207

identical claims or facts among class members." *Marcus,* *687 F.3d at 597* (quotation marks, brackets, and citation omitted). Instead, commonality is established "if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal, 43 F.3d at 56* (citations omitted). Here, the commonality requirement is satisfied. To succeed on their securities fraud claims Plaintiffs must establish that Lannett made material misrepresentations or omissions and did so with scienter. The inquiry would necessarily focus on Lannett's actions, and the answers to questions raised in the inquiry would be answered not from the perspective of each prospective class member, but from an examination of what Lannett did and said. The "classwide answers" to these questions lead inexorably to the conclusion that the commonality requirement of *Rule 23(a)* is met. *Reyes v. Netdeposit, LLC, 802 F.3d 469, 482 (3d Cir. 2015)* (citation omitted).

### *iii. Adequacy*

Plaintiffs similarly meet *Rule 23(a)*'s adequacy requirement. "The principal purpose of the adequacy requirement is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class." *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig., 795 F.3d 380, 393 (3d Cir. 2015)* (citation omitted). "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Id.* (quotation marks and citation omitted). "The adequacy inquiry has two components designed to ensure that absentees' interests are fully pursued," *In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 601-02 (3d Cir. 2009)* (quotation marks and citation omitted): "(1) whether the representatives' interests conflict with those of the class and (2) whether the class attorney is capable of representing the class," *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 185 (3d Cir. 2001)* (citations omitted).

Turning first to the adequacy of Plaintiffs' proposed class counsel, Abraham, Fruchter & Twersky, LLP: Plaintiffs have established that their counsel is "qualified, experienced, and generally able to conduct the proposed litigation," and is therefore adequate. *Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 923 (3d Cir. 1992)* (quotation marks and citation omitted). The law firm resumé of Plaintiffs' proposed class counsel illustrates that counsel has substantial experience in litigating securities fraud class actions. Furthermore,

Plaintiffs' proposed counsel, appointed as lead counsel in this action in March 2017, has vigorously litigated the case including through opposition to motions to dismiss and in discovery disputes. [3]

The named Plaintiffs also establish that they have "the ability and the incentive to represent the claims of the class vigorously ... and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Hassine v. Jeffes, 846 F.2d 169, 179 (3d Cir. 1988)* (citations omitted). [4] Plaintiffs' and class members' interests are aligned in that they all purchased or acquired and lost money on Lannett's artificially inflated common stock during the class period. [5] Accordingly, adequacy is satisfied.

### *iv. Typicality*

**\*5** Defendants argue that the representative parties are not typical of the class because they are subject to unique defenses as to the element of reliance in their Section 10(b) claim. *See Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I"), 563 U.S. 804, 810, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011).*

#### a. Unique Defense: Legal Precepts

On a motion for class certification, the proposed class representatives must meet the typicality requirements of *Rule 23(a)* by showing that the "claims or defenses" of proposed class representatives are "typical of the claims or defenses of the class." *Fed. R. Civ. P. 23(a)(3).* This requirement "ensur[es] that the class representatives are sufficiently *similar* to the rest of the class – in terms of their legal claims, factual circumstances, and stake in the litigation – so that certifying those individuals to represent the class will be fair to the rest of the proposed class." *Schering Plough, 589 F.3d at 597* (citations omitted). Accordingly, "a proposed class representative is not 'typical' under *Rule 23(a)(3)*" if (1) "the representative is subject to a unique defense" that (2) "is likely to become a major focus of the litigation." *Id.* at 598 (quotation marks and citation omitted). [6] As with typicality generally, the atypicality of a potential defense depends on "the attributes of the proposed representatives, the class as a whole, and the similarity between the proposed representatives and the class." *Id.* at 597. It is the defendant's burden to show that a unique defense defeats typicality. *See Beck v. Maximus, 457 F.3d 291, 300 (3d Cir. 2006).*

Fed. Sec. L. Rep. P 101,207

Merely "seeking to disqualify the representative [by raising] a speculative defense" is insufficient to meet this burden. *Id.* at 301.

It is not necessary for a defendant to show that a prospective class representative is the *only* member of the proposed class who is subject to a "unique defense." Indeed, typicality may be defeated where a defense is "inapplicable to many members of the class." *Schering Plough,* 589 F.3d at 599. If, however, a defense is broadly applicable to the class, then the defense is not "unique or atypical" to the proposed representative and will not defeat certification. *Id.* at 598; *see also* 1 Newberg on Class Actions § 3:45 ("[A] defense will not defeat typicality if ... it applies to all members of the proposed class" because "the defense's application to the proposed class representative in that situation renders her situation typical of the rest of the class").

**\*6** Regardless, only a defense that will become a "major focus" of the litigation precludes certification. *Beck,* 457 F.3d at 300 (citations omitted). To pose a risk of becoming a "major focus," the defense must present a risk that the class representative will be preoccupied with litigating the defense to the detriment of litigating issues common to the class on behalf of absent class members. *See Schering Plough,* 589 F.3d at 598; *see also Beck,* 457 F.3d at 301 (the "major focus" standard operates to "protect[ ] class members from a representative who is not focused on common concerns of the class"). Considerations in evaluating whether a defense will become a major focus of the litigation include whether the unique defense is unlikely to be meritorious; whether challenging the defense will impose exacting requirements on the proposed class representative; and, if meritorious, whether the defense would completely dispose of the proposed class representative's claims. *See Beck,* 457 F.3d at 300 ("If a court determines an asserted unique defense has no merit, the defense will not preclude class certification"); *Zenith,* 530 F.2d at 512 (defense could "divert much of [the plaintiff's] attention from the suit as a whole"); *Schering Plough,* 589 F.3d at 599 (defense could "bar[ ]" the plaintiff from suing the defendant).

### b. Unique Defense: Analysis

Plaintiffs' claims arise "from the same event, practice or course of conduct" as that of the class members and are "based on the same legal theory as the claims of the class." *Marcus,* 687 F.3d at 598 (citation omitted). Plaintiffs' and class members' claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 arise from the same set of alleged misrepresentations, and the same set of allegations that they purchased Lannett's stock at artificially inflated prices and were injured when the stock price dropped after the alleged fraud was revealed. Accordingly, absent a finding that Defendants have defenses that are unique to the Plaintiff representatives, Plaintiffs are typical of the class. *See, e.g., Hoxworth,* 980 F.2d at 923 (3d Cir. 1992) (typicality satisfied where plaintiffs' claim "for damages stemm[ed] solely from [defendant's] course of conduct" in violation of securities laws).

But Defendants, focusing on the reliance element of a cause of action for violations of Section 10(b) and Rule 10b-5, contend that Plaintiffs did not rely on the alleged misstatements and omissions alleged in the Complaint and therefore are susceptible to defenses that are atypical of the putative class. Specifically, Defendants contend that Plaintiffs' designated corporate representatives have admitted under oath at their depositions that Plaintiffs had no input on the decision to buy, hold, or sell Lannett common stock during the putative class period; rather, investment decisions were made by their investment managers without Plaintiffs' oversight or guidance. They further contend that the investment managers agreed that they placed no reliance on the alleged misstatements when making their investment decisions. Accordingly, Defendants' argument is that because Plaintiffs did not participate in the investment decisions and because Plaintiffs' investment managers did not rely on the alleged misrepresentations, Plaintiffs are not typical of the putative class they seek to have certified.

As a preliminary matter, Plaintiffs respond by citation to two cases for the proposition that reliance on an investment manager or broker does not constitute a unique defense, as it is "quite likely" that other class members similarly relied on a manager or broker. *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.,* 2020 WL 919249, at \*5 (N.D. Ill. 2020); *Howard v. Liquidity Servs. Inc.,* 322 F.R.D. 103, 127 (D.D.C. 2017). Other than citing them, Plaintiffs make no argument and provide no rationale as to why this Court should adopt wholesale the holdings of these non-precedential out-of-circuit cases.

They do, however, persuade the Court that insofar as they are relying on a fraud-on-the-market presumption of reliance, such presumption applies equally to all potential class members. To set the stage for this argument: In a

securities fraud action, reliance on misrepresentations can be established directly or indirectly. A plaintiff can prove direct reliance by establishing that "they were aware of, and directly misled by, an alleged misrepresentation." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 178 (3d Cir. 2000) (citation omitted). A plaintiff also can prove reliance indirectly via the fraud-on-the-market theory, pursuant to which "a plaintiff in a securities action is generally entitled to a rebuttable presumption of reliance if he or she purchased or sold securities in an efficient market." *Id.* (citation omitted). As *Basic Inc. v. Levinson* explained, the premise of the fraud-on-the-market theory is that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." 485 U.S. 224, 241, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quotation marks and citation omitted). Accordingly, in such a market, "[m]isleading statements will ... defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Id.* at 241-42, 108 S.Ct. 978 (quotation marks and citation omitted). "An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action." *Id.* at 247, 108 S.Ct. 978. Thus, where the fraud-on-the-market theory applies, "the court presumes ... that the plaintiff actually relied on the market price of the security as an indicator of its value," and therefore that the plaintiff relied on the defendant's misrepresentations. *Semerenko*, 223 F.3d at 178-79 (citation omitted).

**\*7** "The fraud on the market theory of reliance, however, creates only a presumption, which a defendant may rebut by raising any defense to actual reliance." *Id.* at 179 (citation omitted). "Any showing that severs the link between the alleged misrepresentation and ... [the plaintiff's] decision to trade at a fair market price ... [is] sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248, 108 S.Ct. 978. A party's presumptive reliance on misrepresentations can be rebutted "by showing that the investor would have purchased or sold the securities at [the market] price even with full knowledge of the misrepresentation, that the investor traded in the securities based on an actual belief that the market price was inaccurate, or that the investor's decision to trade was based on some factor other than the market price." *Semerenko*, 223 F.3d at 179 n.7 (citations omitted). The defendant has the burden of persuasion to rebut presumptive reliance by a preponderance of the evidence. *Goldman Sachs*

*Grp., Inc. v. Ark. Tchr. Ret. Sys.*, ––– U.S. ––––, 141 S.Ct. 1951, ––– L.Ed.2d ––––, 2021 WL 2519035, at \*7 (2021). If presumptive reliance is rebutted, then the "plaintiff would have to prove that he directly relied on the defendant's misrepresentation in buying or selling the stock." *Halliburton II*, 573 U.S. at 269, 134 S.Ct. 2398.

Here, Defendants do not dispute that the fraud-on-the-market theory applies, and thus that class members are entitled to a rebuttable presumption of reliance.[7] Instead, they contend that the evidentiary record rebuts the presumption of reliance as to Plaintiffs UPRRS and Ironworkers and that they are therefore subject to unique defenses which render them atypical of the class. Plaintiffs of course argue otherwise. In evaluating each of their arguments, it is necessary to dip a toe into the merits of the matter.

