# EXHIBIT B

Confidential Information - Subject to Protective Order

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
2                      -  -  -
3    IN RE:  VALSARTAN,     :  MDL NO. 2875
     LOSARTAN, AND         :
4    IRBESARTAN PRODUCTS    :  HON. ROBERT
     LIABILITY LITIGATION   :  B. KUGLER
5    _____   :
                                   :
6    THIS DOCUMENT APPLIES  :
     TO ALL CASES           :
7
            - CONFIDENTIAL INFORMATION -
8           SUBJECT TO PROTECTIVE ORDER
9                      -  -  -
10              September 30, 2021
11                     -  -  -
12
13          Videotaped remote deposition of
     JON P. FRYZEK, Ph.D., taken pursuant to
14   notice, was held via Zoom
     Videoconference, beginning at 9:01 a.m.,
15   EST, on the above date, before Michelle
     L. Gray, a Registered Professional
16   Reporter, Certified Shorthand Reporter,
     Certified Realtime Reporter, and Notary
17   Public.
18
                       -  -  -
19
20          GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
21              deps@golkow.com
22
23
24

Page 2

```
 1
 2   ZOOM APPEARANCES:
 3   HOLLIS LAW FIRM, PA
     BY:  BRETT VAUGHN, ESQ.
         IRIS SIMPSON, ESQ.
 4   8101 College Boulevard, Suite 260
     Overland Park, Kansas 66210
 5   (913) 385-5400
     brett@hollislawfirm.com
 6   Iris@hollislawfirm.com
     Representing the Plaintiffs
 7
 8   DUANE MORRIS, LLP
     BY:  FREDERICK R. BALL, ESQ.
 9   100 High Street, Suite 2400
     Boston, Massachusetts 02110
10   (857) 488-4229
     frball@duanemorris.com
11
         - and -
12
     DUANE MORRIS, LLP
13   BY:  COLEEN W. HILL, ESQ.
     30 South 17th Street
14   Philadelphia, PA 19103
     (215) 979-1164
15   cwhill@duanemorris.com
     Representing the Defendants, Zhejiang
16   Huahai Pharmaceutical Co. Ltd., Prinston
     Pharmaceutical Inc., Huahai U.S., Inc.,
17   and Solco Healthcare US, LLC
18
     WALSH PIZZI O'REILLY FALANGA LLP
19   BY:  CHRISTINE I. GANNON, ESQ.
     Three Gateway Center
20   100 Mulberry Street, 15th Floor
     Newark, New Jersey 07102
21   (973) 757-1017
     cgannon@walsh.law
22   Representing the Defendants, Teva
     Pharmaceutical Industries, Ltd., Teva
23   Pharmaceuticals USA, Inc., Actavis LLC,
     and Actavis Pharma, Inc.
24
```

Page 4

```
 1
 2   ZOOM APPEARANCES:  (Cont'd.)
 3
     FALKENBERG IVES, LLP
 4   BY:  MEGAN A. ZMICK, ESQ.
     230 W. Monroe Street, Suite 2220
 5   Chicago, IL 60606
     (312) 566.4808
 6   Maz@falkenbergives.com
     Representing the Defendant, Humana
 7
 8
     BUCHANAN INGERSOLL ROONEY P.C.
 9   BY:  ASHLEY D.N. JONES, ESQ.
     1700 K Street, NW
10   Washington, D.C. 20006
     (202) 452-7318
11   Ashley.jones@bipc.com
     Representing the Defendant, Albertson's
12   LLC
13
     ALSO PRESENT:
14
15   VIDEOTAPE TECHNICIAN:
     Bill Geigert
16
17   LITIGATION TECHNICIAN:
     Tyler Crotty
18
19   Melisha Valenzuela - Paralegal
     (Hollis Firm)
20
21
22
23
24
```

Page 3

```
 1   ZOOM APPEARANCES:  (Cont'd.)
 2
 3   HINSHAW & CULBERTSON, LLP
     BY:  GEOFFREY M. COAN, ESQ.
 4   53 State Street, 27th Floor
     Boston, Massachusetts  02109
 5   (617) 213-7047
     Gcoan@hinshawlaw.com
 6   Representing the Defendant, ScieGen
     Pharmaceuticals, Inc.
 7
 8   BARNES & THORNBURG, LLP
     BY:  KARA KAPKE, ESQ.
 9   11 S. Meridian Street
     Indianapolis, Indiana 46204
10   (317) 231-6491
     Kara.kapke@btlaw.com
11   Representing CVS Pharmacy, Inc., and Rite
     Aid Corporation
12
13   PIETRAGALLO GORDON ALFANO BOSICK &
     RASPANTI, LLP
14   BY:  JASON M. REEFER, ESQ.
     One Oxford Centre, 38th Floor
15   Pittsburgh, Pennsylvania 15219
     (412) 263-1840
16   JMR@pietragallo.com
     Representing the Defendant, Mylan
17   Pharmaceuticals, Inc.
18
     CIPRIANI & WERNER, P.C.
19   BY:  JILL H. FERTEL, ESQ.
     450 Sentry Parkway, Suite 200
20   Blue Bell, Pennsylvania 19422
     (610) 567-0700
21   Jfertel@c-wlaw.com
     Representing the Defendants, Aurobindo
22   Pharma, USA, Inc. and Aurolife Pharma,
     LLC
23
24
```

Page 5

```
 1                  - - -
 2              I N D E X
 3                  - - -
 4
     Testimony of:
 5
                 JON P. FRYZEK, Ph.D.
 6
 7   By Mr. Vaughn              13
 8
 9
10
11
12              E X H I B I T S
13                  - - -
14
15   NO.      DESCRIPTION         PAGE
16   Fryzek-1    Expert Report       16
                 8/1/21
17               (Fryzek)
18   Fryzek-2    Fryzek Appendix C   17
                 Fee Schedule
19
20   Fryzek-3    IMS Expert Services 20
                 Invoices
21   Fryzek-4    Fryzek Appendix A   21
                 Curriculum Vitae
22
23
24
```

Page 6

- - -
E X H I B I T S (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE

Fryzek-5    Previous deposition    23
transcript, 2/8/2021
Welding rod products
liability litigation

Fryzek-6    Curriculum vitae    68
September 2021

Fryzek-7    April 2018 article    49
Indirect treatment
comparison of
cabazitaxel for
patients with metastatic
castrate-resistant
prostate cancer who
have been previously
treated with a
docetaxel-containing
regimen

Fryzek-8    US map of    63
ToxStrategies
locations

Fryzek-9    US map of    65
Exponent locations

Fryzek-10    Toxic Torts and    86
Environmental Law
Defense Practice
Seminar Course Materials

Fryzek-11    "Epigenetics in    145
chemical-induced
genotoxic
carcinogenesis"
G.A. Chappell, J.E. Rager

Page 7

- - -
E X H I B I T S (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE

Fryzek-12    1990 article    154
Role of metabolism in
dimethylnitrosamine
induced immunosuppression:
A review

Fryzek-13    Concise International    161
Chemical Assessment
Document 38

Fryzek-14    2005 article    166
A cohort study of
Parkinson's Disease
and Other
Neurodegenerative
Disorders of Danish
Welders

Fryzek-15    Evidentiary Order    172
in re: Welding Fume
Products Liability
Litigation

Fryzek-16    2006 article    177
Parkinson's disease
and other basal ganglia
or movement disorders
in a large nationwide
cohort of Swedish welders

Fryzek-17    September 12, 2008    181
New Jersey Law Journal

Page 8

- - -
E X H I B I T S (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE

Fryzek-18    2003 article    190
An introduction to
power and sample size
estimation

Fryzek-19    2004 article    193
Cancer risk among
statin users: A
population-based
cohort study

Fryzek-20    American Statistical    202
Association News
March 7, 2016 article
on statistical
significance and
P-values

Fryzek-21    2013 article    208
Childhood Cancer
Incidence in
Pennsylvania Counties
in Relation to Living
in counties with
Hydraulic Fracturing
Sites

Fryzek-22    2013 Letter to the    213
Editor
Obfuscation does not
provide comfort:
Response to the
Fryzek et al on
Hydraulic Fracturing
and Childhood Cancer

Page 9

- - -
E X H I B I T S (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE

Fryzek-23    Office of the    216
Attorney General,
Commonwealth of
Pennsylvania, Report 1
of the 43rd Statewide
Investigating Grand
Jury

Fryzek-24    2002 article    227
The Reliability of
Dietary Data for
Self- and Next-of-Kin
Respondents

Fryzek-25    2021 article    292
N-Nitrosodimethylamine
Contaminated Valsartan
and the Risk of Cancer

Fryzek-26    "Benefit-risk    320
Analysis
for foods (BRAFO):
Evaluation of exposure
to dietary nitrates,
Wikoff, D.S., C.T.,
, R., G, C., S, F.,
, D.

Fryzek-27    2010 article    362
Use of electronic
medical records in
oncology outcomes
research

Confidential - Information Subject to Protective Order

Page 10

EXHIBITS (Cont'd.)

NO.          DESCRIPTION          PAGE

Fryzek-28   2012 article          370
Occupational exposure
to beryllium and cancer
risk: A review of the
epidemiologic evidence

Fryzek-29   2001 article in JOEM  379
Cancer Mortality in
Relation to
Environmental
Chromium Exposure

Fryzek-30   2021 article          389
Inhalation cancer
risk assessment for
environmental
exposure to
hexavalent chromium:
Comparison of
margin-of-exposure
and linear
extrapolation approaches

Fryzek-31   2006 article in JOEM  395
Corporate Corruption
Of Science - The Case
Of Chromium (VI)

Fryzek-32   2007 publication      407
The association
between selected risk
factors for pancreatic
cancer and the
expression of p53 and
K-ras codon 12 mutations

Page 11

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
None.

Stipulations
PAGE   LINE
None.

Questions Marked
PAGE   LINE
None.

Page 12

THE VIDEOGRAPHER:  Good morning.

We are now on the record.

My name is Bill Geigert, I'm a videographer for Golkow Litigation Services.

Today's date is September 30th, 2021, and the time is 9:01 a.m.

This remote video deposition is being held in the matter of valsartan, losartan, and irbesartan products liability litigation, in the United States District Court for the District of New Jersey.

The deponent is Jon P. Fryzek, Ph.D.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

Due to the nature of remote

Page 13

reporting, please pause briefly before speaking to ensure all parties are heard completely.

All counsel will be noted on the stenographic record.

The court reporter is Michelle Gray and she will now swear in the witness.

- - -

... JON P. FRYZEK, Ph.D., having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. VAUGHN:

Q.   Dr. Fryzek, how many times have you had your deposition taken previously?

A.   I think I sent you that list.  I can't recall off the top of my head.

Q.   You sent the last four years.  Do you know how many you have in

Confidential Information - Subject to Protective Order

Page 14

your history?

A.   Oh, prior to that maybe once or twice.  Not much.

Q.   Okay.  Do you know the ground rules of depos pretty well?

A.   You can repeat them for me.  Thank you.

Q.   So I'll try not to talk over you.  You try not to talk over me.  If you have any questions or any more clarity on one of my questions, just let me know, and try and give verbal answers instead of head shakes, if that's okay.

A.   Yeah.

Q.   Have you ever done a deposition by Zoom before?

A.   Yes.

Q.   When was that?

A.   I believe it was last week.

Q.   What litigation was that for?

A.   Let me see if I can remember.  I think it was for opioids, Endo Pharmaceutics.

Page 15

Q.   And is anyone else in the room with you today?

A.   No.

Q.   Do you have any other applications besides Zoom open on your computer?

A.   I have the Google Chrome for the marked exhibits.

Q.   Great.  No communication devices or apps going on?

A.   No.

Q.   And I ask that it stays that way throughout the deposition.

A.   Okay.

Q.   And you're not on any medications that would impact your memory, correct?

A.   Correct.

Q.   And you don't have any psychiatric conditions that would inhibit you from telling the truth?

A.   I don't.

Q.   Are there any errors or corrections that you want to make in your

Page 16

report before we get started?

A.   Not at this time.

MR. VAUGHN:  Tyler, can we start with Fryzek expert report.

(Document Marked for identification as Exhibit Fryzek-1.)

THE WITNESS:  I have to move this to my other screen so I can see it.

MR. VAUGHN:  All right.

TRIAL TECH:  Do you want to mark this as Exhibit 1?

MR. VAUGHN:  Yeah.  If you can keep track of the exhibit numbers, that will be awesome.

TRIAL TECH:  Absolutely.

THE WITNESS:  I also have a copy of my report printed out here, so.

BY MR. VAUGHN:

Q.   As long as it's the same, if that's easier for you, feel free.

A.   Yeah, it's the same.

Page 17

MR. VAUGHN:  Okay.  And then Tyler, can you go to Page 3.

MR. BALL:  Hey, Brad, it's not showing up in the marked exhibits.  Try refreshing.

TRIAL TECH:  Counsel, I have to -- I have to add it in manually every time it's marked.  So you have to give me a few seconds to add it in after it's marked on the record.  And then you refresh your screen, and it will flow -- populate into the folder.

MR. BALL:  Got it.  Okay.  Thank you.  I had done that, but apparently I refreshed too soon.

TRIAL TECH:  Yes.

BY MR. VAUGHN:

Q.   Dr. Fryzek, how much is EpidStrategies being paid per hour for your work?

A.   $412.

MR. VAUGHN:  Tyler, can we go to the Fryzek expert report,

Confidential Information - Subject to Protective Order

---

Page 18

1    Appendix C now.  And Page 2.
2    (Document marked for
3    identification as Exhibit
4    Fryzek-2.)
5  BY MR. VAUGHN:
6    Q.    And then your fee schedule
7  is $622 an hour, correct?
8    A.    I'm not sure where this is
9  from.
10    Q.    This is what you produced to
11  us with your expert report.  It's Exhibit
12  C of your expert report?
13    A.    If it's -- if I produced it,
14  then it's something that my admin put
15  together.  So I believe that's true.
16    Q.    Okay.  So are you paid $622
17  and then EpidStrat is also paid $412 for
18  your work?
19    A.    No, I'm just paid a regular
20  salary.  So this is not outside my
21  salary.
22    Q.    Say that again.
23    A.    This isn't outside my
24  regular salary.  I'm just paid a regular

Page 19

1  salary.
2    Q.    So who's being paid the 612?
3  Or 622, I'm sorry.
4    A.    I'm not sure.  I haven't
5  seen this before.  I don't know.
6    Q.    So you are not aware of how
7  much you're billing?
8    A.    I'm billing what I wrote at
9  first.  415.
10    Q.    So the 412 is the proper
11  amount?
12    A.    Yeah.
13    Q.    And you're positive about
14  that?
15    A.    It is.  That's my billing
16  rate.
17    THE COURT REPORTER:  Doctor,
18    if you can keep your voice up.
19    You're trailing off.
20    THE WITNESS:  Okay.  Sorry.
21    MR. VAUGHN:  Okay.  Tyler,
22    can we now go to -- see what it
23    was called -- Jon Fryzek invoices
24    IMS.

Page 20

1    (Document marked for
2    identification as Exhibit
3    Fryzek-3.)
4  BY MR. VAUGHN:
5    Q.    Dr. Fryzek, do you have an
6  estimate for how many hours you spent on
7  your expert report?
8    A.    No, I have no idea.
9    Q.    All right.  What is your
10  hourly rate being billed out here?
11    A.    Looks like 622.  So that
12  must be.  That explains it.  That must be
13  what IMS is getting.  622 and then they
14  pay us the 415.  So that's --
15    Q.    And who is IMS?
16    A.    It's a firm that hires
17  expert witnesses or finds expert
18  witnesses.  This is the first time I've
19  ever worked with them.  I never heard of
20  them before.
21    MR. VAUGHN:  All right.
22    Tyler, can we now go to Appendix A
23    of his expert report.  Fryzek's
24    expert report, Appendix A.

Page 21

1    Can we go to the next page.
2    (Document Marked for
3    identification as Exhibit
4    Fryzek-4.)
5  BY MR. VAUGHN:
6    Q.    And I notice you list from
7  2000 to 2006 you were an assistant
8  professor at Vanderbilt.  What all did
9  that entail?
10    A.    I did research projects with
11  them, and I lectured a couple times.
12    Q.    When did you lecture, what
13  for?
14    A.    Pardon me?
15    Q.    What did you lecture on?
16    A.    You know, it's hard for me
17  to remember.  I believe it was just a
18  general seminar about epidemiology.
19    Q.    So it wasn't a class?
20    A.    No.
21    Q.    What year do you think that
22  was?
23    A.    Oh, I can't recall.
24    Q.    But you do recall being an

Confidential Information - Subject to Protective Order

Page 22

¹ assistant professor from 2000 to 2006 at
² Vanderbilt?
³      A.   That was my appointment,
⁴ yeah.
⁵      Q.   Do you recall the first time
⁶ that you ever had your deposition taken?
⁷      A.   I don't recall.  It's been a
⁸ long time ago.
⁹      Q.   You don't remember your
¹⁰ first?
¹¹      A.   No, it's probably been more
¹² than 20 years ago.
¹³      Q.   You don't think -- does 2005
¹⁴ sound right?
¹⁵      A.   I don't know.  I can't
¹⁶ recall.  I'm sorry.  It's not something
¹⁷ that I do regularly.  So it's not
¹⁸ something that I keep in mind.
¹⁹      Q.   Were you an expert in the
²⁰ welding rod litigation?
²¹      A.   I did two studies on welding
²² rods, yeah.
²³      Q.   Say that again.
²⁴      A.   I did two studies on welding

Page 23

¹ rods.  And yes, I did.
²      Q.   You did studies.  Were you
³ an expert in that litigation?
⁴      A.   I'm not sure how they
⁵ classified me.
⁶      Q.   Did you testify?
⁷      A.   I gave a deposition.  I
⁸ didn't testify in court.
⁹      Q.   Why's that?
¹⁰      A.   Pardon me?
¹¹      Q.   Why's that?  Why didn't you
¹² testify in court?
¹³      A.   I have no idea.
¹⁴      MR. VAUGHN:  Tyler, can we
¹⁵ open up 2005 Fryzek welding rod
¹⁶ depo.
¹⁷      (Document marked for
¹⁸ identification as Exhibit
¹⁹ Fryzek-5.)
²⁰      MR. VAUGHN:  Can we go to
²¹ Page 9.
²² BY MR. VAUGHN:
²³      Q.   Line 17.  Doctor, do you see
²⁴ where you are asked, "Have you ever had

Page 24

¹ your deposition taken before?"  And your
² answer was, "Never"?
³      A.   Right.
⁴      Q.   Does that refresh your
⁵ recollection as to when your first
⁶ deposition was?
⁷      A.   No.  I mean, this is
⁸ 15 years ago.  It's hard to remember that
⁹ far back.
¹⁰      Q.   So you think that you might
¹¹ have had a deposition before this?
¹²      A.   I don't think I did.  I'm
¹³ not sure.
¹⁴      Q.   Okay.  You don't recall this
¹⁵ deposition back in 2005, but you remember
¹⁶ being an associate professor at
¹⁷ Vanderbilt from 2000 to 2006?
¹⁸      MR. BALL:  Objection to
¹⁹ form.
²⁰      THE WITNESS:  Being an
²¹ associate professor is much more
²² meaningful to my career, of
²³ course.
²⁴ BY MR. VAUGHN:

Page 25

¹      Q.   Why is an associate
² professor meaningful to your career?
³      A.   Pardon me?
⁴      Q.   Why is it meaningful to your
⁵ career?
⁶      A.   Because it's an academic
⁷ appointment.
⁸      Q.   Were you paid?
⁹      A.   You know, I'm not -- I can't
¹⁰ recall if I was paid or not.  It was part
¹¹ of my affiliation with the International
¹² Epidemiology Institute.
¹³      MR. VAUGHN:  Okay.  Tyler,
¹⁴ can we go to Page 103 now of that
¹⁵ deposition.
¹⁶ BY MR. VAUGHN:
¹⁷      Q.   So line 10, they ask what
¹⁸ your current responsibilities at
¹⁹ Vanderbilt are.  And you answer, "Working
²⁰ on grants," correct?
²¹      A.   Oh, yeah.  Yep.
²²      MR. VAUGHN:  And then,
²³ Tyler, can we go to the next page.
²⁴ BY MR. VAUGHN:

Page 26

1    Q.   And then when they ask you
2  how long you have been affiliated with
3  Vanderbilt there on Line 18 and 19, you
4  answered two years.
5          And this was in 2005,
6  correct?
7    A.   I said I think it's been two
8  years.
9    Q.   And so you think you were
10 wrong at that time?
11   A.   You're asking about stuff
12 that happened more than 15 years ago.  I
13 can't recall.
14   Q.   Okay.
15         MR. VAUGHN:  Tyler, can we
16 go to Page 113 now.
17 BY MR. VAUGHN:
18   Q.   Line 10, have you ever
19 applied to be a professor or instructor
20 at Vanderbilt or any other teaching
21 institution.  You answered, "I -- I was
22 an assistant professor at University
23 Nebraska Medical Center."
24         And then Line 17 through 19,

Page 27

1  "Since then, have you applied for a
2  position or instructor or teacher or
3  professor at any other institution?"
4          What was your answer at that
5  time?
6    A.   I said no.
7    Q.   No.  So in 2005, you did not
8  think that you were an assistant
9  professor at Vanderbilt University,
10 correct?
11         MR. BALL:  Objection to
12 form.
13         THE WITNESS:  I'm sorry, can
14 you repeat that question?  I
15 didn't quite understand it.
16 BY MR. VAUGHN:
17   Q.   In 2005 you did not think
18 you were an assistant professor at
19 Vanderbilt, correct?
20         MR. BALL:  Same objection.
21         THE WITNESS:  I'm not clear
22 how you're getting that
23 conclusion.
24 BY MR. VAUGHN:

Page 28

1    Q.   All right.  Well, you see
2  the question on Line 17 through 19?
3    A.   Yeah.  Right.
4    Q.   Okay.  So it's asking after
5  1996, have you ever applied for a
6  position or instructor or teacher or
7  professor at any other institution, and
8  you said no.
9          Correct?
10   A.   Mm-hmm.
11   Q.   So how were you an assistant
12 professor at Vanderbilt at that time if
13 you had not applied to be a professor at
14 any institution since 1996?
15         MR. BALL:  Objection to
16 form.
17         THE WITNESS:  It's through
18 my work at International
19 Epidemiology Institute.
20         So eventually Vanderbilt
21 absorbed International
22 Epidemiology Institute.  So it was
23 part of that.  I didn't apply for
24 it.

Page 29

1  BY MR. VAUGHN:
2    Q.   Well, why when you were
3  asked the questions Lines 10 through 12
4  when I asked if -- sorry, on line --
5  yeah, 10 through 12, when they asked if
6  you'd been a professor at Vanderbilt, why
7  was your answer that you were an
8  assistant professor at Nebraska, why
9  didn't you just say yeah?
10         MR. BALL:  Objection to
11 form.  Argumentative.
12         THE WITNESS:  I wasn't a
13 professor or instructor at
14 Vanderbilt.  I was an assistant
15 professor.
16 BY MR. VAUGHN:
17   Q.   Which is what you answered
18 for University of Nebraska.  You said, "I
19 was an assistant professor for University
20 of Nebraska."
21         Why didn't you just say I
22 was an assistant -- I am an assistant
23 professor for Vanderbilt?
24         MR. BALL:  Objection.

Confidential Information - Subject to Protective Order

Page 30

1   Argumentative.
2        THE WITNESS:  Yeah, sorry,
3   you're asking me about what I said
4   15 years -- more than 15 years
5   ago.  I can't recall.
6   BY MR. VAUGHN:
7        Q.   Would you not defer to what
8   you gave under oath 15 years ago about
9   events that happened 15 years ago?
10        MR. BALL:  Objection.
11   Argumentative.
12        THE WITNESS:  Well, this
13   is -- yeah, this is going back to
14   1996.  That's what, 30 years ago.
15   BY MR. VAUGHN:
16        Q.   Yeah, I'm talking about this
17   part of your CV that says you're an
18   assistant professor at Vanderbilt from
19   2000 to 2006, which you deferred to your
20   recollection in 2005.
21        A.   I would trust my CV.
22        Q.   Who put your CV together?
23        A.   Right now it's -- my
24   administrator does.

Page 31

1        Q.   Is it -- who is the
2   administrator?
3        A.   Shelley Fierstein.
4        MR. VAUGHN:  All right.  Can
5   we go back to his CV, Appendix A.
6   On Page 3 of the doc.  Yeah.
7        THE WITNESS:  I don't think
8   you have my most current CV that I
9   sent.
10   BY MR. VAUGHN:
11        Q.   That's unfortunate.  That's
12   what you guys sent us.
13        MR. BALL:  That's incorrect.
14   My colleague just told me that you
15   have the most recent updated one.
16   When did you send it,
17   Coleen?
18        MS. HILL:  With his
19   production materials.
20        MR. BALL:  With his
21   production materials.
22        MR. VAUGHN:  So Appendix A
23   to his expert report is not his
24   most up-to-date?

Page 32

1        MR. BALL:  That's correct.
2   It doesn't look like it from what
3   I'm seeing.
4   BY MR. VAUGHN:
5        Q.   What's missing?
6        A.   I'd have to go through it
7   and see it, compare it to my current one.
8        Q.   Is there anything inaccurate
9   in this one?
10        A.   We'd have to go through it
11   and see.
12        Q.   Has there ever been stuff
13   that's inaccurate in your CV?
14        MR. BALL:  Objection to
15   form.
16        THE WITNESS:  I can't
17   recall.
18        THE VIDEOGRAPHER:  Off the
19   record, 9:16.
20        (Brief pause.)
21        THE VIDEOGRAPHER:  We are
22   back on the record at 9:21 a.m.
23        MR. VAUGHN:  Can we stay
24   with that last exhibit we were on

Page 33

1   before we switched it?
2        TRIAL TECH:  Appendix A?
3        MR. VAUGHN:  Correct.
4   BY MR. VAUGHN:
5        Q.   At the bottom, Doctor, you
6   see this is a July 2021 version of your
7   CV, correct?
8        A.   Mm-hmm.  Yeah.  Correct.
9        Q.   All right.  And if we go
10   back up under academic appointments, do
11   you see it lists Georgetown, 2020 to
12   present?
13        A.   Right.
14        Q.   And then this visiting
15   professor at Denmark, you note is from
16   2011 to present, and at University of
17   Pittsburgh, 2011 to present.
18        A.   Yes.
19        Q.   This was produced with your
20   expert report, correct?
21        A.   I'm not sure.  I sent you
22   the most current one where those are
23   updated.
24        Q.   Okay.  These ones were

Confidential Information Subject to Protective Order

Page 34

¹ updated July of 2021, right?
² A. I believe so. I guess.
³ MR. VAUGHN: Okay. Tyler,
⁴ now can we go to the CV that I
⁵ dropped into the chat as the next
⁶ exhibit. And then next page.
⁷ BY MR. VAUGHN:
⁸ Q. And so at the bottom here,
⁹ we can see that this one was updated in
¹⁰ September of 2021 now, right?
¹¹ A. Right.
¹² Q. And this is the new version
¹³ that you're talking about?
¹⁴ A. Yes, sir.
¹⁵ Q. And then if we can go back
¹⁶ to academic appointments, so the
¹⁷ University of Pitts -- in Pennsylvania,
¹⁸ University of Pittsburgh went from 2011
¹⁹ to present, to 2011 to 2020.
²⁰ A. Yes.
²¹ Q. So is that an error on your
²² previous CV?
²³ A. It was.
²⁴ Q. And then for Denmark, it

Page 35

¹ went from 2011 to present and now it's
² all the way back to 2016. Was that also
³ an error in your CV?
⁴ A. Yes.
⁵ Q. But the University of
⁶ Vanderbilt still says 2000 to 2006,
⁷ doesn't it?
⁸ A. Yes.
⁹ Q. Are you going to change that
¹⁰ on your future CVs?
¹¹ A. Change what?
¹² MR. BALL: Objection to
¹³ form.
¹⁴ BY MR. VAUGHN:
¹⁵ Q. Your 2000 to 2006 assistant
¹⁶ professor, that in 2005 you said you were
¹⁷ not?
¹⁸ A. Oh, no. This is -- this is
¹⁹ correct.
²⁰ Q. How did you get the
²¹ appointment at Denmark?
²² A. I've done research
²³ collaboration with them since about 1996,
²⁴ '97.

Page 36

¹ Q. Who is "them"?
² A. Danish researchers.
³ Q. I'm sorry?
⁴ A. I still do collaboration
⁵ with them.
⁶ Q. Are they at certain
⁷ institutes or anything?
⁸ A. Yeah. It's -- it's here,
⁹ the Department of Clinical Epidemiology,
¹⁰ Aarhus University.
¹¹ Q. Is there any other
¹² organizations in Denmark that you do
¹³ research with?
¹⁴ A. Sometimes I do stuff with
¹⁵ the Danish Cancer Society in Copenhagen.
¹⁶ Q. How long have you been
¹⁷ working with them?
¹⁸ A. Since '97, '98. You can see
¹⁹ on my CV when I started publishing with
²⁰ them.
²¹ Q. Have any of your companies
²² ever funded any of the Danish
²³ organizations?
²⁴ A. Oh, I have no idea.

Page 37

¹ Q. Do you -- if they collate
² data for you from the cancer database, do
³ you pay them for that?
⁴ A. So now, the way that I cover
⁵ it with them now is they're a
⁶ subcontractor.
⁷ Q. What does that mean?
⁸ A. They get paid as a
⁹ subcontractor.
¹⁰ Q. You said the way that you
¹¹ handle it now. How did you previously
¹² handle it?
¹³ A. Oh, I wasn't in charge of it
¹⁴ before -- back in the early 2000s when I
¹⁵ was -- I mean, I -- so I don't know how
¹⁶ they did it.
¹⁷ Q. And EpidStat, has it always
¹⁸ been a subcontracting position?
¹⁹ A. Yes.
²⁰ Q. And so EpidStat gets paid,
²¹ and they pay them out of that money?
²² A. Yes.
²³ MR. BALL: Objection to
²⁴ form.

Confidential Information - Subject to Protective Order

Page 38

1     Hey, Jon, you've got to give
2 me a chance to object, please.
3     THE WITNESS:  Okay.  I've
4 got to put the screen back so I
5 can see him.
6 BY MR. VAUGHN:
7     Q.   So when you were visiting
8 professor in Denmark, how often did you
9 visit this university?
10    A.   Oh, I was going there every
11 six months before Covid, even -- even
12 until today.
13    Q.   What were you doing when you
14 were visiting that university?
15    A.   Collaborating on research.
16    Q.   Did you ever teach?
17    A.   I don't believe so.  I don't
18 think I even gave a lecture.  No, I gave
19 a lecture once.
20    Q.   Of all your academic
21 appointments, which ones did you actually
22 teach?
23    A.   Georgetown.
24    Q.   And that's where you are

Page 39

1 currently at?
2     A.   Yep.  Oh, also at Michigan I
3 did, so...
4     Q.   What did you teach at
5 Georgetown?
6     A.   Epidemiology.
7     Q.   What is an adjunct
8 professor, what's different than that
9 than a regular professor?
10    A.   Adjunct professor, you just
11 get paid.  So you don't get on the tenure
12 track or anything like that, any of the
13 benefits, stuff like that.
14    Q.   How many hours a week do you
15 spend teaching?
16    A.   So it's the spring class at
17 Georgetown, and I teach on Thursday
18 nights.  The class, I think, is three
19 hours.
20    Q.   Is that in person or via
21 Zoom or some other platform?
22    A.   Oh, it's through Zoom, of
23 course, through Covid.
24    Q.   Why in your CV does it not

Page 40

1 list an employment history?
2     A.   That's just standard for
3 EpidStrategies, ToxStrategies.  I did
4 give my employment history in my report.
5     Q.   So is that policy at
6 EpidStrategies, that you don't give
7 employment history?
8     A.   ToxStrategies, yeah.  You
9 can look at everyone's -- everyone's CV.
10 It's the same.
11    MR. VAUGHN:  Can we go back
12 to his expert report again, Tyler.
13 Let's go to Page 2.
14    THE WITNESS:  I'm going to
15 look at my report here as well, if
16 that's okay?
17 BY MR. VAUGHN:
18    Q.   Yeah, if you ever need more
19 time when we're going through stuff to
20 review something to answer a question,
21 just let me know, okay?
22    A.   Thank you.  Yeah.
23    Q.   All right.  So it's fourth
24 paragraph down.  You note that you worked

Page 41

1 in the pharmaceutical industry from 2006
2 to 2012.
3     And then are these positions
4 after -- where -- are they where you were
5 working in the pharmaceutical industry
6 from those years?
7     A.   Yes.
8     Q.   And so you worked at Amgen?
9     A.   Amgen.  Yes.
10    Q.   Amgen?
11    A.   Yeah.
12    Q.   And is that a subsidiary of
13 another company?
14    A.   No.  It's a huge company
15 that's about 25,000 employees.
16    Q.   And then you worked at
17 MedImmune?
18    A.   Yes.
19    Q.   Do you know what --
20    A.   MedImmune doesn't exist
21 anymore.  It's -- AstraZeneca's absorbed
22 it.
23    Q.   Okay.  And so what years
24 approximately were you working at Amgen?

Confidential Information - Subject to Protective Order

Page 42

1    A.    Amgen.
2    Q.    Amgen.  I'm sorry.
3    A.    That's all right.  I think
4 it's about 2006 to 2009, I think.  Yeah,
5 it's 2009, 2010, so...
6    Q.    And then MedImmune would
7 have been -- was that after or at the
8 same time?
9    A.    Yeah.  No, that was
10 afterwards.  Amgen is in Los Angeles and
11 MedImmune is out here in Maryland.  So...
12    Q.    And so when you said that
13 your employment history was in your
14 expert report, is this what you're
15 talking about?
16    A.    Yes, sir.
17    Q.    Did you not work anywhere
18 before 2006?
19    A.    I think it says up above.
20        Let's see.  Yeah.  The
21 paragraph right before that, it says, "I
22 joined the faculty of the University of
23 Nebraska Medical Center."
24    Q.    And you didn't have any

Page 43

1 other jobs around this time?
2    A.    I'd just graduated from
3 University of Michigan, so that was my
4 first job after graduating.
5    Q.    Did you work for any other
6 research companies around 2000?
7    A.    Let's see, 2000 -- no.
8    Q.    Early 2000s?
9    A.    No.  It was International
10 Epidemiology Institute.
11    Q.    And did they pay you?
12    A.    Oh, yes.
13    Q.    But you don't consider that
14 as part of your employment history?
15    A.    It is, absolutely.
16    Q.    And is that listed here?
17    A.    International Epidemiology
18 Institute, yes.  It's the -- it's the
19 last sentence of that paragraph.
20    Q.    Oh, I see it.  I see it.
21 Thank you.
22    A.    Yep.
23    Q.    And then from 2006 to 2012,
24 were you working at any other place

Page 44

1 during this time?
2    A.    You mean besides the ones
3 that I've listed here?
4    Q.    Yeah.
5    A.    No.
6    Q.    Have you ever worked for a
7 company called Exponent?
8    A.    Oh, I did for one year, yes.
9    Q.    What year was that?
10    A.    It wasn't even a year.
11        It was -- I can't recall.
12 It was before I formed EpidStat.
13    Q.    2010, 2011 sound about
14 right?
15    A.    Maybe.  I'm not sure.  I
16 can't recall.
17    Q.    Did you leave Exponent to
18 open EpidStat?
19    A.    Yes.
20    Q.    Why?
21    A.    Because I wanted to do
22 pharmacoepidemiology, and so more of an
23 opportunity to do it on my own.
24    Q.    Does Exponent do that type

Page 45

1 of work too?
2    A.    Well, they tried with me.
3 But it didn't really work.
4    Q.    Why didn't it work?
5    A.    There wasn't a lot of
6 support for it.
7    Q.    How so?
8    A.    In terms of personnel,
9 knowledge, things like that.  I published
10 a few things in the pharmacopeia world
11 while I was at Exponent, but not much.
12    Q.    Did you open EpidStat
13 yourself?
14    A.    No.
15    Q.    Who opened it with you?
16    A.    David Garabrant.
17    Q.    Does he have any
18 relationship with Exponent?
19    A.    Not to my knowledge.
20    Q.    How do you know David
21 Garabrant?
22    A.    He was my mentor at
23 University of Michigan.
24    Q.    When did EpidStrat get

Confidential Information - Subject to Protective Order

Page 46

1 acquired by ToxStrat?
2     A.   EpidStat, you mean?
3     Q.   Yeah?
4     A.   EpidStat no longer exists.
5 It wasn't acquired.
6     Q.   EpidStrategies, is that what
7 it's called?
8     A.   Yeah.
9     Q.   Does that still exist?
10     A.   EpidStrategies does.  That's
11 who I work for now.  Yes.  It's a
12 subsidiary of ToxStrategies.
13     Q.   And so it's not the same as
14 EpidStrat was?
15     A.   EpidStat.
16     Q.   Stat?
17     A.   We all are -- yeah.  No, we
18 all -- most of the folks from EpidStat
19 moved over to EpidStrategies.  So it's
20 almost the same people.
21     Q.   Do you know the people that
22 opened ToxStrategies?
23     A.   Pardon me?
24     Q.   The people that opened

Page 47

1 ToxStrategies, do you know them?
2     A.   Yes.
3     Q.   Who are they?
4     A.   It's three of them; Laurie
5 Haws, Deb Proctor, and Mark Harris.
6     Q.   How many of them are
7 previous employees of Exponent?
8     A.   Oh, I don't -- I don't know
9 their employment history.
10     Q.   You don't know if they each
11 left Exponent to open this?
12     A.   I don't -- yeah, I don't
13 know.
14     Q.   Do you know if ToxStrategies
15 is owned by another company?
16     A.   No, it's not.
17     Q.   It's its own company?
18     A.   Yeah.
19     Q.   So EpidStat is where you
20 were previously, and now it's called
21 EpidStrategies?
22         MR. BALL:  Objection to
23     form.
24 BY MR. VAUGHN:

Page 48

1     Q.   Was it just coincidental
2 that you guys named your companies so
3 similar, yours being EpidStat and theirs
4 being ToxStrategies or ToxStat -- Strat?
5     A.   ToxStrategies.  They just
6 wanted to be EpidStrategies so it kind of
7 flowed, you know, so...
8     Q.   When you were running
9 EpidStat, would it be fair to
10 characterize that institute as a research
11 institute that provides expert assistance
12 on the evaluation of complex health
13 issues, and on the conduct and
14 interpretation of epidemiological studies
15 to pharmaceutical and medical device
16 companies?
17         MR. BALL:  Objection to
18     form.
19         THE WITNESS:  I'm not sure
20     what you're reading.  But I don't
21     know.
22         MR. VAUGHN:  Okay.  Tyler,
23     can we go to 2018 indirect
24     treatment comparison.

Page 49

1         (Document marked for
2     identification as Exhibit
3     Fryzek-7.)
4 BY MR. VAUGHN:
5     Q.   Second page.  On that
6 left-hand side under Competing Interests,
7 it says --
8     A.   Can you blow that up a
9 little bit?  I'm sorry.
10     Q.   Yeah, the JPF, is that -- is
11 that your initials?
12     A.   Yes, sir.
13     Q.   All right.  "Are employees
14 of EpidStat Institute."  Can you read
15 that sentence for me?
16     A.   JPF, HR, LT, and DDA are
17 employees of EpidStat Institute, which is
18 a research institute that provides expert
19 assistance on the evaluation of complex
20 health issues and on the conduct and
21 interpretation of epidemiological studies
22 to pharmaceutical and medical device
23 companies."
24     Q.   Is that accurate?

Confidential Information Subject to Protective Order

Page 50

1    A.   That is accurate, yep.
2         MR. VAUGHN:  And can we go
3    back to his invoices, Tyler.  Jon
4    Fryzek invoices IMS.
5    BY MR. VAUGHN:
6    Q.   All right.  And so we see
7    your name on these first ones, and I
8    think if we add those up it comes out to
9    14.5 hours on this bill.
10        Does that look correct to
11   you?
12   A.   I don't know.  You want me
13   to add them up?
14   Q.   Sure.
15   A.   14.75.
16   Q.   14.75, cool.
17        And then who is Mina Suh.
18   Did I say that right?
19   A.   Yep.
20   Q.   Who is she?
21   A.   She is an epidemiologist.
22   Q.   Does she work for you?
23   A.   Yes.  It's Mina Suh.
24   Q.   Mina Suh.  Are you aware

Page 51

1    that she previously worked at Exponent?
2    A.   I have no idea.  She was at
3    ToxStrategies when I joined.
4    Q.   Ok.  Is that the first time
5    you met her?
6    A.   Yes.
7    Q.   And so does she work for
8    ToxStrategies or the EpidStrategies?
9    A.   She was working for
10   ToxStrategies and she moved over to
11   EpidStrategies when we came.
12   Q.   So you guys kind of work
13   with whoever on that?  I mean you can
14   pull from ToxStrategies or EpidStrategies
15   for your work, does it work that way?
16        MR. BALL:  Objection --
17   sorry.  Objection to form.
18        THE WITNESS:  Sometimes.  It
19   depends on the project.
20        MR. VAUGHN:  Okay.  Can we
21   go to the next page, Tyler.
22   BY MR. VAUGHN:
23   Q.   So we've got 6.5 hours
24   billed on this one from you, correct?

Page 52

1    A.   It looks like, yep.
2    Q.   And who is this Janice
3    Lansita?
4    A.   She used to be an employee
5    at ToxStrategies, but she -- she left
6    because of Covid.
7    Q.   So she doesn't work there --
8    doesn't do work for you anymore?
9    A.   No.  She just -- she doesn't
10   do any work, so...
11   Q.   Did she leave like in the
12   middle of 2020?
13   A.   I don't recall when she
14   left.
15   Q.   Was it recent or has it been
16   about a year ago?
17   A.   Yeah, it's been a while.
18   When things shut down with Covid she left
19   to take care of her kids.
20   Q.   Okay.  And so this Mina
21   Suh -- how do you say it again, Mina?
22   A.   Suh.
23   Q.   Suh.  So she's doing
24   42 hours here.  She's doing quite a bit

Page 53

1    of the work on the research of this
2    expert report, right?
3    A.   No.
4         MR. BALL:  Objection to
5    form.
6    BY MR. VAUGHN:
7    Q.   What do you mean no?
8    A.   This is back in 2019.  So
9    this is -- at the beginning she did.
10   Q.   Okay.  Yeah.  Okay.
11        MR. VAUGHN:  Let's go to the
12   next page.
13   BY MR. VAUGHN:
14   Q.   This is still early, this is
15   2019.  So you billed one hour on this
16   one, right?
17   A.   Yes.
18   Q.   And the rest was Mina Suh?
19   A.   Pardon me?
20   Q.   And the rest of them was
21   Mina -- oh, I guess Sarah Cohen billed
22   per hour, and then the rest of the
23   billing was Mina Suh again?
24   A.   Yeah.  Yes.  I'm sorry.

Page 54

1    Q.   Next page.  Not much on that
2 one.  Let's go to the next page.  Just
3 the Sarah Cohen.  Next page.
4 Professional support staff.  What is
5 that?  Previously you'd been identifying
6 people.
7    A.   Yeah, I don't know.  It's
8 a -- must be an admin thing.
9    Q.   Would that be someone within
10 the company, professional support staff,
11 or has that been outsourced?
12    A.   No, it's within company.
13         What year is this?  This was
14 2020?  Yeah.
15    Q.   So we're now at the end of
16 2020.  You just have a few hours billed
17 still.
18         Let's go to the next page, I
19 think we start doing your billing now.
20 All right.  So now we are in 2021.  And I
21 showed this being about 14.75 hours from
22 you, and then 43 hours from professional
23 support staff that's not identified,
24 correct?

Page 55

1    A.   How did you get 14.75?
2    Q.   I added up 1, 1.5, 1, .75,
3 1, 1, 1, .5, 3, 1, 1, 2.
4    A.   You're right.
5    Q.   Okay.  The next page.  So
6 here we have another three hours here
7 from you.  What I found really
8 interesting is that we're in 2021 now,
9 and Janice Lansita is billing hours
10 again?
11    A.   No, that's -- that must be
12 an error or something.  I have no idea.
13 She's retired.
14    Q.   So are you guys going to
15 refund that money or how does that work?
16    A.   This is the first I've
17 seen --
18         MR. BALL:  Objection to
19    form.
20         THE WITNESS:  Sorry, I have
21    no idea.
22 BY MR. VAUGHN:
23    Q.   Are you going to notify your
24 clients about that billing error?

Page 56

1    A.   You already have, so... my
2 client is sitting here, so...
3    Q.   Are you going to notify
4 those within your company of this billing
5 error?
6    A.   I have no idea what happens
7 to that, so...
8    Q.   Who enters the billings?
9    A.   The administrators.  One of
10 the advantages of not having my own
11 company is I don't have to pay to the
12 invoicing -- pay attention to the
13 invoicing like I used to when I had my
14 own company.
15    Q.   And who at your company now
16 is it, again, that pays attention to the
17 invoicing?  What's their name?
18    A.   Mark Harris does all that.
19 He's one of the cofounders.
20    Q.   And you're not aware if he
21 previously worked at Exponent, are you?
22    A.   No idea.
23         MR. VAUGHN:  Let's go to the
24    next page.

Page 57

1 BY MR. VAUGHN:
2    Q.   All right.  I added up that
3 you billed 15.75 hours here.  And then in
4 Janice Lansita again, now she's billed
5 46 hours in 2021.
6    A.   Yeah.
7    Q.   Another billing error?
8    A.   I have no idea.  As I said,
9 this is the first time I'm looking at
10 these.
11    Q.   That obviously isn't right,
12 correct?  I mean, she didn't work there
13 then.
14         MR. BALL:  Objection to
15    form.
16         THE WITNESS:  It must be the
17    incorrect name.
18 BY MR. VAUGHN:
19    Q.   What name do you think it
20 should be?
21    A.   Oh, I have no idea.
22    Q.   Were you working with the
23 staff in doing all this work in preparing
24 your expert report?

Page 58

1    A.    Absolutely.
2    Q.    I mean, this was just six
3  months ago, and it's the person --
4  whoever was spending the most time on
5  this project, you don't know who was
6  spending the most time on this project?
7         MR. BALL:  Objection to
8     form.
9         THE WITNESS:  Yes, I do.
10 BY MR. VAUGHN:
11   Q.    Who is it?
12   A.    Sue Pastula.
13   Q.    Sue who?
14   A.    Pastula.
15   Q.    So you think -- you think
16 that's who that was billed to, is her?
17   A.    I assume so, yes.
18   Q.    How long has she worked
19 there?
20   A.    She's worked there, I think,
21 about a year.  I'm not sure when she
22 started.  She came over from EpidStat
23 too.
24   Q.    And how long did she work at

Page 59

1  EpidStat before?
2    A.    Well, the whole time that we
3  were there, she worked with David
4  Garabrant since the '90s.
5    Q.    Well, shouldn't they know
6  who she is then and not think she's
7  Janice Lansita?
8         MR. BALL:  Objection to
9     form.
10        THE WITNESS:  I would think
11    so.  But as I said, I'm not in
12    charge of the billing.  So that's
13    a billing error they'd done.
14 BY MR. VAUGHN:
15   Q.    Have you ever had billing
16 errors in previous litigations that
17 you've worked on?
18   A.    Not to my knowledge.
19   Q.    You don't remember any of
20 that with the welding rod litigation?
21   A.    I don't recall.
22   Q.    You don't recall.  Okay.
23        MR. VAUGHN:  Let's go ahead
24    and go to the next page.

Page 60

1  BY MR. VAUGHN:
2    Q.    You have 3.5 hours billed on
3  this one.
4    A.    Yep.
5    Q.    And again, we've got
6  57 hours from Janice Lansita.
7    A.    Yeah.  It must be Sue
8  Pastula.  So they've got the wrong name.
9    Q.    I don't know if I see her
10 name disclosed anywhere in this.  I'll
11 keep looking.
12   A.    Yeah, that's why I'm
13 thinking -- that's why I'm thinking it
14 must be Sue.  As I said, I can't -- I
15 don't know unless I look.
16        MR. VAUGHN:  Next page.
17 BY MR. VAUGHN:
18   Q.    It looks you got 13 hours
19 here.  You've got Janice Lansita.  The
20 next page is just Sarah Cohen.
21        MR. VAUGHN:  And let's go to
22    the next one.
23 BY MR. VAUGHN:
24   Q.    And how many people work at

Page 61

1  EpidStrategies right now?
2    A.    I believe we're at eight,
3  eight or nine.
4    Q.    Can you list all eight or
5  nine employees?
6    A.    Yep. It's myself.  Sarah
7  Cohen, Mina Suh, Naimisha Movva, Lauren
8  Bylsma.  Heidi Reichert, Xiaohui Jiang.
9  I think I've got them all.  I think
10 that's all of them.
11   Q.    And so on this one, this
12 38 -- 33 hours for professional support
13 staff, that's just going to be several of
14 them working on it, you think?
15   A.    Yeah.
16   Q.    How do they keep their hours
17 for that?  Do they just -- are they each
18 keeping their own time and then adding it
19 together?
20   A.    We have billing software.
21        MR. BALL:  Object to form.
22 BY MR. VAUGHN:
23   Q.    How does that billing
24 software work for professional support

Page 62

¹ staff?
²     A.   Oh, I have no idea.
³     Q.   When you billed your time,
⁴ you bill it under -- you bill it under
⁵ your name, right?
⁶     A.   Correct.
⁷     Q.   If someone's billing under
⁸ their own name, would they not be
⁹ included under the professional support
¹⁰ staff?
¹¹       MR. BALL:  Objection to
¹²     form.
¹³       THE WITNESS:  Yeah.  As I
¹⁴     said, I don't know.  I'm not in
¹⁵     charge of the invoicing anymore,
¹⁶     so.
¹⁷ BY MR. VAUGHN:
¹⁸     Q.   And let's go to the next
¹⁹ page.  This is really recent.  This is
²⁰ just last month.  So this is all of you
²¹ billing on most of this time, except for
²² a little bit of Janice Lansita.  Actually
²³ you got 16 hours here.
²⁴     A.   Okay.

Page 63

¹     Q.   All right.  If I add all
² those up, I come out to 113 hours.  Does
³ that sound approximately right to you for
⁴ the amount of time that you've spent on
⁵ this?
⁶     A.   Absolutely no idea.
⁷     Q.   No idea.  So you have no
⁸ reason to disagree with me?
⁹     A.   I have no reason to agree or
¹⁰ disagree with you.
¹¹     Q.   If we added up all those
¹² hours, you would agree that's how much
¹³ time you spent on this expert report?
¹⁴     A.   If all the hours are added
¹⁵ up correctly from the invoices, then
¹⁶ that's how much time I spent.
¹⁷       MR. VAUGHN:  Tyler, can we
¹⁸     pull up the ToxStrat mobile
¹⁹     document.
²⁰       (Document Marked for
²¹     identification as Exhibit
²²     Fryzek-8.)
²³ BY MR. VAUGHN:
²⁴     Q.   Did EpidStat, did they

Page 64

¹ have -- did you have a website before you
² were acquired?
³     A.   I'm sorry?
⁴     Q.   Before you were -- before
⁵ you started working at ToxStrategies,
⁶ your old company, the EpidStat --
⁷     A.   Oh, yes, EpidStat.
⁸     Q.   Did you have a website with
⁹ them?
¹⁰     A.   With who?  We had our own
¹¹ website.
¹²     Q.   Your own website?
¹³     A.   Yeah.
¹⁴     Q.   Is that different -- a
¹⁵ different website than what's used now?
¹⁶     A.   Yes.
¹⁷     Q.   Okay.  On this exhibit, is
¹⁸ this a correct representation of where
¹⁹ all ToxStrategies is located?
²⁰     A.   Oh, I have no idea.
²¹     Q.   How many people work at
²² ToxStrategies outside of -- outside of
²³ your department?
²⁴     A.   Yeah, I believe it's about

Page 65

¹ 60 total.  But I'm not sure of the exact
² number.
³     Q.   Does that 60 count
⁴ EpidStrategies?
⁵     A.   Yeah.  But it's approximate.
⁶ I don't know the exact number.
⁷     Q.   And how do you know that
⁸ ToxStrategies is not owned by another
⁹ company?
¹⁰     A.   Because they told me.
¹¹     Q.   Who is they?
¹²     A.   The three owners.
¹³       MR. VAUGHN:  Tyler, can we
¹⁴     open up now the Exponent mobile
¹⁵     web page.
¹⁶       (Document Marked for
¹⁷     identification as Exhibit
¹⁸     Fryzek-9.)
¹⁹ BY MR. VAUGHN:
²⁰     Q.   It looks pretty similar,
²¹ doesn't it?
²²     A.   No.
²³     Q.   No?  I mean --
²⁴       MR. VAUGHN:  Tyler, can you

Page 66

do a aide-by-side?

TRIAL TECH:  Yeah, just give me one second.

MR. VAUGHN:  No rush.

BY MR. VAUGHN:

Q.   You guys are both in Seattle, correct?

A.   It looks like it, yep.

Q.   And then both in San Francisco Bay area, correct?

A.   Yeah.  It's not the same offices.  These were different companies.

Q.   And then on one of them, it says Orange County, and the other one it says southern California.  But then it says Orange County under that, correct?

A.   What -- what are you reading?

Q.   Southern California.  So on Exponent, it says Southern California, but then under it, it says Orange County.  ToxStrategies, it just says Orange County, right?

A.   Right.

Page 67

Q.   You're both in Austin and Houston, correct?

A.   It looks like it, yep.

Q.   And Exponent lists Denver while ToxStrategies lists Boulder which is right outside of Denver, correct?

A.   I have no idea.  I believe they are quite far apart.

Q.   And then Exponent lists Detroit, and ToxStrategies lists Ann Arbor.

A.   Yeah.  The Ann Arbor office is all my employees.

Q.   That Dr. Garabrant that you were talking about earlier, where does he live?

A.   He lives in -- I believe he lives in Ann Arbor, as far as I know.

Q.   Okay.

MR. VAUGHN:  You can go ahead and take that down Tyler.  Can we go back to his CV?

THE WITNESS:  Is this the more recent one or old one?

Page 68

TRIAL TECH:  Most up-to-date.

MR. VAUGHN:  It says August 2021 at the bottom.

THE WITNESS:  Okay, thank you.

(Document marked for identification as Exhibit Fryzek-6.)

BY MR. VAUGHN:

Q.   Let's go to Page, 3 I think.  So at the bottom we have book chapters that I'm looking at.  You've published quite a few book chapters, haven't you, Doctor?

A.   I think just two.  Not very many.

Q.   Oh, is the next page not book chapters too?  No, it's manuscripts.  Okay.  So are these all the book chapters you've ever published?

A.   Yes.

Q.   And then the next page I guess it says manuscripts.  What are

Page 69

manuscripts?

A.   Scientific manuscripts published in journals, scientific journals.

Q.   So these are published?

A.   Yes.  Except for the first one.  The first one says in press so it hasn't been published yet.

Q.   The studies you publish, are they typically funded?

A.   Sometimes, sometimes not.

Q.   Can you give an example of one that was not funded?

A.   It will take me a bit to go through my CV.

Is there -- is there a way --

Q.   There is.  But do you not recall just offhand the last time you've done a nonfunded study?

A.   No.  I mean, I've published over 200 things so it's hard to remember.

Q.   And most of them were funded?

Confidential Information - Subject to Protective Order

Page 70

1    MR. BALL:  Objection to the
2 form.
3    THE WITNESS:  I don't know.
4 BY MR. VAUGHN:
5    Q.   But you can't recall any of
6 the 200 that were unfunded as you sit
7 here?
8    A.   As I --
9    MR. BALL:  Object to form.
10    THE WITNESS:  I'm sorry, I
11 would have to look.  So...
12 BY MR. VAUGHN:
13    Q.   Go ahead.
14    A.   I can control it?
15    Q.   There should be a way you
16 can download it.
17    TRIAL TECH:  So you can --
18 you can do it through the link
19 that was sent in the chat.  Either
20 that or I could give you remote
21 control of the screen.  It might
22 be easier for you to do it through
23 the link that's on the chat.
24    THE WITNESS:  For the marked

Page 71

1 exhibits?
2    TRIAL TECH:  Correct, yeah.
3 The marked exhibits folder.
4    THE WITNESS:  So I have that
5 open.  I just need to refresh my
6 window to see it.
7    TRIAL TECH:  And this should
8 be -- you want to go to Exhibit 6.
9    THE WITNESS:  Thank you.
10    TRIAL TECH:  You're welcome.
11    THE WITNESS:  Hey guys, so I
12 have access now.
13    Can you repeat your question
14 please.
15 BY MR. VAUGHN:
16    Q.   Yeah.
17    Do you recall any studies
18 that you have published that were not
19 funded?
20    A.   Either through an NIH grant
21 or other type of research grant or?
22    Q.   Just not funded at all.
23    A.   Not funded at all.  I know
24 one off the top of my head is the

Page 72

1 pancreatic cancer and obesity.
2    Q.   Mm-hmm.
3    A.   Book chapter on RSV wasn't
4 funded.
5    Q.   Did -- sorry.
6    A.   Neither book chapter was
7 funded.
8    Q.   Okay.  So what about these
9 publications though that you published?
10    A.   Let's see.  So the Le study,
11 Le HQ, Tomenson, it's a review and
12 meta-analysis of occupational titanium
13 dioxide.
14    Q.   Why did you do that study?
15    A.   Why?
16    Q.   Yeah.
17    A.   It was interesting.  So I
18 had done research on titanium dioxide.
19    Q.   What piqued your interest on
20 it?
21    A.   I had done research on
22 titanium dioxide.
23    Q.   Is there any companies that
24 ever funded you that would be interested

Page 73

1 in that research as well?
2    A.   I don't recall.
3    Q.   What journal did you publish
4 that in?
5    A.   It says here, the Journal of
6 Occupational and Environmental Medicine.
7    Q.   Do you publish in that
8 journal a lot?
9    A.   I have published before in
10 that journal.
11    Q.   Do you think it's a
12 reputable journal?
13    A.   I believe so, yeah.
14    Q.   Do you think it has industry
15 bias?
16    A.   Oh, I have no idea.  I don't
17 know what you mean by industry bias
18 either.
19    Q.   Did anyone else -- who were
20 the other people that you published with?
21    A.   Let's see.  They're other
22 epidemiologists, other scientists.
23    Q.   And do you know if any of
24 them got any funding to do this study?

Confidential Information - Subject to Protective Order

Page 74

1    A.   No idea.  I don't believe so
2 though.
3    Q.   Do you talk about that
4 before you publish a study?
5    A.   No.
6    Q.   You don't ask your
7 collaborators, hey, are you guys getting
8 funded by somebody to do this so that you
9 can disclose the conflict of interest in
10 the paper, you don't do that?
11    A.   That's the first author's
12 responsibility.  So I just worry about
13 the science.  Make sure the science is
14 accurate.
15    Q.   Can't bias influence the
16 accuracy of science?
17        MR. BALL:  Objection to
18    form.
19        THE WITNESS:  No.
20 BY MR. VAUGHN:
21    Q.   Bias can't -- why do we care
22 about bias then?
23    A.   I guess I should --
24        MR. BALL:  Objection.  I'm

Page 75

1    sorry.
2        THE WITNESS:  I'm sorry, I'm
3    getting confused about your
4    question.  Can you ask again?
5 BY MR. VAUGHN:
6    Q.   Can bias not influence the
7 integrity of a scientific paper?
8    A.   You'd have to give me an
9 example.
10    Q.   We'll get to them.
11        Your pancreatic cancer and
12 obesity study, why did you do that study?
13    A.   Because I was interested in
14 it.
15    Q.   Why were you interested in
16 that?
17    A.   Because at that time there
18 was a lot of research on obesity and
19 cancer outcomes.  So it was one of the
20 first papers to show the relationship
21 between obesity and pancreatic cancer.
22 Good study.
23    Q.   Is pancreatic cancer also
24 linked to diabetes?  Can pancreatic

Page 76

1 cancer cause diabetes?
2    A.   I -- can pancreatic cancer
3 cause diabetes?  I have no, no idea.
4    Q.   You don't know?
5    A.   No, I don't know.  I haven't
6 studied that.
7    Q.   Do you know if diabetes can
8 cause obesity?
9    A.   I don't know that.
10    Q.   So you don't know if maybe
11 obesity is a symptom of pancreatic cancer
12 as opposed to a cause?
13    A.   So it's established by the
14 American Cancer Society that obesity is
15 related to pancreatic cancer and not
16 through diabetes.
17    Q.   You said related.  But, I
18 mean, if it was a symptom of, it would
19 still be related.  You're saying it's
20 actually a risk factor for?
21    A.   Right.
22        MR. BALL:  Objection to
23    form.
24        THE WITNESS:  You can look

Page 77

1    on the American Cancer Society
2    website and find it.
3 BY MR. VAUGHN:
4    Q.   What year did you do that
5 study?
6    A.   I have to look here to find
7 out.
8    Q.   Were you working for anybody
9 at that time?
10    A.   I was.
11    Q.   Who were you working for?
12    A.   International Epidemiology
13 Institute.
14    Q.   Is that one of the companies
15 you worked for that gets paid by industry
16 to do studies?
17        MR. BALL:  Objection to
18    form.
19        THE WITNESS:  It's one of
20    the companies, consulting firms
21    that I worked for, yes.
22        Do you still want me to find
23    out what year that was published?
24 BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

Page 78

1   Q.   No, that's okay.  It was
2   mostly -- more where you were working at
3   the time.  So why -- is that the IEI?  Is
4   that what it's abbreviated as?
5        A.   It was, yes.
6        Q.   Is that a for-profit
7   company?
8        A.   You know, I don't know.  It
9   no longer -- it no longer exists.  It's
10  by absorbed by Vanderbilt.
11  Q.   By who?
12  A.   Vanderbilt.
13       Q.   Was it often that they would
14  just fund their own studies?
15            MR. BALL:  Objection.
16       Foundation.
17            THE WITNESS:  I was just a
18       junior researcher there.  So I
19       didn't really pay attention to the
20       funding.
21  BY MR. VAUGHN:
22       Q.   So how are you sure that
23  that research for pancreatic cancer and
24  obesity wasn't funded?

Page 79

1            MR. BALL:  Objection to
2       form.
3            THE WITNESS:  Well, easy.
4       Because the data came from my
5       dissertation, my doctoral
6       dissertation.
7   BY MR. VAUGHN:
8        Q.   But how do you know that IEI
9   or no one else within IEI or publishing
10  with you was getting funded?
11           MR. BALL:  Objection to
12      form.
13           THE WITNESS:  On pancreatic
14      cancer.
15  BY MR. VAUGHN:
16      Q.   Huh?
17      A.   On pancreatic cancer?
18      Q.   Yeah.
19      A.   Because it wasn't affiliated
20  with IEI.
21      Q.   Oh, I thought you said it
22  was IEI?
23      A.   Oh.  No, no.
24      Q.   You were working at IEI, but

Page 80

1   it wasn't affiliate with it?
2        A.   Correct, yeah.
3        Q.   And you were doing
4   independent research?
5        A.   I was doing that research on
6   my kitchen table at night.  I wasn't
7   doing it while I was at work.  I was
8   interested in it.
9        Q.   What piqued your interest
10  though in that?
11       A.   I told you.  The pancreatic
12  cancer was my dissertation topic, and
13  there's a lot of studies on obesity and
14  various cancers.  And I realized I had
15  the data in my dissertation dataset, and
16  so I analyzed it and wrote a paper.
17       Q.   Why did you choose
18  pancreatic cancer for your dissertation?
19       A.   I have no -- no reasons.
20       Q.   What professor oversaw you
21  for that dissertation?
22       A.   Well, there were four of
23  them.  So David Garabrant was one.  David
24  Schottenfeld.  It's been 30 years, sir.

Page 81

1   You know, it's kind of hard for me to
2   remember.  Brenda Gillespie was another
3   one.
4        Q.   David Garabrant, was he the
5   main one?
6        A.   No.  Sioban Harlow was the
7   main one.
8        Q.   One second.
9            MR. VAUGHN:  Go to Page 12.
10      Next page.  Keep going.
11  BY MR. VAUGHN:
12       Q.   Here.  The case reports,
13  letters to the editor, what are -- what
14  are these?
15       A.   These are letters to the
16  editor.
17       Q.   What are letters to the
18  editor?  What does that mean?
19       A.   If someone had a comment
20  about a study I did.  We had the
21  opportunity to respond.  So just a few
22  times there were comments.
23       Q.   Why do people comment on
24  your studies?

Page 82

1    MR. BALL:  Objection to
2 form.
3    THE WITNESS:  They have
4 questions.
5 BY MR. VAUGHN:
6    Q.   They ever have criticisms?
7    A.   Well, with over 200 studies
8 I've done, we've got four.  So that's not
9 very often.
10    Q.   Has a governmental agency
11 ever criticized your work?
12    A.   Not that I'm aware of.
13    Q.   Or a health agency ever
14 criticize the work you've done?
15    A.   Not that I'm aware of.
16    Q.   Not that you're aware of.
17    And then abstracts and
18 presentations, what's an abstract?
19    A.   It's a meeting abstract
20 presented at a scientific conference.
21    Q.   Okay.  So all of these are
22 things that you presented at a
23 conference?
24    A.   Well, the first author is

Page 83

1 usually the one that presents them.  But
2 I was involved in them.
3    Q.   A lot of presentations.
4    A.   I know.  It's been busy.
5    Q.   Do you get paid for these
6 presentations?
7    A.   It's usually part of the,
8 you know, contract to do the study.
9    Q.   What all is included in the
10 contract to do the study, besides the
11 study and the presentation?
12    MR. BALL:  Objection.
13    THE WITNESS:  Well, I mean
14 if the data warrants it, we do a
15 presentation.  So the contract is
16 usually just to do the study and
17 write a report.  And if it's
18 interesting, we write a paper and
19 an abstract.
20 BY MR. VAUGHN:
21    Q.   What about being an expert?
22 Is that part of the same contract?
23    A.   Expert in what?
24    Q.   Expert in -- defense expert

Page 84

1 in a litigation?
2    A.   Part of what contract?
3    MR. BALL:  Objection to
4 form.
5 BY MR. VAUGHN:
6    Q.   Is it part of the same
7 contract when you do defense work and
8 publish studies, or are they two separate
9 contracts?
10    MR. BALL:  Objection to
11 form.
12    THE WITNESS:  I'm sorry.
13 I'm confused.
14 BY MR. VAUGHN:
15    Q.   Okay.  So, like, for the
16 welding rod litigation you did you were a
17 defense expert, and you were also
18 publishing studies.  Was that the same
19 contract or did you have two contracts --
20    A.   Yeah --
21    Q.   -- or more contracts?
22    A.   As I said, when I was at
23 IEI, I had no idea how the funding
24 happens.  I just got paid a regular

Page 85

1 salary.
2    Q.   How much did you get paid
3 for the welding rod out of a salary then?
4 Do you know?
5    A.   I have no idea.  I get a
6 monthly salary, so.
7    Q.   And it doesn't depend on
8 your work, the quality, whether it's
9 positive, negative?  You just get paid a
10 salary?
11    MR. BALL:  Objection to
12 form.
13    THE WITNESS:  That's
14 correct.
15    (Whereupon, a discussion was
16 held off the stenographic record.)
17 BY MR. VAUGHN:
18    Q.   So you've only published two
19 book chapters; is that right?  I'm
20 looking at it.
21    A.   That was a lot of work.
22    Q.   Oh, All right.  I'm not
23 trying to say it wasn't.
24    MR. VAUGHN:  Can we, Tyler,

Page 86

1    go to 2012, Toxic Torts.
2        (Document marked for
3    identification as Exhibit
4    Fryzek-10.)
5        TRIAL TECH:  This is 2013.
6        MR. VAUGHN:  Thank you.  I
7    had a typo.  Appreciate it.
8    Making it hard for you.
9 BY MR. VAUGHN:
10    Q.   I didn't see this listed
11 anywhere in your CV.  Do you recall doing
12 a chapter for Toxic Tort and
13 environmental law defense practice
14 seminar course materials?  Do you
15 remember that?
16    A.   No.  I believe it was a
17 presentation that I gave.  I don't
18 believe it was a course.
19    Q.   You don't think that you
20 wrote a chapter for it?
21    A.   I don't think so.
22        MR. VAUGHN:  All right.
23    Tyler, can we go to Page 55.
24 BY MR. VAUGHN:

Page 87

1    Q.   Use of Biomarkers in
2 Observational Research.  And that's you,
3 right, Jon P. Fryzek of the EpidStat
4 Institute?
5    A.   Yep.
6    Q.   Does this refresh your
7 recollection any?
8    A.   Yeah, it was a presentation
9 I gave at a conference.
10        MR. VAUGHN:  Can we go two
11    pages after this.
12 BY MR. VAUGHN:
13    Q.   This is the table of
14 contents to your presentation.
15    A.   Okay.
16    Q.   Is that what you would
17 define that as?
18        MR. BALL:  Objection to
19    form.
20        THE WITNESS:  This is a
21    table of contents, and it looks
22    like it's to my presentation.
23 BY MR. VAUGHN:
24    Q.   You didn't list this --

Page 88

1 you're calling this a presentation.  You
2 didn't list this presentation on your CV
3 either, did you?
4    A.   No, but I will.  I forgot
5 about it.
6    Q.   Oh.  Good.
7    A.   Thank you.
8    Q.   You're welcome.
9        Were you paid for this
10 presentation?
11    A.   No.
12    Q.   Who contacted you to give a
13 presentation on defense practice
14 seminars?
15    A.   It was a presentation --
16        MR. BALL:  Objection to
17    form.
18        THE WITNESS:  A presentation
19    on biomarkers.  It wasn't on
20    defense practice seminars.
21        MR. VAUGHN:  Well, Tyler,
22    can we go back to Page 1.
23 BY MR. VAUGHN:
24    Q.   All right.  But the entire

Page 89

1 seminar was for attorneys that defend
2 toxic torts and environmental law cases,
3 correct?
4    A.   I don't know --
5        MR. BALL:  Objection to
6    form.
7        THE WITNESS:  I don't know
8    who the conference was for, I'm
9    sorry.
10 BY MR. VAUGHN:
11    Q.   Do you see where it says,
12 "The Voice of the Defense Bar," next to
13 dri?
14    A.   Yes.
15    Q.   Do you know what "the
16 defense bar" means?
17    A.   No.
18        I'm sorry, this is the first
19 time I'm seeing this, so...
20    Q.   Were you aware that you
21 wrote this chapter or wrote this
22 presentation?
23    A.   It's a presentation.  I
24 assume it's just my slide deck that I

Confidential Information - Subject to Protective Order

Page 90

1 gave.
2        Q.   There's more than just
3 slides.  We can go through each page with
4 you, but --
5              MR. VAUGHN:  I mean Tyler,
6 let's go to Page 59.
7 BY MR. VAUGHN:
8        Q.   Is this like what you would
9 use in your presentation?
10       A.   I don't recall this.
11       Q.   If you want to download it,
12 feel free or we can scroll through it.
13       A.   We can just scroll through
14 it, because I don't recall writing this.
15       Q.   Let him know when you're
16 ready for the next page.  There's just --
17 it's only like six or seven pages.  Maybe
18 ten.
19       A.   Can we go to the next page.
20 I just want to flip through it.
21              I don't recall this at all.
22              Okay.  Next page.  Next
23 page.
24              Because these are parts of

Page 91

1 my slides.
2        Q.   You think someone else wrote
3 this and put your name on it?
4        A.   Oh, I have no idea.  I could
5 have written it.  But I don't recall it.
6        Q.   You do a lot of work for the
7 defense bar?
8              MR. BALL:  Objection to
9        form.
10             THE WITNESS:  I'm not sure
11        what you mean by that.
12 BY MR. VAUGHN:
13       Q.   Well, as a part of this, it
14 says, "The Voice of the Defense Bar,"
15 Defense Practice Seminar Materials.
16             Do you do a lot of work for
17 defense attorneys?
18             MR. BALL:  Objection to
19        form.
20             THE WITNESS:  What I said
21        was I wasn't paid for this.
22 BY MR. VAUGHN:
23       Q.   Yeah, I understand if you
24 weren't paid.  But, I mean, is work only

Page 92

1 paid?
2              MR. BALL:  Objection to
3        form.
4 BY MR. VAUGHN:
5        Q.   Does it have to be work to
6 be paid?
7        A.   I'm sorry?
8        Q.   Do you -- do you consider
9 work, does it have to be paid?
10       A.   I have no idea.  I'm sorry.
11       Q.   Well, I mean, if this isn't
12 work because it wasn't paid, what would
13 you call it?
14       A.   Giving a seminar.  So...
15       Q.   Have you given previous
16 seminars for the defense bar?
17       A.   No.
18             MR. BALL:  Objection to
19        form.
20             THE WITNESS:  This is the
21        only one.
22 BY MR. VAUGHN:
23       Q.   Will you be adding this to
24 your CV in the future?

Page 93

1        A.   Yes.  And thank you for
2 reminding me of that.
3              MR. VAUGHN:  Do you mind if
4        we take a break?  I've been
5        drinking coffee and stuff.
6              THE VIDEOGRAPHER:  Off the
7        record, 10:11 a.m.
8              (Whereupon a discussion was
9        held off the record.)
10             (Short break.)
11             THE VIDEOGRAPHER:  We are
12        back on the record at 10:24 a.m.
13 BY MR. VAUGHN:
14       Q.   You said earlier that you
15 asked someone at ToxStrat if they were
16 owned by another company.  Who
17 specifically was it that you asked?
18             MR. BALL:  Objection to
19        form.
20             THE WITNESS:  I guess I -- I
21        asked when we first talking about
22        joining them, I met with the three
23        founders.
24 BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

Page 94

1    Q.   I thought you said that they
2 told you that they were not owned by any
3 other company.
4    A.   No, I know they are not
5 owned by any other company though.
6    Q.   How do you know that?
7    A.   Because of our contracts,
8 who signed the contracts, et cetera.
9    Q.   Would the contract have to
10 disclose that if there was a
11 nondisclosure agreement?
12    A.   Oh, I have no idea.  It's
13 not -- it's not owned by another company.
14 I don't know where you are drawing that
15 conclusion.
16    Q.   I'm trying to figure out
17 where you're drawing your conclusion that
18 there's no way it's owned by anybody
19 else.
20    A.   Because I think they would
21 have told me, so...
22    Q.   When you opened EpidStat,
23 you did it with Dr. Garabrant; is that
24 correct?

Page 95

1    A.   What about David Garabrant?
2    Q.   Is that who you opened
3 EpidStat with, is that what you said?
4    A.   Yes.
5    Q.   And do you know if he opened
6 it himself personally or under a PLLC
7 named David Garabrant PLLC?
8    A.   They are separate entities.
9    Q.   So was the PLLC though, did
10 that -- is that what opened it?
11        MR. BALL:  Objection to
12    form.
13        THE WITNESS:  I don't know
14    what you mean by that.
15 BY MR. VAUGHN:
16    Q.   Did his PLLC own EpidStat?
17    A.   Oh, no.
18    Q.   Never?
19    A.   Never.  No.
20    Q.   And so if there was any
21 articles of incorporation or anything
22 like that in a state that lists David
23 Garabrant, PLLC, that's inaccurate,
24 correct?

Page 96

1        MR. BALL:  Objection to
2    form.  Foundation.
3        THE WITNESS:  I guess I'm
4    not clear what you're asking.
5 BY MR. VAUGHN:
6    Q.   What does David Garabrant
7 PLLC, do, do you know?
8    A.   No.  And I'm sorry, I can't
9 really talk about EpidStat, because it's
10 closed.  It's been closed for over two
11 years.
12    Q.   And so you can't talk about
13 it because it's been closed?
14    A.   Because I have an NDA.
15    Q.   So you wouldn't be able to
16 tell me if EpidStat was previously owned
17 by Exponent?
18    A.   Oh, it's not.  I know that.
19    Q.   Oh, it's not now because
20 it's not open.  Was it ever?
21    A.   No.
22    Q.   Do you know if David
23 Garabrant, PLLC, has any association with
24 Exponent?

Page 97

1    A.   Not to my knowledge, no.
2    Q.   Do you have an NDA with your
3 current job?
4        MR. BALL:  Objection to
5    form.
6 BY MR. VAUGHN:
7    Q.   Did you answer?
8    A.   I said no.
9    Q.   You don't have an NDA?
10        MR. VAUGHN:  Go ahead and go
11    to his expert report.
12 BY MR. VAUGHN:
13    Q.   At the bottom of the first
14 page you have two opinions.
15    A.   I'm sorry.  Is it one of the
16 exhibits that I can --
17    Q.   Yeah.  I mean, you have a
18 paper copy.  This is your actual report
19 we're looking --
20    A.   Okay.  Okay.  Thank you.
21 I'm going to have to put my glasses on.
22    Q.   No problem.  Take your time.
23    A.   Okay.  Thanks.  Okay.
24    Q.   At the bottom you have two

Page 98

1 opinions. And that's the only -- the
2 next page goes to different topics. Two
3 opinions. Can you read the first one for
4 me?
5    A.  It says, "My opinions
6 include but are not limited to the
7 following: Opinion 1. The scientific
8 evidence does not support an increased
9 risk of cancer from the low levels of
10 NDMA or NDEA with the use of valsartan
11 products."
12    Q.  So you don't -- sorry. Just
13 the first opinion right now.
14    A.  Okay.
15    Q.  So your opinion is there's
16 no increase at all in the risk of cancer?
17    A.  It's not my opinion. It's
18 the scientific evidence.
19    Q.  And is that any cancer or a
20 specific cancer?
21    A.  It says any cancer.
22    Q.  But when you're saying
23 increased risk, are you looking at it as
24 all cancers or are you saying also if you

Page 99

1 look at individual cancers, none of them
2 have an increased risk?
3    A.  I'm looking at the summary
4 of evidence following the PRISMA
5 guidelines. Used the PRISMA guidelines
6 to do a systematic review of the
7 literature. And it didn't show any
8 increase of all cancer or any cancer, any
9 individual cancer, related to valsartan
10 products.
11    Q.  And when you say low levels,
12 do you mean under 96-nanograms per day?
13    A.  I mean low levels in
14 comparison to endogenous formation, diet,
15 things like that. Just didn't contribute
16 a lot.
17    Q.  Is it your opinion that
18 humans are exposed to more NDMA through
19 their diet than they are through
20 valsartan products?
21    A.  It's my opinion that humans
22 are more exposed to NDMA through
23 endogenous formation. I think studies
24 have shown that. That's 55 to 75 percent

Page 100

1 of the formation, so...
2    Q.  In a person not taking
3 valsartan, you're talking about?
4    A.  Correct. Well, any people.
5    Q.  How much is formed
6 endogenously in a day?
7    A.  The actual amount, I don't
8 know. That wasn't important to my
9 analysis, to epidemiology.
10    Q.  How can you say that more is
11 formed endogenously than through a
12 valsartan pill, if you don't know how
13 much is formed endogenously?
14    A.  Because we reviewed some of
15 the literature on that. It's in my
16 report.
17    Q.  But you can't tell me how
18 much?
19       MR. BALL:  Objection to
20    form.
21       THE WITNESS:  May I look at
22    my report and see if it says?
23 BY MR. VAUGHN:
24    Q.  Of course you can.

Page 101

1    A.  So on Page 36, Paragraph 89,
2 talk about endogenous formation.
3    Q.  How many nanograms a day
4 would a human be forming endogenously of
5 NDMA?
6    A.  As I said, that wasn't
7 important to my analysis. My analysis
8 was a review of all the epidemiology
9 studies. And they didn't show any risk
10 for cancer.
11    Q.  And so you did not consider
12 how much NDMA is formed endogenously when
13 forming your opinions, correct?
14    A.  It was -- I listed it here.
15 So of course it was something that I
16 considered. But the epidemiology
17 literature review didn't show an increase
18 in cancer.
19    Q.  I'm asking about the amount
20 that is formed endogenously in a day.
21 You do not know how much is formed in a
22 day, correct?
23    A.  I don't --
24       MR. BALL:  Objection to

Page 102

1  form.
2      THE WITNESS:  I don't
3  believe anyone does.
4  BY MR. VAUGHN:
5      Q.   Well, then, what was the
6  basis for your opinion a second ago
7  saying more is formed endogenously than
8  is in a valsartan pill?
9      A.   Because it says the crude
10 estimate of 45 to 75 percent of total
11 exposure to n-nitroso compounds is from
12 endogenous formation.  That's what some
13 studies have shown.
14     Q.   What year was this study
15 that you're citing to?
16     A.   I don't know.  As I said,
17 this wasn't important to me --
18     Q.   I think -- I think it's
19 listed here --
20     MR. BALL:  Object.  Hey,
21 hey, he gets to answer.  Don't
22 interrupt him.
23     Go ahead, Dr. Fryzek.
24     THE WITNESS:  Okay.  Thank

Page 103

1  you.
2      As I said, this wasn't
3  important to my review of the
4  epidemiology literature.  I looked
5  at epidemiology literature for my
6  opinions.  And that didn't show a
7  risk of cancer.
8  BY MR. VAUGHN:
9      Q.   And my question, again, was
10 what year was the study that you were
11 citing to.  Are you able to determine
12 that by looking at your expert report
13 right there?
14     A.   I don't recall.  There's
15 two -- there's two articles referenced
16 here, one from 2007 and one from '97.
17     Q.   And are you aware what year
18 contaminated valsartan came on to the
19 market?
20     A.   I believe it was mid 2000s.
21     Q.   What do you mean by mid
22 2000s?
23     A.   2015, '16, '17, something
24 like that.

Page 104

1      Q.   So it would have been after
2  these studies, correct?
3      A.   Correct.
4      Q.   And so this 45 to 75 percent
5  wouldn't apply to people that were taking
6  valsartan, correct?
7      A.   As I said, that wasn't an
8  important consideration of my review.
9      MR. BALL:  Objection.
10     Sorry.  Objection to form.
11 BY MR. VAUGHN:
12     Q.   Are you standing by your
13 opinion that you believe there is more
14 endogenous formation of NDMA than there
15 is in a valsartan pill?
16     A.   My -- my opinion was that
17 the valsartan doesn't cause cancer based
18 on the scientific -- based on the
19 scientific evidence.
20     Q.   So you're not going to give
21 an opinion that more NDMA is formed
22 endogenously than is contained in a
23 valsartan pill, correct?
24     A.   It depends if I find more

Page 105

1  information or not.
2      Q.   At this time, based on the
3  information that you have, you will not
4  be giving that opinion, correct?
5      A.   My opinion will be I don't
6  know.
7      Q.   And if you find more
8  information and you're going to give that
9  opinion, you will notify the attorneys to
10 notify us, correct?  You'll amend your
11 report?
12     A.   I don't know how they do it.
13 An affidavit, I don't know how they do
14 that.
15     MR. VAUGHN:  Can we go back
16 to the first page of his report,
17 Tyler.
18 BY MR. VAUGHN:
19     Q.   Doctor, what's the highest
20 level of NDMA that you're aware of in a
21 valsartan pill?
22     A.   As I said, that wasn't
23 important to my review.
24     Q.   So you have no idea?

Page 106

1    A.    I have no idea.
2    Q.    Do you know the ranges?
3    A.    So my review found no
4 relationship between valsartan and
5 cancer.
6    Q.    Do you know the ranges of
7 NDMA in the valsartan pills?
8    A.    As I said, it wasn't
9 important for my review.
10    Q.    And so that wasn't something
11 that you considered when looking at the
12 studies on valsartan contaminated with
13 NDMA?
14    A.    That wasn't something that
15 the authors of the studies considered.
16    Q.    But when you're looking at a
17 study, do you not look for the strengths
18 and weaknesses of that study?
19    A.    I do.
20    Q.    So did you not look into the
21 levels of valsartan contaminations
22 amongst the different manufacturers to
23 see if there were any weaknesses in the
24 studies that you cite?

Page 107

1    A.    I don't understand how that
2 would be a weakness in epidemiology.
3    Q.    Is the dose of NDMA in
4 valsartan pills consistent amongst all
5 valsartan pills?
6    A.    Oh, that, I don't know.
7    MR. BALL:  Objection to
8 form.
9 BY MR. VAUGHN:
10    Q.    Excuse me?
11    A.    That I don't know.  I
12 believe some of the studies that looked
13 at valsartan tried to do a dose-response
14 relationship with various cancers and
15 didn't find any dose-response
16 relationship.
17    Q.    What is a dose-response
18 relationship?
19    A.    Higher -- higher levels of
20 valsartan cause more cancer.  They just
21 didn't see it in the studies.
22    Q.    They didn't see higher
23 levels of valsartan causing cancer or
24 higher levels of NDMA?

Page 108

1    A.    Of -- well, the NDMA in the
2 valsartan.
3    Q.    Do you know if they knew the
4 levels of NDMA in the various valsartans?
5    MR. BALL:  Objection to
6 form.
7    THE WITNESS:  That I don't
8 know.  I just know it was
9 published in the paper.
10 BY MR. VAUGHN:
11    Q.    Can you read your second
12 opinion for us?
13    A.    Yep.  Opinion 2?
14    Q.    Yep.
15    A.    "The scientific" -- "the
16 scientific evidence does not support an
17 association between dietary intake of
18 NDMA or NDEA and the risk of cancer."
19    Q.    Not even an association?
20    A.    It doesn't support an
21 association, no.  You have to look at the
22 totality of the evidence, and I've
23 graphed them nicely in my report so you
24 can see it pretty quickly.  There is not

Page 109

1 an association.
2    I mean this is even done
3 after decades of research on diet and
4 NDMA and NDEA and cancer, and after
5 decades of research, there's no
6 association.
7    Q.    Have you ever done any of
8 that research yourself?
9    A.    No.  I don't know why that's
10 important.
11    Q.    Have you or your company
12 ever done research on various foods'
13 ability to increase the risk of cancer?
14    A.    I believe they have.
15    Q.    Was that funded by the
16 industry?
17    A.    What industry?
18    Q.    Was it funded by any
19 corporation that would have an interest
20 in that type of research?
21    MR. BALL:  Objection to
22 form.
23    THE WITNESS:  I don't
24 believe it's funded by anyone

Confidential Information - Subject to Protective Order

Page 110

1    right now, the studies that are
2    going on.
3  BY MR. VAUGHN:
4    Q.   Is your company currently
5  doing research into nitrosamines causing
6  cancer?
7    A.   Not -- not that I'm aware
8  of.  I don't think so.
9    Q.   What were you just
10  referencing when you said currently going
11  on?
12    A.   You asked me about studies
13  of food and cancer.  That's what I was
14  referring to.
15    Q.   Do foods contain
16  nitrosamines?
17    A.   No.  You didn't say that.
18  You said the risk of various foods and
19  cancer.
20    Q.   Oh, no, I'm sorry, my
21  question was:  Do foods contain
22  nitrosamines?
23    A.   Do foods contain
24  nitrosamines?

Page 111

1    Q.   Yeah.
2    A.   Yes.  Studies have shown
3  that.
4    Q.   What type of foods contain
5  the highest levels of nitrosamines?
6    A.   Oh, I don't know off the top
7  of my head.
8    Q.   What foods is your company
9  currently studying?
10    A.   I don't know --
11    MR. BALL:  Objection to
12  form.
13    THE WITNESS:  I don't know.
14  That's not an area I do research
15  in.
16  BY MR. VAUGHN:
17    Q.   Then why were you hired to
18  do that research in this case?
19    MR. BALL:  Objection to
20  form.
21    THE WITNESS:  Because I am
22  an epidemiologist.
23  BY MR. VAUGHN:
24    Q.   When you say that with diet,

Page 112

1    there's not an association with the risk
2  of cancer, again is that -- are you
3  saying cancer as a whole or even
4  individual cancers?
5    A.   So all of the studies where
6  you look at all the studies combined,
7  they don't show an association with NDMA
8  or NDEA and cancer overall or individual
9  cancers.
10    Q.   Not even colorectal or
11  liver?
12    A.   No.  You have to look at the
13  totality of the evidence.  So all the --
14  you can't just point to one article or --
15    Q.   Can you acces one article --
16    MR. BALL:  Wait --
17    MR. VAUGHN:  I thought he
18  was done.  I'm sorry.
19  BY MR. VAUGHN:
20    Q.   Continue.
21    A.   I'm sorry, I lost my train
22  of thought.
23    Q.   You said, "No, you have to
24  look at the totality of the evidence so

Page 113

1  you can't just point to one article" --
2    A.   Or abstract.
3    Q.   Oh, sorry, I cut you off two
4  words too soon.
5    Is the inverse also true,
6  you can't just point to one or two papers
7  or abstracts and say that it doesn't
8  cause cancer?
9    A.   You have to look at all the
10  evidence that's published.  That's what
11  we did with our PRISMA guidelines.
12    Q.   In your opinion, you've
13  looked at all the research that was
14  published?
15    A.   Absolutely.
16    Q.   How many studies did you
17  review?
18    A.   We started with over 2,000
19  studies.
20    Q.   Did you review all 2,000?
21    A.   Members of my team did,
22  yeah.  Part of the -- part of the
23  methodology to do it is you have to have
24  multiple reviewers.  You can't just have

Confidential Information Subject to Protective Order

Page 114

¹ one -- one reviewer.  You have to make
² sure that reviewers agree, the correct
³ data, abstract, whatever.
⁴     Q.   Where are those thousands of
⁵ studies listed?  I haven't seen that
⁶ anywhere.  I see like 90 listed at the
⁷ end of your report, and that's -- that's
⁸ all I am aware of.
⁹     A.   You have to look at the
¹⁰ PRISMA diagram, which is on page -- let
¹¹ me see -- Page 12.  So we started out
¹² with 1,884 studies.
¹³     Q.   How many did you guys
¹⁴ exclude?
¹⁵     A.   It says -- it's pretty clear
¹⁶ in this diagram.
¹⁷     Q.   Yeah, I'm asking a question.
¹⁸ How many did you exclude?
¹⁹     A.   It looks like we started out
²⁰ with 1,774 excluded, and then we excluded
²¹ some more after that.
²²     Q.   Of the 1,884 studies, how
²³ many actually remained?
²⁴     A.   That we analyzed, 25.

Page 115

¹     Q.   So you analyzed 25 studies?
²     A.   But we went through 1,884
³ studies.
⁴     Q.   Where do I find a list of
⁵ those studies?
⁶     A.   The 1,884?
⁷     Q.   Yeah.
⁸     A.   You can type in our keywords
⁹ into these databases and you can
¹⁰ replicate the analysis.  That's why --
¹¹ that's why we did the PRISMA analysis, so
¹² other people can replicate it.
¹³     Q.   Why didn't you list that on
¹⁴ your materials considered?
¹⁵     MR. BALL:  Objection to
¹⁶ form.
¹⁷     THE WITNESS:  List what?
¹⁸ BY MR. VAUGHN:
¹⁹     Q.   The 1,884 pieces of
²⁰ literature that your team reviewed.
²¹ Why is that not listed on the materials
²² considered?
²³     A.   Oh, I have no idea.  I can
²⁴ send those to you if you want them.

Page 116

¹     Q.   Oh, that would be great if
² you can get a list together of the ones
³ that you guys actually reviewed.
⁴     MR. BALL:  We'll take it
⁵     under consideration.  As he
⁶     pointed out, he followed the
⁷     PRISMA guidelines so they can
⁸     replicate this.  So we'll take it
⁹     under consideration.
¹⁰ BY MR. VAUGHN:
¹¹     Q.   Would you guys have
¹² studied -- reviewed?
¹³     A.   Sorry --
¹⁴     MR. BALL:  I'm sorry?
¹⁵ BY MR. VAUGHN:
¹⁶     Q.   Would you guys have
¹⁷ downloaded and studied all those studies
¹⁸ that you reviewed?
¹⁹     A.   Yes.  To review them, we
²⁰ would download them and saved them.
²¹     Q.   And the billing that we went
²² over earlier for your expert report, all
²³ of that time that would be captured for
²⁴ the review of these 1,884 studies?

Page 117

¹     A.   Yes.  It's a lot of time as
² you can see from the billing.
³         I just want to be clear,
⁴ that this is -- this is very typical of
⁵ how you do a PRISMA methodology to look
⁶ at the narrative review.
⁷     Q.   So this is typical of how --
⁸ sorry, I didn't mean to interrupt you.
⁹ Continue.
¹⁰     A.   This is -- this is just
¹¹ following the PRISMA guidelines.  This
¹² graph even comes from the PRISMA website.
¹³     Q.   So did you employ your
¹⁴ typical methodology when doing this
¹⁵ expert report?
¹⁶     A.   Yeah.  So we do this for any
¹⁷ type of review, even review articles we
¹⁸ publish.
¹⁹     Q.   And is this the same
²⁰ methodology that you've used when you've
²¹ previously been an expert in a
²² litigation?
²³     A.   It's the standard
²⁴ methodology to do a literature review.

Page 118

¹ So of course.
²          THE VIDEOGRAPHER:  I hate to
³ interrupt.  Doctor, I'm getting a
⁴ lot of lot of noise on your
⁵ microphone.
⁶          (Whereupon a discussion was
⁷ held off the record.)
⁸          THE VIDEOGRAPHER:  Off the
⁹ record 10:44.
¹⁰          (Brief pause.)
¹¹          THE VIDEOGRAPHER:  Back on
¹² the record at 10:45 a.m.
¹³          MR. VAUGHN:  Tyler, can we
¹⁴ go to Page 3 of his expert report
¹⁵ now.
¹⁶ BY MR. VAUGHN:
¹⁷     Q.   We have materials reviewed.
¹⁸ How did you come into possession of these
¹⁹ documents?
²⁰     A.   They were sent to me.
²¹     Q.   Who sent them to you?
²²     A.   Attorneys.  I can't remember
²³ which one.
²⁴     Q.   Defense attorneys?

Page 119

¹     A.   Yes.
²     Q.   Did you request any
³ additional documents after they sent you
⁴ these?
⁵     A.   No.
⁶     Q.   Is there a reason that it's
⁷ only Teva and Mylan documents?
⁸     A.   I have no idea.
⁹     Q.   Did you not review any
¹⁰ internals from any other company?
¹¹     A.   Our focus was really on the
¹² scientific literature.  It wasn't on
¹³ these documents.
¹⁴          MR. VAUGHN:  Tyler, can we
¹⁵ go to Page 9 now.
¹⁶ BY MR. VAUGHN:
¹⁷     Q.   So on 23, is that the PRISMA
¹⁸ guidelines that you've been talking
¹⁹ about?
²⁰     A.   Yes.
²¹     Q.   Okay.  And then so for this
²² first one under 24, your search terms,
²³ can you explain how this works for me?
²⁴ Search term --

Page 120

¹     A.   So the --
²     Q.   Yeah, like this little graph
³ thing here, where it's like category,
⁴ search terms and stuff.  What does this
⁵ mean?
⁶     A.   So these are the terms that
⁷ we actually searched in the database.  So
⁸ we used three databases to search.  We
⁹ used PubMed, Embase and Web of Science.
¹⁰ They all give you slightly different
¹¹ articles.  Some also mention or list
¹² meeting abstracts.
¹³          So that's why we searched
¹⁴ all three of them.  And these were the
¹⁵ terms that we searched, the terms on the
¹⁶ right are the search terms.
¹⁷     Q.   Okay.  So would there be --
¹⁸ sorry, continue.
¹⁹     A.   Well, we filtered them by --
²⁰ we only looked at studies of humans and
²¹ studies in the English language.
²²     Q.   And that were on valsartan;
²³ is that right?  That was for Objective 1,
²⁴ the risk of cancer with exposure to

Page 121

¹ valsartan products, correct?
²     A.   Correct.  So valsartan was
³ either listed in the title or abstract or
⁴ it was a mesh heading, which is a heading
⁵ that, you know, characterizes the
⁶ article.  It's something that the author
⁷ has to include.
⁸          MR. VAUGHN:  Tyler, can you
⁹ go to Page 13.
¹⁰ BY MR. VAUGHN:
¹¹     Q.   So Number 32, can you read
¹² that for me aloud?
¹³     A.   Yes.  "Of the included
¹⁴ studies, five articles described the risk
¹⁵ of cancer with use of NDMA-containing
¹⁶ medications, including three studies of
¹⁷ valsartan and two studies of ranitidine."
¹⁸     Q.   Why did you include two
¹⁹ studies of ranitidine in your evaluation
²⁰ on if valsartan causes cancer?
²¹     A.   Yeah, that's a good
²² question.  When we looked at
²³ NDMA-containing medications, those came
²⁴ up.  We included them.

Confidential Information Subject to Protective Order

Page 122

1    Q.   Why didn't you include any
2 other ranitidine studies?
3    A.   Because they weren't
4 categorized as NDMA-containing
5 medication.
6    Q.   You are not aware of other
7 ranitidine studies about NDMA
8 contamination?
9    A.   Just the ones that came up
10 in our literature search.
11    Q.   What levels of NDMA are in
12 ranitidine?
13    A.   Oh, I have no idea.
14    Q.   And how is that applicable
15 to if the NDMA in valsartan causes
16 cancer?
17    A.   They were another way to
18 look at the data, to look at NDMA.  So we
19 just included them.
20    Q.   But you have no idea how
21 much NDMA is in ranitidine?
22    A.   No.  It wasn't important to
23 the studies so.
24    Q.   Even if it's not important

Page 123

1 to the studies, is it not important to
2 your analysis on if that's applicable to
3 the amount that is in valsartan?
4         MR. BALL:  Objection to
5     form.
6         THE WITNESS:  I'm not clear
7     how we would analyze it unless the
8     authors reported it.
9 BY MR. VAUGHN:
10    Q.   Well, if you're not clear on
11 how to analyze it, then why did you
12 include it in your expert report?
13    A.   I didn't say I wasn't clear
14 how to analyze it.  I said I'm not sure
15 how I would use that information if it's
16 not reported.
17    Q.   Would that not be valuable
18 information if it was reported?
19         MR. BALL:  Object to form.
20         THE WITNESS:  I'm sorry.  I
21     didn't understand.
22 BY MR. VAUGHN:
23    Q.   If the levels of NDMA in
24 ranitidine were reported, would that not

Page 124

1 be important information for you to
2 consider?
3         MR. BALL:  Objection to
4     form.
5         THE WITNESS:  I have no
6     idea.  I just reported on what the
7     authors of the studies reported.
8 BY MR. VAUGHN:
9    Q.   In your opinion, is there
10 more or less NDMA in ranitidine than
11 valsartan?
12    A.   Well, I have no idea, but
13 neither type of study showed any risk of
14 cancer.  So that's comforting.
15    Q.   How important is dose when
16 evaluating a carcinogen?
17    A.   So these weren't considered
18 carcinogens by the FDA.  They are
19 considered impurities, because there's no
20 relationship with cancer with any
21 NDMA-containing medication.
22    Q.   You're saying NDMA is not a
23 probable human carcinogen?
24    A.   Not according to the FDA.

Page 125

1 They've called it an impurity.
2    Q.   You don't think the FDA
3 thinks that NDMA is a potential
4 carcinogen?
5    A.   I'm just telling you what
6 they report.  I don't know what they
7 think.
8    Q.   And because they called it
9 an impurity one time, you think that
10 means it's not a carcinogen now?
11         MR. BALL:  Objection to
12     form.
13         THE WITNESS:  Well, their
14     whole chapter on NDMA has been
15     referred to as an impurity.
16 BY MR. VAUGHN:
17    Q.   Does the FDA talk about how
18 NDMA can increase the risk of cancer?
19    A.   I am not aware of that.
20    Q.   You're not aware of that?
21    A.   Correct.
22         MR. BALL:  Objection to
23     form.
24 BY MR. VAUGHN:

Page 126

1    Q.   Did you not look into that
2  when doing your expert report?
3    A.   They didn't show any
4  human --
5    Q.   If the FDA said that NDMA
6  would increase the risk of cancer in
7  humans, would you defer to the FDA?
8        MR. BALL:  Objection to
9    form.
10       THE WITNESS:  I would look
11   at the articles that they based
12   that decision on.
13 BY MR. VAUGHN:
14   Q.   Do you even know what levels
15 of NDMA the FDA thinks can cause cancer?
16       MR. BALL:  Objection to
17   form.
18       THE WITNESS:  So the FDA is
19   a regulatory authority.  It's not
20   a scientific group.
21       They're looking at NDMA for
22   different reasons than I am.
23 BY MR. VAUGHN:
24   Q.   Do you consider the company

Page 127

1  you work for to be a scientific group?
2    A.   Absolutely.
3    Q.   Have you ever reviewed any
4  other ranitidine NDMA studies besides the
5  two listed in your expert report?
6    A.   Yes.  We also -- our
7  literature search was completed at the
8  end of January of this year.  You know,
9  since we didn't -- we updated that
10 through the end of August to see if any
11 additional or major studies have been
12 produced since that time.  And the
13 studies of ranitidine didn't show
14 anything striking in terms of
15 relationship with cancer.  So we didn't
16 change our conclusions.
17   Q.   Did any of them show an
18 association with cancer?
19   A.   Nothing that was important.
20 I don't recall, you know, what they were.
21   Q.   What do you mean "nothing
22 that was important"?  Do you not think
23 that an increased risk of cancer is
24 important?

Page 128

1        MR. BALL:  Objection to
2    form.
3        THE WITNESS:  It's not me.
4    You have to look through --
5  BY MR. VAUGHN:
6    Q.   You're not the one taking
7  the contaminated valsartan, are you?
8        MR. BALL:  Objection to
9    form.  Argumentative.
10 BY MR. VAUGHN:
11   Q.   Are you taking the
12 contaminated valsartan?
13       MR. BALL:  Objection to
14   form.
15       THE WITNESS:  So I don't
16   prefer to talk about my medication
17   usage, and I think you're out of
18   line with that type of question.
19 BY MR. VAUGHN:
20   Q.   I'm sorry, you said -- you
21 said a second ago, "it's not me," when I
22 asked you if you thought the increased
23 risk of cancer was important, you said,
24 "It's not me."  So I assumed you meant

Page 129

1  it's not me that is taking the
2  contaminated valsartan that has
3  carcinogens in it.
4        MR. BALL:  Objection to
5    form.  Is that even -- is that a
6    question?
7        MR. VAUGHN:  I'm -- yeah.
8  BY MR. VAUGHN:
9    Q.   Did I misinterpret what you
10 were saying earlier?
11   A.   I was talking about the
12 scientists, the published articles on
13 ranitidine.
14   Q.   And so why do you say "It
15 wasn't me"?  What's the relevance of it
16 not being -- did you publish any of these
17 studies that are in your expert report?
18       MR. BALL:  Objection to
19   form.
20       THE WITNESS:  I'm sorry, I
21   got lost about what we are talking
22   about here.
23 BY MR. VAUGHN:
24   Q.   I asked initially, "Have you

Page 130

¹ seen any literature on ranitidine where
² it is associated with an increased risk
³ of cancer?"
⁴       A.   Okay.  So I misunderstood
⁵ what you said.  I thought you said if I
⁶ had seen any additional literature on
⁷ ranitidine.
⁸       Q.   I asked that first and you
⁹ said yes.  And then I asked if any of
¹⁰ that literature showed an increase risk
¹¹ of cancer.
¹²       A.   And I said no.  Nothing that
¹³ was important that would change my
¹⁴ opinion.
¹⁵       Q.   Okay.  And I asked what is
¹⁶ important to you.
¹⁷       A.   I said it was not important
¹⁸ to me.  It's what's important to the
¹⁹ people that wrote the articles, the
²⁰ scientists that wrote the articles.  I
²¹ think that's when you tried to
²² personalize it to what medication I was
²³ using.
²⁴       Q.   Will you be updating your

Page 131

¹ expert report to contain the additional
² ranitidine studies that you reviewed?
³       A.   I would probably include
⁴ them, but it won't change my opinions.
⁵       Q.   What would change your
⁶ opinion?
⁷       A.   If there were a number of
⁸ studies that showed high risk associated
⁹ with ranitidine or valsartan, NDMA
¹⁰ containing medications.
¹¹       Q.   How many studies would be
¹² needed for you to draw that conclusion?
¹³       A.   I have no idea.
¹⁴       Q.   Would three be enough?
¹⁵       A.   You have to look at a lot of
¹⁶ aspects of the study, not just the
¹⁷ relative risk.  You have to look at, you
¹⁸ know, bias, confounding, those type of
¹⁹ factors.  How well they were conducted.
²⁰ The study design.  All sorts of things.
²¹       Q.   Okay.  You have critiques of
²² quite a few of the plaintiffs' experts,
²³ don't you?
²⁴             MR. BALL:  Objection to

Page 132

¹ form.
²             THE WITNESS:  I've critiqued
³ a few of them.  My critiques are
⁴ accurate.
⁵             MR. VAUGHN:  Can we go to
⁶ Page 55 of his report, Tyler?
⁷ BY MR. VAUGHN:
⁸       Q.   Do you recall reading
⁹ Dr. Panigrahy's expert report?
¹⁰       A.   I do, yes.
¹¹       Q.   Do you know Dr. Panigrahy's
¹² background professionally?
¹³       A.   I think he is a physician,
¹⁴ isn't he?
¹⁵       Q.   Do you know if he is a
¹⁶ researcher as well?
¹⁷       A.   Maybe a lab researcher.  He
¹⁸ is not an epidemiologist.
¹⁹       Q.   Cancer researcher?
²⁰       A.   Laboratory worker.  I think.
²¹ But I'm not sure.
²²       Q.   But he has an M.D. is what
²³ you're saying, right?
²⁴       A.   I don't know what his titles

Page 133

¹ are.
²       Q.   Do you have an M.D.?
³       A.   I have a Ph.D. and an MPH.
⁴       Q.   In 137 are you critiquing
⁵ his literature review process?
⁶       A.   Let me read it first.
⁷       Q.   Yeah.
⁸       A.   Yes, he didn't follow PRISMA
⁹ guidelines which are standard guidelines
¹⁰ for literature search.
¹¹       Q.   And so is your critique that
¹² you don't think you can reproduce, find
¹³ all the studies that he -- he reviewed?
¹⁴       A.   Well, that is -- that is one
¹⁵ concern.  It's not --
¹⁶       Q.   Did you look at his
¹⁷ materials considered in his expert report
¹⁸ for all the studies that he listed, the
¹⁹ hundreds and hundreds and hundreds?
²⁰       A.   But the -- you know --
²¹             MR. BALL:  Objection to
²² form -- sorry, Jon.  I didn't mean
²³ to -- objection to form.
²⁴             THE WITNESS:  I don't know

Page 134

how he identified those.  If he just cherry-picked studies to some really positive ones or if he looked at all studies, I just don't know.

BY MR. VAUGHN:

Q.   Do you know if he considered more than 25 studies like you did?

MR. BALL:  Objection to form.

THE WITNESS:  So I don't know what he did.  He doesn't describe his -- his literature search process.

BY MR. VAUGHN:

Q.   Does he discuss more than 25 studies in his expert report?

A.   Oh, I have no idea.  Studies -- he discussed animal studies and mechanistic studies which are out of scope for an epidemiology review.

Q.   Do you think it's improper that he relied on animal and mechanistic studies?

Page 135

A.   I said I don't know.  That's not my critique.  My critique is that he didn't report how he did his literature review.

Q.   Well, if you go to 138, the first thing you say is he "relies heavily on animal and mechanistic evidence."

Are you critiquing him for doing that?

A.   He said he relies heavily.  He doesn't rely on the human studies.

At the end of the day to understand if something causes cancer, you have to study it in humans, right?  To understand if it causes cancer in humans you have to study it in humans.

Q.   Is that what you're advocating is we test NDMA in humans?

MR. BALL:  Objection, vague -- objection to form.  Argumentative.

THE WITNESS:  You're twisting my comments, so...

BY MR. VAUGHN:

Page 136

Q.   So midway through that paragraph it says, "While important information regarding mechanisms of actions of substances," what's the mechanism of action of NDMA, do you know?

A.   Not off the top of my head.

Q.   Do you know if it's a mutagenic -- a mutagenic substance?

A.   I have no idea.

Q.   Do you know if it's genotoxic?

A.   I don't know.

Q.   You didn't consider if NDMA is a genotoxin or a mutagen in forming your expert opinions?

A.   I -- to form my expert opinions, I reviewed the epidemiology literature.  Epidemiology literature didn't show a relationship between NDMA and humans.

MR. VAUGHN:  Can we go to the next page, Tyler.

BY MR. VAUGHN:

Q.   I'm looking at 142.

Page 137

It says, "In his discussion of latency, Dr. Panigrahy felt that NDMA acts both as a tumor initiator and tumor promoter to activate dormant cancers."

Do you -- do you disagree with him on that?

A.   I don't agree or disagree.

Q.   Why did you use the word "felt"?

A.   He did feel it.

Q.   It's his -- it's his opinion, right?

A.   Pardon me.

Q.   It's his expert opinion.  It's not just a feeling, right?

A.   I have no idea.

MR. BALL:  Objection to foundation.

BY MR. VAUGHN:

Q.   And so you don't agree or disagree with him?

MR. BALL:  Objection to form.

THE WITNESS:  Agree or

Page 138

1    disagree about what?
2  BY MR. VAUGHN:
3     Q.   About NDMA acting as a tumor
4  initiator and tumor promoter to activate
5  dormant cancers.
6     A.   I think that this is just an
7  idea he has.  I don't see any evidence to
8  support that.
9     Q.   Did you look for any
10 evidence?
11    A.   In the studies I did, that I
12 looked at.
13    Q.   If NDMA was a mutagen, would
14 it be able to act as a tumor initiator
15 and tumor promoter to activate dormant
16 cancer cells?
17    A.   I have no idea.
18    Q.   You've never done research
19 on that before?
20    A.   No.
21    Q.   You then later in the
22 paragraph note, "If NDMA exposure is a
23 trigger for cancer growth and
24 development, cancer incidence would be

Page 139

1  far higher in the general population and
2  the diet studies would show much stronger
3  effects with the daily exposure humans
4  receive from NDMA."
5        Did I read that correctly?
6     A.   Yes, but you put emphasis on
7  different words that aren't emphasized in
8  the statement.
9     Q.   So as far as what I put
10 emphasis on, I think maybe it was "far
11 higher."  What's the cancer rate in the
12 general population?  Do you know a
13 percentage?
14    A.   No, I don't.
15    Q.   Approximate?
16    A.   No.
17    Q.   Well, how can you make this
18 statement if you don't even know what the
19 general population cancer rate is?
20    A.   Because the statement says
21 if NDMA was a carcinogen, it would be
22 higher than what it is.
23    Q.   But you can't tell me what
24 percentage of people get cancer in their

Page 140

1  lifetime?
2     A.   I'm not sure how that's
3  important to this table.
4     Q.   So if one in three people
5  already get cancer in their lifetime,
6  you're saying that even more than that
7  would have to get cancer for NDMA to be a
8  carcinogen?
9     A.   So I think you're twisting
10 my words around.  I'm not -- I'm not
11 giving absolutes.  I'm just saying that
12 there -- it would be more cancer, we'd
13 see a lot more cancer if NDMA was a
14 carcinogen, in diet and other things.
15    Q.   Well, wouldn't the inverse
16 be true, if we didn't have it in our diet
17 and we weren't exposed to it all, we
18 would expect lower cancer rates?
19    A.   I have no idea.
20    Q.   How much NDMA is a human
21 exposed to daily through their diet?
22    A.   I don't know.
23    Q.   When you say much stronger,
24 that it would show much stronger effects,

Page 141

1  is that not saying that it's already
2  showing effects, diet, NDMA, and cancer?
3     A.   I think you're reading too
4  much into one statement.
5     Q.   What did you mean by much
6  stronger?
7     A.   Why don't you read the whole
8  paragraph.  You can't just pull out a
9  statement and say that that's what the
10 paragraph represents.
11    Q.   I mean, explain to me what
12 this means.  "It would show much stronger
13 effects."  Why did you use that language?
14    A.   Because that's what --
15 that's what we felt.
16    Q.   But the diet studies already
17 are showing an effect of NDMA on human
18 cancer, correct?
19    A.   No.
20       MR. BALL:  Objection to
21    form.
22 BY MR. VAUGHN:
23    Q.   Can you read the next
24 sentence for me, starting with, "The

Page 142

1  studies"?
2      A.   "The studies of
3  NDMA-containing prescriptions that had
4  short follow-up time should have seen
5  increased risk of more cancer than just
6  liver cancer if this were true."
7      Q.   Is that saying that the
8  NDMA-containing prescription studies
9  showed an increase in liver cancer?
10     A.   It doesn't say statistically
11 significant or meaningful.
12     Q.   Okay.  Does it have to say
13 that?
14     A.   Yes.
15     Q.   Why?
16     A.   Because the Gomm study
17 doesn't show a consistent increased risk
18 of cancer.
19     Q.   With the liver.
20     A.   With the liver.
21         (Whereupon a discussion was
22     held off the record.)
23         THE VIDEOGRAPHER:  Off the
24     record 11:08.

Page 143

1          (Short break.)
2          THE VIDEOGRAPHER:  We are
3      back on the record at 11:19 a.m.
4  BY MR. VAUGHN:
5      Q.   Doctor, are you familiar
6  with a Grace Chappell, C-H-A-P-P-E-L-L?
7      A.   If she works at
8  ToxStrategies, yeah.
9      Q.   Yeah, and what -- go ahead.
10     A.   She must be one of the
11 junior researchers there that helped us
12 out.
13     Q.   What about a Julia Rager?
14     A.   That name I'm not familiar
15 with.  Is she at ToxStrategies too?
16     Q.   Yes, she was it looks like.
17 I don't know if you worked with her.  I'm
18 curious if you were familiar with either
19 of them.  Do you have any critiques of
20 Grace Chappell?
21     A.   No.
22         MR. BALL:  Objection to
23     form.
24         MR. VAUGHN:  Tyler, can we

Page 144

1  go to 2017, Epigenetics in
2  Chemical-Induced Genotoxic
3  Carcinogenesis.
4          (Document marked for
5      identification as Exhibit
6      Fryzek-11.)
7          MR. VAUGHN:  And if we go to
8      Page 2.
9          THE WITNESS:  I'm going to
10     have to put this on my other
11     screen so I can see it.
12 BY MR. VAUGHN:
13     Q.   Yep.
14     A.   Okay.
15     Q.   And you see at the top there
16 it notes that they are both at
17 ToxStrategies?
18     A.   Okay.
19         MR. VAUGHN:  Can we go to
20     the next page, Tyler.  Sorry.
21 BY MR. VAUGHN:
22     Q.   That second paragraph, it
23 starts with "genotoxicity."  Could you
24 read that first line for me aloud?

Page 145

1      A.   Yep.  So this is from a
2  toxicology journal, it looks like?
3      Q.   Yeah, it looks like
4  ToxStrategies was trying to publish this
5  in Opinion -- Current Opinion in
6  Toxicology is the journal.
7      A.   It would be nothing that I
8  would ever read.
9      Q.   Okay.  Can you read this
10 aloud for us?
11     A.   Just the first sentence
12 there or you want the whole paragraph?
13     Q.   Yeah, start with the first
14 one.
15     A.   "Genotoxicity is another of
16 the proposed ten key characteristics of
17 carcinogens and has long been recognized
18 to play an important role in chemical
19 carcinogenesis."
20     Q.   And you're not aware if NDMA
21 is a genotoxin, correct?
22     A.   As I said, it wasn't
23 important for my studies or my review.
24     Q.   Can you read the next

Page 146

1  sentence for me?
2      A.   "Genotoxicity is defined as
3  the potential of a chemical to damage
4  DNA, which can result in heritable
5  mutations through cell divisions."
6      Q.   Do you know what heritable
7  mutations are?
8      A.   I assume that they're
9  mutations that are inherited.
10      Q.   So does that mean if it
11  mutates your DMA, that you can pass that
12  onto your children?
13      A.   You're asking me a
14  toxicology question.  I can't respond.
15      Q.   Can you read the next
16  sentence for me?
17      A.   "If not properly repaired,
18  such mutations may ultimately lead to
19  carcinogenesis via activation of
20  oncogenes and/or inactivation of tumor
21  suppressors."
22      Q.   And if we skip down one, it
23  says, "Additionally, DNA damage
24  associated with chemical exposures may

Page 147

1  act as initiating event in carcinogenesis
2  or it may occur within the sequelae of
3  molecular initiating events."
4          Does this sound similar to
5  what Dr. Panigrahy was saying?
6          MR. BALL:  Objection to
7      form.
8          THE WITNESS:  This is
9      toxicology.  As I said, I'm not a
10      toxicologist.
11  BY MR. VAUGHN:
12      Q.   So you weren't critiquing
13  Dr. Panigrahy's opinions related to
14  activation of tumor suppressors?
15      A.   I can't remember what I
16  said.  You have to show me what I wrote.
17          MR. VAUGHN:  We can move on
18      to Page 8 of this study.
19  BY MR. VAUGHN:
20      Q.   I notice in your expert
21  report you are talking about blood
22  cancers, you mentioned formaldehyde as a
23  risk factor and then here your colleagues
24  note, "Formaldehyde represents an example

Page 148

1  of a carcinogen that impacts miRNA
2  expression and causes DNA damage."
3          Do you agree with your
4  colleagues?
5      A.   I agree -- I have no
6  opinion.
7      Q.   Well, you list formaldehyde
8  in your expert report as a risk factor.
9  You don't have an opinion if it's a risk
10  factor for cancer?
11      A.   My opinion is that you have
12  to control for it when you look at the
13  relationship between NDMA and cancer.
14  That's what I was trying to control for.
15      Q.   Why would you need a control
16  for it if it's not a risk factor?
17      A.   I didn't say it wasn't a
18  risk factor.
19      Q.   Do you agree that
20  formaldehyde is a risk factor for cancer?
21      A.   All that I said is it's
22  something you have to control for when
23  you look at these relationships.  You're
24  misinterpreting what I'm saying.

Page 149

1      Q.   Well, I'm asking a different
2  question.  Do you agree that formaldehyde
3  is a risk factor for cancer?
4      A.   I haven't studied
5  formaldehyde so I don't -- studies have
6  shown that and so that's why we said you
7  have to control for it.
8      Q.   You need to control for
9  things that you don't even think are
10  necessarily cancerous?
11          MR. BALL:  Objection to
12      form.
13          THE WITNESS:  I didn't say
14      that.
15  BY MR. VAUGHN:
16      Q.   Do you know how IARC
17  classifies formaldehyde?
18      A.   I have no idea.
19      Q.   You don't know if
20  formaldehyde is a known carcinogen?
21      A.   I don't know how IARC
22  classifies it.
23      Q.   Outside of IARC, are you
24  aware that formaldehyde is a known human

Confidential Information - Subject to Protective Order

Page 150

1  carcinogen?
2          MR. BALL:  Objection to
3      form.
4          THE WITNESS:  As I said,
5      I've never studied formaldehyde.
6      So I have no common knowledge.
7  BY MR. VAUGHN:
8      Q.   So you have no reason to
9  disagree with your colleagues that
10  formaldehyde is a carcinogen?
11      A.   No reason to disagree.
12      Q.   What is miRNA, do you know?
13      A.   I don't know.
14          MR. VAUGHN:  Next page,
15      Tyler.
16  BY MR. VAUGHN:
17      Q.   Bottom of that first
18  paragraph.  It says, "These data clearly
19  demonstrate that formaldehyde can
20  significantly alter the expression of
21  miRNAs, including miRNAs that regulate
22  transcriptional targets involved in DNA
23  damage response signaling."
24          So is this saying that

Page 151

1  formaldehyde can also damage DNA?
2          MR. BALL:  Objection to
3      form.
4          THE WITNESS:  I'm not a
5      toxicologist so I can't interpret
6      these types of studies.  I don't
7      know what data they are referring
8      to.  I don't know what miRNA mean.
9  BY MR. VAUGHN:
10      Q.   And in your opinion, is NDMA
11  carcinogenic to humans at all?
12      A.   None of the studies that I
13  reviewed showed that.
14      Q.   So you don't think at any
15  level NDMA would be carcinogenic to a
16  human?
17      A.   None of the studies --
18          MR. BALL:  Objection to
19      form.
20          THE WITNESS:  -- have shown
21      a relationship between NDMA and
22      cancer in humans.
23  BY MR. VAUGHN:
24      Q.   Would you consider the fact

Page 152

1  that formaldehyde is a known human
2  carcinogen when coming to your opinions
3  on NDMA not being a human carcinogen?
4          MR. BALL:  Objection to
5      form.
6          THE WITNESS:  I'm sorry, I
7      didn't understand your question.
8  BY MR. VAUGHN:
9      Q.   Did you consider the fact
10  that formaldehyde is a known human
11  carcinogen when coming to your opinions
12  that NDMA is not a human carcinogen?
13          MR. BALL:  Objection to
14      form.
15          THE WITNESS:  I guess I
16      don't understand what you're
17      saying there.  I'm sorry.
18  BY MR. VAUGHN:
19      Q.   Do you not understand what
20  the relationship is, is that the problem?
21      A.   Your sentence doesn't make
22  sense.
23          MR. BALL:  Objection to
24      form.

Page 153

1  BY MR. VAUGHN:
2      Q.   Explain to me what part
3  doesn't make sense.
4      A.   The sentence.  I don't
5  understand what you're saying, so...
6      Q.   So you don't think that NDMA
7  is a carcinogen, correct?
8      A.   Pardon me?
9      Q.   You do not believe that NDMA
10  is a human carcinogen, correct?
11      A.   Oh, it's not just me.  It's
12  the regulatory authorities.  It's the
13  studies that we reviewed.  It's all the
14  studies.
15      Q.   And in coming to your
16  conclusion that NDMA is not a human
17  carcinogen, did you consider the fact
18  that formaldehyde is a known human
19  carcinogen?
20          MR. BALL:  Objection to
21      form.
22          THE WITNESS:  As it was --
23      as it was studied in the different
24      studies we looked at.

Page 154

1 BY MR. VAUGHN:
2     Q.   Did you do any research into
3 how NDMA is metabolized in the human
4 body?
5     A.   No.  We reviewed the
6 epidemiology literature.
7     Q.   So you didn't consider how
8 NDMA is metabolized in the human body
9 when coming to your opinions?
10     A.   So that's not something that
11 you commonly consider in epidemiology.
12     Q.   You say not commonly.  When
13 do you actually consider it in
14 epidemiology?
15     A.   I've never considered it.
16         MR. VAUGHN:  Tyler, can we
17     go to 1990, Role of metabolism.
18         (Document marked for
19     identification as Exhibit
20     Fryzek-12.)
21         THE WITNESS:  This is a 1990
22     paper.
23 BY MR. VAUGHN:
24     Q.   It is a 1990 paper.  Is that

Page 155

1 too old for us to be relying on?  Doctor?
2     A.   Oh.  Well, you're having me
3 comment on studies that are outside my
4 field.  So I don't know how much I can
5 help you on this.
6     Q.   Oh, that's okay.  I just
7 want to make sure if you knew some stuff
8 or considered it, is mostly what I'm
9 trying to figure out.  I need to
10 understand what you considered in forming
11 your expert opinions.
12     A.   It's -- I can -- I listed
13 the articles I considered.  They are all
14 epidemiology articles, not toxicology
15 articles.
16     Q.   This -- in the title where
17 it says dimethylnitrosamine, what is
18 that?
19     A.   You have to tell me.
20     Q.   You don't know what that is?
21     A.   Do you?  I mean this is a
22 toxicology paper.  I didn't study
23 toxicology.  I didn't even have a course
24 of it in college -- in graduate school.

Page 156

1     Q.   I just mean this word
2 though.  Dimethylnitrosamine.  Do you
3 know what that is?
4     A.   I have no idea.
5     Q.   And so when you were writing
6 your expert report and reviewing the
7 literature, you had no idea what
8 dimethylnitrosamine was, did you?
9         MR. BALL:  Objection to
10     form.
11         THE WITNESS:  You have to
12     explain to me why that's
13     important.
14 BY MR. VAUGHN:
15     Q.   Well, what if
16 dimethylnitrosamine is another word for
17 NDMA, would that be important to you?
18     A.   If -- if it means the same
19 as NDMA, of course.
20     Q.   But you didn't look into
21 that or know that when you were drafting
22 your opinions?
23     A.   So the PubMed database that
24 we used would have categorized NDMA with

Page 157

1 dimethylnitrosamine as well.  It would
2 have captured it.
3     Q.   How do you know that if you
4 don't even know what dimethylnitrosamine
5 meant?
6     A.   Because that -- there's
7 something called the mesh headings, which
8 we used.
9     Q.   How do you know that it
10 knows it if you don't know it?
11         MR. BALL:  Objection to
12     form.
13         THE WITNESS:  It's in the
14     National Library of Medicine.
15 BY MR. VAUGHN:
16     Q.   Are you making assumptions?
17         MR. BALL:  Object to the
18     form.
19         THE WITNESS:  I think it's a
20     pretty good assumption.
21 BY MR. VAUGHN:
22     Q.   So the answer to my question
23 is yes, you were assuming that the search
24 database knew that dimethylnitrosamine

Confidential Information - Subject to Protective Order

Page 158

1   was the same as NDMA?
2         MR. BALL:  Objection to
3   form.
4         THE WITNESS:  You'd have to
5   point me to an epi article that
6   mentioned dimethylnitrosamine.  I
7   haven't seen any.
8   BY MR. VAUGHN:
9      Q.   So you didn't review any
10  articles on dimethylnitrosamine that were
11  epi studies?
12     A.   I'm asking you to show me
13  one.
14     Q.   I'm asking you if you
15  reviewed any.
16     A.   I don't recall that there
17  was any that were mentioned.  I don't
18  know.
19         MR. VAUGHN:  Tyler, go to
20  Page 3 of this study.
21  BY MR. VAUGHN:
22     Q.   That first paragraph,
23  next-to-last sentence starting with, "The
24  actual enzyme," can you read that aloud

Page 159

1   for me doctor, that sentence?
2      A.   That begins with, "The
3   actual enzyme"?
4         MR. VAUGHN:  Yeah, there we
5   go.  Thank you, Tyler.
6         THE WITNESS:  So I will read
7   this sentence from this toxicology
8   journal that is not epidemiology,
9   outside the scope of my field.
10        "The actual enzyme system
11  responsible for the metabolism of
12  DMN, DMN-demethylase, was
13  subsequently characterized by
14  Bouwers and Emmelot by
15  demonstrating that formaldehyde is
16  the main product of in vitro DMN
17  metabolism.  Since then, the
18  metabolism of DMN has been studied
19  extensively and has been topic of
20  hundreds of papers."
21        MR. VAUGHN:  Can we go to
22  the next page, Tyler.
23  BY MR. VAUGHN:
24     Q.   If we look here, we can see

Page 160

1   how NDMA breaks down.  Do you see the
2   different spots where it turns into
3   formaldehyde?
4      A.   No.
5      Q.   You don't see that?
6      A.   You'd have to show that to
7   me.
8      Q.   On the top right-hand corner
9   it says formaldehyde, and then in the
10  middle right it says formaldehyde.
11     A.   Okay.
12     Q.   You weren't aware of this in
13  forming your expert opinions, were you?
14     A.   I haven't study organic
15  chemistry since I was a junior in
16  college, sophomore in college.
17     Q.   Maybe we can get something
18  recent for you because I know you were
19  criticizing that one from being 1990.
20        MR. VAUGHN:  Tyler, can we
21  do the 2002 World Health
22  Organization, n-nitroso.
23        THE WITNESS:  I didn't
24  criticize that it was 1990.  I

Page 161

1         criticized that it was a
2         toxicology article.
3            (Document marked for
4         identification as Exhibit
5         Fryzek-13.)
6   BY MR. VAUGHN:
7      Q.   How about a World Health
8   Organization paper, is that better for
9   you?
10     A.   Better in what way?
11     Q.   Have you ever reviewed this
12  document before, Doctor?
13     A.   I can't recall.
14        MR. VAUGHN:  Tyler, can we
15  go to Page 19 of the PDF.  So 15,
16  then, of the actual paper.
17        There we go.  Can you blow
18  up that chart up high?
19        THE WITNESS:  Thank you.
20  BY MR. VAUGHN:
21     Q.   And, Doctor, what chemical
22  is at the very top middle?
23     A.   It says NDMA.
24     Q.   And do you see both

Confidential Information - Subject to Protective Order

Page 162

[1] directions where it eventually breaks
[2] down into formaldehyde?
[3]     A.   As I said, I don't
[4] understand this because I'm not an
[5] organic chemist.  This is way outside my
[6] field.
[7]     Q.   Okay.  So again, you didn't
[8] consider the fact that NDMA breaks down
[9] into a known carcinogen when forming your
[10] opinion that NDMA isn't carcinogenic in
[11] humans?
[12]     MR. BALL:  Objection to
[13]     form.
[14]     THE WITNESS:  So, you know,
[15]     I don't understand the type of
[16]     formaldehyde.  I don't understand
[17]     all the intricacies of this.
[18] BY MR. VAUGHN:
[19]     Q.   What types of formaldehyde
[20] are there?
[21]     A.   The epidemiology studies
[22] haven't shown a relationship.
[23]     Q.   You said types of
[24] formaldehyde.  What types of formaldehyde

Page 163

[1] are there?
[2]     A.   I have no idea.  I said I
[3] don't understand.  I don't know this.
[4] This is outside of my field of study.
[5]     MR. VAUGHN:  Let's go ahead
[6]     and go back to his expert report,
[7]     Tyler.  Can we go to Page 50 this
[8]     time.
[9] BY MR. VAUGHN:
[10]     Q.   Do you recall reviewing
[11] Dr. Etminan's expert report?
[12]     A.   Yes.
[13]     Q.   And do you recall what his
[14] profession is?
[15]     A.   I believe he is an
[16] epidemiologist.  Claims to be an
[17] epidemiologist.  I don't know.
[18]     Q.   Do you question him being an
[19] epidemiologist?
[20]     A.   I question some of the
[21] conclusions in this.  They're a little
[22] goofy.
[23]     Q.   They're a little what?
[24]     A.   Goofy.

Page 164

[1]     Q.   Goofy?
[2]     A.   Absolutely.
[3]     Q.   What's goofy?
[4]     A.   The way he did his
[5] literature review, how he interpreted
[6] confidence intervals, his review of the
[7] occupational study, the Hidajat study.  I
[8] don't know.  It's goofy.
[9]     Q.   So on 128 with the dietary
[10] studies.  What's your main critique of
[11] him using dietary studies?
[12]     A.   I don't have a critique of
[13] him using dietary studies.
[14]     MR. BALL:  Jon, you need to
[15]     speak up just a little.  I'm
[16]     having a hard time hearing you.
[17]     THE WITNESS:  I said I'm not
[18]     clear what you're asking.
[19] BY MR. VAUGHN:
[20]     Q.   Okay.  Well, you note in
[21] here the exposure estimates are
[22] unreliable.
[23]     A.   Yes.  That's true for
[24] dietary studies.

Page 165

[1]     Q.   Does that make them
[2] unreliable, the studies?
[3]     A.   If the exposure estimates
[4] unreliable, yes.
[5]     Q.   And so those studies should
[6] not be relied on then if they cannot
[7] determine accurate exposure estimates?
[8]     A.   So you can't just take, you
[9] know, one small phrase from something I
[10] wrote and apply it to everything.  You
[11] have to read the whole thing.  Read the
[12] whole paragraph, the whole sentence.
[13]     Q.   Why are exposure estimates
[14] important?
[15]     A.   Why are they important?
[16]     Q.   Yeah.
[17]     A.   For who?
[18]     Q.   For the validity of a study.
[19]     A.   Because it measures what
[20] they are exposed to.  I'm not clear what
[21] you're asking.
[22]     Q.   What's the problem if you
[23] don't have accurate exposure estimates?
[24]     A.   You're not measuring what

Confidential Information - Subject to Protective Order

Page 166

1 you say you're measuring.
2       Q.   Will that impact the results
3 of the study?
4       A.   Absolutely.
5       Q.   Do you use questionnaires
6 when you do your studies?
7       A.   I did them with my
8 dissertation.
9       Q.   Is that the only time?
10      A.   I'm trying to recall.
11      I believe there were a
12 couple other studies that I did
13 questionnaires as well.  But they weren't
14 questionnaires that I developed.  I just
15 analyzed them.  My dissertation is the
16 only one where I developed the
17 questionnaire.
18          MR. VAUGHN:  Tyler, can we
19      now go to the 2005, a cohort study
20      of Parkinson's disease.
21          (Document marked for
22      identification as Exhibit
23      Fryzek-14.)
24 BY MR. VAUGHN:

Page 167

1       Q.   Did you do this study while
2 you were working at the IEI that we
3 talked about before?
4       A.   Yes.
5       Q.   And the Danish Cancer
6 Society, were they involved with this as
7 well?
8       A.   It was performed at the
9 Danish Cancer Society.
10      Q.   So this is one of those
11 studies that you were talking about that
12 you've worked with the Danish Cancer
13 Society on before?
14      A.   Yes.
15      Q.   Was this another one you
16 decided to publish in the Journal of
17 Environmental Med -- sorry, Journal of
18 Occupational Environmental Med?
19      A.   I'm not sure where it was
20 published.
21      Q.   At the bottom of that
22 objective paragraph, is that where -- you
23 published that or is that a citation?
24      A.   I'm sorry, where are you

Page 168

1 looking -- oh, it does say Journal of
2 Occupational and Environmental Medicine.
3 Yes.
4       Q.   So that's the study that was
5 published in that?
6       A.   Yes.
7       Q.   Okay.  And at this time
8 Sarah Cohen, Loren Lipworth, and William
9 Blot, they all worked with you at the
10 IEI?
11      A.   I'm sorry, I can't see
12 because this is blown up.
13      Q.   If we go --
14          MR. VAUGHN:  Yeah, the
15      bottom part, from the IEI.  If you
16      can blow that up.
17          THE WITNESS:  Yeah, so
18      it's -- yeah, so you mentioned --
19      yeah, myself, Sarah Cohen, Loren
20      Lipworth, Bill Blott.  Yep.
21 BY MR. VAUGHN:
22      Q.   Do you currently work with
23 any of these people?
24      A.   I work with Sarah Cohen and

Page 169

1 Loren Lipworth once in a while.
2       Q.   Where do they work?
3       A.   Sarah Cohen works for me.
4 Loren Lipworth is on faculty at Notre
5 Dame.
6       Q.   And then who gave funding
7 for this research?
8       A.   Oh, I have no idea.
9       Q.   Do you see, just a little
10 bit below, it says, "A grant funding this
11 research was provided by a group of
12 current and former manufacturers of
13 welding consumables"?
14      A.   Yes.
15      Q.   -- see that?
16      A.   I wasn't involved in the
17 funding.
18      Q.   You weren't involved in the
19 funding?
20      A.   No, I was just involved in
21 doing the research at this point of my
22 life.
23      Q.   If we go to Page 2.  I'm
24 looking at the middle column, basically

Page 170

¹ in the middle.
²          MR. VAUGHN:  Yeah, that
³     paragraph.
⁴ BY MR. VAUGHN:
⁵     Q.   All right.  Midway through
⁶ it notes that 1986 there was a
⁷ self-administered questionnaire that was
⁸ mailed to the living workers and their
⁹ next of kin or long-term colleagues.  Is
¹⁰ that how you guys conducted this study?
¹¹     A.   Oh.  So we didn't conduct
¹² the original study.  It was an original
¹³ study of cancer, I believe.  I can't -- I
¹⁴ think it was cancer.
¹⁵     Q.   So these questionnaires
¹⁶ weren't even necessarily filled out by
¹⁷ the person being studied, some of them
¹⁸ were filled out by colleagues?
¹⁹          MR. BALL:  Objection to
²⁰     form.
²¹          THE WITNESS:  I just have to
²²     go with what -- what it says here.
²³     I assume so since I'd be a boy.
²⁴ BY MR. VAUGHN:

Page 171

¹     Q.   But this was accurate enough
² for you guys to use in your study, right?
³     A.   Absolutely.
⁴          MR. BALL:  Objection to
⁵     form.
⁶          MR. VAUGHN:  If we go to
⁷     Page 6, Tyler.  And middle again.
⁸     And middle of that even.
⁹ BY MR. VAUGHN:
¹⁰     Q.   It notes job exposures after
¹¹ this time period were not collected, so
¹² after 1986.  And that specific cumulative
¹³ exposures information could not be
¹⁴ established.
¹⁵     Did I read that correctly?
¹⁶     A.   Yes.
¹⁷     Q.   So even though you guys
¹⁸ weren't able to get any information after
¹⁹ 1986 and you couldn't figure out
²⁰ cumulative exposures, it was still okay
²¹ for this study, right?
²²     A.   Yes.
²³          MR. BALL:  Objection to
²⁴     form.

Page 172

¹          THE WITNESS:  I think the
² nice thing about this study is a
³ couple years ago they did a
⁴ follow-up study, found the same
⁵ results.  To my knowledge.
⁶          So if you just Google Johnni
⁷ Hansen and Danish welders, you'll
⁸ see that they did a follow-up
⁹ study.
¹⁰ BY MR. VAUGHN:
¹¹     Q.   Who funded that study, do
¹² you know?
¹³     A.   I think it says no funding.
¹⁴ But you can look and find out.
¹⁵     Q.   Do you always disclose your
¹⁶ funding?
¹⁷     A.   I believe we do.  I hope we
¹⁸ do.
¹⁹          MR. VAUGHN:  Tyler, can we
²⁰     go to the 2009 welding fume MDL
²¹     document.
²²          (Document marked for
²³     identification as Exhibit
²⁴     Fryzek-15.)

Page 173

¹          MR. VAUGHN:  And then can we
² go to Page 45.
³ BY MR. VAUGHN:
⁴     Q.   You ever seen this before,
⁵ Doctor?
⁶     A.   No.
⁷          MR. VAUGHN:  Can you zoom in
⁸ on that first paragraph, Tyler?
⁹ Yeah.
¹⁰ BY MR. VAUGHN:
¹¹     Q.   Can you go ahead and just
¹² read this entire paragraph aloud for us?
¹³     A.   I'm sorry, so who is the
¹⁴ author of this paragraph?
¹⁵     Q.   Oh, this is by
¹⁶ Judge O'Malley in the Eastern District of
¹⁷ Ohio.
¹⁸     A.   Did she write it, or was it
¹⁹ plaintiffs' attorneys or defense
²⁰ attorneys?
²¹     Q.   This is the judge.
²²     A.   That is the judge.
²³          MR. VAUGHN:  Can we go to
²⁴ Page 73 real quick, just so we can

Confidential Information - Subject to Protective Order

Page 174

1   see the signature.
2   BY MR. VAUGHN:
3       Q.   There we go.  Kathleen
4   O'Malley.
5       A.   Okay.
6       Q.   All right.  Let's go back to
7   Page 45.
8          All right.  Can you now read
9   this paragraph aloud for the jury?
10      A.   "Since the beginning of this
11  MDL, the Court has repeatedly addressed a
12  number of issues related to two
13  epidemiological studies known as the
14  Danish and Swedish Studies.  Defendants
15  provided funding for both studies, and
16  both studies concluded there was no link
17  between welding and parkinsonism.
18  Recitation of the full and complicated
19  background of the issues related to the
20  Danish and Swedish Studies is beyond the
21  scope of this Order; it suffices to say
22  there were discovery issues related to
23  the two Studies serious enough to give
24  the Court reason to exclude any reference

Page 175

1   to them at any MDL trial.  Rather than
2   exclude them (as it could have), however,
3   the Court concluded the Studies would be
4   admissible and reference to them by
5   defendants allowed, but that plaintiffs
6   would have 'free rein on cross
7   examination,' including leeway to ask
8   about a long series of issues that went
9   to the credibility of those studies."
10      Q.   And that's good.  And
11  earlier you testified that you ended up
12  not actually testifying at trial in this
13  litigation, right?
14      A.   Right.
15      Q.   Do you know if this has
16  anything to do with that?
17      A.   I have no idea.  What they
18  are talking about here is they wanted
19  access to the data.  Well, the data is,
20  you know, the Danish citizens' data and
21  no one could get access to that.  They --
22  they --
23      Q.   Well, you don't know -- you
24  don't know if they eventually -- oh, keep

Page 176

1   going.
2       A.   They ended up sending a
3   statistician over there to review the
4   findings.
5       Q.   So they did end up reviewing
6   the data, didn't they?
7       A.   They sent a plaintiff
8   statistician over there, yes.  But they
9   couldn't -- they couldn't release the
10  data outside of Denmark.
11      Q.   And if we look at
12  Citation 71, so the first studies that
13  they are talking about is a cohort of
14  Parkinson's disease published by you.
15  That's the study we just looked at,
16  right?
17      A.   Right.
18      Q.   Okay.  And then the second
19  one was by someone named Fored,
20  F-O-R-E-D.  How do you say that?
21      A.   Oh, Michael Fored.
22      Q.   Do you know him?
23      A.   Yes.
24      Q.   Did you publish with him on

Page 177

1   this other study?
2       A.   Yes.
3       Q.   You were involved with both
4   studies the judge was talking about?
5       A.   Yep.  Yes.
6       Q.   Were any of the other
7   authors involved with both of the
8   studies?
9       A.   I don't know.  We have to
10  look at the author list and see.
11         MR. VAUGHN:  Okay.  Tyler
12  can you pull up 2006 Parkinson's
13  disease.
14         (Document marked for
15  identification as Exhibit
16  Fryzek-16.)
17         MR. VAUGHN:  And can you
18  split screen that with the one
19  that we looked at a little bit
20  ago, 2005, A Cohort Study of
21  Parkinson's Disease.
22  BY MR. VAUGHN:
23      Q.   Doctor, besides yourself, is
24  there any other author that's on both of

Confidential Information - Subject to Protective Order

Page 178

1 these studies?
2     A.    Bill Blot is.  I don't see
3 any others.
4     Q.    And Dr. Blot was also
5 working with you at the IEI at that time,
6 correct?
7     A.    He was one of the owners of
8 IEI.
9        MR. VAUGHN:  All right.
10     Let's only look at the new one,
11     Tyler, the 2006.
12        Can we go to Page 5.
13        Can you blow up the bottom
14     right-hand corner, author
15     affiliations.
16 BY MR. VAUGHN:
17     Q.    So it discloses here that
18 you guys were funded by manufacturers of
19 welding consumables again.  And it says,
20 "Competing interest, none."
21        Who makes that
22 determination?
23     A.    Oh, I have no idea.  I
24 assume it's the first author.

Page 179

1     Q.    Do you agree with that, that
2 you guys don't have any competing
3 interest when you're being funded by the
4 industry that is being sued?
5        MR. BALL:  Objection to
6     form.
7        THE WITNESS:  I didn't know
8     about any of that when I did the
9     studies.  I was just more
10     interested in the science.
11 BY MR. VAUGHN:
12     Q.    You didn't know about any of
13 what?
14     A.    The litigation going up.
15     Q.    You hadn't been hired at
16 this time?
17        What year is this study?
18     A.    2006.  Whatever it says.
19     Q.    Yeah.  Do you recall earlier
20 in your deposition where we reviewed your
21 welding fume deposition?  Do you remember
22 what year that was in?
23     A.    So mind you, this was
24 published in 2000 -- I don't remember

Page 180

1 when the study was performed.
2     Q.    How long does it typically
3 take you to design a study and perform it
4 and write it up?
5     A.    At least a year.  If not
6 longer.
7     Q.    Why is that?
8     A.    It's just how long it takes.
9 It takes a long time to write and analyze
10 and submit to a journal, for a journal to
11 review it, send you back comments,
12 respond to the comments.  It takes a
13 while.
14     Q.    So to have an accurate study
15 it takes quite a while, right?
16        MR. BALL:  Objection to
17     form.
18        THE WITNESS:  They've
19     expedited that nowadays.  But back
20     at this time, it did take longer.
21 BY MR. VAUGHN:
22     Q.    If someone was doing a study
23 in two months, would you kind of question
24 it?

Page 181

1        MR. BALL:  Objection to
2     form.
3        THE WITNESS:  Question it?
4 BY MR. VAUGHN:
5     Q.    The validity of the study,
6 you know, that they designed it, did the
7 study, wrote it, all within a two-month
8 period.  Would you question the validity
9 of it at all?
10        MR. BALL:  Objection to
11     form.
12        THE WITNESS:  It depends on
13     the study.
14 BY MR. VAUGHN:
15     Q.    What's that?
16     A.    It depends on the study.
17     Q.    What's the fastest you're
18 aware of a study being done?
19     A.    I'm sorry.  I don't keep
20 track of those types of things.
21        MR. VAUGHN:  Tyler, can we
22     go to 2008 New Jersey Law Journal.
23        (Document marked for
24     identification as Exhibit

Page 182

Fryzek-17.)

MR. VAUGHN:  And if we go to the next page, left-hand column, starting with "recently."  That paragraph and the following paragraph.

BY MR. VAUGHN:

Q.   All right.  Doctor, can you read this aloud for us?

A.   "Recently in December 2007, District Judge Catherine" -- "Kathleen O'Malley who has been handling hundreds of these cases ordered both sides to fully disclose payments made by any of the parties to researchers.  Court documents obtained by the Center of Public Health demonstrate that welding organizations pay more than 12.5 million to 25 organizations and 33 researchers, virtually all of whom have published papers dismissing the connection between welding fumes and workers' ailments."

Which is true.

"Most of the money,

Page 183

$11 million, was spent after the litigation achieved critical mass in 2003.  Attorneys for the welders, meanwhile, spent about half a million.

The documents also reveal that Jon Fryzek" -- and my name is misspelled incorrectly -- "who works for Maryland's International Epidemiology Institute, known for its industry-commissioned studies" --

I guess I wasn't aware of that.

-- "was paid $971,000 from welding defendants while Paul Lees-Haley was paid $860,000.  C. Warren Olanow, a Manhattan neurologist who published at least a dozen articles cited by defense experts received almost $2.9 million.  The Parkinson Institute in California $3.4 million to conduct a four-year study."

Q.   Do you recall now being paid $971,000?

A.   No.  This study is

Page 184

inaccurate.

Q.   But it isn't a study.  This is a --

A.   Yeah, this review is inaccurate.  It's incorrect.

Q.   So the court documents that were obtained by the Center of Public Integrity are inaccurate?

MR. BALL:  Objection to form.

THE WITNESS:  I think how they report it here in this paper is inaccurate.  I wasn't paid $971,000.  I wish I was.

BY MR. VAUGHN:

Q.   Are you questioning the integrity of the Center For Public Integrity?

MR. BALL:  Objection to form.

THE WITNESS:  I question what's reported here.

BY MR. VAUGHN:

Q.   You don't agree that you

Page 185

were paid $971,000?

A.   No, I wasn't.  My life would have been a lot easier.

Q.   Was IEI paid almost a million dollars?

A.   Oh, I have no idea.

Q.   So you're not really aware of where all the money is going to fund what you're doing, are you?

MR. BALL:  Objection to form.

THE WITNESS:  When I was at IEI, I wasn't involved in invoicing and those things.

MR. VAUGHN:  Can we zoom out and go to the next-to-last paragraph in the middle column, Tyler, starting with "finally."

BY MR. VAUGHN:

Q.   It says, "Finally, Dr. Bigler raised serious concerns about the amount of financial incentive paid by defense insurance carriers and corporate defendants to defense forensic

Confidential Information - Subject to Protective Order

Page 186

1 neuropathologist" -- "psychologists."
2      Do you receive any money
3 from defense insurance carriers when you
4 do work?
5      A.   Oh, I have no idea who the
6 money came from.
7           MR. BALL:  Objection to
8      form.
9 BY MR. VAUGHN:
10     Q.   What about since then?  Do
11 you ever --
12          MR. BALL:  Objection to
13     form.
14 BY MR. VAUGHN:
15     Q.   -- receive funding from
16 insurance companies?
17          MR. BALL:  Objection to
18     form.
19          THE WITNESS:  Not that I
20     know of.
21 BY MR. VAUGHN:
22     Q.   Do you have -- okay.
23     A.   Sorry.
24     Q.   Do you know who the

Page 187

1 insurance companies are for any of the
2 defendants in this litigation?
3      A.   No.  Again, I think they are
4 taking just an early slice of what was
5 going on in this case.  Because at the
6 end of the day, they accept all these
7 studies and there actually was a review
8 article written by welders a few years
9 ago.  And the studies are accurate.  They
10 report the science.
11     Q.   Do the defense attorneys
12 have you testify at trial in this
13 litigation with welding fumes?  No.
14     A.   I never testified at trial.
15     Q.   You've never testified at
16 trial?
17     A.   Not for this.
18     Q.   Not for this.  Oh.  I hope
19 not.
20     A.   Why do you hope not?
21     Q.   I don't think you'd hold up
22 too well in front of a jury with all
23 this.
24     A.   Well --

Page 188

1           MR. BALL:  Objection.
2      Argumentative.
3           Excuse me.  Mr. Vaughn, if
4      you keep this up, we're going to
5      end the deposition.  I'm tired of
6      you insulting his integrity.
7           MR. VAUGHN:  I've got a lot
8      left.
9           MR. BALL:  That's fine.  If
10     you keep it up, if you keep on
11     insulting him and making comments
12     like that, I'm ending the
13     deposition.
14          MR. VAUGHN:  He asked --
15          MR. BALL:  You can take it
16     up with the judge.
17          MR. VAUGHN:  Give me a
18     second.  Let's go back to his
19     expert report.
20          Page 53 please maybe.
21          I've got my documents mixed
22     up.  Good job, Brett.
23          131.  We can blow 131 up.
24 BY MR. VAUGHN:

Page 189

1      Q.   It's another one of your
2 critiques of Dr. Etminan.  And so can you
3 explain this critique for us?  I don't
4 want to misinterpret it.
5      A.   Yeah.  So he just looks at
6 the upper confidence limit of any
7 estimate and uses that, showing that
8 there's risk but he ignores the lower
9 limit which is equally likely, and the
10 lower limit is less than one restriction
11 of the protective effect of NDMA.  You
12 can't just look at one side of the
13 confidence interval.  No one does that in
14 my field.  Not in a textbook, no other
15 epidemiologist would say to do that.
16     Q.   Really?
17     A.   Really.  And I hope -- I
18 hope he's not teaching this in his class.
19 It's inaccurate.
20     Q.   What is your basis that it
21 would be an equal chance that it reduces
22 it just because it -- part of it is under
23 one?
24     A.   If it falls between those

Confidential Information - Subject to Protective Order

Page 190

¹ two limits it is equally likely to be as
² high as it is low.
³     Q.   Equally likely?
⁴     A.   Absolutely.  You just have
⁵ to repeat the study over and over.  You
⁶ can't just play with the upper confidence
⁷ intervals, what he's doing.  You can't do
⁸ that.
⁹     Q.   And so is it your opinion
¹⁰ that nonstatistically significant results
¹¹ are useless?
¹²     A.   They don't show a
¹³ relationship between an exposure and a
¹⁴ disease.  It would be due to chance.
¹⁵     Q.   Equally to chance or
¹⁶ could be due to chance?
¹⁷     A.   Equally likely due to
¹⁸ chance.
¹⁹        THE COURT REPORTER:  Doctor,
²⁰     if you can remove your hand from
²¹     your face and speak up, please.  I
²²     would appreciate it.
²³        Thank you.
²⁴        THE WITNESS:  Yeah.

Page 191

¹        MR. VAUGHN:  Can we now go
²     to 2003, an introduction to power
³     and sample size.
⁴        (Document marked for
⁵     identification as Exhibit
⁶     Fryzek-18.)
⁷ BY MR. VAUGHN:
⁸     Q.   This -- this is statistics,
⁹ is this outside of your wheelhouse too or
¹⁰ is this part of what you do?
¹¹     A.   I do some statistics, but I
¹² can't do emergency medicine which is what
¹³ this journal is published in.
¹⁴     Q.   So you do some statistics?
¹⁵     A.   Absolutely.  But I have two
¹⁶ statisticians that work for me.
¹⁷        MR. VAUGHN:  Can we go to
¹⁸     Page 3, Tyler.
¹⁹ BY MR. VAUGHN:
²⁰     Q.   On the right-hand column,
²¹ third paragraph, it starts with when.
²² Can you read that paragraph out loud for
²³ us, Doctor?
²⁴     A.   "When they are assessing

Page 192

¹ results from trials with negative results
² it is particularly important to question
³ the sample size of the study.  It may
⁴ well be that the study was underpowered
⁵ and that we have incorrectly accepted the
⁶ null hypothesis, a Type II error.  If the
⁷ study had more subjects, then the
⁸ difference may well have been detected.
⁹ In an ideal world this should never
¹⁰ happen because a sample size calculation
¹¹ should appear in the methods section of
¹² all papers, reality shows us that this is
¹³ not the case.  As a consumer of research
¹⁴ we should be able to estimate the power
¹⁵ of the study from the given results."
¹⁶        MR. VAUGHN:  Can we go back
¹⁷     to that expert report real quick,
¹⁸     I'm sorry, Page 53.
¹⁹ BY MR. VAUGHN:
²⁰     Q.   And the bottom of that first
²¹ one, so it would be 129, but we can't see
²² it.  Yeah.
²³        Do you see that last couple
²⁴ sentences where you're saying, "Power is

Page 193

¹ set during the design phase ... and is
² not dependent on the numbers of outcomes
³ identified"?
⁴     A.   Correct.
⁵     Q.   Do you still agree with
⁶ that?
⁷     A.   Yes.
⁸     Q.   It's not dependent on the
⁹ number of outcomes?
¹⁰     A.   No.  Power depends on the
¹¹ sample size.
¹²     Q.   If the sample size is too
¹³ small, will it not catch some of the
¹⁴ increased risk if it's a rare outcome?
¹⁵        MR. BALL:  Objection to
¹⁶     form.
¹⁷        THE WITNESS:  I have no
¹⁸     idea.  It depends on the study.
¹⁹     Depends what you're studying.
²⁰     Depends on a lot of factors.  A
²¹     strong risk factor.
²²        MR. VAUGHN:  Tyler, let's go
²³     to 2004, Cancer risk among statin
²⁴     users.

Page 194

1      (Document marked for
2    identification as Exhibit
3    Fryzek-19.)
4  BY MR. VAUGHN:
5      Q.   You are one of the authors
6  of this study, weren't you, Doctor?
7      A.   Yes.
8      Q.   Now, the bottom right it
9  notes that it was -- the grant sponsor,
10  again this Danish Cancer Society, and
11  then International Epidemiology
12  Institute.
13      A.   Okay.
14      Q.   Who gave the money to the
15  IEI though, do you know?
16      A.   I have no idea.  Sometimes
17  IEI funded their own stuff.  I don't
18  know.
19      Q.   Do you think they funded
20  this one?
21      A.   I have no idea.
22      MR. BALL:  Objection to
23    form.
24      MR. VAUGHN:  Can we go to

Page 195

1      Page 3.
2  BY MR. VAUGHN:
3      Q.   At the bottom right, you
4  note that "The limited number of cancer
5  cases among users of nonstatin
6  lipid-lowering drugs did not allow a
7  thorough examination of site-specific
8  cancer; however, reduced risk estimates
9  were found for several of the selected
10  sites, including colorectal."
11      Did I read that correctly?
12      A.   That's what Søren Friis
13  wrote.  He is the first author, yes.
14      Q.   Do you disagree with it?
15      A.   I have no reason to agree or
16  disagree.
17      Q.   And so a study the way it's
18  designed can be able to show
19  statistically significant results for one
20  cancer, but if another one is more rare,
21  it might not pick that up, correct?
22      MR. BALL:  Objection to
23    form.
24      THE WITNESS:  I'm sorry,

Page 196

1      could you please ask that question
2    again?
3  BY MR. VAUGHN:
4      Q.   So even if a study is
5  properly powered to detect an increased
6  cancer rate in one type of cancer, it
7  might not be powered enough to detect an
8  increased cancer rate in a rarer type of
9  cancer; is that correct?
10      A.   Yes, that's correct.  But,
11  you know, again it depends on the
12  estimate, what you estimate.  The
13  relationship is between the exposure and
14  the outcome.  You have to consider that
15  as well.
16      MR. VAUGHN:  Can we go to
17    Page 4, Tyler.
18  BY MR. VAUGHN:
19      Q.   On the left side, second
20  paragraph.
21      So this paragraph is talking
22  about confounding factors.  Midway
23  through it you note that "We aim to
24  address these potential imbalances and

Page 197

1  cancer risk factors by including a
2  control group of users of nonstatin
3  lipid-lowering drugs who were likely to
4  be more similar to statin users than
5  individuals in the general population."
6      Can you explain that to me?
7      A.   So again, you're asking me
8  to comment on something that I didn't
9  write.  You keep saying that I wrote
10  this.  Søren Friis wrote this.  I just
11  reviewed it.
12      So that's incorrect.
13      Now, let me read this, and I
14  can then comment on it.
15      Okay.
16      Q.   Can you just explain to me
17  what that means, though, how your -- how
18  you and your colleagues were balancing
19  the confounders?
20      A.   Yeah.  So you assume that
21  people that are taking lipid-lowering
22  drugs are similar.  So that's what they
23  did.
24      Q.   And so that would be the

Confidential Information - Subject to Protective Order

Page 198

1  same for, like, people taking blood
2  pressure medications, you would assume
3  they are similar?
4      A.   Yes.
5      Q.   What about people that work
6  at the same company?  Do you assume
7  they're similar or no?
8          MR. BALL:  Objection to
9      form.
10         THE WITNESS:  There are so
11     many factors that goes into that.
12     Depends on where they work, what
13     they did, what time period they
14     worked in.  A lot of different
15     factors go into that.
16 BY MR. VAUGHN:
17     Q.   But when it's the same drug,
18 it's pretty well controlled?
19         MR. BALL:  Objection to
20     form.
21 BY MR. VAUGHN:
22     Q.   The same kind of drug, I'm
23 sorry.
24     A.   What's pretty well

Page 199

1  controlled?
2      Q.   If you're giving -- if your
3  control and test group are using the same
4  classification of drug, that should help
5  control it?
6          MR. BALL:  Objection to
7      form.
8          THE WITNESS:  I'm a little
9      bit confused by your question.
10         Could you please restate it?
11 BY MR. VAUGHN:
12     Q.   By having your test and
13 control group taking the same
14 classification of medications, does that
15 reduce confounding factors?
16     A.   What do you mean by test?
17     Q.   When you do a study, do you
18 have a control group?
19     A.   Sometimes.  The control,
20 comparison --
21     Q.   What group are you comparing
22 it to?
23     A.   I'm sorry?
24     Q.   What group do you compare

Page 200

1  the control to?
2      A.   So you compare -- it depends
3  on what your study design is.
4      Q.   Would you have a test group
5  and a control group?
6      A.   I have not heard the term
7  test group.
8      Q.   What term do you use?
9      A.   It depends on what -- how --
10 the study design.
11     Q.   Give me some examples of
12 terms that you would use besides test.
13     A.   Again, it depends on the
14 study design.  So what study design?  I
15 never heard the term test.
16     Q.   We'll move onto more fun
17 stuff here in a second then.
18         Next paragraph where it
19 says, "Given the widespread rapidly
20 increasing use of statins, any
21 association with an increase or decrease
22 of cancer risk would have a substantial
23 public health impact."
24         Do you agree with that?

Page 201

1      A.   Again, it's difficult just
2  to pull one sentence out of any kind of
3  report and say you agree or disagree with
4  that.
5          So where are you reading
6  that?
7          MR. VAUGHN:  Bottom
8      right-hand corner, Tyler.
9  BY MR. VAUGHN:
10     Q.   Do you agree that any
11 association with an increased or
12 decreased cancer risk would have a
13 substantial public health impact?
14         MR. BALL:  Objection to
15     form.
16         THE WITNESS:  It depends how
17     many folks are using statins now.
18     I don't know how many folks are
19     using statins these days.  This
20     paper is 15 years old, so.
21 BY MR. VAUGHN:
22     Q.   Do you know how many people
23 are using valsartan nowadays?
24     A.   No.

Page 202

1    Q.    Would you agree if there is
2 any association with an increased cancer
3 risk of valsartan, it would have a
4 substantial public health impact?
5         MR. BALL:  Objection to
6 form.
7         THE WITNESS:  So there's no
8 relationship in humans between
9 valsartan and cancer.
10 BY MR. VAUGHN:
11    Q.    I said it --
12    A.    So there would be no public
13 health impact because there is no
14 relationship.
15         MR. VAUGHN:  Tyler, can we
16 go to 2016, American Stat
17 Association.
18         (Document marked for
19 identification as Exhibit
20 Fryzek-20.)
21 BY MR. VAUGHN:
22    Q.    Are you familiar with the
23 American Stat Association, Doctor?
24    A.    No.  But I'm familiar with

Page 203

1 the American Statistical Association.
2    Q.    That's what I'm talking
3 about.  Are they reliable?
4    A.    It's a national
5 organizations for statisticians.
6    Q.    Okay.  Third paragraph.
7 "The P-value was never intended to be a
8 substitute for scientific reasoning."
9         Can you go ahead and read
10 the next sentence for me?  It starts with
11 "well-reasoned."
12    A.    "Well-reasoned statistical
13 arguments contain much more than the
14 value of a single number and whether the
15 number exceeds an arbitrary threshold."
16    Q.    And so do you think you have
17 to have that 95 percent confidence
18 interval for it to actually mean
19 anything?
20         MR. BALL:  Objection to
21 form.
22         THE WITNESS:  For what to
23 mean anything?
24 BY MR. VAUGHN:

Page 204

1    Q.    The results.
2    A.    Some statistical tests only
3 report P-values.  Not all them report 95
4 percent confidence intervals.
5    Q.    Can you explain the
6 difference between P-values and
7 95 percent confidence intervals?
8    A.    So P-values just tell you if
9 something is statistically significant or
10 not.  You can choose whatever level of
11 statistical significance you want.
12 Typically it's .05.
13         The tests that show a
14 P-value or statistical tests that show a
15 P-value of less than .05 are considered
16 to be statistically significant.  Their
17 results are likely not due to chance.
18         Confidence intervals tell
19 you, if they are statistically
20 significant or not, as well as the range
21 of potential values for the estimate.
22    Q.    So you're critiquing
23 Dr. Etminan for using nonstatistically
24 significant results, but isn't this

Page 205

1 saying that that shouldn't be a
2 substitution for scientific reasoning?
3         MR. BALL:  Objection to
4 form.
5         THE WITNESS:  I'm sorry.  I
6 don't understand your question.
7 BY MR. VAUGHN:
8    Q.    Isn't this saying just
9 because you don't hit your P-value of
10 .05, it doesn't mean that you just
11 discount your results, right?
12         MR. BALL:  Objection to
13 form.
14         THE WITNESS:  That doesn't
15 say that.  I don't understand how
16 you're coming to it saying that.
17         This is saying not to use
18 P-values, to use 95 percent
19 confidence intervals.
20 BY MR. VAUGHN:
21    Q.    Well, again, a second ago
22 you just were talking about P-values and
23 how that shows if it's statistically
24 significant or not.

Confidential Information - Subject to Protective Order

Page 206

1    A.   Okay.  I was explaining what
2 the P-value meant.  I thought you wanted
3 me to explain this.
4    Q.   I did want you to because
5 you had said Dr. Etminan used
6 nonstatistically significant results.
7 And you said that the P-value indicates
8 that they're statistically significant.
9         MR. VAUGHN:  Tyler, can we
10         go to the next page.
11         MR. BALL:  Objection.
12         Argumentative.  Was there a
13         question there?
14         MR. VAUGHN:  No, I was
15         asking Tyler to go to the next
16         page.
17         MR. BALL:  I would
18         appreciate the non-commentary.
19 BY MR. VAUGHN:
20    Q.   Okay.  Number 2.  Can you
21 read that out loud, Doctor?
22    A.   "P-values do not measure the
23 probability that the studied hypothesis
24 is true or the probability that the data

Page 207

1 were produced by random chance alone."
2    Q.   Weren't you just telling me
3 that it was an equal chance that it was
4 negative and equal chance that it was
5 positive?
6         MR. BALL:  Objection to
7         form.
8         THE WITNESS:  What was an
9         equal chance?
10 BY MR. VAUGHN:
11    Q.   When part of the result was
12 below one, you said that meant it was an
13 equal chance that it was negative.
14    A.   So this is talking about
15 P-values, not confidence intervals.  They
16 are different things.
17    Q.   Oh, so on your -- when
18 you're critiquing Dr. Etminan, you were
19 only talking about confidence intervals,
20 you were never critiquing him on the
21 P-value stuff, right?
22    A.   I'll have to read -- I'd
23 have to read what I wrote.  I can't -- I
24 can't recall.

Page 208

1    Q.   You have that on paper,
2 don't you, go ahead and review it.
3    A.   Let me find it here and I'll
4 review it.
5         My review of Dr. Etminan
6 doesn't report that Dr. Etminan commented
7 on any P-values.
8    Q.   Do you see on Page 54 where
9 you say that he misrepresented the
10 confidence intervals?
11    A.   The concept of confidence
12 intervals.
13    Q.   Okay.  Do you think he was
14 misrepresenting that?
15    A.   That's what the statement
16 says, yes.
17    Q.   Have you ever been accused
18 of misrepresenting things in your
19 studies?
20    A.   No.
21         MR. VAUGHN:  Tyler, can we
22         go to the 2013 childhood cancer
23         incidence.
24         (Document marked for

Page 209

1 identification as Exhibit
2 Fryzek-21.)
3         MR. VAUGHN:  I thought this
4         was a really interesting article
5         you worked on.  My wife is a
6         pediatrician.
7 BY MR. VAUGHN:
8    Q.   Do you recall this study,
9 Doctor?
10    A.   Yes.
11    Q.   And what's this study about?
12    A.   It's an ecological study
13 looking at cancer around hydraulic
14 fracturing sites.
15    Q.   And do you recall the
16 results of the study?
17    A.   I don't.
18    Q.   Do you remember who funded
19 it?
20    A.   I don't -- I hope it says on
21 here.  Does it say on here?  Yeah, it
22 says the America's National Gas Alliance.
23    Q.   So do you think your
24 findings are probably favorable to them?

Page 210

1    MR. BALL:  Objection to
2  form.
3    THE WITNESS:  Well, my
4  findings are what they are.  I
5  mean you can take -- and do the
6  same analysis.
7  BY MR. VAUGHN:
8    Q.   Can you read where it says
9  under conclusions there in the top left?
10    A.   I wasn't quite done with my
11  comment.
12    Q.   Oh, I apologize.  Continue.
13    A.   You can do the data and do
14  the analysis yourself if you don't
15  believe me.
16    Q.   Do you know if anyone else
17  has looked at that data and done the
18  analysis and doesn't believe you?
19    A.   Oh, I don't know about that.
20    Q.   What's -- what was your
21  conclusion here?  And you were the lead
22  author on this one, right?  So this was
23  actually you that wrote it?
24    A.   Yes.  "This study offers

Page 211

1  comfort concerning health effects of HF
2  on childhood cancers."
3    Q.   And what's HF?
4    A.   Hydraulic fracking.
5    MR. VAUGHN:  Can we go to
6  the bottom left, Tyler, on this
7  page where it has the disclose --
8  yeah.
9  BY MR. VAUGHN:
10    Q.   So it notes Dr. David
11  Garabrant PLLC, and (Pastula and
12  Ms. Jiang).  Do you know who they are?
13    A.   Yes.
14    Q.   How do you know them?
15    A.   They work for me.
16    Q.   Where, at EpidStrategies?
17    A.   Yes.
18    Q.   Have you worked with them a
19  lot in the past?
20    A.   Yes.
21    MR. VAUGHN:  Can we go to
22  the fifth page.  And the sentence
23  right before conclusion.  If you
24  can blow that up -- or the two

Page 212

1  sentences.  Sorry.  As Schoenbach.
2  Yeah.
3  BY MR. VAUGHN:
4    Q.   Can you read, starting with
5  "as Schoenbach" paragraph allowed for me,
6  Doctor?
7    A.   Yep.  "As Schoenbach has
8  commented, 'When sample populations are
9  so small that their strata contain mostly
10  unstable rates and zeroes, the direct
11  standardization procedure may not be
12  appropriate and an alternate procedure
13  becomes desirable.'  Therefore, we
14  believe that the indirect standardization
15  is preferable and gives a more accurate
16  representation of the cancer risks
17  related to HF activities than directly
18  standardized rates."
19    Q.   Can you explain to me what
20  that actually means?
21    A.   It just gives confidence in
22  what we found in our results, the way we
23  were doing this is correct.
24    Q.   And what was it that you

Page 213

1  did?
2    A.   We did indirect
3  standardization.
4    Q.   And what is indirect
5  standardization?
6    A.   It's the way you analyze
7  your data.  So you can do direct
8  standardization or indirect
9  standardization.  You compare it to a
10  national rate or a state rate or
11  something like that.  I have to go back
12  to the method and see who I compared it
13  to.
14    Q.   Do you think that was proper
15  to do in this study?
16    MR. BALL:  Objection to
17  form.
18    THE WITNESS:  Yes.
19    MR. VAUGHN:  Tyler, can we
20  do 2013 response of obfuscation
21  does not provide comfort.
22    (Document marked for
23  identification as Exhibit
24  Fryzek-22.)

Confidential - Information Subject to Protective Order

Page 214

¹ BY MR. VAUGHN:
²     Q.   If we go to Page 2, we can
³ see the title.  There we go.  The bottom.
⁴ This is a response to your article on
⁵ childhood cancer, correct?
⁶     A.   Yes.
⁷         MR. VAUGHN:  And can we go
⁸     to the next page, Tyler.
⁹ BY MR. VAUGHN:
¹⁰     Q.   Who are these people that
¹¹ were critiquing you?
¹²     A.   I believe they are plaintiff
¹³ experts.
¹⁴     Q.   At the Public Health of
¹⁵ Pittsburgh?
¹⁶     A.   Pittsburgh Public Health.
¹⁷     Q.   That was the state that you
¹⁸ were doing your study in, right?
¹⁹     A.   Yes.
²⁰     Q.   Do you think they really
²¹ just have kids in Pittsburgh?
²²         MR. BALL:  Objection to
²³     form.
²⁴         THE WITNESS:  I have no

Page 215

¹     idea.
² BY MR. VAUGHN:
³     Q.   Can you read the -- right
⁴ above their names where it starts with
⁵ nevertheless.
⁶         Can you read that out loud
⁷ through the end of the paragraph?
⁸     A.   "Nevertheless, in the case
⁹ of the Fryzek et al study, what the
¹⁰ public will hear about UGD and childhood
¹¹ cancer -- likely for the first time -- is
¹² controversy engendered by industry's
¹³ funding of a study that obfuscates" -- I
¹⁴ can't say that word very well -- "the
¹⁵ issue and does not legitimately address
¹⁶ the public's health concerns about the
¹⁷ explosive growth of UGD in their
¹⁸ backyards."
¹⁹     Q.   Dr. Fryzek, have you ever
²⁰ been convicted of a crime?
²¹     A.   No.
²²     Q.   To your knowledge, are you
²³ currently under criminal investigation?
²⁴     A.   No.

Page 216

¹     Q.   I hope I don't spoil any
² surprises.
³         MR. VAUGHN:  Tyler, can we
⁴ go to 2020 PA Attorney General's
⁵ Report.
⁶         THE WITNESS:  What did you
⁷ say?  What was your comment?
⁸         MR. BALL:  What did you say?
⁹ Did you say you didn't find that
¹⁰ surprising?
¹¹         MR. VAUGHN:  No, I said I
¹² hope I -- the transcript is full
¹³ of surprises but that's not what I
¹⁴ said either.  I said I hope I
¹⁵ don't spoil any surprises.
¹⁶         MR. BALL:  Okay.  You know,
¹⁷ we're done.  We're done.  That is
¹⁸ the third time -- that is the
¹⁹ third time you have insulted his
²⁰ integrity.
²¹         MR. VAUGHN:  Okay.  Let's
²² just go to Page 9 real quick.
²³         MR. BALL:  You don't have a
²⁴ basis for this bullshit.  We're

Page 217

¹     done.
²         MR. VAUGHN:  I have a basis.
³ Let me -- let me give my basis and
⁴ we can take a lunch break.
⁵         (Document marked for
⁶     identification as Exhibit
⁷     Fryzek-23.)
⁸ BY MR. VAUGHN:
⁹     Q.   You ever seen this document
¹⁰ before, Doctor?
¹¹     A.   No.
¹²         MR. VAUGHN:  Hey, Tyler, can
¹³ we go to Page 9.
¹⁴         THE WITNESS:  I don't even
¹⁵ know -- who wrote this?
¹⁶         MR. VAUGHN:  I guess let's
¹⁷ go to Page 3 first then so we
¹⁸ can -- sorry, I think PDF Page 3.
¹⁹ Page 1 of t he doc -- it will say
²⁰ Page 1 -- yeah.
²¹ BY MR. VAUGHN:
²²     Q.   So this is in the Court of
²³ Common Pleas, Allegheny County,
²⁴ Pennsylvania.

Page 218

1 And this is an order
2 accepting and filing investigating grand
3 jury report Number 1.
4 If we go to the next page.
5 We can see that that was signed by the
6 Honorable Norman Krumenacker, the
7 supervising judge for the 43rd Statewide
8 Investigating Grand Jury.
9 A. Well, I don't know what this
10 is.
11 Q. Okay. So now, if we go back
12 to PDF Page 9. All right. And the top
13 right, kind of the first full paragraph,
14 you can see that this is about fracking
15 in Pennsylvania.
16 Do you see that?
17 A. Okay.
18 Q. Okay. And then if we go to
19 the next paragraph where it starts with
20 "the grand jury."
21 Can you read the first three
22 sentences for me?
23 A. "The grand jury began this
24 investigation based on evidence that

Page 219

1 private companies engaged in
2 unconventional oil and gas activities
3 have committed criminal violations of
4 Pennsylvania's environmental laws. We
5 found such violations and are issuing
6 several presentments recommending the
7 filing of criminal charges. And we
8 believe investigation of additional
9 crimes should and will continue beyond
10 the term of this grand jury."
11 MR. VAUGHN: All right.
12 Tyler, can we now go to Page 178
13 of this document. And paragraph
14 starts with DOH.
15 BY MR. VAUGHN:
16 Q. Doctor, do you know what the
17 DOH is?
18 A. I assume it means Department
19 of Health.
20 Q. Okay. And can you read the
21 first three sentences of this paragraph
22 aloud as well?
23 A. I'm not sure what Department
24 of Health it is for, because cities have

Page 220

1 departments of health, states do.
2 So, "Department of Health
3 staff also engage in research to advance
4 the understanding of health effects
5 associated with fracking. For example,
6 in 2019, under Dr. Levine's direction,
7 DOH and the State of Colorado published a
8 study titled 'A Systematic Review of the
9 Epidemiological Literature Assessing
10 Health Outcomes in Populations Living
11 Near Oil and Natural Gas Operations:
12 Study Quality and Future
13 Recommendations.'
14 "The piece surveyed the most
15 in depth peer-reviewed literature on
16 health effects associated with fracking
17 to date."
18 Q. All right. So this study
19 that the DOH in the state of Colorado
20 published was called "A Systematic Review
21 of Epidemiological Literature Assessing
22 Health Outcomes In Populations Living
23 Near Oil and Natural Gas Operations"; is
24 that correct?

Page 221

1 A. Yeah, I'm not sure where --
2 what journal it's published in.
3 Q. That's fine.
4 MR. VAUGHN: Can we go to
5 Page 112 of this document. PDF
6 112.
7 Sorry. 212.
8 BY MR. VAUGHN:
9 Q. Is this a name of the study
10 that we just saw referenced?
11 A. I have no idea.
12 Q. I'm looking at it right now.
13 "A Systematic Review of Epidemiological
14 Literature Assessing Health Outcomes in
15 Populations Living Near Oil and Natural
16 Gas Operations: Study Quality and Future
17 Recommendation."
18 That what this is, right?
19 Okay. And you were asking
20 what journal it was published in. Are
21 you able to tell from this?
22 A. The International Journal of
23 Environmental Research and Public Health.
24 I believe that was plaintiff attorneys.

Page 222

Q. You think that the
Department of Health and the state of
Colorado is doing this for plaintiffs'
attorneys?
A. They published in a
plaintiff journal, absolutely.
THE COURT REPORTER: Doctor,
I cannot hear you. I'm sorry.
THE WITNESS: They published
in a plaintiff journal.
Absolutely.
BY MR. VAUGHN:
Q. Are you requesting this
grand jury's criminal investigation?
A. I'm questioning --
MR. BALL: Objection to
form.
THE WITNESS: This journal
has been criticized a lot.
MR. VAUGHN: Can we go to
PDF Page 218. And that bottom
paragraph, about midway through.
BY MR. VAUGHN:
Q. Do you see where they

Page 223

specifically call you out? "Fryzek, et
al., also incorrectly interpreted their
standardized incidence ratio results as
has been noted by Saunders."
A. Okay. I have no idea what
they're talking about.
Q. And then closer to the
bottom, do you see where it says, "ONG
operations began in earnest in the late
2000s in Pennsylvania, but Fryzek and
others use data only through 2009. This
truncated period between community
exposure and cancer development is a
major limitation."
Do you see they're talking
about you again there?
A. Yes. I used all the data
that was available.
Q. And you still stand by those
studies?
A. Based on the data we have,
absolutely.
Q. And no one has recently come
to talk to you about your involvement

Page 224

with those studies?
A. I don't even know who
Saunders, et al., is.
THE COURT REPORTER: Doctor,
can you please raise your voice.
THE WITNESS: I said if they
believed we did something wrong,
we should have been made aware of
that. This study is quite a few
years old.
BY MR. VAUGHN:
Q. Yeah but some of the grand
jury stuff is within the last few months.
MR. BALL: Okay.
Mr. Vaughn, again, unless you have
a basis for suggesting that
Dr. Fryzek or his company is under
criminal investigation, you're
either going to end this line of
questioning or we're going to end
the deposition. I'm done.
MR. VAUGHN: That's fine.
I'm done with this line of
questioning. I've gotten my clip

Page 225

back on.
If you want to take a lunch
break even, we can.
Do you want a lunch break?
MR. BALL: Sure.
MR. VAUGHN: Great. How
long do you want?
MR. BALL: Half an hour.
THE VIDEOGRAPHER: Off the
record at 12:31 p.m.
- - -
(Whereupon a luncheon recess
was taken.)
- - -
THE VIDEOGRAPHER: We are
back on the record at 1:07 p.m.
- - -
CONTINUED EXAMINATION.
- - -
BY MR. VAUGHN:
Q. Doctor, what type of foods
contain the highest levels of
nitrosamines?
A. What types of food?

Confidential Information Subject to Protective Order

Page 226

1    Q.   Yeah.
2    A.   I think I wrote about that
3  in the report.  Let me look.
4    Q.   I think you did as well.  I
5  was trying to run a search on it so if
6  you could help me, I'd appreciate it.
7    A.   Yeah.  It will take me a
8  minute to find it here.
9         On Page 35, Paragraph 86.
10   Q.   So the highest levels are
11  in, what is it, processed meats and fish
12  products?
13   A.   Yes.
14        TRIAL TECH:  Do you want to
15  pull that up, Brett?
16        MR. VAUGHN:  No, I think
17  we're okay for now.
18  BY MR. VAUGHN:
19   Q.   What type of processed
20  meats, what does that mean?
21   A.   I assume it's like salami,
22  and things like that.  Bologna.
23   Q.   And --
24   A.   Hot dogs.

Page 227

1    Q.   -- does the way the food is
2  cooked impact it at all, do you know?
3    A.   I don't know.
4    Q.   You didn't consider that in
5  forming your opinions?
6    A.   No.
7        MR. VAUGHN:  Tyler, can we
8  go to, I think it's 2002, the
9  reliability of dietary data.
10       TRIAL TECH:  I'm not seeing
11  that as a 2002 document.
12       MR. VAUGHN:  I might have
13  the wrong -- give me one second.
14  2002-reliability of dietary.
15       (Document marked for
16  identification as Exhibit
17  Fryzek-24.)
18       TRIAL TECH:  I'm not seeing
19  that on my end.  Let me just
20  double-check that it was sent.
21       MR. VAUGHN:  Let me drop it
22  in the chat, would that work?
23       TRIAL TECH:  I've got it
24  here actually.  Just give me one

Page 228

1  second and I can pull that up for
2  you.
3        You're good to go.  Sorry I
4  missed that.
5  BY MR. VAUGHN:
6    Q.   All right, Doctor.  This
7  is -- you were the primary author on this
8  study, right?
9    A.   Yeah.  It was published in
10  2002.
11   Q.   While you were at the --
12   A.   20 years ago.
13   Q.   Do you think things have
14  changed since you published this?
15   A.   I have no idea.  I don't --
16   Q.   Are you just letting me know
17  the year of it, or is there -- is there
18  something with the validity of it because
19  it's 20 years old?
20   A.   I have no idea.  It's just
21  going to be hard for me to remember,
22  so...
23   Q.   All right.  At the bottom of
24  it again, it says the funding was from

Page 229

1  the IEI.
2        I assume that you again have
3  no idea who actually provided the funding
4  to IEI for this study?
5    A.   I believe it was just IEI,
6  because it was Dr. McLaughlin's
7  dissertation data.
8    Q.   And under conclusion, you
9  found that "Dietary data collected
10  retrospectively from next-of-kin may be
11  unreliable," correct?
12   A.   That's what the conclusion
13  says, but you have to read the whole
14  abstract to put it in context.
15   Q.   Before you that you noted that
16  "Overall, subjects tended to have better
17  agreement with their own earlier
18  reporting than did next-of-kin, and
19  spouses were found to be more reliable
20  next-of-kin respondents than older
21  relatives."
22        Do you still agree with that
23  statement?
24   A.   It depends on what study

Page 230

1  you're talking about and where you're at.
2      Q.    Why is that?
3      A.    Pardon me?
4      Q.    Why does it depend on what
5  study you're talking about?
6      A.    Because this was done on a
7  case-control study.  It could be a cohort
8  study.  It depends on how they ask diet.
9      Q.    But you agree that someone
10 giving them the report themselves is more
11 accurate than next-of-kin, correct?
12          MR. BALL:  Objection to
13     form.
14          THE WITNESS:  Usually yes.
15 Usually yes.
16          MR. VAUGHN:  Then can we go
17     to Page 4, Tyler.
18 BY MR. VAUGHN:
19     Q.    In the right-hand paragraph
20 notes, "Associations between food
21 preparation methods and specific cancers,
22 particularly lung and colorectal cancer,
23 have been demonstrated in some
24 epidemiologic studies."

Page 231

1          Did I read that correctly,
2  Doctor?
3      A.    Yes.
4      Q.    And then that "cooking time
5  and method may increase the formation of
6  certain cancer-causing compounds."
7          Did I read that correctly?
8      A.    You did.
9      Q.    And then the next sentence
10 is talking about meat preparation,
11 correct?
12     A.    Yes.
13     Q.    And so these associations on
14 how food is cooked and its risk of
15 increasing cancer, are you talking about
16 meat?
17     A.    You know, I can't recall.
18 As I said, this has been more than
19 20 years ago.  I can't recall.
20     Q.    Do you agree that there are
21 associations between food preparation
22 methods and cancers, particularly lung
23 and colorectal cancer?
24     A.    Again, it's not something

Page 232

1  I've looked at in over 20 years.  So I
2  have no idea.
3      Q.    Do you have any reason to
4  disagree with what you published earlier?
5      A.    Again, I don't know what to
6  say the research is now.  Epidemiology --
7  because all scientific research changes
8  over time.  So I don't know.
9      Q.    Were you not evaluating all
10 of that when you were forming your
11 opinions in this case?
12          MR. BALL:  Objection to
13     form.
14          THE WITNESS:  I guess I'm
15     not quite clear what you're
16     asking.
17 BY MR. VAUGHN:
18     Q.    Well, I thought a big part
19 of your expert report was about dietary
20 intake of nitrosamines and if they
21 increase the risk of cancer in various
22 organs.  Did you not look back over these
23 types of studies?
24     A.    I looked at all studies of

Page 233

1  diet and NDMAs.
2      Q.    And doesn't meat that's been
3  cooked have nitrosamines in it?
4      A.    I believe it does, yes.
5      Q.    And are you aware if the
6  more it's cooked or how it's cooked it
7  can increase the level of nitrosamines?
8      A.    I'm sorry, I'm not clear
9  about that.
10     Q.    You didn't look into how
11 food is cooked, if it impacts the levels
12 of nitrosamines?
13     A.    If the study reported on it
14 we did.
15     Q.    But you didn't do any
16 independent research?
17     A.    No.  This was a -- this was
18 a systematic narrative literature.  We
19 didn't do any kind of research on this.
20     Q.    And then you cite 11 through
21 14.  And so those are studies that you
22 would agree support that certain food
23 preparation methods can increase the risk
24 of lung and colorectal cancer?

Page 234

¹    A.   Oh, I'd have to look at the
² studies.
³    Q.   Why would you have cited
⁴ those studies?
⁵    A.   Again, it's over 20 years
⁶ ago.  So we'll have to look at them and
⁷ see what they say.
⁸    Q.   Why do you normally cite
⁹ studies?
¹⁰    A.   Because they support your
¹¹ statement.
¹²        MR. VAUGHN:  Can we go to
¹³    his expert report now, Tyler.
¹⁴        Give me just a minute to see
¹⁵    where I want to go.
¹⁶        Let's go to Page 21.
¹⁷ BY MR. VAUGHN:
¹⁸    Q.   At the top you say, "Cohort
¹⁹ studies have not demonstrated that NDMA
²⁰ or NDEA and diet are associated with any
²¹ cancer type."
²²        Are you saying that none of
²³ the studies showed an association?
²⁴    A.   Well, again, you can't just

Page 235

¹ look at an individual study.  You have to
² look at the totality of the evidence.
³    Q.   I understand that, but I'm
⁴ just trying to understand this sentence
⁵ where it says cohort studies have not
⁶ demonstrated.  Are you saying that no
⁷ cohort study or the totality of them?
⁸    A.   Totality.  Absolutely.
⁹    Q.   And so --
¹⁰    A.   And you can see that -- you
¹¹ can see that in the graphs that I made.
¹² It's easy to see.  It's on page --
¹³ Figure 3.
¹⁴    Q.   How do you define totality?
¹⁵    A.   How do I define totality?
¹⁶ All of them.  We look at them all
¹⁷ combined.  Include them all combined.
¹⁸    Q.   And so if they all do not
¹⁹ show an association, you do not have a
²⁰ totality of evidence?
²¹    A.   You have to look at them all
²² and make an assessment based on all of
²³ them.
²⁴        If you look at Figure 3 in

Page 236

¹ my report, you can see graphically that
² none of them really are excessive --
³    Q.   What's your definition -- I
⁴ apologize.  What's your definition of
⁵ excessive?
⁶    A.   Excessive, so what we've
⁷ done is we've graphed -- we put on the Y
⁸ axis one, which is no association, which
⁹ made an exposed group and unexposed
¹⁰ group.
¹¹        And then two, which means
¹² it's more likely than not.  And so all of
¹³ them have a confidence interval or a
¹⁴ relative risk or hazard ratio or
¹⁵ something that is two or less.
¹⁶    Q.   Why is two more likely than
¹⁷ not?
¹⁸        MR. BALL:  Objection to
¹⁹    form.
²⁰        THE WITNESS:  People --
²¹ BY MR. VAUGHN:
²²    Q.   You said two would be more
²³ likely than not.  What do you mean by
²⁴ that?

Page 237

¹    A.   Right.  Relative risk of
² two.
³    Q.   Why does it need to be two
⁴ to be more likely than not?
⁵    A.   I believe that's what the
⁶ courts have agreed as more of a
⁷ litigation definition.
⁸    Q.   So outside of legal
⁹ definitions, what would be more likely
¹⁰ than not in epidemiology?
¹¹    A.   Oh, two.  Relative risk or
¹² risk measure of two.
¹³    Q.   And what does two represent?
¹⁴    A.   Pardon me?
¹⁵    Q.   What does the two represent?
¹⁶ Is that like a doubling of the risk?
¹⁷    A.   Yes.
¹⁸    Q.   Why do you need a doubling
¹⁹ of the risk to be more likely than not?
²⁰    A.   Because then you are less
²¹ likely to have influence of confounders,
²² bias, things like that.
²³    Q.   So you're less likely, but
²⁴ just because you're below two, doesn't

Page 238

¹ mean that it's not more likely than not,
² correct?
³         MR. BALL:  Objection to
⁴     form.
⁵         THE WITNESS:  I'm not sure.
⁶ BY MR. VAUGHN:
⁷     Q.    Why aren't you sure?  Is
⁸ that outside of your area of expertise?
⁹     A.    No.  It depends on the study
¹⁰ you're looking at.  It's really study
¹¹ specific.
¹²     Q.    So some studies you could
¹³ have a relative risk less than two and it
¹⁴ still be more likely than not?
¹⁵     A.    I don't believe so.  But
¹⁶ you'd have to show me the studies before
¹⁷ I could make a confirmatory response.
¹⁸     Q.    Okay.  A second ago, you
¹⁹ said it depends on the study.  But now
²⁰ you're saying you don't think there's
²¹ ever a time when below two would be more
²² likely than not?
²³     A.    What I'm saying is I just
²⁴ don't know.

Page 239

¹     Q.    Okay.  So Number 45, section
² of that page.
³     A.    Okay.
⁴     Q.    All right.  At about
⁵ two-thirds of the way down it says, "An
⁶ increased risk of colorectal cancer was
⁷ observed at the highest quartile of NDMA
⁸ intake compared to the lowest."
⁹         And then 2.12.  What's that
¹⁰ 2.12?  What does that signify?
¹¹     A.    That is an adjusted relative
¹² risk.
¹³     Q.    This relative risk is above
¹⁴ two, correct?
¹⁵     A.    Yes.  And the confidence
¹⁶ interval is below two.
¹⁷     Q.    And goes all the way up to
¹⁸ 4.3, correct?
¹⁹     A.    1.04 to 4.33, yeah.
²⁰     Q.    And what's the 1.04
²¹ indicate?
²²     A.    The lower level of the
²³ confidence interval.
²⁴     Q.    So that would be a 4 percent

Page 240

¹ increased risk of cancer is the lowest?
²     A.    Right.
³     Q.    And so this didn't show any
⁴ discrepancy or ambiguity of if it would
⁵ increase the risk of cancer, did it?
⁶     A.    I'm sorry?
⁷     Q.    This --
⁸         MR. BALL:  Objection to
⁹     form.
¹⁰ BY MR. VAUGHN:
¹¹     Q.    This study with the range of
¹² 1.04 to 4.33 in regards to colorectal
¹³ cancer with NDMA exposure, there's no
¹⁴ ambiguity about it increasing the risk,
¹⁵ is there?
¹⁶     A.    Oh, we have to look at the
¹⁷ whole study.  We have to look at
¹⁸ potential confounders they controlled
¹⁹ for, sample size, what it represents,
²⁰ there's a lot of factors besides just the
²¹ confidence interval to statistical
²² significance of a study that shows
²³ causality.
²⁴     Q.    Can you --

Page 241

¹     A.    A lot of things have to
² be --
³     Q.    I kind of read through this
⁴ Number 45.  Can you show me where your
⁵ critiques are on the study?
⁶     A.    So what we could take here,
⁷ it shows in the graph that the confidence
⁸ interval is less than two.
⁹     Q.    I thought --
¹⁰     A.    The relative risk --
¹¹     Q.    I thought it says 2.12.
¹²     A.    That's not the confidence
¹³ interval.  That's the -- that's the
¹⁴ estimate.
¹⁵     Q.    And so you're saying if any
¹⁶ part of the confidence -- if any part of
¹⁷ the lower bound of the confidence
¹⁸ interval is under two, it doesn't count?
¹⁹     A.    I'm not saying it's not more
²⁰ likely than not.  So you can see that in
²¹ our graph.
²²     Q.    But the lowest end of the
²³ confidence interval is 1.04.  The lowest
²⁴ end is still showing a four percent

Confidential Information - Subject to Protective Order

Page 242

1 increased risk, correct?
2      A.   Correct.
3      Q.   How is that not more likely
4 than not that it's increasing the risk of
5 colorectal cancer?
6      A.   Because the definition of it
7 has to be 2.2.
8      Q.   Whose definition?
9      A.   Legal definition.
10      Q.   You're not an attorney, are
11 you?
12           MR. BALL:  Objection to
13      form.
14           THE WITNESS:  I am not.
15 BY MR. VAUGHN:
16      Q.   Going forward, when we do
17 definitions, can you give me definitions
18 from your area of expertise?
19           MR. BALL:  Objection to
20      form.  Considering the fact that
21      you asked him to identify things
22      as a toxicologist and a number of
23      other areas, I think that's a
24      little bit sly.

Page 243

1           MR. VAUGHN:  Okay.  Can you
2      just not give legal opinions?
3           How about that, Rick?  Does
4      that work for you?
5           MR. BALL:  That works for
6      me.
7           MR. VAUGHN:  I appreciate
8      the clarification.
9           THE WITNESS:  There's other
10      aspects that you have to look at.
11      The lower two quartiles didn't
12      show any -- quartiles, I'm
13      sorry -- didn't show any relative
14      risk, and there's no
15      dose-response.  So it's likely to
16      not be causality.
17 BY MR. VAUGHN:
18      Q.   So the lower levels didn't
19 show an increased risk but the higher
20 levels did show an increased risk.  And
21 your opinion is that's not a
22 dose-response?
23      A.   It shows that it's not a
24 dose-response.  The P-value is greater

Page 244

1 than the .05.
2      Q.   Do you agree that the higher
3 amounts of NDMA were associated with
4 cancer and the lower amounts of NDMA were
5 not?
6      A.   They weren't statistically
7 significantly associated at the lowest.
8 At the highest level, yes.
9      Q.   And what was the mean daily
10 NDMA intake in the diet in this study?
11 Do you see that?
12      A.   Yeah.  In the diet was
13 .052 micrograms.
14      Q.   Micrograms.  Do you know
15 what that would be in nanograms?
16      A.   No.  No, I don't.
17      Q.   You don't know how many
18 nanograms are in a microgram?
19      A.   No.
20      Q.   You didn't look into that at
21 all when you were doing your expert
22 report?
23      A.   It wasn't important to my
24 conclusions.

Page 245

1      Q.   Do you think there might be
2 a thousand within it?
3           MR. BALL:  Objection.
4 BY MR. VAUGHN:
5      Q.   Micrograms.  Do you think
6 that might be right?
7      A.   I think it is.  But I'm not
8 100 percent sure.
9      Q.   But if it was a thousand,
10 would that mean that this is 52
11 nanograms?
12      A.   Yes.  If it was a thousand,
13 yes.
14      Q.   And then when you add beer,
15 that subgroup got up to, I guess, 71
16 nanograms?
17      A.   Yes.  Yes.
18      Q.   And so the differences
19 between these groups is just tens of
20 nanograms, right?
21           MR. BALL:  Objection to
22      form.
23           THE WITNESS:  What?
24

Page 246

BY MR. VAUGHN:
Q.   Tens of nanograms.
A.   So the mean daily NDMA intake includes beer.  I don't quite understand what you're doing.
Q.   Oh, I'm reading what you have here.  The mean daily NDMA intake from diet was 52 nanograms and specifically from beer was estimated in a subgroup at 71 nanograms.
A.   Okay.
Q.   And so the difference there is just like about 20 nanograms, right?
A.   Yeah, I am not quite sure what you're doing.  Because the mean daily intake includes beer as well as everything.  So I'm not quite sure what you're doing.
Q.   Okay.  What was the highest exposure daily to NDMA in this group?
A.   I don't know.
Q.   You didn't --
A.   You know, you know, this is a Finnish diet too.  I don't know how --

Page 247

how applicable this is to a U.S. diet.
Q.   What do you think is different?
A.   I have no idea.  You have to look at that.  And also, this is a diet back to 1999, so -- actually it does -- 66 to 72.  So...
          That's one of the important things with epidemiology.  You have to understand not only the statistical significance, the diet but how representative your data is.  I'm not sure how representative this is of a U.S. population taking valsartan.
Q.   Do you think a U.S. population is exposed to less than 52 nanograms in their diet a day?
A.   Oh, I have no idea.
Q.   You didn't look into that, did you?
A.   No.
Q.   Do people from Finland, do they process NDMA differently, do they metabolize it differently?

Page 248

          MR. BALL:  Objection to form.
          THE WITNESS:  I have no idea -- I have no idea.
BY MR. VAUGHN:
Q.   Do you have any reason to believe that people in Finland will metabolize NDMA differently than people in the United States?
          MR. BALL:  Objection to form.
          THE WITNESS:  I don't have -- I don't have any reason to believe that or not.
BY MR. VAUGHN:
Q.   So as far as the levels of NDMA causing cancers in people in Finland, that should still be applicable to the United States, correct?
          MR. BALL:  Objection to form.
          THE WITNESS:  No.
BY MR. VAUGHN:
Q.   Setting diet aside, I'm not

Page 249

saying how much we eat.  I'm just saying, if we were exposed to the same amount of NDMA as people in Finland, would you not expect the same result?
A.   That I have no idea.  Because also you have to look at the age group, the gender, things like that.  You have to look at all the factors.
          MR. VAUGHN:  Can you go to the next page, Tyler.
BY MR. VAUGHN:
Q.   Earlier you were talking about dose-response and how the last study you didn't think really showed a dose-response.
          On Number 40 --
A.   It wasn't --
Q.   Huh?
A.   I just want to be clear.  It wasn't my conclusion.  It's the study's conclusion of a P-value greater than .05.
Q.   Well, do you disagree with the study's conclusion?
A.   No.  I'm just reporting what

Page 250

1 the study said. You said I decided. I
2 didn't decide.
3     Q. But you also agree on that
4 prior study, the high dose of NDMA was
5 associated with cancer compared to the
6 low dose of NDMA, correct?
7     A. I don't believe it was
8 compared to low dose. I can't remember
9 what the comparison was.
10     Q. Did the low dose of NDMA
11 cause an increased risk of cancer?
12     A. They didn't find an
13 increased risk of cancer.
14     Q. Did the high dose increase
15 the risk of cancer?
16     A. That is what they found,
17 yes. For one cancer type, but not for
18 all cancer types. We were just talking
19 about colorectal cancer.
20     Q. And so there was a response
21 to the higher dose, but there wasn't a
22 response to the lower dose, correct?
23         MR. BALL: Objection to
24     form.

Page 251

1         THE WITNESS: There's no --
2     there was no dose-response.
3 BY MR. VAUGHN:
4     Q. That wasn't my question.
5         Was there an increased --
6 scratch that.
7         Do you agree that there was
8 an increased risk with the high dose and
9 there was not an increased risk with the
10 low dose?
11     A. Correct.
12     Q. So Number 47, we go a little
13 bit more than halfway down within 47, in
14 multivariate models. What is a
15 multivariate model?
16     A. Has more than variable in
17 it. Age, gender.
18     Q. It notes "there was a trend
19 of increasing risk of stomach cancer with
20 increasing NDMA intake and a
21 dose-response trend was observed."
22     A. Mm-hmm.
23     Q. And then it says p-trend,
24 0.02. What does that mean?

Page 252

1     A. The trend is significant.
2 The P-value is less than .05.
3     Q. And so being lower than .05,
4 does that make it even stronger?
5         MR. BALL: Objection to
6     form.
7         THE WITNESS: It just says
8     it -- it just says it is or isn't.
9 BY MR. VAUGHN:
10     Q. Being less than .05 doesn't
11 make it more likely that the results are
12 accurate?
13         MR. BALL: Objection to
14     form.
15         THE WITNESS: I don't know
16     what you mean by accurate.
17 BY MR. VAUGHN:
18     Q. Does the P-value being less
19 than .05 increase the statistical
20 significance of the results?
21     A. No. That's not my
22 understanding.
23     Q. But going above the .05
24 decreases the statistical significance?

Page 253

1     A. Correct. It makes it
2 nonstatistically significant.
3     Q. Why does this only go one
4 direction, why would being even low or
5 not increase the statistical
6 significance?
7     A. I guess I'm a little bit
8 lost about what you're asking, I'm sorry.
9     Q. Okay. So you said above a
10 .05 P-value, it would not be
11 statistically significant.
12     A. Right.
13     Q. If you're below a .05, like
14 this .2, .02, would .02 be even more
15 statistically significant in the results
16 than a .05 P-value?
17         MR. BALL: Objection to
18     form.
19         THE WITNESS: It is
20     statistically significant. The
21     point verifies that statistical
22     significance.
23 BY MR. VAUGHN:
24     Q. I'm asking is it more

Page 254

¹ statistically significant to have .02
² versus .05?
³          MR. BALL:  Object to form.
⁴          THE WITNESS:  I guess we're
⁵     getting confused.  Because we
⁶     don't use the word "more
⁷     statistically significant."  We
⁸     just say statistically
⁹     significant.
¹⁰          I do want to point out.
¹¹     When you evaluate this literature
¹²     you can't go through each study
¹³     and look at the positive aspects
¹⁴     of each study.  You have to look
¹⁵     at the totality of the literature.
¹⁶     That's what we did in the graph.
¹⁷ BY MR. VAUGHN:
¹⁸     Q.   Lower down you note,
¹⁹ "However, only the highest levels of
²⁰ intake had statistically significant
²¹ increased risk."
²²          Are you talking about
²³ highest levels of intake of NDMA had a
²⁴ significantly increased risk on the

Page 255

¹ formation of cancer, is that what that
² sentence is saying?
³     A.   It's hard because you take
⁴ it out of context.  Let me try to read
⁵ the paragraph.
⁶          I believe we are talking
⁷ about processed meat and bacon and pork.
⁸     Q.   So you think this sentence
⁹ is talking about the highest levels of
¹⁰ that meat?
¹¹     A.   Correct.
¹²     Q.   And that meat contains NDMA,
¹³ right?
¹⁴     A.   That's what they say, yes.
¹⁵     Q.   And so the highest levels of
¹⁶ the NDMA had statistically significant
¹⁷ increased risk.  What type of risk are
¹⁸ you talking about there?
¹⁹     A.   Of the relationship between
²⁰ the food intake and whatever cancer that
²¹ would be met.
²²     Q.   And this was stomach cancer
²³ again, correct?
²⁴     A.   Yes.

Page 256

¹     Q.   Let's look at Number 49.
²          So this is 11.4-year
³ follow-up.
⁴          Doctor, in your opinion, if
⁵ something is a carcinogen, how soon will
⁶ you start seeing cancers in the
⁷ population if they are exposed to it?
⁸     A.   Oh, it depends on what the
⁹ carcinogen is.
¹⁰     Q.   If it was the most potent
¹¹ carcinogen you know, what would the
¹² soonest be?
¹³     A.   Well, that, I don't know.
¹⁴     Q.   Can people develop cancer
¹⁵ from a carcinogen within a year?
¹⁶          MR. BALL:  Objection to
¹⁷     form.
¹⁸          THE WITNESS:  I'm not -- I
¹⁹     don't know.  That, I don't know.
²⁰ BY MR. VAUGHN:
²¹     Q.   What about within two years?
²²          MR. BALL:  Objection to
²³     form.
²⁴          THE WITNESS:  I don't know.

Page 257

¹ BY MR. VAUGHN:
²     Q.   Within six months?
³          MR. BALL:  Same objection.
⁴          THE WITNESS:  I don't know.
⁵ BY MR. VAUGHN:
⁶     Q.   You didn't consider any of
⁷ that when you were reviewing all these
⁸ studies?
⁹     A.   Consider what?
¹⁰     Q.   Consider how long or how
¹¹ soon someone can get cancer after being
¹² exposed to a carcinogen?
¹³     A.   Well, we considered the
¹⁴ totality of the evidence, not just the
¹⁵ individual studies.
¹⁶     Q.   What is a lag time in a
¹⁷ study?  What does the word "lag time"
¹⁸ mean?
¹⁹     A.   Can you use it and I can
²⁰ explain it to you?
²¹     Q.   So after someone is exposed
²² to a carcinogen, if they had a lag of one
²³ year in the study, what does that mean?
²⁴     A.   That's just a year that they

Page 258

¹ don't count exposure in their exposure
² assessment.
³      Q.   I'm having a hard time
⁴ hearing you.  Can you say that again?
⁵      A.   Let me try to go -- I'll
⁶ hold this up.  Does that help?
⁷      Q.   I can hear you.  Go ahead.
⁸      A.   Okay.  That's a -- that's a
⁹ time period where they don't consider the
¹⁰ exposure.
¹¹      Q.   Do they not --
¹²      A.   So there's acute -- seems
¹³ like --
¹⁴      Q.   Are they not considering --
¹⁵      A.   -- units of dose.
¹⁶      Q.   So the lag doesn't have to
¹⁷ do with if they were diagnosed with
¹⁸ cancer in that first year?  It has to do
¹⁹ with dose?
²⁰      A.   Right.  Well, no, not with
²¹ dose, with exposure.
²²         MR. BALL:  Objection.
²³ BY MR. VAUGHN:
²⁴      Q.   The lag has nothing to do

Page 259

¹ with what's counted as far as diagnoses?
²      A.   It's --
³         MR. BALL:  Objection to
⁴      form.
⁵         THE WITNESS:  -- exposures.
⁶ BY MR. VAUGHN:
⁷      Q.   Sorry.  I'm having a hard
⁸ time hearing you over the objections.
⁹ All the transcript picked up was the word
¹⁰ "exposures."
¹¹      A.   So it deals with exposure.
¹² You're talking about a lag exposure, not
¹³ a lag diagnosis.
¹⁴         THE COURT REPORTER:  Can you
¹⁵      repeat that?
¹⁶         THE WITNESS:  Not a lag
¹⁷      diagnosis.
¹⁸ BY MR. VAUGHN:
¹⁹      Q.   At the bottom of 49 on that
²⁰ Page 22, do you see what the main NDMA
²¹ levels were for cancer cases?
²²         MR. VAUGHN:  Sorry, yeah, on
²³      Page 22 still.  Bottom of -- yeah.
²⁴

Page 260

¹ BY MR. VAUGHN:
²      Q.   59 nanograms a day; is that
³ correct?
⁴      A.   Yes.  Yes.
⁵      Q.   They do the conversion to
⁶ micrograms.  And that's -- would be a
⁷ thousand, right?
⁸      A.   Right.
⁹      Q.   The conversion that we said
¹⁰ earlier.
¹¹         And this one's in Norfolk,
¹² UK.  But they have a pretty similar
¹³ amount of exposure to NDMA as the
¹⁴ Finlands did, didn't they?
¹⁵      A.   Oh, I don't know.
¹⁶      Q.   Well, I mean, we looked
¹⁷ at --
¹⁸      A.   This is -- this isn't
¹⁹ everyone in Norfolk, and not everyone in
²⁰ Finland.  So it's, you know, a cohort of
²¹ people.  It's a group of people.  And
²² each of those groups is not everyone.  So
²³ I have no idea.
²⁴      Q.   Their average amount of

Page 261

¹ exposure is very similar to what the
² people in Finland were exposed to,
³ correct?
⁴      A.   It's not the people in
⁵ Finland.  It's the people in Finland that
⁶ were in the study.  I mean, I don't know
⁷ what the age group is of the people in
⁸ Finland.  So we have to look at those
⁹ types of things too.
¹⁰      Q.   And again, with this study,
¹¹ we're noticing an increased risk of
¹² cancer, are we not?
¹³      A.   I don't know.
¹⁴         MR. BALL:  Objection to
¹⁵      form.
¹⁶         THE WITNESS:  I can read on
¹⁷      my --
¹⁸         MR. VAUGHN:  Let's go to the
¹⁹ next page.
²⁰ BY MR. VAUGHN:
²¹      Q.   I can read it for you if
²² it's quicker.
²³      A.   Okay.
²⁴      Q.   "When NDMA intake was

Page 262

1 analyzed as a continuous variable, there
2 was a small statistically significant
3 increased cancer risk per unit increase
4 in NDMA intake in the full study
5 population."
6         Is that a dose-response when
7 it's saying per unit increase of NDMA?
8     A.   Let me see.  So this is as
9 each unit of NDMA goes up, then the
10 increase goes up slightly, yes.
11     Q.   Is that known as a
12 dose-response?
13     A.   This was looking at
14 continuous -- when this -- when you're
15 looking at continuous, you'd see this.
16 But when you're looking at, like,
17 quartiles you don't see it.  So you have
18 to be careful.
19     Q.   Is this known as a
20 dose-response?
21     A.   I would consider that a
22 dose-response, yes.  Again, you have to
23 be careful of your interpretation,
24 because you see it in men, but not in

Page 263

1 women.  You can't understand that.
2 There's a lot of things, a lot of
3 questions in this study.
4     Q.   Who do you think eats more
5 on average, meat; a male or female?
6     A.   I'm sorry?
7     Q.   Do you think a male or a
8 female eats more meat on average?
9         MR. BALL:  Objection to
10     form.
11         THE WITNESS:  I have no
12     idea.
13 BY MR. VAUGHN:
14     Q.   How about drinking beer?  Do
15 you think men drink more beer than women?
16         MR. BALL:  Object to form.
17         THE WITNESS:  I have no
18     idea.
19 BY MR. VAUGHN:
20     Q.   Okay.  And do you see a
21 little bit farther down, it also notes
22 that there was a statistically
23 significant association with rectal
24 cancer?

Page 264

1     A.   Rectal -- when you analyzed
2 NDMA as a continuous variable, you see it
3 as rectal cancer, GI cancers, and other
4 cancers.
5         MR. VAUGHN:  Let's go to
6 Number 50, Tyler.
7         THE WITNESS:  I just want to
8 mention that you skipped over the
9 last sentence, which I think is
10 important.
11 BY MR. VAUGHN:
12     Q.   Mm-hmm.
13     A.   Can we read that?
14     Q.   Your attorney will have a
15 chance to go back through anything that
16 you would like on his time?
17         MR. BALL:  Jon, if you want
18 to read it, you feel free to read
19 it if you feel it helps explain
20 your answer.
21         THE WITNESS:  The last
22 sentence, I think, is important.
23         It says that the limitations
24 of the study which is biases in

Page 265

1 the measurement error associated
2 with food frequency
3 questionnaires, multiple risk
4 factors -- and also multiple risk
5 factors that are not controlled
6 for in the analysis for specific
7 cancers.
8 BY MR. VAUGHN:
9         MR. VAUGHN:  Move to strike.
10 There was --
11         THE WITNESS:  You have to
12 look at all --
13         MR. VAUGHN: -- no question
14 on the table.
15         THE WITNESS:  You have to
16 look at all those things when you
17 assess the study.  You can't just
18 look at the statistical
19 significance.
20         MR. VAUGHN:  Move to strike.
21 There is no question on the table.
22         MR. BALL:  He was answering
23 your prior question.  He hadn't
24 quite finished.  He made that

Page 266

1    clear.
2         MR. VAUGHN:  All right.  Let
3    go and look at Number 50 now,
4    Tyler.
5    BY MR. VAUGHN:
6         Q.   Let's see.  If we go a
7    little more than halfway down this one
8    actually notes that the median NDMA
9    intake was much higher for men.  It comes
10   out to 80 nanograms, versus women,
11   40-nanograms.
12        Do you think that's probably
13   consistent amongst most of the
14   populations, that men are consuming more
15   NDMA than women?
16        MR. BALL:  Objection to
17   form.
18        THE WITNESS:  I have no
19   idea.
20   BY MR. VAUGHN:
21        Q.   Do you think the
22   difference --
23        A.   -- look at all --
24        Q.   Do you think the

Page 267

1    difference --
2         A.   -- by populations.
3         Q.   Sorry, what did you say?
4         A.   That I haven't looked at all
5    populations in the world to make a
6    statement, the conclusion.
7         Q.   Do you think a difference in
8    80 nanograms a day and 40 nanograms a day
9    might explain why men have a more
10   increased risk of cancer?
11        MR. BALL:  Objection to
12   form.
13        THE WITNESS:  Oh, I have no
14   idea.  There's no relationship
15   between NDMA and cancer -- to
16   explain it.
17   BY MR. VAUGHN:
18        Q.   None?
19        A.   No.  The totality of the
20   evidence.
21        Q.   Okay.  So two sentences
22   later, "In men, esophageal squamous cell
23   cancer was associated with NDMA intake,"
24   and then HR 2.43.  What is HR?

Page 268

1         A.   Hazards ratio.
2         Q.   And what is the difference
3    of an HR and an RR?
4         A.   It's looking at -- it's a
5    survival analysis versus a relative risk.
6         Q.   And then the confidence
7    interval is 95 percent, right?
8         A.   Yes.
9         Q.   And then the -- the P-trend
10   is .01.  So that's below that .05 that
11   you were saying we need, right?
12        A.   Correct.
13        Q.   And are you discounting this
14   one because the lower end is 1.13?
15        MR. BALL:  Objection to the
16   form.
17        THE WITNESS:  You have to
18   look at all of them.  You have to
19   look at all the studies, you know,
20   together.  That's why we did the
21   graphs.
22   BY MR. VAUGHN:
23        Q.   I guess there is diet ones,
24   okay.

Page 269

1         And your opinion is there's
2    no strong evidence that NDMA and NDEA are
3    associated with cancer, correct?
4         MR. BALL:  Objection to
5    form.
6         THE WITNESS:  Where do you
7    see that?
8    BY MR. VAUGHN:
9         Q.   Page 24 of your report.
10        A.   So these studies -- the
11   cohort studies state they are no
12   associations with any cancer type.
13   Case-control says there's no strong
14   evidence that NDMA or NDEA is associated
15   with cancer.  So we separate it by the
16   study designs.
17        Q.   Oh.  So the studies we were
18   looking at a second ago were the cohort
19   studies?
20        A.   Yep, yes, sir.  Yeah.
21        Q.   Ok.  So that part of your
22   opinion is, I guess, on Page 21 where you
23   say "Cohort studies have not demonstrated
24   that NDMA or NDEA in diet are associated

Page 270

1  with any cancer type."
2        And then all those studies
3  that we went through where there is an
4  association with a cancer type, those are
5  the ones that you are talking about?
6        MR. BALL:  Objection to
7  form.
8        THE WITNESS:  You're
9  misquoting my statement.  You have
10  to -- you have to look at all the
11  studies combined.  That's why we
12  did the graphs.
13        You can't just pull out a
14  single study and say that this is
15  statistically significant, so this
16  is an association.  You have to
17  look at the totality of the
18  evidence.
19  BY MR. VAUGHN:
20    Q.   Did I only discuss one study
21  with you?
22    A.   Well, you discussed the
23  positive results of a few studies, yes.
24    Q.   I mean you only have seven

Page 271

1  studies even here.
2    A.   Okay.  That's why we did the
3  graph so you can look at the graph and
4  see.
5        MR. VAUGHN:  Let's go to
6  Page 24 now, Tyler.  52.
7  BY MR. VAUGHN:
8    Q.   All right.  So this one,
9  second line on the right was in Hawaii.
10  So this is a United States one, correct?
11    A.   Let me see.  Conducted in
12  Hawaii.  Yes, in the '80s.  Between '83
13  and '85.
14    Q.   And do you have any reason
15  to believe that humans process NDMA
16  differently now than in '83 or '85?
17    A.   I guess the more important
18  question is, are the diets similar in '83
19  and '85 as they are now.
20    Q.   Why is that the more
21  important question?
22    A.   Because the NDMA exposure
23  levels would be different.  Also, the age
24  and all other confounders as well.  So

Page 272

1  you have to understand the
2  representatives of the population.
3    Q.   What if these NDMA exposure
4  levels are way below what's in valsartan?
5        MR. BALL:  Objection to
6  form.
7  BY MR. VAUGHN:
8    Q.   Would that -- would the
9  study not be very relevant to does the
10  NDMA in valsartan cause cancer?
11    A.   I have no idea.  You have to
12  show me an example of a study that looked
13  at that.
14    Q.   If these studies are showing
15  an association with NDMA and cancer and
16  valsartan has even higher levels of NDMA,
17  would you not expect valsartan with NDMA
18  to be able to cause cancer as well?
19        MR. BALL:  Object to form.
20        THE WITNESS:  The totality
21  of the evidence isn't showing a
22  relationship with cancer.
23  BY MR. VAUGHN:
24    Q.   All right.  Midway through

Page 273

1  on this one where it says, "An
2  association between NDMA and risk of lung
3  cancer was observed for men in the
4  highest two categories of NDMA intake.
5  OR" --
6        And what is OR?
7    A.   Odds ratio.
8    Q.   And how is that different
9  than the HR and RR that we were talking
10  about?
11    A.   Well, odds ratio is for a
12  case-control study.  In a case-control
13  study you pick subjects based on the
14  disease status and then you look back in
15  time to see if they have exposure or not.
16  Which is the odds of having exposure in
17  the cases versus the odds of having
18  exposure in the controls.
19    Q.   So we're seeing a 2.8 odds
20  ratio.  And now that CI, it says 1.5 to
21  4.3.  Does that mean that the levels were
22  getting five -- over five times more
23  cancer?
24    A.   That's the -- that's the

Page 274

1 confidence interval.  If you repeat the
2 study over and over again, 95 percent of
3 the time the S value would be between
4 1.5 and 4.3 -- so 1.4 and 5.3.
5       Q.   So it would be increasing
6 the rate of cancer between 40 percent and
7 530 percent?
8       A.   Correct.  95 percent of the
9 time.
10      Q.   And then Q4, is that -- is
11 that the highest quartile?  The other one
12 said Q3.
13      A.   Yes.
14      Q.   And so Q4, when they gave
15 even more NDMA, the odds ratio went from
16 2.8 to 3.3?
17      A.   It does.  Confidence
18 intervals overlap.  So that tells you the
19 numbers aren't different.
20      Q.   That confidence interval now
21 is up from -- up to 1.7 to 6.2, so at the
22 highest levels they are seeing 70 to
23 620 percent higher levels of cancer with
24 NDMA?

Page 275

1       A.   Right.  But it overlaps with
2 the Quarter 3 confidence intervals.
3       Q.   And it says that this is a
4 strong dose-response trend.  Do you see
5 that?
6       A.   Yes.  Yes.
7       Q.   And then the P-trend is
8 .0006.
9           Is this a strong
10 dose-response trend because of the low
11 P-value or because of the high percent
12 increases in cancer?
13          MR. BALL:  Objection to
14 form.
15          THE WITNESS:  I would say
16 both.  Well, the cancer increase
17 isn't high.  I mean it's between
18 1.7 and 6.2, which overlaps with
19 the quarter -- Quartile 3
20 confidence interval.
21          MR. VAUGHN:  We can go to
22 the next page Tyler.
23 BY MR. VAUGHN:
24      Q.   This would be Number 53.  We

Page 276

1 just can't see that number at the top.
2 At the top it says, "An association was
3 seen between NDMA intake and lung cancer
4 at third and highest quartiles," correct?
5       A.   Correct.
6       Q.   And earlier I think you were
7 talking about how some of these studies
8 weren't maybe controlled properly.  This
9 one is actually controlled for age, sex,
10 residence, urban/rural status, family
11 history of lung cancer, BMI, pack years,
12 and total energy intake, correct?
13      A.   Correct.
14      Q.   And is this showing a
15 dose-response trend again where the third
16 quartile is increasing by 6 percent to
17 296 percent increased risk of cancer
18 while the highest quartile is
19 experiencing a 86 percent to 529 percent
20 increase of cancer?
21      A.   I don't know if they
22 calculated a dose-response trend or not.
23      Q.   Well, I mean, are we not
24 seeing higher rates of cancer as the dose

Page 277

1 goes up if we are seeing third quartiles
2 associated with cancer, the fourth
3 quartile is associated with even higher
4 cancer and it looks like the first two
5 were not?
6       A.   Yeah, so what you also have
7 to look at is the confidence interval.
8           So if the first confidence
9 interval goes from 1.06 to 2.96, and the
10 confidence interval for the highest
11 quartile goes from 1.86 to 5.29, those
12 confidence intervals overlap.
13      Q.   But they also remain
14 higher --
15      A.   I'm not sure if it's
16 statistically different or not.  That's
17 why I would need the P-value to look at
18 that.
19      Q.   You agree that the first two
20 quartiles to the lowest amounts of NDMA
21 were not associated with an increased
22 risk of cancer, correct?
23      A.   Well, I'd have to look at
24 that and see.  I don't -- it's not

Confidential Information - Subject to Protective Order

Page 278

1 represented on this page that you're
2 showing me.
3     Q.    What are your critiques on
4 this study?
5     A.    Let me look at my written
6 copy of my printed-out copy here so I can
7 see.  This is Paragraph 52 or 53?
8     Q.    53.
9     A.    It looks like some of the
10 results were inconsistent.  We'd have to
11 look at the paper to see exactly what it
12 is.  Some of the results are
13 inconsistent.
14     Q.    What results are you talking
15 about?
16     A.    At the end.  The results
17 about NDMA-containing food, et cetera.
18 They don't seem consistent the high risk.
19 Also, it is also a hospital-based
20 case-control study, which there's concern
21 about using hospital controls.  So the
22 study design is problematic as well.
23     Q.    The food that it was
24 associated with an increased risk of

Page 279

1 cancer is also the food that has the
2 highest NDMA concentration, correct?
3         MR. BALL:  Object to form.
4         THE WITNESS:  That's right.
5         But the risk was really small.  It
6         was borderline statistically
7         significant, which is 1.01.  None
8         of the other with high estimated
9         NDMA levels had an association or
10        an increased risk.
11 BY MR. VAUGHN:
12     Q.    So then 54, it looks like
13 you -- you only have three studies cited
14 under lung cancer, the two that we just
15 went over, then you cite Loh.  And so are
16 you use Loh to invalidate the other two
17 results?
18     A.    We reported on all the
19 studies we find.
20     Q.    Well, you're saying that you
21 don't think that the diet or NDMA and
22 NDEA are associated with increased risk
23 of cancer.  And the only three that you
24 discuss on lung cancer are these three.

Page 280

1     And you're coming out and saying it
2 doesn't increase the risk.  And so are
3 you basically using Loh to basically say
4 these other two studies can't be right?
5     A.    No.  I'm saying the other
6 two studies have problems with them as
7 well.  Methodological problems.
8     Q.    And what are those
9 methodological problems?
10    A.    Methodological problems I
11 said.
12    Q.    Yeah, what are they?
13    A.    The first one uses a lot of
14 proxy respondents.
15    Q.    What is a proxy respondent?
16    A.    It's what you showed my
17 paper on, where we compared
18 self-respondents to proxy respondents,
19 and you showed the proxy respondents
20 weren't very good.  So this supports
21 that.
22    Q.    What about the other study?
23    A.    Yeah, it wasn't consistent
24 across the different food groups.

Page 281

1     Q.    But not all the food groups
2 had the same level of NDMA in it, right?
3     A.    Right.  But you would expect
4 some risk.  And you don't see any risk at
5 all.
6     Q.    But the highest levels, you
7 do?
8     A.    If there's an association.
9 But as I said, I don't believe in the
10 association.  The studies don't show
11 there's an association with any cancer.
12    Q.    It literally says, "An
13 association was seen between NDMA intake
14 and lung cancer at the third and highest
15 quartiles."  It's at the top of the page
16 of your report.
17    A.    Right.  That sentence
18 doesn't -- doesn't describe what -- the
19 totality of the studies, right?
20    Q.    Tell me if it's --
21    A.    If you look -- if you look
22 at my -- if you look at my figure, that
23 helps you, so you don't have to look at
24 individual studies.

Confidential Information - Subject to Protective Order

Page 282

1    Q.   But I'm trying to understand
2  what you think is wrong with individual
3  studies and why you think certain ones
4  are stronger.
5    A.   I don't even say that when I
6  graph them.  When you look at the graph,
7  you can see where all the studies fall.
8  Overall, case-control studies with diet
9  are hard to understand because you're
10  picking people after they have the
11  disease, and that may make them report or
12  remember what was in their diet
13  differently.
14    Q.   That's something actually I
15  want to talk about.  Why is that?
16    A.   Why is it?  Because people
17  try to figure out why they had cancer.
18    Q.   And to that end, wouldn't
19  they have to know that NDMA is associated
20  with cancer for it to influence their --
21    A.   Right, so but here they're
22  not asking about NDMA.  They're asking
23  about different food stuff, et cetera.
24    Q.   So wouldn't they have to

Page 283

1  know that certain foods are associated
2  with increased risk of cancers for it
3  bias their answers?
4    A.   Well, I think at this time
5  people knew that there was certain foods
6  that were, you know, not as good for you.
7    Q.   What do you mean by not as
8  good for you?
9    A.   You don't see any vegetables
10  or fruit.
11    Q.   What do you mean by that,
12  you don't see any vegetables or fruit?
13    A.   There's no increased risk
14  for those groups.
15    Q.   Why do you think that is?
16    A.   Because they didn't report
17  it.
18    Q.   And so you think people know
19  that salted meat, salted fish, barbecue
20  has enough carcinogens in it to increase
21  their risk of cancer and is going bias
22  their answers?  That's what you think?
23    MR. BALL:  Objection to
24  form.

Page 284

1    THE WITNESS:  I think that
2  those people realize that those
3  aren't foods that they should have
4  eaten all the time.
5  BY MR. VAUGHN:
6    Q.   And so you think that
7  they're going to associate that with
8  their cancer and say they eat more of it?
9    A.   I think people that are ill,
10  you know, remember things like that more
11  than people that aren't ill, will overly
12  report those things.
13    Q.   So people that are ill say
14  that they eat more bacon than they
15  actually do?
16    A.   Maybe.
17    MR. BALL:  Objection to
18  form.
19  BY MR. VAUGHN:
20    Q.   Do people frequently
21  exaggerate how much alcohol they drink
22  when they're reporting it?
23    A.   You'd have to look at the --
24  individual studies have, you know,

Page 285

1  different results.  So you have
2  different -- some measures of validity in
3  the study.
4    Q.   Do you think these people
5  that are filling out these questionnaires
6  are, like, planning on suing a company
7  that makes bacon or something?
8    MR. BALL:  Object to form.
9  BY MR. VAUGHN:
10    Q.   What's their incentive for
11  lying on these questionnaires?
12    MR. BALL:  Object to form.
13    THE WITNESS:  I didn't
14  say they -- I didn't say they were
15  lying.  I didn't say they had
16  incentives.  I said they were just
17  trying to figure out why they have
18  cancer.
19    When I did my -- when I did
20  my dissertation, I interviewed
21  people myself that had pancreatic
22  disease.  It was a tough disease,
23  and they were trying to figure out
24  why the heck they had it.  They

Page 286

1    died within a month --
2  BY MR. VAUGHN:
3      Q.   I was going to say --
4      A.   -- of being diagnosed.
5      Q.   -- people with pancreatic
6  cancer don't have much time to figure out
7  what caused it, do they?
8      A.   But they think a lot about
9  it, much more than a person without
10  cancer.
11      Q.   You think that means that
12  they recall more accurately or that they
13  exaggerate?
14      MR. BALL:  Objection to
15  form.
16      THE WITNESS:  It depends on
17  the study.  It depends on the
18  population.  It depends on what
19  you're asking.  It depends on a
20  lot of stuff.
21      It's something that you
22  should try to assess in your
23  studies.
24      MR. VAUGHN:  Rick, I know we

Page 287

1  haven't been going for a ton of
2  time, but I drank a bunch of
3  coffee at lunch.  Do you mind if
4  we take a break already?
5      MR. BALL:  That's fine.
6      THE VIDEOGRAPHER:  Off the
7  record, 2:01 p.m.
8      (Short break.)
9      THE VIDEOGRAPHER:  We are
10  back on the record at 2:09 p.m.
11  BY MR. VAUGHN:
12      Q.   Let's go to stomach cancer,
13  Number 55.  And let's go to Page 26 at
14  the top of the page.
15      MR. VAUGHN:  The top part,
16  sorry, where it's continuing on
17  from 55.  Yeah.
18  BY MR. VAUGHN:
19      Q.   The sentence starting with
20  however, the second sentence.  Can you
21  read the sentence aloud for us, Doctor?
22      A.   "However, stomach cancer
23  risk was increased with increasing smoked
24  meat, a food high in NDMA, after

Page 288

1  adjusting for other food groups, total
2  food consumption and ethnicity."
3      Q.   And then where we have this
4  1.76-8.75, is that saying the upper end
5  was increasing the risk of stomach cancer
6  by 875 percent?
7      A.   The confidence interval went
8  from 1.76 to 8.75, yes.
9      Q.   To the 76 percent increased
10  risk to an 875 percent increased risk?
11      A.   Yes.
12      Q.   On number --
13      A.   -- that's assessing for food
14  groups, total food consumption, and
15  ethnicity.  It didn't adjust for every
16  potential risk factor for stomach cancer,
17  like H. pylori.  So it is a limitation.
18      Q.   Do you have reason to
19  believe that one group had a higher rate
20  of H. pylori than the other group?
21      A.   Yeah.  There is a
22  relationship between stomach cancer and
23  H. pylori.
24      Also, as I note here, you

Page 289

1  have to take -- be mindful of the
2  limitations of the study.  Response rate
3  was low, it was only 44 percent.  Usually
4  we like it above 60 percent in
5  case-control studies.  And they had to
6  get rid of a third of the case because
7  they died or had severe illness.  You
8  have to get your cases as quickly as you
9  can after they're diagnosed.
10      My pancreatic cancer
11  studies, but I like -- I went daily to
12  pathology departments to look for people
13  who had pancreatic cancer, was able to
14  get to them within two weeks.  It looks
15  like they had a longer time period.
16      Q.   Is it problematic if a study
17  is excluding a third of the patients that
18  get cancer?
19      MR. BALL:  Objection to
20  form.
21      THE WITNESS:  Oh, very much
22  so.  You're not getting a
23  representative sample of your
24  cases.

Page 290

1 BY MR. VAUGHN:
2       Q.   I missed the first part of
3 your answer with that objection.  I'm
4 sorry, did you say, "Very much so"?
5       A.   Absolutely, yes.
6       Q.   And why is --
7       A.   You really got to -- you
8 really got to try to get everyone you can
9 before they are dead.  Because it could
10 be that the exposure leads to early
11 death.  You don't know.  You don't have
12 those people in your study.
13      Q.   So a study that is
14 evaluating the risk of cancer, you
15 wouldn't want to get rid of one-third of
16 the people that ended up getting cancer,
17 correct?
18      A.   Correct.  You want to try to
19 get your response rate as high as you
20 can, so...
21      Q.   Because if a third of the
22 people were excluded that got cancer,
23 that could really invalidate the results,
24 correct?

Page 291

1       A.   You just don't know unless
2 you do another research study to figure
3 that out.
4       Q.   So that study alone wouldn't
5 be reliable, you would need at least
6 another study to confirm it?
7       A.   I would, yes.  Very much so.
8 I think I -- oh, I actually say that in
9 the last sentence.  "The included cases
10 may represent earlier or less severe form
11 of the disease."  That's a problem.
12      Q.   Because the people with a
13 severe disease could have died really
14 quickly, right?
15      A.   Correct.
16      Q.   Something like pancreatic
17 cancer, that can kill you within a month
18 or two, right?
19      A.   Yeah.  As I said, that's why
20 I tried to get to people as quickly as I
21 could, within two weeks.
22      Q.   What other cancers can kill
23 you really quickly besides pancreatic
24 cancer?  Are there other ones that are

Page 292

1 kind of known for that?
2       A.   I'm trying to think.  Off
3 the top of my -- off the top of my head I
4 can't recall.  Pancreatic cancer is the
5 one that is mostly known.  The other ones
6 I'm not sure.
7            MR. VAUGHN:  Tyler, let's
8       take a break from the report for
9       just a second, and let's go to
10      2021 Gomm.
11           (Document marked for
12      identification as Exhibit
13      Fryzek-25.)
14 BY MR. VAUGHN:
15      Q.   Do you remember the Gomm
16 study, Doctor?
17      A.   Yeah, I believe that is the
18 German valsartan study?
19      Q.   Yeah, using the insurance
20 data from Germany, right?
21      A.   Yes.  Yes, sir.
22      Q.   And you don't know if this
23 insurance company has any relationship to
24 any of the defendants, do you?

Page 293

1       A.   Oh, I have no idea.
2            MR. VAUGHN:  Tyler, can we
3       go to Page 8.
4 BY MR. VAUGHN:
5       Q.   Did you review this part of
6 the study, Doctor, the selection criteria
7 when you were forming your opinions?
8       A.   Yeah, I did read it.
9       Q.   And so patients who were
10 continuously insured by AOK during the
11 years 2009 to '13 were included in this
12 study, correct?
13           Do you see that under
14 Selection Criteria?
15      A.   Yes.
16           Can we make this a little
17 bit bigger?  Thank you.
18           MR. VAUGHN:  Thank you,
19      Tyler.
20 BY MR. VAUGHN:
21      Q.   The valsartan contamination
22 continued on well past 2013, correct?
23      A.   Where do you see that?
24      Q.   Are you aware of the years

Confidential Information - Subject to Protective Order

Page 294

¹ that valsartan was contaminated with
² NDMA?
³     A.   I'm not aware of the years
⁴ in Germany.  But I believe this article
⁵ says so.  Let me look.
⁶     Q.   Go ahead.  Are you able to
⁷ download it and let me know?
⁸     A.   Oh, you want me to download?
⁹     Q.   Or if you go to Page 1 it
¹⁰ notes that in Germany the Federal
¹¹ Institute for Drugs and Medical Devices
¹² ordered a recall of drug products
¹³ contaminated with NDMA in July of 2018.
¹⁴         So would you think then that
¹⁵ in two thousand -- go ahead.
¹⁶     A.   No.  Well, in the methods
¹⁷ section they define how they determine
¹⁸ who was exposed with valsartan and who
¹⁹ was not exposed.  So if you go to the
²⁰ methods section that will tell us.
²¹     Q.   So --
²²     A.   If that's the method in the
²³ abstract, that's not right.
²⁴     Q.   I'm asking you -- there was

Page 295

¹ contaminated valsartan on the market in
² Germany after 2013, correct?
³     A.   But I'd like to look at the
⁴ methods because then we'd be clear.
⁵ Otherwise, I'm just kind of trying to
⁶ remember.
⁷     Q.   Okay.
⁸         MR. VAUGHN:  Go ahead and
⁹     pull the methods section up there
¹⁰     for him.
¹¹ BY MR. VAUGHN:
¹²     Q.   "Cohort comprised patients
¹³ who filled a prescription of valsartan
¹⁴ from the period of 2012 to 2017."
¹⁵     A.   Okay.
¹⁶     Q.   Does that help you?  It's on
¹⁷ Page 1 it notes it too.  Yeah.
¹⁸     A.   If you just go down.  I
¹⁹ think it's the next sentence.
²⁰     "Potential NDMA
²¹ contamination was assessed on the basis
²² of pharmaceutical registration number."
²³         So it looks like they looked
²⁴ for specific pharmaceutical registration

Page 296

¹ numbers between that time, 2012 and 2017.
²     Q.   Which is after 2013,
³ correct?
⁴     A.   2012 isn't.
⁵     Q.   Okay.  So some of it was
⁶ before.
⁷         But, again, their selection
⁸ criteria for patients who were
⁹ continuously insured on the years 2009 to
¹⁰ 2013, correct?
¹¹     A.   I believe that's the year,
¹² yeah.
¹³     Q.   Ok.  If we go back to
¹⁴ page --
¹⁵     A.   It's hard -- it's hard to
¹⁶ remember.
¹⁷         MR. VAUGHN:  Or Page 8, I
¹⁸     guess is what we were on, Tyler.
¹⁹ BY MR. VAUGHN:
²⁰     Q.   If someone lost their
²¹ insurance after 2013, their cancer
²² diagnosis is not going to be captured, is
²³ it?
²⁴     A.   Correct.

Page 297

¹     Q.   Or if they changed
² insurances from AOK, it's not going to be
³ captured either, is it?
⁴     A.   You know, I'm not -- I'm not
⁵ aware of the insurance system in Germany.
⁶ I don't know how it operates.
⁷     Q.   Did you not look into that
⁸ at all --
⁹     A.   What you're saying --
¹⁰     Q.   -- when you were
¹¹ evaluating --
¹²     A.   What you're say -- what
¹³ you're saying is true for the U.S.  So if
¹⁴ they have more than one insurance group,
¹⁵ you know, I just don't know.
¹⁶     Q.   All right.  In the second
¹⁷ paragraph, it notes, "For outpatient
¹⁸ diagnosis, at least one confirmatory
¹⁹ diagnosis within the following four
²⁰ quarters was required for validation."
²¹ Were you aware of that?
²²     A.   That's what it says, yes.
²³     Q.   Is that normal to do?
²⁴         MR. BALL:  Objection to

Confidential Information - Subject to Protective Order

Page 298

form.
          THE WITNESS:  I don't know
if it's normal in Germany.  I
don't know -- I don't know how
patients interact -- interact with
the healthcare system in Germany,
so.
BY MR. VAUGHN:
     Q.   When you do studies, do you
confirm confirmatory diagnosis?
     A.   Typically if you do studies
of these type of claims data, you try to
get -- look at two diagnoses, yes,
because you don't want -- if you just
look at one diagnosis, you run the risk
of getting a rule-out diagnosis.
          So they just report
something to insurance to see if they can
rule it out or not.  They're not sure
that it's actually cancer.
     Q.   So was it improper for the
other cancer patients that weren't
outpatient for them to only require one
diagnosis?

Page 299

          MR. BALL:  Objection to
form.
          THE WITNESS:  You mean
inpatients?
BY MR. VAUGHN:
     Q.   Yeah.
     A.   No.  That's pretty popular
to do that.  So outpatient you need two.
Inpatient you need one.
     Q.   So if someone went and got
an outpatient diagnosis of cancer, went
back home, blew their brains out, they're
not going to get included in this study,
are they?
          MR. BALL:  Object to form.
          THE WITNESS:  Right.  No.
BY MR. VAUGHN:
     Q.   Or someone --
     A.   I have no idea how often
that happens.  I can't imagine that
happens much.
     Q.   You don't think people --
     A.   You're trying to
discredit --

Page 300

     Q.   You don't think people get
diagnosed with cancer and they're so
upset they kill themselves?
          MR. BALL:  Object to form.
          THE WITNESS:  I have no -- I
have no data.  I've never seen any
data.
BY MR. VAUGHN:
     Q.   You're not aware of any of
the plaintiffs in this litigation have
killed themselves because of their cancer
diagnosis?
          MR. BALL:  Object to form.
          THE WITNESS:  I have no
knowledge of that.  No knowledge
of that.
BY MR. VAUGHN:
     Q.   And so also if someone got
an outpatient diagnosis, quit their job,
lost their insurance, they're not going
to be included in this study, are they?
          MR. BALL:  Object to form.
          THE WITNESS:  Yeah, they
would if they had a cancer

Page 301

diagnosis while they had
insurance.
BY MR. VAUGHN:
     Q.   If they -- if they quit
their job and lost their insurance, they
wouldn't get captured in this, would
they?
          MR. BALL:  Object to form.
          THE WITNESS:  It depends --
it depends on whether a cancer
diagnosis was made.  If they quit
their job and lost their
insurance, they wouldn't have any
way to get to a physician to get
medical care.  I'm confused by
your question.
BY MR. VAUGHN:
     Q.   I mean, they could still --
they could still get a different
insurance or they could pay out of
pocket, could they not?
          MR. BALL:  Object to form.
          THE WITNESS:  I have no
idea.  This is a German healthcare

Confidential Information - Subject to Protective Order

Page 302

1    system.  I have no idea.
2  BY MR. VAUGHN:
3       Q.   Further down in that
4  paragraph it notes, "Persons with other
5  cancer diagnosis before the index quarter
6  in which the examined cancer diagnosed
7  were not included in the analysis for
8  specific individual cancer types."
9            Does that mean if someone
10  got a diagnosis outpatient and then a
11  different cancer diagnosis inpatient,
12  that they would not be included?
13           MR. BALL:  Object to form.
14           THE WITNESS:  Let me read
15  it -- let me read it again.
16           They were included -- I
17  think that what they are saying,
18  and this is just my guess of what
19  they're saying, is if a person is
20  diagnosed with two different types
21  of cancer, they weren't included
22  in the individual cancer types,
23  but they're included in the
24  analysis with all the cancer,

Page 303

1    which is commonly done.
2  BY MR. VAUGHN:
3       Q.   Where do you draw the
4  inference that they were included for the
5  all cancer?
6       A.   It says they were not
7  included in the analysis for a specific
8  individual cancer types.  So I assume
9  that that means that they were included
10  for all cancers.
11      Q.   That's an assumption that
12  you're making of the study?
13      A.   I think it's a pretty valid
14  assumption.
15      Q.   Let's go down to exposure.
16           MR. VAUGHN:  The next
17  paragraph, Tyler.
18  BY MR. VAUGHN:
19      Q.   It notes the NDMA content of
20  valsartan tablets seemed to correlate
21  with the dose strength of the tablet.
22           If that's inaccurate, is
23  that going to impact the results of the
24  study?

Page 304

1       A.   I have no idea.
2       Q.   Why do you have no idea?
3       A.   Because I don't know if it's
4  true or not.  And I don't know how it
5  would impact the study.
6       Q.   Well, is the study not
7  trying to look at if higher levels of
8  valsartan can cause cancer?
9            MR. BALL:  Object to form.
10           THE WITNESS:  It was looking
11  at a variety of questions.  That
12  was just one of them.
13  BY MR. VAUGHN:
14      Q.   Did they group people on
15  exposure based on the milligram of the
16  valsartan pill?
17      A.   You'd have to show me that
18  so I can recall that.  I don't recall off
19  the top of my head.
20      Q.   You don't recall how they
21  did this study?
22           MR. BALL:  Object to form.
23           THE WITNESS:  Not -- not
24  off -- not off the top of my head,

Page 305

1    no.
2  BY MR. VAUGHN:
3       Q.   If they did classify people
4  for exposure based in part off of the
5  milligram of the pill, and in reality
6  some of the low milligram pills actually
7  have more NDMA than the high milligram
8  pills, would that impact the results of
9  this study?
10           MR. BALL:  Object to form.
11           THE WITNESS:  I'd have to --
12  I'd have to see how they're
13  classified.  I don't think it
14  would impact the study though
15  because there is no relationship
16  between NDMA and cancer.  I would
17  say it would I still find no
18  relationship.
19  BY MR. VAUGHN:
20      Q.   Don't you base your opinion
21  that there's no association between NDMA
22  and cancer in large part on this study?
23           MR. BALL:  Objection to
24  form.

Page 306

1    THE WITNESS:  Not in large
2  part.  The totality -- the
3  totality of the evidence.
4  BY MR. VAUGHN:
5    Q.   How many valsartan studies
6  did you cite in your report?
7    A.   Two.
8    Q.   Two.  And this is one of the
9  two, right?
10    A.   Right.
11    Q.   And the validity of the
12  results doesn't really matter how much
13  NDMA is in the pills because you're
14  already certain that NDMA is not
15  carcinogenic to humans, right?
16    MR. BALL:  Objection to
17  form.
18    THE WITNESS:  That's not
19  what I -- that's not what I said.
20  I think they analyzed it a
21  number of different ways.
22  BY MR. VAUGHN:
23    Q.   How?
24    A.   They looked at any valsartan

Page 307

1  use, valsartan use by different levels.
2    MR. VAUGHN:  Tyler, can we
3  go to Page 5.
4  BY MR. VAUGHN:
5    Q.   Doctor, do you know how many
6  people were included in this study that
7  got cancer?
8    A.   I think -- I think it says
9  in the results section somewhere.
10    Here it is, no, these are
11  for the different cancer types.  I can't
12  recall that off the top of my head.
13    Q.   If we added up all the
14  cancer types, would that give us the
15  answer?
16    A.   It depends if someone had
17  more than one cancer.
18    Q.   Do you know if they --
19  earlier didn't we disagree that if they
20  were diagnosed with two cancers, they
21  weren't included?
22    MR. BALL:  Objection to
23  form.
24    THE WITNESS:  It wasn't

Page 308

1  they -- it wasn't that they were
2  diagnosed with two cancers.  But
3  it should say in the results how
4  many people had cancer if you are
5  interested in that.
6  BY MR. VAUGHN:
7    Q.   If you could find it, I'd
8  appreciate it.  If I add all of these up,
9  I come out to about 28,000.  I don't know
10  if that sounds about right to you or not.
11    A.   I didn't memorize that.  I'm
12  sorry.  Let me see if I can -- can I
13  control this or do I have to download the
14  document?
15    Q.   You might have to download
16  it.
17    A.   Okay.  What number is this,
18  what exhibit number?
19    MR. VAUGHN:  Tyler, do you
20  know what --
21    TRIAL TECH:  25.
22    THE WITNESS:  I'm sorry?  I
23  missed that.
24    MR. VAUGHN:  25.

Page 309

1    TRIAL TECH:  25.
2    THE WITNESS:  25?
3    MR. VAUGHN:  Yes.
4    THE WITNESS:  All right.  It
5  looks like we have to look at
6  eTable 1.  Do you have eTable 1?
7  I take it it's an online table.
8  BY MR. VAUGHN:
9    Q.   Page 3 has a Table 1, but
10  it's not giving that information.
11    A.   Yeah.  No, it's eTable,
12  which I assume means electronic table,
13  which means it's online.  So I don't know
14  if you guys have access to that.
15    Q.   I don't.
16    A.   Okay.  Because that gives a
17  result for overall cancer.  So you'd have
18  to look at that.
19    Q.   And so is it your opinion
20  that adding all the different cancer
21  types will not give us the total number?
22    MR. BALL:  Objection to
23  form.
24    THE WITNESS:  I have no

Page 310

1    idea.  I said I had no idea.
2  BY MR. VAUGHN:
3    Q.   Okay.
4       MR. VAUGHN:  Well, let's go
5    back to Page 5, Tyler, and look at
6    all those cancers again.
7  BY MR. VAUGHN:
8    Q.   Okay.  So for bladder
9  cancer, between non-exposed and exposed,
10 if we add those together it's about
11 2,500, right?
12   A.   Correct.
13   Q.   And then breast cancer, if
14 we add those two together, it's about
15 4500, right?
16   A.   I'll take your word for it.
17 I believe you.
18   Q.   All right.  And then
19 colorectal, you add those two together it
20 gets pretty close to 5,000, right?
21   A.   Yes.
22   Q.   And kidney, those two
23 together, is close to 2,000?
24   A.   Yes.

Page 311

1    Q.   And lung cancer, if we add
2  those together it's close to 4,000?
3    A.   Yes.
4    Q.   Malignant melanoma, we add
5  those together it's about 2,000?
6    A.   Yes, it -- yes, it is.
7    Q.   And pancreatic cancer, we
8  add those together, it's about 1,500?
9    A.   Yes.
10   Q.   And prostate cancer, we add
11 those together, it's about 5,000 --
12 4,000, right?
13   A.   Yep.
14   Q.   And then uterine cancer, we
15 add those together and it's about 1,000,
16 right?
17   A.   Yeah.  About 1100, 1200.
18   Q.   So if I represent to you
19 that if we add all of those numbers that
20 we just did, we come out to 27,000.  Do
21 you have any reason to disagree with
22 that?
23      MR. BALL:  Objection to
24 form.

Page 312

1       THE WITNESS:  If we add it
2    up?
3  BY MR. VAUGHN:
4    Q.   Yeah, if we add all the
5  numbers that we just did, it comes out to
6  27,000.
7    A.   Okay.  I'll take your word
8  for it.
9       MR. VAUGHN:  Then, Tyler,
10   can we now go to the last page,
11   Page 14.
12 BY MR. VAUGHN:
13   Q.   Doctor, do you see here on
14 that first arrow that goes to the right,
15 14,608 people were excluded because they
16 did not have a consistent cancer
17 diagnosis?
18   A.   Okay.
19   Q.   And out of the total cancer
20 cases, so if there was that 27,000 that
21 were included, and you add these 14,600,
22 would you agree that about one-third of
23 the people diagnosed with cancer were
24 excluded from the study?

Page 313

1    A.   I don't --
2       MR. BALL:  Objection to
3    form.
4  BY MR. VAUGHN:
5    Q.   Okay.  So earlier we said
6  there was 27,000, we agreed, in the study
7  that got cancer.
8    A.   Mm-hmm.
9    Q.   And is 14,600 approximately
10 50 percent of 27,000?
11   A.   Yes.
12   Q.   So would that mean that
13 approximately one in three people
14 diagnosed with cancer were excluded from
15 the study?
16      MR. BALL:  Objection to
17   form.
18      THE WITNESS:  I don't
19   know -- I don't know unless we
20   look at the eTable 1 to see how
21   many cancer patients there were.
22 BY MR. VAUGHN:
23   Q.   If the number we came to
24 earlier, the 27,000, if that was the

1 total number of people that got cancer
2 that were included in the study, would
3 you agree that one-third were excluded?
4          MR. BALL:  Objection to
5     form.
6          THE WITNESS:  If that was,
7     yes.
8 BY MR. VAUGHN:
9     Q.    Thank you, Doctor.
10    A.    You should only be concerned
11 about that if they were not similar to
12 the people who were included.  There's
13 bias involved in that.
14    Q.    Well, the study was on
15 people that just took valsartan, right?
16 Earlier you were saying that they looked
17 at everyone that took valsartan, then
18 they compared that to the general
19 population, right?
20    A.    No, they didn't compare this
21 to the general population.  They only
22 compared it among valsartan users.
23    Q.    Okay.
24          MR. VAUGHN:  Let's go back

1     to his expert report, Tyler.  And
2     Page 26.  Let's go to 56 now.  We
3     left off at 55 last.
4 BY MR. VAUGHN:
5     Q.    So midway through this one
6 it notes that the median NDMA cases was
7 0.18 nanogram a day and .16 --
8     A.    Point --
9     Q.    Huh?  Do you see that?
10    A.    I'm sorry, I'm trying to
11 figure out what this is.  This is the
12 case of stomach cancer in Spain?  Okay.
13    Q.    Is this -- do you know if
14 this is correct, .18 nanograms or is that
15 supposed to be micrograms?
16    A.    Oh, we'd have to look at the
17 study to confirm.
18    Q.    All right. .18 nanograms is
19 really small, right?
20    A.    Yeah, it is.  Yeah.
21    Q.    And just with a .02
22 increase -- .02-nanogram increase a day
23 of NDMA, they saw an increased risk of
24 cancer, didn't they?

1          MR. BALL:  Objection to
2     form.
3          THE WITNESS:  I'm not sure
4     what you're asking.  I'm sorry,
5     I'm a little bit lost.
6 BY MR. VAUGHN:
7     Q.    Okay.  Well, I guess the
8 next sentence, "An increasing risk of
9 stomach cancer was seen with increasing
10 NDMA intake."
11          Do you see that?
12    A.    Yes.
13    Q.    And that P-trend, .007,
14 that's statistically significant, right?
15    A.    Correct.
16    Q.    And if we look at the
17 quartiles.  Quartile 2 is associated with
18 an 86 percent increase of risk.
19 Quartile 3, 79 percent increase of risk,
20 and then Quartile 4, 109 percent
21 increased risk, right?
22    A.    Right.
23    Q.    And then the difference on
24 the median intake, it looks like was

1 just, what, .02 nanograms is what it was
2 saying?
3     A.    Well, this is -- this is the
4 median across all four quartiles, right?
5     Q.    You tell me.
6     A.    You can't do what you did --
7 you can't do what you're doing.
8     Q.    What am I doing?
9     A.    You're looking across all
10 four quartiles.
11    Q.    Is Quartile 4 the quartile
12 that got the most NDMA?
13    A.    I believe that's how they
14 cut it up, yes.
15    Q.    Is Quartile 4 the group that
16 had the highest increased risk of cancer?
17    A.    Yes.
18    Q.    Do you see later on where it
19 notes, "High NDMA intake paired with low
20 vitamin C intake increased the risk of
21 stomach cancer"?
22    A.    Yes.
23    Q.    And the high intake of
24 vitamin C appeared to mitigate the effect

Page 318

1 of high NDMA intake.
2         Do you see that as well?
3     A.   I do.
4     Q.   Were you aware of that
5 before working on your report?
6         MR. BALL:  Objection to
7     form.
8         THE WITNESS:  That just this
9     one study -- this one study showed
10     a relationship?
11 BY MR. VAUGHN:
12     Q.   I'm sorry.  Were you aware
13 that vitamin C could mitigate the
14 carcinogenicity of low levels of NDMA?
15     A.   Well, this is just one
16 study.  You can't take the results of one
17 study and say it's causality.  It's the
18 totality of the evidence.
19     Q.   Do you -- do you not think
20 that vitamin C mitigates the
21 carcinogenicity of NDMA?
22         MR. BALL:  Objection to
23     form.
24         THE WITNESS:  I'd say we

Page 319

1     need more studies to show any type
2     of causality.  Absolutely.
3         Confidence intervals are
4     small.  The risk odds ratios are
5     small.  They're not high.  Only
6     done in one population.  You
7     really need more information.
8 BY MR. VAUGHN:
9     Q.   Do you know a person by the
10 last name Wikoff, W-I-K-O-F-F?
11     A.   Yes.
12     Q.   How do you know them?
13     A.   She's at ToxStrategies.
14 She's a toxicologist.
15     Q.   What about C. Thompson, do
16 you know him?
17     A.   No.
18     Q.   And then Chappell, I think
19 we talked about Chappell before, right?
20 C-H-A-P-P-E-L-L?
21     A.   Yeah.  I believe she's at
22 ToxStrategies, yeah.
23     Q.   And then what about Doepker,
24 D-O-E-P-K-E-R?  Do you know that person?

Page 320

1     A.   No, I don't know that name.
2     Q.   Okay.  The ones that you do
3 know, do you have any criticisms of them?
4         MR. BALL:  Objection to
5     form.
6         THE WITNESS:  No.
7         MR. VAUGHN:  Tyler, can we
8     pull up 2018 benefit risk
9     analysis.
10         (Document marked for
11     identification as Exhibit
12     Fryzek-26.)
13         MR. VAUGHN:  Can we go to
14     Page 2.
15         MR. BALL:  I think you put
16     this up before.  Could you let me
17     know what exhibit it was?
18         MR. VAUGHN:  This is the
19     first time we've done this one.
20         MR. BALL:  Okay.  Sorry.
21         MR. VAUGHN:  No, you're
22     fine.  It's confusing.
23 BY MR. VAUGHN:
24     Q.   And, Doctor, does this

Page 321

1 identify that all of the authors of this
2 study work at ToxStrategies?
3     A.   Yes.
4     Q.   And that's where you
5 currently work, correct?
6     A.   I work at EpidStrategies,
7 which is a division of ToxStrategies.
8     Q.   Thank you, Doctor.
9         MR. VAUGHN:  Tyler, can we
10     go to Page 26.  Maybe I'm wrong.
11     26 at the bottom of it at least.
12         Next page.
13 BY MR. VAUGHN:
14     Q.   All right, Doctor.  Can you
15 read the first three sentences out loud
16 for us?
17     A.   "The recent evaluation by
18 EFSA" -- I don't know who EFSA is --
19 "provides context regarding quantitative
20 estimates related to formation of
21 endogenous n-nitroso compounds in foods
22 that contain nitrates as an additive."
23     Q.   I'm sorry, I have you on the
24 wrong spot.  I apologize for

Confidential Information - Subject to Protective Order

Page 322

[1] interrupting.

[2]        MR. VAUGHN:  Can we pull
[3]    back out real quick, Tyler.
[4]        The top one, I'm sorry.
[5]    Yeah.  I'll try it again.
[6] BY MR. VAUGHN:
[7]    Q.   Can you read the first three
[8] sentences now for me?
[9]    A.   "Significant complexities
[10] are inherent" -- "are inherent to
[11] quantitative evaluation of the potential
[12] for formation of nitroso compounds.  It
[13] is recognized that there are processes
[14] and agents that can reduce formation of
[15] nitrosamines, for example, compounds
[16] containing vitamin C and other compounds
[17] that inhibit nitrosation, causing reduced
[18] formation of n-nitroso compounds, ATSDR
[19] 2017."
[20]    Q.   And then can you skip down,
[21] I guess, to the next -- skip one sentence
[22] and start reading where it says "and
[23] further complicating," and read through
[24] the rest of the paragraph for us.

Page 323

[1]    A.   "And further complicating
[2] the evaluation of these compounds in the
[3] context of nitrate exposures is
[4] observation that although n-nitroso
[5] compounds may have a role in cancer
[6] etiology, consumption of fruits and
[7] vegetables, sources of vitamins and
[8] polyphenols, which can act as nitrosation
[9] inhibitors, can produce protective
[10] effects against various malignancies."
[11]    Q.   Do you disagree with your
[12] colleagues that n-nitroso compounds may
[13] have a role in cancer etiology?
[14]        MR. BALL:  Object to form to
[15]    form.
[16]        THE WITNESS:  I'm sorry.
[17]    Can you ask again?
[18] BY MR. VAUGHN:
[19]    Q.   Do you disagree with your
[20] colleagues that n-nitroso compounds may
[21] have a role in cancer etiology?
[22]        MR. BALL:  Objection.
[23]        THE WITNESS:  I don't know
[24]    if this is -- I don't know if this

Page 324

[1]    is humans or animals we're talking
[2]    about here.
[3]        MR. VAUGHN:  Can you go to
[4]    Page 4, Tyler.  Or Page 5 of the
[5]    PDF, I think.  Page 5.
[6]        There we go.
[7] BY MR. VAUGHN:
[8]    Q.   You see here that first
[9] sentence, it's talking about, "Recent
[10] data suggests that it may be an important
[11] and beneficial constituent in the human
[12] diet."
[13]        So we're talking about human
[14] diet here, correct?
[15]    A.   I'm sorry.  Where are you
[16] reading?
[17]    Q.   Very first paragraph or
[18] sentence.
[19]    A.   Okay.  That's what that
[20] sentence refers to.
[21]    Q.   Do you not think that the
[22] entire study is talking about human diet?
[23]        MR. BALL:  Object to form.
[24]        THE WITNESS:  I don't know.

Page 325

[1]    I haven't had the opportunity to
[2]    read it.
[3] BY MR. VAUGHN:
[4]    Q.   Did you not consult with
[5] your colleagues when you were forming
[6] your opinions in this report?
[7]        MR. BALL:  Objection to
[8]    form.
[9]        THE WITNESS:  So these are
[10]    my opinions, not my colleagues'
[11]    opinions?
[12] BY MR. VAUGHN:
[13]    Q.   No, these are your
[14] colleagues' opinions.
[15]        Did you consult with any of
[16] the authors of this manuscript when you
[17] were developing your opinions in this
[18] case?
[19]    A.   Why would I?  They're
[20] toxicologists.  They don't know anything
[21] about epidemiology.
[22]    Q.   But I knew that you worked
[23] on a panel --
[24]    A.   They're different

Confidential - Information Subject to Protective Order

Page 326

1  disciplines.  They're different
2  disciplines.
3      Q.   Well, but I notice on your
4  billing you had a lot of different people
5  actually doing the review and writing
6  your report.  And some of them just said
7  professionals and stuff.  None of these
8  people would have been involved at all
9  with helping you draft your report or
10  doing research, correct?
11     A.   Correct.
12     Q.   And then back on Page 27, do
13  you disagree with them that n-nitroso
14  compounds may have a role in cancer
15  etiology?
16         MR. BALL:  Objection to
17     form.
18         MR. VAUGHN:  Sorry, go back
19     one page, Tyler.  It's confusing
20     on PDF versus the other page.
21  BY MR. VAUGHN:
22     Q.   Yeah, here at the bottom
23  where they say, "N-nitroso compounds may
24  have a role in cancer etiology."

Page 327

1         Do you disagree with that?
2         MR. BALL:  Objection to
3     form.
4         THE WITNESS:  I don't know
5     if they're talking-- I don't know
6     if they are talking about humans
7     or animals.
8  BY MR. VAUGHN:
9      Q.   If they are talking about
10  humans, do you disagree with your
11  colleagues?
12         MR. BALL:  Objection to
13     form.
14         THE WITNESS:  Again,
15     epidemiology data doesn't show
16     that.
17  BY MR. VAUGHN:
18     Q.   So you're saying yes, you do
19  disagree with your colleagues?
20         MR. BALL:  Objection to
21     form.
22         THE WITNESS:  I'm saying
23     that I don't -- I don't know what
24     this study is about.  I don't know

Page 328

1      what they did.  All I know is what
2      I reviewed.  And my review shows
3      the totality of the evidence,
4      there's no relationship between
5      NDMA and cancer or any specific
6      cancer type.
7          MR. VAUGHN:  We can go back
8      to his expert report now, Tyler,
9      and Page 26 again.
10  BY MR. VAUGHN:
11     Q.   Number 57, I think that's
12  the one we are on.  About midway through
13  it notes that "The mean daily NDMA intake
14  for this population was
15  .18 micrograms" -- and that would be
16  180 nanograms, correct, Doctor?
17     A.   I believe so, yes.
18     Q.   And this one is in Italy,
19  correct?
20     A.   Yes.
21     Q.   And then the next sentence
22  says, "Using the fully adjusted model,
23  there was an increased risk of stomach
24  cancer at the highest intake of NDMA,"

Page 329

1  when they are taking over 191 nanograms.
2          Do you see that?
3      A.   I do.
4      Q.   And do you have any idea if
5  the NDMA levels in valsartan were over
6  198 nanograms?
7          MR. BALL:  Objection to
8      form.
9  BY MR. VAUGHN:
10     Q.   You don't know if they were
11  hundreds of times higher or even
12  thousands of times higher than that?
13         MR. BALL:  Objection to
14     form.
15         THE WITNESS:  I don't know.
16     It doesn't matter for the
17     epidemiology review.
18         With all the epidemiology
19     studies and overall there's not a
20     risk with cancer.
21  BY MR. VAUGHN:
22     Q.   Then if you go a little bit
23  farther do you see where it says,
24  "However, a dose-response trend was

Confidential Information Subject to Protective Order

Page 330

1  observed, P less than .01."
2        So is that saying there's a
3  statistically significant dose-response
4  with NDMA and stomach cancer in this
5  study?
6     A.    In men, but not in women.
7     Q.    Previously we looked at a
8  study, who had higher levels of NDMA
9  intake in their diet, was it men or
10 women?
11       MR. BALL:  Objection to
12    form.
13       THE WITNESS:  I don't know.
14    But you can't take one study from
15    a different population and
16    different country and apply it to
17    a study in a different country
18    with a different population.
19 BY MR. VAUGHN:
20    Q.    We've looked at quite a few
21 different countries now, haven't we?
22       MR. BALL:  Objection to
23    form.
24       THE WITNESS:  Yes.

Page 331

1        Absolutely.
2        MR. VAUGHN:  Let's go to the
3    next page, Tyler.
4  BY MR. VAUGHN:
5     Q.    All right.  Number 58.
6        All right, Now we are in
7  France.  And if we go down about
8  two-thirds of the way.
9        "Median daily intake of NDMA
10 was .25 micrograms."
11       So here the median is
12 250 nanograms, isn't it?
13    A.    Yes.
14    Q.    Which is getting higher,
15 right?
16    A.    Getting higher than --
17       MR. BALL:  Objection to
18    form.
19 BY MR. VAUGHN:
20    Q.    Higher than the previous
21 ones we looked at?
22    A.    I don't recall.
23    Q.    For which --
24    A.    Some of them were -- some

Page 332

1  were means and some were median, so
2  they're different -- they're different
3  measures.  Median isn't the same as a
4  mean.
5     Q.    But do you agree that
6  250 nanograms was higher than the other
7  ones we were looking at, that were like
8  50 nanograms and 70 nanograms?
9        MR. BALL:  Objection to
10    form.
11       THE WITNESS:  If they -- I
12    can't recall, I think they were
13    means.  These are different
14    measures.  You can't compare them.
15 BY MR. VAUGHN:
16    Q.    So but for the median daily
17 NDMA intake at 250 nanograms, there was a
18 statistically significant higher
19 increased of cancer than in the controls,
20 correct?
21       MR. BALL:  Objection to
22    form.
23       THE WITNESS:  They didn't do
24    it -- they didn't do analysis by

Page 333

1    median.  So I'm confused by your
2    answer.
3  BY MR. VAUGHN:
4     Q.    I'm reading what it says on
5  your report, on median daily NDMA intake
6  was 250 nanograms.  When they compared
7  250 nanograms to 230 nanograms there was
8  a statistically significant higher -- oh,
9  is that just saying that the -- is that
10 just saying that the NDMA intake was
11 higher, not the risk of cancer?
12    A.    Correct.
13    Q.    Okay.
14    A.    It doesn't say it -- it just
15 says difference.
16    Q.    Okay.  Can you read the next
17 sentence aloud for us?
18    A.    "There was a sevenfold risk
19 of stomach cancer with the highest NDMA
20 intake, and a nonsignificant increased
21 risk in the middle tertile."
22    Q.    And what does the next
23 sentence say?
24    A.    "A dose-response trend was

Confidential Information - Subject to Protective Order

Page 334

1 observed when NDMA was analyzed as a
2 continuous variable. Results were
3 adjusted for age, sex, occupation, and
4 total caloric intake."
5          Q.   So what is your explanation
6 for why this one showed a sevenfold
7 increase in stomach cancer?
8          MR. BALL:  Objection to
9     form.
10          THE WITNESS:  You have --
11     you have to look at how the study
12     was conducted.  You have to look
13     at all the confounders.
14          So H. pylori is considered
15     for stomach cancer here, which is
16     a major confounder.  And different
17     population.  You have to look at
18     all those things.
19 BY MR. VAUGHN:
20     Q.   Do you have any evidence at
21 all that one group had higher rates of
22 H. pylori than the other?
23          MR. BALL:  Objection to
24     form.

Page 335

1          THE WITNESS:  I have no
2     evidence -- I have no evidence
3     that they didn't.  I'm saying it's
4     something that you need to look
5     at, you need to look at it.  You
6     can't just ignore it.
7 BY MR. VAUGHN:
8     Q.   Do you look at that in every
9 study that you do?
10          MR. BALL:  Objection to
11     form.
12          THE WITNESS:  I don't do a
13     lot of studies -- I don't do a lot
14     of studies of stomach cancer.
15 BY MR. VAUGHN:
16     Q.   So H. pylori would be one
17 confounder, correct?  Can you name any
18 other ones besides H. pylori for this
19 one?
20          MR. BALL:  Objection to
21     form.
22          THE WITNESS:  Yeah, we have
23     to go to page -- I list all the
24     confounders.  Let me find them for

Page 336

1 you.
2 BY MR. VAUGHN:
3     Q.   We are talking about a
4 700 percent increase.  Do you think a
5 confounder can explain a 700 percent
6 increase?
7          And that's just average.  If
8 you look at this, it goes from 1.85 to
9 26.46.  That is a 2,600 percent increase
10 in cancer, is it not?
11          MR. BALL:  Object to form.
12          THE WITNESS:  You are
13     misinterpreting what that's
14     showing.  What that's showing is
15     there's just not a lot of people
16     at that highest intake level.
17     Because the confidence interval is
18     so wide, 1.85 to 26.46.  It's just
19     unstable.
20 BY MR. VAUGHN:
21     Q.   And the lowest part of that
22 confidence interval is still showing
23 85 percent increased risk of cancer,
24 isn't it?

Page 337

1     A.   But it's quite a wide
2 confidence interval.
3          So I'm trying to find my --
4 the list of confounders for stomach
5 cancer.  Do you want me to still find
6 that or?
7     Q.   You know, I was going to get
8 to that in a little bit if we want to
9 just wait.
10     A.   Okay.
11     Q.   So I think we went through
12 five stomach NDMA studies, all of them so
13 far found an increased risk of stomach
14 cancer with increasing risk of NDMA.
15          Let's go --
16     A.   Again, we just --
17          MR. BALL:  Is that a
18     question?  Is that a question or a
19     statement?
20          MR. VAUGHN:  I wasn't even
21     done yet.  I was going to say
22     let's go to Number 59.
23 BY MR. VAUGHN:
24     Q.   Again midway through this

Confidential Information - Subject to Protective Order

1  one, NDMA intake was found to be
2  associated with an increased risk of
3  stomach cancer, odds ratio 1.15, P-trend
4  .001.
5         So is this now the sixth
6  study in a row that we've went through
7  that shows --
8       A.   Yeah --
9       Q.   -- an association with NDMA
10  and cancer?
11      A.   You can't just cherry-pick
12  studies like this.  You have to look at
13  all of the totality together.
14      Q.   Doctor, what do you mean --
15  what do you mean cherry-pick?  I'm going
16  through them in order of your report.
17  These are the first six ones that you
18  listed under stomach cancer.  How am I
19  cherry-picking?
20      A.   Let's look at the graph and
21  see what they all look like together.
22      Q.   Why the graph?  Why can't we
23  go through --
24      A.   Because --

1       Q.   -- what you actually said
2  about these?
3       A.   I did the graph as well.  I
4  mean --
5       Q.   Okay.  And your attorney can
6  ask you questions.  He can go through
7  your graph with you if you want.  But how
8  am I cherry-picking when I'm going
9  through them one by one in the order you
10  put them in your report?
11      A.   I am not sure that you're
12  going through them one by one.  I haven't
13  been paying attention to that.  And I
14  don't know why you don't want to look at
15  my graph.  It's a representation of all
16  these studies.
17      Q.   I've been calling out the
18  number each time.  55, okay, let's go to
19  the next one, 56, 57, 58.  59 is where
20  we're at.
21      A.   Okay.  You must be in the
22  section that's just on stomach cancer
23  too, right?
24      Q.   All right.  Let's move on

1  then from stomach cancer.  Let's go to --
2  let's go to Page 29 where it starts going
3  into upper aerodigestive cancers.  Number
4  63, the first one in that section in your
5  expert report.
6        All right.  If we go down
7  about halfway again.
8        "Cancer of the oral cavity
9  was increased with NDMA intake, but only
10  statistically significant at the highest
11  intake levels."
12       Do you see that, Doctor?
13      A.   I do.  Yes.
14        MR. VAUGHN:  You can go to
15      the next page.
16  BY MR. VAUGHN:
17      Q.   So you only have two listed
18  under upper aerodigestive cancers.  Okay.
19  So the one we just went over.  And we're
20  going to go over to Number 64, which is
21  the other one.  And towards the bottom of
22  that one is --
23      A.   But you're --
24      Q.   -- it says, "NDMA was found

1  to be associated with ESSC," which is
2  esophageal squamous cell carcinoma.  And
3  it ranges from 2.12, se even the lowest
4  end of the confidence -- confidence
5  interval was above two.  And it goes all
6  the way to 5.07 with a P trend of .0001,
7  correct?
8       A.   Yeah, so you're only looking
9  at the poor study designs here.  You're
10  ignoring the cohort studies, which we
11  reviewed at first.  We looked at those.
12  You're ignoring the actual studies of
13  valsartan.
14        MR. VAUGHN:  Tyler, can we
15      go back to Page 24 of his report.
16  BY MR. VAUGHN:
17      Q.   Do you see at the top there,
18  Doctor, you're talking specifically about
19  case-control studies.  You said that --
20      A.   Right.
21      Q.   -- assessed as a whole have
22  not found strong evidence that NDMA or
23  NDEA are associated with cancer.
24        You only listed two

Page 342

¹ case-control studies for upper airway.
² And they both show a statistically
³ significant result.
⁴          How do you get to this
⁵ opinion when you only have two studies
⁶ that both show it?
⁷     A.   I have to look at my graph.
⁸ My graph was pretty clear about it.
⁹     Q.   Your graph is going to be
¹⁰ able to explain more than the paragraphs
¹¹ that you wrote about the studies?
¹²     A.   Yeah, because you'll be able
¹³ to see all the evidence in totality.
¹⁴     Q.   But you would agree with me
¹⁵ the only two studies that you cited for
¹⁶ upper aerodigestive cancers on
¹⁷ case-control studies, they both showed a
¹⁸ statistically significant increased risk?
¹⁹          MR. BALL:  Objection to
²⁰     form.
²¹          THE WITNESS:  The strongest
²²     of these designs are cohort
²³     studies, and they don't show a
²⁴     risk.

Page 343

¹ BY MR. VAUGHN:
²     Q.   Okay.  But how can you say
³ that the case-control studies do not show
⁴ evidence?
⁵     A.   Because they don't.  The
⁶ lower confidence intervals are way below
⁷ two.
⁸     Q.   Okay.  Let's go back to Page
⁹ 30.  Remember the low confidence interval
¹⁰ is 2.12.  That's above two, correct?
¹¹     A.   Slightly above two, yes.
¹²     Q.   It's above two, right?
¹³     A.   It is, yes.
¹⁴     Q.   So where are you coming out
¹⁵ saying that the case-control studies
¹⁶ don't show an increased risk of cancer?
¹⁷ You only have two studies cited here.
¹⁸ Your excuse a second ago was the lower
¹⁹ end of the confidence interval was under
²⁰ two.  It's above two.  So what's your
²¹ reason now?
²²          MR. BALL:  Objection to
²³     form.
²⁴          THE WITNESS:  Of this one

Page 344

¹ study or all the studies combined?
² BY MR. VAUGHN:
³     Q.   The case-control studies.
⁴     A.   When you look at all the
⁵ studies combined -- that's why we graph
⁶ them, so you can see them all combined.
⁷ You don't just pull them out one by one.
⁸     Q.   You only list two studies
⁹ under upper aerodigestive cancers.  They
¹⁰ both show a statistically significant
¹¹ increased risk.  How are you saying that
¹² case-control studies don't show any
¹³ evidence that NDMA or NDEA are associated
¹⁴ with cancer?  You only list two
¹⁵ case-control studies and they both show
¹⁶ an increased risk, do they not?
¹⁷     A.   Okay.  Okay.
¹⁸          MR. BALL:  Objection to
¹⁹     form.
²⁰          THE WITNESS:  And you have
²¹     to -- you have to look at all of
²²     the methodologies of the studies.
²³     And case-control studies of the
²⁴     diet are really hard to do.

Page 345

¹ BY MR. VAUGHN:
²     Q.   I don't see anywhere in your
³ report where you are explaining why these
⁴ two studies don't support evidence that
⁵ NDMA is associated with cancer.  I mean,
⁶ the authors found that it was, right?
⁷          MR. BALL:  Objection to
⁸     form.
⁹          THE WITNESS:  I don't know.
¹⁰     I can't recall what the authors
¹¹     said about the finding.
¹² BY MR. VAUGHN:
¹³     Q.   This part where it says,
¹⁴ NDMA was found to be associated with
¹⁵ ESSC, esophageal squamous cell carcinoma,
¹⁶ and then you give an odds ratio 3.28, a
¹⁷ 95 percent confidence interval from 2.12
¹⁸ to 5.07 and a P-trend of .0001.
¹⁹          Was that your analysis or
²⁰ was that the authors' analysis?
²¹     A.   Oh, it's the authors'
²² analysis, absolutely.
²³     Q.   Let's move on to colorectal
²⁴ cancer.  Number 65.  We go about halfway

Confidential Information - Subject to Protective Order

Page 346

<sup>1</sup> down. "Intake of NDMA was found to be
<sup>2</sup> associated with risk of colorectal cancer
<sup>3</sup> at the highest level of intake."
<sup>4</sup>        And then you skip two
<sup>5</sup> sentences.
<sup>6</sup>        Do you notice again where
<sup>7</sup> they say, "However a dose-response trend
<sup>8</sup> was observed, P-trend .005," correct?
<sup>9</sup>     A.   Correct.
<sup>10</sup>     Q.   We'll keep going.  There was
<sup>11</sup> also, "The highest levels of NDMA intake
<sup>12</sup> were associated with cancer of the
<sup>13</sup> rectum."  And it lists it as
<sup>14</sup> statistically significant, correct?
<sup>15</sup>     A.   Correct.
<sup>16</sup>     Q.   And if we look at a little
<sup>17</sup> higher, Q5 median was 2.29 micrograms a
<sup>18</sup> day, correct?
<sup>19</sup>     A.   In this population, yes.
<sup>20</sup>     Q.   You don't have any idea if
<sup>21</sup> some of the valsartan contained more than
<sup>22</sup> two micrograms of NDMA, do you?
<sup>23</sup>     A.   I don't, no.
<sup>24</sup>     Q.   Doctor, this is the only

Page 347

<sup>1</sup> case-control study that you listed for
<sup>2</sup> colorectal cancer.  But again, remember
<sup>3</sup> earlier you said there was no evidence in
<sup>4</sup> the case-control studies of increased
<sup>5</sup> risk of cancer, right?
<sup>6</sup>        MR. BALL:  Objection to
<sup>7</sup> form.
<sup>8</sup> BY MR. VAUGHN:
<sup>9</sup>     Q.   Do you think this study
<sup>10</sup> supports the fact this there's not an
<sup>11</sup> increased risk of cancer with NDMA?
<sup>12</sup>     A.   I thought the lower
<sup>13</sup> confidence interval is below two, way
<sup>14</sup> below two in both of these studies.
<sup>15</sup>        THE COURT REPORTER:  Can you
<sup>16</sup> raise your voice, please, Doctor?
<sup>17</sup>        THE WITNESS:  I said the
<sup>18</sup> lower confidence interval is below
<sup>19</sup> two, way below two in both of
<sup>20</sup> these studies.
<sup>21</sup> BY MR. VAUGHN:
<sup>22</sup>     Q.   So -- there's only one
<sup>23</sup> study, I think, isn't there?
<sup>24</sup>     A.   I'm sorry, in both of these

Page 348

<sup>1</sup> findings, the two findings there.  The
<sup>2</sup> rectum cancer, colorectal cancer.
<sup>3</sup>     Q.   But -- lowest end of that
<sup>4</sup> confidence interval still showed an
<sup>5</sup> increased risk of cancer, right?
<sup>6</sup>     A.   A borderline.  Borderline.
<sup>7</sup>     Q.   Borderline increased risk of
<sup>8</sup> cancer?
<sup>9</sup>     A.   Yeah.
<sup>10</sup>     Q.   Okay.
<sup>11</sup>        MR. VAUGHN:  Let's go to the
<sup>12</sup> next page.
<sup>13</sup> BY MR. VAUGHN:
<sup>14</sup>     Q.   So again, you have one study
<sup>15</sup> cited for pancreas cancer.
<sup>16</sup>     A.   Mm-hmm.
<sup>17</sup>     Q.   And those, "Plant sources of
<sup>18</sup> NDMA were associated with statistically
<sup>19</sup> significant increased risk at high levels
<sup>20</sup> of intake compared to low levels."
<sup>21</sup>        P-trend .001, correct?
<sup>22</sup>     A.   Correct.  Which you have to
<sup>23</sup> be mindful of how they are doing the
<sup>24</sup> study.  I mean, you're just looking at --

Page 349

<sup>1</sup> again, you're just looking at the
<sup>2</sup> findings here.  I mean they -- so they
<sup>3</sup> did the study and they only looked at
<sup>4</sup> diet in the past year.  They didn't look
<sup>5</sup> at any changes in the diet.  They didn't
<sup>6</sup> look at lifetime diet.  A lot of
<sup>7</sup> questions you have in this type of study.
<sup>8</sup> And I explain that at the very beginning
<sup>9</sup> about the problems with frequency
<sup>10</sup> questionnaires in these type of diet
<sup>11</sup> studies.
<sup>12</sup>     Q.   Do you know if exposure to a
<sup>13</sup> mutagenic carcinogen like NDMA can cause
<sup>14</sup> cancer in one year?
<sup>15</sup>        MR. BALL:  Objection to
<sup>16</sup> form.
<sup>17</sup>        THE WITNESS:  I don't know
<sup>18</sup> that.
<sup>19</sup> BY MR. VAUGHN:
<sup>20</sup>     Q.   And pancreatic cancer is
<sup>21</sup> what this one is looking at, right?
<sup>22</sup>     A.   It is.
<sup>23</sup>     Q.   And you discuss earlier
<sup>24</sup> about how people die so quickly from

Page 350

1 pancreatic cancer, right?
2      A.   Yeah.  And now they are
3 thinking about what they are -- different
4 exposures to different things.  We try to
5 assess all those things.
6      Q.   So you think some people
7 might be saying they eat more plant-based
8 food that's high in NDMA because they
9 have -- they got pancreatic cancer?
10          MR. BALL:  Objection to
11 form.
12          THE WITNESS:  Pancreatic --
13      in my pancreatic cancer study, we
14      were looking at the risk of DDT
15      associated with pancreatic cancer.
16          We put in some fake
17      pesticides to see if they would be
18      more likely to pick the pesticides
19      that are fake than controls.
20      That's the way we tried to control
21      for it.
22          But they didn't do anything
23      like that in these studies.
24          THE COURT REPORTER:  Doctor,

Page 351

1      if you could really just try to
2      throw your voice for me, please.
3          Thank you.
4          THE WITNESS:  Yep, yeah.
5 BY MR. VAUGHN:
6      Q.   The study you did on if DDT
7 increases the risk of pancreatic cancer,
8 do you recall the results of that study?
9      A.   Yeah.  I think that some
10 forms of DDT showed pancreatic cancer.
11      Q.   Really.
12          Are there any other
13 chemicals that you've studied that you've
14 come to the conclusion that they are
15 associated with an increased risk of
16 cancer besides DDT?
17      A.   It wasn't DDT.  It was some
18 forms of DDT.  And I can't recall the
19 other ones.
20      Q.   All right.  Go to --
21      A.   I just remember that one
22 because it was my first study.
23      Q.   You remember your first
24 study, but not your first deposition?

Page 352

1          MR. BALL:  Objection to
2      form.
3          THE WITNESS:  It's a little
4      more -- little more meaningful.
5 BY MR. VAUGHN:
6      Q.   All right, let's go to
7 confounding factors.  And if you need a
8 bathroom break or anything at any time
9 let me know.
10          What is a confounding
11 factor?
12      A.   It is a third factor that is
13 associated with both the exposure and the
14 disease.  If you don't control for it you
15 may see spurious associations.  Like a
16 nuisance factor.
17      Q.   And something that can be a
18 symptom of the outcome would not be a
19 confounder, correct?
20      A.   A symptom of --
21          MR. BALL:  Object to form.
22 BY MR. VAUGHN:
23      Q.   Correct.
24      A.   No, it wouldn't be a

Page 353

1 confounder.
2      Q.   All right.  For bladder
3 cancer you list certain workplace
4 exposures.
5      A.   I think all of these come
6 from the American Cancer Society.  If you
7 just go on their web page you'll see
8 these.
9      Q.   Okay.  And you rely on them
10 for -- so you're relying on the
11 American -- I'm sorry, who was it again,
12 American Cancer Society?
13      A.   American -- oh yeah, the
14 regulatory organization.
15      Q.   Okay.  You note smoking is a
16 risk factor.  Do cigarettes contain NDMA
17 or NDEA?
18      A.   I believe so.
19          MR. VAUGHN:  Go to the next
20      page, Tyler.
21 BY MR. VAUGHN:
22      Q.   It notes occupation
23 industries up there at the top, and one
24 of them is rubber.

Confidential Information Subject to Protective Order

Page 354

1    The rubber industry.  Are
2  they -- are those workers exposed to high
3  levels of NDMA?
4    A.   It's really not clear from
5  the studies.  They are exposed to so many
6  different things, it's hard to
7  understand.
8    Q.   Are one of the things they
9  are exposed to NDMA?
10    A.   I believe some of the
11  studies have shown that they are.  But
12  it's hard to tease out just the NDMA
13  exposure by itself.
14    Q.   What's this P word diabetes
15  medication, do you see that?  Pio?  In
16  the second sentence?
17    A.   Where are you reading?
18    Q.   Right there.
19    A.   Oh.  It's a -- it's a new
20  type of diabetic medication.  I can't
21  remember what it's called.
22    Q.   Is it Actos maybe?
23    A.   I can't recall.  You have to
24  look at the American Cancer Society web

Page 355

1  page.
2    Q.   Are you aware that that drug
3  is a mutagenic carcinogen?
4    MR. BALL:  Object to form.
5    THE WITNESS:  I have no
6    idea.  I have no idea.
7  BY MR. VAUGHN:
8    Q.   Do you know that -- do you
9  know Dr. Botorff, one of the defense
10  experts in this case, a pharmacist?
11    A.   I don't know that name.
12    Q.   You don't know him?  He told
13  me that he kept giving this drug to his
14  patients even after it got a black box
15  warning for cancer.
16    A.   Okay.
17    MR. BALL:  Objection to
18    form.
19  BY MR. VAUGHN:
20    Q.   You list chemotherapy and
21  radiation as a risk factor.  Why is that?
22    A.   It's what's on the American
23  Cancer Society web page.
24    Q.   Do you agree that that's a

Page 356

1  risk factor for bladder cancer?
2    A.   I agree with what the
3  American Cancer Society lists on their
4  web page.  Absolutely, yeah.
5    Q.   Do you have -- you have no
6  basis for why chemotherapy or radiation
7  might increase the risk someone gets
8  cancer?
9    A.   I assume they reviewed the
10  evidence of that.
11    Q.   But you don't know what the
12  mechanism of action is?
13    A.   Oh no, I don't know.
14    Q.   Do immunosuppressives
15  increase the risk of cancer?
16    A.   I'm sorry?
17    Q.   Does something that's an
18  immunosuppressant, does that increase the
19  risk of someone getting cancer?
20    A.   I don't know.
21    MR. VAUGHN:  Let's move to
22    69, blood cancer.
23  BY MR. VAUGHN:
24    Q.   So you mentioned radiation,

Page 357

1  certain chemo again, or having a weakened
2  immune system from taking immune
3  suppression medication.
4    Would you agree that immune
5  suppression can increase the risk of
6  getting cancer?
7    MR. BALL:  Objection to
8    form.
9  BY MR. VAUGHN:
10    Q.   Was that a yes you do agree?
11    MR. BALL:  Objection to
12    form.
13    THE WITNESS:  Some cancers,
14    not -- not all cancers.
15  BY MR. VAUGHN:
16    Q.   Which cancers?
17    A.   This section is on blood
18  cancer, right?
19    Q.   It is.
20    Do you know if NDMA is an
21  immunosuppressant?
22    A.   That, I don't know.  But I
23  know NDMA is not a medication.  You're
24  talking about immunosuppression

Confidential Information - Subject to Protective Order

Page 358

1 medications.
2      Q.   It lists breast implants as
3 a risk.  Do you agree with that?
4      A.   Where?  Oh.  Yeah, there's a
5 rare form of non-Hodgkin's lymphoma that
6 is associated.  That's really -- that's
7 kind of a new finding.
8      Q.   And do you agree with that
9 finding?
10      A.   I haven't evaluated the
11 evidence.  I assume it's true, because
12 the American Cancer Society reports on
13 it.
14      Q.   Have you ever done any
15 research on breast implants and the
16 complications they can cause?
17      A.   I've done a lot, yes.
18      Q.   And were you receiving
19 funding from the corporation when you
20 were doing those studies?
21      A.   I don't know.  Again, that
22 was when I was at IEI.  So I don't know
23 whose funds those were.
24      Q.   Who is Dow Corning

Page 359

1 Corporation?
2      A.   I'm sorry?
3      Q.   Do you know what Dow Corning
4 Corporation is?
5      A.   It's an industry,
6 absolutely.
7      Q.   What type of industry?
8      A.   I believe they used to
9 make -- they used to make breast
10 implants.  But I don't think they do
11 anymore.
12      Q.   Okay.  And when they were
13 funding your research, do you recall if
14 you found that breast implants, that they
15 were associated with anything?
16           MR. BALL:  Objection to
17 form.
18           THE WITNESS:  Yes.  Yes.
19 BY MR. VAUGHN:
20      Q.   What were -- what were
21 breast implants associated with in the
22 studies you did?
23      A.   Suicide.
24      Q.   So was your conclusion of

Page 360

1 those studies that breast implants don't
2 increase the risk of any disease, but
3 women are just more likely to be crazy?
4           MR. BALL:  Objection to
5 form.
6           THE WITNESS:  I don't think
7 that's a statement from any of my
8 papers.  You have to show me where
9 I said that.
10 BY MR. VAUGHN:
11      Q.   Did you say that they have a
12 higher rate of mental health issues?
13           MR. BALL:  Objection to
14 form.
15           THE WITNESS:  I don't -- I
16 don't recall.  These are studies
17 that I did over 20 years ago.  So
18 I don't recall.
19 BY MR. VAUGHN:
20      Q.   If your studies contradict
21 with what the American Cancer Society
22 says now, do you not retract those
23 studies?
24           MR. BALL:  Objection to

Page 361

1 form.
2           THE WITNESS:  So I think
3 you're talking about this rare
4 non-Hodgkin's lymphoma finding
5 that said -- I think people agree
6 that that is a finding on breast
7 implants.  But I don't know enough
8 about it because I didn't study
9 it.
10           MR. VAUGHN:  Let's go back
11 to his expert report.  Page 32.
12 We're still on the expert report.
13 Sorry.  Number 70.
14           I guess we can skip 70.
15 It's on breast cancer, and we're
16 not alleging breast cancer.
17 BY MR. VAUGHN:
18      Q.   Colorectal cancer, 71.  You
19 note that in the U.S. African Americans
20 have the highest incidence and mortality
21 rates of colorectal cancer of all racial
22 groups.
23           Why did you include that?
24      A.   It's an important factor.

Confidential Information Subject to Protective Order

Page 362

Q. Why is it an important factor?

A. Because it's a risk if you're African American. Absolutely.

Q. Why is it a risk if you're an African American?

MR. BALL: Objection to form.

THE WITNESS: Because they show -- I'm a little bit confused by your question. But I assume it's because the studies of the American Cancer Society, based on the findings, show an increased risk for African Americans.

BY MR. VAUGHN:

Q. Have you ever studied colorectal cancer and the risk of African Americans getting it?

A. I have not, no.

MR. VAUGHN: Tyler, can we pull up 2010, Use of Electronic Medical Records.

(Document marked for

Page 363

identification as Exhibit Fryzek-27.)

BY MR. VAUGHN:

Q. You were an author on this paper, correct, Jon -- or Dr. Fryzek?

A. I was, yes.

Q. And this was in 2010. Were you working at Exponent at this time?

A. I was at Amgen.

Q. Were you ever working at Exponent the same time that you were working at Amgen?

A. Oh, no. You can't do that.

Q. And these first three people that are all of Exponent, do you know them?

A. Fionna is still at Exponent. I think Libby has gone back to a faculty position. Gena, I don't know what's happened to her.

Q. Okay. Did you say --

A. This was a long time ago.

Q. Was Fionna the one that you said is still at Exponent?

Page 364

A. I believe she is, yeah.

Q. Do you still work with her?

A. No.

MR. VAUGHN: Can we go to Page 9, Tyler. Bottom right paragraph.

BY MR. VAUGHN:

Q. Doctor, is this discussing different rates of cancer with different ethnicity groups?

A. It is.

Q. Do you where it says, "Rates of cancer incidence, mortality, and survival may differ by age, race, ethnicity, socioeconomic status, economic (sic) attainment level, and geographic location, and it is thought that access to healthcare screening and treatment resources and the quality of treatment given may underlie a large proportion of these differences."

Do you see that?

A. I do.

Q. If we go a little bit

Page 365

further down, it says, "Researchers found that black patients were significantly less likely than white patients to receive therapy for their cancer."

Do you think that's why there's a higher mortality rate of colorectal cancer in United States with African Americans?

MR. BALL: Objection to form.

THE WITNESS: I have no idea.

BY MR. VAUGHN:

Q. You have no idea if access to medical care might impact their death rate?

MR. BALL: Objection to form.

THE WITNESS: No. You have to understand how this study is similar to, you know, the data that the American Cancer Society is looking at, how representative it is, those types of things.

Page 366

1      Are they looking at the same
2  age group?  I don't know.
3  BY MR. VAUGHN:
4      Q.  Do you agree that catching
5  the cancer early increases someone's
6  survival rate?
7          MR. BALL:  Objection to
8      form.
9          THE WITNESS:  That, I don't
10     know.  I haven't done any studies
11     on that.
12 BY MR. VAUGHN:
13     Q.  Do you think it's easier to
14 treat Stage I cancer or Stage IV cancer?
15         MR. BALL:  Objection to
16     form.
17         THE WITNESS:  Oh, Stage I.
18     Stage I.
19 BY MR. VAUGHN:
20     Q.  So if someone caught their
21 cancer at Stage I before it progressed,
22 they'd have a higher chance of surviving,
23 right?
24         MR. BALL:  Objection to

Page 367

1      form.
2          THE WITNESS:  I don't know.
3      It depends on the cancer, et
4      cetera, what the comorbidities
5      are, things like that.
6  BY MR. VAUGHN:
7      Q.  Number 72.  Esophageal
8  cancer.  And if we go on the next page,
9  on 33, where it's talking about it.
10         MR. BALL:  Hey, Brett, are
11     you nearing a good place for a
12     stop?  We've gone about an hour
13     and fifteen.
14         MR. VAUGHN:  We can stop
15     right now if you want to.
16         MR. BALL:  Okay.  Why don't
17     we take a little break.  Ten
18     minutes?
19         MR. VAUGHN:  Yeah.
20     Appreciate it.
21         THE VIDEOGRAPHER:  Off the
22     record, 3:16.
23         (Short break.)
24         THE VIDEOGRAPHER:  We are

Page 368

1      back on the record at 3:26.
2  BY MR. VAUGHN:
3      Q.  Doctor, earlier you stated
4  that it would have been improper for you
5  to work at Exponent while you were
6  working at Amgen.
7          Does the same apply to when
8  you were working at MedImmune?
9      A.  Yes.
10     Q.  And as your report states,
11 you were working at one of those two
12 companies from 2006 to 2012, correct?
13     A.  If my report states it,
14 that's correct.
15         MR. VAUGHN:  Tyler, can we
16     go back to Page 33 of his report.
17     Let's just go ahead and skip down
18     to lung cancer, 76.
19 BY MR. VAUGHN:
20     Q.  You note probable risk
21 factors.
22         Probable risk factors,
23 that's something that is not confirmed to
24 be a carcinogen?

Page 369

1      A.  Correct.
2      Q.  So something like NDMA would
3  fall under a probable risk factor as
4  well?
5          MR. BALL:  Objection to
6      form.
7          THE WITNESS:  I believe the
8      probable risk factors from the
9      American Cancer Society for lung.
10 BY MR. VAUGHN:
11     Q.  And do you see one,
12 beryllium, B-E-R-Y-L-L-I-U-M.  How do you
13 say that?
14     A.  Beryllium.
15     Q.  Do you agree with the
16 American Cancer Society that that is a
17 risk factor for lung cancer?
18     A.  I haven't evaluated all the
19 evidence of that.  I don't know.  I don't
20 know off the top of my head.
21     Q.  Have you ever evaluated that
22 evidence?
23     A.  I have looked at beryllium
24 in terms of cancer, but I can't remember

Page 370

1 the findings.  Been about ten years, I
2 think.
3      Q.   Okay.
4           MR. VAUGHN:  Tyler, can we
5      pull up 2011, occupational
6      exposure to beryllium.
7           TRIAL TECH:  One second.  I
8      might not have added this as well.
9      I know I saw this as one of the
10     exhibits that were sent.
11          MR. VAUGHN:  2012, sorry.
12          TRIAL TECH:  Oh, that's why.
13          MR. VAUGHN:  It got put in
14     there wrong.  It should say '11.
15          (Document marked for
16     identification as Exhibit
17     Fryzek-28.)
18 BY MR. VAUGHN:
19     Q.   Okay.  So the top left-hand
20 corner, this was actually published in
21 2012.  But at the bottom you can see that
22 it was received in July of 2011.  And you
23 were one of the authors on this article,
24 correct, Dr. Fryzek?

Page 371

1      A.   The second author, yes.
2      Q.   And there's a little
3 Number 2 after your name, right?
4      A.   I'm sorry, I can't see it.
5 It's kind of hard -- yes.
6      Q.   And what does that 2
7 indicate?
8      A.   At the time that this was
9 written I was at Exponent in Alexandria,
10 Virginia.
11     Q.   And at what time was this
12 wrote?
13     A.   I can't recall.
14     Q.   If we go to the very bottom
15 of this page --
16     A.   I think -- it was while I
17 was at Exponent.
18     Q.   So 2011 you were at
19 Exponent?
20     A.   When this was written I was
21 at Exponent.  I have no idea.
22     Q.   So it wouldn't have been
23 after 2011, right?
24     A.   Pardon me?

Page 372

1      Q.   It would not have been after
2 2011, right?
3      A.   It looks like -- it looks
4 like not, correct.
5      Q.   And you don't think you
6 wrote this before 2006, do you?
7      A.   I don't think so, no.
8      Q.   Do you recall testifying
9 that between 2006 and 2012, you were
10 working at Amgen and MedImmune, and that
11 it would have been improper for you to be
12 working at Exponent at the same time?
13     A.   Well, maybe I was off on my
14 dates of the pharmaceutical companies.  I
15 can't recall.
16     Q.   Are you going to look back
17 into that to see when your actual
18 employment dates were?
19     A.   I think it's on my LinkedIn
20 profile too.
21     Q.   Is your LinkedIn profile
22 more accurate than your expert report?
23          MR. BALL:  Objection to
24     form.

Page 373

1           THE WITNESS:  It should
2      be -- it should be the same.
3           MR. VAUGHN:  Let's go to the
4      abstract, that first page still.
5      If you can blow up the abstract
6      words.
7 BY MR. VAUGHN:
8      Q.   Can you read the last
9 sentence for us, the overall?
10     A.   "Overall, the available
11 evidence does not support a conclusion
12 that a causal association has been
13 established between occupational exposure
14 to beryllium and the risk of cancer."
15     Q.   Do you think that should
16 really should be a risk factor that's
17 controlled for in the lung cancer studies
18 if you don't even think it's associated
19 with lung cancer?
20     A.   Yeah, because you don't
21 control for risk factors, you --
22          MR. BALL:  Objection.
23          THE WITNESS:  -- you
24     control -- when you control for

Confidential Information — Subject to Protective Order

Page 374

1  items in a relationship, you
2  control for those that are known
3  to be risk factors and those that
4  are potentially risk factors.
5  BY MR. VAUGHN:
6      Q.   Would the potential risk
7  factors have a smaller confounding effect
8  than known risk factors?
9      A.   I have no idea.
10     Q.   If it doesn't actually
11 increase the risk of cancer, is it going
12 to be a confounder?
13     A.   If what doesn't increase the
14 risk of cancer?
15     Q.   If anything.  Like let's say
16 beryllium in this example.  If it does
17 not increase the risk of cancer at all,
18 is it going to be a confounder?
19     A.   I think there's a little bit
20 of confusion of what a confounder is.  So
21 a confounder you're not looking at the
22 totality of the evidence, you're looking
23 at confounding within a study.
24     Q.   When you defined confounder

Page 375

1  earlier, you said it must affect both
2  exposure and outcome.  And so if it's not
3  actually increasing the risk of cancer,
4  how is it affecting the outcome?
5      A.   Again, you have to look at
6  the study specifically.  If it increases
7  the risk of cancer within that study,
8  then it is a confounder.  And it's
9  associated with exposure.  So it's a
10 study-specific idea.
11     Q.   What do you base that off
12 of?
13     A.   Base what off of?
14     Q.   What you just said, that
15 confounders are study specific.
16     A.   Oh.  General epidemiology.
17     Q.   So if one study is looking
18 at lung cancer, and the other study is
19 looking at lung cancer, is -- beryllium
20 can get confounder in one and not the
21 other?
22     A.   Correct.  Ethnicity can be.
23 Age can be.
24         The way to control by

Page 376

1  confounding is done by age is having a
2  certain age group.  Then you are
3  confounding by age.
4      Q.   If beryllium though doesn't
5  actually increase the risk of lung
6  cancer, how is it impacting the results
7  of studies that don't control for
8  beryllium exposure?
9      A.   Again, confounding is a very
10 study-specific thing.  You have to look
11 within each study.
12     Q.   Do you have any reason to
13 believe that any of the studies that you
14 reviewed that beryllium was a confounder?
15     A.   I can't recall.
16         MR. VAUGHN:  Can you go to
17     Page 10, Tyler, of this study.
18         Keep going.  One more page.
19 BY MR. VAUGHN:
20     Q.   Who funded this study,
21 Doctor?
22     A.   Looks like it was Materion
23 Brush.
24     Q.   Do you know why they funded

Page 377

1  this study?
2      A.   I don't.
3      Q.   Do you know if they had
4  anything to do with beryllium exposure
5  from any of their products?
6      A.   I think they manufactured
7  beryllium, but I'm not sure.  I wasn't
8  involved in getting this grant.
9      Q.   Who was involved in getting
10 the grant?
11     A.   Dr. Mandel.
12     Q.   And he also worked for
13 Exponent, correct?
14     A.   At that time, did.
15     Q.   Do you still work with
16 Dr. Mandel?
17     A.   No.
18     Q.   Do you know where he works
19 now?
20     A.   I haven't seen for more
21 than -- I believe he's retired.  But I
22 haven't seen him for more than ten years.
23         MR. VAUGHN:  Go back to the
24     expert report again, Tyler.  Same

Confidential Information - Subject to Protective Order

Page 378

1    spot we were at.  Page 33.
2  BY MR. VAUGHN:
3    Q.   You see where they list
4  chromium compounds, or where you listed
5  chromium compounds as a risk factor for
6  lung cancer as well?
7    A.   Yeah.  Again, it's under
8  American Cancer Society.
9    Q.   And do you agree with the
10  American Cancer Society saying that
11  chromium is a risk factor for lung
12  cancer?
13    A.   I think they listed it.  I
14  don't know how they make the decision.  I
15  would include it as a risk factor --
16  confounder.  Absolutely.
17    Q.   I'm sorry.  I'm reading the
18  transcript.  I'm having a hard time
19  hearing you.
20    A.   I'm sorry.  I'll try to
21  speak up.  I'll hold my microphone up a
22  little.
23    Q.   You're fine.  I gotcha.  You
24  said you would include it as a risk

Page 379

1  factor.  Okay.  But --
2    A.   I said as a confounder.
3    Q.   As a confounder?
4    A.   Yeah.
5    Q.   Do you not think that
6  chromium is a risk factor for cancer?
7    A.   That wasn't the purpose of
8  my review here, my research.
9    Q.   I understand but I'm asking
10  you specifically.  Do you not think that
11  chromium is a risk factor for cancer?
12        MR. BALL:  Objection to
13    form.
14        THE WITNESS:  I don't know.
15  BY MR. VAUGHN:
16    Q.   You don't know if chromium
17  is a risk factor for cancer?
18    A.   I have to review the
19  literature.  I haven't reviewed the
20  literature on chromium.
21    Q.   Have you published
22  literature on chromium?
23    A.   I believe I have.  I can't
24  recall.  I can't recall for sure.

Page 380

1        MR. VAUGHN:  Tyler, can we
2    pull up 2001, Cancer Mortality
3    Chromium Exposure.
4        THE WITNESS:  Oh, yeah.  I
5    thought I had.
6        (Document marked for
7    identification as Exhibit
8    Fryzek-29.)
9        THE WITNESS:  Sorry.  It's
10    hard to remember 30 years of
11    research.
12        MR. VAUGHN:  So let's start
13    with the right-hand side, Tyler.
14    First big, long paragraph.
15  BY MR. VAUGHN:
16    Q.   Do you see where it says,
17  "Although the evidence for
18  carcinogenicity of trivalent chromium is
19  lacking, hexavalent chromium is
20  classified as a human carcinogen."
21        Do you see that?
22    A.   Yes.
23    Q.   Your study, if we look at
24  the abstract part on the left, found

Page 381

1  there was no evidence cancer hazard
2  though with residents living near these
3  California gas compressors, correct?
4    A.   Correct.
5        MR. VAUGHN:  Can we go to
6    the next page, Tyler.
7        Top left.  Yeah those two
8    paragraphs.
9  BY MR. VAUGHN:
10    Q.   Why is this talking about
11  Erin Brockovich?  Is that the movie Erin
12  Brockovich?
13    A.   Yes.
14    Q.   Is that what the people in
15  that movie were exposed to is chromium?
16    A.   Supposedly, yes.  Allegedly.
17    Q.   And PG&E, is that who was
18  being sued for the chromium exposure in
19  Erin Brockovich?
20    A.   Oh, that, I don't know.
21    Q.   Okay.  Outside the movie, is
22  PG&E who was being sued for chromium
23  exposure?
24    A.   Again, I don't know.

Confidential Information - Subject to Protective Order

Page 382

1    MR. BALL:  Objection.
2  BY MR. VAUGHN:
3    Q.   Do you see where it says,
4  "Which was settled in 1996."  And our --
5  the report says, "The litigation against
6  PG&E, which was settled."  So PG&E was
7  being sued for chromium exposure, right?
8    A.   I assume so.
9    Q.   And the next paragraph says,
10 "Given these concerns, we were asked by
11 PG&E to conduct a study of mortality
12 among residents."  Right?
13   A.   Yes.
14   Q.   And the study they paid you
15 to do, you didn't find any association
16 with chromium and cancer, correct?
17   A.   Again, this wasn't a study
18 that they paid me to do.  I was paid by
19 International Epidemiology Institute with
20 a regular salary.
21   Q.   And who paid IEI?
22   A.   Oh, I don't know.  I wasn't
23 involved with that.
24   Q.   I mean it says, "Given these

Page 383

1  concerns, we were asked by PG&E to
2  conduct a study."  Do you think they
3  asked IEI, and IEI is just, like, "Yeah,
4  we'll do it for free"?
5        MR. BALL:  Objection to
6    form.
7        THE WITNESS:  I get --
8    again, I was not involved in
9    getting grants or invoicing.  I
10   was just a researcher.
11 BY MR. VAUGHN:
12   Q.   You were the lead author on
13 this, weren't you?
14   A.   Yeah, absolutely.
15   Q.   You actually wrote this
16 paragraph, right?
17   A.   I don't recall who wrote it.
18   Q.   Didn't you testify earlier
19 that the lead author is the one that's
20 actually writing it?
21   A.   It's usually the lead
22 author.  Yes.
23        MR. VAUGHN:  Can we go to
24   Page 3, Tyler.

Page 384

1  BY MR. VAUGHN:
2    Q.   I'm on the right-hand side,
3  the first paragraph that starts
4  "occupational studies."
5        Doctor, can you read that
6  first sentence aloud for us?
7    A.   "Occupational studies have
8  been a mainstay of medical research to
9  identify and quantify the risks of cancer
10 and other diseases associated with
11 chemical exposures."
12   Q.   Do you still agree with that
13 statement?
14   A.   I guess it depends on what
15 occupational studies you're talking
16 about, how well they are done, things
17 like that --
18   Q.   But in --
19   A.   In general, yes.
20   Q.   In general.  Thank you.
21   A.   Mm-hmm.
22        MR. VAUGHN:  Can we go to
23   Page 5, Tyler.  And bottom left,
24   two paragraphs.  Yeah.

Page 385

1  BY MR. VAUGHN:
2    Q.   So you guys weren't actually
3  able to determine the exposure levels to
4  the hexavalent chromium, were you?
5    A.   No, we weren't.
6    Q.   But that was okay for this
7  study, correct?
8    A.   It depends on what the
9  objectives of the study were.  So it was
10 okay for this study.
11   Q.   Would occupational studies
12 that are able to actually measure the
13 doses be more accurate?
14        MR. BALL:  Objection.
15        THE WITNESS:  This isn't an
16   occupational study.  This is a
17   community study.  This is done on
18   the community members.
19 BY MR. VAUGHN:
20   Q.   So with the community as
21 well, would that study be even more valid
22 if you did know the levels?
23        MR. BALL:  Objection to
24   form.

Confidential Information - Subject to Protective Order

---

Page 386

1      THE WITNESS:  I'm sorry.
2   Can I have the question again?
3   BY MR. VAUGHN:
4      Q.   Scratch it.  It probably
5   wasn't a very good one.
6      The next paragraph you note
7   that you guys examined cancer mortality,
8   not cancer incidence?
9      A.   Correct.
10     Q.   What are the downsides to
11  doing a mortality study versus an
12  incidence study?
13        MR. BALL:  Objection to
14     form.
15        THE WITNESS:  Oh, cancer
16     mortality, the downside is
17     cancer -- if you're diagnosed and
18     you live a long time, you know,
19     it's a misrepresentation of cancer
20     incidence.
21        Usually they're pretty good.
22  BY MR. VAUGHN:
23     Q.   Okay.  I think that's what
24  you're actually -- your study says --

---

Page 387

1         MR. VAUGHN:  If we go to the
2      next column, Tyler, at the top.
3   BY MR. VAUGHN:
4      Q.   It says, "Even for cancers
5   with relatively good survival, although
6   the statistical power of mortality
7   studies will be reduced for cancers with
8   higher survival rates."
9         Is that what you were just
10  describing?
11     A.   Yeah.
12     Q.   Well, can you give me some
13  examples of types of cancers with high
14  survival rates?
15     A.   Typically the blood cancers,
16  leukemia, lymphoma.
17     Q.   What about, like, prostate
18  cancer?
19     A.   Prostate cancer, yes.
20     Q.   And so --
21     A.   Yeah.
22     Q.   So studies that are only
23  looking at cancer mortality instead of
24  cancer incidence, they might not actually

---

Page 388

1   catch the statistical -- statistically
2   significant increased risk of cancer for
3   things like blood cancers or prostate
4   cancers, correct?
5         MR. BALL:  Objection to
6      form.
7         THE COURT REPORTER:  I
8      didn't hear an answer if you said
9      one.
10        THE WITNESS:  I can't
11     remember the question.  Can you
12     read the question back?
13        MR. VAUGHN:  I believe you
14     said correct.
15  BY MR. VAUGHN:
16     Q.   The question was:  So
17  studies that are only looking at cancer
18  mortality instead of cancer incidence,
19  they might not actually catch the
20  statistically increased risk
21  of cancer for things like blood cancer or
22  prostate cancers, correct?
23     A.   Yeah.  And I said correct.
24  Yeah.

---

Page 389

1      Q.   Thank you.
2         Is your company still
3   researching chromium?
4      A.   You mean my company now?
5      Q.   Yeah.
6      A.   Oh, not to my knowledge.  I
7   don't know.  I don't have any
8   epidemiological studies on chromium.
9      Q.   Deborah Proctor.  You know
10  her, correct?
11     A.   Yes.
12     Q.   Who is she again?
13     A.   She is one of the co-owners.
14     Q.   Do you know Bhat, B-H-A-T?
15     A.   Who?
16     Q.   Person with the last name of
17  Bhat, B-H-A-T?
18     A.   I don't know.
19     Q.   Mina Suh, that's who was
20  helping you with your report, right?
21     A.   Correct.  She is an
22  epidemiologist.
23     Q.   Okay.
24        MR. VAUGHN:  Can we pull up

---

Confidential Information - Subject to Protective Order

Page 390

1  2021, inhalation cancer risk
2  assessment, Tyler.
3         (Document marked for
4  identification as Exhibit
5  Fryzek-30.)
6         MR. VAUGHN:  And if we can
7  zoom in on the authors.
8  BY MR. VAUGHN:
9      Q.   And can you give me the
10  authors and the stuff right below it that
11  says where they work?
12         And so all of these authors
13  at the time at least worked either in
14  your division at ToxStrat or at ToxStrat,
15  right?
16      A.   Yeah.  Heidi and Xiaohui are
17  statisticians.
18      Q.   Heidi and who?
19      A.   Xiaohui.
20      Q.   Okay.  Did any of these
21  people besides Mina Suh help you with
22  your report?
23      A.   No.
24      Q.   And Mina Suh was the main

Page 391

1  person that helped you, correct?
2      A.   No.
3      Q.   Who was the main person that
4  helped you?
5      A.   Sue Pastula.
6      Q.   Can you say that one more
7  time?
8      A.   Sue Pastula.
9         MR. VAUGHN:  And can we go
10  to Page 13, Tyler.
11  BY MR. VAUGHN:
12      Q.   And on the right-hand side
13  where it says funding.  So is your
14  company still receiving funding as of
15  2021 from the electrical -- Electric
16  Power Institute?
17      A.   I have no idea.  Again, this
18  is ToxStrategies which is a different
19  group than EpidStrategies.
20  EpidStrategies doesn't have any money
21  from Electrical Power Research Institute.
22      Q.   But Mina Suh, is she at
23  EpidStrategies or ToxStrategies?
24      A.   She was at ToxStrategies.  I

Page 392

1  assume, based on this article, that she
2  started this study when she was at
3  ToxStrategies and then she moved over to
4  EpidStrategies when we came because we
5  were all epidemiologists.
6      Q.   What about Heidi Reichert,
7  it says that she was at EpidStrategies at
8  this time?
9      A.   Right.  Heidi and Xiaohui
10  are statisticians.
11      Q.   And so people within your
12  company were being employed to do
13  chromium studies for the Electric Power
14  Research Institute?
15      A.   It looks like they were
16  employed to do some research analysis.
17  I'm not sure what they were doing.
18         MR. VAUGHN:  Can we go to
19  Page 13 again, Tyler.
20         Can we get the paragraph
21  right above funding.
22         And if we -- midway through.
23  BY MR. VAUGHN:
24      Q.   "Until such data are

Page 393

1  developed, it is important to consider
2  and clearly communicate that assuming the
3  existence of an increased risk of cancer
4  at environmentally relevant exposures is
5  a policy decision not clearly supported
6  by the scientific evidence."
7         Do you agree with that
8  statement?
9         MR. BALL:  Objection to
10  form.
11         THE WITNESS:  I don't agree
12  or disagree.  This is one area --
13  this is an area of study, and it's
14  also toxicology so I can't really
15  respond.
16  BY MR. VAUGHN:
17      Q.   If they are saying that the
18  environmental exposure of chromium is not
19  going to increase your risk of cancer,
20  then why are you saying that it's a
21  potential risk factor that could have
22  confounded the results in the studies in
23  your expert report?
24         MR. BALL:  Objection to

Confidential Information - Subject to Protective Order

Page 394

1  form.
2         THE WITNESS:  I'm not -- I'm
3  not saying that.  That's from the
4  American Cancer Society.
5  BY MR. VAUGHN:
6         Q.   So your employees, or your
7  colleagues, I guess, that published this
8  study are in disagreement with the
9  American Cancer Society?
10        MR. BALL:  Objection to
11  form.
12        THE WITNESS:  I have no
13  idea.
14        As I said, this is the first
15  time I've seen this study.  And
16  it's about toxicology, not
17  epidemiology, so I don't know.
18        MR. VAUGHN:  Tyler, can we
19  go to 2006 -- one sec.  Yep.
20        Did I upload the 2006
21  corporate corruption document,
22  Tyler?
23        TRIAL TECH:  I have two,
24  2006 documents.  One is a cohort

Page 395

1  study.  The other one is a
2  Parkinson's one that we used
3  earlier today.
4         MR. VAUGHN:  That's what I
5  thought.  I'll have this one sent
6  over.  We can skip that one.
7         All right.  Could we go back
8  to his expert report.  Page 33.
9  BY MR. VAUGHN:
10        Q.   Are you on your phone,
11  Doctor?
12        A.   Pardon?
13        Q.   Are you on your phone?
14        A.   Yeah.  I had to cancel my --
15  I had to cancel my gym class tonight.
16  It's getting too late.
17        MR. VAUGHN:  Oh, that's why
18  I couldn't find it, Tyler.  I
19  apologize.  Can we do
20  E-G-I-L-M-A-N, dash 2006?  I
21  forgot to change the file name
22  when I uploaded it.
23        (Document marked for
24  identification as Exhibit

Page 396

1  Fryzek-31.)
2         TRIAL TECH:  I'm just
3  looking for it now.  Give me one
4  second.
5  BY MR. VAUGHN:
6         Q.   Doctor, have you ever heard
7  of someone named Dennis Paustenbach,
8  P-A-U-S-T-E-N-B-A-C-H?
9         A.   Yes.
10        Q.   Who is that?
11        A.   I believe a toxicologist.  I
12  think he is a toxicologist.
13        Q.   Have you ever worked with
14  him?
15        A.   No.
16        TRIAL TECH:  Brett, I'm not
17  seeing this file either.  I don't
18  have it downloaded and I don't
19  have it in the DropBox folder.
20        MR. VAUGHN:  Okay.
21  E-G-I-L-M-A-N.  If you don't see
22  it, that's fine.  I just want to
23  double-check.
24        TRIAL TECH:  It starts with

Page 397

1  A-G-I-L?
2         MR. VAUGHN:  E. E.
3         TRIAL TECH:  Oh, okay.  I
4  see it now.
5         MR. VAUGHN:  Cool.  Sorry
6  about that.
7         TRIAL TECH:  That's okay.
8  This the one you're looking for?
9         MR. VAUGHN:  Yeah.
10        MR. BALL:  Okay.
11        MR. VAUGHN:  Can we go to
12  Page 2.
13  BY MR. VAUGHN:
14        Q.   So, "Convening the panel,"
15  that paragraph under there.
16        It talks about a blue ribbon
17  panel.  Do you know what that is, Doctor?
18        A.   I don't.
19        Q.   Just noting this was in
20  2001.  That was -- that study we looked
21  at a second ago, that was a 2001 study,
22  correct?
23        A.   I don't recall.
24        Q.   Do you know a Brent Finley?

Confidential Information - Subject to Protective Order

Page 398

1    A.   No.
2         MR. VAUGHN:  Can we go to
3    the bottom, where it says,
4    "Balanced representation of
5    science and scientists"?
6    BY MR. VAUGHN:
7    Q.   It says within a week of
8    this panel being made, Dennis
9    Paustenbach, former principal at
10   ChemRisk, was appointed to the panel.
11   And Brent Finley of Exponent says, "So it
12   looks like we've got one of our own on
13   the panel."  Up on the next paragraph.
14        Do you see where it says
15   that?
16   A.   Yep.
17   Q.   Do you know if ChemRisk was
18   a division of Exponent?
19   A.   I have no idea.
20   Q.   Do you know what he means by
21   one of our own on the panel?
22   A.   No.  This is, what, 2001?  I
23   wasn't at Exponent until, what, 2012, you
24   said, 2011?

Page 399

1    Q.   Yeah, but you were
2    publishing literature in 2001 on chromium
3    as well, correct?
4    A.   Okay.  I was, yeah.
5    Q.   Was Deborah Proctor, is she
6    the one that works at ToxStrat?
7    A.   Yeah.
8         MR. VAUGHN:  Can we go to
9    Page 6, Tyler, of the PDF, the
10   third paragraph.  It starts, "On
11   July 25, 2001."
12   BY MR. VAUGHN:
13   Q.   Do you see where it says
14   that she gave testimony as a
15   representative of the Alliance For
16   Responsible Water Policy without
17   acknowledging that the Alliance was
18   funded by PG&E or that she had consulted
19   for them in the past?
20   A.   Okay.
21   Q.   Are you aware of that?
22   A.   No.
23        MR. BALL:  Objection to
24   form.

Page 400

1         THE WITNESS:  I'm not even
2    aware it's true.  I'm not even
3    aware it's true.
4         I mean, you're quoting from
5    this journal that I know that is a
6    plaintiff journal.  And this is
7    pointing that out.  And I don't
8    know what the references are, so.
9    BY MR. VAUGHN:
10   Q.   International Journal of
11   Occupational Environmental Health is a
12   plaintiffs journal?
13   A.   Oh, absolutely.
14   Q.   Do you publish in that
15   journal?
16   A.   No.
17   Q.   Is it just the Journal of
18   Occupational Health that you -- is that
19   the one that you publish in?
20   A.   I'm not sure what you're
21   asking.  I'm sorry.
22   Q.   Give me one second.  I'll
23   take a look.
24        I'll work it out later.

Page 401

1    A.   Who is the author of this
2    paper that you're showing me?
3         MR. BALL:  Jon, you can
4    download it if you want to
5    download it and take it to the top
6    to see who the author is.
7         THE WITNESS:  It's in the
8    exhibits?
9         MR. BALL:  It should be in
10   the exhibits, yeah.  It's Exhibit
11   Number -- hold on.
12        THE WITNESS:  Number 1?
13        MR. BALL:  No, no, it's
14   Exhibit Number --
15        TRIAL TECH:  31.
16        MR. BALL:  31.
17   BY MR. VAUGHN:
18   Q.   Where it says --
19   A.   This is authored by David
20   Egilman.  I'm wondering if he lists all
21   of his plaintiff testimony.  It doesn't
22   look like he does.  So it's a little bit
23   of a conflict of interest.
24   Q.   Okay.  Well, let's see who

Page 402

1 actually said this statement has a
2 conflict of interest.
3        So she gave testimony as a
4 representative of the Alliance For
5 Responsible Water Policy without
6 acknowledging either that the Alliance
7 was funded by PG&E or that she had
8 consulted for PG&E in the past.  And
9 there's a little 48 after it, right?
10      A.   Okay.
11           MR. VAUGHN:  If we go two
12      pages later, Tyler, and blow up
13      48.
14 BY MR. VAUGHN:
15      Q.   And, Doctor, can you read
16 off what that citation is?
17      A.   "Senate hearing of the
18 Senate Health & Human Services Committee,
19 Possible Interference in the Scientific
20 Review of Chromium VI Toxicity,
21 February 28, 2003."
22           I have no idea what that
23 means.
24      Q.   Do you think it's like the

Page 403

1 United States Senate?
2           MR. BALL:  Objection to
3      form.
4           THE WITNESS:  It doesn't say
5      that.
6 BY MR. VAUGHN:
7      Q.   Health & Human Services
8 Committee?  Are you aware if that's a
9 part of the U.S. Senate?
10           MR. BALL:  Objection to
11      form.
12           THE WITNESS:  I don't know
13      if it's U.S. or California or
14      another state.  I have no idea.
15 BY MR. VAUGHN:
16      Q.   Do you think whatever
17 Health & Human Services Committee works
18 for the plaintiffs?
19      A.   I have no idea.
20      Q.   Do you know if the
21 government is allowed to even work in
22 lawsuits?
23           MR. BALL:  Objection to
24      form.

Page 404

1           THE WITNESS:  I have no
2      idea.  I don't work for the
3      government.  It's too bad that
4      Egilman didn't disclose his
5      relationships with plaintiffs.
6 BY MR. VAUGHN:
7      Q.   If it's true that Deborah
8 Proctor did not disclose all of this, is
9 that problematic?
10           MR. BALL:  Objection to
11      form.
12           THE WITNESS:  I have -- I
13      have absolutely no idea.
14 BY MR. VAUGHN:
15      Q.   Is there any company policy
16 at ToxStrat to disclose all financial
17 interest when doing studies?
18           MR. BALL:  Objection to
19      form.
20           THE WITNESS:  I have no
21      idea.
22 BY MR. VAUGHN:
23      Q.   You don't know if that's a
24 company policy?

Page 405

1      A.   No.
2           MR. VAUGHN:  If you can go
3      back to his expert report again
4      Tyler.  78, pharyngeal cancer.
5 BY MR. VAUGHN:
6      Q.   And at the top, do you see
7 where it says, "Well-confirmed risk
8 factors for nasopharyngeal cancer," and
9 one of the things included is
10 salt-preserved fish?
11      A.   Okay.
12      Q.   Do you remember earlier we
13 went over that salt-preserved fish had
14 the highest levels of NDMA?
15           MR. BALL:  Objection to
16      form.
17           THE WITNESS:  I don't --
18 BY MR. VAUGHN:
19      Q.   Sorry.  I can't hear what
20 you said.
21      A.   I don't recall.  I don't
22 know what study you're looking at.  I
23 don't know if all studies had shown that.
24 You can't just pull out one finding and

Confidential Information - Subject to Protective Order

Page 406

1 say that represents the whole literature.
2 You have to look at the literature in
3 totality.
4         Q.   Overall, is salt-preserved
5 fish one of the foods with the highest
6 level of NDMA?
7         MR. BALL:  Objection.
8         THE WITNESS:  I have no
9     idea.
10 BY MR. VAUGHN:
11     Q.   Didn't look into that at all
12 in forming your opinions in this case?
13         MR. BALL:  Objection to
14     form.
15         THE WITNESS:  No.
16 BY MR. VAUGHN:
17     Q.   Let's go on to 77 on
18 pancreatic cancer.
19         Do you see where you listed
20 diabetes and obesity as risk factors for
21 pancreatic cancer?
22     A.   Yes, that's what it says.
23     Q.   When it comes to the
24 confounders, if they are very similar, do

Page 407

1 you have to control for both of them?
2     A.   Again, it's a study-specific
3 thing.  So you have to look at the study
4 and how it's related to the exposure and
5 the disease.
6     Q.   In your opinion, is diabetes
7 a risk factor for pancreatic cancer?
8     A.   So I haven't studied that.
9 I don't know.
10         MR. VAUGHN:  Tyler, can we
11     go to 2007, the association
12     between selected risk factors.
13         (Document marked for
14     identification as Exhibit
15     Fryzek-32.)
16         MR. VAUGHN:  Blow up the
17     names in the bottom left.
18 BY MR. VAUGHN:
19     Q.   So were you working at the
20 University of Michigan at this time in
21 2007?
22     A.   Yes.  This is -- actually
23 this is my dissertation, part of my
24 dissertation.

Page 408

1     Q.   And what is a dissertation?
2     A.   On pancreatic cancer.
3     Q.   What's dissertation mean?
4     A.   A dissertation for my Ph.D.
5     Q.   And so you were not working
6 at IEI at this time, correct?
7     A.   It looks like I wasn't.  It
8 says I was at Amgen during this time.
9     Q.   Okay.
10     A.   But this is just data I
11 analyzed off my Ph.D. data that I had.
12     Q.   And so the title of this
13 study notes Expression of p53 and K-ras
14 Codon 12 mutations.  Do you know if Amgen
15 was developing drugs targeting those?
16     A.   Not to my knowledge.
17     Q.   To your -- you don't know if
18 Amgen at this time has drugs on the
19 market focused on K-ras?
20         MR. BALL:  Objection to --
21     objection to form.
22         THE WITNESS:  Not for
23     pancreatic cancer.  Not for
24     pancreatic cancer.

Page 409

1 BY MR. VAUGHN:
2     Q.   So in abstract, that first
3 paragraph you note that there are a few
4 risk factors for pancreatic cancer,
5 including cigarette smoking, BMI,
6 relative with pancreatic cancer, and
7 diabetes.  A few less risk factors than
8 you listed in your expert report,
9 correct?
10     A.   I'm sorry?
11     Q.   You list -- you list more
12 risk factors in your expert report
13 though, correct?
14     A.   From the American Cancer
15 Society, yes.
16         MR. VAUGHN:  Let's go on the
17     right-hand side of this.
18 BY MR. VAUGHN:
19     Q.   And so for your dissertation
20 paper you did in-person interviews to
21 ascertain information such as
22 demographics and lifestyle factors,
23 correct?
24     A.   Correct.

Confidential Information - Subject to Protective Order

Page 410

1    Q.   And under results, the
2  smoking, was that statistically -- was
3  that associated with an increase?
4    A.   Borderline.  It was 0.9 to
5  4.3.
6    Q.   And so even though it was
7  below one, it's still associated with an
8  increased risk, correct?
9    A.   No.  It's borderline
10 related.
11         MR. VAUGHN:  Go to the next
12   page, Tyler.
13 BY MR. VAUGHN:
14   Q.   That top paragraph notes p53
15 mutations.  What is a p53 mutation?
16   A.   It's a type of mutation on
17 the tumor.  That's all I know about it.
18   Q.   You're the head author, this
19 is your dissertation paper, right?
20   A.   Right.  Talking about
21 15 years ago.  I haven't looked at it
22 since then, so...
23         MR. VAUGHN:  All right.  Can
24   we go further down, Tyler, the

Page 411

1    second paragraph under
2    introduction?
3  BY MR. VAUGHN:
4    Q.   And you see where it says,
5  "It has been observed that both K-ras
6  oncogene and tumor suppressor gene p53
7  are often highly mutated in pancreatic
8  cancer."
9         I read that correctly?
10   A.   Okay, yes.
11   Q.   Do you agree with that
12   statement?
13   A.   I agree that it's accurate,
14 what I wrote there.  And it -- that
15 reference says that.
16   Q.   Does that mean that most
17 people that get pancreatic cancer, they
18 have a mutation of one of their genes,
19 the p53 or the K-ras?
20   A.   I don't think so.
21         MR. BALL:  Objection to
22   form.
23 BY MR. VAUGHN:
24   Q.   What does it mean?

Page 412

1    A.   So we were trying to look at
2  the prevalence or how often these
3  appeared in pancreatic cancer.
4    Q.   It says --
5    A.   You'd have to look at my
6  results to see.
7    Q.   But this sentence does say
8  "often highly mutated in pancreatic
9  cancer," correct?
10   A.   It does say that, yes.
11   Q.   Okay.  And then just the
12 next sentence, "If these markers of
13 genetic damage are related to
14 environmental or lifestyle exposures, it
15 can be hypothesized that this variation
16 may be because of different exposures to
17 potential carcinogens," correct?
18   A.   Correct.
19   Q.   All right.
20         MR. VAUGHN:  Go to the next
21   paragraph, Tyler.
22 BY MR. VAUGHN:
23   Q.   And it notes the information
24 that you ascertained from them.  Can you

Page 413

1  read that for me?
2         "Diagnosed workup and
3  ascertained information"?
4    A.   I'm sorry, I'm not clear
5  where you're reading.
6    Q.   You're fine.  Second
7  sentence, we collected.
8    A.   "We collected histological
9  material from pancreatic cancer patients
10 during their diagnostic workup and
11 ascertained information on a variety of
12 potential exposures related to pancreatic
13 cancer risk, including smoking habits,
14 body mass index, family history of
15 pancreatic cancer, obesity, and history
16 of diabetes."
17   Q.   But did you not evaluate
18 what dietary exposures these people might
19 have had?
20   A.   We didn't, not in this
21 study.
22   Q.   And so you didn't assess
23 NDMA exposure at all when you were doing
24 your study, did you?

Confidential Information - Subject to Protective Order

Page 414

¹      A.   No.  This was a case-control
²  study.  And as I said, it's really hard
³  to estimate diet in case-control studies.
⁴      Q.   But your theory was that it
⁵  might be a result of environmental
⁶  carcinogens, right?
⁷           MR. BALL:  Objection to
⁸      form.
⁹           THE WITNESS:  What might be
¹⁰     a result of environmental
¹¹     carcinogens?
¹² BY MR. VAUGHN:
¹³     Q.   I'm sorry, I can't hear you.
¹⁴     A.   What might be the result of
¹⁵ environmental carcinogens?
¹⁶          MR. VAUGHN:  Can we go to
¹⁷     Page 6, Tyler.  Top left.
¹⁸ BY MR. VAUGHN:
¹⁹     Q.   Doctor, you see where it
²⁰ says, "The p53 tumor suppressor gene is
²¹ found to be altered in almost all human
²² tumors, reflecting its critical role as a
²³ tumor suppressor"?
²⁴     A.   Okay.

Page 415

¹      Q.   Would you agree that if a
²  compound can alter the p53 gene, that
³  it's going to increase the risk of
⁴  cancer?
⁵           MR. BALL:  Objection to
⁶      form.
⁷           THE WITNESS:  You know, I
⁸      just don't know.  I don't know.
⁹           MR. VAUGHN:  And can we go
¹⁰     to the last paragraph on this
¹¹     side, the left-hand side.
¹² BY MR. VAUGHN:
¹³     Q.   And about midway through it
¹⁴ says however.
¹⁵          Doctor, can you read that
¹⁶ sentence aloud for us?
¹⁷     A.   "However, one concern
¹⁸ regarding the association between
¹⁹ diabetes and pancreatic cancer is the
²⁰ probability that diabetes may be a
²¹ consequence of pancreatic cancer rather
²² than a cause as a number of studies have
²³ reported higher risk of increasing years
²⁴ before diagnosis of pancreatic cancer."

Page 416

¹      Q.   And so, do you agree that
²  diabetes can also be a cause of
³  pancreatic cancer?
⁴      A.   This is --
⁵           MR. BALL:  Objection to
⁶      form.
⁷ BY MR. VAUGHN:
⁸      Q.   I'm sorry, can diabetes be a
⁹  symptom of pancreatic cancer?
¹⁰          MR. BALL:  Objection to
¹¹     form.
¹²          THE WITNESS:  It is not
¹³     clear.
¹⁴ BY MR. VAUGHN:
¹⁵     Q.   So the diabetes could
¹⁶ potentially be a symptom of pancreatic
¹⁷ cancer?
¹⁸     A.   Well, it's just not clear
¹⁹ from the studies.
²⁰     Q.   And if it is potentially --
²¹ if diabetes is potentially a symptom of
²² pancreatic cancer, that would not be
²³ proper to consider it a confounder,
²⁴ correct?

Page 417

¹           MR. BALL:  Objection to
²      form.
³           THE WITNESS:  So it depends.
⁴      I mean it depends if it's
⁵      associated with the symptom or
⁶      not.
⁷           MR. VAUGHN:  All right.  Can
⁸      we go to Page 34 of his expert
⁹      report.
¹⁰          The top paragraph.  I'm
¹¹     sorry.
¹² BY MR. VAUGHN:
¹³     Q.   Second one on the right, do
¹⁴ you see where you list formaldehyde as a
¹⁵ risk factor to pharyngeal cancer?
¹⁶     A.   It says some -- yeah, it
¹⁷ says it's been implicated as risk
¹⁸ factors.
¹⁹     Q.   And you recall earlier we
²⁰ discussed NDMA breaks down into
²¹ formaldehyde in the body, correct?
²²     A.   As I said, I didn't
²³ understand that reaction.  I'm not sure
²⁴ if it's the same form of formaldehyde, if

Confidential Information Subject to Protective Order

Page 418

1  the --
2      Q.   You said that earlier about
3  form of formaldehyde when I was asking
4  about it.  What are the different forms
5  of formaldehyde?
6      A.   I don't know.
7      Q.   Are there different forms of
8  formaldehyde?
9      A.   I have no idea.
10     Q.   Then why did you say, "I'm
11  not sure it's the same form of
12  formaldehyde"?
13     A.   Because I think in that
14  organic chemistry chart you showed me, it
15  was -- formaldehyde was combined with
16  another compound.
17         MR. VAUGHN:  Rick, how late
18     do you want to go tonight?
19         THE WITNESS:  I'm sorry?
20         MR. BALL:  We were talking
21     about going to about 6 o'clock.
22         MR. VAUGHN:  You're eastern
23     time?
24         MR. BALL:  Yeah.

Page 419

1          MR. VAUGHN:  How long have
2      we been going since the last
3      break?  I haven't been paying
4      attention.  I'm sorry.  Do you
5      know?
6          THE VIDEOGRAPHER:  It's
7      48 minutes.
8          MR. VAUGHN:  Say, Rick, you
9      mind -- I know it's been not very
10     long again, but if we take a
11     break, I might be able to not push
12     us too late into the evening
13     before -- see if I can get done
14     before tomorrow.
15         MR. BALL:  Okay.  That's
16     fine.  That's great.
17         MR. VAUGHN:  Appreciate it.
18         MR. BALL:  We'd all be happy
19     with that.
20         MR. VAUGHN:  That's what I
21     figured.
22         THE VIDEOGRAPHER:  Off the
23     record, 4:14.
24         (Short break.)

Page 420

1          THE VIDEOGRAPHER:  We are
2      back on the record at 4:23 p.m.
3  BY MR. VAUGHN:
4      Q.   Doctor, have you ever had
5  any conversations with Dr. Anton
6  Pottegard?
7      A.   No.  I've seen him speak at
8  a lecture before, but that's all.
9      Q.   Do you know any of his
10  colleagues that published with him?
11     A.   No.  I can't -- they're not
12  at Aarhus.  I did most of my work at
13  Aarhus.  They're at a different
14  university.  I think they're at Aalborg
15  or something.
16     Q.   Yeah, I think they're at
17  different universities.  That's why I was
18  asking.  I didn't know if you even knew
19  them.
20     A.   Yeah, no.
21         MR. VAUGHN:  Tyler, can we
22     go to Page 45 of his expert report
23     now.
24  BY MR. VAUGHN:

Page 421

1      Q.   Doctor, you reviewed the
2  study by Hidajat, correct?
3      A.   Yes.
4      Q.   That's a human study of --
5  occupational study exposure to
6  n-nitrosamines?
7      A.   In rubber workers.
8      Q.   Is that the first human
9  study you're aware of for NDMA in humans?
10         MR. BALL:  Objection to
11     form.
12         THE WITNESS:  I guess I
13     don't know when it was -- I don't
14     know when it was published.  There
15     have been a number of studies of
16     rubber workers.
17  BY MR. VAUGHN:
18     Q.   It was published in 2019.
19     A.   I'm sure the other ones were
20  prior to that.  But I don't know.
21     Q.   Do you know if the other
22  ones are actually looking at levels of
23  NDMA that the humans were exposed to?
24     A.   I can't recall.  I didn't do

Confidential Information - Subject to Protective Order

Page 422

1  a literature search on those.
2       Q.   Why did you not do a
3  literature search on those?
4       A.   Because the occupational
5  exposure to rubber workers had too many
6  co-exposures, exposures to other things.
7  So it's hard to tease out the NDMA in
8  those workers.  So it's not really
9  meaningful.
10      Q.   The authors obviously
11 thought it was meaningful to publish the
12 paper, correct?
13           MR. BALL:  Objection to
14      form.
15           THE WITNESS:  I don't -- I
16      don't know how meaningful they
17      were.  I mean, it's some
18      information on rubber workers,
19      absolutely.
20 BY MR. VAUGHN:
21      Q.   And whoever peer-reviewed it
22 thought it was legitimate enough to allow
23 it to be published, correct?
24           MR. BALL:  Objection to

Page 423

1      form.
2           THE WITNESS:  Oh, I don't --
3      what journal was it --
4  BY MR. VAUGHN:
5      Q.   Well, it got published?
6      A.   What journal was it
7  published in?  I don't know the review
8  policies or what journal it was in.
9      Q.   Did you check what journal
10 it was in when you were reviewing the
11 article?
12      A.   I don't recall.
13      Q.   Are there some journals that
14 don't do peer review?
15      A.   Well, that's one thing I
16 would look for, so I don't know.
17      Q.   What journal are you
18 familiar with that doesn't do a
19 peer-review process before allowing an
20 article to be published?
21      A.   All the journals I publish
22 in do a peer-review process.
23      Q.   Are you aware of any journal
24 that doesn't do a peer-review process?

Page 424

1      A.   There's something called
2  predatory journals, mostly online-type
3  journals.  They just want you to pay to
4  publish your article.
5      Q.   International Agency for
6  Research on Cancer, it looks like they
7  made a decision on NDMA in 1978; is that
8  right?
9      A.   That's correct.  I think
10 they updated it in '92 or something like
11 that.
12      Q.   At the bottom of that first
13 paragraph, it notes that, "NDMA should be
14 regarded for practical purposes as if it
15 were carcinogenic to humans."  Correct?
16      A.   That's what it says, yes.
17 But it doesn't say it is carcinogenic to
18 humans.
19      Q.   And this conclusion was
20 before Hidajat came out, correct?
21      A.   Correct.
22           MR. VAUGHN:  Can we go to
23      the next page, Tyler.
24           THE WITNESS:  The Hidajat

Page 425

1  came out in 2019.  If it had a
2  meaningful impact on their
3  decision, they would have updated
4  it.
5  BY MR. VAUGHN:
6      Q.   What do you base that on?
7      A.   My knowledge of people that
8  have been at IARC.
9      Q.   How quickly does IARC have a
10 turnaround on classifying things as a
11 carcinogens?
12      A.   It depends on the strength
13 of the studies that they find.  So if it
14 was a concern they would -- they would
15 make an effort to review it.
16      Q.   Have any of the people that
17 you've worked with at your various
18 companies been on the -- been employed by
19 IARC?
20      A.   Yes.
21      Q.   Who?
22      A.   Elisabete Weiderpass, the
23 director of IARC, the head of IARC, she
24 worked with me at Karolinska Institutet

Confidential Information - Subject to Protective Order

Page 426

1  in Scandinavia.
2      Q.   Anyone else?
3      A.   I don't recall anyone else.
4      Q.   Have you ever worked for a
5  company that has lobbied IARC for any
6  purpose?
7          MR. BALL:  Objection to
8      form.
9          THE WITNESS:  Not -- not to
10     my knowledge.  I have no idea.
11 BY MR. VAUGHN:
12     Q.   Let me see.  World Health
13 Organization.  It looks like their
14 determination was in 2002, correct?
15     A.   No, these are two
16 scientists.  They represented the World
17 Health Organization, International
18 Program on Chemical Safety.
19         MR. VAUGHN:  And let's go to
20     the next page where it continues
21     talking about these two authors.
22         The second paragraph starts
23     with "however."  Can you blow that
24     up.

Page 427

1  BY MR. VAUGHN:
2      Q.   And can you read that aloud,
3  Doctor?
4      A.   "However, because of
5  evidence in animal studies and the
6  similarity of NDMA metabolism in humans
7  and other species, NDMA was held to be
8  highly likely, by the authors of the
9  CICAD, to be carcinogenic to humans.  No
10 evaluation of NEDA was conducted."
11     Q.   Is that a typo, it should be
12 NDEA?
13     A.   Yeah, you're right.  You're
14 right.  It's NDEA.
15     Q.   And so this determination
16 was in 2002, and again that was before
17 the Hidajat study, correct?
18     A.   Right.  They determined
19 there was not evidence to show that it
20 was carcinogenic to humans.
21     Q.   Then U.S. EPA, was there a
22 determination in 1987 on the very bottom
23 there, under A, the third line, is that
24 what that 1987 is referring to?

Page 428

1          Sorry --
2      A.   It's the Weight of Evidence
3  guidelines, it's how these guidelines in
4  Group A, Group B, Group C.  That's what
5  the 1987 refers to.
6          MR. VAUGHN:  I'm sorry,
7      Tyler, when I said A, I mean the
8      little A at the bottom, not
9      Group A.  I was unclear.
10         THE WITNESS:  But it's all
11     mixed in.  And in 2021 is their
12     assessment of NDMA.
13 BY MR. VAUGHN:
14     Q.   They did an assessment in
15 2021 of NDMA?
16     A.   That's when this was taken,
17 absolutely.
18     Q.   But did they actually look
19 at NDMA in 2021?
20     A.   I'm trying to read my paper.
21 Let me look -- I'll look at my copy here.
22 No, it looks like 1987.
23     Q.   Okay.  And in 1987, the
24 United States Environmental Protection

Page 429

1  Agency classified NDMA as a probable
2  human carcinogen, correct?
3      A.   Right, a Group B2.  B2, I'm
4  sorry.  Group B2.
5      Q.   And this determination was
6  made before the Hidajat study in humans,
7  correct?
8      A.   Correct.
9          MR. VAUGHN:  Can we go to
10     the next page please, Tyler.
11 BY MR. VAUGHN:
12     Q.   National Toxicology Program.
13 And if we go down to A on NDMA.  Was
14 there a determination made in 2016?
15     A.   Yes.
16     Q.   And was there a
17 determination that NDMA was reasonably
18 anticipated to be a human carcinogen
19 based on sufficient evidence of
20 carcinogenicity from studies in
21 experimental animals?
22     A.   Yes.  But it does not say
23 it's carcinogenic to humans.
24     Q.   And this was two thousand

Confidential Information - Subject to Protective Order

Page 430

1  --
2       A.   You have to be careful of
3  that.
4       Q.   And this was 2016.  So,
5  again, it was before the 2019 study in
6  humans that Hidajat did, correct?
7       A.   Which is interesting to me,
8  because the Hidajat study didn't really
9  move the needle on any of these
10  evaluations, so...
11       Q.   Do you have any evidence
12  that any of the agencies that we have
13  went over have reevaluated NDMA?
14       A.   I -- the evidence I have is
15  they haven't felt a need to, otherwise
16  they would have published it.
17       Q.   So would you agree with me
18  that none of these agencies have
19  reevaluated NDMA?
20       MR. BALL:  Objection to
21  form.
22       THE WITNESS:  Yeah, they
23  haven't -- they I haven't seen a
24  need to.  They haven't done that.

Page 431

1       Absolutely.
2  BY MR. VAUGHN:
3       Q.   And at the bottom it says
4  Agency For Toxic Substances and Disease
5  Registry.
6       MR. VAUGHN:  And if you go
7  to the next page, on 49, Tyler,
8  where it actually has the text.
9       THE WITNESS:  Mm-hmm.
10  BY MR. VAUGHN:
11       Q.   So in 1989 is when they made
12  their determination on NDMA, correct?
13       A.   Correct.
14       Q.   They said, "Although there
15  are no reports of NDMA causing cancer in
16  humans, it is reasonable to expect that
17  exposure to NDMA by eating, drinking, or
18  breathing could cause cancer in humans,"
19  correct?
20       A.   Correct.  It doesn't say it
21  causes, says it's reasonable to expect,
22  which is a different thing.
23       Q.   And again, this was in 1989,
24  well before Hidajat's study in humans

Page 432

1  showing NDMA increases the risk of
2  cancer, correct?
3       MR. BALL:  Objection to
4  form.
5       THE WITNESS:  Correct.
6  BY MR. VAUGHN:
7       Q.   We have U.S. FDA next.
8       A.   Mm-hmm.
9       Q.   Is there a reason why a few
10  of these paragraphs are a different
11  color, they are gray instead of black?
12       A.   Oh, I see.  No, I don't
13  think there's a reason at all.
14       Q.   Okay.
15       A.   It might be just how it's
16  printed out.  Actually it's on there too.
17  Yeah, I don't recall if there is a
18  reason.
19       Q.   Do you recall earlier not
20  remembering the FDA's risk assessment for
21  NDMA?
22       A.   Correct.
23       Q.   Okay.  And if you look at
24  the B, the gray paragraph there.  Do you

Page 433

1  see where it does talk about the FDA's
2  risk assessment?
3       A.   Yeah.
4       I just want you to be
5  mindful, this risk assessment, it's
6  really a toxicology activity.  It's not
7  an epidemiology activity.  So it's really
8  outside the scope of what I do.
9       Q.   So you would disagree with
10  the FDA that there would be an increased
11  risk of cancer?
12       MR. BALL:  Objection to
13  form.
14       THE WITNESS:  The FDA what
15  they -- they say there's one
16  additional case of cancer over the
17  lifetime of 8,000 people, if they
18  were taking the highest valsartan
19  dose possible, 320 milligrams, so
20  I don't agree or disagree with
21  that.
22  BY MR. VAUGHN:
23       Q.   Do you know what the highest
24  levels were in valsartan?

Confidential Information - Subject to Protective Order

Page 434

1  A.  Wasn't 320 the highest
2 level?  I believe it was.
3  Q.  I believe 320 is the
4 milligram of the valsartan pill.
5  A.  Yes.
6  Q.  As far as the NDMA level in
7 valsartan, do you have any idea what the
8 levels are?
9  A.  No.
10  Q.  So you don't know what the
11 FDA -- what they think the levels are,
12 you don't know if that's accurate or not,
13 do you?
14  MR. BALL:  Objection to
15  form.
16  THE WITNESS:  I don't.  I
17  hope it's accurate.
18 BY MR. VAUGHN:
19  Q.  Okay.  You would --
20  A.  They are making a -- it's a
21 regulatory agency.  They are making a
22 decision.
23  Q.  If the levels were actually
24 higher than the FDA was aware of, the

Page 435

1 cancer risk would be even higher as well,
2 correct?
3  MR. BALL:  Objection to
4  form.
5  THE WITNESS:  If it's -- if
6  it's higher than what the FDA,
7  you'd think they -- their
8  calculation is wrong, you should
9  inform them.
10 BY MR. VAUGHN:
11  Q.  Do you know how the FDA
12 picked out which valsartan pills to test?
13  MR. BALL:  Objection to
14  form.
15  THE WITNESS:  I have no
16  idea.  Again, this is a toxicology
17  activity.  It's not epidemiology,
18  so...
19 BY MR. VAUGHN:
20  Q.  You have no idea --
21  A.  It's beyond the scope of
22 what I do.
23  Q.  You have no idea if the --
24  A.  It's not --

Page 436

1  Q.  Sorry.  You done?  I didn't
2 mean to interrupt you.
3  A.  Yeah, I'm sorry, go ahead.
4  Q.  So you're not aware if the
5 companies cherry-picked what valsartan to
6 send to the FDA to test, are you?
7  MR. BALL:  Objection to
8  form.
9  THE WITNESS:  I have no idea
10  if they cherry-picked or didn't
11  cherry-pick or how they got the
12  valsartan pills.  It's outside the
13  scope of what I do.
14  MR. VAUGHN:  Can we go to
15  the next page, Tyler.
16 BY MR. VAUGHN:
17  Q.  You see at the top where it
18 says 96 nanograms a day is what the FDA
19 set the -- set the interim limits to.
20 Are you aware of that?
21  A.  That's what it says.
22  Q.  And they believed even
23 96 nanograms a day will increase the risk
24 of cancer over 70 years though, correct?

Page 437

1  MR. BALL:  Objection to
2  form.
3  THE WITNESS:  In -- in one
4  out of 8,000 people, isn't that
5  what they said?  It's not in
6  everybody.
7 BY MR. VAUGHN:
8  Q.  Do you know if that
9 96 nanograms includes --
10  A.  I'm sorry, 18 -- no, it's
11 one out of 8,000 people, and NDEA is one
12 out of 18,000 people.
13  Q.  Are you aware if these
14 levels, these nanograms per day, include
15 the exposure that humans get through
16 their diet?
17  A.  I assume it's exposure in
18 the diet, endogenous exposure, et cetera.
19  MR. VAUGHN:  Go to Page 51,
20 Tyler.
21  And 124.  If we go about
22  two-thirds of the way down on the
23  right-hand side, it starts with
24  "air measures."  Yeah.

Confidential Information Subject to Protective Order

Page 438

BY MR. VAUGHN:
Q.   Can you read that sentence aloud for us, Doctor?
A.   "Air" -- I'm sorry.  Let me look here.  "Air measures of NDMA may not accurately reflect the dose a worker experiences because a portion of what is inhaled is then exhaled."
Q.   So does that mean that the workers in Hidajat were actually exposed to less NDMA?
MR. BALL:  Objection to form.
THE WITNESS:  We're not -- we're not clear about what levels people at Hidajat were exposed to. It's not only this issue, but it's also the issue dealing with the exposure estimates from 1 year in 1967, and took that to be exposures over the whole lifetime of the people between '67 and 2015.
So there's a lot of issues

Page 439

with Hidajat.
BY MR. VAUGHN:
Q.   Would you agree that part of the NDMA they were exposed to would have been exhaled?
MR. BALL:  Objection.
THE WITNESS:  Yes.
BY MR. VAUGHN:
Q.   I'm sorry.  I couldn't hear you over that objection.
A.   I'm sorry.
Q.   Let me ask the question again.
A.   I'm talking too fast.
Q.   No, you're fine.
Would you agree that part of the NDMA that the workers in Hidajat were exposed to would have been exhaled?
A.   Okay.  And what was your question?
Q.   That was my question.  Would you agree that part of the NDMA that the workers in Hidajat were exposed to would have been exhaled?

Page 440

A.   That's what I wrote, yes.
MR. VAUGHN:  Can we go to the next page, please.  Yeah, that first -- yeah.
BY MR. VAUGHN:
Q.   Can you read the last sentence aloud for us, Doctor?
A.   It is absurd to suggest that workers in this study had similar levels of exposure to NDMA as valsartan users and that any findings of this study are applicable.
Q.   Doctor, what were the NDMA levels in valsartan?
A.   So that, I don't know.  The workers in Hidajat were breathing in NDMA.  And valsartan you take orally.  So it's a different exposure route.
Q.   Why does that matter?
A.   Because carcinogens act differently depending on how they are taken, how they're, you know, taken into the body.
Q.   And how is NDMA going to act

Page 441

differently if it's inhaled versus taken orally?
A.   That, we don't know.  But it's not the same exposure.
Q.   Would different organs be susceptible because it's through air as opposed to oral?
A.   You know, I have no idea. But it's not the same exposure route.
Q.   And again, you have no idea of the minimum or the maximum levels of NDMA in any valsartan pills, correct?
A.   I don't.  Or in the Hidajat study, we don't know what the levels are there either.
Q.   So you don't know the levels in Hidajat.  You don't know the levels in valsartan.  And you're saying that it's absurd for the plaintiffs' expert to suggest that workers in this study, Hidajat, had similar levels of exposure to NDMA as valsartan users?
A.   Because it's --
Q.   If the plaintiffs' experts

Confidential Information Subject to Protective Order

Page 442

1 do know all of that information, why
2 would it be absurd for them to say that?
3         MR. BALL:  Objection to
4     form.
5         THE WITNESS:  The route of
6     exposure was different.
7 BY MR. VAUGHN:
8     Q.    That's not what your paper
9 says.  It doesn't say anything about
10 route of exposure.  It just says that the
11 levels it would be absurd to suggest
12 that the levels were similar?
13     A.    You have to read the whole
14 paragraph though.
15         (Reading to himself.)
16         One thing that you have to
17 try to understand in epidemiology is how
18 representative your population is to the
19 population that you're concerned about.
20         And rubber workers isn't the
21 same as a valsartan user.  If you think
22 it is, then you would have to -- you
23 know, you would have to give evidence
24 that it is.

Page 443

1     Q.    Was Hidajat comparing rubber
2 workers to valsartan users?
3     A.    No.  But the plaintiffs'
4 experts are.
5     Q.    Didn't you previously
6 testify that generally occupational
7 exposures are the mainstay for
8 determining carcinogens?
9         MR. BALL:  Objection to
10     form.
11         THE WITNESS:  If -- if the
12     carcinogens are taken in a similar
13     manner.  You have to -- you have
14     to evaluate them.
15 BY MR. VAUGHN:
16     Q.    So like, chromium, air
17 versus water, do you think one of those
18 routes is noncarcinogenic?
19     A.    You have to --
20         MR. BALL:  Objection to
21     form.
22         THE WITNESS:  -- evaluate
23     it.
24 BY MR. VAUGHN:

Page 444

1     Q.    Say it again.
2     A.    You have to evaluate it.
3 They're different exposures.
4     Q.    If you're -- if a substance
5 is a carcinogen via one route, isn't it a
6 known carcinogen?
7         MR. BALL:  Objection to
8     form.
9         THE WITNESS:  I don't know.
10     But the route of exposure is
11     important.
12 BY MR. VAUGHN:
13     Q.    Doctor, is it your opinion
14 that all of the NDMA exposure in Hidajat
15 was via the respiratory exposure?
16         MR. BALL:  Objection to --
17     sorry.  Objection to form.
18         THE WITNESS:  I'd have to
19     look at the paper.
20         But, you know, they only
21     used one year of exposure data and
22     applied it over, you know, the
23     whole lifetime of the plant
24     workers, the rubber plant workers.

Page 445

1     But they're assuming that the
2     level of exposure is the same
3     across all the years.  But the --
4 BY MR. VAUGHN:
5     Q.    Did they not check -- sorry.
6     A.    -- personal protective
7 equipment, they don't look for any
8 confounders.  Those type of things.
9     Q.    Is it your testimony that in
10 Hidajat, they did not determine levels of
11 NDMA exposure every year?
12     A.    So they calculated what they
13 considered to be levels, you know, based
14 on the data that they had, which was
15 good.  But it may or may not be accurate.
16 They did nothing to show that it was or
17 wasn't accurate.  We don't even know if
18 the people worked in the same jobs
19 throughout that whole time period.  We
20 just know that they were in the same
21 department.  We don't know if the
22 department had the same exposure level
23 throughout it or not.
24     Q.    Do you recall critiquing

Confidential Information Subject to Protective Order

Page 446

1 Dr. Madigan for assuming that the
2 occupational exposure to NDMA was
3 respiratory in Hidajat?
4      A.   You'd have to show me what I
5 said.
6      Q.   You don't recall?
7      A.   There are a lot of things
8 I -- a lot of problems I have with
9 Dr. Madigan.
10      Q.   But you don't recall
11 critiquing him for assuming that the
12 occupational exposure in Hidajat to NDMA
13 was respiratory?
14      A.   You have to show me where I
15 said that.  I don't -- I don't recall.
16      MR. VAUGHN:  If you can go
17 to Page 54 of his expert report.
18 Number 135.  Two-thirds of the way
19 down.
20 BY MR. VAUGHN:
21      Q.   "Dr. Madigan's calculations
22 assumed occupational exposure to NDMA was
23 respiratory."
24      A.   Okay.

Page 447

1      Q.   Do you disagree?  You do not
2 think that the NDMA was respiratory in
3 Hidajat?
4      A.   No.  What I'm saying is that
5 the NDMA exposure in -- for valsartan
6 users wasn't respiratory --
7      Q.   That's not what this says --
8      (Simultaneous speaking.)
9      THE COURT REPORTER:  Just
10 one second.  What?
11 BY MR. VAUGHN:
12      Q.   This says --
13      A.   The NDMA exposures for
14 valsartan use wasn't respiratory.
15      Q.   But that's not what this
16 says, right?  This says, "Dr. Madigan's
17 calculations assumed occupational
18 exposure to NDMA was respiratory."
19      A.   Right.  And so I don't know
20 why you would consider a valsartan user
21 as having respiratory NDMA, and also that
22 it remained constant throughout their
23 career.
24      Q.   Do you think that Hidajat

Page 448

1 was something besides respiratory
2 exposure to NDMA?
3      A.   I don't.
4      MR. VAUGHN:  I have no
5 further questions at this time.
6      MR. BALL:  Can we take about
7 a ten-minute break, and we'll
8 figure out what we want to do.
9      MR. VAUGHN:  What do you
10 mean figure out what you want to
11 do?
12      MR. BALL:  Okay.  Thank you.
13 We can stay off for about ten
14 minutes.
15      MR. VAUGHN:  What do you
16 mean figure out what you want to
17 do?
18      THE WITNESS:  Okay.
19      MR. BALL:  If I want to do
20 any redirect.
21      MR. VAUGHN:  Oh, okay.
22 Gotcha.
23      MR. BALL:  Sorry.  Sorry if
24 I was unclear.  Just give us --

Page 449

1 give us ten minutes, okay?
2      MR. VAUGHN:  Not a problem.
3 Thank you.
4      THE VIDEOGRAPHER:  Off the
5 record, 4:48.
6      (Short break.)
7      THE VIDEOGRAPHER:  We are
8 back on the record at 5:00 p.m.
9      MR. BALL:  Duane Morris
10 doesn't have any questions for
11 Dr. Fryzek.
12      And I believe -- I don't
13 believe any of the other defense
14 counsel do, but I'll let them
15 speak up for themselves if they
16 feel like they need to.
17      (No response.)
18      MR. BALL:  Nope.  Okay,
19 we're done.
20      MR. VAUGHN:  Thank you for
21 your time, Dr. Fryzek.
22      THE VIDEOGRAPHER:  That
23 concludes this deposition.
24      The time is 5:01 p.m.

Page 450

```
1          ***********
2          (Excused.)
3          (Deposition concluded at
4    approximately 5:01 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 452

```
1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8          After doing so, please sign
9    the errata sheet and date it.
10         You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14         It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24
```

Page 451

```
1
2          CERTIFICATE
3
4
5          I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
6    deposition is a true record of the
     testimony given by the witness.
7
          It was requested before
8    completion of the deposition that the
     witness, JON P. FRYZEK, Ph.D., have the
9    opportunity to read and sign the
     deposition transcript.
10
11
12
     _____
13   MICHELLE L. GRAY,
     A Registered Professional
     Reporter, Certified Shorthand
14   Reporter, Certified Realtime
     Reporter and Notary Public
15   Dated:  October 11, 2021
16
17
18         (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24
```

Page 453

```
1          - - - - - -
             E R R A T A
2          - - - - - -
3
4    PAGE  LINE  CHANGE
5    ____  ____  _____
6      REASON:  _____
7    ____  ____  _____
8      REASON:  _____
9    ____  ____  _____
10     REASON:  _____
11   ____  ____  _____
12     REASON:  _____
13   ____  ____  _____
14     REASON:  _____
15   ____  ____  _____
16     REASON:  _____
17   ____  ____  _____
18     REASON:  _____
19   ____  ____  _____
20     REASON:  _____
21   ____  ____  _____
22     REASON:  _____
23   ____  ____  _____
24     REASON:  _____
```

Confidential Information Subject to Protective Order

Page 454

1
2        ACKNOWLEDGMENT OF DEPONENT
3
4         I,_____, do
5  hereby certify that I have read the
6  foregoing pages, 1 - 455, and that the
7  same is a correct transcription of the
8  answers given by me to the questions
9  therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  JON P. FRYZEK, Ph.D.          DATE
17
18
19  Subscribed and sworn
     to before me this
20  _____ day of _____, 20____.
21  My commission expires:_____
22

    _____
23  Notary Public
24

Page 455

1        LAWYER'S NOTES
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____

ERRATA SHEET

Case Name:    Valsartan, Losartan, and Irbesartan Products Liability Litigation (MDL No. 2875)

Deposition Date:    September 30, 2021

Deponent:    Jon Fryzek

1.    To clarify the record
2.    To conform to the facts
3.    To correct transcription error

| Pg. | Line | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 19 | 9 | 415 | 412 | 3 |
| 78 | 10 | By | Been | 3 |
| 94 | 14 | Where | why | 3 |
| 99 | 5 | Used | I used | 3 |
| 131 | 19 | Conducted | Controlled | 3 |
| 166 | 7 | I did them | I did use them | 3 |
| 169 | 4-5 | Notre Dame | Vanderbilt | 3 |
| 187 | 8 | Written by | Written about | 3 |
| 189 | 10 | One restriction | One indicative | 3 |
| 210 | 5 | Take--- | Take the data | 3 |
| 210 | 13 | Do the data | Take the data | 1 |
| 274 | 3 | The s value | The estimate | 3 |
| 305 | 27 | Say it would I still find no | Say I would still find no | 3 |
| 362 | 12 | Studies of the | Studies review by the | 3 |
| 375-376 | 24, 1-3 | The way to control by confounding is done by age is having a certain age group. | The way to control confounding by age is to only study a certain age group. | 3 |
| 376 | 2-3 | Then you are confounding | Then you are controlling | 3 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Date:
Oct 27, 2021
_____

Signature:
_Jon Fryzek_
Jon Fryzek (Oct 27, 2021 14:39 EDT)
_____

_Avier Salter_
Notary

Seal:

Notary Public Common Wealth of Virginia
Registration No. 7931695
Commission Expire; Jul 31, 2025

7931695
Registration#

07/31/25
Expiration Date:

Confidential Information — Subject to Protective Order

1

2               ACKNOWLEDGMENT OF DEPONENT

3

4          I, Jon Fryzek                    , do

5    hereby certify that I have read the

6    foregoing pages, 1 - 455, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _Jon Fryzek_____   10/27/21

16   JON P. FRYZEK, Ph.D.              DATE

17

18

19   Subscribed and sworn

     to before me this

20   27th   day of October      , 20 21 .

21   My commission expires: 07/31/25

22

     _Avier Salter_ 7931695

23   Notary Public
                     Notary Public Common Wealth of Virginia
24                   Registration No. 7931695
                     Commission Expire; Jul 31, 2025