# EXHIBIT A

Confidential Information - Subject to Protective Order

```
 1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
 2                    -  -  -
 3   IN RE:  VALSARTAN,      :  MDL NO. 2875
     LOSARTAN, AND           :
 4   IRBESARTAN PRODUCTS      :  HON. ROBERT
     LIABILITY LITIGATION     :  B. KUGLER
 5   _____ :
                              :
 6   THIS DOCUMENT APPLIES    :
     TO ALL CASES             :
 7
          - CONFIDENTIAL INFORMATION -
 8         SUBJECT TO PROTECTIVE ORDER
 9                    -  -  -
10            September 23, 2021
11                    -  -  -
12
13         Videotaped remote deposition of
     JANICE K. BRITT, Ph.D., taken pursuant to
14   notice, was held via Zoom
     Videoconference, beginning at 9:11 a.m.,
15   EST, on the above date, before Michelle
     L. Gray, a Registered Professional
16   Reporter, Certified Shorthand Reporter,
     Certified Realtime Reporter, and Notary
17   Public.
18
                      -  -  -
19
20        GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
21            deps@golkow.com
22
23
24
```

Page 2

ZOOM APPEARANCES:

MAZIE SLATER KATZ & FREEMAN, LLC
BY:  ADAM SLATER, ESQ.
    JULIA S. SLATER, ESQ.
    CHRISTOPHER J. GEDDIS, ESQ.
103 Eisenhower Parkway, 2nd Floor
Roseland, New Jersey 07068
(973) 228-9898
aslater@mazieslater.com
jslater@mazieslater.com
cgeddis@mazieslater.com
Representing the Plaintiffs

LEVIN PAPANTONIO RAFFERTY PROCTOR
BUCHANAN, O'BRIEN, BARR, MOUGEY, PA
BY:  DANIEL NIGH, ESQ.
316 South Baylen Street
Suite 600
Pensacola, Florida 32502
(888) 435-7001
dnigh@levinlaw.com
Representing the Plaintiffs

FARR LAW FIRM, P.A.
BY:  GEORGE T. WILLIAMSON, ESQ.
    NICOLE S. PEET, ESQ.
99 Nesbit Street
Punta Gorda, Florida 33950
(941) 639-1158
gwilliamson@farr.com
npeet@farr.com
Representing the Plaintiffs

HOLLIS LAW FIRM, PA
IRIS SIMPSON, ESQ.
8101 College Boulevard, Suite 260
Overland Park, Kansas 66210
(913) 385-5400
iris@hollislawfirm.com
Representing the Plaintiffs

Page 3

ZOOM APPEARANCES:  (Cont'd.)

MARTIN HARDING & MAZZOTTI, LLP
BY:  ROSEMARIE RIDDELL BOGDAN, ESQ.
1 Wall Street
Albany, New York 12205
(800) LAW-1010
Rosemarie.bogdan@1800law1010.com
Representing the Plaintiffs

DUANE MORRIS, LLP
BY:  PATRICK C. GALLAGHER, Ph.D., ESQ.
1875 NW Corporate Boulevard
Suite 300
Boca Raton, Florida 33431
(561) 962-2100
Pcgallagher@duanemorris.com
    - and -
DUANE MORRIS, LLP
BY:  LAUREN A. APPEL, ESQ.
100 High Street, Suite 2400
Boston, Massachusetts 02110
(857) 488-4200
Laappel@duanemorris.com

    - and -

DUANE MORRIS, LLP
BY:  RAYMOND VANDERHYDEN, ESQ.
30 South 17th Street
Philadelphia, Pennsylvania 19103
(215) 979-1164
ravanderhyden@duanemorris.com
Representing the Defendants, Zhejiang
Huahai Pharmaceutical Co, Ltd., Prinston
Pharmaceutical Inc., Huahai U.S., Inc.,
and Solco Healthcare US, LLC

Page 4

ZOOM APPEARANCES:  (Cont'd.)

FALKENBERG IVES, LLP
BY:  MEGAN A. ZMICK, ESQ.
230 W. Monroe Street, Suite 2220
Chicago, IL 60606
(312) 566.4808
Maz@falkenbergives.com
Representing the Defendant, Humana

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
BY:  JASON M. REEFER, ESQ.
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
(412) 263-1840
JMR@pietragallo.com
Representing the Defendant, Mylan
Pharmaceuticals, Inc.

HILL WALLACK, LLP
BY:  NAKUL Y. SHAH, ESQ.
21 Roszel Road
Princeton, New Jersey 08543
(609) 734-6358
Nshah@hillwallack.com
Representing the Defendants, Hetero, USA,
Inc., Hetero Labs

HINSHAW & CULBERTSON, LLP
BY:  GEOFFREY M. COAN, ESQ.
53 State Street, 27th Floor
Boston, Massachusetts  02109
(617) 213-7047
Gcoan@hinshawlaw.com
Representing the Defendant, ScieGen
Pharmaceuticals, Inc.

Page 5

ZOOM APPEARANCES:  (Cont'd.)

GREENBERG TRAURIG, LLP
BY:  NICHOLAS A. INSOGNA, ESQ.
One International Place
Suite 1000
Boston, Massachusetts 02110
(617) 310-6231
Insognan@gtlaw.com

    - and -

GREENBERG TRAURIG, LLP
BY:  STEPHEN T. FOWLER, ESQ.
2101 L Street NW
Washington, D.C. 20037
(202) 530-8587
Fowlerst@gtlaw.com
    - and -
GREENBERG TRAURIG, LLP
BY:  VICTORIA DAVIS LOCKARD, ESQ.
    TARYN W. HARPER, ESQ.
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, Georgia 30305
(678) 553-2127
Lockard@gtlaw.com
harpert@gtlaw.com
Representing the Defendants, Teva
Pharmaceutical Industries, Ltd., Teva
Pharmaceuticals USA, Inc., Actavis LLC,
and Actavis Pharma, Inc.

BARNES & THORNBURG, LLP
BY:  KARA KAPKE, ESQ.
11 S. Meridian Street
Indianapolis, Indiana 46204
(317) 231-6491
Kara.kapke@btlaw.com
Representing CVS Pharmacy, Inc., and Rite
Aid Corporation

Page 6

1  ZOOM APPEARANCES:  (Cont'd.)
2
3  LEWIS BRISBOIS BISGAARD & SMITH LLP
   BY:  MEGAN E. GROSSMAN, ESQ.
   550 E. Swedesford Road
4  Suite 270
   Wayne, Pennsylvania 19087
5  (215) 977-4087
   Megan.grossman@lewisbrisbois.com
6  Representing the Defendant, Camber
   Pharmaceuticals
7
8  CIPRIANI & WERNER, P.C.
   BY:  JILL H. FERTEL, ESQ.
9  450 Sentry Parkway, Suite 200
   Blue Bell, Pennsylvania 19422
10 (610) 567-0700
   Jfertel@c-wlaw.com
11 Representing the Defendant, Aurobindo
   Pharmaceuticals
12
13 BUCHANAN INGERSOLL & ROONEY P.C.
   BY:  CHRISTOPHER B. HENRY, ESQ.
14 Carillon Tower
   227 West Trade Street, Suite 600
15 Charlotte, North Carolina 28202
   (704) 444-3475
16 Christopher.henry@bipc.com
   Representing the Defendant, Albertson's
17 LLC
18
19
20
21
22
23
24

Page 7

1  ZOOM APPEARANCES:  (Cont'd.)
2
3  VIDEOTAPE TECHNICIAN:
   Judy Diaz
4
5  ALSO PRESENT:
   Liza Walsh
6  (Teva)
7  Bradley Matta, Esq.
   (Mylan - Viatris)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 8

1
2                  - - -
3            I N D E X
4                  - - -
5  Testimony of:
6
7        JANICE K. BRITT, Ph.D.
8     By Mr. Slater          13
9
10
11
12
13            - - -
14        E X H I B I T S
15            - - -
16 NO.        DESCRIPTION        PAGE
17 Britt-1    Notice of Videotaped  16
            Oral Deposition
18
19 Britt-2    Defendant's Responses 18
            And Objections to
20          Plaintiffs' Notice of
            Videotaped Deposition
21 Britt-3    Expert Report of    61
            Janice K. Britt, Ph.D.
22          8/2/21 with Exhibits
            A, B, and C Attached
23
24

Page 9

1                  - - -
2            E X H I B I T S  (Cont'd.)
3                  - - -
4
5  NO.        DESCRIPTION        PAGE
6  Britt-4    Britt Exhibit A    75
            CV
7
8  Britt-5    Britt Exhibit B    155
            Testimony 2016-2021
9  Britt-6    Britt Exhibit C    156
            Fee Schedule
10
11 Britt-7    Compilation of     157
            Invoices
12          IMS Expert Services
13 Britt-8    How Industry       172
            Scientists Stalled
14          Action on Carcinogen
15 Britt-9    NRDC               183
            Comments from NRDC
16          On EPA's TSCA Systematic
            Review
17          8/16/18
18 Britt-10   FERC Study Finds   192
            No Risk from Protective
19          Coating of Mountain
            Valley Pipeline
20 Britt-11   Evidence-Based     218
            Causation in Toxicology
21          A 10-Year Retrospective
            (James)
22
23
24

Confidential Information - Subject to Protective Order

Page 10

E X H I B I T S (Cont'd.)

- - -

NO.          DESCRIPTION          PAGE

Britt-12   Previous Transcript   277
3/23/18
Janice Britt
Scott v Dyno Nobel

Britt-13   Evidence-Based        280
Toxicology
Sound Science in
New Disguise

Britt-14   Prinston Pharma       291
Issues Voluntary
Nationwide Recall
Press Release

Britt-15   Principles of         294
Toxicology
Environmental and
Industrial Applications
Second Edition
(Williams)

Britt-16   Comments on Recent    298
Discussions Providing
Differing Causation
Methodologies
(James)

Britt-17   Evaluation of the     301
Carcinogenicity
Of 1,1-Dichloroethylene
(Roberts)

---

Page 11

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
34     11
53     15
78     1
164    8

Stipulations

PAGE   LINE
None.

Questions Marked

PAGE   LINE
None.

---

Page 12

THE VIDEOGRAPHER:  We are now on the record.  My name is Judy Diaz, I'm a legal videographer for Golkow Litigation Services.

Today's date is September 23rd, 2021, and the time is 9:11 a.m.

This remote video deposition is being held in the matter of Valsartan, Losartan, and Irbesartan Products Liability Litigation MDL, for the United States District Court, District of New Jersey.

The deponent is Dr. Janice K. Britt, Ph.D.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

All counsel will be noted on the stenographic record.

---

Page 13

The court reporter is Michelle Gray and will now swear in the witness.

- - -

... JANICE K. BRITT, Ph.D., having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. SLATER:

Q.   Good morning, Dr. Britt.

A.   Good morning.

Q.   I'm going to take your deposition now.  You understand that, right?

A.   Yes, I do.

Q.   Do you understand that you're now under oath and you must tell the truth every time you're asked a question?

A.   I do.

Q.   Please provide truthful answers and complete answers as well,

Confidential Information Subject to Protective Order

Page 14

okay?

A.   Can you repeat the question?

Q.   Sure.  We'll expect also not only truthful answers, but complete answers, okay?

A.   Correct, yes, yes.

Q.   If I ask you a question that you don't understand for any reason or don't feel like you can answer it in a truthful and complete way, just tell me.

A.   Okay.

Q.   I have a habit -- I can mispronounce scientific terminology.  I may ask a question in a way that you don't hear what I say, whatever the reason may be.

You can just tell me what -- that you couldn't hear, or what doesn't make sense or what you want me to clarify, and we'll work it out.  And then I'll try to arrive at a question that makes sense to you so that you could answer truthfully.  Okay?

A.   Okay.

Page 15

Q.   During the course of the deposition, there may be objections.  That happens.  I'm sure you've seen it.  That's just lawyers preserving their rights to the future as to whether questions were asked the right way.

There's never going to be, for example, a suggestion of how to answer a question through an objection.  That would be completely inappropriate.

I want you to just understand, if an objection is made, let the lawyer talk.  Let the lawyers speak if they have to discuss it.  And then I would assume you'll be directed to answer unless it's something that is, you know -- falls within a privilege or something.  But I just don't want you to be thrown off by objections, because it's going to happen.  It's inevitable, okay?

A.   Okay.  I understand.

MR. SLATER:  Chris, let's put up as Exhibit 1, the deposition notice, please.

Page 16

(Document Marked for identification as Exhibit Britt-1.)

BY MR. SLATER:

Q.   Doctor, Exhibit 1 on the screen is the deposition notice for this deposition.  Have you seen that document?

A.   I'm going to pull it up on my screen, because I -- it's far away here.

Q.   Sure.  And if you have a hard copy there, you're welcome to look at any hard copies of any documents we use on the screen.  In fact, if you tell me you have the actual document, like I'm hoping you have your report there -- I'm assuming you do -- you can just use the document.  We don't have to put it on the screen.  Okay?

A.   Okay.  I also --

Q.   Let me ask you a question.  When you say you're putting it on your screen, that's not the screen of the laptop that's recording the -- that's

Page 17

doing the Zoom.  You're looking at a different laptop?

MR. GALLAGHER:  Just refresh.

THE WITNESS:  Can you repeat the question?  I'm having a hard time understanding.

BY MR. SLATER:

Q.   You're looking at your own laptop?  Is that my understanding?  Is that correct?

A.   That is correct.

Q.   Okay.  Why can't you look at this on the screen?

A.   It is too far away.  I cannot see it.  I'm about 25 feet away.

MR. GALLAGHER:  So she's got the Golkow exhibit platform, and so that way she has the full document.

MR. SLATER:  That's fine.

BY MR. SLATER:

Q.   Obviously, Dr. Britt, I wouldn't have to tell you this, nobody

Confidential Information Subject to Protective Order

Page 18

¹ can be communicating with you by the --
² electronically.  You know that right,
³ right?
⁴        A.   Yes.  Of course.
⁵        Q.   Okay.
⁶        A.   Yeah, it came up.  Okay.  It
⁷ pulled up.
⁸        Q.   Have you seen this -- I'll
⁹ start over.  On Exhibit -- rephrase.
¹⁰        Exhibit 1 is the notice to
¹¹ take videotaped oral deposition.  Have
¹² you seen this document?
¹³        A.   Yes.
¹⁴        Q.   Did you read it?
¹⁵        A.   Yes.
¹⁶        MR. SLATER:  Let's go now to
¹⁷ Exhibit 2, defendants' responses
¹⁸ and objections to the notice of
¹⁹ deposition.
²⁰        (Document Marked for
²¹ identification as Exhibit
²² Britt-2.)
²³ BY MR. SLATER:
²⁴        Q.   Have you seen this document?

Page 19

¹        A.   Okay.  It's open.
²        Q.   Have you seen this document
³ prior to now?
⁴        A.   No, I do not believe I've
⁵ seen this document.
⁶        Q.   Do you have any information
⁷ as to how the lawyers who hired you
⁸ responded to the deposition notice in
⁹ this document, or is this the first time
¹⁰ you're getting any information on that?
¹¹        A.   I sent them information
¹² that -- in response to the notice.  And
¹³ if I was missing a document, they'd let
¹⁴ me know.  If it didn't match up with my
¹⁵ report.  So I'm assuming that's what this
¹⁶ is based on.  I haven't reviewed this
¹⁷ document.  Do you want me to review?
¹⁸        Q.   Yeah, let me ask you a
¹⁹ question.  Why is it that you can't use
²⁰ Zoom on your laptop and then just look at
²¹ the documents as we put them up and then
²² take a look at the documents if you want
²³ to go into the Golkow document
²⁴ repository?  Why can't you do that?

Page 20

¹ Every other witness has seemed to be able
² to do that.
³        MR. GALLAGHER:  I don't
⁴ understand the issue.  I mean,
⁵ she's looking at the Golkow --
⁶ exhibits on the Golkow --
⁷        THE WITNESS:  Can you read
⁸ that on the screen?
⁹        MR. REEFER:  Yeah -- no, I
¹⁰ cannot read it.
¹¹        MR. SLATER:  Well, you'd
¹² read it if it was on the laptop in
¹³ front of you, Dr. Britt.
¹⁴        THE WITNESS:  No, I can see
¹⁵ it in front of me on the laptop.
¹⁶ But I cannot see it on the screen.
¹⁷ It's too far away.
¹⁸        And it's zoomed -- it's
¹⁹ zoomed in the screen.
²⁰        MR. SLATER:  All right.
²¹ Well, we're going to continue like
²² this for the time being.  But we
²³ may have to have a conversation.
²⁴ BY MR. SLATER:

Page 21

¹        Q.   I understand you can't see
² it on the screen across the room.  But if
³ you're doing it as I'm doing it, where my
⁴ laptop is what I'm using Zoom on, and the
⁵ document is on the laptop right in front
⁶ of you, you can see it perfectly fine,
⁷ because the laptop is two feet from your
⁸ eyes.  That's my point.  And I'm not sure
⁹ why you're not doing that.
¹⁰        MR. GALLAGHER:  Adam, the
¹¹ witness can look at the full
¹² exhibit.  And every witness has
¹³ had access to all the exhibits
¹⁴ through the Golkow link on their
¹⁵ platform.
¹⁶        I mean, she you can flip
¹⁷ through the whole document.
¹⁸ There's nothing wrong with what
¹⁹ she's doing.
²⁰        MR. SLATER:  Well, we'll
²¹ take it up.
²²        MR. GALLAGHER:  It's much
²³ better.
²⁴        MR. SLATER:  Okay.

Confidential Information - Subject to Protective Order

Page 22

BY MR. SLATER:

¹ BY MR. SLATER:
²     Q.   Dr. Britt, your answer is
³ that you have not seen these responses
⁴ that were served on us, right?
⁵     A.   Can you repeat the question?
⁶     Q.   You have not seen this
⁷ document before?  You haven't seen the
⁸ responses that were provided to us in
⁹ response to our deposition notice before
¹⁰ right now; is that correct?
¹¹    A.   Correct.  I have not seen
¹² the document that is on the screen right
¹³ now.
¹⁴    Q.   Let's go to Page 2, Request
¹⁵ Number 1.  "Copies of all invoices for
¹⁶ work performed in connection with any
¹⁷ consultation or expert work performed for
¹⁸ or on behalf of any defendant or their
¹⁹ counsel with regard to any issues in this
²⁰ MDL, included but not limited to for the
²¹ review of documents, review in
²² consultation with regard to plaintiff
²³ experts, preparation of Dr. Britt's
²⁴ report and preparation for deposition or

Page 23

¹ trial."
²         Did you provide all your
³ invoices to counsel?
⁴     A.   I believe counsel had the
⁵ invoices themselves.  I provided them to
⁶ them when they were billed, and so they
⁷ had those invoices.
⁸     Q.   Did you look at the invoices
⁹ that were provided to us to make sure
¹⁰ they were complete?
¹¹    A.   No, I did not.
¹²    Q.   We'll come back to the
¹³ invoice in a little while.
¹⁴        Have you ever performed any
¹⁵ consulting or other work for any of the
¹⁶ defendants in this litigation other than
¹⁷ in this litigation?
¹⁸    A.   No, I've not consulted or
¹⁹ performed any work for any of the
²⁰ other -- for any of the defendants in
²¹ this litigation that I'm aware of besides
²² this case.
²³    Q.   Have you ever -- so the
²⁴ answer to my question is no?  Is the

Page 24

¹ answer no?
²     A.   Yes, the answer is no.
³     Q.   Have you ever worked with
⁴ any of the law firms that are defending
⁵ the defendants in this litigation to your
⁶ knowledge, for example, Duane Morris,
⁷ Greenberg Traurig, any of the law firms
⁸ you're aware of that are defending the
⁹ manufacturers here?
¹⁰        Have you ever worked with
¹¹ them other than in this case?
¹²    A.   I believe I worked with
¹³ Duane Morris before.
¹⁴    Q.   What was that in connection
¹⁵ with?
¹⁶    A.   I don't remember what it
¹⁷ would have been in regards to.
¹⁸    Q.   Was it litigation?
¹⁹    A.   It was either litigation or
²⁰ consulting.
²¹    Q.   When did that happen?
²²    A.   I do not recall the dates.
²³ I would have to look into them.
²⁴    Q.   Was it after 2000?

Page 25

¹     A.   I do not recall.
²     Q.   Was it after 1980?
³     A.   Well, yes, it would have to
⁴ be after 1980.
⁵     Q.   So sometime in the last
⁶ 41 years, but you can't be more specific
⁷ than that?
⁸     A.   It would probably be in the
⁹ last 15 years.
¹⁰    Q.   Do you recall what lawyer at
¹¹ Duane Morris or lawyers you worked with?
¹²    A.   I do not.
¹³    Q.   Do you keep records of who
¹⁴ you do work for?  I assume your companies
¹⁵ keep records of who you've billed in the
¹⁶ past and worked with.
¹⁷    A.   My company?
¹⁸    Q.   Yes.  Your company.
¹⁹    A.   Yes, I assume -- yes, I have
²⁰ billing records.
²¹    Q.   So if you wanted to figure
²² out when you did work with Duane Morris
²³ in the past, you could figure that out,
²⁴ right?

Confidential Information Subject to Protective Order

Page 26

1      A.   Yes, I could potentially do
2  that, yes.
3      Q.   But your testimony under
4  oath is you have no recollection of when
5  or with regard to what you may have ever
6  worked with Duane Morris?
7      A.   Yes.
8           MR. GALLAGHER:  Objection to
9      form of the question.  Objection
10     to form.
11 BY MR. SLATER:
12     Q.   Is that right?
13     A.   Yes.  Yes, that is correct.
14     Q.   Did you prepare for this
15 deposition?
16     A.   Yes.
17     Q.   Did you meet with lawyers
18 from Duane Morris as part of your
19 preparation?
20     A.   Yes.
21     Q.   Did you meet with lawyers
22 from any other law firm as part of your
23 preparation?
24     A.   Yes.

Page 27

1      Q.   Who?
2      A.   Jason from -- I'm not sure
3  of his law firm.
4      Q.   Do you know his last name?
5      A.   I do not know his last name.
6      Q.   Tell me every lawyer that
7  you've met with in connection with this
8  litigation that you've ever spoken with
9  or met with?
10     A.   In person or in Zoom calls,
11 I assume?
12     Q.   Both.  In any way.  Either
13 Zoom, telephone, or in person?
14          MR. GALLAGHER:  Objection to
15     form.
16          You can answer.
17          THE WITNESS:  Patrick, Rick
18     Ball.  They're both with Duane
19     Morris.  And then Jason who I
20     mentioned earlier.  I'm not sure
21     of his firm.  Alan, who's also
22     with Duane Morris.  Zoe, who also
23     works with Jason.
24          I've spoken with Lauren and

Page 28

1      Coleen at Duane Morris.  I've
2  spoken with or corresponded with
3  lawyers from Teva and Hetero,
4  Aurobindo, e-mail or over the
5  phone.
6  BY MR. SLATER:
7      Q.   Do you know who those
8  lawyers are?
9      A.   Can you repeat your
10 question?
11     Q.   Yeah.  Who were the lawyers?
12 I'm asking you for names.
13     A.   I do not recall their names.
14     Q.   Have you been retained by
15 any of the lawyers or any of the
16 manufacturers for any other matters or
17 any other subjects since the time that
18 you were first contacted in this case?
19          MR. GALLAGHER:  Objection to
20     form.
21          You can answer that yes or
22     no.  But I would caution you if
23     there's something that's
24     confidential --

Page 29

1          MR. SLATER:  It's a yes or
2  no question.  It's not privileged.
3          MR. GALLAGHER:  That's what
4      I said.  She can answer it yes or
5      no.
6          THE WITNESS:  Can you repeat
7      the question?
8  BY MR. SLATER:
9      Q.   Sure.  From the time that
10 you were first contacted about the
11 valsartan contamination litigation, have
12 you been retained by any of the lawyers
13 or manufacturers connected with this case
14 with regard to any other matter?
15     A.   No.
16     Q.   Have they discussed any
17 potential other matters with you?
18     A.   No.
19     Q.   Are you hoping to get more
20 business from these lawyers and these
21 manufacturers in the future?
22          MR. GALLAGHER:  Objection to
23     form.
24          THE WITNESS:  No.

Confidential Information - Subject to Protective Order

Page 30

BY MR. SLATER:

Q. You don't want to get more business from these other lawyers? Rephrase.

You don't want to get business in the future from the lawyers of the manufacturers on the defense side in the future?

MR. GALLAGHER: Objection to form.

THE WITNESS: No, that's not a concern of mine.

BY MR. SLATER:

Q. Let's go through the rest of the deposition notice. Let's go to Number 2 on Page 3. Copies of any notes, i.e., written or electronic reflecting consulting or litigation work that has not been documented in invoices.

First of all, do any such notes exist?

A. Which number are we on?

Q. Number 2.

A. On page? Which page?

Page 31

Q. I'm sorry, Doctor. Are you having trouble following along with me? I said Page 3, second request.

A. You're breaking up. So I'm having trouble hearing every fourth word or so.

MR. SLATER: Is it that bad for everybody? Because if it is, I'm going to go on to -- I'm going to go on to my hot spot on my phone.

MR. GALLAGHER: It has been breaking up just a bit.

BY MR. SLATER:

Q. Well, I'm getting notes from people that they seem to be able to hear me, Doctor. So if there's an issue, do you need to get closer to the microphone perhaps?

A. That's fine. Maybe if you can turn your volume up a little bit, or you can turn your volume up.

Q. Request Number 2 on Page 3. We're going to go in order. Request

Page 32

Number 2, do you have any such notes?

MR. GALLAGHER: Objection to form.

THE WITNESS: I have the report, and I have the documents that were supposed to be sent out. I don't have any notes.

BY MR. SLATER:

Q. Did you take any notes in the course of your work in this matter?

A. No.

Q. Did you put Post-It notes or highlight or mark up any of the documents that you were provided?

MR. GALLAGHER: Objection to form.

THE WITNESS: I may have my highlighted some of the papers that I reviewed.

BY MR. SLATER:

Q. Do you have those papers with you that have highlighting on them?

A. No. I just have the papers that I submitted.

Page 33

Q. Well, where are your -- the original documents that you actually highlighted? Where are they located?

A. On our computers -- my files are located in a file at our company.

Q. So you're saying you electronically highlighted the documents, not physically?

A. Yeah. It's electronically highlighted.

MR. SLATER: Counsel, we're going to request that any documents that Dr. Britt has that --

BY MR. SLATER:

Q. Well, let me ask this question. I'll ask this of Dr. Britt.

Dr. Britt, do you know if the highlighted versions of the documents that you were provided, meaning those that you highlighted yourself electronically, were provided to us when your reliance materials were provided?

A. No. They were just my

Confidential Information - Subject to Protective Order

---

Page 34

copies of the report -- of the articles.

MR. SLATER:  So I'm going to ask, if possible, frankly this morning, as soon as possible, if any documents Dr. Britt highlighted or marked in any way, can be immediately transferred to our team so we can look at them and potentially use them in this deposition.

Is that something that can be accomplished?

MR. GALLAGHER:  We'll take your request under advisement.  We can deal with that at a break.

BY MR. SLATER:

Q.   Did you put notes of any nature on those documents that you were reviewing as part of your work in this case, meaning either you typed something in or you put some sort of a note electronically on the document?  Did you do that in addition to highlighting any of the documents?

---

Page 35

A.   No.  I had just highlighted maybe words, a couple words on a document.

Q.   You said that you only highlighted a couple of words in one document?

A.   I would highlight, if there was something that was -- like an odds ratio or a conclusion or, you know, something that I wanted to recall of an article.  I would have highlighted the entire article.

Q.   Let's go to Request 3.  Copies of any notes or other documentation, including PowerPoints, from any presentations, seminars, or classes given by Dr. Britt with regard to the risks and benefits of any angiotensin II receptor blockers or nitrosamines.

Do any such notes or other documentation, including PowerPoints, exist?

A.   No.

Q.   Have you ever given a

---

Page 36

presentation, seminar, or class regarding angiotensin II receptor blockers or nitrosamines?

A.   No.

Q.   Have you ever given any public presentation of any nature whatsoever in your career with regard to nitrosamines?

MR. GALLAGHER:  Objection to the form.

THE WITNESS:  No.

BY MR. SLATER:

Q.   Before you were retained in this case, did you know what an angiotensin II receptor blocker was?

A.   I may have heard about it just in my education or just through my general knowledge of pharmaceuticals.

Q.   Is the answer, no, not that I recall?

A.   Not that I recall.

Q.   Before you were retained in this case -- well, we'll get to that actually.

---

Page 37

Let's look at Number 4.  Copies of any documents or articles relied upon for the opinions set forth in the report served if not listed in the report.

Do any such documents or articles exist?

A.   I've provided all the relevant articles that I've relied on in this case.  There may be articles or documents that I have looked at over the course of my career or education that I've incorporated into my general knowledge base.  But the articles that are relevant to my opinions have been provided.

Q.   And listed in the report, correct?

A.   Correct.

Q.   Let's go to Page 4, Request Number 5.  Copies of any documents or articles reviewed in connection with the report served, whether or not listed in the report or attachments thereto.

---

Page 38

1 And I guess based on your
2 prior answer, the question is whether or
3 not you've produced all the documents or
4 articles that you reviewed in connection
5 with the report?
6 A. Yes, I provided those.
7 Q. And again, as you said in
8 your prior answer, if there was a
9 document or article that you reviewed and
10 relied on, it's listed in the report,
11 correct?
12 A. Correct.
13 Q. Let's go to Number 6. Any
14 illustrations, PowerPoint, images,
15 charts, tables or demonstrative exhibits
16 that may be used by or with Dr. Britt in
17 connection with a Daubert hearing or
18 trial testimony in this litigation.
19 Do any such illustrations,
20 PowerPoints, charts, tables or
21 demonstrative exhibits exist?
22 MR. GALLAGHER: Objection to
23 form.
24 THE WITNESS: No.

