# EXHIBIT C

1      IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW JERSEY
2                   - - -
3   IN RE:  VALSARTAN,     :  MDL NO. 2875
    LOSARTAN, AND          :
4   IRBESARTAN PRODUCTS    :  HON. ROBERT
    LIABILITY LITIGATION   :  B. KUGLER
5   _____ :
                              :
6   THIS DOCUMENT APPLIES  :
    TO ALL CASES           :
7
         - CONFIDENTIAL INFORMATION -
8        SUBJECT TO PROTECTIVE ORDER
9                   - - -
10          September 14, 2021
11                  - - -
12              VOLUME I
13        Videotaped remote deposition of
    LEE-JEN WEI, Ph.D., taken pursuant to
14  notice, was held via Zoom
    Videoconference, beginning at 9:08 a.m.,
15  on the above date, before Michelle L.
    Gray, a Registered Professional Reporter,
16  Certified Shorthand Reporter, Certified
    Realtime Reporter, and Notary Public.
17
18                  - - -
19

          GOLKOW LITIGATION SERVICES
20       877.370.3377 ph| 917.591.5672
              deps@golkow.com
21
22
23
24

Confidential Information - Subject to Protective Order

1  ZOOM APPEARANCES:
2
3  LEVIN PAPANTONIO RAFFERTY PROCTOR
   BUCHANAN, O'BRIEN, BARR, MOUGEY, PA
4  BY:  DANIEL NIGH, ESQ.
   MADELINE PENDLEY, ESQ.
5  316 South Baylen Street, Suite 600
   Pensacola, Florida 32502
6  (888) 435-7001
   dnigh@levinlaw.com
7  Mpendley@levinlaw.com
   Representing the Plaintiffs
8
9  FARR LAW FIRM, P.A.
   BY:  GEORGE T. WILLIAMSON, ESQ.
10 99 Nesbit Street
   Punta Gorda, Florida 33950
11 (941) 639-1158
   gwilliamson@farr.com
12 Representing the Plaintiffs
13
   GOLDENBERG LAW, PLLC
14 BY:  MARLENE J. GOLDENBERG, ESQ.
   800 LaSalle Avenue, Suite 2150,
15 Minneapolis, Minnesota 55402
   (612) 436-5028
16 mjgoldenberg@goldenberglaw.com
   Representing the Plaintiffs
17
18 KANNER & WHITELEY, LLC
   BY:  LAYNE HILTON, ESQ.
19 701 Camp Street
   New Orleans, Louisiana  70130
20 (504) 524-5777
   l.hilton@kanner-law.com
21 Representing the Plaintiffs
22
23
24

1  ZOOM APPEARANCES:  (Cont'd.)
2
   WALSH PIZZI O'REILLY FALANGA
3  BY:  CHRISTINE I. GANNON, ESQ.
   Three Gateway Center
4  100 Mulberry Street
   15th Floor
5  Newark, New Jersey 07102
   (973) 757-1017
6  Cgannon@walsh.law
   Representing the Defendants, Teva
7  Pharmaceutical Industries, Ltd., Teva
   Pharmaceuticals USA, Inc., Actavis LLC,
8  and Actavis Pharma, Inc.
9
   DUANE MORRIS, LLP
10 BY:  PATRICK C. GALLAGHER, Ph.D., ESQ.
   1875 NW Corporate Boulevard
11 Suite 300
   Boca Raton, Florida 33431
12 (561) 962-2131
   Pcgallagher@duanemorris.com
13 Representing the Defendants, Zhejiang
   Huahai Pharmaceutical Co, Ltd., Prinston
14 Pharmaceutical Inc., Huahai U.S., Inc.,
   and Solco Healthcare US, LLC
15
16 BARNES & THORNBURG, LLP
   BY:  KARA KAPKE, ESQ.
17 11 S. Meridian Street
   Indianapolis, Indiana 46204
18 (317) 231-6491
   Kara.kapke@btlaw.com
19 Representing CVS Pharmacy, Inc., and Rite
   Aid Corporation
20
21
22
23
24

1  ZOOM APPEARANCES:  (Cont'd.)
2
   MARTIN HARDING & MAZZOTTI, LLP
3  BY:  ROSEMARIE RIDDELL BOGDAN, ESQ.
   1 Wall Street
4  Albany, New York 12205
   (800) LAW-1010
5  Rosemarie.bogdan@1800law1010.com
   Representing the Plaintiffs
6
7  GREENBERG TRAURIG, LLP
   BY:  CLIFF MERRELL, ESQ.
8  STEVEN M. HARKINS, ESQ.
   Terminus 200
9  3333 Piedmont Road, NE
   Suite 2500
10 Atlanta, Georgia 30305
   (678) 553-2175
11 Merrellc@gtlaw.com
   Harkinss@gtlaw.com
12
      - and -
13
   GREENBERG TRAURIG, LLP
14 BY:  GEROND J. LAWRENCE, ESQ.
   Terminus 200
15 3333 Piedmont Road, NE
   Suite 2500
16 Atlanta, Georgia 30305
   (678) 553-2287
17 Lawrencege@gtlaw.com
   Representing the Defendants, Teva
18 Pharmaceutical Industries, Ltd., Teva
   Pharmaceuticals USA, Inc., Actavis LLC,
19 and Actavis Pharma, Inc.
20
21
22
23
24

1  ZOOM APPEARANCES:  (Cont'd.)
2
   HINSHAW & CULBERTSON, LLP
3  BY:  KATHLEEN E. KELLY, ESQ.
   53 State Street, 27th Floor
4  Boston, Massachusetts  02109
   (617) 213-7047
5  Kekelly@hinshawlaw.com
   Representing the Defendant, ScieGen
6  Pharmaceuticals, Inc.
7
   BUCHANAN INGERSOLL ROONEY
8  BY:  CHRISTOPHER B. HENRY, ESQ.
   Carillon Tower
9  227 West Trade Street, Suite 600
   Charlotte, North Carolina 28202
10 (704) 444-3475
   Christopher.henry@bipc.com
11 Representing the Defendant, Albertson's
   LLC
12
13 PIETRAGALLO GORDON ALFANO BOSICK &
   RASPANTI, LLP
14 BY:  JASON M. REEFER, ESQ.
   One Oxford Centre, 38th Floor
15 Pittsburgh, Pennsylvania  15219
   (412) 263-1840
16 jmr@pietragallo.com
   Representing the Defendant, Mylan
17 Pharmaceuticals, Inc.
18
   CIPRIANI & WERNER
19 BY:  JESSICA HEINZ, ESQ.
   450 Sentry Parkway, Suite 200
20 Blue Bell, Pennsylvania 19422
   (610) 567-0700
21 jheinz@c-wlaw.com
   Representing the Defendants, Aurobindo
22 Pharma, USA, Inc., and
   Aurolife Pharma, LLC
23
24

Page 6

1  2  ZOOM APPEARANCES:  (Cont'd.)

3  VIDEOTAPE TECHNICIAN:
Judy Diaz
4

5  LITIGATION TECHNICIAN:
Joe Wills
6

7  ALSO PRESENT:
8

Lauren Massey - Paralegal
9  Levin Papantonio
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1
2           - - -
3        I N D E X
4           - - -
5  Testimony of:

6           LEE-JEN WEI, Ph.D.

7     By Mr. Nigh            12
8
9
10

11           - - -
12      E X H I B I T S
13           - - -

14  NO.        DESCRIPTION          PAGE
15  Wei-1     Notice to Take         12
   Videotaped Oral
16  Deposition of
   Lee-Jen Wei, Ph.D.
17

18  Wei-2     Defendants Inc.'s      14
   Responses and Objections
19  to Plaintiffs' Notice of
   Videotaped Deposition of
20  Lee-Jen Wei, Ph.D.

21  Wei-3     Dr. Wei's Expert       30
   Report 8/2/21
22  Wei-4     Dr. Madigan's Expert   43
   Report 7/7/21
23
24

Page 8

1
2           - - -
3        E X H I B I T S (Cont'd.)
4           - - -
5  NO.        DESCRIPTION          PAGE

6  Wei-5     Memo of Hours          44
   Of Dr. Wei, 8/3/21
7

8  Wei-6     2002 WHO report on     63
   NDMA
9  Wei-7     Expert Report of       76
   Dr. Wei, In Re Bextra
10  and Celebrex Marketing
   Litigation
11

12  Wei-8     Expert Report of       80
   Dr. Wei, In Re Taxotere
13  Products Liability
   Litigation
14  Wei-9     Expert Report of       82
   Dr. Wei, Bone Care
15  V. Pentech
   Pharmaceuticals
16

17  Wei-10    Deposition of          91
   Dr. Wei, A Woman's
18  Choice-East Side Women's
   Clinic V. Scott Newman
19  Wei-11    Active-comparator      301
   design and new-user
20  design in observational
   studies, Yoshida, 2015
21

22  Wei-12    The incident user      305
   design in comparative
23  effectiveness research,
   Johnson, 2013
24

Page 9

1
2           - - -
3        E X H I B I T S (Cont'd.)
4           - - -
5  NO.        DESCRIPTION          PAGE

6  Wei-13    Use of NDMA            308
   contaminated valsartan
7  products and risk of
   cancer: Danish nationwide
8  cohort study, Pottegard,
   2018
9
10
11           - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

Confidential Information Subject to Protective Order

Page 10

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
None.

Stipulations
PAGE   LINE
None.

Questions Marked
PAGE   LINE
None.

Page 11

- - -

THE VIDEOGRAPHER:  We are now on the record.  My name is Judy Diaz.  I am a legal videographer for Golkow Litigation Services.

Today's date is September 14, 2021, and the time is 9:08 a.m.

This remote video deposition is being held in the matter of Valsartan, Losartan, and Irbesartan Products Liability Litigation MDL.

The deponent is Lee-Jen Wei Ph.D.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

All counsel will be noted on the stenographic record.

The court reporter is Michelle Gray and will now swear

Page 12

in the witness.

- - -

... LEE-JEN WEI Ph.D., having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. NIGH:

Q.   Good morning.  My name is Daniel Nigh, and I represent the plaintiffs.

Dr. Wei, could you please state and spell your name, your last name?

A.   Name is W-E-I, Wei.  First name Lee-Jen, L-E-E, hyphenation, J-E-N.

Q.   Okay.  Let's take a look at LP-1556.

(Document marked for identification as Exhibit Wei-1.)

BY MR. NIGH:

Q.   That's how I'm going to call

Page 13

them out, Doctor.  And then the videographer is growing to put the document up on the screen.  This will be marked as Exhibit -- Exhibit 1.

Okay.  This is -- Doctor, this is your deposition here.  Have you seen this before today?

A.   Yes, sir.  Would you mind blow up a little bit?

Q.   Sure.

A.   Thank you.  Yeah.  Thank you.

Q.   Yeah.  And let's take a look at the third page where it shows exhibit.  And let's go ahead and blow up document requests, and the first couple -- the first couple requests.

Do you see this here?  On the third page of this deposition there was an attachment called exhibits.

Do you see this?

A.   Yes, sir.

Q.   And did you review this request for exhibits -- or request for

Page 14

1 documents I mean?
2    A.   Yes, I did, with the lawyer.
3    Q.   And you provided all of the
4 documents that you had that were
5 responsive to this to your lawyer?
6    A.   As much as I can.
7    Q.   Okay.  Let's take a look at
8 LP-1600.
9         (Document marked for
10        identification as Exhibit
11        Wei-2.)
12        MR. NIGH:  This will be
13        marked as Wei Exhibit Number 2.
14 BY MR. NIGH:
15    Q.   Let's blow up the first part
16 of this.  It says, "Defendants' responses
17 and objections to plaintiffs' notice of
18 videotaped deposition."
19         Do you see that?
20    A.   Yes.
21    Q.   And let's take a look at the
22 second page.  Here we ask for copies of
23 all invoices.  Let's look at Number 1,
24 the documents.

Page 15

1         "Copies of all invoices" --
2 right at the very beginning -- "for work
3 performed in connection with any
4 consultation or expert work provided for
5 on behalf of any defendant."
6         Do you see that?
7    A.   Yes, sir.
8    Q.   And on the second page,
9 there are some objections.
10        The second page says,
11 "Subject to" -- or the next page says,
12 "Subject to" --
13        MR. NIGH:  If we can blow
14        that part up.
15 BY MR. NIGH:
16    Q.   "Subject to and without
17 waiving these objections and any of the
18 foregoing general objections, defendants
19 will produce invoices in advance of
20 Dr. Wei's deposition."
21        Do you see that?
22    A.   Yes, sir.
23    Q.   Okay.  Do you believe that
24 you provided all of your invoices for

Page 16

1 this case?
2    A.   Yes.  There is only one
3 invoice.
4    Q.   Okay.  Let's take a look at
5 the second request.  It says, "Copies of
6 any notes, written or electronic,
7 reflecting consulting or litigation work
8 that has not been documented in
9 invoices."
10    A.   Well, the only thing I have
11 is a draft of my report.  So that's about
12 it.
13    Q.   Okay.  All right.  Let's
14 take a look at Number 3.
15        Let me ask you this, when
16 you would be reviewing -- when you would
17 review literature articles, would you
18 keep notes on those literature articles
19 or would you keep notes anywhere, like in
20 a Word document?
21    A.   No, sir.
22    Q.   So you would only put your
23 notes into the draft of the report?
24    A.   Sometimes I just highlight

Page 17

1 the papers I'm reviewing.
2    Q.   You would only highlight
3 papers that you're reviewing, but you
4 wouldn't write anything on those papers?
5    A.   I don't think so for this
6 case.
7    Q.   Okay.  Number 3 says,
8 "Copies of any notes or other
9 documentation, including PowerPoints for
10 any presentations, seminars, or classes
11 given by Dr. Wei with regard to the risks
12 and benefits of any angiotensin blockers
13 or nitrosamines."
14        Did you have any notes or
15 other documentation for any
16 presentations, seminars, or classes --
17    A.   No, sir.
18    Q.   -- regarding ARBs or
19 nitrosamines?
20        No?  Okay.
21        Do you recall giving any
22 presentations for ARBs or nitrosamines?
23    A.   No, sir.
24    Q.   Okay.  Taking a look at

Confidential Information - Subject to Protective Order

1  Page 4 -- Number 4.  Sorry.
2           "Copies of any documents or
3  articles relied upon for the opinions set
4  forth in the report served."
5           At the bottom it says,
6  "Subject to and without waiving these
7  objections and any of the foregoing
8  general objections, defendants will
9  produce a copy of all electronically
10 available documents identified on
11 Dr. Wei's list of materials considered
12 prior to his deposition."
13          Did you also provide the
14 highlighted studies, studies that you
15 would put -- that you would highlight to
16 your attorneys?
17     A.   Yeah, I remember I send two
18 articles with highlighted portions to the
19 lawyers.
20     Q.   Are there only two articles
21 that you ever highlighted?
22     A.   Yeah, pretty much.
23     Q.   Okay.  What are those two
24 articles?

1      A.   I don't remember.  I send it
2  to the lawyers last week.
3      Q.   Okay.  Let's take a look at
4  Number 5.  "Copies of any documents or
5  articles reviewed in connection with the
6  report thereto, whether or not listed in
7  the report."
8           And the answer at the end
9  says, "Subject to and without waiving
10 these objections and any of the foregoing
11 general objections, defendants will
12 produce a copy of all electronically
13 available documents identified on
14 Dr. Wei's list of materials considered."
15          How did you pull together
16 your -- these electronic documents?
17 What's the process that you undertook to
18 pull these together in order to respond
19 to these requests?
20     A.   Well, first, I got a list of
21 references that are recommended by the
22 lawyers.  And I downloaded to my
23 computer, and as a PDF file.  And
24 that's -- from there, I just used that

1  copies and reviewed papers, documents and
2  et cetera.
3      Q.   Okay.  So I think you said
4  you got a list of references from the
5  lawyers?
6      A.   Yeah.  It is a listing.  It
7  actually is all the files.  They send me
8  a website.  I can just download it
9  easily.
10     Q.   Okay.  Was that like a
11 DropBox or some kind of platform where
12 you could download studies and internal
13 documents, that sort of thing from that
14 file?
15     A.   Probably it's like a
16 DropBox.  It's very convenient, actually.
17 I find it very nice.
18     Q.   Okay.  And is that where you
19 pulled all of your literature that you
20 reviewed in this case?
21     A.   Yes.
22     Q.   Okay.  So all the literature
23 that you reviewed in connection with your
24 report was provided to you by the defense

1  attorneys?
2      A.   Yeah.  There's only one
3  thing that I did make a quick search
4  through the Google about other studies
5  directly related to impurity of valsartan
6  product.
7      Q.   Did you find any additional
8  documents that you reviewed with that
9  Google search?
10     A.   I did not.
11     Q.   Okay.  So if I understand
12 this correctly, you did a quick Google
13 search looking for anything related to
14 the impurity of the valsartan product,
15 and you didn't find any additional
16 documents that you reviewed with that
17 Google search, correct?
18     A.   That's correct, sir.  If I
19 may just add in one sentence.  For all
20 other studies, publications, when I read
21 Dr. Madigan's report, if Dr. Madigan is
22 citing some reference or publication, was
23 not on the list, I would ask the lawyer
24 to send to me.  That's what I did once to

Confidential Information - Subject to Protective Order

Page 22

1 the lawyer.
2     Q.   Okay.  So if I understand
3 you correctly, you also looked at
4 Dr. Madigan's report, and there was one
5 study that you didn't see in that DropBox
6 that you asked the defense lawyers to
7 provide to you?
8     A.   Correct.
9     Q.   Okay.  So all of the
10 literature that you reviewed was provided
11 to you by your lawyers, correct?  I mean,
12 by the defense lawyers, correct?
13     A.   Yes.
14     Q.   Okay.  Let's take a look at
15 Number 6.  "Any illustrations,
16 PowerPoints, images, charts, tables or
17 demonstrative exhibits that may be used
18 by or with Dr. Wei in connection with the
19 Daubert hearing or trial testimony in
20 this litigation."
21         Other than what's contained
22 in your expert report, you don't have any
23 other illustrations, PowerPoints, images,
24 charts or tables or demonstrative

Page 23

1 exhibits that you're expecting to use,
2 correct?
3     A.   Not yet.
4     Q.   Not yet?
5     A.   Yeah, so I think in my
6 report I clearly state that maybe in the
7 future we may actually create a
8 PowerPoint presentation or tables or
9 graphic display.
10     Q.   Do you have any idea what
11 those tables or graphic displays would
12 look like --
13     A.   No.
14     Q.   -- at this time?  No?
15     A.   Not yet.
16     Q.   Okay.  So you understand
17 that I would have no ability to question
18 you regarding those demonstrative tables
19 or those charts here today if they're not
20 contained in your expert report and you
21 don't even know what they would be,
22 correct?
23     A.   They don't exist yet.
24     Q.   Right.  So I wouldn't have

Page 24

1 ability today to ask you questions today
2 regarding those charts or tables,
3 correct?
4     A.   Fair enough.
5     Q.   I'm sorry.  What was your
6 answer?
7     A.   I said fair enough.  What
8 you're saying, yes.
9     Q.   Okay.  Let's take a look at
10 Number 7.  Number 7, "Documentation of
11 any research grant the witness has been
12 provided to study any angiotensin
13 blockers, nitrosamines, and health
14 effects possibly related thereto."
15         You haven't received any
16 research grants related to ARBs, correct?
17     A.   Correct.
18     Q.   And you haven't received any
19 research grants related to nitrosamines,
20 correct?
21     A.   Correct.
22     Q.   Okay.  Take a look at Number
23 8.  "Documentation" -- "Documentation of
24 any research the witness has performed

Page 25

1 with regard to any ARB or nitrosamine."
2         You haven't done any
3 independent research -- other than in
4 connection with your expert opinions here
5 today, you haven't done any independent
6 research regarding ARBs or nitrosamines,
7 correct?
8     A.   Sir, let me make sure.  This
9 is a pretty broad question.  For the
10 safety or impurity of valsartan, I
11 haven't done anything except this report.
12         But if you're talking about
13 in general, the research regarding the
14 ARB, I did know something about it
15 because I work closely with Brigham and
16 Women's Hospital at Harvard cardiologists
17 for many years.
18     Q.   Okay.  Have you performed
19 research related to ARBs?
20     A.   I believe in some of my
21 papers, I utilize some research papers
22 regarding to ARB, ACE inhibitor, beta
23 blockers in the past.
24     Q.   Okay.  Have you done any

Confidential Information - Subject to Protective Order

Page 26

¹ research regarding nitrosamines?
²    A.   I don't think so.
³    Q.   In terms of ARBs, what would
⁴ be the extent of your research?
⁵    A.   Well, mostly we are really
⁶ interested into combining ARB and ACE
⁷ inhibitor, see if we can get a better
⁸ treatment effect from this combination
⁹ compared with monotherapy, for example
¹⁰ ACE inhibitor or ARB alone.
¹¹    Q.   Other than measuring whether
¹² or not you would get a better effect when
¹³ combining ARB and ACE inhibitor compared
¹⁴ to ACE inhibitor or ARB alone, have you
¹⁵ done any other research regarding ARBs?
¹⁶    A.   I don't know exactly.  But
¹⁷ sometimes I writing for physical papers,
¹⁸ I may cite it in some papers related to
¹⁹ ARB publications, mostly related to
²⁰ efficacy.  For example, reduced the
²¹ hospitalization, reduced the
²² cardiovascular death.  That's most of my
²³ statistical papers are about.
²⁴    Q.   Okay.  If I understand you

Page 27

¹ correctly, you have cited to papers and
² ARB publications, in large part as ARBs
³ are medications taken for hypertension
⁴ and help to reduce hospitalizations and
⁵ reduce cardiovascular death; is that
⁶ correct?
⁷    A.   Yes, sir, for heart failure
⁸ patients.  Mostly for heart failure, not
⁹ for blood pressure problem.
¹⁰    Q.   Mostly for heart patients?
¹¹    A.   Heart failure.
¹² F-A-I-L-U-R-E.
¹³    Q.   Oh, heart failure.  Okay.
¹⁴        And in terms of those
¹⁵ patients, if they were to stop taking
¹⁶ their ARB without any substitute, then at
¹⁷ the time that they're stopped taking the
¹⁸ ARB without any substitute, they would
¹⁹ lose the benefit of it helping to reduce
²⁰ hospitalizations, reduce cardiovascular
²¹ death, correct?
²²    A.   I don't know.  I'm not a
²³ clinical person.  I cannot make -- either
²⁴ way.

Page 28

¹    Q.   Let's take a look at nine.
²        Nine asked for, "Copies of
³ any documents, including protocols or
⁴ information about medication side
⁵ effects, available to the witness from
⁶ any hospital or academic institution
⁷ where he has worked, had an appointment,
⁸ or had privileges which set forth
⁹ information related to the risks and
¹⁰ benefits of any ARB or nitrosamine."
¹¹        Do you see that?
¹²    A.   Yes, sir.
¹³    Q.   Now, you didn't have any
¹⁴ copies of documents, including protocols
¹⁵ or information about medication side
¹⁶ effects, correct?
¹⁷    A.   I don't.
¹⁸    Q.   Okay.  Number 10, "Any
¹⁹ documents or other communications the
²⁰ witness has received from any person or
²¹ entity with regard to nitrosamine
²² impurities in any ARB or other drug.
²³        So other than the
²⁴ documentation provided to you by your

Page 29

¹ counsel, you didn't have any other
² documents or review any other documents
³ from any other person or entity regarding
⁴ nitrosamine impurities in ARBs, correct?
⁵    A.   That's correct, sir.  The
⁶ only thing that I'm really concerned
⁷ about all the publications, documents
⁸ cited by Dr. Madigan in his report.
⁹    Q.   Okay.  Number 11, "Any
¹⁰ communications from the witness to any
¹¹ person or entity with regard to
¹² nitrosamine impurities in any ARB or
¹³ other drug, outside of communications
¹⁴ through counsel."
¹⁵        So other than -- other than
¹⁶ defense counsel, you haven't had any
¹⁷ other communications with any other
¹⁸ witness or any other person regarding
¹⁹ your work here regarding nitrosamine
²⁰ impurities and ARBs, correct?
²¹    A.   Correct.
²²    Q.   Okay.  Number 12, "Any
²³ textbook referenced by the witness in
²⁴ forming his opinions."

Page 30

1      You didn't rely on -- did
2  you rely on any portion of any textbook
3  to form your opinions here today?
4      A.   Yes, sir.  There is one
5  book --
6      Q.   Which?
7      A.   -- by David DeMets, Clinical
8  Trials.  I cited in my report.
9      Q.   Which textbook was that
10 again?
11     A.   Do you have a list of
12 references?  I can point it to you.
13     Q.   We'll come back to that.
14     A.   Furberg.  I think the first
15 author is if Furberg, I think.
16     Q.   We can take this down.
17 We'll take a look at your expert report.
18     This is LP-1557.
19     (Document marked for
20 identification as Exhibit
21 Wei-3.)
22     MR. NIGH:  This will be
23 marked as Exhibit Wei-3.
24 BY MR. NIGH:

Page 31

1      Q.   Do you see this here?  This
2  appears to be your expert report that you
3  prepared for this litigation, correct?
4      A.   Yeah.  May I see my
5  signature, on -- toward last -- if you
6  don't mind.
7      Q.   Sure.  Let's take a look at
8  Page 24.
9      A.   Yes, sir.
10     Q.   Is that your signature?
11     A.   Yes, sir.
12     Q.   The date of this is
13 August 2, 2021, correct?
14     A.   Yes, sir.
15     Q.   Now, you understand that one
16 of the purposes of this expert report is
17 to put us on the other side, you know, on
18 the plaintiffs' side, plaintiffs'
19 counsel, on notice of your opinions,
20 correct?
21     A.   Yes, sir.
22     Q.   And if you don't include
23 certain opinions in this expert report,
24 then we would not be provided notice of

Page 32

1  those opinions, correct?
2      A.   I don't know.  Whatever you
3  say.  I don't understand the rules
4  anyway, so I leave it up to you.
5      Q.   Okay.  Let's take a look at
6  Number 11 on Page 5.  And this says
7  "Assignment."
8      And under assignment, it
9  says, "I have been retained by defendants
10 to provide an expert opinion in the
11 litigation styled In Re Valsartan
12 Products Liability Litigation.
13 Specifically, I was asked by counsel for
14 defendants to review and assess the
15 opinions presented by David Madigan,
16 Ph.D., who submitted an expert report on
17 behalf of plaintiffs analyzing the
18 results from the Dietary and Occupational
19 Studies to infer potential risk of
20 carcinogenicity of ND" -- I think you
21 meant NDMA, as opposed to NDME, right?
22     A.   Yes.  It should be NDMA.
23     Q.   Okay.
24     -- "of NDMA or NDEA

Page 33

1  impurities in valsartan and to provide my
2  own assessment of those issues."
3      Correct?
4      A.   Yes, sir.
5      Q.   Okay.  And so is it your
6  understanding -- did you only become
7  involved after Dr. Madigan had completed
8  his expert report?
9      A.   I believe so.  I got
10 Dr. Madigan's report from the lawyer.
11     Q.   Okay.  And so when you
12 started, you had a completed report by
13 Dr. Madigan, correct?
14     A.   Correct.
15     Q.   Now, this isn't the first
16 time that you've been on the opposite
17 side of Dr. Madigan, correct?
18     A.   It's the first time, you're
19 saying, sir?
20     Q.   Right.  This isn't the first
21 time.  This is not the first time you've
22 been on the opposite side of Dr. Madigan,
23 correct?
24     A.   No.  I don't know how many

Page 34

1 times.
2     Q.   Okay.
3     A.   I don't recall how many
4 times we were on opposite sides.
5     Q.   Well, that's what I'm about
6 to ask you.  What are the other times --
7 what other litigation can you remember
8 being on the opposite side of
9 Dr. Madigan?
10    A.   I believe at least we had
11 Celebrex --
12    Q.   Okay.
13    A.   An injury case, and also
14 security case.  Dr. Madigan was on the
15 wrong side.  And I'm sorry.  That's not
16 politically correct.  I just -- he is on
17 the plaintiff's side.
18         Then you have Taxotere case
19 still ongoing.  Dr. Madigan is on the
20 opposite side.
21         I believe there are other
22 cases, sir.  I just don't remember.
23    Q.   So the ones that you can
24 remember -- I'll make sure that I've got

Page 35

1 this correctly.  The ones that you can
2 remember that you've been on the opposite
3 side of Dr. Madigan, there's Taxotere
4 which is -- that's a litigation that's
5 still ongoing, correct?
6     A.   Correct.
7     Q.   There's Celebrex.  Now,
8 that's a litigation that you got involved
9 in more than ten years ago, correct?
10    A.   Yeah.  Correct.
11    Q.   You said there's a
12 securities case?
13    A.   Yeah, it's actually economic
14 loss, in some way.  This -- the investor,
15 they claimed they lost the money,
16 whatever it is, because the safety issue
17 about Celebrex.
18    Q.   I see.  Okay.  And other
19 than those three, I think you mentioned
20 one or two more.  What were the other
21 two -- or the other ones?
22    A.   No, I -- I don't remember
23 other.  I don't remember, sir.
24    Q.   I see.  So you just remember

Page 36

1 those three?
2     A.   Yeah, that's as far as I can
3 tell.  But, you know, maybe there are
4 more.
5     Q.   Okay.  Now, who first
6 reached out to you in this case?
7 Which -- how was that contact made to
8 you?
9     A.   It's defendant lawyers.
10    Q.   Okay.  Defending lawyers.
11 Which defending lawyer reached out to
12 you?
13    A.   Steve -- Steven, right?
14 Steven.
15    Q.   Steve Harkins?
16    A.   Yeah.  Hartley.
17    Q.   Okay.  So Steve Harkins
18 reached out to you?
19    A.   Yes, sir.
20    Q.   Have you ever worked with
21 Steve Harkins on any other litigation?
22    A.   No, sir.
23    Q.   Okay.  All right.  Let's
24 take a look here.  You were asked to

Page 37

1 analyze the opinions by Dr. Madigan.  And
2 so a lot of your report will be basically
3 a response or criticism of Dr. Madigan's
4 report, correct?
5     A.   Yes, sir.
6     Q.   And then you put, "and to
7 provide my own assessment of those
8 issues."
9         Do you see that?
10    A.   Yes, sir.
11    Q.   Now, what do you mean --
12 other than responding or criticizing
13 Dr. Madigan, what did you do in terms of
14 providing your own assessment?
15    A.   For example, I made a
16 comment about observational studies
17 issue.  And I provide the valsartan
18 studies.  And Dr. Madigan didn't mention
19 it at all in his report.
20    Q.   Okay.  So those are a couple
21 of examples where you say you made a
22 comment about observational study.  And
23 then you reviewed the valsartan studies
24 and gave commentary on the valsartan

Page 38

1 studies, right?
2     A.  Yes, sir.
3     Q.  Other than those two
4 examples, is there any other original
5 work that you did that wasn't just a
6 response or criticism to Dr. Madigan's
7 report?
8     A.  Well, Counsel, if you don't
9 mind, maybe later on we can go through my
10 report. We probably can pick up
11 something I can share with you what are
12 the -- actually from my own opinions,
13 which are not. But right now, that's the
14 only two things that I remember.
15     Q.  Okay. And we will go
16 through them further. I'm just trying
17 to, you know, lay some structure here
18 first.
19       So other than those two,
20 those are the only two opinions that you
21 can think of that are original opinions
22 as opposed to responding to Dr. Madigan?
23     A.  Yeah. At this point, yes.
24     Q.  Okay. Now, Dr. Madigan

Page 39

1 calculated lifetime cumulative exposures.
2     Did you understand that?
3     A.  Well, I understand it. But
4 I disagree with it.
5     Q.  I understand that you
6 disagree. But do you understand that he
7 was calculating cumulative exposures?
8     A.  Yes.
9     Q.  Okay. Now, you didn't
10 provide any of your own calculations on
11 cumulative exposures, correct?
12     A.  No.
13     Q.  And you haven't done any of
14 your own calculations on cumulative
15 exposures, correct?
16     A.  No.
17     Q.  And you didn't provide any
18 criticisms of his calculations. You
19 provided criticisms about extrapolating
20 those calculations, but you didn't
21 provide any criticisms on the
22 calculations themselves, correct?
23     A.  Well, I think that his basic
24 methods he rely to calculate exposure

Page 40

1 dosing level is flawed. I don't think I
2 even needed to worry about his
3 mathematical calculation.
4     Q.  Right. And when you said
5 his basic methods, you mean you have
6 concerns about him extrapolating those
7 results to NDMA and valsartan, correct?
8     A.  More than that, sir. Even
9 within the dietary studies, I have a
10 great concern about his conclusion, even
11 without extrapolate the results from a
12 dietary study to valsartan.
13     Q.  Okay. And that may be being
14 able to rely on the findings in the
15 dietary study itself, correct?
16     A.  Correct.
17     Q.  But in terms of the
18 calculations that he did, you didn't have
19 any criticisms of the calculations, just
20 how he would be able to use those
21 calculations, correct?
22     A.  Well, I don't have data to
23 verify exactly the number he calculate.
24 But I understand his mathematical

Page 41

1 formula. But that doesn't mean that his
2 calculated values are valid. I don't
3 know that part because I don't have the
4 data.
5     Q.  Okay. I understand. You
6 didn't -- you didn't provide any
7 criticisms on the math that he did,
8 correct?
9     A.  The formula he used.
10     Q.  Right. You didn't provide
11 any criticisms on the math he did -- he
12 completed, or the formula that he used to
13 complete -- complete those calculations
14 of lifetime cumulative exposures,
15 correct?
16     A.  See, let me answer this
17 question to you, sir. I have no problem
18 if he defines so-called a mean value of
19 this exposure time, okay, mathematically.
20 But I am not so sure that quantity can be
21 utilized to define the threshold of
22 value, beyond that value we have high
23 risk of cancer incidence. I disagree
24 with that, the application.

Confidential Information - Subject to Protective Order

Page 42

1       But, sir, if you ask me if
2  his mathematical formula to calculate
3  what he thinks is okay, I say, yes, his
4  mathematical formula is very simple.
5  Everybody can understand it.
6       Q.   Now, you just said, "I have
7  no problem if he defines a mean value of
8  this exposure time, okay, mathematically.
9  But I am not so sure that the quantity
10 can be utilized to define the threshold
11 value, beyond that value we have high
12 risk of cancer incidence."
13      So you disagree with that
14 application.
15      Now, that opinion is nowhere
16 to be found in your report, correct?
17      A.   Correct.
18      Q.   And so for the first time
19 here today, you're giving that criticism,
20 correct?
21      A.   Well, that's my concern.  I
22 don't mean to put in the report, because
23 basically I don't even think the way he
24 derived this lifetime exposure level is

Page 43

1  correct.  So I don't even bother to go in
2  saying, "Your calculation is misleading,
3  even though mathematically it's correct."
4       MR. NIGH:  Okay.  Let's take
5  a look at LP-1558.
6       (Document marked for
7  identification as Exhibit
8  Wei-4.)
9       MR. NIGH:  Let's blow up
10 that first part.  This will be
11 marked as Exhibit 4, Wei
12 Exhibit 4.
13 BY MR. NIGH:
14      Q.   And you see the top part
15 says, "NDMA-Contaminated Valsartan, David
16 Madigan, Ph.D."  And it shows his
17 signature.
18      Do you see that?
19      A.   Yes, sir.
20      Q.   And this is the report that
21 you were speaking about in Number 11 in
22 terms of your report, your assignment,
23 was to review this report and provide
24 your response or criticisms of this

Page 44

1  report, correct?
2       A.   Yes, sir.
3       Q.   Okay.
4       MR. NIGH:  Let's take a look
5  at LP-1576.
6       (Document marked for
7  identification as Exhibit
8  Wei-5.)
9  BY MR. NIGH:
10      Q.   And can you see that this is
11 your invoice?
12      A.   Yes, sir.
13      MR. NIGH:  Let's go ahead
14 and blow up that top part, the
15 very top part there, right.
16 BY MR. NIGH:
17      Q.   And it starts out with
18 Bluenull LLC, and it gives an address
19 there.
20      Do you see that?
21      A.   Yes, sir.
22      Q.   What is Bluenull LLC?
23      A.   It's a small consulting
24 group I put together more than maybe

Page 45

1  15 years ago.  And the basic idea is we
2  provide statistical consultations to
3  folks like this case or pharmaceutical
4  industry and government university,
5  anything related to quantitative science,
6  we provide service.
7       Q.   Now, for that consulting
8  group, would you agree that the
9  pharmaceutical industry is your top
10 client?
11      A.   Well, we actually had a few
12 projects with pharmaceutical industries.
13      Q.   Right.  Bluenull LLC has
14 received more money from pharmaceutical
15 industry than any other sector, correct?
16      A.   For example, sir, as you
17 started out -- what is other sectors?
18      Q.   Government, university?
19      A.   Of course.  Of course.  We
20 don't do much for university professors.
21      Q.   Okay.  And so my question
22 is, you would agree that the
23 pharmaceutical industry is your top --
24 sorry.  Strike that question.

Page 46

1 You would agree that
2 Bluenull LLC has received more money from
3 pharmaceutical industry than any other
4 sector, correct?
5 A. Well, not quite. Depend on
6 which year. One year we work as the
7 plaintiff side for Toyota braking system,
8 security issue. The Bluenull was in the
9 plaintiffs side.
10 So we didn't work for
11 Toyota, for example.
12 So it is not really --
13 sorry, sir. It's not only --
14 Q. It's all right.
15 A. -- for pharmaceutical area.
16 Actually it's more than that. You know,
17 like, on this case, right, legal case, in
18 this sector.
19 Q. Yeah, my question isn't just
20 one year. You said that you started this
21 15 years ago. So looking over the last
22 15 years, you would agree that Bluenull
23 LLC has received more money from
24 pharmaceutical industry than any other

Page 47

1 sector, correct?
2 A. Correct.
3 Q. Okay. Now, you just told me
4 about one time that Bluenull LLC
5 represented a plaintiff. And that was
6 against Toyota; is that correct?
7 A. Correct.
8 Q. And when we say Bluenull
9 LLC, were you the expert in that -- were
10 you a disclosed expert in that Toyota
11 case where you were representing the
12 plaintiff?
13 A. I was only -- I think I was
14 one of the consultant, because we have
15 many, many consultant at -- to Bluenull.
16 We probably roughly have ten professors
17 from Harvard, from Stanford, Northwestern
18 University. People actually around the
19 country actually are members of a
20 consulting group.
21 So I believe for the Toyota
22 case, we actually had more than me
23 involved in that case. That is usually
24 the case. For example, Lipitor case for

Page 48

1 Pfizer, we had five -- five faculty
2 members in the group working together for
3 the case. So not only me.
4 Q. Were you personally involved
5 in the Toyota case?
6 A. Yes, sir.
7 Q. Now, other than the Toyota
8 case, were you -- did you ever represent
9 any other plaintiff?
10 A. Yes. I remember a couple
11 times we represent people accused by
12 Medicare fraud. I believe we were on the
13 plaintiff's side.
14 Q. Okay. So in a situation
15 where people are accused of Medicare
16 fraud, if you're on the plaintiff's side,
17 which party would you have been
18 representing?
19 A. We have -- represent a
20 doctor, and he was accused by Medicare,
21 and, say, overcharge patients or
22 something like that.
23 Q. So you represented the
24 doctor who is being accused of

Page 49

1 overcharging patients?
2 A. Which is an inappropriate
3 accusation, in my opinion, but yes.
4 Q. I see. But in that
5 situation, you would have actually been
6 representing a defendant, correct?
7 Because he was being accused. He was the
8 accused. He was being accused of
9 overcharging patients, so he would have
10 been a defendant in that case, right?
11 A. Yes. Another case I cannot
12 release to you right now is ongoing.
13 It's from -- I also work for plaintiff,
14 because the other side is actually
15 accused.
16 I'm sorry. I get it
17 confused. It's still defendant. The
18 plaintiff's side is government.
19 Q. Okay.
20 A. The commission. But anyway,
21 I'm sorry. I apologize for that.
22 Q. So that other case that
23 you're thinking of, you actually
24 represent the defendant in that case,

Confidential Information - Subject to Protective Order

Page 50

¹ right?
² A. Yes. Yes.
³ Q. Okay. Other than the
⁴ plaintiff that you represented in the
⁵ Toyota case, is there any other plaintiff
⁶ that you've represented in your career?
⁷ A. For my, it's not. But I'm
⁸ not for sure for other consultants
⁹ because I don't worry about other
¹⁰ consultant in the group. Whether they
¹¹ did, I have no idea.
¹² Q. Well, for right now, my
¹³ questions -- take away Bluenull for now.
¹⁴ I'm just asking about you.
¹⁵ Are you aware of
¹⁶ representing, in your career, other than
¹⁷ the plaintiff in the Toyota case, any
¹⁸ other plaintiff?
¹⁹ A. No, not I can recall.
²⁰ Q. Okay. Let's talk about the
²¹ Toyota case. Tell me what your
²² involvement was in the Toyota case.
²³ A. Toyota case was very
²⁴ interesting. So many years ago, people

Page 51

¹ bought a Toyota with electronic braking
² system, which was new, replacing
³ so-called mechanical braking system.
⁴ Somehow when people step on
⁵ the brake, and the car, instead of
⁶ stopping, is accelerated. So that caused
⁷ some personal injury, also economic loss.
⁸ Economic loss was the case
⁹ plaintiff and -- submitted to the court.
¹⁰ And we actually helping plaintiff's side
¹¹ to -- to actually -- against -- against
¹² the Toyota. That's the case.
¹³ Q. And when did you get first
¹⁴ involved in that case?
¹⁵ A. When? Sir, I'm sorry?
¹⁶ Q. Approximately when did you
¹⁷ first got involved in that case?
¹⁸ A. I don't remember now. But
¹⁹ we can Google easily the case, you know,
²⁰ using Toyota, the braking system. It
²¹ must pop up.
²² Q. Is it more than ten years
²³ ago that you first became involved in
²⁴ that case?

Page 52

¹ A. I think it's less than ten
² years, but it's close.
³ Q. Close to ten years ago?
⁴ A. I cannot tell exactly.
⁵ Q. Okay. Yeah, I'm not asking
⁶ for exactly. Do you believe it was close
⁷ to ten years ago that you first became
⁸ involved in that Toyota braking case?
⁹ A. Sir, I really want to
¹⁰ double-check before I answer your
¹¹ question.
¹² Q. Okay. And you said that you
¹³ would search Google, you would see when
¹⁴ they first brought those cases, but how
¹⁵ would that tell you when you first became
¹⁶ involved? Because I don't think if we
¹⁷ search Google, it will say Dr. Wei became
¹⁸ involved -- first became involved in the
¹⁹ case at this time.
²⁰ So how would you search
²¹ Google to tell when you first became
²² involved?
²³ A. No, no, sir. What I'm
²⁴ saying, you ask me when was that case. I

Page 53

¹ said in general we can Google to find
² out.
³ If you're asking me
⁴ specifically when I was involved, I have
⁵ to go back to check my e-mails, if I
⁶ still have it, and I can get back to you
⁷ on that issue. I thought you were asking
⁸ me, when was the Toyota case, not asking
⁹ me when I got involved in that case.
¹⁰ Correct?
¹¹ Q. Actually. I am asking you
¹² when did you first become involved in
¹³ that Toyota case?
¹⁴ A. Then I cannot Google. You
¹⁵ said -- I'm not a famous person yet. So
¹⁶ I think -- but I can easily -- if I still
¹⁷ keep the e-mails, I can probably tell you
¹⁸ exactly when I was involved in Toyota
¹⁹ case.
²⁰ Q. Would you feel comfortable
²¹ in saying it was between five to 10 years
²² ago?
²³ A. Sir, I don't know why you
²⁴ want me to tell you exactly the timing.

Page 54

¹ Is that very important to you?  If it's
² so important, I can use lunch break to
³ figure out for you.
⁴     Q.   I'm asking you for your
⁵ memory.  You know, I'm not asking for
⁶ exact times.  So do you have any -- any
⁷ way of being able to describe about how
⁸ long ago that you first became involved
⁹ in that case?
¹⁰     A.   Okay.  That's fair question.
¹¹ I don't know why it is so important for
¹² this case.
¹³     Q.   You know, let's do this.  I
¹⁴ would appreciate if you don't try to
¹⁵ question why something is important.  If
¹⁶ I'm asking you the question, I'm allowed to
¹⁷ ask the question.
¹⁸         So let's go forward again on
¹⁹ this again.
²⁰         Do you have any way of being
²¹ able to describe about how long ago that
²² you first became involved in that case?
²³     A.   I don't remember, sir.
²⁴     Q.   Okay.  So you wouldn't be

Page 55

¹ able to say if it was five years ago, ten
² years ago, or 15 years ago, as you
³ remember here?
⁴     A.   No.  Less than 15 years,
⁵ that's for sure.
⁶     Q.   Less than 15.  Okay.  All
⁷ right.  Back to the billing.
⁸         MR. NIGH:  We can put that
⁹     back up there.
¹⁰ BY MR. NIGH:
¹¹     Q.   Okay.  We can see the date
¹² at the top again, if you don't mind.
¹³         Here we can see Bluenull,
¹⁴ and then we can see the date, August 3rd,
¹⁵ 2021.  And then it says, "To:  Greenberg
¹⁶ Traurig," correct?
¹⁷     A.   Yes.
¹⁸     Q.   And it's your understanding
¹⁹ that it was Greenberg Traurig who
²⁰ retained you for this case?
²¹     A.   I'm sorry, sir.  Say it
²² again, please.
²³     Q.   Were you retained on behalf
²⁴ of Greenberg -- on behalf of Teva or by

Page 56

¹ Greenberg Traurig?
²     A.   Yes, sir.
³     Q.   Okay.  And taking a look
⁴ down, we can see your hours.  And it says
⁵ that you spent a total of 45.65 hours on
⁶ this project between July 9th and
⁷ August 2nd.
⁸         Do you see that?
⁹     A.   Yes, sir.
¹⁰     Q.   Now, that would be, you
¹¹ know, over 45 hours in less than a month,
¹² correct?
¹³     A.   Yes, sir.
¹⁴     Q.   And you only first became
¹⁵ involved July 9th after Dr. Madigan
¹⁶ submitted his expert report on July 6th,
¹⁷ correct?
¹⁸     A.   I don't remember on July 9th
¹⁹ I got exactly Dr. Madigan's report that
²⁰ day or not.  But I remember I got a
²¹ listing of references from the lawyers on
²² July 9th asking me to review.
²³     Q.   Okay.  So Dr. Madigan
²⁴ submitted his report at the beginning of

Page 57

¹ July.
²         MR. NIGH:  Actually, let's
³     go back to Madigan's report.
⁴     LP-1558.
⁵         Let's blow up the signature
⁶     and the date.
⁷ BY MR. NIGH:
⁸     Q.   Do you see that signature,
⁹ and, right below it, it's signed July 7,
¹⁰ 2021?
¹¹     A.   Yes, sir.
¹²     Q.   So you only -- you only
¹³ became involved a couple days after the
¹⁴ date of this expert report, correct?
¹⁵     A.   Correct.
¹⁶     Q.   Okay.  Let's go back to your
¹⁷ billing.  And when you first were
¹⁸ involved, my understanding is on
¹⁹ July 9th, you got a list of references
²⁰ from the defense attorneys, correct?
²¹     A.   Correct.
²²     Q.   And then you also had a
²³ DropBox with those studies, correct?
²⁴     A.   I don't think on July 9th I

1 got a listing from the DropBox yet.
2      Q.   Okay.  Do you know
3 approximately when you got the DropBox of
4 studies?
5      A.   I'm not quite sure.  Maybe a
6 week afterward, like three or four days.
7 I don't recall, sir.
8      Q.   Okay.  If we take a look at
9 the bottom here, the next page.  It shows
10 August 2nd, .8 hours.
11           Do you see that?
12      A.   Yes, sir.
13      Q.   Now -- and that's the last
14 date on this invoice.
15           Between August 3rd and
16 today, how long -- how many more hours
17 have you spent on this case?
18      A.   I don't know exactly the
19 number of hours, sir.  I need to go back
20 and check my e-mails.  I haven't
21 tabulated the number of hours that I've
22 been working on this case after
23 August 3rd.
24      Q.   Okay.  Do you see how each

1 of these dates has a number of hours,
2 7/23, three hours; 7/24, 6 hours; 7/25,
3 2.5 hours?
4           Would you be writing down
5 those hours simultaneously as doing the
6 work each day?
7      A.   No.  What happens in my
8 practice -- I don't know other
9 consultants.  At end of the day, I
10 just -- every time I had a conference
11 call, I roughly estimate how many minutes
12 I been on the call that day.
13           Usually I write it up right
14 away after the call and how many hours I
15 reviewed the documents right after I'm
16 recording how many hours, piece by piece.
17 Then end of the day, I actually put up a
18 number, add the total number of hours for
19 that day.
20      Q.   Okay.  And so at the end of
21 the day you would total up your number of
22 hours for each day that you spent time on
23 this case, correct?
24      A.   Yes, sir.

1      Q.   Did you keep doing that
2 after August 3rd?
3      A.   I believe so, yes.
4      Q.   So where do you keep that
5 information, the number of hours that you
6 spent each day?
7      A.   I'm not very good at
8 lawyers.  I know my assigned lawyer, he
9 has very good software to doing this kind
10 of thing.
11           I usually just very casually
12 put in an e-mail, and I put it -- e-mail,
13 send it to myself, so I have a record.
14 And then towards the end of the day, I
15 just go through this and add it up.
16      Q.   So that's what I'm asking
17 for.  I'm not asking for each individual,
18 you know, e-mail.  I'm asking for where
19 do you tabulate at the end of the day,
20 where do you keep those hours?  You say
21 at the end of the day you add them up.
22 You put them somewhere.  Where do you put
23 those hours that you've added up at the
24 end of each day?

1      A.   Basically, for example, I
2 have three e-mails related to the case
3 today.  And end of the day, I look at
4 three, the last e-mail, I just put it
5 down the total number for that date,
6 that's it.
7      Q.   Oh, I see.  So what you're
8 doing is your last piece of work
9 assignment or last e-mail that you
10 received for the day, you will put your
11 total number of hours in that e-mail?
12      A.   Yes, sir.
13      Q.   Okay.  So you would need to
14 go back through each of those e-mails to
15 be able to get the total number of hours
16 that you've completed since August 3rd,
17 correct?
18      A.   Yeah, very inefficient, but
19 that's the way I did it for many years.
20      Q.   Okay.  What's your best
21 estimate in terms of your total number of
22 hours that you spent between August 3rd
23 and today?
24      A.   My best estimate, probably

Confidential Information - Subject to Protective Order

Page 62

1 30 or 35 hours total. But I'm not quite
2 sure. I haven't counted today's yet. I
3 don't know how many hours that you're
4 going to spend with me or even tomorrow.
5      Q.   No, I understand. I'm
6 talking about -- let's -- your best
7 estimate before -- let's say between
8 August 3rd and yesterday, is it still 30
9 to 35 hours?
10      A.   Yeah. Sorry.
11           Yeah, I think it's between
12 30 and 35. That's my rough guess, sir.
13 Again, I apologize, I don't know exactly
14 the number.
15      Q.   Okay. Do you believe the
16 valsartan -- the NDMA in dietary studies
17 or the NDMA is somehow different --
18 sorry. Strike that.
19           Do you believe the NDMA --
20 exogenous NDMA in foods is somehow
21 different or acts differently than the
22 NDMA in valsartan?
23      A.   Sir, I am not a
24 toxicologist. I cannot make that

Page 63

1 comment. I have no opinion on this.
2      Q.   Okay. And you're not a
3 pharmacologist either, so you haven't
4 looked at anything in regards to
5 pharmacokinetics, correct?
6      A.   Correct.
7      Q.   Okay.
8           MR. NIGH: Let's take a look
9      at LP-1474.
10          (Document marked for
11      identification as Exhibit
12      Wei-6.)
13          MR. NIGH: This will be
14      marked as Exhibit -- Wei
15      Exhibit 6.
16 BY MR. NIGH:
17      Q.   At the bottom, you can see
18 World Health Organization, Geneva 2002.
19           And in the center you can
20 see nitrosodimethylamine.
21           Do you see that?
22      A.   Yes, sir.
23      Q.   Do you know what
24 nitrosodimethylamine stands for -- or

Page 64

1 what that is?
2      A.   I thought that is the DM --
3 NDMA; is that correct?
4      Q.   Yes. And so this is a
5 report from the WHO in 2002 on NDMA.
6           Before today, have you ever
7 seen this?
8      A.   I did see it. I didn't read
9 it word by word. And I did a glance
10 over.
11      Q.   Okay. So you have seen this
12 before today?
13      A.   Yes.
14      Q.   And you said that you
15 glanced over it?
16      A.   Yes.
17      Q.   Okay. Let's take a look at
18 Page 4.
19          MR. NIGH: Let's blow up the
20      paragraph on the right side, third
21      paragraph down.
22 BY MR. NIGH:
23      Q.   And here it says, "Based
24 upon laboratory studies in which tumors

Page 65

1 have been induced in all species,
2 examined at relatively low levels, NDMA
3 is clearly carcinogenic."
4           Do you see that?
5      A.   Yes, sir.
6      Q.   Now, today, you're not
7 offering any opinions as to whether or
8 not NDMA is carcinogenic, correct?
9      A.   No.
10      Q.   Okay. And also you didn't
11 review any of the laboratory studies in
12 which tumors were being induced in
13 species when administered NDMA, correct?
14      A.   Correct.
15      Q.   Okay. Here, next it says,
16 "There is overwhelming evidence that NDMA
17 is mutagenic and clastogenic."
18           Do you know what mutagenic
19 and clastogenic refer to?
20      A.   No, sir.
21      Q.   Okay. At the bottom it
22 shows, "Qualitatively, the metabolism of
23 NDMA appears to be similar in humans and
24 animals. As a result, it is considered

Confidential Information - Subject to Protective Order

Page 66

¹ highly likely that NDMA is carcinogenic
² to humans, potentially at relatively low
³ levels of exposure."
⁴         Do you see that?
⁵     A.   Yes, sir.
⁶     Q.   And you did not review human
⁷ tissue studies where they were analyzing
⁸ the metabolism of NDMA, correct?
⁹     A.   Right.
¹⁰     Q.   Taking a look at the next
¹¹ page, on the upper left corner.
¹²         It says, "Cancer is clearly
¹³ the critical endpoint for quantification
¹⁴ of exposure relationship for risk
¹⁵ characterization of NDMA.  In addition to
¹⁶ it being best characterized, in general,
¹⁷ tumors occur at lowest concentration
¹⁸ compared with those typically reported to
¹⁹ induce noncancer effects."
²⁰         Do you see that?
²¹     A.   Yes, sir.
²²     Q.   And you didn't perform any
²³ sort of risk assessment analysis in terms
²⁴ of looking at, you know, at what levels

Page 67

¹ or concentrations of NDMA tumors would be
² induced, either in animals or humans,
³ correct?
⁴     A.   No, sir.  But that was not
⁵ on my assignment.
⁶     Q.   Okay.  And then at the
⁷ bottom it says, "NDMA is a genotoxic
⁸ carcinogen and exposure should be reduced
⁹ to the extent possible."
¹⁰         Do you see that?
¹¹     A.   Yes, sir.
¹²     Q.   And you have no reason to
¹³ disagree with the WHO when they say that
¹⁴ NDMA is a genotoxic carcinogen and
¹⁵ exposure should be reduced to the extent
¹⁶ possible, correct?
¹⁷     A.   Well, it depend on disagree,
¹⁸ or agree.  You asking me.  I said this
¹⁹ document is very old, almost 20 years
²⁰ old.  I'm surprised they didn't even
²¹ up-to-date this website or the report.
²² I'm surprised this is 20 years old, the
²³ document is still existing.
²⁴     Q.   I'm sorry.  You're surprised

Page 68

¹ they haven't updated this report since
² then?
³     A.   You know it's 20 -- almost
⁴ 20 years, right, sir.
⁵     Q.   Have you seen updated
⁶ reports from various --
⁷     A.   No.
⁸     Q.   -- agencies where they
⁹ updated their analysis on NDMA?
¹⁰     A.   I don't think they have
¹¹ updated, as far as I know.
¹²     Q.   As far as you know, you are
¹³ not aware of any other agencies, health
¹⁴ agencies or regulatory agencies that have
¹⁵ updated their opinions on NDMA and
¹⁶ whether or not it's reasonably
¹⁷ anticipated to be carcinogenic?
¹⁸     A.   I don't think -- if there is
¹⁹ one, I would be happy to read it, sir.
²⁰         MR. NIGH:  Let's take a look
²¹     at 23.
²² BY MR. NIGH:
²³     Q.   Now, other than the update,
²⁴ the question on whether or not it's been

Page 69

¹ updated in 20 years, do you have any
² other reasons to disagree?
³     A.   Well, I'm not a -- I'm
⁴ sorry, sir.  I don't mean to talk over
⁵ you.  I'm sorry.  Why don't you finish.
⁶     Q.   No, that's okay.  Do you
⁷ have any other reasons to disagree with
⁸ the WHO?
⁹     A.   No, sir.  I don't know this
¹⁰ WHO's position, you call this document,
¹¹ or paper, whatever you want, right.  But
¹² I'm saying in general, any animal study
¹³ trying transported to human study, and we
¹⁴ know very well, sometimes just doesn't
¹⁵ work.  It's trivial.
¹⁶         And that's why we need human
¹⁷ studies to confirm what the WHO, the
¹⁸ position papers, right.  But I'm
¹⁹ surprised, so many papers published
²⁰ afterwards, WHO did not have updated
²¹ version.  That's my understanding, right.
²² If you have updated version, I'd be happy
²³ to read it.
²⁴     Q.   But my understanding is that

Page 70

¹ you haven't reviewed any updated position
² papers from any of the agencies that
³ have, you know, discussed NDMA and it
⁴ being a probable carcinogen and/or
⁵ reasonably anticipated to be a human
⁶ carcinogen, correct?
⁷     A.    Yeah, from human being --
⁸ from human being studies.
⁹     Q.    Okay.  Let's take a look
¹⁰ at -- now, if there were other regulatory
¹¹ agencies that have looked at updated
¹² epidemiological studies and included that
¹³ in their assessment, isn't that something
¹⁴ that you would want to review?
¹⁵     A.    Oh, yeah, for sure.  I'd
¹⁶ love to read it.
¹⁷         MR. NIGH:  Okay.  Let's take
¹⁸     a look at 23 on the right side.
¹⁹     First paragraph.
²⁰ BY MR. NIGH:
²¹     Q.    And here they say, WHO says,
²² "Therefore, owing to the considerable
²³ evidence of carcinogenicity of NDMA in
²⁴ laboratory species, evidence of direct

Page 71

¹ interaction with DNA consistent with
² tumor formation, and the apparent lack of
³ qualitative species-specific differences
⁴ in the metabolism of this substance, NDMA
⁵ is highly likely to be carcinogenic to
⁶ humans."
⁷         Do you see that?
⁸     A.    Yes, sir.
⁹     Q.    Now, I just want to confirm,
¹⁰ you didn't look at any studies on NDMA in
¹¹ laboratory species, correct?
¹²     A.    Correct.
¹³     Q.    You didn't look at any
¹⁴ studies on the evidence of direct
¹⁵ interaction with DNA consistent with
¹⁶ tumor formation, correct?
¹⁷     A.    Correct.
¹⁸     Q.    And you didn't look at any
¹⁹ studies that showed whether or not there
²⁰ was an apparent lack of qualitative
²¹ species-specific differences in the
²² metabolism of NDMA, correct?
²³     A.    Correct.
²⁴         MR. NIGH:  Okay.  We can put

Page 72

¹ this away.
² BY MR. NIGH:
³     Q.    We've been going over a
⁴ little over an hour.  Would you like to
⁵ take a break about now?
⁶     A.    No.  If you want to take a
⁷ break, you know, go ahead.  But I'm okay.
⁸     Q.    Okay.  Let's keep going.
⁹         All right.  We'll take a
¹⁰ look at LP-1577.  This is your report
¹¹ again.
¹²         Now, Doctor, during
¹³ Dr. Panigrahy's deposition, defense
¹⁴ counsel asked Dr. Panigrahy multiple
¹⁵ questions regarding a couple of sentences
¹⁶ that he had that were identical between
¹⁷ his Actos report and his valsartan
¹⁸ report, a couple sentences out of a
¹⁹ 256 -- 250-plus-page report that he
²⁰ submitted in valsartan.
²¹         Did you review that
²² testimony at all?
²³     A.    No, I don't.
²⁴     Q.    Now, would you be worried

Page 73

¹ yourself about a criticism like that,
² that there are identical sentences from
³ one past expert report versus a -- the
⁴ report that you produced here today?
⁵         MR. MERRELL:  Objection to
⁶     form.
⁷         THE WITNESS:  I'm not quite
⁸     sure of your question.  You said
⁹     am I worried about it?  I didn't
¹⁰     have access to other experts'
¹¹     reports?  Is that what your
¹²     question?
¹³ BY MR. NIGH:
¹⁴     Q.    Would you personal --
¹⁵     A.    I don't understand your --
¹⁶     Q.    Would you be personally
¹⁷ worried if there was a problem with
¹⁸ cutting and pasting or having identical
¹⁹ sentences from a past expert report and
²⁰ the expert report you've submitted in
²¹ valsartan?
²²         MR. MERRELL:  Objection to
²³     form.
²⁴         THE WITNESS:  I'm not quite

Confidential Information - Subject to Protective Order

1  sure which part you're talking
2  about.  For example, for my
3  quantification, usually I usually
4  use older things.  I use it many,
5  many times for legal case, almost
6  identical, except for up-to-dated
7  the number of publications or new
8  award I received.
9      I just simply up-to-date it.
10  If you said, well, you know, you
11  shouldn't cut and paste from
12  previous report.  I say, well,
13  it's my report.  I can do anything
14  that I wanted to, right.  I can
15  copy every word I wanted to, as
16  long as it reflect the truth.
17  BY MR. NIGH:
18      Q.  So it's your belief that --
19  you know, not just qualifications, but if
20  you had it in a prior report, that you
21  could do anything you wanted with that
22  prior report and cut and paste or copy
23  any word that you wanted from a prior
24  report into this report, as long as it

1  reflects the truth, correct?
2      A.  Well, you say any word.
3  That's a very strong word, sir.  I
4  just -- we can repeat many, many word,
5  right.  I mean, I don't mean to play the
6  word game here with you, sir.  I'm just
7  wondering what is wrong with me citing
8  the principle of statistical methods,
9  right?  That's the same old thing, right?
10  Why should I every time write a legal
11  expert witness report, I have to redo it
12  changing the wording with the time,
13  because the principle is there.
14      The same wording, we can use
15  repeatedly.  Then for this case, what's
16  new?  Then I'm going to add in my new
17  opinions, right?  I don't see anything
18  wrong with that, sir.
19      Q.  So it's your testimony that
20  if it's the same principle that's being
21  repeated from a past report into this new
22  report, that you don't have any problem
23  with it having the exact words, as long
24  as it's the same principle that's being

1  applied for both reports, correct?
2      A.  Correct.
3      Q.  Fair enough.  Okay.
4      MR. NIGH:  Let's take a look
5  at -- let's take a look at
6  LP-1562.
7      (Document marked for
8  identification as Exhibit
9  Wei-7.)
10      MR. NIGH:  Let's go ahead
11  and blow up the In Re Bextra and
12  Celebrex Marketing.
13  BY MR. NIGH:
14      Q.  Do you see this, Doctor?
15      A.  Yes.
16      Q.  It says expert report of
17  Professor -- and it's you, right,
18  Dr. Wei?
19      A.  Yes, sir.
20      Q.  Okay.  And here it says,
21  "Name of expert, Dr. Wei."  And it says,
22  "Representing the defendant."
23      Is that accurate, that in
24  the Celebrex case, you were representing

1  the pharmaceutical industry defendant?
2      A.  Yes, sir.
3      Q.  Okay.  And let's take a look
4  below.
5      MR. NIGH:  If we can blow up
6  the table of contents.
7  BY MR. NIGH:
8      Q.  Here, you had a table of
9  contents for this report.
10      Do you see that?
11      A.  Yes, sir.
12      Q.  And then we can take a look
13  at the next page.
14      MR. NIGH:  Let's blow up the
15  table of contents there as well.
16  BY MR. NIGH:
17      Q.  And that continues with the
18  table of contents that you have with this
19  report.
20      Do you see that?
21      A.  Yeah.
22      Q.  And then let's look at
23  introduction.
24      And it says, "1.  I received

1 a Ph.D. degree in statistics in 1975 from
2 the University of Wisconsin.  I have been
3 a tenured professor of biostatistics at
4 Harvard University since 1991 and a
5 professor of biostatistical science and
6 computational biology at Dana Farber
7 Cancer Institute, Harvard Medical School,
8 since 1997."
9         Do you see that?
10     A.   Yes, sir.
11     Q.   This is describing you,
12 correct?
13     A.   Sorry, sir.  Say again.
14     Q.   I said this is -- these
15 qualifications are describing you,
16 correct?
17     A.   Yes, sir.
18     Q.   Okay.  And looking at
19 assignment, Number 4.  Assignment, it
20 says, "I have been asked to determine
21 whether Celebrex, at a daily dose of
22 200 milligrams, 400 milligrams, and
23 800 milligrams is associated with the
24 specific risk of cardiovascular events

1 relative to placebo and non-selective
2 nonsteroidal antiinflammatory drugs based
3 on reliable datasets accessible to me
4 from comparative clinical trials."
5         Do you see that?
6     A.   Yes, sir.
7     Q.   And so in the Celebrex case
8 you had clinical trials that you were
9 analyzing, correct?
10     A.   Yes, sir.
11     Q.   Are you aware of any
12 clinical trials in this case that have
13 compared people contaminated with NDMA,
14 valsartan -- or people taking
15 contaminated NDMA valsartan compared to
16 people taking uncontaminated valsartan?
17     A.   No, sir.
18     Q.   There aren't any such
19 clinical trials that would be of
20 relevance in terms of your opinion for
21 this question that you've looked at in
22 valsartan, correct?
23     A.   I don't have it actually.
24 The only thing that I'm worried about

1 is -- or concerned about is Dr. Madigan's
2 references.
3     Q.   Right.  And so in the
4 valsartan -- in the valsartan case, you
5 actually haven't looked at any data
6 regarding clinical trials, correct?
7     A.   No, sir.
8     Q.   Let's put that one to the
9 side.  We'll come back to it later.
10         MR. NIGH:  Let's take a look
11     at LP-1561.
12         (Document marked for
13     identification as Exhibit
14     Wei-8.)
15         MR. NIGH:  This will be
16     marked as Wei Exhibit 8.
17 BY MR. NIGH:
18     Q.   Here you see it says, "In Re
19 Taxotere Products Liability Litigation."
20         The date shows February 8,
21 2019.
22         Do you see that?
23     A.   Yes, sir.
24     Q.   Do you recall just giving

1 your Taxotere expert report a little over
2 two years ago?
3     A.   I vaguely remember, but not
4 very detailed anymore.
5     Q.   Okay.  And here it says,
6 "Expert report of Dr. Wei," correct?
7     A.   Yes, sir.
8     Q.   Okay.  And again, you were
9 representing the defendant pharmaceutical
10 company in this case, correct?
11     A.   Correct.
12     Q.   And in the introduction --
13 if you see the introduction, which is the
14 first couple sentences, it says, "I
15 received a Ph.D. in statistics from the
16 University of Wisconsin.  I have been a
17 tenured professor of biostatistics at
18 Harvard University since 1991 and was a
19 professor of biostatistical science and
20 computational biology at Dana Farber
21 Cancer Institute, Harvard Medical School,
22 between 1997 and 2012."
23         Correct?
24     A.   Yes, sir.

Confidential Information - Subject to Protective Order

Page 82

1    Q.   So this again, this is
2  describing you, correct?
3    A.   Yes, sir.
4       MR. NIGH:  Let's take a look
5  at LP-1579.
6       (Document marked for
7       identification as Exhibit
8       Wei-9.)
9       MR. NIGH:  This is being
10      marked as Exhibit 9.
11 BY MR. NIGH:
12   Q.   Here it says, "Bone Care
13 International LLC and Genzyme
14 Corporation."
15      Do you see that?
16   A.   Yes, sir.
17   Q.   And here it says, Doctor --
18 it's an expert report on October 30,
19 2009, correct?
20   A.   Yes, sir.
21   Q.   And Bone Care International
22 LLC, that's another -- that's a
23 corporation.  The plaintiff here is a
24 corporation, correct?

Page 83

1    A.   Sorry, back in 2009, my
2  memory is really fuzzy about this case.
3  So if you can remind me of what's going
4  on, I would really appreciate it.
5    Q.   Okay.  Let's take a look at
6  the -- let's take a look under summary of
7  opinion.
8       It says, "I have been asked
9  by counsel for Genzyme to investigate
10 whether there is a difference in
11 treatment of secondary hyperthyroidism
12 in" -- "hyperparathyroidism in patients
13 with end stage renal disease using
14 either" -- I'm not sure I can pronounce
15 that. -- "doxercalciferol administered
16 intravenously or calcitriol administered
17 intravenously with respect to side
18 effects using data from two studies that
19 were reported."and then it gives those
20 cites.
21      Do you see that?
22   A.   Yes, sir.
23   Q.   Does that help refresh your
24 recollection?

Page 84

1    A.   No, not really.  It has been
2  too long.
3    Q.   Do you know that in this
4  case you were representing a corporation?
5    A.   Say it again, sir.
6    Q.   Do you know that in this
7  case you were representing a corporation?
8    A.   I'm not quite sure I
9  understand your question.  I mean, I'm
10 representing Genzyme here, right.
11   Q.   Genzyme.
12   A.   Right.
13   Q.   Do you know that Genzyme is
14 a corporation?
15   A.   Yeah, it used to be by
16 itself, an independent drug company.
17 They bought by Sanofi, I think.
18   Q.   I see.  So Genzyme is a
19 pharmaceutical industry corporation,
20 correct?
21   A.   Yes, sir.
22   Q.   Got it.  So this is another
23 case where you're representing
24 pharmaceutical industry, correct?

Page 85

1    A.   Well, sir, if I remember,
2  the plaintiff was also a corporation.
3    Q.   Right.
4    A.   It's not like -- it is fair
5  game.
6    Q.   It's pharmaceutical company
7  against pharmaceutical company, and you
8  were representing one of the
9  pharmaceutical companies, correct?
10   A.   Yes, sir.
11      MR. NIGH:  Okay.  Let's go
12      up on this expert report at the
13      top of the page, and it says --
14      where -- three and four, let's
15      highlight that all the way down to
16      summary of opinions, yes.
17 BY MR. NIGH:
18   Q.   Here it says, my CV -- I'm
19 not going to go into that.
20      Number 4, it says, "My
21 previous deposition and trial experience
22 is as follows."
23      And it shows Western
24 Division Cincinnati Services.

Confidential Information - Subject to Protective Order

Page 86

1          Do you see that?
2       A.   Yes.
3       Q.   And you represented the
4 defendant in that case, correct?  Do you
5 see where it says defendant?
6       A.    Sorry, yeah.  I -- for the
7 defendant, yes, sir.
8       Q.   And next is Ortho Biotech
9 Products versus Amgen.
10          Do you see that?
11       A.   Yes, sir.
12       Q.   And you represented the
13 plaintiff, but here the plaintiff is a
14 pharmaceutical industry, correct?
15       A.    Yeah.  This is a corporation
16 against a corporation, correct.
17       Q.   Pharmacy industry against
18 pharmacy industry again, correct?
19       A.   Correct.
20       Q.   And next it says, Bracco
21 Diagnostics versus Amersham Health
22 Incorporated.
23          Do you see that?
24       A.   Correct.

Page 87

1       Q.   And here it says for
2 defendant and plaintiff.  Did you
3 represent both the defendants and the
4 plaintiffs in this case?
5       A.    Well, this is interesting
6 case.  Actually, they're suing each
7 other.
8          So in one case -- it's the
9 same company.
10       Q.   Right.  But this is
11 another -- this is another one of, you
12 know, pharmaceutical industry against
13 pharmaceutical industry, correct?
14       A.   Correct.
15       Q.   Okay.  And so you would have
16 represented pharmaceutical industry in
17 that case, correct?
18       A.   Against another one, yes.
19       Q.   And then next we have
20 Howmedica Osteonics versus Zimmer.
21          Do you see that?
22       A.   Yes.
23       Q.   And you represented Zimmer
24 here, correct?

Page 88

1       A.   I apologize.  I don't
2 remember now.  This is 2007.
3       Q.   It says, for defendant.
4          Do you see that?
5       A.   Yeah, I mean, again, if it's
6 against Zimmer, then I'm for the
7 defendant, yes.
8       Q.   But nonetheless, here again,
9 I know we keep saying pharmaceutical.
10 But medical device and pharmaceutical
11 company.  This is another one of those
12 where we see pharmaceutical/medical
13 device company against
14 pharmaceutical/medical device company,
15 correct?
16       A.   Correct.
17       Q.   Okay.  And so you've
18 represented again a pharmaceutical
19 company/medical device company, correct?
20       A.   Correct.
21       Q.   And then we saw Bextra and
22 Celebrex.  And you represented a
23 pharmaceutical company in that case,
24 correct?

Page 89

1       A.   Yes, sir.
2       Q.   And then In Re Pfizer, is
3 the next one, securities litigation.  And
4 you represented the pharmaceutical
5 company in that case as well, correct?
6       A.   Yes, sir.
7       Q.   Okay.  Is it fair to say
8 that the vast majority of your expert
9 opinions are on behalf of pharmaceutical
10 companies?
11       A.   Yeah, as you can see,
12 against another company, not really
13 against an individual cases.
14       Q.   Right.  But my question is
15 not necessarily who they are against.
16 But the vast majority of your
17 representation would be on behalf of
18 pharmaceutical companies or medical
19 device companies, correct?
20       A.   Yeah, for some -- you know,
21 I'm really impressed, sir, you dig out of
22 the interesting case that I was working.
23          The second -- the first one,
24 Western Division Cincinnati Women, that

Confidential Information Subject to Protective Order

Page 90

¹ was a really interesting abortion case.
² And I was not concerning about any
³ company or anything.  It's actually we
⁴ fight for women's right.
⁵         The other side -- you know,
⁶ that's a very interesting case, actually.
⁷         Q.   Well, interesting that you
⁸ brought that up.  But you about you were
⁹ actually on the side of the defendant,
¹⁰ where you were looking to uphold a law
¹¹ that actually made it more difficult for
¹² women to be able to have abortions after
¹³ a certain time frame, correct?
¹⁴         A.   Correct, yes.
¹⁵         Q.   Okay.  So you weren't
¹⁶ actually in that case fighting on behalf
¹⁷ of women's rights.  You were actually on
¹⁸ the other side, right?
¹⁹         A.   Yeah, you're right.
²⁰         Q.   Okay.  Other than that case,
²¹ wouldn't you agree with me that the vast
²² majority of your opinions are on behalf
²³ of pharmaceutical companies or on behalf
²⁴ of medical device companies?

Page 91

¹         A.   Yes, sir.
²         MR. NIGH:  Okay.  Let's go
³    ahead and take a look at LP-1577.
⁴    We'll mark this as Wei Exhibit 10.
⁵         (Document marked for
⁶    identification as Exhibit
⁷    Wei-10.)
⁸ BY MR. NIGH:
⁹         Q.   Here you can see it's called
¹⁰ A Woman's Choice East Side Women's Clinic
¹¹ versus Scott Newman.
¹²         Do you see that?  It says,
¹³ et cetera, et al., defendants?
¹⁴         A.   Yep.
¹⁵         Q.   And this is the case that we
¹⁶ were just talking about, right?
¹⁷         A.   Yeah.
¹⁸         Q.   Okay.  And this is the case
¹⁹ where you were on the side of trying to
²⁰ uphold the law that made it more
²¹ difficult for women to get abortions,
²² correct?
²³         A.   Sir, I'm not so for sure
²⁴ that I would use your word "more

Page 92

¹ difficult" for women seeking abortion.  I
² think that's not appropriate word.
³         We are asking the court
⁴ upheld the law established by the state
⁵ of Indiana, Ohio, was --
⁶         Q.   Well, this is a law.  Sorry.
⁷ I didn't mean to interrupt you.  Go
⁸ ahead.
⁹         A.   So if I remember, sir, this
¹⁰ is a 1999, right?
¹¹         Q.   Yeah.
¹²         A.   That was a long, long time
¹³ ago.  And if I remember correctly, the
¹⁴ Indiana, example, state, had some kind of
¹⁵ abortion rules, right.  For example, in
¹⁶ Mississippi, I believe it's like 24 hours
¹⁷ or 48 hours waiting period.  Forgive me,
¹⁸ sir.  I don't remember detail anymore.
¹⁹         Basically, just saying,
²⁰ look, if a woman looking for abortion
²¹ after first contact with the clinic, and
²² she should wait about a time -- I don't
²³ know one day or two days.  Then go
²⁴ backwards.

Page 93

¹         Some people were just
² wondering, maybe they can settle down and
³ reconsider the situation after they got
⁴ the information from the clinic and they
⁵ can actually make a better decision
⁶ instead of, like, walking into the
⁷ clinic, like I go to fast food store or
⁸ like a McDonalds, right?
⁹         If I want to have abortion,
¹⁰ then I'm going to do right away.  So
¹¹ that's basically the principle, should we
¹² have this waiting period.
¹³         And the state legislature
¹⁴ established and say could you please keep
¹⁵ this rule.
¹⁶         That's what my
¹⁷ understanding, my memory, my
¹⁸ recollection.
¹⁹         Q.   Do you recall stating in
²⁰ here that you would agree with a law that
²¹ says banning abortions after 15 weeks of
²² pregnancy that you would support that?
²³         A.   I don't remember exactly the
²⁴ weeks of the pregnancy anymore, sir.

Page 94

1 This has been long time.
2    Q.   Okay.
3        MR. NIGH:  Let's move on
4    from that.  Let's go ahead and
5    take a break at this point.
6        THE VIDEOGRAPHER:   The time
7    right now is 10:34 a.m.  We're off
8    the record.
9        (Short break.)
10       THE VIDEOGRAPHER:   The time
11   right now is 10:54 a.m.  We're
12   back on the record.
13 BY MR. NIGH:
14   Q.   Now, doctor, remember we
15 were talking about cutting and pasting
16 from prior reports.  And you said that it
17 wouldn't be uncommon for you to cut and
18 paste information from your
19 qualifications into your reports,
20 correct?
21   A.   Sorry, Counsel, your picture
22 is so fuzzy.
23       Okay.  What I was saying,
24 sir, is this, like, my job description, I

Page 95

1 think it's perfectly all right to just
2 use the same old language, right.
3 Nothing wrong with that.
4        If I stated the principle,
5 the principle of a statistical method,
6 that never changes so far, it is all
7 right.
8        But if you're actually
9 dealing with a new case, if a new
10 situation, then I don't think we just
11 repeat what we said before, right, which
12 may not be relevant.
13   Q.   I'm not going to look at
14 your qualifications for now in terms of
15 comparing your results.  I'm going to
16 look at your analysis.  Okay.  We're
17 going to skip past qualifications.
18        I think you would agree with
19 me that you would commonly take the same
20 information in your qualifications in one
21 report and put it into other reports,
22 correct?
23   A.   Correct.  Sorry, Counsel.
24 Could you show your picture again?  Could

Page 96

1 talk again.  I think I want to click
2 again.  It's very fuzzy somehow.
3        MR. MERRELL:  It's fuzzy for
4    me too.
5        MR. NIGH:  Okay.  Let's go
6    ahead and get off the record and
7    see if we can fix the fuzziness.
8        THE VIDEOGRAPHER:  The time
9    right now is 10:56 a.m.  We're off
10   the record.
11       (Brief pause.)
12       THE VIDEOGRAPHER:  The time
13   right now is 10:58 a.m.  We're
14   back on the record.
15 BY MR. NIGH:
16   Q.   Okay.  I think you would
17 agree with me that you would commonly
18 take the same information in your
19 qualifications in one report and put it
20 into other expert reports, correct?
21   A.   Correct.
22   Q.   Okay.  Let's -- what I want
23 to do is get past that and look at your
24 analyses between -- and compare it

Page 97

1 between these reports.
2        MR. NIGH:  So let's go ahead
3    and, side by side, I want to have
4    LP-1557 and LP-1561.
5 BY MR. NIGH:
6    Q.    Side by side, we're going to
7 look at your expert report that you
8 provided here in valsartan with your
9 expert report that you provided in
10 Taxotere.  Okay.
11       MR. NIGH:  Let's take a look
12   at Page 7 of the valsartan report.
13   Valsartan, go to Page 7.  Yes.
14   And then on Taxotere we will go to
15   Page 2.
16       Let's blow up this first
17   paragraph for valsartan that
18   starts with "Suppose."  Let's blow
19   that up.
20       And then let's blow up on
21   the other side Paragraph 12 that
22   starts with "Suppose."
23       And let's -- can we make
24   that just a tad bit, I'm not sure

Page 98

1    if it's to make that other
2    "suppose" bigger.
3  BY MR. NIGH:
4      Q.   What we see, on the left
5  side is your expert report, valsartan.
6  It starts off with, "Suppose that we are
7  interested in the rate of occurrence of a
8  certain clinical event, for example,
9  cancer, among subjects exposed to NDMA or
10 NDEA and their counterparts are control."
11     On the Taxotere side, it
12 says, "Suppose that we are interested in
13 the rate of occurrence of a certain
14 clinical event, for example, permanent
15 alopecia among patients treated with
16 Taxotere relative to its counterpart,
17 control, for patients who have been
18 exposed to other treatments."
19     Do you see that?
20     A.   Yes, sir.
21     Q.   Now, you would agree that
22 the structure of those sentences are very
23 similar, and essentially what it appears
24 you have done is take out what was

Page 99

1  relevant to Taxotere and plug in what's
2  relevant for valsartan, correct?
3      A.   Well, that's -- I change the
4  word here, right.  Not exactly copied the
5  same old thing like on the left --
6  right-hand side.
7      Q.   Right.  At the time that
8  you're doing your valsartan report, you
9  had your Taxotere report.  And you used
10 the Taxotere report as your framework for
11 the valsartan report, correct?
12     A.   For statistical principles
13 here.
14     Q.   Right.  But you used your
15 Taxotere report as your framework for
16 your valsartan report, correct?
17     A.   I used the same -- similar
18 format to describe statistical
19 methodologies from Taxotere case to the
20 valsartan case.
21     Q.   Okay.  And in fact, you used
22 a lot of similar word structure
23 throughout the report in Taxotere
24 compared to your report in valsartan,

Page 100

1  correct?
2      A.   For statistical principle,
3  yes.
4      Q.   Well, let's look at the next
5  line.  It says -- in the next line, it
6  says, "In the first step" -- on the
7  valsartan side.  "In the first step, and
8  we take a sample from a population of
9  subjects exposed and another example from
10 the population of subjects who were not
11 exposed."
12     On the Taxotere side, "In
13 the first step, we take a sample of the
14 population of patients treated with
15 Taxotere and another example from the
16 population of patients who did not
17 receive Taxotere."
18     You would agree those
19 sentences are very similar, correct?
20     A.   Correct.
21     Q.   On the left -- on the left
22 side, your valsartan report, you say,
23 "Assuming that these samples are valid
24 representatives of the two populations,

Page 101

1  quantitative analytic methods can be used
2  to determine whether the exposed group
3  has higher, lower, or similar event rate
4  than that for the control group."
5      On the other side, you say,
6  "Assuming" -- on Taxotere, you say,
7  "Assuming that the samples are valid
8  representatives of two populations,
9  quantitative analytic methods can be used
10 to determine whether the Taxotere group
11 has a higher, lower, or similar rate" --
12 "event rate than that for the
13 non-Taxotere group."
14     Do you see that?
15     A.   Yes, sir.
16     Q.   You would agree those
17 sentences are very similar, correct?
18     A.   Yes, sir.
19     Q.   Next, on the valsartan side,
20 it says, "Since we draw conclusions based
21 on a subset of subjects, any qualitative
22 or quantitative interpretation of the
23 result, whether the rate is higher or
24 not, is subject to sampling error."

Confidential Information - Subject to Protective Order

Page 102

1        On the Taxotere side, you
2  say, "Since we draw conclusions based on
3  a subset of patients, any qualitative or
4  quantitative interpretation of the
5  result, whether the rate is higher or not
6  is subject to sampling error."
7        Correct?
8     A.   Yep.
9     Q.   Those are sentences that
10 appear in both these reports, correct?
11    A.   Correct.
12    Q.   On the valsartan side, you
13 say, "That is, the observed event rate
14 may be higher leading to a possible false
15 positive finding."
16        MR. NIGH:  And we can go
17        down to the next -- yep, very
18        good.  There.
19 BY MR. NIGH:
20    Q.   "That is, the observed event
21 rate may be higher, leading to a possible
22 false positive, or lower leading to a
23 possible false negative finding, than the
24 true event rate in the population."

Page 103

1        On the other side you have,
2  "That is" -- for Taxotere, you have,
3  "That is, the observed event rate may be
4  higher, leading to a possible false
5  positive finding or lower leading to a
6  possible false negative finding than the
7  event rate in the population."
8        Those are the exact
9  sentences, correct, in both reports?
10    A.   Yes, sir.
11    Q.   Next, going down on the
12 valsartan side, on Page 8, it shows, "An
13 efficient statistical method for
14 analyzing such data minimizes the chance
15 of making these two types of errors."
16        And then on the Taxotere
17 side, it says, "An efficient statistical
18 method for analyzing such data minimizes
19 the chance of making these two types of
20 errors."
21        Those are exact sentences in
22 each of those reports, correct?  Correct?
23    A.   Yes, sir.
24    Q.   On the left side it says,

Page 104

1  "It is important to note that except for
2  the exposure to NDMA or NDEA, the exposed
3  subjects in the sample should be similar
4  to the subjects in the non-exposed sample
5  with respect to important observable or
6  unobservable confounders."
7        On the right side you say,
8  "It is important to note that except for
9  treatment with Taxotere, Taxotere users
10 in the sample ideally should be similar
11 to patients in the non-Taxotere sample
12 with respect to important observable or
13 unobservable confounders."  And then you
14 list, "E.g., age, disease status, et al."
15        Do you see that?
16    A.   Yes, sir.
17    Q.   Those sentence -- that part
18 of the sentence is very, very similar in
19 both of the reports, correct?
20    A.   Well, I missed example age
21 and disease status.
22    Q.   Right.  You didn't list any
23 examples in valsartan.  You just listed
24 them in Taxotere, correct?

Page 105

1     A.   Yeah.  Well, it's not
2  identical.  But I missed that part.
3     Q.   Okay.  Let's take a look at
4  18 on valsartan.  And let's scroll down
5  to the next paragraph.
6        So you followed that
7  principle in your report in Taxotere with
8  the same principle that you followed in
9  your report with valsartan, Number 18 and
10 13.
11        It says, "After we have
12 determined how to draw a valid sample
13 size from the population of interest, one
14 has to determine what clinical endpoints
15 are most appropriate to quantify the
16 exposure effect."
17        On the other side, "After we
18 have determined how to draw a valid
19 sample from the patient population of
20 interest, one has to determine what
21 clinical endpoints are most appropriate
22 to quantify the side effect of the
23 treatment."
24        Do you see that?

Confidential Information Subject to Protective Order

Page 106

1    A.   Yes, sir.
2    Q.   Those are very similar
3  sentences, correct?
4    A.   Yes, sir.
5    Q.   Next you have, "For the
6  present legal case," on the other side --
7  in valsartan, you have, "For the present
8  legal case."
9         And on the other side, you
10  have, "For the present legal case."
11         Do you see that?
12    A.   Yeah.
13    Q.   And then on the valsartan
14  side, you say, "For the present legal
15  case, the endpoint is whether the subject
16  had a certain type of cancer or the time
17  to occurrence of cancer."
18         On the Taxotere side, you
19  say, "For the present case, the endpoint
20  is whether the patient had permanent
21  alopecia or not."
22         Do you see that?
23    A.   Yes, sir.
24    Q.   So you basically plugged in

Page 107

1  what's relevant for valsartan on one
2  report and what's relevant for Taxotere
3  on the other report, correct?
4    A.   I used the same language.
5    Q.   Same framework, correct?
6    A.   Yes, sir.
7    Q.   On the valsartan side, you
8  say, "Suppose that, based on the sample
9  of 100 patients, at the end of the study,
10  four patients experienced such events."
11         On the other side, you used
12  the same "suppose" identically.
13         "Suppose that based on a
14  sample of 100 patients at the end of the
15  study, four patients experienced such
16  events."
17         Correct?  Those are
18  identical sentences, right?
19    A.   Yes, sir.
20    Q.   Next you say, "Obvious
21  estimate of the event rate for the
22  underlying population is .04 or
23  4 percent."
24         On the Taxotere side, you

Page 108

1  say, "An obvious estimate of the event
2  rate for the underlying population is .04
3  or 4 percent."
4         Those are exact sentences in
5  each report, correct?
6    A.   Correct.
7    Q.   Next sentence, "This is
8  called a point estimate."
9         On the Taxotere side, you
10  have, "This is called a point estimate."
11         Those are exact sentences,
12  correct?
13    A.   Yep.
14    Q.   Next you have, "However,
15  this estimate is based on a sample of
16  patients."
17         On the other -- Taxotere
18  side, you have, "However this estimate is
19  based on a sample of patients?"
20         Those are exact sentences in
21  your Taxotere report and your valsartan
22  report, correct?
23    A.   Yep.
24    Q.   On the valsartan side, you

Page 109

1  have, "The true event rate for the entire
2  population may be more or less than 4
3  percent."
4         On the Taxotere side, "The
5  true event rate for the entire population
6  may be more or less than 4 percent."
7         Those are exact sentences,
8  correct?
9    A.   Yeah.
10    Q.   On the valsartan side, you
11  have, "Different studies generating
12  different samples may find a different
13  proportion of subjects with cancer."
14         On the Taxotere side, you
15  have, "A different study based on
16  different sample may find different
17  proportion of patients that experienced
18  alopecia events."
19         Very similar sentence,
20  correct?
21    A.   Yep.
22    Q.   Next sentence, you have,
23  "Therefore" --
24         MR. NIGH:  And we're going

Page 110

1  to move onto Page 9 of the
2  valsartan report.
3  BY MR. NIGH:
4     Q.   "Therefore, when observing
5  results of a single sample, it is
6  important to attach a level of confidence
7  to the observed point estimate."
8         On the Taxotere report,
9  "Therefore, when observing results from a
10 single sample, it is important to attach
11 a level of confidence to the observed
12 point estimate."
13        Those are exact sentences,
14 correct?
15    A.   Yep.
16    Q.   On the valsartan side, "This
17 quantitative scientific process is called
18 drawing or making inferences about the
19 true event rate."
20        On the Taxotere side, "This
21 quantitative scientific process is called
22 drawing or making inferences about the
23 true event rate.
24        Those are exact sentences,

Page 111

1  correct?
2     A.   Yep.
3         MR. NIGH:  Let's take a look
4  at Paragraph 19.  Let's compare to
5  this Paragraph 21 in Taxotere.
6  BY MR. NIGH:
7     Q.   Next you have, "Let me turn
8  to the issues of comparing two groups of
9  subjects, one having been exposed and the
10 other being in the control."
11        And on the Taxotere side,
12 "Let me turn to the issues of comparing
13 two groups of patients, one receiving
14 Taxotere and the other receiving a
15 control."
16        Very similar sentences,
17 correct?
18    A.   Yep.
19    Q.   On the valsartan side, "To
20 make sure that two samples of subjects
21 are comparable with respect to all
22 potential confounders, we often rely on a
23 randomized clinical trial setting."
24        On the Taxotere side, "To

Page 112

1  make sure that two samples of patients
2  are comparable with respect to all
3  potential confounders, we often rely on a
4  randomized clinical trial setting."
5         Do you see that?
6     A.   Yep.
7     Q.   Those are identical
8  sentences, correct?
9     A.   Yep.
10    Q.   And here, in valsartan, you
11 never looked at any clinical trials,
12 whereas you looked at clinical trials in
13 Taxotere, correct?
14    A.   I just gave the information.
15 The gold standard to investigate any
16 difference between the two groups would
17 be based on the clinical trial.  That's
18 the point.
19    Q.   Right.  But to try to set up
20 a clinical trial where you expose
21 patients to contaminated --
22 NDMA-contaminated valsartan, compared to
23 patients who are unexposed to -- or not
24 exposed to contaminated valsartan, but

Page 113

1  given uncontaminated valsartan, to set up
2  a trial setting where you were to give
3  patients contaminated with valsartan as
4  the test group, especially contaminated
5  with levels 200 times over the threshold
6  level set by the FDA, that sort of trial
7  would not get approval from any IRB that
8  you know of, correct?
9     A.   Well, sir, I think this
10 paragraph is not really ask us to have
11 clinical trials on valsartan case.  I
12 just wanted to presenting what is the
13 gold standard, if we can do it.
14        The gold standard is using a
15 clinical trial randomized.  If we cannot
16 do it, then we go to the next level of
17 investigation.
18        I just want to point out why
19 the randomized clinical trial gives us a
20 gold -- so-called gold standard.
21    Q.   I understand.  My question
22 is -- I'm sorry.  Did I interrupt you?
23    A.   No.  No, sir.
24    Q.   Okay.

Confidential Information - Subject to Protective Order

Page 114

1    A.   I'm just trying to explain
2 what your question.
3         You asking me, can we do
4 clinical trials for valsartan case?
5         I think this is -- in my
6 humble opinion, we cannot do that, right.
7         I want to pointed out in
8 Paragraph 19 here, I simply indicate to
9 the judge, or to the court, I said,
10 listen, what is the gold standard if we
11 can do it, which is the randomized
12 clinical trial, right.
13    Q.   Well, as --
14    A.   But -- sorry, go ahead.
15    Q.   Sorry.  I didn't mean to
16 interrupt you.
17         As it relates to valsartan,
18 clinical trials would not be a gold
19 standard because it would be unethical to
20 give -- to try to setup a clinical trial
21 that tests whether or not people who are
22 getting contaminated valsartan over a
23 long period of time would get cancer or
24 have an increased risk of cancer compared

Page 115

1 to control group, because you can't --
2 you wouldn't get -- you wouldn't be able
3 to get approval for that sort of clinical
4 trial, right?
5    A.   Right.  I don't mean that I
6 said we needed to do it for randomized
7 trials for valsartan case.  Just in
8 general, the gold standard is to
9 conduct -- is to conduct a randomized
10 clinical trial.  If we cannot do it, then
11 what is the best next level?  That's what
12 I'm trying to say.
13    Q.   I understand.  As it applies
14 to valsartan, though, the gold standard
15 would not be randomized clinical trials,
16 because it would be unethical to conduct
17 such a trial where you're giving
18 people -- you're intentionally giving
19 people NDMA-contaminated valsartan,
20 correct?
21    A.   Sir, in that case, what is
22 the gold standard to evaluate valsartan
23 case then?  I have no idea what your
24 definition by gold standard.

Page 116

1         There is no gold standard.
2 If you cannot do randomized trial,
3 there's no gold standard anymore.
4    Q.   If you can't do a randomized
5 controlled clinical trial, what would be
6 the next best quality of evidence?
7    A.   In my --
8    Q.   If --
9    A.   Go ahead.
10    Q.   Sorry.
11 I added, if you can't -- let
12 me repeat my question.
13         If you can't do a randomized
14 clinical trial, what would be the next
15 best quality of evidence in the hierarchy
16 of scientific evidence?
17    A.   For this case?
18    Q.   For any case, if you're --
19 if it's unethical to conduct a randomized
20 clinical trial, what would be the next
21 best quality of evidence in the hierarchy
22 of scientific evidence?  It would be
23 epidemiological studies, correct?
24    A.   Well, I'm not an

Page 117

1 epidemiologist.  I cannot speak for
2 epidemiology.  I'm just speak as a
3 statistician.  If you're asking me an
4 epidemiology question, I cannot answer,
5 sir.
6    Q.   Okay.  So as a statistician,
7 you've given this statement that clinical
8 trials are the gold standard.
9         You use that same statement
10 in Taxotere where you're looking at
11 randomized clinical trials.  And then you
12 also plug it into valsartan where it's
13 unethical to do clinical trials.  So if
14 you can't use clinical trials, do you
15 know the scientific -- hierarchy of
16 scientific evidence would then next state
17 that epidemiological studies would be the
18 next best evidence?
19    A.   I would say observational
20 study instead of, quote, epidemiological
21 studies if that's okay with you?
22    Q.   That's okay.  Observational
23 studies correct?
24    A.   Yeah.  Yeah.  That's what I

Page 118

1 would say, observational studies.
2    Q.    Now, observational studies
3 are oftentimes commonly referred to as
4 epidemiological studies, correct?
5    A.    I don't know.  If you're
6 using your terminology, it's okay.  If
7 you think it's equivalent, that's in your
8 book, I'm saying I prefer to use
9 observational study.  Is that okay with
10 you?
11    Q.    Yes.  All right.  Let's take
12 a look at the next sentence.  19, if you
13 can see, "Such a clinical study" -- this
14 is for the valsartan -- your valsartan
15 report.
16            "Such a clinical study
17 yields a well designed experiment that
18 has the potential for generating reliable
19 prospective data on safety."
20            In your Taxotere report,
21 "Such a clinical study yields a well
22 designed experiment that has the
23 potential for generating reliable
24 prospective data on drug efficacy or

Page 119

1 safety."
2            Those are exact sentences,
3 correct?
4    A.    Yes, sir.
5    Q.    Next you say, such studies
6 are conducted and monitored according to
7 a pre-specified protocol which details
8 the exposure administered (example, form,
9 dosage, frequency), the clinical and
10 biological endpoint (example, lab value,
11 patient's quality of life, time to
12 remission, time to a toxicity event), the
13 study patient population and other
14 clinical and statistical considerations."
15            In the Taxotere report, you
16 put, "Such studies are conducted and
17 monitored according to pre-specified
18 protocol, which details the treatments
19 administered (example, form, dosage
20 frequency), the clinical or biological
21 endpoints (example, lab value, patient's
22 quality of life, time to remission, time
23 to a toxicity event), the study patient
24 population, and other clinical and

Page 120

1 statistical considerations."
2            Those are exact sentences in
3 your two reports, correct?
4    A.    Yes, sir.
5    Q.    Next, in valsartan, you put,
6 "The trial is usually randomized and
7 blinded."
8            On the other side, you put,
9 "The trial is usually randomized, which
10 means patients are assigned randomly to
11 one of the study arms."
12            Very similar start of each
13 of those sentences, correct?
14    A.    Looks like different to me.
15 But it's okay if you say similar.
16    Q.    Well, your next sentence
17 actually has the second half of the
18 sentence from Taxotere.  You put, "Such
19 subjects are assigned randomly to one of
20 the study arms."
21            That's very similar to the
22 end of your Taxotere sentence, correct?
23    A.    Yes, sir.
24            MR. NIGH: Then let's go down

Page 121

1    to the "this avoids."
2 BY MR. NIGH:
3    Q.    You put, "This avoids
4 selection bias or other experimental
5 bias."
6            On the Taxotere, "This
7 avoids selection bias or other
8 experimental bias."
9            Those are exact sentences,
10 correct?
11    A.    Yes, sir.
12    Q.    Your next sentence in
13 valsartan, "When appropriately designed,
14 results from a well conducted randomized
15 clinical trial are regarded as a gold
16 standard in controlled settings to
17 evaluate the efficacy and safety of an
18 exposure."
19            On the Taxotere side, "When
20 appropriately designed, results from a
21 well conducted randomized clinical trial
22 are regarded as a gold standard in
23 controlled settings to evaluate the
24 efficacy and safety of treatment."

Confidential Information - Subject to Protective Order

Page 122

1    Those are almost identical,
2  correct?
3        A.   Yes, sir.
4        MR. NIGH:  Now, let's turn
5  to, in your valsartan report, Page
6  19.  Let's look at Paragraph 18 of
7  Taxotere.  And let's look at
8  page -- Paragraph 18 of Taxotere
9  and Paragraph 31 in valsartan.
10 BY MR. NIGH:
11       Q.   At 31 you say, "Even if we
12 accept Dr. Madigan's criteria with a
13 false positive of .05 as an arbitrary
14 threshold value."
15       And then I want to direct
16 your attention to, "This procedure was
17 generally used to establish the so-called
18 statistical significance of a result when
19 testing a single clinical endpoint in a
20 single study."
21       Do you see that?
22       A.   Yes, sir.
23       Q.   Then in 18 you put, on the
24 second part of that, after the comma, "Is

Page 123

1  typically used by a study investigators
2  and statisticians to establish the
3  statistical significance of a report when
4  testing a single clinical endpoint in a
5  single study."
6        Do you see that?
7        A.   Yes, sir.
8        Q.   Do you see how both of those
9  sentences are similar?
10       A.   That's the basic principle,
11 sir.  This is a statistical principle.
12       Q.   Next, let's have -- sorry.
13 Go ahead.
14       A.   This is a basic, like, a
15 textbook language.
16       Q.   On 31, the second sentence.
17 "This level can be very liberal, i.e.,
18 can result in statements of statistical
19 significance when none exist, if multiple
20 statistical tests and/or studies are
21 examined simultaneously."
22       On the right side, "The 5
23 percent level of significance for
24 hypothesis testing can be too liberal,

Page 124

1  can result in statements of statistical
2  significance where none exist if multiple
3  endpoints and/or studies are examined
4  simultaneously."
5        Do you see how those
6  sentences are almost identical?
7        A.   Yes, sir.
8        Q.   And this is in response to
9  criticizing Dr. Madigan in looking at
10 multiplicity, correct?
11       A.   You know, sir, this is very
12 interesting, because Dr. Madigan was the
13 other side for the Taxotere.
14       He actually utilized the
15 same methodology, observational study, in
16 Taxotere.
17       So those two legal cases,
18 Dr. Madigan's reports, yeah, very
19 similar.  So we have the similar
20 concerns, right.  That's basically -- he
21 is violating the fundamental statistical
22 principles to do his analysis.
23       Q.   Let me see if I have this
24 right, because I think what you're saying

Page 125

1  is his reports look almost identical.
2        But have you looked at the
3  report in Taxotere and looked at his
4  report in valsartan?  Have you seen that
5  they're actually very different?
6        A.   No, sir.  I'm trying to say
7  he used the same statistical principle to
8  analyze both legal cases.
9        And both have had the same
10 problem, a basic fundamental problem,
11 against the statistical principles.
12       So I use the same language.
13 I say, well, in the Taxotere, we already
14 raised the issue.  And you didn't answer
15 very well.  Why do you want to use the
16 same flawed argument in a new case?
17       Q.   Well, it's actually that you
18 commonly criticize experts for not using
19 or looking at multiplicity.
20       This is a common theme
21 across your expert reports.  It's not
22 just for Dr. Madigan.  We're going to
23 look at Celebrex and we're going to look
24 at several others.  You commonly raise

Confidential Information - Subject to Protective Order

1 the issue of multiplicity, because any
2 time someone is looking at results from
3 single studies, you want to make it a
4 multiplicity issue, correct?
5          MR. MERRELL:  Objection to
6 form.
7          THE WITNESS:  It's not for
8     me, sir.  If you check FDA's
9     principle of drug approval
10    process, they don't allow you to
11    use a single study or multiple
12    endpoint, right, without a
13    multiple adjustment.  Right.
14    Everyone knows.
15         And in New England Journal
16    of Medicine recently, saying you
17    cannot reporting so many different
18    P-values, if different endpoint
19    anymore.  You know, you can see
20    the latest articles published in
21    New England Journal of Medicine,
22    they don't report P-value
23    repeatedly for primary endpoint,
24    secondary endpoint, or different

1 endpoint.
2          They said no way.  You are
3     going to violate the multiple
4     comparison principle.  It's not
5     for me -- you know, for me only,
6     sir.  It's actually fundamental
7     issue of the statistical methods,
8     right.
9          If you look at so many
10    things all together, and even
11    there is nothing cooking, nothing
12    going on, by chance, if you use
13    the same rule, like a .05 as a
14    threshold value, we actually have
15    lot of misinformation result or
16    misleading conclusions.
17         That's what my point.
18 BY MR. NIGH:
19    Q.   All right.  Well --
20    A.   It's not only for -- it's
21 actually from other agencies.  And you
22 can check easily, you know, the FDA's
23 website.  The book I cited by Furberg,
24 right, you just mentioned this book,

1 right.  Everyone is worried about the
2 multiple comparison issues.
3          Q.   Well, I'm glad you raised
4 that.  You raised two different
5 references or two different societies,
6 the FDA and The New England Journal of
7 Medicine, correct?
8     A.   Yes, sir.
9     Q.   Now, aren't you aware that
10 the FDA says that it's improper to use
11 Bonferroni when looking at safety issues?
12         MR. MERRELL:  Objection to
13    form.
14         THE WITNESS:  I don't know
15    exactly what FDA's principle of
16    looking at safety endpoint with a
17    document or not.  I don't know.
18 BY MR. NIGH:
19    Q.   Do you recall -- you just
20 told me the FDA when they're looking at
21 the principle of drug approval, that they
22 will use multiplicity.  But do you
23 realize the FDA has actually condemned
24 the use of Bonferroni when looking at

1 safety issues?
2     A.   Well, I think what I'm
3 trying to say for most NDA, which is new
4 drug applications, FDA insist that we
5 need to apply a multiple -- the
6 adjustment, comparison adjustment.
7          I believe in some trials
8 they use safety endpoint, which is no
9 surprise.  For example, you want to study
10 anti-diabetes drug, the heart attack,
11 stroke, CV death are the safety endpoint,
12 right.  So in that case, it's a safety
13 endpoint.
14         And I believe FDA also
15 insists that you needed to make
16 adjustment for multiple comparisons.
17    Q.   So you're not aware then
18 that the FDA has said that it's improper
19 to use Bonferroni multiplicity testing
20 when looking at safety issues?  Do you
21 know one way or the other?
22         MR. MERRELL:  Objection to
23    form.
24         THE WITNESS:  I said -- sir,

Confidential Information - Subject to Protective Order

Page 130

anti-diabetes drug, you usually would want to conduct a safety trial to see the anti-diabetic the drug would increase the MI, stroke, or CV death. That's actually the safety endpoint.

And for this endpoint, everybody knows what's called, MACE, M-A-C-E, the major cardiology -- cardiovascular event, and we do need a multiple comparison.

I believe in FDA's position, they also like to have the multiple comparisons.

But for your case, for example, valsartan impurity, I'm not for sure FDA has experienced dealing with this kind of situation yet. It's pretty new, right. So I don't know what their position, is.

I cannot speak with FDA. I am not expert in regulatory

Page 131

science. I just use my basic statistical principle to share with you, even for safety endpoint, if you don't take care with the multiple comparison, we're going to have a lot of false positive claims.

That means the treatment probably is safe, but because you don't make adjustment, you find a lot of toxicity models.

So that's a concern, right. It's not really separated from efficacy endpoint from a safety endpoint. I believe we should apply similar principle to safety and efficacy endpoint altogether.

BY MR. NIGH:
Q.   I understand your opinion is that you should apply multiplicity to safety endpoints. I'm not asking you about that.

You raised the FDA as one of your references. I'm now asking you

Page 132

about the FDA and Bonferroni specifically.

Hasn't the FDA weighed in, or are you aware of whether or not the FDA has weighed in on whether or not it's inappropriate to use Bonferroni when looking at safety issues?
A.   I don't know, sir.  We've already explored the Bonferroni adjustment has been used by FDA regulatory people.  We can find out.
Q.   But I'm here today asking you.  You raised FDA, and I'm here today asking you about your opinions.

You haven't seen anything where the FDA says it's okay to use Bonferroni for safety issues, correct?
MR. MERRELL:  Objection to form.
THE WITNESS:  Well, I said it for antidiabetes drug, they may use a safety endpoint.  That's one example.
BY MR. NIGH:

Page 133

Q.   In terms of the New England Journal of Medicine, have you seen multiple studies that have criticized using Bonferroni adjustment for safety issues?
MR. MERRELL:  Objection to form.
THE WITNESS:  I cannot speak with New England Journal of Medicine.  They just issue a guideline for statistical analysis.  They said, well, all the endpoints.  They didn't say efficacy or safety endpoint by the way, which we can go on the website and look, right, to look at carefully.

They are simply saying, look, you have one study, you have to tell me for primary endpoint which is safety or efficacy.

I don't know exactly the language they use.  But they say for primary analysis, you utilize

Confidential Information - Subject to Protective Order

Page 134

1 the P-value.  Pre-specify the
2 level you want it to.  Then the
3 next level for secondary endpoint,
4 you are not allowed to apply the
5 same principle, .05 anymore to
6 claim for the secondary endpoint,
7 there is issue or not.  That's my
8 understanding.
9 BY MR. NIGH:
10     Q.   I'm sorry, it's your
11 understanding that for a secondary
12 endpoint that The New England Journal of
13 Medicine says that you're no longer
14 allowed to apply .05 for as your P-value
15 for the secondary endpoint.  That's your
16 testimony?
17     MR. MERRELL:  Objection to
18     form.
19     THE WITNESS:  They don't --
20     they don't allow you to report in
21     the P-value anymore.
22 BY MR. NIGH:
23     Q.   Okay.  But when they report
24 as the secondary endpoint, they still

Page 135

1 show the confidence intervals for those
2 secondary endpoints at a 95 percent
3 confidence interval.  Right?
4     A.   Yeah, the confidence
5 interval contains more information than
6 the P-value --
7     Q.   Right.
8     A.   -- the size difference.
9     Q.   But the confidence interval
10 reflects the P-value.  In other words, if
11 you can see in that confidence,
12 95 percent confidence interval that it
13 doesn't cross one, then you know you have
14 a P-value less than .05, correct?
15     A.   Well, if you want to
16 interpret it that way, you can do that.
17 But confidence interval would provide you
18 more information than across the
19 boundary, null value or not, right?  You
20 can tell me how big the confidence
21 interval is.  If it's too wide, you know
22 you don't have enough information to tell
23 the truth, right?
24     If the size of the estimate,

Page 136

1 like in this case, odds ratio or relative
2 risk is very small, you say, well, you
3 know, you have a large trial and
4 thousands, thousands of patients in
5 cardiovascular trial, right.  And no
6 matter what, how low your odds ratio,
7 like 1.01, you still have a statistical
8 significance.  Your confidence interval
9 still excluded here, one, for example,
10 odds ratio, but the question is, is that
11 really interesting physically or
12 clinically speaking.  Right?  That's
13 confidence interval will tell you, right.
14     It's much more information
15 than just simply P less than .05.
16     Q.   Okay.  When I asked you
17 about multiplicity and Bonferroni, you
18 raised FDA and you raised New England
19 Journal of Medicine.  I'm only talking
20 now for this question, multiplicity and
21 the use of Bonferroni.
22     Do you believe the FDA and
23 The New England Journal of Medicine
24 support the use of Bonferroni as when it

Page 137

1 comes to safety issues?
2     A.   Sir, I give you one example
3 for MACE event.  I do understand, I
4 repeat it three times for you.  That's a
5 safety endpoint.
6     Q.   Have you --
7     A.   Do you understand what I'm
8 trying to say, sir?  I mean --
9     Q.   I do.
10     A.   -- it's a MACE -- okay.
11     So why don't you take that
12 example and if we actually can get the
13 FDA, being the review for the past five
14 years, let's think about how many FDA is
15 concerning about the safety endpoint,
16 right.  How do they handle the safety
17 endpoint.  But I don't know the detail at
18 all, right.
19     I am just sharing with you,
20 sir, based on my experience dealing with
21 FDA, they don't want us to apply P less
22 than .05 for every endpoint.
23     I don't know if they
24 restrict at the efficacy endpoint and

Confidential Information - Subject to Protective Order

Page 138

¹ they don't care about the safety
² endpoint, I don't know their positions,
³ sir.  This is a principle we do.
⁴ Personally, as you know well, I set up
⁵ for safety and efficacy endpoints
⁶ together.  We need it to be helpful,
⁷ right.  Don't make a large, very large
⁸ unacceptable false positive rate.
⁹          For example, let me give
¹⁰ one -- ten seconds, give you one example.
¹¹ If you have three studies, three
¹² independent study, if you apply the P
¹³ less than .05, clearly there is an issue,
¹⁴ right.
¹⁵          Then apply the three
¹⁶ clinical trials independently, the false
¹⁷ positive rate will become 14 percent
¹⁸ instead of 5 percent anymore.
¹⁹          I say well, do you really
²⁰ think 14 percent is acceptable to be the
²¹ false positive rate, which to me is very
²² high, right.
²³          You can apply the safety
²⁴ endpoint here too.  If you say three

Page 139

¹ studies, study the efficacy issue, well,
² let's apply .05 for each study.  If there
³ is study, P-value less than .05, then
⁴ let's be clear, there is a safety issue.
⁵          I said, sir, wait a second,
⁶ if you apply this principle, you are
⁷ going to make a mistake.  14 percent
⁸ is -- 14.5 percent by the way, okay, to
⁹ make a mistake.  Claim something unsafe.
¹⁰ But actually the drug is safe.
¹¹          Do you think that's
¹² acceptable?  If you think acceptable, or
¹³ society, or FDA accept it.  Well, I have
¹⁴ no argument, that's their position,
¹⁵ right.  I just share with you my
¹⁶ experience with FDA and also New England
¹⁷ Journal of Medicine.
¹⁸     Q.   I'm not asking about, you
¹⁹ know, just multiplicity issues at this
²⁰ point.  My question is simply Bonferroni
²¹ now for this question.
²²          Are you aware that the FDA
²³ has criticized the use of Bonferroni when
²⁴ looking at multiplicity issues?

Page 140

¹     A.   FDA, I don't think that they
² criticize using Bonferroni, right.
³ Bonferroni may be applicable to efficacy
⁴ endpoint and they probably little bit of
⁵ liberal for the safety.
⁶          But my point is that I don't
⁷ know how liberal you want allow safety
⁸ say, well, forget about any adjustment.
⁹          By the way, Bonferroni
¹⁰ adjustment is just one adjustment.  You
¹¹ can have other adjustment.  You don't
¹² have to stay with Bonferroni adjustment.
¹³          The principle is a multiple
¹⁴ comparison issue.  Do you think that
¹⁵ there is a problem applied the same rule
¹⁶ for every single endpoint for every
¹⁷ study, right, with the same P less than
¹⁸ .05.  I said well, be careful.  This
¹⁹ could be a lot of misleading conclusions.
²⁰ That's what I'm trying to say, right.
²¹ Nobody would argue with me.  You cannot
²² do that.  Even Dr. Madigan cannot
²³ dispute, say, well, there is a higher,
²⁴ much higher unacceptable false positive

Page 141

¹ rate if you don't take care of multiple
² comparison problem.  He just argue, say,
³ well, maybe for safety you can relax a
⁴ little bit.  The question is how much
⁵ relaxation you are waiting to do for
⁶ safety endpoint, right.  We don't know.
⁷          You know, you can ask Dr.
⁸ Madigan's opinion.  Do you think he say,
⁹ well, forget about any adjustment.  Just
¹⁰ stay with .05, for anything, for safety.
¹¹ Do you think that is okay or it is not
¹² okay?  Well, I'm not in position to
¹³ educate Dr. Madigan.  He knows this very
¹⁴ well.
¹⁵     Q.   I didn't ask you about
¹⁶ Dr. Madigan.  I simply -- and you gave me
¹⁷ a lot of information that I didn't ask
¹⁸ about.
¹⁹          So what I asked was, are you
²⁰ aware that the FDA has criticized the use
²¹ of Bonferroni when looking at
²² multiplicity issues related to safety.
²³          MR. MERRELL:  Objection to
²⁴     form.

Page 142

1    THE WITNESS:  I think FDA
2 would ask us to make multiple
3 comparison adjustment.  Bonferroni
4 just one of the tool to make
5 adjustments, sir.  Okay.  If
6 you --
7 BY MR. NIGH:
8    Q.   I think --
9    A.   Specifically if you want to
10 put your words in my mouth, if you think
11 FDA against to using Bonferroni
12 adjustment, I say no, they don't have any
13 document saying that you cannot use
14 Bonferroni adjustment.
15    If you have some document
16 issued by FDA saying Bonferroni
17 adjustment is no good, I will be willing
18 to learn.  Everyday I learn something
19 brand new, which is nothing new to me,
20 right.  We should learn something new.
21    So if you say somebody
22 saying, FDA saying no, you shouldn't do
23 Bonferroni adjustment at all for safety.
24 That's fine.  That's their opinion,

Page 143

1 right.
2    I said, well, look, whatever
3 you want to claim, that's regulatory
4 agency's claim.  I just speak for myself.
5 I say, well, my experience with FDA they
6 want to make multiple comparison
7 adjustment.
8    But you say, are they
9 against using Bonferroni.  I said well,
10 where is any document.  They say we don't
11 like Bonferroni adjustment for safety
12 endpoint.  If you have this document I'd
13 be very happy to read it, sir.
14    Q.   It sounds to me from that
15 answer that you're not aware of any
16 document or any situation where the FDA
17 has criticized the use of Bonferroni when
18 looking at safety issues; is that
19 correct?
20    A.   Well, that's my knowledge.
21 I don't know where and when the FDA has
22 this issued such a statement or position,
23 right.  I don't know, sir.
24    Q.   Now let's take a look at --

Page 144

1 let's talk about New England Journal of
2 Medicine.  Are you aware of studies that
3 criticize the use of Bonferroni when
4 looking at safety issues?
5    MR. MERRELL:  Objection to
6 form.
7    THE WITNESS:  I don't know
8 offhand right now any paper they
9 criticize.  I think the best way,
10 we can go to the website of New
11 England Journal of Medicine,
12 right.  They have so-called
13 guidance for statistical analysis.
14    I know most associate
15 editors of statistics in New
16 England Journal of Medicine, they
17 all my colleagues at Harvard,
18 right, so we can easily get their
19 opinion and say what is the
20 position of New England Journal of
21 Medicine, right.
22    But first, sir, you can
23 Google their website.  They have
24 clearly stated what we should do

Page 145

1 from now on handling this
2 secondary endpoint.
3    Like you said very well, we
4 use confidence interval, insert a
5 P-value, right.  I think that is
6 one step improve our scientific
7 investigation.
8    The P-value is useless
9 information for us.  Maybe pass
10 the first hurdle.  But then after
11 pass the first hurdle, you ask
12 yourself, how do you interpret
13 clinical utility of your findings,
14 right, instead of telling me the
15 P-value is .04.
16 BY MR. NIGH:
17    Q.   My question, was let's talk
18 about The New England Journal of
19 Medicine.  Are you aware of studies in
20 The New England Journal of Medicine that
21 criticize the use of Bonferroni when
22 looking at safety issues?
23    MR. MERRELL:  Objection to
24 form.

Confidential Information - Subject to Protective Order

Page 146

1    THE WITNESS:  So I said many
2  times, I don't have the paper
3  right now I can show that to you.
4  But the best way to go into the
5  website to look for the guidance,
6  right.
7  BY MR. NIGH:
8    Q.   It sounds to me like you're
9  not aware of any journal articles or
10  studies in The New England Journal of
11  Medicine that criticize the use of
12  Bonferroni when looking at safety issues;
13  is that correct?
14    A.   Well, I don't know any paper
15  I know.  But I'd be happy to learn.
16    Q.   When you put your expert
17  report together, where you insisted upon
18  the use of Bonferroni for the data in
19  valsartan, did you do any research to see
20  whether or not that has now been
21  criticized in journal articles, or by
22  regulatory agencies when looking at
23  safety?
24    MR. MERRELL:  Objection to

Page 147

1  form.
2    THE WITNESS:  Well, that was
3  not in my assignment.  As you
4  noted very well, in several of my
5  reports, in the legal cases, I
6  raised the same issue, right.  I
7  said well, be careful to interpret
8  the safety issue.  Because this
9  multiplicity.
10    I don't think Bonferroni is
11  really important role here.
12  Bonferroni is just one of the
13  tools.  If we are smart enough, we
14  can figure out another way to make
15  adjustments, right.  Not using
16  Bonferroni adjustment.
17    Bonferroni adjustment some
18  people say maybe a little bit
19  conservative.  I say well, that's
20  okay.  Some say you have a way to
21  make adjustment for multiple
22  comparison, please do it, right.
23  At least so we can see it.
24    And instead of a one-way

Page 148

1  street, don't make any adjustment.
2  For me that's not very good.
3  BY MR. NIGH:
4    Q.   You commonly raise
5  Bonferroni as your go-to multiplicity in
6  many of your expert reports, correct?
7    A.   Yeah.  That's the obvious
8  way, straightforward way to handle
9  multiple comparisons, sir.
10    Q.   Well, actually false
11  discovery rate is used much more often.
12  False discovery rate computations are
13  used much more often when looking at
14  safety issues than Bonferroni, correct?
15    A.   I don't know much about
16  discovery rate, sir.  That's another
17  school of thought.  And I think that they
18  are essentially equivalent to using
19  P-value.  Just using different scale.
20    Q.   And also Fisher pooling is
21  one of the more -- much more common ways
22  of looking -- or looking at multiplicity
23  across clinical studies, correct?
24    A.   No, sir --

Page 149

1    MR. MERRELL:  Objection --
2    MR. NIGH:  Sorry.  Let's
3  strike that question.  Sorry.
4  Strike that question, please.
5    THE WITNESS:  Okay.
6  BY MR. NIGH:
7    Q.   And also Fisher pooling is
8  used much more often when looking at
9  safety issues than Bonferroni, correct?
10    A.   No, sir.  You misunderstand
11  Fisher pooling P-value now.  Fisher
12  P-value pooling is very similar to
13  meta-analysis.  They have several
14  studies, each study has a P-value.  They
15  wound up pooling that P-value across
16  several studies, getting a global
17  P-value.  Okay.  So that's similar to
18  methodology now.
19    So the -- you raise the
20  multiple comparison, is not really
21  similar to meta-analyses.
22    So, I'm sorry, I probably
23  missed your point.  But a pooling,
24  Fisher's pooling is quite different

1  compared with multiple comparison
2  problem.
3      Q.   Fisher pooling allows you to
4  look at the rates of effect across a
5  collection of studies, correct?
6      A.   Yeah.  That meta-analysis,
7  essentially.
8      Q.   It's similar to a
9  meta-analysis, correct?
10     A.   Yeah.  So it is orange and
11 apples you are talking about here now,
12 right.  Before you are talking about
13 multiple studies looking individually.
14 Now you say wait a minute, let me pool it
15 all together now.  That's a different way
16 to answer your question, right.
17     Q.   Those are both -- those are
18 both ways to look at false positive rate.
19 You can look at Fisher pooling across a
20 pool of studies to look to see if that
21 Fisher pool rate still shows an effect
22 for the question and answer, correct?
23     A.   That's a meta-analysis, sir.
24     Q.   Now, you didn't choose to do

1  a false positive rate in your opinion at
2  all, correct?
3      A.   No.  Because it didn't
4  matter considering the discovery rate.
5  My assignment is not really creating new
6  animals for you guys to evaluate, right.
7  So I stay with the P-value Dr. Madigan
8  used.
9      Q.   My problem here, I actually
10 worded the question wrong.
11          You didn't choose to do a
12 false discovery rate in your opinion at
13 all, correct?
14     A.   Because Dr. Madigan didn't
15 do that either.
16     Q.   In fact, you chose the most
17 conservative or what has been widely
18 criticized for safety issues as the most
19 conservative approach for multiplicity,
20 for measuring multiplicity, correct?
21          MR. MERRELL:  Objection to
22 form.
23          THE WITNESS:  Sir, I
24 don't -- I don't understand your

1  language.  Why do we criticize the
2  Bonferroni adjustment?  What is
3  the -- what are you talking about,
4  why are you criticize?
5  BY MR. NIGH:
6      Q.   Sir, again, you haven't
7  reviewed any studies that criticize using
8  Bonferroni?  Not even just in the New
9  England Journal of Medicine.  But that
10 criticize using the Bonferroni adjustment
11 when looking at multiplicity issues.  You
12 haven't reviewed studies on that in
13 regards to safety?
14     A.   Well, sir, you have a
15 different school of thought, right, in
16 statistics even.  This is like your legal
17 profession.  There are so many different
18 ways to actually make a decision, right.
19          People have a different way
20 to make adjustment for multiple
21 comparisons.
22          You know, Bonferroni is one
23 of this, right.  Obvious,
24 straightforward, commonly used adjustment

1  tool.  You can use the other adjustment,
2  right, if you wanted to.
3          I just choose one to
4  illustrate, this can be problematic if
5  you don't make multiple adjustment.  So
6  my point is that multiple comparison
7  adjustment, I'm not to say you should
8  have used always a Bonferroni adjustment.
9  If you don't like Bonferroni adjustment,
10 you can use alternative way.
11          But the question is, should
12 the way take care of multiple comparison
13 problem or not.  That's the issue.
14     Q.   Right.  You chose, in terms
15 of your example, Bonferroni, which would
16 actually be the most conservative way of
17 looking at multiplicity, a/k/a, the
18 friendliest measure to pharmaceutical
19 companies when it comes to looking at
20 safety issues, right?
21     A.   I'm not for sure when you
22 say conservativeness, this is just one of
23 the tools, sir.  I repeat it so many
24 times.  I said you don't have to use

Confidential Information - Subject to Protective Order

1 Bonferroni adjustment. My point is you
2 have to make some adjustment. I just
3 give you example.
4         If you use Bonferroni
5 adjustment, then what kind of threshold
6 value you should use, right. If you have
7 a smaller smarter way to handle multiple
8 comparison problem, I have no issue, sir.
9 At least you have to address this issue
10 of multiple comparison, right. It
11 doesn't matter if it is an efficacy
12 endpoint or safety endpoint, right. Both
13 are very important to us. You don't want
14 to criticize the impurity in valsartan
15 has some issues.
16         If you look at 100 studies,
17 just happen to say one study show up with
18 a P-value less than .05, you say wow,
19 look, this is evidence. It can be
20 helpful to interpret this, right, because
21 you're looking so many studies both
22 together, right.
23         If you stay with the same
24 rule for each study, you are going to

1 make some wrong conclusions. That's what
2 I said in my report.
3         I didn't say you have to use
4 Bonferroni. I just say if you use the
5 Bonferroni, this is the threshold value
6 you should use, right.
7         If you disagree with this
8 approach, that's fine. But my point is
9 you should make some adjustment, right.
10    Q.   The example that you give in
11 many of your expert reports, Bonferroni,
12 would actually be the most conservative
13 way of looking at multiplicity, a/k/a the
14 friendliest measure to pharmaceutical
15 companies when it comes to looking at
16 safety issues, correct?
17         MR. MERRELL:  Objection to
18     form.
19         THE WITNESS:  Well, I'm not
20     quite sure if this is most
21     conservative way to do it. I
22     don't know. Maybe. But I'm --
23     will be very happy to learn what
24     is alternative way to dealing with

1     your present case, right, handling
2     multiple comparisons.
3 BY MR. NIGH:
4     Q.   Have you not seen numerous
5 studies talking about using false
6 discovery rates instead of Bonferroni
7 when discussing safety issues?
8     A.   Well, there are some. But
9 again, I said before, sir, Dr. Madigan
10 didn't use discovery rate. So he used
11 the P-value, right. So my assignment say
12 could you actually review what
13 Dr. Madigan did in his report. That's
14 what I'm responding to the report.
15         I'm not -- I was not in the
16 position to create another quantity for
17 discovery rate. And because Dr. Madigan
18 didn't use it, why should I bother to go
19 to that route.
20     Q.   Well, what you've done is
21 you've cherry-picked the most
22 conservative measure, Bonferroni, when
23 looking -- as an example, when looking at
24 multiplicity issues. And this is the

1 same cherry-picking you've done for many
2 of your past expert reports, just looking
3 at Bonferroni as opposed to other
4 measures of multiplicity.
5         MR. MERRELL:  Objection to
6     form.
7         THE WITNESS:  I strongly
8     disagree with your word
9     "cherry-picking." I didn't look
10     at the data to choose my
11     procedure, right. That's what you
12     call cherry-picking.
13         I actually -- before I even
14     had Dr. Madigan report, I said you
15     should make some adjustment.
16     Bonferroni is one of the tool,
17     right. That's not a cherry-pick
18     answer. That's pre-specified,
19     right.
20         If you disagree with me
21     about Bonferroni adjustment,
22     that's fine. Nobody said that you
23     cannot do that.
24         My point in my report, I say

Page 158

1    you need to make some adjustment
2    for multiple comparison.  If you
3    can show us through the discovery
4    rate to say, oh, this is a better
5    way to make adjustment, I say
6    fine, let's look at it, right.
7    Present it to us.  We're going to
8    look at it.
9  BY MR. NIGH:
10   Q.   You gave an example earlier
11 where you talked about three studies, and
12 if there was a, you know, P-value of .05.
13          And you said your chances of
14 getting one out of those three studies
15 would be 14 percent.  Do you remember
16 that example?
17   A.   Yes, sir.  It's in my report
18 by the way.
19   Q.   Right.
20          What are the chances of two,
21 if two of the three had a positive
22 finding, what would those chances be?
23   A.   Oh, it's very easy to do.
24 It's 1 minus .95 times .95.  If you had a

Page 159

1  calculator, you can do very quickly.
2    Q.   Right.  When you're looking
3  at more than one positive rate, there's a
4  way to calculate that fairly quickly,
5  right?
6    A.   Yeah.
7    Q.   Okay.  It's no longer
8  14 percent at that point, correct?
9    A.   Yeah.  If you have two
10 studies, I don't know, it's maybe
11 10 percent instead of 5 percent, right.
12 If you have four studies, then suddenly
13 it become 20 percent, right.  So the more
14 study that you're looking at, the higher
15 the positive rate now.
16   Q.   Right.  But you're telling
17 me right now -- I mean two positive
18 results.  I'm not talking about one
19 positive out of three.  Two positives out
20 of three.
21          Wouldn't that be important
22 to measure, that -- if you had two out of
23 three, that's a different measurement
24 than one out of three in terms of

Page 160

1  measuring the effect, though, right?
2    A.   Yeah, that's a fair --
3  that's a fair question.  But my position
4  is not really say out of the three there
5  are two truly positive result, right,
6  supposedly.
7          Now, you are asking me, say,
8  what is the point error now.  This is a
9  very interesting question now, right.
10 You say well, your null hypothesis go
11 along with -- the three trials are really
12 -- are not null, right, meaning there's
13 no difference between the two groups.  I
14 said, well, at least the one guy, he's
15 talking it up, he's saying what is the
16 chance, I say 14 percent.  Then you said,
17 what is the chance if two guys popped up.
18 I don't know.  We have to sit down and
19 figure this out.
20   Q.   Right.  When you're looking
21 at Bonferroni, Bonferroni is focused, in
22 terms of its math and its ideals, when
23 thinking about one false positive out of
24 a collection of studies, correct?

Page 161

1    A.   Yeah.  At least one.  You
2  pop it up, you claim positive.
3    Q.   But when there's two or
4  more, that's one of the main criticisms
5  of Bonferroni, is that dividing the
6  P-value by the number of studies, when
7  there's two or more positive findings,
8  would cause Bonferroni to be much too
9  conservative, right?
10   A.   Sir, you actually changing
11 the questions now, right.
12          My point I say in my report,
13 I said it would be helpful when you're
14 dealing with multiple studies, multiple
15 endpoints, to help with multiplicity
16 issue.
17          I give you one example.  I
18 said, well, if there is no difference
19 across all the studies, all the
20 endpoints, right, what is the chance
21 you're going to claim something is
22 positive.  I said this is the number,
23 right.  But if you say wait a minute, I'm
24 changing my story now.  I say out of

Page 162

¹ three study, I have two positive, more
² than .05, then you're asking me, say hey,
³ what is the false positive rate now.  You
⁴ know, that change the story now, right.
⁵          You can go on forever.  You
⁶ can say three positive out of three, that
⁷ is a different story now.  That is not
⁸ exactly what I said in my report.
⁹     Q.   I understand it's not what
¹⁰ you put in your report.  You gave the
¹¹ hypothetical of one out of three.
¹²          My point is, when it's two
¹³ out of three, it changes the findings
¹⁴ dramatically, it's no longer 14 percent.
¹⁵ It's much, much higher -- I mean much,
¹⁶ much lower that those chances would
¹⁷ happen, that you'd get two out of three
¹⁸ by chance when the P-values -- two out of
¹⁹ three studies have a P-value of less than
²⁰ .05.  That'd be much lower than 14
²¹ percent, correct?
²²     A.   Yeah, that's a fair thing to
²³ say, yes.
²⁴     Q.   In fact, you can do it off

Page 163

¹ the top of your head, but that would
² actually be much less to get two out of
³ three that are .05 or less, that -- that
⁴ chances of that pool would actually be
⁵ less than .05?
⁶     A.   I don't know the
⁷ mathematics, sir.  You are too smart for
⁸ me to calculate it so quickly.  I don't
⁹ know.
¹⁰     Q.   Well, when you're looking at
¹¹ a rare event, and most of the -- when
¹² you're looking at a rare event of
¹³ something less than .05 and most of the
¹⁴ events in a pooled data are coming up
¹⁵ positive as that rare event, in that
¹⁶ study, we know then that the -- when you
¹⁷ calculate a pool of data, that it's going
¹⁸ to be lower than the initial .05, right?
¹⁹ I mean that's just a general statistic,
²⁰ general statistics statement.
²¹     A.   Yes, you are absolutely
²² right.  If everything go to the direction
²³ you like, right, you're combining several
²⁴ studies, of course, you can enhance your

Page 164

¹ argument.  Unfortunately, if you look at
² all the meta-analysis Dr. Madigan cited,
³ on the left-hand side, right-hand side of
⁴ null value, right, back and forth, back
⁵ and forth.  And it turns out the odds
⁶ ratio is really not that interesting,
⁷ 1.2, you know, something lower than 2,
⁸ and, you know, that's the issue, right.
⁹ You're combining the negative study with
¹⁰ a positive study, hopefully the positive
¹¹ study will dominate in your result.  You
¹² know, people can play all kinds of games,
¹³ right.  I mean, it's unfortunate, right.
¹⁴     Q.   You know, right now I wasn't
¹⁵ asking about Madigan's report.  But it's
¹⁶ interesting that you brought that,
¹⁷ because you just brought up the
¹⁸ meta-analysis.
¹⁹          Let's set gastric cancer
²⁰ aside in terms of the dietary studies.
²¹ Let's actually focus on lung cancer.
²²          Did you have an opinion on
²³ the lung cancer dietary studies?
²⁴     A.   Can you show me the report

Page 165

¹ so I can refresh my memory?
²     Q.   Well, lung cancer had an
³ effect size of 3.1, P-value of less than
⁴ .001 in the De Stefani study.  Goodman,
⁵ for men, had an effect of 3.3, P value of
⁶ .006 for males.  For females, Goodman had
⁷ an effect size of 2.7, .004.  And then
⁸ for Lowe, effect size of 1.1, P-value of
⁹ .6.
¹⁰          So can't you look at that
¹¹ data and immediately realize that the
¹² pooling of that data would be less -- a
¹³ P-value of less than .05?
¹⁴     A.   You are putting all the
¹⁵ study together you're saying, sir?
¹⁶     Q.   Yes.  For lung.
¹⁷     A.   Are they -- sorry, are they
¹⁸ pretty much in a similar population or
¹⁹ are they different population?
²⁰     Q.   Well, do you know?
²¹     A.   Sorry, sir?
²²     Q.   Do you know?
²³     A.   Say it again?
²⁴     Q.   Do you know?

Confidential - Information Subject to Protective Order

Page 166

1    A.   I don't -- I don't know.
2  You just raised the issue.  I didn't
3  raise it, you know, saying that checking
4  every study they are similar or not.  The
5  meta-analysis are combining.
6         First thing you need to say,
7  well, you know, they are combinable,
8  right.  Some actual studies it is not
9  combinable.  So -- but people actually
10 just are lumping all the orange and
11 all -- the apples altogether, right,
12 getting a summary of statistics.  And
13 using that summary of statistics in a not
14 right way in my opinion, right.  So you
15 can combine it any way you want it to.
16         The things that are if you
17 have any negative trial for lung cancer,
18 yes, you do have, right, but if you are
19 only picking up the highly significant
20 event reporting to us, I don't know.
21 Because Dr. Madigan didn't show all the
22 negative trials in the lung cancer,
23 right.
24    Q.   I'm sorry, do you believe

Page 167

1  there is another study that negative
2  for dietary studies for lung cancer other
3  than what he reported?
4     A.   You just said -- the last
5  one, 1.1 or some alteration, you just
6  told me.
7     Q.   You give that a negative,
8  that's still an increase, it's more than
9  one, correct?
10    A.   Sorry, sir.  Using the
11 P-value of what, .6, something like that?
12    Q.   .6.  Yeah, 1.1 is still an
13 increased risk.
14    A.   Oh boy, I tell you, you
15 mixed the fundamental issue about the
16 inference of statistics, right.  You
17 cannot say my point estimate is 1.1, I've
18 got a problem, right.  Besides you have
19 those observational study, 1.1 odds ratio
20 can be easily changed to less than one if
21 you use different confounders in
22 adjustment.  Everybody knows that.
23         You have measurable
24 confounders.  If you just happen to

Page 168

1  measure those confounders, suddenly odds
2  ratio could be .8, .7.  So the very low
3  odds ratio really doesn't carry too much
4  weight, right.
5         That's why -- you guys have
6  a very interesting book.  I know you know
7  this book very well.  Called scientific
8  evidence, right, for lawyers, something
9  like that.
10         In that book, actually it is
11 written by a lawyer actually many years
12 ago.  He say, okay, this is our Bible.  I
13 look at it, it's very interesting.
14         If the odds ratio is less
15 than two, the guy said forget it, I'm not
16 interested.  I ask the lawyer, hey, why
17 are you using the threshold number two?
18 I said, listen, this is observational
19 study is all messed up already.  You make
20 all kinds of adjustment.  If you use a
21 different adjustment, if we can lower
22 odds ratio point estimate like you say,
23 1.1, right, I can easily swing around,
24 right.

Page 169

1         But if you have like five or
2  six odds ratio, then we don't have the
3  problem of robustness of your data.  This
4  actually, sir, this is the first
5  principle of the so-called Bradford Hill
6  criterion, for causation.
7         First one is that you need
8  to worry about the size of effect.  Not
9  just like the P-value, right.
10    Q.   You referred to it as a
11 negative study, that's why I asked you,
12 but negative would mean below one, in
13 terms of effect size when it comes to
14 statistics, correct?
15    A.   I would say it's a neutral
16 study.  It's not really called a
17 negative.
18    Q.   That's the reason I raised
19 it.  I don't disagree with you about the
20 amount of rate -- amount of weight to be
21 given to the effect size.  I raised it
22 because you used the word "negative
23 study," right?
24    A.   Okay, sorry.  I apologize.

Page 170

1  I use a negative word.
2      Q.   1.1 is technically an
3  increased risk, not statistically
4  significant in the study but it's still
5  technically an increased risk, correct?
6  I'm not talking about what inference to
7  be drawn from it.
8      A.   Well, if you don't have an
9  inference, then we just go home today.
10  You don't have to worry about anything
11  anymore, right.  Everything based on
12  point estimate, you make a decision, you
13  say wow, is that okay, judge.  You can
14  ask the court.
15      Q.   So you have three studies.
16  One is a 1.1 increased risk, not
17  statistically significant.
18          The De Stefani 3.1, more
19  than a doubling of the risk statistically
20  significant with a P-value of less than
21  .001.  And the other one, 3.3 increased
22  risk effect size with the P-value of
23  .0006.
24          You take those three

Page 171

1  studies, how do you view those three
2  studies together?
3      A.   How do I -- how do I do
4  that?
5      Q.   Yes.  How do you view those
6  three studies together?
7      A.   If I -- if I truly believe
8  those studies are well conducted and they
9  considered all the confounders,
10  adjustment, and it's a prospective -- now
11  be careful of the word "prospective,"
12  right, it's not a risk factor.  Okay?
13  Then I would say, yes, there's some
14  strong signal to show us, right, for this
15  case.
16          I don't believe those
17  studies are prospective.  Maybe I'm
18  wrong.  But if my memory tells me they
19  were not prospective.  Okay.
20      Q.   You don't believe that the
21  De Stefani or Goodman studies were
22  prospective studies?
23      A.   Say it again, I'm sorry,
24  sir.

Page 172

1      Q.   You don't believe that the
2  De Stefani or the Goodman -- the De
3  Stefani lung dietary study and the
4  Goodman dietary study that Dr. Madigan
5  cited, you don't believe that those were
6  actually prospective studies?
7      A.   Well, we can check easily.
8  If you put on the papers on the screen we
9  can look very carefully --
10      Q.   I'm asking you -- you viewed
11  these studies.  I'm asking you your
12  knowledge, before we look at the studies,
13  you don't believe that those were
14  prospective studies?
15      A.   Well, I cannot say yes or
16  no.  But we can easily check.
17      Q.   How about colorectal cancer.
18  You get a study that shows 2.1 increased
19  risk.  You get another study that shows
20  1.5 increased risk, P-value of .001, and
21  another study that shows 1.4 increased
22  risk, P-value .005.
23          How do you compare those
24  studies as a pool of studies?

Page 173

1      MR. MERRELL:  Objection to
2      form.
3  BY MR. NIGH:
4      Q.   Those results?
5      A.   I would -- I would say the
6  same thing, sir.  It is well conducted,
7  well balanced with a start of baseline
8  factors, prospectively I then would agree
9  with you, there is some signal indicated,
10  there is a chance the incidence increase,
11  right.
12      Q.   Okay.  Let's go back to the
13  two studies, I mean the two reports on
14  the screen.
15          Okay.  We were in Number 31.
16  And I draw your attention down to using
17  the 5 percent rule.  If we can go down to
18  Taxotere on the right side using the
19  5 percent rule.  Yep.
20          On the valsartan side, you
21  put "Using the 5 percent rule for
22  claiming statistical significance to
23  analyze simultaneously a large number of
24  tests in a study will yield a high rate

Confidential Information - Subject to Protective Order

Page 174

¹ of false positive findings."  On the
² right side, you put "Using the 5 percent
³ rule for claiming statistical
⁴ significance to analyze simultaneously a
⁵ large number of safety endpoints in a
⁶ study will yield a high rate of false
⁷ positive findings."
⁸        Those are identical
⁹ sentences in the two reports, correct?
¹⁰        A.   Yes, sir.
¹¹        Q.   Next it says, "Often the
¹² overall false positive rate could be as
¹³ high as 20 percent or more.  That is, a
¹⁴ very high chance of finding an exposure
¹⁵ is not safe with respect to control when,
¹⁶ in fact, there is no difference between
¹⁷ the two groups."
¹⁸        Let's take a look at
¹⁹ Number 32.  You have -- and let's go to
²⁰ Paragraph 19 for Taxotere.  "A standard
²¹ procedure to handle the multiple
²² comparison issue is to use the Bonferroni
²³ adjustment."
²⁴        That's what you put in

Page 175

¹ valsartan.
²        And in Taxotere you put "A
³ standard procedure to handle the multiple
⁴ comparison issue is to use the Bonferroni
⁵ adjustment."
⁶        Those are identical
⁷ sentences, correct?
⁸        A.   Yep.
⁹        Q.   Next you put, "For example
¹⁰ if there are 50 different types of tests
¹¹ conducted, the false positive rate is
¹² 5 percent, then for each individual test
¹³ we should use a false positive rate of
¹⁴ .1 percent, 5 percent divided by 50, to
¹⁵ assess whether there is a potential
¹⁶ signal on the safety issue" -- "safety
¹⁷ concern."
¹⁸        On the other report you put,
¹⁹ "For example, there are 50 different
²⁰ types of adverse events considered in the
²¹ trial.  If the total false positive rate
²² is 5 percent, then for each individual
²³ adverse event we should use a false
²⁴ positive rate of .1 percent, 5 percent

Page 176

¹ divided by 50, to assess whether there is
² a potential safety" -- "there is a
³ potential signal on the safety concern."
⁴        Those are identical
⁵ sentences, correct?
⁶        A.   Yep.
⁷        Q.   I'm sorry, I missed the very
⁸ first sentence, which says, "A standard
⁹ procedure to handle the multiple" -- oh
¹⁰ no.  We went over that.
¹¹        Next is "The corresponding
¹² confidence interval level should be
¹³ 99.89 percent, which is 100 percent minus
¹⁴ 1 percent" -- or ".1 percent."
¹⁵        And on the other report you
¹⁶ say, "The corresponding confidence
¹⁷ interval level should be 99.9 percent
¹⁸ (100 percent minus .1 percent.)"
¹⁹        Those are identical
²⁰ sentences, correct?
²¹        A.   Yes, sir.
²²        Q.   Turning to Paragraph 33, and
²³ Paragraph 20, the next paragraph.  The
²⁴ next paragraph in valsartan, and then the

Page 177

¹ next paragraph in Taxotere.
²        Next you have "The problem
³ of inflation of a Type I error or
⁴ positive" -- "false positive rate becomes
⁵ much worse when we examine the results of
⁶ several independent clinical studies at
⁷ the same time with a Type I error rate of
⁸ .05 for each study."
⁹        In Taxotere you put "The
¹⁰ problem of inflation of a Type I error or
¹¹ false positive rate becomes much worse
¹² when we examine the results of several
¹³ independent clinical trials of the same
¹⁴ type with a Type I error rate of .05 for
¹⁵ each study."
¹⁶        Those are identical
¹⁷ sentences, correct?
¹⁸        A.   Yep.
¹⁹        Q.   In valsartan you put "For
²⁰ example, suppose there are three
²¹ independent studies which compare the
²² exposure group with control."
²³        In Taxotere you put "For
²⁴ example, suppose there are two

Page 178

¹ independent studies which compare
² Taxotere."
³         Do you see that?
⁴     A.   Yep.
⁵     Q.   Similar but you've gone to
⁶ three in valsartan instead of two in
⁷ Taxotere, correct?
⁸     A.   Sorry, sir, I missed what
⁹ you are saying.
¹⁰     Q.   I said similar sentences
¹¹ except for you've gone with three in your
¹² hypothetical for valsartan and two in
¹³ your hypothetical for Taxotere, correct?
¹⁴     A.   Yep.
¹⁵     Q.   The next sentence is
¹⁶ "Suppose that we claim that there is a
¹⁷ statistical significant difference
¹⁸ between these two groups when the P-value
¹⁹ of any one of these three trials is less
²⁰ than .05."
²¹     In Taxotere you put "Suppose
²² that we claim there is a significant
²³ difference between these two groups
²⁴ P-value of any of these two trials is

Page 179

¹ less than .05."
²         Almost identical except for
³ you use three in -- three trials in
⁴ valsartan and you used two trials in
⁵ Taxotere, correct?
⁶     A.   Yeah.  Because Taxotere only
⁷ has two clinical trials available at that
⁸ time.
⁹     Q.   I see.
¹⁰     Next you put, "If we apply
¹¹ this decision rule, the total Type I
¹² error rate would be 14.3 percent.  That
¹³ is, even if there were no differences
¹⁴ between the exposure and control with
¹⁵ respect to cancer incidence, the chance
¹⁶ of claiming either the exposed or control
¹⁷ is harmful is more than 14.3 percent."
¹⁸     In Taxotere you put, "If we
¹⁹ apply this decision rule, the total
²⁰ Type I error rate would be 9.75 percent.
²¹ That is, even if there were no
²² differences between Taxotere and control
²³ with respect to alopecia events, the
²⁴ chance of claiming either Taxotere or

Page 180

¹ control is harmful is more than
² "9.75 percent in at least one study."
³         Correct?
⁴     A.   Yep.
⁵     Q.   Those sentences are fairly
⁶ similar, except for in valsartan you're
⁷ looking at the hypothetical of three
⁸ trials, and in Taxotere you're looking at
⁹ the hypothetical of two trials, correct?
¹⁰     A.   Yep.
¹¹     Q.   Interesting that you use the
¹² same word "trials" for both valsartan and
¹³ Taxotere when valsartan doesn't have any
¹⁴ clinical trials.
¹⁵     Why did you use the word
¹⁶ "trial" there?
¹⁷     A.   A trial and the study, I use
¹⁸ interchangeable.
¹⁹     Q.   I see.
²⁰     So in a observation study
²¹ you would call those trials?
²²     A.   Well, it depend on your
²³ definition of a trial, right.  If it a
²⁴ trial, if it's a experimental study

Page 181

¹ prospective, and observational, we don't
² call it observational trial, we call it
³ observational study.
⁴     Q.   Well, there are no
⁵ experimental study prospectives in --
⁶ strike that.
⁷     Next is, "This problem is
⁸ compounded if we apply the same rule to a
⁹ large number of studies."
¹⁰     And in Taxotere, you put the
¹¹ same statement, exact same statement,
¹² "This problem is compounded if we apply
¹³ the same rule to a large number of
¹⁴ studies," correct?
¹⁵     A.   Yep.
¹⁶     Q.   And next you put,
¹⁷ "Therefore, when we analyze multiple
¹⁸ studies and statistical tests
¹⁹ simultaneously, any conclusion of
²⁰ toxicity must be carefully interpreted
²¹ due to the multiplicity of tests."
²²     On the other side you put,
²³ "Therefore, when we analyze multiple
²⁴ studies simultaneously, any conclusion of

Page 182

¹ toxicity has to be carefully
² interpreted."
³        Those are similar sentences,
⁴ correct?
⁵      A.   Yeah.  I like to point out,
⁶ you see the words I use, "carefully
⁷ interpreted," right.
⁸        I didn't say you have to do
⁹ Bonferroni or not.
¹⁰       I just say, you have to be
¹¹ carefully interpreted.
¹²     Q.   Okay.
¹³       MR. MERRELL:  Counsel, I
¹⁴ just wanted to talk about lunch.
¹⁵ We're getting sort of close to the
¹⁶ lunch hour.  I don't know what you
¹⁷ have, if you're moving to
¹⁸ something else or what times makes
¹⁹ sense.
²⁰       MR. NIGH:  I think right now
²¹ is a good time to take a break.
²² How long do you guys want for
²³ lunch?
²⁴       THE VIDEOGRAPHER:  The time

Page 183

¹ right now is 12:20 p.m.  We are
² off the record.
³        - - -
⁴      (Whereupon, a luncheon
⁵ recess was taken.)
⁶        - - -
⁷      THE VIDEOGRAPHER:  The time
⁸ right now is 1:17 p.m.  We're back
⁹ on the record.
¹⁰       MR. NIGH:  Okay.  Let's pull
¹¹ up LP-1562, your Celebrex report.
¹² And let's put that side by side
¹³ with your valsartan report.
¹⁴ BY MR. NIGH:
¹⁵     Q.   We'll do similar what we did
¹⁶ with Taxotere.
¹⁷       First, though, in Celebrex,
¹⁸ Dr. Madigan wasn't on the opposite side
¹⁹ of you in Celebrex, correct?
²⁰     A.   Honestly, I don't remember.
²¹ Sorry.
²²     Q.   Do you remember who was on
²³ the opposite side of you on Celebrex?
²⁴     A.   If I read in my report, I

Page 184

¹ can refresh my memory.  Right now I'm not
² quite sure.
³      Q.   Does Dr. Milton Packer give
⁴ you an indication?  Does that sound
⁵ familiar?
⁶      A.   Milton Packer is our side,
⁷ is not opposite side.
⁸      Q.   Oh, he's on your side.
⁹ Okay.
¹⁰     A.   Yeah.
¹¹     Q.   But you don't recall who was
¹² on the opposite side of you in Celebrex,
¹³ correct?
¹⁴     A.   I think probably Dr. Nick
¹⁵ Jewel was one of these guys.
¹⁶     Q.   Who did you say?
¹⁷     A.   Nick Jewel out of Berkeley.
¹⁸ University of California, in Berkeley
¹⁹ campus.  J-E-W-E-L.
²⁰     Q.   Okay.  But you don't recall
²¹ Dr. Madigan being on the opposite side of
²² you in Celebrex, correct?
²³     A.   I vaguely remember he was.
²⁴ But, you know, I'm not quite sure.

Page 185

¹      Q.   Okay.  Let's take a look at
² your report side by side with Celebrex.
³        Now, in Celebrex, you were
⁴ also -- just like in Taxotere and for
⁵ valsartan, you were also retained by the
⁶ defendants who were pharmaceutical
⁷ companies in each -- in Celebrex as well,
⁸ correct?
⁹      A.   Yes.
¹⁰     Q.   Okay.  Looking at the
¹¹ screen, remember we talked about the
¹² Celebrex report, we can pull that up so
¹³ we can quickly see it here.  We looked at
¹⁴ this earlier today.
¹⁵       Do you recall that?
¹⁶     A.   Yes, sir.
¹⁷     Q.   Okay.  Celebrex report,
¹⁸ that's dated March 30th, 2007.  So that's
¹⁹ over 14 years ago, 14 and a half years
²⁰ ago, correct?
²¹     A.   Yeah.
²²     Q.   Okay.  Let's go to paragraph
²³ 17 in valsartan.  Let's look at Paragraph
²⁴ 8 in Celebrex.  We'll do what we did

Confidential Information – Subject to Protective Order

Page 186

¹ before, look at the side-by-side
² comparisons.
³        Okay.  Valsartan says,
⁴ "Suppose that we were interested in a
⁵ rate of occurrence" -- "Suppose that we
⁶ were interested in the rate of occurrence
⁷ of a certain clinical event, for example
⁸ cancer, among subjects exposed to NDMA or
⁹ NDEA to their counterparts (control)."
¹⁰        Next number for Celebrex, 14
¹¹ and a half years ago, you put, "Suppose
¹² that we are interested in the incidence
¹³ rate of a certain clinical event, for
¹⁴ example CV events, among patients treated
¹⁵ with Celebrex relative to the
¹⁶ corresponding rate for patients who have
¹⁷ been exposed to the drug."
¹⁸        Those are similar
¹⁹ sentences, correct?
²⁰     A.   Yeah.  I believe this is
²¹ using the same statistical principle,
²² right, dealing with a similar case.
²³     Q.   Sure.  The next sentence
²⁴ says, "In the first step we take a sample

Page 187

¹ from a population of subjects exposed and
² another sample from the population of
³ subjects who were not exposed."
⁴        Your next sentence in
⁵ Celebrex says, "To do this, we take a
⁶ sample from a population of patients
⁷ treated with Celebrex and another sample
⁸ from the population of patients who did
⁹ not receive Celebrex."
¹⁰        Similar sentences, correct?
¹¹     A.   You know, by changing a
¹² word, right.  You're in the first step
¹³ now, right.
¹⁴     Q.   I recognize you changed a
¹⁵ word.
¹⁶        The next sentence says,
¹⁷ "Assuming that these samples are valid
¹⁸ representatives of the two populations,
¹⁹ quantitative analytic methods can be used
²⁰ to determine whether the exposed group
²¹ has higher, lower, or similar event rate
²² than for the control group."
²³
²⁴

Page 188

¹        Your sentence in Celebrex
² starts off the same way, "Assuming that
³ these samples are representative of the
⁴ two populations, statistical methods can
⁵ be used to determine whether the Celebrex
⁶ group has a different rate of CV events
⁷ than the non-Celebrex group."
⁸        Those are similar sentences,
⁹ correct?
¹⁰     A.   Yes.
¹¹     Q.   Next, it says, "Since we
¹² draw conclusions based on a subset of
¹³ subjects, any qualitative or quantitative
¹⁴ interpretation of the result, i.e.,
¹⁵ whether the rate is higher or not, is
¹⁶ subject to sampling error."
¹⁷        On the other one, you say,
¹⁸ "Since we draw conclusions based on a
¹⁹ subset of patients only, the" -- "any
²⁰ qualitative or quantitative
²¹ interpretation of the result, i.e.,
²² whether the rate is higher or not, is
²³ subject to so-called sampling error."
²⁴        Very similar sentences,

Page 189

¹ correct?
²     A.   Yes, sir.
³     Q.   In valsartan, you put, "That
⁴ is, the observed event rate may be higher
⁵ leading to a false" -- "a possible false
⁶ positive finding, or lower, leading to a
⁷ possible false negative finding, than the
⁸ true event rate in the population."
⁹        In Celebrex, you say, "In
¹⁰ other words, the observed incidence rate
¹¹ may be higher, leading to a possible
¹² false positive finding, or lower, leading
¹³ to a possible false negative finding,
¹⁴ than the true incidence rate in the
¹⁵ population."
¹⁶        Very similar sentences in
¹⁷ the two expert reports, correct?
¹⁸     A.   Yes, sir.
¹⁹     Q.   Next you say, in valsartan,
²⁰ "An efficient statistical method for
²¹ analyzing such data minimizes the chance
²² of making these two types of error."
²³        In your Celebrex report, 14
²⁴ and a half years ago, you say, "An

Confidential Information - Subject to Protective Order

Page 190

1 efficient statistical method for
2 analyzing such data minimizes the chance
3 of making these two types of errors."
4        Exact sentence in both of
5 those, correct?
6    A.   Is that wonderful?  Because
7 my principle is the same, right, for
8 14 years.
9    Q.   I understand.  Exact
10 sentence in both of those reports,
11 correct?
12    A.   What's wrong with that, sir?
13 I don't understand your point.  You can
14 go on for whole day to compare the notes.
15 I'm not quite sure where we're going from
16 here.
17    Q.   Do you understand my
18 question?
19    A.   I understand your question
20 perfectly.  But I'm trying to say that
21 the principle of statistical methods are
22 valid.  20 years ago, today, they are the
23 same old thing.
24    Q.   I understand what you're --

Page 191

1 what you're saying.  That's not my
2 question.
3    A.   Could I finish?  Could I
4 finish, please?
5    Q.   Sure.
6    A.   Can I explain that?  Is that
7 okay I finish?
8    Q.   My question is, are those
9 exact sentences in the two reports?
10 What's your answer?
11    A.   I responded to you, I'm glad
12 that the same principle applied to
13 several cases.
14    Q.   So is your answer, yes,
15 those are exact sentences in the two
16 reports?
17    A.   Yeah, no problem.  It's all
18 similar.  They all the same.  I don't
19 even understand why you repeat
20 everything, again, again, again.
21    Q.   Next sentence, "It is
22 important to know that, except for the
23 exposure to NDMA or NDEA, the exposed
24 subjects in the sample should be similar

Page 192

1 to the subjects in the non-exposed sample
2 with respect to important observable or
3 unobservable confounders."
4        In Celebrex, "It is
5 important to know that, except for the
6 usage of Celebrex, ideally the Celebrex
7 users in the sample should be similar to
8 the patients in the non-Celebrex sample
9 with respect to important observable or
10 unobservable confounders."
11        Gives two examples.
12        Those are very similar
13 sentences again, correct?
14    A.   Yep.
15    Q.   Looking at the next --
16 Number 18.  And looking at Paragraph
17 Number 9.  Looking at the next paragraph
18 in valsartan and the next paragraph in
19 Celebrex.
20        It says, "After we have
21 determined how to draw" -- in valsartan,
22 "After we have determined how to draw a
23 valid sample from the population of
24 interest, one has to determine what

Page 193

1 clinical endpoints are most appropriate
2 to quantify the exposure effect."
3        In Celebrex, "Once an
4 investigator has determined the patient
5 population of interest, he or she must
6 draw a valid sample from the population."
7        Similar sentence, correct?
8    A.   Yep.
9    Q.   Then you go down to,
10 "Suppose that based" -- in valsartan.
11 "Suppose that, based on the sample of 100
12 patients at the end of the study, four
13 patients experienced such events."
14        In Celebrex, "Suppose that
15 based on the sample of 100 patients, four
16 patients experienced similar" --
17 "experienced CV events."
18        Similar statement, correct?
19    A.   Well, one is for a CV event.
20 The other one is cancer, isn't it?  Are
21 they different?
22    Q.   They are very similar,
23 aren't they?
24    A.   Well, how do you define

Confidential Information Subject to Protective Order

Page 194

1 similar.  I said this one case is for CV
2 event.  The right-hand side is for cancer
3 incidence.
4      Q.   You don't think that when it
5 starts out -- the sentence says, "Suppose
6 that, based on a sample of 100 patients,"
7 and the other one says, "Suppose that,
8 based on the sample of 100 patients," and
9 that for both hypotheticals, you assumed
10 four patients that experienced an event,
11 that those are similar sentences?
12      A.   Well, whatever you say.
13 It's similar.  But I'm saying address
14 different legal cases, right.
15      Q.   Next sentence, "An obvious
16 estimate of the event rate for the
17 underlying population is .04 or
18 4 percent."
19           In Celebrex, "An obvious
20 estimate of the incident rate of toxicity
21 for the underlying population is .04, or
22 4 percent."
23           Those are very similar
24 sentences, correct?

Page 195

1      A.   Yep.
2      Q.   Next sentence, "This is
3 called a point estimate."
4           In Celebrex, exact sentence,
5 "This is called a point estimate."
6 Correct?
7      A.   Yep.
8      Q.   Next sentence in valsartan,
9 "However, this estimate is based on a
10 sample of patients."
11           Celebrex, "However, this
12 answer" -- "this estimate is based on a
13 relatively small set of patients."
14           Similar sentence, correct?
15      A.   Yep.
16      Q.   Next sentence, "The true
17 event rate for the entire population may
18 be more or less than 4 percent."
19           Next sentence in Celebrex,
20 the true incidence rate for the entire
21 population may be more or less than .04."
22           Very similar sentence,
23 correct?
24      A.   Yep.

Page 196

1      Q.   Next sentence, "Different
2 studies generating different samples may
3 find a different" -- "may find different
4 proportion of subjects with cancer."
5           Next sentence, "Another
6 investigator using a different sample or
7 study may find that none of the patients
8 experienced a CV event."
9           The following sentence,
10 "Therefore, when observing results from a
11 single sample, it is important to attach
12 a level of confidence to the observed
13 point estimate."
14           In Celebrex, 14 and a half
15 years ago, you put, "Therefore, when
16 observing results from a single sample,
17 it is important to attach a level of
18 confidence to the observed point
19 estimate."
20           Those are the exact same
21 sentence, correct?
22      A.   Yeah.  I'm glad I am
23 consistent.
24      Q.   Looking at valsartan, "This

Page 197

1 quantitative scientific process is called
2 drawing or making inferences about the
3 true event rate."
4           In Celebrex, "This
5 quantitative scientific process is called
6 drawing inferences about the true
7 incident rate."
8           Very similar sentences,
9 correct?
10      A.   Yep.
11           MR. NIGH:  Turning to Number
12 19, and Paragraph 15 in Celebrex.
13 BY MR. NIGH:
14      Q.   In valsartan, you start out,
15 "Let me turn to the issues of comparing
16 two groups of subjects, one having been
17 exposed and the other being in the
18 control."
19           In Celebrex, 14 and a half
20 years ago, you say, "Let me turn to the
21 issues of comparing two groups of
22 patients, one receiving Celebrex and the
23 other receiving a placebo."
24           Very similar sentences,

Page 198

1  correct?
2      A.   Mm-hmm.  Yes.
3      Q.   The next sentence, "To make
4  sure the two samples of subjects are
5  comparable with respect to all potential
6  confounders, we often rely on a
7  randomized clinical trial setting."
8          In Celebrex, "To make sure
9  the two samples of patients, example
10 Celebrex and placebo, are comparable with
11 respect to all potential confounders,
12 investigators often rely on a randomized
13 clinical trial setting."
14         Very similar sentences,
15 correct?
16     A.   Yep.
17     Q.   In valsartan, you say, "Such
18 a clinical study yields a well designed
19 experiment that has the potential for
20 generating reliable prospective data on
21 safety."
22         In Celebrex, you say, "Such
23 a medical study yields a well designed
24 experiment for generating reliable

Page 199

1  prospective data on drug efficacy or
2  safety."
3          Very similar sentences
4  again, correct?
5      A.   Yep.
6      Q.   And in valsartan, you say,
7  "Such studies were conducted and
8  monitored according to a pre-specified
9  protocol, which details the exposure
10 administered (for example, form, dosage
11 frequency), the clinical or biological
12 endpoints (example, lab value, patient's
13 quality of life, time to remission, time
14 to toxicity event), the study patient
15 population, and other clinical and
16 statistical considerations."
17         In Celebrex, you say, "Such
18 studies are conducted and monitored
19 according to a pre-specified protocol
20 which details the treatments administered
21 (example, form, dosage, frequency), the
22 clinical or biological endpoints (for
23 example, lab value, patient's quality of
24 life, time to remission, time to a

Page 200

1  toxicity event), the study patient
2  population (elderly, suffering from
3  rheumatoid arthritis), and other clinical
4  and statistical considerations."
5          Those sentences are very
6  similar, correct?
7      A.   No.  It's quite different in
8  my opinion, right.  I said elderly,
9  something like that.
10         Do I have that on the
11 left-hand side?
12     Q.   Yeah.  You don't think those
13 sentences are very similar, it's almost
14 identical, except for Celebrex you say
15 "elderly and suffering from rheumatoid
16 arthritis."
17     A.   Well, if you want to say
18 similar, that's fine with me.  I said a
19 while -- I always aim it at a specific
20 legal case, right.  I'm modifying my
21 words -- the words I use before, I'm so
22 glad and still confident that 14 years
23 ago I used it, still applicable today,
24 right.  That's a good thing, right?

Page 201

1  Staying with a --
2      Q.   It's a good thing for
3  pharmaceutical companies that they have a
4  cookie-cutter report and know what your
5  opinion is going to be before they hire
6  you, correct?
7          MR. MERRELL:  Objection to
8  form.  Argumentative.
9          THE WITNESS:  Sir, that's
10 not fair to say -- safe to say.
11 BY MR. NIGH:
12     Q.   Okay.  Let's take a look at
13 the next sentence.  "The trial is usually
14 randomized and blinded."
15         Do you see that?
16     A.   Yep.
17     Q.   And in Celebrex, it says,
18 "The trial is usually randomized and
19 blind."
20         Very similar sentences,
21 correct?
22     A.   Yep.
23     Q.   Next in valsartan, it says,
24 "Subjects are assigned randomly to one of

Confidential Information - Subject to Protective Order

Page 202

1 the study arms and neither physicians nor
2 patients are told whether the patient is
3 receiving an active exposure or a
4 control."
5        In Celebrex, 14 and a half
6 years ago, you put, "Patients are
7 assigned randomly to one of the study
8 arms and neither physicians nor patients
9 are told whether the patient is receiving
10 an active drug, Celebrex, or a placebo."
11       Very similar sentences,
12 correct?
13    A.   No.  To me, they're quite
14 different.
15    Q.   Okay.  The wording is almost
16 in the exact same order in both
17 sentences.  All you've done is subbed out
18 what's relevant to Celebrex versus
19 valsartan, right?
20    A.    To me it's quite different,
21 isn't it?
22    Q.   Okay.  Well, we'll let the
23 jury look at that and decide.
24       The next sentence says,

Page 203

1 "This avoids selection bias or other
2 experimental bias."
3        In your other report you
4 say, "This avoids selection bias or other
5 experimental bias."
6        The exact same sentence,
7 correct?
8    A.   Yep.
9    Q.   Next, you say, "When
10 appropriately designed, results from a
11 well conducted randomized clinical trial
12 are regarded as a gold standard in
13 controlled settings to evaluate the
14 efficacy and safety of an exposure."
15       In Celebrex, you say,
16 "Results from a well conducted randomized
17 clinical trial are regarded as a gold
18 standard in controlled settings to
19 evaluate the efficacy and safety of a
20 treatment."
21       Very similar sentences,
22 correct?
23    A.   Yep.
24    Q.   And again, in valsartan, we

Page 204

1 don't have any clinical trials assessing
2 increased risk or whether there's an
3 increased risk with contaminated
4 valsartan, correct?
5    A.   I just point out what is the
6 gold standard for evaluating an exposure.
7 That's what I'm trying to say.  I didn't
8 say anything about valsartan case.  But
9 yeah, if you read the -- go on and read
10 my next paragraph, you can see it, right.
11       You can see there's a gold
12 standard.  Unfortunately, we cannot do
13 it.  As you said very well this morning,
14 we cannot randomize the patient, right.
15    Q.   Right.
16       MR. NIGH:  Looking at --
17 looking at Page 19, Paragraph 31,
18 and look at Paragraph 14 in
19 Celebrex.
20       31, please.  Those are the
21 references.  Paragraph 14.
22 Further up.
23 BY MR. NIGH:
24    Q.   In valsartan, you start off

Page 205

1 with, "Even if we accept Dr. Madigan's
2 criteria that the false positive rate of
3 .05 is an arbitrary threshold value, this
4 procedure was generally used to establish
5 the so-called statistical significance of
6 a report when testing a single clinical
7 endpoint in a single study."
8        In Celebrex, you put, "The
9 95 percent level for the confidence
10 interval or the 5 percent level of
11 significance for testing hypothesis is
12 typically used by investigators and
13 statisticians to establish the
14 statistical significance of a result when
15 testing a single clinical primary
16 endpoint."
17       Similar ideas quoted in each
18 of these, correct?
19    A.   No, I don't think it's
20 similar.  But it is the same principle.
21    Q.   Well, let's look at the next
22 sentence.
23       You put, "This level can be
24 very liberal."

1    And on the other side, you
2 put, "This level can be very liberal."
3    That's identical thus far,
4 right?
5    A.   Yep.
6    Q.   And next in valsartan, you
7 wrote, "I.e., can result in statements of
8 statistical significance when none
9 exists."
10    In Celebrex, 14 and a half
11 years ago, you put, "I.e., can result in
12 statements of statistical significance
13 when none exist."
14    Those are identical,
15 correct?
16    A.   I'm glad it's still 14 years
17 after, still valid argument.
18    Q.   And in valsartan, you put,
19 "If multiple statistical tests and/or
20 studies are examined simultaneously."
21    In Celebrex, you put, "If
22 multiple endpoints are examined
23 simultaneously."
24    Very similar, correct?

1    A.   Yeah.
2    Q.   Looking next you've got,
3 "When using" -- using --
4    MR. NIGH:  Going down,
5    "Using the 5 percent rule."
6 BY MR. NIGH:
7    Q.   "Using the 5 percent rule
8 for claiming statistical significance to
9 analyze simultaneously a large number of
10 tests in a study will yield a high rate
11 of false positive findings."
12    In Celebrex, "Using the 5
13 percent rule for claiming statistical
14 significance to analyze simultaneously a
15 large number of endpoints in a study will
16 yield a high rate of false positive
17 findings across all endpoints."
18    Very similar statements,
19 correct?
20    A.   Yep.
21    Q.   Next you put, "Often, the
22 overall false positive rate could be as
23 high as 20 percent or more, that is, a
24 very high chance of finding exposure is

1 not safe with respect to control, when in
2 fact there is no difference between the
3 two groups."
4    Your next sentence in
5 Celebrex, "It is not unusual that when
6 the 5 percent test hypothesis rule is
7 applied simultaneously to a number of
8 endpoints in the study, the overall false
9 positive rate is as high as 20 percent,
10 that is, a very high chance of claiming a
11 drug is not safe with respect to placebo
12 when in fact there is no difference
13 between the two groups."
14    Very similar statements,
15 correct?
16    A.   Okay.
17    Q.   Taking a look at 30 -- so
18 you've made the statement multiple times
19 that you're glad you're consistent
20 between your reports back in, you know,
21 14 and a half years ago.
22    Have you been consistent
23 with reports even longer and earlier than
24 that?

1    A.   Well, if you can show me,
2 I'd be happy to read it.
3    Q.   You don't know?  Do you --
4 were you continuing to use these
5 cookie -- a lot of these same
6 cookie-cutter statements in reports that
7 you did back Celebrex 14 and a half
8 years ago?
9    MR. MERRELL:  Objection to
10    form.
11    THE WITNESS:  You're asking
12    me if I did something earlier than
13    Celebrex study?  That's what your
14    question, sir?
15 BY MR. NIGH:
16    Q.   Yes.
17    A.   I don't remember, sir.
18    Q.   Now, you said earlier that
19 you don't hold yourself out to be a
20 toxicologist, correct?
21    A.   Correct.
22    Q.   And so you wouldn't consider
23 yourself to be an expert in toxicology,
24 correct?

Page 210

1    A.    Correct.
2    Q.    You said earlier that you
3  don't hold yourself out to be an
4  epidemiologist, correct?
5    A.    Correct.
6    Q.    So you wouldn't consider
7  yourself to -- you wouldn't hold yourself
8  out -- or being -- sorry.  Strike that.
9        So you wouldn't consider
10  yourself to be an expert in epidemiology,
11  correct?
12    A.    Correct.
13    Q.    You said earlier that you
14  don't hold yourself out to be a
15  pharmacologist, correct?
16    A.    I remember -- I didn't
17  remember you asking me about it.  But the
18  answer is no, I don't think I'm a
19  pharmacologist.
20    Q.    So you wouldn't consider
21  yourself to be an expert in -- my
22  question was pharmacologist.  Not
23  oncologist.
24        You wouldn't consider

Page 211

1  yourself to be an expert at pharmacology,
2  correct?
3    A.    That's correct.
4    Q.    Okay.  Now, Doctor, you said
5  that you analyzed two valsartan epi
6  studies, even though Dr. Madigan had not
7  looked at any valsartan epidemiology
8  studies, correct?
9    A.    Yes, sir.
10    Q.    What was your purpose for
11  looking at those two valsartan
12  epidemiology studies?
13    A.    Well, you know, when I read
14  Dr. Madigan's report, he used dietary
15  studies, he used occupational study, to
16  infer the safety issue about an impurity
17  in valsartan.
18        I ask myself right away, how
19  come Dr. Madigan did not use a direct
20  route and to understand the safety issue
21  of impurity in valsartan.
22        So I believe -- forgive me,
23  I don't know the sequence.  Either I ask
24  the lawyers or the lawyer actually

Page 212

1  already send the papers to me, which is
2  two studies.  One is being called a
3  Danish study, the other one we call the
4  German study.
5        And I read both.  I say,
6  wow, those directly addressed issue about
7  impurity questions, which are more
8  relevant to our question in this legal
9  case, compared with the way Dr. Madigan
10  approach.
11        That's why I think it's
12  important to point out there were studies
13  available directly addressed your
14  question.  Period.
15    Q.    What do you think the
16  purpose of Dr. Madigan's report -- expert
17  report was?
18    A.    The purpose of Dr. Madigan,
19  of course, obviously, he want people to
20  extrapolate the results from dietary
21  studies or occupational study to
22  valsartan case.  That's my understanding.
23    Q.    What kind of results was he
24  trying to extrapolate, what were the

Page 213

1  results referring to from the dietary
2  studies and the occupational exposure
3  studies?
4    A.    We can go over Dr. Madigan's
5  report, you know, line by line and figure
6  out, okay, what he wants to do.
7    Q.    No.  I'll bring up the
8  report if we need to.  But I'm asking
9  you, in terms of your knowledge, what
10  kind of -- the purpose or what kind --
11  strike that.  I'll start over.
12        What kind of results was he
13  trying to extrapolate?  What were the
14  results referring to from the dietary
15  studies and the occupational exposure
16  studies?
17    A.    Can we actually go to his
18  report?
19    Q.    This is a big picture
20  question.  It's not a line-by-line
21  question.
22    A.    What?
23    Q.    I said this is a big picture
24  question.  It's not a line-by-line

Page 214

¹ question.
²     What was the purpose of his
³ report in terms of extrapolating results?
⁴ What kind of results was he trying to
⁵ extrapolate?
⁶     A.  Well, he did many things.
⁷ I'm not quite sure how I can use one
⁸ sentence to summarize for you.
⁹     I think the best way, if we
¹⁰ get both reports and we all can
¹¹ understand what he wants us to understand
¹² it, what my comments about it, right.
¹³ That's fair game.
¹⁴     Instead you're asking me,
¹⁵ what do you think about what Dr. Madigan
¹⁶ wants us to understand, right.
¹⁷     I mean, let's go through his
¹⁸ report. And I'm going to answer you what
¹⁹ he wants us to understand.
²⁰     Q.  Are you saying that without
²¹ looking at the report right now, you
²² can't answer the question as to what the
²³ purpose of his report was in terms of
²⁴ extrapolating results from dietary

Page 215

¹ studies and occupational exposure
² studies?
³     A.  Sir, he did so many things,
⁴ I cannot give you one sentence to
⁵ summarize what I got from his report.
⁶     And if you wanted to know
⁷ my -- the overall disagreement, you can
⁸ just go back to my executive summary.
⁹ Also, my conclusions, right. You can
¹⁰ understand exactly what my positions are
¹¹ and what I have concerns about
¹² Dr. Madigan's report.
¹³     I can read it for you, if
¹⁴ you wanted to. I can read my summary,
¹⁵ also my conclusion.
¹⁶     Q.  I've read your report and
¹⁷ your summary and your conclusions many
¹⁸ times. Okay. I don't need to read that
¹⁹ word for word during this deposition.
²⁰ I've done it many times. I don't need
²¹ the instruction on what to go to for your
²² opinions.
²³     I'm asking a simple
²⁴ question.

Page 216

¹     And the best that you can
² answer it, what do you think he was
³ trying to extrapolate from the dietary
⁴ studies and occupational exposure
⁵ studies?
⁶     MR. MERRELL: Objection to
⁷   form. Asked and answered.
⁸     THE WITNESS: I cannot
⁹   answer you.
¹⁰ BY MR. NIGH:
¹¹     Q.  What was he looking at in
¹² the dietary studies and the occupational
¹³ exposure studies? What sort of figures?
¹⁴     A.  If you allow me to go
¹⁵ through his report, I can answer you. I
¹⁶ cannot answer you without looking at the
¹⁷ report, and my report.
¹⁸     Q.  As you sit here right now,
¹⁹ you can't tell us, you know, what results
²⁰ he was looking at, just in general, or
²¹ describe them in dietary and occupational
²² exposure studies?
²³     A.  Well, sir, listen, why don't
²⁴ you just go to my -- let me use mine.

Page 217

¹ You don't have to read it. You said you
² read my report word by word, okay.
³     I'm going to read what I
⁴ wrote, and I'll tell you what he
⁵ translate from dietary to valsartan case.
⁶ Is that okay?
⁷     Q.  Sure.
⁸     A.  Conclusion. Paragraph 37.
⁹     Right. Dr. Madigan claimed
¹⁰ that NDMA statistically significantly
¹¹ increased gastric cancer risk arise in
¹² LCEs as low as 1,962 ug, is the number.
¹³ The equivalent threshold for lung cancer
¹⁴ so-and-so, for the other cancer, and et
¹⁵ cetera, right? Blah, blah, blah, blah.
¹⁶     Based on the report by
¹⁷ Dr. Madigan, that's what you try to
¹⁸ convince us. He said well, listen, guys,
¹⁹ if you have this ratio of so-and-so, you
²⁰ have high risk to get cancer, different
²¹ cancer. Right.
²²     I'm saying those claims
²³ cannot be justified with the issues and
²⁴ the concerns I raise in this report.

Page 218

1 That's 37, okay.
2           38, the same concerns apply
3 to the claims in Paragraph 34 in
4 Dr. Madigan's report. Dr. Madigan's 34,
5 that's the methods, he want to send to
6 us, right. That's -- answer your
7 question.
8           So moreover, those essential
9 values may not be transportable in the
10 case of impurity -- I shouldn't use
11 contaminated -- valsartan without
12 appropriate validation, okay.
13           But he wanted us to believe
14 the findings from dietary study or
15 occupation study can be transported
16 automatically to the valsartan case,
17 right, with those threshold numbers.
18           That's my understanding,
19 okay.
20     Q.   You understand that at no
21 time in all of Dr. Madigan's report does
22 he ever use the word "threshold values"
23 in describing those values, correct?
24     A.   I don't remember. But I

Page 219

1 quote here "the equivalent threshold for
2 lung cancer" is so-and-so. If I
3 misquoted the word "threshold" I
4 apologize. Right.
5     Q.   Back to my original
6 question. He was looking at -- what is
7 the LCE?
8     A.   The way I understand,
9 lifetime exposure for the contaminant.
10     Q.   And that would be lifetime
11 exposure of what?
12     A.   From NDMA, for example.
13     Q.   And what would the ug refer
14 to?
15     A.   I'm sorry?
16     Q.   What would the ug refer to
17 in his report? What was your
18 understanding of what that refers to?
19     A.   AOGE, you're talking about?
20     Q.   No, ug. You used the words
21 "ug" in your reading you're --
22     A.   Oh, it's a measurement.
23 It's smaller than milligram, mg.
24     Q.   What does -- what does ug

Page 220

1 stand for?
2     A.   I don't remember exactly. I
3 think it's smaller than mg. I don't know
4 what its scale, smaller than mg.
5     Q.   You don't know ug refers to
6 or what he's referring to in this report,
7 when you put ug?
8     A.   I can copy what Dr. Madigan
9 say.
10     Q.   You just copied what
11 Dr. Madigan stated, but you don't know
12 what the ug means?
13     A.   Ug is a scale which measure
14 how much the exposure, right, like a g,
15 mg, like ug. That's a different scale,
16 measure how much contamination in the
17 blood or whatever in your body.
18     Q.   Explain quantitatively what
19 ug means?
20     A.   I don't remember how to
21 define, sir.
22     Q.   Do you know what ng means?
23     A.   Mg?
24     Q.   N. N as in Nancy. Ng, do

Page 221

1 you know what ng means?
2     A.   I don't know.
3     Q.   Okay. Do you know what mcg
4 would refer to?
5     A.   No. I'm not a toxicologist.
6 I don't know the scale.
7     Q.   So when you see him put
8 4,000 -- or just -- sorry, the first one
9 that you have quoted in Number 37,
10 "Dr. Madigan claimed that for NDMA" --
11 actually let's do this. Let's put this
12 up on the screen.
13           MR. NIGH: LP -- so the jury
14     can see it too -- LP-1557.
15           This was previously marked
16     Exhibit 3.
17           And turn to number --
18     Paragraph 37. And let's blow that
19     up.
20 BY MR. NIGH:
21     Q.   This is in your report.
22           MR. NIGH: Blow up Paragraph
23     37.
24

Confidential Information - Subject to Protective Order

Page 222

BY MR. NIGH:
Q.   So in your report you put in
Paragraph  Number 33 in the report,
"Dr. Madigan claimed that for NDMA
statistically significant increased
gastric cancer risk at LCEs as low as
1,962 ug."
What does that refer to
quantitatively, 1,962 ug?
A.   I am not a toxicologist.  I
cannot answer you how much is that
exposure.
Q.   That doesn't take a
toxicology opinion to know what ug means,
right?
A.   I don't know, sir.
Q.   So you don't know what
Dr. Madigan was referring to when he put
the word ug or the letters ug, and you
couldn't tell this jury quantitatively
what he's referring to when he says 1,962
ug, right?
A.   I don't know how much he's
mentioning to quantify this.

Page 223

Q.   Do you know how he
calculated these LCEs, what formula?
A.   Well, he calculate -- sorry.
Sorry, sir.  Say it again.
Q.   Do you know how he
calculated these LCEs or what formula he
used?
A.   Oh, yeah, yeah, I know
mathematic formula.  So what he did is
following:  He compared this Q1 to
quarter -- the lower dose, that exposure
against the Q4, which is the highest
dose.
Sometimes he use five set
instead of four.  And then he compared
the Q1 against the Q4.  Then if he says
it's statistically significant, then I'm
going to take this study, the exposure
level, whichever he described, that's
Study Number 1, right.
Then we go to another study.
If it's not a statistically significant,
he dropped it.
Then he go to the third

Page 224

study.  If he find a statistical
significant, he count -- he take the
highest, the Q4, the level, right, for
the lifetime exposure, which I don't know
how much to quantify.  That's what he
explains.
And then he added up, take
an average.  That's my understanding, he
calculated the so-called lifetime
threshold value.
Q.   Have you ever calculated
lifetime cumulative exposures in any of
the work that you've done?
A.   No.
Q.   So this is -- this is novel
to you, when you see these calculations
of lifetime cumulative exposures,
correct?
A.   Novel in a way.  Is not a
statistical novelty because statistical
is very straightforward.  That's what I'm
concerning about his statistical argument
and the claim.
I cannot interpret the

Page 225

physical meaning of this exposure, the
level we're talking about.
Q.   I'm not sure you understood
what he was doing, because you just
mentioned that if he found that it wasn't
statistically significant, he would drop
it.
Why do you think that?
A.   Well, that's my
understanding.  If I misunderstood what
he did, I apologize.
Q.   He has Table 1, and he's
calculated LCEs for nearly every single
dietary study.  Did you realize that?
A.   Hold on a second.  Let me
see the Table 1 here.  Okay.
MR. NIGH:  Yeah.  Let's go
ahead and show it.  LP-1558.
Table 1.
BY MR. NIGH:
Q.   It's important if you're
going to criticize an expert's opinion,
that you understand what they're doing,
correct?

Confidential Information - Subject to Protective Order

Page 226

1    A.   Oh, absolutely.
2    Q.   Okay.  Looking at Table 1,
3 do you see here how he calculated LCE for
4 nearly every single dietary study?
5    A.   Yeah, he lists the LCE and
6 every study they have -- well, some is
7 missing.  But okay, yes.
8    Q.   Nearly every one.  He
9 doesn't have one for Knekt.
10       Do you see that?
11   A.   Yeah.
12   Q.   Do you know why he wouldn't
13 have one for Knekt?
14   A.   No, sir.
15   Q.   Do you know if Knekt gave
16 the value of NDMA in the fourth quartile?
17   A.   I'm sorry, sir.  I don't
18 understand your question.
19   Q.   Now, looking at this, can
20 you explain -- let's just take a look at
21 Palli.  And you see under LCE, it shows
22 5,260?
23       Do you see that?
24   A.   Yes, sir.

Page 227

1    Q.   And that's one -- that's SS.
2 What do you think SS stood for?
3    A.   The effect size, you're
4 talking about.
5    Q.   You think SS on his chart
6 stood for sample size?
7    A.   You mean the last two -- the
8 column statistical significance?  Is that
9 what you're talking about?  Or which one
10 are you talking about?
11   Q.   SS?
12       MR. NIGH:  Can we highlight
13   that column.
14 BY MR. NIGH:
15   Q.   What do you believe that
16 stood for, that SS?
17   A.   I don't know, the SS means.
18   Q.   Okay.  Did you happen to
19 pull these dietary studies to where you
20 could figure out what the SS meant in his
21 table?
22   A.   No, sir.
23   Q.   What do you think effect
24 size meant?

Page 228

1    A.   Effect size, if I interpret
2 it correctly, that's the one we are
3 talking about in the morning, about for
4 example the difference between the two,
5 you can use the hazard ratio, you can use
6 odds ratio, you can use risk ratio, et
7 cetera.
8    Q.   Right.  Odds ratio, risk
9 ratio and HRs, are are all commonly
10 referred to as effect, or effect size,
11 correct?
12   A.   Yes, sir.
13   Q.   Okay.  But you don't know
14 what the SS, right next to that stands
15 for in the table?
16   A.   I -- I don't know.  I better
17 not make a guess.  But I think I know
18 what is going on.  But I apologize.  I
19 don't want to say -- I'm not 100 percent
20 sure.  I don't want to say anything.
21   Q.   Well, you're commenting on
22 his report.  That's what you were hired
23 to do, correct?
24   A.   Yes, sir.

Page 229

1    Q.   So I'm asking you, what do
2 you think his report, the SS stood for?
3    A.   I don't know.
4    Q.   Okay.  Next, do you remember
5 you asked about country, that second
6 column on this table.  You raised
7 country.  Doesn't he provide the
8 countries here?
9    A.   Provide country to me?
10 Sorry.
11   Q.   For each study.  Doesn't he
12 provide the countries for each study?
13   A.   In the table, yes.
14   Q.   Right.
15   A.   Yes, in the table.
16   Q.   And design, what do you
17 think the CC or the C stands for?
18   A.   Sorry.  Where is the CC?
19 I'm sorry.
20   Q.   Right underneath "Design."
21 Do you see CC and C?
22   A.   Oh, I have no idea what CC
23 means.
24   Q.   So as you reviewed his

Confidential Information - Subject to Protective Order

Page 230

¹ expert report and this table, you didn't
² know what CC stood for or what C stood
³ for?
⁴       A.    Yeah, because that's not
⁵ relevant for statistical analysis.
⁶       Q.    The type of study or the
⁷ design of the study can be relevant,
⁸ right?
⁹       A.    Well, I don't know, what
¹⁰ kind of observational study or what,
¹¹ because basically, he didn't tell us
¹² exactly what's going on in the report.
¹³ Right.  Did he say anything about CC
¹⁴ here.  In the footnote, did he indicate
¹⁵ CC?
¹⁶       Q.    Did you pull the studies to
¹⁷ see what CC or C may refer to?
¹⁸       A.    No, because I am basically
¹⁹ using his report.  Anything he send to
²⁰ me, I would read it very carefully.  But
²¹ if he skip it, I said well, that's your
²² problem.  It's not my problem.
²³       Q.    But you don't understand
²⁴ what he's referring to.  And commenting

Page 231

¹ on his report, if you don't understand
² it, isn't that your problem?
³       A.    I don't think so.  Because
⁴ he's got very important statistical
⁵ analysis, he would have put a footnote
⁶ underneath the table.  Say what do you
⁷ mean by CC, what do you mean by SS.
⁸       Q.    Why do you think -- what
⁹ makes you think he's required to do that?
¹⁰       A.    Otherwise, how in the world
¹¹ the people outside the field understand
¹² what he's talking about.
¹³       Q.    Show studies.  Just pull up
¹⁴ the studies, right.
¹⁵       A.    All right.  How in the world
¹⁶ would you --
¹⁷       Q.    Just pull up the studies to
¹⁸ see what it stands for.
¹⁹       A.    You talk over me.  If
²⁰ that -- if you want to talk, I'll let you
²¹ talk first.
²²       I just want to share with
²³ you, you're asking me how come I don't
²⁴ ask Dr. Madigan what CC means.  I say

Page 232

¹ well, listen, he didn't even list it,
² right.  He didn't explain to me in the
³ report.
⁴       And I was told my assignment
⁵ is to look at the report.  I don't have
⁶ to question about Dr. Madigan did.  I say
⁷ well, listen, if you give me the
⁸ information, I use it.  If you don't give
⁹ me information, I don't use it.
¹⁰       Q.    Well, he gives you the
¹¹ information because he cites to every one
¹² of these studies.  So you can simply --
¹³       A.    But what --
¹⁴       Q.    Hold on.  I was asking the
¹⁵ question that time.
¹⁶       A.    Yeah.
¹⁷       Q.    So you can pull up the study
¹⁸ to see what the design of that study is
¹⁹ and figure out what his CCs and Cs are
²⁰ referring to on this chart, right?
²¹       A.    Nope.  I can't.
²²       Q.    You don't think you can?
²³       A.    Sorry?
²⁴       Q.    You don't think you can do

Page 233

¹ that?
²       A.    He should have for us.  Why
³ should we go into each study to check
⁴ what he mean by CC, what is a single C,
⁵ what is a double C?
⁶       Q.    Okay.  So you don't have any
⁷ criticism in terms of the designs of
⁸ these studies or how we look at design of
⁹ study in terms of extrapolating these
¹⁰ results?
¹¹       A.    I don't have information
¹² about his abbreviation.  Say -- this
¹³ study he gave a double C, the other one
¹⁴ is a single C.
¹⁵       But for most of studies, I
¹⁶ go into the study to understand what kind
¹⁷ of observational study they conducted.
¹⁸ Is it prospective or actually
¹⁹ retrospective?  Is it cohort study or
²⁰ meta-analysis?
²¹       That's what I did.  I don't
²² have to go in to ask Dr. Madigan what
²³ he's talking about, what is a CC, or what
²⁴ does a C means.

Confidential Information Subject to Protective Order

Page 234

1    Q.   Okay.  Next column, base
2  high dose ug.
3          What does that refer to?
4    A.   That's, my understanding Q4,
5  whatever you want, base on high value.
6    Q.   Okay.  Your understanding is
7  that would be the highest quartile?
8    A.   Well, sometimes use
9  different topic, right, not only the
10  quartile, something else.
11    Q.   Okay.  How about average --
12  approximate average age.  What does that
13  refer to?
14    A.   That's probably obvious,
15  right.  That's -- everybody understands
16  average age.  That's the study
17  population, I believe.
18    Q.   You believe that's the
19  average age in the study?
20    A.   Of the subjects.
21    Q.   Okay.  Explain that to me
22  more.  You believe that's the average of
23  all the subjects in the study?
24    A.   Well, I better check the

Page 235

1  papers.  And I can confirm you the 60 is
2  exposure time of the age of exposure, or
3  the age of the subject, right, in the
4  study, right.
5    Q.   Okay.  But as you sit here
6  right now, looking at this table from his
7  chart, you couldn't tell me one way or
8  the other?
9    A.   Yeah.  I need to
10  double-check.
11    Q.   Okay.  Looking at LCE ug,
12  what does that mean?
13    A.   Well, as I explained before,
14  he took large -- the highest dose, right
15  tried to figure out the actual level,
16  LCE.  That's how he figure out lifetime
17  exposure.
18    Q.   Okay.  So explain to me what
19  you think his formula was in looking at
20  this table to come to 5,260 for Palli,
21  LCE?
22    A.   Well, this is -- my
23  understanding is he just copied from the
24  paper.  He didn't do himself.  He doesn't

Page 236

1  have the data.  He doesn't have the data
2  for patient, right.
3    Q.   You think he copied the
4  5,260 LCE from the Palli study?
5    A.   I believe that's my
6  understanding.
7    Q.   Do you think that all of
8  these numbers under LCE --
9          MR. NIGH:  Let's highlight
10    all of those in yellow, all the
11    way down.
12          THE WITNESS:  Well, that's
13    what my understanding.
14          Otherwise, he should explain
15    to us how they calculate this
16    number, right.
17          With the individual patient
18    levels he calculated number, or
19    actually is it from the papers,
20    right.
21          He didn't explain too well.
22    He just give us a formula.  Say,
23    well, that's calculated lifetime
24    exposure.

Page 237

1          We said, do you have
2    individuals patient level?
3    Obviously, he didn't have it.
4    Right.
5          So those patients falling
6    into the Q4, for example, right,
7    he did not have those --
8    everybody's exposure level, right.
9          Okay.  So I doubt he can
10    actually calculate this number
11    using individual patient level.
12  BY MR. NIGH:
13    Q.   So is it your testimony that
14  you believe these numbers under LCE are
15  lifted from the papers?
16    A.   I believe he find out from
17  the papers.  Otherwise I'm not quite sure
18  how he calculated those numbers.
19    Q.   But as you sit here right
20  now, looking at this table, which is a
21  table in Dr. Madigan's report -- it takes
22  up the full page in his report -- you
23  don't know whether or not those LCE
24  values were lifted directly from the

Page 238

¹ studies?
²      A.   You're asking me if those
³ numbers are from the papers, right?
⁴ That's what you are asking, right?
⁵      Q.   My question was, as you sit
⁶ here right now, looking at this table,
⁷ which is a table in Dr. Madigan's report,
⁸ it takes up the full page in his report.
⁹ You don't know whether or not those LCE
¹⁰ values were lifted directly from the
¹¹ studies, correct?
¹²      A.   I'm saying he cannot
¹³ calculate this number using individual
¹⁴ patient-level exposure.
¹⁵      Q.   So do you know if they were
¹⁶ lifted directly from the studies or not?
¹⁷      A.   It must be somewhere.
¹⁸ Summary statistics from the paper.
¹⁹ Otherwise I don't know how he calculate
²⁰ it.
²¹      MR. NIGH:  Okay.  Let's go
²²      ahead and take this down.
²³ BY MR. NIGH:
²⁴      Q.   Okay.  Back to my questions

Page 239

¹ earlier on -- Dr. Madigan's purpose was
² to look at the cumulative exposure to
³ NDMA that led to increased risk of
⁴ cancers, correct?
⁵      A.   Yes, sir.
⁶      Q.   Now, the two valsartan
⁷ studies that you looked at, they don't
⁸ discuss how much exposure that the
⁹ patients had to NDMA?  They don't
¹⁰ quantify exposure to NDMA in Pottegard or
¹¹ Gomm, the amount of exposure to NDMA,
¹² correct?
¹³      A.   I have to read the paper
¹⁴ again.  But my recollection, they did not
¹⁵ give a specific individual patient
¹⁶ exposure level.  But again -- sorry.
¹⁷      Q.   So --
¹⁸      A.   But again, I needed --
¹⁹      Q.   Go ahead.
²⁰      A.   Go back and read -- I'm
²¹ sorry.
²²      I had to go back to read the
²³ paper.
²⁴      Q.   So if Pottegard and Gomm

Page 240

¹ don't contain the amount of NDMA that
² those patients -- that the patients were
³ exposed to in those studies, that would
⁴ not be useful to Madigan if his sole
⁵ purpose was to try to look at how much
⁶ NDMA it would take to lead to increased
⁷ risk of cancer, correct?
⁸      A.   Well, again, sir, I don't
⁹ know in those two papers they have
¹⁰ individual exposure value or not.  I
¹¹ don't know.  I have to read again.
¹²      Q.   I started out with the
¹³ assumption that if Pottegard and Gomm do
¹⁴ not contain the amounts of NDMA that the
¹⁵ patients are exposed to -- so starting
¹⁶ with that hypothetical.
¹⁷      Follow me?
¹⁸      A.   Sir, I not answer a
¹⁹ hypothetical question.  I like to see the
²⁰ fact.
²¹      Q.   I'm allowed to ask you
²² questions as an expert that you take the
²³ assumptions, okay.
²⁴      So my first part that I want

Page 241

¹ you to assume that both Pottegard and
² Gomm do not contain the amounts of NDMA
³ that its patients or subjects were
⁴ exposed to.
⁵      Do you follow me so far?
⁶      A.   Yes, sir.
⁷      Q.   If they do not contain the
⁸ amount of NDMA that they are exposed to,
⁹ then that would not be useful to
¹⁰ Dr. Madigan's question of how much NDMA
¹¹ over a lifetime does it take to get
¹² increased risk of cancer, correct?
¹³      MR. MERRELL:  Objection to
¹⁴      form.
¹⁵      THE WITNESS:  I'm not a
¹⁶      toxicologist, sir.  I cannot
¹⁷      answer this question.  I have no
¹⁸      opinion on this.
¹⁹ BY MR. NIGH:
²⁰      Q.   This isn't a toxicology
²¹ opinion.
²²      The question is, you're
²³ reviewing and you're responding to
²⁴ Dr. Madigan's report.  If those two

Confidential Information - Subject to Protective Order

1 valsartan epi studies do not contain the
2 amount of NDMA that the subjects are
3 exposed to, then that would not be useful
4 to Dr. Madigan's question of how much
5 NDMA over a lifetime does it take to get
6 increased risk of cancer, correct?
7          MR. MERRELL:  Objection to
8     form.
9          THE WITNESS:  I don't answer
10     hypothetical question, even though
11     you have every right to ask me,
12     sir.
13 BY MR. NIGH:
14     Q.   Are you refusing to answer
15 the question, in terms of assume
16 Pottegard and Gomm do not show how much
17 NDMA its subjects are exposed to?
18     A.   I told you, sir, I have no
19 opinion on this.
20     Q.   Okay.  I'm going to ask this
21 again.
22          Assume that Pottegard and
23 Gomm do not show or discuss the amount of
24 NDMA that its subjects are exposed to.

1 If that's true, then those studies would
2 not be useful for Dr. Madigan in
3 calculating a cumulative amount of
4 exposure to NDMA that it takes to reach
5 increased risk of cancer, correct?
6          MR. MERRELL:  Objection to
7     form.  Asked and answered.
8          THE WITNESS:  I have no
9     opinion, sir.
10 BY MR. NIGH:
11     Q.   Do you have no opinion
12 because you believe that takes a
13 toxicology mindset to be able to answer
14 that question?
15     A.   Probably.
16     Q.   You believe that in order to
17 calculate a total amount of NDMA, that it
18 would be unuseful to try to use a study
19 that doesn't give you amounts of NDMA.
20 Is that your testimony?
21     A.   Yeah, sir, the problem that
22 I am having here, is that before you even
23 talk about the lifetime exposure, pose
24 the argument without this lifetime

1 exposure for individual level, we have
2 trouble.  We have a concerns about
3 Dr. Madigan's analysis, right.
4          You cannot even pass the
5 hurdle and say this exposed, this
6 unexposed.  Do you have any causality or
7 association interpretation?
8          We couldn't even go through
9 that piece from the dietary studies or
10 occupational study.  How in the world you
11 can go down the next level and claim
12 there was a threshold value, and beyond
13 that we have a concern for cancer risk?
14          So that's -- I said it very
15 clearly in my report.  We couldn't even
16 go through the first hurdle to convince
17 us there was issue, even exposure to
18 unexposed impurity of valsartan.  Right.
19          Then how we can actually go
20 to next level?  That's my basic question
21 to Dr. Madigan, and also to you.
22     Q.   My question, if you
23 understand his report, because the word
24 "threshold" doesn't show up anywhere in

1 his report, right?
2     A.   I apologize if I use the
3 word "threshold."  That's the number that
4 he used claiming, you know, beyond this
5 number we are in trouble, right.  That's
6 my understanding, that's the common
7 language, right?
8          If I use the word
9 "threshold" improperly, I apologize.  But
10 to me that's the same language we use all
11 the time to say what's the cutoff point,
12 what's cutoff value.  We call that a
13 threshold value.
14     Q.   He actually doesn't use the
15 word "cutoff" either.
16     A.   Okay.  That's fair.  Which
17 language does he use then, sir?
18     Q.   Do you understand that he's
19 not explaining a cutoff, a threshold,
20 line in the sand, none of those.  He
21 doesn't use any of that language, right?
22     A.   Okay.  Yeah, so he may -- if
23 the level -- if the patient's exposure
24 level, beyond that number he quoted, that

Page 246

1 means this guy have increased cancer
2 risk.  Is that correct?  That's what he
3 claimed, correct?
4      Q.   Do you see that claim
5 anywhere?
6      A.   Yeah, I mean, that's what he
7 is talking about in conclusion.
8      Q.   Okay.  Now, you talked about
9 causality.
10          As you read his report, did
11 you see a causation opinion that NDMA
12 causes cancer or that valsartan causes
13 cancer?
14      A.   Well, sir, unfortunately he
15 said also very well in the deposition, he
16 was not in the position to talk about
17 causality at all.  The most he can do is
18 talking about association.
19          Even association, we have
20 some question about it, right.  And from
21 association to causality, none of those
22 arguments can be -- hold true, right.  In
23 some sense we have no idea how to
24 interpret the causality now, right.

Page 247

1      Q.   Is it your testimony that
2 there is no association between NDMA and
3 cancer in humans?
4      A.   Sir, I am not in a position
5 to tell you either way.  I'm just
6 responding to my lawyers.  My assignment
7 is asked very simple, do you think
8 Dr. Madigan's argument in his report is
9 valid?  Okay.  I'm saying his argument
10 has a lot of holes, and I don't agree
11 with his argument.
12          I didn't say either way it
13 was association, not association.
14          My point is that at this
15 point, we don't have much evidence to
16 claim either way.  Because most
17 observational study, everybody has
18 limitation, okay.
19          So I'm not in the position
20 to tell you, sir, there's no association,
21 there is association.  I just say we
22 don't have enough data to tell us either
23 way for valsartan case, not dietary, but
24 for valsartan case.

Page 248

1      Q.   My question to you is, is it
2 your testimony that there isn't enough
3 evidence to establish an association
4 between NDMA and cancers in humans?
5          MR. MERRELL:  Objection to
6 form.
7          THE WITNESS:  Correct.  I
8      said there is not much evidence to
9      say there is association or there
10     is no association.  That's my
11     position right now.
12 BY MR. NIGH:
13     Q.   Now, you included Pottegard
14 and Gomm and looked at those studies.
15          Was that for you to form an
16 opinion on whether or not there's an
17 association between valsartan --
18 contaminated valsartan use and cancer?
19     A.   Well, let me say this, sir.
20          I think the two studies are
21 pretty relevant to address the issue
22 regarding the impurity in valsartan.
23 Okay.  It's very direct and to the point.
24 But everybody understands any observation

Page 249

1 study has a limitation.
2          Those two studies had a
3 limitation, right.
4          So at this point, I said,
5 well, if I have a choice to look at
6 information about a valsartan impurity, I
7 would have put a more emphasis on these
8 two studies, instead of using a detour
9 method using dietary studies,
10 occupational study to tell me there is
11 some issue about a valsartan impurity.
12          So that's my position.
13          I'm not in the position to
14 say, yes, these two studies told us there
15 was no association about the cancer risk
16 and the impurity of the valsartan.  And
17 I'm not in a position to say that either.
18     Q.   Dr. Madigan was looking at
19 cumulative exposure and potential
20 increased risk from cumulative exposures
21 to NDMA.
22          How would you use Pottegard
23 or Gomm to assess cumulative exposures?
24     A.   Well, sir, you asked me the

Confidential Information – Subject to Protective Order

Page 250

1 same question before.  You said if they
2 didn't have -- under the hypothetical,
3 the assumption, there were no individual
4 exposure level using -- Dr. Madigan
5 cannot use their study or data to
6 calculate a so-called lifetime exposure.
7          I said I'm not in a position
8 to answer your question, because I would
9 really like to review that paper
10 carefully before I answer yours, right.
11     Q.   Well, there's even even --
12 not just NDMA.  But there's not even
13 enough data in terms of amount of
14 valsartan usage in Pottegard or Gomm to
15 try to draw any conclusions in the amount
16 of cumulative valsartan usage that it
17 would take to reach certain increased
18 risk in Pottegard or Gomm, correct?
19     A.   Well, again, sir, forgive
20 me, I needed to read the paper carefully
21 again, because I've been -- I've not read
22 any their papers about -- after I
23 submitted the August 2nd report.
24     Q.   So as you sit here right

Page 251

1 now, you can't answer whether or not
2 there was enough information in Pottegard
3 or Gomm to draw any conclusions in the
4 amount of cumulative valsartan usage that
5 it would take to reach certain increased
6 risk in those studies, correct?
7     A.   I don't recall, sir.
8     Q.   Now, you included valsartan
9 epi to see whether these valsartan epi
10 studies, Pottegard and Gomm, demonstrate
11 the contaminated valsartan had an
12 association or not with cancer, correct?
13     A.   Yes.  We just simply stated
14 what -- the conclusion from the papers,
15 right.  They didn't find association
16 between those two.
17     Q.   Now, there are other -- you
18 understand that there are other drugs
19 that are -- also have been shown to have
20 NDMA, correct?
21     A.   Well, I vaguely know a
22 little bit.  Not much.
23     Q.   Well, do you know that
24 losartan and irbesartan have been

Page 252

1 demonstrated to have nitrosamines inside
2 of them?
3     A.   I don't know, sir.
4     Q.   Have you reviewed any
5 literature or epi studies to see whether
6 or not there was an association between
7 the nitrosamines in losartan or
8 irbesartan and increased cancer risk?
9     A.   Well, if the reference are
10 not in Dr. Madigan's report, I don't
11 think I read it, except for those few
12 papers that I provide in my report.
13 Otherwise -- not an appendix -- Exhibit A
14 or B, if it's not in this, I didn't read
15 it.
16     Q.   Right.  Why wouldn't you
17 have looked at whether nor not other
18 drugs that are contaminated with
19 nitrosamines had increased risk?
20     A.   It was not in my assignment,
21 sir.
22     Q.   But you looked at Pottegard
23 and Gomm, even though that wasn't cited
24 by Dr. Madigan, correct?

Page 253

1     A.   Well, you know, this is what
2 I said to you.  I'm really curious how
3 come Dr. Madigan didn't use a direct
4 approach to actually use the valsartan
5 impurity study, right, to answer this
6 issue.
7          So I Googled.  And it turns
8 out there were two, only two, that the
9 lawyers send to me, and I couldn't find
10 other studies available right now
11 directly address the issue.
12          So I thought, wow, gee, this
13 is interesting, how come Dr. Madigan did
14 not cite those two papers, right.  To me,
15 that's all relevant to this particular
16 issue, the legal case.
17     Q.   Well, you realize that it's
18 because they don't have any sort of
19 dosing to answer the question that he was
20 asked, right?  No NDMA, no amount of
21 cumulative valsartan, right?
22          MR. MERRELL:  Objection to
23     form.
24          THE WITNESS:  Well, if I

Confidential Information - Subject to Protective Order

Page 254

1    were him, I would have mentioned
2    the papers about -- then you said
3    limitation of the two studies,
4    right.  Instead he just totally
5    ignored and didn't even mention
6    anything in his report.
7    BY MR. NIGH:
8        Q.   You realize there's four
9    other plaintiffs in this -- four other
10   plaintiff experts in this litigation, and
11   all the other four looked at valsartan
12   epi.  But Madigan was only asked to look
13   at dose, right, you saw that from his --
14   from his -- the question that he was
15   asked, right?
16       A.   Oh, no, sir.  No, no, no,
17   no, sir.  If you read Dr. Madigan's
18   report, first that he established this
19   so-called Q1 against Q4.  And he cited
20   all the papers using the dosing-response
21   relationship.  That's the first thing he
22   established.
23          You read this morning about
24   the lung cancer and other cancers, right.

Page 255

1    That's what he did, first place.
2           Then he go in to figure out
3    this lifetime exposure level, right.
4           So we have two pieces.  The
5    first piece, I have a serious concern
6    about his conclusion.  If you cannot sort
7    out exposure, any exposure or a Q4, like
8    for example had some issues, how can we
9    actually go down the next level to figure
10   out what's the value your concerning go
11   about, right.
12       Q.   Okay.  So your questioning
13   is -- you know, your response to that is
14   he was also evaluating the strength of
15   association first?
16       A.   Yeah.  All the odds ratio
17   he's talking about -- he's compare the Q1
18   against Q4 or Q -- whatever he used,
19   quintile or quartile, whatever it is,
20   right, lowest against the highest dose,
21   whether there is statistical significance
22   or not.  That's first step that he
23   established.
24       Q.   Okay.  Turning back to --

Page 256

1    you realize there are other drugs that
2    have also been demonstrated to be
3    contaminated with NDMA, correct?
4        A.   I don't know, sir.
5        Q.   Are you aware that Zantac,
6    generic form name ranitidine, has been
7    demonstrated to be contaminated or have
8    NDMA?
9        A.   I vaguely remember because I
10   was contacted by lawyers on the Zantac.
11   They actually -- I believe, either I
12   Googled or they send me some kind of
13   documents.
14          By the way, I was is not
15   retained for that case at all.
16          In any event, I notice
17   Zantac has impurity also.
18       Q.   It's NDMA for Zantac,
19   correct?
20       A.   Correct.
21       Q.   And also metformin, some
22   metformin drugs have been contaminated or
23   have NDMA, correct?
24       A.   That, I don't know.

Page 257

1        Q.   Did you review any
2    epidemiological studies for ranitidine
3    a/k/a Zantac, or metformin to see whether
4    they had increased risk of cancers?
5        A.   No, sir.
6        Q.   Why not?
7        A.   Well, first, I was not
8    retained by the Zantac team, the legal
9    team, so I don't think I have the time to
10   even begin to understand the impurity of
11   other medicine.
12       Q.   Well, you looked at studies
13   related to whether or not the NDMA in
14   valsartan, whether or not valsartan
15   showed increased risk of cancer.  Why
16   wouldn't you look at other drugs that
17   also have NDMA and see if there's an
18   increased risk of cancer?
19       A.   Well, because Dr. Madigan
20   didn't even mention about other
21   medicines, sir.
22          My job is mainly to address
23   an issue in Dr. Madigan's report.
24       Q.   Dr. Madigan didn't look at

Confidential Information – Subject to Protective Order

Page 258

¹ Pottegard or Gomm either, right?
²      A.   Yeah.  I don't know why.
³ And he didn't mention anything about
⁴ Zantac, metformin.  I didn't see from his
⁵ report, unless I missed something.
⁶      Q.   Did you think it wasn't
⁷ important to consider the other drugs or
⁸ other medications that had NDMA in
⁹ thinking about whether or not NDMA in
¹⁰ valsartan could cause increased risk?
¹¹      A.   Well, that's a very
¹² interesting question.  You should ask
¹³ Dr. Madigan how come he didn't include it
¹⁴ in his report, if you think such an
¹⁵ important issue.  If you can actually
¹⁶ utilize to tally the evidence across all
¹⁷ the medicines, how come he didn't use it?
¹⁸      Q.   Well, I'm asking you right
¹⁹ now.
²⁰           Dr. Madigan --
²¹      A.   Well --
²²      Q.   He didn't include Pottegard
²³ or Gomm either.
²⁴      A.   Yeah.

Page 259

¹      Q.   So I'm asking you.
²      A.   Yeah, that's right.
³      Q.   You included Pottegard and
⁴ Gomm.
⁵      A.   Yeah.
⁶      Q.   This question isn't for
⁷ Madigan.  This isn't in relation to
⁸ Madigan.  Let's throw Madigan out the
⁹ window right now.  My question is to you.
¹⁰ You included Pottegard and Gomm?
¹¹      A.   Yeah.
¹²      Q.   Okay.  So you included those
¹³ two studies.  Why else -- why didn't you
¹⁴ include the other studies that showed
¹⁵ NDMA in medications?
¹⁶      A.   Sir, is this a case for the
¹⁷ valsartan impurity or is this a case for
¹⁸ Zantac impurity or metformin impurity
¹⁹ questions?
²⁰           Is that -- I have to worry
²¹ about other medicine contamination to
²² answer your valsartan question?
²³           You know, I have a problem
²⁴ even to understand, you use a dietary

Page 260

¹ study, extrapolate a result to valsartan.
² I said, you actually can use the
³ metformin result to this valsartan case?
⁴ The population is so different.  The
⁵ patient population is so different,
⁶ right.
⁷           The Zantac population is
⁸ quite different than the valsartan
⁹ population.
¹⁰           So you are rounding a circle
¹¹ here.  You say, well, how in the world I
¹² can use other treatment, other drug
¹³ contamination to help me?  I said, well,
¹⁴ there's two studies.  Danish and German
¹⁵ study directly address this issue.
¹⁶           Why should I ignore?  Why
¹⁷ should I even bother to worry about other
¹⁸ drug contamination issue for this case.
¹⁹      Q.   Okay.  That's helpful.  I
²⁰ think you're saying that you didn't look
²¹ at metformin or Zantac because they have
²² different populations than the valsartan
²³ population, correct?
²⁴      A.   Yeah.  Sir, I don't even

Page 261

¹ know metformin had an issue.  I know
² vaguely about Zantac issue.
³      Q.   Okay.
⁴      A.   Even that part I just
⁵ vaguely know a little bit.  I am not for
⁶ sure how much research I have to be doing
⁷ to answer your current question about
⁸ valsartan impurity, right.
⁹      Q.   Right.  So when you're
¹⁰ thinking about an impurity of NDMA in
¹¹ valsartan, you felt like you didn't need
¹² to look at Zantac or Metformin, because
¹³ they had different populations.  They
¹⁴ also have a different mechanism as to how
¹⁵ NDMA is formed.  Did you know that?
¹⁶      A.   No, I don't.
¹⁷      Q.   Zantac breaks down -- it's
¹⁸ been stated that Zantac breaks down not a
¹⁹ manufacturing defect.  So it's not in the
²⁰ drug right off the assembly line.
²¹           Zantac breaks down due to
²² heat, humidity, time, possibly other
²³ factors inside of the body.
²⁴           That's what's been stated,

Page 262

¹ right?
²        MR. MERRELL:  Objection to
³ form.
⁴        THE WITNESS:  Sir, I'm
⁵ sorry.  Go ahead.  I'm sorry, I
⁶ don't mean to cut you off, I'm
⁷ sorry.
⁸ BY MR. NIGH:
⁹    Q.   Do you recall seeing that,
¹⁰ that the way in which Zantac gets NDMA,
¹¹ is much different than the way in which
¹² valsartan has NDMA, correct?
¹³    A.   No, sir.  I'm so glad you
¹⁴ learn so much in the past few months,
¹⁵ right.  And I have no idea what is the
¹⁶ underlying process of this contamination
¹⁷ works, right, for each medicine.
¹⁸        I really admire you for you
¹⁹ to learn things so fast, right.
²⁰    Q.   But if you were wanting to
²¹ think about whether or not to consider
²² Zantac epidemiological studies as to
²³ whether or not that's beneficial for
²⁴ valsartan epidemiology and the question

Page 263

¹ at hand here, you would want to know that
² the way in which they're getting NDMA is
³ similar, correct?
⁴    A.   I have no opinion, sir.  I
⁵ am not a toxicologist.  Besides, I have
⁶ not reviewed the papers in detail
⁷ regarding the Zantac impurity question.
⁸        I'm not quite sure where --
⁹ where the question right now, sir.  You
¹⁰ continue asking me the question about
¹¹ other impurity, right, other drugs, which
¹² was not in my assignment, which is not my
¹³ expertise.
¹⁴        I'm not quite sure how I can
¹⁵ actually help you on this case to figure
¹⁶ out that the valsartan -- we haven't
¹⁷ solved the valsartan issue again.  Why we
¹⁸ actually worried about other
¹⁹ contaminants, right.
²⁰    Q.   Would you also, in
²¹ understanding the question between Zantac
²² and the amount of NDMA versus valsartan
²³ and the amount of NDMA, that the amount
²⁴ of NDMA that's been reported in Zantac,

Page 264

¹ is much different than the amount of NDMA
² that's been reported in valsartan.
³ That's something that you would also want
⁴ to consider as you're thinking about
⁵ whether or not you look at Zantac epi
⁶ studies for the question at hand here,
⁷ right?
⁸    A.   No.  I don't think it's
⁹ relevant.  It was not in my assignment.
¹⁰    Q.   You don't think that it
¹¹ would be relevant -- when you're
¹² questioning whether or not to include --
¹³ you didn't look at Zantac studies, right,
¹⁴ Zantac epi studies?
¹⁵    A.   Sir, my assignment was not
¹⁶ regarding the Zantac.  My assignment is
¹⁷ regarding the impurity in valsartan,
¹⁸ right.
¹⁹    Q.   Right.
²⁰    A.   So I don't know that you can
²¹ transport the findings from Zantac to our
²² current case or not.  I have no idea,
²³ sir.  I cannot say either way, right.
²⁴ I'm not an epidemiologist.  I am not a

Page 265

¹ toxicologist.  I cannot answer your
² question.
³        If you can educate me here,
⁴ I'm happy to learn from you, right.
⁵    Q.   Nonetheless, you looked at
⁶ Madigan's report, and in thinking about
⁷ whether or not there's an association
⁸ between valsartan that's contaminated
⁹ with NDMA and increased cancer risk, you
¹⁰ decided to look at Pottegard and Gomm,
¹¹ not any of the Zantac epi studies,
¹² correct?
¹³    A.   The Danish study, German
¹⁴ studies are relevant to our current case.
¹⁵        Other medicine contamination
¹⁶ may be interesting, but it was not in my
¹⁷ assignment.
¹⁸    Q.   What do you mean by it
¹⁹ wasn't in your assignment?
²⁰    A.   Well, sir, if you read in my
²¹ Section C, very clearly you helped me
²² this morning even read with me my
²³ assignment, right.  Does my assignment
²⁴ say anything about I should worry about

Confidential Information - Subject to Protective Order

Page 266

1 Zantac impurity?  Does it say anything?
2      Q.   Let's take a look.  Number
3 11.  We're going to pull up your expert
4 report.  I want to be real clear here.
5           MR. NIGH:  Number 11,
6      Page 5.  Put that on the screen.
7      Let's blow that up again.
8 BY MR. NIGH:
9      Q.   It says, "I have been
10 retained by defendants to provide an
11 expert opinion in the litigation
12 styled" -- and chose valsartan.
13 "Specifically, I was asked by counsel for
14 defendants to review and assess the
15 opinions presented by David Madigan, who
16 submitted an expert report on behalf of
17 the plaintiffs analyzing the results from
18 the dietary and occupational exposure
19 studies to infer potential risk of
20 carcinogenicity from NDME or NDEA
21 impurities in valsartan and to provide my
22 own assessment of those issues."
23           That's what it says,
24 correct?

Page 267

1      A.   Yes, sir.
2      Q.   Okay.  Now, that assignment
3 says "analyzing the results from the
4 dietary and occupational exposure studies
5 to infer potential risk of
6 carcinogenicity of NDME or NDEA
7 impurities in valsartan."  That's the
8 first part of that statement.  That
9 statement doesn't include Pottegard or
10 Gomm, correct?
11      A.   Correct.
12      Q.   The second part says, "And
13 to provide my own assessment of those
14 issues."
15           Is it that part of the
16 assignment that you felt authorized to
17 look at Gomm and Pottegard?
18      A.   I said in my report very
19 clearly after I raised some concerns
20 about Dr. Madigan's report, I said, well
21 why don't we actually directly address
22 the issue using the valsartan impurity
23 studies, right, instead of you go to the
24 bypass, somehow take a detour, right,

Page 268

1 using other studies.  So that's what I'm
2 try to.  I provide to you two studies
3 directly addressed issue here, right.
4      Q.   I understand.
5      A.   That's what I'm doing, yeah.
6      Q.   You made the determination
7 in your understanding in providing an
8 assessment of those issues, to go to the
9 valsartan epi studies Pottegard and Gomm,
10 right?
11      A.   Yes.
12      Q.   Why didn't you make the
13 determination to then also look at other
14 medications that were contaminated by
15 NDMA?
16      A.   I am not for sure I should
17 do it that way, sir.
18           If I have unlimited time in
19 my life, I wish I can learn a lot of
20 things from you guys.  You know, you guys
21 catch things so quickly.  I don't catch
22 things very quickly.  I need a lot of
23 time to understand the toxicology report,
24 even epidemiology report.

Page 269

1           Honestly, I have a day job.
2 I cannot afford it, right, to do
3 something is irrelevant to this case.
4      Q.   Okay.  The last part of your
5 sentence, you said, "Honestly I have a
6 day job, I cannot afford it to do
7 something irrelevant to this case."
8           Did you believe that that
9 would be looking at the other medications
10 that were contaminated by NDMA, those
11 epidemiology studies, looking at those
12 studies, would be something that is
13 irrelevant to this case?
14           MR. MERRELL:  Objection to
15 form.  Calls for a legal
16 conclusion.
17           THE WITNESS:  Well, I
18 apologize, sir.
19           You know, if you think that
20 this is very important, looking at
21 other medicine impurity, I wonder
22 how come your expert witness
23 didn't even take a look at it,
24 right.

Page 270

1    If they take a look at it,
2 I'd be happy to make a comment
3 about their findings.  But they
4 didn't do anything.  They didn't
5 even bother to go to valsartan
6 study.
7    I actually made a little bit
8 of effort to bring up to you guys
9 to say, well, two studies directly
10 addressing issue.
11    You said, wow, that's very
12 good.  Why don't you go the next
13 mile and figure out what other
14 things like Zantac, Metformin.
15    I said, well, gee, you know,
16 sir, how many contaminated drug in
17 the world, how many drug I should
18 worry about before I submit my
19 report.
20    Sir, this is unrealistic
21 now, right.  It is really not
22 relevant anymore.
23 BY MR. NIGH:
24    Q.   Now, in your answer, I hope

Page 271

1 you understand that there -- we have more
2 experts than just Dr. Madigan, right?
3    A.   I don't know, sir.  I don't
4 know how many experts you have.
5    Q.   So you haven't seen the
6 opinions, you haven't seen the reports of
7 Dr. Etminan, Dr. Panigrahy, Dr. Lagana,
8 or Dr. Hecht, correct?
9    A.   The only report I read very
10 quickly, not very detailed, was the
11 epidemiologist that you mentioned, right.
12 Other than that, I didn't read the --
13 your expert witness report.
14    Q.   Dr. Etminan you reviewed
15 very quickly.  Is that what you just
16 said?
17    A.   Yes.  I did glance over.
18 Because I find out, interesting enough,
19 all his study he recommended Dr. Madigan
20 included.  I said well, gee, you know, in
21 that case I don't have to read the
22 epidemiology expert witness, because
23 Dr. Madigan solely depend on the
24 epidemiology.  Your other expert read the

Page 272

1 guidance, right, to say, wow,
2 Dr. Madigan, you should read X, Y, Z.
3    So Dr. Madigan say, oh,
4 yeah, yeah I take it.  So in his
5 deposition Dr. Madigan said, Yes, I only
6 consider those documents or papers
7 provided by the epidemiologist.  That's
8 my understanding.
9    Q.   So as you quickly reviewed
10 Dr. Etminan's report, you believe that he
11 doesn't have Pottegard -- Gomm or
12 Pottegard in his expert report as far as
13 you understand?
14    A.   No, sir, I apologize, I
15 don't remember exactly the report
16 anymore.  I'd be happy to read it and get
17 back to you.
18    Q.   But as you sit here today,
19 you wouldn't be able to say one way or
20 the other, right?
21    A.   Correct.
22    Q.   And also you wouldn't be
23 able to say one way or the other whether
24 or not Dr. Etminan, plaintiffs'

Page 273

1 epidemiologist expert, whether or not
2 he's included review of ranitidine
3 epidemiological studies, correct?
4    A.   Correct.
5    MR. MERRELL:  Counsel, we've
6 been going about an hour and a
7 half.  Can we take a break
8 shortly?
9    MR. NIGH:  Yeah, can you
10 give me just about two more
11 minutes and I think it will be a
12 good time for a break.
13    MR. MERRELL:  Of course.
14 BY MR. NIGH:
15    Q.   So I want to see if I
16 understand this correctly.
17    You found it relevant, in
18 terms of the questions here, to look at
19 Gomm and Pottegard, but you did not find
20 it to be relevant or close to the issues
21 at hand, I think you used the word
22 "irrelevant," that is, not a legal
23 conclusion, but you used that word.
24    You found it to be

Confidential Information - Subject to Protective Order

Page 274

1 irrelevant to look at ranitidine or
2 Zantac epidemiology or Metformin
3 epidemiology studies, correct?
4         A.   I apologize to use the word
5 "irrelevant."  That's probably the wrong
6 word to use it.
7              I'm trying to say is my
8 assignment did not include taking a look
9 at other contaminants, right, in other
10 medicines.  That's my first answer to
11 you.
12             Second, honestly, I don't
13 have so much time on hand to deal with
14 all other medicines.  I have no idea how
15 much other medicine is contaminated, I
16 have no idea.  If you ask me, how come
17 you don't do Zantac, Metformin, somebody
18 else would say how come you don't do A,
19 B, C, other drugs.  That is the answer,
20 sir.
21             MR. NIGH:  Okay.  I think we
22 can take a break now.   Thank you.
23             THE VIDEOGRAPHER:  The time
24 right now is 2:51 p.m.  We are off

Page 275

1 the record.
2             (Short break.)
3             THE VIDEOGRAPHER:  The time
4 right now is 3:12 p.m.  We're back
5 on the record.
6 BY MR. NIGH:
7         Q.   Doctor, I want to ask you
8 about the levels of NDMA that were found
9 in valsartan, okay?
10        A.   Yes, sir.
11        Q.   Do you know what the levels
12 of NDMA were that were found in
13 valsartan?
14        A.   I don't know, sir.
15        Q.   Do you have any way of
16 describing the levels of NDMA that were
17 found in valsartan?
18        A.   No, sir.
19        Q.   Do you have any idea or any
20 way of describing how long the valsartan
21 medications were contaminated for in the
22 U.S.?
23        A.   No, sir.
24        Q.   So you haven't seen any

Page 276

1 internal testing or any FDA testing that
2 describes the amount of NDMA that was
3 found in the valsartan drugs, correct?
4         A.   The only information I got
5 is like you said for mainly from
6 Dr. Madigan's report.
7         Q.   Okay.  Well, what do you
8 know in terms of internal testing or FDA
9 testing of the amount of NDMA that's in
10 the valsartan drugs?
11        A.   No, sir.
12        Q.   You have no knowledge of
13 that, correct?
14        A.   No, sir.
15        Q.   Okay.  And how about the
16 amount of NDMA that was measured in
17 people's diets and the dietary levels?
18        A.   I have no idea, sir.
19        Q.   So as you sit here, you
20 can't make any statement or comparison of
21 the amount of NDMA that was in people's
22 diets and the dietary studies versus the
23 amount of NDMA found in the valsartan
24 pills, correct?

Page 277

1         A.   Well, I know a little bit
2 about a dietary, the food and recall.
3 You know, for example, someone can ask
4 me, last month, what did you eat, how
5 many strip of bacon you eat, right,
6 something like that.  And they
7 extrapolate those kind of things and
8 convert it to the level of exposure.
9 That is only the level I understand, sir.
10        Q.   Do you know how many -- how
11 much NDMA that they were reporting in
12 their daily diet in the various quartiles
13 in dietary studies?
14        A.   Well, this quartile, some
15 paper they describe the level.  So I know
16 the level, but I can't understand
17 biologically how much you are talking
18 about, right, in your body or your
19 bloodstream, whatever you define.
20        Q.   Do you know how much NDMA
21 that they were saying was in the foods in
22 those dietary studies, do you have any
23 way of describing that?
24        A.   No.

Page 278

1  Q.  So if I were to make the
2 statement that the amount of NDMA found
3 in valsartan pills was as high as 600
4 times the amount of NDMA in a person's
5 daily diet, you would have no way of
6 knowing if that was true or not, correct?
7      MR. MERRELL:  Objection to
8   form.
9      THE WITNESS:  Yeah, I have
10  no -- I don't know where I can get
11  that information from
12  Dr. Madigan's report.
13 BY MR. NIGH:
14  Q.  Is that something you looked
15 for in Dr. Madigan's report and you just
16 didn't find it or you don't recall
17 looking for that?
18  A.  Well, he maybe mention
19 something.  Maybe if I can read his
20 report again I can confirm.  What I think
21 is he did not mention or I forgot what he
22 mentioned.  Maybe somewhere he mentions
23 well, valsartan impurity probably is X
24 times higher than whatever is, right.

Page 279

1 That's probably what he said somewhere.
2 But I need to go back to his report.
3  Q.  But as you sit here right
4 now, you don't remember any comparison
5 that Madigan made or that you've seen in
6 terms of comparing the amount of NDMA in
7 the valsartan drugs versus the amount of
8 NDMA in these dietary studies, correct?
9  A.  I don't recall, sir.
10  Q.  And as you looked at the
11 dietary studies, you don't recall whether
12 or not, when dietary studies had lower
13 amounts of NDMA in the highest quartiles,
14 they were less likely to show effects
15 than when they had higher amounts of NDMA
16 in the quartiles, the highest quartile.
17 Do you recall ever looking at that?
18  A.  The analysis Dr. Madigan did
19 most is sort of transport from
20 publication.  For example, in a
21 publication, the majority of
22 publications, they compared the quartile,
23 right, the Q1 against the Q2, Q3, and Q4.
24 And most they are reporting on the trend

Page 280

1 test combining those three tests
2 altogether.  That's what Dr. Madigan
3 mainly depend on, right, using those
4 P-values, using this statistical
5 significance job and word, to claim there
6 is issue from this study for this cancer.
7      That's what I'm concerned,
8 from a statistical point of view, is this
9 a valid way to evaluate the safety of an
10 impurity in valsartan.
11  Q.  You don't recall looking at
12 dietary studies or even Madigan's report,
13 to see whether or not as dietary levels
14 are lower -- sorry.  Strike that.
15      You don't recall looking at
16 dietary studies or even Madigan's report
17 to assess whether or not if the dietary
18 levels are lower in the highest quartile
19 in various dietary studies, then it would
20 be less likely to show an effect than
21 dietary studies that had higher amounts
22 of NDMA in the dietary studies.  You
23 never looked at that or saw that in
24 Madigan's report?

Page 281

1  A.  I don't recall, sir.
2  Q.  That wasn't something that
3 was important to you in terms of the
4 findings or conclusions that you made in
5 your report, correct?
6  A.  I'm sorry.  I missed a few
7 words in the beginning.  Could you say it
8 again, please.
9  Q.  I said that wasn't something
10 that was important to you in the findings
11 or the conclusions that you made in your
12 report, correct?
13  A.  Yes, if I didn't say in my
14 report, then it is -- I either say it is
15 not relevant or something I don't think
16 is important.
17  Q.  And comparing the amount of
18 NDMA in the valsartan pills compared to
19 the amount of NDMA in the dietary
20 studies, that also wasn't important to
21 you in the findings or the conclusions
22 that you made in your report, correct?
23  A.  Well, first I have a concern
24 how can we use the dietary study even

Confidential Information - Subject to Protective Order

Page 282

1 infer the issue on the impurity of
2 valsartan.  I have a hard time to
3 extrapolate the result from the dietary
4 studies or occupational study to
5 purity -- impurity valsartan study.
6        Q.   And you're not a
7 toxicologist, correct?
8        A.   No, sir.
9        Q.   So you're not commonly
10 experienced in looking at contaminations
11 or carcinogens or toxins in one source
12 and trying to make conclusions or
13 assumptions of that contamination and the
14 amount of that contamination in another
15 source, correct?  You don't do that?
16        A.   Not for the contamination,
17 but I have involved in many, many Phase I
18 trials for drug development which started
19 with animal study.  We figure out is it
20 highly significant, right, for the new
21 compound.
22        But unfortunately when we
23 transported this model to human beings,
24 sadly, most didn't work.  We cannot even

Page 283

1 transport the animal study result to
2 human beings either.
3        That was my understanding
4 beyond the use safety, right, or
5 contaminant.  I didn't deal with
6 contaminant issues before.
7        Q.   Now, let me rephrase that.
8 I see how you thought of animal studies.
9 So I'm just speaking of human
10 epidemiological studies.
11        You're not commonly --
12 you're not experienced in looking at
13 contamination or carcinogens or toxins in
14 one source of epidemiological studies and
15 trying to make conclusions or assumptions
16 of that contamination and the amount of
17 that contamination in another source.
18 That's not something that you do,
19 correct?
20        A.   I don't, but, sir, if you
21 allow me to say one thing.  Even within
22 the dietary studies, the studies are so
23 heterogenous, you know, as Dr. Madigan
24 indicated in his report, also deposition,

Page 284

1 right, even Song, S-O-N-G, paper, the
2 meta-analysis, they actually admitted
3 even the study involving meta-analysis is
4 so different, right.
5        If you look at the forest
6 plot of meta-analysis by Song, you can
7 see it.  The effect size, even
8 statistical significance, the changing
9 back and forth around this null value,
10 which is one, odds ratio, or OR.
11        You know, that indicates
12 even with the dietary study, I cannot use
13 the result from the one dietary study to
14 another one, right.  Easily it's not
15 applicable.
16        That's why they use
17 meta-analysis, to try to combine the
18 information to go together, get a single
19 summary to tell us if there is something
20 going on with this -- with the
21 contamination.
22        Q.   Okay.  Let me see if I
23 understand your testimony.
24        I believe you are agreeing

Page 285

1 with me that you're not experienced in
2 looking at contamination or carcinogens
3 or toxins in one source of
4 epidemiological studies and trying to
5 make conclusions or assumptions of that
6 contamination and the amount of that
7 contamination in another source.  That's
8 not something that you do, correct?
9        A.   Correct.  I don't do that.
10        Q.   So I think what you're
11 telling me is your concern is that, even
12 looking at the dietary studies, there's
13 so much heterogeneity and other issues
14 with those studies, that you don't
15 believe you can extrapolate even to other
16 dietary studies, those findings, correct?
17        A.   To valsartan, yes.  Okay.
18 Yes.
19        Q.   Right.  Not just to
20 valsartan, but even to other, you know,
21 dietary issues.  So if your question was,
22 does NDMA in diet cause cancer?  You
23 would raise, there's too much
24 heterogeneity between the dietary

Confidential Information - Subject to Protective Order
PageID: 46736

Page 286

1 studies, and model fit issues and other
2 things of that nature, that you don't
3 think the dietary studies could even
4 answer the question, does NDMA in diet
5 increase the risk of cancer, right?
6     A.    Yeah.  For a specific
7 population.  If you ask yourself, for
8 this particular population, can you tell
9 me I have such contamination for NDMA,
10 right, I say, well, I'm not for sure how
11 to answer your question, right.  Even if
12 I use meta-analysis, I cannot, right.
13         Basically we cannot even
14 pre-specify population.  You telling me,
15 and those people what is the number, you
16 know, max number, whatever you want to
17 define as the cutoff, ratio or whatever
18 the number is, that is applicable to
19 everyone or to this particular
20 population, right.  We don't know.  We
21 cannot even use meta-analysis to helping
22 us.
23     Q.    When you say population, you
24 don't mean United States, because we're

Page 287

1 looking at people from the United States,
2 versus other countries, correct?
3     A.    Yeah, I'm talking about
4 population.  For example Danish
5 population, those are using so-called
6 Danish the -- registry database, health
7 -- so-called health registry.  That's
8 their population that they're talking
9 about.
10         Then you talk about the
11 German study.  And those guys deal with
12 insurance companies.  That's the
13 population that they're talking about.
14         So every study population,
15 they have well defined population, right,
16 of subjects they followed.  So that's
17 what I'm talking about in population.
18     Q.    So you would have difficulty
19 taking the findings, for example, in
20 Pottegard, a Danish population, and
21 giving meaning to what happens in the
22 U.S. population.  Is that what you're
23 saying?
24     A.    Yeah.  I agree -- agree with

Page 288

1 that.  I'm saying -- you're absolutely
2 right.  I cannot saying Danish findings
3 is automatically transportable to U.S.
4 particular population.  We don't know
5 that.  We have no idea.
6         Either way, I cannot -- like
7 I said before, sir, even with the two
8 studies, we -- we know they directly
9 address the issue, right.  However, like
10 every observational study, they had a
11 limitation, right.  So we don't know how
12 we can actually say definitely today,
13 sitting here, say impurity of valsartan
14 really caused the problem or not.  We are
15 not in a position even to make a decision
16 right now.  We really need a very well
17 conducted prospective study, not probably
18 with the valsartan contamination or
19 impurity population because that's
20 impossible to do anymore, right.
21         So that's the issue we're
22 facing.  We need to collect more data.
23 And we need more studies.
24         Almost every paper that

Page 289

1 Dr. Madigan cited in the dietary study,
2 towards the end of the day, you know,
3 there's one line, they said there's
4 limitation.  We should conduct a
5 prospective study, a long-term follow-up.
6         That's what they are saying.
7 Unifying words.  You know very well,
8 because you read those papers.  Worried
9 about words, right.
10     Q.    So it's your belief that
11 without that prospective study, it
12 doesn't matter how much contamination
13 there was in the valsartan pills, we
14 wouldn't be able to study the issue,
15 right, because we can't do a prospective
16 study at this point?
17     A.    Well, I think what -- if you
18 allow me to say a few words.  If I
19 were -- had a choice, having a choice, I
20 said either you follow the Danish
21 population a little longer, right.
22 Unfortunately, those population, the
23 patients will be contaminated by other
24 things, right.

Confidential Information - Subject to Protective Order

Page 290

1   Maybe they started eating a
2 lot of food with contamination, et
3 cetera, right.  So we do need longer
4 follow-up, even though the study has
5 4.5 years immediate follow-up.  It's
6 pretty long.
7   But on the other hand we
8 cannot really go back to do a prospective
9 study anymore with this valsartan
10 impurity, anymore, right.
11   So what I think is the best
12 that we can do at this stage, you
13 actually design a trial, for example
14 using dietary, right.  And you say let's
15 use a tactic, just like follow the
16 patient from the beginning for many, many
17 years, right, for dietary.  And see how
18 much contamination you are talking about,
19 right.
20   Then you match the dietary
21 population patients closely to your
22 valsartan U.S. population, what kind of
23 patient are taking this impurity
24 contaminate, right, the valsartan.  So

Page 291

1 that would probably give us a signal to
2 find out what's going on.
3   Q.   So you would want to design
4 a clinical trial where the patients in
5 the dietary study are being given food
6 that has the amount of NDMA as the amount
7 of NDMA that people in valsartan were
8 getting each day in the contaminated
9 pill, is that what you're saying?
10   A.   No, you cannot afford people
11 taking a certain amount of contamination,
12 right.  That's not ethical at all.
13   But I'm saying first you
14 need to sort it out, if any association
15 with exposure and unexposure, right, or
16 the level of exposure, using dietary
17 study first, right.  You cannot force
18 people, say, hey, you give me the
19 equivalence of food contaminant, right,
20 equivalent to valsartan impurity level.
21 I'm not quite sure you can do that,
22 right.
23   Q.   Have you seen anything that
24 suggests that it would take about

Page 292

1 60 pounds of bacon, eating about
2 60 pounds of bacon a day to get the
3 amount of NDMA in your food that people
4 were getting in one pill of valsartan?
5   A.   Well, I don't know.  I never
6 heard about that piece.
7   Q.   Okay.  That's something that
8 you would want to know, right?
9   MR. MERRELL:  Objection to
10   form.
11   THE WITNESS:  Well, you
12   know, there are so many news this
13   day.  I'm just really not sure how
14   true it is.
15 BY MR. NIGH:
16   Q.   Well, if you did the math
17 from the FDA, and what they say the
18 amount of bacon and the amount of NDMA is
19 in bacon, and then you looked at the
20 amount of NDMA in valsartan, you could do
21 the math, you could see that it's 30 to
22 60 pounds of bacon.  You haven't done
23 that though, right?
24   A.   No, I have no idea.  Again,

Page 293

1 I'm not a toxicology or epidemiology.
2   Q.   Okay.  What do you know
3 about new user designs?
4   A.   Well, in the Danish study,
5 the authors did some sensitivity
6 analysis, also called supplementary
7 analysis.  And one thing they did are
8 called incident to users.  They don't use
9 the word "new users."  But anyway, that's
10 a similar term.
11   So they are talking about
12 for the new users they do analysis
13 between the two groups, one is exposed
14 and unexposed.  That's my understanding.
15   Q.   Right.  "New user" and
16 "incident user" are terms that are used
17 commonly to talk about new user design or
18 incident user design, those are used
19 interchangeably, correct?
20   A.   Well, we -- it is
21 interesting.  I think we use -- incidence
22 is a more mathematical term.  And using
23 new user is sort of like ordinary
24 language.

Confidential Information - Subject to Protective Order

Page 294

Q.   Okay.  One is more technical you think and the other -- or more mathematical and the other is ordinary language, but they are discussing the same thing, correct?

A.   That's my understanding, sir.

Q.   Okay.  And is it your understanding that --

A.   I have some of my -- I'm bleeding.

MR. MERRELL:  Do you want to take a break?

THE WITNESS:  No, no, that's okay.  I just scratched myself.

You talk to lawyers you get nervous, right, so I started scratching.  If you allow me to call your first name --

MR. NIGH:  Sure.

THE WITNESS:  You are pretty tough lawyer, aren't you, right, you are famous for.

BY MR. NIGH:

Page 295

Q.   Famous?  Oh, like -- Bill Nye the Science Guy.

A.   Well, anyway.  Sorry, I apologize.

Q.   Okay.  Let's take a look at -- my question is, in the last ten years, aren't there, you know, a lot of studies that are out there talking about that it's helpful or useful to do new user or incident user design in observational studies?

A.   Well, the only thing recently, I did -- helping a company figure out using this so-called EPO equivalent.  I don't know if you know this EPO, this compound.

We actually helping chemo patients, right, their hemoglobin level is too low, we're giving them this EPO, and it jack up their red cells.  Also the hemoglobin level, right.  So there is other alternative right now, and I'm helping a biotech company to analyze the data with the so-called incidence

Page 296

dialysis patient.  That means there's a newly -- newly go to treatment for dialysis patient.

Even in the beginning, they didn't use it, right.  Then during the trial start to use it.

So we are very interested to find out the incident users they not have any benefit by taking this oral EPO equivalent compound.

Q.   Okay.  Describe the benefits or advantages of using a new user design or incident user design?

A.   Well, I think somehow, I'm not quite sure in this case, why this incident user becomes interesting.

I would say the primary endpoint is for entire population, right.  They have 5,000 patients available in the database.  That's their primary endpoint.

Then afterwards they can do other so-called secondary analysis.  For example, this is called a subgroup analysis thing.

Page 297

So they can pick up anything they wanted to, right, the incident users or something else.  People do all the time.  But see the problem is for the subgroup analysis, we have to be careful how to interpret the results now.  Because you cannot use a .05 anymore for all the subanalysis, right.  And that will be exactly falling into this multiple comparison problem.

So if you talking to people, subsequent analysis, yes or no, people always tell you, you have to make adjustment.  To make adjustment, that's exactly the same thing, we talking about the whole day, multiple comparisons, right.  So you have to be careful when you interpret a result for all the subgroup analysis.

In this case we have to be careful to interpret the incident users, right, what is the hazard ratio, what is it you are talking about, right.

And for example, in this

Confidential Information - Subject to Protective Order

Page 298

1 case, I believe at a rate of one point
2 something, you know, is not a really
3 pressing hazard ratio.
4       Q.   I asked you if you could
5 describe the benefits or advantages of
6 using a new user design or incident user
7 design.  Do you know what the benefits of
8 using a new user design or incident user
9 design when looking at observational
10 studies is?
11      A.   Well, in general, I have no
12 opinion on this, sir.  It is case by
13 case.  Depend on what kind of compound
14 you are interested in.  If something
15 existing for new users, of course that
16 would be a primary endpoint, primary
17 population, instead of using the entire
18 population you are interested, right.
19       So it all depends on your
20 question you want to answer.
21      Q.   Do you believe that the
22 benefits or disadvantages of using a new
23 user design or incident user design are
24 somehow different when it's the primary

Page 299

1 endpoint or the secondary endpoint?
2       A.   Well, I can -- I have a lot
3 of experience dealing with drug
4 development using so-called experience --
5 experience means those patients are
6 already using this compound for many
7 months, or something, right.
8       Now you have a new compound
9 now, right.  Then you ask yourself, say
10 do I need to get a naive patient, when I
11 say naive patient means exactly like you
12 said, the new user, right.  So when we do
13 a clinical trial, it's always interesting
14 to know, say, are you going to include
15 experienced patient and naive patient.
16       Most of the time we stratify
17 those two populations, right, to
18 understand what happened if the patient
19 had experience with this compound.  And
20 it turns out usually experienced patient,
21 their response for the extended treatment
22 is very low.  Basically, they already
23 pick it up by those -- the older
24 compound.

Page 300

1       So in a sense for new users,
2 sometimes you show something -- a big
3 difference between the two groups,
4 treating against control.  But
5 experienced sometimes we don't see this
6 very well.  The -- I take it back.  The
7 other way around.  That means the
8 experienced drug, right, the experienced
9 patient using the standard treatment,
10 usually you don't have a very good
11 response, right.  But in the new
12 treatment, it's very good.
13       So the difference is very
14 different.  But for the new user, usually
15 we don't see too much, because they sort
16 of balance out.
17       So it all depend on what you
18 wanted to do.  In this case, it's very
19 interesting.  The experienced user, if
20 you think about it, right, they probably
21 getting used to it and this is the
22 thought.  So you can ask yourself, if you
23 continue using it, what happened.  I
24 think both questions are interesting for

Page 301

1 this case.
2       But I'm not for sure if you
3 want me ranking which one is more
4 important.  I don't know.  It depend on
5 investigator or clinical question that
6 you want to ask.
7       Q.   In observational studies,
8 what are the benefits or advantages of
9 using a new user design or incident user
10 design?
11      A.   For observational study, I
12 don't know, sir.  I know as part of the
13 clinical trial setting.  I think probably
14 the same principle apply to observational
15 study.
16       I think basically, sir, it
17 all depend on your clinical question,
18 what kind of question you want answered.
19       MR. NIGH:  Let's take a look
20 at LP-1578.
21       (Document Marked for
22 identification as Exhibit
23 Wei-11.)
24       MR. NIGH:  This will be

Page 302

1  marked as Exhibit 11.
2         Let's blow up the opinion.
3  BY MR. NIGH:
4     Q.   Actually the a the bottom,
5  we can see that this is published in
6  Rheumatology.
7         Do you see that?  It's
8  published 2015, Rheumatology.
9         Do you see that?
10    A.   Yeah.  It's a little too
11 small for me, sir.
12        MR. NIGH:  Let's blow that
13    up a little bit more, if we can.
14    We can do each one separately.
15 BY MR. NIGH:
16    Q.   Do you see Rheumatology,
17 Nature Reviews Rheumatology, July of
18 2015.
19        Do you see that?
20    A.   Yes, sir.
21        MR. NIGH:  And now, let's
22    pull up the abstract and the
23    title.  Blow up the title.  Yeah,
24    right there.

Page 303

1  BY MR. NIGH:
2     Q.   "Opinion:  Active comparator
3  design and new user design in
4  observational studies."
5         And you can see the authors
6  there, right?
7     A.   Yes.
8     Q.   And it says, "Over the past
9  decade, an increasing number of
10 observational studies have examined the
11 effectiveness or safety of treatments for
12 rheumatoid arthritis.  Unlike randomized
13 clinical" -- "controlled trials, however,
14 observational studies of drug effects
15 have methodological limitations, such as
16 confounding by indication."
17        Do you see that?
18    A.   Yes, sir.
19    Q.   "Active comparator designs
20 and new user designs can help mitigate
21 such biases in observational studies and
22 improve the validity of their findings by
23 making them more closely approximate
24 RCTs."

Page 304

1         Do you see that?
2     A.   Yes, sir.
3     Q.   Is this the first time that
4  you've seen papers that discuss using new
5  user designs can help mitigate these
6  sorts of biases in observational studies?
7     A.   Yeah, this is new to me.
8     Q.   Okay.  Next, it says -- I'll
9  go to, "This principle helps ensure that
10 treatment groups have similar treatment
11 indications, insinuating both measured
12 and unmeasured differences in patient
13 characteristics.
14        It next says, "The new user
15 study includes a cohort of patients from
16 the time of treatment initiation,
17 enabling assessment of patients'
18 pre-treatment characteristics and capture
19 all events occurring during follow-up."
20        Do you see that?
21    A.   Yes, sir.
22    Q.   Are you aware that there
23 were numerous studies over the last ten
24 years that talk about using new user or

Page 305

1  incident user designs in observational
2  studies and the benefits that it
3  provides?  Are you aware of that?
4     A.   No, sir.
5         MR. NIGH:  Let's take a look
6     at another one.  LP-1567.
7         (Document Marked for
8     identification as Exhibit
9     Wei-12.)
10        MR. NIGH:  This will be
11    marked as Exhibit 12.
12 BY MR. NIGH:
13    Q.   Let's take a look at the
14 second page.  At the very top, you can
15 see the name of the journal,
16 pharmacoepidemiology and drug safety,
17 published 2013.
18        Do you see that?
19    A.   Yes, sir.
20    Q.   And it says, in the
21 abstract, "Comparative effectiveness
22 research includes cohort studies and
23 registries of interventions.  When
24 investigators design such studies, how

Page 306

1 important is it to follow patients from
2 the day they initiate a treatment with
3 the study interventions?
4         "Our article considers the
5 question and related issues to start a
6 dialogue on the value of the incident
7 user design in comparative effectiveness
8 research.
9         "By incident user design, we
10 mean a study that sets the cohort's
11 inception date according to patients' new
12 use of an intervention.  In contrast,
13 most epidemiological studies enroll
14 patients who are commonly or recently
15 using an intervention when follow-up
16 began."
17         Now with this, Pottegard had
18 the ability to do a new user design
19 analysis.  Had they made the decision to
20 make that their primary endpoint, the
21 data would not have changed for that
22 analysis, correct?
23     A.   You mean they're going to
24 switch the incident users, the subgroup

Page 307

1 as the population of interest?  That's
2 what you're asking me?
3     Q.   Yes.  They could have done
4 that?
5     A.   Yeah, well, they could.
6     Q.   And they would have all the
7 data to have been able to report on what
8 the findings would have been for the new
9 user analysis, correct?
10     A.   I believe so.  They did a
11 sensitivity analysis using the subgroup
12 analysis.
13     Q.   In looking at Page 5,
14 Number 4 -- actually, below, on the left
15 side it shows recommendations for
16 reporting.
17         Do you see that?
18         Recommendations for
19 reporting.
20         And Number 4 shows,
21 "Investigators should conduct sensitivity
22 analyses with varying definitions of
23 incident use to illustrate the stability
24 of findings with respect to validity and

Page 308

1 precision."
2         Do you see that?
3     A.   Yes, sir.
4     Q.   And that's what Pottegard
5 did, they had a new user design in their
6 study, correct?
7     A.   Yeah.  They did a subgroup
8 analysis, a sensitivity analysis.
9     Q.   Are you aware of whether or
10 not Gomm had a new user analysis?
11     A.   That, I don't know.
12     Q.   Okay.
13         MR. NIGH:  Okay.  Let's take
14     this down.  Let's look at
15     Pottegard.  LP-1573.
16     (Document Marked for
17     identification as Exhibit
18     Wei-13.)
19         MR. NIGH:  This will be
20     marked as Exhibit 13.
21 BY MR. NIGH:
22     Q.   Now you spent time in your
23 report talking about the American
24 Statistical Association.

Page 309

1         Do you remember that?
2     A.   Yes, sir.
3     Q.   And their criticisms of
4 using P-value of less than .05 as a line
5 in the sand, so to speak, right?
6     A.   Yes.
7     Q.   In other words, if a P-value
8 in a study is .051 versus .049, those
9 don't have a large difference in how you
10 interpret that study, correct?
11     A.   Well, it's more than that.
12 Even you can stretch out a little bit.
13 You know, even say .07 and .04, aren't
14 different enough.  Basically, they are
15 the same.
16     Q.   Okay.  I think you used
17 also, if they are .07 and .04, they're
18 going to have a similar effect.
19         Now -- right?  I mean, in
20 terms of your interpretation?
21     A.   Hold on.  Hold on a second,
22 sir.  Sorry to interrupt you.
23         The American Statistical
24 Association, if you read it very

Confidential Information - Subject to Protective Order

Page 310

¹ carefully, they are just telling us,
² don't use a single metric, which is P
³ less than .05, to make a black and white
⁴ claim for the statistical significance.
⁵          We should utilize other
⁶ judgment, for example, from clinical
⁷ input -- clinical input, right, and from
⁸ subject matter people.
⁹          And we all know very well
¹⁰ when Dr. Madigan in his deposition, the
¹¹ defense lawyer showed us ASA statement
¹² line by line.  Everything, she ask
¹³ Dr. Madigan, "Do you agree with ASA
¹⁴ statement?"  And Dr. Madigan always say
¹⁵ yes.
¹⁶          Okay.  So, basically, he
¹⁷ agrees with ASA statement, saying we
¹⁸ should not use P less than .05 or
¹⁹ 95 percent confidence interval, excluding
²⁰ null value or not, to make a decision.
²¹ And broader, we should look at the entire
²² totality of evidence to make a decision.
²³          So that's the point.  So the
²⁴ P-value is the what.  You know, it's not

Page 311

¹ that interesting.  You should provide
² more information to telling us this case,
³ telling actually a lot of information
⁴ regarding the impurity of the valsartan
⁵ or not, right.
⁶     Q.   I understand.  In terms of
⁷ interpreting data from a single study, if
⁸ it has a P-value of .04 or a P-value of
⁹ .07, as you spoke, your interpretation or
¹⁰ the weight that you give to those,
¹¹ there's no bright line rule that says .05
¹² makes the finding important, or under --
¹³ or over 0.5 makes the finding not
¹⁴ important, correct?
¹⁵     A.   That's correct.
¹⁶     Q.   Now, if the P-value is .04
¹⁷ and the other P-value, versus a P-value
¹⁸ of .00001, you don't believe that the
¹⁹ American Statistical Association is
²⁰ saying to ignore a P-value of .0001, as
²¹ you think about the effect that that had
²² in that study, correct?
²³     A.   Oh no, no, sorry.  This is
²⁴ misleading.  You see a study with a huge

Page 312

¹ sample size like cardiovascular trial.
² As you know very well, right,
³ cardiovascular trial, they involve
⁴ thousands and thousands of patients,
⁵ right.  So even your treatment, the group
⁶ difference is so small, the P-value is
⁷ very, very small.  Because basically a
⁸ tiny little difference will grow up the
⁹ P-value or grow down the P-value, right.
¹⁰          Everybody knows the fact, we
¹¹ have the cardiovascular trial, we have a
¹² wonderful P-value, but the clinical
¹³ utility is very little.  I can give you
¹⁴ many, many examples.
¹⁵          But in any event, in a rare
¹⁶ disease, for example, the sample size is
¹⁷ limited.  If I have entire world have 500
¹⁸ kids, they have a problem, you said well,
¹⁹ I'll tell you what, I use 400 patients in
²⁰ the study.
²¹          Basically you use entire
²² population now.  Even the P-value you
²³ know because the sample size, the
²⁴ population size, you're now going to get

Page 313

¹ .0001, but you're going to see clinical
² utility, right.
³          So I don't think we should
⁴ have used a P-value of .001, versus .004.
⁵ .01 is highly significant.  It must be a
⁶ lot of clinical utility, right.  It's not
⁷ true at all.  This actually contradicts
⁸ what we are thinking.  That is the
⁹ problem of using P-value.
¹⁰          I bet you a dollar if I ask
¹¹ you to explain to me what a P-value is
¹² right now, I think you have a hard time
¹³ to explain to me, right.  Most clinical
¹⁴ people have a hard time to understand
¹⁵ what a P-value is.  Basically, they don't
¹⁶ even understand P less than .5, okay.  So
¹⁷ because the traditional way, in the
¹⁸ appropriate way, when everybody using
¹⁹ P-value .05 is for convenience.
²⁰          But anyway, sorry for this
²¹ long response to your question.
²²     Q.   I wouldn't make assumptions
²³ about what I know for P-value, okay?  I
²⁴ think that's inappropriate for this

Page 314

¹ questioning.
²        But my question is, as
³ you're considering the weight of a
⁴ particular study, if a P-value is .04
⁵ versus a P-value of .0001, you would give
⁶ more weight to the study that has a
⁷ P-value of .0001 than you would to the
⁸ study with the P-value of .04, all things
⁹ else equal?
¹⁰    A.   You're saying .04, in the
¹¹ same population, the same treatment, the
¹² same control, is that what you're saying?
¹³    Q.   Everything else equal.  Just
¹⁴ looking at the P-value between those two
¹⁵ studies.
¹⁶    A.   If they are identical
¹⁷ studies, one got a .04, and the other one
¹⁸ .001, we are in trouble.  That means
¹⁹ highly significant difference.  How come
²⁰ you can translate the first study with
²¹ .04?  Then we have really concern now,
²² right.
²³        That means FDA always ask
²⁴ you to do two studies, confirm your

Page 315

¹ so-called significance.  Now you are in
² trouble.  One isn't so significant, the
³ other one is mediocre.  What are you
⁴ going to do?  It's inconsistent.
⁵    Q.   As you interpret P-values,
⁶ is it your statement that you don't think
⁷ that a P-value of .0001 in a study has
⁸ more effect or more weight than a P-value
⁹ of .04?
¹⁰        MR. MERRELL:  Objection to
¹¹ form.
¹²        THE WITNESS:  When you say
¹³ treatment affect size, you see you
¹⁴ go back to clinical utility, or
¹⁵ clinical effectiveness, right.
¹⁶        Your .001, and you --
¹⁷ probably the difference only save
¹⁸ the patient a couple weeks, but
¹⁹ with huge study, you got a .0001,
²⁰ right.
²¹        Then you say .04.  If I gave
²² you the differences of say, two
²³ months, you say wow, which one you
²⁴ really think we have more benefit,

Page 316

¹ is the first study with .04 or the
² second one with .0001.
³        You see the problem in
⁴ utilizing P-value as the sole
⁵ metric to make a decision, you
⁶ don't have the scientific evidence
⁷ at all.  You basically just tell
⁸ me the probabilities then, right,
⁹ which is not very helpful.
¹⁰ BY MR. NIGH:
¹¹    Q.   So as you interpret the
¹² study, and you see a study that has a
¹³ P-value of .04.  And another study -- and
¹⁴ I'll be very clear.  I'm saying a P-value
¹⁵ of .0000001, okay?
¹⁶        You wouldn't put more
¹⁷ interpretation or more weight on the
¹⁸ finding that has a P-value of .0000001
¹⁹ than you would the one that has a P-
²⁰ value of .04?
²¹    A.   I need to look at the
²² confidence interval of the two studies.
²³ The first one, your confidence interval
²⁴ is very tight.  For example, hazard

Page 317

¹ ratio, right.  Your hazard ratio is like
² a .99, right, but because your P-value is
³ so good, your other finding of .998 is
⁴ still below one.  You say, wow, look,
⁵ this is highly significant.  But a hazard
⁶ ratio of .99, that's almost close to one,
⁷ right.
⁸        Then the other one is the
⁹ confidence interval 95 percent.  You say
¹⁰ wow, look, the hazard ratio is a .7.  The
¹¹ other finding is .95, right.
¹²        So which one you prefer?
¹³        You need more -- you need
¹⁴ more evidence to enter in the P-value,
¹⁵ right.
¹⁶    Q.   Sure.  You would want to see
¹⁷ confidence intervals as well.  But
¹⁸ looking at just the P-value --
¹⁹    A.   Yeah.
²⁰    Q.   -- of .04 versus a P-value
²¹ of .0000001, you can't make any
²² comparison between the effect you would
²³ have just looking at P-values?
²⁴    A.   No.  You look at a

Confidential Information - Subject to Protective Order

Page 318

¹ confidence interval, that would tell you
² exactly the size of the difference. Many
³ times what is the effect of size, what is
⁴ the effect of size you are talking about.
⁵ It's not only the P-value matters
⁶ anymore, right.
⁷          P-value is giving you the
⁸ first hurdle. You pass the hurdle. You
⁹ say, well, you know, it looked like my
¹⁰ assumption -- there is no difference
¹¹ between two groups. That's your
¹² assumption. You reject this assumption.
¹³ You say, what is the probability, I
¹⁴ observe this extreme value, I observe the
¹⁵ hazard ratio of .99, right. What is the
¹⁶ chance it is .00001. Because you have
¹⁷ thousands and thousands of patients,
¹⁸ right, so obviously you can detect a tiny
¹⁹ little bit of difference of .99 from one,
²⁰ right. I said who cares, who cares about
²¹ the difference of .01. But because your
²² sample size is so big, you've got such a
²³ good P-value. But I said wait a second,
²⁴ let's look at the size of your -- the

Page 319

¹ group before we jump into the conclusion.
²          Do you think that's more
³ informative than to only use P-value?
⁴     Q.   I think in my question --
⁵ you keep jumping to changing the effect
⁶ size. I haven't told you effect sizes
⁷ yet. I've only asked you to look at
⁸ P-values.
⁹          I'm not sure why you keep
¹⁰ trying to bring -- hold on, hold on. Let
¹¹ me ask my question.
¹²     A.   Okay.
¹³     Q.   I'm not sure why you keep
¹⁴ trying to bring the effect size. It's
¹⁵ almost like a gotcha moment.
¹⁶          What I'm telling you is, in
¹⁷ this next question, since you have
¹⁸ difficulty just looking at the P-value
¹⁹ and want to run to effect size, my
²⁰ question now is, if the effect size is
²¹ the same in both studies and one has a
²² P-value of .04, and the other one has a
²³ P-value of .0000001, would you interpret
²⁴ those any differently?

Page 320

¹          MR. MERRELL:  Object to
² form.
³          THE WITNESS:  Sorry, sir,
⁴ you are changing your story now.
⁵ You're saying solely based on
⁶ P-value multiplication. Now you
⁷ are telling me the two studies are
⁸ the same size, right.
⁹          If the same size, the
¹⁰ confidence interval is .04 is
¹¹ wider, right, then the P-value of
¹² .001, right. Of course, I said
¹³ choose the one that is .001,
¹⁴ because you already told me they
¹⁵ have the same size. That's extra
¹⁶ information you're giving to me,
¹⁷ right.
¹⁸ BY MR. NIGH:
¹⁹     Q.   Let's take a look at
²⁰ Pottegard.
²¹          Okay. If you take a look at
²² Page 4. Direct your attention to the
²³ bottom of the first page, the writing
²⁴ there. You can see that paragraph there,

Page 321

¹ and on over to the second -- to the left
² column where it says "Results
³ Comparable."
⁴          MR. NIGH:  If we can blow
⁵ that up to the next paragraph.
⁶ Just the next paragraph. I don't
⁷ need all the rest of that. So we
⁸ can blow this up bigger.
⁹ BY MR. NIGH:
¹⁰     Q.   When you look at this, you
¹¹ can see "Results comparable to the main
¹² analyses were found when we stratified by
¹³ sex and age, whereas a stronger
¹⁴ association was seen when we restricted
¹⁵ to incident users during the study period
¹⁶ (hazard ratio of 1.58 with a confidence
¹⁷ interval of .99 to 2.52) 95 percent
¹⁸ confidence interval."
¹⁹          Do you see that?
²⁰     A.   Yes, sir.
²¹     Q.   So they report on a
²² 1.58 hazard ratio with a confidence
²³ interval that just barely crosses one,
²⁴ correct?

Confidential - Information Subject to Protective Order

Page 322

1   A.   Yes, sir.
2      Q.   And had they set out as the
3   primary endpoint to be new user design or
4   incident user design, they would still
5   have that same finding, hazard ratio 1.58
6   on this population, with a 95 percent
7   confidence interval of .99 to 2.52,
8   correct?
9      A.   Yes, sir.
10        MR. NIGH:  Okay.  We can
11   take this off -- off the screen.
12        Actually, let's put
13   Pottegard back up.
14   BY MR. NIGH:
15      Q.   As you looked at Pottegard,
16   did you ever wonder or ask the questions,
17   was there contaminated products that were
18   being announced after the publication of
19   this study?
20      A.   I don't know.
21      Q.   Okay.  The point of
22   Pottegard is to compare uncontaminated
23   group to people who were possibly
24   contaminated or probably contaminated,

Page 323

1   correct?
2      A.   Yes.
3      Q.   So already in that study
4   design, we don't have a true test in that
5   study design, because even the people in
6   the test group are defined as possibly or
7   probably contaminated, right?
8      A.   Yes.
9      Q.   And to the extent that
10   people who are put into the test group
11   that were actually not contaminated, then
12   that would -- that would lead to bias
13   toward the null in the study, correct?
14      A.   Let me go little slower.
15   You're saying the control arm supposedly,
16   not a contaminant, that's a control arm,
17   correct?
18      Q.   No, no, the test group.  The
19   test group is defined -- the test group
20   is defined as possibly or probably
21   contaminated, right?
22      A.   Yeah.
23      Q.   And so if that test group
24   included patients or subjects who

Page 324

1   actually did not receive contaminated
2   valsartan, then that would lead to bias
3   towards the null, correct?
4      A.   Well, if you already have
5   this idea, the impurity in valsartan is
6   really hurting us, right.  You don't know
7   that.  You're running around in a circle
8   right now, right?
9        You're saying, well, now
10   suppose this impurity is really hurting
11   us for sure, right.  Then you're saying,
12   okay, I tell you what, part of this
13   contaminated group, actually they were
14   not contaminated, right.
15        You already said that you
16   were higher bias against this impurity.
17   You know what I'm saying?
18        If you actually truly
19   believe the impurity in valsartan is
20   harmful, you don't have to do a study.
21   You just say good-bye.  I don't need any
22   data.
23        But now you're saying, well,
24   wait a minute, let me just argue with

Page 325

1   you.  If this contaminated group, some
2   people did not have contamination, you're
3   saying that you actually bring this
4   towards null.
5        I say well, you already
6   believe the impurity is hurting people,
7   right.  That's your assumption, correct?
8      Q.   Do you know what bias
9   towards the null means, as that
10   terminology is used to review
11   epidemiological studies?
12      A.   Well, that's statistical
13   terminology.  It's not really an
14   epidemiology term.
15      Q.   What does bias toward the
16   null mean as you're reviewing
17   epidemiological studies?
18      A.   You mean the difference
19   between the two groups tend to be smaller
20   than supposed to be.  That's close to the
21   null value.  That's what you're saying.
22   It's all common language.
23      Q.   Your belief that when using
24   the terminology "bias towards the null"

Confidential Information - Subject to Protective Order

Page 326

1 or that certain things would cause bias
2 towards the null, what do you think is
3 meant by that?
4     A.   Well, bias towards the null
5 means that you are in favor supporting
6 the null hypothesis.  The null hypothesis
7 in your case means impurity in valsartan
8 has no association with cancer incidence.
9 That's your null hypothesis, okay.
10         Now, you are saying, look,
11 if I do an analysis, bias towards null,
12 that means that your analysis result
13 actually helping me to demonstrate there
14 is no association.  That's what you're
15 saying.  That's what you -- your case you
16 are talking about, right, that's bias to
17 the null.
18     Q.   So in an epidemiology study,
19 when certain things occur that would lead
20 towards bias toward the null, what is
21 your interpretation as to bias toward the
22 null in that setting?
23     A.   All right.  Let me make it
24 clear, sir.  I'm not speaking with this

Page 327

1 so-called degree of contamination or
2 contaminant, whatever you want to use,
3 the word, right.  Even the treatment or
4 testing group.  You say some patient
5 didn't even take it, the impurity, right.
6 Let's forget about this.
7         In general, in general I say
8 what do you mean by a study biased
9 towards the null?  That means that your
10 study result actually helping me to
11 actually saying we cannot reject your
12 null hypothesis, right.  It's not very
13 powerful to reject a null hypothesis.
14 That is what exactly you are talking
15 about, bias towards the null.
16     Q.   That's not what I'm talking
17 about.  So let me explain.
18         When certain things occur in
19 a study and they lead toward bias toward
20 the null in that study, doesn't that --
21 doesn't that infer that you're basically
22 watering down the results towards the
23 null when certain things happen in a
24 study?

Page 328

1     A.   Sir, listen to me.  That's
2 exactly I'm saying to you.  You lose the
3 power of detect -- you reject the null
4 hypothesis.  That's the same thing you're
5 saying.
6     Q.   I see.  So when you're
7 losing the power to reject the null
8 hypothesis, that would -- that would --
9     A.   Yes, that would be -- yeah.
10     Q.   When you include subjects in
11 the test group that don't have -- that
12 did not take contaminated valsartan, you
13 would lose power to be able to reject the
14 null hypothesis, correct?
15     A.   That's in general term, bias
16 toward the null, sir.  That's exactly the
17 same explanation as you did, right.  You
18 did it much nicer than I did, right,
19 because people don't understand the
20 power.  But you understand.
21     Q.   Yeah, let me ask this again.
22 When you include subjects in the test
23 group that do not have or did not take
24 contaminated valsartan, you would lose

Page 329

1 power to be able to reject the null
2 hypothesis, correct?
3     A.   Correct.
4     Q.   Now, on the flip side, if
5 you included in the control group,
6 patients who actually took contaminated
7 valsartan, you would also lose power to
8 be able to reject the null hypothesis,
9 correct?
10     A.   Yeah.  Either way.  Either
11 way you have a bias towards the null.
12     Q.   As you reviewed the
13 Pottegard study, did you understand that
14 even in the way in which they defined the
15 test group, that they would be including
16 patients who never took contaminated
17 valsartan in the test group?
18     A.   I don't know that a fact or
19 not.  But even suppose hypothetically
20 that happened, but, sir, if you think
21 about any observational study, we have so
22 many confounders.  You have so many
23 unmeasured confounders, you probably
24 don't make a good adjustment, make the

Page 330

1 two groups comparable.
2          You know, this one thing is
3 also a confounder.  We have no idea how
4 much confounding effect what you describe
5 to us, right.
6          So this is part of it for
7 observational study, basically have issue
8 now, right.
9          And that's why I said many
10 times, I'm not in the position to say
11 impurity in valsartan has nothing to do
12 with the cancer incidence at this stage,
13 because we don't have a well-conducted
14 prospective study, right.  Because that's
15 not the case.  So that's what is my
16 position.
17          You can't say, well, the
18 contamination is probably all messed up.
19 I say, well, sorry, that is one of the
20 confounders.  Well, you can consider
21 other confounders.  I can tell you this
22 is probably not an interesting confounder
23 setting, right, balance between the
24 groups.  Probably is nothing, right.  So

Page 331

1 basically I'm not worried about this.
2     Q.   Let's -- let's talk about
3 that, the weight of confounding based on
4 the study design.
5          MR. NIGH:  Let's pull up
6 "Participants" on the first page.
7 BY MR. NIGH:
8     Q.   You don't know -- in terms
9 of understanding the weight of
10 confounding based on the study design,
11 you would want to know how many patients
12 that were contaminated, taking
13 contaminated valsartan, got put into the
14 no exposure group, and then how many
15 people got put into the control group or
16 no exposure, and then how many people who
17 were taking -- who never took
18 contaminated valsartan got put into the
19 test group.  Like you don't know -- you
20 don't know the numbers in each of those
21 groups, right?
22     A.   Yeah, if you say you switch
23 them around, we don't know how many guys.
24 Actually this is classified.  This is

Page 332

1 very common in clinical study.  When we
2 classify those guys, right, yeah.
3     Q.   This classification error
4 can be one of the worst errors in a study
5 design, correct?
6     A.   No.  I disagree.  It depend
7 on how much you have a misclassification,
8 right.  A tiny little bit doesn't really
9 matter much.  Other confounders are
10 probably highly correlated with outcome.
11     Q.   I'm glad you mentioned that.
12 It depends on how much misclassification
13 you have, right?
14     A.   Yeah.
15     Q.   Now, if we look at the
16 study, we can see that the study end date
17 is June 30, 2018, do you see that?
18 "Participants were followed from one year
19 after cohort entry until experiencing a
20 cancer outcome, death, migration, or end
21 of study period (June 30, 2018.)"
22          Do you see that?
23     A.   Yeah.
24     Q.   If we blow it out, we come

Page 333

1 back, I'll show the date of this, we can
2 blow that up as well.
3          And we can see the accepted
4 September 9, 2018.  Do you see that?
5     A.   Yeah.
6     Q.   So after June 30, 2018, and
7 after September 9th of 2018, do you have
8 any idea how many products were recalled
9 and found to have contaminated valsartan
10 either with NDMA or NDEA after the
11 conclusion of this study?
12     A.   I don't know, sir.
13     Q.   Would it bother you if more
14 than 50 percent of the products that were
15 thought to be uncontaminated were
16 actually later found to be contaminated
17 in terms of the study design?
18     A.   I don't know the number you
19 are quoting there, sir.
20     Q.   Well --
21     A.   But I think --
22     Q.   -- are you aware that
23 Torrent announced their contamination
24 after the end date of this study, are you

Page 334

1 aware of that?
2     A.   No, sir.
3     Q.   Are you aware that Hetero
4 announced their contamination after the
5 end date of this study?
6     A.   No, sir.
7     Q.   Are you aware that Aurobindo
8 announced their contamination after the
9 end of this study?
10     A.   No.
11     Q.   Are you aware that there
12 were multiple other companies in Europe
13 that announced the contamination of their
14 products after the end of this study?
15     A.   No, sir.
16     Q.   Wouldn't that be something
17 that you'd want to know in terms of
18 understanding just how much the
19 misclassification error has impacted the
20 findings of this Pottegard study?
21     A.   Well, that's a very good
22 question.  How come Dr. Madigan didn't
23 include in his report then.  If you think
24 this is such an important issue, how come

Page 335

1 you don't take to put into the report.
2     Q.   Dr. Madigan -- Dr. Madigan
3 is not an epidemiologist.  He didn't --
4     A.   Well --
5     Q.   -- for a reason.
6     A.   Okay.
7     Q.   Okay?  Did you see that
8 Dr. -- - sorry.
9          Did you see Dr. Etminan
10 included this in his report?
11     A.   No.  I said I just glanced
12 over it.  I didn't read it carefully.
13     Q.   Did you see --
14     A.   But I'm saying --
15     Q.   Did you see that several of
16 our other experts also included this in
17 their report or no?
18     A.   No, ma'am -- no -- yeah.
19     Q.   Okay.  You asked why
20 Dr. Madigan didn't include it in his
21 report.  But did you see these other
22 experts included that information in
23 their reports?
24     A.   Well, sir, my assignment is

Page 336

1 only dealing with Dr. Madigan's report.
2 I'm not responsible for your other
3 reports, right.  Why should I put all my
4 energy -- sorry?
5     Q.   Dr. Madigan didn't have Gomm
6 or Pottegard.  You made the decision to
7 include Gomm and Pottegard in your
8 report.
9     A.   You're telling me, other
10 guys, expert witness, they know the
11 existence of those two studies.  How come
12 those guys don't communicate with
13 Dr. Madigan, "Hey, Dr. Madigan, there
14 were two studies that directly address
15 the issue the impurity of valsartan."
16 How come they don't --
17     Q.   I don't -- I don't think you
18 understand the purpose of Dr. Madigan's
19 report.
20          Dr. Madigan never gives
21 threshold.  He never gives conclusions on
22 causality, correct?
23     A.   If there is no causality,
24 what's the point to submit a report?

Page 337

1     Q.   Okay.  Did you read his
2 report to get what the point of his
3 report was?
4          MR. MERRELL:  Object to
5 form.
6          THE WITNESS:  Yeah, I mean,
7 he basically told us that there's
8 an association from the dietary
9 study, from an occupational study.
10 But he admitted he couldn't even
11 translate association to
12 causality.
13          But here you are.  You're
14 looking for causality.  You say,
15 sorry, I cannot answer your
16 question because basically I
17 cannot answer causality question.
18          I say, wow, okay, why do we
19 need to bother Dr. Madigan, he's a
20 busy guy, to write a report,
21 right.
22          If your epidemiologist can
23 answer this question, why do you
24 need Dr. Madigan then?

Page 338

1 BY MR. NIGH:
2     Q.   Why do you think we used
3 Dr. Madigan?
4     A.   I don't know.  I'm very
5 curious.  I mean, if he in his deposition
6 said, ma'am, we cannot answer causality
7 question.
8         The first thing I said,
9 well, good-bye.  If you cannot answer
10 causality, why should I need you on the
11 panel, right?
12     Q.   So you would discard his
13 conclusion because he's not answering the
14 question of causality?  You would say
15 good-bye, why should I need you on the
16 panel?
17     A.   Sir, don't put your word in
18 my mouth.  I'm trying to say he couldn't
19 even establish association.  And then he
20 had admitted in public he cannot answer
21 the causality question, okay.
22         So my question for you, if
23 you cannot even say the impurity of the
24 valsartan caused the cancer, then what is

Page 339

1 the point for whole case then?
2     Q.   Do you believe that you can
3 answer the causality question?
4     A.   Sorry?
5     Q.   Do you believe that you can
6 answer the causality question?
7     A.   I can't.  That's why I don't
8 work for you, unfortunately.  You know,
9 you're a very good lawyer.  I know there
10 is a problem.  We cannot establish
11 causality.
12         If I can, sir, you know, I'd
13 be famous.  I would get a Nobel Prize
14 winner.  Nobody actually can jump in
15 association to causality that easily.
16 You need clinical input.  You need all
17 kinds of people, toxicologists, right.
18 You cannot rely on statistician to tell
19 you there's a causality.
20     Q.   Okay.  So are you admitting
21 in public now as well that you cannot
22 provide a causality opinion either?
23     A.   I didn't say any causality,
24 sir.  I didn't say any causality.  I

Page 340

1 didn't helping you to say, well, impurity
2 cause cancer.
3     Q.   You don't have a causality
4 opinion one way or the other though,
5 right?
6     A.   Why should I need another
7 part?  I cannot even establish an
8 association between the impurity and the
9 cancer risk.  I cannot even demonstrate
10 either way.  How in the world we can
11 actually jump into the wagon and say
12 there's a causality.
13         For my part in this, there's
14 no causality issue at all.
15     Q.   Did you review
16 Dr. Panigrahy's report at all?
17     A.   No, I don't think so.
18     Q.   Okay.  So as far as you
19 know, sitting here today, you have no
20 criticisms of Dr. Panigrahy's report or
21 the LCEs that he calculated, correct?
22     A.   You mean Dr. Madigan
23 computed LCE?
24     Q.   No.  No.  My question was

Page 341

1 not about Dr. Madigan.  It's about
2 Dr. Panigrahy.
3         As far as you know, sitting
4 here today, you have no criticisms of
5 Dr. Panigrahy's report or the LCEs that
6 he calculated, correct?
7     A.   I didn't read his report.
8 How in the world I can say I criticize or
9 not criticize.  It's not a logical
10 question, right?
11     Q.   I think it's a logical
12 question.  I think you're agreeing with
13 me.
14         Because you never read his
15 report, you don't have any criticisms
16 regarding Dr. Panigrahy's reports or the
17 LCEs that he calculated, correct?
18     A.   Better way to say, I have no
19 opinion of this.  I don't say I'm not
20 going to criticize.  Which way -- because
21 I don't know which way he did.  So I have
22 no opinion.  I cannot make any comments.
23         If that's a better way to
24 answer your question?

Confidential Information Subject to Protective Order

Page 342

1   Q.   Yes.
2       MR. NIGH:  Okay.  We've been
3   going on for a little bit more
4   than an hour.  Let's go ahead and
5   take a break at this time.
6       THE VIDEOGRAPHER:  The time
7   right now is 4:24 p.m.  We're off
8   the record.
9       (Short break.)
10      THE VIDEOGRAPHER:  The time
11  right now is 4:44 p.m.  We're back
12  on the record.
13  BY MR. NIGH:
14      Q.   Now, Doctor, in your report,
15  you provide no information on the
16  background rate of exogenous NDMA from
17  sources such as diet, beer, or smoke,
18  correct?
19      A.   Correct.
20      Q.   And in fact, that's
21  something that you hold no opinion about
22  or you don't have any knowledge in terms
23  of the amount of nanograms or the amount
24  of exposure that people have to exogenous

Page 343

1   NDMA from diet, beer, and smoke, correct?
2       A.   Yeah.  I have a hard time
3   even past the first hurdle, association
4   question.  I think the next step, I can't
5   even understand how we can establish.
6       Q.   And also in terms of
7   endogenous NDMA, you have no
8   understanding or any -- you haven't
9   looked at any materials that describe or
10  explain the amount of endogenous NDMA or
11  even endogenous nitrosamines, correct?
12      A.   Correct.
13      Q.   Okay.  Let's take a look at
14  your report.
15      MR. NIGH:  It's LP-1557
16  we're going to take a look at Page
17  17.  Actually Page 10, Paragraph
18  21.
19  BY MR. NIGH:
20      Q.   Here you say, "Even if we
21  can claim we collected all of the
22  relevance patients' baseline factors, the
23  modeling of the adjustments for those
24  factors may be questionable since the

Page 344

1   standard lack of fit test for the model
2   fitting does not provide clinically
3   meaningful interpretation via a P-value
4   of the test."
5       Do you see that?
6       A.   Yes, sir.
7       Q.   Do you recall giving similar
8   opinions both in Taxotere and Celebrex as
9   this?
10      A.   Sir, I don't recall.
11      Q.   Okay.  Next you say, "For
12  example, in a publication by Dr. Madigan,
13  heavily cited in his report, Loh, et al.,
14  claimed that dietary NDMA intake was
15  significantly associated with increased
16  cancer risk in men and women via Cox
17  proportional regression, adjusted for
18  age, sex, BMI, cigarette smoking status,
19  alcohol intake, energy intake, physical
20  activity status, education level, and
21  menopausal status in women."
22      The Loh study adjusted for
23  numerous potential confounding factors,
24  correct?

Page 345

1       A.   They tried.  Dr. Loh was
2   trying.  Was trying.
3       Q.   Now, what you say next is,
4   "However, it is not clear a thorough
5   model fitting assessment was conducted."
6       Do you see that?
7       A.   Correct.
8       Q.   You next say, "If the Cox
9   model does not fit the data well, it is
10  known that the resulting hazard ratio
11  does not have clinically meaningful
12  interpretation."
13      And you put, "For this
14  situation, the conclusions of the study
15  and inferences drawn by Dr. Madigan based
16  on the study would be invalid and
17  inherently unreliable."
18      Do you see that?
19      A.   Yes, sir.
20      Q.   Are you stating that Madigan
21  shouldn't rely on Loh because it is not
22  clear a thorough model fit assessment was
23  conducted?
24      A.   Well, sir, this is beyond

Confidential - Information Subject to Protective Order

Page 346

[1] Loh's paper.  Almost every paper, study,
[2] Dr. Madigan cited in his report.  Sort of
[3] lack of assessment of a model fitting.
[4]     Q.   I understand.  I'm asking
[5] you just in regards to Loh.  Are you
[6] stating that Madigan shouldn't rely on
[7] Loh because it is not clear a thorough
[8] model fit assessment was conducted?
[9]     A.   That is my opinion.
[10]     Q.   You recognize that the vast
[11] majority of observational studies do not
[12] include in the study or provide a
[13] comprehensive description of model fit
[14] assessment, correct?
[15]     A.   I'm sorry, sir, you say most
[16] observational study won't including --
[17]     Q.   I'm saying you recognize
[18] that the vast majority of observational
[19] studies do not include in the study or
[20] provide a comprehensive description of
[21] model fit assessment, correct?
[22]     A.   Well, at least for those
[23] papers that I read, they didn't give us a
[24] very thorough assessment.  I don't know

Page 347

[1] in general, sir.
[2]     Q.   Well, in general,
[3] approximately what percent of
[4] observational studies do you believe
[5] provide a comprehensive description of
[6] model fit assessment?
[7]     A.   I don't know.  But for all
[8] the studies Dr. Madigan cited, I look at
[9] carefully.  I couldn't find it.  I mean
[10] that only concerned me.  I don't really
[11] concern about other observational
[12] studies.
[13]     Q.   You don't know whether or
[14] not the vast majority of observational
[15] studies provided do not provide a
[16] comprehensive description of model fit
[17] assessment?
[18]     A.   Well, sir, if they didn't
[19] provide it, that means that the result is
[20] not believable, right.
[21]     Q.   So --
[22]     A.   That's a common --
[23]     Q.   Go ahead, you can finish.
[24]     A.   It is common sense, sir.  If

Page 348

[1] you cannot tell me if the model
[2] adequately fit your data.  I said, well,
[3] can you tell me -- in fact, you need a
[4] validation set, right, to help me, the
[5] model is okay or not.  You cannot use
[6] only one single independent data.  The
[7] independent data set you fit in the
[8] model, right, Cox model in this case, but
[9] you have to use another independent
[10] observational study to validate the model
[11] before clear or not.  That is a well
[12] known fact now, right.  The training, the
[13] validation set independent of datasets.
[14]     Q.   Let me be a little more
[15] clear about my question.
[16]     When I am talking about vast
[17] majority of observational studies, I
[18] don't just mean these dietary studies.  I
[19] mean the vast majority of observational
[20] studies that are done do not include in
[21] the study or provide a comprehensive
[22] description of a model fit assessment,
[23] correct?
[24]     A.   Well, sir, I don't know

Page 349

[1] exactly the percentage you make in this.
[2] But I'm really sorry to see that, right.
[3] You are very smart lawyer.
[4]     If you're actually doing a
[5] study without validating your assessment
[6] appropriate of model, how can you sell
[7] your model to outside world?
[8]     Right.  I mean there are
[9] tons of papers, they all junk papers,
[10] everybody knows that.  Right.  You
[11] publish a paper with all kinds of
[12] confounding, you can find out go fishing
[13] trip, or whatever, cherry-picking, you
[14] pick out a set of variants, you make
[15] adjustment, you got a decent P-value and
[16] say I'm done.  You see that's the
[17] problem, right.
[18]     If you cannot tell me your
[19] model is okay, you can do anything you
[20] want to, tell me the story.  I don't even
[21] know if the story is okay or not okay,
[22] right.
[23]     Q.   So if the vast majority of
[24] observational studies do not provide a

Confidential Information - Subject to Protective Order

Page 350

1 comprehensive description of model fit
2 assessment, then you would disregard
3 those studies?
4     A.   Yeah, basically I think we
5 don't really believe this kind of study
6 anymore, right.
7         I mean, you know, you are a
8 good law firm.  Dr. Madigan is a
9 distinguished statistician.  And we need
10 a very high standard, right, to conduct
11 an analysis of observational study,
12 right.
13         Model checking is very
14 important step.  Without it, we cannot do
15 anything, right, down the road.
16     Q.   And in the absence of that
17 very high standard of conducting an
18 analysis of observational studies, you
19 believe that you cannot demonstrate an
20 association between NDMA and -- NDMA in
21 the diet and cancer, correct?
22     A.   Yeah, I can play game with
23 you, say, doctor.  You see the Loh paper,
24 he lists so many so-called covariates,

Page 351

1 right, which is baseline variables.
2         If I have raw data, I can
3 play game and delete some covariates in
4 the model or adding something else, he
5 didn't include it.  I bet you I probably
6 can play the game with you, turns out my
7 P-value is greater than .05.  But that's
8 an association problem, right.  That's
9 the problem.
10         Everybody can manipulate a
11 model and tell you a story.  They want
12 you to listen to story.
13     Q.   Is that your belief, that
14 Loh could have played games and simply
15 gotten a P-value that was greater than
16 .05?
17     A.   Sir, this is so common.
18 That's why it will be hazard ratio is so
19 low.  Usually we say, well, look, you can
20 manipulate your adjustments, okay, you
21 can make adjustment and make your P-value
22 significant.  We can make adjustment,
23 make your P-value not as significant,
24 right.  That's a well known fact.  That's

Page 352

1 why people usually don't believe
2 observational study.
3         It's like for example,
4 Covid-19, the pandemic, right, in the
5 beginning people submit all kind of
6 observational studies, say oh, yeah, you
7 know, this treatment is great, especially
8 our former president, right.  He said
9 without any evidence, hey, let's see,
10 this observational study show you this is
11 very good treatment.  It turns out in the
12 clinical trial, we don't see anything.
13         So you see, the society now,
14 they don't believe observational study
15 for the Covid-19 anymore.  You say
16 without a clinical trial, forget it, I'm
17 not going to use your treatment, even if
18 you have observational studies that will
19 state the statement of fact.
20         See, this is what happened,
21 right, in the last 18 months.  You know
22 better than I do, right.
23     Q.   All right.  Let me see if
24 I've got your testimony right.

Page 353

1         In general you believe that
2 you can't believe observational studies,
3 correct?
4     A.   If you have really nice
5 recent protocol, pre-specified
6 adjustment, then I have a training set to
7 fit in your model.  I have a validation
8 set to validate what you claim the model
9 is okay or not.  Then I believe you have
10 a story to tell.  You have a valid story
11 to tell us, right.
12         But right now, like you say,
13 I don't even give you the details, how do
14 I select this baseline covariates with
15 adjustment.  How do I select the spec?  I
16 have no idea how you select.  How many
17 covariates are you not including in the
18 covariate adjustment.  I don't know,
19 right.  You just publish.
20         Now, papers that are
21 published in the -- very few people even
22 pay much attention.  Very small group of
23 people, oh, yeah, yeah, yeah, this is
24 interesting.  But in reality, people

Confidential Information - Subject to Protective Order

Page 354

1 don't take this seriously without a
2 rigorous assessment of your model of what
3 your process you are talking about,
4 right.
5          The -- this is actually --
6 you know, we need to hold a high
7 standard, right, for this legal case.
8 You can't set a legal case example in the
9 future. How do we defend the people,
10 right. You have to defend the people in
11 the right way, correct way.
12     Q.   Are you aware that most FDA
13 recalls have been prompted as a result of
14 observational studies and not clinical
15 trials?
16     A.   I don't recall, sir.
17     Q.   Have you ever seen data that
18 demonstrates that?
19     A.   I saw many cases FDA had
20 some concern about safety issue of -- for
21 example, and you finish Phase III trial,
22 right, you want to demonstrate your
23 treatment is okay. But FDA still
24 concerned about the long-term toxicity

Page 355

1 profile. Usually they ask the company to
2 do a marketing Phase IV trial to figure
3 out, do you have the safety issue.
4 That's very common. You know, for
5 example, we did that important E-P-O,
6 EPO, 2000 -- 11 years, to actually sadly
7 say EPO is not safe.
8     Q.   Right.
9     A.   So you see people doing
10 that. But I don't know exactly for this
11 case, sir, any like contaminant or
12 impurity in valsartan and what the FDA
13 did, I don't know.
14     Q.   In general, have you ever
15 seen data that most FDA recalls have been
16 prompted as a result of observational
17 studies and not clinical trials?
18     A.   Well, that's why people
19 criticize the result, right.
20     Q.   I'm sorry. That's why
21 people criticize the FDA recalls?
22     A.   No, no, no. You're saying
23 the observational study was conducted
24 because the recall. And most of the

Page 356

1 people actually say, well, it's okay.
2 You're telling me, I don't really believe
3 you, right, whatever you say. You know,
4 they don't take it seriously right away.
5          So that's what happened in
6 this society. You can publish any paper
7 you wanted to. In fact, my friend, is a
8 JAMA Open associate editor for
9 statistics.
10          He said -- he told me a few
11 months ago, he said that he got lots of
12 papers for different legal case for
13 safety stuff. Everything is
14 observational study, right.
15          He was so surprised. People
16 manipulate the modeling and actually
17 picking up the model they like and write
18 a paper.
19          So the editors very
20 carefully now to select those papers.
21 They just want to use JAMA, for example,
22 as a vehicle to tell all sides my drug is
23 safe or not safe.
24          He decide -- it's not only

Page 357

1 for safety issue. If someone wants to
2 badmouth the other drug company, they
3 also publish papers. So this whole world
4 is flooded with not reliable and
5 misleading studies.
6          But people publish. If you
7 pay for it, this case, you can publish
8 your papers.
9     Q.   In general, have you ever
10 seen data that most FDA recalls have been
11 prompted by observational studies and not
12 clinical trials?
13          MR. MERRELL:  Objection to
14 form. Asked and answered.
15          THE WITNESS:  I don't
16 recall. I don't know, sir. In
17 this moment, I don't know.
18 BY MR. NIGH:
19     Q.   I believe it's your
20 testimony that even if the vast majority
21 of observational studies do not provide a
22 comprehensive description of model
23 fitness assessment, you would not give
24 reliability to those observational

Page 358

¹ studies, correct?
²       A.   I would put very little
³ weight on their findings.
⁴            I don't really trust the
⁵ result with just single study.  I
⁶ probably need a validation study.
⁷       Q.   Well, I mean, even if there
⁸ are numerous observational studies, but
⁹ numerous observational studies on an
¹⁰ issue and none of them provide a
¹¹ comprehensive description of model
¹² fitness assessment, you would throw out
¹³ or ignore the results of all those
¹⁴ studies, correct?
¹⁵       A.   I say I don't even care if
¹⁶ they published those papers or not.  I
¹⁷ don't take it seriously.
¹⁸       Q.   So you would ignore those
¹⁹ results, correct?
²⁰       A.   Yeah, unless they have
²¹ another independent study validating what
²² they are claiming, right.  Then I say,
²³ okay, that's correct.
²⁴       Q.   So in this situation, when

Page 359

¹ Loh doesn't tell you in the study whether
² or not it used a thorough model fitting
³ assessment, you would ignore the results
⁴ of Loh, correct?
⁵       A.   I would probably say I'm not
⁶ going to take this seriously.
⁷       Q.   Okay.  Okay.  Now, let's
⁸ take a look at Zheng.  You have the same
⁹ -- your next paragraph, you say, "As
¹⁰ another example about the adequacy of
¹¹ modeling, in the paper by Zheng, multiple
¹² logistic regression models were
¹³ utilized."  And then you put again, "It
¹⁴ is not clear if the model fits the data
¹⁵ well.  Again, a lack of fit test for
¹⁶ model fitting is not informative since it
¹⁷ only provides a P-value."
¹⁸            And so again, because Zheng
¹⁹ does not provide a thorough model fitting
²⁰ assessment in the study as to whether or
²¹ not that was conducted, you would ignore
²² the results of the Zheng study, correct?
²³       A.   I wasn't excited about the
²⁴ results at all.

Page 360

¹       Q.   You would give it little to
² no weight, correct?
³       A.   Yeah.
⁴       Q.   And in fact, many of the
⁵ dietary studies here that did not make it
⁶ clear that a thorough model fitting
⁷ assessment was conducted, you would have
⁸ ignored those dietary studies or given
⁹ them little to no weight, correct?
¹⁰       A.   Correct.  But, sir, you
¹¹ notice some dietary studies are very,
¹² very old, right, more than 20 years.  And
¹³ at that time probably those guys were not
¹⁴ educated well or trained very well
¹⁵ statistically speaking.  They probably
¹⁶ didn't do it.  Okay.
¹⁷            But I believe a good well
¹⁸ conducted observational study this date,
¹⁹ they probably do a very good thorough job
²⁰ to assess the adequacy of the model
²¹ fitting.
²²       Q.   I'm sorry.  Many of these
²³ dietary studies are not published more
²⁴ than 20 years ago.  There's many of them

Page 361

¹ that are more recent, right?
²       A.   You have one paper published
³ in 1999, right?
⁴       Q.   I know, but many of these
⁵ dietary studies, we've got some that are
⁶ published in 2019, 2012, 2011, 2012 --
⁷ 20 -- 20 -- you know, many of these are
⁸ published in the last decade, correct?
⁹       A.   Yeah.
¹⁰       Q.   But even then, if they
¹¹ didn't specifically put in the study and
¹² describe, make it clear that a thorough
¹³ model fitting assessment was conducted,
¹⁴ then you would have ignored it or given
¹⁵ it little to no weight, correct?
¹⁶       A.   Yeah, I wouldn't pay much
¹⁷ attention to it.
¹⁸       Q.   Isn't that the main problem
¹⁹ in terms of your concern about whether or
²⁰ not there's association between dietary
²¹ studies and the NDMA in diets and whether
²² or not they have an increased risk of
²³ cancer?  Isn't that your main concern,
²⁴ that they didn't include model fit, and

Page 362

[1] as a result you've given little to no
[2] weight or ignore them?
[3]     A.   Sorry.  Go ahead, sorry.  I
[4] don't mean to --
[5]     Q.   That was the end of my
[6] question.
[7]     A.   Okay.  No, sir.  This is a
[8] part of it, right.  You can see my
[9] report.  I have several concerns, right,
[10] more than just the model fitting stuff.
[11]         My concern also, saying the
[12] decisionmaking about so-called
[13] statistical significance and we should do
[14] better job than that, right.
[15]         Even if you have correct
[16] model, you should providing more than
[17] P-value for that application.  That's
[18] another concern I have.
[19]         The third one is more
[20] serious.  I said even if I believe what
[21] you're saying from these publications,
[22] how can we actually convince people you
[23] can extrapolate the result from the
[24] dietary study or occupational study to

Page 363

[1] the impurity in -- in valsartan, right,
[2] the issue we are dealing with right now.
[3]         That's the issue and my
[4] concern.
[5]     Q.   Yeah, but you don't -- you
[6] don't -- you don't do that sort of work,
[7] where you extrapolate results from one
[8] exposure to another exposure setting,
[9] correct?
[10]     A.   I think we have to be very
[11] careful to actually figure out how we can
[12] use one type of study, and we can
[13] extrapolate the result to another
[14] compound.  It's not relative to
[15] valsartan, right.
[16]         And you cannot just directly
[17] say, well, we see from association from
[18] dietary.  It is not automatically
[19] claiming we have issue with valsartan.
[20]     Q.   Yeah.  My question is not
[21] that.  My question is really about your
[22] experience and the work that you do.
[23]         You don't do that sort of
[24] work where you extrapolate results from

Page 364

[1] one exposure setting to another exposure
[2] setting, correct?
[3]     A.   Oh, we do.  We do sometimes
[4] from clinical trial result.  For example,
[5] in a cardiovascular trial, the patient
[6] usually is male patients, right.  And
[7] especially in old age, very few female --
[8] very few female patients involved.
[9]         So we actually very
[10] seriously need to know what the treatment
[11] effect the female patient would uptake,
[12] right.
[13]         So we actually utilize the
[14] entire study helping us to understand
[15] that extrapolation.  But we try to do a
[16] good job, saying we establish a model for
[17] prediction for women, right with the
[18] baseline covariates.
[19]         And then we validate it.
[20] And then we apply this model with one
[21] dataset to another one.
[22]         So we do -- we do actually
[23] do this kind of work.  But you have to be
[24] careful to convince people you can

Page 365

[1] transport your model from one study to
[2] another one, right.
[3]     Q.   So the model that you're
[4] talking about in the work that you've
[5] done would be looking at exposure in male
[6] patients and how that could be
[7] extrapolated to exposure in female
[8] patients, correct?
[9]     A.   Yeah.  That's a part of one
[10] study we did before.
[11]     Q.   You're not talking about
[12] exposure in one setting and extrapolating
[13] to exposure in another setting, correct?
[14]     A.   No, not that I recall.
[15]     Q.   Okay.  For Loh and Zheng,
[16] other than model fit, did you have any
[17] other criticisms of those studies?
[18]     A.   Sir, this is just the two
[19] examples, you know, we can go over all
[20] the papers, publications that Dr. Madigan
[21] cited.
[22]         Most of the paper, just to
[23] follow the same -- like you're saying,
[24] the majority of paper, they didn't even

Confidential Information - Subject to Protective Order

Page 366

[1] bother to evaluate how good the model is,
[2] right.
[3]         So those older publications,
[4] they sort of lack this kind of assessment
[5] and process.  So it's not only for those
[6] two papers, by the way.
[7]     Q.   Other than Loh -- you know,
[8] for Loh and Zheng, did you have any other
[9] specific criticisms of those studies?
[10]     A.   Oh, other studies -- oh,
[11] these two particular studies that you're
[12] talking about?
[13]     Q.   These two studies, any other
[14] criticisms of those two studies?
[15]     A.   Well, I don't know they
[16] actually use -- you see, Counsel, I
[17] wanted to share with you, if you go back
[18] to the Loh covariate adjustment, right,
[19] you can come up how many covariates they
[20] make adjustment.  If you have 11 or
[21] 12 covariates adjustment, for example,
[22] for sake of argument, you put age as
[23] adjustment, right, and the question is do
[24] you think age squared is also an

Page 367

[1] important adjustment.  You say we don't
[2] know.
[3]         How about age cubed, do you
[4] need to make adjustment.  Do you think
[5] actions among the 11 covariates will be
[6] included in the model?
[7]         You see, model is a
[8] simplified version of the truth.  The
[9] true model is so complex.  We actually
[10] try to approach the true model with a
[11] simplified model.
[12]         Now the question is can we
[13] actually assess your simplified model,
[14] actually close to the truth, right.
[15]         So you see, you can see the
[16] Loh and also Zheng papers, right.  You
[17] say, well, I don't know, like we call
[18] kitchen sink, right.  And do whatever the
[19] result are coming up, right.  That's what
[20] people usually do.
[21]         You see, they say well,
[22] let's put everything in this disposal and
[23] see what happens.  It's not a way to do
[24] business or scientific investigation.

Page 368

[1]         If you want to use those
[2] papers as legal cases, you know, please
[3] do, but how in the world we can believe
[4] one informing a thing, I don't know how
[5] many people would believe it.  That's my
[6] point.
[7]     Q.   So your point is you believe
[8] that Loh and Zheng may have over adjusted
[9] the findings, included too many
[10] covariates or confounders that they
[11] adjusted for?  Is that what you're
[12] saying?
[13]     A.   No.  Could be under.  Who
[14] knows?  Basically, I don't know what is
[15] the right adjustment.  You need a
[16] validation set to tell me, yes, this is
[17] right amount of adjustment.  You cannot
[18] adjust to put everything in the sink,
[19] say, listen, let's do it.
[20]         You know, people in the real
[21] world, they have hundreds and hundreds of
[22] covariates, right.  They say using this
[23] machine, learning the process.  Well,
[24] let's see what's going on.  They end up

Page 369

[1] with a model.  They say, well, okay,
[2] believe it or not, this is my model.
[3]         I said, hold a second, if
[4] you cannot validate this model, nobody is
[5] going to believe you.
[6]         So that's the trend this
[7] day, sir.  You know, unfortunately the
[8] dietary papers are such older papers
[9] probably mostly right.  They didn't even
[10] bother -- in the modern world if you
[11] don't have validation of the model,
[12] nobody will even believe you.  If you
[13] read a medical journal, everything
[14] they're talking about modeling, they have
[15] the validation set, independent
[16] validation set, right.
[17]         So though you can see the
[18] trend, the people really want to have a
[19] valid scientific sort of conclusion from
[20] your study.
[21]     Q.   There are many modern
[22] observational studies that are published
[23] that do not include a clear thorough
[24] model fitting assessment described in the

Confidential - Information Subject to Protective Order

Page 370

1  studies, correct?
2       A.  Well, if you find a paper in
3  New England Journal of Medicine or JAMA,
4  I would be very surprised, okay.  But if
5  you find it published in a mediocre
6  journal, anybody can publish this space,
7  as long as you pay a few thousand
8  dollars, right, you can publish.  A
9  publication doesn't mean this is a valid
10 argument, right.  It's not credible.
11      Q.  Okay.  So let's take New
12 England Journal of Medicine or JAMA.
13          You recognize that there are
14 many modern observational studies that
15 have been published in the New England
16 Journal of Medicine or JAMA that do not
17 include a clear thorough model fitting
18 assessment described in the study,
19 correct?
20      A.  Well, give me example.  In
21 the past six months, what kind of paper
22 are you talking about?
23      Q.  How many examples do you
24 want?

Page 371

1       A.  Yeah?  Well, the example --
2       Q.  How many examples do you
3  want to recognize that there are many
4  modern observational studies that have
5  been published in the New England Journal
6  of Medicine or JAMA that do not include a
7  clear thorough model fitting assessment
8  described in the study, how many
9  studies --
10      MR. MERRELL:  Object to
11 form.
12 BY MR. NIGH:
13      Q.  -- do you want to prove that
14 point?
15      A.  Well, it doesn't matter.  If
16 you give me a couple of really high
17 profile observational studies without
18 validation, I will be very happy to write
19 a letter to associate editor.  I know
20 those guys very well.  I say how in the
21 world you guys publish this junk paper,
22 okay.
23          You tell me.  You pick a
24 couple of papers.  I'm going to tell my

Page 372

1  friend, say you guys better do a better
2  job.
3       Q.  Okay.  Taking a look at
4  Page 12, Number 23 in your opinion.  You
5  say, "Moreover, for the papers in
6  meta-analysis cited by Dr. Madigan, it is
7  not clear if the authors for the
8  individual papers in the meta-analysis
9  had carefully checked the adequacy of the
10 models utilized in the analysis.  Without
11 such analysis, the conclusion of the
12 meta-analysis and inferences drawn by
13 Dr. Madigan based on the meta-analysis
14 would be invalid and inherently
15 unreliable."
16          That is rarely done for any
17 meta-analysis of observational studies,
18 correct?
19      A.  That's why we got so many
20 meta-analysis papers floating around in
21 this world, counsel.  You know, how many
22 do you believe is a result of
23 meta-analysis?  I think of very few.
24      Q.  Can you name one

Page 373

1  meta-analysis of observational studies
2  that has carefully checked the adequacy
3  of the models of all the studies that
4  were utilized in its analysis?
5       A.  Well, you can check New
6  England Journal of Medicine.  We can go
7  through tomorrow.  We can get online to
8  check all the recent New England Journal
9  of Medicine -- meta-analysis New England
10 Journal of Medicine published.
11          I'll tell you the truth, New
12 England Journal of Medicine doesn't
13 publish any meta-analysis papers anymore
14 in the past two years anymore, because
15 they don't believe in meta-analysis,
16 right.
17          Then you say well, this is
18 not fair.  You say other journals publish
19 meta-analysis.  I say well, gee, you
20 know, look at the high standard of the
21 journal.  They actually don't believe
22 this meta-analysis anymore.
23          After they published the
24 Vioxx meta-analysis everything -- no, I'm

Confidential Information Subject to Protective Order

Page 374

¹ sorry, it's for the GSK, Tanzeum, right,
² so-called antidiabetes drug, and they
³ publish meta-analysis about maybe
⁴ 12 years ago, maybe more than that.  That
⁵ was last paper.
⁶            New England Journal of
⁷ Medicine published meta-analysis, they
⁸ learned a bad experience from publish
⁹ that paper.
¹⁰           You can tell me if The New
¹¹ England Journal of Medicine has published
¹² a meta-analysis in the past few years,
¹³ I'll be very happy to share with my
¹⁴ associate editor friend at New England
¹⁵ Journal of Medicine.  I say, gee, how
¹⁶ come you guys change your policy.
¹⁷    Q.   Can you name one
¹⁸ meta-analysis of observational studies
¹⁹ that has carefully checked the adequacy
²⁰ of the models of all the studies that
²¹ were utilized in its analysis?
²²    A.   I don't know exactly there
²³ is one.  You are a high standard lawyer.
²⁴ You don't want to go with those people,

Page 375

¹ what the majority say, hey, those guys
² are not very good.  So if the majority of
³ people are not very good, it's okay.
⁴ But, sir, that's not okay, right.
⁵            You like to be in the small
⁶ minority, you do a good job.  You have a
⁷ high standard.  You actually set a good
⁸ example for next generation, correct?
⁹            Instead of using -- say,
¹⁰ hey, listen, nobody is doing this, so I
¹¹ don't have to do it.  Why do we do that.
¹² If society goes what you are trying to
¹³ do, we are in trouble.  We cannot find
¹⁴ truth anymore, right.
¹⁵            Why do you want to say
¹⁶ majority guy didn't do it, so I didn't do
¹⁷ it.  But you know they are not correct.
¹⁸ Why even bother to say I want to mingle
¹⁹ with those guys.
²⁰    Q.   So is it your testimony that
²¹ you cannot name one meta-analysis of
²² observational studies that has carefully
²³ checked the adequacy of the models of all
²⁴ of the studies that were utilized in its

Page 376

¹ analysis?
²    A.   Yeah, most meta-analysis I
³ dealing with using clinical trial result,
⁴ individual study.  So in that case you
⁵ don't have to make adjustment, because
⁶ basically they are balanced, right,
⁷ between the two groups comparatively.
⁸            So usually we don't worry
⁹ about this so-called model checking,
¹⁰ because there is no model.
¹¹           But anything beyond that,
¹² you needed to worry about it.  The
¹³ individual study is a good study or not.
¹⁴ You do a meta-analysis at this stage, you
¹⁵ have to check.  This study is a good
¹⁶ paper or not a good paper, right?
¹⁷ Everybody is doing now.
¹⁸           If it's not a really good
¹⁹ paper, you don't include this paper or
²⁰ publication in your meta-analysis, right.
²¹ That's the practice now.
²²    Q.   So do you agree that you
²³ cannot name one meta-analysis of
²⁴ observational studies that have carefully

Page 377

¹ checked the adequacy of the models of all
² the studies that were utilized in its
³ analysis?
⁴            MR. MERRELL:  Objection to
⁵ form.
⁶            THE WITNESS:  You're saying
⁷ observational studies; is that
⁸ correct?
⁹ BY MR. NIGH:
¹⁰    Q.   Yes.
¹¹    A.   No, I don't -- I'm sitting
¹² here.  I don't know.  Maybe I can do some
¹³ search afterwards and find out for you.
¹⁴    Q.   It's not the state of the
¹⁵ art for published meta-analyses of
¹⁶ observational studies to look at each
¹⁷ individual study that -- in the
¹⁸ meta-analysis and check whether or not
¹⁹ all of the studies described adequacy of
²⁰ the models utilized in the analysis,
²¹ correct?
²²            MR. MERRELL:  Objection to
²³ form.
²⁴            THE WITNESS:  Well, sir, I

Confidential - Information Subject to Protective Order

Page 378

1  really don't understand.  Why do
2  you want to lower your standard?
3       I mean, you have a choice of
4  being very high standard, right?
5  Why do you want to say the
6  majority don't do it, so that's
7  okay and it's acceptable?
8       It's not acceptable.
9       You publish a lot of junk
10  papers in this world, is really
11  not helpful to the society.
12  BY MR. NIGH:
13       Q.   Is it your belief that
14  because New England -- you stated
15  multiple times that New England Journal
16  of Medicine no longer publishes
17  meta-analyses.
18       Is it your belief that they
19  are -- that you would give them -- that
20  you ignore them or give them little to no
21  weight?
22       A.   Well, they -- I think they
23  got a bad experience from this GSK
24  Avandia study by cardiovascular people in

Page 379

1  Cleveland Clinic, Steven Nissen.  They
2  got really hurt.  And the people actually
3  criticized that paper back and forth and
4  left and right.  So they feel so
5  embarrassed.
6       So I still remember my old
7  friend, Steve Largaucous, was associate
8  editor, handled that paper for The New
9  England Journal of Medicine.  After it's
10  published, I ask Steve, I said, "Steve,
11  how in the world you publish this junk
12  paper?"  He said, "Well, I apologize.  We
13  didn't realize, you know, the guy used
14  the wrong methodology."
15       Right.  Now, they even used
16  the clinical trial data, by the way.
17  It's not observational study.  But they
18  used the wrong statistical method to
19  combine in the meta-analysis, right.
20       So everybody jumping up and
21  down.  And this is a famous example.
22       Even Congress, you know, had
23  a public hearing.  It becomes a really
24  interesting public sort of, like, news,

Page 380

1  you know, in that days.
2       Anyway, I think New England
3  Journal of Medicine really pissed.  They
4  are -- I'm not going to publish any paper
5  in the future using meta-analysis.
6       Q.   So is it your belief that -- I
7  understand what you're saying about New
8  England Journal of Medicine.  Is it your
9  belief that meta-analyses have little to
10  no weight and you would ignore them?
11       A.   I don't know why -- I cannot
12  speak for New England Journal of
13  Medicine.
14       If you really wanted to
15  know, I can introduce the editor of New
16  England Journal of Medicine.  He's a
17  professor in our school.
18       Q.   No, no.  I want to make sure
19  you understand my question.  I'm not
20  asking about New England Journal of
21  Medicine.  Throw that part out.
22       Is it your belief that
23  meta-analyses have little to no weight
24  and you would ignore them?

Page 381

1       A.   If they actually, each
2  individual study, if like we are saying,
3  is very good study, then you can combine
4  information using the so-called
5  well-conducted study, right, as a summary
6  of the so-called group difference.
7       But if you combining, no
8  matter what, the quality of the paper is
9  not very high, and that's really hurting
10  us.  Even though you win this legal case,
11  this won't help the society.  Right.
12       Q.   If a meta-analysis doesn't
13  carefully check the adequacy of the
14  models of every single study that are
15  utilized in the meta-analysis, then you
16  would give that meta-analysis little to
17  no weight and you would ignore it,
18  correct?
19       MR. MERRELL:  Objection to
20  form.
21       THE WITNESS:  Yeah, I
22  wouldn't take it seriously.
23  BY MR. NIGH:
24       Q.   I'm sorry.  You said, "Yeah,

Page 382

1 I wouldn't take it seriously," correct?
2      A.   I won't, yeah.  I won't take
3 it.
4      Q.   Let's take a look at Page
5 13 -- actually Number 12.
6           You can see it starts off
7 with, "In their paper Hidajat, et al.,
8 stated."  You can see that Number 24 is
9 talking about Hidajat.
10          On Page 13, you see that,
11 "Censoring" -- middle of the page where
12 it talks about censoring competing
13 events.
14          "Censoring competing events
15 violates the assumption that censoring
16 occurred at random and is independent
17 from the risk of dying from the cause of
18 death of interest, leading to a biased
19 Kaplan-Meier estimator."
20          Do you see that?
21     A.   Yes, sir.
22     Q.   Is it your belief that the
23 Hidajat study used a Kaplan-Meier
24 estimator?

Page 383

1      A.   No, sir.  This is from their
2 paper.  It's not my language.  I am
3 quoting what they are saying.
4      Q.   Yeah.  What I'm asking you,
5 is it your belief that the
6 Kaplan-Meier -- that the Hidajat paper
7 utilized a Kaplan-Meier estimator?
8      A.   No, no, they tried to avoid
9 using Kaplan-Meier.  That's the sentence
10 that you show to us.  That's why they
11 don't use Kaplan-Meier.  They use
12 cumulative incidence function.  These are
13 not my words.
14     Q.   Please ex -- Hidajat used
15 the method by Fine and Gray, correct?
16     A.   Sorry, say it again.
17     Q.   Hidajat used a method by
18 Fine and Gray, correct?
19     A.   Oh, yeah.  Jason Fine was my
20 student back in Harvard days.  You know,
21 he was my Ph.D. student.  I know that
22 paper very well.
23     Q.   Please explain what the
24 problem is with using the Fine and Gray

Page 384

1 method?
2      A.   You want me to explain to
3 you?
4      Q.   Yes.
5      A.   Okay.  Do you want to go to
6 the paper I cited, the Annals of Internal
7 Medicine.  I can take sweet time to
8 explain to you.  It's a beautiful paper
9 we wrote.
10          Do you want to do that?
11     Q.   Where is the paper that you
12 write about the problems with the Fine
13 and Gray method?
14     A.   Go down to reference.
15     Q.   I don't see a reference on
16 this page.  Is it on the next page?
17     A.   Next -- yeah, the next
18 paragraph, 25.  We have JAMA-Cardiology,
19 McCaw; New England Journal of Medicine,
20 Annals of Internal Medicine.
21          Those are all papers saying
22 Fine and Gray has a ratio for
23 subdistribution function is not
24 appropriate.

Page 385

1           You look at the journal we
2 published.  New England Journal of
3 Medicine, Annals of Internal Medicine.
4 JAMA-Cardiology.  That's really the
5 top -- really top clinical journals,
6 right.  It is so hard to get into those
7 journals.
8           As a statistical argument,
9 you can see it.  They knew that it was
10 such an important issue.  That's why they
11 publish.  I'll be more than happy to go
12 through this Internal Medicine paper with
13 you.  If you want to go on tomorrow, I'd
14 be happy to spend all day with you.
15          And you are a smart guy.
16 And towards the end of the day, I hope
17 you would support what we are finding,
18 right.
19     Q.   I'm not asking you -- I'm
20 not asking you to go through the paper.  I'm
21 asking you to explain what the problem is
22 with using the Fine and Gray paper.  Can
23 you not do that without going through the
24 paper?

Confidential Information - Subject to Protective Order

Page 386

1    A.   Well, sir, if I say
2  subdistribution function, do you
3  understand what I'm talking about?
4    Q.   Yes.
5    A.   Well, do you understand what
6  this guy is talking about,
7  subdistribution function?
8    Q.   If I'm -- you know, as the
9  attorney, I'm the one who needs to ask
10 you the questions.
11       So I'm asking you, can you
12 explain what the problem is with the Fine
13 and Gray method without utilizing the
14 paper?
15    A.   Okay.  So let me try.  Okay.
16 I guess you don't understand the
17 definition of subdistribution function.
18       So a patient died from
19 cancer, right.  And a patient could have
20 died from other causes, cardiovascular
21 events, right.  So it's a noncancer
22 death.
23       You have a typical signal
24 illustration.  You have two type of

Page 387

1  death.  One is due to cancer.  The other
2  one is due to noncancer, right.
3       So this paper is
4  interesting.  We said, well, the
5  mortality rate, the overall survival or
6  death rate is 94 percent, is very, very
7  high, almost everybody is dead, right,
8  toward the end of the study.
9       We said, well, the majority
10 of people, they died without a cancer
11 cause.  That means people died because of
12 either cardiovascular event or because of
13 kidney failure, whatever you define,
14 right.
15       So you have two types --
16 kinds of death.  If the guy says, well,
17 gee, you know, if you guys died from
18 noncancer, I have no idea if the guy
19 survived, how long will it take for him
20 to die from cancer, right.
21       This is what we call
22 competing risk.  Right.  The two causes
23 are competing with each other.  You can
24 observe either one, either die from

Page 388

1  cancer or die from cardiovascular, right.
2       So I said, well, gee, you
3  know, how do we handle this?  So instead
4  of using Kaplan-Meier curve, we started
5  to estimate the distribution of those
6  guys.
7       And I said listen, Counsel,
8  if the guy died from cardiovascular, the
9  reason, right, the cause, what is the
10 this guy's time to die from cancer.
11       I say, man, you know, this
12 guy is already in heaven.  I don't know.
13 You know, the guy probably never died
14 from cancer anymore, right.  Who knows he
15 didn't have it.
16       So that means if the guy
17 died from noncancer, basically, we have
18 no information about this patient died
19 from cancer anymore.
20       Okay.  So that's competing
21 risk.
22       So if you define this
23 cumulative incident curve, which is
24 called subdistribution now because you

Page 389

1  have the majority of people, they didn't
2  die from cancer.
3       Your distribution never
4  reached one towards the end of the day.
5  Otherwise the subdistribution function
6  should be from zero to one.
7       So that's why we have
8  subdistribution function.  Okay.
9       Then you say what is the
10 hazard ratio for this case.  I say, wow,
11 gee, well, that's interesting.  I'm only
12 interested in the death is due to the
13 cancer.  Right.  I'm not interested in
14 the death from the non-cancer.
15       I say, well, so how do you
16 define the hazard ratio now?
17       I don't want to -- I don't
18 know, sir -- this is not an insult at
19 all.
20       Do you understand the
21 definition of hazard ratio in general,
22 even without a competing risk, do you
23 understand the definition?  Yes or no?
24       Otherwise I can explain to

Page 390

1 you hazard ratio without a competing risk
2 first.
3        Q.   I'm following your answer.
4 But so far I have not heard your
5 explanation of the problem in using the
6 Fine and Gray method.
7        A.   Yeah, so obviously you don't
8 understand hazard ratio, right, without
9 competing risk.
10        Hazard ratio is actually is
11 intensity for mortality, force of the
12 mortality.  It's not a risk ratio.  It's
13 not an odds ratio.
14        So what is the hazard?
15 Hazard means that a person -- and still,
16 for example, six months right now, this
17 guy is still alive.
18        I say, well, gee, you know,
19 Counsel, what is the probability the guy
20 still survive at six months, then
21 suddenly drop dead next week?  Okay.
22        And I actually figured out a
23 standardized slope of intensity of this
24 guy what's called hazard.  So you go

Page 391

1 along with six months, 12 months,
2 18 months and et cetera.  So you have a
3 curve.
4        That curve is called hazard
5 curve.  What is hazard ratio?  Hazard
6 ratio means that if -- two groups, they
7 have a two hazard function.
8        And I say what's the hazard
9 ratio?  You're assuming these two hazard
10 function are proportional.  That means
11 the ratio of the two hazard function is
12 constant over time.  You're estimating
13 that parameter.  That's why you got the
14 so-called .7, .75, the so-called hazard
15 ratio.  Right.  Okay.  That's for
16 non-competing risk.
17        Then you have a -- there's a
18 competing risk happening.  You say, well,
19 gee, you know, I'm only interested in
20 hazard, dying from the cancer.  Right.
21        I say okay, so what are
22 you -- what are you talking about now?
23 If a guy die from non-cancer, what are
24 you going to do with the patient?

Page 392

1        I say, well, I'm going to
2 put a limitation in my risk assess
3 forever.  Right.
4        Even the guy died from
5 non-cancer, I said, well, in heaven, the
6 guy is going to eventually develop a
7 death of cancer.
8        Do you think this is a
9 reasonable assumption?  Of course not.
10 Right.
11        That's what Jason Fine and
12 Bob Gray's paper, they even themselves
13 indicate it's an interpretation problem.
14        So we actually in the
15 Internal Medicine explain to people, this
16 is paper written for clinical people.
17 You know, it's well written.  I recommend
18 it if you cannot falling asleep some
19 night, to pick it up and read it.
20        And we explain to people,
21 this is not logical the quantity you can
22 use.  Right.
23        And people didn't know how
24 to do it.  So in the Internal Medicine

Page 393

1 paper, we give alternative ways to let
2 us to understand, instead of using hazard
3 ratio, using something else, right.
4        So that's why people started
5 picking up, oh, yeah, yeah, yeah, this is
6 actually very good.
7        Is that okay with you now?
8 Or you still don't understand?
9        Q.   I still haven't heard you
10 explain what the problem is with using
11 the Fine and Gray method.
12        A.   I told you.  If the guy died
13 from non-cancer, what is the hazard the
14 guy is going to have a cancer death?  Can
15 you answer me?  No, you can't, right?
16        Jason Fine actually put this
17 guy in the risk assess when they computed
18 the hazard.  That's the problem.
19        Q.   That's your --
20        A.   I don't know if it's too
21 complicated --
22        Q.   That's your criticism of the
23 Fine and -- have you -- do you feel like
24 you've given the full answer on your --

Confidential Information - Subject to Protective Order

Page 394

1  what you believe to be the problem with
2  using the Fine and Gray method?
3      A.   Yeah, you know, this is such
4  complex situation, sir.  If you don't
5  read my paper, even I spend 20 minutes
6  with you, I don't think you can get it,
7  right.
8          If you read my paper, just
9  take ten minutes, you can understand the
10  underlying formula.  Okay.  So, you know,
11  I'd be happy to go through the paper
12  quickly with you if you wanted to, if you
13  really want to find out what's wrong with
14  Jason Fine's estimate.
15          In fact, he wrote this paper
16  asking me to be author.  I told him, I
17  say, Jason, this doesn't make sense.  And
18  I don't want to be co-author.  So he said
19  fine.  Okay.
20      Q.   Do you feel like you've
21  answered my question on what is the
22  problem with the Fine and Gray method?
23      A.   Are you asking me?
24      Q.   Yes.

Page 395

1      A.   I said it clearly, but you
2  don't understand.  I don't know what I
3  can do.
4          I mean, I said the guy in
5  heaven already, died from a
6  cardiovascular event.  And I said how are
7  you computing this guy's hazard for
8  cancer death?
9      Q.   Okay.  Let's take a look at
10  the next page.  Page 14, Number 26.
11          Next you have, "Based on the
12  information available and the content of
13  Dr. Madigan's report, we cannot use the
14  results from diet or occupational studies
15  to make an inference about the exposure
16  effects for the population with
17  valsartan.  For example, from the
18  meta-analysis by Song et al., regarding
19  gastric cancer" --
20      A.   I'm sorry.  Mr. Nigh, could
21  I stop here?
22      Q.   You want to take a break?
23      A.   Yeah.  I'd like to take a
24  break.  And we're going to decide we like

Page 396

1  to continue tonight or not.  Is that all
2  right with you?
3      Q.   Sure.  Yes.
4          MR. MERRELL:  Is that all
5  right, Mr. Nigh?  We probably
6  should confer.  It's going pretty
7  late.
8          THE VIDEOGRAPHER:  I'm
9  sorry.  Are we going off the
10  record?  I'm sorry.
11          MR. NIGH:  Definitely.
12          MR. MERRELL:  Yes.
13          MR. NIGH:  Let's go off the
14  record.
15          THE VIDEOGRAPHER:  The time
16  right now is 5:37 p.m.  We're off
17  the record.
18          (Excused.)
19          (Deposition adjourned at
20  approximately 5:37 p.m.)
21
22
23
24

Page 397

1
2          CERTIFICATE
3
4
5      I HEREBY CERTIFY that the
witness was duly sworn by me and that the
6  deposition is a true record of the
testimony given by the witness.
7
      It was requested before
8  completion of the deposition that the
witness, LEE-JEN WEI, Ph.D., have the
9  opportunity to read and sign the
deposition transcript.
10
11
12
      _____
13  MICHELLE L. GRAY,
A Registered Professional
Reporter, Certified Shorthand
14  Reporter, Certified Realtime
Reporter and Notary Public
15  Dated:  September 17, 2021
16
17
18      (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

Confidential Information - Subject to Protective Order

Page 398

## INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 400

## ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 401, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____

LEE-JEN WEI, Ph.D.            DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.
My commission expires:_____

_____

Notary Public

Page 399

## E R R A T A

- - - - -

PAGE  LINE  CHANGE

_____  _____  _____

REASON: _____

_____  _____  _____

REASON: _____

_____  _____  _____

REASON: _____

_____  _____  _____

REASON: _____

_____  _____  _____

REASON: _____

_____  _____  _____

REASON: _____

_____  _____  _____

REASON: _____

_____  _____  _____

REASON: _____

_____  _____  _____

REASON: _____

_____  _____  _____

REASON: _____

Page 401

## LAWYER'S NOTES

PAGE  LINE

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

**WORD**
**INDEX**

**< 0 >**
**0.5**  311:*13*
**0000001**
316:15, 18
317:*21*  319:*23*
**00001**  311:*18*
318:*16*
**0001**  311:*20*
313:*1*  314:*5,*
*7*  315:7, *19*
316:2
**0006**  170:*23*
**001**  165:*4*
170:*21*
172:20  313:*4*
314:*18*
315:*16*
320:12, *13*
**004**  165:7
313:*4*
**005**  172:22
**006**  165:6
**01**  313:5
318:*21*
**02109**  5:*4*
**04**  107:22
108:2  145:*15*
194:*17, 21*
195:*21*
309:*13, 17*
311:8, *16*
314:*4, 8, 10,*
*17, 21*  315:*9,*
*21*  316:*1, 13,*
*20*  317:20
319:22  320:*10*
**049**  309:8
**05**  122:*13*
127:*13*  134:*5,*
*14*  135:*14*
136:15
137:22
138:*13*  139:*2,*
*3*  140:*18*
141:*10*
154:*18*
158:*12*  162:2,
*20*  163:*3, 5,*

*13, 18*  165:*13*
177:8, *14*
178:*20*  179:*1*
205:*3*  297:7
309:4  310:*3,*
*18*  311:*11*
313:*19*  351:7,
*16*
**051**  309:8
**07**  309:*13, 17*
311:*9*
**07102**  4:5

**< 1 >**
**1**  3:*3*  13:*4*
14:*23*  77:*24*
158:*24*
175:*14, 24*
176:*14, 18*
223:20
225:*12, 16, 19*
226:2  400:6
**1,962**  217:*12*
222:7, *9, 21*
**1.01**  136:7
**1.1**  165:8
167:*5, 12, 17,*
*19*  168:*23*
170:2, *16*
**1.2**  164:7
**1.4**  172:*21*
**1.5**  172:20
**1.58**  321:*16,*
*22*  322:5
**1:17**  183:8
**10**  28:*18*
53:*21*  91:*4*
159:*11*  343:*17*
**10:34**  94:7
**10:54**  94:*11*
**10:56**  96:9
**10:58**  96:*13*
**100**  4:4
107:9, *14*
154:*16*
176:*13, 18*
193:*11, 15*
194:6, *8*
228:*19*
**11**  4:*17*  29:9
32:6  43:*21*

266:*3, 5*
302:*1*  355:6
366:*20*  367:*5*
**12**  7:7, *15*
29:22  97:*21*
305:*11*
366:*21*  372:*4*
374:*4*  382:*5*
391:*1*
**12:20**  183:*1*
**12205**  3:*4*
**13**  105:*10*
308:*20*  382:*5,*
*10*
**14**  1:*10*  7:*16*
11:8  138:*17,*
*20*  139:7
158:*15*  159:8
160:*16*
162:*14, 20*
185:*19*
186:*10*
189:*23*  190:8
196:*14*
197:*19*
200:22  202:5
204:*18, 21*
206:*10, 16*
208:*21*  209:7
395:*10*
**14.3**  179:*12,*
*17*
**14.5**  139:8
**15**  45:*1*
46:*21, 22*
55:2, *4, 6*
93:*21*  197:*12*
**15219**  5:*15*
**15th**  4:*4*
**17**  185:*23*
343:*17*  397:*15*
**18**  105:*4, 9*
122:6, *8, 23*
192:*16*
352:*21*  391:2
**1875**  4:*10*
**19**  111:*4*
114:8  118:*12*
122:6  174:20
197:*12*  204:*17*

**19422**  5:20
**1975**  78:*1*
**1991**  78:*4*
81:*18*
**1997**  78:8
81:22
**1999**  92:*10*
361:*3*

**< 2 >**
**2**  14:*13*
31:*13*  97:*15*
164:7
**2.1**  172:*18*
**2.5**  59:*3*
**2.52**  321:*17*
322:7
**2.7**  165:7
**2:51**  274:*24*
**20**  67:*19, 22*
68:*3, 4*  69:*1*
159:*13*
174:*13*
176:*23*
190:22
207:*23*  208:9
360:*12, 24*
361:7  394:*5*
400:20
**200**  3:*8, 14*
5:*19*  78:22
113:*5*
**2000**  355:6
**2002**  8:6
63:*18*  64:*5*
**2007**  88:2
185:*18*
**2009**  82:*19*
83:*1*
**2011**  361:6
**2012**  81:22
361:6
**2013**  8:*23*
305:*17*
**2015**  8:20
302:8, *18*
**2018**  9:8
332:*17, 21*
333:*4, 6, 7*
**2019**  80:*21*
361:6

**2021**  1:*10*
11:8  31:*13*
55:*15*  57:*10*
397:*15*
**21**  111:*5*
343:*18*
**213-7047**  5:*4*
**2150**  2:*14*
**227**  5:9
**23**  68:*21*
70:*18*  372:*4*
**231-6491**  4:*18*
**24**  31:8
92:*16*  382:8
**25**  384:*18*
**2500**  3:9, *15*
**250-plus-page**
72:*19*
**256**  72:*19*
**26**  395:*10*
**263-1840**  5:*15*
**27th**  5:*3*
**28202**  5:9
**2875**  1:*3*
**2nd**  56:7
58:*10*  250:*23*

**< 3 >**
**3**  16:*14*  17:7
221:*16*
**3.1**  165:*3*
170:*18*
**3.3**  165:*5*
170:*21*
**3:12**  275:*4*
**30**  7:*19*  62:*1,*
*8, 12*  82:*18*
208:*17*
292:*21*
332:*17, 21*
333:6  398:*16*
**300**  4:*11*
**301**  8:*19*
**30305**  3:*10, 16*
**305**  8:20
**308**  9:6
**30th**  185:*18*
**31**  122:9, *11*
123:*16*
173:*15*

204:*17, 20*
**316**  2:*5*
**317**  4:*18*
**32**  174:*19*
**32502**  2:*5*
**33**  176:22
222:*3*
**3333**  3:*9, 15*
**33431**  4:*11*
**33950**  2:*10*
**34**  218:*3, 4*
**35**  62:*1, 9, 12*
**37**  217:*8*
218:*1*  221:*9,
18, 23*
**38**  218:2
**38th**  5:*14*
**3rd**  55:*14*
58:*15, 23*
60:2  61:*16,
22*  62:8

**< 4 >**
**4**  18:*1*  43:*11,
12*  64:*18*
78:*19*  85:20
107:*23*  108:*3*
109:2, 6
194:*18, 22*
195:*18*
307:*14, 20*
320:22
**4,000**  221:*8*
**4.5**  290:*5*
**4:24**  342:*7*
**4:44**  342:*11*
**400**  78:22
312:*19*
**401**  400:*6*
**412**  5:*15*
**43**  7:22
**435-7001**  2:*6*
**436-5028**  2:*15*
**44**  8:*6*
**444-3475**  5:*10*
**45**  56:*11*
**45.65**  56:*5*
**450**  5:*19*
**46204**  4:*17*
**48**  92:*17*

**< 5 >**
**5**  19:*4*  32:*6*
123:22
138:*18*
159:*11*
173:*17, 19, 21*
174:2  175:*12,
14, 22, 24*
205:*10*  207:*5,
7, 12*  208:*6*
266:*6*  307:*13*
313:*16*
**5,000**  296:*19*
**5,260**  226:22
235:20  236:*4*
**5:37**  396:*16,
20*
**50**  175:*10, 14,
19*  176:*1*
333:*14*
**500**  312:*17*
**504**  2:*20*
**524-5777**  2:*20*
**53**  5:*3*
**553-2175**  3:*10*
**553-2287**  3:*16*
**55402**  2:*15*
**561**  4:*12*
**567-0700**  5:*20*

**< 6 >**
**6**  22:*15*  59:2
63:*15*  165:*9*
167:*11, 12*
**60**  235:*1*
292:*1, 2, 22*
**600**  2:*5*  5:*9*
278:*3*
**610**  5:*20*
**612**  2:*15*
**617**  5:*4*
**63**  8:*6*
**639-1158**  2:*11*
**678**  3:*10, 16*
**6th**  56:*16*

**< 7 >**
**7**  24:*10*  57:*9*
97:*12, 13*

168:2  317:*10*
391:*14*
**7/23**  59:2
**7/24**  59:2
**7/25**  59:2
**7/7/21**  7:22
**701**  2:*19*
**70130**  2:*19*
**704**  5:*10*
**75**  391:*14*
**757-1017**  4:*5*
**76**  8:*9*

**< 8 >**
**8**  24:*23*
58:*10*  80:*16,
20*  103:*12*
168:2  185:*24*
**8/2/21**  7:*21*
**8/3/21**  8:*6*
**80**  8:*10*
**800**  2:*14*  3:*4*
78:*23*
**82**  8:*14*
**877.370.3377**
1:*20*
**888**  2:*6*

**< 9 >**
**9**  82:*10*
110:*1*  192:*17*
333:*4*
**9.75**  179:*20*
180:2
**9:08**  1:*14*
11:*9*
**91**  8:*15*
**917.591.5672**
1:*20*
**94**  387:*6*
**941**  2:*11*
**95**  135:2, *12*
158:*24*  205:*9*
310:*19*  317:*9,
11*  321:*17*
322:*6*
**962-2131**  4:*12*
**973**  4:*5*
**99**  2:*10*
317:2, 6

318:*15, 19*
321:*17*  322:7
**99.89**  176:*13*
**99.9**  176:*17*
**998**  317:*3*
**9th**  56:*6, 15,
18, 22*  57:*19,
24*  333:7

**< A >**
**a.m**  1:*14*
11:*9*  94:*7, 11*
96:*9, 13*
**a/k/a**  153:*17*
155:*13*  257:*3*
**abbreviation**
233:*12*
**ability**  23:*17*
24:*1*  306:*18*
**able**  40:*14, 20*
54:*7, 21*  55:*1*
61:*15*  90:*12*
115:2  243:*13*
272:*19, 23*
289:*14*  307:7
328:*13*  329:*1,
8*
**abortion**  90:*1*
92:*1, 15, 20*
93:*9*
**abortions**
90:*12*  91:*21*
93:*21*
**absence**
350:*16*
**absolutely**
163:*21*  226:*1*
288:*1*
**abstract**
302:22  305:*21*
**academic**  28:*6*
**accelerated**
51:*6*
**accept**  122:*12*
139:*13*  205:*1*
**acceptable**
138:*20*
139:*12*  378:7,
8
**accepted**  333:*3*

**access**  73:*10*
**accessible**  79:*3*
**accurate**
76:*23*  398:20
**accusation**
49:*3*
**accused**  48:*11,
15, 20, 24*
49:*7, 8, 15*
**ACE**  25:22
26:*6, 10, 13, 14*
**ACKNOWLE
DGMENT**
400:*2*
**Actavis**  3:*18,
19*  4:*7, 8*
**actions**  367:*5*
**active**  202:*3,
10*  303:2, *19*
**Active-
comparator**
8:*19*
**activity**  344:*20*
**Actos**  72:*17*
**acts**  62:*21*
**actual**  166:*8*
235:*15*
**add**  21:*19*
59:*18*  60:*15,
21*  75:*16*
**added**  60:*23*
116:*11*  224:7
**adding**  351:*4*
**addition**  66:*15*
**additional**
21:*7, 15*
**address**  44:*18*
154:*9*  194:*13*
248:*21*
253:*11*
257:22
260:*15*
267:*21*  288:*9*
336:*14*
**addressed**
212:*6, 13*
268:*3*
**addressing**
270:*10*
**adequacy**
359:*10*

Confidential Information - Subject to Protective Order

360:20 372:9
373:2 374:19
375:23 377:1,
19 381:13
**adequately**
348:2
**adjourned**
396:19
**adjust** 368:18
**adjusted**
344:17, 22
368:8, 11
**adjustment**
126:13 129:6,
16 131:10
132:10 133:4
140:8, 10, 11,
12 141:9
142:3, 12, 14,
17, 23 143:7,
11 147:16, 17,
21 148:1
152:2, 10, 20,
24 153:1, 5, 7,
8, 9 154:1, 2,
5 155:9
157:15, 21
158:1, 5
167:22
168:20, 21
171:10
174:23 175:5
297:14
329:24
349:15
351:21, 22
353:6, 15, 18
366:18, 20, 21,
23 367:1, 4
368:15, 17
376:5
**adjustments**
142:5 147:15
343:23 351:20
**administered**
65:13 83:15,
16 119:8, 19
199:10, 20
**admire** 262:18

**admitted**
284:2 337:10
338:20
**admitting**
339:20
**advance** 15:19
**advantages**
296:12 298:5
301:8
**adverse**
175:20, 23
**affect** 315:13
**afford** 269:2,
6 291:10
**afterward**
58:6
**age** 104:14, 20
234:12, 16, 19
235:2, 3
321:13
344:18 364:7
366:22, 24
367:3
**agencies** 68:8,
13, 14 70:2,
11 127:21
146:22
**agency's** 143:4
**ago** 35:9
45:1 46:21
50:24 51:23
52:3, 7 53:22
54:8, 21 55:1,
2 81:2 92:13
168:12
185:19, 20
186:11
189:24
190:22
196:15
197:20
200:23 202:6
206:11
208:21 209:8
356:11
360:24 374:4
**agree** 45:8, 22
46:1, 22
67:18 90:21
93:20 95:18
96:17 98:21

100:18
101:16 173:8
247:10
287:24
310:13 376:22
**agreed** 11:19
**agreeing**
284:24 341:12
**agrees** 310:17
**ahead** 13:15
44:13 72:7
76:10 91:3
92:8 94:4
96:6 97:2
114:14 116:9
123:13
225:18
238:22
239:19 262:5
342:4 347:23
362:3
**Aid** 4:19
**aim** 200:19
**al** 91:13
104:14
344:13 382:7
395:18
**Albany** 3:4
**Albertson's**
5:11
**alcohol** 344:19
**ALFANO** 5:13
**alive** 390:17
**allow** 126:10
134:20 140:7
216:14
283:21
289:18 294:18
**allowed** 54:16
134:4, 14
240:21
**allows** 150:3
**alopecia**
98:15 106:21
109:18 179:23
**alteration**
167:5
**alternative**
153:10
155:24
295:22 393:1

**altogether**
131:17
166:11 280:2
**American**
308:23
309:23 311:19
**Amersham**
86:21
**Amgen** 86:9
**amount**
169:20
239:11 240:1
241:8 242:2,
23 243:3, 17
250:13, 15
251:4 253:20
263:22, 23
264:1 276:2,
9, 16, 21, 23
278:2, 4
279:6, 7
281:17, 19
282:14
283:16 285:6
291:6, 11
292:3, 18, 20
342:23
343:10 368:17
**amounts**
240:14 241:2
243:19
279:13, 15
280:21
**analyses**
96:24 307:22
321:12
**analysis** 66:23
68:9 95:16
124:22
133:12, 24
144:13 230:5
231:5 244:3
279:18 293:6,
7, 12 296:22,
24 297:5, 12,
19 306:19, 22
307:9, 11, 12
308:8, 10
326:11, 12
350:11, 18
372:10, 11

373:4 374:21
376:1 377:3,
20
**analytic** 101:1,
9 187:19
**analyze** 37:1
125:8 173:23
174:4 181:17,
23 207:9, 14
295:23
**analyzed**
211:5
**analyzing**
32:17 66:7
79:9 103:14,
18 189:21
190:2 266:17
267:3
**and/or** 70:4
123:20 124:3
206:19 397:21
**angiotensin**
17:12 24:12
**animal** 69:12
282:19 283:1,
8
**animals** 65:24
67:2 151:6
**Annals** 384:6,
20 385:3
**announced**
322:18
333:23 334:4,
8, 13
**Answer** 10:5
19:8 24:6
41:16 52:10
117:4 125:14
143:15
150:16, 22
157:18
191:10, 14
195:12
210:18
214:18, 22
216:2, 9, 15,
16 218:6
222:11
240:18
241:17 242:9,
14 243:13

250:*8, 10*
251:*1* 253:5,
*19* 259:22
261:7 265:1
270:*24*
274:*10, 19*
286:*4, 11*
298:*20*
337:*15, 17, 23*
338:*6, 9, 20*
339:*3, 6*
341:*24* 390:*3*
393:*15, 24*
**answered**
216:7 243:7
301:*18*
357:*14* 394:*21*
**answering**
338:*13*
**answers** 400:*8*
**anticipated**
68:*17* 70:5
**antidiabetes**
132:*21* 374:2
**anti-diabetes**
129:*10* 130:*1*
**anti-diabetic**
130:*3*
**antiinflammato
ry** 79:2
**anybody** 370:6
**anymore** 81:*4*
92:*18* 93:*24*
116:*3* 126:*19*
134:5, *21*
138:*18*
170:*11*
270:22
272:*16*
288:*20* 290:9,
*10* 297:7
318:6 350:6
352:*15*
373:*13, 14, 22*
375:*14*
388:*14, 19*
**anyway** 32:*4*
49:*20* 293:9
295:*3* 313:*20*
380:2
**AOGE** 219:*19*

**apologize**
49:*21* 62:*13*
88:*1* 169:*24*
219:*4* 225:*11*
228:*18* 245:2,
9 269:*18*
272:*14* 274:4
295:*4* 379:*12*
**apparent** 71:*2,*
*20*
**appear** 102:*10*
**APPEARANC
ES** 2:*1* 3:*1*
4:*1* 5:*1* 6:*1*
**appearing**
11:*18*
**appears** 31:2
65:*23* 98:*23*
**appendix**
252:*13*
**apples** 150:*11*
166:*11*
**applicable**
140:*3* 200:*23*
284:*15* 286:*18*
**application**
41:*24* 42:*14*
362:*17*
**applications**
129:*4*
**applied** 76:*1*
140:*15*
191:*12* 208:7
**APPLIES** 1:6
115:*13*
**apply** 129:5
131:*16, 20*
134:*4, 14*
137:*21*
138:*12, 15, 23*
139:2, 6
179:*10, 19*
181:*8, 12*
218:2 301:*14*
364:*20* 397:*19*
**appointment**
28:7
**appreciate**
54:*14* 83:*4*
**approach**
151:*19* 155:8

212:*10* 253:4
367:*10*
**appropriate**
92:2 105:*15,*
*21* 193:*1*
218:*12*
313:*18* 349:6
384:*24* 398:6
**appropriately**
121:*13, 20*
203:*10*
**approval**
113:7 115:*3*
126:9 128:*21*
**approximate**
234:*12* 303:*23*
**Approximately**
51:*16* 58:*3*
347:*3* 396:*20*
**ARB** 25:*1, 14,*
*22* 26:6, *10,*
*13, 14, 19*
27:2, *16, 18*
28:*10, 22*
29:*12*
**arbitrary**
122:*13* 205:*3*
**ARBs** 17:*18,*
*22* 24:*16*
25:6, *19* 26:*3,*
*15* 27:2 29:*4,*
*20*
**area** 46:*15*
**argue** 140:*21*
141:2 324:*24*
**argument**
125:*16*
139:*14* 164:*1*
206:*17*
224:22
243:*24* 247:*8,*
*9, 11* 366:22
370:*10* 385:8
**Argumentative**
201:*8*
**arguments**
246:22
**arm** 323:*15,*
*16*
**arms** 120:*11,*

*20* 202:*1, 8*
**art** 377:*15*
**arthritis**
200:*3, 16*
303:*12*
**article** 306:4
**articles** 16:*17,*
*18* 18:*3, 18,*
*20, 24* 19:5
126:*20* 146:9,
*21*
**ASA** 310:*11,*
*13, 17*
**aside** 164:*20*
**asked** 22:6
28:2 32:*13*
36:*24* 72:*14*
78:*20* 83:8
136:*16*
141:*19*
169:*11* 216:7
229:5 243:7
247:7 249:*24*
253:*20*
254:*12, 15*
266:*13* 298:*4*
319:7 335:*19*
357:*14*
**asking** 50:*14*
52:5 53:*3, 7,*
*8, 11* 54:*4, 5,*
*16* 56:22
60:*16, 17, 18*
67:*18* 92:*3*
114:*3* 117:*3*
131:*21, 24*
132:*12, 14*
139:*18* 160:7
162:2 164:*15*
172:*10, 11*
209:*11*
210:*17* 213:8
214:*14*
215:*23* 229:*1*
231:*23*
232:*14* 238:2,
*4* 258:*18*
259:*1* 263:*10*
307:2 346:*4*
380:*20* 383:*4*
385:*19, 20, 21*

386:*11*
394:*16, 23*
**asleep** 392:*18*
**assembly**
261:*20*
**assess** 32:*14*
175:*15* 176:*1*
249:*23*
266:*14*
280:*17*
360:*20*
367:*13* 392:2
393:*17*
**assessing**
204:*1*
**assessment**
33:2 37:7, *14*
66:*23* 70:*13*
266:22
267:*13* 268:8
304:*17* 345:5,
*22* 346:*3, 8,*
*14, 21, 24*
347:6, *17*
348:22 349:5
350:2 354:2
357:*23*
358:*12* 359:*3,*
*20* 360:7
361:*13* 366:*4*
369:*24*
370:*18* 371:7
**assigned** 60:8
120:*10, 19*
201:*24* 202:7
**Assignment**
32:7, 8 43:22
61:9 67:5
78:*19* 147:*3*
151:5 156:*11*
232:4 247:6
252:*20*
263:*12* 264:9,
*15, 16* 265:*17,*
*19, 23* 267:2,
*16* 274:8
335:*24*
**associate**
144:*14* 356:8
371:*19*
374:*14* 379:7

Confidential Information - Subject to Protective Order

associated 78:23 344:15

association 244:7 246:18, 19, 21 247:2, 13, 20, 21 248:3, 9, 10, 17 249:15 251:12, 15 252:6 255:15 265:7 291:14 308:24 309:24 311:19 321:14 326:8, 14 337:8, 11 338:19 339:15 340:8 343:3 350:20 351:8 361:20 363:17

assume 241:1 242:15, 22

assumed 194:9

Assuming 100:23 101:6, 7 187:17 188:2 391:9

assumption 240:13 250:3 318:10, 12 325:7 382:15 392:9

assumptions 240:23 282:13 283:15 285:5 313:22

Atlanta 3:10, 16

attach 110:6, 10 196:11, 17

attached 398:12 400:11

attachment 13:20

attack 129:10

attention 122:16 173:16

320:22 353:22 361:17

attorney 386:9 398:16

attorneys 18:16 21:1 57:20

August 31:13 55:14 56:7 58:10, 15, 23 60:2 61:16, 22 62:8 250:23

Aurobindo 5:21 334:7

Aurolife 5:22

author 30:15 394:16

authorized 267:16

authors 293:5 303:5 372:7

automatically 218:16 288:3 363:18

available 18:10 19:13 28:5 179:7 212:13 253:10 296:19 395:12

Avandia 378:24

Avenue 2:14

average 224:8 234:11, 12, 16, 19, 22

avoid 383:8

avoids 121:1, 3, 7 203:1, 4

award 74:8

aware 50:15 68:13 79:11 128:9 129:17 132:4 139:22 141:20 143:15 144:2 145:19 146:9 256:5 304:22 305:3 308:9

333:22 334:1, 3, 7, 11 354:12

< B >

back 30:13 53:5, 6 55:7, 9 57:3, 16 58:19 61:14 80:9 83:1 94:12 96:14 164:4 173:12 183:8 208:20 215:8 219:5 238:24 239:20, 22 255:24 272:17 275:4 279:2 284:9 290:8 300:6 315:14 322:13 333:1 342:11 366:17 379:3 383:20

background 342:16

backwards 92:24

bacon 277:5 292:1, 2, 18, 19, 22

bad 374:8 378:23

badmouth 357:2

balance 300:16 330:23

balanced 173:7 376:6

banning 93:21

barely 321:23

BARNES 4:16

BARR 2:3

base 234:1, 5

Based 64:23 79:2 101:20 102:2 107:8, 13 108:15, 19 109:15 112:17 137:20

170:11 188:12, 18 193:10, 11, 15 194:6, 8 195:9, 12 217:16 320:5 331:3, 10 345:15 372:13 395:11

baseline 173:7 343:22 351:1 353:14 364:18

basic 39:23 40:5 45:1 123:10, 14 125:10 131:1 244:20

basically 37:2 42:23 61:1 92:19 93:11 106:24 124:20 230:11, 18 286:13 299:22 301:16 309:14 310:16 312:7, 21 313:15 316:7 327:21 330:7 331:1 337:7, 16 350:4 368:14 376:6 388:17

Baylen 2:5

beautiful 384:8

beer 342:17 343:1

began 306:16

beginning 1:14 15:2 56:24 281:7 290:16 296:4 352:5

behalf 15:5 32:17 55:23, 24 89:9, 17 90:16, 22, 23 266:16

beings 282:23 283:2

belief 74:18 289:10 325:23 351:13 378:13, 18 380:6, 9, 22 382:22 383:5

believable 347:20

believe 15:23 25:20 33:9 34:10, 21 47:21 48:12 52:6 60:3 62:15, 19 92:16 129:7, 14 130:13 131:15 136:22 166:24 171:7, 16, 20 172:1, 5, 13 186:20 211:22 218:13 227:15 234:17, 18, 22 236:5 237:14, 16 243:12, 16 256:11 269:8 272:10 284:24 285:15 298:1, 21 307:10 311:18 324:19 325:6 339:2, 5 347:4 350:5, 19 352:1, 14 353:1, 2, 9 356:2 357:19 360:17 362:20 368:3, 5, 7 369:2, 5, 12 372:22 373:15, 21 394:1

Bell 5:20

beneficial 262:23

Confidential Information - Subject to Protective Order

**benefit** 27:*19*
296:*9* 315:*24*
**benefits** 17:*12*
28:*10* 296:*11*
298:*5, 7, 22*
301:*8* 305:*2*
**Berkeley**
184:*17, 18*
**best** 61:*20, 24*
62:*6* 66:*16*
115:*11* 116:*6,*
*15, 21* 117:*18*
144:*9* 146:*4*
214:*9* 216:*1*
290:*11*
**bet** 313:*10*
351:*5*
**beta** 25:*22*
**better** 26:*7,*
*12* 93:*5*
158:*4* 228:*16*
234:*24*
341:*18, 23*
352:*22*
362:*14* 372:*1*
**Bextra** 8:*9*
76:*11* 88:*21*
**beyond** 41:*22*
42:*11* 244:*12*
245:*4, 24*
283:*4* 345:*24*
376:*11*
**bias** 121:*4, 5,*
*7, 8* 203:*1, 2,*
*4, 5* 323:*12*
324:*2, 16*
325:*8, 15, 24*
326:*1, 4, 11,*
*16, 20, 21*
327:*15, 19*
328:*15* 329:*11*
**biased** 327:*8*
382:*18*
**biases** 303:*21*
304:*6*
**Bible** 168:*12*
**big** 135:*20*
213:*19, 23*
300:*2* 318:*22*
**bigger** 98:*2*

321:*8*
**Bill** 295:*1*
**billing** 55:*7*
57:*17*
**biological**
119:*10, 20*
199:*11, 22*
**biologically**
277:*17*
**biology** 78:*6*
81:*20*
**biostatistical**
78:*5* 81:*19*
**biostatistics**
78:*3* 81:*17*
**Biotech** 86:*8*
295:*23*
**bit** 13:*9*
97:*24* 140:*4*
141:*4* 147:*18*
251:*22* 261:*5*
270:*7* 277:*1*
302:*13*
309:*12*
318:*19* 332:*8*
342:*3*
**black** 310:*3*
**Blah** 217:*15*
**bleeding**
294:*11*
**blind** 201:*19*
**blinded** 120:*7*
201:*14*
**blockers**
17:*12* 24:*13*
25:*23*
**blood** 27:*9*
220:*17*
**bloodstream**
277:*19*
**blow** 13:*9, 15*
14:*15* 15:*13*
43:*9* 44:*14*
57:*5* 64:*19*
76:*11* 77:*5,*
*14* 97:*16, 18,*
*20* 221:*18, 22*
266:*7* 302:*2,*
*12, 23* 321:*4,*
*8* 332:*24*

333:*7*
**Blue** 5:*20*
**Bluenull**
44:*18, 22*
45:*13* 46:*2, 8,*
*22* 47:*4, 8, 15*
50:*13* 55:*13*
**BMI** 344:*18*
**Bob** 392:*12*
**Boca** 4:*11*
**body** 220:*17*
261:*23* 277:*18*
**BOGDAN** 3:*3*
**Bone** 8:*14*
82:*12, 21*
**Bonferroni**
128:*11, 24*
129:*19* 132:*1,*
*6, 9, 17* 133:*4*
136:*17, 21, 24*
139:*20, 23*
140:*2, 3, 9, 12*
141:*21* 142:*3,*
*11, 14, 16, 23*
143:*9, 11, 17*
144:*3* 145:*21*
146:*12, 18*
147:*10, 12, 16,*
*17* 148:*5, 14*
149:*9* 152:*2,*
*8, 10, 22*
153:*8, 9, 15*
154:*1, 4*
155:*4, 5, 11*
156:*6, 22*
157:*3, 16, 21*
160:*21* 161:*5,*
*8* 174:*22*
175:*4* 182:*9*
**book** 30:*5*
118:*8* 127:*23,*
*24* 168:*6, 7, 10*
**BOSICK** 5:*13*
**Boston** 5:*4*
**bother** 43:*1*
156:*18*
260:*17* 270:*5*
333:*13*
337:*19* 366:*1*
369:*10* 375:*18*

**bottom** 18:*5*
58:*9* 63:*17*
65:*21* 67:*7*
302:*4* 320:*23*
**bought** 51:*1*
84:*17*
**Boulevard**
4:*10*
**boundary**
135:*19*
**boy** 167:*14*
**Bracco** 86:*20*
**Bradford**
169:*5*
**brake** 51:*5*
**braking** 46:*7*
51:*1, 3, 20*
52:*8*
**brand** 142:*19*
**break** 54:*2*
72:*5, 7* 94:*5,*
*9* 182:*21*
273:*7, 12*
274:*22* 275:*2*
294:*13* 342:*5,*
*9* 395:*22, 24*
**breaks** 261:*17,*
*18, 21*
**Brief** 96:*11*
**Brigham**
25:*15*
**bright** 311:*11*
**bring** 213:*7*
270:*8* 319:*10,*
*14* 325:*3*
**broad** 25:*9*
**broader**
310:*21*
**brought** 52:*14*
90:*8* 164:*16,*
*17*
**BUCHANAN**
2:*3* 5:*6*
**business**
367:*24*
**busy** 337:*20*
**bypass** 267:*24*

**< C >**
**calcitriol**
83:*16*

**calculate**
39:*24* 40:*23*
42:*2* 159:*4*
163:*8, 17*
223:*3* 236:*15*
237:*10*
238:*13, 19*
243:*17* 250:*6*
**calculated**
39:*1* 41:*2*
223:*2, 6*
224:*9, 11*
225:*13* 226:*3*
236:*18, 23*
237:*18*
340:*21* 341:*6,*
*17*
**calculating**
39:*7* 243:*3*
**calculation**
40:*3* 43:*2*
**calculations**
39:*10, 14, 18,*
*20, 22* 40:*18,*
*19, 21* 41:*13*
224:*16*
**calculator**
159:*1*
**California**
184:*18*
**call** 12:*24*
59:*11, 12, 14*
69:*10* 157:*12*
180:*21* 181:*2*
212:*3* 245:*12*
294:*19*
367:*17* 387:*21*
**called** 13:*20*
91:*9* 108:*8,*
*10* 110:*17, 21*
130:*8* 168:*7*
169:*16* 195:*3,*
*5* 197:*1, 5*
212:*2* 293:*6,*
*8* 296:*23*
388:*24*
390:*24* 391:*4*
**Calls** 269:*15*
**Camp** 2:*19*
**campus**
184:*19*

Confidential Information - Subject to Protective Order

**cancer** 9:7 41:23 42:12 66:12 78:7 81:21 98:9 106:16, 17 109:13 114:23, 24 164:19, 21, 23 165:2 166:17, 22 167:2 172:17 179:15 186:8 193:20 194:2 196:4 217:11, 13, 14, 20, 21 219:2 222:6 240:7 241:12 242:6 243:5 244:13 246:1, 12, 13 247:3 248:18 249:15 251:12 252:8 254:24 257:15, 18 265:9 280:6 285:22 286:5 326:8 330:12 332:20 338:24 340:2, 9 344:16 350:21 361:23 386:19 387:1, 10, 20 388:1, 10, 14, 19 389:2, 13 391:20 392:7 393:14 395:8, 19

**cancers** 239:4 248:4 254:24 257:4

**capture** 304:18

**car** 51:5

**carcinogen** 67:8, 14 70:4, 6

**carcinogenic** 65:3, 8 66:1 68:17 71:5

**carcinogenicity** 32:20 70:23 266:20 267:6

**carcinogens** 282:11 283:13 285:2

**cardiologists** 25:16

**cardiology** 130:10

**cardiovascular** 26:22 27:5, 20 78:24 130:10 136:5 312:1, 3, 11 364:5 378:24 386:20 387:12 388:1, 8 395:6

**Care** 8:14 82:12, 21 131:4 138:1 141:1 153:12 358:15

**career** 50:6, 16

**careful** 140:18 147:7 171:11 297:5, 17, 21 363:11 364:24

**carefully** 133:17 172:9 181:20 182:1, 6, 11 230:20 250:10, 20 310:1 335:12 347:9 356:20 372:9 373:2 374:19 375:22 376:24 381:13 398:4

**cares** 318:20

**Carillon** 5:8

**Carolina** 5:9

**carry** 168:3

**case** 16:1 17:6 20:20

34:13, 14, 18 35:12 36:6 45:3 46:17 47:11, 22, 23, 24 48:3, 5, 8 49:10, 11, 22, 24 50:5, 17, 21, 22, 23 51:8, 12, 14, 17, 19, 24 52:8, 19, 24 53:8, 9, 13, 19 54:9, 12, 22 55:20 58:17, 22 59:23 61:2 74:5 75:15 76:24 79:7, 12 80:4 81:10 83:2 84:4, 7, 23 86:4 87:4, 6, 8, 17 88:23 89:5, 22 90:1, 6, 16, 20 91:15, 18 95:9 99:19, 20 106:6, 8, 10, 15, 19 113:11 114:4 115:7, 21, 23 116:17, 18 125:16 129:12 130:16 136:1 156:1 171:15 186:22 194:1 200:20 204:8 212:9, 22 217:5 218:10, 16 247:23, 24 253:16 256:15 259:16, 17 260:3, 18 263:15 264:22 265:14 269:3, 7, 13 271:21 296:15 297:20 298:1, 12, 13 300:18

301:1 311:2 326:7, 15 330:15 339:1 348:8 354:7, 8 355:11 356:12 357:7 376:4 381:10 389:10

**CASES** 1:6 34:22 52:14 89:13 124:17 125:8 147:5 191:13 194:14 354:19 368:2

**casually** 60:11

**catch** 268:21

**causality** 244:6 246:9, 17, 21, 24 336:22, 23 337:12, 14, 17 338:6, 10, 14, 21 339:3, 6, 11, 15, 19, 22, 23, 24 340:3, 12, 14

**causation** 169:6 246:11

**cause** 161:8 258:10 285:22 326:1 340:2 382:17 387:11 388:9

**caused** 51:6 288:14 338:24

**causes** 246:12 386:20 387:22

**CC** 229:17, 18, 21, 22 230:2, 13, 15, 17 231:7, 24 233:4, 23

**CCs** 232:19

**Celebrex** 8:10 34:11 35:7, 17 76:12, 24 78:21 79:7 88:22 125:23 183:11, 17, 19, 23 184:12, 22

185:2, 3, 7, 12, 17, 24 186:10, 15 187:5, 7, 9 188:1, 5 189:9, 23 192:4, 6, 19 193:3, 14 194:19 195:4, 11, 19 196:14 197:4, 12, 19, 22 198:8, 10, 22 199:17 200:14 201:17 202:5, 10, 18 203:15 204:19 205:8 206:10, 21 207:12 208:5 209:7, 13 344:8

**cells** 295:20

**Censoring** 382:11, 12, 14, 15

**Center** 4:3 63:19

**Centre** 5:14

**certain** 31:23 90:13 98:8, 13 106:16 186:7, 13 250:17 251:5 291:11 326:1, 19 327:18, 23

**CERTIFICAT E** 397:2

**certification** 397:18

**Certified** 1:16 397:13, 14

**CERTIFY** 397:5 400:5

**certifying** 397:22

**cetera** 20:2 91:13 217:15 228:7 290:3 391:2

**Cgannon@wals h.law** 4:6

Confidential Information - Subject to Protective Order

chance 103:*14*, *19* 127:*12* 160:*16*, *17* 161:*20* 162:*18* 173:*10* 174:*14* 179:*15*, *24* 189:*21* 190:2 207:*24* 208:*10* 318:*16*
chances 158:*13*, *20*, *22* 162:*16* 163:*4*
change 99:*3* 162:*4* 374:*16* 399:*4*
changed 167:*20* 187:*14* 306:*21*
changes 95:*6* 162:*13* 398:*11* 400:*10*
changing 75:*12* 161:*10*, *24* 187:*11* 284:*8* 319:*5* 320:*4*
characteristics 304:*13*, *18*
characterization 66:*15*
characterized 66:*16*
Charlotte 5:*9*
chart 227:*5* 232:*20* 235:*7*
charts 22:*16*, *24* 23:*19* 24:2
check 53:*5* 58:*20* 126:*8* 127:*22* 172:*7*, *16* 233:*3* 234:*24* 373:*5*, *8* 376:*15* 377:*18* 381:*13*
checked 372:*9* 373:2 374:*19* 375:*23* 377:*1*

checking 166:*3* 350:*13* 376:*9*
chemo 295:*17*
cherry-pick 157:*17*
cherry-picked 156:*21*
cherry-picking 157:*1*, *9*, *12* 349:*13*
Choice 91:*10* 249:*5* 289:*19* 378:*3*
Choice-East 8:*17*
choose 150:*24* 151:*11* 153:*3* 157:*10* 320:*13*
chose 151:*16* 153:*14* 266:*12*
CHRISTINE 4:*3*
CHRISTOPHER 5:*8*
Christopher.henry@bipc.com 5:*10*
cigarette 344:*18*
Cincinnati 85:*24* 89:*24*
CIPRIANI 5:*17*
circle 260:*10* 324:*7*
cite 26:*18* 253:*14*
cited 27:*1* 29:*8* 30:*8* 127:*23* 164:2 172:*5* 252:*23* 254:*19* 289:*1* 344:*13* 346:2 347:*8* 365:*21* 372:*6* 384:*6*
cites 83:*20* 232:*11*
citing 21:*22* 75:*7*

claim 134:*6* 139:*9* 143:*3*, *4* 161:*2*, *21* 178:*16*, 22 224:*23* 244:*11* 246:*4* 247:*16* 280:*5* 310:*4* 343:*21* 353:*8*
claimed 35:*15* 217:*9* 221:*10* 222:*4* 246:*3* 344:*14*
claiming 173:*22* 174:*3* 179:*16*, *24* 207:*8*, *13* 208:*10* 245:*4* 358:*22* 363:*19*
claims 131:*7* 217:*22* 218:*3*
classes 17:*10*, *16*
classification 332:*3*
classified 331:*24*
classify 332:*2*
clastogenic 65:*17*, *19*
clear 139:*4* 266:*4* 316:*14* 326:*24* 345:*4*, *22* 346:*7* 348:*11*, *15* 359:*14* 360:*6* 361:*12* 369:*23* 370:*17* 371:*7* 372:*7*
clearly 23:*6* 65:*3* 66:*12* 138:*13* 144:*24* 244:*15* 265:*21* 267:*19* 395:*1*
Cleveland 379:*1*
click 96:*1*

client 45:*10*
CLIFF 3:*7*
Clinic 8:*18* 91:*10* 92:*21* 93:*4*, *7* 379:*1*
clinical 27:*23* 30:*7* 79:*4*, *8*, *12*, *19* 80:*6* 98:*8*, *14* 105:*14*, *21* 111:*23* 112:*4*, *11*, *12*, *17*, *20* 113:*11*, *15*, *19* 114:*4*, *12*, *18*, *20* 115:*3*, *10*, *15* 116:*5*, *14*, *20* 117:*7*, *11*, *13*, *14* 118:*13*, *16*, *21* 119:*9*, *14*, *20*, *24* 121:*15*, *21* 122:*19* 123:*4* 138:*16* 145:*13* 148:*23* 177:*6*, *13* 179:*7* 180:*14* 186:*7*, *13* 193:*1* 198:*7*, *13*, *18* 199:*11*, *15*, *22* 200:*3* 203:*11*, *17* 204:*1* 205:*6*, *15* 291:*4* 299:*13* 301:*5*, *13*, *17* 303:*13* 310:*6*, *7* 312:*12* 313:*1*, *6*, *13* 315:*14*, *15* 332:*1* 339:*16* 352:*12*, *16* 354:*14* 355:*17* 357:*12* 364:*4* 376:*3* 379:*16* 385:*5* 392:*16*
clinically 136:*12* 344:*2* 345:*11*
close 52:*2*, *3*, *6* 182:*15*

273:*20* 317:*6* 325:*20* 367:*14*
closely 25:*15* 290:*21* 303:*23*
co-author 394:*18*
cohort 9:*8* 233:*19* 304:*15* 305:*22* 332:*19*
cohort's 306:*10*
colleagues 144:*17*
collect 288:*22*
collected 343:*21*
collection 150:*5* 160:*24*
colorectal 172:*17*
column 227:*8*, *13* 229:*6* 234:*1* 321:*2*
combinable 166:*7*, *9*
combination 26:*8*
combine 166:*15* 284:*17* 379:*19* 381:*3*
combining 26:*6*, *13* 163:*23* 164:*9* 166:*5* 280:*1* 381:*7*
come 30:*13* 80:*9* 211:*19* 231:*23* 235:*20* 253:*3*, *13* 258:*13*, *17* 269:*22* 274:*16*, *18* 314:*19* 332:*24* 334:*22*, *24* 336:*11*, *16* 366:*19* 374:*16*

Confidential Information - Subject to Protective Order

comes 137:1 153:19
155:15 169:13
comfortable 53:20
coming 163:14 367:19
comma 122:24
comment 37:16, 22
63:1 270:2
commentary 37:24
commenting 228:21 230:24
comments 214:12 341:22
commission 49:20 400:21
common 125:20
148:21 245:6
325:22 332:1
347:22, 24
351:17 355:4
commonly 95:19 96:17
118:3 125:18, 24 148:4
152:24 228:9
282:9 283:11
293:17 306:14
communicate 336:12
communications 28:19 29:10, 13, 17
companies 85:9 89:10, 18, 19 90:23, 24 153:19
155:15 185:7
201:3 287:12
334:12
company 81:10 84:16
85:6, 7 87:9
88:11, 13, 14, 19, 23 89:5, 12 90:3

295:13, 23
355:1 357:2
company/medical 88:19
comparable 111:21 112:2
198:5, 10
321:3, 11
330:1
comparative 8:22 79:4
305:21 306:7
comparatively 376:7
comparator 303:2, 19
compare 96:24 111:4
172:23
177:21 178:1
190:14
255:17 322:22
compared 26:9, 13
66:18 79:13, 15 99:24
112:22
114:24 150:1
212:9 223:10, 15 279:22
281:18
comparing 95:15 111:8, 12 197:15, 21
279:6 281:17
comparison 127:4 128:2
129:6 130:12
131:5 140:14
141:2 142:3
143:6 147:22
149:20 150:1
153:6, 12
154:8, 10
158:2 174:22
175:4 276:20
279:4 297:10
317:22
comparisons 129:16
130:15 148:9

152:21 156:2
186:2 297:16
competing 382:12, 14
387:22, 23
388:20
389:22 390:1, 9 391:18
complete 41:13
completed 33:7, 12
41:12 61:16
completion 397:8
complex 367:9 394:4
complicated 393:21
compound 282:21
295:16
296:10
298:13 299:6, 8, 19, 24
363:14
compounded 181:8, 12
comprehensive 346:13, 20
347:5, 16
348:21 350:1
357:22 358:11
computational 78:6 81:20
computations 148:12
computed 340:23 393:17
computer 19:23
computing 395:7
concentration 66:17
concentrations 67:1
concern 40:10
42:21 131:12
175:17 176:3
244:13 255:5

281:23
285:11
314:21
347:11
354:20
361:19, 23
362:11, 18
363:4
concerned 29:6 80:1
280:7 347:10
354:24
concerning 90:2 137:15
224:22 255:10
concerns 40:6
124:20
215:11
217:24 218:2
244:2 267:19
362:9
conclusion 40:10 181:19, 24 215:15
217:8 246:7
251:14 255:6
269:16
273:23 319:1
333:11
338:13
369:19 372:11
conclusions 101:20 102:2
127:16
140:19 155:1
188:12, 18
215:9, 17
250:15 251:3
281:4, 11, 21
282:12
283:15 285:5
336:21 345:14
condemned 128:23
conduct 115:9, 16 116:19
130:2 289:4
307:21 350:10
conducted 119:6, 16
121:14, 21

171:8 173:6
175:11 199:7, 18 203:11, 16
233:17
288:17 345:5, 23 346:8
355:23
359:21 360:7, 18 361:13
conducting 350:17
confer 396:6
conference 59:10
confidence 110:6, 11
135:1, 3, 4, 9, 11, 12, 17, 20
136:8, 13
145:4 176:12, 16 196:12, 18
205:9 310:19
316:22, 23
317:9, 17
318:1 320:10
321:16, 18, 22
322:7
confident 200:22
CONFIDENTIAL 1:6
confirm 69:17
71:9 235:1
278:20 314:24
confounder 330:3, 22
confounders 104:6, 13
111:22 112:3
167:21, 24
168:1 171:9
192:3, 10
198:6, 11
329:22, 23
330:20, 21
332:9 368:10
confounding 303:16 330:4
331:3, 10
344:23 349:12

Confidential Information - Subject to Protective Order

confused
49:17
Congress
379:22
connection
15:3  19:5
20:23  22:18
25:4
conservative
147:19
151:17, 19
153:16
155:12, 21
156:22  161:9
conservativenes
s  153:22
consider
209:22  210:6,
9, 20, 24
258:7  262:21
264:4  272:6
330:20
considerable
70:22
considerations
119:14  120:1
199:16  200:4
considered
18:11  19:14
65:24  171:9
175:20
considering
151:4  314:3
considers
306:4
consistent
71:1, 15
196:23
208:19, 22
constant
391:12
consultant
47:14, 15
50:10
consultants
50:8  59:9
consultation
15:4
consultations
45:2

consulting
16:7  44:23
45:7  47:20
contact  36:7
92:21
contacted
256:10
contain  240:1,
14  241:2, 7
242:1
contained
22:21  23:20
contains  135:5
contaminant
219:9  283:5,
6  291:19
323:16  327:2
355:11
contaminants
263:19  274:9
contaminate
290:24
contaminated
9:6  79:13, 15
112:21, 24
113:3, 4
114:22  204:3
218:11
248:18
251:11
252:18  256:3,
7, 22  265:8
268:14
269:10
270:16
274:15
275:21
289:23  291:8
322:17, 24
323:7, 11, 21
324:1, 13, 14
325:1  328:12,
24  329:6, 16
331:12, 13, 18
333:9, 16
contamination
220:16
259:21
260:13, 18
262:16
265:15

282:13, 14, 16
283:13, 16, 17
284:21  285:2,
6, 7  286:9
288:18
289:12  290:2,
18  291:11
325:2  327:1
330:18
333:23  334:4,
8, 13

contaminations
282:10
Cont'd  3:1
4:1  5:1  6:1
8:2  9:2
content  395:12
contents  77:6,
9, 15, 18
continue
263:10
300:23  396:1
continues
77:17
continuing
209:4
contradicts
313:7
contrast
306:12
control  98:10,
17  101:4
111:10, 15
115:1  174:15
177:22
179:14, 16, 22
180:1  186:9
187:22
197:18  202:4
208:1  300:4
314:12
323:15, 16
329:5  331:15
397:21
controlled
116:5  121:16,
23  203:13, 18
303:13
convenience
313:19

convenient
20:16
convert  277:8
convince
217:18
244:16
362:22  364:24
cookie  209:5
cookie-cutter
201:4  209:6
cooking
127:11
copied  99:4
220:10
235:23  236:3
copies  14:22
15:1  16:5
17:8  18:2
19:4  20:1
28:2, 14
copy  18:9
19:12  74:15,
22  220:8
corner  66:11
Corporate
4:10
Corporation
4:19  82:14,
23, 24  84:4, 7,
14, 19  85:2
86:15, 16
correct  21:17,
18  22:8, 11,
12  23:2, 22
24:3, 16, 17,
20, 21  25:7
27:6, 21
28:16  29:4, 5,
20, 21  31:3,
13, 20  32:1
33:3, 13, 14,
17, 23  34:16
35:5, 6, 9, 10
37:4  39:11,
15, 22  40:7,
15, 16, 21
41:8, 15
42:16, 17, 20
43:1, 3  44:1
45:15  46:4
47:1, 2, 6, 7

49:6  53:10
55:16  56:12,
17  57:14, 15,
20, 21, 23
59:23  61:17
63:5, 6  64:3
65:8, 13, 14
66:8  67:3, 16
70:6  71:11,
12, 16, 17, 22,
23  75:1  76:1,
2  78:12, 16
79:9, 22  80:6
81:6, 10, 11,
23  82:2, 19,
24  84:20, 24
85:9  86:4, 14,
18, 19, 24
87:13, 14, 17,
24  88:15, 16,
19, 20, 24
89:5, 19
90:13, 14
91:22  94:20
95:22, 23
96:20, 21
99:2, 11, 16
100:1, 19, 20
101:17  102:7,
10, 11  103:9,
22  104:19, 24
106:3  107:3,
5, 17  108:5, 6,
12, 22  109:8,
20  110:14
111:1, 17
112:8, 13
113:8  115:20
116:23
117:23  118:4
119:3  120:3,
13, 22  121:10
122:2  124:10
126:4  128:7
132:17
135:14
143:19
146:13  148:6,
14, 23  149:9
150:5, 9, 22
151:2, 13, 20

155:*16*  159:*8*
160:*24*
162:*21*  167:*9*
169:*14*  170:*5*
174:*9*  175:*7*
176:*5, 20*
177:*17*  178:*7,*
*13*  179:*5*
180:*3, 9*
181:*14*  182:*4*
183:*19*
184:*13, 22*
185:*8, 20*
186:*19*
187:*10*  188:*9*
189:*1, 17*
190:*5, 11*
192:*13*  193:*7,*
*18*  194:*24*
195:*6, 14, 23*
196:*21*  197:*9*
198:*1, 15*
199:*4*  200:*6*
201:*6, 21*
202:*12*  203:*7,*
*22*  204:*4*
205:*18*
206:*15, 24*
207:*19*
208:*15*
209:*20, 21, 24*
210:*1, 4, 5, 11,*
*12, 15*  211:*2,*
*3, 8*  218:*23*
224:*18*
225:*24*
228:*11, 23*
238:*11*  239:*4,*
*12*  240:*7*
241:*12*  242:*6*
243:*5*  246:*2,*
*3*  248:*7*
250:*18*  251:*6,*
*12, 20*  252:*24*
256:*3, 19, 20,*
*23*  260:*23*
262:*12*  263:*3*
265:*12*
266:*24*
267:*10, 11*
271:*8*  272:*21*

273:*3, 4*
274:*3*  276:*3,*
*13, 24*  278:*6*
279:*8*  281:*5,*
*12, 22*  282:*7,*
*15*  283:*19*
285:*8, 9, 16*
287:*2*  293:*19*
294:*5*  306:*22*
307:*9*  308:*6*
309:*10*
311:*14, 15, 22*
321:*24*  322:*8*
323:*1, 13, 17*
324:*3*  325:*7*
328:*14*  329:*2,*
*3, 9*  332:*5*
336:*22*
340:*21*  341:*6,*
*17*  342:*18, 19*
343:*1, 11, 12*
344:*24*  345:*7*
346:*14, 21*
348:*23*
350:*21*  353:*3*
354:*11*  358:*1,*
*14, 19, 23*
359:*4, 22*
360:*2, 9, 10*
361:*8, 15*
362:*15*  363:*9*
364:*2*  365:*8,*
*13*  370:*1, 19*
372:*18*  375:*8,*
*17*  377:*8, 21*
381:*18*  382:*1*
383:*15, 18*
400:*7*
**corrections**
398:*5, 7*
400:*10*
**correctly**
21:*12*  22:*3*
27:*1*  35:*1*
92:*13*  228:*2*
273:*16*
**correlated**
332:*10*
**corresponding**
176:*11, 16*
186:*16*

**counsel**  11:*21*
29:*1, 14, 16*
31:*19*  32:*13*
38:*8*  72:*14*
83:*9*  94:*21*
95:*23*  182:*13*
266:*13*  273:*5*
366:*16*
372:*21*  388:*7*
390:*19*
**count**  224:*2*
**counted**  62:*2*
**counterpart**
98:*16*
**counterparts**
98:*10*  186:*9*
**countries**
229:*8, 12*
287:*2*
**country**  47:*19*
229:*5, 7, 9*
**couple**  13:*16,*
*17*  37:*20*
48:*10*  57:*13*
72:*15, 18*
81:*14*  315:*18*
371:*16, 24*
**course**  45:*19*
163:*24*
212:*19*
273:*13*
298:*15*
320:*12*  392:*9*
**COURT**  1:*1*
11:*23*  51:*9*
92:*3*  114:*9*
170:*14*  398:*20*
**covariate**
353:*18*  366:*18*
**covariates**
350:*24*  351:*3*
353:*14, 17*
364:*18*
366:*19, 21*
367:*5*  368:*10,*
*22*
**Covid-19**
352:*4, 15*
**Cox**  344:*16*
345:*8*  348:*8*

**create**  23:*7*
156:*16*
**creating**  151:*5*
**credible**
370:*10*
**criteria**
122:*12*  205:*2*
**criterion**  169:*6*
**critical**  66:*13*
**criticism**  37:*3*
38:*6*  42:*19*
73:*1*  233:*7*
393:*22*
**criticisms**
39:*18, 19, 21*
40:*19*  41:*7,*
*11*  43:*24*
161:*4*  309:*3*
340:*20*  341:*4,*
*15*  365:*17*
366:*9, 14*
**criticize**
125:*18*  140:*2*
144:*3, 9*
145:*21*
146:*11*  152:*1,*
*4, 7, 10*
154:*14*
225:*22*  341:*8,*
*9, 20*  355:*19,*
*21*
**criticized**
133:*3*  139:*23*
141:*20*
143:*17*
146:*21*
151:*18*  379:*3*
**criticizing**
37:*12*  124:*9*
**cross**  135:*13*
**crosses**  321:*23*
**Cs**  232:*19*
**cubed**  367:*3*
**CULBERTSO
N**  5:*1*
**cumulative**
39:*1, 7, 11, 14*
41:*14*  224:*12,*
*17*  239:*2*
243:*3*  249:*19,*
*20, 23*  250:*16*

251:*4*  253:*21*
383:*12*  388:*23*
**curious**  253:*2*
338:*5*
**current**  261:*7*
264:*22*  265:*14*
**curve**  388:*4,*
*23*  391:*3, 4, 5*
**cut**  74:*11, 22*
94:*17*  262:*6*
**cutoff**  245:*11,*
*12, 15, 19*
286:*17*
**cutting**  73:*18*
94:*15*
**CV**  85:*18*
129:*11*  130:*5*
186:*14*  188:*6*
193:*17, 19*
194:*1*  196:*8*
**CVS**  4:*19*

**< D >**
**daily**  78:*21*
277:*12*  278:*5*
**Dana**  78:*6*
81:*20*
**DANIEL**  2:*4*
12:*11*
**Danish**  9:*7*
212:*3*  260:*14*
265:*13*  287:*4,*
*6, 20*  288:*2*
289:*20*  293:*4*
**data**  40:*22*
41:*4*  80:*5*
83:*18*  103:*14,*
*18*  118:*19, 24*
146:*18*
157:*10*
163:*14, 17*
165:*11, 12*
169:*3*  189:*21*
190:*2*  198:*20*
199:*1*  236:*1*
247:*22*  250:*5,*
*13*  288:*22*
295:*24*
306:*21*  307:*7*
311:*7*  324:*22*
345:*9*  348:*2,*

Confidential Information - Subject to Protective Order

6, 7 351:2
354:17
355:15
357:10
359:14 379:16
database
287:6 296:20
dataset 364:21
datasets 79:3
348:13
date 1:15
11:7 31:12
55:11, 14
57:6, 14
58:14 61:5
80:20 306:11
332:16 333:1,
24 334:5
360:18 398:9
400:16
dated 185:18
397:15
dates 59:1
Daubert 22:19
David 30:7
32:15 43:15
266:15
day 56:20
59:6, 9, 12, 17,
19, 21, 22
60:6, 14, 19,
21, 24 61:3,
10 92:23
190:14 269:1,
6 289:2
291:8 292:2,
13 297:16
306:2 369:7
385:14, 16
389:4 400:20
days 57:13
58:6 92:23
380:1 383:20
398:16
De 165:4
170:18
171:21 172:2
dead 387:7
390:21
deal 274:13
283:5 287:11

dealing 95:9
130:19
137:20
155:24
161:14
186:22 299:3
336:1 363:2
376:3
death 26:22
27:5, 21
129:11 130:5
332:20
382:18
386:22 387:1,
6, 16 389:12,
14 392:7
393:14 395:8
decade 303:9
361:8
decent 349:15
decide 202:23
356:24 395:24
decided
265:10
decision 93:5
152:18
170:12
179:11, 19
288:15
306:19
310:20, 22
316:5 336:6

decisionmaking
362:12
deemed
398:19
defect 261:19
defend 354:9,
10
Defendant 5:5,
11, 16 15:5
36:9 49:6, 10,
17, 24 76:22
77:1 81:9
86:4, 5, 7
87:2 88:3, 7
90:9
Defendants
3:17 4:6, 13
5:21 7:16

14:16 15:18
18:8 19:11
32:9, 14 87:3
91:13 185:6
266:10, 14
Defending
36:10, 11
defense 20:24
22:6, 12
29:16 57:20
72:13 310:11
define 41:21
42:10 193:24
220:21
277:19
286:17
387:13
388:22 389:16
defined
287:15 323:6,
19, 20 329:14
defines 41:18
42:7
definitely
288:12 396:11
definition
115:24
180:23
386:17
389:21, 23
definitions
307:22
degree 78:1
327:1
delete 351:3
DeMets 30:7
demonstrate
251:10
326:13 340:9
350:19 354:22
demonstrated
252:1 256:2, 7
demonstrates
354:18
demonstrative
22:17, 24
23:18
Depend 46:5
67:17 180:22
271:23 280:3
298:13

300:17 301:4,
17 332:6
depends
298:19 332:12
deponent
11:15 400:2
deposing
398:16
deposition
1:13 7:16, 19
8:15 10:2
11:10, 18
13:6, 19
14:18 15:20
18:12 72:13
85:21 215:19
246:15 272:5
283:24
310:10 338:5
396:19 397:6,
8, 9 398:3, 13,
17, 19
deps@golkow.c
om 1:20
derived 42:24
describe 54:7,
21 99:18
216:21
277:15
296:11 298:5
330:4 343:9
361:12
described
223:19
369:24
370:18 371:8
377:19
describes
276:2
describing
78:11, 15
82:2 218:23
275:16, 20
277:23
DESCRIPTIO
N 7:14 8:5
9:5 94:24
346:13, 16
347:5, 16
348:22 350:1
357:22 358:11

design 8:19,
20, 22 229:16,
20 230:7
232:18 233:8
290:13 291:3
293:17, 18
295:10
296:12, 13
298:6, 7, 8, 9,
23 301:9, 10
303:3 305:24
306:7, 9, 18
308:5 322:3,
4 323:4, 5
331:4, 10
332:5 333:17
designed
118:17, 22
121:13, 20
198:18, 23
203:10
designs 233:7
293:3 303:19,
20 304:5
305:1
detail 92:18
137:17 263:6
detailed 81:4
271:10
details 119:7,
18 199:9, 20
353:13
detect 318:18
328:3
determination
268:6, 13
determine
78:20 101:2,
10 105:14, 20
187:20 188:5
192:24
determined
105:12, 18
192:21, 22
193:4
detour 249:8
267:24
develop 392:6
development
282:18 299:4

**device** 88:*10,
*13, 14, 19*
89:*19* 90:*24*
**Diagnostics**
86:*21*
**dialogue** 306:*6*
**dialysis** 296:*1,
3*
**Diaz** 6:*3* 11:*4*
**die** 387:*20, 24*
388:*1, 10*
389:*2* 391:*23*
**died** 386:*18,
20* 387:*10, 11,
17* 388:*8, 13,
17, 18* 392:*4*
393:*12* 395:*5*
**diet** 277:*12*
278:*5* 285:*22*
286:*4* 342:*17*
343:*1* 350:*21*
395:*14*
**Dietary** 32:*18*
40:*9, 12, 15*
62:*16* 164:*20,
23* 167:*2*
172:*3, 4*
211:*14*
212:*20* 213:*1,
14* 214:*24*
216:*3, 12, 21*
217:*5* 218:*14*
225:*14* 226:*4*
227:*19* 244:*9*
247:*23* 249:*9*
259:*24*
266:*18* 267:*4*
276:*17, 22*
277:*2, 13, 22*
279:*8, 11, 12*
280:*12, 13, 16,
17, 19, 21, 22*
281:*19, 24*
282:*3* 283:*22*
284:*12, 13*
285:*12, 16, 21,
24* 286:*3*
289:*1* 290:*14,
17, 20* 291:*5,
16* 337:*8*
344:*14*

348:*18* 360:*5,
8, 11, 23*
361:*5, 20*
362:*24*
363:*18* 369:*8*
**diets** 276:*17,
22* 361:*21*
**difference**
83:*10* 112:*16*
135:*8* 160:*13*
161:*18*
174:*16*
178:*17, 23*
208:*2, 12*
228:*4* 300:*3,
13* 309:*9*
312:*6, 8*
314:*19*
315:*17* 318:*2,
10, 19, 21*
325:*18* 381:*6*
**differences**
71:*3, 21*
179:*13, 22*
304:*12* 315:*22*
**different**
62:*17, 21*
109:*11, 12, 15,
16* 120:*14*
125:*5* 126:*17,
18, 24* 128:*4,
5* 148:*19*
149:*24*
150:*15*
152:*15, 17, 19*
159:*23* 162:*7*
165:*19*
167:*21*
168:*21*
175:*10, 19*
188:*6* 193:*21*
194:*14* 196:*1,
2, 3, 6* 200:*7*
202:*14, 20*
217:*20*
220:*15* 234:*9*
260:*4, 5, 8, 22*
261:*13, 14*
262:*11* 264:*1*
284:*4* 298:*24*

300:*14*
309:*14* 356:*12*
**differently**
62:*21* 319:*24*
**difficult** 90:*11*
91:*21* 92:*1*
**difficulty**
287:*18* 319:*18*
**dig** 89:*21*
**direct** 70:*24*
71:*14* 122:*15*
211:*19*
248:*23* 253:*3*
320:*22* 397:*21*
**Direction**
10:*5* 163:*22*
**directly** 21:*5*
212:*6, 13*
237:*24*
238:*10, 16*
253:*11*
260:*15*
267:*21* 268:*3*
270:*9* 288:*8*
336:*14* 363:*16*
**disadvantages**
298:*22*
**disagree** 39:*4,
6* 41:*23*
42:*13* 67:*13,
17* 69:*2, 7*
155:*7* 157:*8,
20* 169:*19*
332:*6*
**disagreement**
215:*7*
**discard** 338:*12*
**disclosed**
47:*10*
**discovery**
148:*11, 12, 16*
151:*4, 22*
156:*6, 10, 17*
158:*3*
**discuss** 239:*8*
242:*23* 304:*4*
**discussed** 70:*3*
**discussing**
156:*7* 294:*4*

**disease** 83:*13*
104:*14, 21*
312:*16*
**display** 23:*9*
**displays** 23:*11*
**disposal**
367:*22*
**dispute** 140:*23*
**disregard**
350:*2*
**distinguished**
350:*9*
**distribution**
388:*5* 389:*3*
**DISTRICT**
1:*1*
**divided**
175:*14* 176:*1*
**dividing** 161:*5*
**Division**
85:*24* 89:*24*
**DM** 64:*2*
**DNA** 71:*1, 15*
**dnigh@levinla
w.com** 2:*6*
**Doctor** 13:*1, 5*
48:*20, 24*
72:*12* 76:*14*
82:*17* 94:*14*
211:*4* 275:*7*
342:*14* 350:*23*
**DOCUMENT**
1:*6* 12:*20*
13:*3, 15* 14:*9*
16:*20* 30:*19*
43:*6* 44:*6*
63:*10* 67:*19,
23* 69:*10*
76:*7* 80:*12*
82:*6* 91:*5*
128:*17*
142:*13, 15*
143:*10, 12, 16*
301:*21* 305:*7*
308:*16*
**documentation**
17:*9, 15*
24:*10, 23*
28:*24*
**documented**
16:*8*

**Documents**
10:*8* 14:*1, 4,
24* 18:*2, 10*
19:*4, 13, 16*
20:*1, 13* 21:*8,
16* 28:*3, 14,
19* 29:*2, 7*
59:*15* 256:*13*
272:*6*
**doing** 59:*5*
60:*1, 9* 61:*8*
99:*8* 225:*4,
23* 261:*6*
268:*5* 349:*4*
355:*9* 375:*10*
376:*17* 398:*8*
**dollar** 313:*10*
**dollars** 370:*8*
**dominate**
164:*11*
**dosage** 119:*9,
19* 199:*10, 21*
**dose** 78:*21*
223:*11, 13*
234:*2* 235:*14*
254:*13* 255:*20*
**dosing** 40:*1*
253:*19*
**dosing-
response**
254:*20*
**double** 233:*5,
13*
**double-check**
52:*10* 235:*10*
**doubling**
170:*19*
**doubt** 237:*9*
**download**
20:*8, 12*
**downloaded**
19:*22*
**doxercalciferol**
83:*15*
**Dr** 7:*19, 22*
8:*6, 9, 12, 14,
17* 12:*13*
15:*20* 17:*11*
18:*11* 19:*14*
21:*21* 22:*4,
18* 29:*8* 33:*7,

10, 13, 17, 22
34:9, 14, 19
35:3  37:1, 3,
13, 18  38:6,
22, 24  52:17
56:15, 19, 23
72:13, 14
76:18, 21
80:1  81:6
122:12  124:9,
12, 18  125:22
140:22  141:7,
13, 16  151:7,
14  156:9, 13,
17  157:14
164:2  166:21
172:4  183:18
184:3, 14, 21
205:1  211:6,
14, 19  212:9,
16, 18  213:4
214:15
215:12  217:9,
17  218:4, 21
220:8, 11
221:10  222:4,
18  231:24
232:6  233:22
237:21  238:7
239:1  241:10,
24  242:4
243:2  244:3,
21  247:8
249:18  250:4
252:10, 24
253:3, 13
254:17
257:19, 23, 24
258:13, 20
267:20  271:2,
7, 8, 14, 19, 23
272:2, 3, 5, 10,
24  276:6
278:12, 15
279:18  280:2
283:23  289:1
310:10, 13, 14
334:22  335:2,
8, 9, 20  336:1,
5, 13, 18, 20
337:19, 24

338:3  340:16,
20, 22  341:1,
2, 5, 16
344:12  345:1,
15  346:2
347:8  350:8
365:20  372:6,
13  395:13
**draft**  16:11, 23
**dramatically**
162:14
**draw**  101:20
102:2  105:12,
18  173:16
188:12, 18
192:21, 22
193:6  250:15
251:3
**drawing**
110:18, 22
197:2, 6
**drawn**  170:7
345:15  372:12
**drop**  225:6
390:21
**DropBox**
20:11, 16
22:5  57:23
58:1, 3
**dropped**
223:23
**drug**  28:22
29:13  84:16
118:24  126:9
128:21  129:4,
10  130:1, 4
132:21
139:10
186:17  199:1
202:10
208:11
260:12, 18
261:20
270:16, 17
282:18  299:3
300:8  303:14
305:16
356:22  357:2
374:2
**drugs**  79:2
251:18

252:18  256:1,
22  257:16
258:7  263:11
274:19  276:3,
10  279:7
**DUANE**  4:8
**due**  181:21
261:21  387:1,
2  389:12
**duly**  12:4
397:5
**dying**  382:17
391:20

**< E >**
**E.g**  104:14
**earlier**  158:10
185:14
208:23
209:12, 18
210:2, 13
239:1
**easily**  20:9
51:19  53:16
127:22
144:18
167:20
168:23  172:7,
16  284:14
339:15
**East**  91:10
**easy**  158:23
**eat**  277:4, 5
**eating**  290:1
292:1
**economic**
35:13  51:7, 8
**editor**  356:8
371:19
374:14  379:8
380:15
**editors**  144:15
356:19
**educate**
141:13  265:3
**educated**
360:14
**education**
344:20
**effect**  26:8, 12
105:16, 22

150:4, 21
160:1  165:3,
5, 7, 8  169:8,
13, 21  170:22
193:2  227:3,
23  228:1, 10
280:20  284:7
309:18
311:21  315:8
317:22  318:3,
4  319:5, 6, 14,
19, 20  330:4
364:11
**effectiveness**
8:22  303:11
305:21  306:7
315:15
**effects**  24:14
28:5, 16
66:19  83:18
279:14
303:14  395:16
**efficacy**  26:20
118:24
121:17, 24
131:14, 17
133:14, 21
137:24  138:5
139:1  140:3
154:11  199:1
203:14, 19
**efficient**
103:13, 17
189:20  190:1
**effort**  270:8
**either**  27:23
63:3  67:2
83:14  151:15
179:16, 24
211:23
245:15  247:5,
12, 16, 22
249:17
256:11  258:1,
23  264:23
281:14  283:2
288:6  289:20
329:10
333:10
339:22

340:10
387:12, 24
**elderly**  200:2,
8, 15
**electronic**
16:6  19:16
51:1
**electronically**
18:9  19:12
**e-mail**  60:12,
18  61:4, 9, 11
**e-mails**  53:5,
17  58:20
61:2, 14
**embarrassed**
379:5
**emphasis**
249:7
**enabling**
304:17
**endogenous**
343:7, 10, 11
**endpoint**
66:13  106:15,
19  119:10
122:19  123:4
126:12, 18, 23,
24  127:1
128:16  129:8,
11, 13  130:6,
7  131:4, 14,
15, 17  132:22
133:14, 20
134:3, 6, 12,
15, 24  137:5,
15, 17, 22, 24
138:2, 24
140:4, 16
141:6  143:12
145:2  154:12
205:7, 16
296:18, 20
298:16  299:1
306:20  322:3
**endpoints**
105:14, 21
119:21  124:3
131:21
133:13  135:2
138:5  161:15,
20  174:5

Confidential Information - Subject to Protective Order

193:*1* 199:*12, 22* 206:*22*
207:*15, 17* 208:*8*
**energy** 336:*4* 344:*19*
**England** 126:*15, 21* 128:*6* 133:*1, 9* 134:*12* 136:*18, 23* 139:*16* 144:*1, 11, 16, 20* 145:*18, 20* 146:*10* 152:*9* 370:*3, 12, 15* 371:*5* 373:*6, 8, 9, 12* 374:*6, 11, 14* 378:*14, 15* 379:*9* 380:*2, 8, 12, 16, 20* 384:*19* 385:*2*
**enhance** 163:*24*
**enroll** 306:*13*
**ensure** 304:*9*
**enter** 317:*14*
**entire** 109:*1, 5* 195:*17, 20* 296:*18* 298:*17* 310:*21* 312:*17, 21* 364:*14*
**entity** 28:*21* 29:*3, 11*
**entry** 332:*19*
**epi** 211:*5* 242:*1* 251:*9* 252:*5* 254:*12* 264:*5, 14* 265:*11* 268:*9*
**epidemiological** 70:*12* 116:*23* 117:*17, 20* 118:*4* 257:*2* 262:*22* 273:*3* 283:*10, 14*

285:*4* 306:*13* 325:*11, 17*
**epidemiologist** 117:*1* 210:*4* 264:*24* 271:*11* 272:*7* 273:*1* 335:*3* 337:*22*
**epidemiology** 117:*2, 4* 210:*10* 211:*7, 12* 262:*24* 268:*24* 269:*11* 271:*22, 24* 274:*2, 3* 293:*1* 325:*14* 326:*18*
**EPO** 295:*14, 16, 19* 296:*9* 355:*6, 7*
**E-P-O** 355:*5*
**equal** 314:*9, 13*
**equivalence** 291:*19*
**equivalent** 118:*7* 148:*18* 217:*13* 219:*1* 291:*20* 295:*15* 296:*10*
**errata** 398:*6, 9, 12, 15* 400:*12*
**error** 101:*24* 102:*6* 160:*8* 177:*3, 7, 10, 14* 179:*12, 20* 188:*16, 23* 189:*22* 332:*3* 334:*19*
**errors** 103:*15, 20* 190:*3* 332:*4*
**especially** 113:*4* 352:*7* 364:*7*
**ESQ** 2:*4, 9, 14, 18* 3:*3, 7, 8, 14* 4:*3, 10,*

16 5:*3, 8, 14, 19*
**essential** 218:*8*
**essentially** 98:*23* 148:*18* 150:*7*
**establish** 122:*17* 123:*2* 205:*4, 13* 248:*3* 338:*19* 339:*10* 340:*7* 343:*5* 364:*16*
**established** 92:*4* 93:*14* 254:*18, 22* 255:*23*
**estimate** 59:*11* 61:*21, 24* 62:*7* 107:*21* 108:*1, 8, 10, 15, 18* 110:*7, 12* 135:*24* 167:*17* 168:*22* 170:*12* 194:*16, 20* 195:*3, 5, 9, 12* 196:*13, 19* 388:*5* 394:*14*
**estimating** 391:*12*
**estimator** 382:*19, 24* 383:*7*
**et** 20:*2* 91:*13* 104:*14* 217:*14* 228:*6* 290:*2* 344:*13* 382:*7* 391:*2* 395:*18*
**ethical** 291:*12*
**Etminan** 271:*7, 14* 272:*24* 335:*9*
**Etminan's** 272:*10*
**Europe** 334:*12*
**evaluate** 115:*22* 121:*17, 23*

151:*6* 203:*13, 19* 280:*9* 366:*1*
**evaluating** 204:*6* 255:*14*
**event** 98:*8, 14* 101:*3, 12* 102:*13, 20, 24* 103:*3, 7* 107:*21* 108:*1* 109:*1, 5* 110:*19, 23* 119:*12, 23* 130:*11* 137:*3* 163:*11, 12, 15* 166:*20* 175:*23* 186:*7, 13* 187:*21* 189:*4, 8* 193:*19* 194:*2, 10, 16* 195:*17* 196:*8* 197:*3* 199:*14* 200:*1* 256:*16* 312:*15* 387:*12* 395:*6*
**events** 78:*24* 107:*10, 16* 109:*18* 163:*14* 175:*20* 179:*23* 186:*14* 188:*6* 193:*13, 17* 304:*19* 382:*13, 14* 386:*21*
**eventually** 392:*6*
**Everybody** 42:*5* 130:*8* 167:*22* 234:*15* 247:*17* 248:*24* 312:*10* 313:*18* 349:*10* 351:*10* 376:*17* 379:*20* 387:*7*

**everybody's** 237:*8*
**Everyday** 142:*18*
**evidence** 65:*16* 70:*23, 24* 71:*14* 116:*6, 15, 16, 21, 22* 117:*16, 18* 154:*19* 168:*8* 247:*15* 248:*3, 8* 258:*16* 310:*22* 316:*6* 317:*14* 352:*9*
**ex** 383:*14*
**exact** 54:*6* 75:*23* 103:*8, 21* 108:*4, 11, 20* 109:*7* 110:*13, 24* 119:*2* 120:*2* 121:*9* 181:*11* 190:*4, 9* 191:*9, 15* 195:*4* 196:*20* 202:*16* 203:*6*
**exactly** 26:*16* 40:*23* 52:*4, 6* 53:*18, 24* 56:*19* 58:*18* 62:*13* 93:*23* 99:*4* 128:*15* 133:*22* 162:*8* 215:*10* 220:*2* 230:*12* 272:*15* 297:*9, 15* 299:*11* 318:*2* 327:*14* 328:*2, 16* 349:*1* 355:*10* 374:*22*
**EXAMINATIO N** 12:*7*
**examine** 177:*5, 12*
**examined** 12:*5* 65:*2* 123:*21* 124:*3* 206:*20, 22* 303:*10*

example 26:9,
20  37:15
45:16  46:11
47:24  61:1
74:2  92:14,
15  98:8, 14
100:9, 15
104:20  119:8,
10, 19, 21
129:9  130:17
132:23  136:9
137:2, 12
138:9, 10
153:15  154:3
155:10
156:23
158:10, 16
161:17  175:9,
19  177:20, 24
186:7, 14
198:9  199:10,
12, 21, 23
219:12  228:4
237:6  255:8
277:3  279:20
287:4, 19
290:13
296:23
297:24  310:6
312:16
316:24
344:12  352:3
354:8, 21
355:5  356:21
359:10  364:4
366:21
370:20  371:1
375:8  379:21
390:16  395:17
examples
37:21  38:4
104:23
192:11
312:14
365:19
370:23  371:2
excited  359:23
excluded
136:9
excluding
310:19

Excused
396:18
executive
215:8
Exhibit  12:21
13:4, 14
14:10, 13
30:20, 23
43:7, 11, 12
44:7  63:11,
14, 15  76:8
80:13, 16
82:7, 10  91:4,
6  221:16
252:13
301:22  302:1
305:8, 11
308:17, 20
exhibits  13:20,
24  22:17  23:1
exist  23:23
123:19  124:2
206:13
existence
336:11
existing  67:23
298:15
exists  206:9
exogenous
62:20  342:16,
24
expecting  23:1
experience
85:21  137:20
139:16  143:5
299:3, 4, 5, 19
363:22  374:8
378:23
experienced
107:10, 15
109:17
130:18
193:13, 16, 17
194:10  196:8
282:10
283:12  285:1
299:15, 20
300:5, 8, 19
experiencing
332:19

experiment
118:17, 22
198:19, 24
experimental
121:4, 8
180:24  181:5
203:2, 5
Expert  7:19,
22  8:9, 10, 14
15:4  22:22
23:20  25:4
30:17  31:2,
16, 23  32:10,
16  33:8  47:9,
10  56:16
57:14  73:3,
19, 20  75:11
76:16, 21
81:1, 6  82:18
85:12  89:8
96:20  97:7, 9
98:5  125:21
130:24
146:16  148:6
155:11  157:2
189:17
209:23
210:10, 21
211:1  212:16
230:1  240:22
266:3, 11, 16
269:22
271:13, 22, 24
272:12  273:1
336:10
expertise
263:13
experts  73:10
125:18
254:10  271:2,
4  335:16, 22
expert's
225:22
expires  400:21
explain  114:1
191:6  220:18
226:20  232:2
234:21
235:18
236:14, 21
313:11, 13

327:17
343:10
383:23  384:2,
8  385:21
386:12
389:24
392:15, 20
393:10
explained
235:13
explaining
245:19
explains  224:6
explanation
328:17  390:5
explored  132:9
expose  112:20
exposed  98:9,
18  100:9, 11
101:2  104:2
111:9  112:24
179:16  186:8,
17  187:1, 3,
20  191:23
197:17  240:3,
15  241:4, 8
242:3, 17, 24
244:5  293:13
exposure
39:24  41:19
42:8, 24  66:3,
14  67:8, 15
104:2  105:16
119:8  121:18
174:14
177:22
179:14
191:23  193:2
199:9  202:3
203:14  204:6
207:24  213:2,
15  215:1
216:4, 13, 22
219:9, 11
220:14
222:12
223:11, 18
224:4  225:1
235:2, 17
236:24  237:8
238:14  239:2,

8, 10, 11, 16
240:10  243:4,
23  244:1, 17
245:23
249:19  250:4,
6  255:3, 7
266:18  267:4
277:8  291:15,
16  331:14, 16
342:24  363:8
364:1  365:5,
7, 12, 13
395:15
exposures
39:1, 7, 11, 15
41:14  224:12,
17  249:20, 23
extended
299:21
extent  26:4
67:9, 15  323:9
extra  320:15
extrapolate
40:11  212:20,
24  213:13
214:5  216:3
260:1  277:7
282:3  285:15
362:23  363:7,
13, 24
extrapolated
365:7
extrapolating
39:19  40:6
214:3, 24
233:9  365:12
extrapolation
364:15
extreme
318:14

< F >
facing  288:22
fact  99:21
151:16
162:24
174:16  208:2,
12  240:20
312:10
329:18
342:20  348:3,

Confidential Information - Subject to Protective Order

12 351:24
352:19 356:7
360:4 394:15
**factor** 171:12
**factors** 173:8
261:23
343:22, 24
344:23
**faculty** 48:1
**fail** 398:18
**failure** 27:7, 8,
11, 13 387:13
**F-A-I-L-U-R-E**
27:12
**Fair** 24:4, 7
54:10 76:3
85:4 89:7
160:2, 3
162:22
201:10
214:13
245:16 373:18
**fairly** 159:4
180:5
**FALANGA**
4:1
**falling** 237:5
297:9 392:18
**false** 102:14,
22, 23 103:4,
6 122:13
131:6 138:8,
16, 21 140:24
148:10, 12
150:18 151:1,
12 156:5
160:23 162:3
174:1, 6, 12
175:11, 13, 21,
23 177:4, 11
189:5, 7, 12,
13 205:2
207:11, 16, 22
208:8
**familiar** 184:5
**famous** 53:15
294:23 295:1
339:13 379:21
**far** 36:2
68:11, 12
95:6 206:3

241:5 272:12
340:18 341:3
390:4
**Farber** 78:6
81:20
**FARR** 2:9
**fast** 93:7
262:19
**favor** 326:5
**FDA** 113:6
128:6, 10, 20,
23 129:4, 14,
18 130:18, 23
131:23 132:1,
3, 5, 10, 13, 16
136:18, 22
137:13, 14, 21
139:13, 16, 22
140:1 141:20
142:1, 11, 16,
22 143:5, 16,
21 276:1, 8
292:17
314:23
354:12, 19, 23
355:12, 15, 21
357:10
**FDA's** 126:8
127:22
128:15 130:13
**February**
80:20
**feel** 53:20
379:4 393:23
394:20
**felt** 261:11
267:16
**female** 364:7,
8, 11 365:7
**females** 165:6
**field** 231:11
**fight** 90:4
**fighting** 90:16
**figure** 54:3
147:14
160:19 213:5
227:20
232:19
235:15, 16
255:2, 9
263:15

270:13
282:19
295:14 355:2
363:11
**figured** 390:22
**figures** 216:13
**file** 19:23
20:14
**files** 20:7
**find** 20:17
21:7, 15 53:1
109:12, 16
131:10
132:11 196:3,
7 224:1
237:16
251:15 253:9
271:18
273:19
278:16 291:2
296:8 347:9
349:12 370:2,
5 375:13
377:13 394:13
**finding**
102:15, 23
103:5, 6
158:22
174:14 189:6,
7, 12, 13
207:24
311:12, 13
316:18 317:3,
11 322:5
385:17
**findings** 40:14
145:13 161:7
162:13 174:1,
7 207:11, 17
218:14
264:21 270:3
281:4, 10, 21
285:16
287:19 288:2
303:22 307:8,
24 334:20
358:3 368:9
**fine** 142:24
155:8 157:22
158:6 200:18
383:15, 18, 19,

24 384:12, 22
385:22
386:12 390:6
392:11
393:11, 16, 23
394:2, 19, 22
**Fine's** 394:14
**finish** 69:5
191:3, 4, 7
347:23 354:21
**FIRM** 2:9
350:8
**first** 12:4, 16
13:16, 17
14:15 19:20
30:14 33:15,
18, 20, 21
36:5 38:18
42:18 43:10
51:13, 17, 23
52:7, 14, 15,
18, 21 53:12
54:8, 22
56:14 57:17
70:19 81:14
89:23 92:21
97:16 100:6,
7, 13 144:22
145:10, 11
166:6 169:4,
7 176:8
183:17
186:24
187:12 221:8
231:21
240:24
244:16
254:18, 21
255:1, 5, 15,
22 257:7
267:8 274:10
281:23
291:13, 17
294:19 304:3
314:20 316:1,
23 318:8
320:23 331:6
338:8 343:3
390:2

**Fisher** 148:20
149:7, 11
150:3, 19, 21
**Fisher's**
149:24
**fishing** 349:12
**fit** 286:1
344:1 345:9,
22 346:8, 13,
21 347:6, 16
348:2, 7, 22
350:1 353:7
359:15
361:24 365:16
**fitness** 357:23
358:12
**fits** 359:14
**fitting** 344:2
345:5 346:3
359:2, 16, 19
360:6, 21
361:13
362:10
369:24
370:17 371:7
**five** 48:1
53:21 55:1
137:13 169:1
223:14
**fix** 96:7
**flawed** 40:1
125:16
**flip** 329:4
**floating**
372:20
**flooded** 357:4
**Floor** 4:4 5:3,
14
**Florida** 2:5,
10 4:11
**focus** 164:21
**focused** 160:21
**folks** 45:3
**Follow** 240:17
241:5 289:20
290:15 306:1
365:23
**followed**
105:6, 8
287:16 332:18

Confidential Information - Subject to Protective Order

following
196:9  223:10
390:3
follows  12:5
85:22
follow-up
289:5  290:4,
5  304:19
306:15
food  93:7
277:2  290:2
291:5, 19
292:3
foods  62:20
277:21
footnote
230:14  231:5
force  291:17
390:11
foregoing
15:18  18:7
19:10  397:18
400:6
forest  284:5
forever  162:5
392:3
forget  140:8
141:9  168:15
327:6  352:16
Forgive  92:17
211:22  250:19
forgot  278:21
form  30:3
73:6, 23
119:8, 19
126:6  128:13
129:23
132:19  133:7
134:18
141:24  144:6
145:24  147:1
151:22
155:18  157:6
173:2  199:10,
21  201:8
209:10  216:7
241:14  242:8
243:7  248:6,
15  253:23
256:6  262:3
269:15  278:8

292:10
315:11  320:2
337:5  357:14
371:11  377:5,
23  381:20
400:10
format  99:18
formation
71:2, 16
formed  261:15
former  352:8
forming  29:24
formula  41:1,
9, 12  42:2, 4
223:2, 6, 9
235:19
236:22  394:10
forth  18:4
28:8  164:4, 5
284:9  379:3
forward  54:18
found  42:16
225:5  273:17,
24  275:8, 12,
17  276:3, 23
278:2  321:12
333:9, 16
four  58:6
85:14  107:10,
15  159:12
193:12, 15
194:10
223:15  254:8,
9, 11
fourth  226:16
frame  90:13
framework
99:10, 15
107:5
fraud  48:12,
16
frequency
119:9, 20
199:11, 21
friend  356:7
372:1  374:14
379:7
friendliest
153:18  155:14
full  237:22
238:8  393:24

function
383:12
384:23  386:2,
7, 17  389:5, 8
391:7, 10, 11
fundamental
124:21
125:10  127:6
167:15
Furberg
30:14, 15
127:23
further  38:16
204:22
future  23:7
354:9  380:5
fuzziness  96:7
fuzzy  83:2
94:22  96:2, 3

< G >
GALLAGHER
4:10
game  75:6
85:5  214:13
350:22  351:3,
6
games  164:12
351:14
GANNON  4:3
gastric  164:19
217:11  222:6
395:19
Gateway  4:3
gee  253:12
270:15
271:20
373:19
374:15
387:17  388:2
389:11
390:18  391:19
general  15:18
18:8  19:11
25:13  53:1
66:16  69:12
115:8  163:19,
20  216:20
298:11  327:7
328:15  347:1,
2  353:1

355:14  357:9
389:21
generally
122:17  205:4
generating
109:11
118:18, 23
196:2  198:20,
24
generation
375:8
generic  256:6
Geneva  63:18
genotoxic
67:7, 14
Genzyme
82:13  83:9
84:10, 11, 13,
18
GEORGE  2:9
Georgia  3:10,
16
German
212:4  260:14
265:13  287:11
GEROND
3:14
getting  114:22
149:16
158:14
166:12
182:15  263:2
291:8  292:4
300:21
give  113:2
114:20  137:2
138:9, 10
154:3  155:10
161:17  167:7
184:3  215:4
232:7, 8
236:22
239:15
243:19
273:10  291:1,
18  311:10
312:13  314:5
346:23
353:13
357:23  360:1
370:20

371:16
378:19, 20
381:16  393:1
given  17:11
113:1  117:7
169:21  291:5
360:8  361:14
362:1  393:24
397:6  400:8
gives  44:18
83:19  113:19
192:11
232:10
336:20, 21
giving  17:21
42:19  80:24
115:17, 18
287:21
295:19  318:7
320:16  344:7
glad  128:3
191:11
196:22
200:22
206:16
208:19
262:13  332:11
glance  64:9
271:17
glanced  64:15
335:11
global  149:16
go  13:15
38:9, 15  43:1
44:13  53:5
54:18  57:3,
16  58:19
60:15  61:14
72:7  76:10
85:11, 19
91:2  92:7, 23
93:7  94:4
96:5  97:2, 13,
14  102:16
113:16
114:14  116:9
120:24
123:13
133:15
144:10  146:4
156:18

160:*10*  162:*5*
163:*22*  170:*9*
173:*12, 17*
174:*19*
185:*22*
190:*14*  193:*9*
204:*9*  213:*4,
17*  214:*17*
215:*8, 21*
216:*14, 24*
223:*21, 24*
225:*17*  233:*3,
16, 22*  238:*21*
239:*19, 20, 22*
244:*8, 11, 16,
19*  255:*2, 9,
10*  262:*5*
267:*23*  268:*8*
270:*5, 12*
279:*2*  284:*18*
290:*8*  296:*2*
304:*9*  315:*14*
323:*14*  342:*4*
347:*23*
349:*12*  362:*3*
365:*19*
366:*17*  373:*6*
374:*24*  384:*5,
14*  385:*11, 13,
20*  390:*24*
394:*11*  396:*13*
**goes** 375:*12*
**going** 12:*24*
62:*4*  72:*3, 8*
75:*16*  83:*3*
85:*19*  93:*10*
95:*13, 15, 17*
97:*6*  103:*11*
109:*24*
125:*22, 23*
127:*3, 12*
131:*6*  139:*7*
154:*24*  158:*7*
161:*21*
163:*17*
190:*15*  201:*5*
207:*4*  214:*18*
217:*3*  223:*18*
225:*22*
228:*18*
230:*12*

242:*20*  266:*3*
273:*6*  284:*20*
291:*2*  299:*14*
306:*23*
309:*18*
312:*24*  313:*1*
315:*4*  341:*20*
342:*3*  343:*16*
352:*17*  359:*6*
368:*24*  369:*5*
371:*24*  380:*4*
385:*23*
391:*24*  392:*1,
6*  393:*14*
395:*24*  396:*6,
9*
**gold** 112:*15*
113:*13, 14, 20*
114:*10, 18*
115:*8, 14, 22,
24*  116:*1, 3*
117:*8*  121:*15,
22*  203:*12, 17*
204:*6, 11*
**GOLDENBER
G** 2:*12, 14*
**GOLKOW**
1:*18*  11:*5*
**Gomm** 239:*11,
24*  240:*13*
241:*2*  242:*16,
23*  248:*14*
249:*23*
250:*14, 18*
251:*3, 10*
252:*23*  258:*1,
23*  259:*4, 10*
265:*10*
267:*10, 17*
268:*9*  272:*11*
273:*19*
308:*10*  336:*5,
7*
**Good** 12:*10*
60:*7, 9*
102:*18*
142:*17*  148:*2*
182:*21*
200:*24*  201:*2*
270:*12*
273:*12*

300:*10, 12*
317:*3*  318:*23*
329:*24*
334:*21*  339:*9*
350:*8*  352:*11*
360:*17, 19*
364:*16*  366:*1*
375:*2, 3, 6, 7*
376:*13, 15, 16,
18*  381:*3*
393:*6*
**good-bye**
324:*21*  338:*9,
15*
**Goodman**
165:*4, 6*
171:*21*  172:*2,
4*
**Google** 21:*4,
9, 12, 17*
51:*19*  52:*13,
17, 21*  53:*1,
14*  144:*23*
**Googled**
253:*7*  256:*12*
**Gorda** 2:*10*
**GORDON**
5:*13*
**gotcha** 319:*15*
**go-to** 148:*5*
**gotten** 351:*15*
**government**
45:*4, 18*  49:*18*
**grant** 24:*11*
**grants** 24:*16,
19*
**graphic** 23:*9,
11*
**Gray** 1:*15*
11:*24*  383:*15,
18, 24*  384:*13,
22*  385:*22*
386:*13*  390:*6*
393:*11*  394:*2,
22*  397:*12*
**Gray's** 392:*12*
**great** 40:*10*
352:*7*
**greater** 351:*7,
15*

**GREENBERG**
3:*7, 11*  55:*15,
19, 24*  56:*1*
**group** 44:*24*
45:*8*  47:*20*
48:*2*  50:*10*
101:*2, 4, 10,
13*  113:*4*
115:*1*  177:*22*
187:*20, 22*
188:*6, 7*
312:*5*  319:*1*
322:*23*  323:*6,
10, 18, 19, 23*
324:*13*  325:*1*
327:*4*  328:*11,
23*  329:*5, 15,
17*  331:*14, 15,
19*  353:*22*
381:*6*
**groups** 111:*8,
13*  112:*16*
160:*13*
174:*17*
178:*18, 23*
197:*16, 21*
208:*3, 13*
293:*13*  300:*3*
304:*10*
318:*11*
325:*19*  330:*1,
24*  331:*21*
376:*7*  391:*6*
**grow** 312:*8, 9*
**growing** 13:*2*
**GSK** 374:*1*
378:*23*
**guess** 62:*12*
228:*17*  386:*16*
**guidance**
144:*13*  146:*5*
272:*1*
**guideline**
133:*11*
**guy** 160:*14*
168:*15*  246:*1*
295:*2*  337:*20*
375:*16*
379:*13*
385:*15*  386:*6*
387:*16, 18*

388:*8, 12, 13,
16*  390:*17, 19,
24*  391:*23*
392:*4, 6*
393:*12, 14, 17*
395:*4*
**guys** 151:*6*
160:*17*  168:*5*
182:*22*
184:*15*
217:*18*
268:*20*  270:*8*
287:*11*
331:*23*  332:*2*
336:*10, 12*
360:*13*
371:*20, 21*
372:*1*  374:*16*
375:*1, 19*
387:*17*  388:*6*
**guy's** 388:*10*
395:*7*
**gwilliamson@f
arr.com** 2:*11*

**< H >**
**half** 120:*17*
185:*19*
186:*11*
189:*24*
196:*14*
197:*19*  202:*5*
206:*10*
208:*21*  209:*7*
273:*7*
**hand** 263:*1*
264:*6*  273:*21*
274:*13*  290:*7*
**handle** 137:*16*
148:*8*  154:*7*
174:*21*  175:*3*
176:*9*  388:*3*
**handled** 379:*8*
**handling**
145:*1*  156:*1*
**happen**
154:*17*
162:*17*
167:*24*
227:*18*  327:*23*

Confidential Information - Subject to Protective Order

happened
299:18
300:23
329:20
352:20  356:5
happening
391:18
happens  59:7
287:21  367:23
happy  68:19
69:22  143:13
146:15
155:23  209:2
265:4  270:2
272:16
371:18
374:13
385:11, 14
394:11
hard  282:2
313:12, 14
343:2  385:6
HARDING
3:1
HARKINS
3:8  36:15, 17,
21
Harkinss@gtla
w.com  3:11
harmful
179:17  180:1
324:20
Hartley  36:16
Harvard
25:16  47:17
78:4, 7  81:18,
21  144:17
383:20
hazard  228:5
297:22  298:3
316:24  317:1,
5, 10  318:15
321:16, 22
322:5  345:10
351:18
389:10, 16, 21
390:1, 8, 10,
14, 15, 24
391:4, 5, 7, 8,
9, 11, 14, 20

393:2, 13, 18
395:7
head  163:1
health  24:13
63:18  68:13
86:21  287:6, 7
Healthcare
4:14
heard  292:6
390:4  393:9
hearing  22:19
379:23
heart  27:7, 8,
10, 11, 13
129:10
heat  261:22
heaven
388:12  392:5
395:5
heavily  344:13
Hecht  271:8
HEINZ  5:19
held  1:14
11:11
help  27:4
83:23  161:15
260:13
263:15
303:20  304:5
348:4  381:11
393:1
helped  265:21
helpful  138:6
154:20
161:13
260:19  295:9
316:9  378:11
helping  27:19
51:10  286:21
295:13, 17, 23
326:13
327:10  340:1
364:14
helps  304:9
hemoglobin
295:18, 21
HENRY  5:8
Hetero  334:3
heterogeneity
285:13, 24

heterogenous
283:23
hey  162:2
168:16
291:18
336:13  352:9
375:1, 10
Hidajat  382:7,
9, 23  383:6,
14, 17
hierarchy
116:15, 21
117:15
high  41:22
42:11  138:22
173:24  174:6,
13, 14  207:10,
16, 23, 24
208:9, 10
217:20  234:2,
5  278:3
350:10, 17
354:6  371:16
373:20
374:23  375:7
378:4  381:9
387:7
higher  101:3,
11, 23  102:5,
14, 21  103:4
140:23, 24
159:14
162:15
187:21
188:15, 22
189:4, 11
278:24
279:15
280:21  324:16
highest
223:12  224:3
234:7  235:14
255:20
279:13, 16
280:18
highlight
16:24  17:2
18:15  85:15
227:12  236:9
highlighted
18:14, 18, 21

highly  66:1
71:5  166:19
282:20  313:5
314:19  317:5
332:10
Hill  169:5
HILTON  2:18
HINSHAW
5:1
hire  201:5
hired  228:22
hold  209:19
210:3, 7, 14
225:15
232:14
246:22
309:21
319:10
342:21  354:6
369:3
holes  247:10
home  170:9
HON  1:4
Honestly
183:20  269:1,
5  274:12
hope  270:24
385:16
hopefully
164:10
Hospital
25:16  28:6
hospitalization
26:21

hospitalizations
27:4, 20
hour  72:4
182:16  273:6
342:4
Hours  8:6
56:4, 5, 11
58:10, 16, 19,
21  59:1, 2, 3,
5, 14, 16, 18, 22
60:5, 20, 23
61:11, 15, 22
62:1, 3, 9
92:16, 17
Howmedica

87:20
HRs  228:9
Huahai  4:13,
14
huge  311:24
315:19
human  66:6
69:13, 16
70:5, 7, 8
282:23  283:2,
9
humans  65:23
66:2  67:2
71:6  247:3
248:4
humble  114:6
humidity
261:22
hundreds
368:21
hurdle  145:10,
11  244:5, 16
318:8  343:3
hurt  379:2
hurting  324:6,
10  325:6
381:9
hyperparathyr
oidism  83:12
hypertension
27:3
hyperthyroidis
m  83:11
hyphenation
12:17
hypothesis
123:24
160:10
205:11  208:6
326:6, 9
327:12, 13
328:4, 8, 14
329:2, 8
hypothetical
162:11
178:12, 13
180:7, 9
240:16, 19
242:10  250:2
hypothetically
329:19

**hypotheticals**
194:*9*

**< I >**
**i.e** 123:*17*
188:*14, 21*
206:*7, 11*
**idea** 23:*10*
45:*1* 50:*11*
115:*23*
229:*22*
246:*23*
262:*15*
264:*22*
274:*14, 16*
275:*19*
276:*18* 288:*5*
292:*24* 324:*5*
330:*3* 333:*8*
353:*16* 387:*18*
**ideally** 104:*10*
192:*6*
**ideals** 160:*22*
**ideas** 205:*17*
**identical**
72:*16* 73:2,
*18* 74:*6*
105:*2* 107:*18*
112:*7* 122:*1*
124:*6* 125:*1*
174:*8* 175:*6*
176:*4, 19*
177:*16* 179:*2*
200:*14* 206:*3,
14* 314:*16*
**identically**
107:*12*
**identification**
12:*21* 14:*10*
30:*20* 43:*7*
44:*7* 63:*11*
76:*8* 80:*13*
82:*7* 91:*6*
301:*22* 305:*8*
308:*17*
**identified**
18:*10* 19:*13*
**ignore** 260:*16*
311:*20*
358:*13, 18*
359:*3, 21*

362:*2* 378:*20*
380:*10, 24*
381:*17*
**ignored** 254:*5*
360:*8* 361:*14*
**III** 354:*21*
**illustrate**
153:*4* 307:*23*
**illustration**
386:*24*
**illustrations**
22:*15, 23*
**images** 22:*16,
23*
**immediate**
290:*5*
**immediately**
165:*11*
**impacted**
334:*19*
**imperative**
398:*14*
**important**
54:*1, 2, 11, 15*
104:*1, 5, 8, 12*
110:*6, 10*
147:*11*
154:*13*
159:*21*
191:*22* 192:2,
*5, 9* 196:*11,
17* 212:*12*
225:*21* 231:*4*
258:*7, 15*
269:*20* 281:*3,
10, 16, 20*
301:*4* 306:*1*
311:*12, 14*
334:*24*
350:*14* 355:*5*
367:*1* 385:*10*
**impossible**
288:*20*
**impressed**
89:*21*
**improper**
128:*10* 129:*18*
**improperly**
245:*9*
**improve**
145:*6* 303:*22*

**impurities**
28:*22* 29:*4,
12, 20* 33:*1*
266:*21* 267:*7*
**impurity** 21:*5,
14* 25:*10*
130:*17*
154:*14*
211:*16, 21*
212:*7* 218:*10*
244:*18*
248:*22* 249:*6,
11, 16* 253:*5*
256:*17*
257:*10*
259:*17, 18*
261:*8, 10*
263:*7, 11*
264:*17* 266:*1*
267:*22*
269:*21*
278:*23*
280:*10* 282:*1,
5* 288:*13, 19*
290:*10, 23*
291:*20* 311:*4*
324:*5, 10, 16,
19* 325:*6*
326:*7* 327:*5*
330:*11*
336:*15*
338:*23* 340:*1,
8* 355:*12*
363:*1*
**inappropriate**
49:*2* 132:*6*
313:*24*
**Inc.'s** 7:*16*
**inception**
306:*11*
**incidence**
41:*23* 42:*12*
173:*10*
179:*15*
186:*12*
189:*10, 14*
194:*3* 195:*20*
293:*21*
295:*24* 326:*8*
330:*12* 383:*12*

**incident** 8:*20*
194:*20* 197:*7*
293:*8, 16, 18*
295:*10* 296:*8,
13, 16* 297:*2,
21* 298:*6, 8,
23* 301:*9*
305:*1* 306:*6,
9, 24* 307:*23*
321:*15* 322:*4*
388:*23*
**include** 31:*22*
258:*13, 22*
259:*14*
264:*12* 267:*9*
274:*8* 299:*14*
328:*10, 22*
334:*23*
335:*20* 336:*7*
346:*12, 19*
348:*20* 351:*5*
361:*24*
369:*23*
370:*17* 371:*6*
376:*19*
**included**
70:*12* 248:*13*
251:*8* 259:*3,
10, 12* 271:*20*
273:*2* 323:*24*
329:*5* 335:*10,
16, 22* 367:*6*
368:*9*
**includes**
304:*15* 305:*22*
**including**
17:*9* 28:*3, 14*
329:*15*
346:*16* 353:*17*
**inconsistent**
315:*4*
**Incorporated**
86:*22*
**increase**
130:*4* 167:*8*
173:*10* 286:*5*
**increased**
114:*24*
167:*13* 170:*3,
5, 16, 21*
172:*18, 20, 21*

204:*2, 3*
217:*11* 222:*5*
239:*3* 240:*6*
241:*12* 242:*6*
243:*5* 246:*1*
249:*20*
250:*17* 251:*5*
252:*8, 19*
257:*4, 15, 18*
258:*10* 265:*9*
344:*15* 361:*22*
**increasing**
303:*9*
**independent**
25:*3, 5* 84:*16*
138:*12* 177:*6,
13, 21* 178:*1*
348:*6, 7, 9, 13*
358:*21*
369:*15* 382:*16*
**independently**
138:*16*
**INDEX** 10:*2*
**Indiana** 4:*17*
92:*5, 14*
**Indianapolis**
4:*17*
**indicate** 114:*8*
230:*14* 392:*13*
**indicated**
173:*9* 283:*24*
**indicates**
284:*17*
**indication**
184:*4* 303:*16*
**indications**
304:*11*
**individual**
60:*17* 89:*13*
175:*12, 22*
236:*17*
237:*11*
238:*13*
239:*15*
240:*10* 244:*1*
250:*3* 372:*8*
376:*4, 13*
377:*17* 381:*2*
**individually**
150:*13*

individuals
237:2
induce  66:19
induced  65:1,
12  67:2
Industries
3:18  4:7
45:12
industry  45:4,
9, 15, 23  46:3,
24  77:1
84:19, 24
86:14, 17, 18
87:12, 13, 16
inefficient
61:18
infer  32:19
211:16
266:19  267:5
282:1  327:21
inference
167:16  170:6,
9  395:15
inferences
110:18, 22
197:2, 6
345:15  372:12
inflation
177:3, 10
INFORMATIO
N  1:6  28:4, 9,
15  60:5  93:4
94:18  95:20
96:18  112:14
135:5, 18, 22
136:14
141:17  145:9
232:8, 9, 11
233:11  249:6
251:2  276:4
278:11
284:18  311:2,
3  320:16
335:22
342:15  381:4
388:18  395:12
informative
319:3  359:16
informing
368:4

INGERSOLL
5:6
inherently
345:17  372:14
inhibitor
25:22  26:7,
10, 13, 14
initial  163:18
initiate  306:2
initiation
304:16
injury  34:13
51:7
input  310:7
339:16
insert  145:4
inside  252:1
261:23
insinuating
304:11
insist  129:4
insisted  146:17
insists  129:15
Institute  78:7
81:21
institution
28:6
instruction
215:21
INSTRUCTIO
NS  398:1
insult  389:18
insurance
287:12
intake  344:14,
19
intensity
390:11, 23
intentionally
115:18
interaction
71:1, 15
interchangeabl
e  180:18
interchangeabl
y  293:19
interest
105:13, 20
192:24  193:5
307:1  382:18

interested
26:6  98:7, 12
168:16  186:4,
6, 12  296:7
298:14, 18
389:12, 13
391:19
interesting
50:24  87:5
89:22  90:1, 6,
7  124:12
136:11  160:9
164:6, 16
168:6, 13
180:11
253:13
258:12
265:16
271:18
293:21
296:16
299:13
300:19, 24
311:1  330:22
353:24
379:24  387:4
389:11
internal  20:12
276:1, 8
384:6, 20
385:3, 12
392:15, 24
International
82:13, 21
interpret
135:16
145:12  147:7
154:20
224:24  228:1
246:24  297:6,
18, 21  309:10
315:5  316:11
319:23
interpretation
101:22  102:4
188:14, 21
244:7  309:20
311:9  316:17
326:21  344:3
345:12  392:13

interpreted
181:20  182:2,
7, 11
interpreting
311:7
interrupt  92:7
113:22
114:16  309:22
interval  135:3,
5, 9, 12, 17, 21
136:8, 13
145:4  176:12,
17  205:10
310:19
316:22, 23
317:9  318:1
320:10
321:17, 18, 23
322:7
intervals
135:1  317:17
intervention
306:12, 15
interventions
305:23  306:3
intravenously
83:16, 17
introduce
380:15
introduction
77:23  81:12,
13
invalid  345:16
372:14
investigate
83:9  112:15
investigation
113:17  145:7
367:24
investigator
193:4  196:6
301:5
investigators
123:1  198:12
205:12
305:24  307:21
investor  35:14
invoice  16:3
44:11  58:14

invoices  14:23
15:1, 19, 24
16:9
involve  312:3
involved  33:7
35:8  47:23
48:4  51:14,
17, 23  52:8,
16, 18, 22
53:4, 9, 12, 18
54:8, 22
56:15  57:13,
18  282:17
364:8
involvement
50:22
involving
284:3
IRB  113:7

IRBESARTAN
1:4  11:13
251:24  252:8
irrelevant
269:3, 7, 13
273:22  274:1,
5
issue  35:16
37:17  46:8
53:7  125:14
126:1, 4
127:7  133:10
134:7  138:13
139:1, 4
140:14  147:6,
8  153:13
154:8, 9
161:16  164:8
166:2  167:15
174:22  175:4,
16  211:16, 20
212:6  244:17
248:21
249:11  253:6,
11, 16  257:23
258:15
260:15, 18
261:1, 2
263:17
267:22  268:3
270:10  280:6

282:1  288:9, 21  289:14
330:7  334:24  336:15
340:14
354:20  355:3  357:1  358:10  363:2, 3, 19  385:10
**issued**  142:16  143:22
**issues**  33:2  37:8  111:8, 12  128:2, 11  129:1, 20  132:7, 17  133:5  137:1  139:19, 24  141:22
143:18  144:4  145:22
146:12
148:14  149:9  151:18
152:11
153:20
154:15
155:16  156:7, 24  197:15, 21  217:23  255:8  266:22
267:14  268:8  273:20  283:6  285:13, 21  286:1  306:5
**its**  98:16  160:22  220:4  241:3  242:17, 24  373:4  374:21  375:24  377:2
**IV**  355:2

**< J >**
**jack**  295:20
**JAMA**  356:8, 21  370:3, 12, 16  371:6
**JAMA-Cardiology**  384:18  385:4

**JASON**  5:14  383:19  392:11  393:16  394:14, 17
**J-E-N**  12:17
**JERSEY**  1:1  4:5
**JESSICA**  5:19
**Jewel**  184:15, 17
**J-E-W-E-L**  184:19
**jheinz@c-wlaw.com**  5:21
**jmr@pietragallo.com**  5:16
**job**  94:24  257:22  269:1, 6  280:5  360:19  362:14  364:16  372:2  375:6
**Joe**  6:5
**Johnson**  8:23
**Journal**  126:15, 21  128:6  133:2, 9  134:12  136:19, 23  139:17  144:1, 11, 16, 20  145:18, 20  146:9, 10, 21  152:9  305:15  369:13  370:3, 6, 12, 16  371:5  373:6, 8, 10, 12, 21  374:6, 11, 15  378:15  379:9  380:3, 8, 12, 16, 20  384:19  385:1, 2
**journals**  373:18  385:5, 7
**judge**  114:9  170:13

**judgment**  310:6
**Judy**  6:3  11:4
**July**  56:6, 15, 16, 18, 22  57:1, 9, 19, 24  302:17
**jump**  319:1  339:14  340:11
**jumping**  319:5  379:20
**June**  332:17, 21  333:6
**junk**  349:9  371:21  378:9  379:11
**jury**  202:23  221:13  222:20
**justified**  217:23

**< K >**
**KANNER**  2:18
**KAPKE**  4:16
**Kaplan-Meier**  382:19, 23  383:6, 7, 9, 11  388:4
**KARA**  4:16
**Kara.kapke@btlaw.com**  4:18
**KATHLEEN**  5:3
**keep**  16:18, 19  53:17  60:1, 4, 20  72:8  88:9  93:14  319:5, 9, 13
**Kekelly@hinshawlaw.com**  5:5
**KELLY**  5:3
**kidney**  387:13
**kids**  312:18
**kind**  20:11  60:9  92:14  130:19  154:5  212:23  213:10, 12

214:4  230:10  233:16
256:12  277:7  290:22  298:13
301:18  350:5  352:5  364:23  366:4  370:21
**kinds**  164:12  168:20  339:17
349:17  387:16
**kitchen**  367:18
**Knekt**  226:9, 13, 15
**knew**  385:9
**know**  23:21  25:14  26:16  27:22  31:17  32:2  33:24  36:3  38:17  41:3  46:16  51:19  53:23  54:5, 11, 13  56:11  58:2, 18  59:8  60:8, 18  62:3, 13  63:23  65:18  66:24  68:3, 11, 12  69:9, 14  70:3  72:7  74:10, 19  84:3, 6, 13  87:12  88:9  89:20  90:5  92:23  113:8  117:15  118:5  124:11  126:19  127:5, 22  128:14, 17  129:21  130:21  132:8  133:22  135:13, 21  136:3  137:17, 23  138:2, 4  139:19  140:7  141:6, 7  143:21, 23  144:7, 14  146:14, 15

148:15
152:22
155:22
158:12
159:10
160:18  162:4  163:6, 9, 16  164:7, 8, 12, 14  165:20, 22, 24  166:1, 3, 7, 20  168:6
182:16
184:24
187:11
191:22  192:5  201:4  208:20  209:3  211:13, 23  213:5
215:6  216:19  220:3, 5, 11, 22  221:1, 2, 3, 6  222:14, 16, 17, 23  223:1, 5, 8  224:4  226:12, 15  227:17
228:13, 16, 17  229:3  230:2, 9  237:23  238:9, 15, 19  240:9, 11  245:4  251:21, 23  252:3  253:1  255:13  256:4, 24  258:2  259:23  261:1, 5, 15  263:1  264:20  268:20  269:19  270:15  271:3, 4, 20  275:11, 14  276:8  277:1, 3, 10, 15, 20  278:10  283:23  284:11  285:20  286:16, 20  288:4, 8, 11  289:2, 7

Confidential Information - Subject to Protective Order

292:5, 8, 12
293:2  295:7,
15  298:2, 7
299:14  301:4,
12  308:11
309:13  310:9,
24  312:2, 23
313:23  318:9
322:20  324:6,
17  325:8
329:18  330:2
331:8, 11, 19,
20, 23  333:12,
18  334:17
336:10  338:4
339:8, 9, 12
340:19  341:3,
21  346:24
347:7, 13
348:24
349:21  350:7
352:7, 21
353:18  354:6
355:4, 10, 13
356:3  357:16,
17  361:4, 7
364:10
365:19  366:7,
15  367:2, 17
368:2, 4, 14,
20  369:7
371:19
372:21
373:20
374:22
375:17
377:12
379:13, 22
380:1, 11, 15
383:20, 21
386:8  387:17
388:3, 11, 12,
13  389:18
390:18
391:19
392:17, 23
393:20  394:3,
10  395:2
**knowing**  278:6
**knowledge**
143:20

172:12  213:9
276:12  342:22
**known**  345:10
348:12  351:24
**knows**  126:14
130:8  141:13
167:22
312:10
349:10
368:14  388:14
**KUGLER**  1:4

< L >
l.hilton@kanne
r-law.com
2:20
**lab**  119:10, 21
199:12, 23
**laboratory**
64:24  65:11
70:24  71:11
**lack**  71:2, 20
344:1  346:3
359:15  366:4
**Lagana**  271:7
**language**  95:2
107:4  123:15
125:12
133:23  152:1
245:7, 10, 17,
21  293:24
294:4  325:22
383:2
**Largaucous**
379:7
**large**  27:2
136:3  138:7
173:23  174:5
181:9, 13
207:9, 15
235:14  309:9
**LaSalle**  2:14
**late**  396:7
**latest**  126:20
**Lauren**  6:7
**LAW**  2:9, 12
90:10  91:20
92:4, 6  93:20
350:8
**LAW-1010**  3:4

**LAWRENCE**
3:14
Lawrencege@g
tlaw.com  3:17
**lawyer**  14:2, 5
21:23  22:1
33:10  36:11
60:8  168:11,
16  211:24
294:22
310:11  339:9
349:3  374:23
**lawyers**  18:19
19:2, 22  20:5
22:6, 11, 12
36:9, 10
56:21  60:8
168:8  211:24
247:6  253:9
256:10  294:16
**LAWYER'S**
401:1
**lay**  38:17
**LAYNE**  2:18
**LCE**  219:7
226:3, 5, 21
235:11, 16, 21
236:4, 8
237:14, 23
238:9  340:23
**LCEs**  217:12
222:6  223:2,
6  225:13
340:21  341:5,
17
**lead**  240:6
323:12  324:2
326:19  327:19
**leading**
102:14, 21, 22
103:4, 5
189:5, 6, 11,
12  382:18
**learn**  142:18,
20  146:15
155:23
262:14, 19
265:4  268:19
**learned**  374:8
**learning**

368:23
**leave**  32:4
**led**  239:3
**L-E-E**  12:17
**LEE-JEN**
1:13  7:3, 16,
19  11:15
12:3, 17
397:8  400:16
**left**  66:11
98:4  99:5
100:21
103:24
307:14  321:1
379:4
**left-hand**
164:3  200:11
**legal**  11:4
46:17  74:5
75:10  106:6,
8, 10, 14
124:17  125:8
147:5  152:16
194:14
200:20  212:8
253:16  257:8
269:15
273:22  354:7,
8  356:12
368:2  381:10
**legislature**
93:13
**letter**  371:19
**letters**  222:19
**level**  40:1
42:24  110:6,
11  113:6, 16
115:11
123:17, 23
134:2, 3
176:12, 17
196:12, 17
205:9, 10, 23
206:2  223:19
224:3  225:2
235:15  237:2,
8, 11  239:16
244:1, 11, 20
245:23, 24
250:4  255:3,
9  277:8, 9, 15,

16  291:16, 20
295:18, 21
344:20
**levels**  65:2
66:3, 24
113:5  236:18
275:8, 11, 16
276:17
280:13, 18
**LEVIN**  2:3
6:9
**LIABILITY**
1:4  8:12
11:13  32:12
80:19
**liberal**  123:17,
24  140:5, 7
205:24  206:2
**life**  119:11, 22
199:13, 24
268:19
**lifetime**  39:1
41:14  42:24
219:9, 10
224:4, 9, 12,
17  235:16
236:23
241:11  242:5
243:23, 24
250:6  255:3
**lifted**  237:15,
24  238:10, 16
**limitation**
247:18  249:1,
3  254:3
288:11  289:4
392:2
**limitations**
303:15
**limited**  312:17
**LINE**  10:6, 9,
12, 15  100:5
213:5  245:20
261:20  289:3
309:4  310:12
311:11  399:4
401:2
**line-by-line**
213:20, 24
**Lipitor**  47:24

Confidential Information - Subject to Protective Order

**list** 18:*11*
19:*14*, 20
20:4  21:*23*
30:*11*  57:*19*
104:*14*, 22
232:*1*
**listed** 19:*6*
104:*23*
**listen** 114:*10*
168:*18*
216:*23*
217:*18*  232:*1*,
7  328:*1*
351:*12*
368:*19*
375:*10*  388:*7*
**listing** 20:*6*
56:*21*  58:*1*
**lists** 226:*5*
350:*24*
**literature**
16:*17*, 18
20:*19*, 22
22:*10*  252:*5*
**LITIGATION**
1:*4*, *18*  6:*3*
8:*10*, *13*  11:*5*,
*14*  16:*7*
22:*20*  31:*3*
32:*11*, *12*
34:*7*  35:*4*, *8*
36:*21*  80:*19*
89:*3*  254:*10*
266:*11*
**little** 13:*9*
72:*4*  81:*1*
140:*4*  141:*4*
147:*18*
251:*22*  261:*5*
270:*7*  277:*1*
289:*21*
302:*10*, *13*
309:*12*  312:*8*,
*13*  318:*19*
323:*14*  332:*8*
342:*3*  348:*14*
358:*2*  360:*1*,
*9*  361:*15*
362:*1*  378:*20*
380:*9*, *23*
381:*16*

**LLC** 2:*18*
3:*18*  4:*7*, *14*
5:*11*, 22
44:*18*, 22
45:*13*  46:*2*,
*23*  47:*4*, *9*
82:*13*, 22
**LLP** 3:*1*, *7*, *11*
4:*8*, *16*  5:*1*, *13*
**logical** 341:*9*,
*11*  392:*21*
**logistic** 359:*12*
**Loh** 344:*13*,
22  345:*1*, *21*
346:*5*, 7
350:*23*
351:*14*  359:*1*,
*4*  365:*15*
366:*7*, *8*, *18*
367:*16*  368:*8*
**Loh's** 346:*1*
**long** 54:*8*, *21*
58:*16*  74:*16*,
*24*  75:*23*
84:*2*  92:*12*
94:*1*  114:*23*
182:*22*
275:*20*  290:*6*
313:*21*  370:*7*
387:*19*
**longer** 134:*13*
159:*7*  162:*14*
208:*23*
289:*21*  290:*3*
378:*16*
**long-term**
289:*5*  354:*24*
**look** 12:*18*
13:*13*  14:*7*,
*21*, *23*  16:*4*,
*14*  17:*24*
19:*3*  22:*14*
23:*12*  24:*9*,
22  28:*1*
30:*17*  31:*7*
32:*5*  36:*24*
43:*5*  44:*4*
56:*3*  58:*8*
61:*3*  63:*8*
64:*17*  66:*10*
68:*20*  70:*9*,

*18*  71:*10*, *13*,
*18*  72:*10*
76:*4*, *5*  77:*3*,
*12*, *22*  80:*10*
82:*4*  83:*5*, *6*
91:*3*  92:*20*
95:*13*, *16*
96:*23*  97:*7*,
*11*  100:*4*
105:*3*  111:*3*
118:*12*  122:*6*,
*7*  125:*1*, *23*
127:*9*  133:*16*,
*19*  143:*2*, *24*
146:*5*  150:*4*,
*18*, *19*, *20*
154:*16*, *19*
157:*9*  158:*6*,
*8*  164:*1*
165:*10*
168:*13*  172:*9*,
*12*  174:*18*
185:*1*, *23*
186:*1*  201:*12*
202:*23*
204:*18*
205:*21*
208:*17*
226:*20*  232:*5*
233:*8*  239:*2*
240:*5*  249:*5*
254:*12*
257:*16*, *24*
260:*20*
261:*12*  264:*5*,
*13*  265:*10*
266:*2*  267:*17*
268:*13*
269:*23*  270:*1*
273:*18*  274:*1*,
*8*  284:*5*
295:*5*  301:*19*
305:*5*, *13*
308:*14*
310:*21*
316:*21*  317:*4*,
*10*, *24*  318:*24*
319:*7*  320:*19*,
*21*  321:*10*
326:*10*
332:*15*

343:*13*, 16
347:*8*  351:*19*
359:*8*  372:*3*
373:*20*
377:*16*  382:*4*
385:*1*  395:*9*
**looked** 22:*3*
63:*4*  70:*11*
79:*21*  80:*5*
112:*11*, *12*
125:*2*, *3*
185:*13*  211:*7*
239:*7*  248:*14*
252:*17*, 22
254:*11*
257:*12*  265:*5*
278:*14*
279:*10*
280:*23*
292:*19*  318:*9*
322:*15*  343:*9*
**looking** 21:*13*
46:*21*  66:*24*
78:*18*  90:*10*
92:*20*  111:*10*
124:*9*  125:*19*
126:*2*  128:*11*,
*16*, *20*, *24*
129:*20*  132:*7*
139:*24*
141:*21*
143:*18*  144:*4*
145:*22*
146:*12*, 22
148:*13*, 22
149:*8*  150:*13*
152:*11*
153:*17*, *19*
154:*21*
155:*13*, *15*
156:*23*  157:*2*
159:*2*, *14*
160:*20*
163:*10*, *12*
180:*7*, *8*
185:*10*
192:*15*, *16*, *17*
196:*24*
204:*16*, *17*
207:*2*  211:*11*
214:*21*

216:*11*, *16*, *20*
219:*6*  226:*2*,
*19*  235:*6*, *11*,
*19*  237:*20*
238:*6*  249:*18*
269:*9*, *11*, *20*
278:*17*
279:*17*
280:*11*, *15*
282:*10*
283:*12*  285:*2*,
*12*  287:*1*
298:*9*  307:*13*
314:*14*
317:*18*, *23*
319:*18*
337:*14*  365:*5*
**Looks** 120:*14*
**LOSARTAN**
1:*3*  11:*12*
251:*24*  252:*7*
**lose** 27:*19*
328:*2*, *13*, 24
329:*7*
**losing** 328:*7*
**loss** 35:*14*
51:*7*, *8*
**lost** 35:*15*
**lot** 37:*2*
99:*22*  127:*15*
131:*6*, *11*
140:*19*
141:*17*  209:*5*
247:*10*
268:*19*, *22*
290:*2*  295:*7*
299:*2*  311:*3*
313:*6*  378:*9*
**lots** 356:*11*
**Louisiana** 2:*19*
**love** 70:*16*
**low** 65:*2*
66:*2*  136:*6*
168:*2*  217:*12*
222:*6*  295:*19*
299:*22*  351:*19*
**Lowe** 165:*8*
**lower** 101:*3*,
*11*  102:*22*
103:*5*  162:*16*,
*20*  163:*18*

machine
368:23
MADELINE
2:4
Madigan
21:21  29:8
32:15  33:7,
13, 17, 22
34:9, 14, 19
35:3  37:1, 13,
18  38:22, 24
43:16  56:15,
23  124:9, 12
125:22
140:22
141:13, 16
151:7, 14
156:9, 13, 17
157:14  164:2
166:21  172:4
183:18
184:21  211:6,
19  212:9, 18
214:15  217:9,
17  220:8, 11
221:10  222:4,
18  231:24
232:6  233:22
240:4  243:2
244:21
249:18  250:4
252:24  253:3,
13  254:12
257:19, 24
258:13, 20
259:7, 8
266:15  271:2,
19, 23  272:2,
3, 5  279:5, 18
280:2  283:23
289:1  310:10,
13, 14  334:22
335:2, 20
336:5, 13, 20
337:19, 24
338:3  340:22
341:1  344:12
345:15, 20
346:2, 6
347:8  350:8

164:7  168:21
187:21  189:6,
12  223:11
279:12
280:14, 18
378:2
lowest  66:17
255:20
LP  221:13
LP-1474  63:9
LP-1556  12:19
LP-1557
30:18  97:4
221:14  343:15
LP-1558  43:5
57:4  225:18
LP-1561
80:11  97:4
LP-1562  76:6
183:11
LP-1567  305:6
LP-1573
308:15
LP-1576  44:5
LP-1577
72:10  91:3
LP-1578
301:20
LP-1579  82:5
LP-1600  14:8
lumping
166:10
lunch  54:2
182:14, 16, 23
luncheon
183:4
lung  164:21,
23  165:2, 16
166:17, 22
167:2  172:3
217:13  219:2
254:24

< M >
ma'am  335:18
338:6
MACE  130:9
137:3, 10
M-A-C-E
130:9

365:20  372:6,
13
Madigan's
7:22  21:21
22:4  33:10
37:3  38:6
56:19  57:3
80:1  122:12
124:18  141:8
164:15  205:1
211:14
212:16  213:4
215:12  218:4,
21  237:21
238:7  239:1
241:10, 24
242:4  244:3
247:8  252:10
254:17
257:23  265:6
267:20  276:6
278:12, 15
280:12, 16, 24
336:1, 18
395:13
main  161:4
321:11
361:18, 23
major  130:9
majority  89:8,
16  90:22
279:21
346:11, 18
347:14
348:17, 19
349:23
357:20
365:24  375:1,
2, 16  378:6
387:9  389:1
making
103:15, 19
110:18, 22
189:22  190:3
197:2  303:23
male  364:6
365:5
males  165:6
man  388:11

manipulate
351:10, 20
356:16
manufacturing
261:19
March  185:18
mark  91:4
Marked  10:14
12:20  13:4
14:9, 13
30:19, 23
43:6, 11  44:6
63:10, 14
76:7  80:12,
16  82:6, 10
91:5  221:15
301:21  302:1
305:7, 11
308:16, 20
Marketing
8:10  76:12
355:2
MARLENE
2:14
MARTIN  3:1
Massachusetts
5:4
Massey  6:7
match  290:20
materials
18:11  19:14
343:9
math  41:7, 11
160:22
292:16, 21
mathematic
223:9
mathematical
40:3, 24  42:2,
4  293:22
294:3

mathematically
41:19  42:8
43:3
mathematics
163:7
matter  11:11
136:6  151:4
154:11
289:12  310:8

332:9  371:15
381:8
matters  318:5
max  286:16
MAZZOTTI
3:1
McCaw
384:19
McDonalds
93:8
mcg  221:3
MDL  1:3
11:14
mean  14:1
22:11  37:11
40:5  41:1, 18
42:7, 22  69:4
75:5  84:9
88:5  92:7
114:15  115:5
137:8  159:17
162:15
163:19
164:13
169:12
173:13
214:17  227:7
231:7  233:4
235:12  246:6
262:6  265:18
286:24
306:10, 23
309:19
325:16, 18
327:8  337:6
338:5  340:22
347:9  348:18,
19  349:8
350:7  358:7
362:4  370:9
378:3  395:4
meaning
160:12  225:1
287:21
meaningful
344:3  345:11
means  120:10
131:8  220:12,
19, 22  221:1
222:14
227:17

Confidential Information - Subject to Protective Order

229:*23*
231:*24*
233:*24*  246:*1*
296:*1*  299:*5,*
*11*  300:*7*
314:*18, 23*
325:*9*  326:*5,*
*7, 12*  327:*9*
347:*19*
387:*11*
388:*16*
390:*15*  391:*6,*
*10*  397:*20*
**meant**  32:*21*
227:*20, 24*
326:*3*
**measurable**
167:*23*
**measure**
153:*18*
155:*14*
156:*22*
159:*22*  168:*1*
220:*13, 16*
**measured**
276:*16*  304:*11*
**measurement**
159:*23*  219:*22*
**measures**
157:*4*
**measuring**
26:*11*  151:*20*
160:*1*
**mechanical**
51:*3*
**mechanism**
261:*14*
**Medical**  78:*7*
81:*21*  88:*10*
89:*18*  90:*24*
198:*23*  369:*13*
**Medicare**
48:*12, 15, 20*
**medication**
28:*4, 15*
**medications**
27:*3*  258:*8*
259:*15*
268:*14*  269:*9*
275:*21*

**Medicine**
126:*16, 21*
128:*7*  133:*2,*
*10*  134:*13*
136:*19, 23*
139:*17*  144:*2,*
*11, 16, 21*
145:*19, 20*
146:*11*  152:*9*
257:*11*
259:*21*
262:*17*
265:*15*
269:*21*
274:*15*  370:*3,*
*12, 16*  371:*6*
373:*6, 9, 10,*
*12*  374:*7, 11,*
*15*  378:*16*
379:*9*  380:*3,*
*8, 13, 16, 21*
384:*7, 19, 20*
385:*3, 12*
392:*15, 24*
**medicines**
257:*21*
258:*17*
274:*10, 14*
**mediocre**
315:*3*  370:*5*
**members**
47:*19*  48:*2*
**Memo**  8:*6*
**memory**  54:*5*
83:*2*  93:*17*
165:*1*  171:*18*
184:*1*
**men**  165:*5*
344:*16*
**menopausal**
344:*21*
**mention**
37:*18*  254:*5*
257:*20*  258:*3*
278:*18, 21*
**mentioned**
35:*19*  127:*24*
225:*5*  254:*1*
271:*11*
278:*22*  332:*11*

**mentioning**
222:*24*
**mentions**
278:*22*
**Meridian**  4:*17*
**MERRELL**
3:*7*  73:*5, 22*
96:*3*  126:*5*
128:*12*
129:*22*
132:*18*  133:*6*
134:*17*
141:*23*  144:*5*
145:*23*
146:*24*  149:*1*
151:*21*
155:*17*  157:*5*
173:*1*  182:*13*
201:*7*  209:*9*
216:*6*  241:*13*
242:*7*  243:*6*
248:*5*  253:*22*
262:*2*  269:*14*
273:*5, 13*
278:*7*  292:*9*
294:*12*
315:*10*  320:*1*
337:*4*  357:*13*
371:*10*  377:*4,*
*22*  381:*19*
396:*4, 12*
**Merrellc@gtla
w.com**  3:*11*
**messed**
168:*19*  330:*18*
**meta-analyses**
149:*21*
377:*15*
378:*17*  380:*9,*
*23*
**meta-analysis**
149:*13*  150:*6,*
*9, 23*  164:*2,*
*18*  166:*5*
233:*20*  284:*2,*
*3, 6, 17*
286:*12, 21*
372:*6, 8, 12,*
*13, 17, 20, 23*
373:*1, 9, 13,*
*15, 19, 22, 24*

374:*3, 7, 12,*
*18*  375:*21*
376:*2, 14, 20,*
*23*  377:*18*
379:*19*  380:*5*
381:*12, 15, 16*
395:*18*
**metabolism**
65:*22*  66:*8*
71:*4, 22*
**metformin**
256:*21, 22*
257:*3*  258:*4*
259:*18*  260:*3,*
*21*  261:*1, 12*
270:*14*  274:*2,*
*17*
**method**  95:*5*
103:*13, 18*
189:*20*  190:*1*
249:*9*  379:*18*
383:*15, 17*
384:*1, 13*
386:*13*  390:*6*
393:*11*  394:*2,*
*22*
**methodological**
303:*15*
**methodologies**
99:*19*
**methodology**
124:*15*
149:*18*  379:*14*
**methods**
39:*24*  40:*5*
75:*8*  101:*1, 9*
127:*7*  187:*19*
188:*4*  190:*21*
218:*5*
**metric**  310:*2*
316:*5*
**mg**  219:*23*
220:*3, 4, 15, 23*
**MI**  130:*4*
**Michelle**  1:*15*
11:*24*  397:*12*
**middle**  382:*11*
**migration**
332:*20*
**mile**  270:*13*

**milligram**
219:*23*
**milligrams**
78:*22, 23*
**Milton**  184:*3,*
*6*
**mind**  13:*8*
31:*6*  38:*9*
55:*12*
**mindset**
243:*13*
**mine**  216:*24*
**mingle**  375:*18*
**minimizes**
103:*14, 18*
189:*21*  190:*2*
**Minneapolis**
2:*15*
**Minnesota**
2:*15*
**minority**  375:*6*
**minus**  158:*24*
176:*13, 18*
**minute**
150:*14*
161:*23*  324:*24*
**minutes**  59:*11*
273:*11*  394:*5,*
*9*
**misclassificatio
n**  332:*7, 12*
334:*19*
**misinformative**
127:*15*
**misleading**
43:*2*  127:*16*
140:*19*
311:*24*  357:*5*
**misquoted**
219:*3*
**missed**  104:*20*
105:*2*  149:*23*
176:*7*  178:*8*
258:*5*  281:*6*
**missing**  226:*7*
**Mississippi**
92:*16*
**mistake**  139:*7,*
*9*
**misunderstand**
149:*10*

Confidential Information - Subject to Protective Order

misunderstood
225:10
mitigate
303:20  304:5
mixed  167:15
mjgoldenberg
@goldenbergla
w.com  2:16
Mm-hmm
198:2
model  282:23
286:1  344:1
345:5, 9, 22
346:3, 8, 13,
21  347:6, 16
348:1, 5, 8, 10,
22  349:6, 7,
19  350:1, 13
351:4, 11
353:7, 8
354:2  356:17
357:22
358:11  359:2,
14, 16, 19
360:6, 20
361:13, 24
362:10, 16
364:16, 20
365:1, 3, 16
366:1  367:6,
7, 9, 10, 11, 13
369:1, 2, 4, 11,
24  370:17
371:7  376:9,
10
modeling
343:23
356:16
359:11  369:14
models
131:11
359:12
372:10  373:3
374:20
375:23  377:1,
20  381:14
modern
369:10, 21
370:14  371:4
modifying
200:20

moment
319:15  357:17
money  35:15
45:14  46:2, 23
monitored
119:6, 17
199:8, 18
monotherapy
26:9
month  56:11
277:4
months
262:14  299:7
315:23
352:21
356:11
370:21
390:16, 20
391:1, 2
morning
12:10  204:13
228:3  254:23
265:22
MORRIS  4:8
mortality
387:5  390:11,
12
MOUGEY  2:3
mouth  142:10
338:18
move  94:3
110:1
moving  182:17
Mpendley@levi
nlaw.com  2:7
Mulberry  4:4
multiple
72:14  123:19
124:2  126:11,
13  127:3
128:2  129:5,
16  130:11
131:5  133:3
140:13  141:1
142:2  143:6
147:21  148:9
149:20  150:1,
13  152:20
153:5, 6, 12
154:7, 10
156:2  158:2

161:14
174:21  175:3
176:9  181:17,
23  206:19, 22
208:18
297:10, 16
334:12
359:11  378:15
multiplication
320:6
multiplicity
124:10
125:19  126:1,
4  128:22
129:19
131:20
136:17, 20
139:19, 24
141:22  147:9
148:5, 22
151:19, 20
152:11
153:17
155:13
156:24  157:4
161:15  181:21
mutagenic
65:17, 18
Mylan  5:16

< N >
naive  299:10,
11, 15
name  11:3
12:10, 14, 15,
16, 17  76:21
256:6  294:19
305:15
372:24
374:17
375:21  376:23
Nancy  220:24
nanograms
342:23
nationwide  9:7
nature  286:2
302:17
ND  32:20
NDA  129:3
NDEA  32:24
98:10  104:2

186:9  191:23
266:20  267:6
333:10
NDMA  8:8
9:6  32:21, 22,
24  40:7
62:16, 17, 19,
20, 22  64:3, 5
65:2, 8, 13, 16,
23  66:1, 8, 15
67:1, 7, 14
68:9, 15  70:3,
23  71:4, 10,
22  79:13, 15
98:9  104:2
186:8  191:23
217:10
219:12
221:10  222:4
226:16  239:3,
9, 10, 11
240:1, 6, 14
241:2, 8, 10
242:2, 5, 17,
24  243:4, 17,
19  246:11
247:2  248:4
249:21
250:12
251:20
253:20  256:3,
8, 18, 23
257:13, 17
258:8, 9
259:15
261:10, 15
262:10, 12
263:2, 22, 23,
24  264:1
265:9  268:15
269:10  275:8,
12, 16  276:2,
9, 16, 21, 23
277:11, 20
278:2, 4
279:6, 8, 13,
15  280:22
281:18, 19
285:22  286:4,
9  291:6, 7
292:3, 18, 20

333:10
342:16  343:1,
7, 10  344:14
350:20  361:21
NDMA-
Contaminated
43:15  112:22
115:19
NDME  32:21
266:20  267:6
NE  3:9, 15
nearly  225:13
226:4, 8
necessarily
89:15
necessary
398:4
need  58:19
61:13  69:16
129:5  130:11
138:6  158:1
166:6  169:7
213:8  215:18,
20  235:9
261:11
268:22  279:2
288:16, 22, 23
290:3  291:14
299:10
316:21
317:13  321:7
324:21
337:19, 24
338:10, 15
339:16  340:6
348:3  350:9
354:6  358:6
364:10  367:4
368:15
needed  40:2
115:6  129:15
239:18
250:20  376:12
needs  386:9
negative
102:23  103:6
164:9  166:17,
22  167:1, 7
169:11, 12, 17,
22  170:1
189:7, 13

**neither** 202:*1, 8*

**nervous** 294:*17*

**Nesbit** 2:*10*

**neutral** 169:*15*

**never** 95:*6* 112:*11* 280:*23* 292:*5* 329:*16* 331:*17* 336:*20, 21* 341:*14* 388:*13* 389:*3*

**NEW** 1:*1* 2:*19* 3:*4* 4:*5* 51:*2* 74:*7* 75:*16, 21* 95:*9* 125:*16* 126:*15, 21* 128:*6* 129:*3* 130:*20* 133:*1, 9* 134:*12* 136:*18, 23* 139:*16* 142:*19, 20* 144:*1, 10, 15, 20* 145:*18, 20* 146:*10* 151:*5* 152:*8* 282:*20* 293:*3, 9, 12, 15, 17, 23* 295:*9* 296:*12* 298:*6, 8, 15, 22* 299:*8, 12* 300:*1, 11, 14* 301:*9* 303:*3, 20* 304:*4, 7, 14, 24* 306:*11, 18* 307:*8* 308:*5, 10* 322:*3* 370:*3, 11, 15* 371:*5* 373:*5, 8, 9, 11* 374:*6, 10, 14* 378:*14, 15* 379:*8* 380:*2, 7, 12, 15, 20* 384:*19* 385:*2*

**Newark** 4:*5*

**newly** 296:*2*

**Newman** 8:*18* 91:*11*

**news** 292:*12* 379:*24*

**new-user** 8:*19* **ng** 220:*22, 24* 221:*1*

**nice** 20:*17* 353:*4*

**nicer** 328:*18*

**Nick** 184:*14, 17*

**NIGH** 2:*4* 7:*7* 12:*9, 11, 23* 14:*12, 14* 15:*13, 15* 30:*22, 24* 43:*4, 9, 13* 44:*4, 9, 13, 16* 55:*8, 10* 57:*2, 7* 63:*8, 13, 16* 64:*19, 22* 68:*20, 22* 70:*17, 20* 71:*24* 72:*2* 73:*13* 74:*17* 76:*4, 10, 13* 77:*5, 7, 14, 16* 80:*10, 15, 17* 82:*4, 9, 11* 85:*11, 17* 91:*2, 8* 94:*3, 13* 96:*5, 15* 97:*2, 5, 11* 98:*3* 102:*16, 19* 109:*24* 110:*3* 111:*3, 6* 120:*24* 121:*2* 122:*4, 10* 127:*18* 128:*18* 131:*18* 132:*24* 134:*9, 22* 142:*7* 145:*16* 146:*7* 148:*3* 149:*2, 6* 152:*5* 156:*3* 158:*9* 173:*3* 182:*20* 183:*10, 14* 197:*11, 13*

201:*11* 204:*16, 23* 207:*4, 6* 209:*15* 216:*10* 221:*13, 20, 22* 222:*1* 225:*17, 20* 227:*12, 14* 236:*9* 237:*12* 238:*21, 23* 241:*19* 242:*13* 243:*10* 248:*12* 254:*7* 262:*8* 266:*5, 8* 270:*23* 273:*9, 14* 274:*21* 275:*6* 278:*13* 292:*15* 294:*20, 24* 301:*19, 24* 302:*3, 12, 15, 21* 303:*1* 305:*5, 10, 12* 308:*13, 19, 21* 316:*10* 320:*18* 321:*4, 9* 322:*10, 14* 331:*5, 7* 338:*1* 342:*2, 13* 343:*15, 19* 357:*18* 371:*12* 377:*9* 378:*12* 381:*23* 395:*20* 396:*5, 11, 13*

**night** 392:*19*

**nine** 28:*1, 2*

**Nissen** 379:*1*

**nitrosamine** 25:*1* 28:*10, 21* 29:*4, 12, 19*

**nitrosamines** 17:*13, 19, 22* 24:*13, 19* 25:*6* 26:*1* 252:*1, 7, 19* 343:*11*

**nitrosodimethy lamine** 63:*20, 24*

**Nobel** 339:*13*

**noncancer** 66:*19* 386:*21* 387:*2, 18* 388:*17*

**non-cancer** 389:*14* 391:*23* 392:*5* 393:*13*

**non-Celebrex** 188:*7* 192:*8*

**non-competing** 391:*16*

**non-exposed** 104:*4* 192:*1*

**non-selective** 79:*1*

**nonsteroidal** 79:*2*

**non-Taxotere** 101:*13* 104:*11*

**Nope** 232:*21*

**North** 5:*9*

**Northwestern** 47:*17*

**Notary** 1:*16* 397:*14* 400:*23*

**note** 104:*1, 8*

**noted** 11:*21* 147:*4* 398:*11* 400:*11*

**notes** 16:*6, 18, 19, 23* 17:*8, 14* 190:*14* 401:*1*

**notice** 1:*14* 7:*15, 18* 14:*17* 31:*19, 24* 256:*16* 360:*11*

**novel** 224:*15, 19*

**novelty** 224:*20*

**null** 135:*19* 160:*10, 12* 164:*4* 284:*9* 310:*20* 323:*13* 324:*3*

325:*4, 9, 16, 21, 24* 326:*2, 4, 6, 9, 11, 17, 20, 22* 327:*9, 12, 13, 15, 20, 23* 328:*3, 7, 14, 16* 329:*1, 8, 11*

**Number** 14:*13, 23* 16:*14* 17:*7* 18:*1* 19:*4* 22:*15* 24:*10, 22* 28:*18* 29:*9, 22* 32:*6* 40:*23* 43:*21* 58:*19, 21* 59:*1, 18, 21* 60:*5* 61:*5, 11, 15, 21* 62:*14* 74:*7* 78:*19* 85:*20* 105:*9* 161:*6, 22* 168:*17* 173:*15, 23* 174:*5, 19* 181:*9, 13* 186:*10* 192:*16, 17* 197:*11* 207:*9, 15* 208:*7* 217:*12* 221:*9, 17* 222:*3* 223:*20* 236:*16, 18* 237:*10* 238:*13* 245:*3, 5, 24* 266:*2, 5* 286:*15, 16, 18* 303:*9* 307:*14, 20* 333:*18* 372:*4* 382:*5, 8* 395:*10*

**numbers** 218:*17* 236:*8* 237:*14, 18* 238:*3* 331:*20*

**numerous** 156:*4* 304:*23* 344:*23* 358:*8,*

9
NW 4:10
Nye 295:2

< O >
Object 320:1
337:4 371:10
Objection
73:5, 22
126:5 128:12
129:22
132:18 133:6
134:17
141:23 144:5
145:23
146:24 149:1
151:21
155:17 157:5
173:1 201:7
209:9 216:6
241:13 242:7
243:6 248:5
253:22 262:2
269:14 278:7
292:9 315:10
357:13 377:4,
22 381:19
Objections
7:18 14:17
15:9, 17, 18
18:7, 8 19:10,
11
O'BRIEN 2:3
observable
104:5, 12
192:2, 9
observation
180:20 248:24
observational
8:20 37:16,
22 117:19, 22
118:1, 2, 9
124:15
167:19
168:18 181:1,
2, 3 230:10
233:17
247:17
288:10
295:11 298:9
301:7, 11, 14

303:4, 10, 14,
21 304:6
305:1 329:21
330:7 346:11,
16, 18 347:4,
11, 14 348:10,
17, 19 349:24
350:11, 18
352:2, 6, 10,
14, 18 353:2
354:14
355:16, 23
356:14
357:11, 21, 24
358:8, 9
360:18
369:22
370:14 371:4,
17 372:17
373:1 374:18
375:22
376:24 377:7,
16 379:17
observe
318:14 387:24
observed
102:13, 20
103:3 110:7,
11 189:4, 10
196:12, 18
observing
110:4, 9
196:10, 16
Obvious
107:20 108:1
148:7 152:23
194:15, 19
234:14
obviously
212:19 237:3
318:18 390:7
occupation
218:15
Occupational
32:18 211:15
212:21 213:2,
15 215:1
216:4, 12, 21
244:10
249:10
266:18 267:4

282:4 337:9
362:24 395:14
occur 66:17
326:19 327:18
occurred
382:16
occurrence
98:7, 13
106:17 186:5,
6
occurring
304:19
October 82:18
odds 136:1, 6,
10 164:5
167:19 168:1,
3, 14, 22
169:2 228:6,
8 255:16
284:10 390:13
offering 65:7
offhand 144:8
oftentimes
118:3
Oh 27:13
61:7 70:15
158:4, 23
167:14 176:9
184:8 219:22
223:8 226:1
229:22
254:16 272:3
295:1 311:23
352:6 353:23
364:3 366:10
383:19 393:5
Ohio 92:5
Okay 12:18
13:5 14:7
15:23 16:4,
13 17:7, 20,
24 18:23
19:3 20:3, 10,
18, 22 21:11
22:2, 9, 14
23:16 24:9,
22 25:18, 24
26:24 27:13
28:18 29:9,
22 32:5, 23
33:5, 11 34:2,

12 35:18
36:5, 10, 17,
23 37:20
38:15, 24
39:9 40:13
41:5, 19 42:3,
8 43:4 44:3
45:21 47:3
48:14 49:19
50:3, 20 52:5,
12 54:10, 24
55:6, 11 56:3,
23 57:16
58:2, 8, 24
59:20 61:13,
20 62:15
63:2, 7 64:11,
17 65:10, 15,
21 67:6 69:6
70:9, 17
71:24 72:7, 8
76:3, 20 77:3
78:18 81:5, 8
83:5 85:11
87:15 88:17
89:7 90:15,
20 91:2, 18
94:2, 23
95:16 96:5,
16, 22 97:10
99:21 105:3
113:24 117:6,
21, 22 118:6,
9 120:15
132:16
134:23
136:16
137:10 139:8
141:11, 12
142:5 147:20
149:5, 17
159:7 168:12
169:24
170:13
171:12, 19
173:12, 15
182:12
183:10 184:9,
20 185:1, 10,
17, 22 186:3
191:7 201:12

202:15, 22
208:16 211:4
213:6 215:18
217:2, 6
218:1, 12, 19
221:3 225:16
226:2, 7
227:18
228:13 229:4
233:6 234:1,
6, 11, 21
235:5, 11, 18
237:9 238:21,
24 240:23
242:20
245:16, 22
246:8 247:9,
18 248:23
255:12, 24
259:12
260:19 261:3
267:2 269:4
274:21 275:9
276:7, 15
284:22
285:17 292:7
293:2 294:1,
8, 15 295:5
296:11 304:8
308:12, 13
309:16
310:16
313:16, 23
316:15
319:12
320:21
322:10, 21
324:12 326:9
335:6, 7, 19
337:1, 18
338:21
339:20
340:18 342:2
343:13
344:11 348:5
349:19, 21
351:20 353:9
354:23 356:1
358:23 359:7
360:16 362:7
365:15 369:1

Confidential Information - Subject to Protective Order

370:*4*, *11*
371:22  372:*3*
375:*3, 4*
378:7  384:5
386:*15*
388:*20*  389:8
390:*21*
391:*15, 21*
393:7  394:*10,
19*  395:*9*
**old**  67:*19, 20,
22*  75:9  95:2
99:5  190:*23*
360:*12*  364:7
379:6
**older**  74:*4*
299:*23*  366:*3*
369:8
**once**  21:*24*
193:3
**oncologist**
210:*23*
**ones**  34:*23*
35:*1, 21*
**one-way**
147:*24*
**ongoing**  34:*19*
35:5  49:*12*
**online**  373:7
**Open**  356:8
**opinion**  32:*10*
42:*15*  49:3
63:*1*  79:20
83:7  114:6
131:*19*  141:8
142:*24*
144:*19*  151:*1,
12*  164:22
166:*14*  200:8
201:5  222:*14*
225:22
241:*18, 21*
242:*19*  243:9,
*11*  246:*11*
248:*16*  263:4
266:*11*
298:*12*  302:2
303:2  339:22
340:4  341:*19,
22*  342:*21*
346:9  372:4

**opinions**  18:*3*
25:4  29:*24*
30:*3*  31:*19,
23*  32:*1, 15*
37:*1*  38:*12,
20, 21*  65:7
68:*15*  75:*17*
85:*16*  89:9
90:22  132:*14*
215:22
266:*15*  271:6
344:8
**opportunity**
397:9
**opposed**
32:*21*  38:22
157:3
**opposite**
33:*16, 22*
34:*4, 8, 20*
35:2  183:*18,
23*  184:*7, 12,
21*
**Oral**  7:*15*
296:9
**orange**  150:*10*
166:*10*
**ORDER**  1:8
19:*18*  202:*16*
243:*16*
**ordinary**
293:*23*  294:*3*
**O'REILLY**
4:*1*
**Organization**
63:*18*
**original**  38:*4,
21*  219:5
398:*15*
**Orleans**  2:*19*
**Ortho**  86:8
**Osteonics**
87:*20*
**outcome**
332:*10, 20*
**outside**  29:*13*
231:*11*  349:7
**overall**  174:*12*
207:22  208:8
215:7  387:5

**overcharge**
48:*21*
**overcharging**
49:*1, 9*
**overwhelming**
65:*16*
**owing**  70:22
**Oxford**  5:*14*

**< P >**
**P.A**  2:*9*
**p.m**  183:*1, 8*
274:*24*  275:4
342:7, *11*
396:*16, 20*
**PA**  2:*3*
**Packer**  184:*3,
6*
**PAGE**  7:*14*
8:5  9:5  10:*6,
9, 12, 15*
13:*14, 19*
14:22  15:*8,
10, 11*  18:*1*
31:8  32:6
58:9  64:*18*
66:*11*  77:*13*
85:*13*  97:*12,
13, 15*  103:*12*
110:*1*  122:*5,
8*  204:*17*
237:22  238:8
266:6  305:*14*
307:*13*
320:22, *23*
331:6  343:*16,
17*  372:4
382:*4, 10, 11*
384:*16*
395:*10*  399:*4*
401:2
**pages**  400:*6*
**Palli**  226:*21*
235:*20*  236:4
**pandemic**
352:*4*
**panel**  338:*11,
16*
**Panigrahy**
72:*14*  271:7
341:2

**Panigrahy's**
72:*13*  340:*16,
20*  341:*5, 16*

**PAPANTONIO**
2:*3*  6:9
**paper**  69:*11*
144:*8*  146:*2,
14*  235:24
238:*18*
239:*13, 23*
250:9, 20
277:*15*  284:*1*
288:24  346:*1*
349:*11*
350:*23*  356:6,
*18*  359:*11*
361:2  365:22,
*24*  370:2, *21*
371:*21*  374:*5,
9*  376:*16, 19*
379:*3, 8, 12*
380:*4*  381:8
382:7  383:*2,
6, 22*  384:6, *8,
11*  385:*12, 20,
22, 24*  386:*14*
387:*3*  392:*12,
16*  393:*1*
394:*5, 8, 11, 15*
**papers**  17:*1, 3,
4*  20:*1*  25:21
26:*17, 18, 23*
27:*1*  69:*18,
19*  70:2
172:8  212:*1*
235:*1*  236:*19*
237:*15, 17*
238:*3*  240:9
250:22
251:*14*
252:*12*
253:*14*  254:*2,
20*  263:6
272:6  289:8
304:*4*  346:*23*
349:9  353:*20*
356:*12, 20*
357:*3, 8*
358:*16*
365:*20*  366:6

**Participants**
331:6  332:*18*
**particular**
253:*15*  286:*8,
19*  288:*4*
314:*4*  366:*11*
**parties**  11:*17*
**party**  48:*17*
**pass**  145:9, *11*
244:*4*  318:8

367:*16*  368:2
369:8  371:*24*
372:*5, 8, 20*
373:*13*
378:*10*  384:*21*
**paragraph**
64:*20, 21*
70:*19*  97:*17,
21*  105:*5*
111:*4, 5*
113:*10*  114:8
122:*6, 8, 9*
174:20
176:22, *23, 24*
177:*1*  185:22,
*23*  192:*16, 17,
18*  197:*12*
204:*10, 17, 18,
21*  217:8
218:*3*  221:*18,
22*  222:*3*
320:*24*  321:*5,
6*  343:*17*
359:9  384:*18*
**Paralegal**  6:7
**parameter**
391:*13*
**Parkway**  5:*19*
**part**  14:*15*
15:*14*  27:2
41:*3*  43:*10,
14*  44:*14, 15*
74:*1*  104:*17*
105:2  122:*24*
240:24  261:4
267:8, *12, 15*
269:4  301:*12*
324:*12*  330:6
340:7, *13*
362:8  365:9
380:*21*

Confidential Information - Subject to Protective Order

**paste** 74:*11,
22* 94:*18*
**pasting** 73:*18*
94:*15*
**patient**
105:*19*
106:*20*
119:*13, 23*
193:*4* 199:*14*
200:*1* 202:*2,
9* 204:*14*
236:*2, 17*
237:*2, 11*
239:*15* 260:*5*
290:*16, 23*
296:*1, 3*
299:*10, 11, 15,
18, 20* 300:*9*
304:*12*
315:*18* 327:*4*
364:*5, 11*
386:*18, 19*
388:*18* 391:*24*
**patient-level**
238:*14*
**patients** 27:*8,
10, 15* 48:*21*
49:*1, 9* 83:*12*
98:*15, 17*
100:*14, 16*
102:*3* 104:*11*
107:*9, 10, 14,
15* 108:*16, 19*
109:*17*
111:*13* 112:*1,
21, 23* 113:*3*
120:*10* 136:*4*
186:*14, 16*
187:*6, 8*
188:*19* 192:*8*
193:*12, 13, 15,
16* 194:*6, 8,
10* 195:*10, 13*
196:*7* 197:*22*
198:*9* 202:*2,
6, 8* 237:*5*
239:*9* 240:*2,
15* 241:*3*
289:*23*
290:*21* 291:*4*
295:*18*

296:*19* 299:*5*
304:*15, 17*
306:*1, 11, 14*
312:*4, 19*
318:*17*
323:*24* 329:*6,
16* 331:*11*
343:*22* 364:*6,
8* 365:*6, 8*
**patient's**
119:*11, 21*
199:*12, 23*
245:*23*
**PATRICK**
4:*10*
**pause** 96:*11*
**pay** 353:*22*
357:*7* 361:*16*
370:*7*
**Pcgallagher@d
uanemorris.co
m** 4:*12*
**PDF** 19:*23*
**PENDLEY**
2:*4*
**Pennsylvania**
5:*15, 20*
**Pensacola** 2:*5*
**Pentech** 8:*15*
**People** 47:*18*
48:*11, 15*
50:*24* 51:*4*
79:*13, 14, 16*
93:*1* 114:*21*
115:*18, 19*
132:*11*
147:*18*
152:*19*
164:*12* 166:*9*
212:*19*
231:*11*
286:*15* 287:*1*
291:*7, 10, 18*
292:*3* 297:*3,
11, 12* 310:*8*
313:*14*
322:*23* 323:*5,
10* 325:*2, 6*
328:*19*
331:*15, 16*
339:*17*

342:*24* 352:*1,
5* 353:*21, 23,
24* 354:*9, 10*
355:*9, 18, 21*
356:*1, 15*
357:*6* 362:*22*
364:*24*
367:*20* 368:*5,
20* 369:*18*
374:*24* 375:*3*
378:*24* 379:*2*
387:*10, 11*
389:*1* 392:*15,
16, 20, 23*
393:*4*
**people's**
276:*17, 21*
**percent**
107:*23* 108:*3*
109:*3, 6*
123:*23* 135:*2,
12* 138:*17, 18,
20* 139:*7, 8*
158:*15* 159:*8,
11, 13* 160:*16*
162:*14, 21*
173:*17, 19, 21*
174:*2, 13*
175:*12, 14, 22,
24* 176:*13, 14,
17, 18* 179:*12,
17, 20* 180:*2*
194:*18, 22*
195:*18* 205:*9,
10* 207:*5, 7,
13, 23* 208:*6,
9* 228:*19*
310:*19* 317:*9*
321:*17* 322:*6*
333:*14* 347:*3*
387:*6*
**percentage**
349:*1*
**perfectly** 95:*1*
190:*20*
**perform** 66:*22*
**performed**
15:*3* 24:*24*
25:*18*
**period** 92:*17*
93:*12* 114:*23*

212:*14*
321:*15* 332:*21*
**permanent**
98:*14* 106:*20*
**person** 27:*23*
28:*20* 29:*3,
11, 18* 53:*15*
390:*15*
**personal** 51:*7*
73:*14*
**personally**
48:*4* 73:*16*
138:*4*
**person's** 278:*4*
**Pfizer** 48:*1*
89:*2*
**ph** 1:*20*
**Ph.D** 1:*13*
4:*10* 7:*3, 16,
19* 11:*16*
12:*3* 32:*16*
43:*16* 78:*1*
81:*15* 383:*21*
397:*8* 400:*16*
**Pharma** 3:*19*
4:*8* 5:*22*

**Pharmaceutical**
3:*18* 4:*7, 13,
14* 45:*3, 9, 12,
14, 23* 46:*3,
15, 24* 77:*1*
81:*9* 84:*19,
24* 85:*6, 7, 9*
86:*14* 87:*12,
13, 16* 88:*9,
10, 18, 23*
89:*4, 9, 18*
90:*23* 153:*18*
155:*14* 185:*6*
201:*3*
**pharmaceutical
/medical**
88:*12, 14*
**Pharmaceutical
s** 3:*18* 4:*7*
5:*6, 17* 8:*15*
**pharmacoepide
miology**
305:*16*

**pharmacokinet
ics** 63:*5*

**pharmacologist**
63:*3* 210:*15,
19, 22*
**pharmacology**
211:*1*
**Pharmacy**
4:*19* 86:*17, 18*
**Phase** 282:*17*
354:*21* 355:*2*
**physical**
26:*17* 225:*1*
344:*19*
**physically**
136:*11*
**physicians**
202:*1, 8*
**pick** 38:*10*
297:*1* 299:*23*
349:*14*
371:*23* 392:*19*
**picking**
166:*19*
356:*17* 393:*5*
**picture** 94:*21*
95:*24* 213:*19,
23*
**piece** 59:*16*
61:*8* 244:*9*
255:*5* 292:*6*
**pieces** 255:*4*
**Piedmont** 3:*9,
15*
**PIETRAGALL
O** 5:*13*
**pill** 291:*9*
292:*4*
**pills** 276:*24*
278:*3* 281:*18*
289:*13*
**pissed** 380:*3*
**Pittsburgh**
5:*15*
**PIZZI** 4:*1*
**place** 255:*1*
**placebo** 79:*1*
197:*23*
198:*10*
202:*10* 208:*11*

Confidential Information - Subject to Protective Order

**plaintiff** 46:7
47:5, 12 48:9
49:13 50:4, 5,
17, 18 51:9
82:23 85:2
86:13 87:2
254:10
**Plaintiffs** 2:7,
12, 16, 21 3:5
7:18 12:12
14:17 31:18
32:17 46:9
87:4 254:9
266:17 272:24
**plaintiff's**
34:17 48:13,
16 49:18
51:10
**platform**
20:11
**play** 75:5
164:12
350:22 351:3,
6
**played** 351:14
**please** 12:13
55:22 93:14
147:22 149:4
191:4 204:20
281:8 368:2
383:14, 23
398:3, 8
**PLLC** 2:12
**plot** 284:6
**plug** 99:1
117:12
**plugged**
106:24
**point** 30:12
38:23 94:5
108:8, 10
110:7, 12
112:18
113:18
127:17
139:20 140:6
149:23 153:6
154:1 155:8
157:24 159:8
160:8 161:12
162:12

167:17
168:22
170:12 182:5
190:13 195:3,
5 196:13, 18
204:5 212:12
245:11
247:14, 15
248:23 249:4
280:8 289:16
298:1 310:23
322:21
336:24 337:2
339:1 368:6,
7 371:14
**pointed** 114:7
**policy** 374:16
**politically**
34:16
**pool** 150:14,
20, 21 163:4,
17 172:24
**pooled** 163:14
**pooling**
148:20 149:7,
11, 12, 15, 23,
24 150:3, 19
165:12
**pop** 51:21
161:2
**popped** 160:17
**population**
100:8, 10, 14,
16 102:24
103:7 105:13,
19 107:22
108:2 109:2,
5 119:13, 24
165:18, 19
187:1, 2, 6, 8
189:8, 15
192:23 193:5,
6 194:17, 21
195:17, 21
199:15 200:2
234:17 260:4,
5, 7, 9, 23
286:7, 8, 14,
20, 23 287:4,
5, 8, 13, 14, 15,
17, 20, 22

288:4, 19
289:21, 22
290:21, 22
296:18
298:17, 18
307:1 312:22,
24 314:11
322:6 395:16
**populations**
100:24 101:8
187:18 188:4
260:22
261:13 299:17
**portion** 30:2
**portions** 18:18
**pose** 243:23
**position** 69:10,
18 70:1
130:13, 22
139:14
141:12
143:22
144:20
156:16 160:3
246:16 247:4,
19 248:11
249:12, 13, 17
250:7 288:15
330:10, 16
**positions**
138:2 215:10
**positive**
102:15, 22
103:5 122:13
131:7 138:8,
17, 21 140:24
150:18 151:1
158:21 159:3,
15, 17, 19
160:5, 23
161:2, 7, 22
162:1, 3, 6
163:15
164:10 174:1,
7, 12 175:11,
13, 21, 24
177:4, 11
189:6, 12
205:2 207:11,
16, 22 208:9

positives
159:19
**possible** 67:9,
16 102:14, 21,
23 103:4, 6
189:5, 7, 11, 13
**possibly** 24:14
261:22
322:23 323:6,
20
**potential**
32:19 111:22
112:3 118:18,
23 175:15
176:2, 3
198:5, 11, 19
249:19
266:19 267:5
344:23
**potentially**
66:2
**Pottegard** 9:8
239:10, 24
240:13 241:1
242:16, 22
248:13
249:22
250:14, 18
251:2, 10
252:22 258:1,
22 259:3, 10
265:10 267:9,
17 268:9
272:11, 12
273:19
287:20
306:17 308:4,
15 320:20
322:13, 15, 22
329:13
334:20 336:6,
7
**pounds** 292:1,
2, 22
**power** 328:3,
7, 13, 20
329:1, 7
**powerful**
327:13
**PowerPoint**
23:8

**PowerPoints**
17:9 22:16, 23
**practice** 59:8
376:21
**precision**
308:1
**prediction**
364:17
**prefer** 118:8
317:12
**pregnancy**
93:22, 24
**prepared** 31:3
**PRESENT**
6:7 106:6, 7,
10, 14, 19
156:1 158:7
**presentation**
23:8
**presentations**
17:10, 16, 23
**presented**
32:15 266:15
**presenting**
113:12
**president**
352:8
**pre-specified**
119:7, 17
157:18 199:8,
19 353:5
**Pre-specify**
134:1 286:14
**pressing** 298:3
**pressure** 27:9
**pre-treatment**
304:18
**pretty** 18:22
25:9 130:20
165:18
248:21 290:6
294:21 396:6
**previous**
74:12 85:21
**previously**
221:15
**primary**
126:23
133:20, 24
205:15
296:17, 20

Confidential Information - Subject to Protective Order

298:*16, 24*
306:*20*  322:*3*
**principle**  75:*8,*
*13, 20, 24*
93:*11*  95:*4, 5*
100:*2*  105:*7,*
*8*  123:*10, 11*
125:*7*  126:*9*
127:*4*  128:*15,*
*21*  131:*2, 16*
134:*5*  138:*3*
139:*6*  140:*13*
169:*5*  186:*21*
190:*7, 21*
191:*12*
205:*20*
301:*14*  304:*9*
**principles**
99:*12*  124:*22*
125:*11*
**Prinston**  4:*13*
**prior**  18:*12*
74:*20, 22, 23*
94:*16*
**privileges**  28:*8*
**Prize**  339:*13*
**probabilities**
316:*8*
**probability**
318:*13*  390:*19*
**probable**  70:*4*
**Probably**
20:*15*  38:*10*
47:*16*  53:*17*
61:*24*  131:*9*
140:*4*  149:*22*
184:*14*
234:*14*
243:*15*  274:*5*
278:*23*  279:*1*
288:*17*  291:*1*
300:*20*
301:*13*
315:*17*
322:*24*  323:*7,*
*20*  329:*23*
330:*18, 22, 24*
332:*10*  351:*5*
358:*6*  359:*5*
360:*13, 15, 19*

369:*9*  388:*13*
396:*5*
**problem**  27:*9*
41:*17*  42:*7*
73:*17*  75:*22*
125:*10*
140:*15*  141:*2*
150:*2*  151:*9*
153:*13*  154:*8*
167:*18*  169:*3*
177:*2, 10*
181:*7, 12*
191:*17*
230:*22*  231:*2*
243:*21*
259:*23*
288:*14*  297:*4,*
*10*  312:*18*
313:*9*  316:*3*
339:*10*
349:*17*  351:*8,*
*9*  361:*18*
383:*24*
385:*21*
386:*12*  390:*5*
392:*13*
393:*10, 18*
394:*1, 22*
**problematic**
153:*4*
**problems**
384:*12*
**procedure**
122:*16*
157:*11*
174:*21*  175:*3*
176:*9*  205:*4*
**process**  19:*17*
110:*17, 21*
126:*10*  197:*1,*
*5*  262:*16*
354:*3*  366:*5*
368:*23*
**PROCTOR**
2:*3*
**produce**
15:*19*  18:*9*
19:*12*
**produced**  73:*4*
**product**  21:*6,*
*14*

**Production**
10:*8*
**PRODUCTS**
1:*4*  8:*12*  9:*7*
11:*13*  32:*12*
80:*19*  86:*9*
322:*17*  333:*8,*
*14*  334:*14*
**profession**
152:*17*
**Professional**
1:*15*  397:*13*
**Professor**
76:*17*  78:*3, 5*
81:*17, 19*
380:*17*
**professors**
45:*20*  47:*16*
**profile**  355:*1*
371:*17*
**project**  56:*6*
**projects**  45:*12*
**prompted**
354:*13*
355:*16*  357:*11*
**pronounce**
83:*14*
**proportion**
109:*13, 17*
196:*4*
**proportional**
344:*17*  391:*10*
**propounded**
400:*9*
**prospective**
118:*19, 24*
171:*10, 11, 17,*
*19, 22*  172:*6,*
*14*  181:*1*
198:*20*  199:*1*
233:*18*
288:*17*  289:*5,*
*11, 15*  290:*8*
330:*14*
**prospectively**
173:*8*
**prospectives**
181:*5*

**PROTECTIVE**
1:*8*

**protocol**
119:*7, 18*
199:*9, 19*
353:*5*
**protocols**  28:*3,*
*14*
**prove**  371:*13*
**provide**  18:*13*
22:*7*  32:*10*
33:*1*  37:*7, 17*
39:*10, 17, 21*
41:*6, 10*
43:*23*  45:*2, 6*
135:*17*  229:*7,*
*9, 12*  252:*12*
266:*10, 21*
267:*13*  268:*2*
311:*1*  339:*22*
342:*15*  344:*2*
346:*12, 20*
347:*5, 15, 19*
348:*21*
349:*24*
357:*21*
358:*10*  359:*19*
**provided**  14:*3*
15:*4, 24*
20:*24*  22:*10*
24:*12*  28:*24*
31:*24*  39:*19*
97:*8, 9*  272:*7*
347:*15*
**provides**
305:*3*  359:*17*
**providing**
37:*14*  268:*7*
362:*16*
**Public**  1:*16*
338:*20*
339:*21*
379:*23, 24*
397:*14*  400:*23*
**publication**
21:*22*  279:*20,*
*21*  322:*18*
344:*12*  370:*9*
376:*20*
**publications**
21:*20*  26:*19*
27:*2*  29:*7*
74:*7*  279:*22*

362:*21*
365:*20*  366:*3*
**publish**
349:*11*
353:*19*  356:*6*
357:*3, 6, 7*
370:*6, 8*
371:*21*
373:*13, 18*
374:*3, 8*
378:*9*  379:*11*
380:*4*  385:*11*
**published**
69:*19*  126:*20*
302:*5, 8*
305:*17*
353:*21*
358:*16*
360:*23*  361:*2,*
*6, 8*  369:*22*
370:*5, 15*
371:*5*  373:*10,*
*23*  374:*7, 11*
377:*15*
379:*10*  385:*2*
**publishes**
378:*16*
**pull**  19:*15, 18*
183:*10*
185:*12*
227:*19*
230:*16*
231:*13, 17*
232:*17*  266:*3*
302:*22*  331:*5*
**pulled**  20:*19*
**Punta**  2:*10*
**purity**  282:*5*
**purpose**
211:*10*
212:*16, 18*
213:*10*  214:*2,*
*23*  239:*1*
240:*5*  336:*18*
**purposes**
31:*16*
**pursuant**  1:*13*
**put**  13:*2*
16:*22*  18:*15*
31:*17*  37:*6*
42:*22*  44:*24*

55:8  59:17
60:12, 22
61:4, 10
71:24  80:8
95:21  96:19
119:16  120:5,
8, 18  121:3
122:23
142:10
146:16
162:10  172:8
173:21  174:2,
24  175:2, 9,
18  177:9, 19,
23  178:21
179:10, 18
181:10, 16, 22
183:12
186:11  189:3
196:15  202:6
205:8, 23
206:2, 11, 18,
21  207:21
220:7  221:7,
11  222:2, 18
231:5  249:7
266:6  316:16
322:12
323:10
331:13, 15, 18
335:1  336:3
338:17
345:13  358:2
359:13
361:11
366:22
367:22
368:18  392:2
393:16
**putting**  165:14
**P-value**
126:22  134:1,
14, 21  135:6,
10, 14  139:3
145:5, 8, 15
148:19
149:11, 12, 14,
15, 17  151:7
154:18
156:11
158:12  161:6

162:19  165:3,
8, 13  167:11
169:9  170:20,
22  172:20, 22
178:18, 24
309:4, 7
310:24  311:8,
16, 17, 20
312:6, 9, 12,
22  313:4, 9,
11, 15, 19, 23
314:4, 5, 7, 8,
14  315:7, 8
316:4, 13, 14,
18, 19  317:2,
14, 18, 20
318:5, 7, 23
319:3, 18, 22,
23  320:6, 11
344:3  349:15
351:7, 15, 21,
23  359:17
362:17
**P-values**
126:18
162:18  280:4
315:5  317:23
319:8

**< Q >**
**Q1**  223:10, 16
254:19
255:17  279:23
**Q2**  279:23
**Q3**  279:23
**Q4**  223:12, 16
224:3  234:4
237:6  254:19
255:7, 18
279:23
**qualifications**
74:19  78:15
94:19  95:14,
17, 20  96:19
**qualitative**
71:3, 20
101:21  102:3
188:13, 20
**Qualitatively**
65:22

**quality**  116:6,
15, 21  119:11,
22  199:13, 23
381:8
**quantification**
66:13  74:3
**quantify**
105:15, 22
193:2  222:24
224:5  239:10
**quantitative**
45:5  101:1, 9,
22  102:4
110:17, 21
187:19
188:13, 20
197:1, 5
**quantitatively**
220:18  222:9,
20
**quantity**
41:20  42:9
156:16  392:21
**quarter**
223:11
**quartile**
226:16  234:7,
10  255:19
277:14
279:16, 22
280:18
**quartiles**
277:12
279:13, 16
**question**
23:17  25:9
41:17  45:21,
24  46:19
52:11  54:10,
15, 16, 17
68:24  73:8,
12  79:21
84:9  89:14
113:21  114:2
116:12  117:4
136:10, 20
139:20, 21
141:4  145:17
149:3, 4
150:16, 22
151:10

153:11  160:3,
9  190:18, 19
191:2, 8
209:14
210:22  212:8,
14  213:20, 21,
24  214:1, 22
215:24  218:7
219:6  226:18
232:6, 15
238:5  240:19
241:10, 17, 22
242:4, 10, 15
243:14
244:20, 22
246:20  248:1
250:1, 8
253:19
254:14
258:12  259:6,
9, 22  261:7
262:24  263:7,
9, 10, 21
264:6  265:2
285:21  286:4,
11  295:6
298:20  301:5,
17, 18  306:5
313:21  314:2
319:4, 11, 17,
20  334:22
337:16, 17, 23
338:7, 14, 21,
22  339:3, 6
340:24
341:10, 12, 24
343:4  348:15
362:6  363:20,
21  366:23
367:12
380:19  394:21
**questionable**
343:24
**questioning**
255:12
264:12  314:1
**Questions**
10:14  24:1
50:13  72:15
161:11  212:7
238:24

240:22
259:19
273:18
300:24
322:16
386:10  400:8
**quick**  21:3, 12
**quickly**  159:1,
4  163:8
185:13
268:21, 22
271:10, 15
272:9  394:12
**quintile**
255:19
**quite**  46:5
58:5  62:1
73:7, 24  84:8
149:24
155:20  184:2,
24  190:15
200:7  202:13,
20  214:7
237:17  260:8
263:8, 14
291:21  296:15
**quote**  117:20
219:1
**quoted**  205:17
221:9  245:24
**quoting**
333:19  383:3

**< R >**
**RAFFERTY**
2:3
**raise**  125:24
148:4  149:19
166:3  217:24
285:23
**raised**  125:14
128:3, 4
131:23
132:13
136:18  147:6
166:2  169:18,
21  229:6
267:19
**random**
382:16

Confidential Information - Subject to Protective Order

randomize 204:*14*

randomized 111:*23* 112:*4* 113:*15, 19* 114:*11* 115:*6, 9, 15* 116:*2, 4, 13, 19* 117:*11* 120:*6, 9* 121:*14, 21* 198:*7, 12* 201:*14, 18* 203:*11, 16* 303:*12*

randomly 120:*10, 19* 201:*24* 202:*7*

ranitidine 256:*6* 257:*2* 273:*2* 274:*1*

ranking 301:*3*

rare 163:*11, 12, 15* 312:*15*

rarely 372:*16*

RASPANTI 5:*13*

rate 98:*7, 13* 101:*3, 11, 12, 23* 102:*5, 13, 21, 24* 103:*3, 7* 107:*21* 108:*2* 109:*1, 5* 110:*19, 23* 138:*8, 17, 21* 141:*1* 148:*11, 12, 16* 150:*18, 21* 151:*1, 4, 12* 156:*10, 17* 158:*4* 159:*3, 15* 162:*3* 169:*20* 173:*24* 174:*6, 12* 175:*11, 13, 21, 24* 177:*4, 7, 11, 14* 179:*12, 20* 186:*5, 6, 13, 16* 187:*21* 188:*6, 15, 22* 189:*4, 8, 10, 14* 194:*16, 20*

195:*17, 20* 197:*3, 7* 205:*2* 207:*10, 16, 22* 208:*9* 298:*1* 342:*16* 387:*5, 6*

rates 150:*4* 156:*6*

ratio 136:*1, 6, 10* 164:*6* 167:*19* 168:*2, 3, 14, 22* 169:*2* 217:*19* 228:*5, 6, 8, 9* 255:*16* 284:*10* 286:*17* 297:*22* 298:*3* 317:*1, 6, 10* 318:*15* 321:*16, 22* 322:*5* 345:*10* 351:*18* 384:*22* 389:*10, 16, 21* 390:*1, 8, 10, 12, 13* 391:*5, 6, 9, 11, 15* 393:*3*

Raton 4:*11*

raw 351:*2*

RCTs 303:*24*

reach 243:*4* 250:*17* 251:*5*

reached 36:*6, 11, 18* 389:*4*

read 21:*20* 64:*8* 68:*19* 69:*23* 70:*16* 143:*13* 183:*24* 204:*9* 209:*2* 211:*13* 212:*5* 215:*13, 14, 16, 18* 217:*1, 2, 3* 230:*20* 239:*13, 20, 22* 240:*11* 246:*10* 250:*20, 21* 252:*11, 14*

254:*17, 23* 265:*20, 22* 271:*9, 12, 21, 24* 272:*2, 16* 278:*19* 289:*8* 309:*24* 335:*12* 337:*1* 341:*7, 14* 346:*23* 369:*13* 392:*19* 394:*5, 8* 397:*9* 398:*3* 400:*5*

reading 219:*21*

real 266:*4* 368:*20*

reality 353:*24*

realize 128:*23* 165:*11* 225:*14* 253:*17* 254:*8* 256:*1* 379:*13*

really 26:*5* 29:*6* 46:*12* 52:*9* 83:*2, 4* 84:*1* 89:*12, 21* 90:*1* 113:*10* 131:*13* 136:*11* 138:*19* 147:*11* 149:*20* 151:*5* 160:*4, 11* 164:*6* 168:*3* 169:*16* 250:*9* 253:*2* 262:*18* 270:*21* 288:*14, 16* 290:*8* 292:*13* 298:*2* 314:*21* 315:*24* 324:*6, 10* 325:*13* 332:*8* 347:*10* 349:*2* 350:*5* 353:*4* 356:*2* 358:*4* 363:*21* 369:*18* 371:*16* 376:*18* 378:*1,*

*10* 379:*2, 23* 380:*3, 14* 381:*9* 385:*4, 5* 394:*13*

Realtime 1:*16* 397:*14*

reason 67:*12* 169:*18* 335:*5* 388:*9* 398:*5* 399:*6, 8, 10, 12, 14, 16, 18, 20, 22, 24*

reasonable 392:*9*

reasonably 68:*16* 70:*5*

reasons 69:*2, 7*

recall 17:*21* 34:*3* 50:*19* 58:*7* 80:*24* 93:*19* 128:*19* 184:*11, 20* 185:*15* 251:*7* 262:*9* 277:*2* 278:*16* 279:*9, 11, 17* 280:*11, 15* 281:*1* 344:*7, 10* 354:*16* 355:*24* 357:*16* 365:*14*

recalled 333:*8*

recalls 354:*13* 355:*15, 21* 357:*10*

receipt 398:*17*

receive 100:*17* 187:*9* 324:*1*

received 24:*15, 18* 28:*20* 45:*14* 46:*2, 23* 61:*10* 74:*8* 77:*24* 81:*15*

receiving 111:*13, 14* 197:*22, 23* 202:*3, 9*

recess 183:*5*

recognize 187:*14* 346:*10, 17* 370:*13* 371:*3*

recollection 83:*24* 93:*18* 239:*14*

recommend 392:*17*

recommendatio ns 307:*15, 18*

recommended 19:*21* 271:*19*

reconsider 93:*3*

record 11:*3, 22* 60:*13* 94:*8, 12* 96:*6, 10, 14* 183:*2, 9* 275:*1, 5* 342:*8, 12* 396:*10, 14, 17* 397:*6*

recording 59:*16*

red 295:*20*

redo 75:*11*

reduce 27:*4, 5, 19, 20*

reduced 26:*20, 21* 67:*8, 15*

REEFER 5:*14*

refer 65:*19* 219:*13, 16* 221:*4* 222:*8* 230:*17* 234:*3, 13*

reference 21:*22* 252:*9* 384:*14, 15*

referenced 29:*23*

references 19:*21* 20:*4* 30:*12* 56:*21* 57:*19* 80:*2* 128:*5* 131:*24* 204:*21*

referred 118:*3* 169:*10* 228:*10*

Confidential Information - Subject to Protective Order

**referring**
213:*1*, *14*
220:*6* 222:*18*,
*21* 230:*24*
232:*20*
**refers** 219:*18*
220:*5*
**reflect** 74:*16*
**reflecting** 16:*7*
**reflects** 75:*1*
135:*10*
**refresh** 83:*23*
165:*1* 184:*1*
**refusing**
242:*14*
**regard** 17:*11*
25:*1* 28:*21*
29:*11*
**regarded**
121:*15*, *22*
203:*12*, *17*
**regarding**
17:*18* 23:*18*
24:*2* 25:*6*, *13*,
*22* 26:*1*, *15*
29:*3*, *18*, *19*
72:*15* 80:*6*
248:*22* 263:*7*
264:*16*, *17*
311:*4* 341:*16*
395:*18*
**regards** 63:*4*
152:*13* 346:*5*
**Registered**
1:*15* 397:*13*
**registries**
305:*23*
**registry** 287:*6*,
*7*
**regression**
344:*17* 359:*12*
**regulatory**
68:*14* 70:*10*
130:*24*
132:*11* 143:*3*
146:*22*
**reject** 318:*12*
327:*11*, *13*
328:*3*, *7*, *13*
329:*1*, *8*

**related** 21:*5*,
*13* 24:*14*, *16*,
*19* 25:*19*
26:*18*, *19*
28:*9* 45:*5*
61:*2* 141:*22*
257:*13* 306:*5*
**relates** 114:*17*
**relation** 259:*7*
**relationship**
66:*14* 254:*21*
**relative** 79:*1*
98:*16* 136:*1*
186:*15* 363:*14*
**relatively**
65:*2* 66:*2*
195:*13*
**relax** 141:*3*
**relaxation**
141:*5*
**release** 49:*12*
**relevance**
79:*20* 343:*22*
**relevant**
95:*12* 99:*1*, *2*
107:*1*, *2*
202:*18* 212:*8*
230:*5*, *7*
248:*21*
253:*15* 264:*9*,
*11* 265:*14*
270:*22*
273:*17*, *20*
281:*15*
**reliability**
357:*24*
**reliable** 79:*3*
118:*18*, *23*
198:*20*, *24*
357:*4*
**relied** 18:*3*
**rely** 30:*1*, *2*
39:*24* 40:*14*
111:*22* 112:*3*
198:*6*, *12*
339:*18*
345:*21* 346:*6*
**remember**
18:*17* 19:*1*
34:*7*, *22*, *24*
35:*2*, *22*, *23*,

*24* 38:*14*
48:*10* 51:*18*
54:*23* 55:*3*
56:*18*, *20*
81:*3* 85:*1*
88:*2* 92:*9*, *13*,
*18* 93:*23*
94:*14* 158:*15*
183:*20*, *22*
184:*23*
185:*11*
209:*17*
210:*16*, *17*
218:*24* 220:*2*,
*20* 229:*4*
256:*9* 272:*15*
279:*4* 309:*1*
379:*6*
**remind** 83:*3*
**remission**
119:*12*, *22*
199:*13*, *24*
**remote** 1:*13*
11:*10*
**remotely**
11:*18*, *20*
**renal** 83:*13*
**repeat** 75:*4*
95:*11* 116:*12*
137:*4* 153:*23*
191:*19*
**repeated** 75:*21*
**repeatedly**
75:*15* 126:*23*
**rephrase**
283:*7*
**replacing** 51:*2*
**Report** 7:*21*,
*22* 8:*6*, *9*, *10*,
*14* 16:*11*, *23*
18:*4* 19:*6*, *7*
20:*24* 21:*21*
22:*4*, *22* 23:*6*,
*20* 25:*11*
29:*8* 30:*8*, *17*
31:*2*, *16*, *23*
32:*16* 33:*8*,
*10*, *12* 37:*2*, *4*,
*19* 38:*7*, *10*
42:*16*, *22*
43:*20*, *22*, *23*

44:*1* 56:*16*,
*19*, *24* 57:*3*,
*14* 64:*5*
67:*21* 68:*1*
72:*10*, *17*, *18*,
*19* 73:*3*, *4*, *19*,
*20* 74:*12*, *13*,
*20*, *22*, *24*
75:*11*, *21*, *22*
76:*16* 77:*9*,
*19* 81:*1*, *6*
82:*18* 85:*12*
95:*21* 96:*19*
97:*7*, *9*, *12*
98:*5* 99:*8*, *9*,
*10*, *11*, *15*, *16*,
*23*, *24* 100:*22*
105:*7*, *9*
107:*2*, *3*
108:*5*, *21*, *22*
110:*2*, *8*
118:*15*, *20*
119:*15* 122:*5*
123:*3* 125:*3*,
*4* 126:*22*
134:*20*, *23*
146:*17* 155:*2*
156:*13*, *14*
157:*14*, *24*
158:*17*
161:*12* 162:*8*,
*10* 164:*15*, *24*
175:*18*
176:*15*
183:*11*, *13*, *24*
185:*2*, *12*, *17*
189:*23* 201:*4*
203:*3* 205:*6*
211:*14*
212:*16*, *17*
213:*5*, *8*, *18*
214:*3*, *18*, *21*,
*23* 215:*5*, *12*,
*16* 216:*15*, *17*
217:*2*, *16*, *24*
218:*4*, *21*
219:*17* 220:*6*
221:*21* 222:*2*,
*3* 228:*22*
229:*2* 230:*1*,
*12*, *19* 231:*1*

232:*3*, *5*
237:*21*, *22*
238:*7*, *8*
241:*24*
244:*15*, *23*
245:*1* 246:*10*
247:*8* 250:*23*
252:*10*, *12*
254:*6*, *18*
257:*23* 258:*5*,
*14* 265:*6*
266:*4*, *16*
267:*18*, *20*
268:*23*, *24*
270:*19* 271:*9*,
*13* 272:*10*, *12*,
*15* 276:*6*
278:*12*, *15*, *20*
279:*2* 280:*12*,
*16*, *24* 281:*5*,
*12*, *14*, *22*
283:*24* 307:*7*
308:*23*
321:*21*
334:*23* 335:*1*,
*10*, *17*, *21*
336:*1*, *8*, *19*,
*24* 337:*2*, *3*,
*20* 340:*16*, *20*
341:*5*, *7*, *15*
342:*14*
343:*14*
344:*13* 346:*2*
362:*9* 395:*13*
**reported**
66:*18* 167:*3*
263:*24* 264:*2*
**reported."and**
83:*19*
**Reporter** 1:*15*,
*16* 11:*23*
397:*13*, *14*, *22*
**reporting**
126:*17*
166:*20*
277:*11*
279:*24*
307:*16*, *19*
**reports** 68:*6*
73:*11* 76:*1*
94:*16*, *19*

Confidential Information - Subject to Protective Order

95:21  96:20
97:1  102:10
103:9, 22
104:19  120:3
124:18  125:1,
21  147:5
148:6  155:11
157:2  173:13
174:9  189:17
190:10  191:9,
16  208:20, 23
209:6  214:10
271:6  335:23
336:3  341:16
**represent**
12:11  48:8,
11, 19  49:24
87:3
**representation**
89:17
**representative**
188:3
**representatives**
100:24  101:8
187:18
**represented**
47:5  48:23
50:4, 6  86:3,
12  87:16, 23
88:18, 22  89:4
**Representing**
2:7, 12, 16, 21
3:5, 17  4:6,
13, 19  5:5, 11,
16, 21  47:11
48:18  49:6
50:16  76:22,
24  81:9  84:4,
7, 10, 23  85:8
**reproduction**
397:20
**Request**  10:8
13:24  16:5
**requested**
397:6
**requests**
13:16, 17
19:19
**required**  231:9
**research**  8:22
24:11, 16, 19,

24  25:3, 6, 13,
19, 21  26:1, 4,
15  146:19
261:6  305:22
306:8
**respect**  83:17
104:5, 12
111:21  112:2
174:15
179:15, 23
192:2, 9
198:5, 11
208:1, 11
307:24
**respond**  19:18
**responded**
191:11
**responding**
37:12  38:22
156:14
241:23  247:6
**response**  37:3
38:6  43:24
124:8  255:13
299:21
300:11  313:21
**Responses**
7:18  14:16
**responsible**
336:2
**responsive**
14:5
**rest**  321:7
**restrict**  137:24
**restricted**
321:14
**result**  65:24
101:23  102:5
122:18
123:18  124:1
127:15  160:5
164:11
188:14, 21
205:14  206:7,
11  260:1, 3
282:3  283:1
284:13
297:18
326:12
327:10
347:19

354:13
355:16, 19
358:5  362:1,
23  363:13
364:4  367:19
372:22  376:3
**resulting**
345:10
**results**  32:18
40:7, 11
95:15  110:5,
9  121:14, 20
126:2  159:18
173:4  177:5,
12  196:10, 16
203:10, 16
212:20, 23
213:1, 12, 14
214:3, 4, 24
216:19
233:10
266:17  267:3
297:6  321:2,
11  327:22
358:13, 19
359:3, 22, 24
363:7, 24
395:14
**retained**  32:9
55:20, 23
185:5  256:15
257:8  266:10
**retrospective**
233:19
**return**  398:15
**review**  13:23
16:17  29:2
32:14  43:23
56:22  65:11
66:6  70:14
72:21  137:13
156:12  250:9
257:1  266:14
273:2  325:10
340:15
**reviewed**  19:5
20:1, 20, 23
21:8, 16
22:10  37:23
59:15  70:1
152:7, 12

229:24  252:4
263:6  271:14
272:9  329:12
**reviewing**
16:16  17:1, 3
241:23  325:16
**Reviews**
302:17
**rheumatoid**
200:3, 15
303:12
**Rheumatology**
302:6, 8, 16, 17
**RIDDELL**  3:3
**right**  15:2
16:13  23:24
32:21  33:20
36:13, 23
38:1, 13  40:4
41:10  44:15
45:13  46:14,
17  49:10, 12
50:1, 12  55:7
57:9  59:13,
15  64:20
66:9  68:4
69:11, 18, 21
70:18  72:9
74:14  75:5, 9,
17  76:17
80:3  84:10,
12  85:3
87:10  89:14
90:4, 18, 19
91:16  92:10,
15  93:8, 10
94:7, 11  95:1,
2, 7, 11  96:9,
13  99:4, 7, 14
104:7, 22
107:18
112:19  114:6,
12  115:4, 5
118:11
123:22
124:20, 24
126:12, 13
127:8, 19, 24
128:1  129:12
130:21
131:12

133:16  135:3,
7, 19, 23
136:5, 12, 13
137:16, 18
138:7, 11, 14,
22  139:15
140:2, 17, 20
141:6  142:20
143:1, 23
144:8, 12, 18,
21  145:5, 14
146:3, 6
147:6, 15, 22
150:12, 16
151:6  152:15,
18, 23  153:2,
14, 20  154:6,
10, 12, 20, 23
155:6, 9
156:1, 11
157:11, 17, 19
158:6, 19
159:2, 5, 11,
13, 16, 17
160:1, 5, 9, 12,
20  161:9, 11,
20, 23  162:4
163:18, 22, 23
164:4, 8, 13,
14  166:8, 11,
14, 18, 23
167:16, 18
168:4, 8, 23,
24  169:6, 9,
23  170:11
171:12, 14
173:11, 18
174:2  180:23
182:7, 20
183:1, 8
184:1  186:22
187:12, 13
190:7  194:14
200:8, 20, 24
202:19
204:10, 14, 15
206:4  211:18
214:12, 16, 21
215:9  216:18
217:9, 15, 21
218:6, 17

219:4  220:14
222:15, 22
223:20  224:3
228:8, 14
229:14, 20
230:8, 13
231:14, 15
232:2, 20
234:9, 15
235:3, 4, 6, 14
236:2, 16, 20
237:4, 6, 8, 19
238:3, 4, 6
242:11  244:3,
18  245:1, 5, 7,
21  246:20, 22,
24  248:11
249:3  250:10,
24  251:15
252:16  253:5,
10, 14, 20, 21
254:4, 13, 15,
24  255:3, 11,
20  258:1, 18
259:2, 9
260:6  261:8,
9, 20  262:1,
15, 17, 19
263:9, 11, 19
264:7, 13, 18,
19, 23  265:4,
23  267:23, 24
268:3, 10
269:2, 24
270:21  271:2,
11  272:1, 20
274:9, 24
275:4  277:5,
18  278:24
279:3, 23
280:3  282:20
283:4  284:1,
4, 14  285:19
286:5, 10, 11,
12, 20  287:15
288:2, 9, 11,
16, 20  289:9,
15, 21, 24
290:3, 10, 14,
17, 19, 24
291:12, 15, 17,

19, 22  292:8,
23  293:15
294:17, 22
295:18, 21, 22
296:5, 18
297:2, 8, 17,
22, 23  298:18
299:7, 9, 12,
17  300:8, 11,
20  302:24
303:6  309:5,
19  310:7
311:5  312:2,
5, 9  313:2, 6,
12, 13  314:22
315:15, 20
316:8  317:1,
2, 7, 11, 15
318:6, 15, 18,
20  320:8, 11,
12, 17  323:7,
21  324:6, 8,
11, 14  325:7
326:16, 23
327:3, 5, 12
328:17, 18
330:5, 8, 14,
23, 24  331:21
332:2, 8, 13
336:3  337:21
338:11
339:17  340:5
341:10  342:7,
11  347:20
348:4, 8, 12
349:2, 8, 10,
17, 22  350:6,
10, 12, 15
351:1, 8, 24
352:4, 8, 21,
22, 23, 24
353:11, 12, 19
354:4, 7, 10,
11, 22  355:8,
19  356:3, 4,
14  358:22
360:12  361:1,
3  362:8, 9, 14
363:1, 2, 15
364:6, 12, 17
365:2  366:2,

18, 23  367:14,
16, 18, 19
368:15, 17, 22
369:9, 16
370:8, 10
373:16  374:1
375:4, 14
376:6, 16, 20
378:4  379:4,
15, 19  381:5,
11  385:6, 18
386:19, 21
387:2, 7, 14,
20, 22  388:1,
9, 14  389:13
390:8, 16
391:15, 20
392:3, 10, 22
393:3, 15
394:7  396:2,
5, 16
**right-hand**
99:6  164:3
194:2
**rights**  90:17
**rigorous**  354:2
**risk**  9:7
32:19  41:23
42:12  66:14,
23  78:24
114:24  136:2
167:13  170:3,
5, 16, 19, 22
171:12
172:19, 20, 22
204:2, 3
217:11, 20
222:6  228:6,
8  239:3
240:7  241:12
242:6  243:5
244:13  246:2
249:15, 20
250:18  251:6
252:8, 19
257:4, 15, 18
258:10  265:9
266:19  267:5
286:5  340:9
344:16
361:22

382:17
387:22
388:21
389:22  390:1,
9, 12  391:16,
18  392:2
393:17
**risks**  17:11
28:9
**Rite**  4:19
**Road**  3:9, 15
350:15
**ROBERT**  1:4
**robustness**
169:3
**role**  147:11
**ROONEY**  5:6
**ROSEMARIE**
3:3
**Rosemarie.bog
dan@1800law1
010.com**  3:5
**rough**  62:12
**roughly**  47:16
59:11
**rounding**
260:10
**route**  156:19
211:20
**rule**  93:15
127:13
140:15
154:24
173:17, 19, 21
174:3  179:11,
19  181:8, 13
207:5, 7, 13
208:6  311:11
**rules**  32:3
92:15
**run**  319:19
**running**  324:7

< S >
**sadly**  282:24
355:6
**safe**  131:9
139:10
174:15
201:10  208:1,

11  355:7
356:23
**safety**  25:10
35:16  118:19
119:1  121:17,
24  128:11, 16
129:1, 8, 11,
12, 20  130:2,
6  131:3, 14,
16, 21  132:7,
17, 22  133:4,
14, 21  137:1,
5, 15, 16
138:1, 5, 23
139:4  140:5,
7  141:3, 6, 10,
22  142:23
143:11, 18
144:4  145:22
146:12, 23
147:8  148:14
149:9  151:18
152:13
153:20
154:12
155:16  156:7
174:5  175:16
176:2, 3
198:21  199:2
203:14, 19
211:16, 20
280:9  283:4
303:11
305:16
354:20  355:3
356:13  357:1
**sake**  366:22
**sample**  100:8,
13  104:3, 4,
10, 11  105:12,
19  107:8, 14
108:15, 19
109:16  110:5,
10  186:24
187:2, 6, 7
191:24  192:1,
7, 8, 23  193:6,
11, 15  194:6,
8  195:10
196:6, 11, 16

Confidential Information - Subject to Protective Order

227:6  312:1,
16, 23  318:22
**samples**
100:23  101:7
109:12
111:20  112:1
187:17  188:3
196:2  198:4, 9
**sampling**
101:24  102:6
188:16, 23
**sand**  245:20
309:5
**Sanofi**  84:17
**save**  315:17
**saw**  88:21
254:13
280:23  354:19
**saying**  24:8
33:19  43:2
52:24  53:21
69:12  88:9
92:19  94:23
118:8  124:24
126:16
133:18
142:13, 16, 22
160:15
165:15  166:3
178:9  191:1
194:13
214:20
217:22
238:12  247:9
260:20
277:21
287:23  288:1,
2  289:6
291:9, 13
310:17
311:20
314:10, 12
316:14  320:5
323:15  324:9,
11, 17, 23
325:3, 21
326:10, 15
327:11  328:2,
5  335:14
346:17
355:22

362:11, 21
364:16
365:23
368:12  377:6
380:7  381:2
383:3  384:21
**says**  14:16
15:10, 11
16:5  17:7
18:5  19:9
32:6, 9  43:15
55:15  56:4
64:23  65:15
66:12  67:7
70:21  76:16,
20, 21  77:24
78:20  80:18
81:5, 14
82:12, 17
83:8  85:13,
18, 20  86:5,
20  87:1  88:3
91:12  93:21
98:12  100:5,
6  101:20
103:17, 24
105:11
128:10
132:16
134:13
174:11  176:8
186:3, 24
187:5, 16
188:11
192:20  194:5,
7  201:17, 23
202:24
222:21
223:16  266:9,
23  267:3, 12
303:8  304:8,
14  305:20
311:11  321:2
387:16
**scale**  148:19
220:4, 13, 15
221:6
**School**  78:7
81:21  148:17
152:15  380:17
**ScieGen**  5:5

**science**  45:5
78:5  81:19
131:1  295:2
**scientific**
110:17, 21
116:16, 22
117:15, 16
145:6  168:7
197:1, 5
316:6  367:24
369:19
**Scott**  8:18
91:11
**scratched**
294:15
**scratching**
294:18
**screen**  13:3
172:8  173:14
185:11
221:12  266:6
322:11
**scroll**  105:4
**search**  21:3, 9,
13, 17  52:13,
17, 20  377:13
**second**  14:22
15:8, 10  16:5
89:23  120:17
122:24
123:16  139:5
225:15  229:5
267:12
274:12
305:14
309:21  316:2
318:23  321:1
369:3
**secondary**
83:11  126:24
134:3, 6, 11,
15, 24  135:2
145:2  296:22
299:1
**seconds**
138:10
**Section**  265:21
**sector**  45:15
46:4, 18  47:1
**sectors**  45:17

**securities**
35:12  89:3
**security**  34:14
46:8
**see**  13:18, 21
14:19  15:6,
21  22:5  26:7
28:11  31:1, 4
35:18, 24
37:9  41:16
43:14, 18
44:10, 20
49:4  52:13
55:11, 13, 14
56:4, 8  57:8
58:11, 24
61:7  63:17,
20, 21  64:8
65:4  66:4, 20
67:10  71:7
75:17  76:14
77:10, 20
78:9  79:5
80:18, 22
81:13  82:15
83:21  84:18
86:1, 5, 10, 23
87:21  88:4,
12  89:11
91:9, 12  96:7
98:4, 19
101:14
104:15
105:24
106:11, 22
112:5  118:13
122:21  123:6,
8  124:5, 23
126:19  130:3
135:11
146:19
147:23
150:20  178:3
179:9  180:19
182:6  185:13
201:15
204:10, 11
221:7, 14
224:16
225:16  226:3,
10, 21, 23

229:21
230:17
231:18
232:18
240:19  246:4,
11  251:9
252:5  257:3,
17  258:4
273:15
280:13  283:8
284:7, 22
290:17
292:21  297:4
300:5, 15
302:5, 7, 9, 16,
19  303:5, 17
304:1, 20
305:15, 18
307:17  308:2
311:24  313:1
315:13  316:3,
12  317:16
320:24
321:11, 19
328:6  332:16,
17, 22  333:3,
4  335:7, 9, 13,
15, 21  344:5
345:6, 18
349:2, 16
350:23  352:9,
12, 13, 20, 23
355:9  362:8
363:17
366:16  367:7,
15, 21, 23
368:24
369:17  382:6,
8, 10, 20
384:15  385:9
**seeing**  262:9
**seeking**  92:1
**seen**  13:7
64:7, 11  68:5
125:4  132:15
133:2  156:4
271:5, 6
275:24  279:5
291:23  304:4
321:14

Confidential Information - Subject to Protective Order

354:*17*
355:*15* 357:*10*
**select** 353:*14*,
*15, 16* 356:*20*
**selection**
121:*4, 7*
203:*1, 4*
**sell** 349:*6*
**seminars**
17:*10, 16*
**send** 18:*17*
19:*1* 20:*7*
21:*24* 60:*13*
212:*1* 218:*5*
230:*19* 253:*9*
256:*12*
**sense** 182:*19*
246:*23* 300:*1*
347:*24* 394:*17*
**sensitivity**
293:*5* 307:*11,*
*21* 308:*8*
**sentence**
21:*19* 104:*17,*
*18* 108:*7*
109:*19, 22*
118:*12*
120:*16, 18, 22*
121:*12*
123:*16* 176:*8*
178:*15*
186:*23* 187:*4,*
*16* 188:*1*
190:*4, 10*
191:*21* 193:*7*
194:*5, 15*
195:*2, 4, 8, 14,*
*16, 19, 22*
196:*1, 5, 9, 21*
198:*3* 201:*13*
202:*24* 203:*6*
205:*22* 208:*4*
214:*8* 215:*4*
269:*5* 383:*9*
**sentences**
72:*15, 18*
73:*2, 19*
81:*14* 98:*22*
100:*19*
101:*17* 102:*9*
103:*9, 21*

106:*3* 107:*18*
108:*4, 11, 20*
109:*7* 110:*13,*
*24* 111:*16*
112:*8* 119:*2*
120:*2, 13*
121:*9* 123:*9*
124:*6* 174:*9*
175:*7* 176:*5,*
*20* 177:*17*
178:*10* 180:*5*
182:*3* 186:*19*
187:*10* 188:*8,*
*24* 189:*16*
191:*9, 15*
192:*13*
194:*11, 24*
197:*8, 24*
198:*14* 199:*3*
200:*5, 13*
201:*20*
202:*11, 17*
203:*21*
**Sentry** 5:*19*
**separated**
131:*13*
**separately**
302:*14*
**September**
1:*10* 11:*8*
333:*4, 7*
397:*15*
**sequence**
211:*23*
**serious** 255:*5*
362:*20*
**seriously**
354:*1* 356:*4*
358:*17* 359:*6*
364:*10*
381:*22* 382:*1*
**served** 18:*4*
**service** 45:*6*
**SERVICES**
1:*18* 11:*6*
85:*24*
**set** 18:*3* 28:*8*
112:*19* 113:*1,*
*6* 138:*4*
164:*19*
195:*13*

223:*14* 322:*2*
348:*4, 7, 13*
349:*14* 353:*6,*
*8* 354:*8*
368:*16*
369:*15, 16*
375:*7*
**sets** 306:*10*
**setting** 111:*23*
112:*4* 113:*2*
198:*7, 13*
301:*13*
326:*22*
330:*23* 363:*8*
364:*1, 2*
365:*12, 13*
**settings**
121:*16, 23*
203:*13, 18*
**settle** 93:*2*
**setup** 114:*20*
**sex** 321:*13*
344:*18*
**share** 38:*11*
131:*2* 139:*15*
231:*22*
366:*17* 374:*13*
**sharing** 137:*19*
**sheet** 398:*7, 9,*
*12, 15* 400:*12*
**Short** 94:*9*
275:*2* 342:*9*
**Shorthand**
1:*16* 397:*13*
**shortly** 273:*8*
**show** 95:*24*
135:*1* 146:*3*
154:*17* 158:*3*
164:*24*
166:*21*
171:*14* 209:*1*
225:*18*
231:*13*
242:*16, 23*
244:*24*
279:*14*
280:*20* 300:*2*
333:*1* 352:*10*
383:*10*

**showed** 71:*19*
257:*15*
259:*14* 310:*11*
**shown** 251:*19*
**shows** 13:*14*
43:*16* 58:*9*
65:*22* 80:*20*
85:*23* 103:*12*
150:*21*
172:*18, 19, 21*
226:*21*
307:*15, 20*
**Side** 8:*17*
28:*4, 15*
31:*17, 18*
33:*17, 22*
34:*8, 15, 17,*
*20* 35:*3* 46:*7,*
*9* 48:*13, 16*
49:*14, 18*
51:*10* 64:*20*
70:*18* 80:*9*
83:*17* 90:*5, 9,*
*18* 91:*10, 19*
97:*3, 6, 21*
98:*5, 11* 99:*6*
100:*7, 12, 22*
101:*5, 19*
102:*1, 12*
103:*1, 12, 17,*
*24* 104:*7*
105:*17, 22*
106:*6, 9, 14,*
*18* 107:*7, 11,*
*24* 108:*9, 18,*
*24* 109:*4, 10,*
*14* 110:*16, 20*
111:*11, 19, 24*
120:*8* 121:*19*
123:*22*
124:*13* 164:*3*
173:*18, 20*
174:*2* 181:*22*
183:*12, 18, 23*
184:*6, 7, 8, 12,*
*21* 185:*2*
194:*2* 200:*11*
206:*1* 307:*15*
329:*4*
**side-by-side**
186:*1*

**sides** 34:*4*
356:*22*
**sign** 397:*9*
398:*8*
**signal** 171:*14*
173:*9* 175:*16*
176:*3* 291:*1*
386:*23*
**signature**
31:*5, 10*
43:*17* 57:*5, 8*
**signed** 57:*9*
**significance**
122:*18* 123:*3,*
*19, 23* 124:*2*
136:*8* 173:*22*
174:*4* 205:*5,*
*11, 14* 206:*8,*
*12* 207:*8, 14*
227:*8* 255:*21*
280:*5* 284:*8*
310:*4* 315:*1*
362:*13*
**significant**
166:*19* 170:*4,*
*17, 20* 178:*17,*
*22* 222:*5*
223:*17, 22*
224:*2* 225:*6*
282:*20* 313:*5*
314:*19* 315:*2*
317:*5* 351:*22,*
*23*
**significantly**
217:*10* 344:*15*
**signing** 398:*10*
**similar** 65:*23*
98:*23* 99:*17,*
*22* 100:*19*
101:*3, 11, 17*
104:*3, 10, 18*
106:*2* 109:*19*
111:*16*
120:*12, 15, 21*
123:*9* 124:*19*
131:*16*
149:*12, 17, 21*
150:*8* 165:*18*
166:*4* 178:*5,*
*10* 180:*6*
182:*3* 183:*15*

186:*18*, 22
187:*10*, *21*
188:*8*, *24*
189:*16*
191:*18*, *24*
192:*7*, *12*
193:*7*, *16*, *18*,
*22*  194:*1*, *11*,
*13*, *23*  195:*14*,
*22*  197:*8*, *24*
198:*14*  199:*3*
200:*6*, *13*, *18*
201:*20*
202:*11*
203:*21*
205:*17*, *20*
206:*24*
207:*18*
208:*14*  263:*3*
293:*10*
304:*10*
309:*18*  344:*7*
**simple**  42:*4*
215:*23*  247:*7*
**simplified**
367:*8*, *11*, *13*
**simply**  74:*9*
114:*8*  133:*18*
136:*15*
139:*20*
141:*16*
232:*12*
251:*13*  351:*14*
**simultaneously**
59:*5*  123:*21*
124:*4*  173:*23*
174:*4*  181:*19*,
*24*  206:*20*, *23*
207:*9*, *14*
208:*7*
**single**  110:*5*,
*10*  122:*19*, *20*
123:*4*, *5*
126:*3*, *11*
140:*16*
196:*11*, *16*
205:*6*, *7*, *15*
225:*13*  226:*4*
233:*4*, *14*
284:*18*  310:*2*

311:*7*  348:*6*
358:*5*  381:*14*
**sink**  367:*18*
368:*18*
**sir**  13:*8*, *22*
15:*7*, *22*
16:*21*  17:*17*,
*23*  21:*18*
25:*8*  27:*7*
28:*12*  29:*5*
30:*4*  31:*9*, *11*,
*14*, *21*  33:*4*,
*19*  34:*22*
35:*23*  36:*19*,
*22*  37:*5*, *10*
38:*2*  40:*8*
41:*17*  42:*1*
43:*19*  44:*2*,
*12*, *21*  45:*16*
46:*13*  48:*6*
51:*15*  52:*9*,
*23*  53:*23*
54:*23*  55:*21*
56:*2*, *9*, *13*
57:*11*  58:*7*,
*12*, *19*  59:*24*
61:*12*  62:*12*,
*23*  63:*22*
65:*5*, *20*  66:*5*,
*21*  67:*4*, *11*
68:*4*, *19*  69:*4*,
*9*  71:*8*  75:*3*,
*6*, *18*  76:*19*
77:*2*, *11*
78:*10*, *13*, *17*
79:*6*, *10*, *17*
80:*7*, *23*  81:*7*,
*24*  82:*3*, *16*,
*20*  83:*22*
84:*5*, *21*  85:*1*,
*10*  86:*7*, *11*
89:*1*, *6*, *21*
91:*1*, *23*  92:*9*,
*18*  93:*24*
94:*24*  98:*20*
101:*15*, *18*
103:*10*, *23*
104:*16*  106:*1*,
*4*, *23*  107:*6*,
*19*  113:*9*, *23*
115:*21*  117:*5*

119:*4*  120:*4*,
*23*  121:*11*
122:*3*, *22*
123:*7*, *11*
124:*7*, *11*
125:*6*  126:*8*
127:*6*  128:*8*
129:*24*  132:*8*
137:*2*, *8*, *20*
138:*3*  139:*5*
142:*5*  143:*13*,
*23*  144:*22*
148:*9*, *16*, *24*
149:*10*
150:*23*
151:*23*  152:*6*,
*14*  153:*23*
154:*8*  156:*9*
158:*17*
161:*10*  163:*7*
165:*15*, *21*
167:*10*  169:*4*
171:*24*  173:*6*
174:*10*
176:*21*  178:*8*
185:*16*  189:*2*,
*18*  190:*12*
201:*9*  209:*14*,
*17*  211:*9*
215:*3*  216:*23*
220:*21*
222:*16*  223:*4*
226:*14*, *17*, *24*
227:*22*
228:*12*, *24*
239:*5*  240:*8*,
*18*  241:*6*, *16*
242:*12*, *18*
243:*9*, *21*
245:*17*
246:*14*  247:*4*,
*20*  248:*19*
249:*24*
250:*19*  251:*7*
252:*3*, *21*
254:*16*, *17*
256:*4*  257:*5*,
*21*  259:*16*
260:*24*  262:*4*,
*13*  263:*4*, *9*
264:*15*, *23*

265:*20*  267:*1*
268:*17*
269:*18*
270:*16*, *20*
271:*3*  272:*14*
274:*20*
275:*10*, *14*, *18*,
*23*  276:*11*, *14*,
*18*  277:*9*
279:*9*  281:*1*
282:*8*  283:*20*
288:*7*  294:*7*
298:*12*
301:*12*, *16*
302:*11*, *20*
303:*18*  304:*2*,
*21*  305:*4*, *19*
308:*3*  309:*2*,
*22*  320:*3*
321:*20*  322:*1*,
*9*  326:*24*
328:*1*, *16*
329:*20*
333:*12*, *19*
334:*2*, *6*, *15*
335:*24*
338:*17*
339:*12*, *24*
344:*6*, *10*
345:*19*, *24*
346:*15*  347:*1*,
*18*, *24*  348:*24*
351:*17*
354:*16*
355:*11*
357:*16*
360:*10*  362:*7*
365:*18*  369:*7*
375:*4*  377:*24*
382:*21*  383:*1*
386:*1*  389:*18*
394:*4*
**sit**  160:*18*
216:*18*  235:*5*
237:*19*  238:*5*
250:*24*
272:*18*
276:*19*  279:*3*
**sitting**  288:*13*
340:*19*  341:*3*
377:*11*

**situation**
48:*14*  49:*5*
93:*3*  95:*10*
130:*20*
143:*16*
345:*14*
358:*24*  394:*4*
**six**  169:*2*
370:*21*
390:*16*, *20*
391:*1*
**size**  105:*13*
135:*8*, *24*
165:*3*, *7*, *8*
169:*8*, *13*, *21*
170:*22*  227:*3*,
*6*, *24*  228:*1*,
*10*  284:*7*
312:*1*, *16*, *23*,
*24*  315:*13*
318:*2*, *3*, *4*, *22*,
*24*  319:*6*, *14*,
*19*, *20*  320:*8*,
*9*, *15*
**sizes**  319:*6*
**skip**  95:*17*
230:*21*
**slope**  390:*23*
**slower**  323:*14*
**small**  44:*23*
136:*2*  195:*13*
302:*11*  312:*6*,
*7*  353:*22*
375:*5*
**smaller**  154:*7*
219:*23*  220:*3*,
*4*  325:*19*
**smart**  147:*13*
163:*7*  349:*3*
385:*15*
**smarter**  154:*7*
**smoke**  342:*17*
343:*1*
**smoking**
344:*18*
**so-and-so**
217:*14*, *19*
219:*2*
**so-called**
41:*18*  51:*3*
113:*20*

Confidential Information - Subject to Protective Order

122:*17*
144:*12* 169:*5*
188:*23* 205:*5*
224:*9* 250:*6*
254:*19* 287:*5,*
*7* 295:*14, 24*
296:*22* 299:*4*
315:*1* 327:*1*
350:*24*
362:*12* 374:*2*
376:*9* 381:*4,*
*6* 391:*14*
**societies** 128:*5*
**society** 139:*13*
352:*13* 356:*6*
375:*12*
378:*11* 381:*11*
**software** 60:*9*
**Solco** 4:*14*
**sole** 240:*4*
316:*4*
**solely** 271:*23*
320:*5*
**solved** 263:*17*
**somebody**
142:*21* 274:*17*
**Song** 284:*1, 6*
395:*18*
**S-O-N-G**
284:*1*
**Sorry** 18:*1*
24:*5* 34:*15*
45:*24* 46:*13*
49:*16, 21*
51:*15* 55:*21*
62:*10, 18*
67:*24* 69:*4, 5*
78:*13* 83:*1*
86:*6* 92:*6*
94:*21* 95:*23*
113:*22*
114:*14, 15*
116:*10*
123:*12*
134:*10* 149:*2,*
*3, 22* 165:*17,*
*21* 166:*24*
167:*10*
169:*24*
171:*23* 176:*7*
178:*8* 183:*21*

210:*8* 219:*15*
221:*8* 223:*3,*
*4* 226:*17*
229:*10, 18, 19*
232:*23*
239:*16, 21*
262:*5, 7*
280:*14* 281:*6*
295:*3* 309:*22*
311:*23*
313:*20* 320:*3*
330:*19* 335:*8*
336:*4* 337:*15*
339:*4* 346:*15*
349:*2* 355:*20*
360:*22* 362:*3*
374:*1* 381:*24*
383:*16*
395:*20* 396:*9,*
*10*
**sort** 20:*13*
66:*23* 113:*6*
115:*3* 182:*15*
216:*13*
253:*18* 255:*6*
279:*19*
291:*14*
293:*23*
300:*15* 346:*2*
363:*6, 23*
366:*4* 369:*19*
379:*24*
**sorts** 304:*6*
**sound** 184:*4*
**sounds** 143:*14*
146:*8*
**source** 282:*11,*
*15* 283:*14, 17*
285:*3, 7*
**sources** 342:*17*
**South** 2:*5*
**space** 370:*6*
398:*6*
**speak** 117:*1, 2*
130:*23* 133:*8*
143:*4* 309:*5*
380:*12*
**speaking**
43:*21* 136:*12*
283:*9* 326:*24*

360:*15*
**spec** 353:*15*
**species** 65:*1,*
*13* 70:*24*
71:*11*
**species-specific**
71:*3, 21*
**specific** 78:*24*
200:*19*
239:*15* 286:*6*
366:*9*
**Specifically**
32:*13* 53:*4*
132:*2* 142:*9*
266:*13* 361:*11*
**spell** 12:*14*
**spend** 62:*4*
385:*14* 394:*5*
**spent** 56:*5*
58:*17* 59:*22*
60:*6* 61:*22*
308:*22*
**spoke** 311:*9*
**squared**
366:*24*
**SS** 227:*1, 2, 5,*
*11, 16, 17, 20*
228:*14* 229:*2*
231:*7*
**stability**
307:*23*
**stage** 83:*13*
290:*12*
330:*12* 376:*14*
**stand** 220:*1*
**standard**
112:*15*
113:*13, 14, 20*
114:*10, 19*
115:*8, 14, 22,*
*24* 116:*1, 3*
117:*8* 121:*16,*
*22* 174:*20*
175:*3* 176:*8*
203:*12, 18*
204:*6, 12*
300:*9* 344:*1*
350:*10, 17*
354:*7* 373:*20*
374:*23* 375:*7*
378:*2, 4*

**standardized**
390:*23*
**stands** 63:*24*
228:*14*
229:*17* 231:*18*
**Stanford**
47:*17*
**start** 120:*12*
173:*7* 197:*14*
204:*24*
213:*11* 296:*6*
306:*5*
**started** 33:*12*
45:*17* 46:*20*
240:*12*
282:*18* 290:*1*
294:*17* 388:*4*
393:*4*
**starting**
240:*15*
**starts** 44:*17*
97:*18, 22*
98:*6* 188:*2*
194:*5* 382:*6*
**State** 5:*3*
12:*14* 23:*6*
92:*4, 14*
93:*13* 117:*16*
352:*19*
377:*14* 398:*5*
**stated** 95:*4*
144:*24*
220:*11*
251:*13*
261:*18, 24*
378:*14* 382:*8*
**statement**
117:*7, 9*
143:*22*
163:*20*
181:*11*
193:*18*
208:*18* 267:*8,*
*9* 276:*20*
278:*2* 310:*11,*
*14, 17* 315:*6*
352:*19*
**statements**
123:*18* 124:*1*
206:*7, 12*

207:*18*
208:*14* 209:*6*
**STATES** 1:*1*
286:*24* 287:*1*
**stating** 93:*19*
345:*20* 346:*6*
**statistic**
163:*19*
**statistical**
26:*23* 45:*2*
75:*8* 95:*5*
99:*12, 18*
100:*2* 103:*13,*
*17* 119:*14*
120:*1* 122:*18*
123:*3, 11, 18,*
*20* 124:*1, 21*
125:*7, 11*
127:*7* 131:*2*
133:*11* 136:*7*
144:*13*
173:*22* 174:*3*
178:*17*
181:*18*
186:*21* 188:*4*
189:*20* 190:*1,*
*21* 199:*16*
200:*4* 205:*5,*
*14* 206:*8, 12,*
*19* 207:*8, 13*
224:*1, 20, 22*
227:*8* 230:*5*
231:*4* 255:*21*
280:*4, 8*
284:*8* 308:*24*
309:*23* 310:*4*
311:*19*
325:*12*
362:*13*
379:*18* 385:*8*
**statistically**
170:*3, 17, 19*
217:*10* 222:*5*
223:*17, 22*
225:*6* 360:*15*
**statistician**
117:*3, 6*
339:*18* 350:*9*
**statisticians**
123:*2* 205:*13*

Confidential Information - Subject to Protective Order

**statistics** 78:*1*
81:*15* 144:*15*
152:*16*
163:*20*
166:*12, 13*
167:*16*
169:*14*
238:*18* 356:*9*
**status** 104:*14,
21* 344:*18, 20,
21*
**stay** 140:*12*
141:*10* 151:7
154:*23*
**Staying** 201:*1*
**Stefani** 165:*4*
170:*18*
171:*21* 172:2,
*3*
**stenographic**
11:22
**step** 51:*4*
100:*6, 7, 13*
145:*6* 186:*24*
187:*12*
255:22 343:*4*
350:*14*
**Steve** 36:*13,
15, 17, 21*
379:7, *10*
**STEVEN** 3:8
36:*13, 14*
379:*1*
**Stipulations**
10:*11*
**stood** 227:2, *6,
16* 229:2
230:2
**stop** 27:*15*
395:2*1*
**stopped** 27:*17*
**stopping** 51:*6*
**store** 93:7
**story** 161:*24*
162:*4, 7*
320:*4* 349:*20,
21* 351:*11, 12*
353:*10*
**straightforwar
d** 148:*8*
152:*24* 224:2*1*

**stratified**
321:*12*
**stratify** 299:*16*
**Street** 2:5, *10,
19* 3:3 4:*4,
17* 5:3, *9*
148:*1*
**strength**
255:*14*
**stretch** 309:*12*
**Strike** 45:*24*
62:*18* 149:*3,
4* 181:*6*
210:8 213:*11*
280:*14*
**strip** 277:5
**stroke** 129:*11*
130:5
**strong** 75:3
171:*14*
**stronger**
321:*13*
**strongly** 157:7
**structure**
38:*17* 98:22
99:22
**student**
383:*20, 21*
**studies** 8:*20*
18:*14* 20:*12*
21:*4, 20*
32:19 37:*16,
18, 23* 38:*1*
40:9 57:*23*
58:*4* 62:*16*
64:*24* 65:*11*
66:7 69:*17*
70:8, *12*
71:*10, 14, 19*
83:*18* 109:*11*
116:*23*
117:*17, 21, 23*
118:*1, 2, 4*
119:5, *16*
123:*20* 124:*3*
126:*3* 133:*3*
138:*11* 139:*1*
144:2 145:*19*
146:*10*
148:*23*
149:*14, 16*

150:5, *13, 20*
152:7, *12*
154:*16, 21*
156:5 158:*11,
14* 159:*10, 12*
160:*24* 161:*6,
14, 19* 162:*19*
163:*24*
164:*20, 23*
166:8 167:2
170:*15* 171:*1,
2, 6, 8, 17, 21,
22* 172:*6, 11,
12, 14, 24*
173:*13* 177:*6,
21* 178:*1*
181:*9, 14, 18,
24* 196:2
199:7, *18*
206:*20* 211:*6,
8, 12, 15*
212:2, *12, 21*
213:2, *3, 15,
16* 215:*1, 2*
216:*4, 5, 12,
13, 22* 227:*19*
230:*16*
231:*13, 14, 17*
232:*12* 233:*8,
15* 238:*1, 11,
16* 239:7
240:*3* 242:*1*
243:*1* 244:9
248:*14, 20*
249:2, *8, 9, 14*
251:*6, 10*
252:5 253:*10*
254:*3* 257:2,
*12* 259:*13, 14*
260:*14*
262:22 264:*6,
13, 14* 265:*11,
14* 266:*19*
267:*4, 23*
268:*1, 2, 9*
269:*11, 12*
270:9 273:*3*
274:*3* 276:22
277:*13, 22*
279:8, *11, 12*
280:*12, 16, 19,*

21, 22* 281:*20*
282:*4* 283:*8,
10, 14, 22*
285:*4, 12, 14,
16* 286:*1, 3*
288:*8, 23*
295:*8, 11*
298:*10* 301:7
303:*4, 10, 14,
21* 304:*6, 23*
305:2, *22, 24*
306:*13*
314:*15, 17, 24*
316:22
319:*21* 320:7
325:*11, 17*
336:*11, 14*
346:*11, 19*
347:*4, 8, 12,
15* 348:*17, 18,
20* 349:*24*
350:*3, 18*
352:*6, 18*
353:2 354:*14*
355:*17* 357:*5,
11, 21* 358:*1,
8, 9, 14* 360:*5,
8, 11, 23*
361:*5, 21*
365:*17* 366:*9,
10, 11, 13, 14*
369:22 370:*1,
14* 371:*4, 9,
17* 372:*17*
373:*1, 3*
374:*18, 20*
375:22, *24*
376:24 377:2,
*7, 16, 19*
395:*14*
**study** 9:8
22:5 24:*12*
37:22 40:*12,
15* 69:*12, 13*
107:9, *15*
109:*15*
117:*20* 118:9,
*13, 16, 21*
119:*13, 23*
120:*11, 20*
122:20 123:*1,*

5* 124:*15*
126:*11* 129:9
133:*19*
138:*12* 139:*1,
2, 3* 140:*17*
149:*14*
154:*17, 24*
159:*14* 162:*1*
163:*16* 164:*9,
10, 11* 165:*4,
15* 166:*4*
167:*1, 19*
168:*19*
169:*11, 16, 23*
170:*4* 172:*3,
4, 18, 19, 21*
173:*24* 174:*6*
177:*8, 15*
180:2, *17, 20,
24* 181:*3, 5*
193:*12* 196:7
198:*18, 23*
199:*14* 200:*1*
202:*1, 7*
205:7 207:*10,
15* 208:8
209:*13*
211:*15* 212:*3,
4, 21* 218:*14,
15* 223:*18, 20,
21* 224:*1*
225:*14* 226:*4,
6* 229:*11, 12*
230:*6, 7, 10*
232:*17, 18*
233:*3, 9, 13,
16, 17, 19*
234:*16, 19, 23*
235:*4* 236:*4*
243:*18*
244:*10*
247:*17* 249:*1,
10* 250:5
253:5 260:*1,
15* 265:*13*
270:*6* 271:*19*
280:*6* 281:*24*
282:*4, 5, 19*
283:*1* 284:*3,
12, 13* 287:*11,
14* 288:*10, 17*

Confidential Information - Subject to Protective Order

289:*1, 5, 11, 14, 16* 290:*4, 9* 291:*5, 17* 293:*4* 301:*11, 15* 304:*15* 306:*3, 10* 308:*6* 309:*8, 10* 311:*7, 22, 24* 312:*20* 314:*4, 6, 8, 20* 315:*7, 19* 316:*1, 12, 13* 321:*15* 322:*19* 323:*3, 5, 13* 324:*20* 326:*18* 327:*8, 10, 19, 20, 24* 329:*13, 21* 330:*7, 14* 331:*4, 10* 332:*1, 4, 16, 21* 333:*11, 17, 24* 334:*5, 9, 14, 20* 337:*9* 344:*22* 345:*14, 16* 346:*1, 12, 16, 19* 348:*10, 21* 349:*5* 350:*5, 11* 352:*2, 10, 14* 355:*23* 356:*14* 358:*5, 6, 21* 359:*1, 20, 22* 360:*18* 361:*11* 362:*24* 363:*12* 364:*14* 365:*1, 10* 369:*20* 370:*18* 371:*8* 376:*4, 13, 15* 377:*17* 378:*24* 379:*17* 381:*2, 3, 5, 14* 382:*23* 387:*8*

**stuff** 356:*13* 362:*10*

**styled** 32:*11* 266:*12*

**subanalysis** 297:*8*

**subbed** 202:*17*

**subdistribution** 384:*23* 386:*2, 7, 17* 388:*24* 389:*5, 8*

**subgroup** 296:*23* 297:*5, 19* 306:*24* 307:*11* 308:*7*

**SUBJECT** 1:*8* 15:*11, 12, 16* 18:*6* 19:*9* 101:*24* 102:*6* 106:*15* 188:*16, 23* 235:*3* 310:*8* 398:*10*

**subjects** 98:*9* 100:*9, 10* 101:*21* 104:*3, 4* 109:*13* 111:*9, 20* 120:*19* 186:*8* 187:*1, 3* 188:*13* 191:*24* 192:*1* 196:*4* 197:*16* 198:*4* 201:*24* 234:*20, 23* 241:*3* 242:*2, 17, 24* 287:*16* 323:*24* 328:*10, 22*

**submit** 270:*18* 336:*24* 352:*5*

**submitted** 32:*16* 51:*9* 56:*16, 24* 72:*20* 73:*20* 250:*23* 266:*16*

**Subscribed** 400:*19*

**subsequent** 297:*12*

**subset** 101:*21* 102:*3* 188:*12, 19*

**substance** 71:*4* 400:*11*

**substitute** 27:*16, 18*

**suddenly** 159:*12* 168:*1* 390:*21*

**suffering** 200:*2, 15*

**suggests** 291:*24*

**suing** 87:*6*

**Suite** 2:*5, 14* 3:*9, 15* 4:*11* 5:*9, 19*

**summarize** 214:*8* 215:*5*

**summary** 83:*6* 85:*16* 166:*12, 13* 215:*8, 14, 17* 238:*18* 284:*19* 381:*5*

**supervision** 397:*22*

**supplementary** 293:*6*

**SUPPORT** 10:*2* 93:*22* 136:*24* 385:*17*

**supporting** 326:*5*

**Suppose** 97:*18, 22* 98:*2, 6, 12* 107:*8, 12, 13* 177:*20, 24* 178:*16, 21* 186:*4, 5, 11* 193:*10, 11, 14* 194:*5, 7* 324:*10* 329:*19*

**supposed** 325:*20*

**supposedly** 160:*6* 323:*15*

**Sure** 13:*10* 25:*8* 31:*7* 34:*24* 41:*20* 42:*9* 50:*8* 55:*5* 58:*5*

62:*2* 70:*15* 73:*8* 74:*1* 83:*14* 84:*8* 91:*23* 97:*24* 111:*20* 112:*1* 130:*18* 153:*21* 155:*20* 184:*2, 24* 186:*23* 190:*15* 191:*5* 198:*4, 8* 214:*7* 217:*7* 225:*3* 228:*20* 237:*17* 261:*6* 263:*8, 14* 268:*16* 286:*10* 291:*21* 292:*13* 294:*20* 296:*15* 301:*2* 317:*16* 319:*9, 13* 324:*11* 380:*18* 396:*3*

**surprise** 129:*9*

**surprised** 67:*20, 22, 24* 69:*19* 356:*15* 370:*4*

**survival** 387:*5*

**survive** 390:*20*

**survived** 387:*19*

**swear** 11:*24*

**sweet** 384:*7*

**swing** 168:*23*

**switch** 306:*24* 331:*22*

**sworn** 11:*20* 12:*4* 397:*5* 400:*19*

**system** 46:*7* 51:*2, 3, 20*

**< T >**

**table** 77:*6, 8, 15, 18* 225:*12, 16, 19* 226:*2* 227:*21* 228:*15* 229:*6, 13, 15* 230:*1*

231:*6* 235:*6, 20* 237:*20, 21* 238:*6, 7*

**tables** 22:*16, 24* 23:*8, 11, 18* 24:*2*

**tabulate** 60:*19*

**tabulated** 58:*21*

**tactic** 290:*15*

**tad** 97:*24*

**Take** 7:*15* 12:*18* 13:*13* 14:*7, 21* 16:*4, 14* 19:*3* 22:*14* 24:*9, 22* 28:*1* 30:*16, 17* 31:*7* 32:*5* 36:*24* 43:*4* 44:*4* 50:*13* 58:*8* 63:*8* 64:*17* 68:*20* 70:*9, 17* 72:*5, 6, 9* 76:*4, 5* 77:*3, 12* 80:*10* 82:*4* 83:*5, 6* 91:*3* 94:*5* 95:*19* 96:*18* 97:*11* 98:*24* 100:*8, 13* 105:*3* 111:*3* 118:*11* 131:*4* 137:*11* 141:*1* 143:*24* 153:*12* 170:*24* 174:*18* 182:*21* 185:*1* 186:*24* 187:*5* 201:*12* 222:*13* 223:*18* 224:*2, 7* 226:*20* 238:*22* 240:*6, 22* 241:*11* 242:*5* 250:*17* 251:*5* 266:*2* 267:*24* 269:*23* 270:*1* 272:*4* 273:*7*

Confidential Information - Subject to Protective Order

274:*22*
291:*24*
294:*13*  295:*5*
300:*6*  301:*19*
305:*5, 13*
308:*13*
320:*19, 21*
322:*11*  327:*5*
328:*12, 23*
335:*1*  342:*5*
343:*13, 16*
354:*1*  356:*4*
358:*17*  359:*6,
8*  370:*11*
381:*22*  382:*1,
2, 4*  384:*7*
387:*19*  394:*9*
395:*9, 22, 23*
**taken**  1:*13*
27:*3*  183:*5*
**takes**  237:*21*
238:*8*  243:*4,
12*
**talk**  50:*20*
69:*4*  96:*1*
144:*1*  145:*17*
182:*14*
231:*19, 20, 21*
243:*23*
246:*16*
287:*10*
293:*17*
294:*16*
304:*24*  331:*2*
**talked**  158:*11*
185:*11*  246:*8*
**talking**  25:*12*
62:*6*  74:*1*
91:*16*  94:*15*
136:*19*
150:*11, 12*
152:*3*  156:*5*
159:*18*
160:*15*  170:*6*
219:*19*  225:*2*
227:*4, 9, 10*
228:*3*  231:*12*
233:*23*  246:*7,
18*  255:*17*
277:*17*  287:*3,
8, 13, 17*

290:*18*
293:*11*  295:*8*
297:*11, 15, 23*
308:*23*  318:*4*
326:*16*
327:*14, 16*
348:*16*  354:*3*
365:*4, 11*
366:*12*
369:*14*
370:*22*  382:*9*
386:*3, 6*
391:*22*
**talks**  382:*12*
**tally**  258:*16*
**Tanzeum**
374:*1*
**Taxotere**  8:*12*
34:*18*  35:*3*
80:*19*  81:*1*
97:*10, 14*
98:*11, 16*
99:*1, 9, 10, 15,
19, 23*  100:*12,
15, 17*  101:*6,
10*  102:*1*
103:*2, 16*
104:*9, 24*
105:*7*  106:*18*
107:*2, 24*
108:*9, 17, 21*
109:*4, 14*
110:*8, 20*
111:*5, 11, 14,
24*  112:*13*
117:*10*
118:*20*
119:*15*
120:*18, 22*
121:*6, 19*
122:*7, 8*
124:*13, 16*
125:*3, 13*
173:*18*
174:*20*  175:*2*
177:*1, 9, 23*
178:*2, 7, 13,
21*  179:*5, 6,
18, 22, 24*
180:*8, 13*
181:*10*

183:*16*  185:*4*
344:*8*
**team**  257:*8, 9*
**technical**
294:*1*
**technically**
170:*2, 5*
**TECHNICIAN**
6:*3*
**tell**  36:*3*
50:*21*  52:*4,
15, 21*  53:*17,
24*  133:*20*
135:*20, 22*
136:*13*
167:*14*
216:*19*  217:*4*
222:*20*
230:*11*  235:*7*
247:*5, 20, 22*
249:*10*
284:*19*  286:*8*
297:*13*
312:*19*  316:*7*
318:*1*  324:*12*
330:*21*
339:*18*  348:*1,
3*  349:*18, 20*
351:*11*
353:*10, 11*
356:*22*  359:*1*
368:*16*
371:*23, 24*
373:*11*  374:*10*
**telling**  145:*14*
159:*16*
285:*11*
286:*14*  310:*1*
311:*2, 3*
319:*16*  320:*7*
336:*9*  356:*2*
**tells**  171:*18*
**ten**  35:*9*
47:*16*  51:*22*
52:*1, 3, 7*
55:*1*  138:*10*
295:*6*  304:*23*
394:*9*
**tend**  325:*19*
**tenured**  78:*3*
81:*17*

**term**  293:*10,
22*  325:*14*
328:*15*
**terminology**
118:*6*  325:*10,
13, 24*
**Terminus**  3:*8,
14*
**terms**  26:*3*
27:*14*  37:*13*
40:*17*  43:*22*
61:*21*  66:*23*
79:*20*  95:*14*
133:*1*  153:*14*
159:*24*
160:*22*
164:*20*
169:*13*  213:*9*
214:*3, 23*
233:*7, 9*
242:*15*
250:*13*
273:*18*  276:*8*
279:*6*  281:*3*
293:*16*
309:*20*  311:*6*
331:*8*  333:*17*
334:*17*
342:*22*  343:*6*
361:*19*
**test**  113:*4, 6*
175:*12*  208:*6*
280:*1*  323:*4,
6, 10, 18, 19, 23*
328:*11, 22*
329:*15, 17*
331:*19*  344:*1,
4*  359:*15*
**testified**  12:*5*
**Testimony**
7:*3*  22:*19*
72:*22*  75:*19*
134:*16*
237:*13*
243:*20*  247:*1*
248:*2*  284:*23*
352:*24*
357:*20*
375:*20*  397:*6*
**testing**  122:*19*
123:*4, 24*

129:*19*  205:*6,
11, 15*  276:*1,
8, 9*  327:*4*
**tests**  114:*21*
123:*20*
173:*24*
175:*10*
181:*18, 21*
206:*19*
207:*10*  280:*1*
**Teva**  3:*17, 18*
4:*6, 7*  55:*24*
**textbook**
29:*23*  30:*2, 9*
123:*15*
**Thank**  13:*11*
274:*22*
**That'd**  162:*20*
**theme**  125:*20*
**thereto**  19:*6*
24:*14*
**thing**  16:*10*
20:*13*  21:*3*
29:*6*  60:*10*
75:*9*  79:*24*
99:*5*  162:*22*
166:*6*  173:*6*
190:*23*
200:*24*  201:*2*
254:*21*
283:*21*  293:*7*
294:*5*  295:*12*
296:*24*
297:*15*  328:*4*
330:*2*  338:*8*
368:*4*
**things**  38:*14*
74:*4*  127:*10*
166:*16*  214:*6*
215:*3*  262:*19*
268:*20, 21, 22*
270:*14*  277:*7*
286:*2*  289:*24*
314:*8*  326:*1,
19*  327:*18, 23*
**think**  17:*5*
20:*3*  23:*5*
26:*2*  30:*14,
15*  32:*20*
35:*19*  38:*21*
39:*23*  40:*1*

Confidential Information - Subject to Protective Order

42:23  47:13
52:1, 16
53:16  57:24
62:11  68:10,
18  84:17
92:2  95:1, 10,
18  96:1, 16
113:9  114:5
118:7  124:24
129:2  137:14
138:20
139:11, 12
140:1, 14
141:8, 11
142:1, 8, 10
144:9  145:5
147:10
148:17
182:20
184:14  194:4
200:12
205:19
210:18
212:11, 15
214:9, 15
216:2  220:3
225:8  227:2,
5, 23  228:17
229:2, 17
231:3, 8, 9
232:22, 24
235:19  236:3,
7  247:7
248:20
252:11  257:9
258:6, 14
260:20
262:21  264:8,
10  269:19
273:11, 21
274:21
278:20
281:15
285:10  286:3
289:17
290:11
293:21  294:2
296:14
300:20, 24
301:13, 16
309:16

311:21  313:3,
12, 24  315:6,
24  319:2, 4
326:2  329:20
333:21
334:23
336:17  338:2
340:17
341:11, 12
343:4  350:4
363:10
366:24  367:4
372:23
378:22  380:2
392:8  394:6
thinking
49:23  160:23
258:9  261:10
264:4  265:6
313:8
thinks  42:3
third  13:14,
19  64:20
223:24  362:19
thirty  398:16

THORNBURG
4:16
thorough
345:4, 22
346:7, 24
359:2, 19
360:6, 19
361:12
369:23
370:17  371:7
thought  53:7
64:2  148:17
152:15
253:12  283:8
300:22  333:15
thousand
370:7
thousands
136:4  312:4
318:17
Three  4:3
35:19  36:1
58:6  59:2
61:2, 4  85:14
137:4  138:11,

15, 24  158:11,
14, 21  159:19,
20, 23, 24
160:4, 11
162:1, 6, 11,
13, 17, 19
163:3  170:15,
24  171:1, 6
177:20  178:6,
11, 19  179:3
180:7  280:1
threshold
41:21  42:10
113:5  122:14
127:14  154:5
155:5  168:17
205:3  217:13
218:17, 22
219:1, 3
224:10
244:12, 24
245:3, 9, 13,
19  336:21
throw  259:8
358:12  380:21
tight  316:24
time  11:8
23:14  27:17
33:16, 18, 21
41:19  42:8,
18  47:4
52:19  59:10,
22  75:10, 12
90:13  92:12,
22  94:1, 6, 10
96:8, 12  99:7
106:16
114:23
119:11, 12, 22
126:2  177:7
179:8  182:21,
24  183:7
199:13, 24
218:21
232:15  235:2
245:11  257:9
261:22
268:18, 23
273:12
274:13, 23
275:3  282:2

297:4  299:16
304:3, 16
308:22
313:12, 14
342:5, 6, 10
343:2  360:13
384:7  388:10
391:12  396:15
times  34:1, 4,
6  48:11  54:6
74:5  113:5
137:4  146:2
153:24
158:24
182:18
208:18
215:18, 20
278:4, 24
318:3  330:10
378:15
timing  53:24
tiny  312:8
318:18  332:8
tissue  66:7
title  302:23
today  13:7
23:19  24:1
25:5  30:3
42:19  58:16
61:3, 23  64:6,
12  65:6  73:4
132:12, 13
170:9  185:14
190:22
200:23
272:18
288:12
340:19  341:4
Today's  11:7
62:2
told  47:3
128:20  167:6
202:2, 9
232:4  242:18
249:14  319:6
320:14  337:7
356:10
393:12  394:16
tomorrow
62:4  373:7

385:13
tonight  396:1
tons  349:9
tool  142:4
153:1  157:16
tools  147:13
153:23
top  43:14
44:14, 15
45:9, 23
55:12  85:13
163:1  305:14
385:5
topic  234:9
Torrent
333:23
total  56:5
59:18, 21
61:5, 11, 15,
21  62:1
175:21
179:11, 19
243:17
totality  310:22
totally  254:4
tough  294:22
Tower  5:8
toxicity
119:12, 23
131:11
181:20  182:1
194:20
199:14  200:1
354:24
toxicologist
62:24  209:20
221:5  222:10
241:16  263:5
265:1  282:7
toxicologists
339:17
toxicology
209:23
222:14
241:20
243:13
268:23  293:1
toxins  282:11
283:13  285:3
Toyota  46:7,
11  47:6, 10,

21 48:5, 7
50:5, 17, 21,
22, 23  51:1,
12, 20  52:8
53:8, 13, 18
**Trade**  5:9
**traditional**
313:17
**trained**  360:14
**training**
348:12  353:6
**transcript**
397:9, 19
398:17, 19
**transcription**
400:7
**translate**
217:5  314:20
337:11
**transport**
264:21
279:19  283:1
365:1
**transportable**
218:9  288:3
**transported**
69:13  218:15
282:23
**TRAURIG**
3:7, 11  55:16,
19  56:1
**treated**  98:15
100:14
186:14  187:7
**treating**  300:4
**treatment**
26:8  83:11
104:9  105:23
121:24  131:8
203:20
260:12  296:2
299:21  300:9,
12  304:10, 16
306:2  312:5
314:11
315:13  327:3
352:7, 11, 17
354:23  364:10
**treatments**
98:18  119:18
199:20  303:11

**trend**  279:24
369:6, 18
**trial**  22:19
85:21  111:23
112:4, 17, 20
113:2, 15, 19
114:12, 20
115:4, 10, 17
116:2, 5, 14,
20  120:6, 9
121:15, 21
130:3  136:3,
5  166:17
175:21
180:16, 17, 23,
24  181:2
198:7, 13
201:13, 18
203:11, 17
290:13  291:4
296:6  299:13
301:13  312:1,
3, 11  352:12,
16  354:21
355:2  364:4,
5  376:3
379:16
**Trials**  30:8
79:4, 8, 12, 19
80:6  112:11,
12  113:11
114:4, 18
115:7, 15
117:8, 11, 13,
14  129:7
138:16
160:11
166:22
177:13
178:19, 24
179:3, 4, 7
180:8, 9, 12,
14, 21  204:1
282:18
303:13
354:15
355:17  357:12
**tried**  235:15
345:1  383:8
**trip**  349:13
**trivial**  69:15

**trouble**  244:2
245:5  314:18
315:2  375:13
**true**  102:24
109:1, 5
110:19, 23
189:8, 14
195:16, 20
197:3, 6
243:1  246:22
278:6  292:14
313:7  323:4
367:9, 10
397:6
**truly**  160:5
171:7  324:18
**trust**  358:4
**truth**  74:16
75:1  135:23
367:8, 14
373:11  375:14
**try**  54:14
112:19
114:20
217:17  240:5
243:18
250:15  268:2
284:17
364:15
367:10  386:15
**trying**  38:16
69:13  91:19
114:1  115:12
125:6  129:3
137:8  140:20
190:20  204:7
212:24
213:13  214:4
216:3  274:7
282:12
283:15  285:4
319:10, 14
338:18  345:2
375:12
**tumor**  71:2, 16
**tumors**  64:24
65:12  66:17
67:1
**turn**  111:7, 12
122:4  197:15,
20  221:17

**Turning**
176:22
197:11  255:24
**turns**  164:5
253:7  299:20
351:6  352:11
**two**  18:17, 20,
23  35:20, 21
38:3, 14, 19,
20  81:2
83:18  92:23
100:24  101:8
103:15, 19
111:8, 13, 20
112:1, 16
120:3  124:17
128:4, 5
158:20, 21
159:9, 17, 19,
22  160:5, 13,
17  161:3, 7
162:1, 12, 17,
18  163:2
168:15, 17
173:13  174:9,
17  177:24
178:6, 12, 18,
23, 24  179:4,
7  180:9
187:18  188:4
189:17, 22
190:3  191:9,
15  192:11
197:16, 21
198:4, 9
208:3, 13
211:5, 11
212:2  227:7
228:4  239:6
240:9  241:24
248:20  249:2,
8, 14  251:16
253:8, 14
254:3  255:4
259:13
260:14  268:2
270:9  273:10
288:7  293:13
299:17  300:3
314:14, 24
315:22

316:22
318:11  320:7
325:19  330:1
336:11, 14
365:18  366:6,
11, 13, 14
373:14  376:7
386:24
387:15, 22
391:6, 7, 9, 11
**type**  106:16
177:3, 7, 10,
14  179:11, 20
230:6  363:12
386:24
**types**  103:15,
19  175:10, 20
189:22  190:3
387:15
**typical**  386:23
**typically**
66:18  123:1
205:12

< U >
**U.S**  4:14
275:22
287:22  288:3
290:22
**ug**  217:12
219:13, 16, 20,
21, 24  220:5,
7, 12, 13, 15, 19
222:7, 9, 14,
19, 22  234:2
235:11
**unacceptable**
138:8  140:24
**uncommon**
94:17
**uncontaminate
d**  79:16
113:1  322:22
333:15
**underlying**
107:12  108:2
194:17, 21
262:16  394:10
**underneath**
229:20  231:6

Confidential Information - Subject to Protective Order

understand
21:11  22:2
23:16  26:24
31:15  32:3
39:2, 3, 5, 6
40:24  41:5
42:5  62:5
73:15  84:9
113:21
115:13
131:19  137:3,
7  151:24
162:9  190:9,
13, 17, 19, 24
191:19
211:20
214:11, 16, 19
215:10
218:20  219:8
225:23
226:18
230:23  231:1,
11  233:16
244:23
245:18
251:18
257:10
259:24  268:4,
23  271:1
272:13
273:16  277:9,
16  284:23
299:18  311:6
313:14, 16
328:19, 20
329:13
336:18  343:5
346:4  364:14
378:1  380:7,
19  386:3, 5,
16  389:20, 23
390:8  393:2,
8  394:9  395:2
understanding
33:6  55:18
57:18  69:21,
24  93:17
134:8, 11
212:22
218:18
219:18  224:8

225:10  234:4,
6  235:23
236:6, 13
245:6  263:21
268:7  272:8
283:3  293:14
294:6, 9
331:9  334:18
343:8
understands
234:15  248:24
understood
225:3
undertook
19:17
unethical
114:19
115:16
116:19  117:13
unexposed
112:23  244:6,
18  293:14
unexposure
291:15
unfortunate
164:13
Unfortunately
164:1  204:12
246:14
282:22
289:22  339:8
369:7
Unifying  289:7
UNITED  1:1
286:24  287:1
university
45:4, 18, 20
47:18  78:2, 4
81:16, 18
184:18
unlimited
268:18
unmeasured
304:12  329:23
unobservable
104:6, 13
192:3, 10
unrealistic
270:20
unreliable

345:17  372:15
unsafe  139:9
unuseful
243:18
unusual  208:5
update  68:23
updated  68:1,
5, 9, 11, 15
69:1, 20, 22
70:1, 11
upheld  92:4
uphold  90:10
91:20
upper  66:11
uptake  364:11
up-to-date
67:21  74:9
up-to-dated
74:6
USA  3:18
4:7  5:22
usage  192:6
250:14, 16
251:4
Use  9:6  23:1
40:20  54:2
74:4  75:14
91:24  95:2
117:9, 14
118:8  125:12,
15  126:11
127:12
128:10, 22, 24
129:8, 19
131:1  132:6,
16, 22  133:23
136:21, 24
139:23
141:20
142:13
143:17  144:3
145:4, 21
146:11, 18
153:1, 10, 24
154:4, 6
155:3, 4, 6
156:10, 18
167:21
168:20  170:1
174:22  175:4,
13, 23  179:3

180:11, 15, 17
182:6  200:21
209:4  211:19
214:7  216:24
218:10, 22
223:14  228:5,
6  232:8, 9
234:8  243:18
245:2, 8, 10,
14, 17, 21
248:18
249:22  250:5
253:3, 4
258:17
259:24  260:2,
12  274:4, 6
281:24  283:4
284:12, 16
286:12, 21
290:15  293:8,
21  296:5, 6
297:7  306:12
307:23  310:2,
18  312:19, 21
319:3  327:2
348:5, 9
352:17
356:21
363:12
366:16  368:1
383:11
392:22  395:13
useful  240:4
241:9  242:3
243:2  295:9
useless  145:8
user  8:20
293:3, 15, 16,
17, 18, 23
295:10
296:12, 13, 16
298:6, 8, 23
299:12
300:14, 19
301:9  303:3,
20  304:5, 14,
24  305:1
306:7, 9, 18
307:9  308:5,
10  322:3, 4

users  104:9
192:7  293:8,
9, 12  296:8
297:2, 21
298:15  300:1
306:24  321:15
usually  47:23
59:13  60:11
74:3  120:6, 9
130:1  201:13,
18  299:20
300:10, 14
351:19  352:1
355:1  364:6
367:20  376:8
utility  145:13
312:13  313:2,
6  315:14
utilize  25:21
133:24
258:16  310:5
364:13
utilized  41:21
42:10  124:14
359:13
372:10  373:4
374:21
375:24  377:2,
20  381:15
383:7
utilizing
316:4  386:13

< V >
vaguely  81:3
184:23
251:21  256:9
261:2, 5
valid  41:2
100:23  101:7
105:12, 18
187:17
190:22
192:23  193:6
206:17  247:9
280:9  353:10
369:19  370:9
validate
348:10  353:8
364:19  369:4

Confidential Information - Subject to Protective Order

**validating**
349:5  358:*21*
**validation**
218:*12*  348:*4,*
*13*  353:7
358:6  368:*16*
369:*11, 15, 16*
371:*18*
**validity**
303:22  307:*24*
**VALSARTAN**
1:*3*  9:*6*
11:*12*  21:5,
*14*  25:*10*
32:*11*  33:*1*
37:*17, 23, 24*
40:7, *12*
43:*15*  62:*16,*
*22*  72:*17, 20*
73:*21*  79:*14,*
*15, 16, 22*
80:*4*  97:8, *12,*
*13, 17*  98:5
99:*2, 8, 11, 16,*
*20, 24*  100:7,
*22*  101:*19*
102:*12*
103:*12*
104:*23*  105:*4,*
*9*  106:7, *13*
107:*1, 7*
108:*21, 24*
109:*10*  110:*2,*
*16*  111:*19*
112:*10, 22, 24*
113:*1, 3, 11*
114:*4, 17, 22*
115:7, *14, 19,*
*22*  117:*12*
118:*14*  120:5
121:*13*  122:5,
*9*  125:*4*
130:*17*
146:*19*
154:*14*
173:20  175:*1*
176:*24*
177:*19*  178:6,
*12*  179:*4*
180:6, *12, 13*
183:*13*  185:5,

*23*  186:*3*
189:*3, 19*
192:*18, 21*
193:*10*  195:8
196:*24*
197:*14*
198:*17*  199:6
201:*23*
202:*19*
203:*24*  204:*4,*
*8, 24*  206:*6,*
*18*  211:5, 7,
*11, 17, 21*
212:*22*  217:5
218:*11, 16*
239:6  242:*1*
244:*18*
246:*12*
247:*23, 24*
248:*17, 18, 22*
249:6, *11, 16*
250:*14, 16*
251:*4, 8, 9, 11*
253:*4, 21*
254:*11*
257:*14*
258:*10*
259:*17, 22*
260:*1, 3, 8, 22*
261:8, *11*
262:*12, 24*
263:*16, 17, 22*
264:*2, 17*
265:8  266:*12,*
*21*  267:7, *22*
268:*9*  270:5
275:*9, 13, 17,*
*20*  276:*3, 10,*
*23*  278:*3, 23*
279:7  280:*10*
281:*18*  282:*2,*
*5*  285:*17, 20*
288:*13, 18*
289:*13*  290:*9,*
*22, 24*  291:7,
*20*  292:*4, 20*
311:*4*  324:*2,*
*5, 19*  326:7
328:*12, 24*
329:7, *17*
330:*11*

331:*13, 18*
333:*9*  336:*15*
338:*24*
355:*12*  363:*1,*
*15, 19*  395:*17*
**value**  41:*18,*
*22*  42:7, *11*
119:*10, 21*
122:*14*
127:*14*
135:*19*  154:6
155:5  164:*4*
165:5  199:*12,*
*23*  205:*3*
224:*10*
226:*16*  234:5
240:*10*
244:*12*
245:*12, 13*
255:*10*  284:*9*
306:6  310:*20*
318:*14*  325:*21*
**values**  41:*2*
218:*9, 22, 23*
237:*24*  238:*10*
**variables**
351:*1*
**variants**
349:*14*
**various**  68:6
277:*12*  280:*19*
**varying**
307:*22*
**vast**  89:8, *16*
90:*21*  346:*10,*
*18*  347:*14*
348:*16, 19*
349:*23*  357:*20*
**vehicle**  356:*22*
**verify**  40:*23*
**version**  69:*21,*
*22*  367:8
**versus**  73:*3*
86:9, *21*
87:*20*  91:*11*
202:*18*
263:*22*
276:*22*  279:7
287:*2*  309:8
311:*17*  313:*4*

314:5  317:*20*
**video**  11:*10*
**Videoconferenc**
**e**  1:*14*
**VIDEOGRAP**
**HER**  11:*2, 5*
13:*2*  94:*6, 10*
96:8, *12*
182:*24*  183:7
274:*23*  275:*3*
342:*6, 10*
396:8, *15*
**VIDEOTAPE**
6:*3*
**Videotaped**
1:*13*  7:*15, 19*
14:*18*
**view**  171:*1, 5*
280:8
**viewed**  172:*10*
**violate**  127:*3*
**violates**  382:*15*
**violating**
124:*21*
**Vioxx**  373:*24*
**VOLUME**
1:*12*

**< W >**
**wagon**  340:*11*
**wait**  92:*22*
139:5  150:*14*
161:*23*
318:*23*  324:*24*
**waiting**  92:*17*
93:*12*  141:5
**waiving**  15:*17*
18:6  19:*9*
**walking**  93:6
**Wall**  3:*3*
**WALSH**  4:*1*
**want**  52:*9*
53:*24*  69:*11*
70:*14*  71:*9*
72:6  93:*9*
96:*1, 22*  97:*3*
113:*18*  114:7
122:*15*
125:*15*  126:*3*
129:*9*  130:*2*
134:*2*  135:*15*

137:*21*  140:7
142:*9*  143:*3,*
*6*  154:*13*
166:*15*
182:*22*
200:*17*
212:*19*  218:5
228:*19, 20*
231:*20, 22*
234:5  240:*24*
263:*1*  264:*3*
266:*4*  273:*15*
275:7  286:*16*
291:*3*  292:8
294:*12*
298:*20*  301:*3,*
*6, 18*  317:*16*
319:*19*  327:*2*
331:*11*
334:*17*
349:*20*
351:*11*
354:*22*
356:*21*  368:*1*
369:*18*
370:*24*  371:*3,*
*13*  374:*24*
375:*15, 18*
378:*2, 5*
380:*18*  384:*2,*
*5, 10*  385:*13*
389:*17*
394:*13, 18*
395:*22*
**wanted**  74:*14,*
*15, 21, 23*
113:*12*  153:*2*
182:*14*  215:*6,*
*14*  218:*13*
297:*2*  300:*18*
356:7  366:*17*
380:*14*  394:*12*
**wanting**
262:*20*
**wants**  213:6
214:*11, 16, 19*
357:*1*
**watering**
327:*22*
**way**  27:*24*
35:*14*  42:*23*

54:7, *20*
61:*19*  85:*15*
127:2  129:*21*
133:*15*
135:*16*  139:*8*
140:9  144:9
146:*4*  147:*14*,
*20*  148:*8*
150:*15*
152:*19*
153:*10, 12, 16*
154:7  155:*13,*
*21, 24*  158:*5,*
*18*  159:*4*
166:*14, 15*
188:2  212:9
214:9  219:8
224:*19*  235:7
236:*11*  247:*5,*
*12, 16, 23*
256:*14*
262:*10, 11*
263:2  264:*23*
268:*17*
272:*19, 23*
275:*15, 20*
277:*23*  278:*5*
280:9  288:*6*
300:7  313:*17,*
*18*  329:*10, 11,*
*14*  340:*4, 10*
341:*18, 20, 21,*
*23*  354:*11*
366:6  367:*23*
379:*16*
**ways**  148:*21*
150:*18*
152:*18*  393:*1*
**website**  20:*8*
67:*21*  127:*23*
133:*16*
144:*10, 23*
146:*5*
**week**  19:2
58:6  390:*21*
**weeks**  93:*21,*
*24*  315:*18*
**WEI**  1:*13*
7:*3, 16, 19*
8:*6, 9, 12, 14,*
*17*  11:*15*

12:*3, 13, 16*
14:*13*  17:*11*
22:*18*  43:*11*
52:*17*  63:*14*
76:*18, 21*
80:*16*  81:6
91:*4*  397:*8*
400:*16*
**W-E-I**  12:*16*
**Wei-1**  7:*15*
12:22
**Wei-10**  8:*15*
91:7
**Wei-11**  8:*19*
301:*23*
**Wei-12**  8:*20*
305:9
**Wei-13**  9:6
308:*18*
**Wei-2**  7:*16*
14:*11*
**Wei-3**  7:*19*
30:*21, 23*
**Wei-4**  7:*22*
43:*8*
**Wei-5**  8:6
44:*8*
**Wei-6**  8:6
63:*12*
**Wei-7**  8:9
76:9
**Wei-8**  8:*10*
80:*14*
**Wei-9**  8:*14*
82:*8*
**weighed**
132:*3, 5*
**weight**  168:*4*
169:*20*
311:*10*  314:*3,*
*6*  315:*8*
316:*17*  331:*3,*
*9*  358:*3*
360:2, 9
361:*15*  362:2
378:*21*
380:*10, 23*
381:*17*
**Wei's**  7:*19*
15:*20*  18:*11*
19:*14*

**Well**  16:*10*
19:*20*  26:*5*
34:5  38:*8*
39:*3, 23*
40:22  42:*21*
45:*11*  46:*5*
50:*12*  67:*17*
69:*3, 14*
74:*10, 12*
75:2  77:*15*
85:*1*  87:*5*
89:5  90:7
92:6  99:*3*
100:*4*  104:*20*
105:*1*  113:9
114:*13*
116:*24*
118:*17, 21*
120:*16*
121:*14, 21*
125:*13, 15, 17*
127:*19*  128:*3*
129:2  132:*20*
133:*12*
135:*15*  136:2
138:*4, 19*
139:*1, 13*
140:*8, 18, 23*
141:*3, 9, 12,*
*14*  143:2, *5, 9,*
*20*  145:*3*
146:*14*  147:2,
*4, 7, 19*
148:*10*
152:*14*
155:*19*  156:*8,*
*20*  160:*10, 14*
161:*18*
163:*10*  165:2,
*20*  166:7
168:7  170:*8*
171:*8*  172:7,
*15*  173:6, 7
180:22  181:*4*
185:7  193:*19,*
*24*  194:*12*
198:*18, 23*
200:*17*
202:22
203:*11, 16*
204:*13*

205:*21*  209:*1*
211:*13*  214:6
216:*23*
217:*18*  223:*3*
225:9  226:6
228:*21*  230:9,
*21*  232:*1, 7,*
*10*  234:*8, 24*
235:*13, 22*
236:*12, 21, 23*
240:8  246:*14,*
*15*  248:*19*
249:*5, 24*
250:*11, 19*
251:*21, 23*
252:9  253:*1,*
*17, 24*  257:*7,*
*12, 19*  258:*11,*
*18, 21*  260:*11,*
*13*  265:*20*
267:*20*
269:*17*  270:9,
*15*  271:*20*
276:7  277:*1,*
*14*  278:*18, 23*
281:*23*
286:*10*
287:*15*
288:*16*  289:7,
*17*  292:*5, 11,*
*16*  293:*4, 20*
295:*3, 12*
296:*14*
298:*11*  299:2
300:6  307:*5*
309:*11*  310:9
312:2, *18*
317:*17*  318:9
324:*4, 9, 23*
325:*5, 12*
326:*4*  330:*17,*
*19, 20*  333:2,
*20*  334:*21*
335:*4, 24*
338:9  339:*21*
340:*1*  345:9,
*24*  346:22
347:2, *18*
348:2, *11, 24*
351:*19, 24*
355:*18*  356:*1*

358:7  359:*15*
360:*14, 17*
363:*17*
366:*15*
367:*17, 21*
368:*23*  369:*1*
370:2, *20*
371:*1, 15, 20*
373:*5, 17, 19*
377:*24*
378:22
379:*12*
383:22  386:*1,*
*5*  387:*4, 9, 16*
388:2  389:*11,*
*15*  390:*18*
391:*18*  392:*1,*
*5, 17*
**well-conducted**
330:*13*  381:*5*
**went**  176:*10*
**We're**  94:7,
*11*  95:*16*
96:9, *13*  97:6
109:*24*
125:22, *23*
131:6  158:7
182:*15*  183:*8*
190:*15*  225:2
266:*3*  275:*4*
286:*24*
288:*21*
295:*19*  342:7,
*11*  343:*16*
395:*24*  396:*16*
**WERNER**
5:*17*
**West**  5:*9*
**Western**
85:*23*  89:*24*
**We've**  72:*3*
132:*8*  273:*5*
342:2  361:*5*
**whichever**
223:*19*
**white**  310:*3*
**WHITELEY**
2:*18*
**wide**  135:*21*
**widely**  151:*17*
**wider**  320:*11*

Confidential Information - Subject to Protective Order

**WILLIAMSON** 2:9
**willing** 142:17
**Wills** 6:5
**win** 381:10
**window** 259:9
**winner** 339:14
**Wisconsin**
78:2 81:16
**wish** 268:19
**Witness** 10:5
11:19 12:1
24:11, 24
28:5, 20
29:10, 18, 23
73:7, 24
75:11 126:7
128:14
129:24
132:20 133:8
134:19 142:1
144:7 146:1
147:2 149:5
151:23
155:19 157:7
201:9 209:11
216:8 236:12
241:15 242:9
243:8 248:7
253:24 262:4
269:17, 22
271:13, 22
278:9 292:11
294:14, 21
315:12 320:3
336:10 337:6
357:15 377:6,
24 381:21
397:5, 6, 8
398:1
**woman** 92:20
**Woman's**
8:17 91:10
**Women** 89:24
90:12 91:21
92:1 344:16,
21 364:17
**Women's**
8:17 25:16
90:4, 17 91:10

**wonder**
269:21 322:16
**wonderful**
190:6 312:12
**wondering**
75:7 93:2
**Word** 16:20
64:9 74:15,
23 75:2, 3, 4,
6 91:24 92:2
99:4, 22
157:8 169:22
170:1 171:11
180:12, 15
187:12, 15
215:19 217:2
218:22 219:3
222:19
244:23 245:3,
8, 15 273:21,
23 274:4, 6
280:5 293:9
327:3 338:17
**worded** 151:10
**wording**
75:12, 14
202:15
**words** 75:23
135:10
142:10 182:6
189:10
200:21
219:20 281:7
289:7, 9, 18
309:7 383:13
**work** 15:2, 4
16:7 25:15
29:19 38:5
46:6, 10
49:13 59:6
61:8 69:15
224:13
282:24 339:8
363:6, 22, 24
364:23 365:4
**worked** 28:7
36:20
**working** 48:2
58:22 89:22
**works** 262:17

**World** 63:18
231:10, 15
244:10
260:11
270:17
312:17
340:10 341:8
349:7 357:3
368:3, 21
369:10
371:21
372:21
378:10 379:11
**worried** 72:24
73:9, 17
79:24 128:1
263:18 289:8
331:1
**worry** 40:2
50:9 169:8
170:10
259:20
260:17
265:24
270:18 376:8,
12
**worse** 177:5,
11
**worst** 332:4
**wound** 149:15
**wow** 154:18
170:13 212:6
253:12
270:11 272:1
315:23 317:4,
10 337:18
389:10
**write** 17:4
59:13 75:10
337:20
356:17
371:18 384:12
**writing** 26:17
59:4 320:23
**written** 16:6
168:11
392:16, 17
**wrong** 34:15
75:7, 18 95:3
151:10 155:1
171:18

190:12 274:5
379:14, 18
394:13
**wrote** 206:7
217:4 384:9
394:15

**< Y >**
**Yeah** 13:11,
13 18:17, 22
20:6 21:2
23:5 31:4
35:10, 13
36:2, 16
38:23 46:19
52:5 61:18
62:10, 11
70:7, 15
77:21 84:15
86:6, 15 88:5
89:11, 20
90:19 91:17
92:11 105:1
106:12 109:9
117:24
124:18 135:4
148:7 150:6,
10 159:6, 9
160:2 161:1
162:22
167:12 179:6
182:5 184:10
185:21
186:20
191:17
196:22
200:12 204:9
207:1 223:8
225:17 226:5,
11 230:4
232:16 235:9
243:21
245:22 246:6
255:16 258:2,
24 259:2, 5,
11 260:24
268:5 272:4
273:9 278:9
286:6 287:3,
24 302:10, 23
304:7 307:5

308:7 317:19
323:22 328:9,
21 329:10
331:22 332:2,
14, 23 333:5
335:18 337:6
343:2 350:4,
22 352:6
353:23
358:20 360:3
361:9, 16
363:5, 20
365:9 371:1
376:2 381:21,
24 382:2
383:4, 19
384:17 390:7
393:5 394:3
395:23
**year** 46:6, 20
332:18
**years** 25:17
35:9 45:1
46:21, 22
50:24 51:22
52:2, 3, 7
53:21 55:1, 2,
4 61:19
67:19, 22
68:4 69:1
81:2 137:14
168:11
185:19
186:11
189:24 190:8,
22 196:15
197:20
200:22 202:6
206:11, 16
208:21 209:8
290:5, 17
295:7 304:24
355:6 360:12,
24 373:14
374:4, 12
**yellow** 236:10
**Yep** 91:14
102:8, 17
108:13, 23
109:21
110:15 111:2,

Confidential Information – Subject to Protective Order

*18*  112:*6, 9*
173:*19*  175:*8*
176:*6*  177:*18*
178:*4, 14*
180:*4, 10*
181:*15*
192:*14*  193:*8*
195:*1, 7, 15,
24*  197:*10*
198:*16*  199:*5*
201:*16, 22*
203:*8, 23*
206:*5*  207:*20*
**yesterday**  62:*8*
**yield**  173:*24*
174:*6*  207:*10,
16*
**yields**  118:*17,
21*  198:*18, 23*
**York**  3:*4*
**Yoshida**  8:*20*

**< Z >**
**Zantac**  256:*5,
10, 17, 18*
257:*3, 8*
258:*4*  259:*18*
260:*7, 21*
261:*2, 12, 17,
18, 21*  262:*10,
22*  263:*7, 21,
24*  264:*5, 13,
14, 16, 21*
265:*11*  266:*1*
270:*14*  274:*2,
17*
**zero**  389:*6*
**Zhejiang**  4:*13*
**Zheng**  359:*8,
11, 18, 22*
365:*15*  366:*8*
367:*16*  368:*8*
**Zimmer**
87:*20, 23*  88:*6*
**Zoom**  1:*14*
2:*1*  3:*1*  4:*1*
5:*1*  6:*1*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
- - -

IN RE:  VALSARTAN,        :   MDL NO. 2875
LOSARTAN, AND             :
IRBESARTAN PRODUCTS       :   HON. ROBERT
LIABILITY LITIGATION      :   B. KUGLER
_____ :
                          :
THIS DOCUMENT APPLIES     :
TO ALL CASES              :


- CONFIDENTIAL INFORMATION -
SUBJECT TO PROTECTIVE ORDER
VOLUME II
- - -
September 15, 2021
- - -


Continued videotaped remote
deposition of LEE-JEN WEI, Ph.D., taken
pursuant to notice, was held via Zoom
Videoconference, beginning at 9:31 a.m.,
on the above date, before Michelle L.
Gray, a Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.


- - -


GOLKOW LITIGATION SERVICES
877.370.3377 ph| 917.591.5672
deps@golkow.com

Page 403

1
2 ZOOM APPEARANCES:
3 LEVIN PAPANTONIO RAFFERTY PROCTOR
   BUCHANAN, O'BRIEN, BARR, MOUGEY, PA
4 BY: DANIEL NIGH, ESQ.
   MADELINE PENDLEY, ESQ.
5 316 South Baylen Street, Suite 600
   Pensacola, Florida 32502
6 (888) 435-7001
   dnigh@levinlaw.com
7 Mpendley@levinlaw.com
   Representing the Plaintiffs
8
9 FARR LAW FIRM, P.A.
   BY: GEORGE T. WILLIAMSON, ESQ.
10 99 Nesbit Street
   Punta Gorda, Florida 33950
11 (941) 639-1158
   gwilliamson@farr.com
12 Representing the Plaintiffs
13
14 GOLDENBERG LAW, PLLC
   BY: MARLENE J. GOLDENBERG, ESQ.
   800 LaSalle Avenue, Suite 2150,
15 Minneapolis, Minnesota 55402
   (612) 436-5028
16 mjgoldenberg@goldenberglaw.com
   Representing the Plaintiffs
17
18 KANNER & WHITELEY, LLC
   BY: LAYNE HILTON, ESQ.
19 701 Camp Street
   New Orleans, Louisiana 70130
20 (504) 524-5777
   l.hilton@kanner-law.com
21 Representing the Plaintiffs
22
23
24

Page 404

1
2 ZOOM APPEARANCES: (Cont'd.)
3 GREENBERG TRAURIG, LLP
   BY: CLIFF MERRELL, ESQ.
   STEVEN M. HARKINS, ESQ.
4 Terminus 200
   3333 Piedmont Road, NE
5 Suite 2500
   Atlanta, Georgia 30305
6 (678) 553-2175
   Merrellc@gtlaw.com
7 Harkinss@gtlaw.com
8    - and -
9 GREENBERG TRAURIG, LLP
   BY: VICTORIA DAVIS LOCKARD, ESQ.
10 GEROND J. LAWRENCE, ESQ.
   Terminus 200
11 3333 Piedmont Road, NE
   Suite 2500
12 Atlanta, Georgia 30305
   (678) 553-2287
13 Lockardv@gtlaw.com
   Lawrenceg@gtlaw.com
14 Representing the Defendants, Teva
   Pharmaceutical Industries, Ltd., Teva
15 Pharmaceuticals USA, Inc., Actavis LLC,
   and Actavis Pharma, Inc.
16
17 WALSH PIZZI O'REILLY FALANGA
   BY: CHRISTINE I. GANNON, ESQ.
18 Three Gateway Center
   100 Mulberry Street
19 15th Floor
   Newark, New Jersey 07102
20 (973) 757-1017
   Cgannon@walsh.law
21 Representing the Defendants, Teva
   Pharmaceutical Industries, Ltd., Teva
22 Pharmaceuticals USA, Inc., Actavis LLC,
   and Actavis Pharma, Inc.
23
24

Page 405

1
2 ZOOM APPEARANCES: (Cont'd.)
   DUANE MORRIS, LLP
3 BY: PATRICK C. GALLAGHER, Ph.D., ESQ.
   1875 NW Corporate Boulevard
4 Suite 300
   Boca Raton, Florida 33431
5 (561) 962-2131
   Pcgallagher@duanemorris.com
6 Representing the Defendants, Zhejiang
   Huahai Pharmaceutical Co., Ltd., Prinston
7 Pharmaceutical Inc., Huahai U.S., Inc.,
   and Solco Healthcare US, LLC
8
9 BARNES & THORNBURG, LLP
   BY: KARA KAPKE, ESQ.
10 11 S. Meridian Street
   Indianapolis, Indiana 46204
11 (317) 231-6491
   Kara.kapke@btlaw.com
12 Representing CVS Pharmacy, Inc., and Rite
   Aid Corporation
13
14 HINSHAW & CULBERTSON, LLP
   BY: KATHLEEN E. KELLY, ESQ.
15 53 State Street, 27th Floor
   Boston, Massachusetts 02109
16 (617) 213-7047
   Kekelly@hinshawlaw.com
17 Representing the Defendant, ScieGen
   Pharmaceuticals, Inc.
18
19 BUCHANAN INGERSOLL ROONEY
   BY: CHRISTOPHER B. HENRY, ESQ.
20 Carillon Tower
   227 West Trade Street, Suite 600
21 Charlotte, North Carolina 28202
   (704) 444-3475
22 Christopher.henry@bipc.com
   Representing the Defendant, Albertson's
23 LLC
24

Page 406

1
2 ZOOM APPEARANCES: (Cont'd.)
3 PIETRAGALLO GORDON ALFANO BOSICK &
   RASPANTI, LLP
   BY: JASON M. REEFER, ESQ.
4 MATTHEW D. SCHERBARTH, ESQ.
   One Oxford Centre, 38th Floor
5 Pittsburgh, Pennsylvania 15219
   (412) 263-1840
6 JMR@pietragallo.com
   MDS@pietragallo.com
7 Representing the Defendant, Mylan
   Pharmaceuticals, Inc.
8
9 CIPRIANI & WERNER
   BY: JESSICA HEINZ, ESQ.
10 450 Sentry Parkway, Suite 200
   Blue Bell, Pennsylvania 19422
11 (610) 567-0700
   jheinz@c-wlaw.com
12 Representing the Defendants, Aurobindo
   Pharma, USA, Inc., and
13 Aurolife Pharma, LLC
14
15
16 VIDEOTAPE TECHNICIAN:
   Judy Diaz
17 LITIGATION TECHNICIAN:
   Joe Wills
18
19
20 ALSO PRESENT:
21 Lauren Massey - Paralegal
   Levin Papantonio
22
23
24

Confidential Information - Subject to Protective Order

Page 407

- - -

I N D E X

- - -

Testimony of:

LEE-JEN WEI, Ph.D.

By Mr. Nigh          409, 538
By Mr. Merrell          521

- - -

E X H I B I T S

- - -

NO.          DESCRIPTION          PAGE
Wei-14      ASA Statement on      410
            P-values
            Context, Process, Purpose
            (Wasserstein)

Wei-15      Screenshots of        537
            Documents Produced
            PDFs

Page 408

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
None.

Stipulations
PAGE   LINE
None.

Questions Marked
PAGE   LINE
None.

Page 409

- - -

THE VIDEOGRAPHER:  We're now on the record.  My name is Judy Diaz.  I am a legal videographer for Golkow Litigation Services.

Today's date is September 15, 2021, and the time is 9:31 a.m.

This is a continuation of the deponent Lee-Jen Wei, Ph.D.

All counsel will be noted on the stenographic record.  The court reporter is Michelle Gray.  The deponent is already under oath.

You may begin, Counsel.

- - -

... LEE-JEN WEI, Ph.D., having been previously sworn, was examined and testified as follows:

- - -

CONTINUED EXAMINATION

- - -

BY MR. NIGH:

Page 410

Q.   Okay.  Let's go ahead and pull up LP-1569.  This will be marked as Exhibit 14.

(Document marked for identification as Exhibit Wei-14.)

MR. NIGH:  And let's go ahead and turn to Page 131.

BY MR. NIGH:

Q.   Doctor, this is the ASA statement on statistical significance in P-values in 2016 that you spoke about multiple times in your deposition yesterday, correct?

A.   Yes, sir.

Q.   Okay.  Let's take a look at the -- well, first let's take a look at what is a P-value.  It says, "Informally a P-value is the probability under a specified statistical model that a statistical summary of the data (example, the summary mean difference between two compared groups) would be equal to or more extreme than its observed value."

Confidential Information - Subject to Protective Order

---

Page 411

1  Do you agree with that
2  statement?
3      A.   Yes, sir.
4      Q.   Okay.  Under principles.
5  Now, these principles, these are the --
6  these are the principles of the statement
7  that you were discussing yesterday,
8  correct?
9      A.   You want me to read it?
10  What is your question, sir?
11     Q.   No.  I said these
12  principles, these are the principles of
13  the ASA statement that you were
14  discussing yesterday, correct?
15     A.   Can I read it?
16     Q.   I'm sorry?
17     A.   Can I read it?
18     Q.   Principles.  Yes, we're
19  going to go through them.
20     A.   Yeah.  Please read for me,
21  or I can read it myself.  Which way you
22  prefer before I answer the question?
23     Q.   Oh, I see.  But first is,
24  you feel like you need to read through

---

Page 412

1  the six principles to know whether or not
2  the word "principles" underneath ASA
3  statement refers to the principles?
4      A.   Yeah.  I see the boldfaced
5  underneath, yes.
6      Q.   So first principle,
7  "P-values can indicate how incompatible
8  the data are with the specified
9  statistical model."
10  Do you agree with that
11  principle from the ASA statement?
12     A.   Yeah.  For our case,
13  essentially you are assuming there's no
14  association.  That's the model you're
15  talking about.
16     Q.   Number two --
17     A.   So I --
18     Q.   Oh, sorry, I didn't know you
19  weren't done.
20     A.   No, that's okay.  Do you
21  want me to read the fine lines or that's
22  not relevant?
23     Q.   The second one is, Number 2.
24     MR. NIGH:  Let's go ahead

---

Page 413

1  and pull that one up.
2      THE WITNESS:  I'm sorry.
3  You didn't answer my question.  I
4  said underneath 1, there is
5  details.  Do we want to go over or
6  you don't want me to go over?
7  BY MR. NIGH:
8      Q.   Okay.  I think I addressed
9  this earlier, that the attorneys ask the
10  questions.  So we don't answer the
11  questions.
12  So no, I don't need to go
13  through the fine line below unless you
14  feel like you need to, to answer the
15  question.
16  So the second one is,
17  "P-values do not measure the
18  probability" --
19     A.   I'm sorry to interrupt you.
20  I'd like to read it.
21     Q.   What do you want to read?
22     A.   Read that Number 1
23  underneath the title.
24     Q.   Okay.  We can go off the

---

Page 414

1  record and you can read this document if
2  you want to.
3      A.   Okay.
4      Q.   Go ahead.
5      THE VIDEOGRAPHER:  The time
6  right now -- the time right now is
7  9:35 a.m.  We're off the record.
8      (Whereupon a discussion was
9  held off the record.)
10     THE VIDEOGRAPHER:  The time
11  right now is 9:38 a.m.  We're back
12  on the record.
13     MR. NIGH:  Let's go ahead
14  and put LP-1569 up.
15  BY MR. NIGH:
16     Q.   I want to draw your
17  attention to Number 3.  This is the one
18  that you cited in your report.
19  It says, "Scientific
20  conclusions and business or policy
21  decisions should not be based only on
22  whether a P-value passes a specific
23  threshold."
24  Do you see that?

---

Confidential Information - Subject to Protective Order

1    A.   Yes, sir.
2    Q.   Now, that statement doesn't
3  say not to use the words "statistically
4  significant" or to stop looking at
5  P-values, correct?  It says, "Not based
6  only on whether a P-value passes a
7  specific threshold."  Correct?
8    A.   I'm sorry.  I missed your
9  first phrase related to statistical
10  significance, could you say it again,
11  please?
12    Q.   Let me break this down.
13  That statement uses the word "not be
14  based only."
15        MR. NIGH:  Can we highlight
16  the word "only."
17  BY MR. NIGH:
18    Q.   Do you see that, the word
19  "only"?
20    A.   Yes, sir.
21    Q.   This doesn't say to stop
22  reporting P-values altogether, correct?
23    A.   I don't understand what
24  you're talking about, sir.  You highlight

1  "only on."  I agree with that phrase.
2  What else are you talking about?  What
3  are you referring to?
4    Q.   The sentence, "Scientific
5  conclusions and business or policy
6  decisions should not be based only on
7  whether a P-value passes a specific
8  threshold."
9        This principle doesn't state
10  to stop reporting or relying on P-values
11  altogether, correct?
12        MR. MERRELL:  Objection to
13  form.  The document speaks for
14  itself.
15        THE WITNESS:  Well,
16  everybody agree there's a P-value
17  is one of the components.  I
18  didn't say you are not going to
19  reporting anything in my report.
20  You can report anything that you
21  wanted to.  I said this is not
22  only thing you can use.  That's
23  exactly I mentioned what --
24  Number 3.

1  BY MR. NIGH:
2    Q.   Right.  And this statement
3  doesn't say to stop using the word
4  "statistically significant" either,
5  correct?
6        MR. MERRELL:  Objection to
7  form.  Document speaks for itself.
8        THE WITNESS:  Wait a second,
9  sir.
10        MR. NIGH:  "The document
11  speaks for itself" is an improper
12  objection.  Please keep it to
13  objection to form.
14        THE WITNESS:  Look at "The
15  use is widespread," on the bottom.
16  Statistical significance.  Look at
17  it on the bottom.
18        MR. NIGH:  Yeah, let's
19  highlight that.
20        THE WITNESS:  Sorry?
21  BY MR. NIGH:
22    Q.   Let's highlight that.
23    A.   Yeah.
24    Q.   And the next statement says,

1  "The widespread use of 'statistical
2  significance' as a license for making a
3  claim of a scientific finding or implied
4  truth leads to considerable distortion of
5  the scientific process."
6        It doesn't say to stop using
7  the word "statistical significance" as a
8  descriptor, does it?
9    A.   Sir, you can use anything
10  you wanted to.  And how did you actually
11  interpret?  That's a different method,
12  right.  ASA suggests that don't use this
13  one.  You guys say, I want to use it.
14  You go ahead and use it.
15        This is free world.  Nobody
16  is going to stop you to not using it,
17  right.
18    Q.   Well --
19    A.   I didn't say you're --
20    Q.   Sorry, I didn't know you
21  weren't done.
22    A.   -- not allowed to use it.
23        Sorry?
24    Q.   Sorry.  I didn't know you

Page 419

1  weren't done.  Go ahead.
2      A.   I'm trying to say, sir, the
3  last sentence exactly reflecting ASA
4  saying, don't use statistical
5  significance, especially using P less
6  than .05 as a license to make a decision.
7  Right.
8          That's exactly what we want
9  the people, including you, sir, to
10  understand.  Life is not so simple.  We
11  cannot use black and white.  Basically,
12  using P less than .05.  That's the
13  message we're sending to outside world.
14          If you don't want to listen,
15  that's okay.  You have any freedom to use
16  it.  Right.  Nobody stop you using it.
17  We just say this is not a valid argument
18  based on ASA statement.  That's it.
19      Q.   All right.  Can you listen
20  to my question.
21          My question was, the ASA
22  statement does not say to stop using the
23  word "statistical significance" as a
24  descriptor only, does it?

Page 420

1      A.   You can use it.  They didn't
2  say you cannot use it.  But they said
3  it's not appropriate to use it.  That's
4  what they said.
5      Q.   They said --
6      A.   Nobody is going to -- sorry.
7      Q.   They said not to use it as a
8  license for making a claim of a
9  scientific finding or implied truth.
10  Don't use it for that purpose.  But they
11  did not say to stop using it as a
12  descriptor, correct?
13      A.   That's not my -- that's not
14  my interpretation, sir.  You can
15  interpret your way.  I can interpret my
16  way.  All right.
17      Q.   So you believe, as you read
18  these words, that the ASA says to stop
19  using the word "statistical significance"
20  in studies.  That's your interpretation?
21      A.   Yes, sir.
22      Q.   Okay.  Do you recognize that
23  even between the date of the publication
24  of this study -- I mean, of this

Page 421

1  statement, in 2016 and today's date, the
2  vast majority of observational studies
3  that are published in journals continue
4  to use the word "statistical
5  significance"?  Agree or disagree?
6          MR. MERRELL:  Objection to
7  form.
8          THE WITNESS:  Unfortunately,
9  sir, people don't listen.
10  BY MR. NIGH:
11      Q.   And even --
12      A.   They just --
13      Q.   Sorry.  I didn't know you
14  weren't done.
15      A.   People should be getting
16  smarter and understand how to translate
17  the data to be interpretable.
18          And ASA is doing their job.
19  I too tell the outside world, don't use
20  this word literally saying black and
21  white decision.  If people wanted to use
22  it, that's their freedom.  And being a
23  scientist, a statistician, being a good
24  lawyer like yourself, we should take

Page 422

1  advice from ASA instead of totally ignore
2  it.  Right.
3          Other people, you know, they
4  misuse it for many, many years.  Now they
5  are saying please don't use it.  People
6  have a bad habit.  Very difficult to
7  change the habit.  And then they still
8  use it.
9          So what are you going to do?
10  As a reader, as myself as a professor in
11  biostatistics, I say please, I'm going to
12  helping ASA to spread the word, please
13  don't use this black and white simple
14  rule to make a decision.  Okay.
15          You can argue any way you
16  want to do and say most of the people
17  still use it.  I say, well, gee, you
18  know, why people still use it?  Can we
19  actually educate the people a little bit
20  more, helping society?  They say oh, no,
21  no, I don't care, as long as everybody --
22  most of the people use it.  I will use
23  it.
24          Is that a right way to do

Confidential Information - Subject to Protective Order

Page 423

1 business, sir, to be a good citizen of
2 the society? It's not only for winning
3 the case or losing the case, right. We
4 actually take this opportunity, actually
5 find the truth, right, instead of just
6 using everybody who misuse the language
7 to helping your case. I'm not so sure
8 that's good for society. Do you agree?
9    Q.   So you would agree that the
10 vast majority of observational studies
11 continue to use the descriptor
12 "statistical significance"?
13    A.   Yeah. Dr. Madigan didn't
14 have to. He is a distinguished
15 statistician. He agreed with ASA
16 statements in his deposition.
17    Q.   Well, Dr. Madigan in his
18 report, at no point does he ever make the
19 claim of a scientific finding when he
20 uses the word "statistical significance."
21 He never actually makes a claim of
22 scientific finding or implied truth in
23 his report when he uses those words,
24 correct?

Page 424

1    A.   I don't know, sir. I have
2 to read his report. If you say so, I
3 feel sorry for him.
4    Q.   I'm sorry. What?
5    A.   If he said his finding is
6 not scientifically findings, I really
7 feel sorry for him. That's what I'm
8 saying.
9    Q.   You mean if when he uses the
10 word "statistical significance," if he
11 were to say that he's not using that as a
12 license for making a claim of a
13 scientific finding or implied truth, you
14 would feel sorry for him?
15    A.   Yes.
16    Q.   Why?
17    A.   Because some -- Dr. Madigan,
18 being a distinguished statistician, if
19 any statistical analysis cannot be
20 interpreted scientific findings, I say
21 why -- why in the world are we sitting
22 here, right? You just play number games.
23 And your result cannot be even applied to
24 the real-world situation.

Page 425

1        I'm really surprised, sir,
2 if he really say so. I'm really
3 interested to pick up a sentence that he
4 claim in his report, and I'm going to
5 send it to ASA and say, hey, listen, man,
6 you know, this is a distinguished
7 professor saying such things. What do
8 you guys think?
9    Q.   I'm sorry. What have you
10 stated that you're going to send to ASA?
11    A.   If what you say is really
12 what Dr. Madigan said in his report -- by
13 the way, his report will be in the public
14 domain anyway eventually, right? We can
15 easily just send this newsletter or
16 whatever to ASA, the publication, and
17 say, listen, you guys make so much effort
18 talking about statistical analysis,
19 helping people, improve this society
20 scientifically.
21        We have this distinguished
22 statistician, a professor at Northeastern
23 University, and say, well, anything I did
24 here cannot be actually extrapolated to

Page 426

1 scientific findings. I said, my
2 goodness, why in the world are you
3 wasting your time to do the data analysis
4 which cannot be even used for a
5 scientific argument? If that's exactly I
6 understand what you're saying, I'm really
7 sorry to hear that, sir.
8    Q.   You might be
9 misunderstanding what I'm saying.
10        When he uses the word
11 "statistical significance," he at no
12 point in his report uses them as a
13 license for making a claim of scientific
14 finding or implied truth, correct?
15        MR. MERRELL:  Objection to
16    form.
17 BY MR. NIGH:
18    Q.   You've reviewed his report.
19    A.   What? Are you done?
20    Q.   You reviewed his report. Do
21 you remember him saying after -- that the
22 study reported statistical significance,
23 that he was interpreting that -- or that
24 he was using that as a license for making

Page 427

1 a claim of a scientific finding or
2 implied truth?
3        A.   Did he use the exact words,
4 a license, no?  Right.  But if you see
5 his conclusion -- did you see that?
6 Everything that he did, using P less than
7 .05, and then claim there is a risk of
8 cancer.  Right.
9              That's exactly what you
10 said.  I don't understand what you're
11 talking about, sir.  I'm really sorry.
12        Q.   At any point, as you
13 reviewed his report, do you recall him
14 ever attaching the word "statistical
15 significance" and then use those as a
16 license for making a claim of a
17 statistical -- a scientific finding or
18 implied truth as opposed to just using
19 that as a descriptor, pulled from the
20 study itself?
21              MR. MERRELL:  Objection to
22 form.
23              THE WITNESS:  You are asking
24 me did he say anything like

Page 428

1        exactly like you're saying as a
2        license for making a claim of
3        scientific findings in his report?
4        Is that what you're asking me?
5 BY MR. NIGH:
6        Q.   My question, as you reviewed
7 Dr. Madigan's report, do you recall him
8 ever attaching the word "statistical
9 significance" and then use that as a
10 license for making a claim of a
11 scientific finding or implied truth as
12 opposed to just using that as a
13 descriptor pulled from the study itself?
14        A.   Boy, I tell you what, sir.
15 If you actually exactly -- Dr. Madigan
16 saying just like a descriptor, instead of
17 an inference, we are in trouble.  That
18 means what you're saying, just
19 descriptor.  There's no way you can make
20 an inference saying the threshold --
21 whatever the number you used yesterday.
22 I'm sorry.  I don't know the value.  He
23 said past this value of a contamination,
24 you are in trouble.

Page 429

1            I said, well, my goodness,
2 is that a scientific finding, what he
3 claim?  You're saying, oh, this has
4 nothing to do with it because he just use
5 P-value as a descriptor.
6            I say, sir, what do you mean
7 by descriptor.  Descriptor means it's
8 nothing.  Just describe the situation.  I
9 say, well, how do we use your descriptor?
10 Make a decision.  I say, I don't use it.
11 I don't use a P-value to make a decision.
12            Come on.  I mean, sir,
13 that's really strange, right?  He use
14 older way.  He uses P less than .05,
15 decide black and white.  Now you're
16 saying no, no, no, he didn't do that.  I
17 really got confused now, sir.
18        Q.   Where do you think in his
19 report that he used it in black and white
20 or as a line in the sand or as a
21 threshold?  Those words show up anywhere
22 in his report, correct?
23        A.   No.  I'm saying he used
24 statistical significance all the time.

Page 430

1 He translate his words, statistical
2 significance mean yes, there is an
3 increase of cancer risk.  That's the
4 implication, sir.
5        Q.   If you actually look at
6 those studies when he would use the word
7 "statistical significance" to say -- to
8 see if the study itself, he used the word
9 "statistical significance"?
10        A.   I'm sorry.  I don't catch
11 what you're saying, sir.
12        Q.   Did you actually pull up the
13 studies where he used the words
14 "statistical significance" to see if that
15 descriptor was also in those studies,
16 statistical significance?
17        A.   Did you say -- did he say
18 that he used a P-value as a descriptor,
19 sir, in his report?  Help me out.  Did he
20 say anything?
21        Q.   My question here is, did you
22 actually pull up the studies where he
23 used the word "statistical significance"
24 to see if those other studies also used

Confidential Information - Subject to Protective Order

Page 431

1 those same exact words, "statistical
2 significance"?
3     A.   What do you mean by he?
4 Dr. Madigan?
5     Q.   Dr. Madigan, yes.
6          Let me ask that question
7 again.
8          Did you actually pull up the
9 studies yourself where Dr. Madigan used
10 the word "statistical significance" to
11 where you yourself could see if those
12 studies also used those same exact words,
13 "statistical significance"?
14     A.   Sir, looking at Table 1,
15 Dr. Madigan's report, okay.
16     Q.   Yes.
17     A.   There is a column for "SS?"
18 That's a statistical significance or not,
19 right?
20     Q.   That doesn't mean sample
21 size?
22     A.   Listen -- listen to me.  You
23 have to listen to me first, sir.
24     Q.   I'm sorry.  I thought you

Page 432

1 were done.
2     A.   I'm really polite to you.
3 Every time I wait until you finish.  You
4 have to give me the right to finish my
5 thing, right.  Otherwise I'm going
6 nowhere here, sir.
7     Q.   Sir, you pause after some of
8 your sentences, so I believe that you're
9 done.  But yes, I will try to wait just
10 in the same way that I've asked you to
11 wait until I'm done.
12     A.   So you're looking at Table 1
13 in the column called "SS?"  Look at this
14 underneath the footnote.  What he say?
15 Statistical significance.  That's SS.
16          He actually saying the Q1
17 against Q2 against Q3, which one is the
18 statistical significance.
19          If this only descriptor, why
20 he make this every paper, every
21 publication he cited, he says this one is
22 statistical significance or not.
23          Did I answer your question,
24 sir?

Page 433

1     Q.   Let's go ahead and pull up
2 that table.
3          MR. NIGH:  LP-1588 -- or
4     1558.  This is Dr. Madigan's
5     report.  We'll look at Table 1.
6 BY MR. NIGH:
7     Q.   Let's go ahead -- now,
8 yesterday when I asked you what SS stood
9 for, you guessed that it may stand for
10 sample size.  Do you remember that?
11     A.   No.  I didn't say anything.
12 I said because I -- I have to read the
13 footnote.  And I was in a hurry.  I
14 didn't read the footnote.
15          Then I look at it last
16 night.  I say, oh, that means statistical
17 significance.  If the sample size, this
18 is not issue, right?
19     Q.   I'm sorry.  You believe that
20 you need to see the footnote to be able
21 to tell that means statistical
22 significance?
23     A.   Otherwise, I don't
24 understand the abbreviation SS, question

Page 434

1 mark, sir.
2     Q.   Okay.  When it comes right
3 after effect size?
4     A.   I'm sorry, sir?
5     Q.   When it comes right after
6 effect size, you wouldn't know what "SS?"
7 means without the footnote?
8     A.   This is not a standard of
9 abbreviation for "SS?"  No one use this
10 one.
11     Q.   Okay.  But now today you
12 know that SS stands for statistical
13 significance?
14     A.   Yeah, yeah.  I read the
15 footnote.  Look at the footnote.  If you
16 can pull up a little bit.
17     Q.   Sure.
18     A.   You can see the footnote.
19     Q.   You feel like you would need
20 the footnote in order to know that "SS?"
21 stands for statistical significance?  Is
22 that what you're saying?
23     A.   Of course.  Of course.
24 Otherwise I wouldn't understand what SS

Page 435

1 means.
2    Q.   Couldn't you just pull the
3 study itself, like you could have -- if
4 you had looked at De Stefani -- let's
5 highlight De Stefani.  If you had looked
6 at De Stefani and you had seen the
7 results there, couldn't you have seen
8 that the Y is a yes?
9    A.   What is your question, sir?
10    Q.   If you had pulled up De
11 Stefani, couldn't you have seen that it
12 was statistically significant, a yes, if
13 you had looked at the dietary study and
14 compared it to this table?
15    A.   I don't know what language
16 they use in the paper.  We have to read
17 again, right, to see what they say -- if
18 they say anything about statistical
19 significance.
20       According to Table 1, and
21 Dr. Madigan say Y, as a star.  Right.  If
22 you look down the bottom, what the star
23 means, right.  That's it from his table.
24    Q.   Couldn't you have looked --

Page 436

1 sorry, I didn't mean to interrupt you.
2 Go ahead.
3    A.   If you want to go back to
4 the paper, we'll sit and read it one by
5 one to see who actually uses statistical
6 significance, the word, right.  And
7 Dr. Madigan just translate or transport
8 that statistically significant or not in
9 his Table 1.  That would be fine.
10       But I really don't
11 understand your question.  You said go
12 back to the paper.  You didn't say
13 anything.  I say, well, we can read the
14 paper to see what kind of language did he
15 use.
16    Q.   So if I understand your
17 testimony correctly, if the study used
18 the word "statistical significance" and
19 Dr. Madigan put that in his report, that
20 would be fine, in your testimony,
21 correct?
22       MR. MERRELL:  Objection to
23    form.
24       THE WITNESS:  I don't

Page 437

1    understand, sir.  What do you mean
2    by fine?
3 BY MR. NIGH:
4    Q.   You just said -- sorry, go
5 ahead.
6    A.   If he copy this one, then he
7 just reporting what the paper saying,
8 right, in the table "SS?"
9       That's my interpretation.  I
10 don't know in the paper itself has
11 clearly state their result are
12 statistically significant or not.  We
13 don't remember.  I don't remember this.
14 You have to go back to check what
15 language did he use.
16    Q.   So your task was to review
17 Dr. Madigan's report and write your own
18 report.  And when you testified
19 yesterday, you didn't know that SS stood
20 for statistical significance in his
21 table, even though you had the ability to
22 review all his footnotes and the table
23 for at least two months before that
24 deposition yesterday, correct?

Page 438

1       MR. MERRELL:  Objection to
2    form.
3       THE WITNESS:  Correct.
4 BY MR. NIGH:
5    Q.   Have you gone through the
6 studies, De Stefani, to see if it
7 actually uses the words "statistically
8 significant"?
9    A.   You asked me again, sir.  We
10 can go back one by one these
11 publications.  Right.  We can see what
12 language they use in the papers.
13    Q.   Yeah.  My question is not
14 for us to go back one by one.  You've had
15 two months to look at these dietary
16 studies.
17       What I want to ask you is
18 your understanding of the study now, not
19 going through them one by one.  Do you
20 recall if De Stefani uses the terminology
21 "statistical significance"?
22    A.   You are testing my memory,
23 sir.  How many papers you list on the
24 Table 1?

Confidential Information — Subject to Protective Order

Page 439

1    Q.   Is your answer no?
2    A.   I cannot answer your
3 question until I refresh my memory
4 reading the papers, sir.
5    Q.   Fair enough.  How about
6 Pobel?
7         MR. NIGH:  Let's highlight
8    that one.
9 BY MR. NIGH:
10    Q.   Do you recall if Pobel uses
11 the terminology in that dietary study
12 that its findings were statistically
13 significant?
14    A.   Again, sir, we need to go
15 back to read the paper.
16    Q.   So you can't answer that
17 question without going back and reading
18 the paper, correct?
19    A.   Yeah, I don't want to test
20 my memory, sir.
21    Q.   How about La Vecchia?  La
22 Vecchia.  Do you recall if the La Vecchia
23 study shows that its findings were
24 statistically significant or states that

Page 440

1 its findings were statistically
2 significant?
3    A.   I don't recall.
4    Q.   How about Larsson?  Do you
5 recall if Larsson states that its
6 findings were statistically significant?
7    A.   No, sir.
8    Q.   How about Zheng.  Let's
9 highlight Zheng down under pancreatic.
10 The second one.  Do you recall if Zheng
11 states that its findings for NDEA were
12 statistically significant?
13    A.   So let me make sure that you
14 exactly asked me.  You say, do I remember
15 in this paper the authors use the words
16 "statistical significance" in the paper,
17 right?  That's what you're asking me,
18 correct?
19    Q.   Yes, yes.
20    A.   So I don't -- sir, with all
21 due respect, right, I don't remember for
22 each paper.  So many papers I reviewed in
23 this case, right.  You don't expect me to
24 remember every word in the paper, right?

Page 441

1 I have less capability to remember
2 everything they said in the paper.
3 That's not fair.
4         If you have time, we can go
5 through this paper, say who has used
6 statistical significance, who did not.
7 That's fair, right?  But instead you ask
8 me --
9    Q.   I'm being fair with my -- go
10 ahead.
11    A.   You're asking me repeatedly,
12 do you remember this so and so.  I
13 already answer your question.  In
14 general, I don't remember exactly, right.
15         But, try to be -- find out
16 the truth, we should go back to read the
17 papers.  But you said you don't want me
18 to go back to the papers.
19         Now, how in the world do you
20 expect me to answer your question?
21    Q.   My question is -- yet again,
22 I'm not asking you to remember every
23 single word in the study.  I'm asking you
24 simply for Zheng.  Do you recall that for

Page 442

1 pancreatic, that Zheng described its
2 findings for NDEA as statistically
3 significant?  Yes or no?
4    A.   I don't recall, sir.
5    Q.   De Stefani.
6         MR. NIGH:  Let's highlight
7    De Stefani.
8 BY MR. NIGH:
9    Q.   Do you recall that
10 De Stefani described their findings as
11 statistically significant?
12    A.   I don't recall, sir.
13    Q.   Goodman, both for males and
14 females, do you recall that Goodman
15 described their findings as statistically
16 significant?
17    A.   No, sir.
18    Q.   Colorectal.  Knekt, do you
19 recall that the authors described their
20 findings as statistically significant?
21    A.   No, sir.
22    Q.   Loh, for rectal, do you
23 recall that they described their
24 findings -- do you recall whether they

1 described their findings as statistically
2 significant?
3      A.   No, sir.
4      Q.   Zhu, do you recall whether
5 they described their findings as
6 statistically significant?
7      A.   No, sir.
8      Q.   And I missed one up there.
9 Keszei, for -- do you recall that Keszei
10 described their findings -- do you recall
11 whether Keszei described their findings
12 as statistically significant?
13      A.   I don't remember.
14      Q.   For all the ones that have
15 no, an N, the ones that are not
16 highlighted, do you recall whether any of
17 those studies described their findings as
18 not statistically significant?
19      A.   I don't remember this.
20      Q.   So out of the -- every
21 single one of these studies, you don't
22 recall whether any of them used the
23 find -- words or findings of describing
24 their findings -- well, strike that.

1      So for every one of these
2 studies listed on Table 1, you don't
3 recall whether any of these studies used
4 the words "statistically significant" or
5 "not statistically significant," correct?
6      A.   Sir, if the paper did not
7 even mention the word "statistical
8 significance," however Dr. Madigan in his
9 Table 1 started using the word
10 "statistical significance," I think
11 Dr. Madigan overly used word "statistical
12 significance" in this Table 1.
13      Q.   Well, I understand that.
14      I'm asking you the other
15 question. So for every one of these
16 studies listed on Table 1, you don't
17 recall whether any of these studies used
18 the words "statistically significant" or
19 "not statistically significant," correct?
20      A.   Yeah, I wish I can read the
21 paper, if you allow me.
22      Q.   My question is, you don't
23 recall whether any of these studies use
24 the words "statistically significant" or

1 "not statistically significant," correct?
2      A.   Yes, sir.
3      Q.   So as you sit here today,
4 you wouldn't be able to know for any of
5 these studies whether or not Dr. Madigan
6 overly used the word "statistically
7 significant" in this table, correct?
8      A.   No, he did.  He actually --
9 in this -- also in reporting statistical
10 significance, this words that he used
11 here, that means it's overly used.
12      Q.   How do you know that none of
13 the authors -- or that any of the authors
14 didn't use the word "statistically
15 significant"?  We just went through every
16 single study, and you couldn't tell me a
17 single one as to whether or not they use
18 the word "statistically significant,"
19 correct?
20      A.   Sir, it doesn't really
21 matter those guys did use or did not use.
22 Even if everybody on the list, right,
23 everybody use the "statistical
24 significance" in their papers,

1 Dr. Madigan should be smart enough to not
2 just copy those words in Table 1, because
3 he is a prominent statistician.  He
4 agrees with the ASA statement.  Okay.  So
5 either way he overly used the word
6 "statistically significance."
7      Q.   So previously you told me
8 that if he had just used the same words
9 the study authors had used he was fine.
10 Now you are changing your testimony to
11 tell me because he is a prominent
12 statistician, he should not be copying
13 the words that the study authors used,
14 correct?
15      MR. MERRELL:  Objection to
16 form.
17      THE WITNESS:  Sir, you
18 misunderstood what I'm saying.  I
19 said if the paper is saying
20 statistical significance, he just
21 literally copied, right, the words
22 into table.
23      Operationally that's
24 correct, right.  He actually used

Confidential Information - Subject to Protective Order

1  this word from the authors, right.
2        But if the authors didn't
3  use it, he used it, then, wow,
4  gee, you know, you are smart
5  enough, you should not use it,
6  right?
7        But you're saying, well,
8  everybody use this word.  I say,
9  well, you're also smart enough.
10  You shouldn't follow -- you should
11  not follow those guys, right.  You
12  should not repeating the so-called
13  statistical significance because
14  you know very well those words are
15  not appropriate, right.
16  BY MR. NIGH:
17     Q.   Okay.  My question is, do
18  you believe it's fine for him to have
19  copied the word "statistically
20  significant" if the authors used those
21  words as well?
22        MR. MERRELL:  Objection to
23     form.
24        THE WITNESS:  I'm saying he

1  is operationally correct citing
2  the authors' words, "statistically
3  significant."  Operationally, he's
4  correct.
5        But should he repeat it,
6  what the author is saying?  I say
7  he should not.
8  BY MR. NIGH:
9     Q.   Okay.  So it's your
10  testimony that it would be operationally
11  correct, but you believe that it would be
12  a flaw, even if it's operationally
13  correct to copy the words that the
14  authors used, "statistical significance"
15  or "not statistically significant."  Is
16  that your testimony?
17     A.   What I'm trying to say, sir,
18  operationally, if he copy what these
19  authors saying, it's a correct way to
20  copy.
21        But the responsibility to be
22  a prominent statistician, he should not
23  picking up something he does not believe.
24  He actually agrees with ASA statement.

1  If he agrees, why should he
2  even recite those SS from other authors,
3  right?  He should avoid.
4     Q.   Okay.  Understanding his
5  responsibility to be a prominent
6  statistician, is it your testimony then
7  that he should not copy the words
8  "statistically significant" if the
9  journal authors used those words
10  themselves?
11        MR. MERRELL:  Objection to
12     form.
13        THE WITNESS:  I don't think
14     that you actually understand what
15     I'm saying, sir.
16  BY MR. NIGH:
17     Q.   I don't --
18     A.   I'm saying he can copy -- he
19  can copy anything he wants to.  But he
20  should make very clear, those statistical
21  significance does not mean we make a
22  black and white decision, right.  This
23  Table 1 give people wrong impression,
24  saying statistical significance plays a

1  vital role to decide this study is
2  positive or neutral or negative.  Right.
3        That's what I'm trying to
4  say.  Being a distinguished statistician,
5  we should be better than those guys,
6  right.  We should educate the society.
7  What is the most appropriate way to
8  communicate with the society, right?
9     Q.   Okay.  So is it your
10  testimony now that he can copy the words
11  "statistical significance" or put a no or
12  yes in a table that has a column "SS?" as
13  long as he has a disclaimer that
14  states -- that makes it clear that
15  statistical significance does not mean we
16  make a black and white decision.  Is that
17  your testimony?
18     A.   I wish he did in his report,
19  in helping us clarify this misused or
20  overly used statistical significance,
21  this terminology.
22     Q.   So you wish, in his report,
23  that he had a disclaimer that states
24  statistical significance does not mean we

Confidential Information - Subject to Protective Order

---

Page 451

1 make a black and white decision. Is that
2 your testimony?
3     A.   Yes, sir. I would respect
4 him very much if he say so in his report.
5         MR. NIGH:  Let's go back to
6     the ASA. LP-1569.
7 BY MR. NIGH:
8     Q.   Do you remember yesterday
9 when you told me that The New England
10 Journal of Medicine stopped reporting on
11 P-values?
12     A.   New England Journal of
13 Medicine issued a recent guideline for
14 statistical analysis. It is saying for
15 primary indicator for a single study, if
16 you have pre-specified value of for -- a
17 positive rate -- you know, sometimes
18 people use .05, .01, .1, you know,
19 whatever you decide in the beginning, in
20 the design of the study, you are allowed
21 to report the P-value for that primary
22 endpoint.
23         And after that, only thing
24 they say you can provide, like you said

---

Page 452

1 yesterday, is confidence interval. And
2 confidence interval for all other
3 secondary endpoints, and the confidence
4 interval actually provides you more than
5 just P-value.
6         Like you said, sir, very
7 well yesterday, you can use 95 percent
8 confidence interval to make a black and
9 white decision. But I believe New
10 England Journal of Medicine really wanted
11 people to understand confidence interval
12 is more useful, provide more information
13 about so-called clinically significance,
14 right, of your findings. That's my
15 understanding.
16     Q.   So the New England -- your
17 statement is The New England Journal of
18 Medicine still allows to report the
19 P-value for the primary endpoint,
20 correct?
21     A.   With confidence interval.
22 They actually want people to use more
23 confidence intervals these days than
24 P-value.

---

Page 453

1     Q.   The vast majority of
2 observational studies, you would agree,
3 even going back 20, 30 years ago, report
4 both the confidence interval and
5 P-values, correct?
6     A.   Some of -- some actually do
7 not have it. Mostly they are reporting
8 both.
9     Q.   Do you believe there is a
10 single dietary study that Madigan listed
11 on his table that doesn't also report the
12 confidence interval?
13     A.   I don't recall, sir.
14     Q.   Do you believe that there's
15 any incident where Hidajat doesn't report
16 the confidence interval?
17     A.   I don't recall, sir.
18     Q.   Let's take a look at other
19 approaches, on the next page.
20         And you have -- I think you
21 have a printed out copy in front of you.
22         So other approaches.  Now,
23 Number 4, other approaches, these are not
24 part of the ASA statement principles,

---

Page 454

1 correct? That was Number 3.
2     A.   I'm sorry, sir. What is
3 your question?
4     Q.   I said these other
5 approaches, these are not part of the ASA
6 statement principles. That was Number 3,
7 correct?
8     A.   Yes, sir.
9     Q.   This is providing
10 alternatives, correct?
11     A.   Yeah, that's the other
12 approaches, yes, sir.
13     Q.   And it says, "In view of the
14 prevalent misuses of and misconceptions
15 concerning P-values, some statisticians
16 prefer to supplement or even replace
17 P-values with other approaches. These
18 include methods that emphasize estimation
19 over testing, such as confidence,
20 credibility, or prediction intervals."
21         Do you see that?
22     A.   Yes, sir.
23     Q.   Now, it looks as if they are
24 discussing other approaches. You can use

---

Confidential Information - Subject to Protective Order

Page 455

¹ the confidence interval -- that's another
² approach -- prediction interval or
³ credibility. But they -- this does not
⁴ say or give direction to stop using
⁵ P-values, correct?
⁶     A.    ASA is not law enforcement
⁷ agency. They cannot put you in jail if
⁸ you use a P-value. In scientific
⁹ society, everything they want to do is
¹⁰ helping the society to understand the
¹¹ underlying cause, like this case, right.
¹²         And if you read it, sir, if
¹³ you read this first paragraph you
¹⁴ highlighted, they emphasize estimation.
¹⁵     What does that mean? That
¹⁶ means that effect size is more important
¹⁷ than the P-value. That's exactly what I
¹⁸ said yesterday to you, sir. We need more
¹⁹ information just than P less than .05.
²⁰     Q.    Right. This is highlighted
²¹ under other approaches, not one of the
²² six principles, correct?
²³     A.    Sir, I -- again, they have a
²⁴ principle ask that don't use the P-value

Page 456

¹ only. Then they say there are some
² alternative proposals, right.
³         ASA is not in a position to
⁴ tell us you have to do A, not B, right.
⁵ They give you other alternatives. This
⁶ is -- everybody scratch their head to say
⁷ what is the best way to translate data
⁸ analysis and results in the real-world.
⁹         And, you know, people --
¹⁰ people don't listen. That's fine with
¹¹ us. We just say, look, if you don't
¹² listen, we just don't take your study
¹³ serious.
¹⁴     Q.    Right. The ASA has not
¹⁵ given the position to recommend stop
¹⁶ using P-values, correct?
¹⁷     A.    They cannot stop you, sir.
¹⁸ This not right language in the society,
¹⁹ scientific society, right.
²⁰     Q.    The ASA hasn't given the
²¹ recommendation to discontinue using
²² P-values in studies, correct?
²³         MR. MERRELL: Objection to
²⁴ form.

Page 457

¹         THE WITNESS: Sir, listen,
² this is go nowhere. I'm trying to
³ say that ASA is not a legal
⁴ entity, right. They cannot tell
⁵ you how to do things. They cannot
⁶ say stop using. Right. They just
⁷ say if you -- if you want to use a
⁸ P-value, you need something else,
⁹ right. Help us.
¹⁰ BY MR. NIGH:
¹¹     Q.    Is your answer that you
¹² agree with me that the ASA hasn't given
¹³ the recommendation to discontinue using
¹⁴ P-values in studies?
¹⁵     A.    Again, sir, ASA is not law
¹⁶ enforcement agency. They cannot tell you
¹⁷ stop using P-values, right. For example,
¹⁸ you say, well, it's like stop stealing
¹⁹ groceries, supermarket. Is okay, not
²⁰ okay, right.
²¹         I mean, the ASA saying
²² please don't. Don't shoplifting in the
²³ supermarket.
²⁴         But if you guys say, did ASA

Page 458

¹ say that you cannot do it?
²         I said, well, that's not my
³ problem. If you want to do it, that's
⁴ your problem, right.
⁵         But they just tell you that
⁶ you should not do it, but they cannot say
⁷ please don't use it. Stop doing it.
⁸     Q.    Okay. Is it your --
⁹     A.    You know -- sorry.
¹⁰     Q.    Is it your testimony that
¹¹ the ASA has stated, "Please stop using
¹² P-values in the studies"?
¹³     A.    No. They cannot do that,
¹⁴ sir. They cannot issue that statement.
¹⁵ Even your legal profession, you tell
¹⁶ people how to do things. Like your firm,
¹⁷ if you have a position paper published
¹⁸ from your firm, you say "People stop
¹⁹ doing X, Y, and Z." You know, people just
²⁰ ignore you, right, because they say if I
²¹ do it, what is the consequence? There is
²² no consequence, right. There's no
²³ penalty.
²⁴         It's a matter of fact to

Confidential Information Subject to Protective Order

Page 459

¹ say, look, if you do it, it's a free
² world, you go ahead, do it.  But how much
³ I would trust your study now, that depend
⁴ on me now.  It depend on the society now,
⁵ right.
⁶       Q.   Did you read that the
⁷ majority of the statisticians who sat
⁸ during this process in this panel
⁹ recommended that we continue to report
¹⁰ the P-values in the studies?
¹¹       MR. MERRELL:  Object to
¹²       form.
¹³       THE WITNESS:  Most
¹⁴       statistician, everybody -- almost
¹⁵       everyone, including Dr. Madigan,
¹⁶       agree with ASA statement, right.
¹⁷       If Dr. Madigan had a strong
¹⁸       objection to what ASA is saying in
¹⁹       this document, he could, as a
²⁰       member of the society, write a
²¹       strong protest letter, right,
²²       saying, "ASA, you mislead us, you
²³       should not telling us not using
²⁴       P-values."  Right.

Page 460

¹       Obviously, Dr. Madigan agree
² with us.  He said we need more
³ information, more than just, like,
⁴ P less than .05.
⁵       He agree.
⁶ BY MR. NIGH:
⁷       Q.   That wasn't my --
⁸       A.   So he agreed -- sorry.
⁹       Q.   Sorry.  Go ahead.  I didn't
¹⁰ know you weren't done.
¹¹       A.   No, I'm sorry.  I'm just
¹² trying to say, if majority of people,
¹³ statisticians, all agree that these are
¹⁴ the principle, then why we don't
¹⁵ practice?
¹⁶       Why Dr. Madigan does not
¹⁷ practice ASA statement issued in 2016.
¹⁸ Now this is 2021.  Five years.
¹⁹       And again, I know
²⁰ Dr. Madigan is a well known statistician.
²¹ If he doesn't want to use this, changing
²² his habit, how in the world he can take a
²³ next generation of statisticians, say,
²⁴ guys, we should make a better way to make

Page 461

¹ a decision.
²       Why is he still using the
³ old-fashioned way using P less than .05?
⁴ That's what gets me.
⁵       I said, well, you are
⁶ provost in Northeastern University.  It
⁷ is a very prestigious, very powerful
⁸ influential position.  If he can't help
⁹ society, he won't write his report solely
¹⁰ based on statistical significance which
¹¹ ASA encourage us to do it.
¹²       In my report, I use a really
¹³ milder word.  I say ASA discourage using
¹⁴ this P less than .05.  I didn't say ASA
¹⁵ asked us to stop using it.
¹⁶       Q.   Okay.  I'm going to ask this
¹⁷ again because that was a very long
¹⁸ answer, and nowhere in my question did I
¹⁹ ask anything about Dr. Madigan.  So I'm
²⁰ going to start the question now.
²¹       Did you read anywhere that
²² the majority of the statisticians who sat
²³ during this process on this panel where
²⁴ they were coming up with the ASA

Page 462

¹ statement on P-values, that the majority
² of the statisticians recommended that we
³ continue to report the P-values in the
⁴ studies?
⁵       MR. MERRELL:  Objection to
⁶       form.
⁷       THE WITNESS:  I don't know
⁸       where -- you are saying panel.
⁹       Which panel are you talking about?
¹⁰ BY MR. NIGH:
¹¹       Q.   Did you read that the
¹² majority of the statisticians who helped
¹³ develop this ASA statement continued to
¹⁴ recommend that we continue to report the
¹⁵ P-values in the studies?
¹⁶       A.   Well, you can report a
¹⁷ P-value, but you should use other
¹⁸ information to make a decision, right.
¹⁹ You cannot use a P-value just simply a
²⁰ descriptor.  And you say, well, what do
²¹ you mean by descriptor?
²²       Statistically speaking,
²³ descriptor is a very weak -- a very mild
²⁴ row.  Right.  There's nothing to do with

Page 463

1 mixed inference.
2        You say, well, you know,
3 Dr. Madigan just use a P-value as a
4 descriptor. No harm done.
5        I say wait a second, he
6 actually used this in decisionmaking.
7 Claimed this value was significant or
8 not, just based on P less than .05. I
9 said, well, this is not a simply a
10 descriptor anymore.
11        So I said to you, sir, the
12 majority of people, including me, I said
13 well, fine, you shouldn't use a P-value
14 if you're reporting. But you should do
15 more than that, right, to make a
16 decision.
17        Q.   Did you read that the
18 majority of statisticians who weighed in
19 on this ASA statement continued to
20 recommend that we report P-values -- that
21 we continue to report P-values in
22 published studies?
23        A.   I don't know where you got
24 this information from. But I agree with

Page 464

1 the majority of statisticians. You can
2 report the P-values.
3        Q.   Okay. Let's go ahead and
4 take a look at your report.
5        MR. NIGH: This is LP-1557.
6 BY MR. NIGH:
7        Q.   And I want to take a look at
8 your reliance list at the very back of
9 the report.
10        At the very back of this,
11 there's a miscellaneous.
12        Now, first off -- actually,
13 if we go to the very beginning.
14 Materials considered.
15        Do you see that?
16        MR. NIGH: Let's blow this
17 up.
18        MR. MERRELL: I have a
19 hardcopy. Is it all right if I
20 hand it to the witness?
21        MR. NIGH: Absolutely.
22 BY MR. NIGH:
23        Q.   Do you see here where it
24 says, "Dr. Wei List of Materials

Page 465

1 Considered"?
2        Do you see that?
3        A.   Yes, sir.
4        Q.   And then it first shows the
5 master personal -- amended master
6 personal injury complaint.
7        Did you review that
8 complaint?
9        A.   Speaking of Number 1, right,
10 you're talking about?
11        Q.   The very first one, yes.
12        A.   Yes.
13        Q.   It next says, "Master
14 medical monitoring complaint."
15        Did you review that
16 complaint?
17        A.   I glanced over it. I don't
18 remember exactly the content anymore.
19        Q.   Next it says, "Master
20 economic monitoring complaint."
21        Did you review that
22 complaint?
23        A.   I did a glance over.
24        Q.   Next it says,

Page 466

1 "Confidentiality and protective order."
2        Did you review that?
3        A.   Yes. I glanced over.
4        Q.   Is it your understanding
5 that the materials that have been
6 provided and submitted are under
7 confidentiality and protective order?
8        A.   You ask me?
9        Q.   Yes.
10        A.   Okay. Yes.
11        Q.   Do you believe that includes
12 the expert reports that have been
13 submitted in this case?
14        A.   You mean all the expert
15 reports should be, what, keep the
16 confidential? Is that what you're
17 asking?
18        Q.   I'm asking you, if when you
19 reviewed the confidentiality and
20 protective order, whether it was your
21 understanding that that includes the
22 expert reports that have been submitted
23 in this case.
24        MR. MERRELL: Objection.

Confidential Information Subject to Protective Order

Page 467

1  Form.
2       THE WITNESS:  I don't know.
3  That's a legal issue.  I don't
4  know.
5  BY MR. NIGH:
6       Q.   Do you believe it would be
7  appropriate to take another person's
8  expert report in this case and to try to
9  submit them to various editorial boards?
10      MR. MERRELL:  Objection to
11  form.
12      THE WITNESS:  I don't know,
13  sir.
14  BY MR. NIGH:
15      Q.   You don't have any
16  understanding as to whether or not that
17  would be unethical?
18      A.   Well, it's nonethical or
19  unethical, if it's in the public domain,
20  I think everybody is entitled to make a
21  comment on this publicly available
22  document.
23      Q.   So your answer would be you
24  don't believe that it would be unethical

Page 468

1  to take a person's expert report and
2  start showing it to editorial boards?
3       MR. MERRELL:  Objection to
4  form.
5       THE WITNESS:  As long it's
6  in the public domain, with the
7  purpose of doing, for example,
8  editorial or letter to the
9  editors, I think it's appropriate.
10      As long as you want educate the
11  next generation how to do things
12  right.
13  BY MR. NIGH:
14      Q.   Okay.  Let's take a look at
15  Page 3 on the reliance list.
16      Looking under miscellaneous.
17  It says, "All materials cited or
18  referenced in my expert report and
19  attachments."
20      Do you see that?
21      A.   Yes, sir.
22      Q.   And then it says, "This list
23  includes item" -- "items plaintiffs'
24  experts relied upon.  By doing so" --

Page 469

1  "and this expert are not waiving any
2  arguments or objections related to
3  admissibility."
4       Do you see that?
5       A.   Yes.
6       Q.   Now, that plaintiffs is
7  plural, correct?
8       A.   What word?  I'm sorry.
9       Q.   Do you see the word
10  "plaintiffs' experts"?  That's plural,
11  correct?
12      A.   Yes.
13      Q.   So is it your statement here
14  that you considered all of the materials
15  that all of the plaintiffs' experts
16  considered?
17      A.   No.  As I said it before, I
18  didn't read carefully about other expert
19  witness reports.  I glanced over your
20  epidemiology plaintiff report.  Other
21  than that, I concentrate on Dr. Madigan's
22  report.
23      Q.   Now, this expert report has
24  your signature.  And attached to it is

Page 470

1  this reliance list.
2       Is it your testimony that
3  you considered all of the materials or
4  reviewed, considered or reviewed, all of
5  the materials and all of the other
6  plaintiffs' experts' reports?
7       A.   Yes.  I didn't use every
8  single word from this plaintiff report.
9  Right.  That's what you're saying.  I
10  just utilized all the information that I
11  got, and I think it's relevant I put more
12  attention to it.  For example,
13  Dr. Madigan's publications listing,
14  majority, almost everything is coming
15  from your epidemiology expert witness,
16  right.
17      Q.   Did you --
18      A.   So I said, oh, I don't have
19  to worry about epi person anymore,
20  because basically Dr. Madigan's report
21  really reflecting what your epi person is
22  going to say.  So I just glanced over the
23  expert witness report in epidemiology.
24      But other than that, I don't

Page 471

1 think other expert report are relevant to
2 me for statistical analysis purpose.
3 Besides, I really want to have an
4 independent opinion myself. Don't
5 actually influence it by other things.
6           Even I read the other
7 reports, honestly, sir, I'm not expert at
8 all, for a few. And quite a few things,
9 I don't even understand what they are
10 talking about.
11       Q.   Okay. Did you -- go ahead.
12       A.   So I just -- this is not
13 efficiently use of my time. Right.
14           This -- my assignment mainly
15 addressed issue and concerns about
16 Dr. Madigan's report.
17       Q.   Did you review any of
18 Dr. Panigrahy's expert report?
19       A.   No. No, sir.
20       Q.   Did you review his list of
21 references in any way?
22       A.   No, sir.
23       Q.   Did you review any of
24 Dr. Hecht's report?

Page 472

1       A.   No, sir.
2       Q.   Did you review any of his
3 list of references in any way?
4       A.   No, sir.
5       Q.   Did you review any of
6 Dr. Lagana's report?
7       A.   Who is the expert? May I
8 ask?
9       Q.   Dr. Stephen Lagana. Do you
10 know who that is? Have you ever heard
11 the name?
12       A.   No. Nope.
13       Q.   Have you ever heard --
14 you've never heard that name?
15       A.   Well, it's one of your
16 expert witness. I'm just asking you
17 which expertise he's in -- or she's in.
18       Q.   I see. Did you ever --
19 well, do you know which expertise he is?
20       A.   I don't know. I'm asking
21 you.
22       Q.   Do you know which expertise
23 Dr. Stephen Hecht is?
24       A.   No, sir.

Page 473

1       Q.   Do you know which expertise
2 Dr. Panigrahy is?
3       A.   No, sir.
4       Q.   Did you ever review any
5 of -- or did you review Dr. Lagana's
6 reference list in any way?
7       A.   No, sir.
8       Q.   Do you recall if you even
9 reviewed Dr. Etminan's reference list in
10 any way?
11       A.   That's epidemiologist,
12 right?
13       Q.   Right.
14       A.   I didn't review carefully
15 about the listing of publications he
16 cited. But I only reviewed relevant
17 statistical part from Dr. Madigan's.
18       Q.   Let me turn the page to
19 Page 1.
20           MR. NIGH: If we can blow up
21       from the list of materials
22       considered, Dr. Wei, all the way
23       down to literature and include --
24       I mean -- yeah, and include --

Page 474

1       let's go down a little bit
2       further. Blow it up even further
3       down.
4           No. No. Down toward -- I
5       just want to blow it up underneath
6       where it says Dr. Panigrahy for
7       literature. All the way down to
8       literature. Yep. Right there.
9       Thank you. I know I was a little
10       unclear with my direction.
11 BY MR. NIGH:
12       Q.   As you look at this, that's
13 your name, Dr. Wei, correct?
14       A.   Sorry, sir?
15       Q.   That's your name, Dr. Wei,
16 Ph.D., correct?
17       A.   Well, sir, if you don't know
18 my name by now, we are in trouble, right?
19       Q.   You can just answer the
20 question, please. Is that your name,
21 Dr. Wei, correct?
22       A.   I feel a little strange why
23 are you asking those kinds of questions.
24           Answer of course, yes.

Page 475

1    Q.   And you're not a medical
2  doctor, correct?
3    A.   No, sir.
4    Q.   Okay.  It says list of
5  materials considered.
6         Do you see that?
7    A.   Yes, sir.
8    Q.   Now, this list of materials
9  considered was attached to the expert
10 report that you signed.  You understand
11 that, correct?
12   A.   Yes, sir.
13        MR. NIGH:  And let's
14   highlight Dr. -- 2021 expert
15   reports with exhibits, highlight
16   Dr. Stephen Hecht. Can we
17   highlight that, please.
18 BY MR. NIGH:
19   Q.   And then you did not, as --
20 your list of materials considered is
21 incorrect because you did not review the
22 report of Dr. Stephen Hecht or its
23 exhibits, correct?
24        MR. MERRELL:  Objection to

Page 476

1  form.
2         THE WITNESS:  That is not
3    the word I understand it, sir.
4         When you say materials
5    considered, that means that
6    potentially those are the
7    documents that I would have
8    considered.
9         Whether I go in to read or
10   not, that's my business.  My
11   interpretation of those two words,
12   "materials considered," doesn't
13   mean that I should utilize all the
14   reports, and in my report, okay,
15   and make a judgment and make
16   assessment of what other expert
17   witness reports.
18        That's my understanding.  If
19   I misunderstand this word, I
20   apologize.
21        When I actually signed off
22   this document, my understanding is
23   that, well, this is a potential
24   document, Dr. Wei, you should --

Page 477

1  it may be helpful for you put in
2  your report.  I say fine.
3         Right.  Lawyers say, okay,
4  here are the reports.  Whether you
5  want to use it or not, because
6  they already send to me, right.
7         I said, well, okay, this is
8  part of a material that I
9  considered.  But that doesn't
10 really matter I'm actually go
11 through the report or not, right.
12 BY MR. NIGH:
13   Q.   So even though you never
14 even laid eyes on Dr. Stephen Hecht's
15 report, never even looked at it, your
16 testimony is that that's materials that
17 you considered?
18   A.   Yeah.  You see, the reason
19 that I don't even bother, because when I
20 read Dr. Madigan's report, he didn't cite
21 anything from those four doctors.
22        Right.  The only thing is
23 talking about epidemiologist.  Right.  So
24 I said, well, okay, if he actually has

Page 478

1  nothing to do with these four
2  expert witness reports, I'm not going to
3  spend my time on those reports.  Right.
4  Rather I should put more energy reading
5  Dr. Madigan's report.  That's my
6  understanding, sir.
7         The lawyers send me the
8  information.  Doesn't mean that I have to
9  use it, right, I have to read it word by
10 word.
11        I'm saying, yes, this is
12 potentially material considered.  But
13 that's my interpretation, sir.  If I
14 misinterpret, I apologize.
15   Q.   I want to make sure I
16 understand.  When you put the -- on this
17 document, materials considered, that even
18 if you've never even laid eyes or even
19 looked at the document -- for example,
20 Dr. Stephen Hecht's report -- you believe
21 that that would be materials that you
22 considered for your expert opinion?
23   A.   That's my --
24        MR. MERRELL:  Objection to

Confidential Information – Subject to Protective Order

<table>
<tr><td>

Page 479

1  form.  Sorry.
2       THE WITNESS:  That's my
3  interpretation, sir.
4  BY MR. NIGH:
5       Q.   So even though you never
6  laid eyes --
7            MR. NIGH:  Let's highlight
8       Dr. Stephen Lagana, his expert
9       report.
10 BY MR. NIGH:
11      Q.   Even though you never even
12 laid eyes on Dr. Stephen Lagana's expert
13 report, it's your testimony that that
14 would be materials that you considered
15 for your expert opinion?
16      A.   That's my interpretation,
17 sir.
18      Q.   So even though --
19           MR. NIGH:  Let's highlight
20      Dr. Dipak Panigrahy.
21 BY MR. NIGH:
22      Q.   Even though you never even
23 laid eyes on Dr. Dipak Panigrahy's expert
24 report or its exhibits, it's your

</td><td>

Page 481

1       Q.   Let's take a look --
2            MR. NIGH:  Let's highlight
3       Dr. Stephen Hecht.
4  BY MR. NIGH:
5       Q.   So even though you don't
6  know what materials are cited in
7  Dr. Stephen Hecht's report, it's your
8  understanding that you considered those
9  materials in forming your expert opinion;
10 is that correct?
11      A.   Yes, sir.  If you allow --
12 if you allow me to say one thing.  When
13 the lawyers send me those documents, I
14 feel obligated to let you know that I
15 have this report.
16           But my understanding,
17 whether I'm going to use it, whether I'm
18 going to read it, that's different
19 matter.  That depends on myself.
20           So the material considered,
21 including all the documents the lawyers
22 send to me, plus something else, based on
23 my expertise.  That's my understanding
24 for this listing for you, sir.

</td></tr>
<tr><td>

Page 480

1  testimony that that would be material
2  that you considered for your expert
3  opinions?
4       A.   That's my interpretation of
5  the materials considered.
6       Q.   Under literature where it
7  says, "All materials cited in the report
8  of Dr. Etminan" --
9            MR. NIGH:  Let's highlight
10      that.
11 BY MR. NIGH:
12      Q.   You don't recall even ever
13 laying eyes on the references that he
14 cited, correct?
15      A.   You mean the highlighted
16 ones, you just highlight?
17      Q.   Let me -- let me revise my
18 question.  You don't even recall ever
19 even laying eyes on Dr. Etminan's
20 reference list, correct?
21      A.   I remember I glanced over.
22 I not -- I don't recall, sir, how much
23 detail I read through the citations or
24 references in this expert witness report.

</td><td>

Page 482

1            If I misunderstand the words
2  or your legal interpretation, I
3  apologize.
4            As I said many times, every
5  day I learn something new.  If you can
6  tell me that's not the right way to do
7  it, I will revise what I -- my practice
8  next time.
9            MR. NIGH:  Let's highlight
10      the next one below that.
11 BY MR. NIGH:
12      Q.   So even though you don't
13 know what materials were cited in
14 Dr. Stephen Lagana's report, it's your
15 understanding that you considered those
16 materials in forming your expert opinion?
17           MR. MERRELL:  Objection to
18      form.
19           THE WITNESS:  I don't think
20      that it is actually necessary I
21      need to read those report or
22      listing of materials cited in this
23      report to form my opinion on
24      Dr. Madigan's report.

</td></tr>
</table>

Page 483

1    MR. NIGH:  And let's
2  highlight the all materials in
3  the -- for Dr. Panigrahy.
4  BY MR. NIGH:
5    Q.   And even though you don't
6  know what materials are cited in
7  Dr. Panigrahy's report, it's your
8  testimony that those are -- that the
9  materials cited in his report are
10  materials that you considered?
11    A.   Yeah, that's what the
12  document -- the defendant lawyers send to
13  me.
14    Q.   Okay.  Is it your belief
15  that if the lawyers sent the document to
16  you, even though you never laid eyes on
17  it, that that would be materials that you
18  considered?
19    A.   Yes, sir.
20    Q.   Okay.  You also didn't
21  review all of the materials cited in
22  Dr. Madigan's report, correct?
23    MR. MERRELL:  Objection to
24  form.

Page 484

1    THE WITNESS:  Now wait a
2  second.  What are you talking
3  about now?
4  BY MR. NIGH:
5    Q.   Dr. Madigan's report, did
6  you review all the dietary studies that
7  he cited in his report?
8    A.   I did as much as I can.  The
9  paper -- lawyers send it to me.  I read
10  it carefully.
11    Q.   Did you review all the
12  materials cited in Dr. Madigan's report?
13    A.   Well, I can go through his
14  materials cited one by one to tell you
15  which one I read it, which one I didn't.
16    Q.   Do you believe that there
17  are materials that you didn't read that
18  are cited in his report?
19    MR. MERRELL:  Objection to
20  form.
21    Sorry.
22    THE WITNESS:  I -- my
23  recollection, I try my best to
24  read every document or paper cited

Page 485

1  by Dr. Madigan.  But I have to
2  confess, like you said, it's two
3  months old.  My memory is not
4  great compared with when I was
5  young.
6    So I'm not quite sure that I
7  read every paper, single paper, or
8  document cited by Dr. Madigan.
9    But if I don't list the
10  papers on this Exhibit B, that
11  means I didn't read it.  Right.
12  BY MR. NIGH:
13    Q.   But even if you listed
14  papers on this Exhibit B, we've
15  established that that doesn't mean that
16  you read it either, right?  Or even laid
17  eyes on it?
18    A.   That's correct.
19    Q.   Okay.  So if you can help me
20  out here.
21    Under MDL pleadings and
22  general documents, are there any of those
23  that you never even read?
24    A.   You mean on this highlight

Page 486

1  portion?
2    Q.   Well, yeah, you can see what
3  I've blown up here.  You can see
4  underneath there.  MDL pleadings and
5  general documents, are there any of those
6  that you've never read?
7    A.   Oh, I said for example,
8  Hecht, Lagana, Panigrahy.
9    Q.   Wait.  I need to be clear.
10  I'm looking under -- do you see where it
11  says MDL pleadings and general documents?
12  Under there, there are six different
13  documents there.  Are there any of those
14  that you didn't read?
15    A.   I don't remember I read the
16  letter from Lori Cohen to the judge.
17    Q.   Okay.
18    A.   I don't remember.
19    MR. NIGH:  Let's highlight
20  that one.
21  BY MR. NIGH:
22    Q.   Are there any other
23  materials there?  Do you believe that you
24  ever laid eyes on the letter from Adam

Confidential Information - Subject to Protective Order

Page 487

1  Slater providing an overview?
2      A.   Well, sir, if you can show
3  me the cover of this document, I probably
4  can remember.  But right now --
5          MR. NIGH:  No, let's not
6  highlight that one, the letter.
7  BY MR. NIGH:
8      Q.   I'm sorry.  I didn't mean to
9  interrupt you.
10     A.   So even for the letter from
11 Lori Cohen to judge, honestly, sir, if
12 you can show me, that would probably
13 bring my letter back, right, to see if I
14 read the letter or not, right.
15     Q.   Okay.  So on these six here,
16 just do you recall reviewing any of these
17 six documents?  Which ones do you recall
18 reviewing and which ones do you not
19 recall reviewing?
20     A.   Yeah, I believe the first
21 one, second one.  I think the fourth one
22 I remember I read it.  But I'm not quite
23 sure the economic monitoring complaint,
24 that one I read.  I don't remember now.

Page 488

1      Q.   And the two letters, you
2  don't remember reading those either?
3      A.   Correct.  I don't remember
4  exactly I read or not.
5      Q.   How about under discovery
6  documents cited by plaintiffs' experts.
7          MR. NIGH:  Let's highlight
8      that.
9  BY MR. NIGH:
10     Q.   Do you recall reviewing
11 either of those two documents?
12     A.   No.  I didn't read the
13 spreadsheet of NDMA.  Actually don't.
14     Q.   You don't recall ever laying
15 eyes on the spreadsheet of "NDMA Test
16 Results For ZHP API" or the Torrent
17 Pharmaceuticals Limited document,
18 correct?
19     A.   Yeah, I know they sent it to
20 me, but I notice that Dr. Madigan didn't
21 even mention anything, so I didn't read
22 it.
23     Q.   Okay.  And I'm sorry.  Is it
24 your testimony that Dr. Madigan never

Page 489

1  mentioned anything about test results?
2      A.   Well, he didn't mention this
3  spreadsheet citing this document.  So I
4  didn't read it.
5      Q.   It's your testimony both the
6  spreadsheets of "NDMA Test Results For
7  ZHP API" and the "Torrent Pharmaceutical
8  Limited Valsartan Impact Assessment of
9  NDMA," that Dr. Madigan didn't review
10 those so you didn't review them either;
11 is that correct?
12         MR. MERRELL:  Objection to
13     form.
14         THE WITNESS:  That's my
15     recollection.  I don't see
16     anywhere in his report talking
17     about T-O-R-R-E-N-T, the company's
18     name.
19         MR. NIGH:  Okay.  All right.
20     Let's go ahead and highlight those
21     two.
22 BY MR. NIGH:
23     Q.   Okay.  Under literature, do
24 you recall reviewing the EPA NDMA

Page 490

1  technical fact sheet?
2      A.   No, sir.
3          MR. NIGH:  Let's highlight
4      that one.
5          Let's go ahead and blow up
6      the rest of the literature.  Okay.
7  BY MR. NIGH:
8      Q.   Do you recall reviewing
9  De Stefani, E.; Galer, cited 1992?  Do
10 you recall reviewing that document?
11     A.   That's interesting.  I
12 vaguely remember this name.  But I don't
13 remember I review it or not, sir.
14     Q.   Okay.  The next one.  "EPA,
15 High Fat Foods and the Risk of Lung
16 Cancer."  Do you remember reviewing that
17 document?
18     A.   I would say most likely I
19 did not.
20     Q.   Okay.  "FDA, Consumption of
21 Nitrate, Nitrite and Nitrosodimethylamine
22 and the Risk of Upper Aerodigestive Tract
23 Cancer."
24         Do you recall reviewing that

Confidential Information - Subject to Protective Order

Page 491

[1] document?
[2]      A.   That one, I think.  I think,
[3] but I'm not quite sure, sir.
[4]      Q.   Okay.
[5]      A.   Yeah, again, memory is
[6] fuzzy.
[7]      Q.   "FDA, Dietary
[8] Nitrosodimethylamine and the Risk of Lung
[9] Cancer:  A Case-Control Study From
[10] Uruguay."
[11]         Do you recall reviewing that
[12] document?
[13]      A.   I don't think so.  This one
[14] I probably didn't read it.
[15]      Q.   Okay.
[16]         MR. NIGH:  Next page.
[17] BY MR. NIGH:
[18]      Q.   Friedman, Furberg and
[19] DeMets, "Fundamentals of Clinical
[20] Trials."
[21]         Do you recall reviewing
[22] that?  It looks like a textbook.
[23]      A.   This is not reviewing.  This
[24] is actually I provide the references,

Page 492

[1] sir.
[2]      Q.   Okay.  So you did review
[3] that material, correct?
[4]      A.   Yeah.  This -- this a book,
[5] like you said.
[6]      Q.   Okay.  Galer, DM, et al.,
[7] "Risk of Colorectal and Other
[8] Gastrointestinal Cancers After Exposure
[9] to Nitrate, Nitrite, and N-Nitroso
[10] Compounds."
[11]         Do you recall reviewing that
[12] document?
[13]      A.   I think I remember this one,
[14] yes.
[15]      Q.   There are two Gomm studies.
[16] Do you recall if you -- there are two
[17] Gomm reported here.  Do you recall if you
[18] reviewed them both?
[19]      A.   I think of Gomm as --
[20] English version, I read the English
[21] version.
[22]      Q.   You don't recall reviewing
[23] the PubMed abstract?
[24]      A.   I'm not quite sure I read

Page 493

[1] that part because I read the paper.  The
[2] abstract, I didn't remember.  So that
[3] part, I don't remember.
[4]      Q.   Okay.  Goodman, MT, et al.,
[5] "N-Nitroso Dimethylamine Hazard Summary."
[6]         Do you recall reviewing that
[7] document?
[8]      A.   Yes.
[9]      Q.   Okay.  Hidajat, "Lifetime
[10] Exposure to Rubber, Dust, Fumes, and
[11] N-Nitrosamines and Cancer Mortality."
[12]         Do you recall reviewing that
[13] document?
[14]      A.   Yes.
[15]      Q.   IARC, 1978, "Some N-Nitroso
[16] Compounds."
[17]         Do you recall reviewing that
[18] document?
[19]      A.   I not remember this one.
[20]      Q.   Okay.  IARC --
[21]      A.   I don't --
[22]      Q.   Sorry, go ahead.
[23]      A.   I don't remember this --
[24] next one I remember.  But not this one.

Page 494

[1]         MR. NIGH:  Let's scroll down
[2]         to where we can see IARC, the
[3]         second one.
[4] BY MR. NIGH:
[5]      Q.   Do you recall reviewing
[6] IARC, "Structure of Dietary Measurement
[7] Error:  Results of the OPEN Biomarker
[8] Study"?
[9]      A.   Yeah, I think I read this
[10] one.
[11]      Q.   Okay.  Jakszyn, "Red Meat,
[12] Dietary Nitrosamines, and Heme Iron and
[13] Risk of Bladder Cancer."
[14]         Do you recall reviewing that
[15] document?
[16]      A.   The name is familiar, but I
[17] believe maybe, again, if you show me the
[18] cover -- abstract, I probably can
[19] remember.  I apologize.  My memory is
[20] fuzzy here.
[21]      Q.   Johnson, GE, "Nitrosamines
[22] And Heme Iron and the Risk of Prostate
[23] Cancer in the European Prospective
[24] Investigation..."

Confidential Information - Subject to Protective Order

1    Do you recall reviewing that
2  document?
3    A.   Yes, sir.
4    Q.   Knekt, "Risk of Colorectal
5  and Other Gastrointestinal Cancers."
6    Do you recall reviewing that
7  document?
8    A.   Yes, sir.
9    Q.   Larsson, "Processed Meat
10  Consumption, Dietary Nitrosamines, and
11  Stomach Cancer."
12    Do you recall reviewing that
13  document?
14    A.   Yes, sir.
15    Q.   Loh, "N-Nitroso Compounds
16  and Cancer Incidence:  The European
17  Prospective Investigation Into Cancer and
18  Nutrition."
19    Do you recall reviewing that
20  document?
21    A.   Yes, sir.
22    MR. NIGH:  Let's continue
23    further down.
24  BY MR. NIGH:

1    Q.   Madigan, D., et al., "A
2  Systematic Statistical Approach to
3  Evaluating Evidence From Observational
4  Studies."
5    Do you recall reviewing that
6  document?
7    A.   Yes, sir.
8    Q.   Is it your understanding
9  that Dr. Madigan has published
10  extensively on the limitations of
11  observational studies?
12    A.   I'm sorry, sir.  Dr. Madigan
13  saying what limitation of the
14  observational study, you said?
15    Q.   Is it your understanding
16  that Dr. Madigan has published
17  extensively on the limitations of
18  observational studies?
19    A.   Yes.
20    Q.   McCaw, et al., "How to
21  Quantify and Interpret Treatment Effects
22  in Comparative."
23    Do you recall reviewing that
24  document?

1    A.   I wrote that paper, sir.
2    Q.   Okay.  Next one.  "Clinical
3  Studies of COVID-19."  You discussed this
4  in your testimony, so do you recall
5  reviewing that document?
6    A.   That's my paper.
7    Q.   Okay.  McCaw, Zack, Kim,
8  Dae, and Dr. Wei, that's obviously your
9  paper, correct?
10    A.   Yes, sir.
11    Q.   Pak, et al.,
12  "Interpretability of Cancer Clinical
13  Trial Results Using Restricted Mean
14  Survival Time."
15    Do you recall reviewing that
16  document?
17    A.   It was my paper.
18    Q.   Okay.  Pottegard.  You
19  reviewed that document, correct?
20    A.   Yes, sir.
21    Q.   Rogers, MAM, "Laboratory
22  Analysis of Valsartan Products."
23    Do you recall reviewing that
24  document?

1    A.   Yes, sir.
2    Q.   Snodin DJ, et al., "Short
3  Commentary on NDMA Contamination of
4  Valsartan Products."
5    Do you recall reviewing that
6  document?
7    A.   I vaguely remember this
8  name.  But honestly I don't remember.
9    Q.   Okay.  Song, et al.,
10  "Dietary Nitrates, Nitrites, and
11  Nitrosamines Intake and the Risk of
12  Gastric Cancer:  A Meta-Analysis."
13    Do you recall reviewing that
14  document?
15    A.   Yes, sir.
16    Q.   Uno, et al., "Moving Beyond
17  the Hazard Ratio in Quantifying the
18  Between Group Difference."
19    Do you recall reviewing that
20  paper?
21    A.   It's my paper.
22    Q.   Wasserstein, that's the ASA
23  statement that we just looked at.
24    So you reviewed that

Page 499

¹ document, correct?
² A. Yes.
³ Q. Zhao, Tian, and Claggett,
⁴ "Estimating Treatment Effect With
⁵ Clinical Interpretation From a
⁶ Comparative Clinical Trial."
⁷ Do you recall reviewing that
⁸ document?
⁹ A. It was my paper.
¹⁰ Q. Okay. Zheng, et al.,
¹¹ "Permitted Daily Exposure Limits For
¹² Noteworthy N-Nitrosamines."
¹³ Do you recall reviewing that
¹⁴ document?
¹⁵ A. Yes, sir.
¹⁶ Q. Zheng, Stuff, Tang, "Dietary
¹⁷ N-Nitroso Compounds and Risk of
¹⁸ Pancreatic Cancer."
¹⁹ Do you recall whether or not
²⁰ you reviewed that document?
²¹ A. Yes.
²² Q. The Zheng, the would be
²³ right before that -- the Zheng,
²⁴ "Permitted Daily Exposure Limits For

Page 500

¹ Noteworthy N-Nitrosamines. Environmental
² and Molecular Mutagenesis."
³ Do you know which cancer
⁴ type they are reporting there? Do you
⁵ recall?
⁶ A. I don't remember. I don't
⁷ remember. I know the second paper very
⁸ well, the second Zheng.
⁹ Q. Zhu, Z-H-U, "Dietary
¹⁰ N-Nitroso Compounds and Risk of
¹¹ Colorectal Cancer."
¹² Do you recall whether or not
¹³ you reviewed that document?
¹⁴ A. I believe so.
¹⁵ Q. Okay. Now, under
¹⁶ miscellaneous, it states, "This list
¹⁷ includes items plaintiffs' experts relied
¹⁸ upon." But we obviously know now that
¹⁹ you haven't reviewed or even laid eyes on
²⁰ many of these expert reports, correct?
²¹ A. Yeah, there is a list that I
²² need to cite in my report.
²³ Q. Okay. Looking at your
²⁴ table.

Page 501

¹ MR. NIGH: Sorry. Back to
² the -- sorry, back to the
³ materials considered.
⁴ BY MR. NIGH:
⁵ Q. Under these materials
⁶ considered, you don't have the Pobel
⁷ study at all in that literature.
⁸ Is it your belief that you
⁹ didn't review the Pobel study?
¹⁰ A. You mean the Danish study?
¹¹ Q. No. That's Pottegard.
¹² A. I'm sorry. Which one are
¹³ you talking about? I'm sorry.
¹⁴ Q. Pobel study, P-O-B-E-L.
¹⁵ MR. NIGH: Let's go ahead
¹⁶ to -- let's go blow it up, the
¹⁷ reliance list.
¹⁸ And let's go to the next
¹⁹ page, because you had them in
²⁰ literature. You had them in
²¹ alphabetical order by their
²² author.
²³ BY MR. NIGH:
²⁴ Q. So you can see here that's

Page 502

¹ the Ms., and that's going to be the next
² page where we have P.
³ You don't have Pobel,
⁴ P-O-B-E-L, on here.
⁵ A. Yeah.
⁶ Q. So do you recall whether or
⁷ not you ever reviewed those materials?
⁸ A. Well, I'm not too sure now.
⁹ I mean, I don't remember that particular
¹⁰ publication, sir.
¹¹ Q. Okay. Let's go back to the
¹² prior page.
¹³ MR. NIGH: Let's blow that
¹⁴ up.
¹⁵ BY MR. NIGH:
¹⁶ Q. La Vecchia.
¹⁷ MR. NIGH: It's hard to see.
¹⁸ We can blow up -- yeah, there we
¹⁹ go.
²⁰ BY MR. NIGH:
²¹ Q. La Vecchia. You don't have
²² that on your list of reliance materials.
²³ Do you recall whether or not
²⁴ you ever reviewed the La Vecchia

Confidential Information — Subject to Protective Order

Page 503

¹ materials?

² A. I don't remember, sir.

³ Q. Okay. Keszei, K-E-S-Z-E-I,

⁴ it's not listed here on your reliance

⁵ materials.

⁶ Do you recall whether or not

⁷ you ever reviewed those materials?

⁸ A. I don't recall, sir.

⁹ Q. Let's go back to the prior

¹⁰ page. You have one De Stefani study

¹¹ listed here.

¹² Do you recall reviewing any

¹³ other De Stefani materials?

¹⁴ A. I don't recall, sir.

¹⁵ MR. NIGH: We can go ahead

¹⁶ and take that down.

¹⁷ Let's go ahead and take a

¹⁸ break at this time and I'm going

¹⁹ to try to get through and trim

²⁰ down to the last things that I

²¹ have.

²² THE VIDEOGRAPHER: The time

²³ right now is 11:07 a.m. We're off

²⁴ the record.

Page 504

¹ (Short break.)

² THE VIDEOGRAPHER: The time

³ right now is 11:25 a.m. We're

⁴ back on the record.

⁵ MR. NIGH: Okay. Let's go

⁶ ahead and pull up LP-1600. This

⁷ was marked Exhibit 2 previously.

⁸ BY MR. NIGH:

⁹ Q. Doctor, you'll recall that

¹⁰ in the deposition notice that we started

¹¹ with, we asked for production of

¹² documents from you.

¹³ Do you recall that?

¹⁴ A. Yes, sir.

¹⁵ Q. And are you aware that in

¹⁶ response to our production of documents,

¹⁷ that we were produced over 500 documents?

¹⁸ A. No, I don't know.

¹⁹ Q. Do you believe as you

²⁰ reviewed the request for documents, would

²¹ you have ever thought that there would be

²² over 500 documents that were responsive

²³ to our request?

²⁴ MR. MERRELL: Objection to

Page 505

¹ form.

² THE WITNESS: I don't know,

³ sir.

⁴ BY MR. NIGH:

⁵ Q. Well, let's take a look at

⁶ it.

⁷ MR. NIGH: Number 1. Let's

⁸ go to the second page. This is

⁹ defendants' -- actually, let's go

¹⁰ to the first page and blow up

¹¹ defendants' responses and

¹² objections.

¹³ BY MR. NIGH:

¹⁴ Q. Do you see that? So this is

¹⁵ the response to our request for

¹⁶ documents.

¹⁷ Do you see that?

¹⁸ A. Yes, sir.

¹⁹ Q. And let's take a look at the

²⁰ second page.

²¹ MR. NIGH: Let's blow up

²² this one.

²³ BY MR. NIGH:

²⁴ Q. "Copies of all invoices for

Page 506

¹ work performed in connection with any

² consultation or expert work performed."

³ That would only be the one

⁴ document, the one invoice that you sent

⁵ to us, correct?

⁶ A. Yes, sir.

⁷ Q. Let's take a look at the

⁸ next page. Number 2, "Copies of any

⁹ notes, written or electronic, reflecting

¹⁰ consulting or litigation work that has

¹¹ not been documented in invoices."

¹² You didn't have any of those

¹³ documents, correct?

¹⁴ A. It's on my draft of the

¹⁵ report.

¹⁶ Q. Okay. Just draft reports.

¹⁷ But other than that -- which we're not

¹⁸ entitled to receive your draft reports.

¹⁹ Other than that, it's your testimony that

²⁰ you didn't have any other documents that

²¹ are responsive to this, correct?

²² A. Yeah. Correct, sir.

²³ Q. Next, Number 3, "Copies of

²⁴ any notes or other documentation,

Confidential Information - Subject to Protective Order

Page 507

¹ including PowerPoints for any
² presentations, seminars or classes given
³ by Dr. Wei with regard to the risk and
⁴ benefits of any angiotensin II receptor
⁵ blockers or nitrosamines."
⁶          It was your testimony that
⁷ you didn't have any documents that were
⁸ responsive to this request, correct?
⁹     A.   Correct.
¹⁰     Q.   Number 4, "Copies of any
¹¹ documents or articles relied upon for the
¹² opinions set forth in the expert" -- "in
¹³ the report served if not listed in the
¹⁴ report."
¹⁵          Do you have an approximation
¹⁶ as to how many documents or articles that
¹⁷ you relied upon for the opinions set
¹⁸ forth in your report?
¹⁹     A.   The documents I cited in my
²⁰ report, that's all the -- all I have.
²¹     Q.   Okay.  It's certainly less
²² than 50 documents or articles that you
²³ relied upon for the opinions set forth in
²⁴ your report, correct?

Page 508

¹          MR. MERRELL:  Objection to
² form.
³          THE WITNESS:  I don't know
⁴ the number.  I didn't count it,
⁵ sir.  I'm sorry.
⁶ BY MR. NIGH:
⁷     Q.   You can't say right now as
⁸ you speak that you reviewed less than
⁹ 50 documents or articles in relying upon
¹⁰ the opinions set forth in your report?
¹¹          MR. MERRELL:  Objection to
¹² form.
¹³          THE WITNESS:  Well, if we
¹⁴ can go back to my report, I will
¹⁵ tell you exactly the papers
¹⁶ documents that I cited.
¹⁷ BY MR. NIGH:
¹⁸     Q.   I don't need an exact number
¹⁹ here.  Do you know whether or not it's
²⁰ approximately 50, less than 50, or are
²¹ you able to say whether or not it's less
²² than 100?
²³          MR. MERRELL:  Objection to
²⁴ form.

Page 509

¹          THE WITNESS:  Well, I prefer
² not to use a guess number.  Sorry,
³ sir.  I just want to have an exact
⁴ number for you.
⁵ BY MR. NIGH:
⁶     Q.   Okay.  Number 5, "Copies of
⁷ any documents or articles reviewed in
⁸ connection with the report served,
⁹ whether or not listed in the report or
¹⁰ attachments thereto."
¹¹          Do you see that request?
¹²     A.   Yes, sir.
¹³     Q.   Number 6.  "Any
¹⁴ illustrations, PowerPoints, images,
¹⁵ charts, tables, or demonstrative exhibits
¹⁶ that may be used by or with Dr. Wei in
¹⁷ connection with the Daubert hearing or
¹⁸ trial testimony."
¹⁹          Do you recall that you told
²⁰ me that you didn't have any of these --
²¹ any extra documents reflecting this,
²² other than your report, correct?
²³     A.   Yes.  I think I remember.
²⁴ My answer is at this point, I didn't have

Page 510

¹ it.  But we probably going to have some
² extra PowerPoint maybe, maybe for the
³ court hearing or something else, in the
⁴ future.
⁵     Q.   Number 7, "Documentation of
⁶ any research grant the witness has
⁷ provided to study any ARB, nitrosamine,
⁸ or health effects potentially related
⁹ thereto."
¹⁰          And do you recall telling me
¹¹ that you didn't have any documents
¹² reflective of this, correct?
¹³     A.   Right.
¹⁴     Q.   Number 8, "Documentation of
¹⁵ any research the witness has performed
¹⁶ with regard to any ARB, nitrosamines, or
¹⁷ health effects potentially related
¹⁸ thereto."
¹⁹          And you recall previously
²⁰ telling me that you didn't have any of
²¹ these documents, correct?
²²     A.   Yes, sir.
²³     Q.   Number 9, "Copies of any
²⁴ documents, including protocols or

Confidential Information - Subject to Protective Order

Page 511

¹ information about medication side
² effects."
³          Do you recall telling me
⁴ that you didn't have any documents
⁵ responsive to this request, correct?
⁶      A.    Correct.
⁷      Q.    Number 10, "Any documents or
⁸ other communications the witness has
⁹ received from any person or entity with
¹⁰ regard to nitrosamine impurities."
¹¹          Do you recall telling me
¹² that you didn't have any of these
¹³ documents, correct, any documents
¹⁴ responsive to this response, or -- strike
¹⁵ that.
¹⁶          Number 10, "Any documents or
¹⁷ other communications the witness has
¹⁸ received from any person or entity with
¹⁹ regard to nitrosamine impurities in any
²⁰ ARB or other drug."
²¹          Do you recall telling me
²² that you do not have any documents
²³ responsive to this request, correct?
²⁴      A.    No, sir.

Page 512

¹      Q.    It is correct that you don't
² have any documents responsive to this
³ request, correct?
⁴      A.    Well, sir, one thing that I
⁵ don't really completely understand, it
⁶ says "or other drugs."  That means
⁷ impurity in other drugs?  Is that what
⁸ you're talking about?
⁹      Q.    Is it your testimony that
¹⁰ you produced us documents that were
¹¹ responsive to this request?
¹²      A.    No.  My question is, I did
¹³ read one paper about the contamination or
¹⁴ impurity for other drug, not this one.
¹⁵      Q.    I see.
¹⁶      A.    Actually, I shared it with
¹⁷ you.  Honestly, Zantac, you know, the
¹⁸ Zantac case.  I read one paper because
¹⁹ the lawyer send it to me, okay.  That was
²⁰ before even we talking about this case.
²¹ That probably was like five or six months
²² ago.
²³      Q.    I see.  So you didn't have
²⁴ any documents that you produced to us

Page 513

¹ that were responsive to Number 10,
² correct?
³      A.    Not for this case, sir.
⁴      Q.    Number 11, "Any
⁵ communication from the witness to any
⁶ person or entity with regard to
⁷ nitrosamine impurities."
⁸          Do you recall that we talked
⁹ about this request and you advised that
¹⁰ you didn't have any documents responsive
¹¹ to this request, correct?
¹²      A.    Correct.
¹³      Q.    Number 12, "Any textbook
¹⁴ referenced by the witness in forming his
¹⁵ opinions."
¹⁶          Do you recall telling us
¹⁷ that there was one textbook that you
¹⁸ referenced, correct?
¹⁹      A.    Correct.
²⁰      Q.    Now, Number 12 which asked
²¹ for the textbooks, there was one
²² document.  Number 1, which asked for the
²³ invoices, there was one document,
²⁴ correct?

Page 514

¹      A.    Yes, sir.
²      Q.    And other than Number 1 and
³ 12, the only other request that you had
⁴ documents responsive to were Number 4 and
⁵ 5.
⁶          MR. NIGH:  Let's turn to
⁷      Page 4 and show those two document
⁸      requests.  And Number 4 as well,
⁹      if we can put that up at the same
¹⁰      time.
¹¹ BY MR. NIGH:
¹²      Q.    Do you see there, "Copies of
¹³ any documents or articles relied upon for
¹⁴ the opinions set forth in the report
¹⁵ served, if not listed in the report."
¹⁶ And, "Copies of any documents or articles
¹⁷ reviewed in connection with the report
¹⁸ served, whether or not listed in the
¹⁹ report or attachments thereto."
²⁰          Do you see that?
²¹      A.    Yes, sir.
²²      Q.    Now, in terms of that, do
²³ you believe that you had over
²⁴ 500 documents that would be responsive to

Confidential Information - Subject to Protective Order

Page 515

¹ that request, those two requests?
²       MR. MERRELL:  Objection to
³ form.
⁴       THE WITNESS:  On your
⁵ side -- or -- I don't know the
⁶ number, sir.
⁷ BY MR. NIGH:
⁸     Q.   Do you believe that there
⁹ would be a total of over 500 documents
¹⁰ that would be responsive to these two
¹¹ requests, that there were either copies
¹² of any documents or articles relied upon
¹³ for the opinions set forth in your
¹⁴ report, or copies of any documents or
¹⁵ articles that you reviewed in connection
¹⁶ with the report that you served?
¹⁷       Do you believe that there
¹⁸ are over 500 articles that would be
¹⁹ responsive to these two requests?
²⁰       MR. MERRELL:  Objection to
²¹ form.
²²       THE WITNESS:  Sir, I have no
²³ opinion on this.
²⁴ BY MR. NIGH:

Page 516

¹     Q.   Well, I'm asking you your
² answer -- this request for documents is
³ directed to you.  So I'm asking for your
⁴ opinion.
⁵       Do you believe that you
⁶ reviewed over 500 articles that you
⁷ either relied upon for opinion in your
⁸ report, or that you reviewed in
⁹ connection with the report that you
¹⁰ served?
¹¹       MR. MERRELL:  Object to
¹² form.
¹³       THE WITNESS:  Sir, I don't
¹⁴ even understand your question.
¹⁵       You know, basically, I
¹⁶ answer your question.  Number 4,
¹⁷ Number 5.  I said I don't have
¹⁸ anything provided to you.
¹⁹       You know, that's my -- my
²⁰ side.
²¹       I don't care other people,
²² your expert witness, how many
²³ articles they didn't cite.  That's
²⁴ not my business.  You should talk

Page 517

¹ to the lawyers instead of talk to
² me.
³ BY MR. NIGH:
⁴     Q.   My question is not what our
⁵ experts looked at.  My question is what
⁶ you looked at.  Do you understand?
⁷     A.   I honestly answered your
⁸ question.  I honestly delivered anything
⁹ I had.  I'm just saying that I don't have
¹⁰ anything to provide to you, sir.
¹¹     Q.   Do you believe that you
¹² looked at over 500 documents that you
¹³ either relied upon for the opinions in
¹⁴ your report or that you reviewed in
¹⁵ connection with the report that you
¹⁶ served?  That's my question.
¹⁷       MR. MERRELL:  Objection to
¹⁸ form.
¹⁹       THE WITNESS:  Sorry, sir.  I
²⁰ don't review more than 500, sir.
²¹ I mean, what is the number
²² coming -- I don't even understand.
²³ What is 500, this discrete number,
²⁴ referring to?  You're just making

Page 518

¹ number for me or something?
² BY MR. NIGH:
³     Q.   No, I'm just asking you.
⁴       My question to you is, do
⁵ you believe that you reviewed over 500
⁶ documents that you either relied upon for
⁷ the opinions in your report, or reviewed
⁸ in connection with the report that you
⁹ served?  I think you're telling me no,
¹⁰ you didn't review anywhere close to 500
¹¹ documents; is that correct?
¹²     A.   Yeah, I don't.
¹³     Q.   Okay.  Do you understand
¹⁴ that when we served this request for
¹⁵ documents, that we received in response
¹⁶ over 500 documents in response to our
¹⁷ request for documents from you?  Were you
¹⁸ aware of that?
¹⁹     A.   No, sir.
²⁰     Q.   Do you have any
²¹ approximation as to the number of
²² documents that you relied upon for the
²³ opinions set forth in your report, or
²⁴ that you reviewed in connection with the

Page 519

1  report that you served?
2      A.   I cannot give you exact
3  numbers, sir.  I have to go through my
4  report, all the papers I reviewed, and I
5  can tell you exactly the number.
6      MR. NIGH:  Okay.  Let me
7  just see if I have any more
8  questions.  I'll be just two
9  minutes.
10     THE VIDEOGRAPHER:  Are we
11 going off the record?
12     MR. NIGH:  Yeah, we just
13 need a couple minutes here.  Just
14 wanted to see if I --
15     THE VIDEOGRAPHER:  The time
16 right now is 11:40 a.m.  We're off
17 the record.
18     (Short break.)
19     THE VIDEOGRAPHER:  The time
20 now is 11:43 a.m.  We're back on
21 the record.
22     MR. NIGH:  Dr. Wei, I have
23 no more questions at this time.  I
24 would reserve the balance of my

Page 520

1  time for any potential redirect.
2  But thank you for your time.
3  Appreciate it.
4      THE WITNESS:  Thank you,
5  sir.
6      MR. MERRELL:  Mr. Nigh, we
7  have -- I do have questions.
8  Mr. -- or sorry, Dr. Wei has a
9  conference call that he needs to
10 do.  So can we reconvene at 1:30?
11 And we won't be very long but he
12 does have a conference call he
13 needed to cover today.
14     MR. NIGH:  Yeah, let me see.
15 How long do you think your
16 questions are?
17     MR. MERRELL:  I think
18 probably 20 -- 20, 30 minutes,
19 something like that.
20     (Whereupon a discussion was
21 held off the stenographic record.)
22     MR. NIGH:  That's fine for
23 me.  We can reconvene at that
24 time.

Page 521

1      MR. MERRELL:  Okay.  Thank
2  you.
3      THE WITNESS:  Thank you,
4  sir.
5      MR. NIGH:  Thank you.
6      THE VIDEOGRAPHER:  The time
7  right now is 11:45 a.m.  We're off
8  the record.
9      (Lunch break.)
10     THE VIDEOGRAPHER:  The time
11 right now is 1:36 p.m.  We're back
12 on the record.
13         - - -
14     EXAMINATION
15         - - -
16 BY MR. MERRELL:
17     Q.   Dr. Wei, I just wanted to
18 ask a few follow-up questions from the
19 last two days.
20         First, I want to ask some
21 questions about your background.  Are you
22 a professor of biostatistics department?
23     A.   Yes, sir.
24     Q.   In that capacity, did you

Page 522

1  give academic lectures?
2      A.   Yes, sir.
3      Q.   Do you also supervise
4  graduate students?
5      A.   Yes, sir.
6      Q.   Did you publish scientific
7  literature?
8      A.   Yes, sir.
9      Q.   Have you been an editor of
10 journals?
11     A.   Yes, sir.
12     Q.   Have you made decisions
13 about what articles should or should not
14 be accepted for publication?
15     A.   Yes.
16     Q.   Have you made editorial
17 decisions about publications?
18     A.   Yes.
19     Q.   Okay.  I want to take a look
20 at your -- just a couple things in your
21 report, which you have in front of you.
22 I'm just going to refer to it here.
23         And take a look at Page 5,
24 which talks about your assignment.

Confidential Information - Subject to Protective Order

---

Page 523

1    A.   Yes.
2    Q.   Were you asked to evaluate
3 Dr. Madigan's opinions specifically?
4    A.   Yes.
5    Q.   Were you asked to evaluate
6 Dr. Madigan's analysis of the dietary and
7 occupational studies on NDMA and NDEA and
8 the risk of cancer?
9    A.   Yes.
10    Q.   And were you asked to assess
11 Dr. Madigan's extrapolation of the
12 dietary and occupational studies on NDMA
13 and NDEA to valsartan with NDMA
14 impurities?
15    A.   Yes, sir.
16    Q.   Did you look at the same
17 articles Dr. Madigan looked at for his
18 report?
19    A.   Yes, sir.
20    Q.   Did you review some
21 additional studies?
22    A.   Yes, I did.
23    Q.   Which ones, for example, did
24 you look at?

---

Page 524

1    A.   Most noteworthy -- the two
2 that's really interesting is the Danish
3 study and the German study of impurity of
4 valsartan.
5    Q.   Those are also called the
6 Gomm and Pottegard studies?
7    A.   Yes.
8    Q.   Did you conduct your own
9 search for literature on valsartan with
10 NDMA impurities in the literature?
11    A.   I did.
12    Q.   And were you able to
13 interpret all of these studies that you
14 looked at as a biostatistician?
15    A.   Yes.
16    Q.   Okay.  Let's take a look at
17 your conclusions in your expert report?
18        (Whereupon, a discussion was
19        held off the stenographic record.)
20 BY MR. MERRELL:
21    Q.   If you turn to Page 22.
22    A.   Yes.
23    Q.   I'm sorry, Page 23.  What
24 conclusion did you reach about

---

Page 525

1 extrapolating the results of the dietary
2 and occupational studies to the risk of
3 cancer from valsartan with NDMA and NDEA
4 impurity?
5    A.   Based what I read -- learned
6 from Dr. Madigan's report I cannot agree
7 with Dr. Madigan.  In my opinion, there
8 is no evidence at this stage we can claim
9 the impurity in valsartan was associated
10 with the cancer incidence increase.
11    Q.   And did Dr. Madigan properly
12 rely on these dietary and occupational
13 studies to reach that conclusion?
14    A.   Don't think --
15        MR. NIGH:  Objection.  Form
16    objection.
17 BY MR. MERRELL:
18    Q.   Is that listed out in your
19 report?
20    A.   Yes, sir.
21    Q.   We'll move to another topic.
22 Do you recall being shown similarities
23 between your expert report here and your
24 expert report in other cases from the

---

Page 526

1 past?
2    A.   Yes, sir.
3    Q.   Were those similarities that
4 were shown to you, were those regarding
5 your qualifications and general
6 background statistical principles?
7        MR. NIGH:  Form objection.
8        THE WITNESS:  Statistic
9    principles actually valid, guess,
10    what, 20 or 30 years ago.
11 BY MR. MERRELL:
12    Q.   So those statistical
13 principles that carried over from your
14 prior expert reports to the valsartan
15 report, had those changed since you wrote
16 them?
17        MR. NIGH:  Form objection.
18        THE WITNESS:  No.
19 BY MR. MERRELL:
20    Q.   And have you been deposed
21 for over two days and for over eight
22 hours at this point?
23        MR. NIGH:  Form objection.
24 BY MR. MERRELL:

---

Confidential Information - Subject to Protective Order

Page 527

1    Q.   If your report was truly
2  identical --
3         (Whereupon a discussion was
4     held off the stenographic record.)
5         THE WITNESS:  The answer is
6     yes.
7         (Whereupon a discussion was
8     held off the stenographic record.)
9  BY MR. MERRELL:
10    Q.   If your report was truly
11  identical to these reports that counsel
12  showed you, wouldn't you anticipate your
13  deposition would take considerably less
14  time than that?
15         MR. NIGH:  Form objection.
16         THE WITNESS:  I would hope
17     so.
18  BY MR. MERRELL:
19    Q.   All right.  These expert
20  reports that you were shown from other
21  cases, did some of those reports involve
22  evaluations of different drugs?
23    A.   Yes, sir.
24    Q.   In preparing your expert

Page 528

1  report in the valsartan litigation, is
2  your report specific to valsartan in your
3  opinions regarding the study and material
4  involved and that you've reviewed in this
5  litigation?
6    A.   Let me -- Counsel, let me
7  just take a few seconds to explain to
8  you, maybe better answer to your
9  question.
10         For example, the plaintiff
11  lawyer provide my expert witness,
12  Taxotere and Celebrex, and also the
13  valsartan, of course, the current case.
14         If you notice, Celebrex and
15  also the Taxotere cases, they all pretty
16  much involving clinical trial data.  And
17  we actually used this clinical trial
18  methodology to assess the plaintiff
19  expert witness reports.
20         On the other hand, in the
21  current case, valsartan impurity, there
22  were no clinical trials data available.
23  So we had to use a different methodology
24  to assess and evaluate Dr. Madigan's

Page 529

1  report.
2    Q.   Your methodology here
3  differed a bit from other cases because
4  of the data available?
5    A.   It's actually the nature of
6  the cases.  The principle of methodology,
7  all the same.  Example -- I use the same
8  example demonstrate across many trials.
9         On the other hand, every
10  case, specifically we have to use
11  different methods to analyze -- to assess
12  the validity of the claims.
13    Q.   Is that what you've done
14  here?
15    A.   Yes, sir.
16    Q.   Let me turn to another
17  topic.  Do you recall your testimony
18  on -- from your deposition yesterday on
19  multiple comparison adjustment?
20    A.   Yes, sir.
21    Q.   Do you recall being asked
22  about your use of the Bonferroni
23  correction?
24    A.   Yes, sir.

Page 530

1    Q.   Is that a multiple
2  comparison adjustment tool?
3    A.   It's one of the tools,
4  because Dr. Madigan used the P-value to
5  assess the group difference.  So the
6  mostly commonly used method still
7  Bonferroni.  If Dr. Madigan used
8  different way to quantify the difference
9  between exposure and non-exposure groups,
10  we would have used a different
11  methodology to assess his claims.
12         But I'm sorry.  One thing I
13  want to emphasize, Dr. Madigan did not
14  make any adjustment for his comparison.
15    Q.   Okay.  Let me ask you --
16  I'll turn to another topic.  Do you
17  recall being asked during the course of
18  your deposition about various studies,
19  including colorectal and lung cancer
20  studies, and having the results
21  represented to you without having the
22  benefit of the publication in front of
23  you?
24         MR. NIGH:  Form objection.

Confidential Information - Subject to Protective Order

Page 531

1      THE WITNESS:  Correct.
2  BY MR. MERRELL:
3      Q.   And to be able to fully
4  answer the questions presented to you,
5  would you need to have the article in
6  front of you?
7      MR. NIGH:  Form objection.
8      THE WITNESS:  Yes.
9  BY MR. MERRELL:
10      Q.   Did you ask for the article?
11      A.   I did.
12      Q.   And was it provided to you?
13      A.   No.
14      Q.   Are you able to know from
15  memory all the information in the various
16  studies that you've reviewed in this
17  case?
18      A.   It would be difficult.
19      Q.   All right.  Let me just show
20  you -- take a look at Table 1 of
21  Dr. Madigan's report.  It should be in
22  the pile next to you.  It's on Page 7.
23      A.   Yes.  Yes, sir.
24      Q.   Now, Table 1 has a list of

Page 532

1  several studies that Dr. Madigan
2  reviewed, right?
3      A.   Yes.
4      Q.   And there's various columns
5  in the table, right?
6      A.   Yes.
7      Q.   Are all the columns and
8  abbreviations defined in this table?
9      A.   Not every column.
10      Q.   Was that Dr. Madigan's
11  responsibility to define the
12  abbreviations and columns?
13      MR. NIGH:  Form objection.
14      THE WITNESS:  I believe so.
15  BY MR. MERRELL:
16      Q.   Have you reviewed the
17  studies referenced in Table 1?
18      A.   Yes.
19      Q.   Did the lack of the
20  abbreviations or definitions, did that
21  impact your ability to review and analyze
22  these studies referenced in the chart?
23      MR. NIGH:  Form objection.
24      THE WITNESS:  That's

Page 533

1  correct.
2      Sorry.  That's correct.  I
3  don't even have to know the
4  abbreviation -- for example, CC or
5  C on the third column -- to
6  actually evaluate each study.
7  BY MR. MERRELL:
8      Q.   All right.  And do you
9  recall being asked information about
10  those studies without the benefit of
11  having them in front of you?
12      A.   Correct.
13      Q.   Are you able to recall from
14  memory all the details of those studies
15  from Table 1?
16      A.   It's difficult.
17      Q.   Let me turn to another
18  topic.  You were asked about your list of
19  materials considered today.
20      Do you recall that?
21      A.   Yes.
22      Q.   And you can put aside
23  Dr. Madigan's report.
24      Does the materials

Page 534

1  considered list include all the documents
2  provided to you by defense counsel?
3      A.   Yes.
4      Q.   And sitting here today, can
5  you recall every document from that list
6  just by being shown the list whether you
7  reviewed it in two months -- in the last
8  two months in preparing your report?
9      MR. NIGH:  Form objection.
10      THE WITNESS:  It would be
11  difficult without seeing the
12  document on the paper.
13  BY MR. MERRELL:
14      Q.   Did plaintiffs' counsel, did
15  he actually show you any of the studies
16  or documents during his questioning to
17  help you remember had you reviewed it?
18      A.   No.
19      Q.   And did defense counsel
20  provide you the articles cited in
21  Dr. Madigan's report?
22      A.   I'm sorry.  Say it again.
23      Q.   Did defense counsel provide
24  you a set of articles that are cited in

Page 535

1  Dr. Madigan's report?
2      A.   No.
3      Q.   The articles -- during the
4  course of your review of this case, did
5  you -- were you provided, before you put
6  your expert report together, the articles
7  in Dr. Madigan's report?
8      A.   Yes.
9      Q.   And if I were to ask you the
10  name of an article or document, just from
11  your materials considered list, are you
12  going to be able to necessarily tell me
13  whether you reviewed it based solely on
14  the name?
15          MR. NIGH:  Form objection.
16          THE WITNESS:  That would be
17      difficult.
18  BY MR. MERRELL:
19      Q.   Okay.  And one final thing,
20  and we can wrap up.
21          I'm going to hand you what
22  was marked earlier, I think, Exhibit 2.
23  It's the objections to the notice of
24  videotaped deposition.

Page 536

1      A.   Yes, sir.
2      Q.   Do you recall towards the
3  end of your testimony today, you were
4  asked about over 500 documents being
5  provided to plaintiffs' counsel in
6  response to the notice of deposition?
7      A.   Yes, sir.
8      Q.   And then were you shown
9  various requests from the notice and
10  objections to the request?
11      A.   Yes.
12      Q.   Take a look at Page 5 of the
13  objections -- I'm sorry, Page 4.
14      A.   Yes.
15      Q.   And do you see Request
16  Number 4 is listed there?
17      A.   Yes, sir.
18      Q.   And if you look at the
19  bottom, does it state, "Defendants will
20  produce a copy of all electronically
21  available documents identified on
22  Dr. Wei's list of materials considered
23  prior to deposition"?
24      A.   Yes.

Page 537

1      Q.   Okay.  And if you look at --
2  on the next page, the same response for
3  Number 5.  It says the same thing?
4      A.   Yes.
5      Q.   So is it your understanding
6  plaintiffs' counsel, in response to their
7  notice for deposition, was provided all
8  the documents from your materials
9  considered list?
10      A.   Yes.
11      Q.   Okay.  Is there anything
12  else that you want to explain or add to
13  your testimony at all today?
14          MR. NIGH:  Form objection.
15          THE WITNESS:  No.
16          MR. MERRELL:  I don't have
17      any further questions.
18          MR. NIGH:  Okay.  I do have
19      some questions.
20          Okay.  We're going to pull
21  up LP-1609.
22          (Document marked for
23  identification as Exhibit
24  Wei-15.)

Page 538

1          MR. NIGH:  We're going to
2  mark this Exhibit Wei-15.
3          Let's go ahead and blow this
4  up.
5              - - -
6          EXAMINATION
7              - - -
8  BY MR. NIGH:
9      Q.   Now, Doctor, you never saw
10  the list of materials that was provided
11  to us from defense counsel, correct?
12      A.   You mean this document?
13      Q.   Yeah.  You never actually
14  saw yourself the list of materials that
15  was presented to plaintiff's counsel in
16  conjunction with the notice of
17  deposition, correct?
18      A.   Yeah.  That's correct.
19      Q.   Okay.  I want you to be able
20  to see.  This is a screen shot that shows
21  all the documents that were provided to
22  plaintiff's counsel in response to
23  Questions 4 and 5.  Do you remember there
24  was one document for, you know, a couple

Confidential Information - Subject to Protective Order

Page 539

¹ other questions.  But this is what we
² received.
³         So that's the first page.
⁴         MR. NIGH:  Let's take a look
⁵ at the second page.  The second
⁶ page.
⁷         Let's take a look at the
⁸ third page.  Third page.
⁹         Let's look at the fourth.
¹⁰ There's the fourth page.
¹¹         Let's look at the fifth.
¹² There's the fifth page.
¹³ BY MR. NIGH:
¹⁴     Q.   And I can represent to you
¹⁵ that each of these PDFs is another
¹⁶ document.
¹⁷         Do you understand that?
¹⁸     A.   Yes.
¹⁹     Q.   Okay.  Let's take a look at
²⁰ the next page.  There's another list.
²¹         Let's take a look at the
²² next page.  You can see all those
²³ documents.
²⁴         Let's take a look at the

Page 540

¹ next one.  You can see those.
²         Let's take a look at the
³ next page.  Do you see those?
⁴         Take a look at the next
⁵ page.  You can see those there.
⁶         Let's take a look at the
⁷ next page.  You can see those.
⁸         Let's take a look at the
⁹ next page.  You can see those there.
¹⁰         Let's take a look at the
¹¹ next page.
¹²         MR. NIGH:  Let's go ahead
¹³ and blow up that a little bit more
¹⁴ so it can be seen.
¹⁵ BY MR. NIGH:
¹⁶     Q.   Okay.  You can see those.
¹⁷ Let's take a look at the next page.
¹⁸     A.   I hardly can see it, sir.
¹⁹ This is too small for me.
²⁰     Q.   Do you see the numbers, now
²¹ I want you to --
²²         MR. NIGH:  Let's blow up a
²³ couple of these ones here, where
²⁴ we can see them even -- the top

Page 541

¹ ones.
² BY MR. NIGH:
³     Q.   Do you see that?  Now you
⁴ can start seeing numbers on documents.
⁵ So we can see it goes two, three, four,
⁶ five, six, seven, eight, nine, ten.
⁷         Do you see that?
⁸     A.   Yes, sir.
⁹         MR. NIGH:  Let's keep
¹⁰ scrolling through.
¹¹         Scroll on down.  Do you see
¹² all the way to 25.  Scroll down.
¹³ Let's keep scrolling down.
¹⁴         Do you see it's going in
¹⁵ numerical order, not a number is
¹⁶ missed.
¹⁷         Keep going down.  All the
¹⁸ way down to 60.
¹⁹ BY MR. NIGH:
²⁰     Q.   Did you see that, 60 in a
²¹ row?
²²     A.   Yeah.
²³     Q.   Okay.  Let's keep going
²⁴ down.  Let's keep scrolling down so you

Page 542

¹ can see all these documents provided to
² us.
³         Now we can see some more
⁴ numbers.  You see one, two, three, four,
⁵ five, six, seven, eight, nine, ten, 11.
⁶         MR. NIGH:  Let's keep
⁷ scrolling down.  More and more.
⁸ This is going to take a while.  So
⁹ let's scroll down with some speed.
¹⁰ BY MR. NIGH:
¹¹     Q.   Let me know if you can't --
¹² if you're not following with the speed
¹³ we're going.
¹⁴     A.   I cannot follow.  You are
¹⁵ going too fast.
¹⁶     Q.   So we're going all the
¹⁷ way -- 41, 42, 43, 44, 45.  It's
¹⁸ sequential.  And we keep going down.
¹⁹ There's not a number being missed here.
²⁰         MR. NIGH:  Let's keep going.
²¹ Keep scrolling down.
²²         52, 53, 54, 55.  You can see
²³ there's not a number missed.
²⁴         Let's keep going down.

Confidential Information Subject to Protective Order

Page 543

1  Still 69.  Let's keep going.
2  70.  71.
3  We're going all the way
4  through here.  We're all the way
5  to 80 now.  Not a number is
6  missed.
7  Keep going down.  91.  Not a
8  number missed.
9  Now we see 92.  We're
10 scrolling all the way down.  102,
11 not a number missed.  All the way
12 to 115.
13 BY MR. NIGH:
14 Q.  Are you following so far?
15 A.  I can barely follow the
16 number, the numerical number.
17 Q.  Do you see 116, all the way
18 to 123?
19 A.  Yeah.
20 Q.  Do you see that?  Okay.
21 MR. NIGH:  Let's scroll
22 down.  Let's do 124 on down to
23 what else we can see on the
24 screen.  124 all the way to 132.

Page 544

1  BY MR. NIGH:
2  Q.  Do you see that?
3  A.  I really can't see the
4  numbers.
5  Q.  Right.  You see the numbers.
6  You can see it's sequential, there's a
7  document for each one of those, correct?
8  A.  But actually, on the record,
9  I guess it's so fast so that you guys --
10 what kind of a document are you referring
11 to for each number?
12 Q.  Well, all I need you to see
13 is the number of documents.  That's it at
14 this point.  That's the point here.
15 So as long as we can see
16 that there's that number of documents.
17 MR. NIGH:  Let's keep going.
18 All the way to 136.  Do you see
19 that?  We can keep going down.
20 137 all the way to 146.
21 147 on that page too.
22 Keep going.
23 148 all the way to 159.
24 And what I'll ask now is

Page 545

1  just to scroll through to the end.
2  These numbers are all in
3  sequential order.  So let's just
4  scroll through.
5  See how many of them there
6  are.  Let's keep going.  Let's
7  keep going.  Let's keep going.
8  We are all the way to 249
9  now.
10 Let's keep going.  Let's
11 keep going.  Let's keep going.  We
12 can keep scrolling.
13 We're all the way to 364.
14 Keep going.
15 It's all the way at 381.
16 We're in the 400s now.
17 Keep going.
18 You can see we're almost to
19 500 now.
20 Keep scrolling.
21 That's 500 documents in
22 there just from -- that are
23 numbered.  We saw many others that
24 were numbered differently.

Page 546

1  Now we can put this down.
2  BY MR. NIGH:
3  Q.  And I'll represent that
4  this --
5  MR. NIGH:  We can take this
6  off.
7  BY MR. NIGH:
8  Q.  I'll represent that this is
9  a screen shot of all the documents that
10 were provided to us, an index of each of
11 them in response to the deposition
12 notice.
13 And my question to you is:
14 As we stated it previously, you didn't
15 review anywhere near 500 documents,
16 correct?
17 MR. MERRELL:  Objection to
18 form.
19 THE WITNESS:  Counsel, let
20 me make sure I understand your
21 question.
22 You actually provide me on
23 the screen more than 500 documents
24 or papers?

Confidential Information Subject to Protective Order

Page 547

¹ BY MR. NIGH:
² Q.   Yes.
³ A.   In the PDF file format.
⁴ You're saying those files, you send it to
⁵ the defendant lawyers; is that correct?
⁶ Q.   No.  I'm saying those files
⁷ were sent to us in response to our
⁸ deposition notice from your lawyers.
⁹ A.   Yeah.  Why that's my
¹⁰ business?  This is between you lawyers.
¹¹ Q.   My question to you is, you
¹² didn't review anywhere near 500
¹³ documents, correct?
¹⁴ MR. MERRELL:  Objection to
¹⁵ form.
¹⁶ THE WITNESS:  It's not
¹⁷ necessary for me to review over
¹⁸ 500 documents.  They are not
¹⁹ relevant.
²⁰ BY MR. NIGH:
²¹ Q.   I understand.  So you didn't
²² rely on those documents as part of your
²³ expert opinion, correct?  You didn't
²⁴ review them, you didn't rely on them,

Page 548

¹ correct?
² MR. MERRELL:  Objection to
³ form.
⁴ THE WITNESS:  Wait a second.
⁵ You're saying rely on any of this,
⁶ or rely on some of this?
⁷ BY MR. NIGH:
⁸ Q.   You didn't rely on over
⁹ 500 documents to put together your expert
¹⁰ report, because you didn't review them,
¹¹ correct?
¹² A.   I reviewed part of it.  I
¹³ didn't review the entire more than
¹⁴ 500 documents.
¹⁵ Q.   Right.  So you wouldn't have
¹⁶ relied on more than 500 documents if you
¹⁷ didn't review more than 500 documents,
¹⁸ correct?
¹⁹ A.   That's correct.
²⁰ Q.   You understand that our
²¹ request for documents was documents that
²² you relied on or reviewed, correct?
²³ A.   I don't know.  That's
²⁴ between you lawyers.  I provide -- I

Page 549

¹ provide on my side --
² MR. NIGH:  Let's pull up --
³ BY MR. NIGH:
⁴ Q.   Sorry, I didn't mean to
⁵ interrupt you.
⁶ MR. NIGH:  Let's pull up
⁷ LP-1600.  It was marked Wei
⁸ Exhibit 2, and let's go to Page 4.
⁹ We can blow up those two requests
¹⁰ again.
¹¹ BY MR. NIGH:
¹² Q.   "Copies of any documents or
¹³ articles relied upon" --
¹⁴ MR. NIGH:  Let's underline
¹⁵ the word "relied upon."
¹⁶ BY MR. NIGH:
¹⁷ Q.   -- and, "Copies of any
¹⁸ documents or articles reviewed."
¹⁹ MR. NIGH:  Let's underline
²⁰ the word "reviewed."
²¹ BY MR. NIGH:
²² Q.   Now, I think your statement
²³ is this is between the lawyers.  I
²⁴ understand.  What I'm asking -- my

Page 550

¹ question to you is, in terms of Number 4
² and Number 5, you didn't rely upon or
³ review anywhere near 500 documents to
⁴ draft your report, correct?
⁵ MR. MERRELL:  Objection to
⁶ form.
⁷ THE WITNESS:  Yeah, that's
⁸ correct.
⁹ MR. NIGH:  Okay.  Let's take
¹⁰ this down.
¹¹ BY MR. NIGH:
¹² Q.   Now, Doctor, you've
¹³ mentioned many times that it's good for
¹⁴ society to have higher quality studies
¹⁵ conducted, and that we shouldn't rely on
¹⁶ these other trashy studies.
¹⁷ Do you remember saying that?
¹⁸ MR. MERRELL:  Objection to
¹⁹ form.
²⁰ THE WITNESS:  I think I use
²¹ junk papers, not trash.
²² BY MR. NIGH:
²³ Q.   Okay.  My apologies.  Let me
²⁴ ask that again.

Confidential Information - Subject to Protective Order

Page 551

1      Doctor, you've mentioned
2  many times that it's good for society to
3  have higher quality studies conducted and
4  that we shouldn't rely on these other
5  junky papers, correct?
6      A.   I said not other.  Just some
7  of the junk papers, if I remember
8  correctly.
9      Q.   Right.  Didn't -- in
10 response to my question about dietary
11 studies and the Hidajat study, you would
12 agree that all the dietary studies and
13 the Hidajat study were junky papers,
14 correct?
15     A.   I didn't say that.
16     Q.   You didn't say that?
17     A.   No.  I said in general, the
18 society should not use junk paper to
19 actually make a decision.
20     Q.   Which dietary studies or
21 Hidajat do you believe are not junk
22 papers?
23     A.   Say it again, sir?
24     Q.   Which dietary studies or

Page 552

1  Hidajat do you believe are not junk
2  papers?
3      A.   Well, I have to go through
4  all the papers again to tell you which is
5  not very reliable, which one is good.
6      Q.   Do you have some
7  understanding now that there are some
8  that were reliable?
9      A.   I don't recall.
10     Q.   You don't recall whether or
11 not any of the dietary studies or Hidajat
12 is reliable?
13     A.   Well, I have to go back to
14 the papers to answer your question, sir.
15     Q.   My question to you is not
16 each individual paper.  My question to
17 you is, do you recall whether any of the
18 dietary studies or Hidajat, in your
19 opinion, was reliable?
20     MR. MERRELL:  Objection to
21 form.
22     THE WITNESS:  I have to go
23 back to read the papers.  If you
24 can show me the paper, I will tell

Page 553

1  you which one is not in the
2  standard we like to have it.
3  BY MR. NIGH:
4      Q.   You understand that it's my
5  turn to depose you here today.  I don't
6  have an obligation to show you every
7  paper that you ask for.  Do you
8  understand that?
9      A.   Oh, absolutely.  I have
10 every right to -- I have no opinion on
11 your question.  Do I have a right to say
12 that?
13     Q.   No.  You have to answer my
14 question.
15     My question to you is:  Do
16 you recall whether any of the dietary
17 studies or Hidajat in your opinion was
18 reliable?  If you don't know, you can
19 answer that way.
20     A.   Okay.  I don't know.
21     Q.   So sitting here today, you
22 don't know, in terms of your memory as,
23 you know, what you've reviewed for your
24 expert opinion here today, you don't know

Page 554

1  whether or not you would consider any of
2  the dietary studies or the Hidajat study
3  as reliable, correct?
4      MR. MERRELL:  Objection to
5  form.
6      THE WITNESS:  Well, I can
7  give you a couple examples, sir,
8  which one I don't think is up to
9  my standard or the society
10 standard.
11     For example, the paper by
12 L-O-H.  Right.  I said clearly in
13 my report.  And Dr. Loh used a Cox
14 model with many, many baseline
15 factors.  And he used that Cox
16 model to establish causation or
17 association analysis.
18     And I didn't find a segment
19 of the model fitting.  I said it
20 very clearly during the
21 deposition.  I said it very
22 clearly in my report.  Without a
23 good solid assessment of the model
24 fitting, I don't think I believe

Page 555

1    the results.  That's the first
2    one.
3        Second paper --
4    BY MR. NIGH:
5        Q.  Go ahead.
6        A.  Can I -- can I finish?
7        Q.  You can.  I'm not asking
8    about what you feel was unreliable.  My
9    question --
10       A.  You said reliable.
11       Q.  Right.
12       A.  You said reliable only.
13   Reliable, that's the same thing, right?
14   I'm give you some samples.
15       Q.  Go ahead.  You can give me
16   some examples of what's unreliable in
17   your opinion.  That's fine, but it wasn't
18   my question.
19       A.  Z-H-E-N-G, the paper, his
20   paper -- the study is a multiple
21   regression model.  He didn't provide a
22   thorough model checking process.  And I
23   don't know how we can take his model and
24   make a decision.

Page 556

1        And my question on many,
2    many papers, I can sit down with you one
3    by one, which one actually using modeling
4    without a formal assessment of a model
5    fitting.
6        That's my concern.  You ask
7    me without a model checking, do you
8    believe this is reliable study or not.
9        In my opinion, they are not.
10       Q.  Okay.  My question to you is
11   not the studies that you believe are
12   unreliable.  So let me start my question
13   again.
14       So sitting here today, you
15   don't know, in terms of your memory, as,
16   you know, what you've reviewed for your
17   expert opinion here today, you don't know
18   whether or not you would consider any of
19   the dietary studies or the Hidajat study
20   as reliable, correct?
21       MR. MERRELL:  Objection to
22   form.
23       THE WITNESS:  I don't think
24   I can claim that any out of all

Page 557

1    those papers that I reviewed, they
2    have a problem or which one is not
3    up to the standard I like to see.
4        If you allow me to go
5    through the papers, I'll be happy
6    to tell you which one is reliable
7    or not, right.
8        But if you're asking me do
9    you think that any paper is
10   reliable, I don't know.
11   BY MR. NIGH:
12       Q.  In your expert report --
13   sorry.  I didn't know you weren't done.
14       A.  I don't report, sir.  I know
15   that you always -- sir, I'm sorry.
16       You always try to check my
17   memory.  I'm not quite sure that a
18   deposition is a place to test a memory of
19   the expert witness.  That's my
20   understanding from many years.
21       Now I'm not quite sure.
22   Every time I'm asking you to help me to
23   review the document or paper, you didn't
24   even bother to show me the paper or

Page 558

1    document.
2        I don't understand why you
3    don't allow me to review it and say what
4    exactly I said either in my report or I'm
5    talking to you in this deposition.
6        I wish I can be more
7    accurate reflecting what I'm thinking
8    instead of using my memory.
9        Q.  Let's take a look at your
10   report.  It's in front of you.  You've
11   been allowed to use your expert report
12   the entire time.  It's marked Exhibit 3.
13       MR. NIGH:  Let's pull it up.
14   LP-1557.
15   BY MR. NIGH:
16       Q.  Is it true that in your
17   expert report, you do not mention a
18   single dietary study or Hidajat as being
19   reliable, correct?
20       A.  I'm not for sure.  So that
21   wasn't my assignment to say which paper
22   is reliable and which paper is not
23   reliable.  I use the totality of evidence
24   across all the publications, and I make

Confidential Information - Subject to Protective Order

Page 559

1 assessment to say in general, those
2 studies support Dr. Madigan say in the
3 report.
4            That's my assignment.  I was
5 not asked to please picking out some
6 studies are reliable and which ones are
7 not reliable.  That was not my job.
8        Q.   I understand.
9            You criticized many studies
10 as being unreliable.  And my question to
11 you is:  Can you find a single study in
12 your report in terms of the dietary
13 studies or occupational exposure studies
14 that you state is reliable in your
15 report?
16            MR. MERRELL:  Objection to
17 form.
18            THE WITNESS:  Sitting here
19 without review all the papers, I
20 cannot answer your question, sir.
21 BY MR. NIGH:
22        Q.   I'm asking you about your
23 report, not the papers.  Do you
24 understand that your report, one of the

Page 560

1 purposes is to put the other side on
2 notice of your opinions.
3            Do you understand that?
4        A.   Yes.
5        Q.   Can you point to me a single
6 paper that you mentioned in your report,
7 in terms of dietary studies or
8 occupational exposure studies, that you
9 stated is reliable?
10        A.   Without a review of those
11 papers, I cannot answer your question,
12 sir.
13        Q.   I'm asking you to review
14 your report.  In your report, do you
15 mention a single dietary study or
16 occupational exposure study that you find
17 to be reliable?
18            I'm not talking about each
19 individual paper.  I'm talking about your
20 expert report that's sitting in front of
21 you, that you can take all the time you
22 want to, to refresh your recollection, if
23 you feel like that's what you need.
24            But do you see a single

Page 561

1 dietary study or occupational exposure
2 study in your report that you state is
3 reliable in your report?
4        A.   Let me make sure I
5 understand your question, sir.  You're
6 saying in my report, did I say anything
7 among all the dietary occupational
8 studies, which one is good paper, which
9 one is a bad study?
10            Is that what you say?
11        Q.   I just asked you -- let
12 me -- let me help there.
13            I'm saying in your report,
14 did you say anything among all the
15 dietary and occupational exposure studies
16 which one is good paper?
17        A.   That was not my assignment,
18 sir.
19        Q.   So is that a no, because it
20 wasn't your assignment?
21        A.   No.
22        Q.   You would agree with me that
23 because you felt like that wasn't your
24 assignment, you didn't say anything among

Page 562

1 all the dietary -- dietary or
2 occupational exposure studies, which one
3 was a good paper and reliable, correct?
4        A.   I didn't say anything in my
5 report which one is good.  I did indicate
6 some papers, and the majority of papers,
7 including meta-analysis by Zui, by Song,
8 I said it very clearly, sir.
9            We need to go back to each
10 individual study in the meta-analysis, if
11 they did a good job or not.  If one of
12 those studies didn't do a good job, that
13 means the resulting meta-analysis paper
14 wasn't very good either.  That's what I
15 said also in my deposition -- I'm sorry,
16 in my report, right.
17            But I had to agree with you
18 that I didn't say anything which study is
19 acceptable, which one is good.  I didn't
20 say it clearly in my report.
21        Q.   Okay.  Now, Doctor, you're
22 here on behalf of the defendant
23 pharmaceutical companies, correct?
24        A.   Yes, sir.

Confidential Information Subject to Protective Order

Page 563

1    Q.   And we've seen, you know,
2    time and time again in the past that you
3    have regularly represented defendant
4    pharmaceutical companies, correct?
5         MR. MERRELL:  Objection to
6    form.
7         THE WITNESS:  I'm not for
8         sure on the so-called regularly,
9         as often as Dr. Madigan helping
10        the plaintiffs' side.
11   BY MR. NIGH:
12        Q.   Doctor, you -- never mind.
13   Strike that.
14             You understand that none of
15   the defendant pharmaceutical companies
16   that you're here on behalf of have
17   attempted to measure the impact or
18   effects that its NDMA-contaminated
19   medications have had on people or the
20   society, that they have not attempted to
21   conduct their own study, correct?
22        MR. MERRELL:  Objection to
23        form.
24        THE WITNESS:  I don't know,

Page 564

1         sir.  I have no data to say.  I
2         have no information about it.  I
3         have no idea.
4    BY MR. NIGH:
5         Q.   Do you understand that none
6    of the defendant pharmaceutical companies
7    that you're on -- that you're here on
8    behalf of have attempted to complete the
9    sort of higher quality study that you've
10   been discussing to measure the impact or
11   effects that its NDMA-contaminated
12   medications have had on people or the
13   society, correct?
14        MR. MERRELL:  Objection to
15        form.
16        THE WITNESS:  I have no idea
17        on this, sir.
18        MR. NIGH:  Okay.  That's all
19        the questions I have.
20        THE WITNESS:  Thank you.
21        MR. MERRELL:  Nothing here.
22        MR. NIGH:  Thank you,
23   Doctor.  Appreciate your time.
24        THE WITNESS:  See you later.

Page 565

1         THE VIDEOGRAPHER:  The time
2    right now is 2:15 p.m.  We are off
3    the record.
4         (Excused.)
5         (Deposition concluded at
6    approximately 2:15 p.m.)

Page 566

1
2         CERTIFICATE
3
4
5         I HEREBY CERTIFY that the
6    witness was duly sworn by me and that the
     deposition is a true record of the
     testimony given by the witness.
7
8         It was requested before
     completion of the deposition that the
9    witness, LEE-JEN WEI, Ph.D., have the
     opportunity to read and sign the
     deposition transcript.
10
11
12
     _____
13   MICHELLE L. GRAY,
     A Registered Professional
     Reporter, Certified Shorthand
14   Reporter, Certified Realtime
     Reporter and Notary Public
15   Dated:  September 17, 2021
16
17
18        (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24

Confidential Information - Subject to Protective Order

Page 567

## INSTRUCTIONS TO WITNESS

1
2
3          Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8          After doing so, please sign
9  the errata sheet and date it.
10         You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14         It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24

Page 569

## ACKNOWLEDGMENT OF DEPONENT

1
2
3
4          I,_____, do
5  hereby certify that I have read the
6  foregoing pages, 402 - 570, and that the
7  same is a correct transcription of the
8  answers given by me to the questions
9  therein propounded, except for the
10 corrections or changes in form or
11 substance, if any, noted in the attached
12 Errata Sheet.
13
14
15 _____
16 LEE-JEN WEI, Ph.D.            DATE
17
18
19 Subscribed and sworn
   to before me this
20 _____ day of _____, 20____.
21 My commission expires:_____
22
   _____
23 Notary Public
24

Page 568

1          - - - - -
           E R R A T A
2          - - - - -
3
4  PAGE  LINE  CHANGE
5  _____
6    REASON: _____
7  _____
8    REASON: _____
9  _____
10   REASON: _____
11 _____
12   REASON: _____
13 _____
14   REASON: _____
15 _____
16   REASON: _____
17 _____
18   REASON: _____
19 _____
20   REASON: _____
21 _____
22   REASON: _____
23 _____
24   REASON: _____

Page 570

## LAWYER'S NOTES

1
2  PAGE  LINE
3  _____ ____  _____
4  _____ ____  _____
5  _____ ____  _____
6  _____ ____  _____
7  _____ ____  _____
8  _____ ____  _____
9  _____ ____  _____
10 _____ ____  _____
11 _____ ____  _____
12 _____ ____  _____
13 _____ ____  _____
14 _____ ____  _____
15 _____ ____  _____
16 _____ ____  _____
17 _____ ____  _____
18 _____ ____  _____
19 _____ ____  _____
20 _____ ____  _____
21 _____ ____  _____
22 _____ ____  _____
23 _____ ____  _____
24 _____ ____  _____

**WORD**
**INDEX**

**< 0 >**
**01** 451:*18*
**02109** 405:*15*
**05** 419:*6, 12*
427:*7* 429:*14*
451:*18*
455:*19* 460:*4*
461:*3, 14*
463:*8*
**07102** 404:*19*

**< 1 >**
**1** 413:*4, 22*
431:*14*
432:*12* 433:*5*
435:*20* 436:*9*
438:*24* 444:*2,*
*9, 12, 16*
446:*2* 449:*23*
451:*18* 465:*9*
473:*19* 505:*7*
513:*22* 514:*2*
531:*20, 24*
532:*17* 533:*15*
**1:30** 520:*10*
**1:36** 521:*11*
**10** 511:*7, 16*
513:*1*
**100** 404:*18*
508:*22*
**102** 543:*10*
**11** 405:*10*
513:*4* 542:*5*
**11:07** 503:*23*
**11:25** 504:*3*
**11:40** 519:*16*
**11:43** 519:*20*
**11:45** 521:*7*
**115** 543:*12*
**116** 543:*17*
**12** 513:*13, 20*
514:*3*
**123** 543:*18*
**124** 543:*22, 24*
**131** 410:*8*
**132** 543:*24*
**136** 544:*18*

**137** 544:*20*
**14** 410:*3*
**146** 544:*20*
**147** 544:*21*
**148** 544:*23*
**15** 402:*11*
409:*7*
**15219** 406:*5*
**1558** 433:*4*
**159** 544:*23*
**15th** 404:*19*
**17** 566:*15*
**1875** 405:*3*
**19422** 406:*10*
**1978** 493:*15*
**1992** 490:*9*

**< 2 >**
**2** 412:*23*
504:*7* 506:*8*
535:*22* 549:*8*
**2:15** 565:*2, 6*
**20** 453:*3*
520:*18*
526:*10* 569:*20*
**200** 404:*4, 10*
406:*10*
**2016** 410:*12*
421:*1* 460:*17*
**2021** 402:*11*
409:*7* 460:*18*
475:*14* 566:*15*
**213-7047**
405:*16*
**2150** 403:*14*
**22** 524:*21*
**227** 405:*20*
**23** 524:*23*
**231-6491**
405:*11*
**249** 545:*8*
**25** 541:*12*
**2500** 404:*5, 11*
**263-1840**
406:*5*
**27th** 405:*15*
**28202** 405:*21*
**2875** 402:*3*

**< 3 >**

**3** 414:*17*
416:*24* 454:*1,*
*6* 468:*15*
506:*23* 558:*12*
**30** 453:*3*
520:*18*
526:*10* 567:*16*
**300** 405:*4*
**30305** 404:*5,*
*12*
**316** 403:*5*
**317** 405:*11*
**32502** 403:*5*
**3333** 404:*4, 11*
**33431** 405:*4*
**33950** 403:*10*
**364** 545:*13*
**381** 545:*15*
**38th** 406:*4*

**< 4 >**
**4** 453:*23*
507:*10* 514:*4,*
*7, 8* 516:*16*
536:*13, 16*
538:*23* 549:*8*
550:*1*
**400s** 545:*16*
**402** 569:*6*
**409** 407:*7*
**41** 542:*17*
**410** 407:*15*
**412** 406:*5*
**42** 542:*17*
**43** 542:*17*
**435-7001**
403:*6*
**436-5028**
403:*15*
**44** 542:*17*
**444-3475**
405:*21*
**45** 542:*17*
**450** 406:*10*
**46204** 405:*10*

**< 5 >**
**5** 509:*6*
514:*5* 516:*17*
522:*23*

**536:**12 **537:**3
**538:**23 **550:**2
**508:**9, 20
**50** 507:*22*
508:*9, 20*
**500** 504:*17,*
*22* 514:*24*
515:*9, 18*
516:*6* 517:*12,*
*20, 23* 518:*5,*
*10, 16* 536:*4*
545:*19, 21*
546:*15, 23*
547:*12, 18*
548:*9, 14, 16,*
*17* 550:*3*
**504** 403:*20*
**52** 542:*22*
**521** 407:*8*
**524-5777**
403:*20*
**53** 405:*15*
542:*22*
**537** 407:*16*
**538** 407:*7*
**54** 542:*22*
**55** 542:*22*
**553-2175**
404:*6*
**553-2287**
404:*12*
**55402** 403:*15*
**561** 405:*5*
**567-0700**
406:*11*
**570** 569:*6*

**< 6 >**
**6** 509:*13*
**60** 541:*18, 20*
**600** 403:*5*
405:*20*
**610** 406:*11*
**612** 403:*15*
**617** 405:*16*
**639-1158**
403:*11*
**678** 404:*6, 12*
**69** 543:*1*

**< 7 >**

**7** 510:*5*
531:*22*
**70** 543:*2*
**701** 403:*19*
**70130** 403:*19*
**704** 405:*21*
**71** 543:*2*
**757-1017**
404:*20*

**< 8 >**
**8** 510:*14*
**80** 543:*5*
**800** 403:*14*
**877.370.3377**
402:*21*
**888** 403:*6*

**< 9 >**
**9** 510:*23*
**9:31** 402:*15*
409:*8*
**9:35** 414:*7*
**9:38** 414:*11*
**91** 543:*7*
**917.591.5672**
402:*21*
**92** 543:*9*
**941** 403:*11*
**95** 452:*7*
**962-2131**
405:*5*
**973** 404:*20*
**99** 403:*10*

**< A >**
**a.m** 402:*15*
409:*8* 414:*7,*
*11* 503:*23*
504:*3* 519:*16,*
*20* 521:*7*
**abbreviation**
433:*24* 434:*9*
533:*4*
**abbreviations**
532:*8, 12, 20*
**ability** 437:*21*
532:*21*
**able** 433:*20*
445:*4* 508:*21*
524:*12* 531:*3,*

Confidential Information - Subject to Protective Order

14 533:13
535:12 538:19
**Absolutely**
464:21 553:9
**abstract**
492:23 493:2
494:18
**academic**
522:1
**acceptable**
562:19
**accepted**
522:14
**accurate**
558:7 567:20
**ACKNOWLE**
**DGMENT**
569:2
**Actavis**
404:15, 22
**Adam** 486:24
**add** 537:12
**additional**
523:21
**addressed**
413:8 471:15
**adjustment**
529:19 530:2,
14
**admissibility**
469:3
**advice** 422:1
**advised** 513:9
**Aerodigestive**
490:22
**agency** 455:7
457:16
**ago** 453:3
512:22 526:10
**agree** 411:1
412:10 416:1,
16 421:5
423:8, 9
453:2 457:12
459:16 460:1,
5, 13 463:24
525:6 551:12
561:22 562:17
**agreed** 423:15
460:8

**agrees** 446:4
448:24 449:1
**ahead** 410:1,
8 412:24
414:4, 13
418:14 419:1
433:1, 7
436:2 437:5
441:10 459:2
460:9 464:3
471:11
489:20 490:5
493:22
501:15
503:15, 17
504:6 538:3
540:12 555:5,
15
**Aid** 405:12
**al** 492:6
493:4 496:1,
20 497:11
498:2, 9, 16
499:10
**Albertson's**
405:22
**ALFANO**
406:1
**allow** 444:21
481:11, 12
557:4 558:3
**allowed**
418:22
451:20 558:11
**allows** 452:18
**alphabetical**
501:21
**alternative**
456:2
**alternatives**
454:10 456:5
**altogether**
415:22 416:11
**amended**
465:5
**analysis**
424:19
425:18 426:3
451:14 456:8
471:2 497:22
523:6 554:17

**analyze**
529:11 532:21
**and/or** 566:21
**angiotensin**
507:4
**Answer** 408:5
411:22 413:3,
10, 14 432:23
439:1, 2, 16
441:13, 20
457:11
461:18
467:23
474:19, 24
509:24 516:2,
16 527:5
528:8 531:4
552:14
553:13, 19
559:20 560:11
**answered**
517:7
**answers** 569:8
**anticipate**
527:12
**anymore**
463:10
465:18 470:19
**anyway**
425:14
**API** 488:16
489:7
**apologies**
550:23
**apologize**
476:20
478:14 482:3
494:19
**APPEARANC**
**ES** 403:1
404:1 405:1
406:1
**applied** 424:23
**APPLIES**
402:6
**apply** 566:19
**Appreciate**
520:3 564:23
**approach**
455:2 496:2

**approaches**
453:19, 22, 23
454:5, 12, 17,
24 455:21
**appropriate**
420:3 447:15
450:7 467:7
468:9 567:6
**approximately**
508:20 565:6
**approximation**
507:15 518:21
**ARB** 510:7,
16 511:20
**argue** 422:15
**argument**
419:17 426:5
**arguments**
469:2
**article** 531:5,
10 535:10
**articles**
507:11, 16, 22
508:9 509:7
514:13, 16
515:12, 15, 18
516:6, 23
522:13
523:17
534:20, 24
535:3, 6
549:13, 18
**ASA** 407:15
410:10
411:13 412:2,
11 418:12
419:3, 18, 21
420:18
421:18 422:1,
12 423:15
425:5, 10, 16
446:4 448:24
451:6 453:24
454:5 455:6
456:3, 14, 20
457:3, 12, 15,
21, 24 458:11
459:16, 18, 22
460:17
461:11, 13, 14,

24 462:13
463:19 498:22
**aside** 533:22
**asked** 432:10
433:8 438:9
440:14
461:15
504:11
513:20, 22
523:2, 5, 10
529:21
530:17 533:9,
18 536:4
559:5 561:11
**asking** 427:23
428:4 440:17
441:11, 22, 23
444:14
466:17, 18
472:16, 20
474:23 516:1,
3 518:3
549:24 555:7
557:8, 22
559:22 560:13
**assess** 523:10
528:18, 24
529:11 530:5,
11
**assessment**
476:16 489:8
554:23 556:4
559:1
**assignment**
471:14
522:24
558:21 559:4
561:17, 20, 24
**associated**
525:9
**association**
412:14 554:17
**assuming**
412:13
**Atlanta** 404:5,
12
**attached**
469:24 475:9
567:12 569:11
**attaching**
427:14 428:8

Confidential Information - Subject to Protective Order

**attachments**
468:*19*
509:*10*  514:*19*
**attempted**
563:*17, 20*
564:*8*
**attention**
414:*17*  470:*12*
**attorney**
567:*16*
**attorneys**
413:*9*
**Aurobindo**
406:*12*
**Aurolife**
406:*13*
**author**  448:*6*
501:*22*
**authors**
440:*15*
442:*19*
445:*13*  446:*9,
13*  447:*1, 2,
20*  448:*2, 14,
19*  449:*2, 9*
**available**
467:*21*
528:*22*  529:*4*
536:*21*
**Avenue**  403:*14*
**avoid**  449:*3*
**aware**  504:*15*
518:*18*

< B >
**back**  414:*11*
436:*3, 12*
437:*14*
438:*10, 14*
439:*15, 17*
441:*16, 18*
451:*5*  453:*3*
464:*8, 10*
487:*13*  501:*1,
2*  502:*11*
503:*9*  504:*4*
508:*14*
519:*20*
521:*11*
552:*13, 23*
562:*9*

**background**
521:*21*  526:*6*
**bad**  422:*6*
561:*9*
**balance**
519:*24*
**barely**  543:*15*
**BARNES**
405:*9*
**BARR**  403:*3*
**based**  414:*21*
415:*5, 14*
416:*6*  419:*18*
461:*10*  463:*8*
481:*22*  525:*5*
535:*13*
**baseline**
554:*14*
**Basically**
419:*11*
470:*20*  516:*15*
**Baylen**  403:*5*
**beginning**
402:*15*
451:*19*  464:*13*
**behalf**  562:*22*
563:*16*  564:*8*
**belief**  483:*14*
501:*8*
**believe**  420:*17*
432:*8*  433:*19*
447:*18*
448:*11, 23*
452:*9*  453:*9,
14*  466:*11*
467:*6, 24*
478:*20*
484:*16*
486:*23*
487:*20*
494:*17*
500:*14*
504:*19*
514:*23*  515:*8,
17*  516:*5*
517:*11*  518:*5*
532:*14*
551:*21*  552:*1*
554:*24*  556:*8,
11*
**Bell**  406:*10*

**benefit**  530:*22*
533:*10*
**benefits**  507:*4*
**best**  456:*7*
484:*23*
**better**  450:*5*
460:*24*  528:*8*
**Beyond**  498:*16*
**Biomarker**
494:*7*
**biostatistician**
524:*14*
**biostatistics**
422:*11*  521:*22*
**bit**  422:*19*
434:*16*  474:*1*
529:*3*  540:*13*
**black**  419:*11*
421:*20*
422:*13*
429:*15, 19*
449:*22*
450:*16*  451:*1*
452:*8*
**Bladder**
494:*13*
**blockers**  507:*5*
**blow**  464:*16*
473:*20*  474:*2,
5*  490:*5*
501:*16*
502:*13, 18*
505:*10, 21*
538:*3*  540:*13,
22*  549:*9*
**blown**  486:*3*
**Blue**  406:*10*
**boards**  467:*9*
468:*2*
**Boca**  405:*4*
**boldfaced**
412:*4*
**Bonferroni**
529:*22*  530:*7*
**book**  492:*4*
**BOSICK**
406:*1*
**Boston**  405:*15*
**bother**  477:*19*
557:*24*

**bottom**
417:*15, 17*
435:*22*  536:*19*
**Boulevard**
405:*3*
**Boy**  428:*14*
**break**  415:*12*
503:*18*  504:*1*
519:*18*  521:*9*
**bring**  487:*13*
**BUCHANAN**
403:*3*  405:*19*
**business**
414:*20*  416:*5*
423:*1*  476:*10*
516:*24*  547:*10*

< C >
**call**  520:*9, 12*
**called**  432:*13*
524:*5*
**Camp**  403:*19*
**cancer**  427:*8*
430:*3*  490:*16,
23*  491:*9*
493:*11*
494:*13, 23*
495:*11, 16, 17*
497:*12*
498:*12*
499:*18*  500:*3,
11*  523:*8*
525:*3, 10*
530:*19*
**Cancers**
492:*8*  495:*5*
**capability**
441:*1*
**capacity**
521:*24*
**care**  422:*21*
516:*21*
**carefully**
469:*18*
473:*14*
484:*10*  567:*4*
**Carillon**
405:*20*
**Carolina**
405:*21*
**carried**  526:*13*

**case**  412:*12*
423:*3, 7*
440:*23*
455:*11*
466:*13, 23*
467:*8*  512:*18,
20*  513:*3*
528:*13, 21*
529:*10*
531:*17*  535:*4*
**Case-Control**
491:*9*
**CASES**  402:*6*
525:*24*
527:*21*
528:*15*  529:*3,
6*
**catch**  430:*10*
**causation**
554:*16*
**cause**  455:*11*
**CC**  533:*4*
**Celebrex**
528:*12, 14*
**Center**  404:*18*
**Centre**  406:*4*
**certainly**
507:*21*
**CERTIFICAT**
**E**  566:*2*
**certification**
566:*18*
**Certified**
402:*17*
566:*13, 14*
**CERTIFY**
566:*5*  569:*5*
**certifying**
566:*22*
**Cgannon@wals**
**h.law**  404:*20*
**change**  422:*7*
568:*4*
**changed**
526:*15*
**changes**
567:*11*  569:*10*
**changing**
446:*10*  460:*21*
**Charlotte**

Confidential Information - Subject to Protective Order

405:*21*

chart  532:*22*

charts  509:*15*

check  437:*14*
557:16

checking
555:22  556:7

CHRISTINE
404:*17*

CHRISTOPHE
R  405:*19*

Christopher.he
nry@bipc.com
405:22

CIPRIANI
406:*9*

citations
480:*23*

cite  477:*20*
500:22  516:*23*

cited  414:*18*
432:*21*
468:*17*
473:*16*  480:*7,
14*  481:*6*
482:*13, 22*
483:*6, 9, 21*
484:*7, 12, 14,
18, 24*  485:*8*
488:*6*  490:*9*
507:*19*
508:*16*
534:*20, 24*

citing  448:*1*
489:*3*

citizen  423:*1*

Claggett  499:*3*

claim  418:*3*
420:*8*  423:*19,
21*  424:*12*
425:*4*  426:*13*
427:*1, 7, 16*
428:*2, 10*
429:*3*  525:*8*
556:24

Claimed  463:*7*

claims  529:*12*
530:*11*

clarify  450:*19*

classes  507:*2*

clear  449:*20*
450:*14*  486:*9*

clearly  437:*11*
554:*12, 20, 22*
562:*8, 20*

CLIFF  404:*3*

Clinical
491:*19*  497:*2,
12*  499:*5, 6*
528:*16, 17, 22*

clinically
452:*13*

close  518:*10*

Cohen  486:*16*
487:*11*

Colorectal
442:*18*  492:*7*
495:*4*  500:*11*
530:*19*

column
431:*17*
432:*13*
450:*12*  532:*9*
533:*5*

columns
532:*4, 7, 12*

Come  429:*12*

comes  434:*2, 5*

coming
461:*24*
470:*14*  517:22

comment
467:*21*

Commentary
498:*3*

commission
569:*21*

commonly
530:*6*

communicate
450:*8*

communication
513:*5*

communication
s  511:*8, 17*

companies
562:*23*  563:*4,
15*  564:*6*

company's
489:*17*

Comparative
496:22  499:*6*

compared
410:23
435:*14*  485:*4*

comparison
529:*19*  530:*2,
14*

complaint
465:*6, 8, 14,
16, 20, 22*
487:23

complete
564:*8*

completely
512:*5*

completion
566:*8*

components
416:*17*

Compounds
492:*10*
493:*16*
495:*15*
499:*17*  500:*10*

concentrate
469:*21*

concern  556:*6*

concerning
454:*15*

concerns
471:*15*

concluded
565:*5*

conclusion
427:*5*  524:*24*
525:*13*

conclusions
414:*20*  416:*5*
524:*17*

conduct  524:*8*
563:21

conducted
550:*15*  551:*3*

conference
520:*9, 12*

confess  485:*2*

confidence
452:*1, 2, 3, 8,
11, 21, 23*

453:*4, 12, 16*
454:*19*  455:*1*

CONFIDENTI
AL  402:*6*
466:*16*

Confidentiality
466:*1, 7, 19*

confused
429:*17*

conjunction
538:*16*

connection
506:*1*  509:*8,
17*  514:*17*
515:*15*  516:*9*
517:*15*  518:*8,
24*

consequence
458:*21, 22*

consider
554:*1*  556:*18*

considerable
418:*4*

considerably
527:*13*

considered
464:*14*  465:*1*
469:*14, 16*
470:*3, 4*
473:22  475:*5,
9, 20*  476:*5, 8,
12*  477:*9, 17*
478:*12, 17, 22*
479:*14*  480:*2,
5*  481:*8, 20*
482:*15*
483:*10, 18*
501:*3, 6*
533:*19*  534:*1*
535:*11*
536:22  537:*9*

consultation
506:*2*

consulting
506:*10*

Consumption
490:*20*  495:*10*

contamination
428:23  498:*3*
512:*13*

Cont'd  404:*1*
405:*1*  406:*1*

content  465:*18*

Context
407:*16*

continuation
409:*9*

continue
421:*3*  423:*11*
459:*9*  462:*3,
14*  463:*21*
495:22

Continued
402:*14*
409:*22*
462:*13*  463:*19*

control  566:*21*

copied  446:*21*
447:*19*

Copies  505:*24*
506:*8, 23*
507:*10*  509:*6*
510:*23*
514:*12, 16*
515:*11, 14*
549:*12, 17*

copy  437:*6*
446:*2*  448:*13,
18, 20*  449:*7,
18, 19*  450:*10*
453:*21*  536:*20*

copying
446:*12*

Corporate
405:*3*

Corporation
405:*12*

correct
410:*14*  411:*8,
14*  415:*5, 7,
22*  416:*11*
417:*5*  420:*12*
423:24
426:*14*
429:22
436:21
437:24  438:*3*
439:*18*
440:*18*  444:*5,
19*  445:*1, 7,
19*  446:*14, 24*

Confidential Information - Subject to Protective Order

448:*1, 4, 11, 13, 19* 452:*20* 453:*5* 454:*1, 7, 10* 455:*5, 22* 456:*16, 22* 469:*7, 11* 474:*13, 16, 21* 475:*2, 11, 23* 480:*14, 20* 481:*10* 483:*22* 485:*18* 488:*3, 18* 489:*11* 492:*3* 497:*9, 19* 499:*1* 500:*20* 506:*5, 13, 21, 22* 507:*8, 9, 24* 509:*22* 510:*12, 21* 511:*5, 6, 13, 23* 512:*1, 3* 513:*2, 11, 12, 18, 19, 24* 518:*11* 531:*1* 533:*1, 2, 12* 538:*11, 17, 18* 544:*7* 546:*16* 547:*5, 13, 23* 548:*1, 11, 18, 19, 22* 550:*4, 8* 551:*5, 14* 554:*3* 556:*20* 558:*19* 562:*3, 23* 563:*4, 21* 564:*13* 569:*7*

**correction** 529:*23*

**corrections** 567:*5, 7* 569:*10*

**correctly** 436:*17* 551:*8*

**counsel** 409:*11, 16* 527:*11* 528:*6* 534:*2, 14, 19, 23* 536:*5* 537:*6* 538:*11, 15, 22* 546:*19*

**count** 508:*4*

**couple** 519:*13* 522:*20* 538:*24* 540:*23* 554:*7*

**course** 434:*23* 474:*24* 528:*13* 530:*17* 535:*4*

**COURT** 402:*1* 409:*13* 510:*3* 567:*20*

**cover** 487:*3* 494:*18* 520:*13*

**COVID-19** 497:*3*

**Cox** 554:*13, 15*

**credibility** 454:*20* 455:*3*

**criticized** 559:*9*

**CULBERTSON** 405:*14*

**current** 528:*13, 21*

**CVS** 405:*12*

**< D >**

**Dae** 497:*8*

**Daily** 499:*11, 24*

**DANIEL** 403:*4*

**Danish** 501:*10* 524:*2*

**data** 410:*21* 412:*8* 421:*17* 426:*3* 456:*7* 528:*16, 22* 529:*4* 564:*1*

**date** 402:*16* 409:*6* 420:*23* 421:*1* 567:*9* 569:*16*

**Dated** 566:*15*

**Daubert** 509:*17*

**DAVIS** 404:*9*

**day** 482:*5* 569:*20*

**days** 452:*23* 521:*19* 526:*21* 567:*16*

**De** 435:*4, 5, 6, 10* 438:*6, 20* 442:*5, 7, 10* 490:*9* 503:*10, 13*

**decide** 429:*15* 450:*1* 451:*19*

**decision** 419:*6* 421:*21* 422:*14* 429:*10, 11* 449:*22* 450:*16* 451:*1* 452:*9* 461:*1* 462:*18* 463:*16* 551:*19* 555:*24*

**decisionmaking** 463:*6*

**decisions** 414:*21* 416:*6* 522:*12, 17*

**deemed** 567:*19*

**Defendant** 405:*17, 22* 406:*7* 483:*12* 547:*5* 562:*22* 563:*3, 15* 564:*6*

**Defendants** 404:*14, 21* 405:*6* 406:*12* 505:*9, 11* 536:*19*

**defense** 534:*2, 19, 23* 538:*11*

**define** 532:*11*

**defined** 532:*8*

**definitions** 532:*20*

**delivered** 517:*8*

**DeMets** 491:*19*

**demonstrate** 529:*8*

**demonstrative** 509:*15*

**department** 521:*22*

**depend** 459:*3, 4*

**depends** 481:*19*

**deponent** 409:*10, 14* 569:*2*

**depose** 553:*5*

**deposed** 526:*20*

**deposing** 567:*16*

**deposition** 402:*14* 408:*2* 410:*13* 423:*16* 437:*24* 504:*10* 527:*13* 529:*18* 530:*18* 535:*24* 536:*6, 23* 537:*7* 538:*17* 546:*11* 547:*8* 554:*21* 557:*18* 558:*5* 562:*15* 565:*5* 566:*6, 8, 9* 567:*3, 13, 17, 19*

**deps@golkow.com** 402:*21*

**describe** 429:*8*

**described** 442:*1, 10, 15, 19, 23* 443:*1, 5, 10, 11, 17*

**describing** 443:*23*

**DESCRIPTION** 407:*14*

**descriptor** 418:*8* 419:*24* 420:*12* 423:*11* 427:*19*

428:*13, 16, 19* 429:*5, 7, 9* 430:*15, 18* 432:*19* 462:*20, 21, 23* 463:*4, 10*

**design** 451:*20*

**detail** 480:*23*

**details** 413:*5* 533:*14*

**develop** 462:*13*

**Diaz** 406:*16* 409:*4*

**dietary** 435:*13* 438:*15* 439:*11* 453:*10* 484:*6* 491:*7* 494:*6, 12* 495:*10* 498:*10* 499:*16* 500:*9* 523:*6, 12* 525:*1, 12* 551:*10, 12, 20, 24* 552:*11, 18* 553:*16* 554:*2* 556:*19* 558:*18* 559:*12* 560:*7, 15* 561:*1, 7, 15* 562:*1*

**differed** 529:*3*

**difference** 410:*22* 498:*18* 530:*5, 8*

**different** 418:*11* 481:*18* 486:*12* 527:*22* 528:*23* 529:*11* 530:*8, 10*

**differently** 545:*24*

**difficult** 422:*6* 531:*18*

533:*16*
534:*11* 535:*17*

**Dimethylamine**
493:*5*
**Dipak** 479:*20,*
*23*
**direct** 566:*21*
**directed** 516:*3*
**Direction**
408:*5* 455:*4*
474:*10*
**disagree** 421:*5*
**disclaimer**
450:*13, 23*
**discontinue**
456:*21* 457:*13*
**discourage**
461:*13*
**discovery**
488:*5*
**discrete**
517:*23*
**discussed**
497:*3*
**discussing**
411:*7, 14*
454:*24* 564:*10*
**discussion**
414:*8* 520:*20*
524:*18* 527:*3,*
*7*
**distinguished**
423:*14*
424:*18* 425:*6,*
*21* 450:*4*
**distortion**
418:*4*
**DISTRICT**
402:*1*
**DJ** 498:*2*
**DM** 492:*6*
**dnigh@levinla**
**w.com** 403:*6*
**Doctor** 410:*10*
475:*2* 504:*9*
538:*9* 550:*12*
551:*1* 562:*21*
563:*12* 564:*23*
**doctors** 477:*21*

**DOCUMENT**
402:*6* 410:*4*
414:*1* 416:*13*
417:*7, 10*
459:*19*
467:*22*
476:*22, 24*
478:*17, 19*
483:*12, 15*
484:*24* 485:*8*
487:*3* 488:*17*
489:*3* 490:*10,*
*17* 491:*1, 12*
492:*12* 493:*7,*
*13, 18* 494:*15*
495:*2, 7, 13,*
*20* 496:*6, 24*
497:*5, 16, 19,*
*24* 498:*6, 14*
499:*1, 8, 14,*
*20* 500:*13*
506:*4* 513:*22,*
*23* 514:*7*
534:*5, 12*
535:*10*
537:*22*
538:*12, 24*
539:*16* 544:*7,*
*10* 557:*23*
558:*1*
**documentation**
506:*24* 510:*5,*
*14*
**documented**
506:*11*
**Documents**
407:*18* 408:*8*
476:*7* 481:*13,*
*21* 485:*22*
486:*5, 11, 13*
487:*17* 488:*6,*
*11* 504:*12, 16,*
*17, 20, 22*
505:*16*
506:*13, 20*
507:*7, 11, 16,*
*19, 22* 508:*9,*
*16* 509:*7, 21*
510:*11, 21, 24*
511:*4, 7, 13,*
*16, 22* 512:*2,*

*10, 24* 513:*10*
514:*4, 13, 16,*
*24* 515:*9, 12,*
*14* 516:*2*
517:*12* 518:*6,*
*11, 15, 16, 17,*
*22* 534:*1, 16*
536:*4, 21*
537:*8* 538:*21*
539:*23* 541:*4*
542:*1* 544:*13,*
*16* 545:*21*
546:*9, 15, 23*
547:*13, 18, 22*
548:*9, 14, 16,*
*17, 21* 549:*12,*
*18* 550:*3*
**doing** 421:*18*
458:*7, 19*
468:*7, 24*
567:*8*
**domain**
425:*14*
467:*19* 468:*6*
**Dr** 423:*13, 17*
424:*17*
425:*12* 428:*7,*
*15* 431:*4, 5, 9,*
*15* 433:*4*
435:*21* 436:*7,*
*19* 437:*17*
444:*8, 11*
445:*5* 446:*1*
459:*15, 17*
460:*1, 16, 20*
461:*19* 463:*3*
464:*24*
469:*21*
470:*13, 20*
471:*16, 18, 24*
472:*6, 9, 23*
473:*2, 5, 9, 17,*
*22* 474:*6, 13,*
*15, 21* 475:*14,*
*16, 22* 476:*24*
477:*14, 20*
478:*5, 20*
479:*8, 12, 20,*
*23* 480:*8, 19*
481:*3, 7*
482:*14, 24*

483:*3, 7, 22*
484:*5, 12*
485:*1, 8*
488:*20, 24*
489:*9* 496:*9,*
*12, 16* 497:*8*
507:*3* 509:*16*
519:*22* 520:*8*
521:*17* 523:*3,*
*6, 11, 17*
525:*6, 7, 11*
528:*24* 530:*4,*
*7, 13* 531:*21*
532:*1, 10*
533:*23*
534:*21* 535:*1,*
*7* 536:*22*
554:*13* 559:*2*
563:*9*
**draft** 506:*14,*
*16, 18* 550:*4*
**draw** 414:*16*
**drug** 511:*20*
512:*14*
**drugs** 512:*6, 7*
527:*22*
**DUANE** 405:*1*
**due** 440:*21*
**duly** 566:*5*
**Dust** 493:*10*

**< E >**
**earlier** 413:*9*
535:*22*
**easily** 425:*15*
**economic**
465:*20* 487:*23*
**editor** 522:*9*
**editorial**
467:*9* 468:*2,*
*8* 522:*16*
**editors** 468:*9*
**educate**
422:*19* 450:*6*
468:*10*
**effect** 434:*3, 6*
455:*16* 499:*4*
**Effects** 496:*21*
510:*8, 17*
511:*2* 563:*18*
564:*11*

**efficiently**
471:*13*
**effort** 425:*17*
**eight** 526:*21*
541:*6* 542:*5*
**either** 417:*4*
446:*5* 485:*16*
488:*2, 11*
489:*10*
515:*11* 516:*7*
517:*13* 518:*6*
558:*4* 562:*14*
**electronic**
506:*9*
**electronically**
536:*20*
**emphasize**
454:*18*
455:*14* 530:*13*
**encourage**
461:*11*
**endpoint**
451:*15, 22*
452:*19*
**endpoints**
452:*3*
**energy** 478:*4*
**enforcement**
455:*6* 457:*16*
**England**
451:*9, 12*
452:*10, 16, 17*
**English** 492:*20*
**entire** 548:*13*
558:*12*
**entitled**
467:*20* 506:*18*
**entity** 457:*4*
511:*9, 18*
513:*6*
**Environmental**
500:*1*
**EPA** 489:*24*
490:*14*
**epi** 470:*19, 21*
**epidemiologist**
473:*11* 477:*23*
**epidemiology**
469:*20*
470:*15, 23*
**equal** 410:*23*

Confidential Information - Subject to Protective Order

errata 567:6,
9, 12, 15
569:12
Error 494:7
especially
419:5
ESQ 403:4, 9,
14, 18 404:3,
9, 10, 17
405:3, 9, 14,
19 406:3, 4, 9
essentially
412:13
establish
554:16
established
485:15
Estimating
499:4
estimation
454:18 455:14
et 492:6
493:4 496:1,
20 497:11
498:2, 9, 16
499:10
Etminan 480:8
Etminan's
473:9 480:19
European
494:23 495:16
evaluate
523:2, 5
528:24 533:6
Evaluating
496:3
evaluations
527:22
eventually
425:14
everybody
416:16
422:21 423:6
445:22, 23
447:8 456:6
459:14 467:20
Evidence
496:3 525:8
558:23
exact 427:3
431:1, 12

508:18 509:3
519:2
exactly
416:23 419:3,
8 426:5
427:9 428:1,
15 440:14
441:14
455:17
465:18 488:4
508:15 519:5
558:4
EXAMINATIO
N 409:22
521:14 538:6
examined
409:20
example
410:21
457:17 468:7
470:12
478:19 486:7
523:23
528:10 529:7,
8 533:4
554:11
examples
554:7 555:16
Excused 565:4
Exhibit 410:3,
5 485:10, 14
504:7 535:22
537:23 538:2
549:8 558:12
exhibits
475:15, 23
479:24 509:15
expect 440:23
441:20
expert 466:12,
14, 22 467:8
468:1, 18
469:1, 18, 23
470:15, 23
471:1, 7, 18
472:7, 16
475:9, 14
476:16 478:2,
22 479:8, 12,
15, 23 480:2,
24 481:9

482:16
500:20 506:2
507:12
516:22
524:17
525:23, 24
526:14
527:19, 24
528:11, 19
535:6 547:23
548:9 553:24
556:17
557:12, 19
558:11, 17
560:20
expertise
472:17, 19, 22
473:1 481:23
experts
468:24
469:10, 15
470:6 488:6
500:17 517:5
expires 569:21
explain 528:7
537:12
Exposure
492:8 493:10
499:11, 24
530:9 559:13
560:8, 16
561:1, 15
562:2
extensively
496:10, 17
extra 509:21
510:2
extrapolated
425:24
extrapolating
525:1
extrapolation
523:11
extreme
410:24
eyes 477:14
478:18 479:6,
12, 23 480:13,
19 483:16
485:17

486:24
488:15 500:19

< F >
fact 458:24
490:1
factors 554:15
fail 567:18
Fair 439:5
441:3, 7, 9
FALANGA
404:17
familiar
494:16
far 543:14
FARR 403:9
fast 542:15
544:9
Fat 490:15
FDA 490:20
491:7
feel 411:24
413:14 424:3,
7, 14 434:19
474:22
481:14 555:8
560:23
felt 561:23
females 442:14
fifth 539:11,
12
file 547:3
files 547:4, 6
final 535:19
find 423:5
441:15
443:23
554:18
559:11 560:16
finding 418:3
420:9 423:19,
22 424:5, 13
426:14 427:1,
17 428:11
429:2
findings 424:6,
20 426:1
428:3 439:12,
23 440:1, 6,
11 442:2, 10,
15, 20, 24

443:1, 5, 10,
11, 17, 23, 24
452:14
fine 412:21
413:13 436:9,
20 437:2
446:9 447:18
456:10
463:13 477:2
520:22 555:17
finish 432:3, 4
555:6
FIRM 403:9
458:16, 18
first 410:17
411:23 412:6
415:9 431:23
455:13
464:12 465:4,
11 487:20
505:10
521:20 539:3
555:1
fitting 554:19,
24 556:5
Five 460:18
512:21 541:6
542:5
flaw 448:12
Floor 404:19
405:15 406:4
Florida 403:5,
10 405:4
follow 447:10,
11 542:14
543:15
following
542:12 543:14
follows 409:20
follow-up
521:18
Foods 490:15
footnote
432:14
433:13, 14, 20
434:7, 15, 18,
20
footnotes
437:22
foregoing
566:18 569:6

Confidential Information - Subject to Protective Order

form 416:13
417:7, 13
421:7 426:16
427:22
436:23 438:2
446:16
447:23
449:12
456:24
459:12 462:6
467:1, 11
468:4 476:1
479:1 482:18,
23 483:24
484:20
489:13 505:1
508:2, 12, 24
515:3, 21
516:12
517:18
525:15 526:7,
17, 23 527:15
530:24 531:7
532:13, 23
534:9 535:15
537:14
546:18
547:15 548:3
550:6, 19
552:21 554:5
556:22
559:17 563:6,
23 564:15
569:10
formal 556:4
format 547:3
forming 481:9
482:16 513:14
forth 507:12,
18, 23 508:10
514:14
515:13 518:23
four 477:21
478:1 541:5
542:4
fourth 487:21
539:9, 10
free 418:15
459:1
freedom
419:15 421:22

Friedman
491:18
front 453:21
522:21
530:22 531:6
533:11
558:10 560:20
fully 531:3
Fumes 493:10
Fundamentals
491:19
Furberg
491:18
further 474:2
495:23 537:17
future 510:4
fuzzy 491:6
494:20

< G >
Galer 490:9
492:6
GALLAGHER
405:3
games 424:22
GANNON
404:17
Gastric 498:12
Gastrointestina
l 492:8 495:5
Gateway
404:18
GE 494:21
gee 422:17
447:4
general
441:14
485:22 486:5,
11 526:5
551:17 559:1
generation
460:23 468:11
GEORGE
403:9
Georgia 404:5,
12
German 524:3
GEROND
404:10
getting 421:15

give 432:4
449:23 455:4
456:5 519:2
522:1 554:7
555:14, 15
given 456:15,
20 457:12
507:2 566:6
569:8
glance 465:23
glanced
465:17 466:3
469:19
470:22 480:21
go 410:1, 7
411:19
412:24 413:5,
6, 12, 24
414:4, 13
418:14 419:1
433:1, 7
436:2, 3, 11
437:4, 14
438:10, 14
439:14 441:4,
9, 16, 18
451:5 457:2
459:2 460:9
464:3, 13
471:11 474:1
476:9 477:10
484:13
489:20 490:5
493:22
501:15, 18
502:11, 19
503:9, 15, 17
504:5 505:8,
9 508:14
519:3 538:3
540:12 549:8
552:3, 13, 22
555:5, 15
557:4 562:9
goes 541:5
going 411:19
416:18
418:16 420:6
422:9, 11
425:4, 10
432:5 438:19

439:17 453:3
461:16, 20
470:22 478:2
481:17, 18
502:1 503:18
510:1 519:11
522:22
535:12, 21
537:20 538:1
541:14, 17, 23
542:8, 13, 15,
16, 18, 20, 24
543:1, 3, 7
544:17, 19, 22
545:6, 7, 10,
11, 14, 17
GOLDENBER
G 403:12, 14
GOLKOW
402:19 409:5
Gomm 492:15,
17, 19 524:6
good 421:23
423:1, 8
550:13 551:2
552:5 554:23
561:8, 16
562:3, 5, 11,
12, 14, 19
Goodman
442:13, 14
493:4
goodness
426:2 429:1
Gorda 403:10
GORDON
406:1
graduate
522:4
grant 510:6
Gray 402:16
409:13 566:12
great 485:4
GREENBERG
404:1, 9
groceries
457:19
Group 498:18
530:5
groups 410:23
530:9

guess 509:2
526:9 544:9
guessed 433:9
guideline
451:13
guys 418:13
425:8, 17
445:21
447:11 450:5
457:24
460:24 544:9
gwilliamson@f
arr.com
403:11

< H >
habit 422:6, 7
460:22
hand 464:20
528:20 529:9
535:21
happy 557:5
hard 502:17
hardcopy
464:19
HARKINS
404:3
Harkinss@gtla
w.com 404:7
harm 463:4
Hazard 493:5
498:17
head 456:6
health 510:8,
17
Healthcare
405:7
hear 426:7
heard 472:10,
13, 14
hearing
509:17 510:3
Hecht 472:23
475:16, 22
481:3 486:8
Hecht's
471:24
477:14
478:20 481:7
HEINZ 406:9

Confidential Information - Subject to Protective Order

held 402:15 414:9 520:21 524:19 527:4, 8

Help 430:19 457:9 461:8 485:19 534:17 557:22 561:12

helped 462:12

helpful 477:1

helping 422:12, 20 423:7 425:19 450:19 455:10 563:9

Heme 494:12, 22

HENRY 405:19

hey 425:5

Hidajat 453:15 493:9 551:11, 13, 21 552:1, 11, 18 553:17 554:2 556:19 558:18

High 490:15

higher 550:14 551:3 564:9

highlight 415:15, 24 417:19, 22 435:5 439:7 440:9 442:6 475:14, 15, 17 479:7, 19 480:9, 16 481:2 482:9 483:2 485:24 486:19 487:6 488:7 489:20 490:3

highlighted 443:16 455:14, 20 480:15

HILTON 403:18

HINSHAW

405:14

HON 402:4

honestly 471:7 487:11 498:8 512:17 517:7, 8

hope 527:16

hours 526:22

Huahai 405:6, 7

hurry 433:13

< I >

IARC 493:15, 20 494:2, 6

idea 564:3, 16

identical 527:2, 11

identification 410:5 537:23

identified 536:21

ignore 422:1 458:20

II 402:9 507:4

illustrations 509:14

images 509:14

Impact 489:8 532:21 563:17 564:10

imperative 567:14

implication 430:4

implied 418:3 420:9 423:22 424:13 426:14 427:2, 18 428:11

important 455:16

impression 449:23

improper 417:11

improve 425:19

impurities 511:10, 19

513:7 523:14 524:10

impurity 512:7, 14 524:3 525:4, 9 528:21

Incidence 495:16 525:10

incident 453:15

include 454:18 473:23, 24 534:1

includes 466:11, 21 468:23 500:17

including 419:9 459:15 463:12 481:21 507:1 510:24 530:19 562:7

incompatible 412:7

incorrect 475:21

increase 430:3 525:10

independent 471:4

INDEX 408:2 546:10

Indiana 405:10

Indianapolis 405:10

indicate 412:7 562:5

individual 552:16 560:19 562:10

Industries 404:14, 21

inference 428:17, 20 463:1

influence 471:5

influential 461:8

Informally 410:18

INFORMATION 402:6 452:12 455:19 460:3 462:18 463:24 470:10 478:8 511:1 531:15 533:9 564:2

INGERSOLL 405:19

injury 465:6

INSTRUCTIONS 567:1

Intake 498:11

interested 425:3

interesting 490:11 524:2

interpret 418:11 420:15 496:21 524:13

Interpretability 497:12

interpretable 421:17

interpretation 420:14, 20 437:9 476:11 478:13 479:3, 16 480:4 482:2 499:5

interpreted 424:20

interpreting 426:23

interrupt 413:19 436:1 487:9 549:5

interval 452:1, 2, 4, 8, 11, 21 453:4, 12, 16 455:1, 2

intervals 452:23 454:20

Investigation

494:24 495:17

invoice 506:4

invoices 505:24 506:11 513:23

involve 527:21

involved 528:4

involving 528:16

IRBESARTAN 402:4

Iron 494:12, 22

issue 433:18 458:14 467:3 471:15

issued 451:13 460:17

item 468:23

items 468:23 500:17

its 410:24 439:12, 23 440:1, 5, 11 442:1 475:22 479:24 563:18 564:11

< J >

jail 455:7

Jakszyn 494:11

JASON 406:3

JERSEY 402:1 404:19

JESSICA 406:9

jheinz@c-wlaw.com 406:11

JMR@pietragallo.com 406:6

job 421:18 559:7 562:11, 12

Joe 406:17

Johnson 494:21

Confidential Information - Subject to Protective Order

journal 449:9
451:10, 12
452:10, 17
journals
421:3 522:10
judge 486:16
487:11
judgment
476:15
Judy 406:16
409:3
junk 550:21
551:7, 18, 21
552:1
junky 551:5,
13

< K >
KANNER
403:18
KAPKE 405:9
KARA 405:9
Kara.kapke@b
tlaw.com
405:11
KATHLEEN
405:14
keep 417:12
466:15 541:9,
13, 17, 23, 24
542:6, 18, 20,
21, 24 543:1,
7 544:17, 19,
22 545:6, 7,
10, 11, 12, 14,
17, 20
Kekelly@hinsh
awlaw.com
405:16
KELLY
405:14
Keszei 443:9,
11 503:3
K-E-S-Z-E-I
503:3
Kim 497:7
kind 436:14
544:10
kinds 474:23
Knekt 442:18
495:4

know 412:1,
18 418:20, 24
421:13 422:3,
18 424:1
425:6 428:22
434:6, 12, 20
435:15
437:10, 19
445:4, 12
447:4, 14
451:17, 18
456:9 458:9,
19 460:10, 19
462:7 463:2,
23 467:2, 4,
12 472:10, 19,
20, 22 473:1
474:9, 17
481:6, 14
482:13 483:6
488:19 500:3,
7, 18 504:18
505:2 508:3,
19 512:17
515:5 516:15,
19 531:14
533:3 538:24
542:11
548:23
553:18, 20, 22,
23, 24 555:23
556:15, 16, 17
557:10, 13, 14
563:1, 24
known 460:20
KUGLER
402:4

< L >
l.hilton@kanne
r-law.com
403:20
La 439:21, 22
502:16, 21, 24
Laboratory
497:21
lack 532:19
Lagana 472:9
479:8 486:8

Lagana's
472:6 473:5
479:12 482:14
laid 477:14
478:18 479:6,
12, 23 483:16
485:16
486:24 500:19
language
423:6 435:15
436:14
437:15
438:12 456:18
Larsson 440:4,
5 495:9
LaSalle 403:14
Lauren 406:21
LAW 403:9,
12 455:6
457:15
LAWRENCE
404:10
Lawrencege@g
tlaw.com
404:13
lawyer 421:24
512:19 528:11
Lawyers
477:3 478:7
481:13, 21
483:12, 15
484:9 517:1
547:5, 8, 10
548:24 549:23
LAWYER'S
570:1
laying 480:13,
19 488:14
LAYNE
403:18
leads 418:4
learn 482:5
learned 525:5
lectures 522:1
LEE-JEN
402:14 407:3
409:10, 18
566:8 569:16
legal 409:4
457:3 458:15
467:3 482:2

letter 459:21
468:8 486:16,
24 487:6, 10,
13, 14
letters 488:1
LEVIN 403:3
406:21
LIABILITY
402:4
license 418:2
419:6 420:8
424:12
426:13, 24
427:4, 16
428:2, 10
Life 419:10
Lifetime 493:9
limitation
496:13
limitations
496:10, 17
Limited
488:17 489:8
Limits 499:11,
24
LINE 408:6, 9,
12, 15 413:13
429:20 568:4
570:2
lines 412:21
list 438:23
445:22 464:8,
24 468:15, 22
470:1 471:20
472:3 473:6,
9, 21 475:4, 8,
20 480:20
485:9 500:16,
21 501:17
502:22
531:24
533:18 534:1,
5, 6 535:11
536:22 537:9
538:10, 14
539:20
listed 444:2,
16 453:10
485:13 503:4,
11 507:13
509:9 514:15,

18 525:18
536:16
listen 419:14,
19 421:9
425:5, 17
431:22, 23
456:10, 12
457:1
listing 470:13
473:15
481:24 482:22
literally
421:20 446:21
literature
473:23 474:7,
8 480:6
489:23 490:6
501:7, 20
522:7 524:9,
10
LITIGATION
402:4, 19
406:17 409:5
506:10 528:1,
5
little 422:19
434:16 474:1,
9, 22 540:13
LLC 403:18
404:15, 22
405:7, 23
406:13
LLP 404:1, 9
405:1, 9, 14
406:3
LOCKARD
404:9
Lockardv@gtla
w.com 404:13
Loh 442:22
495:15 554:13
L-O-H 554:12
long 422:21
450:13
461:17 468:5,
10 520:11, 15
544:15
look 410:16,
17 417:14, 16
430:5 432:13
433:5, 15

434:*15*
435:*22*
438:*15*
453:*18*
456:*11* 459:*1*
464:*4, 7*
468:*14*
474:*12* 481:*1*
505:*5, 19*
506:*7* 522:*19,
23* 523:*16, 24*
524:*16*
531:*20*
536:*12, 18*
537:*1* 539:*4,
7, 9, 11, 19, 21,
24* 540:*2, 4, 6,
8, 10, 17* 558:*9*
**looked** 435:*4,
5, 13, 24*
477:*15*
478:*19*
498:*23* 517:*5,
6, 12* 523:*17*
524:*14*
**looking** 415:*4*
431:*14*
432:*12*
468:*16*
486:*10* 500:*23*
**looks** 454:*23*
491:*22*
**Lori** 486:*16*
487:*11*
**LOSARTAN**
402:*3*
**losing** 423:*3*
**Louisiana**
403:*19*
**LP-1557**
464:*5* 558:*14*
**LP-1569**
410:*2* 414:*14*
451:*6*
**LP-1588** 433:*3*
**LP-1600**
504:*6* 549:*7*
**LP-1609**
537:*21*
**Lunch** 521:*9*

**Lung** 490:*15*
491:*8* 530:*19*

**< M >**
**MADELINE**
403:*4*
**Madigan**
423:*13, 17*
424:*17*
425:*12*
428:*15* 431:*4,
5, 9* 435:*21*
436:*7, 19*
444:*8, 11*
445:*5* 446:*1*
453:*10*
459:*15, 17*
460:*1, 16, 20*
461:*19* 463:*3*
485:*1, 8*
488:*20, 24*
489:*9* 496:*1,
9, 12, 16*
523:*17* 525:*7,
11* 530:*4, 7,
13* 532:*1*
559:*2* 563:*9*
**Madigan's**
428:*7* 431:*15*
433:*4* 437:*17*
469:*21*
470:*13, 20*
471:*16*
473:*17*
477:*20* 478:*5*
482:*24*
483:*22* 484:*5,
12* 523:*3, 6,
11* 525:*6*
528:*24*
531:*21*
532:*10*
533:*23*
534:*21* 535:*1,
7*
**majority**
421:*2* 423:*10*
453:*1* 459:*7*
460:*12*
461:*22* 462:*1,
12* 463:*12, 18*

464:*1* 470:*14*
562:*6*
**making** 418:*2*
420:*8* 424:*12*
426:*13, 24*
427:*16* 428:*2,
10* 517:*24*
**males** 442:*13*
**MAM** 497:*21*
**man** 425:*5*
**mark** 434:*1*
538:*2*
**Marked**
408:*14* 410:*2,
4* 504:*7*
535:*22*
537:*22* 549:*7*
558:*12*
**MARLENE**
403:*14*
**Massachusetts**
405:*15*
**Massey** 406:*21*
**master** 465:*5,
13, 19*
**material**
477:*8* 478:*12*
480:*1* 481:*20*
492:*3* 528:*3*
**Materials**
464:*14, 24*
466:*5* 468:*17*
469:*14* 470:*3,
5* 473:*21*
475:*5, 8, 20*
476:*4, 12*
477:*16*
478:*17, 21*
479:*14* 480:*5,
7* 481:*6, 9*
482:*13, 16, 22*
483:*2, 6, 9, 10,
17, 21* 484:*12,
14, 17* 486:*23*
501:*3, 5*
502:*7, 22*
503:*1, 5, 7, 13*
533:*19, 24*
535:*11*
536:*22* 537:*8*
538:*10, 14*

**matter** 445:*21*
458:*24*
477:*10* 481:*19*
**MATTHEW**
406:*4*
**McCaw**
496:*20* 497:*7*
**MDL** 402:*3*
485:*21* 486:*4,
11*
**MDS@pietraga
llo.com** 406:*6*
**mean** 410:*22*
420:*24* 424:*9*
429:*6, 12*
430:*2* 431:*3,
20* 436:*1*
437:*1* 449:*21*
450:*15, 24*
455:*15*
457:*21*
462:*21*
466:*14*
473:*24*
476:*13* 478:*8*
480:*15*
485:*15, 24*
487:*8* 497:*13*
501:*10* 502:*9*
517:*21*
538:*12* 549:*4*
**means** 428:*18*
429:*7* 433:*16,
21* 434:*7*
435:*1, 23*
445:*11*
455:*16* 476:*5*
485:*11* 512:*6*
562:*13* 566:*20*
**measure**
413:*17*
563:*17* 564:*10*
**Measurement**
494:*6*
**Meat** 494:*11*
495:*9*
**medical**
465:*14* 475:*1*
**medication**
511:*1*

**medications**
563:*19* 564:*12*
**Medicine**
451:*10, 13*
452:*10, 18*
**member**
459:*20*
**memory**
438:*22* 439:*3,
20* 485:*3*
491:*5* 494:*19*
531:*15*
533:*14*
553:*22*
556:*15*
557:*17, 18*
558:*8*
**mention**
444:*7* 488:*21*
489:*2* 558:*17*
560:*15*
**mentioned**
416:*23* 489:*1*
550:*13* 551:*1*
560:*6*
**Meridian**
405:*10*
**MERRELL**
404:*3* 407:*8*
416:*12* 417:*6*
421:*6* 426:*15*
427:*21*
436:*22* 438:*1*
446:*15*
447:*22*
449:*11*
456:*23*
459:*11* 462:*5*
464:*18*
466:*24*
467:*10* 468:*3*
475:*24*
478:*24*
482:*17*
483:*23*
484:*19*
489:*12*
504:*24* 508:*1,
11, 23* 515:*2,
20* 516:*11*
517:*17* 520:*6,*

Confidential Information - Subject to Protective Order

17 521:1, 16 524:20 525:17 526:11, 19, 24 527:9, 18 531:2, 9 532:15 533:7 534:13 535:18 537:16 546:17 547:14 548:2 550:5, 18 552:20 554:4 556:21 559:16 563:5, 22 564:14, 21
**Merrellc@gtlaw.com** 404:6
**message** 419:13
**Meta-Analysis** 498:12 562:7, 10, 13
**method** 418:11 530:6
**methodology** 528:18, 23 529:2, 6 530:11
**methods** 454:18 529:11
**Michelle** 402:16 409:13 566:12
**mild** 462:23
**milder** 461:13
**mind** 563:12
**Minneapolis** 403:15
**Minnesota** 403:15
**minutes** 519:9, 13 520:18
**miscellaneous** 464:11 468:16 500:16
**misconceptions** 454:14
**misinterpret** 478:14

**mislead** 459:22
**missed** 415:8 443:8 541:16 542:19, 23 543:6, 8, 11
**misunderstand** 476:19 482:1
**misunderstanding** 426:9
**misunderstood** 446:18
**misuse** 422:4 423:6
**misused** 450:19
**misuses** 454:14
**mixed** 463:1
**mjgoldenberg @goldenberglaw.com** 403:16
**model** 410:20 412:9, 14 554:14, 16, 19, 23 555:21, 22, 23 556:4, 7
**modeling** 556:3
**Molecular** 500:2
**monitoring** 465:14, 20 487:23
**months** 437:23 438:15 485:3 512:21 534:7, 8
**MORRIS** 405:1
**Mortality** 493:11
**MOUGEY** 403:3
**move** 525:21
**Moving** 498:16
**Mpendley@levinlaw.com**

403:7
**MT** 493:4
**Mulberry** 404:18
**multiple** 410:13 529:19 530:1 555:20
**Mutagenesis** 500:2
**Mylan** 406:7

< N >
**name** 409:3 472:11, 14 474:13, 15, 18, 20 489:18 490:12 494:16 498:8 535:10, 14
**nature** 529:5
**NDEA** 440:11 442:2 523:7, 13 525:3
**NDMA** 488:13, 15 489:6, 9, 24 498:3 523:7, 12, 13 524:10 525:3
**NDMA-contaminated** 563:18 564:11
**NE** 404:4, 11
**near** 546:15 547:12 550:3
**necessarily** 535:12
**necessary** 482:20 547:17 567:4
**need** 411:24 413:12, 14 433:20 434:19 439:14 455:18 457:8 460:2 482:21 486:9 500:22 508:18 519:13 531:5

544:12 560:23 562:9
**needed** 520:13
**needs** 520:9
**negative** 450:2
**Nesbit** 403:10
**neutral** 450:2
**never** 423:21 472:14 477:13, 15 478:18 479:5, 11, 22 483:16 485:23 486:6 488:24 538:9, 13 563:12
**NEW** 402:1 403:19 404:19 451:9, 12 452:9, 16, 17 482:5
**Newark** 404:19
**newsletter** 425:15
**NIGH** 403:4 407:7 409:24 410:7, 9 412:24 413:7 414:13, 15 415:15, 17 417:1, 10, 18, 21 421:10 426:17 428:5 433:3, 6 437:3 438:4 439:7, 9 442:6, 8 447:16 448:8 449:16 451:5, 7 457:10 460:6 462:10 464:5, 6, 16, 21, 22 467:5, 14 468:13 473:20 474:11 475:13, 18 477:12 479:4, 7, 10, 19, 21 480:9, 11 481:2, 4

482:9, 11 483:1, 4 484:4 485:12 486:19, 21 487:5, 7 488:7, 9 489:19, 22 490:3, 7 491:16, 17 494:1, 4 495:22, 24 501:1, 4, 15, 23 502:13, 15, 17, 20 503:15 504:5, 8 505:4, 7, 13, 21, 23 508:6, 17 509:5 514:6, 11 515:7, 24 517:3 518:2 519:6, 12, 22 520:6, 14, 22 521:5 525:15 526:7, 17, 23 527:15 530:24 531:7 532:13, 23 534:9 535:15 537:14, 18 538:1, 8 539:4, 13 540:12, 15, 22 541:2, 9, 19 542:6, 10, 20 543:13, 21 544:1, 17 546:2, 5, 7 547:1, 20 548:7 549:2, 3, 6, 11, 14, 16, 19, 21 550:9, 11, 22 553:3 555:4 557:11 558:13, 15 559:21 563:11 564:4, 18, 22
**night** 433:16
**nine** 541:6 542:5

Confidential Information - Subject to Protective Order

**Nitrate** 490:*21* 492:*9*

**Nitrates** 498:*10*

**Nitrite** 490:*21* 492:*9*

**Nitrites** 498:*10*

nitrosamine 510:*7* 511:*10, 19* 513:*7*

**Nitrosamines** 494:*12, 21* 495:*10* 498:*11* 507:*5* 510:*16*

**Nitrosodimethy lamine** 490:*21* 491:*8*

**N-Nitrosamines** 493:*11* 499:*12* 500:*1*

**N-Nitroso** 492:*9* 493:*5, 15* 495:*15* 499:*17* 500:*10*

**nonethical** 467:*18*

**non-exposure** 530:*9*

**Nope** 472:*12*

**North** 405:*21*

**Northeastern** 425:*22* 461:*6*

**Notary** 402:*17* 566:*14* 569:*23*

**noted** 409:*11* 567:*11* 569:*11*

**notes** 506:*9, 24* 570:*1*

**Noteworthy** 499:*12* 500:*1* 524:*1*

**notice** 402:*15* 488:*20* 504:*10* 528:*14* 535:*23* 536:*6, 9* 537:*7* 538:*16*

546:*12* 547:*8* 560:*2*

**Number** 412:*16, 23* 413:*22* 414:*17* 416:*24* 424:*22* 428:*21* 453:*23* 454:*1, 6* 465:*9* 505:*7* 506:*8, 23* 507:*10* 508:*4, 18* 509:*2, 4, 6, 13* 510:*5, 14, 23* 511:*7, 16* 513:*1, 4, 13, 20, 22* 514:*2, 4, 8* 515:*6* 516:*16, 17* 517:*21, 23* 518:*1, 21* 519:*5* 536:*16* 537:*3* 541:*15* 542:*19, 23* 543:*5, 8, 11, 16* 544:*11, 13, 16* 550:*1, 2*

**numbered** 545:*23, 24*

**numbers** 519:*3* 540:*20* 541:*4* 542:*4* 544:*4, 5* 545:*2*

**numerical** 541:*15* 543:*16*

**Nutrition** 495:*18*

**NW** 405:*3*

**< O >**

**oath** 409:*15*

**Object** 459:*11* 516:*11*

**Objection** 416:*12* 417:*6, 12, 13* 421:*6* 426:*15* 427:*21* 436:*22* 438:*1*

446:*15* 447:*22* 449:*11* 456:*23* 459:*18* 462:*5* 466:*24* 467:*10* 468:*3* 475:*24* 478:*24* 482:*17* 483:*23* 484:*19* 489:*12* 504:*24* 508:*1, 11, 23* 515:*2, 20* 517:*17* 525:*15, 16* 526:*7, 17, 23* 527:*15* 530:*24* 531:*7* 532:*13, 23* 534:*9* 535:*15* 537:*14* 546:*17* 547:*14* 548:*2* 550:*5, 18* 552:*20* 554:*4* 556:*21* 559:*16* 563:*5, 22* 564:*14*

**objections** 469:*2* 505:*12* 535:*23* 536:*10, 13*

**obligated** 481:*14*

**obligation** 553:*6*

**O'BRIEN** 403:*3*

**observational** 421:*2* 423:*10* 453:*2* 496:*3, 11, 14, 18*

**observed** 410:*24*

**Obviously** 460:*1* 497:*8* 500:*18*

**occupational** 523:*7, 12*

525:*2, 12* 559:*13* 560:*8, 16* 561:*1, 7, 15* 562:*2*

**Oh** 411:*23* 412:*18* 422:*20* 429:*3* 433:*16* 470:*18* 486:*7* 553:*9*

**Okay** 410:*1, 16* 411:*4* 412:*6, 20* 413:*8, 24* 414:*3* 419:*15* 420:*22* 422:*14* 431:*15* 434:*2, 11* 446:*4* 447:*17* 448:*9* 449:*4* 450:*9* 457:*19, 20* 458:*8* 461:*16* 464:*3* 466:*10* 468:*14* 471:*11* 475:*4* 476:*14* 477:*3, 7, 24* 483:*14, 20* 485:*19* 486:*17* 487:*15* 488:*23* 489:*19, 23* 490:*6, 14, 20* 491:*4, 15* 492:*2, 6* 493:*4, 9, 20* 494:*11* 497:*2, 7, 18* 498:*9* 499:*10* 500:*15, 23* 502:*11* 503:*3* 504:*5* 506:*16* 507:*21* 509:*6* 512:*19* 518:*13* 519:*6* 521:*1* 522:*19* 524:*16* 530:*15* 535:*19* 537:*1, 11, 18, 20*

538:*19* 539:*19* 540:*16* 541:*23* 543:*20* 550:*9, 23* 553:*20* 556:*10* 562:*21* 564:*18*

**old** 485:*3*

**older** 429:*14*

**old-fashioned** 461:*3*

**ones** 443:*14, 15* 480:*16* 487:*17, 18* 523:*23* 540:*23* 541:*1* 559:*6*

**OPEN** 494:*7*

**Operationally** 446:*23* 448:*1, 3, 10, 12, 18*

**opinion** 471:*4* 478:*22* 479:*15* 481:*9* 482:*16, 23* 515:*23* 516:*4, 7* 525:*7* 547:*23* 552:*19* 553:*10, 17, 24* 555:*17* 556:*9, 17*

**opinions** 480:*3* 507:*12, 17, 23* 508:*10* 513:*15* 514:*14* 515:*13* 517:*13* 518:*7, 23* 523:*3* 528:*3* 560:*2*

**opportunity** 423:*4* 566:*9*

**opposed** 427:*18* 428:*12*

**ORDER** 402:*8* 434:*20* 466:*1, 7, 20* 501:*21* 541:*15* 545:*3*

O'REILLY
404:17
original
567:15
Orleans
403:19
outside
419:13  421:19
overly  444:11
445:6, 11
446:5  450:20
overview
487:1
Oxford  406:4

< P >
P.A  403:9
p.m  521:11
565:2, 6
PA  403:3
PAGE  407:14
408:6, 9, 12,
15  410:8
453:19
468:15
473:18, 19
491:16
501:19  502:2,
12  503:10
505:8, 10, 20
506:8  514:7
522:23
524:21, 23
531:22
536:12, 13
537:2  539:3,
5, 6, 8, 10, 12,
20, 22  540:3,
5, 7, 9, 11, 17
544:21  549:8
568:4  570:2
pages  569:6
Pak  497:11
pancreatic
440:9  442:1
499:18
panel  459:8
461:23  462:8,
9
Panigrahy
473:2  474:6

479:20  483:3
486:8
Panigrahy's
471:18
479:23  483:7

PAPANTONIO
403:3  406:21
paper  432:20
435:16  436:4,
12, 14  437:7,
10  439:15, 18
440:15, 16, 22,
24  441:2, 5
444:6, 21
446:19
458:17  484:9,
24  485:7
493:1  497:1,
6, 9, 17
498:20, 21
499:9  500:7
512:13, 18
534:12
551:18
552:16, 24
553:7  554:11
555:3, 19, 20
557:9, 23, 24
558:21, 22
560:6, 19
561:8, 16
562:3, 13
papers  438:12,
23  439:4
440:22
441:17, 18
445:24
485:10, 14
508:15  519:4
546:24
550:21  551:5,
7, 13, 22
552:2, 4, 14,
23  556:2
557:1, 5
559:19, 23
560:11  562:6
paragraph
455:13

Paralegal
406:21
Parkway
406:10
part  453:24
454:5  473:17
477:8  493:1,
3  547:22
548:12
particular
502:9
passes  414:22
415:6  416:7
PATRICK
405:3
pause  432:7
Pcgallagher@d
uanemorris.co
m  405:5
PDF  547:3
PDFs  407:18
539:15
penalty  458:23
PENDLEY
403:4
Pennsylvania
406:5, 10
Pensacola
403:5
people  419:9
421:9, 15, 21
422:3, 5, 16,
18, 19, 22
425:19
449:23
451:18
452:11, 22
456:9, 10
458:16, 18, 19
460:12
463:12
516:21
563:19  564:12
percent  452:7
performed
506:1, 2
510:15
Permitted
499:11, 24

person  470:19,
21  511:9, 18
513:6
personal
465:5, 6
person's
467:7  468:1
ph  402:21
Ph.D  402:14
405:3  407:3
409:10, 18
474:16  566:8
569:16
Pharma
404:15, 22
406:12, 13

Pharmaceutical
404:14, 21
405:6, 7
489:7  562:23
563:4, 15
564:6
Pharmaceutical
s  404:15, 22
405:17  406:7
488:17
Pharmacy
405:12
phrase  415:9
416:1
pick  425:3
picking
448:23  559:5
Piedmont
404:4, 11
PIETRAGALL
O  406:1
pile  531:22
Pittsburgh
406:5
PIZZI  404:17
place  557:18
plaintiff
469:20  470:8
528:10, 18
Plaintiffs
403:7, 12, 16,
21  468:23
469:6, 10, 15
470:6  488:6

500:17
534:14  536:5
537:6  563:10
plaintiff's
538:15, 22
play  424:22
plays  449:24
pleadings
485:21  486:4,
11
Please  411:20
415:11
417:12  422:5,
11, 12  457:22
458:7, 11
474:20
475:17  559:5
567:3, 8
PLLC  403:12
plural  469:7,
10
plus  481:22
Pobel  439:6,
10  501:6, 9,
14  502:3
P-O-B-E-L
501:14  502:4
point  423:18
426:12
427:12
509:24
526:22
544:14  560:5
policy  414:20
416:5
polite  432:2
portion  486:1
position  456:3,
15  458:17
461:8
positive  450:2
451:17
potential
476:23  520:1
potentially
476:6  478:12
510:8, 17
Pottegard
497:18
501:11  524:6

Confidential Information - Subject to Protective Order

powerful
461:7
PowerPoint
510:2
PowerPoints
507:1  509:14
practice
460:15, 17
482:7
prediction
454:20  455:2
prefer  411:22
454:16  509:1
preparing
527:24  534:8
PRESENT
406:17
presentations
507:2
presented
531:4  538:15
pre-specified
451:16
prestigious
461:7
pretty  528:15
prevalent
454:14
previously
409:19  446:7
504:7  510:19
546:14
primary
451:15, 21
452:19
principle
412:6, 11
416:9  455:24
460:14  529:6
principles
411:4, 5, 6, 12,
18  412:1, 2, 3
453:24  454:6
455:22  526:6,
9, 13
Prinston  405:6
printed  453:21
prior  502:12
503:9  526:14
536:23

probability
410:19  413:18
probably
487:3, 12
491:14
494:18  510:1
512:21  520:18
problem
458:3, 4  557:2
Process
407:16  418:5
459:8  461:23
555:22
Processed
495:9
PROCTOR
403:3
produce
536:20
Produced
407:18
504:17
512:10, 24
Production
408:8  504:11,
16
PRODUCTS
402:4  497:22
498:4
profession
458:15
Professional
402:16  566:13
professor
422:10  425:7,
22  521:22
prominent
446:3, 11
448:22  449:5
properly
525:11
proposals
456:2
propounded
569:9
Prospective
494:23  495:17
Prostate
494:22

PROTECTIVE

402:8  466:1,
7, 20
protest  459:21
protocols
510:24
provide
451:24
452:12
491:24
517:10
528:11
534:20, 23
546:22
548:24  549:1
555:21
provided
466:6  510:7
516:18
531:12  534:2
535:5  536:5
537:7  538:10,
21  542:1
546:10
provides  452:4
providing
454:9  487:1
provost  461:6
Public  402:17
425:13
467:19  468:6
566:14  569:23
publication
420:23
425:16
432:21
502:10
522:14  530:22
publications
438:11
470:13
473:15
522:17  558:24
publicly
467:21
publish  522:6
published
421:3  458:17
463:22  496:9,
16
PubMed
492:23

pull  410:2
413:1  430:12,
22  431:8
433:1  434:16
435:2  504:6
537:20  549:2,
6  558:13
pulled  427:19
428:13  435:10
Punta  403:10
Purpose
407:16
420:10  468:7
471:2
purposes
560:1
pursuant
402:15
put  414:14
436:19
450:11  455:7
470:11  477:1
478:4, 16
514:9  533:22
535:5  546:1
548:9  560:1
P-value
410:18, 19
414:22  415:6
416:7, 16
429:5, 11
430:18
451:21  452:5,
19, 24  455:8,
17, 24  457:8
462:17, 19
463:3, 13
530:4
P-values
407:15
410:12  412:7
413:17  415:5,
22  416:10
451:11  453:5
454:15, 17
455:5  456:16,
22  457:14, 17
458:12
459:10, 24
462:1, 3, 15

463:20, 21
464:2

< Q >
Q1  432:16
Q2  432:17
Q3  432:17
qualifications
526:5
quality
550:14  551:3
564:9
Quantify
496:21  530:8
Quantifying
498:17
question
411:10, 22
413:3, 15
419:20, 21
428:6  430:21
431:6  432:23
433:24  435:9
436:11
438:13  439:3,
17  441:13, 20,
21  444:15, 22
447:17  454:3
461:18, 20
474:20
480:18
512:12
516:14, 16
517:4, 5, 8, 16
518:4  528:9
546:13, 21
547:11  550:1
551:10
552:14, 15, 16
553:11, 14, 15
555:9, 18
556:1, 10, 12
559:10, 20
560:11  561:5
questioning
534:16
Questions
408:14
413:10, 11
474:23  519:8,
23  520:7, 16

Confidential Information - Subject to Protective Order

521:*18, 21*
531:*4*  537:*17, 19*  538:*23*
539:*1*  564:*19*
569:*8*
**quite**  471:*8*
485:*6*  487:*22*
491:*3*  492:*24*
557:*17, 21*

**< R >**
**RAFFERTY**
403:*3*
**RASPANTI**
406:*3*
**rate**  451:*17*
**Ratio**  498:*17*
**Raton**  405:*4*
**reach**  524:*24*
525:*13*
**read**  411:*9, 15, 17, 20, 21, 24*
412:*21*
413:*20, 21, 22*
414:*1*  420:*17*
424:*2*  433:*12, 14*  434:*14*
435:*16*  436:*4, 13*  439:*15*
441:*16*
444:*20*
455:*12, 13*
459:*6*  461:*21*
462:*11*
463:*17*
469:*18*  471:*6*
476:*9*  477:*20*
478:*9*  480:*23*
481:*18*
482:*21*  484:*9, 15, 17, 24*
485:*7, 11, 16, 23*  486:*6, 14, 15*  487:*14, 22, 24*  488:*4, 12, 21*  489:*4*
491:*14*
492:*20, 24*
493:*1*  494:*9*
512:*13, 18*
525:*5*  552:*23*

566:*9*  567:*3*
569:*5*
**reader**  422:*10*
**reading**  439:*4, 17*  478:*4*
488:*2*
**really**  424:*6*
425:*1, 2, 11*
426:*6*  427:*11*
429:*13, 17*
432:*2*  436:*10*
445:*20*
452:*10*
461:*12*
470:*21*  471:*3*
477:*10*  512:*5*
524:*2*  544:*3*
**Realtime**
402:*17*  566:*14*
**real-world**
424:*24*  456:*8*
**reason**  477:*18*
567:*5*  568:*6, 8, 10, 12, 14, 16, 18, 20, 22, 24*
**recall**  427:*13*
428:*7*  438:*20*
439:*10, 22*
440:*3, 5, 10*
441:*24*  442:*4, 9, 12, 14, 19, 23, 24*  443:*4, 9, 10, 16, 22*
444:*3, 17, 23*
453:*13, 17*
473:*8*  480:*12, 18, 22*  487:*16, 17, 19*  488:*10, 14*  489:*24*
490:*8, 10, 24*
491:*11, 21*
492:*11, 16, 17, 22*  493:*6, 12, 17*  494:*5, 14*
495:*1, 6, 12, 19*  496:*5, 23*
497:*4, 15, 23*
498:*5, 13, 19*
499:*7, 13, 19*
500:*5, 12*
502:*6, 23*

503:*6, 8, 12, 14*  504:*9, 13*
509:*19*
510:*10, 19*
511:*3, 11, 21*
513:*8, 16*
525:*22*
529:*17, 21*
530:*17*  533:*9, 13, 20*  534:*5*
536:*2*  552:*9, 10, 17*  553:*16*
**receipt**  567:*17*
**receive**  506:*18*
**received**
511:*9, 18*
518:*15*  539:*2*
**receptor**  507:*4*
**recite**  449:*2*
**recognize**
420:*22*
**recollection**
484:*23*
489:*15*  560:*22*
**recommend**
456:*15*
462:*14*  463:*20*
**recommendatio
n**  456:*21*
457:*13*
**recommended**
459:*9*  462:*2*
**reconvene**
520:*10, 23*
**record**  409:*3, 12*  414:*1, 7, 9, 12*  503:*24*
504:*4*  519:*11, 17, 21*  520:*21*
521:*8, 12*
524:*19*  527:*4, 8*  544:*8*
565:*3*  566:*6*
**rectal**  442:*22*
**Red**  494:*11*
**redirect**  520:*1*
**REEFER**
406:*3*
**refer**  522:*22*

**reference**
473:*6, 9*
480:*20*
**referenced**
468:*18*
513:*14, 18*
532:*17, 22*
**references**
471:*21*  472:*3*
480:*13, 24*
491:*24*
**referring**
416:*3*  517:*24*
544:*10*
**refers**  412:*3*
**reflecting**
419:*3*  470:*21*
506:*9*  509:*21*
558:*7*
**reflective**
510:*12*
**refresh**  439:*3*
560:*22*
**regard**  507:*3*
510:*16*
511:*10, 19*
513:*6*
**regarding**
526:*4*  528:*3*
**Registered**
402:*16*  566:*13*
**regression**
555:*21*
**regularly**
563:*3, 8*
**related**  415:*9*
469:*2*  510:*8, 17*
**relevant**
412:*22*
470:*11*  471:*1*
473:*16*  547:*19*
**reliable**  552:*5, 8, 12, 19*
553:*18*  554:*3*
555:*10, 12, 13*
556:*8, 20*
557:*6, 10*
558:*19, 22, 23*
559:*6, 7, 14*

560:*9, 17*
561:*3*  562:*3*
**reliance**  464:*8*
468:*15*  470:*1*
501:*17*
502:*22*  503:*4*
**relied**  468:*24*
500:*17*
507:*11, 17, 23*
514:*13*
515:*12*  516:*7*
517:*13*  518:*6, 22*  548:*16, 22*
549:*13, 15*
**rely**  525:*12*
547:*22, 24*
548:*5, 6, 8*
550:*2, 15*
551:*4*
**relying**
416:*10*  508:*9*
**remember**
426:*21*
433:*10*
437:*13*
440:*14, 21, 24*
441:*1, 12, 14, 22*  443:*13, 19*
451:*8*  465:*18*
480:*21*
486:*15, 18*
487:*4, 22, 24*
488:*2, 3*
490:*12, 13, 16*
492:*13*  493:*2, 3, 19, 23, 24*
494:*19*  498:*7, 8*  500:*6, 7*
502:*9*  503:*2*
509:*23*
534:*17*
538:*23*
550:*17*  551:*7*
**remote**  402:*14*
**repeat**  448:*5*
**repeatedly**
441:*11*
**repeating**
447:*12*
**replace**  454:*16*

Confidential Information - Subject to Protective Order

**report** 414:*18*
416:*19, 20*
423:*18, 23*
424:2  425:*4,
12, 13*  426:*12,
18, 20*  427:*13*
428:*3, 7*
429:*19, 22*
430:*19*
431:*15*  433:*5*
436:*19*
437:*17, 18*
450:*18, 22*
451:*4, 21*
452:*18*  453:*3,
11, 15*  459:*9*
461:*9, 12*
462:*3, 14, 16*
463:*20, 21*
464:*2, 4, 9*
467:*8*  468:*1,
18*  469:*20, 22,
23*  470:*8, 20,
23*  471:*1, 16,
18, 24*  472:*6*
475:*10, 22*
476:*14*  477:*2,
11, 15, 20*
478:*5, 20*
479:*9, 13, 24*
480:*7, 24*
481:*7, 15*
482:*14, 21, 23,
24*  483:*7, 9,
22*  484:*5, 7,
12, 18*  489:*16*
500:*22*
506:*15*
507:*13, 14, 18,
20, 24*  508:*10,
14*  509:*8, 9,
22*  514:*14, 15,
17, 19*  515:*14,
16*  516:*8, 9*
517:*14, 15*
518:*7, 8, 23*
519:*1, 4*
522:*21*
523:*18*
524:*17*  525:*6,
19, 23, 24*

526:*15*  527:*1,
10*  528:*1, 2*
529:*1*  531:*21*
533:*23*  534:*8,
21*  535:*1, 6, 7*
548:*10*  550:*4*
554:*13, 22*
557:*12, 14*
558:*4, 10, 11,
17*  559:*3, 12,
15, 23, 24*
560:*6, 14, 20*
561:*2, 3, 6, 13*
562:*5, 16, 20*
**reported**
426:*22*  492:*17*
**Reporter**
402:*16, 17*
409:*13*
566:*13, 14, 22*
**reporting**
415:*22*
416:*10, 19*
437:*7*  445:*9*
451:*10*  453:*7*
463:*14*  500:*4*
**reports**
466:*12, 15, 22*
469:*19*  470:*6*
471:*7*  475:*15*
476:*14, 17*
477:*4*  478:*2,
3*  500:*20*
506:*16, 18*
526:*14*
527:*11, 20, 21*
528:*19*
**represent**
539:*14*  546:*3,
8*
**represented**
530:*21*  563:*3*
**Representing**
403:*7, 12, 16,
21*  404:*14, 21*
405:*6, 12, 17,
22*  406:*7, 12*
**reproduction**
566:*20*
**Request**  408:*8*
504:*20, 23*

505:*15*  507:*8*
509:*11*  511:*5,
23*  512:*3, 11*
513:*9, 11*
514:*3*  515:*1*
516:*2*  518:*14,
17*  536:*10, 15*
548:*21*
**requested**
566:*6*
**requests**
514:*8*  515:*1,
11, 19*  536:*9*
549:*9*
**research**
510:*6, 15*
**reserve**  519:*24*
**respect**
440:*21*  451:*3*
**response**
504:*16*
505:*15*
511:*14*
518:*15, 16*
536:*6*  537:*2,
6*  538:*22*
546:*11*  547:*7*
551:*10*
**responses**
505:*11*
**responsibility**
448:*21*  449:*5*
532:*11*
**responsive**
504:*22*
506:*21*  507:*8*
511:*5, 14, 23*
512:*2, 11*
513:*1, 10*
514:*4, 24*
515:*10, 19*
**rest**  490:*6*
**Restricted**
497:*13*
**result**  424:*23*
437:*11*
**resulting**
562:*13*
**results**  435:*7*
456:*8*  488:*16*
489:*1, 6*

494:7  497:*13*
525:*1*  530:*20*
555:*1*
**return**  567:*15*
**review**  437:*16,
22*  465:*7, 15,
21*  466:*2*
471:*17, 20, 23*
472:*2, 5*
473:*4, 5, 14*
475:*21*
483:*21*  484:*6,
11*  489:*9, 10*
490:*13*  492:*2*
501:*9*  517:*20*
518:*10*
523:*20*
532:*21*  535:*4*
546:*15*
547:*12, 17, 24*
548:*10, 13, 17*
550:*3*  557:*23*
558:*3*  559:*19*
560:*10, 13*
**reviewed**
426:*18, 20*
427:*13*  428:*6*
440:*22*
466:*19*  470:*4*
473:*9, 16*
492:*18*
497:*19*
498:*24*
499:*20*
500:*13, 19*
502:*7, 24*
503:*7*  504:*20*
508:*8*  509:*7*
514:*17*
515:*15*  516:*6,
8*  517:*14*
518:*5, 7, 24*
519:*4*  528:*4*
531:*16*  532:*2,
16*  534:*7, 17*
535:*13*
548:*12, 22*
549:*18, 20*
553:*23*
556:*16*  557:*1*

**reviewing**
487:*16, 18, 19*
488:*10*
489:*24*  490:*8,
10, 16, 24*
491:*11, 21, 23*
492:*11, 22*
493:*6, 12, 17*
494:*5, 14*
495:*1, 6, 12,
19*  496:*5, 23*
497:*5, 15, 23*
498:*5, 13, 19*
499:*7, 13*
503:*12*
**revise**  480:*17*
482:*7*
**right**  414:*6,
11*  417:*2*
418:*12, 17*
419:*7, 16, 19*
420:*16*  422:*2,
24*  423:*3, 5*
424:*22*
425:*14*  427:*4,
8*  429:*13*
431:*19*  432:*4,
5*  433:*18*
434:*2, 5*
435:*17, 21, 23*
436:*6*  437:*8*
438:*11*
440:*17, 21, 23,
24*  441:*7, 14*
445:*22*
446:*21, 24*
447:*1, 6, 11,
15*  449:*3, 22*
450:*2, 6, 8*
452:*14*
455:*11, 20*
456:*2, 4, 14,
18, 19*  457:*4,
6, 9, 17, 20*
458:*4, 20, 22*
459:*5, 16, 21,
24*  462:*18, 24*
463:*15*
464:*19*  465:*9*
468:*12*  470:*9,
16*  471:*13*

Confidential Information - Subject to Protective Order

473:*12, 13*
474:*8, 18*
477:*3, 6, 11,*
*22, 23* 478:*3,*
*9* 482:*6*
485:*11, 16*
487:*4, 13, 14*
489:*19*
499:*23*
503:*23* 504:*3*
508:*7* 510:*13*
519:*16* 521:*7,*
*11* 527:*19*
531:*19* 532:*2,*
*5* 533:*8*
544:*5* 548:*15*
551:*9* 553:*10,*
*11* 554:*12*
555:*11, 13*
557:*7* 562:*16*
565:*2*
**risk** 427:*7*
430:*3* 490:*15,*
*22* 491:*8*
492:*7* 494:*13,*
*22* 495:*4*
498:*11*
499:*17*
500:*10* 507:*3*
523:*8* 525:*2*
**Rite** 405:*12*
**Road** 404:*4,*
*11*
**ROBERT**
402:*4*
**Rogers** 497:*21*
**role** 450:*1*
**ROONEY**
405:*19*
**row** 462:*24*
541:*21*
**Rubber**
493:*10*
**rule** 422:*14*

**< S >**
**sample**
431:*20*
433:*10, 17*
**samples**

555:*14*
**sand** 429:*20*
**sat** 459:*7*
461:*22*
**saw** 538:*9, 14*
545:*23*
**saying** 419:*4*
421:*20* 422:*5*
424:*8* 425:*7*
426:*6, 9, 21*
428:*1, 16, 18,*
*20* 429:*3, 16,*
*23* 430:*11*
432:*16*
434:*22* 437:*7*
446:*18, 19*
447:*7, 24*
448:*6, 19*
449:*15, 18, 24*
451:*14*
457:*21*
459:*18, 22*
462:*8* 470:*9*
478:*11*
496:*13* 517:*9*
547:*4, 6*
548:*5* 550:*17*
561:*6, 13*
**says** 410:*18*
414:*19* 415:*5*
417:*24*
420:*18*
432:*21*
454:*13*
464:*24*
465:*13, 19, 24*
468:*17, 22*
474:*6* 475:*4*
480:*7* 486:*11*
512:*6* 537:*3*
**SCHERBART**
**H** 406:*4*
**ScieGen**
405:*17*
**Scientific**
414:*19* 416:*4*
418:*3, 5*
420:*9* 423:*19,*
*22* 424:*13, 20*
426:*1, 5, 13*
427:*1, 17*

428:*3, 11*
429:*2* 455:*8*
456:*19* 522:*6*
**scientifically**
424:*6* 425:*20*
**scientist**
421:*23*
**scratch** 456:*6*
**screen** 538:*20*
543:*24* 546:*9,*
*23*
**Screenshots**
407:*16*
**scroll** 494:*1*
541:*11, 12*
542:*9* 543:*21*
545:*1, 4*
**scrolling**
541:*10, 13, 24*
542:*7, 21*
543:*10*
545:*12, 20*
**search** 524:*9*
**second** 412:*23*
413:*16* 417:*8*
440:*10* 463:*5*
484:*2* 487:*21*
494:*3* 500:*7,*
*8* 505:*8, 20*
539:*5* 548:*4*
555:*3*
**secondary**
452:*3*
**seconds** 528:*7*
**see** 411:*23*
412:*4* 414:*24*
415:*18* 427:*4,*
*5* 430:*8, 14,*
*24* 431:*11*
433:*20*
434:*18*
435:*17* 436:*5,*
*14* 438:*6, 11*
454:*21*
464:*15, 23*
465:*2* 468:*20*
469:*4, 9*
472:*18* 475:*6*
477:*18* 486:*2,*
*3, 10* 487:*13*
489:*15* 494:*2*

501:*24*
502:*17*
505:*14, 17*
509:*11*
512:*15, 23*
514:*12, 20*
519:*7, 14*
520:*14*
536:*15*
538:*20*
539:*22* 540:*1,*
*3, 5, 7, 9, 16, 18,*
*20, 24* 541:*3,*
*5, 7, 11, 14, 20*
542:*1, 3, 4, 22*
543:*9, 17, 20,*
*23* 544:*2, 3, 5,*
*6, 12, 15, 18*
545:*5, 18*
557:*3* 560:*24*
564:*24*
**seeing** 534:*11*
541:*4*
**seen** 435:*6, 7,*
*11* 540:*14*
563:*1*
**segment**
554:*18*
**seminars**
507:*2*
**send** 425:*5, 10,*
*15* 477:*6*
478:*7* 481:*13,*
*22* 483:*12*
484:*9* 512:*19*
547:*4*
**sending**
419:*13*
**sent** 483:*15*
488:*19* 506:*4*
547:*7*
**sentence**
416:*4* 419:*3*
425:*3*
**sentences**
432:*8*
**Sentry** 406:*10*
**September**
402:*11* 409:*7*
566:*15*

**sequential**
542:*18* 544:*6*
545:*3*
**serious** 456:*13*
**served** 507:*13*
509:*8* 514:*15,*
*18* 515:*16*
516:*10*
517:*16* 518:*9,*
*14* 519:*1*
**SERVICES**
402:*19* 409:*5*
**set** 507:*12, 17,*
*23* 508:*10*
514:*14*
515:*13*
518:*23* 534:*24*
**seven** 541:*6*
542:*5*
**shared** 512:*16*
**sheet** 490:*1*
567:*7, 9, 12,*
*15* 569:*12*
**shoplifting**
457:*22*
**Short** 498:*2*
504:*1* 519:*18*
**Shorthand**
402:*17* 566:*13*
**shot** 538:*20*
546:*9*
**show** 429:*21*
487:*2, 12*
494:*17* 514:*7*
531:*19*
534:*15*
552:*24* 553:*6*
557:*24*
**showed** 527:*12*
**showing** 468:*2*
**shown** 525:*22*
526:*4* 527:*20*
534:*6* 536:*8*
**shows** 439:*23*
465:*4* 538:*20*
**side** 511:*1*
515:*5* 516:*20*
549:*1* 560:*1*
563:*10*
**sign** 566:*9*
567:*8*

signature
469:24
signed  475:10
476:21
significance
410:11
415:10
417:16  418:2,
7  419:5, 23
420:19  421:5
423:12, 20
424:10
426:11, 22
427:15  428:9
429:24  430:2,
7, 9, 14, 16, 23
431:2, 10, 13,
18  432:15, 18,
22  433:17, 22
434:13, 21
435:19  436:6,
18  437:20
438:21
440:16  441:6
444:8, 10, 12
445:10, 24
446:6, 20
447:13
448:14
449:21, 24
450:11, 15, 20,
24  452:13
461:10
significant
415:4  417:4
435:12  436:8
437:12  438:8
439:13, 24
440:2, 6, 12
442:3, 11, 16,
20  443:2, 6,
12, 18  444:4,
5, 18, 19, 24
445:1, 7, 15,
18  447:20
448:3, 15
449:8  463:7
signing  567:10
similarities
525:22  526:3

simple  419:10
422:13
simply  441:24
462:19  463:9
single  441:23
443:21
445:16, 17
451:15
453:10  470:8
485:7  558:18
559:11  560:5,
15, 24
sir  410:15
411:3, 10
415:1, 20, 24
417:9  418:9
419:2, 9
420:14, 21
421:9  423:1
424:1  425:1
426:7  427:11
428:14  429:6,
12, 17  430:4,
11, 19  431:14,
23  432:6, 7,
24  434:1, 4
435:9  437:1
438:9, 23
439:4, 14, 20
440:7, 20
442:4, 12, 17,
21  443:3, 7
444:6  445:2,
20  446:17
448:17
449:15  451:3
452:6  453:13,
17  454:2, 8,
12, 22  455:12,
18, 23  456:17
457:1, 15
458:14
463:11  465:3
467:13
468:21  471:7,
19, 22  472:1,
4, 24  473:3, 7
474:14, 17
475:3, 7, 12
476:3  478:6,
13  479:3, 17

480:22
481:11, 24
483:19  487:2,
11  490:2, 13
491:3  492:1
495:3, 8, 14,
21  496:7, 12
497:1, 10, 20
498:1, 15
499:15
502:10  503:2,
8, 14  504:14
505:3, 18
506:6, 22
508:5  509:3,
12  510:22
511:24  512:4
513:3  514:1,
21  515:6, 22
516:13
517:10, 19, 20
518:19  519:3
520:5  521:4,
23  522:2, 5, 8,
11  523:15, 19
525:20  526:2
527:23
529:15, 20, 24
531:23  536:1,
7, 17  540:18
541:8  551:23
552:14  554:7
557:14, 15
559:20
560:12  561:5,
18  562:8, 24
564:1, 17
sit  436:4
445:3  556:2
sitting  424:21
534:4  553:21
556:14
559:18  560:20
situation
424:24  429:8
six  412:1
455:22
486:12
487:15, 17
512:21  541:6
542:5

size  431:21
433:10, 17
434:3, 6
455:16
Slater  487:1
small  540:19
smart  446:1
447:4, 9
smarter
421:16
Snodin  498:2
so-called
447:12
452:13  563:8
society  422:20
423:2, 8
425:19  450:6,
8  455:9, 10
456:18, 19
459:4, 20
461:9  550:14
551:2, 18
554:9  563:20
564:13
Solco  405:7
solely  461:9
535:13
solid  554:23
Song  498:9
562:7
sorry  411:16
412:18  413:2,
19  415:8
417:20
418:20, 23, 24
420:6  421:13
424:3, 4, 7, 14
425:9  426:7
427:11
428:22
430:10
431:24
433:19  434:4
436:1  437:4
454:2  458:9
460:8, 9, 11
469:8  474:14
479:1  484:21
487:8  488:23
493:22
496:12  501:1,

2, 12, 13
508:5  509:2
517:19  520:8
524:23
530:12  533:2
534:22
536:13  549:4
557:13, 15
562:15
sort  564:9
South  403:5
space  567:6
speak  508:8
speaking
462:22  465:9
speaks  416:13
417:7, 11
specific
414:22  415:7
416:7  528:2
specifically
523:3  529:10
specified
410:20  412:8
speed  542:9,
12
spend  478:3
spoke  410:12
spread  422:12
spreadsheet
488:13, 15
489:3
spreadsheets
489:6
SS  431:17
432:13, 15
433:8, 24
434:6, 9, 12,
20, 24  437:8,
19  449:2
450:12
stage  525:8
stand  433:9
standard
434:8  553:2
554:9, 10
557:3
stands  434:12,
21
star  435:21, 22

Confidential Information - Subject to Protective Order

start 461:20 468:2 541:4 556:12
started 444:9 504:10
State 405:15 416:9 437:11 536:19 559:14 561:2 567:5
stated 425:10 458:11 546:14 560:9
Statement 407:15 410:11 411:2, 6, 13 412:3, 11 415:2, 13 417:2, 24 419:18, 22 421:1 446:4 448:24 452:17 453:24 454:6 458:14 459:16 460:17 462:1, 13 463:19 469:13 498:23 549:22
statements 423:16
STATES 402:1 439:24 440:5, 11 450:14, 23 500:16
Statistic 526:8
statistical 410:11, 20, 21 412:9 415:9 417:16 418:1, 7 419:4, 23 420:19 421:4 423:12, 20 424:10, 19 425:18 426:11, 22 427:14, 17 428:8 429:24 430:1, 7, 9, 14,

16, 23 431:1, 10, 13, 18 432:15, 18, 22 433:16, 21 434:12, 21 435:18 436:5, 18 437:20 438:21 440:16 441:6 444:7, 10, 11 445:9, 23 446:20 447:13 448:14 449:20, 24 450:11, 15, 20, 24 451:14 461:10 471:2 473:17 496:2 526:6, 12
statistically 415:3 417:4 435:12 436:8 437:12 438:7 439:12, 24 440:1, 6, 12 442:2, 11, 15, 20 443:1, 6, 12, 18 444:4, 5, 18, 19, 24 445:1, 6, 14, 18 446:6 447:19 448:2, 15 449:8 462:22
statistician 421:23 423:15 424:18 425:22 446:3, 12 448:22
statisticians 454:15 459:7 460:13, 23 461:22 462:2, 12 463:18 464:1
stealing 457:18

Stefani 435:4, 5, 6, 11 438:6, 20 442:5, 7, 10 490:9 503:10, 13
stenographic 409:12 520:21 524:19 527:4, 8
Stephen 472:9, 23 475:16, 22 477:14 478:20 479:8, 12 481:3, 7 482:14
STEVEN 404:3
Stipulations 408:11
Stomach 495:11
stood 433:8 437:19
stop 415:4, 21 416:10 417:3 418:6, 16 419:16, 22 420:11, 18 455:4 456:15, 17 457:6, 17, 18 458:7, 11, 18 461:15
stopped 451:10
strange 429:13 474:22
Street 403:5, 10, 19 404:18 405:10, 15, 20
strike 443:24 511:14 563:13
strong 459:17, 21
Structure 494:6
students 522:4
studies 420:20 421:2 423:10 430:6, 13, 15, 22, 24 431:9,

12 438:6, 16 443:17, 21 444:2, 3, 16, 17, 23 445:5 453:2 456:22 457:14 458:12 459:10 462:4, 15 463:22 484:6 492:15 496:4, 11, 18 497:3 523:7, 12, 21 524:6, 13 525:2, 13 530:18, 20 531:16 532:1, 17, 22 533:10, 14 534:15 550:14, 16 551:3, 11, 12, 20, 24 552:11, 18 553:17 554:2 556:11, 19 559:2, 6, 9, 13 560:7, 8 561:8, 15 562:2, 12
study 420:24 426:22 427:20 428:13 430:8 435:3, 13 436:17 438:18 439:11, 23 441:23 445:16 446:9, 13 450:1 451:15, 20 453:10 456:12 459:3 491:9 494:8 496:14 501:7, 9, 10, 14 503:10 510:7 524:3 528:3 533:6 551:11, 13 554:2 555:20 556:8, 19 558:18 559:11

560:15, 16 561:1, 2, 9 562:10, 18 563:21 564:9
Stuff 499:16
SUBJECT 402:8 567:10
submit 467:9
submitted 466:6, 13, 22
Subscribed 569:19
substance 569:11
suggests 418:12
Suite 403:5, 14 404:5, 11 405:4, 20 406:10
summary 410:21, 22 493:5
supermarket 457:19, 23
supervise 522:3
supervision 566:22
supplement 454:16
SUPPORT 408:2 559:2
sure 423:7 434:17 440:13 478:15 485:6 487:23 491:3 492:24 502:8 546:20 557:17, 21 558:20 561:4 563:8
surprised 425:1
Survival 497:14
sworn 409:19 566:5 569:19
Systematic

Confidential Information - Subject to Protective Order

496:2

< T >
Table 431:14
432:12 433:2,
5 435:14, 20,
23 436:9
437:8, 21, 22
438:24 444:2,
9, 12, 16
445:7 446:2,
22 449:23
450:12
453:11
500:24
531:20, 24
532:5, 8, 17
533:15
tables 509:15
take 410:16,
17 421:24
423:4 453:18
456:12
460:22 464:4,
7 467:7
468:1, 14
481:1 503:16,
17 505:5, 19
506:7 522:19,
23 524:16
527:13 528:7
531:20
536:12 539:4,
7, 19, 21, 24
540:2, 4, 6, 8,
10, 17 542:8
546:5 550:9
555:23 558:9
560:21
taken 402:14
talk 516:24
517:1
talked 513:8
talking
412:15
415:24 416:2
425:18
427:11 462:9
465:10
471:10
477:23 484:2

489:16
501:13 512:8,
20 558:5
560:18, 19
talks 522:24
Tang 499:16
task 437:16
Taxotere
528:12, 15
technical
490:1
TECHNICIAN
406:13, 17
tell 421:19
428:14
433:21
445:16
446:11 456:4
457:4, 16
458:5, 15
482:6 484:14
508:15 519:5
535:12 552:4,
24 557:6
telling 459:23
510:10, 20
511:3, 11, 21
513:16 518:9
ten 541:6
542:5
terminology
438:20
439:11 450:21
Terminus
404:4, 10
terms 514:22
550:1 553:22
556:15
559:12 560:7
test 439:19
488:15 489:1,
6 557:18
testified
409:20 437:18
Testimony
407:3 436:17,
20 446:10
448:10, 16
449:6 450:10,
17 451:2
458:10 470:2

477:16
479:13 480:1
483:8 488:24
489:5 497:4
506:19 507:6
509:18 512:9
529:17 536:3
537:13 566:6
testing 438:22
454:19
Teva 404:14,
21
textbook
491:22
513:13, 17
textbooks
513:21
Thank 474:9
520:2, 4
521:1, 3, 5
564:20, 22
thereto
509:10 510:9,
18 514:19
thing 416:22
432:5 451:23
477:22
481:12 512:4
530:12
535:19 537:3
555:13
things 425:7
457:5 458:16
468:11 471:5,
8 503:20
522:20
think 413:8
425:8 429:18
444:10
449:13
453:20
467:20 468:9
470:11 471:1
482:19
487:21 491:2,
13 492:13, 19
494:9 509:23
518:9 520:15,
17 525:14
535:22
549:22

550:20 554:8,
24 556:23
557:9
thinking 558:7
third 533:5
539:8
thirty 567:16

THORNBURG
405:9
thorough
555:22
thought
431:24 504:21
Three 404:18
541:5 542:4
threshold
414:23 415:7
416:8 428:20
429:21
Tian 499:3
time 409:7
414:5, 6, 10
426:3 429:24
432:3 441:4
471:13 478:3
482:8 497:14
503:18, 22
504:2 514:10
519:15, 19, 23
520:1, 2, 24
521:6, 10
527:14
557:22
558:12
560:21 563:2
564:23 565:1
times 410:13
482:4 550:13
551:2
title 413:23
today 434:11
445:3 520:13
533:19 534:4
536:3 537:13
553:5, 21, 24
556:14, 17
Today's 409:6
421:1
told 446:7

451:9 509:19
tool 530:2
tools 530:3
top 540:24
topic 525:21
529:17
530:16 533:18
Torrent
488:16 489:7
T-O-R-R-E-N-
T 489:17
total 515:9
totality 558:23
totally 422:1
Tower 405:20
Tract 490:22
Trade 405:20
transcript
566:9, 19
567:17, 19
transcription
569:7
translate
421:16 430:1
436:7 456:7
transport
436:7
trash 550:21
trashy 550:16
TRAURIG
404:1, 9
Treatment
496:21 499:4
Trial 497:13
499:6 509:18
528:16, 17
Trials 491:20
528:22 529:8
trim 503:19
trouble
428:17, 24
474:18
true 558:16
566:6
truly 527:1, 10
trust 459:3
truth 418:4
420:9 423:5,
22 424:13
426:14 427:2,

**18** 428:*11*
441:*16*
**try** 432:*9*
441:*15* 467:*8*
484:*23*
503:*19* 557:*16*
**trying** 419:*2*
448:*17* 450:*3*
457:*2* 460:*12*
**turn** 410:*8*
473:*18* 514:*6*
524:*21*
529:*16*
530:*16*
533:*17* 553:*5*
**two** 410:*22*
412:*16*
437:*23*
438:*15*
476:*11* 485:*2*
488:*1, 11*
489:*21*
492:*15, 16*
514:*7* 515:*1,
10, 19* 519:*8*
521:*19* 524:*1*
526:*21* 534:*7,
8* 541:*5*
542:*4* 549:*9*
**type** 500:*4*

< U >
**U.S** 405:*7*
**unclear** 474:*10*
**underline**
549:*14, 19*
**underlying**
455:*11*
**underneath**
412:*2, 5*
413:*4, 23*
432:*14* 474:*5*
486:*4*
**understand**
415:*23*
419:*10*
421:*16* 426:*6*
427:*10*
433:*24*
434:*24*
436:*11, 16*

437:*1* 444:*13*
449:*14*
452:*11*
455:*10* 471:*9*
475:*10* 476:*3*
478:*16* 512:*5*
516:*14* 517:*6,
22* 518:*13*
539:*17*
546:*20*
547:*21*
548:*20*
549:*24* 553:*4,
8* 558:*2*
559:*8, 24*
560:*3* 561:*5*
563:*14* 564:*5*
**understanding**
438:*18* 449:*4*
452:*15* 466:*4,
21* 467:*16*
476:*18, 22*
478:*6* 481:*8,
16, 23* 482:*15*
496:*8, 15*
537:*5* 552:*7*
557:*20*
**unethical**
467:*17, 19, 24*
**Unfortunately**
421:*8*
**UNITED**
402:*1*
**University**
425:*23* 461:*6*
**Uno** 498:*16*
**unreliable**
555:*8, 16*
556:*12* 559:*10*
**Upper** 490:*22*
**Uruguay**
491:*10*
**USA** 404:*15,
22* 406:*12*
**use** 415:*3*
416:*22*
417:*15* 418:*1,
9, 12, 13, 14, 22*
419:*4, 11, 15*
420:*1, 2, 3, 7,
10* 421:*4, 19,*

**21** 422:*5, 8,
13, 17, 18, 22*
423:*11* 427:*3,
15* 428:*9*
429:*4, 9, 10,
11, 13* 430:*6*
434:*9* 435:*16*
436:*15*
437:*15*
438:*12*
440:*15*
444:*23*
445:*14, 17, 21,
23* 447:*3, 5, 8*
451:*18* 452:*7,
22* 454:*24*
455:*8, 24*
457:*7* 458:*7*
460:*21*
461:*12*
462:*17, 19*
463:*3, 13*
470:*7* 471:*13*
477:*5* 478:*9*
481:*17* 509:*2*
528:*23* 529:*7,
10, 22* 550:*20*
551:*18*
558:*11, 23*
**useful** 452:*12*
**uses** 415:*13*
423:*20, 23*
424:*9* 426:*10,
12* 429:*14*
436:*5* 438:*7,
20* 439:*10*
**utilize** 476:*13*
**utilized** 470:*10*

< V >
**vaguely**
490:*12* 498:*7*
**valid** 419:*17*
526:*9*
**validity** 529:*12*
**VALSARTAN**
402:*3* 489:*8*
497:*22* 498:*4*
523:*13* 524:*4,
9* 525:*3, 9*

526:*14* 528:*1,
2, 13, 21*
**value** 410:*24*
428:*22, 23*
451:*16* 463:*7*
**various** 467:*9*
530:*18*
531:*15* 532:*4*
536:*9*
**vast** 421:*2*
423:*10* 453:*1*
**Vecchia**
439:*21, 22*
502:*16, 21, 24*
**version**
492:*20, 21*
**VICTORIA**
404:*9*
**Videoconferenc
e** 402:*15*
**VIDEOGRAP
HER** 409:*2, 4*
414:*5, 10*
503:*22* 504:*2*
519:*10, 15, 19*
521:*6, 10*
565:*1*
**VIDEOTAPE**
406:*13*
**videotaped**
402:*14* 535:*24*
**view** 454:*13*
**vital** 450:*1*
**VOLUME**
402:*9*

< W >
**Wait** 417:*8*
432:*3, 9, 11*
463:*5* 484:*1*
486:*9* 548:*4*
**waiving** 469:*1*
**WALSH**
404:*17*
**want** 411:*9*
412:*21* 413:*5,
6, 21* 414:*2,
16* 418:*13*
419:*8, 14*
422:*16* 436:*3*
438:*17*

439:*19*
441:*17*
452:*22* 455:*9*
457:*7* 458:*3*
460:*21* 464:*7*
468:*10* 471:*3*
474:*5* 477:*5*
478:*15* 509:*3*
521:*20*
522:*19*
530:*13*
537:*12*
538:*19*
540:*21* 560:*22*
**wanted**
416:*21*
418:*10*
421:*21*
452:*10*
519:*14* 521:*17*
**wants** 449:*19*
**Wasserstein**
407:*16* 498:*22*
**wasting** 426:*3*
**way** 411:*21*
420:*15, 16*
422:*15, 24*
425:*13*
428:*19*
429:*14*
432:*10* 446:*5*
448:*19* 450:*7*
456:*7* 460:*24*
461:*3* 471:*21*
472:*3* 473:*6,
10, 22* 474:*7*
482:*6* 530:*8*
541:*12, 18*
542:*17* 543:*3,
4, 10, 11, 17, 24*
544:*18, 20, 23*
545:*8, 13, 15*
553:*19*
**weak** 462:*23*
**WEI** 402:*14*
407:*3* 409:*10,
18* 464:*24*
473:*22*
474:*13, 15, 21*
476:*24* 497:*8*
507:*3* 509:*16*

Confidential Information - Subject to Protective Order

519:22  520:8
521:17  549:7
566:8  569:16
**Wei-14**
407:15  410:6
**Wei-15**
407:16
537:24  538:2
**weighed**
463:18
**Wei's**  536:22
**well**  410:17
416:15
418:18
422:17
423:17
425:23  429:1,
9  436:13
443:24
444:13  447:7,
9, 14, 21
452:7  457:18
458:2  460:20
461:5  462:16,
20  463:2, 9,
13  467:18
472:15, 19
474:17
476:23  477:7,
24  484:13
486:2  487:2
489:2  500:8
502:8  505:5
508:13  509:1
512:4  514:8
516:1  544:12
552:3, 13
554:6
**went**  445:15
**We're**  409:2
411:18  414:7,
11  419:13
503:23  504:3
506:17
519:16, 20
521:7, 11
537:20  538:1
542:13, 16
543:3, 4, 9
545:13, 16, 18

**WERNER**
406:9
**West**  405:20
**we've**  485:14
563:1
**white**  419:11
421:21
422:13
429:15, 19
449:22
450:16  451:1
452:9
**WHITELEY**
403:18
**widespread**
417:15  418:1
**WILLIAMSO
N**  403:9
**Wills**  406:17
**winning**  423:2
**wish**  444:20
450:18, 22
558:6
**Witness**  408:5
413:2  416:15
417:8, 14, 20
421:8  427:23
436:24  438:3
446:17
447:24
449:13  457:1
459:13  462:7
464:20  467:2,
12  468:5
469:19
470:15, 23
472:16  476:2,
17  478:2
479:2  480:24
482:19  484:1,
22  489:14
505:2  508:3,
13  509:1
510:6, 15
511:8, 17
513:5, 14
515:4, 22
516:13, 22
517:19  520:4
521:3  526:8,
18  527:5, 16

528:11, 19
531:1, 8
532:14, 24
534:10
535:16
537:15
546:19
547:16  548:4
550:7, 20
552:22  554:6
556:23
557:19
559:18  563:7,
24  564:16, 20,
24  566:5, 6, 8
567:1
**word**  412:2
415:13, 16, 18
417:3  418:7
419:23
420:19  421:4,
20  422:12
423:20
424:10
426:10
427:14  428:8
430:6, 8, 23
431:10  436:6,
18  440:24
441:23  444:7,
9, 11  445:6,
14, 18  446:5
447:1, 8, 19
461:13  469:8,
9  470:8
476:3, 19
478:9, 10
549:15, 20
**words**  415:3
420:18
423:23  427:3
429:21  430:1,
13  431:1, 12
438:7  440:15
443:23  444:4,
18, 24  445:10
446:2, 8, 13,
21  447:14, 21
448:2, 13
449:7, 9

450:10
476:11  482:1
**work**  506:1, 2,
10
**world**  418:15
419:13
421:19
424:21  426:2
441:19  459:2
460:22
**worry**  470:19
**wow**  447:3
**wrap**  535:20
**write**  437:17
459:20  461:9
**written**  506:9
**wrong**  449:23
**wrote**  497:1
526:15

**< Y >**
**Yeah**  411:20
412:4, 12
417:18, 23
423:13
434:14
438:13
439:19
444:20
454:11
473:24
477:18
483:11  486:2
487:20
488:19  491:5
492:4  494:9
500:21  502:5,
18  506:22
518:12
519:12
520:14
538:13, 18
541:22
543:19  547:9
550:7
**years**  422:4
453:3  460:18
526:10  557:20
**Yep**  474:8
**yesterday**
410:14  411:7,

14  428:21
433:8  437:19,
24  451:8
452:1, 7
455:18  529:18
**young**  485:5

**< Z >**
**Zack**  497:7
**Zantac**
512:17, 18
**Zhao**  499:3
**Zhejiang**
405:6
**Zheng**  440:8,
9, 10  441:24
442:1  499:10,
16, 22, 23
500:8
**Z-H-E-N-G**
555:19
**ZHP**  488:16
489:7
**Zhu**  443:4
500:9
**Z-H-U**  500:9
**Zoom**  402:15
403:1  404:1
405:1  406:1
**Zui**  562:7

Confidential Information - Subject to Protective Order

```
1                    _  _  _  _  _  _

                     E R R A T A

2                    _  _  _  _  _  _

3

4    PAGE   LINE   CHANGE

5    _26_   _17_   Replace "physical" with "statistical"

6          REASON:   Transcription error_____

7     30     15     _Delete "if"_____ _____

8          REASON:   Transcription error_____

9    36      16     Replace "Hartley" with "Harkins"____

10         REASON:   Transcription error_____

11   60      7      Replace "at" with "as"_____

12         REASON:   Transcription error_____

13   60      8      Replace "assigned" with "son is a"____

14         REASON:   Transcription error_____

15   74      3      Replace "quantification" with "qualifications"

16         REASON:   Transcription error_____

17   92      24     Replace "backwards" with "back"

18         REASON:   Transcription error_____

19   126     18     Replace "if" with "for"

20         REASON:   Transcription error_____

21   131     11     Replace "models" with "problems"

22         REASON:   Transcription error_____

23   137     3      Replace "do" with "don't"

24         REASON:   Transcription error_____
```

Confidential Information - Subject to Protective Order

```
1                    _  _  _  _  _  _

                      E R R A T A

2                    _  _  _  _  _  _

3

4      PAGE   LINE    CHANGE

5      140     7      Replace "want allow" with "want to allow for"

6         REASON:    Clarification

7      141     5      Replace "waiting" with "wanting"

8         REASON:    Transcription error

9      150     6      Replace "That" with "That's"

10        REASON:    Transcription error

11     152     7      Replace "at" with "as"

12        REASON:    Transcription error

13     154     7      Delete "smaller"

14        REASON:    Transcription error

15     154    14      Add ", what you're saying has some issues"
                      after "valsartan"
16        REASON:    Clarification

17     157    16      Replace "tool" with "tools"

18        REASON:    Transcription error

19     159    15      Add "false" after "the"

20        REASON:    Clarification

21     160     8      Delete "point"

22        REASON:    Transcription error

23     160    15      Replace "talking it" with "popped"

24        REASON:    Transcription error
```

Confidential Information — Subject to Protective Order

```
 1                  _  _  _  _  _  _

                      E R R A T A

 2                  _  _  _  _  _  _

 3

 4    PAGE    LINE    CHANGE

 5    166     16      Delete "are"

 6        REASON:     Transcription error

 7    167     5       Replace "alteration" with "alternative"

 8        REASON:     Transcription error

 9    184     15      Replace "Jewel" with "Jewell"

10        REASON:     Clarification

11    184     17      Replace "Jewel" with "Jewell"

12        REASON:     Clarification

13    184     19      Replace "J-E-W-E-L" with "J-E-W-E-L-L"

14        REASON:     Clarification

15    201     10      Replace "safe" with "fair"

16        REASON:     Transcription error

17    217     19      Replace "ratio" with "threshold"

18        REASON:     Transcription error

19    218     8       Replace "essential" with "threshold"

20        REASON:     Transcription error

21    223     10      Delete "to"

22        REASON:     Transcription error

23    223     14      Replace "set" with "sets"

24        REASON:     Transcription error
```

Confidential Information - Subject to Protective Order

```
 1                    –  –  –  –  –  –

                       E R R A T A

 2                    –  –  –  –  –  –

 3

 4      PAGE    LINE    CHANGE

 5      224     19      Replace "Is" with "It is"

 6         REASON:      Transcription error

 7      234      9      Replace "topic" with "titles"

 8         REASON:      Transcription error

 9      256     14      Delete "is"

10         REASON:      Transcription error

11      258     16      Replace "to tally" with "totality of"

12         REASON:      Transcription error

13      260     10      Replace "rounding with "running in"

14         REASON:      Transcription

15      280      5      Replace "job and word" with "jargon word"

16         REASON:      Transcription error

17      217     19      Replace "ratio" with "threshold"

18         REASON:      Transcription error

19      290      5      Replace "immediate" with "median"

20         REASON:      Transcription error

21      292     12 & 13 Replace "this day" with "these days"

22         REASON:      Transcription error

23      293      8      Delete "to"

24         REASON:      Transcription error
```

Confidential Information - Subject to Protective Order

```
 1                  _  _  _  _  _  _

                    E R R A T A

 2                  _  _  _  _  _  _

 3

 4   PAGE   LINE   CHANGE

 5   298     3     Replace "pressing" with "impressive"

 6       REASON:   Transcription error

 7   299     4     Replace "experience" with "experienced"

 8       REASON:   Transcription error

 9   299     5     Replace "experience" with "experienced"

10       REASON:   Transcription error

11   310    24     Delete "the what"

12       REASON:   Transcription error

13   312     8     Replace "grow" with "blow"

14       REASON:   Transcription

15   312     9     Replace "grow" with "blow"

16       REASON:   Transcription error

17   315    13     Replace "affect" with "effect"

18       REASON:   Transcription error

19   351    18     Add ", the" after "be"

20       REASON:   Clarification

21   353    15     Replace "spec" with "specific covariates"

22       REASON:   Clarification

23   360    18     Replace "this date" with "these days"

24       REASON:   Transcription error
```

Confidential Information - Subject to Protective Order

```
 1                 _  _  _  _  _  _

                     E R R A T A

 2                 _  _  _  _  _  _

 3

 4     PAGE   LINE   CHANGE

 5     362    12     Replace "decisionmaking" with "decision-making"

 6        REASON:    Transcription error

 7     367    3      Replace "cubed" with "cubic"

 8        REASON:    Transcription error

 9     367    5      Replace "actions" with "interactions"

10        REASON:    Transcription error

11     368    4      Replacing "informing a" with "thing is
                     informing the other"
12        REASON:    Clarification

13     369    6 & 7  Replace "this day" with "these days"

14        REASON:    Transcription

15     369    17     Delete though

16        REASON:    Transcription error

17     370    6      Replace "space" with "piece"

18        REASON:    Transcription error

19     374    1      Replace"Tanzeum" with "Avandia"

20        REASON:    Clarification

21     375    12     Replace "goes" with "does"

22        REASON:    Clarification

23     379    7      Replace "Largaucous" with "Lagakos"

24        REASON:    Transcription error
```

Confidential Information - Subject to Protective Order

```
 1                _  _  _  _  _  _

                  E R R A T A

 2                _  _  _  _  _  _

 3

 4   PAGE   LINE   CHANGE

 5   386     23    Replace "signal" with "simple"

 6        REASON:  Transcription error

 7   391      7    Replace "function" with "functions"

 8        REASON:  Transcription error

 9   391     10    Replace "function" with "functions"

10        REASON:  Transcription error

11   392      2    Replacing "limitation" with "patient"

12        REASON:  Transcription error

13   393     17    Replace "assess" with "sets"

14        REASON:  Transcription

15

16        REASON:

17

18        REASON:

19

20        REASON:

21

22        REASON:

23

24        REASON:
```

Confidential Information - Subject to Protective Order

1

2              ACKNOWLEDGMENT OF DEPONENT

3

4          I, _Lee-Jen Wei_____, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 401, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____        Oct 15, 2021

16   LEE-JEN WEI, Ph.D.                    DATE

17

18

19   Subscribed and sworn

     to before me this

20   15th day of October_____, 2021.

21   My commission expires:

22                              Kimberly Harris
                                NOTARY PUBLIC
                                Forsyth County, GEORGIA
                                My Commission Expires February 6, 2024

     _____
23   Notary Public

24

Confidential Information - Subject to Protective Order

1                    — — — — — —

                 E R R A T A

2                    — — — — — —

3

4   PAGE   LINE   CHANGE

5   <u>61</u>     <u>24</u>     <u>Replace "row" with "role"</u>

6        REASON:   <u>Transcription error</u>

7

8        REASON:

9

10       REASON:

11

12       REASON:

13

14       REASON:

15

16       REASON:

17

18       REASON:

19

20       REASON:

21

22       REASON:

23

24       REASON:

Confidential Information Subject to Protective Order

1

2      ACKNOWLEDGMENT OF DEPONENT

3

4          I, _Lee-Jen Wei_____, do

5  hereby certify that I have read the

6  foregoing pages, 402 - 570, and that the

7  same is a correct transcription of the

8  answers given by me to the questions

9  therein propounded, except for the

10  corrections or changes in form or

11  substance, if any, noted in the attached

12  Errata Sheet.

13

14

15  _____    Oct 15, 2021

16  LEE-JEN WEI, Ph.D.              DATE

17

18

19  Subscribed and sworn

    to before me this

20  _15th_ day of _October_____, 20_21_.

21  My commission expires: _____

22

        Kimberly Harris
        NOTARY PUBLIC
        Forsyth County, GEORGIA
        My Commission Expires February 6, 2024

23  Notary Public

24