# EXHIBIT B

Confidential Information - Subject to Protective Order

1                    UNITED STATES DISTRICT COURT

                        DISTRICT OF NEW JERSEY

2

3     IN RE: VALSARTAN, LOSARTAN,          )

      AND IRBESARTAN PRODUCTS              )

4     LIABILITY LITIGATION                 )

      _____ ) MDL No. 2875

5                                          )

      THIS DOCUMENT RELATES TO ALL         )

6     CASES                                )

7

8

9      CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

10

11

           VIDEO DEPOSITION OF DANIEL CATENACCI, M.D.

12                     VIA VIDEOCONFERENCE

13                     September 13, 2021

                          9:20 a.m.

14

                          Volume 1

15

16

17

18

           Reporter:  John Arndt, CSR, CCR, RDR, CRR

19                  CSR No. 084-004605

                    CCR No. 1186

20

21

22

23

24

Confidential - Information Subject to Protective Order

1        DEPOSITION OF DANIEL CATENACCI, M.D.,
produced, sworn, and examined via videoconference on
2  September 13, 2021, in the City of Chicago, State of
Illinois, before John Arndt, a Certified Shorthand
3  Reporter and Certified Court Reporter.

4

5        APPEARANCES OF COUNSEL
       (All present via videoconference)
6

  On Behalf of Plaintiffs:
7    Mazie Slater Katz & Freeman, LLC
     103 Eisenhower Parkway, 2nd Floor
8    Roseland, NJ 07068
     (973) 228-9898
9    BY:  ADAM M. SLATER
       aslater@mazieslater.com
10     JULIA S. SLATER
       jslater@mazieslater.com
11     CHRISTOPHER J. GEDDIS
12   Morgan Law Firm, Ltd.
     55 W. Wacker Drive, 9th Floor
13   Chicago, IL 60601
     (312) 327-3386
14   BY:  SCOTT A. MORGAN
15   Levin Papantonio Rafferty
     316 South Baylen Street
16   Pensacola, FL 32502
     (850) 435-7013
17   BY:  DANIEL NIGH
       dnigh@levinlaw.com
18

     Martin, Harding & Mazzotti LLP
19   PO Box 15141
     Albany, NY 12212
20   (518) 724-2207
     BY:  ROSEMARIE RIDDELL BOGDAN
21      rosemarie.bogdan@1800law1010.com
22   Kanner & Whiteley, L.L.C.
     701 Camp Street
23   New Orleans, LA 70130
     (504) 524-5777
24   BY:  LAYNE HILTON

1    APPEARANCES OF COUNSEL (CONTINUED)
2

  On Behalf of Teva:
3    Greenberg Traurig, LLP
     One International Place, Suite 2000
4    Boston, MA 02110
     (617) 310.6231
5    BY:  NICHOLAS A. INSOGNA
       insognan@gtlaw.com
6

7    Greenberg Traurig, LLP
     4 Embarcadero Center, Suite 3000
8    San Francisco, CA 94111
     (415) 655-1285
9    BY:  KATE WITTLAKE
       wittlakek@gtlaw.com
10   Greenberg Traurig, LLP
     3333 Piedmont Road NE, Suite 2500
11   Atlanta, GA 30305
     (678) 553-2103
12   BY:  VICTORIA DAVIS LOCKARD
      lockardv@gtlaw.com
13

     Pietragallo Gordon Alfano Bosick & Raspanti, LLP
14   One Oxford Centre
     301 Grant Street, 38th Floor
15   Pittsburgh, PA 15219
     (412) 263-1816
16   BY:  CLEM C. TRISCHLER
      cct@pietragallo.com
17

     Walsh Pizzi O'Reilly Falanga LLP
18   100 Mulberry Street, 15th Floor
     Newark, NJ 07102
19   (973) 757-1100
     BY:  LIZA M. WALSH
20      lwalsh@walsh.law
21
22
23
24

1    APPEARANCES OF COUNSEL (CONTINUED)
2

  On Behalf of Sciegen Pharmaceutical and H.J. Harkins
3  d/b/a Pharma Pac:
     Hinshaw & Culbertson LLP
4    53 State Street, 27th Floor
     Boston, MA 02109
5    (617) 213-7045
     BY:  GEOFFREY M. COAN
6      gcoan@hinshawlaw.com
7  On Behalf of CVS and Rite Aid:
     Barnes & Thornburg LLP
8    11 S. Meridian Street
     Indianapolis, IN 46204
9    (317) 231-6491
     BY:  KARA M. KAPKE
10      kara.kapke@btlaw.com
11  On Behalf of Diane Washington, Personal Representative
  Of the Estate of Allen Washington:
12   Schefman & Associates, PC
     40900 Woodward Ave. Suite 111
13   Bloomfield Hills, MI 48304
     (248) 594-2600
14   BY:  BRYAN SCHEFMAN
      bryan@schefmanlaw.com
15

  On Behalf of Albertson's LLC:
16   Buchanan Ingersoll & Rooney PC
     227 West Trade Street, Suite 600
17   Charlotte, NC 28202
     (704) 444-3475
18   BY:  CHRISTOPHER B. HENRY
      christopher.henry@bipc.com
19

  On Behalf of Zhejiang Huahai Pharmaceutical Co., Ltd.,
20  Prinston Pharmaceutical Inc., Huahai U.S. Inc., and
  Solco Healthcare U.S., LLC:
21   Duane Morris LLP
     100 High Street, Suite 2400
22   Boston, MA 02110
     (857) 488-4267
23   BY:  LAUREN A. APPEL
      laappel@duanemorris.com
24

1    APPEARANCES OF COUNSEL (CONTINUED)
2

  For Aurobindo Pharma Ltd., Aurolife Pharma LLC,
3  and Aurobindo Pharma USA, Inc.:
     Cipriani & Werner, P.C.
4    450 Sentry Parkway, Suite 200
     Blue Bell, PA 19422
5    (610) 862-1929
     BY:  JESSICA M. HEINZ
6     jheinz@c-wlaw.com
7

  Also present:
8

  Elena Williams (Associate Litigation Counsel at
9  Viatris)
10  Michael Newell (videographer)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Confidential Information - Subject to Protective Order

---

Page 6

INDEX OF INTERROGATION
Examination by Mr. Slater          Page 9

INDEX OF EXHIBITS

Exhibit 1                          Page 11
(Notice to take videotaped
oral deposition)
Exhibit 2                          Page 14
(Defendants Inc.'s responses and
Objections to plaintiffs' notice
Of videotaped deposition of Daniel
Catenacci, M.D.)
Exhibit 3                          Page 28
(06/15/21 billing letter)

Exhibit 4                          Page 31
(08/02/21 billing letter)
Exhibit 5                          Page 38
(08/02/21 Catenacci report)

Exhibit 6                          Page 41
(Amended list of materials considered)
Exhibit 7                          Page 44
(08/27/21 Catenacci report)

Exhibit 8                          Page 70
(Curriculum vitae)
Exhibit 9                          Page 70
(Fee schedule)

---

Page 7

INDEX OF EXHIBITS (CONTINUED)
Exhibit 10                         Page 70
(Prior testimony list)

Exhibit 11                         Page 91
(Updated amended list of
Materials considered)

Exhibit 12                         Page 154
(2012 Geynisman article)
          (All exhibits are attached.)

---

Page 8

1    THE VIDEOGRAPHER:  We are now on the
2  record.  My name is Michael Newell.  I'm a videographer
3  for Golkow Litigation Services.  Today's date is
4  September 13, 2021.  The time is 9:20 AM.  This remote
5  video deposition is being held in the matter of in re
6  Valsartan, Losartan, and Irbesartan products liability
7  litigation for the U.S. District Court, District of New
8  Jersey.  The deponent today is Daniel Catenacci, M.D.
9        All parties to this deposition are
10  appearing remotely and have agreed to the witness being
11  sworn in remotely.
12        Due to the nature of remote reporting,
13  please pause briefly before speaking to ensure all
14  parties are heard completely.
15        Will counsel please identify themselves
16  for the record?
17        MR. SLATER:  Adam Slater for the
18  plaintiffs.
19        MR. INSOGNA:  Nick Insogna, Greenberg
20  Traurig, for the defendants.  Also in the room with me
21  are Clem Trischler for defendants and Kate Wittlake for
22  defendants, and also Scott Morgan for plaintiffs.
23        MR. SLATER:  Okay.
24        THE VIDEOGRAPHER:  Okay.  The court

---

Page 9

1  reporter today is John Arndt and will now swear in the
2  witness
3
4        The witness, DANIEL CATENACCI, M.D., first
5  having been duly sworn, testified as follows:
6                EXAMINATION
7  BY MR. SLATER:
8        Q.   Good morning, Dr. Catenacci.
9        A.   Good morning.
10        Q.   I'm Adam Slater.  I'm going to take your
11  deposition now in this litigation.  You understand
12  that's the purpose of this proceeding; correct?
13        A.   Yes.
14        Q.   You understand you must tell the truth in
15  response to every question I ask you?
16        A.   Yes.
17        Q.   If I ask you a question that for some
18  reason is unclear to you or for any reason you don't
19  think you can answer it truthfully and completely
20  because of some question about what I'm asking, just
21  tell me.  You can tell me the question's not clear.  We
22  can specify what it is and I'll try to reask the
23  question if necessary.  Okay?
24        A.   Okay.

---

Confidential Information - Subject to Protective Order

Page 10

1    Q.   Attorneys may object during the course of
2 the deposition.  I think you've been through some, but
3 I'll just let you know or remind you that lawyers are
4 allowed to object.  They're preserving their right for
5 the future.
6         It's never, ever supposed to be a signal
7 to you for how to answer, so I would assume that's not
8 going to be happening, obviously, but don't be thrown
9 off by objections or discussions of counsel.  And I
10 would assume, unless there's a very, very narrow
11 exception, you will be told to go ahead and answer the
12 question after an objection is placed.  Okay?
13    A.   Okay.
14    Q.   Did you prepare for this deposition?
15    A.   Yes.
16    Q.   When did you first start preparing for the
17 deposition?
18    A.   Essentially I guess I started preparing
19 when I started reading about the topic in general.  But
20 certainly after my report I knew that there was going
21 to be a deposition that would have told me which -- we
22 were deciding on which date.  So during that time I
23 continued my reading.  I was always reading and
24 continuing to get a broader understanding of the topic.

Page 11

1    Q.   You referred to the point in time when you
2 started reading about the topic in general.  When was
3 that?
4    A.   It was after I was contacted to serve as
5 an expert on the case.
6    Q.   Am I correct in understanding that before
7 you were first contacted to potentially act as an
8 expert for the defense in this case, you were not
9 reading up on the issues that are specific to this
10 report that you've written?
11    A.   That's correct.
12    Q.   And for example, you weren't following the
13 issue of nitrosamines in valsartan before you were
14 contacted?
15    A.   I heard of it.  I heard of other stories
16 along that line, but I didn't focus on this in any
17 in-depth manner.
18    Q.   Let's put up -- well, rephrase.  Let's
19 identify for the record Exhibit 1, which will be the
20 notice to take deposition.
21         [Exhibit 1 marked for identification.]
22 BY MR. SLATER:
23    Q.   And I don't know if you have that in the
24 room.  If you do, we don't have to put it on the

Page 12

1 screen.
2         MR. INSOGNA:  If you could put it on the
3 screen, that would be helpful.
4         MR. SLATER:  Okay.  Go ahead, Chris.
5 BY MR. SLATER:
6    Q.   Doctor, Exhibit 1 is the notice to take
7 your deposition.  Have you seen that document before?
8    A.   Yes.
9    Q.   Did you read the entire notice?
10    A.   Not in great detail.
11    Q.   Well, did you read the notice?  Did you
12 read each of the categories of document requests?
13    A.   Yeah, I looked through the -- I looked
14 through it, yes.
15    Q.   Did you make any effort to locate and
16 produce any of the documents requested in the
17 deposition notice?
18    A.   I did not do that myself.
19    Q.   With regard to documents that would have
20 been in your possession and control, as opposed to
21 something that the lawyers who retained you might have,
22 did you make any effort to look for those documents
23 that were requested?
24         MR. INSOGNA:  Object to form.

Page 13

1    A.   I didn't need to because I had looked at
2 the documents that were produced that was comprehensive
3 for my whole report and all of my reliance list -- all
4 the documents that I reviewed.
5 BY MR. SLATER:
6    Q.   And I neglected to say something at the
7 start that I had discussed with defense counsel prior,
8 so this is a little bit of a tangent.  We have an
9 agreement and understanding that I will not be
10 addressing any liability opinions or medical
11 monitoring/medical surveillance opinions in this
12 deposition.  I just wanted to put that on the record so
13 there wouldn't be a question later.
14         MR. INSOGNA:  And as I said before we got
15 started, we've traded some e-mails on that.  We've not
16 delineated what subjects in your understanding fall
17 within the scope of that, but I understand that the
18 medical monitoring claim is not at issue at this point,
19 and I understand that you don't intend to ask questions
20 about it.
21         MR. SLATER:  Right.  I don't intend to ask
22 questions about opinions or discussion about the
23 liability -- for example, how it occurred or whether it
24 should have occurred -- meaning the contamination of

Confidential Information - Subject to Protective Order

Page 14

1 the valsartan -- or the opinions provided as to whether
2 or to what extent medical monitoring or medical
3 surveillance would be appropriate in this case.
4 Hopefully that little bit of clarity will answer any
5 questions.
6         MR. INSOGNA:  And as I said, yeah, we've
7 traded e-mails on that subject.  We've not delineated
8 it, but I appreciate your -- what you said.
9         MR. SLATER:  Okay.  Thank you.
10 BY MR. SLATER:
11     Q.   Okay, Doctor.  Let's take down the
12 deposition notice, and let's go to Exhibit 2, which is
13 going to be the responses and objections we received to
14 the deposition notice.  Thanks.
15         [Exhibit 2 marked for identification.]
16         MR. INSOGNA:  I'm going to provide to Dr.
17 Catenacci.
18         MR. SLATER:  Oh, perfect.  If the doctor
19 has it in front of him, we don't have to have it on the
20 screen, then.  Okay.
21 BY MR. SLATER:
22     Q.   Doctor, looking now at Exhibit 2, which is
23 titled Defendant's I-N-C.'s responses and objections to
24 plaintiffs' notice of videotaped deposition of Daniel

Page 15

1 Catenacci, M.D.
2         Do you see that?
3     A.   Yes.
4 BY MR. SLATER:
5     Q.   Have you seen this document before?
6     A.   Yes, it was provided to me.
7     Q.   Did you read the document?
8     A.   I looked through it, similar to the other
9 ones.
10     Q.   If you could turn to Page 2.  There's a
11 heading that says objections to document requests, and
12 Number 1 was a request for various invoices.
13         Did you obtain and produce the invoices
14 that were requested?
15         MR. INSOGNA:  Object to form.
16     A.   I provided my invoice to counsel.
17 BY MR. SLATER:
18     Q.   We'll come back to the invoice in a few
19 moments.  Request Number 2, which is on Page 3, asked
20 for notes for any work that was not documented in the
21 invoices.
22         Is there any such documentation that you
23 would have possessed?
24     A.   Not that I'm aware of.

Page 16

1     Q.   Number 3 asked for any notes or other
2 documentation, including PowerPoints for any
3 presentations, seminars, or classes given by Dr.
4 Catenacci with regard to the risks and benefits of any
5 angiotensin II receptor blockers or nitrosamines.
6         Do any such documents exist?
7     A.   No.
8     Q.   Is that because you have not given any
9 presentations, seminars, or classes regarding the risks
10 and benefits of angiotensin II receptor blockers or
11 nitrosamines?
12     A.   Yes.
13     Q.   Number 4, which is on Page 4, asked for
14 copies of any documents or articles relied upon for the
15 opinions set forth in the report served, if not listed,
16 in the report.
17         Are there any such documents or articles
18 that you've relied on that you didn't list somewhere in
19 the report?
20     A.   No.
21     Q.   And we're going to obviously -- rephrase.
22 We're going to come back to this, but there's been a
23 few different versions of the report, so when I'm
24 talking about the report, I'm talking about the most

Page 17

1 up-to-date version, so -- you understood that?
2     A.   Yes.
3     Q.   Looking at Request Number 5 on Page 4.
4 Copies of any documents or articles reviewed in
5 connection with the report served, whether or not
6 listed in the report or attachments thereto.
7         Does any such document exist?
8     A.   I think there would be many documents that
9 would fall into that category that I looked at that I
10 didn't include or reference.
11     Q.   But they haven't been produced to us, to
12 your knowledge; correct?
13         MR. INSOGNA:  Object to form.
14 BY MR. SLATER:
15     Q.   Well, let me ask the question more
16 directly.  To your knowledge, have any documents or
17 articles that you reviewed in connection with the
18 report that are not actually listed in the report or
19 the attachments to the report have been produced to us?
20     A.   I'm not aware of that.
21     Q.   Number 6 on Page 5 -- any illustrations,
22 PowerPoints, images, charts, tables, or demonstrative
23 exhibits that may be used by or with Dr. Catenacci in
24 connection with the Daubert hearing or trial testimony

Page 18

1  in this litigation.
2       Do you have any such -- rephrase.  Do you
3  have any such documentation that you've produced?
4       A.   No.
5       Q.   Number 7 -- well, let me ask you this,
6  going back to 6.  Is there any such documentation that
7  you have not produced, meaning that you have it but you
8  haven't produced it?
9       A.   No.
10      Q.   Number 7.  Documentation of any research
11 grant the witness has been provided to study any
12 angiotensin II receptor blockers or nitrosamines or
13 health effects potentially related thereto.
14      Does any such documentation exist?
15      A.   No.
16      Q.   Is that because you've done no such
17 research or study?
18      A.   That's correct.
19      Q.   Number 8 on Page 6.  Documentation of any
20 research the witness has performed with regard to any
21 angiotensin II receptor blockers or nitrosamines or
22 health effects potentially related thereto.
23      I don't believe any such documentation has
24 been produced.  Is that because you have not performed

Page 19

1  any such research?
2       MR. INSOGNA:  Object to form.
3       A.   Yes.
4  BY MR. SLATER:
5       Q.   Number 9 requested copies of any documents
6  including protocols or information about the medication
7  side effects available to the witness from any hospital
8  or academic institution where he has worked, had an
9  appointment or had privileges, which set forth
10 information related to the risks and benefits of any
11 angiotensin II receptor blocker or nitrosamine.
12      First of all, did you attempt to identify
13 any such documents to produce to us?
14      A.   No.
15      Q.   Do you know if such documents exist, for
16 example, at the institutions you work at currently?
17      A.   I do not.
18      Q.   For example, there might -- rephrase.  I
19 would think the hospital that you work at there's a
20 formulary and that there would be lists of the
21 different medications, including their risks and
22 benefits.
23      Did you consult that at all regarding any
24 of the drugs that are at issue here -- the valsartan

Page 20

1  drugs?
2       MR. INSOGNA:  Object to form.
3       A.   I did not.
4  BY MR. SLATER:
5       Q.   Were you asked to obtain such documents?
6       A.   I was not.
7       Q.   Number 10 requested any documents or other
8  communications the witness has received from any person
9  or entity with regard to nitrosamine impurities in any
10 angiotensin II receptor blocker or other drug outside
11 of information provided by counsel who retained the
12 witness.
13      So do any such documents or communications
14 exist, to your knowledge?
15      A.   Everything that has been disclosed was
16 provided.
17      Q.   By counsel?
18      A.   Yes.
19      Q.   And Number 11 requested any communications
20 from the witness to any person or entity with regard to
21 nitrosamine impurities in any angiotensin II receptor
22 blocker or other drug outside of communications to
23 counsel who retained the witness.
24      Do any such communications exist?

Page 21

1       A.   Anything that's been disclosed has been
2  provided.
3       Q.   Outside of documented communications, for
4  example, in an e-mail or a letter, have you had any
5  such oral communications with anybody other than
6  counsel about the nitrosamine impurities in the
7  angiotensin II receptor blockers?
8       A.   No.
9       Q.   Have you discussed the subject matter of
10 this litigation or the report you wrote in this
11 litigation with anybody other than counsel?
12      THE REPORTER:  I'm sorry.  Was there an
13 answer?
14      A.   No.
15 BY MR. SLATER:
16      Q.   Finally, Number 12 requested any textbook
17 referenced by the witness in forming his opinions.
18      Are there any such textbooks?
19      A.   No.  Other -- sorry.
20      MR. INSOGNA:  Are you asking other than
21 what's listed on the reliance list?
22 BY MR. SLATER:
23      Q.   Well, no, my question is, first of all --
24 well, yeah.  Let me phrase it.  To extent that a

Page 22

1 textbook was referenced in the report as having been
2 relied on, were those produced?
3          MR. INSOGNA:  And counsel, I would just
4 note our objection to things that the witness had only
5 in hard copy form.
6          MR. SLATER:  Well, I just want to -- we
7 can talk through what the logistics would have been.  I
8 just want to find out what was or wasn't done, and then
9 we can talk through.  I don't think there's anything to
10 object to yet.
11 BY MR. SLATER:
12     Q.   My just question, Doctor, is this.  Did
13 you -- well, first of all, let's ask this.  I've read
14 your report, but let's state for the record.
15          Did you actually rely on any textbook to
16 form your opinions that are set forth in your report?
17     A.   No.  Most of the -- all the references
18 that I use are journal articles.  They're not textbooks
19 per se.
20     Q.   Okay, we can put the -- you can put aside
21 that response to deposition notice.  I'm hopeful --
22 well, actually, we'll get to that.  We'll find out what
23 I'm hopeful about later, and we'll talk about it during
24 lunch or something.

Page 23

1          When were you first contacted by anybody
2 with regard to this litigation?
3     A.   I think it was back in March of this year.
4     Q.   March of 2021?
5     A.   Yes.
6     Q.   Who contacted you?
7     A.   Alex Lagos.
8     Q.   Who is Alex Lagos?
9     A.   He's a counsel for Greenberg Traurig.
10     Q.   An attorney at Greenberg Traurig?
11     A.   Yes.
12     Q.   Do you know how -- rephrase.  Do you know
13 why Alex Lagos contacted you, as opposed to somebody
14 else?  Do you know how he got to you?
15     A.   I looked back at that e-mail, and she
16 indicated that another doctor who I know in Miami had
17 referred her to me.
18     Q.   Who was that doctor in Miami?
19     A.   Greg Lockhart (ph).
20     Q.   Greg Lockhart?  What type of physician is
21 Greg Lockhart?
22     A.   Same as me.  He's a GI medical oncologist.
23     Q.   And I think when I said Alex Lagos, I
24 think I said he but you said she.  So did I misstate?

Page 24

1     A.   Yes.  I think it's Alexandra, maybe.
2     Q.   I want to get that accurate, so I
3 apologize if I misstated.  When you were contacted in
4 March of 2021, what was your understanding as to what
5 you were being asked if you were willing to do?  Let me
6 ask it differently.
7          When you were first contacted in March
8 2021, what was your understanding as to what you were
9 being asked to do?
10     A.   I was being asked to familiarize myself
11 with the issue at hand and ultimately be able to
12 provide a number of different things in a report
13 ultimately, which was first starting with a general
14 background of what is cancer, carcinogenesis, and with
15 a focus on risk factors and focusing on some specific
16 cancers that were listed in the litigation, to provide
17 statistics in terms of incidences of these cancers and
18 cancers overall, and then to evaluate whether or not
19 ultimately the question at hand -- which was the
20 impurities of NDMA and NDEA -- whether or not they
21 would lead to an increased risk over standard rates of
22 cancer.
23          Another thing they asked was whether or
24 not putative exposures to these agents would lead to

Page 25

1 the need to monitor patient -- people or patients that
2 had these exposures and do anything different than what
3 would be routine surveillance over time.
4     Q.   Did you have an understanding as to who
5 was retaining you when you actually agreed to go
6 forward as an expert in this case?
7     A.   Yes, I think I was made clear that they
8 were counsel for the defense of this -- of one of the
9 pharmaceutical companies that was involved, which I
10 believe was Teva.
11     Q.   So you understood -- I'm sorry.  I didn't
12 mean to interrupt.
13     A.   And so the answer to your question is,
14 yes, I knew that that was where they were coming from.
15     Q.   So you understood that you were being
16 retained by attorneys from Greenberg Traurig to be an
17 expert on behalf of Teva in this litigation?
18          MR. INSOGNA:  Object to form.
19     A.   Yes, that's what my understanding was.
20 BY MR. SLATER:
21     Q.   Other than Alex Lagos, have you spoken to
22 any other attorneys in connection with this litigation?
23     A.   Yes.
24     Q.   Who else have you spoken with?

Page 26

1    A.   Nick Insogna.  Katie -- forgive me -- last
2  name.  I don't have all the names.
3    Q.   Well, what I want to know is the names
4  that you can recall.
5         You told me Katie, who's present at the
6  deposition; right?
7    A.   Yes.
8    Q.   Had you ever spoken to her before today?
9    A.   Yes.
10   Q.   When did you first speak to Katie?
11   A.   I don't know exactly, but it was often in
12  calls along with Nick.
13   Q.   Do you know what law firm Katie works
14  with?
15   A.   I believe the same law firm.
16   Q.   What other attorneys, if any, have you
17  spoken with about this case or your report?
18   A.   There was a couple of other attorneys, I
19  believe, from other defendants, the names of which I
20  didn't memorize and I don't know.  But that was during
21  a call that we had on Saturday, and also a meeting on
22  Wednesday.
23   Q.   When you refer to a call on Saturday,
24  you're talking about two days ago?

Page 27

1    A.   Yes.
2    Q.   And when you refer to a meeting on
3  Wednesday, are you talking about last Wednesday, about
4  five days ago?  Other than the two calls that -- well,
5  rephrase.
6         The meeting last Wednesday -- was that
7  also a call, or was that in person?
8    A.   That was on site here in person, but the
9  attorneys that I mentioned from other defendants were
10  on Zoom.
11   Q.   Do you know who from other defendants
12  attended -- what lawyers attended on Wednesday of last
13  week?
14   A.   I don't have the names.
15   Q.   Do you know who in terms of lawyers for
16  other defendants attended the call on Saturday, two
17  days ago?
18   A.   Same -- the same attorneys.
19   Q.   I think Clem Trischler -- Clem is in the
20  room -- rephrase.
21         I believe Clem Trischler is present.  Had
22  you ever spoken with him before today?
23   A.   No, not that I'm aware of.
24   Q.   Are there any other attorneys whose names

Page 28

1  you do recall who you've spoken to about this case or
2  your report?
3    A.   Outside of what I just mentioned, no.
4         MR. SLATER:  Chris, if we have Dr.
5  Catenacci's invoice, I'd like to put that up on the
6  screen, please -- or invoices.
7  BY MR. SLATER:
8    Q.   Great.  Doctor, on the screen we have what
9  we're marking as Exhibit 3 to your deposition, which
10  is --
11         [Exhibit 3 marked for identification.]
12         MR. INSOGNA:  Adam, we don't have that up
13  on the screen.
14         MR. SLATER:  You don't have it on the
15  screen?
16         MR. INSOGNA:  I'm not showing it, no.
17         MR. SLATER:  I'm looking at it on the
18  screen.
19         MR. INSOGNA:  I see it.  I see it.  Yes.
20         MR. SLATER:  Okay.  I'll start over.
21  BY MR. SLATER:
22    Q.  In front of you is what we've marked as
23  Exhibit 3, which is our under -- rephrase.  On the
24  screen we have Exhibit 3, a June 15, 2021, letter, that

Page 29

1  you wrote to Alex Lagos.
2         What is that document?
3    A.   That looks like it's the first invoice
4  that I submitted for this work.
5         MR. SLATER:  Chris, can you blow up that
6  front page a little bit, please, so I can read it?
7  Perfect.  That's good.
8  BY MR. SLATER:
9    Q.   This states that as of June 15, 2021, you
10  had spent 19 hours at $700 an hour and the total was
11  $13,300; correct?
12   A.   Yes.
13         MR. SLATER:  And Chris, can you scroll
14  down to the next page?  I want to see what other
15  information's attached, please.
16         MR. GEDDIS:  What page?  Adam, can you
17  hear me?
18         MR. SLATER:  I would like to get the
19  actual invoices, too, or did we only get the cover
20  letter?
21         MR. GEDDIS:  I think that's --
22         MR. SLATER:  I can't hear you, Chris.
23         MR. GEDDIS:  Adam, it's only one page.  I
24  don't think there's -- I don't know if there's an

Confidential Information - Subject to Protective Order

Page 30

1 additional --

2       MR. SLATER: Okay, let me go back into it
3 then. All right. You can scroll down a little more so
4 we can see the body of the document again. Can you
5 blow it up to where it was? Okay.
6 BY MR. SLATER:
7     Q.  Doctor, was there any enclosure to this
8 letter, or was this simply your -- this -- rephrase.
9         Was there any enclosure, or was this
10 letter your entire invoice?
11     A.  That is my entire invoice.
12     Q.  Do you keep records of the time that you
13 have spent working on this case and what you were doing
14 when you were spending time on this case so that if
15 someone asked you for an itemized list of how you got
16 to the 19 hours, that you would be able to provide
17 that?
18     A.  I don't keep it written, no.
19     Q.  How did you know you spent 19 hours as of
20 June 15? Was that an estimate?
21     A.  I looked back at the dates that I knew I
22 was reviewing and reading and added time that I spent
23 up writing, because this was also the draft report.
24     Q.  Between June 15, 2021, and today, which is

Page 31

1 September 13, 2021, how much additional time have you
2 spent on this matter?
3       MR. INSOGNA: Object to form.
4     A.  Depends which dates. Since this invoice?
5 BY MR. SLATER:
6     Q.  Since the invoice and up to before we
7 started this deposition today, how much additional time
8 have you spent on this matter?
9     A.  There is a second invoice that has some of
10 that time already documented, and that was up unto this
11 submission of my report, and then since then I'd have
12 to go back and calculate it.
13     Q.  Let's go now to the second invoice letter,
14 which we'll mark as Exhibit 4.
15       [Exhibit 4 marked for identification.]
16 BY MR. SLATER:
17     Q.  On the screen we have Exhibit 4, which is
18 in August.
19       MR. SLATER: Can you scroll up to the
20 date, please, Chris? Okay.
21 BY MR. SLATER:
22     Q.  On the screen we have Exhibit 4, which is
23 an August 2, 2021, letter that you sent to Nicholas
24 Insogna at Greenberg Traurig.

Page 32

1         Is that your second invoice in this case?
2       MR. INSOGNA: Speak up a little bit. My
3 voice cracked.
4     A.  Yes.
5       MR. SLATER: Chris, can you blow it up a
6 little more, please? Okay.
7 BY MR. SLATER:
8     Q.  According to this invoice, after your June
9 15, 2021, invoice and up till August 2, 2021, you spent
10 an additional 94.5 hours.
11         Is that correct?
12     A.  Yes.
13     Q.  Did you keep any itemized notes or lists
14 of what time you spent and what you did during those
15 time blocks, or did you do what you told me earlier,
16 which was you just went back to see when you worked on
17 it and estimated?
18       MR. INSOGNA: Object to form.
19     A.  The latter.
20 BY MR. SLATER:
21     Q.  Is there any other invoice after August
22 2nd?
23     A.  No, not yet.
24     Q.  How much time have you spent after the

Page 33

1 August 2nd invoice was sent up until before we started
2 the deposition on this case?
3     A.  Like I said, I'd have to go back and look
4 at and calculate it.
5     Q.  Can you give me your best estimate of how
6 much time you've spent between August 2, 2021, and
7 today?
8     A.  Many hours.
9     Q.  Can you give me some sense of what you
10 mean by that?
11     A.  I have to go back and look at the actual
12 times that I spent on it.
13     Q.  So you have no -- you're not able to
14 estimate in any way?
15       MR. INSOGNA: Object to form.
16     A.  I'd have to go back and look at the actual
17 times that I blocked off that I know, for example, and
18 add them up, and I haven't done that yet. I was going
19 to do it after this deposition.
20 BY MR. SLATER:
21     Q.  In terms of actual preparation for the
22 deposition, do you know how much time you've spent
23 actually preparing for the deposition?
24         I'm not talking about the general work

Page 34

1  you've done on your report, but focused work to try to
2  prepare yourself for this proceeding.
3          MR. INSOGNA:  Object to form.
4      A.   Like I said earlier, it depends on the
5  definition of that, because I've been essentially
6  preparing for this since the get-go, but certainly
7  after the submission of the report when I knew that a
8  deposition was the next step, that was initially when I
9  started to really prepare, and then really focused
10 preparation in the last few weeks with more dedicated
11 time to it.
12 BY MR. SLATER:
13     Q.   Working backwards, in the last few weeks,
14 can you estimate how much time you've spent preparing
15 for the deposition?
16     A.   At least three to four hours a day, and in
17 some days more than that.  Like, for example, the last
18 few weekends were basically doing it all day.
19     Q.   And that's focused preparation for the
20 deposition?
21         MR. INSOGNA:  Object to form.
22     A.   Could you explain -- define what that
23 means?
24 BY MR. SLATER:

Page 35

1      Q.   What I mean is this.  That's -- the time
2  you just described is time you've spent with the focus
3  on preparing for this deposition?
4          MR. INSOGNA:  Same objection.
5      A.   Meeting, having -- reviewing --
6  re-reviewing things that I had read before,
7  re-reviewing my report, reviewing new information that
8  came along like the depositions of the expert
9  witnesses, et cetera, the -- all of the reports of the
10 defense that came out after I submitted my report.  All
11 of that, I mean, I think, would qualify as preparing
12 for this December, and so yes, all of those hours.
13 BY MR. SLATER:
14     Q.   You said reviewing the reports of all of
15 the defense experts.
16         Have you, to your knowledge, reviewed the
17 reports of all the defense experts?
18     A.   I believe so, yes.
19     Q.   Did you rely on those reports in any way
20 in forming the opinions that you're providing here, or
21 did you see them all after the fact?
22     A.   I saw them all after the fact.
23     Q.   So if I understand, you're not relying on
24 the other defense expert reports for your opinions

Page 36

1  here; correct?
2      A.   Not relying on them, no.
3      Q.   Bear with me.  I got to write something
4  down.
5          Have you seen the deposition of Dr.
6  Pennegrafe (ph)?
7      A.   I have not.  That was on Friday, I think.
8      Q.   Okay, let's take down this invoice,
9  please.
10         Do you know how much time or can you
11 estimate how much time you've spent in actual
12 discussions or meetings with counsel as part of your
13 preparation for the deposition?
14     A.   There was the three hours I mentioned on a
15 Zoom call on Saturday, the meeting in person here,
16 hybrid with Zoom on Wednesday, which I believe was five
17 or six hours.  And then there were various calls.  This
18 is just for the deposition preparation?
19     Q.   Correct.
20     A.   Yeah, then there were various short calls
21 on the phone that probably amounted to less than an
22 hour, an hour, approximately.
23     Q.   In terms -- so rephrase.  In terms of
24 actual meetings, whether in person or virtual or by

Page 37

1  telephone, you're estimating about 10 hours for those
2  meetings?
3      A.   Right.
4      Q.   Do I understand that correctly?
5      A.   And that's not e-mail communication.
6      Q.   And I'm certainly not going to ask you for
7  the contents of any e-mails, but is it fair to say that
8  you've had many e-mail communications about and in
9  preparation for this deposition?
10         MR. INSOGNA:  Object to form.
11     A.   In various aspects of communication, yes.
12 BY MR. SLATER:
13     Q.   What do you mean by "in various aspects of
14 communication"?
15     A.   About the report, where to be for the
16 deposition, like logistics.  All kinds of different
17 aspects regarding the deposition.
18     Q.   And those aspects would include
19 substantive communications; correct?
20         MR. INSOGNA:  Object to form.
21     A.   Not usually.  Most of those would be by
22 communication, in person or on the phone, or by Zoom.
23         MR. SLATER:  All right, Chris.
24 BY MR. SLATER:

Page 38

1    Q.   If we could -- and I think you have the
2 reports there, Doctor.  If you have your initial report
3 of August 2nd, 2021, that's the next exhibit I'd like
4 to go to.  We'll mark that as Exhibit 5.
5        [Exhibit 5 marked for identification.]
6        MR. SLATER:  And just logistically for our
7 end, I assume for Chris and the court reporter, we
8 still can mark that document as Exhibit 5 even if we
9 don't put it up on the screen; right?
10       MR. GEDDIS:  That's producing (ph) it all
11 on mine.
12       MR. SLATER:  I just want to make sure it's
13 being handled.  That's all.  I'm not going to get into
14 the details.  I just want to make sure it didn't get
15 lost.  Okay.
16       THE REPORTER:  From my end, as long as he
17 puts it in the Dropbox, I'll mark it as an exhibit.
18       MR. SLATER:  Terrific.
19 BY MR. SLATER:
20    Q.   Okay, Doctor, do you have in front of you
21 x5, your August 2, 2021, report in this case?
22    A.   I do.
23    Q.   When you wrote this report, did you
24 attempt to set forth each of the opinions you had

Page 39

1 reached in this case?
2    A.   Yes.
3    Q.   And did you in fact set forth the opinions
4 you had reached in this case when you signed your
5 August 2, 2021, report?
6        THE REPORTER:  I'm sorry.  Did you answer?
7    A.   Yes.
8 BY MR. SLATER:
9    Q.   In the course of the report itself, you
10 talk about or speak to various facts that you obtained
11 either from studies or from documents that were
12 provided, et cetera.
13       Did you reference and discuss those facts
14 that were most important to you in forming your
15 opinions in the report?
16       MR. INSOGNA:  Object to the form.
17    A.   Yes.
18 BY MR. SLATER:
19    Q.   When you wrote this report, did you write
20 it with care and precision?
21    A.   To the best of my ability, yes.
22    Q.   Did you choose the words that you used in
23 the report with care and precision?
24    A.   Yes.

Page 40

1    Q.   And before you signed the report, did you
2 carefully read it to make sure it said what you wanted
3 it to say?
4    A.   Several times for substance and -- for the
5 substance particularly.  The details and spelling and
6 things like this, to the best of my ability, although
7 even now when I read it every now and then I find a
8 typo.
9    Q.   Before you signed the report, did you
10 ensure that the references that are found within the
11 report were accurate in the sense that if you put a
12 reference number, that it actually correlated to the
13 actual document that you meant to reference?
14    A.   I tried to, yes.
15    Q.   When you say you tried to, what does that
16 mean?
17    A.   As you know, after I submitted the report,
18 it was noticed that some of the references got mixed
19 and that needed to be corrected, and hence the amended
20 report that corrected that.
21    Q.   When you say the references got mixed,
22 what does that mean?
23    A.   It means that they got referenced at the
24 wrong location within the text.

Page 41

1    Q.   Did you find any examples where you had
2 referenced an article for a proposition or something
3 you stated in the report and in fact you didn't intend
4 to reference any source?
5    A.   Not that I'm aware of, no.
6    Q.   In addition to the list of references that
7 are numbered, there's another list that we were
8 provided as an exhibit of materials considered.
9        Did you read all of the -- and we're going
10 to get to the specific document, but did you read all
11 of the articles or other documents that are listed on
12 your list of materials considered?  Did you read every
13 single one of those documents that are listed?
14    A.   Yes, to different amounts of detail and
15 different numbers of times.  Some were more important
16 than others.
17    Q.   Let's go now to the next exhibit, which is
18 going to be the August 25, 2021, report.
19       [Exhibit 6 marked for identification.]
20       MR. INSOGNA:  Set that one aside so you
21 don't confuse them.  Adam, when you say August 25, I
22 believe that's the one we told you to disregard and we
23 sent the August 27th report that Dr. Catenacci
24 provided.

Page 42

1  MR. SLATER: Yeah, I just wanted to make
2  sure that I marked each of the documents that were
3  produced to us so I can ask him about them. I just
4  feel like I want to be -- I just need to be thorough to
5  make sure everything's identified and I get everything
6  in context. We're going to get to the August 27, but
7  I'm just going in order of what was served to us.
8  BY MR. SLATER:
9      Q.  Doctor, do you have the -- oh, you're
10  getting it. Okay.
11     A.  That's --
12     MR. INSOGNA: Yeah.
13  BY MR. SLATER:
14     Q.  Doctor, looking now at Exhibit 6, which is
15  the August 25, 2021, report we were provided.
16         Have you seen that report before?
17     A.  Yes.
18     Q.  And I see that your signature is at the
19  end of the report after Page 60.
20         Did you sign this document?
21     MR. INSOGNA: Object to form. (Inaudible)
22  document.
23     A.  Looks like my signature's there, but it's
24  not actually -- my name is in there with my

Page 43

1  credentials, but there's not an actual signature.
2  BY MR. SLATER:
3      Q.  The version that you're looking at doesn't
4  have a signature on it?
5      A.  August 25th on Page 47?
6      Q.  Go further. If you go past Page 60, there
7  is a signature after Page 60.
8      A.  I only have Page 60. That's where my
9  version ends that I have here in front of me.
10     Q.  In looking at the signature on this
11  report, it seemed to look the same as the signature on
12  the prior version. It looks like an electronic
13  signature.
14         Is that accurate?
15     A.  Yes.
16     Q.  If you look at the very first page of the
17  August 25, 2021, report, the bottom left-hand column,
18  or bottom left of the page.
19         You see where it says active and then
20  there's a number after that?
21     A.  Yes.
22     Q.  Do you know what that refers to?
23     A.  I do not.
24     Q.  That's not something you placed on the

Page 44

1  report; correct?
2      A.  No.
3      Q.  And just to be clear, why was the August
4  25, 2021, report sent to us after we had been served
5  the August 2, 2021, report?
6      A.  I believe it was to correct some of those
7  noted mistakes with the referencing.
8      Q.  Was any change made to the substantive
9  content of the report?
10     A.  No.
11     Q.  Now let's go to the August 27, 2021,
12  report, which we'll mark as Exhibit 7.
13         [Exhibit 7 marked for identification.]
14  BY MR. SLATER:
15     Q.  Do you have that in front of you?
16     A.  Yes.
17     Q.  Oh, I'm sorry. I'm sitting here waiting
18  for you to get it and you're waiting for me to realize
19  you had it.
20     A.  This is the one we started with that I had
21  from the get-go.
22     Q.  Looking now at Exhibit 6, the August 27,
23  2021, report.
24         To your knowledge, is that the most

Page 45

1  up-to-date version of the report and exhibits?
2      A.  Yes.
3      Q.  Was this version of the report provided
4  to, as you stated earlier, correct the mistakes with
5  the references?
6      A.  Yes, I believe so.
7      Q.  Now, it's my understanding that with the
8  exception of Exhibit B, which we'll get to -- well, let
9  me ask the question differently. Exhibit A to this
10  report, the August 27, 2021, report, is a CV.
11         Is that your current and up-to-date CV?
12     A.  No, I have -- I usually update it monthly
13  pretty much, so I have Number 1 (ph).
14     Q.  Is there anything that's been added to
15  this CV that relates in any way to the subject matter
16  of this litigation?
17     A.  No.
18     Q.  If you could, I'd like -- rephrase. I'd
19  like to walk through a little bit of your CV and ask
20  you a couple questions if we could, please.
21     A.  Okay.
22     Q.  Let's go, if we could, to Page 3. There's
23  a heading original articles.
24     A.  Yes.

Page 46

1    Q.   Are those articles that you have authored
2  or coauthored?
3    A.   Yes.
4    Q.   And those are found in the peer-reviewed
5  literature, is my understanding?
6    A.   Yes.
7    Q.   Do any of your published articles that are
8  listed here address specifically any of the issues at
9  issue in this litigation?
10       MR. INSOGNA:  Object to form.
11    A.   No, not specifically.
12 BY MR. SLATER:
13    Q.   I'm going to go through a few more
14 specific questions just to make sure we're all on the
15 same page.
16       Do any of these articles relate to or
17 discuss NDMA, NDEA, or nitrosamines in any way?
18    A.   None of the original articles, no.
19    Q.   Have you ever conducted or participated in
20 any way in a study regarding the health effects of NDMA
21 or NDEA or other nitrosamines?
22    A.   No.
23    Q.   Do you have any plans to conduct such a
24 study?

Page 47

1    A.   No.
2    Q.   Have you ever made a submission to an IRB,
3  an institutional review board, regarding such a study?
4    A.   No.
5    Q.   Have you -- rephrase.  Do any of these
6  publications address in any way the risks and benefits
7  of valsartan or other drugs in that medication class?
8    A.   No.
9    Q.   Do any of your articles address causation
10 of cancer due to exposure to chemicals?
11    A.   No original articles, no.
12    Q.   When you say no original articles, I just
13 want to make sure you're not making a distinction to
14 something else.  What do you -- so what do you mean by
15 that?
16    A.   You had asked me at the beginning of this
17 line of questioning about where -- on Page 3 when it
18 was talking about original articles.  But if you look
19 at further pages, there are other types of articles
20 that I would publish, and those include editorials,
21 commentaries, reviews of given topics, and consensus
22 statement and guidelines, book chapters, et cetera, so
23 none of the work that would be considered original work
24 where I'm doing actual new research has to do with any

Page 48

1  of those questions you asked.
2    Q.   Go if you could to Page 9, please.
3    A.   Okay.
4    Q.   There's a heading consensus statements and
5  guidelines.
6    A.   Yes.
7    Q.   Do any of the materials listed under that
8  heading address any of the issues specific to this
9  litigation?
10       MR. INSOGNA:  Object to form.
11    A.   No.
12 BY MR. SLATER:
13    Q.   For example, do any address nitrosamines
14 in any way?
15    A.   No.
16    Q.   Do any of them address the risks or
17 benefits of valsartan or similar drugs?
18    A.   No.
19    Q.   Looking now on Page 9 of the heading book
20 chapters.  The same question.  Do any of those address
21 the specific issues in this litigation?
22       MR. INSOGNA:  Same objection.
23    A.   No.
24 BY MR. SLATER:

Page 49

1    Q.   Do any of them address nitrosamines in any
2  way?
3    A.   No.
4    Q.   Do any of them address the risks and
5  benefits of medications like valsartan to treat
6  hypertension?
7    A.   No.  One thing I noticed on the book
8  chapters -- because I didn't realize that that's where
9  it was -- is Number 95.
10    Q.   Okay.
11    A.   Which is our society, the American Society
12 of Clinical Oncology, or ASCO -- A-S-C-O -- where I
13 co-wrote with my colleague this self-evaluation
14 program, which is how medical oncologists get certified
15 and get recertified, so this is the study manual.  And
16 so in that encompasses all GI cancers, and so there are
17 background sections that may allude to risk factors and
18 other things that would come up with various cancers.
19       And so I think there would be probably
20 references that nitrosamines have been reported to be
21 associated with gastric cancer and that other reports
22 have shown the opposite and that there's no clear
23 consensus on those dietary studies.
24    Q.   This was authored, it looks like, 2021; is

Page 50

1 that correct?

2    A.    Yes.  Yes.

3    Q.    Do you know when in 2021 you authored it?

4    A.    Well, this was a process over a year, and

5 that they continually elicit us with updates for new

6 trial outcomes and to add to the guidelines for

7 treatment, so it's an ongoing process.  I think it came

8 online in the late spring, early summer, for people

9 using it to study for their board exams.

10    Q.    As you did different iterations of that

11 document, would you have been red-lining so that you

12 could see each of the changes and be able to know when

13 you were modifying the language as you went forward?

14    A.    I would be going back to the most recent

15 version and adding to it and then resubmitting the

16 change -- the new version of the document.

17    Q.    There's a second doctor listed there, B.N.

18 Polite, or "polite"?

19    A.    "Polite," yeah.

20    Q.    Polite?  Who is that?

21    A.    He's a colleague of mine at the

22 university.  He's also a GI medical oncologist.

23    Q.    Did Dr. Polite also contribute to the

24 writing of this document?

Page 51

1    A.    Yes.  We divided up different cancer

2 types, basically, and assigned them to each other.

3    Q.    And what exactly is, again -- I just want

4 to make sure I understand -- the ASCO -- A-S-C-O --

5 self-evaluation program that this was published in?

6 What is this?

7    A.    It's a material source that oncologists

8 would use to prepare for their board exams.  So it has

9 background sections on the cancer, but most of it's

10 focused on the treatment guidelines, treatment

11 standards, clinical care of patients in various

12 settings of the disease.  And then there are usually

13 question books that come along with it so people can

14 prepare for their board exam.

15    Q.    Did you provide that document or at least

16 the chapter that you authored to counsel to produce to

17 us?

18    A.    No, but I'm happy to do so if that's

19 required.

20    Q.    Did you disclose anywhere in that chapter

21 that you had been retained by a defendant in this

22 litigation where one of the questions was the

23 association of certain nitrosamines with certain

24 cancers?  Was that disclosed in any way there?

Page 52

1    MR. INSOGNA:  Object to form.

2    A.    This particular self-evaluation program,

3 no, actually wasn't published when I was talking to

4 them mostly; right?  But in my actual report and on my

5 reliance list is a reference similar to that flavor,

6 which is under the review section of my publication,

7 which is Reference 80, which is -- was written by my

8 fellow and -- which is a trainee -- and review articles

9 are common to do like that, and that's the background

10 on gastroesophageal cancer.

11    And a similar reference is in there

12 in terms of noting a number of potential associations with

13 various cancers, with various gastroesophageal cancers,

14 and pointing out that there are some that do and some

15 that don't suggest an association of nitrosamines with

16 stomach cancer.

17    And that's in my report when I'm talking

18 about risk factors for gastric cancer, and the dietary

19 studies that are lower down in my report.  I'm -- that.

20 BY MR. SLATER:

21    Q.    So if I understand correctly in

22 publications that you just identified, Number 80 and

23 Number 95, you state that there is literature that

24 would support an association with certain gastric

Page 53

1 cancers and there's other literature that is less

2 definitive.

3    Is that a fair understanding?

4    MR. INSOGNA:  Object to form.

5    A.    We were just noting data that's out there

6 that's not definitive in a section that's talking about

7 risk factors for stomach cancer, to point out that

8 studies have been done.  And it's not an exhaustive

9 reference list either in those reports.  There are

10 token references that the fellow decided to put in, but

11 there are clearly more references that one could

12 include on that specific topic.

13 BY MR. SLATER:

14    Q.    From a macro perspective, you would agree

15 that there's a potential association between NDMA and

16 NDEA and certain cancers?  As a general statement, you

17 would agree with that; correct?

18    MR. INSOGNA:  Object to form.

19    A.    No.

20 BY MR. SLATER:

21    Q.    So you think that anybody who would say

22 that there's a potential association between NDMA or

23 NDEA and any human cancer would be incorrect?

24    MR. INSOGNA:  Same objection.

Page 54

1      A.   I think that based on my review, as you
2  can see in my report, I would disagree and I would say
3  that that's an incorrect statement.
4  BY MR. SLATER:
5      Q.   So your position is anybody who has any
6  interest in whether or not nitrosamines, including NDMA
7  and NDEA, cause cancer in humans, you would say to them
8  you can stop researching it, you can stop looking at
9  it, there's no potential for these substances to cause
10  cancer in humans?  It's a closed book, there's no
11  reason to look at the subject further?
12      MR. INSOGNA:  Object to form.  Misstates
13  testimony.
14      A.   I didn't say that, no.  I said that right
15  now if somebody concluded that there is an association,
16  that would be incorrect.  I didn't say that further
17  studies should or shouldn't be done.
18  BY MR. SLATER:
19      Q.   What if -- well, rephrase.  Do you agree
20  that there is a potential association between NDMA and
21  NDEA and certain cancers in humans?
22      MR. INSOGNA:  Object to form.
23      A.   It is -- they are listed as probable
24  carcinogens in humans by the IARC.

Page 55

1  BY MR. SLATER:
2      Q.   And you don't disagree with that; right?
3      A.   I don't agree with that statement, no.  I
4  don't disagree --
5      Q.   You disagree -- go ahead.  I'm sorry.
6      A.   No, I wanted to clear up.  I don't agree
7  with the IARC statement.
8      Q.   I think I skipped over your editorials
9  commentaries heading on Page 8.  I think when you told
10  me about your Reference 80, it reminded me that I had
11  skipped a page, so --
12      Looking at Page 8 of your CV, there's a
13  heading editorials/commentaries?
14      A.   Yes.
15      Q.   And those are References 65 to 74;
16  correct?
17      A.   Yes.
18      Q.   Do any of those publications address the
19  issues in this litigation?
20      A.   No.
21      Q.   Do any of those publications discuss in
22  any way nitrosamines or NDMA or NDEA?
23      A.   No.
24      Q.   Do any of those publications discuss the

Page 56

1  risks or benefits of valsartan or similar medications?
2      A.   No.
3      Q.   Looking now on Page 8 at the heading
4  reviews, which encompasses References 75 to 83.  We've
5  talked about Reference 80 just a moment ago.
6      With the exception of Reference 80, do any
7  of these publications address nitrosamines or NDMA or
8  NDEA in any way?
9      A.   No.
10      Q.   Do any of them address the risks or
11  benefits of valsartan or similar medications?
12      A.   No.
13      Q.   And just to close the loop on Reference
14  80, other than the specific part that you've told us
15  about, is there any other discussion of nitrosamines?
16      A.   No.  It's one or two sentences in that
17  section.
18      Q.   I think we got through consensus
19  statements and guidelines and book chapters.  Looking
20  now at the bottom of Page 9, there's a heading original
21  articles under revision, submitted or in preparation.
22  Do any of those references, which are listed as 1
23  through 5, address nitrosamines in any way?
24      A.   No.

Page 57

1      Q.   Do any of them address the risks or
2  benefits of valsartan or similar medications?
3      A.   No.
4      Q.   On Page 10, there's a heading that says
5  research support, current grant support.
6      Do any of those listed address the issues
7  in this case?
8      A.   No.
9      Q.   Specifically, the potential risks of
10  nitrosamines such as NDMA or NDEA?
11      A.   No.
12      Q.   In the middle of Page 10 there's a heading
13  submitted/planned submission pending grant support.
14      Do any of those items address nitrosamines
15  or the potential risks of nitrosamines?
16      A.   No.
17      Q.   Do any of them address the risks or
18  benefits of valsartan or similar medications?
19      A.   No.
20      Q.   And I think I forgot to ask that last
21  question regarding the current grant support.  Do any
22  of those items address the risks and benefits of
23  valsartan or similar medications?
24      A.   No.

Page 58

1    Q.   Going to the heading on Page 10 that says
2 past grant support, do any of those items address
3 nitrosamines or the potential risks of nitrosamines in
4 any way?
5    A.   No.
6    Q.   Do any of those address the risks and
7 benefits of valsartan or similar medications?
8    A.   No.
9    Q.   On Page 11, there's a heading that says
10 oral presentations, invited speaking, international
11 meetings/conferences.  Do any of those international
12 meetings or conferences reflect speaking that you've
13 done regarding nitrosamines?
14    A.   No.
15    Q.   Have you ever spoken, other than in the
16 context of this case, regarding the potential risks of
17 nitrosamines?
18    A.   No.
19    Q.   Other than in this case, have you ever
20 spoken regarding the question of whether NDMA or NDEA
21 can cause cancer in humans?
22    A.   No.
23    Q.   Do any of these speaking engagements
24 address the risks and benefits of valsartan or similar

Page 59

1 medications?
2    A.   No.
3    Q.   You said no; correct?
4    A.   I said no.  Correct.
5    Q.   Thank you.  Then there's a -- rephrase.
6 Looking at the bottom of Page 12 there's a heading that
7 says national, and I suppose these would be speaking
8 engagements that you've had in the United States?
9    A.   Yes.
10    Q.   Do any of those speaking engagements
11 address in any way nitrosamines or the risks of
12 nitrosamines?
13    A.   No, they do not.
14    Q.   Do any of them address the risks and
15 benefits of valsartan or similar medications?
16    A.   No, they do not.
17    Q.   On Page 15 there's a heading that says
18 regional.  Do any of those speaking engagements address
19 nitrosamines in any way?
20    A.   No, they do not.
21    Q.   Do any of them address the risks and
22 benefits of valsartan or similar medications?
23    A.   No, they do not.
24    Q.   On Page 16 there's a heading intramural.

Page 60

1 Do any of those intramural speaking engagements address
2 nitrosamines or the risks of any nitrosamines?
3    A.   No, they do not.
4    Q.   Do any of them address the risks and
5 benefits of valsartan or similar medications?
6    A.   No, they do not.
7    Q.   On the bottom of Page 17, there's a
8 heading that says invited elected service.
9        Do you see that?
10    A.   Yes.
11    Q.   Do any of those -- I'm going to refer to
12 them as appointments.  Do any of them bring with
13 them -- well, rephrase.
14        Looking at the bottom of Page 17 where it
15 says invited elected service, what is that
16 encompassing?
17    A.   This is a mix of different things,
18 including intramural positions.  Like the first one
19 listed there to be on the clinical trial research
20 committee, which reviews new trials and provides
21 scientific input on how they can be improved before
22 they actually get passed through the IRB, for example.
23        Some of these are -- like the Alliance
24 (ph) one listed there, the third one -- is what's

Page 61

1 called a cooperative group of multiple different
2 institutions that are cancer centers that come together
3 to do studies together, and so there are committees in
4 order to get trials through and passed, et cetera, and
5 so I served on that, for example.
6        Some of these are philanthropic groups
7 that I've been asked to serve on the medical advisory
8 committees, you can see there.  So it's a mix of -- the
9 ASCO, American Society of Clinical Oncology, set the
10 self-evaluation program that I just -- we were talking
11 about for medical oncologists to get board-recertified.
12 That was an invitation to write that chapter by the
13 society, for example.
14        So that's the flavor of what those types
15 of positions -- and some of them are volunteer work, et
16 cetera -- are.
17    Q.   Do any of those positions or the work
18 you've done in connection with those positions address
19 in any way nitrosamines or the risks of nitrosamines?
20    A.   No.
21    Q.   Do any of them address the risks and
22 benefits of valsartan or similar medications?
23    A.   No, they do not.
24    Q.   Looking at Page 18, there's a heading

Page 62

1  editorial activities, and it indicates that you're an
2  ad hoc reviewer for various medical journals; correct?
3      A.   Yes.
4      Q.   That means a peer reviewer; correct?
5      A.   Yes.
6      Q.   Have you ever peer-reviewed any article or
7  publication addressing the potential risks of
8  nitrosamines, including NDMA or NDEA, to humans?
9      A.   No.
10     Q.   Same question regarding potential risks to
11 animals.
12     A.   No.
13     Q.   On Page 18, there's the heading associate
14 editor, and then another one that says editorial board
15 membership.
16         With regard to those editorial positions,
17 have you ever had occasion to look at or be involved
18 with an article addressing nitrosamines or the
19 potential risks of nitrosamines to humans?
20     A.   No.
21     Q.   And in those positions have you ever
22 addressed a publication regarding the risks and
23 benefits of valsartan or a similar medication?
24     A.   No.

Page 63

1      Q.   And with regard to your peer review work
2  and your editorial work, one of the important things is
3  the precision and clarity and accura -- rephrase.  Let
4  me ask this.
5          With regard to the peer review and
6  editorial work, is it fair to say that the accuracy of
7  what is written in an article that's published in the
8  literature is important?
9      A.   Absolutely.
10     Q.   In those positions I assume you endeavor
11 to make sure that the references to the statements made
12 within the articles are accurate; correct?
13     A.   We do that -- for example, as an associate
14 editor I would be looking at that, but also there are
15 staff that review those types of spelling language
16 because we get a lot of submissions, for example, where
17 English is not the first language, and so there's a lot
18 of editing that's done.
19         The first pass of deciding whether an
20 article has merit is looking at the science and looking
21 at the substance.  The other stuff, like spelling,
22 wording, and language, the references, things that are
23 technical like that, are done after the decision is
24 made whether or not this is worth publishing in our

Page 64

1  journal.  And that's after several reviews back and
2  forth with the authors.
3      Q.   When a document is finalized through the
4  editorial process that we're discussing, are the
5  references all supposed to be accurate at that point?
6      A.   At the end when it goes online or when it
7  gets published, yes.  That's what we strive towards.
8  Of course, there are always mistakes to that extent,
9  unfortunately.
10     Q.   Even in the peer review process, there can
11 be some mistakes regarding a reference?  That can
12 happen; right?
13     A.   Absolutely.  All --
14     Q.   The fact that someone -- I'm sorry.  I
15 didn't mean to interrupt.
16     A.   I was going to say, even when I'm
17 publishing myself, I review my manuscript literally
18 hundreds to thousands of times over the course of when
19 it's being written.  Inevitably there will be certain
20 spelling errors or things that you only see after the
21 fact after you see it online.
22         The same thing when doing presentations.
23 You present -- you're preparing for a presentation
24 multiple times, and then as you're doing the

Page 65

1  presentation sometimes you see, "How did I miss that?"
2          All of those -- I mean, those types of
3  things happen to everybody.  We're human.  But it
4  doesn't effect the essence of the message that's
5  being -- attempted to be brought forth.
6      Q.   So the fact that there may be some errors
7  with some references or spelling or something like that
8  from your perspective doesn't undercut the discussion
9  of the science and the substance, as you phrased it
10 earlier?  Do I understand that correctly?
11         MR. INSOGNA:  Object to form.
12     A.   That's right.
13         THE REPORTER:  Sorry.  Did you say
14 "right"?
15     A.   I said "that's right."
16         THE REPORTER:  Thank you.
17 BY MR. SLATER:
18     Q.   There's a heading on Page 18 that says
19 clinical protocols.
20     A.   Yes.
21     Q.   And for the purpose of this question, I'm
22 going to include all the clinical protocols that you've
23 listed in your CV, because there's a whole series of
24 them that follow that heading in different categories;

Confidential Information - Subject to Protective Order

Page 66

1 right?

2  A.  Yes.

3  Q.  With regard to all of those, do any of

4 those clinical protocols address nitrosamines or the

5 potential risks of nitrosamines to humans or animals?

6  A.  No.

7  Q.  Do any address valsartan, the risks and

8 benefits of valsartan or similar medications?

9  A.  No.

10  Q.  Going now to Page 23, the next heading is

11 teaching activities?

12  A.  Yes.

13  Q.  In your teaching, have you ever taught --

14 well, rephrase.

15     In your teaching, have you ever taught

16 specifically with regard to nitrosamines or the risks

17 of nitrosamines to humans or animals?

18  A.  No.

19  Q.  Have you ever taught regarding valsartan

20 or similar medications and their risks and benefits?

21  A.  Probably did when I was a resident and

22 fellow when we're teaching other students.  Maybe even

23 now when I'm rounding as an inpatient attending with

24 medical students, because we take care of patients who

Page 67

1 are sick who are on these medications, so these types

2 of conversations come up in terms of treating patients

3 with blood pressure medication, which is very common.

4  Q.  So an issue could come up -- just because

5 a patient might be utilizing that type of medication --

6 it could be part of the discussion?

7  A.  Right, because some of these are -- I

8 mean, what I'm listing here are different ways of

9 teaching, and one of the predominant ways that I teach

10 is through routine patient care with medical students,

11 residents, and fellows.

12     And so when we're talking about patients

13 who are sick, inevitably they're -- many of them are

14 taking blood pressure medicine.  So I'm sure that these

15 types of topics would have come up.

16  Q.  I'll try to be more precise, then.  And I

17 understand what you said.  With regard to your teaching

18 activities, have you ever taught specifically with

19 regard to the risks and benefits of valsartan or

20 similar medications, other than in the context of maybe

21 discussing a particular patient's list of medications

22 or what's going on in that patient's background?

23  A.  Just that.  Nothing outside of that.

24  Q.  And under teaching on Page 24, you then

Page 68

1 have a heading about those research trainees and

2 mentees that you've mentored.  Has any of that work

3 addressed nitrosamines or the risks to humans or

4 animals of nitrosamines?

5  A.  No, it has not.

6  Q.  Has any of that work addressed the risks

7 and benefits of valsartan or similar medications to

8 valsartan?

9  A.  No, it has not.

10  Q.  And that would be true all the way through

11 to the end of your CV on Page 27?  That covers that

12 whole category; correct?

13  A.  Yes.

14  Q.  We can put aside your CV.  I think we got

15 through it.

16     MR. INSOGNA:  Adam, are you at an okay

17 place to take a break then if you're moving to a new

18 document?

19     MR. SLATER:  Yeah.  Let's go off the

20 record.

21     THE REPORTER:  Okay.

22     THE VIDEOGRAPHER:  We're going off the

23 record at 10:45.

24     [A brief recess was taken.]

Page 69

1     THE VIDEOGRAPHER:  We are back on the

2 record at 10:59 AM.

3 BY MR. SLATER:

4  Q.  So looking now -- I'm going to skip over

5 Exhibit B for a second, and we'll go to Exhibit C of

6 your report.

7  A.  Yes.

8  Q.  This just lists your fee schedule, and

9 those are the fees that you are charging in this

10 matter?

11  A.  Yes.

12  Q.  So $750 an hour for your report,

13 deposition preparation, for your deposition, for your

14 trial preparation, and then $7,500 a day if you

15 actually testify at trial?

16  A.  Yes.

17  Q.  Let's look at Exhibit D if we could.  And

18 for -- and just for the record, we should probably make

19 sure that we mark the entire report with all of the

20 attachments and exhibits as one exhibit.

21     MR. SLATER:  I think, Chris, you might

22 have marked something else as a separate exhibit.  It's

23 fine if you did.  Like the CV might have been a

24 different-numbered exhibit.  But let's also have a

Page 70

1 comprehensive version of the August 27 report with all
2 the attachments and exhibits.  That's just for
3 everybody's --
4         MR. GEDDIS:   -- put together as one
5 document, but I can --
6         MR. SLATER:  We'll talk about it -- I want
7 it all as one document.  We don't want have to break
8 them up.
9         MR. INSOGNA:  And which number would that
10 be, just so that I have it?
11         MR. SLATER:  Well, we've already marked
12 the report as Exhibit 7, so that should be the report
13 with all the attachments and exhibits.  I think, Chris,
14 you might have marked Exhibit 8 as the CV separately
15 also?
16         MR. GEDDIS:  8 is the CV, then 9 was the
17 Exhibit C, and then Exhibit D I marked as 10.
18         MR. SLATER:  Okay.  It's fine.  There's no
19 harm in doing that.  Okay.
20         [Exhibit 8 marked for identification.]
21         [Exhibit 9 marked for identification.]
22         [Exhibit 10 marked for identification.]
23 BY MR. SLATER:
24     Q.   Looking now at Exhibit D, Doctor.  This is

Page 71

1 a listing of your primary testimony, and it should be
2 your prior testimony last four years.
3         Did you compile this list?
4     A.   Yes.
5     Q.   And you confirmed that this was an
6 accurate list, all-encompassing?
7     A.   Yes.
8     Q.   Do any of these cases listed here -- well,
9 let me ask you this in general.  Are these cases all
10 cases in which you testified as an expert in a medical
11 malpractice case?
12     A.   All except for one, I think.
13     Q.   Which is the one exception?
14     A.   The Deposition Number 7, Gross verse BNSF.
15     Q.   Number 7, you said; correct?
16     A.   On my list here, yes.
17     Q.   What was the subject matter of that case,
18 the Gross versus BNSF case?
19     A.   This was -- or it's an ongoing case of a
20 patient with colorectal cancer and exposure to asbestos
21 and causation.
22     Q.   And are you the expert for the lawyer --
23 rephrase.  Are you the expert for the plaintiff,
24 meaning the person with the cancer, or are you the

Page 72

1 expert or an expert for the defendant, the manufacturer
2 of the asbestos?
3     A.   The plaintiff.
4     Q.   So you've offered the opinion in that case
5 that plaintiff's colorectal cancer was caused by
6 asbestos?
7     A.   Contributed -- asbestos contributed to
8 cause, yes.
9     Q.   Do you have the deposition transcript that
10 you -- from the deposition you gave in October of 2019?
11     A.   Yes, we can get it, I think.
12     Q.   Do you have the other deposition
13 transcripts for the other depositions listed?
14     A.   I don't have them here, but I could get
15 them if necessary.
16     Q.   In the deposition in the Gross versus BNSF
17 case, did you offer any opinions about alternative
18 potential causes of the person's colorectal cancer?
19     A.   Yes.
20     Q.   Did the subject of nitrosamines come up at
21 all in that case?
22     A.   No.  Not that I recall.
23     Q.   In the cases you -- rephrase.  You
24 testified the balance of the cases listed here under

Page 73

1 trial and deposition are medical malpractice cases;
2 correct?
3     A.   I think all the other ones are that.
4     Q.   In those cases, are you an expert for the
5 plaintiff, for the defense, or is there a mix?
6     A.   There's a mix.
7     Q.   Is there any sort of a balance one way or
8 the other where you'd say most of them are for one side
9 or the other?  I'm just trying to save walking through
10 them all.
11     A.   Yeah, usually when I'm asked that, in
12 general it's about two-thirds to 70 percent plaintiff,
13 and the remainder defendant.
14     Q.   To your knowledge, has there ever been a
15 ruling by any court as to the -- your qualifications or
16 whether you could provide any sort of testimony that
17 found either you weren't qualified or you couldn't
18 provide testimony -- anything like that?
19     A.   No.
20     Q.   How would you define your profession in
21 terms of what you do?  What would you describe yourself
22 as?
23     A.   I am a medical oncologist that works at an
24 academic center.  I subspecialize in GI cancers and I

Confidential Information - Subject to Protective Order

Page 74

1  direct the GI oncology program at the University of
2  Chicago, and involved in my roles there, which are
3  multiple different aspects, includes patient care,
4  clinical care of patients that have GI cancers for the
5  most part, but occasionally all cancers, because I do
6  inpatient rounds on sick patients that get admitted
7  with various cancers.
8        I do research -- clinical trial research,
9  laboratory research, something called translational
10 research, which translates findings in the laboratory
11 to clinical research and vice versa, findings from the
12 clinical care of patients back to laboratory questions.
13       I teach along the way on various aspects
14 on clinical care to, as we talked about earlier,
15 medical students, residents, fellows, and also teaching
16 from a research perspective in terms of volunteers and
17 students that come through my research lab and clinical
18 trial research endeavors.
19       I oversee as the GI oncology program --
20 that's in my report there -- the clinical and the
21 clinical research program for GI cancers at the
22 university, which entails a number of GI medical
23 oncologists -- like we talked about Blase Polite, who
24 is one of them -- and there are others, six at the

Page 75

1  moment -- as well as research nurses, clinical nurses,
2  clinical research staff, and overseeing that operation.
3        Also in the umbrella is we have satellite
4  sites at the University of Chicago that are in various
5  places in the Chicagoland area that are part of us and
6  that see patients at those sites, but I oversee the
7  clinical research at those programs as well, and even
8  patients come back and forth from those centers to ours
9  for opinions, et cetera.
10       In addition to that and part of all of
11 that is writing grants to support clinical research
12 questions. We talked about in my CV writing
13 publications, writing commentaries, and in addition to
14 that, other extramural things like we talked about and
15 serving as an editor of journals, reviewing journals to
16 provide back to the scientific community that's not
17 actually -- for example, all those ad hoc reviews
18 aren't paid for per se. They're just -- part of our
19 scientific community is to peer review each other's
20 work.
21       So in a nutshell is all of those things
22 that I do as part of my academic position at the
23 University of Chicago.
24       Q.  In reading through your background, my

Page 76

1  sense was that your focus of your professional work is
2  on the treatment of cancer but with a specialization
3  and focus on gastrointestinal cancers and trying to
4  develop better ways to treat cancer.
5        Is that a fair understanding in terms of
6  what your main focus is?
7        A.  That --
8            MR. INSOGNA:  Object to form.  You can
9  answer.
10       A.  That's the primary intent of my research
11 agenda, is in the treatment of patients with various GI
12 cancers, yes.
13 BY MR. SLATER:
14       Q.  Do you consider yourself to be a
15 toxicologist?
16       A.  I do not.
17       Q.  Do you consider yourself to be an expert
18 in toxicology?
19       A.  I do not.
20       Q.  Do you consider yourself to be an
21 epidemiologist?
22       A.  I do not.
23       Q.  Do you hold yourself out as an expert in
24 epidemiology?

Page 77

1            MR. INSOGNA:  Form.
2        A.  I do not.
3  BY MR. SLATER:
4        Q.  Am I correct that you do not consider
5  yourself to be or hold yourself out as an expert in
6  organic chemistry?
7        A.  I do not.
8        Q.  Do you consider yourself to be an expert
9  in the field of risk assessment?
10           MR. INSOGNA:  Object to form.
11       A.  I guess it depends on -- can you clarify
12 in maybe a more detailed question?
13 BY MR. SLATER:
14       Q.  Risk assessment in the context of somebody
15 who would evaluate whether or to what extent a certain
16 exposure to a certain either chemical or other type of
17 environmental exposure would cause a disease -- for
18 example, cancer -- based on certain levels of exposure
19 for certain durations.
20       Is that something that you do?
21       A.  I do not.
22       Q.  So you don't consider yourself to be an
23 expert in that field; correct?
24           MR. INSOGNA:  Form.

Page 78

1    A.   Correct.
2   BY MR. SLATER:
3    Q.   And I didn't see any such calculations or
4   analysis, but did you perform any risk assessment
5   calculations along the lines of what I just described
6   to you in this case, in your work as an expert in this
7   case?
8        MR. INSOGNA:  Object to form.
9    A.   Other than what's written in my report in
10  terms of the -- for the most part rebutting some of the
11  articles that were brought up by expert plaintiffs in
12  terms of pointing out certain aspects that I thought
13  were flawed or the limitations of the studies, and --
14  other than that, I didn't do any other things outside
15  of this report.
16  BY MR. SLATER:
17   Q.   And what I'm getting at is, did you
18  independently do a risk assessment analysis where you
19  calculated doses and duration of use of the valsartan
20  pills at issue and do a calculation of what the risk
21  level would have been to the various people who might
22  have taken the pills?
23       MR. INSOGNA:  Object to form.
24   A.   I did a qualitative assessment of the

Page 79

1   topic, and after reviewing all of the expert --
2   plaintiff expert reports and the literature on my
3   review, and I provided my opinion based on that review.
4        But I didn't do -- because it was my
5   understanding that there was a toxicologist who would
6   be performing more detailed -- a response to that
7   question -- and so I touched on, as I mentioned
8   earlier, some of the papers and opinions in terms of
9   pointing out limitations, because ultimately I'm not a
10  toxicologist or an epidemiologist, as you've pointed
11  out.  I am a scientist and I can read scientific
12  literature and I can provide an opinion based on the
13  data that I reviewed.
14  BY MR. SLATER:
15   Q.   Did you do anything to independently
16  either verify the calculations or the models or the
17  conclusions found in those reports that you were
18  commenting on?
19   A.   I didn't -- sorry.
20       MR. INSOGNA:  Object to form.  Sorry.
21   A.   I didn't independently do calculations
22  outside of what I've already shown in my own report.
23  BY MR. SLATER:
24   Q.   Well, that's what I'm trying to

Page 80

1   understand.  I have your report, and I don't see
2   any reference to you doing any independent risk
3   assessment or calculations, so I just want to make sure
4   I didn't miss that, that there's nowhere where you
5   actually say you did a risk assessment or did a
6   calculation or came up with the numbers as opposed to
7   just commenting on the numbers provided by others?
8    A.   Right --
9        MR. INSOGNA:  Object to form.  Vague,
10  compound.
11   A.   I was commenting on certain calculations
12  and providing my own calculations.  Sometimes they
13  required calculations.
14  BY MR. SLATER:
15   Q.   With regard to this area, this risk
16  assessment toxicology area we're talking about, what
17  did you do to ensure that you had seen each of the
18  important sources of information?  Because you said you
19  looked at various literature.  What did you do to make
20  sure that you had seen everything that was significant?
21   A.   I reviewed all of the plaintiff expert
22  reports which they were relying on for the opinion, and
23  from there I did my independent review of the topic
24  and -- which includes a lot of the things that I

Page 81

1   included in my report -- and ultimately I was not
2   performing a comprehensive detailed analysis of each of
3   those questions.
4        I was -- and I think I pointed out in my
5   report that I felt compelled to point out the ones that
6   were brought forth by plaintiff experts because that's
7   what they were relying on -- point out their
8   limitations.
9    Q.   So if I understand correctly, in terms of
10  what the plaintiffs' experts opinions were, you saw
11  yourself as providing basically rebuttal to what they
12  said, as opposed to providing your own independent
13  analysis from scratch?
14       Do I understand that correctly?
15       MR. INSOGNA:  Object to form.  Misstates
16  testimony.
17   A.   Because I'm not an epidemiologist or a
18  toxicologist and my understanding was that there would
19  be experts providing a more detailed and comprehensive
20  response, I focused on pertinent to these particular
21  topics as I mentioned earlier, the reports and the
22  papers and the opinions that were brought forth by the
23  plaintiff experts, presuming that all of the ones
24  that -- all of the topics and papers that they were

Page 82

1 using in favor of their arguments would be
2 comprehensive. They wouldn't exclude ones that they
3 thought were important to their opinion. So I focused
4 on the ones that they brought forth.
5        And this is because -- I think I should
6 sort of establish this -- is that whenever we have a
7 scientific question and you have a proposed hypothesis,
8 the null hypothesis is that it's negative, that
9 there's, say in this case, no association, and that you
10 have to show evidence to reject that null hypothesis
11 and to accept the alternative.
12       And so if I'm reviewing it from the
13 perspective that I'm looking at the data that have been
14 provided to me to try and reject the null hypothesis
15 and accept the alternative, I was looking at the data
16 that was being brought forth to make that assessment,
17 and those articles are the ones that are in the
18 plaintiff experts' reports, so I focused on those to
19 address those to see if I agreed or not with that
20 opinion.
21 BY MR. SLATER:
22    Q.   So if I understand correctly, you didn't
23 independently research these issues; you looked at what
24 the plaintiff experts had referred to, and those

Page 83

1 materials were provided to you by counsel, and that's
2 what you reviewed; correct?
3        MR. INSOGNA: Object to form.
4    A.   That's where I started, with those
5 articles, and I did an independent review, and there
6 are articles in my report, for example, that they do
7 not reference. I looked outside of their reports, but
8 it was all focused on that question based on the
9 original articles that the plaintiff experts used
10 with --
11 BY MR. SLATER:
12    Q.   You mentioned -- I'm sorry. Go ahead.
13    A.   I was going to say, we're talking about
14 the toxicology and the epidemiology question.
15    Q.   Right. In terms of the level of rigor
16 that you follow in your methodology when you, for
17 example, publish something yourself or review it --
18 review something else somebody else wants to publish --
19 let me rephrase.
20       With regard to the epidemiology and
21 toxicology opinions, from what I'm hearing, you didn't
22 follow the same sort of process you would have followed
23 if you were actually authoring original research or an
24 original paper; correct?

Page 84

1        MR. INSOGNA: Object to form.
2    A.   No, I followed what I normally would do,
3 which is start with a question, and whatever data I
4 have to start with it, and then perform a more
5 extensive literature search on the topic.
6 BY MR. SLATER:
7    Q.   Is it your testimony that you reviewed in
8 its entirety every single report written by the
9 plaintiff experts and every single piece of literature
10 that was referenced by all the plaintiff experts?
11       MR. INSOGNA: Object to form.
12    A.   Only the ones that are in my reliance list
13 are the ones that I relied on to make my opinion. So
14 the answer is no, I didn't look at every -- look at
15 every reference in great detail from the expert
16 plaintiffs. But I looked at what I thought were
17 their -- the articles that they were putting most of
18 the emphasis of their opinions on, that they relied on
19 heavily.
20 BY MR. SLATER:
21    Q.   Part of your methodology is to review
22 those source materials which were most significant?
23 That was what you endeavored to do; correct? Let me
24 ask it differently.

Page 85

1        In terms of your method -- in terms of
2 a -- rephrase. In terms of a scientific methodology,
3 you were reviewing various materials -- literature, for
4 example -- you wanted to make sure that you saw that
5 literature which was most significant with regard to
6 the questions you were trying to answer; right?
7    A.   Yes.
8    Q.   And if it turns out that you didn't review
9 or consider something that was significant, that could
10 potentially undercut the ultimate opinion; correct?
11       MR. INSOGNA: Object to form.
12    A.   If there was an article that was pivotal
13 or instrumental for the opinion to reject the null
14 hypothesis, and accept the alternative hypothesis and I
15 didn't see that, then that would be -- that would not
16 be good.
17 BY MR. SLATER:
18    Q.   In your report was it important for you to
19 accurately characterize the findings in the studies
20 that you discussed?
21    A.   Yes, that would be an important thing to
22 do -- strive to do.
23    Q.   For example, in your peer review or
24 editorial work, if you were to find or be told that

Page 86

1  somebody said something in a proposed article that
2  mischaracterized a source of information, that would be
3  a problem and that would have to be fixed or the
4  article would have to be withdrawn; right?
5      MR. INSOGNA:  Object to form.
6  BY MR. SLATER:
7      Q.  If it was something of significance?
8      A.  There's -- if something found after the
9  fact that's of significance, then articles can be
10  edited or amended or retracted.
11     Q.  Did you think that it was important for
12  you to independent verify that each of the statements
13  you made characterizing the findings in the articles
14  you discussed were accurate?
15     A.  Yes.  That was what I would strive to do
16  when I wrote my report -- ensure that things are
17  accurate.
18     Q.  You talked earlier about your work
19  regarding research and actually being involved in the
20  process to vet proposed research; correct?
21     A.  Yes.
22     Q.  We talked about that a little earlier?
23     A.  Yes.
24     Q.  And my understanding is none of the

Page 87

1  research that you've either personally participated in
2  or had a responsibility to review at some level has --
3  none of that has addressed nitrosamines or the
4  potential risks to humans of nitrosamines; right?
5      A.  Right.
6      Q.  For example, there's no study that you've
7  either been involved in or had presented to you as a
8  proposed study where NDMA would be given to human
9  beings to see what the effect would be on the human
10  beings?
11     Has there ever been any such study like
12  that you've been involved in?
13     A.  No.
14     Q.  If somebody walked into your office
15  tomorrow morning and said, "I want to do a study where
16  I'm going to give NDMA to humans and we're going to
17  have a control group that's not going to get NDMA," do
18  you think that has a chance to pass muster with the
19  IRB?
20     A.  I wouldn't be involved in such a study in
21  my capacity in what I do from a research perspective
22  because I'm more involved in treating cancer, so that
23  wouldn't happen.
24     Q.  Well, based on what you know about NDMA

Page 88

1  and the reading you've done, you would agree with me
2  that there's no IRB in the country that would agree to
3  let that study go forward, because it would be
4  unethical; right?
5      A.  I don't know the details of the study that
6  you're proposing, so I can't comment.
7      Q.  All right, here's the study.  We're going
8  to get the valsartan pills that were manufactured by
9  ZHP with the levels of NDMA that you've commented on in
10  your report and we're going to give those pills to
11  humans for five years every day, and we're going to
12  have another set of people that's going to take
13  valsartan that we know has no contamination risk at
14  all, and we're going to see how those people do over
15  the next 30 years.
16     Is that an ethical study?
17     MR. INSOGNA:  Object to form.
18     A.  Are they randomized?
19  BY MR. SLATER:
20     Q.  Either way, whether they're randomized or
21  not, people are going to get those pills that ZHP
22  produced and they're going to take them for five years
23  with those contamination levels of NDMA.
24     Is that an ethical study that could be

Page 89

1  approved?
2      A.  I don't know.
3      Q.  In all of the research you've done, in all
4  the reading you've done since you were first contacted
5  in this case back in March of this year, have you seen
6  any study where human beings were deliberately given
7  NDMA at the levels found -- and I'll use, for example,
8  at the levels found in the ZHP-manufactured valsartan.
9      Have you seen any study where that was
10  deliberately done?
11     A.  I have not seen any studies where NDMA was
12  given deliberately in a randomized fashion, but I've
13  seen one prospective randomized study that gave
14  ranitidine, which putatively degrades or is activated
15  to have NDMA endogenously after taking it to patients
16  or not and following certain parameters.  I think the
17  primary end point was excretion of NDMA in the urine
18  and changes with and without.
19     That would be the closest thing that would
20  be a prospective study that evaluated that -- something
21  like known exposures to something that putatively
22  causes something, to address the question in a
23  scientific manner.
24     Q.  It was your understanding that the

Confidential Information Subject to Protective Order

Page 90

1 ranitidine study was conducted with the intent of
2 exposing people to NDMA to see what it would -- how it
3 would affect them?
4      MR. INSOGNA: Objection.
5   A.  It's been a while since I read that paper,
6 but it was intended to evaluate levels of excretion of
7 NDMA and changes with or without ranitidine.
8 BY MR. SLATER:
9   Q.  Is that the study that had to be withdrawn
10 from the literature?
11   A.  Not that I'm aware of. It was published
12 in JAMA here. And that obviously wasn't determined to
13 be unethical, because it was conducted and published.
14   Q.  Where was that study done?
15   A.  I don't know. I'd have to look up the
16 paper again.
17   Q.  Is the paper listed in your report?
18   A.  No. You asked me if I knew of a study
19 that did something like that, so that's why I'm telling
20 you.
21   Q.  No, that's fine. That was what I asked
22 you. It was a new question.
23      Let's go now to Exhibit B to your report.
24   A.  Okay.

Page 91

1   Q.  Exhibit B to your report of August 27,
2 2021, is titled amended list of materials considered.
3      Do you see that?
4   A.  Yes.
5      MR. SLATER: And Chris, let's mark as an
6 exhibit separately the updated amended list of
7 materials that we were provided with the production.
8 Let's mark that as Exhibit -- I don't know what number
9 we're up to. Are we now up to Exhibit 11 or 12?
10      MR. GEDDIS: 11. It's 11.
11      THE REPORTER: So this is going to be 12,
12 Chris?
13      MR. GEDDIS: No, this is going to be
14 Exhibit 11.
15      THE REPORTER: Okay. Very good.
16      [Exhibit 11 marked for identification.]
17 BY MR. SLATER:
18   Q.  Doctor, what I'm trying to understand --
19 well, rephrase. Looking now at the Exhibit B to your
20 August 27 report, is this intended to be comprehensive
21 of everything you reviewed as part of your analysis of
22 the questions that you answered in your report?
23      MR. INSOGNA: Object to form. Adam, are
24 you asking about the update that came through in the

Page 92

1 file transfer this week, or are you asking about the
2 August 27th?
3      MR. SLATER: I'm asking about the August
4 27th, but it could apply to either because I'm just
5 asking about the purpose of the list. So the purpose
6 would be the same, I would assume, regardless of which
7 version it is. But let me ask the question again.
8 BY MR. SLATER:
9   Q.  This amended list of materials considered
10 which is attached as Exhibit B to your August 27
11 report -- what is that supposed to convey? What is
12 that document?
13   A.  This lists all of the documents that I
14 reviewed that were pertinent for me to either include
15 in my report or had some contribution to formulating my
16 opinion.
17   Q.  The exhibit we just marked as Exhibit 11
18 was provided to us when your files were provided to us.
19      To your knowledge, was that an updated
20 version of this amended list of materials considered?
21   A.  I think so.
22   Q.  Do you know what was edited and why in the
23 most recent version, which is Exhibit 11?
24   A.  I don't know offhand.

Page 93

1   Q.  Was there anything that you had located or
2 identified as having not been included that should be
3 so that you said, "I need to make sure this gets
4 included"?
5   A.  There may have been a paper, but maybe --
6 forget the name of the author -- but there was one
7 paper about nonlinear estimations of dosing. Patrick I
8 think is the name of the author.
9   Q.  Who?
10   A.  I think it's -- I could be wrong. I can
11 get the name if you give me a second. It's Gerald.
12 Excuse me.
13   Q.  Looking now -- well, let me ask you this.
14 Do you have Exhibit 11, the most updated amended list
15 of materials, available to you?
16   A.  I have a lot of them and we're trying to
17 determine which one's the most recent one. This is the
18 most recent one. So yes.
19   Q.  Okay, great. I'm going to use that as the
20 exhibit we're going to talk about now, because it's the
21 most up-to-date amended list of materials we were
22 provided before the deposition. Okay?
23   A.  Okay.
24   Q.  Looking at the first category, MDL

Page 94

1 pleadings and general documents, did you rely on any of
2 those documents in forming your opinions in this case?
3        MR. INSOGNA: Object to form. Vague.
4    A.  No, not really.
5 BY MR. SLATER:
6    Q.  Did you read each of those documents?
7    A.  Yes. I've looked through all of these
8 documents, as I mentioned at the very beginning, some
9 in more detail than others, though, that I put more
10 emphasis on than others.
11   Q.  When you say you looked through a
12 document, I take that to mean that you may have skimmed
13 it or jumped around to get a gist of a document as
14 opposed to reading an entire document.
15       Do you make the same distinction when you
16 say you looked at a document versus read the entire
17 document?
18   A.  Yes, sometimes I would skim through it,
19 and other times I would really focus and sometimes read
20 it five times, like a specific article, for example.
21   Q.  So if I understand the MDL pleadings in
22 general documents category, you looked through those
23 documents but didn't rely on anything in those
24 documents to form your opinions; is that correct?

Page 95

1        MR. INSOGNA: Object to form. Vague.
2 Mischaracterizes.
3    A.  I think some of those would have had the
4 original cancer types listed, for example, that are
5 part of the litigation, so of course I focused on those
6 because that's what I was trying to focus on in my
7 report.
8 BY MR. SLATER:
9    Q.  So your answer is, with regard to that
10 category of documents, the listing of cancers that were
11 at issue was informative to you of what you were going
12 to be addressing in your report? Do I understand that?
13   A.  As an example --
14       MR. INSOGNA: Objection.
15   A.  As an example to what I used those initial
16 documents for.
17 BY MR. SLATER:
18   Q.  Is there anything else that you used those
19 initial documents for, the MDL pleadings and general
20 documents -- that list right there?
21   A.  Get an understanding of what the whole
22 question was at hand.
23   Q.  Did you rely on that in forming your
24 opinions?

Page 96

1    A.  It served as the basis of the starting
2 point of what was happening.
3    Q.  Anything else that you relied on in those
4 documents to form your opinions?
5        MR. INSOGNA: Object to form.
6    A.  I would have to go back and look to see
7 exactly what's in them again, but -- I can think of at
8 the moment.
9 BY MR. SLATER:
10   Q.  There's a list of expert reports with
11 exhibits. Did you read each of those expert reports
12 cover to cover?
13   A.  Yes.
14   Q.  Did you rely on those expert reports or
15 any parts of them in forming your own opinions?
16       MR. INSOGNA: Object to form. Vague.
17   A.  As we talked about earlier, I used those
18 reports as a starting point of what the argument was in
19 terms of the opinion to reject the null hypothesis and
20 accept the alternative hypothesis. So those were the
21 reports that -- where the substance of that opinion
22 lied.
23 BY MR. SLATER:
24   Q.  Did you see anything in those reports that

Page 97

1 you found to be accurate with regard to the question
2 that you were looking at, meaning did you look at any
3 of the expert reports from the plaintiff experts and
4 say, "I agree with that. That's a good point"?
5        MR. INSOGNA: Object to form. Vague,
6 compound.
7    A.  If the question is, was the report 100
8 percent inaccurate, then the answer to that is no --
9 every topic and every opinion stated there.
10 BY MR. SLATER:
11   Q.  Do you agree with me it was important for
12 you in writing your report to focus both on those
13 things that were supportive of the position that you
14 were taking, as opposed -- as well as that information
15 which was contrary to the position that you were
16 taking?
17   A.  That's how science works, yes. You have
18 to look at all the data on a pertinent question and
19 make an assessment if there is enough information there
20 that would lead you to reject null hypothesis and
21 accept the alternative hypothesis.
22   Q.  So for example, if there was an article
23 that you found to be important in forming your
24 opinions, was it also important for you in your report

Page 98

1  to talk about those aspects of that article that
2  supported your opinion as well as those parts of the
3  article that would cut against your opinion and be
4  supportive of the plaintiff position?
5        Did you feel it was important to address
6  both sides of that coin in your report?
7        MR. INSOGNA:  Object to form.
8        A.   Yes, which I strive to do, is to show all
9  the evidence, the discussion points around them, and an
10 overall opinion as to where my -- where the data lie in
11 terms of whether or not it's enough to sway away from
12 the null hypothesis or not.
13       So it's not often that you would see all
14 data point to one thing.  The way science works is that
15 there are different outcomes with different studies,
16 and ultimately you have to look at the data as a whole
17 in terms of whether or not there's consistency with the
18 findings, what type of evidence we're talking about,
19 because I think as we'll get to along the way here,
20 different studies are different and contribute
21 different things to the understanding of the question
22 at hand and have different emphasis and weight in terms
23 of ultimately how you're going to make your final
24 opinion.

Page 99

1        So yes, though, you have to look at all
2  available data that's there and then, taking all those
3  points into account, come up with a decision whether or
4  not you think there's enough to be swayed away from the
5  null hypothesis.  That's how science works.  You don't
6  ignore data.
7  BY MR. SLATER:
8        Q.   Not only were you obligated to look at all
9  of the data and look at the data on both sides of the
10 question, but you would agree with me you also in your
11 report, if you were going to cite an article, needed to
12 talk about the information that was both pro and con to
13 the position you were taking in order to be evenhanded;
14 correct?
15       MR. INSOGNA:  Object to form.
16 Argumentative.
17       A.   Which is why I've referenced all of the
18 articles that the expert plaintiffs rely on for their
19 opinion.
20 BY MR. SLATER:
21       Q.   It's a little bit of a different question.
22 In writing your report where you evaluated the
23 literature and the studies, was it important for you to
24 make sure that if you were going to point out aspects

Page 100

1  of the data or the findings that were supportive of
2  your position that you also make sure you pointed out
3  the data and findings that was not supportive of your
4  position if there was such information?
5        MR. INSOGNA:  Object to form.
6        A.   I think I answered that in the sense that
7  all the data that was not ultimately in line with my
8  opinion is referenced there, because that was where I
9  started, was where the plaintiff experts were using
10 that.
11       And I think it should be stated that the
12 way science works is that you don't have to disprove
13 the null hypothesis; you have to prove the alternative
14 hypothesis in order to reject the null hypothesis.  The
15 onus is not on me to prove that it's not true.  I'm
16 looking at the data that's being provided to me to try
17 and sway me away from that.
18 BY MR. SLATER:
19       Q.   My question is not -- well, again --
20 rephrase.  Again, what I'm -- rephrase.  What I'm
21 asking you is, when you wrote your report and discussed
22 a particular study, in terms of a valid methodology of
23 writing this type of a report, you needed to reflect in
24 your report the information that was supportive of your

Page 101

1  position but also to be evenhanded to discuss in your
2  report the data that wasn't?
3        I'm not saying just citing the article,
4  but actually discussing with substance, "They say this.
5  That was important to me.  It supports this.  They also
6  say this, though, and I do have to acknowledge that
7  could go the other way."
8        Should you have been evenhanded like that?
9        MR. INSOGNA:  Object to form.
10 Argumentative.
11       A.   And the answer to that is yes, and I mean,
12 I can go through and find examples, but as an example
13 that comes to mind, I pointed out limitations of
14 articles that I was relying on that ultimately don't
15 show an association but that there were limitations to
16 the study, like there are -- in all studies there are
17 some limitation.  So that's an example of showing both
18 sides, and from a scientific perspective that's normal
19 and natural to do something like that.
20 BY MR. SLATER:
21       Q.   From a scientific perspective, it would
22 never be acceptable to mischaracterize the data in a
23 study and describe it in such a way that it spins the
24 article and the findings one way or the other; right?

Confidential Information Subject to Protective Order

Page 102

1          MR. INSOGNA:  Object to form.
2      A.   Not in an intentional malignant way.
3  That's an opinion that one takes out of the data and
4  that's their opinion based on how it's interpreted,
5  and -- for example, some studies provide data and
6  can -- some physicians interpret it differently than
7  others, and it's different interpretation of the data.
8  BY MR. SLATER:
9      Q.   It certainly would never be acceptable to
10 characterize the data and findings in the study in such
11 a way that doesn't accurately reflect what the article
12 actually says; right?
13         MR. INSOGNA:  Same objection.
14     A.   Sometimes, for example, I don't agree with
15 every point or conclusion that is mentioned in an
16 article, so for me to opine on that I think is part of
17 the scientific method.
18         Sometimes statements in articles are
19 speculative or trying to explain a phenomenon, but that
20 doesn't make the statement in an article a gold
21 standard, and that's just the author's interpretation
22 or thoughts, but it doesn't make it the -- it's not
23 infallible, if that's the question.  So I can review
24 the same dataset and provide my own opinions on that

Page 103

1  data.
2  BY MR. SLATER:
3      Q.   With regard to objective data points, it
4  would never be acceptable to mischaracterize those
5  objective data points; correct?
6      A.   No, if there were -- if it was about a
7  number or something that was a data point and it was
8  misrepresented, that could happen, but that's not what
9  I'm talking about.  That would be -- that's not how
10 science works.  You can't change that issue.
11     Q.   If there's objectively-reported data in
12 the study that you're talking about, it would not be
13 scientifically-acceptable to talk in your report about
14 that objective data that's supportive of your position
15 while not referencing and discussing on the other hand
16 other objective data in the study if it actually is
17 supportive of the opposite position; right?
18         You have to be evenhanded in what you
19 discuss in your report; right?
20         MR. INSOGNA:  Object to form.
21 Argumentative, mischaracterizes.
22     A.   You would strive to do that, and I'm not
23 sure what example -- because maybe it's an example that
24 we should have the details of, because it's a little

Page 104

1  bit vague what we're talking about here.  Like are
2  these two data points?  Is one a primary end point and
3  others are secondary end points?  Because that is an
4  important thing to consider.
5          But I'm not sure what you're asking, but
6  of course, if it's a data point, then it should not be
7  mischaracterized or changed -- the number changed, for
8  example, intentionally.
9  BY MR. SLATER:
10     Q.   We talked a little bit earlier about the
11 toxicology and epidemiology aspects of your analysis.
12 Remember that?
13     A.   Yes.
14     Q.   And I think you told me that you knew that
15 there were other people that were actual toxicologists
16 and epidemiologists who were going to address that in a
17 thorough manner, so you didn't feel like you needed to
18 get into that kind of depth because there were other
19 people analyzing that.
20         Do I understand that correctly?
21         MR. INSOGNA:  Object to form.
22 Mischaracterizes the testimony.
23     A.   I was informed that there would be
24 specific experts asking those questions from that

Page 105

1  perspective, and so -- and I'm not a toxicologist or an
2  epidemiologist, but at the same time I think I
3  mentioned earlier I can read papers, scientific papers,
4  and evaluate their strengths and limitations and
5  evaluate them in terms of my ability to formalize an
6  opinion on a given question that is a scientific
7  question.
8  BY MR. SLATER:
9      Q.   Had you authored -- go ahead.  I'm sorry.
10     A.   I was going to say, the language of
11 science is universal in terms of understanding how to
12 apply scientific method -- different disciplines of
13 science like epidemiology, biology, chemistry,
14 epidemiology, toxicology -- but the methods with which
15 one tests hypotheses, as we've been alluding to all
16 along the way here, is the same.  So I can weigh data
17 in the same manner.
18     Q.   In terms of the -- what you just referred
19 to as weighing the data, would you agree with me that
20 the toxicologists and epidemiologists in this case did
21 that in a more rigorous manner than you did because
22 that's their specialty?
23         MR. INSOGNA:  Object to form.
24     A.   They did it in their manner from the way

Confidential Information Subject to Protective Order

Page 106

1  they do it in their discipline, yes.  I looked at it,
2  as I mentioned earlier and in my report, after
3  reviewing the plaintiff experts' reports and seeing the
4  papers that they were relying on for their opinion and
5  evaluating those papers and pointing out limitations
6  and strengths from those papers and how that played a
7  role into my opinion that I was asked to give, which
8  one of them was the question at hand -- is, is there an
9  association with cancer risk with the trace impurities
10  that were found in these agents or not based on the
11  available evidence to date?
12  BY MR. SLATER:
13      Q.   You just used the word trace impurities.
14  How do you define that term?
15      A.   How do I define it?  I --
16      Q.   Yeah.  Why did you use the word trace?
17  What does that mean?
18      A.   Because they're small -- like they're very
19  small amounts in each of the -- in the pills.  I mean,
20  that's what they were referred to in many of the
21  reports and in the FDA reports that I read and
22  referenced.
23      Q.   The amounts of NDMA in the various pills
24  varied depending on the manufacturer.

Page 107

1          Are you aware of that?
2      A.   Yes.
3      Q.   Are you saying that all of those levels
4  right up to the highest level seen are all trace
5  amounts and very small?
6      A.   Yes.
7      Q.   What's your frame of -- what's your basis
8  for that opinion?
9      A.   All in my report in terms of looking at
10  our daily exposures to NDMA based on exogenous and
11  what's endogenous, the estimates of endogenous -- the
12  levels that are found in these pills are minuscule
13  compared to that, so that's what the word trace means
14  to me, is that there are small amounts.
15          Many of the lots there was nothing
16  detected, below the limit of detection, and all the
17  levels are relatively low compared to the known levels
18  that we are exposed to on a daily basis based on the
19  references and studies that I pointed out in my report
20  and after the fact seeing that in many of the other
21  expert reports.
22      Q.   Did you see any levels of NDMA in any of
23  the pills that exceeded the levels that one may be
24  exposed to through just background exposure?

Page 108

1      MR. INSOGNA:  Object to form.  Vague.
2      A.   I don't have them in front of me, but I
3  know that the answer to that is no.  The levels are far
4  lower.
5  BY MR. SLATER:
6      Q.   And that's based on, which we're going to
7  get to later, your understanding about how much
8  exogenous or endogenous NDMA one may be exposed in
9  everyday life?
10      A.   Right.  That's right.
11      Q.   On the first page of this list of
12  materials considered, there's a heading deposition
13  transcripts with exhibits.
14          Did you read each of those deposition
15  transcripts in their entirety?
16      A.   Yes.  Yes.
17      Q.   Did you read all the exhibits in their
18  entirety?
19      A.   I looked at as many as I could.  I didn't
20  read them all in detail, no.  I focused more on the
21  deposition itself.  Some of the -- what did you call
22  them -- attachments?  Is that what they're called --
23  the attachments?
24      Q.   To the report?

Page 109

1      A.   Yeah.
2      Q.   Exhibits?
3      A.   Exhibits.  Excuse me.  Many of them are
4  articles that were -- I already read because they were
5  part of the original review of generating my own
6  report, but yes.  Did I read through everyone's CV
7  entirely?  No.
8      Q.   One of the materials listed here is the
9  transcript of Raphael Nudelman deposition.
10          Who is that?
11      A.   That is a deposition, as I looked at that
12  name, that I read right near the beginning.  You can
13  see the date there.  I think it was in April.  So I'd
14  have to look at it again to remind and refresh my
15  memory what it was.
16      Q.   As you sit here now, you're not sure who
17  Raphael Nudelman is?
18      A.   I can't remember --
19      Q.   One of the things you said -- go ahead.
20  I'm sorry.
21      A.   I was going to say, I haven't reviewed
22  that deposition recently.
23      Q.   One of the things you told me earlier was
24  that these materials were provided to you by defense

Confidential Information Subject to Protective Order

Page 110

1 counsel; correct?

2           MR. INSOGNA:  Object to form.  Misstates

3 testimony.

4     A.    Some of them.

5 BY MR. SLATER:

6     Q.    Well, I guess the transcript will speak

7 for itself.  With regard to the -- new question.  With

8 regard to the materials that defense counsel provided

9 to you, did you expect that defense counsel would give

10 you materials that would not only be supportive of the

11 position that you were going to take, but also those

12 materials that could cut against the position you were

13 going to take?

14          MR. INSOGNA:  Object to form.

15 Mischaracterizes testimony.

16    A.    In terms of actual literature, I didn't

17 expect them to provide me with anything, really.  I

18 would do my own independent research.  In terms of

19 depositions, some of these other legal documents,

20 then the answer is yes.  I would be expecting to

21 receive all the pertinent records for balanced decision

22 and opinion.

23 BY MR. SLATER:

24    Q.    And that's the key, is that you --

Page 111

1 ultimately if you're doing something that's

2 scientifically appropriate in terms of methodologies,

3 to have a balanced dataset; right?

4           MR. INSOGNA:  Object to form.

5 BY MR. SLATER:

6     Q.    Meaning the data on both sides of the

7 question; right?

8           MR. INSOGNA:  Same objection.

9     A.    Yeah, I think we've alluded to that

10 particular question about data, as opposed to like a

11 deposition that happened previously.

12 BY MR. SLATER:

13    Q.    For exam -- rephrase.  You relied on

14 defense counsel to get you the pertinent legal

15 documents -- things like depositions, things like

16 internal corporate documents; correct?

17    A.    Yes.

18    Q.    And if there were such documents that

19 existed that would support the position that you are

20 contrary to, the position -- well, rephrase.

21          If there were such documents that

22 supported the position that NDMA and NDEA can cause

23 cancer in humans, you would have wanted to see that;

24 right?

Page 112

1           MR. INSOGNA:  Object to form.  Assumes

2 facts.  Argumentative.

3     A.    Yes, I would like to see all the documents

4 that were known on either side of the opinion.

5 BY MR. SLATER:

6     Q.    For example, if there were internal

7 documents from Teva, for example, in which people at

8 Teva were recognizing the danger to humans of NDMA and

9 NDEA in the Teva valsartan, you would have wanted to

10 see that so you could take it into account in your

11 analysis; right?

12          MR. INSOGNA:  Object to form.  Assumes

13 facts, argumentative.

14    A.    We're talking about discussions amongst

15 employees at the company?

16 BY MR. SLATER:

17    Q.    No, we're talking about -- well, it would

18 include that -- let me rephrase.  It would include

19 that.  It could also include an analysis of this

20 particular question, like when the company found out

21 there was NDMA in its valsartan, their internal

22 analysis of the risk to humans.

23          You'd want to see that; right?

24          MR. INSOGNA:  Same objection.

Page 113

1     A.    I would like to see all evidence as much

2 as possible, yes.  The more data -- I wouldn't exclude

3 data.  Whether it would be important in my decision is

4 another question, but if there was evidence or some

5 sort of data, then of course, you have to -- what is

6 available, you review and assess.

7 BY MR. SLATER:

8     Q.    For example, if there was deposition

9 testimony or internal documents from one of the

10 manufacturers in which it was acknowledged that NDMA or

11 NDEA could cause cancer in humans, that's something you

12 certainly would have wanted to see; right?

13          MR. INSOGNA:  Object to form.  Assumes

14 facts.

15    A.    I would want to see that, yes.  Would that

16 have played a role in my decision, what they thought?

17 Not necessarily.

18 BY MR. SLATER:

19    Q.    What if the "they" was a toxicologist

20 retained by one of the companies to analyze this exact

21 question?

22          Would that have been important to you to

23 see?

24          MR. INSOGNA:  Same objection.

Confidential Information Subject to Protective Order

Page 114

1    A.   If they had done an analysis, sure, I
2  would like to see what they showed --
3        Q.   What if it was the testimony of a
4  corporate witness who was speaking for the company on
5  that specific question of the risks of the NDMA and
6  NDEA in the valsartan and that person acknowledged that
7  there was a risk to humans of cancer?
8            Would you have wanted to see that?
9            MR. INSOGNA:  Same objections.
10       A.   Sure.
11  BY MR. SLATER:
12       Q.   For example, if there were witnesses who
13  testified for one or more of the manufacturers who
14  agreed that NDMA and NDEA are probable human
15  carcinogens, if they said that in sworn testimony
16  speaking for the company, would you have wanted to see
17  that in forming your opinions?
18           MR. INSOGNA:  Same objections.  Assumes
19  facts.  Do you have a document you want to show him,
20  counsel?
21  BY MR. SLATER:
22       Q.   Please answer.
23           MR. INSOGNA:  You can answer.
24       A.   Sure, I would like to see that, and I

Page 115

1  don't think what you just said would be anything
2  different than what I just already said earlier, and
3  that's been said by many experts, that it's
4  acknowledged that it's a probable human carcinogen.
5  It's not a definite human carcinogen.
6            So what you're telling me right now is not
7  changing anything that we already know, but would I
8  want to see the document?  Of course.
9  BY MR. SLATER:
10       Q.   And when you refer to the probable human
11  carcinogen, that's the finding IARC made; right?
12       A.   Right.
13       Q.   And you don't disagree with IARC; right?
14       A.   Well, I think we're going to get into it,
15  but maybe this is a good time to say.  IARC is telling
16  us that those -- that NDMA and NDEA are probable human
17  carcinogens, but that doesn't take into account the
18  dose or the duration of the exposures to these agents
19  and that they -- ultimately they're an extrapolation
20  from animal models, from rat models, with a lot of
21  limitations that are quite conservative.
22            But yes, I mean, I think we've established
23  that IARC said that, and so this other document you're
24  talking about so far from what you told me wouldn't

Page 116

1  change anything that we already know.
2        Q.   Just so I make sure that it's clean for
3  both of our benefit, you don't disagree with the
4  finding by IARC that NDMA and NDEA are probable human
5  carcinogens?
6            That statement in and of itself you don't
7  disagree with; right?
8            MR. INSOGNA:  Object to form.  Asked and
9  answered.
10       A.   Yeah, I just answered that question.  So
11  yes, I don't think that I disagree with that, with the
12  understanding I also mentioned, is that that doesn't
13  take into account the dose and the duration, which I
14  think is an important thing to consider here in this
15  particular question.
16  BY MR. SLATER:
17       Q.   Putting aside dose and duration, which
18  would become relevant to determining whether a
19  particular person claiming a particular cancer actually
20  got cancer in whole or in part from the exposure to the
21  NDMA in the valsartan pills --
22            I think that's what you're driving at;
23  right?
24       A.   No.

Page 117

1            MR. INSOGNA:  Go ahead.
2        A.   No, that's not -- I'm not talking about
3  that at all.  I'm just saying that because it's listed
4  as a probable carcinogen is one thing, but do have to
5  understand that all that's saying is that at some dose
6  level and for some duration that it's probably
7  carcinogenic in humans.
8            Again, it's only probably and not
9  definitively because it hasn't been shown in humans to
10  have that, yet it has in some animal models, at huge
11  doses, by the way, and for long durations that are
12  astronomically higher than what's in this case, which
13  is why I called it trace exposure in this case.
14  BY MR. SLATER:
15       Q.   Okay, I see where our disconnect is.  I'll
16  try to ask the question artfully.  You -- rephrase.
17            You agree with IARC that NDMA and NDEA are
18  probable human carcinogens, putting aside the dose or
19  duration of use or exposure -- putting that aside, you
20  don't disagree that those substances are probable human
21  carcinogens; correct?
22            MR. INSOGNA:  Form.  Asked and answered.
23       A.   If you're asking me to put those other
24  considerations aside, then yes, officially the IARC

Page 118

1  classifies these as 2A.
2  BY MR. SLATER:
3      Q.   And you don't disagree with that; right?
4      A.   No.
5      Q.   Your answer was no?
6      A.   No, I don't disagree with that.
7      Q.   Sorry.  Sometimes with the delay I get a
8  click on my -- it's totally on my end.  I just missed
9  it.  I'm sorry.
10         [Discussion off the record.]
11 BY MR. SLATER:
12     Q.   Let's go back to the amended list of
13 materials considered, the regulatory guidances and
14 documents.  First there's a heading that says
15 publicly-available documents.
16         Do you see that?
17     A.   Yes.
18     Q.   Have you read or reviewed any of those
19 materials before you were retained in this case?
20     A.   No.
21     Q.   In terms of forming your own opinions in
22 this case, are you relying on the regulatory
23 information to form your own scientific conclusion, or
24 is this more background information on what occurred

Page 119

1  and what the regulator said?
2          How do you mix that into your analysis?  I
3  want to understand how it fit into your methodology.
4          MR. INSOGNA:  Object to form.  Compound.
5      A.   It was obviously background to understand
6  the timeline of what happened and what the FDA's
7  positions were along the way.  I actually referenced a
8  lot of their statements.
9          And so with your question about how to
10 formulate my opinion, a lot of what they made mention
11 and that I point out in my report does some weight
12 in terms of my understanding of things in terms of the
13 risk, the risk assessment that they had made based on
14 these putative exposures, et cetera.  All of their
15 statements did play a role into my opinion.
16 BY MR. SLATER:
17     Q.   In that context, the FDA, for example,
18 established acceptable -- what they called acceptable
19 intake limits.
20         You're aware of that obviously; right?
21     A.   Yes.
22     Q.   You didn't do an independent assessment
23 and form an opinion as to whether or not those figures
24 the FDA adopted are reasonable or not; right?

Page 120

1      A.   I didn't do calculations to show what I
2  would perceive as being an acceptable intake.  I've
3  read the toxicologists on both sides, and as I
4  mentioned I think earlier, I added a paper that I found
5  after from Fitzgerald, I think, about other ways of
6  determining acceptable intakes.
7          And so I did take that into account and I
8  think even in my report you can see where I discussed
9  the acceptable intake from the FDA standpoint and some
10 of the limitations of it.
11     Q.   You didn't do an independent assessment of
12 the intake levels for the FDA and form an opinion that
13 those levels were unreasonable?
14         I didn't see that opinion in your report.
15 I just want to make sure I didn't miss it.
16         MR. INSOGNA:  Objection.  Compound.
17 BY MR. SLATER:
18     Q.   I'll ask it differently because counsel
19 objected.  He -- just like I have to be evenhanded, I
20 have to assume I could ask a bad question every so
21 often.
22         I didn't see an opinion in your report
23 that you disagree with the acceptable intake levels
24 established by the FDA.

Page 121

1          There isn't such an opinion in your
2  report?  Am I correct?
3      A.   I don't know verbatim what I put about
4  that in my report, but if you want my opinion I can
5  tell you right now, but I don't remember what the
6  actual detail -- how I mention that or worded it in my
7  report in terms of that particular threshold level.
8      Q.   What I want to do is -- part of what I'm
9  doing is you understand the purpose of your report
10 obviously is to give us notice before your deposition
11 of what your opinions are.
12         You know that; right?
13     A.   Yes.
14     Q.   So my goal is not to expand into a bunch
15 of other things and ask you a bunch of things you
16 didn't think about.  My goal is to try to stay within
17 your report because those are the opinions we've been
18 told about.
19         You understand that; right?
20     A.   Yes.
21     Q.   In the report itself, I did not see an
22 opinion where you said that the FDA acceptable intake
23 levels are unreasonable for some reason and that
24 different levels should have been adopted and here's

Page 122

1  why.  I didn't see such an analysis.

2       Did I miss it, or is it not there?

3    A.   I don't think I did that analysis

4  explicitly in the report.

5    Q.   For purposes of your opinions, did you

6  accept -- well, let me ask it this way.

7       You said that you've seen some studies

8  where different people in some articles calculated

9  different levels or different approaches to looking at

10  acceptable levels, but putting that aside, you accepted

11  the FDA levels for purposes of your analysis; is that

12  correct?

13       MR. INSOGNA:  Object to form.  Misstates

14  testimony.

15    A.   Well, no.  I mean, I think that that's why

16  I was getting a little confused what you're asking --

17  is that I pointed out from the dietary studies, for

18  example, the exogenous and endogenous known exposures

19  that we were talking about earlier, which are way

20  higher than this supposed acceptable rate that the FDA

21  is saying, and I point that out here.

22       So intuitively that means implicitly that

23  clearly it's lower than what we're always exposed to on

24  an everyday basis, but also point out that it's a

Page 123

1  conservative estimate that was extrapolated from a rat

2  model in a linear fashion that was using doses that

3  were really high doses compared to what we actually

4  know are exposed to on a daily basis and also the

5  question at hand in the trace impurities.  So I did

6  point that out in a number of places in my report.

7  BY MR. SLATER:

8    Q.   You did not actually perform a risk

9  assessment where you took into account all the various

10  data points in the animal studies, the dietary studies,

11  et cetera, and perform your own analysis and establish

12  what would be an appropriate alternative acceptable

13  intake level?

14       That's not something you did; right?

15       MR. INSOGNA:  Object to form.  Compound.

16    A.   I didn't do that, no.

17  BY MR. SLATER:

18    Q.   On Page 2 of this document we're looking

19  at, there's a heading company documents produced, and

20  those would have all been provided to you by counsel;

21  correct?

22    A.   Yes.  Some of them I found on my own, like

23  the FDA statements, as we talked about.  But yeah, some

24  of -- they were all provided by counsel.

Page 124

1    Q.   Well, I'm in the next section now,

2  actually, so I want to make sure we're clear.  On Page

3  2 there's a new heading, company documents produced.

4       Do you see that?

5    A.   Oh.  Sorry.  I'm looking at materials

6  considered at the top of that page, so now in the

7  bottom, yes, those were definitely ones that were

8  provided to me.

9    Q.   And again, to the extent that defense

10  counsel had in their possession company documents that

11  one would objectively say, "Well, that actually

12  supports the position that these substances could cause

13  cancer in humans," you would have wanted to see those

14  so you could take that into account; right?

15       MR. INSOGNA:  Objection.  Assumes facts.

16    A.   I think I answered that I think all data

17  are good to consider.  Whether or not they would

18  actually play a role any differently in an opinion is a

19  different question, though -- until I saw the data.

20  BY MR. SLATER:

21    Q.   Assume for this question that there is

22  deposition testimony and documents you were not shown

23  that an objective viewer would look at and say, "Well,

24  that clearly supports the plaintiff's position in this

Page 125

1  case that the NDMA and NDEA could cause cancer in

2  humans at the dosages taken in the valsartan pills."

3  I'd like you to assume that exists.

4       I'd also like you to assume it was not

5  provided to you.  If that's true, would you agree with

6  me that subject to seeing that information, your

7  opinions could change if you were to see that

8  information because you don't have it available?

9       Would you agree with that?

10       MR. INSOGNA:  Objection.  Assumes facts,

11  incomplete hypothetical, argumentative, misstates

12  testimony.

13    A.   I would have to see what it is that you're

14  talking about to make an appropriate answer to that

15  question.

16  BY MR. SLATER:

17    Q.   Looking now at Page 4 of this document,

18  the heading literature.

19       Is it your testimony that you read every

20  one of these articles cover to cover?

21    A.   No, I didn't read them all cover to cover.

22    Q.   Just --

23    A.   Some of them are skimming through, looking

24  at abstracts, looking at main findings.  Other of them,

Page 126

1  I did read cover to cover multiple times.
2      Q.   And just to be clear and you could confirm
3  this just so we have it for the record.  This section
4  headed literature starts on Page 4 and goes all the way
5  to Page 39, about three-quarters of the way down the
6  page; right?
7      A.   Yes.
8      Q.   If the counsel for the defense was aware
9  of literature that objectively viewed would cut against
10 the position that you've taken in your report, you
11 would have wanted to be given that literature by
12 defense counsel so you could take it into account in
13 forming your opinions; correct?
14         MR. INSOGNA:  Objection.  Assumes facts.
15 Argumentative.  Incomplete hypothetical.
16     A.   If I hadn't already found it and if it
17 wasn't in the actual plaintiff experts' reports, which
18 presumably such documents would be there and relied
19 upon, then if everyone missed it except for defense
20 counsel, sure, I would like to see it.
21 BY MR. SLATER:
22     Q.   Well, this list of literature is the --
23 well, let me ask this question.  Let me understand
24 something.  We'll take a step back.

Page 127

1         In the report you have references,
2  numbered references?
3      A.   Yes.
4      Q.   And the purpose of that is so that if you
5  said something in the report and you're specifically
6  relying on a specific document or a specific study or
7  piece of literature, you're telling us that's where
8  this comes from; right?
9      A.   Yes and no.  Sometimes it's -- especially
10 in the background sections of my report or the
11 backgrounds of cancer where much of what I was saying
12 is common knowledge in my field, but to provide some
13 references in case somebody wanted to go and look at
14 it, one or two token references on a topic, certainly
15 not an exhaustive reference for each topic is in this
16 report or there would a billion references here.  And
17 so yes and no.
18         Sometimes it's more of whoever's reading
19 this can go and look more at detailed information from
20 that discussion if they wanted to, which is a lot of
21 how we do our references and publications.
22         And sometimes we have limit -- most of the
23 time we have a limitation in terms of the number of
24 references one can get included in a paper, and so I'm

Page 128

1  always in the mind frame from that sort of coming from
2  that framework, is that I'm trying to be concise and
3  not include every single topic and every single
4  statement having heavily-referenced articles.
5      Q.   In the course of your report you cited
6  with specific reference numbers certain literature.  If
7  there's other literature in this list of literature
8  that was not specifically referenced with a numerical
9  reference number, does that mean that it's something
10 you looked at for background but it's not something
11 that you found to be so significant that you needed to
12 specifically cite it in the report?
13         MR. INSOGNA:  Object to form.
14     A.   Yes, like the example that came up earlier
15 where one of the articles that I came across and I
16 read, it wasn't as pertinent to my actual opinion.  I
17 had read it, but it wasn't something that I relied on
18 or discussed, and that was that JAMA article; right?
19         But when you asked me about it, then,
20 yeah, I know about it because I came across a lot of
21 things as I was filtering through what I thought was
22 necessary to formulate my opinion here.
23 BY MR. SLATER:
24     Q.   So with regard to the items on this list

Page 129

1  of literature that are not specifically referenced in
2  your report, again, that would be general background
3  information as opposed to something that you thought
4  was so important to your opinion that you needed to
5  actually reference it specifically?  Is that correct?
6         MR. INSOGNA:  Object to form.  Misstates
7  testimony.
8      A.   I'd have to look at the exact example
9  you're looking at to be certain because sometimes maybe
10 it did influence what I was thinking, but I didn't
11 actually put the number here in the reference.  But
12 overall I think it would be safe to say that the things
13 that are referenced here are the ones that are the
14 emphasized reports that were relied upon for generating
15 my opinion.
16 BY MR. SLATER:
17     Q.   Looking now at Page 39 of this document,
18 there's a heading that says records of bellwether
19 plaintiffs.  And I assume what that means is that
20 you're been provided some of the records of some of the
21 bellwether plaintiffs and you're evaluating specific
22 causation in some cases as well.
23         Is that a fair assumption?
24     A.   No, they were provided to me.  I looked

Confidential Information - Subject to Protective Order

Page 130

1  at -- this was a long time ago when they were first
2  given to me back it looks like in April, and I was sort
3  of told that these are -- just to have a full sort of
4  file of this, but you're not -- we're not going to be
5  doing specific patient cases at this point.  So I
6  didn't put a lot of emphasis on reading that to great
7  detail.
8      Q.  Am I correct you didn't rely on the
9  records of bellwether plaintiffs, as you've listed
10  those materials here in forming those opinions in this
11  case?
12      A.  Yeah, I didn't look at them or use those
13  to make opinions here in this in any significant way.
14      Q.  Could you go to Page 52, please?  On Page
15  52 there's a heading postmarketing periodic safety
16  reports.
17      Do you see that?
18      A.  Yes.
19      Q.  Why did you include those documents that
20  come under that heading?  What was the point of that?
21      A.  I think as mentioned earlier, I think it's
22  just to have a complete file to look at.  As you were
23  alluding to earlier, to have as much of the information
24  available to evaluate along the way what was being

Page 131

1  documented.
2      Q.  Did you ask for these documents, which as
3  we can see in the subheadings are various ANDAs --
4  ANDA?
5      Did you ask for that, or that just
6  provided to you by counsel?
7      A.  I can't remember.
8      Q.  Did you rely on those documents in any
9  specific way in forming your opinions in this report?
10      A.  Not in a significant way.  I looked at
11  them.  I think that they have limited utility in the
12  questions that were being asked of me.
13      Q.  I didn't see them cited for any
14  proposition or to support any of your opinions.  Right?
15      A.  Yeah.  Like I said, I think I just said
16  that they had limited utility in forming my opinions.
17      Q.  Looking at the Page 53, there's a heading
18  that says miscellaneous.
19      A.  Which page?  Excuse me.
20      Q.  Last page, Page 53.
21      A.  Yes.
22      Q.  It says miscellaneous.
23      A.  Yes.
24      Q.  The first section under miscellaneous is

Page 132

1  all plaintiff diagnosis and treatment report.
2      Do you know what that is?
3      A.  I think that must be related a little bit
4  to the other section that was about the actual patient,
5  which I didn't look at in great detail.
6      Q.  The next line says, "All plaintiff
7  diagnosis and treatment report additional data."
8      Would that be the same answer?
9      A.  Yes.
10      Q.  The third line says, "All materials cited
11  or referenced in my expert report and attachments."
12      Do you know why that's listed there?
13      A.  Just to be explicit that all of the things
14  in my report are here.  Certainly -- in case one was
15  missed, maybe to ensure that -- that would not be
16  intentional.
17      Q.  So that means if something was referenced
18  in the actual body of the report but didn't find its
19  way into this document, Exhibit B, you're saying I'm
20  relying on it if it's stated in my report, but I didn't
21  get it onto this list?
22      A.  That's what that sounds like, yes.
23      Q.  Or I read it?  May not be relied on, but I
24  read it; right?

Page 133

1      A.  Sure.  Yes.
2      Q.  The last line here says, "This list
3  includes items plaintiffs' experts relied upon.  By so
4  doing, defendants and this expert are not waiving any
5  arguments or objections related to admissibility."
6      Do you know why that line was included?
7      MR. INSOGNA:  Object to form.
8      A.  I don't.
9      MR. SLATER:  Counsel, this is probably
10  another good break point, and it's 1:30 -- or 12:30
11  where you are.  I don't know -- it's probably a decent
12  point to break and eat if you want to eat.  Want to go
13  off the record and talk about it?
14      MR. INSOGNA:  Yeah, we can go off the
15  record and discuss it.
16      THE VIDEOGRAPHER:  We're going off the
17  record at 12:24 PM.
18      [A recess was taken.]
19      THE VIDEOGRAPHER:  We are back on the
20  record at 1:20 PM.
21      MR. SLATER:  I just realized why I keep
22  writing down the wrong time, because you keep telling
23  the time Central Time.
24  BY MR. SLATER:

Page 134

1    Q.   Okay.  All right.  I overlooked one thing
2  I wanted to ask you about earlier, so let's just cover
3  that, and then we'll go back into some other things.
4          Have you consult -- new question.
5          Have you consulted for pharmaceutical
6  companies over the years?
7    A.   Yes.
8    Q.   When did you first start consulting for
9  the pharmaceutical companies?
10   A.   Probably around 10 years ago, 11 years
11 ago, when I joined faculty at the University of
12 Chicago.
13   Q.   What do the consulting activities relate
14 to?  I'm not talking about grants for studies.  I'm
15 putting that to the side.
16         Other than any actual grants for studies,
17 what does your consulting work for the pharmaceutical
18 industry involve?
19   A.   Most of the time it's advising in terms of
20 novel therapeutic agents and how to develop them or
21 where to develop them and looking at some of their data
22 and giving opinions as to what the utility user is not
23 in -- in the future of treating that cancer.  That's --
24 most of that is consulting to that degree.

Page 135

1    Q.   What else?
2    A.   In a smaller subset, I've been asked to be
3  a speaker for certain products, and I will -- I have
4  done that, and I do that much less often, but -- and
5  usually for therapeutic drugs that are for specific
6  treatments for gastroesophageal cancer, which is my
7  sub-subspecialty.
8    Q.   Do you have an estimate of what you've
9  been paid either annually or in total by the
10 pharmaceutical industry for things like promotional or
11 speaking, consulting, travel and lodging,
12 reimbursements for food and beverage, all those things
13 taken together?  Do you have any estimate of what
14 that's -- what those payments have been to you over the
15 years?
16   A.   Yeah, those are -- should be online
17 through the open Sunshine Act policy.
18   Q.   Do you have an understanding or an
19 estimate of what those amounts have been that you've
20 been paid?
21         MR. INSOGNA:  (Inaudible.)
22   A.   Yeah, I mean, I'd have to look back, but I
23 can tell you probably over the years, as I have become
24 more senior and involved, I get asked to do more

Page 136

1  things.  And so looking over the years, it has probably
2  gone up each year a little bit, but on average it's
3  over the last 10 years maybe $20,000, $25,000 a year,
4  roughly, as an estimate as to how much has been
5  provided to me as honoraria for various consulting that
6  I've done.
7  BY MR. SLATER:
8    Q.   We did a little research and came up with
9  some online information.  As you said, it is available.
10 And going backwards, the data I found showed payments
11 of $37,000 approximately for the activities that we
12 just talked about in 2020.
13         Does that sound correct?
14   A.   Yeah, that sounds in line.
15   Q.   And I have a number in 2019 of $41,611.60.
16         Does that sound correct?
17   A.   Sounds like it could be correct.
18   Q.   In 2018, I have the number of $59,127.48.
19         Does that sound correct?
20   A.   Sounds like it's getting higher than
21 average, but one thing I'll point out is that sometimes
22 things like research funding to clinical trials gets
23 into that database and inaccurately lists amounts that
24 come to me directly.

Page 137

1          But regardless, it is probably, as I
2  mentioned, on average -- over the last few years
3  $25,000 as an average over the full 10 to 11 years.
4  Some years more, some years less.  More recent years --
5    Q.   I can tell -- yeah, I can tell you that
6  they break out -- this is the open payments website
7  from the U.S. government, and they actually break out
8  research funding as a separate category.  So I'm just
9  limiting it to the nonresearch funding category.
10   A.   Right, and what I'm saying is that there
11 has been occasion when I was looking at that and it
12 didn't make sense and it wasn't accurate and I had to
13 have them remove it in the past.
14         But regardless, I'm not sure about that
15 either.  It sounds like it's still within line of my
16 actual activities with them as a consultant.  So --
17   Q.   So the number that we had left off with
18 was for 2017, $78,534.93, and they count 82 payments
19 that year.
20         Does that sound accurate?
21   A.   2018?
22   Q.   2017.
23   A.   Yeah, that -- some of those, like you had
24 already pointed out, are for travel.  So I think in

Page 138

1  that year was the year that I went to Europe on a
2  business flight.  So more than like 15 percent of that
3  is just from that one flight.
4      Q.   The Dollars For Docs website, which gets
5  its information, as you know, from the government data,
6  for 2017 has your travel and lodging as $14,196; your
7  promotional and speaking payments at $15,230; your
8  consulting at $37,350; accredited training, $9,800; and
9  then the food and beverages, $1,953.
10     Do those numbers sound accurate?
11     A.   That sounds right.
12     Q.   For 2018, the Dollars for Docs website had
13 promotional and speaking as $37,933; consulting as
14 $7,725; travel and lodging at $6,640; and food and
15 beverage at $1,290.
16     Does that sound accurate?
17     A.   On the surface, it sounds similar, yeah,
18 to the previous year, and accurate.
19     Q.   When there's reference in these documents
20 to promotional speaking, does that mean when you're
21 speaking on behalf of the company and they're paying
22 you as a speaker?
23     A.   It was what I was referring to earlier,
24 where I'll speak on one of their products to a group of

Page 139

1  physicians, usually, or health care professionals on
2  details of that product.
3      That usually is an FDA-approved product
4  that has a topic of the actual studies that led to the
5  FDA approvals and a balanced representation of the
6  risks and benefits of that drug.
7      And so they're like viewed as a --
8  educational presentations to physicians in the
9  community that aren't as aware of these new drugs that
10 are coming through to bring awareness for them.
11     Q.   They're viewed as educational, they're
12 also viewed by the company as marketing events because
13 they're hoping that the doctors you're speaking to will
14 utilize the product that you're talking about; right?
15     MR. INSOGNA:  Object to form.
16     A.   They are commercial events from their
17 perspective, and I think that's obviously why they do
18 it, why I do it.  I only do talks for drugs that I use
19 and that I believe are beneficial to patients with
20 cancer, and I view it as a way to communicate and meet
21 new physicians and relate that information of that
22 drug.
23 BY MR. SLATER:
24     Q.   These speaking engagements -- they're

Page 140

1  arranged for and completely organized by the
2  pharmaceutical company; right?
3      A.   Not always.  Sometimes they are through a
4  third independent party and offer continuing medical
5  education, for example.  And so sometimes they are not
6  organized by the company themselves.
7      Q.   Well, the promotional speaking where the
8  marketing department -- well, let me ask -- let me
9  rephrase.
10     The promotional speaking wouldn't be
11 continuing education; that would be promotional --
12 where you're promoting the product; right?
13     A.   Yes, for ones that you're referring to,
14 then they would be organized by the pharmaceutical
15 company.
16     Q.   And you would be interacting with people
17 from the marketing department; right?
18     A.   I believe so.  They're commercial
19 marketing, sales.
20     Q.   They arrange for the doctors to attend and
21 they bring them to the event; right?
22     A.   Yes.
23     Q.   And you certainly understand that the
24 reason they're retaining you to speak is because

Page 141

1  they're hopeful that when you speak about their product
2  that the doctors in attendance will choose to purchase
3  the product or prescribe the product that you're
4  speaking on, as opposed to competitors, for example;
5  right?
6      MR. INSOGNA:  Object to form.  Calls for
7  speculation.
8  BY MR. SLATER:
9      Q.   You understand that's what the marketing
10 people who hire you want to happen; right?
11     MR. INSOGNA:  Object to form.  Calls for
12 speculation.
13     A.   I think that that is true.
14 BY MR. SLATER:
15     Q.   Now, let's go back to your report, if we
16 could.  And I think probably we should use the most
17 recent version, the August 27, 2021, version.
18     A.   Yes.
19     Q.   So I'm going to walk through the report a
20 little.
21     The first section is the biography and
22 qualifications, and that's just an overview of your
23 background; correct?
24     A.   Yes.

Page 142

1    Q.   The second section, which starts on Page
2  3, titled scope and summary of opinions, is an outline
3  of the information that's found in the report going
4  forward; right?
5    A.   Yes.
6    Q.   Section 3 is titled introduction to
7  cancer, and that's found on Page 6.
8       Do you see that?
9    A.   Yes.
10    Q.   Let's go through this a little bit.
11  This -- we'll rephrase.
12       This introduction to cancer section is
13  really just a general overview of certain concepts
14  related to what cancer is and how it occurs in the
15  body; right?
16    A.   Yes.
17    Q.   At the bottom of Page 7, you state,
18  "Environmental factors that contribute to the cause of
19  cancer have been described and can be specific to
20  certain cancer types.  Environmental factors include
21  aspects of lifestyle, economic, and behavioral
22  exposures.  Poor diet, inactivity, and
23  sedentary lifestyle, and obesity, and metabolic
24  syndrome have each been associated with carcinogenesis.

Page 143

1  Some specific foods are linked to specific cancers."
2       So going through what you just read, that
3  again is an overview of the fact that there's things
4  that we're exposed to in our day-to-day lives that can
5  cause or contribute to cancer; correct?
6       MR. INSOGNA:  Object to form.
7    A.   As an overview, there are a lot of
8  different etiologies of cancer, and I list some of the
9  main categories there.
10  BY MR. SLATER:
11    Q.   On Page 8, the second full paragraph says,
12  "Broadly speaking, any factor that may alter one's DNA
13  sequence could contribute to carcinogenesis and the
14  ultimate development of cancer and could be referred to
15  as a carcinogen."
16       Correct?
17    A.   That's what that says, yes.
18    Q.   Just -- rephrase.
19       Looking at the first paragraph on Page 8,
20  you talk about hypertension as being associated with
21  increased cancer risk and cancer mortality.
22       Correct?
23    A.   Yes.
24    Q.   And you state that this is "particularly

Page 144

1  as it also tracks and closely associates with other
2  cancer-related risk factors of smoking, alcohol use,
3  obesity, diabetes, diet, and other factors"?
4    A.   Yes.
5    Q.   And then you say, "After adjusting for
6  these known cancer risk factors, however, hypertension
7  is also potentially an independent cancer risk factor
8  in a number of tumor types, including renal,
9  colorectal, breast, esophageal, liver, and uterine
10  cancers."
11       Correct?
12    A.   Correct.
13    Q.   And when you say potentially, you're
14  saying it's possible; right?
15    A.   Right.
16    Q.   Did you say yes?
17    A.   Yes, I said right.
18    Q.   Okay.
19    A.   I said that -- I can expand on that, that
20  the data that looked at those studies concluded that
21  it's after adjusting for all the known and associated
22  confounders, which are listed there, that there
23  remained what appeared to be an association, but that's
24  why it's still potentially associated, because despite

Page 145

1  trying to adjust for confounders, there's always
2  residual confounding that's difficult to measure and
3  adjust for.
4       So either way, the point I was making here
5  is that whether it's actually associated independently
6  or because it's associated with all the other things
7  that we know are associated with cancer, hypertension
8  is associated with cancer.
9    Q.   Again, when you say hypertension's
10  associated with cancer, as we just read through, my
11  understanding was that it's something that is seen but
12  there's these other independent factors that you have
13  to adjust for.
14       Do I understand that correctly?
15    A.   And -- yes, and after adjusting for them
16  in some reports that I reference here there was
17  residual association with hypertension and cancer,
18  suggesting that there's a potentially independent
19  association with hypertension even aside of all the
20  other things that we're talking about here.
21    Q.   And the studies that you cited there --
22  you're saying there was a potential association shown.
23       Is that because the association didn't
24  achieve statistical significance?

Confidential Information - Subject to Protective Order

Page 146

1    A.   No, I think that's -- that's scientific
2  language to say that we have to be cautious with our
3  interpretations of studies, and finding an association
4  in a given analysis is not definitive from one look,
5  and so a conservative way to say that there's still
6  potential association that merits further
7  investigation, for example.
8         Again, my point there was to suggest that
9  whether it's independently associated or associated by
10  proxy, it's associated with cancer -- hypertension.
11    Q.   Just for the record, I'm not going through
12  Section 4, the cancer prevention, screening, and
13  incidence section, because I read that as going to the
14  medical monitoring, so I assume we should skip that.
15         Then we have Section 5 on Page 12.
16  Cancer -- actually, it should be -- yes.  Looking --
17  new questions.
18         Looking at Page 12 at the top, cancer
19  symptoms, diagnosis, and staging, Section 5.
20         Does that section relate specifically in
21  any way to the question of whether or not the NDMA or
22  NDEA can cause cancer in humans?
23         MR. INSOGNA:  Object to form.
24  BY MR. SLATER:

Page 147

1    Q.   Or is it just background information?
2    A.   No, it's background information.
3    Q.   Looking at Section 6, cancer treatment.
4         Is that also background information?
5         MR. INSOGNA:  Object to form.
6    A.   Not all of it.  As you can see in Page 13,
7  the last paragraph of Section 6 is discussing the
8  notion that these -- the NDMA and NDEA identified in
9  valsartan could potentially affect how one treats the
10  cancer or how one's cancer responds to treatment, and
11  so I pointed out that there's no such evidence that it
12  has any impact on how one approaches cancer treatment
13  in any way.
14  BY MR. SLATER:
15    Q.   When people are undergoing treatment for
16  lung cancer, is it suggested to them that they should
17  stop smoking?
18    A.   We suggest that to everybody, because
19  smoking can make things worse even in the setting of
20  when you already have cancer.  So we would always say
21  that, but in fact in many cases, like with my patients
22  who we're treating with end-of-life cancers, terminal
23  cancers, who actually at that point the treatment is
24  with the intention to palliate them and to optimize

Page 148

1  quality of life as long as possible, I often say this
2  is not the time to stop, you might as well enjoy life.
3  So -- honestly.  So that's -- in some cases, no, we
4  don't.
5    Q.   And looking at Section 7, posttreatment
6  cancer surveillance, that again is medical monitoring,
7  so I'm not going to get into that.  Okay.
8         Looking now at Section 8, which starts on
9  Page 13.  There's a discussion of specific cancers, and
10  it goes all the way through Page 29.
11    A.   Yes.
12    Q.   The specific discussion of these various
13  cancers is background information and is not
14  specifically significant to your opinions as to whether
15  or not NDMA and NDEA can cause or contribute to cancer
16  in humans; correct?
17         MR. INSOGNA:  Object to form.  Compound.
18    A.   I think the information is impertinent
19  that's in here, from a couple of standpoints.  One is
20  the -- it talks about the incidence of cancer.  And --
21  as a whole, but also each one of these.  And also the
22  risk factors that one has to consider, and how common
23  these cancers can be, based on how common these risk
24  factors are.

Page 149

1         So I think that's a pertinent background
2  understanding when you're talking about now another
3  putative variable that might be associated with cancer
4  risk is to put that in a context of what's already
5  happening and why and to take that into account.
6         But I don't -- I think it's more than just
7  background.  I think it's part of an important
8  consideration.  And these things come up again I think
9  later in the later sections, when we're talking about
10  some of the FDA referenced risks of these agents in
11  valsartan, and putting that in context of what the base
12  rate and risk is of getting cancer in society.  So I
13  think that that's important to consider.
14  BY MR. SLATER:
15    Q.   How does the incidence of these cancers
16  specifically relate to the opinions that you're
17  offering as to whether or not NDMA and NDEA can
18  increase one's cancer -- risk of cancer?
19         MR. INSOGNA:  Object to form.  Misstates
20  testimony.
21    A.   I think they're important to consider when
22  looking at the risk or lack thereof of something else
23  on top of what we already understand.
24         But in terms of what the risk is, if any,

Page 150

1 of the putative exposures to valsartan-containing drugs
2 that had impurities, that's not actually pertinent to
3 the analysis that I did, in terms of the
4 epidemiological analysis, dietary studies, the
5 occupational exposures, and the animal data, per se, in
6 terms of me making an opinion whether or not there is
7 added risk.
8        But I -- what I was alluding to was if
9 we went to the next section, where the FDA is
10 indicating sort of like the one -- above the accepted
11 daily intake and what the risk is for a patient taking
12 it at that daily intake for 70 years, taking that into
13 account, you must understand what the basal incidence
14 of cancers are to put that into context.
15 BY MR. SLATER:
16    Q.   Whatever the baseline incidence of cancer
17 is, either NDMA and NDEA people are exposed to
18 day-to-day either is contributing to that incidence
19 level or not; right?
20        MR. INSOGNA:  Object to form.
21 Argumentative.
22    A.   Can you rephrase that?
23 BY MR. SLATER:
24    Q.   Yeah.  You spoke about the cancer

Page 151

1 incidence being relevant, and then talked about adding
2 something to that risk level.  I think that's what you
3 were saying.  What I'm asking is this.
4        If you have an incidence rate of a
5 particular cancer, as you reflected it here, that
6 incidence rate isn't making any judgments as to what's
7 causing that incidence rate; right.
8        MR. INSOGNA:  Form.
9    A.   I'm not understanding your question.
10 BY MR. SLATER:
11    Q.   You gave me incidence rate -- rephrase.
12        The report state some cancer incidence
13 rates; right?
14    A.   Yes.
15    Q.   In and of itself, the incidence rate of
16 cancer doesn't tell it how it's being caused or what's
17 contributing to the cause of that cancer; right?
18    A.   Not in and of itself, but we know -- for
19 example -- let me clarify.
20        We know that these agents became online in
21 2012, and we know what the incidence rates of cancer
22 have been over the last decade, so we can look at
23 incidence rates before and after, and we can analyze to
24 see are there any increases in incidence, which we're

Page 152

1 going to get to when we talk about the epi data, in
2 terms of the additional contribution of these drugs,
3 does it cause any extra risk.
4        So you need to sort of know what the basal
5 risk is to begin with, from all the known associations
6 and mostly unknown reasons why patients get cancer.
7    Q.   There's no such study that was set up to
8 measure in a general sense the increased risks of
9 cancer in general as of 2012; right?  There was the
10 studying you're talking are Gomm and Pottegard, where
11 they compared different sets of people in the cohort;
12 right?
13    A.   That's true about Gomm and Pottegard.  But
14 we also know, as you've pointed in my report, that the
15 incidence of cancer has been increasing steadily over
16 the last decade, and you can see that the projection is
17 that it will become even more common in terms of cancer
18 mortality in the country.
19        So understanding and knowing that is I
20 think an important thing to take into account as a
21 basal understanding of what we're talking about in
22 terms of cancer risk.
23    Q.   Are you specifically relying on cancer
24 inc -- cancer -- rephrase.

Page 153

1        Are you relying on any specific cancer
2 incidence rate as a basis for your opinion as to
3 whether or not NDMA and NDEA can cause any increased
4 risk of cancer to humans?
5    A.   No.
6        MR. INSOGNA:  Object to form.
7    A.   No, I'm relying on that for that part of
8 the opinion.
9 BY MR. SLATER:
10    Q.   In terms of the lists of risk factors that
11 you provide for these various cancers, did you list
12 nitrosamines as a risk factor for any of them?
13    A.   I -- in this section in the background,
14 no, but we talked about it in the -- nitrosamines in
15 the diet section, where that would be pertinent.
16    Q.   Do you agree NDMA and NDEA intake is a
17 risk factor for cancer as a general proposition?
18    A.   No.
19    Q.   Not for any cancer?
20    A.   I think -- I think it's been found to be
21 associated in some studies that I think we're going to
22 get to.
23    Q.   Bear with me for one second.  I'll be
24 right back.

Page 154

1        Let me just make sure that I'm asking this
2  question clearly.
3        Do you agree or disagree that -- let me
4  rephrase.
5        Do you agree or disagree that nitrosamines
6  are a risk factor for any cancer, yes or no?
7        MR. INSOGNA:  Object to form.
8        A.   I disagree.
9        MR. SLATER:  Chris, do you have handy the
10  article authored by Dr. Catenacci and another author
11  titled "Toward Personalized Treatment of Advanced
12  Biliary Tract Cancers"?  If you do, please put that up
13  on the screen as the next exhibit.
14        MR. GEDDIS:  I'll --
15        MR. SLATER:  What?
16        MR. GEDDIS:  I'll enter it as an exhibit.
17        MR. SLATER:  Yeah.  Yeah.  Sorry.  I
18  didn't hear what you said.  Yeah.
19        [Exhibit 12 marked for identification.]
20  BY MR. SLATER:
21        Q.   Doctor, do you see on the screen -- and
22  actually, I don't know what number we're up to.  Let's
23  just for the record say what exhibit number this is, if
24  anyone knows.

Page 155

1        MR. GEDDIS:  12.
2        THE REPORTER:  Yeah, Exhibit 12.
3        MR. SLATER:  Great.
4  BY MR. SLATER:
5        Q.   Doctor, on the screen is Exhibit 12.  It's
6  an article titled "Toward Personalized Treatment of
7  Advanced Biliary Tract Cancers," published in a journal
8  called Discovery Medicine in July 2012.
9        Do you see that?
10        Q.   You're one of the coauthors of that
11  article; correct?
12        A.   Yes, along with my fellow, Dr. Geynisman.
13        MR. SLATER:  Chris, could you scroll down
14  a little bit and then blow up a little bit the
15  introduction at the bottom of that page?  Just that
16  first paragraph right there, yeah.  That's it.
17  Perfect.
18  BY MR. SLATER:
19        Q.   This starts out in the introduction
20  stating, "Biliary tract cancers are comprised of four
21  distinct adenocarcinomas:  Gallbladder carcinoma;
22  intrahepatic cholangiocarcinoma; hilar
23  cholangiocarcinoma, also known as a Klatskin tumor and
24  further subclassified by the Bismuth criteria; and D,

Page 156

1  extrahepatic cholangiocarcinoma."
2        You see that?
3        A.   Yes.
4        Q.   What is -- well, rephrase.
5        What is the biliary tract?
6        A.   Biliary tract is a set of ducts within the
7  liver that excrete bile into the small bowel, and they
8  also in the bile have enzymes and other factors that
9  help with digestion, and it's also a common route of
10  excretion of degradation products and chemicals.
11        Q.   Are nitrosamines, including NDMA and NDEA,
12  metabolized in the liver?
13        A.   Yes.
14        Q.   What does that mean for them to be
15  metabolized in the liver?
16        A.   When you have NDMA or others, they -- if
17  we're talking about an oral uptake or endogenous in the
18  gut, they get absorbed and they get transported to the
19  liver as first path to the portal venous system, which
20  all things taken orally do.
21        And based on enzymes that are in the liver
22  cells, they metabolize things, called first-pass
23  metabolism, that in that case would actually -- part of
24  the metabolism pathway would convert the NDMA to an

Page 157

1  active metabolite, and then would be excreted through
2  the biliary system after a number of chemical processes
3  that make it conducive to being excreted through the
4  bile, through the biliary tract system that we were
5  talking about.
6        Q.   Let's go, if we could, to the second page
7  of this article, which is Page 42, the right-hand
8  column.  And there's a heading that says "epidemiology
9  and etiology of biliary tract cancers."
10        Do you see that?
11        A.   Yes.
12        Q.   I'd like to go down towards the bottom of
13  that column and read this, and then we'll read over to
14  the next page.
15        Towards the bottom of that page, six lines
16  up from the bottom of that paragraph in the right
17  column, it says, "Whereas the majority of patients have
18  no identifiable etiology, known risk factors include
19  chronic inflammatory diseases, including" -- and then
20  there's a list of those diseases.
21        Do you see that?
22        A.   Yes.
23        Q.   And if you continue on the next page --
24        MR. SLATER:  Can you scroll to the top of

Page 158

1 the next page, please, Chris? Perfect.
2 BY MR. SLATER:
3     Q.   After that list, it says, "Chemicals such
4 as dioxin nitrosamines and asbestos," and then lists
5 some medications and then "other general exposures and
6 behaviors, including smoking, obesity, and diabetes.
7 Many of these presumably lead to a state of chronic
8 inflammation, cancer initiation, and progression."
9         That's what you wrote in this 2012
10 article; correct?
11     A.   That's what's written there, similar to as
12 I pointed out in the gastric paper that I referenced
13 here -- that it was mentioned in that particular paper.
14 It's the same concept in that it's an association
15 that's been reported.  I wasn't -- I was just -- we
16 were trying to show all of the literature that's
17 reported on various associations that have been
18 described.
19     Q.   My question is this.  It's more narrow
20 than what you stated.  Here's my question.
21         In this article you published in 2012,
22 that is what you stated; correct?
23     A.   We stated that it was one of many
24 associations with this cancer, but without going into

Page 159

1 detail, because that wasn't the focus of this paper.
2     Q.   Well, I don't see the word "association"
3 in that paragraph because it doesn't appear in that
4 paragraph; correct?
5         MR. INSOGNA:  Object to form.
6     A.   That's what's implied.
7 BY MR. SLATER:
8     Q.   Is the answer to my -- my question is
9 this.  New question.
10         The word "association" does not appear
11 there; instead you use the word "known risk factors."
12         Correct?
13     A.   That's what is used in that -- the
14 terminology that is used there, yes.
15     Q.   And the specific terminology relative to
16 what we're talking about here in this deposition is
17 that you in a published article in 2012 said that the
18 known risk factors for these biliary tract cancers
19 includes chemicals such as nitrosamines; correct?
20     A.   It does say that.  I'm telling you that
21 implies that these are what have been associated in the
22 literature.  I'll point out it doesn't say NDMA or
23 NDEA.
24     Q.   This refers to nitrosamines as known risk

Page 160

1 factors; correct?
2         MR. INSOGNA:  Object to form.
3     A.   As explained before, but it does say
4 nitrosamines as a group.
5 BY MR. SLATER:
6     Q.   Within the group of -- rephrase.
7         This states that nitrosamines are known
8 risk factors for biliary tract cancers, and that
9 includes NDMA and NDEA?  They are nitrosamines;
10 correct?
11         MR. INSOGNA:  Object to form.  Compound.
12     A.   Those are one of hundreds, I believe, of
13 different nitrosamines.  So this is not specific to any
14 one.  It's an overall review paper noting previously
15 reported associations with these cancer.
16 BY MR. SLATER:
17     Q.   As you sit here now, you agree with me
18 that nitrosamines, including NDMA and NDEA, are known
19 risk factors for biliary tract cancer; correct?
20         MR. INSOGNA:  Object to form.
21     A.   As we'll talk about when we get to the
22 studies looking at nitrosamines in dietary and other
23 studies, there are well-recognized papers, many of
24 which we talk about here, that suggest association of

Page 161

1 nitrosamines with various cancers.
2 BY MR. SLATER:
3     Q.   In terms --
4     A.   And there are other --
5     Q.   In terms of my specific question, you
6 agree with me as you sit here right now that
7 nitrosamines, including NDMA and NDEA, are known risk
8 factors for biliary tract cancers; correct?
9         MR. INSOGNA:  Object to form.  Asked and
10 answered.
11     A.   I'm trying to tell you that what that
12 means is that there are known papers that reported
13 associations with nitrosamines for various cancers, and
14 I pointed one out earlier, including this one, and I
15 think we'll talk about it later when we get to the
16 dietary papers.
17 BY MR. SLATER:
18     Q.   I'm not asking about where, when, or why.
19 I'm just asking this question.
20         As you sit here now, you agree with me
21 that nitrosamines, including NDMA and NDEA, are known
22 risk factors for biliary tract cancers; correct?
23         MR. INSOGNA:  Object to form.  Asked and
24 answered.

Confidential Information - Subject to Protective Order

Page 162

1     A.   There are known reports that have looked
2  at that association and various cancers, including
3  biliary tract cancers.
4  BY MR. SLATER:
5     Q.   Is the answer to my question yes, that
6  they are known risk factors?
7          MR. INSOGNA:  Object to form.  Asked and
8  answered.
9     A.   There are known -- there are known papers
10 that have looked at them as risk factors and reported
11 associations in both positive and negative studies.
12 BY MR. SLATER:
13    Q.   Again, I'm not asking about other papers.
14 I'm not asking about the why or wherefore.  It's a very
15 narrow, very direct question.
16        Do you agree with me as you sit here now
17 that nitrosamines, including NDMA and NDEA, are known
18 risk factors for biliary tract cancer?
19        MR. INSOGNA:  Object to form.  That's the
20 fourth time you've asked the question.  He's answered
21 it.
22    A.   The way you're asking that question, the
23 answer is no.
24 BY MR. SLATER:

Page 163

1     Q.   When you stated in your paper in 2012 that
2  you published that nitrosamines are known risk factors
3  for biliary tract cancers, was that a true statement?
4          MR. INSOGNA:  Form.
5     A.   I'm telling you what was meant by that
6  statement and that there are known associations of
7  nitrosamines with this cancer that was the topic of
8  this paper that have been reported.
9          Whether I agreed with that comment or not,
10 I was -- as we talked about earlier, I was reporting
11 what has been reported in other papers as a review
12 article, not even in detail.
13 BY MR. SLATER:
14    Q.   Was that a true statement when you made it
15 in your paper in 2012?
16        MR. INSOGNA:  Object to form.  Asked and
17 answered.
18    A.   As I stated, yes.
19 BY MR. SLATER:
20    Q.   The answer is yes; correct?
21        MR. INSOGNA:  Object to form.  Asked and
22 answered.
23    A.   As I stated, that is correct.
24 BY MR. SLATER:

Page 164

1     Q.   Well, I just wanted it -- honestly would
2  appreciate just -- it hasn't been asked and answered,
3  because I don't know what "as I stated" means, I don't
4  know if that's supposed to bring in all the other
5  things I didn't ask about, so I would really appreciate
6  it, Doctor, if you could just answer this question with
7  a direct yes or no.
8          When you stated in 2012 in a published
9  article that nitrosamines are known risk factors for
10 biliary tract cancer, was that a true statement?  Yes
11 or no?
12        MR. INSOGNA:  Object to form.  Asked and
13 answered.  He does not have to answer the question the
14 way you want him to.  The --
15    A.   I can't answer that yes, no, without the
16 qualification and the explanation I've given a few
17 times now.
18 BY MR. SLATER:
19    Q.   Doctor, the explanation can be requested
20 either by me in a subsequent question or by defense
21 counsel when they get to question you.  I didn't ask
22 you why it's true, and I didn't ask you why you said
23 it, but you keep telling me that, so that's -- but
24 that's not what I'm asking.  So I'm going to try this

Page 165

1  again with you.
2          When you stated in a published paper in
3  2012 that nitrosamines are known risk factors for
4  biliary tract cancers, was that a true statement?  Yes
5  or no?
6          MR. INSOGNA:  Object to form.  Asked and
7  answered.
8     A.   I answered that as best as I can up until
9  this point.
10 BY MR. SLATER:
11    Q.   Was it a true statement?  Yes or no?
12        MR. INSOGNA:  Object to form.  Asked and
13 answered.
14    A.   It is true that it was an association that
15 was recognized in a number of papers that nitrosamines
16 and all the other things listed there are associated
17 with this cancer.
18 BY MR. SLATER:
19    Q.   Yes or no?
20        MR. INSOGNA:  Same objection.
21    A.   What's the question?
22 BY MR. SLATER:
23    Q.   When you stated in a published paper in
24 2012 that nitrosamines are known risk factors for

Page 166

1 biliary tract cancers, was that a true statement?
2         MR. INSOGNA: Same objection. Asked and
3 answered.
4     A.   I can't answer that any other way than I
5 already have. I can keep giving you the same answer.
6 BY MR. SLATER:
7     Q.   Well, Doctor, you're an expert witness
8 here, so this isn't your first time in a deposition,
9 and you understand that you're supposed to answer the
10 questions as directly as you can.
11        If the lawyer who hired you who's sitting
12 to your side wants to ask you why is that a true
13 statement and you want to talk about associations and
14 things, you certainly can do that in a subsequent part
15 of the deposition, but I'm not asking you the why, and
16 I'm not asking what it meant. I'm asking as it's
17 phrased in this published paper.
18        MR. INSOGNA: Counsel --
19 BY MR. SLATER:
20     Q.   So I'll try it one more time. Perhaps
21 with that clarification, we can get past this speed
22 bump.
23        When you stated in a published paper in
24 2012 that nitrosamines are known risk factors for

Page 167

1 biliary tract cancers, was that a true statement? Yes
2 or no?
3         MR. INSOGNA: Same objection. Asked and
4 answered. He has just stated he has no other way to
5 answer this question. You can continue to bully him,
6 he can continue to give you the answer. You can answer
7 it again.
8     A.   We all see the statement. I was trying to
9 make sure that the underlying intention and meaning of
10 the statement was relayed.
11 BY MR. SLATER:
12     Q.   If you want to relay the underlying
13 intention and the meaning of the statement, I'm sure
14 that you can tell during a break the lawyer who's
15 sitting to your side, and then he'll ask you the
16 question later, or maybe I'll follow up with it, but
17 I'm just trying to go step-by-step. So starting with
18 the simple, I'll try it one more time.
19        When you stated in a published paper in
20 2012 that nitrosamines are known risk factors for
21 biliary tract cancers, was that a true statement? Yes
22 or no?
23        MR. INSOGNA: Same objection. Asked and
24 answered.

Page 168

1     A.   The statement is there, and I defined what
2 it means.
3 BY MR. SLATER:
4     Q.   The statement that was made in this
5 paper -- is that a true statement or not?
6         MR. INSOGNA: Same objection. Asked and
7 answered.
8     A.   A descriptive statement of available
9 studies as a review paper.
10 BY MR. SLATER:
11     Q.   Doctor, is there a reason why you don't
12 want to just say that what you wrote in a published
13 paper was true? You keep saying you want to explain
14 why it's true and what you meant by it, but I'm not
15 asking you that question. I'm just asking if what you
16 published was a true statement.
17        I would really appreciate it if I could
18 get -- this -- we were asked before how long this is
19 going to take. We've now hit, "It's not going that
20 quick." So I'm going to try it one more time.
21        When you stated in a published paper -- I
22 don't know why you're looking at your counsel, if you
23 are looking at counsel. Right?
24        But you don't need -- let me just say

Page 169

1 something. I've been watching this the entire
2 deposition, in good faith, assuming that Dr. Catenacci
3 is just waiting for objections. But I don't think that
4 he needs to look at you every single time he answers a
5 question, and I don't appreciate it, because I don't
6 think that's appropriate.
7         MR. INSOGNA: Adam, there's --
8 BY MR. SLATER:
9     Q.   So I'm going to try this again.
10        MR. INSOGNA: Adam, there is an attorney
11 for your side in the room who can tell you that --
12        MR. SLATER: I don't care. I'm going to
13 try to continue this deposition. I'm commenting on the
14 record that Dr. Catenacci -- and we have a video, it
15 will speak for itself -- is looking at you almost every
16 single time I ask a question. Okay? So I'd prefer to
17 just --
18        MR. INSOGNA: I have to correct that
19 colloquy, because it's inaccurate. There are two
20 screens, one in front of you and one to the doctor's
21 right where the document is being shown. You have an
22 attorney for your side present in the room who can tell
23 you if he's looking at me or if I'm looking at him, and
24 I am not. I am looking directly at the screen. Okay?

Confidential Information - Subject to Protective Order

Page 170

1        You've asked this question probably eight
2  times now.  He has given you his answer and told you
3  that's the only way he knows how to answer the
4  question.
5           MR. SLATER:  And counsel, I don't want to
6  argue with you, okay, because we can do this if we need
7  to at another time in another venue.
8  BY MR. SLATER:
9     Q.   When you stated in a published article in
10  2012 that nitrosamines are known risk factors for
11  biliary tract cancers, was that a true statement?  Yes
12  or no?
13           MR. INSOGNA:  Same objection.  Asked and
14  answered.
15     A.   That is the statement that's there, and
16  I've qualified what I meant by it.
17  BY MR. SLATER:
18     Q.   Is it a true statement?  Yes or no?
19     A.   As I answered, it's true.
20     Q.   As you sit here right now, it's true that
21  NDMA and NDEA are known risk factors for biliary tract
22  cancers; correct?
23           MR. INSOGNA:  Same objection.  Asked and
24  answered.  Now misstating the document.

Page 171

1           MR. SLATER:  It's actually a different
2  question.  I'll ask it differently.
3  BY MR. SLATER:
4     Q.   As you sit here right now, are
5  nitrosamines known risk factors for biliary tract
6  cancers?
7     A.   No.
8     Q.   They're not known risk factors anymore?
9  That changed since 2012?
10     A.   There are associations that have noted
11  nitrosamines through various ways, whether it's
12  occupational, whether it's by diet, that have shown
13  associations with various cancers.  There are similar
14  papers that have shown no associations.
15           And so if you're asking me if there's a
16  known risk factor for this, first of all, it's quite
17  vague, because what -- are we talking about how -- what
18  are the exposures, at what levels, et cetera?
19           So as you asked it, the answer is no.
20     Q.   Well, I'm using the language you used in
21  your published peer-reviewed article, so I'm not using
22  any language that's foreign to you, because this is
23  your own words; right?
24     A.   I'm trying to explain those to you so that

Page 172

1  you under --
2     Q.   Well, I haven't asked you to explain them,
3  though, and you keep trying to explain them, and I
4  don't really understand why.  I'm asking you one
5  question, and you're answering one I didn't ask you,
6  and they're very different.
7           So I would appreciate -- if I don't ask
8  for an explanation, there's no need to give me an
9  explanation.
10     A.   Is there a question?
11           MR. INSOGNA:  There's no question.
12  BY MR. SLATER:
13     Q.   There is peer-reviewed literature
14  establishing an association between NDMA and NDEA and
15  human cancers; correct?
16     A.   Establishing associations?
17     Q.   Yes.
18     A.   Yes, I think I referenced some of them and
19  discussed them, that there are papers that have
20  reported associations in various cancers and various
21  assessments.
22     Q.   You refer in this section of the report to
23  medical societies and whether they list NDMA as a risk
24  factor for certain cancers; right?

Page 173

1     A.   Yes.
2     Q.   You don't list those medical societies --
3  rephrase.
4           You don't list the actual medical society
5  statements in your list of materials considered; right?
6     A.   Right.  As I mentioned earlier, when it
7  was something that was common knowledge that I didn't
8  need to reference, just based on these are statements
9  that we do every day in terms of clinical care of our
10  patients.
11     Q.   The actual statements that you're
12  referring to are not listed in your list of materials
13  considered nor were they provided to us with your
14  materials considered; right?
15           MR. INSOGNA:  Object to form.
16     A.   Other than the answer I provided, no,
17  they're not there.
18  BY MR. SLATER:
19     Q.   And for example, you didn't provide the
20  dates of those society statements or the methodology
21  that was followed by them coming up with these
22  purported statements; right?  That's not discussed in
23  the report; right?
24           MR. INSOGNA:  Object to form.

Page 174

1    A.   I didn't put that explicitly in the
2  report, no.
3  BY MR. SLATER:
4    Q.   If I understood your -- rephrase.
5       If I understand your thinking, you use the
6  word "risk factor" and "association" essentially
7  interchangeably.  Do I understand that?
8       MR. INSOGNA:  Object to form.  Misstates
9  the testimony.
10      MR. SLATER:  Well, I'm not misstating it;
11  I'm asking it.  So I don't know why you're objecting,
12  counsel.  Are you telling him to disagree with me,
13  or -- I don't understand the objection.  What's the
14  objection?
15      MR. INSOGNA:  My objection is you've
16  characterized his testimony -- I think you've
17  mischaracterized.  He can answer you if he disagrees
18  with me.  If he disagrees with you -- I told him he
19  could answer.
20      MR. SLATER:  Okay.  Well, I didn't
21  characterize it.  I actually asked if my
22  characterization was accurate.  It's a different
23  question.  I have an issue with your objection, because
24  I feel like it can be a suggestion, perhaps, as to how

Page 175

1  to answer the question, so I'm just flagging that for
2  the record.
3       MR. INSOGNA:  My understanding is that we
4  are allowed to give explanations for our objections,
5  but noted.
6  BY MR. SLATER:
7    Q.   Do you equate a risk factor with an
8  association?
9    A.   Not always, but in this instance where we
10  were talking about various things that were being
11  associated with cancer and being well-recognized as
12  potential risk factors for cancer, we listed all of the
13  references that were there that have been in the
14  literature.
15   Q.   You're talking about your article in 2012?
16   A.   And also, similar to the other one, where
17  we were doing a review on gastroesophageal cancer and
18  we were -- mentioned a similar phrase.  I think in that
19  actual paper it says associated with, as opposed to a
20  risk factor.
21   Q.   With regard to all the cancers that were
22  listed, there is literature suggesting association for
23  each of them, thus you would consider NDMA and NDEA to
24  be risk factors for each of those cancers; correct?

Page 176

1       MR. INSOGNA:  Object to form.
2    A.   Bit of a vague question.  Can you be a
3  little bit more detailed which cancer we're talking
4  about?
5  BY MR. SLATER:
6    Q.   You went through a whole series of cancers
7  in section --
8    A.   Yes.
9    Q.   And my question is this.  Because there is
10  literature suggesting an association between NDMA and
11  each of those different cancers, would you agree that
12  there's at least an association thus that those
13  substances are risk factors for those cancers?
14   A.   I would say potential risk factors, which
15  in the end I think is another way to characterize that
16  paragraph, would have been potential risk factors.
17   Q.   We talked earlier about precision in
18  writing a report or a peer-reviewed article; right?
19   A.   Yes, we did.
20   Q.   You didn't use the word "potential" in
21  either your article in 2012 or the report; right?
22   A.   The report?  I didn't talk about
23  nitrosamines in this particular paragraph.
24   Q.   You actually did not recognize at all in

Page 177

1  your report the fact that nitrosamines are potential
2  risk factors as you now state for these cancers.  That
3  was not stated; right?
4       MR. INSOGNA:  Object to form.
5    A.   That's not true.  I talked about them as a
6  whole section later on, and the data for and against
7  it.
8  BY MR. SLATER:
9    Q.   Well, I'm talking about in this section,
10  the introduction to cancers summary, where you
11  suggested through your reference to the lack of medical
12  society listings of NDMA as a risk factor, you were
13  suggesting it's not a risk factor; right?
14   A.   I'm suggesting that these are all
15  potential -- that are association studies that have
16  shown some degree of association.  That makes them
17  potential risk factors.
18   Q.   Well, you didn't say, "Even though the
19  medical societies don't list NDMA or NDEA as risk
20  factors, in my opinion they are potential risk factors
21  for these cancers"?
22      That's not stated; correct?
23      MR. INSOGNA:  Object to form.
24   A.   My opinion is not that NDMA is a risk

Page 178

1 factor as a blanket statement without qualifying
2 discussion about it.
3 BY MR. SLATER:
4    Q.   Well, I said potential risk factor, which
5 was your phrase.
6        It doesn't say that; right?
7    A.   Well, I didn't say -- sorry.
8        MR. INSOGNA:  Object to form.
9    A.   I didn't that about NDMA.  I thought we
10 were talking about nitrosamines.
11 BY MR. SLATER:
12    Q.   I'm talking about your report and the
13 language you used in your report.  I thought that's
14 what we were talking about.
15    A.   I thought we were talking about --
16        MR. INSOGNA:  There's no question pending.
17 BY MR. SLATER:
18    Q.   Let's go now to Section 9 of your report
19 on Page 29, please.  You have a section titled
20 valsartan and valsartan-containing drugs.  That's
21 Section 9.  And then 9a is background, generic
22 medications incorporating valsartan.
23        Do you see that?
24    A.   Yes.

Page 179

1    Q.   That's just background information about
2 what the medications are supposed to do; right?
3    A.   Yes.
4    Q.   The presence of NDMA or NDEA in these
5 medications would provide no benefit whatsoever; right?
6        MR. INSOGNA:  Object to form.
7    A.   They should not provide known benefit that
8 I'm aware of.
9 BY MR. SLATER:
10    Q.   Looking now at Page 29, 9b, where you say
11 that VCDs and ARBs are not associated with an increased
12 cancer risk.
13        You start out talking about an FDA
14 meta-analysis that was reported on June 2, 2011; right?
15    A.   Yes.
16    Q.   You didn't think that we were claiming in
17 this case that valsartan in and of itself without
18 contamination with NDMA or NDEA causes cancer, did you?
19    A.   That was not my opinion or the intention
20 of including this section.  The intention of including
21 this section is that first of all there were studies
22 analyzing it, and I thought it was pertinent to
23 understand that the drug by itself prior to any of this
24 happening -- this was done on June 2nd, 2011 -- did not

Page 180

1 have any association with cancer.
2    Q.   Let's talk about that for a moment.
3        As of the reporting of this data in this
4 meta-analysis of 2011, you would not expect that there
5 would have been any NDMA or NDEA in valsartan; right?
6 There's no reason to believe there would have been;
7 correct?
8    A.   And besides this is -- when the study was
9 done, this was looking at a meta-analysis of studies
10 done even before that.  But yes, so the answer is yes,
11 we wouldn't have expected to be any impurities there.
12    Q.   So we know that on this meta-analysis
13 conducted by the FDA as of 2011, when we know there was
14 not NDMA or NDEA in valsartan, the study showed there
15 is no increased risk of cancer at all; right?
16    A.   That was important, I think, to understand
17 as a background to the question at hand.
18    Q.   Now let's look at Section 10 on Page 30,
19 relevant background, VCDs with NDMA or other
20 impurities.
21        Do you see that?
22    A.   Yes.
23    Q.   You start out talking about in June 2018,
24 ZHP reported that it had detected the presence of a

Page 181

1 previous undetected impurity, NDMA, in the active
2 pharmaceutical ingredient for valsartan; right?
3    A.   Yes.
4    Q.   Have you been shown any documents
5 indicating that ZHP actually knew that there was NDMA
6 in its valsartan before June 2018?
7        MR. INSOGNA:  Object to form.
8    A.   Not that I'm aware of.
9 BY MR. SLATER:
10    Q.   You would agree with me that -- well, I'll
11 withdraw that.
12        Why did you point out that it was
13 previously undetected?  Just because -- well, rephrase.
14        Why did you point out that this was
15 previously undetected?
16    A.   I believe I got that from the FDA website
17 where I got this information.  In other words, that it
18 was -- there was a time point at which it was not known
19 to be there.
20    Q.   Did that -- was that of any significance
21 to you in forming your opinions?
22    A.   Not for the questions at hand for me, no.
23 Other than, I mean, when we're talking about the
24 duration of exposure, we'd want to know when it's

1  thought that this was first -- when they first began
2  having these impurities, which I think was determined,
3  and so we know it was in 2012, I believe.
4      So that would be an important thing to
5  understand, because when we look at the epi data, the
6  studies are looking at the time point at which the
7  drugs were available.
8      Q.   And then evaluating the epi data, it's
9  important to have a good understanding of which of the
10  subjects in the study took valsartan contaminated with
11  NDMA and which were not taking contaminated NDMA --
12  contaminated valsartan; correct?
13      A.   That would be an important thing to do in
14  that study, which is what was attempted to be done,
15  yes.  Both of the studies -- Pottegard and Gomm.
16      Q.   In fact, the structure of the study relies
17  heavily on assumptions as to which people were exposed
18  to contaminated valsartan and which were not; right?
19      MR. INSOGNA:  Object to form.
20      A.   Attempts were made to identify which lots
21  were involved and which ones weren't, and they defined
22  them as definitely not, probably, and possibly.  And
23  they looked at it through different sensitivity
24  analyses, excluding the possibly, just the probably, to

1  make sure that the conclusions were consistent.
2  BY MR. SLATER:
3      Q.   Well, to the extent --
4      A.   That was what was available.  That's the
5  best evidence that was available to them.
6      Q.   If that -- rephrase.
7      If those assumptions were wrong, that
8  could impact the data and the significance of the data;
9  right?
10      MR. INSOGNA:  Object to form.
11      A.   They -- the answer to your question is
12  that if assumptions are wrong in a study, they can
13  affect and influence the outcome of the data, as in any
14  study.  And those assumptions I think, in my opinion,
15  after reviewing the papers and what they did to
16  identify those, is really the highest quality evidence
17  that we have to look at this question to date.
18  BY MR. SLATER:
19      Q.   We'll come back to that; I promise.
20      Looking at your report, Page 30 to 31, you
21  quoted some FDA statements, including the statement
22  that, "Patients taking the recalled
23  valsartan-containing medicines should continue taking
24  their medicine until they have a replacement product."

1      You quoted that there; right?
2      A.   Yes.
3      Q.   The understanding was you're taking
4  valsartan due to hypertension and to prevent
5  significant cardiovascular injury versus the risk of
6  using the drug for a short period of time further and
7  entertaining a potential risk of cancer?
8      That's basically what was being weighed;
9  right?
10      A.   Right.  It was weighing risks and benefits
11  of things, and I think that's why I pointed it out,
12  that it was felt that the risk of stopping the drug was
13  worse than continuing the drug until replacements could
14  be found.
15      And later down I think I pointed out that
16  the risk -- the actual risk of not taking valsartan for
17  hypertension is actually really minimal, so sort of
18  shows you how minuscule the risk was of continued
19  impurity in the VCDs.
20      I think that's on page -- I'd have to look
21  and see exactly which page to point you to that, but
22  it's in there.  So --
23      Q.   The FDA in statements consistently told
24  patients to make sure they spoke to their doctor and

1  secured a replacement medication before ceasing their
2  valsartan; right?
3      MR. INSOGNA:  Object to form.
4      A.   Can you repeat that again?  I missed the
5  beginning of the question.
6  BY MR. SLATER:
7      Q.   What we just read states that patients
8  should speak to their doctor, continue taking the
9  valsartan until they have a replacement product.
10      That's what the FDA told people; right?
11      A.   Yes, that's what we just talked about.  In
12  other words, the risk of stopping it was larger than
13  taking it if it had an impurity in it.  That's how I
14  see that.
15      Q.   Right.  The risk of stopping it
16  encompassed the risk of having, for example, a heart
17  attack the next day; right?
18      That's one of the risks; right?
19      A.   That's one of the risks, and that's why I
20  was pointing you to Page 33 at the top.  The actual
21  risk is actually small in stopping the drug, but it's
22  better -- they're standard treatments to take for these
23  conditions because they improve outcomes, but the
24  actual improvement is actually marginal.

Page 186

1        And despite that, they still were told to
2  stay on it instead of stop them, which tells me that
3  the calculated risk of continuing the drug was low
4  compared to stopping it.
5        Q.   Where are you saying that the FDA said
6  taking the medication act -- rephrase.
7        Where are you pointing to where it says
8  stopping the medication actually doesn't create any
9  risk or creates very little risk?
10       A.   Reask -- say that again.  Clarify the
11 question.
12       Q.   I thought what you just told me is that
13 the FDA later came out and said that the risk of
14 stopping your valsartan and having any sort of an
15 adverse event as a result of stopping your hypertension
16 medication is very, very small.
17       Did I misunderstand what you said?
18       A.   You misunderstand what I said.  If you go
19 to Page 33, this is now my interpretation of what
20 statement that FDA said was, is that when you look at
21 the actual risk reduction of adverse events that
22 hyper -- that valsartan and other blood pressure
23 medications mitigate, they do improve outcomes, but
24 they're not dramatic improvements.

Page 187

1        In other words, if you were to stop it, it
2  wouldn't be -- there was no survival differ -- all
3  causes of death did not show any differences between
4  these groups.  So in other words, stopping it wouldn't
5  have had that much of a detriment.
6        But despite this knowledge and knowing
7  about these drugs, the FDA adjudicated that it was
8  still worth staying on the drug because the risk of
9  taking the valsartan-containing impurities was even
10 lower than that.  That's my point.
11       Q.   So you think the FDA told people to keep
12 taking their valsartan so they wouldn't have, for
13 example, a heart attack or a stroke or some adverse
14 cardiovascular event, and that the FDA thought that was
15 a minuscule risk and told people to keep taking the
16 drug anyway?
17       MR. INSOGNA:  Object to form.  You may --
18 BY MR. SLATER:
19       Q.   Is that your testimony, Doctor?  Like does
20 anybody agree with you in the world about that that you
21 know of?
22       A.   Let me answer it in a different way so you
23 understand what I'm saying.
24       If it was calculated that the risk of

Page 188

1  taking these drugs was higher than the risk of
2  continuing -- and stopping the valsartan drugs, then
3  they would have said stop the drug, because the risk of
4  stopping was not as high as continually taking them.
5        Does that make sense to you?
6        Q.   Well --
7        A.   So they were saying the risk that we
8  calculated is very low, as I quoted several times, and
9  that it's better to stay on the drug, because that's
10 more of a risk to stop it.
11       And I'm telling you when you calculate
12 that risk of stopping it, it would be very small, which
13 tells you that the risk of continuing the
14 valsartan-containing drugs with impurity is even
15 smaller than that.  That's all I'm saying.
16       Q.   All right, but in the real world, what the
17 FDA was telling people is, "We don't want you to get
18 off the drug for days or weeks while you look for a new
19 replacement drug"?
20       That's what they told people; right?
21       A.   Because it was felt that it was not that
22 much of a risk to stay on it.  To stay on the drugs, it
23 wasn't that much of a risk.  If it was deemed to be a
24 higher risk, they would have said stop the drugs, it's

Page 189

1  worth stopping them, and accepting the risk of not
2  getting the benefit from the blood pressure medicine.
3        Q.   What they said is the risk of stopping the
4  blood pressure drug, which could kill you in a couple
5  of days potentially, was considered to be a
6  choice than continuing to take the pills for a few more
7  days or even a few weeks, which could potentially cause
8  cancer down the line?
9        That was the trade-off; right?
10       MR. INSOGNA:  Object to form.
11 BY MR. SLATER:
12       Q.   That's the trade-off the FDA was
13 providing; right?
14       A.   The FDA was calculating what the risks
15 were of staying on the drugs or not staying on the
16 drugs, and the consequences of each approach.  And they
17 obviously stated that they thought the risks of staying
18 on it were minimal, and to stay on the drug, because
19 the risks of stopping it was higher from getting a
20 cardiac or other complication.
21       And what I'm telling you is those actual
22 risks are low when you look at the data in that
23 paragraph on top of Page 33.  That's why I included
24 that there.

Page 190

1    In a different scenario, different
2 hypothetical scenario, if the risk of a drug became
3 higher of continually taking it than actually just
4 stopping it, then they would have said that instead.
5 That's my point.
6    Q.   This was the risk of getting off the drug
7 for a couple of days, because they only wanted people
8 to stay on the drug for a very short time until they
9 could get a replacement?
10    That's what the FDA said; right?
11       MR. INSOGNA:  Object to form.
12 BY MR. SLATER:
13    Q.   Is that what the FDA said, Doctor?
14    A.   It stated here -- and I think we agree on
15 that, and what I'm trying to tell you is the
16 interpretation is that the risk was considered very
17 minimal, which I think is verbatim from what they've
18 said, is that the actual risk is very low.
19    Q.   Did the FDA -- did the FDA say, "Well, go
20 ahead and stay on the valsartan with the contamination
21 with NDMA and NDEA for the rest of your life.  Go
22 ahead.  No problem"?
23       Did the FDA ever say that?
24    A.   No, they did not say that.

Page 191

1    Q.   What the FDA did was address a potential
2 drug shortage because of how widespread the
3 contamination was, address the risk of getting off your
4 hypertension medication for a few days?
5    That's what the FDA was looking at; right?
6       MR. INSOGNA:  Object to form.
7    A.   I think it was more than a few days.  It
8 was a few months that they were anticipating them to be
9 on the drugs.  And I think, as I said many times, they
10 calculated what they thought the risks would be of
11 staying on these drugs with impurities versus not, and
12 the calculation was stay on them.
13       And what I'm telling you is that the
14 consequence of stopping the drugs was actually
15 considered quite small anyway, so that tells you that
16 the risk of staying on them was quite minuscule.
17 BY MR. SLATER:
18    Q.   Would you agree with me that it would be
19 completely -- well, rephrase.
20       If a physician prescribing a blood
21 pressure medication to a patient had a choice between
22 valsartan-contaminated as these pills were and an
23 alternative medication that wasn't contaminated with
24 NDMA or NDEA, 10 out of 10 times the doctor would

Page 192

1 recommend the uncontaminated pills that don't have NDMA
2 or NDEA; correct?
3       MR. INSOGNA:  Object to form.
4    A.   That's a different question, and I would
5 agree with that.  If I had a choice, I would choose the
6 one that doesn't have it.  You were asking and we were
7 talking about weighing the risks of taking it versus
8 stopping the drug, and that's a different question.
9 And the risk of stopping it was deemed higher than the
10 risk of continuing it.
11       And what I'm telling you is that the risk
12 of stopping it was a minuscule risk to begin with from
13 the data that I quoted here, and that implicitly that
14 means the risk was lower than -- in terms of just
15 continuing it.  It was a minuscule risk, and I think
16 the FDA even stated it was a low risk for patients.
17       MR. SLATER:  Just for the record -- and I
18 want to just tell the counsel this just so I preserve
19 my rights.  I'm not moving to strike any of the
20 questions during this deposition, because I was
21 instructed not to, and that my rights are still
22 preserved, so I don't want my lack of motions to strike
23 to be interpreted by anybody as me not -- or be
24 interpreted as me thinking that all these answers are

Page 193

1 responsive.
2       I just want to place it on the record in
3 case I have to -- in case I need that bookmarked for
4 later.
5 BY MR. SLATER:
6    Q.   There is no physician you can -- well,
7 rephrase.
8       It would never be reasonable for a
9 physician to recommend to a patient the contaminated
10 valsartan pills that are at issue in this case versus
11 comparable medication that's not contaminated with NDMA
12 and NDEA?
13       You agree with that; right?
14       MR. INSOGNA:  Object to form.
15    A.   What is the question?  Whether or not I
16 would say to take the pills with or without?  Is that
17 what you're asking me?
18 BY MR. SLATER:
19    Q.   There is no physician in your opinion who
20 could reasonably recommend to a patient to take the
21 valsartan with the contamination versus a comparable
22 drug with comparable efficacy without the
23 contamination; correct?
24    A.   I think you asked that already, and I

Page 194

1 agreed, yes, that's true. That was different than the
2 other questions you were asking me.
3        Q.   And that's because there's, as you call --
4 rephrase.
5            And that's because why would anybody
6 entertain this risk if you don't need to; right?
7        MR. INSOGNA:  Object to form.
8        A.   If you had a choice to not take it, then I
9 agree with you, there would be no reason to do that.
10 BY MR. SLATER:
11       Q.   There's no reason -- there's no reason to
12 entertain that risk, right, if you don't have to?
13       MR. INSOGNA:  Object to form.
14       A.   There's no reason to take the drugs with
15 impurity of NDMA or others because we already
16 acknowledge there's no known benefit to it, so there
17 would be no reason to do that.
18 BY MR. SLATER:
19       Q.   Looking at page -- sorry, one second.
20           Looking at Page 30, the first paragraph
21 under Section 10.  You indicate, "According to tests of
22 a random selection of API batches performed by ZHP, the
23 levels of NDMA ranged from 3.4 parts per million to 120
24 parts per million, with an average of 66.5 parts per

Page 195

1 million."
2            And you reference 214 as the source of
3 that information; correct?
4        A.   Yes.
5        Q.   And that's a document that was provided to
6 you by counsel listing some NDMA levels; correct?
7        A.   Yes.
8        Q.   Did counsel ever inform you that there
9 were other documents produced in this litigation that
10 showed ZHP's valsartan was contaminated in some lots
11 with higher levels than what you quoted in your report?
12       MR. INSOGNA:  Object to form.  I'm going
13 to instruct you not to answer anything about what you
14 discussed with counsel.
15 BY MR. SLATER:
16       Q.   I -- well, let me ask it differently.
17           Were you provided any documents by counsel
18 indicating higher levels of contamination with NDMA in
19 ZHP's valsartan?
20           Were you aware of such documents?
21       A.   I don't know.  I looked at that document
22 and also I looked at obviously the ones online that
23 showed the values that were found in various lots and
24 the ranges for both NDMA and NDEA.

Page 196

1        Q.   In terms of internal corporate documents
2 showing their testing, and in terms of the documents
3 that we went through in discovery, you're only aware of
4 those that were provided to you by counsel?
5            We already went through that; right?
6        A.   Yes.
7        Q.   And if you go to Page 34 and 35.  You have
8 a table -- it actually is 33 to 35.
9            You have a table of various test results,
10 and that you got from the FDA; right?  The FDA's
11 information?
12       A.   Yes.
13       Q.   Did you get that independently, or was
14 that provided to you?
15       A.   I found that online independently.
16       Q.   Did you ever ask counsel if these values
17 were consistent with what we learned in discovery when
18 we took depositions of corporate witnesses?
19       MR. INSOGNA:  Object to form.  Same
20 instruction not to answer anything concerning what you
21 discussed with attorneys.
22 BY MR. SLATER:
23       Q.   Did you wonder if those levels were
24 accurate or whether or not higher levels were

Page 197

1 potentially disclosed in discovery when we took
2 depositions of witnesses?
3        MR. INSOGNA:  Object to form.
4        A.   I took the values that the FDA had as the
5 public values and the ones provided here in that one
6 reference in 214.  I didn't think otherwise.
7 BY MR. SLATER:
8        Q.   If there -- rephrase.
9            If the lawyers who hired you had data and
10 documents from the manufacturers that reflected higher
11 levels of NDMA and NDEA, you would have wanted to be
12 provided those; correct?
13       MR. INSOGNA:  Object to form.
14       A.   Yes, I would like -- I think as we
15 discussed earlier, I'd like to be able to look at all
16 of the data to weigh in to see what is and isn't
17 relevant and what is important.
18 BY MR. SLATER:
19       Q.   Go -- rephrase.
20           Looking a little bit below where we just
21 were talking at the end of the chart at Page 35.  You
22 discuss an April 4, 2019, FDA statement.
23           Do you see that?
24       A.   Yes.

Page 198

1    Q.   The first paragraph of that statement you
2   quote -- indicates, "While we've concluded through our
3   risk assessments that the maximum possible exposure to
4   nitrosamines, which are also known environmental
5   contaminants and found in water and foods, including
6   meats, dairy products, and vegetables, in ARB medicines
7   appears to be small, their presence in drug products is
8   not acceptable."
9        You agree that the presence of NDMA or
10  NDEA in drug products is not acceptable; right?
11       MR. INSOGNA:  Form.
12       A.   I wouldn't intentionally put that there.
13  BY MR. SLATER:
14       Q.   From your perspective and in your opinion,
15  it would never be acceptable to include NDMA or NDEA in
16  the valsartan pills as we saw in this case; right?
17       MR. INSOGNA:  Object to form.
18       A.   I would answer it the same as before.  I
19  wouldn't put it there intentionally.  It doesn't seem
20  to have any benefit.
21  BY MR. SLATER:
22       Q.   And it has risk; right?
23       MR. INSOGNA:  Object to form.
24       A.   Well, I think we'll get to that when we

Page 199

1   talk about my assessment of the literature that's
2   available with respect to NDMA and other nitrosamines,
3   in terms of what the risk is and what models that have
4   been shown at what dose levels and for what duration.
5   BY MR. SLATER:
6        Q.   At the outset when these pills were being
7   sold and nobody knew the contamination was there, the
8   patients were intended to take these pills for the rest
9   of their life, likely; right?
10       MR. INSOGNA:  Form.
11       A.   Very often patients on blood pressure
12  medicines are on those medications for longer periods
13  of time.
14  BY MR. SLATER:
15       Q.   If we look further down in that FDA
16  statement, which carries over to Page 36.
17       This actually says in part, "The risk
18  associated with abruptly discontinuing the use of these
19  important medicines far outweighs the low risk that our
20  scientists estimate to be associated with continuing
21  the medicine until the patient's doctor or pharmacist
22  provides a safer placement or a different treatment
23  option."
24       Do you see that?

Page 200

1        A.   Yes.
2        Q.   So the FDA defined what it was speaking
3   about as a low risk as being the low risk associated
4   with continuing the medicine until the patient's doctor
5   or pharmacist provides a safe replacement or a
6   different treatment option.
7        That's how the low risk was defined;
8   correct?
9        A.   The risk was, as we talked about earlier,
10  they were comparing risks of different things, and
11  their statement there suggests that they felt that the
12  risk of continuing the drugs is low, and that they
13  should stay on the medication until a replacement could
14  be found.
15       Q.   They defined the low risk as the risk of
16  continuing the medicine until the patient's doctor or
17  pharmacist provides a safer placement or a different
18  treatment option.
19       That's what the words state; correct?
20       A.   Yes.
21       Q.   At no point did the FDA say there's no
22  risk from taking these pills; right?
23       A.   No.
24       Q.   It's not your -- rephrase.

Page 201

1        And certainly it's not your opinion
2   there's no risk of taking these pills, right, on a
3   prospective basis?
4        You're not saying there was no risk,
5   you're quantifying the risk; right?
6        A.   Yeah, quantifying the risk, and first
7   started with their worst-case scenario risk, which is
8   just on that same page a little lower down, where they
9   make a lot of assumptions, which are all conservative
10  assumptions, to say if patients were taking the highest
11  levels found the whole time that this was the estimated
12  risk to getting cancer over the period of time that
13  they were taking it for the full time.
14       And so as you pointed -- as you asked me,
15  the FDA did not say that there was zero risk, but they
16  were showing that the risks were quite small even in
17  the worst-case scenario.
18       MR. SLATER:  Counsel, I think this is
19  probably a good break point.
20       MR. INSOGNA:  Okay.  We can go off the
21  record and talk about it.
22       MR. SLATER:  Off the record.
23       THE VIDEOGRAPHER:  We are going off the
24  record -- I'm sorry.  We're going off the record at

Confidential Information - Subject to Protective Order

Page 202

2:50.

[A brief recess was taken.]

THE VIDEOGRAPHER: We're back on record at 3:06 PM.

BY MR. SLATER:

Q.  Looking now at the bottom of Page 37 into 38.  You referred to a table published on August 20, 2018, in an FDA communication.

Do you see that?

A.  Yes.

Q.  And you actually give some of the ranges of NDMA in certain foods; correct?

A.  Yes.

[Discussion off the record.]

BY MR. SLATER:

Q.  You list the NDMA levels per this table that's referenced for some food; correct?

A.  Yes.

Q.  Let's look at that.  Cured meat.  The figures are in micrograms.

Do you see that?

A.  Yes, I do.

Q.  If you want to convert that to nanograms, you would multiple by 1,000; right?

Page 203

A.  Yes.

Q.  So for example, for cured meat, in terms of nanograms it would be four to 230 nanograms; right?

A.  Yes.

Q.  With smoked meat, it would be four to 1,020 nanograms; right?

A.  Yes.

MR. SLATER:  Let's go off for a second, please.  Can we please go off the record for a second, please?

THE REPORTER:  Yeah.  Michael?

THE VIDEOGRAPHER:  We're going off the record at 3:08.

[Discussion off the record.]

THE VIDEOGRAPHER:  We're back on the record at 3:09.

BY MR. SLATER:

Q.  For grilled meat, it would be six to 130 nanograms; right?

A.  Yes.

Q.  For bacon, it would be 70 to 90 nanograms; right?

A.  Yes.

Q.  In terms of the levels seen in the

Page 204

valsartan pills of NDMA -- rephrase.

In terms of the levels of NDMA seen in the valsartan pills, starting with ZHP's manufactured valsartan, the levels are far higher in nanograms than what we see here for food; correct?

A.  These are referenced levels that were in the FDA table, and I think when we get into the dietary studies, we'll see that many of the estimates are much, much higher than that.

So putting that into context, your question about these particular numbers and the ones in this table, the ones in this table are -- range between -- or the table above, that's saying what's the acceptable limit per day is 96 nanograms per day of NDMA.  The same page.

Q.  I'll try it again.

The levels of NDMA in these foods, as quoted in your report, are far lower than, for example, the levels seen in the valsartan manufactured by ZHP; correct?

A.  Some are lower, yes.  Some of the ones that were found that were tested didn't have any identified in the lot.  Yeah, some were higher.

Q.  We'll try it again.

Page 205

These levels of NDMA that you put into your report are far lower than the results of NDMA for the ZHP-manufactured valsartan; correct?

A.  I think I answered and said that some are lower and some are higher, based on which lot and which pill, and that also these are not my -- this was quoted from the FDA website.  This is what was put online.

In my report, I talk more extensively about diet and dietary studies, and trying to estimate various levels of NDMA, et cetera, and the limitations of doing that.

Q.  Doctor, you put these figures in your report deliberately to help support your opinions, because you say right afterwards, "This table makes clear that NDMA exposure is a routine part of human life."

Right?

A.  That was --

MR. INSOGNA:  Object to form.

A.  That was the point, was to show that we are exposed, as the FDA pointed out with some examples from one reference, of what we are exposed to just from a few different meats, for example.

This is not an exhaustive list of all the

Page 206

1 baseline exposure. The point was is that we are
2 inundated with exogenous exposure to NDMA and other
3 things like that on a daily basis. That was the point
4 there.
5 BY MR. SLATER:
6     Q.   So the point wasn't what you said in the
7 report where you said, "This table makes clear that
8 NDMA exposure is a routine part of human life. Indeed,
9 as set forth below, estimates for total NDMA
10 consumption often exceed the FDA's suggested acceptable
11 intake"?
12         MR. INSOGNA: Objection.
13 BY MR. SLATER:
14     Q.   That's what your report says is the reason
15 why you put that -- those figures there.
16         Is that not true?
17     A.   Exactly what I just said to you. I
18 said -- the first sentence is that we are exposed to
19 this routinely, and the second sentence as stated forth
20 below in my report, when we talk about dietary exposure
21 and other exposures, are routine and high -- much
22 higher than the FDA's limit, which I also point out on
23 the same page is 96 nanograms per day.
24         So I think we're agreeing.

Page 207

1     Q.   In looking at the tables of the
2 contamination levels that you put in your report, we
3 had gone through earlier where it said -- we have
4 Prinston Pharmaceutical, for example, which was ZHP,
5 for the 320-milligram valsartan pills, in nanograms the
6 NDMA level was 15,180 nanograms to 16,300 nanograms;
7 right?
8     A.   Yes, because those are in micrograms in
9 the table, in that table on Page 35.
10     Q.   The point I'm making is when we make them
11 equivalent in terms of the measurement of nanograms,
12 the levels of NDMA are massive compared to the levels
13 in the foods as stated in your report; right?
14         MR. INSOGNA: Object to form.
15     A.   No, I think I was qualifying that those
16 foods were some examples that were pointed out by the
17 FDA, but I've also in my same report lower down shown
18 the wide range which is extremely higher than that on
19 routine exposure through diet.
20 BY MR. SLATER:
21     Q.   And many of the dietary studies that you
22 talk about were performed at a time period before
23 efforts were made to remove nitrates and NDMA from
24 foods; right?

Page 208

1     A.   Some of those papers are older, yes. Some
2 are from this decade that are referenced.
3     Q.   Did you make any effort to distinguish
4 from study to study whether the dietary NDMA levels
5 stated need to account for efforts by industry to
6 remove nitrates and NDMA from foods?
7     A.   I think as we get through it, there are a
8 lot of limitations to these dietary studies in terms of
9 trying to estimate. So -- I didn't hear if you said
10 something.
11     Q.   I told my dog to relax.
12         MR. INSOGNA: Continue your answer --
13     A.   No, I lost --
14 BY MR. SLATER:
15     Q.   I was muted so I didn't say it to you. I
16 was on mute.
17     A.   I was saying that there are many
18 limitations to these dietary studies in terms of trying
19 to come out with something that's robust. They have so
20 many problems, they're very problematic in terms of
21 looking at the question that I was asked to answer,
22 which is do these levels in these pills increase the
23 risk over what we're exposed to on a routine basis?
24         And so I think, as you saw in my report, I

Page 209

1 conclude that there are many dietary studies of which I
2 discussed that are limited in their ability to help us
3 with that question.
4         And so overall, I think the general
5 opinion and takeaway from the dietary studies to me is
6 that the overall exposure exogenously is much lower
7 than endogenous production, orders of magnitude
8 smaller, and that even looking at just the dietary
9 studies alone, they're very problematic in terms of
10 this particular question, looking at NDMA as opposed to
11 they're looking at nitrosamines, nitrates, nitrates,
12 which is not the same thing, obviously.
13         And so they're looking at surrogates of
14 the question. And then to quantify how much people are
15 taking, they're using questionnaires, which are
16 notoriously limited in so many ways in being
17 quantitative how much is actually going in, and so it's
18 a surrogate of the reality.
19         And so you have to look at the data, which
20 I did, but when I put it together and look at all the
21 pieces of evidence in front of me in terms of the
22 question I was asked, that is not a large component, or
23 I don't put as much emphasis or weight on it as opposed
24 to the human epi studies that have this exact same

Confidential - Information - Subject to Protective Order

Page 210

1  question being assessed, which is patients taking
2  valsartan with or without the impurity, which is a much
3  more relevant question and more to point.
4        So yes, did I look at all the data?  Yes.
5  Did I assess the daily intake of diet in terms of a
6  potential exposure to NDMA?  Yes.  And I explained to
7  you how that relates to overall how I applied this to
8  the question.
9        But ultimately when I look at the full
10 dataset in totality, this is not as important to me as
11 the human epi studies, which are in humans and looking
12 at what they were exposed to, which is a question that
13 I was asked to do.
14       So that's how I would answer the question
15 about diet and the values that are here and comparing
16 it to what's in the pills.
17    Q.   Let's look on Page 38, Section 11, where
18 you talk about the epidemiologic data.
19       Do you see that?
20    A.   Yes.
21    Q.   You state, "As set forth above, I have
22 been asked to opine on whether there is sufficient data
23 to support the conclusion advanced by some of the
24 plaintiffs' experts in this litigation that, to a

Page 211

1  reasonable degree of medical certainty, ingestion of
2  NDMA at the trace levels detected in some valsartan
3  drugs could have caused the cancers that the plaintiffs
4  have alleged in this litigation."
5        I want to stop there.  That's your summary
6  of what the ultimate question was that you were
7  evaluating; correct?
8        MR. INSOGNA:  Form.
9     A.   This was one of the questions that I was
10 asked, yes.
11 BY MR. SLATER:
12    Q.   When you refer to the cancers that the
13 plaintiffs have alleged, are you talking about the
14 plaintiffs who have been diagnosed with cancer who were
15 saying that cancer was caused or contributed to by
16 their intake of the contaminated valsartan?
17    A.   Yes, it's the list of the cancers that
18 were provided to me that have been included in this
19 case.
20    Q.   You state in the second paragraph that you
21 placed the most weight on the epidemiologic data that
22 actually studies the relationship between the exposure
23 and the effect; right?
24    A.   Yes, the human epidemiological data.

Page 212

1     Q.   And if I understand your methodology in
2  terms of what you relied on -- we'll go through it in
3  more detail step-by-step.
4        It's my understanding that you place the
5  epi studies, the Pottegard and Gomm studies for people
6  who are actually taking valsartan, at the top of what
7  you -- your hierarchy of what you looked at here;
8  correct?
9     A.   Of all the available data, that is, yes,
10 the top data, the most relevant data to the question
11 that we're asking.
12    Q.   You refer in the next paragraph, the third
13 paragraph under Section 11, to less valuable dietary
14 studies and animal studies, which you say are only
15 weakly related to the inquiry at issue; right?
16    A.   Yes.
17    Q.   And again, that inquiry is what you
18 referred to just above in terms of the question that
19 you were looking at; right?
20    A.   Yes, whether or not the impurities found
21 in valsartan-containing drugs posed any increased risk.
22    Q.   For the cancers alleged by the plaintiffs
23 who claim that they have cancer in this case?
24    A.   Yes.

Page 213

1     Q.   So let's start to walk through this a
2  little bit.  You talk -- rephrase.
3        Let's look at Section 11a.  And you talk
4  about the fact that there's two large cohort studies of
5  people who fill prescriptions for valsartan produced by
6  manufacturers in which the NDMA impurity was
7  identified.
8        And again, that's the Pottegard and Gomm
9  studies; correct?
10    A.   Yes.
11    Q.   Now, you say those studies compared
12 individuals who took valsartan known or presumed to
13 contain the NDMA impurity and individuals who took
14 valsartan not believed to contain the impurity; right?
15    A.   Yes, that was the general methodology of
16 the study.
17    Q.   Would you agree with me that there is
18 uncertainty as to whether or not those assumptions are
19 actually met as to all the study participants?
20       MR. INSOGNA:  Object to form.
21    A.   There's uncertainty with any assumption in
22 any study, but I think it's a reasonable assumption
23 that based on their tracking method in those national
24 databases looking at the prescription level and

Page 214

1 actually filling scripts -- I mean, they went through
2 every step possible to minimize any error in that
3 assumption.
4 BY MR. SLATER:
5    Q.   Do you have the Pottegard study handy?
6       MR. INSOGNA:  We can get it.  Give us one
7 moment, Adam.
8       MR. SLATER:  Chris, you could mark the
9 Pottegard study and just put it in, but I don't need to
10 put it on the screen if the doctor has it.
11       MR. INSOGNA:  What did you say?
12    A.   224.  That's the reference in my paper.
13       Okay, I have it now in front of me.
14 BY MR. SLATER:
15    Q.   Let's look now at the bottom of Page 38
16 where you talk about the Pottegard study.
17    A.   Okay.
18    Q.   You state that the study subjects were
19 identified from the national Danish registry between
20 September 2011 and June 2017; correct?
21    A.   Yes.
22    Q.   During that time period, was valsartan
23 sold in this -- to these people who were being studied
24 contaminated with NDMA and/or NDEA for that entire time

Page 215

1 period?
2       MR. INSOGNA:  Object to form.
3    A.   I would have to review this, but I think
4 that was what they started with, if you look at Figure
5 2 in the paper, and then based on inclusion of being
6 eligible based on the criteria for the study, they
7 excluded a number of patients, like patients who had
8 previous cancer, et cetera, less than age 40, all that
9 kind of stuff, and so it's not all of those patients
10 that they identified that were in that range.
11 BY MR. SLATER:
12    Q.   My question is different.
13       Did you evaluate whether or not valsartan
14 sold between September 2011 and June 2017 was
15 contaminated or whether it started to be contaminated
16 later for some or all the manufacturers at issue?
17       MR. INSOGNA:  Object to form.
18    A.   I think that it was a date in 2012.  And
19 so the authors, if you look at their methods, they did
20 a number of things to ensure accuracy here in terms of
21 whether patients were taking the drug with or without a
22 potential impurity, and also when they started.
23       They -- so for example, if a patient was
24 on valsartan but not with a contaminated version, they

Page 216

1 would be contributing follow-up time to the control
2 arm, the control cohort.  And only when they were --
3 they filled scripts that had the exposure or the
4 putative exposure was when they then started
5 contributing to the cohort that had it, and so
6 that they note there limits immortal time bias, and so
7 it's a more accurate way of evaluating it.
8       And so to get to your question, they took
9 into account when each patient would have started the
10 actual drug with the impurity, even if they didn't
11 start it right from the beginning of the timing of
12 their study design.
13       Does that make sense?
14 BY MR. SLATER:
15    Q.   Let me just be clear as to what you
16 considered -- I forgot to cover this -- and then we'll
17 come back to this study.
18       In terms of your methodology, my
19 understanding is you looked at the epidemiology
20 regarding valsartan specifically, and that's the
21 Pottegard and Gomm studies.  You also looked at dietary
22 studies, you looked at industrial or occupational
23 exposure studies, and you looked at animal studies.
24       Do I understand that correctly, and you

Page 217

1 put that together, and that was what you considered in
2 reaching your opinions?
3    A.   Yes, as we talked at the very beginning, I
4 also looked at the opinions of the plaintiff experts
5 and what their opinions were and what they were relying
6 on.
7       And then through my independent analysis,
8 the way I normally do any scientific question, based on
9 my experience, based on all my training on how to
10 assess a scientific question and to review the
11 literature, I then did exactly as you said.
12       I looked at the human epi, which I put at
13 the highest priority, since we're humans; and then
14 other ancillary support, which includes, as you pointed
15 out, the occupational exposures, which again are
16 surrogates of NDMA through occupations.
17       And then I'm sure we'll get to that, but
18 sort of not asking the direct question, as an oral
19 exposure but rather an inhaled, and then also the
20 dietary.  We've talked about the limitations of those.
21 And then the animal studies, and we haven't really
22 pointed to that yet, but taking all of that into
23 account.
24       And again, using the human epi, these

Page 218

1 studies here, as sort of the more weighted part of my
2 analysis, since they're actually asking the question
3 that I think we're all interested in, whereas all those
4 other studies are looking at surrogate questions using
5 surrogate assessments and estimations of exposure, so
6 they're far lower on the hierarchy of the evidence to
7 be used in such a case as this than the actual question
8 at hand, which we had two human epi data studies, which
9 are the two that we've been talking about.
10       And I'm happy to answer any other
11 questions about it, but that's why I started with this
12 and focused on this.
13   Q.   I want -- let me ask the question again,
14 because there's a lot you put in there that I tried to
15 keep -- I didn't ask about.  So let's go to my
16 question.
17       I looked at your report.  I looked at what
18 you took into account.  I saw you evaluating the human
19 epi studies, specifically Pottegard and Gomm.  You went
20 through dietary studies.  You looked at
21 industrial/occupational exposure, and you looked at
22 animal studies.
23       And that was the universe that you
24 evaluated in terms of data to come up with your

Page 219

1 opinions; correct?
2   A.   Yes.
3   Q.   And if I understand correctly, going a
4 step further, you basically did an analysis of the
5 weight of the evidence and put it all together to form
6 your opinion; correct?
7       MR. INSOGNA:  Object to form.
8   A.   Yeah, I looked at all of the evidence and
9 the pieces of the evidence from those various
10 categories, some pieces being much larger parts of the
11 puzzle, other pieces being much smaller parts but still
12 considered, and ultimately came to my opinion based on
13 the results.
14 BY MR. SLATER:
15   Q.   When you talk about what you focused on
16 the most, that was again Pottegard and Gomm, which you
17 felt were on a much higher level and much different
18 from the rest of the evidence available; correct?
19   A.   Yes, for the reasons that I stated, since
20 they're much more relevant studies for the question at
21 hand.
22   Q.   Do you know if the -- I'm coming --
23 rephrase.  I'm going back to Pottegard now.
24       Do you know if the contamination levels in

Page 220

1 the various pills varied over the years at all?
2   A.   The contamination levels varied by lot
3 over the years and by different company, according to
4 the FDA reports and the tables that are shown there.
5 They were not consistent.
6   Q.   Was the variation in the impurity levels
7 taken into account in Pottegard?
8   A.   In a way, yes, because patients were doing
9 what was the reality, which was they were being exposed
10 to the question at hand, which is intermittent exposure
11 that more likely than not wasn't the highest level in
12 every patient for the whole time; which as we then
13 point out from the FDA's assessments, they were always
14 taking the worst-case scenario just to show that even
15 that was a minimal risk, but the more likely scenario
16 is that most patients weren't exposed to the highest
17 levels, and certainly not for every lot throughout the
18 duration of time.
19       And so in a way, Pottegard exactly
20 accounts for that because it's the exact reality of
21 what was going on.  So it's looking at the question
22 we're asking, not a hypothetical one of what if
23 somebody had the whole thing the whole time at the
24 highest dose, which we've all agreed is extremely

Page 221

1 unlikely.
2   Q.   You state in your report at the bottom of
3 Page 38, "No statistically significant associations
4 were reported between valsartan products potentially
5 containing NDMA and any type of cancer."
6       And then you refer to the primary
7 endpoint; correct?
8   A.   Yes.  Yes.
9   Q.   The fact that there were no statistically
10 significant associations between valsartan products
11 potentially containing NDMA and any type of cancer --
12 why was that significant to you?
13   A.   Because that's the question that I was
14 asked to assess, is that if there is an added risk,
15 which would be manifested by observing higher
16 incidences of cancer in the patients exposed to it
17 compared to those not.
18       So with this assessment, which was the
19 primary endpoint, looking at any cancer, the answer was
20 no.  That's probably the most important piece of
21 evidence of all the things considered, since it's the
22 exact question we're asking.
23   Q.   You then state at the top of Page 39, "In
24 subgroup secondary analyses by cancer type, there was

Confidential Information - Subject to Protective Order

Page 222

1 no individual cancer that had a statistically
2 significant association of valsartan products
3 potentially containing the NDMA impurity."
4       Why did -- why was that significant to
5 you?
6    A.   Because as secondary analyses, we're
7 interested, of course, in are there specific cancers
8 that may or may not be associated with taking these
9 agents versus the agents without the impurity.
10       And so it's secondary because it's not the
11 primary analysis, it's not statistically designed to
12 answer that question definitively, but it's looking at
13 it because we have the data and potentially making sure
14 that there's no subgroup that might have some
15 association.
16       And in this case, that was not the case in
17 this particular study.
18    Q.   Did you independently verify the
19 statistical analysis in Pottegard or any other study?
20       MR. INSOGNA:  Object to form.
21    A.   I didn't do any statistical analyses.  I
22 can read a paper and understand what the statistics
23 mean, but I didn't confirm them or do any statistical
24 analyses.

Page 223

1 BY MR. SLATER:
2    Q.   And you're not a biostatistician?  You
3 don't hold yourself out as an expert in biostatistics,
4 do you?
5    A.   I have been trained in biostatistics, I
6 have a master's degree in it, but I don't hold myself
7 as a statistician.  I can understand them.  It's the
8 language that we speak in science, which is statistics,
9 to ask questions or hypotheses and determine if there
10 are -- the hypothesis can be accepted or not, as we
11 talked about earlier.
12       So -- but I don't hold myself out to be a
13 statistician.
14    Q.   And again, you accepted the statistical
15 analyses in these studies?  You didn't independently
16 verify; correct?
17    A.   Correct.
18    Q.   If there had been a statistically
19 significant association either to any cancer in general
20 or to a specific cancer, would that have been of
21 significance to you?
22    A.   In a hypothetical world, if the primary
23 endpoint showed that there was a significant
24 correlation in all cancers, then that would be

Page 224

1 important data to consider from human epi data from the
2 study.
3       In terms of the subgroups now, looking at
4 them, when you see -- if you were to see a subgroup
5 that showed a signal, we have to be cautious there.
6 And I think we get to that in the Gomm study, where --
7 there's a concept called multiple testing in
8 statistics, where if you test things enough and you
9 slice the data enough and what might be referred to as
10 massaging the data to look at it in various ways,
11 eventually you may find something by chance.
12       And so that's exactly what a P value
13 actually is, in a sense, where we talk about a P value
14 of .05, in terms of what's statistically significant.
15 And so that's translated to what you're more familiar
16 with, is if it crosses one or not, a hazard ratio or
17 odds ratio or relative risk.
18       If it's crosses one, then it's not
19 statistically significant, and the P value is above .5.
20 And if it doesn't cross the one boundary, then it is
21 considered statistically significant, and the P value
22 is less than .05.  But all that's saying is that you
23 may have a false positive, but it's a less than five
24 percent chance that it's false positive; okay?

Page 225

1       One in 20, five percent of the -- so if
2 you look at 20 hypotheses, you will find one by chance,
3 by accident.  That's what statistics is all about.  And
4 we're allowing for that when we're doing studies like
5 this, and saying we're going to set the threshold at
6 being less than .05.
7       If we find an association, it's probably
8 real, but there's a five percent chance that it's false
9 positive.  But then if you start looking at 20
10 different hypotheses, you're at risk of then really
11 finding something that's false positive.
12       So getting back to the subgroups now, if I
13 find an association in one of the many things I've
14 looked at, then you have to look at that a little bit
15 skeptical.  And you note it, it's there, yet it's not
16 something that's definitive, and that would probably
17 require further independent validation in other cohorts
18 in other studies before one would just hang their hat
19 on that one finding.
20       So that's the difference with sort of
21 looking at the main question and then looking at a
22 whole bunch of subgroup analyses afterwards.
23    Q.   So you're saying the subgroup -- rephrase.
24       Are you saying the subgroup analyses

Confidential Information - Subject to Protective Order

Page 226

1  shouldn't be considered?
2      A.  I don't think I said that.  I said that
3  their value and your ability to put as much weight on
4  the finding is lower.
5      And as an example, in many studies that
6  look at a primary endpoint -- in many of my studies,
7  their treatment and trying to improve survival -- and
8  let's say the study is negative, this drug X doesn't
9  improve survival in everybody enrolled; but in other
10  analyses of man versus female, people above 60 versus
11  less than 60, all kinds of different ways of looking at
12  the people differently, are there difference among
13  subgroups.
14      Sometimes there's one value or two that
15  showed that the drug worked, and so we'll look at that
16  and we'll say, "That's interesting, maybe the drug
17  works in just a subgroup of people," but we also say
18  this is a subgroup analysis, and it's at risk for false
19  positives, and that we'd have to test this
20  independently prospectively, that question and that
21  tumor type, to be -- to have any weight or to hang your
22  hat on that finding, so to speak.
23      And so we consider it, yes, we note it,
24  yes, but we wouldn't act on it per se as much as we

Page 227

1  would a primary endpoint of the same study.
2      Q.  You pointed out with regard to Pottegard
3  that on the subgroup secondary analyses by cancer type
4  there was no statistically significant association.
5      You were stating that as part of the
6  evidence that you're relying on to say that the NDMA in
7  these pills, in your opinion, likely didn't increase
8  the risk to the people that got cancer and are now
9  saying they got cancer from the pills; right?
10      MR. INSOGNA:  Object to form.
11      A.  That's right.  And remember, we go back --
12  BY MR. SLATER:
13      Q.  That's right.  That's all I asked you,
14  though, Doctor.  I literally just asked you yes or no.
15  You confirmed it.  I didn't ask for an explanation.
16      A.  Okay.
17      Q.  Now, in looking at this -- actually, let
18  me find my note.  One second.
19      Looking now at Pottegard, were there
20  trends towards statistically significant association
21  for any cancers?
22      A.  I'm just looking at it real quick.
23      There were -- if you're looking at actual
24  cancers, there were -- when you looked at subgroups,

Page 228

1  your question is as opposed to all cancers, there was
2  essentially no trend.  It was like one, 1.09.  It's
3  essentially no difference.
4      But if you're looking at subgroups of
5  cancers, you can see that some cancers look to the left
6  of the force plot in Figure 3 of that paper, which
7  suggest that it was protective, it was protective of
8  taking these drugs compared to not taking impurity, and
9  in other cancers there were trends the other direction
10  which suggested that it was -- that it was consistent
11  with an association.
12      And so the answer is yes, there were
13  trends both ways.  Trends means by definition in
14  statistics not statistically significant, but trends
15  towards one way or the other.
16      Q.  First let's define for which cancers there
17  were trends towards statistical significance.
18      One would be colorectal cancer; right?
19      A.  Colorectal cancer was 1.46 trend to the
20  right we would say on a force plot, but also the lower
21  boundary was .79, the other side of one.
22      Q.  Am I correct that there was a trend
23  towards significance for colorectal cancer?
24      A.  Depends on what you define as trend.

Page 229

1  Often we define trend as it trends towards one way with
2  a higher ratio, relative risk, and that the P value
3  approaches .05, like maybe it's .06 or .07 or .08, not
4  if it's .2 or .3 and it trends to that side from the
5  hazard ratio.
6      So can you clarify what you mean by trend?
7  Because this is not trending statistically.  .79 is a
8  very low bar, low boundary.  It's not .98 as the lower
9  bound or .99 as the lower bound.  It's .79.
10      Q.  Does the hazard ratio of 1.46 hold any
11  significance?
12      A.  It's the point estimate hazard ratio,
13  meaning that's the point estimate of the 51 patients
14  that were -- that had events with colorectal cancer.
15      Q.  Was there a trend towards statistical
16  significance for uterine cancer?
17      A.  Uterine cancer you can see was 1.81 hazard
18  ratio as a point estimate with confidence interval of
19  .55 to 5.9 with 15 events.
20      The way I interpret that is that's not a
21  statistical trend.  That's spurious with wide range,
22  wide confidence intervals with very few events.
23      Q.  One second.  In the abstract -- we'll just
24  go with that, because it's just easier to focus on, on

Page 230

1 the front page of the article.

2          In the results section, the authors

3 discuss what we just talked about, and they say, "For

4 single cancer outcomes, increases in risk were observed

5 for colorectal cancer, hazard ratio 1.46, 95 percent

6 confidence interval, 0.79 to 2.73, and for uterine

7 cancer, 1.81, 0.55 to 5.90, although with wide

8 confidence intervals that included the null."

9          That's what we just discussed; correct?

10     A.   Yes.

11     Q.   Turn if you could now to the fourth page

12 of the article.

13     A.   Page 4?

14     Q.   I don't have the page numbers on my copy.

15 I'm just not seeing them.  So it's the fourth page,

16 though.  It has -- the discussion starts on this page.

17     A.   Yes.

18     Q.   And they discuss the single cancer

19 outcomes again.

20          You see that in the left-hand column;

21 right?  Right under Figure 2.

22     A.   Which figure?

23     Q.   Figure 2.

24     A.   Figure 2?  The flow chart of cohort

Page 231

1 selection of Danish users?

2     Q.   Yes.

3     A.   Yes.  Okay, I see that.

4     Q.   Right under that, it talks again about

5 what we just discussed, the increased risks seen for

6 certain single cancer outcomes; right?

7     A.   It says that, and it says also did not

8 reach statistical significance, yes.

9     Q.   Right.  They said increased risks were

10 seen, but did not reach statistical significance?

11     A.   That's how they worded it, yes.

12     Q.   The next paragraph, they say, "Results

13 comparable to the main analyses were found when we

14 stratified by sex and age, whereas a

15 stronger association was seen when we restricted to

16 incident users during the study period, hazard ratio

17 1.58, 95 percent confidence interval, 0.99 to 2.52,

18 compared with prevalent users at the beginning of the

19 study period."

20          0.91 was the hazard ratio.  0.66 to 1.25,

21 and that's reflected in Figure 4.

22          Do you see that?

23     A.   Yes, I do.

24     Q.   Did you understand the difference between

Page 232

1 a prevalent user and an incident user?

2     A.   I believe a prevalent user was one who

3 started on blood pressure -- who were on the valsartan

4 at the time of the starting dates, as opposed to an

5 incident user who started at some point later.

6     Q.   And a prevalent user could have been on

7 the medication and then could have stopped a week after

8 the study period was established; right?

9     A.   No, that doesn't sound right.  It's --

10 patients who were taking the medications for the

11 duration that they were taking them were for the.  So

12 patient time and follow-up, what you see there,

13 incorporates how long a patient was on the drug or not.

14 All prevalent -- incidences -- who was on it to begin

15 with versus not.

16     Q.   Right.  A prevalent user was someone who

17 was already using the medication before the study

18 period began; right?

19     A.   And were on it at the beginning of the

20 study period, yes.  That's --

21     Q.   Right.  And then --

22     A.   Yeah.

23     Q.   Right.  And then could have stopped taking

24 the medication shortly thereafter; right?

Page 233

1     A.   Some could, but they would be censored in

2 terms of their follow-up after that point in terms of

3 patient follow-up usage of the drug.

4     Q.   What do you mean, censored?

5     A.   Like they would be -- they would have

6 accounted for the time they were on the drug, and then

7 they would follow them for any incident cancers, but

8 they wouldn't say that they were on it for the duration

9 of the cohort time.  For --

10     Q.   Well, the study didn't require somebody to

11 stay on the drug for the entire cohort time, it just

12 required that they fill a prescription during the study

13 period, one prescription; right?

14     A.   Right.  And the same thing could be for

15 the incident user who could have started three weeks

16 into the cohort and then stopped three weeks later.  I

17 mean, that argument would apply to either group that

18 you just said.

19     Q.   Did you discuss this analysis that I just

20 read to you where the lower bound was 0.99?  And

21 that's -- if it was one, you would say this was

22 statistically significant; right?

23          MR. INSOGNA:  Object to form.  Compound.

24     A.   Well, I think this gets to the question of

Page 234

1 multiple testing, multiple hypothesis testing, where if
2 you're looking at all of these questions you're asking,
3 you've asked many questions now, and so that is why
4 this has much less weight compared to the original
5 question of the main -- of all cancers.
6          But did I talk about every one of these in
7 the paper?  No.  I think I summarized and said that
8 overall that there was no difference in the main
9 analysis, and that in secondary analyses that there was
10 no statistically significant association.
11          I mean, I didn't pick out each one
12 individually, though.  No.
13 BY MR. SLATER:
14      Q.   You didn't analyze this part of the study
15 at all in your report?  It's not mentioned; right?
16          MR. INSOGNA:  Object to form.
17      A.   I just mentioned that all secondary
18 analyses done were not statistically significant, which
19 sort of encompasses all of those subgroups in Figure 3
20 and 4.
21 BY MR. SLATER:
22      Q.   If 0.99 at the lower bound of this
23 confidence interval had come out as 1.00, would you
24 have then talked about it?

Page 235

1          MR. INSOGNA:  Object to form.  Assumes
2 facts.
3      A.   You know, in that hypothetical scenario,
4 which I think there is one such like that in Gomm, I
5 did point it out, as did the authors, to point out that
6 there was a statistical finding, and we're going to get
7 to that, I am sure, about one of the subgroup studies.
8          But I guess -- I think bringing you back
9 to how statistics works is that yeah, if you keep
10 looking at things, you'll find something, and you have
11 to be cautious that it's just by chance.
12          And so overall in this particular paper,
13 which you're asking me about, which I wrote about,
14 there is no statistical significant one, and that's
15 what I said, period.
16 BY MR. SLATER:
17      Q.   So you thought it was important that there
18 was no statistically significant outcomes either in the
19 primary or secondary analyses; right?
20          MR. INSOGNA:  Form.
21      A.   That was an important finding because,
22 remember, my question is when I'm looking at the
23 hypothesis, which is these drugs increase cancer risk,
24 the null analysis is that they don't, and the

Page 236

1 alternative hypothesis is that they do, and so I need
2 to look at data to be able to reject the null
3 hypothesis and accept the alternative.
4          And what that means is is there a
5 statistically significant finding in my main question
6 or not, which there was not, and we will entertain
7 subgroups to see if there are signals that maybe should
8 be followed up on in future analyses, et cetera.
9          And in this case, there was no
10 statistically significant signal -- any of the
11 subgroups analyzed.
12 BY MR. SLATER:
13      Q.   Would you agree with me that the follow-up
14 period was too short to draw any definite conclusions?
15          MR. INSOGNA:  Object to form.
16      A.   I think that the conclusions of the
17 authors are appropriate, which is -- and the
18 limitations that they note are that at the time of the
19 study, which was the follow-up that they were able to
20 have, given this was relatively recent, was assessing
21 what the risk is after this much time, which is I think
22 very relevant to the questions being asked of us,
23 because this is the time point at which plaintiffs are
24 alleging their cancer is being caused by this.  So it's

Page 237

1 very relevant.
2          But at the same time, there are
3 limitations to suggest -- and may point out here we
4 don't know what this means from a longer perspective,
5 we have to follow this longer.
6 BY MR. SLATER:
7      Q.   So is the answer to my question yes?
8          MR. INSOGNA:  Object to form.
9      A.   Can you state the question again, please?
10 BY MR. SLATER:
11      Q.   Would you agree that the follow-up period
12 was too short to draw any definite conclusions?
13      A.   Based -- about what question?  About the
14 question is there short-term risk?  No, there's
15 adequate follow-up.  We looked at it.  There was no
16 short-term risk.  This is what the cases are being
17 asked of us at the moment.
18          Is it adequate to ask the question about
19 longer term, 10, 15, 20 years later?  No, of course
20 not.  We didn't follow them that long.
21      Q.   For what carcinogens would you expect to
22 see a signal in a cohort study conducted about four
23 years after exposure?
24      A.   Not many, in fact.  It depends on the

Page 238

1 dose, and it depends on the duration that they're
2 taking it, of course. But I think based on many of our
3 reports that you've seen, you understand that the
4 carcinogenesis of cancer, which is why I went into that
5 as a background, is it takes decades at the time of the
6 initiation of a cancer to the time it manifests.
7        And so right, an exposure, only three to
8 four years of follow-up from that exposure, if the
9 alleged risk is that it causes the cancer and starts
10 it, then it would be very implausible, especially at
11 these trace levels that we're talking about here.
12 We're not talking about astronomical doses.
13      Q.   Even with these what you call not
14 astronomical doses, and even with this short-term
15 follow-up period, increase in risk was seen for certain
16 specific cancers; right?
17      A.   -- human epi data?
18      Q.   We went through this already. The
19 colorectal cancer and uterine cancer, for example,
20 showed increased risk; right?
21      A.   Nonstatistically increased risk that are
22 random variation from looking at subgroups -- a small
23 number. Yes.
24      Q.   Doctor -- I've really tried to be patient.

Page 239

1 I'd appreciate if you just answer my question. I
2 didn't ask you about -- you keep throwing in things I'm
3 not asking about. Your -- the lawyer sitting next to
4 you can question you to his heart's content when I'm
5 done.
6        MR. INSOGNA: Adam, that's absolutely not
7 accurate. He responded to your question. That you
8 don't like the answer does not mean it was not an
9 answer.
10       MR. SLATER: Okay.
11 BY MR. SLATER:
12      Q.   With what you just termed not astronomical
13 doses of NDMA, we still saw increase in risk as
14 reflected in the article for at least colorectal cancer
15 and uterine cancer, as discussed in the abstract?
16        That's what the words in the study say;
17 correct?
18      A.   The words in the study say a
19 nonstatistically increase in risk, yes. That's all I
20 said when I responded.
21      Q.   Looking at the conclusion, the authors
22 state, "The results do not imply a markedly increased
23 short-term overall risk of cancer in users of valsartan
24 contaminated with NDMA. However, uncertainty persists

Page 240

1 about single cancer outcomes and studies with longer
2 follow-up are needed to assess long-term cancer risk."
3        Do you agree with that description?
4      A.   Yes. Yes.
5      Q.   When they refer to uncertainty persists
6 about single cancer outcomes, that means that this
7 study certainly does not rule out a causal association;
8 right?
9        MR. INSOGNA: Object to form.
10      A.   That would be a correct interpretation,
11 that it doesn't -- it doesn't rule it out that there's
12 a causation, but it doesn't -- certainly doesn't rule
13 it in any way. If anything, the evidence suggests
14 against.
15 BY MR. SLATER:
16      Q.   If you could look in the introduction of
17 the study, just a little further down from we were just
18 reading in that right-hand column of the first page of
19 the article.
20      A.   Yes.
21      Q.   The second paragraph, the second sentence
22 says, "NDMA is one of the most well-characterized and
23 most potent animal carcinogens known." I want to stop
24 there.

Page 241

1        Do you agree with that statement?
2      A.   It doesn't say anything about the dosing
3 and stuff, but we know that at very high doses it does
4 cause cancers in various models like rats, yes. Way --
5      Q.   I'll try again.
6      A.   Way higher than the doses that we're
7 talking about here.
8      Q.   Yeah, but that's not what I asked you, so
9 let's try it again.
10       This says in the second paragraph under
11 the introduction, "NDMA is one of the most
12 well-characterized and most potent animal carcinogens
13 known."
14       Do you agree with that statement?
15       MR. INSOGNA: Object to form. Asked and
16 answered.
17      A.   I answered it with the qualification, but
18 it does say that right there, yes.
19 BY MR. SLATER:
20      Q.   And you agree with it? It's a true
21 statement; right?
22       MR. INSOGNA: Same objection.
23      A.   With the qualifications, because just
24 agreeing to that statement can be very misleading.

Page 242

BY MR. SLATER:

1  BY MR. SLATER:
2      Q.   Do you think this article is misleading?
3      A.   I think that that statement without
4  qualifying that can be very misleading.
5      Q.   Is it scientifically accepted in the
6  scientific community that NDMA is one of the most
7  well-characterized and most potent animal carcinogens
8  known?
9      A.   At high doses, no.
10     Q.   You're saying no, that's not understood in
11 the scientific community?
12     A.   No, excuse me.  At high doses, that is
13 accepted, yes.  That it's a potent carcinogen at very
14 high doses.
15     Q.   So you think at low doses NDMA is not
16 considered a potent carcinogen?
17     A.   No.  We can talk about that, but you can
18 see it in all the datasets that in some -- in some
19 studies, the control are not getting any NDMA to have
20 more cancers than at the low doses.
21        So in other words, no, it's not potent at
22 all at low doses.
23     Q.   Which study is that?
24     A.   The Keto (ph) studies, for example, are

Page 243

1  probably the ones fresh in my mind.
2      Q.   This says in the second paragraph under
3  the introduction, "NDMA is one of the most
4  well-characterized and most potent animal carcinogens
5  known and has been shown to be a potent carcinogen
6  across all species that have been investigated, both as
7  single doses and with long-term exposure to lower
8  quantities."
9        Do you see that statement?
10     A.   At single doses, yes.  I think we'll be
11 talking about astronomically high doses of that agent.
12     Q.   Doctor, all I asked you is if you saw the
13 statement.
14     A.   I saw the statement, yes.
15     Q.   So why -- I don't understand why you're
16 arguing something I didn't even ask you.
17     A.   You asked if I agreed with it.
18     Q.   No, I didn't.
19        MR. INSOGNA:  You don't need to argue --
20 there's no --
21 BY MR. SLATER:
22     Q.   Actually, all I said was do you see that
23 statement.
24     A.   I see the statement.

Page 244

1      Q.   It's a true statement; correct?
2        MR. INSOGNA:  Object to form.
3      A.   With the qualifications that I mentioned.
4  It can be toxic at very high single doses, yes, which
5  is not relevant to what I've been asked to opine on
6  here.
7  BY MR. SLATER:
8      Q.   I'd have to ask you again.  I mean,
9  Doctor, just --
10        MR. SLATER:  We're never getting done
11 today.  I can tell you that right now, counsel.  I'm
12 going to end up having to continue through tomorrow.
13 We're going to have to figure out a time, because I'm
14 just not getting anywhere now.  And it's been going on
15 for hours.
16        MR. INSOGNA:  He is answering your
17 questions.  You just don't like the answers.  You --
18        MR. SLATER:  Counsel, I don't like when
19 people say you don't like the answer.  It's not a
20 question of liking or not liking the answer.  I'd
21 prefer it just be responsive.  That's all I'm asking.
22        MR. INSOGNA:  I think he's answered --
23        MR. SLATER:  I've been very patient,
24 unbelievably patient through this deposition.  I'll

Page 245

1  continue to be so.  But if I ask a straightforward
2  question and the witness continually provides
3  disclaimers and explanations rather than a yes or a no,
4  then I have to just keep coming back.
5        This is an expert.  This isn't some
6  regular layperson witness.  We need to be able to
7  proceed in an orderly way.
8        MR. INSOGNA:  Ask your question.
9  BY MR. SLATER:
10     Q.   This states in the second paragraph under
11 the introduction, "NDMA is one of the most
12 well-characterized and most potent animal carcinogens
13 known and has been shown to be a potent carcinogen
14 across all species that have been investigated, both as
15 single doses and with long-term exposure to lower
16 quantities."
17        That statement is found in a study that
18 you're relying on heavily for your opinion in this
19 case; correct?
20        MR. INSOGNA:  Object to form.
21     A.   The reference there to Number 5 is not to
22 the Keto study that I just mentioned.  If that's your
23 question, no.
24 BY MR. SLATER:

Page 246

1    Q.   I'm talking about this study, the
2   Pottegard study that we're asking about.
3         That's the one you're relying on heavily;
4   right?
5    A.   Oh, for the human epidemiological data?
6   Yes.  I thought you were talking about that sentence
7   that has Reference 5 to the -- and you were insinuating
8   it was to the data I was relying on for animal data.
9   It's not.
10    Q.   I actually wasn't insinuating that.
11   With re -- I'll do it again.
12         In the introduction, right-hand column,
13   second paragraph, it says in part, "NDMA is one of the
14   most well-characterized and most potent animal
15   carcinogens known and has been shown to be a potent
16   carcinogen across all species that have been
17   investigated, both as single doses and with long-term
18   exposure to lower quantities."
19         That statement is found here in the
20   Pottegard study, which you're relying on heavily for
21   your opinion; correct?
22    A.   I'm relying on the results of the study,
23   yes, not that statement in the introduction, no.
24    Q.   It continues, "Although no in vivo data

Page 247

1   are available for humans, NDMA seems to be metabolized
2   similarly in human tissue and rodent tissue."
3         That is also stated; correct?
4    A.   Yes.
5    Q.   You don't disagree with that; right?
6    A.   Not necessarily.
7    Q.   Let's go back where we were talking just
8   before about incident users versus prevalent users,
9   just above the discussion section; okay?
10    A.   Yes.
11    Q.   If the lower range of that analysis had
12   been 1.01 instead of .99, that would have achieved
13   statistical significance; correct?
14    A.   That is a correct statement.
15    Q.   So would it be fair to say that for
16   incident users, people who started taking the drug
17   during the time in question, there was almost a 60
18   percent increased rate of cancer, and this almost
19   reached statistical significance?
20    A.   Almost reached statistical significance
21   would be an appropriate summary, yes.
22    Q.   Let's go, if we could, to the sixth page
23   of the article, the principal findings.
24    A.   Yes.

Page 248

1    Q.   The principal findings starts out, "Our
2   estimates pertain to early cancer risk associated with
3   exposure to NDMA through contaminated valsartan
4   products and should not be interpreted as evidence
5   against NDMA being carcinogenic to humans in general.
6   At most, our findings suggest that the level of NDMA
7   exposure achieved through valsartan products do not
8   translate into a substantially increased short-term
9   cancer risk."
10         Do you see what I just read?
11    A.   Yes.
12    Q.   Did you anywhere in your report reference
13   or comment on what I just read?
14    A.   I believe so, yes.
15    Q.   Or to Pottegard?
16    A.   Yes.
17    Q.   Where?
18    A.   When I -- on Page 40 at the top of my
19   report, the first sentence.  "While each of these
20   studies notes the obvious limitation of a shortened
21   follow-up period" -- the period is actually more
22   closely reflective to what we're talking about now,
23   which I also said a few questions ago as well.
24    Q.   Did you say in your report that the

Page 249

1   results of this study should not be interpreted as
2   evidence against NDMA being carcinogenic to humans in
3   general?
4    A.   I didn't say that, no.
5    Q.   And you would agree with me that the
6   results of this study should not be interpreted as
7   evidence against NDMA being carcinogenic to humans in
8   general?
9         You would agree with that; right?
10    A.   With long-term follow --
11         MR. INSOGNA:  Object to form.
12    A.   With long-term follow-up, I agree with
13   that, yes.  You had asked the question with respect to
14   the follow-up that it did do, which is relevant to
15   current cases I've mentioned.
16   BY MR. SLATER:
17    Q.   Going down to the bottom of that
18   paragraph.  They talk about the single cancer outcomes,
19   in particular colorectal and uterine cancer, and they
20   say that, "This clearly highlights that our study
21   cannot confidently rule out an increased risk from
22   exposure to NDMA."
23         Correct?
24    A.   Yes, they say that.

Confidential - Information Subject to Protective Order

1    Q.   And you agree with that; right?

2    A.   Yeah, I think that that's a very fair

3  statement, as we've been saying, is that these data

4  that we're looking at subgroups are exactly that.

5  They're subgroup analyses looking at smaller subsets.

6         There's no obvious or large -- which I

7  think they also point out throughout this paper and the

8  other paper -- that there's no obvious and large

9  magnitude benefit -- or effect, excuse me, but that

10  smaller effect sizes, and because these are subgroups,

11  we can't rule out a possible association, but there's

12  no evidence from these data that there is.

13    Q.   Further down in the second paragraph under

14  the principal findings, the authors refer to the

15  uncertainty about the actual NDMA content of valsartan

16  products.

17         Do you see that?

18    A.   I remember reading about that.  Where did

19  we -- where is that again?

20    Q.   It's four lines up from the bottom of the

21  page.

22    A.   Yes.

23    Q.   That uncertainty about the actual NDMA

24  content of the valsartan products that the people in

1  this study took has to raise some questions; correct?

2         MR. INSOGNA:  Object to form.

3    A.   It's a known limitation, in that despite

4  all efforts that were made to try and quantify that was

5  being done and what patients were getting what and

6  when, there was always the possibility that -- I mean,

7  especially in a group that was classified as possible

8  as opposed to probable -- that they may not, but there

9  were sensitivity analyses in these studies to sort of

10  address that by excluding the ones that were possible

11  and looking at just those that are probable.

12         There were other sensitivity analyses that

13  cut off the date from if they were only on it for one

14  year to six months or two years, to see if there were

15  any major differences.  So those types of sensitivity

16  analyses that are done in these studies are trying to

17  assess some of the limitations to make sure that there

18  isn't something being missed, to the best of one's

19  ability.

20         But despite that, to your question, that

21  they're noting here appropriately that there's still

22  going to be some uncertainty, like there is with any

23  study of its kind like this.

24  BY MR. SLATER:

1    Q.   The people that they assumed were probably

2  exposed to NDMA were those who took a product that was

3  manufactured by ZHP at some point; right?

4    A.   I believe so.  I'd have to confirm that

5  here again, but that sounds very familiar, yes.

6    Q.   And that means that somebody could have

7  filled one prescription of ZHP-manufactured valsartan

8  and then taken pills manufactured by other

9  manufacturers the entire rest of the study, but they

10  would end up in the side of the study that assumed to

11  have been exposed to NDMA; right?

12         MR. INSOGNA:  Form.

13    A.   I think we talked about that earlier.  I

14  think that they had to -- they were trying to reflect

15  what was happening in reality; and that the likelihood,

16  as you point out very well, is that a given patient is

17  very unlikely to have been unlucky to have gone a lot

18  with the highest levels the whole time.

19         But if that happened, they would be

20  included here, but to the extent that it did happen,

21  this was reflecting what was actually happening.  So

22  this asks the question that's very relevant to us, is

23  do patients who got some do worse than those who

24  didn't.

1  BY MR. SLATER:

2    Q.   So coming back to my question, which I'd

3  appreciate if you could answer.

4         Somebody who was placed on the side of the

5  study as having been assumed to be exposed to NDMA

6  could have filled one prescription of ZHP valsartan one

7  time, and then the rest of the study period taken

8  valsartan manufactured by manufacturers that did not

9  have NDMA contamination, but that person would be on

10  the NDMA side of the study; correct?

11         MR. INSOGNA:  Object to form.

12    A.   They would have to be, because now they've

13  had exposure to the putative exposure.  So yeah.

14  BY MR. SLATER:

15    Q.   So the answer to my question is yes?

16    A.   Yes, patients who were exposed to the

17  probable or possible were then included in that group,

18  because they were in that group.

19    Q.   You would agree that somebody who took one

20  prescription of ZHP valsartan that was contaminated

21  with NDMA would have received a lower dose than

22  somebody who filled prescriptions of ZHP valsartan,

23  let's say, for two full years; right?

24    A.   In the main analysis they did that.  They

Page 254

1 lumped them together as being exposed.  But if you read
2 on Page 2 in the methods on the right, it said they
3 further stratified by the time of cumulative dose of
4 these filled prescriptions with NDMA and put them into
5 categories based on the amounts that they were exposed
6 to.  So they tried to account for what you're getting
7 at, basically.
8         And then if you look at Table 2, they're
9 looking at by that cumulative exposure, which is
10 assessing exactly what you're asking, to say if people
11 that were on more did worse than those who didn't,
12 which was not the case.
13     Q.   You're saying people who took the
14 medication for a longer period of time; right?
15     A.   For more cumulative exposure to the NDMA
16 exposed lots.  That's less than 20,000, greater than
17 50,000, or in between.  Those are the three categories.
18 So they are accounting for what you're asking about.
19         And you can see on the right there,
20 especially after when you look at all the adjustments
21 that they did that there's no difference between those
22 who got less versus more versus intermediate, in terms
23 of their assessment, in terms of hazard ratio.  All of
24 them cross one, one of them is actually lower than one,

Page 255

1 and the effect sizes, the point estimates, are 1.15,
2 1.11.
3     Q.   Are you suggesting that they went through
4 every single prescription filled by each person and
5 stratified based on an analysis of every single
6 prescription for each person?
7     A.   If you read this page, that they said they
8 further stratified exposed person time by cumulative
9 dose from filled prescriptions of potentially
10 NDMA-containing valsartan tablets.
11         So the answer to that is they made an
12 attempt to do that at every prescription.  That was the
13 strength of the study, is that they have the records of
14 when people went and picked up their scripts.
15     Q.   When they did so, did they distinguish
16 between whether or not the pills were manufactured by
17 ZHP, if somebody was in the assumed NDMA-contaminated
18 part of the study, or did they just go by the overall
19 filled prescriptions without analysis of whether it was
20 ZHP or not in every single prescription?
21         MR. INSOGNA:  Object to form.
22     A.   The answer to your question is earlier in
23 that same paragraph, where it says that they were able
24 to identify 128 unique drug products that were

Page 256

1 identified to be manufactured by ZHP, and so they were
2 able to classify by that, versus if you read the next
3 sentence it talks about other products that were
4 classified as possibly contaminated, and they had ZHP
5 and other companies.
6         And so they categorized by those two main
7 categories or not, those three subgroups.
8 BY MR. SLATER:
9     Q.   But again -- but again, when doing the
10 stratification, they didn't go prescription by
11 prescription, say ZHP, not ZHP?  They didn't do that
12 analysis; correct?
13         If you were in the ZHP side of the study,
14 meaning you filled one prescription, that's how you got
15 in and that's how you were analyzed; right?
16     A.   In the all-comer group, yes, that's how
17 they were analyzed, but when they were looking at Table
18 2 they were looking at -- you could see a never-user or
19 an ever-exposure, the top two rows.
20         But then they're looking at the cumulative
21 exposure by looking at the amount that they actually
22 were exposed to.
23     Q.   Well, they have no idea what they were
24 exposed to?  They don't have the exposures levels lot

Page 257

1 by lot, so there's no way for them to know that;
2 correct?
3         MR. INSOGNA:  Object to form.
4     A.   They're looking at the estimated by the
5 pills here, further down in the same methods, where
6 they were estimating based upon the amount of -- the
7 drug amounts that they were taking.
8 BY MR. SLATER:
9     Q.   So if somebody only filled one
10 prescription of ZHP and then took other manufacturers
11 that were uncontaminated, you're saying that they only
12 counted for that person the one prescription of ZHP,
13 even though they were on the presumed contaminated side
14 of the study?
15         MR. INSOGNA:  Object to form.
16 BY MR. SLATER:
17     Q.   Because I didn't see that they did the
18 analysis to that level of granularity.  I thought that
19 once you got on that side, you were analyzed as you
20 were exposed to contaminated pills.
21     A.   I'm looking at this sentence, and the way
22 I read it is we further stratified NDMA exposed person
23 time by cumulative dose from filled prescriptions of
24 potentially NDMA-containing valsartan tablets, which

Confidential Information - Subject to Protective Order

Page 258

1  they knew because they filled the script and they were
2  able to define which products were from ZHP.
3       So I read it as they would add up all of
4  the ones that they took from that company, and if they
5  met, then they would categorize them into those three
6  groups.
7       And then the rows in Table 2, they looked
8  at it whether they never used it versus used it, which
9  was the main analysis; and then they looked at the
10 cumulative exposure to the NDMA pills.
11      That's the way I look -- that's the way I
12 see what they wrote here.
13      Q.  It doesn't actually say that they did what
14 you're saying?  That's what you're assuming; correct?
15      MR. INSOGNA:  Object to form.
16      A.  That's how I read that -- I read that now,
17 even -- that's how it reads to me.  In a question like
18 this, maybe I would look for a clarification.
19 BY MR. SLATER:
20      Q.  Now looking at the top of that page where
21 you were just reading, where they talked about the
22 other side of the study, the other group which was the
23 people they classified as unlikely to be contaminated
24 with NDMA.

Page 259

1       You see that?
2       A.  I'm sorry.  Where?
3       Q.  At the top of the second page of the
4  study, the other side of the study, the people who were
5  assumed not to have been taking valsartan --
6       A.  Yes.
7       Q.  -- that was contaminated with NDMA.
8       Those were people who took pills that were
9  not manufactured by ZHP; correct?
10      A.  In the never group, yes.  Or from that
11 second category, possibly, which included ZHP and they
12 call it other companies, but that doesn't specify which
13 companies.
14      Q.  Well, if you took it from ZHP and another
15 company, you ended up on the contaminated side of the
16 study; right?
17      A.  Yes.  Yes.
18      Q.  This side of the study, the never side of
19 the study, included people who didn't take any
20 ZHP-manufactured valsartan?  That was that group;
21 right?
22      A.  Or the other companies, is the way that I
23 read it, which is that intermediate group of possibly
24 exposed.  Because you read here on the same page, where

Page 260

1  it goes -- just one sentence before the one I quoted
2  before, which is in the main analysis we pooled
3  together prescriptions classified as probably and
4  possibly contaminated as being those exposed, compared
5  to of course those who weren't in those two groups.
6       And right before that, it's defining what
7  those two groups are, and possibly included the ZHP and
8  those from other companies.
9       Q.  As long as they filled the ZHP
10 prescription; right?
11      A.  Or they fit into that category as defined
12 here, yes.
13      Q.  The other side of the study was people who
14 did not take any ZHP; right?
15      A.  And my understanding is -- or if those
16 other companies that are listed in that possibly
17 contaminated intermediate group.
18      Q.  And where do you see that list?
19      A.  The list?
20      Q.  The list of the other companies that were
21 considered to be contaminated.  I didn't see such a
22 list.
23      Who were you assuming -- where do you see
24 that?

Page 261

1       A.  I just see -- I'm just reading what they
2  stated here, and that they say they included in that
3  group of possibly contaminated those who contained an
4  active pharmaceutical ingredient from both -- both from
5  ZHP and from other companies.
6       Q.  That's the -- all right.  We're going in
7  circles and circles here, and I think we're really
8  struggling through something that should be really
9  simple.
10      This says at the bottom left-hand corner
11 of the second page that they identified those that
12 were, quote/unquote, probably contaminated with NDMA,
13 and then 36 additional products possibly contaminated
14 with NDMA, as they contained an active ingredient,
15 active pharmaceutical ingredient, both from ZHP and
16 from other companies.
17      A.  Right.  Yes.
18      Q.  So that would be someone like a Teva that
19 was using ZHP's API and selling the product; right?
20      MR. INSOGNA:  Object to form.
21 BY MR. SLATER:
22      Q.  Or do you not know?
23      A.  I don't know that.
24      Q.  The other side of the study would not have

Page 262

1 been people who took ZHP valsartan at all; right?

2    A.    Yes. I --

3    Q.    Do you know which manufacturers are

4 included in that other side of the study?  Does it say?

5 Because I don't see it.

6    A.    It doesn't say.

7    Q.    Did they analyze whether or not those

8 other manufacturers were also selling valsartan

9 contaminated with NDMA?

10        MR. INSOGNA:  Object to form.

11 BY MR. SLATER:

12    Q.    I don't see that either.

13    A.    I don't see that on this particular

14 paper either, no.

15    Q.    In fact, it's possible that people on

16 the -- what you termed the never side were taking pills

17 contaminated with NDMA also?  That's possible as well

18 to some extent; right?

19        MR. INSOGNA:  Form.

20 BY MR. SLATER:

21    Q.    Because we know manufacturers other than

22 ZHP were also manufacturing and selling contaminated

23 valsartan in Europe at that time; right?

24        MR. INSOGNA:  Object to form.

Page 263

1    A.    I don't know the answer to that. It's

2 possible if they didn't exclude them and they didn't

3 know about it at the time, because this publication was

4 in 2018 as opposed to the Gomm study which was later in

5 2021.

6 BY MR. SLATER:

7    Q.    Well, did they talk about excluding any

8 other manufacturers or identifying other manufacturers

9 as having contaminated pills, or do they link only to

10 ZHP here explicitly?

11    A.    Looks like just to ZHP here.

12    Q.    For example, in the never group, do you

13 know when Torrent announced their contamination of

14 their pills?

15        MR. INSOGNA:  Object to form.

16    A.    The date?

17 BY MR. SLATER:

18    Q.    Yeah.  Do you know if -- I'll ask it

19 differently.

20        Do you know if Torrent announced their

21 contamination before or after this study was published?

22    A.    I don't know.

23    Q.    I'm going to -- I'd like you to assume for

24 purposes of this question that Torrent announced after

Page 264

1 the study was published that their pills were

2 contaminated with NDMA.  Okay?  I'd just ask you to

3 assume that.

4    A.    That I'm assuming what?  That it was done

5 before?

6    Q.    After.

7    A.    They presented after the study --

8    Q.    Let me ask it again.

9        I'd like you to assume that Torrent

10 announced that its pills were contaminated with NDMA

11 after this study was published.

12    A.    That makes sense.

13    Q.    Do you know whether Torrent's pills were

14 contaminated?

15    A.    There was -- yes, I think that's one on

16 the list.

17    Q.    In fact, Torrent was buying its valsartan

18 API from ZHP.

19        Were you aware of that?

20    A.    I think so, yes.

21    Q.    And therefore, Torrent would have some of

22 the highest levels of NDMA that we would see in this

23 litigation, because it came from ZHP; right?

24        MR. INSOGNA:  Object to form.

Page 265

1    A.    Yes, and if they didn't account for that

2 as being from ZHP, I don't know.  It doesn't say in

3 this paper.

4 BY MR. SLATER:

5    Q.    So therefore, Torrent, since there was no

6 announcement or knowledge that Torrent had contaminated

7 valsartan, people who took Torrent valsartan would have

8 ended up in the never group, based on this description

9 of the study; right?

10        MR. INSOGNA:  Object to form.

11    A.    With that hypothesis, in that scenario,

12 that if there were drugs that came out later after the

13 study was done that ended up having also contaminants,

14 and it wasn't already accounted for, then yes, they

15 could have ended up in the control group of this

16 particular study.

17 BY MR. SLATER:

18    Q.    And that would be problematic in terms of

19 the validity of the final results if you had highly

20 contaminated valsartan being taken by people in the

21 never group; right?

22        MR. INSOGNA:  Form.

23    A.    The results would be about ZHP compared to

24 other compounds would hold and that there's no

Page 266

1  difference in terms of their added risk, how I assess
2  that.
3          MR. SLATER: Wait. Could I have that
4  answer read back? I lost that.
5          [The requested portion of the transcript
6          was read by the reporter.]
7  BY MR. SLATER:
8      Q.  I don't think I understand.
9          If people who took Torrent valsartan that
10 was contaminated with NDMA were included in the never
11 group, that would be problematic in terms of the
12 results of the study, in terms of comparing the two
13 groups; right?
14         MR. INSOGNA: Object to form.
15     A.  In that hypothetical scenario, which was
16 not specified here that that's actually what happened,
17 then if there were drugs in the control arm that had
18 contaminant that wasn't accounted for, then that would
19 be problematic in terms of the assessment being done,
20 and it would bias towards the null.
21 BY MR. SLATER:
22     Q.  What about Hetero? Do you know if Hetero
23 was in the contaminated side of the group or the never
24 group, in terms of people who took Hetero valsartan?

Page 267

1  Do you know where they got grouped?
2      A.  It seems like all the non-ZHP drugs would
3  be grouped in the never.
4      Q.  And we know that the Hetero valsartan was
5  contaminated as well; correct?
6      A.  Some lots.
7      Q.  So that would be yet another point of
8  uncertainty, where did the Hetero people end up and
9  what was their level of contamination that they took;
10 right?
11         MR. INSOGNA: Object to form.
12     A.  In that scenario, if that was the case,
13 yes.
14 BY MR. SLATER:
15     Q.  Does this study grapple with this issue
16 that we're talking about at all? Like do they analyze
17 at all other manufacturers, how they determine whether
18 other manufacturer's pills were contaminated?
19         Do they go into any of that at all?
20     A.  They didn't, and the publication date of
21 this is in 2018, like I mentioned. And so it may be,
22 as I think you pointed out, that at the time that they
23 were doing this study that it wasn't known.
24     Q.  Did you ever look into determining --

Page 268

1          MR. SLATER: Whoa. Whoa. Rosemarie, your
2  phone just came on off of mute. You might want to put
3  it back on mute. Thank you.
4  BY MR. SLATER:
5      Q.  Did you ever make any effort to determine
6  which manufacturer's valsartan was recalled in Europe
7  after the Pottegard study?
8          Did you look into that?
9      A.  I looked at the dates at which all of the
10 different recalls were being done over the time after
11 the initial one on the FDA website I saw. They have a
12 similar website, the EMA.
13     Q.  You would agree with me, based on the
14 questioning that we've been going through for the last
15 several minutes, that that would be something that
16 would be very important to consider and understand;
17 right?
18         MR. INSOGNA: Object to form.
19     A.  It would be important to understand. In
20 the end, though, when I was asked to opine on whether
21 or not these trace levels in these drugs were
22 associated with known risks for cancer based on the
23 data, this was one of the studies, and it does not show
24 that there is evidence of an association.

Page 269

1  BY MR. SLATER:
2      Q.  This study draws conclusions based upon a
3  comparison of two groups of people, and based on an
4  assumption that one group was probably or possibly
5  exposed to contaminated valsartan and the other group
6  was not?
7          That's where the data comes from, the
8  comparison of the two groups; right?
9      A.  Right.
10     Q.  It's the base assumptions as to whether or
11 not the people in the groups were exposed or not
12 exposed to contaminated NDMA are not accurate, that
13 would undercut the data completely; right?
14         MR. INSOGNA: Object to form.
15     A.  But in that larger pool of patients
16 getting the never, there are a number of companies that
17 are not having the contaminant.
18         So even if there were -- after the fact
19 that they learned that there were some companies that
20 also did, then it would be a small subset of the whole
21 of the nevers. It's not all of them, in other words.
22         So it's not enough to change the overall
23 outcome per se until some dataset showed that. So in
24 other words, it's an important point to consider, but

Page 270

1 it's not like that proves the alternative hypothesis in
2 any way.
3 BY MR. SLATER:
4     Q.   What it does, in fact, is presents an open
5 question; correct?
6         MR. INSOGNA:  Object to form.
7     A.   An example of confounding, which is in a
8 lot of association studies, that are despite all
9 efforts, like in this case, it's an example of one that
10 wasn't known to be adjusted for in the first place.
11 BY MR. SLATER:
12     Q.   It's actually -- I don't mean to
13 interrupt.  I'm sorry.
14     A.   And it's a risk of all of these types of
15 studies, but again, this is the study most closely
16 related to our question, and even with that potential
17 confounder, it's a small subset of the nevers.
18         It's not all of them, in other words,
19 whereas the ones that are classified in the known,
20 probable, or possible, they are exposed.  And so --
21     Q.   How can you make --
22     A.   -- two cohorts that are different.
23     Q.   How can you make that statement when you
24 have absolutely no idea as to whether or to what extent

Page 271

1 the people in the never group were taking contaminated
2 valsartan also?
3         You don't have any idea how to quantify
4 that, so you can't make the statement you just made;
5 correct?
6         MR. INSOGNA:  Object to form.
7     A.   I'm stating that it's more likely than not
8 not a large subset of that never group.
9 BY MR. SLATER:
10     Q.   Well, what was the percentage of people in
11 the never group that were taking contaminated
12 valsartan?
13         Do you have any idea?
14         MR. INSOGNA:  Object to form.
15     A.   Now that probably could be assessed,
16 because you could go back and look at this.  But in the
17 meantime, I would assume that they would be a small
18 subgroup, because there were many agents out there that
19 weren't contaminated, and the chance that everyone in
20 the control group, in other words, got a contaminated
21 pill is essentially zero.
22 BY MR. SLATER:
23     Q.   How many of the people in the control
24 group were exposed to contaminated valsartan?

Page 272

1         You have no idea; right?  There's no way
2 for you to have any idea on that; right?
3         MR. INSOGNA:  Object to form.
4     A.   I estimate that it's likely a low amount.
5 BY MR. SLATER:
6     Q.   You estimated -- you have no way -- that's
7 a guess, there's no basis for you to make that
8 statement other than to guess; right?
9         MR. INSOGNA:  Object to form.
10     A.   Based on probability, I would say that
11 it's a low likelihood.
12 BY MR. SLATER:
13     Q.   Probability of what?  Probability of
14 biased speculation?  Which I think I just made up that
15 term, which I think you can -- you can use if you want.
16 But -- and let me, without kidding around -- I'm
17 trying -- obviously not trying to be funny.
18         But that sounds to me completely
19 speculative, since you have absolutely no basis to know
20 which manufacturers, what their contamination levels
21 were, or how many took the pills from those
22 manufacturers.
23         You don't have any of that data; right?
24         MR. INSOGNA:  Objection.  Argumentative.

Page 273

1     A.   What I'm stating is that it's unlikely to
2 be a large proportion of that group.
3 BY MR. SLATER:
4     Q.   Based on what?
5     A.   Chance.
6     Q.   So you're just speculating?
7         MR. INSOGNA:  Object to form.
8     A.   You asked me to make an assessment of the
9 quantity of patients.
10 BY MR. SLATER:
11     Q.   What I think you said before is you could
12 go do a follow-up study now.  So in that context, my
13 question is this.
14         As we look at Pottegard, there's a
15 significant open question as to who on each side of the
16 study took contaminated valsartan and to what extent,
17 and you would need to do a subsequent follow-up study
18 and reanalyze the data in order to get any sort of
19 reasonable degree of medical certainty as to the answer
20 to that question; correct?
21         MR. INSOGNA:  Object to form.  Compound,
22 argumentative.
23         THE WITNESS:  To be more precise, you
24 would need the actual data, yes.

Page 274

1          MR. INSOGNA:  Adam, are you moving off of
2  Pottegard now?  We've been about an hour-and-a-half.
3          MR. SLATER:  I was thinking about moving
4  off of Pottegard, although I like saying Pottegard a
5  lot.  But -- so we can go off the record.
6          THE REPORTER:  All right.  One moment.
7          THE VIDEOGRAPHER:  We are going off the
8  record at 4:44 PM.
9          [A brief recess was taken.]
10          [Deposition adjourned until
11          the following day.]
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 276

1
2
3          I, DANIEL CATENACCI, M.D., the witness
4  herein, having read the foregoing testimony of the
5  pages of this deposition, do hereby certify it to be a
6  true and correct transcript, subject to the
7  corrections, if any, shown on the attached page.
8
9
10
11          _____
12          DANIEL CATENACCI, M.D.
13
14
15  Sworn and subscribed to before me,
16  This _____ day of _____, 202_.
17
18
19  _____
20          Notary Public
21
22
23
24
25

Page 275

1          C E R T I F I C A T E
2
3          I, JOHN ARNDT, a Certified Shorthand
4  Reporter and Certified Court Reporter, do hereby
5  certify that prior to the commencement of the
6  examination, DANIEL CATENACCI, M.D., was sworn by me
7  via videoconference to testify the truth, the whole
8  truth and nothing but the truth.
9          I DO FURTHER CERTIFY that the foregoing is a
10  true and accurate transcript of the proceedings as
11  taken stenographically by and before me at the time,
12  place and on the date hereinbefore set forth.
13          I DO FURTHER CERTIFY that I am neither a
14  relative nor employee nor attorney nor counsel of any
15  of the parties to this action, and that I am neither a
16  relative nor employee of such attorney or counsel, and
17  that I am not financially interested in this action.
18
19
20          _____
21          JOHN ARNDT, CSR, CCR, RDR, CRR
22          CSR No. 084-004605
23          CCR No. 1186
24

Page 277

1
2          DEPOSITION ERRATA SHEET
3
4  Page No._____Line No._____Change to:_____
5  _____
6  Reason for change:_____
7  Page No._____Line No._____Change to:_____
8  _____
9  Reason for change:_____
10  Page No._____Line No._____Change to:_____
11  _____
12  Reason for change:_____
13  Page No._____Line No._____Change to:_____
14  _____
15  Reason for change:_____
16  Page No._____Line No._____Change to:_____
17  _____
18  Reason for change:_____
19  Page No._____Line No._____Change to:_____
20  _____
21  Reason for change:_____
22
23  SIGNATURE:_____DATE:_____
24          DANIEL CATENACCI, M.D.

Confidential Information - Subject to Protective Order

1                    UNITED STATES DISTRICT COURT

                       DISTRICT OF NEW JERSEY

2

3     IN RE: VALSARTAN, LOSARTAN,          )

      AND IRBESARTAN PRODUCTS              )

4     LIABILITY LITIGATION                 )

      _____) MDL No. 2875

5                                          )

      THIS DOCUMENT RELATES TO ALL         )

6     CASES                                )

7

8

9      CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

10

11

          VIDEO DEPOSITION OF DANIEL CATENACCI, M.D.

12                    VIA VIDEOCONFERENCE

13                    September 14, 2021

                          9:20 a.m.

14

                          Volume 2

15

16

17

18

          Reporter:  John Arndt, CSR, CCR, RDR, CRR

19                 CSR No. 084-004605

                   CCR No. 1186

20

21

22

23

24

Page 279

1    DEPOSITION OF DANIEL CATENACCI, M.D.,
     produced, sworn, and examined via videoconference on
2    September 14, 2021, in the City of Chicago, State of
     Illinois, before John Arndt, a Certified Shorthand
3    Reporter and Certified Court Reporter.
4
          APPEARANCES OF COUNSEL
5       (All present via videoconference)
6    On Behalf of Plaintiffs:
7       Mazie Slater Katz & Freeman, LLC
        103 Eisenhower Parkway, 2nd Floor
8       Roseland, NJ 07068
        (973) 228-9898
9       BY:  ADAM M. SLATER
             aslater@mazieslater.com
10           JULIA S. SLATER
             jslater@mazieslater.com
11           CHRISTOPHER J. GEDDIS
12      Kanner & Whiteley, LLC
        701 Camp Street
13      New Orleans, LA  70130
        (504) 524-5777
14      BY:  LAYNE HILTON
             l.hilton@kanner-law.com
15
     On Behalf of Teva:
16      Greenberg Traurig, LLP
        One International Place, Suite 2000
17      Boston, MA  02110
        (617) 310.6231
18      BY:  NICHOLAS A. INSOGNA
             insognan@gtlaw.com
19
20      Greenberg Traurig, LLP
        4 Embarcadero Center, Suite 3000
21      San Francisco, CA  94111
        (415) 655-1285
22      BY:  KATE WITTLAKE
             wittlakek@gtlaw.com
23
24

Page 280

1       APPEARANCES OF COUNSEL (CONTINUED)
2
3       Greenberg Traurig, LLP
        3333 Piedmont Road NE, Suite 2500
4       Atlanta, GA  30305
        (678) 553-2103
5       BY:  VICTORIA DAVIS LOCKARD
             lockardv@gtlaw.com
6    Pietragallo Gordon Alfano Bosick & Raspanti, LLP
7       One Oxford Centre
        301 Grant Street, 38th Floor
8       Pittsburgh, PA  15219
        (412) 263-1816
9       BY:  CLEM C. TRISCHLER
             cct@pietragallo.com
             FRANK H. STOY
10           fhs@pietragallo.com
11      Walsh Pizzi O'Reilly Falanga LLP
        100 Mulberry Street, 15th Floor
12      Newark, NJ  07102
        (973) 757-1100
13      BY:  LIZA M. WALSH
             lwalsh@walsh.law
14
     On Behalf of Sciegen Pharmaceutical and H.J. Harkins
15   d/b/a Pharma Pac:
        Hinshaw & Culbertson LLP
16      53 State Street, 27th Floor
        Boston, MA  02109
17      (617) 213-7045
        BY:  GEOFFREY M. COAN
18           gcoan@hinshawlaw.com
19   Morgan Law Firm, Ltd.
        55 W. Wacker Drive, 9th Floor
20      Chicago, IL  60601
        (312) 327-3386
21      BY:  SCOTT A. MORGAN
22   Levin Papantonio Rafferty
        316 South Baylen Street
23      Pensacola, FL 32502
        (850) 435-7013
24      BY:  DANIEL NIGH dnigh@levinlaw.com

Page 281

1       APPEARANCES OF COUNSEL (CONTINUED)
2
        Martin, Harding & Mazzotti LLP
3       PO Box 15141
        Albany, NY 12212
4       (518) 724-2207
5       BY:  ROSEMARIE RIDDELL BOGDAN
             rosemarie.bogdan@1800law1010.com
6    On Behalf of CVS and Rite Aid:
        Barnes & Thornburg LLP
7       11 S. Meridian Street
        Indianapolis, IN 46204
8       (317) 231-6491
9       BY:  KARA M. KAPKE
             kara.kapke@btlaw.com
10   On Behalf of Zhejiang Huahai Pharmaceutical Co., Ltd.,
     Prinston Pharmaceutical Inc., Huahai U.S. Inc., and
11   Solco Healthcare U.S., LLC:
        Duane Morris LLP
12      865 South Figueroa Street, Suite 3100
        Los Angeles, CA  90017
13      (213) 689-7424
14      BY:  ROBERT KUM
             rkum@duanemorris.com
15   For Aurobindo Pharma Ltd., Aurolife Pharma LLC,
     and Aurobindo Pharma USA, Inc.:
16      Cipriani & Werner, P.C
        450 Sentry Parkway, Suite 200
17      Blue Bell, PA  19422
        (610) 862-1929
18      BY:  JESSICA M. HEINZ
             jheinz@c-wlaw.com
19
20   Also present:
21   Elena Williams (Associate Litigation Counsel at
     Viatris)
22
     James Arndt (videographer)
23
24

Page 282

1       INDEX OF INTERROGATION
2    Examination by Mr. Slater          Page 283
     Examination by Mr. Insogna         Page 385
3    Examination by Mr. Kum             Page 411
     Examination by Mr. Slater          Page 419
4
5          INDEX OF EXHIBITS
6
7    Exhibit 13                         Page 283
     (2018 Pottegard study)
8
     Exhibit 14                         Page 283
9    (2021 Gomm study)
10   Exhibit 15                         Page 320
     (2019 Hidajat article)
11
     Exhibit 16                         Page 368
12   (2020 Adamson editorial)
13      (All exhibits are attached.)
14
15
16
17
18
19
20
21
22
23
24

Page 283

1    THE VIDEOGRAPHER:  We are back on the
2  record for the continuation of the deposition of Daniel
3  Catenacci, M.D.  Today's date is September 14th, 2021,
4  and the time is 12:09 PM Central Standard Time.
5    Counsel, please continue.
6    MR. SLATER:  Thank you.
7         EXAMINATION
8  BY MR. SLATER:
9    Q.   Hello, Doctor.
10    THE REPORTER:  Oh, he's muted.
11    [Discussion off the record.]
12    [Exhibit 13 marked for identification.]
13    [Exhibit 14 marked for identification.]
14  BY MR. SLATER:
15    Q.   Doctor, I'm going to start with some
16  questions about the Gomm study, so if you have that
17  handy, perhaps -- I assume you probably have it right
18  in front of you.
19    A.   Right where we left off, yes.
20    Q.   Exactly.  Okay.  You speak on Page 39
21  about the Gomm study, which was published in 2021;
22  right?
23    A.   Yes.
24    Q.   And looking at Page 357 of that article,

Page 284

1  there is a statement in the right-hand column, first
2  paragraph, right at the bottom of that paragraph that
3  says NDMA is one of the most potent mutagenetic
4  carcinogens in animal models.  I'm going to stop there.
5    Do you agree with that statement?
6    A.   I agree with it similarly to the other
7  paper that this was pointed out, that it's
8  carcinogenetic in high doses, yes, in models, in animal
9  models.
10    Q.   Has NDMA been shown to be mutagenetic in
11  animal models where what you would term a high dose was
12  not given to the animal?
13    A.   I am not following the question.
14    Q.   Is there any animal study you're aware of
15  where cancer was caused to the animals by NDMA where a
16  high dose, as you would define that term, was not given
17  to the animal or a lower dose was given?
18    A.   If I understand the question correctly --
19  say, for example, if we're looking at one cancer type,
20  and so you're asking -- let's focus on liver cancer.
21    Are there models that show liver cancer at
22  high doses?  Yes.  Like, for example, the rat model.
23  But there are other models -- say, the nonhuman
24  primates -- at high doses for NDMA that do not show

Page 285

1  liver cancer, if that's the question.
2    Or is the question, are there models at
3  low doses that show the same cancer?
4    Q.   Let me ask it a little bit differently.
5  The scientific consensus in the peer-reviewed
6  literature is that NDMA is one of the most potent
7  mutagenetic carcinogens in animal models.
8    Do you agree with that statement?
9    MR. INSOGNA:  Object to form.
10    A.   I agree with that with the understanding
11  that that's not taking into account the dosing of it,
12  and -- which is what is at play here in the question
13  that I was asked --
14  BY MR. SLATER:
15    Q.   So the peer-reviewed literature, in your
16  opinion, is deficient because, for example, in this
17  peer review article that you're relying on heavily,
18  they don't point out that it has to be at very high
19  doses, as you would term it, so all these articles are
20  in error?
21    A.   These are just incomplete sentences about
22  the details of that statement.  This is an introductory
23  paper saying an overview of this topic, and it's -- but
24  it's not going into the details of what that statement

Page 286

1  means.
2    Q.   So incomplete sentence after incomplete
3  sentence exists across the literature in this area;
4  right?
5    That's what your testimony is?
6    MR. INSOGNA:  Object to form.
7    A.   No, I'm trying to answer the question with
8  the understanding that I wouldn't just give a blank
9  approval to that statement without considering what I
10  said -- the dose and the duration of that agent or any
11  agent when talking about something like that.
12  BY MR. SLATER:
13    Q.   You agree that NDMA is a mutagenetic
14  carcinogen; correct?
15    A.   In animal models at certain doses, it is
16  and has been shown to be, yes.
17    Q.   Go to Page 360, please.  On the top
18  right-hand column -- actually, the right-hand column in
19  the middle of the page -- there's a heading that says
20  regulatory and public health implications.
21    Do you see that?
22    A.   Yes.
23    Q.   And the authors state about halfway down
24  that paragraph, "The immediate recall of all

Confidential Information - Subject to Protective Order

Page 287

1  potentially NDMA-contaminated valsartan drug products
2  by regulatory authorities worldwide was necessary in
3  order to protect the public health."
4        Do you see that?
5     A.   I see that sentence, yes.
6     Q.   And that sentence was made in one of the
7  two articles that you have already told us are the two
8  most important pieces of literature in the scientific
9  literature that you're relying on; right?
10       MR. INSOGNA:  Object to form.
11    A.   This statement is in those papers, and
12 my -- are you asking me what the interpretation of this
13 statement is?
14 BY MR. SLATER:
15    Q.   No, I was asking you to confirm that that
16 statement's found in the Gomm study, which was one of
17 the two studies that you say you're relying on above
18 all else, along with Pottegard?
19       MR. INSOGNA:  Object to form.
20    A.   This statement is in a paper that I relied
21 on from the data to evaluate whether or not there was
22 an increased risk in cancer from trace impurities in
23 these drugs.  This statement has no bearing on that
24 assessment.

Page 288

1  BY MR. SLATER:
2     Q.   Well, when the authors say that it was
3  necessary in order to protect the public health,
4  they're saying that because of the risk that the
5  contamination with NDMA could cause cancer to humans,
6  it was necessary to stop selling those contaminated
7  pills; right?
8        MR. INSOGNA:  Object to form.
9     A.   My interpretation of this is to say that
10 if there was a potential risk, it was necessary to
11 evaluate whether there was or not and not continue to
12 use those medications.  That doesn't prove that there
13 was an association or that these caused that.  They're
14 just stating that it was necessary to make an
15 evaluation whether or not that that existed, and in
16 their paper they conclude there is no association with
17 cancer.
18 BY MR. SLATER:
19    Q.   The regulatory authorities not only
20 ordered the recall to protect the public health, but
21 made a decision that pills with the levels of NDMA that
22 were seen, certainly over 96 nanograms, should not be
23 sold ever again; right?
24       MR. INSOGNA:  Object to form.

Page 289

1     A.   I think I answered that before, but I'll
2  say that they made this recall to ensure there wasn't a
3  risk, to evaluate if there was a risk, and during that
4  time to not continue giving the medications.
5  BY MR. SLATER:
6     Q.   And the conclusion was there is a risk --
7  over 96 nanograms, you can't sell it anymore; right?
8        MR. INSOGNA:  Object to form.
9     A.   That's not their conclusion in this paper,
10 no.
11 BY MR. SLATER:
12    Q.   No, I'm not saying Gomm.  I'm talking
13 about the FDA.
14       MR. INSOGNA:  Dr. Catenacci is not
15 offering regulatory opinions.
16       MR. SLATER:  I'm just -- well, let me
17 ask -- all right.  Here's the question.
18 BY MR. SLATER:
19    Q.   The FDA determined that there was too much
20 risk to sell these pills over 96 nanograms of NDMA;
21 right?
22        That was the level they eventually set;
23 right?
24       MR. INSOGNA:  Same objection.

Page 290

1     A.   According to their statements online that
2  we talked about before, they made an assessment to take
3  these off the market and to evaluate whether or not
4  there was a risk based on some evidence, but in the
5  meantime when it was safe to do so, when there were
6  replacement medications that did not have the
7  impurities, to then go do that, but I think as we
8  mentioned before, even with such potential risks that
9  it was still deemed to be a lower risk than stopping
10 the medications themselves.
11 BY MR. SLATER:
12    Q.   While getting onto a new medication over
13 the next several days or weeks; correct?
14    A.   Or months, or whatever it was.  Right.
15    Q.   Let's go to Page 359, the very bottom,
16 please.  At the very bottom of the right-hand column
17 they're talking about some limitations of the study,
18 and they say at the bottom of the page, "A further
19 limitation is that due to the limited follow-up time,
20 we were not able to monitor the long-term effects of
21 NDMA-contaminated valsartan for more than three years."
22       Correct?
23    A.   Yes.
24    Q.   And you would agree this is a short-term

Page 291

1  study and they were not able to evaluate long-term
2  effects; right?
3      MR. INSOGNA:  Object to form.
4      A.   This is similar to the question about the
5  same limitation in the other study, the Pottegard
6  study, that we talked about before, and that with the
7  current data that we have and the evidence that we
8  have, they were assessing a question that can be
9  assessed, which is this is how long we've got follow-up
10 based -- since -- on the time frame that we're dealing
11 with here.
12     So their analysis, which is appropriate,
13 and their acknowledged limitation is that it's looking
14 at this much follow-up time.  So that doesn't imply,
15 though, that by default it's true that longer-term it's
16 going to show that.  This is always -- all they're
17 concluding here is that there's no association during
18 the follow-up time that we've done.
19 BY MR. SLATER:
20     Q.   Is the answer to my question yes, I'm
21 correct?
22     MR. INSOGNA:  Object to form.
23 BY MR. SLATER:
24     Q.   They couldn't study long-term effects

Page 292

1  because it was a short-term study?
2      A.   That is what the statement implies and
3  that's -- I would agree that's clearly the case.
4      Q.   Just above what I had read on Page 359,
5  about six or eight lines above that, they state,
6  "Although detailed batch-wise information on
7  potentially NDMA-contaminated valsartan was provided,
8  we had no information on the exact NDMA content of
9  individual valsartan tablets."
10     Do you see what I just read?
11     A.   Yes.
12     Q.   And that lack of knowledge about the
13 actual exposure levels was a limitation, according to
14 the authors; right?
15     A.   This, again, is a similar limitation
16 across the two epi studies in that we don't know that
17 precisely and that patients may be -- may or may not be
18 getting the medications, but this is what reflects the
19 reality of what was happening, that they may have been
20 getting it for one prescription and then not the
21 next -- in the drugs themselves -- we don't know the
22 exact values, that is random and intermittent and
23 certainly not going to be at the highest level the
24 whole time.

Page 293

1      And this of course is a limitation that we
2  don't know precisely what's in every pill, but we're
3  looking at patients who had suspected lots that had the
4  impurities, and they're accounting for that, so this is
5  what's reflecting the reality of the question of these
6  potential exposures.
7      Q.   And the -- rephrase.  And they're also
8  commenting on the reality of the quality of the data
9  they had to rely on and they're acknowledging, as you
10 have, that there are gaps in the data about whether or
11 to what extent people on both sides of the study did
12 actually consume contaminated pills; correct?
13     MR. INSOGNA:  Object to form.
14     A.   Yeah, I think that when they talk about
15 the limitations they appropriately in a study such as
16 this indicate that, despite doing as many adjustments
17 and considering as many factors, that there may still
18 be residual confounding.
19 BY MR. SLATER:
20     Q.   There's no randomization in this study, or
21 in Pottegard for that matter; right?
22     A.   No, there is not.
23     Q.   And that's an issue with any study of an
24 insurance database; correct?  You just -- people are

Page 294

1  self-selected before the study is actually done, so you
2  can't randomize; correct?
3      A.   That's a limitation of any study that's
4  not a randomized study, whether it be a cohort study or
5  case control, or --
6      Q.   Looking now at Page 359 in the top left.
7  The Gomm authors actually comment on the Pottegard
8  study; correct?
9      A.   They do.
10     Q.   One thing that is stated is that the
11 Danish registry study by Pottegard, et al, has only a
12 small sample size comprising 5,150 persons with
13 prescription of valsartan.
14     And you would agree that that's a weakness
15 of the Pottegard study, that small number of people;
16 right?
17     A.   That is a relative weakness compared to
18 Gomm, that it's smaller.
19     Q.   Going down a little bit further in that
20 paragraph, the authors state, "However, the number of
21 cancer cases in the Danish study was limited, 302
22 cancers overall, only eight cases each of kidney and
23 bladder cancer.  The statistical power for detection of
24 small effects is therefore limited and no precise

Page 295

1  statements on small effect sizes can be made."
2       You would agree with that statement as
3  well; correct?
4       A.   I do.
5       Q.   And if we flip back to Page 357, please.
6  In the right-hand column, the second paragraph, about
7  six or seven lines down, there's a sentence that says,
8  "However, the sample size of the Danish study was
9  limited to a total of 5,150 patients, which may explain
10 the nonsignificance of the results."
11      You would agree with that statement as
12 well; correct?
13      MR. INSOGNA:  Object to form.
14      A.   That is a hypothesis to explain why the
15 study was negative.
16 BY MR. SLATER:
17      Q.   It's a reasonable hypothesis; right?
18      A.   It's a hypothesis that could be tested.
19      Q.   In this study, do you have an
20 understanding as to how they established whether or not
21 someone took contaminated valsartan or not?
22      A.   In the Gomm study?
23      Q.   Correct.
24      A.   Let me look to the methods here to ensure.

Page 296

1  Under the electronic methods, under exposure.
2       Q.   So you're on the page with the little
3  Roman Numeral 2 in the bottom left?
4       A.   Yes, we can start there.  So the details
5  here are telling us how they accounted for -- first of
6  all, they had -- all patients included in the study had
7  a prescription for valsartan, and then they explain how
8  they determined who was exposed to potential impurity
9  and who wasn't.
10      They talk about how they determine the
11 levels when they look at -- within the exposed gift,
12 how many were getting higher doses based on the
13 pharmaceutical registration numbers of any product that
14 had recall for valsartan during that time period.
15      And they then looked at the amount of the
16 potential or possibly contaminated versus probably
17 contaminated by these records to be able to stratify
18 within those that were exposed and to the dose levels,
19 to look at that, whether or not there was a dose
20 response relationship.
21      They took into account another -- a number
22 of other factors like long-term users versus those that
23 weren't, and the definition of that is in here based on
24 how many of the quarters during the study period the

Page 297

1  patients were filling prescriptions during that period,
2  et cetera.
3       So it's all very clearly laid out here how
4  they looked at the data, how they determined who was
5  and who wasn't, when they were, and to look at this as
6  best as possible with the limitations that we mentioned
7  that some of the information just wasn't available.
8  They looked at as many of the parameters as possible to
9  limit the bias as much as possible.
10      Q.   Coming back to my question, I'm really
11 just trying to focus on how they determined whether or
12 not pills were contaminated or not, and looking at
13 where you are reading from on -- or what you're looking
14 at on Roman Numeral 2 page -- there's a sentence that
15 says the marketing authorization holders -- let me
16 start over.
17      Coming back to my question about how the
18 authors determined whether pills were contaminated or
19 not, they state here on Roman Numeral 2 under exposure,
20 "The marketing authorization holders provided
21 batch-related data on all valsartan drug products for
22 the years 2012 to 2017.  This included detailed
23 information on which batches were manufactured using
24 the active ingredient valsartan supplied by ZHP and how

Page 298

1  many packages of these drug products were sold.  Based
2  on this information, we calculated the proportion of
3  all packages of valsartan drug products sold made up by
4  packages manufactured using contaminated ingredients."
5       Do you see what I just read?
6       A.   Yes.
7       Q.   So tell me if I'm right.  Similar to
8  Pottegard, the Gomm authors established contamination
9  based on whether the API was manufactured by ZHP and
10 that's how they established contamination; correct?
11      MR. INSOGNA:  Object to form.
12      A.   I think in this one what is a little
13 different, you -- taking on right from that sentence
14 you left off on, it says, "We calculated this ratio for
15 all pharmaceutical registration numbers affected by the
16 recall of valsartan drug products."  That's the exact
17 next sentence right after you stopped.
18      And the other thing I read into it in the
19 actual methods section where they're talking more
20 superficially about what they did, but they said,
21 example, ZHP products.  So in other words, it's not
22 limited to ZHP products, but it's any recalled
23 valsartan drug product, according to how this reads.
24      And so as opposed to the Pottegard study

Page 299

1  where I think we had already discussed and you
2  mentioned we talked about how there were the three
3  groups, whether they were exposed to ZHP or not, this
4  one, which was conducted later and published later
5  where it was done after the fact where more of the
6  recalled products were known at the time, they,
7  according to this statement, used any pharmaceutical
8  registration number affected by the recalls of
9  valsartan drug products.
10        So I read into that because they had more
11  information, they accounted for all of those -- all of
12  the products that were known at the time that had been
13  recalled.
14  BY MR. SLATER:
15      Q.  Actually, what they do is what I just
16  read.  They say they based it on did the pill come with
17  ZHP API, and then in another place they say, for
18  example, ZHP.
19          They say basically two different things;
20  right?
21          MR. INSOGNA:  Object to form.
22      A.  They say, example, in the area I mentioned
23  to -- and where you read you say that this is one of --
24  this is what they're using, is ZHP, but then the

Page 300

1  following sentence they said any recalled valsartan
2  drug product.
3  BY MR. SLATER:
4      Q.  And they say they calculated this ratio.
5          Do you have an understanding of what ratio
6  they're referring to?
7      A.  For all pharmaceutical registration
8  numbers affected by the recalls.  So --
9      Q.  So they're looking at the -- well, you
10  answer.
11          MR. INSOGNA:  I'm sorry.  What's the
12  question that's pending?
13  BY MR. SLATER:
14      Q.  Where they refer to the -- we calculated
15  this ratio.  What ratio are they talking about?
16      A.  The proportion of all packages of
17  valsartan drug products sold made up of packages
18  manufactured using contaminated ingredients.  The
19  sentence just before that.
20      Q.  And we have this what I'm terming a
21  conflict where their definition of contaminated -- in
22  one place it says ZHP in another place it says, for
23  example, ZHP.
24          It's not really clear which one it is;

Page 301

1  right?
2      A.  I read it as being that they are using
3  anything at the time of this study that had been
4  recalled.
5      Q.  If they limited it to -- well, rephrase.
6  I'll withdraw that.
7          There's a risk of residual confounding in
8  this study; correct?
9      A.  I think that we mentioned that earlier,
10  yes.  There's always risk of residual confounding in
11  studies like this, even with the best efforts to
12  account for confounding variables.
13      Q.  For example, there's no information about
14  who in the study had potential influencing factors,
15  such as smoking, nutritional habits, genetics?
16          Those factors were not integrated into the
17  analysis; correct?
18      A.  That's right.
19      Q.  That would be a weakness of the study;
20  correct?
21          MR. INSOGNA:  Object --
22  BY MR. SLATER.
23      Q.  It's inherent to the data, but it's a
24  weakness; correct?

Page 302

1      A.  It's a weakness to the data in that it
2  doesn't account for known risk factors for cancer.  I
3  think that ultimately usually those types of
4  confounders would -- not accounting for them could lead
5  to false positive signals in the study.
6      Q.  Look, please, at Table 1.
7      A.  Table 1.  Okay.
8      Q.  On my reading of this table, it appeared
9  that the unexposed group or the presumed unexposed
10  group was generally healthier than the, quote/unquote,
11  "exposed group."  I saw less diabetes, less heart
12  failure, less polypharmacy.
13          Would you agree with that assessment of
14  the two groups?
15      A.  I noticed the same, that most of these
16  risk factors had a higher percentage of patients that
17  were in the exposed group, yes.  I would also point out
18  things like spironolactone, which is a drug that's
19  often given in the setting of cirrhosis of the liver,
20  since that I think is pertinent and relevant to this
21  particular paper that I'm sure we'll get to.
22          And also just the bigger one at the
23  bottom, the Charleston comorbidity index, which sort of
24  summarizes all of those things, all comorbidities -- is

Page 303

1 higher in the one -- the patients who have higher
2 comorbidity indexes, there's a higher percentage of
3 them in the exposed group. So that's an important
4 factor for sure, yes.
5    Q.   And those factors can be strong
6 confounders that traditional statistical techniques
7 cannot always control; correct?
8    A.   Potentially, yeah. And especially when
9 you try to -- that doesn't necessarily mean you've been
10 able to eliminate all of the confounding.
11    Q.   For example, a traditional statistical
12 technique that doesn't control for those factors would
13 be the Cox model that was used here; correct?
14    A.   No, I think very clearly they state here
15 that they did adjustments based on these confounding
16 variables, including all the ones we just mentioned.
17 And that said, there's still going to be potential for
18 residual confounding because these patients clearly, as
19 you've pointed out, have higher risk factors at
20 baseline for getting cancer, and so despite trying to
21 make that adjustment -- that's why all of these hazard
22 ratios are called adjusted hazard ratios -- and they go
23 through that in the methods pretty detailed -- and they
24 even adjusted by just a few of them versus all of them

Page 304

1 to see if there are any major differences, and
2 ultimately there weren't any major differences.
3       But I think that we're agreeing that,
4 despite making all of those adjustments, there could
5 still be residual confounding that, as I mentioned,
6 usually would lead to a signal that's a false positive
7 signal if you don't account for an underlying factor
8 that was there.
9    Q.   Let's look for a moment at your report if
10 we could. I'm looking at Page 39. And I think, for
11 the record, I just got a note from Chris that we marked
12 the Gomm study as Exhibit 14, just for the record.
13       If you could look at your report, Page 39.
14 You make a statement in the middle of the page, or a
15 little below the middle of the page. You say, "In
16 other words, taking NDMA containing the valsartan
17 impurity was not associated with any increased risk in
18 overall cancer or with any specific cancer."
19       Do you see that?
20    A.   Yes.
21    Q.   Looking now at Page 359 of the study, the
22 Gomm study, on the left-hand column. They state in the
23 second full paragraph, "For liver cancer, however, we
24 observed a statistically significant association."

Page 305

1 Correct?
2    A.   I missed where you said we were, but I do
3 remember it saying that, yes.
4    Q.   I'm on Page 359, left-hand column, second
5 paragraph.
6    A.   Okay, yeah. Uh-huh.
7    Q.   Liver cancer is a specific cancer; right?
8    A.   Yes, it is.
9    Q.   So when you said that NDMA containing the
10 valsartan impurity was not associated with any
11 increased risk in overall cancer or with any specific
12 cancer, that's an incorrect statement; correct?
13    A.   When it says any specific cancer, that is
14 inaccurate with respect to the liver finding here.
15    Q.   The authors continue where I was reading.
16 "This is interesting, as from a biological perspective
17 liver cancer is the most likely form of cancer to
18 resulting from NDMA contamination."
19       That's, I guess, their viewpoint; correct?
20    A.   Yes. Yes.
21    Q.   Do you agree with that viewpoint?
22    A.   I think that it's an interesting finding,
23 given that is -- one of the risk factors is that
24 that's where the NDMA is metabolized, in the liver, and

Page 306

1 that at least in the Keto (ph) studies at very high
2 doses, that's -- they do -- they have been noted to
3 have liver cancers, and that the finding here -- one of
4 many findings that's being looked at -- suggests that,
5 at least at a very, very small effect size.
6       I think that's an interesting signal that
7 comes out of this paper, that as we both mentioned has
8 confounding, could be a positive -- a false positive
9 signal based on not adjusting for a lot of different
10 things that we just talked about.
11       As we talked about earlier, it's an
12 interesting finding. Is it enough to hang your hat on
13 and call definitive, as opposed to this should be
14 assessed in an independent cohort that is looking
15 specifically at this question, as opposed to one of
16 many things? That's how I would frame the finding, but
17 it is in that context something that I would say.
18       The only other thing I would point out is
19 that in other animal models, I think I mentioned
20 earlier, is that the nonhuman primates at very high
21 doses of some of these agents don't show liver cancer
22 and that in the Gomm study, even as we both agreed that
23 there is a hypothetical potential of confounding of
24 some of the non-ZHP agents in the control arm, there

Page 307

1  are zero liver cancer patients.
2          So there are two human epi studies that
3  show different things with respect to, say, even just
4  liver, and so this is why this is not consistent across
5  all the data, even in the human epi data.  And so like
6  I said in summary, it's interesting.  It's something
7  that should be followed up and looked at independently,
8  but it's not enough to say, okay, this is enough to
9  move forward and reject the null hypothesis and go to
10  the alternative hypothesis for that specific cancer.
11      Q.  Could you go to Page 358, please?  In the
12  right-hand column, the first full paragraph, along the
13  same lines as what we just talked about, they state,
14  "The analysis of individual cancer types showed a
15  significant association between potentially
16  NDMA-contaminated valsartan and liver cancer, adjusted
17  hazard ratio 1.16."
18          Then they give the confidence interval,
19  1.03 and 1.31, and a P of zero point -- of .017;
20  correct?
21      A.  Yes.
22      Q.  Is there significance to a P value in one
23  of these analyses?
24      A.  Yes.  If you look at their statistical

Page 308

1  methods, the last sentence of their electronic method,
2  it says that all analyses were performed and considered
3  statistically significant for a P value of less than
4  0.05, which is what we talked about earlier.
5          And so in other words, they're admitting
6  they didn't correct for multiple testing in this study,
7  and so as we explained earlier, that this is at risk of
8  a false recovery rate, there's a false positive rate,
9  by looking at multiple things slicing and dicing the
10  data multiple different ways, which was appropriate to
11  see if there's a signal somewhere.
12          And essentially, of all the things
13  assessed in just this study, let alone including all
14  the things looked at at Gomm, let alone if we're
15  looking at the full body of evidence of all the data
16  we're looking at here, one signal comes out.  You just
17  have to be very cautious and skeptical that that's
18  real, especially when the effect size is like so small.
19          So ultimately I think I've summarized and
20  said it many times, is that this has to be followed up
21  on and this alone is not enough to just say, okay, I'm
22  going to reject the null hypothesis, that there's no
23  association with liver cancer, and that I'm going to
24  accept that it's truly there, based on this one finding

Page 309

1  based on the whole body of the other information that
2  we've been evaluating here.  That's just how science
3  works.
4      Q.  What's a P value?
5      A.  The P value, as we talked about earlier,
6  is the value with which you set somewhat arbitrarily,
7  but has been a convention for decades, at .05, meaning
8  that you're willing to accept that what your
9  association is in any given study or whatever analysis
10  you're performing -- is that less than five percent
11  means that you have a less than five percent false
12  positive rate of the finding that you're seeing.  And
13  so the problem with that --
14      Q.  Doctor, I only asked you what it means.  I
15  didn't -- I just wanted to ask -- I'm just asking for
16  terminology.
17          MR. INSOGNA:  Adam, don't cut off the --
18          MR. SLATER:  Yeah.  I'm sorry.  I don't
19  mean to interrupt, but we're trying to use time here,
20  so I just wanted to kind of get us on track with that.
21  That's all I'm trying to say.
22          MR. INSOGNA:  Had you finished your
23  answer?
24      A.  I was just going to say -- I had already

Page 310

1  said it before -- that if you look at multiple things
2  then, then you have to take that into account because
3  then your false positive rate goes up.  And you -- by
4  chance, you could find something by -- that you're
5  calling statistically significant because it's less
6  than .05, but you've looked at multiple different
7  things, which increases your risk of a false positive
8  rate.  That's all.
9  BY MR. SLATER:
10      Q.  A P value of .017 means that there's less
11  than a two percent chance that that finding is due to
12  chance; correct?
13          That's what that means statistically;
14  correct?
15      A.  As a standalone assessment of just looking
16  at that question, yes.  But not in the context of
17  looking at multiple different things.
18      Q.  You disregarded the increased risk for
19  colorectal cancer and uterine cancer in Pottegard
20  because they didn't reach statistical significance in
21  that study; correct?
22          MR. INSOGNA:  Object to form.
23      A.  I criticize -- I didn't criticize them.
24  You were asking --

Page 311

BY MR. SLATER:

1 Q.  I said rejected.

2 A.  I was trying to explain to you why as a
scientist we wouldn't look at that with -- we would
look at that with skepticism that that's a real
finding, the point estimate, given that there's wide
confidence intervals and that it's not even closely
statistically significant and the numbers -- are so
small.  That's a different question altogether.

10 Q.  My only question is this.  The findings of
increased risk for colorectal cancer and uterine cancer
in Pottegard did not reach statistical significance,
and you stated in your report that you don't credit
those findings as a result of the failure to reach
statistical significance.

16 I understand that correctly; right?

17 MR. INSOGNA:  Object to form.

18 A.  In the same way that I rejected that some
of those look like taking the drug is protective,
because it goes the other way.  That's the risk of
looking at subgroups, is that you get random
variations.

23 BY MR. SLATER:

24 Q.  Is the answer to my question yes?

Page 312

1 MR. INSOGNA:  Object to form.

2 A.  Can you repeat the actual question?

3 BY MR. SLATER:

4 Q.  The data showing increased risk for
colorectal cancer and uterine cancer in Pottegard, you
in your report made it clear that you did not credit
that study as establishing any risk for those cancers
because they did not reach statistical significance;
correct?

10 A.  Not exactly, no.  Because even if it did,
if it was a multiple assessment and one out of many
looked like it as a subgroup, we would not look at that
with definitive conclusion.  That's my point.

14 If it was the main analysis which was
powered for that to limit false positive and false
negative rates, then that's different.  But if it's a
subgroup and you're looking at multiple different
subgroups, then that's not the only reason why I
rejected it.  It was clearly not significant.  But it's
also because it was just a small subgroup analysis.

21 Q.  You said you wouldn't draw any definitive
conclusions based on that.  Is it fair to say you
wouldn't draw any definitive conclusions one way or the
other based on Gomm and Pottegard, recognizing all the

Page 313

1 limitations we've discussed the last two days?

2 MR. INSOGNA:  Object to form.

3 A.  No, that's not true.  I mean, that's --

4 BY MR. SLATER:

5 Q.  That's all I asked.  It's a yes or no.

6 A.  No.  No.  It's clearly negative for the
prior endpoint, both of them, for any cancer being at
higher risk.  That's the clear answer that's not
true --

10 Q.  So now coming back -- all right.  New
question.

12 So in Pottegard, colorectal cancer,
uterine cancer, increased risks are shown but not
reaching statistical significance, and that's one of
the reasons why you say, "I don't think there's an
increased risk"?

17 In Gomm, according to the authors in a
peer-reviewed article that you're saying is one of the
two most important articles you've reviewed, they do
find an increased risk for liver cancer reaching
statistical significance, and your response is, "Well,
in that case it might be due to chance."

23 Do I understand you correctly?

24 MR. INSOGNA:  Object to form.

Page 314

1 A.  Yes, that would be the scientists'
impression of that data, is to say we have to be
cautious with that finding and not conclude that it's
true.

5 BY MR. SLATER:

6 Q.  We also need to as a scientist say that
could also be very meaningful and could be an important
signal that this contamination did cause cancer to
people?

10 That's also something you have to take
into account if you're using an objectively reasonable
methodology; right?

13 MR. INSOGNA:  Object to form.

14 A.  Yes, I've acknowledged that, that that is
something that you would not ignore, and that you would
have to follow up on in independent studies and see if
you're seeing a consistent outcome, which many times
the problem is -- and which sort of emphasizes what I'm
trying to say -- is that it doesn't.

20 And so as an example, we have another
study that was done that showed no liver cancers in
either group that we're talking about that maybe have
some contamination of the -- into the control arm with
some of these agents, and there's still no liver

Page 315

1 cancers. So now we have discrepant data not even
2 consistent from these two studies.
3 BY MR. SLATER:
4    Q.   The two studies that you're relying on as
5 over and above all the other evidence in the case have
6 conflicting results; right?
7       MR. INSOGNA:  Object to form.
8    A.   They have results that are very consistent
9 with random variation when you keep looking at data
10 multiple times, yes.
11 BY MR. SLATER:
12    Q.   If we could put that aside for now. Bear
13 with me for a second. I'm trying to tidy up over here
14 for a moment.
15       You mentioned something yesterday that I
16 want to come back to. You said -- well, rephrase.
17       Yesterday I asked you about whether or not
18 it would be ethical to study in a randomized double
19 blind study, the gold standard-type study, study people
20 getting the valsartan that was contaminated at the
21 levels we've seen and have another group of people that
22 gets confirmed uncontaminated valsartan and to run a
23 study.
24       Remember we talked about that yesterday?

Page 316

1    A.   Yes.
2    Q.   And I asked you about running such a study
3 to evaluate the risk of cancer in humans from exposure
4 to that NDMA, and we talked about that; correct?
5    A.   Yes.
6    Q.   And you said you thought there was a study
7 you had seen where that was actually done I think with
8 Zantac or something similar was done with Zantac.
9       Remember you said that yesterday?
10    A.   Yeah, I said that in response to -- your
11 question is, would it be ethical to give a product that
12 was thought to be having an issue such as this to
13 patients prospectively and randomize them? And that
14 was an example of a study that did just that.
15    Q.   The JAMA article you're talking about is
16 Florian (ph); right? Or do you not know the author's
17 name?
18    A.   It sounds familiar. It was in June of
19 2021.
20    Q.   18 participants who were given Zantac a
21 handful of times over the course of about a month.
22       Does that ring a bell?
23    A.   That's right.
24    Q.   And that the people who ran the study

Page 317

1 confirmed with regard to every single pill that the
2 NDMA was well below the acceptable daily limit set by
3 the FDA.
4       Do you recall seeing that in that study?
5    A.   I do.
6    Q.   And they actually stated levels of 6.3
7 nanograms, 7.5 nanograms, and 10.5 nanograms.
8       Do you remember seeing that?
9    A.   I do.
10    Q.   And all they were studying in that study
11 was whether or not taking those pills would increase
12 the level of urinary excretion of NDMA; right? That
13 was the endpoint; correct?
14    A.   The endpoint was to evaluate whether
15 changes in the NDMA levels in the urine, yes.
16    Q.   So coming back to my question, can you
17 imagine any IRB in the United States approving a study
18 where the valsartan pills sold in the United States by
19 Teva that are confirmed to be contaminated at the
20 levels we've seen of NDMA and NDEA would be given to
21 study participants on one side of the study and other
22 people would get valsartan that they know is not
23 contaminated, follow the people for some number of
24 years while they take it, then follow them out for 30

Page 318

1 years to see how many people get cancer?
2       Can you imagine that any IRB in the
3 country would find that to be an ethical study?
4       MR. INSOGNA:  Object to form.
5    A.   And let me come back, because it's
6 important to answer your question, because you haven't
7 looked at the whole part of that study -- the other
8 study they were talking about with ranitidine or
9 Zantac. And that is that in that storyline, one of the
10 issues is that the ranitidine gets degraded
11 endogenously after being eaten and may be affected by
12 different foods, et cetera, and that study took that
13 into account and was looking at where the levels
14 actually are far higher -- that's the hypothesis --
15 compared to the exogenous, which is very relevant here
16 actually, too, with nitrosamines.
17       And so it's not only the exogenous amount
18 that they're talking about in NDMA -- of NDMA in the
19 Zantac, but it's also all of the complication that
20 happens upon degradation, which is one of the issues at
21 hand with Zantac. And that study was doing just that
22 and randomizing the different diets even to evaluate if
23 different diet could affect that.
24       And all of those hypotheses were being

Confidential Information Subject to Protective Order

1 tested there in a setting where it possibly could cause
2 cancer, and they did it prospectively in a randomized
3 fashion and it was not deemed unethical. And so the
4 same question now that you're asking me, I can say is
5 that if it was asking a question prospectively and it
6 was -- and analyzing such as question as this to see if
7 something that we don't know for sure is -- we don't
8 have evidence here that says that this at these levels
9 are clearly associated with cancer and someone was
10 doing a prospective study that was well-designed, then
11 I think it would be difficult to do in this setting,
12 but it has been done in an analogous situation already.
13        I don't know what would happen in another
14 proposed study and whether an IRB would accept it or
15 not, but you asked me if it could be and I'm giving you
16 an example where that exact thing was done in an
17 analogous storyline. That's all.
18 BY MR. SLATER:
19    Q.   So you have no opinion on my situation
20 about whether that could be done; correct?
21        MR. INSOGNA: Object to form.
22    A.   I don't know, which I think was my answer
23 yesterday, too.
24 BY MR. SLATER:

1    Q.   By the way, one question just to close the
2 loop on Zantac. It's been proven that it actually
3 doesn't increase the levels of NDMA in the body; right?
4        It -- the Zantac itself doesn't get
5 somehow activated to create more NDMA? That was a
6 hypothesis that it doesn't appear to have been proven;
7 right?
8    A.   The hypothesis was whether or not taking
9 the ranitidine would increase urine excretion or not
10 depending on diet changes, and they did --
11    Q.   And they didn't; right?
12    A.   And they didn't see any changes in the
13 urinary excretion.
14    Q.   Now, if I can find my notes, we'll turn to
15 the Hidajat study for a few moments. That's apparently
16 a big if.
17        MR. SLATER: And Chris, I'm going to
18 assume you're going to mark this as Exhibit 15.
19 Correct me if I'm wrong.
20        [Exhibit 15 marked for identification.]
21 BY MR. SLATER:
22    Q.   Now, looking at your report also
23 concurrent with looking at the Hidajat study -- because
24 you talk about it on Page 43 of your report; correct?

1    A.   Yes.
2    Q.   If you took a scale and you said, all
3 right, I have to put evidence that I'm looking at on
4 one side or the other pro or con to whether or not NDMA
5 can increase the risk for cancer in humans on one side
6 and saying on one side yes and on the other side no,
7 the Hidajat study would go on the yes side; right?
8    A.   As a simple answer, I would say there are
9 so many problems with this paper in terms of putting it
10 on the yes side that although on the surface say the
11 conclusion is that there's an association, when you
12 look at the numerous problems with saying that with
13 respect to the question we're asking today, it would be
14 a soft yes.
15        It would -- when you're weighing the data
16 and looking at all of the evidence, that would not play
17 a large role into saying -- for the question I've been
18 asked -- in terms of the impurities found in valsartan
19 at the trace levels that they've been found, if they
20 increase the cancer. In that question on the yes/no
21 side, it would be a very -- there's also weight on how
22 much was on each side -- it would be very, very low.
23    Q.   You certainly wouldn't put the Hidajat
24 study in the no side; right?

1    A.   No. I agree with that.
2    Q.   You talked about the limitations and
3 confounders.
4        You talk about that on Page 43; right?
5    A.   Yes.
6    Q.   I'm not asking you to list them, but did
7 you find any strengths of this study -- anything about
8 it that you would say, yes, this was a good part of the
9 study?
10        MR. INSOGNA: Object to form.
11    A.   The positives I guess would be that
12 they're making an effort to try and evaluate a
13 question.
14 BY MR. SLATER:
15    Q.   Pull out the Hidajat study for a moment.
16 Page 225 if you -- 255, I should say.
17        And do you see the column that talks about
18 the exposure levels of NDMA?
19    A.   The column that talks about exposure
20 level --
21    Q.   In the middle?
22    A.   Yes. Okay.
23    Q.   And are the exposure levels listed from
24 lowest to highest?

Page 323

1   A.   Yes.
2   Q.   Is each exposure above the baseline
3 associated with a statistically significant increase in
4 the rate of cancer?
5       MR. INSOGNA:   Object to form.
6   A.   The way you asked that question, they all
7 have less than -- less than P values that would call
8 them statistically significant, yes.
9 BY MR. SLATER:
10   Q.   Am I also correct that the higher the
11 exposure, the higher the cancer risk, according to this
12 table?
13   A.   Yes.
14   Q.   So does that mean there was a
15 statistically significant dose response relationship?
16   A.   In that focused question, without taking
17 all the confounding into account, yes.
18   Q.   When NDMA is inhaled, is it metabolized?
19       MR. INSOGNA:   Object to form.
20 BY MR. SLATER:
21   Q.   In the human body?
22   A.   I think studies that demonstrate or
23 evaluate the pharmacokinetics of this agent that don't
24 take it orally, which as I think we talked about

Page 324

1 earlier where it's absorbed, it goes through the portal
2 system, it goes to the liver.
3       In analyses that looked at what happens if
4 it goes through a different route, in fact it gets
5 metabolized mostly in the liver also despite that,
6 because eventually it gets there, and most of it
7 gets eva -- gets metabolized -- and that's where the
8 enzyme, the P450 enzyme, exists at that concentration
9 that do that, but the answer is yes, eventually that
10 would do that.
11   Q.   So inhaled NDMA would be metabolized in
12 the liver; correct?
13   A.   Eventually.
14   Q.   You mentioned in your analysis of the
15 study that there was a lack of individual smoking data,
16 and I think you said that the authors made no effort to
17 control for smoking history.
18       Do I understand that correctly?
19   A.   Where do you say that, just so I can read
20 it?
21   Q.   It's on Page 43 in the second paragraph,
22 about five lines up, where you say, "Finally the
23 Hidajat study made no effort to control for smoking
24 history."

Page 325

1   A.   Yeah.  Yes.
2   Q.   Did they perform a Monte Carlo analysis?
3   A.   I don't know.  I'd have to look.
4   Q.   Do you know what a Monte Carlo is?
5   A.   I do not.
6   Q.   Go to Page 257, please.
7   A.   Okay.
8   Q.   If you look at Page 257, the left column,
9 the second-to-last paragraph.  It's a long paragraph,
10 and what they say about halfway down that paragraph,
11 they state, "To obtain some indication of the possible
12 confounding effect of smoking in this cohort, we used a
13 statistical external adjustment method."
14       Do you see that?
15   A.   I do.
16   Q.   They say, "External Monte Carlo analyses
17 based on information on smoking prevalence, ex-smokers,
18 and never-smokers from a cohort of rubber industry
19 entrants after 1982 indicated that mean bias is only
20 1.6 percent compared with the general population."  And
21 they go on and then they conclude suggesting that
22 confounding by smoking in this cohort was likely not a
23 significant confounding factor.
24       Do you see that?

Page 326

1   A.   Yes, I recall reading this.  Yes.
2   Q.   So they did attempt to control for
3 smoking; correct?
4   A.   Well, I guess the way I was reading that
5 is that they didn't have smoking exposure from these
6 people in this cohort, so what they did was they tried
7 to extrapolate from other data to see how that might
8 play a role, but I think we've established through all
9 of the studies, whether you like them or not, whether
10 they're positive or negative, particularly a study like
11 this with so many confounding variables, that it's
12 nearly impossible to adjust for all of them.  They can
13 make an effort, but I think we would have to agree that
14 this is trying to mitigate a huge problem in the
15 analysis.
16   Q.   You stated that the Hidajat study made no
17 effort to control for smoking history.  That's what you
18 stated in your report.
19       That's an inaccurate statement; correct?
20   A.   They weren't able to get smoking histories
21 of the patients that they were analyzing, is what I was
22 meaning by that statement.  They didn't have it, so
23 they couldn't adjust for it, and they had no -- they
24 didn't make an effort to get smoking history from those

Confidential Information Subject to Protective Order

Page 327

1 patients.

2    Q.   Your report says that the study made no

3 effort to control for smoking history.  Just looking at

4 those words, you would agree with me that they did

5 attempt to control for smoking; correct?

6    A.   They did this analysis from patients

7 that -- from other patients that weren't these actual

8 patients, making a huge assumption.

9    Q.   Well --

10    A.   But they didn't account for their own

11 patients.  They didn't --

12    Q.   You don't know -- just to be clear, you

13 said you're not sure what a Monte Carlo analysis is;

14 right?

15    A.   I don't know the details of the

16 statistical measures, but I -- which is what you were

17 asking me, and I don't -- but assuming they did that

18 properly, this is an assumption from people that aren't

19 even the people they're talking about in this study.

20    Q.   It's a statistical tool that was used in a

21 peer-reviewed article and you didn't mention it at all

22 in your report?

23        Is that a true statement?

24    A.   I didn't mention this part of the

Page 328

1 analysis, no.

2    Q.   All you said in your report is they made

3 no effort to control for smoking history.  In order to

4 be balanced, wouldn't it have made sense to say they

5 did a Monte Carlo analysis and state what they found so

6 at least you could show both sides and show that they

7 did make an effort to address smoking and didn't just

8 ignore it?

9        MR. INSOGNA:  Objection.  Form.

10        MR. KUM:  Objection.  Form.

11        MR. INSOGNA:  Compound.  Argumentative.

12    A.   I didn't mention every point on every

13 article about every thing.  My summaries here of this

14 paper are pointing out the many, many limitations of

15 this study, which was used heavily by plaintiff experts

16 to look at a question that is far removed from what

17 this study is looking at.

18        So I didn't put that there.  I could

19 have -- I -- we could go through this paper and I could

20 have missed some of the things that would negate this

21 even further.  I was just pointing out a few examples

22 of how this is severely confounded and has so many

23 significant problems with the question at hand here.

24 BY MR. SLATER:

Page 329

1    Q.   Coming back to my question, if one were to

2 come to your report not having the same background we

3 all have, not being so familiar with all this material,

4 and just read that sentence, finally, the Hidajat study

5 made no effort to control for smoking history, that

6 would be misleading in the sense that it would suggest

7 they ignored the issue when in fact we know they

8 actually did a statistical analysis to address it and

9 drew a conclusion on that; correct?

10        MR. INSOGNA:  Object to form.

11    A.   I answered already that I didn't put every

12 point on either side in here.  I was pointing out a

13 major problem that they don't have the patients'

14 smoking history in this analysis.

15 BY MR. SLATER:

16    Q.   Is my statement a true statement?

17        MR. INSOGNA:  Object to form.

18    A.   No.

19 BY MR. SLATER:

20    Q.   In order to give a more fair and

21 balanced -- well, rephrase.

22        In order to give a balanced view of the

23 issue of smoking, it would have been appropriate to

24 state in your report what the authors did with regard

Page 330

1 to smoking; correct?

2        MR. INSOGNA:  Object to form.

3    A.   I was pointing out highlights of this

4 paper in terms of significant limitations.

5 BY MR. SLATER:

6    Q.   In your report on Page 43, in the middle

7 of that second paragraph -- bear with me for one

8 second.  Ah.

9        On Page 43 of your report, in the second

10 paragraph, about two-thirds of the way down, you say,

11 "Moreover, the Hidajat study used estimations of NDMA

12 exposure based on job title and air quality

13 measurements associated with those job titles, while

14 also assuming study participants remained in the same

15 position throughout their careers.  That is a

16 significant and in my view implausible assumption and

17 makes the estimations inherently questionable."

18        That's what you stated in your report;

19 right?

20    A.   Yes, I see that.

21    Q.   Now, look at Hidajat, if you could, Page

22 251, top right-hand corner of the page under the

23 heading exposure assessment.  Halfway down that

24 paragraph it says, "Because only job information in

1 1967 was available, the primary analyses assumed all
2 subjects remained in the same factory department --
3 i.e., not necessarily in the same job -- throughout
4 their careers and were employed until retirement at age
5 70, death, or emigration."
6        Do you see that?
7    A.   Yes.
8    Q.   So when you said in your report that
9 Hidajat assumed everybody stayed in the same position,
10 that was incorrect because they explicitly said they
11 did not assume people stayed in the same job; right?
12    A.   They stayed in the same department, same
13 position in the department.
14    Q.   You said that they will -- you said in
15 your report -- you referred specifically to job titles,
16 and then you said while also assuming study
17 participants remained in the same position.
18        You were referring when you said same
19 position to the same job?  That's what you meant;
20 right?
21    A.   In the same department, as it states here.
22    Q.   But that's not what your report says,
23 because you didn't say that?
24    A.   Where --

1    Q.   I mean, let's look at your report.  You
2 say, "Moreover, the Hidajat study used estimations of
3 NDMA exposure based on job title and air quality
4 measurements associated with those job titles while
5 also assuming study participants remained in the same
6 position throughout their careers."
7        You're obviously when you say same
8 position talking about the job title; right?
9        MR. INSOGNA:  Object to form.
10    A.   And the job titles would be grouped by
11 department; okay?  So I'm not being as specific as you
12 would like, and I think that clearly it states here
13 that they stayed in the same department, which is what
14 the meaning of this was, to clarify.
15 BY MR. SLATER:
16    Q.   Well, you said that is a significant and
17 in my view implausible assumption and makes the
18 estimations inherently questionable, the suggestion
19 that someone would stay in the same job for all those
20 years.
21        But it's certainly not implausible that
22 someone would stay in the same department, is it?
23        MR. INSOGNA:  Object to form.
24    A.   It's an assumption, and people move around

1 to different departments, and to assume that they
2 wouldn't is a huge assumption; that's all.
3        In fact, let me just characterize -- of
4 all the limitations in this study, I think that that's
5 the least important, actually.  Of all of the
6 limitations, which include all of the exposures to all
7 of these other known carcinogens, Type 1 carcinogens in
8 many cases, that are inhaled, not even orally ingested
9 here, that are -- this is the bigger issue with this
10 paper in terms of confounders, to ask the question
11 about -- we're not even -- we're talking about NDMA at
12 trace levels in a pill that's taken for a few years, as
13 opposed to over decades exposure here to so many
14 different carcinogens.
15        It's really -- I mean, it's an extension,
16 it's a surrogate of surrogate of surrogates, trying to
17 look at a question, and of all the evidence we've
18 talked about so far, this is the least evidence -- the
19 least weight evidence that I would put on this one.
20 BY MR. SLATER:
21    Q.   Just to be clear, you're not claiming to
22 be an expert on whether people would stay in the same
23 department in the rubber industry in the United
24 Kingdom?

1        You don't have any knowledge or expertise
2 in that field at all, would you?
3    A.   Nor would I say that they most definitely
4 all stayed in the same department.  I mean, it's my
5 assumption.  That is -- I think we're both agreeing on.
6    Q.   My question is this.  You're not stating
7 that you have some expertise or any special knowledge
8 about whether people would stay in the same position or
9 not or the same department or not; right?
10    A.   I don't have special expertise other than
11 just common sense, that that's just an assumption that
12 that not necessarily is true.
13    Q.   Do you know what the departments were in
14 the United Kingdom in the rubber industry during the
15 time this study was being conducted?
16        Do you know what the departments were
17 called?
18    A.   No.
19    Q.   Do you know how many departments there
20 were?
21    A.   No.
22    Q.   Do you know if there may be two
23 departments in the whole factory?
24    A.   No, although that's not what it sounds

Page 335

1  like here as they're calling it more of a -- multiple
2  different potential departments.
3      Q.   You have absolutely no idea how many
4  departments there would have been in any of these
5  factories; right?
6      A.   No.
7          MR. INSOGNA:  Object to form.
8      A.   Nor does it matter in the grander context,
9  as I've already mentioned.
10 BY MR. SLATER:
11     Q.   Do you know if people in that industry in
12 that time period saw these jobs as jobs for life and
13 would settle into a department and make that their job
14 for life and would work until they either died or
15 stopped working?
16         Do you know if that's how it worked back
17 then?
18         MR. INSOGNA:  Object to form.
19     A.   I don't know.  It's possible.
20 BY MR. SLATER:
21     Q.   You have no idea; right?
22         MR. INSOGNA:  (Inaudible) possible.
23 BY MR. SLATER:
24     Q.   You have no idea; right?

Page 336

1      A.   Not relevant and not --
2          MR. INSOGNA:  Object --
3      A.   And potentially possible.
4  BY MR. SLATER:
5      Q.   In your report you mentioned on Page 43
6  the Straif study from 2000; right?
7      A.   Yes.
8      Q.   That study also found statistically
9  significant increased risks for multiple cancers;
10 correct?
11     A.   Yes, with the exact similar confounding
12 problem and limitations as Hidajat.  Also that --
13     Q.   Do you think that it's difficult to study
14 the risk to humans from exposure to NDMA because of the
15 limitations on how you can set up studies for whether
16 or not you can give NDMA to humans, for example, as
17 we've talked about, and because of just how the world
18 works?
19         Is it just hard to set up a study that you
20 would say, "That's a great study.  That can answer the
21 question"?
22         MR. INSOGNA:  Object to form.
23     A.   It relates to the question about
24 prospective randomized study, which of course would be

Page 337

1  more of a gold standard to ask a question and minimize
2  as many biases as possible.  I already mentioned that
3  there have been similar studies in analogous cases, but
4  I will agree that it's difficult to do randomized
5  studies for various reasons and one of them is it's
6  challenging to do and to coordinate.
7          But that doesn't mean that we should then
8  rely solely on evidence that's not good and just say,
9  well, we're going to do that instead and just agree and
10 believe it.  We have to look at it skeptically; that's
11 all.
12 BY MR. SLATER:
13     Q.   Do you know what the tobacco industry and
14 their experts were saying early on about the quality of
15 the studies that people were saying proved that tobacco
16 caused cancer?
17         Do you know what they were saying at that
18 time?
19         MR. INSOGNA:  Object to form.
20     A.   I don't know --
21 BY MR. SLATER:
22     Q.   Would it surprise you to find out that
23 basically were saying the -- they were saying the same
24 thing -- let me rephrase.

Page 338

1          Would it surprise you to learn that the
2  tobacco industry was basically making the same
3  arguments that we're hearing from you and the
4  manufacturers of the contaminated valsartan back then?
5          MR. INSOGNA:  Objection.
6          MR. KUM:  Objection.  That assumes facts
7  not in evidence.
8          MR. INSOGNA:  Same objection.
9          MR. SLATER:  Wait.  I'm sorry.  Let me
10 just -- before you answer, Doctor.  Did somebody just
11 object and say that it assumes facts not in evidence?
12 This is a deposition.  We're not putting anything into
13 evidence till we get to trial, counsel.
14         Am I missing something, or do -- would you
15 like to maintain that objection?
16         MR. KUM:  Well you're making an assertion
17 without laying a foundation for it, so --
18         MR. SLATER:  Okay.  Assumes facts not in
19 evidence.  Okay.
20 BY MR. SLATER:
21     Q.   Doctor, you can answer the question.
22     A.   Can you repeat it for me, please?
23     Q.   Sure.  Would it surprise you to learn that
24 the tobacco industry made very similar arguments to

Page 339

1  what we're hearing here in defense of these valsartan
2  cases with regard to the risks of cancer from smoking?
3         MR. INSOGNA:  Same objections.
4  BY MR. SLATER:
5     Q.   Same type of thing?  We don't have RCTs.
6  We have to -- you can't rely on animal models.
7  Short-term studies.  We're not seeing a lot of effects
8  on these short-term studies of people who smoked.
9         Would it surprise you to hear that all the
10 same arguments were basically being made to defend the
11 tobacco industry?
12    A.   My response to that is, is that science
13 always will tell the truth if it's done properly, and
14 what you're calling tobacco -- that's a Type 1
15 carcinogen, and we know that, and there's evidence to
16 support that, and the data was done to do that.
17        We're asking here now, do we have enough
18 evidence to say that?  And I'm telling you the answer
19 is no, there's not enough evidence to say that.  That's
20 all I'm saying.
21    Q.   Do you know that the experts for the
22 tobacco industry said exactly the same thing that
23 you're saying here when they were defending tobacco
24 before it was recognized widely around the world to be

Page 340

1  a dangerous carcinogen for humans?
2         MR. INSOGNA:  Object --
3     A.   That's irrelevant.  From a scientific
4  perspective of my -- what I'm asked to do, we are
5  asking if we can reject the null hypothesis, which
6  is -- you have to start from that -- there is no
7  association, there is no causation -- and prove it to
8  me that there is with a body of evidence.
9         So you can't equate that and this which
10 has completely different storylines.  There's not
11 enough body of evidence to make that call at this
12 point.  Both can be true, in other words.
13 BY MR. SLATER:
14    Q.   In terms of your methodology, does Hidajat
15 even figure into the analysis, or do you just say this
16 is a study I don't have to really consider because of
17 the issues I've seen, so I don't even take it into
18 consideration?
19    A.   I think I mentioned yesterday that when
20 you're looking at a question like this, you have to
21 consider all available evidence and weigh it.  And we
22 have evidence looking at the actual question that was
23 asked of me, which is, do these pills that have trace
24 levels, very small levels of this agent, increase the

Page 341

1  risk of cancer?
2         And we have some cohorts that actually
3  were looking at exactly that with the exact pills and
4  controlled in some ways -- everyone was taking
5  valsartan, et cetera.  We already talked about some of
6  the confounding that's residual in those studies.  But
7  those studies are negative.
8         And now we have a whole body of studies
9  that are based on looking at exposures in the
10 occupational setting to in this case rubber workers
11 that have exposure to so many other carcinogens that
12 it's nearly impossible to account for that are looking
13 at extensions of the question at hand here at doses
14 probably far higher than what we're talking about in
15 these trace levels in the pills.
16        Then it's not like I'm not looking at it
17 or I'm not considering it, but it's certainly not
18 anywhere near the level of where I'm putting weight on
19 this particular question at hand.  It's not enough --
20    Q.   So --
21    A.   -- that these studies are positive to
22 say, okay, so we can move on now and establish that not
23 only is there an association, but now it's causing the
24 cancer.

Page 342

1     Q.   Well, I probably can save us a bunch of
2  time right now perhaps with a couple questions based on
3  what you said, because I think I'm getting a good idea
4  of what your understanding is.
5         There's obviously a lot of dietary studies
6  that you've looked at and analyzed; right?
7     A.   Yes.
8     Q.   You talk about them in your report; right?
9     A.   Yes.
10    Q.   You would agree that there are dietary
11 studies that support the proposition that NDMA
12 increases the risk and actually causes cancer in humans
13 and there are some studies that were not definitive on
14 that question or that you might even say support your
15 opinion; right?
16        MR. INSOGNA:  Object to form.
17    A.   You're using the word risk, but I think I
18 would use associations that have been positive or
19 negative, depending on various studies.  And --
20 BY MR. SLATER:
21    Q.   I'll use your vocabulary.  Let me ask
22 again.
23        You would agree that there are dietary
24 studies that support a significant association and

Page 343

1  there are studies that don't or are not definitive one
2  way or the other; right?
3       MR. INSOGNA: Object to form.
4       A.  There are studies that have shown positive
5  associations and others that haven't in looking at the
6  same cancer type and looking at other cancer. In fact,
7  most of the studies that expert plaintiffs rely on
8  don't mention anything about diet causing hepatic or
9  liver cancers, which is the whole focus of the human
10  epi data, and we're not talking about it. We're
11  talking about gastric cancer and other colon cancer
12  over here in the diet.
13       So this is an example of, okay, it's all
14  over the place and there's no consistent story, and so
15  when I'm looking at this to say is there enough
16  evidence to change me from the null hypothesis --
17  alternative -- about any -- about all cancers, the
18  answer is no. And if I'm looking at a specific cancer,
19  there's no consistent trend throughout any of this
20  either.
21       And so, yes, the dietary sub -- back to
22  your question -- has some for and some against, but
23  it's very non -- it's inconsistent, and it's not
24  something one could rely on given all the other

Page 344

1  confounding issues with the diet stuff that I've
2  mentioned in my report.
3  BY MR. SLATER:
4       Q.  If I understand your opinion ultimately --
5  and please correct me if I'm wrong, even though I know
6  you're shy about saying that --
7       A.  That was sarcastic.
8       Q.  I'll start over. I'll start over.
9       Tell me if I understand. Based on your
10  review of everything, you looked at everything and you
11  weighed it as you weighed it and you came up with a
12  conclusion. Your conclusion is the evidence is not
13  sufficient to establish that the exposure of
14  individuals to the valsartan with the NDMA and the NDEA
15  levels in the pills that were actually sold in the
16  United States increased or cau -- the risk for
17  cancer -- or caused cancer to humans?
18       Your position is the evidence is not
19  sufficient to say yes to that, and that's your opinion;
20  right?
21       A.  That's my opinion, yes.
22       Q.  Your opinion is not that the evidence
23  proves that the answer is no? You're not taking the
24  position that, based on the evidence, it's been

Page 345

1  established that NDMA does not increase the risk for
2  cancer or cause cancer in humans; correct?
3       A.  That's not how science works, but
4  certainly any of the data that is reliable or the more
5  reliable data, the answers have been no in those
6  reports. In other words, there was no association in
7  Gomm and all cancers. There's no association in
8  Pottegard and all cancers. But that's not how -- I'm
9  not trying to prove that it doesn't cause based on the
10  scientific approach.
11       Scientific approach is to start with the
12  hypothesis that there's no difference with this and I
13  need to prove that there is based on some sort of
14  evidence, and there is no such evidence to do so.
15       Q.  I just -- the reason I asked the question
16  is because, as you understand, I have to go through
17  what your opinions are. I didn't see an opinion saying
18  that the evidence proves it doesn't increase the risk
19  or cause cancer.
20       That's not an opinion you've drawn, it's
21  not what you've done here; right?
22       A.  That's not the opinion I'm stating
23  explicitly.
24       Q.  There's some discussion in your report

Page 346

1  about endogenous formation of NDMA.
2       You've looked at that and commented on it
3  in your report, that subject; right?
4       A.  Yes.
5       Q.  Again, I'm trying to be good with our time
6  right now, so I'm going to try to cut to the chase with
7  some things.
8       I did not see -- an opinion as to some
9  level of endogenous formation of NDMA that you have
10  said, "Based on my review of the literature, this
11  is what's being formed in the human body and I ascribe to
12  this model and I think this is the right amount"?
13       You haven't formed that opinion; correct?
14       MR. INSOGNA: Object to form.
15  BY MR. SLATER:
16       Q.  Was that question convoluted?
17       A.  A little bit, but I -- my summary --
18       Q.  Let me just ask it cleaner. I'm sorry. I
19  didn't mean to interrupt. Because counsel objected,
20  and he's probably right on that one. Let me ask it
21  again.
22       I did not see in your report an opinion as
23  to an assumed rate or quantification of endogenous
24  nitrosamine formation in the human body.

Confidential Information - Subject to Protective Order

Page 347

1    You didn't form an opinion on that
2  question; right?
3        A.   I didn't calculate a rate on my own, no.
4        Q.   You didn't, for example, adopt a specific
5  article and say this is the model I think is the right
6  one, so this is the one I'm going with?
7        That's not an opinion you have that you've
8  drawn in this case; right?
9        MR. INSOGNA:  Object to form.
10       A.   And to summarize that part of the -- my
11  report and my review of the literature on that is that
12  you're looking at various studies, that there is a
13  known endogenous rate and that the levels, although
14  they range depending on how they're calculated in given
15  authors and different papers, they're high.
16       They're much higher on orders of magnitude
17  than what we're talking about even just with
18  exogenous diet, and when we're talking about sort of
19  the FDA limit, the ADI, and the amounts that are in
20  these actual pills.
21       So that's the sort of general
22  understanding from the diet endogenous formation that I
23  take from it in this -- this to short -- the argument that
24  we are exposed to very high levels of this daily, so

Page 348

1  that this is a big problem in terms of saying that now
2  this little trace amount in a pill is going to change
3  what we're already exposed to at such high levels
4  inherently through routine living.
5        So that's why, again, we come back to
6  look -- some of the studies where they find
7  associations with cancer is when they take into account
8  endogenous versus exogenous, it's the endogenous part
9  in the calculation that looks like there's the
10  association, not based on the exogenous component in
11  the diet.
12  BY MR. SLATER:
13       Q.   Coming back to my question, you didn't
14  adopt any of these studies in your opinions and say
15  that's the right model, that's the right way to
16  calculate it, that's the right amount; right?
17       MR. INSOGNA:  Object to form.
18  BY MR. SLATER:
19       Q.   I'm just making sure I didn't miss it in
20  your report.  I didn't see it.  I just want to make
21  sure it's not an opinion you drew in your report;
22  that's all.
23       MR. INSOGNA:  Same objection.
24       A.   Other than what you read in the report in

Page 349

1  terms of my comments on endogenous and how I just told
2  you how I used that in formulating the opinion, the
3  task at hand, that's it.
4  BY MR. SLATER:
5        Q.   The studies that talk about endogenous
6  formation and actually try to quantify it -- there's a
7  range of different figures they come up with; right?
8        A.   There is a range.
9        Q.   And would you agree that there's no
10  scientifically accepted consensus as to how to
11  calculate endogenous NDMA?
12       Would you agree that's still an open
13  question?
14       A.   I think that there is probably room for
15  refining the calculation, but as I'm using it, all of
16  the available calculations have estimated levels far
17  higher than the levels we're talking about here at
18  hand.  So --
19       Q.   Did you see -- well, all right.  This is,
20  I guess, coming back to my question, though.
21       You certainly aren't giving the opinion
22  that there's some scientific consensus as to how to
23  calculate endogenous NDMA formation?
24       There's multiple people that have

Page 350

1  different approaches, but there's no scientific
2  consensus on this; right?
3        A.   I would -- I don't know that literature as
4  well as whether or not there's scientific consensus,
5  but I know that there are some studies that even
6  attempted to do analysis through different ways to come
7  up with this and show a range, all, again, very high,
8  much higher than what we're talking about here, and
9  consistent with the overall sort of global picture that
10  the endogenous levels take up the majority of this
11  issue and that a minuscule component is the exogenous
12  component, and so many of these dietary studies that
13  don't take that into account aren't addressing that
14  part -- that confounding issue.
15       Q.   The studies are basing their estimates on
16  mathematical models; right?
17       A.   I believe that they are.  Some are
18  measuring directly surrogates of exposure, et cetera,
19  but yes.
20       Q.   For example, you'll acknowledge that
21  certain nitrosamines can be measured and you can figure
22  out to some extent what's coming out of the body, but
23  NDMA, for example, is metabolized and you can't really
24  measure what would be formed in the body; right?

Confidential Information - Subject to Protective Order

Page 351

1    MR. INSOGNA:  Object to form.
2    A.   There are -- I mean, there are the three
3 ways, if I can pull up my --
4 BY MR. SLATER:
5    Q.   Or do you not know?  You can say I don't
6 know and then I move on.
7    MR. INSOGNA:  Object to form.
8    A.   Can I -- I want to point out one area in
9 my report just so that I state it correctly, if I can
10 find it.  The Hrudy (ph) study, which is -- okay.
11 Right.
12    So I was just making sure that I got the
13 three ways in the Hrudy study that were used
14 simultaneously to sort of look at the range that was
15 identified, and so some of them are actually just
16 measuring NDMA levels directly in the blood.
17    And so if you're quantifying how much,
18 say, for example, you're exogenously taking and you
19 could compare how much is in the blood, you can
20 estimate how much was endogenously created.  And so
21 your question of you can't accurately do that -- not
22 necessarily true.
23    You could estimate the exogenous exposure
24 with the limitations that that has, which are far

Page 352

1 lower, and then evaluate how much is in the blood and
2 deduce that there's endogenous creation, because it's
3 much higher in the blood than what you've estimated
4 that was being taken externally.
5 BY MR. SLATER:
6    Q.   You're saying that's one potential
7 approach, but you're not giving an opinion to a
8 reasonable degree of scientific certainty that that's
9 the accurate approach; right?
10    MR. INSOGNA:  Object to form.
11    A.   You asked me if it's possible and what's
12 the rationale of it, and it's been done and shows that,
13 yes.
14 BY MR. SLATER:
15    Q.   But you agree with me you're not reaching
16 an opinion that, for example, the Hrudy model is the
17 right one and the other models are wrong?  You're just
18 saying this is one person who came up with this way to
19 do it and you're pointing it out?
20    Do I understand correctly?
21    MR. INSOGNA:  Object to form.
22    A.   There are multiple ways to do it and I
23 tried to show that there are various ways to do it and
24 that overall the answer is always that it's much higher

Page 353

1 than the exogenous levels in the diet.
2 BY MR. SLATER:
3    Q.   Did you see any studies that estimated the
4 level of endogenous formation of NDMA at not what you'd
5 consider to be very high levels?
6    A.   There were a range, I think, as we talked
7 about, at various extremes, but even at the lowest
8 levels they were higher -- much higher than, say, the
9 FDA ADI, as an example.
10    Q.   Well, for example, did you see any studies
11 that estimated the level at perhaps 1,000 nanograms a
12 day?
13    A.   I believe that 1,000 nanograms a day,
14 which is about 100 times the 96 nanograms that the FDA
15 has indicated as an acceptable level, so that's my
16 point, is that there are orders of magnitude even at
17 the lowest estimates.  That's all I'm saying.
18    So I think in the end I'd agree with you
19 that I'm not here to opine on what's the appropriate
20 way to do it, but I'm looking at all of the body of
21 literature that's talking about endogenous formation,
22 how to calculate it, and the range -- the lower level
23 of the range is far higher, let alone probably the more
24 likely is about -- the actual true way of doing it is

Page 354

1 above that.
2    Q.   Are you saying that 1,000 nanograms a day
3 of intake of NDMA would be a very high level?
4    A.   No, I'm saying it's a lot higher than 96
5 nanograms, which was the FDA's accepted daily intake.
6 And this is on routine daily living.  That's -- I think
7 that's the point.
8    Q.   Just to come back to my question --
9 because I got to know how far we have to go and if I
10 have to go start picking up articles in the other
11 room -- you're not offering an opinion that there's a
12 certain level of endogenous formation -- you're saying
13 this is the level that I'm assuming is formed?
14    You're just telling me there are studies
15 that have measured it with various methods at various
16 levels; correct?
17    MR. INSOGNA:  Object to form.
18    A.   Yes, other than what we've already
19 mentioned in my previous responses.
20 BY MR. SLATER:
21    Q.   I need to understand this.  I didn't see
22 an opinion in your report where you quantified an
23 assumption as to the level of endogenous formation of
24 NDMA in the human body.

Page 355

1    You're not offering a specific opinion as
2 to a specific level; right?
3        MR. INSOGNA:  Object to form.
4    A.   No, other than the ranges that I put in my
5 report.
6 BY MR. SLATER:
7    Q.   And when you refer to the ranges in your
8 report, you're pointing out that there are different
9 models and different ranges have been presented and
10 that's as far as you're going in terms of quantifying
11 endogenous formation; right?
12    A.   Yes.
13    Q.   And you also hold out the -- for the --
14 rephrase.
15        You also agree with me that these models
16 may all be wrong and it may turn out the levels are
17 much lower; right?
18        MR. INSOGNA:  Object to form.
19    A.   There's no evidence about that.  We're
20 always happy to evaluate new data.  That's how science
21 works.  But currently the data suggests that this is
22 the way to do it, that the levels are extremely high.
23 BY MR. SLATER:
24    Q.   You don't have an opinion as to what the

Page 356

1 level of endogenously-formed NDMA is in the human body?
2        You don't have an opinion as to a specific
3 level, do you?
4        MR. INSOGNA:  Object to form.  Vague.
5    A.   Not other than what I've put in my report
6 that there's a range that's very high compared to the
7 question at hand here and the questions at hand, no.
8 BY MR. SLATER:
9    Q.   Your opinion is that there's a potential
10 range and that potential range may have some high
11 figures in it, but you're not saying, "In my opinion,
12 this is the right number," because you haven't
13 evaluated that issue or calculated it; right?
14    A.   I'm not saying that it's one number.  I'm
15 not saying it's a potential range.  It is a clear range
16 that's been reported in the literature of a high --
17 very high amount and then the low end is still high
18 compared to the levels we're talking about at the FDA
19 level.  There is a clear range -- not a potential
20 range.  It's a range that we see in the literature.
21    Q.   If a valsartan pill had 1,000 nanograms of
22 NDMA in it -- let me start over.
23        If a valsartan pill had 1,000 nanograms of
24 NDMA in it, you would agree that's a high exposure;

Page 357

1 right?
2        MR. INSOGNA:  Object to form.
3    A.   That's not what I'm using endogenous
4 amounts for.
5 BY MR. SLATER:
6    Q.   I'm not asking about endogenous.  I'm
7 asking you --
8    A.   I'm telling you -- you're asking if 1,000
9 nanograms per microgram -- if 1,000 nanograms per day
10 is a high level?
11    Q.   In a pill of valsartan.
12        MR. INSOGNA:  I'm sorry.  I missed the
13 question.
14 BY MR. SLATER:
15    Q.   I'll ask it again.  Let me -- we'll start
16 over.
17        Do you agree that 1,000 nanograms of NDMA
18 in a valsartan pill would be a high exposure?
19        MR. INSOGNA:  I just want to make sure I'm
20 clear.  You're saying 1,000 nanograms, is your
21 question?
22        MR. SLATER:  Yes.
23    A.   A high exposure relative to what?
24 Relative to the FDA level that's high --

Page 358

1 BY MR. SLATER:
2    Q.   You just said 1,000 nanograms would even
3 be a high level of NDMA.  I'm asking, does that hold
4 true when it's in a pill sold by the people that hired
5 you?
6        Is it still a high level if it's in the
7 pill from the people that hired you?
8        MR. INSOGNA:  Object to form.
9 Misstates --
10 BY MR. SLATER:
11    Q.   Or does it now become a low level because
12 they're responsible for it?
13        MR. INSOGNA:  Object to form.  Misstates
14 his testimony.
15    A.   I'm trying to tell you that through
16 routine living we have high levels -- 1,000 nanograms
17 is at the lowest estimate of that -- just from living
18 and eating, and that these levels are extremely higher
19 than what the FDA has shown, has reported, or has put
20 out as a threshold of what's safe.  That's all I'm
21 saying.
22        And so what you're asking now, is an extra
23 1,000 nanograms a lot?  No, not in the context of that
24 sea of exposure that we're exposed to all the time just

Page 359

1 from endogenous calculation of that. That's my point.
2 BY MR. SLATER:
3    Q.   So you're -- well, my question was, is
4 1,000 nanograms of NDMA in a valsartan pill sold by the
5 manufacturers that hired you a high exposure in and of
6 itself?
7         MR. INSOGNA:  Object to form.
8    A.   No, it is not a high exposure when taking
9 into account how high of exposures we are every day to
10 just routine living, no.
11 BY MR. SLATER:
12    Q.   So no big deal?  Take 1,000 nanograms of
13 NDMA in your pills every day and it's no big deal?
14         Is that your opinion?
15         MR. INSOGNA:  Object to form.  Misstates
16 the testimony.
17    A.   I was asked to -- whether or not that that
18 made any difference, and I think I have opined many
19 times that there's no evidence that it is.  Now we're
20 asking about that in relation to the routine daily
21 exposures to this same chemical, and it's trivial in
22 the end compared to what we are all the time, and so
23 the answer is no.
24         Now, would I take it on purpose?  That's a

Page 360

1 different question that's not relevant to what I'm
2 being asked at the moment.
3 BY MR. SLATER:
4    Q.   Is that not a question -- then that's not
5 the question you were asked to answer here in this case
6 as an expert; right?
7    A.   What?  Whether I'd want to take a pill of
8 valsartan?  No, nobody asked me that -- to -- my
9 comment on that.
10    Q.   Well, the question of whether or not --
11 you said it'd be a different question of whether or
12 not -- and when you said would I want to take it, I
13 took that as would a person want to take it or would
14 you want to give that to your patients.
15         The answer to that would be no; right?
16         MR. INSOGNA:  Object to form.  Vague.
17 BY MR. SLATER:
18    Q.   We went through that yesterday.  The
19 answer would be no; right?
20    A.   Yeah.  To answer that question, I'd say
21 there's no added benefit of adding that to the pill
22 over what already the benefit is of that pill, so there
23 would be no point in taking it.
24    Q.   All you would be entertaining is potential

Page 361

1 risk; right?
2         MR. INSOGNA:  Object to form.
3    A.   There would be no reason to do that.
4 BY MR. SLATER:
5    Q.   You'd be adding potential risk and no
6 benefit; correct?
7         MR. INSOGNA:  Object to form.
8    A.   There would be adding no known benefit and
9 we don't have any evidence that it would be adding any
10 risk.
11 BY MR. SLATER:
12    Q.   You think there's no evidence in the world
13 that that would be adding potential risk?
14         MR. INSOGNA:  Object to form.
15    A.   I think that's the question that we've
16 been asked that we've been talking about, and I think I
17 opined very clearly that there's no evidence to support
18 that hypothesis and changing from the alternative
19 hypothesis -- the alternative hypothesis, no.
20 BY MR. SLATER:
21    Q.   Isn't really what you're saying is there's
22 evidence, but because of my evaluation of that
23 evidence, I don't believe the evidence is persuasive?
24         That's really what you're saying; right?

Page 362

1    A.   The body of evidence available to us does
2 not allow us to reject the null hypothesis that there's
3 no association with these added trace elements to the
4 alternative hypothesis that there is a clear, not only
5 association, but actual causation of this in terms of
6 cancer.  No, there is not enough evidence to make that
7 assertion.
8    Q.   And that's based on your evaluation of the
9 evidence, which you understand other people have looked
10 at and formed different conclusions on the same
11 evidence; right?
12         MR. INSOGNA:  Object to form.
13    A.   I'd have to disagree with that, because I
14 think if I am correct, Dr. Etmenan (ph) didn't even
15 talk about the human epi data, at least that I could
16 see in the report.  So maybe they made some conclusion,
17 but they didn't look at even all of the evidence that I
18 think's available to us.
19 BY MR. SLATER:
20    Q.   If someone didn't look at all the evidence
21 that is available and relevant to the question, that
22 would indicate a flawed methodology; right?
23         MR. INSOGNA:  Object to form.
24    A.   If you're not looking at the most

Page 363

1  important elements, which I think, as we've
2  established, are the human epi data, looking at the
3  actual question at hand, then that would be quite
4  problematic if you're coming up with an answer without
5  even taking that into account.
6       MR. INSOGNA:  Adam, are you at a point
7  where we can take a break?
8       MR. SLATER:  Sure.  Let's take 10.  Off
9  the record.
10      THE REPORTER:  Okay.  James?
11      THE VIDEOGRAPHER:  Going off the record.
12      THE REPORTER:  We are going off the record
13  at 1:47 PM.
14      [A brief recess was taken.]
15      THE VIDEOGRAPHER:  We are back on the
16  record at 2:05 PM.
17 BY MR. SLATER:
18      Q.  Let's look at Page 44 of your report,
19  please.
20          This is the page where you talk about
21  animal studies; correct?
22      A.  Yes.
23      Q.  At the bottom of the page, you state, "On
24  the other hand, while animal studies are of limited

Page 364

1  utility in extrapolating data to draw firm conclusions
2  about human carcinogenesis, none of the animal studies
3  relied upon by plaintiffs' experts demonstrates that
4  exposure to the levels of NDMA demonstrated to exist in
5  certain valsartan medications would be capable of
6  causing cancer when administered over the brief period
7  that the impurity existed in those medications."
8          That's what you wrote; right?
9      A.  Yes.
10      Q.  And if I understand correctly, what you're
11  saying is you can't use the animal studies to establish
12  that exposure to the NDMA levels in the actual pills
13  over the actual period of time that they were taken
14  would have been sufficient to cause cancer in the
15  people who are claiming cancer was caused.
16          Do I understand that correctly?
17      A.  Yes, and the reason for that is because
18  the levels at which -- depending on which study you
19  look at -- but the levels at which they are causing
20  cancers in the animal models are at much, much higher
21  levels than what we're talking about in these trace
22  levels in the valsartan pills.
23          And so that's what that summary is
24  alluding to.

Page 365

1      Q.  Coming back to what I asked you, you
2  confirmed yes, that's your opinion in terms of how the
3  animal studies fit into this case; right?
4       MR. INSOGNA:  Object to form.
5  BY MR. SLATER:
6      Q.  That the animal studies do not prove that
7  the actual exposures in the valsartan pills here over
8  the period of time that these pills were actually taken
9  by people would not cause cancer in humans?
10          Is -- am I understanding your opinion on
11  the issue of how the animal studies fit in?
12      MR. INSOGNA:  Same objection.
13      A.  At -- yes, at those levels that I'm
14  looking at in those animal studies, they're not
15  supportive of the question at hand.
16 BY MR. SLATER:
17      Q.  In the animal studies where NDMA was being
18  deliberately given to the animals -- and it was; right?
19  They were deliberately giving it to the animals; right?
20      A.  Yes.
21      Q.  They were giving it deliberately to the
22  animals to cause cancer; right?
23      A.  They were evaluating whether it would
24  cause cancer, yes, and titrating up the levels in

Page 366

1  different cohorts, and evaluating at which point were
2  they starting to see cancers, was there a dose
3  relationship, et cetera, and at what level did they
4  start seeing cancers above basal rates in the control
5  group not getting NDMA, which would be a good way to
6  evaluate that question.
7      Q.  NDMA is actually given deliberately to
8  laboratory animals to give them cancer so that they can
9  then be studied once they get diagnosed with cancer;
10  right?
11      A.  Well, now that studies that we were just
12  referring to have established that at certain doses you
13  can elicit a cancer, then the following questions would
14  be okay, now we can use that as models to study cancer,
15  to treat it, to evaluate it, et cetera.  Yes, you would
16  have to know the dose at which to elicit it.  In other
17  words, if you're underdosing them, they never get
18  cancer.
19          And so the answer to your question is yes,
20  though.  Now that that was identified, they can use
21  those doses.
22      Q.  When these large doses are given, the
23  intent is to give cancer to these animals and to do it
24  quickly?

Page 367

1   That's the goal; right?
2       MR. INSOGNA:  Object to form.
3       A.   In a model that you're referring to where
4   you're trying to get a cancer so that now you can study
5   the cancer, sure, you'd want to try and elicit the
6   cancer quickly.
7   BY MR. SLATER:
8       Q.   You rely -- and I think you might have
9   mentioned it, unless I was hearing things -- to certain
10  studies done with monkey animal models; correct?
11      A.   Yes.
12      Q.   And I think that there's two in particular
13  by Adamson.
14           You're familiar with those studies, you're
15  relying on them; correct?
16      A.   Yes.
17      Q.   And one involved seven monkeys, and the
18  other involved six monkeys.
19           Does that sound right?
20      A.   Yes.
21      Q.   Are you aware of what Dr. Adamson's view
22  is on the subject of the risk to humans of exposure to
23  NDMA?
24           MR. INSOGNA:  Object to form.

Page 368

1       A.   I don't know what his view is, or his
2   opinions.
3           MR. SLATER:  Chris, let's put up the
4   editorial from "The Oncologist," titled "The Finding of
5   N-Nitrosodimethylamine in Common Medicines."
6           And I think -- are we up to Exhibit is it
7   16 or 17?
8           THE REPORTER:  I believe it's 16.
9           MR. SLATER:  Hearing nothing to the
10  contrary, I will mark mine as 16.
11          [Exhibit 16 marked for identification.]
12  BY MR. SLATER:
13      Q.   Have you seen this editorial authored by
14  Dr. Adamson?
15      A.   I have not.
16          MR. SLATER:  Chris, if we could, could you
17  go to Page 461 of this article, please?  And go to the
18  right-hand side of the page, and let's just go to the
19  bottom right paragraphs.
20          There's a paragraph three from the --
21  third from the bottom that says, "Aside from their role
22  as complete carcinogens, the nitrosamines are likely to
23  be cofactors or promoters in patients with underlying
24  hepatic damage due to alcoholism, hepatitis, or hepatic

Page 369

1   steatosis."
2       A.   Where is he?
3   BY MR. SLATER:
4       Q.   Third paragraph from the bottom of the
5   right-hand column.
6       A.   Right.  Okay.
7       Q.   Were you aware that Dr. Adamson authored
8   an editorial offering that viewpoint?
9       A.   I wasn't aware of that, but that viewpoint
10  doesn't mean that it's true, if that's your question.
11      Q.   I'm just asking if you're aware that he
12  said that in this editorial.
13      A.   No, I didn't.
14      Q.   Because you've drawn certain conclusions
15  based on his studies on monkeys that you don't believe
16  that we can show that NDMA would increase the risk for
17  cancer to humans, so I thought it might be helpful to
18  show you some -- an editorial that the author of those
19  studies authored last year addressing his viewpoints.
20  I just was curious if you had seen this.
21           You haven't seen that; right?
22      A.   I hadn't seen that, and when you asked me
23  if I relied on his paper, I relied on the data from his
24  paper, not on his opinions in that paper or here.

Page 370

1       Q.   Looking at the bottom right-hand
2   paragraph, it states, "In conclusion, NDMA
3   contamination poses a potential carcinogenic risk of
4   undetermined effect at present for those taking
5   ranitidine, valsartan, or related medications on a
6   regular basis.  It is thus incumbent upon industry and
7   the FDA to take steps to identify and eliminate the
8   sources of contamination of medications with this class
9   of carcinogen."
10           You would agree with that statement;
11  right?
12          MR. INSOGNA:  Object to form.
13      A.   I don't disagree with anything in that
14  statement suggesting that there are possibil -- these
15  are the questions that we're asking now, and we alluded
16  to this in a similar scenario where you asked earlier,
17  that during the time that we're making an evaluation,
18  you want to make an effort to not continue that
19  exposure, but that doesn't confirm that there is a true
20  risk.
21           All of his words are very carefully
22  chosen.  You see "poses a potential risk," that we have
23  to look at this to see if it's actually real.  But none
24  of this is saying that this is a definitive problem, et

Page 371

1  cetera, et cetera.
2       So you're right, I don't disagree with
3  that language to say that we have to sort of look into
4  it and evaluate if there's a risk or not.  That's what
5  we're doing now, and that's what I did, and found no
6  association.
7  BY MR. SLATER:
8     Q.   And did you see any articles in your --
9          MR. SLATER:  You can take this down,
10 Chris.  I'm through with that article.
11 BY MR. SLATER:
12    Q.   Did you see any literature that would
13 support the viewpoint that NDMA can cause cancer in
14 monkeys?
15    A.   Cancer in general?
16    Q.   Did you see any published articles in the
17 peer-reviewed literature concluding that NDMA given to
18 monkeys can cause cancer in those monkeys, or other
19 primates, for that matter?
20    A.   NDMA I think in the papers I referenced
21 and saw didn't.
22    Q.   For example, did you see any article in
23 the peer-reviewed literature that concluded that their
24 data supports epidemiology implicating nitrosamines in

Page 372

1  causation of cancers of stomach and other organs in
2  alcohol as enhancing internal exposure to nitrosamines?
3       Did you see any article indicating that?
4          MR. INSOGNA:  Object to form.
5     A.   So you're asking nitrosamines, not NDMA.
6  So that's a different question, and I didn't see that
7  specifically, but I wasn't looking for nitrosamines
8  specifically.  I was looking for NDMA.
9  BY MR. SLATER:
10    Q.   The language I just read to you came from
11 a study regarding NDMA.  I'm just letting you know
12 that.
13       So I'm asking you, did you see a study
14 that studied NDMA with primates or monkeys specifically
15 where it was concluded that the data supported
16 epidemiology implicating nitrosamines in this study
17 they actually studied NDMA and ethanol co-exposure --
18 I'm sorry.  I got to start over.  I mixed up sentences.
19         MR. INSOGNA:  Counsel, if you're reading
20 from a document, do you want to put it on the screen so
21 he can follow --
22         MR. SLATER:  No, I don't.  I don't.
23 BY MR. SLATER:
24    Q.   Let me -- Doctor, just to be clear, you're

Page 373

1  not aware of a study that utilized NDMA with monkeys
2  and concluded that the data supported epidemiology
3  implicating nitrosamines in causation of cancers of
4  stomach and other organs?
5       You didn't see any such literature in your
6  review?
7          MR. INSOGNA:  Object to form.  If you're
8  going to quote from a document, I believe the witness
9  is entitled to review the document you're quoting from.
10         MR. SLATER:  I'm asking if he saw anything
11 like that in his work to prepare his report and form
12 his opinions.  It's a simple question, yes or no.
13         MR. INSOGNA:  Object to form.
14         MR. SLATER:  Counsel, I'm not putting the
15 document up.  Please stop interrupting me so I can
16 finish this deposition now.
17 BY MR. SLATER:
18    Q.   Yes or no?  Did you see any such article,
19 Doctor?
20    A.   I didn't see that in my research.  I'm
21 always happy to look at new data and analyze it if it
22 comes available.
23    Q.   So in forming your opinions that the --
24 that studies on monkeys establish the viewpoint that

Page 374

1  NDMA would not be causing an increased risk to humans,
2  you didn't take into account any study in which an
3  actual conclusion was able to be drawn that based on a
4  study of monkeys there would be a risk to humans?
5       You didn't see any such study, you took
6  none into account; correct?
7          MR. INSOGNA:  Object to form.
8     A.   I didn't see that study that you're
9  referring to.  I'd be happy to look at it and evaluate
10 its -- how it adds to the body of literature.
11 BY MR. SLATER:
12    Q.   One of the things we touched on yesterday
13 was documents that were internal to the manufacturers
14 of these contaminated pills.
15       Remember we talked about that a little bit
16 yesterday?
17    A.   Yes.
18    Q.   If any such documents were authored by
19 people within those companies that, for example, were
20 toxicologists whose job it was to evaluate the risk of
21 this exposure to nitrosamines, you would have wanted to
22 see that; right?
23         MR. INSOGNA:  Object to form.  Incomplete
24 hypothetical.

Page 375

1    A.   More evidence and more data are always
2   important.  I relied on the available evidence to me to
3   make an analysis to see about the question at hand
4   here.
5        So more evidence and more data are always
6   welcome to put into the analysis.
7   BY MR. SLATER:
8    Q.   Documents showing the opinions and
9   viewpoints of toxicologists who either worked for the
10  manufacturers or were consulted by the manufacturers
11  regarding the risk to humans of the NDMA contamination
12  from your perspective would be certainly something of
13  potential significance that you would have wanted to
14  see; right?
15       MR. INSOGNA:  Object to form.
16   A.   Similar to the opinions of other
17  investigators that you pointed out.  I mean, opinions
18  are not data, and I am looking at data to make my own
19  opinion, not rely on someone, what they felt or wrote
20  or said about something.  That would not sway my
21  analysis here.
22       Data, on the other hand, is a different
23  thing.
24  BY MR. SLATER:

Page 376

1    Q.   If toxicologists who were familiar with
2   the pills and the NDMA and what it is and the risk who
3   actually worked for these companies evaluated this
4   situation, you certainly would want to see their
5   evaluation; right?
6        MR. INSOGNA:  Object to form.  Asked and
7   answered yesterday.
8    A.   And I think just recently I answered of
9   course I would want to see all evidence and data.
10  BY MR. SLATER:
11   Q.   For example, if a toxicologist who worked
12  for Teva said that NDMA is a potent mutagenetic
13  carcinogen and needs to be controlled at subthreshold
14  of toxicological concern levels, you would want to know
15  that toxicologists working at Teva felt that, and you
16  would want to understand why; right?
17       MR. INSOGNA:  Object to form.  Asked and
18  answered.  Incomplete hypothetical.
19   A.   I'd want to know all information, how much
20  that would play a role in determining the question I
21  was asked to assess based on available evidence, based
22  on data and investigations, that's -- I don't even know
23  what you're talking about, and you're not telling me
24  the specifics, so it's all vague questionings.

Page 377

1        I don't know how that would play a role
2   into my decision here.  Would I want to look at it if
3   there was something available?  Of course.
4   BY MR. SLATER:
5    Q.   You'd want to see it, because as you said
6   regarding methodology, if there's something of
7   potential significance, to have a valid methodology
8   you'd need to at least take it into account; right?
9        MR. INSOGNA:  Object to form.  Incomplete
10  hypothetical.
11   A.   I don't know what the evidence or data is
12  you're talking about to even say if it was something
13  that should be included in my analysis to begin with.
14  BY MR. SLATER:
15   Q.   Would the viewpoints of the manufacturers,
16  their internal knowledge of the risk -- and we're
17  talking the companies that actually were selling the
18  pills and were required by law to understand the risks
19  and benefits.
20       If they had viewpoints on this and had
21  analyzed this situation, that certainly could
22  potentially have been significant to you; right?
23       MR. INSOGNA:  Object to form.  Asked and
24  answered.

Page 378

1   BY MR. SLATER:
2    Q.   Potentially significant; right?  You
3   haven't seen it, so you don't know?
4    A.   I don't --
5        MR. INSOGNA:  Object to form.  Asked and
6   answered.  Incomplete hypothetical.  Also, Adam, I
7   thought at the outset you said you were not going to go
8   into liability questions.
9        MR. SLATER:  This is not a liability
10  question.  This has to do with the risk.  These
11  questions all go to the evaluation of the risk of the
12  NDMA and NDEA and the pills that were sold.
13       I'm not talking about avoiding putting the
14  chemical into the pill.  That's a different question
15  probably for someone else.
16  BY MR. SLATER:
17   Q.   So you would want to -- you certainly
18  would want the lawyers who hired you to have given you
19  this type of information that I'm asking you about so
20  you wouldn't have had to sit here right now saying, "I
21  don't know.  I haven't seen any of it.  Maybe it would
22  matter, maybe it wouldn't.  I don't know"?
23       You'd prefer to have seen it; right?
24       MR. INSOGNA:  Object to form.

Page 379

1    A.   I don't know how that would have played a
2    role in my analysis, because I don't know what you're
3    talking about.
4    BY MR. SLATER:
5        Q.   If one of the manufacturers took the
6    position that the NDMA that was found in the valsartan
7    pills presented an unacceptable carcinogenic risk to
8    the intended patient population, you certainly would
9    want to know that; right?
10       MR. INSOGNA:  Same objections.
11       A.   Similar to the previous answer is
12   someone's opinion is different than what the reality is
13   or at least what the data show about that, that
14   specific topic.
15       So I don't know what you're talking about
16   or the details about it, but if it's just an opinion
17   about somebody, it would not necessarily play a role
18   into the actual data analysis that I'm talking about.
19   BY MR. SLATER:
20       Q.   What if it was a position taken by the
21   company in a public document that the NDMA in the
22   valsartan that they were selling presented an
23   unacceptable carcinogenic risk to the intended patient
24   population?

Page 380

1        MR. INSOGNA:  Same objections.
2        A.   That has no data behind it, and I don't
3    know how that would play a role into the data that
4    we've just talked about that's available to me to
5    review.
6    BY MR. SLATER:
7        Q.   You think that a company would take that
8    position without even having any data available to it?
9        MR. INSOGNA:  Same objections.  Incomplete
10   hypothetical.  Argumentative.
11   BY MR. SLATER:
12       Q.   Or you just don't know?
13       A.   I don't know where that position's coming
14   from.  Is it because they found these impurities and
15   they think there's a potential risk and they wanted to
16   mitigate it?
17       I mean, that doesn't tell me that there's
18   a clear association based on data.
19       Q.   You would want to know more?  You would
20   want to understand the document?  But you certainly
21   would want to have the opportunity to consider that;
22   right?
23       MR. INSOGNA:  Object to form.
24       A.   It sounds like that what you're offering,

Page 381

1    though, is opinions and statements, but it's not data
2    that would sway me based on the data that we have
3    available.
4        So that's all I can say, based on what
5    you're telling me.
6    BY MR. SLATER:
7        Q.   So the analysis and opinions of, for
8    example, toxicologists who worked for or retained by
9    the defendants to specifically evaluate the risks posed
10   by this NDMA to patients is something you're telling me
11   wouldn't really matter to you?
12       MR. INSOGNA:  Object to form.  Incomplete
13   hypothetical.
14       A.   I don't know.  I don't know what is
15   involved in this, what you're talking about to even
16   make an opinion on it or state it either way.
17   BY MR. SLATER:
18       Q.   Coming back to the monkey studies --
19   rephrase.
20       Coming back to the animal studies.  When
21   the FDA established the acceptable intake limits, it
22   based those limits on studies with rats; correct?
23       A.   Yes.
24       Q.   And I think -- I don't think it's at my

Page 382

1    power, but I want to make sure I covered this.  We
2    talked yesterday about the long materials considered
3    list, as opposed to the list of numbered references
4    yesterday in your report.
5        Remember that?
6        A.   Yes.
7        Q.   And I'm going to be transparent.  The
8    reason I'm asking you this is so I don't have to walk
9    study by study through this.
10       I think we established yesterday -- just
11   tell me if I had it right -- if something's on the
12   materials considered list but didn't find its way into
13   the report with a specific reference, it's something
14   that you may have reviewed, may have skimmed it, may
15   have looked at it, but it wasn't so significant that
16   you felt that you needed to actually reference it in
17   the report and rely directly on it; right?
18       MR. INSOGNA:  Object to form.
19       A.   Yes.
20   BY MR. SLATER:
21       Q.   So I wouldn't need to go through all the
22   studies that weren't cited in the report to ask how it
23   was important to you, because if it was important it
24   would have been in the report; correct?

Page 383

1    MR. INSOGNA: Object to form.
2    A.   I think I mentioned earlier that the
3  references I put in my actual report are token
4  references, representative references on a topic.
5  They're not an exhaustive reference list of every paper
6  that's talked about this topic.
7  BY MR. SLATER:
8    Q.   Well, that's not my question, and if your
9  answer is that again, we're going to have to go through
10  all the studies, because I'm not going to leave
11  something significant unturned, so let me just make
12  sure you understand where we're coming from.
13    If there's an article that's listed in the
14  materials considered, but it's not in the report, not
15  specifically referenced, it's not something that you
16  found was so significant to your opinions that you
17  actually specifically referenced it and talked about
18  it; correct?
19    MR. INSOGNA: Same objection.
20    A.   For the most part, that's probably true.
21  I think I mentioned one of the papers, which is
22  probably getting to what we're getting at now, which
23  was added later, which was talking about how to
24  establish the dose level and acceptable dose levels.

Page 384

1    That one would probably be an important
2  one, because it's a little bit more relevant to the
3  question as hand.  But other than that, the majority of
4  them are either accessory and aren't relied upon
5  specifically.
6  BY MR. SLATER:
7    Q.   If you had seen something in a study that
8  you felt was of significance, you would have talked
9  about it in the report; right?
10    MR. INSOGNA: Object to form.
11    A.   If I had seen it at the time of the
12  report, yes.
13    MR. SLATER:  Okay.  I have no other
14  questions at this time.
15    MR. INSOGNA:  I'm going to have some
16  questions.  I don't know about anybody else who's on
17  the line.  I'll need a few minutes to organize my
18  notes.  So if you want to take maybe 15, and then we
19  can come back.
20    MR. SLATER:  Sure.
21    MR. INSOGNA:  Okay.  Let's say 20.  Just I
22  don't want you to tell me I'm late again, but I will
23  work as fast as I can.
24    MR. SLATER:  And we're off the record;

Page 385

1  right?  Let's go off.
2    THE VIDEOGRAPHER:  We're going off the
3  record at 2:30 PM.
4    [A brief recess was taken.]
5    THE VIDEOGRAPHER:  We are back on the
6  record at 3:08 PM.
7    EXAMINATION
8  BY MR. INSOGNA:
9    Q.   So Dr. Catenacci, I have a few questions
10  for you.  I think some other attorneys may have a few
11  questions as well.  And this is a little bit awkward, I
12  know, because of the remote nature of this deposition.
13  You're on camera, I'm actually sitting next to you.
14  But if you could just continue to look at the camera, I
15  think that will make it somewhat less awkward, and if
16  we have documents, we'll put those up on screen.
17    MR. SLATER:  Hey, one quick question
18  before you get started, Nick.  Wait --
19    MR. INSOGNA:  Yes.
20    MR. SLATER:  I don't see -- I don't see
21  you on here.
22    A.   On video.
23    MR. SLATER:  Your video.
24    MR. INSOGNA:  Oh, you're right.  You're

Page 386

1  right.  Let me fix that.  Let's pause for a second.
2  Let's just go off the record for one second.  I dropped
3  my feed.
4    THE VIDEOGRAPHER:  We are going off the
5  record at 3:08 PM.
6    [A brief recess was taken.]
7    THE VIDEOGRAPHER:  We are back on the
8  record at 3:12 PM.
9  BY MR. INSOGNA:
10    Q.   So Dr. Catenacci, you were asked a number
11  of questions by plaintiffs' counsel yesterday about the
12  nature of the question you were asked to answer in this
13  case.
14    Do you recall those?
15    A.   Yes.
16    Q.   Have you in the course of this deposition
17  fully described the question that you were intending to
18  address with your report?
19    A.   Yes, I think that I was able to get across
20  that I was asked to evaluate whether these trace levels
21  of NDMA in valsartan increased or were associated with
22  cancer in people taking them.
23    And I was able to relay how I went about
24  that, the methodology, and that ultimately after

Page 387

1  evaluating all the evidence, in terms of the starting
2  point of that there is no association, or null
3  hypothesis, that weighing all the evidence, including
4  the body of evidence we discussed, that there was no
5  such association and that the conclusion was that
6  there's not enough evidence to support the allegation
7  that it was increasing the risk of cancer.
8       Q.   And over the course of your work preparing
9  your report in this case, did defendants' counsel
10 attempt to influence your opinions in any way?
11      A.   No.
12      Q.   Were specific opinions suggested to you?
13      A.   No.
14      Q.   But plaintiffs' counsel also asked you
15 about your methodology and questions about whether you
16 did an independent review or looked at what plaintiffs'
17 experts cited and then relied on their documents.
18      Do you remember those questions?
19      A.   Yes.  Yes.
20      Q.   Now, as a scientist, when you answer a
21 question like the question you just described for us a
22 moment ago, what's the starting premise for you?
23      A.   The starting premise, again, in any
24 scientific question if there's a hypothesis, is what's

Page 388

1  the null hypothesis and what's the alternative, and in
2  order to evaluate that from the standpoint where I had
3  the dataset that was being relied upon to suggest that
4  the alternative hypothesis should be accepted, and I
5  looked at that, because that's the evidence being put
6  forth to try and sway against the null hypothesis.
7       Of course, after evaluating that and
8  looking at that, I looked at the more broader context
9  of all the data available, as we've been discussing,
10 through the routine way that I do research that I've
11 done through my career as a scientist, in terms of all
12 my training and the natural way that one would go about
13 the question like this.
14      So ultimately I looked at those reports
15 from the plaintiffs' experts that they're relying on
16 very closely, because that's what they were relying on,
17 of course, and pointed out, as I mentioned, the
18 limitations of the argument that's being put forward.
19      Q.   And when you looked for articles beyond
20 what the plaintiffs were relying on, did you find any?
21      A.   Yes.
22      Q.   And how many -- just a ballpark, how many
23 articles would you estimate you considered over the
24 course of your review in this case?

Page 389

1       A.   Hundreds.
2       Q.   And can you recall, roughly speaking, how
3  much of that review was a result of your searching?
4       A.   A majority.
5       Q.   Do you feel that the searches you
6  conducted in preparing your report were sufficiently
7  exhaustive to allow you to answer the question as you
8  framed it earlier?
9       A.   Yes.
10      Q.   Are you aware of additional information or
11 data that would change the opinions you've offered in
12 any way?
13      A.   I'm not aware.
14      Q.   Earlier today, plaintiffs' counsel asked
15 whether you made any attempt to calculate an acceptable
16 daily intake of NDMA or NDEA; right?
17      A.   Right.
18      Q.   And I believe that you testified that you
19 did not undertake such an effort; right?
20      A.   Correct.
21      Q.   Was it necessary for you to calculate an
22 ADI of NDMA or of NDEA in order to offer your causation
23 opinion?
24      A.   No.

Page 390

1       Q.   And if I recall correctly, plaintiffs'
2  counsel's questions were in the context of some FDA
3  publications that discussed FDA's ADI for NDMA; right?
4       A.   Yes.
5       Q.   Do you know how FDA went about calculating
6  its ADI figure?
7       A.   Yes, I think I had mentioned that a few
8  times through the deposition that it was obtained from
9  the rat data, extrapolating from the rat data using a
10 linear analysis, using very high doses of the agent in
11 that preclinical model, and looking at the time point
12 at which half of the rats got cancer, died, and
13 extrapolating backwards.
14      Q.   And without yourself doing a calculation
15 of an ADI for NDMA or NDEA, were you able to draw any
16 conclusion or form any opinion about the ADI that FDA
17 set forth in his publications?
18      A.   Yeah, it was clearly a low and what I
19 would say conservative estimate, based on I think we
20 talked about just recently all the numbers and levels
21 in the diet and that were endogenous exposures that
22 we're routinely exposed to on a daily basis.
23      So it just -- it looks obviously low
24 compared to these reports.

Confidential Information Subject to Protective Order

Page 391

1    Q.   When you say it looks low compared to
2   these reports, can you explain what it is you mean by
3   that?
4    A.   It looks like it's at a very low level
5   compared to the levels that we're talking about and
6   that we saw in many of the dietary studies, just
7   talking about the exogenous exposures that we have, let
8   alone the endogenous exposures that we have through
9   just routine daily living.
10        And so it seems low compared to what we're
11  routinely exposed to on a daily basis.
12    Q.   And since you mentioned the endogenous
13  exposure, let me ask you a question about that.
14        Plaintiffs' counsel asked you some
15  questions today about whether you calculated a level of
16  endogenous exposure through the course of preparing
17  your report.
18        Do you remember those questions?
19    A.   Yes.
20    Q.   Did you do an independent calculation of
21  how much endogenous NDMA people are exposed to on a
22  daily basis?
23    A.   No.
24    Q.   Would doing an independent calculation of

Page 392

1   a level of endogenous NDMA or NDEA have influenced your
2   opinions in this case?
3    A.   No.
4    Q.   When you reviewed the literature that you
5   relied on in your report, did you see calculations that
6   others had done of endogenous levels of NDMA or NDEA?
7    A.   Yes.
8    Q.   And that endogenously formed nitrosamines
9   levels in the studies that you reviewed, how do they
10  compare to exposures from other sources?
11    A.   From other sources like exogenous, do you
12  mean?
13    Q.   Correct.  How do the endogenous levels
14  that you saw reported in the medical literature compare
15  to the levels in exogenous sources?
16    A.   They were astronomically higher and dwarf
17  the levels that we have from an exogenous source.
18    Q.   And how, if at all, did that fact inform
19  your opinions?
20    A.   Well, we're looking at, as I mentioned,
21  the levels that we're exposed to on a daily basis.
22  They're extremely high at everyday environmental,
23  including the endogenous exposures.
24        So that's an important consideration when

Page 393

1   we're talking -- and I was asked about exposures to
2   relatively much smaller levels and potentially for a
3   shorter amount of time in the valsartan products.
4    Q.   Plaintiffs' counsel also asked you a
5   series of questions about the reasonableness of
6   prescribing or taking a valsartan drug containing a
7   nitrosamine impurity versus prescribing or taking one
8   without it.
9        Do you recall those questions?
10    A.   Yes.
11    Q.   And your testimony as I see it on the
12  record is that there is no reason to take the drug with
13  the impurity because there's no benefit to it.
14        Do you recall that testimony?
15    A.   Yes.
16    Q.   Can you explain what you mean by there's
17  no benefit to taking the drug with the impurity?
18    A.   I meant that there's no added benefit on
19  top of just taking the drug without the impurity.  In
20  other words, there's no benefit from the impurity
21  itself.
22        In other words, you're still going to get
23  the benefit that you would have gotten -- that it was
24  intended to do, which was an anti-hypertensive

Page 394

1   medication.
2    Q.   So would taking valsartan containing a
3   nitrosamine impurity still offer a benefit to the
4   patient as a sartan drug?
5    A.   Yes.
6    Q.   Is there any evidence of which you're
7   aware that valsartan drugs containing a nitrosamine
8   impurity are any less efficacious for the purpose for
9   which they're prescribed?
10    A.   Not that I'm aware of, no.
11    Q.   Do you hold any opinion or have you seen
12  any literature concerning whether a valsartan drug
13  containing a nitrosamine impurity would still work as
14  intended to control hypertension?
15    A.   I have not seen any evidence to suggest
16  that it wouldn't work the same way that it always
17  would.
18    Q.   Plaintiffs' counsel asked you some
19  questions yesterday about the Pottegard study; right?
20    A.   Yes.
21    Q.   And specifically he asked you whether it's
22  possible that patients in the control arm received
23  valsartan from another manufacturer of the API that was
24  later discovered to have an NDMA or NDEA impurity;

Confidential Information - Subject to Protective Order

Page 395

1 right?

2    A.  Yes.

3    Q.  Have you seen any evidence in the

4 literature anywhere to suggest that is the case?

5    A.  No.

6    Q.  And so far as you're aware, has the

7 Pottegard study been retracted?

8    A.  No.

9    Q.  Other than plaintiffs' counsel's

10 hypothetical, do you know of any source for such a

11 theory?

12    A.  No.

13    Q.  At the time the Pottegard study was

14 conducted, do you know whether other API manufacturers

15 had announced any discovery of an NDMA or NDEA impurity

16 in their API being sold in Denmark?

17    A.  I don't know.

18    Q.  And you know that the Pottegard study

19 looked at patients in Denmark; correct?

20    A.  Yes.

21    Q.  So at that time, was there any better data

22 available to the authors of the Pottegard study about

23 exposure to valsartan containing an impurity?

24    A.  No.

Page 396

1    Q.  So how, if at all, does plaintiffs'

2 counsel's hypothetical about the Pottegard study impact

3 your opinions of the Pottegard study?

4    A.  Not at all.

5    Q.  And I believe you were asked some

6 questions about confounding in the Pottegard study;

7 right?

8    A.  Yes.

9    Q.  And was it your testimony that there is

10 residual confounding in the Pottegard study?

11    A.  Yes, I think that was one of the noted

12 limitations.

13    Q.  And did the potential for residual

14 confounding impact your opinions in any way in this

15 case?

16    A.  No.

17    Q.  In the Pottegard study, was there any

18 incidence of liver cancer in either the control or

19 study arm of the subject?

20    A.  There was not.

21    Q.  Plaintiffs' counsel asked you some

22 questions today about the Gomm study as well; right?

23    A.  Yes.

24    Q.  Specifically asked you about the liver

Page 397

1 cancer finding in that study?

2    A.  Yes.

3    Q.  Do you remember a question about a

4 sentence in your report that said there were not

5 statistically significant associations with cancer

6 overall or any specific answer?

7    A.  Yes.

8    Q.  And plaintiffs' counsel suggested that

9 your report was inaccurate because it did not mention a

10 liver cancer finding in that sentence; correct?

11    A.  That's what he said.

12     MR. SLATER:  Objection.  You can answer.

13 BY MR. INSOGNA:

14    Q.  Do you have your report in front of you?

15    A.  I do.

16    Q.  Look with me, if you would, at Page 39,

17 where you discuss the Gomm study.

18    A.  Yes.

19    Q.  And if you would find that sentence with

20 me where it says, "In other words, taking NDMA

21 containing the valsartan impurity" -- you see that?

22    A.  Yes.

23    Q.  And that was the sentence that plaintiffs'

24 counsel called to your attention; correct?

Page 398

1    A.  Yes.

2    Q.  Can you read to me the next sentence in

3 your report?

4    A.  "The analysis of individual cancer types

5 did show a slight statistically significant association

6 but not causation between potentially NDMAs containing

7 valsartan and liver cancer, with the adjusted hazard

8 ratio, but not for any other cancer evaluated in the

9 listed cancers there."

10    Q.  So the sentence immediately after the one

11 that plaintiffs' counsel focused on discussed the liver

12 cancer finding in the Gomm paper?

13    A.  Yes.

14     MR. SLATER:  Objection.  You can answer.

15 BY MR. INSOGNA:

16    Q.  In writing this the way that you did, were

17 you attempting to conceal the liver cancer finding in

18 any way?

19     MR. SLATER:  Objection.  You can answer.

20    A.  Obviously not.  It's almost like this

21 first sentence should have continued and said other

22 than the analysis of individual cancer types showing

23 the association in liver -- that's probably what I

24 meant and I made an error there and made it into two

Confidential Information Subject to Protective Order

Page 399

1 different sentences.
2 BY MR. INSOGNA:
3      Q.   Turn with me if you would to the
4 discussion of the Hidajat paper, which you have on Page
5 43 of your report.
6           Plaintiffs' counsel asked you a number of
7 questions about the Hidajat study today; right?
8      A.   Yes.
9      Q.   He asked you a series of questions about
10 whether the study subjects stayed in the same job title
11 versus in the same job department; right?
12     A.   Yes.
13     Q.   Do you have the Hidajat paper in front of
14 you?
15     A.   Yes.
16     Q.   If you would look with me on Page 251 in
17 the right-hand column under the heading exposure
18 assessment.  About three-quarters of the way through
19 that paragraph --
20     A.   Yes.
21     Q.   -- there's a sentence that starts,
22 "Lifetime cumulative exposures."
23           Do you see that?
24     A.   Yes.

Page 400

1      Q.   Can you read that sentence?
2      A.   "Lifetime cumulative exposures to rubber
3 dust, rubber fumes, or N-nitrosamines were calculated
4 for each worker based on the assumed number of years
5 worked and department."
6      Q.   And as you read that sentence -- well,
7 what does that sentence tell you about the way
8 nitrosamine exposures were calculated in the study?
9      A.   They were calculated based on the
10 department of which the worker worked in, and so
11 allowing them with the same job title to move around to
12 different jobs within that department wouldn't affect
13 this analysis.
14     Q.   If you would turn back one page to 250 in
15 Hidajat, please.
16     A.   250?
17     Q.   Yes, the first page of the study.  At the
18 very end of that page, there's a sentence that begins,
19 "Due to," and continues onto the next page.
20           Do you see that?
21           MR. SLATER:  I'm sorry.  I lost where you
22 are.  Could you just tell me again, Nick, please?
23           MR. INSOGNA:  Yeah, the very end of Page
24 250 in Hidajat.

Page 401

1           MR. SLATER:  Got it.  Thank you.
2 BY MR. INSOGNA:
3      Q.   Can you read the sentence that begins,
4 "Due to"?
5      A.   "Due to the complexity of exposure
6 patterns and the numerous chemicals used in the rubber
7 production process, disentangling exposure response
8 associations between specific suspected carcinogens and
9 cancer risk in this industry remains difficult."
10     Q.   And did that language inform your opinions
11 about the Hidajat study?
12     A.   Well, it points out what I think I pointed
13 out and other experts have pointed out, is that there's
14 just so much confounding to isolate the contribution of
15 a given toxin or a putative carcinogen is nearly
16 impossible, and they're stating this in that sentence.
17     Q.   And in the Hidajat study they list the
18 carcinogens to which workers are exposed; correct?
19     A.   Yes.
20     Q.   And if you look with me on Page 250 just
21 above where you started reading the paragraph that
22 starts, "Important carcinogenic exposures."
23           Do you see that?
24     A.   Which paragraph?

Page 402

1      Q.   The right-hand column, under the gray
2 table there.
3      A.   What page?
4      Q.   On Page 250, the first page.
5      A.   Oh, the first page.  I'm sorry.  Okay.
6 Okay.  "Important."  Yes.
7      Q.   "Important carcinogenic exposures."
8      A.   Uh-huh.
9      Q.   Do you see that list of carcinogens?
10     A.   Yes.
11           "N-nitrosamines, rubber dust, rubber
12 fumes, polycyclic aromatic hydrocarbons including
13 phthalates, aromatic amines, and beta-naphthylamine,
14 and solvents including benzene, among others."
15     Q.   And when you talk about the potential for
16 confounding and the inability, I believe you read the
17 sentence, to disentangle exposures, are those the other
18 exposures that concerned you with the study?
19     A.   Yes.
20     Q.   Over the course of this deposition, you've
21 been asked a few times about whether you'd like to see
22 certain corporate documents and depositions.
23           Do you recall those questions?
24     A.   Yes.

Page 403

1    Q.   And did you in the course of your review
2 look at any company documents?
3    A.   Yes.
4    Q.   I'd like to look at your reliance list, if
5 we could.  And if we could pull that up on the screen.
6    A.   Okay.
7    Q.   I don't know which number this is in the
8 record.
9        MS. WITTLAKE:  (Inaudible) report, which
10 is Exhibit 7.  It starts on Page 90.
11       MR. INSOGNA:  Okay.  Thank you.
12       MR. SLATER:  I had marked his most recent
13 list of materials considered as Exhibit 11, I think.
14       MR. INSOGNA:  Why don't -- we can put up
15 11.
16       MR. SLATER:  I'm just letting you know.  I
17 thought you were asking.  I didn't know if you were
18 asking me.  Trying to be helpful.
19    A.   Appreciate it.
20       MR. SLATER:  Anytime.  I'm trying to get
21 the last questioner done.
22       MR. INSOGNA:  If you would go to Page 2 of
23 that document, Kate.
24       MR. SLATER:  What page did you say?  18?

Page 404

1        MR. INSOGNA:  Page 2 of the document.
2        MR. SLATER:  Oh, Page 2.
3 BY MR. INSOGNA:
4    Q.   Dr. Catenacci, do you have that in front
5 of you?
6        If you would turn with me also to Page 2.
7    A.   Yes.
8    Q.   You see there's a heading company
9 documents produced?
10    A.   Yes.
11    Q.   And that continues for a few pages.  I
12 want to go through these documents.
13       But first question, did you review these
14 documents that were provided to you?
15    A.   Yes.
16    Q.   I see the first one listed there is a Teva
17 health hazard assessment re valsartan.
18       That was a document you had in your
19 possession?
20    A.   Yes.
21    Q.   And did you review it?
22    A.   Yes.
23    Q.   And there are another one, two, three, I
24 see, health hazard assessments there; correct?

Page 405

1    A.   Yes.
2    Q.   Did you review each of those documents in
3 preparing your opinions?
4    A.   Yes.
5    Q.   There's also a toxicological assessment of
6 NDMA impurity in valsartan by Dr. Nudelman?
7    A.   Yes.
8    Q.   Did you review that document?
9    A.   Yes.
10    Q.   And I believe plaintiffs' counsel asked
11 you yesterday if you reviewed the deposition of Dr.
12 Nudelman.
13       Do you recall that?
14    A.   Yes.
15    Q.   And did you review that deposition?
16    A.   I reviewed it.  It's been some time since
17 I last looked at it.
18    Q.   And this next document here is a ZHP root
19 cause analysis.
20       Do you see that?
21    A.   Yes.
22    Q.   Is that a document you reviewed in
23 preparing your opinion?
24    A.   Yes.

Page 406

1    Q.   And below that is a Mylan root cause.
2       Do you see that?
3    A.   Yes.
4    Q.   Is that also a document you reviewed in
5 preparing your opinions?
6    A.   Yes.
7    Q.   And below that is a Teva risk assessment
8 before for valsartan Huahai.
9       Do you see that?
10    A.   Yes.
11    Q.   Is that a document you reviewed in
12 preparing your opinions?
13    A.   Yes.
14    Q.   And going over the next page, I see
15 another risk assessment and several more tox
16 assessments listed here, as well as some additional
17 data.
18       You see all these listed?
19    A.   Yes.
20    Q.   Are these all documents that you reviewed
21 in preparing your opinions in this case?
22    A.   Yes.
23       MR. SLATER:  Objection.
24 BY MR. INSOGNA:

Confidential Information - Subject to Protective Order

Page 407

1    Q.   Now, you --

2         THE REPORTER: I'm sorry. Sorry. Was the

3    answer yes?

4    A.   Yes.

5         THE REPORTER: Thank you.

6    BY MR. INSOGNA:

7    Q.   You did not cite these documents in the

8    body of your report, did you?

9    A.   No.

10   Q.   Did any of these documents influence or

11   alter your independent opinions in any way?

12   A.   No.

13   Q.   And I believe in response to plaintiffs'

14   counsel questions you testified that it would be

15   interesting to see all available evidence.

16        Was it necessary for you to review

17   corporate depositions in order to form your opinions in

18   this case?

19   A.   No.

20   Q.   Was it necessary for you to review

21   internal corporate documents like these tox assessments

22   that you did review in order to form your opinions in

23   this case?

24   A.   No.

Page 408

1    Q.   Why is that?

2    A.   They weren't part of my analysis. They

3    were sort of background information, but they weren't

4    fundamental data points and studies that I relied upon

5    to answer the question that was being asked of me.

6    Q.   In formulating a scientific opinion about

7    causation or whether there's elevated risk, would you

8    rely on what a company said about its own internal risk

9    assessments in formulating those opinions?

10   A.   No.

11   Q.   Would a company's internal risk assessment

12   or testimony dictate how you render causation opinions

13   in a case like this?

14   A.   No, not at all.

15   Q.   One of the things that plaintiffs' counsel

16   focused on in his questioning was the levels of

17   impurity in valsartan tablets.

18        Do you recall those questions?

19   A.   Yes.

20   Q.   When you -- first of all, in your report,

21   do you identify the levels of putative nitrosamine

22   impurities that you looked at in formulating your

23   opinion?

24   A.   Yes. They're in the table that was from

Page 409

1    the FDA.

2    Q.   And where did you take that -- you just

3    said you took that data from FDA?

4    A.   Yes.

5    Q.   And why is that the source that you chose

6    to use?

7    A.   This is the publicly-available data that

8    was provided after an extensive analysis of multiple

9    lots and to look at the range and to evaluate that.

10   Q.   And to the extent that there are other

11   potential data points on that question, would those

12   influence your opinions in any way?

13   A.   No. I was looking to see what the levels

14   were, what their ranges were, but really to get a sense

15   of what might be a mean exposure level that a patient

16   might have in a given situation.

17   Q.   Over the course of this two days of

18   deposition now, did any of plaintiffs' counsel's

19   hypotheticals or questions cause you to alter your

20   opinions in any way?

21   A.   No.

22        MR. INSOGNA: Looking at notes here, Adam.

23   Give me one moment.

24        MR. SLATER: No. No notes.

Page 410

1         MR. INSOGNA: I'm smiling very widely. I

2    know you're always concerned about that.

3         Okay. I do not have any more questions

4    for Dr. Catenacci.

5         MR. KUM: So I do have some questions. So

6    Adam, here's some food for thought. We could argue

7    over this for --

8         MR. SLATER: I'm not going to --

9         MR. KUM:  -- a couple minutes, but I only

10   have a couple of minutes, and we'd be done.

11        MR. SLATER: This is what I'll say. If

12   you're telling me a couple minutes, some people's

13   couple minutes is 20, some is two.

14        MR. KUM: No. No, I'm going to be less

15   than five minutes.

16        MR. SLATER: Okay. I just want to make it

17   really clear for the record I'm not going to create a

18   big blowup over five minutes of questions. I'm

19   assuming that, Bob, you're the only one who intends to

20   question, that it's not going to be a string of people.

21   So I'm making this concession because it's my

22   understanding only you have to question.

23        I am reserving all my rights. I'm

24   agreeing to this without prejudice to our position that

Confidential Information - Subject to Protective Order

Page 411

1 multiple defense lawyers should not question a defense
2 expert. But if it's going to be less than five
3 minutes, I don't think it's worthwhile to create a big
4 battle over it at this point.
5      Hopefully it will go smoothly and we'll
6 move on, and I'm assuming it will. So -- but I'm
7 reserving all my rights. It's not a concession. I
8 wouldn't want to hear in a conference some day that I
9 agreed to it today and --
10      MR. KUM: Understood.
11      MR. SLATER:  -- that we waived our rights
12 or anything. I'm just doing it to try to be an
13 easygoing guy today.
14      MR. KUM: Absolutely cool.
15      John, are we back on the record? Let me
16 know if we ever went off the record.
17      THE REPORTER: No -- yeah, we actually
18 didn't go off the record.
19      MR. KUM: Okay. Well, that's perfect.
20      EXAMINATION
21 BY MR. KUM:
22      Q.  Dr. Catenacci, this is Bob Kum. I just
23 have a few follow-ups. I'm going to share my screen
24 with you. Plaintiffs' counsel -- I think he marked

Page 412

1 this I wrote down Exhibit 16.
2      MR. KUM: Is that correct, John?
3      THE REPORTER: I can double-check. One
4 moment.
5      MR. KUM: Well, whatever exhibit this is.
6 We'll just -- I want to --
7      THE REPORTER: Yes, it is Exhibit 16.
8 BY MR. KUM:
9      Q.  Doctor, can you see this study?
10      A.  Yes.
11      Q.  And you had indicated you had not seen
12 this prior to today; correct?
13      A.  Yes.
14      Q.  I want to read the first three sentences.
15      It says, "The causes of cancer are
16 manifold. About one quarter to one third of cancers,
17 depending on the specific tumor and population, are
18 caused by infectious agents, while a smaller fraction
19 can be attributed to genetic predisposition. A larger
20 number, perhaps 50 percent or more, arise from
21 environmental and behavioral causes, such as smoking,
22 alcohol, dietary factors, obesity, and pollution."
23      What's your reaction to that statement?
24 Do you agree or disagree with that?

Page 413

1      A.  I agree with that.
2      Q.  I'm going to scroll a little bit farther
3 down. It's on Page 461.
4      Do you see the header clinical evidence of
5 carcinogenesis due to contamination of medications? Do
6 you see that?
7      A.  Yes.
8      Q.  In the middle of it -- and I'll just
9 highlight it -- it reads, "A negative association was
10 reported for the incidence of colorectal cancer. Of
11 interest is the absence of mention of an association
12 with HCC, the primary tumor type that was found in
13 preclinical carcinogenicity in multiple species."
14      Did I read that correctly?
15      A.  Yes.
16      Q.  In layman's terms, what is that -- what is
17 the significance? What does that mean when they talk
18 about the absence of mention of an association of HCC,
19 and how does that relate to your opinions in this case?
20      A.  Well, first, just to point out, HCC means
21 hepatocellular carcinoma, which is liver cancer. And
22 so they're noting that it's of interest that there's no
23 association or mention of this with HCC, which is what
24 preclinical models have suggested.

Page 414

1      So he's pointing it out that it hasn't
2 been demonstrated here in this study.
3      Q.  On the first day, I believe plaintiffs'
4 counsel asked you the generic question of whether you
5 agreed NDMA and NDEA is classified as a probable
6 carcinogen.
7      Do you remember those questions?
8      A.  Yes.
9      Q.  And I don't believe he followed up with
10 asking you an explanation of what probable carcinogen
11 means as it relates to the IR classification.
12      Is that correct?
13      MR. SLATER: Objection.
14      A.  Correct.
15 BY MR. KUM:
16      Q.  Let me just pull up for you the IARC
17 classification.
18      So Doctor, you agree that IARC has, in
19 determining whether a chemical or substance is
20 carcinogenic, groups it into different categories;
21 correct?
22      A.  Yes.
23      Q.  And Group 1 here indicates, "The category
24 is used when there is sufficient evidence of

Confidential Information - Subject to Protective Order

Page 415

1 carcinogenicity in humans.  In other words, there is
2 convincing evidence that the agent causes cancers in
3 humans."
4        Did I get that correct?
5      A.   Yes, sufficient evidence of
6 carcinogenicity in humans.  Yes.
7      Q.   Is NDMA classified as a Group 1
8 carcinogen?
9      A.   No.
10      Q.   Is NDEA classified as a Group 1
11 carcinogen?
12      A.   No.
13      Q.   Is it correct that those two substances
14 I've mentioned are classified as Group 2A?
15      A.   Yes.
16      Q.   Let's go to the definition of what 2A is.
17        Do you see that, Doctor?
18      A.   Yes.
19      Q.   It says here that, "The category is used
20 when there is limited evidence of carcinogenicity in
21 humans and either sufficient evidence of
22 carcinogenicity in experimental animals or strong
23 mechanistic evidence showing that the agent exhibits
24 key characteristics of human carcinogens."

Page 416

1        Did I read that correctly?
2      A.   Yes.
3      Q.   And does that comport with your
4 understanding of what a Group 2A carcinogen is?
5      A.   Yes.
6      Q.   It goes to say that, "Limited evidence of
7 carcinogenicity means that a positive association has
8 been observed between exposure to the agent and cancer,
9 but that other explanations for the observations,
10 technically termed chance, bias, or confounding, could
11 not be ruled out with reasonable confidence."
12        Did you read that -- did you see that,
13 Doctor?
14      A.   Yes, I see that.
15      Q.   And does that comport with your
16 understanding of why they only considered NDMA or NDEA
17 to have limited evidence of carcinogenicity?
18        MR. SLATER:  Objection.  You can answer.
19      A.   Yes.
20 BY MR. KUM:
21      Q.   Yesterday you also mentioned that -- I
22 believe if -- let me see if I've got my notes
23 correctly -- that IARC does not look at chemicals from
24 a risk perspective.

Page 417

1        Did I get that correct?
2        MR. SLATER:  Objection.  You can answer.
3      A.   Yes, I mentioned that yesterday.
4 BY MR. KUM:
5      Q.   I want to go down here to what IARC says
6 about this.
7        Do you see there's the header that says,
8 "What does the classification mean in terms of risk?"
9        Do you see that?
10      A.   Yes.
11      Q.   And it says here that, "The classification
12 indicates the strength of evidence that a cause or
13 agent can cause cancer.  The IARC monographs programme
14 seek to identify agents that are cancer hazards,
15 meaning they pose the potential for the exposure to
16 cause cancer.  However, the classification does not
17 indicate the level of risk associated with a given
18 level or circumstance of exposure."
19        Is that what you meant yesterday when you
20 talked about IARC not classifying risks of a chemical?
21        MR. SLATER:  Objection.  You can answer.
22      A.   That's exactly what I was referring to.
23 BY MR. KUM:
24      Q.   Further on, do you see here the header

Page 418

1 that says, "What is the difference between risk and
2 hazard?"
3      A.   Yes.
4      Q.   It says here, "The IARC monographs
5 programmes identifies cancer risks but not does
6 evaluate the risks associated with special levels or
7 circumstances of exposures."
8        It then goes on to state -- tell me if I'm
9 reading this correctly -- "The distinction between
10 hazard and risk is important.  An agent is considered a
11 cancer hazard if it is capable of causing cancer under
12 some circumstances.  Risk measures the probability it
13 will occur, taking into account the level of exposure
14 to the agent.  The IARC monographs may identify cancer
15 hazards even when risks are very low with known
16 patterns of use or exposure," period.
17        Again, does that comport with your
18 testimony and the concept you were trying to convey
19 yesterday?
20        MR. SLATER:  Objection.
21      A.   Yes, that's exactly what I was referring
22 to.
23        MR. KUM:  Counsel, thank you very much.  I
24 appreciate your accommodation.

Confidential Information - Subject to Protective Order

Page 419

1     MR. SLATER:  No problem.  So I assume it's
2 my turn to go back now, based on our back-and-forth?  I
3 wasn't saying that pejoratively.  Since we -- I think
4 we've agreed no other defense counsel ask questions,
5 I'm going to pick up now.
6         EXAMINATION
7 BY MR. SLATER:
8     Q.   Did you -- let me just fix this.
9         Did you ask the defense if they had any
10 documents that could impact your opinions?
11     A.   I don't think so.
12     Q.   Counsel asked you if the defendants tried
13 to influence you or suggest opinions to you.
14         Without going into any detail, you've been
15 working with defense counsel for months since March and
16 working with them while you were writing your report
17 and preparing for your deposition; right?
18         MR. INSOGNA:  Object to form.
19     A.   I've been working with them, yes.
20 BY MR. SLATER:
21     Q.   And you've had multiple meetings with them
22 long before you started preparing for the deposition
23 about what you were being asked to do, and they were
24 providing documents to you, and you said you were going

Page 420

1 back and forth with them pretty regularly; right?
2         MR. INSOGNA:  Object to form.
3     A.   We were discussing papers, usually what my
4 thoughts were about the paper and my opinion.
5 BY MR. SLATER:
6     Q.   You were asked just by counsel a few
7 moments ago about the Pottegard study, and my
8 paraphrase of what I heard was, "Yes, there's problems
9 with the data, but there's no better data, so that's
10 what we have to work with, basically."
11         Right?
12         MR. INSOGNA:  Object to form.
13     A.   That's an interesting paraphrase.  That's
14 not how I took that.  It was more what we've been
15 discussing the whole time, which is all studies have
16 limitations, and there are different levels of evidence
17 that we put different weights on, and that cohort
18 studies like those, even epi data, are by far the
19 highest level of evidence that we have here, albeit
20 with known limitations that we talked about.
21 BY MR. SLATER:
22     Q.   Well, epidemiologic studies is a category
23 of scientific data; right?
24     A.   Yes.

Page 421

1     Q.   Not all epidemiologic studies are equal,
2 right, in terms of their value and their limitations;
3 right?
4     A.   That's I think what I've been saying.
5     Q.   Some -- rephrase.
6         So when you say human epidemiologic
7 studies have a certain level of value or validity,
8 there are some that actually don't really have much
9 validity or usefulness at all, and there are some that
10 are very valid and useful?
11         It depends on the specific study, the
12 limitations, and what was being addressed; right?
13         MR. INSOGNA:  Object to form.
14     A.   I think that's what I was relaying
15 throughout the deposition, is that there are different
16 levels of evidence and their weight should be different
17 depending on how strong the study is, how much weight
18 should we put towards it.
19 BY MR. SLATER:
20     Q.   Do you have your report there?
21     A.   Yes.
22     Q.   Could you go to Page 39, please?
23         Counsel asked you about some of the
24 language and wording you used in your discussion of the

Page 422

1 Gomm study.  I'd like to go down to the bottom of the
2 paragraph about Gomm.
3         The second-to-last paragraph, you say,
4 "With multiple testing that has been conducted between
5 the two studies, including for each of the various
6 cancers, there is potential that a positive finding
7 here in Gomm et al is due to mere chance, and further
8 analysis is warranted to derive firm conclusions."
9         Right?
10     A.   Right.
11     Q.   There's also the possibility or
12 potential -- rephrase.
13         There's also the potential that the
14 positive finding in Gomm is not due to mere chance but
15 actually indicates a real causal association?
16         That's possible also; right?
17         MR. INSOGNA:  Object to form.
18     A.   A real causal association?  Now we're
19 going to -- that's a possibility.  Anything's possible,
20 but it's less likely, given all the dataset that we're
21 looking at, and that's why I qualified that this is
22 something that would need to be followed up on in an
23 independent analysis to confirm these findings,
24 especially since other studies haven't shown a liver

Confidential Information - Subject to Protective Order

1 finding, and we just looked at that one article from
2 Adamson, who notes himself it's interesting that
3 there's no association with HCC.
4        So I think the theme of the argument here
5 from my perspective is that there's no consistency.
6 Yes, there is this one data point, but there are others
7 that are in direct conflict with this, which makes it
8 less likely and more likely random until proven
9 otherwise.
10 BY MR. SLATER:
11     Q.   You were asked about the company
12 documents --
13     A.   Yes.
14     Q.   -- that are listed on your amended list
15 of materials considered?
16     A.   Yes.
17     Q.   You didn't mention any of them in your
18 report, with the exception of referencing the documents
19 that provided you information about the -- well, let me
20 withdraw that and ask it differently.
21        The documents are not -- rephrase.
22        Looking at the company documents produced
23 that counsel just asked you about, you don't discuss
24 those in your report; right?

1     A.   No.
2     Q.   Meaning I'm correct; right?
3     A.   Yes.
4     Q.   A double negative conundrum.
5        There was nothing in those doc -- well,
6 rephrase.
7        Yesterday when I asked you about doctor --
8 rephrase.
9        Yesterday when I asked you about Raphael
10 Nudelman's deposition, if my recollection is correct,
11 you didn't even know who Raphael Nudelman was
12 yesterday; right?
13     A.   I had forgotten who he was and what that
14 one was about, because I hadn't read that one in some
15 time, like four months ago.  I had read it, but it
16 clearly didn't play a role in my opinion, if that's the
17 question.
18     Q.   The company documents -- well, let me ask
19 you this.
20        In Raphael Nudelman's deposition, there's
21 nothing that you cited to from that deposition in your
22 report; right?
23     A.   Not specifically.
24     Q.   Do you recall what he said in his

1 deposition at all?
2     A.   I'd have to go back and look at the
3 details.
4     Q.   Do you know who he works for?
5     A.   I know now after reviewing just briefly
6 what it was, was that it was the toxicologist that was
7 evaluating on the side of the defense -- I think Teva.
8     Q.   You just -- you reviewed that today to
9 recollect?
10     A.   I just know that that's what it was.  I
11 haven't reviewed the whole deposition since yesterday,
12 no.
13     Q.   Can you tell me anything he said in the
14 deposition at all?
15     A.   I didn't memorize it, no.
16     Q.   Can you tell me anything at all about the
17 deposition?  Do you remember anything he said?
18        MR. INSOGNA:  Object to form.
19     A.   I'm happy to look at it and tell you what
20 I thought about it.
21 BY MR. SLATER:
22     Q.   You don't remember anything from the
23 deposition as you sit here now; right?
24     A.   I'm -- it's been a long time since I

1 looked at it.
2     Q.   So I'm correct?
3     A.   That I can't --
4     Q.   You don't recall anything about the
5 deposition as you sit here now; correct?
6     A.   Other than it was a toxicological
7 analysis, that's all I -- no, I don't know the details.
8 I didn't memorize numbers or anything like that.
9     Q.   Go to the company documents produced list
10 that you were asked about.  Let's look at the first
11 document, the July 6th, 2018, Teva health hazard
12 assessment regarding valsartan.
13        What did that assessment conclude; do you
14 recall?
15        MR. INSOGNA:  Object to form.
16     A.   My recollection of these are they're sort
17 of similar to the Fairs (ph) data, in the sense that
18 they're just sort of reporting all adverse events in
19 patients taking the medications by a monthly sort of
20 documentation to follow, if I recall.
21 BY MR. SLATER:
22     Q.   When did you last look at that document?
23     A.   Oh, it would have been several months ago.
24     Q.   If you had seen anything in any of these

Page 427

1  company documents that was of any significance to you,
2  is it fair to assume you would have discussed that in
3  your report?
4       A.   No.  That was not something that I was
5  relying on from an objective standpoint to answer the
6  question that I was asked.
7       Q.   You said just a few minutes ago that it
8  was not necessary for you to see any of the corporate
9  depositions or documents that you weren't shown; but in
10 reality you don't know what's in those documents, so
11 you don't know whether you would want to see them or
12 not, because you don't know what's there; right?
13      MR. INSOGNA:  Object to form.
14      A.   We went through those questions, and I
15 don't know what's in there, so I can't say one way or
16 another.  But if -- but I think what we're talking
17 about now you're asking about these other documents I
18 did see -- they didn't really play a role in what I was
19 doing here.
20 BY MR. SLATER:
21      Q.   What I'm asking is this.
22           In terms of documents that were not
23 provided to you, there's no way for you to know whether
24 they would have been significant to you or not, because

Page 428

1  you haven't seen them; right?
2       A.   That's fair to say.  I don't know what's
3  in them.  How can I tell you what I would do?
4       Q.   You were asked about looking at the FDA
5  information regarding the levels of NDMA and NDEA in
6  the pills a few minutes ago; right?
7       A.   Yes.
8       Q.   If in reality the FDA information that you
9  accessed was incomplete in terms of the levels of NDMA
10 and NDEA, and that the levels were actually higher, and
11 the defendants produced to us documents showing higher
12 levels of those substances, you would have wanted to
13 know that so that you could have had the accurate
14 information to rely on and put in your report; right?
15      MR. INSOGNA:  Object to form.  Incomplete
16 hypothetical.
17      A.   It would be important to know all data
18 points, as we've established.
19 BY MR. SLATER:
20      Q.   If I could, I'd like to go to that
21 Oncologist -- you don't have a hard copy of it, right,
22 that editorial from The Oncologist?  I think we have to
23 put it up on the screen.
24      MR. SLATER:  Chris, do you think you could

Page 429

1  put that up?  I think it's Exhibit 16.  And you can go
2  to Page 461, the area that the questioning was on just
3  a few minutes ago.  That's great.  Thank you.
4  BY MR. SLATER:
5       Q.   Looking at Page 461 in the right-hand
6  column, you were asked a question about a study that is
7  discussed regarding ranitidine.
8            Do you see that?
9       A.   Yes.
10      Q.   Have you read that study?
11      A.   I'm not sure what study they're referring
12 to here.  All I can see is a number.  This is a
13 commentary -- this paper.
14      Q.   It's a study performed at Sloan Kettering
15 regarding ranitidine.
16           Did you see that study?
17      A.   I don't know.  I'd need to see the details
18 of what even the name of the paper is before I could
19 comment.
20      Q.   You were -- rephrase.
21           Counsel read to you the statement that it
22 was of interest that there was no association mentioned
23 with liver cancer; right?
24      A.   Yes.

Page 430

1       Q.   Gomm did find a statistically significant
2  association to liver cancer; correct?
3       A.   We talked about that, yes.
4       Q.   You were shown by counsel some language
5  from the IARC document.
6       MR. SLATER:  You could take that down,
7  Chris.  Thanks.
8  BY MR. SLATER:
9       Q.   You were asked some questions about an
10 IARC document by defense counsel, and it was suggested
11 that IARC did not consider the risk for Group 2A
12 carcinogens, if I understood correctly.
13           Did I understand correctly the question
14 you were asked?
15      MR. KUM:  Object to form.  Misstates
16 testimony.
17 BY MR. SLATER:
18      Q.   Well, let me ask the question differently.
19           Do you recall that IARC said that NDMA --
20 and I'm paraphrasing -- should be considered to be
21 carcinogenic to humans, for all practical purposes?
22           And the "for all practical purposes" I'm
23 quoting.  I know that language was put out by IARC.
24           Are you familiar that I -- with IARC

Confidential Information Subject to Protective Order

Page 431

1  saying that?
2       A.   I don't remember seeing that just now, if
3  that's the question with what we were --
4       Q.   No, I don't believe counsel showed that to
5  you just now.
6            So what I'm asking is, are you aware that
7  IARC with regard to NDMA said that it should be
8  considered carcinogenic to humans, quote, for all
9  practical purposes, close quote?
10           Are you aware that IARC said that?
11           THE WITNESS:  I'm not aware -- I'm aware
12  of its listing as a 2A carcinogen.
13           MR. SLATER:  I have no other questions.
14           MR. INSOGNA:  I don't have any further --
15           MR. SLATER:  We can get you to your
16  meeting, Doctor.  It's time.
17           MR. INSOGNA:  Thank you.
18           THE VIDEOGRAPHER:  We are going off the
19  record at 4:02 PM.
20
21           [SIGNATURE RESERVED.]
22
23
24

Page 432

1       C E R T I F I C A T E
2
3       I, JOHN ARNDT, a Certified Shorthand
4  Reporter and Certified Court Reporter, do hereby
5  certify that prior to the commencement of the
6  examination, DANIEL CATENACCI, M.D., was sworn by me
7  via videoconference to testify the truth, the whole
8  truth and nothing but the truth.
9       I DO FURTHER CERTIFY that the foregoing is a
10  true and accurate transcript of the proceedings as
11  taken stenographically by and before me at the time,
12  place and on the date hereinbefore set forth.
13      I DO FURTHER CERTIFY that I am neither a
14  relative nor employee nor attorney nor counsel of any
15  of the parties to this action, and that I am neither a
16  relative nor employee of such attorney or counsel, and
17  that I am not financially interested in this action.
18
19
20      _____
21      JOHN ARNDT, CSR, CCR, RDR, CRR
22      CSR No. 084-004605
23      CCR No. 1186
24

Page 433

1
2
3       I, DANIEL CATENACCI, M.D., the witness
4  herein, having read the foregoing testimony of the
5  pages of this deposition, do hereby certify it to be a
6  true and correct transcript, subject to the
7  corrections, if any, shown on the attached page.
8
9
10
11      _____
12      DANIEL CATENACCI, M.D.
13
14
15  Sworn and subscribed to before me,
16  This _____ day of _____, 202_.
17
18
19  _____
20      Notary Public
21
22
23
24

Page 434

1
2       DEPOSITION ERRATA SHEET
3
4  Page No._____Line No._____Change to:_____
5  _____
6  Reason for change:_____
7  Page No._____Line No._____Change to:_____
8  _____
9  Reason for change:_____
10  Page No._____Line No._____Change to:_____
11  _____
12  Reason for change:_____
13  Page No._____Line No._____Change to:_____
14  _____
15  Reason for change:_____
16  Page No._____Line No._____Change to:_____
17  _____
18  Reason for change:_____
19  Page No._____Line No._____Change to:_____
20  _____
21  Reason for change:_____
22
23  SIGNATURE:_____DATE:_____
24      DANIEL CATENACCI, M.D.

Confidential Information - Subject to Protective Order

1

2

3          I, DANIEL CATENACCI, M.D., the witness

4    herein, having read the foregoing testimony of the

5    pages of this deposition, do hereby certify it to be a

6    true and correct transcript, subject to the

7    corrections, if any, shown on the attached page.

8

9

10

11    _____

          *Daniel Catenacci*

12          DANIEL CATENACCI, M.D.

13

14

15    Sworn and subscribed to before me,

16    This ____15____ day of ____October____, 2021.

17

18

19    _____

20          Notary Public

21    My notary expires: 04/29/2023          Notarized online using audio-video communication

BRYAN BLAIR
Notary Public - Arizona
Maricopa County
Commission # 563486
My Comm. Expires April 29, 2023

22

23

24

Confidential Information - Subject to Protective Order

1

2                        DEPOSITION ERRATA SHEET

3

4     Page No. 23   Line No. 9   Change to: "She's a counsel for

5     Greenberg Traurig"

6     Reason for change: misspoke

7     Page No. 26   Line No. ____ Change to: "Kate" - lines

8         1,5,10,13

9     Reason for change: misspoke

10    Page No. 35   Line No. 12   Change to: "for this deposition"

11    _____

12    Reason for change: transcription error

13    Page No. 36   Line No. 6   Change to: Panigrahy

14    _____

15    Reason for change: misspelling

16    Page No. 45   Line No. 13  Change to: "so I have a

17    newer one"

18    Reason for change: transcription error

19    Page No. 96   Line No. 7-8 Change to: "nothing I

20    can think of at the moment"

21    Reason for change: transcription error

22

23    SIGNATURE:_____DATE:_____

24            DANIEL CATENACCI, M.D.

Confidential Information - Subject to Protective Order

1

2                    DEPOSITION ERRATA SHEET

3

4   Page No. __23__ Line No. _19___ Change to: ___Craig Lockhart__

5   _____

6   Reason for change: _____transcription error_____

7   Page No. _25___ Line No. _7____ Change to: ____"I think it was"__

8   _____

9   Reason for change: ____transcription error_____

10  Page No. _31___ Line No. _10___ Change to: _"up until this"___

11  _____

12  Reason for change: ____transcription error_____

13  Page No. _52___ Line No. _19___ Change to: __Delete "I'm -- that."

14  _____

15  Reason for change: _____misspoke_____

16  Page No. _53___ Line No. _6____ Change to: _"We were just noting data

17  that's out there, that's not definitive, in a section that's talking about risk factors"

18  Reason for change: ___comma additions for clarity_____

19  Page No. _81___ Line No. _7____ Change to: _"and pointed out"__

20  _____

21  Reason for change: _____transcription error_____

22

23  SIGNATURE:_____DATE:_____

24              DANIEL CATENACCI, M.D.

Confidential Information - Subject to Protective Order

```
 1

 2                    DEPOSITION ERRATA SHEET

 3

 4    Page No. _98__ Line No. _8__ Change to: _"what I strive to do"_

 5    _____

 6    Reason for change: ___transcription error_____

 7    Page No. _134_ Line No. _22_ Change to: _"As to what the utility

 8    _is or is not"_____

 9    Reason for change: ___transcription error_____

10    Page No. _139_ Line No. _21_ Change to: ___"and relay that information"

11    _____

12    Reason for change: ____transcription error_____

13    Page No. _148_ Line No. _18_ Change to: __"I think the information

14    _is important"_____

15    Reason for change: ___transcription error_____

16    Page No. _156_ Line No. _19_ Change to: _"through the portal

17    __venous system"_____

18    Reason for change: ___transcription error_____

19    Page No. _160_ Line No. _15_ Change to: _"this cancer"____

20    _____

21    Reason for change: ____transcription error_____

22

23    SIGNATURE:_____DATE:_____

24             DANIEL CATENACCI, M.D.
```

Confidential Information - Subject to Protective Order

```
 1

 2                    DEPOSITION ERRATA SHEET

 3

 4    Page No. __185_ Line No. 22___ Change to: "they are standard treatments"

 5    _____

 6    Reason for change: ____transcription error_____

 7    Page No. _187_ Line No. _2___ Change to: ___"no survival differences"

 8    _____

 9    Reason for change: ___transcription error_____

10    Page No. _188_ Line No. _2___ Change to: "the risk of discontinuing"

11    _____

12    Reason for change: _____transcription error_____

13    Page No. _209_ Line No. 11___ Change to: "nitrosamines, nitrates,

14    _nitrites"_____

15    Reason for change: ___transcription error_____

16    Page No. _216_ Line No. _6___ Change to: "and they note that this

17    limits immortal time bias"_____

18    Reason for change: _____transcription error_____

19    Page No. _228_ Line No. _6, 20 Change to: ___Forrest plot_____

20    _____

21    Reason for change: _____transcription error_____

22

23    SIGNATURE:_____DATE:_____

24             DANIEL CATENACCI, M.D.
```

Confidential Information - Subject to Protective Order

```
 1

 2                    DEPOSITION ERRATA SHEET

 3

 4    Page No._236_ Line No._4___ Change to:___"what that means is there"

 5    _____

 6    Reason for change:_____transcription error_____

 7    Page No._252_ Line No._17__ Change to:___"unlucky to have gotten"

 8    _____

 9    Reason for change:___transcription error_____

10    Page No._____ Line No._____ Change to:_____

11    _____

12    Reason for change:_____

13    Page No._____ Line No._____ Change to:_____

14    _____

15    Reason for change:_____

16    Page No._____ Line No._____ Change to:_____

17    _____

18    Reason for change:_____

19    Page No._____ Line No._____ Change to:_____

20    _____

21    Reason for change:_____

22

23    SIGNATURE:_____DATE:_____

24               DANIEL CATENACCI, M.D.
```

Confidential Information - Subject to Protective Order

```
 1

 2

 3              I, DANIEL CATENACCI, M.D., the witness

 4     herein, having read the foregoing testimony of the

 5     pages of this deposition, do hereby certify it to be a

 6     true and correct transcript, subject to the

 7     corrections, if any, shown on the attached page.

 8

 9

10

11     _____

12                   DANIEL CATENACCI, M.D.

13

14

15     Sworn and subscribed to before me,

16     This  15      day of   October   , 2021.

17

18

19     _____

20              Notary Public

                                 Notarized online using audio-video communication

21
           My notary expires:   04/29/2023
22

23

24
```

BRYAN BLAIR
Notary Public - Arizona
Maricopa County
Commission # 563486
My Comm. Expires April 29, 2023

Confidential Information - Subject to Protective Order

```
 1

 2                    DEPOSITION ERRATA SHEET

 3

 4    Page No. 296  Line No. 11   Change to: "within the exposed group"

 5    _____

 6    Reason for change: transcription error_____

 7    Page No. 306  Line No. 1   Change to: Peto_____

 8    _____

 9    Reason for change: misspelling_____

10    Page No. 351  Line No. 10   Change to: Hrudey_____

11    _____

12    Reason for change: misspelling_____

13    Page No. 362  Line No. 14   Change to: Etminan_____

14    _____

15    Reason for change: misspelling_____

16    Page No. 426  Line No. 17   Change to: FAERS data___

17    _____

18    Reason for change: misspelling_____

19    Page No._____ Line No._____ Change to:_____

20    _____

21    Reason for change:_____

22

23    SIGNATURE:_____DATE:_____

24              DANIEL CATENACCI, M.D.
```

Confidential Information - Subject to Protective Order

```
 1

 2                    DEPOSITION ERRATA SHEET

 3

 4    Page No. _414_ Line No. _11_ Change to: ___"the IARC classification"

 5    _____

 6    Reason for change: _____transcription error_____

 7    Page No. _313_ Line No. _7_ Change to: __"primary endpoint"

 8    _____

 9    Reason for change: _____transcription error_____

10    Page No. _343_ Line No. _21_ Change to: _____"the dietary studies"

11    _____

12    Reason for change: ___transcription error_____

13    Page No. _347_ Line No. _23_ Change to: _____"in short"

14    _____

15    Reason for change: ___transcription error_____

16    Page No. _359_ Line No. _19_ Change to: ___"evidence that it does"

17    _____

18    Reason for change: _____transcription error_____

19    Page No. _360_ Line No. _8_ Change to: ___"me that - to - comment"

20    _____

21    Reason for change: ___transcription error_____

22

23    SIGNATURE:_____DATE:_____

24              DANIEL CATENACCI, M.D.
```