# EXHIBIT B

**THIS EXHIBIT CONTAINS CONFIDENTIAL OR
RESTRICTED CONFIDENTIAL INFORMATION
AND HAS BEEN SERVED VIA EMAIL.**

Confidential Information - Subject to Protective Order

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2                     CAMDEN VICINAGE
 3
      -----------------------------)
 4  IN RE:  VALSARTAN, LOSARTAN,  ) MDL No. 2875
    AND IRBESARTAN PRODUCTS       )
 5  LIABILITY LITIGATION          ) Civil No. 19-2875
                                  ) (RBK/JS)
 6  -----------------------------)
    THIS DOCUMENT RELATES TO ALL  )
 7  CASES                         ) HON. ROBERT B. KUGLER
                                  )
 8  -----------------------------)
 9          - CONFIDENTIAL INFORMATION -
              SUBJECT TO PROTECTIVE ORDER
10
11              VIDEOTAPED DEPOSITION OF
         JOHN M. FLACK, MD, MPH, FAHA, MACP, FASH
12                 September 28, 2021
13
14          Remote videotaped deposition of JOHN M.
15  FLACK, MD, MPH, FAHA, MACP, FASH, commencing at 9:09
16  a.m., on the 28th day of September, 2021, before
17  Juliana F. Zajicek, Registered Professional Reporter,
18  Certified Shorthand Reporter and Certified Realtime
19  Reporter.
20
21                      - - -
22
                GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
24
```

Page 2

A P P E A R A N C E S :
(ALL PARTIES APPEARED REMOTELY)

ON BEHALF OF THE PLAINTIFFS:
  SLACK DAVIS SANGER LLP
  6001 Bold Ruler Way, Suite 100
  Austin, Texas 78746
  512-795-8686
  BY:  JOHN R. DAVIS, ESQ.
    jdavis@slackdavis.com

    -and-

  KANNER & WHITELEY, LLC
  701 Camp Street
  New Orleans, Louisiana 70130
  504-524-5777
  BY:  LAYNE HILTON, ESQ.
    l.hilton@kanner-law.com;
    DAVID J. STANOCH, ESQ.
    d.stanoch@kanner-law.com
    -and-
  HOLLIS LAW FIRM
  8101 College Boulevard, Suite 260
  Overland Park, Kansas 66210
  800-701-3672
  BY:  IRIS SIMPSON, ESQ.
    iris@hollislawfirm.com;
    C. BRETT VAUGHN, ESQ.
    brett@hollislawfirm.com

    -and-

  MAZIE SLATER KATZ & FREEMAN, LLC
  103 Eisenhower Parkway
  Roseland, New Jersey 07068
  973-228-9898
  BY:  ADAM SLATER, ESQ.
    aslater@mazieslater.com
    -and-

Page 3

A P P E A R A N C E S :
(ALL PARTIES APPEARED REMOTELY)

ON BEHALF OF THE PLAINTIFFS: (Continued)
  FARR LAW FIRM, P.A.
  99 Nesbit Street
  Punta Gorda, Florida 33950
  941-639-1158
  BY:  GEORGE T. WILLIAMSON, ESQ.
    gwilliamson@farr.com

    -and-

  HONIK LLC
  1515 Market Street, Suite 1100
  Philadelphia, Pennsylvania 19102
  267-535-1300
  BY:  RUBEN HONIK, ESQ.
    ruben@honiklaw.com

ON BEHALF OF DEFENDANT ALBERTSON'S LLC:

  BUCHANAN INGERSOLL & ROONEY PC
  1700 K Street, N.W., Suite 300
  Washington, D.C. 20006-3807
  202-452-7318
  BY:  ASHLEY D. JONES, ESQ.
    ashley.jones@bipc.com
    -and-
  BUCHANAN INGERSOLL & ROONEY PC
  227 West Trade Street, Suite 600
  Charlotte, North Carolina 28202
  704-444-3475
  BY:  CHRISTOPHER B. HENRY, ESQ.
    christopher.henry@bipc.com

Page 4

A P P E A R A N C E S :
(ALL PARTIES APPEARED REMOTELY)

ON BEHALF OF DEFENDANTS CVS PHARMACY, INC. and RITE AID CORPORATION:

  BARNES & THORNBURG LLP
  11 South Meridian Street
  Indianapolis, Indiana 46204-3535
  317-231-6491
  BY:  KARA M. KAPKE, ESQ.
    kkapke@btlaw.com

ON BEHALF OF DEFENDANTS TEVA PHARMACEUTICAL INDUSTRIES, LTD., TEVA PHARMACEUTICALS SA, INC., ACTAVIS LLC, and ACTAVIS PHARMA, INC.:

  GREENBERG TRAURIG, LLP
  Terminus 200
  3333 Piedmont Road NE, Suite 2500
  Atlanta, Georgia 30305
  678-553-2100
  BY:  STEVEN M. HARKINS, ESQ.
    harkinss@gtlaw.com

    -and-

  GREENBERG TRAURIG, LLP
  2101 L Street, N.W., Suite 1000
  Washington, D.C. 20037
  202-530-8587
  BY:  STEPHEN T. FOWLER, ESQ.
    fowlerst@gtlaw.com
    -and-
  WALSH PIZZI O'REILLY FALANGA, LLP
  Three Gateway Center
  100 Mulberry Street, 15th Floor
  Newark, New Jersey 07102
  973-757-1017
  BY:  CHRISTINE I. GANNON, ESQ.
    cgannon@walsh.law

Page 5

A P P E A R A N C E S :
(ALL PARTIES APPEARED REMOTELY)

ON BEHALF OF DEFENDANTS ZHEJIANG HUAHAI PHARMACEUTICAL CO., LTD., PRINSTON PHARMACEUTICAL INC., HUAHAI U S , INC., AND SOLCO HEALTHCARE US, LLC:
  DUANE MORRIS, LLP
  100 High Street, Suite 2400
  Boston, Massachusetts 02110-1724
  857-488-4267
  BY:  LAUREN A  APPEL, ESQ
    laappel@duanemorris.com

ON BEHALF OF DEFENDANTS AUROBINDO PHARMA LTD , AUROLIFE PHARMA LLC, and AUROBINDO PHARMA USA, INC :
  CIPRIANI & WERNER, P C
  450 Sentry Parkway
  Blue Bell, Pennsylvania 19422
  610-567-0700
  BY:  JESSICA M  HEINZ, ESQ
    jheinz@c-wlaw.com

ON BEHALF OF DEFENDANT MYLAN PHARMACEUTICALS, INC :
  PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
  One Oxford Centre
  Pittsburgh, Pennsylvania 15219
  412-263-1840
  BY:  JASON M  REEFER, ESQ
    jmr@pietragallo.com

ON BEHALF OF DEFENDANT SCIEGEN PHARMACEUTICALS, INC :
  HINSHAW & CULBERTSON LLP
  53 State Street, 27th Floor
  Boston, Massachusetts 02109
  617-213-7045
  BY:  GEOFFREY M  COAN, ESQ
    gcoan@hinshawlaw.com

Page 6

1  ALSO PRESENT:
2      MR. BRAD MATTA.
3
   VIDEOGRAPHER:
4
      CAROLIN DE LA ROSA
5      Golkow Litigation Services
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 8

1            E X H I B I T S (Continued)
2  PLAINTIFF-FLACK EXHIBIT        MARKED FOR ID
3  No. 5    Department of Justice, U.S.        84
         Attorney's Office, Southern
4        District of New York Press Release
         dated Wednesday, July 1, 2020,
5        titled: "Acting Manhattan U.S.
         Attorney Announces $678 Million
6        Settlement of Fraud Lawsuit
         Against Novartis Pharmaceuticals
7        For Operating Sham Speaker
         Programs Through Which It Paid
8        Over $100 Million to Doctors To
         Unlawfully Induce Them To
9        Prescribe Novartis Drugs"
10 No. 6    E-mail dated 4/12/06 from Roger    90
         Stojeba to Melissa Ostendorf,
11       Subject: Re: National speakers up
         for grabs!; NPCLSV_LIT002333074
12
   No. 7    E-mail chain dated 3/29/06 from    96
13       Jason Barnes to Jill Gross, among
         others; NPCLSV_LIT003753068 - 070
14
   No. 8    Journal of Human Hypertension,    101
15       Article titled "Efficacy and
         safety of initial combination
16       therapy with amlodipine/valsartan
         compared with amlodipine
17       monotherapy in black patients with
         stage 2 hypertension: The EX-STAND
18       study," by Flack, et al.
19 No. 9    Original Research, Therapeutic    117
         Advances in Cardiovascular
20       Disease, titled "Individualizing
         hypertension treatment with
21       impedance cardiography: A
         meta-analysis of published
22       trials," by Ferrario, Flack, et
         al.
23
   No. 10   John M. Flack, M.D., MPH, List of  124
24       Materials Considered

Page 7

1              I N D E X
2
3  WITNESS:                  PAGE:
4  JOHN M. FLACK, MD, MPH, FAHA, MACP, FASH
5
6      EXAM BY MR. DAVIS.................   10
7      EXAM BY MR. FOWLER.................  187
8      FURTHER EXAM BY MR. DAVIS...........  209
9
10              *****
11
12            E X H I B I T S
13 PLAINTIFF-FLACK EXHIBIT        MARKED FOR ID
14 No. 1    Defendants' Responses and        13
         Objections to Plaintiffs' Amended
15       Notice of Videotaped Deposition of
         John M. Flack, MD, MPH, FAHA,
16       MACP, FASH
17 No. 2    Invoice, Date of Service: Through  22
         July 20, 2021, Invoice Date: July
18       21, 2021
19 No. 3    Expert Report of John Flack, M.D.,  49
         M.P.H.
20
   No. 4    Curriculum Vitae - John M. Flack,  60
21       MD, MPH, FAHA, MACP, FASH
22
23
24

Page 9

1            E X H I B I T S (Continued)
2  PLAINTIFF-FLACK EXHIBIT        MARKED FOR ID
3  No. 11   Scientific Reports, Article titled 157
         "Association between blood
4        pressure and risk of cancer
         development: A systematic review
5        and meta-analysis of observational
         studies," by Seretis, et al.
6
   No. 12   Supplemental list of materials    192
7        considered
8  No. 13   Flash drive containing reliance   193
         material
9
   No. 14   Article published in the         202
10       Pharmacology & Therapeutics
         Journal: "Carcinogenesis: Failure
11       of resolution of inflammation?" By
         Anna Fishbein, et al.
12
   No. 15   Invoice, Date of Service: Through  220
13       July 21 - September 7, 2021,
         Invoice Date: September 7, 2021
14
15
16
17
18
19
20
21
22
23
24

Page 10

1      THE VIDEOGRAPHER:  We are now on the record.  My
2  name is Carolin De La Rosa, a videographer for Golkow
3  Litigation Services.  Today's date is September 28th,
4  2021, and the time is 9:09 a.m.
5          This deposition is being held In the
6  Matter of Valsartan, Losartan, and Irbesartan Products
7  Liability Litigation.
8          The deponent today is Dr. John Flack.
9          All parties are noted on the stenographic
10  record.
11          Will the court reporter please swear in
12  the witness.
13          (WHEREUPON, the witness was duly
14          sworn.)
15              JOHN M. FLACK,
16          MD, MPH, FAHA, MACP, FASH,
17  called as a witness herein, having been first duly
18  sworn, was examined and testified as follows:
19              EXAMINATION
20  BY MR. DAVIS:
21      Q.  Good morning, Dr. Flack.  My name is John
22  Davis.  I will be taking your deposition today.  Let's
23  just start with a couple of simple items.
24          Can you give your current work and home

Page 11

1  addresses for me?
2      A.  My current work address is 7 Illinois
3  University, 701 North First Street in Springfield,
4  Illinois.  My home address is 4420 Foxhall Lane in
5  Springfield, Illinois 62711.
6      Q.  Great.  Thank you.
7          Have you ever given testimony under oath
8  before, Dr. Flack?
9      A.  Yes.  Yes, I have.
10      Q.  About how many times?
11      A.  Four to five.
12      Q.  Okay.  What context would those occasions
13  have occurred in?
14      A.  Expert witness, being an expert witness in
15  cases.
16      Q.  Okay.  For -- for all four or five of
17  those instances, that would have been testifying as an
18  expert witness similar to what you are doing today?
19      A.  Testifying as an expert witness in a case,
20  a specific case of medical care.
21      Q.  Like a medical malpractice case?
22      A.  Correct.
23      Q.  Sorry.  I didn't catch your answer there,
24  is that a yes?

Page 12

1      A.  Yes.  Yes, medical malpractice.
2      Q.  And that was -- all of those four to five
3  instances would have been in that context?
4      A.  All four to five instances would have been
5  medical malpractice.
6      Q.  Okay.  Have you ever been involved as a
7  party in any litigation before?
8      A.  (Indicating.)
9      Q.  Is that a no?
10      A.  No.
11      Q.  Okay.  Just -- just for the record, so
12  that the transcript is clear and the record is clear,
13  it -- I just ask that -- that you provide a verbal
14  answer of -- of yes or no.  "Um-hums" or -- or just
15  kind of shaking your head, that -- that's going to be
16  hard for the court reporter to take down.
17          So the answer was no, that you have not
18  been involved as a party in any litigation before?
19      A.  No.
20      Q.  Okay.  Have you ever been served a
21  subpoena or been a witness in any litigation?
22      A.  No, I haven't.
23      Q.  Okay.  Let's start with -- I'm going to
24  mark an exhibit, which is the responses to the notice

Page 13

1  of this deposition.
2      MR. DAVIS:  For the record, I'm going to mark
3  these as PL-Flack as the beginning modifier.  So this
4  will be Plaintiff-Flack 1.
5          And then I will share my screen.  Unless,
6  Steve, do you have a copy of the responses to the
7  notice?  I can share my screen otherwise.
8      MR. FOWLER:  Yeah, I believe we do.  Bear --
9  bear with me.
10      MR. DAVIS:  Okay.
11      MR. FOWLER:  You know what, I'm --
12      MR. DAVIS:  That's fine, I'll just share my
13  screen.
14          (WHEREUPON, a certain document was
15          marked Plaintiff-Flack Deposition
16          Exhibit No. 1, for identification, as
17          of 09/28/2021.)
18  BY MR. DAVIS:
19      Q.  Dr. Flack, are you able to see the -- the
20  document I've shared?
21      A.  I can see it.
22      Q.  Okay.  Did you personally review the
23  notice that we served on you when it was served?
24      A.  I've seen it, correct.

Confidential Information Subject to Protective Order

Page 14

1    Q.   Okay.  Did you assist in the collection of
2 any documents that were produced to us responsive to
3 this notice?
4    A.   I did.
5    Q.   Can you describe to me, I guess, just at a
6 high -- we'll start at a high level, what type of
7 searches you did for responsive documents?
8    A.   Well, documents were some sent to me, some
9 I pulled off of expert witness reports, and others
10 came off of either reviewing the bibliography in
11 articles that were pulled, as well as searching for
12 valsartan NDMA on PubMed.
13    Q.   Okay.  So let's -- that was a couple of
14 items there.  I just want to make sure I got each one
15 down.
16        So you said that some were sent to you.
17 Would that be by counsel?
18    A.   That would be by counsel.
19    Q.   Okay.  Specifically who -- who of defense
20 counsel sent those to you?
21    A.   Offhand I don't remember.
22    Q.   Okay.  And then you said that some you
23 pulled off of other expert witness reports?
24    A.   Yes, I did.

Page 15

1    Q.   Would that be plaintiff expert witness
2 reports or defendant expert witness reports or both?
3    A.   On the plaintiff and defendant.
4    Q.   Okay.  And then you said you reviewed the
5 bibliographies to some of the articles that you read
6 and tracked down information that way?
7    A.   That is correct.
8    Q.   Okay.  And what were the final, I think
9 you had one or two final things?
10    A.   I searched valsartan and NDMA on the
11 PubMed site.
12    Q.   Okay.  So when you say you searched
13 valsartan and NDMA, are you referring to those as
14 keywords?
15    A.   Yes.
16    Q.   Okay.  So how was that -- how were those
17 keywords constructed?  Was that, like, valsartan -- it
18 had to be valsartan and NDMA or did you search
19 valsartan and then you searched NDMA?
20    A.   When I do searches and I give you terms
21 like that, I use them both simultaneously.
22    Q.   Gotcha.  So any -- any hits in that PubMed
23 database would have been hits for both valsartan and
24 NDMA?

Page 16

1    A.   That's correct.
2    Q.   Okay.  Any -- anything else that you did?
3    A.   No.
4    Q.   Okay.  So I understand you to be talking
5 about documents that you searched for in preparing
6 your report, and we'll come back to that in a second.
7 My -- my more specific question for right now, though,
8 was we had served as part of this notice that I'm
9 scrolling through certain document requests.  You'll
10 see I've highlighted.  There is about 11 of them.  And
11 so some of the -- let's start with the ones that --
12 that you appeared to -- to be refusing to produce
13 documents for.
14        Was that your decision or did you come to
15 that decision after discussions with counsel?
16    MR. FOWLER:  Objection; form to the colloquy.
17 Objection; form of the question.
18 BY THE WITNESS:
19    A.   What documents are you talking about that
20 I refused to provide?
21 BY MR. DAVIS:
22    Q.   Sure.  I'll just -- I'll pull up an
23 example of one of these.
24        So, for example -- so, for example, do you

Page 17

1 see No. 6?
2    A.   Yes, I see it.
3    Q.   Okay.  Do you understand that this is the
4 response that you've provided to that request that
5 I've highlighted?
6    MR. FOWLER:  Objection; form.
7 BY THE WITNESS:
8    A.   I see it.
9 BY MR. DAVIS:
10    Q.   Okay.  Did you assist in preparing that
11 response?
12    MR. FOWLER:  Objection; form.
13 BY MR. DAVIS:
14    Q.   You can answer the question, Dr. Flack.
15    A.   Any -- any document that concerns me I --
16 I've had input on, and so, yes, I did.
17    Q.   Okay.  And so do you understand that the
18 response, for example, to No. 6 here is a refusal to
19 provide responsive documents?
20    MR. FOWLER:  Objection; form.
21 BY THE WITNESS:
22    A.   Actually, no, I -- I don't because
23 there -- there are no documents to produce.
24 BY MR. DAVIS:

Confidential Information - Subject to Protective Order

|  | Page 18 |
|---|---|

1  Q.   So let's -- let's talk about what you did
2 to search for documents then that were responsive to
3 certain of these requests, and let me go through.
4 We'll start at the beginning then and just go through
5 each -- each of them.
6      So No. 1, do you understand that to be
7 asking for all of your invoices?
8  A.   Yes, I do.
9  Q.   Okay.  And you have -- you have produced
10 one invoice in this as -- as a responsive document to
11 that request, correct?
12  A.   No, that's incorrect.  I've submitted two
13 invoices thus far.
14  Q.   You've submitted two invoices to counsel?
15  A.   Correct.
16  Q.   Okay.  Any reason why we would have only
17 been produced one?
18  A.   Actually, it was later.
19  MR. DAVIS:  Steve or Stephen, can I make a
20 request that be sent to me as soon as possible so
21 that I can review it on a break?
22  MR. FOWLER:  Sure, we'll run that down.  I -- I
23 don't know that it wasn't provided, but we'll run down
24 the second invoice.

|  | Page 20 |
|---|---|

1  Q.   There -- there are no written records of
2 that?
3  A.   Nothing beyond a sticky on my computer
4 screen.
5  Q.   Did you keep those stickies on your
6 computer screen?
7  A.   No.
8  Q.   Okay.  So, for example, in the one invoice
9 we have that appears to log 43 and a half hours up
10 through, I believe, July 20th, when were you retained
11 in this case?
12  A.   I don't remember the exact date I was
13 retained.  It was well -- it was before then, but I
14 don't remember the exact date.
15  Q.   Okay.  So when you prepared that July 20th
16 invoice that logged 43 and a half hours, how did you
17 arrive at that number without going back to consult
18 any notes or anything like that?
19  MR. FOWLER:  Objection; form, foundation.
20 BY THE WITNESS:
21  A.   I think I've already answered that
22 question.
23 BY MR. DAVIS:
24  Q.   And what was your answer to that question?

|  | Page 19 |
|---|---|

1  MR. DAVIS:  Sure.  I -- I can tell you I've only
2 got one invoice.  The -- the folder that was produced
3 contained one document.
4 BY MR. DAVIS:
5  Q.   Okay.  Okay.  So you've submitted two
6 invoices to counsel.
7      Is that your testimony?
8  A.   That is correct.
9  Q.   What about backup documents that you kept
10 to keep track of your time that went into those
11 invoices, do you keep written records of your -- the
12 time that you've spent and what you've done?
13  MR. FOWLER:  Objection; form, foundation.
14 BY THE WITNESS:
15  A.   My reported time on my invoices is
16 accurate.
17 BY MR. DAVIS:
18  Q.   Okay.  Well, my question wasn't whether
19 the time was accurate.  My -- my question was whether
20 you kept written records that logged your time
21 contemporaneously to actually spending that time.
22      Do you understand the question?
23  A.   Yeah, I understand the question.  There
24 are no written real records of that.

|  | Page 21 |
|---|---|

1  A.   I'm not going to repeat it.
2  Q.   Sir, I'm -- you -- you have to repeat the
3 question -- or you have to repeat your answer.  I'm
4 sorry.  You have to play by the rules.
5  A.   I've already answered -- I've already
6 answered the question.  I said it's beyond my memory
7 the only thing that I've ever used is stickies on my
8 computer screen.
9  Q.   Okay.  And so my question, which, you
10 know, you still haven't -- and this is not a repeated
11 question, so I'm expecting a new answer here, is when
12 you wrote down 43 and a half hours as of July 20th,
13 how did you come up or tabulate those 43 and a half
14 hours?
15  MR. FOWLER:  Objection; form.  Asked and
16 answered, Counsel.
17 BY THE WITNESS:
18  A.   I don't think there is any magic about how
19 you -- you tabulate it.  You remember the time you
20 spent talking with counsel, you remember the time that
21 you spent on -- on documents.  It wasn't extensive.
22 And there was no need for an extensive set of
23 documentation.  And, actually, I believe 43 and a half
24 hours is -- I don't know.  Is -- are you sure that

Page 22

1 that only includes through -- through July and not
2 beyond that?
3 BY MR. DAVIS:
4    Q.   Well, why don't we go ahead and mark that
5 as an exhibit.  I'm marking Plaintiff-Flack 2, which
6 I'll open.
7          (WHEREUPON, a certain document was
8          marked Plaintiff-Flack Deposition
9          Exhibit No. 2, for identification, as
10         of 09/28/2021.)
11 BY MR. DAVIS:
12   Q.   Can you see that, Dr. Flack?
13   A.   Yes.
14   Q.   Do you recognize this as an invoice that
15 includes a date of service through July 20, 2021?
16   A.   I do.
17   Q.   Okay.  And can you give me an estimate of
18 when you started working on this case?
19   A.   I ended up starting working on this case
20 sometime over the summer, because I had other -- other
21 projects, so sometime probably after June 1st.
22   Q.   But in the month of June?
23   A.   In the month of June, July.  Uh-huh.
24   Q.   Okay.  Well, is it June or July?

Page 23

1    MR. FOWLER:  Objection; form.
2 BY THE WITNESS:
3    A.   I said I worked during the months of June
4 and July.
5 BY MR. DAVIS:
6    Q.   Understood.
7         So this July 20th invoice that is through
8 July 20th but dated July 21st would have encompassed
9 about a month and a half or a month and three weeks of
10 work roughly?
11   A.   Approximately, yes.
12   Q.   Okay.  And so my -- my question is when
13 you wrote down 43 and a half hours, did you -- were
14 you going back to consult any written documents in
15 your possession to actually arrive at that number?
16   MR. FOWLER:  Objection; form, asked and
17 answered.
18 BY THE WITNESS:
19   A.   I really answered that question now twice.
20 I told you that I had it in my head and I used
21 stickies on my computer screen.
22 BY MR. DAVIS:
23   Q.   Okay.  And do you still have those
24 stickies?

Page 24

1    MR. FOWLER:  Asked and answered.
2 BY THE WITNESS:
3    A.   Again, I will repeat my answer to that.  I
4 do not have the stickies.
5 BY MR. DAVIS:
6    Q.   Okay.  And so your -- your testimony is
7 that you went back through in your head about a month
8 and a half worth of work comprising 43 and a half
9 hours and accurately came up with that number?
10   MR. FOWLER:  Objection; form, mischaracterizing.
11 BY THE WITNESS:
12   A.   Actually, that's not my testimony, and you
13 know it's not my testimony.  My testimony is that I
14 had it in my head and I used computer stickies.  I
15 didn't say I did either one solely.
16 BY MR. DAVIS:
17   Q.   Okay.  The second invoice that we don't
18 have, what's the -- what's the date of service on that
19 one?
20   A.   I don't remember.  It was submitted a
21 couple of weeks ago and covered the interim period but
22 it was through the first part of September.
23   Q.   How many hours was that invoice for?
24   A.   My memory, let's see, around 12 hours

Page 25

1 approximately.
2    Q.   Okay.  We'll -- we'll come back to that
3 invoice.  Let's keep going through Exhibit 1.
4    MR. FOWLER:  Counsel, we -- I have a hard copy
5 of that now which I can put before the witness if that
6 will -- if that will help you?
7    MR. DAVIS:  Sure, that would be great.
8 BY MR. DAVIS:
9    Q.   Okay.  In -- in light of that, Dr. Flack,
10 do you have that document in front of you, which is
11 Exhibit 1?
12   A.   I do.
13   Q.   Okay.  I'm going to stop sharing my screen
14 then.
15        Okay.  No. 2, do you have that in front of
16 you, on Page 3?
17   A.   I do.
18   Q.   Okay.  And that request is:  "Copies of
19 any notes, i.e., written or electronic, reflecting
20 consulting or litigation work that has not been
21 documented in invoices."
22   A.   Yes.
23   Q.   Okay.  And you -- your counsel produced
24 marked up copies of -- of two articles to us

Confidential Information - Subject to Protective Order

Page 26

1   yesterday.
2        Are you familiar with what I'm talking
3   about?
4        A.   I'm familiar because I provided them to
5   counsel.
6        Q.   Okay.  Those were the Pottegard and -- and
7   Gomm articles?
8        A.   Correct.
9        Q.   You have -- it appears that you have some
10  highlights and -- and written -- handwritten notes on
11  those articles.
12       Is -- is that typically how you read?  Are
13  you, I guess, an analog person, do you like to read
14  things printed out or do you like to read them
15  electronically?
16       A.   Actually, I'm a -- a pretty diverse
17  learner.  I basically assimilate information in many
18  ways and I'm not wedded to any one in particular.
19  I've got a pretty good memory.  Sometimes I highlight
20  things, but it just depends.  If I'm reading from a
21  computer screen, I don't worry about it.
22       Q.   Were -- were those the only articles that
23  you printed out and marked up in that fashion?
24       A.   Yes.  That's why you received them.

Page 27

1        Q.   Okay.  Is that because those were the --
2   and going back to what you told me before about the
3   sort of five to six ways that you collected documents
4   in this case, that last one was that you had searched
5   valsartan and NDMA in PubMed, were those the results
6   of that search?
7        A.   These articles have shown up in expert
8   witness expert reports, they have shown up on
9   searches, and they were provided by counsel.  So you
10  can take your pick as to which way I got them.
11       Q.   Okay.  But you're -- the answer to my
12  question is that, yes, those did come up in the
13  valsartan and NDMA search that you ran?
14       A.   Yes, they did.
15       Q.   And is that how you printed them, off that
16  search?
17       A.   I just printed them off a printer.
18       Q.   Well, what -- did you print them
19  contemporaneously to doing that search?
20       A.   Well, again, I'll try to answer this
21  question.  These articles were sent to me by counsel,
22  I actually took them off of expert testimony that was
23  given or expert reports, and also PubMed.  So they
24  could have come in any one of those forms.

Page 28

1        Q.   Okay.  And you can't remember in which
2   context you printed them, whether it was off the
3   e-mail from counsel or directly off the search on
4   PubMed?
5        A.   I'm not sure why you'd expect me to
6   remember something like that.
7        Q.   Well, you remember 43 and a half hours
8   pretty specifically, I thought you might remember
9   this.
10       A.   No, you're -- again, you're
11  mischaracterizing what I said.  I said I used memory
12  and I used stickies on the computer screen.  Okay.  I
13  remember things that are relevant.  Okay.  And if you
14  can explain to me why this is relevant, perhaps I'll
15  feel bad about it, but --
16       Q.   Well, resp- -- respectfully, Dr. Flack, I
17  don't have to explain the relevance of my questions,
18  and if I ask irrelevant questions that should be
19  perfectly fine with -- with your counsel since I'm
20  wasting my time, but I -- I'm entitled to an answer to
21  my question irrespective of your view of its
22  relevance.
23       MR. FOWLER:  Objection to form.
24  BY THE WITNESS:

Page 29

1        A.   Listen, again, I've answered questions for
2   you several times, and I -- if you want to waste my
3   time and your time, I'm glad to do it.
4   BY MR. DAVIS:
5        Q.   Sure.
6        So why did you print these two articles
7   and only these two articles?
8        MR. FOWLER:  Objection; form, foundation.
9   BY THE WITNESS:
10       A.   There is no relevant reason to give you
11  for that, so I'm not going to offer you one.
12  BY MR. DAVIS:
13       Q.   Well, again, I'm entitled to a -- an
14  answer regardless of your view of its relevance.
15       So can you explain to me why you printed
16  those two articles and only those two articles?
17       MR. FOWLER:  Objection; form, foundation.
18  BY THE WITNESS:
19       A.   I gave -- I gave you an answer.
20       MR. FOWLER:  Again, let me get my objection into
21  this.
22       Lack of foundation, Counsel.
23  BY MR. DAVIS:
24       Q.   Okay.  Dr. Flack, can you answer the

Confidential Information - Subject to Protective Order

Page 30

1 question why you printed only those two articles?
2    MR. FOWLER: Objection; form, mischaracterizing,
3 lack of foundation.
4 BY THE WITNESS:
5    A.   I've already given you my answer.  There
6 is no particular reason.
7 BY MR. DAVIS:
8    Q.   Okay.  Thank you.
9        And there is nothing other -- no other
10 documents that you found as part of your searches to
11 these document requests that were responsive to Item
12 No. 2?
13    A.   I've given all -- anything that I found to
14 counsel and counsel has forwarded those to you.
15    Q.   Okay.  And how did you -- in -- in
16 searching for responsive documents to these requests,
17 what did you do?  Did you go -- did you have I file on
18 this case, like a physical file that you looked in, do
19 you have a file on a hard drive somewhere?  Can you
20 describe to me what you did to search for responsive
21 documents to these requests?
22    A.   Well, some of it is by memory.  There --
23 there are things that I was asked for that don't
24 exist, and so that was fairly straightforward.  The

Page 31

1 files that I had are basically communications that
2 come to me from either downloading articles or -- or
3 PDFs from the -- from counsel and all -- are articles
4 that I pulled and those are referenced and have been
5 provided to you.
6    Q.   Okay.  And so it -- it sounds like you do
7 have a file, whether it's physical or an electronic
8 format somewhere on this case?
9    MR. FOWLER: Objection; form.
10 BY THE WITNESS:
11    A.   You have received what I have from my
12 counsel -- from counsel.
13 BY MR. DAVIS:
14    Q.   I understand that.  I -- I'm not asking
15 you to confirm that.  Simply I'm asking whether you
16 keep a physical or electronic file on this matter?
17    A.   You have been forwarded physical data and
18 electronic data that I have.
19    Q.   Okay.  Okay.  And do you -- your testimony
20 is that you searched the sources where that data came
21 from fully, is that correct?
22    A.   I don't understand the question.
23    Q.   Sure.
24        Did you -- did you -- if you have a

Page 32

1 physical file, which it appears you do since you have
2 two marked up copies that were produced to me, did you
3 search that physical file in its entirety for
4 responsive documents to this notice?
5    MR. FOWLER: Objection to the colloquy.
6        Go ahead.
7 BY THE WITNESS:
8    A.   You received what is in my physical file.
9 BY MR. DAVIS:
10    Q.   So you -- the entirety of your physical
11 file included those two articles?
12    A.   That is correct.
13    Q.   Okay.  What about an electronic file, did
14 you search that exhaustively?
15    MR. FOWLER: Objection; form.
16 BY THE WITNESS:
17    A.   The electronic data that I had was
18 forwarded to you by counsel.  So did I search it, no.
19 It was just forwarded.
20 BY MR. DAVIS:
21    Q.   Okay.  But you -- so you are saying you
22 did not search your electronic data?
23    MR. FOWLER: Objection; form.
24 BY THE WITNESS:

Page 33

1    A.   My understanding of your question is did
2 you get all of the information electronic and hard
3 copy and you did.
4 BY MR. DAVIS:
5    Q.   How can you be sure of that if you did not
6 search any electronic file on your computer?
7    MR. FOWLER: Objection; form, argumentative.
8 BY THE WITNESS:
9    A.   So, searching a file and then sending you
10 part of it is not going to assure you got all of it.
11 The only thing I did was forwarded what I had, and it
12 was forwarded to you.  So I don't -- there is no
13 problem with you getting everything because I didn't
14 search it.
15 BY MR. DAVIS:
16    Q.   So your testimony is that you did search
17 your electronic media for items that would be
18 responsive to this notice?
19    MR. FOWLER: Objection; form.  This has been
20 asked and answered I think we've -- three times now.
21 BY THE WITNESS:
22    A.   What I did was I forwarded the items that
23 were requested that I had electronically and I just
24 sent them en masse.

Confidential Information - Subject to Protective Order

Page 34

BY MR. DAVIS:

2    Q.   Okay.  But it sounds like there were items
3  that were requested of you that you forwarded to
4  counsel to be produced.
5        My -- my question is whether there were
6  items that were not requested that you may have found
7  had you searched your computer.
8        Do you -- do you understand the
9  distinction there?
10   A.   I don't.
11   MR. FOWLER:  Objection to the form.
12 BY THE WITNESS:
13   A.   There are no other relevant documents to
14 this consultation that I'm doing that I have that you
15 don't have.
16 BY MR. DAVIS:
17   Q.   Okay.  Let's look at No. 3:  "Copies of
18 any notes or other documentation, including
19 PowerPoints, for any presentations, seminars or
20 classes given by Dr. Flack with regard to the risks
21 and benefits of" ARBs "or nitrosamines."
22        Do you see that?
23   A.   I see that.
24   Q.   Okay.  And it appears that we didn't

Page 35

1  receive any documents responsive to this request.
2        Is that a correct characterization?
3    MR. FOWLER:  Objection; form.  Counsel, you do
4  have the objections that -- that clearly state
5  counsel's position that there are no responsive
6  documents because it's beyond the scope of Rule 26.
7  So you have our objection and -- and understanding why
8  you have no such documents.
9  BY MR. DAVIS:
10   Q.   Is that counsel's position, Dr. Flack, or
11 is that a position that you agree with?
12   MR. FOWLER:  Objection; form.
13 BY THE WITNESS:
14   A.   My counsel and I are in sync on this.  So
15 I have no problems with my counsel's position.
16 BY MR. DAVIS:
17   Q.   Okay.  Have you given any presentations,
18 seminars or classes on nitrosamines?
19   A.   I have never given a specific class on
20 nitrosamines, no.
21   Q.   Okay.  Have you ever given any -- any
22 class on anything where nitro -- you recall
23 nitrosamines being a topic of -- of discussion?
24   MR. FOWLER:  Objection; form.

Page 36

1    A.   I'm not aware of any classes where they've
2  been discussed.
3  BY MR. DAVIS:
4    Q.   Okay.  Moving to No. 4, that one reads:
5  "Copies of any documents or articles relied upon for
6  the opinions set forth in the report served, if not
7  listed in the report."
8        Do you see that?
9    A.   I see it.
10   Q.   Are there any such documents or articles
11 that you relied upon that you don't list somewhere in
12 your report?
13   A.   I have forwarded to you everything that
14 I've relied upon.
15   Q.   Okay.  So there is no category of
16 documents out there that's -- that you've relied upon
17 that's not listed somewhere in your report?
18   MR. FOWLER:  Objection; form.
19 BY THE WITNESS:
20   A.   I've forwarded to you the documents that
21 I've used in generating this report.
22 BY MR. DAVIS:
23   Q.   I don't see the -- why you need to qualify
24

Page 37

1  your answer like that.  It's pretty simple question.
2        My -- my question is:  Are there any
3  documents out there that -- that you've relied upon
4  that are not somewhere in your report?
5    MR. FOWLER:  Objection to the colloquy.
6  BY THE WITNESS:
7    A.   I am not qualifying it.  I'm just telling
8  you that I have forwarded all of the documents to you
9  that I have used in my report.  It is pretty
10 straightforward.
11 BY MR. DAVIS:
12   Q.   So the answer is -- is no then, there are
13 no documents out there that you've relied upon that
14 are not somewhere in your report?
15   MR. FOWLER:  Objection to the form and you have
16 the objection to that request, Counsel.
17 BY THE WITNESS:
18   A.   I've answered your question, and I'll
19 repeat that I have forwarded all of documents to you
20 through my counsel that have been used in the
21 generation of my expert report.
22 BY MR. DAVIS:
23   Q.   Okay.  Do you take any issue with me
24 interpreting that as no, there are no other documents

Confidential Information - Subject to Protective Order

Page 38

1  out there, because I'm happy to move on if that's what
2  you are trying to tell me?
3      A.  I can't really speak for how you can
4  interpret it.  My answer is really clear, and
5  certainly no other documents being out there is
6  compatible with my answer.
7      Q.  Okay.  Well, I'll take that as a no then
8  and we'll move on.
9      MR. FOWLER:  Object to the colloquy.
10 BY MR. DAVIS:
11     Q.  Is your answer the same with No. 5, which
12 is:  "Copies of any documents or articles reviewed in
13 connection with the report served, whether or not
14 listed in the report or attachments thereto"?
15     MR. FOWLER:  Same objection to the form.
16 BY THE WITNESS:
17     A.  My answer to you is exactly the same.
18 BY MR. DAVIS:
19     Q.  Thank you.
20     No. 6 requests:  "Any illustrations,
21 PowerPoints, images, charts, tables, or demonstrative
22 exhibits that may be used by you in connection with a
23 Daubert hearing or trial testimony in this
24 litigation."

Page 39

1      Do you see that?
2      A.  Yes, I see it.
3      Q.  Okay.  And I understand that your counsel
4  has objected to responding to this request.
5      Is that your understanding as well?
6      A.  That's what it says.
7      Q.  That's a yes?
8      A.  Yes.
9      Q.  Are you aware of the existence of any
10 illustrations, PowerPoints, images, charts, tables or
11 demonstrative exhibits that have not been included in
12 your report or its attachments?
13     MR. FOWLER:  Objection to form.
14 BY THE WITNESS:
15     A.  There is nothing that's consistent with
16 this question that you haven't received.
17 BY MR. DAVIS:
18     Q.  So the answer is, no, you are not aware of
19 the existence, current existence of any of those
20 categories of documents that do not appear in your
21 report or its exhibits?
22     MR. FOWLER:  Objection; form.  Counsel, if you
23 are speaking of No. 6, you have now gone past that, so
24 object to the form of the question.

Page 40

1      MR. DAVIS:  Well, I'm not -- I'm -- I'm asking a
2  question that's related to No. 6, which is whether he
3  is aware of the existence of any illustrations,
4  PowerPoints, images, charts, tables or demonstrative
5  exhibits that relate in any way to your report or its
6  exhibits that are not included in the -- in the report
7  or exhibits.
8  BY MR. DAVIS:
9      Q.  Do you follow the question, Dr. Flack?
10     MR. FOWLER:  And I object.  To be clear, don't
11 couch it as No. 6 if you are going past that.
12     MR. DAVIS:  It's related to No. 6.  You can stop
13 the -- I'm asking a question of Dr. Flack.
14 BY MR. DAVIS:
15     Q.  Dr. Flack, let me start over just so it's
16 clear.
17     Are you aware of the existence, current
18 existence of any illustrations, PowerPoints, images,
19 charts, tables or demonstrative exhibits that relate
20 in any way to your report or its attachments that are
21 not included in the report or attachments that were
22 served on us?
23     A.  I have no such documents.
24     Q.  Okay.  Thank you.

Page 41

1      No. 7 is documentations of -- or
2  documentation of any research grants that you've been
3  provided to study any ARBs, nitrosamines, or health
4  effects potentially related thereto.
5      Do you see that?
6      A.  Yeah.
7      Q.  Okay.  And -- and we'll get to your CV in
8  a little bit where you do document research grants
9  related in some cases to ARBs.  Let me focus on
10 nitrosamines.
11     Have you received any research grant to
12 study nitrosamines ever?
13     A.  All research grants are listed in my CV.
14 I've never received a grant to study nitrosamines.
15     Q.  Okay.  Thank you.
16     Have you ever received a research grant to
17 study cancer?
18     A.  I am not a cancer researcher and I've
19 never received a research grant to study cancer.
20     Q.  No. 8 is a slightly different request, but
21 is your answer the same with regard to research that
22 you've performed?  Have you performed any research
23 regarding nitrosamines, for example?
24     A.  I have never done any of this with

Page 42

1 nitrosamines, no.

2    Q.   Okay.  And same answer with respect to

3 cancer?

4    A.   That would be correct.

5    Q.   Are you aware of any -- well, let me start

6 with -- so No. 9, it appears your counsel has objected

7 to producing those documents.

8        Is that your understanding?

9    A.   So when I -- when I read No. 9 it's hard

10 to produce something that you are not aware that

11 exists.  I'm not aware that there has been any of

12 these kinds of documents put forth in -- in my

13 practice, certainly not in my department, and so there

14 is really nothing there to produce.

15    Q.   Okay.  Thank you.  That answers my next

16 question, so I can move on.

17        No. 10 is: "Any documents or

18 communications that" you have "received from any

19 person or entity with regard to nitrosamine impurities

20 in ARBs or any other drug."

21        And it appears again your counsel, again,

22 has objected to providing documents responsive to this

23 request.

24        Is that your understanding?

Page 43

1    A.   My understanding of this is you are asking

2 me, for example, if I had a -- a person ask about

3 these impurities or if I sent a letter in regards to

4 that.

5        No. 1, I don't have to give you privileged

6 information in the sense of things that are specific

7 to a patient because we don't release information

8 specific to patients to outside entities.

9        No. 2, I don't have any written documents

10 that I've had conversations with people in person and

11 over the phone about this and all, but there is

12 nothing to produce in regards to that.

13    Q.   Okay.  Well, let -- let's take it

14 stepwise, because No. 10 is documents that you've

15 received, not ones that you've sent.

16        So have -- are you aware of having

17 received documents regarding nitrosamine impurities

18 in -- in any ARB or other drug from any entity or

19 person?

20    A.   No, I am not.

21    Q.   Okay.  And then No. 11, I believe you

22 touched on this, this is communications or documents

23 to anyone regarding nitrosamine impurities.

24        And is your answer to that to the extent

Page 44

1 those communications exist they would be privileged?

2    A.   My -- if I have a -- a conversation about

3 a health-related matter with a patient, I am not at

4 liberty to discuss that with anybody else outside of

5 my care team or other people who are involved in their

6 care.  I've had conversations here, but there is,

7 again, nothing to document.

8    Q.   Okay.  And then, finally, No. 12 is

9 textbooks referenced by you in forming your opinions.

10        Would any textbooks, references, or sites

11 be -- have been included in your report or its

12 attachments?

13    A.   I included everything that I used and

14 documented.  I documented no textbook references in

15 the list of references that were included in my expert

16 report.

17    Q.   Okay.  What's your understanding of who

18 has retained you in this matter?  Is it just Teva or

19 have all of the manufacturer defendants in this

20 litigation retained you?

21    MR. FOWLER:  Objection.

22    MS. KAPKE:  Object to form.

23 BY THE WITNESS:

24    A.   I was retained by Teva.  I have no clear

Page 45

1 understanding about other defendants, and I've -- I've

2 never -- never focused on that.  So my understanding

3 that I was retained by Teva and -- and all, but there

4 may be others involved.

5 BY MR. DAVIS:

6    Q.   Okay.  Have you -- in -- in preparing your

7 report or preparing for your testimony today, have you

8 talked with counsel for any of the other defendants?

9    MR. FOWLER:  Objection; form.

10 BY THE WITNESS:

11    A.   What -- what are you -- what are you

12 asking me?  I mean, have I talked to --

13 BY MR. DAVIS:

14    Q.   Sure.  My -- well, let me -- let me

15 rephrase it in a more particularized way, which is:

16        In your work on this matter, have you had

17 communications only with Teva attorneys at Greenberg

18 Traurig or have you had any communications of any kind

19 with counsel for the other defendants?

20    MR. FOWLER:  Objection; form.

21 BY THE WITNESS:

22    A.   My conversations on this have been with

23 Teva.  There have been other counsel there, but I

24 speak with Teva.

Confidential Information - Subject to Protective Order

Page 46

BY MR. DAVIS:

2    Q.   Okay.  Have you ever had any
3 communications with counsel for any of the other
4 defendants that occurred outside of the presence of
5 counsel for Teva?
6    MR. FOWLER:  Objection; form.
7 BY THE WITNESS:
8    A.   I've never had any communication with any
9 counsel outside of conversations or things that have
10 occurred with Teva being there, Greenberg Traurig.
11 BY MR. DAVIS:
12    Q.   Okay.  And that includes written
13 communications like e-mails?
14    A.   It really includes anything, everything.
15    Q.   Okay.  Have you spoken with any other
16 experts retained by the defense in this litigation?
17    A.   I have not spoken with any other experts
18 retained.
19    Q.   How about written communications, like
20 e-mails?
21    A.   I have not communicated in any form with
22 any other experts in this case.
23    Q.   Okay.  You did review a number of expert
24 reports on -- on both sides, correct?

Page 47

1    A.   I've reviewed some of the expert reports,
2 correct.
3    Q.   Okay.  Which of the defendants' expert
4 reports have you reviewed?
5    A.   I don't remember offhand.  It has been a
6 while, so I don't know exactly which ones I reviewed.
7    Q.   Okay.  Are you relying on any of the
8 opinions expressed by any of these other defense
9 experts in forming your own opinions?
10    A.   My opinion is expressed in my expert
11 report and the way my testimony goes today is based
12 on -- on my understanding and interpretation of -- of
13 data and not re -- really relying on -- on other
14 expert witness reports to guide me in any way.
15    Q.   In preparing your report, did you
16 familiarize yourself with Federal Rule of Civil
17 Procedure 26, which governs the scope and contents of
18 your report?
19    A.   No, I mean, I did not familiarize my --
20 myself with that.
21    Q.   Okay.  Do you feel that your report
22 complies with Rule 26(a)(2)(B)(1), and I'll phrase
23 exactly what I'm talking about here, which requires
24 that the report must contain a complete statement of

Page 48

1 all opinions the witness will express and the basis
2 and reasons for them.
3    Do you feel your report complies with
4 that?
5    MR. FOWLER:  Objection to form.
6 BY THE WITNESS:
7    A.   My report complies with that statement up
8 to the time that I -- I wrote the report.  We don't
9 stop learning and assimilating information and
10 acquiring information at any one particular date.  So
11 my report up to the date I wrote that report is in
12 compliance with that.
13 BY MR. DAVIS:
14    Q.   Okay.  And so it con -- it contains a
15 complete statement of all of your opinions and the
16 basis and reasons for them as of the date you signed
17 it?
18    A.   My report complies with the Federal
19 article you -- you mentioned, No. -- No. 26, as of the
20 date that it was completed.
21    Q.   And to be clear, you haven't served any
22 kind of updated, revised report since that date,
23 correct?
24    A.   I have not served any updated, revised

Page 49

1 report since that date, no.
2    Q.   Let's go ahead and mark it.  I'm marking
3 your report as Plaintiff-Flack 3.
4    (WHEREUPON, a certain document was
5    marked Plaintiff-Flack Deposition
6    Exhibit No. 3, for identification, as
7    of 09/28/2021.)
8 BY MR. DAVIS:
9    Q.   I assume you have a copy of your report
10 printed out, Dr. Flack?
11    A.   Yes, I do.
12    Q.   Okay.  Do you recognize this as your
13 report which you appear to have signed August 2nd,
14 2021?
15    A.   I recognize this as the report I signed,
16 correct.
17    Q.   Okay.  When did you start actually writing
18 this report?
19    A.   Well, I previously stated that I started
20 working on this during the month of June, in early
21 June, and so my work started then and was completed by
22 the date on my report.
23    Q.   Okay.  But -- and that date is August 2nd?
24    A.   That's what the report says, yes.

Confidential Information - Subject to Protective Order

Page 50

1    Q.   Let me refer you back to your invoice for
2  a second, the -- the first one that we have.
3         Do you see that, Dr. Flack?
4    A.   I see it.
5    Q.   Do you see the description of services for
6  those 43 and a half hours?
7    A.   Yeah.
8    Q.   Okay.  It's -- it reads:
9         "Conduct research and review documents and
10 materials, prepare for and participate in meeting,
11 participate in telephone meeting."
12        Do you see that?
13   A.   I see it.
14   Q.   Okay.  Is it -- am I to take that to mean
15 that you had not started writing your report as of
16 July 20th?
17   A.   No, you are not to take it as that because
18 that's not the case.
19   Q.   Okay.  So even though it's not listed in
20 your description of services, you were, in fact,
21 writing your report prior to July 20th?
22   A.   I was writing my report starting in June
23 of this past year.
24   Q.   Okay.  And while we have it up, as of

Page 51

1  July 20th, you had billed $26,100 at a rate of $600
2  per hour?
3    A.   That would be correct.
4    Q.   So when you signed your report on
5  August 2nd, did you feel that you had, in fact,
6  accomplished your assignment of setting forth your
7  opinions in compliance with Rule 26 as I read it?
8    MR. FOWLER:  Objection; form.
9  BY THE WITNESS:
10   A.   I had felt I had accomplished writing a
11 comprehensive report that was within the scope of what
12 I was asked to do.
13 BY MR. DAVIS:
14   Q.   Okay.  Did you endeavor just to list your
15 conclusions in the report or also to explain the
16 process by which you arrived at those conclusions?
17   MR. FOWLER:  Objection; form.  The report speaks
18 for itself.
19 BY THE WITNESS:
20   A.   So my answer to that is that really the --
21 it is pretty self-evident in there that, one, I not
22 only gave conclusions but I gave actual factual data
23 and interpretations that led to those conclusions.  So
24 the premise that I only gave conclusions is erroneous.

Page 52

1  BY MR. DAVIS:
2    Q.   Sorry.  The conclusion that what was
3  erroneous?
4    A.   The conclusion that I only gave
5  conclusions is erroneous.  There is plenty of
6  rationale for why I came to the conclusions that I
7  did.
8    Q.   Okay.  Let's start at -- with just the
9  very first page of your report.
10        You -- you state in that first paragraph
11 that:  "...each of my opinions is based on the
12 materials I have reviewed in connection with this
13 litigation, the methods and procedures of science, and
14 my knowledge of recognized medical and scientific
15 principles..."
16        And I'll continue:  "Each opinion is
17 offered to articulate a sufficiently reliable basis
18 for my opinions concerning this case."
19        Do you see that?
20   A.   I see it.
21   Q.   Okay.  And by "opinions" there, you mean
22 the opinions that are expressed in your report,
23 correct?
24   A.   I'm talking about the opinions in my

Page 53

1  report.
2    Q.   And in coming to those opinions, did you
3  endeavor to discuss the facts and reference materials
4  that you found to be most important to you in coming
5  to those opinions?
6    A.   Yes, I did.
7    Q.   Do you feel like you wrote your report
8  carefully and with precision?
9    A.   Anything that I write and put my name on I
10 write carefully with precision and care.
11   Q.   And that includes the actual wording of
12 the report as well as the substantive content?
13   MR. FOWLER:  Objection; form.
14 BY THE WITNESS:
15   A.   That includes all of that.
16 BY MR. DAVIS:
17   Q.   Did you give your report a detailed once
18 over or twice over before actually signing it when it
19 came time to sign?
20   A.   By the time I write a report I read it and
21 worked on it many times more than a once or twice
22 over.  So at the very end, you know, at some point you
23 finish it, abandon that, but there as been many
24 iterations that you -- you go through and you look at

Page 54

1  it and so there is -- there is ongoing scrutiny.  So
2  it's not just a I write, write, write and then once or
3  twice at the end I look at it.
4      Q.   Well, sure, I guess my -- my question is
5  more geared towards prior to signing it, did you give
6  it a thorough review to make sure that you had not
7  missed anything important?
8      MR. FOWLER:  Objection; form.
9  BY THE WITNESS:
10     A.   So -- so anything that I write, including
11 this report, I'm very careful about what I write, what
12 my interpretations are, how I write it, and -- and all
13 in this report, again, is no exception to that.
14 BY MR. DAVIS:
15     Q.   Okay.  For example, in -- in that review
16 process, did you check your references for accuracy as
17 much as possible?
18     A.   You always check your references for
19 accuracy, correct.
20     Q.   Okay.  And that you didn't leave out any
21 important reference?
22     A.   I don't know what you consider an
23 important reference.  I used references that I thought
24 were -- were important.  Somebody else might think

Page 55

1  others are important.  And so that is an unanswerable
2  question for anyone other than myself.
3      Q.   Well, sure, and that's what I was asking,
4  I guess.  Let me rephrase it.
5          Did you -- did you make sure that you did
6  not leave out any reference that you thought was
7  important in coming to your opinions as expressed in
8  the report?
9      A.   Up to the time that I wrote the report, I
10 included the references that I believed to be the
11 important references, and I've continued to work since
12 the report is -- is written as I should and am
13 supposed to.  So that doesn't preclude the fact
14 that -- that I may find something else in the
15 literature that's not in the report, but it doesn't
16 invalidate what I did up to that point of August the
17 2nd.
18     Q.   Okay.  Well, let me -- let me ask it a
19 slightly different way.
20          You have an Exhibit B, a list of materials
21 considered, correct?  Do you -- do you understand that
22 that's an attachment to your report, Dr. Flack?
23     A.   Yes.
24     Q.   Okay.  And would you agree with me that

Page 56

1  there are quite a few documents or even categories of
2  documents listed in that Exhibit B that are not in
3  your report, and I'll give an example, like the -- you
4  reference a number of plaintiff bellwether documents
5  for bellwether plaintiffs and their records in your
6  materials considered, but I don't see any reference to
7  that in -- in your report.
8          Can you explain why that would be?
9      MR. FOWLER:  Object to the form of the question.
10 BY THE WITNESS:
11     A.   First of all, when you are reviewing
12 documents, literature in writing, you don't -- you
13 don't reference everything that you read.  You
14 reference the most important documents.  And I
15 referenced the most important documents and anything
16 else that was available to me was disclosed to you,
17 but there -- there is no -- everybody who writes does
18 it differently, and -- and all and I -- I did it the
19 way that I am comfortable with doing it.  I published
20 over 210 papers and I am an associate editor for a
21 journal and I know this process backwards and forwards
22 how to write and communicate.
23     Q.   Sure.  And I'm not challenging you on
24 that.  I'm just trying to understand what it means to

Page 57

1  be -- to have made your list of materials considered.
2          Is that -- are all of those things just
3  things that you've reviewed and I think you -- as you
4  testified just were made available to you, is that how
5  I'm to understand that or does that not necessarily
6  factor into your opinions?
7      MR. FOWLER:  Hold on.  Object to the colloquy,
8  object to the compound question.  Can you ask a clear
9  question, Counsel?  I'm not following.
10     MR. DAVIS:  Well, hold on, the witness hasn't
11 said it's not clear.
12 BY MR. DAVIS:
13     Q.   Dr. Flack, did you understand my question?
14     A.   It's not clear.
15     Q.   Okay.  So you -- you testified in a
16 previous answer that those -- that the materials
17 considered were documents that were made available to
18 you, right?
19     A.   I considered documents from a variety of
20 sources, including those that have been made available
21 to me, as previously described.
22     Q.   Okay.  And -- and my -- my question is:
23 Are those -- did it make -- was it sufficient to make
24 that list simply that you reviewed the document or am

Page 58

1 I to interpret every single one of those documents as
2 something that you relied upon in forming your
3 opinions?
4    MR. FOWLER:  Objection; form.
5 BY THE WITNESS:
6    A.   Everything that was supplied to me did not
7 get extensively review.  Some of it was cursorily
8 reviewed, some of it was not reviewed.  You simply
9 have what was supplied to me.
10 BY MR. DAVIS:
11    Q.   Okay.  Thank you.  I just am trying to get
12 an understanding there, and I think that clears it up.
13       Before I move into your CV, we -- we've
14 been going for more than an hour.  Should we take a
15 quick break?  Do you want to take a break, Dr. Flack,
16 before I jump into another set of questions?
17    A.   Yeah, that's fine.
18    MR. DAVIS:  Okay.  Let's go off the record.
19    MR. FOWLER:  Five, six minutes, Counsel?
20    MR. DAVIS:  Are we off the record?
21    THE VIDEOGRAPHER:  The time is 10:12 a.m., off
22 the record.
23       (WHEREUPON, a recess was had
24         from 10:12 to 10:24 a.m.)

Page 59

1    THE VIDEOGRAPHER:  The time is 10:24 a.m., on
2 the record.
3 BY MR. DAVIS:
4    Q.   Okay.  Dr. Flack, just a couple of cleanup
5 items before we move on.
6       You -- you had testified earlier that you
7 had served as an expert witness in four to five
8 medical malpractice cases, is that right?
9    A.   That is correct.
10    Q.   Okay.  Did any of those cases have
11 anything to do with any of the issues in this
12 litigation?
13    A.   None of the cases I previously served as
14 an expert witness had anything to do with this
15 litigation.
16    Q.   Okay.  Or any of the issues around
17 nitrosamines and cancer, anything like that?
18    A.   None of the cases that I previously have
19 been an expert witness in had anything to do with this
20 litigation.
21    Q.   Okay.  I'm going to mark your CV as
22 Exhibit 4.
23       (WHEREUPON, a certain document was
24         marked Plaintiff-Flack Deposition

Page 60

1       Exhibit No. 4, for identification, as
2       of 09/28/2021.)
3    MR. FOWLER:  And I've got a hard copy in front
4 of him, Counsel.
5    MR. DAVIS:  Thank you.
6 BY MR. DAVIS:
7    Q.   Okay.  Do you recognize this as your CV,
8 Dr. Flack?
9    A.   I recognize this as my CV.
10    Q.   Okay.  When is the last time you updated
11 this CV as it was produced to us?
12    A.   It should be dated on the front.  And it
13 was probably sometime in the summer, like spring or
14 summer.
15    Q.   Sure.  I -- I see just above your
16 signature June 28th, 2021.
17    A.   That would be an approximate timeframe,
18 correct.
19    Q.   Okay.  Was this CV prepared specifically
20 for -- for this expert report assignment or is this
21 the CV that you have maintained as part of your --
22 your work outside of this -- this litigation?
23    A.   I maintain a CV that is almost never
24 tailored to any one specific request.  This is just my

Page 61

1 CV.  It is as it is.
2    Q.   Okay.  Did you make any changes to it for
3 use in this litigation?
4    A.   Did I make changes other than updating
5 things that may need to be included, no.
6    Q.   Okay.  Can you briefly walk me through
7 your -- we'll start with your educational background.
8       Can you walk me through that in narrative
9 format, briefly?
10    A.   So I went to Chickasha High School,
11 subsequently went to Langston University where I was a
12 chemistry major, math minor, football player; entered
13 medical school at the University of Oklahoma in 1978,
14 graduated in '82; enrolled in an internal medicine
15 residency there '82 to '85; '85 to '86 I was the chief
16 resident in medicine there; '86 to '88 I was on
17 faculty; and then I left for the University of
18 Minnesota where I did, again, National Institutes of
19 Health postdoctoral fellowship, cardiovascular
20 epidemiology, and finished my MPH there and have been
21 a faculty member there and other places ever since.
22    Q.   Okay.  Let's -- and let's discuss your
23 professional experience then.
24       You -- you started -- where -- where is

Page 62

1  the University of Minnesota located?
2      A.    Minneapolis.
3      Q.    Okay.  Is that where you would say your
4  post-academic career started?
5      A.    No.  My post-academic career started at
6  Oklahoma.  I started working on my MPH at Oklahoma
7  University College of Health.  I spent two years doing
8  that as an instructor in the Department of Medicine
9  before I moved on to finish my MPH.  I completed my
10  MPH post-doc in cardiovascular epi at the University
11  of Minnesota.
12      Q.    Okay.  What -- what years were you in --
13  in Oklahoma?
14      A.    I was in medical school through the end of
15  my faculty there between 1978 and 1988.
16      Q.    Okay.  And then what years were you in
17  Minnesota?
18      A.    I was in Minnesota between '88 to probably
19  '94, a total of about six years.
20      Q.    Okay.  And then after University of
21  Minnesota, where did you go?
22      A.    I switched my education by that time and I
23  spent three years at Wake Forest Bowman Gray before I
24  moved to Wayne State in Detroit.

Page 63

1      Q.    Okay.  At Wayne State in Detroit, what
2  was -- what years were you in Detroit?
3      A.    1997 to 2015.
4      Q.    And you were on the faculty at Wayne
5  State?
6      A.    On the faculty at Wayne State.
7      Q.    Okay.  Did you have a private practice as
8  well?
9      A.    I had a practice, a clinical practice
10  there the entire time I was there.
11      Q.    Okay.  What was the name of your clinical
12  practice?
13      A.    I was director of the hypertension clinic.
14      Q.    The hypertension clinic at -- at where?
15      A.    At Wayne State.
16      Q.    Oh, at Wayne State.  Okay.
17          And then since 2015 to today, you've --
18  you've been in Springfield, Illinois, is that right,
19  at SIU?
20      A.    I've been at Southern Illinois since May
21  of 2015.
22      Q.    Do you have any board certifications?
23      A.    Certified -- board certified by the
24  American Board of Internal Medicine in internal

Page 64

1  medicine, I am also certified as a specialist in
2  clinical hypertension by the now defunct American
3  Society of Hypertension, which was folded into AHA,
4  American Heart Association, and I am president of the
5  American Hypertension Specialist Certification
6  Program.
7      Q.    Okay.  Do you have any board
8  certifications in oncology or anything cancer related?
9      A.    I have no certifications in oncology
10  because I've never had anything other than residency
11  training in oncology.
12      Q.    Okay.  How about, to the extent they
13  exist, any board certifications in toxicology or
14  anything related to exposure to hazardous chemicals?
15      A.    I am not board certified in toxicology.
16      Q.    None of your research interests outside of
17  this litigation involve nitrosamines or cancer, do
18  they?
19      MR. FOWLER:  Objection; form.
20  BY THE WITNESS:
21      A.    I have not conducted any research in
22  nitrosamines, no.
23  BY MR. DAVIS:
24      Q.    Okay.  Looking through your CV, is it fair

Page 65

1  to say that you've received a lot of funding over the
2  years from pharmaceutical companies?
3      MR. FOWLER:  Objection; form.
4  BY THE WITNESS:
5      A.    From my perspective, I had received
6  funding from a -- a range of sources and from a range
7  of pharmaceutical companies to conduct varied
8  research.
9  BY MR. DAVIS:
10      Q.    And well, let's -- let's break it up, I
11  guess.
12          Would you agree that you've received
13  funding from pharmaceutical companies in the form of
14  research grants?
15      A.    Well, that question is pretty clear from
16  my CV.  Absolutely I have.
17      Q.    Okay.  How about consulting work, speaker
18  programs, advisory boards, things like that?
19      A.    I've done some advisory boards.  The
20  speaker bureau, I'm not on any speakers bureaus at --
21  at present.  That's all no.  And so, yeah, I've --
22  I've consulted with companies on -- on various things
23  related to their products and research they are doing.
24      Q.    Okay.  You mentioned you are not on any

Page 66

1 speakers bureaus at present.
2         Were you in the past on speakers bureaus?
3     A.   Yes, I was on speakers bureaus in the
4 past, but I -- I no longer do that.
5     Q.   Why don't you do that any longer?
6     A.   One, I don't really have time to do it
7 because the pharmaceutical industry in certain areas
8 has -- has, one, they have de-emphasized speakers
9 bureaus and, two, they are -- they are promotional,
10 and when I talk, I am not really interested in being
11 promotional.  So any talking that I do is typically
12 done under organizations like the American Heart
13 Association or -- or other organizations.  Sometimes
14 pharmaceuticals may sponsor certain things, but that's
15 rare that I work directly with a pharmaceutical
16 company at a speaking engagement.
17     Q.   Okay.  Do you have any understanding of
18 why pharmaceutical companies have de-emphasized
19 speakers programs?
20     MR. FOWLER:  Objection; form, speculation.
21 BY THE WITNESS:
22     A.   Yeah, I think everybody pretty much knows
23 that the FDA cracked down the -- also, two, the
24 individual practitioner is less of a control factor

Page 67

1 and who writes what prescriptions now, a lot of that
2 is controlled on what's on the formulary, decision is
3 made oftentimes outside of the practitioner.
4         So the approach that pharmaceutical
5 companies have taken to actually promote their
6 products has just morphed over time in an explainable
7 way, understandable way.
8 BY MR. DAVIS:
9     Q.   Okay.  But you did mention that part of
10 the reason for that de-emphasizing is because they got
11 in a lot of trouble over it, right?
12     MR. FOWLER:  Objection; form, mischaracterizes
13 the testimony.
14 BY THE WITNESS:
15     A.   There are -- there are a variety of
16 reasons, including the FDA crackdowns that really
17 forced a change in how pharmaceutical companies
18 sponsor lectures and give promotion and now the -- the
19 issue of promotion is -- has been de-emphasized and
20 it's really not something that I'm engaged in at -- at
21 this point.
22 BY MR. DAVIS:
23     Q.   About what year did you stop participating
24 in speakers bureaus for pharmaceutical companies?

Page 68

1     A.   I would guess that it was probably
2 somewhere around 2008, 2010 when -- when I was no
3 longer doing it.
4     Q.   Do you recall what year you started
5 participating in speakers bureaus?
6     A.   I started in 1986 when I joined the
7 faculty at the University of Oklahoma.
8     Q.   And to be clear, that's when you started
9 participating in speakers bureaus for pharmaceutical
10 companies?
11     A.   Correct.
12     Q.   Okay.  And your testimony is that you
13 still do consulting work for various pharmaceutical
14 companies, is that right?
15     A.   I do for -- for pharmaceutical companies,
16 device companies, I've done consulting related to --
17 typically related to research that's ongoing.
18     Q.   Would you have also started that
19 consulting work back in 1986 or was that a different
20 start date?
21     A.   Well, the people who get called in for
22 consulting are typically people who have an
23 established track record and a clear footprint in --
24 in the field.  So it takes a while to do that.  So a

Page 69

1 lot of the consulting probably did not start until
2 sometime in -- in the 1990s because I needed time to
3 really develop a footprint and a reputation in the
4 field.
5     Q.   What about advisory boards?
6     A.   Yeah, I've done advisory boards from how
7 to recruit into clinical research, I've done advisory
8 boards where I've -- I've sat on mock FDA panels
9 because I spent three years, I believe about three
10 years as a standing member of the FDA cardiorenal
11 advisory panel, and -- and also I've been on advisory
12 boards where companies are taking their product to the
13 FDA and they put together a mock FDA panel or a couple
14 of them before they go and because of my experience
15 I've served on those.
16     Q.   Okay.  Do you currently still serve on
17 pharmaceutical company advisory boards?
18     A.   So typically the advisory boards are ad
19 hoc as opposed to standing, and so am I on any
20 standing advisory boards at this moment, no.
21     Q.   When is the last ad hoc pharmaceutical
22 company advisory board that you've participated in?
23     A.   I participated in an advisory board about
24 two weeks ago with Amgen on their RISE program which

---

Page 70

1 was looking at how to recruit African Americans into
2 their clinical research program so they had better
3 representation in their trials before they went to the
4 FDA for approval.
5     Q.   Okay.  Did you receive any kind of
6 honorarium or payment for that advisory board that you
7 sat on for Amgen?
8     A.   You know my time is valuable and that I --
9 I get paid when -- when I -- when I do this, and of
10 course I got paid to do it.
11     Q.   Okay.  And that's the case for -- for all
12 of these categories of pharmaceutical
13 industry-supported items we went through, like
14 speakers bureaus, consulting, advisory boards, those
15 all come with -- with payment, correct?
16     A.   I am on an advisory board most of the time
17 I've been paid.  There are a couple of times I
18 haven't, but it was typically a very young company and
19 I was just interested in what they were doing and
20 beyond expenses I didn't get payment.
21     Q.   Okay.  Let's go to the grants and
22 contracts portion of your report around page -- it
23 starts at the bottom of Page 23.  And let's start with
24 the active -- I see that you've broken it down by

---

Page 71

1 active, pending review, submitted but unfunded and
2 then completed.
3         Do you see that, and that it extends
4 through about Page 34 of your report from Page 23?
5     A.   Yes.
6     MR. FOWLER:  You keep saying "report," Counsel.
7 CV.
8     MR. DAVIS:  Sorry.  CV.  My apologies.
9 BY MR. DAVIS:
10     Q.   So let's start with the active ones.  Can
11 you tell me what "FTE" means?
12     A.   Full-time equivalent.
13     Q.   Gotcha.  Okay.  So that's a measure of
14 your time?
15     A.   A measure of my time commitment.
16     Q.   Understood.
17         Take a look at No. 3, which is the study
18 that's sponsored by GlaxoSmithKline.
19         Do you see that?
20     A.   I see it.
21     Q.   Okay.  Next to GlaxoSmithKline there is a
22 parenthetical that says "(approximately $210,000)."
23         Do you see that?
24     A.   Yes.

---

Page 72

1     Q.   Okay.  I've noticed that some of the
2 numbers across this Grants and -- and Research section
3 of your report have parentheses around them and some
4 don't.
5         Is the parenthetical meant to signify
6 anything or is that just using parentheses sometimes
7 but not others?
8     A.   Well, it's not really meant to signify
9 anything except that was the estimate.  Some of the
10 grants you -- you basically get paid for recruiting
11 participants, so you don't really know the work of the
12 grant until you've finished your recruitment, so it is
13 really harder to estimate.  So a lot of times there
14 may not be a number there, occasionally there -- there
15 might be, but there -- there is no special meaning to
16 it.
17     Q.   Okay.  Do you own or -- or partially own
18 an -- any entity?
19     A.   I'm not sure I understand your question.
20 What entity are you talking about?
21     Q.   Well, I'm asking if you are the owner or
22 partial owner of any business entity, LLP, LLC,
23 corporation?
24     A.   No, I'm not a part owner of anything

---

Page 73

1 unless you consider --
2     MR. DAVIS:  Hey, Stephen, you might want to mute
3 yourself so you don't get an echo.
4     MR. FOWLER:  That was -- that was accidental.
5 BY THE WITNESS:
6     A.   -- my wife's law firm which is run out of
7 our house.  She is a corporate lawyer.  But other than
8 that, no.
9 BY MR. DAVIS:
10     Q.   Let's focus on just one company for a
11 moment, which is Novartis.
12         Is it fair to say that -- that Novartis
13 has given you millions of dollars in the form of
14 research grants over the years?
15     MR. FOWLER:  Objection; form.
16 BY THE WITNESS:
17     A.   No, it wouldn't be fair to say and there
18 is no evidence of that even remotely in my C -- in my
19 CV.
20 BY MR. DAVIS:
21     Q.   Well, let's -- let's take a look at the
22 completed portions of your grants and contracts which
23 starts on Page 26.
24         You'll see No. 3 there, which is a study

---

Page 74

1 titled "Vitamin D Augmentation of Tekturna in
2 Hypertension"?
3     A.   Correct.
4     Q.   Do you that see the funder there is
5 Novartis?
6     A.   Yes, I see it.
7     Q.   And the funding amount is $512,000 --
8 $512,733?
9     A.   I see that.
10     Q.   Okay.  And then further down on the same
11 page, No. 5.  So --
12     A.   Let's -- let's -- let's go look at it a
13 little further though.  So essentially what happened
14 in this is we got very little of the funding because
15 through the Altitude study and the really crashing and
16 burning of aliskiren, and so the initial funding that
17 they promised they pulled and we only -- we probably
18 didn't get $25,000 in that.  So that was the initial
19 funding amount, but that is not what we received
20 because of what they -- they did.
21     Q.   And -- and the reason they pulled the
22 funding was -- was why again?
23     A.   Because they had a couple of studies that
24 came out with the drug aliskiren, a direct renin

Page 75

1 inhibitor, that really cast a bad light on the drug,
2 and they really just backed off of it, decided that
3 they really weren't going to promote it, and in
4 parallel they weren't going to invest in any science
5 to try to understand the drug better.  That's where
6 our study was, is a study to understand the drug
7 better.
8     Q.   Okay.  So -- so why is this in the
9 completed portion of grants and contracts and not in
10 the submitted but unfunded portion?
11     A.   Well, because it -- it was funded but
12 it -- it's a unique situation in that once it was
13 funded, it was partially funded and then essentially
14 Novartis backed out of the funding commitment when
15 they pretty much abandoned this drug.
16     Q.   Understood.
17         So would that be the same case for No. 5
18 there, also a Tekturna study, $53,000?
19     A.   That was a -- a study that I -- I think we
20 probably went on and did that.  We weren't the -- the
21 primary -- we were a subcontracting with Beaumont, but
22 we -- we probably got the funding for this.
23     Q.   Okay.  What about the one on Page 29,
24 No. 15, which is a Lotrel study funded by Novartis for

Page 76

1 $42,000.
2         Do you see that?
3     A.   Yes, I see that.
4     Q.   Okay.  Did that one actually get funded?
5     A.   Yeah, that's a legitimate study.
6     Q.   And then what about on Page 33, a Sandoz
7 study, do you -- do you -- is it your understanding
8 that Sandoz is owned by Novartis?
9     A.   I have no clue who Sandoz is owned by.  I
10 know they are no longer in existence and I've never
11 equated Sandoz with Novartis.
12     Q.   Okay.  Well, nevertheless, do you -- do
13 you see that stun -- study had a funding amount of
14 almost $760,000?
15     A.   Where is this?
16     Q.   Page 33 of your CV, No. 39.
17     A.   So -- so the the -- the MIDAS study, one, I
18 was -- this actually occurred during the time I was a
19 postdoctoral fellow at the University of Minnesota, I
20 was a -- a co-PI with my mentor, and that was very
21 early in my career, so yeah.
22     Q.   Okay.  Let me just rattle off a few other
23 companies, has MSP Singapore Merck made research
24 grants to you?

Page 77

1     MR. FOWLER:  Form.
2 BY THE WITNESS:
3     A.   I don't recognize that.
4 BY MR. DAVIS:
5     Q.   AstraZeneca?
6     MR. FOWLER:  Same.
7 BY THE WITNESS
8     A.   It may -- if it's listed on my CV, yeah.
9 If not, no.
10 BY MR. DAVIS:
11     Q.   Pfizer?
12     MR. FOWLER:  Same objection.
13 BY THE WITNESS:
14     A.   I've done research for Pfizer.
15 BY MR. DAVIS:
16     Q.   GlaxoSmithKline and Smithkline Beecham?
17     A.   If I haven't done research with them, my
18 CV is inaccurate.  My CV is accurate.
19     Q.   Sanofi Aventis?
20     MR. FOWLER:  Same objection.
21 BY THE WITNESS:
22     A.   Yeah, I've done work with them.
23 BY MR. DAVIS:
24     Q.   Novo Nordisk?

Page 78

1    MR. FOWLER:  Same objection.
2    BY THE WITNESS:
3        A.   If it's on my CV, I've done work with
4    them.
5    BY MR. DAVIS:
6        Q.   Have you ever conducted or participated in
7    a study that had anything to do with NDMA, NDEA or
8    nitrosamines generally?
9        A.   I have never participated, conducted
10   research in that area.
11       Q.   Okay.  Have you ever conducted or
12   participated in a study that had anything to do with
13   examining the carcinogenic potential of any chemical
14   whatsoever?
15       A.   Directly have I ever done that in -- in
16   carcinogenic potential, no, but my training has
17   equipped me with the tools to be able to work across
18   disciplines and to understand exposure and to relate
19   to animal studies.
20       Q.   Do you have any plans to ever conduct a --
21   a study outside this litigation regarding
22   nitrosamines, NDMA or NDEA?
23       A.   It is easy to predict things except about
24   the future, and I -- so I don't really try to predict

Page 79

1    the future, but it is not an area that I have ever
2    worked in or likely will.
3        Q.   Let's go back to your speaking and
4    consulting services for pharmaceutical companies for a
5    bit.
6            Over the various it sounds like decades
7    that you did that, can you provide an estimate of how
8    much money you received in total for -- for that work?
9        MR. FOWLER:  Objection to the colloquy.
10           Go ahead.
11   BY THE WITNESS:
12       A.   No, I have no clue.
13   BY MR. DAVIS:
14       Q.   Do you think it's hundreds of thousands of
15   dollars?
16       A.   I don't have a clue.
17       Q.   Okay.  Has there ever been a year where
18   you've earned more money by speaking, consulting for
19   pharmaceutical companies than you did by treating
20   patients?
21       A.   Well, first of all, the way my salary is
22   structured, only a portion of my salary comes from
23   treating patients.  I have salary that's related to
24   all of my academic duties that may include treating

Page 80

1    patients and teaching in that setting, but I have
2    never made more than my academic salary from
3    consulting.
4        Q.   What about speaking?
5        A.   I -- I have never made more outside
6    consulting, speaking, or any of those things
7    altogether relative to my academic salary.
8        Q.   You -- you were a speaker for Novartis
9    at -- at one point, were you not?
10       A.   Yeah, years ago.
11       Q.   Okay.  And -- and Novartis is the
12   manufacturer of Diovan, Exforge?
13       A.   Correct.
14       Q.   The brand manufacturer, correct?
15       A.   Correct.
16       Q.   Okay.  Were you on the Novartis speaker
17   bureau at one point in time?
18       A.   I may have been on their speakers bureau,
19   but it would have been years ago.
20       Q.   I believe you said you stopped speaking
21   generally around 2010, is that right, would that have
22   been when you stopped speaking for Novartis?
23       A.   Any speaking that I've done or their
24   speakers bureau would have been before then.

Page 81

1        Q.   Okay.  You don't recall being a national
2    speaker for Novartis, as they termed it?
3        A.   I may have been on their speakers bureau
4    and given my standing in the field, I may have been a
5    national speaker, but I don't remember.
6        Q.   Okay.  Did you receive honoraria or
7    payments for that speaking for Novartis?
8        MR. FOWLER:  Objection; asked and answered.
9    BY THE WITNESS:
10       A.   My time is valuable.  When I consult
11   typically I receive payment, not 100 percent of the
12   time.  If it's something that I'm interested in and
13   I -- it is more from a scientific perspective, but
14   most of the time I do receive compensation.
15   BY MR. DAVIS:
16       Q.   What was the primary purpose in your mind
17   of serving as a Novartis speaker?
18       MR. FOWLER:  Objection to the form.
19   BY THE WITNESS:
20       A.   To educate.
21   BY MR. DAVIS:
22       Q.   To educate?
23       A.   To educate.
24       Q.   So that you wouldn't say the primary

Confidential Information - Subject to Protective Order



Page 82

```
 1  purpose of doing those speakers programs was to get
 2  paid a lot of money over a short period of time?
 3     MR. FOWLER:  Objection; form, argumentative,
 4  asked and answered.
 5  BY THE WITNESS:
 6     A.   So I have experience and expertise that
 7  has been coveted and deservedly so.  I'm a straight
 8  shooter and an honest broker.  And when -- when I
 9  lecture and talk, I do it to educate and I'm not
10  promotional.  So that's my approach to -- whenever I
11  speak and that's the reason why I don't really engage
12  in that -- in that now because it has just changed and
13  I don't want any part of it.
```



Confidential Information - Subject to Protective Order



Confidential Information - Subject to Protective Order





Page 98

Page 99

Page 100

Page 101

3    Q.   Okay.  Let's -- let's talk about some of

4  the literature you've -- you've written.

5        You've written favorably about Diovan in

6  studies funded by Novartis, have you not?

7    MR. FOWLER:  Objection; form, lack of

8  foundation.

9  BY THE WITNESS:

10    A.   I -- I have not written favorably about

11  any drug or any class by any manufacturer that was not

12  justified by the evidence.

13  BY MR. DAVIS:

14    Q.   I'm going to mark Exhibit 8.

15        (WHEREUPON, a certain document was

16         marked Plaintiff-Flack Deposition

17         Exhibit No. 8, for identification, as

18         of 09/28/2021.)

19  BY MR. DAVIS:

20    Q.   Okay.  Let me share my screen on this.

21        Do you recognize this as a article

22  that's -- you cite in the literature section of your

23  CV?

24    A.   Yes, yes.

Page 102

1    Q.   Okay.  And you are the primary author on
2    this article it appears?
3        A.    The primary, I'm the primary author on the
4    article.
5        Q.    Okay.  Do you recognize that four of the
6    five other coauthors of yours are Novartis employees?
7        A.    Yes.  They sponsored the study and four of
8    the five, let's see, Dave Calhoun is not, the others I
9    recognize briefly -- I -- I know Hilkert more than the
10   others.
11       Q.    Did -- this might be a simple question,
12   but by being listed as coauthors, did those Novartis
13   personnel assist in the drafting of the manuscript?
14       A.    Of course, to be a coauthor you have to
15   participate meaningfully in the development of the
16   manuscript.
17       Q.    Okay.  And you'll see that the study was
18   supported by Novartis Pharma AG?
19           Do you see that?
20       A.    Yes, yes.
21       Q.    Does that mean financially supported?
22       A.    Yes.
23       Q.    Okay.  Do you recall the conclusion of
24   this study?

Page 103

1        A.    Why don't you pull it up.
2        Q.    Sure.
3            Is the -- and I'm paraphrasing here, but
4    is the study conclusion generally that combination
5    therapy of amlodipine val -- valsartan is more
6    favorable than amlodipine monotherapy?
7        MR. FOWLER:  Objection to the form.  And,
8    Counsel, as presented, nobody can read that.  That
9    script --
10       MR. DAVIS:  Oh, my -- my apologies.  Let me zoom
11   in a little bit more.
12       MR. FOWLER:  You have to do better than that.
13   It is -- it is still, like, a 6 font.  There you go.
14   That's getting better.  Thank you.
15   BY MR. DAVIS:
16       Q.    Okay.  Dr. Flack, if you can't read
17   something let -- let me know because it appears on my
18   screen differently than your screen.
19       A.    Okay.
20       Q.    Do you see the -- do you see the statement
21   that combination therapy with amlodipine and valsartan
22   lowered BP more effectively than amlodipine alone with
23   a favorable safety profile comparable to -- or
24   comparable, I guess, rather, to amlodipine

Page 104

1    monotherapy?
2        A.    Yes, I do.
3        Q.    Okay.  Would you agree that that
4    conclusion is favorable to the use of -- of Diovan or
5    valsartan in this case?
6        MR. FOWLER:  Objection; form, mischaracterizing.
7    BY THE WITNESS:
8        A.    So, would I agree?  Here -- here is --
9    here is what I would say in response to that.  That
10   conclusion is supported by the data in the study.  If
11   I conclude that any calcium blocker and ACE inhibitor
12   or in combination is not more effective than the
13   calcium blocker alone, I would have to be creating
14   fiction because there is not one combination that you
15   can use like that that would not beat the single drug
16   therapy.
17           So making a positive statement that's
18   supported by the data is nothing underhanded,
19   nefarious or misleading.  It is just absolutely
20   correct.  And this drug to this date is an excellent
21   drug.
22           The other --
23   BY MR. DAVIS:
24       Q.    Thank you.

Page 105

1        A.    The other thing --
2        Q.    Let me -- let me my
3        A.    Hold on, Counsel.
4        Q.    I'm sorry.  Go ahead.
5        A.    The combination not only lowers blood
6    pressure, but the inclusion of valsartan actually
7    minimizes the calcium blocker induced edema.  So if
8    this is an example of me saying something favorable,
9    I'm not going to say something not favorable that's
10   not true.  This is basically go back to the tables, it
11   is supported solely by the facts, and I rest my case.
12       Q.    Okay.  Thank you for that.
13           Do you see the conflict of interest
14   section there?
15       A.    I see it.
16       Q.    Okay.  You are -- you're JMF, correct?
17       A.    Yes.
18       Q.    Okay.  And it says that you have received
19   grant and research support and/or as a consultant and
20   speaker for Novartis, Merck, Pfizer, GlaxoSmithKline,
21   AstraZeneca, Solvay, Bristol-Myers Squibb, CVRx,
22   Genzyme, Daiichi Sankyo and -- and Myogen.
23           Do you see that?
24       A.    That's what it says on the paper there.

Confidential Information Subject to Protective Order

Page 106

1    Q.   Okay.  Is that -- is that statement
2  accurate?
3    A.   That's what it says on the paper and I
4  give accurate information when I do those.
5    Q.   Okay.  Turning back to your CV, which is,
6  I believe, Exhibit 4, if you have that in front of
7  you.
8        Your bibliography, which starts on Page 34
9  and goes through Page 50, it has 194 entries on it.
10       Do you see that?
11   A.   Well, it is 194 peer-reviewed articles,
12 there is probably about 20 book chapters in all, so
13 the 194 is not inclusive of all of my peer reviewed
14 work.
15   Q.   Okay.  Well, that actually catches my next
16 question, which is your report said about 210 or so.
17       So were you including in the 210 the
18 articles, peer-reviewed book chapters, is it anything
19 peer reviewed in your report?
20   A.   It is articles and book chapters.
21   Q.   Okay.
22   A.   And if you add 194 and 20, it is actually
23 214.
24   Q.   Okay.  Thank you.

Page 107

1        Have any of those 214 peer-reviewed items
2  that you list in your CV, have they addressed, any of
3  them, NDEA, NDMA or nitrosamines at all?
4    A.   I don't know.  What did your review tell
5  you?
6    Q.   Well, you -- you are the one who wrote
7  them.  I didn't read all of them.
8    A.   Yeah, your question, of course, I have not
9  done work in that.  I have stated previously I haven't
10 done work in NDMA and nitrosamines.
11   Q.   Okay.  How about the association between
12 hypertension and cancer, have any of your 214
13 peer-reviewed items addressed hypertension and cancer
14 specifically?
15   A.   Indirectly, yes.  My -- my work has
16 repeatedly talked about risk factors, lifestyle
17 modification, diet, exercise, physical activity, and
18 those are shared risk factors between hypertension and
19 cancer.  So I am intimately familiar with the diet and
20 lifestyle commonalities between the two entities.
21   Q.   Let me make my question a little more
22 specific.
23       Has -- has -- have any of the 214
24 peer-reviewed items specifically addressed

Page 108

1  hypertension and cancer, not just any what you contend
2  to be shared risk factors?
3        MR. FOWLER:  Objection to form.
4  BY THE WITNESS:
5    A.   Well, first of all, it is not what I
6  contend.  It is what is actually accepted and known,
7  and obesity, diabetes mellitus, which is common of low
8  physical activity, certain intakes of dietary
9  constituents, from salt to fat, I have studied those
10 things in my hypertension work and am very, very
11 familiar with them and there are shared risk factors
12 for several other diseases, including cancer.
13 BY MR. DAVIS:
14   Q.   Okay.  Have -- has any of your -- have any
15 of the 214 articles specifically discussed what you
16 call those shared risk -- risk factors and cancer
17 specifically or is that separate from your published
18 work?
19   A.   Do you want me to state --
20       MR. FOWLER:  Objection to form.
21 BY THE WITNESS:
22   A.   Do you want me to say it again?  You tell
23 me, because I'm not going to give you an answer any
24 different, so tell me if you want me to say it again.

Page 109

1  BY MR. DAVIS:
2    Q.   Well, sure, can -- I guess -- well, let me
3  ask if a different way.
4        Can you point me to one of these 214
5  articles where you actually discuss the association
6  between hypertension and cancer specifically?
7        MR. FOWLER:  Objection; form.
8  BY THE WITNESS:
9    A.   The focus of my articles has not been on
10 hypertension and cancer.  The focus of my articles,
11 though, has been on hypertension, lifestyle, diet and
12 comorbidities that have been linked to cancer.
13       Does that answer your question?
14 BY MR. DAVIS:
15   Q.   Partially.
16       How about have you discussed the link, as
17 you call it, in those articles specifically --
18       MR. FOWLER:  Objection to form.
19 BY MR. DAVIS:
20   Q.   -- the link between the various things you
21 mentioned and cancer?
22       MR. FOWLER:  Same.
23 BY MR. DAVIS:
24   Q.   Has that been discussed specifically in

Page 110

1 any of your articles?

2    MR. FOWLER:  Same.

3 BY THE WITNESS:

4    A.   I have not written specifically on these

5 risk factors and cancer, but I'm intimately familiar

6 with them because of my work in hypertension.

7 BY MR. DAVIS:

8    Q.   Okay.  Thank you.

9        Have any of your articles addressed the

10 causation of cancer due to exposure to carcinogenic

11 chemicals at all?

12    A.   Oh, no, I'd have to look at my -- my CV.

13 Oh, no, actually, it hasn't, because I don't work in

14 that area.

15    Q.   Okay.  Thank you.

16        You've mentioned as part of going through

17 your -- your educational history that you have a -- an

18 MPH.  What is an MPH?

19    A.   I have a Master of Public Health in

20 epidemiology.  It is the ability to look at datasets,

21 work with datasets, study epidemiologic associations,

22 and I'm also a clinical trialist as well.  But I am

23 well versed in all types of studies, from database

24 studies to clinical trials and subgroup analysis and

Page 111

1 anything in between.

2    Q.   In your words, what is epidemiology?

3    A.   Epidemiology is a descriptive science by

4 and large for the most part.  Observational

5 epidemiology is not an experiment.  And then there are

6 things that are linked to epidemiology which become

7 more experimental.  Most of your clinical databases

8 are not.  They are -- they are just clinical epi and

9 you have to take certain steps to try to make them

10 mimic a randomized trial.

11    Q.   Forgive me if I'm a little slow in

12 following you.

13        So you -- you've basically discussed I

14 guess two forms of practicing epidemiological science,

15 one being observational and one being clinical?

16    A.   Yeah, they are both observational for the

17 most part.  They are just done in different settings.

18 So observational epidemiology is like when we publish

19 on the NHANES, National Health and Nutrition

20 Examination Survey, which I did with Michael

21 Buhnerkempe in our group on hypertension.  That's

22 observational epi.

23        When we report on factors that antagonize

24 pharmacologic blood pressure control in the clinical

Page 112

1 dataset, that's clinical epi, but neither one is a

2 randomized trial.  You are just observing in different

3 settings and reporting and trying to remove as much

4 bias as you can.

5    Q.   So I guess it's in the -- the difference

6 is how you go about looking at the -- at the evidence,

7 is that what you would say, one is --

8    A.   No, no.  What I said was the -- they are

9 both observational, they are just different locations.

10    Q.   So I guess maybe -- maybe this will help

11 me understand.

12        Can you just walk me through -- first

13 start with an observe -- observational ep- --

14 epidemiology study, walk me through kind of what the

15 basic ingredients of that would be, and then do the

16 same thing for a clinical epi study so that I can

17 understand exactly what you are talking about.

18    A.   So if you look at our work in NHANES, the

19 hypertension paper we published in the premier

20 hypertension journal in the world, we published the

21 first population-based risk estimates for refractory

22 and resistant hypertension.  We downloaded eight

23 cycles of NHANES, that's done every couple of years,

24 and it's a public use dataset.

Page 113

1        So what the government does is the

2 government goes and employs fancy sampling techniques

3 which allow you to make estimates for the entire

4 population off of a few thousand people.  They have

5 removed a lot of the bias by the weight of the sample

6 and so you can take those observations and you can

7 extrapolate to the entire US population.

8        When I do a clinical epi study, typically

9 we are using a de-identified clinical database that

10 looks at us following patients with certain diseases,

11 condition -- conditions and treatment.  And the

12 problem there is very different because people who get

13 different treatments tend to be different from one

14 another.  There is a reason people get calcium

15 blockers versus ace inhibitors versus diuretics.

16        So when we work in those datasets, we have

17 to undertake a variety of techniques to ensure that

18 the conclusions we are making, the observations that

19 we are putting forth are unbiased and minimally biased

20 as much as we can make them.  It is dirtier data, it

21 is like dietary data and occupational data where

22 you've got a fair amount of confounding issues and

23 confounding by indication for various treatments, but

24 we know how to do all of that in the dataset that

Confidential - Subject to Protective Order

Page 114

1  we've been working in.  And if we work in a dataset we
2  look at something, and we are not really equipped or
3  the dataset is just not suited for it and we are not
4  in it to try to do something just to get a
5  publication.
6      Q.   Okay.  How do you find -- so in that
7  clinical example, you said that it's, you know, kind
8  of drawing from a range of different datasets.
9          How do you identify those datasets to --
10 in order to analyze them?
11     A.   For clinical data we actually have
12 de-identified clinical database that spans about
13 17 years of -- of patients that has longitudinal
14 follow-up that we have published from repeatedly; and
15 also, two, we have project ongoing at my current
16 institution where we've developed one for primary
17 aldosteronism with our endocrinology division which is
18 a -- a clinical and research interest of mine,
19 clinical and subclinical primary aldosteronism.
20     Q.   So for -- for a task like the one you did
21 in this case where you are looking at a -- a range of
22 articles and trying to draw epidemiological
23 conclusions based on synthesizing them, which -- which
24 one of those epi studies would that fall under?

Page 115

1      A.   So the strongest evidence in the
2  valsartan, valsartan impurity with NDMA category
3  really falls under the large cohort studies done in
4  Europe in their nationalized health systems where you
5  have exposure data both before and -- the study
6  started and for a period of time you have the claims
7  data and you can make the linkage all in one dataset.
8  You really can't do that very well here in the
9  United States with our fragmented health system
10 outside of maybe some selected populations.
11     Q.   Well, let me -- and -- and we'll get into
12 the -- the actual studies in a bit, but I'm just
13 trying to familiarize myself with the process first,
14 which is, like, in -- in terms of -- I mean, would you
15 agree that your assignment in this case was to collect
16 some literature, review it and draw some conclusions
17 holistically based on -- on that literature?
18     MR. FOWLER:  Object to the colloquy, object to
19 the form.
20 BY THE WITNESS:
21     A.   So it's easier to just ask me what -- what
22 I was charged to do, and --
23 BY MR. DAVIS:
24     Q.   Sure.

Page 116

1      A.   -- than put words in my mouth.
2          I was charged to -- in the area of general
3  causation to examine the literature and try to make a
4  determination whether the exposure to NDMA in the
5  amount and for the duration of time that -- with very
6  generous estimates of what a person could be exposed
7  to was a likely cause of cancer overall or even
8  site-specific cancers, particularly liver cancer.
9      Q.   And in -- doing that, you examined
10 various sources of -- of data, I suppose, we'll call
11 it, right, in the form of -- of studies, a couple of
12 which from Europe you mentioned, correct?
13     A.   I examined multiple sources of data and
14 some of them included studies from Europe.
15     Q.   Okay.  So in -- doing that task, just
16 kind of put it in -- put the -- put it -- the correct
17 puzzle piece for me, which is what kind of
18 epidemiological study is that that you did?
19     MR. FOWLER:  Object to form.
20 BY THE WITNESS:
21     A.   First, in this area I didn't do any
22 epidemiological study, so I don't get the question.
23 BY MR. DAVIS:
24     Q.   Okay.  Well, maybe let's -- let's take it

Page 117

1  this way, which is let me mark a -- an exhibit.  This
2  is Exhibit 9 that I'm marking.
3          (WHEREUPON, a certain document was
4          marked Plaintiff-Flack Deposition
5          Exhibit No. 9, for identification, as
6          of 09/28/2021.)
7  BY MR. DAVIS:
8      Q.   Do you recognize this as a article that
9  you reference in your bibliography and on which you
10 appear as a coauthor?
11     A.   Yes.
12     Q.   And it's -- the title is "Individualizing
13 hypertension treatment with impedance cardiography:  A
14 meta-analysis of published trials."
15         Do you see that?
16     A.   Correct.
17     Q.   Okay.  Do you recall this particular
18 article that you wrote specifically?
19     A.   Yep.
20     Q.   Okay.  So describe to me what a
21 meta-analysis is?
22     A.   So you do individual trials and some of
23 the questions that you want to try to answer often
24 can't be answered in any one trial.  So a

1   meta-analysis is a way of combining trials together
2   and reporting them as a single trial, as a single set
3   of data.
4       Q.   Would that fall under sort of the broader
5   practice of epidemiological science, a meta-analysis?
6       A.   Yeah, a meta-analysis is a form of -- of
7   epidemiology, but this was beyond observational
8   because here you are doing interventions and combining
9   them but clearly they are epidemiological and
10  statistical principles that you have to adhere to.
11      Q.   Okay.  Let me take you down to the, let's
12  see, this is Page 3 of the article or numbered Page 7.
13           Do you see that?
14      A.   Yes.
15      Q.   Are -- are you able to read this clearly,
16  Dr. Flack?
17      A.   Yep.
18      Q.   Okay.  So you'll see -- and I'm just
19  trying to walk through the process from start to
20  finish so I can understand kind of exactly what you
21  did here.  But you say: "There have been a number of
22  studies demonstrating the ability of ICG-guided
23  therapy."
24           Just briefly, what -- just so we can have

1   some context here, what -- what is ICG?
2       A.   Impedance cardiography.
3       Q.   Okay.
4            And then you say: "We conducted a
5   meta-analysis of trials using ICG in the treatment of
6   adults with" -- "with hypertension."
7            And then you say: "Initially, we
8   conducted a literature and reference search in
9   Medline, PubMed, and Cochrane databases as well as the
10  internet for studies using ICG in the treatment of
11  adults with hypertension."
12           Correct?
13      A.   Correct.
14      Q.   Is that what would generally be called in
15  this field like a literature review or a literature
16  search?
17      A.   When you are looking for trials to
18  include, yes.
19      Q.   Okay.  And then in those databases you say
20  that you applied keywords of hypertension, resistant
21  hypertension, hemodynamics, impedance cardiography,
22  therapy individualization and goal-directed therapy.
23           Do you see all those -- all those terms?
24      A.   Yes.

1       Q.   Would that have been -- just for
2   clarification, would those -- would those terms have
3   been all applied, like, it had to meet all of those
4   fields or just one of the -- or were those applied in
5   the alternative?
6       A.   No, you didn't have to meet all of them.
7       Q.   Okay.  And then there were some inclusion
8   criteria that you discuss below that, correct?
9       A.   Correct.
10      Q.   Okay.  Were those inclusion criteria
11  preset, meaning that before -- i.e., before you
12  actually applied the -- the keywords into the
13  databases, were the inclusion criteria for those
14  studies preset prior to running the searches?
15      A.   I don't remember offhand.  Typically you
16  do, but one way or the other you -- you are going to
17  get a lot of studies that pop up and you are going to
18  basically end up taking only the studies that fit --
19  they are, like, randomized trials, so some of these
20  search terms will show up in studies that are
21  observational studies and they are of no use here.
22      Q.   Okay.  But you say typically you do set
23  those inclusion criter- -- criteria prior to running
24  the actual search, correct?

1       A.   You can set them before or afterwards
2   because at the end of the day you are going to apply
3   it to -- to the -- studies that pop up and -- and
4   all and it's no mortal sin if you don't do it
5   beforehand as long as you have reasonable criteria.
6       Q.   Would -- is it -- is it advisable to -- to
7   do it pre running the search to avoid any kind of bias
8   or cherry-picking possibility?
9       MR. FOWLER:  Objection to form.
10  BY THE WITNESS:
11      A.   Well, first of all, I'm not sure that --
12  that you are fully grasping what -- what you are
13  asking me.  If you apply the -- the -- if you -- if
14  you understand what you want out of -- out of the
15  studies, if you, for example, cherry pick, you are
16  going to get blasted in published literature.  So it's
17  really in all likelihood not going to prevent bias
18  in -- in what you include or not.  If you have a
19  priori applied criteria for inclusion and those
20  criteria are faulty, when you publish it, you are
21  going to get blasted, and setting it up beforehand
22  doesn't shield you from that.
23           What shields you from that is that you
24  have included studies and there is nobody that's

Confidential Information Subject to Protective Order

Page 122

1 saying, Well, you missed this study or you missed that
2 study, okay, that should have been included. That's
3 really, as a journal editor, that's what we are -- we
4 are looking for is were the relevant studies included.
5 And if you've got a gripe with that, what do you think
6 was really missed.
7 BY MR. DAVIS:
8     Q.   Un- -- understood.
9         I guess related to that, is it important
10 in doing -- you know, and let's take this ICG study as
11 an example. Let's say there was an outlier study
12 that, you know, you -- you disagreed with the results
13 or they didn't support what the rest of the collected
14 studies showed in your meta-analysis, is it important
15 to -- to address that study nonetheless even if you
16 are discounting it?
17     A.   You don't include or not include studies
18 based on whether you disagree with the results. You
19 include studies that fit criteria, like are they
20 randomized controlled trials, did they report the
21 outcomes that you are -- you are looking for, and
22 that's why you included them.
23        By definition if you do a study enough
24 times you are going to find disparate results simply

Page 123

1 by chance. And if you do a study where there is
2 really no real benefit, if you do it enough times, by
3 chance, you are going to find a -- a statistical
4 significant result.
5        So an example, if you go and you are doing
6 epidemiologic studies and you are looking at 10 and 11
7 cancer sites and you keep looking at -- at a bunch of
8 different sites and something pops up positive, weakly
9 positive, that's -- that's very likely to have been a
10 type one error or a false positive.
11        And so you have the same corollary here.
12 But we don't exclude or exclude studies because we
13 don't like the results. You include or exclude
14 studies because they don't fit the criteria that will
15 allow us to pool them and to make a -- a single
16 estimate, which by the way when you pool the studies
17 your estimates are more precise, your 95 percent
18 confidence intervals are narrower than they ever are
19 going to be with a single study.
20     Q.   Got it.
21        Let's -- I'm going to mark your materials
22 considered, if I haven't done so already. Let me --
23 yeah. So I'm marking Exhibit B to your report as
24 Plaintiff-Flack 10.

Page 124

1        (WHEREUPON, a certain document was
2        marked Plaintiff-Flack Deposition
3        Exhibit No. 10, for identification,
4        as of 09/28/2021.)
5 BY MR. DAVIS:
6     Q.   Let me know when you have that in front of
7 you, Dr. Flack.
8     A.   It's in front of me.
9     Q.   So you mentioned at the outset that of --
10 of those documents that are on this list, some were
11 sent to you by counsel, some pulled off of other
12 expert reports, you reviewed the bibliographies of
13 articles that you read and pulled some off that, and
14 that you ran in PubMed a search for valsartan and
15 NDMA.
16        Does that capture all of the sources of
17 documents that -- that you collected that made it on
18 to this Exhibit B?
19     A.   Pretty much.
20     Q.   Okay. So let's just go through so I have
21 an understanding of -- and I think we can make this a
22 relatively quick exercise where I don't go through
23 each and every document, but I want to get a general
24 sense of how this stuff arrived in your hands.

Page 125

1        So --
2     MR. FOWLER: Objection.
3 BY MR. DAVIS:
4     Q.   -- let's start with MDL Pleadings and
5 General Documents.
6        Was that provided to you by counsel?
7     A.   Anything that's related to the case like
8 that was sent to me by counsel. So let me make it
9 easy for you, that counsel sent me stuff, sent me
10 articles and all, but if you want to go through the
11 list, I'll be happy to do it with you.
12     Q.   Sure, and let's just make it quick. So --
13 so MDL Pleadings and General Documents, Written
14 Discovery, provided to you by counsel?
15     A.   Correct.
16     Q.   Okay. Deposition Transcripts and Exhibits
17 provided to you by counsel?
18     A.   Where else would they come from? Of
19 course.
20     Q.   Okay. Is there a reason that you only
21 reviewed Teva deposition transcripts and exhibits?
22     A.   I reviewed what I felt was relevant to the
23 case. I reviewed expert testimony coming from people,
24 that -- that are not on the defendant side, and so

Confidential Information - Subject to Protective Order

Page 126

1 that characterization that I only saw things from the
2 defendant side is -- is inaccurate.
3    Q.  Well, let's start with -- with the first
4 point, which is it's your testimony, correct, and
5 sorry if I'm making you repeat this, but that the
6 deposition transcripts and exhibits that were provided
7 to you came to you from counsel?
8    A.  There is no other source.  Yes, they came
9 from counsel.
10    Q.  Did -- did you ask counsel why they were
11 only providing you Teva depositions and exhibits as
12 opposed to depositions and exhibits used at those
13 depositions for the other manufacturers in this case?
14    MR. FOWLER:  Objection; form, lacks foundation.
15 BY THE WITNESS:
16    A.  Did I ask him that question, no.
17 BY MR. DAVIS:
18    Q.  Did you make any inquiry at all about why
19 you were only provided Teva depositions and exhibits
20 to those depositions?
21    A.  No, what --
22    MR. FOWLER:  Objection; foundation.
23 BY THE WITNESS:
24    A.  No, what I did was I tried to make sure

Page 127

1 that I had the relevant studies and I have stated
2 repeatedly that I did not rely on anybody else's
3 expert testimony to generate my conclusions.  So if
4 you extend that is -- those documents are largely
5 irrelevant to me.  I may review them, I may get them
6 sent to me, I may not review them.  Everything that's
7 sent to me I did not sit and -- and dive to in depth.
8 BY MR. DAVIS:
9    Q.  Okay.  Same thing for the other expert
10 reports that you have -- have listed for, I guess,
11 Plaintiff Expert Reports with Exhibits provided to you
12 by counsel?
13    A.  Some of them I scanned, some of them I may
14 have read, some of them I didn't pay any attention to.
15    Q.  Okay.  Teva Documents provided to you by
16 counsel, below that, on Page 3?
17    A.  What's your question?
18    Q.  Was it -- were the Teva Documents listed
19 on Page 3 and 4 under that header, those were provided
20 to you by counsel?
21    A.  That's why they are on the list, yes.
22    Q.  Okay.  And same question with the
23 Deposition Exhibits and Transcripts, did you make any
24 inquiry as to why you were only provided with Teva

Page 128

1 documents as opposed to documents that included those
2 of the other manufacturers?
3    MR. FOWLER:  Objection; form, asked and
4 answered, lacks foundation.
5 BY THE WITNESS:
6    A.  Many of the documents I received had
7 nothing to do or minimal to do with the question that
8 I was asked to address.  They weren't relevant.  And
9 that's why I stated multiple times that I did not use
10 any conclusions anywhere else to draw my own
11 conclusions in this case and in my opinion.
12 BY MR. DAVIS:
13    Q.  Okay.  How about on Page 4, the Publicly
14 Available FDA Documents, were those provided to you by
15 counsel or did you pull those yourself?
16    A.  They were provided by counsel, some of the
17 FDA documents I pulled.
18    Q.  Okay.  And then going from Page 4 through
19 the very top of Page 12 there is quite a few
20 literature sites.  Would those -- you -- I think your
21 testimony previously was that you may have received
22 those documents from a myriad of sources?
23    A.  That's correct.
24    Q.  Is that correct?  Okay.

Page 129

1    Sitting here today, are you able to go
2 through and tell me which ones you received from
3 counsel versus on your own versus some other source?
4    A.  No.
5    Q.  Okay.  What about the Post-Marketing
6 Periodic Safety Reports on Pages 12, 13, how did those
7 arrive in -- to be -- to -- how did those come to be
8 on this exhibit to your report of materials
9 considered?
10    A.  Well, they were materials sent to me,
11 that's a difference between materials sent to me and
12 materials considered.  So they sent these materials
13 for me and these came from counsel.  That -- that
14 actually does not mean that they were considered.
15    Q.  Gotcha.  Okay.
16    Is that the same answer with regard to the
17 Bellwether Plaintiff documents from Page 13 to 20, the
18 last page?
19    A.  My response to you is going to be
20 essentially the same on these documents, yes, so the
21 answer is yes.
22    Q.  Okay.  Okay.  Look at the Miscellaneous
23 section on Page 20.
24    The very last item says:  "This list

Page 130

1  includes items Plaintiffs' experts relied on. By
2  doing so, Defendants and this expert are not waiving
3  any arguments or objections related to admissibility."
4      Do you see that?
5      A.  On what page?
6      I don't know.  That's lawyer's speak.
7  You've got to translate for me.
8      Q.  Well, that was -- that was my question is
9  that strikes me as legalese.
10     Did you write that or did counsel write
11 that?
12     A.  I think my response will tell you I didn't
13 write that.
14     Q.  Okay.  Thank you.
15     MR. DAVIS:  All right.  This is a good breaking
16 point in my outline and, in fact, one of my headphones
17 just went out, so can we take our lunch break, if
18 that's okay with you guys?
19     MR. FOWLER:  Sure, Counsel.
20     MR. DAVIS:  Okay.  All right.  Thank you.  Do
21 you want to -- when -- 45 minutes okay?
22     Let's go off the record first.
23     THE VIDEOGRAPHER:  The time is 11:57 a m., off
24 the record.

Page 131

1      (WHEREUPON, a recess was had
2          from 11:47 to 12:53 p.m.)
3      THE VIDEOGRAPHER:  The time is 12:53 p m. --
4  1:53 p.m. (sic), we are on the record.
5      MR. DAVIS:  I'm sorry.  I didn't -- I didn't
6  hear that.  Are we back on the record now?
7      THE VIDEOGRAPHER:  Yes.
8      MR. DAVIS:  Okay.  Thank you.  Sorry, you -- you
9  are cutting in and out a little bit.
10     THE VIDEOGRAPHER:  I apologize.
11     MR. DAVIS:  Yeah.  Not -- not a problem.
12 BY MR. DAVIS:
13     Q.  Okay.  Doctor, we had left off going
14 through your materials considered list, the Exhibit B
15 to your report which is -- which was marked as
16 Exhibit 9 (sic).  Let me ask a question.
17     Did you look at any test results showing
18 NDMA, NDEA content in any of the valsartan drugs at
19 issue in this litigation?
20     A.  Not in any detail.  I did not pay much
21 attention to that.
22     Q.  Okay.  Let me have you turn, if you would,
23 to Page 31 of your report, which is Section VIII.
24     You write starting in the second line of

Page 132

1  that paragraph:  "...it is my opinion that there is
2  insufficient scientific evidence to establish that
3  trace amounts of NDMA or NDEA in valsartan caused the
4  types of cancers Plaintiffs allege in this
5  litigation."
6      Do you see that?
7      A.  Yes.
8      Q.  Is -- is that your word that you are using
9  there, "trace," that word "trace," is that your word
10 or did you borrow that from someone?
11     A.  I think my command of the English language
12 is fairly pretty good, and if you are insinuating that
13 for some reason that I wouldn't be able to phrase how
14 the NDMA would be in valsartan in multiple ways, you
15 are again barking up the wrong tree.  This is my
16 report, it has got my name on it, and, again, I hope
17 you've got more than this.
18     Q.  Well, Doctor, I'm -- I'm asking because
19 I've seen that word appear in a number of manufacturer
20 communications.  I'm asking if -- if it's your opinion
21 that, indeed, the amounts of NDMA and NDEA in
22 valsartan are trace amounts or is there --
23     MR. FOWLER:  Objection to -- objection to the
24 colloquy.

Page 133

1      Go ahead, Doctor.
2  BY THE WITNESS:
3      A.  I have already taken ownership of the
4  word.  I can't help it that it was somewhere else, and
5  I'm sure through throughout my report there are
6  probably words that somebody else has used somewhere
7  that I use, but there are a variety of ways that you
8  can express this, and I expressed it in a way that is
9  accurate, and there is -- there is probably more than
10 one way that you can say it.
11 BY MR. DAVIS:
12     Q.  But it is your testimony you didn't
13 actually review any of the act- -- the test results
14 for NDMA, NDEA content in valsartan, correct?
15     MR. FOWLER:  Objection; mischaracterizes.
16 BY THE WITNESS:
17     A.  Both -- both of the agencies that regulate
18 drugs in the US and in Europe have posted what the top
19 amounts of NDMA were in -- in pills.  So you don't
20 have to review granular all of the test results coming
21 from the companies when the regulatory agencies have
22 already done it.
23 BY MR. DAVIS:
24     Q.  Well, how -- how can you be positive

Page 134

1 without having compared the internal test results to
2 the FDA published test results that those are, in
3 fact, the maximum amounts?
4    A.   Because the same reason that I trust the
5 FDA when they make decisions and the same reason you
6 trust them when they make decisions that they've done
7 their homework.  You know, I've actually worked with
8 the FDA as a member of cardiorenal.  They are pretty
9 smart people and they're very talented.  So when they
10 and the Europeans post what the top levels of NDMA are
11 in pills and I actually in my simulation used a level
12 even higher than that, I think that that's very
13 commendable.
14    Q.   And you trust the manufacturers to have
15 provided information to the FDA regarding
16 their maximum test levels?
17    A.   I trust the FDA to get to -- to the bottom
18 of this because the FDA basically is commissioning the
19 testing and so, yes, I trust the FDA and the European
20 society to get to the bottom of this and to understand
21 this problem.
22    Q.   Okay.  Well, while -- while we're talking
23 about the FDA, is it -- so it's your opinion that the
24 word "trace" can mean amounts far in excess of what

Page 135

1 the FDA has said as the interim acceptable limits?
2    MR. FOWLER:  Objection; form.
3 BY THE WITNESS:
4    A.   So if I use the word "trace" and the
5 amount is above that, then by implication what you
6 said is -- is true.
7 BY MR. DAVIS:
8    Q.   Explain to me your reasoning there?
9    A.   I've already explained it to you.  Do you
10 want me to explain it to you again, because I'm going
11 to give you exactly the same answer?
12    Q.   Sure, why not.
13    A.   So if the FDA says there is a certain
14 amount in there, the amount in the NDMA pills, at
15 least that some of them is above that, and I'm aware
16 of that and I use the word "trace," then it is
17 unambiguous that I consider it trace.
18    Q.   Okay.  Even if the levels are hundreds of
19 times in excess of the FDA's interim limits --
20    MR. FOWLER:  Objection.
21 BY MR. DAVIS:
22    Q.   -- that's trace in your opinion?
23    MR. FOWLER:  Objection; form, facts not in
24 evidence.

Page 136

1 BY THE WITNESS:
2    A.   Maybe you can give me a definition of what
3 trace and non-trace is, but any definition is going to
4 be arbitrary, and I applied the terminology that I
5 felt was most appropriate and reasonable.
6 BY MR. DAVIS:
7    Q.   You never reviewed any Mylan-produced
8 documents in preparing your report, did you?
9    MR. FOWLER:  Objection; form, lacks foundation.
10 BY THE WITNESS:
11    A.   Is it on my list?
12 BY MR. DAVIS:
13    Q.   It's not.
14    A.   Okay.
15    MR. FOWLER:  Objection.
16 BY THE WITNESS:
17    A.   If it's not on my list, then I never got
18 it and -- and all, and it is not an area that I needed
19 to review.
20 BY MR. DAVIS:
21    Q.   Okay.  So you wouldn't be for -- aware,
22 for example, that Mylan's own pharmacology/toxicology
23 employees internally were objecting to Mylan's use of
24 the word "trace" to describe their NDMA levels?

Page 137

1    MR. FOWLER:  Objection; form, facts not in
2 evidence.
3 BY THE WITNESS:
4    A.   So if I don't have any documents from
5 Mylan and I've never communicated with Mylan, the
6 answer is pretty obvious.  I -- I would not know that.
7 And whether I call it a trace or an impurity or -- or
8 whatever didn't in -- influence my conclusion.
9 BY MR. DAVIS:
10    Q.   Okay.  You didn't review either any FDA or
11 any health authority guidances on the assessment and
12 control of genotoxic or mutagenic compounds, did you?
13    MR. FOWLER:  Objection; form, mischaracterizes.
14 BY THE WITNESS:
15    A.   I've read material that talked about those
16 things, but that's -- that's not my area of expertise,
17 and it's not something that I'm dwelling on.
18 BY MR. DAVIS:
19    Q.   So you would not have reviewed the M7(R1)
20 FDA guidance on Assessment and Control of DNA Reactive
21 (Mutagenic) Impurities in Pharmaceuticals to Limit
22 Potential Carcinogenic Risk?
23    MR. FOWLER:  Objection; form, mischaracterizes.
24 BY THE WITNESS:

Page 138

1    A.   I don't remember a specific document.
2    I've read stuff by the FDA, but I don't remember a
3    specific document.
4    BY MR. DAVIS:
5    Q.   Okay.  It's not in your -- would you agree
6    with me that it's not in Exhibit 10, which is your
7    list of materials considered under publicly available
8    FDA dot -- documents?
9        MR. FOWLER:  Objection; form.
10   BY THE WITNESS:
11   A.   I'll take your word for it.
12   BY MR. DAVIS:
13   Q.   Okay.  So you wouldn't be aware, for
14   example, that the FDA in that document stated that
15   N-nitroso compounds can display extremely high
16   carcinogenic potency?
17       MR. FOWLER:  Objection to the form.
18   BY THE WITNESS:
19   A.   So the -- the ability of these compounds
20   even in experimental animal models to cause cancer,
21   particularly liver cancer, is not related to are you
22   exposed or are you not.  It is done in experiments
23   that have a certain microgram-to-kilogram per day
24   exposure.  And so to simply characterize that as,

Page 139

1    Well, it can, there are certain layers beneath that
2    including the amount, and if you are trying to
3    extrapolate animals to humans, it's an amount per
4    kilogram of body weight which is in -- in my report.
5    And so it's not as simple as -- as you put it out
6    there.  And humans, really, through the valsartan
7    exposure to NDMA have come nowhere close to what
8    animals have where you start seeing cancers.
9    BY MR. DAVIS:
10   Q.   Well, thank you for that, Doctor, but
11   my -- my question was quite simple.  It was whether
12   you were aware that the FDA had said that N-nitroso
13   compounds can display extremely high carcinogenic
14   potency in that document.
15       Is the answer yes or no?
16       MR. FOWLER:  Objection; form, hearsay.
17   BY THE WITNESS:
18   A.   Well -- well, one, I'm not going to answer
19   it yes or no because it is not a yes-or-no question
20   that you are trying to box me into.  Even if you use
21   animal models, there is a certain amount of exposure
22   that you have to have to develop cancer.  So in animal
23   models, and you are trying to extrapolate that in
24   humans, the animals are getting a lot more of exposure

Page 140

1    on a microgram-per-kilogram body weight than humans
2    ever have from valsartan that had NDMA in it.
3        MR. DAVIS:  I'm going to object and move to
4    strike as nonresponsive.
5    BY MR. DAVIS:
6    Q.   The answer was whether you were aware of
7    that statement by the FDA, and that's very simply a
8    yes-or-no question, Doctor.
9        Can you answer it?
10       MR. FOWLER:  Objection.  Objection.  Objection
11   to the colloquy.  Objection to counsel's moving to
12   strike in violation of the court's order in this case
13   not to make such statements.  So objection noted.
14       Doctor, go ahead.
15   BY THE WITNESS:
16   A.   I understand why you want to -- want to
17   strike it because it gets to the heart of the matter
18   and -- and all the heart of the matter is a statement
19   by the FDA, and the FDA has made a -- a whole host of
20   statements about a variety of things.  They've also
21   made statements about the excess cancer risk of what
22   they understand the exposure is, okay.  And -- and
23   also we could talk about that as well.
24   BY MR. DAVIS:

Page 141

1    Q.   Well, I'm -- and you just said that you
2    trusted the FDA.
3        So do you trust the FDA's statements then
4    that N-nitro compounds can display extremely high
5    carcinogenic potency?
6        MR. FOWLER:  Objection; form, asked and
7    answered.
8    BY THE WITNESS:
9    A.   I think what the animal studies would tell
10   you is that under certain conditions at certain
11   exposures that you can induce tumors with these
12   compounds.
13       MR. DAVIS:  Counsel, I'm entitled to an answer
14   to my question.  The answer is whether he is aware
15   that the FDA has made that pronouncement, and I'm
16   entitled to a simple yes-or-no answer.
17   BY MR. DAVIS:
18   Q.   So I'm going to ask it one more time, can
19   I -- can I get a yes-or-no answer, are you aware that
20   the FDA has made that statement?
21       MR. FOWLER:  Objection to the colloquy.  You've
22   changed your question from are you aware to do you --
23   do you accept that.  And I object to the colloquy,
24   Counsel.

Page 142

1  BY THE WITNESS:
2      A.   Well, you are entitled to an answer, but
3  you can't really tell me that I've got to answer it
4  yes or no and it is not a yes-or-no question because
5  if you are asking can it cause cancer, there are
6  conditions under which it can and conditions under
7  which it probably doesn't.
8  BY MR. DAVIS:
9      Q.   Can I get a yes-or-no answer, Doctor, to
10 whether you're aware of whether the FDA has stated
11 that N-nitroso compounds can display extremely high
12 carcinogenic potency, yes or no?
13     MR. FOWLER:  Objection to form.
14 BY THE WITNESS:
15     A.   Do you want me to repeat my answer?
16 BY MR. DAVIS:
17     Q.   If it is a yes or no, then -- then, yes,
18 I'd like you to repeat it?
19     A.   You can't compel me to answer a question
20 yes or no when it is not a yes-or-no question.  You
21 don't have that right.
22     Q.   You are either aware of the statement or
23 you are not, Doctor.
24         Are you aware of the statement from the

Page 143

1  FDA or are you not aware of it?
2      MR. FOWLER:  Same objection.
3  BY THE WITNESS:
4      A.   I am aware, whether the FDA said it or
5  not, that under the right conditions of exposure,
6  which have not been met in human studies, that you can
7  see cancers in animals and predominantly liver cancer.
8  Okay.  So will I trust the FDA?  Absolutely.  And if
9  they weren't concerned, they wouldn't have been
10 concerned about this.
11 BY MR. DAVIS:
12     Q.   Do you agree that NDMA and NDEA are
13 potential human carcinogens?
14     A.   What I know about NDMA and NDEA is that in
15 animals at a certain level of exposure they can cause
16 tumors.  Okay.
17         In humans we are still really waiting on
18 unconfounded data, but surely if you see something in
19 animals that makes you cautious in -- in humans, but
20 we don't have definitive data, certainly not through
21 the valsartan route, that it is causing cancer.
22     Q.   So it is your testimony then that you
23 agree that it's -- there is a potential for NDMA and
24 NDEA to be human carcinogens?

Page 144

1      MR. FOWLER:  Objection; form, mischaracterizing.
2  BY THE WITNESS:
3      A.   What I know is that they are listed as
4  probable carcinogens, okay.  They are not listed as
5  definitive carcinogens.  And whether they are
6  carcinogenic or not depends on a number of things,
7  including the dose, duration of exposure, and -- and
8  all, and you can't really just talk about it, like,
9  Well, it is biologically plausible, therefore, which
10 is what you are trying to do.
11 BY MR. DAVIS:
12     Q.   So you are aware of that, then, it sounds
13 like that the IARC, the World Health Organization and
14 the EPA have all listed NDMA and NDEA as probable
15 human carcinogens?
16     A.   I don't know, that's pretty much what I
17 just said.
18     Q.   Sure.  And sometimes I'm going to ask very
19 basic questions, but it's -- you know, this is part of
20 the yeoman's work of doing this.
21     MR. FOWLER:  Object to the colloquy.
22 BY MR. DAVIS:
23     Q.   Turning to Page 31, back to Page 31 of
24 your report, you say that you've:

Page 145

1         "...conducted a thorough review of the
2  relevant literature on valsartan use and cancer
3  incidence, including the literature cited by
4  plaintiffs' experts in this litigation, and the
5  literature simply does not support a causal
6  association between exposure to trace amounts of
7  nitrosamines and valsartan and cancer development.  I
8  will discuss my assessment of the key literature on
9  this subject in turn."
10         Did I read your report correctly there?
11     A.   It is on the paper.  You read it
12 correctly.
13     Q.   Okay.  The -- and then what follows in
14 your report, I'm just trying to get an understanding
15 of the overall structure, is you have a section on
16 animal studies, a section on occupational studies, and
17 then you have a section on the valsartan studies, is
18 that correct?
19     A.   That would be correct.
20     Q.   Okay.  And is it your opinion that you've
21 adequately discussed the key literature as you
22 identified it on Page 31 of your report?
23     A.   Unless --
24     MR. FOWLER:  Objection to form.

Page 146

1  BY THE WITNESS:
2      A.   -- unless you can prove otherwise or I can
3  uncover something that I missed on my own, then the
4  answer to that is yes.
5  BY MR. DAVIS:
6      Q.   Are you expressing any kind of opinion in
7  your report that the FDA's interim intake limits for
8  NDMA or NDEA are unreasonable?
9      A.   First, I'm not expressing any opinion on
10 whether their limits are -- are reasonable or
11 unreasonable because they themselves have questions
12 about this and there is an uncertainty.  So the limits
13 are -- are where they are and -- and all, but I'm not
14 expressing any -- any opinion -- real opinion on that.
15     Q.   On Page 39 of your report you have a
16 conclusion paragraph there at the end of Section VIII
17 that starts with "Thus."
18          Do you see that?
19     A.   I see it.
20     Q.   "Thus, the available medical and
21 scientific literature, including the animal studies on
22 NDMA/NDEA exposure and occupational exposure studies,
23 and publications examining the effect of NDMA/NDEA in
24 valsartan, does not establish that trace amounts of

Page 147

1  NDMA or NDEA in car" -- "in valsartan cause an
2  independent or increased risk of cancer."
3          Do you see that?
4      A.   I see it.
5      Q.   Is it fair to characterize that paragraph
6  as your conclusion regarding the exercise you went
7  through in Section VIII of your report?
8      MR. FOWLER:  Objection to the form.
9  BY THE WITNESS:
10     A.   I think it is pretty obvious that that's
11 the case.
12     Q.   Okay.  And that conclusion, as you say, is
13 based on the available medical and scientific
14 literature, is that right?
15     A.   Is there anything else?  I mean, I am all
16 ears if I've missed something.  So is there anything
17 else I should be considering?
18     Q.   Well, I'll -- I'll admit, Doctor, I'm not
19 the expert, so --
20     A.   Well, that's clear.
21     Q.   Thank you.
22     A.   That's clear.
23     Q.   How can you be sure that you didn't miss
24 some study?

Page 148

1      MR. FOWLER:  Objection to form.
2  BY THE WITNESS:
3      A.   So -- so usually when there is an issue
4  you've missed something that is -- is crucially
5  important, it gets pointed out to you what -- what you
6  missed.  And barring my discovery of
7  that, my conclusion is, is that of the studies that I
8  deemed relevant to really come to the conclusions that
9  I did, I -- I have included them to the best of my
10 ability.
11 BY MR. DAVIS:
12     Q.   Okay.  Let's turn to Section III.O of your
13 report, which is titled "Epidemiology of Hypertension
14 and Cancer."
15          I guess my first question is:  Are you
16 attempting to posit in this section of your report
17 what hypertension is a cause of cancer?
18     A.   First of all, epidemiology doesn't prove,
19 and even the biologic plausibility of hypertension per
20 se causing cancer, it's one of the things that is
21 potentially explaining the association, but it's
22 really not at the top of the list.
23          Shared risk factors are really a -- a very
24 fertile ground and really are more proximal than that,

Page 149

1  but you do -- you do see risk, increased risk of
2  cancer, in some cancers you see decreased risk, but
3  you see it both in medicated and unmedicated
4  hypertension.
5          So it is clearly not all -- all drug
6  exposure.  And even when you can link drug exposures
7  at times is because of drugs being used that are more
8  likely to be used by people who have these risk
9  factors that it doesn't mean the drugs per se are
10 causal and it doesn't necessarily say that they are
11 not causal.  You are -- you are sort of -- you
12 don't -- you don't really know and -- and all.  So I'm
13 saying far beyond that, if you go toward the end of
14 this, you'll see five or six or more explanations of
15 why you might see an epidemiologic association between
16 hypertension and cancer.
17     Q.   If you turn to Page 25 of your report, you
18 call out kidney cancer specifically.
19          Is -- is it, in your opinion, that the
20 strongest association between kidney cancer and
21 hypertension or -- why did you call that one out in
22 particular?
23     MR. FOWLER:  Objection to form.
24 BY THE WITNESS:

Page 150

1    A.   So the -- the answer to why that one was
2  called out is really the first part of that sentence.
3  It is that the blood pressure level has been linked to
4  an increased risk of cancer in people with kidney
5  cancer.  And all cancers you can't say that for,
6  kidney cancer you can.  And right now it is an
7  unexplained explanation -- it is an unexplained
8  observation that -- that has been made that we don't
9  really know exactly what it means.
10 BY MR. DAVIS:
11    Q.   Okay.  Well, based on the -- you cite a
12 number of articles, and I've -- I've reviewed some of
13 them.
14         My question is:  Based on your review of
15 the literature, is the association strongest between
16 kidney cancer and hypertension or is there some other
17 cancer that you think has a stronger association?
18    A.   So when you are doing epidemiology, and
19 this is one of the tough things about doing
20 epidemiology, and you go into the hypertensive
21 population, it is not -- very few of them are pure
22 hypertensives.  You have hypertensives who are
23 overweight.  You have hypertensives who are overweight
24 and don't exercise much.  You have hypertensives who

Page 151

1  are taking medicines, not taking medicines.  You have
2  hypertensive patients who have diabetes.  And a lot of
3  these factors are linked to cancer.
4         So high -- hypertension is -- it's
5  relationship to cancer at least is partially explained
6  by comorbidities.  It is not fully understood and
7  clearly why it's related to blood pressure level,
8  biologically everything at this juncture is -- is
9  speculation, but what is not in doubt is that a group
10 of hypertensive patients who have your usual
11 comorbidities have a heightened risk for cancer.
12    Q.   Let me ask you a question based on your
13 experience as a -- as a treating physician.
14         When -- when you are treating hypertensive
15 patients, do you often order urinalysis for them?
16    A.   So the answer to that question is actually
17 earlier in my report, and when we talk about the usual
18 workup, urinalysis is part of the initial workup
19 that's listed in my report.
20    Q.   So is that -- are you telling me that's
21 something you would typically do as part of a standard
22 regimen of -- of treating your patients?
23    MR. FOWLER:  Objection; form.
24 BY THE WITNESS:

Page 152

1    A.   I just answered that.  The answer is yes.
2  BY MR. DAVIS:
3    Q.   What's -- what's the reason for ordering
4  urinalysis for your hypertensive patients?
5    A.   So the rationale for ordering a urinalysis
6  is, one, you are going to get an estimate of dipstick
7  proteinuria; two, you are going to get a look at the
8  urine sediment and whether they are casts or red cells
9  or red cell casts which can indicate glomerular
10 disease or other problems in the kidney; three, you
11 are also going to get look at specific gravity, which
12 is an important factor in the kidney's ability to
13 concentrate urine.
14         So -- so there are multiple parameters
15 that you are looking for, things you are looking for
16 when you order a urinalysis.
17    Q.   And you mentioned the presence of red
18 blood cells, did you not, as -- as one reason?
19    A.   Yes.
20    Q.   Okay.  And could the presence of red blood
21 cells in the urine be an indicator potentially of
22 kidney cancer?
23    A.   The presence of red blood cells in the
24 urine is most likely not kidney cancer.  It could be

Page 153

1  anywhere from the kidney to the ureters to the bladder
2  to the urethra.  You don't really know.  But you do
3  know that red cells in the urine are not normal.  And
4  so it doesn't tell you anything specific, but it tells
5  you there is a potential problem that needs
6  evaluation.
7    Q.   Okay.  And what -- what further evaluation
8  or procedures would you recommend for a patient where
9  you saw red blood cells in the urine like that?
10    A.   You may do a cystoscopy, you may do a
11 prostate massage and try to ensure there is no
12 infection based on their response to the prostate
13 massage as well as anything that comes out of the
14 urethra in response to that, you may do a CAT scan or
15 an MRI looking for basically masses in the kidney,
16 stones in the kidney.
17         So there are a range of things pro- -- in
18 the urinary tract that can cause red cells to be there
19 and just seeing red cells per se doesn't tell you even
20 remotely what it is, what it is from.
21    Q.   Sure.
22         And you mentioned masses in the kidneys as
23 a result of doing, like, a CT scan or an ultrasound.
24 When you say "masses," are you referring potentially

Page 154

1  for -- looking for tumors?
2      A.   So you have tumors and many of the masses
3  you'll find in the kidney are -- are benign, some of
4  them are not benign and are malignant.  Certainly
5  malignancy is a potential problem that -- that you
6  are -- you are concerned about, but it is also a menu
7  of problems that you are concerned about of which
8  malignancy is one.
9      Q.   So would you agree with me that in doing
10 that urinalysis, you might be led on the investigative
11 trail as a physician to an eventual discovery of -- of
12 cancer in some cases if you see red blood cells in the
13 urine, then take a CT ultrasound, find a mass, and
14 then discover that that mass is a malignant tumor?
15     A.   What I would -- would say about the --
16 this is that in the relative sense malignancy will be
17 one of the lower probability explanations or findings
18 of a workup.  It is on the list, it does occur, but in
19 a clinical practice most of the people with red cells
20 in their urine are not going to have cancer.
21     Q.   Is -- is endometrial cancer on the list as
22 well for red blood cells in the urine?
23     A.   Well, in women you can bleed out of the
24 endometrium and it can contaminate the urine, so

Page 155

1  absolutely.
2      Q.   Could those examples be examples of what's
3  called detection bias?
4      A.   Well, detection bias, my understanding of
5  it, detection bias is that you've got people under
6  surveillance, they are coming in and out of the
7  healthcare system, and they are getting not only
8  routine tests but sometimes symptom directed tests and
9  just by the fact that they are -- they are there, if
10 you take 100 people who are in the system on a regular
11 basis and 100 people that are in the system less
12 intensely or not in the system, you are obviously
13 going to find more in the people who are in the
14 system.  It doesn't mean they have more disease than
15 the people who are not in the system, but you have the
16 bias in that you can detect it because they are under
17 surveillance.
18     Q.   Would you agree that hypertension patients
19 tend to be under a greater degree of medical
20 surveillance than your average population?
21     MR. FOWLER:  Objection; form.
22 BY THE WITNESS:
23     A.   Actually, I'm not sure that I -- I know
24 that -- that in -- in any direct comparison.  You have

Page 156

1  to realize that a number of hypertensive, it is a very
2  heterogenous population.  You have hypertensive
3  patients that are diagnosed, started on medicine, they
4  never follow up, they never come back.  You get
5  hypertensive patients who are under care, keep all of
6  their -- their appointments.  And you have
7  hypertensive patients who drift in and -- and out of
8  care.  You also have to realize that in the general
9  population, even non-hypertensives, many of them are
10 actually in the system of care for other reasons.  And
11 so, again, it is just kind of heterogenous on both
12 sides that you have people in and out of the system,
13 but if you are hypertensive and you are adherent to
14 and getting good follow-up from your doc or doctors,
15 you should be in the system more, you should be under
16 surveillance more.
17 BY MR. DAVIS:
18     Q.   Okay.  You cite the -- and forgive me if
19 I'm pronouncing this wrong, the Seretis article
20 several times in your report?
21     A.   About what?
22     Q.   Are you -- are you familiar with that
23 article?
24     A.   Why don't you pull up what you are talking

Page 157

1  about.
2      Q.   Sure.  If you look at your report, you
3  cite Seretis at the end of Footnote 23, at the end of
4  Footnote 24, again at Footnote 31c, as an example?
5      A.   Yep.
6      Q.   Okay.
7      A.   What questions can I answer on that?
8      Q.   Sure.  Let me introduce it as an exhibit.
9  This is Flack 11.
10         (WHEREUPON, a certain document was
11         marked Plaintiff-Flack Deposition
12         Exhibit No. 11, for identification,
13         as of 09/28/2021.)
14     MR. FOWLER:  Counsel, I am putting the article
15 in front of the witness.
16     MR. DAVIS:  Okay.  Thank you.
17 BY MR. DAVIS:
18     Q.   I'd like you to go, if you would, Doctor,
19 to the very last page prior to the references, which
20 is Page 7.
21     A.   All right.
22     Q.   The authors are discussing there this
23 detection bias phenomenon and they say:
24     "Third, detection bias may also account

Page 158

1  for some of the reported associations as individuals
2  treated for hypertension are under closer medical
3  surveillance that may lead to easier detection of
4  cancer compared to untreated persons."
5       Do you see that?
6   A.   I see that.
7   Q.   Is there anything about that statement
8  that you -- you disagree with?
9   A.   What I would say is pretty much what I
10 said previously, if you were hypertensive and if you
11 follow up, you are in the system and there is a
12 greater risk for -- greater probability of detection,
13 but it depends on who you are being compared to
14 because there are plenty of people who are not
15 hypertensive who are in the medical system for other
16 reasons who also had a similar kind of ability to have
17 an increased probability of detection.
18       Here they make a statement and there is no
19 specific reference attached to it.  And I'm surprised
20 that as focused you are on references that you would
21 just take the author's word for this.
22  Q.   I'm sorry.  I didn't catch that last
23 sentence.  What was that?
24  A.   I just -- I was surprised, as focused as

Page 159

1  you are on references, that you would not -- you would
2  take the author's word for this because there is
3  absolutely no reference here, it is just a general
4  statement with no foundation other than speculation.
5   Q.   Well, that's why I'm asking your -- your
6  opinion, Doctor.
7       Is -- is there anything about that
8  statement that you disagree with?
9   A.   The statement is qualified and -- and all
10 and without a hard reference to that, I would say that
11 it may not be true.
12  Q.   The -- the very last sentence in the next
13 paragraph says:
14       "However, careful interpretation is
15 required as most meta-analyses included a relatively
16 small number of studies, several relative risks had
17 weak or moderate magnitude and may be affected by a
18 residual confounding."
19       Did I read that correctly?
20  A.   Yes, you did.
21  Q.   Is there anything about that statement
22 that you disagree with?
23  A.   It is a fairly accurate description of
24 epidemiologic data and what you get in epidemiologic

Page 160

1  data.
2   Q.   Okay.  Specifically relating to
3  hypertension and cancer?
4   A.   Specifically related to what's in that --
5  in that -- in that sentence, and -- and that's really
6  true literally whether you are hypertensive or not
7  when you are looking at epidemiological studies.
8  There is nothing unique about hypertension here.
9   Q.   Okay.  Do you interpret the authors of
10 this article as discussing specifically the available
11 meta-analyses for -- and which examined hypertension
12 and cancer?
13  A.   I think these authors did what as a
14 journal editor, associate journal editor I would
15 expect when I am reviewing papers giving authors
16 feedback and at times pushing them then, is that when
17 you write a paper, you -- you basically ex-train --
18 explain the strengths and potential weaknesses.  Okay.
19 And it doesn't mean that everything that is discussed
20 on either side is -- is of equal weight, but you
21 really need to provide the perspectives for a reader
22 who is not steeped in methodology to be able to have
23 some context on what they are reading.
24       And so when they discuss the strengths and

Page 161

1  the potential weaknesses, some of the weaknesses that
2  they discussed, and even some of the strengths they
3  discussed, might not necessarily be something that has
4  been studied and you are absolutely definitive of, but
5  you are saying that it's certainly -- this could be
6  part of the explanation of why you are seeing it line
7  up more on the positive side or -- or the negative
8  side and to be considered.  And I think that they did
9  a very reasonable job in -- in doing that in this
10 paragraph.
11  Q.   Okay.  Well, let's -- let's put you in the
12 shoes of if you were the editor reviewing this article
13 for acceptance, if they had not done that, would you
14 have approved that article for -- for publication?
15  A.   When I'm reviewing articles as an
16 associate editor and forwarding them to my editor with
17 my recommendations, whether an article should be
18 accepted, rejected or not, and sometimes I sat for
19 two, three, maybe four rounds with the investigators
20 going back and forth about, you know, Here is what the
21 reviewer said, here is what I'm saying, and it's still
22 not taken care of, what I'm looking for is -- is
23 balance.  I'm looking for a -- a fair, expansive
24 explanation and to the degree that you can place in a

Confidential Information - Subject to Protective Order

Page 162

1 hierarchy some of the reasons that you are giving,
2 fine, if you can't, just be -- be fair and -- and be
3 expansive in what you include.
4        So if -- if you don't include some of the
5 things that could impact the relative risks that they
6 saw, then you are -- are not being expansive in your
7 explanation.
8        So the way I edit papers, they would have
9 to address both the strengths and the weaknesses,
10 potential weaknesses in a -- a manner to the degree
11 that -- that I understand them applicable to what they
12 are writing.
13     Q.   Let's take the proposition that you put
14 forth in -- in Section III.O of your report at -- at
15 face value, which appears to be, and you can -- and I
16 expect you will obviously correct me if I'm
17 misunderstanding you here, but you are saying that
18 this is a population of people, hypertensives mainly,
19 who are already at a greater risk of cancer than the
20 rest of the world, is that right?
21     A.   The best epidemiologic evidence we have in
22 hypertensive populations is that there are multiple
23 cancers in multiple kinds of hypertensive patients
24 medicated, unmedicated, that are linked either to the

Page 163

1 presence or absence of hypertension and/or the level
2 of blood pressure.  That doesn't tell you why they are
3 at apparently higher risk.  It just tells you they
4 are.
5     Q.   Don't you think it's important that,
6 particularly for these people, not to -- to add to
7 that risk unnecessarily?
8        MR. FOWLER:  Objection; form.
9 BY THE WITNESS:
10     A.   The -- again, I think I know where you are
11 going and I think you read my report and the amounts
12 of NDMA found in valsartan at the exposure levels and
13 coupled with the epidemiologic studies, there is no
14 consistent evidence that the amount of NDMA in
15 valsartan consumed by people in roughly four and a
16 half years, even if they took the max dose at super
17 high levels compared to what the FDA said, even
18 approached, they are probably 30, 40 times lower than
19 what you get in animal models where you start seeing,
20 on a microgram-per-kilogram basis, cancer.
21        So, again, this is an argument that has
22 context to understand it and it is a different
23 question than is it biologically plausible that NDMA,
24 nitrosamines and other similar substances can cause

Page 164

1 cancer, because the devil is in the details.  It
2 depends on the exposure.
3 BY MR. DAVIS:
4     Q.   Well, don't you think, though, it is
5 important not to unnecessarily add to the risk that
6 hypertensives would -- you contend already have a
7 higher risk of -- of cancer, don't you think it's
8 important not to unnecessarily add to that risk?
9        MR. FOWLER:  Objection; form.
10 BY THE WITNESS:
11     A.   So, I would just answer you like this.  If
12 you can point me to any -- any data that says that the
13 amount of exposure from valsartan with NDMA in it has
14 increased cancer risk, I'd like to know what it is.
15 If you have data like that, then we can -- we can
16 discuss it.
17        If you are asking me in a theoretical
18 and -- and all, I would just say is there data to
19 support that position and I'll hang up and listen.
20 BY MR. DAVIS:
21     Q.   You don't think that NDMA or NDEA
22 decreased cancer risk, do you?
23     A.   So what kind of question is that?  I mean,
24 do I think it decreases cancer risk?  There is no

Page 165

1 evidence that it decreases cancer risk.
2     Q.   So the two options in your mind are either
3 potentially no effect or a carcinogenic effect,
4 correct?
5        MR. FOWLER:  Objection; form, mischaracterizes.
6 BY THE WITNESS:
7     A.   Depending on the circumstances, those are
8 going to be the two outcomes that -- that you would
9 be -- be looking at.
10 BY MR. DAVIS:
11     Q.   And you -- do you not think that it --
12 it's important for hypertensives who you claim to be
13 already at a higher risk of cancer not to
14 unnecessarily add to that risk?
15        MR. FOWLER:  Objection; form, asked and
16 answered.
17 BY THE WITNESS:
18     A.   Again -- again, based on the evidence we
19 have in humans, the -- in a case is specious at best.
20 We have arsenic in our drinking water.  We have
21 acceptable levels of arsenic.  We have contaminants,
22 we have impurities, we have things that are in our
23 drugs, including NDMA, that are -- are there and --
24 and all.  So the -- the argument is not are they there

Confidential Information - Subject to Protective Order

Page 166

1 or are they not there. The argument is -- is more
2 nuanced than that.
3 BY MR. DAVIS:
4     Q.   Is it your opinion that the presence of
5 nitrosamines in drugs is unavoidable or a necessary
6 evil that we have to contend with?
7     MR. FOWLER:  Objection; form, beyond the scope.
8 BY THE WITNESS:
9     A.   Well, that's actually not an area that I'm
10 going to offer much of an opinion on.  It -- it
11 must -- there must be some difficulty because we've
12 had multiple products that have shown up with it in
13 there from reputable manufacturers.
14        So there are multiple ways that it can get
15 in there and -- and all and it's not all even the
16 manufacturing process.  Some of it can occur -- occur
17 afterwards.  So, it -- again, it's just multiple ways
18 that NDMA can get in there.
19 BY MR. DAVIS:
20     Q.   But you've -- you've done no independent
21 analysis is what you are saying?
22     MR. FOWLER:  Objection; form.
23 BY THE WITNESS:
24     A.   So what I've done is I have used

Page 167

1 FDA/European data and even augmented the -- the top
2 level of exposure per 320-milligram pill and made the
3 assumption, which is not true, that everybody would be
4 up at 320-milligram pill containing the levels at
5 really higher levels of NDMA and calculated an
6 exposure and related that to the body weight and
7 compared it to animal models.
8        And you know what's in my report and you
9 know that the animal models are a lot more of an
10 exposure and you also know that in the human studies
11 the evidence that this exposure to valsartan causes
12 cancer is firstly nonexistent.
13 BY MR. DAVIS:
14     Q.   Well, let's -- you jumped around a little
15 bit there.  Let -- let's stick with the beginning part
16 of your statement, and -- and my question -- follow-up
17 question to that is:  Are you aware that the FDA's
18 position is that there should be zero nitrosamines in
19 any of these valsartan drug substances?
20     MR. FOWLER:  Objection; form, colloquy, facts
21 not in evidence.
22 BY THE WITNESS:
23     A.   So if the FDA's position is that, somebody
24 needs to explain to me why they set an acceptable

Page 168

1 limit.
2 BY MR. DAVIS:
3     Q.   Have -- you have -- have you done any
4 research into the FDA's thinking on why they set
5 acceptable interim -- interim limits?
6     A.   I asked the -- the question.  They set
7 acceptable limits because getting to zero, just like
8 anything, zero in the arsenic in -- in water may not
9 be -- be feasible to actually do.  Okay.  And so if
10 they are not kicking drugs off the market because they
11 have some NDMA in them, it is a threshold level that
12 they are -- they are setting.
13     Q.   Have you -- have you done any research to
14 determine whether it was infeasible for these
15 manufacturers to manufacture valsartan free and clear
16 of nitrosamines?
17     MR. FOWLER:  Objection; form, beyond the scope.
18 BY THE WITNESS:
19     A.   Well -- well, first of all, that's not my
20 area of expertise.  Secondly, even the FDA, they had a
21 conference on this, even the FDA tells you that the
22 NDMA can come in through the manufacturing process, it
23 can come in even after the drug has been packaged, and
24 so finding NDMA does not necessarily mean that it

Page 169

1 automatically was there from the manufacturing
2 process.  It certainly could be and it could be other
3 causes of it.  And, again, the FDA is not setting a
4 zero tolerance on this and there is a reason they are
5 not setting a zero tolerance on this.  They are
6 setting an acceptable limit.
7 BY MR. DAVIS:
8     Q.   Well, they -- they have in a way set a
9 zero tolerance by saying it's their expectation
10 that -- that drug products should contain zero
11 nitrosamines.
12        Are you not aware of that?
13     MR. FOWLER:  Objection; form, facts not in
14 evidence.
15 BY THE WITNESS:
16     A.   Well, what I'm aware of is that there are
17 compounds still on the market today that have
18 detectable NDMA that the FDA has not taken off the
19 market.  And so while they may have discussions and
20 they are very bright people, very talented, much more
21 so than people give them credit for, there is a reason
22 they have a detectable -- they have a limit of what
23 you can be exposed to.  And in a perfect world, you'd
24 like zero arsenic in your water and you'd like zero

Page 170

1  NDMA, but there is a reason they have set a -- a limit
2  and there is a reason that drugs that are under that
3  limit are -- are not being pulled off but still may
4  have detectable NDMA.
5  BY MR. DAVIS:
6      Q.  There is no manufacturer of water out
7  there, is there?
8      MR. FOWLER:  Form.
9  BY THE WITNESS:
10     A.  Actually, yes, there is.  There are people
11 who do things to water in all -- and in the public
12 sphere our water, drinking water is tested and there
13 are acceptable levels of potential carcinogens,
14 including arsenic, in our water.
15 BY MR. DAVIS:
16     Q.  Have you done any research whatsoever to
17 determine -- have you read any of the -- let me strike
18 that.
19         Have you -- have you read any of the root
20 cause reports of any of these manufacturers as to
21 exactly how NDMA or NDEA got in there?
22     MR. FOWLER:  Objection; form, outside the scope.
23 BY THE WITNESS:
24     A.  Actually, I have.  I've read multiple

Page 171

1  sources of how the NDMA potentially got in there and I
2  also know it can get in through multiple channels.
3  And, so, yes, I mean, I -- I basically have read
4  material.
5  BY MR. DAVIS:
6      Q.  Okay.  Where -- where in your materials
7  considered list did you review the manufacturer of
8  root cause analyses?
9      A.  There are documents in there that the FDA
10 has where they discuss it where it came in there and
11 there are articles that are listed that discuss how it
12 appears the NDMA got -- got in there and those are
13 articles I read.
14     Q.  Is it your contention that you've reviewed
15 anything that suggests to you that any of these
16 manufacturers are unable to figure out how to
17 manufacture valsartan free and clear of nitrosamines?
18     MR. FOWLER:  Objection; form, beyond the scope.
19 BY THE WITNESS:
20     A.  I think it is a question you need to ask
21 them.  I have no insight into their manufacturing
22 processes and I'm not equipped to render an opinion on
23 that.
24 BY MR. DAVIS:

Page 172

1      Q.  Okay.  Let's go to Section VII of your
2  report, Valsartan Recall and Impact on Hypertension
3  Patients.
4      A.  Okay.
5      Q.  You use the word "unexpected" in
6  describing the NDMA, NDEA contamination several times.
7         Do you see that?
8      A.  Yes.
9      Q.  Did you do any investigation or
10 independent analysis on your own to try to figure out
11 whether, in fact, the NDMA or NDEA contamination was
12 unexpected?
13     A.  Well, certainly the FDA used the
14 terminology "unexpected," and secondly, I'm -- I'm all
15 ears if you can tell me what independent analysis I
16 should have done or would have been able to do to --
17 to make that determination.
18     Q.  If, for example, one of these
19 manufacturers had actual knowledge of NDMA
20 contamination a long time before the recall, would
21 that still qualify as unexpected in your opinion?
22     MR. FOWLER:  Object.  Objection; form, facts not
23 in evidence.
24 BY THE WITNESS:

Page 173

1      A.  Well -- well, first of all, the date of
2  the recall I'm sure is not the first date that the FDA
3  had communication with companies, but, again, that's
4  beyond my -- my scope.  For us who depend on the FDA
5  to police our drug supply, it absolutely was -- was
6  unexpected.  And FDA used the terminology "unexpected"
7  as well.  So if I'm in bad company, I'm in bad company
8  with the FDA on that.
9  BY MR. DAVIS:
10     Q.  What about if one of these manufacturers'
11 raw material suppliers explicitly warned them of the
12 potential for nitrosamine formation in the very
13 process that they were doing to make valsartan as far
14 back as 2014, would that qualify still as unexpected
15 in your opinion?
16     MR. FOWLER:  Objection; form, facts not in
17 evidence, scope.
18 BY THE WITNESS:
19     A.  How would you expect me to know what a
20 manufacturer told anybody?  So it would still be
21 unexpected to me because that is not any kind of
22 communication I would have had any access to.
23 BY MR. DAVIS:
24     Q.  Okay.  So you've done no independent

Page 174

1 analysis that leads you to a conclusion that the
2 contamination was indeed unexpected, you're just
3 relying on what you contend to be the FDA's use of
4 that word, correct?
5     MR. FOWLER: Objection; form, mischaracterizes.
6 BY THE WITNESS:
7     A.   Actually, no, what I am saying is given
8 what I was privy to and my dependence on the FDA for
9 safeguarding our -- our drug supply that when this
10 became known, it was unexpected.
11 BY MR. DAVIS:
12    Q.   So you're -- but that's not your --
13 your -- you are not describing any -- any independent
14 analysis or documents that you've reviewed to actually
15 determine whether it was unexpected for any of these
16 manufacturers, isn't that right?
17    A.   My reporting of being unexpected is from
18 the vantage point that I sit in.  I do not see
19 documents like that.  And so from my vantage point, it
20 was unexpected.  The FDA sees more than I do and from
21 their advantage point it was unexpected as well.
22    Q.   But you're not sure what the FDA reviewed
23 at all in making or not making that statement?
24    MR. FOWLER: Objection; form, beyond the scope

Page 175

1 of this general causation expert.
2 BY THE WITNESS:
3     A.   So what -- what I do know from having
4 worked with the FDA, and in an ad hoc basis in -- as a
5 standing member of FDA Cardiorenal Advisory Panel, is
6 they are -- they are awfully smart and they are
7 awfully talented and, if anything, they are -- are
8 tilted to be harder on -- on industry than, you know,
9 than -- they probably go a bit the other way, and it's
10 important that they do that because it helps safeguard
11 us from catastrophes.
12       So I have tremendous respect for not just
13 sitting around looking at stuff on the internet.  I've
14 been to the FDA, I've worked with the FDA, and I know
15 how it works and I've interfaced with their -- their
16 scientists, so I have a pretty informed opinion when I
17 say I have great trust in the Food and Drug
18 Administration.
19 BY MR. DAVIS:
20    Q.   You had the opportunity to ask counsel for
21 internal documents of these manufacturers or
22 depositions, for example, of their witnesses that were
23 taken where these topics were discussed.
24       Why did you not ask for any of that?

Page 176

1     MR. FOWLER: Objection to form, outside the
2 scope, mischaracterizing, lack of foundation.
3 BY THE WITNESS:
4     A.   I was given a -- a narrow assignment and I
5 looked at documents that were relevant to
6 understanding my focused assignment.  There are people
7 who have expertise in these areas about manufacturing
8 that far exceed mine and those questions are best
9 either asked of them or -- or somebody involved in the
10 manufacturing.
11       I had more documents than I ever looked at
12 in all and I -- I had plenty of documents to come to
13 the conclusions, and unless you can tell me that I
14 have really missed something of critical importance or
15 made an error in judgment, I mean, this is just coffee
16 house crap.
17 BY MR. DAVIS:
18    Q.   The last sentence of that Section VII
19 says:
20       "I did not witness any patients have an
21 adverse effect as a result of the NDMA, NDEA
22 impurities found in valsartan."
23       Do you see that?
24    A.   Yes.

Page 177

1     Q.   Have you had any hypertension patients of
2 yours receive a cancer diagnosis in the last five, six
3 years?
4     MR. FOWLER: Objection; form.
5 BY THE WITNESS:
6     A.   I'm sure I have, yeah.
7 BY MR. DAVIS:
8     Q.   For any of those patients, did you do any
9 work to rule out NDMA or NDEA contamination as having
10 contribute -- contributed to their cancer diagnosis?
11    A.   Perhaps you can explain to me how you rule
12 out a cause of cancer in an individual that can't be
13 found in hundreds of thousands of people.
14    Q.   Well, you appear to be ruling out NDMA,
15 NDEA impurities by making that statement that you did
16 not witness any adverse effects.  I'm trying to get to
17 what you mean by that sentence?
18    A.   Well --
19    MR. FOWLER: Objection, argumentative.
20 BY THE WITNESS:
21    A.   -- well, first of all, the -- the adverse
22 effect has to do with when the drug is recalled, and
23 if I'm not mistaken, it says "Valsartan Recall and the
24 Impact on Hypertension Patients."  It's not talking

Page 178

1 about cancer. It is really talking about what went on
2 with patients when we found out that there were lots
3 that had impurities in it and that patients needed
4 alternative therapies. That's really where my
5 comments are.
6         And when I say that I didn't see any harms
7 to patients during this transition, No. 1, we have
8 plenty of ARBs on the market. Valsartan, irbesartan
9 and losartan were involved in the recall of the
10 generics.
11        Two, I've still got five or so other ARBs
12 to choose from. There is zero problem with
13 substitute. Okay. So the transition was fairly
14 seamless once we found out there was a problem between
15 us and the pharmacies and getting people onto other --
16 other therapies.
17        The danger is they read about lawsuits,
18 they read about stuff and -- and potentially causing
19 cancer and what they -- they will do sometimes is stop
20 the drugs on their own, okay. I saw people do that.
21 I didn't see anybody get specifically harmed from
22 that, but that's not something you really, really want
23 to do.
24        So my -- my -- I stand behind my statement

Page 179

1 that I really didn't see anybody harmed in making the
2 transition from these drugs that had NDMA in it to
3 other ARBs.
4 BY MR. DAVIS:
5     Q.   Okay. And I'm jugs trying to get to the
6 bottom of what you did to back that statement up and
7 what you mean by it.
8         So it sounds like you are just saying that
9 that's purely observational on your part, that you did
10 not witness any adverse effect as a result of
11 nitrosamines, it is not that you actually did some
12 kind of follow-up or a specialized treatment regimen
13 for any of those patients that were on recalled
14 valsartan products to rule out NDMA or NDEA as -- as
15 causing their cancer, correct?
16     MR. FOWLER: Objection; form, foundation,
17 compound.
18 BY THE WITNESS:
19     A.   So, again, I'll go back to the heading
20 here, it says Valcar -- "Valsartan Recall and Impact
21 on Hypertension Patients." So it's really talking
22 about the recall. And what was the impact of the
23 recall on hypertensive patients. You are trying to
24 take it back to I should have done something about

Page 180

1 NDMA. If you have anybody who tells you that they
2 know how to do that, they are pulling your leg, okay.
3 You -- you can't do that, but what I can do, because I
4 take care of patients and we talk to patients and I
5 see them in my practice is I know when I've got a
6 problem.
7         Back in the 1990s when they were talking
8 about calcium channel blockers, increased
9 cardiovascular risk caused cancer, whatever, I had
10 patients flushing their nifedipine, okay, but as a
11 practitioner who goes in and closes the door and takes
12 care of people, I know how to deal with that.
13        Fast forward to this valsartan recall,
14 when the valsartan recall happened, we had zero
15 problem transitioning patients to appropriate
16 alternative therapies. Our biggest problem was people
17 who read something online or heard about it on the
18 news or in the newspaper or wherever and decided on
19 their own not to take the drugs because they were
20 basically weighing the short-term (sic) risk of
21 continuing to taking the drug and minimizing the
22 short-term risk of not taking the drug, which is much
23 more substantial.
24 BY MR. DAVIS:

Page 181

1     Q.   Okay. I appreciate that, Doctor, but
2 my -- my question, and I'm not by any means suggesting
3 you should have done -- I mean, you're a hypertension
4 specialist, you are not an oncologist, I'm not
5 suggesting you should have done any work to rule out
6 NDMA or NDEA contamination as having contributed to
7 any cancer that any of your patients received as a
8 result of being on recalled valsartan products.
9         I'm just trying to clarify that you did
10 not do any of that. Is that -- is that right? And
11 I'm not saying I expected you to. I'm just saying you
12 did not, is that right?
13     MR. FOWLER: Objection to colloquy. Objection
14 to colloquy and form.
15 BY THE WITNESS:
16     A.   That's exactly what you are saying, and my
17 response to that is if you can tell me what you can do
18 to rule this out at an individual patient level, I am
19 all ears because there is nobody, I don't care what
20 your training is, who knows how to do that.
21 BY MR. DAVIS:
22     Q.   Okay. So the answer is -- is, no, that
23 you did not make any effort to rule out NDMA or NDEA
24 contamination for any of those patients?

Page 182

1    MR. FOWLER: Objection; foundation,
2  mischaracterizing.
3  BY THE WITNESS:
4    A.   Anyone who was on a drug product that had
5  unacceptable limits of NDMA in it, we got them
6  transitioned.  Beyond that, the ability to
7  investigate -- I'm not -- I'm not into wasting my
8  time.  I'm into spending time on things that can help
9  people and help us take care of them.  There is no way
10 at an individual patient level that you can rule out
11 anything except get them off the drug and keep them
12 under surveillance.
13 BY MR. DAVIS:
14   Q.   Okay.  And it's your -- I think you've
15 alluded to this a couple of times, but your practice
16 was able to swiftly and seamlessly transition patients
17 to an appropriate alternative therapy?
18   A.   You know, we did that, and if we couldn't
19 do that, we would be awfully dumb, which we aren't.
20   Q.   Okay.  Are any of your patients still on
21 valsartan products that have nitrosamines in them?
22   MR. FOWLER: Objection; form.
23 BY MR. DAVIS:
24   Q.   To your knowledge?

Page 183

1    A.   To my knowledge, no.
2    Q.   Did you keep a single one of your patients
3  on recalled valsartan a day longer than they had to be
4  on recalled valsartan?
5    MR. FOWLER: Objection to the form, foundation.
6  BY THE WITNESS:
7    A.   No.  We transitioned them as soon as we
8  could.
9    MR. DAVIS: Let me take a -- a quick break to
10 review my notes.  I'm getting close to the end here.
11       What do you say, five minutes?
12 MR. FOWLER: That's fine, Counsel.
13 MR. DAVIS: Sure.  Let's go off the record.
14 THE VIDEOGRAPHER: The time is two o'clock p.m.
15 We are off the record.
16       (WHEREUPON, a recess was had
17        from 2:00 to 2:23 p.m.)
18 THE VIDEOGRAPHER: It's 2:23 p.m.  We are on the
19 record.
20 BY MR. DAVIS:
21   Q.   Dr. Flack, before I wrap up, I just wanted
22 to touch on briefly Section IX of your report, which
23 appears at Page 39.
24   A.   Okay.

Page 184

1    Q.   Is it fair to -- say that Section IX of
2  your report is kind of a synthesis, and I'm just
3  trying to understand where you are coming from there,
4  but Section IX of your report is a synthesis of your
5  opinions that you reach in Sections VIII and
6  Sections III.O of your report?
7    MR. FOWLER: Objection to form.
8  BY THE WITNESS:
9    A.   So why don't you clarify what you are
10 asking me there.
11 BY MR. DAVIS:
12   Q.   Sure.
13       So in -- in Section III.O of your report,
14 you put forth opinions on hypertension and can -- and
15 cancer and there being risk factors.  In Section VIII
16 of your report you posit that there is no causal
17 relationship between NDMA, NDEA in valsartan and
18 cancer.  In Section IX of your report is a synthesis
19 of those two sections where you posit that it is more
20 likely that patients developed these cancers from
21 their status as being hypertensive as opposed to
22 exposure to nitrosamines.
23       Is that a fair reading of your report,
24 that it synthesizes those two sections?

Page 185

1    MR. FOWLER: Objection; form, vague.
2  BY THE WITNESS:
3    A.   So -- so I'll -- I'll state what I'm
4  trying to say.
5        When you do -- you look at the Pottegard
6  study, you look at the Gomm study, you basically
7  firstly find nothing there in humans when they've been
8  studied with exposed and unexposed valsartan patients.
9  And so you really don't have virtually any evidence in
10 humans.  And then you look at a group of people who,
11 whether they are taking valsartan or not, you know
12 that they have higher risk.  In the absence -- that
13 statement is more about the absence of data in humans,
14 in human studies, the unconfounded studies that you
15 can find an increase in risk.
16       So you're -- you're left with a
17 plausible -- a synthesis of the data is that if there
18 is no data in humans that are -- expands into the
19 hundreds of thousands that there is increased risk and
20 there are hypertensives both in the exposed and
21 control group, then it is very hard to say that any
22 exposure to NDMA at levels well below what is --
23 causes cancer in animals is playing a -- a role here.
24 So essentially that -- that's what -- what I'm saying

Confidential Information Subject to Protective Order

Page 186

1  and that's the data and that -- that's not disputable.
2  BY MR. DAVIS:
3      Q.   Well, I get that that's the substance
4  of -- of your opinions as expressed in Sections III.O
5  and VIII.
6         My question is more just as to the
7  structure of your report which is:  Am I correct in
8  reading Section IX as an output of the opinions that
9  you express in Sections III.O and VII -- or in VIII?
10  My apologies.
11     MR. FOWLER:  Objection; form.
12  BY THE WITNESS:
13     A.   Well, here is the way I would answer that.
14  Really, there is no inconsistencies and there is a
15  logical sequencing of the data, how it was laid out
16  and how it was considered to develop an aggregate
17  opinion.  So these areas of the report are -- are
18  connected and the -- the end result is my opinion,
19  which certainly I have no real reason to believe any
20  different based on all that I know.
21  BY MR. DAVIS:
22     Q.   Okay.  And it's correct that you don't
23  cite anything new in Section IX of your report,
24  correct, aside from a filing by the plaintiffs in the

Page 187

1  litigation?
2      A.   Section IX was written before the report
3  was sent, anything that is needed to be referenced is
4  referenced in there, so there is nothing that's come
5  up beyond that.
6      Q.   Okay.
7      MR. DAVIS:  Okay.  That's -- that's all I have.
8  I -- I pass the witness.  Thank you.
9      THE WITNESS:  Thank you.
10     MR. FOWLER:  Can -- can you all hear me if I
11  continue to speak using the doctor's computer's
12  microphone and rather than my own?
13     MR. DAVIS:  I can hear you.
14     MR. FOWLER:  Okay.
15          EXAMINATION
16  BY MR. FOWLER:
17     Q.   Dr. Flack, do you understand whether your
18  report in this case applies only to Teva or does it
19  apply to all of the generic manufacturing -- strike
20  that -- or does it apply to all of the defendants in
21  this case?
22     MR. DAVIS:  Objection to form.  Objection;
23  leading.
24  BY MR. FOWLER:

Page 188

1      Q.   Let me rephrase.
2         Doctor, what is your understanding of
3  the -- well, what -- do -- do you have an
4  understanding whether your report applies only to
5  Teva?
6      MR. DAVIS:  Same objections.
7  BY THE WITNESS:
8      A.   Yes, I do.  I was initially contacted in
9  that Teva -- by Teva, but it is my understanding that
10  I am -- my report also applies to the other defendants
11  in the case.
12  BY MR. FOWLER:
13     Q.   And, Doctor, directing your attention to
14  the materials considered list, I believe it's on -- on
15  Page 4, do you see the FDA Regulatory Documents, the
16  Laboratory Analysis of Valsartan Products?
17     A.   Yes, I do.
18     Q.   Is that a document you reviewed in this
19  case?
20     A.   If I reviewed it, it was cursory.
21     Q.   Do you recall whether that document
22  contains FDA's finished dose testing for each of the
23  manufacturing defendants in this case?
24     A.   No, I do not.

Page 189

1      Q.   Based upon your review of the levels of --
2  that FDA tested in finished doses, how did you arrive
3  at the -- level that you measured -- or that you
4  utilized in reaching your opinions?
5      MR. DAVIS:  Objection; foundation.  I think he
6  just testified that he only reviewed it in a cursory
7  manner and does not recall the -- that they tested
8  finished dose levels.  So I'm objecting to foundation
9  there.
10     MR. FOWLER:  Well, I don't think that's --
11  that's what he said, Counsel.
12  BY THE WITNESS:
13     A.   So, my -- I used a -- a couple of
14  assumptions that really augmented the exposure that
15  someone theoretically could have had.
16         No. 1, most of the testing was below
17  20.1 micrograms.  I used 24.1 which was -- was well
18  above that, certainly well above the average.
19         Two, I made the assumption that everyone
20  got a 320-milligram pill, which is not correct because
21  the 10-milligram -- the 160 has probably 10 micrograms
22  in it or -- on average.
23         So -- and the third assumption I made was
24  that people took the pill every day at the highest

Confidential Information - Subject to Protective Order

Page 190

1  dose, which is also not true because many people who
2  even refill prescriptions don't take the medicine and
3  they'll stop it.
4       So that was the -- way that I did
5  this, and it was really teed off of the FDA and the
6  European agencies and summarizing their -- their
7  testing data, and that's how I arrived at those
8  exposures.
9  BY MR. FOWLER:
10     Q.   Where -- where did you get the
11  20.1-microgram level that you just referenced?
12     A.   That was probably in the -- in the testing
13  data that was supplied.  But I -- again, I didn't
14  spend a lot of time on it.
15     Q.   Doctor, based upon your testimony that the
16  level in valsartan is insufficient to cause cancer,
17  there would be no need to rule out NDMA as a cause of
18  cancer in your hypertension patients, correct?
19     A.   What I don't know --
20     MR. DAVIS:  Objection; leading.  Sorry.
21  BY THE WITNESS:
22     A.   What I repeatedly said is I do not know
23  how to rule out NDMA as a cause of cancer in an
24  individual patient when you can't find it in hundreds

Page 191

1  of thousands of patients.  So I -- I don't know how to
2  do it, and I'm a pretty good doctor.
3  BY MR. FOWLER:
4       Q.   Doctor, if FDA's finished dose testing of
5  all of the defendant manufacturers' finished dose
6  products was -- with -- with the exception of one was
7  below 20.1, would you need to know each of those lower
8  levels to render your opinion?
9       MR. DAVIS:  Objection; foundation.
10  BY THE WITNESS:
11     A.   So in -- I went well above the highest
12  level in the assumptions I made about exposure.
13  BY MR. FOWLER:
14     Q.   And does that opinion with regard to the
15  exposure level, would you apply that to each of the
16  defendants in this case?
17     MR. DAVIS:  Objection.
18     MS. KAPKE:  Was there an answer to that
19  question?  I'm sorry.  I didn't hear it.
20  BY THE WITNESS:
21     A.   Yes.
22     MS. KAPKE:  Thanks.
23  BY MR. FOWLER:
24     Q.   A little housekeeping.  I -- I want to

Page 192

1  mark what has been previously provided to -- to
2  counsel.  I want to mark your supplemental list of
3  materials considered as the next exhibit.  I believe
4  it's possibly 11.
5       MR. FOWLER:  Whatever the next exhibit is, Madam
6  Court Reporter.
7       MR. DAVIS:  Steve, I've -- I've marked ours as
8  Plaintiffs, Plaintiff-X -- Flack, so --
9       MR. FOWLER:  That's fine.
10     MR. DAVIS:  -- you probably don't want to mark
11  that as a plaintiff's exhibit?
12     MR. FOWLER:  I'll mark it as Flack what is the
13  next number.  I don't mind using your nomenclature
14  just so they are all together, Counsel.
15     MR. DAVIS:  That's fine.  That's fine.
16     MR. FOWLER:  Would it be 12?
17     MR. DAVIS:  It would be -- let's see.
18     MR. FOWLER:  Madam Court Reporter, you can
19  easily tell us that.
20     MR. DAVIS:  It would be 12.
21     MR. FOWLER:  Okay.  Thank you.
22         (WHEREUPON, a certain document was
23          marked Plaintiff-Flack Deposition
24          Exhibit No. 12, for identification,

Page 193

1  as of 09/28/2021.)
2  BY MR. FOWLER:
3       Q.   As -- as Plaintiffs' Flack Exhibit 12, I'm
4  putting before you the supplemental reliance list,
5  Doctor.
6       Have you seen this document before?
7       A.   Yes, I have.
8       MR. FOWLER:  And I also want to mark a -- a
9  flash drive which contains all of your reliance
10  material which has been provided to -- to counsel, but
11  I'd like to mark this as -- as Plaintiff-Flack 13.
12         And, Madam Court Reporter, we'll -- we'll
13  overnight the flash drive to you, is that all right,
14  we'll put it in an envelope?
15     THE COURT REPORTER:  Yes.
16     MR. FOWLER:  Okay.  So we'll put that there.
17         (WHEREUPON, a certain document was
18          marked Plaintiff-Flack Deposition
19          Exhibit No. 13, for identification,
20          as of 09/28/2021.)
21     MR. FOWLER:  Madam Reporter, we want to
22  introduce an exhibit through the -- through the chat
23  since we obviously don't have the link, but we're
24  having difficulty.

Page 194

1 Can we -- do you understand why we may not
2 be able to introduce that in the chat room?
3 THE COURT REPORTER: No.
4 MR. FOWLER: Or how we can upload this exhibit?
5 It is just not dropping in.
6 MR. DAVIS: Hey, Steve, while she is looking
7 into that, was this supplemental list of materials
8 that you've marked as 12, was that provided to me?
9 MR. FOWLER: It was. Counsel, it was in the --
10 the 48 hours before set of documents that we provided.
11 And -- and, Counsel, I can tell you that
12 it goes to Page 20 -- it goes to Page 22. It doesn't
13 say supplemental. That's our -- our bad, but it --
14 you'll know that it is the supplemental list because
15 it goes to -- to 22 as opposed to I think 20 on the --
16 the previous.
17 MR. DAVIS: Okay. I'm going to reserve my
18 rights on that until I can confirm that that was
19 actually provided to me. I'm not saying that it
20 wasn't, but I -- I don't have it, so.
21 MR. FOWLER: Sure, sure. I understand.
22 Can -- Madam Reporter, can we e-mail you
23 the exhibit we want to -- to introduce? How can we --
24 we can present this? Because typically we are able to

Page 195

1 drop it into the chat and it is not happening.
2 THE COURT REPORTER: I would suggest that you
3 e-mail it to Mr. Davis and he upload it.
4 MR. FOWLER: Okay. We'll do that. We'll do
5 that. And just lift that up so it's ready and I'll
6 tell you when to send it, please.
7 BY MR. FOWLER:
8 Q. Doctor, early on in this deposition, you
9 were asked whether any category of documents relied
10 upon in reaching your opinion that's not listed.
11 Do you recall that, that question?
12 A. Yes, I do.
13 Q. Is there any other source of information
14 that you relied upon in forming your opinions that was
15 not listed?
16 A. Well, I have decades of experience. Even
17 after my formal residency training, I've learned more
18 medicine, more epidemiology, since I finished my
19 medical training and my epidemiology training through
20 the school of hard knocks application, going through
21 the peer review and grant process. So that would be
22 a -- a source of knowledge that would really buttress
23 any of the specific material listed in -- in the
24 documents that were provided to me or I pulled.

Page 196

1 MR. DAVIS: And, Steve, before you continue, let
2 me just state a continuing objection here because
3 I'm -- I'm not sure I received this supplemental list
4 of materials, having just gone through my e-mails.
5 So I'm just going to as a matter of
6 caution put a continuing objection on the record on
7 that.
8 MR. FOWLER: Okay. I'm not -- I'm not asking
9 about it. All I did is mark it, Counsel. I'm not
10 asking any other questions other than you've seen it
11 and it's marked. None of these -- this is -- I've
12 moved past that.
13 MR. DAVIS: Okay.
14 MR. FOWLER: So you -- your objection is noted
15 and I understand if -- if there is some -- I
16 understand your objection and your reservation.
17 BY MR. FOWLER:
18 Q. Counsel (sic), do you recall a -- the
19 questions about the -- the research grants that you
20 have been awarded over the years in the course of your
21 professional career?
22 A. Yes, I do.
23 Q. With regard to the money that -- that
24 is -- is the grant, if you will, who gets that money?

Page 197

1 A. So the vast majority of the money that
2 comes in for a grant goes to support space rental,
3 personnel needed to -- and professionals, dieticians,
4 nurses, medical assistants, receptionists, secretaries
5 to actually do the work. The school always gets a
6 cut, and there are incident costs. The investigators,
7 particularly in an industry-sponsored grant, really
8 get a small sliver of that, and typically what happens
9 is it -- it goes into your salary to support your
10 existing salary and is not added on top of it. So
11 it's a level of support that is there, but only a -- a
12 few percentage points of the overall total grant go --
13 come directly to you as the investigator.
14 Q. Doctor, directing your attention to
15 Page 25 of your report, in that paragraph under
16 Section O, Epidemiology of Hypertension and Cancer, do
17 you recall being asked questions about the -- the
18 second sentence in that paragraph that begins "BP
19 level"?
20 A. Yes, I do.
21 Q. Now, is the actual -- hypertension is
22 actually the -- the blood pressure level. Have I got
23 that part right?
24 A. The hypertension initially diagnosed is

Page 198

1 the blood pressure level, but even if your blood
2 pressure is 110 over 70, if you are on
3 antihypertensive drugs you have hypertension despite
4 the fact that your pressure now is a little more on
5 those drugs.
6     Q.   And my -- my question with regard to the
7 sentence when you referred to kidney cancer, you
8 referred -- is -- is that specific to the blood
9 pressure level as -- I'm going to stop there.
10     A.   So kidney cancer --
11     MR. DAVIS:  Objection.
12 BY THE WITNESS:
13     A.    -- unlike a number of cancers appears to
14 show a risk gradient that's in direct relation to the
15 level of blood pressure.  That's not true in many
16 other cancers, but for some reason it is in kidney
17 cancer.
18 BY MR. FOWLER:
19     Q.   When -- when you expressed your opinion
20 about the risk of cancer in hypertension patients,
21 other than the actual BP level, what else were you
22 referring to there?
23     A.   So there -- there are a number of
24 potential explanations for high levels of cancer in

Page 199

1 patients with hypertension, and a lot of it has to do
2 with comorbidities that are listed, some of which
3 intersect on the same cancers, and diabetes, obesity,
4 levels of physical activity, dietary intake, a variety
5 of things that are more common in hypertensive
6 patients than in non-hypertensive patients that have
7 been linked to cancer themselves.
8     Q.   And, Doctor, for your hypertensive patient
9 population, as a matter of your routine following of
10 those patients, are they subject to ongoing health
11 assessments and surveillance?
12     MR. DAVIS:  And I'm going to object to the form.
13 But, also, Steve, you've accidentally turned your
14 camera off.
15     MR. FOWLER:  Sorry about that.
16 BY THE WITNESS:
17     A.   So hypertensive patients, if you look at
18 ACC/AHA guidelines, European guidelines and -- and
19 what we do in practice, it -- you basically -- they --
20 they are surveilled like non-hypertensive patients for
21 other non-cardiovascular conditions.
22 BY MR. FOWLER:
23     Q.   Okay.  And, Doctor, bear with me here,
24 can -- have -- have you had an opportunity to -- to

Page 200

1 state exactly what it is, what -- what question it was
2 that you were asked to answer in this case, I should
3 say?
4     A.   Well, I can state it again.  I -- I was
5 asked in hypertensive patients to make a general
6 causation determination as to whether the level of
7 exposure to valsartan containing NDMA caused cancer,
8 and that -- that's what I was asked to do.
9     Q.   And when you say "caused cancer," are you
10 speaking of causing cancer or are you speaking of
11 increased -- any increased risk?
12     A.   What I'm speaking of is in human studies,
13 basically the best evidence that we have, is there
14 evidence that valsartan in the amounts that were out
15 there for the duration of time potentially in pills
16 caused cancer.
17     Q.   And did you assess that risk against the
18 patient population that -- that you've pres -- of the
19 type that you've prescribed valsartan to?
20     A.   Well, in these studies the -- you've got
21 people with hypertension, one, valsartan, you have
22 people who are not on valsartan, and so you've got
23 a -- a reasonably comparable group to -- to look at.
24 And in those studies there is virtually no indication

Page 201

1 that exposure at this level for this duration causes
2 cancer.
3     MR. FOWLER:  Counsel, we are sending you an
4 article that we are going to mark as
5 Plaintiffs-Flack 14.  You should be receiving it
6 imminently.
7     And for the record, this article is
8 published in the Pharmacology & Therapeutics Journal.
9 It's called "Carcinogenesis:  Failure of resolution of
10 inflammation?" by Dr. Anna Fishbein, Bruce Hammock,
11 Charles Serhan, and Dipak Panigrahy.
12     Tell me when you have it, Counsel, and
13 if -- if you wouldn't mind, please, loading that up.
14     MR. DAVIS:  Okay.  I haven't received it yet.
15     MR. FOWLER:  Yeah, just give it a beat.  It
16 will -- it will pop up.
17     Okay.  I'll direct it.
18     MR. DAVIS:  Okay.  I've -- I've got it.  So
19 what -- what are you asking me to do, Counsel?
20     MR. FOWLER:  If you can screen share the last
21 page, please.
22     MR. DAVIS:  Okay.  Are you going to be marking
23 this as an exhibit?
24     MR. FOWLER:  Yes.  That's Plaintiffs-Flack 14.

Page 202

1    (WHEREUPON, a certain document was
2    marked Plaintiff-Flack Deposition
3    Exhibit No. 14, for identification,
4    as of 09/28/2021.)
5    MR. DAVIS:  Okay.  I'm going to, again, reserve
6 rights.  Me marking it as an exhibit, I mean,
7 Plaintiffs' something doesn't mean I'm okay with it.
8    MR. FOWLER:  I totally understand.  I appreciate
9 your accommodation.
10    MR. DAVIS:  It is an .eml link as opposed to a
11 PDF.  Let me see if it still --
12    MR. FOWLER:  No, we sent a PDF.  We believe we
13 sent it as a PDF.  We opened it as a PDF.
14    And -- and, you know, it is -- it is
15 not -- it is not essential if you can't pull it up.  I
16 can -- I only have a single question.
17    MR. DAVIS:  So I'm going to -- I'm marking
18 this -- I'm going to mark it as 13 (sic).  I don't
19 have the supplemental invoice that you've asked to be
20 marked as 12 (sic), so that one is going to be skipped
21 for the record.  So I'm renaming this 13 (sic) for the
22 record.
23    MR. FOWLER:  Thirteen was the flash drive.
24    MR. DAVIS:  Oh, all right.  Sorry.  It's

Page 203

1 already -- it's already introduced.  We'll have to
2 clear that up later.
3    MR. FOWLER:  That's fine, Counsel.  Thank you.
4    So I should -- I take it if you are not
5 able to share it, I'll just ask my questions, is that
6 right?
7    MR. DAVIS:  I can -- I can share a PDF, but when
8 it loaded into the Golkow remote thing, it loaded as
9 an .eml, so I'm not sure what that means, but I've --
10 I've got a PDF I can share here.
11    MR. FOWLER:  Okay.  So at least you can see it,
12 Counsel.  That's fine.
13    MR. DAVIS:  Okay.  That's fine.
14 BY MR. FOWLER:
15    Q.   Let -- let me see it and go to the last
16 page.  Actually, it's -- it's the -- the declar- --
17 the dec -- well, the declaration of interest.  It's on
18 PDF Page 24 of 37.  And I would represent, Doctor --
19 well, let me ask it this way.
20    Doctor, as counsel said during your
21 questioning, he asked you to put your shoes -- put
22 yourself in the shoes of an editor of a journal.  So
23 I'd like you to put those shoes back on, and I want to
24 ask you this question.

Page 204

1    If you -- if you as an editor of a journal
2 received an article co-written by an author who while
3 writing it had received over half a million dollars
4 from counsel for plaintiffs in a litigation directly
5 on the same issue being written about, would you as an
6 editor expect the conflicts of interest to disclose
7 that?  And I'll just stop there.
8    MR. DAVIS:  Objection; foundation.  I don't
9 think you've even established that the witness has
10 reviewed this article.
11    MR. FOWLER:  That's okay.
12    MR. DAVIS:  I meant objection to the --
13 BY THE WITNESS:
14    A.   So my understanding of the question is if
15 I'm a journal editor and I'm -- and I have -- I
16 received an article and someone has either first
17 authored, last authored or middle authored the article
18 and they receive half a million dollars from a
19 pharmaceutical company or other entity that they are
20 actually providing expert opinions for, there -- there
21 is just no way that that should not be disclosed.
22 That would be expected to be disclosed.
23    As an editor, you are at the mercy by and
24 large of, one, what people report to you, unless you

Page 205

1 ever some very specific information that -- that you
2 are aware of.  So it's really kind of an honor system,
3 but there -- there is no good explanation for why you
4 would have received that amount of money from an
5 entity while you are working on this litigation and
6 then write a scientific article that is in parallel
7 and essentially the same subject and not include that
8 as a potential conflict.
9 BY MR. FOWLER:
10    Q.   And -- and you recall being shown an
11 article that you drafted where in the Conflicts of
12 Interest you disclosed being a speaker for a number of
13 pharmaceutical companies.
14    Do you recall that?
15    MR. DAVIS:  I just meant to get an objection on
16 the record there before you move on that I object to
17 that as proffering an expert opinion on -- on
18 something the -- the witness is not designated to --
19 to -- as an expert on.
20    THE WITNESS:  I actually am an expert.  I'm a
21 general editor.
22    MR. FOWLER:  Objection to the --
23    MR. DAVIS:  You haven't been proffered as an
24 expert though, Dr. Flack.

Confidential Information Subject to Protective Order

Page 206

1    MR. FOWLER:  Well, we'll have to talk about
2  that.
3    MR. DAVIS:  Okay.  Okay.
4  BY MR. FOWLER:
5    Q.   Counsel (sic), do you recall being shown
6  your disclosure in the conflicts of interest in the
7  article that you wrote?
8    A.   Yes, I do.
9    Q.   And why -- can you explain as a journal
10  editor why it's important to have that section on the
11  conflicts of interest?
12    A.   The -- the real issue as a journal editor
13  that -- that you are trying to steer away from is the
14  lack of transparency.  And so what you do is you ask
15  authors to disclose their conflicts on ownership,
16  remuneration, and certainly ownership, remuneration
17  instruments variables, payment that relate to or even
18  potentially could be related to the subject matter
19  that they are writing on.
20    Everything that is listed as a potential
21  conflict, it's not sitting there saying you're --
22  you're creating some kind of damning of the -- of the
23  author.  You are just simply saying, here are the
24  author's potential conflicts and it's an exercise in

Page 207

1  transparency that you are engaging in.
2    When you don't have that and you've got a
3  sizeable conflict, that's just not where you want to
4  be and that's not the expectation that any credible
5  journal would have.
6    MR. DAVIS:  Steve, you are off camera again.
7    MR. FOWLER:  Oh, I don't know what is happening
8  there.  Hold on.  I'm not even touching the thing, but
9  okay.
10  BY MR. FOWLER:
11    Q.   Doctor, I'm asking you about the materials
12  considered list using what counsel had marked as
13  exhibit, I think it was 3.
14    Did -- did you have access to all of the
15  documents and information contained on Exhibit 3?
16    MR. DAVIS:  Exhibit, for the record, that's
17  Exhibit 10 is the materials considered.
18    MR. FOWLER:  Okay.  Thank you, Counsel.
19  BY MR. FOWLER:
20    Q.   On Exhibit 10 that counsel marked, did you
21  have access to all of that, those documents that were
22  provided to you?
23    A.   I had access to them.
24    Q.   Were you able to identify or select those

Page 208

1  documents and information that was important --
2  important or relevant to your opinions?
3    A.   Yeah, I looked over documents and -- and
4  all and a lot of the documents simply were not
5  directly relevant to me or sometimes they contained
6  information that I could pull for -- from elsewhere,
7  such as what the FDA did, for example, with NDMA in --
8  in their -- in their testing.
9    Q.   Do you believe you needed any information
10  or depositions or documents from any of the other
11  manufacturers in order to form your opinions in this
12  case?
13    A.   No.  I had plenty of information to make
14  the case that -- that I made about the level of
15  exposure and also in relationship to animal models and
16  what we see in humans and then look at the human
17  studies.
18    Q.   Has counsel today shown you any document
19  from any other manufacturer reflecting the level of
20  NDMA in valsartan higher than the level that you
21  assumed in doing your calculations?
22    MR. DAVIS:  Objection; leading.
23  BY THE WITNESS:
24    A.   I -- I haven't seen in any FDA material

Page 209

1  nor in any document produced today a level as high as
2  what I used in my calculations.
3    MR. FOWLER:  All right.  Thank you, Doctor.  No
4  further questions.
5    FURTHER EXAMINATION
6  BY MR. DAVIS:
7    Q.   Okay.  Doctor, I just have a few
8  follow-ups.  Let's -- let's start with this Fishbein
9  article that's in the Journal of Pharmacology &
10  Therapeutics.  I believe that it's marked as maybe
11  Exhibit 13 (sic), but I'm not positive about that.
12    Had you reviewed this article prior to
13  being shown it today?
14    Doctor, did you -- did you get the
15  question or are we breaking up?
16    A.   No, you are not breaking up.  I'm just
17  looking.
18    No.
19    Q.   Okay.  Are you familiar that many journals
20  keep their own rules as to what needs to be disclosed
21  as to conflicts of interest?
22    MR. FOWLER:  Objection; form, foundation.
23  BY THE WITNESS:
24    A.   I've been an associate editor of three

Page 210

1 journals and while the -- the disclosures may vary
2 some, there -- there would never be an instance where
3 you would get a half a million dollars on a subject
4 that you wrote an article for from an entity and then
5 not disclose that payment.  There is -- there is no
6 journal around that would do that.  I'm also on the
7 American College of Physician Board of Regents, I can
8 tell you extensively what the Journal of the Annals of
9 Internal Medicine does, and if something like that
10 came to knowledge there, it -- Christine Lang would
11 bring it to the board and -- and all and it would not
12 be something that was just overlooked.
13 BY MR. DAVIS:
14     Q.   Have you specifically reviewed the
15 conflicts of interest disclosure rules that are
16 maintained by the Journal of Pharmacology &
17 Therapeutics where this article was published?
18     A.   I have not specifically reviewed those,
19 but I will again state that there is no ethical
20 journal committed to transparency that would allow a
21 half a million dollar payment on a subject that you
22 are writing an article for not to be disclosed.
23     Q.   But that's without having actually
24 reviewed the disclosure rules by this particular

Page 211

1 journal, correct?
2     A.   What you are really trying to minimize is
3 the fact that I have been an associate editor for
4 three journals and have written a couple hundred
5 publications and am intimately familiar with Annals of
6 Internal Medicine which is one of the best journals of
7 the world because I sit on the American College of
8 Physicians board, and there is no wiggle room in
9 differences in how journals require disclosure that
10 would excuse that, none.
11     Q.   But that's speculation because you have --
12 as you have testified, you haven't actually reviewed
13 this journal's rules, which are what govern
14 disclosures in this journal, correct?
15     A.   So my speculation based on my experience
16 is -- is pretty sound and there -- there is -- there
17 is not a journal, and I doubt you reviewed it either,
18 there is not a journal that I have ever had any
19 association with, and I've been to conferences about
20 this, I have listened to editorial discussions, this
21 violates the spirit of transparency and disclosure,
22 and trying to defend this is shameful.
23     Q.   Thank you for that commentary.  I'm going
24 to for the second time move to strike something today.

Page 212

1     MR. FOWLER:  Well, objection to the colloquy for
2 the 15th time today.
3 BY MR. DAVIS:
4     Q.   When did you learn that your report would
5 not just apply to Teva but to other defendants?
6     MR. FOWLER:  Objection; form, to the extent you
7 are calling for attorney/client privilege.
8 BY MR. DAVIS:
9     Q.   I'm asking a --
10     A.   Sometime --
11     Q.   -- a when, not a --
12     A.   Sometime after my engagement with Teva.
13     Q.   So that could include any time from your
14 engagement up through today?
15     MR. FOWLER:  Objection; form.
16 BY THE WITNESS:
17     A.   Oh, I knew well before today that it's
18 sometime, and I don't remember the exact date, but
19 I -- I understood that.
20 BY MR. DAVIS:
21     Q.   You -- you understood that after meeting
22 with 20 minutes with your counsel to discuss your
23 redirect?
24     MR. FOWLER:  Objection; form, argumentative,

Page 213

1 mischaracterizing.
2 BY THE WITNESS:
3     A.   I don't think that's what I said, and you
4 are deliberately twisting and actually distorting what
5 I said.  That is not what I said.
6 BY MR. DAVIS:
7     Q.   You mentioned that there appears to be a
8 linkage for kidney -- this is Section III.O of your
9 report, you were asked some questions, and I believe
10 gave an answer indicating that the linkage between
11 kidney cancer increased as blood pressure levels
12 increased.
13         Is that -- was that your testimony?
14     MR. FOWLER:  Objection; form, mischaracterizing.
15 BY THE WITNESS:
16     A.   There is a statement in the paper that
17 says unlike many cancers, something to that effect,
18 there is a direct relationship between the risk of
19 kidney cancer and blood pressure level.
20 BY MR. DAVIS:
21     Q.   In your practice of treating
22 hypertensives, are your uncontrolled patients under a
23 greater degree of medical surveillance than your
24 controlled hypertension patients?

Page 214

1    A.   Our practice in -- and, again, it follows
2  the evidence and -- and recommendations which are
3  based on evidence to the degree we agree with it, at
4  the end of the day your patients are under
5  surveillance for their general health, and if we have
6  hypertensive patients who are controlled or
7  uncontrolled, we -- we really have a fairly similar
8  way of -- of surveilling them and their health risk
9  are both cardiovascular and non-cardiovascular.
10    Q.   So is the answer to my -- my question
11 that, yes, your uncontrolled hypertension patients are
12 indeed under a greater degree of medical surveillance
13 than your controlled ones?
14    MR. FOWLER:  Objection; form.
15 BY THE WITNESS:
16    A.   Actually, there is nothing in the answer I
17 just gave you that would lead you to say that.  So my
18 hypertensive patients who are controlled and
19 uncontrolled essentially get the same surveillance.
20 BY MR. DAVIS:
21    Q.   You don't -- you don't make a point to
22 schedule more diagnostic tests, more appointments with
23 patients who are not under control in terms of their
24 blood pressure levels than you do your patients that

Page 215

1  are within acceptable ranges?
2    A.   So let me explain to you what you are
3  asking and why you are barking up the wrong tree.
4    No. 1, when you start looking and doing a
5  bunch of testing for something that is very low
6  prevalence, it's a fact that most of the positive
7  tests you get are going to be false positives because
8  the prevalence of the disease is low.  That's the
9  problem you run into screening for pheochromocytoma.
10 And that is a problem that you are going to run into
11 for screening for kidney cancer.  If I took all of my
12 uncontrolled patients and ordered CAT scans on them,
13 looking at their kidneys or did invasive testing and
14 all, I would be a wasteful doctor, I would not only be
15 wasteful, but I would be finding things that people
16 would be following up on and cause harm to the
17 patient.  So no, on something very low prevalence,
18 just because it's an increased risk, it doesn't
19 mean that because it's probably at the bottom of the
20 potential things you are going to find that you go and
21 do a bunch of testing.  And that's based on solid
22 epidemiologic principles.  You can't really start
23 looking for low prevalence diseases because most of
24 your positive tests are going to be false positives.

Page 216

1    So I'm a pretty good doctor, and I don't
2  do stuff like that just to practice defensive
3  medicine.
4    Q.   But, Doctor, I'm not asking you about
5  kidney cancer right now.  I'm asking you about how you
6  treat your uncontrolled hypertension patients versus
7  your controlled ones.
8    And my question is:  To a general -- as a
9  general principle, are you placing your uncontrolled
10 hypertension patients under a greater degree of
11 medical surveillance than you are someone who is on
12 therapy and with -- has blood pressure levels within
13 acceptable levels?
14    A.   Counselor, I have answered that question
15 now a couple of times.  Patients often switch back and
16 forth between controlled and uncontrolled.  And I've
17 already answered that question and told you no.
18    Q.   Okay.  The list of supplemental materials
19 that you reviewed that I don't have, so, you know, I'm
20 going to reserve all rights to raise more questions
21 about that at a certain point if -- if it's true that
22 that wasn't sent to me, how -- what's -- what's
23 generally on that list?  Can you -- can you tell me
24 what's on the list?

Page 217

1    MR. FOWLER:  Objection; form, super broad and
2  the list speaks for itself.
3    MR. DAVIS:  Well, I have no choice, Steve, I
4  don't have the document, so I'm going to start with
5  some general questions.
6  BY MR. DAVIS:
7    Q.   Dr. Flack, do you know generally what's --
8  what's on that list of materials considered that's
9  supplemental?
10    MR. FOWLER:  That's a different question.
11    THE WITNESS:  What's this?
12    MR. FOWLER:  That's not the supplemental.
13    THE WITNESS:  Is this the stuff that was sent
14 yesterday?
15    MR. FOWLER:  That's -- that's -- that's the
16 original.
17    THE WITNESS:  Was this the stuff that was sent
18 yesterday?
19    MR. FOWLER:  In part.  I -- I don't -- I can't
20 help you out, but it -- I mean, the differences speak
21 for themselves.
22 BY THE WITNESS:
23    A.   It is probably some stuff you got with
24 regards to sheets that were marked up for me and --

Page 218

1 and all.  That's what I -- I know about.

2    MR. DAVIS:  Okay.  Well, okay.  Since it appears

3 I can't get any specific answers on it, I'm going to

4 reserve my rights on that.

5 BY MR. DAVIS:

6    Q.   Doctor, did you -- did you write an

7 editorial recently suggesting that ARBs can help with

8 COVID in some way?

9    A.   That would be a mischaracterization of the

10 editorial, because we don't know about that and there

11 are people who have been on both sides of this fence

12 who think that, you know, it could be harmful,

13 potentially helpful, and we just don't have good -- a

14 good understanding of that.

15    Q.   But you're familiar with the editorial I'm

16 talking about?

17    A.   Correct.

18    Q.   Okay.  Why was that not disclosed on your

19 CV?

20    A.   My -- my disclosure for the American

21 Journal of Hypertension certainly has been disclosed

22 and if the editorial is not on my CV, it's just an

23 oversight because it should be on my CV.

24    Q.   Did you disclose the work you've done in

Page 219

1 this case that you contend would be a conflict of

2 interest worthy of disclosure in that editorial?

3    MR. FOWLER:  Objection; form.

4 BY THE WITNESS:

5    A.   Well, Counselor, you haven't done your

6 homework.  The article -- the editorial that I wrote

7 with Ernesto Shiff, one of the other editorial

8 coauthors, well annotated any work that I -- I did

9 here.  So it's really hard for me to preemptively list

10 a disclosure when you are talking about a timeframe

11 that began -- was well before I ever was engaged on

12 this.

13 BY MR. DAVIS:

14    Q.   Okay.  But nonetheless, that -- that

15 editorial is not disclosed in your CV, correct?

16    MR. FOWLER:  Objection; form, disclosed.

17 BY THE WITNESS:

18    A.   If the editorial is not on my CV,

19 certainly it is just an oversight.  It is in the

20 public record and really has -- has no direct bearing

21 on this case.

22 BY MR. DAVIS:

23    Q.   Just one final housekeeping matter.  I'm

24 going to mark the supplemental invoice that was sent

Page 220

1 to me today.

2    MR. FOWLER:  No objection.

3        (WHEREUPON, a certain document was

4        marked Plaintiff-Flack Deposition

5        Exhibit No. 15, for identification,

6        as of 09/28/2021.)

7    MR. DAVIS:  That's marked as Plaintiff-Flack 14

8 (sic).

9    MR. FOWLER:  I think it would have to be 15,

10 right?

11    MR. DAVIS:  Or, yeah, I guess we'll -- after

12 this is over we can have a discussion with the court

13 reporter.

14    MR. FOWLER:  Sure.

15 BY MR. DAVIS:

16    Q.   Let me publish real fast -- I'm publishing

17 what at present is marked as Plaintiffs-Exhibit 14

18 (sic).

19        This is your supplemental invoice that

20 documents work through September 7th, between

21 July 21st and September 7th, correct?

22    A.   Correct.

23    Q.   And do you see that the amount due there

24 is $7800?

Page 221

1    A.   For the amount of work I did, correct.

2    Q.   And do you see that the description of

3 services is almost verbatim the description of

4 services from your first invoice?

5    A.   It is a continuation of what I've been

6 doing.

7    Q.   Okay.

8    A.   So it should be.

9    Q.   How many hours would you estimate between

10 September 7th and today that you have accumulated?

11    A.   Probably about 14 or 15.

12    Q.   Was your method in this -- for these

13 13 hours that are listed here, was your method of

14 tabulating them the same way as it was in the first

15 invoice, which is namely you testified your memory and

16 maybe some sticky notes?

17    A.   I didn't testify memory and maybe sticky

18 notes.  I testified my memory and sticky notes, and

19 there has been no change in how I -- I count the

20 hours.

21    Q.   Okay.  And do you have those sticky notes?

22    A.   No, I do not.

23    Q.   In your possession?

24    A.   No.

Page 222

1   Q.   Okay.  What -- what happened to them?

2   A.   I don't know.

3   Q.   You threw them out?

4   A.   Maybe somebody took them off of my

5 computer, I don't know, maybe the janitor ate them.  I

6 don't have them.

7   Q.   Did you look for them?

8   A.   Why would I look for them?

9   Q.   Because they are responsive to the notice

10 we served on you.

11   MR. FOWLER:  Objection; form, argumentative.

12 BY THE WITNESS:

13   A.   I told you how I tabulated.  They may be

14 on my computer, they may be not and -- and all, but I

15 have it in my head, because I haven't really done that

16 much and I kept a running -- a running tabulation on

17 it, so.

18   MR. DAVIS:  Okay.  I'm going to formally request

19 that those notes be searched for, Counsel.  They

20 are -- they are responsive, and it's -- it doesn't

21 appear that he is aware of whether they exist or not,

22 so I'm -- I'm going to request that those be searched

23 for.  And that -- that concludes my I suppose recross,

24 Doctor.  Thank you.

Page 223

1   MR. FOWLER:  Thank you, Counsel.  Nothing

2 further.  I think that's a wrap.  Thanks everybody.

3   MR. DAVIS:  Thank you.

4   THE VIDEOGRAPHER:  The time is 3:14 p.m.  We are

5 off the record.

6   ---

7   Thereupon, at 3:14 p.m., on Tuesday,

8 September 28, 2021, the deposition was concluded.

9   ---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 224

1   REPORTER'S CERTIFICATE

2

3   I, JULIANA F. ZAJICEK, a Registered

4 Professional Reporter and Certified Shorthand

5 Reporter, do hereby certify that prior to the

6 commencement of the examination of the witness herein,

7 the witness was duly remotely sworn by me to testify

8 to the truth, the whole truth and nothing but the

9 truth.

10   I DO FURTHER CERTIFY that the foregoing is

11 a verbatim transcript of the testimony as taken

12 stenographically by me at the time, place and on the

13 date hereinbefore set forth, to the best of my

14 availability.

15   I DO FURTHER CERTIFY that I am neither a

16 relative nor employee nor attorney nor counsel of any

17 of the parties to this action, and that I am neither a

18 relative nor employee of such attorney or counsel, and

19 that I am not interested directly or indirectly in the

20 outcome of this action.

21   IN WITNESS WHEREOF, I do hereunto set my

22 hand on this 4th day of October, 2021.

23

24   JULIANA F. ZAJICEK, Certified Reporter

Page 225

1   DEPOSITION ERRATA SHEET

2

3

4 Case Caption:  In Re:  Valsartan, Losartan, and

5   Irbesartan Products Liability Litigation

6

7   DECLARATION UNDER PENALTY OF PERJURY

8

9   I declare under penalty of perjury that I

10 have read the entire transcript of my Deposition taken

11 in the captioned matter or the same has been read to

12 me, and the same is true and accurate, save and except

13 for changes and/or corrections, if any, as indicated

14 by me on the DEPOSITION ERRATA SHEET hereof, with the

15 understanding that I offer these changes as if still

16 under oath.

17

18   JOHN M. FLACK, MD, MPH, FAHA, MACP, FASH

19

20 SUBSCRIBED AND SWORN TO

21 before me this         day

22 of         , A.D. 20___.

23

24   Notary Public

Page 226

```
1        DEPOSITION ERRATA SHEET
2   Page No._____Line No._____Change to:_____
3   _____
4   Reason for change:_____
5   Page No._____Line No._____Change to:_____
6   _____
7   Reason for change:_____
8   Page No._____Line No._____Change to:_____
9   _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23  SIGNATURE:_____DATE:_____
24      JOHN M. FLACK, MD, MPH, FAHA, MACP, FASH
```

Page 227

```
1        DEPOSITION ERRATA SHEET
2   Page No._____Line No._____Change to:_____
3   _____
4   Reason for change:_____
5   Page No._____Line No._____Change to:_____
6   _____
7   Reason for change:_____
8   Page No._____Line No._____Change to:_____
9   _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23  SIGNATURE:_____DATE:_____
24      JOHN M. FLACK, MD, MPH, FAHA, MACP, FASH
```

Confidential Information - Subject to Protective Order

**WORD INDEX**

**< $ >**
**$10,000** 99:24
 100:20
**$100** 8:8
**$210,000**
 71:22
**$25,000** 74:18
**$26,100** 51:1
**$42,000** 76:1
**$512,000** 74:7
**$512,733** 74:8
**$53,000** 75:18
**$600** 51:1
**$678** 8:5 85:4
**$760,000**
 76:14
**$7800** 220:24

**< 0 >**
**02109** 5:22
**02110-1724**
 5:6
**070** 8:13
**07068** 2:20
**07102** 4:21
**09/28/2021**
 13:17 22:10
 49:7 60:2
 84:15 90:4
 96:2 101:18
 117:6 124:4
 157:13 193:1,
 20 202:4
 220:6

**< 1 >**
**1** 7:14 8:4
 13:4, 16 18:6
 25:3, 11 43:5
 100:11 178:7
 189:16 215:4
**1:11-cv-71**
 90:9
**1:53** 131:4
**10** 7:6 8:22
 42:17 43:14
 123:6, 24
 124:3 138:6

189:21
207:17, 20
**10:12** 58:21,
 24
**10:24** 58:24
 59:1
**100** 2:4 4:21
 5:5 81:11
 155:10, 11
**1000** 4:16
**101** 8:13
**103** 2:20
**10-milligram**
 189:21
**11** 4:5 9:3
 16:10 43:21
 123:6 157:9,
 12 192:4
**11:47** 131:2
**11:57** 130:23
**110** 198:2
**1100** 3:9
**117** 8:19
**12** 9:5 24:24
 44:8 128:19
 129:6 192:16,
 20, 24 193:3
 194:8 202:20
**12:53** 131:2, 3
**124** 8:22
**13** 7:14 9:8
 129:6, 17
 193:11, 19
 202:18, 21
 209:11 221:13
**14** 9:8 201:5,
 24 202:3
 220:7, 17
 221:11
**15** 9:11
 75:24 220:5,
 9 221:11
**150** 90:16
**1515** 3:9
**15219** 5:17
**157** 9:3
**15th** 4:21
 212:2
**160** 189:21
**17** 114:13

**1700** 3:14
**187** 7:7
**19102** 3:9
**192** 9:5
**19-2875** 1:5
**193** 9:8
**194** 106:9, 11,
 13, 22
**19422** 5:11
**1978** 61:13
 62:15
**1986** 68:6, 19
**1988** 62:15
**1990s** 69:2
 180:7
**1997** 63:3
**1st** 22:21
 85:1

**< 2 >**
**2** 7:17 8:17
 22:5, 9 25:15
 30:12 43:9
 86:16 87:23
 98:24
**2:00** 183:17
**2:23** 183:17,
 18
**20** 7:17
 22:15 106:12,
 22 129:17, 23
 194:12, 15
 212:22 225:22
**20.1** 189:17
 191:7
**20.1-
microgram**
 190:11
**200** 4:11
**20006-3807**
 3:14
**2002** 85:14
**20037** 4:16
**2006** 91:6
 96:16 97:16
 98:24 99:11
**2008** 68:2
**2010** 68:2
 80:21
**2011** 85:14
**2014** 173:14

**2015** 63:3, 17,
 21
**202** 9:8
**2020** 8:4 85:1
**2021** 1:12, 16
 7:17, 18 9:13
 10:4 22:15
 49:14 60:16
 223:8 224:22
**202-452-7318**
 3:15
**202-530-8587**
 4:17
**209** 7:8
**20th** 20:10, 15
 21:12 23:7, 8
 50:16, 21
 51:1 92:15
**21** 7:18 9:13
**210** 56:20
 106:16, 17
**2101** 4:16
**214** 106:23
 107:1, 12, 23
 108:15 109:4
**21st** 23:8
 220:21
**22** 7:17
 194:12, 15
**220** 9:11
**227** 3:18
**23** 70:23
 71:4 157:3
**24** 157:4
 203:18
**24.1** 189:17
**2400** 5:5
**25** 149:17
 197:15
**2500** 4:11
**26** 35:6
 47:17 48:19
 51:7 73:23
**26(a)(2)(B)(1**
 47:22
**260** 2:14
**267-535-1300**
 3:10
**27th** 5:21
**28** 1:12 223:8

**28202** 3:19
**2875** 1:4
**28th** 1:16
 10:3 60:16
**29** 75:23
**2nd** 49:13, 23
 51:5 55:17

**< 3 >**
**3** 7:19 25:16
 34:17 49:3, 6
 71:17 73:24
 83:2 85:11
 118:12
 127:16, 19
 207:13, 15
**3/29/06** 8:11
**3:14** 223:4, 7
**30** 163:18
**300** 3:14
**30305** 4:12
**31** 131:23
 144:23 145:22
**317-231-6491**
 4:6
**31c** 157:4
**320-milligram**
 167:2, 4
 189:20
**33** 76:6, 16
**3333** 4:11
**33950** 3:5
**34** 71:4 106:8
**37** 203:18
**39** 76:16
 146:15 183:23

**< 4 >**
**4** 7:19 36:5
 59:22 60:1
 106:6 127:19
 128:13, 18
 188:15
**4/12/06** 8:10
**40** 93:15
 163:18
**412-263-1840**
 5:17
**43** 20:9, 16
 21:12, 13, 23

Confidential Information - Subject to Protective Order

23:*13* 24:*8*
28:*7* 50:*6*
**4420** 11:*4*
**45** 130:*21*
**450** 5:*11*
**46204-3535**
*4:5*
**48** 194:*10*
**49** 7:*19*
**4th** 224:*22*

**< 5 >**
**5** 8:*3* 38:*11*
74:*11* 75:*17*
84:*10, 14*
**50** 106:*9*
**504-524-5777**
*2:10*
**512-795-8686**
*2:5*
**53** 5:*21*

**< 6 >**
**6** 8:*10* 17:*1,*
*18* 38:*20*
39:*23* 40:*2,*
*11, 12* 89:*24*
90:*3* 103:*13*
**60** 7:*19*
**600** 3:*18*
**6001** 2:*4*
**610-567-0700**
*5:12*
**617-213-7045**
*5:22*
**62711** 11:*5*
**66210** 2:*15*
**678-553-2100**
*4:12*

**< 7 >**
**7** 8:*11* 9:*13*
11:*2* 41:*1*
95:*22* 96:*1, 6*
118:*12* 157:*20*
**70** 198:*2*
**701** 2:*9* 11:*3*
**70130** 2:*9*
**704-444-3475**
*3:19*
**78746** 2:*5*

**7th** 220:*20, 21*
221:*10*

**< 8 >**
**8** 8:*13* 41:*20*
101:*14, 17*
**800-701-3672**
*2:15*
**8101** 2:*14*
**82** 61:*14, 15*
**84** 8:*3*
**85** 61:*15*
**857-488-4267**
*5:6*
**86** 61:*15, 16*
**877.370.3377**
*1:23*
**88** 61:*16*
62:*18*

**< 9 >**
**9** 8:*19* 42:*6,*
*9* 117:*2, 5*
131:*16*
**9:09** 1:*15*
10:*4*
**90** 8:*10*
**917.591.5672**
*1:23*
**94** 62:*19*
**941-639-1158**
*3:5*
**95** 123:*17*
**96** 8:*11*
**973-228-9898**
*2:21*
**973-757-1017**
*4:22*
**99** 3:*4*

**< A >**
**A.D** 225:*22*
**a.m** 1:*16*
10:*4* 58:*21,*
*24* 59:*1*
130:*23*
**abandon** 53:*23*
**abandoned**
75:*15*
**ability** 110:*20*
118:*22*

138:*19*
148:*10*
152:*12*
158:*16* 182:*6*
**able** 13:*19*
78:*17* 93:*13*
100:*18*
118:*15* 129:*1*
132:*13*
160:*22*
172:*16*
182:*16* 194:*2,*
*24* 203:*5*
207:*24*
**absence** 163:*1*
185:*12, 13*
**Absolutely**
65:*16* 104:*19*
143:*8* 155:*1*
159:*3* 161:*4*
173:*5*
**academic**
79:*24* 80:*2, 7*
**ACC/AHA**
199:*18*
**accept** 87:*14*
93:*13* 141:*23*
**acceptable**
86:*23* 135:*1*
165:*21*
167:*24* 168:*5,*
*7* 169:*6*
170:*13* 215:*1*
216:*13*
**acceptance**
161:*13*
**accepted**
108:*6* 161:*18*
**access** 173:*22*
207:*14, 21, 23*
**accidental**
73:*4*
**accidentally**
199:*13*
**accommodatio
n** 202:*9*
**accomplished**
51:*6, 10*
**account**
157:*24*

**accumulated**
221:*10*
**accuracy**
54:*16, 19*
**accurate**
19:*16, 19*
77:*18* 106:*2,*
*4* 133:*9*
159:*23* 225:*12*
**accurately**
24:*9*
**ACE** 104:*11*
113:*15*
**acquiring**
48:*10*
**act** 133:*13*
**ACTAVIS** 4:*9*
**Acting** 8:*5*
**action** 224:*17,*
*20*
**active** 70:*24*
71:*1, 10*
**activity**
107:*17* 108:*8*
199:*4*
**actual** 51:*22*
53:*11* 115:*12*
120:*24*
172:*19*
197:*21* 198:*21*
**ad** 69:*18, 21*
175:*4*
**ADAM** 2:*21*
**add** 106:*22*
163:*6* 164:*5,*
*8* 165:*14*
**added** 197:*10*
**address** 11:*2,*
*4* 122:*15*
128:*8* 162:*9*
**addressed**
107:*2, 13, 24*
110:*9*
**addresses** 11:*1*
**adequately**
145:*21*
**adhere** 118:*10*
**adherent**
156:*13*

**Administration**
175:*18*
**admissibility**
130:*3*
**admit** 147:*18*
**adults** 119:*6,*
*11*
**Advances** 8:*19*
**advantage**
174:*21*
**adverse**
176:*21*
177:*16, 21*
179:*10*
**advisable**
121:*6*
**advisers** 87:*13*
**advisory**
65:*18, 19*
69:*5, 6, 7, 11,*
*17, 18, 20, 22,*
*23* 70:*6, 14,*
*16* 175:*5*
**African** 70:*1*
97:*18, 20*
98:*5, 6* 99:*3*
**AG** 102:*18*
**agencies**
133:*17, 21*
190:*6*
**aggregate**
186:*16*
**ago** 24:*21*
69:*24* 80:*10,*
*19* 91:*8*
**agree** 35:*11*
55:*24* 65:*12*
104:*3, 8*
115:*15* 138:*5*
143:*12, 23*
154:*9* 155:*18*
214:*3*
**agreed** 89:*14*
**AHA** 64:*3*
**ahead** 22:*4*
32:*6* 49:*2*
79:*10* 105:*4*
133:*1* 140:*14*
**AID** 4:*3*

Confidential Information - Subject to Protective Order

al 8:18, 22
9:5, 11
ALBERTSON'
S 3:11
alcohol 88:4,
19
alcohols 88:13
aldosteronism
114:17, 19
ALFANO 5:13
aliskiren
74:16, 24
allegation 89:1
allege 132:4
alleged 85:14
allow 113:3
123:15 210:20
alluded 182:15
alternative
120:5 178:4
180:16 182:17
Altitude 74:15
altogether
80:7
Amended 7:14
American
63:24 64:2, 4,
5 66:12
97:18, 20
98:5, 6 99:3
210:7 211:7
218:20
Americans
70:1
Amgen 69:24
70:7
amlodipine
8:16 103:5, 6,
21, 22, 24
amlodipine/vals
artan 8:16
amount 74:7,
19 76:13
83:11 100:13,
16 113:22
116:5 135:5,
14 139:2, 3,
21 163:14
164:13 205:4
220:23 221:1

amounts
93:13 132:3,
21, 22 133:19
134:3, 24
145:6 146:24
163:11 200:14
analog 26:13
analyses 171:8
analysis
110:24
166:21
172:10, 15
174:1, 14
188:16
analyze 114:10
and/or 105:19
163:1 225:13
animal 78:19
138:20
139:21, 22
141:9 145:16
146:21
163:19 167:7,
9 208:15
animals 139:3,
8, 24 143:7,
15, 19 185:23
Anna 9:11
201:10
Annals 210:8
211:5
annotated
219:8
Announces 8:5
announcing
85:3
answer 11:23
12:14, 17
17:14 20:24
21:3, 11 24:3
27:11, 20
28:20 29:14,
19, 24 30:5
37:1, 12 38:4,
6, 11, 17
39:18 41:21
42:2 43:24
51:20 57:16
89:3 100:5
108:23
109:13

117:23
129:16, 21
135:11 137:6
139:15, 18
140:6, 9
141:13, 14, 16,
19 142:2, 3, 9,
15, 19 146:4
150:1 151:16
152:1 157:7
164:11
181:22
186:13
191:18 200:2
213:10
214:10, 16
answered
20:21 21:5, 6,
16 23:17, 19
24:1 29:1
33:20 37:18
81:8 82:4
86:1, 10
99:13 117:24
128:4 141:7
152:1 165:16
216:14, 17
answers 42:15
218:3
antagonize
111:23
antihypertensiv
e 198:3
anybody 44:4
100:12, 20
127:2 173:20
178:21 179:1
180:1
anyway 95:20
apologies 71:8
92:10 103:10
186:10
apologize
131:10
apparently
163:3
appear 39:20
49:13 117:10
132:19
177:14 222:21

APPEARED
2:1 3:1 4:1
5:1 16:12
appears 20:9
26:9 32:1
34:24 42:6,
21 100:23
102:2 103:17
162:15
171:12
183:23
198:13 213:7
218:2
APPEL 5:7
applicable
162:11
application
195:20
applied
119:20 120:3,
4, 12 121:19
136:4
applies
187:18 188:4,
10
apply 121:2,
13 187:19, 20
191:15 212:5
appointments
156:6 214:22
appreciate
181:1 202:8
approach
67:4 82:10
86:20 92:22
approached
163:18
appropriate
136:5 180:15
182:17
approval 70:4
approved
161:14
approximate
60:17
Approximately
23:11 25:1
71:22
April 91:6
97:16 98:24

99:11
ARB 43:18
arbitrary
136:4
ARBs 34:21
41:3, 9 42:20
178:8, 11
179:3 218:7
area 78:10
79:1 97:15
99:10 110:14
116:2, 21
136:18
137:16 166:9
168:20
areas 66:7
176:7 186:17
argument
163:21
165:24 166:1
argumentative
33:7 82:3
99:14 177:19
212:24 222:11
arguments
130:3
arrange 92:21
arrangements
83:21
arrive 20:17
23:15 129:7
189:2
arrived 51:16
124:24 190:7
arsenic
165:20, 21
168:8 169:24
170:14
Article 8:15
9:3, 8 48:19
101:21 102:2,
4 117:8, 18
118:12
156:19, 23
157:14
160:10
161:12, 14, 17
201:4, 7
204:2, 10, 16,
17 205:6, 11
206:7 209:9,

Confidential Information - Subject to Protective Order

*12* 210:*4, 17,*
*22* 219:*6*
**articles** 14:*11*
15:*5* 25:*24*
26:*7, 11, 22*
27:*7, 21* 29:*6,*
*7, 16* 30:*1*
31:*2, 3* 32:*11*
36:*6, 11*
38:*12* 106:*11,*
*18, 20* 108:*15*
109:*5, 9, 10,*
*17* 110:*1, 9*
114:*22*
124:*13*
125:*10*
150:*12*
161:*15*
171:*11, 13*
**articulate**
52:*17*
**ashamed**
100:*11, 21*
**ASHLEY** 3:*15*
**ashley.jones@b**
**ipc.com** 3:*16*
**aside** 186:*24*
**Asked** 21:*15*
23:*16* 24:*1*
30:*23* 33:*20*
51:*12* 81:*8*
82:*4* 83:*16*
85:*24* 86:*9*
99:*9, 13*
128:*3, 8*
141:*6* 165:*15*
168:*6* 176:*9*
195:*9* 197:*17*
200:*2, 5, 8*
202:*19*
203:*21* 213:*9*
**asking** 18:*7*
31:*14, 15*
40:*1, 13* 43:*1*
45:*12* 55:*3*
72:*21* 100:*10*
121:*13*
132:*18, 20*
142:*5* 159:*5*
164:*17*
184:*10* 196:*8,*

*10* 201:*19*
207:*11* 212:*9*
215:*3* 216:*4, 5*
**aslater@mazies**
**later.com** 2:*22*
**assess** 200:*17*
**assessment**
137:*11, 20*
145:*8*
**assessments**
199:*11*
**assignment**
51:*6* 60:*20*
115:*15* 176:*4,*
*6*
**assimilate**
26:*17*
**assimilating**
48:*9*
**assist** 14:*1*
17:*10* 102:*13*
**assistants**
197:*4*
**associate**
56:*20* 160:*14*
161:*16*
209:*24* 211:*3*
**Association**
9:*3* 64:*4*
66:*13* 107:*11*
109:*5* 145:*6*
148:*21*
149:*15, 20*
150:*15, 17*
211:*19*
**associations**
110:*21* 158:*1*
**assume** 49:*9*
**assumed**
208:*21*
**assumption**
167:*3* 189:*19,*
*23*
**assumptions**
189:*14* 191:*12*
**assure** 33:*10*
**AstraZeneca**
77:*5* 105:*21*
**ate** 222:*5*
**Atlanta** 4:*12*
97:*15* 99:*10*

**attached**
158:*19*
**attachment**
55:*22*
**attachments**
38:*14* 39:*12*
40:*20, 21*
44:*12*
**attempting**
148:*16*
**attention** 90:*7*
127:*14*
131:*21*
188:*13* 197:*14*
**Attorney** 8:*5*
87:*24* 94:*23*
95:*1* 224:*16,*
*18*
**attorney/client**
212:*7*
**attorneys**
45:*17*
**Attorney's** 8:*3*
**Augmentation**
74:*1*
**augmented**
167:*1* 189:*14*
**August** 49:*13,*
*23* 51:*5* 55:*16*
**AUROBINDO**
5:*9*
**AUROLIFE**
5:*9*
**Austin** 2:*5*
**author** 102:*1,*
*3* 204:*2*
206:*23*
**authored**
204:*17*
**authority**
137:*11*
**authors**
157:*22* 160:*9,*
*13, 15* 206:*15*
**author's**
158:*21* 159:*2*
206:*24*
**automatically**
169:*1*
**availability**
224:*14*

**available**
56:*16* 57:*4,*
*17, 20* 128:*14*
138:*7* 146:*20*
147:*13* 160:*10*
**Aventis** 77:*19*
**average**
155:*20*
189:*18, 22*
**avoid** 121:*7*
**awarded**
196:*20*
**aware** 36:*2*
39:*9, 18* 40:*3,*
*17* 42:*5, 10,*
*11* 43:*16*
85:*8* 89:*13*
93:*21* 135:*15*
136:*21*
138:*13*
139:*12* 140:*6*
141:*14, 19, 22*
142:*10, 22, 24*
143:*1, 4*
144:*12*
167:*17*
169:*12, 16*
205:*2* 222:*21*
**awfully** 175:*6,*
*7* 182:*19*

**< B >**
**back** 16:*6*
20:*17* 23:*14*
24:*7* 25:*2*
27:*2* 50:*1*
68:*19* 79:*3*
87:*23* 95:*4,*
*12* 105:*10*
106:*5* 131:*6*
144:*23* 156:*4*
161:*20*
173:*14* 179:*6,*
*19, 24* 180:*7*
203:*23* 216:*15*
**backed** 75:*2,*
*14*
**background**
61:*7*
**backup** 19:*9*

**backwards**
56:*21*
**bad** 28:*15*
75:*1* 173:*7*
194:*13*
**balance**
161:*23*
**balanced** 95:*5*
**barking** 84:*7*
132:*15* 215:*3*
**BARNES** 4:*3*
8:*13*
**barring** 148:*6*
**base** 97:*22*
**based** 47:*11*
52:*11* 82:*21*
114:*23*
115:*17*
122:*18*
147:*13*
150:*11, 14*
151:*12*
153:*12*
165:*18*
186:*20* 189:*1*
190:*15*
211:*15* 214:*3*
215:*21*
**basic** 112:*15*
144:*19*
**basically**
26:*17* 31:*1*
72:*10* 83:*2*
95:*12* 105:*10*
111:*13*
120:*18*
134:*18*
153:*15*
160:*17* 171:*3*
180:*20* 185:*6*
199:*19* 200:*13*
**basis** 48:*1, 16*
52:*17* 155:*11*
163:*20* 175:*4*
**Bear** 13:*8, 9*
96:*4* 199:*23*
**bearing**
219:*20*
**beat** 104:*15*
201:*15*

Confidential - Information - Subject to Protective Order

Beaumont 75:21
Beecham 77:16
began 219:11
beginning 13:3 18:4 167:15
begins 197:18
BEHALF 2:3 3:3, 11 4:3, 7 5:3, 9, 13, 20
believe 13:8 20:10 21:23 43:21 69:9 80:20 106:6 186:19 188:14 192:3 202:12 208:9 209:10 213:9
believed 55:10
Bell 5:11
bellwether 56:4, 5 129:17
belt 97:22
beneath 139:1
benefit 123:2
benefits 34:21
benign 154:3, 4
best 148:9 162:21 165:19 176:8 200:13 211:6 224:13
better 70:2 75:5, 7 103:12, 14
beyond 20:3 21:6 22:2 35:6 70:20 118:7 149:13 166:7 168:17 171:18 173:4 174:24 182:6 187:5
bias 112:4 113:5 121:7, 17 155:3, 4, 5, 16 157:23, 24
biased 113:19

bibliographies 15:5 124:12
bibliography 14:10 106:8 117:9
biggest 180:16
billed 51:1
biologic 148:19
biologically 144:9 151:8 163:23
bit 41:8 79:5 103:11 115:12 131:9 167:15 175:9
black 8:17
bladder 153:1
blasted 121:16, 21
bleed 154:23
blocker 104:11, 13 105:7
blockers 113:15 180:8
blood 9:3 105:5 111:24 150:3 151:7 152:18, 20, 23 153:9 154:12, 22 163:2 197:22 198:1, 8, 15 213:11, 19 214:24 216:12
Blue 5:11
board 63:22, 23, 24 64:7, 13, 15 69:22, 23 70:6, 16 82:24 84:3 88:20 210:7, 11 211:8
boards 65:18, 19 69:5, 6, 8, 12, 17, 18, 20 70:14
body 139:4 140:1 167:6
Bold 2:4

book 106:12, 18, 20
booked 91:20
borrow 132:10
BOSICK 5:13
Boston 5:6, 22
bottom 70:23 90:19 134:17, 20 179:6 215:19
Boulevard 2:14
Bowman 62:23
box 139:20
BP 103:22 197:18 198:21
BRAD 6:2
brand 80:14
break 18:21 58:15 65:10 130:17 183:9
breakfast 92:15
breaking 130:15 209:15, 16
BRETT 2:17
brett@hollislawfirm.com 2:17
bribe 93:22
bribed 95:10
bribery 89:16, 21
bribes 83:21 85:18 86:8 88:5 89:2 93:13, 23
briefly 61:6, 9 102:9 118:24 183:22
bright 169:20
bring 210:11
Bristol-Myers 105:21
broad 217:1
broader 118:4
broadly 89:8
broken 70:24

broker 82:8
Bruce 201:10
BUCHANAN 3:11, 18
Buhnerkempe 111:21
bunch 123:7 215:5, 21
bureau 65:20 80:17, 18, 24 81:3 87:5 88:12
bureaus 65:20 66:1, 2, 3, 9 67:24 68:5, 9 70:14
burning 74:16
business 72:22
buttress 195:22

< C >
calcium 104:11, 13 105:7 113:14 180:8
calculated 167:5
calculations 208:21 209:2
Calhoun 102:8
call 108:16 109:17 116:10 137:7 149:18, 21
called 10:17 68:21 119:14 150:2 155:3 201:9
calling 212:7
CAMDEN 1:2
camera 199:14 207:6
Camp 2:9
cancelling 91:19, 20
cancer 9:4 41:17, 18, 19 42:3 59:17 64:8, 17 107:12, 13, 19

108:1, 12, 16 109:6, 10, 12, 21 110:5, 10 116:7, 8 123:7 138:20, 21 139:22 140:21 142:5 143:7, 21 145:2, 7 147:2 148:14, 17, 20 149:2, 16, 18, 20 150:4, 5, 6, 16, 17 151:3, 5, 11 152:22, 24 154:12, 20, 21 158:4 160:3, 12 162:19 163:20 164:1, 7, 14, 22, 24 165:1, 13 167:12 177:2, 10, 12 178:1, 19 179:15 180:9 181:7 184:15, 18 185:23 190:16, 18, 23 197:16 198:7, 10, 17, 20, 24 199:7 200:7, 9, 10, 16 201:2 213:11, 19 215:11 216:5
cancers 116:8 132:4 139:8 143:7 149:2 150:5 162:23 184:20 198:13, 16 199:3 213:17
Caption 225:4
captioned 225:11
capture 124:16
car 147:1
Carcinogenesis 9:10 201:9

carcinogenic
78:*13, 16*
110:*10*
137:*22*
138:*16*
139:*13*  141:*5*
142:*12*  144:*6*
165:*3*
carcinogens
143:*13, 24*
144:*4, 5, 15*
170:*13*
cardiography
8:*21*  117:*13*
119:*2, 21*
cardiorenal
69:*10*  134:*8*
175:*5*

Cardiovascular
8:*19*  61:*19*
62:*10*  180:*9*
214:*9*
care  11:*20*
44:*5, 6*  53:*10*
156:*5, 8, 10*
161:*22*  180:*4,
12*  181:*19*
182:*9*
career  62:*4, 5*
76:*21*  100:*12*
196:*21*
careful  54:*11*
159:*14*
carefully  53:*8,
10*
CAROLIN
6:*2*  10:*2*
Carolina  3:*19*
case  11:*19, 20,
21*  20:*11*
22:*18, 19*
27:*4*  30:*18*
31:*8*  46:*22*
50:*18*  52:*18*
70:*11*  75:*17*
90:*8, 10, 12*
96:*6, 8*  104:*5*
105:*11*
114:*21*
115:*15*  125:*7,*

23  126:*13*
128:*11*
140:*12*
147:*11*
165:*19*
187:*18, 21*
188:*11, 19, 23*
191:*16*  200:*2*
208:*12, 14*
219:*1, 21*
225:*1*
CASES  1:*7*
11:*15*  41:*9*
59:*8, 10, 13,
18*  154:*12*
cast  75:*1*
casts  152:*8, 9*
CAT  153:*14*
215:*12*
catastrophes
175:*11*
catch  11:*23*
158:*22*
catches  106:*15*
categories
39:*20*  56:*1*
70:*12*
category
36:*16*  115:*2*
195:*9*
causal  145:*5*
149:*10, 11*
184:*16*
causation
110:*10*  116:*3*
175:*1*  200:*6*
cause  116:*7*
138:*20*  142:*5*
143:*15*  147:*1*
148:*17*
153:*18*
163:*24*
170:*20*  171:*8*
177:*12*
190:*16, 17, 23*
215:*16*
caused  132:*3*
180:*9*  200:*7,
9, 16*

causes  167:*11*
169:*3*  185:*23*
201:*1*
causing
143:*21*
148:*20*
178:*18*
179:*15*  200:*10*
caution  196:*6*
cautious
143:*19*
cell  152:*9*
cells  152:*8, 18,
21, 23*  153:*3,
9, 18, 19*
154:*12, 19, 22*
Center  4:*20*
Centre  5:*16*
cert  88:*20*
certain  13:*14*
16:*9*  18:*3*
22:*7*  49:*4*
59:*23*  66:*7,
14*  84:*12*
90:*1*  95:*23*
101:*15*  108:*8*
111:*9*  113:*10*
117:*3*  124:*1*
135:*13*
138:*23*  139:*1,
21*  141:*10*
143:*15*
157:*10*
192:*22*
193:*17*  202:*1*
216:*21*  220:*3*
certainly  38:*5*
42:*13*  88:*20*
143:*20*  154:*4*
161:*5*  169:*2*
172:*13*
186:*19*
189:*18*
206:*16*
218:*21*  219:*19*
CERTIFICAT
E  224:*1*
Certification
64:*5*

certifications
63:*22*  64:*8, 9,
13*
Certified  1:*18*
63:*23*  64:*1,
15*  224:*4, 24*
certify  224:*5,
10, 15*
cetera  96:*22*
cgannon@wals
h.law  4:*23*
chain  8:*11*
91:*11*  96:*12*
97:*6*
challenging
56:*23*
chance  123:*1,
3*
change  67:*17*
221:*19*  226:*4,
7, 10, 13, 16, 19,
22*  227:*4, 7,
10, 13, 16, 19,
22*
changed
82:*12*  141:*22*
changes  61:*2,
4*  225:*13, 15*
channel  180:*8*
channels  171:*2*
chapters
106:*12, 18, 20*
characterizatio
n  35:*2*  98:*1,
14*  126:*1*
characterize
138:*24*  147:*5*
characterized
86:*6*  89:*15*
characterizing
93:*22*
charged
115:*22*  116:*2*
Charles
201:*11*
Charlotte  3:*19*
charts  38:*21*
39:*10*  40:*4, 19*
chat  193:*22*
194:*2*  195:*1*

check  54:*16,
18*
chemical
78:*13*
chemicals
64:*14*  110:*11*
chemistry
61:*12*
cherry  121:*15*
cherry-picking
121:*8*
Chickasha
61:*10*
chief  61:*15*
choice  217:*3*
choose  178:*12*
CHRISTINE
4:*22*  210:*10*
CHRISTOPHE
R  3:*20*
christopher.hen
ry@bipc.com
3:*20*
CIPRIANI  5:*9*
circumstances
165:*7*
cite  101:*22*
150:*11*
156:*18*  157:*3*
186:*23*
cited  145:*3*
Civil  1:*5*
47:*16*
claim  165:*12*
claims  115:*6*
clarification
120:*2*
clarify  181:*9*
184:*9*
class  35:*19,
22*  101:*11*
classes  34:*20*
35:*18*  36:*2*
cleanup  59:*4*
clear  12:*12*
38:*4*  40:*10,
16*  44:*24*
48:*21*  57:*8,
11, 14*  65:*15*
68:*8, 23*  95:*2*
98:*9*  147:*20,*

Confidential Information - Subject to Protective Order

22 168:15
171:17 203:2
**clearly** 35:4
97:7 118:9,
15 149:5
151:7
**clears** 58:12
**clinic** 63:13,
14
**clinical** 63:9,
11 64:2 69:7
70:2 110:22,
24 111:7, 8,
15, 24 112:1,
16 113:8, 9
114:7, 11, 12,
18, 19 154:19
**close** 100:2, 6
139:7 183:10
**closer** 158:2
**closes** 180:11
**clue** 76:9
79:12, 16
**COAN** 5:23
**coauthor**
102:14 117:10
**coauthors**
102:6, 12
219:8
**Cochrane**
119:9
**coffee** 176:15
**cohort** 115:3
**collect** 115:15
**collected** 27:3
122:13 124:17
**collection** 14:1
**College** 2:14
62:7 210:7
211:7
**colloquy**
16:16 32:5
37:5 38:9
57:7 79:9
99:12 115:18
132:24
140:11
141:21, 23
144:21
167:20

181:13, 14
212:1
**combination**
8:15 103:4,
21 104:12, 14
105:5
**combining**
118:1, 8
**come** 16:6, 14
21:13 25:2
27:12, 24
31:2 70:15
82:21 125:18
129:7 139:7
148:8 156:4
168:22, 23
176:12 187:4
197:13
**comes** 79:22
153:13 197:2
**comfortable**
56:19
**coming** 53:2,
4 55:7 83:14
98:9 125:23
133:20 155:6
184:3
**command**
132:11

**commencement**
224:6
**commencing**
1:15
**commendable**
134:13
**commentary**
211:23
**comments**
178:5
**commissioning**
134:18
**commitment**
71:15 75:14
**committed**
210:20
**common**
108:7 199:5
**commonalities**
107:20

**communicate**
56:22
**communicated**
46:21 137:5

**communication**
46:8 92:20
173:3, 22
**communication
s** 31:1 42:18
43:22 44:1
45:17, 18
46:3, 13, 19
94:3, 18
132:20
**comorbidities**
109:12 151:6,
11 199:2
**companies**
65:2, 7, 13, 22
66:18 67:5,
17, 24 68:10,
14, 15, 16
69:12 76:23
79:4, 19
86:13 89:11
91:17 133:21
173:3 205:13
**company**
66:16 69:17,
22 70:18
73:10 82:24
92:21 95:3,
11 173:7
204:19
**comparable**
103:23, 24
200:23
**compared**
8:16 134:1
158:4, 13
163:17 167:7
**comparison**
155:24
**compatible**
38:6
**compel** 142:19
**compensated**
83:3
**compensation**
81:14

**Complaint**
85:13
**complete**
47:24 48:15
134:15
**completed**
48:20 49:21
62:9 71:2
73:22 75:9
**compliance**
48:12 51:7
**complies**
47:22 48:3, 7,
18
**compound**
57:8 179:17
**compounds**
137:12
138:15, 19
139:13 141:4,
12 142:11
169:17
**comprehensive**
51:11
**comprising**
24:8
**computer**
20:3, 6 21:8
23:21 24:14
26:21 28:12
33:6 34:7
222:5, 14
**computer's**
187:11
**con** 48:14
**concentrate**
152:13
**concerned**
143:9, 10
154:6, 7
**concerning**
52:18
**concerns**
17:15
**conclude**
86:19 104:11
**concluded**
223:8
**concludes**
222:23

**conclusion**
52:2, 4 82:21
102:23 103:4
104:4, 10
137:8 146:16
147:6, 12
148:7 174:1
**conclusions**
51:15, 16, 22,
23, 24 52:5, 6
113:18
114:23
115:16 127:3
128:10, 11
148:8 176:13
**condition**
113:11
**conditions**
113:11
141:10 142:6
143:5 199:21
**Conduct** 50:9
65:7 78:20
**conducted**
64:21 78:6, 9,
11 89:10
119:4, 8 145:1
**conference**
168:21
**conferences**
211:19
**confidence**
123:18
**CONFIDENTI
AL** 1:9
**confirm** 31:15
194:18
**conflict**
105:13 205:8
206:21 207:3
219:1
**conflicts**
204:6 205:11
206:6, 11, 15,
24 209:21
210:15
**confounding**
113:22, 23
159:18
**connected**
186:18

connection
38:13, 22
52:12
consider
54:22  73:1
135:17
Considered
8:24  9:7
55:21  56:6
57:1, 17, 19
123:22  129:9,
12, 14  131:14
138:7  161:8
171:7  186:16
188:14  192:3
207:12, 17
217:8
considering
147:17
consistent
39:15  163:14
constituents
108:9
constituted
83:21  89:2
constructed
15:17
consult  20:17
23:14  81:10
consultant
105:19
consultation
34:14
consulted
65:22  93:1
consulting
25:20  65:17
68:13, 16, 19,
22  69:1
70:14  79:4,
18  80:3, 6
consumed
163:15
contacted
188:8
contain  47:24
169:10
contained
19:3  90:21
207:15  208:5

containing
9:8  167:4
200:7
contains
48:14  188:22
193:9
contaminants
165:21
contaminate
154:24
contamination
172:6, 11, 20
174:2  177:9
181:6, 24
contemporaneo
usly  19:21
27:19
contend  108:1,
6  164:6
166:6  174:3
219:1
content  53:12
85:17  131:18
133:14
contention
171:14
contents  47:17
context  11:12
12:3  28:2
119:1  160:23
163:22
continuation
221:5
continue
52:16  187:11
196:1
Continued
3:3  8:1  9:1
55:11
continuing
180:21  196:2,
6
contracts
70:22  73:22
75:9
contribute
177:10
contributed
177:10  181:6
control  66:24
111:24

137:12, 20
185:21  214:23
controlled
67:2  122:20
213:24  214:6,
13, 18  216:7,
16
conversation
44:2
conversations
43:10  44:6
45:22  46:9
co-PI  76:20
Copies  25:18,
24  32:2
34:17  36:6
38:12
copy  13:6
25:4  33:3
49:9  60:3
corollary
123:11
corporate  73:7
CORPORATI
ON  4:3  72:23
Correct  11:22
13:24  15:7
16:1  18:11,
15  19:8  26:8
31:21  32:12
35:2  42:4
46:24  47:2
48:23  49:16
51:3  52:23
54:19  55:21
59:9  60:18
68:11  70:15
74:3  80:13,
14, 15  85:23
91:9  96:17
104:20
105:16
116:12, 16
117:16
119:12, 13
120:8, 9, 24
125:15  126:4
128:23, 24
133:14
145:18, 19
162:16  165:4

174:4  179:15
186:7, 22, 24
189:20
190:18  211:1,
14  218:17
219:15
220:21, 22
221:1
corrections
225:13
correctly
145:10, 12
159:19
corruption
93:14
costs  197:6
couch  40:11
counsel  14:17,
18, 20  16:15
18:14  19:6
21:16, 20
25:4, 23  26:5
27:9, 21  28:3,
19  29:22
30:14  31:3,
12  32:18
34:4  35:3, 14
37:16, 20
39:3, 22  42:6,
21  45:8, 19,
23  46:3, 5, 9
57:9  58:19
60:4  71:6
90:20  96:20
97:8  99:14
103:8  105:3
124:11  125:6,
8, 9, 14, 17
126:7, 9, 10
127:12, 16, 20
128:15, 16
129:3, 13
130:10, 19
141:13, 24
157:14
175:20
183:12
189:11  192:2,
14  193:10
194:9, 11
196:9, 18

201:3, 12, 19
203:3, 12, 20
204:4  206:5
207:12, 18, 20
208:18
212:22
222:19  223:1
224:16, 18
Counselor
216:14  219:5
counsel's  35:5,
10, 15  140:11
count  221:19
country  88:5
couple  10:23
14:13  24:21
59:4  69:13
70:17  74:23
112:23
116:11
182:15
189:13  211:4
216:15
coupled
163:13
course  70:10
102:14  107:8
125:19  196:20
COURT  1:1
10:11  12:16
192:6, 18
193:12, 15
194:3  195:2
220:12
court's  140:12
covered  24:21
coveted  82:7
COVID  218:8
co-written
204:2
crackdowns
67:16
cracked  66:23
crap  176:16
crashing  74:15
creating
104:13  206:22
credible  207:4
credit  169:21
criter  120:23

Confidential Information - Subject to Protective Order

criteria 120:8, 10, 13, 23 121:5, 19, 20 122:19 123:14
critical 176:14
crucially 148:4
CT 153:23 154:13
CULBERTSON 5:21
current 10:24 11:2 39:19 40:17 114:15
currently 69:16
Curriculum 7:19
cursorily 58:7
cursory 188:20 189:6
cut 197:6
cutting 131:9
CV 41:7, 13 58:13 59:21 60:7, 9, 11, 19, 21, 23 61:1 64:24 65:16 71:7, 8 73:19 76:16 77:8, 18 78:3 101:23 106:5 107:2 110:12 218:19, 22, 23 219:15, 18
CVRx 105:21
CVS 4:3
cycles 112:23
cystoscopy 153:10

< D >
D.C 3:14 4:16
d.stanoch@kanner-law.com 2:12
Daiichi 105:22
damning 206:22
danger 178:17
data 31:17, 18, 20 32:17, 22

47:13 51:22 104:10, 18 113:20, 21 114:11 115:5, 7 116:10, 13 118:3 143:18, 20 159:24 160:1 164:12, 15, 18 167:1 185:13, 17, 18 186:1, 15 190:7, 13
database 15:23 110:23 113:9 114:12
databases 111:7 119:9, 19 120:13
dataset 112:1, 24 113:24 114:1, 3 115:7
datasets 110:20, 21 113:16 114:8, 9
Date 7:17 9:11, 13 10:3 20:12, 14 22:15 24:18 48:10, 11, 16, 20, 22 49:1, 22, 23 68:20 104:20 173:1, 2 212:18 224:13
dated 8:4, 10, 11 23:8 60:12 85:1 91:5
Daubert 38:23
Dave 102:8
DAVID 2:11
DAVIS 2:4, 6 7:6, 8 10:20, 22 13:2, 10, 12, 18 16:21 17:9, 13, 24 18:19 19:1, 4, 17 20:23 22:3, 11 23:5, 22 24:5, 16

25:7, 8 29:4, 12, 23 30:7 31:13 32:9, 20 33:4, 15 34:1, 16 35:9, 16 36:4, 23 37:11, 22 38:10, 18 39:17 40:1, 8, 12, 14 45:5, 13 46:1, 11 48:13 49:8 51:13 52:1 53:16 54:14 57:10, 12 58:10, 18, 20 59:3 60:5, 6 64:23 65:9 67:8, 22 71:8, 9 73:2, 9, 20 77:4, 10, 15, 23 78:5 79:13 81:15, 21 82:14 83:8, 19 84:10, 16 86:4 87:2, 19 88:10, 23 89:22 90:5, 23, 24 93:20 94:8, 21 95:14 96:3, 23, 24 97:9, 13 98:10 99:20 101:13, 19 103:10, 15 104:23 108:13 109:1, 14, 19, 23 110:7 115:23 116:23 117:7 122:7 124:5 125:3 126:17 127:8 128:12 130:15, 20 131:5, 8, 11, 12 133:11, 23 135:7, 21 136:6, 12, 20 137:9, 18 138:4, 12

139:9 140:3, 5, 24 141:13, 17 142:8, 16 143:17 144:11, 22 146:5 148:11 150:10 152:2 156:17 157:16, 17 164:3, 20 165:10 166:3, 19 167:13 168:2 169:7 170:5, 15 171:5, 24 173:9, 23 174:11 175:19 176:17 177:7 179:4 180:24 181:21 182:13, 23 183:9, 13, 20 184:11 186:2, 21 187:7, 13, 22 188:6 189:5 190:20 191:9, 17 192:7, 10, 15, 17, 20 194:6, 17 195:3 196:1, 13 198:11 199:12 201:14, 18, 22 202:5, 10, 17, 24 203:7, 13 204:8, 12 205:15, 23 206:3 207:6, 16 208:22 209:6 210:13 212:3, 8, 20 213:6, 20 214:20 217:3, 6 218:2, 5 219:13, 22 220:7, 11, 15 222:18 223:3
day 1:16 121:2 138:23

183:3 189:24 214:4 224:22 225:21
DE 6:2 10:2
deal 180:12
dec 203:17
decade 88:1
decades 79:6 195:16
decided 75:2 180:18
deciding 83:4
decision 16:14, 15 67:2
decisions 134:5, 6
declar 203:16
declaration 203:17 225:7
declare 225:9
decreased 149:2 164:22
decreases 164:24 165:1
deemed 148:8
de-emphasized 66:8, 18 67:19
de-emphasizing 67:10 95:18
defend 211:22
DEFENDANT 3:11 5:13, 20 15:2, 3 125:24 126:2 191:5
DEFENDANTS 4:3, 7 5:3, 9 7:14 44:19 45:1, 8, 19 46:4 47:3 130:2 187:20 188:10, 23 191:16 212:5
defense 14:19 46:16 47:8
defensive 216:2
definition 122:23 136:2, 3

**definitive** 143:*20* 144:*5* 161:*4*

**defunct** 64:*2*

**degree** 155:*19* 161:*24* 162:*10* 213:*23* 214:*3, 12* 216:*10*

**de-identified** 113:*9* 114:*12*

**deliberately** 213:*4*

**demonstrating** 118:*22*

**demonstrative** 38:*21* 39:*11* 40:*4, 19*

**Department** 8:*3* 42:*13* 62:*8* 84:*21*

**depend** 173:*4*

**dependence** 174:*8*

**Depending** 165:*7*

**depends** 26:*20* 144:*6* 158:*13* 164:*2*

**deponent** 10:*8*

**DEPOSITION** 1:*11, 14* 7:*15* 10:*5, 22* 13:*1, 15* 22:*8* 49:*5* 59:*24* 84:*13* 90:*2* 95:*24* 101:*16* 117:*4* 124:*2* 125:*16, 21* 126:*6* 127:*23* 157:*11* 192:*23* 193:*18* 195:*8* 202:*2* 220:*4* 223:*8* 225:*1, 10, 14* 226:*1* 227:*1*

**depositions** 126:*11, 12, 13, 19, 20* 175:*22* 208:*10*

**deps@golkow.com** 1:*23*

**depth** 127:*7*

**describe** 14:*5* 30:*20* 117:*20* 136:*24*

**described** 57:*21* 89:*21*

**describing** 172:*6* 174:*13*

**description** 50:*5, 20* 159:*23* 221:*2, 3*

**descriptive** 111:*3*

**deservedly** 82:*7*

**designated** 205:*18*

**despite** 198:*3*

**detail** 131:*20*

**detailed** 53:*17*

**details** 164:*1*

**detect** 155:*16*

**detectable** 169:*18, 22* 170:*4*

**detection** 155:*3, 4, 5* 157:*23, 24* 158:*3, 12, 17*

**determination** 116:*4* 172:*17* 200:*6*

**determine** 168:*14* 170:*17* 174:*15*

**Detroit** 62:*24* 63:*1, 2*

**develop** 69:*3* 139:*22* 186:*16*

**developed** 114:*16* 184:*20*

**development** 9:*4* 102:*15* 145:*7*

**device** 68:*16*

**devil** 164:*1*

**diabetes** 108:*7* 151:*2* 199:*3*

**diagnosed** 156:*3* 197:*24*

**diagnosis** 177:*2, 10*

**diagnostic** 214:*22*

**diet** 107:*17, 19* 109:*11*

**dietary** 108:*8* 113:*21* 199:*4*

**dieticians** 197:*3*

**difference** 112:*5* 129:*11*

**differences** 211:*9* 217:*20*

**different** 41:*20* 55:*19* 68:*19* 108:*24* 109:*3* 111:*17* 112:*2, 9* 113:*12, 13* 114:*8* 123:*8* 163:*22* 186:*20* 217:*10*

**differently** 56:*18* 103:*18*

**difficulty** 166:*11* 193:*24*

**dinner** 92:*15*

**dinners** 88:*18*

**Diovan** 80:*12* 92:*16* 101:*5* 104:*4*

**Dipak** 201:*11*

**dipstick** 152:*6*

**direct** 74:*24* 88:*21* 90:*7* 155:*24* 198:*14* 201:*17* 213:*18* 219:*20*

**directed** 155:*8*

**directing** 188:*13* 197:*14*

**directly** 28:*3* 66:*15* 78:*15*

**diabetes**

197:*13* 204:*4* 208:*5* 224:*19*

**director** 63:*13*

**dirtier** 113:*20*

**disagree** 88:*24* 122:*18* 158:*8* 159:*8, 22*

**disagreed** 122:*12*

**disciplines** 78:*18*

**disclose** 204:*6* 206:*15* 210:*5* 218:*24*

**disclosed** 56:*16* 204:*21, 22* 205:*12* 209:*20* 210:*22* 218:*18, 21* 219:*15, 16*

**disclosure** 206:*6* 210:*15, 24* 211:*9, 21* 218:*20* 219:*2, 10*

**disclosures** 210:*1* 211:*14*

**discounting** 122:*16*

**discover** 154:*14*

**Discovery** 125:*14* 148:*6* 154:*11*

**discuss** 44:*4* 53:*3* 61:*22* 109:*5* 120:*8* 145:*8* 160:*24* 164:*16* 171:*10, 11* 212:*22*

**discussed** 36:*3* 108:*15* 109:*16, 24* 111:*13* 145:*21* 160:*19* 161:*2, 3* 175:*23*

**discussing** 90:*11* 157:*22* 160:*10*

**discussion** 35:*23* 220:*12*

**discussions** 16:*15* 169:*19* 211:*20*

**Disease** 8:*20* 152:*10* 155:*14* 215:*8*

**diseases** 108:*12* 113:*10* 215:*23*

**disparate** 122:*24*

**display** 138:*15* 139:*13* 141:*4* 142:*11*

**disputable** 186:*1*

**distinction** 34:*9*

**distorting** 213:*4*

**DISTRICT** 1:*1* 8:*4* 90:*9*

**diuretics** 113:*15*

**dive** 127:*7*

**diverse** 26:*16*

**division** 114:*17*

**DNA** 137:*20*

**doc** 156:*14*

**docket** 90:*8, 17* 96:*8*

**Doctor** 97:*7* 131:*13* 132:*18* 133:*1* 139:*10* 140:*8, 14* 142:*9, 23* 147:*18* 157:*18* 159:*6* 181:*1* 188:*2, 13* 190:*15* 191:*2, 4* 193:*5* 195:*8* 197:*14* 199:*8, 23* 203:*18, 20*

207:*11* 209:*3, 7, 14* 215:*14* 216:*1, 4* 218:6 222:*24*
**Doctors** 8:8 85:*19* 86:8 88:5 156:*14*
**doctor's** 96:*13* 98:*19* 187:*11*
**DOCUMENT** 1:*6* 13:*14, 20* 16:9 17:*15* 18:*10* 19:*3* 22:7 25:*10* 30:*11* 41:8 44:7 49:*4* 57:*24* 59:*23* 84:*12* 90:*1, 14, 15* 94:*12* 95:*23* 101:*15* 117:*3* 124:*1, 23* 138:*1, 3, 14* 139:*14* 157:*10* 188:*18, 21* 192:*22* 193:6, *17* 202:*1* 208:*18* 209:*1* 217:*4* 220:*3*
**documentation** 21:*23* 34:*18* 41:2 89:*20*
**documentation s** 41:*1*
**documented** 25:*21* 44:*14*
**documents** 14:2, *7, 8* 16:5, *13, 19* 17:*19, 23* 18:2 19:9 21:*21* 23:*14* 27:*3* 30:*10, 16, 21* 32:4 34:*13* 35:*1, 6, 8* 36:6, *11, 17, 21* 37:*3, 8, 13, 19, 24* 38:5, *12* 39:20 40:*23* 42:7, *12, 17, 22*

43:*9, 14, 17, 22* 50:9 56:*1, 2, 4, 12, 14, 15* 57:*17, 19* 58:*1* 124:*10, 17* 125:5, *13* 127:4, *15, 18* 128:*1, 6, 14, 17, 22* 129:*17, 20* 136:8 137:*4* 138:8 171:9 174:*14, 19* 175:*21* 176:5, *11, 12* 188:*15* 194:*10* 195:9, *24* 207:*15, 21* 208:*1, 3, 4, 10* 220:*20*
**doing** 11:*18* 27:*19* 34:*14* 56:*19* 62:7 65:*23* 68:*3* 70:*19* 82:*1* 83:7 84:8 86:7 89:5, *7, 8* 95:2 97:*14* 99:9, *17* 100:*1* 116:9, *15* 118:8 122:*10* 123:5 130:2 144:*20* 150:*18, 19* 153:*23* 154:9 161:9 173:*13* 208:*21* 215:4 221:6
**DOJ** 89:*14*
**dollar** 95:*4* 100:*13* 210:*21*
**dollars** 73:*13* 79:*15* 88:2 95:*12* 204:*3, 18* 210:*3*
**domino** 93:*12*
**door** 180:*11*
**dose** 144:7 163:*16* 188:22 189:8 190:*1* 191:*4, 5*

**doses** 189:2
**dot** 138:8
**doubt** 99:4 151:9 211:*17*
**downloaded** 112:22
**downloading** 31:2
**Dr** 10:*8, 21* 11:8 13:*19* 17:*14* 22:12 25:9 28:*16* 29:*24* 34:20 35:*10* 40:9, *13, 15* 49:*10* 50:*3* 55:22 57:*13* 58:*15* 59:4 60:8 84:*18* 89:*13* 92:8 96:6 98:*1, 13* 99:8, *22* 100:5 103:*16* 118:*16* 124:7 183:*21* 187:*17* 201:*10* 205:24 217:7
**drafted** 205:*11*
**drafting** 102:*13*
**draw** 114:22 115:*16* 128:*10*
**drawing** 114:8
**drift** 156:7
**drinking** 165:20 170:*12*
**drive** 9:8 30:*19* 193:9, *13* 202:*23*
**driver** 82:*16* 83:6
**drop** 195:*1*
**dropping** 194:5
**drug** 42:*20* 43:*18* 74:*24* 75:*1, 5, 6, 15* 82:*23* 101:*11* 104:*15, 20, 21* 149:*5, 6*

167:*19* 168:*23* 169:*10* 173:5 174:9 175:*17* 177:*22* 180:*21, 22* 182:*4, 11*
**Drugs** 8:9 88:6 131:*18* 133:*18* 149:*7, 9* 165:*23* 166:5 168:*10* 170:2 178:*20* 179:2 180:*19* 198:*3, 5*
**DUANE** 5:5
**due** 110:*10* 220:*23*
**duly** 10:*13, 17* 224:7
**dumb** 182:*19*
**duration** 116:5 144:7 200:*15* 201:*1*
**duties** 79:*24*
**dwelling** 137:*17*

< E >
**earlier** 59:6 151:*17*
**early** 49:*20* 76:*21* 195:8
**earned** 79:*18* 93:*15*
**ears** 147:*16* 172:*15* 181:*19*
**easier** 115:*21* 158:*3*
**easily** 192:*19*
**easy** 78:*23* 125:9
**echo** 73:*3*
**edema** 105:7
**edit** 162:8
**editor** 56:20 122:*3* 160:*14* 161:*12, 16* 203:22 204:*1, 6, 15, 23* 205:*21*

206:*10, 12* 209:*24* 211:*3*
**editorial** 211:20 218:7, *10, 15, 22* 219:*2, 6, 7, 15, 18*
**educate** 81:*20, 22, 23* 82:9 86:22
**education** 62:22
**educational** 61:7 85:*17* 110:*17*
**effect** 146:*23* 165:3 176:*21* 177:*22* 179:*10* 213:*17*
**effective** 104:*12*
**effectively** 103:22
**effects** 41:*4* 177:*16*
**Efficacy** 8:*15*
**effort** 181:*23*
**eight** 112:22
**Eisenhower** 2:*20*
**either** 14:*10* 24:15 31:2 83:*16* 137:*10* 142:22 160:*20* 162:*24* 165:2 176:9 204:*16* 211:*17*
**electronic** 25:*19* 31:7, *16, 18* 32:*13, 17, 22* 33:2, *6, 17*
**electronically** 26:*15* 33:*23*
**else's** 127:2
**E-mail** 8:*10, 11* 28:*3* 90:*17, 19* 91:*4, 5, 11* 92:*3* 93:5

Confidential Information - Subject to Protective Order

94:*10*  96:*12*
97:*1*  98:*1, 12,*
*16, 17, 18*
194:*22*  195:*3*
e-mails  46:*13,*
*20*  196:*4*
eml  202:*10*
203:*9*
employ  86:*22*
employee
224:*16, 18*
employees
102:*6*  136:*23*
employs  113:*2*
en  33:*24*
enacted  91:*16*
encompassed
23:*8*
encourage
87:*8*
endeavor
51:*14*  53:*3*
ended  22:*19*
endocrinology
114:*17*
endometrial
154:*21*
endometrium
154:*24*
engage  82:*11*
engaged
67:*20*  219:*11*
engagement
66:*16*  212:*12,*
*14*
engaging
207:*1*
English  132:*11*
enrolled  61:*14*
ensure  113:*17*
153:*11*
entered  61:*12*
entire  63:*10*
100:*11*  113:*3,*
*7*  225:*10*
entirety  32:*3,*
*10*
entities  43:*8*
107:*20*

entitled  28:*20*
29:*13*  141:*13,*
*16*  142:*2*
entity  42:*19*
43:*18*  72:*18,*
*20, 22*  204:*19*
205:*5*  210:*4*
entries  106:*9*
envelope
193:*14*
ep  112:*13*
EPA  144:*14*
epi  62:*10*
111:*8, 22*
112:*1, 16*
113:*8*  114:*24*
epidemiologic
110:*21*  123:*6*
149:*15*
159:*24*
162:*21*
163:*13*  215:*22*

epidemiological
111:*14*
114:*22*
116:*18, 22*
118:*5, 9*  160:*7*
epidemiology
61:*20*  110:*20*
111:*2, 3, 5, 6,*
*18*  112:*14*
118:*7*  148:*13,*
*18*  150:*18, 20*
195:*18, 19*
197:*16*
equal  160:*20*
equated  76:*11*
equipped
78:*17*  114:*2*
171:*22*
equivalent
71:*12*
Ernesto  219:*7*
ERRATA
225:*1, 14*
226:*1*  227:*1*
erroneous
51:*24*  52:*3, 5*
error  123:*10*
176:*15*

ESQ  2:*6, 10,*
*11, 16, 17, 21*
3:*6, 10, 15, 20*
4:*6, 13, 17, 22*
5:*7, 12, 18, 23*
essential
202:*15*
essentially
74:*13*  75:*13*
88:*17*  129:*20*
185:*24*  205:*7*
214:*19*
establish  99:*7,*
*18, 21*  132:*2*
146:*24*
established
68:*23*  204:*9*
estimate
22:*17*  72:*9,*
*13*  79:*7*
123:*16*  152:*6*
221:*9*
estimates
112:*21*  113:*3*
116:*6*  123:*17*
et  8:*18, 22*
9:*5, 11*  96:*22*
ethical  82:*22,*
*24*  89:*10*
210:*19*
Europe  115:*4*
116:*12, 14*
133:*18*
European
134:*19*  190:*6*
199:*18*
Europeans
134:*10*
evaluation
153:*6, 7*
event  100:*1*
events  82:*17*
85:*16, 17*
86:*7*  88:*14,*
*19*  93:*23*
100:*16*
eventual
154:*11*
everybody
56:*17*  66:*22*
167:*3*  223:*2*

evidence
73:*18*  86:*24*
89:*18*  101:*12*
112:*6*  115:*1*
132:*2*  135:*24*
137:*2*  162:*21*
163:*14*  165:*1,*
*18*  167:*11, 21*
169:*14*
172:*23*
173:*17*  185:*9*
200:*13, 14*
214:*2, 3*
evil  166:*6*
exact  20:*12,*
*14*  212:*18*
exactly  38:*17*
47:*6, 23*
112:*17*
118:*20*
135:*11*  150:*9*
170:*21*
181:*16*  200:*1*
EXAM  7:*6, 7,*
*8*
EXAMINATIO
N  10:*19*
111:*20*
187:*15*  209:*5*
224:*6*
examine  116:*3*
examined
10:*18*  116:*9,*
*13*  160:*11*
examining
78:*13*  146:*23*
example
16:*23, 24*
17:*18*  20:*8*
41:*23*  43:*2*
54:*15*  56:*3*
87:*10*  105:*8*
114:*7*  121:*15*
122:*11*  123:*5*
136:*22*
138:*14*  157:*4*
172:*18*
175:*22*  208:*7*
examples
155:*2*
exceed  176:*8*

excellent
104:*20*
exception
54:*13*  191:*6*
excess  134:*24*
135:*19*  140:*21*
exclude
123:*12, 13*
excuse  211:*10*
exercise
107:*17*
124:*22*  147:*6*
150:*24*  206:*24*
Exforge  80:*12*
exhaustively
32:*14*
EXHIBIT
7:*13*  8:*2*  9:*2*
12:*24*  13:*16*
22:*5, 9*  25:*3,*
*11*  49:*6*
55:*20*  56:*2*
59:*22*  60:*1*
84:*10, 14*
90:*3, 16, 21,*
*22*  94:*24*
95:*22*  96:*1, 6,*
*7, 21*  99:*14*
100:*3, 7*
101:*14, 17*
106:*6*  117:*1,*
*2, 5*  123:*23*
124:*3, 18*
129:*8*  131:*14,*
*16*  138:*6*
157:*8, 12*
192:*3, 5, 11,*
*24*  193:*3, 19,*
*22*  194:*4, 23*
201:*23*  202:*3,*
*6*  207:*13, 15,*
*16, 17, 20*
209:*11*  220:*5*
exhibits  38:*22*
39:*11, 21*
40:*5, 6, 7, 19*
98:*2*  125:*16,*
*21*  126:*6, 11,*
*12, 19*  127:*11,*
*23*

Confidential - Information Subject to Protective Order

exist 30:*24*
44:*1* 64:*13*
222:*21*
existence 39:*9,*
*19* 40:*3, 17,*
*18* 76:*10*
existing
197:*10*
exists 42:*11*
exorbitant
88:*3, 12* 94:*5*
expands
185:*18*
expansive
161:*23* 162:*3,*
*6*
expect 28:*5*
89:*4* 160:*15*
162:*16*
173:*19* 204:*6*
expectation
169:*9* 207:*4*
expected
181:*11* 204:*22*
expecting
21:*11*
expenses 70:*20*
experience
61:*23* 69:*14*
82:*6* 151:*13*
195:*16* 211:*15*
experiences
88:*11*
experiment
111:*5*
experimental
111:*7* 138:*20*
experiments
138:*22*
Expert 7:*19*
11:*14, 18, 19*
14:*9, 23* 15:*1,*
*2* 27:*7, 8, 22,*
*23* 37:*21*
44:*15* 46:*23*
47:*1, 3, 10, 14*
59:*7, 14, 19*
60:*20* 94:*5*
124:*12*
125:*23* 127:*3,*
*9, 11* 130:*2*

147:*19* 175:*1*
204:*20*
205:*17, 19, 20,*
*24*
expertise 82:*6*
137:*16*
168:*20* 176:*7*
experts 46:*16,*
*17, 22* 47:*9*
97:*20* 98:*4, 7*
99:*3* 130:*1*
145:*4*
explain 28:*14,*
*17* 29:*15*
51:*15* 56:*8*
135:*8, 10*
160:*18*
167:*24*
177:*11* 206:*9*
215:*2*
explainable
67:*6*
explained
135:*9* 151:*5*
explaining
148:*21*
explanation
150:*7* 161:*6,*
*24* 162:*7*
205:*3*
explanations
149:*14*
154:*17* 198:*24*
explicitly
173:*11*
exposed 116:*6*
138:*22*
169:*23* 185:*8,*
*20*
exposure
64:*14* 78:*18*
110:*10* 115:*5*
116:*4* 138:*24*
139:*7, 21, 24*
140:*22* 143:*5,*
*15* 144:*7*
145:*6* 146:*22*
149:*6* 163:*12*
164:*2, 13*
167:*2, 6, 10,*
*11* 184:*22*

185:*22*
189:*14*
191:*12, 15*
200:*7* 201:*1*
208:*15*
exposures
141:*11* 149:*6*
190:*8*
express 48:*1*
133:*8* 186:*9*
expressed
47:*8, 10*
52:*22* 55:*7*
133:*8* 186:*4*
198:*19*
expressing
146:*6, 9, 14*
EX-STAND
8:*17*
extend 127:*4*
extends 71:*3*
extensive
21:*21, 22*
extensively
58:*7* 210:*8*
extent 43:*24*
64:*12* 212:*6*
ex-train
160:*17*
extrapolate
113:*7* 139:*3,*
*23*
extremely
138:*15*
139:*13* 141:*4*
142:*11*

**< F >**
face 162:*15*
fact 50:*20*
51:*5* 55:*13*
85:*17* 92:*3*
130:*16* 134:*3*
155:*9* 172:*11*
198:*4* 211:*3*
215:*6*
factor 57:*6*
66:*24* 152:*12*
factors 107:*16,*
*18* 108:*2, 11,*
*16* 110:*5*

111:*23*
148:*23* 149:*9*
151:*3* 184:*15*
facts 53:*3*
89:*17* 99:*7,*
*16, 18, 21*
105:*11*
135:*23* 137:*1*
167:*20*
169:*13*
172:*22* 173:*16*
factual 51:*22*
faculty 61:*17,*
*21* 62:*15*
63:*4, 6* 68:*7*
FAHA 1:*11,*
*15* 7:*4, 15, 21*
10:*16* 225:*18*
226:*24* 227:*24*
Failure 9:*10*
201:*9*
fair 64:*24*
73:*12, 17*
95:*5* 113:*22*
147:*5* 161:*23*
162:*2* 184:*1,*
*23*
fairly 30:*24*
132:*12*
159:*23*
178:*13* 214:*7*
FALANGA
4:*20*
fall 93:*12*
114:*24* 118:*4*
falls 115:*3*
false 123:*10*
215:*7, 24*
familiar 26:*2,*
*4* 86:*5*
107:*19*
108:*11* 110:*5*
156:*22*
209:*19* 211:*5*
218:*15*
familiarize
47:*16, 19*
115:*13*
fancy 113:*2*
far 18:*13*
97:*21* 98:*7*

134:*24*
149:*13*
173:*13* 176:*8*
FARR 3:*4*
FASH 1:*11,*
*15* 7:*4, 16, 21*
10:*16* 225:*18*
226:*24* 227:*24*
fashion 26:*23*
Fast 180:*13*
220:*16*
fat 108:*9*
faulty 121:*20*
favorable
103:*6, 23*
104:*4* 105:*8, 9*
favorably
101:*5, 10*
fax 1:*23*
FDA 66:*23*
67:*16* 69:*8,*
*10, 13* 70:*4*
84:*3* 128:*14,*
*17* 134:*2, 5, 8,*
*15, 17, 18, 19,*
*23* 135:*1, 13*
137:*10, 20*
138:*2, 8, 14*
139:*12* 140:*7,*
*19* 141:*2, 15,*
*20* 142:*10*
143:*1, 4, 8*
163:*17*
168:*20, 21*
169:*3, 18*
171:*9* 172:*13*
173:*2, 4, 6, 8*
174:*8, 20, 22*
175:*4, 5, 14*
188:*15* 189:*2*
190:*5* 208:*7,*
*24*

FDA/European
167:*1*
FDA's 135:*19*
141:*3* 146:*7*
167:*17, 23*
168:*4* 174:*3*
188:*22* 191:*4*
feasible 168:*9*

Confidential Information - Subject to Protective Order

**Federal** 47:*16*
48:*18* 90:*8*
**feedback**
160:*16*
**feel** 28:*15*
47:*21* 48:*3*
51:*5* 53:*7*
**fees** 88:*3* 94:*4*
**fellow** 76:*19*
**fellowship**
61:*19*
**felt** 51:*10*
125:*22* 136:*5*
**fence** 218:*11*
**Ferrario** 8:*22*
**fertile** 148:*24*
**fiction** 104:*14*
**field** 68:*24*
69:*4* 81:*4*
87:*18* 88:*18*
119:*15*
**fields** 120:*4*
**figure** 171:*16*
172:*10*
**file** 30:*17, 18,*
*19* 31:*7, 16*
32:*1, 3, 8, 11,*
*13* 33:*6, 9*
**filed** 90:*15*
96:*7*
**files** 31:*1*
**filing** 186:*24*
**final** 15:*8, 9*
219:*23*
**finally** 44:*8*
**financially**
102:*21*
**find** 55:*14*
114:*6* 122:*24*
123:*3* 154:*3,*
*13* 155:*13*
185:*7, 15*
190:*24* 215:*20*
**finding**
168:*24* 215:*15*
**findings**
154:*17*
**fine** 13:*12*
28:*19* 58:*17*
90:*23* 94:*20*
96:*23* 162:*2*

183:*12* 192:*9,*
*15* 203:*3, 12,*
*13*
**finish** 53:*23*
62:*9* 118:*20*
**finished** 61:*20*
72:*12* 188:*22*
189:*2, 8*
191:*4, 5*
195:*18*
**Fir** 86:*12*
**FIRM** 2:*14*
3:*4* 73:*6*
**first** 10:*17*
11:*3* 24:*22*
50:*2* 52:*9, 10*
56:*11* 79:*21*
86:*12* 90:*7*
92:*8, 17*
93:*12* 94:*2*
100:*8* 108:*5*
112:*12, 21*
115:*13*
116:*21*
121:*11* 126:*3*
130:*22* 146:*9*
148:*15, 18*
150:*2* 168:*19*
173:*1, 2*
177:*21*
204:*16* 221:*4,*
*14*
**firstly** 167:*12*
185:*7*
**Fishbein** 9:*11*
201:*10* 209:*8*
**fit** 120:*18*
122:*19* 123:*14*
**five** 11:*11, 16*
12:*2, 4* 27:*3*
58:*19* 59:*7*
102:*6, 8*
149:*14* 177:*2*
178:*11* 183:*11*
**FLACK** 1:*11,*
*15* 7:*4, 15, 19*
8:*18, 22* 10:*8,*
*15, 21* 11:*8*
13:*19* 17:*14*
22:*12* 25:*9*
28:*16* 29:*24*

34:*20* 35:*10*
40:*9, 13, 15*
49:*10* 50:*3*
55:*22* 57:*13*
58:*15* 59:*4*
60:*8* 84:*18*
89:*13* 96:*6*
98:*1, 13, 18*
99:*8, 22*
100:*5* 103:*16*
118:*16* 124:*7*
157:*9* 183:*21*
187:*17* 192:*8,*
*12* 193:*3*
205:*24* 217:*7*
225:*18*
226:*24* 227:*24*
**Flash** 9:*8*
193:*9, 13*
202:*23*
**Floor** 4:*21*
5:*21*
**Florida** 3:*5*
**flushing**
180:*10*
**focus** 41:*9*
73:*10* 109:*9,*
*10*
**focused** 45:*2*
158:*20, 24*
176:*6*
**folded** 64:*3*
**folder** 19:*2*
**folks** 97:*12*
**follow** 40:*9*
156:*4* 158:*11*
**following** 57:*9*
111:*12*
113:*10* 199:*9*
215:*16*
**follows** 10:*18*
145:*13* 214:*1*
**follow-up**
114:*14*
156:*14*
167:*16* 179:*12*
**follow-ups**
209:*8*
**font** 103:*13*
**food** 91:*17*

175:*17*
**football** 61:*12*
**Footnote**
157:*3, 4*
**footprint**
68:*23* 69:*3*
**forced** 67:*17*
**foregoing**
224:*10*
**Forest** 62:*23*
**Forgive**
111:*11* 156:*18*
**form** 16:*16,*
*17* 17:*6, 12,*
*20* 19:*13*
20:*19* 21:*15*
23:*1, 16*
24:*10* 28:*23*
29:*8, 17* 30:*2*
31:*9* 32:*15,*
*23* 33:*7, 19*
34:*11* 35:*3,*
*12, 24* 36:*19*
37:*15* 38:*15*
39:*13, 22, 24*
44:*22* 45:*9,*
*20* 46:*6, 21*
48:*5* 51:*8, 17*
53:*13* 54:*8*
56:*9* 58:*4*
64:*19* 65:*3,*
*13* 66:*20*
67:*12* 73:*13,*
*15* 77:*1*
81:*18* 82:*3,*
*18* 83:*12, 23*
85:*24* 86:*9*
87:*6* 88:*9, 15*
89:*17* 93:*24*
99:*13* 101:*7*
103:*7* 104:*6*
108:*3, 20*
109:*7, 18*
115:*19*
116:*11, 19*
118:*6* 121:*9*
126:*14* 128:*3*
135:*2, 23*
136:*9* 137:*1,*
*13, 23* 138:*9,*
*17* 139:*16*

141:*6* 142:*13*
144:*1* 145:*24*
147:*8* 148:*1*
149:*23*
151:*23*
155:*21* 163:*8*
164:*9* 165:*5,*
*15* 166:*7, 22*
167:*20*
168:*17*
169:*13* 170:*8,*
*22* 171:*18*
172:*22*
173:*16* 174:*5,*
*24* 176:*1*
177:*4* 179:*16*
181:*14*
182:*22* 183:*5*
184:*7* 185:*1*
186:*11*
187:*22*
199:*12*
208:*11*
209:*22* 212:*6,*
*15, 24* 213:*14*
214:*14* 217:*1*
219:*3, 16*
222:*11*
**formal** 195:*17*
**formally**
222:*18*
**format** 31:*8*
61:*9*
**formation**
173:*12*
**forming** 44:*9*
47:*9* 58:*2*
195:*14*
**forms** 27:*24*
111:*14*
**formulary**
67:*2*
**forth** 36:*7*
42:*12* 51:*6*
113:*19*
161:*20*
162:*14*
184:*14*
216:*16* 224:*13*
**forward**
180:*13*

Confidential Information - Subject to Protective Order

**forwarded**
30:14  31:17
32:18, 19
33:11, 12, 22
34:3  36:14,
21  37:8, 19
**forwarding**
161:16
**forwards**
56:21
**found**  30:10,
13  34:6  53:4
163:12
176:22
177:13  178:2,
14
**foundation**
19:13  20:19
29:8, 17, 22
30:3  87:6
90:22  96:22
99:13  101:8
126:14, 22
128:4  136:9
159:4  176:2
179:16  182:1
183:5  189:5,
8  191:9
204:8  209:22
**Four**  11:11,
16  12:2, 4
59:7  92:21
98:2  102:5, 7
161:19  163:15
**FOWLER**
4:17  7:7
13:8, 11
16:16  17:6,
12, 20  18:22
19:13  20:19
21:15  23:1,
16  24:1, 10
25:4  28:23
29:8, 17, 20
30:2  31:9
32:5, 15, 23
33:7, 19
34:11  35:3,
12, 24  36:19
37:5, 15  38:9,
15  39:13, 22

40:10  44:21
45:9, 20  46:6
48:5  51:8, 17
53:13  54:8
56:9  57:7
58:4, 19  60:3
64:19  65:3
66:20  67:12
71:6  73:4, 15
77:1, 6, 12, 20
78:1  79:9
81:8, 18  82:3,
18  83:12, 23
85:24  86:9
87:6  88:9, 15
89:17  90:20
93:17, 24
94:14, 20
96:20  97:7
99:12  101:7
103:7, 12
104:6  108:3,
20  109:7, 18,
22  110:2
115:18
116:19  121:9
125:2  126:14,
22  128:3
130:19
132:23
133:15  135:2,
20, 23  136:9,
15  137:1, 13,
23  138:9, 17
139:16
140:10  141:6,
21  142:13
143:2  144:1,
21  145:24
147:8  148:1
149:23
151:23
155:21
157:14  163:8
164:9  165:5,
15  166:7, 22
167:20
168:17
169:13  170:8,
22  171:18
172:22

173:16  174:5,
24  176:1
177:4, 19
179:16
181:13  182:1,
22  183:5, 12
184:7  185:1
186:11
187:10, 14, 16,
24  188:12
189:10  190:9
191:3, 21, 23
192:5, 9, 12,
16, 18, 21
193:2, 8, 16,
21  194:4, 9,
21  195:4, 7
196:8, 14, 17
198:18
199:15, 22
201:3, 15, 20,
24  202:8, 12,
23  203:3, 11,
14  204:11
205:9, 22
206:1, 4
207:7, 10, 18,
19  209:3, 22
212:1, 6, 15,
24  213:14
214:14  217:1,
10, 12, 15, 19
219:3, 16
220:2, 9, 14
222:11  223:1
**fowlerst@gtlaw
.com**  4:18
**Foxhall**  11:4
**fraction**  95:7
**fragmented**
115:9
**Fraud**  8:6
85:4
**free**  168:15
171:17
**FREEMAN**
2:17
**frequency**
99:2
**front**  25:10,
15  60:3, 12

106:6  124:6,
8  157:15
**FTE**  71:11
**Full-time**
71:12
**fully**  31:21
121:12  151:6
**funded**  75:11,
13, 24  76:4
101:6
**funder**  74:4
**funding**  65:1,
6, 13  74:7, 14,
16, 19, 22
75:14, 22
76:13
**FURTHER**
7:8  74:10, 13
153:7  209:4,
5  223:2
224:10, 15
**future**  78:24
79:1

**< G >**
**GANNON**
4:22
**Gateway**  4:20
**gcoan@hinsha
wlaw.com**
5:23
**geared**  54:5
**general**  116:2
124:23  125:5,
13  156:8
159:3  175:1
200:5  205:21
214:5  216:8,
9  217:5
**generalization**
98:5
**generally**  78:8
80:21  103:4
119:14
216:23  217:7
**generate**  127:3
**generating**
36:22
**generation**
37:21
**generic**  187:19

**generics**
178:10
**generous**
116:6
**genotoxic**
137:12
**Genzyme**
105:22
**GEOFFREY**
5:23
**GEORGE**  3:6
**Georgia**  4:12
**getting**  33:13
95:10  103:14
139:24  155:7
156:14  168:7
178:15  183:10
**gifts**  91:17
**give**  10:24
15:20  22:17
29:10  43:5
53:17  54:5
56:3  67:18
106:4  108:23
135:11  136:2
169:21  201:15
**given**  11:7
27:23  30:5,
13  34:20
35:17, 19, 21
73:13  81:4
99:16  100:13
174:7  176:4
**giving**  160:15
162:1
**glad**  29:3
**GlaxoSmithKli
ne**  71:18, 21
77:16  105:20
**glomerular**
152:9
**go**  18:3, 4
22:4  30:17
32:6  49:2
53:24  58:18
62:21  69:14
70:21  74:12
79:3, 10
85:11  87:23
91:22  93:5
103:13  105:4,

*10* 112:6 123:5 124:*20, 22* 125:*10* 129:*1* 130:22 133:*1* 140:*14* 149:*13* 150:*20* 157:*18* 172:*1* 175:9 179:*19* 183:*13* 197:*12* 203:*15* 215:*20*
**goal-directed** 119:22
**goes** 47:*11* 106:9 113:2 180:*11* 194:*12, 15* 197:2, 9
**going** 12:*15, 23* 13:2 20:*17* 21:*1* 23:*14* 25:*3, 13* 27:2 29:*11* 33:*10* 40:*11* 58:*14* 59:*21* 75:*3, 4* 83:5, *16, 17* 84:*10* 87:*11* 88:*17* 93:*11* 100:*13* 101:*14* 105:9 108:*23* 110:*16* 120:*16, 17* 121:2, *16, 17, 21* 122:24 123:*3, 19, 21* 128:*18* 129:*19* 131:*13* 135:*10* 136:*3* 139:*18* 140:*3* 141:*18* 144:*18* 152:*6, 7, 11* 154:*20* 155:*13* 161:*20* 163:*11* 165:8 166:*10* 194:*17*

195:*20* 196:5 198:9 199:*12* 201:*4, 22* 202:5, *17, 18, 20* 211:*23* 215:7, *10, 20, 24* 216:*20* 217:*4* 218:*3* 219:*24* 222:*18, 22*
**GOLKOW** 1:*21* 6:5 10:2 203:*8*
**Gomm** 26:7 185:6
**Good** 10:*21* 26:*19* 130:*15* 132:*12* 156:*14* 191:2 205:*3* 216:*1* 218:*13, 14*
**Gorda** 3:5
**GORDON** 5:*13*
**Gotcha** 15:22 71:*13* 129:*15*
**govern** 211:*13*
**government** 83:*22* 85:*14* 86:6 90:*16* 96:7 113:*1, 2*
**Government's** 89:*1*
**governs** 47:*17*
**grabs** 8:*11* 92:*4*
**gradient** 198:*14*
**graduated** 61:*14*
**grant** 41:*11, 14, 16, 19* 72:*12* 95:*4, 8* 105:*19* 195:*21* 196:*24* 197:2, *7, 12*
**Granted** 91:*4*
**grants** 41:2, *8, 13* 65:*14* 70:*21* 72:2,

*10* 73:*14, 22* 75:9 76:*24* 196:*19*
**granular** 133:*20*
**grasping** 94:6 121:*12*
**gravity** 152:*11*
**Gray** 62:*23*
**Great** 11:6 25:7 175:*17*
**greater** 155:*19* 158:*12* 162:*19* 213:*23* 214:*12* 216:*10*
**GREENBERG** 4:9, *13* 45:*17* 46:*10*
**Greene** 97:*3*
**Greene's** 97:*1*
**gripe** 122:5
**Gross** 8:*13*
**ground** 148:*24*
**grounds** 96:*21*
**group** 111:*21* 151:9 185:*10, 21* 200:*23*
**guess** 14:5 26:*13* 54:*4* 55:*4* 65:*11* 68:*1* 103:*24* 109:2 111:*14* 112:5, *10* 122:9 127:*10* 148:*15* 220:*11*
**guidance** 137:*20*
**guidances** 137:*11*
**guide** 47:*14*
**guidelines** 199:*18*
**guise** 85:*16*
**guys** 130:*18*
**gwilliamson@f arr.com** 3:6

**< H >**

**half** 20:9, *16* 21:*12, 13, 23* 23:9, *13* 24:8 28:7 50:6 95:*3, 12* 163:*16* 204:*3, 18* 210:*3, 21*
**Hammock** 201:*10*
**hand** 224:22
**hands** 124:*24*
**handwritten** 26:*10*
**hang** 164:*19*
**happened** 74:*13* 180:*14* 222:*1*
**happening** 195:*1* 207:7
**happens** 197:8
**happy** 38:*1* 100:2, 5 125:*11*
**hard** 12:*16* 25:*4* 30:*19* 33:2 42:9 60:*3* 82:*21* 93:*15* 159:*10* 185:*21* 195:*20* 219:9
**harder** 72:*13* 175:8
**HARKINS** 4:*13* harkinss@gtla w.com 4:*13*
**harm** 215:*16*
**harmed** 178:*21* 179:*1*
**harmful** 218:*12*
**harms** 178:6
**hazardous** 64:*14*
**head** 12:*15* 23:*20* 24:7, *14* 222:*15*
**header** 127:*19*
**heading** 179:*19*

**headphones** 130:*16*
**health** 41:*3* 61:*19* 62:7 110:*19* 111:*19* 115:*4, 9* 137:*11* 144:*13* 199:*10* 214:*5, 8*
**HEALTHCAR E** 5:*4* 91:*18* 155:7
**health-related** 44:*3*
**hear** 131:6 187:*10, 13* 191:*19*
**heard** 180:*17*
**hearing** 38:*23*
**hearsay** 90:*21* 96:*21* 139:*16*
**Heart** 64:*4* 66:*12* 140:*17, 18*
**heightened** 151:*11*
**HEINZ** 5:*12*
**held** 10:5
**help** 25:6 112:*10* 133:*4* 182:8, 9 217:*20* 218:7
**helpful** 218:*13*
**helps** 175:*10*
**hemodynamics** 119:*21*
**HENRY** 3:*20*
**hereinbefore** 224:*13*
**hereof** 225:*14*
**hereunto** 224:*21*
**heterogenous** 156:2, *11*
**Hey** 73:2 194:6
**hierarchy** 162:*1*
**High** 5:5 14:6 61:*10*

Confidential Information - Subject to Protective Order

138:*15*
139:*13* 141:*4*
142:*11* 151:*4*
163:*17*
198:*24* 209:*1*
**higher** 134:*12*
163:*3* 164:*7*
165:*13* 167:*5*
185:*12* 208:*20*
**highest**
189:*24* 191:*11*
**highlight**
26:*19* 85:*11*
**highlighted**
16:*10* 17:*5*
**highlights**
26:*10*
**highly** 82:*22*
89:*10*
**Hilkert** 102:*9*
**HILTON** 2:*10*
**HINSHAW**
5:*21*
**history** 110:*17*
**hits** 15:*22, 23*
**hitting** 97:*22*
**hoc** 69:*19, 21*
175:*4*
**Hold** 57:*7, 10*
105:*3* 207:*8*
**holistically**
115:*17*
**HOLLIS** 2:*14*
**home** 10:*24*
11:*4*
**homework**
99:*3* 134:*7*
219:*6*
**HON** 1:*7*
**honest** 82:*8*
**HONIK** 3:*6,*
*10*
**honor** 205:*2*
**honoraria**
81:*6*
**honorarium**
70:*6* 93:*14*
**hope** 94:*7, 13,*
*16* 97:*23*
132:*16*

**host** 140:*19*
**hosted** 85:*15*
**hour** 51:*2*
58:*14*
**hours** 20:*9, 16*
21:*12, 14, 24*
23:*13* 24:*9,*
*23, 24* 28:*7*
50:*6* 194:*10*
221:*9, 13, 20*
**house** 73:*7*
176:*16*
**housekeeping**
191:*24* 219:*23*
**HUAHAI** 5:*3*
**Human** 8:*13*
143:*6, 13, 24*
144:*15*
167:*10*
185:*14*
200:*12* 208:*16*
**humans** 139:*3,*
*6, 24* 140:*1*
143:*17, 19*
165:*19* 185:*7,*
*10, 13, 18*
208:*16*
**hundred** 211:*4*
**hundreds**
79:*14* 88:*2*
135:*18*
177:*13*
185:*19* 190:*24*
**Hypertension**
8:*13, 17, 20*
63:*13, 14*
64:*2, 3, 5*
74:*2* 107:*12,*
*13, 18* 108:*1,*
*10* 109:*6, 10,*
*11* 110:*6*
111:*21*
112:*19, 20, 22*
117:*13* 119:*6,*
*11, 20, 21*
148:*13, 17, 19*
149:*4, 16, 21*
150:*16* 151:*4*
155:*18* 158:*2*
160:*3, 8, 11*
163:*1* 172:*2*

177:*1, 24*
179:*21* 181:*3*
184:*14*
190:*18*
197:*16, 21, 24*
198:*3, 20*
199:*1* 200:*21*
213:*24*
214:*11* 216:*6,*
*10* 218:*21*
**hypertensive**
150:*20* 151:*2,*
*10, 14* 152:*4*
156:*1, 2, 5, 7,*
*13* 158:*10, 15*
160:*6* 162:*22,*
*23* 179:*23*
184:*21* 199:*5,*
*8, 17* 200:*5*
214:*6, 18*
**hypertensives**
150:*22, 23, 24*
162:*18* 164:*6*
165:*12*
185:*20* 213:*22*

**< I >**
**i.e** 25:*19*
120:*11*
**IARC** 144:*13*
**ICG** 119:*1, 5,*
*10* 122:*10*
**ICG-guided**
118:*22*
**ID** 7:*13* 8:*2*
9:*2*
**identification**
13:*16* 22:*9*
49:*6* 60:*1*
84:*14* 90:*3*
96:*1* 101:*17*
117:*5* 124:*3*
157:*12*
192:*24*
193:*19* 202:*3*
220:*5*
**identified**
145:*22*
**identifies**
98:*17*

**identify** 114:*9*
207:*24*
**III.O** 148:*12*
162:*14* 184:*6,*
*13* 186:*4, 9*
213:*8*
**Illinois** 11:*2, 4,*
*5* 63:*18, 20*
**illustrations**
38:*20* 39:*10*
40:*3, 18*
**images** 38:*21*
39:*10* 40:*4, 18*
**imminently**
201:*6*
**impact** 162:*5*
172:*2* 177:*24*
179:*20, 22*
**impedance**
8:*21* 117:*13*
119:*2, 21*
**implication**
135:*5*
**implications**
98:*8*
**importance**
176:*14*
**important**
53:*4* 54:*7, 21,*
*23, 24* 55:*1, 7,*
*11* 56:*14, 15*
82:*16* 83:*4*
122:*9, 14*
148:*5* 152:*12*
163:*5* 164:*5,*
*8* 165:*12*
175:*10*
206:*10* 208:*1,*
*2*
**impurities**
42:*19* 43:*3,*
*17, 23* 137:*21*
165:*22*
176:*22*
177:*15* 178:*3*
**impurity**
115:*2* 137:*7*
**inaccurate**
77:*18* 126:*2*
**incidence**
145:*3*

**include** 79:*24*
119:*18*
121:*18*
122:*17, 19*
123:*13* 162:*3,*
*4* 205:*7*
212:*13*
**included**
32:*11* 39:*11*
40:*6, 21*
44:*11, 13, 15*
55:*10* 61:*5*
116:*14*
121:*24* 122:*2,*
*4, 22* 128:*1*
148:*9* 159:*15*
**includes** 22:*1,*
*15* 46:*12, 14*
53:*11, 15*
130:*1*
**including**
34:*18* 54:*10*
57:*20* 67:*16*
88:*3* 91:*17*
106:*17*
108:*12* 139:*2*
144:*7* 145:*3*
146:*21*
165:*23* 170:*14*
**inclusion**
105:*6* 120:*7,*
*10, 13, 23*
121:*19*
**inclusive**
106:*13*
**inconsistencies**
186:*14*
**incorrect**
18:*12*
**increase**
185:*15*
**increased**
147:*2* 149:*1*
150:*4* 158:*17*
164:*14* 180:*8*
185:*19*
200:*11*
213:*11, 12*
215:*18*
**independent**
147:*2* 166:*20*

172:*10, 15*
173:*24* 174:*13*
**Indiana** 4:*5*
**Indianapolis**
4:*5*
**indicate** 152:*9*
**indicated**
225:*13*
**Indicating**
12:*8* 213:*10*
**indication**
113:*23* 200:*24*
**indicator**
152:*21*
**indirect** 197:*6*
**Indirectly**
107:*15* 224:*19*
**individual**
66:*24* 117:*22*
177:*12*
181:*18*
182:*10* 190:*24*
**individualizatio**
**n** 119:*22*
**Individualizing**
8:*20* 117:*12*
**individuals**
97:*6* 158:*1*
**Induce** 8:*8*
141:*11*
**induced** 105:*7*
**INDUSTRIES**
4:*9*
**industry** 66:*7*
175:*8*
**industry-**
**sponsored**
197:*7*
**industry-**
**supported**
70:*13*
**infeasible**
168:*14*
**infection**
153:*12*
**inference**
97:*17*
**infinitely**
87:*10*
**inflammation**
9:*11* 201:*10*

**influence**
137:*8*
**influenced**
86:*23* 95:*10*
**INFORMATIO**
**N** 1:*9* 15:*6*
26:*17* 33:*2*
43:*6, 7* 48:*9,*
*10* 106:*4*
134:*15*
195:*13* 205:*1*
207:*15* 208:*1,*
*6, 9, 13*
**informed**
175:*16*
**infrequent**
89:*6*
**INGERSOLL**
3:*11, 18*
**ingredients**
112:*15*
**inhibitor** 75:*1*
104:*11*
**inhibitors**
113:*15*
**initial** 8:*15*
74:*16, 18*
151:*18*
**Initially** 119:*7*
188:*8* 197:*24*
**innuendo**
99:*19*
**input** 17:*16*
**inquiry**
126:*18* 127:*24*
**insight** 171:*21*
**insinuating**
132:*12*
**insinuation**
87:*14*
**instance** 210:*2*
**instances**
11:*17* 12:*3, 4*
**Institutes**
61:*18*
**institution**
114:*16*
**instructor**
62:*8*
**instruments**
206:*17*

**insufficient**
132:*2* 190:*16*
**intake** 146:*7*
199:*4*
**intakes** 108:*8*
**intensely**
155:*12*
**interest**
105:*13*
114:*18*
203:*17* 204:*6*
205:*12* 206:*6,*
*11* 209:*21*
210:*15* 219:*2*
**interested**
66:*10* 70:*19*
81:*12* 224:*19*
**interests** 64:*16*
**interface**
82:*23*
**interfaced**
175:*15*
**interfacing**
89:*11*
**interim** 24:*21*
135:*1, 19*
146:*7* 168:*5*
**internal** 61:*14*
63:*24* 91:*11*
92:*20* 94:*3,*
*18* 134:*1*
175:*21* 210:*9*
211:*6*
**internally**
136:*23*
**internet**
119:*10* 175:*13*
**interpret** 38:*4*
58:*1* 160:*9*
**interpretation**
47:*12* 159:*14*
**interpretations**
51:*23* 54:*12*
**interpreting**
37:*24*
**intersect** 199:*3*
**intervals**
123:*18*
**interventions**
118:*8*

**intimately**
107:*19* 110:*5*
211:*5*
**introduce**
157:*8* 193:*22*
194:*2, 23*
**introduced**
203:*1*
**invalidate**
55:*16*
**invasive**
215:*13*
**invest** 75:*4*
**investigate**
182:*7*
**investigation**
172:*9*
**investigative**
154:*10*
**investigator**
197:*13*
**investigators**
161:*19* 197:*6*
**investing** 83:*2*
**Invoice** 7:*17*
9:*11, 13*
18:*10, 24*
19:*2* 20:*8, 16*
22:*14* 23:*7*
24:*17, 23*
25:*3* 50:*1*
202:*19*
219:*24*
220:*19* 221:*4,*
*15*
**invoices** 18:*7,*
*13, 14* 19:*6,*
*11, 15* 25:*21*
**involve** 64:*17*
**involved** 12:*6,*
*18* 44:*5* 45:*4*
176:*9* 178:*9*

**IRBESARTAN**
1:*4* 10:*6*
178:*8* 225:*5*
**IRIS** 2:*16*
iris@hollislawfi
rm.com 2:*16*
**irrelevant**
28:*18* 127:*5*

**irrespective**
28:*21*
**issue** 37:*23*
67:*19* 131:*19*
148:*3* 204:*5*
206:*12*
**issues** 59:*11,*
*16* 113:*22*
**Item** 30:*11*
129:*24*
**items** 10:*23*
14:*14* 33:*17,*
*22* 34:*2, 6*
59:*5* 70:*13*
107:*1, 13, 24*
130:*1*
**iterations**
53:*24*
**its** 28:*21*
29:*14* 32:*3*
39:*12, 21*
40:*5, 20* 44:*11*
**IX** 183:*22*
184:*1, 4, 18*
186:*8, 23*
187:*2*

**< J >**
**janitor** 222:*5*
**JASON** 5:*18*
8:*13*
jdavis@slackda
vis.com 2:*6*
**JERSEY** 1:*1*
2:*20* 4:*21*
**JESSICA** 5:*12*
jheinz@c-
wlaw.com
5:*13*
**Jill** 8:*13*
**JMF** 105:*16*
jmr@pietragall
o.com 5:*18*
**job** 161:*9*
**JOHN** 1:*11,*
*14* 2:*6* 7:*4,*
*15, 19* 8:*22*
10:*8, 15, 21*
98:*17* 225:*18*
226:*24* 227:*24*

Confidential Information - Subject to Protective Order

joined 68:6
JONES 3:15
Journal 8:13
9:10 56:21
112:20 122:3
160:14 201:8
203:22 204:1,
15 206:9, 12
207:5 209:9
210:6, 8, 16,
20 211:1, 14,
17, 18 218:21
journals
209:19 210:1
211:4, 6, 9
journal's
211:13
judgment
176:15
jugs 179:5
Juliana 1:17
224:3, 24
July 7:17 8:4
9:13 20:10,
15 21:12
22:1, 15, 23,
24 23:4, 7, 8
50:16, 21
51:1 85:1
92:15 220:21
jump 58:16
jumped
167:14
juncture 151:8
June 22:21,
22, 23, 24
23:3 49:20,
21 50:22
60:16
Justice 8:3
84:22
justified
101:12

< K >
KANNER 2:6
Kansas 2:15
KAPKE 4:6
44:22 191:18,
22

KARA 4:6
KATZ 2:17
keep 19:10,
11 20:5 25:3
31:16 71:6
123:7 156:5
182:11 183:2
209:20
kept 19:9, 20
222:16
key 145:8, 21
keywords
15:14, 17
119:20 120:12
kicking 168:10
kidding 84:2
kidney 149:18,
20 150:4, 6,
16 152:10, 22,
24 153:1, 15,
16 154:3
198:7, 10, 16
213:8, 11, 19
215:11 216:5
kidneys
153:22 215:13
kidney's
152:12
kilogram
139:4
kind 12:15
45:18 48:22
70:5 87:21
97:22 112:14
114:7 116:16,
17 118:20
121:7 146:6
156:11
158:16
164:23
173:21
179:12 184:2
205:2 206:22
kinds 42:12
162:23
kkapke@btlaw.
com 4:7
knew 86:13
212:17
knocks 195:20

know 13:11
18:23 21:10,
24 24:13
47:6 53:22
54:22 56:21
70:8 72:11
76:10 84:4,
17 87:9 89:4,
8 93:12 95:9
97:11 102:9
103:17 107:4
113:24 114:7
122:10, 12
124:6 130:6
134:7 137:6
143:14 144:3,
16, 19 149:12
150:9 153:2,
3 155:23
161:20
163:10
164:14 167:8,
9, 10 171:2
173:19 175:3,
8, 14 180:2, 5,
12 182:18
185:11
186:20
190:19, 22
191:1, 7
194:14
202:14 207:7
216:19 217:7
218:1, 10, 12
222:2, 5
knowledge
52:14 85:10
89:8 172:19
182:24 183:1
195:22 210:10
known 108:6
174:10
knows 66:22
181:20
KUGLER 1:7

< L >
l.hilton@kanne
r-law.com
2:11
LA 6:2 10:2

laappel@duane
morris.com
5:7
Laboratory
188:16
Lack 29:22
30:3 96:21
99:13 101:7
176:2 206:14
lacks 126:14
128:4 136:9
laid 186:15
Lane 11:4
Lang 210:10
Langston
61:11
language
132:11
large 111:4
115:3 204:24
largely 127:4
larger 97:8
LAUREN 5:7
LAW 2:14
3:4 73:6
91:16
Lawsuit 8:6
85:4, 9, 13
87:16, 21
lawsuits
178:17
lawyer 73:7
lawyer's 130:6
layers 139:1
LAYNE 2:10
lead 158:3
214:17
leading
187:23
190:20 208:22
leads 174:1
learn 212:4
learned 195:17
learner 26:17
learning 48:9
leave 54:20
55:6
lecture 82:9
lectures 67:18
86:18 100:18

led 51:23
154:10
left 61:17
131:13 185:16
leg 180:2
legalese 130:9
legitimate 76:5
letter 43:3
level 14:6
134:11
143:15 150:3
151:7 163:1
167:2 168:11
181:18
182:10 189:3
190:11, 16
191:12, 15
197:11, 19, 22
198:1, 9, 15,
21 200:6
201:1 208:14,
19, 20 209:1
213:19
levels 134:10,
16 135:18
136:24
163:12, 17
165:21 167:4,
5 170:13
185:22 189:1,
8 191:8
198:24 199:4
213:11
214:24
216:12, 13
LIABILITY
1:5 10:7
225:5
liberty 44:4
lifestyle
107:16, 20
109:11
lift 195:5
light 25:9
75:1
likelihood
121:17
Limit 137:21
168:1 169:6,
22 170:1, 3

Confidential Information - Subject to Protective Order

limits 135:*1,
19* 146:7, *10,
12* 168:*5, 7*
182:*5*
line 94:*4*
100:*10*
131:*24* 161:*6*
link 109:*16,
20* 149:*6*
193:*23* 202:*10*
linkage 115:7
213:*8, 10*
linked 109:*12*
111:*6* 150:*3*
151:*3* 162:*24*
199:*7*
List 8:22 9:*5*
36:*12* 44:*15*
51:*14* 55:*20*
57:*1, 24* 83:*6*
87:*12* 107:*2*
124:*10*
125:*11*
127:*21*
129:*24*
131:*14*
136:*11, 17*
138:7 148:*22*
154:*18, 21*
171:7 188:*14*
192:2 193:*4*
194:7, *14*
196:*3* 207:*12*
216:*18, 23, 24*
217:2, *8* 219:*9*
listed 36:*8, 18*
38:*14* 41:*13*
50:*19* 56:*2*
77:8 92:*18*
102:*12*
127:*10, 18*
144:*3, 4, 14*
151:*19*
171:*11*
195:*10, 15, 23*
199:2 206:*20*
221:*13*
Listen 29:*1*
86:*18* 164:*19*
listened

211:*20*
lists 92:*8, 11*
literally 160:*6*
literature
55:*15* 56:*12*
101:*4, 22*
115:*16, 17*
116:*3* 119:*8,
15* 121:*16*
128:*20* 145:2,
3, 5, 8, 21*
146:*21*
147:*14* 150:*15*
LITIGATION
1:*5, 21* 6:*5*
10:*3, 7* 12:*7,
18, 21* 25:*20*
38:*24* 44:*20*
46:*16* 52:*13*
59:*12, 15, 20*
60:*22* 61:*3*
64:*17* 78:*21*
131:*19* 132:*5*
145:*4* 187:*1*
204:*4* 205:*5*
225:*5*
little 41:*8*
74:*13, 14*
103:*11*
107:*21*
111:*11* 131:*9*
167:*14*
191:*24* 198:*4*
liver 116:*8*
138:*21* 143:*7*
living 96:*17*
LLC 2:*6, 17*
3:*6, 11* 4:*9*
5:*4, 9* 72:*22*
LLP 2:*4* 4:*3,
9, 13, 20* 5:*5,
16, 21* 72:*22*
loaded 203:*8*
loading 201:*13*
located 62:*1*
locations
91:*22* 112:*9*
log 20:*9*
logged 19:*20*
20:*16*
logical 186:*15*

long 121:*5*
172:*20*
longer 66:*4, 5*
68:*3* 76:*10*
183:*3*
longitudinal
114:*13*
look 34:*17*
53:*24* 54:*3*
71:*17* 73:*21*
74:*12* 97:*1*
99:2 110:*12,
20* 112:*18*
114:2 129:*22*
131:*17* 152:*7,
11* 157:*2*
185:*5, 6, 10*
199:*17*
200:*23*
208:*16* 222:*7,
8*
looked 30:*18*
176:*5, 11*
208:*3*
Looking
64:*24* 70:*1*
84:5 112:*6*
114:*21*
119:*17* 122:*4,
21* 123:*6, 7*
152:*15*
153:*15* 154:*1*
160:7 161:*22,
23* 165:*9*
175:*13* 194:*6*
209:*17* 215:*4,
13, 23*
looks 96:*12*
113:*10*
LOSARTAN
1:*4* 10:*6*
178:9 225:*4*
lot 65:*1* 67:*1,
11* 69:*1*
72:*13* 82:*2*
113:*5* 120:*17*
139:*24* 151:*2*
167:9 190:*14*
199:*1* 208:*4*
Lotrel 75:*24*

lots 178:*2*
Louisiana 2:*9*
low 108:*7*
215:*5, 8, 17, 23*
lower 154:*17*
163:*18* 191:*7*
lowered
103:*22*
lowers 105:*5*
lunch 92:*15*
130:*17*
lunches 91:*19*

< M >
M.D 7:*19*
8:*22*
M.P.H 7:*19*
M7(R1 137:*19*
MACP 1:*11,
15* 7:*4, 16, 21*
10:*16* 225:*18*
226:*24* 227:*24*
Madam 192:*5,
18* 193:*12, 21*
194:*22*
magic 21:*18*
magnitude
159:*17*
maintain
60:*23*
maintained
60:*21* 210:*16*
major 61:*12*
majority 197:*1*
making 86:*24*
87:*14* 97:*18*
98:*4* 104:*17*
113:*18* 126:*5*
174:*23*
177:*15* 179:*1*
malignancy
154:*5, 8, 16*
malignant
154:*4, 14*
malpractice
11:*21* 12:*1, 5*
59:*8*
Manhattan
8:*5*
manner 89:*10*
162:*10* 189:*7*

manufacture
168:*15* 171:*17*
manufacturer
44:*19* 80:*12,
14* 101:*11*
132:*19* 170:*6*
171:7 173:*20*
208:*19*
manufacturers
126:*13* 128:*2*
134:*14*
166:*13*
168:*15*
170:*20*
171:*16*
172:*19*
173:*10*
174:*16*
175:*21* 191:*5*
208:*11*
manufacturing
166:*16*
168:*22* 169:*1*
171:*21* 176:*7,
10* 187:*19*
188:*23*
manuscript
102:*13, 16*
mark 12:*24*
13:2 22:*4*
49:2 59:*21*
84:*10* 95:*21*
101:*14* 117:*1*
123:*21* 192:*1,
2, 10, 12*
193:*8, 11*
196:9 201:*4*
202:*18* 219:*24*
MARKED
7:*13* 8:2 9:*2*
13:*15* 22:*8*
25:*24* 26:*23*
32:2 49:*5*
59:*24* 84:*13*
90:2 95:*24*
101:*16* 117:*4*
124:*2* 131:*15*
157:*11* 192:*7,
23* 193:*18*
194:8 196:*11*
202:2, *20*

207:*12, 20*
209:*10*
217:*24* 220:*4,*
*7, 17*
**Market** 3:*9*
168:*10*
169:*17, 19*
178:*8*
**marking** 22:*5*
49:*2* 89:*23*
117:*2* 123:*23*
201:*22* 202:*6,*
*17*
**mass** 154:*13,*
*14*
**Massachusetts**
5:*6, 22*
**massage**
153:*11, 13*
**masse** 33:*24*
**masses** 153:*15,*
*22, 24* 154:*2*
**Master** 110:*19*
**material** 9:*8*
137:*15* 171:*4*
173:*11*
193:*10*
195:*23* 208:*24*
**Materials**
8:*24* 9:*5*
50:*10* 52:*12*
53:*3* 55:*20*
56:*6* 57:*1, 16*
123:*21* 129:*8,*
*10, 11, 12*
131:*14* 138:*7*
171:*6* 188:*14*
192:*3* 194:*7*
196:*4* 207:*11,*
*17* 216:*18*
217:*8*
**math** 61:*12*
**MATTA** 6:*2*
**Matter** 10:*6*
31:*16* 44:*3,*
*18* 45:*16*
140:*17, 18*
196:*5* 199:*9*
206:*18*
219:*23* 225:*11*
**max** 163:*16*

**maximum**
134:*3, 16*
**MAZIE** 2:*17*
**MD** 1:*11, 15*
7:*4, 15, 21*
10:*16* 225:*18*
226:*24* 227:*24*
**MDL** 1:*4*
125:*4, 13*
**meals** 88:*3, 13*
**mean** 45:*12*
47:*19* 50:*14*
52:*21* 92:*19*
93:*14* 102:*21*
115:*14*
129:*14*
134:*24*
147:*15* 149:*9*
155:*14*
160:*19*
164:*23*
168:*24* 171:*3*
176:*15*
177:*17* 179:*7*
181:*3* 202:*6,*
*7* 215:*19*
217:*20*
**meaning**
72:*15* 120:*11*
**meaningfully**
102:*15*
**means** 56:*24*
71:*11* 85:*18*
150:*9* 181:*2*
203:*9*
**meant** 72:*5, 8*
86:*8* 204:*12*
205:*15*
**measure**
71:*13, 15*
**measured**
189:*3*
**media** 33:*17*
**medical** 11:*20,*
*21* 12:*1, 5*
52:*14* 59:*8*
61:*13* 62:*14*
146:*20*
147:*13*
155:*19* 158:*2,*
*15* 195:*19*

197:*4* 213:*23*
214:*12* 216:*11*
**medicated**
149:*3* 162:*24*
**medicine**
61:*14, 16*
62:*8* 63:*24*
64:*1* 156:*3*
190:*2* 195:*18*
210:*9* 211:*6*
216:*3*
**medicines**
151:*1*
**Medline** 119:*9*
**meet** 120:*3, 6*
**meeting** 50:*10,*
*11* 212:*21*
**Melissa** 8:*10*
91:*2, 14*
**mellitus** 108:*7*
**member**
61:*21* 69:*10*
134:*8* 175:*5*
**memory** 21:*6*
24:*24* 26:*19*
28:*11* 30:*22*
92:*18* 221:*15,*
*17, 18*
**mention** 67:*9*
**mentioned**
48:*19* 65:*24*
109:*21*
110:*16*
116:*12* 124:*9*
152:*17*
153:*22* 213:*7*
**mentor** 76:*20*
**menu** 154:*6*
**Merck** 76:*23*
105:*20*
**mercy** 204:*23*
**Meridian** 4:*5*
**met** 143:*6*
**meta-analyses**
159:*15* 160:*11*
**meta-analysis**
8:*21* 9:*5*
117:*14, 21*
118:*1, 5, 6*
119:*5* 122:*14*

**method**
221:*12, 13*
**methodology**
160:*22*
**methods** 52:*13*
**Michael**
111:*20*
**Michigan**
96:*17*
**microgram-**
**per-kilogram**
140:*1* 163:*20*
**micrograms**
189:*17, 21*
**microgram-to-**
**kilogram**
138:*23*
**microphone**
187:*12*
**mid** 97:*15*
98:*24* 99:*11*
**MIDAS** 76:*17*
**middle** 204:*17*
**Million** 8:*5, 8*
85:*4* 95:*4, 12*
204:*3, 18*
210:*3, 21*
**millions** 73:*13*
88:*2*
**mimic** 111:*10*
**mind** 81:*16*
86:*18* 165:*2*
192:*13* 201:*13*
**mine** 114:*18*
176:*8*
**minimal** 128:*7*
**minimally**
113:*19*
**minimize**
211:*2*
**minimizes**
105:*7*
**minimizing**
180:*21*
**minimum**
83:*11* 100:*1*
**Minneapolis**
62:*2* 91:*23*
**Minnesota**
61:*18* 62:*1,*
*11, 17, 18, 21*

76:*19* 91:*16*
93:*11*
**minor** 61:*12*
**minutes** 58:*19*
93:*15* 130:*21*
183:*11* 212:*22*
**Miscellaneous**
129:*22*
**mischaracteriz**
**ation** 218:*9*
**mischaracteriz**
**es** 67:*12*
133:*15*
137:*13, 23*
165:*5* 174:*5*
**mischaracterizi**
**ng** 24:*10*
28:*11* 30:*2*
104:*6* 144:*1*
176:*2* 182:*2*
213:*1, 14*
**misleading**
104:*19*
**missed** 54:*7*
122:*1, 6*
146:*3* 147:*16*
148:*4, 6*
176:*14*
**mistaken**
177:*23*
**misunderstandi**
**ng** 162:*17*
**mock** 69:*8, 13*
**models**
138:*20*
139:*21, 23*
163:*19* 167:*7,*
*9* 208:*15*
**moderate**
159:*17*
**modification**
107:*17*
**modifier** 13:*3*
**moment**
69:*20* 73:*11*
**money** 79:*8,*
*18* 82:*2, 16*
83:*5, 11* 84:*6*
95:*6, 7*
196:*23, 24*
197:*1* 205:*4*

monotherapy 8:17 103:6 104:1
month 22:22, 23 23:9 24:7 49:20
months 23:3
morning 10:21
morphed 67:6
MORRIS 5:5
mortal 121:4
mouth 116:1
move 38:1, 8 42:16 58:13 59:5 100:3, 5, 6, 22, 23 140:3 205:16 211:24
moved 62:9, 24 196:12
Moving 36:5 140:11
MPH 1:11, 15 7:4, 15, 21 8:22 10:16 61:20 62:6, 9, 10 110:18 225:18 226:24 227:24
MRI 153:15
MSP 76:23
Mulberry 4:21
multiple 116:13 128:9 132:14 152:14 162:22, 23 166:12, 14, 17 170:24 171:2
multiply 100:15
mutagenic 137:12, 21
mute 73:2
MYLAN 5:13 137:5
Mylan-produced 136:7
Mylan's 136:22, 23

Myogen 105:22
myriad 128:22

< N >
N.W 3:14 4:16
name 10:2, 21 53:9 63:11 91:2 96:13 98:2, 12, 16, 19 132:16
names 91:10
narrative 61:8
narrow 176:4
narrower 123:18
National 8:11 61:18 81:1, 5 87:5 88:12 91:20 92:4 111:19
nationalized 115:4
NDEA 78:7, 22 107:3 131:18 132:3, 21 133:14 143:12, 14, 24 144:14 146:8 147:1 164:21 170:21 172:6, 11 176:21 177:9, 15 179:14 181:6, 23 184:17
NDMA 14:12 15:10, 13, 18, 19, 24 27:5, 13 78:7, 22 107:3, 10 115:2 116:4 124:15 131:18 132:3, 14, 21 133:14, 19 134:10 135:14 136:24 139:7 140:2 143:12, 14, 23 144:14 146:8 147:1

163:12, 14, 23 164:13, 21 165:23 166:18 167:5 168:11, 22, 24 169:18 170:1, 4, 21 171:1, 12 172:6, 11, 19 176:21 177:9, 14 179:2, 14 180:1 181:6, 23 182:5 184:17 185:22 190:17, 23 200:7 208:7, 20
NDMA/NDEA 146:22, 23
NE 4:11
near 87:12
necessarily 57:5 149:10 161:3 168:24
necessary 166:5
need 21:22 36:24 88:20 99:2 160:21 171:20 190:17 191:7
needed 61:5 69:2 136:18 178:3 187:3 197:3 208:9
needless 91:18
needs 153:5 167:24 209:20
nefarious 104:19
negative 161:7
neither 112:1 224:15, 17
Nesbit 3:4
never 35:19 41:14, 19, 24 45:2 46:8 60:23 64:10 76:10 78:9 80:2, 5

100:13 136:7, 17 137:5 156:4 210:2
nevertheless 76:12
NEW 1:1 2:9, 20 4:21 8:4 21:11 90:9 186:23
Newark 4:21
news 180:18
newspaper 180:18
NHANES 111:19 112:18, 23
nifedipine 180:10
nitro 35:22
nitrosamine 42:19 43:17, 23 173:12
nitrosamines 34:21 35:18, 20, 23 41:3, 10, 12, 14, 23 42:1 59:17 64:17, 22 78:8, 22 107:3, 10 145:7 163:24 166:5 167:18 168:16 169:11 171:17 179:11 182:21 184:22
N-nitro 141:4
N-nitroso 138:15 139:12 142:11
No._____Change 226:2, 5, 8, 11, 14, 17, 20 227:2, 5, 8, 11, 14, 17, 20
No._____Line 226:2, 5, 8, 11, 14, 17, 20 227:2, 5, 8, 11, 14, 17, 20

nomenclature 192:13
non-cardiovascular 199:21 214:9
nonexistent 167:12
non-hypertensive 199:6, 20
non-hypertensives 156:9
nonresponsive 140:4
non-trace 136:3
Nope 97:4
Nordisk 77:24
normal 153:3
North 3:19 11:3
Notary 225:24
noted 10:9 140:13 196:14
notes 20:18 25:19 26:10 34:18 183:10 221:16, 18, 21 222:19
Notice 7:15 12:24 13:7, 23 14:3 16:8 32:4 33:18 222:9
noticed 72:1
Novartis 8:6, 9 73:11, 12 74:5 75:14, 24 76:8, 11 80:8, 11, 16, 22 81:2, 7, 17 82:15, 23 83:9, 21 84:4 85:4, 15, 22 86:7 87:4 88:1, 11 89:5, 7, 14 90:10, 18 91:12 93:1, 7, 22 97:6, 15, 20

98:7, *24*
99:*10*, *23*
101:*6* 102:*6*,
*12*, *18* 105:*20*
**Novartis's**
88:6
**Novo** 77:*24*
**NPCLSV_LIT0**
**02333074** 8:*11*
**NPCLSV_LIT0**
**03753068** 8:*13*
**nuanced** 166:*2*
**number** 20:*17*
23:*15* 24:*9*
46:*23* 56:*4*
72:*14* 90:*12*
100:*15*, *18*
118:*21*
132:*19* 144:*6*
150:*12* 156:*1*
159:*16*
192:*13*
198:*13*, *23*
205:*12*
**numbered**
118:*12*
**numbers** 72:*2*
**nurses** 197:*4*
**Nutrition**
111:*19*

< O >
**oath** 11:*7*
225:*16*
**obesity** 108:*7*
199:*3*
**Object** 38:*9*
39:*24* 40:*10*
44:22 56:*9*
57:*7*, *8* 96:*20*
97:*24* 98:*13*
99:*12* 115:*18*
116:*19* 140:*3*
141:*23*
144:*21*
172:22
199:*12* 205:*16*
**objected** 39:*4*
42:*6*, *22*
**objecting**
136:*23* 189:8

**Objection**
16:*16*, *17*
17:*6*, *12*, *20*
19:*13* 20:*19*
21:*15* 23:*1*,
*16* 24:*10*
28:23 29:*8*,
*17*, *20* 30:*2*
31:*9* 32:*5*, *15*,
*23* 33:*7*, *19*
34:*11* 35:*3*, *7*,
*12*, *24* 36:*19*
37:*5*, *15*, *16*
38:*15* 39:*13*,
*22* 44:*21*
45:*9*, *20* 46:*6*
48:*5* 51:*8*, *17*
53:*13* 54:*8*
58:*4* 64:*19*
65:*3* 66:*20*
67:*12* 73:*15*
77:*12*, *20*
78:*1* 79:*9*
81:*8*, *18* 82:*3*,
*18* 83:*12*, *23*
85:*24* 86:*9*
87:*6* 88:*9*, *15*
89:*17* 90:*21*
93:*17*, *24*
94:*14* 101:*7*
103:*7* 104:*6*
108:*3*, *20*
109:*7*, *18*
121:*9* 125:*2*
126:*14*, *22*
128:*3* 132:*23*
133:*15* 135:*2*,
*20*, *23* 136:*9*,
*15* 137:*1*, *13*,
*23* 138:*9*, *17*
139:*16*
140:*10*, *11*, *13*
141:*6*, *21*
142:*13* 143:*2*
144:*1* 145:*24*
147:*8* 148:*1*
149:*23*
151:*23*
155:*21* 163:*8*
164:*9* 165:*5*,
*15* 166:*7*, *22*

167:*20*
168:*17*
169:*13*
170:22
171:*18*
172:22
173:*16* 174:*5*,
*24* 176:*1*
177:*4*, *19*
179:*16*
181:*13* 182:*1*,
*22* 183:*5*
184:*7* 185:*1*
186:*11*
187:22 189:*5*
190:*20* 191:*9*,
*17* 196:*2*, *6*,
*14*, *16* 198:*11*
204:*8*, *12*
205:*15*, 22
208:22
209:22 212:*1*,
*6*, *15*, *24*
213:*14*
214:*14* 217:*1*
219:*3*, *16*
220:*2* 222:*11*
**Objections**
7:*14* 35:*4*
130:*3* 188:*6*
**observation**
150:*8*
**observational**
9:*5* 111:*4*, *15*,
*16*, *18*, *22*
112:*9*, *13*
118:*7* 120:*21*
179:*9*
**observations**
113:*6*, *18*
**observe**
112:*13*
**observing**
112:*2*
**obvious** 137:*6*
147:*10*
**obviously**
155:*12*
162:*16* 193:*23*
**occasionally**
72:*14*

**occasions**
11:*12*
**occupational**
113:*21*
145:*16* 146:22
**occur** 154:*18*
166:*16*
**occurred**
11:*13* 46:*4*,
*10* 76:*18*
**o'clock** 183:*14*
**October**
224:22
**offer** 29:*11*
166:*10* 225:*15*
**offered** 52:*17*
**Offhand**
14:*21* 47:*5*
120:*15*
**Office** 8:*3*
**official** 84:*21*
**oftentimes**
67:*3*
**Oh** 63:*16*
100:*20*
103:*10*
110:*12*, *13*
202:24 207:*7*
212:*17*
**Okay** 11:*12*,
*16* 12:*6*, *11*,
*20*, *23* 13:*10*,
*22* 14:*1*, *13*,
*19*, *22* 15:*4*, *8*,
*12*, *16* 16:*2*, *4*
17:*3*, *10*, *17*
18:*9*, *16* 19:*5*,
*18* 20:*8*, *15*
21:*9* 22:*17*,
*24* 23:*12*, *23*
24:*6*, *17* 25:*2*,
*9*, *13*, *15*, *18*, *23*
26:*6* 27:*1*, *11*
28:*1*, *12*, *13*
29:*24* 30:*8*,
*15* 31:*6*, *19*
32:*13*, *21*
34:*2*, *17*, *24*
35:*17*, *21*
36:*5*, *16*
37:23 38:*7*

39:*3* 40:*24*
41:*7*, *15* 42:*2*,
*15* 43:*13*, *21*
44:*8*, *17* 45:*6*
46:*2*, *12*, *15*,
*23* 47:*3*, *7*, *21*
48:*14* 49:*12*,
*17*, *23* 50:*8*,
*14*, *19*, *24*
51:*14* 52:*8*,
*21* 54:*15*, *20*
55:*18*, *24*
57:*15*, *22*
58:*11*, *18*
59:*4*, *10*, *16*,
*21* 60:*7*, *10*,
*19* 61:*2*, *6*, *22*
62:*3*, *12*, *16*,
*20* 63:*1*, *7*, *11*,
*16* 64:*7*, *12*,
*24* 65:*17*, *24*
66:*17* 67:*9*
68:*12* 69:*16*
70:*5*, *11*, *21*
71:*13*, *21*
72:*1*, *17*
74:*10* 75:*8*,
*23* 76:*4*, *12*,
*22* 78:*11*
79:*17* 80:*11*,
*16* 81:*1*, *6*
84:*20*, *24*
85:22 86:*5*
87:*20*, *23*
90:*14* 91:*4*,
*10*, *14* 92:*7*,
*14* 93:*5*, *21*
94:*9* 95:*4*, *8*,
*21* 96:*5*, *11*,
*16*, *19* 97:*5*,
*14* 98:*21*
99:*4* 101:*3*,
*20* 102:*1*, *5*,
*17*, *23* 103:*16*,
*19* 104:*3*
105:*12*, *16*, *18*
106:*1*, *5*, *15*,
*21*, *24* 107:*11*
108:*14* 110:*8*,
*15* 114:*6*
116:*15*, *24*

117:*17, 20*
118:*11, 18*
119:*3, 19*
120:*7, 10, 22*
122:2 124:*20*
125:*16, 20*
127:*9, 15, 22*
128:*13, 18, 24*
129:*5, 15, 22*
130:*14, 18, 20, 21* 131:*8, 13, 22* 134:*22*
135:*18*
136:*14, 21*
137:*10* 138:*5, 13* 140:*22*
143:*8, 16*
144:*4* 145:*13, 20* 147:*12*
148:*12*
150:*11*
152:*20* 153:*7*
156:*18* 157:*6, 16* 160:*2, 9, 18* 161:*11*
168:*9* 171:*6*
172:*1, 4*
173:*24*
178:*13, 20*
179:*5* 180:*2, 10* 181:*1, 22*
182:*14, 20*
183:*24*
186:*22* 187:*6, 7, 14* 192:*21*
193:*16*
194:*17* 195:*4*
196:*8, 13*
199:*23*
201:*14, 17, 18, 22* 202:*5, 7*
203:*11, 13*
204:*11* 206:*3*
207:*9, 18*
209:*7, 19*
216:*18* 218:*2, 18* 219:*14*
221:*7, 21*
222:*1, 18*

**Oklahoma**
61:*13* 62:*6, 13* 68:*7*
**once** 53:*17, 21*
54:*2* 75:*12*
178:*14*
**oncologist**
181:*4*
**oncology** 64:*8, 9, 11*
**ones** 16:*11*
43:*15* 47:*6*
71:*10* 129:*2*
214:*13* 216:*7*
**ongoing** 54:*1*
68:*17* 114:*15*
199:*10*
**online** 180:*17*
**open** 22:*6*
**opened** 202:*13*
**Operating** 8:*7*
85:*5*
**opinion** 47:*10*
52:*16* 128:*11*
132:*1, 20*
134:*23*
135:*22*
145:*20* 146:*6, 9, 14* 149:*19*
159:*6* 166:*4, 10* 171:*22*
172:*21*
173:*15*
175:*16*
186:*17, 18*
191:*8, 14*
195:*10*
198:*19* 205:*17*
**opinions** 36:*7*
44:*9* 47:*8, 9*
48:*1, 15* 51:*7*
52:*11, 18, 21, 22, 24* 53:*2, 5*
55:*7* 57:*6*
58:*3* 184:*5, 14* 186:*4, 8*
189:*4* 195:*14*
204:*20* 208:*2, 11*
**opportunity**
175:*20* 199:*24*

**opposed**
69:*19* 126:*12*
128:*1* 184:*21*
194:*15* 202:*10*
**options** 165:*2*
**ORDER** 1:*9*
114:*10*
140:*12*
151:*15*
152:*16* 208:*11*
**ordered**
215:*12*
**ordering**
152:*3, 5*
**O'REILLY**
4:*20*
**Organization**
144:*13*
**organizations**
66:*12, 13*
**Original** 8:*19*
217:*16*
**Orleans** 2:*9*
**Ostendorf**
8:*10* 91:*2*
**ought** 100:*11, 21*
**outcome**
224:*20*
**outcomes**
122:*21* 165:*8*
**outlier** 122:*11*
**outline** 130:*16*
**output** 186:*8*
**outset** 124:*9*
**outside** 43:*8*
44:*4* 46:*4, 9*
60:*22* 64:*16*
67:*3* 78:*21*
80:*5* 115:*10*
170:*22* 176:*1*
**overall** 116:*7*
145:*15* 197:*12*
**Overland** 2:*15*
**overlooked**
210:*12*
**overnight**
193:*13*
**oversight**
218:*23* 219:*19*

**overweight**
150:*23*
**owned** 76:*8, 9*
**owner** 72:*21, 22, 24*
**ownership**
133:*3* 206:*15, 16*
**Oxford** 5:*16*

**< P >**
**P.A** 3:*4*
**P.C** 5:*9*
**p.m** 131:2, *3, 4* 183:*14, 17, 18* 223:*4, 7*
**packaged**
168:*23*
**PAGE** 7:*3*
25:*16* 52:*9*
70:*22, 23*
71:*4* 73:*23*
74:*11* 75:*23*
76:*6, 16*
85:*11* 87:*23*
97:*2* 106:*8, 9*
118:*12*
127:*16, 19*
128:*13, 18, 19*
129:*17, 18, 23*
130:*5* 131:*23*
144:*23*
145:*22*
146:*15*
149:*17*
157:*19, 20*
183:*23*
188:*15*
194:*12*
197:*15*
201:*21*
203:*16, 18*
226:2, *5, 8, 11, 14, 17, 20*
227:2, *5, 8, 11, 14, 17, 20*
**Pages** 129:*6*
**Paid** 8:*7* 70:*9, 10, 17* 72:*10*
82:*2* 83:*11*

84:*4* 87:*12*
100:*16*
**panel** 69:*11, 13* 175:*5*
**panels** 69:*8*
**Panigrahy**
201:*11*
**paper** 105:*24*
106:*3* 112:*19*
145:*11*
160:*17* 213:*16*
**papers** 56:*20*
160:*15* 162:*8*
**paragraph**
52:*10* 132:*1*
146:*16* 147:*5*
159:*13*
161:*10*
197:*15, 18*
**parallel** 75:*4*
205:*6*
**parameters**
152:*14*
**paraphrasing**
103:*3*
**parentheses**
72:*3, 6*
**parenthetical**
71:*22* 72:*5*
**Park** 2:*15*
**Parkway** 2:*20*
5:*11*
**part** 16:*8*
24:*22* 30:*10*
33:*10* 60:*21*
67:*9* 72:*24*
82:*13* 110:*16*
111:*4, 17*
144:*19* 150:*2*
151:*18, 21*
161:*6* 167:*15*
179:*9* 197:*23*
217:*19*
**partial** 72:*22*
**partially**
72:*17* 75:*13*
109:*15* 151:*5*
**participants**
72:*11*

Confidential Information - Subject to Protective Order

**participate** 50:*10, 11* 102:*15*
**participated** 69:*22, 23* 78:*6, 9, 12*
**participating** 67:*23* 68:*5, 9*
**participation** 82:*17* 88:*19*
**particular** 26:*18* 30:*6* 48:*10* 117:*17* 149:*22* 210:*24*
**particularized** 45:*15*
**particularly** 116:*8* 138:*21* 163:*6* 197:*7*
**PARTIES** 2:*1* 3:*1* 4:*1* 5:*1* 10:*9* 224:*17*
**party** 12:*7, 18*
**pass** 187:*8*
**patient** 43:*7* 44:*3* 153:*8* 181:*18* 182:*10* 190:*24* 199:*8* 200:*18* 215:*17*
**patients** 8:*17* 43:*8* 79:*20, 23* 80:*1* 113:*10* 114:*13* 151:*2, 10, 15, 22* 152:*4* 155:*18* 156:*3, 5, 7* 162:*23* 172:*3* 176:*20* 177:*1, 8, 24* 178:*2, 3, 7* 179:*13, 21, 23* 180:*4, 10, 15* 181:*7, 24* 182:*16, 20* 183:*2* 184:*20* 185:*8* 190:*18* 191:*1* 198:*20* 199:*1, 6, 10, 17, 20* 200:*5* 213:*22, 24*

214:*4, 6, 11, 18, 23, 24* 215:*12* 216:*6, 10, 15*
**patterns** 86:*23*
**pay** 94:*5* 127:*14* 131:*20*
**payment** 70:*6, 15, 20* 81:*11* 206:*17* 210:*5, 21*
**payments** 81:*7*
**payor** 93:*21*
**PC** 3:*11, 18*
**PDF** 202:*11, 12, 13* 203:*7, 10, 18*
**PDFs** 31:*3*
**peer** 106:*13, 19* 195:*21*
**peer-reviewed** 106:*11, 18* 107:*1, 13, 24*
**PENALTY** 225:*7, 9*
**pending** 71:*1*
**Pennsylvania** 3:*9* 5:*11, 17*
**people** 43:*10* 44:*5* 68:*21, 22* 84:*5* 113:*4, 12, 14* 125:*23* 134:*9* 149:*8* 150:*4* 154:*19* 155:*5, 10, 11, 13, 15* 156:*12* 158:*14* 162:*18* 163:*6, 15* 169:*20, 21* 170:*10* 176:*6* 177:*13* 178:*15, 21* 180:*12, 16* 182:*9* 185:*10* 189:*24* 190:*1* 200:*21, 22* 204:*24* 215:*15* 218:*11*
**percent** 81:*11* 123:*17*

**percentage** 197:*12*
**perfect** 169:*23*
**perfectly** 28:*19*
**performed** 41:*22*
**period** 24:*21* 82:*2* 85:*23* 99:*24* 115:*6*
**Periodic** 129:*6*
**PERJURY** 225:*7, 9*
**person** 26:*13* 42:*19* 43:*2, 10, 19* 116:*6*
**personally** 13:*22*
**personnel** 102:*13* 197:*3*
**persons** 158:*4*
**perspective** 65:*5* 81:*13*
**perspectives** 160:*21*
**pertained** 94:*10*
**Pfizer** 77:*11, 14* 105:*20*
**ph** 1:*23*
**PHARMA** 4:*9* 5:*9* 91:*16* 102:*18*
**PHARMACEU TICAL** 4:*7* 5:*3* 65:*2, 7, 13* 66:*7, 15, 18* 67:*4, 17, 24* 68:*9, 13, 15* 69:*17, 21* 70:*12* 79:*4, 19* 89:*11* 204:*19* 205:*13*
**PHARMACEU TICALS** 4:*9* 5:*13, 20* 8:*6* 66:*14* 137:*21*
**pharmacies** 178:*15*
**pharmacologic** 111:*24*

**Pharmacology** 9:*10* 201:*8* 209:*9* 210:*16*
**pharmacology/t oxicology** 136:*22*
**PHARMACY** 4:*3*
**phenomenon** 157:*23*
**pheochromocyt oma** 215:*9*
**Philadelphia** 3:*9*
**phone** 43:*11*
**phrase** 47:*22* 132:*13*
**physical** 30:*18* 31:*7, 16, 17* 32:*1, 3, 8, 10* 107:*17* 108:*8* 199:*4*
**physician** 151:*13* 154:*11* 210:*7*
**Physicians** 211:*8*
**pick** 27:*10* 121:*15*
**piece** 116:*17*
**Piedmont** 4:*11*
**PIETRAGALL O** 5:*13*
**pill** 167:*2, 4* 189:*20, 24*
**pills** 133:*19* 134:*11* 135:*14* 200:*15*
**Pittsburgh** 5:*17*
**PIZZI** 4:*20*
**place** 91:*22* 161:*24* 224:*12*
**places** 61:*21*
**placing** 216:*9*
**plaintiff** 15:*1, 3* 56:*4* 127:*11* 129:*17*
**PLAINTIFF- FLACK** 7:*13* 8:*2* 9:*2* 13:*4,*

15 22:*5, 8* 49:*3, 5* 59:*24* 84:*13* 89:*24* 90:*2* 95:*24* 101:*16* 117:*4* 123:*24* 124:*2* 157:*11* 192:*23* 193:*11, 18* 202:*2* 220:*4, 7*
**PLAINTIFFS** 2:*3* 3:*3* 7:*14* 56:*5* 130:*1* 132:*4* 145:*4* 186:*24* 192:*8* 193:*3* 202:*7* 204:*4*
**plaintiff's** 192:*11*
**Plaintiffs- Exhibit** 220:*17*
**Plaintiffs- Flack** 201:*5, 24*
**Plaintiff-X** 192:*8*
**plans** 78:*20*
**plausibility** 148:*19*
**plausible** 144:*9* 163:*23* 185:*17*
**play** 21:*4*
**player** 61:*12*
**playing** 185:*23*
**Pleadings** 125:*4, 13*
**please** 10:*11* 195:*6* 201:*13, 21*
**plenty** 52:*5* 158:*14* 176:*12* 178:*8* 208:*13*
**PL-Flack** 13:*3*
**point** 53:*22* 55:*16* 67:*21* 80:*9, 17* 109:*4* 126:*4* 130:*16* 164:*12*

Confidential Information - Subject to Protective Order

174:*18, 19, 21*
214:*21* 216:*21*
**pointed** 148:*5*
**points** 197:*12*
**police** 173:*5*
**pool** 123:*15, 16*
**pop** 120:*17*
121:*3* 201:*16*
**pops** 123:*8*
**popular** 86:*21*
87:*4*
**population** 113:*4, 7*
150:*21*
155:*20* 156:*2, 9* 162:*18*
199:*9* 200:*18*
**population-based** 112:*21*
**populations** 115:*10* 162:*22*
**portion** 70:*22*
75:*9, 10*
79:*22* 85:*12*
**portions** 73:*22*
**posit** 148:*16*
184:*16, 19*
**position** 35:*5, 10, 11, 15*
164:*19*
167:*18, 23*
**positive** 104:*17* 123:*8, 9, 10* 133:*24*
161:*7* 209:*11*
215:*6, 24*
**positives** 215:*7, 24*
**possession** 23:*15* 221:*23*
**possibility** 121:*8*
**possible** 18:*20*
54:*17*
**possibly** 192:*4*
**post** 134:*10*
**post-academic** 62:*4, 5*
**post-doc** 62:*10*

**postdoctoral** 61:*19* 76:*19*
**posted** 133:*18*
**Post-Marketing** 129:*5*
**potency** 138:*16*
139:*14* 141:*5*
142:*12*
**potential** 78:*13, 16*
137:*22*
143:*13, 23*
153:*5* 154:*5*
160:*18* 161:*1*
162:*10*
170:*13*
173:*12*
198:*24* 205:*8*
206:*20, 24*
215:*20*
**potentially** 41:*4* 148:*21*
152:*21*
153:*24* 165:*3*
171:*1* 178:*18*
200:*15*
206:*18* 218:*13*
**Pottegard** 26:*6* 185:*5*
**PowerPoints** 34:*19* 38:*21*
39:*10* 40:*4, 18*
**practice** 42:*13*
63:*7, 9, 12*
118:*5* 154:*19*
180:*5* 182:*15*
199:*19*
213:*21* 214:*1*
216:*2*
**practicing** 111:*14*
**practitioner** 66:*24* 67:*3*
180:*17*
**practitioners** 91:*18*
**pre** 121:*7*
**precise** 123:*17*

**precision** 53:*8, 10*
**preclude** 55:*13*
**predict** 78:*23, 24*
**predominantly** 143:*7*
**preemptively** 219:*9*
**premier** 112:*19*
**premise** 51:*24*
**prepare** 50:*10*
**prepared** 20:*15* 60:*19*
**preparing** 16:*5* 17:*10*
45:*6, 7* 47:*15*
136:*8*
**pres** 200:*18*
**Prescribe** 8:*9*
88:*5*
**prescribed** 200:*19*
**prescriptions** 67:*1* 190:*2*
**presence** 46:*4*
152:*17, 20, 23*
163:*1* 166:*4*
**PRESENT** 6:*1* 65:*21*
66:*1* 194:*24*
220:*17*
**presentations** 34:*19* 35:*1*
**presented** 103:*8*
**preset** 120:*11, 14*
**president** 64:*4*
**Press** 8:*4*
**pressure** 9:*4*
105:*6* 111:*24*
150:*3* 151:*7*
163:*2* 197:*22*
198:*1, 2, 4, 9, 15* 213:*11, 19*
214:*24* 216:*12*
**pretty** 26:*16, 19* 28:*8* 37:*1, 9* 51:*21*

65:*15* 66:*22*
75:*15* 82:*20*
93:*4* 95:*17, 18* 124:*19*
132:*12* 134:*8*
137:*6* 144:*16*
147:*10* 158:*9*
175:*16* 191:*2*
211:*16* 216:*1*
**prevalence** 215:*6, 8, 17, 23*
**prevent** 121:*17*
**previous** 57:*16* 82:*22*
194:*16*
**previously** 49:*19* 57:*21*
59:*13, 18*
92:*24* 107:*9*
128:*21*
158:*10* 192:*1*
**primarily** 83:*6* 86:*21*
**primary** 75:*21* 81:*16, 24* 102:*1, 3*
114:*16, 19*
**principle** 216:*9*
**principles** 52:*15* 118:*10*
215:*22*
**PRINSTON** 5:*3*
**print** 27:*18*
29:*6*
**printed** 26:*14, 23* 27:*15, 17*
28:*2* 29:*15*
30:*1* 49:*10*
**printer** 27:*17*
**printing** 84:*6*
**prior** 50:*21*
54:*5* 120:*14, 23* 157:*19*
209:*12* 224:*5*
**priori** 121:*19*
**private** 63:*7*
**privilege** 212:*7*

**privileged** 43:*5* 44:*1*
**privy** 94:*3*
174:*8*
**pro** 153:*17*
**probability** 154:*17*
158:*12, 17*
**probable** 144:*4, 14*
**probably** 22:*21* 60:*13*
62:*18* 68:*1*
69:*1* 74:*17*
75:*20, 22*
83:*7* 86:*20*
97:*19* 106:*12*
133:*6, 9*
142:*7* 163:*18*
175:*9* 189:*21*
190:*12*
192:*10*
215:*19*
217:*23* 221:*11*
**problem** 33:*13* 113:*12*
131:*11*
134:*21* 153:*5*
154:*5* 178:*12, 14* 180:*6, 15, 16* 215:*9, 10*
**problems** 35:*15* 152:*10*
154:*7*
**Procedure** 47:*17*
**procedures** 52:*13* 153:*8*
**process** 51:*16*
54:*16* 56:*21*
115:*13*
118:*19*
166:*16*
168:*22* 169:*2*
173:*13* 195:*21*
**processes** 171:*22*
**produce** 16:*12* 17:*23*
42:*10, 14*
43:*12*

Confidential Information - Subject to Protective Order

**produced** 14:2  18:9, 17  19:2  25:23  32:2  34:4  60:11  90:17  209:1
**producing** 42:7
**product**  69:12  182:4
**PRODUCTS** 1:4  10:6  65:23  67:6  86:16  166:12  169:10  179:14  181:8  182:21  188:16  191:6  225:5
**Professional** 1:17  61:23  196:21  224:4
**professionals** 197:3
**proffered** 205:23
**proffering** 205:17
**profile**  103:23
**Program**  64:6  69:24  70:2  83:10  92:7, 11, 14, 16, 19  97:15  99:10
**Programs**  8:7  65:18  66:19  82:1  85:5, 15  86:15  87:3  88:3  89:6, 15, 21  91:19  93:3  94:11
**prohibits** 91:16
**project**  114:15
**projects**  22:21
**promised** 74:17  95:3, 7, 13
**promote**  67:5  75:3  83:1  86:15

**promotion** 67:18, 19
**promotional** 66:9, 11  82:10  86:14
**pronouncement** 141:15
**pronouncing** 156:19
**proposition** 162:13
**prostate** 153:11, 12
**PROTECTIVE** 1:9
**proteinuria** 152:7
**prove**  146:2  148:18
**provide**  12:13  16:20  17:19  79:7  85:18  86:8  160:21
**provided**  17:4  18:23  26:4  27:9  31:5  41:3  125:6, 14, 17  126:6, 19  127:11, 15, 19, 24  128:14, 16  134:15  192:1  193:10  194:8, 10, 19  195:24  207:22
**providing** 42:22  85:16  91:17  126:11  204:20
**proximal** 148:24
**Public**  110:19  112:24  170:11  219:20  225:24
**publication** 114:5  161:14
**publications** 146:23  211:5

**Publicly** 128:13  138:7
**publish** 111:18  121:20  220:16
**published** 8:21  9:8  56:19  108:17  112:19, 20  114:14  117:14  121:16  134:2  201:8  210:17
**publishing** 96:5  220:16
**PubMed** 14:12  15:11, 22  27:5, 23  28:4  119:9  124:14
**pull**  16:22  103:1  128:15  156:24  202:15  208:6
**pulled**  14:9, 11, 23  31:4  74:17, 21  84:21  90:8  95:12  96:6  124:11, 13  128:17  170:3  195:24
**pulling**  180:2
**Punta**  3:5
**pure**  150:21
**purely**  179:9
**purpose**  81:16  82:1
**pushing** 160:16
**put**  25:5  42:12  53:9  69:13  116:1, 16  139:5  161:11  162:13  184:14  193:14, 16  196:6  203:21, 23

**putting**  83:17  113:19  157:14  193:4
**puzzle**  116:17

< Q >
**qualified** 159:9
**qualify**  36:24  172:21  173:14
**qualifying** 37:7
**question**  16:7, 17  17:14  19:18, 19, 22, 23  20:22, 24  21:3, 6, 9, 11  23:12, 19  27:12, 21  28:21  30:1  31:22  33:1  34:5  37:1, 2, 18  39:16, 24  40:2, 9, 13  42:16  54:4  55:2  56:9  57:8, 9, 13, 22  65:15  72:19  83:14, 24  88:21  98:14  102:11  106:16  107:8, 21  109:13  116:22  126:16  127:17, 22  128:7  130:8  131:16  139:11, 19  140:8  141:14, 22  142:4, 19, 20  148:15  150:14  151:12, 16  163:23  164:23  167:16, 17  168:6  171:20  181:2  186:6  191:19  195:11  198:6

**200:1**  202:16  203:24  204:14  209:15  214:10  216:8, 14, 17  217:10
**questioning** 203:21
**questions** 28:17, 18  29:1  58:16  100:10  117:23  144:19  146:11  157:7  176:8  196:10, 19  197:17  203:5  209:4  213:9  216:20  217:5
**quick**  58:15  124:22  125:12  183:9
**quite**  56:1  91:8  128:19  139:11
**quote**  87:24

< R >
**racial**  98:5
**raise**  216:20
**ran**  27:13  124:14
**randomized** 111:10  112:2  120:19  122:20
**range**  65:6  114:8, 21  153:17
**ranges**  215:1
**rare**  66:15
**RASPANTI** 5:16
**rate**  51:1
**rationale**  52:6  152:5
**rattle**  76:22
**raw**  173:11
**RBK/JS**  1:5
**reach**  184:5

Confidential Information - Subject to Protective Order

**reaching**
189:*4* 195:*10*
**Reactive**
137:*20*
**read** 15:*5*
26:*12, 13, 14*
42:*9* 51:*7*
53:*20* 56:*13*
103:*8, 16*
107:*7* 118:*15*
124:*13*
127:*14*
137:*15* 138:2
145:*10, 11*
159:*19*
163:*11*
170:*17, 19, 24*
171:*3, 13*
178:*17, 18*
180:*17*
225:*10, 11*
**reader** 160:*21*
**reading** 26:*20*
85:*12* 160:*23*
184:*23* 186:8
**reads** 36:*5*
50:*8*
**ready** 195:*5*
**real** 19:*24*
123:2 146:*14*
186:*19*
206:*12* 220:*16*
**realize** 95:*3*
156:*1, 8*
**really** 23:*19*
38:*3, 4* 42:*14*
46:*14* 47:*13*
51:*20* 66:*6,*
*10* 67:*16, 20*
69:*3* 72:*8, 11,*
*13* 74:*15*
75:*1, 2, 3*
78:*24* 82:*11,*
*20* 84:*5*
88:*20* 91:*13*
94:*6* 97:*21*
99:*17* 114:2
115:*3, 8*
121:*17* 122:*3,*
*6* 123:2
139:6 142:*3*

143:*17* 144:*8*
148:*8, 22, 23,*
*24* 149:*12*
150:*2, 9*
153:2 160:*5,*
*21* 167:*5*
176:*14* 178:*1,*
*4, 22* 179:*1,*
*21* 185:*9*
186:*14*
189:*14* 190:*5*
195:*22* 197:*7*
205:2 211:2
214:*7* 215:*22*
219:*9, 20*
222:*15*
**Realtime** 1:*18*
**reason** 18:*16*
29:*10* 30:6
67:*10* 74:*21*
82:*11* 113:*14*
125:*20*
132:*13* 134:*4,*
*5* 152:*3, 18*
169:*4, 21*
170:*1, 2*
186:*19*
198:*16* 226:*4,*
*7, 10, 13, 16, 19,*
*22* 227:*4, 7,*
*10, 13, 16, 19,*
*22*
**reasonable**
100:*16* 121:*5*
136:*5* 146:*10*
161:*9*
**reasonably**
200:*23*
**reasoning**
135:*8*
**reasons** 48:*2,*
*16* 67:*16*
156:*10*
158:*16* 162:*1*
**recall** 35:*22*
68:*4* 81:*1*
97:*3, 14* 99:*9*
102:*23*
117:*17* 172:*2,*
*20* 173:2
177:*23* 178:*9*

179:*20, 22, 23*
180:*13, 14*
188:*21* 189:*7*
195:*11*
196:*18*
197:*17*
205:*10, 14*
206:*5*
**recalled**
177:*22*
179:*13* 181:*8*
183:*3, 4*
**receive** 35:*1*
70:*5* 81:*6, 11,*
*14* 87:*20, 22*
177:2 204:*18*
**received**
26:*24* 31:*11*
32:*8* 39:*16*
41:*11, 14, 16,*
*19* 42:*18*
43:*15, 17*
65:*1, 5, 12*
74:*19* 79:*8*
105:*18* 128:*6,*
*21* 129:2
181:*7* 196:*3*
201:*14* 204:*2,*
*3, 16* 205:*4*
**receiving**
201:*5*
**receptionists**
197:*4*
**recess** 58:*23*
131:*1* 183:*16*
**recognize**
22:*14* 49:*12,*
*15* 60:*7, 9*
77:*3* 91:*1, 10*
93:*8* 98:*15*
101:*21* 102:*5,*
*9* 117:*8*
**recognized**
52:*14*
**recollection**
83:*15* 100:*19*
**recommend**
153:*8*
**recommendatio
ns** 161:*17*
214:2

**record** 10:*1,*
*10* 12:*11, 12*
13:2 58:*18,*
*20, 22* 59:2
68:*23* 95:*1, 9*
130:*22, 24*
131:*4, 6*
183:*13, 15, 19*
196:*6* 201:*7*
202:*21, 22*
205:*16*
207:*16*
219:*20* 223:*5*
**records** 19:*11,*
*20, 24* 20:*1*
56:*5*
**recross** 222:*23*
**recruit** 69:*7*
70:*1*
**recruiting**
72:*10*
**recruitment**
72:*12*
**red** 152:*8, 9,*
*17, 20, 23*
153:*3, 9, 18,*
*19* 154:*12, 19,*
*22*
**redacted**
96:*13* 98:*20*
**redirect**
212:*23*
**REEFER** 5:*18*
**refer** 50:*1*
**reference**
53:*3* 54:*21,*
*23* 55:6 56:*4,*
*6, 13, 14*
101:2 117:*9*
119:*8* 158:*19*
159:*3, 10*
**referenced**
31:*4* 44:*9*
56:*15* 98:*3*
187:*3, 4*
190:*11*
**references**
44:*10, 14, 15*
54:*16, 18, 23*
55:*10, 11*

157:*19*
158:*20* 159:*1*
**referred**
198:*7, 8*
**referring**
15:*13* 153:*24*
198:*22*
**refill** 190:2
**reflecting**
25:*19* 208:*19*
**refractory**
112:*21*
**refusal** 17:*18*
**refused** 16:*20*
**refusing** 16:*12*
**regard** 34:*20*
41:*21* 42:*19*
129:*16*
191:*14*
196:*23* 198:*6*
**regarding**
41:*23* 43:*17,*
*23* 78:*21*
134:*15* 147:*6*
**regardless**
29:*14*
**regards** 43:*3,*
*12* 89:*15*
217:*24*
**Regents** 210:*7*
**regimen**
151:*22* 179:*12*
**Registered**
1:*17* 224:*3*
**regular** 155:*10*
**regulate**
133:*17*
**regulatory**
133:*21* 188:*15*
**rejected**
161:*18*
**relate** 40:*5, 19*
78:*18* 206:*17*
**related** 40:*2,*
*12* 41:*4, 9*
64:*8, 14*
65:*23* 68:*16,*
*17* 79:*23*
85:*16* 122:*9*
125:*7* 130:*3*
138:*21* 151:*7*

Confidential Information - Subject to Protective Order

160:*4*  167:*6*
206:*18*
**RELATES**  1:*6*
**relating**  160:*2*
**relation**
198:*14*
**relationship**
151:*5*  184:*17*
208:*15*  213:*18*
**relative**  80:*7*
154:*16*
159:*16*  162:*5*
224:*16*, *18*
**relatively**
124:*22*  159:*15*
**Release**  8:*4*
43:*7*
**relevance**
28:*17*, *22*
29:*14*  100:*15*
**relevant**
28:*13*, *14*
29:*10*  34:*13*
122:*4*  125:*22*
127:*1*  128:*8*
145:*2*  148:*8*
176:*5*  208:*2*, *5*
**reliable**  52:*17*
**reliance**  9:*8*
193:*4*, *9*
**relied**  36:*6*, *12*,
*15*, *17*  37:*3*,
*13*  58:*2*
130:*1*  195:*9*,
*14*
**rely**  127:*2*
**relying**  47:*7*,
*13*  174:*3*
**remember**
14:*21*  20:*12*,
*14*  21:*19*, *20*
24:*20*  28:*1*, *6*,
*7*, *8*, *13*  47:*5*
81:*5*  99:*17*
120:*15*  138:*1*,
*2*  212:*18*
**Remote**  1:*14*
203:*8*
**REMOTELY**
2:*1*  3:*1*  4:*1*
5:*1*  73:*18*

100:*14*
153:*20*  224:*7*
**remove**  112:*3*
**removed**  113:*5*
**remuneration**
206:*16*
**renaming**
202:*21*
**render**  171:*22*
191:*8*
**renin**  74:*24*
**rental**  197:*2*
**repeat**  21:*1*, *2*,
*3*  24:*3*  37:*19*
126:*5*  142:*15*,
*18*
**repeated**  21:*10*
**repeatedly**
107:*16*
114:*14*  127:*2*
190:*22*
**rephrase**
45:*15*  55:*4*
188:*1*
**Report**  7:*19*
16:*6*  36:*7*, *8*,
*13*, *18*, *22*
37:*4*, *9*, *14*, *21*
38:*13*, *14*
39:*12*, *21*
40:*5*, *6*, *20*, *21*
44:*11*, *16*
45:*7*  47:*11*,
*15*, *18*, *21*, *24*
48:*3*, *7*, *8*, *11*,
*18*, *22*  49:*1*, *3*,
*9*, *13*, *15*, *18*, *22*,
*24*  50:*15*, *21*,
*22*  51:*4*, *11*,
*15*, *17*  52:*9*,
*22*  53:*1*, *7*, *12*,
*17*, *20*  54:*11*,
*13*  55:*8*, *9*, *12*,
*15*, *22*  56:*3*, *7*
60:*20*  70:*22*
71:*4*, *6*  72:*3*
106:*16*, *19*
111:*23*
122:*20*
123:*23*  129:*8*
131:*15*, *23*

132:*16*  133:*5*
136:*8*  139:*4*
144:*24*
145:*10*, *14*, *22*
146:*7*, *15*
147:*7*  148:*13*,
*16*  149:*17*
151:*17*, *19*
156:*20*  157:*2*
162:*14*
163:*11*  167:*8*
172:*2*  183:*22*
184:*2*, *4*, *6*, *13*,
*16*, *18*, *23*
186:*7*, *17*, *23*
187:*2*, *18*
188:*4*, *10*
197:*15*
204:*24*  212:*4*
213:*9*
**reported**
19:*15*  158:*1*
**Reporter**  1:*17*,
*18*, *19*  10:*11*
12:*16*  192:*6*,
*18*  193:*12*, *15*,
*21*  194:*3*, *22*
195:*2*  220:*13*
224:*4*, *5*, *24*
**REPORTER'S**
224:*1*
**reporting**
112:*3*  118:*2*
174:*17*
**Reports**  9:*3*
14:*9*, *23*  15:*2*
27:*8*, *23*
46:*24*  47:*1*, *4*,
*14*  124:*12*
127:*10*, *11*
129:*6*  170:*20*
**represent**
90:*15*  203:*18*
**representation**
70:*3*
**reputable**
166:*13*
**reputation**
69:*3*  84:*9*
87:*18*  93:*2*, *3*

**request**  17:*4*
18:*11*, *20*
25:*18*  35:*1*
37:*16*  39:*4*
41:*20*  42:*23*
60:*24*  222:*18*,
*22*
**requested**
33:*23*  34:*3*, *6*
**requests**  16:*9*
18:*3*  30:*11*,
*16*, *21*  38:*20*
**require**  211:*9*
**required**
159:*15*
**requires**  47:*23*
**Research**  8:*19*
41:*2*, *8*, *11*, *13*,
*16*, *19*, *21*, *22*
50:*9*  64:*16*,
*21*  65:*8*, *14*,
*23*  68:*17*
69:*7*  70:*2*
72:*2*  73:*14*
76:*23*  77:*14*,
*17*  78:*10*
105:*19*
114:*18*  168:*4*,
*13*  170:*16*
196:*19*
**researcher**
41:*18*
**resent**  98:*8*
**reservation**
196:*16*
**reserve**
194:*17*  202:*5*
216:*20*  218:*4*
**residency**
61:*15*  64:*10*
195:*17*
**resident**  61:*16*
**residual**
159:*18*
**resistant**
112:*22*  119:*20*
**resolution**
9:*11*  201:*9*
**resp**  28:*16*
**respect**  42:*2*
175:*12*

**respectfully**
28:*16*
**responding**
39:*4*
**response**  17:*4*,
*11*, *18*  94:*10*,
*16*  104:*9*
129:*19*
130:*12*
153:*12*, *14*
181:*17*
**Responses**
7:*14*  12:*24*
13:*6*
**responsible**
89:*7*
**responsive**
14:*2*, *7*  17:*19*
18:*2*, *10*
30:*11*, *16*, *20*
32:*4*  33:*18*
35:*1*, *5*  42:*22*
222:*9*, *20*
**rest**  105:*11*
122:*13*  162:*20*
**result**  123:*4*
153:*23*
176:*21*
179:*10*  181:*8*
186:*18*
**results**  27:*5*
122:*12*, *18*, *24*
123:*13*
131:*17*
133:*13*, *20*
134:*1*, *2*
**retained**
20:*10*, *13*
44:*18*, *20*, *24*
45:*3*  46:*16*, *18*
**review**  9:*4*
13:*22*  18:*21*
46:*23*  50:*9*
54:*6*, *15*  58:*7*
71:*1*  107:*4*
115:*16*
119:*15*  127:*5*,
*6*  133:*13*, *20*
136:*19*
137:*10*  145:*1*
150:*14*  171:*7*

183:*10*  189:*1*
195:*21*
**reviewed**  15:*4*
38:*12*  47:*1, 4,*
*6*  52:*12*  57:*3,*
*24*  58:*8*
106:*13, 19*
124:*12*
125:*21, 22, 23*
136:*7*  137:*19*
150:*12*
171:*14*
174:*14, 22*
188:*18, 20*
189:*6*  204:*10*
209:*12*
210:*14, 18, 24*
211:*12, 17*
216:*19*
**reviewer**
161:*21*
**reviewing**
14:*10*  56:*11*
160:*15*
161:*12, 15*
**revised**  48:*22,*
*24*
**right**  16:*7*
57:*18*  59:*8*
63:*18*  67:*11*
68:*14*  80:*21*
86:*17*  91:*1, 8*
116:*11*
130:*15, 20*
142:*21*  143:*5*
147:*14*  150:*6*
157:*21*
162:*20*
174:*16*
181:*10, 12*
193:*13*
197:*23*
202:*24*  203:*6*
209:*3*  216:*5*
220:*10*
**rights**  194:*18*
202:*6*  216:*20*
218:*4*
**RISE**  69:*24*
**risk**  9:*4*
86:*14*  107:*16,*

18  108:*2, 11,*
*16*  110:*5*
112:*21*
137:*22*
140:*21*  147:*2*
148:*23*  149:*1,*
*2, 8*  150:*4*
151:*11*
158:*12*
162:*19*  163:*3,*
*7*  164:*5, 7, 8,*
*14, 22, 24*
165:*1, 13, 14*
180:*9, 20, 22*
184:*15*
185:*12, 15, 19*
198:*14, 20*
200:*11, 17*
213:*18*  214:*8*
215:*18*
**risks**  34:*20*
159:*16*  162:*5*
**RITE**  4:*3*
**Road**  4:*11*
**ROBERT**  1:*7*
**Roger**  8:*10*
93:*6*
**role**  185:*23*
**room**  194:*2*
211:*8*
**ROONEY**
3:*11, 18*
**root**  170:*19*
171:*8*
**ROSA**  6:*2*
10:*2*
**Roseland**  2:*20*
**roughly**  23:*10*
163:*15*
**rounds**  161:*19*
**route**  143:*21*
**routine**  155:*8*
199:*9*
**RUBEN**  3:*10*
**ruben@honikla**
**w.com**  3:*11*
**Rule**  35:*6*
47:*16, 22*
51:*7*  177:*9,*
*11*  179:*14*
181:*5, 18, 23*

182:*10*
190:*17, 23*
**Ruler**  2:*4*
**rules**  21:*4*
209:*20*
210:*15, 24*
211:*13*
**ruling**  177:*14*
**run**  18:*22, 23*
73:*6*  215:*9, 10*
**running**  86:*14*
90:*20*  120:*14,*
*23*  121:*7*
222:*16*

< S >
**SA**  4:*9*
**safeguard**
175:*10*
**safeguarding**
174:*9*
**safety**  8:*15*
103:*23*  129:*6*
**salary**  79:*21,*
*22, 23*  80:*2, 7*
197:*9, 10*
**salesman**  83:*1*
**salt**  108:*9*
**sample**  113:*5*
**sampling**
113:*2*
**Sandoz**  76:*6,*
*8, 9, 11*
**SANGER**  2:*4*
**Sankyo**  105:*22*
**Sanofi**  77:*19*
**sat**  69:*8*  70:*7*
161:*18*
**save**  225:*12*
**saw**  89:*9*
98:*1*  126:*1*
153:*9*  162:*6*
178:*20*
**saying**  32:*21*
71:*6*  100:*19,*
*23*  105:*8*
122:*1*  149:*13*
161:*5, 21*
162:*17*
166:*21*  169:*9*
174:*7*  179:*8*

181:*11, 16*
185:*24*
194:*19*
206:*21, 23*
**says**  39:*6*
49:*24*  71:*22*
90:*16*  105:*18,*
*24*  106:*3*
129:*24*
135:*13*
159:*13*
164:*12*
176:*19*
177:*23*
179:*20*  213:*17*
**scan**  153:*14,*
*23*
**scanned**
127:*13*
**scans**  215:*12*
**schedule**
214:*22*
**scheduled**
92:*14*
**School**  61:*10,*
*13*  62:*14*
195:*20*  197:*5*
**SCIEGEN**
5:*20*
**science**  52:*13*
75:*4*  111:*3,*
*14*  118:*5*
**Scientific**  9:*3*
52:*14*  81:*13*
132:*2*  146:*21*
147:*13*  205:*6*
**scientists**
175:*16*
**scope**  35:*6*
47:*17*  51:*11*
166:*7*  168:*17*
170:*22*
171:*18*  173:*4,*
*17*  174:*24*
176:*2*
**screen**  13:*5, 7,*
*13*  20:*4, 6*
21:*8*  23:*21*
25:*13*  26:*21*
28:*12*  84:*11*

101:*20*
103:*18*  201:*20*
**screening**
215:*9, 11*
**script**  103:*9*
**scrolling**  16:*9*
**scrutiny**  54:*1*
**se**  148:*20*
149:*9*  153:*19*
**seamless**
178:*14*
**seamlessly**
182:*16*
**search**  15:*18*
18:*2*  27:*6, 13,*
*16, 19*  28:*3*
30:*20*  32:*3,*
*14, 18, 22*
33:*6, 14, 16*
119:*8, 16*
120:*20, 24*
121:*7*  124:*14*
**searched**
15:*10, 12, 19*
16:*5*  27:*4*
31:*20*  34:*7*
222:*19, 22*
**searches**  14:*7*
15:*20*  27:*9*
30:*10*  120:*14*
**searching**
14:*11*  30:*16*
33:*9*
**second**  16:*6*
18:*24*  24:*17*
50:*2*  92:*7*
96:*4*  131:*24*
197:*18*  211:*24*
**secondly**
92:*11*  94:*3*
168:*20*  172:*14*
**secretaries**
197:*4*
**section**  72:*2*
101:*22*
105:*14*
129:*23*
131:*23*
145:*15, 16, 17*
146:*16*  147:*7*
148:*12, 16*

Confidential Information - Subject to Protective Order

162:*14* 172:*1* 176:*18* 183:*22* 184:*1, 4, 13, 15, 18* 186:*8, 23* 187:2 197:*16* 206:*10* 213:8

**Sections** 184:*5, 6, 19, 24* 186:*4, 9*

**sediment** 152:8

**see** 13:*19, 21* 16:*10* 17:*1, 2, 8* 22:*12* 24:24 34:*22, 23* 36:9, *10, 24* 39:*1, 2* 41:5 50:*3, 4, 5, 12, 13* 52:*19, 20* 56:6 60:*15* 70:24 71:*3, 19, 20, 23* 73:24 74:4, *6, 9* 76:2, *3, 13* 84:*17, 19, 20, 24* 85:*3, 7, 20, 21* 88:7 90:*12, 13* 91:5, *14, 21, 24* 92:2, *5, 6, 12, 13* 93:6, *16, 19* 96:9, *10, 11, 14* 97:7 98:*12* 102:8, *17, 19* 103:*20* 105:*13, 15, 23* 106:*10* 117:*15* 118:*12, 13, 18* 119:*23* 130:4 132:6 143:*7, 18* 146:*18, 19* 147:*3, 4* 149:*1, 2, 3, 14, 15* 154:*12* 158:*5, 6* 172:7 174:*18* 176:*23* 178:6,

21 179:*1* 180:5 188:*15* 192:*17* 202:*11* 203:*11, 15* 208:*16* 220:23 221:2

**seeing** 139:*8* 153:*19* 161:6 163:*19*

**seen** 13:*24* 132:*19* 193:6 196:*10* 208:*24*

**sees** 174:*20*

**select** 207:*24*

**selected** 115:*10*

**self-evident** 51:*21*

**seminars** 34:*19* 35:*18*

**send** 195:*6*

**sending** 33:9 201:*3*

**sense** 43:*6* 124:*24* 154:*16*

**sent** 14:*8, 16, 20* 18:*20* 27:*21* 33:24 43:*3, 15* 124:*11* 125:*8, 9* 127:*6, 7* 129:*10, 11, 12* 187:3 202:*12, 13* 216:22 217:*13, 17* 219:*24*

**sentence** 150:2 158:*23* 159:*12* 160:5 176:*18* 177:*17* 197:*18* 198:7

**Sentry** 5:*11*

**separate** 108:*17*

**September** 1:*12, 16* 9:*13* 10:*3* 24:22 220:*20, 21* 221:*10* 223:8

**sequencing** 186:*15*

**Seretis** 9:5 156:*19* 157:*3*

**Serhan** 201:*11*

**seriously** 99:*5*

**serve** 69:*16*

**served** 12:*20* 13:*23* 16:8 36:7 38:*13* 40:22 48:*21, 24* 59:*7, 13* 69:*15* 85:*17* 88:*13* 222:*10*

**Service** 7:*17* 9:*11* 22:*15* 24:*18*

**SERVICES** 1:*21* 6:5 10:*3* 50:*5, 20* 79:*4* 221:*3, 4*

**serving** 81:*17*

**set** 21:22 36:7 58:*16* 118:2 120:22 121:*1* 167:*24* 168:*4, 6* 169:*8* 170:*1* 194:*10* 224:*13, 21*

**setting** 51:6 80:*1* 121:*21* 168:*12* 169:*3, 5, 6*

**settings** 111:*17* 112:*3*

**Settlement** 8:6 85:*8*

**shaking** 12:*15*

**Sham** 8:7 85:*5*

**shameful** 211:*22*

**shams** 86:*7*

**share** 13:*5, 7, 12* 84:*11* 101:*20* 201:*20* 203:*5, 7, 10*

**shared** 13:*20* 107:*18* 108:*2, 11, 16* 148:*23*

**sharing** 25:*13*

**SHEET** 225:*1, 14* 226:*1* 227:*1*

**sheets** 217:*24*

**shield** 121:*22*

**shields** 121:*23*

**Shiff** 219:*7*

**shoes** 161:*12* 203:*21, 22, 23*

**shooter** 82:*8*

**short** 82:*2*

**Shorthand** 1:*18* 224:*4*

**short-term** 180:*20, 22*

**show** 89:*20* 120:*20* 198:*14*

**showed** 122:*14*

**showing** 131:*17*

**shown** 27:*7, 8* 166:*12* 205:*10* 206:*5* 208:*18* 209:*13*

**sic** 85:*13* 131:*4, 16* 180:*20* 196:*18* 202:*18, 20, 21* 206:*5* 209:*11* 220:*8, 18*

**side** 125:*24* 126:2 160:*20* 161:*7, 8*

**sides** 46:*24* 156:*12* 218:*11*

**sign** 53:*19*

**signature** 60:*16*

**SIGNATURE:**

_____**DA**
**TE** 226:*23* 227:*23*

**signed** 48:*16* 49:*13, 15* 51:*4*

**shared** (cont.)

**significant** 123:*4*

**signify** 72:*5, 8*

**signing** 53:*18* 54:*5*

**similar** 11:*18* 158:*16* 163:*24* 214:*7*

**simple** 10:*23* 37:*1* 102:*11* 139:*5, 11* 141:*16*

**Simply** 31:*15* 57:24 58:*8* 84:6 122:*24* 138:*24* 140:7 145:*5* 206:*23* 208:*4*

**SIMPSON** 2:*16*

**simulation** 134:*11*

**simultaneously** 15:*21*

**sin** 121:*4*

**Singapore** 76:*23*

**single** 58:*1* 104:*15* 118:*2* 123:*15, 19* 183:2 202:*16*

**Sir** 21:*2*

**sit** 127:*7* 174:*18* 211:*7*

**site** 15:*11*

**sites** 44:*10* 123:*7, 8* 128:*20*

**site-specific** 116:*8*

**Sitting** 129:*1* 175:*13* 206:*21*

**situation** 75:*12*

**SIU** 63:*19*

**six** 27:*3* 58:*19* 62:*19* 149:*14* 177:2

**sizeable** 207:*3*

**skipped** 202:*20*

**SLACK** 2:4

Confidential Information - Subject to Protective Order

**SLATER**
2:*17, 21*
**slightly** 41:*20*
55:*19*
**sliver** 197:*8*
**slow** 111:*11*
**small** 159:*16*
197:*8*
**smart** 134:*9*
175:*6*
**smear** 92:*24*
**Smithkline**
77:*16*
**so-called** 88:*2*
**Society** 64:*3*
134:*20*
**SOLCO** 5:*4*
**solely** 24:*15*
105:*11*
**solid** 215:*21*
**Solvay** 105:*21*
**Somebody**
54:*24* 133:*6*
167:*23* 176:*9*
222:*4*
**soon** 18:*20*
183:*7*
**Sorry** 11:*23*
21:*4* 52:*2*
71:*8* 90:*6*
94:*19* 96:*4*
105:*4* 126:*5*
131:*5, 8*
158:*22*
190:*20*
191:*19*
199:*15* 202:*24*
**sort** 27:*3*
118:*4* 149:*11*
**sound** 211:*16*
**sounds** 31:*6*
34:*2* 79:*6*
144:*12* 179:*8*
**source** 126:*8*
129:*3* 195:*13,*
*22*
**sources** 31:*20*
57:*20* 65:*6*
116:*10, 13*
124:*16*

128:*22* 171:*1*
**South** 4:*5*
**Southern** 8:*3*
63:*20* 90:*9*
**space** 197:*2*
**spans** 114:*12*
**speak** 38:*3*
45:*24* 82:*11*
97:*21* 130:*6*
187:*11* 217:*20*
**Speaker** 8:*7*
65:*17, 20*
80:*8, 16* 81:*2,*
*5, 17* 82:*17*
83:*10* 85:*5,*
*15, 22* 86:*6,*
*13, 16* 87:*5,*
*11* 88:*2, 12*
89:*6* 97:*14*
98:*24* 99:*10*
100:*1* 105:*20*
205:*12*
**speakers** 8:*11*
65:*20* 66:*1, 2,*
*3, 8, 19* 67:*24*
68:*5, 9* 70:*14*
80:*18, 24*
81:*3* 82:*1*
86:*15* 87:*5,*
*10, 12* 91:*20*
92:*4, 21*
**speaking**
39:*23* 66:*16*
79:*3, 18* 80:*4,*
*6, 20, 22, 23*
81:*7* 87:*15*
88:*3* 93:*15,*
*22* 94:*4, 11*
95:*16* 200:*10,*
*12*
**speaks** 51:*17*
217:*2*
**special** 72:*15*
**specialist** 64:*1,*
*5* 181:*4*
**specialized**
179:*12*
**specific** 11:*20*
16:*7* 35:*19*
43:*6, 8* 60:*24*
107:*22* 138:*1,*

*3* 152:*11*
153:*4* 158:*19*
195:*23* 198:*8*
205:*1* 218:*3*
**Specifically**
14:*19* 28:*8*
60:*19* 89:*14*
94:*10* 107:*14,*
*24* 108:*15, 17*
109:*6, 17, 24*
110:*4* 117:*18*
149:*18* 160:*2,*
*4, 10* 178:*21*
210:*14, 18*
**specious**
165:*19*
**speculation**
66:*20* 151:*9*
159:*4* 211:*11,*
*15*
**spend** 190:*14*
**spending**
19:*21* 182:*8*
**spent** 19:*12*
21:*20, 21*
62:*7, 23* 69:*9*
88:*1*
**sphere** 170:*12*
**spirit** 211:*21*
**spoken** 46:*15,*
*17* 93:*1*
**sponsor** 66:*14*
67:*18*
**sponsored**
71:*18* 102:*7*
**spring** 60:*13*
**Springfield**
11:*3, 5* 63:*18*
**Squibb** 105:*21*
**stage** 8:*17*
**stand** 92:*23*
93:*2* 178:*24*
**standard**
151:*21*
**standing**
69:*10, 19, 20*
81:*4* 175:*5*
**STANOCH**
2:*11*
**start** 10:*23*
12:*23* 14:*6*

16:*11* 18:*4*
40:*15* 42:*5*
49:*17* 52:*8*
61:*7* 68:*20*
69:*1* 70:*23*
71:*10* 90:*19*
112:*13*
118:*19* 125:*4*
126:*3* 139:*8*
163:*19* 209:*8*
215:*4, 22*
217:*4*
**started** 22:*18*
49:*19, 21*
50:*15* 61:*24*
62:*4, 5, 6*
68:*4, 6, 8, 18*
115:*6* 156:*3*
**starting** 22:*19*
50:*22* 131:*24*
**starts** 70:*23*
73:*23* 106:*8*
146:*17*
**State** 5:*21*
35:*4* 52:*10*
62:*24* 63:*1, 5,*
*6, 15, 16*
108:*19* 185:*3*
196:*2* 200:*1,*
*4* 210:*19*
**stated** 49:*19*
107:*9* 127:*1*
128:*9* 138:*14*
142:*10*
**statement**
47:*24* 48:*7,*
*15* 82:*22*
99:*23* 103:*20*
104:*17* 106:*1*
140:*7, 18*
141:*20*
142:*22, 24*
158:*7, 18*
159:*4, 8, 9, 21*
167:*16*
174:*23*
177:*15*
178:*24* 179:*6*
185:*13* 213:*16*

**statements**
140:*13, 20, 21*
141:*3*
**STATES** 1:*1*
83:*22* 86:*6*
88:*24* 90:*10*
115:*9*
**statistical**
118:*10* 123:*3*
**status** 184:*21*
**steeped** 160:*22*
**steer** 206:*13*
**stellar** 93:*4*
**stenographic**
10:*9*
**stenographicall
y** 224:*12*
**STEPHEN**
4:*17* 18:*19*
73:*2*
**steps** 111:*9*
**stepwise** 43:*14*
**stereotype**
97:*19*
**Steve** 13:*6*
18:*19* 192:*7*
194:*6* 196:*1*
199:*13* 207:*6*
217:*3*
**STEVEN** 4:*13*
**stick** 167:*15*
**stickies** 20:*5*
21:*7* 23:*21,*
*24* 24:*4, 14*
28:*12*
**sticky** 20:*3*
221:*16, 17, 18,*
*21*
**Stojeba** 8:*10*
93:*7*
**stones** 153:*16*
**stop** 25:*13*
40:*12* 48:*9*
67:*23* 178:*19*
190:*3* 198:*9*
204:*7*
**stopped** 80:*20,*
*22* 95:*16*
**stories** 87:*1*
**straight** 82:*7*

Confidential Information - Subject to Protective Order

straightforward 30:24 37:10
straws 94:6
Street 2:9 3:4, 9, 14, 18 4:5, 16, 21 5:5, 21 11:3
strengths 160:18, 24 161:2 162:9
strenuously 97:24
strike 140:4, 12, 17 170:17 187:19 211:24
strikes 130:9
stronger 150:17
strongest 115:1 149:20 150:15
structure 145:15 186:7
structured 79:22
studied 108:9 161:4 185:8
studies 9:5 74:23 78:19 101:6 110:23, 24 114:24 115:3, 12 116:11, 14 118:22 119:10 120:14, 17, 18, 20, 21 121:3, 15, 24 122:4, 14, 17, 19 123:6, 12, 14, 16 127:1 141:9 143:6 145:16, 17 146:21, 22 148:7 159:16 160:7 163:13 167:10 185:14 200:12, 20, 24 208:17

study 8:18 41:3, 12, 14, 17, 19 71:17 73:24 74:15 75:6, 18, 19, 24 76:5, 7, 13, 17 78:7, 12, 21 102:7, 17, 24 103:4 104:10 110:21 112:14, 16 113:8 115:5 116:18, 22 122:1, 2, 10, 11, 15, 23 123:1, 19 147:24 185:6
stuff 124:24 125:9 138:2 175:13 178:18 216:2 217:13, 17, 23
stun 76:13
subclinical 114:19
subcontracting 75:21
subgroup 110:24
SUBJECT 1:9 8:11 92:3 145:9 199:10 205:7 206:18 210:3, 21
submitted 18:12, 14 19:5 24:20 71:1 75:10
subpoena 12:21 87:20, 22
SUBSCRIBED 225:20
subscribing 86:22
subsequently 61:11
substance 186:3

substances 163:24 167:19
substantial 180:23
substantive 53:12
substitute 178:13
sufficient 57:23
sufficiently 52:17
suggest 195:2
suggesting 181:2, 5 218:7
suggests 171:15
Suite 2:4, 14 3:9, 14, 18 4:11, 16 5:5
suited 114:3
summarizing 190:6
summer 22:20 60:13, 14
super 163:16 217:1
Supplemental 9:5 192:2 193:4 194:7, 13, 14 196:3 202:19 216:18 217:9, 12 219:24 220:19
supplied 58:6, 9 190:13
suppliers 173:11
supply 173:5 174:9
support 105:19 122:13 145:5 164:19 197:2, 9, 11
supported 102:18, 21 104:10, 18 105:11

suppose 116:10 222:23
supposed 55:13
sure 14:14 16:22 18:22 19:1 21:24 25:7 28:5 29:5 31:23 33:5 45:14 54:4, 6 55:3, 5 56:23 60:15 72:19 83:14 89:23 90:23 93:11 103:2 109:2 115:24 121:11 125:12 126:24 130:19 133:5 135:12 144:18 147:23 153:21 155:23 157:2, 8 173:2 174:22 177:6 183:13 184:12 194:21 196:3 203:9 220:14
surely 143:18
surprise 91:15
surprised 158:19, 24
surveillance 155:6, 17, 20 156:16 158:3 182:12 199:11 213:23 214:5, 12, 19 216:11
surveilled 199:20
surveilling 214:8
Survey 111:20
swear 10:11
swiftly 182:16

switch 216:15
switched 62:22
sworn 10:14, 18 224:7 225:20
symptom 155:8
sync 35:14
synthesis 184:2, 4, 18 185:17
synthesizes 184:24
synthesizing 114:23
system 115:9 155:7, 10, 11, 12, 14, 15 156:10, 12, 15 158:11, 15 205:2
systematic 9:4
systems 115:4

< T >
tables 38:21 39:10 40:4, 19 105:10
tabulate 21:13, 19
tabulated 222:13
tabulating 221:14
tabulation 222:16
tailored 60:24
take 12:16 27:10 37:23 38:7 43:13 50:14, 17 58:14, 15 71:17 73:21 100:15 111:9 113:6 116:24 118:11 122:10 130:17 138:11 154:13 155:10

158:*21*  159:2
162:*13*
179:*24*  180:*4,
19*  182:*9*
183:*9*  190:2
203:*4*
**taken**  67:5
133:*3*  161:*22*
169:*18*
175:*23*
224:*11*  225:*10*
**takes**  68:*24*
180:*11*
**talented**  134:9
169:*20*  175:7
**talk**  18:*1*
66:*10*  82:9
99:5  101:*3*
140:*23*  144:8
151:*17*  180:*4*
206:*1*
**talked**  45:*8,
12*  107:*16*
137:*15*
**talking**  16:*4,
19*  21:*20*
26:2  47:*23*
52:*24*  66:*11*
72:*20*  112:*17*
134:*22*
156:*24*
177:*24*  178:*1*
179:*21*  180:7
218:*16*  219:*10*
**task**  114:*20*
116:*15*
**teaching**  80:*1*
**team**  44:5
**techniques**
113:2, *17*
**teed**  190:5
**Tekturna**
74:*1*  75:*18*
**telephone**
50:*11*
**tell**  19:*1*  38:2
71:*11*  82:*15*
83:9  92:*22*
98:6  99:*22*
107:*4*  108:*22,
24*  129:2

130:*12*  141:*9*
142:*3*  153:*4,
19*  163:2
172:*15*
176:*13*
181:*17*
192:*19*
194:*11*  195:6
201:*12*  210:8
216:*23*
**telling**  37:7
151:*20*
**tells**  153:*4*
163:*3*  168:*21*
180:*1*
**tend**  113:*13*
155:*19*
**tens**  85:*15*
**termed**  81:2
**terminology**
136:*4*  172:*14*
173:6
**Terminus**  4:*11*
**terms**  15:*20*
115:*14*
119:*23*  120:2,
20*  214:*23*
**test**  131:*17*
133:*13*, 20*
134:*1, 2, 16*
**tested**  170:*12*
189:2, 7
**testified**  10:*18*
57:*4, 15*  59:6
189:6  211:*12*
221:*15, 18*
**testify**  221:*17*
224:7
**testifying**
11:*17, 19*
**testimony**
11:7  19:7
24:6, *12, 13*
27:*22*  31:*19*
33:*16*  38:*23*
45:7  47:*11*
67:*13*  68:*12*
95:*15, 17*
100:*4*  125:*23*
126:*4*  127:*3*
128:*21*

133:*12*
143:*22*
190:*15*
213:*13*  224:*11*
**testing**  134:*19*
188:*22*
189:*16*  190:7,
12*  191:*4*
208:*8*  215:*5,
13, 21*
**tests**  155:8
214:*22*  215:7,
24*
**TEVA**  4:7, *9*
44:*18, 24*
45:*3, 17, 23,
24*  46:*5, 10*
125:*21*
126:*11, 19*
127:*15, 18, 24*
187:*18*  188:*5,
9*  212:*5, 12*
**Texas**  2:5
**textbook**  44:*14*
**textbooks**
44:*9, 10*
**Thank**  11:6
30:8  38:*19*
40:*24*  41:*15*
42:*15*  58:*11*
60:5  103:*14*
104:*24*
105:*12*
106:*24*  110:*8,
15*  130:*14, 20*
131:8  139:*10*
147:*21*
157:*16*  187:*8,
9*  192:*21*
203:*3*  207:*18*
209:*3*  211:*23*
222:*24*  223:*1,
3*
**Thanks**
191:*22*  223:2
**theoretical**
164:*17*
**theoretically**
189:*15*
**Therapeutic**
8:*19*

**Therapeutics**
9:*10*  201:8
209:*10*  210:*17*
**therapies**
178:*4, 16*
180:*16*
**therapy**  8:*16*
103:*5, 21*
104:*16*
118:*23*
119:*22*
182:*17*  216:*12*
**thereto**  38:*14*
41:*4*
**thing**  21:7
33:*11*  93:*12*
105:*1*  112:*16*
127:*9*  203:8
207:8
**things**  15:9
26:*14, 20*
28:*13*  30:*23*
43:6  46:9
57:2, *3*  61:5
65:*18, 22*
66:*14*  78:*23*
80:6  83:*4*
108:*10*
109:*20*  111:6
126:*1*  137:*16*
140:*20*  144:6
148:*20*
150:*19*
152:*15*
153:*17*  162:5
165:*22*
170:*11*  182:8
199:5  215:*15,
20*
**think**  15:8
20:*21*  21:*18*
33:*20*  54:*24*
57:3  58:*12*
66:*22*  75:*19*
79:*14*  82:*20*
97:*17*  122:5
124:*21*
128:*20*
130:*12*
132:*11*
134:*12*  141:9

147:*10*
150:*17*
160:*13*  161:8
163:5, *10, 11*
164:*4, 7, 21,
24*  165:*11*
171:*20*
182:*14*  189:*5,
10*  194:*15*
204:9  207:*13*
213:*3*  218:*12*
220:9  223:2
**thinking**  168:*4*
**Third**  157:*24*
189:*23*
**Thirteen**
202:*23*

**THORNBURG**
4:*3*
**thorough**  54:6
145:*1*
**thought**  28:8
54:*23*  55:6
**thousand**
113:*4*
**thousands**
79:*14*  85:*15*
177:*13*
185:*19*  191:*1*
**Three**  4:*20*
23:9  33:*20*
62:*23*  69:9
92:*20*  152:*10*
161:*19*
209:*24*  211:*4*
**three-page**
96:*12*
**threshold**
168:*11*
**threw**  222:*3*
**tilted**  175:8
**time**  10:*4*
19:*10, 12, 15,
19, 20, 21*
21:*19, 20*
28:*20*  29:*3*
48:*8*  53:*19,
20*  55:9
58:*21*  59:*1*
60:*10*  62:*22*

Confidential Information Subject to Protective Order

63:*10*  66:6
67:6  69:2
70:*8, 16*
71:*14, 15*
76:*18*  80:*17*
81:*10, 12, 14*
82:2  83:2, *3,*
*18*  85:*23*
87:*16*  95:*16*
96:*16*  115:6
116:5  130:*23*
131:*3*  141:*18*
172:*20*  182:8
183:*14*
190:*14*
200:*15*
211:*24*  212:2,
*13*  223:*4*
224:*12*
**timeframe**
60:*17*  86:*17*
87:*13*  100:*17*
219:*10*
**times**  11:*10*
29:*2*  33:*20*
53:21  70:*17*
72:*13*  122:*24*
123:2  128:9
135:*19*  149:7
156:*20*
160:*16*
163:*18*  172:6
182:*15*  216:*15*
**title**  117:*12*
**titled**  8:5, *15,*
*20*  9:*3*  74:*1*
85:6  148:*13*
**today**  10:8, *22*
11:*18*  45:7
47:*11*  63:*17*
129:*1*  169:*17*
208:*18*  209:*1,*
*13*  211:*24*
212:2, *14, 17*
220:*1*  221:*10*
**Today's**  10:*3*
**told**  23:*20*
27:2  173:*20*
216:*17*  222:*13*
**tolerance**

169:*4, 5, 9*
**tools**  78:*17*
**top**  83:6
87:*12*  128:*19*
133:*18*
134:*10*
148:*22*  167:*1*
197:*10*
**topic**  35:*23*
**topics**  175:*23*
**top-shelf**  88:*4,*
*13*
**total**  62:*19*
79:8  197:*12*
**totally**  202:8
**touch**  183:*22*
**touched**  43:*22*
**touching**  207:*8*
**tough**  150:*19*
**toxicology**
64:*13, 15*
**trace**  132:*3, 9,*
*22*  134:*24*
135:*4, 16, 17,*
*22*  136:*3, 24*
137:7  145:6
146:*24*
**track**  19:*10*
68:*23*
**tracked**  15:6
**tract**  153:*18*
**Trade**  3:*18*
**trail**  154:*11*
**training**  64:*11*
78:*16*  181:*20*
195:*17, 19*
**transcript**
12:*12*  224:*11*
225:*10*
**Transcripts**
125:*16, 21*
126:6  127:*23*
**transition**
178:7, *13*
179:2  182:*16*
**transitioned**
182:6  183:7
**transitioning**
180:*15*
**translate**
130:7

**transparency**
206:*14*  207:*1*
210:*20*  211:*21*
**TRAURIG**
4:*9, 13*  45:*18*
46:*10*
**treat**  216:6
**treated**  158:2
**treating**  79:*19,*
*23, 24*  151:*13,*
*14, 22*  213:*21*
**treatment**
8:*20*  113:*11*
117:*13*  119:5,
*10*  179:*12*
**treatments**
113:*13, 23*
**tree**  84:7
132:*15*  215:*3*
**tremendous**
175:*12*
**trial**  38:*23*
111:*10*  112:2
117:*24*  118:2
**trialist**  110:*22*
**trials**  8:*22*
70:*3*  110:*24*
117:*14, 22*
118:*1*  119:5,
*17*  120:*19*
122:*20*
**tried**  126:*24*
**trouble**  67:*11*
**Troy**  97:*1, 3*
**true**  105:*10*
135:6  159:*11*
160:6  167:*3*
190:*1*  198:*15*
216:*21*  225:*12*
**trust**  134:*4, 6,*
*14, 17, 19*
141:*3*  143:*8*
175:*17*
**trusted**  141:2
**truth**  224:*8, 9*
**try**  27:*20*
75:5  78:*24*
111:9  114:*4*
116:*3*  117:*23*
153:*11*  172:*10*

**trying**  38:2
56:*24*  58:*11*
92:*21*  95:*10*
99:*7, 17, 18,*
*21*  112:*3*
114:*22*
115:*13*
118:*19*  139:2,
*20, 23*  144:*10*
145:*14*
177:*16*  179:5,
*23*  181:9
184:*3*  185:*4*
206:*13*  211:2,
*22*
**Tuesday**  223:7
**tumor**  154:*14*
**tumors**
141:*11*
143:*16*  154:*1,*
*2*
**turn**  131:22
145:9  148:*12*
149:*17*
**turned**  199:*13*
**Turning**
106:5  144:*23*
**twice**  23:*19*
53:*18, 21*  54:*3*
**twisting**  213:*4*
**two**  15:9
18:*12, 14*
19:5  25:*24*
29:6, *7, 16*
30:*1*  32:2, *11*
62:7  66:*9, 23*
69:*24*  82:*24*
91:*19*  92:*18*
96:*12*  107:*20*
111:*14*
114:*15*  152:7
161:*19*  165:2,
*8*  178:*11*
183:*14*
184:*19, 24*
189:*19*
**two-day**  99:*24*
**type**  14:6
123:*10*  200:*19*
**types**  110:*23*
132:*4*

**typically**
26:*12*  66:*11*
68:*17, 22*
69:*18*  70:*18*
81:*11*  113:8
120:*15, 22*
151:*21*
194:*24*  197:*8*

**< U >**
**U.S**  5:*3*  8:*3,*
*5*  84:*21*
**uh**  100:*20*
**Uh-huh**  22:*23*
**ultrasound**
153:*23*  154:*13*
**Um-hums**
12:*14*
**Un**  122:*8*
**unable**  171:*16*
**unacceptable**
182:5
**unambiguous**
135:*17*
**unanswerable**
55:*1*
**unavoidable**
166:5
**unbiased**
113:*19*
**uncertainty**
146:*12*
**unconfounded**
143:*18*  185:*14*
**uncontrolled**
213:*22*  214:*7,*
*11, 19*  215:*12*
216:*6, 9, 16*
**uncover**  146:*3*
**underhanded**
104:*18*
**understand**
16:*4*  17:*3, 17*
18:*6*  19:*22,*
*23*  31:*14, 22*
34:*8*  39:*3*
55:*21*  56:*24*
57:*5, 13*
72:*19*  75:5, *6*
78:*18*  112:*11,*
*17*  118:*20*

121:*14*
134:*20*
140:*16, 22*
162:*11*
163:22  184:*3*
187:*17*  194:*1,*
*21*  196:*15, 16*
202:*8*

**understandable**
67:7
**understanding**
33:*1*  35:7
39:*5*  42:8, *24*
43:*1*  44:*17*
45:*1, 2*  47:*12*
58:*12*  66:*17*
76:7  83:*20*
94:*17*  124:*21*
145:*14*  155:*4*
176:*6*  188:*2,*
*4, 9*  204:*14*
218:*14*  225:*15*
**Understood**
23:*6*  71:*16*
75:*16*  122:8
151:*6*  212:*19,*
*21*
**undertake**
113:*17*
**unethical**
83:*18*  84:*6*
**unexpected**
172:*5, 12, 14,*
*21*  173:*6, 14,*
*21*  174:*2, 10,*
*15, 17, 20, 21*
**unexplained**
150:7
**unexposed**
185:*8*
**unfunded**
71:*1*  75:*10*
**unique**  75:*12*
160:*8*
**UNITED**  1:*1*
83:22  86:*5*
88:*24*  90:*10*
115:*9*
**University**
11:*3*  61:*11,*

*13, 17*  62:*1, 7,*
*10, 20*  68:7
76:19
**unlawful**
83:*21*
**Unlawfully**  8:*8*
**unmedicated**
149:*3*  162:*24*
**unnecessarily**
163:7  164:*5,*
*8*  165:*14*
**unreasonable**
93:*13*  146:*8,*
*11*
**untreated**
158:*4*
**updated**
48:22, *24*
60:*10*
**updating**  61:*4*
**upload**  194:*4*
195:*3*
**ureters**  153:*1*
**urethra**  153:*2,*
*14*
**urinalysis**
151:*15, 18*
152:*4, 5, 16*
154:*10*
**urinary**
153:*18*
**urine**  152:*8,*
*13, 21, 24*
153:*3, 9*
154:*13, 20, 22,*
*24*
**USA**  5:*9*
**use**  15:*21*
61:*3*  99:*2*
104:*4, 15*
112:*24*
120:*21*  128:*9*
133:7  135:*4,*
*16*  136:*23*
139:*20*  145:*2*
172:*5*  174:*3*
**usual**  151:*10,*
*17*
**usually**  148:*3*
**utilized**  95:*19*

189:*4*

< V >
**vague**  185:*1*
**val**  103:*5*
**Valcar**  179:*20*
**VALSARTAN**
1:*4*  10:6
14:*12*  15:*10,*
*13, 17, 18, 19,*
*23*  27:*5, 13*
103:*5, 21*
104:*5*  105:*6*
115:2  124:*14*
131:*18*  132:*3,*
*14, 22*  133:*14*
139:*6*  140:*2*
143:*21*  145:*2,*
*7, 17*  146:*24*
147:*1*  163:*12,*
*15*  164:*13*
167:*11, 19*
168:*15*
171:*17*  172:*2*
173:*13*
176:*22*
177:*23*  178:*8*
179:*14, 20*
180:*13, 14*
181:*8*  182:*21*
183:*3, 4*
184:*17*  185:*8,*
*11*  188:*16*
190:*16*  200:*7,*
*14, 19, 21, 22*
208:*20*  225:*4*
**valuable**  70:*8*
81:*10*
**value**  83:*17*
162:*15*
**vantage**
174:*18, 19*
**variables**
206:*17*
**varied**  65:*7*
**variety**  57:*19*
67:*15*  113:*17*
133:7  140:*20*
199:*4*
**various**  65:*22*
68:*13*  79:*6*

109:*20*
113:23  116:*10*
**vary**  210:*1*
**vast**  197:*1*
**VAUGHN**
2:*17*
**VDATH**  95:7
**Velazquez**
92:*8, 9, 10*
**verbal**  12:*13*
**verbatim**
221:*3*  224:*11*
**versed**  110:*23*
**versus**  90:*10*
113:*15*  129:*3*
216:6
**VICINAGE**
1:*2*
**VIDEOGRAP**
**HER**  6:*2*
10:*1, 2*  58:*21*
59:*1*  130:*23*
131:*3, 7, 10*
183:*14, 18*
223:*4*

**VIDEOTAPED**
1:*11, 14*  7:*15*
**view**  28:*21*
29:*14*
**VII**  172:*1*
176:*18*  186:*9*
**VIII**  131:*23*
146:*16*  147:*7*
184:*5, 15*
186:*5, 9*
**violates**  211:*21*
**violation**
140:*12*
**virtually**
185:*9*  200:*24*
**Vitae**  7:*19*
**Vitamin**  74:*1*

< W >
**waiting**  143:*17*
**waiving**  130:2
**Wake**  62:*23*
**walk**  61:*6, 8*
112:*12, 14*

118:*19*
**WALSH**  4:*20*
**want**  14:*14*
29:*2*  58:*15*
73:*2*  82:*13*
91:*21*  99:22
100:*17, 20*
108:*19, 22, 24*
117:*23*
121:*14*
124:*23*
125:*10*
130:*21*
135:*10*
140:*16*
142:*15*
178:22
191:*24*  192:*2,*
*10*  193:*8, 21*
194:*23*
203:*23*  207:*3*
**wanted**  99:*24*
183:*21*
**warned**  173:*11*
**Washington**
3:*14*  4:*16*
**waste**  29:*2*
**wasteful**
215:*14, 15*
**wasting**  28:*20*
182:7
**water**  165:*20*
168:*8*  169:*24*
170:*6, 11, 12,*
*14*
**Way**  2:*4*
15:*6*  27:*10*
40:*5, 20*
45:*15*  47:*11,*
*14*  55:*19*
56:*19*  67:7
79:*21*  89:*12*
100:*14*  109:*3*
117:*1*  118:*1*
120:*16*
123:*16*  133:*8,*
*10*  162:*8*
169:*8*  175:*9*
182:*9*  186:*13*
190:*4*  203:*19*

Confidential Information - Subject to Protective Order

204:*21* 214:*8* 218:*8* 221:*14*
**Wayne** 62:*24* 63:*1, 4, 6, 15, 16*
**ways** 26:*18* 27:*3* 132:*14* 133:*7* 166:*14, 17*
**weak** 159:*17*
**weakly** 123:*8*
**weaknesses** 160:*18* 161:*1* 162:*9, 10*
**website** 84:*20, 22*
**websites** 84:*4*
**wedded** 26:*18*
**Wednesday** 8:*4*
**weeks** 23:*9* 24:*21* 69:*24*
**weighing** 180:*20*
**weight** 113:*5* 139:*4* 140:*1* 160:*20* 167:*6*
**Well** 14:*8, 11* 19:*18* 20:*13* 22:*4, 24* 27:*18, 20* 28:*7, 16* 29:*13* 30:*22* 38:*7* 39:*5* 40:*1* 42:*5* 43:*13* 45:*14* 49:*19* 53:*12* 54:*4* 55:*3, 18* 57:*10* 63:*8* 65:*10, 15* 68:*21* 72:*8, 21* 73:*21* 75:*11* 76:*12* 79:*21* 93:*5* 94:*2, 22* 95:*21* 98:*8, 11, 19, 23* 99:*6* 100:*20* 106:*11, 15* 107:*6* 108:*5* 109:*2* 110:*22,*

23 115:*8, 11* 116:*24* 119:*9* 121:*11* 122:*1* 126:*3* 129:*10* 130:*8* 132:*18* 133:*24* 134:*22* 139:*1, 10, 18* 140:*23* 141:*1* 142:*2* 144:*9* 147:*18, 20* 150:*11* 153:*13* 154:*22, 23* 155:*4* 159:*5* 161:*11* 164:*4* 166:*9* 167:*14* 168:*19* 169:*8, 16* 172:*13* 173:*1, 7* 174:*21* 177:*14, 18, 21* 185:*22* 186:*3, 13* 188:*3* 189:*10, 17, 18* 191:*11* 195:*16* 200:*4, 20* 203:*17, 19* 206:*1* 212:*1, 17* 217:*3* 218:*2* 219:*5, 8, 11*
**went** 19:*10* 24:*7* 61:*10, 11* 70:*3, 13* 75:*20* 92:*19* 130:*17* 147:*6* 178:*1* 191:*11*
**we're** 134:*22* 193:*23*
**WERNER** 5:*9*
**West** 3:*18*
**we've** 33:*20* 58:*13* 90:*11* 114:*1, 16* 166:*11*
**whatsoever** 78:*14* 170:*16*
**WHEREOF** 224:*21*
**WHITELEY**

2:*6*
**Whoops** 90:*6*
**wife's** 73:*6*
**wiggle** 211:*8*
**wild** 86:*24*
**wildly** 86:*21* 87:*3*
**WILLIAMSON** 3:*6*
**willing** 83:*10* 91:*22*
**WITNESS** 7:*3* 10:*12, 13, 17* 11:*14, 18, 19* 12:*21* 14:*9, 23* 15:*1, 2* 16:*18* 17:*7, 21* 19:*14* 20:*20* 21:*17* 23:*2, 18* 24:*2, 11* 25:*5* 27:*8* 28:*24* 29:*9, 18* 30:*4* 31:*10* 32:*7, 16, 24* 33:*8, 21* 34:*12* 35:*13* 36:*1, 20* 37:*6, 17* 38:*16* 39:*14* 44:*23* 45:*10, 21* 46:*7* 47:*14* 48:*1, 6* 51:*9, 19* 53:*14* 54:*9* 56:*10* 57:*10* 58:*5* 59:*7, 14, 19* 64:*20* 65:*4* 66:*21* 67:*14* 73:*5, 16* 77:*2, 7, 13, 21* 78:*2* 79:*11* 81:*9, 19* 82:*5, 19* 83:*13* 84:*1* 86:*2, 11* 87:*7* 88:*12, 16* 89:*19* 93:*18* 94:*1, 15, 19* 97:*10* 99:*15* 101:*9* 104:*7* 108:*4, 21*

109:*8* 110:*3* 115:*20* 116:*20* 121:*10* 126:*15, 23* 128:*5* 133:*2, 16* 135:*3* 136:*1, 10, 16* 137:*3, 14, 24* 138:*10, 18* 139:*17* 140:*15* 141:*8* 142:*1, 14* 143:*3* 144:*2* 146:*1* 147:*9* 148:*2* 149:*24* 151:*24* 155:*22* 157:*15* 163:*9* 164:*10* 165:*6, 17* 166:*8, 23* 167:*22* 168:*18* 169:*15* 170:*9, 23* 171:*19* 172:*24* 173:*18* 174:*6* 175:*2* 176:*3, 20* 177:*5, 16, 20* 179:*10, 18* 181:*15* 182:*3* 183:*6* 184:*8* 185:*2* 186:*12* 187:*8, 9* 188:*7* 189:*12* 190:*21* 191:*10, 20* 198:*12* 199:*16* 204:*9, 13* 205:*18, 20* 208:*23* 209:*23* 212:*16* 213:*2, 15* 214:*15* 217:*11, 13, 17, 22* 219:*4, 17* 222:*12* 224:*6, 7, 21*
**witnessed** 88:*17*

**witnesses** 175:*22*
**women** 154:*23*
**word** 93:*14* 132:*8, 9, 19* 133:*4* 134:*24* 135:*4, 16* 136:*24* 138:*11* 158:*21* 159:*2* 172:*5* 174:*4*
**wording** 53:*11*
**words** 111:*2* 116:*1* 133:*6*
**work** 10:*24* 11:*2* 23:*10* 24:*8* 25:*20* 45:*16* 49:*21* 55:*11* 60:*22* 65:*17* 66:*15* 68:*13, 19* 72:*11* 77:*22* 78:*3, 17* 79:*8* 106:*14* 107:*9, 10, 15* 108:*10, 18* 110:*6, 13, 21* 112:*18* 113:*16* 114:*1* 144:*20* 177:*9* 181:*5* 197:*5* 218:*24* 219:*8* 220:*20* 221:*1*
**worked** 23:*3* 53:*21* 79:*2* 100:*12* 134:*7* 175:*4, 14*
**working** 22:*18, 19* 49:*20* 62:*6* 114:*1* 205:*5*
**works** 175:*15*
**workup** 151:*18* 154:*18*
**world** 112:*20* 144:*13* 162:*20* 169:*23* 211:*7*
**worry** 26:*21*
**worth** 24:*8*
**worthy** 219:*2*

Confidential Information - Subject to Protective Order

**wrap**  183:*21* 223:2

**write**  53:*9, 10, 20*  54:2, *10, 11, 12*  56:22 130:*10, 13* 131:*24* 160:*17*  205:6 218:6

**writes**  56:*17* 67:*1*  91:*14* 93:*10*

**writing**  49:*17* 50:*15, 21, 22* 51:*10*  56:12 94:9  162:*12* 204:*3*  206:*19* 210:22

**written**  19:*11, 20, 24*  20:*1* 23:*14*  25:*19* 26:*10*  43:9 46:*12, 19* 55:*12*  101:*1, 4, 5, 10*  110:4 125:*13*  187:2 204:5  211:*4*

**wrong**  84:7 132:*15* 156:19  215:3

**wrote**  21:*12* 23:*13*  48:*8, 11*  53:7  55:9 91:*24*  107:6 117:*18*  206:7 210:*4*  219:6

**< Y >**

**Yeah**  13:*8* 19:*23*  41:6 50:7  58:*17* 65:*21*  66:22 69:6  76:5, *21* 77:*8, 22* 80:*10*  84:23 88:8  93:*19* 94:*13*  107:8 111:*16*  118:6 123:*23* 131:*11*  177:6

201:*15*  208:*3* 220:*11*

**year**  50:*23* 67:*23*  68:4 79:*17*

**years**  62:7, *12, 16, 19, 23* 63:2  65:2 69:*9, 10* 73:*14*  80:*10, 19*  112:*23* 114:*13* 163:*16*  177:*3* 196:*20*

**yeoman's** 144:*20*

**Yep**  85:2 91:7  96:*15* 117:*19* 118:*17*  157:5

**yes-or-no** 139:*19*  140:*8* 141:*16, 19* 142:*4, 9, 20*

**yesterday** 26:*1*  217:*14, 18*

**York**  8:*4* 90:9

**young**  70:*18*

**< Z >**

**Zajicek**  1:*17* 224:*3, 24*

**zero**  167:*18* 168:7, *8* 169:*4, 5, 9, 10, 24*  178:*12* 180:*14*

**ZHEJIANG** 5:*3*

**zoom**  103:*10*

**Errata Sheet**

**September 28, 2021**
**Deposition Transcript – John M. Flack, MD, MPH, FAHA, MACP, FASH**
**In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation**

| Pages, Lines | Change: | Reason |
|---|---|---|
| Page 11, Line 2 | "work address is ~~7~~ **Southern** Illinois" | Transcription error |
| Page 33, Line 1 | "My understanding of your question is **that you** did" | Clarification |
| Page 33, Line 2 | "~~you~~ get all of the information" | Clarification |
| Page 53, Line 20 | "By the time I write a report I **have** read it and" | Clarification |
| Page 53, Line 23 | "that, but there ~~as~~ **have** been many" | Clarification |
| Page 54, Line 2 | "just ~~a~~ **that** I write" | Transcription error |
| Page 61, Line 18 | "where I did, ~~again~~ **an**, National Institutes" | Transcription error |
| Page 61, Line 19 | "postdoctoral fellowship~~,~~ **in** cardiovascular" | Clarification |
| Page 65, Line 5 | "perspective, I ~~had~~ **have** received" | Transcription error |
| Page 66, Line 23 | "the FDA cracked down ~~the~~ **on them**-- also," | Clarification |
| Page 67, Line 1 | "~~and~~ **in** who writes what prescriptions" | Transcription error |
| Page 67, Line 18 | "and give ~~promotion~~ **promotional talks**" | Clarification |
| Page 74, Line 18 | "get **but** about $25,000 in that. So" | Clarification |
| Page 75, Line 5 | "drug better. That's ~~where~~ **what**" | Clarification |
| Page 75, Line 6 | "our study was, ~~is~~ a study to" | Clarification |
| Page 86, Line 22 | "there to ~~employ~~ **promote** subscribing" | Clarification |
| Page 104, Line 12 | "~~or~~ in combination" | Transcription error |
| Page 105, Line 10 | "not true. ~~This is basically~~ **G**o back" | Clarification |

| Page 108, Line 7 | "~~diabetes mellitus, which is common~~ **diabetes mellitus - which is common**" | Clarification |
|---|---|---|
| Page 108, Line 8 | "~~physical activity, certain intakes of~~ **physical activity - certain intakes with**" | Clarification |
| Page 112, Line 23 | "cycles of NHANES **data**, that's" | Clarification |
| Page 113, Line 5 | "bias by ~~the weight of the sample~~ **how they weight their sampling**" | Clarification |
| Page 113, Line 6 | "~~and~~ so you" | Clarification |
| Page 127, Line 7 | "dive ~~to~~ **too** in depth" | Transcription error |
| Page 129, Line 11 | "~~that's~~ **there's** a difference" | Transcription error |
| Page 132, Line 12 | "is ~~fairly~~ pretty good" | Transcription error |
| Page 144, Line 9 | "Well, **you can't say** it is biologically plausible, therefore **it causes cancer in humans**, which" | Clarification |
| Page 152, Line 24 | "It could ~~be~~ **originate**" | Clarification |
| Page 153, Line 1 | "the ~~ureters~~ **uterus** to" | Transcription error |
| Page 160, Line 17 | "you basically ~~ex-train~~" | Transcription error |
| Page 167, Line 12 | "cancer is ~~firstly~~ **virtually** nonexistent." | Transcription error |
| Page 178, Line 12 | "There is zero problem with **finding a**" | Clarification |
| Page 180, Line 9 | "risk **and** caused cancer" | Transcription error |
| Page 185, Line 17 | "plausible **hypothesis** -- a synthesis" | Clarification |
| Page 185, Line 18 | "no **confirmatory** data in humans ~~that are — expands into the despite studying~~" | Clarification |
| Page 185, Line 22 | "well below what ~~is~~" | Clarification |
| Page 189, Line 21 | "the ~~10 milligram~~ -- the 160-**milligram pill** has probably 10 micrograms" | Clarification |
| Page 190, Line 2 | "medicine ~~and~~ **because**" | Clarification |
| Page 198, Line 4 | "~~is a little more~~ **normal** on" | Transcription error |
| Page 205, Line 21 | "~~general~~ **journal** editor." | Transcription error |
| Page 210, Line 10 | "Christine ~~Lang~~ **Laine** would" | Transcription error |

| Page 210, Line 8 | "the Journal of The Annals of" | Clarification |
| Page 210, Line 9 | "Internal Medicine **Journal** does" | Clarification |
| Page 214, Line 9 | "are for both cardiovascular" | Transcription error |
| Page 219, Line 7 | "Ernesto Shiff **Schiffrin**, one" | Transcription error |

_____

John M. Flack, MD, MPH, FAHA, MACP, FASH

_____, Notary Public.

This, the 2nd day of November, 2021.

My Commission Expires:_____

Kimberly Harris
NOTARY PUBLIC
Forsyth County, GEORGIA
My Commission Expires February 6, 2024

3