# Exhibit 23

Protected Information - Steven M. Lagana, M.D.

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF NEW JERSEY
 3
 4                       - - -
 5
   IN RE:  BENICAR            :   MDL NO. 2606
 6 (OLMESARTAN) PRODUCTS      :
   LIABILITY LITIGATION       :
 7                            :
 8
 9
                           - - -
10
                    February 7, 2017
11
                           - - -
12
                   PROTECTED INFORMATION
13
                           - - -
14
               Oral expert deposition of
15   STEPHEN M. LAGANA, M.D., taken pursuant
     to notice, was held at the law offices of
16   Robins Kaplan LLP, 601 Lexington Avenue,
     Suite 3400, New York, New York, beginning
17   at 10:09 a.m., on the above date, before
     Kimberly A. Cahill, a Federally Approved
18   Registered Merit Reporter and Notary
     Public.
19
20
                           - - -
21
22            GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph | 917.591.5672 fax
23               deps@golkow.com
24
```

Protected Information - Steven M. Lagana, M.D.

Page 354

1  A. Yep.
2  Q. What does that mean, 4.82?
3  A. It means that if we take the
4  other ARB users to be the controls, if we
5  said 1 out of -- these are made-up
6  numbers and totally inaccurate, but if we
7  said 1 out of a hundred patients taking
8  an ARB other than olmesartan were
9  hospitalized with a discharge diagnosis
10 of celiac disease, 4.82 olmesartan users
11 would be hospitalized with a discharge
12 diagnosis of celiac disease.
13 Q. A fourfold increase
14 according to these data?
15 A. Almost five.
16 Q. Almost five.
17    Doctor, in terms of the
18 number of files examined, how does this
19 study compare with the Mini-Sentinel?
20 A. The number of patient years
21 examined, you're asking?
22 Q. Patient years or files out
23 of which the analysis in the
24 Mini-Sentinel was done -- let me back up.

Page 355

1  Do you know how the Mini-Sentinel was
2  done?
3  A. I wouldn't say I know
4  exactly how it's done, no.
5  Q. So you can't compare the
6  size of the database that the FDA was
7  looking at to arrive at their conclusions
8  compared to what the French folks were
9  looking at.
10 A. I was not going to make that
11 comparison, no.
12 Q. Okay.
13    Isn't the result obtained
14 for celiac disease by the French people
15 looking at their French data for
16 olmesartan compared to other ARBs
17 inconsistent with the FDA's analysis in
18 the Mini-Sentinel on celiac disease?
19    MR. SLATER: Objection;
20    foundation.
21    (Pause.)
22    THE WITNESS: I don't see
23    the Mini-Sentinel here. I don't
24    know.

Page 356

1     MR. PARKER: Okay. Fair
2     enough.
3  BY MR. PARKER:
4  Q. Doctor, I want to change
5  subjects in the time I have left and move
6  around a little bit.
7  A. Sure.
8  Q. Do you have an understanding
9  of what is meant by the Bradford Hill
10 criteria?
11 A. I do.
12 Q. Those criteria are not
13 addressed, not mentioned, in your report;
14 correct?
15 A. Not specifically, no.
16 Q. Have you ever published a
17 paper of any type in which you used the
18 Bradford Hill criteria to arrive at a
19 conclusion of whether cause and effect
20 relationship existed between a drug and
21 an outcome?
22 A. I think that the Bradford
23 Hill criteria is something that we learn
24 about in medicine and think about when

Page 357

1  we're evaluating those questions, but
2  I've never -- I've never, you know,
3  specifically written a paper in which I
4  looked at each point and made a response.
5  Q. I take it from your last
6  answer that in the period of time that
7  you were writing your general causation
8  report, you were aware of and understood
9  the Bradford Hill factors criteria.
10 A. I was familiar with the
11 criteria.
12 Q. And what is their use in
13 medical science?
14 A. They are a set of questions
15 which are used to address cause and
16 effect.
17 Q. Can you explain for me why
18 that methodology was not used in your
19 report?
20 A. I think it influences my
21 thinking, those points influence my
22 thinking. I didn't explicitly go through
23 them because -- I don't know. Just did
24 not do that.

Protected Information - Steven M. Lagana, M.D.

Page 402

1 causation, if that was the only thing
2 that changed.
3     Q.  You were asked by counsel a
4 few minutes ago about a hypothetical
5 where he said a patient is assumed to
6 have taken olmesartan for two years and
7 then after two years develops diarrhea
8 that lasts for two days and, after those
9 two days are up, the person stops taking
10 olmesartan for whatever reason.
11     First question on that
12 person, would the differential diagnosis
13 -- if you were looking back
14 retrospectively to try to figure out what
15 had caused the diarrhea, would the
16 differential include olmesartan
17 enteropathy?  Yes or no.
18     A.  Yes.
19     Q.  If you wanted to be more
20 sure of that at the time, when the person
21 stopped taking the drug and then got
22 better, would an endoscopy provide
23 information if the person had had an
24 endoscopy at that time?

Page 403

1     A.  It certainly could, yeah.
2     Q.  Could potentially.
3     A.  Uh-hum.
4     Q.  Would a rechallenge
5 potentially provide important information
6 as well if someone wanted to be sure --
7 you know, you got better after two days.
8 Would giving the drug to the person again
9 and seeing whether it recurs, would that
10 be helpful information?
