# EXHIBIT I

1         IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW JERSEY
2                     -  -  -
3    IN RE:  VALSARTAN,      :  MDL NO. 2875
     LOSARTAN, AND          :
4    IRBESARTAN PRODUCTS     :  HON. ROBERT
     LIABILITY LITIGATION    :  B. KUGLER
5    _____   :
                              :
6    THIS DOCUMENT APPLIES    :
     TO ALL CASES            :
7

8         - CONFIDENTIAL INFORMATION -
           SUBJECT TO PROTECTIVE ORDER
9                     -  -  -
10              September 30, 2021
11                    -  -  -
12

13        Videotaped remote deposition of
     JON P. FRYZEK, Ph.D., taken pursuant to
14   notice, was held via Zoom
     Videoconference, beginning at 9:01 a.m.,
15   EST, on the above date, before Michelle
     L. Gray, a Registered Professional
16   Reporter, Certified Shorthand Reporter,
     Certified Realtime Reporter, and Notary
17   Public.
18

                      -  -  -

19
20         GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
21            deps@golkow.com
22
23
24

```
 1    ZOOM APPEARANCES:
 2
      HOLLIS LAW FIRM, PA
 3    BY:   BRETT VAUGHN, ESQ.
            IRIS SIMPSON, ESQ.
 4    8101 College Boulevard, Suite 260
      Overland Park, Kansas 66210
 5    (913) 385-5400
      brett@hollislawfirm.com
 6    Iris@hollislawfirm.com
      Representing the Plaintiffs
 7
 8    DUANE MORRIS, LLP
      BY:   FREDERICK R. BALL, ESQ.
 9    100 High Street, Suite 2400
      Boston, Massachusetts 02110
10    (857) 488-4229
      frball@duanemorris.com
11
             - and -
12
      DUANE MORRIS, LLP
13    BY:   COLEEN W. HILL, ESQ.
      30 South 17th Street
14    Philadelphia, PA 19103
      (215) 979-1164
15    cwhill@duanemorris.com
      Representing the Defendants, Zhejiang
16    Huahai Pharmaceutical Co, Ltd., Prinston
      Pharmaceutical Inc., Huahai U.S., Inc.,
17    and Solco Healthcare US, LLC
18
      WALSH PIZZI O'REILLY FALANGA LLP
19    BY:   CHRISTINE I. GANNON, ESQ.
      Three Gateway Center
20    100 Mulberry Street, 15th Floor
      Newark, New Jersey 07102
21    (973) 757-1017
      Cgannon@walsh.law
22    Representing the Defendants, Teva
      Pharmaceutical Industries, Ltd., Teva
23    Pharmaceuticals USA, Inc., Actavis LLC,
      and Actavis Pharma, Inc.
24
```

Confidential - Information Subject to Protective Order

```
 1   ZOOM APPEARANCES:  (Cont'd.)

 2

 3   HINSHAW & CULBERTSON, LLP
     BY:  GEOFFREY M. COAN, ESQ.
 4   53 State Street, 27th Floor
     Boston, Massachusetts  02109
 5   (617) 213-7047
     Gcoan@hinshawlaw.com
 6   Representing the Defendant, ScieGen
     Pharmaceuticals, Inc.
 7

 8   BARNES & THORNBURG, LLP
     BY:  KARA KAPKE, ESQ.
 9   11 S. Meridian Street
     Indianapolis, Indiana 46204
10   (317) 231-6491
     Kara.kapke@btlaw.com
11   Representing CVS Pharmacy, Inc., and Rite
     Aid Corporation
12

13   PIETRAGALLO GORDON ALFANO BOSICK &
     RASPANTI, LLP
14   BY:  JASON M. REEFER, ESQ.
     One Oxford Centre, 38th Floor
15   Pittsburgh, Pennsylvania 15219
     (412) 263-1840
16   JMR@pietragallo.com
     Representing the Defendant, Mylan
17   Pharmaceuticals, Inc.

18
     CIPRIANI & WERNER, P.C.
19   BY:  JILL H. FERTEL, ESQ.
     450 Sentry Parkway, Suite 200
20   Blue Bell, Pennsylvania 19422
     (610) 567-0700
21   Jfertel@c-wlaw.com
     Representing the Defendants, Aurobindo
22   Pharma, USA, Inc. and Aurolife Pharma,
     LLC
23

24
```

Confidential Information - Subject to Protective Order

```
 1   ZOOM APPEARANCES:  (Cont'd.)

 2

 3

     FALKENBERG IVES, LLP
 4   BY:  MEGAN A. ZMICK, ESQ.
     230 W. Monroe Street, Suite 2220
 5   Chicago, IL 60606
     (312) 566.4808
 6   Maz@falkenbergives.com
     Representing the Defendant, Humana
 7

 8

     BUCHANAN INGERSOLL ROONEY P.C.
 9   BY:  ASHLEY D.N. JONES, ESQ.
     1700 K Street, NW
10   Washington, D.C. 20006
     (202) 452-7318
11   Ashley.jones@bipc.com
     Representing the Defendant, Albertson's
12   LLC

13

     ALSO PRESENT:
14

15   VIDEOTAPE TECHNICIAN:
     Bill Geigert
16

17   LITIGATION TECHNICIAN:
     Tyler Crotty
18

19   Melisha Valenzuela - Paralegal
     (Hollis Firm)
20

21

22

23

24
```

```
1                          -   -   -
2                   I  N  D  E  X
3                          -   -   -
4

   Testimony of:

5
                        JON  P.  FRYZEK,  Ph.D.
6

7  By Mr. Vaughn                          13
8

9

10

11                         -   -   -
12                 E  X  H  I  B  I  T  S
13                         -   -   -
14
```

```
15  NO.            DESCRIPTION              PAGE
16  Fryzek-1       Expert Report           16
                   8/1/21
17                 (Fryzek)
18  Fryzek-2       Fryzek Appendix C       17
                   Fee Schedule
19
    Fryzek-3       IMS Expert Services     20
20                 Invoices
21  Fryzek-4       Fryzek Appendix A       21
                   Curriculum Vitae
22

23

24
```

```
 1                          -   -   -
 2                 E X H I B I T S  (Cont'd.)
 3                          -   -   -
 4
 5    NO.             DESCRIPTION              PAGE
 6    Fryzek-5        Previous deposition       23
                      transcript, 2/8/2005
 7                    Welding rod products
                      liability litigation
 8
      Fryzek-6        Curriculum vitae          68
 9                    September 2021
10    Fryzek-7        April 2018 article        49
                      Indirect treatment
11                    comparison of
                      cabazitaxel for
12                    patients with metastatic
                      castrate-resistant
13                    prostate cancer who
                      have been previously
14                    treated with a
                      docetaxel-containing
15                    regimen
16    Fryzek-8        US map of                 63
                      ToxStrategies
17                    locations
18    Fryzek-9        US map of                 65
                      Exponent locations
19
      Fryzek-10       Toxic Torts and           86
20                    Environmental Law
                      Defense Practice
21                    Seminar Course Materials
22    Fryzek-11       "Epigenetics in          145
                      chemical-induced
23                    genotoxic
                      carcinogenesis"
24                    G.A. Chappell, J.E. Rager
```

Confidential Information Subject to Protective Order

```
 1                        -   -   -

 2              E X H I B I T S   (Cont'd.)

 3                        -   -   -

 4

 5    NO.              DESCRIPTION              PAGE

 6    Fryzek-12        1990 article            154
                       Role of metabolism in
 7                     dimethylnitrosamine
                       induced immunosuppression:
 8                     A review

 9    Fryzek-13        Concise International 161
                       Chemical Assessment
10                     Document 38

11    Fryzek-14        2005 article            166
                       A cohort study of
12                     Parkinson's Disease
                       and Other
13                     Neurodegenerative
                       Disorders of Danish
14                     Welders

15    Fryzek-15        Evidentiary Order       172
                       in re: Welding Fume
16                     Products Liability
                       Litigation
17
      Fryzek-16        2006 article            177
18                     Parkinson's disease
                       and other basal ganglia
19                     or movement disorders
                       in a large nationwide
20                     cohort of Swedish welders

21    Fryzek-17        September 12, 2008      181
                       New Jersey Law Journal
22

23

24
```

Confidential Information Subject to Protective Order

```
1                     -   -   -
2            E X H I B I T S  (Cont'd.)
3                     -   -   -
4
5   NO.             DESCRIPTION              PAGE
6   Fryzek-18       2003 article            190
                    An introduction to
7                   power and sample size
                    estimation
8
    Fryzek-19       2004 article            193
9                   Cancer risk among
                    statin users:  A
10                  population-based
                    cohort study
11
    Fryzek-20       American Statistical    202
12                  Association News
                    March 7, 2016 article
13                  on statistical
                    significance and
14                  P-values
15  Fryzek-21       2013 article            208
                    Childhood Cancer
16                  Incidence in
                    Pennsylvania Counties
17                  in Relation to Living
                    in counties with
18                  Hydraulic Fracturing
                    Sites
19
    Fryzek-22       2013 Letter to the      213
20                  Editor
                    Obfuscation does not
21                  provide comfort:
                    Response to the
22                  Fryzek et al on
                    Hydraulic Fracturing
23                  and Childhood Cancer
24
```

Confidential Information - Subject to Protective Order

```
 1                   -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                   -   -   -
 4
 5    NO.             DESCRIPTION              PAGE
 6    Fryzek-23       Office of the           216
                      Attorney General,
 7                    Commonwealth of
                      Pennsylvania, Report 1
 8                    of the 43rd Statewide
                      Investigating Grand
 9                    Jury
10    Fryzek-24       2002 article            227
                      The Reliability of
11                    Dietary Data for
                      Self- and Next-of-Kin
12                    Respondents
13    Fryzek-25       2021 article            292
                      N-Nitrosodimethylamine
14                    Contaminated Valsartan
                      and the Risk of Cancer
15
      Fryzek-26       "Benefit-risk           320
16                    Analysis
                      for foods (BRAFO):
17                    Evaluation of exposure
                      to dietary nitrates
18                    Wikoff, D.S., C,T.,
                      J, R., G, C., S, F.,
19                    C, D.,
20    Fryzek-27       2010 article            362
                      Use of electronic
21                    medical records in
                      oncology outcomes
22                    research
23
24
```

Confidential Information - Subject to Protective Order

```
 1                    -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                    -   -   -
 4
```

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Fryzek-28 | 2012 article Occupational exposure to beryllium and cancer risk: A review of the epidemiologic evidence | 370 |
| Fryzek-29 | 2001 article in JOEM Cancer Mortality in Relation to Environmental Chromium Exposure | 379 |
| Fryzek-30 | 2021 article Inhalation cancer risk assessment for environmental exposure to hexavalent chromium: Comparison of margin-of-exposure and linear extrapolation approaches | 389 |
| Fryzek-31 | 2006 article in JOEM Corporate Corruption Of Science - The Case Of Chromium (VI) | 395 |
| Fryzek-32 | 2007 publication The association between selected risk factors for pancreatic cancer and the expression of p53 and K-ras codon 12 mutations | 407 |

Confidential Information — Subject to Protective Order

1                          –   –   –

2              DEPOSITION SUPPORT INDEX

3                          –   –   –

4

5   Direction to Witness Not to Answer

6   PAGE    LINE
    None.

7

8   Request for Production of Documents

9   PAGE    LINE
    None.

10

11  Stipulations

12  PAGE    LINE
    None.

13

14  Questions Marked

15  PAGE    LINE
    None.

16

17

18

19

20

21

22

23

24

Confidential Information - Subject to Protective Order

```
 1                      -   -   -

 2              THE VIDEOGRAPHER:  Good

 3       morning.

 4              We are now on the record.

 5              My name is Bill Geigert, I'm

 6       a videographer for Golkow

 7       Litigation Services.

 8              Today's date is

 9       September 30th, 2021, and the time

10       is 9:01 a.m.

11              This remote video deposition

12       is being held in the matter of

13       valsartan, losartan, and

14       irbesartan products liability

15       litigation, in the United States

16       District Court for the District of

17       New Jersey.

18              The deponent is Jon P.

19       Fryzek, Ph.D.

20              All parties to this

21       deposition are appearing remotely

22       and have agreed to the witness

23       being sworn in remotely.

24              Due to the nature of remote
```

Confidential Information - Subject to Protective Order

```
 1          reporting, please pause briefly

 2          before speaking to ensure all

 3          parties are heard completely.

 4                All counsel will be noted on

 5          the stenographic record.

 6                The court reporter is

 7          Michelle Gray and she will now

 8          swear in the witness.

 9                      -  -  -

10                ... JON P. FRYZEK, Ph.D.,

11          having been first duly sworn, was

12          examined and testified as follows:

13                      -  -  -

14                  EXAMINATION

15                      -  -  -

16   BY MR. VAUGHN:

17          Q.    Dr. Fryzek, how many times

18   have you had your deposition taken

19   previously?

20          A.    I think I sent you that

21   list.  I can't recall off the top of my

22   head.

23          Q.    You sent the last four

24   years.  Do you know how many you have in
```

Confidential Information - Subject to Protective Order

1    your history?

2         A.    Oh, prior to that maybe once

3    or twice.  Not much.

4         Q.    Okay.  Do you know the

5    ground rules of depos pretty well?

6         A.    You can repeat them for me.

7    Thank you.

8         Q.    So I'll try not to talk over

9    you.  You try not to talk over me.  If

10   you have any questions or any more

11   clarity on one of my questions, just let

12   me know, and try and give verbal answers

13   instead of head shakes, if that's okay.

14        A.    Yeah.

15        Q.    Have you ever done a

16   deposition by Zoom before?

17        A.    Yes.

18        Q.    When was that?

19        A.    I believe it was last week.

20        Q.    What litigation was that

21   for?

22        A.    Let me see if I can

23   remember.  I think it was for opioids,

24   Endo Pharmaceutics.

Confidential Information - Subject to Protective Order

1    Q.    And is anyone else in the

2    room with you today?

3    A.    No.

4    Q.    Do you have any other

5    applications besides Zoom open on your

6    computer?

7    A.    I have the Google Chrome for

8    the marked exhibits.

9    Q.    Great.  No communication

10   devices or apps going on?

11   A.    No.

12   Q.    And I ask that it stays that

13   way throughout the deposition.

14   A.    Okay.

15   Q.    And you're not on any

16   medications that would impact your

17   memory, correct?

18   A.    Correct.

19   Q.    And you don't have any

20   psychiatric conditions that would inhibit

21   you from telling the truth?

22   A.    I don't.

23   Q.    Are there any errors or

24   corrections that you want to make in your

Confidential Information - Subject to Protective Order

1    report before we get started?

2           A.    Not at this time.

3                 MR. VAUGHN:  Tyler, can we

4           start with Fryzek expert report.

5                 (Document Marked for

6           identification as Exhibit

7           Fryzek-1.)

8                 THE WITNESS:  I have to move

9           this to my other screen so I can

10          see it.

11                MR. VAUGHN:  All right.

12                TRIAL TECH:  Do you want to

13          mark this as Exhibit 1?

14                MR. VAUGHN:  Yeah.  If you

15          can keep track of the exhibit

16          numbers, that will be awesome.

17                TRIAL TECH:  Absolutely.

18                THE WITNESS:  I also have a

19          copy of my report printed out

20          here, so.

21    BY MR. VAUGHN:

22          Q.    As long as it's the same, if

23    that's easier for you, feel free.

24          A.    Yeah, it's the same.

Confidential Information - Subject to Protective Order

1           MR. VAUGHN:  Okay.  And then

2     Tyler, can you go to Page 3.

3           MR. BALL:  Hey, Brad, it's

4     not showing up in the marked

5     exhibits.  Try refreshing.

6           TRIAL TECH:  Counsel, I have

7     to -- I have to add it in manually

8     every time it's marked.  So you

9     have to give me a few seconds to

10    add it in after it's marked on the

11    record.  And then you refresh your

12    screen, and it will flow --

13    populate into the folder.

14          MR. BALL:  Got it.  Okay.

15    Thank you.  I had done that, but

16    apparently I refreshed too soon.

17          TRIAL TECH:  Yes.

18  BY MR. VAUGHN:

19      Q.    Dr. Fryzek, how much is

20  EpidStrategies being paid per hour for

21  your work?

22      A.    $412.

23          MR. VAUGHN:  Tyler, can we

24    go to the Fryzek expert report,

Confidential Information - Subject to Protective Order

1    Appendix C now.  And Page 2.

2        (Document marked for

3    identification as Exhibit

4    Fryzek-2.)

5  BY MR. VAUGHN:

6        Q.    And then your fee schedule

7  is $622 an hour, correct?

8        A.    I'm not sure where this is

9  from.

10        Q.    This is what you produced to

11  us with your expert report.  It's Exhibit

12  C of your expert report?

13        A.    If it's -- if I produced it,

14  then it's something that my admin put

15  together.  So I believe that's true.

16        Q.    Okay.  So are you paid $622

17  and then EpidStrat is also paid $412 for

18  your work?

19        A.    No, I'm just paid a regular

20  salary.  So this is not outside my

21  salary.

22        Q.    Say that again.

23        A.    This isn't outside my

24  regular salary.  I'm just paid a regular

Confidential Information - Subject to Protective Order

```
 1   salary.
 2          Q.    So who's being paid the 612?
 3   Or 622, I'm sorry.
 4          A.    I'm not sure.  I haven't
 5   seen this before.  I don't know.
 6          Q.    So you are not aware of how
 7   much you're billing?
 8          A.    I'm billing what I wrote at
 9   first.  415.
10          Q.    So the 412 is the proper
11   amount?
12          A.    Yeah.
13          Q.    And you're positive about
14   that?
15          A.    It is.  That's my billing
16   rate.
17                THE COURT REPORTER:  Doctor,
18          if you can keep your voice up.
19          You're trailing off.
20                THE WITNESS:  Okay.  Sorry.
21                MR. VAUGHN:  Okay.  Tyler,
22          can we now go to -- see what it
23          was called -- Jon Fryzek invoices
24          IMS.
```

Confidential Information - Subject to Protective Order

1              (Document marked for

2         identification as Exhibit

3         Fryzek-3.)

4    BY MR. VAUGHN:

5         Q.    Dr. Fryzek, do you have an

6    estimate for how many hours you spent on

7    your expert report?

8         A.    No, I have no idea.

9         Q.    All right.  What is your

10   hourly rate being billed out here?

11        A.    Looks like 622.  So that

12   must be.  That explains it.  That must be

13   what IMS is getting.  622 and then they

14   pay us the 415.  So that's --

15        Q.    And who is IMS?

16        A.    It's a firm that hires

17   expert witnesses or finds expert

18   witnesses.  This is the first time I've

19   ever worked with them.  I never heard of

20   them before.

21              MR. VAUGHN:  All right.

22        Tyler, can we now go to Appendix A

23        of his expert report.  Fryzek's

24        expert report, Appendix A.

Confidential Information - Subject to Protective Order

1              Can we go to the next page.

2                  (Document Marked for

3          identification as Exhibit

4          Fryzek-4.)

5    BY MR. VAUGHN:

6          Q.    And I notice you list from

7    2000 to 2006 you were an assistant

8    professor at Vanderbilt.  What all did

9    that entail?

10         A.    I did research projects with

11   them, and I lectured a couple times.

12         Q.    When did you lecture, what

13   for?

14         A.    Pardon me?

15         Q.    What did you lecture on?

16         A.    You know, it's hard for me

17   to remember.  I believe it was just a

18   general seminar about epidemiology.

19         Q.    So it wasn't a class?

20         A.    No.

21         Q.    What year do you think that

22   was?

23         A.    Oh, I can't recall.

24         Q.    But you do recall being an

Confidential Information - Subject to Protective Order

1    assistant professor from 2000 to 2006 at

2    Vanderbilt?

3         A.    That was my appointment,

4    yeah.

5         Q.    Do you recall the first time

6    that you ever had your deposition taken?

7         A.    I don't recall.  It's been a

8    long time ago.

9         Q.    You don't remember your

10   first?

11        A.    No, it's probably been more

12   than 20 years ago.

13        Q.    You don't think -- does 2005

14   sound right?

15        A.    I don't know.  I can't

16   recall.  I'm sorry.  It's not something

17   that I do regularly.  So it's not

18   something that I keep in mind.

19        Q.    Were you an expert in the

20   welding rod litigation?

21        A.    I did two studies on welding

22   rods, yeah.

23        Q.    Say that again.

24        A.    I did two studies on welding

Confidential Information - Subject to Protective Order

1    rods.  And yes, I did.

2         Q.    You did studies.  Were you

3    an expert in that litigation?

4         A.    I'm not sure how they

5    classified me.

6         Q.    Did you testify?

7         A.    I gave a deposition.  I

8    didn't testify in court.

9         Q.    Why's that?

10        A.    Pardon me?

11        Q.    Why's that?  Why didn't you

12   testify in court?

13        A.    I have no idea.

14             MR. VAUGHN:  Tyler, can we

15        open up 2005 Fryzek welding rod

16        depo.

17             (Document marked for

18        identification as Exhibit

19        Fryzek-5.)

20             MR. VAUGHN:  Can we go to

21        Page 9.

22   BY MR. VAUGHN:

23        Q.    Line 17.  Doctor, do you see

24   where you are asked, "Have you ever had

1    your deposition taken before?"  And your

2    answer was, "Never"?

3          A.    Right.

4          Q.    Does that refresh your

5    recollection as to when your first

6    deposition was?

7          A.    No.  I mean, this is

8    15 years ago.  It's hard to remember that

9    far back.

10         Q.    So you think that you might

11   have had a deposition before this?

12         A.    I don't think I did.  I'm

13   not sure.

14         Q.    Okay.  You don't recall this

15   deposition back in 2005, but you remember

16   being an associate professor at

17   Vanderbilt from 2000 to 2006?

18              MR. BALL:  Objection to

19         form.

20              THE WITNESS:  Being an

21         associate professor is much more

22         meaningful to my career, of

23         course.

24   BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1     Q.     Why is an associate

2  professor meaningful to your career?

3     A.     Pardon me?

4     Q.     Why is it meaningful to your

5  career?

6     A.     Because it's an academic

7  appointment.

8     Q.     Were you paid?

9     A.     You know, I'm not -- I can't

10  recall if I was paid or not.  It was part

11  of my affiliation with the International

12  Epidemiology Institute.

13          MR. VAUGHN:  Okay.  Tyler,

14      can we go to Page 103 now of that

15      deposition.

16  BY MR. VAUGHN:

17     Q.     So line 10, they ask what

18  your current responsibilities at

19  Vanderbilt are.  And you answer, "Working

20  on grants," correct?

21     A.     Oh, yeah.  Yep.

22          MR. VAUGHN:  And then,

23      Tyler, can we go to the next page.

24  BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1    Q.    And then when they ask you

2  how long you have been affiliated with

3  Vanderbilt there on Line 18 and 19, you

4  answered two years.

5           And this was in 2005,

6  correct?

7    A.    I said I think it's been two

8  years.

9    Q.    And so you think you were

10 wrong at that time?

11   A.    You're asking about stuff

12 that happened more than 15 years ago.  I

13 can't recall.

14   Q.    Okay.

15           MR. VAUGHN:  Tyler, can we

16      go to Page 113 now.

17 BY MR. VAUGHN:

18   Q.    Line 10, have you ever

19 applied to be a professor or instructor

20 at Vanderbilt or any other teaching

21 institution.  You answered, "I -- I was

22 an assistant professor at University

23 Nebraska Medical Center."

24           And then Line 17 through 19,

Confidential Information - Subject to Protective Order

1    "Since then, have you applied for a

2    position or instructor or teacher or

3    professor at any other institution?"

4              What was your answer at that

5    time?

6         A.    I said no.

7         Q.    No.  So in 2005, you did not

8    think that you were an assistant

9    professor at Vanderbilt University,

10   correct?

11             MR. BALL:  Objection to

12        form.

13             THE WITNESS:  I'm sorry, can

14        you repeat that question?  I

15        didn't quite understand it.

16   BY MR. VAUGHN:

17        Q.    In 2005 you did not think

18   you were an assistant professor at

19   Vanderbilt, correct?

20             MR. BALL:  Same objection.

21             THE WITNESS:  I'm not clear

22        how you're getting that

23        conclusion.

24   BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1    Q.    All right.  Well, you see

2    the question on Line 17 through 19?

3    A.    Yeah.  Right.

4    Q.    Okay.  So it's asking after

5    1996, have you ever applied for a

6    position or instructor or teacher or

7    professor at any other institution, and

8    you said no.

9          Correct?

10   A.    Mm-hmm.

11   Q.    So how were you an assistant

12   professor at Vanderbilt at that time if

13   you had not applied to be a professor at

14   any institution since 1996?

15         MR. BALL:  Objection to

16         form.

17         THE WITNESS:  It's through

18         my work at International

19         Epidemiology Institute.

20         So eventually Vanderbilt

21         absorbed International

22         Epidemiology Institute.  So it was

23         part of that.  I didn't apply for

24         it.

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    Well, why when you were

3    asked the questions Lines 10 through 12

4    when I asked if -- sorry, on line --

5    yeah, 10 through 12, when they asked if

6    you'd been a professor at Vanderbilt, why

7    was your answer that you were an

8    assistant professor at Nebraska, why

9    didn't you just say yeah?

10              MR. BALL:  Objection to

11        form.  Argumentative.

12              THE WITNESS:  I wasn't a

13        professor or instructor at

14        Vanderbilt.  I was an assistant

15        professor.

16   BY MR. VAUGHN:

17        Q.    Which is what you answered

18   for University of Nebraska.  You said, "I

19   was an assistant professor for University

20   of Nebraska."

21              Why didn't you just say I

22   was an assistant -- I am an assistant

23   professor for Vanderbilt?

24              MR. BALL:  Objection.

Confidential Information - Subject to Protective Order

1          Argumentative.

2                  THE WITNESS:  Yeah, sorry,

3          you're asking me about what I said

4          15 years -- more than 15 years

5          ago.  I can't recall.

6   BY MR. VAUGHN:

7          Q.    Would you not defer to what

8   you gave under oath 15 years ago about

9   events that happened 15 years ago?

10                 MR. BALL:  Objection.

11         Argumentative.

12                 THE WITNESS:  Well, this

13         is -- yeah, this is going back to

14         1996.  That's what, 30 years ago.

15  BY MR. VAUGHN:

16         Q.    Yeah, I'm talking about this

17  part of your CV that says you're an

18  assistant professor at Vanderbilt from

19  2000 to 2006, which you deferred to your

20  recollection in 2005.

21         A.    I would trust my CV.

22         Q.    Who put your CV together?

23         A.    Right now it's -- my

24  administrator does.

Confidential Information - Subject to Protective Order

1     Q.    Is it -- who is the

administrator?

2

3     A.    Shelley Fierstein.

4           MR. VAUGHN:  All right.  Can

5     we go back to his CV, Appendix A.

6     On Page 3 of the doc.  Yeah.

7           THE WITNESS:  I don't think

8     you have my most current CV that I

9     sent.

10   BY MR. VAUGHN:

11    Q.    That's unfortunate.  That's

12   what you guys sent us.

13          MR. BALL:  That's incorrect.

14    My colleague just told me that you

15    have the most recent updated one.

16          When did you send it,

17    Coleen?

18          MS. HILL:  With his

19    production materials.

20          MR. BALL:  With his

21    production materials.

22          MR. VAUGHN:  So Appendix A

23    to his expert report is not his

24    most up-to-date?

Confidential Information - Subject to Protective Order

1          MR. BALL:  That's correct.

2     It doesn't look like it from what

3     I'm seeing.

4  BY MR. VAUGHN:

5          Q.    What's missing?

6          A.    I'd have to go through it

7  and see it, compare it to my current one.

8          Q.    Is there anything inaccurate

9  in this one?

10          A.    We'd have to go through it

11  and see.

12          Q.    Has there ever been stuff

13  that's inaccurate in your CV?

14          MR. BALL:  Objection to

15     form.

16          THE WITNESS:  I can't

17     recall.

18          THE VIDEOGRAPHER:  Off the

19     record, 9:16.

20     (Brief pause.)

21          THE VIDEOGRAPHER:  We are

22     back on the record at 9:21 a.m.

23          MR. VAUGHN:  Can we stay

24     with that last exhibit we were on

Confidential Information - Subject to Protective Order

1      before we switched it?

2              TRIAL TECH:  Appendix A?

3              MR. VAUGHN:  Correct.

4   BY MR. VAUGHN:

5      Q.    At the bottom, Doctor, you

6   see this is a July 2021 version of your

7   CV, correct?

8      A.    Mm-hmm.  Yeah.  Correct.

9      Q.    All right.  And if we go

10  back up under academic appointments, do

11  you see it lists Georgetown, 2020 to

12  present?

13     A.    Right.

14     Q.    And then this visiting

15  professor at Denmark, you note is from

16  2011 to present, and at University of

17  Pittsburgh, 2011 to present.

18     A.    Yes.

19     Q.    This was produced with your

20  expert report, correct?

21     A.    I'm not sure.  I sent you

22  the most current one where those are

23  updated.

24     Q.    Okay.  These ones were

Confidential Information - Subject to Protective Order

1    updated July of 2021, right?

2         A.    I believe so.  I guess.

3               MR. VAUGHN:  Okay.  Tyler,

4         now can we go to the CV that I

5         dropped into the chat as the next

6         exhibit.  And then next page.

7    BY MR. VAUGHN:

8         Q.    And so at the bottom here,

9    we can see that this one was updated in

10   September of 2021 now, right?

11        A.    Right.

12        Q.    And this is the new version

13   that you're talking about?

14        A.    Yes, sir.

15        Q.    And then if we can go back

16   to academic appointments, so the

17   University of Pitts -- in Pennsylvania,

18   University of Pittsburgh went from 2011

19   to present, to 2011 to 2020.

20        A.    Yes.

21        Q.    So is that an error on your

22   previous CV?

23        A.    It was.

24        Q.    And then for Denmark, it

Confidential Information - Subject to Protective Order

1    went from 2011 to present and now it's

2    all the way back to 2016.  Was that also

3    an error in your CV?

4          A.    Yes.

5          Q.    But the University of

6    Vanderbilt still says 2000 to 2006,

7    doesn't it?

8          A.    Yes.

9          Q.    Are you going to change that

10   on your future CVs?

11         A.    Change what?

12               MR. BALL:  Objection to

13         form.

14   BY MR. VAUGHN:

15         Q.    Your 2000 to 2006 assistant

16   professor, that in 2005 you said you were

17   not?

18         A.    Oh, no.  This is -- this is

19   correct.

20         Q.    How did you get the

21   appointment at Denmark?

22         A.    I've done research

23   collaboration with them since about 1996,

24   '97.

Confidential Information - Subject to Protective Order

1    Q.    Who is "them"?

2    A.    Danish researchers.

3    Q.    I'm sorry?

4    A.    I still do collaboration

5  with them.

6    Q.    Are they at certain

7  institutes or anything?

8    A.    Yeah.  It's -- it's here,

9  the Department of Clinical Epidemiology,

10  Aarhus University.

11    Q.    Is there any other

12  organizations in Denmark that you do

13  research with?

14    A.    Sometimes I do stuff with

15  the Danish Cancer Society in Copenhagen.

16    Q.    How long have you been

17  working with them?

18    A.    Since '97, '98.  You can see

19  on my CV when I started publishing with

20  them.

21    Q.    Have any of your companies

22  ever funded any of the Danish

23  organizations?

24    A.    Oh, I have no idea.

Confidential Information - Subject to Protective Order

1    Q.    Do you -- if they collate

2    data for you from the cancer database, do

3    you pay them for that?

4    A.    So now, the way that I cover

5    it with them now is they're a

6    subcontractor.

7    Q.    What does that mean?

8    A.    They get paid as a

9    subcontractor.

10    Q.    You said the way that you

11    handle it now.  How did you previously

12    handle it?

13    A.    Oh, I wasn't in charge of it

14    before -- back in the early 2000s when I

15    was -- I mean, I -- so I don't know how

16    they did it.

17    Q.    And EpidStat, has it always

18    been a subcontracting position?

19    A.    Yes.

20    Q.    And so EpidStat gets paid,

21    and they pay them out of that money?

22    A.    Yes.

23        MR. BALL:  Objection to

24    form.

Confidential Information - Subject to Protective Order

1          Hey, Jon, you've got to give

2      me a chance to object, please.

3          THE WITNESS:  Okay.  I've

4      got to put the screen back so I

5      can see him.

6  BY MR. VAUGHN:

7      Q.    So when you were visiting

8  professor in Denmark, how often did you

9  visit this university?

10     A.    Oh, I was going there every

11  six months before Covid, even -- even

12  until today.

13     Q.    What were you doing when you

14  were visiting that university?

15     A.    Collaborating on research.

16     Q.    Did you ever teach?

17     A.    I don't believe so.  I don't

18  think I even gave a lecture.  No, I gave

19  a lecture once.

20     Q.    Of all your academic

21  appointments, which ones did you actually

22  teach?

23     A.    Georgetown.

24     Q.    And that's where you are

Confidential Information - Subject to Protective Order

1    currently at?

2          A.     Yep.  Oh, also at Michigan I

3    did, so...

4          Q.     What did you teach at

5    Georgetown?

6          A.     Epidemiology.

7          Q.     What is an adjunct

8    professor, what's different than that

9    than a regular professor?

10         A.     Adjunct professor, you just

11   get paid.  So you don't get on the tenure

12   track or anything like that, any of the

13   benefits, stuff like that.

14         Q.     How many hours a week do you

15   spend teaching?

16         A.     So it's the spring class at

17   Georgetown, and I teach on Thursday

18   nights.  The class, I think, is three

19   hours.

20         Q.     Is that in person or via

21   Zoom or some other platform?

22         A.     Oh, it's through Zoom, of

23   course, through Covid.

24         Q.     Why in your CV does it not

Confidential Information - Subject to Protective Order

1    list an employment history?

2         A.    That's just standard for

3    EpidStrategies, ToxStrategies.  I did

4    give my employment history in my report.

5         Q.    So is that policy at

6    EpidStrategies, that you don't give

7    employment history?

8         A.    ToxStrategies, yeah.  You

9    can look at everyone's -- everyone's CV.

10   It's the same.

11              MR. VAUGHN:  Can we go back

12        to his expert report again, Tyler.

13        Let's go to Page 2.

14              THE WITNESS:  I'm going to

15        look at my report here as well, if

16        that's okay?

17   BY MR. VAUGHN:

18        Q.    Yeah, if you ever need more

19   time when we're going through stuff to

20   review something to answer a question,

21   just let me know, okay?

22        A.    Thank you.  Yeah.

23        Q.    All right.  So it's fourth

24   paragraph down.  You note that you worked

Confidential Information - Subject to Protective Order

1  in the pharmaceutical industry from 2006

2  to 2012.

3           And then are these positions

4  after -- where -- are they where you were

5  working in the pharmaceutical industry

6  from those years?

7       A.    Yes.

8       Q.    And so you worked at Amgen?

9       A.    Amgen.  Yes.

10      Q.    Amgen?

11      A.    Yeah.

12      Q.    And is that a subsidiary of

13  another company?

14      A.    No.  It's a huge company

15  that's about 25,000 employees.

16      Q.    And then you worked at

17  MedImmune?

18      A.    Yes.

19      Q.    Do you know what --

20      A.    MedImmune doesn't exist

21  anymore.  It's -- AstraZeneca's absorbed

22  it.

23      Q.    Okay.  And so what years

24  approximately were you working at Amgen?

Confidential Information - Subject to Protective Order

1      A.     Amgen.

2      Q.     Amgen.  I'm sorry.

3      A.     That's all right.  I think

4  it's about 2006 to 2009, I think.  Yeah,

5  it's 2009, 2010, so...

6      Q.     And then MedImmune would

7  have been -- was that after or at the

8  same time?

9      A.     Yeah.  No, that was

10 afterwards.  Amgen is in Los Angeles and

11 MedImmune is out here in Maryland.  So...

12     Q.     And so when you said that

13 your employment history was in your

14 expert report, is this what you're

15 talking about?

16     A.     Yes, sir.

17     Q.     Did you not work anywhere

18 before 2006?

19     A.     I think it says up above.

20            Let's see.  Yeah.  The

21 paragraph right before that, it says, "I

22 joined the faculty of the University of

23 Nebraska Medical Center."

24     Q.     And you didn't have any

Confidential Information - Subject to Protective Order

1    other jobs around this time?

2          A.    I'd just graduated from

3    University of Michigan, so that was my

4    first job after graduating.

5          Q.    Did you work for any other

6    research companies around 2000?

7          A.    Let's see, 2000 -- no.

8          Q.    Early 2000s?

9          A.    No.  It was International

10   Epidemiology Institute.

11         Q.    And did they pay you?

12         A.    Oh, yes.

13         Q.    But you don't consider that

14   as part of your employment history?

15         A.    It is, absolutely.

16         Q.    And is that listed here?

17         A.    International Epidemiology

18   Institute, yes.  It's the -- it's the

19   last sentence of that paragraph.

20         Q.    Oh, I see it.  I see it.

21   Thank you.

22         A.    Yep.

23         Q.    And then from 2006 to 2012,

24   were you working at any other place

Confidential Information - Subject to Protective Order

1    during this time?

2         A.    You mean besides the ones

3    that I've listed here?

4         Q.    Yeah.

5         A.    No.

6         Q.    Have you ever worked for a

7    company called Exponent?

8         A.    Oh, I did for one year, yes.

9         Q.    What year was that?

10        A.    It wasn't even a year.

11              It was -- I can't recall.

12    It was before I formed EpidStat.

13        Q.    2010, 2011 sound about

14    right?

15        A.    Maybe.  I'm not sure.  I

16    can't recall.

17        Q.    Did you leave Exponent to

18    open EpidStat?

19        A.    Yes.

20        Q.    Why?

21        A.    Because I wanted to do

22    pharmacoepidemiology, and so more of an

23    opportunity to do it on my own.

24        Q.    Does Exponent do that type

Confidential Information - Subject to Protective Order

1    of work too?

2         A.    Well, they tried with me.

3    But it didn't really work.

4         Q.    Why didn't it work?

5         A.    There wasn't a lot of

6    support for it.

7         Q.    How so?

8         A.    In terms of personnel,

9    knowledge, things like that.  I published

10   a few things in the pharmacopeia world

11   while I was at Exponent, but not much.

12        Q.    Did you open EpidStat

13   yourself?

14        A.    No.

15        Q.    Who opened it with you?

16        A.    David Garabrant.

17        Q.    Does he have any

18   relationship with Exponent?

19        A.    Not to my knowledge.

20        Q.    How do you know David

21   Garabrant?

22        A.    He was my mentor at

23   University of Michigan.

24        Q.    When did EpidStrat get

Confidential Information - Subject to Protective Order

1    acquired by ToxStrat?

2         A.    EpidStat, you mean?

3         Q.    Yeah?

4         A.    EpidStat no longer exists.

5    It wasn't acquired.

6         Q.    EpidStrategies, is that what

7    it's called?

8         A.    Yeah.

9         Q.    Does that still exist?

10        A.    EpidStrategies does.  That's

11   who I work for now.  Yes.  It's a

12   subsidiary of ToxStrategies.

13        Q.    And so it's not the same as

14   EpidStrat was?

15        A.    EpidStat.

16        Q.    Stat?

17        A.    We all are -- yeah.  No, we

18   all -- most of the folks from EpidStat

19   moved over to EpidStrategies.  So it's

20   almost the same people.

21        Q.    Do you know the people that

22   opened ToxStrategies?

23        A.    Pardon me?

24        Q.    The people that opened

Confidential Information - Subject to Protective Order

1    ToxStrategies, do you know them?

2          A.    Yes.

3          Q.    Who are they?

4          A.    It's three of them; Laurie

5    Haws, Deb Proctor, and Mark Harris.

6          Q.    How many of them are

7    previous employees of Exponent?

8          A.    Oh, I don't -- I don't know

9    their employment history.

10         Q.    You don't know if they each

11   left Exponent to open this?

12         A.    I don't -- yeah, I don't

13   know.

14         Q.    Do you know if ToxStrategies

15   is owned by another company?

16         A.    No, it's not.

17         Q.    It's its own company?

18         A.    Yeah.

19         Q.    So EpidStat is where you

20   were previously, and now it's called

21   EpidStrategies?

22               MR. BALL:  Objection to

23         form.

24   BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1      Q.    Was it just coincidental
2  that you guys named your companies so
3  similar, yours being EpidStat and theirs
4  being ToxStrategies or ToxStat -- Strat?
5      A.    ToxStrategies.  They just
6  wanted to be EpidStrategies so it kind of
7  flowed, you know, so...
8      Q.    When you were running
9  EpidStat, would it be fair to
10  characterize that institute as a research
11  institute that provides expert assistance
12  on the evaluation of complex health
13  issues, and on the conduct and
14  interpretation of epidemiological studies
15  to pharmaceutical and medical device
16  companies?
17            MR. BALL:  Objection to
18        form.
19            THE WITNESS:  I'm not sure
20        what you're reading.  But I don't
21        know.
22            MR. VAUGHN:  Okay.  Tyler,
23        can we go to 2018 indirect
24        treatment comparison.

Confidential Information - Subject to Protective Order

1              (Document marked for

2         identification as Exhibit

3         Fryzek-7.)

4    BY MR. VAUGHN:

5         Q.    Second page.  On that

6    left-hand side under Competing Interests,

7    it says --

8         A.    Can you blow that up a

9    little bit?  I'm sorry.

10        Q.    Yeah, the JPF, is that -- is

11   that your initials?

12        A.    Yes, sir.

13        Q.    All right.  "Are employees

14   of EpidStat Institute."  Can you read

15   that sentence for me?

16        A.    JPF, HR, LT, and DDA are

17   employees of EpidStat Institute, which is

18   a research institute that provides expert

19   assistance on the evaluation of complex

20   health issues and on the conduct and

21   interpretation of epidemiological studies

22   to pharmaceutical and medical device

23   companies."

24        Q.    Is that accurate?

Confidential Information - Subject to Protective Order

1    A.    That is accurate, yep.

2          MR. VAUGHN:  And can we go

3    back to his invoices, Tyler.  Jon

4    Fryzek invoices IMS.

5    BY MR. VAUGHN:

6    Q.    All right.  And so we see

7    your name on these first ones, and I

8    think if we add those up it comes out to

9    14.5 hours on this bill.

10         Does that look correct to

11   you?

12   A.    I don't know.  You want me

13   to add them up?

14   Q.    Sure.

15   A.    14.75.

16   Q.    14.75, cool.

17         And then who is Mina Suh.

18   Did I say that right?

19   A.    Yep.

20   Q.    Who is she?

21   A.    She is an epidemiologist.

22   Q.    Does she work for you?

23   A.    Yes.  It's Mina Suh.

24   Q.    Mina Suh.  Are you aware

Confidential Information - Subject to Protective Order

1    that she previously worked at Exponent?

2        A.    I have no idea.  She was at

3    ToxStrategies when I joined.

4        Q.    Ok.  Is that the first time

5    you met her?

6        A.    Yes.

7        Q.    And so does she work for

8    ToxStrategies or the EpidStrategies?

9        A.    She was working for

10   ToxStrategies and she moved over to

11   EpidStrategies when we came.

12       Q.    So you guys kind of work

13   with whoever on that?  I mean you can

14   pull from ToxStrategies or EpidStrategies

15   for your work, does it work that way?

16           MR. BALL:  Objection --

17       sorry.  Objection to form.

18           THE WITNESS:  Sometimes.  It

19       depends on the project.

20           MR. VAUGHN:  Okay.  Can we

21       go to the next page, Tyler.

22   BY MR. VAUGHN:

23       Q.    So we've got 6.5 hours

24   billed on this one from you, correct?

Confidential Information - Subject to Protective Order

1          A.      It looks like, yep.

2          Q.      And who is this Janice

3     Lansita?

4          A.      She used to be an employee

5     at ToxStrategies, but she -- she left

6     because of Covid.

7          Q.      So she doesn't work there --

8     doesn't do work for you anymore?

9          A.      No.  She just -- she doesn't

10    do any work, so...

11         Q.      Did she leave like in the

12    middle of 2020?

13         A.      I don't recall when she

14    left.

15         Q.      Was it recent or has it been

16    about a year ago?

17         A.      Yeah, it's been a while.

18    When things shut down with Covid she left

19    to take care of her kids.

20         Q.      Okay.  And so this Mina

21    Suh -- how do you say it again, Mina?

22         A.      Suh.

23         Q.      Suh.  So she's doing

24    42 hours here.  She's doing quite a bit

Confidential Information - Subject to Protective Order

1    of the work on the research of this

2    expert report, right?

3            A.    No.

4                  MR. BALL:   Objection to

5            form.

6    BY MR. VAUGHN:

7            Q.    What do you mean no?

8            A.    This is back in 2019.  So

9    this is -- at the beginning she did.

10           Q.    Okay.  Yeah.  Okay.

11                 MR. VAUGHN:   Let's go to the

12           next page.

13   BY MR. VAUGHN:

14           Q.    This is still early, this is

15   2019.  So you billed one hour on this

16   one, right?

17           A.    Yes.

18           Q.    And the rest was Mina Suh?

19           A.    Pardon me?

20           Q.    And the rest of them was

21   Mina -- oh, I guess Sarah Cohen billed

22   per hour, and then the rest of the

23   billing was Mina Suh again?

24           A.    Yeah.  Yes.  I'm sorry.

Confidential Information - Subject to Protective Order

1     Q.    Next page.  Not much on that

2    one.  Let's go to the next page.  Just

3    the Sarah Cohen.  Next page.

4    Professional support staff.  What is

5    that?  Previously you'd been identifying

6    people.

7          A.    Yeah, I don't know.  It's

8    a -- must be an admin thing.

9          Q.    Would that be someone within

10   the company, professional support staff,

11   or has that been outsourced?

12         A.    No, it's within company.

13               What year is this?  This was

14   2020?  Yeah.

15         Q.    So we're now at the end of

16   2020.  You just have a few hours billed

17   still.

18               Let's go to the next page, I

19   think we start doing your billing now.

20   All right.  So now we are in 2021.  And I

21   showed this being about 14.75 hours from

22   you, and then 43 hours from professional

23   support staff that's not identified,

24   correct?

Confidential Information - Subject to Protective Order

1    A.    How did you get 14.75?

2    Q.    I added up 1, 1.5, 1, .75,

3  1, 1, 1, .5, 3, 1, 1, 2.

4    A.    You're right.

5    Q.    Okay.  The next page.  So

6  here we have another three hours here

7  from you.  What I found really

8  interesting is that we're in 2021 now,

9  and Janice Lansita is billing hours

10  again?

11    A.    No, that's -- that must be

12  an error or something.  I have no idea.

13  She's retired.

14    Q.    So are you guys going to

15  refund that money or how does that work?

16    A.    This is the first I've

17  seen --

18        MR. BALL:  Objection to

19      form.

20        THE WITNESS:  Sorry, I have

21      no idea.

22  BY MR. VAUGHN:

23    Q.    Are you going to notify your

24  clients about that billing error?

Confidential Information - Subject to Protective Order

1    A.    You already have, so... my

2    client is sitting here, so...

3    Q.    Are you going to notify

4    those within your company of this billing

5    error?

6    A.    I have no idea what happens

7    to that, so...

8    Q.    Who enters the billings?

9    A.    The administrators.  One of

10   the advantages of not having my own

11   company is I don't have to pay to the

12   invoicing -- pay attention to the

13   invoicing like I used to when I had my

14   own company.

15   Q.    And who at your company now

16   is it, again, that pays attention to the

17   invoicing?  What's their name?

18   A.    Mark Harris does all that.

19   He's one of the cofounders.

20   Q.    And you're not aware if he

21   previously worked at Exponent, are you?

22   A.    No idea.

23   MR. VAUGHN:  Let's go to the

24   next page.

Confidential Information - Subject to Protective Order

```
1    BY MR. VAUGHN:
2         Q.    All right.  I added up that
3    you billed 15.75 hours here.  And then in
4    Janice Lansita again, now she's billed
5    46 hours in 2021.
6         A.    Yeah.
7         Q.    Another billing error?
8         A.    I have no idea.  As I said,
9    this is the first time I'm looking at
10   these.
11        Q.    That obviously isn't right,
12   correct?  I mean, she didn't work there
13   then.
14             MR. BALL:  Objection to
15        form.
16             THE WITNESS:  It must be the
17        incorrect name.
18   BY MR. VAUGHN:
19        Q.    What name do you think it
20   should be?
21        A.    Oh, I have no idea.
22        Q.    Were you working with the
23   staff in doing all this work in preparing
24   your expert report?
```

Confidential Information - Subject to Protective Order

1          A.     Absolutely.

2          Q.    I mean, this was just six

3    months ago, and it's the person --

4    whoever was spending the most time on

5    this project, you don't know who was

6    spending the most time on this project?

7               MR. BALL:  Objection to

8          form.

9               THE WITNESS:  Yes, I do.

10   BY MR. VAUGHN:

11         Q.    Who is it?

12         A.     Sue Pastula.

13         Q.     Sue who?

14         A.     Pastula.

15         Q.     So you think -- you think

16   that's who that was billed to, is her?

17         A.     I assume so, yes.

18         Q.     How long has she worked

19   there?

20         A.     She's worked there, I think,

21   about a year.  I'm not sure when she

22   started.  She came over from EpidStat

23   too.

24         Q.     And how long did she work at

Confidential Information - Subject to Protective Order

1    EpidStat before?

2        A.    Well, the whole time that we

3    were there, she worked with David

4    Garabrant since the '90s.

5        Q.    Well, shouldn't they know

6    who she is then and not think she's

7    Janice Lansita?

8            MR. BALL:  Objection to

9        form.

10            THE WITNESS:  I would think

11        so.  But as I said, I'm not in

12        charge of the billing.  So that's

13        a billing error they'd done.

14    BY MR. VAUGHN:

15        Q.    Have you ever had billing

16    errors in previous litigations that

17    you've worked on?

18        A.    Not to my knowledge.

19        Q.    You don't remember any of

20    that with the welding rod litigation?

21        A.    I don't recall.

22        Q.    You don't recall.  Okay.

23            MR. VAUGHN:  Let's go ahead

24        and go to the next page.

Confidential Information - Subject to Protective Order

1  BY MR. VAUGHN:

2       Q.    You have 3.5 hours billed on

3  this one.

4       A.    Yep.

5       Q.    And again, we've got

6  57 hours from Janice Lansita?

7       A.    Yeah.  It must be Sue

8  Pastula.  So they've got the wrong name.

9       Q.    I don't know if I see her

10  name disclosed anywhere in this.  I'll

11  keep looking.

12       A.    Yeah, that's why I'm

13  thinking -- that's why I'm thinking it

14  must be Sue.  As I said, I can't -- I

15  don't know unless I look.

16            MR. VAUGHN:  Next page.

17  BY MR. VAUGHN:

18       Q.    It looks you got 13 hours

19  here.  You've got Janice Lansita.  The

20  next page is just Sarah Cohen.

21            MR. VAUGHN:  And let's go to

22       the next one.

23  BY MR. VAUGHN:

24       Q.    And how many people work at

Confidential Information - Subject to Protective Order

1  EpidStrategies right now?

2       A.    I believe we're at eight,

3  eight or nine.

4       Q.    Can you list all eight or

5  nine employees?

6       A.    Yep.  It's myself.  Sarah

7  Cohen, Mina Suh, Naimisha Movva, Lauren

8  Bylsma.  Heidi Reichert, Xiaohui Jiang.

9  I think I've got them all.  I think

10  that's all of them.

11       Q.    And so on this one, this

12  38 -- 33 hours for professional support

13  staff, that's just going to be several of

14  them working on it, you think?

15       A.    Yeah.

16       Q.    How do they keep their hours

17  for that?  Do they just -- are they each

18  keeping their own time and then adding it

19  together?

20       A.    We have billing software.

21            MR. BALL:  Object to form.

22  BY MR. VAUGHN:

23       Q.    How does that billing

24  software work for professional support

Confidential Information - Subject to Protective Order

1  staff?

2          A.    Oh, I have no idea.

3          Q.    When you billed your time,

4  you bill it under -- you bill it under

5  your name, right?

6          A.    Correct.

7          Q.    If someone's billing under

8  their own name, would they not be

9  included under the professional support

10  staff?

11              MR. BALL:  Objection to

12          form.

13              THE WITNESS:  Yeah.  As I

14          said, I don't know.  I'm not in

15          charge of the invoicing anymore,

16          so.

17  BY MR. VAUGHN:

18          Q.    And let's go to the next

19  page.  This is really recent.  This is

20  just last month.  So this is all of you

21  billing on most of this time, except for

22  a little bit of Janice Lansita.  Actually

23  you got 16 hours here.

24          A.    Okay.

Confidential Information - Subject to Protective Order

1    Q.    All right.  If I add all

2    those up, I come out to 113 hours.  Does

3    that sound approximately right to you for

4    the amount of time that you've spent on

5    this?

6    A.    Absolutely no idea.

7    Q.    No idea.  So you have no

8    reason to disagree with me?

9    A.    I have no reason to agree or

10   disagree with you.

11   Q.    If we added up all those

12   hours, you would agree that's how much

13   time you spent on this expert report?

14   A.    If all the hours are added

15   up correctly from the invoices, then

16   that's how much time I spent.

17        MR. VAUGHN:  Tyler, can we

18        pull up the ToxStrat mobile

19        document.

20        (Document Marked for

21        identification as Exhibit

22        Fryzek-8.)

23   BY MR. VAUGHN:

24   Q.    Did EpidStrat, did they

Confidential Information - Subject to Protective Order

1    have -- did you have a website before you

2    were acquired?

3           A.    I'm sorry?

4           Q.    Before you were -- before

5    you started working at ToxStrategies,

6    your old company, the EpidStat --

7           A.    Oh, yes, EpidStat.

8           Q.    Did you have a website with

9    them?

10          A.    With who?  We had our own

11   website.

12          Q.    Your own website?

13          A.    Yeah.

14          Q.    Is that different -- a

15   different website than what's used now?

16          A.    Yes.

17          Q.    Okay.  On this exhibit, is

18   this a correct representation of where

19   all ToxStrategies is located?

20          A.    Oh, I have no idea.

21          Q.    How many people work at

22   ToxStrategies outside of -- outside of

23   your department?

24          A.    Yeah, I believe it's about

```
1    60 total.  But I'm not sure of the exact

2    number.

3              Q.     Does that 60 count

4    EpidStrategies?

5              A.     Yeah.  But it's approximate.

6    I don't know the exact number.

7              Q.     And how do you know that

8    ToxStrategies is not owned by another

9    company?

10             A.     Because they told me.

11             Q.     Who is they?

12             A.     The three owners.

13             MR. VAUGHN:  Tyler, can we

14             open up now the Exponent mobile

15             web page.

16                  (Document Marked for

17             identification as Exhibit

18             Fryzek-9.)

19   BY MR. VAUGHN:

20             Q.     It looks pretty similar,

21   doesn't it?

22             A.     No.

23             Q.     No?  I mean --

24             MR. VAUGHN:  Tyler, can you
```

Confidential Information - Subject to Protective Order

1        do a aide-by-side?

2              TRIAL TECH:  Yeah, just give

3        me one second.

4              MR. VAUGHN:  No rush.

5   BY MR. VAUGHN:

6        Q.    You guys are both in

7   Seattle, correct?

8        A.    It looks like it, yep.

9        Q.    And then both in San

10  Francisco Bay area, correct?

11       A.    Yeah.  It's not the same

12  offices.  These were different companies.

13       Q.    And then on one of them, it

14  says Orange County, and the other one it

15  says southern California.  But then it

16  says Orange County under that, correct?

17       A.    What -- what are you

18  reading?

19       Q.    Southern California.  So on

20  Exponent, it says Southern California,

21  but then under it, it says Orange County.

22  ToxStrategies, it just says Orange

23  County, right?

24       A.    Right.

Confidential Information - Subject to Protective Order

1    Q.    You're both in Austin and

2    Houston, correct?

3    A.    It looks like it, yep.

4    Q.    And Exponent lists Denver

5    while ToxStrategies lists Boulder which

6    is right outside of Denver, correct?

7    A.    I have no idea.  I believe

8    they are quite far apart.

9    Q.    And then Exponent lists

10   Detroit, and ToxStrategies lists Ann

11   Arbor.

12   A.    Yeah.  The Ann Arbor office

13   is all my employees.

14   Q.    That Dr. Garabrant that you

15   were talking about earlier, where does he

16   live?

17   A.    He lives in -- I believe he

18   lives in Ann Arbor, as far as I know.

19   Q.    Okay.

20         MR. VAUGHN:  You can go

21   ahead and take that down Tyler.

22         Can we go back to his CV?

23         THE WITNESS:  Is this the

24   more recent one or old one?

Confidential Information - Subject to Protective Order

1          TRIAL TECH:  Most

2     up-to-date.

3          MR. VAUGHN:  It says

4     August 2021 at the bottom.

5          THE WITNESS:  Okay, thank

6     you.

7          (Document marked for

8     identification as Exhibit

9     Fryzek-6.)

10   BY MR. VAUGHN:

11       Q.    Let's go to Page, 3 I think.

12   So at the bottom we have book chapters

13   that I'm looking at.  You've published

14   quite a few book chapters, haven't you,

15   Doctor?

16       A.    I think just two.  Not very

17   many.

18       Q.    Oh, is the next page not

19   book chapters too?  No, it's manuscripts.

20          Okay.  So are these all the

21   book chapters you've ever published?

22       A.    Yes.

23       Q.    And then the next page I

24   guess it says manuscripts.  What are

Confidential Information - Subject to Protective Order

1    manuscripts?

2          A.    Scientific manuscripts

3    published in journals, scientific

4    journals.

5          Q.    So these are published?

6          A.    Yes.  Except for the first

7    one.  The first one says in press so it

8    hasn't been published yet.

9          Q.    The studies you publish, are

10   they typically funded?

11         A.    Sometimes, sometimes not.

12         Q.    Can you give an example of

13   one that was not funded?

14         A.    It will take me a bit to go

15   through my CV.

16               Is there -- is there a

17   way --

18         Q.    There is.  But do you not

19   recall just offhand the last time you've

20   done a nonfunded study?

21         A.    No.  I mean, I've published

22   over 200 things so it's hard to remember.

23         Q.    And most of them were

24   funded?

Confidential Information - Subject to Protective Order

1                MR. BALL:  Objection to the

2          form.

3                THE WITNESS:  I don't know.

4    BY MR. VAUGHN:

5          Q.    But you can't recall any of

6    the 200 that were unfunded as you sit

7    here?

8          A.    As I --

9                MR. BALL:  Object to form.

10               THE WITNESS:  I'm sorry, I

11         would have to look.  So...

12   BY MR. VAUGHN:

13         Q.    Go ahead.

14         A.    I can control it?

15         Q.    There should be a way you

16   can download it.

17               TRIAL TECH:  So you can --

18         you can do it through the link

19         that was sent in the chat.  Either

20         that or I could give you remote

21         control of the screen.  It might

22         be easier for you to do it through

23         the link that's on the chat.

24               THE WITNESS:  For the marked

Confidential Information - Subject to Protective Order

1          exhibits?

2                    TRIAL TECH:  Correct, yeah.

3          The marked exhibits folder.

4                    THE WITNESS:  So I have that

5          open.  I just need to refresh my

6          window to see it.

7                    TRIAL TECH:  And this should

8          be -- you want to go to Exhibit 6.

9                    THE WITNESS:  Thank you.

10                   TRIAL TECH:  You're welcome.

11                   THE WITNESS:  Hey guys, so I

12         have access now.

13                   Can you repeat your question

14         please.

15    BY MR. VAUGHN:

16         Q.    Yeah.

17               Do you recall any studies

18    that you have published that were not

19    funded?

20         A.    Either through an NIH grant

21    or other type of research grant or?

22         Q.    Just not funded at all.

23         A.    Not funded at all.  I know

24    one off the top of my head is the

Confidential Information - Subject to Protective Order

1    pancreatic cancer and obesity.

2          Q.     Mm-hmm.

3          A.     Book chapter on RSV wasn't

4    funded.

5          Q.     Did -- sorry.

6          A.     Neither book chapter was

7    funded.

8          Q.     Okay.  So what about these

9    publications though that you published?

10          A.     Let's see.  So the Le study,

11    Le HQ, Tomenson, it's a review and

12    meta-analysis of occupational titanium

13    dioxide.

14          Q.     Why did you do that study?

15          A.     Why?

16          Q.     Yeah.

17          A.     It was interesting.  So I

18    had done research on titanium dioxide.

19          Q.     What piqued your interest on

20    it?

21          A.     I had done research on

22    titanium dioxide.

23          Q.     Is there any companies that

24    ever funded you that would be interested

Confidential Information - Subject to Protective Order

1  in that research as well?

2       A.    I don't recall.

3       Q.    What journal did you publish

4  that in?

5       A.    It says here, the Journal of

6  Occupational and Environmental Medicine.

7       Q.    Do you publish in that

8  journal a lot?

9       A.    I have published before in

10  that journal.

11       Q.    Do you think it's a

12  reputable journal?

13       A.    I believe so, yeah.

14       Q.    Do you think it has industry

15  bias?

16       A.    Oh, I have no idea.  I don't

17  know what you mean by industry bias

18  either.

19       Q.    Did anyone else -- who were

20  the other people that you published with?

21       A.    Let's see.  They're other

22  epidemiologists, other scientists.

23       Q.    And do you know if any of

24  them got any funding to do this study?

Confidential Information - Subject to Protective Order

1        A.    No idea.  I don't believe so

2    though.

3        Q.    Do you talk about that

4    before you publish a study?

5        A.    No.

6        Q.    You don't ask your

7    collaborators, hey, are you guys getting

8    funded by somebody to do this so that you

9    can disclose the conflict of interest in

10   the paper, you don't do that?

11       A.    That's the first author's

12   responsibility.  So I just worry about

13   the science.  Make sure the science is

14   accurate.

15       Q.    Can't bias influence the

16   accuracy of science?

17            MR. BALL:  Objection to

18        form.

19            THE WITNESS:  No.

20   BY MR. VAUGHN:

21       Q.    Bias can't -- why do we care

22   about bias then?

23       A.    I guess I should --

24            MR. BALL:  Objection.  I'm

Confidential Information - Subject to Protective Order

1          sorry.

2                    THE WITNESS:  I'm sorry, I'm

3          getting confused about your

4          question.  Can you ask again?

5     BY MR. VAUGHN:

6          Q.    Can bias not influence the

7     integrity of a scientific paper?

8          A.    You'd have to give me an

9     example.

10         Q.    We'll get to them.

11                Your pancreatic cancer and

12    obesity study, why did you do that study?

13         A.    Because I was interested in

14    it.

15         Q.    Why were you interested in

16    that?

17         A.    Because at that time there

18    was a lot of research on obesity and

19    cancer outcomes.  So it was one of the

20    first papers to show the relationship

21    between obesity and pancreatic cancer.

22    Good study.

23         Q.    Is pancreatic cancer also

24    linked to diabetes?  Can pancreatic

Confidential Information - Subject to Protective Order

1    cancer cause diabetes?

2         A.    I -- can pancreatic cancer

3    cause diabetes?  I have no, no idea.

4         Q.    You don't know?

5         A.    No, I don't know.  I haven't

6    studied that.

7         Q.    Do you know if diabetes can

8    cause obesity?

9         A.    I don't know that.

10        Q.    So you don't know if maybe

11   obesity is a symptom of pancreatic cancer

12   as opposed to a cause?

13        A.    So it's established by the

14   American Cancer Society that obesity is

15   related to pancreatic cancer and not

16   through diabetes.

17        Q.    You said related.  But, I

18   mean, if it was a symptom of, it would

19   still be related.  You're saying it's

20   actually a risk factor for?

21        A.    Right.

22             MR. BALL:  Objection to

23        form.

24             THE WITNESS:  You can look

Confidential Information - Subject to Protective Order

1          on the American Cancer Society

2          website and find it.

3    BY MR. VAUGHN:

4          Q.    What year did you do that

5    study?

6          A.    I have to look here to find

7    out.

8          Q.    Were you working for anybody

9    at that time?

10          A.    I was.

11          Q.    Who were you working for?

12          A.    International Epidemiology

13   Institute.

14          Q.    Is that one of the companies

15   you worked for that gets paid by industry

16   to do studies?

17              MR. BALL:  Objection to

18          form.

19              THE WITNESS:  It's one of

20          the companies, consulting firms

21          that I worked for, yes.

22              Do you still want me to find

23          out what year that was published?

24   BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1        Q.    No, that's okay.  It was

2   mostly -- more where you were working at

3   the time.  So why -- is that the IEI?  Is

4   that what it's abbreviated as?

5        A.    It was, yes.

6        Q.    Is that a for-profit

7   company?

8        A.    You know, I don't know.  It

9   no longer -- it no longer exists.  It's

10  by absorbed by Vanderbilt.

11       Q.    By who?

12       A.    Vanderbilt.

13       Q.    Was it often that they would

14  just fund their own studies?

15            MR. BALL:  Objection.

16       Foundation.

17            THE WITNESS:  I was just a

18       junior researcher there.  So I

19       didn't really pay attention to the

20       funding.

21  BY MR. VAUGHN:

22       Q.    So how are you sure that

23  that research for pancreatic cancer and

24  obesity wasn't funded?

Confidential Information - Subject to Protective Order

1           MR. BALL:  Objection to

2      form.

3           THE WITNESS:  Well, easy.

4      Because the data came from my

5      dissertation, my doctoral

6      dissertation.

7  BY MR. VAUGHN:

8      Q.    But how do you know that IEI

9  or no one else within IEI or publishing

10 with you was getting funded?

11          MR. BALL:  Objection to

12     form.

13          THE WITNESS:  On pancreatic

14     cancer.

15 BY MR. VAUGHN:

16     Q.    Huh?

17     A.    On pancreatic cancer?

18     Q.    Yeah.

19     A.    Because it wasn't affiliated

20 with IEI.

21     Q.    Oh, I thought you said it

22 was IEI?

23     A.    Oh.  No, no.

24     Q.    You were working at IEI, but

Confidential Information - Subject to Protective Order

1    it wasn't affiliate with it?

2         A.    Correct, yeah.

3         Q.    And you were doing

4    independent research?

5         A.    I was doing that research on

6    my kitchen table at night.  I wasn't

7    doing it while I was at work.  I was

8    interested in it.

9         Q.    What piqued your interest

10   though in that?

11        A.    I told you.  The pancreatic

12   cancer was my dissertation topic, and

13   there's a lot of studies on obesity and

14   various cancers.  And I realized I had

15   the data in my dissertation dataset, and

16   so I analyzed it and wrote a paper.

17        Q.    Why did you choose

18   pancreatic cancer for your dissertation?

19        A.    I have no -- no reasons.

20        Q.    What professor oversaw you

21   for that dissertation?

22        A.    Well, there were four of

23   them.  So David Garabrant was one.  David

24   Schottenfeld.  It's been 30 years, sir.

Confidential Information - Subject to Protective Order

1    You know, it's kind of hard for me to

2    remember.  Brenda Gillespie was another

3    one.

4         Q.    David Garabrant, was he the

5    main one?

6         A.    No.  Sioban Harlow was the

7    main one.

8         Q.    One second.

9              MR. VAUGHN:  Go to Page 12.

10   Next page.  Keep going.

11   BY MR. VAUGHN:

12        Q.    Here.  The case reports,

13   letters to the editor, what are -- what

14   are these?

15        A.    These are letters to the

16   editor.

17        Q.    What are letters to the

18   editor?  What does that mean?

19        A.    If someone had a comment

20   about a study I did.  We had the

21   opportunity to respond.  So just a few

22   times there were comments.

23        Q.    Why do people comment on

24   your studies?

Confidential Information - Subject to Protective Order

1           MR. BALL:  Objection to

2      form.

3           THE WITNESS:  They have

4      questions.

5  BY MR. VAUGHN:

6      Q.    They ever have criticisms?

7      A.    Well, with over 200 studies

8  I've done, we've got four.  So that's not

9  very often.

10      Q.    Has a governmental agency

11  ever criticized your work?

12      A.    Not that I'm aware of.

13      Q.    Or a health agency ever

14  criticize the work you've done?

15      A.    Not that I'm aware of.

16      Q.    Not that you're aware of.

17           And then abstracts and

18  presentations, what's an abstract?

19      A.    It's a meeting abstract

20  presented at a scientific conference.

21      Q.    Okay.  So all of these are

22  things that you presented at a

23  conference?

24      A.    Well, the first author is

Confidential Information - Subject to Protective Order

1    usually the one that presents them.  But

2    I was involved in them.

3         Q.    A lot of presentations.

4         A.    I know.  It's been busy.

5         Q.    Do you get paid for these

6    presentations?

7         A.    It's usually part of the,

8    you know, contract to do the study.

9         Q.    What all is included in the

10   contract to do the study, besides the

11   study and the presentation?

12             MR. BALL:  Objection.

13             THE WITNESS:  Well, I mean

14        if the data warrants it, we do a

15        presentation.  So the contract is

16        usually just to do the study and

17        write a report.  And if it's

18        interesting, we write a paper and

19        an abstract.

20   BY MR. VAUGHN:

21        Q.    What about being an expert?

22   Is that part of the same contract?

23        A.    Expert in what?

24        Q.    Expert in -- defense expert

Confidential Information - Subject to Protective Order

1    in a litigation?

2         A.    Part of what contract?

3              MR. BALL:  Objection to

4         form.

5    BY MR. VAUGHN:

6         Q.    Is it part of the same

7    contract when you do defense work and

8    publish studies, or are they two separate

9    contracts?

10             MR. BALL:  Objection to

11        form.

12             THE WITNESS:  I'm sorry.

13        I'm confused.

14   BY MR. VAUGHN:

15        Q.    Okay.  So, like, for the

16   welding rod litigation you did you were a

17   defense expert, and you were also

18   publishing studies.  Was that the same

19   contract or did you have two contracts --

20        A.    Yeah --

21        Q.    -- or more contracts?

22        A.    As I said, when I was at

23   IEI, I had no idea how the funding

24   happens.  I just got paid a regular

Confidential Information - Subject to Protective Order

1    salary.

2         Q.    How much did you get paid

3    for the welding rod out of a salary then?

4    Do you know?

5         A.    I have no idea.  I get a

6    monthly salary, so.

7         Q.    And it doesn't depend on

8    your work, the quality, whether it's

9    positive, negative?  You just get paid a

10    salary?

11              MR. BALL:  Objection to

12         form.

13              THE WITNESS:  That's

14         correct.

15              (Whereupon, a discussion was

16         held off the stenographic record.)

17    BY MR. VAUGHN:

18         Q.    So you've only published two

19    book chapters; is that right?  I'm

20    looking at it.

21         A.    That was a lot of work.

22         Q.    Oh, All right.  I'm not

23    trying to say it wasn't.

24              MR. VAUGHN:  Can we, Tyler,

Confidential Information - Subject to Protective Order

1      go to 2012, Toxic Torts.

2           (Document marked for

3      identification as Exhibit

4      Fryzek-10.)

5           TRIAL TECH:  This is 2013.

6           MR. VAUGHN:  Thank you.  I

7      had a typo.  Appreciate it.

8      Making it hard for you.

9   BY MR. VAUGHN:

10          Q.   I didn't see this listed

11  anywhere in your CV.  Do you recall doing

12  a chapter for Toxic Tort and

13  environmental law defense practice

14  seminar course materials?  Do you

15  remember that?

16          A.   No.  I believe it was a

17  presentation that I gave.  I don't

18  believe it was a course.

19          Q.   You don't think that you

20  wrote a chapter for it?

21          A.   I don't think so.

22          MR. VAUGHN:  All right.

23      Tyler, can we go to Page 55.

24  BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1        Q.    Use of Biomarkers in

2   Observational Research.  And that's you,

3   right, Jon P. Fryzek of the EpidStat

4   Institute?

5        A.    Yep.

6        Q.    Does this refresh your

7   recollection any?

8        A.    Yeah, it was a presentation

9   I gave at a conference.

10           MR. VAUGHN:  Can we go two

11        pages after this.

12   BY MR. VAUGHN:

13        Q.    This is the table of

14   contents to your presentation.

15        A.    Okay.

16        Q.     Is that what you would

17   define that as?

18           MR. BALL:  Objection to

19        form.

20           THE WITNESS:  This is a

21        table of contents, and it looks

22        like it's to my presentation.

23   BY MR. VAUGHN:

24        Q.    You didn't list this --

Confidential Information - Subject to Protective Order

1    you're calling this a presentation.  You

2    didn't list this presentation on your CV

3    either, did you?

4         A.    No, but I will.  I forgot

5    about it.

6         Q.    Oh.  Good.

7         A.    Thank you.

8         Q.    You're welcome.

9               Were you paid for this

10   presentation?

11        A.    No.

12        Q.    Who contacted you to give a

13   presentation on defense practice

14   seminars?

15        A.    It was a presentation --

16            MR. BALL:  Objection to

17         form.

18            THE WITNESS:  A presentation

19         on biomarkers.  It wasn't on

20         defense practice seminars.

21            MR. VAUGHN:  Well, Tyler,

22         can we go back to Page 1.

23   BY MR. VAUGHN:

24        Q.    All right.  But the entire

Confidential Information - Subject to Protective Order

1    seminar was for attorneys that defend

2    toxic torts and environmental law cases,

3    correct?

4         A.    I don't know --

5              MR. BALL:  Objection to

6         form.

7              THE WITNESS:  I don't know

8         who the conference was for, I'm

9         sorry.

10   BY MR. VAUGHN:

11        Q.    Do you see where it says,

12   "The Voice of the Defense Bar," next to

13   dri?

14        A.    Yes.

15        Q.    Do you know what "the

16   defense bar" means?

17        A.    No.

18              I'm sorry, this is the first

19   time I'm seeing this, so...

20        Q.    Were you aware that you

21   wrote this chapter or wrote this

22   presentation?

23        A.    It's a presentation.  I

24   assume it's just my slide deck that I

Confidential Information - Subject to Protective Order

1    gave.

2          Q.    There's more than just

3    slides.  We can go through each page with

4    you, but --

5                MR. VAUGHN:  I mean Tyler,

6          let's go to Page 59.

7    BY MR. VAUGHN:

8          Q.    Is this like what you would

9    use in your presentation?

10         A.    I don't recall this.

11         Q.    If you want to download it,

12    feel free or we can scroll through it.

13         A.    We can just scroll through

14    it, because I don't recall writing this.

15         Q.    Let him know when you're

16    ready for the next page.  There's just --

17    it's only like six or seven pages.  Maybe

18    ten.

19         A.    Can we go to the next page.

20    I just want to flip through it.

21                I don't recall this at all.

22                Okay.  Next page.  Next

23    page.

24                Because these are parts of

Confidential Information - Subject to Protective Order

1    my slides.

2         Q.    You think someone else wrote

3    this and put your name on it?

4         A.    Oh, I have no idea.  I could

5    have written it.  But I don't recall it.

6         Q.    You do a lot of work for the

7    defense bar?

8              MR. BALL:  Objection to

9         form.

10             THE WITNESS:  I'm not sure

11        what you mean by that.

12   BY MR. VAUGHN:

13        Q.    Well, as a part of this, it

14   says, "The Voice of the Defense Bar,"

15   Defense Practice Seminar Materials.

16             Do you do a lot of work for

17   defense attorneys?

18             MR. BALL:  Objection to

19        form.

20             THE WITNESS:  What I said

21        was I wasn't paid for this.

22   BY MR. VAUGHN:

23        Q.    Yeah, I understand if you

24   weren't paid.  But, I mean, is work only

Confidential Information - Subject to Protective Order

```
 1   paid?

 2              MR. BALL:  Objection to

 3        form.

 4   BY MR. VAUGHN:

 5        Q.    Does it have to be work to

 6   be paid?

 7        A.    I'm sorry?

 8        Q.    Do you -- do you consider

 9   work, does it have to be paid?

10        A.    I have no idea.  I'm sorry.

11        Q.    Well, I mean, if this isn't

12   work because it wasn't paid, what would

13   you call it?

14        A.    Giving a seminar.  So...

15        Q.    Have you given previous

16   seminars for the defense bar?

17        A.    No.

18              MR. BALL:  Objection to

19        form.

20              THE WITNESS:  This is the

21        only one.

22   BY MR. VAUGHN:

23        Q.    Will you be adding this to

24   your CV in the future?
```

Confidential Information - Subject to Protective Order

 1        A.    Yes.  And thank you for
 2   reminding me of that.
 3             MR. VAUGHN:  Do you mind if
 4        we take a break?  I've been
 5        drinking coffee and stuff.
 6             THE VIDEOGRAPHER:  Off the
 7        record, 10:11 a.m.
 8             (Whereupon a discussion was
 9        held off the record.)
10             (Short break.)
11             THE VIDEOGRAPHER:  We are
12        back on the record at 10:24 a.m.
13   BY MR. VAUGHN:
14        Q.    You said earlier that you
15   asked someone at ToxStrat if they were
16   owned by another company.  Who
17   specifically was it that you asked?
18             MR. BALL:  Objection to
19        form.
20             THE WITNESS:  I guess I -- I
21        asked when we first talking about
22        joining them, I met with the three
23        founders.
24   BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

 1          Q.     I thought you said that they

 2    told you that they were not owned by any

 3    other company.

 4          A.     No, I know they are not

 5    owned by any other company though.

 6          Q.     How do you know that?

 7          A.     Because of our contracts,

 8    who signed the contracts, et cetera.

 9          Q.     Would the contract have to

10    disclose that if there was a

11    nondisclosure agreement?

12          A.     Oh, I have no idea.  It's

13    not -- it's not owned by another company.

14    I don't know where you are drawing that

15    conclusion.

16          Q.     I'm trying to figure out

17    where you're drawing your conclusion that

18    there's no way it's owned by anybody

19    else.

20          A.     Because I think they would

21    have told me, so...

22          Q.     When you opened EpidStat,

23    you did it with Dr. Garabrant; is that

24    correct?

Confidential Information - Subject to Protective Order

1      A.     What about David Garabrant?

2      Q.     Is that who you opened

3   EpidStat with, is that what you said?

4      A.     Yes.

5      Q.     And do you know if he opened

6   it himself personally or under a PLLC

7   named David Garabrant PLLC?

8      A.     They are separate entities.

9      Q.     So was the PLLC though, did

10  that -- is that what opened it?

11          MR. BALL:  Objection to

12       form.

13          THE WITNESS:  I don't know

14       what you mean by that.

15  BY MR. VAUGHN:

16      Q.     Did his PLLC own EpidStat?

17      A.     Oh, no.

18      Q.     Never?

19      A.     Never.  No.

20      Q.     And so if there was any

21  articles of incorporation or anything

22  like that in a state that lists David

23  Garabrant, PLLC, that's inaccurate,

24  correct?

Confidential Information - Subject to Protective Order

1              MR. BALL:  Objection to

2       form.  Foundation.

3              THE WITNESS:  I guess I'm

4       not clear what you're asking.

5  BY MR. VAUGHN:

6       Q.    What does David Garabrant

7  PLLC, do, do you know?

8       A.    No.  And I'm sorry, I can't

9  really talk about EpidStat, because it's

10  closed.  It's been closed for over two

11  years.

12       Q.    And so you can't talk about

13  it because it's been closed?

14       A.    Because I have an NDA.

15       Q.    So you wouldn't be able to

16  tell me if EpidStat was previously owned

17  by Exponent?

18       A.    Oh, it's not.  I know that.

19       Q.    Oh, it's not now because

20  it's not open.  Was it ever?

21       A.    No.

22       Q.    Do you know if David

23  Garabrant, PLLC, has any association with

24  Exponent?

Confidential Information - Subject to Protective Order

1         A.     Not to my knowledge, no.

2         Q.     Do you have an NDA with your

3    current job?

4                MR. BALL:  Objection to

5         form.

6    BY MR. VAUGHN:

7         Q.     Did you answer?

8         A.     I said no.

9         Q.     You don't have an NDA?

10               MR. VAUGHN:  Go ahead and go

11        to his expert report.

12   BY MR. VAUGHN:

13        Q.     At the bottom of the first

14   page you have two opinions.

15        A.     I'm sorry.  Is it one of the

16   exhibits that I can --

17        Q.     Yeah.  I mean, you have a

18   paper copy.  This is your actual report

19   we're looking --

20        A.     Okay.  Okay.  Thank you.

21   I'm going to have to put my glasses on.

22        Q.     No problem.  Take your time.

23        A.     Okay.  Thanks.  Okay.

24        Q.     At the bottom you have two

1  opinions.  And that's the only -- the

2  next page goes to different topics.  Two

3  opinions.  Can you read the first one for

4  me?

5          A.    It says, "My opinions

6  include but are not limited to the

7  following:  Opinion 1.  The scientific

8  evidence does not support an increased

9  risk of cancer from the low levels of

10  NDMA or NDEA with the use of valsartan

11  products."

12          Q.    So you don't -- sorry.  Just

13  the first opinion right now.

14          A.    Okay.

15          Q.    So your opinion is there's

16  no increase at all in the risk of cancer?

17          A.    It's not my opinion.  It's

18  the scientific evidence.

19          Q.    And is that any cancer or a

20  specific cancer?

21          A.    It says any cancer.

22          Q.    But when you're saying

23  increased risk, are you looking at it as

24  all cancers or are you saying also if you

Confidential Information - Subject to Protective Order

1    look at individual cancers, none of them

2    have an increased risk?

3         A.    I'm looking at the summary

4    of evidence following the PRISMA

5    guidelines.  Used the PRISMA guidelines

6    to do a systematic review of the

7    literature.  And it didn't show any

8    increase of all cancer or any cancer, any

9    individual cancer, related to valsartan

10   products.

11        Q.    And when you say low levels,

12   do you mean under 96-nanograms per day?

13        A.    I mean low levels in

14   comparison to endogenous formation, diet,

15   things like that.  Just didn't contribute

16   a lot.

17        Q.    Is it your opinion that

18   humans are exposed to more NDMA through

19   their diet than they are through

20   valsartan products?

21        A.    It's my opinion that humans

22   are more exposed to NDMA through

23   endogenous formation.  I think studies

24   have shown that.  That's 55 to 75 percent

Confidential Information - Subject to Protective Order

1    of the formation, so...

2          Q.    In a person not taking

3    valsartan, you're talking about?

4          A.    Correct.  Well, any people.

5          Q.    How much is formed

6    endogenously in a day?

7          A.    The actual amount, I don't

8    know.  That wasn't important to my

9    analysis, to epidemiology.

10         Q.    How can you say that more is

11   formed endogenously than through a

12   valsartan pill, if you don't know how

13   much is formed endogenously?

14         A.    Because we reviewed some of

15   the literature on that.  It's in my

16   report.

17         Q.    But you can't tell me how

18   much?

19              MR. BALL:  Objection to

20         form.

21              THE WITNESS:  May I look at

22         my report and see if it says?

23   BY MR. VAUGHN:

24         Q.    Of course you can.

Confidential Information - Subject to Protective Order

1          A.     So on Page 36, Paragraph 89,

2    talk about endogenous formation.

3          Q.     How many nanograms a day

4    would a human be forming endogenously of

5    NDMA?

6          A.     As I said, that wasn't

7    important to my analysis.  My analysis

8    was a review of all the epidemiology

9    studies.  And they didn't show any risk

10   for cancer.

11         Q.     And so you did not consider

12   how much NDMA is formed endogenously when

13   forming your opinions, correct?

14         A.     It was -- I listed it here.

15   So of course it was something that I

16   considered.  But the epidemiology

17   literature review didn't show an increase

18   in cancer.

19         Q.     I'm asking about the amount

20   that is formed endogenously in a day.

21   You do not know how much is formed in a

22   day, correct?

23         A.     I don't --

24                MR. BALL:  Objection to

Confidential Information - Subject to Protective Order

1       form.

2               THE WITNESS:  I don't

3       believe anyone does.

4  BY MR. VAUGHN:

5       Q.    Well, then, what was the

6  basis for your opinion a second ago

7  saying more is formed endogenously than

8  is in a valsartan pill?

9       A.    Because it says the crude

10  estimate of 45 to 75 percent of total

11  exposure to n-nitroso compounds is from

12  endogenous formation.  That's what some

13  studies have shown.

14      Q.    What year was this study

15  that you're citing to?

16      A.    I don't know.  As I said,

17  this wasn't important to me --

18      Q.    I think -- I think it's

19  listed here --

20              MR. BALL:  Object.  Hey,

21      hey, he gets to answer.  Don't

22      interrupt him.

23              Go ahead, Dr. Fryzek.

24              THE WITNESS:  Okay.  Thank

Confidential Information - Subject to Protective Order

1    you.
2         As I said, this wasn't
3    important to my review of the
4    epidemiology literature.  I looked
5    at epidemiology literature for my
6    opinions.  And that didn't show a
7    risk of cancer.
8  BY MR. VAUGHN:
9         Q.   And my question, again, was
10  what year was the study that you were
11  citing to.  Are you able to determine
12  that by looking at your expert report
13  right there?
14        A.   I don't recall.  There's
15  two -- there's two articles referenced
16  here, one from 2007 and one from '97.
17        Q.   And are you aware what year
18  contaminated valsartan came on to the
19  market?
20        A.   I believe it was mid 2000s.
21        Q.   What do you mean by mid
22  2000s?
23        A.   2015, '16, '17, something
24  like that.

Confidential Information - Subject to Protective Order

1        Q.     So it would have been after

2   these studies, correct?

3        A.     Correct.

4        Q.     And so this 45 to 75 percent

5   wouldn't apply to people that were taking

6   valsartan, correct?

7        A.     As I said, that wasn't an

8   important consideration of my review.

9               MR. BALL:  Objection.

10       Sorry.  Objection to form.

11  BY MR. VAUGHN:

12       Q.     Are you standing by your

13  opinion that you believe there is more

14  endogenous formation of NDMA than there

15  is in a valsartan pill?

16       A.     My -- my opinion was that

17  the valsartan doesn't cause cancer based

18  on the scientific -- based on the

19  scientific evidence.

20       Q.     So you're not going to give

21  an opinion that more NDMA is formed

22  endogenously than is contained in a

23  valsartan pill, correct?

24       A.     It depends if I find more

Confidential Information - Subject to Protective Order

1   information or not.

2          Q.    At this time, based on the

3   information that you have, you will not

4   be giving that opinion, correct?

5          A.    My opinion will be I don't

6   know.

7          Q.    And if you find more

8   information and you're going to give that

9   opinion, you will notify the attorneys to

10  notify us, correct?  You'll amend your

11  report?

12         A.    I don't know how they do it.

13  An affidavit, I don't know how they do

14  that.

15              MR. VAUGHN:  Can we go back

16         to the first page of his report,

17         Tyler.

18  BY MR. VAUGHN:

19         Q.    Doctor, what's the highest

20  level of NDMA that you're aware of in a

21  valsartan pill?

22         A.    As I said, that wasn't

23  important to my review.

24         Q.    So you have no idea?

Confidential Information - Subject to Protective Order

1        A.      I have no idea.

2        Q.      Do you know the ranges?

3        A.      So my review found no

4    relationship between valsartan and

5    cancer.

6        Q.      Do you know the ranges of

7    NDMA in the valsartan pills?

8        A.      As I said, it wasn't

9    important for my review.

10        Q.      And so that wasn't something

11    that you considered when looking at the

12    studies on valsartan contaminated with

13    NDMA?

14        A.      That wasn't something that

15    the authors of the studies considered.

16        Q.      But when you're looking at a

17    study, do you not look for the strengths

18    and weaknesses of that study?

19        A.      I do.

20        Q.      So did you not look into the

21    levels of valsartan contaminations

22    amongst the different manufacturers to

23    see if there were any weaknesses in the

24    studies that you cite?

Confidential Information - Subject to Protective Order

1          A.     I don't understand how that

2    would be a weakness in epidemiology.

3          Q.     Is the dose of NDMA in

4    valsartan pills consistent amongst all

5    valsartan pills?

6          A.     Oh, that, I don't know.

7                 MR. BALL:  Objection to

8          form.

9    BY MR. VAUGHN:

10         Q.     Excuse me?

11         A.     That I don't know.  I

12   believe some of the studies that looked

13   at valsartan tried to do a dose-response

14   relationship with various cancers and

15   didn't find any dose-response

16   relationship.

17         Q.     What is a dose-response

18   relationship?

19         A.     Higher -- higher levels of

20   valsartan cause more cancer.  They just

21   didn't see it in the studies.

22         Q.     They didn't see higher

23   levels of valsartan causing cancer or

24   higher levels of NDMA?

Confidential Information - Subject to Protective Order

1    A.    Of -- well, the NDMA in the

2  valsartan.

3    Q.    Do you know if they knew the

4  levels of NDMA in the various valsartans?

5         MR. BALL:  Objection to

6         form.

7         THE WITNESS:  That I don't

8         know.  I just know it was

9         published in the paper.

10  BY MR. VAUGHN:

11    Q.    Can you read your second

12  opinion for us?

13    A.    Yep.  Opinion 2?

14    Q.    Yep.

15    A.    "The scientific" -- "the

16  scientific evidence does not support an

17  association between dietary intake of

18  NDMA or NDEA and the risk of cancer."

19    Q.    Not even an association?

20    A.    It doesn't support an

21  association, no.  You have to look at the

22  totality of the evidence, and I've

23  graphed them nicely in my report so you

24  can see it pretty quickly.  There is not

Confidential Information - Subject to Protective Order

1    an association.

2              I mean this is even done

3    after decades of research on diet and

4    NDMA and NDEA and cancer, and after

5    decades of research, there's no

6    association.

7         Q.    Have you ever done any of

8    that research yourself?

9         A.    No.  I don't know why that's

10   important.

11        Q.    Have you or your company

12   ever done research on various foods'

13   ability to increase the risk of cancer?

14        A.    I believe they have.

15        Q.    Was that funded by the

16   industry?

17        A.    What industry?

18        Q.    Was it funded by any

19   corporation that would have an interest

20   in that type of research?

21             MR. BALL:  Objection to

22        form.

23             THE WITNESS:  I don't

24        believe it's funded by anyone

1          right now, the studies that are

2          going on.

3    BY MR. VAUGHN:

4          Q.     Is your company currently

5    doing research into nitrosamines causing

6    cancer?

7          A.     Not -- not that I'm aware

8    of.  I don't think so.

9          Q.     What were you just

10   referencing when you said currently going

11   on?

12         A.     You asked me about studies

13   of food and cancer.  That's what I was

14   referring to.

15         Q.     Do foods contain

16   nitrosamines?

17         A.     No.  You didn't say that.

18   You said the risk of various foods and

19   cancer.

20         Q.     Oh, no, I'm sorry, my

21   question was:  Do foods contain

22   nitrosamines?

23         A.     Do foods contain

24   nitrosamines?

Confidential Information Subject to Protective Order

1    Q.    Yeah.

2    A.    Yes.  Studies have shown

3 that.

4    Q.    What type of foods contain

5 the highest levels of nitrosamines?

6    A.    Oh, I don't know off the top

7 of my head.

8    Q.    What foods is your company

9 currently studying?

10    A.    I don't know --

11    MR. BALL:  Objection to

12    form.

13    THE WITNESS:  I don't know.

14    That's not an area I do research

15    in.

16 BY MR. VAUGHN:

17    Q.    Then why were you hired to

18 do that research in this case?

19    MR. BALL:  Objection to

20    form.

21    THE WITNESS:  Because I am

22    an epidemiologist.

23 BY MR. VAUGHN:

24    Q.    When you say that with diet,

Confidential Information - Subject to Protective Order

1  there's not an association with the risk

2  of cancer, again is that -- are you

3  saying cancer as a whole or even

4  individual cancers?

5       A.   So all of the studies where

6  you look at all the studies combined,

7  they don't show an association with NDMA

8  or NDEA and cancer overall or individual

9  cancers.

10      Q.   Not even colorectal or

11  liver?

12      A.   No.  You have to look at the

13  totality of the evidence.  So all the --

14  you can't just point to one article or --

15      Q.   Can you acces one article --

16           MR. BALL:  Wait --

17           MR. VAUGHN:  I thought he

18  was done.  I'm sorry.

19  BY MR. VAUGHN:

20      Q.   Continue.

21      A.   I'm sorry, I lost my train

22  of thought.

23      Q.   You said, "No, you have to

24  look at the totality of the evidence so

Confidential Information - Subject to Protective Order

1   you can't just point to one article" --

2          A.    Or abstract.

3          Q.    Oh, sorry, I cut you off two

4   words too soon.

5                Is the inverse also true,

6   you can't just point to one or two papers

7   or abstracts and say that it doesn't

8   cause cancer?

9          A.    You have to look at all the

10  evidence that's published.  That's what

11  we did with our PRISMA guidelines.

12         Q.    In your opinion, you've

13  looked at all the research that was

14  published?

15         A.    Absolutely.

16         Q.    How many studies did you

17  review?

18         A.    We started with over 2,000

19  studies.

20         Q.    Did you review all 2,000?

21         A.    Members of my team did,

22  yeah.  Part of the -- part of the

23  methodology to do it is you have to have

24  multiple reviewers.  You can't just have

Confidential Information - Subject to Protective Order

1    one -- one reviewer.  You have to make

2    sure that reviewers agree, the correct

3    data, abstract, whatever.

4          Q.    Where are those thousands of

5    studies listed?  I haven't seen that

6    anywhere.  I see like 90 listed at the

7    end of your report, and that's -- that's

8    all I am aware of.

9          A.    You have to look at the

10   PRISMA diagram, which is on page -- let

11   me see -- Page 12.  So we started out

12   with 1,884 studies.

13         Q.    How many did you guys

14   exclude?

15         A.    It says -- it's pretty clear

16   in this diagram.

17         Q.    Yeah, I'm asking a question.

18   How many did you exclude?

19         A.    It looks like we started out

20   with 1,774 excluded, and then we excluded

21   some more after that.

22         Q.    Of the 1,884 studies, how

23   many actually remained?

24         A.    That we analyzed, 25.

Confidential Information - Subject to Protective Order

1    Q.    So you analyzed 25 studies?

2    A.    But we went through 1,884

3  studies.

4    Q.    Where do I find a list of

5  those studies?

6    A.    The 1,884?

7    Q.    Yeah.

8    A.    You can type in our keywords

9  into these databases and you can

10  replicate the analysis.  That's why --

11  that's why we did the PRISMA analysis, so

12  other people can replicate it.

13    Q.    Why didn't you list that on

14  your materials considered?

15        MR. BALL:  Objection to

16    form.

17        THE WITNESS:  List what?

18  BY MR. VAUGHN:

19    Q.    The 1,884 pieces of

20  literature that your team reviewed.

21  Why is that not listed on the materials

22  considered?

23    A.    Oh, I have no idea.  I can

24  send those to you if you want them.

Confidential Information - Subject to Protective Order

1        Q.    Oh, that would be great if

2    you can get a list together of the ones

3    that you guys actually reviewed.

4             MR. BALL:  We'll take it

5         under consideration.  As he

6         pointed out, he followed the

7         PRISMA guidelines so they can

8         replicate this.  So we'll take it

9         under consideration.

10   BY MR. VAUGHN:

11       Q.    Would you guys have

12   studied -- reviewed?

13       A.    Sorry --

14             MR. BALL:  I'm sorry?

15   BY MR. VAUGHN:

16       Q.    Would you guys have

17   downloaded and studied all those studies

18   that you reviewed?

19       A.    Yes.  To review them, we

20   would download them and saved them.

21       Q.    And the billing that we went

22   over earlier for your expert report, all

23   of that time that would be captured for

24   the review of these 1,884 studies?

Confidential Information - Subject to Protective Order

1    A.    Yes.  It's a lot of time as

2  you can see from the billing.

3         I just want to be clear,

4  that this is -- this is very typical of

5  how you do a PRISMA methodology to look

6  at the narrative review.

7    Q.    So this is typical of how --

8  sorry, I didn't mean to interrupt you.

9  Continue.

10    A.    This is -- this is just

11  following the PRISMA guidelines.  This

12  graph even comes from the PRISMA website.

13    Q.    So did you employ your

14  typical methodology when doing this

15  expert report?

16    A.    Yeah.  So we do this for any

17  type of review, even review articles we

18  publish.

19    Q.    And is this the same

20  methodology that you've used when you've

21  previously been an expert in a

22  litigation?

23    A.    It's the standard

24  methodology to do a literature review.

Confidential Information - Subject to Protective Order

1    So of course.

2              THE VIDEOGRAPHER:  I hate to

3        interrupt.  Doctor, I'm getting a

4        lot of lot of noise on your

5        microphone.

6              (Whereupon a discussion was

7        held off the record.)

8              THE VIDEOGRAPHER:  Off the

9        record 10:44.

10             (Brief pause.)

11             THE VIDEOGRAPHER:  Back on

12       the record at 10:45 a.m.

13             MR. VAUGHN:  Tyler, can we

14       go to Page 3 of his expert report

15       now.

16   BY MR. VAUGHN:

17       Q.    We have materials reviewed.

18   How did you come into possession of these

19   documents?

20       A.    They were sent to me.

21       Q.    Who sent them to you?

22       A.    Attorneys.  I can't remember

23   which one.

24       Q.    Defense attorneys?

Confidential Information - Subject to Protective Order

1    A.    Yes.

2    Q.    Did you request any

3    additional documents after they sent you

4    these?

5    A.    No.

6    Q.    Is there a reason that it's

7    only Teva and Mylan documents?

8    A.    I have no idea.

9    Q.    Did you not review any

10   internals from any other company?

11   A.    Our focus was really on the

12   scientific literature.  It wasn't on

13   these documents.

14           MR. VAUGHN:  Tyler, can we

15       go to Page 9 now.

16   BY MR. VAUGHN:

17   Q.    So on 23, is that the PRISMA

18   guidelines that you've been talking

19   about?

20   A.    Yes.

21   Q.    Okay.  And then so for this

22   first one under 24, your search terms,

23   can you explain how this works for me?

24   Search term --

Confidential Information - Subject to Protective Order

1    A.    So the --

2    Q.    Yeah, like this little graph

3  thing here, where it's like category,

4  search terms and stuff.  What does this

5  mean?

6         A.    So these are the terms that

7  we actually searched in the database.  So

8  we used three databases to search.  We

9  used PubMed, Embase and Web of Science.

10  They all give you slightly different

11  articles.  Some also mention or list

12  meeting abstracts.

13           So that's why we searched

14  all three of them.  And these were the

15  terms that we searched, the terms on the

16  right are the search terms.

17        Q.    Okay.  So would there be --

18  sorry, continue.

19        A.    Well, we filtered them by --

20  we only looked at studies of humans and

21  studies in the English language.

22        Q.    And that were on valsartan;

23  is that right?  That was for Objective 1,

24  the risk of cancer with exposure to

Confidential Information - Subject to Protective Order

1  valsartan products, correct?

2       A.    Correct.  So valsartan was

3  either listed in the title or abstract or

4  it was a mesh heading, which is a heading

5  that, you know, characterizes the

6  article.  It's something that the author

7  has to include.

8            MR. VAUGHN:  Tyler, can you

9       go to Page 13.

10 BY MR. VAUGHN:

11      Q.    So Number 32, can you read

12 that for me aloud?

13      A.    Yes.  "Of the included

14 studies, five articles described the risk

15 of cancer with use of NDMA-containing

16 medications, including three studies of

17 valsartan and two studies of ranitidine."

18      Q.    Why did you include two

19 studies of ranitidine in your evaluation

20 on if valsartan causes cancer?

21      A.    Yeah, that's a good

22 question.  When we looked at

23 NDMA-containing medications, those came

24 up.  We included them.

Confidential Information - Subject to Protective Order

1       Q.    Why didn't you include any

2  other ranitidine studies?

3       A.    Because they weren't

4  categorized as NDMA-containing

5  medication.

6       Q.    You are not aware of other

7  ranitidine studies about NDMA

8  contamination?

9       A.    Just the ones that came up

10  in our literature search.

11       Q.    What levels of NDMA are in

12  ranitidine?

13       A.    Oh, I have no idea.

14       Q.    And how is that applicable

15  to if the NDMA in valsartan causes

16  cancer?

17       A.    They were another way to

18  look at the data, to look at NDMA.  So we

19  just included them.

20       Q.    But you have no idea how

21  much NDMA is in ranitidine?

22       A.    No.  It wasn't important to

23  the studies so.

24       Q.    Even if it's not important

Confidential Information - Subject to Protective Order

1    to the studies, is it not important to

2    your analysis on if that's applicable to

3    the amount that is in valsartan?

4                    MR. BALL:  Objection to

5           form.

6                    THE WITNESS:  I'm not clear

7           how we would analyze it unless the

8           authors reported it.

9    BY MR. VAUGHN:

10          Q.    Well, if you're not clear on

11   how to analyze it, then why did you

12   include it in your expert report?

13          A.    I didn't say I wasn't clear

14   how to analyze it.  I said I'm not sure

15   how I would use that information if it's

16   not reported.

17          Q.    Would that not be valuable

18   information if it was reported?

19                    MR. BALL:  Object to form.

20                    THE WITNESS:  I'm sorry.  I

21          didn't understand.

22   BY MR. VAUGHN:

23          Q.    If the levels of NDMA in

24   ranitidine were reported, would that not

Confidential Information - Subject to Protective Order

1    be important information for you to

2    consider?

3              MR. BALL:  Objection to

4         form.

5              THE WITNESS:  I have no

6         idea.  I just reported on what the

7         authors of the studies reported.

8    BY MR. VAUGHN:

9         Q.    In your opinion, is there

10   more or less NDMA in ranitidine than

11   valsartan?

12        A.    Well, I have no idea, but

13   neither type of study showed any risk of

14   cancer.  So that's comforting.

15        Q.    How important is dose when

16   evaluating a carcinogen?

17        A.    So these weren't considered

18   carcinogens by the FDA.  They are

19   considered impurities, because there's no

20   relationship with cancer with any

21   NDMA-containing medication.

22        Q.    You're saying NDMA is not a

23   probable human carcinogen?

24        A.    Not according to the FDA.

Confidential Information - Subject to Protective Order

1    They've called it an impurity.

2        Q.    You don't think the FDA

3    thinks that NDMA is a potential

4    carcinogen?

5        A.    I'm just telling you what

6    they report.  I don't know what they

7    think.

8        Q.    And because they called it

9    an impurity one time, you think that

10   means it's not a carcinogen now?

11            MR. BALL:  Objection to

12        form.

13            THE WITNESS:  Well, their

14        whole chapter on NDMA has been

15        referred to as an impurity.

16   BY MR. VAUGHN:

17       Q.    Does the FDA talk about how

18   NDMA can increase the risk of cancer?

19       A.    I am not aware of that.

20       Q.    You're not aware of that?

21       A.    Correct.

22            MR. BALL:  Objection to

23        form.

24   BY MR. VAUGHN:

1      Q.     Did you not look into that

2   when doing your expert report?

3      A.     They didn't show any

4   human --

5      Q.     If the FDA said that NDMA

6   would increase the risk of cancer in

7   humans, would you defer to the FDA?

8              MR. BALL:  Objection to

9         form.

10             THE WITNESS:  I would look

11        at the articles that they based

12        that decision on.

13   BY MR. VAUGHN:

14      Q.     Do you even know what levels

15   of NDMA the FDA thinks can cause cancer?

16             MR. BALL:  Objection to

17        form.

18             THE WITNESS:  So the FDA is

19        a regulatory authority.  It's not

20        a scientific group.

21             They're looking at NDMA for

22        different reasons than I am.

23   BY MR. VAUGHN:

24      Q.     Do you consider the company

Confidential Information - Subject to Protective Order

1    you work for to be a scientific group?

2         A.    Absolutely.

3         Q.    Have you ever reviewed any

4    other ranitidine NDMA studies besides the

5    two listed in your expert report?

6         A.    Yes.  We also -- our

7    literature search was completed at the

8    end of January of this year.  You know,

9    since we didn't -- we updated that

10   through the end of August to see if any

11   additional or major studies have been

12   produced since that time.  And the

13   studies of ranitidine didn't show

14   anything striking in terms of

15   relationship with cancer.  So we didn't

16   change our conclusions.

17        Q.    Did any of them show an

18   association with cancer?

19        A.    Nothing that was important.

20   I don't recall, you know, what they were.

21        Q.    What do you mean "nothing

22   that was important"?  Do you not think

23   that an increased risk of cancer is

24   important?

Confidential Information - Subject to Protective Order

1             MR. BALL:  Objection to

2       form.

3             THE WITNESS:  It's not me.

4       You have to look through --

5  BY MR. VAUGHN:

6       Q.    You're not the one taking

7  the contaminated valsartan, are you?

8             MR. BALL:  Objection to

9       form.  Argumentative.

10 BY MR. VAUGHN:

11      Q.    Are you taking the

12 contaminated valsartan?

13            MR. BALL:  Objection to

14      form.

15            THE WITNESS:  So I don't

16      prefer to talk about my medication

17      usage, and I think you're out of

18      line with that type of question.

19 BY MR. VAUGHN:

20      Q.    I'm sorry, you said -- you

21 said a second ago, "it's not me," when I

22 asked you if you thought the increased

23 risk of cancer was important, you said,

24 "It's not me."  So I assumed you meant

Confidential Information - Subject to Protective Order

```
 1    it's not me that is taking the
 2    contaminated valsartan that has
 3    carcinogens in it.
 4              MR. BALL:  Objection to
 5         form.  Is that even -- is that a
 6         question?
 7              MR. VAUGHN:  I'm -- yeah.
 8    BY MR. VAUGHN:
 9         Q.    Did I misinterpret what you
10    were saying earlier?
11         A.    I was talking about the
12    scientists, the published articles on
13    ranitidine.
14         Q.    And so why do you say "It
15    wasn't me"?  What's the relevance of it
16    not being -- did you publish any of these
17    studies that are in your expert report?
18              MR. BALL:  Objection to
19         form.
20              THE WITNESS:  I'm sorry, I
21         got lost about what we are talking
22         about here.
23    BY MR. VAUGHN:
24         Q.    I asked initially, "Have you
```

Confidential Information - Subject to Protective Order

1   seen any literature on ranitidine where

2   it is associated with an increased risk

3   of cancer?"

4           A.    Okay.  So I misunderstood

5   what you said.  I thought you said if I

6   had seen any additional literature on

7   ranitidine.

8           Q.    I asked that first and you

9   said yes.  And then I asked if any of

10   that literature showed an increase risk

11   of cancer.

12           A.    And I said no.  Nothing that

13   was important that would change my

14   opinion.

15           Q.    Okay.  And I asked what is

16   important to you.

17           A.    I said it was not important

18   to me.  It's what's important to the

19   people that wrote the articles, the

20   scientists that wrote the articles.  I

21   think that's when you tried to

22   personalize it to what medication I was

23   using.

24           Q.    Will you be updating your

Confidential Information Subject to Protective Order

```
 1    expert report to contain the additional
 2    ranitidine studies that you reviewed?
 3         A.     I would probably include
 4    them, but it won't change my opinions.
 5         Q.     What would change your
 6    opinion?
 7         A.     If there were a number of
 8    studies that showed high risk associated
 9    with ranitidine or valsartan, NDMA
10    containing medications.
11         Q.     How many studies would be
12    needed for you to draw that conclusion?
13         A.     I have no idea.
14         Q.     Would three be enough?
15         A.     You have to look at a lot of
16    aspects of the study, not just the
17    relative risk.  You have to look at, you
18    know, bias, confounding, those type of
19    factors.  How well they were conducted.
20    The study design.  All sorts of things.
21         Q.     Okay.  You have critiques of
22    quite a few of the plaintiffs' experts,
23    don't you?
24                MR. BALL:  Objection to
```

Confidential Information - Subject to Protective Order

1          form.

2                    THE WITNESS:   I've critiqued

3          a few of them.   My critiques are

4          accurate.

5                    MR. VAUGHN:   Can we go to

6          Page 55 of his report, Tyler?

7   BY MR. VAUGHN:

8          Q.    Do you recall reading

9   Dr. Panigrahy's expert report?

10         A.    I do, yes.

11         Q.    Do you know Dr. Panigrahy's

12  background professionally?

13         A.    I think he is a physician,

14  isn't he?

15         Q.    Do you know if he is a

16  researcher as well?

17         A.    Maybe a lab researcher.   He

18  is not an epidemiologist.

19         Q.    Cancer researcher?

20         A.    Laboratory worker.   I think.

21  But I'm not sure.

22         Q.    But he has an M.D. is what

23  you're saying, right?

24         A.    I don't know what his titles

Confidential Information - Subject to Protective Order

1    are.

2          Q.    Do you have an M.D.?

3          A.    I have a Ph.D. and an MPH.

4          Q.    In 137 are you critiquing

5    his literature review process?

6          A.    Let me read it first.

7          Q.    Yeah.

8          A.    Yes, he didn't follow PRISMA

9    guidelines which are standard guidelines

10   for literature search.

11         Q.    And so is your critique that

12   you don't think you can reproduce, find

13   all the studies that he -- he reviewed?

14         A.    Well, that is -- that is one

15   concern.  It's not --

16         Q.    Did you look at his

17   materials considered in his expert report

18   for all the studies that he listed, the

19   hundreds and hundreds and hundreds?

20         A.    But the -- you know --

21               MR. BALL:  Objection to

22         form -- sorry, Jon.  I didn't mean

23         to -- objection to form.

24               THE WITNESS:  I don't know

Confidential Information - Subject to Protective Order

```
 1              how he identified those.  If he

 2              just cherry-picked studies to some

 3              really positive ones or if he

 4              looked at all studies, I just

 5              don't know.

 6     BY MR. VAUGHN:

 7              Q.    Do you know if he considered

 8     more than 25 studies like you did?

 9                   MR. BALL:  Objection to

10              form.

11                   THE WITNESS:  So I don't

12              know what he did.  He doesn't

13              describe his -- his literature

14              search process.

15     BY MR. VAUGHN:

16              Q.    Does he discuss more than

17     25 studies in his expert report?

18              A.    Oh, I have no idea.

19     Studies -- he discussed animal studies

20     and mechanistic studies which are out of

21     scope for an epidemiology review.

22              Q.    Do you think it's improper

23     that he relied on animal and mechanistic

24     studies?
```

Confidential Information - Subject to Protective Order

1      A.    I said I don't know.  That's

2 not my critique.  My critique is that he

3 didn't report how he did his literature

4 review.

5      Q.    Well, if you go to 138, the

6 first thing you say is he "relies heavily

7 on animal and mechanistic evidence."

8           Are you critiquing him for

9 doing that?

10     A.    He said he relies heavily.

11 He doesn't rely on the human studies.

12          At the end of the day to

13 understand if something causes cancer,

14 you have to study it in humans, right?

15 To understand if it causes cancer in

16 humans you have to study it in humans.

17     Q.    Is that what you're

18 advocating is we test NDMA in humans?

19          MR. BALL:  Objection,

20      vague -- objection to form.

21      Argumentative.

22          THE WITNESS:  You're

23      twisting my comments, so...

24 BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1    Q.    So midway through that

2  paragraph it says, "While important

3  information regarding mechanisms of

4  actions of substances," what's the

5  mechanism of action of NDMA, do you know?

6    A.    Not off the top of my head.

7    Q.    Do you know if it's a

8  mutagenic -- a mutagenic substance?

9    A.    I have no idea.

10   Q.    Do you know if it's

11 genotoxic?

12   A.    I don't know.

13   Q.    You didn't consider if NDMA

14 is a genotoxin or a mutagen in forming

15 your expert opinions?

16   A.    I -- to form my expert

17 opinions, I reviewed the epidemiology

18 literature.  Epidemiology literature

19 didn't show a relationship between NDMA

20 and humans.

21        MR. VAUGHN:  Can we go to

22     the next page, Tyler.

23 BY MR. VAUGHN:

24   Q.    I'm looking at 142.

Confidential Information - Subject to Protective Order

1             It says, "In his discussion

2    of latency, Dr. Panigrahy felt that NDMA

3    acts both as a tumor initiator and tumor

4    promoter to activate dormant cancers."

5             Do you -- do you disagree

6    with him on that?

7        A.    I don't agree or disagree.

8        Q.    Why did you use the word

9    "felt"?

10        A.    He did feel it.

11        Q.    It's his -- it's his

12    opinion, right?

13        A.    Pardon me.

14        Q.    It's his expert opinion.

15    It's not just a feeling, right?

16        A.    I have no idea.

17             MR. BALL:  Objection to

18        foundation.

19    BY MR. VAUGHN:

20        Q.    And so you don't agree or

21    disagree with him?

22             MR. BALL:  Objection to

23        form.

24             THE WITNESS:  Agree or

Confidential Information - Subject to Protective Order

1        disagree about what?

2   BY MR. VAUGHN:

3        Q.    About NDMA acting as a tumor

4   initiator and tumor promoter to activate

5   dormant cancers.

6        A.    I think that this is just an

7   idea he has.  I don't see any evidence to

8   support that.

9        Q.    Did you look for any

10  evidence?

11       A.    In the studies I did, that I

12  looked at.

13       Q.    If NDMA was a mutagen, would

14  it be able to act as a tumor initiator

15  and tumor promoter to activate dormant

16  cancer cells?

17       A.    I have no idea.

18       Q.    You've never done research

19  on that before?

20       A.    No.

21       Q.    You then later in the

22  paragraph note, "If NDMA exposure is a

23  trigger for cancer growth and

24  development, cancer incidence would be

Confidential Information - Subject to Protective Order

1    far higher in the general population and

2    the diet studies would show much stronger

3    effects with the daily exposure humans

4    receive from NDMA."

5              Did I read that correctly?

6         A.    Yes, but you put emphasis on

7    different words that aren't emphasized in

8    the statement.

9         Q.    So as far as what I put

10   emphasis on, I think maybe it was "far

11   higher."  What's the cancer rate in the

12   general population?  Do you know a

13   percentage?

14        A.    No, I don't.

15        Q.    Approximate?

16        A.    No.

17        Q.    Well, how can you make this

18   statement if you don't even know what the

19   general population cancer rate is?

20        A.    Because the statement says

21   if NDMA was a carcinogen, it would be

22   higher than what it is.

23        Q.    But you can't tell me what

24   percentage of people get cancer in their

Confidential Information - Subject to Protective Order

1  lifetime?

2      A.   I'm not sure how that's

3  important to this table.

4      Q.   So if one in three people

5  already get cancer in their lifetime,

6  you're saying that even more than that

7  would have to get cancer for NDMA to be a

8  carcinogen?

9      A.   So I think you're twisting

10 my words around.  I'm not -- I'm not

11 giving absolutes.  I'm just saying that

12 there -- it would be more cancer, we'd

13 see a lot more cancer if NDMA was a

14 carcinogen, in diet and other things.

15     Q.   Well, wouldn't the inverse

16 be true, if we didn't have it in our diet

17 and we weren't exposed to it all, we

18 would expect lower cancer rates?

19     A.   I have no idea.

20     Q.   How much NDMA is a human

21 exposed to daily through their diet?

22     A.   I don't know.

23     Q.   When you say much stronger,

24 that it would show much stronger effects,

Confidential Information - Subject to Protective Order

1    is that not saying that it's already

2    showing effects, diet, NDMA, and cancer?

3         A.    I think you're reading too

4    much into one statement.

5         Q.    What did you mean by much

6    stronger?

7         A.    Why don't you read the whole

8    paragraph.  You can't just pull out a

9    statement and say that that's what the

10   paragraph represents.

11        Q.    I mean, explain to me what

12   this means.  "It would show much stronger

13   effects."  Why did you use that language?

14        A.    Because that's what --

15   that's what we felt.

16        Q.    But the diet studies already

17   are showing an effect of NDMA on human

18   cancer, correct?

19        A.    No.

20              MR. BALL:  Objection to

21        form.

22   BY MR. VAUGHN:

23        Q.    Can you read the next

24   sentence for me, starting with, "The

Confidential Information - Subject to Protective Order

1    studies"?

2         A.    "The studies of

3    NDMA-containing prescriptions that had

4    short follow-up time should have seen

5    increased risk of more cancer than just

6    liver cancer if this were true."

7         Q.    Is that saying that the

8    NDMA-containing prescription studies

9    showed an increase in liver cancer?

10        A.    It doesn't say statistically

11   significant or meaningful.

12        Q.    Okay.  Does it have to say

13   that?

14        A.    Yes.

15        Q.    Why?

16        A.    Because the Gomm study

17   doesn't show a consistent increased risk

18   of cancer.

19        Q.    With the liver.

20        A.    With the liver.

21            (Whereupon a discussion was

22       held off the record.)

23            THE VIDEOGRAPHER:  Off the

24       record 11:08.

Confidential Information - Subject to Protective Order

1                    (Short break.)

2                    THE VIDEOGRAPHER:  We are

3          back on the record at 11:19 a.m.

4     BY MR. VAUGHN:

5          Q.    Doctor, are you familiar

6     with a Grace Chappell, C-H-A-P-P-E-L-L?

7          A.    If she works at

8     ToxStrategies, yeah.

9          Q.    Yeah, and what -- go ahead.

10         A.    She must be one of the

11    junior researchers there that helped us

12    out.

13         Q.    What about a Julia Rager?

14         A.    That name I'm not familiar

15    with.  Is she at ToxStrategies too?

16         Q.    Yes, she was it looks like.

17    I don't know if you worked with her.  I'm

18    curious if you were familiar with either

19    of them.  Do you have any critiques of

20    Grace Chappell?

21         A.    No.

22                MR. BALL:  Objection to

23         form.

24                MR. VAUGHN:  Tyler, can we

Confidential Information - Subject to Protective Order

1        go to 2017, Epigenetics in

2        Chemical-Induced Genotoxic

3        Carcinogenesis.

4              (Document marked for

5        identification as Exhibit

6        Fryzek-11.)

7              MR. VAUGHN:  And if we go to

8        Page 2.

9              THE WITNESS:  I'm going to

10       have to put this on my other

11       screen so I can see it.

12   BY MR. VAUGHN:

13       Q.    Yep.

14       A.    Okay.

15       Q.    And you see at the top there

16   it notes that they are both at

17   ToxStrategies?

18       A.    Okay.

19              MR. VAUGHN:  Can we go to

20       the next page, Tyler.  Sorry.

21   BY MR. VAUGHN:

22       Q.    That second paragraph, it

23   starts with "genotoxicity."  Could you

24   read that first line for me aloud?

Confidential Information - Subject to Protective Order

1    A.    Yep.  So this is from a

2   toxicology journal, it looks like?

3    Q.    Yeah, it looks like

4   ToxStrategies was trying to publish this

5   in Opinion -- Current Opinion in

6   Toxicology is the journal.

7    A.    It would be nothing that I

8   would ever read.

9    Q.    Okay.  Can you read this

10  aloud for us?

11   A.    Just the first sentence

12  there or you want the whole paragraph?

13   Q.    Yeah, start with the first

14  one.

15   A.    "Genotoxicity is another of

16  the proposed ten key characteristics of

17  carcinogens and has long been recognized

18  to play an important role in chemical

19  carcinogenesis."

20   Q.    And you're not aware if NDMA

21  is a genotoxin, correct?

22   A.    As I said, it wasn't

23  important for my studies or my review.

24   Q.    Can you read the next

Confidential Information - Subject to Protective Order

```
 1   sentence for me?
 2        A.    "Genotoxicity is defined as
 3   the potential of a chemical to damage
 4   DNA, which can result in heritable
 5   mutations through cell divisions."
 6        Q.    Do you know what heritable
 7   mutations are?
 8        A.    I assume that they're
 9   mutations that are inherited.
10        Q.    So does that mean if it
11   mutates your DMA, that you can pass that
12   onto your children?
13        A.    You're asking me a
14   toxicology question.  I can't respond.
15        Q.    Can you read the next
16   sentence for me?
17        A.    "If not properly repaired,
18   such mutations may ultimately lead to
19   carcinogenesis via activation of
20   oncogenes and/or inactivation of tumor
21   suppressors."
22        Q.    And if we skip down one, it
23   says, "Additionally, DNA damage
24   associated with chemical exposures may
```

Confidential Information - Subject to Protective Order

1   act as initiating event in carcinogenesis

2   or it may occur within the sequelae of

3   molecular initiating events."

4           Does this sound similar to

5   what Dr. Panigrahy was saying?

6           MR. BALL:  Objection to

7       form.

8           THE WITNESS:  This is

9       toxicology.  As I said, I'm not a

10      toxicologist.

11  BY MR. VAUGHN:

12      Q.   So you weren't critiquing

13  Dr. Panigrahy's opinions related to

14  activation of tumor suppressors?

15      A.   I can't remember what I

16  said.  You have to show me what I wrote.

17          MR. VAUGHN:  We can move on

18      to Page 8 of this study.

19  BY MR. VAUGHN:

20      Q.   I notice in your expert

21  report you are talking about blood

22  cancers, you mentioned formaldehyde as a

23  risk factor and then here your colleagues

24  note, "Formaldehyde represents an example

Confidential Information Subject to Protective Order

1  of a carcinogen that impacts miRNA

2  expression and causes DNA damage."

3          Do you agree with your

4  colleagues?

5      A.   I agree -- I have no

6  opinion.

7      Q.   Well, you list formaldehyde

8  in your expert report as a risk factor.

9  You don't have an opinion if it's a risk

10  factor for cancer?

11      A.   My opinion is that you have

12  to control for it when you look at the

13  relationship between NDMA and cancer.

14  That's what I was trying to control for.

15      Q.   Why would you need a control

16  for it if it's not a risk factor?

17      A.   I didn't say it wasn't a

18  risk factor.

19      Q.   Do you agree that

20  formaldehyde is a risk factor for cancer?

21      A.   All that I said is it's

22  something you have to control for when

23  you look at these relationships.  You're

24  misinterpreting what I'm saying.

Confidential Information - Subject to Protective Order

1    Q.    Well, I'm asking a different

2    question.  Do you agree that formaldehyde

3    is a risk factor for cancer?

4    A.    I haven't studied

5    formaldehyde so I don't -- studies have

6    shown that and so that's why we said you

7    have to control for it.

8    Q.    You need to control for

9    things that you don't even think are

10   necessarily cancerous?

11          MR. BALL:  Objection to

12     form.

13          THE WITNESS:  I didn't say

14     that.

15   BY MR. VAUGHN:

16   Q.    Do you know how IARC

17   classifies formaldehyde?

18   A.    I have no idea.

19   Q.    You don't know if

20   formaldehyde is a known carcinogen?

21   A.    I don't know how IARC

22   classifies it.

23   Q.    Outside of IARC, are you

24   aware that formaldehyde is a known human

Confidential Information Subject to Protective Order

1    carcinogen?

2              MR. BALL:  Objection to

3         form.

4              THE WITNESS:  As I said,

5         I've never studied formaldehyde.

6         So I have no common knowledge.

7    BY MR. VAUGHN:

8         Q.   So you have no reason to

9    disagree with your colleagues that

10   formaldehyde is a carcinogen?

11        A.   No reason to disagree.

12        Q.   What is miRNA, do you know?

13        A.   I don't know.

14             MR. VAUGHN:  Next page,

15        Tyler.

16   BY MR. VAUGHN:

17        Q.   Bottom of that first

18   paragraph.  It says, "These data clearly

19   demonstrate that formaldehyde can

20   significantly alter the expression of

21   miRNAs, including miRNAs that regulate

22   transcriptional targets involved in DNA

23   damage response signaling."

24             So is this saying that

Confidential Information - Subject to Protective Order

```
1    formaldehyde can also damage DNA?
2              MR. BALL:  Objection to
3         form.
4              THE WITNESS:  I'm not a
5         toxicologist so I can't interpret
6         these types of studies.  I don't
7         know what data they are referring
8         to.  I don't know what miRNA mean.
9    BY MR. VAUGHN:
10        Q.    And in your opinion, is NDMA
11   carcinogenic to humans at all?
12        A.    None of the studies that I
13   reviewed showed that.
14        Q.    So you don't think at any
15   level NDMA would be carcinogenic to a
16   human?
17        A.    None of the studies --
18             MR. BALL:  Objection to
19        form.
20             THE WITNESS:  -- have shown
21        a relationship between NDMA and
22        cancer in humans.
23   BY MR. VAUGHN:
24        Q.    Would you consider the fact
```

Confidential Information Subject to Protective Order

```
1    that formaldehyde is a known human
2    carcinogen when coming to your opinions
3    on NDMA not being a human carcinogen?
4               MR. BALL:  Objection to
5         form.
6               THE WITNESS:  I'm sorry, I
7         didn't understand your question.
8    BY MR. VAUGHN:
9         Q.    Did you consider the fact
10   that formaldehyde is a known human
11   carcinogen when coming to your opinions
12   that NDMA is not a human carcinogen?
13              MR. BALL:  Objection to
14        form.
15              THE WITNESS:  I guess I
16        don't understand what you're
17        saying there.  I'm sorry.
18   BY MR. VAUGHN:
19        Q.    Do you not understand what
20   the relationship is, is that the problem?
21        A.    Your sentence doesn't make
22   sense.
23              MR. BALL:  Objection to
24        form.
```

Confidential Information - Subject to Protective Order

BY MR. VAUGHN:

Q.    Explain to me what part doesn't make sense.

A.    The sentence.  I don't understand what you're saying, so...

Q.    So you don't think that NDMA is a carcinogen, correct?

A.    Pardon me?

Q.    You do not believe that NDMA is a human carcinogen, correct?

A.    Oh, it's not just me.  It's the regulatory authorities.  It's the studies that we reviewed.  It's all the studies.

Q.    And in coming to your conclusion that NDMA is not a human carcinogen, did you consider the fact that formaldehyde is a known human carcinogen?

MR. BALL:  Objection to form.

THE WITNESS:  As it was -- as it was studied in the different studies we looked at.

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    Did you do any research into

3    how NDMA is metabolized in the human

4    body?

5         A.    No.  We reviewed the

6    epidemiology literature.

7         Q.    So you didn't consider how

8    NDMA is metabolized in the human body

9    when coming to your opinions?

10        A.    So that's not something that

11   you commonly consider in epidemiology.

12        Q.    You say not commonly.  When

13   do you actually consider it in

14   epidemiology?

15        A.    I've never considered it.

16             MR. VAUGHN:  Tyler, can we

17        go to 1990, Role of metabolism.

18             (Document marked for

19        identification as Exhibit

20        Fryzek-12.)

21             THE WITNESS:  This is a 1990

22        paper.

23   BY MR. VAUGHN:

24        Q.    It is a 1990 paper.  Is that

Confidential Information - Subject to Protective Order

```
 1    too old for us to be relying on?  Doctor?
 2         A.    Oh.  Well, you're having me
 3    comment on studies that are outside my
 4    field.  So I don't know how much I can
 5    help you on this.
 6         Q.    Oh, that's okay.  I just
 7    want to make sure if you knew some stuff
 8    or considered it, is mostly what I'm
 9    trying to figure out.  I need to
10    understand what you considered in forming
11    your expert opinions.
12         A.    It's -- I can -- I listed
13    the articles I considered.  They are all
14    epidemiology articles, not toxicology
15    articles.
16         Q.    This -- in the title where
17    it says dimethylnitrosamine, what is
18    that?
19         A.    You have to tell me.
20         Q.    You don't know what that is?
21         A.    Do you?  I mean this is a
22    toxicology paper.  I didn't study
23    toxicology.  I didn't even have a course
24    of it in college -- in graduate school.
```

Confidential Information - Subject to Protective Order

1    Q.    I just mean this word

2    though.  Dimethylnitrosamine.  Do you

3    know what that is?

4    A.    I have no idea.

5    Q.    And so when you were writing

6    your expert report and reviewing

7    literature, you had no idea what

8    dimethylnitrosamine was, did you?

9    MR. BALL:  Objection to

10    form.

11    THE WITNESS:  You have to

12    explain to me why that's

13    important.

14    BY MR. VAUGHN:

15    Q.    Well, what if

16    dimethylnitrosamine is another word for

17    NDMA, would that be important to you?

18    A.    If -- if it means the same

19    as NDMA, of course.

20    Q.    But you didn't look into

21    that or know that when you were drafting

22    your opinions?

23    A.    So the PubMed database that

24    we used would have categorized NDMA with

Confidential Information - Subject to Protective Order

1  dimethylnitrosamine as well.  It would

2  have captured it.

3         Q.    How do you know that if you

4  don't even know what dimethylnitrosamine

5  meant?

6         A.    Because that -- there's

7  something called the mesh headings, which

8  we used.

9         Q.    How do you know that it

10 knows it if you don't know it?

11              MR. BALL:  Objection to

12        form.

13              THE WITNESS:  It's in the

14        National Library of Medicine.

15 BY MR. VAUGHN:

16        Q.    Are you making assumptions?

17              MR. BALL:  Object to the

18        form.

19              THE WITNESS:  I think it's a

20        pretty good assumption.

21 BY MR. VAUGHN:

22        Q.    So the answer to my question

23 is yes, you were assuming that the search

24 database knew that dimethylnitrosamine

Confidential Information Subject to Protective Order

1    was the same as NDMA?

2           MR. BALL:  Objection to

3        form.

4           THE WITNESS:  You'd have to

5        point me to an epi article that

6        mentioned dimethylnitrosamine.  I

7        haven't seen any.

8    BY MR. VAUGHN:

9        Q.    So you didn't review any

10   articles on dimethylnitrosamine that were

11   epi studies?

12       A.    I'm asking you to show me

13   one.

14       Q.    I'm asking you if you

15   reviewed any.

16       A.    I don't recall that there

17   was any that were mentioned.  I don't

18   know.

19           MR. VAUGHN:  Tyler, go to

20       Page 3 of this study.

21   BY MR. VAUGHN:

22       Q.    That first paragraph,

23   next-to-last sentence starting with, "The

24   actual enzyme," can you read that aloud

Confidential Information - Subject to Protective Order

1    for me doctor, that sentence?

2         A.    That begins with, "The

3    actual enzyme"?

4              MR. VAUGHN:  Yeah, there we

5         go.  Thank you, Tyler.

6              THE WITNESS:  So I will read

7         this sentence from this toxicology

8         journal that is not epidemiology,

9         outside the scope of my field.

10             "The actual enzyme system

11        responsible for the metabolism of

12        DMN, DMN-demethylase, was

13        subsequently characterized by

14        Bouwers and Emmelot by

15        demonstrating that formaldehyde is

16        the main product of in vitro DMN

17        metabolism.  Since then, the

18        metabolism of DMN has been studied

19        extensively and has been topic of

20        hundreds of papers."

21             MR. VAUGHN:  Can we go to

22        the next page, Tyler.

23   BY MR. VAUGHN:

24        Q.    If we look here, we can see

Confidential Information - Subject to Protective Order

1  how NDMA breaks down.  Do you see the

2  different spots where it turns into

3  formaldehyde?

4      A.    No.

5      Q.    You don't see that?

6      A.    You'd have to show that to

7  me.

8      Q.    On the top right-hand corner

9  it says formaldehyde, and then in the

10  middle right it says formaldehyde.

11      A.    Okay.

12      Q.    You weren't aware of this in

13  forming your expert opinions, were you?

14      A.    I haven't study organic

15  chemistry since I was a junior in

16  college, sophomore in college.

17      Q.    Maybe we can get something

18  recent for you because I know you were

19  criticizing that one from being 1990.

20          MR. VAUGHN:  Tyler, can we

21      do the 2002 World Health

22      Organization, n-nitroso.

23          THE WITNESS:  I didn't

24      criticize that it was 1990.  I

Confidential Information - Subject to Protective Order

1          criticized that it was a

2          toxicology article.

3                 (Document marked for

4          identification as Exhibit

5          Fryzek-13.)

6    BY MR. VAUGHN:

7          Q.    How about a World Health

8    Organization paper, is that better for

9    you?

10         A.    Better in what way?

11         Q.    Have you ever reviewed this

12   document before, Doctor?

13         A.    I can't recall.

14                MR. VAUGHN:  Tyler, can we

15         go to Page 19 of the PDF.  So 15,

16         then, of the actual paper.

17                There we go.  Can you blow

18         up that chart up high?

19                THE WITNESS:  Thank you.

20   BY MR. VAUGHN:

21         Q.    And, Doctor, what chemical

22   is at the very top middle?

23         A.    It says NDMA.

24         Q.    And do you see both

Confidential Information - Subject to Protective Order

1  directions where it eventually breaks

2  down into formaldehyde?

3       A.   As I said, I don't

4  understand this because I'm not an

5  organic chemist.  This is way outside my

6  field.

7       Q.   Okay.  So again, you didn't

8  consider the fact that NDMA breaks down

9  into a known carcinogen when forming your

10 opinion that NDMA isn't carcinogenic in

11 humans?

12           MR. BALL:  Objection to

13      form.

14           THE WITNESS:  So, you know,

15      I don't understand the type of

16      formaldehyde.  I don't understand

17      all the intricacies of this.

18 BY MR. VAUGHN:

19      Q.   What types of formaldehyde

20 are there?

21      A.   The epidemiology studies

22 haven't shown a relationship.

23      Q.   You said types of

24 formaldehyde.  What types of formaldehyde

Confidential Information - Subject to Protective Order

1    are there?

2          A.    I have no idea.  I said I

3    don't understand.  I don't know this.

4    This is outside of my field of study.

5                MR. VAUGHN:  Let's go ahead

6          and go back to his expert report,

7          Tyler.  Can we go to Page 50 this

8          time.

9    BY MR. VAUGHN:

10         Q.    Do you recall reviewing

11   Dr. Etminan's expert report?

12         A.    Yes.

13         Q.    And do you recall what his

14   profession is?

15         A.    I believe he is an

16   epidemiologist.  Claims to be an

17   epidemiologist.  I don't know.

18         Q.    Do you question him being an

19   epidemiologist?

20         A.    I question some of the

21   conclusions in this.  They're a little

22   goofy.

23         Q.    They're a little what?

24         A.    Goofy.

Confidential Information - Subject to Protective Order

1    Q.    Goofy?

2    A.    Absolutely.

3    Q.    What's goofy?

4    A.    The way he did his

5    literature review, how he interpreted

6    confidence intervals, his review of the

7    occupational study, the Hidajat study.  I

8    don't know.  It's goofy.

9    Q.    So on 128 with the dietary

10   studies.  What's your main critique of

11   him using dietary studies?

12   A.    I don't have a critique of

13   him using dietary studies.

14           MR. BALL:  Jon, you need to

15       speak up just a little.  I'm

16       having a hard time hearing you.

17           THE WITNESS:  I said I'm not

18       clear what you're asking.

19   BY MR. VAUGHN:

20   Q.    Okay.  Well, you note in

21   here the exposure estimates are

22   unreliable.

23   A.    Yes.  That's true for

24   dietary studies.

Confidential Information - Subject to Protective Order

1    Q.    Does that make them

2    unreliable, the studies?

3    A.    If the exposure estimates

4    unreliable, yes.

5    Q.    And so those studies should

6    not be relied on then if they cannot

7    determine accurate exposure estimates?

8    A.    So you can't just take, you

9    know, one small phrase from something I

10   wrote and apply it to everything.  You

11   have to read the whole thing.  Read the

12   whole paragraph, the whole sentence.

13   Q.    Why are exposure estimates

14   important?

15   A.    Why are they important?

16   Q.    Yeah.

17   A.    For who?

18   Q.    For the validity of a study.

19   A.    Because it measures what

20   they are exposed to.  I'm not clear what

21   you're asking.

22   Q.    What's the problem if you

23   don't have accurate exposure estimates?

24   A.    You're not measuring what

Confidential Information - Subject to Protective Order

1   you say you're measuring.

2          Q.    Will that impact the results

3   of the study?

4          A.    Absolutely.

5          Q.    Do you use questionnaires

6   when you do your studies?

7          A.    I did them with my

8   dissertation.

9          Q.    Is that the only time?

10         A.    I'm trying to recall.

11               I believe there were a

12  couple other studies that I did

13  questionnaires as well.  But they weren't

14  questionnaires that I developed.  I just

15  analyzed them.  My dissertation is the

16  only one where I developed the

17  questionnaire.

18               MR. VAUGHN:  Tyler, can we

19         now go to the 2005, a cohort study

20         of Parkinson's disease.

21               (Document marked for

22         identification as Exhibit

23         Fryzek-14.)

24  BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1  Q.    Did you do this study while

2  you were working at the IEI that we

3  talked about before?

4  A.    Yes.

5  Q.    And the Danish Cancer

6  Society, were they involved with this as

7  well?

8  A.    It was performed at the

9  Danish Cancer Society.

10  Q.    So this is one of those

11  studies that you were talking about that

12  you've worked with the Danish Cancer

13  Society on before?

14  A.    Yes.

15  Q.    Was this another one you

16  decided to publish in the Journal of

17  Environmental Med -- sorry, Journal of

18  Occupational Environmental Med?

19  A.    I'm not sure where it was

20  published.

21  Q.    At the bottom of that

22  objective paragraph, is that where -- you

23  published that or is that a citation?

24  A.    I'm sorry, where are you

Confidential Information Subject to Protective Order

1    looking -- oh, it does say Journal of

2    Occupational and Environmental Medicine.

3    Yes.

4         Q.    So that's the study that was

5    published in that?

6         A.    Yes.

7         Q.    Okay.  And at this time

8    Sarah Cohen, Loren Lipworth, and William

9    Blot, they all worked with you at the

10   IEI?

11        A.    I'm sorry, I can't see

12   because this is blown up.

13        Q.    If we go --

14             MR. VAUGHN:  Yeah, the

15        bottom part, from the IEI.  If you

16        can blow that up.

17             THE WITNESS:  Yeah, so

18        it's -- yeah, so you mentioned --

19        yeah, myself, Sarah Cohen, Loren

20        Lipworth, Bill Blott.  Yep.

21   BY MR. VAUGHN:

22        Q.    Do you currently work with

23   any of these people?

24        A.    I work with Sarah Cohen and

Confidential Information - Subject to Protective Order

1    Loren Lipworth once in a while.

2          Q.    Where do they work?

3          A.    Sarah Cohen works for me.

4    Loren Lipworth is on faculty at Notre

5    Dame.

6          Q.    And then who gave funding

7    for this research?

8          A.    Oh, I have no idea.

9          Q.    Do you see, just a little

10   bit below, it says, "A grant funding this

11   research was provided by a group of

12   current and former manufacturers of

13   welding consumables"?

14         A.    Yes.

15         Q.    -- see that?

16         A.    I wasn't involved in the

17   funding.

18         Q.    You weren't involved in the

19   funding?

20         A.    No, I was just involved in

21   doing the research at this point of my

22   life.

23         Q.    If we go to Page 2.  I'm

24   looking at the middle column, basically

Confidential Information - Subject to Protective Order

1    in the middle.

2              MR. VAUGHN:  Yeah, that

3        paragraph.

4    BY MR. VAUGHN:

5        Q.    All right.  Midway through

6    it notes that 1986 there was a

7    self-administered questionnaire that was

8    mailed to the living workers and their

9    next of kin or long-term colleagues.  Is

10   that how you guys conducted this study?

11       A.    Oh.  So we didn't conduct

12   the original study.  It was an original

13   study of cancer, I believe.  I can't -- I

14   think it was cancer.

15       Q.    So these questionnaires

16   weren't even necessarily filled out by

17   the person being studied, some of them

18   were filled out by colleagues?

19              MR. BALL:  Objection to

20        form.

21              THE WITNESS:  I just have to

22        go with what -- what it says here.

23        I assume so since I'd be a boy.

24   BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1          Q.     But this was accurate enough

2     for you guys to use in your study, right?

3          A.     Absolutely.

4                 MR. BALL:  Objection to

5          form.

6                 MR. VAUGHN:  If we go to

7          Page 6, Tyler.  And middle again.

8          And middle of that even.

9     BY MR. VAUGHN:

10         Q.     It notes job exposures after

11    this time period were not collected, so

12    after 1986.  And that specific cumulative

13    exposures information could not be

14    established.

15                Did I read that correctly?

16         A.     Yes.

17         Q.     So even though you guys

18    weren't able to get any information after

19    1986 and you couldn't figure out

20    cumulative exposures, it was still okay

21    for this study, right?

22         A.     Yes.

23                MR. BALL:  Objection to

24         form.

Confidential Information - Subject to Protective Order

1           THE WITNESS:  I think the

2     nice thing about this study is a

3     couple years ago they did a

4     follow-up study, found the same

5     results.  To my knowledge.

6           So if you just Google Johnni

7     Hansen and Danish welders, you'll

8     see that they did a follow-up

9     study.

10  BY MR. VAUGHN:

11     Q.    Who funded that study, do

12  you know?

13     A.    I think it says no funding.

14  But you can look and find out.

15     Q.    Do you always disclose your

16  funding?

17     A.    I believe we do.  I hope we

18  do.

19           MR. VAUGHN:  Tyler, can we

20     go to the 2009 welding fume MDL

21     document.

22           (Document marked for

23     identification as Exhibit

24     Fryzek-15.)

Confidential Information - Subject to Protective Order

1              MR. VAUGHN:  And then can we

2      go to Page 45.

3  BY MR. VAUGHN:

4      Q.    You ever seen this before,

5  Doctor?

6      A.    No.

7              MR. VAUGHN:  Can you zoom in

8      on that first paragraph, Tyler?

9      Yeah.

10 BY MR. VAUGHN:

11     Q.    Can you go ahead and just

12 read this entire paragraph aloud for us?

13     A.    I'm sorry, so who is the

14 author of this paragraph?

15     Q.    Oh, this is by

16 Judge O'Malley in the Eastern District of

17 Ohio.

18     A.    Did she write it, or was it

19 plaintiffs' attorneys or defense

20 attorneys?

21     Q.    This is the judge.

22     A.    That is the judge.

23             MR. VAUGHN:  Can we go to

24     Page 73 real quick, just so we can

Confidential Information Subject to Protective Order

1          see the signature.

2     BY MR. VAUGHN:

3          Q.     There we go.  Kathleen

4     O'Malley.

5          A.     Okay.

6          Q.     All right.  Let's go back to

7     Page 45.

8               All right.  Can you now read

9     this paragraph aloud for the jury?

10          A.     "Since the beginning of this

11     MDL, the Court has repeatedly addressed a

12     number of issues related to two

13     epidemiological studies known as the

14     Danish and Swedish Studies.  Defendants

15     provided funding for both studies, and

16     both studies concluded there was no link

17     between welding and parkinsonism.

18     Recitation of the full and complicated

19     background of the issues related to the

20     Danish and Swedish Studies is beyond the

21     scope of this Order; it suffices to say

22     there were discovery issues related to

23     the two Studies serious enough to give

24     the Court reason to exclude any reference

Confidential Information - Subject to Protective Order

1   to them at any MDL trial.  Rather than

2   exclude them (as it could have), however,

3   the Court concluded the Studies would be

4   admissible and reference to them by

5   defendants allowed, but that plaintiffs

6   would have 'free rein on cross

7   examination,' including leeway to ask

8   about a long series of issues that went

9   to the credibility of those studies."

10        Q.    And that's good.  And

11  earlier you testified that you ended up

12  not actually testifying at trial in this

13  litigation, right?

14        A.    Right.

15        Q.    Do you know if this has

16  anything to do with that?

17        A.    I have no idea.  What they

18  are talking about here is they wanted

19  access to the data.  Well, the data is,

20  you know, the Danish citizens' data and

21  no one could get access to that.  They --

22  they --

23        Q.    Well, you don't know -- you

24  don't know if they eventually -- oh, keep

Confidential Information Subject to Protective Order

1   going.

2        A.    They ended up sending a

3   statistician over there to review the

4   findings.

5        Q.    So they did end up reviewing

6   the data, didn't they?

7        A.    They sent a plaintiff

8   statistician over there, yes.  But they

9   couldn't -- they couldn't release the

10  data outside of Denmark.

11       Q.    And if we look at

12  Citation 71, so the first studies that

13  they are talking about is a cohort of

14  Parkinson's disease published by you.

15  That's the study we just looked at,

16  right?

17       A.    Right.

18       Q.    Okay.  And then the second

19  one was by someone named Fored,

20  F-O-R-E-D.  How do you say that?

21       A.    Oh, Michael Fored.

22       Q.    Do you know him?

23       A.    Yes.

24       Q.    Did you publish with him on

Confidential Information - Subject to Protective Order

1    this other study?

2           A.    Yes.

3           Q.    You were involved with both

4    studies the judge was talking about?

5           A.    Yep.  Yes.

6           Q.    Were any of the other

7    authors involved with both of the

8    studies?

9           A.    I don't know.  We have to

10   look at the author list and see.

11                MR. VAUGHN:  Okay.  Tyler

12         can you pull up 2006 Parkinson's

13         disease.

14                (Document marked for

15         identification as Exhibit

16         Fryzek-16.)

17                MR. VAUGHN:  And can you

18         split screen that with the one

19         that we looked at a little bit

20         ago, 2005, A Cohort Study of

21         Parkinson's Disease.

22   BY MR. VAUGHN:

23          Q.    Doctor, besides yourself, is

24   there any other author that's on both of

Confidential Information - Subject to Protective Order

1    these studies?

2          A.     Bill Blot is.   I don't see

3    any others.

4          Q.     And Dr. Blot was also

5    working with you at the IEI at that time,

6    correct?

7          A.     He was one of the owners of

8    IEI.

9                 MR. VAUGHN:   All right.

10         Let's only look at the new one,

11         Tyler, the 2006.

12                Can we go to Page 5.

13                Can you blow up the bottom

14         right-hand corner, author

15         affiliations.

16   BY MR. VAUGHN:

17         Q.     So it discloses here that

18   you guys were funded by manufacturers of

19   welding consumables again.   And it says,

20   "Competing interest, none."

21                Who makes that

22   determination?

23         A.     Oh, I have no idea.   I

24   assume it's the first author.

Confidential Information - Subject to Protective Order

1      Q.    Do you agree with that, that

2   you guys don't have any competing

3   interest when you're being funded by the

4   industry that is being sued?

5            MR. BALL:  Objection to

6        form.

7            THE WITNESS:  I didn't know

8        about any of that when I did the

9        studies.  I was just more

10       interested in the science.

11  BY MR. VAUGHN:

12       Q.    You didn't know about any of

13  what?

14       A.    The litigation going up.

15       Q.    You hadn't been hired at

16  this time?

17            What year is this study?

18       A.    2006.  Whatever it says.

19       Q.    Yeah.  Do you recall earlier

20  in your deposition where we reviewed your

21  welding fume deposition?  Do you remember

22  what year that was in?

23       A.    So mind you, this was

24  published in 2000 -- I don't remember

Confidential Information - Subject to Protective Order

1   when the study was performed.

2         Q.    How long does it typically

3   take you to design a study and perform it

4   and write it up?

5         A.    At least a year.  If not

6   longer.

7         Q.    Why is that?

8         A.    It's just how long it takes.

9   It takes a long time to write and analyze

10  and submit to a journal, for a journal to

11  review it, send you back comments,

12  respond to the comments.  It takes a

13  while.

14        Q.    So to have an accurate study

15  it takes quite a while, right?

16              MR. BALL:  Objection to

17        form.

18              THE WITNESS:  They've

19        expedited that nowadays.  But back

20        at this time, it did take longer.

21  BY MR. VAUGHN:

22        Q.    If someone was doing a study

23  in two months, would you kind of question

24  it?

Confidential Information Subject to Protective Order

1          MR. BALL:  Objection to

2     form.

3          THE WITNESS:  Question it?

4  BY MR. VAUGHN:

5     Q.    The validity of the study,

6  you know, that they designed it, did the

7  study, wrote it, all within a two-month

8  period.  Would you question the validity

9  of it at all?

10          MR. BALL:  Objection to

11     form.

12          THE WITNESS:  It depends on

13     the study.

14  BY MR. VAUGHN:

15     Q.    What's that?

16     A.    It depends on the study.

17     Q.    What's the fastest you're

18  aware of a study being done?

19     A.    I'm sorry.  I don't keep

20  track of those types of things.

21          MR. VAUGHN:  Tyler, can we

22     go to 2008 New Jersey Law Journal.

23          (Document marked for

24     identification as Exhibit

Confidential Information - Subject to Protective Order

1      Fryzek-17.)

2              MR. VAUGHN:   And if we go to

3      the next page, left-hand column,

4      starting with "recently."  That

5      paragraph and the following

6      paragraph.

7   BY MR. VAUGHN:

8      Q.    All right.  Doctor, can you

9   read this aloud for us?

10      A.    "Recently in December 2007,

11   District Judge Catherine" -- "Kathleen

12   O'Malley who has been handling hundreds

13   of these cases ordered both sides to

14   fully disclose payments made by any of

15   the parties to researchers.  Court

16   documents obtained by the Center of

17   Public Health demonstrate that welding

18   organizations pay more than 12.5 million

19   to 25 organizations and 33 researchers,

20   virtually all of whom have published

21   papers dismissing the connection between

22   welding fumes and workers' ailments."

23              Which is true.

24              "Most of the money,

Confidential Information - Subject to Protective Order

1    $11 million, was spent after the

2    litigation achieved critical mass in

3    2003.  Attorneys for the welders,

4    meanwhile, spent about half a million.

5              The documents also reveal

6    that Jon Fryzek" -- and my name is

7    misspelled incorrectly -- "who works for

8    Maryland's International Epidemiology

9    Institute, known for its

10   industry-commissioned studies" --

11             I guess I wasn't aware of

12   that.

13             -- "was paid $971,000 from

14   welding defendants while Paul Lees-Haley

15   was paid $860,000.  C. Warren Olanow, a

16   Manhattan neurologist who published at

17   least a dozen articles cited by defense

18   experts received almost $2.9 million.

19   The Parkinson Institute in California

20   $3.4 million to conduct a four-year

21   study."

22        Q.    Do you recall now being paid

23   $971,000?

24        A.    No.  This study is

Confidential Information - Subject to Protective Order

 1    inaccurate.

 2          Q.    But it isn't a study.  This

 3    is a --

 4          A.    Yeah, this review is

 5    inaccurate.  It's incorrect.

 6          Q.    So the court documents that

 7    were obtained by the Center of Public

 8    Integrity are inaccurate?

 9                MR. BALL:  Objection to

10          form.

11                THE WITNESS:  I think how

12          they report it here in this paper

13          is inaccurate.  I wasn't paid

14          $971,000.  I wish I was.

15    BY MR. VAUGHN:

16          Q.    Are you questioning the

17    integrity of the Center For Public

18    Integrity?

19                MR. BALL:  Objection to

20          form.

21                THE WITNESS:  I question

22          what's reported here.

23    BY MR. VAUGHN:

24          Q.    You don't agree that you

Confidential Information - Subject to Protective Order

1  were paid $971,000?

2  A.   No, I wasn't.  My life would

3  have been a lot easier.

4  Q.   Was IEI paid almost a

5  million dollars?

6  A.   Oh, I have no idea.

7  Q.   So you're not really aware

8  of where all the money is going to fund

9  what you're doing, are you?

10  MR. BALL:  Objection to

11  form.

12  THE WITNESS:  When I was at

13  IEI, I wasn't involved in

14  invoicing and those things.

15  MR. VAUGHN:  Can we zoom out

16  and go to the next-to-last

17  paragraph in the middle column,

18  Tyler, starting with "finally."

19  BY MR. VAUGHN:

20  Q.   It says, "Finally,

21  Dr. Bigler raised serious concerns about

22  the amount of financial incentive paid by

23  defense insurance carriers and corporate

24  defendants to defense forensic

Confidential Information - Subject to Protective Order

1   neuropathologist" -- "psychologists."

2              Do you receive any money

3   from defense insurance carriers when you

4   do work?

5       A.    Oh, I have no idea who the

6   money came from.

7              MR. BALL:  Objection to

8        form.

9   BY MR. VAUGHN:

10      Q.    What about since then?  Do

11  you ever --

12             MR. BALL:  Objection to

13       form.

14  BY MR. VAUGHN:

15      Q.    -- receive funding from

16  insurance companies?

17             MR. BALL:  Objection to

18       form.

19             THE WITNESS:  Not that I

20       know of.

21  BY MR. VAUGHN:

22      Q.    Do you have -- okay.

23      A.    Sorry.

24      Q.    Do you know who the

Confidential Information - Subject to Protective Order

1    insurance companies are for any of the

2    defendants in this litigation?

3              A.    No.  Again, I think they are

4    taking just an early slice of what was

5    going on in this case.  Because at the

6    end of the day, they accept all these

7    studies and there actually was a review

8    article written by welders a few years

9    ago.  And the studies are accurate.  They

10   report the science.

11             Q.    Do the defense attorneys

12   have you testify at trial in this

13   litigation with welding fumes?  No.

14             A.    I never testified at trial.

15             Q.    You've never testified at

16   trial?

17             A.    Not for this.

18             Q.    Not for this.  Oh.  I hope

19   not.

20             A.    Why do you hope not?

21             Q.    I don't think you'd hold up

22   too well in front of a jury with all

23   this.

24             A.    Well --

Confidential Information - Subject to Protective Order

1              MR. BALL:  Objection.

2       Argumentative.

3              Excuse me.  Mr. Vaughn, if

4       you keep this up, we're going to

5       end the deposition.  I'm tired of

6       you insulting his integrity.

7              MR. VAUGHN:  I've got a lot

8       left.

9              MR. BALL:  That's fine.  If

10      you keep it up, if you keep on

11      insulting him and making comments

12      like that, I'm ending the

13      deposition.

14             MR. VAUGHN:  He asked --

15             MR. BALL:  You can take it

16      up with the judge.

17             MR. VAUGHN:  Give me a

18      second.  Let's go back to his

19      expert report.

20             Page 53 please maybe.

21             I've got my documents mixed

22      up.  Good job, Brett.

23             131.  We can blow 131 up.

24   BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1      Q.    It's another one of your

2   critiques of Dr. Etminan.  And so can you

3   explain this critique for us?  I don't

4   want to misinterpret it.

5      A.    Yeah.  So he just looks at

6   the upper confidence limit of any

7   estimate and uses that, showing that

8   there's risk but he ignores the lower

9   limit which is equally likely, and the

10  lower limit is less than one restriction

11  of the protective effect of NDMA.  You

12  can't just look at one side of the

13  confidence interval.  No one does that in

14  my field.  Not in a textbook, no other

15  epidemiologist would say to do that.

16     Q.    Really?

17     A.    Really.  And I hope -- I

18  hope he's not teaching this in his class.

19  It's inaccurate.

20     Q.    What is your basis that it

21  would be an equal chance that it reduces

22  it just because it -- part of it is under

23  one?

24     A.    If it falls between those

Confidential Information - Subject to Protective Order

1    two limits it is equally likely to be as

2    high as it is low.

3         Q.    Equally likely?

4         A.    Absolutely.  You just have

5    to repeat the study over and over.  You

6    can't just play with the upper confidence

7    intervals, what he's doing.  You can't do

8    that.

9         Q.    And so is it your opinion

10   that nonstatistically significant results

11   are useless?

12        A.    They don't show a

13   relationship between an exposure and a

14   disease.  It would be due to chance.

15        Q.    Equally due to chance or

16   could be due to chance?

17        A.    Equally likely due to

18   chance.

19             THE COURT REPORTER:  Doctor,

20        if you can remove your hand from

21        your face and speak up, please.  I

22        would appreciate it.

23             Thank you.

24             THE WITNESS:  Yeah.

Confidential Information Subject to Protective Order

1            MR. VAUGHN:  Can we now go

2       to 2003, an introduction to power

3       and sample size.

4            (Document marked for

5       identification as Exhibit

6       Fryzek-18.)

7  BY MR. VAUGHN:

8       Q.    This -- this is statistics,

9  is this outside of your wheelhouse too or

10 is this part of what you do?

11      A.    I do some statistics, but I

12 can't do emergency medicine which is what

13 this journal is published in.

14      Q.    So you do some statistics?

15      A.    Absolutely.  But I have two

16 statisticians that work for me.

17           MR. VAUGHN:  Can we go to

18      Page 3, Tyler.

19 BY MR. VAUGHN:

20      Q.    On the right-hand column,

21 third paragraph, it starts with when.

22 Can you read that paragraph out loud for

23 us, Doctor?

24      A.    "When they are assessing

Confidential Information - Subject to Protective Order

1    results from trials with negative results

2    it is particularly important to question

3    the sample size of the study.  It may

4    well be that the study was underpowered

5    and that we have incorrectly accepted the

6    null hypothesis, a Type II error.  If the

7    study had more subjects, then the

8    difference may well have been detected.

9    In an ideal world this should never

10   happen because a sample size calculation

11   should appear in the methods section of

12   all papers, reality shows us that this is

13   not the case.  As a consumer of research

14   we should be able to estimate the power

15   of the study from the given results."

16                MR. VAUGHN:  Can we go back

17       to that expert report real quick,

18       I'm sorry, Page 53.

19   BY MR. VAUGHN:

20       Q.    And the bottom of that first

21   one, so it would be 129, but we can't see

22   it.  Yeah.

23                Do you see that last couple

24   sentences where you're saying, "Power is

Confidential Information - Subject to Protective Order

1    set during the design phase ... and is

2    not dependent on the numbers of outcomes

3    identified"?

4           A.    Correct.

5           Q.    Do you still agree with

6    that?

7           A.    Yes.

8           Q.    It's not dependent on the

9    number of outcomes?

10          A.    No.  Power depends on the

11   sample size.

12          Q.    If the sample size is too

13   small, will it not catch some of the

14   increased risk if it's a rare outcome?

15              MR. BALL:  Objection to

16          form.

17              THE WITNESS:  I have no

18          idea.  It depends on the study.

19          Depends what you're studying.

20          Depends on a lot of factors.  A

21          strong risk factor.

22              MR. VAUGHN:  Tyler, let's go

23          to 2004, Cancer risk among statin

24          users.

Confidential Information - Subject to Protective Order

1          (Document marked for

2          identification as Exhibit

3          Fryzek-19.)

4    BY MR. VAUGHN:

5          Q.    You are one of the authors

6    of this study, weren't you, Doctor?

7          A.    Yes.

8          Q.    Now, the bottom right it

9    notes that it was -- the grant sponsor,

10   again this Danish Cancer Society, and

11   then International Epidemiology

12   Institute.

13         A.    Okay.

14         Q.    Who gave the money to the

15   IEI though, do you know?

16         A.    I have no idea.  Sometimes

17   IEI funded their own stuff.  I don't

18   know.

19         Q.    Do you think they funded

20   this one?

21         A.    I have no idea.

22               MR. BALL:  Objection to

23         form.

24               MR. VAUGHN:  Can we go to

Confidential Information - Subject to Protective Order

1          Page 3.

2    BY MR. VAUGHN:

3          Q.    At the bottom right, you

4    note that "The limited number of cancer

5    cases among users of nonstatin

6    lipid-lowering drugs did not allow a

7    thorough examination of site-specific

8    cancer; however, reduced risk estimates

9    were found for several of the selected

10   sites, including colorectal."

11              Did I read that correctly?

12         A.    That's what Søren Friis

13   wrote.  He is the first author, yes.

14         Q.    Do you disagree with it?

15         A.    I have no reason to agree or

16   disagree.

17         Q.    And so a study the way it's

18   designed can be able to show

19   statistically significant results for one

20   cancer, but if another one is more rare,

21   it might not pick that up, correct?

22              MR. BALL:  Objection to

23         form.

24              THE WITNESS:  I'm sorry,

Confidential Information - Subject to Protective Order

1          could you please ask that question

2          again?

3     BY MR. VAUGHN:

4          Q.    So even if a study is

5     properly powered to detect an increased

6     cancer rate in one type of cancer, it

7     might not be powered enough to detect an

8     increased cancer rate in a rarer type of

9     cancer; is that correct?

10         A.    Yes, that's correct.  But,

11    you know, again it depends on the

12    estimate, what you estimate.  The

13    relationship is between the exposure and

14    the outcome.  You have to consider that

15    as well.

16              MR. VAUGHN:  Can we go to

17         Page 4, Tyler.

18    BY MR. VAUGHN:

19         Q.    On the left side, second

20    paragraph.

21              So this paragraph is talking

22    about confounding factors.  Midway

23    through it you note that "We aim to

24    address these potential imbalances and

Confidential Information - Subject to Protective Order

1    cancer risk factors by including a

2    control group of users of nonstatin

3    lipid-lowering drugs who were likely to

4    be more similar to statin users than

5    individuals in the general population."

6              Can you explain that to me?

7         A.    So again, you're asking me

8    to comment on something that I didn't

9    write.  You keep saying that I wrote

10   this.  Søren Friis wrote this.  I just

11   reviewed it.

12             So that's incorrect.

13             Now, let me read this, and I

14   can then comment on it.

15             Okay.

16        Q.    Can you just explain to me

17   what that means, though, how your -- how

18   you and your colleagues were balancing

19   the confounders?

20        A.    Yeah.  So you assume that

21   people that are taking lipid-lowering

22   drugs are similar.  So that's what they

23   did.

24        Q.    And so that would be the

Confidential Information Subject to Protective Order

1   same for, like, people taking blood

2   pressure medications, you would assume

3   they are similar?

4          A.    Yes.

5          Q.    What about people that work

6   at the same company?  Do you assume

7   they're similar or no?

8               MR. BALL:  Objection to

9          form.

10              THE WITNESS:  There are so

11         many factors that goes into that.

12         Depends on where they work, what

13         they did, what time period they

14         worked in.  A lot of different

15         factors go into that.

16  BY MR. VAUGHN:

17         Q.    But when it's the same drug,

18  it's pretty well controlled?

19              MR. BALL:  Objection to

20         form.

21  BY MR. VAUGHN:

22         Q.    The same kind of drug, I'm

23  sorry.

24         A.    What's pretty well

Confidential Information - Subject to Protective Order

1  controlled?

2      Q.    If you're giving -- if your

3  control and test group are using the same

4  classification of drug, that should help

5  control it?

6            MR. BALL:  Objection to

7       form.

8            THE WITNESS:  I'm a little

9       bit confused by your question.

10           Could you please restate it?

11  BY MR. VAUGHN:

12     Q.    By having your test and

13  control group taking the same

14  classification of medications, does that

15  reduce confounding factors?

16     A.    What do you mean by test?

17     Q.    When you do a study, do you

18  have a control group?

19     A.    Sometimes.  The control,

20  comparison --

21     Q.    What group are you comparing

22  it to?

23     A.    I'm sorry?

24     Q.    What group do you compare

Confidential Information - Subject to Protective Order

1    the control to?

2         A.    So you compare -- it depends

3    on what your study design is.

4         Q.    Would you have a test group

5    and a control group?

6         A.    I have not heard the term

7    test group.

8         Q.    What term do you use?

9         A.    It depends on what -- how --

10   the study design.

11        Q.    Give me some examples of

12   terms that you would use besides test.

13        A.    Again, it depends on the

14   study design.  So what study design?  I

15   never heard the term test.

16        Q.    We'll move onto more fun

17   stuff here in a second then.

18             Next paragraph where it

19   says, "Given the widespread rapidly

20   increasing use of statins, any

21   association with an increase or decrease

22   of cancer risk would have a substantial

23   public health impact."

24             Do you agree with that?

Confidential Information - Subject to Protective Order

1        A.    Again, it's difficult just

2   to pull one sentence out of any kind of

3   report and say you agree or disagree with

4   that.

5              So where are you reading

6   that?

7              MR. VAUGHN:   Bottom

8        right-hand corner, Tyler.

9   BY MR. VAUGHN:

10       Q.    Do you agree that any

11  association with an increased or

12  decreased cancer risk would have a

13  substantial public health impact?

14             MR. BALL:   Objection to

15       form.

16             THE WITNESS:   It depends how

17       many folks are using statins now.

18       I don't know how many folks are

19       using statins these days.   This

20       paper is 15 years old, so.

21  BY MR. VAUGHN:

22       Q.    Do you know how many people

23  are using valsartan nowadays?

24       A.    No.

Confidential Information - Subject to Protective Order

1        Q.    Would you agree if there is

2   any association with an increased cancer

3   risk of valsartan, it would have a

4   substantial public health impact?

5             MR. BALL:  Objection to

6        form.

7             THE WITNESS:  So there's no

8        relationship in humans between

9        valsartan and cancer.

10  BY MR. VAUGHN:

11       Q.    I said it --

12       A.    So there would be no public

13  health impact because there is no

14  relationship.

15            MR. VAUGHN:  Tyler, can we

16       go to 2016, American Stat

17       Association.

18            (Document marked for

19       identification as Exhibit

20       Fryzek-20.)

21  BY MR. VAUGHN:

22       Q.    Are you familiar with the

23  American Stat Association, Doctor?

24       A.    No.  But I'm familiar with

Confidential Information - Subject to Protective Order

1   the American Statistical Association.

2          Q.    That's what I'm talking

3   about.  Are they reliable?

4          A.    It's a national

5   organizations for statisticians.

6          Q.    Okay.  Third paragraph.

7   "The P-value was never intended to be a

8   substitute for scientific reasoning."

9               Can you go ahead and read

10  the next sentence for me?  It starts with

11  "well-reasoned."

12         A.    "Well-reasoned statistical

13  arguments contain much more than the

14  value of a single number and whether the

15  number exceeds an arbitrary threshold."

16         Q.    And so do you think you have

17  to have that 95 percent confidence

18  interval for it to actually mean

19  anything?

20              MR. BALL:  Objection to

21         form.

22              THE WITNESS:  For what to

23         mean anything?

24  BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1    Q.    The results.

2    A.    Some statistical tests only

3  report P-values.  Not all them report 95

4  percent confidence intervals.

5    Q.    Can you explain the

6  difference between P-values and

7  95 percent confidence intervals?

8    A.    So P-values just tell you if

9  something is statistically significant or

10  not.  You can choose whatever level of

11  statistical significance you want.

12  Typically it's .05.

13         The tests that show a

14  P-value or statistical tests that show a

15  P-value of less than .05 are considered

16  to be statistically significant.  Their

17  results are likely not due to chance.

18         Confidence intervals tell

19  you, if they are statistically

20  significant or not, as well as the range

21  of potential values for the estimate.

22    Q.    So you're critiquing

23  Dr. Etminan for using nonstatistically

24  significant results, but isn't this

Confidential Information - Subject to Protective Order

1    saying that that shouldn't be a

2    substitution for scientific reasoning?

3              MR. BALL:  Objection to

4         form.

5              THE WITNESS:  I'm sorry.  I

6         don't understand your question.

7    BY MR. VAUGHN:

8         Q.   Isn't this saying just

9    because you don't hit your P-value of

10   .05, it doesn't mean that you just

11   discount your results, right?

12             MR. BALL:  Objection to

13        form.

14             THE WITNESS:  That doesn't

15        say that.  I don't understand how

16        you're coming to it saying that.

17             This is saying not to use

18        P-values, to use 95 percent

19        confidence intervals.

20   BY MR. VAUGHN:

21        Q.   Well, again, a second ago

22   you just were talking about P-values and

23   how that shows if it's statistically

24   significant or not.

Confidential Information - Subject to Protective Order

1    A.    Okay.  I was explaining what

2    the P-value meant.  I thought you wanted

3    me to explain this.

4    Q.    I did want you to because

5    you had said Dr. Etminan used

6    nonstatistically significant results.

7    And you said that the P-value indicates

8    that they're statistically significant.

9         MR. VAUGHN:  Tyler, can we

10        go to the next page.

11        MR. BALL:  Objection.

12        Argumentative.  Was there a

13        question there?

14        MR. VAUGHN:  No, I was

15        asking Tyler to go to the next

16        page.

17        MR. BALL:  I would

18        appreciate the non-commentary.

19 BY MR. VAUGHN:

20    Q.    Okay.  Number 2.  Can you

21 read that out loud, Doctor?

22    A.    "P-values do not measure the

23 probability that the studied hypothesis

24 is true or the probability that the data

Confidential Information - Subject to Protective Order

1   were produced by random chance alone."

2        Q.    Weren't you just telling me

3   that it was an equal chance that it was

4   negative and equal chance that it was

5   positive?

6             MR. BALL:   Objection to

7        form.

8             THE WITNESS:   What was an

9        equal chance?

10  BY MR. VAUGHN:

11       Q.    When part of the result was

12  below one, you said that meant it was an

13  equal chance that it was negative.

14       A.    So this is talking about

15  P-values, not confidence intervals.   They

16  are different things.

17       Q.    Oh, so on your -- when

18  you're critiquing Dr. Etminan, you were

19  only talking about confidence intervals,

20  you were never critiquing him on the

21  P-value stuff, right?

22       A.    I'll have to read -- I'd

23  have to read what I wrote.   I can't -- I

24  can't recall.

Confidential Information - Subject to Protective Order

1        Q.    You have that on paper,

2   don't you, go ahead and review it.

3        A.    Let me find it here and I'll

4   review it.

5              My review of Dr. Etminan

6   doesn't report that Dr. Etminan commented

7   on any P-values.

8        Q.    Do you see on Page 54 where

9   you say that he misrepresented the

10  confidence intervals?

11       A.    The concept of confidence

12  intervals.

13       Q.    Okay.  Do you think he was

14  misrepresenting that?

15       A.    That's what the statement

16  says, yes.

17       Q.    Have you ever been accused

18  of misrepresenting things in your

19  studies?

20       A.    No.

21             MR. VAUGHN:  Tyler, can we

22        go to the 2013 childhood cancer

23        incidence.

24             (Document marked for

Confidential Information - Subject to Protective Order

1    identification as Exhibit

2    Fryzek-21.)

3         MR. VAUGHN:  I thought this

4    was a really interesting article

5    you worked on.  My wife is a

6    pediatrician.

7  BY MR. VAUGHN:

8         Q.    Do you recall this study,

9  Doctor?

10        A.    Yes.

11        Q.    And what's this study about?

12        A.    It's an ecological study

13 looking at cancer around hydraulic

14 fracturing sites.

15        Q.    And do you recall the

16 results of the study?

17        A.    I don't.

18        Q.    Do you remember who funded

19 it?

20        A.    I don't -- I hope it says on

21 here.  Does it say on here?  Yeah, it

22 says the America's National Gas Alliance.

23        Q.    So do you think your

24 findings are probably favorable to them?

Confidential Information - Subject to Protective Order

1          MR. BALL:  Objection to

2     form.

3          THE WITNESS:  Well, my

4     findings are what they are.  I

5     mean you can take -- and do the

6     same analysis.

7  BY MR. VAUGHN:

8     Q.    Can you read where it says

9  under conclusions there in the top left?

10     A.    I wasn't quite done with my

11  comment.

12     Q.    Oh, I apologize.  Continue.

13     A.    You can do the data and do

14  the analysis yourself if you don't

15  believe me.

16     Q.    Do you know if anyone else

17  has looked at that data and done the

18  analysis and doesn't believe you?

19     A.    Oh, I don't know about that.

20     Q.    What's -- what was your

21  conclusion here?  And you were the lead

22  author on this one, right?  So this was

23  actually you that wrote it?

24     A.    Yes.  "This study offers

Confidential Information - Subject to Protective Order

1   comfort concerning health effects of HF

2   on childhood cancers."

3        Q.    And what's HF?

4        A.    Hydraulic fracking.

5             MR. VAUGHN:  Can we go to

6        the bottom left, Tyler, on this

7        page where it has the disclose --

8        yeah.

9   BY MR. VAUGHN:

10       Q.    So it notes Dr. David

11  Garabrant PLLC, and (Pastula and

12  Ms. Jiang).  Do you know who they are?

13       A.    Yes.

14       Q.    How do you know them?

15       A.    They work for me.

16       Q.    Where, at EpidStrategies?

17       A.    Yes.

18       Q.    Have you worked with them a

19  lot in the past?

20       A.    Yes.

21             MR. VAUGHN:  Can we go to

22        the fifth page.  And the sentence

23        right before conclusion.  If you

24        can blow that up -- or the two

Confidential Information - Subject to Protective Order

1      sentences.  Sorry.  As Schoenbach.

2      Yeah.

3  BY MR. VAUGHN:

4      Q.    Can you read, starting with

5  "as Schoenbach" paragraph allowed for me,

6  Doctor?

7      A.    Yep.  "As Schoenbach has

8  commented, 'When sample populations are

9  so small that their strata contain mostly

10  unstable rates and zeroes, the direct

11  standardization procedure may not be

12  appropriate and an alternate procedure

13  becomes desirable.'  Therefore, we

14  believe that the indirect standardization

15  is preferable and gives a more accurate

16  representation of the cancer risks

17  related to HF activities than directly

18  standardized rates."

19      Q.    Can you explain to me what

20  that actually means?

21      A.    It just gives confidence in

22  what we found in our results, the way we

23  were doing this is correct.

24      Q.    And what was it that you

Confidential Information - Subject to Protective Order

1    did?

2         A.    We did indirect

3    standardization.

4         Q.    And what is indirect

5    standardization?

6         A.    It's the way you analyze

7    your data.  So you can do direct

8    standardization or indirect

9    standardization.  You compare it to a

10   national rate or a state rate or

11   something like that.  I have to go back

12   to the method and see who we compared it

13   to.

14        Q.    Do you think that was proper

15   to do in this study?

16             MR. BALL:  Objection to

17        form.

18             THE WITNESS:  Yes.

19             MR. VAUGHN:  Tyler, can we

20        do 2013 response of obfuscation

21        does not provide comfort.

22             (Document marked for

23        identification as Exhibit

24        Fryzek-22.)

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    If we go to Page 2, we can

3    see the title.  There we go.  The bottom.

4    This is a response to your article on

5    childhood cancer, correct?

6         A.    Yes.

7               MR. VAUGHN:  And can we go

8         to the next page, Tyler.

9    BY MR. VAUGHN:

10        Q.    Who are these people that

11   were critiquing you?

12        A.    I believe they are plaintiff

13   experts.

14        Q.    At the Public Health of

15   Pittsburgh?

16        A.    Pittsburgh Public Health.

17        Q.    That was the state that you

18   were doing your study in, right?

19        A.    Yes.

20        Q.    Do you think they really

21   just have kids in Pittsburgh?

22               MR. BALL:  Objection to

23        form.

24               THE WITNESS:  I have no

Confidential Information - Subject to Protective Order

1    idea.

2    BY MR. VAUGHN:

3         Q.    Can you read the -- right

4    above their names where it starts with

5    nevertheless.

6              Can you read that out loud

7    through the end of the paragraph?

8         A.    "Nevertheless, in the case

9    of the Fryzek et al study, what the

10   public will hear about UGD and childhood

11   cancer -- likely for the first time -- is

12   controversy engendered by industry's

13   funding of a study that obfuscates" -- I

14   can't say that word very well -- "the

15   issue and does not legitimately address

16   the public's health concerns about the

17   explosive growth of UGD in their

18   backyards."

19        Q.    Dr. Fryzek, have you ever

20   been convicted of a crime?

21        A.    No.

22        Q.    To your knowledge, are you

23   currently under criminal investigation?

24        A.    No.

Confidential Information - Subject to Protective Order

1      Q.    I hope I don't spoil any

2   surprises.

3            MR. VAUGHN:  Tyler, can we

4      go to 2020 PA Attorney General's

5      Report.

6            THE WITNESS:  What did you

7      say?  What was your comment?

8            MR. BALL:  What did you say?

9      Did you say you didn't find that

10     surprising?

11           MR. VAUGHN:  No, I said I

12     hope I -- the transcript is full

13     of surprises but that's not what I

14     said either.  I said I hope I

15     don't spoil any surprises.

16           MR. BALL:  Okay.  You know,

17     we're done.  We're done.  That is

18     the third time -- that is the

19     third time you have insulted his

20     integrity.

21           MR. VAUGHN:  Okay.  Let's

22     just go to Page 9 real quick.

23           MR. BALL:  You don't have a

24     basis for this bullshit.  We're

Confidential Information - Subject to Protective Order

1    done.

2           MR. VAUGHN:  I have a basis.

3    Let me -- let me give my basis and

4    we can take a lunch break.

5           (Document marked for

6    identification as Exhibit

7    Fryzek-23.)

8  BY MR. VAUGHN:

9    Q.    You ever seen this document

10 before, Doctor?

11   A.    No.

12          MR. VAUGHN:  Hey, Tyler, can

13   we go to Page 9.

14          THE WITNESS:  I don't even

15   know -- who wrote this?

16          MR. VAUGHN:  I guess let's

17   go to Page 3 first then so we

18   can -- sorry, I think PDF Page 3.

19   Page 1 of t he doc -- it will say

20   Page 1 -- yeah.

21 BY MR. VAUGHN:

22   Q.    So this is in the Court of

23 Common Pleas, Allegheny County,

24 Pennsylvania.

Confidential Information - Subject to Protective Order

1          And this is an order

2   accepting and filing investigating grand

3   jury report Number 1.

4          If we go to the next page.

5   We can see that that was signed by the

6   Honorable Norman Krumenacker, the

7   supervising judge for the 43rd Statewide

8   Investigating Grand Jury.

9       A.   Well, I don't know what this

10  is.

11      Q.   Okay.  So now, if we go back

12  to PDF Page 9.  All right.  And the top

13  right, kind of the first full paragraph,

14  you can see that this is about fracking

15  in Pennsylvania.

16          Do you see that?

17      A.   Okay.

18      Q.   Okay.  And then if we go to

19  the next paragraph where it starts with

20  "the grand jury."

21          Can you read the first three

22  sentences for me?

23      A.   "The grand jury began this

24  investigation based on evidence that

Confidential Information - Subject to Protective Order

1    private companies engaged in

2    unconventional oil and gas activities

3    have committed criminal violations of

4    Pennsylvania's environmental laws.  We

5    found such violations and are issuing

6    several presentments recommending the

7    filing of criminal charges.  And we

8    believe investigation of additional

9    crimes should and will continue beyond

10   the term of this grand jury."

11            MR. VAUGHN:  All right.

12        Tyler, can we now go to Page 178

13        of this document.  And paragraph

14        starts with DOH.

15   BY MR. VAUGHN:

16        Q.   Doctor, do you know what the

17   DOH is?

18        A.   I assume it means Department

19   of Health.

20        Q.   Okay.  And can you read the

21   first three sentences of this paragraph

22   aloud as well?

23        A.   I'm not sure what Department

24   of Health it is for, because cities have

Confidential Information - Subject to Protective Order

1    departments of health, states do.

2              So, "Department of Health

3    staff also engage in research to advance

4    the understanding of health effects

5    associated with fracking.  For example,

6    in 2019, under Dr. Levine's direction,

7    DOH and the State of Colorado published a

8    study titled 'A Systematic Review of the

9    Epidemiological Literature Assessing

10   Health Outcomes in Populations Living

11   Near Oil and Natural Gas Operations:

12   Study Quality and Future

13   Recommendations.'

14             "The piece surveyed the most

15   in depth peer-reviewed literature on

16   health effects associated with fracking

17   to date."

18        Q.    All right.  So this study

19   that the DOH in the state of Colorado

20   published was called "A Systematic Review

21   of Epidemiological Literature Assessing

22   Health Outcomes In Populations Living

23   Near Oil and Natural Gas Operations"; is

24   that correct?

Confidential Information Subject to Protective Order

1    A.    Yeah, I'm not sure where --
2 what journal it's published in.
3    Q.    That's fine.
4         MR. VAUGHN:  Can we go to
5    Page 112 of this document.  PDF
6    112.
7         Sorry.  212.
8 BY MR. VAUGHN:
9    Q.    Is this a name of the study
10 that we just saw referenced?
11    A.    I have no idea.
12    Q.    I'm looking at it right now.
13 "A Systematic Review of Epidemiological
14 Literature Assessing Health Outcomes in
15 Populations Living Near Oil and Natural
16 Gas Operations:  Study Quality and Future
17 Recommendation."
18         That what this is, right?
19         Okay.  And you were asking
20 what journal it was published in.  Are
21 you able to tell from this?
22    A.    The International Journal of
23 Environmental Research and Public Health.
24 I believe that was plaintiff attorneys.

Confidential Information - Subject to Protective Order

1      Q.    You think that the
2  Department of Health and the state of
3  Colorado is doing this for plaintiffs'
4  attorneys?
5      A.    They published in a
6  plaintiff journal, absolutely.
7           THE COURT REPORTER:  Doctor,
8      I cannot hear you.  I'm sorry.
9           THE WITNESS:  They published
10     in a plaintiff journal.
11     Absolutely.
12  BY MR. VAUGHN:
13     Q.    Are you requesting this
14  grand jury's criminal investigation?
15     A.    I'm questioning --
16          MR. BALL:  Objection to
17     form.
18          THE WITNESS:  This journal
19     has been criticized a lot.
20          MR. VAUGHN:  Can we go to
21     PDF Page 218.  And that bottom
22     paragraph, about midway through.
23  BY MR. VAUGHN:
24     Q.    Do you see where they

Confidential Information - Subject to Protective Order

1    specifically call you out?  "Fryzek, et

2    al., also incorrectly interpreted their

3    standardized incidence ratio results as

4    has been noted by Saunders."

5          A.    Okay.  I have no idea what

6    they're talking about.

7          Q.    And then closer to the

8    bottom, do you see where it says, "ONG

9    operations began in earnest in the late

10   2000s in Pennsylvania, but Fryzek and

11   others use data only through 2009.  This

12   truncated period between community

13   exposure and cancer development is a

14   major limitation."

15              Do you see they're talking

16   about you again there?

17         A.    Yes.  I used all the data

18   that was available.

19         Q.    And you still stand by those

20   studies?

21         A.    Based on the data we have,

22   absolutely.

23         Q.    And no one has recently come

24   to talk to you about your involvement

Confidential Information - Subject to Protective Order

1  with those studies?

2      A.   I don't even know who

3  Saunders, et al., is.

4          THE COURT REPORTER:  Doctor,

5      can you please raise your voice.

6          THE WITNESS:  I said if they

7      believed we did something wrong,

8      we should have been made aware of

9      that.  This study is quite a few

10     years old.

11 BY MR. VAUGHN:

12     Q.   Yeah but some of the grand

13 jury stuff is within the last few months.

14         MR. BALL:  Okay.

15     Mr. Vaughn, again, unless you have

16     a basis for suggesting that

17     Dr. Fryzek or his company is under

18     criminal investigation, you're

19     either going to end this line of

20     questioning or we're going to end

21     the deposition.  I'm done.

22         MR. VAUGHN:  That's fine.

23     I'm done with this line of

24     questioning.  I've gotten my clip

Confidential Information - Subject to Protective Order

1          back on.

2                  If you want to take a lunch

3          break even, we can.

4                  Do you want a lunch break?

5                  MR. BALL:  Sure.

6                  MR. VAUGHN:  Great.  How

7          long do you want?

8                  MR. BALL:  Half an hour.

9                  THE VIDEOGRAPHER:  Off the

10         record at 12:31 p.m.

11                      -   -   -

12                  (Whereupon a luncheon recess

13         was taken.)

14                      -   -   -

15                  THE VIDEOGRAPHER:  We are

16         back on the record at 1:07 p.m.

17                      -   -   -

18                  CONTINUED EXAMINATION.

19                      -   -   -

20    BY MR. VAUGHN:

21         Q.    Doctor, what type of foods

22    contain the highest levels of

23    nitrosamines?

24         A.    What types of food?

Confidential Information - Subject to Protective Order

```
1        Q.    Yeah.

2        A.    I think I wrote about that

3   in the report.  Let me look.

4        Q.    I think you did as well.  I

5   was trying to run a search on it so if

6   you could help me, I'd appreciate it.

7        A.    Yeah.  It will take me a

8   minute to find it here.

9              On Page 35, Paragraph 86.

10       Q.    So the highest levels are

11  in, what is it, processed meats and fish

12  products?

13       A.    Yes.

14             TRIAL TECH:  Do you want to

15       pull that up, Brett?

16             MR. VAUGHN:  No, I think

17       we're okay for now.

18  BY MR. VAUGHN:

19       Q.    What type of processed

20  meats, what does that mean?

21       A.    I assume it's like salami,

22  and things like that.  Bologna.

23       Q.    And --

24       A.    Hot dogs.
```

Confidential Information - Subject to Protective Order

1      Q.      -- does the way the food is

2  cooked impact it at all, do you know?

3      A.      I don't know.

4      Q.      You didn't consider that in

5  forming your opinions?

6      A.      No.

7           MR. VAUGHN:  Tyler, can we

8        go to, I think it's 2002, the

9        reliability of dietary data.

10          TRIAL TECH:  I'm not seeing

11       that as a 2002 document.

12          MR. VAUGHN:  I might have

13       the wrong -- give me one second.

14       2002-reliability of dietary.

15          (Document marked for

16       identification as Exhibit

17       Fryzek-24.)

18          TRIAL TECH:  I'm not seeing

19       that on my end.  Let me just

20       double-check that it was sent.

21          MR. VAUGHN:  Let me drop it

22       in the chat, would that work?

23          TRIAL TECH:  I've got it

24       here actually.  Just give me one

1      second and I can pull that up for

2      you.

3              You're good to go.  Sorry I

4      missed that.

5  BY MR. VAUGHN:

6          Q.   All right, Doctor.  This

7  is -- you were the primary author on this

8  study, right?

9          A.   Yeah.  It was published in

10  2002.

11          Q.   While you were at the --

12          A.   20 years ago.

13          Q.   Do you think things have

14  changed since you published this?

15          A.   I have no idea.  I don't --

16          Q.   Are you just letting me know

17  the year of it, or is there -- is there

18  something with the validity of it because

19  it's 20 years old?

20          A.   I have no idea.  It's just

21  going to be hard for me to remember,

22  so...

23          Q.   All right.  At the bottom of

24  it again, it says the funding was from

Confidential Information - Subject to Protective Order

```
 1    the IEI.

 2              I assume that you again have

 3    no idea who actually provided the funding

 4    to IEI for this study?

 5         A.   I believe it was just IEI,

 6    because it was Dr. McLaughlin's

 7    dissertation data.

 8         Q.   And under conclusion, you

 9    found that "Dietary data collected

10    retrospectively from next-of-kin may be

11    unreliable," correct?

12         A.   That's what the conclusion

13    says, but you have to read the whole

14    abstract to put it in context.

15         Q.   Before that you noted that

16    "Overall, subjects tended to have better

17    agreement with their own earlier

18    reporting than did next-of-kin, and

19    spouses were found to be more reliable

20    next-of-kin respondents than older

21    relatives."

22              Do you still agree with that

23    statement?

24         A.   It depends on what study
```

1    you're talking about and where you're at.

2         Q.    Why is that?

3         A.    Pardon me?

4         Q.    Why does it depend on what

5    study you're talking about?

6         A.    Because this was done on a

7    case-control study.  It could be a cohort

8    study.  It depends on how they ask diet.

9         Q.    But you agree that someone

10   giving them the report themselves is more

11   accurate than next-of-kin, correct?

12              MR. BALL:  Objection to

13        form.

14              THE WITNESS:  Usually yes.

15        Usually yes.

16              MR. VAUGHN:  Then can we go

17        to Page 4, Tyler.

18   BY MR. VAUGHN:

19        Q.    In the right-hand paragraph

20   notes, "Associations between food

21   preparation methods and specific cancers,

22   particularly lung and colorectal cancer,

23   have been demonstrated in some

24   epidemiologic studies."

Confidential Information - Subject to Protective Order

1          Did I read that correctly,

2  Doctor?

3          A.    Yes.

4          Q.    And then that "cooking time

5  and method may increase the formation of

6  certain cancer-causing compounds."

7          Did I read that correctly?

8          A.    You did.

9          Q.    And then the next sentence

10  is talking about meat preparation,

11  correct?

12          A.    Yes.

13          Q.    And so these associations on

14  how food is cooked and its risk of

15  increasing cancer, are you talking about

16  meat?

17          A.    You know, I can't recall.

18  As I said, this has been more than

19  20 years ago.  I can't recall.

20          Q.    Do you agree that there are

21  associations between food preparation

22  methods and cancers, particularly lung

23  and colorectal cancer?

24          A.    Again, it's not something

Confidential Information - Subject to Protective Order

1   I've looked at in over 20 years.  So I

2   have no idea.

3          Q.    Do you have any reason to

4   disagree with what you published earlier?

5          A.    Again, I don't know what to

6   say the research is now.  Epidemiology --

7   because all scientific research changes

8   over time.  So I don't know.

9          Q.    Were you not evaluating all

10  of that when you were forming your

11  opinions in this case?

12              MR. BALL:  Objection to

13         form.

14              THE WITNESS:  I guess I'm

15         not quite clear what you're

16         asking.

17  BY MR. VAUGHN:

18         Q.    Well, I thought a big part

19  of your expert report was about dietary

20  intake of nitrosamines and if they

21  increase the risk of cancer in various

22  organs.  Did you not look back over these

23  types of studies?

24         A.    I looked at all studies of

Confidential Information - Subject to Protective Order

1    diet and NDMAs.

2         Q.    And doesn't meat that's been

3    cooked have nitrosamines in it?

4         A.    I believe it does, yes.

5         Q.    And are you aware if the

6    more it's cooked or how it's cooked it

7    can increase the level of nitrosamines?

8         A.    I'm sorry, I'm not clear

9    about that.

10        Q.    You didn't look into how

11   food is cooked, if it impacts the levels

12   of nitrosamines?

13        A.    If the study reported on it

14   we did.

15        Q.    But you didn't do any

16   independent research?

17        A.    No.  This was a -- this was

18   a systematic narrative literature.  We

19   didn't do any kind of research on this.

20        Q.    And then you cite 11 through

21   14.  And so those are studies that you

22   would agree support that certain food

23   preparation methods can increase the risk

24   of lung and colorectal cancer?

Confidential Information - Subject to Protective Order

1      A.    Oh, I'd have to look at the

2  studies.

3      Q.    Why would you have cited

4  those studies?

5      A.    Again, it's over 20 years

6  ago.  So we'll have to look at them and

7  see what they say.

8      Q.    Why do you normally cite

9  studies?

10     A.    Because they support your

11 statement.

12            MR. VAUGHN:  Can we go to

13       his expert report now, Tyler.

14            Give me just a minute to see

15       where I want to go.

16            Let's go to Page 21.

17 BY MR. VAUGHN:

18     Q.    At the top you say, "Cohort

19 studies have not demonstrated that NDMA

20 or NDEA and diet are associated with any

21 cancer type."

22            Are you saying that none of

23 the studies showed an association?

24     A.    Well, again, you can't just

Confidential Information - Subject to Protective Order

1    look at an individual study.  You have to

2    look at the totality of the evidence.

3         Q.    I understand that, but I'm

4    just trying to understand this sentence

5    where it says cohort studies have not

6    demonstrated.  Are you saying that no

7    cohort study or the totality of them?

8         A.    Totality.  Absolutely.

9         Q.    And so --

10        A.    And you can see that -- you

11   can see that in the graphs that I made.

12   It's easy to see.  It's on page --

13   Figure 3.

14        Q.    How do you define totality?

15        A.    How do I define totality?

16   All of them.  We look at them all

17   combined.  Include them all combined.

18        Q.    And so if they all do not

19   show an association, you do not have a

20   totality of evidence?

21        A.    You have to look at them all

22   and make an assessment based on all of

23   them.

24             If you look at Figure 3 in

Confidential Information - Subject to Protective Order

1   my report, you can see graphically that

2   none of them really are excessive --

3        Q.    What's your definition -- I

4   apologize.  What's your definition of

5   excessive?

6        A.    Excessive, so what we've

7   done is we've graphed -- we put on the Y

8   axis one, which is no association, which

9   made an exposed group and unexposed

10  group.

11            And then two, which means

12  it's more likely than not.  And so all of

13  them have a confidence interval or a

14  relative risk or hazard ratio or

15  something that is two or less.

16       Q.    Why is two more likely than

17  not?

18            MR. BALL:  Objection to

19       form.

20            THE WITNESS:  People --

21  BY MR. VAUGHN:

22       Q.    You said two would be more

23  likely than not.  What do you mean by

24  that?

Confidential Information - Subject to Protective Order

1    A.    Right.  Relative risk of

2    two.

3         Q.    Why does it need to be two

4    to be more likely than not?

5         A.    I believe that's what the

6    courts have agreed as more of a

7    litigation definition.

8         Q.    So outside of legal

9    definitions, what would be more likely

10   than not in epidemiology?

11        A.    Oh, two.  Relative risk or

12   risk measure of two.

13        Q.    And what does two represent?

14        A.    Pardon me?

15        Q.    What does the two represent?

16   Is that like a doubling of the risk?

17        A.    Yes.

18        Q.    Why do you need a doubling

19   of the risk to be more likely than not?

20        A.    Because then you are less

21   likely to have influence of confounders,

22   bias, things like that.

23        Q.    So you're less likely, but

24   just because you're below two, doesn't

Confidential Information - Subject to Protective Order

1    mean that it's not more likely than not,

2    correct?

3                    MR. BALL:  Objection to

4          form.

5                    THE WITNESS:  I'm not sure.

6    BY MR. VAUGHN:

7          Q.    Why aren't you sure?  Is

8    that outside of your area of expertise?

9          A.    No.  It depends on the study

10   you're looking at.  It's really study

11   specific.

12         Q.    So some studies you could

13   have a relative risk less than two and it

14   still be more likely than not?

15         A.    I don't believe so.  But

16   you'd have to show me the studies before

17   I could make a confirmatory response.

18         Q.    Okay.  A second ago, you

19   said it depends on the study.  But now

20   you're saying you don't think there's

21   ever a time when below two would be more

22   likely than not?

23         A.    What I'm saying is I just

24   don't know.

Confidential Information - Subject to Protective Order

1       Q.     Okay.  So Number 45, section

2   of that page.

3       A.     Okay.

4       Q.     All right.  At about

5   two-thirds of the way down it says, "An

6   increased risk of colorectal cancer was

7   observed at the highest quartile of NDMA

8   intake compared to the lowest."

9              And then 2.12.  What's that

10  2.12?  What does that signify?

11      A.     That is an adjusted relative

12  risk.

13      Q.     This relative risk is above

14  two, correct?

15      A.     Yes.  And the confidence

16  interval is below two.

17      Q.     And goes all the way up to

18  4.3, correct?

19      A.     1.04 to 4.33, yeah.

20      Q.     And what's the 1.04

21  indicate?

22      A.     The lower level of the

23  confidence interval.

24      Q.     So that would be a 4 percent

Confidential Information - Subject to Protective Order

```
 1   increased risk of cancer is the lowest?

 2        A.    Right.

 3        Q.    And so this didn't show any

 4   discrepancy or ambiguity of if it would

 5   increase the risk of cancer, did it?

 6        A.    I'm sorry?

 7        Q.    This --

 8             MR. BALL:  Objection to

 9        form.

10   BY MR. VAUGHN:

11        Q.    This study with the range of

12   1.04 to 4.33 in regards to colorectal

13   cancer with NDMA exposure, there's no

14   ambiguity about it increasing the risk,

15   is there?

16        A.    Oh, we have to look at the

17   whole study.  We have to look at

18   potential confounders they controlled

19   for, sample size, what it represents,

20   there's a lot of factors besides just the

21   confidence interval to statistical

22   significance of a study that shows

23   causality.

24        Q.    Can you --
```

Confidential Information - Subject to Protective Order

```
1        A.    A lot of things have to
2   be --
3        Q.    I kind of read through this
4   Number 45.  Can you show me where your
5   critiques are on the study?
6        A.    So what we could take here,
7   it shows in the graph that the confidence
8   interval is less than two.
9        Q.    I thought --
10        A.    The relative risk --
11        Q.    I thought it says 2.12.
12        A.    That's not the confidence
13   interval.  That's the -- that's the
14   estimate.
15        Q.    And so you're saying if any
16   part of the confidence -- if any part of
17   the lower bound of the confidence
18   interval is under two, it doesn't count?
19        A.    I'm not saying it's not more
20   likely than not.  So you can see that in
21   our graph.
22        Q.    But the lowest end of the
23   confidence interval is 1.04.  The lowest
24   end is still showing a four percent
```

Confidential Information - Subject to Protective Order

```
 1   increased risk, correct?

 2         A.    Correct.

 3         Q.    How is that not more likely

 4   than not that it's increasing the risk of

 5   colorectal cancer?

 6         A.    Because the definition of it

 7   has to be 2.2.

 8         Q.    Whose definition?

 9         A.    Legal definition.

10         Q.    You're not an attorney, are

11   you?

12               MR. BALL:  Objection to

13         form.

14               THE WITNESS:  I am not.

15   BY MR. VAUGHN:

16         Q.    Going forward, when we do

17   definitions, can you give me definitions

18   from your area of expertise?

19               MR. BALL:  Objection to

20         form.  Considering the fact that

21         you asked him to identify things

22         as a toxicologist and a number of

23         other areas, I think that's a

24         little bit sly.
```

Confidential Information - Subject to Protective Order

1          MR. VAUGHN:  Okay.  Can you

2      just not give legal opinions?

3          How about that, Rick?  Does

4      that work for you?

5          MR. BALL:  That works for

6      me.

7          MR. VAUGHN:  I appreciate

8      the clarification.

9          THE WITNESS:  There's other

10     aspects that you have to look at.

11     The lower two quartiles didn't

12     show any -- quartiles, I'm

13     sorry -- didn't show any relative

14     risk, and there's no

15     dose-response.  So it's likely to

16     not be causality.

17 BY MR. VAUGHN:

18     Q.    So the lower levels didn't

19 show an increased risk but the higher

20 levels did show an increased risk.  And

21 your opinion is that's not a

22 dose-response?

23     A.    It shows that it's not a

24 dose-response.  The P-value is greater

Confidential Information - Subject to Protective Order

1  than the .05.

2          Q.    Do you agree that the higher

3  amounts of NDMA were associated with

4  cancer and the lower amounts of NDMA were

5  not?

6          A.    They weren't statistically

7  significantly associated at the lowest.

8  At the highest level, yes.

9          Q.    And what was the mean daily

10  NDMA intake in the diet in this study?

11  Do you see that?

12          A.    Yeah.  In the diet was

13  .052 micrograms.

14          Q.    Micrograms.  Do you know

15  what that would be in nanograms?

16          A.    No.  No, I don't.

17          Q.    You don't know how many

18  nanograms are in a microgram?

19          A.    No.

20          Q.    You didn't look into that at

21  all when you were doing your expert

22  report?

23          A.    It wasn't important to my

24  conclusions.

Confidential Information - Subject to Protective Order

1          Q.    Do you think there might be

2    a thousand within it?

3                MR. BALL:  Objection.

4    BY MR. VAUGHN:

5          Q.    Micrograms.  Do you think

6    that might be right?

7          A.    I think it is.  But I'm not

8    100 percent sure.

9          Q.    But if it was a thousand,

10   would that mean that this is 52

11   nanograms?

12         A.    Yes.  If it was a thousand,

13   yes.

14         Q.    And then when you add beer,

15   that subgroup got up to, I guess, 71

16   nanograms?

17         A.    Yes.  Yes.

18         Q.    And so the differences

19   between these groups is just tens of

20   nanograms, right?

21                MR. BALL:  Objection to

22         form.

23                THE WITNESS:  What?

24

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2          Q.    Tens of nanograms.

3          A.    So the mean daily NDMA

4    intake includes beer.  I don't quite

5    understand what you're doing.

6          Q.    Oh, I'm reading what you

7    have here.  The mean daily NDMA intake

8    from diet was 52 nanograms and

9    specifically from beer was estimated in a

10   subgroup at 71 nanograms.

11         A.    Okay.

12         Q.    And so the difference there

13   is just like about 20 nanograms, right?

14         A.    Yeah, I am not quite sure

15   what you're doing.  Because the mean

16   daily intake includes beer as well as

17   everything.  So I'm not quite sure what

18   you're doing.

19         Q.    Okay.  What was the highest

20   exposure daily to NDMA in this group?

21         A.    I don't know.

22         Q.    You didn't --

23         A.    You know, you know, this is

24   a Finnish diet too.  I don't know how --

Confidential Information - Subject to Protective Order

1    how applicable this is to a U.S. diet.

2        Q.    What do you think is

3    different?

4        A.    I have no idea.  You have to

5    look at that.  And also, this is a diet

6    back to 1999, so -- actually it does --

7    66 to 72.  So...

8            That's one of the important

9    things with epidemiology.  You have to

10   understand not only the statistical

11   significance, the diet but how

12   representative your data is.  I'm not

13   sure how representative this is of a U.S.

14   population taking valsartan.

15       Q.    Do you think a U.S.

16   population is exposed to less than

17   52 nanograms in their diet a day?

18       A.    Oh, I have no idea.

19       Q.    You didn't look into that,

20   did you?

21       A.    No.

22       Q.    Do people from Finland, do

23   they process NDMA differently, do they

24   metabolize it differently?

Confidential Information - Subject to Protective Order

1           MR. BALL:  Objection to

2     form.

3           THE WITNESS:  I have no

4     idea -- I have no idea.

5  BY MR. VAUGHN:

6     Q.    Do you have any reason to

7  believe that people in Finland will

8  metabolize NDMA differently than people

9  in the United States?

10          MR. BALL:  Objection to

11    form.

12          THE WITNESS:  I don't

13    have -- I don't have any reason to

14    believe that or not.

15  BY MR. VAUGHN:

16    Q.    So as far as the levels of

17  NDMA causing cancers in people in

18  Finland, that should still be applicable

19  to the United States, correct?

20          MR. BALL:  Objection to

21    form.

22          THE WITNESS:  No.

23  BY MR. VAUGHN:

24    Q.    Setting diet aside, I'm not

Confidential Information - Subject to Protective Order

1    saying how much we eat.  I'm just saying,

2    if we were exposed to the same amount of

3    NDMA as people in Finland, would you not

4    expect the same result?

5         A.    That I have no idea.

6    Because also you have to look at the age

7    group, the gender, things like that.  You

8    have to look at all the factors.

9              MR. VAUGHN:  Can you go to

10         the next page, Tyler.

11    BY MR. VAUGHN:

12         Q.    Earlier you were talking

13    about dose-response and how the last

14    study you didn't think really showed a

15    dose-response.

16              On Number 40 --

17         A.    It wasn't --

18         Q.    Huh?

19         A.    I just want to be clear.  It

20    wasn't my conclusion.  It's the study's

21    conclusion of a P-value greater than .05.

22         Q.    Well, do you disagree with

23    the study's conclusion?

24         A.    No.  I'm just reporting what

Confidential Information - Subject to Protective Order

1    the study said.  You said I decided.  I

2    didn't decide.

3            Q.    But you also agree on that

4    prior study, the high dose of NDMA was

5    associated with cancer compared to the

6    low dose of NDMA, correct?

7            A.    I don't believe it was

8    compared to low dose.  I can't remember

9    what the comparison was.

10           Q.    Did the low dose of NDMA

11   cause an increased risk of cancer?

12           A.    They didn't find an

13   increased risk of cancer.

14           Q.    Did the high dose increase

15   the risk of cancer?

16           A.    That is what they found,

17   yes.  For one cancer type, but not for

18   all cancer types.  We were just talking

19   about colorectal cancer.

20           Q.    And so there was a response

21   to the higher dose, but there wasn't a

22   response to the lower dose, correct?

23                 MR. BALL:  Objection to

24        form.

Confidential Information Subject to Protective Order

1          THE WITNESS:  There's no --

2      there was no dose-response.

3   BY MR. VAUGHN:

4      Q.    That wasn't my question.

5          Was there an increased --

6   scratch that.

7          Do you agree that there was

8   an increased risk with the high dose and

9   there was not an increased risk with the

10  low dose?

11     A.    Correct.

12     Q.    So Number 47, we go a little

13  bit more than halfway down within 47, in

14  multivariate models.  What is a

15  multivariate model?

16     A.    Has more than variable in

17  it.  Age, gender.

18     Q.    It notes "there was a trend

19  of increasing risk of stomach cancer with

20  increasing NDMA intake and a

21  dose-response trend was observed."

22     A.    Mm-hmm.

23     Q.    And then it says p-trend,

24  0.02.  What does that mean?

Confidential Information - Subject to Protective Order

1        A.    The trend is significant.

2   The P-value is less than .05.

3        Q.    And so being lower than .05,

4   does that make it even stronger?

5              MR. BALL:  Objection to

6        form.

7              THE WITNESS:  It just says

8        it -- it just says it is or isn't.

9   BY MR. VAUGHN:

10        Q.    Being less than .05 doesn't

11   make it more likely that the results are

12   accurate?

13              MR. BALL:  Objection to

14        form.

15              THE WITNESS:  I don't know

16        what you mean by accurate.

17   BY MR. VAUGHN:

18        Q.    Does the P-value being less

19   than .05 increase the statistical

20   significance of the results?

21        A.    No.  That's not my

22   understanding.

23        Q.    But going above the .05

24   decreases the statistical significance?

Confidential Information - Subject to Protective Order

1        A.     Correct.  It makes it

2   nonstatistically significant.

3        Q.     Why does this only go one

4   direction, why would being even low or

5   not increase the statistical

6   significance?

7        A.     I guess I'm a little bit

8   lost about what you're asking, I'm sorry.

9        Q.     Okay.  So you said above a

10  .05 P-value, it would not be

11  statistically significant.

12       A.     Right.

13       Q.     If you're below a .05, like

14  this .2, .02, would .02 be even more

15  statistically significant in the results

16  than a .05 P-value?

17              MR. BALL:  Objection to

18       form.

19              THE WITNESS:  It is

20       statistically significant.  The

21       point verifies that statistical

22       significance.

23  BY MR. VAUGHN:

24       Q.     I'm asking is it more

Confidential Information - Subject to Protective Order

1    statistically significant to have .02

2    versus .05?

3              MR. BALL:  Object to form.

4              THE WITNESS:  I guess we're

5         getting confused.  Because we

6         don't use the word "more

7         statistically significant."  We

8         just say statistically

9         significant.

10             I do want to point out.

11        When you evaluate this literature

12        you can't go through each study

13        and look at the positive aspects

14        of each study.  You have to look

15        at the totality of the literature.

16        That's what we did in the graph.

17   BY MR. VAUGHN:

18        Q.    Lower down you note,

19   "However, only the highest levels of

20   intake had statistically significant

21   increased risk."

22             Are you talking about

23   highest levels of intake of NDMA had a

24   significantly increased risk on the

Confidential Information - Subject to Protective Order

1    formation of cancer, is that what that

2    sentence is saying?

3         A.    It's hard because you take

4    it out of context.  Let me try to read

5    the paragraph.

6              I believe we are talking

7    about processed meat and bacon and pork.

8         Q.    So you think this sentence

9    is talking about the highest levels of

10   that meat?

11        A.    Correct.

12        Q.    And that meat contains NDMA,

13   right?

14        A.    That's what they say, yes.

15        Q.    And so the highest levels of

16   the NDMA had statistically significant

17   increased risk.  What type of risk are

18   you talking about there?

19        A.    Of the relationship between

20   the food intake and whatever cancer that

21   would be met.

22        Q.    And this was stomach cancer

23   again, correct?

24        A.    Yes.

Confidential Information - Subject to Protective Order

1          Q.    Let's look at Number 49.

2                So this is 11.4-year

3    follow-up.

4                Doctor, in your opinion, if

5    something is a carcinogen, how soon will

6    you start seeing cancers in the

7    population if they are exposed to it?

8          A.    Oh, it depends on what the

9    carcinogen is.

10         Q.    If it was the most potent

11   carcinogen you know, what would the

12   soonest be?

13         A.    Well, that, I don't know.

14         Q.    Can people develop cancer

15   from a carcinogen within a year?

16               MR. BALL:  Objection to

17         form.

18               THE WITNESS:  I'm not -- I

19         don't know.  That, I don't know.

20   BY MR. VAUGHN:

21         Q.    What about within two years?

22               MR. BALL:  Objection to

23         form.

24               THE WITNESS:  I don't know.

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    Within six months?

3              MR. BALL:  Same objection.

4              THE WITNESS:  I don't know.

5    BY MR. VAUGHN:

6         Q.    You didn't consider any of

7    that when you were reviewing all these

8    studies?

9         A.    Consider what?

10        Q.    Consider how long or how

11   soon someone can get cancer after being

12   exposed to a carcinogen?

13        A.    Well, we considered the

14   totality of the evidence, not just the

15   individual studies.

16        Q.    What is a lag time in a

17   study?  What does the word "lag time"

18   mean?

19        A.    Can you use it and I can

20   explain it to you?

21        Q.    So after someone is exposed

22   to a carcinogen, if they had a lag of one

23   year in the study, what does that mean?

24        A.    That's just a year that they

Confidential Information - Subject to Protective Order

1  don't count exposure in their exposure

2  assessment.

3       Q.    I'm having a hard time

4  hearing you.  Can you say that again?

5       A.    Let me try to go -- I'll

6  hold this up.  Does that help?

7       Q.    I can hear you.  Go ahead.

8       A.    Okay.  That's a -- that's a

9  time period where they don't consider the

10  exposure.

11       Q.    Do they not --

12       A.    So there's acute -- seems

13  like --

14       Q.    Are they not considering --

15       A.    -- units of dose.

16       Q.    So the lag doesn't have to

17  do with if they were diagnosed with

18  cancer in that first year?  It has to do

19  with dose?

20       A.    Right.  Well, no, not with

21  dose, with exposure.

22            MR. BALL:  Objection.

23  BY MR. VAUGHN:

24       Q.    The lag has nothing to do

Confidential Information - Subject to Protective Order

1    with what's counted as far as diagnoses?

2          A.    It's --

3                MR. BALL:   Objection to

4          form.

5                THE WITNESS:   -- exposures.

6    BY MR. VAUGHN:

7          Q.    Sorry.   I'm having a hard

8    time hearing you over the objections.

9    All the transcript picked up was the word

10   "exposures."

11         A.    So it deals with exposure.

12   You're talking about a lag exposure, not

13   a lag diagnosis.

14               THE COURT REPORTER:   Can you

15         repeat that?

16               THE WITNESS:   Not a lag

17         diagnosis.

18   BY MR. VAUGHN:

19         Q.    At the bottom of 49 on that

20   Page 22, do you see what the main NDMA

21   levels were for cancer cases?

22               MR. VAUGHN:   Sorry, yeah, on

23         Page 22 still.   Bottom of -- yeah.

24

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    59 nanograms a day; is that

3    correct?

4         A.    Yes.   Yes.

5         Q.    They do the conversion to

6    micrograms.   And that's -- would be a

7    thousand, right?

8         A.    Right.

9         Q.    The conversion that we said

10   earlier.

11             And this one's in Norfolk,

12   UK.  But they have a pretty similar

13   amount of exposure to NDMA as the

14   Finlands did, didn't they?

15        A.    Oh, I don't know.

16        Q.    Well, I mean, we looked

17   at --

18        A.    This is -- this isn't

19   everyone in Norfolk, and not everyone in

20   Finland.  So it's, you know, a cohort of

21   people.  It's a group of people.  And

22   each of those groups is not everyone.  So

23   I have no idea.

24        Q.    Their average amount of

Confidential Information Subject to Protective Order

1    exposure is very similar to what the

2    people in Finland were exposed to,

3    correct?

4         A.    It's not the people in

5    Finland.  It's the people in Finland that

6    were in the study.  I mean, I don't know

7    what the age group is of the people in

8    Finland.  So we have to look at those

9    types of things too.

10        Q.    And again, with this study,

11   we're noticing an increased risk of

12   cancer, are we not?

13        A.    I don't know.

14             MR. BALL:  Objection to

15        form.

16             THE WITNESS:  I can read on

17        my --

18             MR. VAUGHN:  Let's go to the

19        next page.

20   BY MR. VAUGHN:

21        Q.    I can read it for you if

22   it's quicker.

23        A.    Okay.

24        Q.    "When NDMA intake was

1  analyzed as a continuous variable, there

2  was a small statistically significant

3  increased cancer risk per unit increase

4  in NDMA intake in the full study

5  population."

6           Is that a dose-response when

7  it's saying per unit increase of NDMA?

8       A.    Let me see.  So this is as

9  each unit of NDMA goes up, then the

10  increase goes up slightly, yes.

11       Q.    Is that known as a

12  dose-response?

13       A.    This was looking at

14  continuous -- when this -- when you're

15  looking at continuous, you'd see this.

16  But when you're looking at, like,

17  quartiles you don't see it.  So you have

18  to be careful.

19       Q.    Is this known as a

20  dose-response?

21       A.    I would consider that a

22  dose-response, yes.  Again, you have to

23  be careful of your interpretation,

24  because you see it in men, but not in

Confidential Information - Subject to Protective Order

1   women.  You can't understand that.

2   There's a lot of things, a lot of

3   questions in this study.

4        Q.    Who do you think eats more

5   on average, meat; a male or female?

6        A.    I'm sorry?

7        Q.    Do you think a male or a

8   female eats more meat on average?

9            MR. BALL:  Objection to

10       form.

11           THE WITNESS:  I have no

12       idea.

13  BY MR. VAUGHN:

14       Q.    How about drinking beer?  Do

15  you think men drink more beer than women?

16           MR. BALL:  Object to form.

17           THE WITNESS:  I have no

18       idea.

19  BY MR. VAUGHN:

20       Q.    Okay.  And do you see a

21  little bit farther down, it also notes

22  that there was a statistically

23  significant association with rectal

24  cancer?

Confidential Information - Subject to Protective Order

1          A.     Rectal -- when you analyzed

2   NDMA as a continuous variable, you see it

3   as rectal cancer, GI cancers, and other

4   cancers.

5                 MR. VAUGHN:  Let's go to

6          Number 50, Tyler.

7                 THE WITNESS:  I just want to

8          mention that you skipped over the

9          last sentence, which I think is

10         important.

11  BY MR. VAUGHN:

12         Q.     Mm-hmm.

13         A.     Can we read that?

14         Q.     Your attorney will have a

15  chance to go back through anything that

16  you would like on his time?

17                MR. BALL:  Jon, if you want

18         to read it, you feel free to read

19         it if you feel it helps explain

20         your answer.

21                THE WITNESS:  The last

22         sentence, I think, is important.

23                It says that the limitations

24         of the study which is biases in

1          the measurement error associated

2          with food frequency

3          questionnaires, multiple risk

4          factors -- and also multiple risk

5          factors that are not controlled

6          for in the analysis for specific

7          cancers.

8     BY MR. VAUGHN:

9               MR. VAUGHN:  Move to strike.

10         There was --

11              THE WITNESS:  You have to

12         look at all --

13              MR. VAUGHN: -- no question

14         on the table.

15              THE WITNESS:  You have to

16         look at all those things when you

17         assess the study.  You can't just

18         look at the statistical

19         significance.

20              MR. VAUGHN:  Move to strike.

21         There is no question on the table.

22              MR. BALL:  He was answering

23         your prior question.  He hadn't

24         quite finished.  He made that

Confidential Information - Subject to Protective Order

1          clear.

2                    MR. VAUGHN:  All right.  Let

3          go and look at Number 50 now,

4          Tyler.

5     BY MR. VAUGHN:

6          Q.    Let's see.  If we go a

7     little more than halfway down this one

8     actually notes that the median NDMA

9     intake was much higher for men.  It comes

10    out to 80 nanograms, versus women,

11    40-nanograms.

12                   Do you think that's probably

13    consistent amongst most of the

14    populations, that men are consuming more

15    NDMA than women?

16                   MR. BALL:  Objection to

17         form.

18                   THE WITNESS:  I have no

19         idea.

20    BY MR. VAUGHN:

21         Q.    Do you think the

22    difference --

23         A.    -- look at all --

24         Q.    Do you think the

Confidential Information - Subject to Protective Order

1  difference --

2       A.     -- by populations.

3       Q.     Sorry, what did you say?

4       A.     That I haven't looked at all

5  populations in the world to make a

6  statement, the conclusion.

7       Q.     Do you think a difference in

8  80 nanograms a day and 40 nanograms a day

9  might explain why men have a more

10 increased risk of cancer?

11             MR. BALL:  Objection to

12       form.

13             THE WITNESS:  Oh, I have no

14       idea.  There's no relationship

15       between NDMA and cancer -- to

16       explain it.

17 BY MR. VAUGHN:

18       Q.     None?

19       A.     No.  The totality of the

20 evidence.

21       Q.     Okay.  So two sentences

22 later, "In men, esophageal squamous cell

23 cancer was associated with NDMA intake,"

24 and then HR 2.43.  What is HR?

Confidential Information - Subject to Protective Order

1        A.      Hazards ratio.

2        Q.      And what is the difference

3   of an HR and an RR?

4        A.      It's looking at -- it's a

5   survival analysis versus a relative risk.

6        Q.      And then the confidence

7   interval is 95 percent, right?

8        A.      Yes.

9        Q.      And then the -- the P-trend

10   is .01.  So that's below that .05 that

11   you were saying we need, right?

12        A.      Correct.

13        Q.      And are you discounting this

14   one because the lower end is 1.13?

15              MR. BALL:  Objection to the

16        form.

17              THE WITNESS:  You have to

18        look at all of them.  You have to

19        look at all the studies, you know,

20        together.  That's why we did the

21        graphs.

22   BY MR. VAUGHN:

23        Q.      I guess there is diet ones,

24   okay.

Confidential Information - Subject to Protective Order

1          And your opinion is there's

2  no strong evidence that NDMA and NDEA are

3  associated with cancer, correct?

4          MR. BALL:  Objection to

5      form.

6          THE WITNESS:  Where do you

7      see that?

8  BY MR. VAUGHN:

9      Q.    Page 24 of your report.

10     A.    So these studies -- the

11  cohort studies state they are no

12  associations with any cancer type.

13  Case-control says there's no strong

14  evidence that NDMA or NDEA is associated

15  with cancer.  So we separate it by the

16  study designs.

17     Q.    Oh.  So the studies we were

18  looking at a second ago were the cohort

19  studies?

20     A.    Yep, yes, sir.  Yeah.

21     Q.    Ok.  So that part of your

22  opinion is, I guess, on Page 21 where you

23  say "Cohort studies have not demonstrated

24  that NDMA or NDEA in diet are associated

Confidential Information - Subject to Protective Order

1    with any cancer type."

2                 And then all those studies

3    that we went through where there is an

4    association with a cancer type, those are

5    the ones that you are talking about?

6                 MR. BALL:  Objection to

7           form.

8                 THE WITNESS:  You're

9           misquoting my statement.  You have

10          to -- you have to look at all the

11          studies combined.  That's why we

12          did the graphs.

13                You can't just pull out a

14          single study and say that this is

15          statistically significant, so this

16          is an association.  You have to

17          look at the totality of the

18          evidence.

19   BY MR. VAUGHN:

20          Q.    Did I only discuss one study

21   with you?

22          A.    Well, you discussed the

23   positive results of a few studies, yes.

24          Q.     I mean you only have seven

Confidential Information Subject to Protective Order

```
1   studies even here.

2        A.    Okay.  That's why we did the

3   graph so you can look at the graph and

4   see.

5              MR. VAUGHN:  Let's go to

6        Page 24 now, Tyler.  52.

7   BY MR. VAUGHN:

8        Q.    All right.  So this one,

9   second line on the right was in Hawaii.

10  So this is a United States one, correct?

11       A.    Let me see.  Conducted in

12  Hawaii.  Yes, in the '80s.  Between '83

13  and '85.

14       Q.    And do you have any reason

15  to believe that humans process NDMA

16  differently now than in '83 or '85?

17       A.    I guess the more important

18  question is, are the diets similar in '83

19  and '85 as they are now.

20       Q.    Why is that the more

21  important question?

22       A.    Because the NDMA exposure

23  levels would be different.  Also, the age

24  and all other confounders as well.  So
```

Confidential Information - Subject to Protective Order

1  you have to understand the

2  representatives of the population.

3        Q.    What if these NDMA exposure

4  levels are way below what's in valsartan?

5              MR. BALL:  Objection to

6        form.

7  BY MR. VAUGHN:

8        Q.    Would that -- would the

9  study not be very relevant to does the

10  NDMA in valsartan cause cancer?

11        A.    I have no idea.  You have to

12  show me an example of a study that looked

13  at that.

14        Q.    If these studies are showing

15  an association with NDMA and cancer and

16  valsartan has even higher levels of NDMA,

17  would you not expect valsartan with NDMA

18  to be able to cause cancer as well?

19              MR. BALL:  Object to form.

20              THE WITNESS:  The totality

21        of the evidence isn't showing a

22        relationship with cancer.

23  BY MR. VAUGHN:

24        Q.    All right.  Midway through

Confidential Information - Subject to Protective Order

1   on this one where it says, "An

2   association between NDMA and risk of lung

3   cancer was observed for men in the

4   highest two categories of NDMA intake.

5   OR" --

6           And what is OR?

7       A.    Odds ratio.

8       Q.    And how is that different

9   than the HR and RR that we were talking

10  about?

11      A.    Well, odds ratio is for a

12  case-control study.  In a case-control

13  study you pick subjects based on the

14  disease status and then you look back in

15  time to see if they have exposure or not.

16  Which is the odds of having exposure in

17  the cases versus the odds of having

18  exposure in the controls.

19      Q.    So we're seeing a 2.8 odds

20  ratio.  And now that CI, it says 1.5 to

21  4.3.  Does that mean that the levels were

22  getting five -- over five times more

23  cancer?

24      A.    That's the -- that's the

Confidential Information - Subject to Protective Order

1    confidence interval.  If you repeat the

2    study over and over again, 95 percent of

3    the time the S value would be between

4    1.5 and 4.3 -- so 1.4 and 5.3.

5         Q.    So it would be increasing

6    the rate of cancer between 40 percent and

7    530 percent?

8         A.    Correct.  95 percent of the

9    time.

10        Q.    And then Q4, is that -- is

11   that the highest quartile?  The other one

12   said Q3.

13        A.    Yes.

14        Q.    And so Q4, when they gave

15   even more NDMA, the odds ratio went from

16   2.8 to 3.3?

17        A.    It does.  Confidence

18   intervals overlap.  So that tells you the

19   numbers aren't different.

20        Q.    That confidence interval now

21   is up from -- up to 1.7 to 6.2, so at the

22   highest levels they are seeing 70 to

23   620 percent higher levels of cancer with

24   NDMA?

Confidential Information - Subject to Protective Order

1        A.    Right.  But it overlaps with
2   the Quarter 3 confidence intervals.
3        Q.    And it says that this is a
4   strong dose-response trend.  Do you see
5   that?
6        A.    Yes.  Yes.
7        Q.    And then the P-trend is
8   .0006.
9              Is this a strong
10  dose-response trend because of the low
11  P-value or because of the high percent
12  increases in cancer?
13             MR. BALL:  Objection to
14        form.
15             THE WITNESS:  I would say
16        both.  Well, the cancer increase
17        isn't high.  I mean it's between
18        1.7 and 6.2, which overlaps with
19        the quarter -- Quartile 3
20        confidence interval.
21             MR. VAUGHN:  We can go to
22        the next page Tyler.
23  BY MR. VAUGHN:
24        Q.    This would be Number 53.  We

Confidential Information - Subject to Protective Order

1  just can't see that number at the top.

2  At the top it says, "An association was

3  seen between NDMA intake and lung cancer

4  at third and highest quartiles," correct?

5       A.    Correct.

6       Q.    And earlier I think you were

7  talking about how some of these studies

8  weren't maybe controlled properly.  This

9  one is actually controlled for age, sex,

10  residence, urban/rural status, family

11  history of lung cancer, BMI, pack years,

12  and total energy intake, correct?

13       A.    Correct.

14       Q.    And is this showing a

15  dose-response trend again where the third

16  quartile is increasing by 6 percent to

17  296 percent increased risk of cancer

18  while the highest quartile is

19  experiencing a 86 percent to 529 percent

20  increase of cancer?

21       A.    I don't know if they

22  calculated a dose-response trend or not.

23       Q.    Well, I mean, are we not

24  seeing higher rates of cancer as the dose

Confidential Information - Subject to Protective Order

1    goes up if we are seeing third quartiles

2    associated with cancer, the fourth

3    quartile is associated with even higher

4    cancer and it looks like the first two

5    were not?

6         A.    Yeah, so what you also have

7    to look at is the confidence interval.

8              So if the first confidence

9    interval goes from 1.06 to 2.96, and the

10   confidence interval for the highest

11   quartile goes from 1.86 to 5.29, those

12   confidence intervals overlap.

13        Q.    But they also remain

14   higher --

15        A.    I'm not sure if it's

16   statistically different or not.  That's

17   why I would need the P-value to look at

18   that.

19        Q.    You agree that the first two

20   quartiles to the lowest amounts of NDMA

21   were not associated with an increased

22   risk of cancer, correct?

23        A.    Well, I'd have to look at

24   that and see.  I don't -- it's not

Confidential Information - Subject to Protective Order

1    represented on this page that you're

2    showing me.

3         Q.    What are your critiques on

4    this study?

5         A.    Let me look at my written

6    copy of my printed-out copy here so I can

7    see.  This is Paragraph 52 or 53?

8         Q.    53.

9         A.    It looks like some of the

10   results were inconsistent.  We'd have to

11   look at the paper to see exactly what it

12   is.  Some of the results are

13   inconsistent.

14        Q.    What results are you talking

15   about?

16        A.    At the end.  The results

17   about NDMA-containing food, et cetera.

18   They don't seem consistent the high risk.

19   Also, it is also a hospital-based

20   case-control study, which there's concern

21   about using hospital controls.  So the

22   study design is problematic as well.

23        Q.    The food that it was

24   associated with an increased risk of

1    cancer is also the food that has the

2    highest NDMA concentration, correct?

3              MR. BALL:  Object to form.

4              THE WITNESS:  That's right.

5         But the risk was really small.  It

6         was borderline statistically

7         significant, which is 1.01.  None

8         of the other with high estimated

9         NDMA levels had an association or

10        an increased risk.

11   BY MR. VAUGHN:

12        Q.    So then 54, it looks like

13   you -- you only have three studies cited

14   under lung cancer, the two that we just

15   went over, then you cite Loh.  And so are

16   you use Loh to invalidate the other two

17   results?

18        A.    We reported on all the

19   studies we find.

20        Q.    Well, you're saying that you

21   don't think that the diet or NDMA and

22   NDEA are associated with increased risk

23   of cancer.  And the only three that you

24   discuss on lung cancer are these three.

Confidential Information - Subject to Protective Order

```
1    And you're coming out and saying it
2    doesn't increase the risk.  And so are
3    you basically using Loh to basically say
4    these other two studies can't be right?
5           A.    No.  I'm saying the other
6    two studies have problems with them as
7    well.  Methodological problems.
8           Q.    And what are those
9    methodological problems?
10          A.    Methodological problems I
11   said.
12          Q.    Yeah, what are they?
13          A.    The first one uses a lot of
14   proxy respondents.
15          Q.    What is a proxy respondent?
16          A.    It's what you showed my
17   paper on, where we compared
18   self-respondents to proxy respondents,
19   and you showed the proxy respondents
20   weren't very good.  So this supports
21   that.
22          Q.    What about the other study?
23          A.    Yeah, it wasn't consistent
24   across the different food groups.
```

Confidential Information - Subject to Protective Order

1      Q.    But not all the food groups

2   had the same level of NDMA in it, right?

3      A.    Right.  But you would expect

4   some risk.  And you don't see any risk at

5   all.

6      Q.    But the highest levels, you

7   do?

8      A.    If there's an association.

9   But as I said, I don't believe in the

10  association.  The studies don't show

11  there's an association with any cancer.

12     Q.    It literally says, "An

13  association was seen between NDMA intake

14  and lung cancer at the third and highest

15  quartiles."  It's at the top of the page

16  of your report.

17     A.    Right.  That sentence

18  doesn't -- doesn't describe what -- the

19  totality of the studies, right?

20     Q.    Tell me if it's --

21     A.    If you look -- if you look

22  at my -- if you look at my figure, that

23  helps you, so you don't have to look at

24  individual studies.

Confidential Information - Subject to Protective Order

1    Q.    But I'm trying to understand

2   what you think is wrong with individual

3   studies and why you think certain ones

4   are stronger.

5    A.    I don't even say that when I

6   graph them.  When you look at the graph,

7   you can see where all the studies fall.

8   Overall, case-control studies with diet

9   are hard to understand because you're

10  picking people after they have the

11  disease, and that may make them report or

12  remember what was in their diet

13  differently.

14   Q.    That's something actually I

15  want to talk about.  Why is that?

16   A.    Why is it?  Because people

17  try to figure out why they had cancer.

18   Q.    And to that end, wouldn't

19  they have to know that NDMA is associated

20  with cancer for it to influence their --

21   A.    Right, so but here they're

22  not asking about NDMA.  They're asking

23  about different food stuff, et cetera.

24   Q.    So wouldn't they have to

Confidential Information - Subject to Protective Order

1    know that certain foods are associated

2    with increased risk of cancers for it

3    bias their answers?

4          A.    Well, I think at this time

5    people knew that there was certain foods

6    that were, you know, not as good for you.

7          Q.    What do you mean by not as

8    good for you?

9          A.    You don't see any vegetables

10   or fruit.

11         Q.    What do you mean by that,

12   you don't see any vegetables or fruit?

13         A.    There's no increased risk

14   for those groups.

15         Q.    Why do you think that is?

16         A.    Because they didn't report

17   it.

18         Q.    And so you think people know

19   that salted meat, salted fish, barbecue

20   has enough carcinogens in it to increase

21   their risk of cancer and is going bias

22   their answers?  That's what you think?

23              MR. BALL:  Objection to

24        form.

Confidential Information - Subject to Protective Order

1          THE WITNESS:  I think that
2      those people realize that those
3      aren't foods that they should have
4      eaten all the time.
5   BY MR. VAUGHN:
6          Q.    And so you think that
7   they're going to associate that with
8   their cancer and say they eat more of it?
9          A.    I think people that are ill,
10  you know, remember things like that more
11  than people that aren't ill, will overly
12  report those things.
13         Q.    So people that are ill say
14  that they eat more bacon than they
15  actually do?
16         A.    Maybe.
17         MR. BALL:  Objection to
18      form.
19  BY MR. VAUGHN:
20         Q.    Do people frequently
21  exaggerate how much alcohol they drink
22  when they're reporting it?
23         A.    You'd have to look at the --
24  individual studies have, you know,

Confidential Information - Subject to Protective Order

1    different results.  So you have

2    different -- some measures of validity in

3    the study.

4         Q.    Do you think these people

5    that are filling out these questionnaires

6    are, like, planning on suing a company

7    that makes bacon or something?

8              MR. BALL:  Object to form.

9    BY MR. VAUGHN:

10        Q.    What's their incentive for

11   lying on these questionnaires?

12             MR. BALL:  Object to form.

13             THE WITNESS:  I didn't

14        say they -- I didn't say they were

15        lying.  I didn't say they had

16        incentives.  I said they were just

17        trying to figure out why they have

18        cancer.

19             When I did my -- when I did

20        my dissertation, I interviewed

21        people myself that had pancreatic

22        disease.  It was a tough disease,

23        and they were trying to figure out

24        why the heck they had it.  They

Confidential Information - Subject to Protective Order

1          died within a month --

2   BY MR. VAUGHN:

3          Q.    I was going to say --

4          A.    -- of being diagnosed.

5          Q.    -- people with pancreatic

6   cancer don't have much time to figure out

7   what caused it, do they?

8          A.    But they think a lot about

9   it, much more than a person without

10  cancer.

11         Q.    You think that means that

12  they recall more accurately or that they

13  exaggerate?

14              MR. BALL:  Objection to

15         form.

16              THE WITNESS:  It depends on

17         the study.  It depends on the

18         population.  It depends on what

19         you're asking.  It depends on a

20         lot of stuff.

21              It's something that you

22         should try to assess in your

23         studies.

24              MR. VAUGHN:  Rick, I know we

Confidential Information - Subject to Protective Order

```
1          haven't been going for a ton of
2          time, but I drank a bunch of
3          coffee at lunch.  Do you mind if
4          we take a break already?
5                    MR. BALL:  That's fine.
6                    THE VIDEOGRAPHER:  Off the
7          record, 2:01 p.m.
8                    (Short break.)
9                    THE VIDEOGRAPHER:  We are
10         back on the record at 2:09 p.m.
11    BY MR. VAUGHN:
12         Q.    Let's go to stomach cancer,
13    Number 55.  And let's go to Page 26 at
14    the top of the page.
15                   MR. VAUGHN:  The top part,
16         sorry, where it's continuing on
17         from 55.  Yeah.
18    BY MR. VAUGHN:
19         Q.    The sentence starting with
20    however, the second sentence.  Can you
21    read the sentence aloud for us, Doctor?
22         A.    "However, stomach cancer
23    risk was increased with increasing smoked
24    meat, a food high in NDMA, after
```

Confidential Information - Subject to Protective Order

1   adjusting for other food groups, total

2   food consumption and ethnicity."

3        Q.    And then where we have this

4   1.76-8.75, is that saying the upper end

5   was increasing the risk of stomach cancer

6   by 875 percent?

7        A.    The confidence interval went

8   from 1.76 to 8.75, yes.

9        Q.    To the 76 percent increased

10  risk to an 875 percent increased risk?

11       A.    Yes.

12       Q.    On number --

13       A.    -- that's assessing for food

14  groups, total food consumption, and

15  ethnicity.  It didn't adjust for every

16  potential risk factor for stomach cancer,

17  like H. pylori.  So it is a limitation.

18       Q.    Do you have reason to

19  believe that one group had a higher rate

20  of H. pylori than the other group?

21       A.    Yeah.  There is a

22  relationship between stomach cancer and

23  H. pylori.

24            Also, as I note here, you

Confidential Information - Subject to Protective Order

1  have to take -- be mindful of the

2  limitations of the study.  Response rate

3  was low, it was only 44 percent.  Usually

4  we like it above 60 percent in

5  case-control studies.  And they had to

6  get rid of a third of the case because

7  they died or had severe illness.  You

8  have to get your cases as quickly as you

9  can after they're diagnosed.

10          My pancreatic cancer

11  studies, but I like -- I went daily to

12  pathology departments to look for people

13  who had pancreatic cancer, was able to

14  get to them within two weeks.  It looks

15  like they had a longer time period.

16      Q.    Is it problematic if a study

17  is excluding a third of the patients that

18  get cancer?

19          MR. BALL:  Objection to

20      form.

21          THE WITNESS:  Oh, very much

22      so.  You're not getting a

23      representative sample of your

24      cases.

Confidential Information - Subject to Protective Order

1  BY MR. VAUGHN:

2       Q.    I missed the first part of

3  your answer with that objection.  I'm

4  sorry, did you say, "Very much so"?

5       A.    Absolutely, yes.

6       Q.    And why is --

7       A.    You really got to -- you

8  really got to try to get everyone you can

9  before they are dead.  Because it could

10  be that the exposure leads to early

11  death.  You don't know.  You don't have

12  those people in your study.

13       Q.    So a study that is

14  evaluating the risk of cancer, you

15  wouldn't want to get rid of one-third of

16  the people that ended up getting cancer,

17  correct?

18       A.    Correct.  You want to try to

19  get your response rate as high as you

20  can, so...

21       Q.    Because if a third of the

22  people were excluded that got cancer,

23  that could really invalidate the results,

24  correct?

Confidential Information - Subject to Protective Order

1     A.    You just don't know unless

2  you do another research study to figure

3  that out.

4     Q.    So that study alone wouldn't

5  be reliable, you would need at least

6  another study to confirm it?

7     A.    I would, yes.  Very much so.

8  I think I -- oh, I actually say that in

9  the last sentence.  "The included cases

10  may represent earlier or less severe form

11  of the disease."  That's a problem.

12     Q.    Because the people with a

13  severe disease could have died really

14  quickly, right?

15     A.    Correct.

16     Q.    Something like pancreatic

17  cancer, that can kill you within a month

18  or two, right?

19     A.    Yeah.  As I said, that's why

20  I tried to get to people as quickly as I

21  could, within two weeks.

22     Q.    What other cancers can kill

23  you really quickly besides pancreatic

24  cancer?  Are there other ones that are

Confidential Information - Subject to Protective Order

1  kind of known for that?

2       A.    I'm trying to think.  Off

3  the top of my -- off the top of my head I

4  can't recall.  Pancreatic cancer is the

5  one that is mostly known.  The other ones

6  I'm not sure.

7            MR. VAUGHN:  Tyler, let's

8       take a break from the report for

9       just a second, and let's go to

10       2021 Gomm.

11            (Document marked for

12       identification as Exhibit

13       Fryzek-25.)

14  BY MR. VAUGHN:

15       Q.    Do you remember the Gomm

16  study, Doctor?

17       A.    Yeah, I believe that is the

18  German valsartan study?

19       Q.    Yeah, using the insurance

20  data from Germany, right?

21       A.    Yes.  Yes, sir.

22       Q.    And you don't know if this

23  insurance company has any relationship to

24  any of the defendants, do you?

Confidential Information - Subject to Protective Order

1    A.    Oh, I have no idea.

2          MR. VAUGHN:   Tyler, can we

3    go to Page 8.

4    BY MR. VAUGHN:

5    Q.    Did you review this part of

6    the study, Doctor, the selection criteria

7    when you were forming your opinions?

8    A.    Yeah, I did read it.

9    Q.    And so patients who were

10   continuously insured by AOK during the

11   years 2009 to '13 were included in this

12   study, correct?

13         Do you see that under

14   Selection Criteria?

15   A.    Yes.

16         Can we make this a little

17   bit bigger?  Thank you.

18         MR. VAUGHN:   Thank you,

19   Tyler.

20   BY MR. VAUGHN:

21   Q.    The valsartan contamination

22   continued on well past 2013, correct?

23   A.    Where do you see that?

24   Q.    Are you aware of the years

Confidential Information - Subject to Protective Order

1   that valsartan was contaminated with

2   NDMA?

3          A.    I'm not aware of the years

4   in Germany.  But I believe this article

5   says so.  Let me look.

6          Q.    Go ahead.  Are you able to

7   download it and let me know?

8          A.    Oh, you want me to download?

9          Q.    Or if you go to Page 1 it

10  notes that in Germany the Federal

11  Institute for Drugs and Medical Devices

12  ordered a recall of drug products

13  contaminated with NDMA in July of 2018.

14            So would you think then that

15  in two thousand -- go ahead.

16         A.    No.  Well, in the methods

17  section they define how they determine

18  who was exposed with valsartan and who

19  was not exposed.  So if you go to the

20  methods section that will tell us.

21         Q.    So --

22         A.    If that's the method in the

23  abstract, that's not right.

24         Q.    I'm asking you -- there was

Confidential Information - Subject to Protective Order

1    contaminated valsartan on the market in

2    Germany after 2013, correct?

3         A.    But I'd like to look at the

4    methods because then we'd be clear.

5    Otherwise, I'm just kind of trying to

6    remember.

7         Q.    Okay.

8              MR. VAUGHN:  Go ahead and

9         pull the methods section up there

10        for him.

11   BY MR. VAUGHN:

12        Q.    "Cohort comprised patients

13   who filled a prescription of valsartan

14   from the period of 2012 to 2017."

15        A.    Okay.

16        Q.    Does that help you?  It's on

17   Page 1 it notes it too.  Yeah.

18        A.    If you just go down.  I

19   think it's the next sentence.

20             "Potential NDMA

21   contamination was assessed on the basis

22   of pharmaceutical registration number."

23             So it looks like they looked

24   for specific pharmaceutical registration

Confidential Information - Subject to Protective Order

1  numbers between that time, 2012 and 2017.

2        Q.    Which is after 2013,

3  correct?

4        A.    2012 isn't.

5        Q.    Okay.  So some of it was

6  before.

7        But, again, their selection

8  criteria for patients who were

9  continuously insured on the years 2009 to

10  2013, correct?

11        A.    I believe that's the year,

12  yeah.

13        Q.    Ok.  If we go back to

14  page --

15        A.    It's hard -- it's hard to

16  remember.

17        MR. VAUGHN:  Or Page 8, I

18        guess is what we were on, Tyler.

19  BY MR. VAUGHN:

20        Q.    If someone lost their

21  insurance after 2013, their cancer

22  diagnosis is not going to be captured, is

23  it?

24        A.    Correct.

Confidential Information - Subject to Protective Order

1    Q.    Or if they changed

2   insurances from AOK, it's not going to be

3   captured either, is it?

4    A.    You know, I'm not -- I'm not

5   aware of the insurance system in Germany.

6   I don't know how it operates.

7    Q.    Did you not look into that

8   at all --

9    A.    What you're saying --

10    Q.    -- when you were

11   evaluating --

12    A.    What you're say -- what

13   you're saying is true for the U.S.  So if

14   they have more than one insurance group,

15   you know, I just don't know.

16    Q.    All right.  In the second

17   paragraph, it notes, "For outpatient

18   diagnosis, at least one confirmatory

19   diagnosis within the following four

20   quarters was required for validation."

21   Were you aware of that?

22    A.    That's what it says, yes.

23    Q.    Is that normal to do?

24        MR. BALL:  Objection to

Confidential Information - Subject to Protective Order

```
 1              form.

 2                   THE WITNESS:  I don't know

 3              if it's normal in Germany.  I

 4              don't know -- I don't know how

 5              patients interact -- interact with

 6              the healthcare system in Germany,

 7              so.

 8     BY MR. VAUGHN:

 9         Q.    When you do studies, do you

10     confirm confirmatory diagnosis?

11         A.    Typically if you do studies

12     of these type of claims data, you try to

13     get -- look at two diagnoses, yes,

14     because you don't want -- if you just

15     look at one diagnosis, you run the risk

16     of getting a rule-out diagnosis.

17                   So they just report

18     something to insurance to see if they can

19     rule it out or not.  They're not sure

20     that it's actually cancer.

21         Q.    So was it improper for the

22     other cancer patients that weren't

23     outpatient for them to only require one

24     diagnosis?
```

Confidential Information Subject to Protective Order

1              MR. BALL:  Objection to

2        form.

3              THE WITNESS:  You mean

4        inpatients?

5   BY MR. VAUGHN:

6        Q.    Yeah.

7        A.    No.  That's pretty popular

8   to do that.  So outpatient you need two.

9   Inpatient you need one.

10       Q.    So if someone went and got

11  an outpatient diagnosis of cancer, went

12  back home, blew their brains out, they're

13  not going to get included in this study,

14  are they?

15             MR. BALL:  Object to form.

16             THE WITNESS:  Right.  No.

17  BY MR. VAUGHN:

18       Q.    Or someone --

19       A.    I have no idea how often

20  that happens.  I can't imagine that

21  happens much.

22       Q.    You don't think people --

23       A.    You're trying to

24  discredit --

Confidential Information - Subject to Protective Order

1          Q.     You don't think people get

2    diagnosed with cancer and they're so

3    upset they kill themselves?

4                  MR. BALL:  Object to form.

5                  THE WITNESS:  I have no -- I

6          have no data.  I've never seen any

7          data.

8    BY MR. VAUGHN:

9          Q.     You're not aware of any of

10   the plaintiffs in this litigation have

11   killed themselves because of their cancer

12   diagnosis?

13                 MR. BALL:  Object to form.

14                 THE WITNESS:  I have no

15         knowledge of that.  No knowledge

16         of that.

17   BY MR. VAUGHN:

18         Q.     And so also if someone got

19   an outpatient diagnosis, quit their job,

20   lost their insurance, they're not going

21   to be included in this study, are they?

22                 MR. BALL:  Object to form.

23                 THE WITNESS:  Yeah, they

24         would if they had a cancer

Confidential Information - Subject to Protective Order

1           diagnosis while they had

2           insurance.

3    BY MR. VAUGHN:

4           Q.    If they -- if they quit

5    their job and lost their insurance, they

6    wouldn't get captured in this, would

7    they?

8                 MR. BALL:  Object to form.

9                 THE WITNESS:  It depends --

10          it depends on whether a cancer

11          diagnosis was made.  If they quit

12          their job and lost their

13          insurance, they wouldn't have any

14          way to get to a physician to get

15          medical care.  I'm confused by

16          your question.

17   BY MR. VAUGHN:

18          Q.    I mean, they could still --

19   they could still get a different

20   insurance or they could pay out of

21   pocket, could they not?

22                MR. BALL:  Object to form.

23                THE WITNESS:  I have no

24          idea.  This is a German healthcare

Confidential Information - Subject to Protective Order

1    system.  I have no idea.

2    BY MR. VAUGHN:

3         Q.    Further down in that

4    paragraph it notes, "Persons with other

5    cancer diagnosis before the index quarter

6    in which the examined cancer diagnosed

7    were not included in the analysis for

8    specific individual cancer types."

9              Does that mean if someone

10   got a diagnosis outpatient and then a

11   different cancer diagnosis inpatient,

12   that they would not be included?

13              MR. BALL:  Object to form.

14              THE WITNESS:  Let me read

15        it -- let me read it again.

16              They were included -- I

17        think that what they are saying,

18        and this is just my guess of what

19        they're saying, is if a person is

20        diagnosed with two different types

21        of cancer, they weren't included

22        in the individual cancer types,

23        but they're included in the

24        analysis with all the cancer,

Confidential Information - Subject to Protective Order

1      which is commonly done.

2  BY MR. VAUGHN:

3      Q.    Where do you draw the

4  inference that they were included for the

5  all cancer?

6      A.    It says they were not

7  included in the analysis for a specific

8  individual cancer types.  So I assume

9  that that means that they were included

10  for all cancers.

11      Q.    That's an assumption that

12  you're making of the study?

13      A.    I think it's a pretty valid

14  assumption.

15      Q.    Let's go down to exposure.

16      MR. VAUGHN:  The next

17      paragraph, Tyler.

18  BY MR. VAUGHN:

19      Q.    It notes the NDMA content of

20  valsartan tablets seemed to correlate

21  with the dose strength of the tablet.

22           If that's inaccurate, is

23  that going to impact the results of the

24  study?

Confidential Information - Subject to Protective Order

1      A.     I have no idea.

2      Q.     Why do you have no idea?

3      A.     Because I don't know if it's

4  true or not.  And I don't know how it

5  would impact the study.

6      Q.     Well, is the study not

7  trying to look at if higher levels of

8  valsartan can cause cancer?

9           MR. BALL:  Object to form.

10          THE WITNESS:  It was looking

11     at a variety of questions.  That

12     was just one of them.

13  BY MR. VAUGHN:

14     Q.     Did they group people on

15  exposure based on the milligram of the

16  valsartan pill?

17     A.     You'd have to show me that

18  so I can recall that.  I don't recall off

19  the top of my head.

20     Q.     You don't recall how they

21  did this study?

22          MR. BALL:  Object to form.

23          THE WITNESS:  Not -- not

24     off -- not off the top of my head,

Confidential Information - Subject to Protective Order

1          no.

2    BY MR. VAUGHN:

3          Q.    If they did classify people

4    for exposure based in part off of the

5    milligram of the pill, and in reality

6    some of the low milligram pills actually

7    have more NDMA than the high milligram

8    pills, would that impact the results of

9    this study?

10              MR. BALL:  Object to form.

11              THE WITNESS:  I'd have to --

12         I'd have to see how they're

13         classified.  I don't think it

14         would impact the study though

15         because there is no relationship

16         between NDMA and cancer.  I would

17         say it would I still find no

18         relationship.

19   BY MR. VAUGHN:

20         Q.    Don't you base your opinion

21   that there's no association between NDMA

22   and cancer in large part on this study?

23              MR. BALL:  Objection to

24         form.

Confidential Information Subject to Protective Order

```
 1                  THE WITNESS:  Not in large
 2          part.  The totality -- the
 3          totality of the evidence.
 4   BY MR. VAUGHN:
 5          Q.    How many valsartan studies
 6   did you cite in your report?
 7          A.    Two.
 8          Q.    Two.  And this is one of the
 9   two, right?
10          A.    Right.
11          Q.    And the validity of the
12   results doesn't really matter how much
13   NDMA is in the pills because you're
14   already certain that NDMA is not
15   carcinogenic to humans, right?
16                  MR. BALL:  Objection to
17          form.
18                  THE WITNESS:  That's not
19          what I -- that's not what I said.
20                  I think they analyzed it a
21          number of different ways.
22   BY MR. VAUGHN:
23          Q.    How?
24          A.    They looked at any valsartan
```

Confidential Information - Subject to Protective Order

1  use, valsartan use by different levels.

2              MR. VAUGHN:  Tyler, can we

3        go to Page 5.

4  BY MR. VAUGHN:

5        Q.    Doctor, do you know how many

6  people were included in this study that

7  got cancer?

8        A.    I think -- I think it says

9  in the results section somewhere.

10             Here it is, no, these are

11  for the different cancer types.  I can't

12  recall that off the top of my head.

13       Q.    If we added up all the

14  cancer types, would that give us the

15  answer?

16       A.    It depends if someone had

17  more than one cancer.

18       Q.    Do you know if they --

19  earlier didn't we disagree that if they

20  were diagnosed with two cancers, they

21  weren't included?

22             MR. BALL:  Objection to

23       form.

24             THE WITNESS:  It wasn't

Confidential Information - Subject to Protective Order

1          they -- it wasn't that they were

2          diagnosed with two cancers.  But

3          it should say in the results how

4          many people had cancer if you are

5          interested in that.

6     BY MR. VAUGHN:

7          Q.    If you could find it, I'd

8     appreciate it.  If I add all of these up,

9     I come out to about 28,000.  I don't know

10    if that sounds about right to you or not.

11         A.    I didn't memorize that.  I'm

12    sorry.  Let me see if I can -- can I

13    control this or do I have to download the

14    document?

15         Q.    You might have to download

16    it.

17         A.    Okay.  What number is this,

18    what exhibit number?

19              MR. VAUGHN:  Tyler, do you

20         know what --

21              TRIAL TECH:  25.

22              THE WITNESS:  I'm sorry?  I

23         missed that.

24              MR. VAUGHN:  25.

Confidential Information - Subject to Protective Order

```
 1              TRIAL TECH:  25.

 2              THE WITNESS:  25?

 3              MR. VAUGHN:  Yes.

 4              THE WITNESS:  All right.  It

 5         looks like we have to look at

 6         eTable 1.  Do you have eTable 1?

 7         I take it it's an online table.

 8    BY MR. VAUGHN:

 9         Q.    Page 3 has a Table 1, but

10    it's not giving that information.

11         A.    Yeah.  No, it's eTable,

12    which I assume means electronic table,

13    which means it's online.  So I don't know

14    if you guys have access to that.

15         Q.    I don't.

16         A.    Okay.  Because that gives a

17    result for overall cancer.  So you'd have

18    to look at that.

19         Q.    And so is it your opinion

20    that adding all the different cancer

21    types will not give us the total number?

22              MR. BALL:  Objection to

23         form.

24              THE WITNESS:  I have no
```

Confidential Information - Subject to Protective Order

1          idea.  I said I had no idea.

2     BY MR. VAUGHN:

3          Q.    Okay.

4               MR. VAUGHN:  Well, let's go

5          back to Page 5, Tyler, and look at

6          all those cancers again.

7     BY MR. VAUGHN:

8          Q.    Okay.  So for bladder

9     cancer, between non-exposed and exposed,

10    if we add those together it's about

11    2,500, right?

12         A.    Correct.

13         Q.    And then breast cancer, if

14    we add those two together, it's about

15    4500, right?

16         A.    I'll take your word for it.

17    I believe you.

18         Q.    All right.  And then

19    colorectal, you add those two together it

20    gets pretty close to 5,000, right?

21         A.    Yes.

22         Q.    And kidney, those two

23    together, is close to 2,000?

24         A.    Yes.

Confidential Information - Subject to Protective Order

1          Q.     And lung cancer, if we add

2    those together it's close to 4,000?

3          A.     Yes.

4          Q.     Malignant melanoma, we add

5    those together it's about 2,000?

6          A.     Yes, it -- yes, it is.

7          Q.     And pancreatic cancer, we

8    add those together, it's about 1,500?

9          A.     Yes.

10         Q.     And prostate cancer, we add

11   those together, it's about 5,000 --

12   4,000, right?

13         A.     Yep.

14         Q.     And then uterine cancer, we

15   add those together and it's about 1,000,

16   right?

17         A.     Yeah.  About 1100, 1200.

18         Q.     So if I represent to you

19   that if we add all of those numbers that

20   we just did, we come out to 27,000.  Do

21   you have any reason to disagree with

22   that?

23              MR. BALL:  Objection to

24         form.

Confidential Information - Subject to Protective Order

1          THE WITNESS:  If we add it

2      up?

3  BY MR. VAUGHN:

4      Q.    Yeah, if we add all the

5  numbers that we just did, it comes out to

6  27,000.

7      A.    Okay.  I'll take your word

8  for it.

9          MR. VAUGHN:  Then, Tyler,

10      can we now go to the last page,

11      Page 14.

12  BY MR. VAUGHN:

13      Q.    Doctor, do you see here on

14  that first arrow that goes to the right,

15  14,608 people were excluded because they

16  did not have a consistent cancer

17  diagnosis?

18      A.    Okay.

19      Q.    And out of the total cancer

20  cases, so if there was that 27,000 that

21  were included, and you add these 14,600,

22  would you agree that about one-third of

23  the people diagnosed with cancer were

24  excluded from the study?

Confidential Information - Subject to Protective Order

1     A.    I don't --

2           MR. BALL:  Objection to

3     form.

4  BY MR. VAUGHN:

5     Q.    Okay.  So earlier we said

6  there was 27,000, we agreed, in the study

7  that got cancer.

8     A.    Mm-hmm.

9     Q.    And is 14,600 approximately

10 50 percent of 27,000?

11    A.    Yes.

12    Q.    So would that mean that

13 approximately one in three people

14 diagnosed with cancer were excluded from

15 the study?

16          MR. BALL:  Objection to

17    form.

18          THE WITNESS:  I don't

19    know -- I don't know unless we

20    look at the eTable 1 to see how

21    many cancer patients there were.

22 BY MR. VAUGHN:

23    Q.    If the number we came to

24 earlier, the 27,000, if that was the

Confidential Information - Subject to Protective Order

1  total number of people that got cancer

2  that were included in the study, would

3  you agree that one-third were excluded?

4          MR. BALL:  Objection to

5      form.

6          THE WITNESS:  If that was,

7      yes.

8  BY MR. VAUGHN:

9      Q.    Thank you, Doctor.

10     A.    You should only be concerned

11 about that if they were not similar to

12 the people who were included.  There's

13 bias involved in that.

14     Q.    Well, the study was on

15 people that just took valsartan, right?

16 Earlier you were saying that they looked

17 at everyone that took valsartan, then

18 they compared that to the general

19 population, right?

20     A.    No, they didn't compare this

21 to the general population.  They only

22 compared it among valsartan users.

23     Q.    Okay.

24          MR. VAUGHN:  Let's go back

Confidential Information - Subject to Protective Order

1          to his expert report, Tyler.  And

2          Page 26.  Let's go to 56 now.  We

3          left off at 55 last.

4     BY MR. VAUGHN:

5          Q.    So midway through this one

6     it notes that the median NDMA cases was

7     0.18 nanogram a day and .16 --

8          A.    Point --

9          Q.    Huh?  Do you see that?

10         A.    I'm sorry, I'm trying to

11    figure out what this is.  This is the

12    case of stomach cancer in Spain?  Okay.

13         Q.    Is this -- do you know if

14    this is correct, .18 nanograms or is that

15    supposed to be micrograms?

16         A.    Oh, we'd have to look at the

17    study to confirm.

18         Q.    All right. .18 nanograms is

19    really small, right?

20         A.    Yeah, it is.  Yeah.

21         Q.    And just with a .02

22    increase -- .02-nanogram increase a day

23    of NDMA, they saw an increased risk of

24    cancer, didn't they?

Confidential Information - Subject to Protective Order

1          MR. BALL:  Objection to

2     form.

3          THE WITNESS:  I'm not sure

4     what you're asking.  I'm sorry,

5     I'm a little bit lost.

6  BY MR. VAUGHN:

7     Q.    Okay.  Well, I guess the

8  next sentence, "An increasing risk of

9  stomach cancer was seen with increasing

10  NDMA intake."

11          Do you see that?

12     A.    Yes.

13     Q.    And that P-trend, .007,

14  that's statistically significant, right?

15     A.    Correct.

16     Q.    And if we look at the

17  quartiles.  Quartile 2 is associated with

18  an 86 percent increase of risk.

19  Quartile 3, 79 percent increase of risk,

20  and then Quartile 4, 109 percent

21  increased risk, right?

22     A.    Right.

23     Q.    And then the difference on

24  the median intake, it looks like was

Confidential Information - Subject to Protective Order

1  just, what, .02 nanograms is what it was

2  saying?

3         A.     Well, this is -- this is the

4  median across all four quartiles, right?

5         Q.     You tell me.

6         A.     You can't do what you did --

7  you can't do what you're doing.

8         Q.     What am I doing?

9         A.     You're looking across all

10 four quartiles.

11        Q.     Is Quartile 4 the quartile

12 that got the most NDMA?

13        A.     I believe that's how they

14 cut it up, yes.

15        Q.     Is Quartile 4 the group that

16 had the highest increased risk of cancer?

17        A.     Yes.

18        Q.     Do you see later on where it

19 notes, "High NDMA intake paired with low

20 vitamin C intake increased the risk of

21 stomach cancer"?

22        A.     Yes.

23        Q.     And the high intake of

24 vitamin C appeared to mitigate the effect

Confidential Information - Subject to Protective Order

1    of high NDMA intake.

2              Do you see that as well?

3         A.    I do.

4         Q.    Were you aware of that

5    before working on your report?

6              MR. BALL:  Objection to

7         form.

8              THE WITNESS:  That just this

9         one study -- this one study showed

10        a relationship?

11   BY MR. VAUGHN:

12        Q.    I'm sorry.  Were you aware

13   that vitamin C could mitigate the

14   carcinogenicity of low levels of NDMA?

15        A.    Well, this is just one

16   study.  You can't take the results of one

17   study and say it's causality.  It's the

18   totality of the evidence.

19        Q.    Do you -- do you not think

20   that vitamin C mitigates the

21   carcinogenicity of NDMA?

22              MR. BALL:  Objection to

23        form.

24              THE WITNESS:  I'd say we

Confidential Information - Subject to Protective Order

1          need more studies to show any type

2          of causality.  Absolutely.

3               Confidence intervals are

4          small.  The risk odds ratios are

5          small.  They're not high.  Only

6          done in one population.  You

7          really need more information.

8     BY MR. VAUGHN:

9          Q.    Do you know a person by the

10    last name Wikoff, W-I-K-O-F-F?

11         A.    Yes.

12         Q.    How do you know them?

13         A.    She's at ToxStrategies.

14    She's a toxicologist.

15         Q.    What about C. Thompson, do

16    you know him?

17         A.    No.

18         Q.    And then Chappell, I think

19    we talked about Chappell before, right?

20    C-H-A-P-P-E-L-L?

21         A.    Yeah.  I believe she's at

22    ToxStrategies, yeah.

23         Q.    And then what about Doepker,

24    D-O-E-P-K-E-R?  Do you know that person?

Confidential Information - Subject to Protective Order

1       A.    No, I don't know that name.

2       Q.    Okay.  The ones that you do

3  know, do you have any criticisms of them?

4            MR. BALL:  Objection to

5       form.

6            THE WITNESS:  No.

7            MR. VAUGHN:  Tyler, can we

8       pull up 2018 benefit risk

9       analysis.

10           (Document marked for

11      identification as Exhibit

12      Fryzek-26.)

13           MR. VAUGHN:  Can we go to

14      Page 2.

15           MR. BALL:  I think you put

16      this up before.  Could you let me

17      know what exhibit it was?

18           MR. VAUGHN:  This is the

19      first time we've done this one.

20           MR. BALL:  Okay.  Sorry.

21           MR. VAUGHN:  No, you're

22      fine.  It's confusing.

23  BY MR. VAUGHN:

24      Q.    And, Doctor, does this

Confidential Information - Subject to Protective Order

1    identify that all of the authors of this

2    study work at ToxStrategies?

3          A.    Yes.

4          Q.    And that's where you

5    currently work, correct?

6          A.    I work at EpidStrategies,

7    which is a division of ToxStrategies.

8          Q.    Thank you, Doctor.

9          MR. VAUGHN:  Tyler, can we

10         go to Page 26.  Maybe I'm wrong.

11         26 at the bottom of it at least.

12         Next page.

13   BY MR. VAUGHN:

14         Q.    All right, Doctor.  Can you

15   read the first three sentences out loud

16   for us?

17         A.    "The recent evaluation by

18   EFSA" -- I don't know who EFSA is --

19   "provides context regarding quantitative

20   estimates related to formation of

21   endogenous n-nitroso compounds in foods

22   that contain nitrates as an additive."

23         Q.    I'm sorry, I have you on the

24   wrong spot.  I apologize for

Confidential Information - Subject to Protective Order

1    interrupting.

2              MR. VAUGHN:  Can we pull

3         back out real quick, Tyler.

4              The top one, I'm sorry.

5         Yeah.  I'll try it again.

6    BY MR. VAUGHN:

7         Q.    Can you read the first three

8    sentences now for me?

9         A.    "Significant complexities

10   are inherent" -- "are inherent to

11   quantitative evaluation of the potential

12   for formation of nitroso compounds.  It

13   is recognized that there are processes

14   and agents that can reduce formation of

15   nitrosamines, for example, vegetables

16   containing vitamin C and other compounds

17   that inhibit nitrosation, causing reduced

18   formation of n-nitroso compounds, ATSDR

19   2017."

20        Q.    And then can you skip down,

21   I guess, to the next -- skip one sentence

22   and start reading where it says "and

23   further complicating," and read through

24   the rest of the paragraph for us.

Confidential Information - Subject to Protective Order

1        A.      "And further complicating

2   the evaluation of these compounds in the

3   context of nitrate exposures is

4   observation that although n-nitroso

5   compounds may have a role in cancer

6   etiology, consumption of fruits and

7   vegetables, sources of vitamins and

8   polyphenols, which can act as nitrosation

9   inhibitors, can produce protective

10  effects against various malignancies."

11       Q.      Do you disagree with your

12  colleagues that n-nitroso compounds may

13  have a role in cancer etiology?

14              MR. BALL:  Object to form to

15       form.

16              THE WITNESS:  I'm sorry.

17       Can you ask again?

18  BY MR. VAUGHN:

19       Q.      Do you disagree with your

20  colleagues that n-nitroso compounds may

21  have a role in cancer etiology?

22              MR. BALL:  Objection.

23              THE WITNESS:  I don't know

24       if this is -- I don't know if this

Confidential Information - Subject to Protective Order

1          is humans or animals we're talking

2          about here.

3                    MR. VAUGHN:  Can you go to

4          Page 4, Tyler.  Or Page 5 of the

5          PDF, I think.  Page 5.

6                    There we go.

7  BY MR. VAUGHN:

8          Q.    You see here that first

9  sentence, it's talking about, "Recent

10  data suggests that it may be an important

11  and beneficial constituent in the human

12  diet."

13                    So we're talking about human

14  diet here, correct?

15          A.    I'm sorry.  Where are you

16  reading?

17          Q.    Very first paragraph or

18  sentence.

19          A.    Okay.  That's what that

20  sentence refers to.

21          Q.    Do you not think that the

22  entire study is talking about human diet?

23                    MR. BALL:  Object to form.

24                    THE WITNESS:  I don't know.

Confidential Information - Subject to Protective Order

1          I haven't had the opportunity to

2          read it.

3     BY MR. VAUGHN:

4          Q.    Did you not consult with

5     your colleagues when you were forming

6     your opinions in this report?

7               MR. BALL:  Objection to

8          form.

9               THE WITNESS:  So these are

10         my opinions, not my colleagues'

11         opinions?

12    BY MR. VAUGHN:

13         Q.    No, these are your

14    colleagues' opinions.

15              Did you consult with any of

16    the authors of this manuscript when you

17    were developing your opinions in this

18    case?

19         A.    Why would I?  They're

20    toxicologists.  They don't know anything

21    about epidemiology.

22         Q.    But I knew that you worked

23    on a panel --

24         A.    They're different

Confidential Information - Subject to Protective Order

1    disciplines.  They're different

2    disciplines.

3         Q.    Well, but I notice on your

4    billing you had a lot of different people

5    actually doing the review and writing

6    your report.  And some of them just said

7    professionals and stuff.  None of these

8    people would have been involved at all

9    with helping you draft your report or

10   doing research, correct?

11        A.    Correct.

12        Q.    And then back on Page 27, do

13   you disagree with them that n-nitroso

14   compounds may have a role in cancer

15   etiology?

16             MR. BALL:  Objection to

17        form.

18             MR. VAUGHN:  Sorry, go back

19        one page, Tyler.  It's confusing

20        on PDF versus the other page.

21   BY MR. VAUGHN:

22        Q.    Yeah, here at the bottom

23   where they say, "N-nitroso compounds may

24   have a role in cancer etiology."

Confidential Information - Subject to Protective Order

1                    Do you disagree with that?

2                    MR. BALL:  Objection to

3          form.

4                    THE WITNESS:  I don't know

5          if they're talking-- I don't know

6          if they are talking about humans

7          or animals.

8    BY MR. VAUGHN:

9          Q.    If they are talking about

10   humans, do you disagree with your

11   colleagues?

12                   MR. BALL:  Objection to

13         form.

14                   THE WITNESS:  Again,

15         epidemiology data doesn't show

16         that.

17   BY MR. VAUGHN:

18         Q.    So you're saying yes, you do

19   disagree with your colleagues?

20                   MR. BALL:  Objection to

21         form.

22                   THE WITNESS:  I'm saying

23         that I don't -- I don't know what

24         this study is about.  I don't know

1           what they did.  All I know is what

2           I reviewed.  And my review shows

3           the totality of the evidence,

4           there's no relationship between

5           NDMA and cancer or any specific

6           cancer type.

7                MR. VAUGHN:  We can go back

8           to his expert report now, Tyler,

9           and Page 26 again.

10   BY MR. VAUGHN:

11        Q.    Number 57, I think that's

12   the one we are on.  About midway through

13   it notes that "The mean daily NDMA intake

14   for this population was

15   .18 micrograms" -- and that would be

16   180 nanograms, correct, Doctor?

17        A.    I believe so, yes.

18        Q.    And this one is in Italy,

19   correct?

20        A.    Yes.

21        Q.    And then the next sentence

22   says, "Using the fully adjusted model,

23   there was an increased risk of stomach

24   cancer at the highest intake of NDMA,"

Confidential Information - Subject to Protective Order

1    when they are taking over 191 nanograms.

2                    Do you see that?

3         A.    I do.

4         Q.    And do you have any idea if

5    the NDMA levels in valsartan were over

6    198 nanograms?

7                    MR. BALL:  Objection to

8         form.

9    BY MR. VAUGHN:

10        Q.    You don't know if they were

11   hundreds of times higher or even

12   thousands of times higher than that?

13                   MR. BALL:  Objection to

14        form.

15                   THE WITNESS:  I don't know.

16        It doesn't matter for the

17        epidemiology review.

18                   With all the epidemiology

19        studies and overall there's not a

20        risk with cancer.

21   BY MR. VAUGHN:

22        Q.    Then if you go a little bit

23   farther do you see where it says,

24   "However, a dose-response trend was

Confidential Information - Subject to Protective Order

1    observed, P less than .01."

2              So is that saying there's a

3    statistically significant dose-response

4    with NDMA and stomach cancer in this

5    study?

6         A.    In men, but not in women.

7         Q.    Previously we looked at a

8    study, who had higher levels of NDMA

9    intake in their diet, was it men or

10   women?

11             MR. BALL:  Objection to

12        form.

13             THE WITNESS:  I don't know.

14        But you can't take one study from

15        a different population and

16        different country and apply it to

17        a study in a different country

18        with a different population.

19   BY MR. VAUGHN:

20        Q.    We've looked at quite a few

21   different countries now, haven't we?

22             MR. BALL:  Objection to

23        form.

24             THE WITNESS:  Yes.

Confidential Information Subject to Protective Order

1      Absolutely.

2              MR. VAUGHN:  Let's go to the

3      next page, Tyler.

4    BY MR. VAUGHN:

5      Q.    All right.  Number 58.

6              All right, Now we are in

7    France.  And if we go down about

8    two-thirds of the way.

9              "Median daily intake of NDMA

10   was .25 micrograms."

11             So here the median is

12   250 nanograms, isn't it?

13     A.    Yes.

14     Q.    Which is getting higher,

15   right?

16     A.    Getting higher than --

17             MR. BALL:  Objection to

18     form.

19   BY MR. VAUGHN:

20     Q.    Higher than the previous

21   ones we looked at?

22     A.    I don't recall.

23     Q.    For which --

24     A.    Some of them were -- some

Confidential Information - Subject to Protective Order

1  were means and some were median, so

2  they're different -- they're different

3  measures.  Median isn't the same as a

4  mean.

5          Q.    But do you agree that

6  250 nanograms was higher than the other

7  ones we were looking at, that were like

8  50 nanograms and 70 nanograms?

9                MR. BALL:  Objection to

10         form.

11               THE WITNESS:  If they -- I

12         can't recall, I think they were

13         means.  These are different

14         measures.  You can't compare them.

15  BY MR. VAUGHN:

16         Q.    So but for the median daily

17  NDMA intake at 250 nanograms, there was a

18  statistically significant higher

19  increased of cancer than in the controls,

20  correct?

21               MR. BALL:  Objection to

22         form.

23               THE WITNESS:  They didn't do

24         it -- they didn't do analysis by

Confidential Information - Subject to Protective Order

1       median.  So I'm confused by your

2       answer.

3  BY MR. VAUGHN:

4       Q.    I'm reading what it says on

5  your report, on median daily NDMA intake

6  was 250 nanograms.  When they compared

7  250 nanograms to 230 nanograms there was

8  a statistically significant higher -- oh,

9  is that just saying that the -- is that

10 just saying that the NDMA intake was

11 higher, not the risk of cancer?

12      A.    Correct.

13      Q.    Okay.

14      A.    It doesn't say it -- it just

15 says difference.

16      Q.    Okay.  Can you read the next

17 sentence aloud for us?

18      A.    "There was a sevenfold risk

19 of stomach cancer with the highest NDMA

20 intake, and a nonsignificant increased

21 risk in the middle tertile."

22      Q.    And what does the next

23 sentence say?

24      A.    "A dose-response trend was

Confidential Information - Subject to Protective Order

1    observed when NDMA was analyzed as a

2    continuous variable.  Results were

3    adjusted for age, sex, occupation, and

4    total caloric intake."

5         Q.    So what is your explanation

6    for why this one showed a sevenfold

7    increase in stomach cancer?

8              MR. BALL:  Objection to

9         form.

10             THE WITNESS:  You have --

11        you have to look at how the study

12        was conducted.  You have to look

13        at all the confounders.

14             So H. pylori is considered

15        for stomach cancer here, which is

16        a major confounder.  And different

17        population.  You have to look at

18        all those things.

19   BY MR. VAUGHN:

20        Q.    Do you have any evidence at

21   all that one group had higher rates of

22   H. pylori than the other?

23             MR. BALL:  Objection to

24        form.

Confidential Information - Subject to Protective Order

1           THE WITNESS:  I have no

2       evidence -- I have no evidence

3       that they didn't.  I'm saying it's

4       something that you need to look

5       at, you need to look at it.  You

6       can't just ignore it.

7    BY MR. VAUGHN:

8       Q.   Do you look at that in every

9    study that you do?

10          MR. BALL:  Objection to

11      form.

12          THE WITNESS:  I don't do a

13      lot of studies -- I don't do a lot

14      of studies of stomach cancer.

15   BY MR. VAUGHN:

16      Q.   So H. pylori would be one

17   confounder, correct?  Can you name any

18   other ones besides H. pylori for this

19   one?

20          MR. BALL:  Objection to

21      form.

22          THE WITNESS:  Yeah, we have

23      to go to page -- I list all the

24      confounders.  Let me find them for

Confidential Information - Subject to Protective Order

1       you.

2   BY MR. VAUGHN:

3       Q.    We are talking about a

4   700 percent increase.  Do you think a

5   confounder can explain a 700 percent

6   increase?

7            And that's just average.  If

8   you look at this, it goes from 1.85 to

9   26.46.  That is a 2,600 percent increase

10  in cancer, is it not?

11           MR. BALL:  Object to form.

12           THE WITNESS:  You are

13       misinterpreting what that's

14       showing.  What that's showing is

15       there's just not a lot of people

16       at that highest intake level.

17       Because the confidence interval is

18       so wide, 1.85 to 26.46.  It's just

19       unstable.

20  BY MR. VAUGHN:

21      Q.    And the lowest part of that

22  confidence interval is still showing

23  85 percent increased risk of cancer,

24  isn't it?

Confidential Information - Subject to Protective Order

1          A.     But it's quite a wide
2     confidence interval.
3               So I'm trying to find my --
4     the list of confounders for stomach
5     cancer.  Do you want me to still find
6     that or?
7          Q.     You know, I was going to get
8     to that in a little bit if we want to
9     just wait.
10          A.     Okay.
11          Q.     So I think we went through
12     five stomach NDMA studies, all of them so
13     far found an increased risk of stomach
14     cancer with increasing risk of NDMA.
15               Let's go --
16          A.     Again, we just --
17               MR. BALL:  Is that a
18          question?  Is that a question or a
19          statement?
20               MR. VAUGHN:  I wasn't even
21          done yet.  I was going to say
22          let's go to Number 59.
23     BY MR. VAUGHN:
24          Q.     Again midway through this

Confidential Information - Subject to Protective Order

1    one, NDMA intake was found to be

2    associated with an increased risk of

3    stomach cancer, odds ratio 1.15, P-trend

4    .001.

5              So is this now the sixth

6    study in a row that we've went through

7    that shows --

8         A.    Yeah --

9         Q.    -- an association with NDMA

10   and cancer?

11        A.    You can't just cherry-pick

12   studies like this.  You have to look at

13   all of the totality together.

14        Q.    Doctor, what do you mean --

15   what do you mean cherry-pick?  I'm going

16   through them in order of your report.

17   These are the first six ones that you

18   listed under stomach cancer.  How am I

19   cherry-picking?

20        A.    Let's look at the graph and

21   see what they all look like together.

22        Q.    Why the graph?  Why can't we

23   go through --

24        A.    Because --

Confidential Information - Subject to Protective Order

1       Q.      -- what you actually said

2    about these?

3       A.      I did the graph as well.  I

4    mean --

5       Q.    Okay.  And your attorney can

6    ask you questions.  He can go through

7    your graph with you if you want.  But how

8    am I cherry-picking when I'm going

9    through them one by one in the order you

10   put them in your report?

11      A.      I am not sure that you're

12   going through them one by one.  I haven't

13   been paying attention to that.  And I

14   don't know why you don't want to look at

15   my graph.  It's a representation of all

16   these studies.

17      Q.    I've been calling out the

18   number each time.  55, okay, let's go to

19   the next one, 56, 57, 58.  59 is where

20   we're at.

21      A.    Okay.  You must be in the

22   section that's just on stomach cancer

23   too, right?

24      Q.    All right.  Let's move on

Confidential Information - Subject to Protective Order

1    then from stomach cancer.  Let's go to --
2    let's go to Page 29 where it starts going
3    into upper aerodigestive cancers.  Number
4    63, the first one in that section in your
5    expert report.
6                All right.  If we go down
7    about halfway again.
8                "Cancer of the oral cavity
9    was increased with NDMA intake, but only
10   statistically significant at the highest
11   intake levels."
12               Do you see that, Doctor?
13        A.    I do.  Yes.
14               MR. VAUGHN:  You can go to
15        the next page.
16   BY MR. VAUGHN:
17        Q.    So you only have two listed
18   under upper aerodigestive cancers.  Okay.
19   So the one we just went over.  And we're
20   going to go over to Number 64, which is
21   the other one.  And towards the bottom of
22   that one is --
23        A.    But you're --
24        Q.    -- it says, "NDMA was found

Confidential Information - Subject to Protective Order

1  to be associated with ESSC," which is

2  esophogeal squamous cell carcinoma.  And

3  it ranges from 2.12, se even the lowest

4  end of the confidence -- confidence

5  interval was above two.  And it goes all

6  the way to 5.07 with a P trend of .0001,

7  correct?

8       A.    Yeah, so you're only looking

9  at the poor study designs here.  You're

10 ignoring the cohort studies, which we

11 reviewed at first.  We looked at those.

12 You're ignoring the actual studies of

13 valsartan.

14       MR. VAUGHN:  Tyler, can we

15       go back to Page 24 of his report.

16 BY MR. VAUGHN:

17       Q.    Do you see at the top there,

18 Doctor, you're talking specifically about

19 case-control studies.  You said that --

20       A.    Right.

21       Q.    -- assessed as a whole have

22 not found strong evidence that NDMA or

23 NDEA are associated with cancer.

24            You only listed two

Confidential Information - Subject to Protective Order

1  case-control studies for upper airway.

2  And they both show a statistically

3  significant result.

4           How do you get to this

5  opinion when you only have two studies

6  that both show it?

7       A.    I have to look at my graph.

8  My graph was pretty clear about it.

9       Q.    Your graph is going to be

10 able to explain more than the paragraphs

11 that you wrote about the studies?

12      A.    Yeah, because you'll be able

13 to see all the evidence in totality.

14      Q.    But you would agree with me

15 the only two studies that you cited for

16 upper aerodigestive cancers on

17 case-control studies, they both showed a

18 statistically significant increased risk?

19           MR. BALL:  Objection to

20      form.

21           THE WITNESS:  The strongest

22      of these designs are cohort

23      studies, and they don't show a

24      risk.

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    Okay.  But how can you say

3    that the case-control studies do not show

4    evidence?

5         A.    Because they don't.  The

6    lower confidence intervals are way below

7    two.

8         Q.    Okay.  Let's go back to Page

9    30.  Remember the low confidence interval

10   is 2.12.  That's above two, correct?

11        A.    Slightly above two, yes.

12        Q.    It's above two, right?

13        A.    It is, yes.

14        Q.    So where are you coming out

15   saying that the case-control studies

16   don't show an increased risk of cancer?

17   You only have two studies cited here.

18   Your excuse a second ago was the lower

19   end of the confidence interval was under

20   two.  It's above two.  So what's your

21   reason now?

22             MR. BALL:  Objection to

23        form.

24             THE WITNESS:  Of this one

Confidential Information - Subject to Protective Order

1          study or all the studies combined?

2    BY MR. VAUGHN:

3          Q.    The case-control studies.

4          A.    When you look at all the

5    studies combined -- that's why we graph

6    them, so you can see them all combined.

7    You don't just pull them out one by one.

8          Q.    You only list two studies

9    under upper aerodigestive cancers.  They

10   both show a statistically significant

11   increased risk.  How are you saying that

12   case-control studies don't show any

13   evidence that NDMA or NDEA are associated

14   with cancer?  You only list two

15   case-control studies and they both show

16   an increased risk, do they not?

17         A.    Okay.  Okay.

18              MR. BALL:  Objection to

19         form.

20              THE WITNESS:  And you have

21         to -- you have to look at all of

22         the methodologies of the studies.

23         And case-control studies of the

24         diet are really hard to do.

Confidential Information - Subject to Protective Order

1   BY MR. VAUGHN:

2        Q.    I don't see anywhere in your

3   report where you are explaining why these

4   two studies don't support evidence that

5   NDMA is associated with cancer.  I mean,

6   the authors found that it was, right?

7              MR. BALL:  Objection to

8        form.

9              THE WITNESS:  I don't know.

10       I can't recall what the authors

11       said about the finding.

12  BY MR. VAUGHN:

13       Q.    This part where it says,

14  NDMA was found to be associated with

15  ESSC, esophageal squamous cell carcinoma,

16  and then they give an odds ratio 3.28, a

17  95 percent confidence interval from 2.12

18  to 5.07 and a P-trend of .0001.

19             Was that your analysis or

20  was that the authors' analysis?

21       A.    Oh, it's the authors'

22  analysis, absolutely.

23       Q.    Let's move on to colorectal

24  cancer.  Number 65.  We go about halfway

Confidential Information - Subject to Protective Order

1    down.  "Intake of NDMA was found to be

2    associated with risk of colorectal cancer

3    at the highest level of intake."

4              And then you skip two

5    sentences.

6              Do you notice again where

7    they say, "However a dose-response trend

8    was observed, P-trend .005," correct?

9         A.    Correct.

10        Q.    We'll keep going.  There was

11   also, "The highest levels of NDMA intake

12   were associated with cancer of the

13   rectum."  And it lists it as

14   statistically significant, correct?

15        A.    Correct.

16        Q.    And if we look at a little

17   higher, Q5 median was 2.29 micrograms a

18   day, correct?

19        A.    In this population, yes.

20        Q.    You don't have any idea if

21   some of the valsartan contained more than

22   two micrograms of NDMA, do you?

23        A.    I don't, no.

24        Q.    Doctor, this is the only

Confidential Information - Subject to Protective Order

1  case-control study that you listed for

2  colorectal cancer.  But again, remember

3  earlier you said there was no evidence in

4  the case-control studies of increased

5  risk of cancer, right?

6              MR. BALL:  Objection to

7         form.

8  BY MR. VAUGHN:

9       Q.   Do you think this study

10 supports the fact this there's not an

11 increased risk of cancer with NDMA?

12      A.   I thought the lower

13 confidence interval is below two, way

14 below two in both of these studies.

15             THE COURT REPORTER:  Can you

16        raise your voice, please, Doctor?

17             THE WITNESS:  I said the

18        lower confidence interval is below

19        two, way below two in both of

20        these studies.

21 BY MR. VAUGHN:

22      Q.   So -- there's only one

23 study, I think, isn't there?

24      A.   I'm sorry, in both of these

Confidential Information Subject to Protective Order

1  findings, the two findings there.  The

2  rectum cancer, colorectal cancer.

3        Q.    But -- lowest end of that

4  confidence interval still showed an

5  increased risk of cancer, right?

6        A.    A borderline.  Borderline.

7        Q.    Borderline increased risk of

8  cancer?

9        A.    Yeah.

10       Q.    Okay.

11             MR. VAUGHN:  Let's go to the

12       next page.

13  BY MR. VAUGHN:

14       Q.    So again, you have one study

15  cited for pancreas cancer.

16       A.    Mm-hmm.

17       Q.    And those, "Plant sources of

18  NDMA were associated with statistically

19  significant increased risk at high levels

20  of intake compared to low levels."

21             P-trend .001, correct?

22       A.    Correct.  Which you have to

23  be mindful of how they are doing the

24  study.  I mean, you're just looking at --

Confidential Information Subject to Protective Order

1  again, you're just looking at the

2  findings here.  I mean they -- so they

3  did the study and they only looked at

4  diet in the past year.  They didn't look

5  at any changes in the diet.  They didn't

6  look at lifetime diet.  A lot of

7  questions you have in this type of study.

8  And I explain that at the very beginning

9  about the problems with frequency

10 questionnaires in these type of diet

11 studies.

12         Q.    Do you know if exposure to a

13 mutagenic carcinogen like NDMA can cause

14 cancer in one year?

15              MR. BALL:  Objection to

16        form.

17              THE WITNESS:  I don't know

18        that.

19 BY MR. VAUGHN:

20        Q.    And pancreatic cancer is

21 what this one is looking at, right?

22        A.    It is.

23        Q.    And you discuss earlier

24 about how people die so quickly from

Confidential Information - Subject to Protective Order

1    pancreatic cancer, right?

2         A.    Yeah.  And now they are

3    thinking about what they are -- different

4    exposures to different things.  We try to

5    assess all those things.

6         Q.    So you think some people

7    might be saying they eat more plant-based

8    food that's high in NDMA because they

9    have -- they got pancreatic cancer?

10             MR. BALL:  Objection to

11        form.

12             THE WITNESS:  Pancreatic --

13        in my pancreatic cancer study, we

14        were looking at the risk of DDT

15        associated with pancreatic cancer.

16             We put in some fake

17        pesticides to see if they would be

18        more likely to pick the pesticides

19        that are fake than controls.

20        That's the way we tried to control

21        for it.

22             But they didn't do anything

23        like that in these studies.

24             THE COURT REPORTER:  Doctor,

Confidential Information - Subject to Protective Order

1        if you could really just try to

2        throw your voice for me, please.

3               Thank you.

4               THE WITNESS:  Yep, yeah.

5   BY MR. VAUGHN:

6        Q.    The study you did on if DDT

7   increases the risk of pancreatic cancer,

8   do you recall the results of that study?

9        A.    Yeah.  I think that some

10  forms of DDT showed pancreatic cancer.

11       Q.    Really.

12              Are there any other

13  chemicals that you've studied that you've

14  come to the conclusion that they are

15  associated with an increased risk of

16  cancer besides DDT?

17       A.    It wasn't DDT.  It was some

18  forms of DDT.  And I can't recall the

19  other ones.

20       Q.    All right.  Go to --

21       A.    I just remember that one

22  because it was my first study.

23       Q.    You remember your first

24  study, but not your first deposition?

Confidential Information Subject to Protective Order

1          MR. BALL:  Objection to

2     form.

3          THE WITNESS:  It's a little

4     more -- little more meaningful.

5  BY MR. VAUGHN:

6     Q.    All right, let's go to

7  confounding factors.  And if you need a

8  bathroom break or anything at any time

9  let me know.

10          What is a confounding

11  factor?

12     A.    It is a third factor that is

13  associated with both the exposure and the

14  disease.  If you don't control for it you

15  may see spurious associations.  Like a

16  nuisance factor.

17     Q.    And something that can be a

18  symptom of the outcome would not be a

19  confounder, correct?

20     A.    A symptom of --

21          MR. BALL:  Object to form.

22  BY MR. VAUGHN:

23     Q.    Correct.

24     A.    No, it wouldn't be a

Confidential Information Subject to Protective Order

1  confounder.

2       Q.    All right.  For bladder

3  cancer you list certain workplace

4  exposures.

5       A.    I think all of these come

6  from the American Cancer Society.  If you

7  just go on their web page you'll see

8  these.

9       Q.    Okay.  And you rely on them

10  for -- so you're relying on the

11  American -- I'm sorry, who was it again,

12  American Cancer Society?

13       A.    American -- oh yeah, the

14  regulatory organization.

15       Q.    Okay.  You note smoking is a

16  risk factor.  Do cigarettes contain NDMA

17  or NDEA?

18       A.    I believe so.

19            MR. VAUGHN:  Go to the next

20       page, Tyler.

21  BY MR. VAUGHN:

22       Q.    It notes occupation

23  industries up there at the top, and one

24  of them is rubber.

Confidential Information - Subject to Protective Order

1        The rubber industry.  Are

2    they -- are those workers exposed to high

3    levels of NDMA?

4        A.   It's really not clear from

5    the studies.  They are exposed to so many

6    different things, it's hard to

7    understand.

8        Q.   Are one of the things they

9    are exposed to NDMA?

10        A.   I believe some of the

11    studies have shown that they are.  But

12    it's hard to tease out just the NDMA

13    exposure by itself.

14        Q.   What's this P word diabetes

15    medication, do you see that?  Pio?  In

16    the second sentence?

17        A.   Where are you reading?

18        Q.   Right there.

19        A.   Oh.  It's a -- it's a new

20    type of diabetic medication.  I can't

21    remember what it's called.

22        Q.   Is it Actos maybe?

23        A.   I can't recall.  You have to

24    look at the American Cancer Society web

Confidential Information - Subject to Protective Order

1    page.

2          Q.    Are you aware that that drug

3    is a mutagenic carcinogen?

4               MR. BALL:  Object to form.

5               THE WITNESS:  I have no

6         idea.  I have no idea.

7    BY MR. VAUGHN:

8          Q.    Do you know that -- do you

9    know Dr. Botorff, one of the defense

10   experts in this case, a pharmacist?

11         A.    I don't know that name.

12         Q.    You don't know him?  He told

13   me that he kept giving this drug to his

14   patients even after it got a black box

15   warning for cancer.

16         A.    Okay.

17              MR. BALL:  Objection to

18        form.

19   BY MR. VAUGHN:

20         Q.    You list chemotherapy and

21   radiation as a risk factor.  Why is that?

22         A.    It's what's on the American

23   Cancer Society web page.

24         Q.    Do you agree that that's a

Confidential Information Subject to Protective Order

1   risk factor for bladder cancer?

2        A.    I agree with what the

3   American Cancer Society lists on their

4   web page.  Absolutely, yeah.

5        Q.    Do you have -- you have no

6   basis for why chemotherapy or radiation

7   might increase the risk someone gets

8   cancer?

9        A.    I assume they reviewed the

10  evidence of that.

11       Q.    But you don't know what the

12  mechanism of action is?

13       A.    Oh no, I don't know.

14       Q.    Do immunosuppressives

15  increase the risk of cancer?

16       A.    I'm sorry?

17       Q.    Does something that's an

18  immunosuppressant, does that increase the

19  risk of someone getting cancer?

20       A.    I don't know.

21            MR. VAUGHN:  Let's move to

22       69, blood cancer.

23  BY MR. VAUGHN:

24       Q.    So you mentioned radiation,

Confidential Information - Subject to Protective Order

1    certain chemo again, or having a weakened

2    immune system from taking immune

3    suppression medication.

4              Would you agree that immune

5    suppression can increase the risk of

6    getting cancer?

7              MR. BALL:  Objection to

8         form.

9    BY MR. VAUGHN:

10        Q.    Was that a yes you do agree?

11             MR. BALL:  Objection to

12        form.

13             THE WITNESS:  Some cancers,

14        not -- not all cancers.

15   BY MR. VAUGHN:

16        Q.    Which cancers?

17        A.    This section is on blood

18   cancer, right?

19        Q.    It is.

20             Do you know if NDMA is an

21   immunosuppressant?

22        A.    That, I don't know.  But I

23   know NDMA is not a medication.  You're

24   talking about immunosuppression

Confidential Information - Subject to Protective Order

1   medications.

2          Q.     It lists breast implants as

3   a risk.  Do you agree with that?

4          A.     Where?  Oh.  Yeah, there's a

5   rare form of non-Hodgkin's lymphoma that

6   is associated.  That's really -- that's

7   kind of a new finding.

8          Q.     And do you agree with that

9   finding?

10         A.     I haven't evaluated the

11  evidence.  I assume it's true, because

12  the American Cancer Society reports on

13  it.

14         Q.     Have you ever done any

15  research on breast implants and the

16  complications they can cause?

17         A.     I've done a lot, yes.

18         Q.     And were you receiving

19  funding from the corporation when you

20  were doing those studies?

21         A.     I don't know.  Again, that

22  was when I was at IEI.  So I don't know

23  whose funds those were.

24         Q.     Who is Dow Corning

Confidential Information - Subject to Protective Order

```
1   Corporation?
2         A.    I'm sorry?
3         Q.    Do you know what Dow Corning
4   Corporation is?
5         A.    It's an industry,
6   absolutely.
7         Q.    What type of industry?
8         A.    I believe they used to
9   make -- they used to make breast
10  implants.  But I don't think they do
11  anymore.
12        Q.    Okay.  And when they were
13  funding your research, do you recall if
14  you found that breast implants, that they
15  were associated with anything?
16              MR. BALL:  Objection to
17        form.
18              THE WITNESS:  Yes.  Yes.
19  BY MR. VAUGHN:
20        Q.    What were -- what were
21  breast implants associated with in the
22  studies you did?
23        A.    Suicide.
24        Q.    So was your conclusion of
```

Confidential Information - Subject to Protective Order

1   those studies that breast implants don't

2   increase the risk of any disease, but

3   women are just more likely to be crazy?

4                MR. BALL:  Objection to

5          form.

6                THE WITNESS:  I don't think

7          that's a statement from any of my

8          papers.  You have to show me where

9          I said that.

10  BY MR. VAUGHN:

11       Q.    Did you say that they have a

12  higher rate of mental health issues?

13               MR. BALL:  Objection to

14         form.

15               THE WITNESS:  I don't -- I

16         don't recall.  These are studies

17         that I did over 20 years ago.  So

18         I don't recall.

19  BY MR. VAUGHN:

20       Q.    If your studies contradict

21  with what the American Cancer Society

22  says now, do you not retract those

23  studies?

24               MR. BALL:  Objection to

Confidential Information - Subject to Protective Order

1      form.

2              THE WITNESS:  So I think

3      you're talking about this rare

4      non-Hodgkin's lymphoma finding

5      that said -- I think people agree

6      that that is a finding on breast

7      implants.  But I don't know enough

8      about it because I didn't study

9      it.

10             MR. VAUGHN:  Let's go back

11     to his expert report.  Page 32.

12     We're still on the expert report.

13     Sorry.  Number 70.

14             I guess we can skip 70.

15     It's on breast cancer, and we're

16     not alleging breast cancer.

17   BY MR. VAUGHN:

18       Q.    Colorectal cancer, 71.  You

19   note that in the U.S. African Americans

20   have the highest incidence and mortality

21   rates of colorectal cancer of all racial

22   groups.

23             Why did you include that?

24       A.    It's an important factor.

Confidential Information - Subject to Protective Order

1      Q.    Why is it an important

2  factor?

3      A.    Because it's a risk if

4  you're African American.  Absolutely.

5      Q.    Why is it a risk if you're

6  an African American?

7           MR. BALL:  Objection to

8           form.

9           THE WITNESS:  Because they

10          show -- I'm a little bit confused

11          by your question.  But I assume

12          it's because the studies of the

13          American Cancer Society, based on

14          the findings, show an increased

15          risk for African Americans.

16  BY MR. VAUGHN:

17     Q.    Have you ever studied

18  colorectal cancer and the risk of African

19  Americans getting it?

20     A.    I have not, no.

21          MR. VAUGHN:  Tyler, can we

22          pull up 2010, Use of Electronic

23          Medical Records.

24          (Document marked for

Confidential Information - Subject to Protective Order

1    identification as Exhibit

2    Fryzek-27.)

3  BY MR. VAUGHN:

4    Q.    You were an author on this

5  paper, correct, Jon -- or Dr. Fryzek?

6    A.    I was, yes.

7    Q.    And this was in 2010.  Were

8  you working at Exponent at this time?

9    A.    I was at Amgen.

10    Q.    Were you ever working at

11  Exponent the same time that you were

12  working at Amgen?

13    A.    Oh, no.  You can't do that.

14    Q.    And these first three people

15  that are all of Exponent, do you know

16  them?

17    A.    Fionna is still at Exponent.

18  I think Libby has gone back to a faculty

19  position.  Gena, I don't know what's

20  happened to her.

21    Q.    Okay.  Did you say --

22    A.    This was a long time ago.

23    Q.    Was Fionna the one that you

24  said is still at Exponent?

1        A.      I believe she is, yeah.

2        Q.      Do you still work with her?

3        A.      No.

4                MR. VAUGHN:   Can we go to

5        Page 9, Tyler.   Bottom right

6        paragraph.

7    BY MR. VAUGHN:

8        Q.      Doctor, is this discussing

9    different rates of cancer with different

10   ethnicity groups?

11       A.      It is.

12       Q.      Do you where it says, "Rates

13   of cancer incidence, mortality, and

14   survival may differ by age, race,

15   ethnicity, socioeconomic status, economic

16   (sic) attainment level, and geographic

17   location, and it is thought that access

18   to healthcare screening and treatment

19   resources and the quality of treatment

20   given may underlie a large proportion of

21   these differences."

22               Do you see that?

23       A.      I do.

24       Q.      If we go a little bit

Confidential Information - Subject to Protective Order

1    further down, it says, "Researchers found

2    that black patients were significantly

3    less likely than white patients to

4    receive therapy for their cancer."

5                Do you think that's why

6    there's a higher mortality rate of

7    colorectal cancer in United States with

8    African Americans?

9                MR. BALL:  Objection to

10        form.

11                THE WITNESS:  I have no

12        idea.

13   BY MR. VAUGHN:

14        Q.    You have no idea if access

15   to medical care might impact their death

16   rate?

17                MR. BALL:  Objection to

18        form.

19                THE WITNESS:  No.  You have

20        to understand how this study is

21        similar to, you know, the data

22        that the American Cancer Society

23        is looking at, how representative

24        it is, those types of things.

1              Are they looking at the same

2       age group?  I don't know.

3   BY MR. VAUGHN:

4       Q.    Do you agree that catching

5   the cancer early increases someone's

6   survival rate?

7              MR. BALL:  Objection to

8       form.

9              THE WITNESS:  That, I don't

10       know.  I haven't done any studies

11       on that.

12   BY MR. VAUGHN:

13       Q.    Do you think it's easier to

14   treat Stage I cancer or Stage IV cancer?

15              MR. BALL:  Objection to

16       form.

17              THE WITNESS:  Oh, Stage I.

18       Stage I.

19   BY MR. VAUGHN:

20       Q.    So if someone caught their

21   cancer at Stage I before it progressed,

22   they'd have a higher chance of surviving,

23   right?

24              MR. BALL:  Objection to

Confidential Information - Subject to Protective Order

1       form.

2               THE WITNESS:  I don't know.

3       It depends on the cancer, et

4       cetera, what the comorbidities

5       are, things like that.

6   BY MR. VAUGHN:

7               Q.    Number 72.  Esophageal

8   cancer.  And if we go on the next page,

9   on 33, where it's talking about it.

10              MR. BALL:  Hey, Brett, are

11      you nearing a good place for a

12      stop?  We've gone about an hour

13      and fifteen.

14              MR. VAUGHN:  We can stop

15      right now if you want to.

16              MR. BALL:  Okay.  Why don't

17      we take a little break.  Ten

18      minutes?

19              MR. VAUGHN:  Yeah.

20      Appreciate it.

21              THE VIDEOGRAPHER:  Off the

22      record, 3:16.

23              (Short break.)

24              THE VIDEOGRAPHER:  We are

Confidential Information - Subject to Protective Order

1          back on the record at 3:26.

2    BY MR. VAUGHN:

3          Q.    Doctor, earlier you stated

4    that it would have been improper for you

5    to work at Exponent while you were

6    working at Amgen.

7                Does the same apply to when

8    you were working at MedImmune?

9          A.    Yes.

10         Q.    And as your report states,

11   you were working at one of those two

12   companies from 2006 to 2012, correct?

13         A.    If my report states it,

14   that's correct.

15               MR. VAUGHN:  Tyler, can we

16         go back to Page 33 of his report.

17         Let's just go ahead and skip down

18         to lung cancer, 76.

19   BY MR. VAUGHN:

20         Q.    You note probable risk

21   factors.

22               Probable risk factors,

23   that's something that is not confirmed to

24   be a carcinogen?

Confidential Information Subject to Protective Order

1        A.      Correct.

2        Q.      So something like NDMA would

3    fall under a probable risk factor as

4    well?

5               MR. BALL:  Objection to

6        form.

7               THE WITNESS:  I believe the

8        probable risk factors from the

9        American Cancer Society for lung.

10   BY MR. VAUGHN:

11       Q.      And do you see one,

12   beryllium, B-E-R-Y-L-L-I-U-M.  How do you

13   say that?

14       A.      Beryllium.

15       Q.      Do you agree with the

16   American Cancer Society that that is a

17   risk factor for lung cancer?

18       A.      I haven't evaluated all the

19   evidence of that.  I don't know.  I don't

20   know off the top of my head.

21       Q.      Have you ever evaluated that

22   evidence?

23       A.      I have looked at beryllium

24   in terms of cancer, but I can't remember

Confidential Information - Subject to Protective Order

1    the findings.  Been about ten years, I

2    think.

3         Q.    Okay.

4              MR. VAUGHN:  Tyler, can we

5         pull up 2011, occupational

6         exposure to beryllium.

7              TRIAL TECH:  One second.  I

8         might not have added this as well.

9         I know I saw this as one of the

10        exhibits that was sent.

11             MR. VAUGHN:  2012, sorry.

12             TRIAL TECH:  Oh, that's why.

13             MR. VAUGHN:  It got put in

14        there wrong.  It should say '11.

15             (Document marked for

16        identification as Exhibit

17        Fryzek-28.)

18   BY MR. VAUGHN:

19        Q.    Okay.  So the top left-hand

20   corner, this was actually published in

21   2012.  But at the bottom you can see that

22   it was received in July of 2011.  And you

23   were one of the authors on this article,

24   correct, Dr. Fryzek?

1        A.     The second author, yes.

2        Q.     And there's a little

3   Number 2 after your name, right?

4        A.     I'm sorry, I can't see it.

5   It's kind of hard -- yes.

6        Q.     And what does that 2

7   indicate?

8        A.     At the time that this was

9   written I was at Exponent in Alexandria,

10  Virginia.

11       Q.     And at what time was this

12  wrote?

13       A.     I can't recall.

14       Q.     If we go to the very bottom

15  of this page --

16       A.     I think -- it was while I

17  was at Exponent.

18       Q.     So 2011 you were at

19  Exponent?

20       A.     When this was written I was

21  at Exponent.  I have no idea.

22       Q.     So it wouldn't have been

23  after 2011, right?

24       A.     Pardon me?

Confidential Information Subject to Protective Order

1      Q.    It would not have been after

2    2011, right?

3      A.    It looks like -- it looks

4    like not, correct.

5      Q.    And you don't think you

6    wrote this before 2006, do you?

7      A.    I don't think so, no.

8      Q.    Do you recall testifying

9    that between 2006 and 2012, you were

10   working at Amgen and MedImmune, and that

11   it would have been improper for you to be

12   working at Exponent at the same time?

13     A.    Well, maybe I was off on my

14   dates of the pharmaceutical companies.  I

15   can't recall.

16     Q.    Are you going to look back

17   into that to see when your actual

18   employment dates were?

19     A.    I think it's on my LinkedIn

20   profile too.

21     Q.    Is your LinkedIn profile

22   more accurate than your expert report?

23          MR. BALL:  Objection to

24     form.

Confidential Information - Subject to Protective Order

1        THE WITNESS:  It should

2    be -- it should be the same.

3        MR. VAUGHN:  Let's go to the

4    abstract, that first page still.

5    If you can blow up the abstract

6    words.

7  BY MR. VAUGHN:

8      Q.    Can you read the last

9  sentence for us, the overall?

10     A.    "Overall, the available

11 evidence does not support a conclusion

12 that a causal association has been

13 established between occupational exposure

14 to beryllium and the risk of cancer."

15     Q.    Do you think that should

16 really should be a risk factor that's

17 controlled for in the lung cancer studies

18 if you don't even think it's associated

19 with lung cancer?

20     A.    Yeah, because you don't

21 control for risk factors, you --

22        MR. BALL:  Objection.

23        THE WITNESS:  -- you

24    control -- when you control for

Confidential Information - Subject to Protective Order

1          items in a relationship, you

2          control for those that are known

3          to be risk factors and those that

4          are potentially risk factors.

5    BY MR. VAUGHN:

6          Q.    Would the potential risk

7    factors have a smaller confounding effect

8    than known risk factors?

9          A.    I have no idea.

10         Q.    If it doesn't actually

11   increase the risk of cancer, is it going

12   to be a confounder?

13         A.    If what doesn't increase the

14   risk of cancer?

15         Q.    If anything.  Like let's say

16   beryllium in this example.  If it does

17   not increase the risk of cancer at all,

18   is it going to be a confounder?

19         A.    I think there's a little bit

20   of confusion of what a confounder is.  So

21   a confounder you're not looking at the

22   totality of the evidence, you're looking

23   at confounding within a study.

24         Q.    When you defined confounder

Confidential Information - Subject to Protective Order

1  earlier, you said it must affect both

2  exposure and outcome.  And so if it's not

3  actually increasing the risk of cancer,

4  how is it affecting the outcome?

5       A.    Again, you have to look at

6  the study specifically.  If it increases

7  the risk of cancer within that study,

8  then it is a confounder.  And it's

9  associated with exposure.  So it's a

10  study-specific idea.

11       Q.    What do you base that off

12  of?

13       A.    Base what off of?

14       Q.    What you just said, that

15  confounders are study specific.

16       A.    Oh.  General epidemiology.

17       Q.    So if one study is looking

18  at lung cancer, and the other study is

19  looking at lung cancer, is -- beryllium

20  can get confounder in one and not the

21  other?

22       A.    Correct.  Ethnicity can be.

23  Age can be.

24            The way to control by

Confidential Information - Subject to Protective Order

1    confounding is done by age is having a

2    certain age group.  Then you are

3    confounding by age.

4         Q.    If beryllium though doesn't

5    actually increase the risk of lung

6    cancer, how is it impacting the results

7    of studies that don't control for

8    beryllium exposure?

9         A.    Again, confounding is a very

10   study-specific thing.  You have to look

11   within each study.

12        Q.    Do you have any reason to

13   believe that any of the studies that you

14   reviewed that beryllium was a confounder?

15        A.    I can't recall.

16             MR. VAUGHN:  Can you go to

17        Page 10, Tyler, of this study.

18             Keep going.  One more page.

19   BY MR. VAUGHN:

20        Q.    Who funded this study,

21   Doctor?

22        A.    Looks like it was Materion

23   Brush.

24        Q.    Do you know why they funded

Confidential Information - Subject to Protective Order

1    this study?

2          A.    I don't.

3          Q.    Do you know if they had

4    anything to do with beryllium exposure

5    from any of their products?

6          A.    I think they manufactured

7    beryllium, but I'm not sure.  I wasn't

8    involved in getting this grant.

9          Q.    Who was involved in getting

10   the grant?

11         A.    Dr. Mandel.

12         Q.    And he also worked for

13   Exponent, correct?

14         A.    At that time, did.

15         Q.    Do you still work with

16   Dr. Mandel?

17         A.    No.

18         Q.    Do you know where he works

19   now?

20         A.    I haven't seen for more

21   than -- I believe he's retired.  But I

22   haven't seen him for more than ten years.

23              MR. VAUGHN:  Go back to the

24         expert report again, Tyler.  Same

Confidential Information - Subject to Protective Order

1      spot we were at.  Page 33.

2  BY MR. VAUGHN:

3      Q.    You see where they list

4  chromium compounds, or where you listed

5  chromium compounds as a risk factor for

6  lung cancer as well?

7      A.    Yeah.  Again, it's under

8  American Cancer Society.

9      Q.    And do you agree with the

10  American Cancer Society saying that

11  chromium is a risk factor for lung

12  cancer?

13      A.    I think they listed it.  I

14  don't know how they make the decision.  I

15  would include it as a risk factor --

16  confounder.  Absolutely.

17      Q.    I'm sorry.  I'm reading the

18  transcript.  I'm having a hard time

19  hearing you.

20      A.    I'm sorry.  I'll try to

21  speak up.  I'll hold my microphone up a

22  little.

23      Q.    You're fine.  I gotcha.  You

24  said you would include it as a risk

Confidential Information - Subject to Protective Order

1   factor.  Okay.  But --

2         A.    I said as a confounder.

3         Q.    As a confounder?

4         A.    Yeah.

5         Q.    Do you not think that

6   chromium is a risk factor for cancer?

7         A.    That wasn't the purpose of

8   my review here, my research.

9         Q.    I understand but I'm asking

10  you specifically.  Do you not think that

11  chromium is a risk factor for cancer?

12              MR. BALL:  Objection to

13        form.

14              THE WITNESS:  I don't know.

15  BY MR. VAUGHN:

16        Q.    You don't know if chromium

17  is a risk factor for cancer?

18        A.    I have to review the

19  literature.  I haven't reviewed the

20  literature on chromium.

21        Q.    Have you published

22  literature on chromium?

23        A.    I believe I have.  I can't

24  recall.  I can't recall for sure.

Confidential Information - Subject to Protective Order

1           MR. VAUGHN:  Tyler, can we

2      pull up 2001, Cancer Mortality

3      Chromium Exposure.

4           THE WITNESS:  Oh, yeah.  I

5      thought I had.

6           (Document marked for

7      identification as Exhibit

8      Fryzek-29.)

9           THE WITNESS:  Sorry.  It's

10      hard to remember 30 years of

11      research.

12           MR. VAUGHN:  So let's start

13      with the right-hand side, Tyler.

14      First big, long paragraph.

15  BY MR. VAUGHN:

16      Q.   Do you see where it says,

17  "Although the evidence for

18  carcinogenicity of trivalent chromium is

19  lacking, hexavalent chromium is

20  classified as a human carcinogen."

21           Do you see that?

22      A.   Yes.

23      Q.   Your study, if we look at

24  the abstract part on the left, found

Confidential Information Subject to Protective Order

1    there was no evidence cancer hazard

2    though with residents living near these

3    California gas compressors, correct?

4         A.    Correct.

5              MR. VAUGHN:  Can we go to

6         the next page, Tyler.

7              Top left.  Yeah those two

8         paragraphs.

9    BY MR. VAUGHN:

10        Q.    Why is this talking about

11   Erin Brockovich?  Is that the movie Erin

12   Brockovich?

13        A.    Yes.

14        Q.    Is that what the people in

15   that movie were exposed to is chromium?

16        A.    Supposedly, yes.  Allegedly.

17        Q.    And PG&E, is that who was

18   being sued for the chromium exposure in

19   Erin Brockovich?

20        A.    Oh, that, I don't know.

21        Q.    Okay.  Outside the movie, is

22   PG&E who was being sued for chromium

23   exposure?

24        A.    Again, I don't know.

Confidential Information - Subject to Protective Order

1          MR. BALL:  Objection.

2    BY MR. VAUGHN:

3          Q.    Do you see where it says,

4    "Which was settled in 1996."  And our --

5    the report says, "The litigation against

6    PG&E, which was settled."  So PG&E was

7    being sued for chromium exposure, right?

8          A.    I assume so.

9          Q.    And the next paragraph says,

10   "Given these concerns, we were asked by

11   PG&E to conduct a study of mortality

12   among residents."  Right?

13         A.    Yes.

14         Q.    And the study they paid you

15   to do, you didn't find any association

16   with chromium and cancer, correct?

17         A.    Again, this wasn't a study

18   that they paid me to do.  I was paid by

19   International Epidemiology Institute with

20   a regular salary.

21         Q.    And who paid IEI?

22         A.    Oh, I don't know.  I wasn't

23   involved with that.

24         Q.    I mean it says, "Given these

Confidential Information - Subject to Protective Order

1    concerns, we were asked by PG&E to

2    conduct a study."  Do you think they

3    asked IEI, and IEI is just, like, "Yeah,

4    we'll do it for free"?

5             MR. BALL:  Objection to

6         form.

7             THE WITNESS:  I get --

8         again, I was not involved in

9         getting grants or invoicing.  I

10        was just a researcher.

11   BY MR. VAUGHN:

12        Q.    You were the lead author on

13   this, weren't you?

14        A.    Yeah, absolutely.

15        Q.    You actually wrote this

16   paragraph, right?

17        A.    I don't recall who wrote it.

18        Q.    Didn't you testify earlier

19   that the lead author is the one that's

20   actually writing it?

21        A.    It's usually the lead

22   author.  Yes.

23             MR. VAUGHN:  Can we go to

24        Page 3, Tyler.

Confidential Information - Subject to Protective Order

```
1    BY MR. VAUGHN:

2         Q.    I'm on the right-hand side,

3    the first paragraph that starts

4    "occupational studies."

5              Doctor, can you read that

6    first sentence aloud for us?

7         A.    "Occupational studies have

8    been a mainstay of medical research to

9    identify and quantify the risks of cancer

10   and other diseases associated with

11   chemical exposures."

12        Q.    Do you still agree with that

13   statement?

14        A.    I guess it depends on what

15   occupational studies you're talking

16   about, how well they are done, things

17   like that --

18        Q.    But in --

19        A.    In general, yes.

20        Q.    In general.  Thank you.

21        A.    Mm-hmm.

22              MR. VAUGHN:  Can we go to

23   Page 5, Tyler.  And bottom left,

24   two paragraphs.  Yeah.
```

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    So you guys weren't actually

3    able to determine the exposure levels to

4    the hexavalent chromium, were you?

5         A.    No, we weren't.

6         Q.    But that was okay for this

7    study, correct?

8         A.    It depends on what the

9    objectives of the study were.  So it was

10   okay for this study.

11        Q.    Would occupational studies

12   that are able to actually measure the

13   doses be more accurate?

14             MR. BALL:  Objection.

15             THE WITNESS:  This isn't an

16        occupational study.  This is a

17        community study.  This is done on

18        the community members.

19   BY MR. VAUGHN:

20        Q.    So with the community as

21   well, would that study be even more valid

22   if you did know the levels?

23             MR. BALL:  Objection to

24        form.

Confidential Information - Subject to Protective Order

1          THE WITNESS:  I'm sorry.

2     Can I have the question again?

3 BY MR. VAUGHN:

4     Q.     Scratch it.  It probably

5 wasn't a very good one.

6          The next paragraph you note

7 that you guys examined cancer mortality,

8 not cancer incidence?

9     A.     Correct.

10     Q.     What are the downsides to

11 doing a mortality study versus an

12 incidence study?

13          MR. BALL:  Objection to

14     form.

15          THE WITNESS:  Oh, cancer

16     mortality, the downside is

17     cancer -- if you're diagnosed and

18     you live a long time, you know,

19     it's a misrepresentation of cancer

20     incidence.

21          Usually they're pretty good.

22 BY MR. VAUGHN:

23     Q.     Okay.  I think that's what

24 you're actually -- your study says --

Confidential Information Subject to Protective Order

1          MR. VAUGHN:  If we go to the

2     next column, Tyler, at the top.

3  BY MR. VAUGHN:

4          Q.    It says, "Even for cancers

5  with relatively good survival, although

6  the statistical power of mortality

7  studies will be reduced for cancers with

8  higher survival rates."

9          Is that what you were just

10  describing?

11          A.    Yeah.

12          Q.    Well, can you give me some

13  examples of types of cancers with high

14  survival rates?

15          A.    Typically the blood cancers,

16  leukemia, lymphoma.

17          Q.    What about, like, prostate

18  cancer?

19          A.    Prostate cancer, yes.

20          Q.    And so --

21          A.    Yeah.

22          Q.    So studies that are only

23  looking at cancer mortality instead of

24  cancer incidence, they might not actually

Confidential Information - Subject to Protective Order

1    catch the statistical -- statistically

2    significant increased risk of cancer for

3    things like blood cancers or prostate

4    cancers, correct?

5              MR. BALL:  Objection to

6         form.

7              THE COURT REPORTER:  I

8         didn't hear an answer if you said

9         one.

10             THE WITNESS:  I can't

11        remember the question.  Can you

12        read the question back?

13             MR. VAUGHN:  I believe you

14        said correct.

15   BY MR. VAUGHN:

16        Q.   The question was:  So

17   studies that are only looking at cancer

18   mortality instead of cancer incidence,

19   they might not actually catch the

20   statistically significant increased risk

21   of cancer for things like blood cancer or

22   prostate cancers, correct?

23        A.   Yeah.  And I said correct.

24   Yeah.

Confidential Information - Subject to Protective Order

1      Q.    Thank you.

2            Is your company still

3      researching chromium?

4      A.    You mean my company now?

5      Q.    Yeah.

6      A.    Oh, not to my knowledge.  I

7      don't know.  I don't have any

8      epidemiological studies on chromium.

9      Q.    Deborah Proctor.  You know

10     her, correct?

11     A.    Yes.

12     Q.    Who is she again?

13     A.    She is one of the co-owners.

14     Q.    Do you know Bhat, B-H-A-T?

15     A.    Who?

16     Q.    Person with the last name of

17     Bhat, B-H-A-T?

18     A.    I don't know.

19     Q.    Mina Suh, that's who was

20     helping you with your report, right?

21     A.    Correct.  She is an

22     epidemiologist.

23     Q.    Okay.

24           MR. VAUGHN:  Can we pull up

Confidential Information - Subject to Protective Order

1          2021, inhalation cancer risk

2          assessment, Tyler.

3                    (Document marked for

4          identification as Exhibit

5          Fryzek-30.)

6                    MR. VAUGHN:  And if we can

7          zoom in on the authors.

8     BY MR. VAUGHN:

9          Q.    And can you give me the

10    authors and the stuff right below it that

11    says where they work?

12                   And so all of these authors

13    at the time at least worked either in

14    your division at ToxStrat or at ToxStrat,

15    right?

16         A.    Yeah.  Heidi and Xiaohui are

17    statisticians.

18         Q.    Heidi and who?

19         A.    Xiaohui.

20         Q.    Okay.  Did any of these

21    people besides Mina Suh help you with

22    your report?

23         A.    No.

24         Q.    And Mina Suh was the main

Confidential Information Subject to Protective Order

1    person that helped you, correct?

2            A.     No.

3            Q.     Who was the main person that

4    helped you?

5            A.     Sue Pastula.

6            Q.     Can you say that one more

7    time?

8            A.     Sue Pastula.

9                   MR. VAUGHN:   And can we go

10           to Page 13, Tyler.

11   BY MR. VAUGHN:

12           Q.     And on the right-hand side

13   where it says funding.  So is your

14   company still receiving funding as of

15   2021 from the electrical -- Electric

16   Power Institute?

17           A.     I have no idea.  Again, this

18   is ToxStrategies which is a different

19   group than EpidStrategies.

20   EpidStrategies doesn't have any money

21   from Electrical Power Research Institute.

22           Q.     But Mina Suh, is she at

23   EpidStrategies or ToxStrategies?

24           A.     She was at ToxStrategies.  I

Confidential Information - Subject to Protective Order

1    assume, based on this article, that she

2    started this study when she was at

3    ToxStrategies and then she moved over to

4    EpidStrategies when we came because we

5    were all epidemiologists.

6         Q.    What about Heidi Reichert,

7    it says that she was at EpidStrategies at

8    this time?

9         A.    Right.  Heidi and Xiaohui

10   are statisticians.

11        Q.    And so people within your

12   company were being employed to do

13   chromium studies for the Electric Power

14   Research Institute?

15        A.    It looks like they were

16   employed to do some research analysis.

17   I'm not sure what they were doing.

18             MR. VAUGHN:  Can we go to

19        Page 13 again, Tyler.

20             Can we get the paragraph

21        right above funding.

22             And if we -- midway through.

23   BY MR. VAUGHN:

24        Q.    "Until such data are

Confidential Information - Subject to Protective Order

1    developed, it is important to consider

2    and clearly communicate that assuming the

3    existence of an increased risk of cancer

4    at environmentally relevant exposures is

5    a policy decision not clearly supported

6    by the scientific evidence."

7              Do you agree with that

8    statement?

9              MR. BALL:  Objection to

10        form.

11             THE WITNESS:  I don't agree

12        or disagree.  This is one area --

13        this is an area of study, and it's

14        also toxicology so I can't really

15        respond.

16   BY MR. VAUGHN:

17        Q.   If they are saying that the

18   environmental exposure of chromium is not

19   going to increase your risk of cancer,

20   then why are you saying that it's a

21   potential risk factor that could have

22   confounded the results in the studies in

23   your expert report?

24             MR. BALL:  Objection to

Confidential Information - Subject to Protective Order

```
 1              form.

 2                   THE WITNESS:  I'm not -- I'm

 3              not saying that.  That's from the

 4              American Cancer Society.

 5    BY MR. VAUGHN:

 6         Q.    So your employees, or your

 7    colleagues, I guess, that published this

 8    study are in disagreement with the

 9    American Cancer Society?

10                   MR. BALL:  Objection to

11              form.

12                   THE WITNESS:  I have no

13              idea.

14                   As I said, this is the first

15              time I've seen this study.  And

16              it's about toxicology, not

17              epidemiology, so I don't know.

18                   MR. VAUGHN:  Tyler, can we

19              go to 2006 -- one sec.  Yep.

20                   Did I upload the 2006

21              corporate corruption document,

22              Tyler?

23                   TRIAL TECH:  I have two,

24              2006 documents.  One is a cohort
```

Confidential Information - Subject to Protective Order

1           study.  The other one is a

2           Parkinson's one that we used

3           earlier today.

4                   MR. VAUGHN:  That's what I

5           thought.  I'll have this one sent

6           over.  We can skip that one.

7                   All right.  Could we go back

8           to his expert report.  Page 33.

9   BY MR. VAUGHN:

10          Q.     Are you on your phone,

11  Doctor?

12          A.     Pardon?

13          Q.     Are you on your phone?

14          A.     Yeah.  I had to cancel my --

15  I had to cancel my gym class tonight.

16  It's getting too late.

17                  MR. VAUGHN:  Oh, that's why

18          I couldn't find it, Tyler.  I

19          apologize.  Can we do

20          E-G-I-L-M-A-N, dash 2006?  I

21          forgot to change the file name

22          when I uploaded it.

23                  (Document marked for

24          identification as Exhibit

Confidential Information - Subject to Protective Order

1        Fryzek-31.)

2             TRIAL TECH:  I'm just

3        looking for it now.  Give me one

4        second.

5   BY MR. VAUGHN:

6        Q.    Doctor, have you ever heard

7   of someone named Dennis Paustenbach,

8   P-A-U-S-T-E-N-B-A-C-H?

9        A.    Yes.

10       Q.    Who is that?

11       A.    I believe a toxicologist.  I

12  think he is a toxicologist.

13       Q.    Have you ever worked with

14  him?

15       A.    No.

16            TRIAL TECH:  Brett, I'm not

17       seeing this file either.  I don't

18       have it downloaded and I don't

19       have it in the DropBox folder.

20            MR. VAUGHN:  Okay.

21       E-G-I-L-M-A-N.  If you don't see

22       it, that's fine.  I just want to

23       double-check.

24            TRIAL TECH:  It starts with

Confidential Information - Subject to Protective Order

1    A-G-I-L?

2         MR. VAUGHN:  E.  E.

3         TRIAL TECH:  Oh, okay.  I

4    see it now.

5         MR. VAUGHN:  Cool.  Sorry

6    about that.

7         TRIAL TECH:  That's okay.

8    This the one you're looking for?

9         MR. VAUGHN:  Yeah.

10         MR. BALL:  Okay.

11         MR. VAUGHN:  Can we go to

12    Page 2.

13 BY MR. VAUGHN:

14         Q.    So, "Convening the panel,"

15 that paragraph under there.

16              It talks about a blue ribbon

17 panel.  Do you know what that is, Doctor?

18         A.    I don't.

19         Q.    Just noting this was in

20 2001.  That was -- that study we looked

21 at a second ago, that was a 2001 study,

22 correct?

23         A.    I don't recall.

24         Q.    Do you know a Brent Finley?

Confidential Information - Subject to Protective Order

1        A.     No.

2               MR. VAUGHN:  Can we go to

3        the bottom, where it says,

4        "Balanced representation of

5        science and scientists"?

6  BY MR. VAUGHN:

7        Q.     It says within a week of

8  this panel being made, Dennis

9  Paustenbach, former principal at

10 ChemRisk, was appointed to the panel.

11 And Brent Finley of Exponent says, "So it

12 looks like we've got one of our own on

13 the panel."  Up on the next paragraph.

14               Do you see where it says

15 that?

16        A.     Yep.

17        Q.     Do you know if ChemRisk was

18 a division of Exponent?

19        A.     I have no idea.

20        Q.     Do you know what he means by

21 one of our own on the panel?

22        A.     No.  This is, what, 2001?  I

23 wasn't at Exponent until, what, 2012, you

24 said, 2011?

Confidential Information - Subject to Protective Order

1        Q.    Yeah, but you were

2   publishing literature in 2001 on chromium

3   as well, correct?

4        A.    Okay.  I was, yeah.

5        Q.    Was Deborah Proctor, is she

6   the one that works at ToxStrat?

7        A.    Yeah.

8              MR. VAUGHN:  Can we go to

9        Page 6, Tyler, of the PDF, the

10       third paragraph.  It starts, "On

11       July 25, 2001."

12  BY MR. VAUGHN:

13       Q.    Do you see where it says

14  that she gave testimony as a

15  representative of the Alliance For

16  Responsible Water Policy without

17  acknowledging that the Alliance was

18  funded by PG&E or that she had consulted

19  for them in the past?

20       A.    Okay.

21       Q.    Are you aware of that?

22       A.    No.

23             MR. BALL:  Objection to

24       form.

Confidential Information - Subject to Protective Order

1              THE WITNESS:  I'm not even

2         aware it's true.  I'm not even

3         aware it's true.

4              I mean, you're quoting from

5         this journal that I know that is a

6         plaintiff journal.  And this is

7         pointing that out.  And I don't

8         know what the references are, so.

9    BY MR. VAUGHN:

10        Q.    International Journal of

11   Occupational Environmental Health is a

12   plaintiffs journal?

13        A.    Oh, absolutely.

14        Q.    Do you publish in that

15   journal?

16        A.    No.

17        Q.    Is it just the Journal of

18   Occupational Health that you -- is that

19   the one that you publish in?

20        A.    I'm not sure what you're

21   asking.  I'm sorry.

22        Q.    Give me one second.  I'll

23   take a look.

24              I'll work it out later.

Confidential Information - Subject to Protective Order

1      A.    Who is the author of this

2  paper that you're showing me?

3            MR. BALL:  Jon, you can

4       download it if you want to

5       download it and take it to the top

6       to see who the author is.

7            THE WITNESS:  It's in the

8       exhibits?

9            MR. BALL:  It should be in

10      the exhibits, yeah.  It's Exhibit

11      Number -- hold on.

12            THE WITNESS:  Number 1?

13            MR. BALL:  No, no, it's

14      Exhibit Number --

15            TRIAL TECH:  31.

16            MR. BALL:  31.

17  BY MR. VAUGHN:

18      Q.    Where it says --

19      A.    This is authored by David

20  Egilman.  I'm wondering if he lists all

21  of his plaintiff testimony.  It doesn't

22  look like he does.  So it's a little bit

23  of a conflict of interest.

24      Q.    Okay.  Well, let's see who

Confidential Information - Subject to Protective Order

1    actually said this statement has a

2    conflict of interest.

3                So she gave testimony as a

4    representative of the Alliance For

5    Responsible Water Policy without

6    acknowledging either that the Alliance

7    was funded by PG&E or that she had

8    consulted for PG&E in the past.  And

9    there's a little 48 after it, right?

10          A.    Okay.

11                MR. VAUGHN:  If we go two

12          pages later, Tyler, and blow up

13          48.

14    BY MR. VAUGHN:

15          Q.    And, Doctor, can you read

16    off what that citation is?

17          A.    "Senate hearing of the

18    Senate Health & Human Services Committee,

19    Possible Interference in the Scientific

20    Review of Chromium VI Toxicity,

21    February 28, 2003."

22                I have no idea what that

23    means.

24          Q.    Do you think it's like the

Confidential Information Subject to Protective Order

1    United States Senate?

2                MR. BALL:  Objection to

3         form.

4                THE WITNESS:  It doesn't say

5         that.

6    BY MR. VAUGHN:

7         Q.    Health & Human Services

8    Committee?  Are you aware if that's a

9    part of the U.S. Senate?

10               MR. BALL:  Objection to

11        form.

12               THE WITNESS:  I don't know

13        if it's U.S. or California or

14        another state.  I have no idea.

15   BY MR. VAUGHN:

16        Q.    Do you think whatever

17   Health & Human Services Committee works

18   for the plaintiffs?

19        A.    I have no idea.

20        Q.    Do you know if the

21   government is allowed to even work in

22   lawsuits?

23               MR. BALL:  Objection to

24        form.

Confidential Information - Subject to Protective Order

1          THE WITNESS:  I have no

2      idea.  I don't work for the

3      government.  It's too bad that

4      Egilman didn't disclose his

5      relationships with plaintiffs.

6  BY MR. VAUGHN:

7      Q.    If it's true that Deborah

8  Proctor did not disclose all of this, is

9  that problematic?

10          MR. BALL:  Objection to

11      form.

12          THE WITNESS:  I have -- I

13      have absolutely no idea.

14  BY MR. VAUGHN:

15      Q.    Is there any company policy

16  at ToxStrat to disclose all financial

17  interest when doing studies?

18          MR. BALL:  Objection to

19      form.

20          THE WITNESS:  I have no

21      idea.

22  BY MR. VAUGHN:

23      Q.    You don't know if that's a

24  company policy?

Confidential Information - Subject to Protective Order

1    A.    No.

2         MR. VAUGHN:  If you can go

3    back to his expert report again

4    Tyler.  78, pharyngeal cancer.

5  BY MR. VAUGHN:

6         Q.    And at the top, do you see

7  where it says, "Well-confirmed risk

8  factors for nasopharyngeal cancer," and

9  one of the things included is

10  salt-preserved fish?

11        A.    Okay.

12        Q.    Do you remember earlier we

13  went over that salt-preserved fish had

14  the highest levels of NDMA?

15        MR. BALL:  Objection to

16   form.

17        THE WITNESS:  I don't --

18  BY MR. VAUGHN:

19        Q.    Sorry.  I can't hear what

20  you said.

21        A.    I don't recall.  I don't

22  know what study you're looking at.  I

23  don't know if all studies had shown that.

24  You can't just pull out one finding and

1  say that represents the whole literature.

2  You have to look at the literature in

3  totality.

4       Q.    Overall, is salt-preserved

5  fish one of the foods with the highest

6  level of NDMA?

7          MR. BALL:  Objection.

8          THE WITNESS:  I have no

9     idea.

10  BY MR. VAUGHN:

11       Q.    Didn't look into that at all

12  in forming your opinions in this case?

13          MR. BALL:  Objection to

14     form.

15          THE WITNESS:  No.

16  BY MR. VAUGHN:

17       Q.    Let's go on to 77 on

18  pancreatic cancer.

19          Do you see where you listed

20  diabetes and obesity as risk factors for

21  pancreatic cancer?

22       A.    Yes, that's what it says.

23       Q.    When it comes to the

24  confounders, if they are very similar, do

Confidential Information - Subject to Protective Order

1    you have to control for both of them?

2         A.    Again, it's a study-specific

3    thing.  So you have to look at the study

4    and how it's related to the exposure and

5    the disease.

6         Q.    In your opinion, is diabetes

7    a risk factor for pancreatic cancer?

8         A.    So I haven't studied that.

9    I don't know.

10              MR. VAUGHN:  Tyler, can we

11              go to 2007, the association

12              between selected risk factors.

13              (Document marked for

14              identification as Exhibit

15              Fryzek-32.)

16              MR. VAUGHN:  Blow up the

17              names in the bottom left.

18    BY MR. VAUGHN:

19         Q.    So were you working at the

20    University of Michigan at this time in

21    2007?

22         A.    Yes.  This is -- actually

23    this is my dissertation, part of my

24    dissertation.

Confidential Information - Subject to Protective Order

1          Q.     And what is a dissertation?

2          A.     On pancreatic cancer.

3          Q.     What's dissertation mean?

4          A.     A dissertation for my Ph.D.

5          Q.     And so you were not working

6   at IEI at this time, correct?

7          A.     It looks like I wasn't.  It

8   says I was at Amgen during this time.

9          Q.     Okay.

10         A.     But this is just data I

11  analyzed off my Ph.D. data that I had.

12         Q.     And so the title of this

13  study notes Expression of p53 and K-ras

14  Codon 12 mutations.  Do you know if Amgen

15  was developing drugs targeting those?

16         A.     Not to my knowledge.

17         Q.     To your -- you don't know if

18  Amgen at this time has drugs on the

19  market focused on K-ras?

20              MR. BALL:  Objection to --

21         objection to form.

22              THE WITNESS:  Not for

23         pancreatic cancer.  Not for

24         pancreatic cancer.

Confidential Information - Subject to Protective Order

```
1    BY MR. VAUGHN:
2         Q.    So in abstract, that first
3    paragraph you note that there are a few
4    risk factors for pancreatic cancer,
5    including cigarette smoking, BMI,
6    relative with pancreatic cancer, and
7    diabetes.  A few less risk factors than
8    you listed in your expert report,
9    correct?
10        A.    I'm sorry?
11        Q.    You list -- you list more
12   risk factors in your expert report
13   though, correct?
14        A.    From the American Cancer
15   Society, yes.
16             MR. VAUGHN:  Let's go on the
17        right-hand side of this.
18   BY MR. VAUGHN:
19        Q.    And so for your dissertation
20   paper you did in-person interviews to
21   ascertain information such as
22   demographics and lifestyle factors,
23   correct?
24        A.    Correct.
```

Confidential Information - Subject to Protective Order

1      Q.    And under results, the

2   smoking, was that statistically -- was

3   that associated with an increase?

4      A.    Borderline.  It was 0.9 to

5   4.3.

6      Q.    And so even though it was

7   below one, it's still associated with an

8   increased risk, correct?

9      A.    No.  It's borderline

10  related.

11         MR. VAUGHN:  Go to the next

12      page, Tyler.

13  BY MR. VAUGHN:

14      Q.    That top paragraph notes p53

15  mutations.  What is a p53 mutation?

16      A.    It's a type of mutation on

17  the tumor.  That's all I know about it.

18      Q.    You're the head author, this

19  is your dissertation paper, right?

20      A.    Right.  Talking about

21  15 years ago.  I haven't looked at it

22  since then, so...

23         MR. VAUGHN:  All right.  Can

24      we go further down, Tyler, the

Confidential Information - Subject to Protective Order

1          second paragraph under

2          introduction?

3    BY MR. VAUGHN:

4          Q.    And you see where it says,

5    "It has been observed that both K-ras

6    oncogene and tumor suppressor gene p53

7    are often highly mutated in pancreatic

8    cancer."

9                I read that correctly?

10         A.    Okay, yes.

11         Q.    Do you agree with that

12   statement?

13         A.    I agree that it's accurate,

14   what I wrote there.  And it -- that

15   reference says that.

16         Q.    Does that mean that most

17   people that get pancreatic cancer, they

18   have a mutation of one of their genes,

19   the p53 or the K-ras?

20         A.    I don't think so.

21               MR. BALL:  Objection to

22         form.

23   BY MR. VAUGHN:

24         Q.    What does it mean?

Confidential Information - Subject to Protective Order

1      A.    So we were trying to look at

2  the prevalence or how often these

3  appeared in pancreatic cancer.

4      Q.    It says --

5      A.    You'd have to look at my

6  results to see.

7      Q.    But this sentence does say

8  "often highly mutated in pancreatic

9  cancer," correct?

10     A.    It does say that, yes.

11     Q.    Okay.  And then just the

12 next sentence, "If these markers of

13 genetic damage are related to

14 environmental or lifestyle exposures, it

15 can be hypothesized that this variation

16 may be because of different exposures to

17 potential carcinogens," correct?

18     A.    Correct.

19     Q.    All right.

20          MR. VAUGHN:  Go to the next

21     paragraph, Tyler.

22 BY MR. VAUGHN:

23     Q.    And it notes the information

24 that you ascertained from them.  Can you

Confidential Information - Subject to Protective Order

1   read that for me?

2              "Diagnosed workup and

3   ascertained information"?

4         A.    I'm sorry, I'm not clear

5   where you're reading.

6         Q.    You're fine.  Second

7   sentence, we collected.

8         A.    "We collected histological

9   material from pancreatic cancer patients

10  during their diagnostic workup and

11  ascertained information on a variety of

12  potential exposures related to pancreatic

13  cancer risk, including smoking habits,

14  body mass index, family history of

15  pancreatic cancer, obesity, and history

16  of diabetes."

17        Q.    But did you not evaluate

18  what dietary exposures these people might

19  have had?

20        A.    We didn't, not in this

21  study.

22        Q.    And so you didn't assess

23  NDMA exposure at all when you were doing

24  your study, did you?

Confidential Information - Subject to Protective Order

1          A.     No.  This was a case-control
2     study.  And as I said, it's really hard
3     to estimate diet in case-control studies.
4          Q.     But your theory was that it
5     might be a result of environmental
6     carcinogens, right?
7                    MR. BALL:  Objection to
8          form.
9                    THE WITNESS:  What might be
10         a result of environmental
11         carcinogens?
12    BY MR. VAUGHN:
13         Q.     I'm sorry, I can't hear you.
14         A.     What might be the result of
15    environmental carcinogens?
16                    MR. VAUGHN:  Can we go to
17         Page 6, Tyler.  Top left.
18    BY MR. VAUGHN:
19         Q.     Doctor, you see where it
20    says, "The p53 tumor suppressor gene is
21    found to be altered in almost all human
22    tumors, reflecting its critical role as a
23    tumor suppressor"?
24         A.     Okay.

Confidential Information - Subject to Protective Order

```
 1          Q.    Would you agree that if a
 2   compound can alter the p53 gene, that
 3   it's going to increase the risk of
 4   cancer?
 5                MR. BALL:  Objection to
 6          form.
 7                THE WITNESS:  You know, I
 8          just don't know.  I don't know.
 9                MR. VAUGHN:  And can we go
10          to the last paragraph on this
11          side, the left-hand side.
12   BY MR. VAUGHN:
13          Q.    And about midway through it
14   says however.
15                Doctor, can you read that
16   sentence aloud for us?
17          A.    "However, one concern
18   regarding the association between
19   diabetes and pancreatic cancer is the
20   probability that diabetes may be a
21   consequence of pancreatic cancer rather
22   than a cause as a number of studies have
23   reported higher risk of increasing years
24   before diagnosis of pancreatic cancer."
```

1    Q.    And so, do you agree that

2  diabetes can also be a cause of

3  pancreatic cancer?

4    A.    This is --

5         MR. BALL:  Objection to

6    form.

7  BY MR. VAUGHN:

8    Q.    I'm sorry, can diabetes be a

9  symptom of pancreatic cancer?

10         MR. BALL:  Objection to

11    form.

12         THE WITNESS:  It is not

13    clear.

14  BY MR. VAUGHN:

15    Q.    So the diabetes could

16  potentially be a symptom of pancreatic

17  cancer?

18    A.    Well, it's just not clear

19  from the studies.

20    Q.    And if it is potentially --

21  if diabetes is potentially a symptom of

22  pancreatic cancer, that would not be

23  proper to consider it a confounder,

24  correct?

1          MR. BALL:  Objection to

2     form.

3          THE WITNESS:  So it depends.

4     I mean it depends if it's

5     associated with the symptom or

6     not.

7          MR. VAUGHN:  All right.  Can

8     we go to Page 34 of his expert

9     report.

10          The top paragraph.  I'm

11     sorry.

12 BY MR. VAUGHN:

13     Q.    Second one on the right, do

14 you see where you list formaldehyde as a

15 risk factor to pharyngeal cancer?

16     A.    It says some -- yeah, it

17 says it's been implicated as risk

18 factors.

19     Q.    And you recall earlier we

20 discussed NDMA breaks down into

21 formaldehyde in the body, correct?

22     A.    As I said, I didn't

23 understand that reaction.  I'm not sure

24 if it's the same form of formaldehyde, if

Confidential Information - Subject to Protective Order

1    the --

2          Q.    You said that earlier about

3    form of formaldehyde when I was asking

4    about it.  What are the different forms

5    of formaldehyde?

6          A.    I don't know.

7          Q.    Are there different forms of

8    formaldehyde?

9          A.    I have no idea.

10          Q.    Then why did you say, "I'm

11    not sure it's the same form of

12    formaldehyde"?

13          A.    Because I think in that

14    organic chemistry chart you showed me, it

15    was -- formaldehyde was combined with

16    another compound.

17                MR. VAUGHN:  Rick, how late

18          do you want to go tonight?

19                THE WITNESS:  I'm sorry?

20                MR. BALL:  We were talking

21          about going to about 6 o'clock.

22                MR. VAUGHN:  You're eastern

23          time?

24                MR. BALL:  Yeah.

Confidential Information - Subject to Protective Order

1          MR. VAUGHN:  How long have

2     we been going since the last

3     break?  I haven't been paying

4     attention.  I'm sorry.  Do you

5     know?

6          THE VIDEOGRAPHER:  It's

7     48 minutes.

8          MR. VAUGHN:  Say, Rick, you

9     mind -- I know it's been not very

10     long again, but if we take a

11     break, I might be able to not push

12     us too late into the evening

13     before -- see if I can get done

14     before tomorrow.

15          MR. BALL:  Okay.  That's

16     fine.  That's great.

17          MR. VAUGHN:  Appreciate it.

18          MR. BALL:  We'd all be happy

19     with that.

20          MR. VAUGHN:  That's what I

21     figured.

22          THE VIDEOGRAPHER:  Off the

23     record, 4:14.

24          (Short break.)

Confidential Information Subject to Protective Order

1          THE VIDEOGRAPHER:  We are

2          back on the record at 4:23 p.m.

3    BY MR. VAUGHN:

4          Q.    Doctor, have you ever had

5    any conversations with Dr. Anton

6    Pottegard?

7          A.    No.  I've seen him speak at

8    a lecture before, but that's all.

9          Q.    Do you know any of his

10   colleagues that published with him?

11         A.    No.  I can't -- they're not

12   at Aarhus.  I did most of my work at

13   Aarhus.  They're at a different

14   university.  I think they're at Aalborg

15   or something.

16         Q.    Yeah, I think they're at

17   different universities.  That's why I was

18   asking.  I didn't know if you even knew

19   them.

20         A.    Yeah, no.

21         MR. VAUGHN:  Tyler, can we

22         go to Page 45 of his expert report

23         now.

24   BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1        Q.    Doctor, you reviewed the

2   study by Hidajat, correct?

3        A.    Yes.

4        Q.    That's a human study of --

5   occupational study exposure to

6   n-nitrosamines?

7        A.    In rubber workers.

8        Q.    Is that the first human

9   study you're aware of for NDMA in humans?

10            MR. BALL:   Objection to

11       form.

12            THE WITNESS:   I guess I

13       don't know when it was -- I don't

14       know when it was published.   There

15       have been a number of studies of

16       rubber workers.

17   BY MR. VAUGHN:

18       Q.    It was published in 2019.

19       A.    I'm sure the other ones were

20   prior to that.   But I don't know.

21       Q.    Do you know if the other

22   ones are actually looking at levels of

23   NDMA that the humans were exposed to?

24       A.    I can't recall.   I didn't do

Confidential Information - Subject to Protective Order

1    a literature search on those.

2         Q.    Why did you not do a

3    literature search on those?

4         A.    Because the occupational

5    exposure to rubber workers had too many

6    co-exposures, exposures to other things.

7    So it's hard to tease out the NDMA in

8    those workers.  So it's not really

9    meaningful.

10        Q.    The authors obviously

11   thought it was meaningful to publish the

12   paper, correct?

13              MR. BALL:  Objection to

14        form.

15              THE WITNESS:  I don't -- I

16        don't know how meaningful they

17        were.  I mean, it's some

18        information on rubber workers,

19        absolutely.

20   BY MR. VAUGHN:

21        Q.    And whoever peer-reviewed it

22   thought it was legitimate enough to allow

23   it to be published, correct?

24              MR. BALL:  Objection to

Confidential Information - Subject to Protective Order

1    form.

2            THE WITNESS:  Oh, I don't --

3    what journal was it --

4    BY MR. VAUGHN:

5        Q.    Well, it got published?

6        A.    What journal was it

7    published in?  I don't know the review

8    policies or what journal it was in.

9        Q.    Did you check what journal

10   it was in when you were reviewing the

11   article?

12       A.    I don't recall.

13       Q.    Are there some journals that

14   don't do peer review?

15       A.    Well, that's one thing I

16   would look for, so I don't know.

17       Q.    What journal are you

18   familiar with that doesn't do a

19   peer-review process before allowing an

20   article to be published?

21       A.    All the journals I publish

22   in do a peer-review process.

23       Q.    Are you aware of any journal

24   that doesn't do a peer-review process?

Confidential Information - Subject to Protective Order

1    A.    There's something called

2  predatory journals, mostly online-type

3  journals.  They just want you to pay to

4  publish your article.

5    Q.    International Agency for

6  Research on Cancer, it looks like they

7  made a decision on NDMA in 1978; is that

8  right?

9    A.    That's correct.  I think

10 they updated it in '92 or something like

11 that.

12   Q.    At the bottom of that first

13 paragraph, it notes that, "NDMA should be

14 regarded for practical purposes as if it

15 were carcinogenic to humans."  Correct?

16   A.    That's what it says, yes.

17 But it doesn't say it is carcinogenic to

18 humans.

19   Q.    And this conclusion was

20 before Hidajat came out, correct?

21   A.    Correct.

22        MR. VAUGHN:  Can we go to

23     the next page, Tyler.

24        THE WITNESS:  The Hidajat

Confidential Information - Subject to Protective Order

1          came out in 2019.  If it had a

2          meaningful impact on their

3          decision, they would have updated

4          it.

5    BY MR. VAUGHN:

6          Q.    What do you base that on?

7          A.    My knowledge of people that

8    have been at IARC.

9          Q.    How quickly does IARC have a

10   turnaround on classifying things as a

11   carcinogens?

12         A.    It depends on the strength

13   of the studies that they find.  So if it

14   was a concern they would -- they would

15   make an effort to review it.

16         Q.    Have any of the people that

17   you've worked with at your various

18   companies been on the -- been employed by

19   IARC?

20         A.    Yes.

21         Q.    Who?

22         A.    Elisabete Weiderpass, the

23   director of IARC, the head of IARC, she

24   worked with me at Karolinska Institutet

1    in Scandinavia.

2         Q.    Anyone else?

3         A.    I don't recall anyone else.

4         Q.    Have you ever worked for a

5    company that has lobbied IARC for any

6    purpose?

7              MR. BALL:  Objection to

8         form.

9              THE WITNESS:  Not -- not to

10        my knowledge.  I have no idea.

11   BY MR. VAUGHN:

12        Q.    Let me see.  World Health

13   Organization.  It looks like their

14   determination was in 2002, correct?

15        A.    No, these are two

16   scientists.  They represented the World

17   Health Organization, International

18   Program on Chemical Safety.

19             MR. VAUGHN:  And let's go to

20        the next page where it continues

21        talking about these two authors.

22             The second paragraph starts

23        with "however."  Can you blow that

24        up.

Confidential Information - Subject to Protective Order

1   BY MR. VAUGHN:

2        Q.     And can you read that aloud,

3   Doctor?

4        A.     "However, because of

5   evidence in animal studies and the

6   similarity of NDMA metabolism in humans

7   and other species, NDMA was held to be

8   highly likely, by the authors of the

9   CICAD, to be carcinogenic to humans.  No

10  evaluation of NEDA was conducted."

11       Q.     Is that a typo, it should be

12  NDEA?

13       A.     Yeah, you're right.  You're

14  right.  It's NDEA.

15       Q.     And so this determination

16  was in 2002, and again that was before

17  the Hidajat study, correct?

18       A.     Right.  They determined

19  there was not evidence to show that it

20  was carcinogenic to humans.

21       Q.     Then U.S. EPA, was there a

22  determination in 1987 on the very bottom

23  there, under A, the third line, is that

24  what that 1987 is referring to?

Confidential Information Subject to Protective Order

1          Sorry --

2          A.    It's the Weight of Evidence

3    guidelines, it's how these guidelines in

4    Group A, Group B, Group C.  That's what

5    the 1987 refers to.

6                    MR. VAUGHN:  I'm sorry,

7          Tyler, when I said A, I mean the

8          little A at the bottom, not

9          Group A.  I was unclear.

10                    THE WITNESS:  But it's all

11         mixed in.  And in 2021 is their

12         assessment of NDMA.

13   BY MR. VAUGHN:

14         Q.    They did an assessment in

15   2021 of NDMA?

16         A.    That's when this was taken,

17   absolutely.

18         Q.    But did they actually look

19   at NDMA in 2021?

20         A.    I'm trying to read my paper.

21   Let me look -- I'll look at my copy here.

22   No, it looks like 1987.

23         Q.    Okay.  And in 1987, the

24   United States Environmental Protection

Confidential Information Subject to Protective Order

```
 1   Agency classified NDMA as a probable
 2   human carcinogen, correct?
 3         A.    Right, a Group B2.  B2, I'm
 4   sorry.  Group B2.
 5         Q.    And this determination was
 6   made before the Hidajat study in humans,
 7   correct?
 8         A.    Correct.
 9               MR. VAUGHN:  Can we go to
10         the next page please, Tyler.
11   BY MR. VAUGHN:
12         Q.    National Toxicology Program.
13   And if we go down to A on NDMA.  Was
14   there a determination made in 2016?
15         A.    Yes.
16         Q.    And was there a
17   determination that NDMA was reasonably
18   anticipated to be a human carcinogen
19   based on sufficient evidence of
20   carcinogenicity from studies in
21   experimental animals?
22         A.    Yes.  But it does not say
23   it's carcinogenic to humans.
24         Q.    And this was two thousand
```

Confidential Information - Subject to Protective Order

1   --

2          A.    You have to be careful of

3   that.

4          Q.    And this was 2016.  So,

5   again, it was before the 2019 study in

6   humans that Hidajat did, correct?

7          A.    Which is interesting to me,

8   because the Hidajat study didn't really

9   move the needle on any of these

10  evaluations, so...

11         Q.    Do you have any evidence

12  that any of the agencies that we have

13  went over have reevaluated NDMA?

14         A.    I -- the evidence I have is

15  they haven't felt a need to, otherwise

16  they would have published it.

17         Q.    So would you agree with me

18  that none of these agencies have

19  reevaluated NDMA?

20              MR. BALL:  Objection to

21         form.

22              THE WITNESS:  Yeah, they

23         haven't -- they I haven't seen a

24         need to.  They haven't done that.

1       Absolutely.

2   BY MR. VAUGHN:

3       Q.     And at the bottom it says

4   Agency For Toxic Substances and Disease

5   Registry.

6              MR. VAUGHN:   And if you go

7         to the next page, on 49, Tyler,

8         where it actually has the text.

9              THE WITNESS:   Mm-hmm.

10  BY MR. VAUGHN:

11      Q.     So in 1989 is when they made

12  their determination on NDMA, correct?

13      A.     Correct.

14      Q.     They said, "Although there

15  are no reports of NDMA causing cancer in

16  humans, it is reasonable to expect that

17  exposure to NDMA by eating, drinking, or

18  breathing could cause cancer in humans,"

19  correct?

20      A.     Correct.  It doesn't say it

21  causes, says it's reasonable to expect,

22  which is a different thing.

23      Q.     And again, this was in 1989,

24  well before Hidajat's study in humans

Confidential Information - Subject to Protective Order

1   showing NDMA increases the risk of

2   cancer, correct?

3              MR. BALL:  Objection to

4        form.

5              THE WITNESS:  Correct.

6   BY MR. VAUGHN:

7        Q.    We have U.S. FDA next.

8        A.    Mm-hmm.

9        Q.    Is there a reason why a few

10  of these paragraphs are a different

11  color, they are gray instead of black?

12       A.    Oh, I see.  No, I don't

13  think there's a reason at all.

14       Q.    Okay.

15       A.    It might be just how it's

16  printed out.  Actually it's on there too.

17  Yeah, I don't recall if there is a

18  reason.

19       Q.    Do you recall earlier not

20  remembering the FDA's risk assessment for

21  NDMA?

22       A.    Correct.

23       Q.    Okay.  And if you look at

24  the B, the gray paragraph there.  Do you

Confidential Information - Subject to Protective Order

1    see where it does talk about the FDA's

2    risk assessment?

3         A.    Yeah.

4              I just want you to be

5    mindful, this risk assessment, it's

6    really a toxicology activity.  It's not

7    an epidemiology activity.  So it's really

8    outside the scope of what I do.

9         Q.    So you would disagree with

10   the FDA that there would be an increased

11   risk of cancer?

12             MR. BALL:  Objection to

13        form.

14             THE WITNESS:  The FDA what

15        they -- they say there's one

16        additional case of cancer over the

17        lifetime of 8,000 people, if they

18        were taking the highest valsartan

19        dose possible, 320 milligrams, so

20        I don't agree or disagree with

21        that.

22   BY MR. VAUGHN:

23        Q.    Do you know what the highest

24   levels were in valsartan?

1    A.    Wasn't 320 the highest

2  level?  I believe it was.

3    Q.    I believe 320 is the

4  milligram of the valsartan pill.

5    A.    Yes.

6    Q.    As far as the NDMA level in

7  valsartan, do you have any idea what the

8  levels are?

9    A.    No.

10    Q.    So you don't know what the

11  FDA -- what they think the levels are,

12  you don't know if that's accurate or not,

13  do you?

14        MR. BALL:  Objection to

15    form.

16        THE WITNESS:  I don't.  I

17    hope it's accurate.

18  BY MR. VAUGHN:

19    Q.    Okay.  You would --

20    A.    They are making a -- it's a

21  regulatory agency.  They are making a

22  decision.

23    Q.    If the levels were actually

24  higher than the FDA was aware of, the

Confidential Information Subject to Protective Order

1  cancer risk would be even higher as well,

2  correct?

3                    MR. BALL:  Objection to

4          form.

5                    THE WITNESS:  If it's -- if

6          it's higher than what the FDA,

7          you'd think they -- their

8          calculation is wrong, you should

9          inform them.

10  BY MR. VAUGHN:

11          Q.    Do you know how the FDA

12  picked out which valsartan pills to test?

13                    MR. BALL:  Objection to

14          form.

15                    THE WITNESS:  I have no

16          idea.  Again, this is a toxicology

17          activity.  It's not epidemiology,

18          so...

19  BY MR. VAUGHN:

20          Q.    You have no idea --

21          A.    It's beyond the scope of

22  what I do.

23          Q.    You have no idea if the --

24          A.    It's not --

Confidential Information - Subject to Protective Order

1    Q.    Sorry.  You done?  I didn't

2    mean to interrupt you.

3    A.    Yeah, I'm sorry, go ahead.

4    Q.    So you're not aware if the

5    companies cherry-picked what valsartan to

6    send to the FDA to test, are you?

7            MR. BALL:  Objection to

8        form.

9            THE WITNESS:  I have no idea

10        if they cherry-picked or didn't

11        cherry-pick or how they got the

12        valsartan pills.  It's outside the

13        scope of what I do.

14            MR. VAUGHN:  Can we go to

15        the next page, Tyler.

16    BY MR. VAUGHN:

17    Q.    You see at the top where it

18    says 96 nanograms a day is what the FDA

19    set the -- set the interim limits to.

20    Are you aware of that?

21    A.    That's what it says.

22    Q.    And they believed even

23    96 nanograms a day will increase the risk

24    of cancer over 70 years though, correct?

Confidential Information Subject to Protective Order

1          MR. BALL:  Objection to

2     form.

3          THE WITNESS:  In -- in one

4     out of 8,000 people, isn't that

5     what they said?  It's not in

6     everybody.

7  BY MR. VAUGHN:

8     Q.    Do you know if that

9  96 nanograms includes --

10    A.    I'm sorry, 18 -- no, it's

11 one out of 8,000 people, and NDEA is one

12 out of 18,000 people.

13    Q.    Are you aware if these

14 levels, these nanograms per day, include

15 the exposure that humans get through

16 their diet?

17    A.    I assume it's exposure in

18 the diet, endogenous exposure, et cetera.

19         MR. VAUGHN:  Go to Page 51,

20     Tyler.

21         And 124.  If we go about

22     two-thirds of the way down on the

23     right-hand side, it starts with

24     "air measures."  Yeah.

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    Can you read that sentence

3    aloud for us, Doctor?

4         A.    "Air" -- I'm sorry.  Let me

5    look here.  "Air measures of NDMA may not

6    accurately reflect the dose a worker

7    experiences because a portion of what is

8    inhaled is then exhaled."

9         Q.    So does that mean that the

10   workers in Hidajat were actually exposed

11   to less NDMA?

12            MR. BALL:  Objection to

13        form.

14            THE WITNESS:  We're not --

15        we're not clear about what levels

16        people at Hidajat were exposed to.

17        It's not only this issue, but it's

18        also the issue dealing with the

19        exposure estimates from 1 year in

20        1967, and took that to be

21        exposures over the whole lifetime

22        of the people between '67 and

23        2015.

24            So there's a lot of issues

Confidential Information - Subject to Protective Order

1          with Hidajat.

2     BY MR. VAUGHN:

3          Q.    Would you agree that part of

4     the NDMA they were exposed to would have

5     been exhaled?

6               MR. BALL:  Objection.

7               THE WITNESS:  Yes.

8     BY MR. VAUGHN:

9          Q.    I'm sorry.  I couldn't hear

10    you over that objection.

11         A.    I'm sorry.

12         Q.    Let me ask the question

13    again.

14         A.    I'm talking too fast.

15         Q.    No, you're fine.

16               Would you agree that part of

17    the NDMA that the workers in Hidajat were

18    exposed to would have been exhaled?

19         A.    Okay.  And what was your

20    question?

21         Q.    That was my question.  Would

22    you agree that part of the NDMA that the

23    workers in Hidajat were exposed to would

24    have been exhaled?

Confidential Information - Subject to Protective Order

1     A.    That's what I wrote, yes.

2           MR. VAUGHN:  Can we go to

3     the next page, please.  Yeah, that

4     first -- yeah.

5  BY MR. VAUGHN:

6     Q.    Can you read the last

7  sentence aloud for us, Doctor?

8     A.    It is absurd to suggest that

9  workers in this study had similar levels

10  of exposure to NDMA as valsartan users

11  and that any findings of this study are

12  applicable.

13     Q.    Doctor, what were the NDMA

14  levels in valsartan?

15     A.    So that, I don't know.  The

16  workers in Hidajat were breathing in

17  NDMA.  And valsartan you take orally.  So

18  it's a different exposure route.

19     Q.    Why does that matter?

20     A.    Because carcinogens act

21  differently depending on how they are

22  taken, how they're, you know, taken into

23  the body.

24     Q.    And how is NDMA going to act

1    differently if it's inhaled versus taken

2    orally?

3           A.     That, we don't know.  But

4    it's not the same exposure.

5           Q.     Would different organs be

6    susceptible because it's through air as

7    opposed to oral?

8           A.     You know, I have no idea.

9    But it's not the same exposure route.

10          Q.     And again, you have no idea

11   of the minimum or the maximum levels of

12   NDMA in any valsartan pills, correct?

13          A.     I don't.  Or in the Hidajat

14   study, we don't know what the levels are

15   there either.

16          Q.     So you don't know the levels

17   in Hidajat.  You don't know the levels in

18   valsartan.  And you're saying that it's

19   absurd for the plaintiffs' expert to

20   suggest that workers in this study,

21   Hidajat, had similar levels of exposure

22   to NDMA as valsartan users?

23          A.     Because it's --

24          Q.     If the plaintiffs' experts

Confidential Information - Subject to Protective Order

1    do know all of that information, why

2    would it be absurd for them to say that?

3            MR. BALL:  Objection to

4        form.

5            THE WITNESS:  The route of

6        exposure was different.

7    BY MR. VAUGHN:

8        Q.    That's not what your paper

9    says.  It doesn't say anything about

10   route of exposure.  It just says that the

11   levels -- it would be absurd to suggest

12   that the levels were similar?

13       A.    You have to read the whole

14   paragraph though.

15            (Reading to himself.)

16            One thing that you have to

17   try to understand in epidemiology is how

18   representative your population is to the

19   population that you're concerned about.

20            And rubber workers isn't the

21   same as a valsartan user.  If you think

22   it is, then you would have to -- you

23   know, you would have to give evidence

24   that it is.

Confidential Information - Subject to Protective Order

1      Q.     Was Hidajat comparing rubber

2   workers to valsartan users?

3      A.     No.  But the plaintiffs'

4   experts are.

5      Q.     Didn't you previously

6   testify that generally occupational

7   exposures are the mainstay for

8   determining carcinogens?

9           MR. BALL:  Objection to

10          form.

11          THE WITNESS:  If -- if the

12          carcinogens are taken in a similar

13          manner.  You have to -- you have

14          to evaluate them.

15   BY MR. VAUGHN:

16      Q.     So like, chromium, air

17   versus water, do you think one of those

18   routes is noncarcinogenic?

19      A.     You have to --

20          MR. BALL:  Objection to

21          form.

22          THE WITNESS:  -- evaluate

23          it.

24   BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1    Q.    Say it again.

2    A.    You have to evaluate it.

3  They're different exposures.

4    Q.    If you're -- if a substance

5  is a carcinogen via one route, isn't it a

6  known carcinogen?

7         MR. BALL:  Objection to

8      form.

9         THE WITNESS:  I don't know.

10     But the route of exposure is

11     important.

12  BY MR. VAUGHN:

13    Q.    Doctor, is it your opinion

14  that all of the NDMA exposure in Hidajat

15  was via the respiratory exposure?

16         MR. BALL:  Objection to --

17     sorry.  Objection to form.

18         THE WITNESS:  I'd have to

19     look at the paper.

20         But, you know, they only

21     used one year of exposure data and

22     applied it over, you know, the

23     whole lifetime of the plant

24     workers, the rubber plant workers.

Confidential Information - Subject to Protective Order

1          But they're assuming that the

2          level of exposure is the same

3          across all the years.  But the --

4    BY MR. VAUGHN:

5          Q.     Did they not check -- sorry.

6          A.      -- personal protective

7    equipment, they don't look for any

8    confounders.  Those type of things.

9          Q.     Is it your testimony that in

10   Hidajat, they did not determine levels of

11   NDMA exposure every year?

12         A.     So they calculated what they

13   considered to be levels, you know, based

14   on the data that they had, which was

15   good.  But it may or may not be accurate.

16   They did nothing to show that it was or

17   wasn't accurate.  We don't even know if

18   the people worked in the same jobs

19   throughout that whole time period.  We

20   just know that they were in the same

21   department.  We don't know if the

22   department had the same exposure level

23   throughout it or not.

24         Q.     Do you recall critiquing

Confidential Information - Subject to Protective Order

1    Dr. Madigan for assuming that the

2    occupational exposure to NDMA was

3    respiratory in Hidajat?

4           A.    You'd have to show me what I

5    said.

6           Q.    You don't recall?

7           A.    There are a lot of things

8    I -- a lot of problems I have with

9    Dr. Madigan.

10          Q.    But you don't recall

11   critiquing him for assuming that the

12   occupational exposure in Hidajat to NDMA

13   was respiratory?

14          A.    You have to show me where I

15   said that.  I don't -- I don't recall.

16               MR. VAUGHN:  If you can go

17          to Page 54 of his expert report.

18          Number 135.  Two-thirds of the way

19          down.

20   BY MR. VAUGHN:

21          Q.    "Dr. Madigan's calculations

22   assumed occupational exposure to NDMA was

23   respiratory."

24          A.    Okay.

Confidential Information - Subject to Protective Order

1    Q.    Do you disagree?  You do not

2  think that the NDMA was respiratory in

3  Hidajat?

4    A.    No.  What I'm saying is that

5  the NDMA exposure in -- for valsartan

6  users wasn't respiratory --

7    Q.    That's not what this says --

8    (Simultaneous speaking.)

9    THE COURT REPORTER:  Just

10  one second.  What?

11  BY MR. VAUGHN:

12    Q.    This says --

13    A.    The NDMA exposures for

14  valsartan use wasn't respiratory.

15    Q.    But that's not what this

16  says, right?  This says, "Dr. Madigan's

17  calculations assumed occupational

18  exposure to NDMA was respiratory."

19    A.    Right.  And so I don't know

20  why you would consider a valsartan user

21  as having respiratory NDMA, and also that

22  it remained constant throughout their

23  career.

24    Q.    Do you think that Hidajat

Confidential Information Subject to Protective Order

1  was something besides respiratory

2  exposure to NDMA?

3          A.    I don't.

4              MR. VAUGHN:  I have no

5      further questions at this time.

6              MR. BALL:  Can we take about

7      a ten-minute break, and we'll

8      figure out what we want to do.

9              MR. VAUGHN:  What do you

10     mean figure out what you want to

11     do?

12             MR. BALL:  Okay.  Thank you.

13     We can stay off for about ten

14     minutes.

15             MR. VAUGHN:  What do you

16     mean figure out what you want to

17     do?

18             THE WITNESS:  Okay.

19             MR. BALL:  If I want to do

20     any redirect.

21             MR. VAUGHN:  Oh, okay.

22     Gotcha.

23             MR. BALL:  Sorry.  Sorry if

24     I was unclear.  Just give us --

Confidential Information Subject to Protective Order

1    give us ten minutes, okay?

2           MR. VAUGHN:  Not a problem.

3    Thank you.

4           THE VIDEOGRAPHER:  Off the

5    record, 4:48.

6           (Short break.)

7           THE VIDEOGRAPHER:  We are

8    back on the record at 5:00 p.m.

9           MR. BALL:  Duane Morris

10   doesn't have any questions for

11   Dr. Fryzek.

12          And I believe -- I don't

13   believe any of the other defense

14   counsel do, but I'll let them

15   speak up for themselves if they

16   feel like they need to.

17          (No response.)

18          MR. BALL:  Nope.  Okay,

19   we're done.

20          MR. VAUGHN:  Thank you for

21   your time, Dr. Fryzek.

22          THE VIDEOGRAPHER:  That

23   concludes this deposition.

24          The time is 5:01 p.m.

1                    * * * * * * * * * * *

2                    (Excused.)

3                    (Deposition concluded at

4          approximately 5:01 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Confidential Information - Subject to Protective Order

1

2                        CERTIFICATE

3

4

5              I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.

7

              It was requested before
8  completion of the deposition that the
   witness, JON P. FRYZEK, Ph.D., have the
9  opportunity to read and sign the
   deposition transcript.

10

11

12        _Michelle L Gray_____
          MICHELLE L. GRAY,
13        A Registered Professional
          Reporter, Certified Shorthand
14        Reporter, Certified Realtime
          Reporter and Notary Public
15        Dated:  October 11, 2021

16

17

18              (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)

23

24

Confidential Information - Subject to Protective Order

```
1              INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4   over carefully and make any necessary

5   corrections.  You should state the reason

6   in the appropriate space on the errata

7   sheet for any corrections that are made.

8              After doing so, please sign

9   the errata sheet and date it.

10             You are signing same subject

11  to the changes you have noted on the

12  errata sheet, which will be attached to

13  your deposition.

14             It is imperative that you

15  return the original errata sheet to the

16  deposing attorney within thirty (30) days

17  of receipt of the deposition transcript

18  by you.  If you fail to do so, the

19  deposition transcript may be deemed to be

20  accurate and may be used in court.

21

22

23

24
```

Confidential Information - Subject to Protective Order

```
1                    _   _   _   _   _   _

                       E R R A T A

2                    _   _   _   _   _   _

3

4      PAGE   LINE   CHANGE

5      _____  _____  _____

6         REASON: _____

7      _____  _____  _____

8         REASON: _____

9      _____  _____  _____

10        REASON: _____

11     _____  _____  _____

12        REASON: _____

13     _____  _____  _____

14        REASON: _____

15     _____  _____  _____

16        REASON: _____

17     _____  _____  _____

18        REASON: _____

19     _____  _____  _____

20        REASON: _____

21     _____  _____  _____

22        REASON: _____

23     _____  _____  _____

24        REASON: _____
```

1

2         ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 455, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    JON P. FRYZEK, Ph.D.              DATE

17

18

19   Subscribed and sworn

     to before me this

20   _____ day of _____, 20_____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

Confidential Information - Subject to Protective Order

```
1                     LAWYER'S NOTES

2    PAGE   LINE

3    _____  _____  _____

4    _____  _____  _____

5    _____  _____  _____

6    _____  _____  _____

7    _____  _____  _____

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24   _____  _____  _____
```