# EXHIBIT M

**THIS EXHIBIT CONTAINS CONFIDENTIAL OR
RESTRICTED CONFIDENTIAL INFORMATION
AND HAS BEEN SERVED VIA EMAIL.**

Confidential Information - Subject to Protective Order

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
 2                  CAMDEN VICINAGE
 3   IN RE: VALSARTAN, LOSARTAN      )
     AND IRBESARTAN PRODUCTS         )
 4   LIABILITY LITIGATION            )   MDL NO. 2875
     _____ )
 5                                   )   HON. ROBERT B.
     THIS DOCUMENT RELATES TO:       )   KUGLER
 6                                   )
     ALL ACTIONS                     )
 7   _____ )
 8
 9                    — — —
10            Monday, October 4, 2021
                      — — —
11
12            CONFIDENTIAL INFORMATION
13           SUBJECT TO PROTECTIVE ORDER
                      — — —
14
15
16            Remote Video-Recorded Oral
     Deposition of GEORGE JOHNSON, Ph.D. held at
17   the location of the witness commencing at
     9:07 a.m. BST on the above date, before
18   Michael E. Miller, Fellow of the Academy of
     Professional Reporters, Certified Court
19   Reporter, Registered Diplomate Reporter,
     Certified Realtime Reporter, and New Jersey
20   Certified Court Reporter No. 30XI00242200.
21
22                    — — —
23            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
24                deps@golkow.com
```

Page 2

```
 1   REMOTE APPEARANCES:
 2   MARTIN HARDING & MAZZOTTI LLP
         BY:  ROSEMARIE RIDDELL BOGDAN, ESQUIRE
 3           rosemarie.bogdan@1800law1010.com
             NICOLE HADDADNIA, ESQUIRE
 4           nicole.haddadnia@1800law1010.com
         1 Wall Street
 5       Post Office Box 15141
         Albany, New York 12212
 6       (518)862-1200
         Counsel for Plaintiffs
 7
 8   GOLDENBERGLAW
         BY:  MARLENE GOLDENBERG, ESQUIRE
 9           mjgoldenberg@goldenberglaw.com
             (present with The Witness)
10       800 Lasalle Avenue
         Suite 2150
11       Minneapolis, Minnesota 55402
         (616)333-4662
12       Counsel for Plaintiffs
13
14   LEVIN PAPANTONIO RAFFERTY PROCTOR BUCHANAN
         O'BRIEN BARR MOUGEY PA
15       BY:  DANIEL A. NIGH, ESQUIRE
             dnigh@levinlaw.com
16       316 South Baylen Street
         Suite 600
17       Pensacola, Florida 32502
         (850)435-7000
18       Counsel for Plaintiffs
19
20   HOLLIS LAW FIRM
         BY:  C. BRETT VAUGHN, ESQUIRE
21           brett@hollislawfirm.com
         8101 College Boulevard
22       Overland Park, Kansas 66210
         (913) 385-5400
23       Counsel for Plaintiffs
24
```

Page 3

```
 1   REMOTE APPEARANCES:
 2   GREENBERG TRAURIG LLP
         BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
 3           lockardv@gtlaw.com
             (present with The Witness)
 4           STEVEN M. HARKINS, ESQUIRE
             harkinss@gtlaw.com
 5           TARYN HARPER, ESQUIRE
             harpert@gtlaw.com
 6       Terminus 200
         3333 Piedmont Road NE, Suite 2500
 7       Atlanta, Georgia 30305
         (678)553-2100
 8       Counsel for Teva Pharmaceutical Industries Ltd.,
         Teva Pharmaceuticals USA Inc., Actavis LLC, and
 9       Actavis Pharma Inc.
10
11   GREENBERG TRAURIG LLP
         BY:  STEPHEN T. FOWLER, ESQUIRE
12           fowlerst@gtlaw.com
             (present with The Witness)
13       2101 L Street NW
         Suite 1000
14       Washington, D.C. 20037
         (202)331-1000
15       Counsel for Teva Pharmaceutical Industries Ltd.,
         Teva Pharmaceuticals USA Inc., Actavis LLC, and
16       Actavis Pharma Inc.
17
18   WALSH PIZZI O'REILLY FALANGA LLP
         BY:  CHRISTINE I. GANNON, ESQUIRE
19           cgannon@walsh.law
         Three Gateway Center
20       100 Mulberry Street, 15th Floor
         Newark, New Jersey 07102
21       (973)757-1017
         Counsel for Teva Pharmaceutical Industries Ltd.,
22       Teva Pharmaceuticals USA Inc., Actavis LLC, and
         Actavis Pharma Inc.
23
24
```

Page 4

```
 1   REMOTE APPEARANCES:
 2   BARNES & THORNBURG LLP
         BY:  KARA KAPKE, ESQUIRE
 3           kara kapke@btlaw.com
         11 South Meridian Street
 4       Indianapolis, Indiana 46204
         (317)236-1313
 5       Counsel for CVS Pharmacy Inc. and Rite Aid
         Corporation
 6
 7   CIPRIANI & WERNER PC
         BY:  JILL H. FERTEL, ESQUIRE
 8           jfertel@c-wlaw.com
         450 Sentry Parkway
 9       Suite 200
         Blue Bell, Pennsylvania 19422
10       (610)567-0700
         Counsel for Aurobindo Pharma USA Inc.
11       and Aurolife Pharma LLC
12
13   FALKENBERG IVES LLP
         BY:  MEGAN A. ZMICK, ESQUIRE
14           maz@falkenbergives.com
         230 West Monroe Street
15       Suite 2220
         Chicago, Illinois 60606
16       (312)566-4801
         Counsel for Humana Pharmacy Inc.
17
18   DUANE MORRIS LLP
         BY:  FREDERICK R. BALL, ESQUIRE
19           frball@duanemorris.com
         100 High Street
20       Suite 200
         Boston, Massachusetts 02110
21       (857)488-4200
         Counsel for Zhejiang Huahai Pharmaceutical Co., Ltd.;
22       Prinston Pharmaceutical Inc.; Huahai U.S. Inc.; and
         Solco Healthcare U.S., LLC
23
24
```

Page 5

```
 1   REMOTE APPEARANCES:
 2   BUCHANAN INGERSOLL & ROONEY PC
         BY:  ASHLEY D. JONES, ESQUIRE
 3           ashley.jones@bipc.com
         1700 K Street NW
 4       Suite 300
         Washington, D.C. 20006
 5       (202) 452-7900
         Counsel for Alberston's LLC
 6
 7   PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
         BY:  FRANK H. STOY, ESQUIRE
 8           fhstoy@pietragallo.com
         One Oxford Centre
 9       38th Floor
         Pittsburgh, Pennsylvania 15219
10       (412)263-1840
         Counsel for Mylan Pharmaceuticals Inc.
11
12   ALSO PRESENT:
13       MELISHA VALENZUELA
         Hollis Law Firm
14
15   TRIAL TECHNICIAN:
16       CHRIS RITONA
         Precision Trial Inc.
17
18   VIDEOGRAPHER:
19       JOSEPH VINER
         Golkow Litigation Services
20       (present with The Witness)
21
22
23
24
```

Confidential Information - Subject to Protective Order

1              INDEX
2       GEORGE JOHNSON, Ph.D.
3          October 4, 2021
4
5   APPEARANCES                        2
6   PROCEEDINGS                       10
7
8   EXAMINATION OF GEORGE JOHNSON, Ph.D.:
9       BY MS. BOGDAN              11
10
11  CERTIFICATE                      310
12  ERRATA                           312
13  ACKNOWLEDGMENT OF DEPONENT           313
14  LAWYER'S NOTES                   314
15
16
17
18
19
20
21
22
23
24

1           DEPOSITION EXHIBITS
2   NUMBER                        MARKED
3   Johnson-1    Notice To Take VIDEO-RECORDED    19
4       ORAL Deposition
5   Johnson-2    10/1/21 Johnson Expert Report    23
6   Johnson-3    2020 HESI Annual Report          41
7   Johnson-4    2nd Impurities: Genotoxic and    79
8       Beyond Summit Slide
9   Johnson-5    Speakers at 2018 Berlin Summit   81
10  Johnson-6    Invoices,                       142
11       JOHNSON000037 - JOHNSON000044
12  Johnson-7    E-mail(s) re: Limit of NDEA in   153
13       Sartans,
14       TEVA-MDL2875-00443142
15  Johnson-8    E-mail(s) re: Snodin & Elder     163
16       Commentary,
17       TEVA-MDL2875-00492386
18  Johnson-9    E-mail(s) re: Snodin & Elder     172
19       Commentary,
20       TEVA-MDL2875-00425960
21  Johnson-10   Mutation as a Toxicological      177
22       Endpoint for Regulatory
23       Decision-Making, by Heflich
24       et al

1          DEPOSITION EXHIBITS
2   Johnson-11   EMM Author Guidelines,       183
3       Conflict of Interest
4       Declaration
5   Johnson-12   Quantitative Interpretation of   194
6       Genetic Toxicity Dose-Response
7       Data for Risk Assessment and
8       Regulatory Decision-Making:
9       Current Status and Emerging
10      Priorities, by White et al
11  Johnson-13   Genotoxicity as a            195
12      toxicologically relevant
13      endpoint to inform risk
14      assessment: A case study with
15      ethylene oxide, by Gollapudi
16      et al
17  Johnson-14   The use of benchmark dose    201
18      uncertainty measurements for
19      robust comparative potency
20      analyses, by Wheeldon et al
21  Johnson-15   Permitted daily exposure     208
22      limits for noteworthy
23      N-nitrosamines, by Johnson
24      et al

1          DEPOSITION EXHIBITS
2   Johnson-16   6/8/21 Greenberg Traurig     227
3       Letter
4   Johnson-17   Business Ethics Article, Legal   237
5       Scrapes Turn to
6       Science-for-Hire Giant
7       Exponent
8   Johnson-18   Tolerability of risk: A      243
9       commentary on the nitrosamine
10      contamination issue, by Elder
11      et al
12  Johnson-19   JPharmSci Declaration of     245
13      Interest Policy
14  Johnson-20   Laboratory Analysis of       247
15      Valsartan Products
16  Johnson-21   USFDA General Advice Letter  259
17  Johnson-22   1978 IARC Monographs on the  266
18      Evaluation of the Carcinogenic
19      Risk of Chemicals to Humans
20  Johnson-23   1987 IARC Monographs on the  300
21      Evaluation of the Carcinogenic
22      Risk of Chemicals to Humans
23
24

Confidential Information - Subject to Protective Order

Page 10

```
1              ------------
2         P R O C E E D I N G S
3      October 4, 2021, 9:07 a.m. BST
4              ------------
5         THE VIDEOGRAPHER:  We're now on
6   the record.  My name is Joseph Viner.
7   I'm a videographer from Golkow
8   Litigation Services.
9         Today's date is October 4th,
10  2021, and the time is 9:07 a.m.
11        This video deposition is being
12  held in London, U.K., in the matter of
13  Valsartan, Losartan and Irbesartan
14  Products Liability Litigation
15  in the United States District Court of
16  New Jersey.
17        The deponent is Dr. George
18  Johnson.
19        The court reporter today is
20  Mike Miller, and will now swear in the
21  witness.
22        ///
23        ///
24        ///
```

Page 11

```
1              ------------
2      GEORGE JOHNSON, Ph.D.,
3      having been duly sworn,
4      testified as follows:
5              ------------
6         EXAMINATION
7              ------------
8   BY MS. BOGDAN:
9      Q.    Good morning, Dr. Johnson.  My
10  name is Rosemarie Bogdan, and I'm going to be
11  asking you some questions today.  I represent
12  the plaintiffs in the action that has been
13  commenced.
14        Have you had your deposition
15  taken before?
16     A.    I have not.
17     Q.    Okay.  In any capacity, in any
18  litigation, this is the first time?
19     A.    This is the first time.
20     Q.    Okay.  So since it is your
21  first time giving a deposition, one thing
22  that I would ask, and I'm sure the court
23  reporter would ask, is that you wait until
24  I'm done asking my question before you begin
```

Page 12

```
1   to answer.  That way the record can be clear.
2   We can't speak at the same time, okay?
3      A.    That's okay.  Thank you for the
4   advice, okay.
5      Q.    And doing this by Zoom,
6   sometimes there's a little delay with the
7   connection, so to speak, so we have to be
8   really cognizant of that.  I think we'll
9   notice if there is a delay as we go on this
10  morning, and then we'll have to obviously
11  accommodate it if there is.
12        If you don't understand a
13  question that I ask, please let me know so I
14  have the opportunity to rephrase it for you.
15     A.    Understood.
16     Q.    If you answer a question, I'm
17  going to assume you understood it, so if you
18  don't understand what I'm asking, please let
19  me know that, okay?
20     A.    Okay.
21     Q.    Now, did you meet with the
22  attorneys for the defendants prior to today?
23     A.    Yes, I did.
24     Q.    When did you meet with them?
```

Page 13

```
1         MS. LOCKARD:  Did you say when
2   or where?
3         MS. BOGDAN:  When.
4         MS. LOCKARD:  Sorry, I couldn't
5   hear.
6      A.    When?  We met -- I'll have to
7   look at that.  We had an official meeting
8   yesterday and the day before, and we arrived
9   day before that.  Is that correct?
10  BY MS. BOGDAN:
11     Q.    Okay.  And how many hours did
12  you spend with the defense counsel?
13     A.    During this current trip?
14     Q.    Yes.
15     A.    During this current trip, I
16  would say over the four days, including
17  today, it would be about 40 hours.  We've
18  been spending a lot of time.  That's
19  including my time as well.
20     Q.    And when you say 40 -- you said
21  four-zero, 40 hours?
22     A.    That's including my work on
23  this -- on this project as well as our
24  meetings together.
```

Page 14

1    Q.    And so what were the hours of
2  your meetings together in the last few days?
3    A.    In the last few days, we
4  spent -- we met yesterday at their office in
5  Greenberg Traurig from 10:30 until 4:00, and
6  the previous day was 11:00 until 5:00.
7    Q.    Now, did you spend time on your
8  own preparing for the deposition?
9    A.    Yes, I did.
10    Q.    And how many hours did you
11  spend preparing for the deposition on your
12  own?
13    A.    On my own?  During this trip or
14  altogether?
15    Q.    During this trip.
16    A.    During this trip.  On top of
17  that, I spent an additional maybe 4 hours
18  both of those days, and the previous day, I
19  would say 10 hours preparing, reading
20  everything.  I like to prepare for things, so
21  lots of reading.
22    Q.    And what materials or documents
23  did you review to prepare for the deposition?
24    A.    The recent documents that I've

Page 15

1  been looking at are the depositions from the
2  other expert witnesses.  I've spent a lot of
3  time on those.  I've refreshed my memory of
4  my own publication, of my own report.  So
5  those have been the big ones.
6        And then critiquing some of the
7  key publications which support or which I
8  critique in my report as well, so mainly
9  those ones.
10    Q.    Did you keep note of the key
11  publications that you reviewed to prepare for
12  your testimony today, meaning the identity of
13  them?
14    A.    They're all contained within
15  the list that you have.
16    Q.    I'm asking specifically which
17  ones they are.
18    A.    I did not keep a list of those.
19    Q.    Do you have a list in your mind
20  of the publications or studies that you view
21  as key publications in this case?
22    A.    In my mind is my 2021
23  publication around this topic.  Another one
24  would be the Peto study on the cancer

Page 16

1  bioassay dose response.  Another one would be
2  the OECD guideline and the cancer bioassay,
3  and then I tried to keep up to date, so the
4  most recent expert witness depositions would
5  be the key ones I've been looking at over the
6  last few days.
7    Q.    Okay.  I did pick up that you
8  mentioned the Peto study.  I'm assuming you
9  said Peto, P-E-T-O?
10    A.    Correct.
11    Q.    And then there was a second one
12  that you mentioned that was -- mentioned the
13  words "guideline" and "bioassay," but I don't
14  believe I heard the author or the entity that
15  did the study.
16    A.    For the videographer, if you
17  say it very slowly, OECD.  They provide the
18  guidelines for all genetic toxicity assays
19  and cancer bioassays, and then they need to
20  be abided to.  So I revised those.
21    Q.    So you're speaking of the
22  guidelines?
23    A.    Correct, the OECD guidelines.
24    Q.    Now, who is in the room with

Page 17

1  you there today?
2    A.    Victoria Lockard, Steve Fowler.
3  I heard the names --
4        THE WITNESS:  But you're --
5        MS. GOLDENBERG:  Marlene
6  Goldenberg.  I'm on Rosemarie's team.
7        THE WITNESS:  Marlene
8  Goldenberg.  I know, but apologies.
9    A.    And the videographer.
10        THE WITNESS:  Apologies for not
11  remembering your name as well.
12        MS. LOCKARD:  Joe.
13    A.    So did you get that?  So
14  there's four of us.  Hopefully you've heard
15  those names, and myself.
16  BY MS. BOGDAN:
17    Q.    Do you have any documents with
18  you today?
19    A.    I do.
20    Q.    Okay.  What documents do you
21  have with you today?
22        MS. LOCKARD:  You can say
23  what's in front of you.
24    A.    What's in front of me is my

Page 18

1  report and my publication and my CV, and we
2  have boxes of the list of other relevant
3  details that you have -- you have the list
4  of, I think.
5       MS. LOCKARD:  Those are my
6  boxes.
7       THE WITNESS:  Those are your
8  boxes.
9       MS. LOCKARD:  Counsel's boxes.
10      THE WITNESS:  We have counsel's
11  boxes too.
12  BY MS. BOGDAN:
13      Q.    And the counsel boxes, they
14  were not yours, right?  That's not your
15  records that you brought in as part of your
16  file.
17      A.    Correct.
18      Q.    And then I'm assuming you just
19  have the -- you have the videographer there
20  and you have the Zoom open on a computer?  I
21  can't quite see the setup.
22      A.    This might take a bit longer to
23  explain.  So we have the computer in front of
24  me that I'm speaking to you on via Zoom.  We

Page 19

1  have the videographer at the end of the room
2  with the camera to record everything.  And
3  that's why I keep looking, to ensure that
4  during the video -- yeah.  Is that enough
5  detail?
6      Q.    Yep, that's good.
7       Do you have any type of a cell
8  phone there with you that you're interacting
9  with?
10      A.    I do not.
11      Q.    Okay.  And you're not
12  interacting with the computer, correct?
13      A.    Correct.
14      MS. BOGDAN:  If we could pull
15  up and mark as Exhibit 1 the notice to
16  take the videotaped deposition of
17  Dr. Johnson.
18      (Whereupon, Deposition Exhibit
19  Johnson-1, Notice To Take Videotaped
20  Oral Deposition, was marked for
21  identification.)
22      MS. GOLDENBERG:  Can you turn
23  your camera on?  It will be easier to
24  see if you have any objections, but

Page 20

1  the depo protocol does require that
2  cameras be turned on for anybody else
3  in the room.
4       MS. LOCKARD:  Not if there's
5  counsel in the room.  That's for
6  remote.
7       MS. GOLDENBERG:  Rosemarie is
8  remote.
9       MS. LOCKARD:  I'll turn it on,
10  but I don't agree that that's
11  required.
12       I just put in front of
13  Dr. Johnson a hard copy of his notice
14  of video deposition, for the record.
15  BY MS. BOGDAN:
16      Q.    Dr. Johnson, do you see that
17  document that's been marked as Exhibit 1?
18      A.    I see the document on Zoom, and
19  I also have a hard copy.
20      Q.    Have you seen that before?
21      A.    As far as I can recall, I have,
22  and I've seen many documents, but yes.
23      Q.    Turning your attention to the
24  third page of the exhibit, which is -- begins

Page 21

1  with Exhibit A.
2      A.    Okay.  I can see it.  Thank
3  you.
4      Q.    That requests certain documents
5  be produced?
6      A.    Yes, I can see this.  And just
7  to reconfirm, I definitely have seen this
8  document.
9      Q.    All right.  And did you go
10  about collecting the things that are itemized
11  here on Exhibit A?
12      A.    I did, and I'm confident with
13  the list.
14      Q.    So you produced all of your
15  invoices and billing records for this matter?
16      A.    Correct.
17      Q.    With regard to the second
18  itemized request, did you have any notes that
19  you produced?
20      A.    I did not.
21      Q.    And you didn't have any notes
22  to produce?
23      A.    No.  My understanding of this
24  topic was included in the report, and there

Confidential Information - Subject to Protective Order

Page 22

was no notes surrounding that.

Q.   So other than your report that you wrote, there are no other notes or summaries or any other writings that you took as part of your work in this matter?

MS. LOCKARD:  Objection, asked and answered.

A.   So my response again is: Correct, there are no additional notes.

BY MS. BOGDAN:

Q.   And did you produce copies of all materials, documents and articles that you relied on for your opinions that you're providing in this matter?

A.   Yes, that is correct.

Q.   Are there any textbooks that you're relying on for your opinions in this matter?

A.   There are no textbooks that I'm relying upon for my opinion, but I do read textbooks.

Q.   I know you read textbooks, but I'm sorry, the connection is a little bit fuzzy.  Did you say that there are no

Page 23

textbooks you relied on?

A.   There were no textbooks I'm relying on for my opinion presented in the report, but I do read textbooks.

Q.   Now, did you prepare a report in this case?

A.   I did prepare a report in this case.

Q.   Do you have a copy of it there in front of you?

A.   Yes, I do.

Q.   And is that what was served as an amended report on October 1st, 2021?

A.   As far as I'm aware, that's correct.

MS. BOGDAN:  Can we please pull up the doctor's amended report and mark it as Exhibit 2.

(Whereupon, Deposition Exhibit Johnson-2, 10/1/21 Johnson Expert Report, was marked for identification.)

THE WITNESS:  Apologies. Clarification.  In this instance and

Page 24

further instances, will this also appear in that additional link for me to look at in an online way, or do we rely on my hard copy?  Thank you.

MS. LOCKARD:  You need to be able to pull up the link and --

THE WITNESS:  Is that this? Would I just go over to -- apologies for this.

TRIAL TECHNICIAN:  No worries. Just remember you may need to hit F5 to refresh the browser to see the document.

THE WITNESS:  Excellent.  So it's Exhibit 2, after the refresh, I have that.  Brilliant.  And I have a hard copy.  Thank you very much.

MS. BOGDAN:  Have we marked that as Exhibit 2?

THE STENOGRAPHER:  Yes.

BY MS. BOGDAN:

Q.   Now, does that Exhibit 2 report contain all your opinions you intend to offer in this matter?

Page 25

A.   Not just my opinions in the report, but I have additional knowledge that may come out during this deposition, so it may not contain those opinions.  But I'm very confident of all my opinions presented in this report.

Q.   And when you say I may have additional knowledge that will come out during this deposition, what additional knowledge are you referring to?

MS. LOCKARD:  Objection, form, vague, ambiguous.

A.   We will see during the deposition, if there's a question that I can expound upon beyond that presented in my report, then I will do so.

BY MS. BOGDAN:

Q.   Doctor, when you said additional knowledge, I was -- are you saying that because there's something that you know now that you have learned since authoring this report that you did not include that would further support your opinions?

A.   That is not correct.  I

Confidential Information - Subject to Protective Order

Page 26

1  included all of the information within that
2  report, but during reading the depositions of
3  other expert witnesses, I've critiqued
4  further detail and realized that some of
5  those opinions can be -- can be critiqued
6  quite heavily based on my understanding, but
7  not all of that is presented in this report.
8      Q.   And which depositions of expert
9  witnesses are you speaking to particularly?
10     A.   I forget the name of the one
11 I've quite recently -- where there was a
12 critique and a long explanation around the
13 IARC findings that are very historical.  I've
14 read those and have additional information to
15 critique and reject those obsolete -- that
16 obsolete report.
17     Q.   And what report are you
18 referring to being obsolete?
19     A.   I forget the date.  I think
20 it's in the '70s from the IARC, the
21 International Agency for the Research of
22 Cancer, I think.  The IARC or a subset of the
23 WHO, on NDMA.
24     Q.   Are you referring to the 1978

Page 27

1  monograph regarding NDMA published by IARC?
2      A.   Yes.
3      Q.   Any other critiques that you're
4  aware of as you sit here today based upon
5  reading of the deposition transcripts?
6      A.   Not that I'm aware of today,
7  but I've been working on this topic my whole
8  career, and I will have additional
9  information when asked.
10     Q.   Now, the report that's in front
11 of you that's been marked Exhibit 2, did you
12 write that report yourself?
13     A.   Yes, I did.
14     Q.   Did you have the assistance of
15 a graduate student or anyone -- did anyone
16 assist you in writing it?
17     A.   No, they did not.
18     Q.   How much time did you spend
19 writing the report?
20     A.   Within the invoices, the report
21 is discussed, so the invoices that cover
22 reports within the statement cover it.  And
23 in addition to that, I've spent another
24 approximately 130 hours since that last

Page 28

1  invoice on this project, including this
2  deposition preparation.  So a subset of that
3  time will be on preparation of that report.
4      Q.   So there's an invoice for time
5  that you have already spent that has not yet
6  been prepared and sent to the defendants?
7      A.   That is correct.
8      Q.   Now, the amended report dated
9  October 1st, 2021, what changes did you make
10 in the report?
11     A.   I cannot be clear on those
12 changes at the current time.
13     Q.   What prompted making those
14 changes or serving an amended report?
15     A.   They are typographical changes
16 surrounding references where there was not
17 complete references, so it was all around
18 referencing to ensure that everyone had a
19 precise list of references.  That was the --
20 that was the changes.  That was the
21 amendments, as far as I understand.  And I
22 have -- I hope I've got a good memory, and
23 that's how I remember it.
24     Q.   Now, in the text of the report

Page 29

1  itself, you have references which are
2  primarily in the footnotes, correct?
3      A.   Correct.  I saw this as a good
4  way of presenting the references.
5      Q.   And then there's an Exhibit A
6  to the report, which is your CV, correct?
7      A.   I can see -- yeah, I can see my
8  CV.
9      Q.   Okay.  Is that your most recent
10 CV?
11     A.   Correct.  In addition to
12 updating the report, I updated my CV with
13 recent publications.  I've been publishing a
14 lot recently and wanted to ensure that you
15 had seen those publications within my CV.  So
16 that was another amendment, to address that
17 last question, as well.
18     Q.   And then there's an Amended
19 List of Materials Considered, correct?
20     A.   As far as I'm aware, that's
21 correct.
22     Q.   Who prepared the Amended List
23 of Materials Considered?
24     A.   I prepared much of the

Page 30

1 information within that list, and the final
2 list was prepared by GT.
3          THE WITNESS:  Am I allowed to
4     call them GT?
5          MS. LOCKARD:  Sure.
6          THE WITNESS:  Thank you.
7 BY MS. BOGDAN:
8     Q.    GT, Greenberg Traurig?
9     A.    Correct.  Is it okay for me to
10 say GT from here onwards?
11     Q.    That's fine.
12     A.    Thank you.
13     Q.    As long as the record reflects
14 what GT stands for, that's absolutely fine.
15          And what documents were added
16 to the Amended List of Materials Considered?
17     A.    I'm unaware of the exact
18 details, and it would be the updated expert
19 depositions and things of that effect.
20     Q.    Did you read all of the expert
21 deposition transcripts that are reflected?
22     A.    I considered all of them and
23 read in detail at least half of them.
24     Q.    Can you tell me which ones you

Page 31

1 read in detail?
2     A.    The -- my critique of the ones
3 I read in detail is contained in my report,
4 and the more recent ones are the ones related
5 to my understanding of genetic toxicology,
6 risk assessment and so on.
7     Q.    I was looking for, Dr. Johnson,
8 which of the deposition transcripts you read
9 in detail, and they're reflected on page 1 of
10 your Amended List of Materials Considered?
11     A.    I do not have that list in
12 front of me at the current time.
13          MS. LOCKARD:  He does now.  I
14     just handed him the amended list.
15     A.    I do now.
16 BY MS. BOGDAN:
17     Q.    I believe also it's being
18 displayed on the screen for you.
19     A.    Oh.  Sorry, I'm still on
20 Golkow.  Thank you.  I've gone back to Zoom.
21          I now have the information in
22 front of me, and I will --
23          MS. LOCKARD:  There's no
24     question pending.

Page 32

1          THE WITNESS:  There's no
2     question pending.  Apologies.  I now
3     have that in front of me.
4 BY MS. BOGDAN:
5     Q.    Okay.  I do believe there was a
6 question.  What I asked was:  Which of the
7 deposition transcripts did you review in
8 detail?
9     A.    I've reviewed the transcript
10 from Hecht.  That was very good.  I enjoyed
11 reading that and that had some critical
12 understanding of that.  Raphael Nudelman as
13 well, and Panigrahy.  Those are the ones that
14 come to the forefront of my memory, but I've
15 read other ones as well.
16     Q.    Did you read all of them?
17     A.    I opened all of them, but I
18 read in detail the ones relevant to my area
19 of expertise.
20     Q.    On the -- when you say you
21 opened them, what does that mean?
22     A.    They were provided as PDFs, and
23 I clicked open, and I would look through, see
24 the topic.  If it was not relevant to my

Page 33

1 report and my level of expertise, my area of
2 expertise, then I would go on to another one.
3     Q.    Did you add to your report
4 critiques of the deposition testimony that
5 you read?
6     A.    I think my critiques were on
7 the expert reports and not on the expert
8 depositions, mainly due to timings of the
9 report, because the depositions hadn't
10 appeared at that time.  So I was critiquing
11 the reports and reflecting on that within my
12 report.  That's my understanding.
13     Q.    Did you create any writings
14 regarding your critiques of the deposition
15 testimony?
16     A.    I did not.
17     Q.    Did you make any notes
18 regarding your review of the deposition
19 testimonies that you read?
20     A.    I did not.  My practice with
21 this, observe comments and statements within
22 the depositions that I agree with sometimes,
23 and I think that's useful information to
24 remember.  If I disagree with it, I'll look

Confidential Information — Subject to Protective Order

**Page 34**

1  into it, I'll research it by reading the
2  up-to-date scientific knowledge around that
3  topic, and come to my own understanding of
4  whether I agree with that statement or not,
5  with no notes.  Just into my -- into my
6  brain.
7      Q.    Now, you mentioned that you
8  reviewed Raphael Nudelman's deposition?
9      A.    Yes.  And I think that was --
10 we had feedback then.  I think that was quite
11 an early one, if I remember correctly.
12     Q.    Do you know Raphael Nudelman?
13     A.    I have met Raphael Nudelman.
14 Should I tell the story of how I know him?
15 No?
16         MS. LOCKARD:  Just answer the
17     question, Dr. Johnson.  Listen to the
18     question and answer the question,
19     please.
20     A.    I do know Raphael Nudelman.
21 Since this issue started, I've met him since
22 that time.
23 BY MS. BOGDAN:
24     Q.    How did you first become

**Page 35**

1  acquainted with Raphael Nudelman?
2      A.    I had looked into this topic on
3  my own regard with some of my regulatory
4  colleagues.  I've prepared a PowerPoint
5  presentation, and I've been invited to
6  present this at an Informa Impurities
7  conference in Berlin, and at that time I met
8  Raphael Nudelman, I think over breakfast, and
9  I saw his -- he'd seen my presentation, he
10 was interested in my presentation, and I met
11 him at that time.



**Page 36**

11     Q.    Now, when you say colleagues,
12 I'm not looking for the private health
13 information with regard to whichever
14 individual was on valsartan, but who did you
15 speak with regarding this topic as far as
16 your interest in it and wanting to learn more
17 information about it?
18     A.    So that small group that I
19 discussed, we were all -- we're all risk
20 assessment experts and genetic toxicology
21 experts and cancer bioassay experts.  We
22 discussed it in depth with those colleagues.
23         I then opened it up to a group
24 that I chair within the Health Environmental

**Page 37**

1  Science Institute based in Washington, D.C.
2  that's a tripartite -- tripartite
3  organization made up of regulatory bodies of
4  industry, academics and consultants, and I
5  presented it to that group.
6          And we -- and they -- I was
7  doing the work.  They were interested.  They
8  were helping with the adjustment factors
9  within the PDE, critiquing it.  I presented
10 at Impurities conferences, which were made up
11 of the same sort of people, industry,
12 regulatory experts and so on.
13         And at that time, I had not
14 been to many Impurities conferences, but
15 since this was so relevant, I started getting
16 invited to a lot of Impurities conferences,
17 and at those times I was learning from the
18 other speakers as well from their
19 presentations, it was very good.  I was
20 becoming very up to date with the topic, and
21 yeah, lots and lots of people.
22         This is my area of research for
23 the last few years independently of this
24 case, and I work with many different expert

Confidential Information – Subject to Protective Order

Page 38

1    groups where this relates to our interest.
2        Q.    Now, what were the names of --
3    you mentioned that there were several
4    Health Canada colleagues that you spoke with.
5    Who are they?
6        A.    That's a confidential matter as
7    far as I'm concerned.
8        Q.    The names of the Health Canada
9    colleagues that you spoke with regarding the
10   issue with nitrosamine contamination in
11   valsartan?
12       A.    Yes.
13       Q.    Why do you say that that's a
14   confidential...
15       A.    Because of the nature of this
16   case.
17           MS. BOGDAN:  I don't understand
18       what privilege the witness is
19       claiming.  If he had conversations
20       regarding this issue on the topic of
21       nitrosamine contamination --
22           MS. LOCKARD:  His position --
23           MS. BOGDAN:  -- I just want to
24       know --

Page 39

1           MS. LOCKARD:  Yeah, his
2       position on this is that he had
3       discussions confidentially prior to
4       being retained in this case with these
5       agency individuals, and that
6       discussion occurred with the
7       understanding that it was
8       confidential.  So he's uncomfortable
9       disclosing those names.
10          MS. BOGDAN:  Well, I --
11          MS. LOCKARD:  So I'll make an
12      objection based on confidentiality,
13      and, you know, if we need to discuss
14      it off the record, we can do that.
15          THE WITNESS:  That's correct,
16      that is my position.
17          MS. BOGDAN:  Well, it will be
18      the plaintiffs' position that with
19      regard to anyone that he spoke with
20      particularly regarding this issue at
21      the time that the recall became known,
22      that that would be highly relevant to
23      the issues posed here in this matter.
24          And certainly this deposition

Page 40

1    is not public information, and, you
2    know, the identities of these
3    individuals from the Health Canada
4    agency would be relevant, highly
5    pertinent and certainly discoverable.
6    BY MS. BOGDAN:
7        Q.    Do you serve with any of these
8    individuals in -- on any of the groups or
9    committees that you've referenced in your
10   earlier testimony?
11       A.    That is correct.  I work with
12   some of these regulatory experts on sort of
13   these expert groups.
14       Q.    And which expert groups do you
15   serve with these individuals on?
16       A.    We've created with the experts
17   on the question -- apologies.  Wipe that.
18   That didn't make sense.
19           I work with many of these
20   experts on the Health Environmental Science
21   Institute Genetic Toxicology Technical
22   Committee, the HESI GTTC, and also on the
23   upcoming IWGT, I think the expanded version
24   of that is the International Workshop on

Page 41

1    Genetic Toxicology, and it's upcoming.  It's
2    supposed to be this year in Ottawa, and it's
3    been delayed due to COVID to be next year.
4           MS. BOGDAN:  If we could pull
5       up the 2020 HESI Annual Report,
6       please.
7           MS. LOCKARD:  You'll have to
8       use your link for that.
9           THE WITNESS:  I'm just going to
10      find it now on the Golkow.
11          (Whereupon, Deposition Exhibit
12      Johnson-3, 2020 HESI Annual Report,
13      was marked for identification.)
14          THE WITNESS:  It has yet to
15      appear on it, on Golkow.
16          MS. LOCKARD:  Hit refresh.
17          THE WITNESS:  I'm refreshing.
18      Exhibit 3, is that correct?
19          TRIAL TECHNICIAN:  That is
20      correct.
21          THE WITNESS:  Thank you.
22   BY MS. BOGDAN:
23       Q.    Is this the organization that
24   you were referring to, Dr. Johnson?

Confidential Information -- Subject to Protective Order

Page 42

1    A.    I need a few seconds while the
2  slow Internet catches up.  It's still
3  loading.
4    Q.    Okay.
5    A.    HESI Annual Report.  Correct.
6  A subset of HESI.  They're made up of
7  different expert groups, and the GTTC is one
8  such group.
9    Q.    What is HESI?
10    A.    I've stated it in previous
11  questions and I'll state it again.  It's the
12  Health Environmental Science Institute.
13    Q.    What is its purpose?
14    A.    My way of describing them is we
15  find best practice or we find issues that
16  relate to our expertise or we find blue-sky
17  thinking of new approaches.  We create an
18  expert group, we critique that, and then we
19  publish that and ensure the publish size and
20  keep it all open.  And then we educate as
21  well through workshops and publications.
22    Q.    What are the funding sources
23  for HESI?
24    A.    As a whole, they are -- so

Page 43

1  industry provides funds across the different
2  industry bodies to HESI, and then there's
3  subsets of that.  A portion of funding goes
4  to the expert groups, and those expert groups
5  can use the funding for meetings.
6    Q.    And when you say industry, what
7  types of industries are you referring to?
8    A.    It includes pharmaceutical
9  companies, also contract research
10  organizations, also -- I think we still have
11  cosmetics companies, agrochemical companies,
12  pet- -- not petrochemical companies at the
13  current time, I do not think, but that may be
14  incorrect.
15    So anyone that uses genetic
16  toxicology within their day-to-day life.  If
17  there's a big company involved within that,
18  then they would want to be a part of this
19  expert committee.
20    Q.    So HESI is funded by industry,
21  which would be made up of pharmaceutical
22  companies, chemical companies and other
23  business entities?
24    A.    That's how I understand their

Page 44

1  funding platform is.
2    Q.    Are you an employee of HESI?
3    A.    No.  They do not pay me in any
4  way.  They pay for the meetings, but there's
5  been no meetings since COVID.  There's been
6  online meeting technologies that may have
7  cost some of the money, but the face-to-face
8  meetings uses up the major proportion of
9  that, and then some of the rest of the
10  funding goes towards funding HESI staff to
11  support our clerical needs.  There's no money
12  that goes to me.
13    Q.    Does HESI fund research?
14    A.    They have an ability to fund
15  research.  Those subgroups have an ability to
16  use money, if there's surplus money, to fund
17  research.  It's not -- it's up to that
18  committee.
19    Q.    Have you done any research that
20  was funded by HESI?
21    A.    Not that I'm aware of.  The
22  reason for my delay is we've had funding --
23  it's usually been from Health Canada -- to
24  support our project, and then we integrate

Page 45

1  that within the HESI group.  So that's how I
2  see it.
3    So we do projects within our
4  group, and then they're always funded by
5  Health Canada.
6    And if there's an example where
7  I have been funded for HESI research, that
8  would be my misunderstanding that it would
9  be -- I think it's Health Canada.
10    My confident answer is no.
11    Q.    And --
12    A.    Apologies.  I would definitely
13  not be the PI if that was the case anyway.
14  Sorry.
15    Q.    And when you say PI, are you
16  referring to principal investigator?
17    A.    Exactly that term.
18    Q.    So which of the committees are
19  you affiliated with with HESI?  Would that be
20  the genetic toxicology group?
21    A.    Yes, that would be the one.
22    Q.    And what role do you have with
23  the genetic toxicology group?
24    A.    There's a subgroup called the

Confidential Information - Subject to Protective Order

Page 46

quantitative subgroup, where we address exactly the issue we're discussing today, and I chair that. I cochair that with another member. He's currently from Hoffman-La Roche, Andreas Zeller, and previously it was someone from Health Canada. And yeah, it's usually -- so that's my role within there.

And when you're a chair of a subgroup, you become on the steering group of the GTTC.

Q. And GCC [sic] stands for?

A. GTTC stands for Genetic Toxicology Technical Committee, as far as I'm aware.

Q. So for the transcript, that should be GTTC, correct --

A. Correct.

Q. -- not GCC? Okay, that makes sense.

A. Cool.

Q. And who is on the subgroup with you?

A. It's a big subgroup. There's

Page 47

different levels of membership. There's interested parties, and that includes many regulators, many industry experts, many academics, many consultants. Then there's an active -- more active work group, that would include myself, Paul White from Health Canada, and Andreas Zeller, and we do a large proportion of the work and present that to the wider group, who are very interested in this topic and have opinions but have less time to put into it because this is our research area of expertise.

Q. Now, does this organization collect committee dues? Are there dues that people have to pay to belong?

A. My understanding of the funding is the HESI bigger committee takes an annual fee from the company, and then they pay a certain amount to become a part of a group such as the GTTC. That's my understanding of the funding.

Q. So the members pay a fee to HESI to belong to the organization?

A. The industry groups are

Page 48

requested for that. The consultants, the academics and the regulatory bodies are not requested that funding, as far as I'm aware.

Q. What is the cost for an industry -- when you say industry group, are you referring to individual companies?

A. I am referring to individual companies.

Q. And what is the fee for an individual company to join HESI in a given year?

A. I do not want to say an incorrect number. Because I'm not a company, I don't know the exact number.

Q. If we could move to page 33 of this exhibit, which should have Genetic Toxicology. And when I say 33, I mean the numbered page 33. There we go.

A. I'm almost there.

Q. And, Doctor, let me know once you have that loaded on the screen.

A. With the top word being "Genetic Toxicology" and then "Our Mission"; is that correct?

Page 49

Q. Yes.

A. Excellent. Thank you. I have that in front of me.

Q. Okay. Is that the group to which you belong?

A. Yes.

Q. And then if we could move to page 35, please.

A. Yeah, I can see that too.

Q. Okay. Great.

Under In Progress at the top of the page, in the third sentence, could you read that, please, beginning with "Permitted"?

A. Permitted daily exposure limits for noteworthy mutagenic nitrosamines. And this entirely links to my publication, which was a HESI publication.

Q. And when you say links to, so this is referencing a publication that you were actually involved with, correct?

A. Correct.

Q. And when was that publication published?

Page 50

1    A.   I'm reaching to get it because
2  the exact date could be useful.  It was
3  received 1st of March 2021 and accepted 11th
4  of May 2021.
5    Q.   So that was actually
6  referencing that publication that you had
7  underway in 2020?
8    A.   Yes, and as I mentioned
9  previously, it was underway at the time of my
10  presentation in Berlin too, just the research
11  around it.
12    Q.   And are you referring to the
13  2018 presentation in Berlin?
14    A.   Correct.
15    Q.   And who did you attend -- or
16  you actually spoke at the 2018 --
17    A.   I think --
18    Q.   -- Berlin presentation or did
19  you just attend?
20    (Clarification requested by the
21    stenographer.)
22    THE WITNESS:  Berlin Informa.
23  BY MS. BOGDAN:
24    Q.   And what was the name of that

Page 51

1  seminar?
2    A.   I've attended many seminars.
3  The Informa seminars would have Informa
4  Impurities.  The focus is on impurities
5  within that seminar.
6    Q.   Who was the sponsor of that
7  seminar?
8    A.   I do not know.  Informa were
9  the people running it.
10    Q.   Is Informa the name of the
11  company or the administrative group that runs
12  seminars?
13    A.   My understanding is the
14  administrative group that runs seminars.
15    Q.   Who spoke with you at that
16  seminar?
17    A.   I cannot recall exactly.  My
18  answer would be that's where I met Raphael
19  Nudelman, as I've previously stated in my
20  dep, due to a previous question, and Andrew
21  Teasdale presented as well.  He's a leading
22  expert in impurities.  And beyond that, I
23  couldn't recall any other names.  That was my
24  first Impurities conference, and I was yet to

Page 52

1  know who the leading experts in that area
2  were.
3    Q.   And who did Raphael Nudelman
4  work for at the time, if anyone, in 2018 when
5  you first met him?
6    A.   It was my understanding that he
7  worked for Teva.
8    Q.   Does he still work for Teva, to
9  your understanding?
10    A.   I think he does, yes.  I'm
11  confident that he does.
12    Q.   And Andrew Teasdale, what
13  company does he work for?
14    A.   He works for AstraZeneca, and
15  he's on many, many expert groups on this
16  topic.
17    Q.   And what prompted the holding
18  of this conference in Berlin in 2018?
19    MS. LOCKARD:  Objection, form,
20    speculation.
21    You can answer.
22    THE WITNESS:  I can answer?
23    A.   Informa, from my recollection
24  and understanding, have been running

Page 53

1  Impurities conferences for many years, and as
2  an expert, as a group of scientists and
3  people working on topics, you always present
4  the newest topic under consideration at that
5  time.  So that would have been the reason for
6  detailing on this topic.
7  BY MS. BOGDAN:
8    Q.   Had the recalls or the issue
9  with nitrosamine contamination in valsartan
10  come to the forefront before this meeting
11  took place?
12    MS. LOCKARD:  Objection,
13    compound, vague.
14    A.   I'm unaware of that.
15  BY MS. BOGDAN:
16    Q.   Were valsartan recalls part of
17  the topic that was addressed at this Berlin
18  conference in 2018?
19    A.   The topic, potentially,
20  instructions would mention the reason for our
21  focus on this topic.  The science was the
22  focus of the topic.  It was mostly to do with
23  the structural activity relationship experts,
24  so I was in the room for the chemists talking

Confidential Information - Subject to Protective Order

Page 54

1    about chemistry, and I was the toxicologist.
2    So we talked about the science, but there
3    would have been introductory information as
4    well.
5        Q.    Did this conference take place
6    after it became known that NDMA was in
7    valsartan?
8            MS. LOCKARD:  Objection, form,
9        vague.
10       A.    My understanding -- I do not
11   know the answer to that.
12   BY MS. BOGDAN:
13       Q.    What did you speak on at this
14   conference?
15       A.    It was very similar to my
16   publication and aspects of my report, which
17   is more detailed and focused risk assessment
18   of this exploratory paper.
19           So it was on the first steps in
20   producing the paper, so it was to show that
21   NDMA, and potentially I think I talked to
22   NDEA at that time, were mutagenic substances
23   with very clear mutation spectrum, with very
24   clear DNA adducts, with very clear

Page 55

1    understanding about DNA repair, and that's
2    been my area of expertise for many years.
3            So I introduced that in some
4    slides, and then I showed with that
5    understanding you can carry out permitted
6    daily exposure according to the ICH guidance,
7    and I carried out a permitted daily exposure
8    with some of the data available to me.
9        Q.    Did this conference take place
10   in June of 2018?
11       A.    Potentially.
12       Q.    And when was the conference
13   originally scheduled to take place, as far --
14   excuse me.
15           When was the date of the
16   conference set?
17       A.    I do not know.
18       Q.    When were you invited to speak
19   at the conference?
20       A.    I do not know.
21       Q.    Were you invited to speak at
22   the conference more than a month before it
23   took place?
24       A.    I do not know.  I've presented

Page 56

1    at many of these conferences.
2        Q.    Do you have any -- did you
3    present any written materials at the
4    conference?
5        A.    I presented a slide set which I
6    spoke to.
7        Q.    So a PowerPoint-type
8    presentation?
9        A.    Yes.
10       Q.    Do you still have that?
11       A.    I'm unaware if I do.
12       Q.    Did anyone at the conference
13   speak specifically about NDMA or NDEA in
14   valsartan?
15       A.    Andrew Teasdale presented the
16   issue at hand and the reason, the chemical
17   reason for NDMA in this instance.
18       Q.    And who does Andrew Teasdale --
19   or who did he work for at the time?
20           MS. LOCKARD:  Objection, asked
21       and answered.
22           MS. BOGDAN:  I remember the
23       doctor saying Raphael Nudelman worked
24       for Teva.

Page 57

1    BY MS. BOGDAN:
2        Q.    Who did Andrew Teasdale work
3    for?
4            MS. LOCKARD:  Objection, asked
5        and answered.
6        A.    As stated previously, Andrew
7    Teasdale works for AstraZeneca and did at
8    that time, and he's also party to numerous
9    expert groups, including the official ones
10   which talk with the regulatory bodies.
11   BY MS. BOGDAN:
12       Q.    How many speakers presented at
13   this conference in Berlin?
14       A.    I do not know.
15       Q.    Was it one day of presentations
16   or more than one day?
17       A.    I do not know.  At an estimate,
18   two days.
19       Q.    Did you go with anyone to the
20   conference?
21       A.    No, I did not.  I went to
22   Berlin by myself.  It was exciting.
23       Q.    If we could go back to the
24   exhibit, same page, 35.

Page 58

1    A.   This was the HESI document?
2    Q.   Yes.
3    A.   Okay.
4    Q.   And if we could go to
5  Participating Organizations.
6    A.   Participate -- on page 35?
7    Q.   Yeah.  And if we could go to
8  Academic/Research Institutes.
9    A.   Yep.  I'm there, yes.
10   Q.   Is the university that you work
11 for listed?
12   A.   Yes.  I work for Swansea
13 University.
14   Q.   And how long have you worked
15 for Swansea?
16   A.   I carried out my Ph.D. from
17 2002 to 2006, at which time I did some
18 demonstrating, so I think I got paid at that
19 time.  The 2007 period, I had a postdoctoral
20 research project on dose response in another
21 set of compounds that were not nitrosamines.
22       Then I got a job as a tutor,
23 which is a teaching role, and I had research
24 ability at that time.  And then I worked my

Page 59

1  way through the grades to where I am today.
2       So that's the time -- the time
3  frame.
4    Q.   And when you say worked my way
5  through the grades to where I am today, where
6  are you today?
7    A.   I'm an associate professor;
8  that's one down from professor in the
9  university -- in the U.K. university career
10 grades.
11   Q.   Are you on track to become a
12 professor?
13   A.   Yes, very close to becoming
14 professor.
15   Q.   If we could go back to page 35
16 and look at Industry, please, which is right
17 under Academic/Research Institutions?
18   A.   Not that I am looking -- I'm
19 not looking at Zoom, but I have it in front
20 of me.  Thank you.
21   Q.   And do you recognize the names
22 of the companies listed?
23   A.   I do recognize them, yes.
24   Q.   And this list of companies is

Page 60

1  affiliated with the Genetic Toxicology
2  Committee?
3    A.   Yes, correct.
4    Q.   Could you please read the names
5  of the companies and tell me what type of
6  business they're in?
7        MS. LOCKARD:  Objection.
8  BY MS. BOGDAN:
9    Q.   If you know.
10       MS. LOCKARD:  Vague.
11 BY MS. BOGDAN:
12   Q.   Well, we can go one by one
13 then.  The first company listed is AbbVie.
14       Do you see that?
15   A.   I see AbbVie.  I --
16   Q.   What is -- what is the business
17 of AbbVie?
18   A.   I do not know.  I think they
19 may have a pharmaceutical wing, but I'm not
20 confident in that statement.
21   Q.   The next company is Amgen.
22       Do you see that?
23   A.   I see that, and it would be the
24 same answer.  They may have a pharmaceutical

Page 61

1  wing, but I do not know.
2    Q.   Do you know any other type of
3  business Amgen is involved in?
4    A.   I -- I do not, no.
5    Q.   Are they a chemical company?
6    A.   I repeat myself.  I do not
7  know.
8    Q.   The next company name,
9  AstraZeneca, what type of company is
10 AstraZeneca?
11   A.   Pharmaceutical company.
12   Q.   The next company, BASF, what
13 type of business do they have?
14   A.   Chemical company.
15   Q.   The next company, Boehringer
16 Ingelheim, what type of company is that?
17       MS. LOCKARD:  Objection, vague.
18 BY MS. BOGDAN:
19   Q.   What is the business of
20 Boehringer Ingelheim?
21   A.   I know -- I think they have a
22 pharmaceutical wing and they may do other
23 business as well.
24   Q.   The next company, Bristol Myers

Confidential Information - Subject to Protective Order

---

Page 62

1  Squibb Company, what is their business, if
2  you know?
3      A.    Again, I think they have a
4  pharmaceutical wing and a focus on
5  pharmaceuticals.  I'm unaware of their other
6  business.
7      Q.    The next company listed,
8  Charles River Laboratories.  What is the
9  business of Charles River Laboratories?
10      A.    Charles River are a leading
11  contract research organization to which
12  industry and government regulatory bodies get
13  a lot of their work carried out, so lots of
14  the genetic toxicology-type approaches and
15  cancer bioassays.
16      Q.    And they actually do testing
17  and laboratory-type work?
18      A.    Correct, on a very large scale.
19      Q.    The next company, Corteva
20  Agriscience, what is the business of Corteva
21  Agriscience?
22      A.    I do not know, but from the
23  second word, I would assume some agrochemical
24  links.

Page 63

1      Q.    Covance, do you see that
2  company listed?
3      A.    I do.  I see -- apologies.
4      Q.    No, we just have a little bit
5  of delay.  I apologize as well.  I'm not
6  trying to speak over you, and I know you're
7  not trying to speak over me.
8          What is the business of
9  Covance?
10      A.    Covance are in the same
11  industrial field as Charles River and carry
12  out a lot of the genetic toxicology, cancer
13  bioassay work and clinical trials work for
14  everyone, including industry and regulatory
15  bodies and academics, if they wish.  It's a
16  contract research organization.
17      Q.    The next company, Denali
18  Therapeutics, what is the business of Denali?
19      A.    I do not know Denali, but from
20  therapeutics, they should be in the business
21  of therapeutics.
22      Q.    The next company, the Dow
23  Chemical Company, what is the business of Dow
24  Chemical Company?

Page 64

1      A.    The Dow Chemical Company are a
2  chemical company.
3      Q.    Yeah.
4          The next company listed, Eli
5  Lilly and Company, what is the business of
6  Eli Lilly?
7      A.    I think, again, that they have
8  a pharmaceutical wing and some focus, and
9  potentially they'll do other business.
10  That's -- that's my understanding.
11      Q.    The next company, Genentech,
12  what is the business of Genentech?
13      A.    Again, I don't have a clear
14  understanding of their -- of their work.
15      Q.    The next company, Gentronix,
16  what is the work of Gentronix?
17      A.    Gentronix are an up-and-coming
18  contract research organization, and in
19  addition to carrying out the CRO work, the
20  contract research organization work, for
21  industry, and also for regulatory bodies and
22  so on, and government research bodies and all
23  those guys, they also have some inventions of
24  their own test systems too.

Page 65

1      Q.    The next company listed,
2  GlaxoSmithKline, what is the business of
3  GlaxoSmithKline?
4      A.    I'm confident that they have a
5  pharmaceutical wing and they change their
6  profiles quite a lot, but used to make some
7  food as well, I think.
8      Q.    The next entity, Helix3 Inc.,
9  what is the business of Helix3 Inc.?
10      A.    From my understanding, I think
11  they're a contract research organization,
12  again, a small one, using novel approaches,
13  but again, doing this work for industry and
14  for government regulatory bodies and anyone
15  such as NIH who wishes to outsource any
16  experimental work.
17      Q.    The next company, Janssen
18  Pharmaceuticals, is that a pharmaceutical
19  company to your knowledge?
20      A.    Janssen Pharmaceuticals is a
21  subset of Johnson & Johnson, and this is
22  their pharmaceutical wing.
23      Q.    The next company, Litron
24  Laboratories, are you familiar with that

Confidential Information - Subject to Protective Order

Page 66

1  company?
2      A.    Yes, very familiar with Litron
3  Laboratories.  You'll see from my
4  publications, I work with them on science a
5  lot.  They are a CRO, contract research
6  organization, and they also carry out a lot
7  of inventive, patented assay development
8  work, and they're very well regarded as well.
9  So again, a CRO.
10      Q.    When you say a contract
11  research organization, that means they can be
12  contracted by a third party to do research,
13  correct?
14      A.    They can, but usually it's less
15  research and more mandated assays, including
16  the genetic toxicology assays that would go
17  towards submissions or to hazard and risk
18  assessments by the regulatory body
19  themselves.
20      Q.    So they do more testing?
21      A.    Contract research organization,
22  the focus would be on testing, and the
23  companies and regulatory bodies would
24  outsource that work for these bodies to do

Page 67

1  their testing, all in accordance with OECD
2  guidelines.
3      Q.    The next company, L'Oreal
4  Corporation, is that -- (audio
5  malfunction) --
6          (Clarification requested by the
7      stenographer.)
8  BY MS. BOGDAN:
9      Q.    Is that a cosmetic company?
10      A.    According to my understanding,
11  they focus on cosmetics.
12      Q.    The next company, Merck &
13  Company, what is the business of Merck?
14      A.    I would like to take this one
15  and the next one together.  I'm aware that
16  there's two Mercks, and I think they both
17  have a focus on pharmaceuticals.  And one is
18  more European and one is more American, and I
19  don't know which one is which.
20      Q.    The next company,
21  MilliporeSigma, what is the business of
22  MilliporeSigma?
23      A.    MilliporeSigma are a huge
24  company.  They -- we use them a lot in

Page 68

1  laboratory research to buy consumables and so
2  on for tissue culture and buy the chemicals
3  for the testing.  They're such a big company,
4  they may have other wings as well, but from
5  my understanding of Sigma is they produce a
6  lot of scientific reagents.
7      Q.    And the next company, Novartis,
8  what is the business of Novartis?
9      A.    Novartis, I'm quite confident
10  they're focused on pharmaceuticals entirely,
11  I think.
12      Q.    The next company, Pfizer Inc.,
13  what's the business of Pfizer?
14      A.    Again, Pfizer are a very large
15  pharmaceutical company.
16      Q.    The next company listed is
17  Procter & Gamble Company.  What is the
18  business of Procter & Gamble?
19      A.    My understanding of Procter &
20  Gamble is the focus is on cosmetics, and I
21  think they've got some food and
22  nutraceuticals and products along those
23  lines, but I don't think there's a focus on
24  pharmaceuticals as such.

Page 69

1      Q.    The next company listed, Roche,
2  what is the business of Roche?
3      A.    Roche are a pharmaceutical
4  company, and I think they produce equipment
5  as well for research, such as PCRs and such.
6      Q.    The next company, Sanofi, what
7  is the business of Sanofi?
8      A.    I think they're a
9  pharmaceutical company.
10      Q.    And the next company, Syngenta,
11  what is the business of Syngenta?
12      A.    I think they're an agrochemical
13  company, but I may need to be corrected.
14      Q.    The next company, Takeda
15  Pharmaceutical Company, is that a
16  pharmaceutical company?
17      A.    Apologies for talking over you.
18          I think they are a Japanese
19  pharmaceutical company.
20      Q.    And then lastly, Toxys, what is
21  the business of Toxys?
22      A.    Contract research organization.
23  I would compare them with Gentronix, Litron.
24  A new contract research organization that

1  comes up with novel assays that they've
2  patented, so that kind of work.  Contract
3  research organization and inventors and
4  sellers of their products.
5      Q.    Now, do each of these
6  industries that we've gone through elect to
7  be affiliated with the genetic toxicology
8  committee?
9      A.    My understanding is, is that's
10  correct, but they will not be a part of all
11  of the different subgroups.
12      Q.    Do they have representatives
13  that serve on the genetic toxicology
14  committee?
15      A.    They do, but not all of them on
16  the quantitative group to which this work is
17  focused.
18      Q.    Which of these companies have
19  committee members on the quantitative
20  subcommittee group?
21      A.    The most precise way for this
22  answer would be the list of coauthors on my
23  publication in May 2021 titled Permitted
24  Daily Exposure -- Daily Exposure Limits for

1  Noteworthy N-nitrosamines.  There's a list
2  there.  Would you like me to read those?
3      Q.    Are all of the coauthors on the
4  Permitted Daily Exposure Limits for
5  Noteworthy N-nitrosamines on the quantitative
6  subcommittee with you?
7      A.    Yes, they were active members
8  on this publication, which is a part of the
9  quantitative subgroup's output.
10      Q.    Okay.  Was there -- were there
11  any members on the quantitative subcommittee
12  that were not coauthors of the Permitted
13  Daily Exposure Limits for Noteworthy
14  Nitrosamines article?
15      A.    There would be.  As I was
16  mentioning, there's an active group and then
17  there's a group of people who are keeping
18  updated.
19          So this would be the active
20  group, and then there would be the people
21  with interest in the topic as a larger body
22  of that group.  So those would not be
23  coauthors on these.  There's people that have
24  an interest but have no active role in this

1  work.
2      Q.    Are all of the individuals that
3  have an active role in this work coauthors?
4      A.    Yes, that's my understanding of
5  that, yes.
6      Q.    So who are those individuals
7  that serve on the quantitative subcommittee
8  group with you?
9      A.    We have the people on my paper.
10  Myself and Andreas chair the group, and Paul
11  White is an active member.  He was cochair,
12  but due to workload, has now stepped back.
13  But he's in a leadership position with myself
14  and Andreas Zeller.
15          And then depending on the
16  project, people will come in or not to be an
17  active participant in the next publication.
18  For example, the next one is being created by
19  Health Canada to carry out risk assessments
20  using confidence intervals for -- from BMD
21  for mutation and cancer, and that will be
22  directed -- I think the next two papers are
23  Health Canada-focused projects that will have
24  an expanded list of authors who will

1  contribute to that manuscript.
2          So it's a bit fluid depending
3  on which subproject, due to level of
4  expertise.  These are very expert papers and
5  not everyone can contribute to a suitable
6  level.
7      Q.    The ones that are coming out
8  that you mentioned were going to be
9  Health Canada-focused projects, are they
10  going to be dealing with nitrosamines?
11      A.    They will not deal with
12  nitrosamines.  A big area of interest for
13  that group is PAHs.
14      Q.    Okay.  Could you tell me the
15  names of the quantitative subcommittee
16  members that you serve with?  I think you
17  said you were going to reference your
18  research article.
19      A.    Yes.  The members relevant to
20  today's discussion are entirely this subgroup
21  that actively worked on this nitrosamine
22  paper, and those are the names that I will
23  read now.
24          Shall I -- so Krista Dobo,

Confidential Information – Subject to Protective Order

Page 74

1  Bhaskar Gollapudi, Jim Harvey, Julia
2  Kenny, Michelle Kenyon, Anthony Lynch, Sheroy
3  Minocherhomji, John Nicolette, Veronique
4  Thybaud, Ryan Wheeldon, Andreas Zeller.
5  That's the complete list.
6      Q.    And Krista Dobo, she works for
7  Pfizer, correct?
8      A.    Yes, unless she's changed roles
9  recently, that would be correct.
10     Q.    At the time that the work on
11  the article was underway, she worked for
12  Pfizer?
13     A.    Yes.  And to expand on that
14  question, each of these numbered affiliations
15  were correct and remain correct at this time.
16     Q.    Meaning the numbers -- the
17  affiliations that are noted on the research
18  article itself?
19     A.    Correct.
20     Q.    So Bhaskar Gollapudi?
21     A.    Bhaskar Gollapudi.
22     Q.    Was affiliated with Exponent?
23     A.    Correct.
24     Q.    A consultant?

Page 75

1      A.    Correct.
2      Q.    Jim Harvey was affiliated with
3  GlaxoSmithKline, correct?
4      A.    That is correct.
5      Q.    Julia Kenny, also affiliated
6  with GlaxoSmithKline?
7      A.    That is correct.
8      Q.    Michelle Kenyon, affiliated
9  with Pfizer, as was Krista Dobo, correct?
10     A.    That is correct.
11     Q.    Anthony Lynch, also affiliated
12  with GlaxoSmithKline?
13     A.    That is correct.
14     Q.    Sheroy Minocherhomji, am I
15  pronouncing that correctly?
16     A.    You're pronouncing it as well
17  as I can.
18     Q.    Okay.  Affiliated with Amgen?
19     A.    According to -- I don't work
20  with him on a regular basis, but this is
21  correct information here, Amgen.
22     Q.    John Nicolette, affiliated with
23  AbbVie, correct?
24     A.    Yeah, correct.

Page 76

1      Q.    Veronique Thybaud, affiliated
2  with Sanofi, correct?
3      A.    Yes, that is correct.
4      Q.    Okay.  Ryan Wheeldon, or
5  Wheeldon or Wheeldon, he actually worked some
6  with you at the university?
7      A.    That's correct.
8      Q.    Does he work in your
9  department?
10     A.    He is finishing up his Ph.D.
11  project with me.
12     Q.    And then Andreas Zeller works
13  for Hoffman-La Roche, correct?
14     A.    That is correct.  And the
15  significance of him being last author is, as
16  I've mentioned previously, he cochairs this
17  group with me and has a very active role in
18  understanding this topic too.
19     Q.    Now, you mentioned Paul White
20  had taken -- had an active role in this
21  Genetic Toxicology Committee at the time that
22  this research article was being worked on,
23  correct?
24     A.    He did, yes.  He focused on

Page 77

1  other projects -- I think maybe three other
2  publications -- and therefore did not have
3  time to work on this project with us.
4      Q.    Did he work on this project
5  with you at all?
6      A.    He would have seen our
7  publications and discussed our work with us
8  with his expert understanding.  So to that
9  extent, providing critique and so on.
10     Q.    And when you say would have
11  seen our publications, meaning he would have
12  had input into the drafting of this article,
13  would have reviewed it before it was
14  published?
15     A.    Not into the drafting, but the
16  output figures were presented to the Genetic
17  Toxicology Technical Committee, and at that
18  time, he would have discussed his opinions of
19  the topic at that time.
20     Q.    And when you say output
21  figures, what are you referring to?
22     A.    The dose-response modeling
23  within that publication.  He's an expert on
24  BMD and will have had some opinions on that.

Confidential Information - Subject to Protective Order

Page 78

1  We wrote a paper together on adjustment
2  factors, and he had a good opinion on that.
3  Those main points.
4      Q.    So his area of expertise is
5  dose-response modeling?
6      A.    Yes.
7      Q.    And I see here it's -- did you
8  say BMD or BND?
9      A.    BMD, for which I'll mention
10 later, so I'll expand now, means benchmark
11 dose.  So BMD, benchmark dose.
12     Q.    But he is not a coauthor on the
13 paper, correct?
14     A.    That is correct.
15     Q.    Did you ask him to be a
16 coauthor on the paper?
17     A.    We discussed it, but workload
18 issues, he didn't contribute to the
19 publication.
20     Q.    And where does Mr. White work?
21     A.    He works in Ottawa at
22 Health Canada and has a professorship at the
23 university there as well, at University of
24 Ottawa, I think.

Page 79

1          MS. LOCKARD:  We've been going
2      about an hour and a half, so when you
3      get to a good stopping point, can we
4      take a break?
5          MS. BOGDAN:  Sure, we can take
6      a five-minute break right now if you'd
7      like.
8          MS. LOCKARD:  Sure.
9          THE VIDEOGRAPHER:  Going off
10     the record.  The time is 10:35 a.m.
11         (Recess taken, 10:35 a.m. to
12     10:49 a.m. BST)
13         THE VIDEOGRAPHER:  Back on the
14     record.  The time is 10:49.
15 BY MS. BOGDAN:
16     Q.    Could we pull up the exhibits
17 for the 2018 2nd Impurities seminar?
18         (Whereupon, Deposition Exhibit
19     Johnson-4, 2nd Impurities: Genotoxic
20     and Beyond Summit Slide, was marked
21     for identification.)
22         MS. LOCKARD:  The 2018.
23         THE WITNESS:  Will this appear
24     as Exhibit 4 or should I look at Zoom?

Page 80

1          MS. LOCKARD:  It should come up
2  on both.
3          THE WITNESS:  Okay.
4          MS. BOGDAN:  If we could please
5  mark that as the next exhibit.
6          MS. LOCKARD:  Exhibit 4.
7          THE WITNESS:  I can see it on
8  Zoom, and I don't need to scroll, so
9  I'm happy.  I can see it.
10 BY MS. BOGDAN:
11     Q.    Is this the seminar or summit
12 that you were previously testifying about
13 that took place in Berlin in June of 2018?
14     A.    As far as I'm aware, it is, but
15 I'm scanning for Informa, and cannot see
16 Informa on that slide.
17     Q.    Okay.  And that exhibit
18 indicates -- excuse me -- that it took place
19 on June 7th and 8th?
20     A.    That exhibit does indicate
21 that, correct.
22     Q.    And it took place at the
23 Mövenpick Hotel in Berlin.  Is that where the
24 seminar took place?

Page 81

1      A.    That's what it says on the
2  exhibit, correct.
3      Q.    Okay.  Is that where you
4  remember the seminar taking place in Berlin?
5      A.    I remember it taking place in
6  Berlin.  I can't recall the exact name of the
7  hotel.
8      Q.    Okay.
9          MS. BOGDAN:  If we could please
10 pull up the next exhibit and mark it
11 Exhibit 5, which would be the
12 presenters at the 2nd Impurity
13 genotoxic and beyond summit.
14         (Whereupon, Deposition Exhibit
15     Johnson-5, Speakers at 2018 Berlin
16     Summit, was marked for
17     identification.)
18 BY MS. BOGDAN:
19     Q.    And please let me know once
20 that appears for you on the screen.
21     A.    I can see this on Zoom, so it's
22 appearing on the screen, correct.
23         (Telephonic interruption.)
24         THE WITNESS:  We have a phone

Confidential Information - Subject to Protective Order

Page 82

1    call.
2        MS. LOCKARD:  False alarm.
3    BY MS. BOGDAN:
4        Q.    Would you please look at that
5    exhibit and tell me if those appear to be --
6    well, first, let's see.
7            Are you on that exhibit?
8        A.    Yes, I'm on that exhibit.
9        Q.    Okay.  And do those appear to
10   be the individuals that spoke at that 2018
11   summit in Berlin?
12       A.    That appears to be correct, and
13   triggered my memory that I didn't attend all
14   of the lectures.
15       Q.    So you attended part of the
16   seminar?
17       A.    Correct.
18       Q.    Which lectures, if you can
19   remember, did you attend?
20       A.    I'm fairly confident I attended
21   Andrew Teasdale's lecture.  The rest, I
22   potentially did not see.  Definitely Andrew
23   Teasdale.
24       Q.    Okay.  Andrew Teasdale spoke

Page 83

1    about what?
2        A.    From my recollection, Andrew
3    Teasdale spoke about how the chemistry, about
4    how NDMA could be produced as an impurity in
5    these drugs.  That's what I recall.
6        Q.    Meaning the actual chemical
7    reaction, like...
8        A.    Exactly, the chemical reaction
9    for producing this in this instance.
10       Q.    And this exhibit indicates that
11   he worked for AstraZeneca at the time?
12       A.    Correct, and he was a leading
13   expert in genotoxic impurities at the time as
14   well.
15       Q.    Okay.  And then did you meet
16   Dr. Russ Naven at that conference?
17       A.    I'm looking closely for the
18   face, because I do not know that person.
19           I do not think so.
20       Q.    How about Mike Urquhart, do you
21   know that individual?
22       A.    I'm unsure at this conference
23   whether I've met him.  I've met him at a
24   conference on impurities.

Page 84

1    Q.    So you know him as you sit here
2    today, but you're not sure if you met him
3    there?
4        A.    "Know him" is too strong.  I'm
5    aware of him and have been on these
6    conferences at the same time as him.
7        Q.    And he works for GSK to your
8    knowledge?
9        A.    To my knowledge, that's
10   correct.
11       Q.    And Dr. Raphael Nudelman who is
12   depicted there is the gentleman we've already
13   spoken about who works for Teva, correct?
14       A.    That is correct.
15       Q.    How about Dr. Alexander Amberg
16   with Sanofi, do you know that individual?
17       A.    I do not know that individual.
18       Q.    What about Lance Smallshaw with
19   UCB Biopharma, do you know him?
20       A.    I do not know Lance Smallshaw.
21       Q.    How about Dr. Lutz Müller with
22   Hoffman-La Roche?
23       A.    I do know him and have met him
24   previous to this session.  We worked together

Page 85

1    on the comparable case on EMS.
2        Q.    When you say the comparable
3    case of EMS, what does EMS stand for?
4        A.    EMS stands for ethyl
5    methanesulfonate.
6        Q.    And why did you refer to that
7    as a comparable case?
8        A.    I refer to it as a comparable
9    case because it's a ethylating agent that
10   causes DNA adducts and DNA mutations in a
11   very comparable way to these nitrosamines,
12   and within their impurity issue in Viracept,
13   they calculated a PDE that was accepted based
14   on the understanding that low levels of this
15   alkylating agent were repaired by DNA repair
16   and the PDE calculation could be produced and
17   accepted.  So it's very comparable in my
18   opinion.
19           MS. BOGDAN:  Just off the
20       record for a second.
21           (Discussion off the
22       stenographic record.)
23   BY MS. BOGDAN:
24       Q.    What is EMS?

Confidential Information - Subject to Protective Order

Page 86

1    A.    I answered that in the previous
2 statement.  EMS is ethyl methanesulfonate, an
3 alkylating agent.
4    Q.    I should have asked the
5 question better.  I'm -- is it a component --
6 is it a drug itself?  Is it a pharmaceutical?
7    A.    It's a genotoxic impurity that
8 was found in a batch of Viracept, an
9 impurity.
10    Q.    Okay.  And Viracept would be
11 the pharmaceutical?
12    A.    That was the affected
13 pharmaceutical to which a certain batch had
14 levels of EMS as an impurity.
15    Q.    And EMS is not a nitrosamine,
16 correct?
17    A.    It's definitely not a
18 nitrosamine, but it is an alkylating agent
19 with a very similar mutagenic and adduct
20 profile to these substances.
21    Q.    Is it in the class of N-nitroso
22 compounds?
23    A.    It is not.
24    Q.    What is an N-nitroso compound?

Page 87

1    A.    An N-nitroso compound covers
2 all of the compounds with nitro aspects to
3 them.
4    Q.    And can you describe what you
5 mean by a nitro aspect to them?
6    A.    I'm not a chemist, but there's
7 a group of these nitroso compounds to which
8 there are a hundred that contributes to TTC,
9 so chemically I would not like to expand on
10 what they are.
11        (Clarification requested by the
12 stenographer.)
13    A.    TTC, threshold for
14 toxicological concern calculation.
15 BY MS. BOGDAN:
16    Q.    And so because you're not a
17 chemist, you would defer to the chemists to
18 describe N-nitroso compounds as far as their
19 chemical composition and makeup?
20    A.    I would defer to chemists for
21 that aspect.  My focus would be on their
22 interaction with DNA, that repair, and the
23 link to carcinogenicity.
24    Q.    Are nitrosamines a group of

Page 88

1 chemicals that are encompassed in the larger
2 group of N-nitroso compounds?
3    A.    Yes, that is correct, as far as
4 I'm aware.
5    Q.    Can you describe the
6 characteristics of a nitrosamine?
7        MS. LOCKARD:  Objection, form,
8    vague.
9    A.    As stated, I'm not a chemist,
10 and I would not like to describe the chemical
11 nature of this group of nitroso compounds.
12 BY MS. BOGDAN:
13    Q.    Do you generally know what
14 makes an N-nitroso -- or strike that.
15        Do you generally know what
16 makes a chemical an N-nitroso compound?
17    A.    It would be the nitrogen group
18 and the oxygen group.
19        MS. LOCKARD:  Did you say would
20    be the nitrogen group?
21    A.    It would be descriptions around
22 the nitro -- nitrogen group and the oxygen
23 group.
24 BY MS. BOGDAN:

Page 89

1    Q.    And aside from describing
2 N-nitroso compounds as having a nitrogen
3 group and an oxygen group, can you elaborate
4 any further with regard to the chemical
5 structure of N-nitroso compounds?
6        MS. LOCKARD:  Objection, vague.
7    A.    As stated, I would not describe
8 the chemical nature as I'm not a chemist.
9 BY MS. BOGDAN:
10    Q.    Did you actually publish an
11 article with Dr. Müller?
12    A.    I would have to look back over
13 my publication record to confirm or deny
14 that.  I -- as I sit here today, I'm not
15 aware whether I have or have not.
16    Q.    Did you produce any type of
17 writing, whether it be peer reviewed and
18 published or not, with regard to the EMS
19 matter that you worked with Dr. Müller on?
20        MS. LOCKARD:  Objection, vague
21    as to "produce."
22    A.    The EMS publications within my
23 publication record, the mechanistic studies
24 on EMS were linked to Hoffman-La Roche.

Confidential Information - Subject to Protective Order

Page 90

BY MS. BOGDAN:
Q.    When you say were linked to Hoffman-La Roche, meaning they were the authors?
A.    They were the industrial sponsors for the postdoctoral research that carried out the work and that grant paid for the researcher and for the consumables for that project to produce those related papers.
Q.    And did you work personally on those?
A.    I did not work personally on the wet work, the lab bench work, but I worked on the analysis of the data, the production of the study design and so on, and the drafting of the report within my publication list on this topic.
Q.    And was that work done at the university?
A.    At the university, correct.
(Clarification requested by the stenographer.)
A.    Yes, that work was carried out at the university by my postdoc and myself.

Page 91

BY MS. BOGDAN:
Q.    And what time period are we speaking of that the work was done?
A.    I would have to see my publication record for the exact dates. I think it's the Zair publication.
Q.    Is that in your CV, Dr. Johnson?
A.    I'm looking at my CV now. It's in my -- it's in my CV, Zair, et al. Z-A-I-R, et al., 2011, N-Methylpurine DNA Glycosylase Plays a Pivotal Role in the Threshold Response of Ethyl Methanesulfonate-Induced Chromosome Damage, in Toxicological Sciences.
Q.    Back to the exhibit that still should be up on your screen, there's a Dr. Wichard who works for Bayer.
Do you see -- we're on the second column, second person down.
A.    I see him, and I'm looking at the others. I do not know that person.
Q.    How about Dr. Vanderkelen who worked for Nelson Labs? Do you know her?

Page 92

A.    I do not know her.
Q.    How about Dr. Qiu who works for Boehringer Ingelheim?
MS. LOCKARD:  Objection, vague.
BY MS. BOGDAN:
Q.    Do you know Dr. Qiu?
A.    I do not.
Q.    Do you know Dr. Tom Van -- it's -- I don't know how to pronounce the last name, W-I-J-K, who's with Abbott Healthcare?
A.    I do not know him and have not talked to him, but I have seen his work in presentations, so I know of him.
Q.    How about Dr. Catrin Hasselgren with Genentech, do you know her?
A.    As far as I'm aware, I do not know her either.
Q.    Okay.  And with Intertek, Dr. Tino Otte, do you know him?
A.    As far as I'm aware, I do not know him.
Q.    Looking at this list of speakers, other than attending Dr. Teasdale's

Page 93

presentation, does looking at this list of speakers refresh your recollection of any other presentations you attended?
A.    It reflects my recollection that I did not attend those other ones, and I focused on Andy Teasdale. I was aware he was an expert and went to his talk. I cannot recollect any others due to being chemistry focused and not in my area of interest or expertise.
Q.    What do you consider yourself an expert in?
A.    I consider myself an expert and I have been told by many people globally to be an expert in genetic toxicology. Of course I've been told I'm an expert in benchmark dose-response modeling. I've also been told by regulators that I have a high level of expertise in human health risk assessment as well.
Q.    The first area that you mentioned was genetic toxicology. Could you define genetic toxicology?
A.    Genetic toxicology is an area

Confidential Information - Subject to Protective Order

Page 94

1  of toxicology focused on compounds producing
2  genetic damage to DNA.  To test for this, you
3  have a battery of mandated tests with OECD
4  guidelines, and for this particular topic, a
5  modification of that guideline within the ICH
6  guidance.
7         So it's a mandated series of
8  tests to test to see if genetic damage has
9  occurred from these compounds, the mechanism
10 of how it's occurred, and more advanced, of
11 what levels it does not occur, and so on.
12        So mandated part of industrial
13 and regulatory testing of compounds to see if
14 they're mutagenic or not, and potency and
15 mechanism and so on.
16     Q.   Now, the second area that you
17 mentioned was benchmark dose-response
18 modeling.  Would you please describe what
19 that is?
20     A.   Benchmark dose statistical
21 modeling is applying a series of statistical
22 models to toxicology and cancer bioassay data
23 to derive a benchmark dose, and that
24 benchmark dose is defined as a point of

Page 95

1  departure for those animal tests, and that's
2  wrapped up in itself.
3         And then the next area that
4  you'll ask me about will be risk assessment.
5  So that part is defining a point of departure
6  with advanced statistical modeling from
7  in vivo, relevant robust test systems.
8  That's what benchmark dose modeling is.
9      Q.   What is cancer bioassay data?
10     A.   In order to carry out a risk
11 assessment for cancer, the cancer bioassay
12 must be adhered to.  There's guidelines on
13 this topic from the OECD, where it's
14 specified routes of administration, tissues
15 that should be assessed, study design, animal
16 husbandry and so on.
17        So there's a mandated way to
18 carry out cancer bioassay analysis in
19 rodents.  This is in my list of references as
20 well.  And from that, you get the best data
21 that adheres to this test guideline, and you
22 can do a hazard assessment on it if you're a
23 hazard-based organization.  We can do a risk
24 assessment if we're talking about risks on

Page 96

1  those data.
2      Q.   Bringing it down to a little
3  bit more simple, what is actually a cancer
4  bioassay study, like what physically is it?
5      A.   Physically, get a group of
6  rodents, treat them with a compound for the
7  lifetime of those rodents, sacrifice the
8  animals, carry out pathological assessment to
9  see levels of tumors and positions of tumors
10 all through the organs of those individuals.
11     Q.   And when you say treat them
12 with a compound, is -- what is the purpose of
13 treating them with a compound?
14     A.   It's different depending on
15 what the compound is and what it's predicted
16 to be, et cetera.  If we want to see if a
17 substance is carcinogenic to animals, then we
18 carry out this test to see is something
19 carcinogenic in animals or not.
20        Then the more advanced version
21 of the assay, in an expanded one with
22 multiple doses, multiple numbers of animals,
23 you can carry out dose-response analysis and
24 actually define a level on that dose response

Page 97

1  that you can extrapolate away from the animal
2  concentration to human.
3         And that's where we get to the
4  risk assessment, because we can use those
5  concentrations in that way.
6      Q.   And is that the type of
7  methodology that was used in the Peto study
8  of NDMA and NDEA?
9      A.   Yes.  And that was one of the
10 most robust cancer bioassay studies that I've
11 actually ever seen.  It's a really extensive
12 dataset that was fantastic for my benchmark
13 dose analysis and statistical modeling.
14     Q.   And is it the most extensive
15 dataset that you have seen with regard to
16 NDMA and NDEA?
17     A.   It is.  For that endpoint of
18 cancer in animals, it definitely is.
19     Q.   And the endpoint for that study
20 was actually cancer, correct?
21        MS. LOCKARD:  Objection, form,
22     vague.
23 BY MS. BOGDAN:
24     Q.   What was the endpoint of that

Confidential Information — Subject to Protective Order

Page 98

1  study?
2      A.    The endpoint was cancer in the
3  animals tested.
4      Q.    And did the study run for --
5  how long?
6      A.    As far as I'm aware, from
7  reading it, it abided to the OECD guidelines
8  and was a lifetime exposure or the animals
9  were sacrificed at two years.
10      Q.    And for a study that has cancer
11  as the endpoint, is it desirable to have a
12  lifetime exposure study?
13      A.    For the study itself, there's
14  advantages to it.  For the risk assessment
15  where we're discussing lifetime exposure,
16  then you would need to do that from a
17  lifetime exposure study.  So within that, you
18  have the option.
19          So it's a good test system for
20  us to make these assumptions in human health
21  risk assessment from.
22      Q.    Where did you gain your
23  experience with regard to risk assessment?
24      A.    I've been doing consultancy

Page 99

1  with companies on this specific topic for
2  numerous years, and in those, we submit -- I
3  submit risk assessments based on this type of
4  modeling, calculating PDEs and so on, and
5  submitting those as risk assessments to the
6  regulatory bodies.
7          I've also got experience with
8  the regulatory bodies in doing risk
9  assessments.  I've worked with the RIVM, the
10  National Institute of Health on a couple of
11  cases -- not cases, a couple of example
12  compounds where we did the dose-response
13  modeling and calculate levels of risk with
14  different risk assessment procedures.
15          And I was provided with lots of
16  this expertise by a close working
17  relationship with numerous regulators within
18  the HESI GTTC and also specifically on this
19  topic with Wout Slob, the leading expert on
20  risk assessment based on the benchmark dose
21  approach.  I've been developing that
22  expertise for numerous years.
23      Q.    Now, are you referring to HESI,
24  that working with regulators within HESI, or

Page 100

1  were you talking about another group?
2      A.    I was referring to HESI, Health
3  Environmental Science Institute, and the
4  regulators, regulatory experts within that.
5      Q.    And how long have you been
6  affiliated with the HESI group?
7      A.    The exact definition, the exact
8  year, I do not know.  But I've worked for
9  numerous years and predict it would be 2010.

Confidential Information — Subject to Protective Order



Confidential Information – Subject to Protective Order

Page 106



BY MS. BOGDAN:

Q.    You mentioned that you had worked with doing risk assessments with regulatory bodies, and I think you testified that you had submitted risk assessments to regulatory bodies.

Can you please tell me what risk assessments you submitted to regulatory bodies?

A.    I've done numerous of these. These are documented and carried out in a consultancy role under Swansea Innovations in my university, abiding to the roles of

Page 107

consultancy.

When we carried out the -- when I carried out these risk assessments, I've been doing numerous of these. One I did the Cobalt Consortium on Cancer and carried out the analysis, submitted it to the RIVM at that time, and then to ECHA, the European Chemicals Agency.

I carried on working on that issue, and due to my working relationship with RIVM, did some further work on Cobalt with RIVM as well through -- with Wout Slob as well.

The related ones to -- more related to today's case, I've worked on different industries, focused mostly on this topic.  If there's a genetic toxicant that I can -- we understand the mechanism or we can show that low levels are withstood, then we carry out an in vivo dose-response analysis to find the point of departure, and then carry out the risk assessment.

So those are what I'm talking about, and the ones related to today would be

Page 108

with the pharmaceutical companies, where I've carried out those calculations on parent drugs.  So the whole drug, and then added a safety factor to get to a level of human intake that's okay for the clinical trials. Calculated those, submitted them for a risk assessment.  Those have been accepted.

I've done similar ones for genotoxic impurities within other pharmaceutical products, carried out these analyses, submitted them to the regulatory bodies, and those have been accepted as well.

And that's my answer.

Q.    You used the term "RIVM"?  What does that stand for?

A.    I cannot say the exact term because it's a Dutch -- there's some Dutch words in there.  RIVM, it's the Dutch National Institute of Health, but those are the correct letters.

Q.    And that's the project you did with the Cobalt Consortium on Cancer?

A.    Yes.

Q.    Who funded that research?

Page 109

A.    It started with the Cobalt Consortium, so the companies who produced cobalt and had industrial exposure to cobalt.

Q.    So they were the manufacturers of cobalt that --

A.    As far as I --

Q.    -- that work?

(Clarification requested by the stenographer.)

BY MS. BOGDAN:

Q.    So it was the manufacturers of cobalt that funded that work?

A.    As far as I'm aware, and that was through the Cobalt Consortium.

Q.    And what was the purpose of that study?

A.    It was a hazard, not risk-based, assessment.  It was a hazard-based assessment to see the potency of cobalt as a carcinogen in these -- in the cancer bioassay, so it was a hazard-based potency assessment.

Q.    And was the assessment with regard to coming into contact with cobalt by

Confidential Information – Subject to Protective Order

Page 110

¹ breathing it, by ingesting it, by -- through
² the skin or something else?
³     A.    I cannot remember the route of
⁴ administration for the animal studies which I
⁵ assessed, but they were relevant at that
⁶ time.
⁷     Q.    Do you know what exposure or
⁸ the type of exposure that the Cobalt
⁹ Consortium on Cancer was concerned about?
¹⁰    A.    I do not know the -- I do not
¹¹ know that at the current time.  I did at the
¹² time, but now I do not know that.
¹³    Q.    Were they concerned about
¹⁴ cobalt coming from a medical device?
¹⁵    A.    My understanding -- it may be
¹⁶ incorrect -- was battery production in
¹⁷ industry.  The workers producing products
¹⁸ with cobalt, that was the concern.
¹⁹    Q.    And this type of risk
²⁰ assessment work that you did, was that
²¹ provided to the Cobalt Consortium on Cancer?
²²        MS. LOCKARD:  Objection, form,
²³    misstates the testimony.
²⁴        ///

Page 111

¹ BY MS. BOGDAN:
²     Q.    You did a risk assessment for
³ the Cobalt Consortium on Cancer, correct?
⁴     A.    It was a hazard-based
⁵ assessment, not a risk assessment.  They're
⁶ slightly different.
⁷     Q.    Right.  Okay, I'm sorry, I
⁸ misspoke.  I forgot you had made the
⁹ distinction.
¹⁰        So the hazard risk assessment
¹¹ that you did for the Cobalt Consortium on
¹² Cancer, was that submitted to any regulatory
¹³ authority?
¹⁴        MS. LOCKARD:  Objection, form,
¹⁵    misstates the testimony.
¹⁶    A.    As my understanding, created
¹⁷ the report.  That was submitted to the
¹⁸ regulators, the RIVM in that regard.  And I
¹⁹ worked with the RIVM.  They were -- had an
²⁰ active interest in my work.  It was quite
²¹ advanced.  And yes, they did submit to the
²² regulators.
²³ BY MS. BOGDAN:
²⁴    Q.    And when you say you worked

Page 112

¹ with the regulators, did the RIVM hire you as
² a consultant or did you interact with them as
³ a representative of the Cobalt Consortium on
⁴ Cancer?
⁵     A.    The RIVM did not recruit me as
⁶ a consultant, so I would have been on behalf
⁷ of the Cobalt Consortium.
⁸     Q.    Now, you also mentioned that
⁹ you had done risk assessments for
¹⁰ pharmaceuticals.  Am I remembering that
¹¹ correctly?
¹²    A.    Yes, correct.
¹³    Q.    Who hired you to do risk
¹⁴ assessments on behalf of -- or of
¹⁵ pharmaceuticals?
¹⁶    A.    I could not recall all of the
¹⁷ companies, numerous companies, where I did
¹⁸ these assessments on their substances,
¹⁹ including GSK, Dart, and I would have to
²⁰ recall to a list which resides in Swansea
²¹ Innovations to expand on that list.  But none
²² of those were nitrosamines.
²³    Q.    And so you would do these risk
²⁴ assessments at the request of the

Page 113

¹ pharmaceutical company and then provide the
² risk assessment back to the pharmaceutical
³ company, correct?
⁴     A.    Yes, that would be correct.  I
⁵ would prepare the risk assessment in a
⁶ similar way to this, submit that to the
⁷ pharmaceutical company, correct.
⁸     Q.    And it would be the
⁹ pharmaceutical company that would actually
¹⁰ present the risk assessment to the
¹¹ regulators, correct?
¹²        MS. LOCKARD:  Objection, form,
¹³    speculation.
¹⁴    A.    The regulatory submissions
¹⁵ would include my documents in their
¹⁶ submission.
¹⁷ BY MS. BOGDAN:
¹⁸    Q.    And you said they -- your work
¹⁹ did not involve nitrosamines, your previous
²⁰ work?
²¹    A.    What -- as far as I'm aware,
²² that is correct.  That work did not include
²³ nitrosamines.
²⁴    Q.    Did it involve contaminants in

Confidential Information - Subject to Protective Order

Page 114

1  pharmaceuticals?
2      A.    In some cases, they were
3  impurity assessments, correct.
4      Q.    And how do you define an
5  impurity?
6      A.    I would refer back to the
7  impurity guidance within the ICH, including
8  degradants, and there's a list within the ICH
9  of what an impurity is defined as.
10     Q.    As you sit here today, how
11  would you define an impurity?
12     A.    I would define impurity as a
13  substance that's within a pharmaceutical -- a
14  genotoxic impurity in pharmaceuticals as a
15  substance that could be a degradant or a
16  byproduct within the process of making the
17  finished article.
18     Q.    Now, when you say a substance,
19  that would be a chemical?
20     A.    That would be a chemical.
21  That's how I would define "substance" in that
22  statement.
23     Q.    And would it be a chemical that
24  was not intended to be in the drug product?

Page 115

1      A.    As an impurity, within this
2  area of producing chemicals, there's an
3  understanding that a hundred percent purity
4  is not achievable, and this is why the ICH
5  impurity regulation exists to instead talk
6  about presence or absence, we talk about
7  concentrations and levels of impurities that
8  are acknowledged to be present in such
9  substances and such drugs.
10     Q.    And would your risk assessments
11  address the appropriate, in your opinion,
12  levels that should be allowed in the drug
13  products?
14     A.    They have done.  They would be
15  calculations to ensure that a human exposed
16  to that level of that substance had no
17  increased risk of whatever endpoint that was,
18  so if it was mutation, mutation; if it was
19  chromosome loss, then chromosome damage; if
20  it's cancer, then cancer, in that regard.
21     Q.    And would your work be confined
22  to the area of genotoxic risk assessment?
23     A.    It would not.  That's my
24  initial area of expertise, and as I

Page 116

1  demonstrated with, for example, the work of
2  the Cobalt Consortium, I have that experience
3  with cancer bioassay data as well.  In some
4  of my publications, you'll see -- such as
5  when I work with the RIVM assessing cancer
6  bioassay data and benchmark dose confidence
7  intervals.  I have upcoming projects on that
8  with Health Canada as well.  Then those would
9  be covering cancers in addition to genetic
10  toxicology.
11     Q.    So you look at chemicals that
12  are carcinogens that are not necessarily
13  genotoxic?
14     A.    My particular area of expertise
15  is genotoxic carcinogens.  I do not work with
16  nongenotoxic carcinogens that act via
17  different mechanisms to induce the cancer.
18         My area of expertise would be
19  mutagenic carcinogens where it's well
20  characterized, and it could be through other
21  genetic damage processes leading to the
22  cancer.
23     Q.    What is your Ph.D. in?  What
24  field?

Page 117

1      A.    Ph.D., it was within the
2  department of biology, now medicine.  The
3  title of the Ph.D. is Mechanistic
4  Investigations of the Quantitative and
5  Qualitative Effects of Genotoxicants.  So I
6  developed other understanding throughout that
7  learning process, but my Ph.D. is in genetics
8  and in genetic toxicology, and as you see
9  from the title, in mechanisms underlying
10  those, which include DNA repair, and also the
11  quantitative aspects, including dose-response
12  modeling, and qualitative, yes or no, effects
13  of genotoxicants.  So an expanded version of
14  my Ph.D. title would include those different
15  aspects.
16     Q.    But that is different than risk
17  assessment, is it not?
18     A.    It is different to risk
19  assessment.  It's the initial step in risk
20  assessment is defining points of departure
21  that can then be used in risk assessment.
22         So I initiated this expertise
23  calculating those points of departure that
24  could then be used for risk assessment.  I

Confidential Information - Subject to Protective Order

Page 118

1  started my training on that data defining
2  those and then got to the stage of applying
3  that throughout my career.
4      Q.    So risk assessment was not part
5  of your bachelor's degree and your Ph.D.,
6  correct?
7          MS. LOCKARD:  Objection,
8      compound.
9  BY MS. BOGDAN:
10     Q.    Risk assessment training was
11 not part of your bachelor's degree studies,
12 correct?
13     A.    Aspects of risk assessment
14 training were included in my Ph.D.  My Ph.D.
15 was linked to the European Union PEPFAC
16 funding, which was to --
17     Q.    I --
18     A.    Pardon?
19         MS. LOCKARD:  Can he finish?
20 BY MS. BOGDAN:
21     Q.    I'm sorry, sir.  I had asked
22 about your bachelor degree studies, not your
23 Ph.D. studies.
24     A.    Oh, apologies.  I heard you say

Page 119

1  both.
2      Q.    So I'll read back my last
3  question.
4          Risk assessment training was
5  not part of your bachelor's degree studies,
6  correct?
7      A.    In my bachelor's degree, I
8  carried out two modules on genetic toxicology
9  and information around hazard and risk
10 assessment in that module as taught by
11 Professor Jim Parry at that time.
12         I did an undergraduate project
13 on genetic toxicology, which was linked to
14 risk assessment through the analysis of
15 bisphenol A.  You'll see my first publication
16 in 2002 was on bisphenol A, was on
17 mechanisms, was on dose response.  That
18 linked to a European Union risk assessment
19 project on aneugens, and also the European
20 Food Safety Authority -- the U.K. version of
21 that, the Food Standards Agency, were also
22 involved and party to that big paper.
23         So I would say through those
24 modules and through my dissertation, I was

Page 120

1  trained -- I was -- my training on risk
2  assessment was initiated.
3      Q.    Did the work that you
4  personally did involve mechanisms and
5  dose response?
6      A.    In this undergraduate project
7  on bisphenol A, mechanisms and dose response,
8  and then expanded application of that
9  information in the rest of the report.
10     Q.    Did you actually perform the
11 risk assessment yourself or was that -- you
12 said linked to a risk assessment project.
13 Was the risk assessment project performed by
14 others?
15     A.    That would be correct at that
16 time, and I was aware of those being -- those
17 taking place.
18     Q.    And your Ph.D. is in genetic
19 toxicology through the department of biology?
20     A.    I -- my Ph.D. was within
21 genetic toxicology, and within that, I
22 expanded on my undergraduate project again on
23 bisphenol A, and I think on -- on bisphenol A
24 and on alkylating agents and their mechanisms

Page 121

1  of action and their dose response.  And I was
2  learning and understood the application of
3  that to hazard and risk assessment, and that
4  was at the Ph.D. stage.
5      Q.    Did you actually do a hazard or
6  risk assessment as part of your Ph.D. thesis?
7      A.    That was not included as part
8  of the output within my Ph.D. thesis, but I
9  attended numerous conferences where this was
10 discussed and included, and also my
11 supervisor was carrying these out and linked
12 to groups such as the committee on
13 mutagenicity where these were being carried
14 out.
15         So not entirely within this,
16 but through my training it was started at
17 that time, my understanding and training
18 around hazard and risk assessment.
19     Q.    Do you consider yourself a
20 regulatory expert?
21     A.    I've been considered by others,
22 including regulators, as a regulatory expert,
23 so to quote them, I would state that I'm
24 considered as an expert in regulatory

Confidential Information - Subject to Protective Order

Page 122

1   practice.
2           With this particular focus on
3   what we're talking about today, with
4   dose response, when we're talking about PDE
5   with acceptable intakes, with margins of
6   exposure, yes, I am considered an expert in
7   those particular applications within risk
8   assessment.
9       Q.    And when you say you're
10  considered an expert by others, who are those
11  others?
12      A.    In verbal conversations -- and
13  we can come back to names when we get that
14  piece completed -- but the straightforward
15  one would be I was on the expert panel for
16  the European Medicines Agency on this topic,
17  and I was a stated expert on that group.
18      Q.    And when did this take place
19  and what group was this?  Did you say the
20  EMA?
21      A.    EMA, European Medicines Agency.
22  I have a date somewhere.
23      Q.    Are you looking at your CV to
24  try to --

Page 123

1       A.    I am looking at my CV to try to
2   find a date.  Okay.
3           On my CV at the bottom of the
4   Awards, Achievements, Positions of
5   Responsibility, invited expert to EMA 2020
6   nitrosamine expert consultation, with the
7   number afterwards, for the record,
8   EMA/80573/2020.
9           But to be invited to an expert
10  group by a regulatory body assumes that they
11  consider you as an expert.
12      Q.    And where are you referring to
13  on your CV, Doctor, just so that I make sure
14  I'm in the same place.
15      A.    Hopefully it's the first page.
16  Mine says page 1, and I think it is page 1.
17  There's my name, there's my address --
18      Q.    Oh, at the bottom of the --
19      A.    Awards, Achievements -- Awards,
20  Achievements and Positions of Responsibility.
21  It's the bottom bullet point in that section.
22      Q.    Okay.  Who else was invited as
23  an expert to that EMA 2020 nitrosamine
24  consultation?

Page 124

1       A.    The scientists that I remember
2   and I know of -- I'm sure those -- that
3   information is public for you to expand on my
4   answer -- would be Bernd Kaina, Professor
5   Bernd Kaina of Mainz University, who is the
6   global expert on MGMT and DNA repair.
7           There were other experts, I
8   can't remember their names.  There was an
9   epidemiology expert.  There was an expert
10  that had been involved in the cigarette smoke
11  instance, and there was -- I think there was
12  ten in total, and apologies for not
13  remembering the names.
14          Oh, apologies, one more.  Jan
15  van Benthem from the RIVM.  Jan van Benthem.
16      Q.    And when you said you
17  considered yourself a regulatory expert, is
18  that limited to points of departure,
19  benchmark dose, dose response within the
20  field of genetic toxicology?
21      A.    I'd expand that statement to
22  include based on cancer bioassay data as
23  well.
24      Q.    Do you consider yourself an

Page 125

1   expert in epidemiology?
2       A.    I do not consider myself an
3   expert in epidemiology.
4       Q.    Directing you to the Amended
5   List of Materials Considered -- now, have we
6   marked that as an exhibit or is that part of
7   the -- your report that's already been
8   marked?
9       A.    Can you clarify the question?
10      Q.    I'm not sitting there with you
11  in the room, so I can't see if the report --
12  your report that's been marked already as an
13  exhibit has Exhibit A attached to it and
14  Exhibit B, or if it's standing alone, so to
15  speak.
16          (Conference out of the hearing
17  of the stenographer.)
18          MS. LOCKARD:  They were served
19  together.  It was served as an exhibit
20  with the report, but Exhibit 2 is just
21  the report.
22          MS. BOGDAN:  Okay.
23          MS. LOCKARD:  So he's got the
24  amended list in his hand if we want to

Confidential Information -- Subject to Protective Order

Page 126

1    mark it as Exhibit 6.
2         MS. BOGDAN:  So could we pull
3    up, then, the amended Exhibit A and B
4    of his report, and then mark that
5    separately, if it was not included
6    with the report itself?
7         THE STENOGRAPHER:  Just to
8    clarify, A and B together will be
9    Exhibit 6?
10        TRIAL TECHNICIAN:  Exhibit A
11   and B are part of the report.
12   Exhibit A starts on page 70, Exhibit B
13   starts on page 79.
14        MS. BOGDAN:  That's perfect.  I
15   just --
16        TRIAL TECHNICIAN:  Which page
17   would you like to see, Exhibit A,
18   which is his CV?
19        MS. BOGDAN:  No, I would like
20   to go to, I guess what you said was
21   page 79, which would be the start of
22   the Amended List of Materials
23   Considered.
24        TRIAL TECHNICIAN:  Okay.

Page 127

1         MS. LOCKARD:  I -- the version
2    we have here doesn't have page numbers
3    on it for the record, but he does have
4    the amended list in front of him.
5         MS. BOGDAN:  I think it's just
6    the page number of the PDF.  It
7    doesn't have a -- and we can refer to
8    it at this point with the page number
9    that's right on the bottom of the List
10   of the Materials Considered.
11   BY MS. BOGDAN:
12        Q.    So do you recognize this
13   document, sir?
14        A.    I recognize the document that's
15   being presented on Zoom, correct.
16        Q.    Now, this document is 25 pages
17   long, I believe?
18        A.    I believe that too.
19        Q.    And how many documents are
20   listed on the Amended List of Materials
21   Considered?  Do you know?
22        A.    I have not counted them in this
23   format, no.
24        Q.    Would you agree with me that

Page 128

1    there's hundreds?
2         A.    I prefer not to make guesses,
3    but it looks like a large number, towards
4    that amount.
5         Q.    Now, are these materials that
6    are listed here materials that you were
7    provided by counsel?
8         A.    So on page 1 would be the
9    materials passed on by GT.  If that's another
10   name for counsel, then that would be that.
11        Q.    So the MDL -- let me just -- so
12   the record is clear, I'm sorry, I didn't mean
13   to speak over you.  There's just a little
14   delay.
15        The -- so under Materials
16   Considered, the MDL pleadings and general
17   documents were materials you got from
18   counsel, correct?
19        A.    Correct.
20        Q.    The expert reports --
21        A.    Yeah, again, from --
22        Q.    -- would be materials you got
23   from counsel?
24        A.    I would agree with that.  Thank

Page 129

1    you for highlighting them.
2         Q.    The next section, which is
3    entitled Deposition Transcripts With
4    Exhibits, are those materials that you
5    received from counsel?
6         A.    Yes.  As far as I'm aware, yes,
7    definitely.
8         Q.    And they continue on to page 2
9    as well.  Again, materials from counsel?
10        A.    These were provided by counsel.
11        Q.    Okay.  Now we get to a section
12   called Regulatory Guidances and Documents.
13        Do you see that?
14        A.    I do see that.
15        Q.    Were these provided by counsel?
16        A.    Many of these were -- these --
17   so a lot of this is from my own research and
18   from preparing for presentations and
19   preparing my report.  I would have got a lot
20   of these independently.
21        I think where we see in the
22   second column like a Teva mark on it, you may
23   interpret this as being passed on by counsel,
24   but the ICH M7 guidance is obviously

Page 130

1 something that I would have looked at and
2 that I have to reference as well.
3        So these documents are ones
4 that I researched and digested, considered
5 and went into my report, independently of
6 counsel, as far as I'm aware.
7    Q.   Okay.  If we could go to
8 page 3, please.  And there's a document that
9 is about two-thirds of the way down the page,
10 it starts with 2019 ICH Q3D(R1).
11        Do you see that?
12    A.   I do see that.
13    Q.   That was added in the Amended
14 List of Materials Considered.  Why was that
15 added?
16    A.   To ensure that there was a
17 latest revision of the ICH Q3D guidance which
18 relates to this, because there's an expanded
19 version of the PDE calculation within that.
20    Q.   And that was not previously
21 listed on your materials considered, correct?
22    A.   Correct.  That was a typo.
23    Q.   Even though the date of your
24 report was August of 2020, correct?

Page 131

1    A.   The date of my report was
2 August 2020.
3    Q.   So at the time that your report
4 was issued, that 2019 guidance was in
5 existence, correct?
6    A.   Yeah, that's correct.
7    Q.   Now let's go to the next
8 section on page 5, which is Literature and
9 Standards.
10    A.   I can see on your screen and I
11 have this in front of me.
12    Q.   Okay.  Where did those
13 materials considered originate from?  Were
14 they provided by counsel or through your
15 research?
16    A.   These would be through my
17 research and included in developing my
18 understanding of this topic from contribution
19 to this work and to just developing my
20 understanding of the topic, so from myself.
21    Q.   If we could go to the next
22 page, please.  I see a lot of references in
23 this materials considered list to TEVA-MDL.
24        Do you see that over on the

Page 132

1 right-hand column?
2    A.   I see that, yes.
3    Q.   Who were you originally hired
4 by as an expert in this case?
5    A.   By GT.
6    Q.   On behalf of what defendant?
7    A.   On behalf of Teva, as far as
8 I'm aware.
9    Q.   Are you serving as an expert on
10 behalf of defendants other than Teva?
11    A.   Yes, I am.
12    Q.   When did that change?
13    A.   That changed at the beginning
14 of this year, when my role changed from a
15 consultant, where I was developing an
16 understanding of this topic, to the
17 preparation of my report.  At that time I was
18 made aware by counsel that I was working for
19 a wider group of affected companies.
20    Q.   Did they tell you who those
21 companies were?
22    A.   They did, yes.
23    Q.   And who are those companies?
24    A.   Well, my pronunciation and

Page 133

1 recollection may not be precise, include
2 Mylan, ZHP, Prinston and one beginning with A
3 with "bindo" at the end, I think.  There may
4 be more.  That's my recollection.  So more
5 than Teva.
6    Q.   Aurobindo?
7    A.   Yeah, that sounds correct.
8    Q.   How about Hetero?
9    A.   Hetero, yes, I think I'm
10 representing them as well.  Yes, they're
11 included.
12    Q.   As we go on in this materials
13 considered list, especially once we get to
14 page 19, which has Company Documents
15 Produced --
16    A.   I'm going to look at your
17 screen for this bit.
18    Q.   -- all of those documents
19 appear to be Teva documents; is that correct?
20 Teva/Mylan?
21    A.   That's what it states here.
22    Q.   Did you read all these
23 documents?
24    A.   I had access to and considered

Confidential Information - Subject to Protective Order

Page 134

1  these documents.
2      Q.    And when you say I had access
3  to and considered them, what does that mean
4  as far as your activity with regard to these
5  documents?
6      A.    If the document was relevant to
7  my risk assessment, then I read it.  If not,
8  I would be aware of it and had access to it.
9      Q.    So that means you opened each
10  and every one of these documents that are
11  listed under Company Documents Produced to
12  make that determination?
13      A.    If the title was in the name
14  and it didn't look relevant, then maybe not.
15  But yes, I would have opened all the ones
16  that were relevant and considered whether to
17  bring in information from other ones as well.
18      Q.    And if we go on to page 20, all
19  the documents on that page are also Teva
20  documents, correct, as far as how they're
21  identified?
22      A.    As far as how they're
23  identified, they are Teva documents on this
24  page.

Page 135

1      Q.    And moving to page 21, they're
2  all identified as Teva documents, correct?
3      A.    According to this page, they
4  are identified on the right column as Teva
5  documents, and then you can see from some of
6  the statements, HHA for valsartan produced --
7  products provided by Mylan, et cetera.  So
8  the other companies do appear here as well.
9      Q.    Do you have any understanding
10  of any relationship between Teva and Mylan?
11      A.    I am aware that some of the
12  companies made the API and then the generic
13  companies included those APIs in the
14  products; and the exact relationship, I will
15  not comment on now.
16      Q.    If we look at page 22, they're
17  also all Teva documents, identified as such?
18      A.    Yeah, according to the right
19  column there, they're stated as Teva
20  documents.
21      Q.    And then on page 23, we have
22  some Teva documents, and then there are a few
23  documents with Auro or APL, which the
24  description indicates are Aurobindo

Page 136

1  documents, correct?
2      A.    I can see that that's correct
3  from what you've just said on this document.
4      Q.    And then moving on to page 24,
5  again, we have some Aurobindo documents, some
6  Mylan documents and some Teva documents, with
7  one document towards the very, very bottom,
8  second up from the bottom, that says ZHP
9  Response to DMF Information Request Letter,
10  Prinston.
11          Do you see that?
12      A.    I do see that.
13      Q.    Did you ask for more company
14  documents to be produced from ZHP at the time
15  that you were asked to serve as an expert for
16  all defendants?
17      A.    I cannot recall requesting that
18  information.
19      Q.    Is this materials considered
20  list comprehensive of all of the materials
21  that you considered in forming your opinions
22  in this matter?
23      A.    It is.  From my understanding,
24  this is very comprehensive.

Page 137

1      Q.    So if a document is not on this
2  list, you did not consider it?
3      A.    I've been working on this topic
4  for my whole career and read many documents
5  that formed my expertise in this area, and
6  those would lead to my ability to make these
7  risk assessment judgments.
8          So in that regard, this is
9  comprehensive of my decision, and I would
10  support that these were comprehensive and
11  linked to my report entirely, but I wanted to
12  make that statement as well, that I've always
13  worked on this topic and I've read many
14  documents in this area as well.
15      Q.    With regard to internal company
16  documents that would have been produced by
17  the defendants in the litigation, if the
18  document is not on this list of materials
19  considered, is it fair to assume that you did
20  not consider it?
21      A.    From my understanding, that
22  would be correct.
23      Q.    Do you know of the journal
24  Environmental and Molecular Mutagenesis?

Confidential Information - Subject to Protective Order

---

Page 138

1    A.    I do know of that journal, yes.

2    Q.    And how do you know of that

3    journal?

4    A.    I know of that journal, it's a

5    very good journal in this area of genetic

6    toxicology.  It's linked to the American

7    Environmental and Genomic Society.  It's very

8    highly linked at the current time to

9    Health Canada, which have been senior editors

10    on it previous to -- they still contain many

11    Health Canada experts, and within my area of

12    genetic toxicology, it's a preferred journal

13    for many experts, including the regulatory

14    experts, where we see it as a top journal in

15    genetic toxicology.

16    Q.    Who is the editor-in-chief of

17    Environmental and Molecular Mutagenesis?

18    A.    I think it's -- at the current

19    time it's Bhaskar Gollapudi.  And I think

20    previous to that was -- apologies.  Bhaskar

21    Gollapudi at the current time, and for our

22    paper which we published this year, the

23    editor was Carol York -- Carol Yauk, Y-A-U-K,

24    who handled the publication because Bhaskar

---

Page 139

1    was a coauthor on the publication.  So she

2    was editor for this latest EMM publication on

3    PDE.  Apologies for the long answer.

4    Q.    So Bhaskar Gollapudi is the

5    editor-in-chief of Environmental and

6    Molecular Mutagenesis even currently,

7    correct?

8    A.    I think that is correct, but

9    the leadership changes frequently, so I think

10    it's correct to the best of my knowledge.

11    Q.    But for the purposes of the

12    publication entitled Permitted Daily Exposure

13    Limits For Noteworthy N-nitrosamines,

14    Carol -- did you say Yauk?

15    A.    I think that's a suitable way

16    of pronouncing it.

17    Q.    -- served that role of editor

18    because he was a named author in the article,

19    correct?

20    A.    Correct, yes.  And I think

21    that's standard practice in publishing as

22    well.

23    Q.    When were you first retained as

24    a consultant to do work on this matter?

---

Page 140

1    A.    I think we opened discussions

2    with GT and Teva at the beginning of 2019,

3    and that relates to my first invoice in 2019.

4    Q.    Do you have a copy of that

5    first invoice that you had in 2019 with you?

6    A.    It is currently not in front of

7    me.

8    MS. BOGDAN:  Does counsel have

9    a copy of that?  The first invoice

10    that we have in the production is in

11    2020.

12    MS. LOCKARD:  I have hard

13    copies.  Are you using one as an

14    exhibit?

15    MS. BOGDAN:  I would like to

16    use all of the invoices as exhibits,

17    and I don't believe the 2019 invoice

18    was in the production.

19    THE WITNESS:  I'm --

20    MS. LOCKARD:  Hold on, there's

21    no question.

22    The invoices were all in the

23    production.

24    MS. BOGDAN:  We have pulled

---

Page 141

1    them out, and the first one starts in

2    2020.

3    MS. LOCKARD:  Yeah, he -- he

4    may have misspoke.  You can ask him

5    about it, but we have all the

6    invoices.

7    BY MS. BOGDAN:

8    Q.    Dr. Johnson, did you do work in

9    2019 on this project for Teva?

10    A.    I became -- we signed the

11    documents in 2019, and I misspoke.  It was

12    2020 for the invoice, I think.  But you see

13    from my recollection of the dates, we need to

14    go by the invoice.

15    Q.    Did you do work for a period of

16    time before you billed?

17    A.    I have it in front of me.  The

18    date I misspoke on.  I said 2019.  The date

19    is actually the 11th of the 9th, 2020, the

20    sum of 30,000 --

21    MS. LOCKARD:  No.  Just listen

22    to the question.  Just hold on.

23    You're racing through.

24    THE WITNESS:  Apologies.

---

Confidential Information — Subject to Protective Order

Page 142

1    MS. BOGDAN:  Why don't we pull
2    up the exhibit that's entitled
3    Invoices, and we can mark these.
4        (Whereupon, Deposition Exhibit
5    Johnson-6, Invoices, JOHNSON000037 -
6    JOHNSON000044, was marked for
7    identification.)
8        THE STENOGRAPHER:  That's
9    Exhibit 6.
10       MS. LOCKARD:  Okay.  And is
11   this a collection of all four?
12       MS. BOGDAN:  I believe so, that
13   they were put into one exhibit.
14       Is that an eight-page exhibit,
15   because there's fronts and backs, of
16   all four invoices?  I could ask our
17   tech.
18       TRIAL TECHNICIAN:  Eight pages
19   total in this file.
20       MS. BOGDAN:  Right, okay.  So
21   there's fronts and backs of each,
22   so...
23       TRIAL TECHNICIAN:  Looks like a
24   total of four invoices, yes.

Page 143

1        MS. BOGDAN:  Okay.  So yes,
2    they're all together.  So this is
3    Exhibit 6.
4    BY MS. BOGDAN:
5        Q.    Doctor, I'd ask you if you can
6    please take a look at the first page of
7    Exhibit 6, and tell me if you recognize that
8    document.
9        A.    I do recognize that document.
10       Q.    And what do you recognize that
11   document to be?
12       A.    I recognize this document to be
13   my first invoice to GT on this topic.
14       Q.    Did you have any invoices that
15   you submitted to Teva for your work on this
16   project?
17       A.    No, not that I'm aware of, no.
18       Q.    Okay.  And does this first
19   invoice encompass all your work up until the
20   date of the invoice?
21       A.    That is -- that would be
22   correct.
23       Q.    And that would be 91 hours of
24   time?

Page 144

1        A.    That's -- that sounds correct,
2    at my rate.  Yes, that sounds correct.
3        Q.    When did you begin your work?
4    That 91 hours of work, when did it start?
5        A.    I cannot give an exact date
6    because I do not know that answer.
7        Q.    Can you give an approximate
8    number of months you've been working on this
9    project before submitting your invoice in
10   November of 2020?
11       MS. LOCKARD:  Objection, form.
12   A.    I could not --
13       MS. LOCKARD:  Vague.
14   A.    I would not want to approximate
15   that, but I can confirm I did count -- I did
16   carry out this amount of hours.
17   BY MS. BOGDAN:
18       Q.    Did you keep a record of the
19   number of hours you worked by day to then
20   come up with the 91-hour total that's
21   reflected in the invoice that's been marked
22   as Exhibit 6?
23       A.    At the time I would have done,
24   and I don't need that document anymore, and

Page 145

1    don't have that, that time.  I've got that
2    for the current time and the time I have yet
3    to invoice for.
4        Q.    Did you do work on this project
5    in the year 2019?
6        MS. LOCKARD:  Objection, form,
7    vague as to "project."
8        A.    I do not know the answer to
9    that.
10   BY MS. BOGDAN:
11       Q.    Who first contacted you about
12   serving as a consultant for Teva?
13       A.    Raphael Nudelman, and we linked
14   with GT.
15       Q.    Do you have any record as to
16   when Raphael Nudelman contacted you?
17       A.    I do not have that record
18   personally.
19       Q.    How did he contact you?
20       A.    I would predict by e-mail.
21       Q.    Did you save that e-mail?
22       A.    I do not know.
23       Q.    What did Ralph say in that
24   e-mail?

Page 146

1    A.    I do not know.  The assumption
2  would be to initiate consultancy with GT.
3         MS. LOCKARD:  Don't speculate,
4     please.  If you remember, you can
5     answer, but you don't have to assume
6     or speculate.
7         THE WITNESS:  Okay.
8  BY MS. BOGDAN:
9    Q.    Generally, what did Ralph
10 communicate to you in that e-mail?  Not the
11 exact words he used, but generally, what was
12 the e-mail about?
13   A.    I think it was to explain my
14 work to Teva.
15   Q.    And when you say explain my
16 work, what do you mean by that?
17   A.    My presentations on this topic
18 at that time, explain that work to Teva,
19 yeah.
20   Q.    Meaning explain the type of
21 work you do?
22   A.    Explain the slide set
23 presentation that I had delivered to
24 Impurities conferences to Teva.

Page 147

1    Q.    Is that like the Impurities
2  conference that took place in June of 2018?
3    A.    Exactly that.
4    Q.    Did you present that
5  information at more seminars than the June of
6  2018 one that took place in Germany?
7    A.    I did present the evolving
8  level of work at other Impurities
9  conferences.
10   Q.    And when did those take place?
11   A.    I do not know exact dates.
12 Frequently over the last couple of years.
13   Q.    Do you know where they took
14 place?
15   A.    Before the travel ban, in
16 Berlin; Mainz, Germany.  And then travel
17 ban -- post travel ban, via online
18 conferences.
19   Q.    So there are two in-person that
20 you remember?
21   A.    In Berlin and Mainz, Germany
22 that I remember.
23   Q.    And how many online conferences
24 have you done?

Page 148

1    A.    I have done -- I do not know
2  the number and will not approximate.
3    Q.    Has there been more than one?
4    A.    There has been more than one.
5    Q.    Has there been more than 10?
6    A.    I do not know.
7    Q.    And these invoices are in
8  pounds?
9    A.    These invoices are in Great
10 British pounds.
11   Q.    And who generates these
12 invoices?
13   A.    Swansea Innovations generates
14 these invoices.
15   Q.    Is Swansea Innovations separate
16 from Swansea University?
17   A.    There's a good statement in
18 here to answer this question.  Swansea
19 Innovations is a wholly owned subsidiary of
20 Swansea University.
21   Q.    And you're referring to right
22 on the invoice itself where you're reading
23 that?
24   A.    Correct.  On your screen too.

Page 149

1    Q.    Are you an employee of Swansea
2  Innovations?
3    A.    I'm an employee of Swansea
4  University and carry out consultancy through
5  Swansea Innovations.
6    Q.    And when employees of Swansea
7  University do consultant-type work, is that
8  done through this wholly owned subsidiary?
9    A.    Yes, it is.
10   Q.    And as such, Swansea
11 Innovations bills for your time?
12   A.    That would be correct.
13   Q.    And then how are you
14 compensated for your work doing consultant
15 services like you've done in this case for
16 Teva?
17   A.    Swansea Innovations takes 20%
18 of this value.  My college, Swansea
19 University Medical School, takes 5% of this
20 value.  The remaining funds go into that
21 month's paycheck through PAYE to account for
22 tax, et cetera.
23   Q.    And what does Swansea
24 Innovations use with the percentage that it

Confidential Information – Subject to Protective Order

Page 150

1  retains?
2      A.    I do not know.  I should not
3  assume.
4      Q.    Does all your consultant-type
5  work go through Swansea Innovations?
6      A.    Yes.
7      Q.    What percentage of your income
8  per year is derived from doing consultant
9  work?
10     A.    I have not made that
11  calculation.
12     Q.    Can you provide an estimate?
13     A.    My wage is 60,000.
14         (Clarification requested by the
15     stenographer.)
16         MS. LOCKARD:  Yeah, I just want
17     to object if we're asking him about
18     his salary, but I --
19         MS. BOGDAN:  Yeah, I didn't ask
20     him about his salary.  I was asking
21     about the percentage of his income
22     that he derives from doing consulting
23     work.
24         MS. LOCKARD:  Yeah, if you can

Page 151

1      do the math in your head --
2          THE WITNESS:  Apologies.
3          MS. LOCKARD:  It's fine.  But a
4      percentage, not amounts.
5      A.    It is -- I have my wage, which
6  is a value.  My consultancy is half of that
7  value on top of that value.
8  BY MS. BOGDAN:
9      Q.    So an additional 50%?
10     A.    That's a better statement --
11  (audio malfunction) --
12         (Clarification requested by the
13     stenographer.)
14     A.    That's a better statement.
15  That's an additional 50%, is the average for
16  my consultancy work.
17  BY MS. BOGDAN:
18     Q.    If we could go to the next
19  invoice that's dated April 20th, 2021, and
20  that's for an additional 35 hours of work?
21     A.    Okay.  Yeah, I agree, 35 hours
22  of work additional.  Yes, agree.
23     Q.    Okay.  And then the next -- I
24  think we have the wrong exhibit up.  Okay.

Page 152

1          Then the next invoice in that
2  same exhibit, which is dated -- is it dated
3  July 5th, 2021 or May 7th, 2021?
4      A.    This is the English format, and
5  it's July 5th.
6      Q.    Thought so.  Okay.
7          And that's for an additional
8  35 hours of work?
9      A.    Yeah, I agree with this, yes.
10     Q.    Okay.  And then the last
11  invoice is July 28, 2021, and that's for an
12  additional 70 hours of work, correct?
13     A.    Yeah, I agree that's correct.
14     Q.    Did you keep any type of record
15  of what actual work you did, meaning
16  something that's itemized as to what you
17  spent your hours doing?
18     A.    No, I did not.
19     Q.    So other than these invoices,
20  there's no written record of how you spent
21  that time?
22     A.    Correct, no written record of
23  how I spent the time.
24     Q.    Do these invoices include all

Page 153

1  the time that you spent up until the time
2  that you generated your written report?
3      A.    Yes, they include that time
4  within these invoices.
5      Q.    If we could please pull up an
6  e-mail, which is Teva document 443142.
7          (Whereupon, Deposition Exhibit
8      Johnson-7, E-mail(s) re: Limit of NDEA
9      in Sartans, TEVA-MDL2875-00443142, was
10     marked for identification.)
11         THE STENOGRAPHER:  This will be
12     Exhibit 7.
13         MS. BOGDAN:  Mark it Exhibit 7.
14  BY MS. BOGDAN:
15     Q.    Doctor, Exhibit 7 should now be
16  hopefully up on your screen.  Can you see
17  that?
18     A.    I can see it in very small
19  text.  Is this available in the other format?
20  Excellent.
21         MS. LOCKARD:  I'm sorry for the
22     interruption, but I can't get anything
23     past Exhibit 5 on my document box.  Is
24     it just me?

Page 154

1        (Technical comments off the
2   stenographic record.)
3        MS. BOGDAN:  Did that work?
4        MS. LOCKARD:  I have it now.
5   Do you have it, Dr. Johnson?
6        THE WITNESS:  I have that now,
7   thank you.
8   BY MS. BOGDAN:
9        Q.    This is an e-mail from Ralph
10  Nudelman dated November 14th, 2018, to an
11  individual by the name of Claire Lyons.
12        Do you know Claire Lyons?
13        A.    It does not ring a bell.  I do
14  not think I know Claire Lyons.
15        Q.    And Corey Sawyer is copied on
16  it.  Do you know Corey Sawyer?
17        A.    As far as I understand, I do
18  not know Corey Sawyer.
19        Q.    And in this e-mail, if I could
20  direct your attention to the first paragraph,
21  which reads:  Claire, from so many e-mails on
22  this topic, I lost track of what we had
23  previously discussed, and I would like to go
24  back to an e-mail I wrote on September 20th,

Page 155

1   copy attached, where I calculated a limit for
2   NDEA based on BMDL10 and not on linear
3   extrapolation from the TD50.
4        Then, open parens:  There were
5   several follow-up e-mails to that one with
6   further clarifications, close parentheses,
7   period.
8        Do you see that sentence?
9        A.    I do see that sentence.
10        Q.    Did you provide to Ralph
11  Nudelman a calculation limit for NDEA based
12  upon BMDL10 --
13        A.    Not that -- I'll let you --
14        Q.    -- prior to November 14th,
15  2018?
16        A.    This was linked to my
17  presentation at the former meeting where I
18  presented a BMDL10 analysis on these
19  compounds, and this will relate to that
20  presentation and slide set.  Nothing more.
21        Q.    Did Raphael Nudelman attend
22  your presentation?
23        A.    Yes, I think that he did.
24        Q.    And as part of your

Page 156

1   presentation, you presented on that exact
2   issue?
3        A.    I'm confident that I did.
4        Q.    And you presented on a
5   benchmark dose limit as opposed to linear
6   extrapolation from a TD50?
7        A.    I'm confident that I did, yes.
8        Q.    And did you provide any type of
9   written materials to the attendees of that
10  seminar?
11        A.    Not that I recall.
12        Q.    Was it presented by way of a
13  PowerPoint?
14        A.    It was presented by way of a
15  PowerPoint.
16        Q.    Were the attendees given copies
17  of the PowerPoints that were used by the
18  presenters?
19        A.    I do not know.
20        Q.    As a speaker, did you have to
21  provide a copy of your PowerPoint to the
22  seminar organizers?
23        A.    I do not know.  Conferences act
24  in that regard in different ways.

Page 157

1        Q.    Do you still have that
2   particular slide where you presented a BMDL10
3   limit for NDEA?
4        A.    I have multiple slides with
5   that statement in addition to my publication
6   on that topic.
7        Q.    And has the calculation
8   basically been the same since 2018 for the
9   BMDL10 for NDEA?
10        A.    The full publication, I would
11  reanalyze the full data to ensure the precision,
12  so because there's prepublished data, there
13  is room for that number to change.
14        Q.    Do you know what that number
15  was in 2018 when you presented at the seminar
16  that Raphael Nudelman went to?
17        A.    No, I do not.
18        Q.    Would you be able to search
19  your records to see if you still had a copy
20  of that PowerPoint that was presented in
21  2018?
22        A.    My way of working is I get the
23  slide date and update it for the next
24  conference, so I wouldn't be confident in

Confidential Information - Subject to Protective Order

Page 158

1 finding that.
2     Q.    You mentioned earlier in your
3 testimony the name of the company that
4 organized this conference.  What was the name
5 of that company?
6     A.    Informa is what I think the
7 company is called, I-N-F-O-R-M-A, I think.
8     Q.    And do you know where they're
9 headquartered?
10     A.    I do not.
11     Q.    Are they in Europe or do you
12 just not have any idea?
13     A.    I do not know.
14     Q.    How were you contacted to
15 present at that seminar?
16     A.    I do not know.
17     Q.    Did someone recommend you to be
18 a speaker at that seminar?
19     A.    I do not know.
20     Q.    Were you told what topic they
21 wanted you to speak about at that seminar?
22     A.    I do not know.
23     Q.    Do you know how they got your
24 name as a potential speaker?

Page 159

1     A.    No, I do not know.
2     Q.    Had you ever spoken at an
3 Informa seminar before?
4     A.    I had not.
5     Q.    Had you ever attended an
6 Informa seminar before?
7     A.    I had not.
8     Q.    Did Informa pay for your travel
9 to the seminar and your hotel?
10     A.    Yes, I think so.
11     Q.    Was this the first time that
12 you spoke publicly regarding nitrosamine
13 impurities in pharmaceuticals?
14     A.    Yes, I do think so.
15     Q.    Did Informa provide you any
16 information upon which to base your
17 presentation on?
18     A.    No, I do not think so.
19     Q.    Now, referring you to the next
20 sentence in the e-mail, which reads:  The
21 rationale to use BMDL10 instead of TD50 is
22 [as read] I very nicely explained in the
23 Valsartan Art 31 uAR 19.9.18, open parens, to
24 MAHs, close parens, document, copy attached.

Page 160

1     Are you aware of the existence
2 of that document?
3     A.    That does not ring a bell.  I
4 do not know that title for that document.
5     Q.    Then the next sentence reads:
6 I believe this was written by George Johnson
7 of Swansea University, who is the super
8 expert of this field, and thus, I had
9 recommended him as an external expert.
10     Do you see that?
11     A.    I do see that.
12     Q.    Do you know of a document that
13 explained the rationale to use BMDL10 instead
14 of TD50 that was written by you that would
15 have been in existence as of November 14th,
16 2018?
17     A.    I do not know beyond the
18 PowerPoint presentation from that Informa
19 meeting.
20     Q.    Now, that meeting was in June
21 of 2018, correct?  And this e-mail is dated
22 November of 2018.
23     Did you have any contact with
24 Ralph Nudelman between the June of 2018

Page 161

1 conference and the date of this e-mail?
2     A.    I don't think so.
3     Q.    As of the date of this e-mail,
4 had you been contacted by Teva or GT to serve
5 as an external expert for Teva?
6     A.    I can't recall.
7     Q.    Do you see the next paragraph
8 in this e-mail that begins with "The BMDL10"?
9     A.    I see that.
10     Q.    Would you please read that
11 paragraph?
12     A.    The BMDL10 represents an
13 estimate of the lowest dose which is 95%
14 certain to cause no more than 10 -- than a
15 10% cancer incidence in rodents, as the point
16 of departure for the calculation of excess
17 cancer risk.
18     Q.    Is that a sentence that was
19 written by you?  Do you recognize that
20 sentence?
21     A.    That's a sentence that could
22 relate to many documents on the BMDL
23 calculation.
24     Q.    Do you agree with that

Confidential Information — Subject to Protective Order

Page 162

sentence?

A.    I do agree with that sentence.

Q.    Does it look familiar to you?

A.    Looks familiar in the fact that it's in most publications on this topic, a very similar statement to that.

Q.    Have you written a statement similar to that?

A.    Within my publications you will see statements very similar to that.

Q.    And then with regard to the second sentence, which reads: The BMDL10 is considered to represent a more realistic point of departure for risk estimations in low-exposure scenarios more realistic point of departure for risk estimations in low-exposure scenarios than the TD50 value.

Does that sentence look familiar to you?

A.    With the same regard, that looks similar to any publication along these lines.

Q.    Could those two sentences have come off your PowerPoints from the 2018

Page 163

seminar that you did in Berlin?

MS. LOCKARD:  Objection, form, speculation.

A.    I do not know, and I don't want to speculate.

MS. BOGDAN:  If we could please pull up the next exhibit, which is Teva document that ends in 492386.

(Whereupon, Deposition Exhibit Johnson-8, E-mail(s) re: Snodin & Elder Commentary, TEVA-MDL2875-00492386, was marked for identification.)

THE STENOGRAPHER:  That's Exhibit 8.

BY MS. BOGDAN:

Q.    And please let me know once you're able to visualize that.

A.    I'm able to visualize that on Golkow.

Q.    Okay.  And that's an e-mail from Ralph Nudelman to you, correct?

A.    That's correct.

Q.    And what is the date of that

Page 164

e-mail?

A.    This is American format, but I think it's the 26th of the 3rd, 2019.

Q.    So it would be March 26th, 2019?

A.    Looks that way.

Q.    Do you remember getting an e-mail from Ralph Nudelman in March of 2019?

A.    I don't remember specifically, but many experts send me on publications that they deem relevant.

Q.    At the time that you got this e-mail from Ralph Nudelman, were you doing consulting work for Teva with regard to the nitrosamine contamination of valsartan products?

A.    I cannot recall.

Q.    Well, did you have any e-mail exchanges typically with Ralph Nudelman before you were hired as an external consultant for the company?

A.    Not that I can recall.

Q.    So your e-mail communications with him began after you were hired to work

Page 165

as an external consultant for Teva, correct?

MS. LOCKARD:  Objection, form.

A.    I have e-mails from many experts, and they send me information, but I would not have had information around details of this, of the consultancy, prior to starting up the official consultancy.

BY MS. BOGDAN:

Q.    So it's your testimony that this e-mail would have been after you had been approached and agreed to serve as a consultant for Teva?

MS. LOCKARD:  Objection, form, misstates the testimony.

A.    I don't know.  It could have come after.  It could have come before.  I do not know.

BY MS. BOGDAN:

Q.    Did you have Ralph Nudelman's e-mail address before you were hired as a consultant for Teva?

A.    I don't think so.  I'd never worked with him previously.

Q.    Was there any type of agreement

Page 166

1 between yourself and Teva regarding working
2 as an expert for them?
3        MS. LOCKARD:  Object to form,
4    vague.
5        A.    I do not know that information.
6 BY MS. BOGDAN:
7    Q.    Was there any type of a
8 retainer agreement or writing between you or
9 Swansea Innovations and Teva that set forth
10 the nature of the type of work you were going
11 to do and how much you were going to charge
12 to do it?
13        MS. LOCKARD:  Objection, form,
14    ambiguous.
15        A.    I don't think so.
16 BY MS. BOGDAN:
17    Q.    How would we determine the date
18 on which you started to do consulting work
19 for Teva?
20        MS. LOCKARD:  Objection, form,
21    ambiguous.
22        A.    I do not know the start date.
23 BY MS. BOGDAN:
24    Q.    Do you have any record, whether

Page 167

1 it be on a calendar or otherwise, that would
2 indicate when you started doing consulting
3 work for Teva?
4        A.    I do not have that information,
5    no.
6    Q.    Would Swansa -- or Swansea,
7 excuse me, Innovations, have any such written
8 record as to when you began doing consulting
9 work for Teva?
10        MS. LOCKARD:  Objection, form,
11    ambiguous.
12        A.    I do not know.
13 BY MS. BOGDAN:
14    Q.    Do you notify Swansea
15 Innovations if you have been approached and
16 have agreed to do consulting work?
17        A.    I do, and they generate these
18 invoices.
19    Q.    Well, that's after you've done
20 the work, correct?
21        A.    Yes.
22    Q.    What about initially when
23 you're agreed to do the work, do you do any
24 type of notification to Swansea Innovations

Page 168

1 to let that subsidiary of the university know
2 that you are going to be doing consulting
3 work for a particular company?
4        A.    Yes, and they will -- yes.
5    Q.    How do you go about notifying
6 them?
7        A.    I will e-mail Swansea
8 Innovations with that information.
9    Q.    Do you have a copy of the
10 e-mail that you sent to Swansea Innovations
11 with the information that you had been
12 approached by Teva to do consulting work?
13        MS. LOCKARD:  Objection, form,
14    ambiguous.
15        A.    I do not have that e-mail.
16 BY MS. BOGDAN:
17    Q.    Would Swansea keep a copy of
18 that e-mail?
19        A.    I do not know.
20    Q.    What is the purpose of sending
21 Swansea Innovations that e-mail?
22        A.    To initiate the consultancy
23 documentation.
24    Q.    And what is the consultancy

Page 169

1 documentation particularly?
2        A.    Conflict of interest --
3 nondisclosure agreements, often, are those
4 forms.  Mostly those -- mostly nondisclosure
5 agreements, if they're required by the
6 company.
7    Q.    Was there a nondisclosure
8 agreement required by Mylan -- by Teva?
9        A.    Not that I'm aware of at this
10 time for this first invoice.
11    Q.    Now, this first invoice is for
12 91 hours of time.  How many hours a week did
13 you work on this project approximately, back
14 in the fall of 2020?
15        A.    I do not know.  It wasn't a
16 strict number of hours per week.
17    Q.    The 91 hours of work that's
18 billed for on the November 9th, 2020 e-mail,
19 what months of 2020 was that work done in?
20        A.    I do not know.
21    Q.    Was some of it done in October
22 of 2020?
23        A.    That would be an assumption,
24 but could be correct.

Confidential Information - Subject to Protective Order

Page 170

1    MS. LOCKARD:  When we get to a
2  stopping point, let's take a break,
3  because I know we've been going for an
4  hour and a half or so.
5  BY MS. BOGDAN:
6    Q.    Well, would the 91 hours of
7  work have been done in November of 2020 in
8  total, like all of it done in November of
9  2020?
10    A.    No, that did not happen.
11    Q.    So we know some of the work
12  occurred before November of 2020; is that
13  fair?
14    A.    That is fair.
15    Q.    Did you do any work consulting
16  for Teva during the summer of 2020?
17    MS. LOCKARD:  Objection, form,
18  ambiguous.
19    A.    I would have been reading the
20  regulatory documents related to this issue
21  and to my consultancy with GT and Teva during
22  months previous to October.
23  BY MS. BOGDAN:
24    Q.    Can you give me an estimation

Page 171

1  of the number of months previous to October
2  of 2020 that you would have been doing work
3  reading regulatory documents in connection
4  with your consultant work for Teva?
5    MS. LOCKARD:  Objection, form,
6  ambiguous.
7    A.    I couldn't give you an accurate
8  assumption, no.
9    MS. LOCKARD:  So I'd like to
10  take a break now.  So, Rosemarie, what
11  would you like to do about a lunch
12  break?  Because we have food here
13  that's been sitting.
14    MS. BOGDAN:  Oh, I wasn't aware
15  because I'm obviously not there.
16  If -- there's just one more document
17  on this topic that I wanted to show,
18  so I'm happy to take a break, but it
19  makes sense to just do this one more,
20  and then take a lunch break.  It's
21  just a one-page document.
22    MS. LOCKARD:  Okay.  If there's
23  just a couple of questions.
24    MS. BOGDAN:  Okay.  It's

Page 172

1  really -- it's just a one-page
2  document, and you'll see it when I put
3  it up.  It's Teva 425960.
4    (Whereupon, Deposition Exhibit
5  Johnson-9, E-mail(s) re: Snodin &
6  Elder Commentary,
7  TEVA-MDL2875-00425960, was marked for
8  identification.)
9    THE STENOGRAPHER:  And that's
10  Exhibit 9.
11  BY MS. BOGDAN:
12    Q.    And, Doctor, when you can see
13  that, please let me know.
14    A.    Okay.  Not yet.  Still not
15  there.
16    Q.    It's only one page, so it
17  shouldn't take too long.
18    A.    But it's not here.
19    I've got it.
20    Q.    Okay.  Do you see that?  It's
21  an e-mail?
22    A.    I see that.
23    Q.    And what is it dated?
24    A.    26th of the 3rd, 2019.

Page 173

1    Q.    Okay.  And is that e-mail from
2  you?
3    A.    That is my e-mail address,
4  g.johnson@swansea.ac.uk.
5    Q.    And who is the e-mail to?
6    A.    To Raphael Nudelman with cc'd
7  in other people, Brian McCormick and Rachel
8  Gallagher.
9    Q.    And are they all, to your
10  knowledge, affiliated with Teva
11  Pharmaceuticals?
12    A.    Yes, as far as my knowledge
13  from their e-mail addresses, they look
14  associated with Teva.
15    Q.    And do you remember sending
16  this e-mail?
17    A.    I do not remember sending this
18  e-mail, but if someone sends me a document,
19  the subject for this is Snodin & Elder, it's
20  polite to reply.
21    Q.    At the time that you replied to
22  this e-mail, were you doing work for Teva as
23  a consultant?
24    MS. LOCKARD:  Objection, form,

Confidential Information - Subject to Protective Order

Page 174

1  ambiguous.
2      A.    I do not know.  I do not think
3  so.
4  BY MS. BOGDAN:
5      Q.    And why don't you think so?
6      A.    The nature of this e-mail was
7  passing on a commentary on this topic.
8      Q.    What about the nature of the
9  e-mail passing on commentary on this topic
10 makes you think you weren't doing consulting
11 work yet?
12     A.    Because the previous e-mail
13 that this was replied to that you showed me
14 previously was a one-sentence passing me on
15 this commentary with no further information,
16 which you could assume would be given if
17 consultancy and detailed analysis of the
18 situation would have started.
19     Q.    Meaning the shortness of the
20 redacted portion?  Is that what you're
21 referring to?
22     A.    Of the previous e-mail that
23 looks like related to this one.  This is
24 Snodin & Elder commentary.  The previous

Page 175

1  exhibit you showed me was what this is
2  replying to, as far as I'm aware.
3      Q.    Did you keep copies of your
4  e-mails back and forth with Raphael Nudelman?
5          MS. LOCKARD:  Objection, form.
6      (Clarification requested by the
7  stenographer.)
8      A.    I do not think so.
9          MS. BOGDAN:  All right.  Did
10 you want to take a break, Victoria,
11 for lunch?
12         MS. LOCKARD:  Yes.  It's 1:20
13 in the afternoon here, so let's do
14 that.
15         THE VIDEOGRAPHER:  Going off
16 the record.  The time is 1:20 p.m.
17         (Recess taken, 1:20 p.m. to
18 2:03 p.m. BST)
19         THE VIDEOGRAPHER:  Back on the
20 record.  The time is 2:03 p.m.
21 BY MS. BOGDAN:
22     Q.    Good afternoon.  Can you hear
23 me?
24     A.    Good afternoon.

Page 176

1      Q.    Okay.  Good.
2          Now, I have previously asked
3  you about being familiar with the journal
4  Environmental and Molecular Mutagenesis
5  before we took the break.
6      A.    Yes, you had previously asked
7  me about that.
8      Q.    That's right.  And you have
9  actually published several articles in that
10 journal, correct?
11     A.    That is correct.
12     Q.    How did you first come to
13 publish in that journal?
14     A.    Potentially as a coauthor on a
15 publication with another coauthor, and then
16 realizing it was a suitable journal.
17 Potentially as a coauthor.
18     Q.    Do you know the first journal
19 that you published as a coauthor in
20 Environmental and Molecular Mutagenesis?
21     A.    I do not.
22         MS. BOGDAN:  Why don't we
23 please bring up exhibit C2, which
24 should be entitled Mutation as a

Page 177

1  Toxicological Endpoint for Regulatory
2  Decision-Making.
3          (Whereupon, Deposition Exhibit
4  Johnson-10, Mutation as a
5  Toxicological Endpoint for Regulatory
6  Decision-Making, by Heflich et al, was
7  marked for identification.)
8          THE WITNESS:  I don't have it
9  yet.  Oh.  Here.
10     A.    I have that on my desktop now.
11 BY MS. BOGDAN:
12     Q.    Okay.  We don't seem to have it
13 up on our screen.  I don't know if the other
14 people on Zoom can see it, but I don't.
15 There we go.  I think that's the first time
16 it's hit your screen before our screen.
17     A.    Yay.
18         TRIAL TECHNICIAN:  Double
19 click.
20 BY MS. BOGDAN:
21     Q.    All right.  Now, with regard to
22 when you're a coauthor on a publication, do
23 you have a choice as to which journal the
24 publication is submitted to for publication

Confidential Information — Subject to Protective Order

Page 178

1 or is that the primary author's call usually,
2 in your practice?
3    A.    It can go any way.  There can
4 be any decision made.  There's no standard
5 process for deciding on a journal article, a
6 journal to target.
7    Q.    For example, with this
8 particular journal article that's been marked
9 as Exhibit 10, was there a discussion between
10 the coauthors as to where it would be
11 submitted for publication?
12    A.    I cannot remember.  I see a big
13 link with these coauthors in that journal.
14    Q.    Okay.  And when you say you see
15 a big link with these coauthors in that
16 journal, what makes you say that?
17    A.    Bob Heflich, Robert Heflich
18 from FDA, used to be an editor on it.
19 Bhaskar Gollapudi is an editor on it, the
20 current editor.  Paul White was a lead editor
21 as well, and Francesco Marchetti, both of
22 those from Health Canada.  I'm unsure with
23 Kristine Witt, whether she's been involved on
24 the editorial board.  So that's why I make

Page 179

1 that statement.
2    Q.    And was Bhaskar Gollapudi the
3 editor-in-chief at the time that this
4 particular article was published back in
5 2019?
6    A.    I do not know, either him or
7 Francesco Marchetti.
8    Q.    How did you first meet Bhaskar
9 Gollapudi?
10    A.    I met him at the HESI Genetic
11 Toxicology Technical Committee.  That's where
12 I met him.
13    Q.    And did he serve on that
14 committee with you?
15    A.    He did at that time, yes.
16    Q.    And what time period are we
17 talking about?
18    A.    Towards generation of our
19 publication in 2013, so the lead-up to
20 generate that publication.
21    Q.    So that didn't come out as
22 clearly with the connection.
23    So sometime working up to the
24 2013 publication?

Page 180

1    A.    Correct.
2    Q.    Is that what you --
3    A.    Correct, yes.
4    Q.    Okay.  What 2013 publication
5 are you referring to?
6    A.    I'm going to look at my CV for
7 the exact.  Yep.
8    Found it.  There's plenty of
9 coauthors, Gollapudi, et al.; we include
10 numerous FDA and Health Canada, all those
11 authors.  So many authors on that.
12 Gollapudi, et al. 2013, Environmental
13 Molecular Mutagenesis and so on.
14    So I'll read the title.
15 Quantitative Approaches for Assessing
16 Dose-Response Relationships in Genetic
17 Toxicology Studies.
18    Q.    And is that the first study
19 that you coauthored with Gollapudi?
20    A.    I think it is, yes.
21    Q.    And what company does Gollapudi
22 work with or for, if you know?
23    A.    At the current time?
24    Q.    In -- well, is there a

Page 181

1 difference between now and back in 2013?
2    Who did he work for in 2013, if
3 you know?
4    A.    One of two, Exponent or Dow,
5 Dow Chemical.  Either Exponent or Dow
6 Chemical.
7    Q.    He worked for Dow Chemical
8 before he worked for Exponent?
9    A.    Yes, he did, and may have had a
10 job in between.  Those are the two major jobs
11 that I'm aware that he's undertaken, the
12 companies that he's worked with.
13    Q.    And currently does he work with
14 Exponent?
15    A.    Yes, I think he does.
16    Q.    And the title of this
17 commentary is Mutation As a Toxicological
18 Endpoint for Regulatory Decision-Making,
19 correct?
20    A.    Yes, I see that's correct.
21    Q.    Okay.  And you are the second
22 noted author on this publication, correct?
23    A.    That is correct.
24    Q.    Did you note on this

Confidential Information - Subject to Protective Order

Page 182

1  publication that was published in October of
2  2019 any conflicts of interest?
3      A.    May I look at the statement?
4  I'm not sure.  I don't think conflicts of
5  interest were stated, that there was any
6  conflict of interest for this publication.
7      Q.    At the time of this
8  publication, you were working as a consultant
9  for Teva in connection with this litigation;
10  isn't that correct?
11      MS. LOCKARD:  Objection, form,
12  ambiguous.
13      A.    My consultancy with Teva and
14  GT, I did some of that in 2020, and we were
15  preparing this manuscript for many years.
16  BY MS. BOGDAN:
17      Q.    But at the time of its
18  publication, you were doing consulting work
19  for Teva, correct?
20      MS. LOCKARD:  Objection, form,
21  ambiguous.
22      A.    I do not know.  It says
23  published online, 10th of October 2019.
24  2019?  I do not know if that's the case.

Page 183

1  BY MS. BOGDAN:
2      Q.    But you did not disclose any
3  conflict of interest in this publication,
4  correct?
5      A.    Correct.  This sort of
6  publication would be more of a review
7  concept-type document, and conflict of
8  interest, from my interpretation, better
9  linked to new opinions based on data.
10      MS. BOGDAN:  If you could
11  please pull up exhibit entitled
12  Environmental and Molecular
13  Mutagenesis, Author Guidelines,
14  please.
15      (Whereupon, Deposition Exhibit
16  Johnson-11, EMM Author Guidelines,
17  Conflict of Interest Declaration, was
18  marked for identification.)
19      THE STENOGRAPHER:  That's
20  Exhibit 11.
21      A.    Okay.  Yeah, I have those in
22  front of me.
23      MS. BOGDAN:  And have we marked
24  this as an exhibit?

Page 184

1      THE STENOGRAPHER:  Yes.
2      THE WITNESS:  Is that question
3  to me?
4      MS. BOGDAN:  Exhibit 11?
5      THE STENOGRAPHER:  Yes.
6  BY MS. BOGDAN:
7      Q.    If I could direct your
8  attention to the second page of the exhibit,
9  under Conflict of Interest Declaration at the
10  bottom of the page.
11      A.    Okay.  I can see that.
12      Q.    Can you please read the first
13  sentence of the Conflict of Interest
14  Declaration?
15      A.    At the time of submission, EMM
16  policy requires that each and every author
17  reveal any financial interests or
18  connections, direct or indirect, or other
19  situations that might raise the question of
20  bias in the work reported or the conclusions,
21  implications, or opinions stated.
22      Q.    Does that sentence say anything
23  about it being a review article versus
24  original work?

Page 185

1      A.    It does not state that, no.
2      Q.    Please read the second sentence
3  of the Conflict of Interest Declaration.
4      A.    These include pertinent
5  commercial or other sources of funding for
6  the individual author or for the associated
7  departments or organizations, personal
8  relationships, or direct academic
9  competition.
10      Q.    Were you paid for your work
11  consulting for Teva?
12      A.    I'm paid by GT when consulting
13  with Teva and GT.
14      Q.    If we could go back to the
15  first page of Exhibit 10, please.
16      A.    I'm on that page.
17      Q.    The decisions -- or excuse me,
18  the opinions that you're giving in this
19  matter, don't they deal with toxicological
20  endpoints for regulatory decision-making?
21      A.    The focus is on genetic
22  toxicological endpoints, including mutation
23  and including chromosomal data for that
24  decision-making, and does not include making

Page 186

1  the decision based on cancer bioassay data.
2      Q.    However, your report and your
3  opinions that you've given in this case
4  include evaluation of mutations for
5  regulatory decision-making, do they not?
6      A.    They include evaluation of
7  mutations in order to define the mechanism,
8  and this document does not define the
9  mechanism.  This document is around
10  discussing -- using the metrics from the
11  in vivo mutation data to define the point of
12  departure for risk assessment, which is
13  different.
14      Q.    In this litigation, are you not
15  proposing PEDs [sic] for NDMA and NDEA?
16      A.    In this litigation, I'm
17  proposing PDEs for NDEA and NDMA based on
18  cancer bioassay dose response data, yes.
19      Q.    But proposing PEDs, which
20  are -- what does PED stand for, just so that
21  the record is clear?
22      A.    It's PDE.  It's permitted daily
23  exposure.
24      Q.    And with regard to the opinions

Page 187

1  that you're offering for permitted daily
2  exposures, that goes to regulatory concerns
3  with regard to how much NDMA or NDEA can be
4  in a pharmaceutical, does it not?
5      A.    It does not, because the risk
6  assessment I've carried out in my report is
7  entirely around PDE metrics from the cancer
8  bioassay data, and this commentary is to
9  propose that in the future we could do that
10  calculation on mutation data, but that's not
11  what is done in my report, in my risk
12  assessment here.  So they are independent and
13  different approaches.
14      Q.    So you're actually
15  distinguishing between mutation data and
16  carcinogenesis data?  Is that my
17  understanding?
18      A.    That is your understanding,
19  with regard to using that data for a PDE
20  calculation.
21      Q.    Do you agree that your opinion
22  involves regulatory decision-making and
23  suggesting daily exposure limits?
24      A.    That's not what this paper is

Page 188

1  about.  My paper is about defining those from
2  the cancer bioassay data and applying them to
3  this instance.
4      Q.    I'm not asking about the paper
5  at this point.
6          Do you agree that your opinion
7  in this case involves regulatory
8  decision-making and suggesting daily exposure
9  limits?
10      A.    My opinion is based on defining
11  a human exposure limit that can be applied in
12  order to define whether a human is at
13  increased risk of cancer.
14      Q.    So this case involves defining
15  human exposure limits, correct?
16      A.    Correct, but from cancer data
17  and not from mutation data, which is the
18  entire premise of the commentary which we're
19  discussing.
20      Q.    Don't you cite to your 2021
21  Permitted Daily Exposure Limits for
22  Noteworthy Nitrosamine paper as support for
23  your decision -- or your opinions in this
24  case?

Page 189

1      A.    From my report submitted as my
2  risk assessment for this, I did cite my PDE
3  publication, and the decisions and opinions
4  are based on the cancer-derived PDE metrics
5  and not from the mutation-derived PDE
6  metrics.  They are very independent.
7      Q.    So with regard to your opinions
8  that you're offering in this case, you are
9  not in any way relying on the mutation PDE
10  values that you set forth in your 2021
11  publication entitled Permitted Daily Exposure
12  Limits for Noteworthy Nitrosamines?
13      A.    That's correct.  My reliance
14  here is on the cancer-derived PDE metrics
15  where the mutations were presented in that
16  publication for other reasons.
17      Q.    And what were the other reasons
18  that the mutations were presented in the 2021
19  publication but are not presented in your
20  report in this litigation?
21      A.    My area of research, including
22  what we've discussed today, is -- and based
23  on this paper, which you kindly put forward,
24  the mutation toxicological endpoint for --

Page 190

1   (audio malfunction) --
2           (Clarification requested by the
3   stenographer.)
4       A.    -- for regulatory
5   decision-making.  So the mutation PDEs in my
6   2021 publication talk to this and say in the
7   future, could we use mutation-derived PDEs,
8   and if we did, what would they look like
9   compared to cancer-derived PDEs.
10          Because in addition to these
11  nitrosamines that we're looking at today,
12  many nitrosamines do not have reliable cancer
13  bioassay data.  So if we could do the risk
14  assessment on a more sensitive endpoint where
15  we admit that we would have a lower PDE,
16  would we still protect the human population.
17          So that's the premise of adding
18  those mutation-derived ones in the conceptual
19  format of that discussion in support of the
20  decision, the ideas here.
21          But for the actual application
22  to a risk assessment, we've got the cancer
23  data.  It's very strong cancer data, and we
24  use that for our human health risk assessment

Page 191

1   and not the mutation data for the human
2   health risk assessment in this instance.
3   BY MS. BOGDAN:
4       Q.    However, in your 2021 research
5   article, the one that we've been speaking
6   about, Permitted Daily Exposure Limits for
7   Noteworthy Nitrosamines, you did go about
8   calculating PDEs for both NDMA and NDEA for
9   cancer and mutation, correct?
10      A.    That is correct, and we
11  critique the mutation-derived PDEs and
12  provide information about how future datasets
13  could look and further concepts around
14  adjustment factors in order to apply those in
15  a future setting in a more conceptual way.
16      Q.    And when you say in a future
17  setting in a more conceptual way, meaning
18  despite the fact you calculated these
19  mutation PDEs in the article, you did it only
20  for conceptual purposes?
21          MS. LOCKARD:  Objection, form,
22  misstates.
23      A.    We did it in support of this
24  idea that you could, in theory, use mutation

Page 192

1   data to derive PDEs.  And in the paper, we
2   present them in comparison to cancer-derived
3   PDEs to see if they would still provide a
4   concentration similar to the PDE or we
5   predicted below the PDE because mutation
6   occurs at a lower concentration in a cancer
7   as supported by this.  And we're working on
8   future case studies along that line.
9   BY MS. BOGDAN:
10      Q.    Okay.  We will go back and talk
11  more about the 2021 publication later.
12          With regard to the exhibit that
13  is still, I believe, up on your screen --
14      A.    Sorry.  Okay.
15      Q.    -- which is the Mutation as a
16  Toxicological Endpoint for Regulatory
17  Decision-Making?
18      A.    It is no longer on my screen.
19  Could you inform me which exhibit it is
20  again, please?
21      Q.    I believe it was exhibit -- was
22  it 11?
23          THE STENOGRAPHER:  11 was the
24  last one.

Page 193

1           TRIAL TECHNICIAN:  It was
2   Exhibit 10.
3           MS. BOGDAN:  10.
4           TRIAL TECHNICIAN:  Yes.
5       A.    I have it now.
6   BY MS. BOGDAN:
7       Q.    Would this article pertain to
8   Teva Pharmaceuticals, potentially in their
9   work as a pharmaceutical company?
10      A.    This article relates to that
11  concept around using mutation data for risk
12  assessment in future studies, so not linked
13  to Teva.  To the whole field of analysis,
14  could we use mutation data in future risk
15  assessments in the absence of cancer data.
16      Q.    When you're talking about using
17  mutation data, that could be used in the
18  pharmaceutical industry, correct?
19      A.    That could be correct, and it
20  could also be applied to other industries and
21  regulatory arenas too.
22      Q.    If we could please bring up the
23  next exhibit, which is an Environmental and
24  Molecular Mutagenesis commentary entitled

Confidential Information – Subject to Protective Order

Page 194

1  Quantitative Interpretation of Genetic
2  Toxicity Dose.
3         (Whereupon, Deposition Exhibit
4     Johnson-12, Quantitative
5     Interpretation of Genetic Toxicity
6     Dose-Response Data for Risk Assessment
7     and Regulatory Decision-Making:
8     Current Status and Emerging
9     Priorities, by White et al, was marked
10    for identification.)
11        THE STENOGRAPHER:  Chris, I'm
12    showing that as 12?
13        TRIAL TECHNICIAN:  That is
14    correct.
15  BY MS. BOGDAN:
16    Q.   If we could go to the first
17  page of the commentary, please.
18    A.   I think I have this.  Is this
19  the one downloaded from ResearchGate?
20    Q.   Yes, I believe so, Doctor, and
21  if you could go to the second page of the
22  exhibit.
23    A.   Yeah.
24    Q.   Is this a commentary that you

Page 195

1  coauthored?
2    A.   Yes, it is a commentary that I
3  coauthored with Health Canada experts.
4    Q.   Does this commentary involve
5  concepts such as point of departure metrics
6  and benchmark doses?
7    A.   It includes those concepts
8  entirely related to genetic toxicology data.
9    Q.   Did you disclose any conflicts
10  of interest in this commentary?
11    A.   I'm just searching to the
12  conflict of interest part.  Apologies.
13        I cannot see conflict of
14  interest stated in this publication.
15    Q.   If we could please go to the
16  next exhibit, which is going to be a research
17  article entitled Genotoxicity as the -- there
18  we go -- Toxicologically Relevant Endpoint to
19  Inform Risk Assessment.
20        (Whereupon, Deposition Exhibit
21    Johnson-13, Genotoxicity as a
22    toxicologically relevant endpoint to
23    inform risk assessment: A case study
24    with ethylene oxide, by Gollapudi

Page 196

1  et al, was marked for identification.)
2  BY MS. BOGDAN:
3    Q.   Is this another research
4  article that you're a coauthor on?
5    A.   This has yet to appear.  Are we
6  on Exhibit 13?  Okay, I have it.
7    Q.   Is the article up for you now,
8  Doctor?
9    A.   Yes, I have it now.
10    Q.   Is this an article that you
11  were a coauthor on?
12    A.   Yes, it's an article I'm a
13  coauthor on.
14    Q.   Okay.  And who are your
15  coauthors on this article?
16    A.   So Bhaskar Gollapudi, who we've
17  talked about from Exponent.  Abby Li from
18  Exponent, Steave Su from Exponent, myself,
19  Richard Reiss from Exponent and Richard
20  Albertini, also called Dick Albertini, from
21  Burlington, Vermont, University of Vermont
22  College of Medicine.
23    Q.   Now, when was this research
24  article accepted?  I believe it's at the top

Page 197

1  of the --
2    A.   Oh, excellent.
3    Q.   -- page.
4    A.   Accepted 4th of September 2020.
5    Q.   And I see there are three dates
6  on the top, received, and then revised and
7  then accepted.
8        Could you describe that process
9  for me, please?
10    A.   With a publication in line with
11  this one or any publication, you submit the
12  publication, it gets reviewed by external
13  reviewers, if you're lucky to get to that
14  stage.  Those external reviewers will
15  critique the publication -- although at that
16  stage, it's not a publication; it's a
17  manuscript.  Ask you -- they'll accept it,
18  they'll give minor revisions, major revisions
19  or reject.
20        Then you have a period where
21  you can amend your publication in line with
22  those reviewers' comments and editorial
23  comments.  That can be a long process,
24  particularly in this example when it goes

Confidential Information - Subject to Protective Order

Page 198

1 over the summer, and then -- and then it's
2 accepted and put on -- put online in the
3 final publication.
4      Q.    So the accepted date is the
5 publication data, essentially, for online?
6      A.    For online.
7      Q.    So this particular research
8 article was published September 4th of 2020?
9      A.    Yes.  The final accepted
10 version was published then.
11      Q.    Did you disclose any conflicts
12 of interest in this publication?
13      A.    In this publication, there was
14 funding from the American Chemistry Council,
15 and this was declared in the Conflict of
16 Interest section.
17      Q.    Did you personally declare any
18 conflict of interest or disclose that you
19 were doing consulting work for Teva
20 Pharmaceuticals?
21           MS. LOCKARD:  Objection, form,
22      ambiguous.
23      A.    In this statement, the conflict
24 of interest covers the authors with the

Page 199

1 American Chemistry Council.  In my opinion,
2 this does not work to the -- this was not
3 relevant or applicable to the risk assessment
4 report that I was compiling and generating
5 for Teva and GT.
6 BY MS. BOGDAN:
7      Q.    Even though the research
8 article discusses points of departure and
9 daily exposure values, correct?
10      A.    With the same discussions that
11 these were based on the genetic toxicology
12 data.
13      Q.    But this research article is
14 dealing with points of departure, daily
15 exposure values, using PROAST software and
16 doing benchmark dose analyses; is that not
17 true?
18      A.    These analyses using PROAST and
19 benchmark dose were on different datasets.
20 They are called continuous datasets from
21 genetic toxicology, carried out in a
22 different way to when you do it on cancer
23 bioassay data, which is contour datasets.  So
24 that calculation is different.

Page 200

1           And the application of those
2 datasets to create a PDE, as we've stated for
3 cancer, is an accepted approach, and for
4 genetic toxicology data, it's more a
5 conceptual approach that's trying to gain
6 momentum.
7           So I see quite a major --
8 distinguish a major difference between this
9 and a risk assessment based on cancer
10 bioassay data, as I've presented for GT and
11 the clients.
12      Q.    Does this research article
13 discuss calculating daily exposure values,
14 yes or no?
15      A.    This article is used to
16 calculate permitted daily exposure values
17 from genetic toxicology data.
18      Q.    And this article also discusses
19 using a benchmark dose analysis, does it not?
20      A.    This article also describes the
21 use of the benchmark dose analysis on genetic
22 toxicology data.
23      Q.    And this article also discusses
24 point of departure values, does it not?

Page 201

1      A.    This article also discusses the
2 use of point of departure values from genetic
3 toxicology data.
4           MS. BOGDAN:  If you could
5      please put up the next exhibit, which
6      is a research article, The Use of
7      Benchmark Dose Uncertainty
8      Measurements.
9           (Whereupon, Deposition Exhibit
10      Johnson-14, The use of benchmark dose
11      uncertainty measurements for robust
12      comparative potency analyses, by
13      Wheeldon et al, was marked for
14      identification.)
15           THE STENOGRAPHER:  14.
16      A.    Okay.  It's arrived.  It's
17 loading.  I can see it.
18 BY MS. BOGDAN:
19      Q.    Is this another research
20 article that you coauthored?
21      A.    This is another research
22 article that I coauthored.
23      Q.    And again, in the Environmental
24 and Molecular Mutagenesis journal?

Confidential Information – Subject to Protective Order

Page 202

1    A.    Yes, that's correct.

2    Q.    And this research article,

3  again, refers to benchmark dose methods,

4  correct?

5    A.    This does refer to benchmark

6  dose methods as the best statistical -- the

7  best statistical approach for analyzing these

8  sorts of data, yes.

9    Q.    And it does benchmark dose

10  modeling, correct?

11    A.    This uses benchmark dose

12  modeling on in vitro genetic toxicology data

13  points, correct.

14    Q.    And did you disclose a conflict

15  of interest in this publication based upon

16  the fact that you were doing consulting work

17  for --

18    A.    No, because it has even less

19  relevance than the in vivo genetic toxicology

20  BMDs that were generated. So these are

21  in vitro BMD potency comparisons using the

22  advanced statistical tool of benchmark dose.

23    Q.    With regard to the conflict of

24  interest declaration that we previously put

Page 203

1  up, with the EMM policy requiring that each

2  and every author reveal any financial

3  interest or connections, direct or indirect,

4  or other situations that might raise the

5  question of bias in the work reported, or the

6  conclusions, implications or opinions stated,

7  is it your testimony that research articles

8  that you are doing that specifically address

9  benchmark dose, which is the analysis that

10  you're doing in this litigation, are not

11  relevant?

12    A.    If those benchmark dose

13  analyses are on in vitro genetic toxicology

14  data and in vivo genetic toxicology data,

15  then they are not a conflict when I'm

16  carrying out the risk assessment here on

17  in vivo cancer bioassay data.

18    Q.    So you were making a

19  distinction between in vivo genetic

20  toxicology data and cancer bioassay data in

21  whether or not you need to disclose a

22  conflict of interest?

23    A.    I am making that distinction.

24    Q.    Even though what you're

Page 204

1  calculating, benchmark dose, is -- or applies

2  to both situations?

3    A.    The calculation is completely

4  different if we're talking about benchmark

5  dose. As I've suggested, the cancer bioassay

6  data is a quantum calculation using a

7  different part of the BMD tool, using

8  completely different statistical modeling

9  from what you do on continuous data for

10  genetic toxicity data, which uses a different

11  suite of models. So they're very

12  distinguished, yes.

13    Q.    Aren't these articles favoring

14  the benchmark dose method?

15    A.    Which articles are we talking

16  about?

17    Q.    The article that's right up on

18  the screen here, The Use of Benchmark Dose

19  Uncertainty Measurements for Robust

20  Comparative Potency Analyses.

21    A.    This publication -- okay?

22    Q.    I'm sorry.

23    And the abstract. Can you read

24  the first sentence in the abstract?

Page 205

1    A.    The benchmark dose method is

2  the favored approach for quantitative

3  dose-response analysis where uncertainty

4  measurements are delineated between the upper

5  and lower confidence bounds, or confidence

6  intervals.

7    Q.    Would you say that that

8  research article is suggesting that the

9  benchmark dose method is the preferred

10  quantitative approach?

11    A.    For these in vitro datasets

12  using the covariant analysis approach where

13  you end up with these potency ranks, I would

14  agree that this is -- BMD is the favored

15  approach as related here.

16    Q.    And in this case, are you not

17  also advocating that the benchmark dose

18  method is the favored approach?

19    A.    With these in vitro data,

20  this --

21    Q.    I'm not asking about in vitro

22  data. I'm just asking if you're also

23  advocating in this case that the benchmark

24  dose method is the favored approach.

Confidential Information - Subject to Protective Order

Page 206

1    MS. LOCKARD:  I'm going to
2  object with you arguing and
3  interrupting the witness.  I've let it
4  go on a little bit, but he's entitled
5  to give his answer.  If it's not the
6  question that you meant to ask, you
7  can ask it again, but please don't cut
8  the witness off.
9    Go ahead.
10    THE WITNESS:  Could you please
11  ask that question again?
12  BY MS. BOGDAN:
13    Q.    The first question -- there was
14  a run-on there, but is this research article
15  advocating the benchmark dose approach?
16    A.    This article is advocating a
17  very specific use of the benchmark dose
18  approach for analyzing in vitro data.
19    Q.    So is this article, yes or no,
20  advocating the benchmark dose approach?
21    MS. LOCKARD:  Objection, form,
22  asked and answered.
23    A.    This article is using the
24  benchmark dose approach on in vitro genetic

Page 207

1  toxicology data and showing the benefits of
2  that for in vitro genetic toxicology data.
3  BY MS. BOGDAN:
4    Q.    So this article is using the
5  benchmark dose approach?
6    A.    This article is using the
7  benchmark dose approach on in vitro genetic
8  toxicology data.
9    Q.    And in this case, in your
10  expert report, you're using the benchmark
11  dose approach, correct?
12    A.    I used the benchmark dose
13  approach for the in vivo data in a different
14  manner to how we use it here for these
15  in vitro data.  And in my report, where I
16  based my judgment on my cancer-derived BMD
17  using the quantum approach, using model
18  averaging of that suite of models specific
19  for cancer bioassay data analysis, which is
20  very independent and different to this
21  utility of it for in vitro genetic toxicology
22  data, there's quite a large difference in
23  those approaches.
24    MS. BOGDAN:  If we could please

Page 208

1  pull up the next research article,
2  Permitted Daily Exposure Limits for
3  Noteworthy N-nitrosamines.
4    (Whereupon, Deposition Exhibit
5  Johnson-15, Permitted daily exposure
6  limits for noteworthy N-nitrosamines,
7  by Johnson et al, was marked for
8  identification.)
9    THE STENOGRAPHER:  Exhibit 15.
10  BY MS. BOGDAN:
11    Q.    Please let me know, Doctor,
12  when you can see the exhibit.
13    A.    I can see the exhibit.
14    Q.    And when was this research
15  article published?
16    A.    It was accepted the 11th of May
17  2021.
18    Q.    And in the Conflict of Interest
19  section, which is towards the back of the
20  article, three or four pages from the end...
21    A.    Yes.  I've got that.
22    Q.    Was there a conflict of
23  interest that you noted there?
24    A.    There's a conflict of interest

Page 209

1  I stated in this section.
2    Q.    Are you G.E.J.?
3    A.    I am G.E.J. in this instance.
4    Q.    And did you write that conflict
5  of interest language?
6    A.    I did write this conflict of
7  interest language.
8    Q.    And what did you write?
9    A.    G.E.J., which is me, is a
10  consultant who evaluates the risks posed by
11  pharmaceutical impurities.  His clients did
12  not influence the content of this manuscript.
13  The other authors do not declare any
14  conflicts of interest.
15    Q.    And what caused you to write
16  that conflict of interest?
17    A.    Because I was working on
18  nitrosamines, and I was working on
19  nitrosamines with Teva and GT, and also an
20  expanded version of this, including
21  confidence intervals around the PDE from my
22  cancer-derived BMD were part of my risk
23  assessment that were submitted for my expert
24  opinion to Teva and GT.

Confidential Information – Subject to Protective Order

Page 210

1    So because of that, I saw that
2 there was some level that should be disclosed
3 in this Conflict of Interest section.
4    Q.    Did you disclose in the
5 Conflict of Interest section who -- what type
6 of clients you had?
7    A.    Pharmaceutical clients.
8    Q.    I don't -- where did you write
9 that you have pharmaceutical clients?
10    A.    G.E.J. is a consultant who
11 evaluates the risks posed by pharmaceutical
12 impurities.  His clients did not influence --
13 so I'm a consultant who evaluates.  If I
14 consult, then I work with the company to
15 evaluate pharmaceutical impurities, which
16 would be with a pharmaceutical company.
17    Q.    Couldn't you be a consultant
18 that evaluates the risks posed to the
19 patients on behalf of the patients?
20    MS. LOCKARD:  Objection, calls
21 for speculation.
22    A.    I do not know.
23 BY MS. BOGDAN:
24    Q.    Is there anything in that

Page 211

1 Conflict of Interest section that explains
2 that you are working for the pharmaceutical
3 companies?
4    A.    I think it does, yes.
5    Q.    Because it says that you are a
6 consultant who evaluates the risk posed by
7 pharmaceutical impurities?
8    A.    That's my interpretation of
9 that statement, yes.
10    Q.    Did you consult anyone with
11 regard to the language that you were choosing
12 to use in the Conflict of Interest section?
13    A.    I used this language based on
14 the language I've seen from other
15 pharmaceutical consultants in this area.
16    Q.    And where had you seen this
17 language used before, in this particular
18 journal, Environmental and Molecular
19 Mutagenesis?
20    A.    I do not know where I found it
21 previously, but I still think it is a good
22 statement.
23    Q.    Now, in this conflict of
24 interest box, it also has another sentence

Page 212

1 that precedes the ones that are highlighted
2 here.
3    A.    I'm not looking at your copy.
4 Apologies.  Okay, now I am.  Can you
5 rehighlight that section, please?  Okay.
6    And what was your question
7 again?
8    Q.    The section or the statement
9 that says:  The other authors do not declare
10 any conflicts of interest.
11    Do you see that?
12    A.    I do see that.
13    Q.    Did you have any specific
14 conversation with the other authors regarding
15 conflicts of interest or is that something
16 they would independently report?
17    A.    I do not know.  They saw --
18 this was part of the document that all
19 coauthors saw.  That's my level of
20 understanding here.
21    Q.    With regard to Bhaskar
22 Gollapudi who works for Exponent, do you know
23 whether he had any conflicts of interest?
24    A.    I do not know.

Page 213

1    Q.    Are you familiar with Exponent?
2    A.    I'm not very familiar with
3 Exponent, but I'm aware of some of their
4 consultants.
5    Q.    Who are you aware of other than
6 Bhaskar Gollapudi?
7    A.    There is two other coauthors on
8 the ethylene oxide paper, although I can't
9 recall their names, which also work for
10 Exponent, for example.
11    Q.    Have you ever worked for
12 Exponent?
13    A.    No.  No.
14    Q.    As the lead author, did you
15 have a choice as to where this manuscript was
16 being sent to be considered for publication?
17    A.    Yes, I did have.  Yes, I did.
18    Q.    And did you send it to any
19 other journals other than the Environmental
20 and Molecular Mutagenesis journal?
21    A.    No, I did not.  In this area of
22 applied genetic toxicology towards risk
23 assessment, I realized this is the best
24 journal for that particular topic.

Confidential Information - Subject to Protective Order

Page 214

1    Q.    And how did you go about
2  selecting your coauthors for this
3  publication?
4    A.    These coauthors were people who
5  contributed to a suitable extent within the
6  HESI GTTC to be rewarded or to maintain
7  coauthorship.  And you'll see from the
8  Acknowledgements section at the end, there
9  was also other people that we had discussions
10 with who didn't meet that criteria but did
11 contribute along the lines of the suggested
12 text in that Acknowledgements section.
13   Q.    I understand that they were
14 coauthors that -- were people who contributed
15 to a suitable extent, but how did you
16 identify them as being potential coauthors or
17 approach them to begin with?
18   A.    Within the HESI GTTC group,
19 particularly on this topic, I do a large
20 amount of the work, I did a large amount of
21 the work, presented it to the HESI GTTC, and
22 requested if people wanted to become involved
23 in this research and could contribute to this
24 research.  That was the main way of getting

Page 215

1  these coauthors involved.
2    Q.    And were you the one that came
3  up with the idea or the topic for the
4  research article?
5    A.    As stated at the beginning of
6  our conversation, I worked on this topic with
7  a couple of regulatory friends to assess
8  this.  I realized it was an important topic,
9  and decided to devise a publication around
10 this topic, and then prepared this
11 publication with these coauthors, and openly
12 within the rest of the HESI GTTC, we created
13 the publication, and then we submitted it to
14 the -- the request itself from the journal
15 and had it accepted.
16   Q.    Isn't this publication
17 involving exactly the type of work that you
18 were doing for Teva with regard to your
19 investigation into this case?
20      MS. LOCKARD:  Objection, form,
21   misstates testimony.
22   A.    I see this publication as a
23 case example, as an idea about what a -- this
24 approach could look like to derive PDEs and

Page 216

1  how they could be compared to each other when
2  you use the BMDLs from the cancer and the
3  mutation datasets.  Then in my report, which
4  is different to this, I then started applying
5  that in a risk assessment concept.
6        So the publication is not a
7  risk assessment, and the report becomes a
8  risk assessment through this extended
9  analysis and application of information
10 around the concentrations presented in that
11 report.  And there is a bit of a -- there is
12 a large distinguishing factor along those
13 lines.
14   Q.    But with regard to the position
15 that you're taking as to how to calculate the
16 PDEs for NDMA and NDEA, isn't that set forth
17 in this paper that was published in May of
18 2021?
19   A.    The mutation data, we had a
20 conceptual total for the PDE calculation that
21 we put forward, and some discussion points
22 about how that could potentially change for a
23 real risk assessment from there onwards.
24       For the cancer-derived PDE

Page 217

1  where we did this off the BMDL lower, there's
2  an extended version of this risk assessment,
3  which I support, where you can do that
4  calculation as well as calculating a BMD
5  upper, so it wasn't complete in that respect.
6        Also, the composite uncertainty
7  factors were really for the global
8  population, but for a smaller population, you
9  can actually adjust these uncertainty
10 factors, even for the cancer bioassay data,
11 to reduce them from 500 to 50, which would
12 cause an order of magnitude increase on the
13 PDEs in my report.
14       So there's -- this was
15 more look at this, it can be done.  Here's an
16 example.  This is not the finished product.
17 My report is more this is how I am going to
18 use this for a real assessment of risk in
19 these patients.
20   Q.    Did you submit your report in
21 this case for publishing and peer review?
22      MS. LOCKARD:  Objection,
23   compound.
24   A.    I submitted it to the clients,

Page 218

1 as it was a client -- client-facing document.
2 BY MS. BOGDAN:
3     Q.    Did you submit your report in
4 this case to a journal and ask that it be
5 reviewed for publication?
6         MS. LOCKARD:  Objection, form,
7     compound.
8     A.    I did not submit my
9 confidential report for my clients to a
10 journal.
11 BY MS. BOGDAN:
12     Q.    Don't you cite in your report
13 as authority your article that was published
14 May 11th of 2021?
15     A.    I cite my article, but I
16 wouldn't use the term "as authority."  I cite
17 my article as the first approach of deriving
18 PDEs using basic composite uncertainty
19 factors using just the lower bound.
20         So, no, it wouldn't be as
21 what's said in the paper is absolute.  It's
22 using the concepts from that and developing a
23 more extended risk assessment in my report.
24     Q.    Now, with your coauthors on

Page 219

1 this publication, you have Anthony Lynch, Jim
2 Harvey and Julia Kenny, who all work for
3 GlaxoSmithKline, correct?
4     A.    That's correct.
5     Q.    And GlaxoSmithKline produced
6 Zantac from 1983 to 2017; isn't that correct?
7         MS. LOCKARD:  Objection, form,
8     speculation.
9     A.    I do not know.
10 BY MS. BOGDAN:
11     Q.    Do you know that
12 GlaxoSmithKline manufactured Zantac?
13     A.    I haven't looked into that.
14     Q.    Are you aware that Zantac was
15 recalled because of an issue with NDMA
16 contamination?
17     A.    I was aware that there was many
18 pharmaceuticals that were recalled.
19     Q.    And your conclusion that you're
20 reaching in this 2021 publication with the
21 PDE for NDMA, is that PDE higher than the
22 acceptable intake limit that's been
23 established by the FDA for NDMA?
24     A.    It is higher than the

Page 220

1 acceptable intake based on the linear
2 extrapolation, yes.
3     Q.    And similarly with regard to
4 the value that you have calculated for NDEA,
5 is that permissible daily exposure for NDEA
6 that you set forth in your publication higher
7 than the acceptable intake that has been put
8 forth by the FDA for NDEA?
9     A.    That is correct.  Theirs is
10 based on linear back-extrapolation.
11     Q.    And would the drug companies
12 benefit from higher permissible levels of
13 NDMA and NDEA allowed in pharmaceuticals?
14         MS. LOCKARD:  Objection, form,
15     speculation.
16     A.    I do not know.
17 BY MS. BOGDAN:
18     Q.    With higher limits of NDMA that
19 are allowed, couldn't they sell
20 pharmaceuticals that would have more NDMA in
21 them -- in them?
22         MS. LOCKARD:  Objection, form,
23     speculation.
24     A.    That could be one

Page 221

1 interpretation.
2 BY MS. BOGDAN:
3     Q.    And similarly, with a raised
4 allowed limit for NDEA, wouldn't that permit
5 pharmaceutical companies to sell medicines
6 with more NDEA in it?
7         MS. LOCKARD:  Objection, form,
8     speculation.
9     A.    If the firm -- if the human
10 exposure limit was higher, then a higher
11 level of that substance would be shown not to
12 increase human risk at those concentrations.
13 BY MS. BOGDAN:
14     Q.    All right.  So we went over the
15 three authors, Lynch, Harvey and Kenny that
16 work for GSK.  You have other coauthors of
17 Dobo and Kenyon, correct?
18     A.    That is correct.
19     Q.    And they both work for Pfizer;
20 isn't that correct?
21     A.    That is correct.
22     Q.    And Pfizer manufactures
23 Chantix, which was recalled this past summer
24 due to an N-nitroso contamination.

Confidential Information — Subject to Protective Order

Page 222

1      Are you aware of that?
2      A.    I was not aware of that, and
3  it's not articulated in this publication.
4      Q.    And Pfizer also produced
5  Zantac.  Did you know that?
6      A.    I did not know that.
7      Q.    And Zantac has also been
8  recalled because of an N-nitrosamine
9  contamination issue.
10      Are you aware of that?
11      A.    I'm aware that this issue has
12  affected many companies and many drugs have
13  been taken from the market.
14      Q.    Now, more of your coauthors
15  also work for pharma.  You have Thybaud who
16  works for Sanofi.  Isn't that correct?
17      A.    At the time she worked for
18  Sanofi, and now she is retired.
19      Q.    And Sanofi was another company
20  that manufactured Zantac, which has been
21  recalled because of NDMA contamination; isn't
22  that correct?
23      A.    I did not know that
24  specifically.  I did not know that

Page 223

1  specifically.
2      Q.    And Sanofi has also
3  manufactured irbesartan, which has been
4  recalled because of NDMA and NDEA.  Are you
5  aware of that?
6      A.    I was not aware of that, but
7  realize that many companies, including the
8  ones listed here, would have had similar
9  issues.
10      Q.    So except for Gollapudi, who
11  works for Exponent, each of the other
12  coauthors works for pharma, correct?
13      A.    And Ryan Wheeldon with Swansea
14  University, correct, with the pharmaceutical
15  statement.
16      Q.    And GSK, Pfizer -- I say
17  "Sanofi," you say "Sanofi" -- they've all had
18  issues with contamination of N-nitrosamines
19  in their drugs?
20      MS. LOCKARD:  Objection.
21      That's not a question.  Calls for
22      speculation if it is.
23  BY MS. BOGDAN:
24      Q.    On previous publications, some

Page 224

1  of which that we've already gone through,
2  have dealt with -- if I can find them here --
3  benchmark dose -- let me find them here.  I
4  just put them down here -- mutations,
5  regulatory decision-makings.  There was an
6  author by the name of Paul White.  And so --
7      A.    Yeah, I've met him.
8      Q.    Yes?  Right?  Yes?
9      A.    Sorry, I spoke over you.  Can
10  you repeat the question?  I spoke over you.
11      Q.    That's okay.
12      Paul White was a coauthor with
13  you on several of these earlier environmental
14  and molecular mutagenesis publications,
15  correct?
16      A.    Correct.  That is correct.
17      Q.    Did you ask if he would be
18  willing to coauthor the permitted daily
19  exposure limits for the nitrosamine
20  publication?
21      A.    I asked for his contributions,
22  and due to workload, he was unable to commit
23  to coauthorship.  You'll see from
24  Acknowledgements that we acknowledged the

Page 225

1  discussions with Paul White in that section.
2      At this time, he was not a
3  cochair of this HESI GTTC quantitative group
4  with me.  It was myself and Andreas.
5      Q.    And when you say you asked for
6  his contributions, meaning you asked him to
7  be a coauthor?
8      A.    Meaning we had discussions
9  around the work.  We had just written a paper
10  on uncertainty factors that could be applied
11  to the genetic toxicity PDE.  Those
12  discussions were useful.  Those sorts of
13  discussions.
14      Q.    Other than work, did he give
15  any other reason that he was unable to commit
16  to being a coauthor?
17      A.    No, that would be workload
18  issues for Paul White.
19      MS. LOCKARD:  Do you need
20      something to drink?
21      THE WITNESS:  Yeah, is there
22      any more Coke or is that all
23      downstairs?
24      (Comments off the stenographic

Confidential Information - Subject to Protective Order

Page 226

1    record.)
2    BY MS. BOGDAN:
3        Q.    When was it when you were asked
4    to not only serve as an expert for Teva but
5    then to serve as an expert for all defendants
6    in the case?
7            MS. LOCKARD:  Objection, asked
8        and answered.
9        A.    As a response, we can see from
10   the invoices it was when I changed from
11   consultancy to reporting, when I was
12   generating the report.  I was made aware at
13   that time that it was for the other clients,
14   extended from Teva.  That was beginning of
15   2021.
16   BY MS. BOGDAN:
17       Q.    Is there something on the
18   invoice that indicates to you that that is
19   the timing of when that took place?
20       A.    Yes.  So in my 05-07-2021
21   invoice for 35 hours, the discussions around
22   reporting moved me really from understanding
23   the whole area as a whole and having
24   discussions with Teva and GT to focusing on a

Page 227

1    report for the client and the extended board
2    of clients.
3            MS. BOGDAN:  Could we pull up
4        the retainer letter, please, between
5        Greenberg Traurig and Dr. Johnson.
6            (Whereupon, Deposition Exhibit
7        Johnson-16, 6/8/21 Greenberg Traurig
8        Letter, was marked for
9        identification.)
10           THE STENOGRAPHER:  Exhibit 16.
11   BY MS. BOGDAN:
12       Q.    Doctor, do you want to let me
13   know when you see that?
14       A.    I see that.
15       Q.    Oh, okay.  I was just waiting.
16   I didn't know if it was taking time for it to
17   load, so...
18           Do you recognize that
19   correspondence?
20       A.    I do recognize that
21   correspondence.
22       Q.    And when did you receive this
23   correspondence relevant to when you were
24   asked to be an expert on behalf of all

Page 228

1    defendants?
2        A.    I do not know.
3        Q.    Was it after you were asked to
4    be an expert on behalf of all defendants?
5            MS. LOCKARD:  Objection, form,
6        asked and answered.
7            THE WITNESS:  Yes.
8        A.    I do not know.
9    BY MS. BOGDAN:
10       Q.    Referring you to the first
11   paragraph of the letter, it says a couple of
12   sentences down:  This letter will confirm our
13   agreement to retain you as a(n)
14   consultant/expert in connection with the
15   above-styled litigation on behalf of Teva.
16           Do you see that sentence?
17       A.    I see that sentence.
18       Q.    Did you receive any type of
19   similar letter from Greenberg Traurig after
20   you were asked to serve as an expert on
21   behalf of all defendants?
22           MS. LOCKARD:  Objection, form.
23       It's confusing.
24       A.    I do not know.  Contracts are

Page 229

1    done through Swansea Innovations.
2    BY MS. BOGDAN:
3        Q.    When you say contracts are done
4    through Swansea Innovations, is there a
5    separate writing that Swansea Innovations has
6    with clients in order to hire you as a
7    consultant or expert?
8        A.    Could you say that again,
9    please.
10       Q.    You answered the last question
11   where you said:  I know contracts are done
12   through Swansea Innovations.
13           So is there a separate writing
14   that Swansea Innovations has that would
15   pertain to your work as a consultant, slash,
16   expert for Teva?
17       A.    I understand now.
18           They do not.  They would have
19   this.  That's my understanding.
20       Q.    Now, in this letter it
21   indicates on the second page that materials
22   for your initial review would be sent to you
23   separately via secure FTP, which is the first
24   sentence on the second page.

Page 230

1    Were materials sent to you to
2  review?
3    A.    This -- I think they refer to a
4  list of materials that were sent to me, and
5  yes, they were sent to me.
6    Q.    And are those included in your
7  list of materials considered?
8    A.    Yes.
9    Q.    And then down further on that
10  page, there's a paragraph that starts "Please
11  note." Can you read that sentence, please.
12    A.    Please note we are not asking
13  for any sort of written report or written
14  work product at this time. Once you have
15  completed your review of the initial
16  materials, please call me to arrange a
17  convenient time when you can discuss your
18  opinions on the case.
19    Q.    And did you follow that
20  instruction?
21    A.    I was compiling a report was my
22  understanding.
23    Q.    And when did you start to
24  compile the report?

Page 231

1    A.    I don't know precisely the
2  answer to that.
3    Q.    Can you provide an estimate
4  with regard to when you started the report
5  relative to when you finished it?
6    A.    I cannot.
7    Q.    You cannot state how many
8  months you were working on the report?
9    A.    Not precisely.
10    THE WITNESS: May I ask for a
11  break to get another bottle of Diet
12  Coke?
13    MS. LOCKARD: Is this a good
14  time, Rosemarie?
15    MS. BOGDAN: Sure. We can take
16  a five-minute break.
17    THE VIDEOGRAPHER: Going off
18  the record. The time is 3:20 p.m.
19    (Recess taken, 3:20 p.m. to
20  3:34 p.m. BST)
21    THE VIDEOGRAPHER: Back on the
22  record. The time is 3:34 p.m.
23  BY MS. BOGDAN:
24    Q.    With regard to the research

Page 232

1  article entitled Permitted Daily Exposure
2  Limits for Noteworthy Nitrosamines, who
3  funded the work for that study?
4    A.    It was done independently of
5  research funding. It was using published
6  data that we reanalyzed and put forward, but
7  due to my work with GT and Teva at that time,
8  I acknowledged in the Conflict of Interest
9  section that statement.
10    MS. BOGDAN: If we could please
11  pull that exhibit up. It's the
12  research article entitled Permitted.
13    And what exhibit number has
14  this been marked?
15    TRIAL TECHNICIAN: This is, I
16  believe, 14 of our number, so it was
17  marked as Exhibit 15.
18  BY MS. BOGDAN:
19    Q.    Directing your attention to the
20  first page where it says Funding Information
21  on the left-hand side?
22    A.    Okay. Yes, I can see that.
23    Q.    What does it say there?
24    A.    Baxter International Inc.

Page 233

1    Q.    And what type of company is
2  Baxter?
3    MS. LOCKARD: Objection, form,
4  ambiguous.
5    A.    From my understanding, it is a
6  medicinal product company.
7  BY MS. BOGDAN:
8    Q.    As the lead author, did you go
9  about acquiring the funding for this research
10  article?
11    MS. LOCKARD: Objection, vague.
12    A.    This Baxter International
13  Incorporated funding was used by Ryan
14  Wheeldon to pay for his tuition fees during
15  his Ph.D.
16  BY MS. BOGDAN:
17    Q.    So it was his tuition fees and
18  then he spent his time contributing to this
19  paper, and that's what that funding
20  information indicates?
21    A.    That's the entirety of that.
22  That's what that funding indicates.
23    Q.    Who paid you for your time in
24  writing and authoring this research article?

Page 234

1    A.   This was something I did off my
2 own back in my own time with the HESI GTTC.
3 I contribute my time without receiving
4 additional funding because this is my
5 research interest.
6         This particular topic I've been
7 working on my whole academic life, and I put
8 in a lot of time on that basis without
9 receiving funding.
10        But I'll state it again.
11 Because of the interest and link to my
12 clients, Teva and GT, I acknowledged that
13 there was that conflict of interest there.
14 So no funding from other sources.  I hope
15 that statement was clear.
16   Q.   Did you use any of the
17 knowledge you had gained doing your
18 consulting work on this litigation regarding
19 nitrosamine contamination in valsartan drugs
20 when writing this research article?
21        MS. LOCKARD:  Objection, form,
22    vague.
23    A.   I did not.  From day one when I
24 was made aware of this issue of the

Page 235

1 substance or these substances that were
2 carrying out adducts and mutations through
3 the mechanism that I understood entirely, I
4 had the knowledge at hand to be able to write
5 this pretty much from day one.
6 BY MS. BOGDAN:
7    Q.   When did you begin working on
8 this research article?
9    A.   The concepts contained within
10 the research article would date back to that
11 Informa Impurities conference where I put
12 forward the concept of it and then refined
13 that and my understanding of it throughout,
14 and then preparation of the manuscript.  PI
15 cannot say you dates and times, but it was
16 in a -- I worked on it when I could and
17 prepared it and submitted it as you've seen.
18   Q.   Did you start work on this
19 before you were retained to be a consultant
20 for Teva in this litigation?
21   A.   As stated, I worked on this
22 concept and did a lot of analysis before
23 that, correct.
24   Q.   When did the first draft of

Page 236

1 this research article come into being?
2    A.   I do not know.
3    Q.   Was it in 2018?
4    A.   I don't think I'm that
5 efficient.  I don't think so.
6    Q.   Was it in 2019?
7    A.   I do not know.
8    Q.   Did this go out for peer
9 review?
10   A.   It did go out for peer review.
11   Q.   Did it get any critical
12 comments as part of the peer-review process?
13   A.   It got some detailed
14 peer-reviewed comments, some critical, which
15 we addressed and overcame and changed
16 accordingly.  Some supportive.  Same from the
17 editor as well.  We addressed the comments,
18 and they were happy, we were happy.  The
19 editor who works at Health Canada supported
20 that those changes were accepted, and the
21 peer-review process was adhered to, and the
22 editorial process as well.
23   Q.   And what were the changes that
24 were made in response to the critical

Page 237

1 peer-review comments?
2    A.   I do not know.
3    Q.   Do you remember the topic areas
4 of the critical peer-review comments?
5    A.   I do not.  Mostly stylistic,
6 around wording, I think.
7    Q.   How many research articles have
8 you authored with a coauthor affiliated with
9 Exponent?
10   A.   I do not know.
11   Q.   Would you say there's been more
12 than five?
13   A.   I do not know.
14        MS. BOGDAN:  Could we please
15 pull up exhibit Business Ethics
16 Magazine by FairWarning.org.
17        (Whereupon, Deposition Exhibit
18 Johnson-17, Business Ethics Article,
19 Legal Scrapes Turn to Science-for-Hire
20 Giant Exponent, was marked for
21 identification.)
22        THE STENOGRAPHER:  Exhibit 17.
23        THE WITNESS:  Not yet.
24        TRIAL TECHNICIAN:  Give me one

Confidential Information - Subject to Protective Order

Page 238

1    moment.  It's giving me some trouble.
2    Hang on.
3           There we go, should see it now.
4           THE WITNESS:  I can see it now,
5    Exhibit 17 is loading.  It's on my
6    screen.
7    BY MS. BOGDAN:
8        Q.    Are you aware of articles like
9    this criticizing Exponent and the work that
10   it does on behalf of industry?
11       A.    I'm not aware of this article
12   or similar ones.
13       Q.    Directing your attention to the
14   last statement on the first page, which
15   reads: It's a go-to destination for major
16   industries with liability problems, even as
17   it is derided by critics as hired -- as a
18   hired gun whose findings are for sale.
19          Do you see that?
20       A.    I see that.
21       Q.    Are you aware of allegations
22   like that regarding Exponent?
23       A.    No, I'm not.
24       Q.    If we could turn to page 3 --

Page 239

1    or actually, page 2 of the document.
2    Directing your attention to the last
3    paragraph.
4        A.    I can see it.
5        Q.    Okay.  Where it reads:
6    Opponents say Exponent's scientists and
7    engineers routinely bend conclusions to the
8    needs of clients, noting that the company in
9    the 1990s supported the tobacco industry in
10   denying the lung cancer risk of secondhand
11   smoke.
12          Were you aware of that
13   allegation?
14          MS. LOCKARD:  Objection, vague.
15       A.    I'm not aware of that statement
16   from the 1990s.
17   BY MS. BOGDAN:
18       Q.    And with regard to the second
19   statement:  The firm's forte, they say, is
20   doubt science, muddying the waters by
21   attacking research showing evidence of harm,
22   highlighting or exaggerating scientific
23   uncertainties about health hazards, and
24   calling for more research to delay action.

Page 240

1    The result, critics say, is a pro-industry
2    imprint on scientific literature.
3           Are you aware of those types of
4    allegations against Exponent?
5        A.    I'm not aware of those types of
6    allegations towards Exponent.
7        Q.    And if I could direct you to
8    page 5, this is the middle paragraph.
9        A.    I think I can see it, next to a
10   picture of someone; is that correct?
11       Q.    That's a picture of Roger L.
12   McCarthy, a former CEO and chairman of
13   Exponent.
14       A.    I see that.
15       Q.    What it says is:  The drive for
16   repeat business is not the only reason.
17   Clients who fund research often own the data
18   that is generated and must approve the
19   publication of results, said Roger L.
20   McCarthy, a former Exponent CEO and chairman,
21   who retired from the company in 2009 and
22   agreed to speak with FairWarning.
23          Are you aware of those
24   statements of the former CEO of the company?

Page 241

1        A.    This is the first time I have
2    seen that statement.
3        Q.    We can take that down.
4           Would it be fair to say that
5    you've authored more than five articles with
6    Exponent coauthors?
7           MS. LOCKARD:  Objection, asked
8    and answered.
9        A.    I do not know.
10   BY MS. BOGDAN:
11       Q.    Well, how many articles have
12   you authored with Gollapudi?
13       A.    I do not know, but if you would
14   wish me to count them, that could be another
15   question.
16       Q.    Not here.
17          We have the Permitted Daily
18   Exposure Limits For Noteworthy Nitrosamines,
19   that was with Gollapudi, right?
20       A.    Yes.  Can you give me the dates
21   when we're going through these, please?
22       Q.    Sure.  That was accepted
23   May 11th of 2021.
24       A.    Excellent.  I agree that is one

Confidential Information - Subject to Protective Order

Page 242

1  with Bhaskar Gollapudi.
2      Q.    Genotoxicity as a
3  Toxicologically Relevant Endpoint to Inform
4  Risk Assessment:  A case study with ethyl
5  oxide.  That was September 4th of 2020.  That
6  was with Gollapudi, correct?
7      A.    That is correct.
8      Q.    Here's one from 2016,
9  Next-Generation Testing Strategy for
10 Assessment of Genomic Damage:  A conceptual
11 framework -- (audio malfunction) --
12      (Clarification requested by the
13      stenographer.)
14 BY MS. BOGDAN:
15     Q.    -- and considerations.
16     A.    The first author of that one,
17 please?
18     Q.    Dearfield, Kerry Dearfield.
19     A.    Yeah, that's correct.  He's
20 ex-EPA and USDA, thank you.
21     Q.    Here is one from 2014,
22 Derivation of Point of Departure Estimates in
23 Genetic Toxicology Studies?
24     A.    Yeah, that was me, first

Page 243

1  author.
2      Q.    Here's another one, Mutation as
3  a Toxicological Endpoint for Regulatory
4  Decision-Making.  That was published online,
5  October 10th of 2019?
6      A.    Yeah, with Bob Heflich from FDA
7  as first author.  I see that, yes.
8      Q.    Yeah.  All right.  And those
9  are the ones I have.
10     A.    Okay.
11          MS. BOGDAN:  If we could put up
12     the article entitled Tolerability of
13     Risk:  A commentary on the nitrosamine
14     contamination issue.
15          (Whereupon, Deposition Exhibit
16     Johnson-18, Tolerability of risk: A
17     commentary on the nitrosamine
18     contamination issue, by Elder et al,
19     was marked for identification.)
20 BY MS. BOGDAN:
21     Q.    Are you a coauthor of that
22 study?
23          THE WITNESS:  Yeah, it's not
24     appearing as an exhibit yet.  Is that

Page 244

1  Exhibit 18?
2          MS. BOGDAN:  This is going to
3      be marked a new exhibit.  I don't
4      think it's been marked yet.
5          THE WITNESS:  Okay.  I can see
6      it, thank you.
7          MS. BOGDAN:  And it has been
8      marked as Exhibit 18 for
9      identification?
10         THE STENOGRAPHER:  Yes.
11 BY MS. BOGDAN:
12     Q.    Are you a coauthor of that
13 study?
14     A.    I'm a coauthor of this
15 commentary, yes.
16     Q.    And did you disclose a conflict
17 of interest in this commentary that was
18 published in the Journal of Pharmaceutical
19 Sciences?
20     A.    We did not, no.
21     Q.    And this commentary is about
22 the nitrosamine contamination issue in
23 pharmaceuticals, correct?
24     A.    It is a commentary on the

Page 245

1  nitrosamine contamination issue, correct.
2          MS. BOGDAN:  If we could please
3      pull up the Journal of Pharmaceutical
4      Sciences introduction, types of
5      articles and declaration of interest
6      exhibit, please.
7          (Whereupon, Deposition Exhibit
8      Johnson-19, JPharmSci Declaration of
9      Interest Policy, was marked for
10     identification.)
11         THE STENOGRAPHER:  Exhibit 19.
12 BY MS. BOGDAN:
13     Q.    And if you could please go to
14 page 4 of that exhibit.
15     A.    Okay.  Page 4.
16     Q.    And under Declaration of
17 Interest --
18     A.    I can see that.
19     Q.    -- it says:  All authors must
20 disclose any financial and personal
21 relationships with other people or
22 organizations that could inappropriately
23 influence, bias, their work.  Examples of
24 potential competing interests include

Page 246

1  employment, consultancies, stock ownership,
2  honoraria, paid expert testimony, patent
3  applications/registrations, and grants or
4  other funding.
5          Do you see that?
6      A.   Yes, I see that.
7      Q.   And authors must disclose any
8  interest in two places: A summary
9  declaration of interest statement in the
10 title page file, or the manuscript file. If
11 there are no interests to declare, then
12 please state this: Declarations of interest,
13 none.
14          Do you see that?
15     A.   I do see that.
16     Q.   This is the declaration of
17 interest for the Journal of Pharmaceutical
18 Sciences where you published general
19 commentary entitled Tolerability of Risk: A
20 commentary on the nitrosamine contamination
21 issue, is it not?
22     A.   That is the journal associated
23 with that publication, yes.
24          MS. BOGDAN: We can take that

Page 247

1      exhibit down, please. Thank you.
2          I'm trying to get my spot here.
3      Okay. If we could please pull up the
4      FDA Laboratory analysis of valsartan
5      products.
6          (Whereupon, Deposition Exhibit
7      Johnson-20, Laboratory Analysis of
8      Valsartan Products, was marked for
9      identification.)
10         THE STENOGRAPHER: Exhibit 19.
11         TRIAL TECHNICIAN: That's
12     Exhibit 20, Mike.
13 BY MS. BOGDAN:
14     Q.   Let me know, Doctor, once it's
15 up on your screen.
16     A.   It's just come up on my screen.
17     Q.   Do you recognize that document?
18     A.   I recognize the table and this
19 document, yes.
20     Q.   What do you recognize that to
21 be?
22     A.   I recognize this to be the FDA
23 analysis as stated in the text of these
24 substances in the finished product, drugs and

Page 248

1  APIs.
2      Q.   All right. Let's -- do you
3  have a hard copy in front of you so you can
4  see the second and third page?
5      A.   I have a hard copy in front of
6  me. I didn't catch the second statement.
7          MS. LOCKARD: He has a hard
8      copy. Let me just make sure it's the
9      same thing you have.
10         MS. BOGDAN: If you could just
11     move this to the second and third page
12     so that the witness can see the whole
13     exhibit.
14         MS. LOCKARD: Yes, it appears
15     to be the same as your exhibit.
16 BY MS. BOGDAN:
17     Q.   Did you review this document as
18 part of your investigation into this matter?
19     A.   I reviewed it and included the
20 metrics in my report.
21     Q.   Now, when you say you included
22 the metrics, what are you referring to?
23     A.   Oh, I included the table,
24 including the numbers and details into my

Page 249

1  report, as far as I'm aware.
2      Q.   What information does the table
3  have in it?
4      A.   It has a row of columns. We've
5  got Company, Product Name, Lots Tested, NDMA
6  levels and NDEA levels within those lots
7  tested from the different companies in a
8  different size and different tablets.
9      Q.   And did you put this
10 information directly into your report?
11     A.   I put this directly into my
12 report. I also included an additional
13 modification of the midpoint based on these
14 numbers, where appropriate.
15     Q.   And when you say you added the
16 midpoint, why did you do that?
17     A.   I do a lot of statistical
18 analysis, and I like to have as much
19 information for metrics as possible. The
20 numbers were not available to carry out means
21 and standard deviations, and the midpoints
22 are calculated as another useful metric for
23 me to use in my analyses.
24     Q.   So you did the midpoint of the

Confidential Information - Subject to Protective Order

Page 250

1    lots that were tested as shown in the table?
2        A.    Yes.
3        Q.    And how many lots approximately
4    were tested for each of the manufacturers'
5    products?
6        A.    They vary.  The lots that were
7    tested according to this table, average --
8    there was lots of three lots tested for
9    certain companies.  There's some where six
10    lots were tested.  There's variation in the
11    number of lots tested.
12        Q.    Do you know how many lots of --
13    for example, let's take Aurobindo at the top.
14            Do you see that at the very
15    top?
16        A.    I see that at the very top.
17        Q.    And you see amlodipine,
18    10 milligrams/valsartan -- valsartan,
19    320 milligrams?
20        A.    Yes, I do see that.
21        Q.    Okay.  Do you know how many
22    lots Aurobindo actually made of that
23    medication during the relevant time period
24    when the contamination took place?

Page 251

1        A.    I do not know that number.
2        Q.    Did you make inquiry to find
3    out the number of lots that were
4    manufactured?
5        A.    I did not inquire to that, but
6    the available data from these companies on
7    the lots tested was made available to me, but
8    I did not request the number that you've just
9    suggested.
10        Q.    So you didn't request for any
11    of the companies that are listed in this
12    exhibit information about the total number of
13    lots they actually manufactured of each of
14    these products?
15        A.    No.  My acceptance that the FDA
16    is a regulatory body that did this analysis
17    and presented a useful body of information
18    was enough for me to present this table as it
19    was.
20        Q.    Well, you testified that you
21    like to have as much information for metrics
22    as possible; is that true?
23        A.    Where suitable, lots of metrics
24    can be very useful, and access to that

Page 252

1    information can be useful.
2        Q.    Did you ask for the information
3    regarding the test results that the
4    individual manufacturers had for the NDMA and
5    NDEA levels in their product based on the
6    testing they had performed?
7        A.    Yes, and I was provided with
8    that information, had access to that
9    information, and saw that there was no real
10    issue in going with these numbers that I
11    presented here from FDA to the final product.
12        Q.    Did you create any type of
13    writing or chart comparing the values that
14    you looked at for the defendants' internal
15    testing results with the results that are
16    reported --
17        A.    I did not.
18        Q.    -- on this exhibit?
19        A.    I did not.  Apologies for
20    speaking over you.
21        Q.    No, that's -- we have a little
22    bit of a delay going on.  It seems to have
23    gotten a little worse, so I'll try to make
24    sure I have a real pause before I start

Page 253

1    speaking again.
2            If you reviewed the internal
3    test results from the manufacturer's testing
4    of their product, then wouldn't you have had
5    information regarding the lots that were
6    manufactured?
7        A.    That information -- I was --
8    the interest from those lots from my
9    perspective was upper limits and whether they
10    exceeded the upper limits in this final
11    product presented in the FDA table.  And from
12    my discussions and observations from that
13    information, I was happy to go with this FDA
14    table.
15        Q.    And did you systematically go
16    through each of the manufacturers listed on
17    the left to see if their internal test
18    results showed levels that were higher than
19    what was reported by the FDA on this table?
20            MS. LOCKARD:  Objection, form,
21    ambiguous.
22        A.    I had this information to hand.
23    It was available for my consideration, and I
24    did consider that those -- those data from

Page 254

1  the different companies.
2  BY MS. BOGDAN:
3      Q.    And how many internal test
4  result documents did you review?
5      A.    I do not know.
6      Q.    Did you review hundreds of
7  internal test results from the company
8  showing the levels of NDMA and NDEA in their
9  products?
10     A.    I do not know.
11     Q.    Can you point me to where on
12 your list of materials considered internal
13 testing data is for the companies?  Do you
14 have a --
15         MS. LOCKARD:  I'm turning to
16     the corporate document section, and
17     I'm not pointing anything out.
18 BY MS. BOGDAN:
19     Q.    Doctor, did you make any note
20 on your list of materials considered which of
21 those corporate documents you're referring to
22 having reviewed with regard to the internal
23 testing data from the companies?
24     A.    I --

Page 255

1          MS. LOCKARD:  You can take time
2      to look through that.
3          THE WITNESS:  Okay.
4          MS. LOCKARD:  I just put it in
5      front of you.
6          (Document review.)
7      A.    I think it comes under the
8  testing results, to -- say, Mylan API testing
9  results on, say, page 19.  Maybe other
10 documents with similar titles as well.  As
11 I've suggested, I've not made notes as to
12 which of these documents I've reviewed.  I
13 reviewed them as and when they were provided
14 by me -- provided to me.
15 BY MS. BOGDAN:
16     Q.    Did you make any efforts to
17 take the midpoint for the internal test
18 results that the companies arrived at when
19 doing NDMA and NDEA testing of their
20 products?
21     A.    I did not with those.  My
22 interest was in upper limits from those
23 documents.
24     Q.    If your interest was in upper

Page 256

1  limits, why did you calculate the midpoint?
2      A.    For additional information from
3  the FDA analyses.
4      Q.    When calculating something like
5  the midpoint of testing values -- strike
6  that.
7          How did you make a
8  determination that the test results that the
9  FDA reported were representative of all of
10 the product that each of the defendants had
11 manufactured over the time period the
12 contamination took place?
13     A.    I made the determination that
14 the FDA was the regulatory body in charge of
15 risk assessment for these batches within the
16 U.S., and that this was a suitable data
17 source.
18     Q.    And this data source reports
19 the test results on between one and six
20 batches of product per type, per
21 manufacturer, correct?
22     A.    That is correct.  And it was
23 analyzed in a consistent manner by the same
24 people to enable these comparisons as well.

Page 257

1      Q.    However, if there were hundreds
2  of batches and lots that were made, wouldn't
3  it be better to have information regarding
4  all of the test results as opposed to one,
5  two, three, four, five or six for a
6  particular batch?
7      A.    In science and risk assessment,
8  decisions have to be made at a point to make
9  a decision on a certain dataset.  You don't
10 need infinite data sources unless you're
11 aware of something that extremely deviates
12 from the data presented here.  And to my
13 knowledge to date, that has not been
14 presented, and these are robust to allow us
15 to make this decision.
16     Q.    You used the word "robust."
17 What makes these results robust if the lots
18 tested were either one, two, three, four,
19 five or six lots in comparison to hundreds
20 that were made?
21     A.    My term of "robust" would be
22 from -- analyzed by the FDA using extremely
23 top-end machinery to get very precise results
24 in a way that they're happy to carry out a

1  risk assessment on.  I would use here -- that
2  was expansion on my use of the term "robust."
3      Q.    You're appearing as an expert
4  on behalf of the defendants in this
5  litigation, correct?
6      A.    Yes, that is correct.
7      Q.    Do you have any reason as you
8  sit there to believe that their own testing
9  of the product that they manufactured results
10  were incorrect or wrong?
11      A.    I do not have any reason to
12  make that assumption, and I'm not an expert
13  in testing samples such as these using
14  techniques such as mass spectrometry.
15      Q.    Through your investigation into
16  this matter, did you learn any information
17  that would lead you to believe that the
18  defendant's own testing of its product for
19  NDMA or NDEA was flawed?
20      A.    I did.  I looked at the
21  information, had discussions, and found no
22  evidence that the analyses were flawed.
23      Q.    Did you request test results
24  from either ZHP, Prinston or Solco regarding

1  the product that they manufactured?
2      A.    I'm quite confident that I've
3  got that information -- I've had that
4  information passed to me and highlighted as
5  being the information from those companies
6  throughout this time.
7      Q.    And did you record that
8  information in your report?
9      A.    The information that I have
10  accessed and have considered, these would be
11  in the list of materials provided or whatever
12  term we have for that long list.
13      Q.    And that list is completely
14  comprehensive of what you reviewed, correct?
15      A.    As far as I'm aware, that is
16  correct.
17          MS. BOGDAN:  If we could please
18      pull up the exhibit which is the
19      general advice letter of the FDA.
20          (Whereupon, Deposition Exhibit
21      Johnson-21, USFDA General Advice
22      Letter, was marked for
23      identification.)
24          THE STENOGRAPHER:  Exhibit 21.

1          MS. LOCKARD:  What number
2  exhibit would this be?
3          MS. BOGDAN:  21, I believe.
4          THE WITNESS:  After this set of
5  questions, can I request another short
6  break?  Getting -- another short
7  break, please.
8          MS. BOGDAN:  Why don't we
9  actually, if you would like a break,
10  take one before we start asking
11  questions about this document.  I'd
12  rather not break while I'm working
13  with the document.  So does that work
14  for you?
15          THE WITNESS:  Works for me.
16          THE VIDEOGRAPHER:  Going off
17  the record.  The time is 4:17 p.m.
18          (Recess taken, 4:17 p.m. to
19      4:32 p.m. BST)
20          THE VIDEOGRAPHER:  We're back
21  on the record.  The time is 4:32 p.m.
22  BY MS. BOGDAN:
23      Q.    Dr. Johnson, is this exhibit,
24  which is the general advice letter from the

1  FDA, now up on the screen?
2      A.    Yes, it is.  Could you make it
3  larger -- or I could open it -- I could open
4  it in exhibits.
5      Q.    I think it was just made
6  larger.  Can you see it now?
7      A.    I can see it now, that's great.
8      Q.    Yeah.  Did you review this
9  letter as part of your investigation into
10  this matter?
11      A.    I can't recall this specific
12  letter.
13      Q.    All right.  Well, this letter
14  in the first sentence, do you see it's
15  referring to angiotensin II receptor
16  blockers, ARB?
17      A.    Yes.  Yes, I can see that.
18      Q.    Is valsartan an ARB?
19      A.    To my understanding, it is.
20      Q.    If we could go down to the
21  third paragraph, could you read the first
22  sentence in the third paragraph?
23      A.    Tell me the first word of that
24  sentence, please.

Confidential Information - Subject to Protective Order

| Page 262 | Page 264 |
|---|---|

**Page 262**

1    Q.    "Nitrosamine."

2    A.    Okay.  Reading this out:

3  Nitrosamine compounds are potent genotoxic

4  carcinogens in several nonclinical species

5  and are classified as probable human

6  carcinogens by the International Agency for

7  Research on Cancer, brackets, IARC.

8    Q.    Do you agree with that

9  statement?

10    A.    I agree that IARC classify

11  nitrosamine compounds as potent genotoxic

12  carcinogens in many instances, and that they

13  are probable human carcinogens.

14    Q.    Are NDMA and NDEA nitrosamine

15  compounds?

16    A.    Yes, they are nitrosamine

17  compounds, NDMA and NDEA.

18    Q.    Do you agree that NDMA is a

19  potent genotoxic carcinogen?

20    A.    The term "potency," from this

21  definition -- it's taken from the TD linear

22  back-extrapolation for potency.  So I agree

23  that they are genotoxic carcinogens, but the

24  definition they use for "potent" relies on

**Page 263**

1  the linear back-extrapolation approach, which

2  I have issues with.

3    Q.    Do you agree that NDMA is a

4  genotoxic carcinogen?

5    A.    I believe --

6        MS. LOCKARD:  Objection, form,

7    vague.

8    A.    -- NDMA has been shown to be a

9  genotoxic carcinogen in animal studies, yes.

10  BY MS. BOGDAN:

11    Q.    Do you agree that NDEA is a

12  genotoxic carcinogen?

13        MS. LOCKARD:  Objection, form,

14    vague.

15    A.    I believe that NDEA is a

16  genotoxic carcinogen in animals too.

17  BY MS. BOGDAN:

18    Q.    Do you have an opinion whether

19  NDMA is a human carcinogen?

20    A.    I believe that has not

21  been shown to date through the data as I've

22  seen.

23    Q.    Do you know what an RCT is?

24    A.    Potentially.  Could you expand

**Page 264**

1  on that phrase, please?

2    Q.    Randomized controlled trial?

3    A.    I understand what a randomized

4  controlled trial is to a certain level, but I

5  do not carry out analysis on clinical trials.

6    Q.    In your research into this

7  matter, have you found any RCTs on humans to

8  determine whether NDMA is a human carcinogen?

9    A.    I have not seen data to that

10  regard to show that humans have increased

11  levels of cancer following exposure to NDMA.

12    Q.    The same question as it

13  pertains to NDEA.  In your research into this

14  matter, have you found any randomized

15  controlled trials on humans to determine

16  whether NDEA is a human carcinogen?

17    A.    I have not seen any clinical

18  trial, randomized controlled trial studies on

19  NDEA in humans to show that it's a human

20  carcinogen.  I have not seen that data.

21    Q.    Do you know whether it would be

22  ethical to conduct human trials using NDMA or

23  NDEA to determine if they're carcinogenic in

24  people?

**Page 265**

1    A.    It's more that they would not

2  be practical.  That's why we go with the

3  animal studies for such analyses for

4  genotoxic impurities.

5    Q.    And why wouldn't they be

6  practical?

7    A.    The rodent carcinogenicity

8  studies, these are lifetime studies.  To do a

9  lifetime study in a human would take a lot

10  longer to generate the data, over, say, a

11  70-year period, then sacrifice the human at

12  the end of that and carry out pathology on

13  their organs, not practical.  Two years, much

14  better than 70 years.

15    Q.    Are you familiar with IARC?

16    A.    I am.  I have a familiarity

17  with IARC that carry out hazard assessments,

18  yes.

19    Q.    And were you familiar with them

20  before your investigation into this case?

21        MS. LOCKARD:  Objection, form,

22    the word "investigation."

23    A.    I was aware of IARC before

24  this -- I've been aware of IARC for many

Confidential Information - Subject to Protective Order

Page 266

1  years.
2  BY MS. BOGDAN:
3      Q.    In the field of toxicology, is
4  IARC looked to as a resource with regard to
5  evaluating the carcinogenic risk of chemicals
6  to humans?
7      A.    No, it is not.  It is to define
8  the hazard identified by these substances and
9  not the risk.
10      MS. BOGDAN:  If we could please
11  pull up the exhibit IARC Monographs on
12  the Evaluation of the Carcinogenic
13  Risk of Chemicals to Humans.
14      (Whereupon, Deposition Exhibit
15  Johnson-22, 1978 IARC Monographs on
16  the Evaluation of the Carcinogenic
17  Risk of Chemicals to Humans, was
18  marked for identification.)
19      THE STENOGRAPHER:  22.
20      TRIAL TECHNICIAN:  I don't see
21  this.
22      MS. BOGDAN:  It's dated 1978,
23  the original one.
24      THE WITNESS:  I have yet to

Page 267

1  receive it as an exhibit.  Is it 22?
2  That may have just popped up.  Is this
3  Exhibit 22?
4      MS. LOCKARD:  Should be.
5      THE WITNESS:  Right.  It has
6  come up, very gray.  I can see it,
7  yes.
8  BY MS. BOGDAN:
9      Q.    What is the title of that
10  document?
11      A.    IARC Monographs on the
12  Evaluation of the Carcinogenic Risk of
13  Chemicals to Humans.
14      Q.    So does the title of that
15  document indicate to you that IARC monographs
16  are used to evaluate the carcinogenic risk of
17  chemicals to humans?
18      A.    This title, presented in 1978,
19  was before the IARC announced that they were
20  actually a hazard-based organization more
21  recently.  They do not talk about
22  concentrations and human exposure limits,
23  rather, yes/no, and categorizing them in
24  human carcinogen, probable carcinogen and so

Page 268

1  on, which is not risk.  It's hazard.
2      Q.    And evaluating whether or not a
3  chemical is a hazard to a human, would one of
4  those things or attributes that would make it
5  a hazard be that it's carcinogenic?
6      MS. LOCKARD:  Objection, vague.
7      A.    That would be one of the
8  aspects of hazards, as long as the data
9  abided to the OECD guideline on the cancer
10  bioassay for which these decisions could be
11  made.  And this monograph predates the OECD
12  guideline for the cancer bioassay.
13  BY MS. BOGDAN:
14      Q.    Now, when you're talking about
15  the OCD -- or OECD guideline for cancer
16  bioassay, you're talking about the guidelines
17  to run an animal test, correct?
18      A.    A very specific animal test
19  where the species are defined, with rodent
20  being the preferred and very specific
21  criteria on study design.
22      Q.    If we could go back to the
23  previous exhibit, which was the general
24  advice letter from the FDA, please.  The next

Page 269

1  sentence that begins "In fact," do you see
2  that?
3      A.    The one which you're
4  highlighting beginning "In fact," yes, I see
5  that.
6      Q.    So that sentence reads:  In
7  fact, N-nitroso compounds are identified as a
8  cohort of concern in internationally
9  harmonized guidance, ICH M7, Assessment and
10  Control of DNA Reactive (Mutagenic)
11  Impurities in Pharmaceuticals to Limit
12  Potential Carcinogenic Risk.
13      Do you see that sentence?
14      A.    Yes, I see that sentence.
15      Q.    Are you familiar with the
16  concept of "cohort of concern" that's
17  referred to in that sentence?
18      A.    I'm very familiar with that
19  term.
20      Q.    What does that term mean?
21      A.    For genotoxic impurities,
22  they're of high importance, and that's why
23  the ICH M7 guideline really was prepared.
24      Within that, they came up with

Confidential Information - Subject to Protective Order

Page 270

¹ a concept, an applied concept called the
² threshold for toxicological concern, where
³ they assessed all of the data from the cancer
⁴ potency database that used to reside in
⁵ Berkeley in the GOLD database that now
⁶ resides at Lhasa, took all of that
⁷ information, took the harmonic means from the
⁸ TD50s from the cancer bioassay dose-response
⁹ data, did a 1-in-100,000 level of risk
¹⁰ calculations or linear back-extrapolation,
¹¹ one of the things that I push against with
¹² the PDE based on threshold assumption.
¹³        And from the calculation for
¹⁴ the threshold of toxicological concern, a
¹⁵ proportion of the nitroso compounds were
¹⁶ shown to be more potent, the 1 in 100,000 at
¹⁷ the concentration of 1.5 micrograms per day
¹⁸ in humans.  And that's all that means.
¹⁹    Q.    And the ones that were shown to
²⁰ be more potent, do those include NDMA and
²¹ NDEA?
²²    A.    That was not prescribed, but
²³ the regulatory bodies have done the
²⁴ acceptable intake space on those compounds.

Page 271

¹    Q.    And the regulatory bodies
² followed the TD50 linear extrapolation
³ approach to come up with the acceptable
⁴ intakes; is that correct?
⁵    A.    They did, yes.
⁶    Q.    And when we're referring to
⁷ regulatory bodies, the TD50 linear
⁸ extrapolation approach is the one that's
⁹ followed by the FDA, correct, for NDMA and
¹⁰ NDEA?
¹¹    A.    It is the one that's followed
¹² in order to generate the acceptable intakes
¹³ presented for NDMA and NDEA.
¹⁴    Q.    And the EMA also followed the
¹⁵ TD50 linear extrapolation approach to come up
¹⁶ with the acceptable intakes for NDMA and
¹⁷ NDEA?
¹⁸    A.    That is correct.  On this
¹⁹ reactive response, they needed to carry out a
²⁰ very quick and harmonized approach that
²¹ global regulatory bodies could do, where you
²² could get the harmonic means from the TD50,
²³ CPDB database, and do a very simple linear
²⁴ back-extrapolation, and come up with these

Page 272

¹ acceptable intakes across the global platform
² to generate these acceptable intakes.
³    Q.    So the TD50 linear
⁴ back-extrapolation methodology for NDMA is
⁵ accepted by the FDA, correct?
⁶    A.    It is accepted by the FDA, and
⁷ so is permitted daily exposure, as stated in
⁸ the ICH guidance.
⁹    Q.    And the TD50 linear
¹⁰ back-extrapolation methodology for
¹¹ determining acceptable intake of NDEA is
¹² accepted by the FDA, correct?
¹³    A.    That is correct.  And they used
¹⁴ the linear back-extrapolation from the TD50
¹⁵ to generate the accepted intake, but within
¹⁶ the guidance, there's also an option for
¹⁷ other risk assessment approaches, including
¹⁸ the PDE.
¹⁹    Q.    However, the FDA did not elect
²⁰ to use any of those other approaches.  They
²¹ used the linear back-extrapolation approach
²² using TD50 and the harmonic mean, correct?
²³    A.    Correct.  To that time, in this
²⁴ very reactive procedure, they -- they did

Page 273

¹ make that decision, and then in the future
² with further nitrosamines, when increased
³ information about mechanism of action,
⁴ dose response is included, then there will be
⁵ more options for the PDE as the science
⁶ catches up.
⁷    Q.    The next sentence reads:
⁸ ICH M7 recommends that known mutagenic
⁹ carcinogens such as nitrosamines be
¹⁰ controlled at or below the acceptable cancer
¹¹ risk level.
¹²        Is that what the ICH M7
¹³ recommends to your knowledge?
¹⁴    A.    At the current time, to my
¹⁵ knowledge, that's the recommendation.
¹⁶    Q.    Due to their known potent
¹⁷ carcinogenic effects, and because it is
¹⁸ feasible to limit these impurities by taking
¹⁹ reasonable steps to prevent or eliminate
²⁰ their presence, the FDA has determined that
²¹ there is no acceptable specification for
²² nitrosamines in ARB, API and DP.
²³        Is that your understanding of
²⁴ the FDA's determination?

Confidential Information - Subject to Protective Order

Page 274

1    MS. LOCKARD:  Objection, form.
2    A.    Yeah, from this statement I've
3  read and see that that's the statement from
4  the FDA, yes.
5  BY MS. BOGDAN:
6    Q.    And in that sentence, if we
7  could highlight it, what does API stand for?
8    A.    From my understanding, it means
9  active pharmaceutical ingredient.
10   Q.    And what do the initials DP
11  stand for?
12   A.    I'm unsure.
13   Q.    Have you seen the initials DP
14  refer to drug product before?
15   A.    I haven't seen it abbreviated
16  to DP.  I see finished product, FP, more by
17  my colleagues in this area.
18   Q.    And when someone takes a
19  medication, is the API the actual active
20  ingredient, the amount of the -- excuse me --
21  the amount of the active ingredient in the
22  tablet, meaning if you're taking valsartan
23  and it's 320 milligrams, it would be the
24  valsartan 320 milligrams that's contained in

Page 275

1  the tablet?
2    MS. LOCKARD:  Objection, form.
3    A.    Could you restate that question
4  again, please.
5  BY MS. BOGDAN:
6    Q.    You said that API is the active
7  pharmaceutical ingredient, correct?  Active
8  pharmaceutical ingredient.  How does that
9  relate to a tablet that somebody takes?
10   A.    This isn't my area of
11  expertise, but my understanding is the active
12  pharmaceutical ingredient is combined with
13  other substances for, say, different delivery
14  around the -- around the human in this
15  instance.  So it's a part of the drug but not
16  the complete construction of the final drug,
17  or DP, in this instance.
18   Q.    Are you an expert in
19  pharmaceutical manufacturing?
20   A.    I'm not an expert in
21  pharmaceutical manufacturing.
22     MS. BOGDAN:  We can take that
23  down.
24     ///

Page 276

1  BY MS. BOGDAN:
2    Q.    What is a mutagen?
3    A.    The definition in Europe is
4  that a mutagen is a substance that causes
5  gene mutations, and we assess for that with
6  mutagenicity tests in genetic toxicology.
7  There's some use in the U.S. by different
8  regulatory bodies that a mutagen covers all
9  types of genotoxicants.
10   Q.    Do you differentiate between
11  the term "genotoxicants" and "mutagens"?
12   A.    In -- I do, in this instance,
13  particularly when working with very important
14  substances where the mechanism of action is
15  mutation.  We understand the mutation
16  mechanism.  Definitely use the term
17  "mutagen."
18   Q.    Does a mutagen change the DNA
19  sequence?
20   A.    At the correct dose, the
21  mutagen can cause adducts, those DNA adducts
22  at certain places within the DNA, such as the
23  O6 position of guanine, which these compounds
24  can target, can leave an alkyl group on those

Page 277

1  specific positions in the DNA.
2    If those are left unrepaired by
3  the high levels of enzymes such as MGMT, and
4  if they're in a region where upon replication
5  they can be miscoded to another base, so upon
6  replication with the O6-alkylguanine lesion,
7  it would go from GC to AT.
8    And then that would go from
9  being an adduct to that specific area having
10  a mutation, and that mutation would have been
11  caused by that adduct.
12   Q.    So in order to have a mutation,
13  the change in the DNA has to replicate,
14  correct?
15   A.    In order for the adduct to go
16  into a mutation, it has to be misrecognized
17  as something else, and when it's
18  misrecognized as something else, another base
19  gets put opposite it, and that happens at the
20  DNA replication part of the cell cycle.
21   Q.    How do mutations lead to
22  cancer?
23   A.    Mutations can lead to cancer if
24  those mutations are in the coding region of

Confidential Information - Subject to Protective Order

---

Page 278

1  DNA. Say 95% of our DNA is junk DNA that
2  wouldn't have a coding gene. Then also to
3  say the 25,000 other genes that we have,
4  there's some that are associated with cancer.
5         The broad term for those types
6  of genes are "oncogenes." If an oncogene is
7  upregulated through mutation, that leads to
8  increased proliferation, the hallmark of
9  cancer.
10        If a tumor suppressor gene --
11 if there's a mutation which causes a tumor
12 suppressor gene to be silenced, then things
13 like DNA repair are not triggered. So if
14 there's mutations in this very specific
15 region of DNA and they're not picked up from
16 the DNA repair machinery, then they can lead
17 to cancer.
18        And a few of those genes -- say
19 most cancers would need, say, three to six
20 genes to be mutated before the cancer would
21 ensue, then at those concentrations of --
22 those levels of mutation, those levels of
23 mutation could lead to cancer. That's my
24 explanation of it.

Page 279

1     Q.   And is NDMA a mutagen?
2     A.   NDMA is an alkylating agent and
3  it acts at those positions -- at that
4  position of guanine, which I mentioned. And
5  when we carried out mutation testing on NDMA,
6  we saw that it was a mutagen in the genetic
7  toxicology test system for mutation.
8     Q.   Is NDEA a mutagen?
9     A.   NDEA is a mutagen through a
10 very similar mechanism acting at the same
11 sort of adduct spectrum, mutation spectrum as
12 NDMA as well.
13    Q.   Are they both alkyline agents?
14    A.   The term is "alkylating agent."
15    Q.   Oh, I'm sorry. Yeah.
16    A.   Alkylating.
17    Q.   Okay.
18    A.   So NDMA and the metabolite of
19 NDMA can cause a CH3 group, which is a methyl
20 group, and the broader term of a methyl group
21 would be under an alkyl group. So that's the
22 methylating part of that term.
23        And then NDEA could cause C2H5,
24 which would be an ethyl group, and that's

Page 280

1  also under the blanket term of "alkyl."
2         So because of those substances
3  acting via that mechanism for causing DNA
4  adducts and then mutation, they can be termed
5  "alkylating agents" because they provide an
6  alkyl group to the DNA at certain
7  concentrations.
8     Q.   Now, I've heard that they can
9  also, when they are metabolized into their
10 reactive form, form an ion. Is that true?
11    A.   The ion, from my understanding,
12 the ion is the part with the methyl or ethyl
13 group, depending whether it's NDMA or NDEA
14 respectively. And that metabolite, that ion,
15 is the active group of that.
16        And because that requires -- to
17 get to that stage, requires metabolism
18 specifically from cytochrome P450 enzymes,
19 which are mostly found particularly at high
20 levels in the liver, that activity of that
21 ion causing those adduct mutations for these
22 substances is clearly identified in the
23 liver.
24    Q.   Now, you mentioned the P450

Page 281

1  enzymes. Are they found elsewhere in the
2  human body other than the liver?
3     A.   They are found at much lower
4  levels other than the liver. The liver's job
5  is really to be a metabolic powerhouse, and
6  because of that, the liver contains huge
7  amounts, high levels of these cytochrome
8  P450s than other organs, but as a residual,
9  at very low levels, they can be found
10 potentially in some other organs. But I'm
11 not an expert on those levels in other
12 organs.
13    Q.   I was going to ask: Did you do
14 research into where the cytochrome P450s
15 exist in the human body other than the liver?
16    A.   That was not part of my remit
17 and part of my report. I was looking at the
18 endpoints rather than the cytochrome P450
19 levels. Okay.
20    Q.   What exactly were you asked to
21 do when you were hired as a consultant by
22 Teva in this litigation?
23        MS. LOCKARD: Objection, form,
24 vague.

Page 282

1    A.    The exact remit of what I
2  was -- what we discussed and what my report
3  and risk assessment would include as
4  supported by Teva and GT and later with the
5  other defendants, at the time of initiation,
6  because they had seen my presentation on the
7  PDE in these different ways, it was very
8  much:  Can you expand on this report around
9  PDEs and see how it applies to our situation.
10          Beyond that, it was built on
11 what I've already done, what I already know,
12 and see how it applies to this situation.
13 BY MS. BOGDAN:
14   Q.    And when you say they had seen
15 my presentation on the PDE, what presentation
16 are you referring to?
17   A.    This initiates from that
18 Informa Impurities conference where I
19 presented that work that we've discussed
20 quite extensively already in Berlin where I
21 had done the work with my regulatory
22 colleagues, come up with some interesting
23 findings, and presented them at that meeting.
24          And really, it was just an

Page 283

1  extension of what do these PDEs look like
2  when you apply your numbers to the situation.
3  Yes.
4    Q.    Who funded that original work
5  you did that led to the presentation in
6  Berlin, I believe you testified in 2018?
7          MS. LOCKARD:  Objection, asked
8      and answered and vague.
9    A.    We discussed this extensively
10 earlier to my recollection, and again, it was
11 not funded.  It was really research exercise
12 triggered from my work with my regulatory
13 experts and then expanded upon to the HESI
14 GTTC.
15          So I was not funded to carry
16 out that initial work that was presented at
17 that conference.
18   Q.    Is NDMA genotoxic?
19   A.    NDMA, in line with my
20 description of the term "genotoxic," my
21 description of the term "genotoxic" is in
22 line with many of those experts in Europe
23 where genotoxic is the all-encompassing
24 power, the all-encompassing term for

Page 284

1  mutagens, for clastogens, for antigens.
2          So under the blanket term of
3  "genotoxic," mutagen becomes under that.  And
4  as I've already described, NDMA has been
5  shown to be a mutagen in these in vitro and
6  in vivo tests.
7    Q.    And then the same question with
8  regard to NDEA because we're dealing with
9  both compounds here, Doctor.
10          Is NDEA genotoxic?
11   A.    Within the same definition,
12 within -- under the term, blanket term
13 "genotoxic" is the term "mutagen," so because
14 I've already discussed around NDEA being
15 assessed and shown to be a mutagen in vitro
16 and in vivo with the standard tests, then we
17 can say it's a mutagen, and we can say it's
18 a -- and it's genotoxic.
19   Q.    And why are mutagens and
20 genotoxins as far as chemicals a concern, if
21 at all?
22   A.    At the right concentration, at
23 a high concentration, the genotoxicant or --
24 that would probably be something I'd talk

Page 285

1  about chromosomal, structural damage or
2  chromosome loss, but I want to talk about
3  mutation because that's relevant here.
4          So we're trying to protect
5  against increased levels of mutation by
6  ensuring that high levels of mutagens and
7  that people aren't exposed to them, because
8  at high levels of mutagens, they cause
9  mutation.  High levels of mutation can lead
10 to cancer at certain doses of a substance
11 that is a mutagen.
12          MS. BOGDAN:  Okay.  Can we pull
13     back up the next exhibit that was
14     already marked, which was that IARC
15     monograph.
16          TRIAL TECHNICIAN:  Was that
17     Exhibit 22?
18          MS. BOGDAN:  I believe so.
19     It's the one right after the FDA
20     letter.  It was the last exhibit we
21     marked.
22          TRIAL TECHNICIAN:  Okay.
23          MS. BOGDAN:  No, that's not it.
24     It's the one that had the gray cover,

Page 286

1    the IARC monograph dated 1978.
2        (Technical comments off the
3    stenographic record.)
4  BY MS. BOGDAN:
5      Q.    Have you reviewed this document
6  as part of your investigation into this case?
7      A.    I've considered this document,
8  but it didn't contribute to my decision
9  because the data within this predate the
10 guidance on how to carry out cancer
11 dose-response analysis in animals and also
12 predates the best cancer data in animals,
13 which would be the Peto data.
14      So because of that and this
15 being a hazard-based assessment on yes/no
16 rather than concentrations, I deemed this to
17 be obsolete and did not contribute to my
18 decisions and my risk assessment.
19      Q.    Did you read through it?
20      A.    I've read through parts of it
21 as a critique to my understanding that this
22 was used in another deposition, so I read
23 through it to look into it for that reason.
24      Q.    If you could please turn to --

Page 287

1  it will not be page 88 in the PDF, but
2  page 88 marked as such in the bottom
3  left-hand corner.
4      A.    All right.  Okay.  Mine starts
5  at 124.
6        TRIAL TECHNICIAN:  Yeah, same,
7  125.
8        MS. BOGDAN:  Can you go to
9  page 88?
10        TRIAL TECHNICIAN:  No, it
11 starts at 125.
12        MS. BOGDAN:  Okay.  Well, then,
13 we'll go to page 125, which is the
14 Nitrosodimethylamine section, and then
15 from there, if we could go to page --
16 you just have a different version of
17 this than I have in front of me here,
18 so if we could go to page -- to
19 page 151.
20        THE WITNESS:  I'm on page 151.
21 BY MS. BOGDAN:
22      Q.    Okay.  Do you see the section
23 that starts "Humans"?
24      A.    Yes.

Page 288

1      Q.    Okay.  And the second
2  paragraph, it says:  Studies in vitro suggest
3  that NDMA is metabolized by human liver and
4  lung via the same metabolic pathway as in
5  other mammalian species.
6        Do you see that?
7      A.    I do see that.
8      Q.    It's fuzzy.  Okay.
9        Do you agree that the studies
10 that are available suggest that NDMA is
11 metabolized by humans via the same metabolic
12 pathway as in other mammals?
13        MS. LOCKARD:  Objection to
14 form, vague.
15      A.    As with a lot of information in
16 the IARC monographs, they don't talk about
17 levels at all.  Studies in vitro suggest that
18 NDMAs metabolize by human liver and lung by
19 the same metabolic pathway.
20        That does not mean that there's
21 the same amount of -- same level of
22 metabolism in the lung as there is in the
23 liver.  That's not stated here.
24        ///

Page 289

1  BY MS. BOGDAN:
2      Q.    I was more interested in asking
3  your opinion -- I'm sorry.  I -- I didn't
4  realize you weren't finished.
5        MS. LOCKARD:  Go ahead,
6  Dr. Johnson.
7      A.    Apologies.  This is a very
8  vague statement from my perspective.
9  BY MS. BOGDAN:
10      Q.    I was more interested in your
11 opinion regarding whether in your
12 investigation into this matter you formed any
13 opinion with regard to whether NDMA is
14 metabolized in humans in a similar way as in
15 other mammals.
16        MS. LOCKARD:  Objection, form.
17 There's -- there's no question
18 pending.
19      A.    Can you --
20 BY MS. BOGDAN:
21      Q.    Do you have an opinion -- do
22 you have an opinion whether NDMA is
23 metabolized in humans in a similar way as
24 other mammals?

Confidential Information - Subject to Protective Order

Page 290

1    A.    I have an opinion that
2  cytochrome P450 2E1 is able to metabolize
3  NDMA in humans and in other organisms.
4    Q.    And when you say other
5  organisms, is that mammals or some other type
6  of organism?
7    A.    Specific to my report, where I
8  focused on the rodents and the rodent cancer
9  bioassay, then the presence and ability to
10  metabolize NDMA by cytochrome P450 2E1, there
11  is capacity for that in the rodent systems
12  that we used.  So in that regard, that's my
13  answer.
14    Q.    So your answer is that in the
15  rodent cancer bioassay testing, that it
16  indicated that the rodents had the ability to
17  metabolize NDMA by the cytokine P450s as NDMA
18  is metabolized by humans?
19    A.    Yes, that was my understanding.
20  And from my analysis and reading around that
21  statement being correct, I'm comfortable with
22  that statement.
23        And also from my understanding
24  of how these substances -- how NDMA causes

Page 291

1  mutation and then cancer at certain
2  concentrations is why we can focus on the
3  liver as being the target organ for the
4  highest level of mutation and cancer as seen
5  through the robust cancer bioassay and
6  mutation test systems that I've included in
7  my report.  The downstream organs are lesser
8  affected or not affected.
9        So in that regards, that's my
10  answer.
11    Q.    And that's based upon the
12  information you derived from the rodent
13  bioassays?
14    A.    And also an understanding of
15  the metabolism of the substance.  And I'm
16  aware of experts in PK modeling and --
17  pharmacokinetic modeling and distribution
18  modeling that the analysis presented by such
19  experts are that the substance, including
20  NDMA, would reach the liver and be
21  metabolized by those enzymes in the liver to
22  the highest extent, potentially leaving not
23  very much of that substance to go to
24  downstream organs.

Page 292

1        That's my understanding from
2  the literature and from reading many
3  different reports from different experts.
4    Q.    Do you have a particular study
5  that you reviewed that you would cite to for
6  the proposition that you just testified to?
7    A.    I'm aware that there's
8  metabolism experts as another -- I was
9  getting feedback.  Has something changed?
10  I'm getting feedback.
11    Q.    I heard a little feedback as
12  well.  It seems like it's cleared now.
13    A.    Okay.  So I'm aware that
14  there's a metabolism expert -- I potentially
15  forgot the name -- but from the GT side that
16  has been in line with this concept that the
17  liver has the highest level of metabolism.  I
18  think it's Bottorff, but I may be corrected.
19  And that's in line with my discussions.
20        Also, because I work very
21  closely with EMA and so forth, I realize all
22  the risk assessments to date have also been
23  on the liver, exactly down to this same
24  issue, this same discussion point that the

Page 293

1  liver is the most metabolically competent
2  organ for metabolizing this substance.
3        And with all of that
4  information together, that's where I come to
5  my conclusion.
6    Q.    You testified earlier, I
7  believe, that you had reviewed the other
8  defendants' expert reports; is that correct?
9    A.    Some of them.  And I considered
10  them all.
11        (Clarification requested by the
12  stenographer.)
13  BY MS. BOGDAN:
14    Q.    Did you consider some of them
15  or consider them all?  It was difficult to
16  hear your response, Doctor.
17    A.    Oh, apologies.  I've considered
18  them all and assessed some of them.
19    Q.    And what's the difference
20  between considering them and assessing them?
21    A.    My definition as I've just
22  stated, considered would be is the report
23  relevant to my report or to my understanding.
24  If it's something like the epi experts, then

Page 294

1  that would just be considered and not read in
2  detail.
3        If it was something more
4  relevant, something like the Hecht report, I
5  would read that in a fine level of detail, or
6  the Panigrahy one, for example, and then that
7  would -- I would carry it out in that way.
8     Q.   Did you rely on, for example --
9  I think you mentioned Dr. Bottorff's report
10 with regard to the determination that the
11 liver was the target organ?
12    A.   I did not.  I made that
13 decision based on the risk assessments to
14 date that were all on the liver, as with all
15 the experts, understand that this is the case
16 for these substances, and from my reanalysis
17 of the in vivo cancer bioassay data as well,
18 for which the liver was always the most
19 sensitive and most important test tissue.
20    Q.   When you reviewed the
21 defendants' expert reports, did you find
22 anything you disagreed with?
23        MS. LOCKARD:  Objection, vague,
24    overbroad.

Page 295

1        Do you want him to reread them
2    and tell you what he disagrees with or
3    if he agrees with every statement?
4        MS. BOGDAN:  Well, let me ask
5    the question a different way.
6  BY MS. BOGDAN:
7     Q.   When you reviewed the
8  defendants' expert reports, was there
9  anything you took note of in their report
10 that you disagreed with?
11    A.   I cannot recall.
12    Q.   If we reviewed your list of
13 materials considered, would you be able to
14 tell me which expert reports you assessed?
15    A.   I would not be beyond the
16 previous answer that I gave to this question.
17    Q.   Would you be able to tell me
18 any of the experts by name that you read and
19 assessed their full report?
20    A.   Can you repeat the last half
21 of -- the final sentence, please?
22    Q.   Sure.
23        I said would you be able to
24 tell me any of the experts by name that you

Page 296

1  read and assessed their full report?
2     A.   Dr. Hecht, Lagana, Panigrahy.
3  Potentially Etminan, but maybe I'm not so
4  confident.  Let me get through.
5        I've read, I would say Chodosh.
6  And there's been other ones in there, say,
7  aspects of Bottorff, Raphael Nudelman, and
8  I've seen many of the others as well.
9        But off the top of my head,
10 maybe their names are more memorable.  I can
11 agree to those ones.
12    Q.   When -- if we could go back to
13 the exhibit, page 151, that's up on the
14 screen, when you reviewed the older studies,
15 did you find studies in different animal
16 species where NDMA was found to cause cancer?
17        MS. LOCKARD:  Objection, form,
18    vague.
19    A.   I looked at some of these -- I
20 think some of these are listed here -- and
21 the studies contributing to those decisions.
22 I think one of the experts expanded on many
23 of these studies in their report.
24        So due to that, I looked at

Page 297

1  those reports to see if the cancer studies
2  within these test systems looked to be of
3  suitable study design, say, were they the
4  right route of exposure, or were they
5  intraperitoneal injections?  Were they
6  swimming in crazy -- like very high
7  concentrations of the substance?
8        Really to see if the test -- if
9  the study design was anything close to the
10 OECD guidelines, which this document, again,
11 predates, to make it so any of these findings
12 were able to contribute to my decision.
13        And I found issues with all of
14 the study designs that I looked at, mostly
15 based on route of administration, very high
16 concentrations, no dose response.  It's also
17 precancer bioassay OECD guideline, which
18 means that not even the animal husbandry,
19 things like that were consistent, preparation
20 of dosing.  Basically, nothing can be
21 reliable from such a test.
22        And that's the kind of
23 considerations that I went through.  In
24 considering how incredible datasets such as

Confidential Information - Subject to Protective Order

Page 298

1  the Peto dose-response data and those that
2  reside in the cancer potency database for
3  this actual risk assessment are not this
4  preliminary, really issue-based hazard
5  assessment from IARC, then I found many
6  issues in these studies.
7  BY MS. BOGDAN:
8      Q.    If we could please go to
9  page 152.  You see the section that's
10 entitled Evaluation?
11     A.    I can see the section.
12     Q.    Okay.  And in that evaluation,
13 which again, was done in 1978 --
14     A.    Yeah.
15     Q.    -- it reads:  There is
16 sufficient evidence of carcinogenic effect of
17 N-nitrosodimethylamine in many experimental
18 animals.
19     A.    Based on --
20     Q.    Do you --
21     MS. LOCKARD:  Hold on.
22     (Simultaneous discussion
23     interrupted by the stenographer.)
24     ///

Page 299

1  BY MS. BOGDAN:
2      Q.    There's a little bit of a
3  delay.  Do you agree with that statement?
4      A.    I believe that that's their
5  statement, but it's based on very flawed
6  experimental designs, predating the cancer
7  bioassay guideline and obsolete to my report,
8  and this is hazard-based too.
9      Q.    Well, the Peto study that
10 you're referencing, which came along later,
11 if I'm remembering, maybe 1991, correct,
12 thereabouts?
13     A.    Yes, correct, thereabouts.
14     Q.    That -- that study provided
15 evidence of a carcinogenic effect of
16 N-nitrosodimethylamine, didn't it?
17     MS. LOCKARD:  Objection, form,
18     vague.
19     A.    It provided carcinogenicity at
20 certain doses in that study in those -- in
21 that test system.
22 BY MS. BOGDAN:
23     Q.    And then reading on, the
24 statement by IARC back in 1978 was:

Page 300

1  Similarities in its metabolism by human and
2  rodent tissues have been demonstrated.
3          And then it reads on:  Although
4  no epidemiological data were available -- and
5  then it says -- and efforts should be
6  directed toward this end,
7  N-nitrosodimethylamine should be regarded for
8  practical purposes as if it were carcinogenic
9  to humans.
10         Was that the guidance that was
11 given by IARC back in 1978?
12     A.    That looks to be the guidance
13 provided by IARC in 1978, but it looks like
14 with their updated definition, that it will
15 be probable human carcinogen.
16     MS. BOGDAN:  Can we please mark
17     the IARC monograph dated 1987.
18     (Whereupon, Deposition Exhibit
19     Johnson-23, 1987 IARC Monographs on
20     the Evaluation of the Carcinogenic
21     Risk of Chemicals to Humans, was
22     marked for identification.)
23     MS. BOGDAN:  Can I have a check
24     on the time?

Page 301

1          THE STENOGRAPHER:  You are at
2  6 hours, 52.
3          And this is Exhibit 23.
4  BY MS. BOGDAN:
5      Q.    Have you reviewed this document
6  or are you familiar with it?
7      A.    Apologies.  It's not up yet.
8  Which exhibit again, please?
9          THE STENOGRAPHER:  23.
10         THE WITNESS:  Yeah, it's still
11 not up for me, apologies.  It's
12 appeared now.  I'm just loading it.
13     MS. BOGDAN:  Okay.
14         THE WITNESS:  Okay.  Here we
15 go.  I've got it.
16 BY MS. BOGDAN:
17     Q.    All right.  And, this document,
18 if you can see it, is an IARC monograph as
19 well, and it's an update to the IARC
20 monographs.  And this document was produced
21 in 1987.
22         Can you see that?
23     A.    I can see that, again,
24 predating the Peto study, which is

Confidential Information - Subject to Protective Order

Page 302

1  interesting.
2      Q.    Okay.  And then are you
3  familiar with the different classifications
4  that IARC has developed for the different
5  chemicals?
6      A.    I am.  I'm aware of their
7  hazard-based classifications of these
8  chemicals.
9      Q.    Do you know what IARC has
10  graded NDMA?
11        MS. LOCKARD:  Object to form,
12    vague, misstates the document.
13      A.    My understanding is a probable
14  human carcinogen.
15  BY MS. BOGDAN:
16      Q.    If we could go to page 31 of
17  this document.  And the page numbers are on
18  the upper inside corner.
19      A.    Almost there.
20      Q.    If I could direct your
21  attention to the very last paragraph, which
22  starts with "Group 2A."
23      A.    I'm still finding it.  My PDF
24  reader is saying the pages are different.

Page 303

1  Group 2A, I think I found it.
2      Q.    Okay.  I think it's also been
3  put up maybe a little larger on the screen so
4  you can see it.
5      A.    Oh.  I'll go with the Zoom
6  screen for this.  Thank you.
7      Q.    Is it your understanding that
8  IARC has classified NDMA and NDEA as a
9  Group 2A chemical?
10      A.    It is my understanding that
11  they've classified NDMA and NDEA as probably
12  carcinogenic to humans based on this
13  hazard-based assessment, yes.
14      Q.    Can you read the description
15  that IARC has for the agent is probably
16  carcinogenic to humans?
17      A.    Which sentence --
18      Q.    You can read them all in its
19  entirety.
20      A.    Okay.  This category is used
21  when there is limited evidence of
22  carcinogenicity in humans and sufficient
23  evidence of carcinogenicity in experimental
24  animals.  Exceptionally, an agent may be

Page 304

1  classified into this category solely on the
2  basis of limited evidence of carcinogenicity
3  in humans or of sufficient evidence of
4  carcinogenicity in experimental animals
5  strengthened by supporting evidence from
6  other relevant data.
7      Q.    And is that your understanding
8  of the 2A classification by IARC for a
9  probable human carcinogen?
10      A.    That is my interpretation of
11  their classification of 2A, a probable human
12  carcinogen, yeah.
13      Q.    If we can go to page 42 of the
14  document, and where it says:  Group 2A.  The
15  working group concluded that the following
16  agents are probably carcinogenic to humans.
17        Do you see that?
18      A.    Yes, I see that.
19      Q.    And directing your attention
20  down the list, about seven from the bottom,
21  do you see N-nitrosodiethylamine?
22      A.    Yes, I do.
23      Q.    And N-nitrosodimethylamine?
24      A.    Yes, I do.

Page 305

1      Q.    And this document is
2  classifying them as, if we look at the top,
3  probably carcinogenic to humans, correct?
4      A.    According to their definition
5  of that with no consideration of dose, just
6  in a hazard-based assignment, they're
7  probably carcinogenic to humans, correct,
8  according to their classification.
9      Q.    Okay.  Thank you.
10        MS. BOGDAN:  Can we go off the
11  record, please.
12        THE VIDEOGRAPHER:  Going off
13  the record.  The time is 5:38 p.m.
14        (Discussion off the record.)
15        (Whereupon, the following
16  proceedings were conducted off the
17  videotaped record.)
18        MS. LOCKARD:  So we're back on
19  the record after having taken a break.
20        I just want to make the record
21  clear that plaintiffs' counsel is
22  stopping the deposition after we've
23  been on the record now for less than
24  7 hours.

Confidential Information - Subject to Protective Order

Page 306

1    It's our expectation that, you
2  know, the option for going into a
3  second day is when it cannot be
4  finished in the first day.
5    It's only 12:39 p.m. on
6  East Coast time currently, so for the
7  record, we are ready and willing to
8  continue moving forward with the
9  deposition.
10    We have international flights
11  tomorrow night that we have to make,
12  so if -- you know, if we're going to
13  stop now, I just want to make sure the
14  record is clear we're going to have to
15  plow through tomorrow because we're
16  not changing our flights because we
17  stopped at, you know, 12:30 on Eastern
18  Time.
19    MS. BOGDAN:  And just so the
20  record is clear, we began this
21  deposition at 4:00 a.m. Eastern Time,
22  so we have been at this over 8, almost
23  9 hours, and had to, obviously, get up
24  and be here.

Page 307

1    Victoria, I don't know what
2  time your flights are tomorrow.  We
3  noticed the deposition for two days.
4    And we have done -- when you
5  say under 7 hours of record time,
6  well, 6 hours and 58 minutes is, in my
7  opinion, about 7 hours of record time.
8    So I don't understand why there
9  would be any reason that we could not
10  start at, again, 4:00 a.m. Eastern
11  Standard Time tomorrow and continue to
12  take the deposition.
13    I don't know what time your
14  flights are, but, you know, given the
15  fact that this is a two-day
16  deposition, I just don't think that's
17  a justification for not being able to
18  conclude this.
19    THE STENOGRAPHER:  Anything
20  else?
21    MS. LOCKARD:  Yeah.
22    The only other thing I'm saying
23  is if we're stopping now, tomorrow, if
24  we're starting in the morning at 9:00,

Page 308

1    we're not going to have time for
2  breaks.  We're going to have to go --
3  I mean, very short breaks, but we're
4  going to have to go through.
5    MS. BOGDAN:  What time is your
6  flight tomorrow?
7    MS. LOCKARD:  He's got to leave
8  for the airport, my colleague, at 2:00
9  to make the flight.
10    So, I mean, we assumed that we
11  would push through today and get
12  there, you know, do the last bit
13  tomorrow.  But if we're -- if you're
14  taking 10 hours on the record, I
15  just want to be clear, we're not going
16  to push late tomorrow, so...
17    MS. GOLDENBERG:  I mean, that's
18  3 hours of testimony in 5 hours of
19  time.  I think we should be okay.
20    MS. LOCKARD:  Well, I'm just
21  making our position known so there's
22  no dispute about it tomorrow.  And
23  we'll start tomorrow at the same time.
24    THE STENOGRAPHER:  Anything

Page 309

1    else for the record?
2    MS. BOGDAN:  Did Marlene's
3  statement get on the record?  Because
4  I was going to say the same thing.
5    MS. LOCKARD:  It did.  It's on
6  the record.
7    I mean, obviously, I'm going to
8  have questioning too, so -- but we can
9  go off the record.  We'll start at
10  9:00 a.m. tomorrow.
11    THE STENOGRAPHER:  Off the
12  record.
13    (Time noted: 5:43 p.m. BST)
14    --o0o--

Confidential Information - Subject to Protective Order

Page 310

CERTIFICATE

I, MICHAEL E. MILLER, Fellow of the Academy of Professional Reporters, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Court Reporter and Notary Public, do hereby certify that prior to the commencement of the examination, GEORGE JOHNSON, Ph.D. was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that pursuant to FRCP Rule 30, signature of the witness was not requested by the witness or other party before the conclusion of the deposition.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

MICHAEL E. MILLER, FAPR, RDR, CRR
Fellow of the Academy of Professional Reporters
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
Certified Court Reporter

New Jersey Certified Court Reporter
No. 30XI00242200
Expires: 6/30/2022

Dated: October 18, 2021

Page 311

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 312

ERRATA

PAGE LINE CHANGE

____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____

Page 313

ACKNOWLEDGMENT OF DEPONENT

I, GEORGE JOHNSON, Ph.D., do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
GEORGE JOHNSON, Ph.D.          DATE

Subscribed and sworn to before me this _____ day of _____, 20 _____.
My commission expires: _____

_____
Notary Public

Confidential Information - Subject to Protective Order

Page 314

1          LAWYER'S NOTES
2
3    PAGE   LINE
4    ____   ____   _____
5    ____   ____   _____
6    ____   ____   _____
7    ____   ____   _____
8    ____   ____   _____
9    ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18   ____   ____   _____
19   ____   ____   _____
20   ____   ____   _____
21   ____   ____   _____
22   ____   ____   _____
23   ____   ____   _____
24   ____   ____   _____

**WORD
INDEX**

**< 0 >**
**02110**  4:*20*
**05-07-2021**
*226:20*
**07102**  3:*20*

**< 1 >**
**1**  2:*4*  19:*15*
*20:17*  31:*9*
*123:16*  128:*8*
*270:16*
**1.5**  270:*17*
**1:20**  175:*12,
16, 17*
**10**  6:*6*  14:*19*
*148:5*  161:*14,
15*  178:*9*
*185:15*  193:*2,
3*  250:*18*
*308:14*
**10/1/21**  7:*5*
*23:20*
**10:30**  14:*5*
**10:35**  79:*10,
11*
**10:49**  79:*12,
14*
**100**  3:*20*  4:*19*
**100,000**
*270:16*
**1000**  3:*13*
**10th**  182:*23*
*243:5*
**11**  4:*3*  6:*9*
*183:20*  184:*4*
*192:22, 23*
**11:00**  14:*6*
**11:25**  103:*14,
15*
**11:34**  103:*16,
18*
**11th**  50:*3*
*141:19*
*208:16*
*218:14*  241:*23*
**12**  194:*12*
**12:30**  306:*17*

**12:39**  306:*5*
**12212**  2:*5*
**124**  287:*5*
**125**  287:*7, 11,
13*
**13**  196:*6*
**130**  27:*24*
**14**  201:*15*
*232:16*
**142**  7:*10*
**14th**  154:*10*
*155:14*  160:*15*
**15**  208:*9*
*232:17*
**151**  287:*19,
20*  296:*13*
**15141**  2:*5*
**152**  298:*9*
**15219**  5:*9*
**153**  7:*12*
**15th**  3:*20*
**16**  227:*10*
**163**  7:*15*
**17**  237:*22*
*238:5*
**1700**  5:*3*
**172**  7:*18*
**177**  7:*21*
**18**  244:*1, 8*
*310:22*
**183**  8:*2*
**19**  7:*3*
*133:14*
*245:11*
*247:10*  255:*9*
**19.9.18**  159:*23*
**194**  8:*5*
**19422**  4:*9*
**195**  8:*11*
**1978**  9:*17*
*26:24*  266:*15,
22*  267:*18*
*286:1*  298:*13*
*299:24*
*300:11, 13*
**1983**  219:*6*
**1987**  9:*20*
*300:17, 19*
*301:21*
**1990s**  239:*9,*

*16*
**1991**  299:*11*
**1-in-100,000**
*270:9*
**1st**  23:*13*
*28:9*  50:*3*

**< 2 >**
**2**  6:*5*  23:*18*
*24:15, 19, 22*
*27:11*  125:*20*
*129:8*  239:*1*
**2:00**  308:*8*
**2:03**  175:*18,
20*
**20**  134:*18*
*149:17*
*247:12*  313:*16*
**200**  3:*6*  4:*9,
20*
**20006**  5:*4*
**2002**  58:*17*
*119:16*
**20037**  3:*14*
**2006**  58:*17*
**2007**  58:*19*
**2009**  240:*21*
**201**  8:*17*
**2010**  100:*9*
**2011**  91:*11*
**2013**  179:*19,
24*  180:*4, 12*
*181:1, 2*
**2014**  242:*21*
**2016**  242:*8*
**2017**  219:*6*
**2018**  7:*9*
*50:13, 16*
*52:4, 18*
*53:18*  55:*10*
*79:17, 22*
*80:13*  81:*15*
*82:10*  147:*2,
6*  154:*10*
*155:15*  157:*8,
15, 21*  160:*16,
21, 22, 24*
*162:24*  236:*3*
*283:6*
**2019**  130:*10*
*131:4*  140:*2,*

*3, 5, 17*  141:*9,
11, 18*  145:*5*
*164:3, 5, 8*
*172:24*  179:*5*
*182:2, 23, 24*
*236:6*  243:*5*
**202**  5:*5*
**202)331-1000**
*3:14*
**2020**  7:*6*
*41:5, 12*  50:*7*
*123:5, 23*
*130:24*  131:*2*
*140:11*  141:*2,
12, 19*  144:*10*
*169:14, 18, 19,
22*  170:*7, 9,
12, 16*  171:*2*
*182:14*  197:*4*
*198:8*  242:*5*
**2021**  1:*10*
*6:3*  10:*3, 10*
*15:22*  23:*13*
*28:9*  50:*3, 4*
*70:23*  151:*19*
*152:3, 11*
*188:20*
*189:10, 18*
*190:6*  191:*4*
*192:11*
*208:17*
*216:18*
*218:14*
*219:20*
*226:15*
*241:23*  310:*22*
**208**  8:*21*
**20th**  151:*19*
*154:24*
**21**  135:*1*
*259:24*  260:*3*
**2101**  3:*13*
**2150**  2:*10*
**22**  135:*16*
*266:19*  267:*1,
3*  285:*17*
**2220**  4:*15*
**227**  9:*2*
**23**  7:*5*
*135:21*  301:*3,*

*9*
**230**  4:*14*
**237**  9:*4*
**24**  136:*4*
**243**  9:*8*
**245**  9:*12*
**247**  9:*14*
**25**  127:*16*
**25,000**  278:*3*
**2500**  3:*6*
**259**  9:*16*
**266**  9:*17*
**26th**  164:*3, 4*
*172:24*
**28**  152:*11*
**2875**  1:*4*
**2A**  302:*22*
*303:1, 9*
*304:8, 11, 14*
**2E1**  290:*2, 10*
**2nd**  7:*7*
*79:17, 19*
*81:12*

**< 3 >**
**3**  41:*18*
*130:8*  238:*24*
*308:18*
**3:20**  231:*18,
19*
**3:34**  231:*20,
22*
**30**  105:*1, 11*
*310:11*  311:*16*
**30,000**  141:*20*
**30305**  3:*7*
**30XI00242200**
*1:20*  310:*22*
**31**  159:*23*
*302:16*
**310**  6:*11*
**312**  6:*12*
**312)566-4801**
*4:16*
**313**  6:*13*
**314**  6:*14*
**316**  2:*16*
**317)236-1313**
*4:4*

**320** 250:*19*
274:*23, 24*
**32502** 2:*17*
**33** 48:*15, 17,
18*
**3333** 3:*6*
**35** 49:*8*
57:*24* 58:*6*
59:*15* 151:*20,
21* 152:*8*
226:*21*
**385-5400** 2:*22*
**38th** 5:*9*
**3rd** 164:*3*
172:*24*

**< 4 >**
**4** 1:*10* 6:*3*
10:*3* 14:*17*
79:*24* 80:*6*
245:*14, 15*
**4:00** 14:*5*
306:*21* 307:*10*
**4:17** 260:*17,
18*
**4:32** 260:*19,
21*
**40** 13:*17, 20,
21*
**41** 7:*6*
**412)263-1840**
5:*10*
**42** 304:*13*
**425960** 172:*3*
**443142** 153:*6*
**450** 4:*8*
**452-7900** 5:*5*
**46204** 4:*4*
**492386** 163:*8*
**4th** 10:*9*
197:*4* 198:*8*
242:*5*

**< 5 >**
**5** 81:*11*
131:*8* 149:*19*
153:*23* 240:*8*
308:*18*
**5:00** 14:*6*
**5:38** 305:*13*
**5:43** 309:*13*

**50** 151:*9, 15*
217:*11*
**500** 217:*11*
**518)862-1200**
2:*6*
**52** 301:*2*
**55402** 2:*11*
**58** 307:*6*
**5th** 152:*3, 5*

**< 6 >**
**6** 126:*1, 9*
142:*9* 143:*3,
7* 144:*22*
301:*2* 307:*6*
**6/30/2022**
310:*22*
**6/8/21** 9:*2*
227:*7*
**60,000** 150:*13*
**600** 2:*16*
**60606** 4:*15*
**610)567-0700**
4:*10*
**616)333-4662**
2:*11*
**66210** 2:*22*
**678)553-2100**
3:*7*

**< 7 >**
**7** 153:*12, 13,
15* 305:*24*
307:*5, 7*
**70** 126:*12*
152:*12* 265:*14*
**70s** 26:*20*
**70-year** 265:*11*
**79** 7:*7*
126:*13, 21*
**7th** 80:*19*
152:*3*

**< 8 >**
**8** 163:*15*
306:*22*
**800** 2:*10*
**81** 7:*9*
**8101** 2:*21*
**850)435-7000**
2:*17*

**857)488-4200**
4:*21*
**877.370.3377**
1:*23*
**88** 287:*1, 2, 9*
**8th** 80:*19*

**< 9 >**
**9** 172:*10*
306:*23*
**9:00** 307:*24*
309:*10*
**9:07** 1:*17*
10:*3, 10*
**91** 143:*23*
144:*4* 169:*12,
17* 170:*6*
**913** 2:*22*
**917.591.5672**
1:*23*
**91-hour**
144:*20*
**95** 161:*13*
278:*1*
**973)757-1017**
3:*21*
**9th** 141:*19*
169:*18*

**< A >**
**a(n** 228:*13*
**a.m** 1:*17*
10:*3, 10*
79:*10, 11, 12*
103:*14, 15, 16,
18* 306:*21*
307:*10* 309:*10*
**Abbott** 92:*10*
**abbreviated**
274:*15*
**AbbVie** 60:*13,
15, 17* 75:*23*
**Abby** 196:*17*
**abided** 16:*20*
98:*7* 268:*9*
**abiding** 106:*24*
**ability** 44:*14,
15* 58:*24*
101:*10* 137:*6*
290:*9, 16*
310:*9*

**able** 24:*6*
103:*21*
157:*18*
163:*18, 19*
235:*4* 290:*2*
295:*13, 17, 23*
297:*12* 307:*17*
**above-styled**
228:*15*
**absence** 115:*6*
193:*15*
**absolute**
102:*10* 218:*21*
**absolutely**
30:*14* 103:*6*
**abstract**
204:*23, 24*
**academic**
185:*8* 234:*7*
**Academic/Rese
arch** 58:*8*
59:*17*
**academics**
37:*4* 47:*4*
48:*2* 63:*15*
**Academy**
1:*18* 310:2, *19*
**accept** 101:*11*
197:*17*
**acceptable**
122:*5* 219:22
220:*1, 7*
270:*24* 271:*3,
12, 16* 272:*1,
2, 11* 273:*10,
21*
**acceptance**
251:*15*
**accepted** 50:*3*
85:*13, 17*
108:*7, 12*
196:*24* 197:*4,
7* 198:*2, 4, 9*
200:*3* 208:*16*
215:*15*
236:*20*
241:*22* 272:*5,
6, 12, 15*
**access** 133:*24*
134:*2, 8*
251:*24* 252:*8*

**accessed**
259:*10*
**accommodate**
12:*11*
**account**
149:*21*
**accurate**
171:*7* 311:*19*
**achievable**
115:*4*
**Achievements**
123:*4, 19, 20*
**acknowledged**
115:*8* 224:*24*
232:*8* 234:*12*
**Acknowledgem
ents** 214:*8, 12*
224:*24*
**ACKNOWLE
DGMENT**
6:*13* 313:*1*
**acquainted**
35:*1*
**acquiring**
233:*9*
**act** 116:*16*
156:*23*
**Actavis** 3:*8, 9,
15, 16, 22*
**acting** 279:*10*
280:*3*
**action** 11:*12*
121:*1* 239:*24*
273:*3* 276:*14*
310:*14, 16*
**ACTIONS** 1:*6*
**active** 47:*5*
71:*7, 16, 19,
24* 72:*3, 11,
17* 76:*17, 20*
111:*20* 274:*9,
19, 21* 275:*6,
7, 11* 280:*15*
**actively** 73:*21*
**activity** 53:*23*
134:*4* 280:*20*
**acts** 279:*3*
**actual** 83:*6*
106:*6* 152:*15*
190:*21*

Confidential Information - Subject to Protective Order

274:*19* 298:*3*
**add** 33:*3*
**added** 30:*15*
108:*3* 130:*13,*
*15* 249:*15*
**adding** 190:*17*
**addition**
27:*23* 29:*11*
64:*19* 116:*9*
157:*5* 190:*10*
**additional**
14:*17* 22:*9*
24:*2* 25:*2, 8,*
*9, 19* 26:*14*
27:*8* 151:*9,*
*15, 20, 22*
152:*7, 12*
234:*4* 249:*12*
256:*2*
**address** 29:*16*
46:*1* 115:*11*
123:*17*
165:*20* 173:*3*
203:*8*
**addressed**
53:*17* 236:*15,*
*17*
**addresses**
173:*13*
**adduct** 86:*19*
277:*9, 11, 15*
279:*11* 280:*21*
**adducts** 54:*24*
85:*10* 235:*2*
276:*21* 280:*4*
**adhered**
95:*12* 236:*21*
**adheres** 95:*21*
**adjust** 217:*9*
**adjustment**
37:*8* 78:*1*
191:*14*
**administration**
95:*14* 110:*4*
297:*15*
**administrative**
51:*11, 14*
**admit** 190:*15*
**advance** 105:*3*
**advanced**
94:*10* 95:*6*

96:*20* 111:*21*
202:*22*
**advantages**
98:*14*
**Advice** 9:*16*
12:*4* 259:*19,*
*21* 260:*24*
268:*24*
**advocating**
205:*17, 23*
206:*15, 16, 20*
**affiliated**
45:*19* 60:*1*
70:*7* 74:*22*
75:*2, 5, 8, 11,*
*18, 22* 76:*1*
100:*6* 173:*10*
237:*8*
**affiliations**
74:*14, 17*
**afternoon**
175:*13, 22, 24*
**agencies**
102:*9* 104:*1*
**Agency** 26:*21*
36:*4* 39:*5*
40:*4* 107:*8*
119:*21*
122:*16, 21*
262:*6*
**agent** 85:*9, 15*
86:*3, 18*
279:*2, 14*
303:*15, 24*
**agents** 120:*24*
279:*13* 280:*5*
304:*16*
**agree** 20:*10*
33:*22* 34:*4*
105:*9, 21*
106:*8* 127:*24*
128:*24*
151:*21, 22*
152:*9, 13*
161:*24* 162:*2*
187:*21* 188:*6*
205:*14*
241:*24* 262:*8,*
*10, 18, 22*
263:*3, 11*

288:*9* 296:*11*
299:*3*
**agreeable**
104:*2*
**agreed** 165:*11*
167:*16, 23*
240:*22*
**agreement**
105:*5, 12, 17*
165:*24* 166:*8*
169:*8* 228:*13*
**agreements**
169:*3, 5*
**agrees** 295:*3*
**Agriscience**
62:*20, 21*
**agrochemical**
43:*11* 62:*23*
69:*12*
**ahead** 206:*9*
289:*5*
**Aid** 4:*5*
**airport** 308:*8*
**al** 7:*24* 8:*10,*
*16, 20, 24*
9:*11* 91:*10,*
*11* 177:*6*
180:*9, 12*
194:*9* 196:*1*
201:*13* 208:*7*
243:*18*
**alarm** 82:*2*
**Albany** 2:*5*
**Alberston's**
5:*5*
**Albertini**
196:*20*
**Alexander**
84:*15*
**ALFANO** 5:*7*
**alkyl** 276:*24*
279:*21* 280:*1,*
*6*
**alkylating**
85:*15* 86:*3,*
*18* 120:*24*
279:*2, 14, 16*
280:*5*
**alkyline**
279:*13*

**allegation**
239:*13*
**allegations**
238:*21* 240:*4,*
*6*
**all-**
**encompassing**
283:*23, 24*
**allow** 257:*14*
**allowed** 30:*3*
115:*12*
220:*13, 19*
221:*4*
**allows** 104:*16*
**altogether**
14:*14*
**Amberg** 84:*15*
**ambiguous**
25:*12* 166:*14,*
*21* 167:*11*
168:*14*
170:*18* 171:*6*
174:*1* 182:*12,*
*21* 198:*22*
233:*4* 253:*21*
**amend** 197:*21*
**amended**
23:*13, 17*
28:*8, 14*
29:*18, 22*
30:*16* 31:*10,*
*14* 125:*4, 24*
126:*3, 22*
127:*4, 20*
130:*13*
**amendment**
29:*16*
**amendments**
28:*21*
**American**
67:*18* 138:*6*
164:*2* 198:*14*
199:*1*
**Amgen** 60:*21*
61:*3* 75:*18, 21*
**amlodipine**
250:*17*
**amount** 47:*19*
128:*4* 144:*16*
214:*20*

**allegation**
**allegation**
274:*20, 21*
288:*21*
**amounts**
151:*4* 281:*7*
**analyses** 8:*20*
108:*11*
199:*16, 18*
201:*12*
203:*13*
204:*20*
249:*23* 256:*3*
258:*22* 265:*3*
**Analysis** 9:*14*
90:*14* 95:*18*
96:*23* 97:*13*
107:*6, 20*
119:*14*
155:*18*
174:*17*
193:*13*
200:*19, 21*
203:*9* 205:*3,*
*12* 207:*19*
216:*9* 235:*22*
247:*4, 7, 23*
249:*18*
251:*16* 264:*5*
286:*11*
290:*20* 291:*18*
**analyzed**
256:*23* 257:*22*
**analyzing**
202:*7* 206:*18*
**Andreas** 46:*5*
47:*7* 72:*10,*
*14* 74:*4*
76:*12* 225:*4*
**Andrew** 51:*20*
52:*12* 56:*15,*
*18* 57:*2, 6*
82:*21, 22, 24*
83:*2*
**Andy** 93:*6*
**aneugens**
119:*19*
**angiotensin**
261:*15*
**animal** 95:*1,*
*15* 97:*1*
110:*4* 263:*9*
265:*3* 268:*17,*

*18* 296:*15* 297:*18*

**animals** 96:*8, 17, 19,* 22 97:*18* 98:*3, 8* 263:*16* 286:*11, 12* 298:*18* 303:*24* 304:*4*

**announced** 267:*19*

**Annual** 7:*6* 41:*5, 12* 42:*5* 47:*17*

**answer** 12:*1, 16* 34:*16, 18* 45:*10* 51:*18* 52:*21, 22* 54:*11* 60:*24* 70:22 101:22 102:*23* 103:*3, 10* 104:*5* 105:6 108:*13* 124:*4* 139:*3* 144:6 145:*8* 146:5 148:*18* 206:5 231:2 290:*13, 14* 291:*10* 295:*16*

**answered** 22:7 56:*21* 57:5 86:*1* 206:22 226:*8* 228:6 229:*10* 241:*8* 283:*8*

**answers** 313:*5*

**Anthony** 74:2 75:*11* 219:*1*

**antigens** 284:*1*

**anybody** 20:2

**anymore** 144:2*4*

**anyway** 45:*13*

**API** 135:*12* 255:8 273:22 274:7, *19* 275:6

**APIs** 135:*13* 248:*1*

**APL** 135:*23*

**apologies** 17:*8, 10* 23:*23* 24:8 32:2 40:*17* 45:*12* 63:*3* 69:*17* 118:*24* 124:*12, 14* 138:*20* 139:*3* 141:*24* 151:2 195:*12* 212:*4* 252:*19* 289:7 293:*17* 301:*7, 11*

**apologize** 63:*5*

**appear** 24:2 41:*15* 79:*23* 82:*5, 9* 133:*19* 135:*8* 196:*5*

**APPEARANCES** 2:*1* 3:*1* 4:*1* 5:*1* 6:*5*

**appeared** 33:*10* 301:*12*

**appearing** 81:22 243:*24* 258:*3*

**appears** 81:*20* 82:*12* 248:*14*

**applicable** 199:*3*

**application** 120:8 121:2 190:*21* 200:*1* 216:*9*

**applications** 122:*7*

**applications/registrations** 246:*3*

**applied** 188:*11* 193:*20* 213:22 225:*10* 270:*1*

**applies** 204:*1* 282:*9, 12*

**apply** 191:*14* 283:*2*

**applying** 94:*21* 118:2 188:2 216:*4*

**approach** 99:*21* 200:*3, 5* 202:7 205:2, *10, 12, 15, 18, 24* 206:*15, 18, 20, 24* 207:*5, 7, 11, 13, 17* 214:*17* 215:24 218:*17* 263:*1* 271:*3, 8, 15, 20* 272:*21*

**approached** 165:*11* 167:*15* 168:*12*

**approaches** 42:*17* 62:*14* 65:*12* 180:*15* 187:*13* 207:*23* 272:*17, 20*

**appropriate** 115:*11* 249:*14* 311:*6*

**appropriately** 105:*24*

**approve** 240:*18*

**approximate** 144:7, *14* 148:*2*

**approximately** 27:*24* 169:*13* 250:*3*

**April** 151:*19*

**ARB** 261:*16, 18* 273:22

**area** 32:*18* 33:*1* 37:22 47:*12* 52:*1* 55:*2* 73:*12* 78:*4* 93:*9, 21, 24* 94:*16* 95:*3* 100:*12* 115:2, *22, 24* 116:*14, 18* 137:*5, 14*

138:*5, 11* 189:*21* 211:*15* 213:*21* 226:*23* 274:*17* 275:*10* 277:9

**areas** 237:*3*

**arenas** 193:*21*

**arguing** 206:2

**arrange** 230:*16*

**arrived** 13:8 201:*16* 255:*18*

**Art** 159:*23*

**Article** 9:*4* 71:*14* 73:*18* 74:*11, 18* 76:*22* 77:*12* 89:*11* 114:*17* 139:*18* 178:*5, 8* 179:*4* 184:*23* 191:*5, 19* 193:*7, 10* 195:*17* 196:*4, 7, 10, 12, 15, 24* 198:8 199:*8, 13* 200:*12, 15, 18, 20, 23* 201:*1, 6, 20, 22* 202:2 204:*17* 205:8 206:*14, 16, 19, 23* 207:*4, 6* 208:*1, 15, 20* 215:*4* 218:*13, 15, 17* 232:*1, 12* 233:*10, 24* 234:*20* 235:*8, 10* 236:*1* 237:*18* 238:*11* 243:*12*

**articles** 22:*12* 176:*9* 203:7 204:*13, 15* 237:7 238:8 241:*5, 11* 245:*5*

**articulated** 222:*3*

**ASHLEY** 5:2

ashley.jones@b ipc.com 5:*3*

**aside** 89:*1*

**asked** 22:6 27:9 32:6 56:*20* 57:*4* 86:*4* 101:*23* 104:6 118:*21* 136:*15* 176:2, 6 206:22 224:*21* 225:*5, 6* 226:*3, 7* 227:*24* 228:*3, 6, 20* 241:7 281:*20* 283:7

**asking** 11:*11, 24* 12:*18* 15:*16* 150:*17, 20* 188:*4* 205:*21, 22* 230:*12* 260:*10* 289:2

**aspect** 87:*5, 21*

**aspects** 54:*16* 87:2 117:*11, 15* 118:*13* 268:8 296:7

**assay** 66:7 96:*21*

**assays** 16:*18* 66:*15, 16* 70:*1* 96:*21*

**assess** 215:7 276:5

**assessed** 95:*15* 110:*5* 270:*3* 284:*15* 293:*18* 295:*14, 19* 296:*1*

**assessing** 116:5 180:*15* 293:*20*

**Assessment** 8:7, *14* 31:6 35:*23* 36:*20* 54:*17* 93:*20* 95:*4, 11, 22, 24* 96:*8* 97:*4* 98:*14, 21, 23* 99:*14, 20* 101:*10, 17, 20*

102:*1, 7, 13*
107:22  108:7
109:*18, 19, 22, 23*  110:*20*
111:*2, 5, 10*
113:*2, 5, 10*
115:22
117:*17, 19, 20, 21, 24*  118:*4, 10, 13*  119:*4, 10, 14, 18*
120:*2, 11, 12, 13*  121:*3, 6, 18*  122:*8*
134:7  137:7
186:*12*  187:*6, 12*  189:*2*
190:*14, 22, 24*
191:2  193:12
194:6  195:*19, 23*  199:*3*
200:9  203:16
209:*23*
213:*23*  216:*5, 7, 8, 23*  217:*2, 18*  218:*23*
242:*4, 10*
256:15  257:7
258:*1*  269:*9*
272:*17*  282:*3*
286:*15, 18*
298:*3, 5*
303:*13*
**assessments**
66:*18*  72:*19*
99:*3, 5, 9*
106:*14, 16, 19*
107:*3*  112:*9, 14, 18, 24*
114:*3*  115:*10*
193:*15*
265:*17*
292:22  294:*13*
**assignment**
305:*6*
**assist**  27:*16*
**assistance**
27:*14*
**associate**  59:7
**associated**
100:*16*

173:*14*  185:6
246:22  278:*4*
**assume**  12:*17*
62:*23*  137:*19*
146:5  150:*3*
174:*16*
**assumed**
308:*10*
**assumes**
123:*10*
**assuming**
16:8  18:*18*
**assumption**
146:*1*  169:*23*
171:8  258:*12*
270:*12*
**assumptions**
98:*20*
**AstraZeneca**
52:*14*  57:7
61:*9, 10*  83:*11*
**Atlanta**  3:7
**attached**
125:*13*  155:*1*
159:*24*
311:*12*  313:7
**attacking**
239:*21*
**attend**  50:*15, 19*  82:*13, 19*
93:5  155:*21*
**attended**  51:2
82:*15, 20*
93:*3*  121:*9*
159:*5*
**attendees**
156:9, *16*
**attending**
92:*24*
**attention**
20:*23*  154:*20*
184:8  232:*19*
238:*13*  239:2
302:*21*  304:*19*
**attorney**
310:*13, 15*
311:*16*
**attorneys**
12:*22*
**attributes**
268:*4*

**audio**  67:4
151:*11*  190:*1*
242:*11*
**August**
130:*24*  131:2
**Auro**  135:*23*
**Aurobindo**
4:*10*  133:6
135:*24*  136:*5*
250:*13, 22*
**Aurolife**  4:*11*
**Author**  8:2
16:*14*  76:*15*
139:*18*
181:22
183:*13, 16*
184:*16*  185:6
203:2  213:*14*
224:6  233:8
242:*16*  243:*1, 7*
**authored**
237:8  241:*5, 12*
**authoring**
25:*21*  233:*24*
**authority**
111:*13*
119:*20*
218:*13, 16*
**authors**  72:*24*
90:*4*  180:*11*
198:*24*
209:*13*  212:*9, 14*  221:*15*
245:*19*  246:7
**author's**  178:*1*
**available**  55:8
153:*19*
249:*20*  251:*6, 7*  253:*23*
288:*10*  300:*4*
**Avenue**  2:*10*
**average**
151:*15*  250:7
**averaging**
207:*18*
**Awards**  123:*4, 19*
**aware**  23:*14*
27:*4, 6*  29:20

44:*21*  46:*15*
48:*3*  67:*15*
80:*14*  84:*5*
88:*4*  89:*15*
92:*17, 21*
93:6  98:6
109:*13*
113:*21*
120:*16*  129:6
130:6  132:*8, 18*  134:*8*
135:*11*
143:*17*  160:*1*
169:9  171:*14*
175:2  181:*11*
213:*3, 5*
219:*14, 17*
222:*1, 2, 10, 11*  223:*5, 6*
226:*12*
234:*24*  238:*8, 11, 21*  239:*12, 15*  240:*3, 5, 23*  249:*1*
257:*11*
259:*15*
265:*23, 24*
291:*16*  292:*7, 13*  302:6

**< B >**
**bachelor**
118:22
**bachelor's**
118:*5, 11*
119:*5, 7*
**back**  31:*20*
57:23  59:*15*
72:*12*  79:*13*
89:*12*  91:*16*
103:*17*  106:*4*
113:2  114:6
119:2  122:*13*
154:*24*
169:*13*  175:*4, 19*  179:*4*
181:*1*  185:*14*
192:*10*
208:*19*
231:*21*  234:2
235:*10*

260:*20*
268:22
285:*13*
296:*12*
299:*24*
300:*11*  305:*18*
**back-extrapolation**
220:*10*
262:22  263:*1*
270:*10*
271:24  272:*4, 10, 14, 21*
**backs**  142:*15, 21*
**BALL**  4:*18*
**ban**  147:*15, 17*
**BARNES**  4:2
**BARR**  2:*14*
**base**  159:*16*
277:*5, 18*
**based**  26:6
27:4  37:*1*
39:*12*  85:*13*
99:*3, 20*
124:22  155:*2, 11*  183:*9*
186:*1, 17*
188:*10*  189:*4, 22*  199:*11*
200:9  202:*15*
207:*16*
211:*13*  220:*1, 10*  249:*13*
252:5  270:*12*
291:*11*
294:*13*
297:*15*
298:*19*  299:*5*
303:*12*
**BASF**  61:*12*
**basic**  218:*18*
**basically**
157:8  297:*20*
**basis**  75:*20*
234:8  304:2
**batch**  86:8, *13*
257:6
**batches**
256:*15, 20*
257:2

**battery** 94:*3* 110:*16*
**Baxter** 232:*24* 233:*2, 12*
**Bayer** 91:*18*
**Baylen** 2:*16*
**becoming** 37:*20* 59:*13*
**began** 164:*24* 167:*8* 306:*20*
**beginning** 49:*13* 132:*13* 133:*2* 140:*2* 215:*5* 226:*14* 269:*4*
**begins** 20:*24* 161:*8* 269:*1*
**behalf** 112:*6, 14* 132:*6, 7, 10* 210:*19* 227:*24* 228:*4, 15, 21* 238:*10* 258:*4*
**believe** 16:*14* 31:*17* 32:*5* 104:*24* 127:*17, 18* 140:*17* 142:*12* 160:*6* 192:*13, 21* 194:*20* 196:*24* 232:*16* 258:*8, 17* 260:*3* 263:*5, 15, 20* 283:*6* 285:*18* 293:*7* 299:*4*
**Bell** 4:*9* 154:*13* 160:*3*
**belong** 47:*15, 23* 49:*5*
**bench** 90:*13*
**benchmark** 8:*17* 78:*10, 11* 93:*17* 94:*17, 20, 23, 24* 95:*8* 97:*12* 99:*20* 116:*6* 124:*19* 156:*5* 195:*6* 199:*16, 19*

200:*19, 21* 201:*7, 10* 202:*3, 5, 9, 11, 22* 203:*9, 12* 204:*1, 4, 14, 18* 205:*1, 9, 17, 23* 206:*15, 17, 20, 24* 207:*5, 7, 10, 12* 224:*3*
**bend** 239:*7*
**benefit** 220:*12*
**benefits** 207:*1*
**Benthem** 124:*15*
**Berkeley** 270:*5*
**Berlin** 7:*9* 35:*7* 50:*10, 13, 18, 22* 52:*18* 53:*17* 57:*13, 22* 80:*13, 23* 81:*4, 6, 15* 82:*11* 147:*16, 21* 163:*1* 282:*20* 283:*6*
**Bernd** 124:*4, 5*
**best** 42:*15* 95:*20* 139:*10* 202:*6, 7* 213:*23* 286:*12* 310:*9*
**better** 86:*5* 151:*10, 14* 183:*8* 257:*3* 265:*14*
**Beyond** 7:*8* 25:*15* 51:*22* 79:*20* 81:*13* 160:*17* 282:*10* 295:*15*
**Bhaskar** 74:*1, 20, 21* 138:*19, 20, 24* 139:*4* 178:*19* 179:*2, 8* 196:*16* 212:*21* 213:*6* 242:*1*
**bias** 184:*20* 203:*5* 245:*23*

**big** 15:*5* 43:*17* 46:*24* 68:*3* 73:*12* 119:*22* 178:*12, 15*
**bigger** 47:*17*
**billed** 141:*16* 169:*18*
**billing** 21:*15*
**bills** 149:*11*
**bindo** 133:*3*
**bioassay** 16:*1, 2, 13* 36:*21* 63:*13* 94:*22* 95:*9, 11, 18* 96:*4* 97:*10* 109:*21* 116:*3, 6* 124:*22* 186:*1, 18* 187:*8* 188:*2* 190:*13* 199:*23* 200:*10* 203:*17, 20* 204:*5* 207:*19* 217:*10* 268:*10, 12, 16* 270:*8* 290:*9, 15* 291:*5* 294:*17* 297:*17* 299:*7*
**bioassays** 16:*19* 62:*15* 291:*13*
**biology** 117:*2* 120:*19*
**Biopharma** 84:*19*
**bisphenol** 119:*15, 16* 120:*7, 23*
**bit** 18:*22* 22:*23* 63:*4* 73:*2* 96:*3* 133:*17* 206:*4* 216:*11* 252:*22* 299:*2* 308:*12*
**blanket** 280:*1* 284:*2, 12*

**blockers** 261:*16*
**Blue** 4:*9*
**blue-sky** 42:*16*
**BMD** 72:*20* 77:*24* 78:*8, 9, 11* 202:*21* 204:*7* 205:*14* 207:*16* 209:*22* 217:*4*
**BMDL** 161:*22* 217:*1*
**BMDL10** 155:*2, 12, 18* 157:*2, 9* 159:*21* 160:*13* 161:*8, 12* 162:*12*
**BMDLs** 216:*2*
**BMDs** 202:*20*
**BND** 78:*8*
**board** 178:*24* 227:*1*
**Bob** 178:*17* 243:*6*
**bodies** 37:*3* 43:*2* 48:*2* 57:*10* 62:*12* 63:*15* 64:*21, 22* 65:*14* 66:*23, 24* 99:*6, 8* 100:*16* 106:*15, 17, 20* 108:*12* 270:*23* 271:*1, 7, 21* 276:*8*
**body** 66:*18* 71:*21* 123:*10* 251:*16, 17* 256:*14* 281:*2, 15*
**Boehringer** 61:*15, 20* 92:*3*
**BOGDAN** 2:*2* 6:*9* 11:*8, 10* 13:*3, 10* 17:*16* 18:*12* 19:*14* 20:*15* 22:*10* 23:*16* 24:*18, 21*

25:*17* 30:*7* 31:*16* 32:*4* 34:*23* 38:*17, 23* 39:*10, 17* 40:*6* 41:*4, 22* 50:*23* 53:*7, 15* 54:*12* 56:*22* 57:*1, 11* 60:*8, 11* 61:*18* 67:*8* 79:*5, 15* 80:*4, 10* 81:*9, 18* 82:*3* 85:*19, 23* 87:*15* 88:*12, 24* 89:*9* 90:*1* 91:*1* 92:*5* 97:*23* 102:*22* 103:*2, 11* 104:*9, 18* 105:*8, 20* 106:*12* 109:*10* 111:*1, 23* 113:*17* 118:*9, 20* 125:*22* 126:*2, 14, 19* 127:*5, 11* 140:*8, 15, 24* 141:*7* 142:*1, 12, 20* 143:*1, 4* 144:*17* 145:*10* 146:*8* 150:*19* 151:*8, 17* 153:*13, 14* 154:*3, 8* 163:*6, 16* 165:*8, 18* 166:*6, 16, 23* 167:*13* 168:*16* 170:*5, 23* 171:*14, 24* 172:*11* 174:*4* 175:*9, 21* 176:*22* 177:*11, 20* 182:*16* 183:*1, 10, 23* 184:*4, 6* 191:*3* 192:*9* 193:*3, 6* 194:*15*

Confidential Information — Subject to Protective Order

196:2  199:6
201:4, 18
206:12  207:3,
24  208:10
210:23  218:2,
11  219:10
220:17  221:2,
13  223:23
226:2, 16
227:3, 11
228:9  229:2
231:15, 23
232:10, 18
233:7, 16
235:6  237:14
238:7  239:17
241:10
242:14
243:11, 20
244:2, 7, 11
245:2, 12
246:24
247:13
248:10, 16
254:2, 18
255:15
259:17  260:3,
8, 22  263:10,
17  266:2, 10,
22  267:8
268:13  274:5
275:5, 22
276:1  282:13
285:12, 18, 23
286:4  287:8,
12, 21  289:1,
9, 20  293:13
295:4, 6
298:7  299:1,
22  300:16, 23
301:4, 13, 16
302:15
305:10
306:19  308:5
309:2
**BOSICK**  5:7
**Boston**  4:20
**bottle**  231:11
**bottom**  123:3,
18, 21  127:9
136:7, 8

184:10  287:2
304:20
**Bottorff**
292:18  296:7
**Bottorff's**
294:9
**Boulevard**
2:21
**bound**  218:19
**bounds**  205:5
**Box**  2:5
153:23  211:24
**boxes**  18:2, 6,
8, 9, 11, 13
**brackets**  262:7
**brain**  34:6
**break**  79:4, 6
102:15  103:1,
6, 12  170:2
171:10, 12, 18,
20  175:10
176:5  231:11,
16  260:6, 7, 9,
12  305:19
**breakfast**  35:8
**breaks**  308:2,
3
**breathing**
110:1
**BRETT**  2:20
**brett@hollisla**
**wfirm.com**
2:21
**Brian**  173:7
**Brilliant**  24:16
**bring**  134:17
176:23  193:22
**Bringing**  96:2
**Bristol**  61:24
**British**  148:10
**broad**  278:5
**broader**
279:20
**brought**  18:15
**browser**  24:12
**BST**  1:17
10:3  79:12
103:16
175:18
231:20
260:19  309:13

**BUCHANAN**
2:14  5:2
**built**  282:10
**bullet**  123:21
**Burlington**
196:21
**Business**  9:4
43:23  60:6,
16  61:3, 13,
19, 23  62:1, 6,
9, 20  63:8, 18,
20, 23  64:5, 9,
12  65:2, 9
67:13, 21
68:8, 13, 18
69:2, 7, 11, 21
237:15, 18
240:16
**buy**  68:1, 2
**byproduct**
114:16

**< C >**
**C2**  176:23
**C2H5**  279:23
**calculate**
99:13  200:16
216:15  256:1
**calculated**
85:13  108:6
155:1  191:18
220:4  249:22
**calculating**
99:4  117:23
191:8  200:13
204:1  217:4
256:4
**calculation**
85:16  87:14
130:19
150:11
155:11  157:7
161:16, 23
187:10, 20
199:24  204:3,
6  216:20
217:4  270:13
**calculations**
108:2  115:15
270:10
**calendar**  167:1

**call**  30:4
82:1  178:1
230:16
**called**  45:24
129:12  158:7
196:20
199:20  270:1
**calling**  239:24
**calls**  210:20
223:21
**CAMDEN**  1:2
**camera**  19:2,
23
**cameras**  20:2
**Canada**  35:19
36:2  38:4, 8
40:3  44:23
45:5, 9  46:6
47:7  72:19
78:22  101:1
116:8  138:9,
11  178:22
180:10  195:3
236:19
**Canada-**
**focused**  72:23
73:9
**cancer**  15:24
16:2, 19
26:22  36:21
62:15  63:12
72:21  94:22
95:9, 11, 18
96:3  97:10,
18, 20  98:2,
10  107:5
108:22
109:21  110:9,
21  111:3, 12
112:4  115:20
116:3, 5, 17,
22  124:22
161:15, 17
186:1, 18
187:7  188:2,
13, 16  190:12,
22, 23  191:9
192:6  193:15
199:22  200:3,
9  203:17, 20
204:5  207:19

216:2  217:10
239:10  262:7
264:11  268:9,
12, 15  270:3,
8  273:10
277:22, 23
278:4, 9, 17,
20, 23  285:10
286:10, 12
290:8, 15
291:1, 4, 5
294:17
296:16  297:1
298:2  299:6
**cancer-derived**
189:4, 14
190:9  192:2
207:16
209:22  216:24
**cancers**  116:9
278:19
**capacity**
11:17  290:11
**carcinogen**
109:20
262:19  263:4,
9, 12, 16, 19
264:8, 16, 20
267:24
300:15
302:14  304:9,
12
**carcinogenesis**
187:16
**Carcinogenic**
9:18, 21
96:17, 19
264:23  266:5,
12, 16  267:12,
16  268:5
269:12
273:17
298:16
299:15  300:8,
20  303:12, 16
304:16  305:3,
7
**carcinogenicity**
87:23  265:7
299:19

Confidential Information - Subject to Protective Order

303:*22*, *23*
304:2, *4*
**carcinogens**
116:*12*, *15*, *16*,
*19*  262:*4*, *6*,
*12*, *13*, *23*
273:*9*
**career**  27:*8*
59:*9*  118:*3*
137:*4*
**carefully**
311:*4*
**Carol**  138:*23*
139:*14*
**carried**  55:7
58:*16*  62:*13*
90:*7*, *23*
106:22  107:*2*,
*3*, *5*, *9*  108:*2*,
*10*  119:*8*
121:*13*  187:*6*
199:*21*  279:5
**carry**  55:5
63:*11*  66:6
72:*19*  95:*10*,
*18*  96:*8*, *18*,
*23*  107:*20*, 22
144:*16*  149:*4*
249:*20*
257:*24*  264:5
265:*12*, *17*
271:*19*
283:*15*
286:*10*  294:7
**carrying**
64:*19*  121:*11*
203:*16*  235:2
**case**  8:*14*
15:*21*  23:6, *8*
37:*24*  38:*16*
39:*4*  45:*13*
85:*1*, *3*, 7, *9*
100:*15*
104:*12*, *16*
107:*15*  132:*4*
149:*15*
182:*24*  186:*3*
188:7, *14*, *24*
189:8  192:8
195:*23*
205:*16*, *23*

207:*9*  215:*19*,
*23*  217:*21*
218:*4*  226:6
230:*18*  242:*4*
265:*20*  286:6
294:*15*
**cases**  99:*11*
114:*2*
**catch**  248:6
**catches**  42:2
273:6
**categorizing**
267:*23*
**category**
303:*20*  304:*1*
**Catrin**  92:*15*
**cause**  161:*14*
217:*12*
276:*21*
279:*19*, *23*
285:*8*  296:*16*
**caused**  209:*15*
277:*11*
**causes**  85:*10*
276:*4*  278:*11*
290:*24*
**causing**  280:*3*,
*21*
**cc'd**  173:6
**cell**  19:*7*
277:*20*
**Center**  3:*19*
**Centre**  5:*8*
**CEO**  240:*12*,
*20*, *24*
**certain**  21:*4*
47:*19*  86:*13*
104:*1*  161:*14*
250:*9*  257:*9*
264:*4*  276:*22*
280:6  285:*10*
291:*1*  299:*20*
**certainly**
39:*24*  40:5
104:*9*
**CERTIFICAT
E**  6:*11*  310:*1*
**Certified**  1:*18*,
*19*, *20*  310:*3*,
*20*

**certify**  310:*4*,
7, *9*, *13*  313:*4*
**cetera**  96:*16*
135:7  149:22
**cgannon@wals
h.law**  3:*19*
**CH3**  279:*19*
**chair**  36:*24*
46:*3*, *9*  72:*10*
**chairman**
240:*12*, *20*
**change**  65:*5*
132:*12*
157:*13*
216:22
276:*18*
277:*13*  312:*2*
**changed**  74:*8*
132:*13*, *14*
226:*10*
236:*15*  292:*9*
**changes**  28:*9*,
*12*, *14*, *15*, *20*
139:*9*  236:*20*,
*23*  311:*11*
313:6
**changing**
306:*16*
**Chantix**
221:*23*
**characteristics**
88:6
**characterized**
116:*20*
**charge**  166:*11*
256:*14*
**Charles**  62:*8*,
*9*, *10*  63:*11*
**chart**  252:*13*
**check**  300:*23*
**chemical**
43:22  56:*16*
61:*5*, *14*
63:*23*, *24*
64:*1*, *2*  83:*6*,
*8*  87:*19*
88:*10*, *16*
89:*4*, *8*
114:*19*, *20*, *23*
181:*5*, *6*, *7*
268:*3*  303:*9*

**chemically**
87:*9*
**Chemicals**
9:*19*, 22  68:*2*
88:*1*  107:*8*
115:*2*  116:*11*
266:*5*, *13*, *17*
267:*13*, *17*
284:*20*
300:*21*  302:*5*,
*8*
**chemist**  87:*6*,
*17*  88:*9*  89:*8*
**chemistry**
54:*1*  83:*3*
93:*8*  198:*14*
199:*1*
**chemists**
53:*24*  87:*17*,
*20*
**Chicago**  4:*15*
**Chodosh**
296:*5*
**choice**  177:*23*
213:*15*
**choosing**
211:*11*
**CHRIS**  5:*16*
194:*11*
**CHRISTINE**
3:*18*
**chromosomal**
185:*23*  285:*1*
**Chromosome**
91:*14*  115:*19*
285:*2*
**cigarette**
124:*10*
**CIPRIANI**  4:*7*
**cite**  188:*20*
189:*2*  218:*12*,
*15*, *16*  292:*5*
**claiming**
38:*19*  102:6
103:*4*
**Claire**  154:*11*,
*12*, *14*, *21*
**Clarification**
23:*24*  50:*20*
67:6  87:*11*
90:*21*  109:*8*

150:*14*
151:*12*  175:6
190:*2*  242:*12*
293:*11*
**clarifications**
155:6
**clarify**  125:*9*
126:*8*
**class**  86:*21*
**classification**
304:*8*, *11*
305:*8*
**classifications**
302:*3*, 7
**classified**
262:*5*  303:*8*,
*11*  304:*1*
**classify**  262:*10*
**classifying**
305:*2*
**clastogens**
284:*1*
**clear**  12:*1*
28:*11*  54:*23*,
*24*  64:*13*
128:*12*
186:*21*
234:*15*
305:*21*
306:*14*, *20*
308:*15*
**cleared**  292:*12*
**clearly**  179:22
280:22
**clerical**  44:*11*
**click**  177:*19*
**clicked**  32:*23*
**client**  218:*1*
227:*1*
**client-facing**
218:*1*
**clients**  200:*11*
209:*11*  210:*6*,
*7*, *9*, *12*
217:*24*  218:*9*
226:*13*  227:*2*
229:6  234:*12*
239:8  240:*17*
**clinical**  63:*13*
108:*5*  264:*5*,
*17*

Confidential Information — Subject to Protective Order

**close** 35:*20*
59:*13* 99:*16*
155:*6* 159:*24*
297:*9*
**closely** 83:*17*
292:*21*
**Coast** 306:*6*
**coauthor**
78:*12, 16*
139:*1* 176:*14,
15, 17, 19*
177:*22* 196:*4,
11, 13* 224:*12,
18* 225:*7, 16*
237:*8* 243:*21*
244:*12, 14*
**coauthored**
180:*19* 195:*1,
3* 201:*20, 22*
**coauthors**
70:*22* 71:*3,
12, 23* 72:*3*
178:*10, 13, 15*
180:*9* 196:*15*
212:*19* 213:*7*
214:*2, 4, 14,
16* 215:*1, 11*
218:*24*
221:*16*
222:*14*
223:*12* 241:*6*
**coauthorship**
214:*7* 224:*23*
**Cobalt** 107:*5,
11* 108:*22*
109:*1, 3, 5, 12,
14, 20, 24*
110:*8, 14, 18,
21* 111:*3, 11*
112:*3, 7* 116:*2*
**cochair** 46:*3*
72:*11* 225:*3*
**cochairs** 76:*16*
**coding** 277:*24*
278:*2*
**cognizant** 12:*8*
**cohort** 269:*8,
16*
**Coke** 225:*22*
231:*12*

**colleague** 36:*2*
308:*8*
**colleagues**
35:*4, 20*
36:*11, 22*
38:*4, 9*
274:*17* 282:*22*
**collect** 47:*14*
**collecting**
21:*10*
**collection**
142:*11*
**College** 2:*21*
149:*18* 196:*22*
**column** 91:*20*
129:*22* 132:*1*
135:*4, 19*
**columns** 249:*4*
**combined**
275:*12*
**come** 25:*3, 8*
32:*14* 34:*3*
53:*10* 72:*16*
80:*1* 102:*17*
122:*13*
144:*20*
162:*24*
165:*16*
176:*12*
179:*21* 236:*1*
247:*16* 267:*6*
271:*3, 15, 24*
282:*22* 293:*4*
**comes** 70:*1*
255:*7*
**comfortable**
290:*21*
**coming** 73:*7*
109:*24* 110:*14*
**commenced**
11:*13*

**commencement**
310:*4*
**commencing**
1:*17*
**comment**
100:*13* 135:*15*
**Commentary**
7:*16, 19* 9:*9*
163:*11* 172:*6*

174:*7, 9, 15,
24* 181:*17*
187:*8* 188:*18*
193:*24*
194:*17, 24*
195:*2, 4, 10*
243:*13, 17*
244:*15, 17, 21,
24* 246:*19, 20*
**comments**
33:*21* 154:*1*
197:*22, 23*
225:*24*
236:*12, 14, 17*
237:*1, 4* 286:*2*
**commercial**
185:*5*
**commission**
313:*17*
**commit**
224:*22* 225:*15*
**Committee**
40:*22* 43:*19*
44:*18* 46:*14*
47:*14, 17*
60:*2* 70:*8, 14,
19* 76:*21*
77:*17* 121:*12*
179:*11, 14*
**committees**
40:*9* 45:*18*
**communicate**
146:*10*
**communication**
**s** 164:*23*
**companies**
43:*9, 11, 12,
22* 48:*6, 8*
59:*22, 24*
60:*5* 66:*23*
70:*18* 99:*1*
108:*1* 109:*2*
112:*17*
132:*19, 21, 23*
135:*8, 12, 13*
181:*12* 211:*3*
220:*11* 221:*5*
222:*12* 223:*7*
249:*7* 250:*9*
251:*6, 11*

254:*1, 13, 23*
255:*18* 259:*5*
**company**
43:*17* 47:*18*
48:*10, 13*
51:*11* 52:*13*
60:*13, 21*
61:*5, 8, 9, 11,
12, 14, 15, 16,
24* 62:*1, 7, 19*
63:*2, 17, 22,
23, 24* 64:*1, 2,
4, 5, 11, 15*
65:*1, 17, 19,
23* 66:*1* 67:*3,
9, 12, 13, 20, 24*
68:*3, 7, 12, 15,
16, 17* 69:*1, 4,
6, 9, 10, 13, 14,
15, 16, 19*
113:*1, 3, 7, 9*
133:*14*
134:*11*
136:*13*
137:*15* 158:*3,
5, 7* 164:*21*
168:*3* 169:*6*
180:*21* 193:*9*
210:*14, 16*
222:*19* 233:*1,
6* 239:*8*
240:*21, 24*
249:*5* 254:*7*
**comparable**
85:*1, 2, 7, 8,
11, 17*
**comparative**
8:*19* 201:*12*
204:*20*
**compare** 69:*23*
**compared**
190:*9* 216:*1*
**comparing**
252:*13*
**comparison**
192:*2* 257:*19*
**comparisons**
202:*21* 256:*24*
**compensated**
149:*14*

**competent**
293:*1*
**competing**
245:*24*
**competition**
185:*9*
**compile**
230:*24*
**compiling**
199:*4* 230:*21*
**complete**
28:*17* 74:*5*
217:*5* 275:*16*
**completed**
122:*14* 230:*15*
**completely**
204:*3, 8*
259:*13*
**component**
86:*5*
**composite**
217:*6* 218:*18*
**composition**
87:*19*
**compound**
53:*13* 86:*24*
87:*1* 88:*16*
96:*6, 12, 13,
15* 118:*8*
217:*23* 218:*7*
**compounds**
58:*21* 86:*22*
87:*2, 7, 18*
88:*2, 11* 89:*2,
5* 94:*1, 9, 13*
99:*12* 155:*19*
262:*3, 11, 15,
17* 269:*7*
270:*15, 24*
276:*23* 284:*9*
**comprehensive**
136:*20, 24*
137:*9, 10*
259:*14*
**computer**
18:*20, 23*
19:*12*
**concentration**
97:*2* 192:*4, 6*
270:*17*
284:*22, 23*

Confidential Information — Subject to Protective Order

concentrations
97:5  115:7
216:10
221:12
267:22
278:21  280:7
286:16  291:2
297:7, 16
concept
193:11  216:5
235:12, 22
269:16  270:1
292:16
concepts
191:13  195:5,
7  218:22
235:9
concept-type
183:7
conceptual
190:18
191:15, 17, 20
200:5  216:20
242:10
concern  87:14
110:18  269:8,
16  270:2, 14
284:20
concerned
38:7  110:9, 13
concerns
103:23  187:2
conclude
307:18
concluded
304:15
conclusion
219:19  293:5
310:12
conclusions
184:20  203:6
239:7
conduct
264:22
conducted
305:16
conference
35:7  51:24
52:18  53:18
54:5, 14  55:9,
12, 16, 19, 22

56:4, 12
57:13, 20
83:16, 22, 24
125:16  147:2
157:24  158:4
161:1  235:11
282:18  283:17
conferences
36:9  37:10,
14, 16  53:1
56:1  84:6
121:9  146:24
147:9, 18, 23
156:23
confidence
72:20  116:6
205:5  209:21
confident
21:12  25:5
45:10  52:11
60:20  65:4
68:9  82:20
156:3, 7
157:24  259:2
296:4
CONFIDENTI
AL  1:12  38:6,
14  39:8
103:22, 24
104:10, 14
105:14, 18
106:1  218:9
confidentiality
39:12  100:14
102:3  103:4,
10
confidentially
39:3
confined
115:21
confirm  89:13
144:15  228:12
Conflict  8:3
169:2  182:6
183:3, 7, 17
184:9, 13
185:3  195:12,
13  198:15, 18,
23  202:14, 23
203:15, 22
208:18, 22, 24

209:4, 6, 16
210:3, 5
211:1, 12, 23
232:8  234:13
244:16
conflicts
182:2, 4
195:9  198:11
209:14
212:10, 15, 23
confusing
228:23
connection
12:7  22:23
171:3  179:22
182:9  228:14
connections
184:18  203:3
consider
93:11, 13
121:19
123:11
124:24  125:2
137:2, 20
253:24
293:14, 15
consideration
53:4  253:23
305:5
considerations
242:15  297:23
Considered
29:19, 23
30:16, 22
31:10  121:21,
24  122:6, 10
124:17  125:5
126:23
127:10, 21
128:16  130:4,
14, 21  131:13,
23  133:13, 24
134:3, 16
136:19, 21
137:19
162:13
213:16  230:7
254:12, 20
259:10  286:7
293:9, 17, 22
294:1  295:13

considering
293:20  297:24
consistent
256:23  297:19
Consortium
107:5  108:22
109:2, 14
110:9, 21
111:3, 11
112:3, 7  116:2
construction
275:16
consult
210:14  211:10
consultancies
246:1
consultancy
98:24  106:23
107:1  146:2
149:4  151:6,
16  165:6, 7
168:22, 24
170:21
174:17
182:13  226:11
consultant
74:24  112:2,
6  132:15
139:24
145:12
149:14  150:8
164:21  165:1,
12, 21  171:4
173:23  182:8
209:10
210:10, 13, 17
211:6  229:7,
15  235:19
281:21
consultant/expe
rt  228:14
consultants
37:4  47:4
48:1  211:15
213:4
consultant-
type  149:7
150:4
consultation
123:6, 24

consulting
150:22
164:14
166:18  167:2,
8, 16  168:2,
12  170:15
174:10
182:18
185:11, 12
198:19
202:16  234:18
consumables
68:1  90:8
contact
109:24
145:19  160:23
contacted
35:22  145:11,
16  158:14
161:4
contain  24:23
25:4  138:10
contained
15:14  31:3
235:9  274:24
contains  281:6
contaminants
113:24
contamination
9:10  38:10,
21  53:9
164:15
219:16
221:24  222:9,
21  223:18
234:19
243:14, 18
244:22  245:1
246:20
250:24  256:12
content  209:12
continue
106:3  129:8
306:8  307:11
continuous
199:20  204:9
contour
199:23
contract  43:9
62:11  63:16
64:18, 20

65:*11* 66:*5*, *10*, *21* 69:*22*, *24* 70:*2*
**contracted** 66:*12*
**Contracts** 228:*24* 229:*3*, *11*
**contribute** 73:*1*, *5* 78:*18* 214:*11*, *23* 234:*3* 286:*8*, *17* 297:*12*
**contributed** 214:*5*, *14*
**contributes** 87:*8*
**contributing** 233:*18* 296:*21*
**contribution** 131:*18*
**contributions** 224:*21* 225:*6*
**Control** 269:*10*
**controlled** 264:*2*, *4*, *15*, *18* 273:*10*
**convenient** 230:*17*
**conversation** 212:*14* 215:*6*
**conversations** 38:*19* 100:*14* 122:*12*
**Cool** 46:*21*
**copied** 154:*15*
**copies** 22:*11* 140:*13* 156:*16* 175:*3*
**copy** 20:*13*, *19* 23:*9* 24:*4*, *17* 140:*4*, *9* 155:*1* 156:*21* 157:*19* 159:*24* 168:*9*, *17* 212:*3* 248:*3*, *5*, *8*
**Corey** 154:*15*, *16*, *18*

**corner** 287:*3* 302:*18*
**corporate** 254:*16*, *21*
**Corporation** 4:*5* 67:*4*
**correct** 13:*9* 16:*10*, *23* 18:*17* 19:*12*, *13* 21:*16* 22:*9*, *15* 23:*15* 25:*24* 28:*7* 29:*2*, *3*, *6*, *11*, *19*, *21* 30:*9* 39:*15* 40:*11* 41:*18*, *20* 42:*5* 46:*17*, *18* 48:*24* 49:*21*, *22* 50:*14* 60:*3* 62:*18* 66:*13* 70:*10* 74:*7*, *9*, *15*, *19*, *23* 75:*1*, *3*, *4*, *7*, *9*, *10*, *13*, *21*, *23*, *24* 76:*2*, *3*, *7*, *13*, *14*, *23* 78:*13*, *14* 80:*21* 81:*2*, *22* 82:*12*, *17* 83:*12* 84:*10*, *13*, *14* 86:*16* 88:*3* 90:*20* 97:*20* 104:*22*, *23* 108:*20* 111:*3* 112:*12* 113:*3*, *4*, *7*, *11*, *22* 114:*3* 118:*6*, *12* 119:*6* 120:*15* 127:*15* 128:*18*, *19* 130:*21*, *22*, *24* 131:*5*, *6* 133:*7*, *19* 134:*20* 135:*2* 136:*1*, *2* 137:*22* 139:*7*, *8*, *10*, *19*, *20* 143:*22* 144:*1*, *2* 148:*24*

149:*12* 152:*12*, *13*, *22* 160:*21* 163:*22*, *23* 165:*1* 167:*20* 169:*24* 176:*10*, *11* 180:*1*, *3* 181:*19*, *20*, *22*, *23* 182:*10*, *19* 183:*4*, *5* 188:*15*, *16* 189:*13* 191:*9*, *10* 193:*18*, *19* 194:*14* 199:*9* 202:*1*, *4*, *10*, *13* 207:*11* 219:*3*, *4*, *6* 220:*9* 221:*17*, *18*, *20*, *21* 222:*16*, *22* 223:*12*, *14* 224:*15*, *16* 235:*23* 240:*10* 242:*6*, *7*, *19* 244:*23* 245:*1* 256:*21*, *22* 258:*5*, *6* 259:*14*, *16* 268:*17* 271:*4*, *9*, *18* 272:*5*, *12*, *13*, *22*, *23* 275:*7* 276:*20* 277:*14* 290:*21* 293:*8* 299:*11*, *13* 305:*3*, *7* 313:*5*
**corrected** 69:*13* 292:*18*
**corrections** 311:*4*, *7* 313:*6*
**correctly** 34:*11* 75:*15* 112:*11*
**correspondence** 227:*19*, *21*, *23*
**Corteva** 62:*19*, *20*
**cosmetic** 67:*9*

**cosmetics** 43:*11* 67:*11* 68:*20*
**cost** 44:*7* 48:*4*
**Council** 198:*14* 199:*1*
**Counsel** 2:*6*, *12*, *18*, *23* 3:*8*, *15*, *21* 4:*5*, *10*, *16*, *21* 5:*5*, *10* 13:*12* 18:*13* 20:*5* 128:*7*, *10*, *18*, *23* 129:*5*, *9*, *10*, *15*, *23* 130:*6* 131:*14* 132:*18* 140:*8* 305:*21* 310:*14*, *15*
**Counsel's** 18:*9*, *10*
**count** 144:*15* 241:*14*
**counted** 127:*22*
**couple** 99:*10*, *11* 147:*12* 171:*23* 215:*7* 228:*11*
**course** 93:*16*
**COURT** 1:*1*, *18*, *20* 10:*15*, *19* 11:*22* 310:*3*, *20* 311:*20*
**Covance** 63:*1*, *9*, *10*
**covariant** 205:*12*
**cover** 27:*21*, *22* 285:*24*
**covering** 116:*9*
**covers** 87:*1* 198:*24* 276:*8*
**COVID** 41:*3* 44:*5*
**CPDB** 271:*23*
**crazy** 297:*6*
**create** 33:*13* 42:*17* 200:*2* 252:*12*

**created** 36:*7* 40:*16* 72:*18* 111:*16* 215:*12*
**criteria** 214:*10* 268:*21*
**critical** 32:*11* 236:*11*, *14*, *24* 237:*4*
**criticizing** 238:*9*
**critics** 238:*17* 240:*1*
**critique** 15:*8* 26:*12*, *15* 31:*2* 42:*18* 77:*9* 191:*11* 197:*15* 286:*21*
**critiqued** 26:*3*, *5*
**critiques** 27:*3* 33:*4*, *6*, *14*
**critiquing** 15:*6* 33:*10* 37:*9*
**CRO** 64:*19* 66:*5*, *9*
**CRR** 310:*18*
**culture** 68:*2*
**Current** 8:*9* 13:*13*, *15* 28:*12* 31:*12* 43:*13* 110:*11* 138:*8*, *18*, *21* 145:*2* 178:*20* 180:*23* 194:*8* 273:*14*
**currently** 46:*4* 139:*6* 140:*6* 181:*13* 306:*6*
**cut** 206:*7*
**CV** 18:*1* 29:*6*, *8*, *10*, *12*, *15* 91:*7*, *9*, *10* 122:*23* 123:*1*, *3*, *13* 126:*18* 180:*6*
**CVS** 4:*5*
**cycle** 277:*20*
**cytochrome** 280:*18* 281:*7*,

Confidential Information – Subject to Protective Order

14, 18 290:2, 10
**cytokine** 290:17

**< D >**
**D.C** 3:14 5:4 37:1
**daily** 8:21 49:15 55:6, 7 70:24 71:4, 13 139:12 186:22 187:1, 23 188:8, 21 189:11 191:6 199:9, 14 200:13, 16 208:2, 5 220:5 224:18 232:1 241:17 272:7
**Damage** 91:14 94:2, 8 115:19 116:21 242:10 285:1
**DANIEL** 2:15
**Dart** 112:19
**Data** 8:7 36:6 55:8 90:14 94:22 95:9, 20 96:1 116:3, 6 118:1 124:22 157:11, 12 183:9 185:23 186:1, 11, 18 187:8, 10, 15, 16, 19 188:2, 16, 17 190:13, 23 191:1 192:1 193:11, 14, 15, 17 194:6 195:8 198:5 199:12, 23 200:4, 10, 17, 22 201:3 202:8, 12 203:14, 17, 20 204:6, 9, 10 205:19, 22

206:18 207:1, 2, 8, 13, 15, 19, 22 216:19 217:10 232:6 240:17 251:6 253:24 254:13, 23 256:16, 18 257:10, 12 263:21 264:9, 20 265:10 268:8 270:3, 9 286:9, 12, 13 294:17 298:1 300:4 304:6
**database** 270:4, 5 271:23 298:2
**dataset** 97:12, 15 257:9
**datasets** 191:12 199:19, 20, 23 200:2 205:11 216:3 297:24
**date** 1:17 10:9 16:3 26:19 37:20 50:2 55:15 122:22 123:2 130:23 131:1 141:18 143:20 144:5 157:23 161:1, 3 163:24 166:17, 22 198:4 235:10 257:13 263:21 292:22 294:14 310:8 311:9 313:12
**dated** 28:8 151:19 152:2 154:10 160:21 172:23 266:22 286:1 300:17 310:22

**dates** 91:5 141:13 147:11 197:5 235:15 241:20
**DAVIS** 3:2
**day** 13:8, 9 14:6, 18 57:15, 16 144:19 234:23 235:5 270:17 306:3, 4 313:16
**days** 13:16 14:2, 3, 18 16:6 57:18 105:1, 11 307:3 311:16
**day-to-day** 43:16
**deal** 73:11 185:19
**dealing** 73:10 199:14 284:8
**dealt** 224:2
**Dearfield** 242:18
**decided** 215:9
**deciding** 178:5
**decision** 137:9 178:4 186:1 188:23 190:20 257:9, 15 273:1 286:8 294:13 297:12
**Decision-Making** 7:23 8:8 177:2, 6 181:18 185:20, 24 186:5 187:22 188:8 190:5 192:17 194:7 243:4
**decision-makings** 224:5
**decisions** 185:17 189:3 257:8 268:10 286:18 296:21

**Declaration** 8:4 9:12 183:17 184:9, 14 185:3 202:24 245:5, 8, 16 246:9, 16
**Declarations** 246:12
**declare** 198:17 209:13 212:9 246:11
**declared** 198:15
**deem** 103:22 164:11
**deemed** 104:4 105:18, 24 286:16 311:19
**defendant** 132:6
**defendants** 12:22 28:6 132:10 136:16 137:17 226:5 228:1, 4, 21 252:14 256:10 258:4 282:5 293:8 294:21 295:8
**defendant's** 258:18
**defense** 13:12
**defer** 87:17, 20 102:2 103:9
**define** 93:23 96:24 114:4, 11, 12, 21 186:7, 8, 11 188:12 266:7
**defined** 94:24 104:15, 21 114:9 268:19
**defining** 95:5 117:20 118:1 188:1, 10, 14
**definitely** 21:7 45:12 82:22 86:17

97:18 129:7 276:16
**definition** 100:7 105:22 262:21, 24 276:3 284:11 293:21 300:14 305:4
**degradant** 114:15
**degradants** 114:8
**degree** 118:5, 11, 22 119:5, 7
**delay** 12:6, 9 44:22 63:5 128:14 239:24 252:22 299:3
**delayed** 41:3
**delineated** 205:4
**delivered** 146:23
**delivery** 275:13
**demonstrated** 116:1 300:2
**demonstrating** 58:18
**Denali** 63:17, 18, 19
**deny** 89:13
**denying** 239:10
**dep** 51:20
**department** 76:9 117:2 120:19
**departments** 185:7
**departure** 95:1, 5 107:21 117:20, 23 124:18 161:16 162:14, 16 186:12 195:5 199:8, 14

Confidential Information – Subject to Protective Order

200:24  201:2
242:22
**depending**
72:15  73:2
96:14  280:13
**depicted**  84:12
**depo**  20:1
**DEPONENT**
6:13  10:17
313:1
**deposing**
311:15
**Deposition**
1:16  7:1, 4
8:1  9:1
10:11  11:14,
21  14:8, 11,
23  19:16, 18,
20  20:14
23:19  25:3, 9,
14  27:5  28:2
30:21  31:8
32:7  33:4, 14,
18  34:8
39:24  41:11
79:18  81:14
104:4  106:3
129:3  142:4
153:7  163:9
172:4  177:3
183:15  194:3
195:20  201:9
208:4  227:6
237:17
243:15  245:7
247:6  259:20
266:14
286:22
300:18
305:22  306:9,
21  307:3, 12,
16  310:12
311:3, 13, 17,
18
**depositions**
15:1  16:4
26:2, 8  30:19
33:8, 9, 22
**deps@golkow.c**
**om**  1:24
**depth**  36:22

**derided**
238:17
**Derivation**
242:22
**derive**  94:23
192:1  215:24
**derived**  150:8
291:12
**derives**  150:22
**deriving**
218:17
**describe**  87:4,
18  88:5, 10
89:7  94:18
197:8
**described**
284:4
**describes**
200:20
**describing**
42:14  89:1
**description**
135:24
283:20, 21
303:14
**descriptions**
88:21
**design**  90:15
95:15  268:21
297:3, 9
**designate**
105:1, 10
**designated**
105:13
**designating**
105:3
**designation**
104:10, 14
**designs**
297:14  299:6
**desirable**
98:11
**desktop**
177:10
**despite**  191:18
**destination**
238:15
**detail**  19:5
26:4  30:23
31:1, 3, 9

32:8, 18
36:10  294:2, 5
**detailed**  54:17
174:17  236:13
**detailing**  53:6
**details**  18:3
30:18  165:5
248:24
**determination**
134:12  256:8,
13  273:24
294:10
**determine**
166:17  264:8,
15, 23
**determined**
273:20
**determining**
272:11
**develop**
100:12  102:13
**developed**
117:6  302:4
**developing**
99:21  131:17,
19  132:15
218:22
**development**
66:7
**deviates**
257:11
**deviations**
249:21
**device**  110:14
**devise**  215:9
**devised**  100:17
**Dick**  196:20
**Diet**  231:11
**difference**
181:1  200:8
207:22  293:19
**different**
37:24  42:7
43:1  47:1
70:11  96:14
99:14  101:5
107:16  111:6
116:17
117:14, 16, 18
156:24
186:13

187:13
199:19, 22, 24
204:4, 7, 8, 10
207:13, 20
216:4  249:7,
8  254:1
275:13  276:7
282:7  287:16
292:3  295:5
296:15  302:3,
4, 24
**differentiate**
276:10
**difficult**
293:15
**digested**  130:4
**Diplomate**
1:19  310:3, 19
**direct**  154:20
184:7, 18
185:8  203:3
240:7  302:20
**directed**
72:22  300:6
**Directing**
125:4  232:19
238:13  239:2
304:19
**directly**
249:10, 11
**disagree**  33:24
**disagreed**
294:22  295:10
**disagrees**
295:2
**disclose**  183:2
195:9  198:11,
18  202:14
203:21  210:4
244:16
245:20  246:7
**disclosed**
210:2
**disclosing**  39:9
**discoverable**
40:5
**discuss**  39:13
200:13  230:17
**discussed**
27:21  36:19,
22  77:7, 18

78:17  101:9
121:10
154:23
189:22  282:2,
19  283:9
284:14
**discusses**
199:8  200:18,
23  201:1
**discussing**
46:2  98:15
186:10  188:19
**discussion**
39:6  73:20
85:21  178:9
190:19
216:21
292:24
298:22  305:14
**discussions**
39:3  140:1
199:10  214:9
225:1, 8, 12,
13  226:21, 24
253:12
258:21  292:19
**displayed**
31:18
**dispute**  308:22
**dissertation**
119:24
**distinction**
111:9  203:19,
23
**distinguish**
200:8
**distinguished**
204:12
**distinguishing**
187:15  216:12
**distribution**
291:17
**DISTRICT**
1:1  10:15
**DMF**  136:9
**DNA**  54:24
55:1  85:10,
15  87:22
91:11  94:2
117:10  124:6
269:10

Confidential Information - Subject to Protective Order

276:*18, 21, 22*
277:*1, 13, 20*
278:*1, 13, 15,*
*16* 280:*3, 6*
**dnigh@levinla**
**w.com** 2:*15*
**Dobo** 73:*24*
74:*6* 75:*9*
221:*17*
**Doctor** 25:*18*
48:*20* 56:*23*
102:*23* 103:*8*
123:*13* 143:*5*
153:*15*
172:*12*
194:*20* 196:*8*
208:*11*
227:*12*
247:*14*
254:*19* 284:*9*
293:*16*
**doctor's** 23:*17*
**DOCUMENT**
1:*5* 20:*17, 18*
21:*8* 24:*13*
58:*1* 127:*13,*
*14, 16* 130:*8*
134:*6* 136:*3,*
*7* 137:*1, 18*
143:*8, 9, 11,*
*12* 144:*24*
153:*6, 23*
159:*24* 160:*2,*
*4, 12* 163:*8*
171:*16, 21*
172:*2* 173:*18*
183:*7* 186:*8,*
*9* 212:*18*
218:*1* 239:*1*
247:*17, 19*
248:*17*
254:*16* 255:*6*
260:*11, 13*
267:*10, 15*
286:*5, 7*
297:*10* 301:*5,*
*17, 20* 302:*12,*
*17* 304:*14*
305:*1*
**documentation**
168:*23* 169:*1*

**documented**
106:*22*
**documents**
14:*22, 24*
17:*17, 20*
20:*22* 21:*4*
22:*12* 30:*15*
113:*15*
127:*19*
128:*17*
129:*12* 130:*3*
133:*14, 18, 19,*
*23* 134:*1, 5,*
*10, 11, 19, 20,*
*23* 135:*2, 5,*
*17, 20, 22, 23*
136:*1, 5, 6, 14*
137:*4, 14, 16*
141:*11*
161:*22*
170:*20* 171:*3*
254:*4, 21*
255:*10, 12, 23*
**doing** 12:*5*
37:*7* 65:*13*
98:*24* 99:*8*
106:*14* 107:*4*
149:*14* 150:*8,*
*22* 152:*17*
164:*13* 167:*2,*
*8* 168:*2*
171:*2* 173:*22*
174:*10*
182:*18*
198:*19*
199:*16*
202:*16* 203:*8,*
*10* 215:*18*
234:*17*
255:*19* 311:*8*
**dose** 8:*17*
16:*1* 58:*20*
78:*11* 94:*20,*
*23, 24* 95:*8*
96:*24* 97:*13*
99:*20* 116:*6*
119:*17* 120:*5,*
*7* 121:*1*
122:*4* 124:*19*
156:*5* 161:*13*
186:*18* 194:*2*

199:*16, 19*
200:*19, 21*
201:*7, 10*
202:*3, 6, 9, 11,*
*22* 203:*9, 12*
204:*1, 5, 14,*
*18* 205:*1, 9,*
*17, 24* 206:*15,*
*17, 20, 24*
207:*5, 7, 11,*
*12* 224:*3*
273:*4* 276:*20*
297:*16* 305:*5*
**Dose-Response**
8:*6* 77:*22*
78:*5* 93:*17*
94:*17* 96:*23*
99:*12* 107:*20*
117:*11*
180:*16* 194:*6*
205:*3* 270:*8*
286:*11* 298:*1*
**doses** 96:*22*
195:*6* 285:*10*
299:*20*
**dosing** 297:*20*
**Double** 177:*18*
**doubt** 239:*20*
**Dow** 63:*22, 23*
64:*1* 181:*4, 5,*
*7*
**downloaded**
194:*19*
**downstairs**
225:*23*
**downstream**
291:*7, 24*
**DP** 273:*22*
274:*10, 13, 16*
275:*17*
**Dr** 10:*17*
11:*9* 19:*17*
20:*13, 16*
31:*7* 34:*17*
41:*24* 83:*16*
84:*11, 15, 21*
89:*11, 19*
91:*8, 18, 23*
92:*2, 6, 8, 15,*
*20, 24* 102:*16*
141:*8* 154:*5*

227:*5* 260:*23*
289:*6* 294:*9*
296:*2*
**draft** 235:*24*
**drafting**
77:*12, 15*
90:*16*
**drink** 225:*20*
**drive** 240:*15*
**drug** 35:*20,*
*22, 24* 86:*6*
108:*3* 114:*24*
115:*12*
220:*11*
274:*14*
275:*15, 16*
**drugs** 83:*5*
108:*3* 115:*9*
222:*12*
223:*19*
234:*19* 247:*24*
**DUANE** 4:*18*
**due** 33:*8*
41:*3* 51:*20*
72:*12* 73:*3*
93:*8* 107:*10*
221:*24*
224:*22* 232:*7*
273:*16* 296:*24*
**dues** 47:*14*
**duly** 11:*3*
310:*5*
**Dutch** 101:*3*
108:*17, 18*

< E >
**earlier** 40:*10*
158:*2* 224:*13*
283:*10* 293:*6*
**early** 34:*11*
**easier** 19:*23*
**East** 306:*6*
**Eastern**
306:*17, 21*
307:*10*
**ECHA** 107:*7*
**editor** 138:*23*
139:*2, 17*
178:*18, 19, 20*
236:*17, 19*

**editorial**
178:*24*
197:*22* 236:*22*
**editor-in-chief**
138:*16* 139:*5*
179:*3*
**editors** 138:*9*
**educate** 42:*20*
**effect** 30:*19*
298:*16* 299:*15*
**Effects** 117:*5,*
*12* 273:*17*
**efficient** 236:*5*
**efforts** 255:*16*
300:*5*
**Eight** 142:*18*
**eight-page**
142:*14*
**either** 92:*18*
179:*6* 181:*5*
257:*18* 258:*24*
**elaborate** 89:*3*
**Elder** 7:*15, 18*
9:*10* 163:*11*
172:*6* 173:*19*
174:*24* 243:*18*
**elect** 70:*6*
272:*19*
**Eli** 64:*4, 6*
**eliminate**
273:*19*
**EMA** 122:*20,*
*21* 123:*5, 23*
271:*14* 292:*21*
**EMA/80573/20**
**20** 123:*8*
**e-mail** 145:*20,*
*21, 24* 146:*10,*
*12* 153:*6*
154:*9, 19, 24*
159:*20*
160:*21* 161:*1,*
*3, 8* 163:*21*
164:*1, 8, 13,*
*18, 23* 165:*10,*
*20* 168:*7, 10,*
*15, 18, 21*
169:*18*
172:*21* 173:*1,*
*3, 5, 13, 16, 18,*

22  174:6, 9, 12, 22
**E-mail(s** 7:12, 15, 18  153:8 163:10  172:5
**e-mails** 154:21  155:5 165:3  175:4
**Emerging** 8:9 194:8
**EMM** 8:2 139:2  183:16 184:15  203:1
**employee** 44:2  149:1, 3 310:13, 15
**employees** 149:6
**employment** 246:1
**EMS** 85:1, 3, 4, 24  86:2, 14, 15  89:18, 22, 24
**enable** 256:24
**encompass** 143:19
**encompassed** 88:1
**Endpoint** 7:22  8:13 97:17, 19, 24 98:2, 11 115:17  177:1, 5  181:18 189:24 190:14 192:16 195:18, 22 242:3  243:3
**endpoints** 185:20, 22 281:18
**ends** 163:8
**engineers** 239:7
**English** 152:4
**enjoyed** 32:10
**ensue** 278:21
**ensure** 19:3 28:18  29:14

42:19  115:15 130:16  157:11
**ensuring** 285:6
**entire** 188:18
**entirely** 49:17 68:10  73:20 121:15 137:11  187:7 195:8  235:3
**entirety** 233:21  303:19
**entities** 43:23
**entitled** 129:3 139:12  142:2 176:24 183:11 189:11 193:24 195:17  206:4 232:1, 12 243:12 246:19  298:10
**entity** 16:14 65:8
**Environmental** 36:24  40:20 42:12  100:3 137:24  138:7, 17  139:5 176:4, 20 180:12 183:12 193:23 201:23 211:18 213:19  224:13
**enzymes** 277:3  280:18 281:1  291:21
**EPA** 100:18, 23
**epi** 293:24

**epidemiological** 300:4
**epidemiology** 124:9  125:1, 3
**equipment** 69:4
**ERRATA** 6:12  311:6, 9,

11, 15  312:1 313:7
**especially** 133:13
**ESQUIRE** 2:2, 3, 8, 15, 20  3:2, 4, 5, 11, 18  4:2, 7, 13, 18  5:2, 7
**essentially** 198:5
**established** 219:23
**estimate** 57:17  150:12 161:13  231:3
**Estimates** 242:22
**estimation** 170:24
**estimations** 162:14, 16
**et** 7:24  8:10, 16, 20, 24 9:11  91:10, 11  96:16 135:7  149:22 177:6  180:9, 12  194:9 196:1  201:13 208:7  243:18
**ethical** 264:22
**Ethics** 9:4 237:15, 18
**ethyl** 85:4 86:2  91:13 242:4  279:24 280:12
**ethylating** 85:9
**ethylene** 8:15 195:24  213:8
**Etminan** 296:3
**Europe** 158:11  276:3 283:22
**European** 36:4  67:18 107:7  118:15 119:18, 19 122:16, 21

**evaluate** 210:15  267:16
**evaluates** 209:10 210:11, 13, 18 211:6
**evaluating** 266:5  268:2
**Evaluation** 9:18, 21 186:4, 6 266:12, 16 267:12 298:10, 12 300:20
**evidence** 239:21 258:22 298:16 299:15 303:21, 23 304:2, 3, 5
**evolving** 147:7
**exact** 30:17 48:14  50:2 81:6  91:5 100:7  108:16 135:14  144:5 146:11 147:11  156:1 180:7  282:1
**Exactly** 45:17 46:2  51:17 83:8  147:3 215:17 281:20  292:23
**exaggerating** 239:22
**EXAMINATIO N** 6:8  11:6 310:4
**example** 45:6 72:18  99:11 116:1  178:7 197:24 213:10 215:23 217:16 250:13  294:6, 8

**Examples** 245:23
**exceeded** 253:10
**Excellent** 24:14  49:2 153:20  197:2 241:24
**Exceptionally** 303:24
**excess** 161:16
**exchanges** 164:19
**exciting** 57:22
**excuse** 55:14 80:18  167:7 185:17  274:20
**ex-EPA** 242:20
**exercise** 283:11
**Exhibit** 19:15, 18  20:17, 24 21:1, 11 23:18, 19 24:15, 19, 22 27:11  29:5 41:11, 18 48:16  57:24 79:18, 24 80:5, 6, 17, 20 81:2, 10, 11, 14  82:5, 7, 8 83:10  91:16 125:6, 13, 14, 19, 20  126:1, 3, 9, 10, 12, 17 140:14  142:2, 4, 9, 13, 14 143:3, 7 144:22 151:24  152:2 153:7, 12, 13, 15, 23  163:7, 9, 15  172:4, 10  175:1 176:23  177:3 178:9  183:11, 15, 20, 24 184:4, 8 185:15

Confidential Information – Subject to Protective Order

192:*12*, *19*, *21*
193:*2*, *23*
194:*3*, *22*
195:*16*, *20*
196:*6* 201:*5*,
*9* 208:*4*, *9*, *12*,
*13* 227:*6*, *10*
232:*11*, *13*, *17*
237:*15*, *17*, *22*
238:*5* 243:*15*,
*24* 244:*1*, *3*, *8*
245:*6*, *7*, *11*,
*14* 247:*1*, *6*,
*10*, *12* 248:*13*,
*15* 251:*12*
252:*18*
259:*18*, *20*, *24*
260:*2*, *23*
266:*11*, *14*
267:*1*, *3*
268:*23*
285:*13*, *17*, *20*
296:*13*
300:*18* 301:*3*,
*8*
**EXHIBITS**
7:*1* 8:*1* 9:*1*
79:*16* 129:*4*
140:*16* 261:*4*
**exist** 281:*15*
**existence**
131:*5* 160:*1*,
*15*
**exists** 115:*5*
**expand** 74:*13*
78:*10* 87:*9*
112:*21* 124:*3*,
*21* 263:*24*
282:*8*
**expanded**
40:*23* 72:*24*
96:*21* 117:*13*
120:*8*, *22*
130:*18*
209:*20*
283:*13* 296:*22*
**expansion**
258:*2*
**expectation**
306:*1*

**experience**
98:*23* 99:*7*
116:*2*
**experimental**
65:*16* 298:*17*
299:*6* 303:*23*
304:*4*
**Expert** 7:*5*
15:*2* 16:*4*
23:*20* 26:*3*, *8*
30:*18*, *20*
33:*7* 36:*3*
37:*24* 40:*13*,
*14* 42:*7*, *18*
43:*4*, *19*
51:*22* 52:*15*
53:*2* 57:*9*
73:*4* 77:*8*, *23*
83:*13* 93:*7*,
*12*, *13*, *15*, *16*
99:*19* 100:*17*,
*19* 101:*12*
102:*6* 121:*20*,
*22*, *24* 122:*6*,
*10*, *15*, *17*
123:*5*, *6*, *9*, *11*,
*23* 124:*6*, *9*,
*17* 125:*1*, *3*
128:*20* 132:*4*,
*9* 136:*15*
160:*8*, *9*
161:*5* 166:*2*
207:*10*
209:*23* 226:*4*,
*5* 227:*24*
228:*4*, *20*
229:*7*, *16*
246:*2* 258:*3*,
*12* 275:*18*, *20*
281:*11*
292:*14* 293:*8*
294:*21* 295:*8*,
*14*
**expertise**
32:*19* 33:*1*, *2*
42:*16* 47:*12*
55:*2* 73:*4*
78:*4* 93:*10*,
*19* 99:*16*, *22*
100:*12*, *21*
102:*6*, *13*

115:*24*
116:*14*, *18*
117:*22* 137:*5*
275:*11*
**experts** 36:*20*,
*21* 37:*12*
40:*12*, *16*, *20*
47:*3* 52:*1*
53:*23* 100:*4*
124:*7* 138:*11*,
*13*, *14* 164:*10*
165:*4* 195:*3*
283:*13*, *22*
291:*16*, *19*
292:*3*, *8*
293:*24*
294:*15*
295:*18*, *24*
296:*22*
**Expires**
310:*22* 313:*17*
**explain** 18:*23*
146:*13*, *15*, *18*,
*20*, *22*
**explained**
159:*22* 160:*13*
**explains** 211:*1*
**explanation**
26:*12* 278:*24*
**exploratory**
54:*18*
**Exponent** 9:*7*
74:*22* 181:*4*,
*5*, *8*, *14*
196:*17*, *18*, *19*
212:*22* 213:*1*,
*3*, *10*, *12*
223:*11* 237:*9*,
*20* 238:*9*, *22*
240:*4*, *6*, *13*,
*20* 241:*6*
**Exponent's**
239:*6*
**exposed**
115:*15* 285:*7*
**exposure** 8:*21*
49:*15* 55:*6*, *7*
70:*24* 71:*4*,
*13* 98:*8*, *12*,
*15*, *17* 109:*3*
110:*7*, *8*

122:*6* 139:*12*
186:*23*
187:*23* 188:*8*,
*11*, *15*, *21*
189:*11* 191:*6*
199:*9*, *15*
200:*13*, *16*
208:*2*, *5*
220:*5* 221:*10*
224:*19* 232:*1*
241:*18*
264:*11*
267:*22* 272:*7*
297:*4*
**exposures**
187:*2*
**expound** 25:*15*
**extended**
216:*8* 217:*2*
218:*23*
226:*14* 227:*1*
**extension**
283:*1*
**extensive**
97:*11*, *14*
**extensively**
282:*20* 283:*9*
**extent** 77:*9*
214:*5*, *15*
291:*22*
**external**
160:*9* 161:*5*
164:*20* 165:*1*
197:*12*, *14*
**extrapolate**
97:*1*
**extrapolation**
155:*3* 156:*6*
220:*2* 271:*2*,
*8*, *15*
**extremely**
257:*11*, *22*

**< F >**
**F5** 24:*11*
**face** 83:*18*
**face-to-face**
44:*7*
**fact** 162:*4*
191:*18*

202:*16* 269:*1*,
*4*, *7* 307:*15*
**factor** 108:*4*
216:*12*
**factors** 37:*8*
78:*2* 191:*14*
217:*7*, *10*
218:*19* 225:*10*
**fail** 311:*18*
**fair** 137:*19*
170:*13*, *14*
241:*4*
**fairly** 82:*20*
**FairWarning**
240:*22*
**FairWarning.o**
**rg** 237:*16*
**FALANGA**
3:*18*
**FALKENBER**
**G** 4:*13*
**fall** 105:*21*
169:*14*
**False** 82:*2*
**familiar** 35:*14*
65:*24* 66:*2*
162:*3*, *4*, *19*
176:*3* 213:*1*,
*2* 265:*15*, *19*
269:*15*, *18*
301:*6* 302:*3*
**familiarity**
265:*16*
**fantastic** 97:*12*
**FAPR** 310:*18*
**far** 20:*21*
23:*14* 28:*21*
29:*20* 36:*15*
38:*7* 46:*14*
48:*3* 55:*13*
80:*14* 87:*18*
88:*3* 92:*17*,
*21* 98:*6*
106:*4* 109:*6*,
*13* 113:*21*
129:*6* 130:*6*
132:*7* 134:*4*,
*20*, *22* 154:*17*
173:*12* 175:*2*
249:*1* 259:*15*
284:*20*

Confidential Information – Subject to Protective Order

**favored** 205:*2, 14, 18, 24*

**favoring** 204:*13*

**fax** 1:*23*

**FDA** 101:*5* 178:*18* 180:*10* 219:*23* 220:*8* 243:*6* 247:*4, 22* 251:*15* 252:*11* 253:*11, 13, 19* 256:*3, 9, 14* 257:*22* 259:*19* 261:*1* 268:*24* 271:*9* 272:*5, 6, 12, 19* 273:*20* 274:*4* 285:*19*

**FDA's** 273:*24*

**feasible** 273:*18*

**fee** 47:*18, 22* 48:*9*

**feedback** 34:*10* 292:*9, 10, 11*

**fees** 233:*14, 17*

**Fellow** 1:*18* 310:*2, 19*

**FERTEL** 4:*7*

**fhstoy@pietrag allo.com** 5:*8*

**field** 63:*11* 116:*24* 124:*20* 160:*8* 193:*13* 266:*3*

**figures** 77:*16, 21*

**file** 18:*16* 142:*19* 246:*10*

**final** 30:*1* 36:*8* 198:*3, 9* 252:*11* 253:*10* 275:*16* 295:*21*

**financial** 184:*17* 203:2 245:*20*

**financially** 310:*15*

**find** 41:*10* 42:*15, 16* 107:*21* 123:2 224:*2, 3* 251:2 294:*21* 296:*15*

**finding** 158:*1* 302:*23*

**findings** 26:*13* 238:*18* 282:*23* 297:*11*

**fine** 30:*11, 14* 151:*3* 294:*5*

**finish** 118:*19*

**finished** 114:*17* 217:*16* 231:*5* 247:*24* 274:*16* 289:*4* 306:*4*

**finishing** 76:*10*

**FIRM** 2:*20* 5:*13* 221:*9*

**firm's** 239:*19*

**first** 11:*18, 19, 21* 34:*24* 51:*24* 52:*5* 54:*19* 60:*13* 82:*6* 93:*21* 119:*15* 123:*15* 139:*23* 140:*3, 5, 9* 141:*1* 143:*6, 13, 18* 145:*11* 154:*20* 159:*11* 169:*10, 11* 176:*12, 18* 177:*15* 179:*8* 180:*18* 184:*12* 185:*15* 194:*16* 204:*24* 206:*13* 218:*17* 228:*10* 229:*23* 232:*20* 235:*24*

**238:**14 241:1 242:*16, 24* 243:*7* 261:*14, 21, 23* 306:*4*

**five** 237:*12* 241:*5* 257:*5, 19*

**five-minute** 79:*6* 231:*16*

**flawed** 258:*19, 22* 299:*5*

**flight** 308:*6, 9*

**flights** 306:*10, 16* 307:*2, 14*

**Floor** 3:*20* 5:*9*

**Florida** 2:*17*

**fluid** 73:*2*

**focus** 51:*4* 53:*21, 22* 62:*4* 64:*8* 66:*22* 67:*11, 17* 68:*20, 23* 87:*21* 122:*2* 185:*21* 291:*2*

**focused** 54:*17* 68:*10* 70:*17* 76:*24* 93:*6, 9* 94:*1* 107:*16* 290:*8*

**focusing** 226:*24*

**follow** 230:*19*

**followed** 271:*2, 9, 11, 14*

**following** 264:*11* 304:*15* 305:*15*

**follows** 11:*4*

**follow-up** 155:*5*

**food** 65:*7* 68:*21* 119:*20, 21* 171:*12*

**footnotes** 29:2

**forefront** 32:*14* 53:*10*

**foregoing** 310:*7* 313:*4*

**forget** 26:*10, 19*

**forgot** 111:*8* 292:*15*

**form** 25:*11* 52:*19* 54:*8* 88:*7* 97:*21* 110:*22* 111:*14* 113:*12* 144:*11* 145:*6* 163:*2* 165:*2, 13* 166:*3, 13, 20* 167:*10* 168:*13* 170:*17* 171:*5* 173:*24* 175:*5* 182:*11, 20* 191:*21* 198:*21* 206:*21* 215:*20* 218:*6* 219:*7* 220:*14, 22* 221:*7* 228:*5, 22* 233:*3* 234:*21* 253:*20* 263:*6, 13* 265:*21* 274:*1* 275:*2* 280:*10* 281:*23* 288:*14* 289:*16* 296:*17* 299:*17* 302:*11* 313:*6*

**format** 127:*23* 152:*4* 153:*19* 164:*2* 190:*19*

**formed** 137:*5* 289:*12*

**former** 155:*17* 240:*12, 20, 24*

**forming** 136:*21*

**forms** 169:*4*

**forte** 239:*19*

**forth** 166:*9* 175:*4* 189:*10* 216:*16* 220:*6, 8* 292:*21* 310:*9*

**forward** 189:*23* 216:*21* 232:*6* 235:*12* 306:*8*

**found** 86:*8* 180:*8* 211:*20* 258:*21* 264:*7, 14* 280:*19* 281:*1, 3, 9* 296:*16* 297:*13* 298:*5* 303:*1*

**four** 13:*16* 17:*14* 142:*11, 16, 24* 208:*20* 257:*5, 18*

**four-zero** 13:*21*

**FOWLER** 3:*11* 17:2

**fowlerst@gtlaw .com** 3:*12*

**FP** 274:*16*

**frame** 59:*3*

**framework** 242:*11*

**Francesco** 178:*21* 179:*7*

**FRANK** 5:*7*

**frball@duanem orris.com** 4:*19*

**FRCP** 310:*11*

**FREDERICK** 4:*18*

**frequently** 139:*9* 147:*12*

**friends** 215:*7*

**front** 17:*23, 24* 18:*23* 20:*12* 23:*10* 27:*10* 31:*12, 22* 32:*3* 49:*3* 59:*19* 127:*4* 131:*11* 140:*6* 141:*17* 183:*22* 248:*3, 5* 255:*5* 287:*17*

**fronts** 142:*15, 21*

**FTP** 229:*23*

Confidential Information – Subject to Protective Order

**full** 157:*10*
295:*19* 296:*1*

**fund** 44:*13,
14, 16* 240:*17*

**funded** 43:*20*
44:*20* 45:*4, 7*
108:*24*
109:*12* 232:*3*
283:*4, 11, 15*

**funding** 42:*22*
43:*3, 5* 44:*1,
10, 22* 47:*16,
21* 48:*3*
118:*16* 185:*5*
198:*14* 232:*5,
20* 233:*9, 13,
19, 22* 234:*4,
9, 14* 246:*4*

**funds** 43:*1*
149:*20*

**further** 24:*1*
25:*23* 26:*4*
89:*4* 107:*11*
155:*6* 174:*15*
191:*13* 230:*9*
273:*2* 310:*7,
9, 13*

**future** 187:*9*
190:*7* 191:*12,
15, 16* 192:*8*
193:*12, 14*
273:*1*

**fuzzy** 22:*24*
288:*8*

**< G >**

**G.E.J** 209:*2, 3,
9* 210:*10*

**g.johnson@swa
nsea.ac.uk**
173:*4*

**gain** 98:*22*
200:*5*

**gained** 102:*5*
234:*17*

**Gallagher**
173:*8*

**Gamble** 68:*17,
18, 20*

**GANNON**

3:*18*

**Gateway** 3:*19*

**GC** 277:*7*

**GCC** 46:*12, 19*

**gene** 276:*5*
278:*2, 10, 12*

**Genentech**
64:*11, 12*
92:*16*

**General** 9:*16*
128:*16*
246:*18*
259:*19, 21*
260:*24* 268:*23*

**generally**
88:*13, 15*
146:*9, 11*

**generate**
167:*17*
179:*20*
265:*10*
271:*12* 272:*2,
15*

**generated**
153:*2* 202:*20*
240:*18*

**generates**
148:*11, 13*

**generating**
199:*4* 226:*12*

**generation**
179:*18*

**generic** 135:*12*

**genes** 278:*3, 6,
18, 20*

**Genetic** 8:*6*
16:*18* 31:*5*
36:*20* 40:*21*
41:*1* 43:*15*
45:*20, 23*
46:*13* 48:*16,
23* 60:*1*
62:*14* 63:*12*
66:*16* 70:*7,
13* 76:*21*
77:*16* 93:*15,
22, 23, 24*
94:*2, 8*
107:*17* 116:*9,
21* 117:*8*
119:*8, 13*

120:*18, 21*
124:*20* 138:*5,
12, 15* 179:*10*
180:*16*
185:*21* 194:*1,
5* 195:*8*
199:*11, 21*
200:*4, 17, 21*
201:*2* 202:*12,
19* 203:*13, 14,
19* 204:*10*
206:*24* 207:*2,
7, 21* 213:*22*
225:*11*
242:*23* 276:*6*
279:*6*

**genetics** 117:*7*

**Genomic**
138:*7* 242:*10*

**Genotoxic** 7:*7*
79:*19* 81:*13*
83:*13* 86:*7*
108:*9* 114:*14*
115:*22*
116:*13, 15*
262:*3, 11, 19,
23* 263:*4, 9,
12, 16* 265:*4*
269:*21*
283:*18, 20, 21,
23* 284:*3, 10,
13, 18*

**genotoxicant**
284:*23*

**Genotoxicants**
117:*5, 13*
276:*9, 11*

**Genotoxicity**
8:*11* 195:*17,
21* 242:*2*

**genotoxins**
284:*20*

**gentleman**
84:*12*

**Gentronix**
64:*15, 16, 17*
69:*23*

**GEORGE**
1:*16* 6:*2, 8*
10:*17* 11:*2*

160:*6* 310:*5*
313:*4, 12*

**Georgia** 3:*7*

**Germany**
147:*6, 16, 21*

**getting** 37:*15*
164:*7* 214:*24*
260:*6* 292:*9,
10*

**Giant** 9:*6*
237:*20*

**give** 144:*5, 7*
170:*24* 171:*7*
197:*18* 206:*5*
225:*14*
235:*15*
237:*24* 241:*20*

**given** 48:*10*
156:*16*
174:*16* 186:*3*
300:*11*
307:*14* 313:*5*

**gives** 104:*24*

**giving** 11:*21*
105:*2* 185:*18*
238:*1*

**GlaxoSmithKli
ne** 65:*2, 3*
75:*3, 6, 12*
219:*3, 5, 12*

**global** 124:*6*
217:*7* 271:*21*
272:*1*

**globally** 93:*14*
101:*9*

**Glycosylase**
91:*12*

**go** 12:*9* 21:*9*
24:*8* 33:*2*
48:*18* 57:*19,
23* 58:*4, 7*
59:*15* 60:*12*
66:*16* 106:*4*
126:*20* 130:*7*
131:*7, 21*
133:*12*
134:*18*
141:*14*
149:*20* 150:*5*
151:*18*
154:*23* 168:*5*

177:*15* 178:*3*
185:*14* 191:*7*
192:*10*
194:*16, 21*
195:*15, 18*
206:*4, 9*
214:*1* 233:*8*
236:*8, 10*
238:*3* 245:*13*
253:*13, 15*
261:*20* 265:*2*
268:*22* 277:*7,
8, 15* 287:*8,
13, 15, 18*
289:*5* 291:*23*
296:*12* 298:*8*
301:*15*
302:*16* 303:*5*
304:*13*
305:*10* 308:*2,
4* 309:*9*

**goes** 43:*3*
44:*10, 12*
187:*2* 197:*24*

**going** 11:*10*
12:*17* 41:*9*
73:*8, 10, 17*
79:*1, 9*
102:*19*
103:*13* 105:*9*
133:*16*
166:*10, 11*
168:*2* 170:*3*
175:*15* 180:*6*
195:*16* 206:*1*
217:*17*
231:*17*
241:*21* 244:*2*
252:*10, 22*
260:*16*
281:*13*
305:*12* 306:*2,
12, 14* 308:*1,
2, 4, 15* 309:*4,
7*

**GOLD** 270:*5*

**GOLDENBER
G** 2:*8* 17:*5, 6,
8* 19:*22* 20:*7*
308:*17*

Confidential Information - Subject to Protective Order

GOLDENBERGLAW  2:8
GOLKOW  1:23  5:19  10:7  31:20  41:10, 15  163:20
Gollapudi  8:15  74:1, 20, 21  138:19, 21  139:4  178:19  179:2, 9  180:9, 12, 19, 21  195:24  196:16  212:22  213:6  223:10  241:12, 19  242:1, 6
Good  11:9  19:6  28:22  29:3  32:10  37:19  78:2  79:3  98:19  101:11  138:5  148:17  175:22, 24  176:1  211:21  231:13
GORDON  5:7
go-to  238:15
gotten  252:23
government  62:12  64:22  65:14
graded  302:10
grades  59:1, 5, 10
graduate  27:15
grant  90:7
grants  246:3
gray  267:6  285:24
Great  49:10  148:9  261:7
GREENBERG  3:2, 11  9:2  14:5  30:8  227:5, 7  228:19

group  36:18, 23  37:5  42:8, 18  45:1, 4, 20, 23  46:10  47:5, 9, 19  48:5  49:4  51:11, 14  53:2  70:16, 20  71:16, 17, 20, 22  72:8, 10  73:13  76:17  87:7, 24  88:2, 11, 17, 18, 20, 22, 23  89:3  96:5  100:1, 6  101:2, 6  122:17, 19  123:10  132:19  214:18  225:3  276:24  279:19, 20, 21, 24  280:6, 13, 15  302:22  303:1, 9  304:14, 15
groups  38:1  40:8, 13, 14  42:7  43:4  47:24  52:15  57:9  101:5  121:12
GSK  84:7  112:19  221:16  223:16
GT  30:2, 4, 8, 10, 14  128:9  132:5  140:2  143:13  145:14  146:2  161:4  170:21  182:14  185:12, 13  199:5  200:10  209:19, 24  226:24  232:7  234:12  282:4  292:15
GTTC  40:22  42:7  46:11,

13, 17  47:20  99:18  214:6, 18, 21  215:12  225:3  234:2  283:14
guanine  276:23  279:4
guess  126:20
guesses  128:2
guidance  55:6  94:6  114:7  129:24  130:17  131:4  269:9  272:8, 16  286:10  300:10, 12
Guidances  129:12
guideline  16:2, 13  94:5  95:21  268:9, 12, 15  269:23  297:17  299:7
Guidelines  8:2  16:18, 22, 23  67:2  94:4  95:12  98:7  100:18  183:13, 16  268:16  297:10
gun  238:18
guys  64:23

< H >
HADDADNIA  2:3
half  30:23  79:2  151:6  170:4  295:20
hallmark  278:8
hand  56:16  125:24  235:4  253:22
handed  31:14
handled  138:24
Hang  238:2
happen  170:10
happens  277:19

happy  80:9  171:18  236:18  253:13  257:24
hard  20:13, 19  24:4, 17  140:12  248:3, 5, 7
HARDING  2:2
HARKINS  3:4  harkinss@gtlaw.com  3:4
harm  239:21
harmonic  270:7  271:22  272:22
harmonized  269:9  271:20
HARPER  3:5  harper@gtlaw.com  3:5
Harvey  74:1  75:2  219:2  221:15
Hasselgren  92:15
hazard  66:17  95:22  109:17  111:10  119:9  121:3, 5, 18  265:17  266:8  268:1, 3, 5  298:4
hazard-based  95:23  109:19, 21  111:4  267:20  286:15  299:8  302:7  303:13  305:6
hazards  239:23  268:8
head  151:1  296:9
headquartered  158:9
Health  35:19  36:2, 12, 24  38:4, 8  40:3, 20  42:12

44:23  45:5, 9  46:6  47:6  72:19, 23  73:9  78:22  93:19  98:20  99:10  100:2  101:1  108:19  116:8  138:9, 11  178:22  180:10  190:24  191:2  195:3  236:19  239:23
Healthcare  4:22  92:11
hear  13:5  175:22  293:16
heard  16:14  17:3, 14  118:24  280:8  292:11
hearing  125:16
heavily  26:6
Hecht  32:10  294:4  296:2
he'd  35:9, 24
Heflich  7:23  177:6  178:17  243:6
held  1:16  10:12
Helix3  65:8, 9
helping  37:8
hereinbefore  310:9
HESI  7:6  40:22  41:5, 12  42:5, 6, 9, 23  43:2, 20  44:2, 10, 13, 20  45:1, 7, 19  47:17, 23  48:10  49:18  58:1  99:18, 23, 24  100:2, 6  101:6  179:10  214:6, 18, 21  215:12  225:3  234:2  283:13

Confidential Information - Subject to Protective Order

Hetero 133:8, 9
HHA 135:6
High 4:19 93:18 269:22 277:3 280:19 281:7 284:23 285:6, 8, 9 297:6, 15
higher 219:21, 24 220:6, 12, 18 221:10 253:18
highest 291:4, 22 292:17
highlight 274:7
highlighted 212:1 259:4
highlighting 129:1 239:22 269:4
highly 39:22 40:4 103:22 104:10, 14 105:14, 18, 24 138:8
hire 112:1 229:6
hired 112:13 132:3 164:20, 24 165:20 238:17, 18 281:21
historical 26:13
hit 24:11 41:16 177:16
Hoffman-La 46:5 76:13 84:22 89:24 90:3
Hold 140:20 141:22 298:21
holding 52:17
HOLLIS 2:20 5:13
HON 1:5
honoraria 246:2

hope 28:22 234:14
Hopefully 17:14 123:15 153:16
Hotel 80:23 81:7 159:9
hour 79:2 170:4
hours 13:11, 17, 21 14:1, 10, 17, 19 27:24 143:23 144:4, 16, 19 151:20, 21 152:8, 12, 17 169:12, 16, 17 170:6 226:21 301:2 305:24 306:23 307:5, 6, 7 308:14, 18
Huahai 4:21, 22
huge 67:23 100:20 281:6
human 93:19 97:2 98:20 108:4 115:15 188:11, 12, 15 190:16, 24 191:1 221:9, 12 262:5, 13 263:19 264:8, 16, 19, 22 265:9, 11 267:22, 24 268:3 275:14 281:2, 15 288:3, 18 300:1, 15 302:14 304:9, 11
Humana 4:16
Humans 9:19, 22 264:7, 10, 15, 19 266:6, 13, 17 267:13, 17 270:18 287:23 288:11 289:14, 23

290:3, 18 300:9, 21 303:12, 16, 22 304:3, 16 305:3, 7
hundred 87:8 115:3
hundreds 128:1 254:6 257:1, 19
husbandry 95:16 297:18

< I >
IARC 9:17, 20 26:13, 20, 22 27:1 262:7, 10 265:15, 17, 23, 24 266:4, 11, 15 267:11, 15, 19 285:14 286:1 288:16 298:5 299:24 300:11, 13, 17, 19 301:18, 19 302:4, 9 303:8, 15 304:8
ICH 55:6 94:5 114:7, 8 115:4 129:24 130:10, 17 269:9, 23 272:8 273:8, 12
idea 158:12 191:24 215:3, 23
ideas 190:20
identification 19:21 23:22 41:13 79:21 81:17 142:7 153:10 163:13 172:8 177:7 183:18 194:10 196:1 201:14 208:8 227:9 237:21 243:19 244:9

245:10 247:9 259:23 266:18 300:22
identified 134:21, 23 135:2, 4, 17 266:8 269:7 280:22
identify 214:16
identities 40:2 102:10
identity 15:12 II 261:15
Illinois 4:15
imperative 311:14
implications 184:21 203:6
importance 269:22
important 215:8 276:13 294:19
imprint 240:2
improved 101:10
Impurities 7:7 35:6 37:10, 14, 16 51:4, 22, 24 53:1 79:17, 19 83:13, 24 108:9 115:7 146:24 147:1, 8 159:13 209:11 210:12, 15 211:7 235:11 265:4 269:11, 21 273:18 282:18
Impurity 81:12 83:4 85:12 86:7, 9, 14 114:3, 5, 7, 9, 11, 12, 14 115:1, 5

inappropriately 245:22

incidence 161:15
include 25:22 47:6 113:15, 22 117:10, 14 124:22 133:1 152:24 153:3 180:9 185:4, 24 186:4, 6 245:24 270:20 282:3
included 21:24 26:1 118:14 121:7, 10 126:5 131:17 133:11 135:13 230:6 248:19, 21, 23 249:12 273:4 291:6
includes 43:8 47:2 195:7
including 13:16, 19, 22 28:1 57:9 63:14 66:15 112:19 114:7 117:11 121:22 138:13 185:22, 23 189:21 209:20 223:7 248:24 272:17 291:19
income 150:7, 21
Incorporated 233:13
incorrect 43:14 48:13 110:16 258:10
increase 217:12 221:12
increased 115:17 188:13 264:10 273:2 278:8 285:5

Confidential Information Subject to Protective Order

incredible 297:24
independent 187:12 189:6 207:20
independently 37:23 129:20 130:5 212:16 232:4
INDEX 6:1
Indiana 4:4
Indianapolis 4:4
indicate 80:20 167:2 267:15
indicated 290:16
indicates 80:18 83:10 135:24 226:18 229:21 233:20, 22
indirect 184:18 203:3
individual 36:14 48:6, 7, 10 83:21 84:16, 17 106:5 154:11 185:6 252:4
individuals 39:5 40:3, 8, 15 72:2, 6 82:10 96:10 101:22, 24 102:7, 11
induce 116:17
industrial 63:11 90:5 94:12 109:3
Industries 3:8, 15, 21 43:7 70:6 107:16 193:20 238:16
industry 37:4, 11 43:1, 2, 6, 20 47:3, 24 48:5 59:16 62:12 63:14 64:21 65:13

110:17 193:18 238:10 239:9
infinite 257:10
influence 209:12 210:12 245:23
inform 8:13 192:19 195:19, 23 242:3
Informa 35:6 50:22 51:3, 8, 10 52:23 80:15, 16 158:6 159:3, 6, 8, 15 160:18 235:11 282:18
I-N-F-O-R-M-A 158:7
INFORMATION 1:12 26:1, 14 27:9 30:1 31:21 33:23 36:13, 17 40:1 54:3 75:21 119:9 120:9 124:3 134:17 136:9, 18 147:5 159:16 165:4, 5 166:5 167:4 168:8, 11 174:15 191:12 216:9 232:20 233:20 249:2, 10, 19 251:12, 17, 21 252:1, 2, 8, 9 253:5, 7, 13, 22 256:2 257:3 258:16, 21 259:3, 4, 5, 8, 9 270:7 273:3 288:15 291:12 293:4
Ingelheim 61:16, 20 92:3

INGERSOLL 5:2
ingesting 110:1
ingredient 274:9, 20, 21 275:7, 8, 12
initial 115:24 117:19 229:22 230:15 283:16
initially 35:14 167:22
initials 274:10, 13
initiate 146:2 168:22
initiated 117:22 120:2
initiates 282:17
initiation 282:5
injections 297:5
Innovations 106:23 112:21 148:13, 15, 19 149:2, 5, 11, 17, 24 150:5 166:9 167:7, 15, 24 168:8, 10, 21 229:1, 4, 5, 12, 14
in-person 147:19
input 77:12
inquire 251:5
inquiry 251:2
inside 302:18
instance 23:24 56:17 83:9 124:11 188:3 191:2 209:3 275:15, 17 276:12
instances 24:1 262:12
Institute 37:1 40:21 42:12

99:10 100:3 108:19
Institutes 58:8
Institutions 59:17
instruction 230:20
instructions 53:20 311:1
intake 108:5 219:22 220:1, 7 270:24 272:11, 15
intakes 122:5 271:4, 12, 16 272:1, 2
integrate 44:24
intend 24:23
intended 114:24
interact 112:2
interacting 19:8, 12
interaction 87:22
interactions 104:1
Interest 8:3 9:13 36:16 38:1 71:21, 24 73:12 93:9 111:20 169:2 182:2, 5, 6 183:3, 8, 17 184:9, 13 185:3 195:10, 12, 14 198:12, 16, 18, 24 202:15, 24 203:3, 22 208:18, 23, 24 209:5, 7, 14, 16 210:3, 5 211:1, 12, 24 212:10, 15, 23 232:8 234:5, 11, 13 244:17 245:5, 9, 17 246:8, 9, 12,

17 253:8 255:22, 24
interested 35:10 36:5 37:7 47:2, 9 289:2, 10 310:15
interesting 282:22 302:1
interests 184:17 245:24 246:11
internal 137:15 252:14 253:2, 17 254:3, 7, 12, 22 255:17
International 26:21 40:24 232:24 233:12 262:6 306:10
internationally 269:8
Internet 42:2
interpret 129:23
Interpretation 8:5 35:23 183:8 194:1, 5 211:8 221:1 304:10
interrupted 298:23
interrupting 206:3
interruption 81:23 153:22
Intertek 92:19
intervals 72:20 116:7 205:6 209:21
intraperitoneal 297:5
introduced 55:3
introduction 245:4
introductory 54:3

inventions 64:*23*
inventive 66:*7*
inventors 70:*3*
investigation 215:*19* 248:*18* 258:*15* 261:*9* 265:*20, 22* 286:*6* 289:*12*
Investigations 117:*4*
investigator 45:*16*
invited 35:*5* 37:*16* 55:*18, 21* 123:*5, 9, 22*
invoice 28:*1, 4* 140:*3, 5, 9, 17* 141:*12, 14* 143:*13, 19, 20* 144:*9, 21* 145:*3* 148:*22* 151:*19* 152:*1, 11* 169:*10, 11* 226:*18, 21*
Invoices 7:*10* 21:*15* 27:*20, 21* 140:*16, 22* 141:*6* 142:*3, 5, 16, 24* 143:*14* 148:*7, 9, 12, 14* 152:*19, 24* 153:*4* 167:*18* 226:*10*
involve 113:*19, 24* 120:*4* 195:*4*
involved 43:*17* 49:*21* 61:*3* 119:*22* 124:*10* 178:*23* 214:*22* 215:*1*
involves 187:*22* 188:*7, 14*
involving 215:*17*

ion 280:*10, 11, 12, 14, 21*

IRBESARTAN 1:*3* 10:*13* 223:*3*
issue 9:*10* 34:*21* 38:*10, 20* 39:*20* 46:*2* 53:*8* 56:*16* 85:*12* 107:*10* 156:*2* 170:*20* 219:*15* 222:*9, 11* 234:*24* 243:*14, 18* 244:*22* 245:*1* 246:*21* 252:*10* 292:*24*
issue-based 298:*4*
issued 131:*4*
issues 39:*23* 42:*15* 78:*18* 223:*9, 18* 225:*18* 263:*2* 297:*13* 298:*6*
itemized 21:*10, 18* 152:*16*
its 42:*13* 182:*17* 258:*18* 300:*1* 303:*18*
IVES 4:*13*
IWGT 40:*23*

< J >
Jan 124:*14, 15*
Janssen 65:*17, 20*
Japanese 69:*18*
JERSEY 1:*1, 19* 3:*20* 10:*16* 310:*20*
jfertel@c-wlaw.com 4:*8*
JILL 4:*7*

Jim 74:*1* 75:*2* 119:*11* 219:*1*
job 58:*22* 181:*10* 281:*4*
jobs 181:*10*
Joe 17:*12*
John 74:*3* 75:*22*
JOHNSON 1:*16* 6:*2, 8* 7:*5* 8:*23* 10:*18* 11:*2, 9* 19:*17* 20:*13, 16* 23:*20* 31:*7* 34:*17* 41:*24* 65:*21* 91:*8* 102:*16* 141:*8* 154:*5* 160:*6* 208:*7* 227:*5* 260:*23* 289:*6* 310:*5* 313:*4, 12*
JOHNSON000 037 7:*11* 142:*5*
JOHNSON000 044 7:*11* 142:*6*
Johnson-1 7:*3* 19:*19*
Johnson-10 7:*21* 177:*4*
Johnson-11 8:*2* 183:*16*
Johnson-12 8:*5* 194:*4*
Johnson-13 8:*11* 195:*21*
Johnson-14 8:*17* 201:*10*
Johnson-15 8:*21* 208:*5*
Johnson-16 9:*2* 227:*7*
Johnson-17 9:*4* 237:*18*
Johnson-18 9:*8* 243:*16*
Johnson-19 9:*12* 245:*8*

Johnson-2 7:*5* 23:*20*
Johnson-20 9:*14* 247:*7*
Johnson-21 9:*16* 259:*21*
Johnson-22 9:*17* 266:*15*
Johnson-23 9:*20* 300:*19*
Johnson-3 7:*6* 41:*12*
Johnson-4 7:*7* 79:*19*
Johnson-5 7:*9* 81:*15*
Johnson-6 7:*10* 142:*5*
Johnson-7 7:*12* 153:*8*
Johnson-8 7:*15* 163:*10*
Johnson-9 7:*18* 172:*5*
join 48:*10*
JONES 5:*2*
JOSEPH 5:*19* 10:*6*
journal 137:*23* 138:*1, 3, 4, 5, 12, 14* 176:*3, 10, 13, 16, 18* 177:*23* 178:*5, 6, 8, 13, 16* 201:*24* 211:*18* 213:*20, 24* 215:*14* 218:*4, 10* 244:*18* 245:*3* 246:*17, 22*
journals 213:*19*
JPharmSci 9:*12* 245:*8*
judgment 207:*16*
judgments 137:*7*
Julia 74:*1* 75:*5* 219:*2*

July 152:*3, 5, 11*
June 55:*10* 80:*13, 19* 147:*2, 5* 160:*20, 24*
junk 278:*1*
justification 307:*17*

< K >
Kaina 124:*4, 5*
Kansas 2:*22*
KAPKE 4:*2*
KARA 4:*2*
kara.kapke@bt law.com 4:*3*
keep 15:*10, 18* 16:*3* 19:*3* 42:*20* 144:*18* 152:*14* 168:*17* 175:*3*
keeping 71:*17*
Kenny 74:*2* 75:*5* 219:*2* 221:*15*
Kenyon 74:*2* 75:*8* 221:*17*
Kerry 242:*18*
key 15:*7, 10, 21* 16:*5*
kind 70:*2* 297:*22*
kindly 189:*23*
know 12:*13, 19* 17:*8* 22:*22* 25:*20* 34:*12, 14, 20* 38:*24* 39:*13* 40:*2* 48:*14, 20* 51:*8* 52:*1* 54:*11* 55:*17, 20, 24* 57:*14, 17* 60:*9, 18* 61:*1, 2, 7, 21* 62:*2, 22* 63:*6, 19* 67:*19* 81:*19* 83:*18, 21* 84:*1, 4, 16, 17, 19, 20, 23* 88:*13, 15*

Confidential Information Subject to Protective Order

91:22, *24*
92:*1, 6, 8, 9,*
*12, 14, 16, 18,*
*20, 22*  100:*8*
101:*23*
102:*10, 20*
110:*7, 10, 11,*
*12*  124:*2*
127:*21*
137:*23*  138:*1,*
*2, 4*  144:*6*
145:*8, 22*
146:*1*  147:*11,*
*13*  148:*1, 6*
150:*2*  154:*12,*
*14, 16, 18*
156:*19, 23*
157:*14*  158:*8,*
*13, 16, 19, 22,*
*23*  159:*1*
160:*4, 12, 17*
163:*4, 17*
165:*15, 17*
166:*5, 22*
167:*12*  168:*1,*
*19*  169:*15, 20*
170:*3, 11*
172:*13*  174:*2*
176:*18*
177:*13*  179:*6*
180:*22*  181:*3*
182:*22, 24*
208:*11*
210:*22*
211:*20*
212:*17, 22, 24*
219:*9, 11*
220:*16*  222:*5,*
*6, 23, 24*
227:*13, 16*
228:*2, 8, 24*
229:*11*  231:*1*
236:*2, 7*
237:*2, 10, 13*
241:*9, 13*
247:*14*
250:*12, 21*
251:*1*  254:*5,*
*10*  263:*23*
264:*21*
282:*11*  302:*9*

306:*2, 12, 17*
307:*1, 13, 14*
308:*12*
**knowledge**
25:*2, 8, 10, 19*
34:*2*  65:*19*
84:*8, 9*
139:*10*
173:*10, 12*
234:*17*  235:*4*
257:*13*
273:*13, 15*
**known**  39:*21*
54:*6*  273:*8,*
*16*  308:*21*
**Krista**  73:*24*
74:*6*  75:*9*
**Kristine**
178:*23*
**KUGLER**  1:*5*

< L >
**lab**  90:*13*
**Laboratories**
62:*8, 9*  65:*24*
66:*3*
**Laboratory**
9:*14*  68:*1*
247:*4, 7*
**laboratory-**
**type**  62:*17*
**Labs**  91:*24*
**Lagana**  296:*2*
**Lance**  84:*18,*
*20*
**language**
106:*6*  209:*5,*
*7*  211:*11, 13,*
*14, 17*
**large**  47:*7*
62:*18*  68:*14*
128:*3*  207:*22*
214:*19, 20*
216:*12*
**larger**  71:*21*
88:*1*  261:*3, 6*
303:*3*
**Lasalle**  2:*10*
**lastly**  69:*20*
**late**  308:*16*

**latest**  130:*17*
139:*2*
**LAW**  2:*20*
5:*13*
**LAWYER'S**
6:*14*  314:*1*
**lead**  137:*6*
178:*20*
213:*14*  233:*8*
258:*17*
277:*21, 23*
278:*16, 23*
285:*9*
**leadership**
72:*13*  139:*9*
**leading**  51:*21*
52:*1*  62:*10*
83:*12*  99:*19*
100:*17, 18*
116:*21*
**leads**  278:*7*
**lead-up**  179:*19*
**learn**  36:*16*
258:*16*
**learned**  25:*21*
**learning**
37:*17*  102:*8*
117:*7*  121:*2*
**leave**  276:*24*
308:*7*
**leaving**  291:*22*
**lecture**  82:*21*
**lectures**  82:*14,*
*18*
**led**  283:*5*
**left**  253:*17*
277:*2*
**left-hand**
232:*21*  287:*3*
**Legal**  9:*4*
237:*19*
**lesion**  277:*6*
**lesser**  291:*7*
**Letter**  9:*3, 16*
136:*9*  227:*4,*
*8*  228:*11, 12,*
*19*  229:*20*
259:*19, 22*
260:*24*  261:*9,*
*12, 13*  268:*24*

285:*20*
**letters**  108:*20*
**level**  33:*1*
73:*3, 6*  93:*19*
96:*24*  100:*20*
101:*11*  108:*4*
115:*16*  147:*8*
210:*2*  212:*19*
221:*11*  264:*4*
270:*9*  273:*11*
288:*21*  291:*4*
292:*17*  294:*5*
**levels**  47:*1*
85:*14*  86:*14*
94:*11*  96:*9*
99:*13*  107:*19*
115:*7, 12*
220:*12*  249:*6*
252:*5*  253:*18*
254:*8*  264:*11*
277:*3*  278:*22*
280:*20*  281:*4,*
*7, 9, 11, 19*
285:*5, 6, 8, 9*
288:*17*
**LEVIN**  2:*14*
**Lhasa**  270:*6*
**Li**  196:*17*
**LIABILITY**
1:*4*  10:*14*
238:*16*
**life**  43:*16*
234:*7*
**lifetime**  96:*7*
98:*8, 12, 15,*
*17*  265:*8, 9*
**Lilly**  64:*5, 6*
**Limit**  7:*12*
153:*8*  155:*1,*
*11*  156:*5*
157:*3*  188:*11*
219:*22*  221:*4,*
*10*  269:*11*
273:*18*
**limited**
124:*18*
303:*21*  304:*2*
**limits**  8:*22*
49:*15*  70:*24*
71:*4, 13*
139:*13*

187:*23*  188:*9,*
*15, 21*  189:*12*
191:*6*  208:*2,*
*6*  220:*18*
224:*19*  232:*2*
241:*18*  253:*9,*
*10*  255:*22*
256:*1*  267:*22*
**line**  36:*7*
100:*13*
101:*21*  192:*8*
197:*10, 21*
283:*19, 22*
292:*16, 19*
312:*2*  314:*3*
**linear**  155:*2*
156:*5*  220:*1,*
*10*  262:*21*
263:*1*  270:*10*
271:*2, 7, 15,*
*23*  272:*3, 9,*
*14, 21*
**lines**  68:*23*
162:*22*
214:*11*  216:*13*
**link**  24:*2, 6*
41:*8*  87:*23*
178:*13, 15*
234:*11*
**linked**  36:*1, 3*
89:*24*  90:*2*
118:*15*
119:*13, 18*
120:*12*
121:*11*
137:*11*  138:*6,*
*8*  145:*13*
155:*16*  183:*9*
193:*12*
**links**  49:*17,*
*19*  62:*24*
**list**  15:*15, 18,*
*19*  18:*2, 3*
21:*13*  28:*19*
29:*19, 22*
30:*1, 2, 16*
31:*10, 11, 14*
59:*24*  70:*22*
71:*1*  72:*24*
74:*5*  90:*17*
92:*23*  93:*1*

Confidential Information - Subject to Protective Order

95:19  112:20,
21  114:8
125:5, 24
126:22  127:4,
9, 20  130:14
131:23
133:13
136:20  137:2,
18  230:4, 7
254:12, 20
259:11, 12, 13
295:12  304:20
**listed** 58:11
59:22  60:13
62:7  63:2
64:4  65:1
68:16  69:1
127:20  128:6
130:21
134:11  223:8
251:11
253:16  296:20
**Listen** 34:17
141:21
**Literature**
131:8  240:2
292:2
**LITIGATION**
1:4, 23  5:19
10:8, 14
11:18  137:17
182:9  186:14,
16  189:20
203:10
228:15
234:18
235:20  258:5
281:22
**Litron** 65:23
66:2  69:23
**little** 12:6
22:23  63:4
96:2  128:13
206:4  252:21,
23  292:11
299:2  303:3
**liver** 280:20,
23  281:2, 4, 6,
15  288:3, 18,
23  291:3, 20,
21  292:17, 23

293:1  294:11,
14, 18
**liver's** 281:4
**LLC** 3:8, 15,
22  4:11, 22
5:5
**LLP** 2:2  3:2,
11, 18  4:2, 13,
18  5:7
**load** 227:17
**loaded** 48:21
**loading** 42:3
201:17  238:5
301:12
**location** 1:17
**LOCKARD**
3:2  13:1, 4
17:2, 12, 22
18:5, 9  20:4,
9  22:6  24:5
25:11  30:5
31:13, 23
34:16  38:22
39:1, 11  41:7,
16  52:19
53:12  54:8
56:20  57:4
60:7, 10
61:17  79:1, 8,
22  80:1, 6
82:2  88:7, 19
89:6, 20  92:4
97:21  102:14,
24  103:19
104:13, 23
105:12  106:8,
11  110:22
111:14
113:12  118:7,
19  125:18, 23
127:1  140:12,
20  141:3, 21
142:10
144:11, 13
145:6  146:3
150:16, 24
151:3  153:21
154:4  163:2
165:2, 13
166:3, 13, 20
167:10

168:13  170:1,
17  171:5, 9,
22  173:24
175:5, 12
182:11, 20
191:21
198:21  206:1,
21  210:20
215:20
217:22  218:6
219:7  220:14,
22  221:7
223:20
225:19  226:7
228:5, 22
231:13  233:3,
11  234:21
239:14  241:7
248:7, 14
253:20
254:15  255:1,
4  260:1
263:6, 13
265:21  267:4
268:6  274:1
275:2  281:23
283:7  288:13
289:5, 16
294:23
296:17
298:21
299:17
302:11
305:18
307:21  308:7,
20  309:5
**lockardv@gtla
w.com** 3:3
**London** 10:12
**long** 26:12
30:13  58:14
98:5  100:5
127:17  139:3
172:17
197:23
259:12  268:8
**longer** 18:22
35:21  192:18
265:10
**look** 13:7
24:3  32:23

33:24  59:16
79:24  82:4
89:12  116:11
133:16
134:14
135:16  143:6
162:3, 18
173:13  180:6
182:3  190:8
191:13
215:24
217:15  255:2
283:1  286:23
305:2
**looked** 35:2,
12  36:2, 6
130:1  219:13
252:14
258:20  266:4
296:19, 24
297:2, 14
**looking** 15:1
16:5  19:3
31:7  36:12
59:18, 19
83:17  91:9,
21  92:23
93:1  122:23
123:1  190:11
212:3  281:17
**looks** 128:3
142:23  162:4,
21  164:6
174:23
300:12, 13
**L'Oreal** 67:3
**LOSARTAN**
1:3  10:13
**loss** 115:19
285:2
**lost** 154:22
**lot** 13:18
15:2  29:14
37:16  62:13
63:12  65:6
66:5, 6  67:24
68:6  129:17,
19  131:22
234:8  235:22
249:17  265:9
288:15

**lots** 14:21
37:21  62:13
99:15  249:5,
6  250:1, 3, 6,
8, 10, 11, 12, 22
251:3, 7, 13,
23  253:5, 8
257:2, 17, 19
**low** 85:14
107:19  281:9
**lower** 190:15
192:6  205:5
217:1  218:19
281:3
**lowest** 161:13
**low-exposure**
162:15, 17
**lucky** 197:13
**lunch** 171:11,
20  175:11
**lung** 239:10
288:4, 18, 22
**Lutz** 84:21
**Lynch** 74:2
75:11  219:1
221:15
**Lyons** 154:11,
12, 14

**< M >**
**M7** 129:24
269:9, 23
273:8, 12
**machinery**
257:23  278:16
**Magazine**
237:16
**magnitude**
217:12
**MAHs** 159:24
**main** 78:3
214:24
**maintain**
214:6
**Mainz** 124:5
147:16, 21
**major** 44:8
181:10
197:18  200:7,
8  238:15
**makeup** 87:19

Confidential Information Subject to Protective Order

making 28:13
114:16
185:24
203:18, 23
308:21
malfunction
67:5 151:11
190:1 242:11
mammalian
288:5
mammals
288:12
289:15, 24
290:5
mandated
66:15 94:3, 7,
12 95:17
manner
207:14 256:23
manufactured
219:12
222:20 223:3
251:4, 13
253:6 256:11
258:9 259:1
manufacturer
256:21
manufacturers
109:4, 11
250:4 252:4
253:16

manufacturer's
253:3
manufactures
221:22
manufacturing
275:19, 21
manuscript
73:1 182:15
197:17
209:12
213:15
235:14 246:10
March 50:3
164:4, 8
Marchetti
178:21 179:7
margins 122:5
mark 19:15
23:18 80:5

81:10 106:4
126:1, 4
129:22 142:3
153:13 300:16
MARKED
7:2 19:20
20:17 23:21
24:18 27:11
41:13 79:20
81:16 125:6,
8, 12 142:6
144:21
153:10
163:12 172:7
177:7 178:8
183:18, 23
194:9 196:1
201:13 208:7
227:8 232:14,
17 237:20
243:19 244:3,
4, 8 245:9
247:8 259:22
266:18
285:14, 21
287:2 300:22
market 222:13
MARLENE
2:8 17:5, 7
Marlene's
309:2
MARTIN 2:2
mass 258:14
Massachusetts
4:20
materials
14:22 22:12
29:19, 23
30:16 31:10
56:3 125:5
126:22
127:10, 20
128:5, 6, 9, 15,
17, 22 129:4,
9 130:14, 21
131:13, 23
133:12
136:19, 20
137:18 156:9
229:21 230:1,
4, 7, 16

254:12, 20
259:11 295:13
math 151:1
matter 10:12
21:15 22:5,
14, 18 24:24
38:6 39:23
89:19 136:22
139:24
185:19
248:18
258:16
261:10 264:7,
14 289:12
maz@falkenbe
rgives.com
4:14
MAZZOTTI
2:2
McCarthy
240:12, 20
McCormick
173:7
MDL 1:4
128:11, 16
mean 32:21
48:17 87:5
128:12 134:3
146:16
269:20
272:22
288:20 308:3,
10, 17 309:7
meaning
15:12 74:16
77:11 83:6
90:3 104:19
146:20
152:15
174:19
191:17 225:6,
8 274:22
means 66:11
78:10 104:10,
17 134:9
249:20 270:7,
18 271:22
274:8 297:18
meant 206:6
measurements
8:18 201:8,

11 204:19
205:4
mechanism
94:9, 15
107:18 186:7,
9 235:3
273:3 276:14,
16 279:10
280:3
mechanisms
116:17 117:9
119:17 120:4,
7, 24
mechanistic
89:23 117:3
medical
110:14 149:19
medication
250:23 274:19
medicinal
233:6
medicine
117:2 196:22
Medicines
36:4 122:16,
21 221:5
meet 12:21,
24 83:15
179:8 214:10
meeting 13:7
44:6 53:10
155:17
160:19, 20
282:23
meetings
13:24 14:2
43:5 44:4, 5, 8
MEGAN 4:13
MELISHA
5:13
member 46:4
72:11
members
47:22 70:19
71:7, 11
73:16, 19
membership
47:1
memorable
296:10

memory 15:3
28:22 32:14
82:13
mention
53:20 78:9
mentioned
16:8, 12 34:7
38:3 50:8
73:8 76:16,
19 93:22
94:17 106:13
112:8 158:2
279:4 280:24
294:9
mentioning
71:16
Merck 67:12,
13
Mercks 67:16
Meridian 4:3
met 13:6
14:4 34:13,
21 35:7, 10
51:18 52:5
83:23 84:2,
23 179:10, 12
224:7
metabolic
281:5 288:4,
11, 19
metabolically
293:1
metabolism
280:17
288:22
291:15 292:8,
14, 17 300:1
metabolite
279:18 280:14
metabolize
288:18 290:2,
10, 17
metabolized
280:9 288:3,
11 289:14, 23
290:18 291:21
metabolizing
293:2
methanesulfon
ate 85:5 86:2

**Methanesulfon ate-Induced** 91:*14*
**method** 204:*14* 205:*1, 9, 18, 24*
**methodology** 97:*7* 272:*4, 10*
**methods** 202:*3, 6*
**methyl** 279:*19, 20* 280:*12*
**methylating** 279:*22*
**metric** 249:*22*
**metrics** 186:*10* 187:*7* 189:*4, 6, 14* 195:*5* 248:*20, 22* 249:*19* 251:*21, 23*
**MGMT** 124:*6* 277:*3*
**Michael** 1:*18* 310:*2, 18*
**Michelle** 74:*2* 75:*8*
**micrograms** 270:*17*
**middle** 240:*8*
**midpoint** 249:*13, 16, 24* 255:*17* 256:*1, 5*
**midpoints** 249:*21*
**Mike** 10:*20* 83:*20* 247:*12*
**Miller** 1:*18* 10:*20* 310:*2, 18*
**milligrams** 250:*19* 274:*23, 24*
**milligrams/vals artan** 250:*18*

**MilliporeSigma** 67:*21, 22, 23*
**mind** 15:*19, 22*

**Mine** 123:*16* 287:*4*
**Minneapolis** 2:*11*
**Minnesota** 2:*11*

**Minocherhomji** 74:*3* 75:*14*
**minor** 197:*18*
**minute** 35:*18*
**minutes** 307:*6*
**miscoded** 277:*5*
**misrecognized** 277:*16, 18*
**Mission** 48:*23*
**misspoke** 111:*8* 141:*4, 11, 18*
**misstates** 110:*23* 111:*15* 165:*14* 191:*22* 215:*21* 302:*12*
**misunderstandi ng** 45:*8*
**mjgoldenberg @goldenberglaw.com** 2:*9*
**model** 207:*17*
**modeling** 77:*22* 78:*5* 93:*17* 94:*18, 21* 95:*6, 8* 97:*13* 99:*4, 13* 117:*12* 202:*10, 12* 204:*8* 291:*16, 17, 18*
**models** 94:*22* 204:*11* 207:*18*
**modification** 94:*5* 249:*13*
**module** 119:*10*
**modules** 119:*8, 24*
**Molecular** 137:*24* 138:*17* 139:*6*

176:*4, 20* 180:*13* 183:*12* 193:*24* 201:*24* 211:*18* 213:*20* 224:*14*
**moment** 238:*1*
**momentum** 200:*6*
**Monday** 1:*10*
**money** 44:*7, 11, 16*
**monograph** 27:*1* 268:*11* 285:*15* 286:*1* 300:*17* 301:*18*
**Monographs** 9:*17, 20* 266:*11, 15* 267:*11, 15* 288:*16* 300:*19* 301:*20*
**Monroe** 4:*14*
**month** 55:*22*
**months** 144:*8* 169:*19* 170:*22* 171:*1* 231:*8*
**month's** 149:*21*
**morning** 11:*9* 12:*10* 307:*24*
**MORRIS** 4:*18*
**MOUGEY** 2:*14*
**move** 48:*15* 49:*7* 248:*11*
**moved** 226:*22*
**Mövenpick** 80:*23*
**moving** 135:*1* 136:*4* 306:*8*
**muddying** 239:*20*
**Mulberry** 3:*20*
**Müller** 84:*21* 89:*11, 19*
**multiple** 96:*22* 157:*4*

**mutagen** 276:*2, 4, 8, 17, 18, 21* 279:*1, 6, 8, 9* 284:*3, 5, 13, 15, 17* 285:*11*
**Mutagenesis** 137:*24* 138:*17* 139:*6* 176:*4, 20* 180:*13* 183:*13* 193:*24* 201:*24* 211:*19* 213:*20* 224:*14*
**mutagenic** 49:*16* 54:*22* 86:*19* 94:*14* 116:*19* 269:*10* 273:*8*
**mutagenicity** 121:*13* 276:*6*
**mutagens** 276:*11* 284:*1, 19* 285:*6, 8*
**mutated** 278:*20*
**Mutation** 7:*21* 54:*23* 72:*21* 115:*18* 176:*24* 177:*4* 181:*17* 185:*22* 186:*11* 187:*10, 15* 188:*17* 189:*9, 24* 190:*5* 191:*1, 9, 19, 24* 192:*5, 15* 193:*11, 14, 17* 216:*3, 19* 243:*2* 276:*15* 277:*10, 12, 16* 278:*7, 11, 22, 23* 279:*5, 7, 11* 280:*4* 285:*3, 5, 9* 291:*1, 4, 6*
**mutation- derived** 189:*5*

190:*7, 18* 191:*11*
**mutations** 85:*10* 186:*4, 7* 189:*15, 18* 224:*4* 235:*2* 276:*5* 277:*21, 23, 24* 278:*14* 280:*21*
**Myers** 61:*24*
**Mylan** 5:*10* 133:*2* 135:*7, 10* 136:*6* 169:*8* 255:*8*

< N >
**name** 10:*6* 11:*10* 17:*11* 26:*10* 50:*24* 51:*10* 61:*8* 81:*6* 92:*10* 100:*15* 123:*17* 128:*10* 134:*13* 154:*11* 158:*3, 4, 24* 224:*6* 249:*5* 292:*15* 295:*18, 24*
**named** 139:*18*
**names** 17:*3, 15* 35:*16* 38:*2, 8* 39:*9* 51:*23* 59:*21* 60:*4* 73:*15, 22* 101:*24* 105:*17, 21* 106:*5* 122:*13* 124:*8, 13* 213:*9* 296:*10*
**National** 99:*10* 108:*19*
**nature** 38:*15* 88:*11* 89:*8* 103:*24* 166:*10* 174:*6, 8*
**Naven** 83:*16*
**NCRA** 310:*19, 20*

Confidential Information - Subject to Protective Order

**NDEA** 7:12 54:22 56:13 97:8, 16 153:8 155:2, 11 157:3, 9 186:15, 17 187:3 191:8 216:16 220:4, 5, 8, 13 221:4, 6 223:4 249:6 252:5 254:8 255:19 258:19 262:14, 17 263:11, 15 264:13, 16, 19, 23 270:21 271:10, 13, 17 272:11 279:8, 9, 23 280:13 284:8, 10, 14 303:8, 11

**NDMA** 26:23 27:1 54:6, 21 56:13, 17 83:4 97:8, 16 186:15, 17 187:3 191:8 216:16 219:15, 21, 23 220:13, 18, 20 222:21 223:4 249:5 252:4 254:8 255:19 258:19 262:14, 17, 18 263:3, 8, 19 264:8, 11, 22 270:20 271:9, 13, 16 272:4 279:1, 2, 5, 12, 18, 19 280:13 283:18, 19 284:4 288:3, 10 289:13, 22 290:3, 10, 17, 24 291:20 296:16 302:10 303:8, 11

**NDMAs** 288:18 **NE** 3:6 **necessarily** 116:12 **necessary** 311:4 **need** 16:19 24:5, 11 39:13 42:1 69:13 80:8 98:16 141:13 144:24 203:21 225:19 257:10 278:19 **needed** 271:19 **needs** 44:11 239:8 **neither** 310:13, 14 **Nelson** 91:24 **never** 165:22 **NEW** 1:1, 19 2:5 3:20 10:16 42:17 69:24 183:9 244:3 310:20 **Newark** 3:20 **newest** 53:4 **Next-Generation** 242:9 **nicely** 159:22 **NICOLE** 2:3 **nicole.haddadn ia@1800law101 0.com** 2:4 **Nicolette** 74:3 75:22 **NIGH** 2:15 **night** 306:11 **NIH** 65:15 101:4 **nitro** 87:2, 5 88:22 **nitrogen** 88:17, 20, 22 89:2 **nitrosamine** 9:9 38:10, 21

53:9 73:21 86:15, 18 88:6 123:6, 23 159:12 164:15 188:22 224:19 234:19 243:13, 17 244:22 245:1 246:20 262:1, 3, 11, 14, 16 **nitrosamines** 49:16 58:21 71:14 73:10, 12 85:11 87:24 112:22 113:19, 23 189:12 190:11, 12 191:7 209:18, 19 232:2 241:18 273:2, 9, 22 **nitroso** 87:7 88:11 270:15 **Nitrosodimethy lamine** 287:14 **N-Methylpurine** 91:11 **N-nitrosamine** 222:8 **N-nitrosamines** 8:23 71:1, 5 139:13 208:3, 6 223:18 **N-nitroso** 86:21, 24 87:1, 18 88:2, 14, 16 89:2, 5 221:24 269:7 **N-nitrosodiethyla mine** 304:21 **N-nitrosodimethy lamine** 298:17 299:16 300:7 304:23

**nonclinical** 262:4 **nondisclosure** 169:3, 4, 7 **nongenotoxic** 116:16 **Notary** 310:4 313:20 **note** 15:10 181:24 230:11, 12 254:19 295:9 **noted** 74:17 181:22 208:23 309:13 311:11 313:7 **NOTES** 6:14 21:18, 21 22:1, 3, 9 33:17 34:5 255:11 314:1 **noteworthy** 8:22 49:16 71:1, 5, 13 139:13 188:22 189:12 191:7 208:3, 6 232:2 241:18 **Notice** 7:3 12:9 19:15, 19 20:13 105:3 **noticed** 307:3 **notification** 167:24 **notify** 167:14 **notifying** 168:5 **noting** 239:8 **Novartis** 68:7, 8, 9 **novel** 65:12 70:1 **November** 144:10 154:10 155:14 160:15, 22

169:18 170:7, 8, 12 **Nudelman** 32:12 34:12, 13, 20 35:1, 8 51:19 52:3 56:23 84:11 145:13, 16 154:10 155:11, 21 157:16 160:24 163:22 164:8, 13, 19 173:6 175:4 296:7 **Nudelman's** 34:8 165:12 **NUMBER** 7:2 48:13, 14 123:7 127:6, 8 128:3 144:8, 19 148:2 157:13, 14 169:16 171:1 232:13, 16 250:11 251:1, 3, 8, 12 260:1 **numbered** 48:18 74:14 **numbers** 74:16 96:22 127:2 248:24 249:14, 20 252:10 283:2 302:17 **numerous** 57:8 99:2, 17, 22 100:9 101:8 106:21 107:4 112:17 121:9 180:10 **nutraceuticals** 68:22 **NW** 3:13 5:3

< O > **o0o** 309:14 **O6** 276:23

Confidential Information - Subject to Protective Order

O6-
alkylguanine
277:6
object 150:17
166:3 206:2
302:11
Objection
22:6 25:11
39:12 52:19
53:12 54:8
56:20 57:4
60:7 61:17
88:7 89:6, 20
92:4 97:21
110:22
111:14
113:12 118:7
144:11 145:6
163:2 165:2,
13 166:13, 20
167:10
168:13
170:17 171:5
173:24 175:5
182:11, 20
191:21
198:21
206:21
210:20
215:20
217:22 218:6
219:7 220:14,
22 221:7
223:20 226:7
228:5, 22
233:3, 11
234:21
239:14 241:7
253:20 263:6,
13 265:21
268:6 274:1
275:2 281:23
283:7 288:13
289:16
294:23
296:17 299:17
objections
19:24
O'BRIEN 2:14
observations

253:12
observe 33:21
obsolete 26:15,
16, 18 286:17
299:7
obviously
12:10 104:11
129:24
171:15
306:23 309:7
occur 94:11
occurred 39:6
94:9, 10
170:12
occurs 192:6
OCD 268:15
October 1:10
6:3 10:3, 9
23:13 28:9
169:21
170:22 171:1
182:1, 23
243:5 310:22
OECD 16:2,
17, 23 67:1
94:3 95:13
98:7 268:9,
11, 15 297:10,
17
offer 24:23
offering 187:1
189:8
Office 2:5
14:4
official 13:7
57:9 165:7
Oh 31:19
118:24
123:18
124:14
171:14 177:9
197:2 227:15
248:23
279:15
293:17 303:5
Okay 11:17,
20 12:2, 3, 4,
19, 20 13:11
16:7 17:20
19:11 21:2
29:9 30:9

32:5 42:4
46:19 49:4,
10 58:3
71:10 73:14
75:18 76:4
80:3, 17 81:3,
8 82:9, 24
83:15 86:10
92:19 102:20
103:19 105:8
106:11 108:5
111:7 123:2,
22 125:22
126:24
129:11 130:7
131:12
142:10, 20
143:1, 18
146:7 151:21,
23, 24 152:6,
10 163:21
171:22, 24
172:14, 20
173:1 176:1
177:12
178:14 180:4
181:21
183:21
184:11
192:10, 14
196:6, 14
201:16
204:21 212:4,
5 224:11
227:15
232:22 239:5
243:10 244:5
245:15 247:3
250:21 255:3
262:2 279:17
281:19
285:12, 22
287:4, 12, 22
288:1, 8
292:13
298:12
301:13, 14
302:2 303:2,
20 305:9
308:19
older 296:14

once 48:20
81:19 133:13
163:17
230:14 247:14
oncogene
278:6
oncogenes
278:6
one-page
171:21 172:1
ones 15:5, 9,
17 16:5
30:24 31:2, 4
32:13, 15, 18
57:9 73:7
93:5 107:14,
24 108:8
130:3 134:15,
17 190:18
212:1 223:8
238:12 243:9
270:19 296:6,
11
one-sentence
174:14
online 24:3
44:6 147:17,
23 182:23
198:2, 5, 6
243:4
onwards
30:10 216:23
open 18:20
32:23 42:20
155:4 159:23
261:3
opened 32:17,
21 36:23
134:9, 15
140:1
openly 215:11
opinion 22:20
23:3 78:2
85:18 115:11
187:21 188:6,
10 199:1
209:24
263:18 289:3,
11, 13, 21, 22
290:1 307:7

opinions
22:13, 17
24:23 25:1, 4,
5, 23 26:5
36:7 47:10
77:18, 24
136:21 183:9
184:21
185:18 186:3,
24 188:23
189:3, 7
203:6 230:18
Opponents
239:6
opportunity
12:14
opposed
156:5 257:4
opposite
277:19
option 98:18
272:16 306:2
options 273:5
Oral 1:16
7:4 19:20
ORDER 1:13
95:10 102:12
104:15, 21, 24
105:23 106:7
186:7 188:12
191:14
217:12 229:6
271:12
277:12, 15
O'REILLY
3:18
organ 291:3
293:2 294:11
organism
290:6
organisms
290:3, 5
organization
37:3 41:23
47:13, 23
62:11 63:16
64:18, 20
65:11 66:6,
11, 21 69:22,
24 70:3
95:23 267:20

Confidential Information Subject to Protective Order

organizations 43:10 58:5 185:7 245:22

organized 158:4

organizers 156:22

organs 96:10 265:13 281:8, 10, 12 291:7, 24

original 184:24 266:23 283:4 311:15

originally 55:13 132:3

originate 131:13

Ottawa 41:2 78:21, 24

Otte 92:20

output 71:9 77:16, 20 121:8

outsource 65:15 66:24

overbroad 294:24

overcame 236:15

Overland 2:22

owned 148:19 149:8

ownership 246:1

Oxford 5:8

oxide 8:15 195:24 213:8 242:5

oxygen 88:18, 22 89:3

< P >

p.m 175:16, 17, 18, 20 231:18, 19, 20, 22 260:17, 18, 19, 21 305:13 306:5 309:13

P450 280:18, 24 281:18 290:2, 10

P450s 281:8, 14 290:17

PA 2:14

page 20:24 31:9 48:15, 18 49:8, 12 57:24 58:6 59:15 123:15, 16 126:12, 13, 16, 21 127:2, 6, 8 128:8 129:8 130:8, 9 131:8, 22 133:14 134:18, 19, 24 135:1, 3, 16, 21 136:4 143:6 172:16 184:8, 10 185:15, 16 194:17, 21 197:3 229:21, 24 230:10 232:20 238:14, 24 239:1 240:8 245:14, 15 246:10 248:4, 11 255:9 287:1, 2, 9, 13, 15, 18, 19, 20 296:13 298:9 302:16, 17 304:13 312:2 314:3

pages 127:16 142:18 208:20 302:24 313:5

PAHs 73:13

paid 58:18 90:7 185:10, 12 233:23 246:2

panel 122:15

Panigrahy 32:13 294:6 296:2

PAPANTONIO 2:14

paper 54:18, 20 72:9 73:22 78:1, 13, 16 119:22 138:22 187:24 188:1, 4, 22 189:23 192:1 213:8 216:17 218:21 225:9 233:19

papers 72:22 73:4 90:9

paragraph 154:20 161:7, 11 228:11 230:10 239:3 240:8 261:21, 22 288:2 302:21

Pardon 118:18

parens 155:4 159:23, 24

parent 108:2

parentheses 155:6

Park 2:22

Parkway 4:8

Parry 119:11

part 18:15 22:5 43:18 47:19 53:16 70:10 71:8 82:15 94:12 95:5 118:4, 11 119:5 121:6, 7 125:6 126:11 155:24 195:12 204:7 209:22 212:18 236:12 248:18 261:9 275:15 277:20 279:22 280:12

281:16, 17 286:6

participant 72:17

Participate 58:6

Participating 58:5

particular 94:4 100:11, 15, 22 116:14 122:2, 7 157:12 168:3 178:8 179:4 198:7 211:17 213:24 234:6 257:6 292:4

particularly 26:9 39:20 169:1 197:24 214:19 276:13 280:19

parties 47:2 310:14

parts 286:20

party 57:8 66:12 119:22 310:11

passed 128:9 129:23 259:4

passing 174:7, 9, 14

patent 246:2

patented 66:7 70:2

pathological 96:8

pathology 265:12

pathway 288:4, 12, 19

patients 210:19 217:19

Paul 47:6 72:10 76:19 178:20 224:6, 12 225:1, 18

pause 252:24

pay 44:3, 4 47:15, 18, 22 159:8 233:14

paycheck 149:21

PAYE 149:21

PC 4:7 5:2

PCRs 69:5

PDE 37:9 85:13, 16 122:4 130:19 139:3 186:22 187:7, 19 189:2, 4, 5, 9, 14 190:15 192:4, 5 200:2 209:21 216:20, 24 219:21 225:11 270:12 272:18 273:5 282:7, 15

PDEs 99:4 186:17 190:5, 7, 9 191:8, 11, 19 192:1, 3 215:24 216:16 217:13 218:18 282:9 283:1

PDF 127:6 287:1 302:23

PDFs 32:22

PED 186:20

PEDs 186:15, 19

peer 89:17 217:21 236:8, 10

peer-review 236:12, 21 237:1, 4

peer-reviewed 236:14

pending 31:24 32:2 102:21 289:18

Pennsylvania 4:9 5:9

Pensacola 2:17

people 35:17 37:11, 21

Confidential Information Subject to Protective Order

47:15  51:9
53:3  71:17,
20, 23  72:9,
16  93:14
173:7  177:14
214:4, 9, 14,
22  245:21
256:24
264:24  285:7
**PEPFAC**
118:15
**percent**  115:3
**percentage**
149:24  150:7,
21  151:4
**perfect**  126:14
**perform**
101:16, 19
120:10
**performed**
120:13  252:6
**period**  58:19
91:2  141:15
155:7  179:16
197:20
250:23
256:11  265:11
**periods**  102:11
**permissible**
220:5, 12
**permit**  221:4
**Permitted**
8:21  49:14,
15  55:5, 7
70:23  71:4,
12  139:12
186:22  187:1
188:21
189:11  191:6
200:16  208:2,
5  224:18
232:1, 12
241:17  272:7
**person**  83:18
91:20, 22
**personal**
185:7  245:20
**personally**
90:10, 12
120:4  145:18
198:17

**perspective**
253:9  289:8
**pertain**  193:7
229:15
**pertains**
264:13
**pertinent**  40:5
185:4
**pet**  43:12
**petition**
105:10
**Peto**  15:24
16:8, 9  97:7
286:13  298:1
299:9  301:24
**P-E-T-O**  16:9
**petrochemical**
43:12
**Pfizer**  68:12,
13, 14  74:7,
12  75:9
221:19, 23
222:4  223:16
**ph**  1:23
**Ph.D**  1:16
6:2, 8  11:2
58:16  76:10
116:23  117:1,
3, 7, 14  118:5,
14, 23  120:18,
20  121:4, 6, 8
233:15  310:5
313:4, 12
**Pharma**  3:9,
16, 22  4:10,
11  222:15
223:12

**Pharmaceutical**
3:8, 15, 22
4:21, 22  43:8,
21  60:19, 24
61:11, 22
62:4  64:8
65:5, 18, 22
68:15  69:3, 9,
15, 16, 19
86:6, 11, 13
108:1, 10
113:1, 2, 7, 9
114:13  187:4

193:9, 18
209:11  210:7,
9, 11, 15, 16
211:2, 7, 15
221:5  223:14
244:18  245:3
246:17  274:9
275:7, 8, 12,
19, 21
**Pharmaceutical
s**  3:8, 15, 22
5:10  62:5
65:18, 20
67:17  68:10,
24  112:10, 15
114:1, 14
159:13
173:11  193:8
198:20
219:18
220:13, 20
244:23  269:11
**pharmacokinet
ic**  291:17
**Pharmacy**  4:5,
16
**phone**  19:8
81:24
**phrase**  264:1
**physically**
96:4, 5
**PI**  45:13, 15
235:14
**pick**  16:7
**picked**  278:15
**picture**
240:10, 11
**piece**  122:14
**Piedmont**  3:6
**PIETRAGALL
O**  5:7
**Pittsburgh**  5:9
**Pivotal**  91:12
**PIZZI**  3:18
**PK**  291:16
**place**  53:11
54:5  55:9, 13,
23  80:13, 18,
22, 24  81:4, 5
120:17
122:18

123:14  147:2,
6, 10, 14
226:19
250:24
256:12  310:8
**places**  246:8
276:22
**Plaintiffs**  2:6,
12, 18, 23
11:12  39:18
305:21
**platform**  44:1
272:1
**Plays**  91:12
**pleadings**
128:16
**please**  12:13,
18  23:16
34:19  41:6
49:8, 13
59:16  60:4
80:4  81:9, 19
82:4  94:18
106:18  130:8
131:22  143:6
146:4  153:5
161:10  163:6,
17  172:13
176:23
183:11, 14
184:12  185:2,
15  192:20
193:22
194:17
195:15  197:9
201:5  206:7,
10  207:24
208:11  212:5
227:4  229:9
230:10, 11, 12,
16  232:10
237:14
241:21
242:17  245:2,
6, 13  246:12
247:1, 3
259:17  260:7
261:24  264:1
266:10
268:24  275:4
286:24

295:21  298:8
300:16  301:8
305:11  311:3,
8
**plenty**  180:8
**plow**  306:15
**point**  79:3
94:24  95:5
103:3  107:21
123:21  127:8
161:15
162:14, 15
170:2  186:11
188:5  195:5
200:24  201:2
242:22
254:11  257:8
292:24
**pointing**
254:17
**points**  78:3
117:20, 23
124:18  199:8,
14  202:13
216:21
**Policy**  9:13
184:16  203:1
245:9
**polite**  173:20
**popped**  267:2
**population**
190:16  217:8
**portion**  43:3
104:3  174:20
**portions**  105:1
**posed**  39:23
209:10
210:11, 18
211:6
**position**  38:22
39:2, 16, 18
72:13  216:14
276:23  279:4
308:21
**positions**  96:9
123:4, 20
277:1  279:3
**possible**
249:19  251:22
**Post**  2:5

Confidential Information Subject to Protective Order

147:*17*
**postdoc** 90:*24*
**postdoctoral** 58:*19* 90:*6*
**potency** 8:*19* 94:*14* 109:*19, 22* 201:*12* 202:*21* 204:*20* 205:*13* 262:20, *22* 270:*4* 298:*2*
**potent** 262:*3, 11, 19, 24* 270:*16, 20* 273:*16*
**potential** 158:*24* 214:*16* 245:*24* 269:*12*
**potentially** 53:*19* 54:*21* 55:*11* 64:*9* 82:22 101:*7* 176:*14, 17* 193:*8* 216:*22* 263:*24* 281:*10* 291:*22* 292:*14* 296:*3*
**pounds** 148:*8, 10*
**power** 283:*24*
**powerhouse** 281:*5*
**PowerPoint** 35:*4* 156:*13, 15, 21* 157:*20* 160:*18*
**PowerPoints** 156:*17* 162:*24*
**PowerPoint-type** 56:*7*
**practical** 265:*2, 6, 13* 300:*8*
**practice** 33:*20* 42:*15* 122:*1* 139:*21* 178:*2*
**precancer**

297:*17*
**precedes** 212:*1*
**precise** 28:*19* 70:*21* 133:*1* 257:*23*
**precisely** 231:*1, 9*
**Precision** 5:*16* 157:*11*
**predate** 286:*9*
**predates** 268:*11* 286:*12* 297:*11*
**predating** 299:*6* 301:*24*
**predict** 100:*9* 145:*20*
**predicted** 96:*15* 192:*5*
**prefer** 128:*2*
**preferred** 138:*12* 205:*9* 268:*20*
**preliminary** 298:*4*
**premise** 188:*18* 190:*17*
**preparation** 28:*2, 3* 132:*17* 235:*14* 297:*19*
**prepare** 14:*20, 23* 15:*11* 23:*5, 7* 113:*5*
**prepared** 28:*6* 29:*22, 24* 30:*2* 35:*4* 215:*10* 235:*17* 269:*23*
**preparing** 14:*8, 11, 19* 129:*18, 19* 182:*15*
**prepublished** 157:*12*
**prescribed** 270:*22*
**presence** 115:*6* 273:*20* 290:*9*

**present** 2:*9* 3:*3, 12* 5:*12, 20* 35:*6* 47:*8* 53:*3* 56:*3* 113:*10* 115:*8* 147:*4, 7* 158:*15* 192:*2* 251:*18*
**presentation** 35:*5, 9, 10* 50:*10, 13, 18* 56:*8* 93:*1* 146:*23* 155:*17, 20, 22* 156:*1* 159:*17* 160:*18* 282:*6, 15* 283:*5*
**presentations** 37:*19* 57:*15* 92:*14* 93:*3* 129:*18* 146:*17*
**presented** 23:*3* 25:*5, 15* 26:*7* 37:*5, 9* 51:*21* 55:*24* 56:*5, 15* 57:*12* 77:*16* 127:*15* 155:*18* 156:*1, 4, 12, 14* 157:*2, 15, 20* 189:*15, 18, 19* 200:*10* 214:*21* 216:*10* 251:*17* 252:*11* 253:*11* 257:*12, 14* 267:*18* 271:*13* 282:*19, 23* 283:*16* 291:*18*
**presenters** 81:*12* 156:*18*
**presenting** 29:*4* 36:*9*
**pretty** 235:*5*
**prevent** 273:*19*

**previous** 14:*6, 18* 42:*10* 51:*20* 84:*24* 86:*1* 101:*21* 113:*19* 138:*10, 20* 170:22 171:*1* 174:*12, 22, 24* 223:*24* 268:*23* 295:*16*
**previously** 46:*6* 50:*9* 51:*19* 57:*6* 76:*16* 80:*12* 102:*4* 104:*20* 130:*20* 154:*23* 165:*23* 174:*14* 176:*2, 6* 202:*24* 211:*21*
**primarily** 29:*2*
**primary** 178:*1*
**principal** 45:*16*
**Prinston** 4:*22* 133:*2* 136:*10* 258:*24*
**prior** 12:*22* 39:*3* 100:*15* 155:*14* 165:*6* 310:*4*
**Priorities** 8:*10* 194:*9*
**private** 36:*12*
**privilege** 38:*18*
**PROAST** 199:*15, 18*
**probable** 262:*5, 13* 267:*24* 300:*15* 302:*13* 304:*9, 11*
**probably** 284:*24* 303:*11, 15* 304:*16* 305:*3, 7*
**problems** 238:*16*

**procedure** 272:*24*
**procedures** 99:*14*
**PROCEEDINGS** 6:*6* 305:*16*
**process** 114:*16* 117:*7* 178:*5* 197:*8, 23* 236:*12, 21, 22*
**processes** 116:*21*
**Procter** 68:*17, 18, 19*
**PROCTOR** 2:*14*
**produce** 21:22 22:*11* 68:*5* 69:*4* 89:*16, 21* 90:*9*
**produced** 21:*5, 14, 19* 83:*4* 85:*16* 109:*2* 133:*15* 134:*11* 135:*6* 136:*14* 137:*16* 219:*5* 222:*4* 301:*20*
**producing** 54:*20* 83:*9* 94:*1* 110:*17* 115:*2*
**product** 114:*24* 217:*16* 230:*14* 233:*6* 247:*24* 249:*5* 252:*5, 11* 253:*4, 11* 256:*10, 20* 258:*9, 18* 259:*1* 274:*14, 16*
**production** 90:*15* 110:*16* 140:*10, 18, 23*
**PRODUCTS** 1:*3* 9:*15* 10:*14* 68:*22*

70:4  108:10
110:17
115:13  135:7,
14  164:16
247:5, 8
250:5  251:14
254:9  255:20
**Professional**
1:18  310:2, 19
**professor**
59:7, 8, 12, 14
119:11  124:4
**professorship**
78:22
**profile**  86:20
**profiles**  65:6
**Progress**  49:11
**pro-industry**
240:1
**project**  13:23
28:1  44:24
58:20  72:16
76:11  77:3, 4
90:9  108:21
119:12, 19
120:6, 12, 13,
22  141:9
143:16  144:9
145:4, 7
169:13
**projects**  45:3
72:23  73:9
77:1  116:7
**proliferation**
278:8
**prompted**
28:13  52:17
**pronounce**
92:9
**pronouncing**
75:15, 16
139:16
**pronunciation**
132:24
**proportion**
44:8  47:8
270:15
**propose**  187:9
**proposing**
186:15, 17, 19

**proposition**
292:6
**propounded**
313:6
**protect**
190:16  285:4

**PROTECTIVE**
1:13  104:15,
21, 24  105:23
106:6
**protocol**  20:1
**provide**  16:17
113:1  150:12
155:10  156:8,
21  159:15
191:12  192:3
231:3  280:5
**provided**
32:22  99:15
110:21  128:7
129:10, 15
131:14  135:7
252:7  255:13,
14  259:11
299:14, 19
300:13
**provides**  43:1
**providing**
22:14  77:9
**public**  40:1
124:3  310:4
313:20
**publication**
15:4, 23  18:1
36:8  49:17,
18, 20, 23
50:6  54:16
70:23  71:8
72:17  77:23
78:19  89:13,
23  90:17
91:5, 6
119:15
138:24  139:1,
2, 12  157:5,
10  162:21
176:15
177:22, 24
178:11
179:19, 20, 24

180:4  181:22
182:1, 6, 8, 18
183:3, 6
189:3, 11, 16,
19  190:6
192:11
195:14
197:10, 11, 12,
15, 16, 21
198:3, 5, 12,
13  202:15
204:21
213:16  214:3
215:9, 11, 13,
16, 22  216:6
218:5  219:1,
20  220:6
222:3  224:20
240:19  246:23
**publications**
15:7, 11, 20,
21  29:13, 15
42:21  66:4
77:2, 7, 11
89:22  116:4
162:5, 9
164:10
223:24  224:14
**publicly**
159:12
**publish**  42:19
89:10  176:13
**published**
27:1  49:24
77:14  89:18
138:22  176:9,
19  179:4
182:1, 23
198:8, 10
208:15
216:17
218:13  232:5
243:4  244:18
246:18
**publishing**
29:13  139:21
217:21
**pull**  19:14
23:16  24:6
41:4  79:16
81:10  126:2

142:1  153:5
163:7  183:11
208:1  227:3
232:11
237:15  245:3
247:3  259:18
266:11  285:12
**pulled**  140:24
**purity**  115:3
**purpose**  42:13
96:12  109:15
168:20
**purposes**
104:12
139:11
191:20  300:8
**pursuant**
105:22  310:9
**push**  270:11
308:11, 16
**put**  20:12
47:11  142:13
172:2  189:23
198:2  201:5
202:24
216:21  220:7
224:4  232:6
234:7  235:11
243:11  249:9,
11  255:4
277:19  303:3

< Q >
**Q3D**  130:17
**Q3D(R1**
130:10
**Qiu**  92:2, 6
**Qualitative**
117:5, 12
**Quantitative**
8:5  46:1
70:16, 19
71:5, 9, 11
72:7  73:15
117:4, 11
180:15  194:1,
4  205:2, 10
225:3
**quantum**
204:6  207:17

**question**
11:24  12:13,
16  25:14
29:17  31:24
32:2, 6  34:17,
18  40:17
51:20  74:14
86:5  101:17
102:21  105:7
119:3  125:9
140:21
141:22
148:18  184:2,
19  203:5
206:6, 11, 13
212:6  223:21
224:10
229:10
241:15
264:12  275:3
284:7  289:17
295:5, 16
**questioning**
309:8
**questions**
11:11  42:11
104:6  105:7
171:23  260:5,
11  313:6
**quick**  271:20
**quite**  18:21
26:6, 11
34:10  65:6
68:9  111:20
200:7  207:22
259:2  282:20
**quote**  121:23

< R >
**Rachel**  173:7
**racing**  141:23
**RAFFERTY**
2:14
**raise**  184:19
203:4
**raised**  221:3
**Ralph**  145:23
146:9  154:9
155:10
160:24

Confidential Information Subject to Protective Order

163:*22* 164:*8,
13, 19* 165:*19*
**Randomized**
264:*2, 3, 14, 18*
**ranks** 205:*13*
**Raphael**
32:*12* 34:*8,
12, 13, 20*
35:*1, 8* 51:*18*
52:*3* 56:*23*
84:*11* 145:*13,
16* 155:*21*
157:*16* 173:*6*
175:*4* 296:*7*
**RASPANTI**
5:*7*
**rate** 144:*2*
**rationale**
159:*21* 160:*13*
**RCT** 263:*23*
**RCTs** 264:*7*
**RDR** 310:*18*
**reach** 291:*20*
**reaching** 50:*1*
219:*20*
**reaction** 83:*7,
8*
**Reactive**
269:*10*
271:*19*
272:*24* 280:*10*
**read** 22:*20, 22*
23:*4* 26:*14*
30:*20, 23*
31:*1, 3, 8*
32:*15, 16, 18*
33:*5, 19*
49:*13* 60:*4*
71:*2* 73:*23*
119:*2* 133:*22*
134:*7* 137:*4,
13* 159:*22*
161:*10*
180:*14*
184:*12* 185:*2*
204:*23*
230:*11*
261:*21* 274:*3*
286:*19, 20, 22*
294:*1, 5*
295:*18* 296:*1,*

*5* 303:*14, 18*
311:*3* 313:*4*
**reader** 302:*24*
**reading** 14:*19,
21* 26:*2* 27:*5*
32:*11* 34:*1*
98:*7* 148:*22*
170:*19* 171:*3*
262:*2* 290:*20*
292:*2* 299:*23*
**reads** 154:*21*
159:*20* 160:*5*
162:*12*
238:*15* 239:*5*
269:*6* 273:*7*
298:*15* 300:*3*
**ready** 306:*7*
**reagents** 68:*6*
**real** 216:*23*
217:*18* 252:*9,
24*
**realistic**
162:*13, 15*
**realize** 35:*18*
223:*7* 289:*4*
292:*21*
**realized** 26:*4*
213:*23* 215:*8*
**realizing**
176:*16*
**really** 12:*8*
97:*11* 172:*1*
217:*7* 226:*22*
269:*23* 281:*5*
282:*24*
283:*11* 297:*8*
298:*4*
**Realtime** 1:*19*
310:*3, 20*
**reanalysis**
294:*16*
**reanalyze**
157:*11*
**reanalyzed**
232:*6*
**reason** 44:*22*
53:*5, 20*
56:*16, 17*
225:*15*
240:*16* 258:*7,
11* 286:*23*

307:*9* 311:*5*
312:*4, 6, 8, 10,
12, 14, 16, 18,
20, 22, 24*
**reasonable**
273:*19*
**reasons**
189:*16, 17*
**recall** 20:*21*
39:*21* 51:*17,
23* 81:*6* 83:*5*
112:*16, 20*
136:*17*
156:*11* 161:*6*
164:*17, 22*
213:*9* 261:*11*
295:*11*
**recalled** 35:*21*
219:*15, 18*
221:*23* 222:*8,
21* 223:*4*
**recalls** 53:*8,
16*
**receipt** 311:*16*
**receive**
227:*22*
228:*18* 267:*1*
**received** 50:*3*
129:*5* 197:*6*
**receiving**
234:*3, 9*
**receptor**
261:*15*
**Recess** 79:*11*
103:*15*
175:*17*
231:*19* 260:*18*
**recognize**
59:*21, 23*
127:*12, 14*
143:*7, 9, 10,
12* 161:*19*
227:*18, 20*
247:*17, 18, 20,
22*
**recollect** 93:*8*
**recollection**
52:*23* 83:*2*
93:*2, 4* 133:*1,
4* 141:*13*
283:*10*

**recommend**
158:*17*
**recommendatio
n** 273:*15*
**recommended**
160:*9*
**recommends**
273:*8, 13*
**reconfirm**
21:*7*
**record** 10:*6*
12:*1* 19:*2*
20:*14* 30:*13*
39:*14* 79:*10,
14* 85:*20, 22*
89:*13, 23*
91:*5* 103:*5,
14, 18* 123:*7*
127:*3* 128:*12*
144:*18*
145:*15, 17*
152:*14, 20, 22*
154:*2* 166:*24*
167:*8* 175:*16,
20* 186:*21*
226:*1* 231:*18,
22* 259:*7*
260:*17, 21*
286:*3* 305:*11,
13, 14, 17, 19,
20, 23* 306:*7,
14, 20* 307:*5,
7* 308:*14*
309:*1, 3, 6, 9,
12*
**records** 18:*15*
21:*15* 157:*19*
**recruit** 112:*5*
**redacted**
174:*20*
**reduce** 217:*11*
**refer** 85:*6, 8*
114:*6* 127:*7*
202:*5* 230:*3*
274:*14*
**reference**
73:*17* 130:*2*
**referenced**
40:*9*
**references**
28:*16, 17, 19*

29:*1, 4* 95:*19*
131:*22*
**referencing**
28:*18* 49:*20*
50:*6* 299:*10*
**referred**
269:*17*
**referring**
25:*10* 26:*18,
24* 41:*24*
43:*7* 45:*16*
48:*6, 7* 50:*12*
77:*21* 99:*23*
100:*2, 11*
123:*12*
148:*21*
159:*19*
174:*21* 180:*5*
228:*10*
248:*22*
254:*21*
261:*15* 271:*6*
282:*16*
**refers** 202:*3*
**refined** 235:*12*
**reflect** 103:*5*
**reflected**
30:*21* 31:*9*
144:*21*
**reflecting**
33:*11*
**reflects** 30:*13*
93:*4*
**refresh** 24:*12,
15* 41:*16* 93:*2*
**refreshed** 15:*3*
**refreshing**
41:*17*
**regard** 21:*17*
35:*3, 13*
36:*13* 39:*19*
89:*4, 18*
97:*15* 98:*23*
109:*24*
111:*18*
115:*20* 134:*4*
137:*8, 15*
156:*24*
162:*11, 20*
164:*14*
177:*21*

Confidential Information Subject to Protective Order

186:*24*  187:*3,* *19*  189:*7*
192:*12*
202:*23*
211:*11*
212:*21*
215:*18*
216:*14*  220:*3*
231:*4, 24*
239:*18*
254:*22*
264:*10*  266:*4*
284:*8*  289:*13*
290:*12*  294:*10*
**regarded**  66:*8*
300:*7*
**regarding**
27:*1*  33:*14,* *18*  36:*15*
38:*9, 20*
39:*20*  159:*12*
166:*1*  212:*14*
234:*18*
238:*22*  252:*3*
253:*5*  257:*3*
258:*24*  289:*11*
**regards**  291:*9*
**region**  277:*4,* *24*  278:*15*
**Registered**
1:*19*  310:*3, 19*
**regular**  75:*20*
**regulation**
115:*5*
**regulator**
35:*19*
**regulators**
47:*3*  93:*18*
99:*17, 24*
100:*4, 10*
101:*1, 8*
111:*18, 22*
112:*1*  113:*11*
121:*22*
**Regulatory**
7:*22*  8:*8*
35:*3*  37:*3, 12*
40:*12*  48:*2*
57:*10*  62:*12*
63:*14*  64:*21*
65:*14*  66:*18,*

*23*  94:*13*
99:*6, 8*  100:*4,* *16*  106:*15, 17,* *19*  108:*11*
111:*12*
113:*14*
121:*20, 22, 24*
123:*10*
124:*17*
129:*12*
138:*13*
170:*20*  171:*3*
177:*1, 5*
181:*18*
185:*20*  186:*5*
187:*2, 22*
188:*7*  190:*4*
192:*16*
193:*21*  194:*7*
215:*7*  224:*5*
243:*3*  251:*16*
256:*14*
270:*23*  271:*1,* *7, 21*  276:*8*
282:*21*  283:*12*
**rehighlight**
212:*5*
**Reiss**  196:*19*
**reject**  26:*15*
197:*19*
**relate**  42:*16*
155:*19*
161:*22*  275:*9*
**related**  31:*4*
90:*9*  107:*14,* *15, 24*  170:*20*
174:*23*  195:*8*
205:*15*
**RELATES**
1:*5*  38:*1*
130:*18*  140:*3*
193:*10*
**relationship**
53:*23*  99:*17*
107:*10*
135:*10, 14*
**Relationships**
180:*16*  185:*8*
245:*21*
**relative**  231:*5*
310:*13, 14*

**relevance**
202:*19*
**relevant**  8:*12*
18:*2*  32:*18,* *24*  37:*15*
39:*22*  40:*4*
73:*19*  95:*7*
110:*5*  134:*6,* *14, 16*  164:*11*
195:*18, 22*
199:*3*  203:*11*
227:*23*  242:*3*
250:*23*  285:*3*
293:*23*  294:*4*
304:*6*
**reliable**
190:*12*  297:*21*
**reliance**
189:*13*
**relied**  22:*13*
23:*1*
**relies**  262:*24*
**rely**  24:*4*
294:*8*
**relying**  22:*17,* *20*  23:*3*  189:*9*
**remain**  74:*15*
**remaining**
149:*20*
**remember**
24:*11*  28:*23*
33:*24*  34:*11*
56:*22*  81:*4, 5*
82:*19*  110:*3*
124:*1, 8*
146:*4*  147:*20,* *22*  164:*7, 9*
173:*15, 17*
178:*12*  237:*3*
**remembering**
17:*11*  112:*10*
124:*13*  299:*11*
**remit**  281:*16*
282:*1*
**Remote**  1:*16*
2:*1*  3:*1*  4:*1*
5:*1*  20:*6, 8*
**repair**  55:*1*
85:*15*  87:*22*
117:*10*  124:*6*

278:*13, 16*
**repaired**  85:*15*
**repeat**  61:*6*
224:*10*
240:*16*  295:*20*
**rephrase**
12:*14*
**replicate**
277:*13*
**replication**
277:*4, 6, 20*
**replied**
173:*21*  174:*13*
**reply**  173:*20*
**replying**  175:*2*
**Report**  7:*5, 6*
15:*4, 8*  18:*1*
21:*24*  22:*2*
23:*4, 5, 7, 13,* *17, 21*  24:*22*
25:*2, 6, 16, 22*
26:*2, 7, 16, 17*
27:*10, 12, 19,* *20*  28:*3, 8, 10,* *14, 24*  29:*6,* *12*  31:*3*  33:*1,* *3, 9, 12*  36:*8*
41:*5, 12*  42:*5*
54:*16*  90:*16*
111:*17*  120:*9*
125:*7, 11, 12,* *20, 21*  126:*4,* *6, 11*  129:*19*
130:*5, 24*
131:*1, 3*
132:*17*
137:*11*  153:*2*
186:*2*  187:*6,* *11*  189:*1, 20*
199:*4*  207:*10,* *15*  212:*16*
216:*3, 7, 11*
217:*13, 17, 20*
218:*3, 9, 12,* *23*  226:*12*
227:*1*  230:*13,* *21, 24*  231:*4,* *8*  248:*20*
249:*1, 10, 12*
259:*8*  281:*17*
282:*2, 8*

290:*7*  291:*7*
293:*22, 23*
294:*4, 9*
295:*9, 19*
296:*1, 23*
299:*7*
**reported**
184:*20*  203:*5*
252:*16*
253:*19*  256:*9*
**Reporter**  1:*19,* *20*  10:*19*
11:*23*  310:*3,* *19, 20*
**Reporters**
1:*18*  310:*2, 19*
**reporting**
226:*11, 22*
**reports**  27:*22*
33:*7, 11*
128:*20*
256:*18*  292:*3*
293:*8*  294:*21*
295:*8, 14*
297:*7*
**represent**
11:*11*  162:*13*
**representative**
112:*3*  256:*9*
**representatives**
70:*12*
**representing**
133:*10*
**represents**
161:*12*
**request**  21:*18*
112:*24*  136:*9*
215:*14*  251:*8,* *10*  258:*23*
260:*5*
**requested**
48:*1, 3*  50:*20*
67:*6*  87:*11*
90:*21*  109:*8*
150:*14*
151:*12*  175:*6*
190:*2*  214:*22*
242:*12*
293:*11*  310:*11*
**requesting**

136:17
requests 21:4
require 20:1
required
20:11 169:5, 8
requires
184:16
280:16, 17
requiring
203:1
reread 295:1
Research
26:21 34:1
37:22 43:9
44:13, 15, 17,
19 45:7
47:12 50:10
58:20, 23
62:11 63:16
64:18, 20, 22
65:11 66:5,
11, 12, 15, 21
68:1 69:5, 22,
24 70:3
73:18 74:17
76:22 90:6
108:24
129:17
131:15, 17
189:21 191:4
195:16 196:3,
23 198:7
199:7, 13
200:12 201:6,
19, 21 202:2
203:7 205:8
206:14 208:1,
14 214:23, 24
215:4 231:24
232:5, 12
233:9, 24
234:5, 20
235:8, 10
236:1 237:7
239:21, 24
240:17 262:7
264:6, 13
281:14 283:11
researched
130:4

researcher
90:8
ResearchGate
194:19
reside 270:4
298:2
resides 112:20
270:6
residual 281:8
resolution
102:18
resolve 103:23
resource 266:4
respect 217:5
respectively
280:14
response 16:1
22:8 58:20
91:13 96:24
119:17 120:5,
7 121:1
122:4 124:19
136:9 186:18
226:9 236:24
271:19 273:4
293:16 297:16
Responsibility
123:5, 20
rest 44:9
82:21 120:9
215:12
restate 275:3
result 240:1
254:4
results 240:19
252:3, 15
253:3, 18
254:7 255:8,
9, 18 256:8,
19 257:4, 17,
23 258:9, 23
retain 228:13
retained 39:4
139:23 235:19
retainer 166:8
227:4
retains 150:1
retired 100:20,
23 222:18
240:21
return 311:14

reveal 184:17
203:2
reveals 105:19
review 14:23
32:7 33:18
106:5 183:6
184:23
217:21
229:22 230:2,
15 236:9, 10
248:17 254:4,
6 255:6 261:8
reviewed
15:11 32:9
34:8 77:13
89:17 197:12
218:5 248:19
253:2 254:22
255:12, 13
259:14 286:5
292:5 293:7
294:20 295:7,
12 296:14
301:5
reviewers
197:13, 14, 22
revised 16:20
197:6
revision
130:17
revisions
197:18
revisit 106:7
rewarded
214:6
Richard
196:19
RIDDELL 2:2
right 18:14
21:9 59:16
79:6 102:10,
15 103:11
104:13 111:7
127:9 135:4,
18 142:20
148:21 175:9
176:8 177:21
204:17
221:14 224:8
241:19 243:8
248:2 261:13

267:5 284:22
285:19 287:4
297:4 301:17
right-hand
132:1
ring 154:13
160:3
Risk 8:7, 13
9:8, 19, 22
31:6 35:23
36:19 54:17
66:17 72:19
93:19 95:4,
10, 23 97:4
98:14, 21, 23
99:3, 5, 8, 13,
14, 20 101:10,
16, 19 102:1,
7, 13 106:14,
16, 19 107:3,
22 108:6
110:19 111:2,
5, 10 112:9,
13, 23 113:2,
5, 10 115:10,
17, 22 117:16,
18, 19, 21, 24
118:4, 10, 13
119:4, 9, 14,
18 120:1, 11,
12, 13 121:3,
6, 18 122:7
134:7 137:7
161:17
162:14, 16
186:12 187:5,
11 188:13
189:2 190:13,
22, 24 191:2
193:11, 14
194:6 195:19,
23 199:3
200:9 203:16
209:22 211:6
213:22 216:5,
7, 8, 23 217:2,
18 218:23
221:12
239:10 242:4
243:13, 16
246:19

256:15 257:7
258:1 266:5,
9, 13, 17
267:12, 16
268:1 269:12
270:9 272:17
273:11 282:3
286:18
292:22
294:13 298:3
300:21
risk-based
109:18
risks 95:24
209:10
210:11, 18
Rite 4:5
RITONA 5:16
River 62:8, 9,
10 63:11
RIVM 99:9
101:3 107:6,
11, 12 108:14,
18 111:18, 19
112:1, 5
116:5 124:15
Road 3:6
105:16
ROBERT 1:5
178:17
robust 8:19
95:7 97:10
201:11
204:19
257:14, 16, 17,
21 258:2
291:5
Roche 46:5
69:1, 2, 3
76:13 84:22
89:24 90:3
rodent 265:7
268:19 290:8,
11, 15 291:12
300:2
rodents 95:19
96:6, 7
161:15 290:8,
16
Roger 240:11,
19

Confidential Information - Subject to Protective Order

role 45:*22*
46:*7* 58:*23*
71:*24* 72:*3*
76:*17, 20*
91:*12* 106:*23*
132:*14* 139:*17*
roles 74:*8*
106:*24*
room 16:*24*
19:*1* 20:*3, 5*
53:*24* 125:*11*
157:*13*
ROONEY 5:*2*
ROSEMARIE
2:*2* 11:*10*
20:*7* 102:*20*
104:*8* 171:*10*
231:*14*
rosemarie.bogd
an@1800law10
10.com 2:*3*
Rosemarie's
17:*6*
route 110:*3*
297:*4, 15*
routes 95:*14*
routinely
239:*7*
row 105:*15*
249:*4*
Rule 310:*11*
run 98:*4*
268:*17*
running 51:*9*
52:*24*
run-on 206:*14*
runs 51:*11, 14*
Russ 83:*16*
Ryan 74:*4*
76:*4* 223:*13*
233:*13*

< S >
sacrifice 96:*7*
265:*11*
sacrificed 98:*9*
safety 108:*4*
119:*20*
salary 150:*18,*
*20*
sale 238:*18*

samples
258:*13*
Sanofi 69:*6, 7*
76:*2* 84:*16*
222:*16, 18, 19*
223:*2, 17*
Sartans 7:*13*
153:*9*
save 145:*21*
saw 29:*3*
35:*9* 210:*1*
212:*17, 19*
252:*9* 279:*6*
Sawyer
154:*15, 16, 18*
saying 25:*19*
56:*23* 302:*24*
307:*22*
says 81:*1*
123:*16* 136:*8*
182:*22* 211:*5*
212:*9* 228:*11*
232:*20*
240:*15*
245:*19* 288:*2*
300:*5* 304:*14*
scale 62:*18*
scanning
80:*15*
scenarios
162:*15, 17*
scheduled
55:*13*
School 149:*19*
Science 37:*1*
40:*20* 42:*12*
53:*21* 54:*2*
66:*4* 100:*3*
239:*20* 257:*7*
273:*5*
Science-for-
Hire 9:*6*
237:*19*
Sciences
91:*15* 244:*19*
245:*4* 246:*18*
scientific 34:*2*
68:*6* 239:*22*
240:*2*
scientists 53:*2*
124:*1* 239:*6*

Scrapes 9:*5*
237:*19*
screen 31:*18*
48:*21* 81:*20,*
*22* 91:*17*
131:*10*
133:*17*
148:*24*
153:*16*
177:*13, 16*
192:*13, 18*
204:*18* 238:*6*
247:*15, 16*
261:*1* 296:*14*
303:*3, 6*
scroll 80:*8*
search 157:*18*
searching
195:*11*
second 16:*11*
21:*17* 62:*23*
85:*20* 91:*20*
94:*16* 129:*22*
136:*8* 162:*12*
181:*21* 184:*8*
185:*2* 194:*21*
229:*21, 24*
239:*18* 248:*4,*
*6, 11* 288:*1*
306:*3*
secondhand
239:*10*
seconds 42:*1*
section 123:*21*
129:*2, 11*
131:*8* 198:*16*
208:*19* 209:*1*
210:*3, 5*
211:*1, 12*
212:*5, 8*
214:*8, 12*
225:*1* 232:*9*
254:*16*
287:*14, 22*
298:*9, 11*
secure 229:*23*
see 18:*21*
19:*24* 20:*16,*
*18* 21:*2, 6*
24:*12* 25:*13*
29:*7* 32:*23*

45:*2* 49:*9*
60:*14, 15, 22,*
*23* 63:*1, 3*
66:*3* 78:*7*
80:*7, 9, 15*
81:*21* 82:*6,*
*22* 91:*4, 19,*
*21* 94:*8, 13*
96:*9, 16, 18*
102:*17* 103:*1*
109:*19* 116:*4*
117:*8* 119:*15*
125:*11*
126:*17*
129:*13, 14, 21*
130:*11, 12*
131:*10, 22, 24*
132:*2* 135:*5*
136:*2, 11, 12*
138:*14*
141:*12*
153:*16, 18*
155:*8, 9*
157:*19*
160:*10, 11*
161:*7, 9*
162:*10* 172:*2,*
*12, 20, 22*
177:*14*
178:*12, 14*
181:*20*
184:*11* 192:*3*
195:*13* 197:*5*
200:*7* 201:*17*
208:*12, 13*
212:*11, 12*
214:*7* 215:*22*
224:*23* 226:*9*
227:*13, 14*
228:*16, 17*
232:*22* 238:*3,*
*4, 19, 20*
239:*4* 240:*9,*
*14* 243:*7*
244:*5* 245:*18*
246:*5, 6, 14,*
*15* 248:*4, 12*
250:*14, 16, 17,*
*20* 253:*17*
261:*6, 7, 14,*
*17* 266:*20*

267:*6* 269:*1,*
*4, 13, 14*
274:*3, 16*
282:*9, 12*
287:*22* 288:*6,*
*7* 297:*1, 8*
298:*9, 11*
301:*18, 22, 23*
303:*4* 304:*17,*
*18, 21*
seen 20:*20, 22*
21:*7* 29:*15*
35:*9* 77:*6, 11*
92:*13* 97:*11,*
*15* 211:*14, 16*
235:*17* 241:*2*
263:*22* 264:*9,*
*17, 20* 274:*13,*
*15* 282:*6, 14*
291:*4* 296:*8*
selecting 214:*2*
sell 220:*19*
221:*5*
sellers 70:*4*
seminar 51:*1,*
*5, 7, 16* 79:*17*
80:*11, 24*
81:*4* 82:*16*
156:*10, 22*
157:*15*
158:*15, 18, 21*
159:*3, 6, 9*
163:*1*
seminars 51:*2,*
*3, 12, 14* 147:*5*
send 164:*10*
165:*4* 213:*18*
sending
168:*20*
173:*15, 17*
sends 173:*18*
senior 138:*9*
sense 40:*18*
46:*20* 171:*19*
sensitive
190:*14* 294:*19*
sent 28:*6*
168:*10*
213:*16*
229:*22* 230:*1,*
*4, 5*

Confidential Information Subject to Protective Order

**sentence** 49:*12* 155:*8, 9* 159:*20* 160:*5* 161:*18, 20, 21* 162:*1, 2, 12, 18* 184:*13, 22* 185:*2* 204:*24* 211:*24* 228:*16, 17* 229:*24* 230:*11* 261:*14, 22, 24* 269:*1, 6, 13, 14, 17* 273:*7* 274:*6* 295:*21* 303:*17*

**sentences** 162:*23* 228:*12*

**Sentry** 4:*8*

**separate** 148:*15* 229:*5, 13*

**separately** 126:*5* 229:*23*

**September** 154:*24* 197:*4* 198:*8* 242:*5*

**sequence** 276:*19*

**series** 94:*7, 21*

**serve** 40:*7, 15* 70:*13* 72:*7* 73:*16* 136:*15* 161:*4* 165:*11* 179:*13* 226:*4, 5* 228:*20*

**served** 23:*12* 125:*18, 19* 139:*17*

**SERVICES** 1:*23* 5:*19* 10:*8* 149:*15*

**serving** 28:*14* 132:*9* 145:*12*

**session** 84:*24*

**set** 55:*16* 56:*5* 58:*21* 146:*22* 155:*20* 166:*9* 189:*10*

216:*16* 220:*6* 260:*4* 310:*9*

**setting** 191:*15, 17*

**setup** 18:*21*

**seven** 304:*20*

**sheet** 311:*6, 9, 12, 15* 313:*7*

**Sheroy** 74:*2* 75:*14*

**short** 260:*5, 6* 308:*3*

**shortness** 174:*19*

**show** 54:*20* 107:*19* 171:*17* 264:*10, 19*

**showed** 55:*4* 174:*13* 175:*1* 253:*18*

**showing** 194:*12* 207:*1* 239:*21* 254:*8*

**shown** 221:*11* 250:*1* 263:*8, 21* 270:*16, 19* 284:*5, 15*

**sic** 46:*12* 186:*15*

**side** 232:*21* 292:*15*

**Sigma** 68:*5*

**sign** 311:*8*

**signature** 310:*11*

**signed** 141:*10*

**significance** 76:*15*

**signing** 311:*10*

**silenced** 278:*12*

**similar** 54:*15* 86:*19* 108:*8* 113:*6* 162:*6, 8, 10, 21* 192:*4* 223:*8* 228:*19* 238:*12* 255:*10*

279:*10* 289:*14, 23*

**Similarities** 300:*1*

**similarly** 220:*3* 221:*3*

**simple** 96:*3* 271:*23*

**Simultaneous** 298:*22*

**sir** 118:*21* 127:*13*

**sit** 27:*4* 84:*1* 89:*14* 114:*10* 258:*8*

**sitting** 125:*10* 171:*13*

**situation** 174:*18* 282:*9, 12* 283:*2*

**situations** 184:*19* 203:*4* 204:*2*

**six** 250:*9* 256:*19* 257:*5, 19* 278:*19*

**size** 42:*19* 249:*8*

**skin** 110:*2*

**slash** 229:*15*

**Slide** 7:*8* 56:*5* 79:*20* 80:*16* 146:*22* 155:*20* 157:*2, 23*

**slides** 55:*4* 157:*4*

**slightly** 111:*6*

**Slob** 99:*19* 107:*12*

**slow** 42:*2*

**slowly** 16:*17*

**small** 36:*18* 65:*12* 153:*18*

**smaller** 217:*8*

**Smallshaw** 84:*18, 20*

**smoke** 124:*10* 239:*11*

**Snodin** 7:*15, 18* 163:*10*

172:*5* 173:*19* 174:*24*

**Society** 138:*7*

**software** 199:*15*

**Solco** 4:*22* 258:*24*

**solely** 304:*1*

**somebody** 275:*9*

**soon** 35:*18*

**Sorry** 13:*4* 22:*23* 31:*19* 45:*14* 111:*7* 118:*21* 128:*12* 153:*21* 192:*14* 204:*22* 224:*9* 279:*15* 289:*3*

**sort** 37:*11* 40:*12* 102:*17* 183:*5* 230:*13* 279:*11*

**sorts** 202:*8* 225:*12*

**sounds** 133:*7* 144:*1, 2*

**source** 256:*17, 18*

**sources** 42:*22* 185:*5* 234:*14* 257:*10*

**South** 2:*16* 4:*3*

**space** 270:*24* 311:*6*

**speak** 12:*2, 7* 36:*15* 54:*13* 55:*18, 21* 56:*13* 63:*6, 7* 103:*7* 125:*15* 128:*13* 158:*21* 240:*22*

**speaker** 156:*20* 158:*18, 24*

**Speakers** 7:*9* 37:*18* 57:*12* 81:*15* 92:*24* 93:*2*

**speaking** 16:*21* 18:*24* 26:*9* 91:*3* 191:*5* 252:*20* 253:*1*

**species** 262:*4* 268:*19* 288:*5* 296:*16*

**specific** 99:*1* 206:*17* 207:*18* 212:*13* 261:*11* 268:*18, 20* 277:*1, 9* 278:*14* 290:*7*

**specifically** 15:*16* 56:*13* 99:*18* 164:*9* 203:*8* 222:*24* 223:*1* 280:*18*

**specification** 273:*21*

**specified** 95:*14*

**spectrometry** 258:*14*

**spectrum** 54:*23* 279:*11*

**speculate** 146:*3, 6* 163:*5*

**speculation** 52:*20* 113:*13* 163:*3* 210:*21* 219:*8* 220:*15, 23* 221:*8* 223:*22*

**spend** 13:*12* 14:*7, 11* 27:*18*

**spending** 13:*18*

**spent** 14:*4, 17* 15:*2* 27:*23* 28:*5* 152:*17, 20, 23* 153:*1* 233:*18*

**spoke** 38:*4, 9* 39:*19* 50:*16* 51:*15* 56:*6* 82:*10, 24* 83:*3* 159:*12* 224:*9, 10*

Confidential Information Subject to Protective Order

**spoken** 84:*13* 103:*20* 159:2
**sponsor** 51:*6*
**sponsors** 90:*6*
**spot** 247:*2*
**Squibb** 62:*1*
**staff** 44:*10*
**stage** 118:*2* 121:*4* 197:*14, 16* 280:*17*
**stand** 85:*3* 108:*15* 186:*20* 274:*7, 11*
**standard** 139:*21* 178:*4* 249:*21* 284:*16* 307:*11*
**Standards** 119:*21* 131:9
**standing** 125:*14*
**stands** 30:*14* 46:*12, 13* 85:*4*
**start** 36:*5* 126:*21* 144:*4* 166:22 230:23 235:18 252:24 260:*10* 307:*10* 308:*23* 309:*9*
**started** 34:*21* 36:*9* 37:*15* 109:*1* 118:*1* 121:*16* 166:*18* 167:2 174:*18* 216:4 231:*4*
**starting** 165:*7* 307:*24*
**starts** 126:*12, 13* 130:*10* 141:*1* 230:*10* 287:*4, 11, 23* 302:22
**state** 42:*11* 121:*23* 185:*1* 231:*7* 234:*10* 246:*12* 311:*5*

**stated** 42:*10* 51:*19* 57:6 88:*9* 89:*7* 122:*17* 135:*19* 182:*5* 184:*21* 195:*14* 200:2 203:*6* 209:*1* 215:5 235:*21* 247:*23* 272:7 288:*23* 293:22
**statement** 27:22 34:*4* 35:*17* 60:*20* 86:2 102:*3* 114:22 124:*21* 137:*12* 148:*17* 151:*10, 14* 157:*5* 162:*6, 7* 179:*1* 182:*3* 198:*23* 211:*9, 22* 212:*8* 223:*15* 232:*9* 234:*15* 238:*14* 239:*15, 19* 241:*2* 246:*9* 248:*6* 262:*9* 274:2, *3* 289:*8* 290:*21, 22* 295:*3* 299:*3, 5, 24* 309:*3*
**statements** 33:*21* 135:6 162:*10* 240:*24*
**STATES** 1:*1* 10:*15* 133:*21*
**statistical** 94:*20*, *21* 95:6 97:*13* 202:6, *7, 22* 204:*8* 249:*17*
**Status** 8:*9* 194:*8*
**Steave** 196:*18*
**steering** 46:*10*
**STENOGRAP HER** 24:*20*

**50:***21* 67:*7* 87:*12* 90:22 109:*9* 125:*17* 126:*7* 142:*8* 150:*15* 151:*13* 153:*11* 163:*14* 172:*9* 175:*7* 183:*19* 184:*1, 5* 190:*3* 192:*23* 194:*11* 201:*15* 208:*9* 227:*10* 237:22 242:*13* 244:*10* 245:*11* 247:*10* 259:24 266:*19* 293:*12* 298:*23* 301:*1, 9* 307:*19* 308:*24* 309:*11*
**stenographic** 85:22 154:2 225:*24* 286:*3*
**stenographicall y** 310:*8*
**step** 117:*19*
**STEPHEN** 3:*11*
**stepped** 72:*12*
**steps** 54:*19* 273:*19*
**Steve** 17:2
**STEVEN** 3:*4*
**stock** 246:*1*
**stop** 306:*13*
**stopped** 306:*17*
**stopping** 79:*3* 170:2 305:22 307:*23*
**story** 34:*14*
**STOY** 5:*7*
**straightforwar d** 122:*14*
**Strategy** 242:*9*

**Street** 2:*4, 16* 3:*13, 20* 4:*3, 14, 19* 5:*3*
**strengthened** 304:*5*
**strict** 169:*16*
**strike** 88:*14* 256:*5*
**strong** 84:*4* 190:23
**structural** 53:*23* 285:*1*
**structure** 89:*5*
**student** 27:*15*
**studies** 15:*20* 89:*23* 97:*10* 110:*4* 118:*11, 22, 23* 119:*5* 180:*17* 192:*8* 193:*12* 242:*23* 263:*9* 264:*18* 265:*3, 8* 288:2, *9, 17* 296:*14, 15, 21, 23* 297:*1* 298:*6*
**study** 8:*14* 15:*24* 16:*8, 15* 90:*15* 95:*15* 96:*4* 97:*7, 19* 98:*1, 4, 10, 12, 13, 17* 109:*16* 180:*18* 195:23 232:*3* 242:*4* 243:22 244:*13* 265:*9* 268:*21* 292:*4* 297:*3, 9, 14* 299:*9, 14, 20* 301:*24*
**stylistic** 237:*5*
**Su** 196:*18*
**subcommittee** 70:*20* 71:*6, 11* 72:*7* 73:*15*
**subgroup** 45:*24* 46:*1, 10, 22, 24* 73:*20*

**subgroups** 44:*15* 70:*11*
**subgroup's** 71:*9*
**SUBJECT** 1:*13* 173:*19* 311:*10*
**submission** 113:*16* 184:*15*
**submissions** 66:*17* 113:*14*
**submit** 99:*2, 3* 111:*21* 113:*6* 197:*11* 217:*20* 218:*3, 8*
**submitted** 106:*16, 19* 107:6 108:*6, 11* 111:*12, 17* 143:*15* 177:24 178:*11* 189:*1* 209:23 215:*13* 217:*24* 235:*17*
**submitting** 99:*5* 144:*9*
**subproject** 73:*3*
**Subscribed** 313:*15*
**subset** 26:22 28:2 42:*6* 65:*21* 101:*6*
**subsets** 43:*3*
**subsidiary** 148:*19* 149:*8* 168:*1*
**substance** 96:*17* 114:*13, 15, 18, 21* 115:*16* 221:*11* 235:*1* 276:*4* 285:*10* 291:*15, 19, 23* 293:2 297:*7* 313:*7*
**substances** 54:22 86:*20* 112:*18* 115:*9*

Confidential Information Subject to Protective Order

235:1 247:24
266:8 275:13
276:14 280:2,
22 290:24
294:16
**sufficient**
298:16
303:22 304:3
**suggest** 288:2,
10, 17
**suggested**
204:5 214:11
251:9 255:11
**suggesting**
187:23 188:8
205:8
**suitable** 73:5
139:15
176:16 214:5,
15 251:23
256:16 297:3
**Suite** 2:10, 16
3:6, 13 4:9,
15, 20 5:4
204:11 207:18
**sum** 141:20
**summaries**
22:4
**summary**
246:8
**summer**
170:16 198:1
221:23
**Summit** 7:8, 9
79:20 80:11
81:13, 16
82:11
**super** 160:7
**supervisor**
121:11
**support** 15:7
25:23 44:11,
24 137:10
188:22
190:19
191:23 217:3
**supported**
192:7 236:19
239:9 282:4
**supporting**
304:5

**supportive**
236:16
**supposed** 41:2
**suppressor**
278:10, 12
**sure** 11:22
30:5 79:5, 8
84:2 105:16,
20 123:13
124:2 182:4
231:15
241:22 248:8
252:24
295:22 306:13
**surplus** 44:16
**surrounding**
22:1 28:16
**Swansa** 167:6
**Swansea**
58:12, 15
106:23
112:20
148:13, 15, 16,
18, 20 149:1,
3, 5, 6, 10, 17,
18, 23 150:5
160:7 166:9
167:6, 14, 24
168:7, 10, 17,
21 223:13
229:1, 4, 5, 12,
14
**swear** 10:20
**swimming**
297:6
**sworn** 11:3
310:5 313:15
**Syngenta**
69:10, 11
**system** 98:19
279:7 299:21
**systematically**
253:15
**systems** 64:24
95:7 290:11
291:6 297:2

**< T >**
**table** 247:18
248:23 249:2
250:1, 7

251:18
253:11, 14, 19
**tablet** 274:22
275:1, 9
**tablets** 249:8
**Take** 7:3
18:22 19:16,
19 54:5 55:9,
13 67:14
79:4, 5 103:1,
6, 12 122:18
143:6 147:10
170:2 171:10,
18, 20 172:17
175:10
231:15 241:3
246:24
250:13 255:1,
17 260:10
265:9 275:22
307:12
**Takeda** 69:14
**taken** 11:15
35:24 76:20
79:11 103:15
175:17
222:13
231:19
260:18
262:21
305:19 310:8
**takes** 47:17
149:17, 19
274:18 275:9
**talk** 57:10
93:7 102:16
115:5, 6
190:6 192:10
267:21
284:24 285:2
288:16
**talked** 54:2,
21 92:13
196:17
**talking** 53:24
69:17 95:24
100:1 107:23
122:3, 4
179:17
193:16 204:4,
15 268:14, 16

**target** 178:6
276:24 291:3
294:17
**TARYN** 3:5
**taught** 119:10
**tax** 149:22
**TD** 262:21
**TD50** 155:3
156:6 159:21
160:14
162:17 271:2,
7, 15, 22
272:3, 9, 14, 22
**TD50s** 270:8
**teaching** 58:23
**team** 17:6
**Teasdale**
51:21 52:12
56:15, 18
57:2, 7 82:23,
24 83:3 93:6
**Teasdale's**
82:21 92:24
**tech** 142:17
**Technical**
40:21 46:14
77:17 154:1
179:11 286:2
**TECHNICIAN**
5:15 24:10
41:19 126:10,
16, 24 142:18,
23 177:18
193:1, 4
194:13
232:15
237:24
247:11
266:20
285:16, 22
287:6, 10
**techniques**
258:14
**technologies**
44:6
**Telephonic**
81:23
**tell** 30:24
34:14 60:5
73:14 82:5
106:18

132:20 143:7
261:23 295:2,
14, 17, 24
**ten** 124:12
**term** 45:17
104:20
108:14, 16
218:16
257:21 258:2
259:12
262:20
269:19, 20
276:11, 16
278:5 279:14,
20, 22 280:1
283:20, 21, 24
284:2, 12, 13
**termed** 280:4
**Terminus** 3:6
**test** 64:24
94:2, 8 95:7,
21 96:18
98:19 252:3
253:3, 17
254:3, 7
255:17 256:8,
19 257:4
258:23
268:17, 18
279:7 291:6
294:19 297:2,
8, 21 299:21
**tested** 98:3
249:5, 7
250:1, 4, 7, 8,
10, 11 251:7
257:18
**testified** 11:4
106:15
251:20 283:6
292:6 293:6
**testify** 310:5
**testifying**
80:12
**testimonies**
33:19
**testimony**
15:12 33:4,
15 40:10
110:23
111:15 158:3

Confidential Information Subject to Protective Order

165:9, *14*
203:7  215:*21*
246:2  308:*18*
310:8
**testing**  62:*16*
66:*20, 22*
67:*1*  68:*3*
94:*13*  242:9
252:6, *15*
253:3  254:*13,*
*23*  255:8, *19*
256:5  258:8,
*13, 18*  279:5
290:*15*
**tests**  94:*3, 8*
95:*1*  276:6
284:6, *16*
**Teva**  3:8, *15,*
*21, 22*  52:7, 8
56:24  84:*13*
129:22  132:7,
*10*  133:5, *19*
134:*19, 23*
135:2, *4, 10,*
*17, 19, 22*
136:6  140:2
141:9  143:*15*
145:12
146:*14, 18, 24*
149:*16*  153:6
161:4, 5
163:8  164:*14*
165:*1, 12, 21*
166:*1, 9, 19*
167:3, 9
168:*12*  169:8
170:*16, 21*
171:*4*  172:*3*
173:*10, 14, 22*
182:9, *13, 19*
185:*11, 13*
193:8, *13*
198:*19*  199:5
209:*19, 24*
215:*18*  226:4,
*14, 24*  228:*15*
229:*16*  232:7
234:*12*
235:*20*
281:22  282:4

**Teva/Mylan**
133:*20*
**TEVA-MDL**
131:*23*
**TEVA-**
**MDL2875-**
**00425960**
7:*20*  172:7
**TEVA-**
**MDL2875-**
**00443142**
7:*14*  153:9
**TEVA-**
**MDL2875-**
**00492386**
7:*17*  163:*12*
**text**  28:*24*
153:*19*
214:*12*  247:*23*
**textbooks**
22:*16, 19, 21,*
*22*  23:*1, 2, 4*
**Thank**  12:*3*
21:2  24:4, *17*
30:6, *12*
31:*20*  41:*21*
49:2  59:*20*
128:*24*  154:7
242:*20*  244:6
247:*1*  303:6
305:9
**Theirs**  220:9
**theory**  191:*24*
**Therapeutics**
63:*18, 20, 21*
**thereabouts**
299:*12, 13*
**thesis**  121:6, *8*
**thing**  11:*21*
248:9  307:22
309:4
**things**  14:*20*
21:*10*  30:*19*
268:4  270:*11*
278:*12*  297:*19*
**think**  12:8
18:4  26:*19,*
*22*  33:6, *23*
34:9, *10*  35:8
40:*23*  43:*10,*
*13*  45:9

50:*17*  52:*10*
54:*21*  58:*18*
60:*18*  61:*21*
62:3  64:7
65:7, *10*
67:*16*  68:*11,*
*21, 23*  69:*4, 8,*
*12, 18*  72:22
73:*16*  77:*1*
78:*24*  83:*19*
91:6  104:5
106:*15*
120:*23*
123:*16*
124:*11*  127:5
129:*21*  133:*3,*
*9*  138:*18, 19*
139:*8, 9, 15,*
*20*  140:*1*
141:*12*
146:*13*
151:*24*
154:*14*
155:*23*  158:6,
*7*  159:*10, 14,*
*18*  161:2
164:*3*  165:22
166:*15*  174:2,
*5, 10*  175:8
177:*15*
180:*20*
181:*15*  182:4
194:*18*  211:*4,*
*21*  230:*3*
236:4, 5
237:6  240:9
244:4  255:7
261:5  292:*18*
294:9  296:*20,*
*22*  303:*1, 2*
307:*16*  308:*19*
**thinking**  42:*17*
**third**  20:*24*
49:*12*  66:*12*
248:4, *11*
261:*21, 22*
**thirty**  311:*16*

**THORNBURG**
4:*2*
**Thought**  152:6

**Three**  3:*19*
77:*1*  197:5
208:*20*
221:*15*  250:8
257:5, *18*
278:*19*
**threshold**
87:*13*  91:*13*
270:2, *12, 14*
**Thybaud**  74:*4*
76:*1*  222:15
**time**  10:*10*
11:*18, 19, 21*
12:2  13:*18,*
*19*  14:7  15:*3*
27:*18*  28:*3, 4,*
*12*  31:*12*
33:*10*  34:22
35:7, *11*
37:*13*  39:*21*
43:*13*  47:*11*
50:9  52:4
53:5  54:22
56:*19*  57:8
58:*17, 19, 24*
59:2  74:*10,*
*15*  76:*21*
77:3, *18, 19*
79:*10, 14*
83:*11, 13*
84:6  91:2
102:*11*
103:*14, 18*
107:7  110:6,
*11, 12*  119:*11*
120:*16*
121:*17*  131:*3*
132:*17*
136:*14*  138:8,
*19, 21*  141:*16*
143:*24*
144:*23*  145:*1,*
*2*  146:*18*
149:*11*
152:*21, 23*
153:*1, 3*
159:*11*
164:*12*
169:*10, 12*
173:*21*
175:*16, 20*

177:*15*  179:*3,*
*15, 16*  180:*23*
182:7, *17*
184:*15*
222:*17*  225:2
226:*13*
227:*16*
230:*14, 17*
231:*14, 18, 22*
232:7  233:*18,*
*23*  234:2, *3, 8*
241:*1*  250:*23*
255:*1*  256:*11*
259:6  260:*17,*
*21*  272:*23*
273:*14*  282:5
300:*24*
305:*13*  306:*6,*
*18, 21*  307:2,
*5, 7, 11, 13*
308:*1, 5, 19,*
*23*  309:*13*
310:8
**times**  37:*17*
235:*15*
**timing**  226:*19*
**timings**  33:8
**Tino**  92:*20*
**tissue**  68:2
294:*19*
**tissues**  95:*14*
300:2
**title**  117:*3, 9,*
*14*  134:*13*
160:4  180:*14*
181:*16*
246:*10*  267:*9,*
*14, 18*
**titled**  70:*23*
**titles**  255:*10*
**tobacco**  239:9
**today**  10:*19*
11:*11*  12:22
13:*17*  15:*12*
17:*1, 18, 21*
27:4, 6  46:2
59:*1, 5, 6*
84:2  89:*14*
105:*13*
107:*24*
114:*10*  122:*3*

Confidential Information - Subject to Protective Order

189:*22*
190:*11* 308:*11*
**Today's** 10:*9*
73:20 107:*15*
**told** 93:*14, 16,
18* 158:*20*
**Tolerability**
9:*8* 243:*12,
16* 246:*19*
**Tom** 92:*8*
**tomorrow**
306:*11, 15*
307:*2, 11, 23*
308:*6, 13, 16,
22, 23* 309:*10*
**tool** 202:22
204:*7*
**top** 14:*16*
48:22 49:*11*
138:*14* 151:7
196:24 197:*6*
250:*13, 15, 16*
296:*9* 305:*2*
**top-end**
257:*23*
**topic** 15:*23*
21:24 27:7
32:24 34:*3*
35:*2, 13, 15*
36:*5, 15*
37:20 38:20
47:*10* 52:16
53:*4, 6, 17, 19,
21, 22* 71:*21*
76:*18* 77:*19*
90:*17* 94:*4*
95:*13* 99:*1,
19* 100:*23, 24*
101:*2, 4, 7, 12*
107:*17*
122:*16*
131:*18, 20*
132:*16* 137:*3,
13* 143:*13*
146:*17*
154:*22* 157:*6*
158:*20* 162:*5*
171:*17* 174:*7,
9* 213:*24*
214:*19* 215:*3,*

6, 8, 10 234:*6*
237:*3*
**topics** 53:*3*
**total** 124:*12*
142:*19, 24*
144:*20* 170:*8*
216:*20* 251:*12*
**toxicant**
107:*17*
**Toxicity** 8:*6*
16:*18* 194:*2,
5* 204:*10*
225:*11*
**Toxicological**
7:*21* 87:*14*
91:*15* 177:*1,
5* 181:*17*
185:*19, 22*
189:*24*
192:*16* 243:*3*
270:*2, 14*
**toxicologically**
8:*12* 195:*18,
22* 242:*3*
**toxicologist**
54:*1*
**toxicology**
31:*5* 36:*20*
40:*21* 41:*1*
43:*16* 45:*20,
23* 46:*14*
48:*17, 23*
60:*1* 63:*12*
66:*16* 70:*7,
13* 76:*21*
77:*17* 93:*15,
22, 23, 24*
94:*1, 22*
116:*10* 117:*8*
119:*8, 13*
120:*19, 21*
124:*20* 138:*6,
12, 15* 179:*11*
180:*17* 195:*8*
199:*11, 21*
200:*4, 17, 22*
201:*3* 202:*12,
19* 203:*13, 14,
20* 207:*1, 2, 8,
21* 213:*22*

242:*23* 266:*3*
276:*6* 279:*7*
**toxicology-type**
62:*14*
**Toxys** 69:*20,
21*
**track** 59:*11*
154:*22*
**trained**
101:*13, 19*
102:*1* 120:*1*
**training** 118:*1,
10, 14* 119:*4*
120:*1* 121:*16,
17*
**transcript**
32:*9* 46:*16*
105:*2* 310:*7*
311:*17, 18*
**transcription**
313:*5*
**transcripts**
27:*5* 30:*21*
31:*8* 32:*7*
129:*3*
**TRAURIG**
3:*2, 11* 9:*2*
14:*5* 30:*8*
227:*5, 7*
228:*19*
**travel** 147:*15,
16, 17* 159:*8*
**treat** 96:*6, 11*
**treating** 96:*13*
**TRIAL** 5:*15,
16* 24:*10*
41:*19* 126:*10,
16, 24* 142:*18,
23* 177:*18*
193:*1, 4*
194:*13*
232:*15*
237:*24*
247:*11* 264:*2,
4, 18* 266:*20*
285:*16, 22*
287:*6, 10*
**trials** 63:*13*
108:*5* 264:*5,
15, 22*
**tried** 16:*3*

**triggered**
82:*13* 278:*13*
283:*12*
**trip** 13:*13, 15*
14:*13, 15, 16*
**tripartite** 37:*2*
**trouble** 238:*1*
**true** 199:*17*
251:*22* 280:*10*
**truth** 310:*5, 6*
**try** 122:24
123:*1* 252:*23*
**trying** 63:*6, 7*
200:*5* 247:*2*
285:*4*
**TTC** 87:*8, 13*
**tuition** 233:*14,
17*
**tumor** 278:*10,
11*
**tumors** 96:*9*
**Turn** 9:*5*
19:22 20:*9*
237:*19*
238:*24* 286:*24*
**turned** 20:*2*
**Turning**
20:*23* 254:*15*
**tutor** 58:*22*
**two** 57:*18*
67:*16* 72:22
98:*9* 119:*8*
147:*19*
162:*23* 181:*4,
10* 213:*7*
246:*8* 257:*5,
18* 265:*13*
307:*3*
**two-day**
307:*15*
**two-thirds**
130:*9*
**type** 19:*7*
60:*5* 61:*2, 9,
13, 16* 89:*16*
97:*6* 99:*3*
110:*8, 19*
146:*20*
152:*14* 156:*8*
165:*24* 166:*7,
10* 167:*24*

210:*5* 215:*17*
228:*18* 233:*1*
252:*12*
256:*20* 290:*5*
**types** 43:*7*
240:*3, 5*
245:*4* 276:*9*
278:*5*
**typically**
164:*19*
**typo** 130:22
**typographical**
28:*15*

**< U >**
**U.K** 10:*12*
59:*9* 119:*20*
**U.S** 4:22
256:*16* 276:*7*
**uAR** 159:*23*
**UCB** 84:*19*
**unable** 224:22
225:*15*
**unaware**
30:*17* 53:*14*
56:*11* 62:*5*
**uncertainties**
239:*23*
**uncertainty**
8:*18* 201:*7,
11* 204:*19*
205:*3* 217:*6,
9* 218:*18*
225:*10*
**uncomfortable**
39:*8*
**undergraduate**
119:*12* 120:*6,
22*
**underlying**
117:*9*
**understand**
12:*12, 18*
28:*21* 35:22
38:*17* 43:*24*
103:*21*
107:*18*
154:*17*
214:*13*
229:*17* 264:*3*

Confidential Information - Subject to Protective Order

276:15
294:15  307:8
**understanding**
21:23  26:6
31:5  32:12
33:12  34:3
39:7  47:16,
20  51:13
52:6, 9, 24
54:10  55:1, 5
64:10, 14
65:10  67:10
68:5, 19  70:9
72:4  76:18
77:8  85:14
110:15
111:16  115:3
117:6  121:17
131:18, 20
132:16  135:9
136:23
137:21
187:17, 18
212:20
226:22
229:19
230:22  233:5
235:13
261:19
273:23  274:8
275:11
280:11
286:21
290:19, 23
291:14  292:1
293:23
302:13  303:7,
10  304:7
**Understood**
12:15, 17
106:9, 10
121:2  235:3
**undertaken**
181:11
**underway**
50:7, 9  74:11
**Union**  118:15
119:18
**UNITED**  1:1
10:15

**university**
58:10, 13
59:9  76:6
78:23  90:19,
20, 24  106:24
124:5  148:16,
20  149:4, 7,
19  160:7
168:1  196:21
223:14
**unrepaired**
277:2
**unsure**  83:22
178:22  274:12
**up-and-coming**
64:17
**upcoming**
40:23  41:1
116:7
**update**  157:23
301:19
**updated**
29:12  30:18
71:18  300:14
**updating**
29:12
**upper**  205:4
217:5  253:9,
10  255:22, 24
302:18
**upregulated**
278:7
**up-to-date**
34:2
**Urquhart**
83:20
**USA**  3:8, 15,
22  4:10
**USDA**  100:19
242:20
**use**  8:17  41:8
43:5  44:16
67:24  97:4
104:11, 16
140:16
149:24
159:21
160:13  190:7,
24  191:24
193:14
200:21  201:2,

6, 10  204:18
206:17
207:14
211:12  216:2
217:18
218:16
234:16
249:23  258:1,
2  262:24
272:20  276:7,
16
**useful**  33:23
50:2  225:12
249:22
251:17, 24
252:1
**uses**  43:15
44:8  202:11
204:10
**USFDA**  9:16
259:21
**usually**  44:23
46:7  66:14
178:1
**utility**  207:21

**< V >**
**vague**  25:12
53:13  54:9
60:10  61:17
88:8  89:6, 20
92:4  97:22
144:13  145:7
166:4  233:11
234:22
239:14  263:7,
14  268:6
281:24  283:8
288:14  289:8
294:23
296:18
299:18  302:12
**VALENZUEL
A**  5:13
**VALSARTAN**
1:3  9:15
10:13  36:14
38:11  53:9,
16  54:7
56:14  135:6
159:23

164:15
234:19  247:4,
8  250:18
261:18
274:22, 24
**value**  149:18,
20  151:6, 7
162:17  220:4
**values**  189:10
199:9, 15
200:13, 16, 24
201:2  252:13
256:5
**Van**  92:8
124:15
**Vanderkelen**
91:23
**variation**
250:10
**various**  102:9
**vary**  250:6
**VAUGHN**
2:20
**verbal**  122:12
**verbatim**
310:7
**Vermont**
196:21
**Veronique**
74:3  76:1
**version**  40:23
96:20  101:4
117:13
119:20  127:1
130:19
198:10
209:20  217:2
287:16
**versus**  184:23
**VICINAGE**
1:2
**VICTORIA**
3:2  17:2
103:7  175:10
307:1
**video**  10:11
19:4  20:14
**VIDEOGRAP
HER**  5:18
10:5, 7  16:16
17:9  18:19

19:1  79:9, 13
103:13, 17
175:15, 19
231:17, 21
260:16, 20
305:12
**Video-
Recorded**
1:16  7:3
**videotaped**
19:16, 19
305:17
**view**  15:20
**VINER**  5:19
10:6
**Viracept**
85:12  86:8, 10
**visualize**
163:18, 19
**vitro**  202:12,
21  203:13
205:11, 19, 21
206:18, 24
207:2, 7, 15,
21  284:5, 15
288:2, 17
**vivo**  95:7
107:20
186:11
202:19
203:14, 17, 19
207:13  284:6,
16  294:17

**< W >**
**wage**  150:13
151:5
**wait**  11:23
**waiting**  227:15
**Wall**  2:4
**WALSH**  3:18
**want**  35:16
38:23  43:18
48:12  96:16
102:24  103:5
105:14, 16
125:24
144:14
150:16  163:4
175:10
227:12  285:2

Confidential Information - Subject to Protective Order

295:*1*  305:*20*
306:13  308:15
**wanted**  29:*14*
137:*11*
158:*21*
171:*17*  214:22
**wanting**  36:*16*
**Washington**
3:*14*  5:4  37:*1*
**waters**  239:*20*
**way**  12:*1*
24:*3*  29:*4*
42:*14*  44:4
59:*1, 4*  70:*21*
85:*11*  95:*17*
97:5  101:*18*
113:*6*  130:9
139:*15*
156:*12, 14*
157:22  164:6
178:*3*  189:9
191:*15, 17*
199:*22*
214:*24*
257:*24*
289:*14, 23*
294:7  295:5
**ways**  156:*24*
282:7
**week**  169:*12,
16*
**well**  13:*19, 23*
15:*8*  17:*11*
29:*17*  32:*13,
15*  37:*18*
39:*10, 17*
42:*21*  51:*21*
54:*4*  60:*12*
61:*23*  63:5
65:7  66:8
68:4  69:5
75:*16*  78:*23*
82:6  83:*14*
93:*20*  95:*20*
100:*24*
101:*13*  102:*5,
22*  103:2
107:*12, 13*
108:*12*  116:*3,
8, 19*  124:*23*
129:9  130:2

132:*24*
133:*10*
134:*17*  135:*8*
137:*12, 14*
139:*22*
164:*18*
167:*19*  170:6
178:*21*
180:*24*  217:4
236:*17, 22*
241:*11*
251:*20*
255:*10*
256:*24*
261:*13*
279:*12*
287:*12*
292:*12*
294:*17*  295:4
296:8  299:9
301:*19*  307:6
308:*20*
**went**  57:*21*
93:7  130:5
157:*16*
221:*14*  297:*23*
**We're**  10:*5*
36:*4, 19*  46:2
91:*19*  95:*24*
98:*15*  102:*19*
104:*18*
105:*16*  122:*3,
4*  150:*17*
188:*18*
190:*11*  192:7
204:*4*  241:*21*
260:*20*  271:6
284:*8*  285:4
305:*18*
306:*12, 14, 15*
307:*23, 24*
308:*1, 2, 3, 13,
15*
**WERNER**  4:7
**West**  4:*14*
**wet**  90:*13*
**We've**  13:*17*
40:*16*  44:22
70:6  79:*1*
84:*12*  101:9
170:*3*  189:22

190:*22*  191:5
196:*16*  200:2
224:*1*  249:4
282:*19*  305:22
**Wheeldon**
8:*20*  74:4
76:*4, 5*
201:*13*
223:*13*  233:14
**whichever**
36:*13*
**White**  8:*10*
47:6  72:*11*
76:*19*  78:*20*
178:*20*  194:9
224:6, *12*
225:*1, 18*
**wholly**  148:*19*
149:*8*
**Wichard**
91:*18*
**wider**  47:9
132:*19*
**W-I-J-K**  92:*10*
**willing**  224:*18*
306:7
**wing**  60:*19*
61:*1, 22*  62:4
64:8  65:*5, 22*
**wings**  68:4
**Wipe**  40:*17*
**wish**  63:*15*
241:*14*
**wishes**  65:*15*
**withstood**
107:*19*
**witness**  1:*17*
2:9  3:*3, 12*
5:20  10:*21*
16:4  17:*4, 7,
10*  18:*7, 10*
23:23  24:7,
*14*  30:*3, 6*
32:*1*  38:*18*
39:*15*  41:9,
*14, 17, 21*
50:22  52:22
79:23  80:*3, 7*
81:24  103:9,
*20*  106:*10*
140:*19*

141:*24*  146:7
151:2  154:6
177:*8*  184:2
206:*3, 8, 10*
225:*21*  228:7
231:*10*
237:*23*  238:4
243:*23*  244:5
248:*12*  255:3
260:*4, 15*
266:*24*  267:5
287:*20*
301:*10, 14*
310:*11*  311:*1*
**witnesses**  15:2
26:*3, 9*
**Witt**  178:*23*
**word**  48:22
62:*23*  257:*16*
261:*23*  265:22
**wording**  237:6
**words**  16:*13*
108:*18*  146:*11*
**work**  13:22
22:5  37:*7, 24*
40:*11, 19*
47:*5, 8*  52:*4,
8, 13*  56:*19*
57:2  58:*10,
12*  62:*13, 17*
63:*13*  64:*14,
16, 19, 20*
65:*13, 16*
66:*4, 8, 24*
70:*2, 16*  72:*1,
3*  74:*10*
75:*19*  76:8
77:*3, 4, 7*
78:*20*  90:7,
*10, 12, 13, 18,
23*  91:*3*
92:*13*  101:9,
*20*  102:*1*
104:7  107:*11*
109:*7, 12*
110:*20*
111:*20*
113:*18, 20, 22*
115:*21*  116:*1,
5, 15*  120:*3*
131:*19*

139:*24*  141:*8,
15*  143:*15, 19*
144:*3, 4*
145:*4*  146:*14,
16, 18, 21*
147:*8*  149:*7,
14*  150:*5, 9,
23*  151:*16, 20,
22*  152:*8, 12,
15*  154:*3*
164:*14, 24*
166:*10, 18*
167:*3, 9, 16,
20, 23*  168:*3,
12*  169:*13, 17,
19*  170:*7, 11,
15*  171:*2, 4*
173:*22*
174:*11*
180:*22*  181:*2,
13*  182:*18*
184:*20, 24*
185:*10*  193:9
198:*19*  199:2
202:*16*  203:5
210:*14*  213:9
214:*20, 21*
215:*17*  219:2
221:*16, 19*
222:*15*  225:*9,
14*  229:*15*
230:*14*  232:*3,
7*  234:*18*
235:*18*  238:9
245:*23*
260:*13*
282:*19, 21*
283:*4, 12, 16*
292:*20*
**worked**  52:7
56:*23*  58:*14,
24*  59:4
73:*21*  74:*11*
76:*5, 22*
83:*11*  84:24
89:*19*  90:*14*
91:*24*  99:9
100:*8, 16, 19,
24*  102:*12*
106:*14*
107:*15*

Confidential Information - Subject to Protective Order

111:*19*, *24*
137:*13*
144:*19*
165:*23*  181:*7,*
*8, 12*  213:*11*
215:*6*  222:*17*
235:*16, 21*
**workers**
110:*17*
**working**  27:7
53:3  99:*16,*
*24*  100:*11*
102:7  107:*9,*
*10*  132:*18*
137:*3*  144:8
157:*22*  166:*1*
179:*23*  182:8
192:7  209:*17,*
*18*  211:2
231:8  234:7
235:7  260:*12*
276:*13*  304:*15*
**workload**
72:*12*  78:*17*
224:22  225:*17*
**works**  52:*14*
57:7  74:6
76:12  78:*21*
84:*7, 13*
91:*18*  92:2
212:22
222:16
223:*11, 12*
236:19  260:*15*
**Workshop**
40:*24*
**workshops**
42:*21*
**worries**  24:*10*
**worse**  252:*23*
**Wout**  99:*19*
107:*12*
**wrapped**  95:2
**write**  27:12
209:*4, 6, 8, 15*
210:8  235:*4*
**writing**  27:*16,*
*19*  89:*17*
166:8  229:*5,*
*13*  233:*24*
234:*20*  252:*13*

**writings**  22:*4*
33:*13*
**written**  56:*3*
152:*20, 22*
153:2  156:*9*
160:6, *14*
161:*19*  162:7
167:7  225:*9*
230:*13*
**wrong**  151:*24*
258:*10*
**wrote**  22:3
78:*1*  154:*24*

**< Y >**
**Yauk**  138:*23*
139:*14*
**Y-A-U-K**
138:*23*
**Yay**  177:*17*
**yeah**  19:*4*
29:7  37:*21*
39:*1*  46:7
49:9  58:7
64:*3*  75:*24*
104:*13*
128:*21*  131:6
133:7  135:*18*
141:3  146:*19*
150:*16, 19, 24*
151:*21*  152:9,
*13*  183:*21*
194:*23*  224:7
225:*21*
242:*19, 24*
243:6, *8, 23*
261:8  274:2
279:*15*  287:6
298:*14*
301:*10*
304:*12*  307:*21*
**year**  41:2, *3*
48:*11*  100:8
132:*14*
138:22  145:5
150:8
**years**  37:*23*
53:*1*  55:2
98:9  99:*2, 22*
100:9  101:*12*
147:*12*

182:*15*
265:*13, 14*
266:*1*
**Yep**  19:*6*
58:9  180:7
**yes/no**  267:*23*
286:*15*
**yesterday**
13:8  14:*4*
**York**  2:5
138:*23*

**< Z >**
**Zair**  91:6, *10*
**Z-A-I-R**  91:*11*
**Zantac**  219:*6,*
*12, 14*  222:*5,*
*7, 20*
**Zeller**  46:5
47:7  72:*14*
74:4  76:*12*
**Zhejiang**  4:*21*
**ZHP**  133:2
136:*8, 14*
258:*24*
**ZMICK**  4:*13*
**Zoom**  12:5
18:*20, 24*
20:*18*  31:*20*
59:19  79:*24*
80:8  81:*21*
127:*15*
177:*14*  303:5

Errata Sheet

October 4-5, 2021 Deposition Transcript – George Johnson, Ph.D.
In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation

**MONDAY 10/4/21**

| Pages, Lines | Change: | Reason |
|---|---|---|
| 64:24 | Change "test" to **"testing"** | Clarification |
| 83:23 | Change "I've" to **"I"** | Clarification |
| 94:10 | Change "how it's occurred" to **"how it occurs"** | Clarification |
| 157:23 | Change "slide date" to "slide **deck**" | Clarification. |
| 174:13 | Change "replied" to **"replying"** | Clarification |
| 192:6-7 | "or if, as we predicted, the observed concentration would be below the PDE…" | Clarification |
| 199:23 | Change "contour" to **"quantal"** | Transcription error |
| 205:12 | Change "covariant" to **"covariate"** | Transcription error |
| 219:17 | Change "was" to **"were"** | Transcription error / Correction |
| 258:20 | "I did, (as in "what I did was")" – should edit to say, "What I did was, I looked at …. | Transcription error / Correction |

**TUESDAY 10/5/21**

| Pages, Lines | Change: | Reason |
|---|---|---|
| 328:2 | Add: "and even then it will not be 100% pure." | Completeness / clarification |
| 340:22 | Change "multiples suggested" to read "multiple *species*" suggested by…. | Transcription error / clarification. |
| 351:11-13 | Remove names; incorrect recollection, these persons not involved. | Correction |
| 377:11-12 | Change "lie to" and make it **"align with"** | Transcription error / correct testimony |
| 379:3 | Change "far" to **"for"** | Transcription error / correct testimony |
| 381:6 | Insert "**do not**" before have | Transcription error / correct testimony |
| 384:5 | Change 1-100 risk to **1-100,000** | Transcription error / correct testimony |
| 384:6 | Change 1-100 risk to **1-100,000** | Transcription error / correct testimony |
| 387:1-2 | Edit "That's the background" to **"That's the actual background rate of cancer."** | Completeness and clarification |
| 421:3 | Delete "would be" | Correction / Clarification |
| 445:20 | Change "antigens" to **"aneugens"** | Transcription error / correct testimony |

| 446:21 | Change "vice president" to "**past president**" | Transcription error / correct testimony |
| 460:1 | Change "is it shows" to "is **that** it shows" | Clarification |
| 463:12 | Strike "I do" | Clarification |
| 492:6 | Change "talking" to "**talk**" | clarification |
| 495:21 | Change "To say" to "**For example**" | Clarification |
| 507:13 | Change "yeah" to "**yes**" | Proper English |
| 518:24 | Add comma after "would be**,**" | Clarification on sentence |

_____

George Johnson, Ph.D.


_____, Notary Public.

This, the 17ᵗʰ day of November , 2021.

My Commission Expires: _____ .

Kimberly Harris
NOTARY PUBLIC
Forsyth County, GEORGIA
My Commission Expires February 6, 2024