### 1. Post-Disclosure Purchases

Defendants first argue that UPRRS and Ironworkers are subject to a unique defense because they purchased Lannett stock after "corrective disclosures," each of which are mentioned in the Complaint: (1) a July 16, 2014 regulatory filing disclosing Lannett's receipt of a subpoena and interrogatories from the Connecticut Attorney General regarding Lannett's pricing of a generic drug; (2) a November 6, 2014 regulatory filing disclosing a federal grand jury subpoena served on a Lannett executive arising out of an antitrust investigation of the pharmaceutical industry; (3) a December 8, 2014 regulatory filing disclosing Lannett's receipt of a federal grand jury subpoena arising out of the investigation; (4) a November 3, 2016 *Bloomberg* article concerning an ongoing federal antitrust investigation into price-fixing of generic drugs; and, (5) an October 31, 2017 complaint filed by the Connecticut Attorney General alleging a price-fixing conspiracy by generic drug makers. The records of UPRRS's and Ironworkers' transactions in Lannett stock establish that both purchased Lannett stock for the first time after the first three of these disclosures and purchased more stock after the fourth disclosure.

**\*8** Defendants posit that the timing of these purchases rebuts the presumption of reliance for both Plaintiffs because their post-disclosure purchases are "strong evidence" that they would have, and did, purchase Lannett stock regardless of the alleged fraud. But, if after class certification Defendants try to rebut Plaintiffs' presumption of reliance based on the timing of Plaintiffs' stock transactions, the issues litigated will be

Fed. Sec. L. Rep. P 101,207

broadly applicable to the class. The putative class includes all persons and entities that purchased Lannett stock from July 15, 2014, to October 31, 2017. The first three corrective disclosures occurred in the first six months of the class period, and the fourth corrective disclosure occurred approximately one year before the end of the class period. Because these disclosures were made early in or in the midst of the class period, many other class members likely will have purchased Lannett stock after these disclosures, just as Plaintiffs did. The question of whether the purchase of stock before or after a corrective disclosure defeats reliance is one that is salient across the class and is not unique to the named Plaintiffs.

### 2. Ironworkers' Investment Advisor

Defendants next argue that Ironworkers' presumption of reliance is rebutted because the testimony of the designated corporate representative of Ironworkers' investment manager, Snow Capital Management ("SCM"), proves that SCM would have decided to buy Lannett stock "even if the alleged misstatements had never been made." This argument, however, is countermanded by *Peil v. Speiser*, which explained that a party's failure to directly rely on misrepresentations fails to rebut the presumption of reliance because it "misses the point of the fraud on the market theory, under which a plaintiff may prevail even if he was entirely unaware of the alleged misrepresentations." 806 F.2d 1154, 1163 (3d Cir. 1986).

Defendants next argue that SCM's views were "atypical of the putative class" because SCM believed Lannett stock was undervalued due to concerns that Lannett would be implicated in price-fixing, whereas the Complaint alleges that Defendants' misrepresentations "created the false impression among investors ... [that] there was no risk that Lannett would be implicated ... [in] any illegal price-fixing scheme." Certainly SCM's corporate representative testified that after "spen[ding] considerable time" researching Lannett, SCM concluded that the market price of Lannett's stock was "cheap" because of "surrounding pressures that were possibly impacting the company's valuation," including "pricing erosion" – that is, decreasing drug prices – "in the generic industry" and "investigations by the Department of Justice and Attorney Generals ... of various states into various generic drug manufacturers." But that some members of the class were focused on undervalued stock and others were not does not defeat *Basic*'s presumption of reliance which extends to "value investors," who "believe[ ] that certain stocks are

undervalued or overvalued and attempt[ ] to 'beat the market' by buying the undervalued stocks and selling the overvalued ones." *Halliburton II*, 573 U.S. at 273, 134 S.Ct. 2398. *Halliburton II* rejected the argument that value investors do not rely on the market price of a security because they "implicitly rel[y] on the fact that a stock's market price will eventually reflect material information," thereby allowing the investor to make a profit. *Id.* The value investor "tries to estimate *how* undervalued or overvalued a particular stock is, and such estimates can be skewed by a market price tainted by fraud." *Id.* at 274, 134 S.Ct. 2398. "[T]o indirectly rely on a misstatement in the sense relevant for the *Basic* presumption, [the value investor] need only trade stock based on the belief that the market price will incorporate public information within a reasonable period." *Id.*

### 3. UPRRS's Investment Advisor

Defendants next argue that UPRRS's presumptive reliance is rebutted because the testimony of Roger Porter – the designated corporate representative of UPRRS's investment manager, Thompson, Siegel, and Walmsley ("TSW") – and internal e-mails between TSW employees prove that "TSW did not rely on the alleged misstatements or the integrity of the market price" in deciding to invest in Lannett stock. Defendants' first argument, that TSW invested in Lannett because it believed Lannett stock was undervalued, fails for the same reason set forth above.[8]

**\*9** Similarly, Defendants' argument that the presumption is undercut because TSW did not directly rely on the statements of the individual defendants has no traction because, as discussed *supra*, arguments premised on a party's failure to directly rely on misrepresentations do not necessarily rebut the presumption of reliance. *See Peil*, 806 F.2d at 1163.[9]

Defendants next argue that UPRRS's presumptive reliance is rebutted because TSW would have invested in Lannett regardless of whether TSW knew that Lannett's price increases on generic drugs were the result of anticompetitive conduct in the generic drug industry, which the alleged fraud purportedly concealed. This argument is not supported by the record. For evidentiary support, Defendants point to June 2015 e-mails between Porter and TSW research analysts discussing the prospects of Lannett's stock – specifically, Porter explains that, in his opinion, the "real driver" for the growth in Lannett's stock would be management and acquisitions because "gross margins" on Lannett drugs

Fed. Sec. L. Rep. P 101,207

"are clearly coming down." Although these e-mails are
evidence that at least some TSW employees – Porter and
the two research analysts – believed that Lannett's drug price
increases would not be a continuing source of growth for the
company, these e-mails do not discuss the suspected causes of
Lannett's drug price increases, let alone attribute these price
increases to anticompetitive conduct.

Defendants finally argue that UPRRS's presumptive reliance
is rebutted because TSW "fully appreciated" the risk that
Lannett would be implicated in government investigations
and enforcement actions. In essence, Defendants argue
that TSW saw through Defendants' alleged fraud but
invested anyway, "sever[ing] the link between the alleged
misrepresentation" and the "decision to trade at a fair market
price." *Basic*, 485 U.S. at 248, 108 S.Ct. 978. Neither
does the record support this argument. Defendants rely on
a series of November 2016 e-mails in which two TSW
research analysts and other TSW employees received a third-
party research report that analyzed the risks posed by the
Department of Justice's probe of price-fixing in the generic
drugs market and identified subpoenas of persons at Lannett
as an "unfavorable" factor in evaluating the strength of
the government's case. The e-mails between the two TSW
research analysts indicate that far from fully appreciating
the risks, the employees dismissed the potential case as a
"big overshoot" and questioned whether there was "enough
circumstantial evidence to suggest that an illegal pricing
action has taken place." This correspondence fails to show
that TSW invested in Lannett despite knowing the risks that
Lannett would be implicated in government investigations
and enforcement actions.

*************

**\*10**  For the reasons set forth above, Defendants have not
met their burden to show by a preponderance of the evidence
that the named Plaintiffs are subject to a unique or atypical
defense that is likely to become a major focus of the litigation.
Because UPRRS and Ironworkers have satisfied each of
the requirements of Rule 23(a), they will be appointed as
representatives of the class. *See* Fed. R. Civ. P. 23(a) ("One or
more members of a class may sue ... as representative parties"
where Rule 23(a) pre-requisites are satisfied).

**B. Rule 23(b) Requirements**

Having determined that Plaintiffs have established
numerosity, commonality, adequacy and typicality as required
by Federal Rule of Civil Procedure 23(a), the question is
now whether they can meet the requirements of Rule 23(b)
(3), to wit that (1) "questions of law or fact common to
class members predominate over any questions affecting only
individual members" (predominance); and, (2) "a class action
is superior to other available methods for fairly and efficiently
adjudicating the controversy" (superiority). Fed. R. Civ. P.
23(b)(3). In addition, the concept of ascertainability is an
implied additional requirement of Rule 23(b)(3), because "[i]f
class members are impossible to identify without extensive
and individualized fact-finding or 'mini-trials,' then a class
action is inappropriate." *Marcus*, 687 F.3d at 593.

Here, Defendants do not dispute that Plaintiffs have
established superiority and ascertainability. They do argue,
however, that Plaintiffs have not established predominance
specifically because they have failed to comply with the
requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27, 133
S.Ct. 1426, 185 L.Ed.2d 515 (2013). First, however, again in
the interest in clearing away the brush before reaching the
core of that challenge, a quick analysis of the superiority and
ascertainability requirements is warranted.

*i. Superiority*

"The superiority requirement [of Rule 23(b)(3)] asks the
court to balance, in terms of fairness and efficiency, the
merits of a class action against those of alternative available
methods of adjudication." *In re Warfarin Sodium Antitrust
Litig.*, 391 F.3d 516, 533-34 (3d Cir. 2004) (quotation marks
and citation omitted). The Rule provides a "nonexhaustive
list of factors" relevant to evaluating the superiority of
adjudication via class action, *Amchem Prods., Inc. v. Windsor*,
521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997),
including: (1) "the class members' interests in individually
controlling the prosecution or defense of separate actions";
(2) "the extent and nature of any litigation concerning the
controversy already begun by or against class members";
(3) "the desirability or undesirability of concentrating the
litigation of the claims in the particular forum"; and, (4) "the
likely difficulties in managing a class action," Fed. R. Civ. P.
23(b)(3).

Here, absent the class action device many potential claims
would not be filed: Numerous potential plaintiffs with small
damages claims would not be warranted in litigating a lengthy

Fed. Sec. L. Rep. P 101,207

securities fraud action such as this, while others, who may have more at stake, would flood the courts with individual cases seeking damages on the same theory. Certainly, class members would have no ability to control the prosecution of separate actions. Further, concentration of the case in a class action would be an efficient use of limited judicial resources. Adjudication by class action presents no obvious manageability problems, as common questions of law and fact are central to each class member's claims. As such, a class action is superior to alternative methods for adjudicating the case.

### ii. Ascertainability

**\*11** To establish ascertainability, the proponent of class certification must prove by a preponderance of the evidence that "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd*, 784 F.3d at 163 (quotation marks and citations omitted). They need not "be able to identify all class members at class certification – instead, a plaintiff need only show that class members *can* be identified." *Id.* (quotation marks and citation omitted). Here, Plaintiffs propose a definite class relying on objective criteria: all persons and entities (excluding Defendants and their officers and directors) that purchased or acquired Lannett's publicly traded common stock from July 15, 2014, to October 31, 2017. Plaintiffs explain and Defendants do not dispute that class members can be identified using records of shareholder acquisitions. Thus, the ascertainability requirement is met.