Page 39

1 BY MR. SLATER:
2 Q. Let's go to Number 7, on
3 Page 5, please. Documentation of any
4 research grant the witness has been
5 provided to study any angiotensin II
6 receptor blocks or nitrosamines any
7 health effects potentially related
8 thereto.
9 Have there ever been any
10 such research grants?
11 A. No.
12 Q. Let's go to Number 8.
13 Documentation of any research the witness
14 has performed with regard to any
15 angiotensin II receptor blockers or
16 nitrosamines or health effects
17 potentially related thereto.
18 Before you were retained in
19 this litigation, have you ever performed
20 any such research?
21 MR. GALLAGHER: Objection to
22 form.
23 THE WITNESS: I have not
24 performed any research as far as,

Page 40

1 like, bench research.
2 BY MR. SLATER:
3 Q. You said that you had never
4 performed any bench research?
5 A. Right.
6 Q. That would mean that you
7 never performed experiments in a lab?
8 A. Experiments. Correct. I
9 have not.
10 Q. Why did you draw the
11 distinction to no bench experiments? Is
12 there something else that did exist or
13 occur?
14 A. Well, I know that from
15 correspondence that has occurred
16 subsequent to this, that the request was
17 made about -- something on my CV.
18 Q. That's the -- that's the
19 work that you did in connection with a
20 munitions plant?
21 A. Correct. Originally I read
22 this to be research. Like, when I think
23 of research, especially after the
24 question about research grants, I was

Page 41

1 thinking of research as far as bench
2 research goes. Yes.
3 Q. You've never done any bench
4 research or experiments regarding
5 nitrosamines, correct?
6 A. Correct.
7 Q. Before you were retained in
8 this case, have you ever done research
9 with regard to the health risks of
10 nitrosamines including NDMA and NDEA?
11 Had you ever researched that topic?
12 A. There was one matter that I
13 did evaluating some toxicity data as
14 part -- I was not a testifying expert
15 witness. I was just evaluating the data
16 as part of the tasks as a consultant.
17 Q. So you were consulting in a
18 matter that was in litigation?
19 A. Can you repeat the question?
20 Q. Were you consulting on a
21 matter that was in litigation?
22 A. Yes. I was consulting -- I
23 was assisting another expert.
24 Q. Who was the other expert

Confidential Information - Subject to Protective Order

1 that you were assisting?
2     A.   Dr. Robert James.
3     Q.   Your coworker, correct?
4     A.   Yes.
5     Q.   Was that the munitions
6 issue?
7     A.   Correct.
8     Q.   Did Dr. James serve a report
9 in that case?
10     A.   I do not know if he did or
11 not.
12     Q.   What was the nature of the
13 work that you did to support Dr. James in
14 the munitions plant matter he was
15 retained in?
16     A.   I do not recall specifically
17 what I did.  It was likely identifying
18 relevant studies related to the toxicity
19 of nitrosamines, NDMA, to review.  I
20 likely reviewed the documents, provided
21 summaries of those documents, and then he
22 would have reviewed the summaries and
23 reviewed the literature himself to form
24 his opinions for the case.

1     Q.   When did that occur?
2     A.   I do not recall the exact
3 date.  It was, to the best of my
4 recollection, probably 10, 15 years ago.
5 Probably closer to --
6     Q.   Where were you -- go ahead.
7 I'm sorry.
8     A.   Probably closer to 15 years
9 ago.
10     Q.   Where were you working at
11 the time?
12     A.   I would have been working at
13 Terra, T-E-R-R-A.
14     Q.   Who was the company that you
15 worked with prior to ToxStrategies,
16 correct?
17     A.   Correct, yes.
18     Q.   Were you provided the --
19 rephrase.
20          The documents that you would
21 have reviewed, were those literature,
22 from the scientific literature?
23     A.   Can you repeat the question?
24     Q.   You said that you reviewed

1 studies regarding the toxicity of
2 nitrosamines including NDMA, correct?
3     A.   Yes, that's most likely what
4 I would have done, yes.
5     Q.   So you would have been
6 looking at scientific articles?
7     A.   Correct.
8     Q.   And you would have looked at
9 them on a computer, right?
10     A.   Correct.
11     Q.   And you said that you
12 provided summaries.  Would those have
13 been electronically typed summaries on
14 your computer that you then provided to
15 Dr. James?
16     A.   More than likely, yes.
17 Unless I -- we printed off our copies.
18     Q.   Well, even if you printed
19 out -- you would have prepared these
20 electronically --
21     A.   Yes.
22     Q.   -- as probably a Word
23 document, right?
24     A.   Yes, yes.

1     Q.   Where are those documents
2 now?  I'm talking the literature that you
3 collected and the summaries of that
4 literature that you prepared for
5 Dr. James.
6     A.   I do not know what those
7 documents are.  We've been through many
8 iterations and computers and computer
9 types, Microsoft versus Mac and back and
10 forth.  A lot of the older documents, not
11 for that case, but for other cases, I'm
12 not even able to access, if I can find
13 them.  So I'm not sure where those
14 documents are.
15     Q.   Did you make an effort to
16 locate those documents?
17     A.   I did.
18     Q.   What effort did you make?
19     A.   I looked on my files that I
20 have access to.
21     Q.   Did you have backup systems
22 so that if you had documents on your
23 computer, they would be backed up in some
24 other location?

Confidential Information - Subject to Protective Order

---

Page 46

1      MR. GALLAGHER:  Objection to
2  form.
3      THE WITNESS:  We did have
4  backups, but after a certain
5  period of time.  Especially that
6  far back when we switched from
7  whatever the older Mac system was
8  when it went to Word, a lot of my
9  documents were lost.
10      So if I could find them, I
11  don't know if they would even be
12  readable.  I looked for it.  And I
13  couldn't find it.  So there were
14  backups though.
15  BY MR. SLATER:
16      Q.   Who was the client in that
17  matter that you and Dr. James were
18  working for?
19      A.   I do not recall.
20      Q.   Have you ever -- have you --
21  rephrase.
22      Is that the only munitions
23  plant that you've ever done work in
24  connection with in your career?

---

Page 47

1      A.   I've -- well, munitions.  I
2  guess I've done some work, like, with
3  nerve gases, but I don't think that
4  really is consistent -- or would be
5  consistent with munitions.  But yeah,
6  that's the only REX type.
7      Q.   But you don't remember who
8  the client was for the sole munitions
9  plant matter that you ever did?
10      A.   No.
11      MR. GALLAGHER:  Objection to
12  form.
13      THE WITNESS:  No, I do not
14  recall, mostly because I would not
15  have been directly interacting
16  with the client.
17  BY MR. SLATER:
18      Q.   Did you speak to Dr. James
19  to see if he could locate the materials
20  in connection with that munitions matter?
21      MR. GALLAGHER:  Objection to
22  form.
23      THE WITNESS:  No, I did not.
24  I know just in past conversations

---

Page 48

1  with him, that he had lost all of
2  his files in the past year or two.
3      So he relies on me for his
4  files.  I did not speak to him
5  this week when this came up.  He's
6  at a funeral this week.
7  BY MR. SLATER:
8      Q.   Did you say Dr. James lost
9  all his files in the past year or two?
10      A.   Yes.
11      Q.   How did that happen?
12      A.   I do not know.
13      Q.   Do you work with Dr. James?
14      A.   Yes, on occasion.  He's in
15  semi-retirement.  He lives in Idaho now.
16      Q.   When he left -- well,
17  rephrase.
18      Is he still employed by
19  ToxStrategies?
20      A.   Yes.  He still does
21  consulting work for ToxStrategies.  It's
22  like a consulting type arrangement, I
23  believe.  I'm not 100 percent sure.  But,
24  yes, he still does do work for

---

Page 49

1  ToxStrategies.
2      Q.   You said there were times
3  when the computer systems changed over.
4  Did you make sure that you migrated
5  whatever information was on the existing
6  system --
7      MR. GALLAGHER:  Objection to
8  form.
9  BY MR. SLATER:
10      Q.   -- to the new system?
11      A.   I was not responsible for
12  that.
13      Q.   Well, was somebody?  I
14  assume you wouldn't want to lose data
15  when you switched computer systems, that
16  your company would have made a concerted
17  effort to make sure everything was saved
18  and migrated, right?
19      A.   I was not responsible for
20  the computer upgrades or other people's
21  computers or data movement or migration
22  or when somebody gets a new computer.
23  I'm not responsible for -- for that.
24      Q.   Do you know who the lawyers

---

Confidential Information - Subject to Protective Order

Page 50

1  were involved in the munitions plant
2  matter?
3      A.  Pardon me?  Excuse me?
4  Repeat the question.
5      Q.  Do you know who the lawyers
6  were who were involved with the munitions
7  plant matter?
8      A.  I do not.
9      Q.  Do you know where the case
10 was filed?
11     A.  It was in Utah.
12     Q.  Do you know what the outcome
13 of the case was?
14     A.  I remember it did go to
15 trial.
16     Q.  Is it in state or federal
17 court?  Do you know?
18     A.  I do not know.
19     Q.  Did you attend the trial?
20     A.  No.
21     Q.  Did Dr. James testify at the
22 trial?
23     A.  Yes.
24     Q.  Who was -- rephrase.

Page 51

1          What was the involvement of
2  your client -- if you don't remember the
3  name of the client, what was the
4  involvement of the client?  Was it the
5  owner of the munitions plant, was it
6  someone who was harmed at the munitions
7  plant?  Who were you working on behalf
8  of?
9          MR. GALLAGHER:  Objection to
10     form.
11         THE WITNESS:  I don't
12     remember.
13 BY MR. SLATER:
14     Q.  Well, was your goal to
15 minimize the risks from whatever
16 chemicals or substances were in the
17 munitions plant?  Was that the assignment
18 for your company?
19         MR. GALLAGHER:  Objection to
20     form.  Objection to form.
21         THE WITNESS:  No.
22 BY MR. SLATER:
23     Q.  Do you know what the --
24 rephrase.

Page 52

1          Do you know what your
2  company was retained for?  Do you have an
3  understanding of why you were retained?
4          MR. GALLAGHER:  Objection to
5     form.
6          THE WITNESS:  I don't recall
7     the specific reason why we were
8     retained for that particular case.
9     It was likely just to evaluate the
10    data, subject data, toxicity, and
11    reach a conclusion as to whether
12    or not there was any increased
13    risk or harm or just --
14    specifically, I don't remember the
15    case.
16 BY MR. SLATER:
17     Q.  With regard to nitrosamines
18 in that case, was NDMA the nitrosamine
19 that you evaluated?
20     A.  I believe it was one of the
21 chemicals.  And I only say that because
22 it's on my CV.  I did go back and look at
23 my older CVs.  And it was on my older CVs
24 dating back to 2012 or 2011, so.

Page 53

1      Q.  So is the answer yes, NDMA
2  was the nitrosamine?
3      A.  Yes.  Yes.
4          MR. GALLAGHER:  Objection to
5     form.
6          THE WITNESS:  Yes.
7  BY MR. SLATER:
8      Q.  Do you recall what studies
9  you looked at at the time?
10     A.  I do not.
11     Q.  Do you recall what your
12 summaries of the literature you reviewed
13 stated?
14     A.  I do not.
15         MR. SLATER:  I'm going to
16     move on to a new subject for now.
17     But we're going to reserve all our
18     rights with regard to this subject
19     to request further documents or
20     information on the subject of the
21     work done on this munitions plant
22     matter.
23         MR. GALLAGHER:  Yeah, Adam,
24     we've responded to this.

Page 54

1       MR. SLATER:  Well, I'm just
2   stating for the record that I
3   reserve my right to make other
4   requests, now that I have some
5   testimony.  But we'll maybe come
6   back to it.  Maybe we won't.
7   BY MR. SLATER:
8       Q.   Other than the matter
9   regarding the munitions plant about
10  15 years ago where you assisted
11  Dr. James, have you ever in your career
12  before being retained in this case done
13  any research with regard to nitrosamines
14  or NDMA or NDEA in particular?
15      A.   Can you repeat the question?
16      Q.   Other than the munitions
17  plant matter that we've just spoken
18  about, is there ever a time in your
19  career where you've researched
20  nitrosamines or NDMA or NDEA in
21  particular before being retained in this
22  matter?
23      MR. GALLAGHER:  Objection to
24  form.

Page 55

1       THE WITNESS:  I do not
2   recall being asked.
3   BY MR. SLATER:
4       Q.   Did you say that you don't
5   recall?
6       A.   -- recall --
7       Q.   Nothing that you can
8   remember as you sit here now, right?
9       A.   Can you repeat the question?
10      Q.   Nothing that you can think
11  of as you sit here right now, correct?
12      A.   Correct.
13      Q.   One other question going
14  back to the report on the munitions.  Was
15  Dr. Guzelian involved as well?
16      A.   I do not recall.  He may
17  have been.  But I can't recall
18  specifically.
19      Q.   Did you make any effort to
20  speak to Dr. Guzelian about the -- your
21  effort to find documents regarding the
22  munitions plant matter?
23      A.   No.
24      MR. GALLAGHER:  Objection to

Page 56

1   form.
2       THE WITNESS:  No, I did not.
3   BY MR. SLATER:
4       Q.   Does he work with your
5   company or is he separately employed?
6       A.   He's separately employed.
7       Q.   Number 9, I think we can
8   skip because that would not be applicable
9   to you because you don't have hospital
10  privileges anywhere, correct?
11      A.   Can you repeat your
12  question?
13      Q.   I'm looking at the
14  deposition notice now.  Request Number 9,
15  on Page 5.
16      A.   Okay.
17      Q.   I'm assuming that you have
18  no appointments or privileges with any
19  hospital or academic institution; is that
20  correct?
21      A.   That's correct.
22      Q.   Let's go to the next page,
23  Page 6, Request Number 10.
24      Number 10 requested any

Page 57

1   documents or other communications the
2   witness has received from any person or
3   entity with regard to nitrosamine
4   impurities in any angiotensin II receptor
5   blocker or other drug outside of
6   information provided by counsel who
7   retained the witness.
8       Do any such documents or
9   communications exist?
10      A.   No.
11      Q.   Who are you retained by?
12      A.   Duane Morris.
13      Q.   So no other lawyer from any
14  other law firm has provided you any other
15  document or other substantive
16  communications that you --
17      A.   Let me --
18      MR. GALLAGHER:  Objection to
19  form.
20      MR. SLATER:  I hadn't
21  finished the question.
22      THE WITNESS:  I was retained
23  by Duane Morris, but there's
24  co-defendants.

Confidential Information - Subject to Protective Order

Page 58

1    So legal -- I guess legally
2    maybe I didn't respond to your
3    question correctly.  I guess they
4    all retained me.
5    BY MR. SLATER:
6    Q.   Other than Duane Morris, did
7    any lawyers from any other law firm
8    provide you documents or information that
9    you considered in writing your report?
10   A.   Yes.  Yes.  And I am working
11   with them also.  And they did provide
12   documents and those were provided to you.
13   Q.   Are they all listed in the
14   report?
15   A.   Pardon me?  Can you explain?
16   Q.   Are they all listed in your
17   report?
18   A.   Yes, they are.
19   Q.   Number 11 --
20   A.   May I add a caveat to that.
21   Unless it was something that was received
22   after my report it wouldn't be listed,
23   but it would have still been sent as --
24   in response to this.

Page 59

1    Q.   Well, we're going to get to
2    it.  But I have one report from you dated
3    August 2, 2021.  That's your only report
4    in this case, right?
5    A.   That's correct.
6    Q.   Number 11 requests any
7    communications from the witness to any
8    person or entity with regard to
9    nitrosamine impurities in any angiotensin
10   II receptor blocker or other drug outside
11   of communications with counsel who
12   retained the witness.
13       Do any such communications
14   exist?
15   A.   No.
16   Q.   Number 12, requests any
17   textbook referenced by the witness in
18   forming her opinions.  Is there any such
19   textbook?
20   A.   Any textbook or document
21   should be included in my -- what was sent
22   to you all, so.
23   Q.   Did you rely on any textbook
24   in forming your opinions?

Page 60

1    A.   I know there was one
2    textbook.  And I did send that to you.
3    Q.   Which textbook is that?
4    A.   Everything that has been
5    sent, yes, everything has been sent.
6    Q.   What was the one textbook?
7    A.   It was a book chapter out of
8    Wilson and Crouch.  I was sent that
9    textbook.  It was on risks, general
10   risks.
11   Q.   General risks of what?
12       MR. GALLAGHER:  Objection to
13   form.
14       THE WITNESS:  Various jobs,
15   work exposure factors, exposures
16   that we have in mind.
17   BY MR. SLATER:
18   Q.   Anything specific in that
19   textbook to nitrosamines, NDMA or NDEA?
20   A.   Not that I recall.
21   Q.   You can put that aside.
22       Let me ask you, Doctor, do
23   you have your report, your complete
24   report with all the exhibits and

Page 61

1    attachments, electronically only or do
2    you have a hard copy with you?
3    A.   I have an electronic copy.
4    Q.   All right.
5        MR. SLATER:  All right.
6    Let's put the report up on the
7    screen and mark that as Exhibit 3
8    please.
9        (Document Marked for
10   identification as Exhibit
11   Britt-3.)
12   BY MR. SLATER:
13   Q.   On the screen as Exhibit 3
14   is a document titled "Expert report of
15   Janice K. Britt, Ph.D."  And it's dated
16   August 2, 2021.
17       Is that your report in this
18   case?
19   A.   Yes.  Let me pull it up real
20   quick.  Hit refresh right?  Yes,
21   correct.
22   Q.   If I were to go to reports
23   that you've written in other cases, would
24   I find the same or very similar language

Confidential Information - Subject to Protective Order

Page 62

1  in reports in other matters as some of
2  the sections of this report?
3          MR. GALLAGHER:  Objection to
4      form.
5          THE WITNESS:  The general
6      format of my reports is very
7      similar.
8  BY MR. SLATER:
9      Q.   What do you mean by that?
10     A.   Phrasing of the -- my
11  understanding of the case, my background,
12  my qualifications, methods, my opinions,
13  and if I have any appendices.  So that's
14  sort of the general format that I use in
15  all my reports.  So they probably look
16  similar.  The body will look different,
17  because it's different chemicals,
18  different exposures, different issues.
19     Q.   Are there any sections of
20  the substantive content of this report,
21  that if I went to reports you wrote in
22  other cases, that I would find the same
23  or very similar language?
24          MR. GALLAGHER:  Objection to

Page 63

1      form.
2  BY MR. SLATER:
3      Q.   What I'm getting at is
4  this -- what I'm getting at is this:
5  There are some general discussions about
6  risks and animal studies and things like
7  that.
8          Is that information found in
9  other reports you've written as well,
10  where you basically have this section
11  that you talk about these issues where
12  you've used that in multiple reports over
13  the years?
14          MR. GALLAGHER:  Objection to
15     form.
16          THE WITNESS:  Yeah, some of
17     the language -- some of the risk
18     numbers have been used.  You know,
19     some of the language has been used
20     in other reports.  I update it.  I
21     revise it, you know, as new
22     information comes out.
23          So yes.  In some of the
24     reports, not in all.  If it's

Page 64

1  relevant, it may be included.
2  BY MR. SLATER:
3      Q.   So if I understand
4  correctly, this entire report was not
5  written specifically for this matter.
6  There are parts of this report that you
7  took from work product that you had from
8  the past and adapted it to use in this
9  report.
10          Do I understand correctly?
11          MR. GALLAGHER:  Objection to
12     form.
13          THE WITNESS:  That would
14     only apply to some of the, just
15     generic background risk
16     information.  And it can -- I
17     would have updated it, and I would
18     have adapted it to the
19     case-specific information here.
20  BY MR. SLATER:
21     Q.   Which parts of the report
22  contain what you've termed the generic
23  background risk information?
24     A.   It would be the background

Page 65

1  cancer risk that we all face, exposures
2  to radiation, exposures to carcinogens in
3  our diet, things like that, some of
4  the -- or kind of the back end of the
5  report.  And I -- of course, I updated it
6  and there's information that's more
7  specific to issues here, like the overall
8  age of the population, prevalence of
9  hypertension.  So it's -- some of it's
10  similar, but then again it's updated and
11  it's adapted.
12     Q.   I'm going to come back to
13  just a few basic questions.  I think I
14  might have gotten myself sidetracked.
15          The report that's Exhibit 3,
16  that is your report in this case,
17  correct?
18     A.   Yes.  This is the report in
19  my case, yeah, in this case, yes.
20     Q.   When you signed this report,
21  did you carefully read it to make sure
22  that it accurately stated everything that
23  you wanted to communicate in the report?
24     A.   Yes.

Confidential Information - Subject to Protective Order

---

Page 66

Q. You understood in writing this report, that you were required to set forth the opinions that you had reached, correct?

A. Correct.

Q. Did you do so? Does this report contain your opinions?

A. Yes.

Q. We've already gone over this, but just to confirm, are all the materials that you actually relied on in forming those opinions listed in the report and the list of references attached?

A. Yes.

Q. In the course of the report, you go through various facts and you discuss some facts in some detail. Does the report contain those facts that you believed were most important to you in forming your opinions?

A. Can you repeat the question?

Q. Sure. Does the report contain and discuss those facts that were

---

Page 67

most important to you in forming your opinions?

MR. GALLAGHER: Objection to form.

THE WITNESS: Yeah, so, I mean, I considered other information, you know, what was important, you know, went into my report, you know, the most, I guess, key elements that were relevant to this case, so yes.

BY MR. SLATER:

Q. The key facts that you felt were most relevant to this case and were the basis of your opinions, they are set forth in this report, correct?

A. Correct. Like, for example, if there was, especially like an understanding of the case. I'm assuming that's what you're talking about. I was -- you know, I didn't put in every single, solitary detail about all the recall information.

I summarized it, you know,

---

Page 68

to be succinct and complete. So let me know if that's not what your -- what you're talking about.

Q. I'm asking about all the facts in the report. You -- well, rephrase. I'll ask it differently.

Throughout the report, there were various facts you cited. And what I just want to make sure of is that those facts that were most important to you in forming your opinions are set forth in the report, so I can understand what are the facts you're relying on and drawing your opinions based upon?

A. Yes, yes, yes.

Q. We'll get to it. You've been an expert in other litigation, correct? This is not your first time?

A. Correct.

Q. Do you agree that it's important for an expert witness in a case such as this to be objective?

A. Yes.

Q. Do you agree that it's

---

Page 69

important for an expert in a case like this to have no bias impacting her or his opinions?

A. Yes.

MR. GALLAGHER: Objection to form.

THE WITNESS: Yes.

BY MR. SLATER:

Q. Do you agree that in your work in this case, it was important for you to consider the important facts and the important studies and literature that related to the subject that you were opining on?

MR. GALLAGHER: Objection to form.

THE WITNESS: Can you repeat the question?

BY MR. SLATER:

Q. Sure. Do you agree that, to the extent there were studies or literature that would be significant to the subject you gave your opinions on, that you needed to consider those studies

---

Confidential Information - Subject to Protective Order

Page 70

1 or literature?
2          MR. GALLAGHER:  Objection to
3     form.
4          THE WITNESS:  Yes, I agree
5     that it's important to analyze the
6     literature.  And -- yes, I agree.
7 BY MR. SLATER:
8     Q.   For example, if there was
9 something that was important factually
10 that was in the possession of the
11 attorneys in this case who are on the
12 defense side, that might have impacted
13 your opinions, and you would want to see
14 that, right?
15          MR. GALLAGHER:  Objection to
16     form.
17          THE WITNESS:  Can you repeat
18     the first -- or can you just
19     repeat that question?
20 BY MR. SLATER:
21     Q.   Sure.  You were retained by
22 the lawyers at Duane Morris, but you've
23 made clear that you were working on
24 behalf of all the lawyers on the defense

Page 71

1 side, and you gave us the names of a
2 bunch of them that you spoke with,
3 correct?
4     A.   Correct.
5     Q.   To the extent that they were
6 aware of materials that were exchanged in
7 the course of this litigation, and those
8 materials could have been significant to
9 your opinions, you would have wanted to
10 see those materials, correct?
11          MR. GALLAGHER:  Objection to
12     form.
13          THE WITNESS:  Correct.
14 BY MR. SLATER:
15     Q.   For example, if one of the
16 defendants or more of the defendants had
17 retained or got an opinion from a
18 toxicologist about the health risks of
19 the nitrosamine impurities, you would
20 want to see that, right, before forming
21 your opinion in this case, correct?
22          MR. GALLAGHER:  Objection to
23     form.
24          THE WITNESS:  If it was --

Page 72

1     if it was for this -- if it was
2     relevant for this case and it was
3     done for this matter, yes.
4 BY MR. SLATER:
5     Q.   Did you see any documents --
6 well, rephrase.  Let me ask it
7 differently.
8          Were you provided any
9 documents with regard to an evaluation of
10 the health risks of the nitrosamine
11 impurities that was performed by any
12 toxicologist that was either employed by
13 or consulting for any of the
14 manufacturers in this case?
15     A.   Yes.  I believe there was
16 some outside or expert reports that were
17 provided.
18     Q.   And to the extent they were
19 provided to you, they were listed in your
20 report, right?
21     A.   Correct.
22     Q.   If there were other
23 documents that the lawyers had with
24 regard to that report or reports you were

Page 73

1 provided, meaning, for example, e-mails
2 where the toxicologist who wrote the
3 report was talking in more detail about
4 his or her opinions, you would have
5 wanted to see that as well, right?
6          MR. GALLAGHER:  Objection to
7     form.
8          THE WITNESS:  Correct, if
9     there were -- if there were
10     relevant e-mails.
11 BY MR. SLATER:
12     Q.   And ultimately what I'm
13 driving at here is, if you were --
14 rephrase.
15          What I'm driving at is that
16 you as an expert want to review anything
17 that's relevant and significant to the
18 subject that you're giving an opinion on,
19 right?  You don't want to later find out
20 that there's some gap in your knowledge
21 that could impact your opinions, right?
22     A.   That's correct.
23          MR. GALLAGHER:  Object to
24     form.

Page 74

1    THE WITNESS:  I mean, but I
2  did review all the materials that
3  I received.  And these other
4  reports are these individuals'
5  opinions.  But ultimately I came
6  to my own opinions.  But I did
7  review those other outside
8  reports.
9  BY MR. SLATER:
10    Q.   Your report has a few
11  exhibits, and what I'd like to do first
12  is go to Exhibit A to your report, if we
13  could, which is part of Exhibit 3,
14  obviously.  But the report itself has an
15  Exhibit A, which I believe is your CV; is
16  that correct?
17    A.   Did you say this is part of
18  Exhibit 3?
19    Q.   It should be, right?  I'm
20  not looking to --
21    MR. SLATER:  Chris, I don't
22  want to do a separate -- well,
23  actually, it's fine.  You know
24  what, let's go ahead.  You can

Page 75

1  mark Exhibit A to Dr. Britt's
2  August 2, 2021 report as
3  Exhibit 4.
4    So it will be part of
5  Exhibit 3, and it will also be
6  separately marked as Exhibit 4.
7    MR. GALLAGHER:  It is not
8  part of Exhibit 3, because they
9  were produced as separate
10  documents.
11    MR. SLATER:  Ah, thank you
12  for clarifying that.
13    MR. GALLAGHER:  Just to be
14  clear for the record.  Yeah.
15    (Document marked for
16  identification as Exhibit
17  Britt-4.)
18  BY MR. SLATER:
19    Q.   All right.  So we're going
20  to look at Exhibit 4 now, which is
21  Exhibit A to your report.
22    MR. SLATER:  I just want to
23  make something clear for the
24  record, because this isn't how I

Page 76

1  wanted this done.  I want
2  Exhibit 3 -- and we're going to do
3  this today so we can confirm it
4  for everybody, to contain
5  everything that was -- I want it
6  to include the exhibits, A, B, and
7  C which are the exhibits to the
8  report.
9    I'm going to want those to
10  be attached to complete the report
11  with all the exhibits.  Okay?
12    We don't have to do it now,
13  but we'll want to do that later.
14    MR. GALLAGHER:  Yeah, you're
15  welcome to mark the exhibits as
16  you wish.
17    MR. SLATER:  No, I was
18  actually not saying that to you, I
19  was letting Chris know.
20    MR. GALLAGHER:  Okay.
21    MR. SLATER:  But thank you.
22  Thank you.
23  BY MR. SLATER:
24    Q.   So we're now looking at

Page 77

1  Exhibit 4, which is Exhibit A to your
2  report.  Is that your CV?
3    A.   Yes, it is.
4    Q.   Is that your most up-to-date
5  CV.  It has a date of April 2021 on it?
6    A.   I believe I have a -- maybe
7  a June or July 2021 CV.
8    Q.   Do you know why that wasn't
9  provided to us?
10    A.   I do not.  It was just
11  updated.  We can look and see.  Maybe
12  it's September.  It's -- my editor was
13  taking a while to update it.  It's -- my
14  newer one just contains probably just a
15  couple more publications or abstracts.
16  That would be the only significant
17  difference.
18    MR. SLATER:  Would it be
19  possible at a break just to send
20  that over to us so we can just
21  mark it and make sure that we can
22  then just identify anything that's
23  in addition to what we have here?
24    MR. GALLAGHER:  Yep, we'll

Page 78

1    take that under advisement at a
2    break.
3         MR. SLATER:  Thank you.
4    BY MR. SLATER:
5         Q.    This says that you work at
6    ToxStrategies, and your title is managing
7    scientist; is that correct?
8         A.    Correct.
9         Q.    What is ToxStrategies?
10        A.    It's a consulting firm that
11   provides services in areas of toxicology,
12   risk assessment.  We have a variety of
13   different types of scientists that are
14   employed there, and we do different types
15   of work.  Basically, we're mostly --
16   mostly toxicologists.
17        Q.    How many toxicologists are
18   employed by ToxStrategies?
19        A.    I'm not sure exactly.
20   Approximately -- maybe approximately 20,
21   15, 20.
22        Q.    You said there are --
23   rephrase.
24             Are there any other --

Page 79

1    rephrase.
2             Are there any scientists or
3    employees who have -- who are not
4    toxicologists but are actually -- who
5    specialize in some other field?
6         A.    We have engineers, and I
7    believe we have some statisticians,
8    biostatisticians.  So we have individuals
9    who have degrees in non-toxicology.
10        Q.    Were you the only person
11   from ToxStrategies that worked on this
12   matter, or did anybody else work on it?
13        A.    I'm the only person that
14   worked on this report, aside from I had
15   someone who pulled a few papers for me in
16   our library, I think Christine.  And I
17   had an individual check my risk numbers,
18   QC my risk numbers.
19        Q.    What does that mean?
20        A.    For my risk calculations, I
21   just wanted to make sure there was no
22   errors.  So I had them check my numbers.
23        Q.    Who checked your numbers?
24        A.    That would have been Jon

Page 80

1    Urban.  He's also --
2         Q.    What's his specialty?
3         A.    He's a Ph.D. toxicologist.
4             And an editor that puts
5    periods in and makes sure that my
6    sentences are complete.
7         Q.    Who was the editor?
8         A.    Rick Nelson.
9         Q.    You said Rick Nielsen?
10        A.    Nelson, N-E-L-S-O-N.
11        Q.    I didn't know if you had the
12   guitar player for the -- lead guitar for
13   Cheap Trick working with you now.
14        A.    Well, you know.
15        Q.    On the first page of your
16   CV, there's a section that says
17   professional profile, which I assume is a
18   general summary of the work that you do,
19   correct?
20        A.    Correct.  Past work and
21   present work, sort of a mixture.
22        Q.    You are a toxicologist,
23   correct?
24        A.    That's correct.