11     A.  It would.
12     Q.  And depending on the
13 findings, that would be clinical
14 information that would be factored into
15 an ultimate diagnosis?
16     A.  It would.
17     Q.  Now, looking at the Basson
18 article -- I'm just going to turn to it
19 real quick -- and looking at page 5 of
20 the article, and there's a statement here
21 on the top left, "The strength of the
22 association and the consistency with
23 reported cases (including the long lag
24 time between initiation of olmesartan and

Page 404

1 diagnosis of malabsorption) are strong
2 arguments in favor of causality."
3     Is that statement of any
4 significance to you?
5     A.  Well, yeah, I think it's a
6 -- it's a strong statement.  They're
7 applying the Bradford Hill criteria
8 there, or at least some of them, and I
9 think that -- well, they've said it quite
10 plainly, that their findings are strong
11 evidence in favor of causality, and I
12 agree with that.
13     Q.  You mentioned --
14     A.  And by the way, if I could
15 just mention another thing about this
16 study --
17     Q.  Sure.
18     A.  -- which I don't think that
19 we got to too specifically, when you look
20 at the strength of the association, the
21 relative risk of 5 or 10 as is seen after
22 two years of therapy on olmesartan,
23 that's a very high relative risk.
24     Q.  And why is that significant?

Page 405

1     A.  Well, again, getting back to
2 the -- if we think about the Bradford
3 Hill criteria, the strength of the
4 association, the fact that there's a
5 tenfold increased risk is strong.
6     Q.  And, you know, you've
7 mentioned the Bradford Hill criteria.
8 Counsel had asked you if it was
9 specifically mentioned in your report.
10 You didn't actually name that criteria;
11 correct?
12     A.  That's true.
13     Q.  Were you fully familiar with
14 that criteria when you did your report?
15     A.  Yeah --
16     MR. PARKER:  Objection.
17     MR. SLATER:  Let me ask the
18     question again.
19 BY MR. SLATER:
20     Q.  Were you familiar with the
21 Bradford Hill criteria when you did your
22 analysis and wrote your report in this
23 case?
24     A.  Yeah.

Protected Information - Steven M. Lagana, M.D.

Page 406

1  Q.  Okay.
2      Even though it was not
3  named, did you take into account the
4  factors in the Bradford Hill criteria in
5  doing your analysis of the available
6  information that you relied on in forming
7  your opinion?
8      MR. PARKER:  Objection.
9      MR. SLATER:  You can answer.
10     THE WITNESS:  Okay.  I think
11  that those factors are fundamental
12  to how people in medicine think
13  about medical science, and
14  certainly I did think about them
15  and I did address them, although
16  not in the context of listing the
17  criteria point -- on a
18  point-by-point basis.  But, yeah,
19  I did think about them and I did
20  try to incorporate them.
21     MR. SLATER:  And I'm just,
22  for the record, going to give you
23  a list of the Bradford Hill
24  criteria.

Page 407

1  BY MR. SLATER:
2      Q.  Strength of association,
3  consistency, specificity, temporality,
4  biologic gradient, plausibility,
5  coherence, experimental evidence, and
6  analogy, is that one way to describe
7  those criteria?
8      MR. PARKER:  Objection.
9      THE WITNESS:  Yes, I believe
10  so.
11  BY MR. SLATER:
12     Q.  And I'll actually -- counsel
13  objected, so I'm going to read you -- I'm
14  going to ask you a different question.
15     With regard to the Bradford
16  Hill criteria, I'm going to list what I
17  believe to be some of those factors and
18  -- well, actually, you know what?  I
19  don't need to go through it again.
20     Are you familiar with the
21  Bradford Hill criteria factors?
22     A.  Yes.
23     Q.  In analyzing, for example,
24  the literature and your experience and

Page 408

1  putting that all together, did you
2  incorporate analysis of those factors
3  that was implicit into your analysis of
4  this material?
5      MR. PARKER:  Objection.
6      THE WITNESS:  Yes.
7  BY MR. SLATER:
8      Q.  Coming back to the Basson
9  article, towards the end at the bottom of
10  page 5, there's a statement that says,
11  "Patients treated with olmesartan should
12  be informed about the risk of this
13  complication, and should be advised to
14  seek medical attention if they experience
15  gastrointestinal symptoms.  This
16  information should also be widely
17  delivered to physicians of all
18  disciplines, particularly to
19  gastroenterologists who are faced to this
20  new category of patients."
21     In the context of a question
22  of whether there's -- whether the authors
23  in this article had a viewpoint on
24  causation, is that statement I just read

Page 409

1  to you of any significance?
2      MR. PARKER:  Objection.
3      MR. SLATER:  You can answer.
4      THE WITNESS:  Okay.  I don't
5  think there's really any vagary to
6  that statement.  I think that
7  they're expressly stating that
8  this is a new category of patient
9  that we're now aware of.  I think
10  that they're saying this
11  information is important, to be
12  widely distributed.  And I
13  absolutely agree.
14     The patients that we've seen
15  at Columbia who suffered from this
16  condition have been in terrible
17  shape.  Many have had
18  life-threatening illness.  And
19  there's a million
20  antihypertensives on the market.
21  I -- you know, very rarely do you
22  see this degree of improvement,
23  both pathologically and
24  clinically, with a fairly simple