### iii. Preliminary Issues Concerning the Predominance Inquiry

Before determining whether Plaintiffs have satisfied the predominance requirement, two preliminary issues must be resolved: first, whether, as Defendants argue, the Supreme Court's decision in *Comcast v. Behrend*, 569 U.S. 27, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013) precludes certification here; and, second, whether the opinions of the parties' respective damages experts should be excluded for failure to satisfy the *Daubert* standard.

a. Applicability of *Comcast v. Behrend*

Defendants raise only one argument in their predominance challenge. Relying on *Comcast v. Behrend*, they argue that Plaintiffs fail to put forward a damages model that is consistent with their theory of liability. Contrary to Defendants' position, *Comcast* does not move the needle.

*Comcast* was an antitrust case, brought by subscribers to Comcast's cable-television services. 569 U.S. at 29-30, 133 S.Ct. 1426. These subscribers alleged that Comcast was engaged in a scheme to buy up competitor cable providers in Philadelphia and the surrounding area, which enabled the company to hold cable prices in this region at supra-competitive levels. *Id.*

The plaintiffs sought to certify a class under Rule 23(b)(3). To establish predominance, the district court required plaintiffs to show both "(1) that the existence of individual injury resulting from the alleged antitrust violation (referred to as 'antitrust impact') was 'capable of proof at trial through evidence that [was] common to the class rather than individual to its members'; and (2) that the damages resulting from that injury were measurable 'on a class-wide basis' through use of a 'common methodology.' " *Id.* (quoting *Behrend v. Comcast Corp.*, 264 F.R.D. 150, 154 (E.D. Pa. 2010)). The plaintiffs offered four theories of antitrust impact, only one of which – their so-called "overbuilder" theory – was accepted by the district court as capable of class-wide proof. *Id.* at 31, 133 S.Ct. 1426. Under this theory, Comcast's conduct reduced competition from "overbuilders," companies that build competing cable networks in regions where an incumbent cable provider operates. *Id.*

The plaintiffs maintained that their damages could be measured on a class-wide basis, pursuant to a regression model which compared actual prices in the region affected by the alleged anticompetitive conduct with hypothetical prices in an unaffected region. *Id.* at 32, 133 S.Ct. 1426. Importantly, the model purported to measure the cumulative effect of the plaintiffs' four antitrust impact theories on cable subscription prices, and was incapable of isolating damages attributable to plaintiffs' sole surviving liability theory. *Id.*

Neither the district court nor the Third Circuit saw this as a predominance-defeating issue, but the Supreme Court did. According to the Supreme Court, if the plaintiffs were to:

prevail on their claims, they would be entitled only to damages resulting

from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court. It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).

*12 *Id.* at 35. The Court noted that "[f]or all we know, subscribers in Gloucester County may have been overcharged" not because of reduced overbuilder competition, but because of Comcast's "alleged elimination of satellite competition (a theory of liability that is not capable of classwide proof)." *Id.* Because the plaintiffs' proposed damages model could not "bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to the deterrence of overbuilding, Rule 23(b)(3) [could not] authorize treating subscribers ... as members of a single class." *Id.* at 38, 133 S.Ct. 1426.

Lower courts have since spilt much ink attempting to decipher *Comcast*'s impact on the Rule 23(b)(3) predominance analysis. *See, e.g.*, Alex Parkinson, *Comcast Corp. v. Behrend and Chaos on the Ground*, 81 U. Chi. L. Rev. 1213, 1225-38 (2014) (describing chaos among the lower courts as to *Comcast*'s implications). In *Neale v. Volvo Cars of North America, LLC*, the Third Circuit limited *Comcast* to its unique facts, finding the case "inapposite" to the predominance analysis in a products liability action. 794 F.3d 353, 374 (3d Cir. 2015). There, plaintiffs sought certification of six state-wide damages classes composed of consumers who alleged that Volvo sold vehicles with a uniform design defect. *Id.* at 357. The district court granted the plaintiffs' request and Volvo appealed, arguing that certification was inappropriate under *Comcast*.

The Third Circuit disagreed, interpreting the *Comcast* decision thus: "Comcast held that an antitrust litigation class could not be certified because the plaintiffs' damages model did not demonstrate the theory of antitrust impact that the district court accepted for class action treatment." *Id.* at 374; *see also Suboxone*, 967 F.3d at 270 (*Comcast* held

"that class certification was inappropriate when a damages model reflected injury from four antitrust injuries, but only one viable theory of antitrust liability and injury remained in the case"). The court explained: "Because [the *Comcast* plaintiffs'] evidence could not translate the relevant legal theory of the harmful event into an analysis of the economic impact of that event, [the Supreme Court] determined that common questions could not predominate over individual ones." *Neale*, 794 F.3d at 374 (quotation marks, italics, and citation omitted). In *Neale*, however, there was no question that the class members' damages flowed from the defendant's conduct that created the legal liability; thus, *Comcast* did not apply. *See id.*; *see also Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) ("Unlike the situation in *Comcast*, there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis; all members of the mold class attribute their damages to mold and all members of the control-unit class to a defect in the control unit").

Plaintiffs suggest that neither does *Comcast* apply to this securities action, where Plaintiffs propose to measure out-of-pocket damages based on the difference in the amount of artificial inflation in Defendants' stock price at the time of purchase and at the time of sale. There is some merit to this assertion: Unlike in *Comcast*, where the plaintiffs offered multiple different theories of how the defendant's conduct violated federal antitrust law, here in this securities fraud case Plaintiffs (having toyed with various other theories during this litigation[10] now focus on a single theory of liability – that the Defendants made material misrepresentations or omissions; that Defendants' misrepresentations artificially inflated Lannett's stock price; and the stock price declined when the truth emerged causing financial loss to Plaintiffs and the class. Although the Complaint alleges many misrepresentations about various, interrelated topics, because each of Defendants' alleged misrepresentations is part of their broader alleged concealment of the lack of competition in the generic drug market and the potential adverse consequences on Lannett's business, each misrepresentation is categorically part of the same, single theory. *See, e.g.*, *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) ("individual alleged misstatements ... relat[ing] to different aspects of a larger problem" were part of "a network of interrelated lies, each one slightly distinct from the other, but all collectively aimed at perpetuating a broader, material lie").

*13 *Comcast* is "inapposite" here because the numerical mismatch between damages model (one model) and liability

Fed. Sec. L. Rep. P 101,207

theory (four theories) at issue in that case is not present here. To recap, the *Comcast* plaintiffs pursued four liability theories prior to certification, and their damages expert developed a model that calculated damages based on all four theories. The district court rejected three of these theories at class certification, after the damages model had been developed. This resulted in a mismatch between the sole theory of liability remaining at class certification and the damages model, which calculated damages as if all four liability theories remained. Here, at class certification, Plaintiffs advance a single theory of liability, as delineated by their proposed damages expert, Chad Coffman, thus:

> Defendants repeatedly issued materially false or misleading statements and financial results throughout the Class Period, even as the details of the price-fixing scheme under investigation came to light and as the investigation widened to include Lannett itself. The Complaint alleges that through a series of corrective disclosures, the market finally learned the truth about Lannett's fraudulent scheme, and once revealed, the price of Lannett Common Stock fell, harming investors who bought at inflated prices.

Coffman employed that theory in his expert report and testified unequivocally during the hearing on Defendants' motion to exclude his opinion that he did not incorporate Plaintiffs' prior theories of liability at any point in drafting his report. The issue that led to a mismatch between damages model and liability theory fatal to certification in *Comcast* – *i.e.*, that the expert damages opinion was prepared to measure damages for four different theories of liability, and could not disaggregate damages for the one remaining theory of liability after three theories were rejected – is, accordingly, not presented here. That said, the Supreme Court's explanation that "[t]he first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*" does have application to the predominance analysis which application will be explored *infra. Comcast*, 569 U.S. at 38, 133 S.Ct. 1426 (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011)).

b. *Daubert* Motions

Coffman's report focuses on whether the market for Lannett common stock was efficient during the class period and whether calculating damages is subject to a common methodology under Section 10(b) and Rule 10b-5. He concludes that the answer to both questions is yes. In response, Defendants submitted a report by Jennifer Marietta-Westberg ("the Marietta-Westberg Report") opining to the contrary that Coffman did not put forth a methodology for calculating damages on a class-wide basis in a manner consistent with Plaintiffs' theory of liability. Both parties argue that the other party's expert fails to satisfy the *Daubert* standard for the admission of expert evidence. Thus, before finally getting to the predominance analysis it is necessary to address the parties' respective *Daubert* motions.

*1. Daubert Standard*

Federal Rule of Evidence 702, which codified the *Daubert* standard and governs the admissibility of expert testimony, states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

**\*14** Fed. R. Evid. 702. The *Daubert* standard "has three major requirements: (1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge, *i.e.*, reliability; and (3) the expert's testimony

Fed. Sec. L. Rep. P 101,207

must assist the [finder] of fact, *i.e.*, fit." *United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (quotation marks, brackets, and citation omitted). The party offering the expert must satisfy each requirement by a preponderance of the evidence. *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999).

To satisfy the qualification requirement, an expert must possess "specialized knowledge regarding the area of testimony." *Betterbox Comm'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 327 (3d Cir. 2002) (quotation marks and citation omitted). "The basis of this specialized knowledge can be practical experience as well as academic training and credentials." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quotation marks and citations omitted). The qualification requirement is interpreted "liberally," *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008), and "a broad range of knowledge, skills, and training qualify an expert as such," *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) (citation omitted). The expert need not "be the best qualified or ... have the specialization that the court considers most appropriate," *Pineda*, 520 F.3d at 244, and "[i]f the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility," *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997) (citation omitted).

To satisfy the reliability requirement, "the expert must have good grounds for his or her belief," not "subjective belief or unsupported speculation." *Paoli*, 35 F.3d at 742 (quotation marks and citation omitted). Expert opinion need not possess the "best foundation, or even ... the best methodology or unassailable research. Rather, the test is whether the particular opinion is based on valid reasoning and reliable methodology." *TMI*, 193 F.3d at 665 (quotation marks and citation omitted). "The evidentiary requirement of reliability is lower than the merits standard of correctness," and Plaintiffs seeking introduction of expert evidence do not "have to prove their case twice – they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *Paoli*, 35 F.3d at 744. *Daubert* offers multiple factors to evaluate reliability, including, *inter alia*, "whether the method is generally accepted" and "the qualifications of the expert witness testifying based on the methodology." *Id.* at 742 n.8 (citations omitted). However, there is "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," and the "reasonable measures of

reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 153, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (citation omitted).

The final requirement of Rule 702 demands that "expert testimony ... fit the issues in the case." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). "In assessing whether an expert's proposed testimony fits, we are asking whether the expert testimony proffered is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Schiff*, 602 F.3d at 173 (quotation marks, ellipses, and citation omitted). "[T]his is a question of relevance, and Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility if it has the potential for assisting the trier of fact." *Id.* (quotation marks and citations omitted). "The standard is not that high, but is higher than bare relevance." *Id.* (internal quotation marks and citation omitted). However, "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786 (quotation marks and citations omitted).