Page 81

1         Q.    You are not a physician.  We
2    know that, right?  Is that correct?
3         A.    That is correct.  I have a
4    Ph.D. in toxicology.
5         Q.    Are you an epidemiologist?
6         A.    No, I'm not an
7    epidemiologist, but I have had courses in
8    epidemiology.  And as part of being a
9    toxicologist, we do evaluate epi studies,
10   hemo studies, occupational studies.
11             So I do have familiarity
12   with epidemiologic literature and some of
13   the shortcomings, but I'm not a -- I do
14   not have a Ph.D. in epidemiology.
15        Q.    First question, you are not
16   an epidemiologist, right?
17        A.    No.
18        Q.    You don't hold yourself out
19   as an expert in epidemiology, do you?
20        A.    Correct.  I do not.
21        Q.    And I think I saw something
22   in your report about the fact that even
23   though you discuss some epidemiologic
24   literature, you're aware that there are

Page 82

¹ other defense experts who specialize in
² that field.  You wrote something to that
³ effect in your report, right?
⁴       A.   Correct.
⁵       Q.   And do I understand that to
⁶ mean that you discussed the epidemiology
⁷ that you talk about in your report, but
⁸ you really would defer to the
⁹ epidemiologists that were retained by the
¹⁰ defense with regard to their evaluation
¹¹ and analysis of the epidemiologic
¹² literature?  Is that correct?
¹³       MR. GALLAGHER:  Objection to
¹⁴    form.
¹⁵       THE WITNESS:  Can you repeat
¹⁶    the question?
¹⁷ BY MR. SLATER:
¹⁸       Q.   Are you deferring to the
¹⁹ defense experts who are epidemiologists
²⁰ with regard to the analysis and import of
²¹ the epidemiology studies that you
²² mentioned?  Because I think you said
²³ something about that in your report, that
²⁴ there were more qualified experts who

Page 83

¹ actually specialize in that field.  So I
² just want to know if I understood that
³ correctly?
⁴       A.   Like I just said, I'm not --
⁵ I'm not the epidemiologist in this case,
⁶ and I don't have a Ph.D. in epidemiology.
⁷ And I can review the papers.  But on
⁸ specific information or to file opinions
⁹ on papers, I would defer to the other
¹⁰ experts in this case.
¹¹       Q.   And your report specifically
¹² referred to the defense expert
¹³ epidemiologists.  Why didn't you also
¹⁴ defer to the plaintiff expert
¹⁵ epidemiologists?
¹⁶       MR. GALLAGHER:  Objection to
¹⁷    form.
¹⁸       THE WITNESS:  I --
¹⁹    ultimately I agreed more with the
²⁰    methodology of the defense expert.
²¹ BY MR. SLATER:
²²       Q.   You thought that the defense
²³ expert epidemiologist used a different
²⁴ methodology than the plaintiff expert

Page 84

¹ epidemiologist?
²       A.   The methodology, the type of
³ methodology.
⁴       Q.   When you say the type of
⁵ methodology, what do you mean by that?
⁶       A.   Just the methodology he
⁷ used, the literature search, the
⁸ consideration of confounders, just
⁹ overall.
¹⁰       Q.   Well, I interpret
¹¹ methodology to mean the approach that the
¹² expert took in terms of what was reviewed
¹³ and considered as part of the overall
¹⁴ analysis.  Did you think that the
¹⁵ epidemiologists on the plaintiff and
¹⁶ defense side followed different
¹⁷ methodologies?
¹⁸       MR. GALLAGHER:  Objection to
¹⁹    form.
²⁰       THE WITNESS:  I don't
²¹    recall --
²² BY MR. SLATER:
²³       Q.   Or is that something -- is
²⁴ that something that you're not sure of?

Page 85

¹       A.   I don't recall the specific
² methodology.  But I recall reading the
³ expert's report and I agreed with their
⁴ methodology.
⁵       Q.   Did you read the plaintiff
⁶ expert epidemiologist's report?
⁷       A.   Yes, I did.
⁸       Q.   Did you read it completely,
⁹ all the pages?
¹⁰       A.   Yes, I did.
¹¹       Q.   When you say that you agreed
¹² with the defense expert methodology more
¹³ than you agreed with the plaintiff expert
¹⁴ methodology, do you mean to say that you
¹⁵ agree with the conclusions drawn by the
¹⁶ expert on the defense side?  Is that what
¹⁷ you're saying?
¹⁸       MR. GALLAGHER:  Objection to
¹⁹    form.
²⁰       THE WITNESS:  No, just the
²¹    overall approach and the
²²    methodology used.
²³ BY MR. SLATER:
²⁴       Q.   What was different about the

Confidential Information - Subject to Protective Order

---

Page 86

1 overall approach and methodology that
2 made you favor the defense expert versus
3 the plaintiff expert?  Do you recall?
4       A.   I do not recall the specific
5 examples of the differences between the
6 two.
7       Q.   In the professional profile
8 on Page 1 of your CV, about half to
9 two-thirds of the way down, where you
10 have a list of all the specific compounds
11 that you've worked with, there is a
12 listing of n-nitrosodimethylamine, NDMA.
13       Do you see that?
14       A.   Yes.
15       Q.   Is that listed in connection
16 with the munitions plant matter in Utah
17 that we talked about earlier in the
18 deposition?
19       A.   Yes.
20       Q.   Because that's the only
21 other matter or time that you've actually
22 worked with or evaluated, I should say,
23 NDMA, correct?
24       A.   Correct.

---

Page 87

1       Q.   If you could, could you
2 please go to the second page of your CV.
3 At the very top, there is some societies
4 that you are a member of.  I'd like to
5 walk through those.  The Society of
6 Toxicology, what is that?
7       A.   That's the main society of
8 toxicologists.  Membership is probably
9 about 10,000 individuals.  Just what
10 toxicologists join, that's the main --
11 our main society, just like the American
12 Bar Association is for lawyers.
13       It's where -- we have a
14 journal.  We have newsletters.  It's just
15 the main society, and you have to be --
16 you have to have letters of
17 recommendation.  You have to have a
18 certain number of years of experience,
19 and there's different degrees of
20 membership.  So I'm one of them.  So it's
21 basically -- it's our society.
22       Q.   Does that society have
23 meetings?
24       A.   Yes, it does.

---

Page 88

1       Q.   Who sponsors those meetings?
2       A.   I do not know who.
3       Q.   Have you ever attended those
4 meetings?
5       A.   Yes, I have.
6       Q.   Would people from --
7 rephrase.
8       Have various industry
9 groups, for example, sponsored booths or
10 dinners or presentations talking about
11 industry groups, maybe in the pesticide
12 area or employers of workers in
13 occupational settings, that sort of
14 thing?  Do they sponsor parts of those
15 meetings?
16       A.   I don't know about that.  I
17 don't have knowledge of that.
18       Q.   What is the Society For Risk
19 Analysis?
20       A.   It's -- it's a smaller
21 society.  They do have meetings every
22 year, and they have a journal.  It's more
23 for risk assessment.  It's for people who
24 do -- you know, analyze risks of exposure

---

Page 89

1 to radon and cancer or -- you know, the
2 different types -- so it's more -- it's
3 more statistical analysis and risk
4 analysis.  It's -- there is some
5 toxicology involved, but it's more for a
6 risk assessor type.
7       Q.   Going back to the Society of
8 Toxicology.  Do you know whether or not
9 there can be corporate memberships as
10 well as individuals that can be members
11 of that society?
12       A.   I'm not aware of that.
13       Q.   Do you know for the Society
14 of Risk Analysis, are there corporate
15 members?
16       A.   I do not know.
17       Q.   What is the American
18 Conference of Governmental Industrial
19 Hygienists?
20       A.   It's an organization for
21 industrial hygienists.  I'm not an
22 industrial hygienist, but I have an
23 associate membership.  It's the
24 organization that has recommended levels

---

Confidential Information - Subject to Protective Order

Page 90

¹ of different compounds, radiation,
² vibration, noise for the workplace.
³ Similar to OSHA PELs or the NIOSH values.
⁴ They do have meetings where they set
⁵ these levels. So I'm just a member in
⁶ that.
⁷    Q.    What is EUROTOX?
⁸    A.    That's the European -- sort
⁹ of like the European toxicology society.
¹⁰ So I'm a member of that.
¹¹    Q.    Do you know if any of these
¹² societies that we just talked about are,
¹³ or were created by, or are sponsored by
¹⁴ chemical manufacturers?
¹⁵    A.    I do not know.
¹⁶    Q.    Am I correct that you're
¹⁷ limiting your opinions in this case to
¹⁸ opinions formed in the field of
¹⁹ toxicology?
²⁰    MR. GALLAGHER:  Objection to
²¹    form.
²²    THE WITNESS:  Yes, I am,
²³    with the caveat that if I
²⁴    evaluated, you know, like I said,

Page 91

¹    an epi paper or a human health
²    paper that also falls within the
³    realm of toxicology, because we
⁴    also evaluate epi papers. But I
⁵    am a toxicologist. That is my
⁶    field.
⁷ BY MR. SLATER:
⁸    Q.    For example, you're not
⁹ offering medical opinions, correct?
¹⁰    MR. GALLAGHER:  Objection to
¹¹    form.
¹²    THE WITNESS:  No. I'm not
¹³    offering medical opinions.
¹⁴ BY MR. SLATER:
¹⁵    Q.    That would be outside your
¹⁶ expertise, correct?
¹⁷    A.    That's correct.
¹⁸    Q.    I'm looking now at Page 3 of
¹⁹ your report which has a heading,
²⁰ professional experience.
²¹    Do you see that?
²²    MR. GALLAGHER:  Do you
²³    mean -- is it the report or the
²⁴    CV?

Page 92

¹    MR. SLATER:  Did I say
²    report?
³    MR. GALLAGHER:  Yes.
⁴    MR. SLATER:  Just making
⁵    sure you're awake, Patrick.
⁶ BY MR. SLATER:
⁷    Q.    Looking now at Page 3 of
⁸ your CV, there's a heading, professional
⁹ experience.
¹⁰    Do you see that?
¹¹    A.    Yes.
¹²    Q.    What is that communicating
¹³ to us as we read this?
¹⁴    A.    Those are just examples of
¹⁵ different types of chemicals or
¹⁶ occupational exposures or consumer
¹⁷ products or pharmaceutical products that
¹⁸ I've evaluated and the types of
¹⁹ evaluations that I've done with those
²⁰ types of products.
²¹    Q.    Does this include both
²² litigated matters and matters in which
²³ you were asked to consult for a company
²⁴ and provide your input?

Page 93

¹    A.    Yes, it's a mixture. It's a
² mixture of litigation, as well as some of
³ the pharmaceutical work I do, pet food,
⁴ consumer products. You know, it's just a
⁵ mixture of everything that I do, all of
⁶ my professional experience.
⁷    Q.    There is a subsection that
⁸ says "Chemical-Specific Toxicity
⁹ Assessments."
¹⁰    Do you see that?
¹¹    A.    Yes.
¹²    Q.    With regard to that section
¹³ of this CV, is every single example
¹⁴ provided there work that you performed on
¹⁵ behalf of a manufacturer of some
¹⁶ substance or product?
¹⁷    A.    Can you repeat your
¹⁸ question?
¹⁹    Q.    Let me tell you what I'm
²⁰ trying to get at. That probably wasn't
²¹ the best to get at it. I'll ask it
²² differently.
²³    There's a subheading,
²⁴ "Chemical-Specific Toxicity Assessments."

Confidential Information - Subject to Protective Order

Page 94

1  Do any of the examples
2  provided relate to a matter where you
3  were retained on behalf of a plaintiff,
4  somebody who claims to have been harmed
5  due to some toxic substance?  Has it
6  ever -- do any of these examples cover
7  such a situation?
8       MR. GALLAGHER:  Objection to
9  form.
10      THE WITNESS:  Do you mean
11      where I was retained as an expert
12      witness?
13  BY MR. SLATER:
14      Q.   Expert witness or as a
15  consultant on behalf of a plaintiff,
16  someone who was harmed or alleging a harm
17  due to exposure to a substance?
18      MR. GALLAGHER:  Objection to
19      form.
20      THE WITNESS:  Some of these
21      were just general evaluations.
22      Some of them were defense.  I
23      don't know if any specifically
24      were plaintiff, if that makes

Page 95

1  sense.
2  BY MR. SLATER:
3      Q.   What I'm trying to
4  understand is whether any of the examples
5  that you provide under the heading
6  "Chemical-Specific Toxicity Assessments"
7  related to a matter where you were
8  retained to be a consultant or an expert
9  on behalf of a person who claimed to have
10 been harmed due to a toxic or potentially
11 toxic substance?
12     A.   No, I do not believe so.
13     Q.   Have you ever been retained
14 in your career on behalf of a plaintiff
15 in a litigation who was claiming to have
16 been harmed due to exposure to a toxic
17 substance?
18      MR. GALLAGHER:  Objection to
19      form.
20      THE WITNESS:  As an expert?
21 BY MR. SLATER:
22     Q.   Right.
23     A.   No.  I have not been
24 retained as an expert.

Page 96

1      Q.   So every time you've ever
2  been in any litigated matter in your
3  career, it's been on behalf of the
4  defense, correct?
5      A.   State that one more time or
6  please repeat it.
7      Q.   Sure.  Am I correct that
8  every single time in your career that
9  you've been retained in a litigated
10 matter, it's been on behalf of the
11 defense?
12     A.   Yes.  All my retentions have
13 been for the defense.  I have evaluated
14 cases with plaintiffs' lawyers and worked
15 for plaintiffs.  But all my retentions
16 have been defense.
17     Q.   What do you mean that you've
18 evaluated matters for plaintiff lawyers?
19     A.   Like lawyers, I mean -- just
20 through ToxStrategies we get requests for
21 evaluations.  And so I evaluate those,
22 and I look at all the evidence, the
23 literature, the complaint, the exposure,
24 the medical records, whatever information

Page 97

1  that I request.  And it's provided to me.
2      And then I come to a
3  conclusion, or a preliminary conclusion.
4  And then I make that -- I discuss it with
5  a potential client.  So it's just never
6  worked out that any of those have been
7  plaintiffs so far.
8      I know that we had one that
9  I wasn't the expert.  There was a
10 plaintiff, one or two, but I haven't been
11 the expert.
12     Q.   You're saying there's one or
13 two examples you can recall where a
14 plaintiff lawyer came to your firm and
15 asked if your firm could look at a
16 situation and potentially be an expert?
17     A.   I mean, there's --
18      MR. GALLAGHER:  Objection to
19      form.
20      THE WITNESS:  There have
21      been several that have come to us,
22      and that I've looked at, and, you
23      know, we've talked about it.  And
24      I don't know what happened to the

Confidential Information Subject to Protective Order

Page 98

1    disposition of the case.
2         There's been -- over the
3    years, I mean, we have done
4    plaintiffs.  I mean, I can recall
5    more recently that Dr. James -- so
6    it does happen.  It's not very
7    common though.
8    BY MR. SLATER:
9         Q.   Any time a plaintiff
10   attorney has come to your company to see
11   if your company could support their case
12   that a toxic substance harmed an
13   individual, you've told the lawyer, "We
14   can't help you.  We can't give that
15   opinion.  You need to go find somebody
16   else."  Is that a fair summary?
17        MR. GALLAGHER:  Objection to
18   form.
19        THE WITNESS:  No, no.  I
20   always talk to them.  I get the
21   information.  I look at it the
22   same way.  I look at everything
23   with -- the same way that I look
24   at all the same information and

Page 99

1    request medical records,
2    depositions, you know, any
3    exposure data.
4         And I make an assessment.
5    It's I -- it's all the same.  It's
6    all done the same way, regardless
7    of who is --
8    BY MR. SLATER:
9         Q.   But what I'm getting at
10   is -- what I'm getting at is, in all
11   those matters you've ultimately told the
12   plaintiff lawyer, "I'm sorry.  I can't
13   help you.  I can't give you the opinion,
14   that you're -- that you need in order to
15   advance this case.  You need to find
16   someone else."
17        Correct?
18        MR. GALLAGHER:  Objection to
19   form.  Objection to form.  Asked
20   and answered.
21        THE WITNESS:  Like I said, I
22   tell them the opinion that I have.
23   And then usually I either --
24   usually don't hear back from them

Page 100

1    or --
2         So I don't know what happens
3    with the case, the disposition
4    with the other side.
5         I don't understand the inner
6    workings of law firms or employers
7    or what they do with that
8    information.
9    BY MR. SLATER:
10        Q.   I think we're
11   overcomplicating this.  This is what I'm
12   asking.
13        In the instances over the
14   years where a plaintiff lawyer has come
15   to your firm, provided information and
16   documents to see if you could support
17   their case as a plaintiff, once you've
18   looked at the materials, you've said no,
19   I can't support your case, and they've
20   had to go elsewhere; is that correct?
21        MR. GALLAGHER:  Objection to
22   form.  Asked and answered.
23        THE WITNESS:  I don't say
24   that.  I give them my opinion of

Page 101

1    the case.
2    BY MR. SLATER:
3         Q.   If your opinion had been --
4    if your opinion had been well, yes, I
5    think this toxic exposure caused your
6    client's harm, presumably you'd be
7    retained.  But you're telling me in every
8    instance where a plaintiff has come to
9    you, you've said, "I cannot support the
10   position that the toxic substance or the
11   toxic exposure at issue harmed your
12   client."
13        That's -- I'm just trying to
14   get to the bottom line.  That's been the
15   ultimate outcome of those matters, right?
16        MR. GALLAGHER:  Objection to
17   form.  Mischaracterizes testimony.
18   Asked and answered.  And when you
19   get a chance, Adam, we've been
20   going about an hour and-a-half
21   now.  But go ahead.
22   BY MR. SLATER:
23        Q.   You can answer.
24        A.   Correct, I mean, I give them

Confidential Information - Subject to Protective Order

1 my opinion and if -- and sometimes we're
2 retained, and sometimes we're not.
3        Q.   Have you ever given the
4 opinion in any litigated matter that a
5 plaintiff was exposed to a toxic
6 substance that was at issue in that case,
7 and that it caused harm to that
8 plaintiff?
9        A.   Can you repeat that?
10       Q.   Sure.
11            Have you ever given the
12 opinion in your career that a plaintiff
13 who alleged injury due to exposure to a
14 toxic substance, was actually harmed by
15 that substance?
16            MR. GALLAGHER:  Objection to
17       form.
18            THE WITNESS:  I have not
19       been the expert in a case where I
20       had that opinion.
21            MR. SLATER:  If you want to
22       take a break now, we can do it.
23       Let's go off the record.
24            THE VIDEOGRAPHER:  The time

1 right now is 10:40 a.m.  We're off
2 the record.
3        (Short break.)
4            THE VIDEOGRAPHER:  The time
5 is 10:56 a.m.  We're back on the
6 record.
7 BY MR. SLATER:
8        Q.   I need to go over a couple
9 of things that I forgot to ask you about
10 a little earlier.
11            Do you hold yourself out as
12 a regulatory expert?
13       A.   Can you repeat that?
14       Q.   Sure.  Do you hold yourself
15 out as a regulatory expert?
16            MR. GALLAGHER:  Objection to
17       form.
18            THE WITNESS:  I am familiar
19       with some regulations.  But you'd
20       have to be more specific.
21 BY MR. SLATER:
22       Q.   In terms of the expert --
23 rephrase.
24            In terms of your expert

1 qualifications, are you putting yourself
2 out as an expert in the field of
3 regulatory matters -- rephrase.
4            Let me ask it differently.
5            Do you hold yourself out as
6 a regulatory expert, where people can
7 come to you and you can give them
8 regulatory expertise where you have a
9 full understanding of the regulatory
10 structure, the regulatory world, where
11 you specialize in that field?
12            MR. GALLAGHER:  Objection to
13       form.
14            THE WITNESS:  No.  That's
15       not my primary area of expertise.
16       So no, that's not my -- that's not
17       what I was asked to provide in
18       this case.
19 BY MR. SLATER:
20       Q.   Sorry.  I was writing notes,
21 and I realize that I couldn't read any of
22 them, I had to rewrite my own notes.
23            Looking at your CV back on
24 Page 3.  At the bottom of that page

1 there's a matter where you say that you
2 did review of toxicity of glyphosate.
3            Who was that review done
4 for?
5        A.   I do not recall who that
6 would have been for.  That would have
7 been several years ago.  I do not recall
8 who that would have been done for.
9        Q.   Was it the manufacturer of a
10 product that contained glyphosate?
11       A.   I do not recall.
12       Q.   Did you reach an opinion as
13 to whether or not glyphosate is toxic to
14 humans?
15            MR. GALLAGHER:  Objection to
16       form.  I'll caution you to the
17       extent any of the substance of
18       your opinions is confidential, I
19       caution you not to breach
20       confidentiality agreements.
21            THE WITNESS:  Like I said, I
22       don't recall.  I also don't recall
23       if I was -- in this specific
24       instance if I was working for -- I

Page 106

1   definitely was not an expert or a
2   named expert in this matter.  I
3   don't know if I was assisting
4   another consultant or if I was --
5   I don't even remember the
6   specifics of this, what this task
7   was for.
8          I would have likely looked
9   at, you know, exactly what it
10  said.  I would have looked at the
11  toxicity, looked at regulatory
12  information and then either
13  provided that to whoever requested
14  me to do that.  That's the extent
15  of my knowledge at this time.
16  BY MR. SLATER:
17      Q.   Could you look at Page 4,
18  please, of your CV.  The third entry from
19  the top says, "Evaluation of potential
20  carcinogenicity of take-home asbestos
21  exposure.  Evaluation of the animal and
22  epidemiological asbestos literature brake
23  worker studies for mesothelioma."
24          Do you see that?

Page 107

1       A.   Yes.
2       Q.   Who did you do that for,
3   that assignment?
4       A.   I was assisting another
5   consultant for that.  I was not an expert
6   in that case.
7       Q.   Who was the client?
8       A.   That would be confidential.
9       Q.   Was it the employer of brake
10  workers --
11      A.   No.
12      Q.   -- without telling me who it
13  was?
14      A.   No, it was not.
15      Q.   Did you reach a conclusion
16  as to whether or not take-home asbestos
17  exposure was carcinogenic to humans?
18          MR. GALLAGHER:  Objection to
19      form.  And again, to the extent
20      the substance --
21          MR. SLATER:  We don't know
22      who the client was.  So I'm not
23      really understanding what these
24      objections are.

Page 108

1           I'm allowed to understand
2       the opinions that she's formed
3       based on the analysis over her
4       career.
5           THE WITNESS:  Since I was
6       performing tasks for -- that I was
7       given, I would have summarized
8       information but it would have been
9       ultimately the expert that would
10      have formed the opinions, not me.
11  BY MR. SLATER:
12      Q.   Do you recall what your
13  understanding of the literature was as to
14  whether or not take-home asbestos
15  exposure can be carcinogenic to humans?
16          MR. GALLAGHER:  Objection to
17      form.
18          THE WITNESS:  In the context
19      of this specific case or in
20      general?
21  BY MR. SLATER:
22      Q.   In the context of what is
23  listed there, the third entry on this
24  page that we are talking about.

Page 109

1       A.   I mean, again, this is a
2   confidential matter.  So I'm not sure if
3   I should be discussing this specifically.
4           MR. GALLAGHER:  If it's
5       confidential, you should not be
6       disclosing.
7           THE WITNESS:  I think this
8       is confidential, so...
9   BY MR. SLATER:
10      Q.   Let's go four further down,
11  "Evaluation of the carcinogenicity of
12  chrysotile asbestos."
13          Who was that assignment for?
14      A.   I do not recall who that was
15  for.  That was also for another expert.
16  That was probably 15 to 20 years ago.  I
17  would not -- I was not aware -- I do not
18  know who the client was for that.
19      Q.   What was the conclusion that
20  you reached based on your evaluation of
21  the carcinogenicity of chrysotile
22  asbestos.  Did you conclude that it's
23  carcinogenic to humans?
24      A.   Again, I would have just

Confidential Information - Subject to Protective Order

Page 110

[1] been pulling background information on
[2] exposure to fibers, various sort of
[3] state-of-the-art issues on what was known
[4] when.  And then I would have given that
[5] information to the expert to allow them
[6] to draw their own conclusions.  I don't
[7] remember if I drew conclusions at the
[8] time.
[9]      Q.   Going down another four or
[10] five.  There's, "Effects of tire-derived
[11] fuel burn.  Evaluated the adverse effects
[12] of inhalation exposure to various
[13] compounds, including mercury and zinc and
[14] particulate matter from a tire-derived
[15] fuel test burn."
[16]      Do you know who you were
[17] retained by to do that evaluation?
[18]      A.   I do not.  I do not recall
[19] who the client was for that.  It was more
[20] of a consulting matter for the client.  I
[21] do not remember that there was a
[22] particular matter.  I just remember that
[23] we looked at the literature and just kind
[24] of provided information on -- to what the

Page 111

[1] effects would be.
[2]      Q.   Going further down, there's
[3] one that says, "Toxicity of carbon
[4] monoxide.  Reviewed the carbon monoxide
[5] toxicity literature, in particular the
[6] literature concerned with the
[7] neuropsychological effects of exposure."
[8]      Was that part of a defense
[9] of a litigated matter?
[10]      A.   I believe that probably
[11] encompasses just my general experience
[12] that I've had with carbon monoxide over
[13] the years, not one particular experience
[14] or one particular matter.  So that's sort
[15] of a general statement, my general
[16] experience.
[17]      Q.   You're saying you don't --
[18] I'm sorry.  I didn't mean to talk over
[19] you.  You're saying it's a general?
[20]      A.   No.  They're -- general --
[21] sorry.
[22]      General experience that I
[23] have, there has been issues, you know, in
[24] my career where I've been asked to look

Page 112

[1] at carbon monoxide toxicity.
[2]      Q.   Well, this says not in
[3] general, it says in particular the
[4] literature concerned with the
[5] neuropsychological effects of exposure.
[6]      So I was assuming this was a
[7] matter where somebody claimed to have
[8] been exposed to CO2 and that it caused
[9] neuropsychological harm?
[10]      A.   Well, there's --
[11]      MR. GALLAGHER:  Objection to
[12] form.
[13]      THE WITNESS:  Correct.
[14]      MR. GALLAGHER:  Objection to
[15] form.
[16]      THE WITNESS:  Correct.
[17] That's usually what -- when you've
[18] got carbon monoxide, that's
[19] usually the effect that you're
[20] going to see.
[21]      So if I was ever asked or,
[22] whenever we look at or I look at
[23] carbon monoxide, that's usually
[24] the effect or the endpoint or

Page 113

[1] whatever -- the most common that
[2] we look at or I look at.
[3]      When I say we, I'm thinking
[4] of toxicologists in general.
[5] BY MR. SLATER:
[6]      Q.   Am I correct -- well, we've
[7] already covered it.
[8]      Let's go now to Page 5.
[9] There is a subheading that says, "Food
[10] Additives and Flavorings?"
[11]      Do you see that?
[12]      A.   Yes.
[13]      Q.   At the bottom of that page
[14] it says, "Safety of farmed versus wild
[15] salmon.  Evaluated the concentrations of
[16] PCB in farmed and wild salmon compared to
[17] the U.S. FDA's tolerance level."
[18]      Do you recall who you
[19] performed that evaluation for?
[20]      A.   That was another matter I
[21] was assisting someone else with.  I do
[22] not know who the client was, that was
[23] farmed or wild.  I just know that we were
[24] asked to look at the different

Confidential Information - Subject to Protective Order

Page 114

¹ concentrations and compared them to the
² level -- this was an older case.  I would
³ say probably 15 years ago.
⁴      Q.   This refers to PCBs.  What
⁵ are PCBs?
⁶      A.   Those are
⁷ polychlorinatedbiphenyls.
⁸      Q.   Are they toxic to humans?
⁹          MR. GALLAGHER:  Objection to
¹⁰     form.
¹¹         THE WITNESS:  It depends on
¹²     the concentration.
¹³ BY MR. SLATER:
¹⁴      Q.   At certain concentrations,
¹⁵ it can be toxic to humans?
¹⁶      A.   The most common effect
¹⁷ are -- really, the main effect seen at
¹⁸ really high occupational levels is
¹⁹ chloracne, which is a skin condition.  It
²⁰ sort of looks like acne.
²¹      Q.   Page 6 of your CV.  There is
²² a heading that says "Consumer and
²³ Personal Care Products."
²⁴      A.   Okay.

Page 115

¹      Q.   Going about two-thirds of
² the way down the page there is one that
³ says, "Evaluation of the carcinogenicity
⁴ of benzene, trichloroethylene and
⁵ 1,1,1-trichloroethylene and brain
⁶ cancer."
⁷          Who did you perform that
⁸ evaluation for?
⁹      A.   I do not recall the client.
¹⁰ I believe it was -- those were components
¹¹ of a -- of a glue, but I do not recall
¹² the specific client.
¹³      Q.   And when you say that you
¹⁴ believe it had to do with components of a
¹⁵ glue, it says that in the entry.
¹⁶ Chemical testing on the glue product --
¹⁷      A.   Okay.  Yes.
¹⁸      Q.   -- and result evaluating --
¹⁹      A.   So, yeah.
²⁰      Q.   I'll read it again.  This
²¹ says, "Chemical testing on the glue
²² product was conducted and results
²³ evaluated to assess other potential
²⁴ exposures."

Page 116

¹          Was that chemical testing
² performed by you?
³      A.   No, it was not.
⁴      Q.   Was it done by --
⁵      A.   It was performed -- yeah,
⁶ one of the individuals at our company had
⁷ industrial hygiene experience and they
⁸ organized that testing.  And we looked at
⁹ those results and evaluated them.
¹⁰      Q.   Do you recall what the
¹¹ conclusion was as to the carcinogenicity
¹² of those substances?
¹³          MR. GALLAGHER:  Same caution
¹⁴     with respect to the extent the
¹⁵     substance is confidential.
¹⁶         THE WITNESS:  Yeah.  I mean,
¹⁷     it's -- none of these compounds
¹⁸     were determined to cause brain
¹⁹     cancer in humans.
²⁰ BY MR. SLATER:
²¹      Q.   Is benzene a carcinogen to
²² humans?
²³      A.   The only known cancer
²⁴ associated with benzene is acute

Page 117

¹ myelogenous leukemia, but high doses,
² typically in worker studies.
³      Q.   Please go to Page 7.  At the
⁴ bottom of the section that we've just
⁵ been going through, the last entry is
⁶ "General pesticide experience, evaluated
⁷ the toxicity of numerous pesticides."
⁸          Do you see that entry?
⁹ Right where it says, "Pharmaceutical
¹⁰ agents and medical devices."
¹¹      A.   Oh, yes.
¹²      Q.   There's a whole list of
¹³ different pesticides there, correct?
¹⁴      A.   Correct.
¹⁵      Q.   Are any of them toxic to
¹⁶ humans?
¹⁷          MR. GALLAGHER:  Objection.
¹⁸     Form.
¹⁹ BY MR. SLATER:
²⁰      Q.   In your opinion?
²¹          MR. GALLAGHER:  Objection to
²²     form.
²³ BY MR. SLATER:
²⁴      Q.   Well, let me stop there.