**\*15** Here, in addition to the questions regarding qualifications, reliability, and fit, there is an additional overlay – the expert's relevance to the class certification determination – that must be considered. Specifically, under *In re Blood Reagents Antitrust Litigation*, where a party relies on expert testimony to meet class certification requirements the court must evaluate any *Daubert* challenges to such expert testimony in deciding the class certification motion. 783 F.3d 183 (3d Cir. 2015). That is because the proponent of certification must satisfy Rule 23(b) with "evidentiary proof," and "[e]xpert testimony that is insufficiently reliable to satisfy the *Daubert* standard cannot ... establish through evidentiary proof that Rule 23(b) is satisfied." *Id.* at 187 (quotation marks and citations omitted). Accordingly, "a plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert*." *Id.* (quotation marks and citations omitted).

*Blood Reagents* sets out a two-step process for addressing *Daubert* challenges in the context of class certification proceedings. The first question to be answered is whether the "aspects of plaintiffs' expert testimony offered to satisfy Rule 23" are "critical to class certification." *Id.* at 187-88. If they are, then the Court turns to deciding whether the expert

Utesch v. Lannett Company, Inc., Slip Copy (2021)

Fed. Sec. L. Rep. P 101,207

evidence is admissible under *Daubert*. *Id.* at 188. If they are not, there is no need to address the *Daubert* challenge in that the expert testimony would have no bearing on whether the class should be certified.

### 2. The Coffman Report

Defendants contend that Coffman's opinion fails to satisfy the *Daubert* standard because it is unreliable and fails to fit the facts of the case, but do not contend that he is unqualified to serve as an expert.

Coffman opines that although damages "calculations would likely depend, in part, on the completion of discovery, and full development of the case record, based on [his] expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, ... damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole," to wit, the out-of-pocket damages methodology. Under this method, "damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale." After artificial inflation – that is, the increase in Lannett's stock price caused by the fraudulent misrepresentations – is "quantified on each day during the class period," calculating damages "for each class member is formulaic based upon information collected in the claims process," including the record of each class member's purchase and sale of a security.

In response to Defendants' *Daubert* motion to exclude Coffman's opinion, Plaintiffs, interestingly, contend that there is no need to go beyond the first step of the *Blood Reagents* analysis and that, accordingly, there is no need to decide the motion. Specifically, they suggest that Coffman's opinion is "helpful, but not critical to showing that damages can be calculated consistent with Plaintiffs' theory of liability,"[11] because the out-of-pocket damages method is widely recognized as standard in securities fraud cases. However, it cannot be presumed that Rule 23 is satisfied merely because a case involves securities fraud claims. *See Hydrogen Peroxide*, 552 F.3d at 322. Something more is required and, in the absence of other evidence, the Coffman Report is critical to certification and must meet the *Daubert* standard.

**\*16** Turning now to the *Daubert* analysis. As stated, it is not disputed that Coffman possesses the requisite specialized knowledge to be qualified as an expert. He holds advanced degrees in economics and public policy, is a certified chartered financial analyst, and has substantial experience in securities valuation and damages analysis. Specifically, he is currently president of Global Economics Group, which he founded in 2008 and which "specializes in the application of economics, finance, statistics, and valuation principles" in a variety of contexts, including securities litigation. He was previously employed for 12 years at Chicago Partners LLC, during which he conducted and managed analysis of securities valuation and damages. He testified during his deposition that he has served as an expert in between 50 and 100 securities class actions, and his resume reflects that he regularly serves as a damages expert in such cases.

With respect to the reliability requirement, that too is satisfied. Coffman's opinion that "damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole" is based on his expertise and experience in dozens of similar matters, understanding of the nature of the claims in this case, and explanation of the out-of-pocket method. As noted, Coffman has ample experience as a damages expert in securities fraud cases. *See Paoli, 35 F.3d at 742 n.8* (recognizing that "the qualifications of the expert witness testifying based on the methodology" supports reliability). Further, he explains that the out-of-pocket method "has been applied in virtually every matter in which [he has] observed or participated in" as an expert, and correctly states that the out-of-pocket damages methodology is a "standard and well-accepted method for calculating class wide damages" for claims under Section 10(b), as are at issue here. *See e.g.,* 7 Newberg on Class Actions § 22:81 (5th ed.) (explaining that "most courts utiliz[e] an 'out of pocket' damage measurement that similarly applies across the class" to calculate damages for Section 10 and Rule 10b-5 claims). Moreover, Coffman's report, deposition testimony, and testimony at the *Daubert* hearing clearly show Coffman examined and relied on the case-specific allegations of the Complaint in this matter.[12] Lastly, Coffman describes how the out-of-pocket method works,[13] including how damages are calculated (as the difference in the artificial inflation of Lannett's stock at the time of purchase and sale) across the class (that is, by calculating for each class member the difference in artificial inflation when they bought and sold Lannett stock using purchase and sale information gathered during the claims process).[14] Coffman's experience, expertise, understanding of Plaintiffs' claims, and explanation of the out-of-pocket method render him reliable.[15]

Fed. Sec. L. Rep. P 101,207

**\*17**  Coffman's opinion also satisfies the fit requirement. In opining that damages "in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole," the Coffman Report is squarely relevant to the dispute at issue: whether Plaintiffs have established by a preponderance of the evidence for purposes of certification that damages will be susceptible to class-wide measurement. It is therefore helpful for purposes of resolving "the particular disputed factual issues in the case." *TMI*, 193 F.3d at 670 (citation omitted).

Because Coffman is qualified as a damages expert, and his opinion is reliable and fits with this case, Coffman's opinion meets the *Daubert* standard and Defendants' motion to exclude will be denied.

### 3. The Marietta-Westberg Report

Plaintiffs move to exclude Marietta-Westberg's opinion, contending that Marietta-Westberg is unqualified, her opinion is unreliable, and that it fails to fit the issues presented at class certification.

Marietta-Westberg opines that Coffman "has not put forth an appropriate methodology that can measure damages in a manner consistent with Plaintiffs' theory of liability." Specifically, she opines that Coffman has not adequately explained how Plaintiffs will calculate (1) the impact on Lannett's stock price of the alleged misrepresentations and corrective disclosures; (2) the impact on Lannett's stock price of Defendants' alleged risk-related misrepresentations (that is, misrepresentations of Lannett's risk of being implicated in government investigations and enforcement actions against anticompetitive conduct) and the materialization of these risks; and, (3) "time-varying inflation" (that is, how the level of fraudulent inflation of Lannett's stock varied during the class period). She further goes on to state that "there is reason to believe" that the drop in Lannett's stock price after the alleged corrective disclosures cannot be a "reliable measure" of the inflation in Lannett's stock because the drop is attributable to factors other than revelations of Defendants' alleged fraud.

However, her report challenges neither the use of the out-of-pocket method in this case nor that this method could be applied on a class-wide basis. To the contrary, she testified during the *Daubert* hearing that she "does not dispute the out-

of-pocket method," but instead "disputes ... the lack of detail in the damages method." In other words, her report does not challenge the central premise of Plaintiffs' argument for why predominance is satisfied as to damages – that is, because damages can be calculated on a class-wide basis using the out-of-pocket method – but only raises issues regarding the details of how this method will be applied. Indeed, Marietta-Westberg concurred during the *Daubert* hearing that the artificial inflation of Lannett's stock price will "be determined based upon proof that is common to all class members," and similarly that an analysis of the drop in Lannett's stock price following alleged corrective disclosures would not differ as to particular Plaintiffs or class members. She is correct: each of the issues raised in her report concern a matter entirely common to the class, to wit, whether Plaintiffs will be able to accurately calculate how much of the increase or decrease in Lannett's stock price is attributable to Defendants' alleged fraud, and the revelation of that fraud, rather than other potential factors.

Although "[w]eighing conflicting expert testimony at the certification stage ... may be integral to the rigorous analysis Rule 23 demands," *Hydrogen Peroxide*, 552 F.3d at 323, "a court should not address merits-related issues beyond what is necessary to determine preliminarily whether certain elements will necessitate individual or common proof," *Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 305 (3d Cir. 2016) (quotation marks and citation omitted). Undoubtedly at the merits stage of this litigation Marietta-Westberg and Coffman will go head-to-head regarding the viability of Plaintiffs' damages model. Certainly, the soundness of Coffman's analysis can be appropriately challenged at the merits stage of this litigation, but it is not necessary to address it here. *See, e.g., Amgen*, 568 U.S. at 466, 133 S.Ct. 1184 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage"). Because Plaintiffs' answers for these issues will be the same for each class member, their resolution is not necessary to determine if Plaintiffs have satisfied the predominance requirement. [16] Accordingly, because predominance – the sole disputed class certification requirement for which the Marietta-Westberg Report is offered – does not turn on her report, it is not critical to class certification, *see Blood Reagents*, 783 F.3d at 187, and therefore, Plaintiffs' *Daubert* challenge need not be addressed.

#### iv. Predominance

**\*18** Now that the preliminary issues – the applicability (or rather non-applicability) of *Comcast v. Behrend* to this matter and the parties' respective *Daubert* motions – are resolved, what remains is to determine if Plaintiffs have shown that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

Defendants do not dispute that predominance is satisfied as to Defendants' underlying liability for Plaintiffs' claims. They do, however, argue that Plaintiffs have failed to establish that damages can be calculated consistent with Plaintiffs' theory of liability. Their challenge to predominance arises in the context of their discussion of the applicability of *Comcast*. And, while, as discussed *supra, Comcast* is distinguishable, its central and uncontroversial premise – that "[t]he first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*" – drives the predominance inquiry here. *Comcast*, 569 U.S. at 38, 133 S.Ct. 1426 (quotation marks and citation omitted).

The predominance analysis "look[s] first to the elements of the plaintiffs' underlying claims and then, through the prism of Rule 23, undertake[s] a rigorous assessment of the available evidence and the method or methods by which the plaintiffs propose to use the evidence to prove those elements." *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 128 (3d Cir. 2018) (quotation marks, brackets, and citations omitted). "Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Hydrogen Peroxide*, 552 F.3d at 311 (quotation marks and citations omitted).

"An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016) (quotation marks, brackets, and citation omitted). If "proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Newton*, 259 F.3d at 172. However, if "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues," the

predominance requirement is satisfied. *Tyson Foods*, 577 U.S. at 453, 136 S.Ct. 1036 (quotation marks and citations omitted).

Because "the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct," *Sullivan*, 667 F.3d at 298, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud," *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231 (citation omitted); *see also Sullivan*, 667 F.3d at 297-300 (explaining that "the presence of ... questions stemming solely from [the defendant's] asserted behavior" is an "apt illustration" of why predominance is "readily met" in cases alleging fraud (quotation marks and citations omitted)).