Confidential Information - Subject to Protective Order

Page 118

¹ Let me ask the question differently.
² Your evaluations of the
³ toxicity of the listed pesticides, did
⁴ you ever conclude that any of those
⁵ pesticides were toxic to humans?
⁶ A. I don't remember the
⁷ specifics of each of these. This is a
⁸ general statement of my experience that I
⁹ had over the years. Each -- and some of
¹⁰ these were just ones when I worked with
¹¹ the State of Florida, as for the Bureau
¹² of Pesticides when I was regulating these
¹³ pesticides. Some of it was part of my
¹⁴ consulting career.
¹⁵ Some of these pesticides,
¹⁶ certainly at high enough doses could
¹⁷ cause toxicity in humans, obviously --
¹⁸ I'll quote Paracelsus -- if you have a
¹⁹ high enough dose, could cause acute
²⁰ effects in humans.
²¹ So for each one of these
²² specifically, I cannot recall the
²³ exposure circumstances that would be
²⁴ associated with each of these.

Page 119

¹ And I don't remember -- my
² conclusions may have or may not have been
³ or which may or may not have been
⁴ involved in a specific request or if they
⁵ were even in a litigation-type
⁶ circumstance.
⁷ Q. Have you ever concluded that
⁸ any of the pesticides listed here in this
⁹ entry are toxic to humans at the exposure
¹⁰ levels that would occur in normal use of
¹¹ those products in which they are
¹² contained?
¹³ MR. GALLAGHER: Object to
¹⁴ form.
¹⁵ MR. INSOGNA: Object to
¹⁶ form.
¹⁷ THE WITNESS: Repeat that
¹⁸ again.
¹⁹ BY MR. SLATER:
²⁰ Q. Sure. With regard to the
²¹ whole list of pesticides here in this
²² entry on your CV, have you ever concluded
²³ that any of those pesticides when used as
²⁴ intended are toxic to humans?

Page 120

¹ MR. INSOGNA: Same
² objection.
³ MR. GALLAGHER: Objection to
⁴ form.
⁵ THE WITNESS: No.
⁶ Considering what they're used --
⁷ as they are intended to be used
⁸ with proper equipment and
⁹ according to labeled directions, I
¹⁰ have not -- I have not concluded
¹¹ that they would cause harm to
¹² humans.
¹³ BY MR. SLATER:
¹⁴ Q. And that clues DDT?
¹⁵ A. Well, DDT is -- like I said,
¹⁶ it's significant at sufficient doses it
¹⁷ might. But DDT is still used, for
¹⁸ example, in other countries in -- as a
¹⁹ treatment for malaria in tents. So it's
²⁰ actually still used.
²¹ Q. Did you say it's still used
²² in other countries?
²³ A. Correct.
²⁴ Q. But it's not used in the

Page 121

¹ United States anymore?
² A. I don't believe it is.
³ Q. Why's that?
⁴ A. I don't remember the reason
⁵ that it's not used anymore at this time.
⁶ Q. Has there ever been a time
⁷ in your career where you haven't been
⁸ doing some work on behalf of a pesticide
⁹ manufacturer?
¹⁰ I'm talking about after you
¹¹ left the State of Florida. So in your
¹² private toxicology practice, have you
¹³ continuously been doing some work for
¹⁴ pesticide manufacturers at all times?
¹⁵ MR. GALLAGHER: Objection to
¹⁶ form.
¹⁷ THE WITNESS: No. No. It's
¹⁸ sporadic work. My pesticide work
¹⁹ is sporadic.
²⁰ BY MR. SLATER:
²¹ Q. On Page 7 there's a heading,
²² "Pharmaceutical Agents and Medical
²³ Devices."
²⁴ Do you see that?

Confidential Information - Subject to Protective Order

Page 122

1    A.   Yes.
2    Q.   The first heading says,
3 "Safety assessment of excipients used in
4 pharmaceutical products. Evaluated the
5 pharmacokinetic and animal toxicity data
6 related to excipient compounds."
7         What matter was that?
8    A.   That's confidential.
9    Q.   What is an excipient
10 compound?
11   A.   Those are compounds that
12 might -- may or may not occur in a
13 pharmaceutical product. I was asked to
14 evaluate the different excipients, the
15 toxicity of those, or potential toxicity.
16   Q.   Okay. About five or six
17 down it says, "Assessment of side effects
18 of a popular over-the-counter
19 medication." And you were trying to
20 determine whether Stevens-Johnson
21 syndrome was causally associated with the
22 product. What product was that?
23   A.   That's confidential.
24   Q.   It's acetaminophen, right?

Page 123

1    A.   We -- correct, yes. Yeah.
2 The client is confidential.
3    Q.   Yeah, I'm not asking who the
4 client is.
5    A.   Okay. Yeah, it was --
6    Q.   Let me guess, you concluded
7 that acetaminophen was not causally
8 associated with Stevens-Johnson syndrome?
9        MR. GALLAGHER:  Objection to
10 form.
11       And I caution you the same
12 caution to the extent that the
13 substance of your opinions is
14 confidential.
15       THE WITNESS:  Right. I was
16 not the expert in this case. I
17 was just assisting.
18 BY MR. SLATER:
19   Q.   Did you reach any conclusion
20 in your mind as you were assisting?
21       MR. GALLAGHER:  Objection to
22 form.
23       THE WITNESS:  Well, in this
24 case in particular, the individual

Page 124

1 had already developed their
2 condition prior to any use. So in
3 this particular instance, there
4 was no causation.
5 BY MR. SLATER:
6    Q.   That was your opinion?
7    A.   That was the opinion that
8 was reached by the expert.
9    Q.   When you say the expert, you
10 mean the expert that you were assisting?
11   A.   Correct.
12   Q.   And that was a litigated
13 matter, I suppose, right?
14   A.   Yes.
15   Q.   Go to Page 8, please.
16 There's a heading that says "Regulatory
17 Compliance."
18   A.   Yes.
19   Q.   The first entry says,
20 "Evaluation of respiratory regulatory
21 limit for caprolactam"?
22       MR. SLATER:  I'll just spell
23 it for Michelle.
24 C-A-P-R-O-L-A-C-T-A-M.

Page 125

1 BY MR. SLATER:
2    Q.   Do you see that entry?
3    A.   Yes.
4    Q.   And it says that you
5 prepared rebuttal comments to OEHHA in
6 California in response to proposed RELs,"
7 reference exposure limit -- levels.
8        What was this matter? What
9 were you doing here?
10   A.   For the client we were, or I
11 was assisting in preparing rebuttal
12 comments. I believe they were trying
13 to -- I don't know if they were
14 introducing a new regulatory limit or
15 changing a limit. But we were just
16 providing some commentary, because OEI
17 usually allows people to respond to
18 their -- any kind of new regulatory value
19 or altered regulatory value. We were
20 just preparing comments for that. Or I
21 was assisting.
22   Q.   Was your client a seller of
23 caprolactam?
24   A.   That would be confidential.

Confidential Information - Subject to Protective Order

Page 126

1    Q.   Were the rebuttal comments
2 intended to convince this California body
3 not to impose certain reference exposure
4 levels?
5          MR. GALLAGHER:  Objection to
6    form.
7 BY MR. SLATER:
8    Q.   Was that the intent of those
9 comments?
10          MR. GALLAGHER:  Objection to
11    form.
12          THE WITNESS:  The purpose of
13    the comments were just to respond
14    to the data they analyzed.  We may
15    have provided additional data to
16    make it a more complete dataset.
17    I don't recall the exact
18    specifics.  I'd have to go back
19    and look at the comments, if I can
20    find them.
21 BY MR. SLATER:
22    Q.   What is caprolactam?
23    A.   It's a chemical that's used
24 in the -- as an additive to protectants,

Page 127

1 like repellants sometimes.  It's an
2 industrial chemical.  It's not very
3 common.
4    Q.   In this regulatory
5 compliance section, do they all relate
6 to -- well, I'll withdraw that actually.
7          Is it fair to say whoever
8 retained you on this caprolactam matter,
9 intended to use your rebuttal comments to
10 help convince that California body not to
11 impose reference exposure levels that
12 would have impacted their ability to sell
13 caprolactam?
14          MR. INSOGNA:  Object to
15    form.
16          MR. GALLAGHER:  Objection to
17    form.
18          THE WITNESS:  That's
19    confidential.
20 BY MR. SLATER:
21    Q.   Okay.  If it's so
22 confidential, why is it on your CV?
23          MR. GALLAGHER:  Objection to
24    form.

Page 128

1          THE WITNESS:  The work is
2    not confidential, what I did.
3    It's just some of the details, or
4    the client would be confidential.
5 BY MR. SLATER:
6    Q.   I'm just asking for the
7 purpose of the rebuttal comments.  You're
8 telling me that's confidential?
9          MR. GALLAGHER:  Objection to
10    form.
11 BY MR. SLATER:
12    Q.   Let me just ask you, isn't
13 it common sense that the manufacturer
14 wanted the reference exposure levels not
15 to be lowered to the point where it would
16 affect their ability to sell the product?
17 I mean, isn't that what these comments
18 were about?
19          MR. GALLAGHER:  Objection to
20    form.  Argumentative and asked and
21    answered.
22          THE WITNESS:  In some cases,
23    they just want the body of
24    evidence to be complete.

Page 129

1 BY MR. SLATER:
2    Q.   Complete so that they
3 wouldn't have their business impacted,
4 right?
5          MR. GALLAGHER:  Again,
6    objection to form.  Argumentative
7    and asked and answered.
8 BY MR. SLATER:
9    Q.   Do you recall?  Can you tell
10 me?
11    A.   No, the same answer.  As
12 scientists, we want the body of evidence
13 to be the most complete it is so we have
14 a total comprehension and we have the
15 full body to work with.  We don't want
16 portions of evidence or decisions to be
17 made on just part of the evidence.
18    Q.   So you thought that you were
19 being hired just to make the evidence
20 complete and that the client that hired
21 you didn't have a purpose in submitting
22 the information?  Is that what you're
23 telling us?
24    A.   They didn't have --

Page 130

1  MR. GALLAGHER: Objection to
2  form.
3  THE WITNESS: Sorry, they
4  didn't have what?
5  BY MR. SLATER:
6  Q.  A purpose in hiring you.
7  They didn't have a motivation to
8  influence the final decision by this
9  body? They just were trying to be
10  helpful?
11  MR. GALLAGHER: Objection to
12  form.
13  THE WITNESS: I don't know
14  what their purpose was. They
15  offer -- we, and many other
16  organizations, they are working
17  towards transparency and
18  involvement of individual
19  scientists to be part of the
20  process.
21  And that's what -- that's
22  what we do, we work together and
23  we try to get the best science out
24  there.

Page 131

1  BY MR. SLATER:
2  Q.  Going down to the bottom of
3  the page, second-to-last entry,
4  "Evaluation of vinyl chloride
5  carcinogenicity. Conducted an assessment
6  of the animal and epidemiologic evidence
7  to determine whether a causal association
8  exists between vinyl chloride and liver
9  or brain cancer among individuals exposed
10  to vinyl chloride in the environment."
11  Who retained you for that
12  one?
13  A.  I do not recall.
14  Q.  What was the outcome of your
15  evaluation in that matter?
16  A.  Again, that would have been
17  assisting someone else, another expert or
18  a expert.
19  Q.  Who?
20  A.  So I would have just
21  provided information, summaries of
22  studies, and then let them reach their
23  own conclusion.
24  Q.  Who were you assisting?

Page 132

1  A.  I cannot be completely sure
2  at this time. I can look and see. This
3  is an older evaluation.
4  Q.  In your opinion, is vinyl
5  chloride carcinogenic to humans?
6  MR. GALLAGHER: Objection to
7  form.
8  THE WITNESS: Yes. It is --
9  it causes angiosarcoma in humans
10  at high doses.
11  BY MR. SLATER:
12  Q.  Are those high doses that
13  would be encountered by humans in normal
14  everyday life?
15  MR. GALLAGHER: Objection to
16  form.
17  THE WITNESS: You'd have to
18  give me the doses, and I'd have to
19  do my analysis.
20  BY MR. SLATER:
21  Q.  I'll ask the question
22  differently.
23  You said at high doses it
24  can be carcinogenic to humans. So my

Page 133

1  question is, when you use the word "high
2  doses," are those the doses that you
3  would expect people to be exposed to in
4  day-to-day life?
5  A.  No.
6  MR. GALLAGHER: Objection to
7  form.
8  THE WITNESS: No, those are
9  doses that existed in industry
10  typically back in the '50s, I
11  guess early days -- in the past,
12  when the exposures were much
13  higher in the industry.
14  These are not, you know,
15  everyday environmental exposures
16  that exist today.
17  BY MR. SLATER:
18  Q.  With regard to all these
19  matters -- actually, let me -- let's go
20  to the next page, Page 9.
21  At the top of the page it
22  says, "Toxicity assessment and toxicity
23  profile generation for a former
24  electronics site in Seminole county,

Page 134

¹ Florida.  Reviewed the toxicity of
² multiple chemicals for multiple diseases,
³ generated toxicity profiles for benzene,
⁴ freon, lead, methylene chloride, rosin,
⁵ 1,1-dichloroethylene,
⁶ 1,1,1-trichloroethylene,
⁷ trichloroethylene, toluene, 1,4-dioxane
⁸ and vinyl chloride.  Provided thorough
⁹ research regarding confounders for over
¹⁰ 30 cancer and noncancer conditions?"
¹¹     Who was the client in that
¹² matter?
¹³     A.   That would be confidential.
¹⁴     Q.   Was it a litigated matter?
¹⁵     A.   I believe it was in
¹⁶ litigation.  We were just consulting.  We
¹⁷ weren't experts, or I wasn't an expert.
¹⁸     Q.   Did you conclude that these
¹⁹ chemicals had caused any harm to anybody?
²⁰ Or was that not your role?
²¹     A.   That was not --
²²     MR. GALLAGHER:  Objection to
²³ form.
²⁴     THE WITNESS:  That was not

Page 135

¹     our role.  We were just tasked to
²     say what the chemicals were and
³     just basic, like, mini tox
⁴     profiles and just provide the
⁵     chemicals and the data, the
⁶     animal, epi data.
⁷ BY MR. SLATER:
⁸     Q.   Well, actually, it says you
⁹ provided thorough research regarding
¹⁰ confounders for over 30 cancer and
¹¹ noncancer conditions.  What's a
¹² confounder?
¹³     A.   That would be like if it
¹⁴ was -- if there was -- I don't remember
¹⁵ the specific cancers in this case.  But
¹⁶ if it was a breast cancer, we would say,
¹⁷ well, if someone has BRCA or if they're
¹⁸ obese, that would have been the type of
¹⁹ confounder that we would have said.
²⁰     Or if it was diabetes for
²¹ noncancer, you know, we would have said
²² are they obese or family history of
²³ diabetes.
²⁴     So those would have been the

Page 136

¹ confounders that we would identify.
²     Q.   How do you define a
³ confounder?
⁴     A.   It's a risk factor for a
⁵ condition or a disease.
⁶     Q.   So when you were providing
⁷ these confounders to this confidential
⁸ client, you were providing them with
⁹ analysis of other risk factors and
¹⁰ alternative causes for the conditions
¹¹ complained of as opposed to this list of
¹² chemicals here.  You were trying to help
¹³ them defend the matter by pointing to
¹⁴ other potential causes, right?
¹⁵     MR. GALLAGHER:  Objection to
¹⁶ form.
¹⁷     MR. INSOGNA:  Objection to
¹⁸ form.
¹⁹     THE WITNESS:  I'm not sure
²⁰ what they did with the
²¹ information.  That's what we did,
²² we provided confounders, and we
²³ provided the toxicity information.
²⁴ BY MR. SLATER:

Page 137

¹     Q.   Well, you provided the
² confounders.  But you did understand that
³ that was the reason that they wanted
⁴ these confounders is so they could point
⁵ to alternative causes, correct?
⁶     MR. INSOGNA:  Objection to
⁷ form.
⁸     MR. GALLAGHER:  Objection to
⁹ form.
¹⁰     MR. SLATER:  Can we have one
¹¹ person defend the deposition,
¹² please?
¹³ BY MR. SLATER:
¹⁴     Q.   Can you answer the question?
¹⁵     A.   Can you repeat it, please?
¹⁶     Q.   You understood that the
¹⁷ reason that you were retained was so that
¹⁸ whoever retained you could point to
¹⁹ alternative causes for the conditions
²⁰ that were being claimed in that matter,
²¹ right?  You understood that's why they
²² wanted the confounders?
²³     MR. GALLAGHER:  Objection to
²⁴ form.

Confidential Information - Subject to Protective Order

Page 138

1  THE WITNESS:  I don't --
2  that's not my understanding.  And
3  confounders can be used when
4  you're looking at a study.  It can
5  be used for other information.  So
6  I don't recall what they wanted
7  that information for specifically.
8  BY MR. SLATER:
9  Q.  It would seem to me, and you
10 correct me if I'm wrong, that you would
11 want potential customers or clients to
12 see this and know that you're available
13 to help them defend toxic exposure cases,
14 this would be -- this would be something
15 that would interest somebody who has to
16 defend a toxic exposure case, that you
17 will look for confounders to explain away
18 potential toxic injuries, correct?
19 MR. GALLAGHER:  Objection to
20 form.
21 THE WITNESS:  No.
22 BY MR. SLATER:
23 Q.  Isn't that what you do?  You
24 represent industry for the most part, the

Page 139

1  vast majority of your work, industry
2  entities who are defending themselves
3  against claims that they produced some
4  substance that's causing harm or could
5  cause harm to humans.  Isn't that what
6  you do?
7  MR. GALLAGHER:  Objection to
8  form.
9  THE WITNESS:  No.
10 BY MR. SLATER:
11 Q.  No?  Isn't that what you're
12 doing here in this case?
13 MR. GALLAGHER:  Objection to
14 form.
15 THE WITNESS:  No.
16 BY MR. SLATER:
17 Q.  Do you know why you were
18 hired in this case?  Do you think you
19 were hired to give helpful information,
20 or were you hired to try to advance a
21 litigation position on behalf of
22 manufacturers who sold valsartan with
23 NDMA and NDEA?
24 MR. GALLAGHER:  Objection to

Page 140

1  form.
2  THE WITNESS:  I was hired to
3  evaluate the reported complaints
4  or theoretical complaints that
5  might appear in the future, to
6  evaluate the doses, and to see
7  what the theoretical excess cancer
8  risk might be.
9  Most of my work is not
10 litigation.  It's a very small
11 part of what I do.
12 BY MR. SLATER:
13 Q.  Whether it's litigation or
14 consulting, the vast majority of the work
15 that you do is for manufacturers,
16 sellers, or other entities that create
17 exposures to potentially toxic
18 substances, right?  That's who --
19 MR. GALLAGHER:  Objection to
20 form.
21 THE WITNESS:  That's not
22 correct.
23 BY MR. SLATER:
24 Q.  That's not the vast majority

Page 141

1  of the work that you do?
2  A.  No.
3  Q.  Well, we just went through a
4  bunch of matters.  I understand that
5  you've told me virtually every one that I
6  asked about it was confidential and you
7  couldn't tell me the details.  But in
8  every single matter listed where there
9  was a private client, it was the entity
10 that was either selling a product that
11 could potentially cause a toxic exposure
12 or created a situation that potentially
13 created a toxic exposure to humans,
14 right?  Every single one --
15 MR. GALLAGHER:  Objection.
16 BY MR. SLATER:
17 Q.  -- where you've done work
18 for a public entity, correct?
19 MR. GALLAGHER:  Objection to
20 form.
21 THE WITNESS:  Correct.  I do
22 work -- sometimes it's a consumer
23 product.  It's a -- supplies food
24 and they have something in their

Confidential Information - Subject to Protective Order

Page 142

1  product that they're concerned
2  about.  And we evaluate it and
3  say, yes, you have a concern, no,
4  you have a concern.
5      So sometimes it's a consumer
6  product.  It may be a corporation,
7  but it's done the same thing, or a
8  pharmaceutical company, or it's --
9  or we do a lot of work for
10 regulatory agencies also, I'd say
11 40 percent of my work over the
12 last year has been for a
13 regulatory agency.
14     I'm not going to say who it
15 is, but probably only 20 percent
16 of my work is litigation.
17 BY MR. SLATER:
18     Q.   You're not going to tell me
19 who the regulatory agency is?
20     A.   That's confidential.  It's
21 not my client.
22     Q.   Okay.  Looking now there's a
23 heading on Page 9.  It says
24 "Miscellaneous Projects."  The first one

Page 143

1  says, "Evaluation of a possible cancer
2  cluster.  Study potential cancer clusters
3  and whether these were relating to
4  environmental exposures to dioxin."
5      Who was your client in that
6  matter?
7      A.   Again, that's confidential.
8  It's an ongoing case.  I don't feel
9  comfortable talking about that.
10     Q.   Are you retained by the
11 entity that released the dioxin into the
12 environment?
13     MR. GALLAGHER:  Object.  I
14 caution you to the extent
15 answering the question would force
16 you to disclose --
17 BY MR. SLATER:
18     Q.   Well, we know it's not --
19     MR. GALLAGHER:  -- anything
20 that's confidential.
21 BY MR. SLATER:
22     Q.   We know -- let me ask it
23 differently.
24     We know you're not retained

Page 144

1  by the plaintiffs who claimed they were
2  harmed by the dioxin, because you already
3  told us that you're not doing work for
4  plaintiffs.  So you're working on behalf
5  of the entity that is being sued for
6  releasing dioxin into the environment,
7  correct?
8      MR. GALLAGHER:  Objection to
9  form.  Again, to the --
10     THE WITNESS:  This is
11 confidential.  I can't talk about
12 this case.
13 BY MR. SLATER:
14     Q.   You can't tell me which
15 side -- well, rephrase.
16     You're not representing the
17 plaintiff -- you're not -- rephrase.
18     You are not working on
19 behalf of the plaintiff there, right?
20     MR. GALLAGHER:  Objection to
21 form.
22     THE WITNESS:  I am --
23     MR. GALLAGHER:  Asked and
24 answered.  Go ahead.

Page 145

1      THE WITNESS:  We're working
2  for -- we are working for
3  defendant.  But you can't assume
4  that they released anything.
5  You're -- it's --
6  BY MR. SLATER:
7      Q.   The alleged release of
8  dioxin into the environment.  Is that
9  what you're saying?
10     A.   Correct.
11     MR. GALLAGHER:  Objection to
12 form.
13     THE WITNESS:  Correct.
14 BY MR. SLATER:
15     Q.   The last entry here says,
16 "Lead toxicity presentations.  Summarized
17 the regulatory standards for lead and the
18 toxicity of lead based on target organs
19 and presented information to companies at
20 their request."
21     Are you saying that over the
22 years you've provided consulting work to
23 companies who wanted information about
24 the toxicity of lead?

Confidential Information - Subject to Protective Order

Page 146

1    A.   There was two presentations
2  on this.  And this is a very long time
3  ago.  I would say probably over 20 years
4  ago.  Companies that had maybe some
5  elevated lead in their workers and they
6  just wanted some information on toxicity
7  and, you know, what levels were of
8  concern and which were not of concern.
9        I did another presentation
10 for kind of another -- it was like a
11 general meeting or -- some kind of
12 manufacturers, just kind of let them know
13 what was of concern and not of concern.
14    Q.   Did you tell them, "Don't
15 worry, lead is not toxic to humans.  You
16 have nothing to worry about"?
17    A.   No.
18    Q.   Is lead toxic to humans?
19    A.   It can --
20        MR. GALLAGHER:  Objection to
21    form.
22        THE WITNESS:  It can be at
23    certain concentrations.
24 BY MR. SLATER:

Page 147

1    Q.   Are you aware of any
2  circumstances that have ever occurred in
3  the United States of America where lead
4  exposure at sufficient concentrations
5  occurred so that people developed
6  diseases as a result?  Has that ever
7  happened in the history of the United
8  States, to your knowledge?
9    A.   Yes.  Yes.  I mean, there's
10 children who ingest too much soil or too
11 much paint with high levels of lead from
12 the '40s or '50s can get elevated blood
13 lead levels and have to undergo
14 treatment.  So, yes, it has occurred.
15    Q.   How about drinking water,
16 are you aware of any circumstance where
17 levels of lead in drinking water was
18 toxic to humans?
19    A.   There has been instances
20 where lead from old plumbing in homes has
21 caused increased levels of lead in
22 certain drinking water.  I would have to
23 have the concentrations and do that to
24 tell if they were sufficient to cause

Page 148

1  blood lead elevations, versus other
2  sources.
3    Q.   Looking now at the heading
4  "Publications," is that a list of your
5  publications?
6    A.   Yes.  And as I said, there
7  may have been a couple more that I've
8  added since April.
9    Q.   At the bottom of Page 9,
10 there's one from 2016, "The role of
11 systematic review in the practice of
12 toxicology and risk assessment:  In
13 appreciation for the primary tool in
14 evidence-based practices."  Do you see
15 that -- "approaches."
16        Do you see that?
17    A.   Yes.
18    Q.   Did you perform a systematic
19 review in this matter?  And the reason
20 that I'm asking --
21    A.   I was not --
22    Q.   Let me just -- because I
23 read your report, and I didn't see any
24 reference to you performing a systematic

Page 149

1  review.  I'm assuming the answer is no,
2  but I want to confirm that.
3    A.   That's correct.
4    Q.   To your knowledge, did
5  anybody in this matter perform a
6  systematic review of any expert?
7        MR. GALLAGHER:  Objection to
8    form.
9        THE WITNESS:  I would -- I
10    would defer to other experts and
11    how they would characterize their
12    process or their methods or their
13    review.
14 BY MR. SLATER:
15    Q.   Did you read all the expert
16 reports in this case from all the defense
17 experts and all the plaintiff experts?
18 Is that your understanding?
19    A.   Yes, I did.
20    Q.   Did any of them indicate in
21 their reports that they performed a
22 systematic review?
23    A.   I can't recall right now if
24 they used those specific words, no.

Confidential Information - Subject to Protective Order

Page 150

1    Q.   Did you see in any of the
2  reports -- well, rephrase.
3         In reading the reports, did
4  you determine that any of the experts for
5  either side did perform a systematic
6  review, whether they called it that or
7  not?  Did you see anybody perform a
8  systematic review?
9         MR. GALLAGHER:  Object to
10        form.
11        THE WITNESS:  I mean, in
12        reviewing, for example,
13        Dr. Fryzek's expert report as far
14        as epi evidence, it appeared that
15        he used methods that you would use
16        in a systematic review.
17  BY MR. SLATER:
18    Q.   But you're not sure if he
19  did a full-blown systematic review or
20  not?
21        MR. GALLAGHER:  Objection to
22        form.
23        THE WITNESS:  It appeared
24        that he completed a systematic

Page 151

1    review, and I know he has
2    experience in that area.
3  BY MR. SLATER:
4    Q.   What is a systematic review?
5    A.   It's where you ask a
6  question -- it's where you ask a
7  question, it's a very, very specific
8  question of what you're looking for.  And
9  you provide -- you conduct a targeted
10  literature search.
11        And then you do the
12  literature search.  You identify the
13  papers that are specific to your question
14  that you're asking.  And you review
15  those -- those papers.
16        And usually you have a set
17  of criteria against which you evaluate
18  those papers, whether or not they --
19  depending on the type of paper.
20  Sometimes you can rank and rate them
21  based on the type of paper, like if it's
22  cohort versus a case report.
23        So different people have a
24  little bit different definition of

Page 152

1  systematic review or what they may or may
2  not include, depending on the issue at
3  hand and the type of evidence you're
4  looking at.
5    Q.   Can you go to Page 10,
6  please.
7    A.   Okay.
8    Q.   There's a heading that says
9  "Abstracts and Presentations."
10    A.   Yes.
11    Q.   Let me ask you, let me come
12  back to one thing.  I want to make
13  sure --
14    A.   Okay.
15    Q.   In your list of
16  publications, do any of those
17  publications address at all the toxicity
18  or potential risks associated with
19  nitrosamines, NDMA or NDEA?  I don't see
20  it.  I just want to make sure I'm not
21  missing it.
22    A.   No.
23    Q.   Looking now at the heading
24  "Abstracts and Presentations."

Page 153

1    A.   Okay.
2    Q.   Do any of those address the
3  potential toxicity or risks associated
4  with nitrosamines, NDMA, or NDEA?
5    A.   No.
6    Q.   At the top of page 11, one
7  of your abstracts is titled "Mesothelioma
8  Diagnosis:  Should Genetic Screening Be
9  Used to Evaluate Primary Site and
10  Plausibility of Asbestos Causation."
11        Do you see that?
12    A.   Yes.
13    Q.   What were you communicating
14  in that abstract?
15    A.   Basically that the thought
16  now is that for some mesothelioma
17  individuals, there's a component of
18  genetics that come into play, especially
19  some of the cases of younger age people
20  who have like a family history of
21  mesothelioma.
22        So it was just sort of an
23  introduction to that.  It is a little bit
24  older paper.