**\*19** Plaintiffs have established by a preponderance of the evidence that the predominance requirement is satisfied as to damages. Here, they have adequately established that damages are susceptible to class-wide proof by showing that damages can be measured on a class-wide basis. As set out in the Coffman Report, Plaintiffs propose to calculate damages using a damages methodology that is applicable to the entire class: the out-of-pocket method. The Coffman Report explains how, after calculating the impact of Defendants' misrepresentations on Lannett's stock price, calculating damages under the out-of-pocket method is "formulaic" for each class member based on a simple calculation of the difference between the amount of fraud-induced inflation of Lannett's stock price at the time of purchase and sale. As Plaintiffs contend, calculating damages using the out-of-pocket method is standard in securities fraud class actions, and Defendants have not contended to the contrary. *See also, e.g., Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 297 (3d Cir. 1991); *Levy v. Gutierrez*, 448 F.Supp.3d 46, 65 (D.N.H. 2019) (explaining that "courts have found that Coffman's [out-of-pocket damages] methodology ... provides a workable method for measuring damages" in securities fraud class actions, and collecting cases). Further, the out-of-pocket method is consistent with Plaintiffs' liability theory. As Plaintiffs explain, their theory of liability is that "Defendants' misrepresentations artificially inflated Lannett stock, and that the stock price declined when the truth emerged causing financial loss to those who purchased at inflated prices." Plaintiffs' proposal of the out-of-pocket method to measure this loss is consistent with their theory of liability.

Plaintiffs concede that calculating damages using the out-of-pocket damages method will require individual

Utesch v. Lannett Company, Inc., Slip Copy (2021)
Fed. Sec. L. Rep. P 101,207

damages calculations based on the record of each class member's transactions in Lannett stock. Individual class members' damages will differ depending on when and how much Lannett stock they purchased or sold. However, such individualized damages calculations do not defeat predominance. *See, e.g., In re Cmty. Bank of N. Va.*, 418 F.3d 277, 305-06 (3d Cir. 2005) ("Although the calculation of individual damages is necessarily an individual inquiry, ... the necessity of this inquiry does not preclude class action treatment where class issues predominate" (citations omitted)). As it is undisputed that common issues will predominate as to Defendants' liability, and because Plaintiffs have adequately established that damages can be calculated on a class-wide basis and that the necessity of individualized damages calculations for each class member does not defeat predominance, the predominance requirement is satisfied.

\*\*\*\*\*\*\*\*\*\*\*\*\*

Accordingly, Plaintiffs have satisfied each of the superiority, ascertainability, and predominance requirements of Rule 23(b), as well as each of the class action pre-requisites of Rule 23(a). The case therefore may proceed as a certified class action.

### IV. CONCLUSION

For the foregoing reasons, the *Daubert* motions will be denied, the motion for class certification will be granted, UPRRS and Ironworkers will be appointed class representatives, and Abraham, Fruchter & Twersky, LLP will be appointed class counsel. An appropriate order follows.

**All Citations**

Slip Copy, 2021 WL 3560949, Fed. Sec. L. Rep. P 101,207

### Footnotes

1   Excluded from the Class are Defendants, the officers and directors of Lannett, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

2   In addition to these and the Section 20(a) claims, the Complaint also asserts that Defendants violated Subsections (a) and (c) of Rule 10b-5, which respectively make it unlawful to "employ any device, scheme, or artifice to defraud" and "engage in any act, practice, or course of business which operates ... as a fraud." 17 C.F.R. § 240.10b-5(a), (c). Claims under these subsections are referred to as " 'scheme liability claims' because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements." *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 643 n.29 (3d Cir. 2011), *abrogated on other grounds by Amgen*, 568 U.S. at 465, 133 S.Ct. 1184. Plaintiffs' Motion and briefing in support of their Motion do not raise the scheme liability claim of the Complaint for class certification. Accordingly, this claim will not be certified for class treatment.

3   Rule 23(g) provides that "a court that certifies a class must appoint class counsel," and sets out a non-exhaustive list of factors governing the appointment of class counsel, including: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and, (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1). For the reasons set forth above, Abraham, Fruchter & Twersky, LLP, satisfies the criteria of Rule 23(g), and will be appointed class counsel.

4   Defendants contend that adequacy is not established because both UPRRS and Ironworkers "lack even a basic understanding of the facts underlying this action" and defer to counsel in making decisions about the case. But, "[a] class representative need only possess a minimal degree of knowledge necessary to meet the adequacy standard." *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) (quotation marks and citation omitted). The deposition testimony of Plaintiffs' designated Rule 30(b)(6) witnesses demonstrate that Plaintiffs understand the nature of their causes of action – to wit, that this is a class action lawsuit against Lannett and its executives premised on their false and misleading statements

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.    16

about drug pricing which caused investors, including Plaintiffs and class members, to lose money. There is no need for Plaintiffs to have mastered the factual and legal issues presented in the case to satisfy the adequacy requirement, because their representation of the class will be accomplished through adequate counsel. *See, e.g.*, *Lewis v. Curtis*, 671 F.2d 779, 789 (3d Cir. 1982), *abrogated on other grounds by Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991); *see also In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 967 F.3d 264, 273 (3d Cir. 2020).

5    Defendants also contest adequacy on the grounds that UPRRS is underfunded, arguing that UPRRS's "precarious financial position raises serious concerns about potential conflicts of interest and whether it could represent the putative class if it is forced to declare bankruptcy or faces an immediate liquidity crunch." To preclude class certification, a conflict of interest "must be fundamental" and cannot be "unduly speculative." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012) (quotation marks and citations omitted). "A fundamental conflict exists where some class members claim to have been harmed by the same conduct that benefitted other members of the class" and "touches the specific issues in controversy." *Id.* (quotation marks, brackets, and citations omitted). Although Defendants suggest that UPRRS's financial status could pressure UPRRS to settle the case, this does not constitute a fundamental conflict as the Third Circuit has defined it. Further, UPRRS has vigorously litigated the case since its appointment as lead plaintiff over four years ago. Potential adverse consequences of UPRRS's financial situation are speculative, and do not render UPRRS inadequate.

6    One focus of the typicality inquiry is "the extent to which the proposed representative may face significant unique or atypical defenses to her claims." *Id.* at 597-98 (citation omitted). Even where a proposed class representative's claims are the same as those of class members, its individual factual circumstances may allow a defendant to assert a unique or atypical defense to the proposed representative's claims – that is, a "defense[ ] against it which would not be applicable to the class as a whole." *Zenith Lab'ys, Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir. 1976). If the proposed representative faces a defense that is unique to them, "the representative's interests might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class." *Schering Plough*, 589 F.3d at 598 (quotation marks and citations omitted).

7    To invoke the *Basic* presumption of reliance, "a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Id.* at 277-78, 134 S.Ct. 2398 (citations omitted). Plaintiffs need not demonstrate materiality to establish that the fraud-on-the-market theory applies at class certification. *Amgen*, 568 U.S. at 459-60, 133 S.Ct. 1184. Here, as to the remaining elements, Plaintiffs allege misrepresentations that were publicly known, including in public regulatory filings, press releases, and public statements, Plaintiffs purchased stock during the class period, and Lannett's common stock traded on a quintessential efficient market, the New York Stock Exchange. *See Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[I]n an open and developed securities market like the New York Stock Exchange, the price of a company's stock is determined by all available material information regarding the company and its business"). Plaintiffs thus have satisfied the pre-requisites required to establish that the *Basic* presumption of reliance applies for purposes of class certification.

8    Porter testified that TSW has a "value shop" investment approach and tries "to buy companies for some value below their intrinsic value and hopefully sell them at their intrinsic value or above." As to TSW's purchase of Lannett stock, Porter testified that TSW "took a position in Lannett ... thinking that [it] had a favorable risk/reward relationship," explaining further that Lannett had "large cash position, a backlog of generic drugs that hadn't been approved yet, the opportunity to deploy their balance sheet for M&A opportunities," and other opportunities. As to potential "negatives" in investing in Lannett, Porter agreed that "one of the primary risks" included "price erosion" in the pricing of generic drugs.

9    Further, the testimony cited by Defendants fails to establish that TSW did not directly rely on the misrepresentations of the individual defendants alleged in the Complaint. In this testimony, when asked if TSW "generally" relied on what Bedrosian said about Lannett, Porter testified that he "wouldn't say we rely"

because "we really rely on ourselves" by "collect[ing] information" and "form[ing] our own risk/reward analysis." Porter then explained that TSW "listen[s]" to "management's discussions about risks and opportunities" and "factor that into our case." In other words, Porter confirmed that companies' management's statements are a factor in TSW's decision to trade in a security.

10    The Complaint does, at points, mention Lannett's potential involvement in anticompetitive conduct. However, to the extent that Plaintiffs' Complaint might have espoused a theory of liability that Lannett concealed its own involvement in anticompetitive conduct, this Court's May 15, 2019 Opinion put paid to that theory. *See Utesch v. Lannett Co., Inc.*, 385 F.Supp.3d 408, 417 n.4 (E.D. Pa. 2019) ("Defendants' arguments as to this theory [went] without response from Plaintiffs, and therefore the theory [was] waived").

11    But this suggestion is directly contradicted by (1) other portions of their briefing in which they argue that "the Coffman Report demonstrates that damages in this action are capable of being calculated on a class-wide basis using the out-of-pocket damages methodology"; and, (2) that they offer no other "evidentiary proof" in support of this proposition.

12    Defendants suggest that Coffman conducted no case-specific analysis in support of his opinion, making much of his testimony that the language of the damages section of the Coffman Report was "language [he'd] used before" in past cases and that the "language describing the out-of-pocket damages methodology and the rationale behind it ... doesn't change from report to report." That Coffman is a frequent flyer in these kinds of cases in the context of this *Daubert* motion cuts in favor of his reliability rather than against it.

13    Defendants argue that Coffman's opinion is unreliable because he does not propose a damages method, but instead offers only a definition of out-of-pocket loss. But he does more than that – he proposes a method of calculating damages on a class-wide basis. He also summarizes, albeit in general terms, the steps by which out-of-pocket losses would be calculated for the class (that is, by quantifying levels of inflation of Lannett's stock during the class period, then performing a "formulaic" calculation of class members' damages by subtracting the level of inflation of Lannett's stock at the time of each investor's sale from the level of inflation at the time of purchase). *See also, e.g.*, 4 Newberg on Class Actions § 12:5 (5th ed.) (listing "common methods" of proving class-wide damages, including a "formula derived from the facts of the case that can be applied generally to all class members").