Page 154

1    I think this was eventually
2 published as a full paper, but I was not
3 an author on that.
4    Q.   There's a section headed
5 "Book Chapters."  Do any of those book
6 chapters relate to nitrosamines,
7 specifically the toxicity or risks
8 associated with nitrosamines and NDMA or
9 NDEA in particular?
10    A.   No.
11    Q.   Do any of the textbooks in
12 which those chapters were found address
13 the potential risks of nitrosamines,
14 NDMA, NDEA?  Is that addressed in any of
15 those books?
16    A.   I am not -- I do not know
17 for the books themselves.
18    Q.   The next heading is
19 "Seminars and Continuing Education."
20    Do any of those relate to
21 potential risks of nitrosamines NDMA or
22 NDEA?
23    A.   No.
24    Q.   Let's go now if we could to

Page 155

1 Exhibit B to the report, which I guess
2 we'll mark as Exhibit 5.
3    (Document Marked for
4    identification as Exhibit
5    Britt-5.)
6    THE WITNESS:  So that would
7 be Exhibit 3?
8    MR. GALLAGHER:  It's
9 Exhibit 5.
10 BY MR. SLATER:
11    Q.   Testimony experience of
12 January K. Britt, Ph.D., 2016 to 2021.
13    A.   Exhibit 4?
14    MR. GALLAGHER:  Exhibit B to
15 your report.  Exhibit 5, if you
16 refresh.
17    THE WITNESS:  Okay.
18 BY MR. SLATER:
19    Q.   Is this a complete list of
20 all testimony that you've provided from
21 2016 to the present?
22    A.   Yes.
23    Q.   During that time period, do
24 you know how many reports you have

Page 156

1 written where you were not either deposed
2 or didn't testify?
3    A.   I would say approximately
4 20, 15 to 20.
5    Q.   Did any of these litigated
6 matters listed on this Exhibit B, which
7 is Exhibit 5, relate at all to
8 nitrosamines, the risks thereof,
9 including NDMA or NDEA?
10    A.   No.
11    Q.   Let's go to Exhibit C now.
12    MR. SLATER:  Mark that as
13 Exhibit 6.  This is exhibit C to
14 the report of Dr. Britt.
15    (Document Marked for
16    identification as Exhibit
17    Britt-6.)
18 BY MR. SLATER:
19    Q.   This document just indicates
20 what your fee schedule is.  Is that
21 accurate for what you've been charging in
22 this matter?
23    A.   Yes.
24    MR. SLATER:  Chris, do you

Page 157

1 have -- let's mark as Exhibit 7,
2 Chris, and put up the invoice or
3 the collection of invoices, I
4 should say.
5    (Document Marked for
6    identification as Exhibit
7    Britt-7.)
8    MR. GEDDIS:  Do you want
9 them all combined?  I'm just going
10 to have to put them together.
11    MR. SLATER:  You gave them
12 to me stapled together.
13    MR. GEDDIS:  That is true.
14    MR. SLATER:  I don't think I
15 want to do them one at a time.  I
16 think that will take a while.
17    Is that something that we
18 can do?
19    MR. GEDDIS:  No.
20    MR. SLATER:  I'm sorry.  No
21 what?  You can't put them
22 together?
23    MR. GEDDIS:  I'm putting
24 them together.  But I need to do

Confidential Information - Subject to Protective Order

---

Page 158

1    it.
2           MR. SLATER:  All right.
3    We'll come back to them then.
4           You know what, Chris, just
5    put up the first one.  4/15/19.
6    Then during a break you can scan
7    them or have someone scan them in
8    and send them to you, and then we
9    can just identify it.  But let's
10   go to April 15, 2019.  Mark that
11   as Exhibit 7.
12          MR. GEDDIS:  They are all in
13   the exhibit now.
14          MR. SLATER:  I'm sorry,
15   Chris.  What did you say?
16          MR. GEDDIS:  They are all
17   Exhibit 7 now.
18          MR. SLATER:  Oh, they're all
19   combined?
20          MR. GEDDIS:  Yes.
21          MR. SLATER:  But they're not
22   in any sort of an order, I guess,
23   right, because the one up on the
24   screen is August 11, 2020?

---

Page 159

1           Look, just leave it.
2    Just -- if you can get to the
3    first one, that would be great.
4    If they're in order, that would be
5    awesome.  But I don't want to take
6    a lot more time on it.
7           Chris, can you put it up,
8    please?  I don't care which one is
9    first.  I just want to move on.
10          Chris, please just put the
11   combined invoices on the screen.
12          Perfect.  Okay.
13   BY MR. SLATER:
14      Q.   On the screen we have
15   Exhibit 7, which is the invoices that we
16   were provided by defense counsel.  And
17   the first one is April 15, 2019.
18          First question, is that the
19   first invoice in this matter?
20          MR. GALLAGHER:  I don't
21   think what's on the screen is the
22   exhibit.  What's on the screen is
23   a 21-page document.  And the
24   exhibit that I have is 16 pages.

---

Page 160

1           MR. SLATER:  I don't know
2    what -- I don't understand.
3           MR. GALLAGHER:  I'm saying
4    what you have on the screen is not
5    the document.
6           MR. SLATER:  April 15, 2019
7    invoice.  Is that the invoice
8    that's on the screen?
9           MR. GALLAGHER:  Okay.
10   There's a new Exhibit 7 uploaded.
11          THE WITNESS:  Oh, is there?
12          MR. GALLAGHER:  It's called
13   Exhibit 7 complete.
14          THE WITNESS:  There it is.
15          MR. GALLAGHER:  Thank you.
16   BY MR. SLATER:
17      Q.   Okay.  Start over.
18          Exhibit 7 is the invoices we
19   were provided by defense counsel.
20          Are those all the invoices
21   that you have provided to defense counsel
22   since the start of your retention in this
23   matter?
24          Are these your invoices,

---

Page 161

1    Doctor?
2       A.   Yeah, I'm trying to make
3    sure they are all through -- 8/21.  Yeah,
4    this should be all of them.
5       Q.   The first one is April 15,
6    2019.  Is that when you were first
7    retained in this matter?
8       A.   Yes, that's the approximate
9    date.
10      Q.   This is on a -- I'm going to
11   call it a letterhead of IMS Expert
12   Services.  What is that company?
13      A.   That's a company that I
14   guess is best described as they help
15   individuals locate experts for whatever
16   needs they might have for consulting.
17      Q.   Were you retained through
18   IMS Expert Services in this matter?
19      A.   Yes, and they -- they are
20   the ones that contacted me initially.
21      Q.   So --
22      A.   I was retained through them.
23      Q.   So if I understand
24   correctly, the Duane Morris lawyers went

---

Confidential Information Subject to Protective Order

Page 162

¹ to IMS Expert Services, would have said
² something to the effect of we're looking
³ for a toxicologist for this matter, and
⁴ IMS identified you and put you in touch
⁵ with Duane Morris, and that's how you got
⁶ involved in this matter?  Am I correct?
⁷          MR. GALLAGHER:  Objection to
⁸     form.
⁹          THE WITNESS:  I'm not aware
¹⁰    of the background of how I was
¹¹    contacted or who would have talked
¹²    to who.
¹³ BY MR. SLATER:
¹⁴    Q.   If you were hired directly
¹⁵ and they didn't go through IMS, IMS
¹⁶ wouldn't be involved, right?
¹⁷          MR. GALLAGHER:  Objection to
¹⁸    form.
¹⁹          THE WITNESS:  Can you repeat
²⁰    that?
²¹ BY MR. SLATER:
²²    Q.   Sure.  If the Duane Morris
²³ lawyers had come to your company
²⁴ directly, not through IMS, but had just

Page 163

¹ come to you directly to hire you, IMS
² wouldn't be involved, right?
³          MR. GALLAGHER:  Objection to
⁴     form.
⁵          THE WITNESS:  That's
⁶     correct.
⁷ BY MR. SLATER:
⁸     Q.   So we can agree that Duane
⁹ Morris went to IMS, described the type of
¹⁰ expertise or described this case or
¹¹ whatever they told them, and IMS then
¹² connected Duane Morris with you correct?
¹³          MR. GALLAGHER:  Objection to
¹⁴    form.  Objection to form.
¹⁵          THE WITNESS:  Correct.
¹⁶ BY MR. SLATER:
¹⁷    Q.   Who is paying IMS Expert
¹⁸ Services for your involvement in this
¹⁹ matter?
²⁰          MR. GALLAGHER:  Objection to
²¹    form.
²²          THE WITNESS:  I am assuming
²³    Duane Morris, the people I'm
²⁴    representing or working for are

Page 164

¹ paying IMS.
² BY MR. SLATER:
³    Q.   Do you know what IMS is
⁴ being paid in connection with your work
⁵ in this litigation?
⁶    A.   I do not.
⁷          MR. SLATER:  We're
⁸    requesting that information.
⁹          THE WITNESS:  Yes.
¹⁰          MR. GALLAGHER:  We'll take
¹¹    it under advisement.
¹²          MR. SLATER:  I'm saying
¹³    that -- I'm saying that more for
¹⁴    the record.
¹⁵          MR. GALLAGHER:  Yep.
¹⁶ BY MR. SLATER:
¹⁷    Q.   Is IMS doing anything in
¹⁸ connection with this case other than what
¹⁹ they've done so far, which is connect you
²⁰ with Duane Morris and issue your
²¹ invoices?  Have they had any other --
²²          MR. GALLAGHER:  Objection to
²³    form.
²⁴          THE WITNESS:  Have they had

Page 165

¹    any other -- what was the last
²    part?  I'm sorry.
³ BY MR. SLATER:
⁴    Q.   Involvement.
⁵    A.   No.
⁶    Q.   For example, are they
⁷ helping do research or are they helping
⁸ prepare exhibits, or are they doing
⁹ anything in connection with your
¹⁰ involvement in this case, to your
¹¹ knowledge?
¹²    A.   No.
¹³    Q.   Is your firm -- well,
¹⁴ rephrase.
¹⁵          Does your company pay IMS
¹⁶ when they identify you as an expert and
¹⁷ you're then retained in a matter?
¹⁸    A.   Could you repeat that?
¹⁹    Q.   Let me ask you this.  Does
²⁰ your company pay IMS for the fact that
²¹ they're -- that they have you on their
²² list, first of all?
²³    A.   No.  No.  No.
²⁴    Q.   When you get retained

Confidential Information - Subject to Protective Order

Page 166

¹ through IMS's services, does your company
² pay IMS?
³     A.   No.  No.
⁴     Q.   Has your company paid
⁵ anything to IMS in connection with the
⁶ valsartan litigation?
⁷     A.   No.
⁸     Q.   So to your knowledge, any
⁹ payments to IMS would have been made by
¹⁰ Duane Morris or the defendants together,
¹¹ to your knowledge?
¹²     A.   Correct.
¹³     Q.   I've added up all the
¹⁴ amounts.  Actually, I'm not going to make
¹⁵ that up.
¹⁶         Somebody added up all the
¹⁷ amounts on these invoices between
¹⁸ April 15, 2019, and the last invoice we
¹⁹ have, October 23 -- rephrase.  Let me
²⁰ withdraw that.
²¹         We added up the amounts of
²² each of the invoices, with invoice dates
²³ April 15, 2019, through the last date we
²⁴ see of September 8th, 2021, and came up

Page 167

¹ with a number of 274,606.20.  Does that
² sound about right for what you invoiced
³ through September 8, 2021?
⁴     A.   I have not added them up.
⁵ So I would have to add them up.
⁶     Q.   I'm also advised that
⁷ there's work done where -- rephrase.
⁸         I'm also advised that these
⁹ invoices include charges for them -- for
¹⁰ IMS finding articles, which is not
¹¹ included in that amount.
¹²         So I'm putting that aside in
¹³ that amount.
¹⁴         Does your answer remain the
¹⁵ same, you haven't added them up?
¹⁶         MR. GALLAGHER:  Objection to
¹⁷     form.
¹⁸         THE WITNESS:  Correct.
¹⁹ BY MR. SLATER:
²⁰     Q.   Why is IMS obtaining
²¹ literature?  Why are they doing that?
²²         MR. GALLAGHER:  Objection to
²³     form.
²⁴         THE WITNESS:  I wasn't aware

Page 168

¹ that they were.  I usually -- our
² library gets those articles either
³ through RightFind or our
⁴ librarian -- or my librarian gets
⁵ it through her sources.
⁶ BY MR. SLATER:
⁷     Q.   So any charges that you see
⁸ here for obtaining literature, you would
⁹ expect that that was work that your firm
¹⁰ performed and charged for, correct?
¹¹     A.   Correct.  I don't interact
¹² with IMS on any -- anything related to my
¹³ report.
¹⁴     Q.   Why does IMS issue the
¹⁵ invoices?  Why doesn't your company issue
¹⁶ the invoices?
¹⁷         MR. GALLAGHER:  Objection to
¹⁸     form.
¹⁹         THE WITNESS:  That's just
²⁰     the arrangement that was agreed
²¹     upon.
²² BY MR. SLATER:
²³     Q.   Is there also an arrangement
²⁴ that if you perform future work for this

Page 169

¹ client, that IMS will also be paid for --
² in connection with that work in the
³ future as well, since they've introduced
⁴ you to this client?
⁵     A.   No.
⁶     Q.   So you can get introduced
⁷ one time, do the assignment, and then go
⁸ work for that client going forward
⁹ without telling IMS or paying them?
¹⁰         MR. GALLAGHER:  Objection to
¹¹     form.
¹²         THE WITNESS:  I do not know.
¹³     I do not know the answer.  I don't
¹⁴     know what -- that's never
¹⁵     occurred, so I don't know the
¹⁶     answer to that.
¹⁷ BY MR. SLATER:
¹⁸     Q.   Do you have -- rephrase.
¹⁹         Can you tell me how much
²⁰ time has been spent on this matter since
²¹ the September 8, 2021 invoice?
²²     A.   Probably been another
²³ 40 hours.
²⁴     Q.   And what has that been --

Confidential Information - Subject to Protective Order

Page 170

1 rephrase.
2         And what have you done in
3 those approximate 40 hours?
4     A.   Just, you know, get ready
5 for this deposition.
6     Q.   So you've spent 40 hours
7 preparing for the deposition
8 approximately?
9     A.   Well, reviewing new
10 materials or new reports that were sent
11 last minute.
12     Q.   I have not been provided any
13 supplemental expert reports indicating
14 any change to your opinions.  So am I
15 correct that the opinions in your report
16 have remained the same, regardless of
17 anything that you've seen since you
18 issued your original report?
19     A.   Yes.
20         MR. SLATER:  Let me go off
21 the record for a second.
22         THE VIDEOGRAPHER:  The time
23 right now is 12:07 p.m.  We are
24 off the record.

Page 171

1         (Short break.)
2         THE VIDEOGRAPHER:  The time
3 right now is 12:25 p.m.  We're
4 back on the record.
5         MR. SLATER:  Okay.  We're
6 back on, right?
7 BY MR. SLATER:
8     Q.   When did you --
9         THE VIDEOGRAPHER:  We're
10 back on.
11         MR. SLATER:  Okay.
12 BY MR. SLATER:
13     Q.   When did you first become
14 aware of the contamination of valsartan
15 with NDMA and NDEA?
16         MR. GALLAGHER:  Objection to
17 form.
18         THE WITNESS:  I do not
19 recall the specific date.
20 BY MR. SLATER:
21     Q.   Did you know about it before
22 you were contacted to work in this
23 litigation?
24         MR. GALLAGHER:  Objection to

Page 172

1 form.
2         THE WITNESS:  I believe I --
3 I had seen it in the news or
4 CNN.com.
5 BY MR. SLATER:
6     Q.   Had you done any reading or
7 research on the topic before you were
8 retained?
9     A.   No.
10     Q.   So you may have seen a news
11 report about it, but you didn't go any
12 deeper, that was the sum total of your
13 knowledge about this situation before you
14 were contacted?
15     A.   Yes.
16         MR. SLATER:  I think the
17 next exhibit is eight.
18         Chris, could you put up the
19 article titled "How Industry
20 Scientists Stalled Action on
21 Carcinogen."
22         Exhibit 8, please.
23         (Document Marked for
24 identification as Exhibit

Page 173

1 Britt-8.)
2 BY MR. SLATER:
3     Q.   Doctor, have you ever seen
4 this article?
5     A.   No, I don't recall seeing
6 this article.
7     Q.   This starts off right under
8 the title and says, "For the past
9 60 years, water polluted with chromium
10 has plagued Hinkley, California, the
11 dessert town made famous by the film Erin
12 Brockovich.  Although residents there won
13 their lawsuit against the polluter,
14 Pacific Gas & Electric Company, there's
15 still a debate over whether the compound
16 causes cancer in drinking water.  The
17 Environmental Protection Agency says yes,
18 but industry scientists disagree."
19         Do you see that?
20     A.   Yes.
21     Q.   First of all, has your firm
22 ever been retained by Pacific Gas &
23 Electric Company?
24     A.   Repeat the question.

Confidential Information - Subject to Protective Order

Page 174

1    Q.   Has your firm ever been
2 retained by Pacific Gas & Electric
3 Company?
4    A.   I do not know.
5    Q.   Let's go to Page 2 out of 11
6 of this article.
7    A.   Okay.
8    Q.   The second paragraph says,
9 "Some of the most powerful voices in the
10 debate are companies with a stake in the
11 outcome.
12        They've hired scientists to
13 convince regulators that the chemical
14 compound is safe.  The lawsuit that
15 Brockovich championed was merely the
16 beginning of an intriguing tale about
17 corporate manipulation of science?"
18        Do you see that?
19    A.   Okay.  Okay.  I see that.
20    Q.   As a general matter, would
21 you agree with me that to the extent that
22 corporate manipulation of science has
23 occurred in any context involving
24 potentially toxic substances, that would

Page 175

1 be a bad thing?
2        MR. GALLAGHER:  Objection to
3    form.
4        THE WITNESS:  Repeat the
5    question.
6 BY MR. SLATER:
7    Q.   Sure.  Would you agree with
8 me as a general matter that any corporate
9 manipulation of science in the context of
10 a potential toxic exposure, would be a
11 bad thing?
12        MR. GALLAGHER:  Objection to
13    form.
14        THE WITNESS:  Can you define
15    "corporate manipulation"?
16 BY MR. SLATER:
17    Q.   I would define corporate
18 manipulation of science as corporations
19 hiring scientists to advance scientific
20 positions that are not valid for the
21 pecuniary gain of those corporations.
22    A.   Yeah, I would agree that you
23 would not want to hire a science --
24 scientist that was going to advance --

Page 176

1 advance your -- the science towards --
2 just for your gain.  Yes, I agree.  That
3 would not be a good thing.
4    Q.   As a toxicologist, it would
5 never be ethical for you to engage in the
6 corporate manipulation of science or to
7 assist in the corporate manipulation of
8 science, correct?
9    A.   As you define manipulation,
10 that's correct.
11    Q.   Would it also be unethical
12 to deliberately advance a one-sided
13 position on a question of whether a toxic
14 exposure is potentially harmful to
15 humans?
16        MR. GALLAGHER:  Objection to
17    form.
18        THE WITNESS:  Repeat that
19    question.
20 BY MR. SLATER:
21    Q.   Sure.  Would it be unethical
22 for you as a toxicologist to advance a
23 position that is one-sided, deliberately
24 one-sided, to only focus on some of the

Page 177

1 evidence in order to advance a corporate
2 position that a toxic exposure was not
3 dangerous to humans?
4        MR. GALLAGHER:  Objection to
5    form.
6        THE WITNESS:  Can you define
7    "deliberately one-sided"?
8 BY MR. SLATER:
9    Q.   Knowing that there's other
10 scientific information of significance
11 that's directly relevant to the points
12 that you're making, and you deliberately
13 don't reference the other side of the
14 coin.
15        MR. GALLAGHER:  Objection to
16    form.
17        THE WITNESS:  I guess I --
18        yeah, I agree.  You should always
19        look at all the evidence and then
20        reach a conclusion based on
21        overall totality and strength of
22        the evidence.  That's what I was
23        saying earlier about the
24        caprolactam or anything, you know,

Page 178

 1    where the government wants your
 2    input.  If you got input or
 3    someone's got input, whoever wants
 4    to respond or input, has the
 5    ability to do it.  That's what
 6    transparency is about, so it's not
 7    one-sided.
 8  BY MR. SLATER:
 9    Q.   Let's go back to this
10  article now, the third paragraph on
11  Page 2 out of 11.  I'm going to read
12  through this by way of context to lead up
13  to part of the article a little further
14  down.
15        It says, "In 2008, the
16  national toxicology program, part of the
17  National Institutes of Health, published
18  ground breaking research detailing how
19  mice and rats that drank heavy doses of a
20  toxic form of chromium called chromium-6
21  developed cancerous tumors.  The findings
22  prompted the Environmental Protection
23  Agency to act."
24        Do you see that?

Page 179

 1    A.   Yes, I see that.
 2    Q.   And do you understand what
 3  the National Institutes of Health is?
 4    A.   The National -- the National
 5  Toxicology Program or -- yes, yes, I know
 6  who that is.  Yeah.
 7    Q.   What is the NIH?
 8    A.   It's part of the government
 9  that conducts research and oversees
10  health.  National Toxicology Program is
11  part of that.  It's sort of a research
12  arm.  They conduct some kind of generic
13  chronic cancer bioassays in animals.
14    Q.   Going down to the next
15  paragraph, this states, "EPA scientists
16  evaluated hundreds of studies and
17  concluded that chromium-6 likely causes
18  cancer in people who drink it.  The
19  agency in 2011 was on the verge of making
20  its scientists' findings official, a
21  first step toward forming more stringent
22  clean water rules.
23        "But last year, it bowed to
24  pressure and announced it was going to

Page 180

 1  wait for new studies being paid for by
 2  the chemical industry."
 3        Do you see that?
 4    A.   Yes.
 5    Q.   By the way, when did you
 6  start working at ToxStrategies?
 7    A.   I believe it was 2012.
 8    Q.   Reading further down.
 9        "To lead those studies, the
10  American Chemistry Council, the
11  industry's main trade group and
12  lobbyists, hired ToxStrategies Inc., a
13  Texas-based firm with scientists
14  experienced in poking holes in research
15  that links chromium to cancer.
16        The company describes its
17  business this way on its website:  'We
18  often interact and collaborate with
19  regulatory, academic, and industrial
20  professionals to ensure that the most
21  appropriate science is incorporated into
22  each assessment?'"
23        Do you see that?
24    A.   Yes.

Page 181

 1    Q.   And you're aware, are you
 2  not, that ToxStrategies was retained by
 3  the American Chemistry Council to lead
 4  the studies to try to establish that
 5  chromium-6 was not cancerous to humans,
 6  right?
 7        MR. GALLAGHER:  Objection to
 8    form.
 9        THE WITNESS:  I -- that was
10    before I was hired.  And I do not
11    know -- I know that -- you know,
12    we've -- some people at our
13    company have done chromium work.
14    But I do not know the details of
15    that work or who the clients are.
16  BY MR. SLATER:
17    Q.   Were you aware that your
18  company was hired as described in this
19  article?
20        MR. GALLAGHER:  Objection to
21    form.
22        THE WITNESS:  I do not have
23    any knowledge of this, no.
24  BY MR. SLATER:

Confidential Information - Subject to Protective Order

Page 182

1    Q.   You're learning about the
2  involvement of ToxStrategies, Inc., in
3  this matter that I'm reading to you about
4  here, with the chromium-6, you're
5  learning about it for the first time
6  right now as we're reading through this
7  article?
8          MR. GALLAGHER:  Objection to
9      form.
10         THE WITNESS:  Like I said, I
11     know that there are some
12     individuals at our company that do
13     chromium-6 or have -- you know,
14     are interested in chromium-6, have
15     looked at chromium -- chromium-6,
16     published papers on it.
17         But I don't follow chromium
18     to any great degree.  I know a
19     little bit about it, but I am not
20     sure of the inner workings of
21     anything described in here.
22         MR. SLATER:  I want to go to
23     another document.  And of course,
24     I'm going to skip one that we

Page 183

1   discussed.  I want to go to the
2   heading Natural Resources Defense
3   Council.
4          (Document Marked for
5      identification as Exhibit
6      Britt-9.)
7  BY MR. SLATER:
8      Q.   In front of you, Doctor, we
9  have --
10         MR. GALLAGHER:  Is it in
11     front of her yet?  Is this an
12     exhibit?
13         MR. SLATER:  I'm sorry.
14     What are you asking, Patrick?  Is
15     this an --
16         THE WITNESS:  It just popped
17     up.
18         MR. SLATER:  It's Exhibit 9.
19         THE WITNESS:  We have a
20     little bit of a delay here.
21         MR. GALLAGHER:  Got it.
22         THE WITNESS:  I have it.
23  BY MR. SLATER:
24     Q.   On the screen we have

Page 184

1  Exhibit 9, which is an August 16, 2018,
2  set of comments from the Natural
3  Resources Defense Council on the
4  Environmental Protection Agency's TSCA
5  systematic review.
6          Do you see that?
7      A.   Yes.
8      Q.   Are you familiar with this
9  issue?
10     A.   I have not -- I have not
11  seen this document.
12     Q.   This says -- rephrase.
13         To give a little more detail
14  right on the front page, it says,
15  "Comments on the application of the TSCA
16  systematic review to the exposure and use
17  assessment and human health and
18  environmental hazard summary for five PBT
19  chemicals."  And then there's an EPA
20  number.
21         Do you know what PBT
22  chemicals are?
23     A.   Persistent, biopersistence.
24  I can't remember what the T stands for.

Page 185

1  Usually chemicals that persist in nature.
2      Q.   Let's go now to Page 7,
3  please.
4      A.   Okay.
5      Q.   Looking at Page 7, the first
6  full paragraph says, "The TSCA systematic
7  review fails to account for the
8  significance of rare adverse outcomes in
9  studies with limitations or a lower
10  statistical significance."
11         Do you see that?  Do you see
12  that sentence that I just read?
13     A.   Yes.  I see it.  Yes, I see
14  it.
15     Q.   Do you agree with me that in
16  evaluating a question of causation or
17  potential causation, it's important to
18  account for the significance of rare
19  adverse outcomes in studies with
20  limitations or a lower statistical
21  significance?
22     A.   If I'm reading this right,
23  they're saying that the EPA assessment
24  does not properly account for adverse

Confidential Information - Subject to Protective Order

Page 186

1 outcomes, study limitations or if they've
2 got a low significance. I believe if
3 there is something statistically
4 significant, it needs to be considered.
5 But I don't know if they're -- I'm not
6 sure how they are defining lower
7 statistical significance.
8        Certainly if the study has
9 got significant limitations, it renders
10 it unreliable. It doesn't need to be
11 included in a systemic -- systematic
12 review. So I'm not sure of the context
13 that NRDC was writing this sentence. I
14 haven't reviewed this whole, entire
15 document, so.
16        Q.   My question was more a
17 general question. I'll try to ask it a
18 little bit more differently.
19        A.   Okay.
20        Q.   In order to have a valid
21 methodology, is it important to account
22 for the significance of rare adverse
23 outcomes that may result from a toxic
24 exposure?

Page 187

1        MR. GALLAGHER:  Objection to
2 form.
3        THE WITNESS:  It's important
4 to consider if something is a rare
5 adverse outcome, there's -- you
6 should look at the study type, if
7 it was the correct study to look
8 at rare adverse outcomes.
9 There're certain study types that
10 are better at looking at.
11        There's ways of looking at
12 background control data if you're
13 looking at animal studies.
14        So I think it's important
15 that you do it. But you've got to
16 look at how you do it.
17        So like, again, I'm not sure
18 what the context of what they were
19 seeing here.
20 BY MR. SLATER:
21        Q.   Well, I'll read a little
22 further --
23        A.   So if you could --
24        Q.   Yeah, sure. I'm going to

Page 188

1 read a little further now in the context
2 of this document, and then that will lead
3 us up as context to the next paragraph.
4        This document states, "We
5 are particularly concerned that the EPA
6 Toxics Office plans to use its systematic
7 review to discard the scientific evidence
8 linking the rare outcome of congenital
9 heart defects with trichloroethylene
10 (TCE).
11        "The heart effects are rare
12 but can be disabling or even deadly.
13 Based on a transparent systematic review
14 of the scientific evidence, EPA
15 scientists determined that there were
16 some uses of TCE in consumer and
17 industrial products that were so
18 dangerous they should be discontinued.
19 In particular, EPA scientists had raised
20 concerns with low dose exposures during
21 pregnancy that could lead to permanent
22 heart malformations in the developing
23 fetus."
24        Do you see what I just read?

Page 189

1        A.   Yes.
2        Q.   Now, continuing, they state,
3 "However, recently the ToxStrategies
4 consulting firm published a list of
5 biases with the TCE heart studies that it
6 contends should make the study unusable
7 for regulatory purposes. Its analysis
8 and conclusion follow the criteria laid
9 out in the TSCA systematic review.
10 Significantly, ToxStrategies received
11 funding from Entek" -- E-N-T-E-K --
12 "International, whose Oregon-based
13 battery parts operations have been
14 repeatedly fined for violations related
15 to its TCE pollution, including allegedly
16 poisoning its workers."
17        And it points to an article
18 in The Oregonian, May 6, 2017.
19        "Thus ToxStrategies itself
20 also had a financial bias, something that
21 the TSCA systematic review does not
22 include in the risk of bias analysis as
23 discussed further below?"
24        Do you see that?

Page 190

1    A.   I see that.
2    Q.   First of all, are you
3 familiar with this situation, which this
4 document was dated August 16, 2018?
5        MR. GALLAGHER:  Objection to
6    form.
7        THE WITNESS:  No.  I have
8    not seen this particular -- no,
9    I've not seen this document.
10 BY MR. SLATER:
11   Q.   Are you familiar with this
12 TSCA systematic review issue, or are you
13 telling me --
14   A.   No.
15   Q.   -- you're hearing about this
16 one far the first time also?
17       MR. GALLAGHER:  Objection to
18   form.
19       THE WITNESS:  I have not
20   seen the five PBT TSCA systematic
21   review.  I was unaware of this
22   specific issue.  I know that there
23   is in general controversy about
24   the effects of TCE in the heart

Page 191

1 based on animal studies and how
2 they are extrapolated to humans.
3        I suspect that they are
4 talking about the Johnson study
5 here.
6        This is something that's
7 been considered for many, many
8 years.  They've tried to recreate
9 the Johnson study in animals, and
10 they've had a hard time.
11       As far as it relates to this
12 specifically, I do not know.  And
13 I know that's something that I've
14 looked at this before in other
15 matters before the years, it's
16 been -- it's been an issue in the
17 scientific committee so --
18 community.
19       But as far as it relates to
20 this specific NRDC document, I've
21 not seen it, and I'm not aware of
22 the specific Oregon battery --
23 Oregon-based battery parts
24 operation.  I'm not aware of this.

Page 192

1        MR. SLATER:  You can take
2    that down.  Let's go to the next
3    article.  That is Exhibit 10.
4    FERC study.
5        THE WITNESS:  Okay.
6        (Document Marked for
7    identification as Exhibit
8    Britt-10.)
9 BY MR. SLATER:
10   Q.   Looking now at Exhibit 10,
11 this is an article titled "FERC Study
12 Finds No Risk From Protective Coating of
13 Mountain Valley Pipeline" dated
14 October 8, 2020.
15       And this caption talks about
16 a chalky substance being found and a
17 concern about it degrading into nearby
18 water and soil and that the federal
19 energy regulatory commission found no
20 basis for the fears about this coating.
21       Do you see that?
22   A.   Yes.  I see -- I see that.
23       MR. SLATER:  Let's go to
24   Page 2 out of 5.

Page 193

1 BY MR. SLATER:
2    Q.   Right in the middle of the
3 page there's a paragraph that says --
4 hang on one second.
5        Looking at the top of the
6 page, the second paragraph says, "In a
7 report released Thursday, the Federal
8 Energy Regulatory Commission addressed
9 concerns that had been raised about the
10 Mountain Valley pipeline."
11       And if we go down three more
12 paragraphs, this states, "The report
13 cites the conclusion of ToxStrategies, a
14 consulting firm hired by Atlantic Coast
15 that there should be no impact on human
16 health or the environment from the chalky
17 residue that forms on the pipes after
18 prolonged exposure to sunlight."  And
19 Atlantic Coast is the pipeline company.
20       Do you see what I've just
21 read?
22   A.   I see that.
23   Q.   Are you familiar with this
24 matter?