14    Coffman concedes that Plaintiffs have more work to do to calculate damages using the out-of-pocket method. Specifically, his report explains, to calculate the level of inflation of Lannett's stock caused by Defendants' fraud, which is the "input" for the out-of-pocket method, Plaintiffs will have to perform a "detailed" analysis "informed by information learned in discovery." His report identifies multiple frequently-used methods and techniques to calculate artificial inflation and distinguish "confounding" sources of increases or decreases in a stock price from the impact of an alleged fraud. Although the Report does not identify the specific methods or techniques to be deployed here, the method of determining the inflation of Lannett's stock price caused by the alleged fraud is common to the class. Moreover, a plaintiff's "damages model need not be exact" at class certification. *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 261 (3d Cir. 2016) (citation omitted). Thus, Coffman need not support his opinion with a damages model specifying precisely how Plaintiffs will measure the price impact of the various misrepresentations and corrective disclosures alleged here, nor specify exactly how Plaintiffs will distinguish the impact of various other factors to be uncovered in discovery that may have affected Lannett's stock price during the class period.

15    Defendants also challenge Coffman's opinion as unreliable and not fitting the case based on an event study model Coffman used to assess market efficiency for purposes of determining if the *Basic* presumption of reliance applies. Because, Defendants argue, this event study model can measure only the impact on Lannett's stock price of news specific to Lannett, and not the impact of news concerning Lannett's competitors, the event study model cannot support Coffman's damages opinion and does not fit the facts of the case. However, this event study is not the basis of Coffman's opinion: the Coffman Report's section on damages explicitly states that "[t]he event study [he] performed for th[e] report is for Market Efficiency purposes and is not an attempt at valuing artificial inflation" of Lannett's stock price.

Utesch v. Lannett Company, Inc., Slip Copy (2021)

Fed. Sec. L. Rep. P 101,207

16    Further, to the extent that Marietta-Westberg is opining that Plaintiffs will be unable to prove that class members' losses were not "caused by factors other than the revelation of a misrepresentation" such as "changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events," this is squarely an issue of loss causation, and Plaintiffs need not prove loss causation at class certification. *Halliburton I*, 563 U.S. at 812-813, 131 S.Ct. 2179 (quotation marks and citations omitted).

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

17

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 253 of 261
PageID: 45191
Zanger v. Gulf Stream Coach, Inc., Not Reported in F.Supp.2d (2005)

2005 WL 3163392
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan, Southern Division.

Cory M. ZANGER, Plaintiff,
v.
GULF STREAM COACH, INC., a Foreign
Corporation, and General R.V. Center, Inc.,
a Michigan Corporation, General Motors
Corporation, a Delaware Corporation,
Jointly and Severally, Defendants.

No. 05-CV-72300-DT.
|
Nov. 28, 2005.

**Attorneys and Law Firms**

Brian P. Parker, Brian P. Parker Assoc., Bingham Farms, MI, for Plaintiff.

Daniel J. McCarthy, Mellon, McCarthy, and Edmund S. Yee, Dold, Spath, Troy, MI, for Defendants.

*OPINION AND ORDER GRANTING
DEFENDANT GULF STREAM COACH'S
MOTION FOR PURSUANT TO FED. R. CIV. P. 56*

BORMAN, J.

**\*1** Now before the Court is Defendant Gulf Stream Coach, Inc.'s ("Gulf Stream") Motion for Dismissal and Motion for Summary Judgment. The Court held a hearing on November 9, 2005. Having considered the entire record, and for the reasons that follow, the Court GRANTS Gulf Stream's Motion for Summary Judgment.

I. *FACTS*
In this action, Plaintiff Cory Zanger ("Plaintiff") brought suit on July 6, 2005 against Gulf Stream, General R.V. Center, Inc. ("General RV") and General Motors Corporation ("GM") (collectively "Defendants") based on the alleged breaches of warranty and contract and violations of state and federal statutes.

On August 10, 2004, GM filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiff failed to state a claim for which relief can be granted on each of the seven (7) counts in Plaintiff's Complaint.[1] In its Opinion and Order of October 24, 2005, the Court dismissed Counts IV, VI and VII of the Complaint in their entirety as applied to GM. Additionally, Count II was dismissed to the extent that it was based on a breach of express warranty, and Count V was dismissed to the extent that it was based on fraud. However, Counts I and III survived, as well as the remaining claims under Counts II and V.

On September 21, 2005, Gulf Stream filed the present Motion to Dismiss and Motion for Summary Judgment arguing failure to state a claim and failure to show the existence of a genuine issue as to any material fact, for each of the counts. (Def.'s Mot. 20). Plaintiff filed his response on October 10, 2005. Gulf Stream filed its reply on October 25, 2005.

This controversy revolves around Cory Zanger's purchase of a new 2004 Gulf Stream Endura recreational vehicle ("motor home") from General RV. (Compl.¶ 5). GM manufactured the chassis of the motor home while Gulf Stream manufactured the coach and final assembly. (Def.'s Br. 1). Plaintiff received Gulf Stream's Limited Warranty at the time of purchase of the motor home. (*Id.*). The relevant part of the warranty provided:

> This Limited Warranty covers only those defects which occur or exist within the period or periods referenced above and which are specifically identified to Gulf Stream Coach, Inc. in the manner specified in Section 3 of this Limited Warranty. All obligations of Gulf Stream pursuant to this Limited Warranty are limited to replacing or repairing the defective part or component.

> This Limited Warrant is expressly IN LIEU of any other express warranty and is further IN LIEU of any implied warranty, including, but not limited to, any implied WARRANTY OF MERCHANTABILITY or FITNESS for a particular purpose.

(Def.'s Br., Ex. A) (emphasis in original).

After taking possession of the motor home, Plaintiff experienced various problems with both the chassis and coach of the vehicle. (Pl.'s Resp. 2).[2] Plaintiff subsequently took the vehicle in for repairs. (Compl.¶ 11). Plaintiff's vehicle was unavailable to Plaintiff for a period up to 180 days. (Pl.'s Resp. 1). Plaintiff contends that Defendants were offered numerous attempts to cure these defects, but failed to do so. (Compl.¶

14). Plaintiff was not satisfied with the repairs that were made and notified Defendants that he desired to have them buy-back the vehicle. (*Id.* at ¶ 12-15). Defendants refused to buy-back the vehicle, resulting in this suit.

**\*2** Gulf Stream moves to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). Defendant also moves for Summary Judgment under Federal Rule of Civil Procedure 56. Defendant makes six (6) arguments: (1) the breach of express warranty claim should be dismissed because the Gulf Stream warranty was not an express warranty under the Michigan UCC, but a limited warranty (Def.'s Mot. 2-3); (2) it has not breached its implied warranties of merchantability or fitness because Michigan law requires privity of contract for that claim to be valid (*Id.* at 4-7); (3) Gulf Stream's warranty was a limited warranty, not an express warranty, so there was no privity between Plaintiff and Gulf Stream and therefore no violation of the Magnuson-Moss Warranty Act ("MMWA") (*Id.* at 9); (4) revocation of acceptance is solely a remedy for breach of warranty, not an independent cause of action in the absence of a valid express or implied warranty (*Id.* at 9); (5) Plaintiff's Michigan Consumers Protection Act ("MCPA") claim fails because it is premised on breach of express or implied warranty and Plaintiff has no valid claim against Gulf Stream that it offered Plaintiff any express or implied warranties (*Id.* at 10); (6) Gulf Stream did not negligently repair the motor home because it never repaired it on any occasion. (*Id.* at 11).

Plaintiff argues that Defendant's Motion to Dismiss and Motion for Summary Judgment must be denied. First, Plaintiff argues that vertical privity is not required in Michigan to pursue a breach of warranty claim against a remote manufacturer. (Pl's Resp. 5). Second, the warranty offered by Gulf Stream failed in its essential purpose because Gulf Stream did not repair Plaintiff's vehicle within a reasonable time. (*Id.* at 7). Third, Plaintiff states that because he has viable claims that Gulf Stream breached its express and implied warranties, there is a cause of action for a violation of the Magnuson-Moss Warranty Act. (*Id.* at 10-12). Fourth, Plaintiff argues that he stated a valid claim for breach of implied warranties against Gulf Stream and therefore stated a valid claim under the MCPA. (*Id.* at 13). Plaintiff concedes that Gulf Stream is not liable on the revocation and negligent repair claims. (*Id.* at 2, 17).

II. *ANALYSIS*

A. Standard of Review

A complaint brought under Federal Rule of Civil Procedure 12(b)(6) should not be dismissed for failure to state a claim, "unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Hoover v. Ronwin,* 456 U.S. 558, 587, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984). For purposes of a motion to dismiss, the pleadings and affidavits are viewed "in a light most favorable to the Plaintiff." *Niemi v. NHK Spring Co.,* 276 F.Supp.2d 717 (E.D.Mich.2003). All factual allegations and any inferences derived from those allegations must be accepted as true. *Cheriee Gazette v. City of Pontiac,* 41 F.3d 1061, 1064 (6th Cir.1994). "If, on a [motion to dismiss] ..., matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgement and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to represent all material made pertinent to such a motion by Rule 56. FED. R. CIV. P. 12(b).

**\*3** Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case where the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323; *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed.1979)) (citations

Case 1:19-md-02875-RMB-SAK   Document 1748-28   Filed 11/10/21   Page 255 of 261
PageID: 45193
*Zanger v. Gulf Stream Coach, Inc.*, Not Reported in F.Supp.2d (2005)

omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.; Feliciano v. City of Cleveland,* 988 F.2d 649, 654 (6th Cir.1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.,* 749 F.2d 1205, 1210-1211 (6th Cir.1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex,* 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.,* 106 F.3d 135, 145 (6th Cir.1997); *see also Anderson,* 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). " '[C]onclusory' allegations unsupported by 'specific' evidence will be insufficient to establish a genuine issue of fact." *Id.* (citations omitted); *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 902, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

**\*4** "[T]he showing (whether as to standing or the merits) required to overcome a motion for summary judgment is more extensive than that required in the context of a motion to dismiss. *Id.* "The principal difference is that in the former context evidence is required, while in the latter setting the litigant may rest upon the allegations of his complaint." *Id.* (citations omitted); *see* FED. R. CIV. P. 56(e) (requiring the "nonmoving party to go beyond the pleadings."). Because Gulf Stream relies upon evidence not included in the pleadings, the Court treats Gulf Stream's motion as a motion for summary judgment.

B. Discussion

1. Breach of Express Warranty (Count VII)

"Express warranty" is defined in Mich. Comp. Law section 440.2313 of the Uniform Commercial Code as follows:

(1) Express warranties by the seller are created as follows:

(a) An affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the good shall conform to the affirmation or promise

(b) A description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) A sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or mode.

M.C.L. § 440.2313(1).
Gulf Stream contends that the warranty accompanying the motor home was a "limited warranty" and not an "express warranty" as claimed by Plaintiff. Gulf Stream argues that the warranty is not an "express warranty" because it is limited to repairing or replacing defective parts during the limited warranty period. As a result of the limitations of the warranty, Gulf Stream asserts that the warranty does not fall into the area covered by Mich. Comp. Law section 440.2313.