Confidential Information - Subject to Protective Order

Page 194

1          MR. GALLAGHER:  Objection to
2    form.
3          THE WITNESS:  I have not
4    heard of this matter.  It sounds
5    like the Energy Regulatory
6    Commission had -- you know, there
7    was concerns raised, and
8    ToxStrategies basically said there
9    was no -- no impact on health or
10   environment.
11         So I'm not familiar with
12   this matter.  I don't know what
13   the chemical was or anything about
14   this.
15   BY MR. SLATER:
16      Q.   We've just gone through a
17   few articles talking about various
18   matters your company has been involved
19   in.  And it's fair to say that this is
20   representative of the type of work your
21   company does.  It works on behalf of
22   industry to try to reduce or eliminate
23   regulation that could impact those
24   clients' businesses, right?

Page 195

1          MR. GALLAGHER:  Objection to
2    form.
3          THE WITNESS:  I would not
4    phrase it that way.  I say we get
5    calls or requests from --
6    sometimes it's industry.
7    Sometimes it's regulatory agencies
8    to -- where there's a concern.
9          And we evaluate the
10   literature, we look at the
11   exposure, and we look at the
12   doses, and we come to a conclusion
13   based on whatever concern or
14   alleged concern there may or may
15   not be.
16         We do all kinds of work.  We
17   do work for, like I said -- I
18   don't want to give clients' names
19   out.
20         But we do for regulatory
21   agencies all over the world, in
22   the United States, we do work for,
23   you know, companies of course that
24   provide consumer products, foods,

Page 196

1    trying to keep, you know,
2    consumers safe as far as industry.
3    So we do a wide variety of work.
4          MR. SLATER:  We can take
5    that down, Chris.
6    BY MR. SLATER:
7       Q.   Let's go back to your
8    report.
9          MR. SLATER:  Chris, we don't
10   need to put it up on the screen.
11   I think as long as the doctor has
12   a copy.  This way we can see a
13   little easier, I think.
14   BY MR. SLATER:
15      Q.   If you need it put on the
16   screen, let me know.
17      A.   Okay.
18      Q.   But this way I don't have it
19   blocking my view.
20      A.   Okay.
21      Q.   I'm looking at your report.
22   I'm on Page 10, your executive summary.
23      A.   Okay.
24      Q.   What is the purpose of the

Page 197

1    executive summary?  Is that just what it
2    says, a general summary of what you
3    looked at and a summary of your opinion?
4          MR. GALLAGHER:  Objection to
5    form.
6          THE WITNESS:  Yes, it's just
7    an overall summary of the report,
8    just condensed into a few
9    paragraphs.
10   BY MR. SLATER:
11      Q.   You start off and state, "In
12   this matter, the plaintiffs, through
13   their experts, are arguing novel
14   hypotheses that rely on many
15   uncertainties, assumptions and unknowns."
16         So I want to stop there.
17   The hypothesis that -- rephrase.
18         Using your term, the
19   hypothesis that NDMA is a human
20   carcinogen is not a novel hypothesis,
21   right?
22         MR. GALLAGHER:  Objection to
23   form.
24         THE WITNESS:  Can you repeat

Confidential Information - Subject to Protective Order

Page 198

1    your question?
2    BY MR. SLATER:
3        Q.    Sure.
4        You referred to novel
5    hypothesis.  In fact, the hypothesis that
6    NDMA is a human carcinogen is not novel,
7    correct?
8        MR. GALLAGHER:  Objection to
9    form.
10       THE WITNESS:  It's not --
11   it's not a known human carcinogen.
12       There's several regulatory
13       agencies, scientific societies,
14       that have come to that conclusion
15       after evaluating the data.
16       So in that aspect, it would
17       be novel or something that needs
18       to be considered or evaluated.
19       That's why we're here.
20   BY MR. SLATER:
21       Q.    The hypothesis that NDMA is
22   a probable human carcinogen is not novel,
23   correct?
24       MR. GALLAGHER:  Objection to

Page 199

1    form.
2        THE WITNESS:  It is a -- you
3        know, regulatory agencies such as
4        IARC and EPA have classified it as
5        a, you know, probable human
6        carcinogen based on animal data,
7        not based on -- it's not a known
8        human carcinogen.  There's not
9        sufficient data to conclude that
10       it's a human carcinogen.
11   BY MR. SLATER:
12       Q.    Coming back to my question.
13   The hypothesis that NDMA is a probable
14   human carcinogen is not novel, correct?
15       MR. GALLAGHER:  Objection to
16   form.
17       THE WITNESS:  That's
18       correct, with the caveats that I
19       have.
20   BY MR. SLATER:
21       Q.    So when you said that the
22   plaintiffs, through their experts, are
23   arguing novel hypotheses, that's not
24   entirely accurate, because the hypothesis

Page 200

1    that NDMA is a probable human carcinogen
2    is not a novel hypothesis, correct?
3        MR. GALLAGHER:  Objection to
4        form.
5        THE WITNESS:  I guess that
6        assumes that the plaintiffs are
7        not going to say it's a human
8        carcinogen.
9    BY MR. SLATER:
10       Q.    Have you read any of the
11   expert depositions of any of the
12   plaintiffs' experts?
13       A.    I have not reviewed those.
14       Q.    If the position taken by the
15   plaintiffs is that NDMA is a probable
16   human carcinogen, you would agree that's
17   not a novel position to take, right?
18       A.    That's correct.  It's still
19   not to the level of a known human
20   carcinogen.
21       Q.    You would agree with me that
22   the description of NDMA as a probable
23   human carcinogen is accurate, correct?
24       MR. GALLAGHER:  Objection to

Page 201

1    form.
2        THE WITNESS:  Correct.
3    BY MR. SLATER:
4        Q.    You refer to -- I'm sorry.
5        You refer to reliance on
6    many uncertainties, assumptions, and
7    unknowns.
8        Do you see that?
9        A.    Yes.
10       Q.    You would agree with me that
11   the plaintiffs' experts are not solely
12   relying on what you would term
13   uncertainties, assumptions, and unknowns,
14   right?
15       A.    Repeat the question.
16       Q.    Sure.
17       You referred to the
18   plaintiffs' experts relying on many
19   uncertainties, assumptions, and unknowns.
20       You say "many."
21       You're certainly not saying
22   that all of their opinions are based
23   solely on uncertainties, assumptions, and
24   unknowns, right?

Page 202

1    MR. GALLAGHER:  Objection to
2    form.
3    THE WITNESS:  Correct.
4  BY MR. SLATER:
5    Q.   You would agree with me that
6  at least, to some extent, the plaintiffs'
7  experts are relying on what you would
8  agree is solid science, right?
9    MR. GALLAGHER:  Objection to
10    form.
11    THE WITNESS:  What is your
12    definition of "solid science"?
13  BY MR. SLATER:
14    Q.   Science that encompasses a
15  valid methodology and reasonable
16  conclusions.
17    MR. GALLAGHER:  Objection to
18    form.
19    THE WITNESS:  Well, if the
20    plaintiffs' experts are going to
21    say it's a known human carcinogen,
22    I don't think that it's reached
23    that level of evidence.
24    And there's many regulatory

Page 203

1    agencies that of course have that
2    same opinion.
3  BY MR. SLATER:
4    Q.   My question is not as to
5  their conclusions.  My question has to do
6  with what they relied on in forming their
7  conclusions.  And as I just defined solid
8  science, you would agree that at last to
9  some extent, the plaintiffs' expert are
10  relying on solid science, right?
11    MR. GALLAGHER:  Objection to
12    form.
13    MR. INSOGNA:  Objection to
14    form.
15    THE WITNESS:  Some of their
16    studies I would say do not
17    contribute to any -- or not --
18    would not normally be included in
19    the overall -- or not meet the
20    criteria of what would be included
21    in a good evaluation, as can be
22    seen in other -- some of the other
23    experts, like some of the epi
24    studies.

Page 204

1    You probably need to defer
2  to Dr. Fryzek to ask him questions
3  about the certain studies.
4    But some of the information
5  I would say is not based
6  necessarily on solid science or
7  wouldn't meet overall the level of
8  what would be included, say, like,
9  when IARC included those, because
10  I'm sure they evaluated some of
11  the same studies that IARC did,
12  but they reached different
13  conclusions, so.
14  BY MR. SLATER:
15    Q.   So the flip side of what you
16  said would be accurate, that some of what
17  the plaintiffs' experts relied on, you
18  would agree is solid science, right?
19    MR. GALLAGHER:  Objection to
20    form.
21    THE WITNESS:  Some of the
22    statements they may have made
23    are -- would be accurate, correct.
24  BY MR. SLATER:

Page 205

1    Q.   In terms of whether or not a
2  person's cancer was caused or not caused
3  by NDMA or NDEA, that's a medical
4  conclusion that you're not drawing,
5  correct?
6    MR. GALLAGHER:  Objection to
7    form.
8    THE WITNESS:  Repeat the
9    question.
10  BY MR. SLATER:
11    Q.   Sure.  You told me before
12  you're not going to be providing medical
13  opinions.  Medical causation as to
14  whether a person's disease was actually
15  caused or contributed to by, in this
16  case, NDMA or NDEA, that's not something
17  you're opining on.  That's a medical
18  opinion, right?
19    MR. GALLAGHER:  Objection to
20    form.
21    THE WITNESS:  Yeah, so for a
22    specific plaintiff, like for a
23    specific -- I mean, as far -- you
24    mean diagnosis, like, for a

Confidential Information - Subject to Protective Order

Page 206

1 physician, I wouldn't be, like,
2 making an actual diagnosis of a
3 plaintiff or an individual.
4         But as far as specific
5 causation, you know, assuming that
6 there was general causation for
7 this, which there is not, you
8 know, one can go about and do a
9 dose exposure calculation to see
10 what the risk is.  But for this
11 case, you couldn't -- there would
12 be no need to do a specific
13 exposure analysis, because there's
14 no general cause of it.
15         But no, I would not be
16 diagnosing a plaintiff or doing a
17 differential diagnosis, because
18 that would be for a physician to
19 do.
20 BY MR. SLATER:
21     Q.   You say in this first
22 paragraph of your executive summary that,
23 "Accepting these premises," meaning the
24 premises of the plaintiffs' experts,

Page 207

1 "would mean that there are literally
2 hundreds if not thousands of other
3 potential chemical causes of the alleged
4 diseases that now cannot be excluded
5 objectively using a proper specific
6 causation analysis."
7         Do you see that?
8     A.   Yes.
9     Q.   So you're lumping together
10 NDMA and NDEA with hundreds if not
11 thousands of other potential chemical
12 causes?  Is that what you're saying?
13         MR. GALLAGHER:  Objection to
14 form.
15 BY MR. SLATER:
16     Q.   And you're saying they're
17 all fully uncertain?
18     A.   I'm not saying -- I'm not
19 saying they're uncertain.  I'm just
20 saying that if you're going to assume
21 that NDMA or NDEA is a human carcinogen
22 and you're going to presume they're
23 capable of causing, at these low doses,
24 someone's cancer, you need to also

Page 208

1 consider all the other hundreds or
2 thousands of chemicals, and I detailed
3 this later in the report, that we're all
4 exposed to on a daily basis, in the air,
5 diet, drugs we take, the radiation from
6 medical exams, all those different things
7 that we get.
8         And I noted too in my report
9 that Panigrahy has one paper where he
10 talks about different mechanisms of
11 cancer and he states there's basically
12 1,400 carcinogens.
13         So even Dr. Panigrahy
14 recognizes there is a multitude of
15 potential chemicals out there that, you
16 know, we just get exposed to potentially
17 in our daily human lives.  So...
18     Q.   Would you agree with me that
19 NDMA -- well, rephrase.
20         Would you agree with me that
21 the scientific consensus is that NDMA is
22 among the world's most extensively tested
23 agents for carcinogenicity?
24         MR. GALLAGHER:  Objection to

Page 209

1 form.
2         THE WITNESS:  I would agree
3     that it's been tested in a large
4     number of species.  And there is a
5     lot of research.  I don't know if
6     it's among the most.  I haven't
7     done that analysis to see where it
8     ranks in studies.
9 BY MR. SLATER:
10     Q.   The scientific consensus is
11 that NDMA has consistently demonstrated
12 carcinogenicity in multiple different
13 animal species, correct?
14         MR. GALLAGHER:  Objection to
15     form.
16         THE WITNESS:  That's
17     correct.  In animal species, yes.
18 BY MR. SLATER:
19     Q.   That is a fact of
20 significance that any expert looking at
21 this question of general causation would
22 need to take into account, right?
23         MR. GALLAGHER:  Objection to
24     form.

Page 210

1    THE WITNESS:  Yeah, I mean,
2  that was considered, I think, by
3  most of the experts.  And it's a
4  probable animal carcinogen.  But
5  it's still -- the human evidence
6  doesn't raise it to the level of a
7  human carcinogen.
8    Like I said, other agencies
9  have looked at that, looked at all
10  the totality of the evidence and
11  the mechanistic evidence, and they
12  also agree that it's just not to
13  the level of a known human
14  carcinogen.
15  BY MR. SLATER:
16    Q.   With regard to animals, NDMA
17  and NDEA are not probable carcinogens.
18  They are animal carcinogens, correct?
19    A.   That's correct.
20    Q.   That's a significant fact
21  that would have to be taken into account
22  by any expert applying a valid
23  methodology in this case, right?
24    A.   That's correct.

Page 211

1    Q.   Do you say anywhere in your
2  report, that NDMA and NDEA are animal
3  carcinogens?  I'm just curious.  I didn't
4  see that.  I'm just curious if you said
5  that anywhere in your report.
6    A.   Yeah, on Page 32.  I say,
7  "While NDMA and NDEA have found to be
8  carcinogenic in several animal species."
9    Q.   That's where you were
10  recognizing the fact that they are known
11  animal carcinogens, right?
12    A.   Correct.
13    Q.   Because of the evidence as
14  to the carcinogenicity of NDMA and NDEA
15  in animals, you would not want to lump
16  that together with hundreds or thousands
17  of other chemical substances that have
18  not achieved that level of certainty,
19  right?
20    MR. GALLAGHER:  Objection to
21  form.
22    THE WITNESS:  Can you repeat
23  the question?
24  BY MR. SLATER:

Page 212

1    Q.   Sure.  Because NDMA and NDEA
2  are accepted as animal carcinogens, as
3  we've discussed a moment ago, you would
4  not want to lump them together in your
5  analysis with hundreds or thousands of
6  other chemicals that have not achieved
7  such a level of certainty, correct?
8    MR. GALLAGHER:  Objection to
9  form.
10    THE WITNESS:  That's
11  correct.  Like I said, even like
12  Dr. Panigrahy stated, he stated
13  there's over 1,400 carcinogenic
14  chemicals.
15    So even he's admitted
16  there's numerous carcinogens in
17  the environment that we are
18  potentially exposed to.
19    MR. GALLAGHER:  When you get
20  to a point, can we take a break?
21    MR. SLATER:  We're talking
22  lunch now?
23    MR. GALLAGHER:  For lunch,
24  yeah.

Page 213

1    MR. SLATER:  Sure.
2    MR. GALLAGHER:  If you have,
3  like, five more minutes of
4  questions or we can break now.
5    MR. SLATER:  Yeah, break
6  now.  I've got a bowl of berries
7  in front of me.
8    Let's go off the record.
9    THE VIDEOGRAPHER:  The time
10  is 1:08 p.m.  We are off the
11  record.
12    - - -
13    (Whereupon, a luncheon
14  recess was taken.)
15    - - -
16    THE VIDEOGRAPHER:  The time
17  right now is 1:57 p.m.  We're back
18  on the record.
19    - - -
20  BY MR. SLATER:
21    Q.   I think I neglected to ask
22  you at the very outset.  Your title is
23  managing scientist.  What does that mean?
24    A.   Well, I guess at

Confidential Information - Subject to Protective Order

1  ToxStrategies, we have, I guess, like a
2  different -- types or levels of
3  individuals, like, when we have a
4  Scientist 1, 2, or 3, depending on your
5  level of experience or education.
6         So managing scientist is
7  sort of, I guess, just where I'm at in my
8  career and my experience. So there's
9  levels above me obviously and levels
10 below me. So but that's just where I'm
11 at.
12        I'm a toxicologist still.
13 But just where I'm at is a managing
14 scientist. Means that there will be
15 people that, you know, help me do work
16 or, you know, things like that, there are
17 more senior managing scientists, I think.
18 It's just kind of a hierarchy in the
19 company.
20   Q.   Does it indicate any
21 particular responsibilities or is it just
22 the hierarchy of seniority or whatever
23 that may be?
24   A.   It's just a hierarchy of

1  seniority, just based on, like, you know,
2  what affiliations you have, kind of like
3  where you're at in your career,
4  publications, degrees, things like that.
5    Q.   Okay. The next thing that
6  I'd like to ask you about is
7  evidence-based toxicology.
8         First question is, what is
9  evidence-based toxicology as you use that
10 term?
11    A.   Evidence-based toxicology is
12 basically -- has its basis in
13 evidence-based medicine, which has been
14 around for a fairly long time. But it's
15 still used by physicians in forming
16 opinions on treatment methods and
17 treatment regimens for patients.
18        It was derived out of the
19 need -- since physicians are so busy and
20 they can't evaluate all the literature
21 that comes out on any treatment or a new
22 medication or new procedure for a patient
23 or for a specific disease, evidence-based
24 medicine was -- came about based on that.

1         So, basically what it is,
2  you do a -- like I said, initially --
3  earlier, you start with a systematic
4  review, and you -- so you can look at the
5  evidence-based methods, it's called.
6  They are guidelines that kind of --
7  that's the basis of evidence-based
8  toxicology.
9         You basically set out a
10 question, what your specific question
11 that you're asking, like does chemical X
12 at a certain level cause disease Y?
13        And then you formulate your
14 literature search. You do that. Then
15 you evaluate your literature, and you
16 can -- if you want you can rank and rate
17 it based on the types of literature.
18        If you've got human
19 literature, for example, you would put
20 your -- if there's any randomized control
21 trials, you put those first, and then
22 cohort and case-controls. So it just
23 goes down. There's a hierarchy that, you
24 know, most individuals follow. And it's

1  simple to find.
2         Then after that you can
3  evaluate it further based on the doses,
4  like, an individual gets or you can use
5  some kind of further criteria, causation
6  criteria. There is temporality,
7  coherence of evidence, to kind of further
8  refine your conclusions.
9         So it's basically meant to
10 be a transparent methodology that's
11 systematic that if it's out there, anyone
12 that follows that should be able to come
13 to the same conclusions that you do.
14        And we published a paper on
15 this in 2015, I believe. It was, like, a
16 ten-year retrospective of evidence-based
17 toxicology.
18        And since that time a lot of
19 agencies, regulatory agencies, you know,
20 IPSA, EPA, even IARC is sort of trying to
21 take that method and approach that they
22 use to be transparent, you know, invite
23 people in to see the process, make sure
24 it's transparent. They're incorporating

Confidential Information - Subject to Protective Order

Page 218

¹ systematic reviews into their process to
² make sure they get all the evidence.
³        So it's basically --
⁴ longwinded review -- what it is.
⁵        Q.   I wanted to make sure I have
⁶ an understanding.  And I think what we
⁷ can probably do right now is put up this.
⁸        MR. SLATER:  We're up to, I
⁹    want to say 11.  But if I'm wrong,
¹⁰    correct me if I'm wrong.  The
¹¹    ten-year retrospective article.
¹²        (Document Marked for
¹³    identification as Exhibit
¹⁴    Britt-11.)
¹⁵        MR. SLATER:  I'm not sure
¹⁶    I'm right about the exhibit
¹⁷    number.
¹⁸        MR. GEDDIS:  I think you are
¹⁹    correct.
²⁰ BY MR. SLATER:
²¹        Q.   We've marked as Exhibit 10
²² (sic), the article titled "Evidence-Based
²³ Causation in Toxicology:  A Ten-Year
²⁴ Retrospective."  And you're one of the

Page 219

¹ authors of that, correct?
²        A.   Correct.
³        Q.   This starts off indicating,
⁴ "We introduced evidence-based toxicology
⁵ (EBT) in 2005 to address the disparities
⁶ that exist between the various weight of
⁷ evidence (WOE) methods typically applied
⁸ in the regulatory hazard decisionmaking
⁹ field and urged toxicologists to adopt
¹⁰ the evidence-based guidelines long
¹¹ utilized in medicine, i.e.,
¹² evidence-based medicine (EBM)."
¹³        So I want to stop there and
¹⁴ just establish a few things.  One, this
¹⁵ proposed methodology you said was
¹⁶ introduced in 2005.  And that would have
¹⁷ been another article authored by Robert
¹⁸ James and a few other people in 2005,
¹⁹ correct?
²⁰        A.   Correct.
²¹        Q.   I'm going to go through some
²² terminology first.
²³        You referred to weight of
²⁴ evidence methods.  And that's -- weight

Page 220

¹ of evidence is a methodology to evaluate
² a question of causation, right?
³        A.   Yeah.  It's one of the terms
⁴ that people use.  It's kind of a -- it
⁵ can be a kind of a catchall kind of term.
⁶        But, yeah, that's -- that's
⁷ one of the terms that people use when
⁸ they're evaluating any causation.
⁹        Q.   When you refer to
¹⁰ evidence-based medicine -- and I think
¹¹ you talked about it before, that doctors
¹² in the medical field have applied that to
¹³ treatment decisions, correct?
¹⁴        A.   Right.  Right.
¹⁵        Q.   Evidence-based medicine is
¹⁶ not a causation concept.  It's a concept
¹⁷ that is supposed to support treatment
¹⁸ decisions, correct?
¹⁹        A.   Well, so evaluate what the
²⁰ best -- you know, using whatever
²¹ criteria, if it's the Hill criteria,
²² whatever criteria it is that they use to
²³ decide which is the best treatment.  Like
²⁴ if it's for a stroke or for a new

Page 221

¹ heart -- you know, new medicine for a
² heart disease or whatever, they'll use
³ it's the same methodology considering,
⁴ you know, all the different -- it's
⁵ basically the same.  It's not -- you
⁶ asked a question, you get your
⁷ literature, and then you evaluate the
⁸ literature.
⁹        So the systematic review
¹⁰ part is the same part.
¹¹        Q.   Just to come back to my
¹² question.  Evidence-based medicine is a
¹³ concept intended to be utilized in the
¹⁴ context of making treatment decisions,
¹⁵ correct?
¹⁶        A.   That's correct.  That's
¹⁷ correct.
¹⁸        Q.   It's not a causation
¹⁹ methodology when it's used in the medical
²⁰ field, right?
²¹        A.   It's used to -- it's used to
²² make decisions on the best -- or if a
²³ treatment is the best -- or if it's an
²⁴ accurate, or if there's adequate

Page 222

1 information to use that treatment or not.
2 So it's a yes or no decision that's made
3 on a specific treatment.
4          I'm not sure if causation is
5 the best word.
6      Q.    Well, I just want to make
7 sure we're clear with our terminology
8 here. Evidence-based toxicology, as
9 posed in the 2005 and 2015 articles, is a
10 causation concept, a methodology to
11 evaluate questions of causation, correct?
12          MR. GALLAGHER: Objection to
13     form.
14          THE WITNESS: Correct.
15 BY MR. SLATER:
16     Q.    Evidence-based medicine is a
17 methodology used by medical doctors to
18 make treatment decisions, not to evaluate
19 causation questions, correct?
20     A.    That's --
21          MR. GALLAGHER: Objection to
22     form.
23          THE WITNESS: That's true.
24 The basic -- you know, it's to

Page 223

1     make decisions on various
2     treatment. But the methodology is
3     the same. Or it's based on
4     similar methodologies.
5 BY MR. SLATER:
6     Q.    The weight of -- rephrase.
7          The weight of evidence
8 methods that you contrast to EBT in your
9 article, are accepted methodologies to
10 evaluate causation questions, right?
11          MR. GALLAGHER: Objection to
12     form.
13          MR. SLATER: Let me ask it
14     differently.
15 BY MR. SLATER:
16     Q.    The weight of evidence
17 methodology to evaluate a causation
18 question is an accepted methodology in
19 the scientific community to evaluate
20 questions of causation, right?
21          MR. GALLAGHER: Objection to
22     form.
23          THE WITNESS: Repeat the
24 question.

Page 224

1 BY MR. SLATER:
2     Q.    Sure.
3          The weight of evidence
4 approach is an accepted, recognized
5 methodology to evaluate questions of
6 causation, correct?
7          MR. GALLAGHER: Objection to
8     form.
9          THE WITNESS: I would say,
10 as I said before, weight of
11 evidence is sort of a general kind
12 of catchall term, like when we
13 described in our paper, there's --
14 we looked at 52 -- you know,
15 there's other papers, like this
16 Reference 17, 52 different weight
17 of evidence frameworks.
18          So do you have a specific
19 one that you were talking about or
20 just the weight of -- what
21 exact -- can you expand further?
22 BY MR. SLATER:
23     Q.    My understanding of weight
24 of evidence -- well, why don't we do

Page 225

1 this.
2          Why don't you tell me what
3 your understanding is as to what the
4 weight of evidence approach is, as a
5 generic matter, to evaluating causation
6 questions. What does that mean? Because
7 you contrast weight of evidence with
8 evidence-based toxicology in your
9 article.
10          So you've told me what EBT
11 is. Now I'm asking you to describe to me
12 what weight of evidence means.
13     A.    Well, weight of evidence,
14 like I said, it's a general -- it's a
15 general phrase, and it can mean different
16 things to different individuals. And
17 that was sort of the problem in some of
18 these evaluations, that one person may
19 just say, oh, you know, I just looked at
20 all the animal studies or some of the
21 animal studies, or, you know, I looked at
22 a few of the mechanism studies or I just
23 looked at four papers. So -- and then I
24 just made a decision. Or someone may say

Confidential Information - Subject to Protective Order

[1] I just looked at a review article, you
[2] know, or whatever they said.
[3]         So this was set out to have,
[4] like, a set methodology that people could
[5] follow.  And like I said, other
[6] regulatory agencies, IRIS, IARC, they're
[7] all starting to use systematic review,
[8] evidence-based toxicology because they
[9] see that's a good transparent way that
[10] people can follow and they can reach the
[11] same decisions if they follow the same
[12] set methodology.
[13]         Whereas, weight of evidence
[14] can be different types of methods, and
[15] they vary depending on whose -- whose
[16] weight of evidence methods you look at.
[17]     Q.   Are you able to tell me what
[18] weight of evidence means as you
[19] understand it with any more specificity
[20] than what you just told me?
[21]     A.   No.
[22]     Q.   Did you just say that
[23] regulatory agencies -- and I think you
[24] said all of them -- are starting to now

[1] utilize evidence-based toxicology?  If
[2] you said that, that would have been a
[3] misstatement, because all regulatory
[4] agencies have not adopted EBT as a
[5] methodology, right?
[6]         MR. GALLAGHER:  Objection to
[7]     form.
[8]         THE WITNESS:  No, they have
[9]     not.  I said some of them are
[10]     starting to approach EBT-like
[11]     methods or evidence-based or
[12]     systematic review into their
[13]     methods to become more
[14]     transparent.
[15]         For example, the one
[16]     document that you showed earlier
[17]     from Environmental Defense Fund,
[18]     that was, I think, them responding
[19]     to a TSCA systematic review.
[20]         So EPA just started using
[21]     systematic review not too long ago.
[22]         So that was kind of an
[23]     advancement -- you know, an
[24]     advancement in the way EPA

[1] analyzes chemicals is to use a
[2] systematic review.
[3]         Similar, IARC is using
[4] systematic review now, and they're
[5] starting to come up with a
[6] methodology that's repeatable,
[7] that whenever they have their
[8] meetings they all follow the same
[9] method.  So that's what that
[10] means.
[11] BY MR. SLATER:
[12]     Q.   You're not saying that the
[13] term "systematic review" is inherent to
[14] evidence-based toxicology, because that
[15] term has been in the literature long
[16] before 2005, right?
[17]     A.   Yeah, it's --
[18]         MR. GALLAGHER:  Objection to
[19]     form.
[20]         THE WITNESS:  It's part of
[21]     evidence-based toxicology.
[22] BY MR. SLATER:
[23]     Q.   So evidence-based toxicology
[24] coopted and incorporated a systematic

[1] review as part of the EBT methodology; is
[2] that correct?
[3]         MR. GALLAGHER:  Objection to
[4]     form.
[5]         THE WITNESS:  I like to say
[6]     coopted.  It incorporates the
[7]     method of systematic review as
[8]     part of the process of EBT.
[9] BY MR. SLATER:
[10]     Q.   Let me try to ask it clean.
[11] And I appreciate you clarifying because I
[12] realized when I asked the question, the
[13] two things -- they might have sounded
[14] pejorative, the coopt part.  So I didn't
[15] want it to sound that way.
[16]         If I understand correctly,
[17] this concept of EBT incorporated the
[18] already existing systematic review
[19] methodology as part of this proposed EBT
[20] methodology.  Do I understand that
[21] correctly?
[22]     A.   Yes.  That's correct.
[23]     Q.   So when EBT is carried out
[24] as intended, part of that process is a

Page 230

¹ systematic review.
²        Do I understand that
³ correctly?
⁴     A.   Yes.
⁵     Q.   And I think what you said is
⁶ some regulatory bodies are starting to
⁷ incorporate systematic reviews into their
⁸ evaluations of questions.
⁹        Did I understand that
¹⁰ correctly?
¹¹        MR. GALLAGHER:  Objection to
¹² form.
¹³        THE WITNESS:  Yeah.  Some of
¹⁴     them are starting to incorporate
¹⁵     systematic reviews into their
¹⁶     process of looking, whenever they
¹⁷     assess a chemical or an exposure
¹⁸     or -- into -- into their
¹⁹     assessment process, like EPA for
²⁰     example.
²¹ BY MR. SLATER:
²²     Q.   You are not saying that, for
²³ example, the EPA or another regulatory
²⁴ agency has explicitly come out and said,

Page 231

¹ "We adopt EBT as a methodology we're
² utilizing."  You're saying they're
³ utilizing certain aspects of what is part
⁴ of EBT as part of their evaluations of
⁵ certain questions.
⁶        Do I understand that
⁷ correctly?
⁸        MR. GALLAGHER:  Objection to
⁹     form.
¹⁰        THE WITNESS:  I'd have to
¹¹     look and see if they specifically
¹²     spelled it out, EBT.
¹³        I know that in, for example,
¹⁴     like in 2006 the National Academy
¹⁵     of Science criticized -- I believe
¹⁶     it was the EPA, and said, you
¹⁷     know, when you do your risk tox
¹⁸     assessment, when you do your
¹⁹     assessment, you need to follow the
²⁰     criteria -- causation methods,
²¹     similar to those in Guzelian in
²²     2005, which is the precursor
²³     article to this.
²⁴        So there have been agencies

Page 232

¹     that have said, "Look, you need to
²     follow this type of EBT method."
³        Whether or not they called
⁴     it out, EBT, there may be examples
⁵     of that.  I would have to check.
⁶     I know that this method has been
⁷     referred to.
⁸ BY MR. SLATER:
⁹     Q.   The EBT method, if I
¹⁰ understand correctly, has been proposed
¹¹ in 2005 by your colleagues.  You then
¹² co-authored the ten-year retrospective in
¹³ 2015.  And if I understand correctly,
¹⁴ this is a methodology that has been
¹⁵ proposed and is being considered, but you
¹⁶ would not say it's been accepted as a
¹⁷ scientific methodology across, for
¹⁸ example, toxicology, right?
¹⁹        MR. GALLAGHER:  Objection to
²⁰     form.
²¹        THE WITNESS:  I'm not trying
²²     to say that every toxicologist
²³     uses evidence-based toxicology.
²⁴     But it has expanded into the field

Page 233

¹     and is becoming more accepted.
²        There's -- SOT has
³     evidence-based toxicology, you
⁴     know, subforums.  There's
⁵     publications about it.  So it's
⁶     certainly becoming more prevalent
⁷     in the field of toxicology.
⁸        Again, not every
⁹     toxicologist practices, you know,
¹⁰     causation.  Some do research.
¹¹     Some do -- and it's -- and if
¹²     you're in the field where you're
¹³     assessing whether or not a
¹⁴     chemical causes some kind of
¹⁵     disease or in fact, you know,
¹⁶     like, when the EPA does their
¹⁷     assessments for IRIS, they're
¹⁸     getting closer and closer to this
¹⁹     type of assessment.
²⁰ BY MR. SLATER:
²¹     Q.   Is that in the context of
²² what you told me earlier, that they're
²³ performing systematic reviews?
²⁴     A.   Yes.  That's part -- that's

Confidential Information - Subject to Protective Order

Page 234

1 part of it, yes.
2     Q.   Is there another part of it?
3     A.   Well, I'm not sure about
4 their causation part.  I'd have to go and
5 look at their documents.  I know they
6 just updated their IRIS document about
7 how they perform their assessments.  I'm
8 not sure if they've applied, like what
9 kind of causation criteria they're
10 putting in there.  I'm not sure.
11     Q.   I got it.  So you're -- I
12 appreciate the clarification.  So you're
13 telling me the EPA and these other
14 regulatory agencies are starting to
15 incorporate systematic review or aspects
16 of what you described as EBT as part of
17 their evaluations of questions that
18 they're addressing, you're not saying
19 this is something that's now been
20 accepted for their evaluation of
21 causation questions, though.  You're
22 differentiating, correct?
23         MR. GALLAGHER:  Objection to
24     form.