Plaintiff argues that Gulf Stream breach its express warranty because the problems that were repaired under the warranty still exist. Additionally, Plaintiff argues that the warranty failed its essential purpose because the vehicle's aggregate repairs were not completed in a reasonable time and, as a result, the benefit of the bargain regarding the warranty was lost. Plaintiff relies on *Computer Networks v. AM General Corp.,* 265 Mich.App. 309, 696 N.W.2d 49 (2005) and *Kelynack v. Yamaha Motor Corp.,* 152 Mich.App. 105, 394 N.W.2d 17 (1986).

In *Computer Networks,* the court held that "where a limited express warranty fails of its essential purpose or deprives either party of the value of the bargain, the parties may pursue other remedies under the Uniform Commercial Code ("UCC")." *Computer Networks,* 265 Mich.App. at 314, 696 N.W.2d 49. The court ruled that the manufacturer has a reasonable, limited time to replace parts or make repairs. *Id.* at 54 (citing *Kelynack,* 152 Mich. at 112, 115 N.W. 1004). To find unreasonableness, the court stated that it must look to the time it took to make each individual repair. *Id.*

Case 1:19-md-02875-RMB-SAK Document 1748-28 Filed 11/10/21 Page 256 of 261
PageID: 45194
Zanger v. Gulf Stream Coach, Inc., Not Reported in F.Supp.2d (2005)

**\*5** In the instant case, the Court finds that Plaintiff's reliance on *Computer Networks* and *Kelynack v. Yamaha Motor Corp* is misplaced. Contrary to Plaintiff's argument, those cases stand for the proposition that the unreasonableness of repair or replacement of parts is measured by whether the time to perform the numerous, individual repairs is unreasonable, not the aggregate time a vehicle is being repaired. Plaintiff did not argue that any of the defects individually were repaired in an unreasonable amount of time. Plaintiff only argued that repairs took 180 days and that the loss of the use of a vehicle for such a substantial amount of days was unreasonable.

In *Gernhardt v. Winnebago Industries,* this Court held that limiting a warranty to a specified period of time for repair and replacement of defects "does not fit within the parameters of [Mich. Comp. Law section] 440.2313." *Gernhardt,* 2003 WL 23976324, \*8-\*9 (E.D.Mich. Dec.30, 2003) (unpublished) (hereinafter *"Gernhardt I"* ). A limited warranty does not meet the definition of an express warranty because by providing a sole exclusive remedy, [3] a limited warranty "does not constitute an affirmation of fact or promise to which the [vehicle] had to conform, a description of the vehicle, or a sample or model of the [vehicle]." *Gernhardt I,* 2003 WL 23976324 at \*8 (citing *Rokicsak v. Colony Marine Sales and Servs., Inc.,* 219 F.Supp.2d 810, 816 (E.D.Mich.2002) (examined in light of Mich. Comp. Law section 440.2313)).

In the instant case, as in *Gernhardt I,* Gulf Stream's warranty only covers repair and replacement of defective parts or components. It does not constitute "an affirmation of fact or promise" relating to the motor home, "a description" of the motor home, or "a sample or model" of the motor home as an express warranty would under Mich. Comp. Law section 440.2313. *See Pack v. Damon Corp.,* 2004 U.S. Dist LEXIS 17960, \*5-\*7 (E.D.Mich. August 23, 2004) (Steeh, G) (unpublished). Consequently, the Court grants Gulf Stream's Motion for Summary Judgment with respect to Plaintiff's breach of express warranty claim.

2. Breach of Implied Warranty of Merchantability and Fitness (Counts I & III)

The Michigan UCC describes the implied warranty of merchantability:

> (1) Unless excluded or modified (section 2316), a warranty that the goods shall be merchantable is implied

> in a contract for their sale if the seller is a merchant with respect to goods of that kind

M.C.L. § 440.2314(1).

Gulf Stream seeks dismissal of Plaintiff's breach of implied warranty claims arguing that it is not a "seller" under Mich. Comp. Law section 440.2314(1) because it did not have direct contact with the Plaintiff and lacks privity with Plaintiff. Gulf Stream contends it is the manufacturer of the motor home but had no role in the sale of the motor home to Plaintiff. Thus, Gulf Stream argues that there is no contract for the sale of the vehicle between Plaintiff and Gulf Stream and therefore no privity exists. Plaintiff rebuts by arguing that privity is no longer required in Michigan in an implied warranty claim against a remote manufacturer.

*a. Privity Issue*

**\*6** As stated by this Court in *Zanger v. Gulf Stream,* 2005 WL 2769007 (E.D.Mich. Oct.25, 2005) (unpublished) (hereinafter *"Zanger I"* ), there is a split of opinion on the issue of the existence of a privity requirement for a remote manufacturer under Michigan law. Gulf Stream argues that this Court, in *Gernhardt I,* held that contractual privity is necessary under Michigan law in order for a consumer to bring an implied warranty claim against a remote manufacturer. While the holding of *Gernhardt I* is correctly stated, this Court in *Zanger I* held that privity is not required in an implied warranty claim against a remote manufacturer. The Court takes note of the *Gernhardt I* decision but concludes that "vertical privity no longer is required in Michigan to pursue a breach of implied warranty claim against a remote manufacturer." [4] *Zanger I,* 2005 WL 2769007 at \*5 (citing *Michels,* 298 F.Supp.2d at 650. Because Plaintiff does not need privity to bring a claim of breach of implied warranty of merchantability, Plaintiff's claim survives.

The Michigan UCC describes the implied warranty of fitness:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods,

there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

M.C.L. § 440.2315. As with the implied warranty of merchantability and for the same reasons, privity of contract is not required for a consumer to recover on an implied warranty of fitness claim.

### b. Disclaimed Implied Warranty Issue

Gulf Stream argues that even if the Court finds that privity is no longer required, Plaintiff's implied warranty claims should still be dismissed because Gulf Stream legally disclaimed all implied warranties. Michigan Compiled Laws section 440.2316(2) provides:

Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and incase of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'

"There is no dispute that a seller may disclaim implied warranties under Michigan law as long as the disclaimer is conspicuous." *Parsley v. Monaco Coach Co.,* 327 F.Supp.2d 797, 800 (E.D.Mich.2004) (citing M.C.L. § 440.2316(2)); *Michigan Dessert Corp., v. A.E. Staley Manf. Co.,* 23 Fed. Appx. 330 (6th Cir.2001) (unpublished). A term or clause is conspicuous under Michigan Complied Law section 440.1201(10) "when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color...." The court determines whether a term or clause is conspicuous or not. (*Id.*).

**\*7** In *Watson v. Damon Corp.,* 2002 WL 32059736 (W.D.Mich. Dec.17, 2002) (Quist, G) (unpublished), the court tackled a similar issue dealing with motor homes. On the breach of implied warranties of merchantability and fitness issue, the *Watson* court found that the dealer properly disclaimed its express and implied warranties but the coach and chassis companies did not. The dealer's warranty

stated that, "THE DEALER HEREBY DISCLAIMS, TO THE APPLICABLE STATE LAW, ALL WARRANTIES EXPRESSED OR IMPLIED INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE." *Watson,* 2002 WL 32059736 at \*4. The court held that because the disclaimed warranties of merchantability and fitness were entirely capitalized and in writing, the disclaimer was conspicuous. *Id.* at \*14. The coach and chassis companies did not attempt to disclaim their warranties. *Id.* at \*15-\*17.

In *Ducharme v. A & S RV Center, Inc.,* 321 F.Supp.2d 843 (E.D.Mich.2004), another case dealing with motor home manufacturers, the dealer, the engine manufacturer and the chassis company all disclaimed express and implied warranties in their respective limited warranties. However, the dealer was the only party to argue that it properly disclaimed all warranties, express and implied. *Id.* at 852. The court found that the dealer's warranty was in writing and conspicuous because "the notice to purchasers of warranties is written in all capital letters in contrasting color ... [and] the disclaimer of the warranty of merchantability is capitalized and in bold print." *Id.*

In the instant case, Gulf Stream has disclaimed all implied warranties. The warranty states:

All obligations of Gulf Stream pursuant to this Limited Warranty are limited to replacing or repairing the defective part or component.

This Limited Warrant is expressly IN LIEU of any other express warranty and is further IN LIEU of any implied warranty, including, but not limited to, any implied WARRANTY OF MERCHANTABILITY or FITNESS for a particular purpose.

(Def.'s Br., Ex. A) (emphasis in original). The relevant portion is completely in bold with key words and phrases in capitals. A reasonable person reading the warranty would notice this disclaimer. Therefore, the Court finds that this portion of the warranty is conspicuous.

Though Plaintiff does not need privity to bring a claim of breach of implied warranty of fitness, the Court finds that Plaintiff properly disclaimed all warranties, express and implied. Accordingly, the Court grants Gulf Stream's Motion for Summary Judgment on both breach of implied warranty claims.

Zanger v. Gulf Stream Coach, Inc., Not Reported in F.Supp.2d (2005)

3. Revocation (Count IV)

Gulf Stream argues that revocation is not available against a remote manufacturer who is not in privity with the plaintiff. Plaintiff concedes that he does not have a revocation claim against Gulf Stream. As a result, the Court grants Gulf Stream's Motion to Dismiss Plaintiff's revocation claim.

4. Violation of the Magnuson-Moss Warranty Act (Count II)

**\*8** Plaintiff's Magnuson-Moss Warranty Act ("MMWA") claim is actually two separate claims. The first is a claim for refund or replacement under section 2304(a) of the Act. The second is for breach of implied warranty under the Act.

*a. Section 2304(a)*

Gulf Stream argues that they are not a "warrantor" under the MMWA. Gulf Stream asserts that section 2304(a) of the Act does not apply to it because Gulf Stream did not provide any express written warranties. Gulf Stream contends that its limited warranty was not an "express" warranty as defined in the statute. Though difficult to decipher between Plaintiff's MMWA express warranty claims and his MMWA implied warranty claims, Plaintiff appears to restate his earlier argument that because the warranty is a viable express warranty, he has a claim under the Act. Plaintiff cites to portions of the MMWA but no case law in support of his position.