Page 235

1         THE WITNESS:  I would have
2     to look at the causation part and
3     see who all, you know, has
4     accepted that as part of their
5     actual assessment process.
6         This has been -- in the last
7     two or three years it's kind of
8     been moving along quite rapidly.
9     So I would need to see who has
10     finally accepted certain things
11     and who hasn't.
12 BY MR. SLATER:
13     Q.   Would you agree with me that
14 EBT is considered to be favorable as a
15 methodology to an entity that is being
16 sued or a claim being brought against or
17 a regulatory action being brought against
18 regarding a potential toxic exposure?
19         MR. GALLAGHER:  Objection to
20     form.
21         THE WITNESS:  I mean, it's a
22     transparent, repeatable method
23     that should be able to be used --
24     can be used by anybody.  And

Page 236

1 that's why regulatory agencies are
2 starting to use this type of
3 method, systematic review, because
4 you are required to lay out your
5 methods.
6         A lot of journals now will
7 actually say, you know -- like
8 there are certain guidelines that
9 you have to follow, like the
10 ARRIVE guidelines if you're doing
11 experimental research.
12         If you're doing a
13 meta-analysis, or even if you're
14 doing a systematic review there's
15 actually guidelines to follow if
16 you're going to publish a
17 systematic review.  So you have to
18 follow those guidelines.
19         So for example, if I am peer
20 reviewing a journal article for
21 somebody, they're like, "Make sure
22 they follow these guidelines."  So
23 you have to go -- did they, you
24 know, follow this?  Did they do

Page 237

1 that?  Did they mention -- you
2 know, so there's -- it's starting
3 to get more incorporated and, you
4 know, there's systematic review
5 journals.  So I went on a tangent
6 there.
7 BY MR. SLATER:
8     Q.   With regard to this EBT
9 concept, things that you told me about is
10 once you do the literature search, you
11 evaluate, you rank, and rate the
12 literature, right?
13     A.   Correct.
14     Q.   You said something to the
15 effect of the human literature as the top
16 of the hierarchy.  Did I understand that
17 correctly?
18     A.   Yes.
19         MR. GALLAGHER:  Objection to
20     form.
21         THE WITNESS:  Yes.  If you
22     have human literature, that's the
23     most relevant literature for
24     looking at causation.  If you

Confidential Information - Subject to Protective Order

Page 238

1    don't have any human, you would go
2    to animal.
3        So there's a hierarchy.
4    Even within the human literature,
5    there's a hierarchy of study
6    design that is stronger and goes
7    to a weaker -- like randomized
8    control trial is considered the
9    gold standard.  But if you don't
10   have that, then cohort is the next
11   best, and then you kind of go down
12   from there.
13   BY MR. SLATER:
14       Q.   In order to properly
15   undertake an EBT method -- rephrase.
16       In order to apply an EBT
17   methodology as intended, if I understand
18   correctly, you have to place the human
19   literature at the top of the hierarchy if
20   it exists, correct?
21       MR. GALLAGHER:  Objection to
22   form.
23       THE WITNESS:  If there is --
24   if there's -- you know, you would

Page 239

1    lab -- you would evaluate the
2    human literature.  And if it's --
3    if it's, you know, high quality
4    literature, you know, a priori,
5    you set out your quality for
6    ranking and rating, your -- I
7    think there's even a table here
8    that talks about that.
9        Yeah, so you would rank and
10   rate your studies.  A priori means
11   before you start doing it, to
12   eliminate bias.
13       So you would say when I look
14   at these studies, I want to make
15   sure they have a control group,
16   and if the control group is
17   matched, and they looked for
18   confounders, and they, you know,
19   looked at the medical records, and
20   they had, you know, realtime
21   exposure data, not just
22   self-reported data.
23       So you set out this list of
24   criteria that you want to evaluate

Page 240

1    your studies on.  And then you get
2    the studies, and then you evaluate
3    them against the criteria that you
4    picked out a priori, again,
5    beforehand.
6        You look at your studies,
7    and then you make your decision
8    based on the best quality studies,
9    the highest ranking type of
10   studies, cohort versus, like, a
11   case report of one person.  And
12   then you can go from there.
13   BY MR. SLATER:
14       Q.   In this matter in the
15   valsartan context, there's obviously no
16   RCT, right?
17       A.   Correct.
18       Q.   There's no randomized
19   controlled trial where you had a group of
20   people given valsartan with NDMA or NDEA
21   impurities at the levels seen with the
22   pills here, and then have a separate
23   group that took valsartan that was
24   confirmed not to be contaminated at all.

Page 241

1    That study has never been done to your
2    knowledge, right?
3        A.   That's correct.
4        Q.   And you wouldn't expect such
5    a study to be performed, correct?
6        A.   No.  I mean, we do have the
7    epi study so that -- conducted so far on
8    the individuals who have taken valsartan
9    so far.  And we have the data on those
10   individuals.  So we have those studies.
11   And then --
12       Q.   So in this case, in terms of
13   the hierarchy of human data, which sits
14   at the top according to EBT, there's no
15   RCT, so you go to the next level, and
16   that would be the cohort studies that
17   you've talked about?
18       A.   Correct.  That's the next in
19   the hierarchy or the pyramid, if you
20   will.
21       Q.   In terms of the cohort
22   studies that are most significant, would
23   those be the studies that looked at
24   people that took valsartan?

Page 242

1    MR. GALLAGHER: Objection to
2 form.
3    THE WITNESS: Repeat the
4 question.
5 BY MR. SLATER:
6    Q.   Sure. In terms of the human
7 epidemiologic studies, would I be correct
8 that the ones that you would say are most
9 prominent would be the ones that
10 evaluated people who were taking
11 valsartan during the time period when the
12 contaminated pills were on the market and
13 comparing people who took the
14 contaminated versus people that you
15 assume took pills that were not
16 contaminated?
17    That's the -- that's the epi
18 studies that you would put at the top in
19 terms of significance, right?
20    A.   Yeah, if I'm understanding
21 you right, so the -- if you look at
22 number one, on the EBT, so you would, you
23 know, collect and get all the relevant
24 literature, but before you would ask your

Page 243

1 question, so you would say -- and it has
2 to be specific, like did NDMA or NDEA in
3 valsartan cause specific cancer, or is it
4 a known human carcinogen or does it cause
5 cancer.
6    So the valsartan-exposed
7 studies would be, you know, the best
8 studies to look at as far as whether or
9 not there's any risk there. So that
10 would be your kind of highest priority to
11 look at.
12    Is that what you're asking.
13    Q.   Right. I'm trying to
14 identify in terms of your hierarchy in
15 looking at whatever existed in terms of
16 literature, the Pottegard, Gomm and Al
17 Kindi studies would be the most
18 significant because those are ones based
19 on cohorts of people that were taking the
20 contaminated valsartan, correct?
21    MR. GALLAGHER: Objection to
22 form.
23    THE WITNESS: Correct.
24 BY MR. SLATER:

Page 244

1    Q.   One of the things I like to
2 do is I like to try not to go down a road
3 that I don't need to. And I think based
4 on what you told me earlier, in terms of
5 the study design, the strengths and
6 weaknesses, any problems with those epi
7 or issues with those epi studies, you
8 would defer to the epidemiologist that
9 was retained by the defense. You would
10 really defer to that person on those
11 questions, right?
12    MR. GALLAGHER: Objection to
13 form.
14    THE WITNESS: That's
15    correct. I mean, I can talk about
16    basic high level study problems or
17    study design. But yes, as far as
18    the overall opinions, I will defer
19    to other experts.
20 BY MR. SLATER:
21    Q.   For example, to the extent
22 there was an issue in the Pottegard study
23 with uncertainty as to whether or not the
24 people on both sides of the study

Page 245

1 actually fit the criteria and how that
2 would impact a statistical analysis or
3 the strength of the findings, that would
4 be something that I would talk to the
5 epidemiologist about, right?
6    A.   Yes, correct.
7    Q.   In terms of just the gross
8 conclusions from those studies, my
9 understanding is in Pottegard, there was
10 an increased risk for colorectal and
11 uterine cancer shown, but in both of
12 those cancers, the findings did not reach
13 statistical significance. Does that
14 sound correct to you?
15    MR. GALLAGHER: Objection to
16    form.
17    THE WITNESS: I'm going to
18    pull -- if it's okay, can I pull
19    up that study?
20 BY MR. SLATER:
21    Q.   Sure.
22    A.   Okay. Can you repeat your
23 question?
24    Q.   With regard to the Pottegard

Page 246

¹ study, there was a finding of increased
² risk for colorectal cancer and uterine
³ cancer, but neither finding reached
⁴ statistical significance, correct?
⁵     A.   That's correct.
⁶     Q.   Even though those increased
⁷ risks did not reach statistical
⁸ significance, you would still want to
⁹ take them into account in evaluating the
¹⁰ question before you, right?
¹¹     A.   Yes, I would take them into
¹² consideration, but they would not have
¹³ any significant influence over the
¹⁴ overall conclusions as, you know, as they
¹⁵ were or were not significant.
¹⁶     Q.   When you just said not
¹⁷ significance -- rephrase.
¹⁸         You mean they wouldn't have
¹⁹ significance to the ultimate -- the
²⁰ ultimate conclusion -- let me ask it
²¹ differently.
²²         In forming your opinions,
²³ did you factor in that in a study of only
²⁴ 5,150 people, which I believe the study

Page 247

¹ said in Pottegard, they showed increased
² risks for colorectal cancer and uterine
³ cancer, albeit not reaching statistical
⁴ significance.  Was that something that
⁵ you factored into your analysis?
⁶         MR. GALLAGHER:  Objection to
⁷     form.
⁸         THE WITNESS:  I considered
⁹     it as part of my analysis, but
¹⁰     because these were not significant
¹¹     findings, it did not change my
¹² conclusion that NDMA or NDEA were
¹³     human carcinogens.
¹⁴ BY MR. SLATER:
¹⁵     Q.   And again, to follow up on
¹⁶ what I was asking before.  To the extent
¹⁷ that the sample size of just over 5,000
¹⁸ people could have some impact on
¹⁹ interpretation of the data, that's
²⁰ something that you would defer to the
²¹ epidemiologist on that specific granular
²² question, correct?
²³         MR. GALLAGHER:  Objection to
²⁴     form.

Page 248

¹         THE WITNESS:  Yes, I'll
²     defer to other expert.
³ BY MR. SLATER:
⁴     Q.   In terms of the ultimate
⁵ conclusions in Gomm -- which was the
⁶ German study with hundreds of thousands
⁷ of people, correct?
⁸     A.   Correct.
⁹     Q.   In Gomm, there was no
¹⁰ finding of an increased risk for what
¹¹ they determined, quote, any cancer, just
¹² across-the-board overall risk for cancer,
¹³ but they did make a finding of a
¹⁴ statistically significant increased risk
¹⁵ for liver cancer, correct?
¹⁶     A.   Can we pull that study up?
¹⁷     Q.   You can.  I don't have it
¹⁸ with me.  I'm --
¹⁹     A.   Okay.  Okay.
²⁰     Q.   I mean, we can get it.  But
²¹ you can certainly pull it up.
²²     A.   Okay.
²³         Okay.  Can you repeat the
²⁴ question, please?

Page 249

¹     Q.   I was afraid you'd ask that.
²     A.   Sorry.
³     Q.   No, that's okay.  In the
⁴ Gomm study, which was a study of hundreds
⁵ of thousands of people in the German
⁶ health insurance database, there was no
⁷ finding of an increased risk for,
⁸ quote-unquote, any cancer, but there was
⁹ a finding for a statistically significant
¹⁰ increased risk for liver cancer, correct?
¹¹     A.   Yes.  The adjusted HR, or
¹² hazard ratio, was 1.16, and the
¹³ confidence interval was 1.03 to 1.31.  So
¹⁴ yes, it was slightly significantly
¹⁵ elevated.
¹⁶     Q.   That's a finding --
¹⁷     A.   But --
¹⁸     Q.   I'm sorry.  Go ahead.
¹⁹     A.   I was going to say but when
²⁰ they looked at -- when they did
²¹ additional analyses, there was no risk
²² for exposure versus non-exposure among
²³ long-term users.  And when they looked at
²⁴ dose-response, there was no dose-response

Page 250

1 relationship based on dose exposure
2 categories, that's in Table 2.
3         So just to add that.
4     Q.   All right.  Just coming back
5 to my question, with regard to liver
6 cancer, the Gomm study made the finding
7 of a statistically significant increased
8 risk for liver cancer, correct?
9     A.   Yes, it did.
10     Q.   That is a significant
11 finding in terms of your approach to this
12 question, right?
13         MR. GALLAGHER:  Objection to
14     form.
15         THE WITNESS:  Again, I
16     considered -- I considered that
17     finding as I would have, you know,
18     all the findings.  There was -- in
19     the Pottegard study there was no
20     liver cancers.
21         And then the -- there was
22     another study I think I looked at
23     in my report.  And then the Yoon
24     study didn't find -- let me look.

Page 251

1 BY MR. SLATER:
2     Q.   I didn't ask about Yoon, did
3 I?
4     A.   Well, I was saying that --
5 yeah, so I considered that.  But Gomm
6 didn't -- I mean, Pottegard didn't find
7 any liver cancers at all in their study.
8     Q.   All right.  Just coming back
9 to my question.
10         The finding of a
11 statistically significant increased risk
12 for liver cancer is something that you
13 certainly needed to take into account,
14 right?
15     A.   That's correct.
16     Q.   And as you told me a moment
17 ago, you gave very little, if any,
18 significance to the uterine cancer and
19 colorectal cancer increased risks in
20 Pottegard because they were not
21 statistically significant, right?
22         MR. GALLAGHER:  Objection to
23     form.
24         THE WITNESS:  That's

Page 252

1 correct.
2 BY MR. SLATER:
3     Q.   So if you're going to apply
4 the same methodology in terms of
5 statistical significance because liver
6 cancer did reach statistical significance
7 in Gomm, that would be a significant
8 finding, right?
9         MR. GALLAGHER:  Objection to
10     form.
11         THE WITNESS:  Technically it
12     was a significant finding, but the
13     effect of that finding was
14     diminished by the other
15     non-meaningful findings in Table 2
16     where there was no dose-response
17     relationship and there was no
18     relationship with exposure with
19     long-term users.
20 BY MR. SLATER:
21     Q.   I'm not asking you about how
22 you can evaluate that beyond what I'm
23 asking.  I'm not getting into the other
24 level, or any other levels on it.

Page 253

1 Just -- I'm really just trying to go step
2 by step.
3     A.   Okay.
4     Q.   So let me just ask it again.
5         The finding of a
6 statistically significant increased risk
7 of liver cancer in Gomm was a fact of
8 significance to you that you needed to
9 take into account in forming your opinion
10 in this case, right?
11         MR. GALLAGHER:  Objection to
12     form.
13         THE WITNESS:  I took it in
14     consideration, yes.
15 BY MR. SLATER:
16     Q.   And in terms of why there
17 may have been no finding of liver cancer
18 in Pottegard while there was a finding of
19 statistically significant increased risk
20 for liver cancer in Gomm, in terms of how
21 the sample size or other aspects of the
22 epidemiological analysis may have
23 impacted that, again, that's something
24 that you would defer to the

Page 254

1 epidemiologist, right?
2     A.   That's correct.
3     Q.   I want to walk through your
4 methodology a little more.  So we talked
5 about the fact that the human studies
6 would be at the top of the methodology --
7 rephrase.
8         In terms of your EBT
9 methodology, we talked about the fact
10 that the human studies, and in particular
11 those studying people who actually took
12 the valsartan with the impurities would
13 be at the top of the hierarchy, correct?
14     A.   Correct.
15     Q.   In terms of what you also
16 looked at in addition to those studies,
17 what else did you factor into that
18 analysis?  I want to go step by step.
19         MR. GALLAGHER:  Objection to
20 form.
21 BY MR. SLATER:
22     Q.   So let's go to the next
23 level.  Is there other epidemiology not
24 of people that took valsartan that you

Page 255

1 looked at, that you thought was of
2 significance to you in your evaluation?
3     A.   I'd like to -- I looked at
4 studies that included -- I think it was
5 Iwagami and Yoon.
6     Q.   What was the first one you
7 said?
8     A.   Iwagami.
9     Q.   Are these the ranitidine
10 studies?
11     A.   Pardon me?
12     Q.   Are these the ranitidine
13 studies?
14     A.   Yes.  Yes.
15     Q.   In terms of -- let me ask
16 you this.  Did you look at the dietary
17 studies?
18         MR. GALLAGHER:  Objection to
19 form.
20         THE WITNESS:  No, I did not
21 look at any of the dietary
22 studies.  I did not consider those
23 in my analysis.  I looked at them
24 briefly when I was looking at some

Page 256

1 of the other expert reports.  But
2 it was my understanding that the
3 other experts did the evaluation
4 of the dietary studies.
5 BY MR. SLATER:
6     Q.   So you didn't look at the
7 dietary studies because it was your
8 understanding that other experts were
9 going to evaluate that for the defense?
10     A.   Correct.  In depth, yes.
11     Q.   Did you look at animal
12 studies as part of your evaluation?
13         MR. GALLAGHER:  Objection to
14 form.
15         THE WITNESS:  I looked at
16 the Peto studies.  I would defer
17 to other experts as far as the
18 in depth evaluation of animal
19 studies.
20 BY MR. SLATER:
21     Q.   You just saved us a lot of
22 time.  So I'm going to thank you for
23 that.  I have a big stack over here that
24 I don't have to go through with you now.

Page 257

1 So that's good.
2         I didn't see any discussion
3 in your report regarding the mechanistic
4 studies of human tissue and evaluating
5 that in contrast to animal tissue and how
6 mechanistically DNA adducts could be
7 impacted and all of that.
8         I didn't see an analysis of
9 that as part of your evaluation.  Am I
10 correct, that wasn't part of it?
11         MR. GALLAGHER:  Objection to
12 form.
13         THE WITNESS:  Yeah.  That
14 was -- yeah, that was not part of
15 anything I was asked to do.  There
16 was other experts that I would
17 defer to for those questions -- or
18 those issues.
19 BY MR. SLATER:
20     Q.   Obviously there's discussion
21 of animal studies in your report, and for
22 example, there's a very lengthy
23 discussion generally about animal to
24 human extrapolation in Appendix A.  Is

Page 258

1 that generally for background regarding
2 how animal studies might fit into such an
3 analysis, but is it limited to that
4 background information?
5         MR. GALLAGHER:  Objection to
6 form.
7         THE WITNESS:  Yeah, it's a
8 general, you know, discussion of
9 extrapolating from animals to
10 humans and sort of some of the
11 shortcomings that have been
12 associated with that type of
13 extrapolation.
14 BY MR. SLATER:
15     Q.   One of the things that you
16 said as part of the discussion of
17 methodology is one could incorporate
18 another methodology into your analysis
19 under the EBT approach.
20         Did I understand that
21 correctly, or did I get confused really
22 bad?
23     A.   I think it was --
24         MR. GALLAGHER:  Objection to

Page 259

1 form.
2         THE WITNESS:  -- the weight
3 of evidence.  The weight of
4 evidence is kind of an umbrella
5 term for just different types of
6 methodologies that individuals
7 have used in the literature, over
8 time, to evaluate whether or not a
9 compound can cause a certain
10 disease.
11         If you just look up in
12 PubMed weight of evidence, you'll
13 get a lot of different hits and
14 different people will use
15 different methods.
16         You know, one person may
17 just look at rat studies or
18 certain studies, or they may only
19 look at a subset, or they may not
20 do a literature search, you know.
21         It just varies among
22 individuals.  And so there's kind
23 of a move to have a more
24 systematic, you know, reproducible

Page 260

1     process that everyone can follow
2     and follow along with and see how
3     it's done.
4 BY MR. SLATER:
5     Q.   I know I asked an unartful
6 question now.  Let me ask it again and
7 try to do it in a more comprehensible
8 way.
9     A.   Okay.
10     Q.   As part of the EBT
11 approach -- and if I misunderstood, you
12 can tell me.  I thought you said as part
13 of that approach, other methodologies can
14 be incorporated in, for example, like a
15 Bradford Hill analysis could be done, I
16 guess.  Or is that something that's a
17 separate methodology, and I
18 misunderstood?
19     A.   No, that's --
20         MR. GALLAGHER:  Objection to
21 form.
22         THE WITNESS:  That's part of
23     the last part of EBT, is, you
24     know, once you have your

Page 261

1     literature, and you do your
2     assessment, then you can sort of
3     do an assessment of all the
4     literature, and you look at how,
5     you know, there's coherence and
6     dose-response and temporality.  So
7     it's sort of the last part of the
8     evaluation.
9 BY MR. SLATER:
10     Q.   Got it.  And I went through
11 your report, and I did not see a Bradford
12 Hill analysis performed.  That's not
13 something that you did here, correct?
14     A.   No.  I was not -- that was
15 not part of what I was asked to do.
16     Q.   Going back to your article
17 now, Your 2015 article on evidence-based
18 causation in toxicology.  Do you have
19 that still handy?
20     A.   Okay.  Yes.
21     Q.   Look at Page 1246, please.
22 It's the second page of the article.
23     A.   Okay.
24     Q.   In the bottom left hand

Confidential Information Subject to Protective Order

Page 262

¹ column towards the end, you state, "In a
² similar vein, while our original article
³ stated, and we still accept as true, that
⁴ human data are the most valid metrics to
⁵ determine human causality, EBT does not
⁶ call for eliminating the consideration of
⁷ animal studies."
⁸         That's an accurate statement
⁹ of this methodology, correct?
¹⁰     A.   That's correct.
¹¹     Q.   You continue, "In fact, our
¹² publications have consistently argued
¹³ that when human data are insufficient to
¹⁴ answer human causation and human risk
¹⁵ questions, the regulatory risk assessment
¹⁶ process will derive conservative
¹⁷ health-protective exposure guidelines in
¹⁸ the interim."  Correct?
¹⁹     A.   That's correct.
²⁰     Q.   When you refer to the
²¹ regulatory risk assessment process, would
²² that be, for example, the FDA setting the
²³ acceptable intake levels for NDMA in
²⁴ pharmaceuticals?  Is that an example of

Page 263

¹ that?
²         MR. GALLAGHER:  Objection to
³     form.
⁴         THE WITNESS:  That might be
⁵     an example that you could say, you
⁶     know, you could look at that.  But
⁷     I think that's -- it's -- you
⁸     know, we have human -- we have
⁹     some human evidence that's been
¹⁰     looked at, and it has been raised
¹¹     to that the level of human
¹²     carcinogenicity.
¹³         And I think there's enough
¹⁴     evidence that, in the regulatory
¹⁵     risk assessment process -- so
¹⁶     regulatory agencies like FDA or
¹⁷     EPA, will often derive, you know
¹⁸     conservative, health-protective
¹⁹     exposure guidelines, even when
²⁰     there is human evidence, just
²¹     because that's sort of what, you
²²     know, is in the nature of what
²³     they're tasked to do.
²⁴ BY MR. SLATER:

Page 264

¹     Q.   In terms of the regulatory
² focus, you referred to it being health
³ protective.  That's because the
⁴ regulators like the FDA, they want to
⁵ make sure that they don't allow an
⁶ unacceptable risk to be put out into the
⁷ public, right?
⁸     A.   Right.  Right.  So they're
⁹ protective, they're conservative, they're
¹⁰ proactive, they're -- and then there's
¹¹ even some language -- like, for example,
¹² the EPA, they say that they're risks are
¹³ protective, they're not predictive.
¹⁴         So they're not -- their
¹⁵ risks are for broad populations.  They're
¹⁶ not meaning to predict that any type of
¹⁷ illness is actually going to occur.  They
¹⁸ are just being protective.
¹⁹         And what's inherent in that
²⁰ is that they've got uncertainty factors
²¹ that based on animal evidence, which
²² is -- animals are for the most part more
²³ sensitive than humans.  So they've got
²⁴ all this extra protectiveness in there.

Page 265

¹ So and even --
²     Q.   All I'm -- I didn't mean to
³ interrupt.
⁴     A.   No, no I'm done.  I'm done.
⁵     Q.   Yeah, all I was driving at
⁶ is really just the small question of the
⁷ regulatory agency, like, for example, the
⁸ FDA, is tasked with being health
⁹ protective and avoiding unacceptable risk
¹⁰ to the public.  That's their goal, right?
¹¹         MR. GALLAGHER:  Objection to
¹²     form.
¹³         MR. INSOGNA:  Objection to
¹⁴     form.
¹⁵ BY MR. SLATER:
¹⁶     Q.   If I understand what you're
¹⁷ writing right here.
¹⁸     A.   Yeah, that's their goal.
¹⁹ That's not what I was asked to do.  But
²⁰ that is -- that is their goal, to derive
²¹ something that will protect the
²² population.  That's their task.
²³     Q.   And you got to my next
²⁴ question.

Confidential Information - Subject to Protective Order

Page 266

1    You didn't form opinions as
2  to the rightness or wrongness of the
3  regulatory decisions as to whether or to
4  what extent valsartan could be sold with
5  certain levels of contamination.  You
6  weren't judging that.
7        You were looking at a
8  different question, which is whether or
9  not those levels in your opinion would be
10 sufficient to cause cancer in humans.  Do
11 I understand that correctly?
12    A.   That's correct.
13         MR. GALLAGHER:  Objection to
14    form.
15         THE WITNESS:  That's
16    correct.
17 BY MR. SLATER:
18    Q.   Just to take it one step
19 further, if I'm understanding correctly,
20 you see it really as two completely
21 different questions, one question is what
22 is an acceptable or unacceptable risk in
23 terms of protecting the public health
24 from a regulatory perspective, is one set

Page 267

1  of questions.
2        A completely different set
3  of questions is, would a certain level of
4  a particular substance, in this case NDMA
5  or NDEA, be sufficient, in your opinion,
6  to cause cancer in humans as those pills
7  would be taken for the time period that
8  they were taken.
9        Am I right about that, that
10 these really are two different questions
11 that don't overlap?
12         MR. GALLAGHER:  Objection to
13    form.
14         THE WITNESS:  Yeah, so the
15    FDA is being protective.  They
16    derived a conservative value that
17    someone could be exposed to for a
18    lifetime, for those two
19    compounds -- or well, other --
20    nitrosamines, NDMA and NDEA in
21    particular for this case.
22         And what I was asked to do
23    and what I did is I considered,
24    you know, the low doses, the doses

Page 268

1  that plaintiffs -- potential
2  plaintiffs were exposed to based
3  on the duration they were exposed
4  to.
5        So I did a more specific
6  risk based on the theoretical
7  risks that the FDA derived to get
8  a more -- a more specific risk
9  based on the particular exposure
10 of the plaintiffs.
11 BY MR. SLATER:
12    Q.   So for example, to the
13 extent that a decision was made, for
14 example, by one of the manufacturers, and
15 that they stated this publicly that, "The
16 exposure to the impurity
17 n-nitrosodimethylamine (NDMA) that was
18 detected in valsartan product line
19 presents an unacceptable carcinogenic
20 risk to the intended patient population,"
21 and therefore, that's why the recall
22 occurred, you're not taking issue with
23 that, and you're not evaluating whether
24 it was the right or wrong decision to

Page 269

1  stop selling it.
2        You're looking at actual
3  causation of actual cancer in humans.  Do
4  I understand that correctly?
5         MR. GALLAGHER:  Objection to
6    form.
7         THE WITNESS:  That was an
8    FDA statement, you said?
9  BY MR. SLATER:
10    Q.   That's a statement I read,
11 frankly, from a press release from ZHP
12 when they announced their recall.
13    A.   Okay.  Could you read
14 that --
15         MR. GALLAGHER:  Objection to
16    form.
17         THE WITNESS:  Could you read
18    that again?
19 BY MR. SLATER:
20    Q.   Sure.  "The exposure to the
21 impurity n-nitrosodimethylamine (NDMA)
22 that was detected in valsartan product
23 line, presents an unacceptable
24 carcinogenic risk to the intended patient

Confidential Information - Subject to Protective Order

Page 270

1 population."
2        So that's a statement as to
3 the decisionmaking to stop selling the
4 drugs with this impurity.  That's not
5 what you're focusing on.  You're focusing
6 on, would this actually cause cancer in
7 humans.  Do I understand that?
8        MR. GALLAGHER:  Objection to
9    form.
10        THE WITNESS:  I haven't seen
11    that document.  Do you have that
12    document?
13 BY MR. SLATER:
14    Q.   I do.  I have it right here.
15 I'm just trying to understand, to the
16 extent that ZHP said it was an
17 unacceptable carcinogenic risk to the
18 intended patient population, and thus
19 they stopped selling the pill, and as you
20 know, that was the decision made by the
21 FDA in announcing the recalls, that's
22 not -- you're not quibbling with that,
23 you're not focusing on that, because
24 that's a regulatory decision about

Page 271

1 whether or not these drugs should be in
2 the marketplace, based on regulatory
3 standards.
4        You're looking at a
5 different question, which is causation of
6 cancer and whether or not people are
7 getting cancer or will get cancer from
8 the pills.  Do I understand that
9 correctly?
10        MR. GALLAGHER:  Objection to
11    form.
12        THE WITNESS:  Yeah, that's
13    correct.  I'm not going to make a
14    regulatory assessment decision
15    on -- on that.
16 BY MR. SLATER:
17    Q.   And to the extent that these
18 regulatory agencies and pharmacopoeias,
19 et cetera, made the decision that, even
20 at the trace levels found, the presence
21 of NDMA and NDEA was considered
22 unacceptable, so these pills should not
23 be sold with those impurities, again
24 that's not something that you are

Page 272

1 disputing, it's a completely different
2 question from the one that you're
3 answering, correct?
4        MR. GALLAGHER:  Objection to
5    form.
6        THE WITNESS:  Yeah, I'm
7    not -- I don't have an opinion on
8    that.
9        MR. SLATER:  Bear with me a
10    second.  I'm trying to clean up my
11    desk --
12        THE WITNESS:  No problem.
13        MR. SLATER:  -- and the
14    room.  And I'm sure you'd feel
15    really bad for me for the mess
16    that's in here, or not.  I know
17    that Patrick feels bad.
18 BY MR. SLATER:
19    Q.   Does EBT posit that only
20 human studies can establish that a
21 chemical causes harm to humans, or is
22 capable of causing harms to humans?
23    A.   I don't know if it makes
24 that statement.  I don't think we make

Page 273

1 that statement.
2    Q.   Do you agree -- I'm going to
3 ask you a general question now.
4        Do you agree that a
5 toxicologist cannot guarantee that a
6 certain dose of a chemical will never
7 cause an injury to a particular person?
8        MR. GALLAGHER:  Objection to
9    form.
10        THE WITNESS:  Can you repeat
11    the question, please.
12 BY MR. SLATER:
13    Q.   Sure.  Do you agree that a
14 toxicologist cannot guarantee that a
15 certain dose of a chemical will never
16 cause an injury to a particular person?
17        MR. GALLAGHER:  Objection to
18    form.
19        THE WITNESS:  I don't know
20    if we can absolutely 100 percent
21    guarantee that something would
22    never happen.  But we -- based on
23    the data that we have and our
24    ability to look at exposure-dose

Page 274

relationships within animal studies and human studies, we can predict with a pretty good likelihood what would happen.