The MMWA provides a private right of action to a consumer against a manufacturer who does not comply with its written or implied warranty. 15 U.S.C. § 2310. "Only to the extent that Magnuson-Moss is applicable to the sale of consumer goods does it supercede inconsistent provisions of the UCC." *Source v. Naperville Jeep Eagle,* 309 Ill.App.3d 313, 242 Ill.Dec. 738, 722 N.E.2d 227, 234 (Ill.App.1999) (citing *Murphy v. Mallard Coach Co.,* 179 A.D.2d 187, 582 N.Y.S.2d 528 (N.Y.1992)). If the written warranty does not meet the requirement of the MMWA, then it must meet the requirements of the UCC. *Source,* 242 Ill.Dec. 738, 722 N.E.2d at 234. The MMWA breaks down express warranties into two categories: "full" and "limited." 15 U.S.C. § 2303(a). To be classified as "full," a warranty must meet the minimum definition of "full warranty" under the Act. 15 U.S.C. § 2303(a). If the warranty does not meet the definition of "full warranty," then the warranty, for purposes of the Act, is a "limited warranty." 15 U.S.C. § 2303(a). The minimum standards for a "full warranty" are:

(a) Remedies under written warranty; duration of implied warranty; exclusion or limitation on consequential damages for breach of written or implied warranty; election of refund or replacement. In order for a warrantor warranting a consumer product by means of a written warranty to meet the Federal minimum standards for warranty-

(1) such warrantor must as a minimum remedy such consumer product within a reasonable time and without charge, in the case of a defect, malfunction, or failure to conform with such written warranty;

(2) notwithstanding section 108(b) [15 USCS § 2308(b) ], such warrantor may not impose any limitation on the duration of any implied warranty on the product;

(3) such warrantor may not exclude or limit consequential damages for breach of any written or implied warranty on such product, unless such exclusion or limitation conspicuously appears on the face of the warranty; and

(4) if the product (or component part thereof) contains a defect or malfunction after a reasonable number of attempts by the warrantor to remedy defects or malfunctions in such product, such warrantor must permit the consumer to elect either a refund for, or replacement without charge of, such product or part (as the case may be).

**\*9** 15 U.S.C. § 2304(a) (emphasis added). In the instant case, the Gulf Stream warranty does not meet the minimum standard because it limits the duration of the implied warranty for the motor home. [5] Therefore, the MMWA does not cover the written warranty. Since the MMWA does not apply, the Court next looks to the Michigan UCC definition of an express warranty. Based upon the discussion of express warranties above, the Court grants Gulf Stream's Motion for Summary Judgment on Plaintiff's MMWA § 2304 claim.

*b. Implied Warranty*

Gulf Stream argues that because Plaintiff has failed to state a claim for a breach of the implied warranties of merchantability and fitness, they also have failed to state a claim for breach of implied warranties under the MMWA.

Section 2301(7) of the Act defines an implied warranty as "an implied warranty arising under State law...." Though

Zanger v. Gulf Stream Coach, Inc., Not Reported in F.Supp.2d (2005)

the Court finds that vertical privity is no longer required under Michigan law to pursue a breach of implied warranty claim, as mentioned above, Gulf Stream properly disclaimed all implied warranties. Accordingly, the Court grants Gulf Stream's Motion for Summary Judgment on Plaintiff's MMWA claim based on a breach of implied warranties.

### 5. Violation of the Michigan Consumer Protection Act ("MCPA") (Count V)

Gulf Stream alleges that Plaintiff cannot assert a warranty-based violation of the MCPA against a remote manufacturer where there is no breach of an express or implied warranty. Gulf Stream contends that all of Plaintiff's MCPA claims are warranty-based. Gulf Stream argues that Plaintiff's MCPA claim should be dismissed because there are no express or implied warranties running between Plaintiff and Gulf Stream. Further, Gulf Stream avers that Plaintiff failed to state in his Complaint any specific actions taken by Gulf Stream which violated the MCPA. Plaintiff responds by stating that since he has a valid claim for breach if implied warranties, he also has a valid claim under the MCPA. Plaintiff also argues that he does not need to prove a transaction between the parties for Gulf Stream's conduct to fall under the MCPA. Plaintiff contends that a MCPA claim does not need to be predicated on proof of fraud or breach of warranty.

The majority of all MCPA claims involve charges of fraud. *Parsley v. Monaco Coach Corp.,* 327 F.Supp.2d 797, 807 (W.D.Mich.2004). "It is proper to construe the provision of the MCPA 'with reference to the common-law tort of fraud.' " *Zine v. Chrysler Corp.,* 236 Mich.App. 261, 600 N.W.2d 384, 398 (Mich.App.1999). Furthermore, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Michels,* 298 F.Supp.2d at 650 (citing Federal Rule of Civil Procedure 9(b)). It is not clear whether Plaintiff is alleging a claim under the MCPA for fraud, [6] though it appears that Plaintiff is only referring to the general language of the MCPA.

In addition to fraud, a breach of implied warranties also violates the MCPA. *Mikos v. Chrysler Corp.,* 158 Mich.App. 781, 404 N.W.2d 783 (1987). As stated above, Gulf Stream has disclaimed all implied warranties. Therefore, Plaintiff does not have a breach of implied warranties claim under the MCPA.

**\*10** Further, Plaintiff alleges that Gulf Stream engaged in numerous acts or practices prohibited by the MCPA that

were independent of any allegation of common law fraud or breach of warranty. Plaintiff cites *Mayhall v. A.H. Pond Co.,* 129 Mich.App. 178, 341 N.W.2d 268 (1983) to support his argument. In *Mayhall,* the issue before the court was whether a plaintiff who suffers only frustrated expectation without also suffering a loss momentarily, suffered a loss compensable under the MCPA. The court ruled that "the great majority of the specific prohibited practice enumerated in the statute .. involve fraud." *Id.* at 182, 341 N.W.2d 268. However, the court held that "[t]he MCPA ... has a somewhat broader scope. It prohibits not only 'deceptive' business practices, but also those which are 'unfair' and 'unconscionable.' " *Id.* Plaintiff further relies on *Peters v. Cars To Go, Inc.,* 1999 WL 33502378 (W.D.Mich. Mar.17, 1999) (unpublished), which dealt with whether a Truth in Lending Act violation rose to the level of common law fraud. *Id.* The court, based on *Mayhall,* found that "[p]laintiffs need not prove fraud in order to show that [d]efendant violated the MCPA. While the *Mayhall* court did find that the legal principle applicable to the common law tort of fraud may provide guidance in interpreting the MCPA, it also found that conduct not amounting to fraud may support a violation of the MCPA." *Id.* at \*2, 341 N.W.2d 268. Thus, on the facts of the case, the *Cars* court found that the alleged Truth in Lending Act violations supported a claim of the MCPA, even though they did not rise to the level of common law fraud. *Id.*

Though Plaintiff mainly relies on *Mayhall* and *Cars* to support his argument that he can bring a claim under the MCPA that does not rise to the level of common law fraud, those cases are not binding on this Court. Further, the only conduct Plaintiff claims with specificity are that Gulf Stream's disclaimer of warranties could be confusing [7] and that the Gulf Stream failed to follow its warranty which "plainly promises the benefit of repairs at no charge within the stated time and mileage parameters." Regarding the alleged confusing warranty disclaimer, while "probability" in Mich. Comp. Law section 445.903(a) and (n) might denote an objective standard, *Daenzer v. Wayland Ford, Inc.,* 2002 WL 1050209 (E.D.Mich. May 7, 2002) (unpublished), the Court finds that a reasonable person would not be mislead or confused by the disclaimer. In regard to the failure to provide promised benefits claim, Plaintiff's allegations are ambiguous and do not allege that Gulf Stream refused to repair each problem with the motor home during the warranty period as stated in the warranty. Further, Gulf Stream denies that it ever repaired the motor home and Plaintiff has not provided proof that Gulf Stream itself performed the repairs.

Case 1:19-md-02875-RMB-SAK    Document 1748-28    Filed 11/10/21    Page 260 of 261
Zanger v. Gulf Stream Coach, Inc., Not Reported in F.Supp.2d (2005)
PageID: 45198

Additionally, although Plaintiff asserts a claim under the MCPA independent of fraud or breach of implied warranty, there is not a single published opinion on point. Plaintiff does not provide nor can this Court locate precedential case law supporting a claim under the MCPA when a dealer, who promises to repair each problem in good faith, attempts to repair without success.

 **\*11**  Accordingly, the Court grants Gulf Stream's Motion for Summary Judgment to the extent Plaintiff alleges a claim under the MCPA independent of fraud and breach of implied warranties.

 6. Negligent Repair (Count VI)
Gulf Stream argues that Plaintiff failed to allege a harm that was separate and distinct from the duties imposed by the contract at issue. Gulf Stream further argues that it never repaired the motor home on any occasion. Plaintiff concedes that he does not have a negligent repair claim against Gulf Stream. As a result, the Court grants Gulf Stream's Motion for Summary Judgment on Plaintiff's negligent repair claim.

III. *CONCLUSION*
For the reasons stated above, the Court GRANTS Gulf Stream's Motion for Summary Judgment in its entirety.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 3163392

---

## Footnotes

1    Count I: Breach of Warranty of Merchantability
        Count 2: Violation of the Magnuson-Moss Warranty Act
        Count 3: Breach of Warranty of Fitness
        Count 4: Revocation
        Count 5: Violation of the Michigan Consumer Protection Act
        Count 6: Negligent Repair
        Count 7: Breach of Express Warranty
     (Compl.¶¶ 18-68).

2    Plaintiff misnumbered the pages in his Response. All references to pages in Plaintiff's Response refer to the "corrected" page number.

3    In this case, the sole exclusive remedy is repair and replacement of defects.

4    In a second *Gernhardt* decision, *Gernhardt v. Winnebago,* 2005 WL 2562783 (E.D.Mich. October 12, 2005) (unpublished) (hereinafter *"Gernhardt II"* ), this Court reconsidered and amended its decision in *Gernhardt I,* holding that privity is no longer required.
        After taking into consideration recent case law decided after this Court issued its December 30, 2003 Order, the Court has decided to reverse its previous ruling and instead hold that vertical privity is not required to reach a remote manufacturer in a breach of implied warranty claim under Michigan law. This holding concurs with more recent opinions of other judges in this courthouse.
     *Gernhardt,* 2005 WL 2562783 at *6.

5    The Limited Warranty covers defects which occur for two (2) years or 24,000 miles, whichever comes first, regarding structural defects in the floor, walls and roof. The Warranty also covers defects for one (1) year or 12,000 miles, whichever comes first, for defects in materials and/or workmanship in the construct of the vehicle and its original components. (Def.'s Br., Ex. A)

6    Plaintiff alleges that it is: "at least a jury question whether Defendants sold Plaintiff' a unit that contained so many defects while representing it to be defect-free and then failing to repair the problems"; "at least disputed (and therefore a question for the jury) whether the chassis defects should have been covered by warranty, since it appears [Gulf Stream] sold Defendant's General and Plaintiff a unit with numerous problems such

that Exhibit 1 [ (the motor home service receipts) ] reveals this to be the case"; and "it is a factual issue whether Defendant sold the until with manufacturer-related defects. They [sic] fact that the problems occurred so soon, states these problems came from the [Gulf Stream] factory." (Pl.'s Resp. 13).

7    Plaintiff claims that "[a] reasonable person reading Defendant's Warranty could be confused or misunderstand that the term "IN LIEU" is not being used in its ordinary sense, whatever that is and Defendant went to great lengths to write and ambiguous disclaimer." (Pl.'s Resp. 11).

---

**End of Document**                         © 2021 Thomson Reuters. No claim to original U.S. Government Works.