Say, for example, like, with alcohol, we know like if someone drinks one drink, what's going to happen, two drinks what's going to happen. You can predict blood alcohol levels and the effects the blood alcohol.

So, you know, with chemicals, with enough data, we can have a pretty good idea of what's going to happen with certain doses and exposures.

But if a chemical doesn't have much data, it gets a little harder. So it's going to be chemical specific.

BY MR. SLATER:

Q. Sorry. I'm just trying to find -- I wrote down something. I was on a certain page, and I can't figure it

Page 275

out. Bear with me for one second. Okay. Let me ask again because I think I understand your answer, but I want to make sure we're situated on this one narrow question.

Do you agree that a toxicologist cannot guarantee that a certain dose of a substance will never cause an individual -- or an injury to a particular -- let me rephrase.

Do you agree that a toxicologist cannot guarantee that a certain dose will never cause an injury to a particular person?

MR. GALLAGHER: Objection to form.

BY MR. SLATER:

Q. And I'm using the word guarantee deliberately.

MR. GALLAGHER: Objection to form.

THE WITNESS: Like I said before, we have good data on the compound. We have a fairly good

Page 276

ability to predict what's going to happen dose-responsewise with a chemical, and if toxicity is going to occur within the dose range of the data for which we have exposure information and dose information.

MR. SLATER: Chris, do you have available the transcript from the Scott versus Dyno Nobel case from March 23, 2018?

THE WITNESS: I don't think so.

MR. SLATER: Oh, I'm not asking you. I'm asking Chris.

THE WITNESS: Oh, go ahead.

MR. SLATER: I'm asking my boss.

Chris, do you have that? I'm asking before -- I guess you're putting it up. So that's why he's not answering me. He's finding it.

MR. GEDDIS: Sorry. My

Page 277

microphone was muted on my laptop. Do you want me to put it up?

MR. SLATER: Yep. Please. It's March 23, 2018 deposition transcript.

(Document Marked for identification as Exhibit Britt-12.)

THE WITNESS: Okay, what page?

BY MR. SLATER:

Q. We're going to go to page -- well, first I'm showing you the transcript. This is a deposition. I guess you were deposed in this matter, March 23, 2018, correct?

A. Correct.

Q. And that's the Scott versus Dyno, D-Y-N-O, Nobel, N-O-B-E-L, matter which was pending in Missouri, it looks like. Correct?

A. Yes.

MR. SLATER: Okay. Chris, could you go now to Page 12,

Page 278

1  please.
2  BY MR. SLATER:
3      Q.   Looking at Line 6.
4          You were asked, "And you
5  agree that a toxicologist cannot
6  guarantee that a certain dose will never
7  cause an individual" -- and then it says
8  S-I-C -- "to a particular person,
9  correct?"
10         Presuming you're being asked
11  about a injury to a particular person,
12  right?  What was your answer?
13     A.   I said, "Repeat that again."
14  And then they repeated it.  And then I
15  said correct.
16     Q.   Do you stand by that
17  testimony now as a general proposition?
18     A.   I think that's what I said.
19  And I gave the caveat that as long as you
20  have sufficient data within the dose
21  exposure range that you can predict with
22  a reasonable -- you know, with reasonable
23  certainty what's going to happen.
24     Q.   But you didn't say that when

Page 279

1  you were deposed in 2018, right?  You
2  just said correct, right?
3      A.   Correct.  I just -- I
4  elaborated more today than I did back
5  then.
6      Q.   Are you aware of criticisms
7  in the literature regarding
8  evidence-based toxicology?
9          MR. GALLAGHER:  Objection to
10  form.
11  BY MR. SLATER:
12     Q.   Are you aware that there are
13  criticisms of the evidence-based
14  toxicology approach in the literature?
15     A.   I'm not aware of any.
16         MR. SLATER:  Chris, do you
17  have available -- you can take the
18  transcript down.  Do you have the
19  Ruden article?  That would be --
20  could we just put that up for a
21  moment?
22         MR. GEDDIS:  As an exhibit?
23         MR. SLATER:  And for the
24  transcript, we should have an

Page 280

1  exhibit also.  If I missed saying
2  that, the Scott transcript will be
3  Exhibit, what -- is that 11.
4          MR. GEDDIS:  Exhibit 12.
5          MR. SLATER:  12?
6          MR. GEDDIS:  Yeah, and Ruden
7  is 13.
8          MR. SLATER:  Perfect.
9          (Document marked for
10         identification as Exhibit
11         Britt-13.)
12  BY MR. SLATER:
13     Q.   This is an article, Exhibit
14  13 -- rephrase.
15         Article 13 is an article --
16  rephrase.
17         Exhibit 13 is an article
18  titled "Evidence-Based Toxicology:  Sound
19  Science in New Disguise."  Authored by
20  Christina Ruden, Ph.D., and Sven Ove
21  Hansson, Ph.D.  Sorry if I mispronounced
22  their names.
23         Have you seen this article
24  before?

Page 281

1      A.   I've seen it.  I don't think
2  I've ever read it.  I know that I
3  believe -- I believe Rob James and
4  Guzelian may have responded to it.  I'm
5  not 100 percent sure.
6      Q.   Did you speak to Robert
7  James about this litigation at all?
8      A.   No, no.
9      Q.   So I think you're saying
10  that you hadn't read this and you
11  certainly didn't evaluate it, so you have
12  no specific responses to what is stated
13  in this article, I assume, right?
14     A.   No.  When was this?  2008.
15  Yeah, I vaguely remember, I didn't
16  participate.  I don't know.  I didn't
17  read this.
18         MR. SLATER:  Let's go to
19  Page 305, please, Chris.
20  BY MR. SLATER:
21     Q.   Okay.  On Page 305, there's
22  a heading on the left-hand side that
23  says, "The origins of evidence-based
24  toxicology."

Page 282

1    Do you see that?
2    A.    Okay.  I see that, yes.
3    Q.    In the second paragraph, it
4  says, "Guzelian et al.'s proposal is
5  connected to both the tobacco industry
6  and to litigation concerning potential
7  occupational toxic injuries.  Beginning
8  with the former, the tobacco industry has
9  a long history of neglecting and
10 distorting scientific evidence."
11    Do you have any reason to
12 disagree with what I just read?
13    A.    I don't know anything about
14 that.  I have no opinion on that.  I
15 don't know where that -- I don't know.  I
16 have no opinion on that.
17    Q.    Going down further towards
18 the bottom of that paragraph, the last
19 two sentences say, "The notion of 'sound
20 science'" -- and sound science is in
21 quotes -- "has now been thoroughly
22 discredited.  It appears that
23 evidence-based toxicology is an attempt
24 to relaunch the same controversial

Page 283

1  principle again under a name that sounds
2  uncontroversial.
3    "Phillip S. Guzelian has a
4  background as a consultant for the
5  tobacco industry.  During his time
6  affiliated with Phillip Morris, he was
7  paid about 100,000 per year.
8    "The second connection
9  concerns Phillip S. Guzelian's litigation
10 activities concerning potential
11 occupation.  He acts regularly as an
12 expert giving testimony in litigation
13 matters when workers claim to have
14 sustained an occupational toxic injury."
15    I'm going to stop there.
16 Dr. Guzelian is who?
17    A.    He is an M.D. toxicologist.
18    Q.    What is your connection to
19 him?
20    MR. GALLAGHER:  Objection to
21    form.
22    THE WITNESS:  I have --
23 BY MR. SLATER:
24    Q.    Is he your co-author?

Page 284

1    A.    He was a co-author on an
2  article.  I've helped him with consulting
3  years ago, in the past.
4    Q.    Dr. Guzelian is one of your
5  co-authors on the "Evidence-Based
6  Causation in Toxicology:  A Ten-Year
7  Retrospective" article, correct?
8    A.    That's correct.
9    Q.    And has he worked with your
10 company in the past?
11    A.    Pardon me?  Say it one more
12 time.
13    Q.    Has he worked with you in
14 your company?
15    MR. GALLAGHER:  Objection to
16    form.
17    THE WITNESS:  What do you
18    mean by my company?
19 BY MR. SLATER:
20    Q.    The companies that you've
21 been employed by.  Let's start with
22 ToxStrategies.  Has he worked with you
23 during the time that you've been there?
24    A.    Probably helped him a couple

Page 285

1  of times on a couple of matters since
2  I've been at ToxStrategies.
3    Q.    How about at Terra, your
4  prior employer?
5    A.    Yes, I did at Terra.
6    Q.    Did he work for Terra?
7    A.    No.
8    Q.    So he's an outside
9  consultant, but you've worked together on
10 matters with him?
11    A.    Yes.
12    Q.    Coming back to this now, it
13 says that he regularly acts as an expert
14 giving testimony in litigation matters
15 when workers claim to have sustained an
16 occupational toxic injury.
17    Are you aware of that?
18    MR. GALLAGHER:  Objection to
19    form.
20    THE WITNESS:  I'm not sure
21    of the scope of the work that he
22    does.
23 BY MR. SLATER:
24    Q.    This says -- I'm continuing.

Confidential Information - Subject to Protective Order

Page 286

¹ "According to his own estimate, he has
² depositions on average four times a year
³ during the last 20 years, and he has
⁴ testified in court trials on average two
⁵ to three times a year.  For all of his
⁶ medicolegal work, he has received
⁷ approximately $500,000 to $1 million per
⁸ year according to his own testimony.  In
⁹ all these cases but one has he testified
¹⁰ on behalf of an industry defendant."
¹¹         Were you aware of any of
¹² that information about his background as
¹³ a testifying expert?
¹⁴         A.   I know he testifies as an
¹⁵ expert.  I don't know how many times he's
¹⁶ given depositions in the past.  I don't
¹⁷ know the accuracy of this information.
¹⁸         Q.   Looking at the references,
¹⁹ the last one is Number 30.  I'll just
²⁰ start there and move forward.  The
²¹ reference at the end is, "Trial testimony
²² of Phillip S. Guzelian in the case of
²³ Jesus Delaluz" -- D-E-L-A-L-U-Z -- "v.
²⁴ Safety Kleen Corporation."

Page 287

¹         So it is a citation to
² actual trial testimony, right?
³         A.   Yes.
⁴         Q.   And Reference 29 about how
⁵ often he testifies, that's the deposition
⁶ of Phillip Guzelian in the same case,
⁷ right?
⁸         MR. GALLAGHER:  Objection to
⁹    form.
¹⁰         THE WITNESS:  Correct.
¹¹ BY MR. SLATER:
¹²         Q.   And if we keep going
¹³ backwards to the bottom of the left-hand
¹⁴ column when it talked about what he was
¹⁵ paid by Phillips Morris, that's Reference
¹⁶ 28, and it references documents relating
¹⁷ to Guzelian's involvement with the
¹⁸ tobacco industry, and it gives the exact
¹⁹ place where the link -- it gives the link
²⁰ that can take you to those documents.
²¹         Do you see that?
²²         MR. GALLAGHER:  Objection to
²³    form.
²⁴         THE WITNESS:  I see that.

Page 288

¹ BY MR. SLATER:
²         Q.   Going to the next paragraph
³ now, back where I was reading, this
⁴ continues.  "In 2004, he joined the
⁵ advisory council of the Atlantic Legal
⁶ Foundation, an organization that still
⁷ uses the term 'sound science' in
⁸ describing its principles for legal
⁹ evidence.  It is clear from transcripts
¹⁰ of Phillip S. Guzelian's depositions that
¹¹ he acts efficiently in the interest of
¹² his corporate clients.
¹³         "His assessment of workers'
¹⁴ claims that their diseases are
¹⁵ work-related, he applies the same
¹⁶ exceptionally high standards of evidence
¹⁷ that are proposed in Guzelian, et al.,
¹⁸ 2005."
¹⁹         Do you see that?
²⁰         A.   Yes.
²¹         Q.   And would you agree with me
²² that in some, the application of the
²³ evidence-based toxicology approach in the
²⁴ types of cases being described here, for

Page 289

¹ example where a worker is claiming to
² have been injured by a toxic exposure at
³ work, the EBT approach heightens the bar
⁴ to establish causation so it would be --
⁵ if accepted, would make it harder to
⁶ prove a toxic exposure case than either
⁷ Bradford Hill or weight of evidence
⁸ methodologies, correct?
⁹         MR. GALLAGHER:  Objection to
¹⁰    form.
¹¹         THE WITNESS:  No, I don't
¹²    agree that evidence-based
¹³    toxicology -- it's a method
¹⁴    anybody can use.  It doesn't apply
¹⁵    to any particular entity.  That's
¹⁶    why regulatory agencies and
¹⁷    anybody can use it.
¹⁸ BY MR. SLATER:
¹⁹         Q.   I understand anyone can use
²⁰ it.  But the application of EBT in this
²¹ type of case as I'm describing it, an
²² exposure case to a toxic substance, if
²³ EBT is applied as described here, it
²⁴ would make it harder to prove a case or a

Page 290

[1] toxic exposure because of the heavy
[2] weighting to human studies, correct?
[3]         MR. GALLAGHER:  Objection to
[4]     form.
[5]         THE WITNESS:  I don't agree.
[6]         MR. SLATER:  Yeah, I think
[7]     that -- let's take a break.  And
[8]     then let's reconvene in about ten
[9]     minutes.  Is that okay?
[10]         THE VIDEOGRAPHER:  The time
[11]     now is --
[12]         MR. GALLAGHER:  Ten minute?
[13]         THE WITNESS:  Yeah.
[14]         THE VIDEOGRAPHER:  The time
[15]     now is 3:13 p.m.  We're off the
[16]     record.
[17]         (Short break.)
[18]         THE VIDEOGRAPHER:  The time
[19]     right now is 3:36 p.m.  We're back
[20]     on the record.
[21]         MR. SLATER:  Chris, let's
[22]     put up what we marked previously
[23]     as Exhibit 129, as Exhibit 14 to
[24]     this deposition.

Page 291

[1]         (Document Marked for
[2]     identification as Exhibit
[3]     Britt-14.)
[4] BY MR. SLATER:
[5]     Q.   Doctor, just so you know
[6] what I'm putting in front of you, this is
[7] the document that I referred to a little
[8] bit -- hang on.  Sorry, let me start
[9] over.
[10]         Doctor, this is the press
[11] release that I referred to a little
[12] earlier.
[13]         So in fairness to you, you
[14] had asked if you could see it.  I wanted
[15] to make sure that I could show it to you.
[16]         This exhibit was marked as
[17] Exhibit 129 during the depositions of the
[18] ZHP witnesses.  You have not seen this,
[19] right?
[20]     A.   I don't -- it doesn't look
[21] familiar.  I don't believe so.
[22]     Q.   Just to draw your attention
[23] to the part that I was reading from, just
[24] above that, there's a section that says,

Page 292

[1] "For immediate release.  Cranbury, New
[2] Jersey, July 13, 2018."
[3]         Do you see that?
[4]     A.   Yes.
[5]     Q.   And about the second half of
[6] it after they list the valsartan tablets
[7] that were recalled, ZHP told the world in
[8] this press release, "This product recall
[9] is due to the detection of a trace amount
[10] of an unexpected impurity,
[11] n-nitrosodimethylamine (NDMA) made by the
[12] manufacturer ZHP that is used in the
[13] manufacture of the subject product lots.
[14] This impurity has been classified as a
[15] probable human carcinogen as per
[16] International Agency for Research on
[17] Cancer (IARC) classification."
[18]         And then if you go down a
[19] little further, you get down to the part
[20] that I just read to you a little earlier
[21] today that states, "The exposure to the
[22] impurity n-nitrosodimethylamine (NDMA)
[23] that was detected in valsartan product
[24] line presents an unacceptable

Page 293

[1] carcinogenic risk to the intended patient
[2] population."
[3]         Do you see that?
[4]         MR. GALLAGHER:  Objection to
[5]     form.
[6]         THE WITNESS:  Let's see.
[7] BY MR. SLATER:
[8]     Q.   I'm sorry.  Did you say that
[9] you do see that?
[10]     A.   Yeah, I do see that now.
[11] Yes, I do see it.
[12]     Q.   And just to close the loop,
[13] this is not something that you had seen
[14] previously to the best of your
[15] recollection, right?
[16]     A.   No, no.
[17]     Q.   Okay.  And just in fairness
[18] and candor, I'm showing it to you because
[19] I don't like to necessarily use a
[20] document and have you wonder whether or
[21] not I was making up what I read to you.
[22] So I wanted you to see it.
[23]     A.   That's fine.
[24]         MR. SLATER:  We can take

Page 294

that down.

Chris, what I'd like to use next as Exhibit 15 is the textbook Principles of Toxicology.

(Document Marked for identification as Exhibit Britt-15.)

MR. SLATER:  Let's go to the next page, please, which has the actual cover of the textbook. Perfect.

BY MR. SLATER:

Q.   Doctor, do you recognize this as the cover of a textbook that was edited by Dr. Williams, Dr. James, and Dr. Roberts?

Do you recognize this?

A.   Yes.

Q.   If we go to the next page.

A.   Okay.

Q.   It shows that it's copyrighted in 2000, correct?

A.   Yes.

Q.   And if we go to the next

Page 295

page, the list of contributors, it lists you as one of the contributors.  You wrote a chapter or a part of this book, correct?

A.   Yes.

Q.   If we go a few sections into the table of contents, there's Chapter 15.  Chapter 15 is Properties and Effects of Pesticides.  And it looks like that's the chapter that you wrote for this book; is that correct?

A.   That's correct.

Q.   Now, what I would like to do -- bear with me.  This is a very long book.  Let's go to Page 305, Table 13.13.

A.   Page 35?

Q.   305.  And if it's easier, Chris is scrolling through it.  But I think you can't see the screen that well from where you're sitting.

MR. GALLAGHER:  Sorry, what page?

MR. SLATER:  305.

THE WITNESS:  Oh, 305.

Page 296

BY MR. SLATER:

Q.   This is a Table 13.13 which is found in the section of the book or the chapter titled "Cancer and Our Environment," which is a chapter you did not write obviously, right?

A.   Correct.

Q.   And if we were to go back to it, this is the chapter titled "Chemical Carcinogenesis" authored by Dr. James and Christopher Saranko.  So that would be Dr. James who you have co-authored some articles with and have worked with over the years, right?

A.   That's correct.

Q.   And if you look at the table, it says, "Agents listed in the Report on Carcinogens Eighth Edition from the National Toxicology Program as known or suspected human carcinogens."

And if we go down to the middle of the page, it lists "Agents reasonably anticipated to human carcinogens?"

Page 297

Do you see that title?

A.   Yes.

Q.   And then if we go to the next page, Page 306, where these chemicals are being listed, two of them are diethylnitrosamine, and dimethylnitrosamine, which are NDEA and NDMA, correct?

A.   Yes.

Q.   So in this textbook edited by Dr. James, he recognized that NDEA and NDMA are reasonably anticipated to be human carcinogens all the way back in 2000.  That's what this establishes, correct?

A.   Correct.  This is similar to what the other regulatory agencies have stated and NTP still has the same categorization for NDMA and NDEA as anticipated, not known human carcinogens.  NTP just has two rankings.  Some agencies have more than one.  They have four, three.  NTP just has the two.  So it's in the reasonably anticipated.

Page 298

1    Q.   Got it.
2    A.   So yes, I agree.
3    Q.   Okay.
4       MR. SLATER:  Chris, let's
5   take that down now and go to our
6   next exhibit which is going to be
7   Exhibit 16.
8       (Document Marked for
9   identification as Exhibit
10   Britt-16.)
11       MR. SLATER:  Which is the
12   article -- rephrase.
13       Exhibit 16 will be the
14   "Letter to the editor:  Comments
15   on recent discussions providing
16   differing causation
17   methodologies," please.
18   BY MR. SLATER:
19    Q.   This is a letter to the
20   editor submitted to Human and
21   Experimental Toxicology in 2014 by
22   yourself, Dr. James, Dr. Guzelian and
23   someone named NC Halmes.  Hope I'm
24   pronouncing that correctly.

Page 299

1    A.   Yes, yes.
2    Q.   It's titled "Comments on
3   recent discussions providing differing
4   causation methodologies," correct?
5    A.   Yes.
6    Q.   What I'd like to do is turn
7   to Page 110, please.
8    A.   Okay.
9    Q.   Looking at the left-hand
10   column, the first full paragraph, if we
11   go down about halfway, there's a sentence
12   that starts, "For decades, regulatory
13   agencies like the U.S. EPA have used
14   animal data to identify the potential
15   human health hazards and safe exposure
16   guidelines for a given chemical exposure
17   where the goal is to protect human
18   health."
19       That's a true statement,
20   correct?
21    A.   That's true.
22       MR. GALLAGHER:  Objection to
23   form.
24       THE WITNESS:  That's true.

Page 300

1   BY MR. SLATER:
2    Q.   The next sentence says,
3   "This is not equivalent to actually
4   knowing human causation."  And that
5   sentence reflects back to what we
6   discussed earlier as to the difference
7   between the regulatory decision to
8   protect human health versus the
9   evaluation of causation for people that
10   are exposed to the substance, correct?
11    A.   That's correct.
12    Q.   Looking at the next
13   sentence, it says, "The International
14   Agency for Research on Cancer (IARC) and
15   U.S. EPA have long determined human
16   causation based on human data of
17   sufficient strength and consistency that
18   are capable of confirming or denying the
19   hazards suggested by animal studies."
20       That's a true statement,
21   correct?
22       MR. GALLAGHER:  Objection to
23   form.
24       THE WITNESS:  Correct.

Page 301

1       MR. SLATER:  You can take
2   that down.  Let's go down -- we'll
3   mark as Exhibit 17, the article
4   "Evaluation Of the Carcinogenicity
5   of 1,1-dichloroethylene," please.
6       (Document marked for
7   identification as Exhibit
8   Britt-17.)
9       THE WITNESS:  Okay.
10   BY MR. SLATER:
11    Q.   Exhibit 17 is an article
12   titled "Evaluation of the Carcinogenicity
13   of 1,1-dichloroethylene," and then in
14   parentheses vinylidene -- I don't know if
15   I pronounced that right -- chloride.
16    A.   Vinylidene.
17    Q.   Vinylidene.  Thank you.
18       And there's a series of
19   authors, including yourself and Dr.
20   James, correct?
21    A.   Correct.
22    Q.   And this was published in
23   the Regulatory Toxicology and
24   Pharmacology Journal in 2002, right?

Confidential Information - Subject to Protective Order

Page 302

1    A.   Yes.
2    Q.   The first sentence just
3  gives us some context for this article.
4  It says, "The U.S. Environmental
5  Protection Agency has classified
6  1,1-dichloroethylene vinylidene chloride
7  (VDC) as a 'capital C' Carcinogen and has
8  developed an inhalation unit risk value
9  and an oral cancer slope factor for this
10  chemical.  The development and use of
11  these cancer potency estimates for risk
12  assessment purposes are questionable."
13       So that's giving us an
14  overview of the point of this article,
15  correct?
16    A.   Correct.
17    Q.   Okay.  Let's go now to Page
18  50.
19    A.   Okay.
20    Q.   I want to focus on the
21  bottom right, the mode of action section,
22  which states, "The mode of action by
23  which VDC might produce a carcinogenic
24  response is unclear."

Page 303

1       So that's just to give
2  context.  That's what this section of
3  this article is talking about now,
4  correct?
5    A.   Yes.
6    Q.   If you turn to Page 52, the
7  continuation of that section.
8       MR. SLATER:  Page 52.
9  Perfect.
10       THE WITNESS:  Okay.
11  BY MR. SLATER:
12    Q.   In the top left, there's the
13  carryover and it says, starting on the
14  fourth line of this sentence, "Reitz" --
15  R-E-I-T-Z -- "et al, 1980, observed
16  dose-related DNA alkylation following VDC
17  inhalation in mice and rats.  However,
18  the extent of DNA alkylation was low,
19  orders of magnitude less than that
20  produced by the genotoxic carcinogen
21  dimethylnitrosamine included in the study
22  as a positive control (Reitz, et al.,
23  1980.)"
24       Do you see that?

Page 304

1    A.   Yes.
2    Q.   What does that mean when you
3  refer to a positive control?
4       MR. GALLAGHER:  Objection to
5  form.
6       THE WITNESS:  Sometimes they
7  use positive controls to get an
8  effect to compare relatively
9  what's going on with one substance
10  versus another in a study.
11  BY MR. SLATER:
12    Q.   And here you pointed out
13  that NDMA was used as the positive
14  control for this study of VDC, and that
15  the DNA alkylation for VDC was orders of
16  magnitude less than that produced by the
17  NDMA which you characterize as "the
18  genotoxic carcinogen
19  dimethylnitrosamine," correct?
20       MR. GALLAGHER:  Objection to
21  form.
22       THE WITNESS:  Yeah, I just
23  was stating that comparatively
24  speaking, in this -- these animal

Page 305

1  studies, that this one mechanism,
2  that NDMA was a -- showed more of
3  an effect than the vinylidene
4  dichloride.
5       MR. SLATER:  Thank you,
6  Doctor.  As of now, I have no
7  other questions.
8       MR. GALLAGHER:  All right.
9  Can we take just five minutes?
10       MR. SLATER:  Sure.
11       MR. GALLAGHER:  We'll come
12  back.
13       THE VIDEOGRAPHER:  The time
14  right now is 3:53 p.m.  We're off
15  the record.
16       (Short break.)
17       THE VIDEOGRAPHER:  The time
18  right now is 4:05 p.m.  We're back
19  on the record.
20       MR. GALLAGHER:  Dr. Britt,
21  we do not have any questions for
22  you at this time.  And we consider
23  the deposition closed.
24       THE WITNESS:  Thank you.

Confidential Information Subject to Protective Order

Page 306

1          MR. SLATER:  Thank you very
2   much, everybody.
3          THE VIDEOGRAPHER:  The time
4   right now is 4:05 p.m.  We're back
5   on the -- we're off the record.
6          (Excused.)
7          (Deposition concluded at
8   approximately 4:06 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 308

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8          After doing so, please sign
9   the errata sheet and date it.
10          You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14          It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24

Page 307

1
2          CERTIFICATE
3
4
5          I HEREBY CERTIFY that the
6   witness was duly sworn by me and that the
    deposition is a true record of the
7   testimony given by the witness.
8          It was requested before
    completion of the deposition that the
9   witness, JANICE K. BRITT, Ph.D., have the
    opportunity to read and sign the
10   deposition transcript.
11
12
        _____
13   MICHELLE L. GRAY,
     A Registered Professional
14   Reporter, Certified Shorthand
     Reporter, Certified Realtime
15   Reporter and Notary Public
16   Dated:  October 6, 2021
17
18          (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24

Page 309

1          - - - - - -
            E R R A T A
2          - - - - - -
3
4   PAGE  LINE  CHANGE
5   ____  ____  _____
6        REASON:  _____
7   ____  ____  _____
8        REASON:  _____
9   ____  ____  _____
10        REASON:  _____
11   ____  ____  _____
12        REASON:  _____
13   ____  ____  _____
14        REASON:  _____
15   ____  ____  _____
16        REASON:  _____
17   ____  ____  _____
18        REASON:  _____
19   ____  ____  _____
20        REASON:  _____
21   ____  ____  _____
22        REASON:  _____
23   ____  ____  _____
24        REASON:  _____

Confidential Information - Subject to Protective Order

Page 310

2       ACKNOWLEDGMENT OF DEPONENT

4       I,_____, do
5  hereby certify that I have read the
6  foregoing pages, 1 - 311, and that the
7  same is a correct transcription of the
8  answers given by me to the questions
9  therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.

15  _____
16  JANICE K. BRITT, Ph.D.        DATE

19  Subscribed and sworn
    to before me this
20  _____ day of _____, 20____.
21  My commission expires:_____

    _____
23  Notary Public

Page 311

1       LAWYER'S NOTES
2  PAGE  LINE
3  _____ _____ _____
4  _____ _____ _____
5  _____ _____ _____
6  _____ _____ _____
7  _____ _____ _____
8  _____ _____ _____
9  _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24  _____ _____ _____