# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN DIVISION

| | |
|---|---|
| IN RE: VALSARTAN<br>PRODUCTS LIABILITY LITIGATION | Case No. 19-md-2875-RBK<br>MDL No. 2875<br><br>Hon. Robert B. Kugler, District Judge<br><br>Hon. Thomas Vanaskie (Ret.), Special Master |
| **This Documents Relates to All Actions** | |

**COMPENDIUM OF UNPUBLISHED CASES CITED IN WHOLESALER DEFENDANTS' REPLY BRIEF**

# TABLE OF CONTENTS

**Case**                                                                      **Tab**

*In re Allergan Biocell Textured Breast Implant Products Liability*
    *Litigation*,
    No. 2:19-md-2921-BRM-ESK, 2021 WL 1050910 (D.N.J.
    March 31, 2021).......................................................................... 1

*In re Fieldturf Artificial Turf Marketing And Sales Practices*
    *Litigation,*
    No. 3:17-md-2779 (MAS) (TJB), 2018 WL 4188459, (D.N.J.
    August 31, 2018) ........................................................................ 2

*In re Insulin Pricing Litigation*,
    No. 3:17-cv-0699-BRM-LHG2019, WL 643709 (D.N.J. June
    26, 2019) ..................................................................................... 3

*In re Magnesium Oxide Antitrust Litigation*,
    No. 10–5943 (DRD), 2011 WL 5008090 (D.N.J. February 8,
    2016) ........................................................................................... 4

*William B. McGuire., v. BMW of North America, LLC*,
    No. 13–7356 (JLL), 2014 WL 2566132 (D.N.J. June 6, 2014) ........... 5

*Garner Rickman v. BMW of North America*,
    No. 18-4363(KM) (JBC), 2020 WL 3468250 (D.N.J June 25,
    2020) ........................................................................................... 6

*Jeff Withrow v. FCA US LLC*,
    No. 19-13214, 2021 WL 2529847 (E.D. Mich. June 21,
    2021) ........................................................................................... 7

# Tab 1

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by  D'Addario v. Johnson & Johnson,  D.N.J.,  March 31, 2021

2021 WL 1050910
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

IN RE: ALLERGAN BIOCELL TEXTURED BREAST
IMPLANT PRODUCTS LIABILITY LITIGATION

Case No. 2:19-md-2921-BRM-ESK
|
MDL No. 2921
|
Signed 03/19/2021

**Synopsis**
**Background:** Patients who had breast implant devices implanted into their bodies brought personal injury action against sellers of implants for manufacturing defect based on strict liability and negligence, failure to warn based on strict liability and negligence, general negligence, breach of the implied warranty of merchantability, negligent misrepresentation, breach of express warranty, survivorship and wrongful death, loss of consortium, and punitive damages. In addition to claims in personal injury complaint, patients filed consolidated class action complaint, alleging medical monitoring, violations of state consumer fraud and deceptive trade practices acts, unjust enrichment, declaratory judgment, and equitable relief. Defendant filed motion to strike and to dismiss for failure to state a claim as to class action complaint, motion to dismiss for failure to state a claim on preemption grounds as to both complaints, and motion to dismiss for failure to state a claim on non-preemption grounds as to personal injury complaint.

**Holdings:** The District Court, Brian R. Martinotti, J., held that:

[1] patients' failure to warn claims were preempted;

[2] patients' claims related to seller's devices used in investigative studies were preempted;

[3] patients alleged sufficient facts to support manufacturing defect claims;

[4] patients' claims for negligence per se could not be asserted under law of jurisdictions that did not recognize claims based on violations of FDCA and FDA current good manufacturing practices;

[5] patients' failure to warn claims could not be asserted under law of states that did not explicitly recognize a duty to warn by reporting adverse events to the FDA;

[6] patients could not assert claims for breach of warranty under law of certain states; and

[7] named patients lacked standing to serve as class representatives for state-specific subclasses of which no named patient was a member.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion to Strike; Motion to Dismiss for Failure to State a Claim.

West Headnotes (154)

**[1]     Federal Civil Procedure**  🔑

Determining whether a complaint states a plausible claim for relief, for purposes of surviving a motion to dismiss for failure to state a claim, is a context-specific task that requires the reviewing district court to draw on its judicial experience and common sense. Fed. R. Civ. P. 12(b)(6).

**[2]     Federal Civil Procedure**  🔑

Where the well-pleaded facts do not permit the district court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not shown that the pleader is entitled to relief, for purposes of surviving a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 8(a)(2), 12(b)(6).

**[3]     Federal Civil Procedure**  🔑

In reviewing a motion to dismiss for failure to state a claim, the district court is not compelled to accept unsupported conclusions and unwarranted inferences, nor a legal conclusion couched as a factual allegation. Fed. R. Civ. P. 8(a)(2), 12(b)(6).

**[4]    Federal Civil Procedure** 🔑

The purpose of a motion to strike is to simplify the pleadings and save time and expense by excising from a plaintiff's complaint any redundant, immaterial, impertinent, or scandalous matter which will not have any possible bearing on the outcome of the litigation. Fed. R. Civ. P. 12(f).

**[5]    Federal Civil Procedure** 🔑

Because of the drastic nature of the remedy, motions to strike are usually viewed with disfavor, and will generally be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues. Fed. R. Civ. P. 12(f).

**[6]    Federal Civil Procedure** 🔑

A district court possesses considerable discretion in disposing of a motion to strike. Fed. R. Civ. P. 12(f).

**[7]    Federal Civil Procedure** 🔑

The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. Fed. R. Civ. P. 23.

**[8]    Federal Civil Procedure** 🔑

The requirements set out in rule governing class certification are not mere pleading rules. Fed. R. Civ. P. 23.

**[9]    Federal Civil Procedure** 🔑

A district court may delve beyond the pleadings to determine whether the requirements for class certification are satisfied, and conduct a preliminary inquiry into the merits. Fed. R. Civ. P. 23.

**[10]    Federal Civil Procedure** 🔑

The party seeking class certification bears the burden of establishing each element of the rule governing class certification by a preponderance of the evidence; this requires actual, not presumed, conformance with the rule's requirements. Fed. R. Civ. P. 23.

**[11]    Federal Civil Procedure** 🔑

Class certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of the rule governing class certification are met. Fed. R. Civ. P. 23.

**[12]    States** 🔑

Preemption is an affirmative defense that the defendant has the burden to prove.

**[13]    States** 🔑

The question of whether a certain state action is pre-empted by federal law is one of congressional intent; such a determination of congressional intent and of the boundaries and character of a pre-empting congressional enactment is one of federal law.

**[14]    States** 🔑

The law of the transferee forum applies to federal questions, for purposes of determining whether a certain state action is pre-empted by federal law, though the district court may give the law of the transferor forum close consideration.

**[15]**    **Products Liability** 🔑

State requirements are pre-empted under the Medical Device Amendments (MDA) to the Food, Drug, and Cosmetic Act (FDCA) only to the extent that they are different from, or in addition to the requirements imposed by federal law. Federal Food, Drug, and Cosmetic Act § 521, 21 U.S.C.A. § 360k(a).

**[16]**    **Products Liability** 🔑

The Medical Device Amendments (MDA) to the Federal Food, Drug, and Cosmetic Act (FDCA) does not prevent a state from providing a damages remedy for claims premised on a violation of Food and Drug Administration (FDA) regulations; the state duties in such a case parallel, rather than add to, federal requirements. Federal Food, Drug, and Cosmetic Act § 521, 21 U.S.C.A. § 360k(a).

**[17]**    **Products Liability** 🔑

Patients' state law failure to warn claims, alleging that seller of breast implant devices failed to update the warnings on their devices in violation of the pre-market approvals (PMA) issued by the Food and Drug Administration (FDA), imposed a state law duty that differed from or added to what was required under FDA regulations governing label supplements, and, thus, claims were preempted under preemption provision of Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA); FDA label supplement regulations were not mandatory, but rather only required that a PMA supplement be submitted when unanticipated adverse effects increased in the incidence of anticipated adverse effects, or device failures necessitated a labeling modification. Federal Food, Drug, and Cosmetic Act § 521, 21 U.S.C.A. § 360k(a)(1).

**[18]**    **Products Liability** 🔑

The exception to the requirement that a manufacturer submit a pre-market approval (PMA) supplement for the Food and Drug Administration (FDA) to review and approve before making any change affecting the safety or effectiveness of the device, unless made through the FDA's "changes being effected" (CBE) process, allows a manufacturer to add or strengthen a contraindication, warning, or precaution without pre-approval from the FDA; nevertheless, if the manufacturer can show clear evidence that the FDA would not have approved the labeling change, the exception does not apply. 21 C.F.R. § 814.39(d)(1).

**[19]**    **Products Liability** 🔑

Patients' state law failure to warn claims, alleging that seller of breast implants failed to make adverse event reports to the Food and Drug Administration (FDA) regarding the risk of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL) through use of implants, paralleled FDA regulations requiring reporting of adverse event information, and, thus, claims were not expressly preempted under preemption provision of Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA). Federal Food, Drug, and Cosmetic Act § 521, 21 U.S.C.A. § 360k(a)(1).

**[20]**    **States** 🔑

In states that recognize failure to report claims, a manufacturer's failure to report adverse events to the Food and Drug Administration (FDA) can form the basis of a parallel claim that survives preemption.

**[21]**    **Products Liability** 🔑

The underlying rationale of a report-based failure to warn claim is that the Food and Drug Administration (FDA) reporting regulations are related to the manufacturer's duty to provide the FDA with a disseminated safety device; a manufacturer's failure to provide such information to the FDA is a parallel violation of a state duty to provide reasonable and adequate information regarding a product's risks.

**[22]**    Products Liability   🖙

The Food and Drug Administration (FDA) may be reasonably relied upon to disclose information regarding medical device failures through publicly accessible databases when provided with information regarding a device's safety and effectiveness, for purposes of a failure-to-warn claim.

**[23]**    Products Liability   🖙

Patients' state law failure to warn claims, alleging that seller of breast implants failed to make adverse event reports to the Food and Drug Administration (FDA) regarding the risk of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL) through use of implants, were not impliedly preempted under preemption provision of Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA); claims were based on state law tort principles, and not solely based on seller's alleged fraud on the FDA. Federal Food, Drug, and Cosmetic Act § 521, 21 U.S.C.A. § 360k(a)(1).

**[24]**    Products Liability   🖙

A failure to warn claim that can be established solely by evidence of fraud on the Food and Drug Administration (FDA) is impliedly preempted under the preemption provision of Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA). Federal Food, Drug, and Cosmetic Act § 521, 21 U.S.C.A. § 360k(a)(1).

**[25]**    Products Liability   🖙

Patients advanced sufficient facts to suggest the existence of manufacturing defects in seller's breast implants, and, thus, patients' state law manufacturing defect claims were not expressly preempted under preemption provision of Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA); patients alleged that debris in the implants was not a part of the pre-market approvals (PMA) received from the Food and Drug Administration (FDA), constituting a deviation from the design in violation of the PMAs. Federal Food, Drug, and Cosmetic Act § 521, 21 U.S.C.A. § 360k(a)(1).

**[26]**    Products Liability   🖙

To the extent that a manufacturing defect claim is a hardware failure because the device did not conform to the standards of other units, and also violated federal regulations and procedures in manufacturing, then it would be a parallel claim and would not be preempted.

**[27]**    Products Liability   🖙

If a defendant's device was manufactured in compliance with its pre-market approvals (PMA) received from the Food and Drug Administration (FDA), then any claim of manufacturing defect would not parallel a federal claim and would be preempted.

**[28]**    Products Liability   🖙

Where the plaintiff alleging a manufacturing defect claim has advanced facts that suggest the existence of parallel state law claims and federal claims alleging violation of Food and Drug Administration (FDA) regulations, but does not have access to the confidential information to specifically plead the alleged violation of FDA regulations, fairness compels that some leniency be afforded plaintiff from the stringent *Twombly* and *Iqbal* pleading standards to allow this claim to proceed.

**[29]**    Products Liability   🖙

Patients' claims that seller's breast implant devices violated the Food and Drug Administration's (FDA) current good manufacturing practices (CGMP) requiring a device manufacturer to test products under actual or simulated use conditions constituted a parallel federal claim to their state law manufacturing defect claims, and, thus, patients' state law claims were not expressly preempted under preemption

provision of Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA). Federal Food, Drug, and Cosmetic Act § 521, 21 U.S.C.A. § 360k(a)(1); 21 C.F.R. § 820.30(g).

**[30]    Products Liability** 🔑

Citing to the Food and Drug Administration's (FDA) Current Good Manufacturing Practices (CGMP) could present a parallel federal claim, for purposes of surviving preemption; the plaintiff must identify what regulations under the CGMPs parallel the FDA state law claim, and should not simply provide a laundry list of alleged CGMP violations, which is too general to be capable of enforcement.

**[31]    Products Liability** 🔑

Patients' claims that seller's breast implant devices violated the Food, Drug, and Cosmetic Act's (FDCA) adulteration provisions, which stated that a medical device is adulterated if the methods used in its manufacture were not in conformity with the Food and Drug Administration's (FDA) current good manufacturing practices (CGMP) requirements, constituted a parallel federal claim to their state law manufacturing defect claims, and, thus, patients' state law claims were not expressly preempted under preemption provision of Medical Device Amendments (MDA) to FDCA. Federal Food, Drug, and Cosmetic Act §§ 501, 521, 21 U.S.C.A. §§ 351(h), 360k(a)(1).

**[32]    Products Liability** 🔑

Patients' state law claims for negligence per se, alleging that seller's breast implants and tissue expanders implanted into patients' bodies increased their risk of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL), was not impliedly preempted under preemption provision of Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA); claims invoked the statutory violations to prove seller's liability for

a separate underlying tort, instead of contending the violations themselves formed a cause of action. Federal Food, Drug, and Cosmetic Act § 521, 21 U.S.C.A. § 360k(a)(1).

**[33]    Negligence** 🔑

The doctrine of per se liability does not create an independent basis of tort liability but rather establishes, by reference to a statutory scheme, the standard of care appropriate to the underlying tort.

**[34]    Negligence** 🔑

The Federal Food, Drug, and Cosmetic Act (FDCA) or its accompanying regulations can be invoked to establish the standard or duty which defendants allegedly failed to meet, for purposes of a negligence per se claim. Federal Food, Drug, and Cosmetic Act, § 1 et seq., 21 U.S.C.A. § 301 et seq.

**[35]    States** 🔑

The Federal Food, Drug, and Cosmetic Act (FDCA) does not preempt state common law claims such as negligence. Federal Food, Drug, and Cosmetic Act, § 1 et seq., 21 U.S.C.A. § 301 et seq.

**[36]    Products Liability** 🔑

Patients' state law claims for strict liability, negligence, and similar claims related to seller's breast implant devices approved for use in investigative studies under the Investigational Device Exemption (IDE) of the Federal Food, Drug, and Cosmetic Act (FDCA) were preempted by the preemption provision of the Medical Device Amendments (MDA) to the FDCA. Federal Food, Drug, and Cosmetic Act §§ 520, 521, 21 U.S.C.A. §§ 360j(g), 360k(a)(1).

**[37]    Products Liability** 🔑

The Food and Drug Administration (FDA) approves devices for use in investigative studies under the Investigational Device Exemption (IDE) only upon a determination that the device is sufficiently safe and effective for investigative use on human beings. Federal Food, Drug, and Cosmetic Act § 520, 21 U.S.C.A. § 360j(g).

**[38]    Products Liability** 🔑

State tort law invoked to challenge the safety or effectiveness of a device approved for use in investigative studies under the Investigational Device Exemption (IDE) of the Federal Food, Drug, and Cosmetic Act (FDCA) is federally preempted by the Medical Device Amendments (MDA) to the FDCA. Federal Food, Drug, and Cosmetic Act §§ 520, 521, 21 U.S.C.A. §§ 360j(g), 360k(a)(1).

**[39]    Products Liability** 🔑

State law claims concerning devices that were not approved for use in investigative studies under the Investigational Device Exemption (IDE) of the Federal Food, Drug, and Cosmetic Act (FDCA) are not preempted by the Medical Device Amendments (MDA) to the FDCA. Federal Food, Drug, and Cosmetic Act §§ 520, 521, 21 U.S.C.A. §§ 360j(g), 360k(a)(1).

**[40]    Products Liability** 🔑

Patients' state law claims for negligent failure to warn, alleging seller of breast implants and tissue expanders violated Food and Drug Administration (FDA) regulations by failing to conduct clinical studies following pre-market approvals (PMA) issued by FDA, were preempted by preemption provision of Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA). Federal Food, Drug, and Cosmetic Act § 521, 21 U.S.C.A. § 360k(a)(1).

**[41]    Products Liability** 🔑

Patients' state law breach of implied warranty of merchantability claims, alleging that seller's breast implants failed to comply with Food and Drug Administration (FDA) regulations and adulteration provisions of Food, Drug, and Cosmetic Act (FDCA), paralleled violations of federal law, and, thus, were not expressly preempted by preemption provision of Medical Device Amendments (MDA) to FDCA; claims did not impose requirements that were different from, or in addition to, the federal ones, but instead claimed that implants were not merchantable solely because of seller's failure to comply with the FDA regulations and the FDCA's adulteration provisions. Federal Food, Drug, and Cosmetic Act §§ 501, 520, 521, 21 U.S.C.A. §§ 351(h), 360j(f), 360k(a)(1).

**[42]    Sales** 🔑

State law claims for breach of implied warranty concerning a medical device may be preempted to the extent that they impose new or additional requirements on manufacturers beyond federal regulations governing medical device at issue.

**[43]    Sales** 🔑

A state law claim for breach of implied warranty is viable, for purpose of preemption, to the extent it seeks recovery for conduct that may also have violated the Federal Food, Drug, and Cosmetic Act (FDCA). Federal Food, Drug, and Cosmetic Act, § 1 et seq., 21 U.S.C.A. § 301 et seq.

**[44]    Products Liability** 🔑

Breast implant seller waived argument for review, that preemption provision of Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA) preempted patients' claims for negligent misrepresentation, breach of express warranty, and breach of state consumer fraud and deceptive trade practice statutes based on breast implants that allegedly increased patients' risk of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL), where seller failed to raise argument in its opening brief. Federal Food, Drug, and Cosmetic Act § 521, 21 U.S.C.A. § 360k(a)(1).

**[45]    Federal Civil Procedure** 🔑

Absent compelling circumstances, failure to raise an argument in one's opening brief waives it.

**[46]    Products Liability** 🔑

Patients plausibly alleged facts suggesting that breast implant sellers made statements not approved by the Food and Drug Administration (FDA) in its pre-market approvals (PMA) of seller's implants, and, thus, patients' claims for negligent misrepresentation, breach of express warranty, and breach of state consumer fraud and deceptive trade practice statutes were not preempted by preemption provision of Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA) to the extent the claims were based on the statements; complaint alleged that sellers authored a misleading video posted on a video sharing website concerning safety features of one of its implant products. Federal Food, Drug, and Cosmetic Act § 521, 21 U.S.C.A. § 360k(a)(1).

**[47]    Federal Courts** 🔑

Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law.

**[48]    States** 🔑

Under the *Erie* doctrine, a state is not without law save as its highest court has declared it.

**[49]    Federal Courts** 🔑

A federal court is not free to reject state rules of decision that are commonly accepted and acted upon by the bar and inferior courts merely because it has not received the sanction of the highest state court.

**[50]    Federal Courts** 🔑

State law is to be applied in the federal as well as the state courts and, under the *Erie* doctrine, it is the duty of the former in every case to ascertain from all the available data what the state law is and apply it.

**[51]    Federal Courts** 🔑

In predicting how a matter would be decided under state law, a federal court sitting in diversity should examine (1) what the state's highest court has said in related areas, (2) the decisional law of the state's intermediate courts, (3) federal appeals and district court cases interpreting state law, and (4) decisions from other jurisdictions that have discussed the issues.

**[52]    Federal Courts** 🔑

Where two competing yet sensible interpretations of state law exist, a federal court sitting in diversity should opt for the interpretation that restricts liability, rather than expands it, until the Supreme Court of the state decides differently.

**[53]    Federal Courts** 🔑

In a multidistrict litigation (MDL), parties may elect to file a master complaint and a corresponding consolidated answer, which supersede prior individual pleadings; in such a case, the transferee court may treat the master pleadings as merging the discrete actions for the duration of the MDL pretrial proceedings.

**[54]    Federal Courts** 🔑

No merger of discrete actions occurs in a multidistrict litigation (MDL) when the master complaint is not meant to be a pleading with legal effect but only an administrative summary of the claims brought by all the plaintiffs; when plaintiffs file a master complaint of this variety, each individual complaint retains its separate legal existence.

**[55]    Federal Civil Procedure** 🔑

Where defendants bring a motion to dismiss that raises issues common to all plaintiffs in a multidistrict litigation (MDL), the administrative nature of a master complaint does not necessarily preclude motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

**[56]    Federal Civil Procedure** 🔑

When the information that may or may not support the plaintiffs' claims is largely within the control of the defendants, the district court may assess the sufficiency of the plaintiffs' claims with substantial leniency, for purposes of a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

**[57]    Products Liability** 🔑

The district court would consider, with substantial leniency, the facts that were specific to each individual patient or largely within the control of seller of breast implants, for purposes of the motion to dismiss stage of patients' multidistrict personal injury action for strict liability, negligence, and related claims.

**[58]    Products Liability** 🔑

Whether present injuries existed as to individual patients, who had seller's breast implants and tissue expanders implanted into their bodies, was a factual issue specific to each individual patient, and, thus, District court would not consider, at motion to dismiss stage, whether individual patients sufficiently alleged injuries required to sustain claims against seller of breast implants, which allegedly increased patients' risk of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL), in multidistrict litigation (MDL) for medical monitoring, violations of state consumer fraud and deceptive trade practices acts, and related claims under state law.

**[59]    Products Liability** 🔑

Patients, who had seller's breast implants inserted into their bodies, sufficiently alleged in their personal injury complaint that implants contained design defects, as required to support state law manufacturing defect claims in multidistrict litigation (MDL); complaint alleged that seller's scrubbing process during the manufacture of implants used different brushes and un-validated methods that violated the pre-market approvals (PMA) requirements issued by the Food and Drug Administration (FDA), and resulted in a defectively manufactured surface with particle residues unintended by the product specifications approved by the FDA, causing severe harm to patients.

**[60]    Products Liability** 🔑

Patients' claims for negligence per se in multidistrict litigation (MDL), alleging that insertion of seller's breast implants into patients' bodies increased patients' risk of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL), could not be asserted under the law of states that did not recognize such claims based on violations of the Food, Drug, and Cosmetic Act (FDCA) and the Food and Drug Administration's (FDA) current good manufacturing practices (CGMP). Federal Food, Drug, and Cosmetic Act, § 1 et seq., 21 U.S.C.A. § 301 et seq.

**[61]    Products Liability** 🔑

A Food and Drug Administration (FDA) regulation that imposes specific substantive requirement concerning the safety and effectiveness of a medical device may form the basis of a negligence per se claim under Tennessee law.

**[62]    Products Liability** 🔑

Patients' state law claims in multidistrict litigation (MDL) for failure to warn, which

alleged that seller of breast implants failed to make adverse event reports to the Food and Drug Administration (FDA) regarding the risk of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL) through use of implants, could not be under the law of states that did not explicitly recognize a duty to warn by reporting adverse events to the FDA.

**[63]    Products Liability** 🔑

Patients' state law claims for negligent misrepresentation concerning seller's breast implants, which allegedly increased patients' risk of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL), were sufficiently pleaded at motion to dismiss stage of patients' multidistrict litigation (MDL); determinations regarding seller's alleged negligent misrepresentations would involve evaluation of individualized facts, as each individual patient could have received from seller a distinct set of implant-related information, and evidence of such alleged misrepresentations was primarily within the control of seller.

**[64]    Federal Courts** 🔑

Because pleading rules are procedural in nature, the transferee court in a multidistrict litigation (MDL) must apply federal law as interpreted by the court of the district where the transferee court sits.

**[65]    Federal Civil Procedure** 🔑

Plaintiffs pleading negligent representation without more is sufficient to state a claim.

**[66]    Federal Civil Procedure** 🔑

Where a plaintiff grounds his claims in allegations of fraud, and the claims thus sound in fraud, the heightened pleading standard under the rule requiring particularized pleading for the conduct underlying fraud claims apply. Fed. R. Civ. P. 9(b).

**[67]    Federal Civil Procedure** 🔑

Absent a determination that plaintiffs' claims sounded in fraud, or some analysis explaining why the heightened pleading standard under the rule requiring particularized pleading for the conduct underlying fraud claims apply, applying the rule to such claims constitutes legal error. Fed. R. Civ. P. 9(b).

**[68]    Products Liability** 🔑

To the extent patients' claims sounded in fraud, patients' state law claims for negligent misrepresentation concerning seller's textured breast implants, which allegedly increased patients' risk of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL), were sufficiently pleaded at motion to dismiss stage of patients' multidistrict litigation (MDL); complaint alleged that seller's did not reference the BIA-ALCL risk in its promotional video, which was publicly available online, described the "greatly improved safety" of breast augmentation and seller's textured and smooth implants, but did not reference the increased risks of contracting BIA-ALCL associated with the textured type, potentially misrepresenting that textured implants were safer than smooth implants. Fed. R. Civ. P. 9(b).

**[69]    Products Liability** 🔑

Patients' claims in multidistrict litigation (MDL) for negligent misrepresentation, alleging that sellers of breast implants misrepresented the patients' risks of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL) by having implants inserted into their bodies, were viable under Alabama law, where patients alleged that their physicians were not properly warned of the risks associated with the implants, and that the physicians would not have recommended the implants if sellers provided adequate warnings.

**[70]    Products Liability** 🔑

Under the learned intermediary doctrine, the duty to warn imposed on a medical device manufacturer is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the use of its product.

**[71]    Products Liability** 🔑

Under Alabama law, if the warning to a learned intermediary regarding a medical device is inadequate or misrepresents the risk, the device manufacturer remains liable for the injuries sustained by the patient.

**[72]    Products Liability** 🔑

Under the learned intermediary doctrine, to support a claim for negligent misrepresentation under Alabama law, the patient must show that the manufacturer of a medical device failed to warn the physician of a risk not otherwise known to the physician and that the failure to warn was the actual and proximate cause of the patient's injury.

**[73]    Products Liability** 🔑

Patients' claims in multidistrict litigation (MDL) for negligent misrepresentation, alleging that sellers of breast implants misrepresented the patients' risks of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL) by having implants inserted into their bodies, were not viable under Arkansas law, where Arkansas explicitly declined to recognize the tort of negligent misrepresentation.

**[74]    Products Liability** 🔑

Patients' claims in multidistrict litigation (MDL) for negligent misrepresentation, alleging that sellers of breast implants misrepresented the patients' risks of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL) by having implants inserted into their bodies, were not viable under Louisiana law; the Louisiana Product Liability Act (LPLA) provided the exclusive theory of liability for manufacturers for damages caused by their products, and did not include a theory for negligent misrepresentation. La. Rev. Stat. Ann. § 9:2800.51 et seq.

**[75]    Products Liability** 🔑

The Louisiana Product Liability Act (LPLA) establishes the exclusive theory of liability for manufacturers for damages caused by their products under Louisiana law. La. Rev. Stat. Ann. § 9:2800.51 et seq.

**[76]    Products Liability** 🔑

The Louisiana Product Liability Act (LPLA) authorizes four theories of recovery for product liability claims: (1) construction or composition defect, (2) design defect, (3) inadequate warning, or (4) breach of express warranty. La. Rev. Stat. Ann. §§ 9:2800.52, 9:2800.53, 9:2800.54.

**[77]    Products Liability** 🔑

Under Louisiana law, a plaintiff may not recover from a product manufacturer for damage caused by its product on the basis of any theory not set forth in Louisiana Products Liability Act (LPLA). La. Rev. Stat. Ann. § 9:2800.51 et seq.

**[78]    Products Liability** 🔑

Patients' claims in multidistrict litigation (MDL) for negligent misrepresentation, alleging that sellers of breast implants misrepresented the patients' risks of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL) by having implants inserted into their bodies, were not viable under Minnesota law; patients did not allege pecuniary loss related to a business transaction.

**[79]    Negligence** 🔑

Under Minnesota law, one who, in the course of his business, profession or employment, or in a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for the pecuniary loss caused to them by their justifiable reliance upon information, if he fails to exercise reasonable care or competence in obtaining or communicating information.

**[80]    Negligence** 🔑

The scope of a negligent misrepresentation claim under Minnesota law is limited to the commercial or business setting with consequent pecuniary loss, and does not extend to medical bills.

**[81]    Products Liability** 🔑

Patients' claims in multidistrict litigation (MDL) for negligent misrepresentation, alleging that sellers of breast implants misrepresented the patients' risks of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL) by having implants inserted into their bodies, were not viable under Mississippi common law; negligent misrepresentation claims were subsumed by the Mississippi Product Liability Act (MPLA). Miss. Code Ann. § 11-1-63(a).

**[82]    Products Liability** 🔑

Under Mississippi law, common law claims for negligent misrepresentation based on damages caused by a product are subsumed by the Mississippi Product Liability Act (MPLA) and must be analyzed under the statute. Miss. Code Ann. § 11-1-63(a).

**[83]    Products Liability** 🔑

Under Mississippi law, common law claims for damages caused by a product which seek to impose liability outside the Mississippi Product Liability Act's (MPLA) framework must be

dismissed for failure to state a claim. Miss. Code Ann. § 11-1-63(a).

**[84]    Products Liability** 🔑

Patients' claims in multidistrict litigation (MDL) for negligent misrepresentation, alleging that sellers of breast implants misrepresented the patients' risks of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL) by having implants inserted into their bodies, were viable under Texas law to the extent claims were not subsumed by a failure to warn claim.

**[85]    Products Liability** 🔑

Texas law recognizes a cause of action for negligent misrepresentation where the plaintiff suffered physical harm, even though a plaintiff's negligent misrepresentation claim could be found as merely a recasting of their failure to warn claim.

**[86]    Products Liability** 🔑

Under Texas law, a negligent misrepresentation claim may be considered a failure to warn claim when, no matter how a plaintiff casts her claims, the plaintiff essentially alleges that the defendant failed to warn her that the defendant's product causes a disease; in this situation, if the plaintiff's failure to warn claim is rejected for some reason, then its negligent misrepresentation claim will be rejected for the same reason.

**[87]    Products Liability** 🔑

Patients' claims in multidistrict litigation (MDL) for negligent misrepresentation, alleging that sellers of breast implants misrepresented the patients' risks of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL) by having implants inserted into their bodies, were not viable under Virginia law, where Virginia explicitly did not recognize the tort of negligent misrepresentation.

In re Allergan Biocell Textured Breast Implant Products..., --- F.Supp.3d ---- (2021)

**[88]    Sales** 🗝️

Patients' claims in multidistrict litigation (MDL) for breach of implied warranty of merchantability, alleging that seller's breast implants deviated from the pre-market approvals (PMA) received from the Food and Drug Administration (FDA), were viable under Alabama law.

**[89]    Sales** 🗝️

In general, Alabama law does not recognize a cause of action for breach of implied warranty of merchantability for inherently dangerous products.

**[90]    Sales** 🗝️

Under Alabama law, an implantable Class III medical device is an inherently dangerous product precluded from liability for breach of the implied warranty of merchantability.

**[91]    Sales** 🗝️

Alabama law allows a breach of the implied warranty of merchantability claim based on an alleged failure to manufacture a medical device in accordance with the Food and Drug Administration's (FDA) requirements, as opposed to a general allegation that the product contains inherent dangers.

**[92]    Sales** 🗝️

Patients' claims in multidistrict litigation (MDL) for breach of implied warranty of merchantability, alleging that seller's breast implants deviated from the pre-market approvals (PMA) received from the Food and Drug Administration (FDA), were viable under Arizona law to the extent claims were not based on Arizona's version of the Uniform Commercial Code (UCC). Ariz. Rev. Stat. Ann. § 47-1101 et seq.

**[93]    Sales** 🗝️

Patients' claims in multidistrict litigation (MDL) for breach of implied warranty of merchantability, alleging that seller's breast implants deviated from the pre-market approvals (PMA) received from the Food and Drug Administration (FDA), were viable under California law to the extent claims alleged that patients relied on seller's judgment regarding the implants.

**[94]    Sales** 🗝️

Under California law, privity of contract is required in an action for breach of either express or implied warranty.

**[95]    Sales** 🗝️

Patients' claims in multidistrict litigation (MDL) for breach of implied warranty of merchantability, alleging that seller's breast implants deviated from the pre-market approvals (PMA) received from the Food and Drug Administration (FDA), were viable under Florida law to the extent claims allege patients' were in privity of contract with seller.

**[96]    Sales** 🗝️

Pursuant to Florida law, the plaintiff must be in privity of contract with the seller of a product to recover under theories of breach of express or implied warranties.

**[97]    Sales** 🗝️

Most often under Florida law, privity of contract, for purposes of breach of express or implied warranties claims, does not exist between manufacturers and patients when the medication is only available by prescription; but a plaintiff may meet a "relaxed" privity standard if it relied on the safety claims in manufacturer's

advertisements purposely targeting patients like
the plaintiff.

**[98]    Sales**  🔑

Patients' claims in multidistrict litigation
(MDL) for breach of implied warranty of
merchantability, alleging that seller's breast
implants deviated from the pre-market approvals
(PMA) received from the Food and Drug
Administration (FDA), were viable under
Georgia law to the extent claims allege patients'
were in privity of contract with seller.

**[99]    Sales**  🔑

Georgia law generally precludes an ultimate
consumer from recovering on any express or
implied warranty when the manufacturer sells
the product to the original consumer.

**[100]    Sales**  🔑

Under Georgia law, if the manufacturer of
a product expressly warrants to the ultimate
consumer that the product will perform in a
certain way or that it meets particular standards,
privity with the ultimate consumer is deemed to
exist, for purposes of a claim for breach of the
express or implied warranty of merchantability.

**[101]    Sales**  🔑

Patients, who alleged that a flaw in the
manufacturing of seller's breast implants
increased their risk of risk of developing
breast-implant associated anaplastic large cell
lymphoma (BIA-ALCL), could proceed on their
Idaho law claims for breach of implied and
express warranties in multidistrict litigation
(MDL) against seller to the extent claims for
breach of implied warranty were based on
Idaho's version of the Uniform Commercial
Code (UCC) and breach of express warranty
claims were based on direct contacts between
patients and seller. Idaho Code Ann. § 28-12-101
et seq.

**[102]    Sales**  🔑

Idaho does not recognize a breach of warranty
claim in personal injury products liability actions
which do not involve a contractual relationship
between the manufacturer and the injured person.

**[103]    Sales**  🔑

Under Idaho law, a plaintiff may pursue a breach
of warranty claim for personal injuries based
on Idaho's version of the Uniform Commercial
Code (UCC) only if: (a) the plaintiff is in
contractual privity with the manufacturer or
seller, or (b) the plaintiff qualifies as a third party
beneficiary of the underlying sales contract.
Idaho Code Ann. § 28-12-101 et seq.

**[104]    Sales**  🔑

Patients' claims in multidistrict litigation (MDL)
for breach of the implied and express warranties,
alleging that seller's breast implants deviated
from the pre-market approvals (PMA) received
from the Food and Drug Administration (FDA),
were viable under Indiana law to the extent
claims to the extent implied warranty claims
were based on Indiana's version of the Uniform
Commercial Code (UCC). Ind. Code Ann. §
26-1-2-101 et seq.

**[105]    Products Liability**  🔑

A product can be defective within the meaning of
the Indiana Product Liability Act (IPLA) because
of a manufacturing flaw, a defective design or
a failure to warn of the dangers while using the
product. Ind. Code Ann. § 34-20-2-1.

**[106]    Products Liability**  🔑

The Indiana Product Liability Act (IPLA)
governs strict liability and negligence claims.
Ind. Code Ann. § 34-20-1-1 et seq.

**[107]  Sales** 🔑

Breach of implied warranty and breach of express warranty claims are not recognized under the Indiana Product Liability Act (IPLA). Ind. Code Ann. § 34-20-1-1.

**[108]  Sales** 🔑

Warranty claims can be asserted under Indiana's Uniform Commercial Code (UCC) and independent from the Indiana Product Liability Act (IPLA). Ind. Code Ann. §§ 26-1-2-101 et seq.

**[109]  Sales** 🔑

Indiana law does not require vertical privity between a consumer and a manufacturer as a condition to a claim by the consumer against the manufacturer for breach of the manufacturer's implied warranty of merchantability.

**[110]  Sales** 🔑

Breach of express warranty claims, even if asserted for the recovery of physical harm, are not subsumed by the Indiana Products Liability Act (IPLA), particularly in light of the legislative inaction as to the relationship between Indiana's version of the Uniform Commercial Code (UCC) and the IPLA. Ind. Code Ann. §§ 26-1-2-313(1), 34-20-1-1 et seq.

**[111]  Sales** 🔑

Under Indiana law, vertical privity is not required to pursue a breach of warranty claim based on alleged express warranties.

**[112]  Sales** 🔑

Patients' claims in multidistrict litigation (MDL) for breach of the implied and express warranties, alleging that seller's breast implants deviated from the pre-market approvals (PMA) received

from the Food and Drug Administration (FDA), were viable under Kentucky law.

**[113]  Sales** 🔑

Under Kentucky law, privity of contract is an essential element of a claim for breach of an implied warranty.

**[114]  Sales** 🔑

Under Kentucky law, privity of contract does not extend beyond the buyer-seller setting, for purposes of a claim of breach of an implied warranty, and an intervening purchaser destroys privity; however, an actual and direct promise for the benefit of a third party will be sufficient to create privity between the promisor and the third party beneficiary.

**[115]  Sales** 🔑

Under Kentucky law, contractual privity is not necessary, for purposes of a breach of an express warranty claim, because privity exists when the manufacturer made express warranties directly to the intended consumer of the product.

**[116]  Sales** 🔑

Patients' claims in multidistrict litigation (MDL) for breach of implied warranty of merchantability, alleging that seller's breast implants deviated from the pre-market approvals (PMA) received from the Food and Drug Administration (FDA), were viable under Michigan law.

**[117]  Sales** 🔑

Patients' claims in multidistrict litigation (MDL) for breach of express warranty, alleging that seller's breast implants deviated from the pre-market approvals (PMA) received from the Food and Drug Administration (FDA), were viable under Michigan law to the extent they were based on patients' status as third-party beneficiaries

of the warranty or on the Michigan Uniform Commercial Code (UCC). Mich. Comp. Laws Ann § 440.2101 et seq.

**[118]    Sales** 🔑

Under Michigan law, contractual privity is required for a breach of express warranty claim based on Michigan's version of the Uniform Commercial Code (UCC). Mich. Comp. Laws Ann § 440.2101 et seq.

**[119]    Sales** 🔑

Under Michigan law, an express warranty running from a remote manufacturer to a consumer does not create the requisite contractual privity for a breach of express warranty claim.

**[120]    Sales** 🔑

An intended third-party warranty beneficiary is in privity of contact with the original parties for purposes of an express warranty claim under Michigan law. Mich. Comp. Laws Ann. § 600.1405(1).

**[121]    Sales** 🔑

Under Michigan law, the privity requirement of the Michigan Uniform Commercial Code (UCC) is inapplicable to a products liability action based on express warranty. Mich. Comp. Laws Ann § 440.2101 et seq.

**[122]    Sales** 🔑

Patients' claims in multidistrict litigation (MDL) for breach of implied warranty of merchantability, alleging that seller's breast implants deviated from the pre-market approvals (PMA) received from the Food and Drug Administration (FDA), were viable under Nevada.

**[123]    Sales** 🔑

Patients' claims in multidistrict litigation (MDL) for breach of implied warranty of merchantability, alleging that seller's breast implants deviated from the pre-market approvals (PMA) received from the Food and Drug Administration (FDA), were viable under New York law; claims were based on patients' personal injuries allegations, that implants increased their risk of developing breast-implant associated anaplastic large cell lymphoma (BIA-ALCL).

**[124]    Sales** 🔑

Under New York law, there is no requirement of privity for a breach of implied warranty claim so long as the plaintiff's claim is one for personal injury.

**[125]    Sales** 🔑

Patients' claims in multidistrict litigation (MDL) for breach of implied warranty of merchantability, alleging that seller's breast implants deviated from the pre-market approvals (PMA) received from the Food and Drug Administration (FDA), were viable under Ohio law to the extent they were based on Ohio's Uniform Commercial Code (UCC). Ohio Rev. Code Ann. § 1302.26 et seq.

**[126]    Sales** 🔑

An express warranty claim, but not an implied warranty claim, may be asserted under the Ohio Product Liability Act (OPLA). Ohio Rev. Code Ann. § 2307.71 et seq.

**[127]    Products Liability** 🔑

All common law claims arising from damages in connection with product liability claims are abrogated by the Ohio Product Liability Act (OPLA). Ohio Rev. Code Ann. § 2307.71(B).

**[128]    Sales** 🔑

To sustain a contract-based breach of implied warranty claim under Ohio law, the parties must be in privity; but when the manufacturer is so involved in the sales transaction that the distributor merely becomes the agent of the manufacturer, then the manufacturer and the ultimate consumer are in privity of contract.

**[129]    Sales** 🔑

Under Ohio law, a consumer may have privity of contract with a manufacturer, for purposes of a contract-based breach of implied warranty claim, if that consumer is an intended third-party beneficiary to a contract.

**[130]    Sales** 🔑

Patients' claims in multidistrict litigation (MDL) for breach of implied warranty of merchantability, alleging that seller's breast implants deviated from the pre-market approvals (PMA) received from the Food and Drug Administration (FDA), were not viable under Pennsylvania law.

**[131]    Sales** 🔑

Patients' claims in multidistrict litigation (MDL) for breach of implied warranty of merchantability, alleging that seller's breast implants deviated from the pre-market approvals (PMA) received from the Food and Drug Administration (FDA), were viable under Washington law to the extent they were based on a third party beneficiary theory.

**[132]    Sales** 🔑

Privity is required for a breach of an implied warranty claim under Washington law.

**[133]    Sales** 🔑

For a remote purchaser, implied warranties are enforceable under Washington law if the manufacturer was involved in the transaction, knew the purchaser's identity and purpose, communicated with the purchaser, or delivered the good.

**[134]    Sales** 🔑

Patients' claims in multidistrict litigation (MDL) for breach of implied warranty of merchantability, alleging that seller's breast implants deviated from the pre-market approvals (PMA) received from the Food and Drug Administration (FDA), were not viable under Wisconsin law, where patients' also asserted a number of strict liability tort claims.

**[135]    Federal Courts** 🔑

Dismissal of class allegations at the pleading stage should be done rarely and the better course is to deny such motion because the shape and form of a class action evolves only through the process of discovery. Fed. R. Civ. P. 23.

**[136]    Federal Civil Procedure** 🔑

A defendant may move to strike class action allegations prior to discovery in those rare cases where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met. Fed. R. Civ. P. 23.

**[137]    Federal Civil Procedure** 🔑

The usual practice favoring pre-class action certification discovery derives from the fundamental premise that claims, including class claims, should not be dismissed on the pleadings unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Fed. R. Civ. P. 12.

**[138]    Federal Civil Procedure** 🔑

Patients, who were citizens of 39 different states, lacked standing to serve as class representatives for state-specific subclasses of which no named patient was a member, in putative class action for state law claims for medical monitoring, unjust enrichment, and related claims brought on behalf of subclasses consisting of all persons nationwide who were implanted with seller's textured breast implant devices, but had not yet been diagnosed with breast-implant associated anaplastic large cell lymphoma (BIA-ALCL), and consisting of persons who signed liability releases as part of explant of their breast implant device. U.S. Const. art. 3, § 2, cl. 1.

**[139]    Federal Civil Procedure** 🔑

To establish Article III standing, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members. U.S. Const. art. 3, § 2, cl. 1.

**[140]    Federal Civil Procedure** 🔑

Class representatives must meet Article III standing requirements the moment a complaint is filed. U.S. Const. art. 3, § 2, cl. 1.

**[141]    Federal Civil Procedure** 🔑

Named plaintiffs in a class action lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury. U.S. Const. art. 3, § 2, cl. 1.

**[142]    Federal Civil Procedure** 🔑

Prior to the class certification stage, it is premature to examine named plaintiffs' standing to pursue claims on behalf of absent class members of a nationwide class in states other than those in which they were injured, because such an inquiry is one of predominance and only arises if the district court certifies the nationwide class. U.S. Const. art. 3, § 2, cl. 1.

**[143]    Federal Civil Procedure** 🔑

When it comes to state-specific subclasses in a class action, the district court may dismiss the state subclasses of which no plaintiff is a member at the pleading stage.

**[144]    Federal Civil Procedure** 🔑

Patients, who had received breast implants manufactured by breast implant seller, met the typicality requirement for certification of class represented by 63 named patients from 39 different states, and consisting of a nationwide class and subclasses comprised of persons from every state and territory of the United States who were implanted with seller's textured breast implant devices, but had not yet been diagnosed with breast-implant associated anaplastic large cell lymphoma (BIA-ALCL), and of persons who signed liability releases as part of explant of their breast implant device, in putative class action for state law claims for medical monitoring, unjust enrichment, and related claims; all claims stemmed from allegations that implants increased patients' risk of developing BIA-ALCL. Fed. R. Civ. P. 23(a).

**[145]    Federal Civil Procedure** 🔑

A defendant's challenge of typicality of a putative class may be premature and not appropriate at the pleading stage, because dismissal of class claims prior to discovery and a motion to certify the class by the plaintiff is the exception rather than the rule. Fed. R. Civ. P. 23(a).

**[146]    Federal Civil Procedure** 🔑

Putative class members need not share identical claims to satisfy the typicality requirement for class certification. Fed. R. Civ. P. 23(a).

**[147]    Federal Civil Procedure** 🔑

The typicality requirement for class certification is designed to align the interests of the class

and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals. Fed. R. Civ. P. 23(a).

**[148]    Federal Civil Procedure** 🔑

At the motion to strike stage, the burden on plaintiffs to show that questions of law or fact common to class members predominate over any questions affecting only individual members, as required for class certification, is less than at the class certification stage; the district court must determine only whether plaintiffs satisfied their burden to set forth factual allegations to advance a prima facie showing of predominance or that at least it is likely that discovery will reveal evidence so that critical elements of plaintiffs' claims may be proven on a class-wide basis. Fed. R. Civ. P. 23.

**[149]    Federal Civil Procedure** 🔑

District court's inquiry into whether questions of law or fact common to putative class members predominated over any questions affecting only individual members would have been premature at motion to strike stage of patients' putative class action against sellers of breast implant devices for medical monitoring, unjust enrichment, and related state law claims; absent discovery, district court would not be able to determine how the various state laws would apply to the facts of the patients, patients alleged a series of common factual and legal issues arising out of seller's conduct, and remedies sought by the putative class in the form of a class-wide medical monitoring program and recovery for economic losses would not present individualized issues that predominated over common ones. Fed. R. Civ. P. 23(b)(3).

**[150]    Federal Civil Procedure** 🔑

A district court may formulate subclasses in a putative class action independently of any proposals made by the parties. Fed. R. Civ. P. 23.

**[151]    Federal Civil Procedure** 🔑

District court's inquiry into whether a class action was superior to other available methods, as requirement for class certification, would have been premature at motion to strike stage of patients' putative class action against sellers of breast implant devices for medical monitoring, unjust enrichment, and related state law claims from various jurisdictions; without discovery, the court would be unable to examine whether applying the varying state laws to the facts would render a class action unmanageable and undesirable, and discovery would help patients formulate subclasses or group controlling state laws into limited categories that could make proposed class action more manageable and desirable. Fed. R. Civ. P. 23(b)(3).

**[152]    Federal Civil Procedure** 🔑

The superiority requirement for class certification asks the district court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication. Fed. R. Civ. P. 23(b)(3).

**[153]    Declaratory Judgment** 🔑

Subsection of class action rule permitting plaintiffs to maintain a class when the party opposing the class has acted or refused to act on grounds that apply generally to the class did not apply to patients' proposed nationwide class comprised of persons from every state and territory of the United States who were implanted with seller's textured breast implant devices, but had not yet been diagnosed with breast-implant associated anaplastic large cell lymphoma (BIA-ALCL), as required to certify class in patients' putative class action against sellers for medical monitoring; proposed class included class members from states that expressly prohibited no-injury medical monitoring claims. Fed. R. Civ. P. 23(b)(2).

**[154]    Federal Civil Procedure** 🔑

Subsection of class action rule permitting plaintiffs to maintain a class when the party opposing the class has acted or refused to act on grounds that apply generally to the class applies only when a single injunction or declaratory judgment would provide relief to each member of the class. Fed. R. Civ. P. 23(b)(2).

## OPINION

Martinotti, District Judge

**\*1** Before this Court are three motions by Defendants Allergan, Inc. and Allergan USA, Inc. ("Allergan"): (1) Motion to Strike/Dismiss Plaintiffs' Consolidated Class Action Complaint ("CAC") (ECF No. 118) and every other class action complaint filed in a lawsuit that is part of this Multi District Litigation ("MDL") pursuant to Fed. R. Civ. P. 12(b)(6) and 12(f) (ECF No. 171-2); (2) Motion to Dismiss Plaintiffs' complaints on preemption grounds pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 171-1); and (3) Motion to Dismiss Plaintiffs' Master Long Form Personal Injury Complaint ("PIC") (ECF No. 119) on non-preemption grounds and every other complaint filed in a lawsuit that is part of this MDL and alleges personal injury damages pursuant to Fed. R. Civ. P. 8(a), 9(b) and 12(b)(6) (ECF No. 171-3). Plaintiffs filed Oppositions to Allergan's Motions. (ECF Nos. 216, 219, 220.) Allergan filed a Notice of Supplemental Authority. (ECF No. 224.) Plaintiffs responded to Allergan's Notice. (ECF No. 225.) Allergan filed Replies in support of its Motions. (ECF Nos. 236, 237, 238.) Allergan filed a second Notice of Supplemental Authority. (ECF No. 246.) Plaintiffs responded to Allergan's second Notice. (ECF No. 250.) Having reviewed the parties' submissions filed in connection with the Motions and having heard oral argument on December 14, 2020 (ECF No. 261), [1] for the reasons set forth below and for good cause having been shown, Allergan's Motion to Strike/Dismiss CAC (ECF No. 171-2), Motion to Dismiss Plaintiffs' complaints on preemption grounds (ECF No. 171-1), and Motion to Dismiss PIC (ECF No. 171-3) are **GRANTED IN PART and DENIED IN PART.**

For the ease of the reader, the Court has included a table of contents:

## TABLE OF CONTENTS

I. **BACKGROUND**...——
A. Factual Background...——

B. Procedural History...——

II. **LEGAL STANDARD**...——
A. Rule 12(b)(6)...——

B. Rule 12(f)...——

C. Rule 23...——

III. **DECISION**...——
A. Allergan's Motion to Dismiss on Preemption Grounds (ECF No. 171-1)...——

1. Failure to Warn Claims...——

2. Plaintiffs' Manufacturing Defect Claims Are Not Preempted...——

3. Plaintiffs' Negligence *Per Se* Claims Are Not Preempted...——

4. Plaintiffs' Claims Concerning Investigational Devices Used In An Approved Clinical Trial Are Preempted...——

5. Plaintiffs' Negligent Failure to Warn Claims Alleging Allergan's Failure to Conduct Post-PMA Clinical Studies Are Preempted...——

6. Plaintiffs' Implied Warranty Claims Are Not Preempted...——

7. Plaintiffs' Claims for Negligent Misrepresentation, Breach of Express Warranty, and Breach of State Consumer Fraud and Deceptive Trade Practice Statutes Are Not Preempted...——

B. Allergan's Motion to Dismiss on Non-Preemption Grounds (ECF No. 171-3)...——

1. The Court Will Review the PIC with Leniency...——

2. The Court Will Not Scrutinize Whether Plaintiffs Have Sufficiently Alleged Present Injuries in the PIC...——

3. Plaintiffs' Manufacturing Defect Claims Should Not Be Dismissed...——

 **\*2**  4. Plaintiffs' Negligence *Per Se* Claims Are Not Viable in Some Jurisdictions...——

5. Plaintiffs' Report-Based Failure to Warn Claims Are Not Viable in Some Jurisdictions...——

6. Plaintiffs' Negligent Misrepresentation Claims...——

7. Plaintiffs Cannot Assert Warranty Claims in Some Jurisdictions...——

8. Summary for Allergan's Motion to Dismiss on Non-Preemption Grounds...——

C. Allergan's Motion to Strike/Dismiss Plaintiffs' Class Allegations (ECF No. 171-2)...——

1. Named Plaintiffs Lack Article III Standing in Some Jurisdictions...——

2. The Class Allegations Meet the Typicality Requirement...——

3. The Rule 23(b)(3) Inquiry Is Premature...——

4. A Rule 23(b)(2) Medical Monitoring Class Is Inapplicable...——

IV. **CONCLUSION**...——

## I. BACKGROUND

### A. Factual Background

Plaintiffs and class members are patients who had Allergan's BIOCELL textured breast implants and tissue expanders [2] (together, the BIOCELL implants) implanted into their bodies. (ECF No. 119 at ¶ 1.) Many of the Plaintiffs are breast cancer survivors or women having undergone prophylactic mastectomies, who were implanted with the BIOCELL implants in reconstructive surgery. (*Id.* at ¶ 8.) Plaintiffs allege the BIOCELL implants cause Breast-Implant Associated Anaplastic Large Cell Lymphoma ("BIA-ALCL"), a cancer of the immune system that develops in the area around an implant, often between the implant and the surrounding scar tissue. (*Id.* at ¶¶ 1, 27.) BIA-ALCL frequently presents as a late-onset seroma in the breast, which is an accumulation of fluid between the capsule and the implant, resulting in swelling of the breast. (ECF No. 118 at ¶ 138.) Left untreated,

BIA-ALCL can spread through the body and be fatal. (*Id.*) Symptoms of BIA-ALCL can arise even after the implant is removed. (*Id.* at ¶ 139.) Diagnostic procedures for detecting BIA-ALCL include computed tomography scans, magnetic resonance imagings, and fluid sampling. (*Id.* at ¶ 140.) BIA-ALCL is treated with the surgery to remove the implant and the surrounding capsule and tissue, and may require other treatments such as reconstructive surgery, chemotherapy, and radiation. (ECF No. 119 at ¶ 29.) Some of the Plaintiffs have been diagnosed with BIA-ALCL, others have had their implants removed, and others still have BIOCELL implants in their bodies. (*Id.* at ¶ 8.)

This case involves dozens of recalled models of the BIOCELL implants. (*Id.* at ¶ 41.) Many models were sold pursuant to three pre-market approvals ("PMAs") that Allergan received from the United States Food and Drug Administration ("FDA") on May 20, 2000, on November 17, 2006, and on February 20, 2013. (*Id.* at ¶ 53.) Plaintiffs allege these PMAs contained Conditions of Approval, requiring Allergan to (among other things) conduct studies of the devices' safety, report adverse events to the FDA, and revise the labeling to add warnings when necessitated by new safety information. (*Id.* at ¶¶ 59–61.) Other models, including the BIOCELL tissue expanders, were approved through the much less rigorous § 510(k) process. (*Id.* at ¶ 52.) Still others were approved for use in investigative studies under the Investigational Device Exemption ("IDE"). (*Id.* at ¶ 50.)

 **\*3**  For over 20 years, Allergan and its predecessor companies marketed and sold the BIOCELL Implants. (ECF No. 118 at ¶¶ 112–37.) To texturize the implant shell, Allergan allegedly employed a "salt loss" manufacturing process. (*Id.* at ¶¶ 13, 167.) The process applies solid particles of cubic salt over the implant shell surface, embedding the particles within. (*Id.*) The implant is then covered with another silicone layer, which is scrubbed off, and the shell is washed. (*Id.*) Plaintiffs state the FDA-approved manufacturing specifications require all solid particles be scrubbed off and dissolved. (*Id.* at ¶ 168.) Plaintiffs allege Allergan performs the final scrubbing process manually, which leaves solid particles and other residues on the implants' surface. (*Id.* at ¶ 169.) Plaintiffs claim these particles, residues, the implant's increased surface area resulting from the texturizing process, and the chronic friction that occurs between the body's tissues and the implant cause inflammation, increased T-cell activity, malignant T-cell transformation and, ultimately, BIA-ALCL. (*Id.* at ¶ 170.)

Allergan recalled the BIOCELL implants in July 2019 after the FDA found they posed a heightened risk of BIA-ALCL. (*Id.* at ¶¶ 138, 191–92.) Plaintiffs claim Allergan's textured implants increase the risk of BIA-ALCL by 3,000 times. (*Id.* at ¶ 158.) The FDA has concluded "the risk of BIA-ALCL with Allergan BIOCELL textured implants is approximately six times the risk of BIA-ALCL with textured implants from other manufacturers." (*Id.* at ¶ 193.) According to the FDA, 246,831 BIOCELL Implants have been recalled in the United States. (*Id.* at ¶ 386.)

As early as 1997, some women were reported to have developed BIA-ALCL after receiving the BIOCELL Implants. (*Id.* at ¶ 141.) Over the course of the next two decades, the number of reported cases of BIA-ALCL associated with the BIOCELL Implants continued to mount. (*Id.* at ¶¶ 141–45, 149, 154–57.) Through this period, Allergan allegedly concealed the risks of BIA-ALCL by failing to appropriately submit adverse event reports to the FDA or otherwise disclose to the public complete and accurate safety information regarding the BIOCELL Implants. (*Id.* at ¶ 209–20.)

On July 29, 2019, the FDA issued a Class I Recall notice. (*Id.* at ¶ 2.) According to the FDA, the continued distribution of the BIOCELL Implants "would likely cause serious, adverse health consequences and potentially death from BIA-ALCL." (*Id.* at ¶ 193.) Allergan refuses to pay the implants' users for the cost of explant surgeries to remove the implants or for ongoing monitoring and testing for BIA-ALCL. (*Id.* at ¶ 198.)

**B. Procedural History**

This litigation began as a series of actions filed in judicial districts throughout the country. (ECF No. 144 at 1.) By Order dated December 18, 2019, the United States Judicial Panel on Multidistrict Litigation transferred several of those matters to the District of New Jersey, thereby creating MDL No. 2921. (ECF No. 1.) The Panel has continued to transfer cases since that time, and Plaintiffs have directly filed others, such that this MDL currently consists of more than 562 member cases. (ECF No. 144 at 1–2.)

On May 26, 2020, Liaison Counsel for Plaintiffs and Co-Lead Plaintiffs' Counsel filed the PIC. (ECF No. 119.) The complaint asserts: claims for manufacturing defect, based on strict liability (Count I) and negligence (Count II); claims for failure to warn, based on strict liability (Count IV) and negligence (Count V); claims for general negligence (Count

III) and breach of the implied warranty of merchantability (Count VII), primarily based on the aforementioned defects; claims for negligent misrepresentation (Count VI) and breach of express warranty (Count VIII), based on false representations and warranties Allergan allegedly made regarding the safety of the BIOCELL implants. (ECF No. 216 at 29.) The complaint also asserts a claim for survivorship and wrongful death on behalf of representatives of decedents who died after being implanted with the BIOCELL implants (Count XI), loss of consortium on behalf of the spouses of those implanted with the BIOCELL implants (Count XII), and punitive damages (Count XIII). (*Id.* at 29–30.)

**\*4** On May 26, 2020, certain Plaintiffs filed the CAC. (ECF No. 118.) In addition to certain claims also asserted in the PIC (strict liability and negligent failure to warn, strict liability and negligent manufacturing defect, strict liability and negligent design defect (for non-PMA devices), and breach of implied warranty of merchantability), the CAC asserts claims for medical monitoring (Counts 300–05), violations of state consumer fraud and deceptive trade practices acts (Counts 330–82), unjust enrichment (Counts 383–436), declaratory judgment declaring that releases signed by certain class members are unenforceable (Counts 437–38), and rescission of those releases (Count 439). (ECF No. 216 at 30.) The CAC also seeks equitable relief in the form of a court-ordered medical monitoring program funded by Allergan. (*Id.*)

On August 7, 2020, Allergan filed a Motion to Strike/ Dismiss Plaintiffs' CAC and every other class action complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 12(f) (ECF No. 171-2), Motion to Dismiss Plaintiffs' complaints on preemption grounds pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 171-1), and a Motion to Dismiss Plaintiffs' PIC and every other complaint on non-preemption grounds pursuant to Fed. R. Civ. P. 8(a), 9(b) and 12(b)(6) (ECF No. 171-3). On October 7, 2020, Plaintiffs filed an Opposition to Allergan's Motion to Dismiss Plaintiffs' PIC and CAC on preemption grounds. (ECF No. 216.) On October 9, 2020, Plaintiffs filed an Opposition to Allergan's Motion to Strike/ Dismiss Plaintiffs' CAC (ECF No. 219) and an Opposition to Allergan's Motion to Dismiss Plaintiffs' PIC and CAC on non-preemption grounds (ECF No. 220). On October 14, 2020, Allergan filed a Notice of Supplemental Authority. (ECF No. 224.) On October 15, 2020, Plaintiffs responded to Allergan's October 14, 2020 Notice. (ECF No. 225.) On November 8, 2020, Allergan filed a Reply in Support of its Motion to Dismiss Plaintiffs' PIC on non-preemption grounds (ECF No. 236), a Reply in Support of its Motion to Dismiss

Plaintiffs' CAC (ECF No. 237), and a Reply in Support of its Motion to Dismiss Plaintiffs' PIC and CAC on non-preemption grounds (ECF No. 238). On November 20, 2020, Allergan filed another Notice of Supplemental Authority. (ECF No. 246.) On November 24, 2020, Plaintiffs responded to Allergan's November 20, 2020 Notice. (ECF No. 250.)

On December 14, 2020, the Court held oral argument on the motions (ECF No. 261) and permitted simultaneous supplemental briefing, which were filed on January 5, 2020 (ECF Nos. 262, 263). On January 27, 2021, Allergan filed a third Notice of Supplemental Authority. (ECF No. 267.) On January 28, 2021, Plaintiffs responded to Allergan's January 27, 2021 Notice. (ECF No. 268.) On February 10, 2021, Allergan filed a fourth Notice of Supplemental Authority. (ECF No. 271.) On February 11, 2021, Plaintiffs responded to Allergan's February 11, 2021 Notice. (ECF No. 273.)

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

In deciding a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted). However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286, 106 S.Ct. 2932 (citations omitted). Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (citing *Papasan*, 478 U.S. at 286, 106 S.Ct. 2932).

**\*5** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a probability requirement." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "further factual enhancement" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557, 127 S.Ct. 1955).

**[1]  [2]  [3]** "Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679, 129 S.Ct. 1937. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged —but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* (citing *Fed. R. Civ. P. 8(a)(2)*). However, courts are "not compelled to accept 'unsupported conclusions and unwarranted inferences,' " *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citing *Schuylkill Energy Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), nor "a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286, 106 S.Ct. 2932 (citations omitted).

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to *Rule 12(b)(6)*, the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss to a summary judgment motion, including items that are *integral to or explicitly relied upon* in the complaint." *Coulter v. Doerr*, 486 F. App'x 227, 228 (3d Cir. 2012) (citing *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999)).

### B. Rule 12(f)

**[4]  [5]  [6]** A court may, upon motion or *sua sponte*, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Fed. R. Civ. P. 12(f)*. "The purpose of a motion to strike is to simplify the pleadings and save time and expense by excising from a plaintiff's complaint any redundant, immaterial, impertinent, or scandalous matter which will not have any possible bearing on the outcome of the litigation." *Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 609 (D.N.J. 2002) (citations and internal quotations omitted). However, "[b]ecause of the

drastic nature of the remedy, ... motions to strike are usually 'viewed with disfavor' and will generally 'be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues.' " *Id.* (citing *Tonka Corp. v. Rose Art Indus., Inc.*, 836 F. Supp. 200, 217 (D.N.J. 1993)); *see also Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d 698, 702 (D.N.J. 2013) (explaining that motions to strike are extremely disfavored). "A court possesses considerable discretion in disposing of a motion to strike under Rule 12(f)." *Kim v. Baik*, No. 06-3604, 2007 U.S. Dist. LEXIS 13553, 2007 WL 674715, at *5 (D.N.J. Feb. 27, 2007) (citing *River Rd. Dev. Corp. v. Carlson Corporation-Northeast*, No. 89-7037, 1990 U.S. Dist. LEXIS 6201, 1990 WL 69085, at *2 (E.D. Pa. May 23, 1990)). In short, this is not the time to decide motions *in limine.* The issue to be resolved is whether there is some harm will result from permitting something to be alleged at all—a high bar.

## C. Rule 23

**\*6  [7]**  "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 348, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) (citing *Califano v. Yamasaki*, 442 U.S. 682, 700–701, 99 S. Ct. 2545, 61 L. Ed. 2d 176 (1979).). "To invoke this exception, every putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012). A class may be certified pursuant to Rule 23(a) when:

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These four requirements are customarily referred to as: (1) numerosity; (2) commonality; (3) typicality; and (4) adequate representation. *Dukes*, 564 U.S. at 349, 131 S.Ct. 2541. In addition, Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b) (3). These requirements are known as "predominance" and "superiority," respectively. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008). Additionally, when certification is sought under Rule 23(b)(3), the Third Circuit has found that a prerequisite to an analysis of the Rule 23(a) requirements is the proposed class "must be currently and readily ascertainable based on objective criteria." *Marcus*, 687 F.3d at 592–93 (citations omitted).

 **[8]  [9]  [10]  [11]**  "[T]he requirements set out in Rule 23 are not mere pleading rules." *Hydrogen Peroxide*, 552 F.3d at 316 (citing *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675–77 (7th Cir. 2001)). "A court may 'delve beyond the pleadings to determine whether the requirements for class certification are satisfied,' " and conduct a "preliminary inquiry into the merits." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 306 (3d Cir. 2011) (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 167 (3d Cir. 2001)). "The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence." *Marcus*, 687 F.3d at 591 (citing *Hydrogen Peroxide*, 552 F.3d at 307). This requires "actual" not "presumed" conformance with Rule 23's requirements. *Id.* (citing *Hydrogen Peroxide*, 552 F.3d at 326). "Class certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met." *Hydrogen Peroxide*, 552 F.3d at 309 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)).

## III. DECISION

### A. Allergan's Motion to Dismiss on Preemption Grounds (ECF No. 171-1)

Allergan argues Plaintiffs' claims trigger express and implied preemption and are mostly foreclosed by the Medical Device Amendments ("MDA"). (ECF No. 171-1 at 34.) Plaintiffs counter that their claims regarding Allergan's violations of its duties under state law parallel federal requirements and therefore are not preempted. (ECF No. 216 at 31.) The Court will conduct the preemption analysis according to the principles discussed below.

 **\*7  [12]  [13]  [14]**  "Preemption is an affirmative defense that the defendant has the burden to prove." *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 130 (3d Cir. 2018) (citing *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 n.6 (3d Cir. 2016)). "The question whether a certain state

action is pre-empted by federal law is one of congressional intent." *Gade v. National Solid Wastes Management Ass'n,* 505 U.S. 88, 96, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (citing *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 208, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985)). "Such a determination of congressional intent and of the boundaries and character of a pre-empting congressional enactment is one of federal law." *International Longshoremen's Ass'n. v. Davis,* 476 U.S. 380, 388, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986). "The law of the transferee forum applies ... to federal questions, though the Court may give the law of the transferor forum 'close consideration.' " *United States v. Bristol-Myers Squibb Co. (In re Plavix Mktg., Sales Practice & Prods Liab. Litig.),* 332 F. Supp. 3d 927, 936 (D.N.J. 2017) (citing *In re Nazi Era Cases Against German Defendants Litig.,* 320 F. Supp. 2d 204, 214 (D.N.J. 2004), *aff'd,* 153 F. App'x 819 (3d Cir. 2005)); *see also Becnel v. Anco Insulations, Inc.,* No. 08-44556, 2011 WL 304866 at *2, 2011 U.S. Dist. LEXIS 9920 at *7 (E.D. Pa. Jan. 28, 2011) ("[T]he MDL transferee court applies the federal law of the circuit where it sits.") (citations omitted). Accordingly, the Court will primarily apply the federal law from this District and the Third Circuit on the issue of preemption.

The law relating to the field of medical devices presents a unique set of preemption issues. Congress introduced the MDA, 21 U.S.C. § 360c *et seq.,* to the Federal Food, Drug, and Cosmetic Act ("FDCA") to establish a new regulatory regime implemented by the FDA on "various levels of oversight for medical devices, depending on the risks they present." *Riegel v. Medtronic, Inc.,* 552 U.S. 312, 316, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008). "Class I devices pose the least risks, Class II devices are 'more harmful,' and Class III devices pose the greatest risks." *Shuker v. Smith & Nephew, PLC,* 885 F.3d 760, 765 (3d Cir. 2018) (citing *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 477, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); 21 U.S.C. § 360c(a)(1)). "Class III devices receive 'the most federal oversight,' and Class I and II devices receive much less." *Id.* (citing *Riegel,* 552 U.S. at 316–17, 128 S.Ct. 999). Before marketing a Class III medical device, the manufacturer must submit a PMA application that the FDA can grant "only after it determines that a device offers a reasonable assurance of safety and effectiveness." *Riegel,* 552 U.S. at 323, 128 S.Ct. 999 (citing 21 U.S.C. § 360e(d)). However, "[a] new device need not undergo premarket approval if the FDA finds it is 'substantially equivalent' to another device exempt from premarket approval." *Id.* (citing 21 U.S.C. § 360c(f)(1)(A)). The FDA "review of devices for substantial equivalence is known as the § 510(k) process,

named after the statutory provision describing the review." *Id.* Class I and Class II devices and most Class III devices are subject to the § 510(k) process. *Id.* at 317, 128 S.Ct. 999; *Shuker,* 885 F.3d at 767.

[15]  [16]  A state law product liability or tort claim relating to a medical device may be expressly or impliedly preempted by the MDA. The MDA "contains a broad express preemption provision," which:

> [P]roclaims 'no State ... may establish or continue in effect with respect to a device ... any requirement' that 'is different from, or in addition to,' any federal requirement and that relates either 'to the safety or effectiveness of the device' or 'to any other matter' included in a federal requirement applicable to the device.

*Shuker,* 885 F.3d at 767 (citing 21 U.S.C. § 360k(a)). That is to say, "[s]tate requirements are pre-empted under the MDA only to the extent that they are 'different from, or in addition to' the requirements imposed by federal law." *Riegel,* 552 U.S. at 330, 128 S.Ct. 999 (citing 21 U.S.C. § 360k(a)(1)). Therefore, "§ 360k does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case 'parallel,' rather than add to, federal requirements." *Id.* The implied preemption issue is explained in *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), where the Supreme Court "under the auspices of the MDA" foreclosed a state common law fraud-on-the-FDA tort claim. *Sullivan v. Novartis Pharms. Corp.,* 602 F. Supp. 2d 527, 535 (D.N.J. 2009) (citing *Buckman,* 531 U.S. 341, 121 S.Ct. 1012). "The FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with the medical device provisions: 'All such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States.' " *Buckman,* 531 U.S. at 349 n.4, 121 S.Ct. 1012 (citing 21 U.S.C. § 337(a)).

**\*8**  Allergan insists there are four principles that determine whether a state law product liability or tort claim avoids preemption under the MDA. (ECF No. 261 at 9:1–2.) First, if the controlling state law provides something mandatory where the federal law makes it discretionary, then the state law requires something different from or in addition to the federal requirements. *Id.* at 9:7–10. Second, to avoid preemption, a device specific requirement must have been breached and that device specific requirement has to come from the PMA. *Id.* at 9:14–17. Third, to avoid preemption, genuine equivalence is

required between the federal regulation and the parallel state law. *Id.* at 10:1–4. Fourth, implied preemption is triggered when the source of the state law duty in fact is in the federal regulations, which are critical to the state law claims. *Id.* at 10:9–13. However, these four principles add nothing to the preemption analysis the Court just discussed.

The first principle merely restates the express preemption inquiry under *Riegel*, which holds "state requirements are pre-empted under the MDA only to the extent that they are 'different from, or in addition to' the requirements imposed by federal law." *Riegel*, 552 U.S. at 330, 128 S.Ct. 999 (citing 21 U.S.C. § 360k(a)(1)).

The second principle refers to the first prong in the two-step framework for the express preemption inquiry under *Riegel*: (1) whether the federal requirements are applicable to the specific device at issue, and (2) if so, whether the controlling state law requires something different from or in addition to the federal one, and relates to the safety and effectiveness of the device. *Id.* at 321–22, 128 S.Ct. 999. But the Court need not consider the first prong here. The BIOCELL implants are approved under one of the three regulatory paths: (1) the PMA, (2) the IDE, and (3) § 510(k). The PMA imposes requirements specific to a Class III device. *Horn v. Thoratec Corp.*, 376 F.3d 163, 171–72 (3d Cir. 2004); *Steele v. Depuy Orthopaedics, Inc.*, 295 F. Supp. 2d 439, 452 (D.N.J. 2003). The IDE is also device-specific. *Gile v. Optical Radiation Corp.*, 22 F.3d 540, 542 (3d Cir. 1994) (citing 21 U.S.C. § 360j(g)(2)(A)) ("Persons seeking an exemption from pre-market approval for a particular medical device (an 'investigational device exemption' or 'IDE') must apply to the FDA for permission to undertake clinical investigations."). Because the PMA and the IDE are device-specific federal requirements, the first prong is met for Plaintiffs' claims concerning PMA/IDE-approved BIOCELL implants, so that the Court need only examine the second prong. As for § 510(k), even though its review process is device-specific, "§ 510(k) does not trigger preemption." *Soufflas v. Zimmer, Inc.*, 474 F. Supp. 2d 737, 747 (E.D. Pa. 2007) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 493–94, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). As a result, a preemption analysis for Plaintiffs' claims concerning § 510(k)-approved BIOCELL implants is unnecessary. Because either the first prong is inconsequential or no preemption analysis is necessary in analyzing Plaintiffs' claims, the Court need not examine the first prong or apply the two-step framework under *Riegel.*

The third principle also adds nothing new to the express preemption inquiry under *Riegel.* "State and federal requirements are not genuinely equivalent if a manufacturer could be held liable under the state law without having violated the federal law." *Wolicki-Gables v. Arrow Int'l, Inc.*, 634 F.3d 1296, 1300 (11th Cir. 2011) (citing *McMullen v. Medtronic, Inc.*, 421 F.3d 482, 489 (7th Cir. 2005)). In other words, genuine equivalence is found if the controlling state law requires something "different from, or in addition to" the federal requirements.

The fourth principle is essentially restating the implied preemption inquiry under *Buckman*, which prohibits a private enforcement of the FDCA. *Buckman*, 531 U.S. at 349 n.4, 121 S.Ct. 1012 (citing 21 U.S.C. § 337(a)).

In conclusion, Plaintiffs' allegations of Allergan's violations of state law duties, if in parallel with federal requirements and not amounting to a private enforcement of the FDCA, are not preempted.

### 1. Failure to Warn Claims

#### a. Plaintiffs' Label-Based Failure to Warn Claims Are Expressly Preempted

**\*9** Allergan claims Plaintiffs' attacks on the adequacy of Allergan's FDA-approved labels would require something different from, or in addition to, what the controlling federal regulations mandate, and therefore cannot survive express preemption. (ECF No. 171-1 at 41.) In particular, Allergan argues Plaintiffs' misbranding claims are preempted, as they have the effect of establishing a substantive requirement for a specific device, e.g., a specific labeling requirement, and are different from, or in addition to, the FDA requirement. (ECF No. 238 at 21–22.) Allergan also states Plaintiffs cannot assert a claim for Allergan's failure to change the label through a Changes Being Effected ("CBE") supplement, because the CBE regulation permits, but does not require, such a change. (ECF No. 171-1 at 53–54.) Allergan maintains any claim that would convert the permissive CBE process into a mandatory submission is expressly preempted, as such a claim is necessarily "different from or in addition to" the FDA's regulatory scheme. (ECF No. 238 at 20.)

Plaintiffs counter their label-based failure to warn claims are not preempted, because they are based on Allergan's violations of parallel state law. (ECF No. 216 at 34.) Plaintiffs

contend Allergan has a separate duty under state law to warn consumers of the risk of developing BIA-ALCL by patients with the use of BIOCELL implants. (*Id.* at 34–35.) Plaintiffs suggest such a state law duty parallels with two independent federal law requirements: (1) the PMAs for the BIOCELL implants require Allergan to submit a PMA supplement when unanticipated adverse effects or increases in the incidence of anticipated adverse effects necessitate a labeling modification, including, if permitted, a CBE submission; and (2) the FDCA misbranding provisions require Allergan to update its labeling that is false or misleading. (*Id.* at 35–37.) Plaintiffs insist, when the CBE regulation applies, the PMA requires Allergan to act before the FDA approves the label change. (ECF No. 263 at 7.) The Court disagrees.

"The MDA expressly pre-empts state requirements 'different from, or in addition to, any requirement applicable ... to the device' under federal law." *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 321, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008) (citing 21 U.S.C. § 360k(a)(1)). "[O]nce there is any device-specific requirement (as there always is for Class III devices receiving PMA), then all state law claims are preempted if they differ from or add to any federal requirements applicable to the device." *McLaughlin v. Bayer Corp.*, 172 F. Supp. 3d 804, 814 n.5 (E.D. Pa. 2016). "To the extent that [the plaintiff] asserts a failure to warn claim based only on [the defendant's] failure to comply with FDA regulations, however, such a claim is not expressly preempted." *Mendez v. Shah*, 28 F. Supp. 3d 282, 300 (D.N.J. 2014) (citing *Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 769 (5th Cir. 2011)). That is to say, if Plaintiffs' label-based failure to warn claims differ from or add to *any* requirement in either the PMAs or the FDCA's misbranding provisions, the claims will be expressly preempted.

[17] Here, Plaintiffs allege Allergan failed to comply with requirements in the PMAs for the BIOCELL implants. (ECF No. 216 at 35.) In particular, Plaintiffs claim the CBE regulations direct and require Allergan to update the warnings on the BIOCELL implants, which Allergan allegedly fails to do in violation of the PMAs. (ECF No. 119 at ¶¶ 63–64.) However, as discussed below, the CBE process is not mandatory.

[18] The PMAs require Allergan to submit a PMA supplement for the FDA to review and approve before making any change affecting the safety or effectiveness of the device, unless made through the CBE process. (ECF No. 119 at ¶ 61.) This CBE exception "allows a manufacturer to 'add or strengthen a contraindication, warning, [or] precaution'

without pre-approval from the FDA." *Nelson v. Biogen Idec, Inc.*, No. 12-7317, 2018 WL 1960441 at *13, 2018 U.S. Dist. LEXIS 70283 at *37 (D.N.J. April 25, 2018) (citing *Wyeth v. Levine*, 555 U.S. 555, 614, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009)). "Nevertheless, if the manufacturer can show clear evidence that the FDA would not have approved the labeling change, the CBE exception does not apply." *Id.* (citing *Wyeth*, 555 U.S. at 571, 129 S.Ct. 1187). In other words, "[t]he CBE procedure is permissive, not mandatory." *Brooks v. Mentor Worldwide, LLC*, No. 19-2088-KHV, 2019 WL 4628264 at *6, 2019 U.S. Dist. LEXIS 161820 at *13 (D. Kan. Sep. 23, 2019), *aff'd* 985 F.3d 1272 (10th Cir. 2021) (citations omitted); *see also* 21 C.F.R. § 814.39(d)(1) ("After FDA approves a PMA, any change ... to reflect newly acquired information that enhances the safety of the device or the safety in the use of the device *may be* placed into effect by the applicant prior to ... a written FDA order approving the PMA supplement provided that: (i) The PMA supplement and its mailing cover are plainly marked 'Special PMA Supplement - Changes Being Effected.' ").

*10 Here, Plaintiffs have not alleged Allergan's failure to comply with any FDA labeling requirement. Though the CBE process allows Allergan to update the label of its implants, Allergan is not obligated to do so, because the CBE process is not mandatory. However, Plaintiffs' label-based failure to warn claims would require Allergan to update warnings on the implants' label. This amounts to a state law duty that differs from or adds to the federal requirements in the PMAs, which triggers express preemption. *See Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1280 (10th Cir. 2021) (citations omitted) ("And absent a federal requirement that [a medical device manufacturer] do so, federal law expressly preempts any state-law duty requiring a manufacturer to update its labeling."); *In re: Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200, 1205 (8th Cir. 2010) ("Even if federal law allowed [the defendant] to provide additional warnings, as [the plaintiff] alleged, any state law imposing an additional requirement is preempted by § 360k."); *Heisner v. Genzyme Corp.*, No. 08-C-593, 2010 WL 894054, at *3, 2010 U.S. Dist. LEXIS 21339, at *7–8 (N.D. Ill. March 8, 2010) (concluding the MDA preempts all negligence and strict liability claims turning on the defendant's failure to provide supplemental warnings because CBE is not mandatory); *McMullen v. Medtronic, Inc.*, 421 F.3d 482, 489 (7th Cir. 2005) ("Because § 814.39 permits, but does not require, a manufacturer to provide interim supplemental warnings pending approval by the FDA, a common-law duty to provide such a warning imposes an additional obligation."). The PMA

requirement that a PMA supplement "be submitted when unanticipated adverse effects, increases in the incidence of anticipated adverse effects, or device failures necessitate a labeling ... modification" (ECF No. 119 at ¶ 61) does not mandate a change of label. Instead, the PMA only requires a submission to the FDA, which, depending on the FDA's decision, may or may not translate into a mandatory label change. Therefore, Plaintiffs cannot allege Allergan's failure to submit a PMA supplement to the FDA as the basis for their label-based failure to warn claims, though this alleged failure may support other theories for a failure to warn claim. Accordingly, the Court concludes Plaintiffs' label-based failure to warn claims are expressly preempted.

**b. Plaintiffs' Report-Based Failure
to Warn Claims Are Not Preempted**

Allergan argues Plaintiffs' accusation of Allergan's alleged failure to make proper adverse event reports to the FDA is not based on any parallel state law duty, and is therefore expressly preempted. (ECF No. 171-1 at 43.) Allergan maintains Plaintiffs' allegations of Allergan's method of reporting as inadequate is similarly expressly preempted, because there is no state law duty to warn grounded in a method of reporting to the FDA. (*Id.* at 48–49.) Allergan explains the adverse event information that made its way into the MAUDE database accessible by physicians does not correspond to a warning to physicians about any specific report or risk, as it is the FDA that decides whether to exercise its regulatory prerogative to publish the information in the first place or take some other action. (ECF No. 262 at 11–12.) Allergan also insists Plaintiffs' report-based failure to warn claims are impliedly preempted, because Plaintiffs, as private persons, cannot base their warning claims on the purported breach of a federal duty, and any attempt to recognize such a duty would impermissibly interfere with the federal statutory scheme's requirements. (ECF No. 171-1 at 49–50.)

Plaintiffs argue their report-based failure to warn claims are not preempted, because these state law claims parallel the FDA requirements regarding the reporting of adverse safety information. (ECF No. 216 at 40.) Plaintiffs cite numerous court decisions holding a device manufacturer can violate its state law duty to warn by failing to report adverse safety information to the FDA. (*Id.* at 41–45.) Plaintiffs allege Allergan's improper submission to the FDA of Alternative Summary Reports ("ASRs"), which contain a series of alphanumeric codes (not a narrative description) and are not

made publicly available for years, rather than Medical Device Reports ("MDRs"), which contain a full narrative description of the event and are published in the FDA's MAUDE database every month, violates both the state law duty to warn patients or their physicians and the parallel federal requirements. (*Id.* at 51–52.) The Court agrees.

**[19]** Here, for the preemption inquiry, the Court will not conduct a state-by-state analysis to examine whether Plaintiffs' report-based failure to warn claims are based on a parallel state law duty. The Court determines, and the parties agree, preemption should be examined at the federal level, rather than on a state-by-state basis. (ECF No. 261 12:11–15, 24:13–16); *see also Buquer v. City of Indianapolis,* No. 1:11-cv-00708-SEB-MJD, 2012 WL 830316, at *6, 2012 U.S. Dist. LEXIS 31830, at *16 (S.D. Ind. March 9, 2012)* ("[P]reemption must be considered on a national and not a state-by-state basis."). This avoids an across-the-board dismissal of report-based failure to warn claims in all jurisdictions, if some jurisdictions recognize a report-based duty to warn not different from or in addition to federal reporting requirements.

***11*** **[20]** "In states that recognize failure to report claims, ... a manufacturer's failure to report adverse events to the FDA can form the basis of a parallel claim that survives preemption." *Nunn v. Mentor Worldwide, LLC,* 847 Fed.Appx. 373, 376 (9th Cir. 2021) (citations omitted); *see also Sewell v. Mentor Worldwide, LLC,* 847 Fed.Appx. 380, —— (9th Cir. 2021) (same); *Vieira v. Mentor Worldwide, LLC,* 845 Fed.Appx. 503, —— (9th Cir. 2021) (same); *Billetts v. Mentor Worldwide, LLC,* 847 Fed.Appx. 377, —— (9th Cir. 2021) (same). Accordingly, the Court declines to dismiss Plaintiffs' report-based failure to warn claims on preemption grounds, and will conduct a state-by-state analysis in Part III.B.5, *infra,* to examine the claims' viability in different jurisdictions. This is consistent with the precedents in the Third Circuit, as discussed below.

**[21]** **[22]** The Restatement (Second) of Torts provides "a supplier's duty to warn is discharged by providing information about the product's dangerous propensities to a third person upon whom it can reasonably rely to communicate the information to the ultimate users of the product or those who may be exposed to its hazardous effects." Restatement (Second) of Torts § 388 cmt. n (1965). This Restatement may establish a device manufacturer's traditional state law duty to warn by reporting adverse safety events to the FDA.[3] *Freed v. St. Jude Med.,* Inc., 364 F. Supp. 3d 343,

358–60 (D. Del. 2019); *Silver v. Medtronic, Inc.*, 236 F. Supp. 3d 889, 900 (M.D. Pa. 2017); *Richardson v. Bayer Healthcare Pharm. Inc.*, No. 4:15-cv-00443-BLW, 2016 WL 4546369, at *8 (D. Idaho Aug. 30, 2016); *McLaughlin v. Bayer Corp.*, 172 F. Supp. 3d 804, 838 (E.D. Pa. 2016). The underlying rationale of a report-based failure to warn claim is that the FDA reporting regulations "are related to the manufacturer's duty to provide the [FDA] with information regarding a device's safety and effectiveness, which is then disseminated to the public." *Freed*, 364 F. Supp. 3d at 358 n.13 (citing *Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 770–71 (5th Cir. 2011)). "A manufacturer's failure to provide such information to the FDA is a parallel violation of a state duty ... to provide reasonable and adequate information regarding a product's risks." *Id.* (citing *Hughes*, 631 F.3d at 770–71). "[T]he FDA may be reasonably relied upon to disclose information regarding medical device failures through the publicly accessible database when provided with that information." *Silver*, 236 F. Supp. 3d at 900. Accordingly, Plaintiffs' report-based failure to warn claims are not expressly preempted.

**[23]** **[24]** For implied preemption, the Court is bound by the Third Circuit's interpretation of the holdings in *Buckman.* The application of *Buckman* "is often limited to 'fraud-on-the-agency' claims and not extended to claims based on state law tort principles." *Mendez v. Shah*, 28 F. Supp. 3d 282, 291 (D.N.J. 2014) (citing *Bausch v. Stryker Corp.*, 630 F.3d 546, 557 (7th Cir. 2010)); *see also Freed*, 364 F. Supp. 3d at 352 (citing *Hughes*, 631 F.3d at 775) ("To avoid implied preemption under *Buckman*, a claim must assert violation of a state tort duty that also violates some FDA requirement."); *Bull v. St. Jude Med., Inc.*, No. 17-1141, 2018 WL 3397544 at *9, 2018 U.S. Dist. LEXIS 115730 at *27 (E.D. Pa. July 12, 2018) ("State law claims that allege liability based on a common law tort theory and which parallel federal law claims ... are not impliedly preempted under *Buckman*."). A failure to warn claim that "can be established solely by evidence of fraud on the agency is [impliedly] preempted." *Chester v. Boston Sci. Corp.*, No. 16-02421, 2017 WL 751424, at *10, 2017 U.S. Dist. LEXIS 26676, at *27 (D.N.J. Feb. 27, 2017) (citing *Cornett v. Johnson & Johnson*, 211 N.J. 362, 48 A.3d 1041, 1056 (N.J. 2012)); *see also Stout v. Advanced Bionics, LLC*, No. 2:11cv1061, 2013 WL 12133966 at *5, 2013 U.S. Dist. LEXIS 203717 at *13 (W.D. Pa. Sept. 19, 2013) (concluding the plaintiffs' negligence claims based on the device manufacturer's failure to obtain supplemental PMA approval for a change of supplier are "disguised fraud-on-the-

FDA claims" and impliedly preempted, because the "approval is an administrative requirement created by the FDA, not a substantive safety requirement of state law"). Here, Plaintiffs' report-based failure to warn claims are based on state law tort principles illustrated in § 388 of the Restatement (Second) of Torts, and not solely based on Allergan's alleged fraud on the FDA. Such an alleged violation of the state law duty to "warn physicians about the risks of [a medical device] based on the failure to fully comply with its federal duty to report all adverse events to the FDA" represents "a traditional state failure to warn theory premised on alleged non-compliance with federal regulations—that it is not impliedly preempted under *Buckman*." *Bull*, 2018 WL 3397544, at *9, 2018 U.S. Dist. LEXIS 115730, at *28.

**\*12** Accordingly, the Court finds Plaintiffs' report-based failure to warn claims are not preempted.

## 2. Plaintiffs' Manufacturing Defect Claims Are Not Preempted

**[25]** Allergan concedes claims for manufacturing defects, when properly alleged, may not be expressly or impliedly preempted, but contends Plaintiffs' manufacturing defect claims fail for several reasons. (ECF No. 171-1 at 57.) First, Allergan argues Plaintiffs have not alleged its BIOCELL implants deviate from an FDA-approved manufacturing process or attendant FDA-approved device specifications, and therefore must be dismissed. (*Id.* at 60.) Allergan contends the FDA could not have intended these allegedly dangerous particles to be on a medical device. (ECF No. 262 at 15.) Second, Allergan maintains Plaintiffs' allegations, disguised in "manufacturing defect" clothing, are actually aimed at the PMA-approved processes by which all of Allergan's devices are manufactured, and should be preempted as an effort to change what federal regulation commands. (ECF No. 171-1 at 61.) Third, Allergan states the Current Good Manufacturing Practices ("CGMPs"), the quality system requirements ("QSRs"), and FDCA's adulteration provisions are not device-specific, and cannot serve as parallel federal requirements. (ECF No. 262 at 14.) Allergan argues the CGMPs are too vague to create identifiable federal requirements and supply a federal parallel to Plaintiffs' manufacturing defect claims. (ECF No. 238 at 38–39.) In addition, Allergan argues Plaintiffs' adulteration allegations are preempted, because they do not resemble any common law manufacturing defect claim, and exist solely by virtue of the FDA requirements. (ECF No. 171-1 at 65.)

Plaintiffs counter they have alleged manufacturing defects in the BIOCELL implants. (ECF No. 216 at 55.) For example, Plaintiffs allege the debris, including silicone particles, on the implants' surface is not an intended part of the design for the BIOCELL implants. (*Id.*) Plaintiffs suggest the Court should not entertain Allergan's argument that the implants' design may not call for surfaces littered with debris, because Allergan has not produced all the documents from its PMA submissions. (ECF No. 263 at 10 n.6.) Plaintiffs further allege violations of CGMPs by Allergan in the manufacturing process. (ECF No. 216 at 56.) Plaintiffs state their manufacturing defect claims also parallel the FDCA's prohibition on marketing an adulterated device, and therefore are not preempted. (*Id.* at 65.) The Court agrees.

 **[26]**   **[27]**   **[28]**   "To the extent that the [manufacturing defect] claim is a hardware failure because the device did not conform to the standards of other units, and also violated federal regulations and procedures in manufacturing, then it would be parallel claim and would not be preempted." *Mendez v. Shah*, 28 F. Supp. 3d 282, 298–99 (D.N.J. 2014) (citations omitted); *see also Nunn v. Mentor Worldwide, LLC*, 847 Fed.Appx. 373, 376 (9th Cir. 2021) (citing *Weber v. Allergan, Inc.*, 940 F.3d 1106, 1112 (9th Cir. 2019)) ("For [Plaintiffs'] manufacturing defect claims to survive express preemption under the MDA, Plaintiffs must allege that Defendants 'deviated from a particular premarket approval or other FDA requirement applicable to the Class III medical device.' "); *Sewell v. Mentor Worldwide, LLC*, 847 Fed.App'x 380, —— (9th Cir. 2021) (same); *Vieira v. Mentor Worldwide, LLC*, 845 Fed.App'x 503, —— (9th Cir. 2021) (same); *Billetts v. Mentor Worldwide, LLC*, 847 Fed.Appx. 377, —— (9th Cir. 2021) (same). "However, if the [defendant's] device was manufactured in compliance with its PMA, then any claim of manufacturing defect would not parallel a federal claim and would be preempted." *Mendez*, 28 F. Supp. 3d at 299 (citing *In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litigation*, 623 F.3d 1200, 1207 (8th Cir. 2010)). Also, "it would be an injustice to penalize a plaintiff for alleging, through no fault of her own, what turned out to be insufficient facts about the manufacturing process of a device that caused injury," as the manufacturer's agreements with the FDA "that would provide the necessary factual specificity are confidential, and available only to the defendants and the FDA." *Killen v. Spine*, No. 11-1508, 2012 WL 4482371, at *9, 2012 U.S. Dist. LEXIS 141639, at *23–24 (W.D. Pa. Aug. 21, 2012) (citations omitted).

 **\*13**    [I]n this unique set of circumstances, where [the plaintiff] has advanced facts that suggest the existence [of] parallel claims, but does not have access to the confidential information to specifically plead the alleged violation of FDA regulations, fairness compels that some leniency be afforded plaintiff from the stringent *Twombly/Iqbal* pleading standards to allow this claim to proceed.

*Id.* at *9, 2012 U.S. Dist. LEXIS 141639, at *24–25. Here, Plaintiffs allege the debris in the BIOCELL implants is not a part of the PMA-approved design for the BIOCELL implants, and therefore constitutes a deviation from the design in violation of the PMAs. (ECF No. 216 at 55.) Therefore, Plaintiffs have advanced facts suggesting plausible manufacturing defects in the BIOCELL implants, and fairness compels some leniency be afforded to Plaintiffs in asserting their manufacturing defect claims. Accordingly, the Court declines to dismiss Plaintiffs' manufacturing defect claims at this stage.

Alternatively, the CGMPs and the FDCA's adulteration provisions could also serve as parallel federal requirements.

 **[29]**   **[30]**   "[C]iting to the FDA's Current Good Manufacturing Practices ("CGMP") could present a parallel federal claim." *Mendez v. Shah*, 94 F. Supp. 3d 633, 638 (D.N.J. 2015); *see also Killen*, 2012 WL 4482371, at *8, 2012 U.S. Dist. LEXIS 141639, at *21 (rejecting "the blanket position that CGMPs can never serve as the basis for a parallel claim"). To survive preemption, the plaintiff must identify "what regulations under the CGMPs ... parallel [the plaintiff's] state law claim," *Mendez*, 94 F. Supp. 3d at 639, and should not "simply provide a 'laundry list of alleged CGMP violations,' " which is "too general to be capable of enforcement." *Silver v. Medtronic, Inc.*, 236 F. Supp. 3d 889, 897 (M.D. Pa. 2017) (holding the CGMP violations alleged qualify as federal regulations from which a parallel state claim may be made, because the FDA warning letters delineate specific deviations of the defendant's devices from specific CGMPs). Otherwise, "a comparison cannot be made" between the plaintiff's state law claims and relevant federal obligations to determine if the state law "requirements with

In re Allergan Biocell Textured Breast Implant Products..., --- F.Supp.3d ---- (2021)

respect to the device are 'different from, or in addition to,' the federal ones." *Mendez*, 94 F. Supp. 3d at 639. Here, Plaintiffs have alleged Allergan's violations of specific CGMP regulations. (ECF No. 119 at ¶¶ 129–39.) In particular, Plaintiffs allege Allergan "violated state law and parallel federal requirements set forth at 21 C.F.R. § 820.30 by failing to," among other things, "test production units under actual or simulated use conditions." (*Id.* at ¶ 132.) Section 820.30(g), which requires a device manufacturer "to test products under actual or simulated use conditions[,] is specific enough to support a parallel [state law] claim." *Sadler v. Advanced Bionics, Inc.*, 929 F. Supp. 2d 670, 686 (W.D. Ky. 2013) (citing 21 C.F.R. § 820.30(g)). Therefore, Plaintiffs have identified federal parallels for their manufacturing defect claims based on the CGMPs.

[31] The FDCA's adulteration provisions state a medical device is adulterated if "the methods used in, or the facilities or controls used for, its manufacture, packing, storage, or installation are not in conformity with" the CGMP requirements. 21 U.S.C. §§ 351(h), 360j(f). That is to say, adulteration is found if specific CGMP violations are identified. Since Plaintiffs have specified the CGMP regulations that Allergan allegedly violates, Plaintiffs can assert manufacturing defect claims based on Allergan's alleged violation of the FDCA's adulteration provisions. *See Silver*, 236 F. Supp. 3d at 898–99 (concluding the plaintiff asserts a parallel manufacturing defect claim, because the plaintiff "alleges that [the defendant] breached his Pennsylvania common law duty to exercise reasonable care in manufacturing the Device in failing to ensure that the Device conformed to its own PMA specifications and complied with CGMPs," resulting in an " 'adulterated' device [that] was unreasonably dangerous and caused him harm").

*14 Finally, the Court need not consider implied preemption here, because Allergan does not challenge Plaintiffs' manufacturing defect claims based on implied preemption. Accordingly, with parallel federal requirements in the implants' PMAs, CGMPs, and the FDCA's adulteration provisions, the Court finds Plaintiffs' manufacturing defect claims are not preempted.

### 3. Plaintiffs' Negligence *Per Se* Claims Are Not Preempted

[32] Allergan argues Plaintiffs' negligence *per se* claims, which are based solely on the violation of the FDCA, are

improper attempts at private FDCA enforcement and should be impliedly preempted. (ECF No. 171-1 at 65–66.) Plaintiffs maintain state-created causes of action that invoke negligence *per se* based on FDCA violations are not preempted. (ECF No. 216 at 72.) The Court agrees with Plaintiffs and finds negligence *per se* claims are not preempted.

[33]  [34]  [35] "[T]he doctrine of *per se* liability does not create an independent basis of tort liability but rather establishes, by reference to a statutory scheme, the standard of care appropriate to the underlying tort." *In re Orthopedic Bone Screw Products Liability Litigation*, 193 F.3d 781, 791 (3d Cir. 1999) (citing *Grove Fresh Distribs., Inc. v. Flavor Fresh Foods, Inc.*, 720 F. Supp. 714, 716 (N.D. Ill. 1989)). "[T]he FDCA or its accompanying regulations" can be invoked to "establish the standard or duty which defendants allegedly failed to meet." *Id.* (citing *Grove Fresh Distribs.*, 720 F. Supp. at 716); *see also Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 554 (E.D. Pa. 2006) ("Here, Plaintiff's negligence *per se* claim is premised on the alleged violation of the FDCA."). "[T]he FDCA does not preempt state common law claims 'such as negligence.' " *Polt v. Sandoz, Inc.*, No. 16-2362, 2017 WL 11507637, at *1 n.1, 2017 U.S. Dist. LEXIS 228038, at *5 n.1 (E.D. Pa. July 7, 2017) (citing *Orthopedic Bone Screw*, 193 F.3d at 792).

Therefore, the FDCA and the FDA regulations may set the basis for Plaintiffs' negligence *per se* claims. Because Plaintiffs' negligence *per se* claims "invoke the statutory violations to prove defendants' liability for a separate underlying tort," instead of "contending the violations themselves form a cause of action," they are not impliedly preempted. *Id.* at *1 n.1, 2017 U.S. Dist. LEXIS 228038, at *4 n.1 (citing *Orthopedic Bone Screw*, 193 F.3d at 791).

### 4. Plaintiffs' Claims Concerning Investigational Devices Used In An Approved Clinical Trial Are Preempted

[36] Allergan argues Plaintiffs' claims concerning its investigational devices (McGhan Textured Breast Implant, Style 153), and post-PMA claims against its reclassified devices (McGhan RTV® Saline-Filled Mammary Implant), are expressly and impliedly preempted. (ECF No. 171-1 at 69–70.) Plaintiffs contend there is no preemption when these investigational devices are used outside an approved clinical trial. (ECF No. 261 at 37:7–9, 38:6–10.) The Court finds Plaintiffs' claims concerning Allergan's investigational devices used in an approved clinical trial are preempted.

As Allergan concedes, whether a device enjoys PMA approval when used for a particular patient governs the availability of preemption. (ECF No. 171 at 73.) Therefore, Plaintiffs' post-PMA claims against Allergan's reclassified devices, which had the PMA approval when used by Plaintiffs, are treated no differently from the claims against the PMA-approved devices as discussed previously. However, Plaintiffs' claims concerning Allergan's investigational devices, which have not received PMAs, must be analyzed separately.

 **\*15**  **[37]**  **[38]**  **[39]**  "To obtain the data to support an application for premarket approval, a manufacturer may use the device in clinical trials under active FDA supervision pursuant to the FDCA's Investigational Device Exemption ("IDE") provisions and accompanying federal regulations." *Orthopedic Bone Screw*, 193 F.3d at 786 (citing 21 U.S.C. § 360j(g)). The FDA approves an IDE investigation "only upon a determination that the device is sufficiently safe and effective for investigative use on human beings." *Hunsaker v. Surgidev Corp.*, 818 F. Supp. 744, 752 (M.D. Pa. 1992) (citing *Slater v. Optical Radiation Corp.*, 961 F.2d 1330, 1333 (7th Cir. 1992)). "A jury determination that the device is not sufficiently safe and effective would not only be contrary to the experimental purposes of the exemption, but, more important[ly], would directly conflict with the FDA's contrasting judgment." *Gile v. Optical Radiation Corp.*, 22 F.3d 540, 545 (3d Cir. 1994) (citing *id.* at 752–53). "Therefore, state tort law invoked to challenge the safety or effectiveness of a [device] which is part of an FDA investigation is federally preempted." *Id.* (citing *Hunsaker*, 818 F. Supp. at 753). Such "state tort claims run counter to the important public policy, recognized by Congress, of promoting scientific inventions." *Id.* at 546. However, the state law claims concerning investigational devices used outside an approved clinical trial are not preempted under the IDE. *English v. Mentor Corp.*, 67 F.3d 477, 480 (3d Cir. 1995) ("The FDA had initially granted an Investigational Device Exemption to [the defendant], permitting it to test its prosthesis on human subjects; [the plaintiff], however, did not receive a device as part of an IDE test study and thus [the defendant] cannot rely on IDE regulations in support of its argument that [plaintiff's] state tort claims are preempted."), *vacated on other grounds*, 518 U.S. 1030, 116 S.Ct. 2575, 135 L.Ed.2d 1090 (1996); *see also Caccia v. Biomet, Inc.*, No. 3:13-CV-73 RLM, 2013 WL 4502211, at \*4, 2013 U.S. Dist. LEXIS 119124, \*12–13 (N.D. Ind. Aug. 21, 2013) (rejecting the argument that "a manufacturer that obtains IDE

status for a device to be used in a controlled investigational setting is, during the time the study is being conducted, exempt from liability for use of that device outside the clinical trial"). Therefore, Plaintiffs' claims challenging the safety or effectiveness of Allergan's investigational devices used in an approved clinical study are expressly preempted.

### 5. Plaintiffs' Negligent Failure to Warn Claims Alleging Allergan's Failure to Conduct Post-PMA Clinical Studies Are Preempted

 **[40]**  Allergan contends Plaintiffs' claims alleging Allergan failed to conduct post-PMA clinical studies are expressly preempted, because there is no state law duty that requires Allergan to undertake the studies. (ECF No. 171-1 at 56.) Allergan maintains such a requirement exists solely by virtue of the FDA's regulatory oversight and Allergan's PMA-based obligations. (*Id.*) Plaintiffs counter they are asserting negligent failure to warn claims for Allergan's alleged violation of FDA regulations and the PMA orders, which require Allergan to conduct post-PMA studies regarding the safety of BIOCELL implants. (ECF No. 216 at 75.) The Court disagrees and finds these claims to be preempted.

The Court is not aware of, and Plaintiffs do not identify, any legal authority suggesting the existence of a parallel state law duty to warn resulting from post-PMA studies. On the contrary, some courts have explicitly rejected such a duty to warn as impliedly preempted. *See, e.g., Nunn v. Mentor Worldwide, LLC*, 847 Fed.App'x 373, 376 (9th Cir. 2021) ("[T]o the extent Plaintiffs base their failure to warn claims on [the device manufacturer's] alleged failure to properly conduct the post-approval studies, Plaintiffs' claims are impliedly preempted because Plaintiffs do not identify a parallel state law duty to conduct post-approval studies."); *Sewell v. Mentor Worldwide, LLC*, 847 Fed.App'x. 380, —— (9th Cir. 2021) (same); *Vieira v. Mentor Worldwide, LLC*, 845 Fed.App'x. 503, —— (9th Cir. 2021) (same); *Billetts v. Mentor Worldwide, LLC*, 847 Fed.App'x 377, —— (9th Cir. 2021) (same); *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) (citations omitted) ("Federal law thus impliedly preempts Plaintiffs' claims based on alleged failures to properly conduct post-approval testing and reporting as attempts to enforce the MDA."); *Ebrahimi v. Mentor Worldwide LLC*, No. 16-7316-DMG (KSx), 2017 WL 4128976, at \*4, 2017 U.S. Dist. LEXIS 153840, at \*12 (C.D. Cal. Sept. 15, 2017) (citing *Eidson v. Medtronic, Inc.*, 981 F. Supp. 2d 868, 881 (N.D. Cal. 2013)) ("[T]o

the extent [the plaintiff] bases her failure-to-warn claim on [the device manufacturer's] failure to comply with the federal requirement to complete the six post-approval studies, the claim is impliedly preempted."). Therefore, the Court concludes Plaintiffs' negligent failure to warn claims alleging Allergan's failure to conduct post-PMA clinical studies are preempted.

### 6. Plaintiffs' Implied Warranty Claims Are Not Preempted

**\*16**  **[41]**  Allergan argues an implied warranty claim targeting the safety and effectiveness of a PMA-approved medical device is expressly preempted. (ECF No. 171-1 at 36.) Allergan maintains it is following federal law, and therefore any claim premised on alleged faults in the FDA-approved design is expressly preempted. (ECF No. 238 at 43.) Plaintiffs counter their implied warranty claims are not preempted, because they parallel violations of federal law: the BIOCELL implants are not merchantable due to the violations of federal requirements regarding manufacturing and labeling. (ECF No. 216 at 71.) The Court agrees these claims are not preempted.

**[42]**  **[43]**  "State law claims for breach of implied warranty may be preempted to the extent that they impose new or additional requirements on manufacturers beyond the federal regulations governing the medical device at issue." *Freed v. St. Jude Med., Inc.*, 364 F. Supp. 3d 343, 356 (D. Del. 2019) (citations omitted). But a state law claim for breach of implied warranty is "viable," "to the extent [it] seek[s] recovery for conduct that may also have violated the FDCA." *In re Orthopedic Bone Screw Products Liability Litigation*, 193 F.3d 781, 792 (3d Cir. 1999). Here, Plaintiffs' claims are not imposing requirements that are different from, or in addition to, the federal ones. Instead, Plaintiffs claim the BIOCELL implants are not merchantable solely because of Allergan's alleged failure to comply with the FDA regulations and the FDCA's adulteration provisions. (ECF No. 119 at ¶ 240.) Therefore, Plaintiffs' claims are not expressly preempted, because they parallel violations of federal law. *C.f. Freed*, 364 F. Supp. 3d at 356 (dismissing the plaintiff's state law claims for breach of implied warranty as expressly preempted, because the plaintiff does not allege violation of any federal regulations or plead facts setting out the specifics of the breaches at issue); *Bentzley v. Medtronic, Inc.*, 827 F. Supp. 2d 443, 454 (E.D. Pa. 2011) (finding express preemption of the plaintiff's implied warranty of merchantability claim that

asserts the defendant's medical device is "not merchantable for its intended use because of its tendency to infuse the incorrect dosage of insulin," which represents a standard different from, or in addition to, the federal requirements); *Steele v. Depuy Orthopaedics, Inc.*, 295 F. Supp. 2d 439, 455 (D.N.J. 2003) (concluding the MDA preempts the plaintiff's implied warranty claims, which "impose safety and effectiveness requirements ... that, if successful, would differ from, or impose additional requirements to, those requirements established by the FDA on [the defendant's] device").

The Court need not address the issue of implied preemption, which Allergan does not raise. Accordingly, the Court concludes Plaintiffs' implied warranty claims are not preempted.

### 7. Plaintiffs' Claims for Negligent Misrepresentation, Breach of Express Warranty, and Breach of State Consumer Fraud and Deceptive Trade Practice Statutes Are Not Preempted

Allergan argues, for Plaintiffs' warranty or misrepresentation claims to survive preemption, they must be supported by allegations of Allergan's representations occurring outside the approval process and going beyond what the device's labeling encompasses, which Plaintiffs have not pled. (ECF No. 262 at 15–16.) Allergan stresses Plaintiffs allege no specific statements of Allergan that formed the basis of any purported bargain entered by Plaintiffs or that materially deviated from language approved by the FDA. (*Id.* at 16.) Plaintiffs assert several of their misrepresentation-based claims are not preempted, because Allergan did not argue in its opening brief that these claims were preempted, thereby waiving such preemption arguments. (ECF No. 216 at 68.) The Court agrees the claims are not preempted.

**\*17**  **[44]**  **[45]**  "Absent compelling circumstances not present here, failure to raise an argument in one's opening brief waives it." *Anspach v. City of Philadelphia*, 503 F.3d 256, 258 n.1 (3d Cir. 2007) (citations omitted); *see also Holk v. Snapple Bev. Corp.*, 575 F.3d 329, 337 n.5 (3d Cir. 2009) ("An issue is waived unless a party raises it in its opening brief."). Preemption arguments are not except from this waiver rule. *See Eagle Sys. v. Asaro-Angelo*, No. 18-11445, 2019 WL 3459088 at \*4, 2019 U.S. Dist. LEXIS 127972 at \*9 (D.N.J. July 31, 2019). Allergan did not argue in its opening brief that Plaintiffs' claims for negligent

misrepresentation, breach of express warranty, and breach of state consumer fraud and deceptive trade practice statutes were preempted, and has not explained why it could not have done so. Therefore, Allergan has waived the preemption arguments against these claims.

[46] Notwithstanding the waiver, these claims are not preempted. As discussed in Part III.B.6.a, *infra*, the PIC has at least sufficiently alleged a misleading promotional YouTube video that Allergan authored concerning the safety features of its Natrelle Breast Implants, which constitutes an off-label representation not approved by the FDA. Therefore, Plaintiffs' claims for negligent misrepresentation, breach of express warranty, and breach of state consumer fraud and deceptive trade practice statutes are supported by adequate factual allegations. To the extent these claims are based on Allergan's statements not approved by the FDA, they are not preempted. *Hart v. Medtronic, Inc.*, No. 1:16-cv-05403, 2017 WL 5951698 at *4, 2017 U.S. Dist. LEXIS 196837 at *14 (D.N.J. Nov. 30, 2017) (citations omitted) ("An express warranty claim is not preempted under the MDA if a Plaintiff can show that Defendants made 'voluntary statements' that were 'not approved by the FDA or mandated by the FDA about the use or effectiveness' of a medical device."); *McLaughlin v. Bayer Corp.*, 172 F. Supp. 3d 804, 827 (E.D. Pa. 2016) (citing *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 330, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008)) ("Plaintiffs can potentially allege cognizable and parallel misrepresentation claims at least insofar as they allege [the defendant] made false or misleading statements ... that were inconsistent with specific statements in approved FDA materials."); *Morton v. Allergan, Inc.*, No. 14-cv-1312, 2015 WL 12839493, at *4, 2015 U.S. Dist. LEXIS 188871, at *9–10 (D.N.J. April 2, 2015) (recognizing the plaintiff's claims for negligent misrepresentation and breach of state consumer fraud statute, if adequately pleaded, may satisfy "a narrow exception for a 'parallel' claim, e.g., 'a damages remedy for claims premised on a violation of FDA regulations' " to avoid preemption under the MDA); *Horn v. Thoratec Corp.*, 376 F.3d 163, 168 (3d Cir. 2004) (citing *Michael v. Shiley, Inc.*, 46 F.3d 1316, 1325–31 (3d Cir. 1995)) ("[The plaintiff's] claims for breach of express warranty (based on the [device's] packaging materials) and fraud (based on the manufacturer's advertisements and promotional materials), neither of which were the subject of the FDA's PMA approval, were held not to be preempted."); *Steele v. Depuy Orthopaedics, Inc.*, 295 F. Supp. 2d 439, 456 (D.N.J. 2003) (citing *Michael*, 46 F.3d at 1328) ("[A]ny express warranty claims that are based on representations made by [the device manufacturer]

concerning non-FDA approved promotional and advertising materials also are not preempted by the MDA because those claims arise out of a private contractual agreement rather than 'a product of state action.' ").

Finally, both parties agree Plaintiffs' claims concerning Allergan's tissue expanders and implants sold before the 2000 PMA are not preempted. (ECF No. 119 at ¶ 43; ECF No. 171-1 at 22; ECF No. 261 at 37:7–8.) Indeed, Allergan's tissue expanders and pre-PMA implants were sold through the 510(k) process (ECF No. 119 at ¶¶ 5, 43, 46), which does not trigger preemption. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 493–94, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).

*18 In conclusion, the Court finds the following Plaintiffs' claims are preempted and therefore dismissed: (1) label-based failure to warn claims; (2) claims challenging the safety or effectiveness of Allergan's investigational devices used in an approved clinical trial; and (3) negligent failure to warn claims based on Allergan's alleged failure to conduct post-PMA clinical studies. The above preemptions, however, do not apply to Plaintiffs' claims concerning Allergan's tissue expanders and implants sold before the 2000 PMA, as set forth above and as agreed upon by the parties. (ECF No. 119 at ¶ 43; ECF No. 171-1 at 22; ECF No. 261 at 37:7–8.)

### B. Allergan's Motion to Dismiss on Non-Preemption Grounds (ECF No. 171-3)

Allergan argues Plaintiffs raise novel state law personal injury claims that have not been authorized by a state statute or adopted by any state's highest court, and this Court should not recognize such claims under the *Erie* doctrine. (ECF No. 171-3 at 10.) Allergan maintains, when confronted with open questions of state law liability, federal courts in this Circuit must opt for the interpretation that restricts liability, rather than expands it, until the state's highest court decides differently. (ECF No. 236 at 6.) However, Allergan concedes the Court need not rely solely on the decisions of a state's highest court in interpreting state laws. (ECF No. 261 at 64:20–21.) Plaintiffs contend the *Erie* doctrine does not mandate the dismissal of all the state claims not recognized by that state's highest court. (ECF No. 220 at 17.) Instead, they assert, if the state's highest court has not spoken, district courts sitting in diversity must predict what the state's highest court would decide. (*Id.* at 17–18.) The Court agrees the *Erie* doctrine does not mandate dismissal.

[47] [48] [49] [50] [51] [52] "Under the *Erie* doctrine, federal courts sitting in diversity apply state

substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). "A state is not without law save as its highest court has declared it." *West v. AT&T Co.*, 311 U.S. 223, 236, 61 S.Ct. 179, 85 L.Ed. 139 (1940). "There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them." *Id.* "In those circumstances a federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court." *Id.* "State law is to be applied in the federal as well as the state courts and it is the duty of the former in every case to ascertain from all the available data what the state law is and apply it." *Id.* at 237, 61 S.Ct. 179. "In predicting how a matter would be decided under state law," a federal court should examine: "(1) what the [State's] Supreme Court has said in related areas; (2) the decisional law of the [State's] intermediate courts; (3) federal appeals and district court cases interpreting state law; and (4) decisions from other jurisdictions that have discussed the issues we face here." *Hughes v. Long*, 242 F.3d 121, 128 (3d Cir. 2001) (citing *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 406 (3d Cir. 2000)). "[W]here 'two competing yet sensible interpretations' of state law exist," a federal court "should opt for the interpretation that restricts liability, rather than expands it, until the Supreme Court of [the State] decides differently." *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 253 (3d Cir. 2010) (citing *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3d Cir. 2010)). Therefore, even if a state's highest court has not decided whether a particular state law claim exists, the Court will predict that the state's highest court may decide by looking into other relevant legal authorities.

### 1. The Court Will Review the PIC with Leniency

**\*19** As a threshold matter, Plaintiffs state Allergan's motion to dismiss on non-preemption grounds is premature at this stage. (ECF No. 220 at 20.) Plaintiffs claim an MDL master complaint is an administrative tool to assist discovery and allows a court to decide on common issues of fact or law. (*Id.*) Plaintiffs contend a master complaint does not set forth any Plaintiff's specific facts, and does not necessarily include complete recitations of the factual bases and claims a Plaintiff may assert, which makes dismissal of any specific claim alleged in the PIC premature. (*Id.* at 21.) Therefore, Plaintiffs maintain, any ruling on the PIC would have to take the individually filed complaints into account. (*Id.* at 22.)

Plaintiffs suggest the decision on matters specific to each Plaintiff and its State should be left for later proceedings. (*Id.*) Allergan insists the Court should narrow Plaintiffs' claims where Plaintiffs have failed to state a claim upon which relief can be granted. (ECF No. 236 at 8.) Allergan asks the Court to apply Rules 8 and 12. (*Id.* at 10.) For the reasons set forth below, the Court will apply some leniency in reviewing the PIC.

**[53]  [54]  [55]  [56]**  In an MDL, "parties may elect to file a master complaint and a corresponding consolidated answer, which supersede prior individual pleadings." *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 n.3, 135 S.Ct. 897, 190 L.Ed.2d 789 (2015). "In such a case, the transferee court may treat the master pleadings as merging the discrete actions for the duration of the MDL pretrial proceedings." *Id.* "No merger occurs, however, when the master complaint is not meant to be a pleading with legal effect but only an administrative summary of the claims brought by all the plaintiffs." *Id.* "When plaintiffs file a master complaint of this variety, each individual complaint retains its separate legal existence." *In re Refrigerant Compressors Antitrust Litig.*, 731 F.3d 586, 590 (6th Cir. 2013). "Where defendants bring a motion to dismiss that raises issues common to all plaintiffs, however, the administrative nature of a Master Complaint does not necessarily preclude 12(b)(6) motion practice." *In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, No. 11 C 5468, 2012 WL 3582708, at *4, 2012 U.S. Dist. LEXIS 117239, at *21–22 (N.D. Ill. Aug. 16, 2012). "[W]hen the information that may or may not support Plaintiffs' claims is largely within the control of the Defendants," the court may "assess the sufficiency of plaintiffs' claims with substantial leniency." *In re Trasylol Prods. Liab. Litig.*, No. 08-MD-1928-MIDDLEBROOKS, 2009 WL 577726 at *8, 2009 U.S. Dist. LEXIS 65481 at *71 (S.D. Fla March 4, 2009).

**[57]**  Here, Plaintiffs consider the PIC as "an administrative method to set forth common facts and potential claims which individual Plaintiffs ... may assert against Allergan." (ECF No. 119 at 4.) The individual Short Form Complaint to be filed by each Plaintiff will adopt the pleadings in the PIC. Therefore, in this motion to dismiss inquiry, the Court will not afford special leniency in reviewing such "common facts" as presented in the PIC. However, the Court will review, with substantial leniency, the facts that may be specific to each individual Plaintiff or largely within the control of Allergan. In other words, the lack of potentially individualized factual allegations of Plaintiffs, such as causation of individual

Plaintiffs' injuries, will not be a ground for dismissal. The Court understands each Plaintiff may allege in its Short Form Complaint facts not mentioned in the PIC.

### 2. The Court Will Not Scrutinize Whether Plaintiffs Have Sufficiently Alleged Present Injuries in the PIC

Allergan contends Plaintiffs not diagnosed with BIA-ALCL do not have a legally cognizable injury to bring this MDL (ECF No. 171-3 at 11), which is formed for the very specific injury of BIA-ALCL (ECF No. 261 at 49:18–24.) Allergan claims any alleged injuries without clinical significance are merely potential precursors to a harm that may never be realized (ECF No. 236 at 11.) Allergan maintains most states do not recognize tort claims for an "increased risk" or "fear of developing a disease due to exposure" without a currently manifest physical injury. (ECF No. 171-3 at 11–12.) As for medical monitoring, Allergan suggests most states reject it as a relief, and the few states that allow medical monitoring as a relief or a cause of action require the plaintiff to first demonstrate a legally cognizable injury. (*Id.* at 12.) Plaintiffs claim to have sustained injuries even if they are not diagnosed with BIA-ALCL; such injuries include: (1) tissue damage; (2) a collection of fluid built up under the skin (called a "seroma"); (3) unchecked T-cell proliferation; (4) malignant T-cell mutation; and (5) chronic physiologic inflammation. (ECF No. 220 at 25.) Additionally, Plaintiffs claim to have sustained injuries in the diagnostic procedures to detect BIA-ALCL, and the surgeries to remove the BIOCELL implants from their bodies and, in some cases, replace it with a non-defective implant. (*Id.* at 25–26.) Finally, Plaintiffs seek damages for emotional distress, which includes the fear of cancer. (*Id.* at 27.)

**\*20** **[58]** The Court finds the question of whether present injuries exist is a factual issue specific to each individual Plaintiff, and should not be scrutinized at this stage. Each Plaintiff is entitled to allege its own present injuries, including the diagnosis of BIA-ALCL, separately in the Short Form Complaint. Accordingly, the Court will not dismiss Plaintiffs' claims, including the requests for the relief of medical monitoring, fear of or increase risk of cancer, based on a failure to allege present injuries in the PIC.

### 3. Plaintiffs' Manufacturing Defect Claims Should Not Be Dismissed

**[59]** Allergan contends Plaintiffs fail to identify a single manufacturing defect for the manufacturing defect claims, but rather attack the manufacturing process of the BIOCELL implants and allege the textured surface of every device is defective as a result of that process. (ECF No. 171-3 at 14–15.) Allergan relies on *Coba* to argue these claims actually target the design defect of the BIOCELL implants and therefore should be dismissed. (*Id.* at 15 (citing *Coba v. Ford Motor Co.*, 932 F.3d 114, 123–24 (3d Cir. 2019)).) Plaintiffs claim to have described in the PIC that the BIOCELL implants deviate from their intended and approved design specifications. (ECF No. 220 at 29.) The Court agrees.

The alleged manufacturing defects in the BIOCELL implants involve individualized factual issues, as the actual implant used, including its possible defects, is unique to each Plaintiff. Further, the product information of the implants is primarily within the control of Allergan. Therefore, at this stage, the Court will not dismiss Plaintiffs' manufacturing defect claims solely based on an insufficiency of manufacturing defects alleged in the PIC.

Even an exhaustive Rule 12(b)(6) analysis does not warrant dismissal of Plaintiffs' manufacturing defect claims. To sufficiently plead a manufacturing defect claim, Plaintiffs must allege Allergan "deviated from a particular premarket approval or other FDA requirement applicable to the Class III medical device," and "cannot simply demonstrate a defect or a malfunction and rely on *res ipsa loquitur* to suggest only ... that the thing speaks for itself." *Nunn v. Mentor Worldwide, LLC*, 847 Fed.App'x 373, 376 (9th Cir. 2021) (citing *Weber v. Allergan, Inc.*, 940 F.3d 1106, 1112 (9th Cir. 2019)); *Sewell v. Mentor Worldwide, LLC*, 847 Fed.App'x 380, —— (9th Cir. 2021) (same); *Vieira v. Mentor Worldwide, LLC*, 845 Fed.App'x. 503, —— (9th Cir. 2021) (same); *Billetts v. Mentor Worldwide, LLC*, 847 Fed.App'x 377, —— (9th Cir. 2021) (same). Allergan concedes a manufacturing defect is "a deviation from the manufacturer's intended specifications that renders the device unreasonably dangerous." (ECF No. 171-3 at 14–15.) The PIC has alleged exactly that. For example, Plaintiffs allege Allergan's scrubbing process used different brushes and un-validated methods that violated PMA requirements, and resulted in a defectively manufactured surface with particle residues unintended by the product specifications approved by the FDA, causing severe harm to patients. (ECF No. 119 at ¶ 118.) Allergan argues the PMA does not specify a prohibition of the surface particles (ECF No. 261 at 43:8–10), but this does

not make the particles a part of the FDA-approved product specifications.

Even if Allergan is correct that Plaintiffs fail to specifically allege a deviation of the implants from their PMA-approved specifications, as discussed in Part III.A.2, *supra*, fairness compels some leniency be afforded to Plaintiffs in asserting their manufacturing defect claims at this stage, because Plaintiffs may not have access to the confidential information to specifically plead Allergan's deviations. Accordingly, the Court declines to dismiss Plaintiffs' manufacturing defect claims based on a potentially inadequate identification of deviations from the PMA-approved specificications.

**\*21** Finally, *Coba* is inapposite here. The defects in *Coba* involved the delamination of a vehicle's fuel tank coatings, "whereby particles of the tank lining would separate from the underlying metal and mix with the vehicle's fuel." *Coba*, 932 F.3d at 117. The delamination was caused by the exposure of the fuel tank coatings to "the acetic and formic acids in fuel," which the coatings could not "tolerate." *Id.* at 123. In other words, in *Coba*, the defects associated with delamination, including the particles of the tank lining, were not a part of the fuel tank in its manufactured form; instead, the defect resulted from the erosions of the fuel tank after it was manufactured, and was caused by an external matter, i.e., the fuel. The *Coba* court decided the fuel tank defect was a design defect. *Id.* But this is different from the alleged defects in the BIOCELL implants, which involve unintended surface particles in the implants' manufactured form.

Accordingly, the Court will not dismiss Plaintiffs' manufacturing defect claims.

### 4. Plaintiffs' Negligence *Per Se* Claims Are Not Viable in Some Jurisdictions

**[60]** Allergan insists Plaintiffs' negligence *per se* claims fail for multiple independent reasons. (ECF No. 171-3 at 15.) Allergan explains many states do not recognize any negligence *per se* claim, or do not allow a negligence *per se* claim based on alleged FDCA or CGMP violations. (*Id.* at 16–18.) Plaintiffs argue the FDCA can be and is actually recognized as the basis for a negligence *per se* claim. (ECF No. 220 at 36–39.) The Court finds Plaintiffs cannot assert an FDCA/CGMP-based negligence *per se* claim in some jurisdictions.

The following jurisdictions do not allow any negligence *per se* claim or an FDCA/CGMP-based negligence *per se* claim concerning a prescription device:

• Alaska. *Shanks v. Upjohn Co.*, 835 P.2d 1189, 1200–01 (Alaska 1992) (affirming a lower court's decision not to give a negligence *per se* instruction in action against a prescription drug manufacturer, where the negligence *per se* claim is under the misbranding provisions of Alaska's Food, Drug, and Cosmetics Act, because the state statute, using the same languages in FDCA's misbranding provisions, is too vague to define a reasonable standard of care). Though *Shanks* did not conclude that no provision of FDCA/CGMP could form the basis of a negligence *per se* claim, the Court does not discern any legal authority in Alaska that recognizes an FDCA/CGMP-based negligence *per se* claim concerning a prescription device.

• Arkansas. *Central Okla. Pipeline, Inc. v. Hawk Field Services, LLC*, 2012 Ark. 157, 400 S.W.3d 701, 712 (2012) (citing *Shannon v. Wilson*, 329 Ark. 143, 947 S.W.2d 349 (1997)) ("Under Arkansas law, the violation of a statute is only evidence of negligence and does not constitute negligence *per se*.").

• Colorado. *Liby v. City Park Family*, No. 2011-CV-436, 2012 Colo. Dist. LEXIS 781, at \*12 (D. Colo. Feb. 27, 2012) ("[T]he FDCA and its underlying regulations cannot serve as a basis for a negligence *per se* claim."). Plaintiffs argue *Franklin* recognized the viability of FDCA/CGMP-based negligence *per se* claims. (ECF No. 220-1 at 96 (citing *Franklin v. Medtronic, Inc.*, No. 09-cv-02301-REB-KMT, 2010 WL 2543579, 2010 U.S. Dist. LEXIS 71069 (D. Colo. May 12, 2010)).) The Court does not read such a ruling into *Franklin.* The *Franklin* court found the plaintiff's negligence *per se* claim was preempted, because "the underlying allegations [were] far too conclusory and factually deficient to state a plausible 'parallel' claim," and were only "facially 'premised on a violation of FDA regulations.' " *Franklin*, 2010 WL 2543579, at \*10, 2010 U.S. Dist. LEXIS 71069, at \*30. But this does not mean, if the plaintiff in *Franklin* sufficiently alleged a violation of FDA regulations, its negligence *per se* claim would surely be viable. The *Franklin* court did not analyze other factors under Colorado law that may preclude FDCA/CGMP-based negligence *per se* claims, such as those considered in *Liby* in rejecting FDCA-based negligence *per se* claims. *Liby*, 2012 Colo. Dist. LEXIS 781, at \*5–6.

**\*22** • Connecticut. *Norman v. Bayer Corp.*, No. 3:16-cv-00253 (JAM), 2016 WL 4007547 at \*5, 2016 U.S. Dist. LEXIS 96993 at \*14 (D. Conn. July 26, 2016) (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 353, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001)) (concluding the plaintiff's negligence *per se* claim based on "several FDA statutes and regulations ... arise[d] directly and wholly derivatively from the violation of federal law," and "is therefore subject to implied preemption").

• Florida. *McClelland v. Medtronic, Inc.*, 944 F. Supp. 2d 1193, 1200 (M.D. Fla. 2013) (citations omitted) ("As with Plaintiff's claims ... for negligence *per se* and failure to warn, Plaintiff's attempt to recast a claim for violation of the FDCA as a state-law negligence claim is impliedly barred by § 337(a)."); *McClelland v. Medtronic, Inc.*, No. 6:11-CV-1444-Orl-36KRS, 2012 WL 5077401, at \*5, 2012 U.S. Dist. LEXIS 152197, at \*12–13 (M.D. Fla. 2012) (citations and internal quotations omitted) ("[U]nder Florida law, the violation of a statute can only give rise to civil liability if the statute indicates an intention to create a private cause of action. The FDCA expressly provides that all actions to enforce the Act shall be by and in the name of the United States. This language evidences legislative intent to prohibit a private right of action for a violation of the FDCA. Therefore, Plaintiff cannot assert a negligence *per se* claim based on violations of the FDCA or the FDA's implementing regulations.").

• Georgia. *Green v. Medtronic, Inc.*, No. 1:19-CV-3242-TWT, 2020 WL 4577713, at \*4, 2020 U.S. Dist. LEXIS 145524 at \*11 (N.D. Ga. May 1, 2020) (citing *Leonard v. Medtronic, Inc.*, No. 1:10-CV-03787-JEC, 2011 WL 3652311, at \*8, 2011 U.S. Dist. LEXIS 93176 at \*23 (N.D. Ga. Aug. 19, 2011)) ("Nor may a negligence per se claim be premised on breaches of duties created by the FDCA."); *Scoggins v. Floyd Healthcare Mgmt.*, No. 4:14-CV-00274-HLM-WEJ, 2016 WL 11544774, at \*41, 2016 U.S. Dist. LEXIS 201663, at \*107 (N.D. Ga. June 10, 2016) (citing *Miller v. Chase Home Fin., LLC*, No. 2:10-CV-206-WCO, 2011 WL 10944693 (N.D. Ga. Oct. 6, 2011), *aff'd*, 677 F.3d 1113 (11th Cir. 2012)) ("[A] claim for negligence *per se* [under Georgia law] fails if the statute or regulation establishing the claimed legal duty does not provide a cause of action for damages for its violation."); *Horn v. Boston Sci. Neuromodulation Corp.*, No. CV409-074, 2011 WL 3893812, at \*9, 2011 U.S. Dist. LEXIS 102164 at \*25 (S.D. Ga. 2011) ("[B]ecause [CGMPs] fail to provide any tangible or concrete standard, this Court agrees that to allow a violation of such a flexible standard to result in liability would, in itself, be imposing a standard

'different from, or in addition to' those imposed by the MDA. 21 U.S.C. § 360k(a)(1). Indeed, any claim based on the QSRs or similarly vague FDA regulations would fail under comparable reasoning.").

• Hawaii. *Sailola v. Mun. Servs. Bureau*, No. 13-00544 HG-RLP, 2014 WL 3389395, at \*9, 2014 U.S. Dist. LEXIS 93087 at \*23 (D. Haw. July 9, 2014) (citing *Aana v. Pioneer Hi-Bred Intern., Inc.*, 965 F.Supp.2d 1157, 1175 (D. Haw. 2013)) ("Hawaii law does not recognize a negligence *per se* cause of action for violation of a statutory standard.").

• Indiana. *Bayer Corp. v. Leach*, 153 N.E.3d 1168, 1179 (Ind. Ct. App. 2020) (concluding the plaintiff's negligence *per se* claim is impliedly preempted to the extent it is premised "on a standard imported from the Indiana FDCA," which "is specifically designed to parallel federal requirements" in the FDCA); *Cavender v. Medtronic, Inc.*, No. 3:16-CV-232, 2017 WL 1365354, at \*5, 2017 U.S. Dist. LEXIS 57376, at \*17–18 (N.D. Ind. April 14, 2017) (finding the plaintiff's negligence *per se* claim based on federal regulations "is not a cognizable independent claim and is subsumed by the [Indiana Product Liability Act]").

**\*23** • Kansas. *Brooks v. Mentor Worldwide, LLC*, No. 19-2088-KHV, 2019 WL 4628264, at \*5 n.5, 2019 U.S. Dist. LEXIS 161820, at \*10 n.5 (D. Kan. Sept. 23, 2019), *aff'd* 985 F.3d 1272 (10th Cir. 2021) (citations omitted) ("Plaintiffs cannot recover under the theory of negligence *per se* based on violations of the FDCA. In Kansas, negligence *per se* 'is limited to violations of a statute where the legislature intended to create an individual right of action for injury arising out of a statutory violation.' ").

• Kentucky. *Sadler v. Advanced Bionics, Inc.*, 929 F. Supp. 2d 670, 681 (W.D. Ky. 2013) ("Plaintiffs' negligence *per se* claims, which are premised upon violations of federal law, are not cognizable as a matter of Kentucky law and must be dismissed.").

• Louisiana. *King v. Bayer Pharms. Corp.*, No. 09-0465, 2009 WL 2135223, at \*4, 2009 U.S. Dist. LEXIS 125802, at \*11–12 (W.D. La. June 8, 2009) (citing *Jefferson v. Lead*, 106 F.3d 1245, 1251 (5th Cir. 1997)) ("Plaintiffs' claims against Defendants for strict liability, negligence and negligence *per se* are not viable as independent theories of recovery outside of the [Louisiana Products Liability Act] framework.").

• Maine. *Binette v. Dyer Library Ass'n*, 688 A.2d 898, 904 (Me. 1996) (citations omitted) ("Maine does not recognize the doctrine of negligence *per se*.").

• Maryland. *Webb v. Green Tree Servicing, LLC*, No. ELH-11-2105, 2012 WL 2065539, at *6, 2012 U.S. Dist. LEXIS 79451 at *18 (D. Md. June 7, 2012) ("Maryland does not recognize the negligence *per se* doctrine.").

• Massachusetts. *Amoah v. McKinney*, No. 4:14-40181-TSH, 2016 WL 6134119, at *15 n.15, 2016 U.S. Dist. LEXIS 191864, at *45 n.15 (D. Mass. Sept. 2, 2016) (citing *Juliano v. Simpson*, 461 Mass. 527, 962 N.E.2d 175, 179 (2012)) ("[A] theory of negligence *per se* ... is not recognized by Massachusetts law.").

• Michigan. *Barnes v. Birds Eye Foods, Inc.*, No. 1:10-cv-541, 2011 WL 13362363, at *5, 2011 U.S. Dist. LEXIS 166587 at *15 (W.D. Mich. Sept. 26, 2011) ("Michigan law does not recognize negligence *per se* as an independent cause of action ...").

• Minnesota. *Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1152 (D. Minn. 2011) (citations omitted) ("A negligence-*per-se* claim that is predicated on an alleged violation of the FDCA is, by definition, a claim that would give rise to liability under Minnesota law only because of the FDCA's enactment. Such a claim is preempted under *Buckman*.").

• Nebraska. *Scheele v. Rains*, 292 Neb. 974, 874 N.W.2d 867, 872 (2016) (citations omitted) ("[T]he violation of a regulation or statute is not negligence per se, but may be evidence of negligence to be considered with all the other evidence in the case."); *Orduna v. Total Constr. Servs.*, 271 Neb. 557, 713 N.W.2d 471, 479 (2006) (citations omitted) ("[T]he violation of a statute is not negligence per se, but is evidence of negligence.").

• Nevada. *Miller v. DePuy Spine, Inc.*, 638 F. Supp. 2d 1226, 1231 (D. Nev. 2009) (citations omitted) ("Congress has stated its intent that the FDCA and regulations thereunder be enforced only by the U.S. Government, ... Nevada law [therefore] would not provide a damages remedy for any violation of FDA regulations," and will "refus[e] to impose negligence *per se* for violation of a statute in absence of legislative intent to impose civil liability.").

• New Hampshire. *Bartlett v. Mut. Pharm. Co.*, 731 F. Supp. 2d 135, 155 (D.N.H. 2010) (citations omitted) (predicting "the New Hampshire Supreme Court would not treat [the defendant's] violation of 21 C.F.R. § 314.80(b)[4] as establishing a *per se* breach of its duty of care, but rather would allow the jury to consider that violation as evidence of such a breach"). Though *Bartlett* did not conclude that no provision of FDCA/CGMP could form the basis of a negligence *per se* claim, the Court does not discern any legal authority in New Hampshire that recognizes an FDCA/CGMP-based negligence *per se* claim concerning a prescription device.

**\*24** • New Jersey. *Green v. 712 Broadway, LLC*, No. 17-991, 2018 WL 2754075, at *6, 2018 U.S. Dist. LEXIS 96657 at *18 (D.N.J. June 8, 2018) (citing *Sang Geoul Lee v. Won Il Park*, 720 F. App'x 663, 666 (3d Cir. 2017)) ("Under New Jersey law, a claim of negligence *per se* is supported by the violation of a statute or regulation, but only when that statute or regulation serves to impose direct tort liability on the person who offends it.").

• New Mexico. *Rimbert v. Eli Lilly & Co.*, 577 F. Supp. 2d 1174, 1240 (D.N.M. 2008) ("The Court is not certain how it could let proceed a negligence *per se* claim based on the FDCA and its regulations without interpreting and applying in some way the FDA's regulations. Because the Tenth Circuit has indicated that such a private cause of action for violation of the FDCA is foreclosed, [the defendant] is entitled to summary judgment as a matter of law on [the plaintiff's] negligence *per se* claim.").

• North Carolina. *Hill v. Danek Med., Inc.*, No. 4:96-CV-177-H1, 1998 WL 1048182, at *5, 1998 U.S. Dist. LEXIS 21749 (E.D.N.C. Sept. 9, 1998) ("[T]o the extent that plaintiffs' complaint can be said to present a negligence *per se* claim for violations of the FDCA ... a negligence *per se* claim is nothing but a disguised attempt at private FDCA enforcement, which is precluded by law.").

• North Dakota. *Mehl v. Canadian Pac. Ry.*, 417 F. Supp. 2d 1104, 1118 (D.N.D. 2006) (citing *Kimball v. Landeis*, 652 N.W. 2d 330, 336 (N.D. 2002)) ("North Dakota law does not recognize a claim for negligence *per se*.").

• Rhode Island. *State v. Purdue Pharma L.P.*, No. PC-2018-4555, 2020 WL 2315956, at *2, 2020 R.I. Super. LEXIS 34, at *6 (R.I. Super. May 5, 2020) (citing *Salcone v. Bottomley*, 85 R.I. 264, 129 A.2d 635, 637 (1957)) ("Rhode

Island does not recognize negligence *per se* as a cause of action.").

• Texas. *Monk v. Wyeth Pharms., Inc.*, No. SA-16-CV-1273-XR, 2017 WL 2063008, at *8, 2017 U.S. Dist. LEXIS 72477 at *23 (W.D. Tex May 11, 2017) ("Texas law likely does not recognize a cause of action for negligence per se based solely on the violation of the FDCA and FDA regulations."); *Hackett v. G.D. Searle & Co.*, 246 F. Supp. 2d 591, 594 (W.D. Tex 2012) (citations omitted) ("[T]he FDCA and FDA regulations do not give rise to a negligence per se cause of action under the standard the Texas Supreme Court established in *Perry v. S.N.*, 973 S.W.2d 301, 41 Tex. Sup. Ct. J. 1162, (Tex. 1998).").

• Utah. *Colosimo v. Gateway Cmty. Church*, 424 P.3d 866, 882 n.82 (Utah 2018) ("So it is only after a statute or ordinance is adopted by the court as the standard of conduct of a reasonable person, thereby imposing a duty recognizable in tort, that a court will then determine whether a violation thereof constitutes prima facie evidence of negligence or negligence per se."); *Gaw v. State*, 798 P.2d 1130, 1135 (Utah Ct. App. 1990) ("The violation of a statute does not necessarily constitute negligence *per se* and may be considered only as evidence of negligence. The violation may be regarded as prima facie evidence of negligence, but is subject to justification or excuse.").

• Washington. *Veridian Credit Union v. Eddie Bauer, LLC*, 295 F. Supp. 3d 1140, 1150 (W.D. Wash. 2017) (citing RCW 5.40.050) ("In Washington, ... the violation of a statute or the breach of a statutory duty is not considered negligence *per se*, but may be considered by the trier of fact only as evidence of negligence.").

**\*25** • West Virginia. *Mullins v. Ethicon, Inc.*, No. 2:12-cv-02952, 2017 WL 275452, at *2 (S.D. W. Va. Jan. 19, 2017) (citations omitted) ("The plaintiff cannot properly state a negligence *per se* claim under the Food, Drug, and Cosmetics Act."); *Gillingham v. Stephenson*, 209 W.Va. 741, 551 S.E.2d 663, 670 (2001) (citations omitted) ("In West Virginia a 'violation of a statute is prima facie negligence and not negligence per se.' "). Plaintiffs cite *Digitek*, where the court denied the defendant's motion to dismiss the plaintiffs' FDCA-based negligence *per se* claim. (ECF No. 220-1 at 132 (citing *In re Digitek Prods. Liab. Litig.*, No. 2:08-md-01968, 2009 WL 2433468, 2009 U.S. Dist. LEXIS 113947 (S.D.W. Va. Aug. 3, 2009)).) But *Digitek* involved an MDL proceeding, where the court did not conduct a state-by-state analysis of the viability of the plaintiffs' claims. *Digitek*, 2009 WL 2433468, at *11–*12, 2009 U.S. Dist. LEXIS 113947, at *111. Therefore, *Digitek* said nothing about whether West Virginia recognized an FDCA/CGMP-based negligence *per se* claim.

The following jurisdictions allow an FDCA/CGMP-based negligence *per se* claim:

• Alabama. *Allen v. Delchamps, Inc.*, 624 So. 2d 1065, 1067–68 (Ala. 1993) (finding the FDCA may "establish a duty or standard of care" for the plaintiff's negligence *per se* claim).

• Arizona. *Conklin v. Medtronic, Inc.*, 244 Ariz. 139, 418 P.3d 912, 920 (Ariz. Ct. App. 2019) (finding certain FDCA provisions and FDA regulations "may be adopted as a standard of conduct to support a negligence per se claim").

• California. *Bird v. Globus Med., Inc.*, No. 19-cv-1024-KJM-CKD, 2020 WL 5366300, at *4, 2020 U.S. Dist. LEXIS 164480, at *16 (E.D. Cal. Sept. 4, 2020) ("Because plaintiffs' negligence per se claim is also based on a state law duty that appears to parallel federal law, it also is not preempted by the MDA."); *Mize v. Mentor Worldwide LLC*, 51 Cal.App.5th 850, 265 Cal. Rptr. 3d 468, 481 (2020) (allowing the plaintiff to "pursue her negligence *per se* claim" based on the defendant device manufacturer's alleged "manufacturing defects and its failure to properly report adverse events to the FDA [that] caused her injuries" in violation of "the MDA and FDA regulations"); *Coleman v. Medtronic, Inc.*, 223 Cal.App.4th 413, 167 Cal. Rptr. 3d 300, 316 (2014) (allowing the plaintiff's negligence *per se* claim based on FDCA violations); *Knoppel v. St. Jude Med., Inc.*, No. SACV 13-383 JVS (ANx), 2013 WL 12116393, at *6, 2013 U.S. Dist. LEXIS 201072, at *19 (C.D. Cal. Sept. 24, 2013) (concluding "Plaintiffs have stated a claim for negligence per se," because "to the extent Plaintiffs' negligence per se claim invokes federal statutes in order to articulate a standard of care for medical device manufacturing, it is not impliedly preempted").

• Delaware. *Price v. Blood Bank of Del., Inc.*, 790 A.2d 1203, 1213 (Del. 2002) (ruling the "plaintiff is entitled to a negligence *per se* instruction if he establishes a factual basis for causation" despite "the general language of the FDA protocol" that underlies the plaintiff's negligence *per se* claim).

• District of Columbia. *Iacangelo v. Georgetown Univ.*, 580 F. Supp. 2d 111, 119–20 (D.D.C. 2008) (allowing the plaintiff's

negligence *per se* claims based on alleged FDCA violations upon the plaintiff's "demonstrating that the statute creates a reasonable standard of care").

• Illinois. *Sellers v. Boehringer Ingelheim Pharms., Inc.*, 881 F. Supp. 2d 992, 1010 (S.D. Ill. 2012) (holding "the plaintiff has asserted facts sufficient to support a plausible claim for relief under the theory of negligence per se," because "the plaintiff has alleged that, under Illinois common law, [the defendant] owed a duty of care to the plaintiff and that the FDCA provides the definition for the standard of care owed to the plaintiff," and "the fact that there is no private right of action under the FDCA does not warrant dismissal of the plaintiff's negligence per se claims").

**\*26**  • Mississippi. *Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 772 & n.8 (5th Cir. 2011) (concluding the plaintiff's negligence *per se* claim under Mississippi law based on the defendant's alleged violations of the FDA regulations is not expressly or impliedly preempted)

• Missouri. *Williams v. Bayer Corp.*, 541 S.W.3d 594, 606 (Mo. Ct. App. 2017) (finding the plaintiff's negligence *per se* claim "is grounded on a well-established duty imposed on manufacturers by Missouri state law to warn consumers about the risks of using their product, which [the plaintiff] argues [the defendant] breached by failing to meet the post-premarket approval reporting requirements listed in the MDA and the [defendant's device's] PMA."); *Mattingly v. Medtronic, Inc.*, 486 F. Supp. 2d 964, 969 (E.D. Mo 2007) (finding the plaintiffs' negligence *per se* claim based on FDA regulations "could parallel similar federal requirements such that the claim could survive a preemption challenge").

• New York. *Henson v. Wright Med. Tech., Inc.*, No. 5:12-CV-805 (FJS/TWD), 2013 WL 1296388, at \*5, 2013 U.S. Dist. LEXIS 44295 at \*16 (N.D.N.Y. March 28, 2013) (citing *Sita v. Danek Med.*, 43 F. Supp. 2d 245, 262 (E.D.N.Y. 1999)) ("[T]he Second Circuit has expressly recognized that a private cause of action for per se negligence arises under New York State law upon violation of the FDCA."); *Lawrence v. Sofamor, S.N.C.*, No. 95-CV-1507, 1999 WL 592689, at \*6, 1999 U.S. Dist. LEXIS 12228 at \*18 (N.D.N.Y. Aug. 2, 1999) (citing *Ezagui v. Dow Chemical Corp.*, 598 F.2d 727, 733 (2d Cir. 1979)) ("Under New York law, a cause of action exists for negligence *per se* when the underlying claim is for misbranding, or otherwise illegally omitting product warnings required by the FDCA; that is, New York recognizes

that a violation of a statute or regulation may serve as the basis for negligence *per se*.").

• Oklahoma. *Howard v. Zimmer, Inc.*, 299 P.3d 463, 465 (Okla. 2013) (holding the FDCA does not prohibit Oklahoma from recognizing a claim for negligence *per se* based on a violation of the MDA).

• Oregon. *Santoro v. Endologix Inc.*, No. 3:19-cv-01679-YY, 2020 WL 6295077, at \*12, 2020 U.S. Dist. LEXIS 200421 at \*35 (D. Or. Oct. 6, 2020) (finding "plaintiff has alleged a cognizable claim of negligence *per se*" based on the FDCA concerning the defendant's PMA-approved medical device).

• Pennsylvania. *Polt v. Sandoz, Inc.*, 462 F. Supp. 3d 557, 569 (E.D. Pa. 2020) (citations omitted) ("[A]lthough the FDCA does not create a private cause of action, a violation of the FDCA can form the basis for a negligence *per se* claim.").

• South Carolina. *Fisher v. Pelstring*, 817 F. Supp. 2d 791, 824 (D.S.C. 2011) (allowing a negligence action in which the standard of care is defined by the FDA regulations).

**[61]**  • Tennessee. An FDA regulation that imposes specific substantive requirement concerning the safety and effectiveness of a medical device may form the basis of a negligence *per se* claim under Tennessee law. *See Spier v. Coloplast Corp.*, 121 F. Supp. 3d 809, 816 (E.D. Tenn. 2015) (citing *Howard v. Sulzer Orthopedics, Inc.*, 382 F. App'x 436, 441 (6th Cir. 2010)) ("[A] negligence per se claim based on a GMP violation constituted a non-preempted parallel claim."); *Purchase v. Advanced Bionics, LLC*, 896 F. Supp. 2d 694, 698 (W.D. Tenn. 2011) ("If the CGMP regulation in question sets forth a specific and substantive standard of care that is intended to protect others, then it imposes a requirement on the manufacturer. As a result, the violation of that CGMP regulation may support a parallel claim and, incidentally, a negligence per se claim."); *c.f. King v. Danek Med.*, 37 S.W.3d 429, 457 (Tenn. Ct. App. 2000) (citing *Talley v. Danek Med., Inc.*, 179 F.3d 154, 161 (4th Cir. 1999)) ("The administrative requirement that a given device be approved by the FDA before being marketed—as opposed to a specific substantive requirement that a device be safe and effective—is only a tool to facilitate administration of the underlying regulatory scheme. Because it lacks any independent substantive content, it does not impose a standard of care, the breach of which could form the basis of a negligence per se claim.").

**\*27**  • Virginia. *Carmine v. Poffenbarger*, 154 F. Supp. 3d 309, 317 (E.D. Va. 2015) (allowing the plaintiff's negligence *per se* claim based on alleged violations of the FDCA); *Orthopedic Equipment Co. v. Eutsler*, 276 F.2d 455, 461 (4th Cir. 1960) ("[A] violation of the Federal Food, Drug, and Cosmetic Act is negligence *per se* in Virginia ....").

• Wisconsin. *Valente v. Sofamor, S.N.C.*, 48 F. Supp. 2d 862, 876 (E.D. Wis. 1999) ("[I]f the plaintiffs could show causation, they could assert negligence *per se* claims against the defendants based on the defendants' alleged violation of FDCA regulations.").

Finally, the Court discerns no relevant legal authority in these states: Idaho, Iowa, Montana, Vermont, and Wyoming. The Court need not consider relevant legal authority in Ohio, because Plaintiffs do not allege a negligence *per se* claim under Ohio law. (*See* ECF No. 119 at ¶¶ 84–86.)

Therefore, Plaintiffs cannot assert negligence *per se* claims based on alleged FDCA/CGMP violations in the following jurisdictions: Alaska, Arkansas, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Rhode Island, Texas, Utah, Vermont, Washington, West Virginia, and Wyoming. These claims shall be dismissed.

### 5. Plaintiffs' Report-Based Failure to Warn Claims Are Not Viable in Some Jurisdictions

 **[62]**   Allergan argues Plaintiffs' report-based failure to warn claims should be dismissed, because there is no state law duty to report adverse events to the FDA. (ECF No. 171-3 at 19.) Plaintiffs contend at least 15 states explicitly recognize a state law duty to warn via adverse event reporting, and most of the remaining states are also likely to recognize such a duty. (ECF No. 220 at 43–44.) The Court finds the state law duty to warn by reporting adverse events to the FDA is not recognized in some jurisdictions.

The following jurisdictions allow a failure to warn claim based on a device manufacturer's inadequate reporting to the FDA under state law tort principles:

• California. *Mize v. Mentor Worldwide LLC*, 51 Cal.App.5th 850, 265 Cal. Rptr. 3d 468, 479 (2020) (citations omitted) ("A claim based on the failure to warn the FDA of adverse events is not preempted to the extent state tort law recognizes a parallel duty."); *Coleman v. Medtronic, Inc.*, 223 Cal.App.4th 413, 167 Cal. Rptr. 3d 300, 312 (2014) ("[T]he duty to warn should not be so narrowly defined as to exclude a requirement to file adverse event reports with the FDA if that is the only available method to warn doctors and consumers.").

• Delaware. *Freed v. St. Jude Med.*, Inc., 364 F. Supp. 3d 343, 358 n.13 (D. Del. 2019).

• Hawaii. *Beavers-Gabriel v. Medtronic, Inc.*, No. 13-00686 JMS-RLP, 2015 WL 143944, at \*12 (D. Haw. Jan. 9, 2015) (citing *Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 944 P.2d 1279, 1297–98 (1997)) ("Hawaii law imposes a general duty of reasonable care on product manufacturers, and recognizes a cause of action for failure to warn.... Thus, this duty of care supplies a basis for Plaintiff's strict liability and negligence claims that arises independently of [the defendant's] duty to warn the FDA under federal law.").

 **\*28**  • Illinois. *Gravitt v. Mentor Worldwide, LLC*, No. 17 C 5428, 2018 WL 2933609, at \*9, 2018 U.S. Dist. LEXIS 98198 at \*33 (N.D. Ill. June 12, 2018) (citations omitted) ("[The defendant's] alleged underreporting [its medical device's] tendency to rupture implicates the state law duty of a manufacturer to inform regulators and the public when it has reason to know that a product is riskier than initially believed."); *Laverty v. Smith & Nephew, Inc.*, 197 F. Supp. 3d 1026, 1035 (N.D. Ill. 2016) ("The MDA sets standards for what, when, how, and to whom a manufacturer must report; it does not eviscerate the longstanding state-imposed duty to warn simply by redefining the way medical device manufacturers satisfy that obligation.... Illinois has long recognized negligence and strict liability torts arising out of a failure to warn, placing a duty on a product manufacturer not to communicate directly with an end user, but to engage in 'reasonable conduct for the benefit' of the end user. Here, that reasonable conduct includes fully and correctly complying with FDA disclosure requirements.").

• Indiana. *McAfee v. Medtronic, Inc.*, No. 1:12-CV-417 RLM, 2015 WL 3617755, at \*5, 2015 U.S. Dist. LEXIS 74101, at \*10–11 (N.D. Ind. June 4, 2015) (finding the plaintiff "stated plausible claims for relief" under Indiana state law "based on an alleged failure to warn the FDA" with adverse event reports).

• Idaho. *Richardson v. Bayer Healthcare Pharm. Inc.*, No. 4:15-cv-00443-BLW, 2016 WL 4546369, at *8 (D. Idaho Aug. 30, 2016) (citation omitted) (holding under Idaho law the manufacturer of a product may have a duty to forewarn a user of the product, which includes warnings and reports to the FDA in the context of Class III medical devices).

• Kentucky. *Waltenburg v. St. Jude Med., Inc.*, 33 F. Supp. 3d 818, 839–40 (W.D. Ky. 2014) (finding to the extent the plaintiffs' failure to warn claim "is based on Defendants' failure to comply with FDA [reporting] regulations, that claim is not preempted by § 360k(a)" or impliedly preempted).

• Louisiana. *Gavin v. Medtronic, Inc.*, No. 12-0851 SECTION: "G"(5), 2013 WL 3791612, at *14, 2013 U.S. Dist. LEXIS 101216, at *44 (E.D. La. July 19, 2013) (ruling the state law duty to provide adequate warnings and the FDA reporting requirements imposed by 21 C.F.R. § 803.50 are parallel).

• Maryland. *Williams v. Smith & Nephew, Inc.*, 123 F. Supp. 3d 733, 742 (D. Md. 2015) (citations and internal quotations omitted) ("Maryland tort law recognizes that a duty to warn can undergird a negligence case in a product liability action. Moreover, this duty to warn extends beyond the time of sale, and requires the manufacturer to make reasonable efforts to convey an effective warning. And reasonable efforts would, in some circumstances, entail a warning to a third party such as the FDA.").

• Minnesota. *Angeles v. Medtronic, Inc.*, 863 N.W.2d 404, 419 (Minn. App. 2015) ("[The plaintiffs' state law] claim is not expressly or impliedly preempted by federal law to the extent that [the plaintiffs] allege that [the defendant] failed to report adverse events to the FDA.").

• Mississippi. *Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 769 (5th Cir. 2011) (finding under Mississippi law "a failure to warn claim limited to an assertion that the defendant violated a relevant federal statute or regulation is 'parallel' to federal requirements").

• Missouri. *Williams v. Bayer Corp.*, 541 S.W.3d 594, 606 (Mo. Ct. App. 2017) ("[The plaintiff's] claim is not analogous to the 'fraud-on-the-FDA' theory that was rejected in *Buckman* and is instead grounded on a well-established duty imposed on manufacturers by Missouri state law to warn consumers about the risks of using their product, which [the

plaintiff] argues [the defendant] breached by failing to meet the post-premarket approval reporting requirements listed in the MDA and the [device's] PMA.").

• Nevada. *Scovil v. Medtronic Inc.*, No. 2:14-CV-00213-APG-VCF, 2015 WL 880614, at *7, 2015 U.S. Dist. LEXIS 25708, at *19 (D. Nev. March 2, 2015) (finding Nevada law contains a parallel requirement that a medical device manufacturer report adverse events to the FDA as required by federal law).

**\*29** • New York. *Barone v. Bausch & Lomb, Inc.*, No. E2017000711, 2019 WL 9341358, at *5, 2019 N.Y. Misc. LEXIS 6423, 2019 WL 9341358, at *6–7 (N.Y. Sup. Ct., Dec. 6, 2019), *rev'd on other grounds*, 191 A.D.3d 1365, 141 N.Y.S.3d 808 (2021) (allowing a failure to warn claim based on an alleged failure to comply with the parallel state and federal duty to report adverse events to the FDA concerning an implantable medical device); *A.F. v. Sorin Grp. USA*, Inc., 346 F. Supp. 3d 534, 544 (S.D.N.Y. 2018) ("[A] manufacturer's duty to take steps that are reasonably necessary to warn the medical community may include warning the FDA as required by the MDA. To the extent Plaintiffs assert a claim for failure to warn the FDA, that claim is not preempted.").

• Pennsylvania. *Silver v. Medtronic, Inc.*, 236 F. Supp. 3d 889, 900 (M.D. Pa. 2017); *McLaughlin v. Bayer Corp.*, 172 F. Supp. 3d 804, 838 (E.D. Pa. 2016).

• Rhode Island. *Hodges v. Brannon*, 707 A.2d 1225, 1228 (R.I. 1998) (affirming the trial court's limiting the evidentiary use of the defendant's negative event reports filed to the FDA "to the duty-to-warn and notice issues").

• Texas. *Schouest v. Medtronic, Inc.*, 13 F. Supp. 3d 692, 706 (S.D. Tex. 2014) (allowing the plaintiff's negligence claim "predicated on [the defendant's] failure to submit adverse-event reports to the FDA after the FDA granted the [defendant's] device premarket approval").

• Vermont. *Halsey v. Smith & Nephew*, No. 5:12-cv-171, 2014 WL 12717702, at *10–11, 2014 U.S. Dist. LEXIS 203484, at *31–32 (D. Vt. Feb. 4, 2014) (citing *Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1227 (9th Cir. 2013); *Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 769–70 (5th Cir. 2011)) (allowing a failure to warn claim parallel to federal requirements such as the FDA's medical device reporting regulations).

• Washington. *O'Neil v. St. Jude Med., Inc.*, No. C13-0661RSL, 2013 WL 6173803, at \*3, 2013 U.S. Dist. LEXIS 167450 at \*11 (W.D. Wash. Nov. 22, 2013) (allowing a failure to warn claim concerning a medical device parallel to the federal obligation to report adverse events to the FDA).

• Wisconsin. *Garross v. Medtronic, Inc.*, 77 F. Supp. 3d 809, 815–16 (E.D. Wis. 2015) (allowing a state common law duty to warn based the defendant's alleged failure to report adverse events concerning a medical device to the FDA).

The following jurisdictions explicitly reject a report-based failure to warn claim:

• Arizona. *Conklin v. Medtronic, Inc.*, 245 Ariz. 501, 431 P.3d 571, 578 (2018) ("[O]nly federal law, not state law, imposes a duty on [the defendant] to submit adverse event reports to the FDA.").

• Colorado. *Golden v. Brown*, No. 17CV30568, 2017 WL 4239015, at \*2 (Colo. Dist. Ct. Sept. 24, 2017) (citations omitted) ("[T]here is no state law duty identical to the federal requirement that a device manufacturer report adverse events to the FDA.").

• Connecticut. *Norman v. Bayer Corp.*, 3:16-cv-00253 (JAM), 2016 WL 4007547, at \*4, 2016 U.S. Dist. LEXIS 96993, at \*10 (D. Conn. July 26, 2016) (citations omitted) ("There is no general or background duty under Connecticut law to report risks to a regulatory body.... The failure-to-warn claim arises solely from the MDA's reporting requirements, and therefore is subject to implied preemption.").

• District of Columbia. *Kubicki v. Medtronic, Inc.*, 293 F. Supp. 3d 129, 183 (D.D.C. 2018) ("[T]here is no D.C. common law claim that imposes liability for a manufacturer's failure to report to the FDA adverse incidents concerning an approved medical device.").

• Florida. *Romer v. Corin Group, PLC*, No. 2:18-cv-19-FtM-99MRM, 2018 WL 4281470, at \*7, 2018 U.S. Dist. LEXIS 152752, at \*19 (M.D. Fla. Sept. 7, 2018) (citing *McClelland v. Medtronic, Inc.*, 944 F. Supp. 2d 1193, 1200–01 (M.D. Fla. 2013)) ("Since Florida does not provide a duty to file such [adverse event] reports with the FDA, plaintiffs' claim is merely an 'attempt to recast a claim for violation of the FDCA as a state-law negligence claim' and is impliedly preempted.").

**\*30** • Georgia. *Cline v. Advanced Neuromodulation Sys.*, 17 F. Supp. 3d 1275, 1285–87 (N.D. Ga. 2014) (dismissing the plaintiff's negligent failure to warn claim based on the defendant's failure to timely file MDRs partly because the FDA's disclosure of MDRs to the public is not guaranteed).

• Kansas. *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) (affirming dismissal of the plaintiffs' failure to warn claim based on the defendant's failure to conduct post-approval reporting of adverse events to the FDA, because the plaintiffs did not identify a parallel duty under Kansas law).

• Massachusetts. *Phillips v. Medtronic, Inc.*, No. SUCV2009-05286-A, 2012 WL 3641487 at \*10, 2012 Mass. Super. LEXIS 3435 at \*28 (Mass. Super. July 10, 2012) (citations omitted) ("[A] parallel claim based on failure to report adverse events, corrections and removals, and failure to submit supplemental reports to the FDA is impliedly preempted because it is premised solely on a duty created by the MDA which did not exist in the common law: the duty to provide information to a regulatory agency to enable it to determine whether to take enforcement action with respect to a device approved through the PMA process.").

• Michigan. *Hill v. Bayer Corp.*, 485 F.Supp.3d 843, 855 (E.D. Mich. 2020) (concluding the plaintiff's "negligent failure-to-warn-FDA claim[ ] [is] impliedly preempted," because the plaintiff "has not alleged any Michigan requirement that a manufacturer report adverse events to the FDA"); *White v. Medtronic, Inc.*, No. 18-11590, 2019 WL 1339613 at \*6, 2019 U.S. Dist. LEXIS 49259 at \*13 (E.D. Mich. Feb. 20, 2019) ("[T]he federal requirement that manufacturers report adverse events to the FDA has no state law analog, and thus there is no parallel state cause of action.").

• Montana. *Noel v. Bayer Corp.*, 481 F.Supp.3d 1111, 1127 (D. Mont. 2020) ("The claims based on a failure to warn (or report adverse events) to the FDA are impliedly pre-empted because there are no parallel requirements based on Montana law.").

• New Jersey. *D'Addario v. Johnson & Johnson*, No. 19-15627, 2020 WL 3546750, at \*4– –\*5, 2020 U.S. Dist. LEXIS 116760, at \*12 (D.N.J. June 30, 2020) (declining to recognize a separate state law duty to warn the FDA).

• North Carolina. *McNeil-Williams v. DePuy Orthopaedics, Inc.*, No. 5:18-CV-220-FL, 2019 WL 2179217, at \*5,

2019 U.S. Dist. LEXIS 84339, at *13 (E.D.N.C. May 20, 2019) (finding North Carolina law "does not recognize an independent state law duty to make adverse event reports to the FDA").

• Ohio. *Aaron v. Medtronic, Inc.*, 209 F. Supp. 3d 994, 1005–06 (S.D. Ohio 2016) ("[T]here is no state-law duty to report adverse events to the FDA [in Ohio].").

• Oregon. *Alton v. Medtronic, Inc.*, 970 F. Supp. 2d 1069, 1089 (D. Or. 2013) ("[T]o the extent the [plaintiff's] claim was construed as premised on alleged misrepresentations and/or omissions in [the defendant's] mandatory reports to the FDA regarding the risk of adverse outcomes from off-label applications of the [defendant's] device, the claim was clearly impliedly preempted.").

• South Carolina. *Ellis v. Smith & Nephew, Inc.*, No. 6:15-545-TMC, 2016 WL 7319397, at *7, 2016 U.S. Dist. LEXIS 193607, at *19 (D.S.C. Feb. 16, 2016) (declining to recognize a failure to warn claim that is predicated on the defendant's alleged failure to provide required reports to the FDA).

**\*31**  • Tennessee. *Potolicchio v. Medtronic, Inc.*, No. 1:15-cv-122, 2016 WL 3129186, at *4, 2016 U.S. Dist. LEXIS 71723, at *12 (E.D. Tenn. 2016) (citing *Nye v. Bayer Cropscience, Inc.*, 347 S.W.3d 686, 701 (Tenn. 2011)) ("No Tennessee law requires [the defendant] to warn the FDA about adverse events. Tennessee law requires manufacturers to warn physicians, but not the FDA.").

Finally, the Court is unaware of, and counsel has not provided, any relevant legal authority in the following jurisdictions: Alabama, Alaska, Arkansas, Iowa, Maine, Nebraska, New Hampshire, Nevada, North Dakota, Oklahoma, South Dakota, Utah, Virginia, West Virginia, and Wyoming. Given the split among the jurisdictions as to the viability of a report-based failure to warn claim, the Court will "opt for the interpretation that restricts liability, rather than expands it, until the Supreme Court of [the State] decides differently." *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 253 (3d Cir. 2010) (citing *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3d Cir. 2010)). Therefore, the Court assumes a report-based failure to warn claim is not allowed in these states.

Accordingly, Plaintiffs' report-based failure to warn claims are dismissed under the laws of Alabama, Alaska, Arkansas, Arizona, Colorado, Connecticut, District of Columbia,

Florida, Georgia, Iowa, Kansas, Maine, Massachusetts, Michigan, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Utah, Virginia, West Virginia, and Wyoming.

### 6. Plaintiffs' Negligent Misrepresentation Claims

#### a. Plaintiffs' Negligent Misrepresentations Claims Are Sufficiently Pleaded

**[63]**  Allergan argues Plaintiffs' negligent misrepresentation claims fail to meet the heightened pleading standard under Rule 9. (ECF No. 171-3 at 21.) Plaintiffs counter their negligent misrepresentation claims are sufficiently pleaded even under Rule 9, though Rule 9 should not govern Plaintiffs' negligent misrepresentation claims. (ECF No. 220 at 47–48.) The Court agrees.

Determinations regarding Allergan's alleged negligent misrepresentations will involve evaluation of individualized facts, because each individual Plaintiff may have received from Allergan a distinct set of implant-related information. Additionally, the evidence of such alleged misrepresentations is primarily within the control of Allergan. Therefore, at this stage, the Court will not dismiss Plaintiffs' negligent misrepresentation claims based on an insufficiency of facts alleged in the PIC. Moreover, even applying the the heightened pleading standard under Rule 9, the Court finds Plaintiffs have sufficiently pleaded Allergan's alleged negligent misrepresentations.

**[64]**  "Because pleading rules are procedural in nature, 'the transferee court must apply federal law as interpreted by the court of the district where the transferee court sits.' " *In re Asbestos Prods. Liab. Litig. (No. VI)*, 611 F. App'x 86, 89 (3d Cir. 2015) (citing *Various Plaintiffs v. Various Defendants (Oil Field Cases)*, 673 F. Supp. 2d 358, 362 (E.D. Pa. 2009)). Therefore, the Court will apply the federal law in the Third Circuit in determining the pleading standard applicable to Plaintiffs' negligent representation claims.

**\*32 [65] [66] [67]**  "[U]nder the Federal Rules, plaintiff's pleading negligent representation without more is sufficient to state a claim." *Manley v. Maran*, No. 02-2504, 2003 WL 27392744, 2003 U.S. Dist. LEXIS 19696, at *9 (D.N.J. June 20, 2003). "[T]he defendants' objection that plaintiff had to plead specific facts is misplaced," as the plaintiff only need to

satisfy "the liberal pleading requirement of Rule 8 and state[ ] a claim upon which relief can be granted." *Id.* at \*9, 11; *see also Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 604 n.12 (D.N.J. 2016) (citations omitted) ("Where the claims are expressly premised on negligence rather than fraud, Fed. R. Civ. P. 9(b) has been held inapplicable."). However, "where the plaintiff grounds his claims in allegations of fraud—and the claims thus sound in fraud—the heightened pleading requirements of Rule 9(b) apply." *Gray v. Bayer Corp.*, 2009 WL 1617930, at \*2, 2009 U.S. Dist. LEXIS 48181, at \*5 (D.N.J. June 9, 2009) (citing *In re Suprema Specialties, Inc. Securities Litig.*, 438 F.3d 256, 270 (3d Cir. 2006)). But "[a]bsent a determination that plaintiffs' claims sounded in fraud, or some analysis explaining why Rule 9(b) should apply," applying Rule 9(b) to such claims "constitutes legal error." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 717 n.20 (3d Cir. 1996).

[68] Assuming Plaintiffs' negligent misrepresentation claims sound in fraud, the Court finds they meet the heightened pleading standard under Rule 9. Plaintiffs have alleged the "essential factual background" of Allergan's alleged misrepresentations of its implants that lack any reference to the BIA-ALCL risk, by describing the "who, what, when, where and how of the events at issue." *Suprema Specialties*, 438 F.3d at 276–77 (citation omitted). For example, the PIC describes Allergan's allegedly misleading promotional YouTube video for its Natrelle Breast Implants. (ECF No. 119 at ¶ 97.) This publicly available online video describes (1) the "greatly improved safety" of breast augmentation, and (2) Allergan's textured and smooth implants, but does not make any distinction between the two types of implants as to the significantly increased risks of contracting BIA-ALCL associated with the textured type. (*Id.*) These descriptions may imply Allergan's textured implants, which include the BIOCELL implants, enjoy a greatly improved safety feature comparable to smooth implants and, therefore, could plausibly be misrepresentations of the implants' safety features. The bottom of the video displays the following text: "© 2010 Allergan, Inc. ® mark owned by Allergan, Inc." [5] This suggests the video is authored by Allergan and first published in 2010.

**b. Plaintiffs Cannot Assert Negligent Misrepresentation Claims in Some Jurisdictions**

Allergan contends Plaintiffs' negligent misrepresentation claims should be dismissed in the thirteen states that either subsume negligent misrepresentation within the state's product liability statute, or do not recognize negligent misrepresentation as a separate cause of action. (ECF No. 171-3 at 23.) Plaintiffs point out they do not make any negligent misrepresentation claim in two of the thirteen states, i.e., New Jersey and Indiana, and can assert the claim in the other nine states. (ECF No. 220 at 54.) The Court finds Plaintiffs cannot assert negligent misrepresentation claims in some states.

As explained in Part III.B.6.a, *supra*, the Court need not review the factual sufficiency of Plaintiffs' negligent misrepresentation allegations. Moreover, scrutinizing such factual sufficiency under the potentially varying state laws of negligent misrepresentation would be both cumbersome and unrealistic at this stage, especially when individual Plaintiffs may allege separately in their Short Form Complaints Allergan's misrepresentations to which they each have been exposed. Here, the Court will only examine whether Plaintiffs' negligent misrepresentation claims can be viable as a matter of law. The Court will not examine the controlling laws in New Jersey and Indiana, under whose laws Plaintiffs do not assert any negligent misrepresentation claim.

**\*33** • Alabama:

[69]    [70]    [71]    [72] Plaintiffs' claims are viable under Alabama law. Allergan suggests Plaintiffs' negligent misrepresentation claims would be considered a product liability action, and may be barred by the learned intermediary doctrine. (ECF No. 236-1 at 240–41.) The Court disagrees. In Alabama, Ala. Code § 6-5-521 "codifies who may bring a 'product liability action,' " including a negligent misrepresentation cause of action, and a plaintiff can assert a negligent misrepresentation claim. *Dalraida Props. v. ElastiKote, LLC*, No. 2:14-cv-1213-MHT-PWG, 2015 WL 4393158, at \*6, 2015 U.S. Dist. LEXIS 92498, at \*16–17 (M.D. Ala. July 15, 2015) (citing Ala. Code § 6-5-521). Also, Plaintiffs' negligent misrepresentation claims are not necessarily precluded by the learned intermediary doctrine. "Under the learned intermediary doctrine, a manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the use of its product." *Walls v. Alpharma USPD, Inc.*, 887 So. 2d 881, 883 (Ala. 2004). "[I]f the warning to the learned intermediary is inadequate or misrepresents the risk, the manufacturer remains liable for the injuries

sustained by the patient." *Wyeth, Inc. v. Weeks*, 159 So. 3d 649, 673 (Ala. 2014). "The patient must show that the manufacturer failed to warn the physician of a risk not otherwise known to the physician and that the failure to warn was the actual and proximate cause of the patient's injury." *Id.* Here, Plaintiffs allege their physicians were not properly warned of the risks associated with the BIOCELL implants, and the physicians would not have recommended BIOCELL if Allergan provided adequate warnings. (ECF No. 119 at ¶ 204.) Therefore, Plaintiffs' allegations are sufficient under the learned intermediary doctrine.

• Arkansas:

**[73]** Plaintiffs' claims are not viable under Arkansas law. Allergan argues Arkansas does not recognize negligent misrepresentation as a separate cause of action. (ECF No. 236-1 at 241.) Plaintiffs explain Arkansas recognizes the tort of misrepresentation rather than negligent misrepresentation. (*Id.* at 242.) The Court disagrees. Arkansas "decline[s] to recognize the tort of negligent misrepresentation." *South County v. First W. Loan Co.*, 315 Ark. 722, 871 S.W.2d 325, 326 (Ark. 1994). "Misrepresentation, also commonly referred to as deceit or fraud, has been an intentional tort in Arkansas for well over a century." *Id.* (citations omitted). "Thus, Plaintiffs cannot state a claim of negligent misrepresentation upon which relief may be granted." *Stube v. Pfizer Inc.*, 446 F. Supp. 3d 424, 442 (W.D. Ark. 2020). Plaintiffs claim their factual allegations have sufficiently stated a claim for misrepresentation under Arkansas law. (ECF No. 236-1 at 242.) But this is irrelevant to the viability of Plaintiffs' negligent misrepresentation claims under Arkansas law.

• Florida:

Plaintiffs' claims are viable under Florida law. Florida "recognize[s] a cause of action for negligent misrepresentation." *Moransais v. Heathman*, 744 So. 2d 973, 982 (Fla. 1999) (citing *First Florida Bank, N.A. v. Max Mitchell & Co.*, 558 So. 2d 9 (Fla. 1990)).

**\*34** • Georgia:

Plaintiffs' claims are viable under Georgia law. Georgia allows a cause of action for negligent misrepresentation, and "adopt[s] the standard for negligent misrepresentation set out in Restatement of Torts 2d, § 552 (1977)." *Neidiger/Tucker/Bruner, Inc. v. Suntrust Bank*, 242 Ga.App. 369, 530 S.E.2d

18, 21 (2000) (citing *Robert & Co. Assoc. v. Rhodes-Haverty Partnership*, 250 Ga. 680, 300 S.E.2d 503, 504 (1983)).

• Louisiana:

**[74]** **[75]** **[76]** **[77]** Plaintiffs' claims are not viable under Louisiana law. Allergan argues the Louisiana Product Liability Act ("LPLA") is the exclusive theory of liability for manufacturers for damages caused by their products, and Plaintiffs therefore cannot assert negligent misrepresentation claims. (ECF No. 236-1 at 244.) Plaintiffs maintain their negligent misrepresentation claims could proceed under the LPLA. (*Id.* at 245.) The Court disagrees. "The LPLA establishes the exclusive theory of liability for manufacturers for damages caused by their products." *Baudin v. AstraZeneca Pharms. LP*, 413 F. Supp. 3d 498, 503 (M.D. La. 2019). "The LPLA authorizes four theories of recovery: (1) construction or composition defect; (2) design defect; (3) inadequate warning; or (4) breach of express warranty." *Johnson v. Teva Pharms. USA, Inc.*, No. 2:10 CV 404, 2010 WL 3271934 at \*2, 2010 U.S. Dist. LEXIS 84747 at \*7 (W.D. La. Aug. 11, 2010) (citing La. Rev. Stat. Ann. § 9:2800.52-54). "A plaintiff may not recover from a manufacturer for damage caused by a product on the basis of any theory not set forth in the LPLA." *Id.* at \*7–8 (citing *Jefferson v. Lead Industries, Ass'n., Inc.*, 106 F.3d 1245, 1250–51 (5th Cir. 1997)). A negligent misrepresentation claim is "not cognizable under the LPLA, and must be dismissed." *Lewis v. GE Healthcare, Inc.*, No. 5:19-CV-00490, 2020 WL 1490719 at \*4, 2020 U.S. Dist. LEXIS 51999 at \*9 (W.D. La. March 25, 2020). Here, Plaintiffs are suing Allergan, a manufacturer, for damages caused by its products. Therefore, the LPLA governs, and does not allow a negligent misrepresentation claim.

• Minnesota:

**[78]** **[79]** **[80]** Plaintiffs' claims are not viable under Minnesota law. Allergan states Plaintiffs fail to plead negligent misrepresentation, because they do not allege pecuniary loss related to a business transaction, and Minnesota limits the negligent misrepresentation claim to damages for pecuniary loss. (ECF No. 236-1 at 245.) Plaintiffs contend Minnesota law does not clearly limit Plaintiffs' claims to pecuniary loss. (*Id.* at 246.) Moreover, Plaintiffs claim to have sustained pecuniary loss related to a business transaction with Allergan: because of Allergan's alleged misrepresentations, Plaintiffs purchased and used implants from Allergan, and incurred pecuniary loss in the

form of medical costs and lost wages. (*Id.*) The Court disagrees. In Minnesota,

> One who, in the course of his business, profession or employment, or in a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

**\*35** *Bonhiver v. Graff*, 311 Minn. 111, 248 N.W.2d 291, 298 (1976) (citing Restatement, Torts 2d, Tent. Draft No. 12, § 552). "[T]he scope of a negligent misrepresentation claim" is limited "to a commercial or business setting with consequent pecuniary loss," and does not extend to "medical bills." *Forslund v. Stryker Corp.*, No. 09-2134 (JRT/JJK), 2010 WL 3905854, at \*6, 2010 U.S. Dist. LEXIS 104227, at \*19–20 (D. Minn. Sept. 30, 2010) (citing *id.*) (dismissing the plaintiff's negligent misrepresentation claim for damages resulting from the defendant's medical implant in the plaintiff's body). Plaintiffs' claims are analogous to that in *Forslund*, and should be dismissed under Minnesota law.

• Mississippi:

 **[81]  [82]  [83]** Plaintiffs' claims are viable only under the Mississippi Product Liability Act ("MPLA"). Allergan contends Plaintiffs' negligent misrepresentation claims are subsumed by the MPLA and should be dismissed. (ECF No. 236-1 at 247.) The Court finds Plaintiffs' common law negligent misrepresentation claims should be dismissed. "[T]he MPLA applies to 'any action for damages caused by a product.' " *Young v. Bristol-Myers Squibb Co.*, No. 4:16-CV-00108-DMB-JMV, 2017 WL 706320 at \*3, 2017 U.S. Dist. LEXIS 24730 at \*8 (N.D. Miss. Feb. 22, 2017) (citing Miss. Code Ann. § 11-1-63(a)). "Accordingly, common law claims based on damages caused by a product are subsumed by the MPLA and must be analyzed under the statute." *Id.* (citing *Elliott v. El Paso Corp.*, 181 So.3d 263, 269 (Miss. 2015)); *see also Arnoult v. CL Med. SARL*, No. 1:14-CV-271-KS-MTP, 2015 WL 5554301 at \*4, 2015 U.S. Dist. LEXIS

125843 at \*9 (S.D. Miss. Sept. 21, 2015) (citations omitted) ("[T]he MPLA subsumes negligent misrepresentation claims arising from a defective product."); *Little v. Smith & Nephew, Inc.*, No. 1:15-cv-00028-GHD-DAS, 2015 WL 3651769, at \*13, 2015 U.S. Dist. LEXIS 75666, at \*34 (N.D. Miss. June 11, 2015) (citations omitted) ("Numerous Mississippi district courts have held that the MPLA subsumes common law negligent misrepresentation claims based on a defective product."). "Common law claims for damages caused by a product which seek to impose liability outside the MPLA's framework must be dismissed for failure to state a claim." *Young*, 2017 WL 706320, at \*3, 2017 U.S. Dist. LEXIS 24730, at \*8 (citing *Elliott*, 181 So.3d at 269).

Plaintiffs claim they "may pursue negligent misrepresentation claims outside of the MPLA where, as here, defendant made affirmative misrepresentations in addition to and separate from those made on the product's label," such as Allergan's "affirmative misrepresentations in marketing and other non-PMA materials upon which Plaintiffs and Plaintiffs' physicians relied." (ECF No. 236-1 at 247–48 (citing *R.J. Reynolds Tobacco Co. v. King*, 921 So. 2d 268 (Miss. 2005); *Jowers v. BOC Grp., Inc.*, No. 1:08-CV-0036, 2009 WL 995613, 2009 U.S. Dist. LEXIS 53126 (S.D. Miss. Apr. 14, 2009)).) But this argument is contrary to the clear language of the MPLA, which provides:

> The manufacturer, designer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer, designer or seller:
>
> (i) 1. The product was defective because it deviated in a material way from the manufacturer's or designer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, or
>
> 2. The product was defective because it failed to contain adequate warnings or instructions, or
>
> 3. The product was designed in a defective manner, or
>
> 4. The product breached an express warranty or *failed to conform to other express factual representations* upon which the claimant justifiably relied in electing to use the product; and
>
> **\*36** (ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and

(iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

Miss. Code Ann § 11-1-63(a). Therefore, in addition to express warranty, the MPLA covers a manufacturer's "other express factual representations," such as Allergan's alleged off-label affirmative misrepresentations.

Plaintiffs' reliance on *Jowers* and *King* does not change the conclusion. The *Jowers* court found an off-label misrepresentation "[went] beyond any failure to warn, and so [wa]s not simply a 'product liability claim,' and, thus, is not automatically abrogated by the MPLA." *Jowers*, 2009 WL 995613, at *9, 2009 U.S. Dist. LEXIS 53126, at *37. But an off-label misrepresentation, even if not constituting a failure to warn under Miss. Code Ann § 11-1-63(a)(i) 2, falls under "other express factual representations" under § 11-1-63(a)(i) 4. Therefore, interpreting a manufacturer's off-label misrepresentations as going beyond the MPLA's coverage is contrary to the statute's plain language and multiple Mississippi court decisions after *Jowers*, as cited above. Such an inaccurate interpretation of the MPLA is also not supported by the *King* court, which addressed a "singular issue: Does the inherent characteristic defense of Miss. Code Ann. § 11-1-63(b) ... bar 'any action for damages caused by' manufactured commercial cigarettes regardless of how the plaintiff labels the causes of action in the complaint?" *King*, 921 So. 2d at 270. "§ 11-1-63(b) is commonly referred to as the 'inherent characteristics defense' and is just that." *Id.* at 272. It provides:

> A product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

Miss. Code Ann § 11-1-63(b). That is to say, the *King* court did not consider the issue of negligent representation, and is therefore inapplicable here. Plaintiffs fail to demonstrate they can pursue negligent misrepresentation claims outside of the MPLA.

Accordingly, the Court dismisses Plaintiffs' common law negligent misrepresentation claims under Mississippi law.

• Ohio:

Plaintiffs' claims are viable under Ohio law. Ohio "recognize[s] the tort of negligent misrepresentation." *Ed Schory & Sons v. Francis*, 75 Ohio St.3d 433, 662 N.E.2d 1074, 1080 (1996) (citations omitted).

• Tennessee:

Plaintiffs' claims are viable under Tennessee law. "Tennessee's courts have also recognized the common-law tort of negligent misrepresentation and have adopted the Restatement (Second) of Torts § 552 (1977) as the guiding principle with regard to these claims." *Hodge v. Craig*, 382 S.W.3d 325, 344 (Tenn. 2012) (citations omitted).

• Texas:

**[84]** **[85]** **[86]** Plaintiffs' claims are viable under Texas law. Allergan maintains Plaintiffs' negligent misrepresentation claim is subsumed by a failure to warn claim. (ECF No. 236-1 at 250 (citing *Phares v. Actavis-Elizabeth LLC*, 892 F. Supp. 2d 835 (S.D. Tex. 2012)).) The Court disagrees. Texas courts "recognize[ ] a cause of action for negligent misrepresentation where the plaintiff suffered physical harm," even though a plaintiff's negligent misrepresentation claim could be found as "merely a recasting of their failure to warn claim." *Elmazouni v. Mylan, Inc.*, 220 F. Supp. 3d 736, 744 (N.D. Tex. 2016). A negligent misrepresentation may be considered a failure to warn claim when, "[n]o matter how [a plaintiff] casts her claims, [the plaintiff] essentially alleges that [the defendant] failed to warn her that [the defendant's product] causes [a disease]." *Phares*, 892 F. Supp. 2d at 841. In this situation, if the plaintiff's failure to warn claim is rejected for some reason, then its negligent misrepresentation claim will be rejected for the same reason. *Id.* at 845–46 (dismissing the plaintiff's failure to warn and negligent misrepresentation claims for the same reason, i.e., the defendant owing no legally cognizable duty to the plaintiff); *see also Miles v. Boston Sci. Corp.*,

No. H-19-4319, 2020 WL 3871329, at *9, 2020 U.S. Dist. LEXIS 120190 at *26 (S.D. Tex. July 9, 2020) (citations omitted) ("Here, [the plaintiff's] fraud by concealment and negligent misrepresentation claims are premised on her allegation that [the defendant] knowingly omitted material facts about [the defendant's product], or in other words, failed to adequately warn her and her physicians. Since the learned intermediary doctrine applies, her fraud-based and negligent misrepresentation claims fail for the same reasons as her failure to warn claim as discussed above."); *Perez v. Am. Med. Sys.*, 461 F. Supp. 3d 488, 507–08 (W.D. Tex. 2020) ("Plaintiffs' negligent misrepresentation [and] implied warranty ... claims are all grounded in allegations that Defendant provided inadequate warnings .... Therefore, the independent intermediary doctrine applies to these claims.... Plaintiffs cannot demonstrate causation as a matter of law [as required under the doctrine for the failure to warn claim]. Therefore, Defendant is entitled to summary judgment on Plaintiffs' negligent misrepresentation ... as well."). But a plaintiff may still assert a negligent misrepresentation claim independent of a failure to warn claim. *See Hardy v. Zimmer*, No. 2:16-cv-242-JRG, 2017 WL 1551601, at *1–2, 2017 U.S. Dist. LEXIS 65430, at *4–5 (E.D. Tex. April 28, 2017). In conclusion, Plaintiffs may assert a negligent misrepresentation claim not subsumed by a failure to warn claim under Texas law.

**\*37** • Virginia:

 **[87]** Plaintiffs' claims are not viable under Virginia law. The parties dispute whether Virginia recognizes a negligent misrepresentation claim. (ECF No. 236-1 at 251–52.) Plaintiffs cite *Hansen* to argue negligent misrepresentation is a cognizable claim under Virginia law. (*Id.* at 252 (citing *Hansen v. Stanley Martin Companies, Inc.*, 266 Va. 345, 585 S.E.2d 567, 573 (2003)).) The Court disagrees. *Hansen* is inapposite here, because the dispute in *Hansen* was governed by Maryland's substantive law. *Hansen*, 585 S.E.2d at 571. Instead, "it is well-established that 'Virginia does not recognize any tort of negligent misrepresentation.' " *A.T. Massey Coal Co. v. Rudimex GmbH*, No. 3:05CV190-JRS, 2006 WL 44278 at *6, 2006 U.S. Dist. LEXIS 1882 at *16 (E.D. Va. Jan. 9, 2006) (citing *Bentley v. Legent Corp.*, 849 F. Supp. 429, 434 (E.D. Va. 1994)); *see also Zaklit v. Global Linguist Solutions, LLC*, No. 1:14cv314 (JCC/JFA), 2014 WL 3109804, at *19, 2014 U.S. Dist. LEXIS 92623, at *58 (E.D. Va. July 8, 2014) (citations and internal quotations omitted) ("Virginia does not recognize a general cause of action for negligent misrepresentation."); *Johnson v. Capital*

*Area Permanente Group*, 30 Va. Cir. 107, 109 n.2 (Va. Cir. Ct. 1993) (citations omitted) ("Virginia law does recognize negligent misrepresentation.").

Accordingly, the Court dismisses Plaintiffs' negligence misrepresentation claims under the laws of Arkansas, Louisiana, Minnesota, and Virginia, as well as Mississippi's common law.

### 7. Plaintiffs Cannot Assert Warranty Claims in Some Jurisdictions

Allergan states Plaintiffs' warranty claims fail for several reasons: (1) some states do not allow implied warranty claims in prescription medical device litigations; (2) some states require notice as an element of warranty claims, and Plaintiffs do not plead notice in the PIC; and (3) some states require privity to assert warranty claims, and Plaintiffs lack privity with Allergan. (ECF No. 171-3 at 23.) Plaintiffs rebut Allergan's challenges on the following bases: (1) courts frequently permit warranty claims in cases involving prescription medical devices; (2) before the PIC was filed, Allergan had actual notice of the defects in its BIOCELL implants; (3) to the extent the purpose of a pre-suit notice is to provide an opportunity for the defendant to cure, the notice is not required here, because a cure is impossible for each Plaintiff who is already surgically implanted with Allergan's implant; and (4) Plaintiffs' warranty claims do not require privity because Plaintiffs are alleging personal injury. (ECF No. 220 at 56–60.) The Court finds Plaintiffs' implied warranty claims are not viable in some jurisdictions.

As a threshold matter, the Court will review with substantial leniency the following individualized factual issues, for the reasons explained in Part III.B.1, *supra*. First, a lack of adequate notice by the defendant, even if required for asserting a warranty claim, will not be a ground for dismissal here. This is because whether Allergan has received adequate notice via its own efforts or from a Plaintiff will involve (1) facts specific to each individual Plaintiff and (2) evidence primarily within Allergan's control. Second, the Court will not scrutinize whether Plaintiffs have sufficiently alleged the defects in the BIOCELL implants. This is because the actual implant used by each individual Plaintiff, including its possible defects, is unique. Third, whether Allergan has directed (mis)representations, warranties or other communications towards Plaintiffs involves individualized factual issues, because each Plaintiff may have engaged in

a unique set of contacts with Allergan. Fourth, whether Plaintiffs can establish a third party beneficiary status with respect to the agreement between Allergan and its implant distributors involves individualized factual issues, because it may turn on the interactions between each individual Plaintiff and Allergan. As a result, Plaintiffs' potentially insufficient allegations of notice, defects, Allergan's direct contacts with Plaintiffs, and the third party beneficiary status will not be considered in the motion to dismiss inquiry.

**\*38** However, the Court will examine, under the laws of different jurisdictions: (1) whether warranty claims are allowed in prescription medical device litigations, because this is a purely legal question, and (2) whether privity is required for asserting Plaintiffs' warranty claims, because privity involves a fact common to all Plaintiffs: the BIOCELL implants are prescription medical devices, which suggests Plaintiffs do not purchase the implants directly from Allergan.

In addition, as the following analysis shows, there are often several independent legal theories on which to assert express or implied warranty claims under the law of a given jurisdiction, such as a state's Uniform Commercial Code ("UCC"), product liability statute, common law, and certain exceptions. Plaintiffs, in asserting their warranty claims, do not limit the claims' underlying legal theories. Therefore, as long as Plaintiffs' express or implied claim may be viable under one of the theories recognized in a jurisdiction, the Court will allow that claim to proceed at this stage.

Finally, the viability of an implied warranty of fitness claim is not an issue here, because Plaintiffs do not assert such a claim in the PIC.

• Alabama:

**[88]  [89]  [90]  [91]** Plaintiffs' claims are viable under Alabama law. The parties dispute whether Alabama law recognizes an implied warranty of merchantability claim for medical devices. (ECF No. 236-1 at 254.) "In general, Alabama law does not recognize a cause of action for breach of implied warranty of merchantability for inherently dangerous products." *Barnhill v. Teva Pharms. USA, Inc.*, 819 F. Supp. 2d 1254, 1263 (S.D. Ala. 2011). "An implantable Class III medical device ... is an inherently dangerous product." *Grubbs v. Medtronic, Inc.*, No. 2:18-cv-01468-AKK, 2019 WL 3288263 at \*4, 2019 U.S. Dist. LEXIS 121216 at \*11 (N.D. Ala. July 22, 2019) (citations omitted). However, Alabama allows an implied warranty

of merchantability claim based on an alleged failure to "manufacture the Device in accordance with the FDA's requirements," as opposed to "a general allegation that the product contains inherent dangers." *Id.* at \*4, 2019 U.S. Dist. LEXIS 121216, at \*11–12. As discussed in Parts III.A.2 and III.B3, *supra*, Plaintiffs have sufficiently alleged the BIOCELL implants deviate from FDA-approved product specifications, and their implied warranty claims are therefore allowed in Alabama.

• Arizona:

**[92]** Plaintiffs' claims are viable under Arizona law. The parties dispute whether Arizona law requires privity for an express warranty claim. (ECF No. 236-1 at 255–56.) Plaintiffs cite *Flory* to argue that privity is not required when the defendant's alleged breach of warranty causes physical injury. (*Id.* at 256 (citing *Flory v. Silvercrest Indus.*, 129 Ariz. 574, 633 P.2d 383 (1981)).) The Court disagrees. *Flory* suggested Arizona Revised statutes ("A.R.S.") § 44-2335 might extend a seller's warranties to "personally injured family members and household members and guests" of its buyer. *Flory*, 633 P.2d at 387–88. But § 44-2335 only "eliminates the necessity of horizontal privity as to certain personally injured plaintiffs, but not the necessity of vertical privity, or privity in the chain of distribution," and "does not create warranties on the part of ... remote manufacturers." *Id.* Instead, "the Arizona Supreme Court held that the lack of privity between a purchaser and a manufacturer precluded recovery based on express warranty under the U.C.C.," but "the lack of privity did not preclude the purchaser from bringing a cause of action for breach of express warranty outside the U.C.C." *Plagens v. Nat'l RV Holdings, Inc.*, 328 F. Supp. 2d 1068, 1074 (D. Ariz. 2004) (citing *Flory v. Silvercrest Indus. Inc.*, 129 Ariz. 574, 633 P.2d 383, 387–89 (1981)); *see also In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*, 955 F. Supp. 2d 1311, 1339 (S.D. Fla. 2013) (citations and internal quotations omitted) (finding under Arizona law "a plaintiff may not proceed with a breach of warranty action under the Uniform Commercial Code against a manufacturer not in privity with the plaintiff" but "lack of privity between a manufacturer and retail purchaser does not preclude a claim outside the U.C.C. for breach of express warranty"). Therefore, though privity is required for asserting UCC-based express warranty claims, Plaintiffs may, at minimum, assert non-UCC-based express warranty claims under Arizona law.

**\*39** Moreover, *Hix* rejected the "argument that a patient of an implantable medical product can never be in privity with

the manufacturer." *Hix v. Bos. Sci. Corp.*, No. CV-19-00422-PHX-DJH, 2019 WL 6003456, at *6, 2019 U.S. Dist. LEXIS 197384, at *13 (D. Ariz. Nov. 14, 2019). Instead, privity may "exist between the patient and the manufacturer" and "a breach of express warranty could be brought[,] if the plaintiff was capable of pleading sufficient facts to show that the manufacturer made representations specifically to the plaintiff, rather than just plaintiff's physicians." *Id.* at *6, 2019 U.S. Dist. LEXIS 197384, at *14 (citing *Martin v. Medtronic, Inc.*, 63 F. Supp. 3d 1050, 1061 (D. Ariz. 2014)). Because the Court will not scrutinize Allergan's representations made to an individual Plaintiff at this stage, Plaintiffs' express warranty claims under Arizona law, whether or not based on UCC, will not be dismissed for a lack of privity.

• California:

**[93] [94]** Plaintiffs' claims are viable under California law. The parties dispute whether privity of contract is required for Plaintiffs' implied and express warranty claims under California law. (ECF No. 236-1 at 258–60.) "[P]rivity of contract is required in an action for breach of either express or implied warranty." *Blanco v. Baxter Healthcare Corp.*, 158 Cal.App.4th 1039, 70 Cal. Rptr. 3d 566, 582 (2008) (citations omitted). However, California courts have not concluded "a patient of an implantable medical product can never be in privity with the manufacturer," and have only held "privity does not exist between the patient and the manufacturer if the patient did not rely on the manufacturer's judgment but did rely on the physician's skill and judgment." *Zetz v. Bos. Sci. Corp.*, 398 F. Supp. 3d 700, 711 (E.D. Cal. 2019); *see also Fundin v. Chi. Pneumatic Tool Co.*, 152 Cal.App.3d 951, 199 Cal. Rptr. 789, 793–94 (1984) (citing *Burr v. Sherwin Williams Co.*, 42 Cal.2d 682, 268 P.2d 1041, 1049 (1954)) ("[W]hen a consumer relies on representations made by a manufacturer in labels or advertising material, recovery is allowable on the theory of express warranty without a showing of privity."); *c.f. Blanco*, 70 Cal. Rptr. 3d at 582 (concluding the plaintiff patient cannot sue the defendant medical device manufacturer for breach of implied warranties, because "there is no evidence [the plaintiff] relied on [the defendant's] judgment that the [device] was appropriate for her"). Because the Court declines to scrutinize whether the PIC contains sufficient allegations of Allergan's misrepresentations made to an individual Plaintiff, the Court will not dismiss Plaintiffs' warranty claims under California law for a lack of privity.

• Florida:

**[95] [96] [97]** Plaintiffs' claims are viable under Florida law. The parties dispute the privity requirement. (ECF No. 236-1 at 262–63.) "Pursuant to Florida law, the plaintiff must be in privity of contract to recover under theories of breach of express or implied warranties." *Cubbage v. Novartis Pharms. Corp.*, No. 5:16-cv-129-Oc-30PRL, 2016 WL 3595747 at *7, 2016 U.S. Dist. LEXIS 86753 at *20 (M.D. Fla. July 5, 2016) (citations omitted). "Most often, privity does not exist between manufacturers and patients when the medication is only available by prescription." *Dimieri v. Medicis Pharms. Corp.*, No. 2:14-cv-176-FtM-38DNF, 2014 WL 3417364, at *6, 2014 U.S. Dist. LEXIS 95409, at *15 (M.D. Fla. July 14, 2014) (citations omitted). But a plaintiff may meet a "relaxed" privity standard if it "relied on the safety claims in those advertisements" of the defendant manufacturer purposely targeting patients like the plaintiff. *Humleker v. Boston Sci. Corp.*, No. 6:19-cv-121-Orl-31EJK, 2019 WL 6465059, at *2, 2019 U.S. Dist. LEXIS 207077, at *5 (M.D. Fla. Dec. 2, 2019); *c.f. Dimieri*, 2014 WL 3417364, at *6, 2014 U.S. Dist. LEXIS 95409, at *15–16 (concluding "Plaintiff fails to allege the existence of privity between himself and Defendant" because "Plaintiff does not assert the existence of any direct contact between Defendant and Plaintiff when the physician prescribed" the medicine). Here, the Court will not scrutinize Plaintiffs' direct contacts with Allergan, and therefore will not dismiss Plaintiffs' warranty claims under Florida law for a lack of privity.

**\*40** • Georgia:

**[98] [99] [100]** Plaintiffs' claims are viable under Georgia law. The parties dispute the privity requirement. (ECF No. 236-1 at 264–65.) "Georgia law still generally precludes the ultimate consumer from recovering on any express or implied warranty when the manufacturer sells the product to the original consumer, e.g. a retailer." *Lee v. Mylan Inc.*, 806 F. Supp. 2d 1320, 1325–26 (M.D. Ga. 2011) "However, Georgia courts recognize an exception to this general rule." *Id.* at 1326. "If the manufacturer expressly warrants to the ultimate consumer that the product will perform in a certain way or that it meets particular standards, privity with that ultimate consumer is deemed to exist." *Id.* (citations omitted); *see also Hemmings v. Camping Time RV Ctrs., LLC*, No. 1:17-CV-1331-TWT, 2017 WL 4552896, at *6, 2017 U.S. Dist. LEXIS 168417, at *15–16 (N.D. Ga. 2017) ("[W]here the manufacturer extends an express warranty to the end consumer, privity is created that satisfies the requirements of the implied warranty of merchantability."). Here, the Court

will not scrutinize whether Plaintiffs have sufficiently alleged an express warranty from Allergan, and therefore will not dismiss Plaintiffs' warranty claims under Georgia law for a lack of privity.

• Idaho:

**[101]  [102]**  Plaintiffs' claims are viable under Idaho law. The parties dispute the privity requirement. (ECF No. 236-1 at 265–66.) Plaintiffs argue their warranty claims do not require privity when they are brought under the Idaho Products Liability Reform Act ("IPLRA") rather than UCC. (*Id.* at 266 (citing *Glenn v. B & R Plastics, Inc.*, 326 F. Supp. 3d 1044, 1063–64 (D. Idaho 2018)).) The Court disagrees. The *Glenn* court ruled "the Idaho Supreme Court had concluded in *Oats* that plaintiffs lacking privity with the manufacturer or seller may pursue their claims for personal injuries based on breach of warranty under the IPLRA rather than the UCC." *Glenn*, 326 F. Supp. 3d at 1064 (citing *Oats v. Nissan Motor Corp.*, 126 Idaho 162, 879 P.2d 1095, 1105 (1994)). But this is an inaccurate reading of *Oats*, which did not explicitly recognize a non-privity breach of warranty action under the IPLRA; *Oats* only allowed the plaintiff, who initially brought a non-privity breach of warranty action, to proceed under the IPLRA with a strict liability claim. *Oats*, 879 P.2d at 1105 ("[W]hen a plaintiff brings a non-privity breach of warranty action against a manufacturer or seller to recover for personal injuries allegedly sustained as a result of a defective product, that action is one for strict liability in tort, governed by the provisions of the IPLRA."). Instead, "Idaho does not recognize a breach of warranty claim in personal injury products liability actions which do not involve a contractual relationship between the manufacturer and the injured person." *Elliott v. Smith & Nephew*, No. 1:12-CV-0070-EJL-MHW, 2013 WL 1622659, at *8, 2013 U.S. Dist. LEXIS 59072, at *26 (D. Idaho April 15, 2013) (citing *Oats*, 879 P.2d at 1105).

**[103]**  However, privity is not always necessary for a UCC-based warranty claim under Idaho law. "[A] plaintiff may pursue UCC breach of warranty claims for personal injuries only if: (a) the plaintiff is in contractual privity with the manufacturer or seller, or (b) the plaintiff qualifies as a third party beneficiary of the underlying sales contract." *Corbett v. Remington Arms Co., LLC*, No. 4:15-cv-00279-BLW, 2016 WL 1755456, at *2, 2016 U.S. Dist. LEXIS 58967, at *5 (D. Idaho May 2, 2016) (citing *Oats*, 879 P.2d at 1102). Moreover, for express warranty claims, certain direct contacts between the patient and the manufacturer may meet the privity

requirement. *See id.* at *3, 2016 U.S. Dist. LEXIS 58967, at *9 ("At best, the existence of a warranty registration card [the plaintiff filled and sent directly to the defendant] might support an express warranty claim, but [the plaintiff] has not convinced the Court that any such warranty would include implied warranties."). Therefore, Plaintiffs may proceed with UCC-based warranty claims and non-UCC-based express warranty claims, as the Court will not scrutinize whether Plaintiffs have sufficiently alleged a third party beneficiary status or direct contacts with Allergan in the PIC.

**\*41**  • Indiana:

**[104]  [105]  [106]  [107]**  Plaintiffs' claims are viable under Indiana law. The parties dispute the privity requirement. (ECF No. 236-1 at 268.) The Indiana Product Liability Act ("IPLA") "ha[s] codified the entire field of products liability" under Indiana law. *Weigle v. SPX Corp.*, 729 F.3d 724, 737 (7th Cir. 2013); *see also Gardner v. Tristar Sporting Arms*, No. 1:09-cv-0671-TWP-WGH, 2010 WL 3724190, at *2, 2010 U.S. Dist. LEXIS 97188, at *6 (S.D. Ind. Sept. 15, 2010) (citations omitted) ("[T]he IPLA has effectively supplanted products liability common law claims."). "A product can be defective within the meaning of the IPLA because of a manufacturing flaw, a defective design or a failure to warn of the dangers while using the product." *Campbell Hausfeld/ Scott Fetzer Co. v. Johnson*, 109 N.E.3d 953, 956 (Ind. 2018). "Thus, the IPLA governs the strict liability and negligence claims." *Ind. Farm Bureau Ins. v. Amazon*, 498 F.Supp.3d 1075, 1080 (S.D. Ind. 2020) (citations omitted). "[B]reach of implied warranty" and "breach of express warranty" claims are not "recognized under the IPLA." *Bradburn v. Bard, Inc.*, No. 3:19-cv-925-PPS-MGG, 2020 WL 3065024 ,at *3, 2020 U.S. Dist. LEXIS 101201, at *8 (N.D. Ind. June 9, 2020) (citing Ind. Code § 34-20-1-1). Therefore, Plaintiffs cannot pursue warranty claims under the IPLA.

**[108]**  However, warranty claims can be asserted under Indiana's UCC and independent from the IPLA. *Atkinson v. P & G-Clairol, Inc.*, 813 F. Supp. 2d 1021, 1025 (N.D. Ind. 2011) ("The fact that the Supreme Court of Indiana has established that different damages are available under tort and contract law for a defective product bolsters the argument that a defective product can give rise to claims under both the IPLA and the UCC."); *Cincinnati Ins. Cos. v. Hamilton Beach/Proctor-Silex, Inc.*, No. 4:05 cv 49, 2006 WL 299064, at *3, 2006 U.S. Dist. LEXIS 9807 at *8 (N.D. Ind. Feb. 7, 2006) (citations omitted) ("[C]laims under the IPLA are independent from breach of warranty claims alleged under

Indiana's adoption of the Uniform Commercial Code."); *Hunt v. Unknown Chem. Mfr. No. One*, No. IP 02-389-C-M/S, 2003 WL 23101798, at *12, 2003 U.S. Dist. LEXIS 20138 at *34 (S.D. Ind. Nov. 5, 2003) (citing *Hitachi Const. Mach. Co., Ltd. v. Amax Coal Co.*, 737 N.E.2d 460 (Ind. App. 2000)) ("[T]he IPLA did not vitiate contract actions under the Uniform Commercial Code"). But the IPLA bars implied warranty claims sounding in tort. *McClellon v. Thermo King Corp.*, No. 1:11-cv-01337-SEB-MJD, 2013 WL 6571946, at *4, 2013 U.S. Dist. LEXIS 174996, at *10–11 (S.D. Ind. Dec. 13, 2013) (citations omitted) ("[A] breach of implied warranty claim duplicates an IPLA strict liability claim and should not be pursued as a separate count."); *1st Call Home Health, LLC v. Porter*, No. 18A05-1110-PL-528, 2012 WL 695005, at *2, 2012 Ind. App. Unpub. LEXIS 261, at *7 (Ind. Ct. App. March 2, 2012) ("The IPLA effectively supplants the common-law breach of implied warranty in tort claim."). To conclude, "[t]ort-based implied warranty claims are subsumed under the IPLA, but contract-based implied warranty claims are not." *Ind. Farm*, 498 F.Supp.3d at 1079 (citations omitted).

**\*42  [109]**  Here, Plaintiffs allege Allergan "impliedly warranted to Plaintiff that the defective implants were of merchantable quality and safe for their ordinary and intended use in the human body as breast implants and tissue expanders." (ECF No. 119 at ¶ 232.) "This is enough for a contract-based claim of breach of implied warranty." *Constructora Mi Casita S De RL De CV v. NIBCO Inc.*, No. 3:16-CV-565-PPS-MGG, 2017 WL 3438182, at *5, 2017 U.S. Dist. LEXIS 126649 at *16 (N.D. Ind. Aug. 9, 2017) (citations omitted) (noting the plaintiff has pleaded the defendant "impliedly warranted to Plaintiff that [the defendant's products] were of merchantable quality and fit for the use for which they were intended"). As for privity, "Indiana law does not require vertical privity between a consumer and a manufacturer as a condition to a claim by the consumer against the manufacturer for breach of the manufacturer's implied warranty of merchantability." *Hyundai Motor Am., Inc. v. Goodin*, 822 N.E.2d 947, 959 (Ind. 2005). Therefore, Plaintiffs may pursue UCC-based implied warranty claims against Allergan.

**[110]    [111]**  In contrast, express warranty claims, even if asserted for the recovery of physical harm, "are not subsumed by the IPLA, particularly in light of the legislative inaction as to the relationship between the UCC and the IPLA." *Bayer Corp. v. Leach*, 153 N.E.3d 1168, 1190 (Ind. Ct. App. 2020) (citing *DePuy, Inc. v. Farmer*, 847 N.E.2d 160, 168

(Ind. 2006)). Also, "vertical privity is not required to pursue a claim based on those alleged express warranties." *Id.* at 1191. "[A] remote purchaser was 'not precluded from suing a manufacturer because of lack of privity of contract, where the manufacturer allegedly made express warranties' directly to the remote purchaser." *Id.* (citing *Prairie Production, Inc. v. Agchem Division-Pennwalt Corp.*, 514 N.E.2d 1299, 1302 (Ind. Ct. App. 1987)). Because the Court declines to scrutinize whether Plaintiffs sufficiently allege direct contacts with Allergan in the PIC, the Court will not dismiss at this stage Plaintiffs' express warranty claims for lack of privity.

In conclusion, under Indiana law, Plaintiffs may assert express warranty claims and UCC-based implied warranty of merchantability claims.

• Kentucky:

**[112]    [113]    [114]    [115]**  Plaintiffs' claims are viable under Kentucky law. The parties dispute the privity requirement. (ECF No. 236-1 at 269.) "Under Kentucky law, privity of contract is an essential element of a claim for breach of an implied warranty." *Estate of Demoss v. Eli Lilly & Co.*, 234 F. Supp. 3d 873, 882 (W.D. Ky. 2017) (citations omitted). "[P]rivity of contract does not extend beyond the buyer-seller setting, and an intervening purchaser destroys privity." *Id.* (citations omitted). However, "an actual and direct promise for the benefit of a third party will be sufficient to create privity between the promisor and the third party beneficiary." *Louisville Gas & Elec. Co. v. Continental Field Systems, Inc.*, 420 F. Supp. 2d 764, 770 (W.D. Ky. 2005) (citations omitted). Here, whether an individual Plaintiff may establish a third-party beneficiary status will not be scrutinized at this stage, meaning Plaintiffs may proceed with an implied warranty claim. As for asserting an express warranty claim, a contractual privity is not necessary, because privity exists "when the manufacturer made express warranties directly to the intended consumer of the product." *Huff v. Howmedica Osteonics*, No. 5:14-CV-00134-TBR, 2014 WL 4918807, at *4, 2014 U.S. Dist. LEXIS 137735 at *8 (W.D. Ky. Sept. 29, 2014) (citations omitted). Here, whether Allergan extended express warranties to an individual Plaintiff will not be scrutinized at this stage, meaning Plaintiffs may proceed with an express warranty claim. As a result, the Court declines to dismiss Plaintiffs' warranty claims under Kentucky law for a lack of privity.

• Michigan:

**[116]** Plaintiffs' claims are viable under Michigan law. The parties dispute whether implied warranty claims are barred in prescription medical product litigation. (ECF No. 236-1 at 269–70.) The Court finds Michigan allows an implied warranty claim asserted against medical products, including medical devices. *See Davis v. C.R. Bard, Inc.*, No. 11-12556, 2012 WL 6082933, at *10, 2012 U.S. Dist. LEXIS 172925, at *31 (E.D. Mich. Dec. 6, 2012) (denying the defendant's motion for summary judgement on the plaintiff's implied warranty claim against the defendant's medical device); *Walker v. Johnson & Johnson Vision Prods.*, 217 Mich.App. 705, 552 N.W.2d 679, 682 (Minn. Ct. App. 1996) (rejecting "the view that § 360k(a) provides blanket preemption of all state law claims against manufacturers of Class III medical devices," including the plaintiff's breach of implied warranty claim); *Smith v. E.R. Squibb & Sons,* Inc., 405 Mich. 79, 273 N.W.2d 476, 480 (1979) (conceding, in a drug product liability case, implied warranty and negligence may be independent causes of action).

***43** **[117]** **[118]** **[119]** **[120]** **[121]** Further, the parties dispute whether privity is required for breach of express warranty claims. (ECF No. 236-1 at 269–71.) Contractual privity is required for a UCC-based express warranty claim. *Tice v. Zimmer Holdings, Inc.*, No. 1:15-cv-134, 2015 WL 4392985, at *7, 2015 U.S. Dist. LEXIS 91738 at *17 (W.D. Mich. July 15, 2015). "[A]n express warranty running from a remote manufacturer to a consumer does not create the requisite contractual privity." *Chiasson v. Winnebago Indus.*, No. 01-CV-74809, 2002 WL 32828652, at *9, 2002 U.S. Dist. LEXIS 27462 at *28 (E.D. Mich. May 16, 2002) (citing *Meridian Mutual Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999)). "However, an intended third-party beneficiary is in privity of contact with the original parties for purposes of an express warranty." *Montgomery v. Kraft Foods Global, Inc.*, No. 1:12-CV-00149, 2012 WL 6084167, at *13, 2012 U.S. Dist. LEXIS 173035 at *37 (W.D. Mich. Dec. 6, 2012) (citing Mich. Comp. Laws § 600.1405(1)). Here, the Court will not scrutinize whether Plaintiffs may establish an intended third-party beneficiary status, meaning Plaintiffs may proceed with a UCC-based express warranty claim. Moreover, "under Michigan law, the privity requirement of the Michigan UCC is inapplicable to a products liability action based on express warranty." *Bouverette v. Westinghouse Elec. Corp.*, 245 Mich.App. 391, 628 N.W.2d 86, 92 (2001) (citing *Reid v. Volkswagen of America, Inc.*, 512 F.2d 1294, 1297 (6th Cir. 1975)). Therefore, Plaintiffs may proceed with express warranty

claims, whether or not based on UCC, at this stage under Michigan law.

• Nevada:

**[122]** Plaintiffs' claims are viable under Nevada law. The parties dispute whether, for an implied warranty of merchantability claim, contractual privity between the buyer and seller is required. (ECF No. 236-1 at 273–74.) The Court finds a split exists among Nevada courts as to whether contractual privity is required for a personally injured user to assert an implied warranty of merchantability claim against the manufactuer of the medical device allegedly causing the injury. While some courts answered in the affirmative, *see Claridge v. I-Flow Corp.*, No. 2:18-cv-01654-GMN-BNW, 2019 WL 4139433, 2019 U.S. Dist. LEXIS 148935, at *8 (D. Nev. Aug. 30, 2019); *Finnerty v. Howmedica Osteonics Corp.*, No. 2:14-cv-00114-GMN-GWF, 2016 WL 4734130, 2016 U.S. Dist. LEXIS 123071, at *21 (D. Nev. Sept. 12, 2016); *Phillips v. C.R. Bard, Inc.*, No. 3:12-cv-00344-RCJ-WGC, 2014 WL 7177256, 2014 U.S. Dist. LEXIS 174506, at *24–25 (D. Nev. Dec. 16, 2014), others answered in the negative, *see Reed v. Arthrex, Inc.*, No. 3:17-cv-00337-LRH-WGC, 2017 WL 4560140, 2017 U.S. Dist. LEXIS 168247, at *10–11 (D. Nev. Oct. 11, 2017); *Forest v. Vitek, Inc.*, 884 F. Supp. 378, 382 (D. Nev. 1993). Even assuming privity is required for an implied warranty of merchantability claim and Plaintiffs lack such privity, Plaintiffs may still pursue this claim under a third party beneficiary theory. *Copper Sands Homeowners Ass'n v. Copper Sands Realty, LLC*, No. 2:10-cv-00510-GMN-GWF, 2012 WL 1044311, at *3, 2012 U.S. Dist. LEXIS 42370, at *11–12 (D. Nev. March 27, 2012) ("[The defendant] argues that [the plaintiffs'] claim for Breach of Implied Warranty fails because there is no privity of contract between the parties. However, because the Court finds that [the plaintiffs] are a third party beneficiary to the contract this argument fails."); *c.f. Neal-Lomax v. Las Vegas Metro. Police Dep't*, No. 2:05-CV-1464-PMP-PAL, 2006 WL 2022989 at *8, 2006 U.S. Dist. LEXIS 49692 at *22 (D. Nev. July 17, 2006) (rejecting the implied warranty claim as a matter of law because the victim, "not a named or intended third party beneficiary of the contract between [the defendant police department] and [the defendant Taser manufacturer]," "was not in privity with" the defendant Taser manufacturer).

• New York:

**[123]** **[124]** Plaintiffs' claims are viable under New York law. The parties dispute whether privity is required for

implied warranty claims. (ECF No. 236-1 at 277.) "There is no requirement of privity for [an implied] warranty claim so long as the plaintiff's claim is one for personal injury." *Mahoney v. Endo Health Solutions, Inc.*, No. 15cv9841(DLC), 2016 WL 3951185 at *5, 2016 U.S. Dist. LEXIS 94732 at *12 (S.D.N.Y. July 20, 2016); *see also Bristol Vill., Inc. v. Louisiana-Pacific Corp.*, 916 F. Supp. 2d 357, 363 (W.D.N.Y. 2013) (citations omitted) ("[U]nder New York law, 'a claim based upon a breach of an implied warranty requires a showing of privity between the manufacturer and the plaintiff when there is no claim for personal injuries.' "). Because Plaintiffs are suing Allergan for their personal injuries, they need not allege privity for their implied warranty claims under New York law.

*44 • Ohio:

[125]   [126]   [127] Plaintiffs' claims are viable under Ohio law. The parties dispute whether the Ohio Product Liability Act ("OPLA") abrogates any common law warranty claims, and whether privity is required for Plaintiffs' implied warranty of merchantability claims. (ECF No. 236-1 at 278–79.) "Ohio product liability law was consolidated under the OPLA, Ohio Revised Code section 2307.71 through section 2307.80, and applies to any recovery of compensatory or putative damages based on a product liability claim." *Mitchell v. Proctor & Gamble*, No. 2:09-CV-426, 2010 WL 728222, at *2, 2010 U.S. Dist. LEXIS 17956 at *5 (S.D. Ohio Mar. 1, 2010) (citing Ohio Rev. Code § 2307.72(A), (B)). An express warranty claim, but not an implied warranty claim, may be asserted under the OPLA. *Everhart v. Tm Claims Serv.*, No. 2:09-cv-267, 2009 WL 10679479, at *7–8, 2009 U.S. Dist. LEXIS 147751, at *19–20 (S.D. Ohio Oct. 8, 2009). "[A]ll common law claims arising from damages in connection with product liability claims are abrogated by the OPLA." *Stratford v. SmithKline Beecham Corp.*, No. 2:07-CV-639, 2008 WL 2491965, at *4, 2008 U.S. Dist. LEXIS 84826 at *12 (S.D. Ohio June 17, 2008) (citing Ohio Rev. Code § 2307.71(B)). Therefore, Plaintiffs cannot pursue tort-based common law warranty claims and OPLA-based implied warranty claims, though OPLA-based express warranty claims are viable.

[128]   [129] However, "Plaintiffs' warranty claims are separately cognizable under contract law and Ohio Revised Code § 1302.26 et seq." (Ohio's UCC), even if the plaintiffs are also "asserting tort claims sounding in product liability." *Miles v. Raymond Corp.*, 612 F. Supp. 2d 913, 924 (N.D. Ohio 2009). "[T]o sustain a contract-based breach of implied

warranty claim, the parties must be in privity." *Caterpillar Fin. Servs. Corp. v. Harold Tatman & Son's, Enters.*, 50 N.E.3d 955, 962 (Ohio Ct. App. 2015). But "when the manufacturer is so involved in the sales transaction that the distributor merely becomes the agent of the manufacturer, then the manufacturer and the ultimate consumer are in privity of contract." *Bobb Forest Prods., Inc. v. Morbark Indus. Inc.*, 151 Ohio App.3d 63, 783 N.E.2d 560, 576 (2002) (citations omitted). "A consumer may also have privity of contract with the manufacturer if that consumer is an intended third-party beneficiary to a contract." *Id.* at 576 (citations omitted). Whether a Plaintiff can establish an intended third-party beneficiary status or prove the distributor for the BIOCELL implants to be an agent of Allergan will depend on facts specific to that individual Plaintiff, which the Court declines to scrutinize at this stage. As a result, Plaintiffs' UCC-based implied warranty claims are viable under Ohio law.

• Pennsylvania:

[130] Plaintiffs' implied warranty of merchantability claims are not viable under Pennsylvania law. The parties dispute whether implied warranty claims are barred in prescription medical product litigations. (ECF No. 236-1 at 280–81.) In Pennsylvania, there is "a split in authority on the applicability of breach of implied warranty of merchantability claims based on defects in the manufacture of medical devices." *Terrell v. Davol, Inc.*, No. 13-5074, 2014 WL 3746532, at *7, 2014 U.S. Dist. LEXIS 103695 at *22 (E.D. Pa. July 30, 2014). The *Terrell* court refused to recognize "the breach of an implied warranty of merchantability claim [wa]s a viable cause of action under Pennsylvania law" based on defects in prescription medical devices. *Id.* at *7, 2014 U.S. Dist. LEXIS 103695, at *23–24. This is in line with some Pennsylvania cases that reject implied warranty claims in prescription medical device cases. *See Pasqual v. I-Flow Corp.*, No. 13-003571, 2013 WL 7394907, 2013 Pa. Dist. & Cnty. Dec. LEXIS 15739, at *34 (Allegheny Com. Pl. Oct. 15, 2013) ("Pennsylvania does not recognize implied warranty claims in prescription medical device cases."); *Schiff v. Hurwitz*, No. 12cv0264, 2012 WL 1828035, at *6, 2012 U.S. Dist. LEXIS 70039 at *16 (W.D. Pa. May 18, 2012) ("Breach of implied warranty is inapplicable to prescription medical devices in Pennsylvania."). But other Pennsylvania cases "recognize a claim for breach of the implied warranty of merchantability where it is based on a manufacturing defect" of a prescription medical device. *Doughtery v. C.R. Bard, Inc.*, No. 11-6048, 2012 U.S. Dist. LEXIS 100374, 2012 WL 2940727, at *7 (E.D. Pa. July 18, 2012); *see*

*also* Smith v. Howmedica Osteonics Corp., 251 F. Supp. 3d 844, 855 (E.D. Pa. 2017) (denying the defendant's motion to dismiss "insofar as breach of the implied warranty of merchantability claim asserts a manufacturing defect" in a medical device). With such unclarity, the Court will "opt for the interpretations that restrict liability," Travelers Indem. Co. v. Dammann & Co., 594 F.3d 238, 253 (3d Cir. 2010), and therefore finds Plaintiffs' implied warranty claims not viable in Pennsylvania.

**\*45**  • Tennessee:

Plaintiffs' claims are viable under Tennessee law. The parties dispute the privity requirement. (ECF No. 236-1 at 282–83.) Allergan argues, even if an exception to the privity requirement exists, Plaintiffs not diagnosed with BIA-ALCL cannot assert warranty claims because they do not suffer current injuries. (*Id.* at 283.) The Court disagrees. First, "[t]he Tennessee General Assembly abolished the requirement of privity on April 10, 1972." Travelers Indem. Co. v. Indus. Paper & Packaging Corp., No. 3:02-CV-491, 2006 WL 2050686, at \*8, 2006 U.S. Dist. LEXIS 49318 at \*29 (E.D. Tenn. July 19, 2006). "The legislation enacted provides that in all cases of action for personal injury or property damage brought on account of ... breach of warranty, privity shall not be a requirement to maintain said action." *Id.* (citing T.C.A. § 29-34-104). Second, as explained in Part III.B.2, *supra*, the Court declines to determine, at this stage, whether Plaintiffs have alleged any legally cognizable injuries, and therefore, will not dismiss Plaintiffs' claims on that basis.

• Washington:

**[131]  [132]  [133]** Plaintiffs' claims are viable under Washington law. The parties dispute the privity requirement for implied warranty claims. (ECF No. 236-1 at 284–85.) Plaintiffs contend privity is met when the buyer is an intended third party beneficiary of the manufacturer's warranties to a third party. (*Id.* at 284.) The Court agrees. Privity is "required for a breach of an implied warranty claim" under Washington law. Thongchoom v. Graco, 117 Wash.App. 299, 71 P.3d 214, 219 (2003) (citing Baughn v. Honda Motor Co., 107 Wash.2d 127, 727 P.2d 655, 669 (1986)). However, there is a third party beneficiary exception to the privity requirement: for a remote purchaser, "implied warranties are enforceable if the manufacturer was involved in the transaction, knew the purchaser's identity and purpose, communicated with the purchaser, or delivered the good." Johnson v. Metro-Goldwyn-Mayer Studios Inc., No. C17-541 RSM, 2017 WL 3313963, at \*6, 2017 U.S. Dist. LEXIS 122810 at \*15 (W.D. Wash. Aug. 3, 2017) (citing Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc., 119 Wash.2d 334, 831 P.2d 724, 730 (1992) (en banc)). At this stage, the Court will not scrutinize whether Plaintiffs may establish a third party beneficiary status. Therefore, Plaintiffs may pursue their implied warranty claims under a third party beneficiary theory.

• Wisconsin:

**[134]** Plaintiffs' claims are not viable under Wisconsin law. The parties dispute the privity requirement. (ECF No. 236-1 at 285–86.) Notwithstanding the privity requirement, "[t]he Wisconsin Supreme Court has held that 'it is inappropriate to bring an action for breach of warranty where a tort remedy is sought' because 'a breach of warranty theory is encumbered with the ancient baggage of contract actions.' " Karnes v. C. R. Bard, Inc., No. 18-cv-931-wmc, 2019 WL 1639807, at \*7, 2019 U.S. Dist. LEXIS 65115, at \*20 (W.D. Wis. April 16, 2019) (citing Austin v. Ford Motor Co., 86 Wis.2d 628, 273 N.W.2d 233, 240 (1979)). The *Austin* court "established that strict liability in tort actions precludes breach of warranty claims for physically injured users of unreasonably dangerous defective products." *Id.* at \*8, 2019 U.S. Dist. LEXIS 65115, at \*22 (citing Crosby v. Premier Marine, Inc., No. 01 C 50286, 2002 WL 596373, at \*1 (N.D. Ill. Apr. 15, 2002)). Here, Plaintiffs have asserted a number of strict liability tort claims. (ECF No. 119 at 73, 89, 116.) Therefore, the Court dismisses Plaintiffs' warranty claims, so that "the interest of justice and the adjudication of claims will be expedited." Karnes, 2019 WL 1639807, at \*7, 2019 U.S. Dist. LEXIS 65115, at \*21 (citing Austin, 273 N.W.2d at 240).

**\*46**  In conclusion, the following warranty claims are dismissed: implied warranty of merchantability claims under Pennsylvania law and warranty claims under Wisconsin law.

### 8. Summary for Allergan's Motion to Dismiss on Non-Preemption Grounds

In summary, the Court dismisses: (1) FDCA/CGMP-based negligence *per se* claims under the laws of Alaska, Arkansas, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Rhode Island, Texas,

Utah, Vermont, Washington, West Virginia, and Wyoming; (2) report-based failure to warn claims under the laws of Alabama, Alaska, Arkansas, Arizona, Colorado, Connecticut, District of Columbia, Florida, Georgia, Iowa, Kansas, Maine, Massachusetts, Michigan, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Utah, Virginia, West Virginia, and Wyoming; (3) negligence misrepresentation claims under the laws of Arkansas, Louisiana, Minnesota, and Virginia, as well as common law negligence misrepresentation claims under Mississippi law; and (4) the following warranty claims: implied warranty of merchantability claims under Pennsylvania law and warranty claims under Wisconsin law.

### C. Allergan's Motion to Strike/Dismiss Plaintiffs' Class Allegations (ECF No. 171-2)

Allergan challenges Plaintiffs' class allegations asserted for the following three classes, purportedly nationwide in scope:

> A "medical monitoring" class comprised of all persons who were implanted with Allergan's textured breast implant devices, but have not yet been diagnosed with BIA-ALCL;

> 112 separate subclasses—two for every U.S. State and Territory—consisting of the exact same putative members as the nationwide class; and

> A "release subclass" comprised of persons who signed an optional release of liability as part of their individual warranty claims leading to the explant of their breast implant devices.

(ECF No. 171-2 at 10.)

Plaintiffs argue Allergan's Motion to Strike/Dismiss the CAC is premature and a rare remedy: because the issue of whether Plaintiffs can satisfy Rule 23 is a fact-intensive question, class certification decisions should be made following discovery. (ECF No. 219 at 13.) Allergan contends striking class allegations at the pleadings stage is not rare. (ECF No. 237 at 11 n.1.) Allergan insists courts can strike class allegations whose impropriety is evident from the face of the complaint. (*Id.* at 11.) The Court finds not all the class allegations in the CAC should be stricken/dismissed at this stage.

**[135]  [136]  [137]** "Class certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met.' " *In re Hydrogen Peroxide Antitrust Litigation,* 552 F.3d 305, 309 (3d Cir.

2008) (citations omitted). "The court may 'delve beyond the pleadings to determine whether the requirements for class certification are satisfied.' " *Id.* at 316 (citations omitted). "The majority of courts have found that a Rule 12(b)(6) dismissal of class allegations is appropriate, even when the plaintiff has not yet filed a motion for conditional class certification." *Horowitz v. AT&T Inc.,* No. 3:17-cv-4827, 2018 WL 1942525, at *17, 2018 U.S. Dist. LEXIS 69191, at *51 (D.N.J. April 25, 2018) (citations omitted). But in this District, "dismissal of class allegations at [the pleading] stage should be done rarely and that the better course is to deny such motion because the shape and form of a class action evolves only through the process of discovery." *Id.*; *see also Luppino v. Mercedes-Benz USA, LLC,* No. 09-CV-5582, 2013 U.S. Dist. LEXIS 161689, 2013 WL 6047556, at *3 (D.N.J. Nov. 12, 2013) (citation omitted) ("Generally courts do not consider whether a proposed class meets the Fed. R. Civ. P. 23 requirements until after plaintiffs move for class certification."). "A defendant may move to strike class action allegations prior to discovery in those rare cases where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met." *Clark v. McDonald's Corp.,* 213 F.R.D. 198, 205 n.3 (D.N.J. 2003) (citations omitted); *see also McPeak v. S-L Distrib. Co.,* No. 12-348, 2014 WL 4388562, at *4, 2014 U.S. Dist. LEXIS 123728, at *9 (D.N.J. Sept. 5, 2014) (citations omitted) ("It is only when no amount of discovery or time will allow for plaintiffs to resolve deficiencies in class definitions under Rule 23, that a motion to strike class allegations should be granted."). "[T]he usual practice favoring pre-certification discovery derives from the fundamental premise of Fed. R. Civ. P. 12, which is that claims, including class claims, should not be dismissed on the pleadings 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Ehrhart v. Synthes (USA),* No. 07-01237, 2007 WL 4591276, at *4, 2007 U.S. Dist. LEXIS 94760 at *12 (D.N.J. Dec. 21, 2007) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).

**\*47** Accordingly, the Court will dismiss Plaintiffs' class allegations only if, on its face, the CAC demonstrates the Rule 23 requirements cannot be met even after discovery. In particular, the Court will not consider the potential factual differences among individual Plaintiffs, which could otherwise defeat class certification. For example, in arguing Plaintiffs cannot satisfy the typicality requirement, Allergan refers to a failure of representation by device: the implants used by the class representatives may not be typical of the

whole class, because not every type of the BIOCELL Implants has been implanted in the class representatives. (ECF No. 171-2 at 22, 24.) At this stage, the Court will not entertain this alleged failure of representation, which involves factual differences in the actual implant used by individual Plaintiffs, because such "differences among plaintiffs[ ] may be defeated by common proof developed in discovery." *Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 94 (3d Cir. 2011) (citing *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 327–28 (5th Cir. 2008)); *see also Horowitz*, 2018 WL 1942525, at *17, 2018 U.S. Dist. LEXIS 69191, at *51–52 (declining to dismiss class pleadings under Rule 12(b)(6) in an age discrimination case, even though the plaintiffs "do not allege that they and all putative collective members were employed by the same [defendant's] entity, worked in the same department, performed similar work, or had similar circumstances of employment," because the plaintiffs "have at least alleged they and the potential opt-ins have been injured by a single policy, the 2020 Scheme, which targeted workers over the age of 40").

### 1. Named Plaintiffs Lack Article III Standing in Some Jurisdictions

[138]   Allergan argues the named Plaintiffs lack the standing to serve as class representatives for the subclasses from jurisdictions where the named Plaintiffs are not citizens. (ECF No. 237 at 17.) Plaintiffs contend a plaintiff living in one state can have the standing as a class representative for the state law claims of class members in other states. (ECF No. 219 at 27.) The Court disagrees.

[139]   [140]   [141]   "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–49, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) (citations omitted). "[C]lass representatives must meet Article III standing requirements the moment a complaint is filed." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 367 (3d Cir. 2015) (citing *Lewis v. Casey*, 518 U.S. 343, 358, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)). "[N]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury." *In re Ductile Iron Pipe Fittings ("DIPF") Indirect Purchaser Antitrust Litig.*, No. 12-169, 2013 WL 5503308, at *11, 2013 U.S. Dist. LEXIS 142466 at *35 (D.N.J. Oct. 2, 2013); *see also Cooper v. Medimetriks Pharms., Inc.*, No. 18-11987, 2019 WL 1370414, at *4, 2019 U.S. Dist. LEXIS 50265, at *11–12 (D.N.J. March 25, 2019) (citing *McGuire v. BMW of N. LLC*, No. 13-7356, 2014 U.S. Dist. LEXIS 77009, 2014 WL 2566132, at *6 (D.N.J. June 6, 2014)) ("Cooper is the only named plaintiff in this Action. Cooper is not a New Jersey resident (she is a resident of Ohio) and Cooper did not suffer any alleged injuries in New Jersey (she was allegedly injured in Ohio), and thus Cooper is barred from proceeding as a class representative for the [New Jersey state] claims."); *Lauren v. PNC Bank, N.A.*, 296 F.R.D. 389, 391 (W.D. Pa. 2014) ("[The plaintiff] suffered an alleged injury exclusively under Ohio law. Therefore, she does not have standing to assert unjust enrichment claims under the law(s) of any other state."); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 157–58 (E.D. Pa. 2009) (finding the named plaintiffs have no standing to bring claims under the laws of states where no named plaintiff is located and where no member of a named plaintiff purchased the defendant's accused product).

[142]   [143]   However, prior to the class certification stage, it is premature to examine the named plaintiffs' "standing to pursue claims on behalf of absent class members of the nationwide class ... in states other than those in which they were injured," because such an inquiry "is one of predominance" and "only arises if the Court certifies the nationwide class." *In re FieldTurf Artificial Turf Mktg. & Sales Practices Litig.*, No. 3:17-md-2779, 2018 WL 4188459, at *8, 2018 U.S. Dist. LEXIS 149379, at *28 (D.N.J. Aug. 31, 2018) (citations omitted). After all, "class discovery will unveil the various members of the currently unknown class," which will enable the court to determine whether all the state law claims have "a proper representative who resides in the subject states and if those claims may proceed, even if the named [plaintiffs'] claims become moot." *In re Liquid Aluminum Sulfate Antitrust Litig.*, No. 16-md-2687, 2017 WL 3131977, at *19, 2017 U.S. Dist. LEXIS 115294, at *84 (D.N.J. July 20, 2017) (citing *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 413, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)). In contrast, when it comes to state-specific (sub)classes, the court may "dismiss the state subclasses of which no Plaintiff is a member" at the pleading stage. *FieldTurf*, 2018 WL 4188459, at *8, 2018 U.S. Dist. LEXIS 149379, at *29; *see also In re: Niaspan Antitrust Litig.*, No. 13-MD-2460, 2015 WL 8150588, at *3, 2015 U.S. Dist. LEXIS 164021, at *8–9 (E.D. Pa. Dec. 8, 2015) (citations and internal quotations omitted) (concluding at the pleading stage that the named plaintiffs "lack standing to bring claims on behalf of" the state-specific classes when the named "plaintiffs have not alleged that any one named plaintiff either

resides in or made purchases and/or reimbursements of [the accused product] in those states").

**\*48** Plaintiffs cite *Ramirez* to argue the named Plaintiffs can represent absent class members in other states. (ECF No. 219 at 28 (citing *Ramirez v. STi Prepaid LLC*, 644 F. Supp. 2d 496, 504–06 (D.N.J. 2009)).) Indeed, the *Ramirez* court held "once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court, and there remains no further separate class standing requirement in the constitutional sense." *Ramirez*, 644 F. Supp. 2d at 504–05 (citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 306–07 (3d Cir. 1998)). However, both *Ramirez* and *Prudential* involved a nationwide class. *Id.* at 498; *Prudential*, 148 F.3d at 289. Therefore, the two cases are inapplicable, because the issue here is the named Plaintiffs' standing as representatives for certain state-specific subclasses.

Accordingly, the Court finds the named Plaintiffs do not have the standing as class representatives to assert claims for the state-specific subclasses of which they are not members. The named Plaintiffs are citizens of 39 different states. (*See* ECF No. 118 at ¶¶ 22–84.) Therefore, the Court dismisses the claims of the following subclasses of which no named Plaintiff is a member: Alaska, American Samoa, Arkansas, District of Columbia, Guam, Hawaii, Indiana, Kansas, Maryland, Mississippi, Nebraska, New Hampshire, North Dakota, Northern Mariana Islands, Puerto Rico, U.S. Virgin Islands, and Vermont. Plaintiffs may later reappoint class representatives or reformulate (sub)classes to cure the above deficiencies.

### 2. The Class Allegations Meet the Typicality Requirement

**[144]** Allergan argues Plaintiffs cannot satisfy the typicality requirement under Rule 23(a). (ECF No. 171-2 at 21.) Allergan points out the 63 named Plaintiffs are citizens of 39 different states, which leads to a failure of representation by jurisdiction: (1) 32 subclasses are not represented by any named Plaintiff; (2) some dual subclasses for each jurisdiction lack or share a representative; (3) an unknown number of unidentified named Plaintiffs purport to represent the claims of a jurisdiction of which they are not citizens. (*Id.*) Plaintiffs insist they meet the typicality requirement: even though they live in different states, their claims all stem from the same course of conduct by Allergan, i.e., the manufacture and sale

of the BIOCELL Implants, and all Plaintiffs share the same interests in obtaining reliefs in the form of medical monitoring and repayment of economic losses resulting from Allergan's recall. (ECF No. 219 at 25.) The Court agrees.

**[145]** A defendant's challenge of typicality may be "premature" and "not appropriate" at the pleading stage, because "[d]ismissal of class claims prior to discovery and a motion to certify the class by plaintiff is the exception rather than the rule." *Durso v. Samsung Elecs. Am., Inc.*, No. 2:12-cv-05352, 2013 WL 5947005, at \*13, 2013 U.S. Dist. LEXIS 160596, at \*35 (D.N.J. Nov. 6, 2013) (citations omitted). Further, the following analysis shows Plaintiffs meet the typicality requirement.

**[146]   [147]** "The Third Circuit has 'set a low threshold for satisfying' the typicality requirement holding that 'if the claims of the named plaintiffs and class members involve the same conduct by the defendant, typicality is established.' " *In re Remeron End-Payor Antitrust Litig.*, No. 04-5126, 2005 WL 2230314, at \*9, 2005 U.S. Dist. LEXIS 27011, at \*24 (D.N.J. Sept. 13, 2005) (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183–84 (3d Cir. 2001)). "[C]lass members need not 'share identical claims' " to satisfy the typicality requirement. *In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016) (citing *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)). "The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 141 (3d Cir. 1998) (citing *Baby Neal v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994)). The court need not "consider the variations among the laws of the 50 states" in the typicality inquiry. *Prudential*, 148 F.3d at 311 (affirming the district court's finding of typicality, despite the defendant's challenge that the district court's typicality analysis was inadequate for not having considered the variations among the laws of the 50 states); *see also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529, 531–32 (3d Cir. 2004) (affirming the district court's finding of typicality based on the same alleged wrongful conduct of the defendant and the same general legal theories underlying the plaintiffs' claims, while addressing variance of the substantive laws of the fifty states only in the commonality and predominance analysis); *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986) (considering the variances in products liability law among different states only in the Rule 23(b)(3) analysis).

**\*49** Here, the claims asserted by the named Plaintiffs and putative class members stem from the same course of conducts of Allergan. The named Plaintiffs and putative class members share an aligned interest in seeking damages from Allergan. The Court need not consider the variances among controlling state laws for the typicality inquiry. Therefore, Plaintiffs meet the typicality requirement.

### 3. The Rule 23(b)(3) Inquiry Is Premature

### a. The Court Declines to Dismiss Plaintiffs' Class Allegations on Predominance Grounds

Allergan argues the nationwide medical monitoring classes cannot meet Rule 23(b)(3)'s predominance requirement, because: (1) medical monitoring and product liability laws differ widely between the states; and (2) the liability and causation inquiries are highly individualized and not susceptible to class-wide proof. (ECF No. 171-2 at 28–29.) Allergan contends Plaintiffs' claims for consumer fraud and unjust enrichment cannot meet the predominance requirement, because (1) the relevant factual inquiry is inherently individual, such as Plaintiffs' reliance on Allergan's representation or omission (*id.* at 40), and (2) consumer protection statutes and unjust enrichment claims vary widely between states (ECF No. 237 at 39). Allergan also claims to have an array of affirmative defenses that will require individualized findings of fact, and are not susceptible to common proof. (ECF No. 171-2 at 42–43.) Finally, Allergan maintains the legal and factual questions surrounding the validity of each class member's Release constitute individualized inquiries, making it impossible for Plaintiffs to meet the predominance requirement. (*Id.* at 44.)

Plaintiffs claim they will establish at the class certification stage that any material differences among state laws can be handled through commonly used case management tools, for example, by grouping similar state laws or through subclassing. (ECF No. 219 at 30.) Plaintiffs argue Allergan's concerns regarding any factual issues among class members are speculative before discovery. (*Id.* at 31.) As for the consumer fraud and unjust enrichment claims, Plaintiffs point out the reliance requirement has been relaxed under most state laws. (*Id.* at 33.) Plaintiffs contend Allergan's potential affirmative defenses do not provide a basis to strike the class allegations, because (1) discovery is necessary to determine whether and how the affirmative defenses affect class treatment, and (2) affirmative defenses in themselves

do not preclude class certification. (*Id.* at 34–36.) Finally, Plaintiffs allege the Court need not decide prior to discovery whether challenging the releases through the mechanism of a class action would be impermissible, because (1) the release is a form document, so that the challenges likely do not entail consumer-specific evidence, and (2) relevant extrinsic evidence unlikely involves meaningful variation among the vast majority of class members. (*Id.* at 37–38.) The Court agrees.

**[148]** "[A]t the motion to strike stage, the burden on plaintiffs is less than at the certification stage." *In re Ry. Indus. Emple. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 514 (W.D. Pa. 2019). "The court must determine only whether plaintiffs satisfied their burden to set forth factual allegations to advance a prima facie showing of predominance or that at least it is likely that discovery will reveal evidence" so that critical elements of Plaintiffs' claims "may be proven on a class-wide basis." *Id.* Courts in this Circuit have declined to conduct a predominance inquiry upon a defendant's motion to strike/dismiss a plaintiff's class allegations, recognizing the dismissal of class claims before discovery and a class certification motion "is the exception rather than the rule." *Luppino v. Mercedes-Benz USA, LLC*, No. 09-CV-5582, 2013 WL 6047556, at \*7, 2013 U.S. Dist. LEXIS 161689, at \*20 (D.N.J. Nov. 12, 2013); *Durso v. Samsung Elecs. Am., Inc.*, No. 2:12-cv-05352, 2013 WL 5947005, 2013 U.S. Dist. LEXIS 160596, at \*35 (D.N.J. Nov. 6, 2013); *see also Derrick v. Glen Mills Sch.*, No. 19-1541, 2019 WL 7019633, at \*9, 2019 U.S. Dist. LEXIS 220610, \*25–26 (E.D. Pa. Dec. 19, 2019) ("Without the benefit of at least some limited discovery, ... any determination regarding predominance would be premature."); *Goldman v. RadioShack Corp.*, No. 2:03-CV-0032, 2003 WL 21250571, at \*1, 2003 U.S. Dist. LEXIS 7611, at \*2 (E.D. Pa. April 16, 2003) (postponing "class certification because further discovery is needed regarding the predominance test of FED. R. CIV. P. 23(b)(3)"); *Seiffert v. Green*, No. 81-1956, 1988 WL 2068, at \*1, 1988 U.S. Dist. LEXIS 1375, at \*3 (E.D. Pa. Jan. 13, 1988) (granting a motion for class certification while noting "[i]f discovery reveals such extensive individualized proof that common issues of law or fact no longer predominate, class action treatment may no longer be appropriate"); *c.f. Sanders v. Johnson & Johnson, Inc.*, No. 03-2663, 2006 WL 1541033, at \*11, 2006 U.S. Dist. LEXIS 35881, at \*33–34 (D.N.J. May 31, 2006) (striking class allegations at the pleading stage, based on variances in the applicable state laws and individual factual circumstances, when the plaintiff also filed a cross-motion for partial class certification, so that the

Court does not need to address whether [the defendants'] motion [to strike] was timely or premature"). After all, "[i]t is not this Court's place to predict what evidence may be found and which theory (or theories) Plaintiffs may pursue." *Buck v. Am. Gen. Life Ins. Co.*, No. 17-13278, 2018 WL 5669173, at *9, 2018 U.S. Dist. LEXIS 186890, at *25 (D.N.J. Oct. 31, 2018) (dismissing the defendant's motion to strike class allegations on predominance grounds). Courts in other circuits have also suggested a pre-discovery predominance inquiry is premature. *See Amaraut v. Sprint/United Mgmt. Co.*, No. 3:19-cv-411-WQH-AHG, 2020 WL 8024170, at *8, 2020 U.S. Dist. LEXIS 7558, at *28–29 (S.D. Cal. Jan. 14, 2020) (holding the plaintiffs seeking pre-certification discovery need not "make a prima facie showing that Rule 23 class action requirements are satisfied or to show that discovery is likely to produce substantiation of the class allegations"); *Choi v. Kimberly-Clark Worldwide, Inc.*, No. SA CV 19-0468-DOC (ADSx), 2019 WL 4894120, at *6, 2019 U.S. Dist. LEXIS 175623, at *16 (C.D. Cal. Aug. 28, 2019) (concluding the defendant's argument that variances in state law will defeat the predominance of a nationwide class is premature and "Plaintiff should be afforded the opportunity to conduct discovery and determine whether a narrower class than the definition proposed in the Complaint is appropriate"); *Smith v. Pizza Hut, Inc.*, No. 09-cv-01632-CMA-BNB, 2011 WL 2791331, at *6, 2011 U.S. Dist. LEXIS 76793, at *16 (D. Colo. July 14, 2011) (citations omitted) ("[T]he predominance of individual questions is only relevant at the post-discovery stage of the collective action certification."); *Chenensky v. New York Life Ins. Co.*, No. 07 Civ. 11504, 2011 WL 1795305, at *4, 2011 U.S. Dist. LEXIS 48199, at *10–11 (S.D.N.Y. April 27, 2011) (declining to consider the predominance requirement before class discovery, because any conclusion will be "based on assumptions of fact rather than on findings of fact" and the plaintiffs may redraw "class boundaries that obviate the need for individual proof" after discovery).

**\*50  [149]**  Therefore, the Court finds a predominance inquiry is premature at this stage. First, as previously explained, the Court will not scrutinize the factual differences among individual class members at this stage, and will not dismiss class allegations because of such potential differences. Second, the variances of controlling state laws do not necessarily defeat predominance. Without discovery, the Court is unable to examine how these state laws will apply to the facts of Plaintiffs, so as to determine whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual

members." Fed. R. Civ. P. 23(b)(3). Discovery may also help Plaintiffs reformulate their (sub)classes, and group the varying state laws, if feasible, into a few categories in light of the facts revealed in discovery. Third, Plaintiffs have made a prima facie showing of predominance. Plaintiffs refer to a series of common factual and legal issues arising out of Allergan's conducts, which, after discovery, may provide answers applicable to all named Plaintiffs and other class members. (ECF No. 219 at 28–29.) Plaintiffs also point out the remedies sought by the class, i.e., a class-wide medical monitoring program and recovery for economic losses, will not present individualized issues that predominate over common ones. (*Id.* at 29.) These showings cut against striking/dismissing Plaintiffs' class allegations. *C.f. Lafferty v. Sherwin-Williams Co.*, No. 1:17-06321, 2018 WL 3993448, at *6, 2018 U.S. Dist. LEXIS 141549, at *13–14 (D.N.J. Aug. 21, 2018) (finding individualized factual issues predominate common issues at the pleading stage in a toxic exposure tort case, where "individual fact finding is essential to determine whether one of these hazardous substances impacted" the plaintiffs, some of whom "have never been exposed to hazardous substances").

**[150]**  Finally, Allergan relies on *Almond* to argue that the variations in state law could be a basis to strike class allegations. (ECF No. 246 at 3.) Indeed, the *Almond* court, at the pleading stage of a prescription drug product liability litigation, concluded a nationwide class that sought the medical monitoring relief could not meet Rule 23(b)(3)'s predominance requirement, because "a fault line divides class members whom state law permits to seek relief through a no-injury medical monitoring claim, and those whom state law prohibits" asserting no-injury medical monitoring claims. *Almond v. Janssen Pharms., Inc.*, 337 F.R.D. 90, 100 (E.D. Pa. 2020). However, the Court notes the nationwide class in *Almond* could be divided into two subclasses: one subclass for the jurisdictions that permit a no-injury medical monitoring claim, and the other subclass for those that prohibit such a claim. It is within a district court's sound discretion, after performing a balancing analysis of costs and benefits, to allow or refuse the creation of subclasses under Rule 23(c). *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 271 (3d Cir. 2009); *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005). A district court may formulate subclasses "independently of any proposals made by the parties." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 494 (3d Cir. 2015) (citing Tobias Barrington Wolff, *Discretion in Class Certification*, 162 U. Pa. L. Rev. 1897, 1898 (2014)). Here, the Court is not in a position to question whether it was within the

*Almond* court's discretion not to consider the above possible subclasses. But the Court could exercise its discretion here to grant Plaintiffs the opportunity of discovery, so that they may reformulate subclasses, if necessary, in light of the facts revealed in the discovery. The Court will then examine whether Plaintiffs' proposed subclasses or other arrangements meet the predominance requirement.

Accordingly, at this stage, the Court declines to dismiss Plaintiffs' class allegations on predominance grounds.

### b. The Court Declines to Dismiss Plaintiffs' Class Allegations on Superiority Grounds

[151] Allergan argues the analysis of the four superiority factors under Rule 23(b)(3) shows a class action would not be superior to other available methods. (ECF No. 171-2 at 47.) First, Allergan states Plaintiffs have indicated a clear intent to control their own individual cases, as the Plaintiffs' Steering Committee to date has refused to adopt the PIC for any of the individual cases in this MDL, even though the Committee is the counsel of record in roughly 75% of those individual cases. (*Id.* at 48.) Second, Allergan claims it is hard to prove Plaintiffs' proposed class action is superior to, and therefore should supplant, the pending MDL that achieves many of the same efficiencies that Rule 23 is supposed to foster. (*Id.* at 50.) Third, Allergan points out the great multitude of claims under the varying laws of 56 jurisdictions make the proposed class action unmanageable: the difficulty of formulating jury instructions and conducting individualized factual inquires under these different state laws will be substantial. (*Id.* at 50–52.) Plaintiffs counter a single class action trial adjudicated with common proof is more efficient than multiple individual trials based on the same common evidence. (ECF No. 219 at 39–40.) Plaintiffs explain individual Plaintiffs have agreed to file Short Form Complaints according to the Case Management Order No. 17, which should not suggest an intent to control their own individual cases. (*Id.* at 40 n.12.) Plaintiffs state Allergan's superiority argument is a premature factual argument that will hinge on the full discovery record. (ECF No. 263 at 19.) Plaintiffs point out individual and class action cases frequently proceed together in product liability MDLs, and do not conflict with each other, because class members are always free to opt out of a class action or file individual actions. (*Id.*) The Court agrees.

\*51  [152]  Under Rule 23(b)(3), courts must take a "close look" at whether a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem Prods. v. Windsor*, 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (citing Fed. R. Civ P. 23(b)(3)). Rule 23(b)(3) provides a list of factors pertinent to a court's the predominance and superiority analysis:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

> (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ P. 23(b)(3). "The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998) (citations and internal quotations omitted). Before discovery, however, "there is insufficient information to conduct an informed balancing assessment." *Kantor v. Hiko Energy, LLC*, 100 F. Supp. 3d 421, 431 (E.D. Pa. 2015). "Erring in favor of the class action proceeding in this instance," a court may "decline to strike the class allegations" on superiority grounds. *Id.* (citing *Kahan v. Rosenstiel*, 424 F.2d 161, 169 (3d Cir. 1970)) "Many courts have determined that discovery is helpful and relevant in determining whether to certify a class and especially in evaluating the class certification factor of superiority." *Santiago v. Apothaker Scian, P.C.*, No. 2:16-CV-1432, 2017 WL 1552324, at \*2, 2017 U.S. Dist. LEXIS 64760, at \*5 (D.N.J. April 27, 2017) (citations omitted).

The Court finds a superiority inquiry is premature at this stage. First, without discovery, the Court is unable to examine whether applying the varying state laws to the facts here will render a class action unmanageable and undesirable. The discovery will also help Plaintiffs formulate subclasses or group the controlling state laws into limited categories that may make their proposed class action more manageable and desirable. Second, the failure of the Plaintiffs' Steering Committee to adopt the PIC is irrelevant here. After all, individual Plaintiffs, when filing their Short Form Complaints, will adopt the PIC. The Court discerns

no reason why the Plaintiffs' Steering Committee should adopt the PIC. Third, "[t]he superior nature of the class action is closely related to the predominance requirement because 'only where predominance exists do the economies of scale justify aggregating claims in a class action.' " *In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79, 93 (E.D. Pa. 2003) (citing *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 186 (D.N.J. 2003)). Since the Court finds a predominance inquiry is premature, the superiority determination should also be postponed. Accordingly, the Court declines to dismiss Plaintiffs' class allegations on superiority grounds.

### 4. A Rule 23(b)(2) Medical Monitoring Class Is Inapplicable

 **[153]**  Allergan argues Plaintiffs cannot invoke Rule 23(b)(2) for their proposed class action, because (1) all the reliefs they request, including those for medical monitoring, consumer fraud, and unjust enrichment, are in essence economic damages, and (2) their proposed classes lack cohesiveness. (ECF No. 171-2 at 55–57.) Plaintiffs counter it is premature at this stage to decide whether they can establish a Rule 23(b)(2) medical monitoring class, because discovery will help them formulate a medical monitoring program for Allergan to fund and implement. (ECF No. 219 at 40–41.) Plaintiffs contend Allergan blurs the line between Rule 23(b)(3) and (b)(2) classes by arguing the Rule 23(b)(2) certification is improper for lacking cohesiveness. (*Id.* at 41.) The Court finds a Rule 23(b)(2) class is inapplicable here.

 **\*52**  **[154]**  Rule 23(b)(2) class actions are limited to those seeking "injunctive relief or corresponding declaratory relief [that] is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). Apart from the medical monitoring program, Plaintiffs do not request other injunctive or declaratory reliefs in the CAC. Therefore, as for the Rule 23(b)(2) inquiry, the Court will only consider the appropriateness of a Rule 23(b)(2) medical monitoring class.

As the following analysis shows, Plaintiffs not diagnosed with BIA-ALCL may not recover the medical monitoring relief under the laws of some jurisdictions. Though Plaintiffs not diagnosed with BIA-ALCL claim to have sustained physical injuries in the form of certain subclinical changes (ECF No. 220 at 25), these subclinical changes are not legally recognizable injuries in some jurisdictions. If such jurisdictions require a present injury in requesting the medical monitoring relief, then Plaintiffs not diagnosed with BIA-ALCL may not request the medical monitoring relief in these jurisdictions.

The following jurisdictions explicitly refuse to consider subclinical changes as legally recognizable physical injuries:

• Alabama. *Lindsey v. 3M Co.*, No. 5:15-cv-01750-AKK, 2020 WL 1479170 at \*2, 2020 U.S. Dist. LEXIS 52159 at \*5 (N.D. Ala. March 26, 2020) ("Alabama law requires that plaintiffs currently have a disease as a result of exposure in order to recover in tort.").

• Arizona. *Burns v. Jaquays Mining Corp.*, 156 Ariz. 375, 752 P.2d 28, 30 (Ariz. Ct. App. 1987) ("[S]ubclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.").

• Delaware. *In re Asbestos Litig.*, No. 87C-09-24, 1994 WL 721763 at \*3, 1994 Del. Super. LEXIS 693 at \*9 (Del. Super. June 14, 1994) ("[A]symptomatic pleural thickening, which results only in scarring of the lungs without any physical impairment or illness, is not an actual loss and therefore should not be considered a compensable injury.").

• Georgia. *Parker v. Brush Wellman, Inc.*, 230 F. App'x 878, 882 (11th Cir. 2007) (citing *Boyd v. Orkin Exterminating Co., Inc.*, 191 Ga. App. 38, 381 S.E.2d 295, 298 (Ga. Ct. App. 1989), *overruled on other grounds*, *Hanna v. McWilliams*, 213 Ga. App. 648, 446 S.E.2d 741 (Ga. Ct. App. 1994)) (In the leading Georgia case dealing with exposure to a toxic substance, the Court of Appeals indicated that a personal injury plaintiff must present evidence of 'actual disease, pain or impairment of some kind.' ").

• Hawaii. *In re Hawaii Fed. Asbestos Cases*, 734 F. Supp. 1563, 1567 (D. Haw. 1990) ("[T]he mere presence of asbestos fibers, pleural thickening or pleural plaques in the lung unaccompanied by an objectively verifiable functional impairment is not enough" to "show a compensable harm by adducing objective testimony of a functional impairment due to asbestos exposure.").

• Indiana. *Ott v. AlliedSignal, Inc.*, 827 N.E.2d 1144, 1156 (Ind. Ct. App. 2005) ("[S]ubclinical injuries or other physiological changes resulting from exposure to asbestos are insufficient to support a cause of action until symptoms emerge or until the disease can be diagnosed without resort to extraordinary procedures.").

• Iowa. *Pickrell v. Sorin Grp. USA, Inc.*, 293 F. Supp. 3d 865, 868 (S.D. Iowa 2018) (finding the plaintiff suffered no injury because she was asymptomatic).

**\*53** • Kentucky. *Luttrell v. Cooper Indus.*, 60 F. Supp. 2d 629, 630–32 (E.D. Ky. 1998) (stating the plaintiff's "personal injury claim for cancer had not accrued at the time of the earlier lawsuit" where "the plaintiffs offered evidence that they suffered cellular damage that had yet to be manifested as physical injuries").

• Maine. *Bernier v. Raymark Industries, Inc.*, 516 A.2d 534, 543 (Me. 1986) (citations omitted) ("[S]ubclinical injury ... is 'insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.' ").

• Maryland. *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 386, 71 A.3d 30 (Md. 2013) (citations omitted) ("In the context of physical injuries sustained as a result of exposure to toxic substances, subcellular change produced by exposure to toxic chemicals—without manifested symptoms of a disease or actual impairment—is not a compensable 'injury' under Maryland law.").

• Mississippi. *Harris v. Brush Wellman, Inc.*, No. 1:04cv598HSO-RHW, 2007 WL 5960181, at \*11 n.16, 2007 U.S. Dist. LEXIS 81970, at \*38–39 n.16 (S.D. Miss. Oct. 30, 2007) (citing *Paz v. Brush Engineered Materials, Inc.*, 949 So. 2d 1 (Miss. 2007)) ("[T]he Mississippi Supreme Court determined that plaintiffs did not demonstrate an actionable injury despite allegations of subclinical, subcellular, and cellular injury.").

• Missouri. *Laswell v. Brown*, 683 F.2d 261, 269 (8th Cir. 1982) (declining to recognize the exposure "to an unusually high risk of disease in genetically passed cellular damage" as a cognizable injury under Missouri law).

• New Jersey. *Caterinicchio v. Pittsburgh Corning Corp.*, 127 N.J. 428, 605 A.2d 1092, 1096 (1992) ("[T]he presence of pleural thickening may not, alone, mandate a jury finding

of compensable injury for an otherwise healthy plaintiff."); *Schweitzer v. Consolidated Rail Corp. (Conrail)*, 758 F.2d 936, 942 (3d Cir. 1985) ("[S]ubclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.").

• New York. *Caronia v. Philip Morris USA, Inc.*, 22 N.Y.3d 439, 982 N.Y.S.2d 40, 5 N.E.3d 11, 18 (2013) ("[I]t is speculative, at best, whether asymptomatic plaintiffs will ever contract a disease; allowing them to recover medical monitoring costs without first establishing physical injury would lead to the inequitable diversion of money away from those who have actually sustained an injury as a result of the exposure.").

• North Carolina. *Dennis v. Bayer Healthcare Pharms. Inc.*, No. 3:18-CV-00491-KDB-DCK, 2020 WL 534307, at \*6, 2020 U.S. Dist. LEXIS 18180, at \*18–19 (W.D.N.C. Feb. 3, 2020) (citations omitted) ("In cases involving disease, North Carolina courts have held that a cause of action does not accrue until the disease is diagnosed.").

• Ohio. *Ackison v. Anchor Packing Co.*, 120 Ohio St.3d 228, 897 N.E.2d 1118, 1125–26 (2018) (declining to find asymptomatic pleural thickening sufficient to establish a compensable injury for asbestos exposure).

• Pennsylvania. *Zieber v. Bogert*, 565 Pa. 376, 382, 773 A.2d 758 (2001) (finding asymptomatic asbestos-related pleural thickening is not a compensable injury); *Schweitzer v. Consolidated Rail Corp. (Conrail)*, 758 F.2d 936, 942 (3d Cir. 1985) ("[S]ubclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.").

**\*54** • Virginia. *Contreras v. Thor Norfolk Hotel, L.L.C.*, 292 F. Supp. 2d 798, 802 (E.D. Va. 2003) ("[U]ntil Plaintiff is diagnosed with an asbestos-related disease, he has no cause of action stemming from a physical injury.").

• Texas. *McManaway v. KBR, Inc.*, No. H-10-1044, 2015 U.S. Dist. LEXIS 190297, at \*56 (S.D. Tex. Jan. 23, 2015) (ruling the plaintiffs cannot recover for their asymptomatic genetic transformation injuries); *Ford Motor Co. v. Miller*, 260 S.W.3d 515, 518 (Tex. App. 2008) (citing RESTATEMENT (SECOND) OF TORTS § 7 cmt. b (1965)) ("[A] mere

physical change that is not detrimental does not constitute a harm.").

• West Virginia. *Ball v. Joy Mfg. Co.*, 755 F. Supp. 1344, 1371 (S.D.W. Va. 1990) (concluding the plaintiffs, who were exposed to toxic chemicals but not yet diagnosed with a related disease, "may not recover such [medical monitoring] costs here because they have not suffered an actionable injury under the law of West Virginia").

• Wisconsin. *Peter v. Sprinkmann Sons Corp.*, 360 Wis.2d 411, 860 N.W.2d 308, 313 (Wis. Ct. App. 2015) ("[The plaintiff] did not have any legally cognizable claim for injuries before April 29, 1994, because [the plaintiff] was not diagnosed with mesothelioma until 2012."); *Alsteen v. Wauleco, Inc.*, 335 Wis.2d 473, 802 N.W.2d 212, 217–18 (Wis. Ct. App. 2011) ("[A]symptomatic plaintiffs who are merely exposed to toxic chemicals do not suffer a corresponding physical injury.").

The following jurisdictions do not allow a medical monitoring relief without a present physical injury:

• Alabama. *Hinton v. Monsanto Co.*, 813 So.2d 827, 829 (Ala. 2001) (rejecting the plaintiff's contention that he could recover for "medical monitoring" without a "manifest, present injury").

• Delaware. *In re Asbestos Litig.*, No. 87C-09-24, 1994 WL 16805917 at *1, 1994 Del. Super. LEXIS 685 at *4 (Del. Super. Ct. Aug. 5, 1994) (citing *Mergenthaler v. Asbestos Corp. of America*, 480 A.2d 647, 651 (Del. 1984)) ("Because the Court has determined that plaintiffs do not have a compensable physical injury, plaintiffs may not recover for the expenses of medical surveillance.").

• District of Columbia. *Witherspoon v. Philip Morris, Inc.*, 964 F. Supp. 455, 467 (D.D.C. 1997) (citing *Burton v. R.J. Reynolds*, 884 F. Supp. 1515, 1523 (D. Kan. 1995)) ("Whether a cause of action or a part of damages requested, medical monitoring requires that the plaintiff have a present injury and a reasonable fear that the present injury could lead to the future occurrence of disease.").

• Georgia. *Parker v. Brush Wellman, Inc.*, 377 F. Supp. 2d 1290, 1302 (N.D. Ga. 2005) ("This Court does not read Georgia law as permitting the establishment of a medical monitoring fund with respect to persons who have not endured a cognizable tort injury.").

• Iowa. *Pickrell v. Sorin Grp. USA*, Inc., 293 F. Supp. 3d 865, 868 (S.D. Iowa 2018) ("[T]he Iowa Supreme Court, if confronted with the opportunity to recognize a medical monitoring cause of action, would either decline to do so or would require an actual injury.").

• Kentucky. *Wood v. Wyeth-Ayerst Labs.*, 82 S.W.3d 849, 857 (Ky. 2002) ("rejecting prospective medical monitoring claims (in the absence of present injury)").

• Louisiana. *Burmaster v. Plaquemines Parish Gov't*, 982 So. 2d 795, 806 (La. 2008) (citing *Bourgeois v. A.P. Green Indus., Inc.*, 783 So. 2d 1251, 1255 (La. 2001)) ("[T]he Louisiana Legislature amended La. Civ. Code art. 2315 to eliminate medical monitoring as a compensable item of damage, unless the plaintiff has manifested physical or mental injury or disease.").

**\*55** • Michigan. *Henry v. Dow Chem. Co.*, 473 Mich. 63, 701 N.W.2d 684, 692–93 (2005) (holding a medical monitoring claim "does not exist in Michigan" and "our common law requires a present injury in addition to economic loss incurred as a result of that injury").

• Minnesota. *Palmer v. 3M Co.*, No. C2-04-6309, 2007 WL 1879844, 2007 Minn. Dist. LEXIS 162, at *46 (Minn. Dist. Ct. June 19, 2007) ("Minnesota law does not recognize an independent tort of medical monitoring."); *Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 555 (D. Minn. 1999) (citations omitted) ("[E]ach Plaintiff seeking participation in a medical monitoring program must establish injury;" "an increased risk of disease due to 'mere exposure to a toxic substance' by itself is not a sufficient injury under Minnesota law.").

• Mississippi. *Paz v. Brush Engineered Materials, Inc.*, 949 So. 2d 1, 9 (Miss. 2007) (declining to recognize "a medical monitoring cause of action without a showing of physical injury").

• New York. *Caronia v. Philip Morris USA, Inc.*, 22 N.Y.3d 439, 982 N.Y.S.2d 40, 5 N.E.3d 11, 18 (2013) ("[P]olicy reasons set forth above militate against a judicially-created independent cause of action for medical monitoring. Allowance of such a claim, absent any evidence of present physical injury or damage to property, would constitute a significant deviation from our tort jurisprudence.").

• North Carolina. *Curl v. Am. Multimedia, Inc.*, 187 N.C.App. 649, 654 S.E.2d 76, 81 (2007) (electing not to create a new cause of action of medical monitoring for the plaintiffs that are not diagnosed with an illness).

• North Dakota. *Mehl v. Canadian Pac. Ry.*, 227 F.R.D. 505, 518 (D.N.D. 2005) ("Given these basic principles of North Dakota tort law, a plaintiff would be required to demonstrate a legally cognizable injury to recover any type of damages in a newly recognized tort, including a medical monitoring claim.").

• Oklahoma. *Taylor v. Michelin N. Am., Inc.*, No. 14-CV-293-JED-FHM, 2018 WL 1569495 at *7, 2018 U.S. Dist. LEXIS 54405 at *23 (N.D. Okla. March 30, 2018) (dismissing the plaintiffs' medical monitoring class allegations because "the plaintiffs have not yet presented evidence of physical injuries attributable to contaminants from the plant"); *Reece v. AES Corp.*, No. CIV-12-0457-JH, 2014 WL 61242 at *7, 2014 U.S. Dist. LEXIS 2236 at *31 (E.D. Okla. Jan. 8, 2014) ("Plaintiffs concede that Oklahoma law does not allow a remedy for medical monitoring in the absence of an existing disease or physical injury.").

• Oregon. *Hamilton v. Silven, Schmeits & Vaughan*, No. 2:09-cv-1094-SI, 2013 WL 2318809 at *8, 2013 U.S. Dist. LEXIS 74352 at *27 (D. Or. May 28, 2013) (citing *Lowe v. Philip Morris USA, Inc.*, 344 Or. 403, 183 P.3d 181, 186 (2008)) ("Medical monitoring damages are not recoverable in Oregon without some present symptoms."); *Lowe*, 183 P.3d at 187 ("[N]egligent conduct that results only in a significantly increased risk of future injury that requires medical monitoring does not give rise to a claim for negligence.").

• Tennessee. *Bostick v. St. Jude Med., Inc.*, No. 03-2636 BV, 2004 WL 3313614 at *14, 2004 U.S. Dist. LEXIS 29997 at *45 (W.D. Tenn. Aug. 17, 2004) (citations omitted) ("Tennessee requires present injury for medical monitoring claims.").

• Texas. *Norwood v. Raytheon Co.*, 414 F. Supp. 2d 659, 665 (W.D. Tex. 2006) ("[T]he Texas Supreme Court appears likely to reject medical monitoring claims ... in the absence of a present physical injury.").

**\*56**  • Washington. *Duncan v. Northwest Airlines, Inc.*, 203 F.R.D. 601, 606–07 (W.D. Wash. 2001) (concluding a stand-alone medical monitoring cause of action "is contrary to Washington law, which is grounded in actual present injury and limits recovery for enhanced risk").

• West Virginia. *Ball v. Joy Mfg. Co.*, 755 F. Supp. 1344, 1371 (S.D.W. Va. 1990) (concluding the plaintiffs, who were exposed to toxic chemicals but not yet diagnosed with a related disease, "may not recover such [medical monitoring] costs here because they have not suffered an actionable injury under the law of West Virginia").

• Wisconsin. *Alsteen v. Wauleco, Inc.*, 335 Wis.2d 473, 802 N.W.2d 212, 218–19 (Wis. Ct. App. 2011) (citations omitted) ("[D]efining the need for medical monitoring as an 'injury' does nothing more than attach a specific item of damages to what is actually a claim for increased risk of future harm. Yet, Wisconsin tort law does not compensate for increased risk of future harm; actual, present injury is required.").

As a result, in the jurisdictions that (1) reject subclinical changes as physical injuries and (2) require physical injuries be shown for recovering the medical monitoring relief, the Plaintiffs not diagnosed with BIA-ALCL cannot request the medical monitoring relief. Whether Plaintiffs' other alleged injuries, such as those relating to diagnostic procedures and removal surgeries, are legally cognizable is irrelevant, because they are not the types of injuries that give rise to the need of medical monitoring. As a result, the Plaintiffs not diagnosed with BIA-ALCL cannot obtain a medical monitoring relief, at least, under the laws of Alabama, Delaware, Georgia, Iowa, Kentucky, Mississippi, New York, North Carolina, Texas, West Virginia, and Wisconsin.

In other words, a nationwide Rule 23(b)(2) class action for medical monitoring will not provide any relief to some Plaintiffs. The Court needs no individualized factual inquiries or discovery to reach this conclusion, because Plaintiffs concede only 16.7% of Plaintiffs are diagnosed with BIA-ALCL (ECF No. 263-1 at 1), and refer to class members not diagnosed with BIA-ALCL in every state-specific subclass (ECF No. 118 at ¶¶ 270–382). Because the proposed medical monitoring class "includes class members from states that expressly prohibit no-injury medical monitoring claims, the declaratory relief Plaintiff[s] seek[ ] could never be 'appropriate respecting the class as whole.' " *Almond v. Janssen Pharms., Inc.*, 337 F.R.D. 90, 100 (E.D. Pa. 2020). "Accordingly, the nationwide class cannot satisfy Rule 23(b)(2)." *Id.* (citations omitted). Plaintiffs may later reformulate medical monitoring (sub)classes to cure the above deficiencies.

In sum, the Court dismisses Plaintiffs' class allegations asserted for (1) the following subclasses: Alaska, American Samoa, Arkansas, District of Columbia, Guam, Hawaii, Indiana, Kansas, Maryland, Mississippi, Nebraska, New Hampshire, North Dakota, Northern Mariana Islands, Puerto Rico, U.S. Virgin Islands, and Vermont; and (2) a nationwide Rule 23(b)(2) medical monitoring class.

## IV. CONCLUSION

For the reasons set forth above, Allergan's Motion to Strike/Dismiss CAC (ECF No. 171-2), Motion to Dismiss Plaintiffs' complaints on preemption grounds (ECF No. 171-1), and Motion to Dismiss PIC (ECF No. 171-3) are **GRANTED IN PART and DENIED IN PART** as follows: The Court dismisses with prejudice all Plaintiffs' claims to the extent they are based on the alleged defects in Allergan's investigational devices used in an approved clinical trial, other than Allergan's tissue expanders and implants sold before the 2000 PMA. In addition, the Court dismisses with prejudice Plaintiffs' claims for: negligence *per se* (Count III) to the extent the claims are asserted under the laws of Alaska, Arkansas, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Rhode Island, Texas, Utah, Vermont, Washington, West Virginia, and Wyoming; strict liability (Count IV) and negligent failure to warn (Count V) to the extent they are based on Allergan's alleged failure to (1) warn on its label the risk of developing BIA-

ALCL and (2) conduct post-PMA clinical studies, for the BIOCELL implants, other than Allergan's tissue expanders and implants sold before the 2000 PMA; strict liability (Count IV) and negligent failure to warn (Count V) to the extent they are based on Allergan's alleged failure to adequately report safety information to the FDA under the laws of Alabama, Alaska, Arkansas, Arizona, Colorado, Connecticut, District of Columbia, Florida, Georgia, Iowa, Kansas, Maine, Massachusetts, Michigan, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Utah, Virginia, West Virginia, and Wyoming; negligent representation (Count VI) the extent they are asserted under the laws of Arkansas, Louisiana, Minnesota, and Virginia, as well as Mississippi common law; implied warranty of merchantability (Count VII) to the extent they are asserted under Pennsylvania law and Wisconsin law; and express warranty (Count VIII) to the extent they are asserted under Wisconsin law. Also, the Court strikes/dismisses without prejudice Plaintiffs' class allegations for (1) the a nationwide Rule 23(b)(2) medical monitoring class; and (2) the PMA and non-PMA Device State Subclasses the extent of the subclasses for Alaska, American Samoa, Arkansas, District of Columbia, Guam, Hawaii, Indiana, Kansas, Maryland, Mississippi, Nebraska, New Hampshire, North Dakota, Northern Mariana Islands, Puerto Rico, U.S. Virgin Islands, and Vermont. The motions to dismiss are denied as to the remaining claims.

**All Citations**

--- F.Supp.3d ----, 2021 WL 1050910

## Footnotes

1    Following oral argument, the Court permit simultaneous supplemental briefing, which was filed by Plaintiffs and Allergan on January 5, 2021. (ECF Nos. 262, 263.)

2    A tissue expander is an empty breast implant gradually filled with saline until the breast tissue expands to the desired size. A second surgery is performed to remove the tissue expander and insert a permanent breast implant. (ECF No. 119 at ¶ 4.)

3    The Court is not holding the Restatement establishes a duty to warn for every state. Here, the Restatement only provides a theory that allows a state failure to warn claim to survive express preemption. It is up to each State to decide whether to adopt the Restatement as the basis for a state law duty to warn.

4    The FDA regulation for postmarketing reporting of adverse drug experiences

5    Dra Panama, *Natrelle Breast Implants - Picking the Right Implants for Your Body and the Surgery Process*., YouTube (Sept. 23, 2013), https://www.youtube.com/watch?v=vu-0W8vSNrU.

In re Allergan Biocell Textured Breast Implant Products..., --- F.Supp.3d ---- (2021)

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 2

2018 WL 4188459
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

IN RE: FIELDTURF ARTIFICIAL
TURF MARKETING AND SALES
PRACTICES LITIGATION

Civil Action No. 3:17-md-2779 (MAS) (TJB)
|
Signed 08/31/2018

**MEMORANDUM OPINION**

Michael A. Shipp, United States District Judge

**\*1** This matter comes before the Court upon Defendants FieldTurf USA Inc., FieldTurf, Inc., FieldTurf Tarkett SAS, and Tarkett Inc.'s (collectively, "FieldTurf") motion to dismiss certain claims in the Consolidated Amended Class Action Complaint ("Complaint") filed in this multidistrict litigation. [1] (ECF No. 91.) Plaintiffs: (i) Borough of Carteret ("Carteret"), State Operated School District of the City of Newark ("Newark"), and County of Hudson ("Hudson") (collectively, "NJ Plaintiffs"); (ii) City of Fremont ("Fremont") and Santa Ynez Valley Union High School District ("Santa Ynez") (collectively, "CA Plaintiffs"); (Hi) Levittown Union Free School District ("Levittown" or "NY Plaintiff"); and Neshannock Township School District ("Neshannock" or "PA Plaintiff") (collectively, "Plaintiffs") filed opposition (ECF No. 100) and FieldTurf replied (ECF No. 112). The Court has carefully considered the parties' submissions and decides this matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, FieldTurf's motion to dismiss is granted in part and denied in part.

**I. Background** [2]

Plaintiffs are school districts, a county, a borough, and a city that purchased defective FieldTurf Duraspine fields. [3] (Compl. ¶¶ 23-30.) All allege that they:

> **\*2** decided to buy the Duraspine Turf Field based in part on FieldTurf's representations that the field had

> superior materials and design such that it had greater durability and resistance to wear, matting, and UV than competing products and a useful lifespan of more than 10 years.... At the time of purchase, Plaintiff[s] did not know that the field was composed of defective and inferior materials that did not [comport with FieldTurf's] represent[ations]. Plaintiff[s] would not have purchased the Duraspine Turf Field, or would have paid less for it, had [they] known that the fields were defective and did not have the qualities and lifespan represented. Plaintiff[s] ha[ve] suffered a concrete injury as a direct and proximate result of Defendants' misconduct ....

(*Id.*)

**A. FieldTurf's Product**

An alternative to natural grass, artificial turf fields are designed for year-round use, in a variety of weather conditions, and for long periods of time. (Compl. ¶ 44.) Artificial turf does not require recovery time between events or the same maintenance as natural grass. (*Id.*) It consists of a minimum of three components: "(1) plastic grass blades, which are manufactured from plastic 'fiber' or 'yarn' and bundled into individual 'tufts'; (2) a backing material to which the tufts are attached; and (3) an adhesive used to secure the tufts to the backing." (*Id.* ¶ 45.) Artificial soil called "infill" may also be used, and when assembled, may be referred to as a " 'turf system." (*Id.*) Design and performance involve "sophisticated engineering" and "specialized knowledge" not possessed by the average consumer, and, accordingly, purchasers rely on the sellers for information about the quality and performance and cannot determine when a field is deteriorating prematurely. (*Id.* ¶ 48.)

FieldTurf "markets, manufactures, sells, and installs" these fields across the United States and is particularly known for its "infilled" fields. (*Id.* ¶¶ 49-50.) It also controls installation and ensures the fields are installed in a uniform fashion. (*Id.* ¶ 52.) In September 2005, FieldTurf entered into an agreement with Mattex Leisure Industries ("Mattex") to obtain fiber for its fields that had a "monofilament design"

with a central "spine." (*Id.* ¶¶ 55-56.) FieldTurf named this fiber "Duraspine" and planned to sell Duraspine Turf fields at higher prices, as this turf was more durable and long-lasting. (*Id.* ¶ 57.)

### B. FieldTurf's Claims and Sales

FieldTurf launched a uniform marketing campaign to disseminate the message in a consistent manner and to promote sales. (*Id.* ¶ 60.) Components of the campaign included trade publications (*id.* ¶ 63.), flyers (*id.* ¶¶ 64, 65), materials given to every prospective customer (*id.* ¶ 68,) and a standard sales pitch (*id.* ¶¶ 69-71.) [4] Advertising and marketing materials featured clients like NFL teams and claimed Duraspine Turf fields were "the best fields money could buy." (*Id.* ¶ 60-61.) A 2006 trade publication quoted then-CEO John Gilman ("Gilman") as saying his company's "breakthrough in technology" would "change the industry" and "double the expected useful life" of an artificial turf field. (*Id.* ¶ 63.) He stated that the fibers used in Duraspine Turf were "stronger," "wear more slowly," and were more resistant to "environmental agents." (*Id.*) As a result, Gilman said the Duraspine Turf fields' lifespan was "longer than the 10 years" already expected from current products. (*Id.*) Similarly, in a marketing document, featured in a national marketing campaign and distributed to all potential customers, "10 Reasons Why FieldTurf and Its MonoGrass System Should be Selected," FieldTurf stated that testing reflected that Duraspine Turf would last longer than FieldTurf's current product, which had an eight to ten-year life. (*Id.* ¶¶ 66, 68.) The document also stated that such durability was a "fact" and the field could be amortized on a "10+ year basis." (*Id.* ¶ 67.) A standard marketing pitch claimed that the Duraspine Turf "would virtually eliminate" the maintenance of natural grass and could be used year-round, lasting longer than any other product on the market. (*Id.* ¶ 69.) It claimed "FieldTurf has nothing to hide" and its comments were "[n]o marketing spin." (*Id.* ¶ 70.) Finally, FieldTurf claimed its fields were cheaper over the long term and sometimes save customers up to $1 million. (*Id.* ¶ 71.)

**\*3** Although promising customers that they would probably never need to rely on a warranty, FieldTurf also provided customers with an eight-year express warranty [5] for the Duraspine Turf after contracting for purchase. (*Id.* ¶ 87.)

As a result, customers were induced by FieldTurf' representations, paid a premium price, and sales of the Duraspine Turf fields nearly doubled in a few years. (*Id.*

¶¶ 73, 77.) Plaintiffs were no exception, as FieldTurf made specific representations about the Duraspine Turfs quality, design, materials, durability, and lifespan, and Plaintiffs relied upon these statements in their purchase. (*Id.* ¶¶ 79-84, 86.) The fields were the most expensive in the industry. (*Id.* ¶ 75.) From late 2005 to 2012, FieldTurf sold a minimum of 1,450 of these Duraspine Turf fields for an average of $300,000 to $500,000 each, resulting in revenues of over half a billion dollars. (*Id.* ¶ 59.)

### C. FieldTuiT's Knowledge

#### 1. Prior to Market Launch

FieldTurf knew that the Duraspine Turf was defective, unfit for its ordinary use and that its representations about Duraspine's durability and lifespan were false, as reflected by its testing and the testing performed by others. (*Id.* ¶ 100.) In early 2004, FieldTurf began to suspect that testing performed by Mattex was insufficient to determine the fiber's durability, and as a result, FieldTurf began to conduct its own testing. (*Id.* ¶ 92.) FieldTurf, however, performed the test using non-standard equipment knowing that the equipment would render inaccurate results. (*Id.*) By early 2005, FieldTurf's tests showed that the fiber "fibrillated" in one-third of the expected lifespan and FieldTurf contacted Mattex to ask about its material and methods. (*Id.* ¶ 93.) In addition, a representative from Bonar Yarns, another FieldTurf supplier, reported in a 2005 e-mail message that the Duraspine showed "poor results in the Lisport test!" (*Id.* ¶ 94.) This test is the standard industry test used by FIFA, soccer's international governing body. (*Id.*) Gilman was concerned, and in an e-mail message, questioned whether the company "erred in our over exuberance in the adoption of the monofilament yarns, specifically the Mattex yarns?" (*Id.* ¶ 95.) FieldTurf's director of manufacturing, Derek Bearden, ran more tests and acknowledged on multiple occasions that the "finger coating" method employed to attach the fiber to the backing was not dependable and secure. (*Id.* ¶¶ 95, 96, 98.) In July 2005, FieldTurf's primary West Coast installer stated that FieldTurf should not carry out its Fall 2005 launch because it had "no idea whether it [Duraspine Turf] will work" and should not "rush a product to market and have it fail." (*Id.* ¶ 97.) Finally, in mid-2005, tests at a France facility revealed that the five tested samples "deteriorated 40-80%" after simulating five to six years of use. (*Id.* ¶¶ 33, 99.)

In re FieldTurf Artificial Turf Marketing and Sales Practices... Not Reported in Fed....

96 UCC Rep.Serv.2d 790

Case 1:19-md-02875-RMB-SAK    Document 1802-1    Filed 12/02/21    Page 76 of 182
PageID: 54329

### 2. During the Period Sold

**\*4**  "[T]hroughout the time it sold and installed Duraspine Turf fields, FieldTurf repeatedly confirmed its awareness that Duraspine Turf was defective, lacked necessary strength, durability, and resistance and did not have the lifespan FieldTurf claimed." (*Id.* ¶ 102.) For example: (i) its operations director informed the CEO and others in 2006 that Duraspine fields installed in 2005 were already prematurely degrading (*id.* ¶ 103); *and in January 2006, an employee in France observed that a field installed nine months prior was failing (*id.* ¶ 105). As a result, in December 2006, Gilman wrote to Mattex, stating, "We are seeing fields showing splitting <u>under a year of play</u> and have already had to replace one full-sized field due to <u>yarn failure after only a few months of installation!</u>" (*Id.* ¶ 106 (emphasis in original).)) " <u>[W]e know</u> with heavy use, <u>the fiber is coming apart</u>." (*Id.* (emphasis in original).)) In 2007, Ken Gilman, who is Gilman's son and was then a FieldTurf executive, stated in an e-mail message to the then-interim CEO that:

> [Duraspine] is nowhere near as robust or resilient as we initially thought and probably will not last that much longer than a high quality slit-film yarn .... In all likelihood in years 5 and 6 these Duraspine Turf fields will be matted down and fibrillating pretty heavily.... <u>Our marketing claims and sales pitches need to reflect this reality</u>.

(*Id.* ¶ 109.) He also stated the FieldTurf was promoting useless maintenance equipment which would not revitalize a field. (*Id.* ¶ 111.) When FieldTurf's counsel noted that the e-mail message was discoverable and could be used in litigation, Ken Gilman asked an IT representative whether the e-mail message could be "zapped off," the IT consultant answered in the negative and stated "[I]legally, it is not possible ... You would be asking me ... to commit a possible crime." (*Id.* ¶¶ 112-13.) Ken Gilman continued to try and convince FieldTurf to revise the representations in its sales and marketing representations. (*Id.* ¶¶ 114, 116, 117, 119.) Notably, one e-mail message, included as a screenshot in the Complaint, stated, among other things:

> As you know[,] our sales and marketing guys continually make claims that we can't possibly meet in the real world. This opens us up to tons of exposure from a legal standpoint.... On the marketing side[,] the claims made regarding the Duraspine ... are ridiculous. Everyday[,] we are putting stuff out there that can't and won't live up to the marketing spin. We have to control this somehow!!!"

(*Id.* ¶ 114.) FieldTurf did not alter its sales and marketing claims, remove the product from the market, or inform customers of their misrepresentations. (*Id.* ¶ 120.) Ken Gilman was fired in 2008, and FieldTurf signed another exclusive supply agreement with TenCate, Mattex's successor, in or around July 2018. (*Id.* ¶¶ 120, 179.)

### 3. FieldTurf's "Finger-Coating" Method

During the manufacturing process, fibers are sown or "tufted" into a backing material in rows so that cleans can penetrate the infill material instead of the fiber. (*Id.* ¶ 122.) The manufacturer subsequently applies polyurethane to secure the fibers and prevent "tuft bind" issues. Tuft bind problems occur when the coating does not effectively lock fibers in place and they come loose from the backing. (*Id.* ¶ 123.) Tuft bind failures result in fibers laying on top of the field like mowed grass. (*Id.* ¶ 124.) Derek Bearden. then-Vice President of Manufacturing, recommended coating the whole backing with polyurethane; however, FieldTurf utilized a "finger coating" method in which it applied polyurethane to the back of each row of fibers only. (*Id.* ¶¶ 125-26.) The remaining backing material between the rows was left uncoated. (*Id.*) Significant tuft bind failures resulted and FieldTurf received multiple complaints. (*Id.* ¶¶ 127-28.) Bearden told management that a full coating would "immediately make a significant difference." (*Id.*) Nevertheless, FieldTurf did not alter its process and instead manipulated test results to conceal the defect. (*Id.* ¶¶ 129-30.) John Rodgers, FieldTurf's Senior Research and Development Project Manager, stated that to obtain passing scores on "tuft bind pull force" tests, the company disregarded the lowest five of twenty pulls. (*Id.* ¶ 130.) Finally, Revolution Turf, FieldTurf's product

In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
96 UCC Rep.Serv.2d 790

that launched in 2012, at minimum, suffers from the same attachment defects of Duraspine described above. (*Id.* ¶¶ 131-32.)

#### 4. FieldTurf's Infill and Safety Testing

**\*5** FieldTurf marketing materials and sales presentations represented that FieldTurf used "ten pounds of infill per square foot" in installations but actually used much less, as reflected in FieldTurf's instructions to installers. (*Id.* ¶ 134.) A FieldTurf internal report stated that the "low infill phenomenon is real" (*id.* ¶ *135) and the issue decreased durability, safety, and performance (*id.* ¶ 136). The lower amount of infill increased the rate by which the fields deteriorated because fibers would not remain upright and instead laid over, exposing them to more wear. (*Id.* ¶ 137.) The end result was a "harder, sub-par" surface and not a premium product as represented. (*Id.* ¶ 138.) This practice continues today. (*Id.* ¶ 139.) In connection with this issue, FieldTurf cited to studies comparing turf to natural grass, studies it falsely represented to be "independent" but were actually funded by FieldTurf. (*Id.* ¶¶ 140-43.)

#### D. Consumer Complaints and FicldTurf's Response

While defects in the Duraspine Turf were not immediately apparent to customers, in 2009 and 2010, FieldTurf began receiving a distressing amount of complaints uniformly stating that the fiber on the fields was "fading, splitting, thinning and ultimately disintegrating within two to three years of installation." (*Id.* ¶¶ 144-45.) Plaintiffs, including, for example, Levittown, Newark, and Fremont, suffered similar problems, with a Newark football coach noting "You grab it and it rips. It rips like grass." (*Id.* ¶ 146.) FieldTurf, in response, conducted a "systematic campaign" to deceive purchasers and avoid warranties by: failing to inform customers that FieldTurf knew the fields were defective; failing to tell customers when FieldTurf representatives detected field failure; downplaying field failures observed by customers; and trying to persuade customers against enforcing their warranties. (*Id.* ¶ 147.) Notably, FieldTurf instructed its sales and marketing teams to handle customer complaints—the same people who misled customers into buying the defective product. (*Id.*)

First, FieldTurf would deny the existence of a defect in the fields, many of which FieldTurf itself claimed were defective in its litigation against the manufacturer, discussed below,

and describe problems "as an anomaly or normal wear and tear, or claim that the issues would improve over time." (*Id.* ¶¶ 149, 153.) Then, FieldTurf would delay action, advise customers to monitor the fields, and conduct an inspection six to eight months later. (*Id.* ¶ 150.) FieldTurf would repeat this cycle until the expiration of warranty periods. (*Id.*) For those customers that demanded action, FieldTurf invented "FiberGuard," a clear coat of paint used on the fields; however, FieldTurf knew that the FiberGuard was ineffective. (*Id.* ¶ 151.) Additionally, FieldTurf accelerated applications on fields in high UV areas with one to two years remaining on their warranty periods, so that defect claims would fall outside the warranty period. (*Id.* ¶ 152.) When FieldTurf replaced a field, however, it provided more of the same defective product. (*Id.* ¶ 154.) If a customer refused to accept a replacement, FieldTurf offered either the customer an "upgrade" for an additional charge that was actually just the existing Duraspine Turf or Revolution Turf, which was still defective. (*Id.* ¶ 155.) Plaintiffs and others were subject to all of these tactics. (*Id.* ¶¶ 157-77.)

For example, in April 2013, Carteret reached out to FieldTurf about premature wear and spoke to two FieldTurf representatives, Perry DiPiazza and Andrew Schwartz, to report a warranty claim. (*Id.* ¶ 157.) The two stated that they need to conduct an inspection, which was performed five months later. (*Id.*) Over a year passed before Carteret received additional information, and only after Carteret only received a response after it sent October 2014 correspondence requesting an update. (*Id.* ¶ 158.) Almost two years after Carteret's first call to FieldTurf, DiPiazza e-mailed Carteret apologizing and promising to ease concerns; however, Carteret subsequently sent FieldTurf three letters between October 2015 and May 2016 and no further inspection was conducted. (*Id.* ¶¶ 159-60.) In June 2016, FieldTurf finally expressed "personal apologies" through its representative. (*Id.*) FieldTurf's delay tactic appeared to be an effort to allow the warranty period to expire. (*Id.* ¶ 161.) Several months after FieldTurf's apology, FieldTurf e-mailed Carteret three proposals "that would require it to pay thousands of dollars in repair and replacement costs." (*Id.*)

#### E. FieldTurf's Lawsuit Against TenCate and the NJ Advance Media Investigation

**\*6** On March 1, 2011, FieldTurf sued TenCate, Mattex's successor and supplier of the fiber used in the Duraspine Fields sold to Plaintiffs and the putative class members. (*Id.* ¶ 179.) To bring its case, FieldTurf admitted that the fiber used was "inferior" and "defective" in its design

and composition. (*Id.* ¶ 180.) According to FieldTurf, the representations TenCate/Mattex made about the nature of the fiber were false and misleading—and essentially identical to the representations made by FieldTurf itself. (*Id.*) FieldTurf admitted that: (i) the fiber was cheap, defective, less durable, and lacked sufficient UV stabilizers; (ii) the defects were due to the inferior materials Mattex/Tencate used; and (iii) the manufacturing process diminished the fiber's quality. (*Id.* ¶ 181.) FieldTurf's experts opined that: (i) scientific testing demonstrated that the fiber showed signs of premature physical and chemical degradation and had insufficient amounts of UV protection; and (ii) the general deterioration confirmed that the fiber was defective. (*Id.* ¶¶ 182-83.) Finally, "FieldTurf's CEO, Erie Daliere, testified that FieldTurf continued to sell, install, and profit from Duraspine Turf fields despite knowing they were defective." (*Id.* ¶ 184.)

NJ Advance Media conducted an exhaustive six-month investigation of these events, reviewing 5,000 pages of production from forty document requests, interviewing coaches, officials, and current FieldTurf employees, and inspecting fifty fields in New Jersey. (*Id.* ¶ 186.) It also enlisted the University of Michigan's Breaker Space Lab to test Duraspine Turf fibers from three fields in New Jersey. (*Id.*) In December 2016, NJ Advance Media published its results. (*Id.*) Testing confirmed that the turf's tensile strength failed to meet both industry and FieldTurf's own standards.[6] (*Id.* ¶ 187.) The investigation concluded:

- FieldTurf knew its Duraspine Turf fields were defective. For most of the time they sold the fields, which cost at least $300,000 to $500,000 each, executives were aware the turf was deteriorating faster than expected and might not last a decade or more as promised.

- They misled their customers. Despite candid, internal email discussions about their overblown sales pitches, executives never changed their marketing campaign for Duraspine Turf fields.

- They have and continue to keep quiet about their lies. From the time fields began to fail in 2006 until today, executives have never told most customers about Duraspine Turf's problems or how to identify signs it was prematurely falling apart.

- FieldTurf officials slow-footed warranty claims and told customers the deterioration was normal, or that their fields needed more maintenance, or the problems

would get better. Further, to this day, in testimony before governmental bodies, and in publicly released statements. FieldTurf continues to publicly deny there was a widespread defect with its Duraspine Turf products.

(*Id.* ¶ 188.)

## II. **Legal Standard** [7]

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ). On a motion to dismiss for failure to state a claim, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

**\*7** A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Malleus v. George*, 641 F.3d 560. 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' " *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ). Second, the court must "[review] the complaint to strike conclusory allegations[.]" *Id.* The court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff[.]" *Fowler v. UPMC Shadyside*, 578 F.3d 203. 210 (3d Cir. 2009) (citation omitted). In doing so, however, the court is free to ignore legal conclusions or factually unsupported accusations that merely state "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' " *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

Finally, some of Plaintiffs' claims allege fraud, and those claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 301 n.9 (3d

Cir. 2011); *Frederico v. Home Depot*, 507 F.3d 188, 202-03 (3d Cir. 2007).

### III. Discussion

#### A. Claims Under Statutes of Forty-Three Jurisdictions Where There is No Named Plaintiff

"[A] class representative *must be part of the class* and 'possess the same interest and suffer the same injury' as the class members." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2550, 180 L.Ed.2d 374 (2011) (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) ) (emphasis added); *see also Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349. 360 (3d Cir. 2013) ("It is axiomatic that the lead plaintiff must fit the class definition"). The Court acknowledges disagreement among the courts regarding whether, prior to class certification, named plaintiffs must demonstrate that they have standing to assert all claims in the class action complaint "or whether it is sufficient to establish standing for a single claim because a court will determine if the named plaintiffs have standing to represent the unnamed class members seeking redress under the balance of asserted claims during the class certification process[.]" *McGuire v. BMW of N. Am., LLC*, No. 13-7356, 2014 WL 2566132, at *5 (D.N.J. June 6, 2014) (quoting *In Re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 WL 5008090, at *8 (D.N.J. Oct. 20, 2011) ).

Here, Plaintiffs bring claims for fraud, fraudulent concealment, fraud in the inducement. and unjust enrichment/quasicontract (Compl. ¶¶ 219-64) on behalf of themselves and a nationwide class of:

> [a]ll persons or entities in the United States and its territories who purchased one or more Duraspine Turf fields for their own use and not for resale. Excluded from the Class are FieldTurf, or its affiliates, subsidiaries, agents, board members, directors, officers, and/or employees. Also excluded from the Class are authorized Duraspine Turf field installers.

(Comp. ¶ 191.)

In addition, Plaintiffs seek to bring claims for breach of express warranty, breach of implied warranties, and breach of various consumer protection laws and to represent state classes defined as: "[a]ll persons or entities who purchased one or more Duraspine Turf fields for their own use and not for resale within [a specific state] or who purchased one or more Duraspine Turf fields for their own use and not for resale and reside in [a specific state]." (*Id.* ¶ 192.)

FieldTurf argues that Plaintiffs lack standing to bring claims under the laws of states in which they do not reside, no fields are located, and no injuries are alleged to have occurred. (FT's Moving Br. 11-13.) Plaintiffs counter that they undisputedly possess Article III standing and that FieldTurf actually challenges whether Plaintiffs can represent absent class members—a question to be addressed in the Rule 23 class certification analysis, not on a motion to dismiss. (Pls.' Opp'n Br. 7-11.) Further, Plaintiffs note that FieldTurf clearly sold its products throughout the country and if Plaintiffs here can recover on their claims, many customers in other states can also recover under similar laws. (*Id.* at 7.) On reply, FieldTurf notes that the state classes are defined as "[a]ll persons or entities who purchased one or more Duraspine Turf fields ... within [the State] or who purchased one or more Duraspine Turf fields ... and reside in [the State]" and Plaintiffs are not members of the forty-three state classes at issue and, therefore, those classes can never be certified. (FieldTurf's Reply Br. ("FT's Reply Br.") 1-2, ECF No. 112). FieldTurf asserts that the case law Plaintiffs offer in opposition is inapplicable, because those cases involve plaintiffs that purport to represent and *be a member* of a single class involving claims under many states' laws. (*Id.* at 3.)

**\*8** The Court defers consideration of standing to pursue claims on behalf of absent class members of the nationwide class and deems the inquiry premature and more appropriate for the class certification analysis. The Court agrees with the rationale of one contingent of courts, that "the fact that the named Plaintiffs may not have individual standing to allege violations of consumer protection laws in states other than those in which they [were injured] is immaterial." because "[t]he issue ... is one of predominance[—]whether questions of law or fact common to class members predominate over any questions affecting only individual members." *Ramirez v. STI Prepaid LLC*, 644 F.Supp.2d 496, 505 (D.N.J. Mar. 18, 2009) (citing Fed. R. Civ. P. 23 (b)(3) ); *In re Liquid Aluminum Sulfate Antitrust Litig.*, No. 16-md-2687, 2017 WL 3131977, at *28, 2017 U.S. Dist. LEXIS 115294, at *83-84 (D.N.J. July 20. 2017). Here, the question of whether Plaintiffs have

standing to bring claims for violations of laws of other states only arises if the Court certifies the nationwide class. Accordingly, FieldTurf's motion to dismiss claims brought on behalf of the nationwide class is denied on this ground.

From the face of the Complaint, however, the named plaintiffs cannot represent any putative state subclasses of which they are not a member. Additionally, FieldTurf is correct in its assessment that the case law Plaintiffs offer involves plaintiffs that purport to represent and *be a member* of a single class involving claims under many states' laws. Accordingly, FieldTurf's motion to dismiss the state subclasses of which no Plaintiff is a member (*i.e.*, other than the New York, New Jersey, Pennsylvania, and California subclasses) is granted without prejudice and Plaintiffs are granted leave to amend.

### B. Consumer Protection Claims

FieldTurf asserts that the NJ Plaintiffs, NY Plaintiff, and CA Plaintiffs do not adequately allege state consumer fraud claims because they are insufficiently pled or barred by the statute of limitations. (FT's Moving Br. 13.) The Court will examine each, in turn.

### 1. NJ Plaintiffs' Claims Under the New Jersey Consumer Fraud Act ("NJCFA")

To state a claim under the NJCFA, a plaintiff must allege three elements: (1) the defendant's unlawful conduct;[8] (2) the plaintiff's ascertainable loss; and (3) a causal relationship between the two. *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 389, 929 A.2d 1076 (N.J. 2007); *Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007). There are three general categories of unlawful conduct: affirmative acts, knowing omissions, and violation of regulations promulgated under N.J. Stat. Ann. § § 56:8-2, 56:8-4. *Harnish v. Widener Univ. Sch. of Law*, 931 F.Supp.2d 641, 648 (D.N.J. 2013) (citing *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 647 A.2d 454, 462 (N.J. 1994) ). Finally, when bringing an NJCFA claim, plaintiffs must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Castro v. Sovran Self Storage, Inc.*, 114 F.Supp.3d 204. 219 n.12 (D.N.J. 2015); Fed. R. Civ. P. 9(b). "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200 (citing *Lum v. Bank of Am.*, 361 F.3d 217, 223-34 (3d Cir. 2004) ).

#### a. Applicability of the NJCFA

First, FieldTurf argues that the NJ Plaintiffs cannot invoke the protections of the NJCFA because they are not "consumers" and the purchased fields are not "merchandise." (FT's Moving Br. 14.) FieldTurf states that the NJCFA does not apply to "transactions involving sophisticated institutional buyers of products that are not sold to the general public and are subject to individualized specifications and negotiations' " and the fields at issue here are worth hundreds of thousands of dollars and sold to a small group of sophisticated customers. (FT's Moving Br. 14-15.) Despite Plaintiffs' assertion that the Court's analysis turns on whether the fields were sold to the public at large, FieldTurf asserts that the Complaint fails to make this allegation and instead alleges that specialized products were sold to "municipalities, school districts, universities, and athletic organizations." (FT's Reply Br. 112 (quoting Compl. ¶ 259).) Plaintiffs in opposition assert that: (i) the NJCFA is broadly construed and protective; (ii) the NJCFA can apply to expensive products purchased by knowledgeable buyers; and (in) the proper inquiry for the Court is whether a product at issue was sold to the public at large. (Pls.' Opp'n Br. 12-14.)

**\*9** The Court finds that FieldTurf has not carried its burden to demonstrate that based on the Complaint's allegations, the NJCFA does not apply to the sale of the fields. In support of its argument, FieldTurf cites cases involving products that, based on the facts as pled, appear unlike the fields at issue. (*See* FT's Moving Br. 14-15 (citing *Boc Grp. v. Lummus Crest*, 251 N.J.Super. 271, 597 A.2d 1109, 1109-10 (N.J. Super. Ct. Law Div. 1990) (case regarding "the design, engineering and operation of a plant in Texas intended to manufacture needle coke, which is used to produce graphite electrodes"); *Khan v. Conventus Inter-Ins. Exck*, 440 N.J.Super. 372, 113 A.3d 803, 806 (N.J. Super. Ct. Law Div. 2013) (medical malpractice insurance); *Centrum Fin. Servs., Inc. v. Chicago Title Ins. Co.*, No. 09-3300, 2010 WL 936201, at *4 (D.N.J. Mar. 12, 2010) (title insurance policy); *Princeton Healthcare Sys. v. Netsmart N.Y., Inc.*, 422 N.J.Super. 467, 29 A.3d 361, 365 (N.J. Super. Ct. App. Div. 2011) ("complex computer system"). Here, the NJ Plaintiffs are public entities—a school district, borough, and county (Compl. ¶¶ 23, 25, 29)—and there is an inherently public undertone to these transactions. Plaintiffs allege that "[b]ecause so many of these consumers were public and/or taxpayer funded entities, FieldTurf's wrongful acts directly impacted the public interest in honest dealings with such

consumers and in ensuring that public funds and taxpayer dollars are not wasted on defective, inferior, fraudulent goods." (*Id.* ¶ 178; *see also id.* ¶ 138 (alleging the fields were "far from the 'premium' product FieldTurf marketed ... and. in many instances, taxpayers, paid for.").) Accordingly, the Court declines to bar the NJ Plaintiffs' NJCFA claims on this basis and as a matter of law at this stage of the proceedings. The Court, therefore, denies FieldTurf's motion to dismiss the NJ Plaintiffs' NJCFA claims on this ground.

#### b. "Ascertainable Loss"

Second, FieldTurf claims that the NJ Plaintiffs have not alleged an "ascertainable loss." (FT's Moving Br. 16.) FieldTurf asserts that an alleged defect covered by an express warranty cannot constitute an ascertainable loss under the NJCFA and instead, a plaintiff must seek redress under the warranty. (*Id.* at 16-17.) According to FieldTurf, Plaintiffs fail to allege any defect that is not covered by FieldTurf's warranty. (*Id.* at 17.) Plaintiffs, however, assert that a written warranty does not bar the Finding of ascertainable loss under the NJCFA. (Pls.' Opp'n Br. 16.) Plaintiffs assert that an ascertainable loss is simply receiving less than what was promised, which was the case here where the fields did not conform to FieldTurf's representations. (*Id.*) Further, Plaintiffs contend that a breach of warranty claim does not preclude an NJCFA claim if it is brought in the alternative, when the warranty is allegedly ineffective. (*Id.*) FieldTurf, on reply, asserts that Plaintiffs cite authority standing for the proposition that an NJCFA claim can only arise where the alleged breach of warranty is unconscionable and the NJ Plaintiffs' allegations that FieldTurf unreasonably delayed responding to warranty claims or denied a claim does not rise to unconscionability. (FT's Reply Br. 5-6.)

Generally, an ascertainable loss under the NJCFA: (i) "is one that is quantifiable or measurable, not hypothetical or illusory." *Annecharico v. Raymour & Flanigan*, No. 16-1652, 2016 WL 7015615, at *7 (D.N.J. Nov. 30, 2016) (internal quotation marks and citations omitted) (citing *D'Agostino v. Maldonado*, 216 N.J. 168, 78 A.3d 527, 537 (N.J. 2013) ); and (ii) "occurs when a consumer receives less than what was promised." *Dzielak v. Whirlpool Corp.*, 26 F.Supp.3d 304, 335 (D.N.J. 2014) (quotations omitted) (citing *Union Ink Co., Inc. v. AT&T Corp.*, 352 N.J.Super. 617, 801 A.2d 361, 379 (N.J. Super. Ct. App. Div. 2002) ).

Here, the Court finds that FieldTurf has failed to carry its burden to demonstrate that Plaintiffs failed to allege ascertainable loss. FieldTurf relies heavily on an unreported case from this district, *Glass v. BMW of North Am., LLC*, 2011 WL 6887721, which interpreted a Supreme Court of New Jersey decision, *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 872 A.2d 783 (N.J. 2005). *Thiedemann* states that "defects that arise and are addressed by warranty, *at no cost to the consumer*, do not provide the predicate 'loss' that the [NJ]CFA expressly requires[.]" *Id.* at 794 (emphasis added). The *Thiedemann* plaintiffs' "problems caused by the defective sensors did not result in any out-of-pocket monetary loss[, a]ll repairs were performed by defendant under warranty, at no cost to [plaintiffs], and the loaner vehicles were provided during periods when [their] car was being repaired." *Id.* Moreover, the New Jersey Supreme Court has described *Thiedemann* using language suggesting that cost to the consumer is a factor in the determination of ascertainable loss. *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 964 A.2d 741, 750 (N.J. 2009) (citing *Thiedemann*, 872 A.2d at 794) ) ("We have held that a consumer who had repairs to a vehicle performed under warranty at no cost did not sustain such a loss.")

**\*10** In this case, each of the NJ Plaintiffs alleges it spent thousands of dollars in connection with repair and/or replacement of its fields. (Compl. ¶¶ 161, 163, 169.) Finally, Plaintiffs assert their warranty claims in the alternative. (Compl. 81 n.9.) Accordingly, for the purpose of this motion, the Court finds Plaintiffs' allegations of ascertainable loss sufficient. *See Miller v. Chrysler Grp. LLC*, No. 12-760, 2014 WL 12617598, at *7, 2014 U.S. Dist. LEXIS 90314, at *21-22 (quoting *Thiedemann*, 872 A.2d at 792) (noting that the New Jersey Supreme Court has held that "either out-of-pocket loss or a demonstration of loss in value will suffice" to create an issue of fact related to ascertainable loss and finding allegations sufficient to withstand a motion to dismiss).

#### c. Hudson's NJCFA Claim

Finally, FieldTurf alleges that Hudson has not sufficiently alleged: (i) "unlawful conduct" pursuant to Rule 9(b) and, instead, asserts " 'generic and conclusory boilerplate allegations" without mention of the date, time or place of the misrepresentation or the persons involved (FT's Moving Br. 17-18, FT's Reply Br. 6); and (ii) a causal connection between a misrepresentation and the alleged loss, as misrepresentations made to the public and not to a plaintiff

In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
96 UCC Rep.Serv.2d 790

are insufficient (FT's Moving Br. 18-19, FT's Reply Br. 6). Plaintiffs contend that FieldTurf is sufficiently on notice of the unlawful conduct at issue because it sued TenCate regarding defects, its experts testified to such defects, and FieldTurf's executives knew that the company was misleading customers and, consequently, that FieldTurf was exposed to fraud claims. (Pls.' Opp'n Br. 17.) Plaintiffs assert that they have identified the who, what and when of the fraud: FieldTurf, its multitude of misrepresentations and omissions about the Duraspine Turf, and the date of Hudson's purchase of the fields. (*Id.* at 18.) Plaintiffs further claim that Hudson has adequately alleged that it would not have purchased or would have paid a lower price for the fields had it known the truth about the product. (*Id.*)

To satisfy Rule 9(b), "a plaintiff must plead or allege the date, time and place of the alleged fraud *or otherwise inject precision or some measure of substantiation into a fraud allegation.*" *Frederico,* 507 F.3d at 200 (emphasis added). The Court declines to "require specificity just for specificity's sake" and finds that, given the highly unusual nature of the facts of this case, which, as pled in the Complaint, involve FieldTurf's own lawsuit against its manufacturer and an extensive media investigation. FieldTurf is sufficiently on notice of the misconduct alleged. *Smajlaj v. Campbell Soup Co.,* 782 F.Supp.2d 84, 104 (D.N.J. 2011). Here. Plaintiffs allege that Hudson made its purchases based partially " 'on FieldTurf's representations to the market throughout the 2007-2009 period that the fields had superior materials and design such that they had greater durability and resistance to wear, matting, and UV than competing products and a useful lifespan of more than 10 years." (Compl. ¶ 86.) Additionally, "Mr. DiPiazza served as FieldTurf's representative to Hudson in the sales process and thereafter." (*Id.*) Read in conjunction with the numerous allegations in the Complaint that detail FieldTurf's national marketing campaign (*see generally id.* ¶¶ 60-71), the Court finds that Hudson has adequately alleged a misrepresentation.

Finally, the Court finds that Hudson has adequately alleged causation. *See, e.g., Ramirez v. STi Prepaid LLC,* 644 F.Supp.2d 496, 501 (D.N.J. 2009) (finding adequate allegations that plaintiffs would not have purchased the items at issue if truth was disclosed). Plaintiffs allege that Hudson based its decision to purchase the fields "in part on FieldTurf's representations that the fields had superior materials and design such that they had greater durability and resistance to wear, matting, and UV than competing products and a useful lifespan of more than 10 years" and "claimed

comparative cost savings of Duraspine Turf fields." (Compl. ¶ 25.) Plaintiffs further allege that at the time of purchase, Hudson did not know the fields did not live up to these representations and Hudson would not have purchased the Duraspine Turf fields, or would have paid less for them, had it known that the fields were defective and did not have the qualities and lifespan represented. (*Id.*) The Court finds that Hudson has adequately raised its fraud allegation here, and FieldTurf's motion to dismiss on this ground is denied.

### 2. Levittown's Claims for Consumer Protection and False Advertising Under New York General Business Law Sections 349 and 350

**\*11** New York General Business Law § 349 and § 350 prohibit "deceptive acts or practices" and "false advertising" in the conduct of any business, trade or commerce or in the furnishing of any service in New York state. *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 124 (2d Cir. 2017) (quoting N.Y. Gen. Bus. Law § 349(a) ); *4 K & D Corp. v. Concierge Auctions, LLC, 2* F.Supp.3d 525, 547 (S.D.N.Y. 2014) (quoting N.Y. Gen. Bus. Law § 350). "To successfully assert a claim under either section, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.' " *Orlander v. Staples, Inc.,* 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Conclit Co.,* 18 N.Y.3d 940, 944 N.Y.S.2d 452, 967 N.E.2d 675, 675 (N.Y. 2012) ) (internal quotation marks omitted).

### a. Statute of Limitations

FieldTurf asserts that: (i) even if plaintiffs allege fraud, a three-year statute of limitations applies and began to run on the date of the alleged injury, which can be no later than the 2008 sale of allegedly defective goods (FT's Moving Br. 20; FT's Reply Br. 7); and (ii) Levittown has not pled allegations sufficient to toll the limitations period based on equitable estoppel because (a) merely pleading that a defendant failed to disclose the wrong is insufficient (FT's Moving Br. 20-21) and (b) Levittown does not and cannot allege due diligence in pursuing its suit or FieldTurf's acts that prevented it from filing suit (FT's Reply Br. 8). In opposition, Plaintiffs assert that Levittown's claims are timely because: (i) a six-year statute of limitations applies to fraud claims (Pls.' Opp'n Br. 19); (ii) Levittown's claims accrued

in 2016 when the fields failed because a claim premised on misrepresentations regarding future performance does not accrue until such performance fails (*id.* at 20); and (iii) FieldTurf's active concealment before and after the sale tolled the limitations period because Levittown was induced by fraud, misrepresentations or deception to refrain from timely filing an action (*id.* at 21).

### i. Accrual of the Claims

A statute of limitations defense may "be raised by a motion under Rule 12(b)(6). but only if 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.' " *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (quoting *Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975) ). "If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Id.* (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978) ). Here, the Court finds that based on the facts pled and briefing provided, Plaintiffs present at least a colorable argument based on the language of a New York Court of Appeals decision that Levittown's injury could have occurred in 2016 when it determined its fields needed to be replaced. *See Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 944 N.Y.S.2d 732, 967 N.E.2d 1177, 1185 (N.Y. 2012) (quoting *Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 211, 727 N.Y.S.2d 30, 750 N.E.2d 1078 (N.Y. 2001) ). The Court acknowledges that FieldTurf provided case law from New York federal district courts in support of its contention; however, because Plaintiffs' argument is at least plausibly valid, the Court finds that FieldTurf has not carried its burden to demonstrate that Levittown's claim is barred as a matter of law, as "the bar is not apparent on the face of the complaint." *Robinson*, 313 F.3d at 135.

### ii. Equitable Estoppel

**\*12** Equitable estoppel prevents a defendant from asserting a statute of limitations defense " 'where it is the defendant's affirmative wrongdoing ... which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding.' " *Putter v. N. Shore Univ. Hosp.*, 7 N.Y.3d 548, 825 N.Y.S.2d 435, 858 N.E.2d 1140, 1142 (N.Y. 2006) (quoting *Zumpano v. Ouinn*, 6 N.Y.3d 666, 816 N.Y.S.2d 703, 849 N.E.2d 926. 929 (N.Y. 2006). "A plaintiff

seeking to apply the doctrine of equitable estoppel must 'establish that subsequent and specific actions by defendants somehow kept [it] from timely bringing suit.' " *Id.* "Equitable estoppel is appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to his or her reasonable reliance on deception, fraud or misrepresentations by the defendant." *Id.* Here, in light of the significant facts pled that allege an overarching "deny-and-delay" scheme (*see generally* Compl. ¶¶ 146-78), the Court declines to find that Levittown has failed to plead specific misrepresentations made that prevented it from filing suit and is entitled to some discovery on this issue. Further consideration of this issue may be appropriately requested at a later stage of the proceedings.

### b. Sufficiency of the Pleadings

FieldTurf asserts that because it sold the fields to only business entities, both § 349 and § 350 do not apply unless plaintiffs show that the same activity was also directed at non-business consumers. (FT's Moving Br. 21.) FieldTurf characterizes its sale to Levittown as a "private transaction" without "ramifications for the public at large." (FT's Reply Br. 8.) According to FieldTurf, to allege consumer-oriented conduct, Plaintiffs must state that the deceptive acts are standardized and not rooted in a private dispute with individualized allegations. (*Id.*) FieldTurf: (i) characterizes Levittown as a sophisticated entity; and (ii) claims that Levittown does not allege that individual consumers were harmed, that it was treated similar to FieldTurf's nonbusiness customers, or that the public interest is implicated here. (FT's Moving Br. 22; FT's Reply Br. 8.)

Plaintiffs claim that their allegations as to Levittown are sufficient because the critical question is whether the matter affects the public interest in New York, and a municipality can bring a claim under the statutes at issue. (Pls.' Opp'n Br. 22.) Further, even if Levittown was a "business entity." Plaintiffs argue that a business entity may sue if the deceptive practices possibly affected similarly situated customers or the public interest; pleading a widespread or standardized practice is not required. (*Id.* at 23.)

For similar reasons as stated in Section III.B.1.a., the Court finds that FieldTurf has not met its burden to show that Levittown, on these facts, is a business entity for the purposes of § 349 and § 350, and accordingly, Levittown may not be required to plead the additional facts FieldTurf claims

In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
96 UCC Rep.Serv.2d 790

are necessary. FieldTurf asserts that Levittown: (i) is a school district serving five regions and multiple schools; (ii) purchased its fields for two high schools; (iii) alleged that the cost to replace the fields would be $2 million; and (iv) the parties engaged in a formal bidding process. (FT's Moving Br. 22.) These facts, allowing all favorable inferences to the Plaintiffs, actually make Levittown appear to be different than a business.

Moreover, even if Levittown is considered to be a business, while "courts have stated consistently that unique private transactions between sophisticated business parties do not give rise to liability under the statute[,]" a business may bring a claim under the statute "if it is harmed by consumer-oriented conduct." *Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F.Supp.2d 296, 301-02 (E.D.N.Y. 2010). Courts have construed the term "consumer-oriented conduct" liberally. *New York v. Feldman*, 210 F.Supp.2d 294, 301 (S.D.N.Y. 2002). "A defendant engages in 'consumer-oriented' activity if his actions cause any 'consumer injury or harm to the public interest.' " *Id.* (quoting *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256. 264 (2d Cir. 1995) ). "The 'critical question', then, 'is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer ....' " *Id.* (quoting *Schnabolk*, 65 F.3d at 264) (alterations in original). Accordingly, at this stage, because Plaintiffs have plausibly alleged that Levittown is different from a business entity and that the matter affects the public interest (*see* Compl. ¶ 26 ("Levittown ... is a school district ...): ¶ 138 (alleging the fields were "far From the 'premium' product FieldTurf marketed ... and. in many instances, taxpayers, paid for."); ¶ 146a (describing effects on games and practices); ¶ 178 (alleging that "many of those consumers were public and/or taxpayer funded entities" and "FieldTurf's wrongful acts directly impacted the public interest in honest dealing with such consumer and in ensuring that public funds and taxpayer dollars are not wasted on defective, inferior, and fraudulent goods.") ), the Court declines to dismiss Levittown's claims pursuant to § 349 and § 350 at this time.

### 3. CA Plaintiffs' False Advertising Claims and Unlawful, Unfair, or Fraudulent Business Acts Claims

#### a. Statute of Limitations

**\*13** FieldTurf asserts that the CA Plaintiffs' false advertising claims are subject to a three-year statute of limitations that runs from the dates the fields were purchased in 2006, 2007,

and 2011. (FT's Moving Br. 23.) Specifically, FieldTurf claims that Santa Ynez and Fremont alleged discovery in 2011, and Santa Ynez was told about FieldTurf's pending litigation during that same year, and had knowledge of enough facts to have filed a claim. (FT's Reply Br. 9.) The CA Plaintiffs did not, according to FieldTurf, toll the statute of limitations because they failed to allege required facts regarding the time and manner of discovery of the problem and their inability to uncover the issue, despite due diligence, before the date of discovery. (FT's Moving Br. 23-24.) As to the unfair competition law claims, FieldTurf asserts that a four-year statute of limitations governs and began to run on the date the cause of action accrued, which was on the dates of purchase, not on the dates of discovery. (*Id.* at 24-25.)

Plaintiffs, in opposition, assert that either the discovery rule or fraudulent concealment tolls the statute of limitations for all the CA Plaintiffs' claims. (Pls.' Opp'n Br. 24.) As an initial matter, Plaintiffs note that FieldTurf acknowledges that the discovery rule applies to Plaintiffs' false advertising claims and the CA Plaintiffs' Unfair Competition Law claims can be equitably tolled by the discovery rule as well, as FieldTurf relies on a case that is no longer good law. (*Id.* at 24-25.) Second, Plaintiffs argue that the discovery rule operates here because "as a result of FieldTurf's continuing course of lies," Plaintiffs did not realize that the breakdown in their fields were due to known defects until 2016. (*Id.*) Third, Plaintiffs argue they have pled fraudulent concealment because they pled when and the circumstances under which the fraud was discovered, and that the CA Plaintiffs were not at fault for their failure to discover the fraud or had no knowledge of the facts. (*Id.* at 26.) Finally, Plaintiffs argue that FieldTurf is estopped from asserting a statute of limitations defense as a result of misrepresentations and concealment before and after the sale. (*Id.* at 27.)

#### i. Discovery Rule

"In California, the discovery rule postpones accrual of a claim until the plaintiff discovers, or has reason to discover, the cause of action." *Plumlee v. Pfizer, Inc.*, No. 13-414, 2014 WL 695024, at \*8 (N.D. Cal. Feb. 21. 2014) (quoting *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1024 (9th Cir. 2008) ) (internal quotations omitted). "A plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable

diligence." *Id.* (quoting *E-Fob, Inc. v. Accountants, Inc. Servs.*, 153 Cal. App. 4th 1308, 1319, 64 Cal.Rptr.3d 9 (Cal. Ct. App. 2007) ) (internal quotations and citation omitted); *see also Clemens*, 534 F.3d at 1024 (quoting *Bedolla v. Logan & Fraier*, 52 Cal. App. 3d 118, 129, 125 Cal.Rptr. 59 (Cal. Ct. App. 1975) ) ("A plaintiff must affirmatively excuse his failure to discover the fraud ... by showing that he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry.").

Here, the parties agree that the discovery rule applies to False Advertising Law claims but disagree as to whether it also applies to Unfair Competition Law claims. The Court finds that Plaintiffs have raised sufficient argument that the California Supreme Court applies the discovery rule to the Unfair Competition Law and the case that FieldTurf relies upon has been characterized by other California courts as incorrect. *See Plumlee*, 2014 WL 695024, at *8 (citing *Yumid v. Smart Balance, Inc.*, 733 F.Supp.2d 1117, 1131 (C.D. Cal. 2010) and *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1196, 151 Cal.Rptr.3d 827, 292 P.3d 871 (Cal. 2013) ). FieldTurf fails to adequately rebut this argument on reply, merely stating that Plaintiffs have not cited a case where the statute of limitations is tolled by the discovery rule. (FT's Reply Br. 9.) The Court finds that FieldTurf has not carried its burden to demonstrate that the discovery rule does not apply.

**\*14** Viewing the facts pled most favorably to Plaintiffs, the Court finds that the application of the discovery rule has been adequately pled. Plaintiffs allege the time and manner of discovery. (*See, e.g.*, Compl. ¶ 206 ("Indeed, it took NJ Advance Media six months of in-depth investigation, analyzing 5,000 pages of production from 40 document requests, interviewing dozens of coaches, officials, and current and former FieldTurf employees, examining 50 fields in New Jersey, and commissioning the services of an independent testing laboratory, the University of Michigan's Breaker Space Lab, to test turf fibers from three different Duraspine Turf fields in New Jersey even to begin to uncover the breadth of FieldTurf's fraudulent scheme."); ¶ 209 ("Plaintiffs and Class members had no realistic ability to discover the omissions or fraudulent nature of the misrepresentations until at least December 2016, when NJ Advance Media published the results of its investigation.").)

Plaintiffs also allege that the CA Plaintiffs could not have discovered the facts earlier, despite reasonable diligence. (*See, e.g., id.* ¶ 203 ("Plaintiff[s] and class members had

no way of knowing about the defects in Duraspine Turf and the other information concealed by FieldTurf. FieldTurf systematically lied to Plaintiff[s] and Class Members concerning the qualities of Duraspine Turf. When problems were discovered, FieldTurf claimed there was no defect, and provided other reasons for the rapid deterioration in FieldTurf's products, like poor maintenance. In addition, FieldTurf advised Plaintiff[s] and Class Members that over time, the problems they were experiencing, would diminish."); ¶¶ 164, 170-73, 201-10.) Fremont alleges that despite contacting FieldTurf regarding a field's condition in March 2011 and having FieldTurf representatives inspect the field, FieldTurf " 'denied that the field deterioration was unusual or excessive" and "instead advised Fremont that the field was in normal condition and had enough remaining blades, assuring Fremont that the loss of fiber" was "normal wear and tear." (*Id.* ¶ 164.) Santa Ynez alleges that it knew of its first-installed field's problems and the "pending litigation with the manufacturer of the earlier version of Duraspine used on [its then-]current field;" however, it also alleges that FieldTurf replaced that field in 2012 and represented that the replacement was an improved version that did not suffer from the same issues, when, in fact, the problems remained. (*Id.* ¶¶ 170-73.)

### ii. Fraudulent Concealment & Equitable Estoppel

A plaintiff may toll the statute of limitations under the doctrine of fraudulent concealment," by alleging a defendant's "affirmative deceptive conduct," not merely "nondisclosure." *Yumul v. Smart Balance, Inc.*, 733 F.Supp.2d 1117, 1131 (C.D. Cal. 2010); *see also hauler v. Anoufrieva*, 642 F.Supp.2d 1060, 1100 (C.D. Cal. 2008) ("A plaintiff alleging fraudulent concealment must establish that his failure to have notice of his claim was the result of the affirmative conduct by the defendant.") (citation omitted). As to equitable estoppel, " 'four elements must be present in order to apply the doctrine ...: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' " *Honeywell v. Workers' Comp. Appeals Bd.*, 35 Cal. 4th 24, 37, 24 Cal.Rptr.3d 179, 105 P.3d 544 (Cal. 2005) (quoting *City of Long Beach v. Mansell*, 3 Cal. 3d 462, 489, 91 Cal.Rptr. 23, 476 P.2d 423 (Cal. 1970) ).

Case 1:19-md-02875-RMB-SAK   Document 1802-1   Filed 12/02/21   Page 86 of 182
PageID: 54339
In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
96 UCC Rep.Serv.2d 790

For similar reasons as discussed above in the section regarding the discovery rule, Plaintiffs have pled fraudulent concealment and equitable estoppel here. (*See, e.g.,* Compl. ¶¶ 164, 170-73, 211, 212 ("FieldTurf knowingly manufactured, marketed, sold, and installed Duraspine Turf fields well after it knew, or had reason to know, the fields were defective in their composition, design, engineering, and installation, and yet FieldTurf never amended or updated its marketing, promotional, or sales material used universally by FieldTurf and provided to Plaintiffs and Class members."), 213-14.)

### b. Santa Ynez's Claim for False Advertising

**\*15**  California's false advertising law

makes it "unlawful for any person.... corporation ..., or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services ... or to induce the public to enter into any obligation relating thereto, to make or disseminate ... before the public in this state, ... in any newspaper or other publication ... or in any other manner or means whatsoever ... any statement, concerning that real or personal property or those services ... which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading ...."

*Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950, 119 Cal.Rptr.2d 296, 45 P.3d 243 (Cal. 2002) (quoting Cal. Bus. & Prof. Code § 17500).

FieldTurf argues that Santa Ynez cannot bring a claim for false advertising because it does not allege that it viewed any advertising or marketing materials. (FT's Moving Br. 25.) Plaintiffs, in opposition, assert that a plaintiffs actual reliance on a misrepresentation can be inferred, so all that must be alleged is that a misrepresentation was made and that but for the misrepresentation, a plaintiff would not have made a purchase. (Pls.' Opp'n Br. 28.) Here, Plaintiffs allege misrepresentations made to Santa Ynez by a FieldTurf representative. (Compl. ¶ 81 ("Likewise, in the Fall of 2005, FieldTurf's Regional Sales Representative, Tim Coury, told Santa Ynez's Athletic Director, Ken Fredrickson, that the Duraspine Turf product had a useful life of 10+ years, and would last beyond the eight year warranty period, discussed below.").) The Complaint, however, also alleges that "[t]he '10 Reasons Why' document was part of a national marketing campaign *distributed to all potential customers*. FieldTurf specifically intended for customers to rely on the information in the document, as well as information in its other sales and marketing materials." (*Id.* ¶ 68) (emphasis added). Construing the Complaint on a motion to dismiss and on these unique facts, the Court finds that Santa Ynez has sufficiently pled a claim for false advertising and declines to dismiss the claim.

### C. New Jersey, New York, and Pennsylvania Fraudulent Concealment, Fraud, and Fraud in the Inducement Claims

FieldTurf argues that the NJ, NY, and PA Plaintiffs have failed to adequately allege a duty to disclose under state common law. requiring dismissal of the fraudulent concealment claims, as well as the fraud and fraud in the inducement claims to the extent that they are premised on an omission. (FT's Moving Br. 26, 28.) FieldTurf asserts that Plaintiffs failed to allege the type of relationship between the parties that would create a duty of disclosure. (*Id.* at 27, 24 Cal.Rptr.3d 179, 105 P.3d 544.)

#### 1. New Jersey

Under New Jersey law, "where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, *unless such disclosure is necessary to make a previous statement true* or the parties share a 'special relationship.' " *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993) (citing *Berman v. Gurwics*, 189 N.J.Super. 89, 458 A.2d 1311, 1313 (N.J. Super. Ct. Chan. Div. 1981) ) (emphasis added). FieldTurf argues that: (i) Plaintiffs have not alleged any facts suggesting a special relationship exists (FT's Moving Br. 28); and (ii) in opposition, Plaintiffs admit that they base their claims on affirmative misrepresentations which, unlike partial disclosures, do not result in a duty to disclose (FT's Reply Br. 11-12). Plaintiffs assert that New Jersey law imposes a duty to disclose when such disclosure is required to make an earlier statement true. (Pls.' Opp'n Br. 30-31.)

**\*16**  The Court finds that FieldTurf has not carried its burden to show that there is no duty to disclose on these facts. The Court does not agree with FieldTurf's conclusion that Plaintiffs conceded that their claims rest solely on misrepresentations. In addition to highlighting various alleged misrepresentations, Plaintiffs' opposition

96 UCC Rep.Serv.2d 790

points to allegations that Plaintiffs claim to be omissions. (Pls.' Opp'n Br. 29 (citing Compl. ¶ 120 ("FieldTurf did not revise its sales and marketing claims, let alone pull the Duraspine Turf products from the market or tell any customers that the fields 'cannot possibly technically' meet FieldTurf's claims ...."), ¶ 234 ("Defendants fraudulently concealed and suppressed material facts regarding the defective Duraspine Turf fields. Despite advertising these products as having a 10-plus-year lifespan, Defendant knew when it marketed, sold, and installed the fields that Duraspine Turf fields were inferior in composition and design and did not have the superior qualities of UV and wear resistance and fiber memory Defendants represented, nor the lifespan Defendants claimed. Defendants failed to disclose these facts to consumers at the time they marketed, sold, and installed the fields.").) FieldTurf cites to a case from the District of New Jersey on reply that, according to FieldTurf, implicitly holds that a manufacturer's statement that cars would be defect-free constitutes an affirmative misrepresentation, not a partial disclosure, and does not create a duty to disclose. (*See id.* 11-12.) On a motion to dismiss under these distinguishable, unique facts in the present matter, the Court declines to adopt FieldTurf's position at this time.

### 2. New York and Pennsylvania

In the context of a fraudulent concealment claim under New York law, "the duty to disclose arises where a party, with a duty to be complete, has made only a partial or ambiguous statement, or 'where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.' " *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 91 (2d Cir. 2005) (quoting *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) ). Under Pennsylvania law, "the concealment of certain facts cannot constitute fraud." *Protica, Inc. v. iSatori Techs., LLC*, No. 11-1105, 2012 WL 1071223, at *5 (E.D. Pa. Mar. 29, 2012) (citing *WP 851 Assocs., L.P. v. Wachovia Bank, N.A.*, No. 07-2374, 2008 WL 114992, at *6 (E.D. Pa. Jan. 11, 2008). "[A] duty to disclose does not typically arise unless there is a confidential or fiduciary relationship between the parties.' " *Id.* Such a confidential or fiduciary relationship arises in certain situations, such as:

> where there is an agreement between the parties; as a result of one party's

reliance on the other's representations, *if one party is the only source of information to the other party or the problems are not discoverable by other reasonable means; when disclosure is necessary to prevent an ambiguous or partial statement from being misleading*; where subsequently acquired knowledge makes a previous representation false; or *where the undisclosed fact is basic to the transaction*.

*Bucci v. Wachovia Bank, N.A.*, 591 F.Supp.2d 773, 783 (E.D. Pa. 2008) (emphasis added) (citation omitted). " 'The duty to speak does not arise where 'both the plaintiff and defendant were sophisticated business entities, entrusted with equal knowledge of the facts.' " *Id.* (quoting *Duquesne Light Co. v. Weslinghouse Elec. Corp.*, 66 F.3d 604. 612 (3d Cir. 1995) ).

As to Levittown, FieldTurf argues that Levittown: (i) has not alleged any facts to support the existence of a duty, merely the legal conclusion that FieldTurf was under a duty to disclose the nature of the Duraspine fields (FT's Moving Br. 29); and (ii) failed to plead a partial or ambiguous statement or that FieldTurf withheld the essence of the transaction (FT's Reply Br. 12). As to Neshannock, FieldTurf asserts that no allegations suggest a fiduciary, fiduciary-like, or confidential relationship. (FT's Moving Br. 30.) Plaintiffs argue that the Complaint contains ample allegations of FieldTurf's calculated misleading conduct, despite knowing that its representations were false, and "[h]aving spoken (indeed, lied), FieldTurf had a duty to tell the whole truth." (Pls.' Opp'n Br. 32-33.) Plaintiffs reiterate that they are largely towns and schools that relied on FieldTurf 's knowledge regarding the specifications of the Duraspine Turf. Here, the Court finds that both Levittown and Neshannock have alleged an independent duty.

The Court finds that, as to Levittown, Plaintiffs adequately alleged that FieldTurf made partial or ambiguous statements and that FieldTurf possesses "superior knowledge" and knows that Levittown acted on the basis of mistaken knowledge. (*See, e.g.*, Compl. ¶ 48 (" 'The design and performance of an artificial turf field 'involves sophisticated engineering and specialized knowledge beyond the ken of the average consumer, be it a school, a recreation department, or an individual small business owner. As a result, purchasers

96 UCC Rep.Serv.2d 790

(including Plaintiffs and the Class members here) necessarily rely on the sellers of the fields (including FieldTurf) for complete and accurate information on the quality and expected performance of the fields. Similarly, the average purchaser does not possess the expertise to pick up on signs that a field is degrading prematurely."); ¶ 149 ("Step one in the process was to deny to the existence of any known defect. FieldTurf abused its discretion under the warranties and, relying on its industry expertise, took advantage of Plaintiffs and Class members' inability to detect field failures.").) For similar reasons, the Court finds that Plaintiffs have adequately alleged a duty with respect to Neshannock.

### 3. Hudson's and Neshannock's Fraud Claims

**\*17** As to Hudson, FieldTurf argues that a misrepresentation has not been adequately pled because: (i) there are no allegations that Hudson actually possessed, read or saw marketing or advertising materials; and (ii) relies on conclusory allegations and bases its fraud claim on FieldTurf's "representations to the market" from 2007 to 2009, which is insufficient under Rule 9. (FT's Moving Br. 31-32.) Plaintiffs contend that FieldTurf requests specificity for its own sake and that general allegations of reliance are sufficient. (Pls' Opp'n Br. 33-34.) Based on the reasoning set forth in Section III.B.1.c. denying dismissal of Hudson's NJCFA claim, the Court declines to dismiss Hudson's fraud claim on this ground.

As to Neshannock, FieldTurf argues that the "gist of the action" doctrine bars Neshannock's fraud claims because its breach of contract claim is premised on the same allegations. (FT's Moving Br. 32-33.) The Complaint alleges that in 2015, Neshannock observed deterioration of the field, complained to FieldTurf, FieldTurf repaired the field, and the same issues arose weeks later. (*Id.* at 34, 24 Cal.Rptr.3d 179, 105 P.3d 544.) According to FieldTurf, this claim is grounded in the warranty claim. (*Id.*) Plaintiffs assert that a plaintiff may plead both tort and contract claims, the existence of a contract does not per se bar tort claims, especially here, where Plaintiffs' warranty claims are brought in the alternative and Plaintiffs assert fraud claims challenging the underlying contracts and warranties. (Pls.' Opp'n Br. 35.)

The gist of the action doctrine "ensure[s] that a party does not bring a tort claim for what is, in actuality, a claim for a breach of contract." *Bruno v. Erie Ins. Co.*, 630 Pa. 79, 99, 106 A.3d 48 (Pa. 2014). The "critical determinative

factor in determining whether a claim is a tort or breach of contract claim is 'the nature of the duty alleged to have been breached." *Id.* at 112, 106 A.3d 48 (internal quotations and citation omitted). The Court, however, finds that because Neshannock's warranty claims are pled in the alternative, and Plaintiffs specifically brought such claims " 'without waiver of Plaintiffs' claims that any warranty or contract cannot be enforced by the Defendants" (Comp. 81-82 n.9), at the motion to dismiss stage, Neshannock's fraud claims may proceed. *See, e.g., Mill Run Assocs. v. Locke Prop. Co.*, 282 F.Supp.2d 278, 291-91 (E.D. Pa. 2003) (denying motion to dismiss fraud in the inducement claim where a counterclaim "contains both contract and tort claims, which are pleaded in the alternative[,] [which] is permissible under Federal Rule of Civil Procedure Rule 8(e)."); *see also Turuvekere v. ContinuServe, LLC*, No. 12-5158, 2012 WL 5961957, at \*4 (E.D. Pa. Nov. 28, 2012) (quoting *Weber Display & Packaging v. Providence Wash. Ins. Co.*, No. 02-7792, 2003 WL 329141, at \*4 (E.D. Pa. Feb. 10, 2013) ) (" 'Courts have cautioned against deciding whether the gist of an action is in contract or tort at the motion to dismiss stage of a proceeding.' ").

### D. Warranty Claims

### 1. NJ Plaintiffs' Claims for Breach of Implied Warranty

FieldTurf argues that the NJ Plaintiffs' claims for breach of the implied warranty of merchantability and fitness for a particular purpose are untimely and inadequately pled. (FT's Moving Br. 35.) FieldTurf asserts that the four-year statute of limitations in New Jersey's Uniform Commercial Code governs the transaction, and the claims accrued on the delivery of the fields. (*Id.* at 35, 24 Cal.Rptr.3d 179, 105 P.3d 544.) The latest an NJ Plaintiff purchased a field was more than six years before Plaintiffs asserted their claims. Additionally, the NJ Plaintiffs, according to FieldTurf. have not pled that they were unable to use the fields for the purpose for which they were purchased, *i.e.*, playing sports. (*Id.* at 36-37, 24 Cal.Rptr.3d 179, 105 P.3d 544.) FieldTurf further claims that Plaintiffs have not pled fraudulent concealment and have not pled that they exercised due diligence in uncovering information that would have permitted them to file suit. (FT's Reply Br. 14.) In opposition. Plaintiffs assert that they have adequately pled equitable tolling of the statute of limitations based on FieldTurf's fraudulent concealment and "deny-and-delay" scheme. (Pls.' Opp'n Br. 35-36.)

### a. Fraudulent Concealment

**\*18**  To plead fraudulent concealment that tolls the statute of limitations, a plaintiff must allege " '(1) wrongful concealment by the party raising the statute of limitations defense, resulting in (2) plaintiff's failure to discover the operative facts forming the basis of his cause of action during the limitations period (3) despite the exercise of due diligence.' " *In re Volkswagen Timing Chain Prod Liab. Litig.,* No. 16-2765, 2017 WL 1902160, at \*14 (D.N.J. May 8, 2017) (quoting *Dewey v. Volkswagen AG,* 558 F.Supp.2d 505. 523 (D.N.J. 2008) ). The Court finds that each of these elements is adequately pled here. (*See, e.g., id.* ¶ 203 ("Plaintiff[s] and class members had no way of knowing about the defects in Duraspine Turf and the other information concealed by FieldTurf. FieldTurf systematically lied to Plaintiff and Class Members concerning the qualities of Duraspine Turf. When problems were discovered. FieldTurf claimed there was no defect, and provided other reasons for the rapid deterioration in FieldTurf's products, like poor maintenance. In addition, FieldTurf advised Plaintiff and Class Members that over time, the problems they were experiencing, would diminish."); ¶¶ 157-61 (describing three years of delay tactics FieldTurf employed in its dealings with Carteret); ¶¶ 162-63 (describing that Hudson reached out to FieldTurf stating it was "stunned at how rapidly the Fibers had deteriorated" and that "[t]he turf in some areas were worn right down to the fabric backing," but received no response); ¶ 146b (stating that ""[o]n information and belief, from the date of installation through 2016. more than Fifty repairs were required on Newark's Shabazz Field alone"); ¶ 168 (alleging that on August 5, 2015, FieldTurf denied warranty coverage for any future repairs to Newark's Shabazz High and Schools Stadium fields' because sufficient maintenance had not been performed, as Newark had not hired a specific vendor to perform the maintenance); *see also* ¶¶ 201-10.) *See, e.g., In re Volkswagen,* 2017 WL 1902160, at \*4 (holding that similar allegations adequately pled fraudulent concealment).

### b. Sufficiency of the Pleadings

"Pursuant to the implied warranty of merchantability, a merchant warrants that goods sold are fit for the ordinary purposes for which the goods are used." *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.,* No. 03-4558, 2008 WL 4126264, at \*19 (D.N.J. Sept. 3, 2008) (citing *N.J.S.A. § 12A:2-314*). FieldTurf claims that the ordinary purpose for which the fields were used was playing sports; however, the NJ Plaintiffs assert that their purpose was more significant. (Pls.' Opp'n Br. 39.)

The Court finds that FieldTurf has not carried its burden to demonstrate that the NJ Plaintiffs have failed to plead claims for breach of the implied warranty. The Court agrees with Plaintiffs that based on the facts pled, Plaintiffs have adequately alleged that the fields failed to serve their ordinary purpose. First, Plaintiffs allege that the fields failed to meet industry standards and deteriorated prematurely. (*See, e.g.,* Compl. ¶ 94 ("In the Spring of 2005, FieldTurf learned of more evidence confirming major problems with the fiber's durability. Bonar Yarns, another FieldTurf supplier, reported that the fiber showed 'poor results' on a standard industry test called the Lisport test, used by FIFA (the world-wide governing body for soccer).");  ¶ 187 ("The Breaker Space Lab tests confirmed the tensile strength of the turf to be well below industry standards, and FieldTurf's own standards."); *see also* ¶¶ 16-20, 145-46, 167-70, 189).) Second, Plaintiffs alleged that they were promised fields not simply for playing sports, but with "endurance, good aesthetics, and low maintenance." (Pls.' Opp'n Br. 39; *see, e.g.,* Compl. ¶ 61 ("In its advertising and marketing of Duraspine Turf fields. FieldTurf showcased high-profile clients (such as NFL teams) and touted its Duraspine Turf fields as being the best fields money could buy."); ¶ 62 ("In 2006, FieldTurf's then-CEO John Gilman claimed in a trade publication that, among other things, his company's 'breakthrough in technology' would 'change the industry,' as Duraspine Turf 'will double the expected useful life' of an artificial turf field."); *see also* ¶¶ 79-80, 86.) Finally, Plaintiffs alleged that the fields failed to meet the expectations. (*See, e.g., id.* ¶¶ 146a, 161, 163, 169.)

### 2. Levittown's Claims for Breach of the Express and Implied Warranty

FieldTurf asserts that Levittown's claims for breach of the express and implied warranty are time barred, as the four-year statute of limitations prescribed by the Uniform Commercial Code began to run from the date of delivery of the fields. (FT's Moving Br. 37.) FieldTurf characterizes the written warranty at issue as a repair and replace warranty, not a warranty of future performance that guarantees a product will function for a certain period. (*Id.* at 37-39, 24 Cal.Rptr.3d 179, 105 P.3d 544.) Plaintiffs assert that, similar to the NJ Plaintiffs, they have properly pled Levittown's fraudulent concealment, resulting in equitable tolling of the statute of limitations. (Pls.'

96 UCC Rep.Serv.2d 790

Opp'n Br. 35-36.) Further, Plaintiffs argue that they alleged that FieldTurf made warranties of future performance outside of the written warranty, including that the fields had a lifespan of ten or more years and those claims accrue when the breach was discovered. (*Id.* at 37, 24 Cal.Rptr.3d 179, 105 P.3d 544.) On reply. FieldTurf asserts that where an express written warranty exists, evidence of additional oral warranties is not permitted, and the cases Plaintiffs cite are distinguishable because they involve situations without a written warranty at all. (FT's Reply Br. 15.)

**\*19** As stated in underline Section III.B.2.a.ii. above, the Court finds that Levittown has pled sufficient facts to establish equitable tolling of the statute of limitations. Additionally, at this juncture, the Court declines to bar Levittown from bringing an express warranty claim based on an alleged future performance warranty created by FieldTurf's oral misrepresentations, as Plaintiffs assert fraud claims challenging the underlying warranties and have asserted warranty claims in the alternative.

### 3. Neshannock's Claims for Breach of Express and Implied Warranties

"Under Pennsylvania law, '[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.' " *Morello v. Kenco Toyota Lift*, 142 F.Supp.3d 378, 387 (E.D. Pa. 2015) (quoting 13 Pa.C.S.A. § 2312(a)(1) ).

FieldTurf asserts that Neshannock fails to allege any of the elements required to state a claim for a breach of FieldTurf's warranty. (FT's Moving Br. 39.) According to FieldTurf, Neshannock only alleges that it complained about the condition of the field, FieldTurf groomed the turf, and the problems reoccurred; however, it does not allege it notified FieldTurf of the problem or that FieldTurf rejected a warranty claim or declined to fix or replace the field. (*Id.* at 40, 24 Cal.Rptr.3d 179, 105 P.3d 544.) FieldTurf further contends that Plaintiffs merely cite to general allegations (in support of their arguments regarding both express and implied warranties), but none relate to Neshannock's fields. (FT's Reply Br. 16.) In opposition, Plaintiffs assert that this claim is based on statements FieldTurf made in its marketing and sales campaign. (Pls.' Opp'n Br. 39.)

Pursuant to FieldTurf's characterization of the elements required to state a claim—asserting that a plaintiff must plead a warranty, reliance, breach, proximate cause and damages (FT's Moving Br. 39 (citing *Yurcic v. Purdue Pharma, L.P.*, 343 F.Supp.2d 386, 394, (M.D. Pa. 2004) ), the Court finds that Plaintiffs have sufficiently done so. Plaintiffs allege a warranty (*see, e.g.*, Compl. ¶ 84 ("FieldTurf also represented in its marketing materials given to Neshannock in or around Spring 2008 that the expected useful life of Duraspine Turf was 10+ years, which was supported by '10 Year Cost Analysis FieldTurf v. Natural Grass' marketing brochure provided to Neshannock, and that Duraspine Turf had durability and longevity superior to its competitors' turf products.") ); reliance (*see, e.g., id.* ¶ 28 (Neshannock "decided to buy the Duraspine Turf Field based in part on FieldTurf's representations that the field had superior materials and design such that it had greater durability and resistance to wear, matting, and UV than competing products and a useful lifespan of more than 10 years. These representations, along with the claimed comparative cost savings of the Duraspine Turf Field, were among the primary reasons Plaintiff[s] chose the Duraspine Turf Field.") ); breach (*see, e.g., id.* ¶¶ 28, 60-71, 167); causation (*see, e.g., id.* ¶ 28) and damages (*see, e.g., id.* ¶ 167).

Section 2314 provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." 13 Pa. Cons. Stat. § 2314(a). To be "merchantable," goods must "have an inherent soundness which makes them suitable for the purpose for which they are designed, ... be free from significant defects,... perform in the way that goods of that kind should perform, and ... be of reasonable quality within expected variations and for the ordinary purpose for which they are used." *Gall v. Allegheny Cty. Health Dep't*, 521 Pa. 68, 555 A.2d 786, 789-90 (Pa. 1989).

**\*20** "The UCC implies a warranty of fitness for a particular purpose when 'the seller at the time of contracting has reason to know: (1) any particular purpose for which the goods are required; and (2) that the buyer is relying on the skill or judgment of the seller to select or furnish suitable goods.' " *Visual Commims., Inc. v. Konica Minolta Bus. Solutions U.S.A., Inc.*, 611 F.Supp.2d 465, 470-71 (quoting 13 Pa. Cons. Stat. Ann. § 2315). "A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business[.]" *Id.* (quoting *Gall.* 555 A.2d at 790).

In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
96 UCC Rep.Serv.2d 790

As to the implied warranty claims, FieldTurf contends that allegations that part of Neshannock's fields were wearing down seven and a half years after installation is not sufficient and there are no allegations that the field was not fit for the purpose for which it intended. (FT's Moving Br. 41.) Conversely, Plaintiffs assert that they have alleged the fields' intended use was for "outdoor, year-round ... extensive athletic and other activities" and were fairing earlier than other artificial turf products; therefore, Plaintiffs have alleged that the defective fields cannot be merchantable or fit for their ordinary purpose. (Pls.' Opp'n Br. 40-41.) For similar reasons as stated in Section III.D.1.b., the Court finds that FieldTurf has not carried its burden to demonstrate that Neshannock has failed to state a claim for a breach of the implied warranties under Pennsylvania law.

#### 4. CA Plaintiffs' Claims for Breach of the Implied Warranty

FieldTurf argues that the CA Plaintiffs' claims For breach of the implied warranty are untimely because the four-year statute of limitations began to run when the fields were delivered. (FT's Moving Br. 41.) Plaintiffs counter that these warranty claims are timely because: (i) a cause of action accrues on delivery of conforming goods, and here, the fields were never conforming; (ii) the statute of limitations was tolled during the eight-year express warranty period because a breach of future performance warranty occurs when performance fails; and (ii) fraudulent concealment and the discovery rule toll the statute of limitations. (Pls.' Opp'n Br. 41.) On reply, FieldTurf notes that: (i) the CA Plaintiffs did not allege that they took issue with the fields on delivery; therefore, the fields are conforming goods for the purposes of the statute; and (ii) the majority of California courts reject Plaintiffs' argument regarding tolling of the statute of limitations. (FT's Reply Br. 16-17.)

As an initial matter, the Court agrees with FieldTurf that Plaintiffs have provided no support for their contention that

the goods are "nonconforming" simply because they were allegedly defective on delivery. The Court is unpersuaded by this argument. Next, the Court recognizes that multiple California courts decline to apply the future performance exception to implied warranty claims.[9] Nevertheless, based on similar reasoning as discussed in Section III.B.3.a.ii., the Court finds that the CA Plaintiffs have adequately alleged that fraudulent concealment and the discovery rule apply here to toll the statute of limitations.

#### 5. Unjust Enrichment Claims

**\*21** FieldTurf argues for dismissal of Plaintiffs' unjust enrichment claims, declaring that Plaintiffs cannot assert unjust enrichment claims when valid contracts exist on this issue. (FT's Moving Br. 42.) In other words, alleging breach of the express warranty allegedly precludes an unjust enrichment claim. (*Id.* at 42-43, 78 S.Ct. 99.) Plaintiffs, in opposition, state that the unjust enrichment and warranty claims are pled in the alternative because FieldTurf's behavior may cause the warranties to be unenforceable. (Pls.' Opp'n Br. 42.) Accordingly, Plaintiffs state that it is premature to determine which claim survives. (*Id.*) The Court agrees with Plaintiffs and finds that the two types of claims at issue were adequately pled in the alternative, and the Court will not rule as to which survives on a motion to dismiss. (*See* Compl. ¶ 256.)

#### IV. Conclusion

For the reasons set forth above, FieldTurf's motion to dismiss is granted in part and denied in part. An Order consistent with this Memorandum Opinion will be entered.

#### All Citations

Not Reported in Fed. Supp., 2018 WL 4188459, 96 UCC Rep.Serv.2d 790

---

### Footnotes

1    This multidistrict litigation is currently composed of the following member cases, listed with the districts where the actions were originally filed or removed: *Santa Ynez Valley Union High School District v. Fieldturf, USA, Inc., et al.*, No. 17-3947 (C.D. Cal.); *Lake Tahoe Unified School District v. Fieldturf, USA, Inc., et al.*, No.

17-4035 (E.D. Cal.); *The Paw, Inc. v. FieldTurf USA, Inc., et al.*, No. 17-4030 (D. Minn.); *Borough of Carteret, el al. v. FieldTurf USA, Inc., et al.*, No. 16-09252 (D.N.J.); *Gentile v. FieldTurf USA, Inc., et al.*, No. 17-173 (D.N.J.); *New Castle School District v. FieldTurf USA, Inc. et al.*, No. 17-13065 (W.D. Pa.); *Ranney School v. FieldTurf USA Inc., et al.*, No. 17-3414 (D.N.J.); *Lakeview Day Camp v. FieldTurf USA Inc.*, No. 17-3301 (D.N.J.); *Neshannock Township School District v. FieldTurf USA, Inc., et al.*, No. 17-4391 (W.D. Pa.); *Chaffey Joint High School District, et al. v. FieldTurf USA, Inc. et al.*, No. 17-4516 (C.D. Cal.); *Pajaro Unified School District (PVUSD) v. FieldTurf USA, Inc. et al.*, No. 17-4438 (N.D. Cal.); *Cherokee Central Schools v. FieldTurf USA, Inc. et al.*, No. 17-4405 (W.D.N.C.); *Brownsville Independent School District v. FieldTurf USA, Inc. et al.*, No. 17-4406 (S.D. Tex.); *Chaffey Joint Union High School District v. FieldTurf USA, Inc. et al.*, No. 17-4516 (C.D. Cal.); *City of Fremont v. FieldTurf USA, Inc. et al.*, No. 17-7714 (N.D. Cal.); *County of Hudson v. FieldTurf USA, Inc. et al.*, No. 17-1628 (D.N.J.); and *Borough of Little Ferry v. FieldTurf USA Inc. et al.*, No. 18-9740 (D.N.J.). On March 16, 2018, the Township of Medford voluntarily dismissed its case without prejudice. (ECF No. 99.)

2    For the purposes of this motion to dismiss, the Court accepts as true and summarizes the facts alleged in the Complaint. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

3    Carteret purchased six fields: four contracted for in September 2006 and installed in 2008; one contracted for in January 2007 and installed in May 2007; and one contracted for in 2010 and installed in 2011. (Compl. ¶ 23.) Fremont purchased two fields, one in each of 2007 and 2011. (*Id.* ¶ 24.) Hudson purchased five fields: one contracted for in 2007 and installed between 2007 and 2009; two contracted for in 2007 and installed between 2007 and 2008; and two fields contracted for in 2009 and installed between 2009 and 2010. (*Id.* ¶ 25.) Levittown purchased two fields in 2008. (*Id.* ¶ 26.) Neshannock purchased a field in 2008. (*Id.* ¶ 28.) Newark purchased four fields between late 2006 and 2010. (*Id.* ¶ 29.) Santa Ynez purchased one field in 2006. (*Id.* ¶ 30.)

4    Included in the Complaint are various screenshots of marketing materials. (Compl. at 22. 23. 25, 27.)

5    The warranty stated:

> FieldTurf USA warrants that if [Duraspine Turf] proves to be defective in material or workmanship, resulting in premature wear, during normal and ordinary use of the Product for sporting activities set out below or for any other uses for which FieldTurf gives written authorization, within 8 years from the date of completion of installation. FieldTurf will, at FieldTurf' option, either repair or replace the affected area without charge, to the extent required to meet the warranty period (but no cash refunds will be made).

> (Compl. ¶ 88.)

6    "[N]ew fibers should withstand at least 3.6 lbs. of force and lose no more than 50% of tensile strength after eight years, *i.e.*, 1.8 lbs. of force. The lab tested fibers collected from low-traffic areas of three Duraspine Turf fields installed in New Jersey in 2008. All three samples showed tensile strength well below 1.8 lbs. of force." (*Id.* ¶ 187.)

7    In its moving brief, FieldTurf discussed choice of law issues and asserted that: (i) the procedural law of the transferee district, the District of New Jersey, applies; and (ii) applying the choice of law rules in the states in which the actions were originally filed—here, New Jersey, Pennsylvania, and California—Plaintiffs' claims are substantively assessed under the laws of each of their home states. (FieldTurf's Moving Br. ("FT's Moving Br.") 10-11, ECF No. 91-1.) Plaintiffs do not argue to the contrary in their opposition. (*See generally* Pls.' Opp'n Br., ECF No. 100.) The Court agrees with FieldTurf's analysis and, accordingly, applies New Jersey law to the NJ Plaintiffs' claims, New York law to Levittown's claims, Pennsylvania law to Neshannock's claims, and California law to the CA Plaintiffs' claims.

8    The NJCFA defines " 'unlawful practice" as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise[.]

In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....

96 UCC Rep.Serv.2d 790

N.J.S.A. § 56:8-2. "Merchandise" is a broad term that includes "goods." "commodities." and "services of anything offered." N.J.S.A. § 56:8-(c).

9    The future performance exception of the California Commercial Code provides:

A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Cal. Com. Code § 2725(2). The California Court of Appeal has held that this exception "must be narrowly construed" and "applies only when the seller has *expressly agreed* to warrant its product for a specific and defined period of time." *Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 169 Cal.App.4th 116, 87 Cal.Rptr.3d 5, 16 (Cal. Ct. App. 2008) (emphasis in original). "[B]ecause an implied warranty is one that arises by operation of law rather than by an express agreement of the parties, courts have consistently held [that] it is not a warranty that explicitly extends to future performance of the goods." *Philips v. Ford Motor Co.*, No. 14-2989, 2016 U.S. Dist. LEXIS 58954, at MI (N.D. Cal. 2016) (quoting *Cardinal Health 301, Inc.*, 87 Cal.Rptr.3d at 19-20).

---

**End of Document**                                     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Tab 3

In re Insulin Pricing Litigation, Not Reported in Fed. Supp. (2019)

RICO Bus.Disp.Guide 13,138

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by   Gress v. Freedom Mortgage Corporation,   M.D.Pa.,
June 26, 2019

2019 WL 643709

**NOT FOR PUBLICATION**

United States District Court, D. New Jersey.

IN RE INSULIN PRICING LITIGATION

Civil Action No. 3:17-cv-0699-BRM-LHG
|
Signed 02/15/2019

## OPINION

BRIAN R. MARTINOTTI United States District Judge

**\*1** Before this Court is a Motion to Dismiss filed by Defendant Novo Nordisk Inc. ("Novo") and Defendant Sanofi-Aventis U.S. LLC ("Sanofi") (collectively "Defendants") seeking to dismiss the putative plaintiffs' ("Plaintiffs") First Amended Complaint pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6). (ECF No. 158.)[1] Plaintiffs filed an Opposition to Defendants' Motion to Dismiss. (ECF No. 181.) Defendants filed a Reply Brief to the Plaintiffs' Opposition. (ECF No. 190.) On January 17, 2019, this Court held oral argument on the limited issue of the applicability of the indirect purchaser rule to Plaintiffs' RICO claims, Counts One and Two. Plaintiffs' counsel supplemented the record by way of a letter brief to this Court on February 5, 2019. (ECF No. 249.) Defendants replied on February 8, 2019. (ECF No. 251.) For the reasons set forth herein, Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

### A. Factual Background

The Plaintiffs are sixty-seven individuals, including one "Jane Doe," who filed the Complaint on behalf of themselves and a proposed nationwide class of analog insulin consumers. (Plaintiffs' First Amended Complaint (ECF No. 131) ¶¶ 21-155.) The Plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal

Rule of Civil Procedure 23(a) and 23(b)(3). (ECF No. 131 ¶ 280.) The Plaintiffs define their class as

"[a]ll individual persons in the United States and its territories who paid any portion of the purchase price for a prescription of Lantus, Levemir, Novolog, Apidra, and/or Toujeo at a price calculated by reference to a benchmark price, AWP (Average Wholesale Price),[2] or WAC (Wholesale Acquisition Price) for purposes other than resale."

(Id.)

Specifically, the class includes uninsured consumers, consumers in high-deductible health plans, consumers who reach the Medicare Part D donut hole, and consumers with high coinsurance rates. (Id. ¶ 282.) The Plaintiffs request this Court toll the class period to the "earliest date of the Defendant Drug Manufacturers' initiation of the scheme described herein." (Id. ¶ 283.)

Defendants are pharmaceutical companies headquartered in the United States. (Id. ¶¶ 157-58.) Defendants research, develop, and manufacture prescription medications. (Id.) Defendant Novo ("Novo") makes the "rapid-acting" analog insulin Novolog and the "long-acting" analog insulin Levemir. (Id. ¶ 282 (Table 2).) Novo introduced Novolog to the United States market in 2000 and Levemir in 2005. (Id.) Defendant Sanofi ("Sanofi") manufactures the "rapid-acting" insulin Apidra and the "long-acting" insulin Pantus. (Id.) Sanofi introduced Lantus to the United States market in 2000 and Apidra in 2004. Novo and Sanofi determine the sale price of their drugs, the AWP or WAC, and subsequently publish list prices for their analog insulins. (Id. ¶ 174.)

**\*2** The distribution of a branded prescription drug, such as the analog insulin at issue in this litigation, involves three transactions. First, a drug manufacturer sells its medication to a wholesaler. (Id. ¶¶ 163-164.) Second, the wholesaler takes possession of the medication and sells it to a pharmacy. (Id. ¶¶ 164, 170 fig. 3.) Third, the pharmacy sells the drug to the consumers. (Id. ¶¶ 164, 170 fig. 3.) Health insurers and pharmacy benefit managers ("PBMs"),[3] which many insurers hire to manage their prescription drug benefits, are not directly involved in this distribution chain as they do not take physical possession of the medication. (Id. ¶¶ 165-66.)

Three separate payments are involved in the medication distribution chain: from the wholesaler to the manufacturer;

In re Insulin Pricing Litigation, Not Reported in Fed. Supp. (2019)

Case 1:19-md-02875-RMB-SAK   Document 1802-1   Filed 12/02/21   Page 96 of 182
PageID: 54349
RICO Bus.Disp.Guide 13,138

from the pharmacy to the wholesaler; and from the consumer, and his or her insurer, if any, to the pharmacy. (*Id.* ¶ 168.) Additionally, there may also be a rebate payment from the manufacturer to the insurer or the insurer's PBM. (*Id.* ¶ 169.)

Wholesalers pay manufacturers based on the manufacturer's publicly reported list price, the WAC. (*Id.* ¶ 176.) The WAC is "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates, or reductions in price[.]" 42 U.S.C. § 1395w-3a(c)(6)(B). Accordingly, wholesalers pay the manufacturer the WAC price minus small percentage discounts derived via prompt payment or some other incentive. (ECF No. 131 ¶¶ 169, 176, 181.) Manufacturers are required to report the average price that wholesalers pay for each drug, accounting for any discounts, which is known as the Average Manufacturing Price ("AMP"). *See* 42 U.S.C. § 1396r-8(k)(1).

Wholesalers sell to pharmacies at a price negotiated with each individual pharmacy. (ECF No. 131 ¶ 176.) The prices paid by the pharmacies are frequently very close to the WAC, as wholesalers generally pay manufacturers the WAC minus a percentage discount. (*Id.* ¶ 181.)

The consumer's purchase price is determined by his or her pharmacy, and in the case of insured consumers, by the terms of his or her insurance contract. (*Id.* ¶¶ 181, 183-184.) The drug manufacturers do not sell the drugs directly to the consumers, and as such, they do not set the price that the consumer pays for the prescription drug. (*Id.* ¶¶ 163, 171.) If a consumer is uninsured, the pharmacy independently determines the payment price. (*Id.* ¶¶ 182, 285.) If the consumer is insured, the insurance company or its PBM negotiates with the pharmacy to set a price. (*Id.* ¶¶ 166, 170 fig. 3, 171.) The insurer and the consumer each pay a portion of the negotiated price, subject to any deductibles or copayment requirements contained in the consumer's contract. (*Id.* ¶¶ 165, 183-184.) Plaintiffs contend that the prices charged by the pharmacies to uninsured consumers, and the prices set by insurers and PBMs for consumers subject to deductible and copayment requirements, are directly related to the AWP, or "benchmark" or "sticker" price. (*Id.* ¶¶ 2, 209.)

Plaintiffs allege that PBMs retain a portion of the rebate and pass the remainder of the cost on to the health insurance company and/or consumer. (*Id.* ¶¶ 4, 201, 204.) Plaintiffs further maintain that some insurers have elected not to pass

on manufacturer rebates to consumers (*Id.* ¶ 200), and that as a result, the benchmark price is fraudulent because it does not account for manufacturer rebate payments made to PBMs. (*Id.* ¶¶ 252, 255). Additionally, Plaintiffs assert that spread between the "net price"[4] and the benchmark price constitutes further evidence of a fraudulent scheme. (*Id.* ¶¶ 202, 206.)

**\*3** Plaintiffs allege that PBM rebates are part of an industry scheme to inflate the price of analog insulin, whereby the three largest PBMs – CVS Health, Express Scripts, and OptumRx – use their leverage to create formularies, ranked lists of drugs. (*Id.* ¶¶ 169, 180.) Plaintiffs allege that health insurers "cover all or a portion of their members' drug costs based on whether and where drugs fall on their PBM formularies." (*Id.* ¶ 180.) If a drug is excluded from the formularies, consumers may be required to pay a larger share of the cost, or even the full cost. (*Id.* ¶¶ 193-94.) Plaintiffs assert that the use of formularies gives PBMs wide latitude to extract rebates from manufacturers. (*Id.* ¶ 241.) Accordingly, Plaintiffs contend that Novo and Sanofi compete against one another by offering rebates to PBMs for formulary placements. (*Id.*)

Plaintiffs contend a pricing "scheme" to "widen a secret spread between the manufacturers' published and misleading benchmark prices, and their undisclosed, net selling prices for their analog insulins." (*Id.* ¶ 2.) Plaintiffs assert "PBM profits are tied to the size of the spread between the benchmark price and actual net selling prices," (*Id.* ¶¶ 2, 210) such that manufacturers have an incentive to offer a larger spread to PBMs than those offered by their competitors. (*Id.* ¶ 267.) Plaintiffs premise their pricing scheme on two separate theories. First, Plaintiffs contend that Defendants "publicly report one price ... for their analog insulins while secretly offering a far lower price – the net price – to the largest PBMs." (*Id.* ¶ 2.) Plaintiffs argue that because PBMs do not "negotiate discounts or rebates" and instead merely "pad [their] pockets[,]" the rebates are illegitimate. (*Id.* ¶¶ 2, 6.) Second, Plaintiffs contend that Defendants misrepresented the benchmark prices as "reasonable approximations of the insulins' real prices." (*Id.* ¶¶ 3, 12-13, 254, 302, 350.) Plaintiffs allege that each of these schemes entails a "pattern" of predicate acts of federal mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, (*Id.* ¶ 326) and that these violations "have directly and proximately caused the plaintiffs and members of the class to be injured ... [through] inflated payments based on fictitious benchmark prices for the analog insulins." (*Id.* ¶¶ 20, 266, 336, 341, 354.)

## B. Procedural History

On February 2, 2017, the first complaint was filed in this matter, *Chaires, et. al v. Novo Nordisk, et al.* ("*In re Insulin*"), Civil Action No. 17-699(BRM)(LHG). (ECF No. 1.) Thereafter, several prospective plaintiffs filed complaints in six separate actions: *Barnett, et al. v. Novo Nordisk, Inc* ("*Barnett*")., Civil Action No. 17-1580(BRM)(LHG); *Boss, et al. v. CVS Health Corp.* ("*Boss*"), Civil Action No. 17-1823(BRM)(LHG); *Christensen, et al. v. Novo Nordisk, Inc., et al.* ("*Christensen*"), Civil Action No. 17-2678(BRM)(LHG); *Valdes, et al. v. Sanofi-Aventis U.S. LLC, et al.* ("*Valdes*"), Civil Action No. 17-939(BRM)(LHG); *Carfagno v. Novo Nordisk Inc.* ("*Carfagno*"), Civil Action No. 17-3407(BRM)(LHG); and *Bentele, et al. v. Eli Lilly & Co.* ("*Bentele*"), Civil No. 18-11479(BRM)(LHG).

On February 22, 2017, this Court consolidated *Valdes* into *In re Insulin* absent objection from any parties, pursuant to Federal Rule of Civil Procedure 42(a). (ECF No. 11.) On September 18, 2017, this Court appointed Steve W. Berman, Esq. of Hagens Berman and James E. Cecchi, Esq. of Carella Byrne as interim lead Plaintiffs' counsel pursuant to Federal Rule of Civil Procedure 23(g). (ECF Nos. 71 & 72.) On January 3, 2018, this Court consolidated *Carfagno* into *In re Insulin* absent objection from any of the parties. (ECF No. 84.) On January 19, 2018, this Court consolidated *Barnett, Boss,* and *Christensen* into *In re Insulin*. (ECF No. 89.)

On March 29, 2018, Plaintiffs filed the First Amended Class Action Complaint against Defendants. (ECF No. 131.) On May 14, 2018, Defendants filed a Motion to Dismiss Plaintiffs' Complaint (ECF No. 158), comprised of a brief in support of dismissing Counts One through Five of the Complaint (ECF No. 158-1) and a separate brief in support of dismissing Counts Six through Fifty-Nine of the Complaint. (ECF No. 158-2.) On July 5, 2018, Plaintiff filed an Opposition to Defendants' Motion to Dismiss. (ECF No. 181.) On August 20, 2018, Defendants filed a Reply Brief to Plaintiffs' Opposition to the Motion to Dismiss. (ECF No. 190.)

## II. LEGAL STANDARDS

### A. Rule 12(b)(6)

**\*4** In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted). However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) ). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286, 106 S.Ct. 2932. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a probability requirement.' " *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). "Detailed factual allegations" are not required, but "more than an unadorned, the-defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557, 127 S.Ct. 1955).

"Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged —but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679, 129 S.Ct. 1937 (quoting Fed. R. Civ. P. 8(a)(2) ). However, courts are "not compelled to accept

*In re Insulin Pricing Litigation, Not Reported in Fed. Supp. (2019)*
RICO Bus.Disp.Guide 13,138

'unsupported conclusions and unwarranted inferences,' " *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997) ), nor "a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286, 106 S.Ct. 2932.

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any " 'document *integral to or explicitly relied upon* in the complaint.' " *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996) ).

### B. Rule 9(b)

Pursuant to Federal Rule of Civil Procedure 9(b), when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake, although intent, knowledge, and other conditions of a person's mind may be alleged generally." *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017) (citations omitted); *see also U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (holding that a "plaintiff alleging fraud must ... support its allegations with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue") (citations omitted). Accordingly, "a party must plead [its] claim with enough particularity to place defendants on notice of the 'precise misconduct with which they are charged.' " *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ).

### III. DECISION

### A. RICO Violation Claims

**\*5** Defendants contend that this Court should dismiss Counts One and Two of Plaintiffs' Complaint, which allege violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 (1970) ("RICO"), asserting that Plaintiffs' claims are barred by the "indirect purchaser rule," do not plead facts amounting to mail or wire fraud, fail to plead a valid RICO enterprise, do not adequately plead proximate causation, and do not adequately plead a RICO conspiracy. (ECF No. 158-1 at 26-54.) Plaintiffs counter that the RICO claims should not be dismissed at this juncture because, *inter alia*, they have adequately pled each element of such violation and Supreme Court and Third Circuit precedent have consistently rejected Defendants' narrow interpretation of the indirect purchaser rule. (ECF No. 181 at 14-52.) For the reasons set forth below, this Court finds that Plaintiffs cannot sustain their RICO causes of action.

To demonstrate a violation of 18 U.S.C. § 1962(c), a plaintiff must prove:

> "(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated ..., either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity."

*United States v. Bergrin*, 650 F.3d 257, 265 (3d Cir. 2011) (quoting *United States v. Irizarry*, 341 F.3d 273, 285 (3d Cir. 2003) ).

Proving a violation of 18 U.S.C. § 1962(c) "requires no more than this." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).

### i. RICO Elements

First, Defendants contend that Plaintiffs do not plead facts amounting to mail or wire fraud. (ECF No. 158-1 at 30.) Illicit racketeering activity includes "a host of so-called predicate acts, including 'any act which is indictable under ... Section 1341 [mail fraud].' " *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008) (quoting 18 U.S.C. § 1961(1)(B) ). The Third Circuit has traditionally interpreted mail fraud statutes broadly. *See United States v. Martinez*, 905 F.2d 709, 715 (3d Cir.), *cert. denied*, 498 U.S. 1017, 111 S.Ct. 591, 112 L.Ed.2d 595 (1990). Fraud is "measured in a particular case by

Case 1:19-md-02875-RMB-SAK    Document 1802-1    Filed 12/02/21    Page 99 of 182
PageID: 54352
In re Insulin Pricing Litigation, Not Reported in Fed. Supp. (2019)
RICO Bus.Disp.Guide 13,138

determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community." *United States v. Riley*, 621 F.3d 312, 327 n.19 (3d Cir. 2010) (citation omitted). However, without "a specific fraudulent statement" identifying "the time, place, speaker, and content" of the alleged misrepresentation, a civil RICO claim asserting fraud should be dismissed. *Jaye v. Oak Knoll Vill. Condo. Owners Ass'n, Inc.*, 2016 WL 7013468, at *15 (D.N.J. Nov. 30, 2016).

Plaintiffs have adequately pled mail and wire fraud. Plaintiffs allege Defendants committed mail and wire fraud by publishing artificially inflated AWPs via mail and interstate wire facilities. (ECF No. 131 ¶¶ 318-25.) [5] Plaintiffs further alleged Defendants knew that AWP is a pricing index and that purchasers pay for analog insulin based on that index. (ECF No. 131 ¶¶ 253-62, 323, 325.) Federal courts have held that excessive inflation of prices on an index, such as the AWPs in this matter, may constitute mail and wire fraud. *See In re Lupron® Mktg. & Sales Practices Litig.*, 295 F.Supp.2d 148, 165-68 (D. Mass. 2003); *see also Schmuck v. United States*, 489 U.S. 705, 710-11, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). Defendants' reliance on *Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308, 1313-14 (11th Cir. 2000) and *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 71 (1st Cir. 1998) is misplaced. As Plaintiffs highlight in their brief, this is not a matter of nondisclosure. (ECF No. 181 at 19.) Rather, Plaintiffs allege that Defendants committed fraud by "[holding] out their artificially increased AWPs as benchmark prices, fully aware that AWP is a pricing index intended to approximate the true cost of a drug." (*Id.*) Plaintiffs further contend that the AWP had no reasonable relationship to the actual price of the drugs, and that Defendants knew of this fraud. (ECF No. 131 ¶¶ 176-178, 254.) Accordingly, Plaintiffs have adequately pled mail and wire fraud.

**\*6** Second, Defendants contend Plaintiffs failed to plead a valid RICO enterprise. (ECF No. 158-1 at 41.) An essential feature of an association-in-fact enterprise is the sharing of a "common purpose" between the members. *United States v. Boyle*, 556 U.S. 938, 948, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). "From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the enterprise's purpose." *Id.* at 946, 129 S.Ct. 2237. [6] The Third Circuit has held that *Boyle*'s construction of the term "association-in-fact enterprise" is

"capacious," "expansive," and "obviously broad." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 366 (3d Cir. 2010). Additionally, a valid RICO enterprise requires "defendants [to] conduct[ ] or participat[e] in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (quoting 18 U.S.C. § 1962(c) ).

Plaintiffs have adequately pled a valid RICO enterprise. Indeed, Plaintiffs' Complaint alleged a common fraudulent purpose between the Defendants, provided a motive for such purpose, and detailed the alleged relationships between the Defendants. (ECF No. 131 ¶¶ 254, 302-09, 334-35.) [7] Moreover, Plaintiffs also point out that the Amended Complaint satisfies the participation prong by virtue of their allegation that Novo and Sanofi both accomplished "something more" that would be unlikely absent collusion: preferred formulary status without real price reductions. (ECF No. 181 at 48-49.)

Defendants' contentions that Plaintiffs have failed to adequately plead a valid RICO enterprise are without merit. Defendants contend that PBMs and manufacturers cannot have a common purpose in the RICO enterprise because they play different roles in the distribution chain (ECF No. 158-1 at 42-43.) However, Defendants' construction of the common fraudulent purpose prong is too narrow, as federal courts have held that allegations of falsely inflated AWPs may "provide a plausible common fraudulent purpose." *In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F.Supp.2d 196, 206 (D. Mass. 2004). Defendants also argue that Plaintiffs have not adequately pled that Defendants participated in the affairs of the alleged enterprise, contending that the allegations are "entirely consistent with [defendants and the PBMs] each going about their own business." *United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013). On the contrary, Plaintiffs have alleged conduct that would not occur in competition for business in a legitimate market. *See id.* at 856. As such, Plaintiffs adequately alleged a valid RICO enterprise.

**\*7** Third, Defendants contend that Plaintiffs failed to adequately plead proximate causation. A sustainable RICO claim requires proximate causation. *In re Avandia Marketing, Sales Practices & Product Liability Litigation*, 804 F.3d 633, 638 (3d Cir. 2015). "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a but for cause of his injury, but was the proximate

In re Insulin Pricing Litigation, Not Reported in Fed.Supp. (2019)

RICO Bus.Disp.Guide 13,138

Case 1:19-md-02875-RMB-SAK    Document 1802-1    Filed 12/02/21    Page 100 of 182
PageID: 54353

cause as well.' " *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9, 130 S.Ct. 983, 175 L.Ed.2d 943 (2010) (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) ). If a plaintiff's alleged injuries "could have resulted from factors other than [the defendants'] alleged acts of fraud," there is no proximate causation. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006).

Plaintiffs have adequately plead proximate causation. Although Plaintiffs assert that the costs were passed down to them, they explicitly allege that their injuries would not have occurred "[b]ut for the misrepresentations that the Defendant Drug Manufacturers made regarding the benchmark prices of their analog insulins" as the inflated AWP prices forced the intermediaries to raise their prices so as to not suffer the out-of-pocket overcharges alleged in the suit. (ECF No. 131 ¶¶ 339-40.) Defendants assert that Plaintiffs "cannot show the direct relationship required to establish proximate causation," (ECF No. 158-1 at 50), however, the allegation that the cost is borne by the "end payor" is sufficient to establish proximate causation in this context. *In re Pharm. Indus. Average Wholesale Price Litig.*, 295 F.Supp.2d at 175. Proximate causation in the RICO context requires "some direct relation between the injury asserted and the injurious conduct alleged," *Holmes*, 503 U.S. at 268, 112 S.Ct. 1311, and the Amended Complaint makes such allegations.

Finally, Defendants assert that Plaintiffs have not adequately pled a RICO conspiracy. (ECF No. 158-1 at 51.) In order to adequately plead a RICO conspiracy, Plaintiffs must "allege facts suggesting that [the defendants] knowingly agreed to facilitate any illegal scheme." *Mason v. Campbell*, 2016 WL 8716458, at *6 (E.D. Pa. July 29, 2016) (citing *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). "[E]vidence of parallel conduct by alleged co-conspirators is not sufficient to show an agreement." *In re Ins. Brokerage*, 618 F.3d at 321. Rather, allegations of parallel conduct " 'must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.' " *Id.* at 322 (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

Plaintiffs have adequately pled a RICO conspiracy. Plaintiffs do not merely allege parallel conduct, but rather assert facts that suggest a preceding agreement. Plaintiffs assert not only that Defendants "agree[d] and conspir[ed] to violate 18 U.S.C. § 1962(c)" (ECF No. 131 ¶ 346), but also allege separate conspiracies of pricing enterprises between

Novo and Sanofi and each PBM: CVS, Express Scripts, and OptumRx. (ECF No. 131 ¶¶ 310-12.) These allegations clearly suffice for a RICO conspiracy, and as such, Plaintiffs have adequately pled the existence of a RICO conspiracy.

### ii. The Indirect Purchaser Rule

Next, Defendants assert Plaintiffs lack standing to pursue their RICO claim because they are "three levels down the distribution chain" from Defendants and are therefore "classic indirect purchasers" pursuant to the indirect purchaser rule doctrine established by the Supreme Court in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) and *Kansas v. UtiliCorp United Inc.*, 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1998). (ECF No. 158-1 at 26-27.) Plaintiffs argue that applying the indirect purchaser rule – an antitrust law principle – to RICO claims of fraudulent pricing runs contrary to Supreme Court precedent, and that, in any event, Plaintiffs were directly harmed as they paid prices based on Defendants' fraudulent AWPs, irrespective of the prices paid by intermediaries in the distribution chain. (ECF No. 181 at 31-32.) On January 17, 2019, this Court held oral argument on the limited issue of the applicability of the indirect purchaser rule to Plaintiffs' RICO claims.

**\*8** The Supreme Court developed the indirect purchaser rule in the antitrust context, when it held that Clayton Act plaintiffs may not demonstrate injury by providing evidence only of indirect purchases. *Illinois Brick*, 431 U.S. at 737, 97 S.Ct. 2061. The Court warned that allowing indirect purchasers to recover under such a theory would "transform treble-damages actions into massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant." *Id.* at 739, 97 S.Ct. 2061. Moreover, the indirect purchaser rule was also intended to prevent defendants from being exposed to "multiple liability" should both indirect and direct purchasers in a distribution chain be permitted to assert claims arising out of a single overcharge. *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 851 (3d Cir. 1996). Because 18 U.S.C. § 1964(c), RICO's private cause of action, was modeled on the Clayton Act, "antitrust standing principles apply equally to allegations of RICO violations." *McCarthy*, 80 F.3d at 855; *see also Holmes*, 503 U.S. at 270-74, 112 S.Ct. 1311.

Defendants argue Plaintiffs "do not, and cannot, allege that they purchase analog insulin directly from any

defendant," (ECF No. 158-1 at 39), citing the Complaint's allegation that Defendants' products are sold "from manufacturers to wholesaler, wholesaler to retailer (or mail order), and retailer to patient." (*Id.*) In support of its argument, Defendants cite this District's decision in *Hale v. Stryker Orthopaedics,* 2009 WL 321579 at *3 (D.N.J. Feb. 9, 2009), which dismissed a plaintiff's RICO complaint where the plaintiffs did "not plead that they purchased [the products] directly from [the defendants]." The *Hale* court determined that a plaintiffs' co-payment alone does not confer standing upon it as several actors stood in the distribution chain between the plaintiffs and the defendants. *Id* at *4, 130 S.Ct. 983.

Although Plaintiffs advocated competently against applying the indirect purchaser rule in this case, this Court is bound by the controlling caselaw and thus concludes Plaintiffs' Complaint has not sufficiently pled allegations to withstand Defendants' indirect purchaser rule challenge. Plaintiffs' Complaint merely alleges that Defendants' artificial price inflation of the AWPs caused them to pay an increased price for analog insulin, yet never alleges that such overpayments were made directly to Defendants. Specifically, Plaintiffs assert:

336.... [W]hen a plaintiff or class member fills a prescription for one of the analog insulins, she is responsible for paying all or a portion of the medication's cost. If the plaintiff or class member is uninsured, she must pay 100% of the drugs' point-of-sale prices, which are based on the Defendant Drug Manufacturers' benchmark prices. If the plaintiff or class member has a high-deductible health plan, she must pay 100% of the drugs' point-of-sale prices, based on Defendant Drug Manufacturers' benchmark prices, until she satisfies her deductible. If the plaintiff's or class member's health plan contains a coinsurance requirement, she is responsible for paying a percentage of her drugs' point-of-sale prices, based on the Defendants Drug Manufacturers' benchmark prices. And if the plaintiff or class member is a member of a Medicare Part D plan, she is responsible for paying all or a portion of her drugs' point-of-sale prices based on Defendant Drug Manufacturers' benchmark prices, until she reaches her maximum contribution.

337. The amount of each of these cash payments is based on the Defendant Drug Manufacturers' benchmark prices. Therefore, when each Defendant Drug Manufacturer artificially inflated each analog insulin's benchmark price and then used each Manufacturer-PBM Insulin Pricing

Enterprises to sell those analog insulins, they also artificially inflate plaintiffs' and class members' out-of-pocket expenses.

338. The plaintiffs' and class members' damages are therefore the difference between the defendants' reported benchmark prices and the net prices at which they sell their analog insulins for all plaintiff and class member out-of-pocket expenses.

**\*9** 339. Plaintiffs' injuries, and those of the class members, were proximately caused by the Defendant Drug Manufacturers' racketeering activity. But for the misrepresentations that the Defendant Drug Manufacturers made regarding the benchmark prices of their analog insulins and the scheme that the Manufacturer-PBM Insulin Pricing Enterprises employed, plaintiffs and others similarly situated would have paid less, out-of-pocket, for their analog insulins.

(ECF No. 131 ¶¶ 336-39.)

Plaintiffs' core allegation is that Defendants engaged in a scheme to "artificially inflat[e] the benchmark prices of their analog insulin." (ECF No. 131 at ¶ 20.) However, Plaintiffs concede that they, the consumers, are not the first party to pay for the analog insulin at a purportedly inflated price. Rather, Plaintiffs outline a scheme whereby the analog insulins are sold to wholesalers at prices "based on the benchmark prices that are set by the manufacturers," and are subsequently sold to pharmacies, hospitals, and clinics at prices approximating the benchmark prices. (ECF No. 131 at ¶¶ 164, 176.) As such, Plaintiffs are multiple purchasers down the distribution chain from Defendants and are quintessential indirect purchasers for the purposes of the indirect purchaser rule. *See McCarthy,* 80 F.3d at 848 (holding that "only the purchaser immediately downstream from the alleged [RICO violator]" possesses standing to pursue an action).

Plaintiffs contend the indirect purchaser rule does not vitiate their RICO standing as the rule does not apply to RICO claims, and that Defendants' alleged fraud directly injured Plaintiffs as Defendants set the AWPs that ultimately dictated the price paid by the Plaintiffs, thereby conferring upon them RICO standing. (ECF No. 181 at 30-36.) Plaintiffs posit the Complaint explains the process by which Plaintiffs pay out-of-pocket costs, and thus suffer a direct injury based directly on the prices set by Defendants. (ECF No. 131 ¶¶ 260-69.) This Court is not persuaded by Plaintiffs' arguments. In *McCarthy,* the Third Circuit unequivocally held that the

In re Insulin Pricing Litigation, Not Reported in Fed.Supp. (2019)

RICO Bus.Disp.Guide 13,138

indirect purchaser rule applies to RICO claims, stating "the central and dispositive issue [in a RICO action] is whether plaintiffs are 'direct purchasers.' If so, they are entitled to pursue ... their ... RICO claims." *McCarthy*, 80 F.3d at 855.

At oral argument, Plaintiffs urged this Court to rely on *Avandia*, 804 F.3d at 638, to the extent it conflicts with *McCarthy* with respect to the applicability of the indirect purchaser rule in RICO actions. Though *Avandia* is the more recent Third Circuit decision, the facts of this matter are meaningfully distinguishable such that *Avandia* does not provide persuasive support to Plaintiffs' position. Plaintiffs assert the *Avandia* plaintiffs were "third party payors" who "did not directly purchase [the product] from the manufacturer ... but instead reimbursed a pharmacy that purchased [the product] in the chain of distribution." (ECF No. 181 at 35.) Plaintiffs contend that because the "distribution chain did not preclude the RICO claim" and because "the issue was whether the pharmaceutical company's misrepresentations directly caused the health insurers to pay a higher rate than they otherwise would have," its Complaint should be permitted to proceed as it alleges the "same conduct forming the basis of the RICO scheme." (ECF No. 181 at 35-36.) This Court disagrees.

Unlike here, the *Avandia* plaintiffs were not seeking recourse pursuant to payments made to third parties based on allegedly fraudulent prices set by a manufacturer. *Avandia* did not concern an identical case of an indirect purchaser. Rather, the *Avandia* plaintiffs' cause of action was couched in the defendants' alleged failure to disclose known health risks of various drugs ultimately included in their formularies, as the court explained:

> **\*10** The conduct that allegedly caused plaintiffs' injuries is the same conduct forming the basis of the RICO scheme alleged in the complaint – the misrepresentation of the heart-related risks of taking Avandia that caused TPPs and PBMs to place Avandia in the formulary. The injury alleged by the TPPs is an economic injury independent of any physical injury suffered by Avandia users. And, as far as we can tell, prescribing physicians

did not suffer RICO injury from [the] marketing of Avandia.

*Avandia*, 804 F.3d at 644.

The *Avandia* plaintiffs were third-party payors who included the product, Avandia, in their formulary decisions at favorable rates in *direct reliance* on material misrepresentations made by the defendant, a pharmaceutical company. *Avandia*, 804 F.3d at 636. [8] By contrast, Plaintiffs allege their damages stem from artificially inflated AWPs paid by wholesalers and pharmacies *before* the consumers make their purchasers from those intermediaries. *See Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 95 (3d Cir. 2011) (holding that the indirect purchaser rule applies to prescription drug sales and noting that "[b]ecause of the complicated interplay between market forced, the possibility that the wholesaler was harmed by defendant's actions exists even if the majority of the injury is borne by the indirect purchaser").

At oral argument, Plaintiffs also cited a recent decision from the District of Kansas, *In re Epipen*, 336 F. Supp. 3d 1259 (D. Kan. 2018), in further support of its position that the indirect purchaser rule should not bar its RICO claim. (Ps' Ltr. (ECF No. 244).) Plaintiffs contend the *Epipen* court relied on Supreme Court decisions in *Holmes* and *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008) in declining to extend the indirect purchaser rule to a RICO action with a similar fact pattern. (*Id.*) This Court disagrees with Plaintiffs' assertions. *Holmes* explicitly held that federal jurisprudence interpreting antitrust principles govern RICO claims because Congress modeled RICO's civil action provision on a substantially similar provision in the Clayton Act, stating:

> The key to better interpretation lies in some statutory history. We have repeatedly observed, *see Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 150-51, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) ... that Congress modeled § 1964(c) ... [of RICO after] the federal antitrust laws, § 4 of the Clayton Act ...

> In *Associated General Contractors* ... we discussed how Congress enacted § 4 in 1914 with language borrowed from § 7 of the Sherman Act, passed 24 years earlier. Before 1914, lower federal courts had read § 7 to incorporate common-law principles of proximate causation ... and as we reasoned, as many lower federal courts had done before

Case 1:19-md-02875-RMB-SAK    Document 1802-1    Filed 12/02/21    Page 103 of 182
PageID: 54356

In re Insulin Pricing Litigation, Not Reported in Fed.Supp. (2019).

RICO Bus.Disp.Guide 13,138

us ... that congressional use of the § 7 language in § 4 presumably carried the intention to adopt 'the judicial gloss that avoided a simple literal interpretation.' ... Thus, we held that a plaintiff's right to sue under § 4 required a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well.

**\*11** The reasoning applies just as readily to § 1964(c) [of RICO]. We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4.... It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them.

*Holmes*, 503 U.S. at 267-68, 112 S.Ct. 1311.

Nothing in *Holmes* undercuts the voluminous federal jurisprudence determining that courts may apply the indirect purchaser rule to RICO actions with the same force as under antitrust law. [9] The *Epipen* court's discussion of *Holmes* merely suggests *Holmes* did not create a bright line applying the indirect purchaser rule to all RICO actions with the same force as in the antitrust context, stating "the Court has 'cautioned our use of the term "direct" should merely be understood as a reference to the proximate cause enquiry that is informed by the concerns set out in the text.' " *Epipen*, 336 F.Supp.3d at 1324 (quoting *Holmes*, 503 U.S. at 269 n.15, 112 S.Ct. 1311). The court in *Epipen* continued to note "the Supreme Court has recognized that 'the infinite variety of claims that may arise [under RICO] make it virtually impossible to announce a black-letter rule that will dictate the result in every case' for determining whether an alleged RICO violation was the proximate cause of plaintiff's injuries." *Epipen*, 336 F.Supp.3d at 1324-25 (quoting *Holmes*, 503 U.S. at 272 n.20, 112 S.Ct. 1311).

Similarly, the Supreme Court's holding in *Bridge* does not preclude the application of the indirect purchaser rule to Plaintiffs' RICO claims. *Bridge* merely held that plaintiffs who are injured "by reason of" a pattern of mail fraud may have RICO standing "even if he [or she] has not relied on any misrepresentations." *Bridge*, 553 U.S. at 649-50, 128 S.Ct. 2131. Unlike here, *Bridge* does not concern the case of an indirect purchaser and does not stand for the proposition that plaintiffs multiple levels down the consumer chain may possess RICO standing despite the indirect purchaser rule. The disparity between the holding in *Epipen* and the Third Circuit decisions is best explained by the conflicting application of the indirect purchaser rule between the Third and Tenth Circuits. The *Epipen* court readily admitted the Third Circuit recognizes the indirect purchaser rule in the RICO context, whereas the Tenth Circuit does not, explaining:

> Because defendants just cite cases from outside the Tenth Circuit to support their argument that indirect purchasers lack RICO standing, the court declines to apply that rule here. Instead, applying the guidance from our Circuit in *Safe Streets* [*Alliance v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017)], the court already has determined that the class plaintiffs adequately have alleged that defendants' RICO violations proximately caused their injuries.

> **\*12** ...

> And just as importantly, defendants cite no cases from the Tenth Circuit holding that a RICO plaintiff lacks standing to assert a claim for overpaying for pharmaceuticals when the plaintiff receives the benefit of the bargain in the form of purchasing effective drugs, even at inflated prices. The court declines to apply the holdings from the District of New Jersey cases here, as defendants urge.

*Epipen*, 336 F.Supp.3d at 1325-26.

Finally, Plaintiffs' contentions that they suffered direct injury as a result of Defendants' artificially inflated AWPs, thereby conferring RICO standing, are also without merit. (ECF No. 181 at 32.) Plaintiffs argue the consumers' place in the chain of distribution in irrelevant because "the plaintiffs pay prices *directly* based on the defendants' fraudulent AWPs *irrespective of the prices other intermediaries within the chain pay.*" (*Id.*) Plaintiffs further assert that Defendants' potential overcharges of intermediaries are inconsequential as "[t]he issue is that the defendant[ ] grossly misrepresented the pricing benchmarks used to *directly* set consumer prices." (*Id.*) However, such is still insufficient to overcome the indirect purchaser rule.

The Amended Complaint explicitly describes the distribution chain and flow of revenue therein: first, Defendants sell analog insulin to wholesalers at prices "based on benchmark prices that are set by manufacturers" (ECF No. 131 ¶ 176); second, wholesalers earn a margin by selling insulin to pharmacies at approximately the same prices as the benchmarks prices set (ECF No. 131 ¶¶ 164, 167-68); and third, pharmacies earn a margin by charging benchmark-based prices, which are set by bargaining between the pharmacy and PBMs (in the case of insured consumers)

or unilaterally by the pharmacy (in the case of uninsured consumers). (ECF No. 131 ¶¶ 179, 181, 201). Notably, Plaintiffs do not allege that Defendants invariably set the direct prices paid by consumers, but instead that those prices are sometimes determined after certain negotiations between intermediaries in the distribution chain who subsequently impose various mark-ups. (*Id.*)

Although Plaintiffs do allege the benchmark prices "directly" affect the price paid by consumers (ECF No. 181 at 32), such would be insufficient to overcome the indirect purchaser rule bar to RICO standing. The indirect purchaser rule still applies even when the alleged improper price inflation is passed to a plaintiff on a "dollar for dollar basis." *McCarthy,* 80 F.3d at 853. [10] The Plaintiffs have merely alleged a pass-through of the inflated price from one of the various intermediaries to the consumers. Such allegations cannot overcome an indirect purchaser rule challenge.

**\*13** The facts of this case closely mirror those of *Hale,* 2009 WL 321579. In *Hale,* plaintiffs asserted RICO violations pursuant to the defendants' alleged artificial price inflation of hip and knee implant devices. *Id.* at \*1. As in this matter, the *Hale* plaintiffs failed to allege they directly purchased the subject products from the defendants. *Id.* at \*4. Rather, the plaintiffs pled only that they suffered a direct injury evidenced by heightened coinsurance payments passed down to them through the distribution chain. Accordingly, the *Hale* court determined that the plaintiffs lacked RICO standing pursuant to the indirect purchaser rule, stating:

> While Plaintiffs argue that they have pled direct injury since they paid artificially-inflated coinsurance payments for their surgeries, Plaintiffs have not alleged that they were direct purchasers of the replacement joints manufactured by Defendants. Between Plaintiffs and Defendants in the chain of distribution stand several actors, including the hospitals performing the joint surgeries and Plaintiffs' insurers. The chain of distribution squarely presents the multiple liability and damage apportionment risks discussed in *McCarthy.* Thus, Plaintiffs' co-payment alone does not allow them to stand in the shoes of a direct purchaser for standing purposes.
>
> ...
>
> After carefully considering the arguments put forth by both sides, it seems clear that under the facts as pled, Plaintiffs cannot escape the bar of the "direct purchaser" rule. To do so, Plaintiffs would have to plead that they bought their

implants directly from Defendants. Since Plaintiffs have not so pled, they lack standing under these facts to bring their RICO claims.

*Id.*

Although Plaintiffs allege injury not only through heightened coinsurance payments, but also via fraudulent AWPs that "directly set consumer prices" (ECF No. 181 at 32), Plaintiffs have failed to plead any direct purchase between themselves and Defendants. The chain of distribution alleged in this matter is fatal to Plaintiff's RICO claim, and as in *Hale,* such distribution chain "squarely presents the multiple liability and damage apportionment risks discussed in *McCarthy.*" *Id.* Allowing Plaintiffs' RICO claims to proceed would expose Defendants to liability to Plaintiffs as well as to the various direct purchasers, such as the wholesalers and PBMs, thereby allowing to persist the exact harm that the indirect purchaser rule seeks to prevent.

Finally, in a February 5, 2019 letter brief (ECF No. 249), Plaintiffs urged this Court to follow a recent decision from this District, *In re Mercedes-Benz Emission Litig.,* No. 16-881, 2019 WL 413541 (D.N.J. Feb. 1, 2019), in which the court allowed RICO claims to persist despite the fact that the plaintiffs did not directly purchase the product, luxury automobiles, directly from the manufacturers. *Mercedes-Benz* is distinguishable from this case. Although the *Mercedes-Benz* plaintiffs were not direct purchasers, that matter did not concern overpayments made to and by intermediaries, as here. Rather, *Mercedes-Benz* dealt primarily with proximate causation in the RICO context, a separate requirement. The court was not confronted with an indirect purchaser challenge to plaintiffs' standing, it was not briefed on the indirect purchaser rule, and it did not perform an analysis of the indirect purchaser rule whatsoever. *Id.* at \*18-26.

Although Plaintiffs have adequately pled the various elements of a RICO claim, they failed to allege that they directly purchased the analog insulin from Defendants. Rather, Plaintiffs claim injury by virtue of inflated prices of their downstream purchase. Therefore, Plaintiffs' claims are barred by the indirect purchaser rule, and as such, Plaintiffs lack standing to maintain this action pursuant to RICO. Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED WITHOUT PREJUDICE** as to Counts One and Two.

Case 1:19-md-02875-RMB-SAK    Document 1802-1    Filed 12/02/21    Page 105 of 182
PageID: 54358

In re Insulin Pricing Litigation, Not Reported in Fed.Supp. (2019)
RICO Bus.Disp.Guide 13,138

## B. New Jersey Consumer Fraud Act

**\*14** Defendants contend that this Court should dismiss Counts Three, Four, and Five of the Plaintiffs' Complaint, which allege violations of the NJCFA, asserting that the Plaintiffs' Complaint fails to plead the deceptive practices and unconscionable pricing claims with specificity, does not plead unlawful conduct, and does not allege that Plaintiffs suffered any ascertainable loss. (ECF No. 158-1 at 54-60.) Plaintiffs counter that the Complaint plausibly pleads all necessary elements on an NJCFA claim. (ECF No. 181 at 52-59.) For the reasons set forth below, this Court finds that Plaintiffs have adequately pled an NJCFA claim.

The New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.* ("NJCFA") states, in pertinent part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice;
> ....

N.J.S.A. § 56:8-2.

Courts have interpreted this section to require the following three elements to state a cause of action under the NJCFA: "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 964 A.2d 741, 749 (N.J. 2009) (citing *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 192 N.J. 372, 929 A.2d 1076, 1086 (N.J. 2007) ).

### i. Specificity

Defendants assert Plaintiffs' Complaint does "not identify with specificity how defendants purportedly violated the NJCFA," and that as such, the Complaint lacks the particularity and specificity required by Rule 9(b) to withstand a motion to dismiss. (ECF No. 158-1 at 54.) The heightened pleading standard set forth in Rule 9(b) applies to a plaintiff's NJCFA claim. *See Dewey v. Volkswagen*, 558 F.Supp.2d 505, 524 (D.N.J. 2008) (applying Rule 9(b) to a NJCFA and common law fraud claims); *see also DeGennaro v. Am. Bankers Ins. Co. of Fla.*, 2017 WL 2693881, at \*5 (D.N.J. June 22, 2017). To satisfy the specificity requirement of Rule 9(b), "the pleadings must state what the misrepresentation was, what was purchased, when the conduct complained of occurred, by whom the misrepresentation was made, and how the conduct led plaintiff to sustain an ascertainable loss." *Smajlaj v. Campbell Soup Co.*, 728 F. Supp. 2d 84, 104 (D.N.J. 2011).

Plaintiffs' Complaint makes the necessary, specific allegations to withstand Defendants' Motion to Dismiss. The Complaint alleges misrepresentation in that Defendants warranted that the artificially inflated publicly reported benchmark prices of Novolog, Levemir, Apidra, Lantus, and Toujeo were the reasonable approximations of the true cost (ECF No. 131 ¶¶ 359-63, 379-83). Moreover, the Complaint also alleges that Plaintiffs purchased the subject drugs (*Id.* ¶¶ 355, 375), provides allegations concerning when the conduct occurred. (*Id.* ¶¶ 234-37), and asserts that the conduct led Plaintiffs to suffer a loss. (*Id.* ¶¶ 372-73, 392-93, 403-04). Accordingly, the allegations in Plaintiffs' Complaint are pled with sufficient specificity.

### ii. Unlawful Conduct

Defendants assert Plaintiffs' Complaint has "failed to plead any unlawful conduct by defendants" in that it fails "to identify any actions of defendants that were capable of misleading consumers as to analog insulin pricing or rebates" (ECF No. 158-1 at 55), and that as such, it cannot withstand this Motion to Dismiss. "The [NJCFA] creates three categories of unlawful practices: affirmative acts, knowing omissions, and violations of state regulations." *Maniscalo v. Brother Int'l Corp. (USA)*, 627 F.Supp.2d 494, 499 (D.N.J. 2009) (quoting *Vukovich v. Haifa*, No. 03-737,

RICO Bus.Disp.Guide 13,138

2007 WL 655597, *9 (D.N.J. Feb. 27, 2007) (citing *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 647 A.2d 454 (N.J. 1994) ) ). Affirmative acts require no showing of intent on behalf of the defendant. *See Fenwick v. Kay Am. Jeep, Inc.*, 72 N.J. 372, 371 A.2d 13, 16 (N.J. 1977). "Thus, a defendant who makes an affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence or the intent to deceive." *Vukovich*, 2007 WL 655597, at *9 (citation omitted). "In contrast, when the alleged consumer fraud consists of an omission, a plaintiff must show that the defendant acted with knowledge, thereby making intent an essential element of the fraud." *Id.* Notably, unlawful acts expressly regulated by other statutes, regulations, or rules not promulgated under the NJCFA can also give rise to an NJCFA claim. *See Henderson v. Hertz Corp.*, No. L-6937-03, 2005 WL 4127090, at *5 (N.J. Super. Ct. App. Div. June 22, 2006); *see also Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255, 696 A.2d 546, 551-55 (N.J. 1997).

**\*15** Additionally, the NJCFA "prohibit[s] business practices that are unfair or unconscionable *in addition to* practices that are fraudulent, deceptive, or misleading; these terms are defined separately and differently in the text of the statutes and in relevant case law interpreting them." *Cottrell v. Alcon Labs.*, 874 F.3d 154, 166 (3d Cir. 2017) (citations omitted). "There is no precise formulation for an 'unconscionable' act that satisfies the statutory standard for an unlawful practice." *D'Agostino v. Maldonado*, 96 N.H. 447, 78 A.2d 527, 537 (N.J. 2013). Rather, the NJCFA "establishes 'a broad business ethic' applied 'to balance the interest of the consumer public and those of the sellers.' " *Id.* (quoting *Kugler v. Romain*, 58 N.J. 522, 279 A.2d 640, 652 (N.J. 1971) ).

Plaintiffs' Complaint adequately pled unlawful conduct in violation of the NJCFA. New Jersey courts have interpreted NJCFA's reach expansively, and in light of the applicable jurisprudence, Plaintiffs have adequately pled unconscionable conduct. Specifically, the Complaint alleges that Defendants knew, but did not disclose, the benchmark prices it selected for the various drugs it manufactures, and then offered the price spreads to PBMs in exchange for favorable placement on formularies. (ECF No. 131 ¶¶ 360, 380.) Additionally, Plaintiffs adequately pled unfair business practices in their assertions that Defendants' artificially inflated AWPs thereby causing gross overpayments among the most vulnerable members of society. (ECF No. 131 ¶¶ 267-71.) Accordingly, Plaintiffs' Complaint has adequately pled unlawful conduct pursuant to the NJCFA.

### iii. Ascertainable Loss

Defendants contend Plaintiffs' Complaint must be dismissed because they have not, and cannot, establish an ascertainable loss, as required in an NJCFA pleading. (ECF No. 158-1 at 57.) An "ascertainable loss" is one that is "quantifiable or measurable." *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 872 A.2d 783, 793 (N.J. 2005). A "plaintiff must suffer a definite, certain and measurable loss, rather than one that is merely theoretical." *Bosland*, 964 A.2d at 749. However, New Jersey courts have found that "if the defendant or a non-party takes action to ensure that plaintiff sustains no out-of-pocket loss or loss of value prior to litigation, then plaintiff's CFA claim may fail." *D'Agostino*, 78 A.2d at 543; *see also Thiedemann*, 872 A.2d at 794 (finding no ascertainable loss when defendant repaired defect in accordance with terms of warranty). Courts support alleged damages based on either an out-of-pocket theory or a benefit of the bargain theory. *See Smajlaj v. Campbell Soup Co.*, 782 F.Supp.2d 84, 99-103 (D.N.J. 2011). "An out-of-pocket-loss theory will suffice only if the product received was essentially worthless." *Mladenov v. Wegmans Food Mkts., Inc.*, 124 F.Supp.3d 360, 374 (D.N.J. 2015). "A benefit-of-the-bargain theory requires that the consumer be misled into buying a product that is ultimately worth less than the product that was promised." *Id.* (citation omitted). Additionally, plaintiffs must set forth allegations sufficient to show that those losses are causally connected to defendant's alleged conduct. *Bosland*, 964 A.2d at 749.

Plaintiffs have adequately pled an ascertainable loss. Plaintiffs' Complaint fails to plead an ascertainable loss under the "out-of-pocket-loss" theory because it never alleges that the products are "essentially worthless." *Mladenov*, 124 F.Supp.3d at 374, however, Plaintiffs have adequately pled ascertainable losses pursuant to the "benefit-of-the-bargain theory." A plaintiff alleging an ascertainable loss under the benefit of the bargain theory "states a claim if he or she alleges (1) a reasonable belief about the product induced by a misrepresentation; and (2) that the difference in value between the product promised and the one received can be reasonably quantified." *Smajlaj*, 782 F.Supp.2d at 99. As such, a plaintiff " 'must proffer evidence of a loss that is not hypothetical or illusory' and that is 'presented with some certainty demonstrating that it is capable of calculation.' " *Id.* (quoting *Thiedemann*, 872 A.2d at 792-93); *see also Hemy v. Perdue Farms, Inc.*, 2011 WL 6002463, at *18 (D.N.J.

In re Insulin Pricing Litigation, Not Reported in Fed.Supp. (2019)
RICO Bus.Disp.Guide 13,138

Nov. 30, 2011) (holding that the allegation that plaintiff was charged a "premium," by itself, does not support a claim for an ascertainable loss).

**\*16** Plaintiffs have alleged that they were misled as to the difference between the benchmark prices and the "true prices" of the medications. (ECF No. 131 ¶¶ 359-63, 379-83.) Plaintiffs contend that Defendants intentionally and knowingly misrepresented material facts and thereby "inflated" the price of analog insulin to the detriment of the consumers, who "pay for analog insulin based on the medicines' *benchmark* price." (ECF No. 131 ¶¶ 10, 209.) Accordingly, Plaintiffs have adequately pled an ascertainable loss pursuant to the "benefit-of-the-bargain" theory, as they contend that they were "unfairly deprived of the benefit of the bargain" as they paid more than their pro-rata share of the net prices of the subject insulin. (ECF No. 131 ¶¶ 368-70.)

As Plaintiffs have sufficiently pled unlawful conduct with specificity as well as an ascertainable loss, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **DENIED** as to Counts Three, Four, and Five.

### C. Plaintiffs' State Law Claims, Generally

Defendants contend that all of Plaintiffs' various state law claims should be dismissed, as Plaintiffs fail to allege fraudulent, unfair, or unconscionable conduct (ECF No. 158-2 at 4-5), all of Plaintiffs' claims are cursory recitations of the statutory elements (*Id.* at 5-6, 130 S.Ct. 983), all the claims fail to plead proximate causation (*Id.* at 6-7, 130 S.Ct. 983), all the claims fail to comply with Rule 9(b) (*Id.* at 7-8, 130 S.Ct. 983), and all the claims fail because the Plaintiffs' damages are speculative (*Id.* at 8-9, 130 S.Ct. 983). This Court finds Plaintiffs have adequately alleged fraudulent, unfair, or unconscionable conduct, have pled proximate causation, and have satisfied the requirements of Rule 9(b). Additionally, Plaintiffs have also adequately pled an ascertainable loss. (ECF No. 131 ¶ 250.) Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **DENIED** as to Counts Six through Fifty-Nine. [11]

### D. Plaintiffs' State Law Claims, Specifically

#### i. Article III Standing

Defendants contend that seventeen of the various state law claims asserted against them should be dismissed as they each lack a plaintiff with Article III standing. (ECF No. 158-2 at 9-11.) Specifically, Defendants assert that the Complaint contains seventeen counts under the laws of states in which no named plaintiff resides or is alleged to have made any purchases of the subject insulin analog. [12] (ECF No. 158-2 at 10.) "Plaintiffs have the burden to establish standing." *Winer Family Trust v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007). "[A] plaintiff who raises multiple causes of action 'must demonstrate standing for each claim he seeks to press.' " *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 245 (3d Cir. 2012) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) ). The threshold standing determination may not be postponed to class certification, rather, "class representatives must meet Article III standing requirements the moment a complaint is filed." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 367 (3d Cir. 2015) (citing *Lewis v. Casey*, 518 U.S. 343, 358, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ).

**\*17** Consistent with *Neale*, district courts within the Third Circuit and throughout the nation have held that named plaintiffs in a class action "lack standing to bring claims on behalf of putative classes under the laws of states where no named plaintiff is located and where no named plaintiff purchased the product at issue." *In re: Niaspan Antitrust Litig.*, 2015 WL 8150588, at \*3 (E.D. Pa. Dec. 8, 2015). Indeed, the Complaint includes seventeen counts in which no named plaintiff resides in such state, nor is there any allegation of injury in such state. This runs afoul of the Supreme Court's holding in *DaimlerChrysler*, as well as the rules promulgated by courts of this Circuit.

Plaintiffs concede that the Complaint includes several counts for which it lacks a named plaintiff residing in, or claiming injury in, such state. (ECF No. 181 at 63.) Instead, Plaintiffs assert that they do not need to claim an injury in each state to maintain standing, citing the Third Circuit's decision in *In re Prudential Ins. Co.*, 148 F.3d 283 (3d Cir. 1998). Plaintiffs' reliance on *Prudential* is inappropriate. While the court in *Prudential* held that "[o]nce individual standing by the class representative is met, a proper party is before the court" and there "remains no further separate class standing requirement in the constitutional sense," *id.* at 306-07, *Prudential* concerned a matter where the class included members alleging injury in all fifty states. Indeed, *Prudential* explicitly noted that the matter was "an appeal from the

Case 1:19-md-02875-RMB-SAK    Document 1802-1    Filed 12/02/21    Page 108 of 182
PageID: 54361

In re Insulin Pricing Litigation, Not Reported in Fed.Supp. (2019)
RICO Bus.Disp.Guide 13,138

approval of the settlement of a nationwide class action lawsuit against Prudential Life Insurance company alleging deceptive sales practices *affecting over 8 million claimants throughout the fifty states and the District of Columbia.*" *Id.* at 289 (emphasis added). As such, any attempt by Plaintiffs to assert that the holding in *Prudential* somehow undermines the Supreme Court's ruling in *DaimlerChrysler* is without merit.

Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED WITHOUT PREJUDICE** as to Counts Seven, Eight, Fourteen, Fifteen, Sixteen, Twenty, Thirty-Nine, Forty-Two, Forty-Three, Forty-Five, Forty-Eight, Forty-Nine, Fifty, Fifty-Five, Fifty-Six, Fifty-Seven, and Fifty-Nine.

### ii. Standing for Claims as to Particular Defendants

Defendants contend that Plaintiffs lack standing to pursue certain claims against certain defendants because none of them "suffered an injury alleged in a given state from that defendant's products." (ECF No. 158-2 at 11.) [13] Plaintiffs counter that all claims raised in the Complaint satisfy Rule 23's typicality requirement. (ECF No. 181 at 66-67.) To determine whether a plaintiff is typical of a class, courts consider the attributes of the plaintiff, the class as a whole, and the similarity between the plaintiff and the class. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 598 (3d Cir. 2012). The Third Circuit has explained the typicality requirement as follows:

> [The analysis involves] three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advances and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*Schering Plough*, 589 F.3d at 599.

**\*18** Although Plaintiffs' claims at issue may satisfy the three typicality prongs, this matter is distinguishable from *Marcus* in that *Marcus* dealt with claims regarding slightly differing products against a *single* defendant. Contrary to Plaintiffs' contention, *Marcus* did not hold that plaintiffs who did not purchase a product from a defendant may nevertheless sue that defendant based on their purchase of a different defendant's similar product. [14] *Marcus*, 687 F.3d at 599. Rather, this District has held that claims concerning products that a class-action plaintiff neither purchased nor used cannot stand. [15] *See Lieberson v. Johnson & Johnson Consumer Cos., Inc.*, 865 F.Supp.2d 529, 537 (D.N.J. 2011) (holding that "[b]ecause Plaintiff has not alleged that she purchased or used two of the four ... products at issue here, Plaintiff cannot establish an injury-in-fact with regard to those products); *see also Green v. Green Mountain Coffee Roasters, Inc.*, 279 F.R.D. 275, 280 (D.N.J. 2011) (holding that plaintiffs did not have standing to pursue claims concerning products that they "neither purchased nor used"). As Plaintiffs have asserted multiple claims absent allegations of such products being purchased or used in such jurisdictions, such claims cannot withstand this Motion to Dismiss.

Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED WITHOUT PREJUDICE** as to Counts Thirteen, Twenty-Seven, Twenty-Nine, Thirty, Thirty-Four, Thirty-Five, Thirty-Eight, Forty-Seven, and Fifty-One.

### iii. Statutory Prohibitions on Consumer Class Actions

Defendants contend that eight of the Plaintiffs' claims must be dismissed due to state law statutory prohibitions on consumer class actions in each respective state. [16] (ECF No. 158-2 at 13.) Defendants assert that the Supreme Court's holding in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*, 559 U.S. 393, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010) compels this Court to apply the class-action bar incorporated in state consumer protection laws. (ECF No. 158-2 at 14.) Plaintiffs argue that the Third Circuit's holding in *Knepper v. Rite Aid Corp.*, 675 F.3d 249 (3d Cir. 2012) interprets *Shady Grove* to preclude applying state class-action bars in the consumer protection context. (ECF No. 181 at 68.)

In re Insulin Pricing Litigation, Not Reported in Fed.Supp. (2019)

RICO Bus.Disp.Guide 13,138

*Shady Grove* held that the certification of a class-action under Rule 23 alleging violations of New York law did not violate the Rules Enabling Act, even though New York state law prohibited such a suit from proceeding as a class action. 559 U.S. at 406-09, 130 S.Ct. 1431. *Knepper* noted "[u]nder the plurality's view [in *Shady Grove*], any supposed substantive purpose underlying § 216(b) [the FLSA's provision barring opt-out classes] is irrelevant, and we need only determine whether Rule 23 'really regulates procedure,' which the Court has already concluded it does." 675 F.3d at 265. As such, any supposed, substantive purpose of a state law bar to class-actions is irrelevant, because Rule 23 "really regulates procedure." *Id.* Therefore, Defendants' contention lacks merit.

**\*19** Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **DENIED** as to Counts Seven, Eighteen, Twenty-Six, Twenty-Seven, Thirty-Four, Thirty-Six, Forty-Nine, and Fifty-One. [17]

#### iv. Privity

Defendants assert that six of Plaintiffs' claims must be dismissed as the consumer protection laws of such states require privity, which Plaintiffs have failed to plead. [18] (ECF No. 158-2 at 14-15.) Plaintiffs' concede that Kentucky law requires privity – thereby agreeing that their claim under Kentucky law should be dismissed – but that no other state law as alleged by Defendant requires privity to maintain a consumer fraud action. (ECF No. 181 at 69-70.)

In support of its contention that privity is required under the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 14-1522, *et seq.* ("ACFA"), Defendants cite *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401 (9th Cir. 1992). The court in *Sutter* held that the ACFA has a "clear intent to protect unwary buyers from unscrupulous sellers" and that where a plaintiff is "not a buyer, nor [a] ... target of deceptive advertising" it cannot maintain an action under the ACFA. *Id.* at 407. Plaintiffs have asserted that they are both "buyers," although not directly from Defendants, and the target of deceptive pricing. As Arizona jurisprudence does not explicitly require *direct* privity of contract between the plaintiff and defendant to maintain a suit under the ACFA, Plaintiffs' Arizona state law claim survives.

In support of its contention that privity is required under the Idaho Consumer Protection Act, I.C. § 48-601, *et seq.*

("ICPA"), Defendants cite *Taylor v. McNichols*, 149 Idaho 826, 243 P.3d 642 (Idaho 2010). *Taylor* held that in order to have standing under the ICPA, "the aggrieved party must have been in a contractual relationship with the party alleged to have acted unfairly or deceptively." *Id.* at 662; *see also Haskin v. Glass*, 102 Idaho 785, 640 P.2d 1186, 1189 (Idaho Ct. App. 1982) (holding "that a claim under the ICPA must be based upon a contract"). However, while a contractual relationship is necessary, courts have not determined whether *direct* privity is required to confer standing under the ICPA. *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*, 295 F.Supp.3d 927, 1021-22 (N.D. Cal. 2018) (holding that "[a]rguably, [the ICPA] and *Haskin* simply reflect that a plaintiff's claim must ultimately be founded on a contract; they do not necessarily require that the contract must be one entered into by the plaintiff and defendant directly"); *see also Johnson v. Ford Motor Co.*, 2015 WL 7571841, at *10 (S.D. W.Va. Nov. 24, 2015) (rejecting the assertion that an automobile purchaser could not sue Ford Motor Company under the ICPA because she was not a direct purchaser). Accordingly, as direct privity is not required under Idaho law, Plaintiffs' failure to plead such is not fatal to its action.

**\*20** Finally, Defendants assert that the Vermont Consumer Fraud Act, Vt. Stat. Ann. Tit. 9, § 2451, *et seq.* ("VCFA") requires privity of contract. (ECF No. 158-2 at 15.) In support of this contention, Defendants cite *Otis-Wisher v. Medtronic, Inc.*, 616 F. App'x 433, 435 (2d Cir. 2015), which upheld the dismissal of a claim under the VCFA finding that the plaintiff was not a "consumer" because she was merely prescribed the device by her doctor. *Otis-Wisher* is inapplicable to this matter, as Plaintiffs undoubtedly qualify as consumers. On the contrary, in *Elkins v. Microsoft Corp.*, 174 Vt. 328, 817 A.2d 9, 20 (Vt. 2002), the Vermont Supreme Court held that "consumers can generally sue under [the VCFA] even though they are indirect purchasers of a good or service from the defendant." Thus, direct privity of contract is not required under Vermont law and Plaintiffs may assert its claim under the VCFA.

Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED WITHOUT PREJUDICE** as to Count Twenty-Six and **DENIED** as to Counts Nine, Twenty-One, and Twenty-Four. [19]

#### v. Reliance

In re Insulin Pricing Litigation, Not Reported in Fed.Supp. (2019)...

RICO Bus.Disp.Guide 13,138

Defendants assert that six of Plaintiffs' claims must be dismissed as Plaintiffs failed to adequately plead reliance.[20] (ECF No. 158-2 at 15-16.) These six counts all allege violations of state consumer fraud laws in which reliance is a necessary element. On the contrary to Defendants' contention, Plaintiffs adequately pled reliance upon Defendants' alleged misrepresentations, as well as proximate causation to their damages stemming therefrom. (ECF No. 131 ¶¶ 3, 206, 259, 335.) Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **DENIED** as to Counts Ten, Twelve, Eighteen, Thirty-One, Thirty-Eight, and Forty-Seven.[21]

### vi. Allegations of Wrongdoing

Defendants assert that five of Plaintiffs' claims must be dismissed as Plaintiffs failed to adequately plead wrongdoing within the state, as required by each respective state consumer fraud law.[22] (ECF No. 158-2 at 16-17.) Plaintiffs contend that Defendants argument is erroneous, as each claim concerns consumers who reside in and purchased insulin in the particular state whose laws they invoke. (ECF No. 181 at 73.) The Court agrees with Plaintiffs.

The Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. § 505, *et seq.* ("ICFA") "applies only to fraudulent transactions that take place 'primarily and substantially' inside Illinois." *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill.2d 45, 316 Ill.Dec. 522, 879 N.E.2d 910, 921 (Ill. 2007) (quoting *Avery v. State Farm Mut. Auto Ins. Co.*, 216 Ill.2d 100, 296 Ill.Dec. 448, 835 N.E.2d 801, 852 (Ill. 2005) ). It is evident that the purchase of insulin by a plaintiff within Illinois would satisfy this requirement, and Plaintiffs' Complaint pled such. Therefore, Plaintiffs adequately pled wrongdoing under Illinois law.

**\*21** The New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.* ("NHCPA") is construed "to cover a defendant's extra-territorial acts if those acts affect travel or commerce within the state." *Harbour Capital Corp. v. Allied Capital Corp.*, 2009 WL 2185449, at *8-9 (D.N.H. July 22, 2009). Defendants may not "injure trade or commerce in New Hampshire but escape liability under [the NHCPA] by remaining outside the state." *Id.* As Plaintiffs have pled extra-territorial acts affecting commerce within New Hampshire, they have sufficiently pled wrongdoing under New Hampshire law.

New York courts hold that in order to allege injury under the New York General Business Law §§ 349-350, the plaintiff must allege that "the transaction in which the consumer is deceived" occurred in New York. *Goshen v. Mut. Life Ins. Co. of New York*, 98 N.Y.2d 314, 746 N.Y.S.2d 858, 774 N.E.2d 1190, 1195 (N.Y. 2002). In *Goshen*, the plaintiff "purchased his policy and paid his premiums in Florida, through a Florida insurance agent," and the Court found that "for the purposes of section 349, any deception took place in Florida, not in New York." *Id.* at 1196, 746 N.Y.S.2d 858, 774 N.E.2d. On the contrary, Plaintiffs allege that the New York class members purchased the insulin analog in New York, and thus that the deception occurred in New York. Accordingly, Plaintiffs have adequately alleged wrongdoing in New York.

Finally, this Court is satisfied that Plaintiffs have adequately pled wrongdoing in both Tennessee and Wisconsin so as to withstand Defendants' Motion to Dismiss. The Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, *et seq.* ("TCPA") is to "be liberally construed" to "protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within the state." *Id.* at § 47-18-102(2). Tennessee courts allow plaintiffs discovery "in order to tie its TCPA claims to specific transactions occurring in Tennessee." *Encore Med., L.P. v. Jay Kennedy, D.C.*, 2013 WL 839838, at *32 (W.D. Pa. Mar. 6, 2013). Similarly, the Wisconsin Supreme Court has held that the purpose of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 110.18 ("DTPA") "includes protecting Wisconsin residents from untrue, deceptive, or misleading representation made to induce action." *K&S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 301 Wis.2d 109, 732 N.W.2d 792, 802 (Wis. 2007). This necessarily includes transactions that took place in Wisconsin, *see, e.g., In re GM LLC Ignition Switch Litig.*, 257 F.Supp.3d 372, 446-60 (S.D.N.Y. 2017), which the Complaint pleads. As such, Plaintiffs have sufficiently pled factual allegations asserting wrongdoing in Tennessee and Wisconsin so as to withstand Defendants' Motion to Dismiss.

Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **DENIED** as to Counts Twenty-Two, Thirty-Nine, Forty-One, and Fifty-One.

### vii. Procedural Requirements

Finally, Defendants contend that Plaintiffs' claims under Mississippi law, Count Thirty-Four, and Ohio law, Count Forty-Four, must be dismissed because they fail to meet procedural requirements under respective state laws. (ECF No. 158-2 at 17-18.) As this Court has determined that Plaintiffs lack standing to bring its Mississippi state claim, Count Thirty-Four will not be analyzed again herein.

Defendants assert that this Court must dismiss Plaintiffs' claim pursuant to the Ohio Consumer Sales Practice Act, Ohio Rev. Code Ann. § 1345.01, *et seq.* ("OCSPA") because the statute's section on remedies prohibits a plaintiff from bringing a class action "unless the defendant has notice that conduct substantially similar to its alleged conduct is deceptive or unconscionable as declared by either (1) a rule adopted by the Ohio Attorney General, or (2) an Ohio state court holding." *Chapman v. Tristar Prods., Inc.*, 2016 WL 6216135, at *4 (N.D. Ohio Oct. 25, 2016). "Ohio courts are to construe the OCSPA liberally in favor of consumers." *Id.* Courts interpreting Ohio law have held that

the notice argument "is not appropriate at the moment-to-dismiss stage; it belongs at the class certification or summary judgment stages." *Id.* at 4, 130 S.Ct. 983 (citing *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 684 F.Supp.2d 942, 948 (N.D. Ohio 2009). As such, there are no grounds to dismiss Plaintiffs' claims at Ohio law at this juncture. Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **DENIED** as to Count Forty-Four.

### IV. CONCLUSION

 **\*22**  For the reasons set forth above, Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART** as set forth herein and in the accompanying order.

### All Citations

Not Reported in Fed. Supp., 2019 WL 643709, RICO Bus.Disp.Guide 13,138

### Footnotes

1 Defendants' Motion to Dismiss is separated into two briefs. The first brief addresses Counts One (Violation of RICO), Two (Conspiracy to Violate RICO), Three (Violation of the New Jersey Consumer Fraud Act Against Novo), Four (Violation of the New Jersey Consumer Fraud Act Against Sanofi), and Five (Violation of the New Jersey Consumer Fraud Act Against Novo and Sanofi). (ECF No. 158-1.) The second brief focuses on Counts Six through Fifty-Nine, violations of the consumer fraud laws of the various states. (ECF No. 158-2.)

2 The Plaintiffs frequently use the terms "benchmark price" and "sticker price" to refer to the AWP. (ECF No. 131 ¶¶ 1, 2, 174.)

3 PBMs are retained by health insurance companies to manage their prescription drug benefits and negotiate, specifically for discounts, with drug companies and pharmacies on behalf of the health insurance companies. (ECF No. 131 ¶ 166.) PBMs do not purchase prescription drugs, nor do they make any payments to manufacturers. (*Id.*) PBMs typically do not take possession of drugs either, however, some PBMs operate mail-order pharmacies and purchase drugs from wholesalers solely in their capacity as a seller to the consumer. (ECF No. 131 ¶¶ 7, 166.)

4 The "net price" refers to the revenue obtained by the manufacturer after subtracting the rebate amounts it negotiates and pays to PBMs. (ECF No. 131 ¶¶ 169, 170 fig. 3.) The net price may fluctuate as it necessarily depends on a particular PBM's negotiation. (ECF No. 131 ¶ 171.)

5 Specifically, Plaintiffs allege "[t]he Defendant Drug Manufacturers intended that the PBMs would (and did) distribute, through the U.S. mail and interstate wire facilities, promotional and other materials which claimed that rebates saved health care payers and consumers like the plaintiffs and class members money on their prescription needs." (ECF No. 131 ¶ 321(f).)

6 The Supreme Court has also defined an association-in-enterprise, for RICO purposes, as "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

Case 1:19-md-02875-RMB-SAK    Document 1802-1    Filed 12/02/21    Page 112 of 182
PageID: 54365
In re Insulin Pricing Litigation, Not Reported in Fed.Supp. (2019)
RICO Bus.Disp.Guide 13,138

7    Specifically, Plaintiffs allege that "[e]ach manufacturer-PBM Enterprise also shares a common purpose of perpetuating use of insulin benchmark prices as the basis for consumer cost-sharing and out-of-pocket payments in the pharmaceutical industry ... these corporations would not be able to market large spreads to PBMs in exchange for formulary positions without the use of the inflated benchmark prices as the basis for consumer cost-sharing and out-of-pocket payments in the pharmaceutical industry." (ECF No. 131 ¶ 302.) Plaintiffs further alleged that "[e]ach of the Manufacturer-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between each Defendant Drug Manufacturer and each PBM that is an associate." (ECF No. 131 ¶ 303.)

8    Similarly, Plaintiffs' reliance on the Second Circuit's decision in *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003) is also misplaced. (ECF No. 181 at 36.) *Desiano* concerned an antitrust action to recover alleged overpayments made to a drug manufacturer, however, unlike in this matter, the relief sought included "only the portion of the prescription paid [directly] by the [healthcare providers] and exclude[d] the part paid by the patients, in the form of a 'co-pay.' " *Id.* at 345.

9    Additionally, this Court disagrees with Plaintiffs' reliance on *Sedima*, 473 U.S. at 498-99, 105 S.Ct. 3275. Although *Sedima* postulates that "RICO is evolving into something quite different from the original conception of its enactors," *id.* at 500, 105 S.Ct. 3275, and even suggests that interpreting its elements in identical fashion to those under antitrust law may play a role in such evolution, *id.* at 498-99, 105 S.Ct. 3275, it does not at all mention the indirect purchaser rule and certainly provides no analysis tending to suggest a preference that such rule not be applied in the RICO context.

10    *McCarthy* notes "the fact that the [subject costs] were passed on [from an intermediary] to [the plaintiffs] on a dollar for dollar basis ... is not dispositive. Indeed, the subcontractors in *Illinois Brick* and the utility companies in *Utilicorp* passed on their costs to the plaintiffs in those respective cases; yet the Supreme Court deemed this fact insufficient to confer standing to the indirect-purchaser plaintiffs in those cases." 80 F.3d at 853.

11    Defendants' motion to dismiss each count herein is only denied as to the extent that such counts may be dismissed on other grounds.

12    Those counts include: Count Seven (Alabama); Count Eight (Alaska); Count Fourteen (Connecticut) Count Fifteen (Delaware); Count Sixteen (Washington, D.C.); Count Twenty (Hawaii); Count Thirty-Nine (New Hampshire); Count Forty-Two (North Carolina); Count Forty-Three (North Dakota); Count Forty-Five (Oklahoma); Count Forty-Eight (Rhode Island); Count Forty-Nine (South Carolina); Count Fifty (South Dakota); Count Fifty-Five (Virginia); County Fifty-Six (Washington); Count Fifty-Seven (West Virginia); and County Fifty-Nine (Wyoming).

13    Those counts are, as to Novo: Count Thirteen (Colorado); County Thirty (Massachusetts); Count Thirty-Five (Missouri); and Count Thirty-Eight (Nevada). As to Sanofi, the counts include: Count Twenty-Seven (Louisiana); County Twenty-Nine (Maryland); Count Thirty-Four (Mississippi); Count Forty-Seven (Pennsylvania); and Count Fifty-One (Tennessee).

14    Similarly, this Court is unpersuaded by Plaintiffs' argument that *Riaubia v. Hyundai Motor Am.*, No. 16-5150, 2017 WL 3602520 (Aug. 22, 2017) supports its position. Like *Marcus*, *Riaubia* deals with "absent [class] members [who] were allegedly injured by the same non-conforming feature of different models of the same product, manufactured or distributed *by the same defendants* based on uniform representations." *Id.* at *2 (emphasis added).

15    This Court notes that, while many decisions from this District have held that claims concerning products that a plaintiff has not alleged to have used nor purchased cannot stand, "[c]ourts in this district are divided on this issue." *Neuss v. Rubi Rose, LLC*, No. 16-2339, 2017 WL 2367056, at *5 (D.N.J. May 31, 2017). In *Neuss*, this District declined to grant a defendant's motion to dismiss claims against one defendant from plaintiffs who had neither purchased nor used their product, on the basis that (1) the class-action plaintiffs had the same basis for each defect among the different products, (2) the products were closely related, and (3) all of the claims were against only two defendants. *Id.* Unlike in this matter, however, one of the defendants in *Neuss* was a subsidiary and agent of the other. *Id.* at *2.

RICO Bus.Disp.Guide 13,138

16    Those eight counts are: Count Seven (Alabama); Count Eighteen (Georgia); Count Twenty-Six (Kentucky); Count Twenty-Seven (Louisiana); Count Thirty-Four (Mississippi); Count Thirty-Six (Montana); Count Forty-Nine (South Carolina); and Count Fifty-One (Tennessee).

17    Defendants' motion to dismiss each count herein is only denied as to the extent that such counts may be dismissed on other grounds.

18    Those six counts are: Count Nine (Arizona); Count Sixteen (Washington, D.C.); Count Twenty-One (Idaho); Count Twenty-Six (Kentucky); Count Thirty (Massachusetts); and Count Fifty-Four (Vermont).

19    This Court did not provide an analysis for its decision to grant Defendants' motion to dismiss Count Twenty-Six, pleading a violation of the Kentucky Consumer Protection Act, as Plaintiff conceded that such Act requires direct privity of contract, which its Complaint failed to allege. (ECF No. 181 at 69.) Additionally, this Court also did not provide an analysis of Defendants' privity of contract argument as to Count Sixteen, alleging a violation of the Washington D.C. Consumer Protection Procedures Act, or Count Thirty, alleging a violation of the Massachusetts General Law Chapter 93(A), as both counts were previously dismissed without prejudice for lack of standing.

20    Those six counts are: Count Ten (Arkansas); Count Twelve (California); Count Eighteen (Georgia); Count Thirty-One (Michigan); Count Thirty-Eight (Nevada); and Count Forty-Seven (Pennsylvania).

21    Defendants' motion to dismiss each count herein is only denied as to the extent that such counts may be dismissed on other grounds.

22    Those five counts are: Count Twenty-Two (Illinois); Count Thirty-Nine (New Hampshire); Count Forty-One (New York); Count Fifty-One (Tennessee); and Count Fifty-Eight (Wisconsin).

---

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Tab 4

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2012-1 Trade Cases P 77,878

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by    Le v. Kohls Department Stores, Inc.,    E.D.Wis.,
February 8, 2016

2011 WL 5008090
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

In re MAGNESIUM OXIDE
ANTITRUST LITIGATION.

Civ. No. 10–5943 (DRD).
|
Oct. 20, 2011.

**Attorneys and Law Firms**

Trujillo, Rodriguez & Richards, LLC, by: Lisa J. Rodriguez, Esq., Haddonfield, NJ, Gold Bennett Cera & Sidener LLP, by: Solomon B. Cera, Esq., C. Andrew Dirksen, Esq., San Francisco, CA, Goldman Scarlato & Karon, P.C., by: Daniel R. Karon, Esq., Cleveland, OH, for Direct Purchaser Plaintiffs.

Lite Depalma Greenberg, LLC, by: Allyn Z. Lite, Esq., Joseph J. DePalma, Esq., Newark, NJ, Hagens Berman Sobol Shapiro LLP, by: Steve W. Berman, Esq., Anthony D. Shapiro, Esq., Elizabeth A. Fegan, Esq., Jason A. Zweig, Esq., New York, NY, Hudson Mallaney & Shindler, by: J. Barton Goplerud, Esq., West Des Moines, IA, Girardi Keese, by: Stephen G. Larson, Esq., Los Angeles, CA, for Indirect Purchaser Plaintiffs.

Loweinstein Sanler PC, by: Douglas S. Eakley, Esq., Michael J. Hahn, Esq., Roseland, NJ, Paul, Weiss, Rifkind, Wharton & Garrison LLP, by: Aidan Synnott, Esq., Daniel A. Crane, Esq., New York, NY, Cozen O'Connor, P.C., by: John P. Johnson, Esq., Francis P. Newell, Esq., Peter M. Ryan, Esq., Philadelphia, PA, Finklestein Thompson LLP, by: Rosalee B. Connell, Esq., Douglas G. Thompson, Esq., Michael G. McLellan, Esq., Washington, DC, for Defendants.

**OPINION**

DEBEVOISE, Senior District Judge.

*1 This matter arises out of the consolidation of five separate actions in this Court [1] alleging a conspiracy to fix prices

in and allocate shares of the domestic Magnesium Oxide market from January 2002 to the present ("the Class Period"). On November 15, 2010, Direct Purchaser Plaintiffs ("DP Plaintiffs") Orangeburg Milling Company, Inc., Bar Ale, Inc., and Air Krete, Inc. filed a Class Action Complaint ("CAC") against Defendants Premier Chemicals, LLC ("Premier"), Sumitomo Corporation of America ("Sumitomo"), and YAS, Inc. ("YAS") pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, alleging violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and seeking class certification under Federal Rule of Civil Procedure 23(b)(2) and (3), declaratory judgment, treble damages, costs and attorneys' fees, and an injunction. On December 30, 2010, DP Plaintiffs filed an Amended CAC to add additional factual allegations in support of their claims.

On October 7, 2010, Indirect Purchaser Plaintiffs ("IP Plaintiffs") Ronald Hayek, Daniel, Walker, Sue Walker, and John Bidart filed a CAC against Defendants under Section 16 of the Clayton Act, alleging violations of Section 1 of the Sherman Act, and under various state antitrust and consumer protection laws. IP Plaintiffs seek similar relief as DP Plaintiffs. [2] On December 31, 2010, IP Plaintiffs filed an Amended CAC to add similar factual allegations as those added by DP Plaintiffs in their Amended CAC.

On March 1, 2011, Defendants filed a Motion to Dismiss [3] all of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, Defendants' motion is granted. No Defendant is entitled to dismissal of Plaintiffs' federal and state antitrust claims on the merits because Plaintiffs sufficiently allege a meeting of the minds among all Defendants to fix prices in and allocate shares of the domestic Magnesium Oxide market. However, Defendants are entitled to dismissal of IP Plaintiffs' federal and state antitrust claims and the majority of their consumer protection claims for lack of standing. In addition, those consumer protection claims under which IP Plaintiffs have standing are dismissed to the extent they are based on allegations of fraud because those allegations do not comply with the requirements of Federal Rule of Civil Procedure 9(b). Finally, Plaintiffs' federal and state antitrust claims are dismissed because they are time-barred by their respective statutes of limitations.

**I. BACKGROUND**

2012-1 Trade Cases P 77,878

Magnesium Oxide ("MgO") is a solid, white, naturally occurring mineral that is used in producing a wide variety of products, including refractory products, animal feeds, fertilizers, electrical insulation, and pharmaceuticals. It is formed by an ionic bond between one magnesium atom and one oxygen atom. MgO can be mined from magnesite or processed from seawater or subterranean brines containing magnesium chloride. This case concerns the two most common forms of MgO: Caustic-calcined magnesia ("CCM") and dead-burned magnesia ("DBM"). DBM and CCM are produced differently and have different commercial applications. [4]

**\*2** In 2000, according to the CACs, domestic consumption of DBM and CCM came from two sources: the United States and China. Roughly 50% of CCM "and a lesser amount of" DBM consumed in the United States were produced domestically, while the rest was imported from China. (Direct Purchasers' Consolidated Amended Class Action Complaint ("Direct CAC") ¶ 27; (Indirect Purchasers' Consolidated Amended Class Action Complaint ("Indirect CAC") ¶ 33.) At that time, Premier allegedly maintained control over the majority of DBM and CCM consumed in the United States by (1) purchasing imported CCM and DBM for resale to its customers in the United States, and (2) sourcing magnesite from China for production into DBM to be sold domestically.

"Sumitomo similarly purchased Chinese MgO but only [DBM] for resale to its U.S. customers" and "sourced magnesite from China for manufacture into [DBM] for sale in the U.S." (Direct CAC ¶ 27; Indirect CAC ¶ 34.) To do so, it enlisted the help of YAS to (1) "facilitate[ ][its] purchases of Chinese magnesite" (Direct CAC ¶ 27; Indirect CAC ¶ 35), and (2) purchase Chinese DBM for resale in the United States.

This arrangement proved successful because Hideo Sumikawa, the current president of YAS, previously worked for Sumitomo and has since maintained relationships with certain Chinese magnesite mines. "In particular, Sumitomo, through Coy Akiyama—head of Sumitomo's inorganic chemicals unit—purchases [DBM] from Chinese mines that Sumikawa (YAS) has facilitated, thereby allowing Sumitomo and YAS to participate together in the U.S. MgO market." (Direct CAC ¶ 33; Indirect CAC ¶ 41.)

According to Plaintiffs, sometime before the Class Period, Premier "saw its share of MgO markets shrink due to increased Chinese competition." (Direct CAC ¶ 28; Indirect CAC ¶ 36.) Specifically, "cheaper imports, mainly from

China ha[d] replaced some of the U.S. domestic production, notably affecting Premier." (Direct CAC ¶ 29; Indirect CAC ¶ 37.) Thus, during the Class Period, Premier and Sumitomo allegedly bought nearly all of the Chinese DBM available for purchase and resold it to their customers in the United States.

In addition, Plaintiffs allege that, "[d]uring the Class Period, with some limited exceptions, the MgO markets were considered to be fairly saturated, with limited potential for growth." (Direct CAC ¶ 30; Indirect CAC ¶ 38.) However, "[i]nstead of competing, representatives from Premier, Sumitomo, and YAS began meeting regularly to discuss fixing U.S. MgO prices and allocating MgO markets." (Direct CAC ¶ 31; Indirect CAC ¶ 39.) Specifically, Plaintiffs allege a conspiracy among Premier, Sumitomo, and YAS to (1) fix prices in and allocate shares of the domestic DBM market and (2) allocate the domestic CCM market to Premier so that it could fix prices in that market, which resulted in Plaintiffs' purchasing DBM and CCM at artificially high prices.

### i. The DBM and CCM Agreements

**\*3** Plaintiffs allege that, during the Class Period, Cary W. Ahl, Sr. Premier's then-president, "regularly called" Mr. Sumikawa of YAS "to discuss fixing Premier's and Sumitomo's [DBM] prices and allocating their respective MgO accounts in the U.S." (Direct CAC ¶ 34; Indirect CAC ¶ 42.) These market allocation and price-fixing schemes were allegedly implemented by Mr. Ahl and his successors at Premier and Terry Wakisama at Sumitomo.

In the summer of 2004, Coy Akiyama of Sumitomo, Mr. Sumikawa of YAS, Gary Vannorsdel, an animal nutrition broker, and Mr. Vannorsdel's son, met at a Holiday Inn, in Tulsa, Oklahoma, to discuss plans for Sumitomo to enter the CCM market without upsetting Premier. Sumitomo had been shipping DBM to the United States on "partially empty barges and wanted to maximize efficiencies by filling these barges with [CCM] for sale to the western U.S." (Direct CAC ¶ 39; Indirect CAC ¶ 48.) Indeed, DBM shipments filled only half of Sumitomo's New Orleans barge capacity. Apparently, "Tulsa was the only port that could accommodate this barge, and Sumitomo had access to a very large storage facility in Tulsa." (Direct CAC ¶ 36; Indirect CAC ¶ 44.)

At the Tulsa meeting, "[i]n the course of discussing a strategy for Sumitomo to enter the U.S. [CCM] market, Akiyama (Sumitomo) recounted to Sumikawa (YAS) multiple discussions between him and Ahl where Ahl had

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2012-1 Trade Cases P 77,878

called Akiyama to set [DBM] prices; to allocate [DBM] markets; and to ensure that Sumitomo was maintaining its agreement with Premier to fix [DBM] prices and allocate [DBM] markets." (Direct CAC ¶ 40; Indirect CAC ¶ 49.) At one point, Mr. Vannorsdel "expressed concern about compromising his relationship with Premier by helping facilitate Sumitomo and YAS's involvement" in the CCM market, to which Mr. Akiyama responded, " 'Don't be concerned because we [Sumitomo] talk with Premier on a daily basis to set prices and to discuss what accounts they can have.' " (Direct CAC ¶ 41; Indirect CAC ¶ 50.)

Shortly after the Tulsa meeting, Mr. Ahl discovered Sumitomo's plan to enter the CCM market and retaliated by dropping DBM prices. [5] As a result, Sumitomo did not follow through with its plans to enter the CCM market. "Following the [CCM]-related message that Premier sent to Sumitomo and YAS via Premier's pre-market-entry retaliation, Sumitomo and YAS illegally agreed with Premier to remain out of the [CCM] market—a market Sumitomo, as a rational profit-seeking entity, was motivated to enter— thus allowing Premier to maintain its control over [CCM] pricing." (Direct CAC ¶ 43; Indirect CAC ¶ 52.)

### ii. Fraudulent Concealment

Plaintiffs allege that the MgO conspiracy was "inherently self-concealing" and that Defendants took affirmative measures to conceal it. (Direct CAC ¶ 48–49; Indirect CAC ¶ 55–56.) Specifically, Plaintiffs allege that "[D]efendants met secretly and among themselves for the express purpose of fixing prices and allocating markets of domestically sold MgO." (Direct CAC ¶ 50; Indirect CAC ¶ 57.) In addition, Defendants allegedly explained increases in the price of MgO "by references to tight supply, thinning margins, and increased energy and freight costs." (Direct CAC ¶ 51; Indirect CAC ¶ 58.) As a result, Plaintiffs allege that "neither [P]laintiffs nor the class members had knowledge of any of the foregoing violations, and neither [P]laintiffs nor the class members, until recently, could have discovered through reasonable diligence that [D]efendants and their co-conspirators had engaged in the foregoing violations." (Direct CAC ¶ 49; Indirect CAC ¶ 56.)

### iii. The Complaints

**\*4** On November 15, 2010, DP Plaintiffs—i.e. those who purchased either DBM or CCM directly from one or more Defendants, their predecessors, subsidiaries, or co-conspirators during the Class Period—filed a CAC against

Defendants under Sections 4 and 16 of the Clayton Act alleging violations of Section 1 of the Sherman Act, and seeking class certification under Federal Rule of Civil Procedure 23(b)(2) and (3), declaratory judgment, treble damages, costs and attorneys' fees, and an injunction. On December 30, 2010, DP Plaintiffs filed an Amended CAC to add additional factual allegations in support of their claims.

On October 7, 2010, IP Plaintiffs—i.e. those who purchased products containing DBM or CCM that was manufactured, distributed or sold by one or more Defendants, their predecessors, subsidiaries, or co-conspirators during the Class Period—filed a CAC against Defendants under Section 16 of the Clayton Act, alleging violations of Section 1 of the Sherman Act, and under various state antitrust and consumer protection laws, and seeking similar relief as the DP Plaintiffs. On December 31, 2010, IP Plaintiffs filed an Amended CAC to add similar factual allegations as those added by DP Plaintiffs in their Amended CAC.

## II. DISCUSSION

Defendants now move to dismiss both Amended CACs pursuant to Federal Rule of Civil Procedure 12(b)(6). In doing so, Defendants argue that Plaintiffs (1) lack standing to assert their federal and state antitrust claims; (2) fail to allege a plausible antitrust conspiracy to fix DBM prices, allocate portions of the domestic DBM market, and allocate the domestic CCM market to Premier; and (3) fail to plead fraudulent concealment with particularity to equitably toll the applicable federal and state antitrust statutes of limitations. Defendants further argue that IP Plaintiffs' lack standing to assert their consumer protection and unfair competition claims, and that those claims are improperly pled.

### A. Standard of Review

In assessing the parties' arguments, the Court must apply the standard of review applicable to requests for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). That rule permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted. When considering a Rule 12(b)(6) motion, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). The Court's inquiry, however, "is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be

2012-1 Trade Cases P 77,878

afforded an opportunity to offer evidence in support of their claims." *In re Rockefeller Ctr. Prop., Inc.,* 311 F.3d 198, 215 (3d Cir.2002).

The Supreme Court recently clarified the Rule 12(b)(6) standard in two cases: *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), and *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The decisions in those cases abrogated the rule established in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." In contrast, *Bell Atlantic,* 550 U.S. at 545, held that "[f]actual allegations must be enough to raise a right to relief above the speculative level." Thus, the assertions in the complaint must be enough to "state a claim to relief that is plausible on its face," *id.* at 570, meaning that the facts alleged "allow [ ] the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Iqbal,* 129 S.Ct. at 1949; *see also, Phillips v. County of Allegheny,* 515 F.3d 224, 234–35 (3d Cir.2008) (In order to survive a motion to dismiss, the factual allegations in a complaint must "raise a reasonable expectation that discovery will reveal evidence of the necessary element," thereby justifying the advancement of "the case beyond the pleadings to the next stage of litigation.").

 **\*5**  When assessing the sufficiency of a complaint, the Court must distinguish factual contentions—which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted—from "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal,* 129 S.Ct. at 1949. Although for the purposes of a motion to dismiss the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 1950. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.*

When a claim is dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6), leave to amend and reassert that claim is ordinarily granted. *In re Burlington Coat Factory Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997). A claim may be dismissed with prejudice, however, if amending the complaint would be futile. *Id .* "Futile," as used in this context, means that the

complaint could not be amended to state a legally-cognizable claim. *Id.* (citing *Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir.1996)).

**B. Plaintiffs' Standing to Bring Antitrust Claims**

Standing is a jurisdictional prerequisite under Article III of the United States Constitution. "Under Article III, the Federal Judiciary is vested with the 'Power' to resolve not questions and issues but 'Cases' or 'Controversies.' " *Arizona Christian Sch. Tuition Org. v. Winn,* ——U.S. ——, ——, 131 S.Ct. 1436, 1441, 179 L.Ed.2d 523 (2011). "To state a case or controversy under Article III, a plaintiff must establish standing." *Id.* at 1442 (citing *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). The Supreme Court explained the elements of standing in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992):

> "First, the plaintiff must have suffered an 'injury in fact'— an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical." ' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court .' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' "

Defendants argue that Plaintiffs lack antitrust standing because they do not identify whether they purchased DBM or CCM. Specifically, Defendants contend that the alleged agreements regarding DBM and CCM, respectively, amount to "two conspiracies [that] are allegedly directed at different purchasers and encompass different time frames[,] and [n]othing indicates that anticompetitive activity in one market would have an effect on prices in the other market." (YAS Br., 9.) "Under these circumstances," according to Defendants, "a purchaser of [DBM] would suffer no redressable injury from anticompetitive conduct in the [CCM] market, and would accordingly lack standing to maintain claims based on such conduct (and vice versa)." (*Id.*).

 **\*6**  This argument is unavailing because, as discussed fully below, Plaintiffs allege a single conspiracy in the domestic MgO market comprised of two agreements: one to fix prices in and allocate shares of the domestic DBM market, and one to allocate the domestic CCM market to Premier. These

2012-1 Trade Cases P 77,878

agreements are interdependent in that Defendants entered into the CCM agreement in order to maintain the DBM agreement. As a result, price-fixing in the DBM market has an effect on prices in the CCM market, and vice versa, because the absence of one agreement would eliminate the consideration for the other.

As a general matter, DP Plaintiffs' allegation that they were "injured by having paid more for MgO[6] than they otherwise would have paid absent [D]efendants' unlawful conduct" (Direct CAC ¶ 56) is sufficient to establish antitrust standing. Standing to sue under Section 4 of the Clayton Act is determined by a five-factor test: [7] "(1) the causal connection between the antitrust violation and the harm to the plaintiff; (2) whether the plaintiff's alleged injury is of the type that the antitrust laws were intended to redress; i.e., did the plaintiff suffer antitrust injuries; (3) the directness of the injury; (4) the existence of more direct victims of the violation; and (5) the potential for duplicative recovery or complex apportionment of damages." *In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395, 399 (3d Cir.2000) (citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 495 U.S. 519, 538 (1983). Here, there is little doubt that those who purchased DBM and/or CCM directly from Defendants at supracompetitive prices have standing to sue for damages under Section 4 and for injunctive relief under Section 16. *See id.* at 401 ("It is difficult to imagine a more formidable demonstration of antitrust injury" than supra-competitive pricing.); *In re Mercedez Benz Anti–Trust Litig.,* 157 F.Supp.2d 355, 364 (D.N.J.2001) ("Where, as here, it is alleged that consumers paid a price higher than the price that would have been offered had the dealers been competing, the purpose of the antitrust laws is obviously thwarted."). Thus, DP Plaintiffs have standing to pursue their antitrust claims.

IP Plaintiffs, however, do not. While they seek solely injunctive relief under Section 16 of the Clayton Act—and therefore are not subject to the aforementioned five-factor test, *see* Note 7—they must still allege "(1) [a] threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust injury." *In re Warfin,* 214 F.3d at 400. In analyzing whether an antitrust injury proximately caused an alleged loss to an indirect purchaser, this Circuit has been guided by the Supreme Court's decision in *Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982).[8] *McCready* explained that "an antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but ... [i]t is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action." 457 U.S. at 476. Thus, in determining whether an injury was proximately caused by an antitrust violation for Article III standing purposes, courts should "look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2) more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy." *Id.* at 478. In doing so, they should consider whether the plaintiff's injury is "inextricably intertwined with the injury that the conspirators sought to inflict," *In re Warfarin,* 214 F.3d at 400–01 (purchasers of prescription drug whose active ingredient was the subject of a price-fixing conspiracy maintained standing to sue as indirect purchasers because "the excess amount paid" for the drug was "inextricably intertwined with the injury [Defendant] aimed to inflict"), or, put another way, "whether the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations ... would be likely to cause." *McCready,* 457 U.S. at 479 (quotations and citations omitted) (alleged conspiracy among psychiatrists and Blue Shield to take patients away from psychologists by refusing to reimburse Blue Shield subscribers for psychotherapeutic services resulted in "clearly foreseeable" harm to Blue Shield subscribers and "was a necessary step in effecting the ends of the alleged illegal conspiracy.").

**\*7** Here, IP Plaintiffs allege that "as a direct and proximate result of Defendants' and their co-conspirators' unlawful contract, combination and conspiracy, Plaintiffs and the Class members were injured and financially damaged in their business and property by having paid more for MgO Products than they would have absent Defendants' and their coconspirators' unlawful conduct." (Indirect CAC ¶ 54.) However, they fail to specify which MgO products—i.e. products containing DBM or CCM—they purchased. The mere fact that a product contains DBM or CCM does not necessarily mean that an increase in the price of that product is "inextricably intertwined" with, or an "a necessary step in achieving the ends" of, the alleged conspiracy to fix prices in and allocate shares of the domestic DBM and CCM markets. Indeed, the price of DBM and CCM would have a minimal foreseeable effect on the price of products containing trace amounts of them, but a significant foreseeable effect on the price of products in which they are major ingredients. Thus, without knowing which specific products IP Plaintiffs

purchased, it is impossible to determine whether an increase in their price is the type of injury that furthers the object of the alleged conspiracy to fix prices and allocate shares of the domestic DBM and CCM markets. Accordingly, IP Plaintiffs' federal antitrust claims are dismissed for lack of standing. [9] However, IP Plaintiffs are granted leave to amend in order to allege (1) the specific purchased products containing DBM or CCM and (2) the nexus between an increase in the price of those products and the alleged conspiracy to fix prices in and allocate shares of the domestic DBM and CCM markets.

Defendants further argue that IP Plaintiffs lack standing to assert their state law antitrust claims, with the exception of Iowa and California, because they only allege purchasing MgO products in Iowa and California. Specifically, Defendants contend that IP Plaintiffs "have no standing to bring claims based on violations of states in which they neither reside nor purchased any MgO products." (Sumitomo Br. (IP Pl.), 4.) IP Plaintiffs counter that "Defendants improperly confuse 'standing' with class certification issues," which, at this point, are premature. (IP Pl's Br., 30.) Specifically, IP Plaintiffs maintain that they "are not bringing claims in their own name in other states; rather they are seeking to *represent* similarly situated persons in other states," and that "[t]his issue, improperly raised by Defendants on a motion to dismiss will be addressed at class certification under Rule 23." (*Id.* at 31) (emphasis in original).

It is well-settled that a named plaintiff in a class action lawsuit is required to establish Article III standing. *See Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." (quotations and citations omitted)); *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("[T]he plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants."); *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." (citations omitted)); *Winer Family Trust v. Queen,* 503 F.3d, 319, 326 (3d Cir.2007) ("The initial inquiry in either case is whether the lead plaintiff individually has standing.").

**\*8** Less well-settled is whether, pre-class certification, named plaintiffs are required to establish standing for each and every claim set forth in a class action complaint, or whether it is sufficient to establish standing for a single claim because a court will determine if the named plaintiffs have standing to represent the unnamed class members seeking redress under the balance of asserted claims during the class certification process pursuant to Federal Rule of Civil Procedure 23. This issue typically arises in cases, such as this one, where named plaintiffs assert analogous causes of action under the laws of many states but cannot specifically tie their injuries to each state. Indeed, here, IP Plaintiffs, who allege that they purchased MgO products in Iowa and California, assert violations of twenty-five states' antitrust laws. [10]

Courts, including this one, have held that "the fact that the named Plaintiffs may not have individual standing to allege violations of ... laws in states other than those in which they purchased Defendants' [product] is immaterial [because] [t]he issue ... is one of predominance—whether questions of law or fact common to all class members predominate over any questions affecting only individual members." *Ramirez v. STI Prepaid LLC,* 644 F.Supp.2d 496, 505 (D.N.J.2009) (quotations and citations omitted); *see also In re Grand Theft Auto Video Game Consumer Litig. (No. II),* No. 06–MD–1739, 2006 WL 3039993, at \*3 (S.D.N.Y. Oct. 25, 2006) ("The relevant question ... is not whether the Named Plaintiffs have standing to sue Defendants—they most certainly do—but whether their injuries are sufficiently similar to those of the purported Class to justify the prosecution of a nationwide class action. This question is, at least in the first instance, appropriately answered through the class certification process."); *In re Buspirone Patent Litig.,* 185 F.Supp.2d 363, 377 (S.D.N.Y.2002) ("[T]hese alleged problems with standing will not arise unless class certification is granted. If certification is granted, the proposed class would contain plaintiffs who have personal standing to raise claims under the laws governing purchases in all of the [ ] states, and the only relevant question about the named plaintiffs' standing to represent them will be whether the named plaintiffs meet the ordinary criteria for class standing ...").

Other courts find that they must initially "review[ ] the standing of actual, not proposed plaintiffs" to assert the claims in a class action complaint because "[t]he alternative ... would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with

2012-1 Trade Cases P 77,878

respect to injuries in potentially every state in the Union." *In re Wellbutrin XL Antitrust Litig.,* 260 F.R.D. 143, 154–56 (E.D.Pa.2009); *see also In re Potash Antitrust Litig.,* 667 F.Supp.2d 907, 924 (N.D.Ill.2009) (named plaintiffs are required to establish standing for each claim under which they purport to represent class members because "[t]o have standing as a class representative, the plaintiff must be part of the class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." (quotations and citations omitted)), *rev'd on other grounds by, Minn–Chem Inco. v. Agrium Inco.,* ––– F.3d ––––, No. 10–1712, 2011 WL 4424789 (7th Cir. Sept.23, 2011); *In re Packaged Ice Antitrust Litig.,* 08–md–01952, 2011 WL 891160, at \*11 (E.D.Mich. Mar. 11, 2011) ("[N]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury.").

**\*9** Two Supreme Court decisions, *Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) and *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), are at the heart of this issue. In *Amchem,* the Supreme Court reviewed a challenge to certification of a global settlement class involving persons who were exposed to asbestos. *See* 521 U .S. at 591–92. In doing so, it analyzed the role of settlement in determining class certification under Rule 23, as well as arguments set forth by objectors that certain members of the settlement class lacked standing to sue because they had not sustained a cognizable injury or because their injury was not redressable. *Id.* at 612. The Court declined to reach the standing arguments because it found the class certification issues under Rule 23 to be dispositive. *Id.* Consequently, the Court held that because resolution of the class certification issues "here is logically antecedent to the existence of Article III issues, it is appropriate to reach them first." *Id.* (citation omitted).

The Court further explained that it was "follow[ing] the path taken by the [Third Circuit] Court of Appeals" in "declin[ing] to reach these issues because they 'would not exist but for the [class-action] certification.' " *Id.* (quoting *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 623 (3d Cir.1996)). To be sure, in *Georgine,* the Court of Appeals, when faced with class certification and Article III issues simultaneously, decided the class certification issues first because they were dispositive. 83 F.3d at 623. In doing so, the Court found "it prudent not to decide issues unnecessary to the disposition of the case, especially when many of these issues implicate constitutional questions." *Id.* (citing

*Spector Motor Serv., Inc. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) (expressing the rule that courts will avoid constitutional questions when possible)). Thus, these rulings echo the "fundamental and longstanding principle of judicial restraint [ ] requir[ing] that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988).

The *Ortiz* court also dealt with certification issues regarding a global settlement class for asbestos related injuries and arguments regarding the Article III standing of certain class members who petitioners alleged did not suffer an injury-in-fact. 527 U.S. at 821, 831. As in *Amchem,* the Court decided to address the class certification issues before the Article III questions. *Id.* at 831. In doing so, it explained:

> Ordinarily, of course, this or any other Article III court must be sure of its own jurisdiction before getting to the merits. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). But the class certification issues are, as they were in *Amchem,* "logically antecedent" to Article III concerns, 521 U.S., at 612, 117 S.Ct. 2231, 138 L.Ed.2d 689, and themselves pertain to statutory standing, which may properly be treated before Article III standing, *see Steel Co., supra,* at 92, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210. Thus the issue about Rule 23 certification should be treated first, "mindful that [the Rule's] requirements must be interpreted in keeping with Article III constraints...." *Amchem, supra,* at 612–613, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689.

**\*10** *Id.*

Thus, *Amchem* and *Ortiz* stand for the proposition that, in cases where a court is presented with class certification and Article III standing issues simultaneously, and the class certification issues are dispositive in that they pertain to statutory standing—i.e. whether a statute authorizes a given party to sue in the first place, the certification issues are "logically antecedent" to the standing issues and the court may therefore elect to address the certification issues first in the interest of judicial restraint. Under these circumstances, if a court finds that "certification of [a] proposed class [is] improper, the issue of certain class members' standing would [be] moot." *In re Welbutrin XL,* 260 F.R.D. at 153.

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2012-1 Trade Cases P 77,878

Here, however, the Court is presented solely with the issue of whether the named IP Plaintiffs have standing to assert the causes of action in the Indirect CAC, a threshold issue that the Court must address. *See Lewis* 518 U.S. at 357. Contrary to *Ramirez* and *In re Grand Theft Auto,* the "[Supreme] Court's standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 335, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006); *see also Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."); *Blum v. Yaretsky,* 457 U.S. 991, 999, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) ("It is not enough that the conduct of which the plaintiff complains will injure *someone.* The complaining party must also show that he is within the class of persons who will be concretely affected. Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."). Otherwise, a plaintiff would be able to bring a class action complaint under the laws of nearly every state in the Union without having to allege concrete, particularized injuries relating to those states, thereby dragging defendants into expensive nationwide class discovery, potentially without a good-faith basis. In other words, the plaintiff would have to do "no more than name the preserve on which he intends to hunt." *Johnson v. Ga. Highway Express, Inc.,* 417 F.2d 1122, (5th Cir.1969), overruled on other grounds by *Griffin v. Dugger,* 823 F.2d 1476 (11th Cir.1987). Accordingly, because the named IP Plaintiff lack standing to assert antitrust violations under the laws of Arizona, the District of Columbia, Hawaii, Illinois, Maine, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, and West Virginia, *see* Note 10, IP Plaintiffs' claims under those laws are dismissed.

## C. The Alleged MgO Conspiracy

### i. One Conspiracy or Two

**\*11** As an initial matter, Defendants maintain that Plaintiffs allegations are confusing to the point where it is impossible to determine whether the alleged conspiracy relates to DBM, CCM, or MgO in general. As a result, Defendants contend that Plaintiffs fail to allege a plausible antitrust conspiracy. This contention is unfounded. While Plaintiffs at times refer to anticompetitive conduct regarding MgO generally, it is

clear from the surrounding allegations whether such conduct concerns DBM or CCM. [11] Indeed, as evidenced by their next contention, Defendants have no problem categorizing Plaintiffs' individual allegations as relevant to DBM or CCM.

On that note, Defendants contend that, to the extent that the Court finds that Plaintiffs allege distinct conspiracies regarding DBM and CCM, respectively, the Court should analyze the allegations relating to each conspiracy separately and require that those allegations independently meet the pleading requirements of *Twombly* and *Iqbal.* Plaintiffs counter that they allege a single MgO conspiracy comprised of intertwined and interdependent anticompetitive agreements.

As Plaintiffs point out, it is well-settled that "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *see also In re Fine Paper Antitrust Litig.,* 685 F.2d 810, 822 (3d Cir.1982) ("a seriatim examination of [ ] claims against each [ ] conspiracy defendant[ ] as if they were separate lawsuits ... overlook[s] the conspiracy itself."). Defendants contend that the Supreme Court's ruling in *Continental Ore* is inapposite because that case concerned a monopolistic exclusion conspiracy, as opposed to a price-fixing conspiracy. This contention is remarkably unpersuasive. The very case that *Continental Ore* cites for the proposition that a court must look to an alleged conspiracy as a whole, *United States v. Patten,* 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333 (1913), concerned a conspiracy to artificially inflate the price of cotton. Furthermore, there is no indication that *Continental Ore* limited its ruling to conspiracies based on monopolistic exclusion. *See* 370 U.S. at 699 ("we do not believe that ... liability under the antitrust laws can be measured by any rigid or mechanical formula ..."). Finally, Defendants fail to present, nor does the Court see, a single reason why it would be any less logical or equitable to assess an alleged price-fixing or market allocation conspiracy as a whole than a monopolistic exclusion conspiracy.

Defendants' contention that the Court should analyze Plaintiffs' allegations separately with respect to DBM and CCM because Plaintiffs allege "two different courses of conduct as to the two different products at two different times" (Sumitomo Reply Br., 3) is also unavailing. While it is true that Defendants initially "agreed to fix prices

2012-1 Trade Cases P 77,878

and allocate markets for DBM," ("the DBM Agreement") and subsequently agreed to allocate the domestic CCM market to Premier ("the CCM Agreement"), (*id.*), those agreements are not mutually exclusive. To the contrary, the CCM Agreement is dependent on the DBM Agreement, and vice versa. *See In re Vitamins Antitrust Litig.,* 320 F.Supp.2d 1, 16 (D.D.C.2004) (recognizing the potential "interdependency between various branches of a common conspiracy."). Specifically, Defendants entered into the CCM Agreement in order to restore and maintain the DBM Agreement after Premier broke that agreement due to Sumitomo and YAS's attempt to enter the domestic CCM market. Consequently, the absence of one eliminates the consideration for the other. Moreover, "[h]orizontal antitrust conspiracies commonly include sellers in more than one relevant market." *In re Vitamins Antitrust Litig.,* No. MISC 99–197, 2000 WL 1475705, at \*10 (D.D.C. May 9, 2000). Accordingly, the Court will treat Plaintiffs CACs as alleging a single conspiracy not to compete in the sale of two forms of MgO.

### ii. The Necessity of Allegations Regarding the MgO Market

**\*12** Defendants argue that Plaintiffs fail to allege an unlawful price-fixing and market allocation conspiracy because they do not set forth relevant market conditions and Sumitomo's, YAS's, and Premier's relative market power indicating that they plausibly could have fixed the price of DBM and allocated the domestic DBM and CCM markets. Plaintiffs argue that they are alleging per se violations of Section 1 of the Sherman Act and therefore "Defendants' arguments concerning market power and relevant markets are legally irrelevant." (DP Pl's. Br., 12.)

"Section 1 of the Sherman Act provides: Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 314 (3d Cir.2010) (quoting 15 U.S.C. § 1). "[T]his statutory language imposes two essential requirements on an antitrust plaintiff." *Id.* "First, the plaintiff must show that the defendant was a party to a contract, combination ... or conspiracy." *Id.* at 315 (quotation and citation omitted). This requires the plaintiff to demonstrate "some form of concerted action" indicating a "unity of purpose or a common design and understanding or a meeting of the minds or a conscious commitment to a common scheme." *Id.* (quotations and citations omitted).

Second, "the plaintiff must show that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade ." *Id.* (quotation and citation omitted). "[T]he usual standard applied to determine whether a challenged practice unreasonably restrains trade is the so-called rule of reason." *Id.* (quotation and citation omitted). "[U]nder a rule-of-reason analysis, the plaintiff bears the initial burden of showing that the alleged [agreement] produced an adverse, anticompetitive effect within the relevant geographic market." *Id.* (quotation and citation omitted). "[S]uccessful attempts to meet this burden typically include a demonstration of defendants' market power, as a judgment about market power is [a] means by which the effects of the [challenged] conduct on the market place can be assessed." *Id.* at 315–16 (quotation and citations omitted).

"If the plaintiff carries this burden, the court will need to decide whether the anticompetitive effects of the practice are justified by any countervailing pro-competitive benefits." *Id.* However, "Judicial experience has shown that some classes of restraints" almost never have "redeeming competitive benefits," and therefore a court need not apply the rule of reason analysis. *Id.* Instead, they are "subject to a 'per se' standard." *Id.* "Paradigmatic examples are horizontal agreements among competitors to fix prices or to divide markets." *Id.* (quotation and citation omitted). If a plaintiff's allegations "fall into one of the recognized classes," an unreasonable restraint on trade is "conclusively presumed" and therefore "plaintiffs are relieved of the obligation to define a market and prove market power." *Id.* (citations omitted).

**\*13** As discussed below, Plaintiffs sufficiently allege that Defendants entered into (1) a horizontal agreement to fix prices in and allocate shares of the domestic DBM market and (2) a horizontal agreement to allocate the domestic CCM market to Premier. Accordingly, Plaintiffs assert per se antitrust violations that do not require allegations regarding the nature of the domestic DBM and CCM markets or Defendants' power within those markets. [12]

### iii. The DBM Agreement

Defendants argue that Plaintiffs' allegations of an agreement to fix prices in and allocate shares of the domestic DBM market are facially insufficient because (1) they fail to provide the substance of the agreement, (2) they fail to rule out potentially alternative, lawful explanations for such an agreement, and (3) their "factual narrative is inherently

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2012-1 Trade Cases P 77,878

implausible." (Sumitomo (DP Pl's.) Br., 15 .) Plaintiffs argue that their allegations of a price-fixing and market allocation agreement are sufficient because (1) they "explicitly state who was conferring with whom about MgO pricing, markets and customers" (DP Pl's. Br., 15.), and (2) Defendants' arguments regarding the inherent plausibility of the alleged conspiracy implicate factual questions that are not properly resolved on a motion to dismiss.

Defendants' contention that Plaintiffs' allegations are inadequate because they "fail to disclose the actual substance of the alleged conversations or agreements" (Sumitomo (DP Pl's.) Br., 14) is unavailing. *Twombly* does not require detailed allegations regarding the specific nature of a price-fixing or market allocation agreement; rather, "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." 550 U.S. at 556. Put another way, a complaint "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." *Id.* Requiring Plaintiffs to set forth the full details of an antitrust conspiracy at this stage of the litigation would present an onerous burden because "in antitrust cases, [ ] the proof is largely in the hands of the alleged conspirators." *In re Neurontin Antitrust Litig.,* No. 02–1390, 2009 WL 2751029, at *7 (D.N.J. Aug.28, 2009) (quoting *Hosp. Building Co. Trustees of Rex Hosp.,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)).

Here, Plaintiffs allege that (1) a significant portion of DBM consumed in the United States comes from China; (2) during the Class Period, Premier and Sumitomo bought nearly all Chinese DBM available for purchase and resold it to their customers in the United States; (3) Mr. Ahl of Premier "regularly called" Mr. Sumikawa of YAS "to discuss fixing Premier's and Sumitomo's [DBM] prices and allocating their respective MgO accounts in the U.S" (Direct CAC ¶ 34; Indirect CAC ¶ 42); (4) these market allocation and price-fixing schemes were implemented by Mr. Ahl and his successors at Premier and Mr. Wakisama of Sumitomo; (5) at the 2004 Tulsa meeting, Mr. Akiyama recounted to Mr. Sumikawa "multiple discussions" between him and Mr. Ahl to set DBM prices and allocate DBM markets "and ensure that Sumitomo was maintaining its agreement with Premier to fix [DBM] prices and allocate [DBM] markets," (Direct CAC ¶ 40; Indirect CAC ¶ 49); and (5) when Mr. Vannorsdel allegedly "expressed concern about compromising his relationship with Premier by helping facilitate Sumitomo and YAS's involvement" in the CCM market, Mr. Akiyama responded, " 'Don't be concerned

because we [Sumitomo] talk with Premier on a daily basis to set prices and to discuss what accounts they can have.' " (Direct CAC ¶ 41; Indirect CAC ¶ 50.)

**\*14** These allegations plausibly suggest that Defendants entered into an agreement to fix prices in and allocate shares of the domestic DBM market, the specifics of which can be reasonably expected to be revealed in discovery. Plaintiffs state (1) the subject of the alleged agreement, (2) the parties to the agreement and the specific individuals that discussed and implemented the agreement, and (3) the context in which the agreement arose. This is sufficient to withstand a motion to dismiss.

Defendants' contention that Plaintiffs fail to assert a plausible antitrust conspiracy because their allegations could, in fact, refer to a lawful vertical agreement between Sumitomo and Premier to fix prices for DBM whereby Sumitomo purchases DBM from Premier as a reseller, is irrelevant. At the pleading stage, Plaintiffs need only set forth allegations that create an inference of an unlawful agreement, *Twombly,* 550 U.S. at 556, which, as previously discussed, they have done; they need not set forth allegations tending to rule out potential alternative explanations. [13]

Finally, Defendants' contention that the alleged DBM Agreement is "inherently implausible" in that, on the one hand, Sumitomo was allegedly worried about retaliatory action by Premier for attempting to enter the CCM market and, on the other hand, "could give credible assurances to the Vannorsdels that it could shield them from Premier['s] retaliation because of [Sumitomo's] 'daily' contact with Premier," (Sumitomo (DP Pl.'s) Br., 15) is similarly irrelevant because it asks the Court to improperly assess the merits of Plaintiffs' allegations. [14] *See Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.,* 525 F.3d 8, 17 (D.C.Cir.2008) ("*Twombly* was concerned with the plausibility of an inference of conspiracy, not with the plausibility of a claim. A court deciding a motion to dismiss must not make any judgment about the probability of the plaintiff's success ... the court must assume that all the allegations in the complaint as true (even if doubtful in fact)" (quotations and citations omitted)). Thus, Plaintiffs have sufficiently alleged an unlawful agreement among Defendants to fix prices in and allocate shares of the domestic DBM market.

### iv. The CCM Agreement

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2012-1 Trade Cases P 77,878

Defendants contend that Plaintiffs fail to allege the existence of an unlawful agreement to allocate the domestic CCM market to Premier because (1) they merely allege parallel conduct that does not indicate concerted action, (2) there are obvious alternative explanations for Sumitomo and YAS's decision not to enter the CCM market, and (3) they fail to establish that Defendants were competitors in the CCM market. Plaintiffs counter that they are not relying on parallel conduct but rather direct admissions of an agreement among Defendants to allocate the domestic CCM market to Premier, and therefore Defendants' proffered alternative explanations are irrelevant.

As previously discussed, Section 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade ... but only restraints effected by a contract, combination, or conspiracy." *Twombly*, 550 U.S. at 553 (quotation and citation omitted). This is because seemingly anticompetitive conduct may be just as "consistent with conspiracy ... [as] with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 554 (citation omitted). Accordingly, "[t]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express." *Id.* at 553 (quotation and citation omitted). "Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557.

 **\*15** This is usually accomplished by pleading one or more "plus factors" that "indicate the existence of an actionable agreement." *In re Ins. Brokerage*, 618 F.3d at 321. While "[t]here is no finite set of such criteria," the Court of Appeals has identified "at least three such plus factors: (1) evidence that the defendant had a motive to enter into a[ ] conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Id.* at 321–22 (quotations and citation omitted).

Here, Plaintiffs' allegations suggest an agreement among Defendants to allocate the CCM market to Premier. Plaintiffs allege that (1) representatives from Sumitomo and YAS met with others at a Tulsa hotel, in the summer of 2004, to discuss entering the domestic CCM market in order to fill Sumitomo's barge capacity; (2) Premier discovered their plan to enter the domestic CCM market and retaliated by lowering DBM

prices; and (3) as a result, Sumitomo and YAS agreed with Premier to remain out of the CCM market.

To be sure, contrary to Plaintiffs' contentions, these allegations do not amount to a direct admission of an unlawful agreement to allocate the CCM market to Premier; taken in isolation, they merely amount to parallel conduct plus a conclusory allegation of an agreement. Placing these allegations in the context of the CACs as a whole, however, Plaintiffs successfully demonstrate the first plus factor—that Sumitomo and YAS had a motive to enter into an unlawful agreement with Premier to stay out of the domestic CCM market—and provide a plausible context for that agreement. As previously discussed, Sumitomo and YAS maintained an agreement with Premier to fix prices in and allocate shares of the domestic DBM market. As a result, as the CACs indicate, Sumitomo and YAS wanted to enter the CCM market undetected so that they could continue to maintain their agreement with Premier in the DBM market. When Premier discovered their plans and, in response, cut prices in the DBM market, Sumitomo and YAS agreed with Premier to stay out of the CCM market with the motive of restoring and maintaining their agreement in the DBM market.

In this context, Defendants' alternative explanations that a profit-maximizing entity could independently decide not to enter a market in which (1) it remained unfamiliar with the product and its customers and (2) the dominant player recently cut prices are by no means "obvious" or "more plausible" (Sumitomo (DP Pl's.) Br., 18) than an illegal agreement to stay out of the CCM market and therefore do not provide a basis for dismissal. At the pleading stage, "a claim of conspiracy predicated on parallel conduct should be dismissed if common economic experience, or the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for defendants' common behavior." *In re Ins. Brokerage*, 618 F.3d at 326. Plaintiffs' allegations need not rule out all potential alternative explanations. *See Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 352 (2d Cir.2010) ("Although the *Twombly* court acknowledged that for purposes of summary judgment a plaintiff must present evidence that tends to exclude the possibility of independent action, it specifically held that, to survive a motion to dismiss, plaintiffs need only enough factual matter (taken as true) to suggest that an agreement was made" (quotations and citations omitted)).

 **\*16** Finally, Sumitomo's argument that Plaintiffs fail to allege a plausible agreement to allocate the CCM market

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2012-1 Trade Cases P 77,878

to Premier because there is no indication that Defendants were actual or potential competitors in the CCM market is unavailing. Sumitomo specifically contends that Plaintiffs must establish that it had the intent and capability of entering the CCM market as a competitor in order to allege a plausible agreement among Defendants to allocate the CCM market to Premier. However, the authority cited by Sumitomo provides little support for this contention. *See Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46, 49–50, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (parties need not have competed in the same territorial market to unlawfully allocate that market); *Andrx Pharm, Inc. v. Bioval Corp., Int'l,* 256 F.3d 799, 806–07 (D.C.Cir.2001) (potential competitor must show background and experience in new market, financial capability to enter market, and affirmative steps toward entry in order to establish injury-in-fact for standing to sue under Section 4 of the Clayton Act); *Engine Specialities, Inc. v. Bombardier Ltd.,* 605 F.2d 1, 9 (1st Cir.1979) (to sustain jury finding of unlawful horizontal market allocation agreement among potential competitors, there must have been sufficient support in the record to establish that potential competitors had the "necessary desire, intent, and capability to enter the market").

To be sure, the Court of Appeals has generally recognized that the existence of an unlawful horizontal agreement to allocate a given market must occur among competitors or potential competitors in that market:

> An agreement among persons who are not actual or potential competitors in a relevant market is for Sherman Act purposes *brutum fulmen* ... To some extent, of course, a horizontal agreement tends to define the relevant market, for it tends to show that the parties to it are at least potential competitors. If they were not, there would be no point to such an agreement. Thus its very existence supports an inference that it would have an effect in a relevant market. Where, ... however, the disputed issue is the existence or scope of the alleged horizontal agreement that is to be inferred from circumstantial evidence, the first inquiry must be whether or not each firm alleged to have been a

party to it was an actual or potential competitor in that market.

*United States v. Sargent Elec. Co.,* 785 F.2d 1123, 1127 (3d Cir.1986) (reversing dismissal of indictment on double jeopardy grounds). However, Sumitomo fails to present, nor is the Court aware of, any authority requiring a purchaser plaintiff to specifically establish, at the pleading stage, that the parties to a horizontal agreement to allocate a given market were competitors or potential competitors in that market. To require Plaintiffs, pre-discovery, to establish Sumitomo's background and experience in the CCM market, its financial capability to enter that market, and the specific steps taken by Sumitomo to enter it, would be overly onerous, as much of this information is likely to be exclusively in the hands of Sumitomo. [15] Thus, Plaintiffs have sufficiently alleged an unlawful agreement among Defendants to allocate the domestic CCM market to Premier.

### *v. YAS' Involvement in the Alleged Conspiracy*

**\*17** YAS separately argues that Plaintiffs fail to establish its participation in the alleged conspiracy because they fail to show that it came to a meeting of the minds with Sumitomo and Premier to (1) fix prices in and allocate shares of the domestic DBM market and (2) allocate the domestic CCM market to Premier. [16] Plaintiffs counter that (1) they have set forth direct allegations indicating YAS's knowledge and participation in the alleged conspiracy, and (2) YAS need not have played the same role in the conspiracy, maintain the same motives as Sumitomo or Premier for participating in it, or sell MgO to be held liable.

As previously discussed, to hold YAS or any other Defendant liable, Plaintiffs must set forth allegations suggesting that YAS maintained "unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme" with Sumitomo and Premier to (1) fix prices in and allocate shares of the domestic DBM market, and (2) allocate the CCM market to Premier. *In re Ins. Brokerage,* 618 F.3d at 315 (quotations and citation omitted). This does not require a showing that YAS knew of or participated in every transaction in furtherance of or related to the alleged conspiracy. *See TV Signal Co. of Aberdeen v. American Tel. & Tel. Co.,* 462 F.2d 1256, 1259 (8th Cir.1972) ("Although knowledge is implicit in the requirement of unity of purpose, no case of which we are aware requires that each party to a conspiracy knows of each

transaction encompassed by the conspiracy in order to be held accountable therefore."); *In re Vitamins Antitrust Litig.,* 320 F.Supp.2d 1, 15 (D.D.C.2004) ("Although Plaintiffs must show that each Defendant had knowledge of an agreement as to the overall conspiracy, they need not show (1) evidence of a formal agreement, or (2) knowledge, on behalf of the Defendant, of every detail of the alleged conspiracy."); *In re Mercedez–Benz,* 157 F.Supp.2d at 375 ("That a particular defendant may or may not have joined in a specific overt act in furtherance of the conspiracy ... does not affect its status as a conspirator."). On the other hand, "knowledge alone [of the conspiracy] is not sufficient" to hold it liable. *In re Vitamins,* 320 F.Supp.2d at 16. Plaintiffs must therefore set forth allegations suggesting that YAS (1) had knowledge of the conspiracy to fix prices and allocate shares of the domestic DBM market, and allocate the CCM market to Premier, and (2) intended to join that conspiracy. *Id.* "[A] a party progresses form mere knowledge of an endeavor to intent to join it when there is 'informed and interested cooperation, stimulation, instigation. And there is also a stake in the venture which, even if it may not be essential, is not irrelevant to the question of conspiracy.' " *Id.* (quoting *Direct Sales Co. v. United States,* 319 U.S. 703, 713, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943)).

### 1. The DBM Agreement

Plaintiffs allege that Mr. Sumikawa of YAS (1) facilitates Sumitomo's purchases of Chinese DBM for resale in the domestic DBM market, (2) received regular phone calls from Mr. Ahl of Premier "to discuss fixing Premier's and Sumitomo's [DBM] prices and allocating their respective [DBM] accounts in the U.S," (Direct CAC ¶ 34; Indirect CAC ¶ 42), and (3) attended the 2004 Tulsa meeting where (i) Mr. Akiyama of Sumitomo recounted to him "multiple discussions" between him and Mr. Ahl to set DBM prices and allocate DBM markets "and ensure that Sumitomo was maintaining its agreement with Premier to fix [DBM] prices and allocate [DBM] markets," (Direct CAC ¶ 40; Indirect CAC ¶ ) and (ii) it was revealed that Sumitomo communicates with Premier on a daily basis fix prices and allocate accounts. These allegations create a plausible inference that YAS had knowledge of an agreement to fix prices and allocate shares of the domestic DBM market and the intent to join it. Accepting Plaintiff's allegations as true and making all reasonable inferences in their favor, YAS' facilitation of Sumitomo's DBM purchasing indicates a plausible stake in the DBM Agreement, while its receipt of phone calls to discuss the Agreement and attendance at a meeting at which it was revealed indicates that YAS had knowledge of the DBM

Agreement and that it engaged in informed and interested cooperation.

**\*18** Citing to *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) and *Hinds County, Mississippi v. Wachovia Bank N.A.,* 620 F.Supp.2d 499, 518 (S.D.N.Y.2009), YAS argues that these allegations should be "discounted" because they amount to mere "averments of agreements made at some unidentified place and time." (YAS Br., 4.) *In re Elevator Antitrust Litig.* concerned a list of "basically every type of conspiratorial activity that one could imagine ... in entirely general terms without any specification of any particular activities by any particular defendant." 502 F.3d at 50. Similarly, *Hinds County* dealt with conclusory allegations of " 'per se illegal horizontal communications' in support of [an] alleged conspiracy." 620 F.Supp.2d at 518. Here, in contrast, Plaintiffs allege (1) the way in which YAS participates with Sumitomo—a member of the conspiracy—in the domestic DBM market, (2) phone calls from Premier—another party to the conspiracy—to YAS to discuss fixing prices in and allocating shares of the domestic DBM market, and (3) YAS's attendance at a meeting where Sumitomo—its partner in the domestic DBM market—recounted to YAS discussions in which it set prices and allocated shares of the domestic DBM market with Premier. These allegations, do not amount to a mere "list of theoretical possibilities," *In re Elevator Antitrust Litig.,* 502 F.3d at 50, or "require the Court to assume the existence of the conspiracy." *Hinds County,* 620 F.Supp.2d at 518. Rather, they make the alleged conspiracy more plausible.

YAS further argues that "it is wholly implausible that [it] (a minor player that was not itself a manufacturer, importer or seller [17] ) would have discussed fixing Premier's and Sumitomo's [DBM] prices," particularly since Plaintiffs fail to "allege that YAS had any ability to influence (let alone) dictate Sumitomo's [DBM] prices, nor which customers Sumitomo dealt with." (YAS Br., 5.) As previously discussed, this line of argument is not only improper at the pleading stage—where the Court must accept Plaintiffs' allegations as true—it is also unpersuasive. There is nothing "wholly implausible" about YAS participating in discussions to fix prices in and allocate shares of the domestic DBM market. Sumitomo was only able to participate in the domestic DBM market in the first place due to YAS's relationship with Chinese mines from which Sumitomo could purchase DBM and magnesite. Consequently, it is certainly plausible that YAS could participate in discussions with co-conspirators to fix prices and allocate shares of the DBM market.

### 2. The CCM Agreement

Plaintiffs' allegations suggesting an agreement among Sumitomo and Premier to allocate the CCM market to Premier apply with equal force to YAS. As previously discussed, Plaintiffs allege that (1) Sumitomo and YAS met with others at a Tulsa hotel, in the summer of 2004, to discuss entering the domestic CCM market in order to fill Sumitomo's barge capacity; (2) Premier discovered their plan to enter the domestic CCM market and retaliated by lowering DBM prices to keep Sumitomo and YAS out of the CCM market; and (3) as a result, Sumitomo and YAS agreed with Premier to remain out of the CCM market.

**\*19** YAS argues that these allegations are conclusory because they "provide [ ] no details whatsoever about YAS's participation in this alleged agreement, including what role it is alleged to have played." (YAS Br., 7.) At the pleading stage, however, Plaintiffs need not allege the specific nature of YAS's or any other Defendant's participation in the agreement to allocate the CCM market to Premier. *See In re Static Random Access Memory (SRAM) Antitrust Litig.,* 580 F.Supp.2d 896, 904 (N.D.Cal.2008) ("Although Plaintiffs will need to provide evidence of each Defendants' participation [at summary judgment] ... they now only need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy."). As previously discussed, Plaintiffs must set forth allegations suggesting that YAS had knowledge of the agreement and the intent to join it. Plaintiffs' allegations that YAS, as Sumitomo's partner in the domestic MgO market, (1) attended a meeting to arrange for Sumitomo to enter the domestic CCM market and (2) subsequently agreed with Sumitomo and Premier to allocate that market to Premier in order to maintain their agreement to fix prices and allocate shares of the domestic DBM market, do just that.

Finally, like Sumitomo, YAS argues that it cannot be held liable for the alleged agreement to allocate the domestic CCM market to Premier because Plaintiffs fail to establish that YAS was an actual or potential competitor in that market. For the reasons discussed in Point II.C*iv*, at the pleading stage, Plaintiffs, as purchasers, need not establish that YAS was an actual or potential competitor in the CCM market in order to allege its participation in a horizontal conspiracy. Furthermore, YAS's (1) role in facilitating Sumitomo's purchase of Chinese DBM and (2) attendance at the 2004 Tulsa meeting where it, Sumitomo, and the Vannorsdels discussed entering into the CCM market, suggests that YAS

intended to participate with Sumitomo in the CCM market in the same way as they had been participating in the DBM market. Thus, Plaintiffs have set forth allegations plausibly suggesting that YAS participated in an agreement to allocate the CCM market to Premier.

### D. Statute of Limitations and Fraudulent Concealment

Actions brought under the Clayton Act are subject to a four-year statute of limitations. 15 U.S.C. § 15b. In an antitrust conspiracy that continues over a period of years, each overt act in furtherance thereof that injures the plaintiff —for example, the selling of a price-fixed product—starts the statute of limitations period running for that particular act. *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 189, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 ("Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business" (citations omitted)). However, "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr,* 521 U.S. at 190 (citations omitted).

**\*20** Defendants argue that Plaintiffs' federal antitrust claims are barred by the applicable four-year statute of limitations. Specifically, Defendants contend that Plaintiffs (1) fail to allege overt acts in furtherance of the alleged conspiracy that occurred after 2004 and (2) fail to plead fraudulent concealment with particularity to otherwise toll the statute of limitations. Plaintiffs do not dispute that they fail to allege overt acts after 2004, but maintain that they plead fraudulent concealment with the requisite particularity to toll the statute of limitations.

The equitable doctrine of fraudulent concealment applies to every federal statute of limitations. *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946). To toll a statute of limitations through fraudulent concealment, a plaintiff must show "(1) an affirmative act of concealment; (2) which misleads or relaxes the plaintiff's inquiry, who (3) exercised due diligence in investigating his cause of action ." *In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1178–79 (3d Cir.1993) (citation omitted). In addition, allegations of fraudulent concealment must be pled with particularity in accordance with Federal Rule of Civil Procedure 9(b). *In re Mercedes–Benz,* 157 F.Supp.2d at 368.

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2012-1 Trade Cases P 77,878

However, "Rule 9[ (b) ] does not require plaintiffs to plead facts that, by the nature of the alleged fraud, are within the defendants' control." *Id.* (citing *In re Craftmatic Secs. Litig.,* 890 F.2d 628, 645 (3d Cir.1989)). Indeed, "[c]ourts must be sensitive to the fact that [a rigid] application of Rule 9(b) prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud." *In re Craftmatic,* 890 F.2d at 645 (quotation and citation omitted). "Thus, courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control." *Id.* Accordingly, under the more flexible application of Rule 9(b), Plaintiffs need not allege the specific information that is exclusively within Defendants' knowledge or control. *See id.* at 646. However, Plaintiffs must allege facts suggesting fraudulent concealment and "why additional information lies exclusively within the defendants' control." *Id* .

As discussed fully below, Plaintiffs fail to satisfy each element of fraudulent concealment, thus requiring dismissal of their federal antitrust claims as time-barred. However, the Court will grant Plaintiffs leave to amend their allegations of fraudulent concealment to equitably toll the statute of limitations. [18]

### i. Affirmative Acts of Concealment

Defendants argue that (1) Plaintiffs fail to sufficiently allege affirmative acts of concealment and (2) their allegations that the MgO conspiracy is self-concealing cannot satisfy the first element of fraudulent concealment. [19] Plaintiffs contend that they have alleged (1) a self-concealing conspiracy that satisfies the first element of fraudulent concealment, or, (2) in the alternative, affirmative acts of concealment committed by Defendants.

**\*21** The Court of Appeals has yet to define what constitutes an affirmative act of concealment in antitrust cases. However, courts have generally taken two distinct views. *In re Mercedez–Benz,* 157 F.Supp.2d at 368. The first requires a plaintiff to show one or more affirmative acts to conceal an antitrust conspiracy that are wholly extrinsic to the conspiracy itself. *See, e.g., Colorado v. Western Paving Constr. Co.,* 630 F.Supp. 206, 2010 (D.Colo.1986), *aff'd en banc by an equally divided court,* 841 F.2d 1025 (10th Cir.1988), *cert. denied,* 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988). The second also requires a plaintiff to show one or more affirmative acts of concealment, but those acts may be part and parcel to, or in furtherance of, the conspiracy. *Supermarket of Marlington, Inc. v. Meadow Gold Dairies,*

*Inc.,* 71 F.3d 119, 122 (4th Cir.1995) (citing *Texas v. Allen Constr. Co.,* 851 F.2d 1526, 1532 (5th Cir.1988)). The Court finds the first view to be overly restrictive in this case. In a conspiracy involving price-fixing, "it is virtually impossible to distinguish between acts in furtherance of the conspiracy and acts designed to maintain the conspiracy's secrecy because the conspiracy's success is often contingent upon its ability to avoid detection by regulators and purchasers." *In re Aspartame Antitrust Litig.,* No. 06–1732, 2007 WL 5215231, at \*5 (E.D.Pa. Jan.18, 2007); *See also In re Mercedez–Benz,* 157 F.Supp.2d at 372 ("secrecy is [the] natural lair" of a price-fixing conspiracy).

Several courts, including those in this Circuit, have found that a plaintiff may avoid the affirmative act requirement altogether in cases where an antitrust conspiracy is "inherently self-concealing." *See, e.g., In re Aspartame,* 2007 WL 5215231, at \*5; *In re Nine West Shoes Antitrust Litig.,* 80 F.Supp.2d 181, 192 (S.D.N.Y.2000); *In re Mercedez–Benz,* 157 F.Supp.2d at 371; *Pennsylvania Milk Indus. Mgmt. Corp.,* 812 F.Supp. 500 (E.D.Pa.1992); *Bethlehem Steel Corp. v. Fischbach & Moore, Inc.,* 641 F.Supp. 271, 273–74 (E.D.Pa.1986). However, the definition of a self-concealing antitrust conspiracy, particularly one that involves price-fixing, remains nebulous. The *In re Mercedez–Benz* court held that a self-concealing antitrust conspiracy is one where "concealment is so intertwined with the conspiracy as a whole that the equitable foundations of the fraudulent concealment doctrine require the limitations period to be tolled." 157 F.Supp.2d at 371. Other courts maintain that all properly alleged price-fixing conspiracies are inherently self-concealing. *See, e.g., In re Issuer Plaintiff Initial Public Offering Antitrust Litig.,* No. 00–7804, 2004 WL 487222, at \*4 (S.D.N.Y. Mar.12, 2004); *Nine West,* 80 F.Supp.2d at 192.

The Court agrees that, under certain circumstances, an antitrust conspiracy may depend on its own concealment to the point that any act in furtherance thereof can also be said to conceal it. As the Supreme Court explained long ago, the purpose of the fraudulent-concealment doctrine is to prevent a defendant from "concealing a fraud, or ... committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it." *Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1874). However, the Court cannot find that conspiracies involving price-fixing are *per se* self-concealing, as such a finding would render them wholly exempt from the applicable statute of limitations.

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2012-1 Trade Cases P 77,878

**\*22** Although not binding, *In re Publication Paper Antitrust Litig.,* No. 04–1631, 2005 WL 2175139 (D.Conn. Sept.7, 2005) provides a helpful framework under which to determine whether a conspiracy involving price-fixing is self-concealing for the purposes of establishing fraudulent concealment. That case found that a price-fixing conspiracy may be self-concealing, depending on the nature of the industry in which the item is price-fixed:

> In a competitive, well-regulated industry it will often be the case that a price-fixing conspiracy, if not concealed, would immediately fail because of governmental or private legal action. In such circumstances, any announcement of a price increase will carry with it an implicit statement that the price increase is legitimate, i.e., the result of competitive forces, not collusion. Nevertheless, not every price-fixing conspiracy is self-concealing. For example, there may be industries in which the participants are aware of collusion but it is not stopped because of indifference, fear, or because the perpetrators are exempt from, or beyond the reach of, antitrust laws. In such circumstances, the defendants' announcement of a price increase will not carry with it any implied certification of legitimacy, and so, absent additional circumstances, will not be self-concealing.

*In re Publication Paper,* 2005 WL 2175139, at \*4. Accordingly, "whether a particular price-fixing conspiracy or, more precisely, whether a particular announcement of a price increase necessarily conceals its true nature depends on the nature of the industry and the circumstances surrounding the announcement." *Id.* In other words, a plaintiff must show circumstances indicating that a price increase "carries with it a pretense of legitimacy" or "that it would necessarily be assumed that [it was] the result of legitimate market forces." *Id.* To do so, a plaintiff may, for example, set forth allegations showing "that price increases are not abnormal, that such increases are typically ascribed to market forces, that an openly collusive price increase would not be

tolerated, and that there was nothing suspicious about the circumstances under which each of the pre-limitations period price announcements were made." *Id.*

Here, Plaintiffs fail to allege particular circumstances surrounding the MgO market indicating that the alleged conspiracy was self-concealing. Plaintiffs come close to pleading an affirmative act of concealment in alleging that "price increases for MgO were justified by references to tight supply, thinning margins, and increased energy and freight costs" (Direct CAC ¶ 51; Indirect CAC ¶ 58), however they fail to explain the particular circumstances surrounding Defendants' price increases and pretextual justifications for those increases—information which is in Plaintiffs' control—in accordance with Rule 9(b). [20] Thus, Plaintiffs have failed to meet the first element of fraudulent concealment to toll the statute of limitations. However, the Court will grant Plaintiffs leave to amend to adequately plead either (1) circumstances surrounding the MgO market during the Class Period indicating that the alleged conspiracy is self-concealing, or (2) particular circumstances surrounding Defendants' price increases and the allegedly pretextual justifications for those price increases. *See In re Burlington Coat Factory Litig.,* 114 F.3d at 1434.

### ii. Reliance

**\*23** Defendants argue that Plaintiffs fail to meet the second element of fraudulent concealment because they have not alleged that that they relied on Defendants' alleged affirmative acts of concealment. Plaintiffs argue that there is no reliance requirement to establish fraudulent concealment.

While the aforementioned elements of fraudulent concealment do not specifically note a reliance requirement, the language of the second element strongly suggests one. As previously noted, the second element of fraudulent concealment requires a showing that the defendant's concealment misled or relaxed the plaintiff's potential inquiry into what otherwise would have been evidence of its cause of action. *In re Lower Lake Erie,* 998 F.2d at 1179; *see also Forbes v. Eagleson,* 228 F.3d 471, 487 (3d Cir.2000) ("[T]he plaintiff must show that he actually was mis[led] ... into thinking that he d [id] not have a cause of action" (quotation and citation omitted)). Implicit in the notion that a plaintiff's inquiry was misled or relaxed by an act of concealment is that the plaintiff relied on that act of concealment. That is, the plaintiff's inquiry would not have been misled or relaxed if it did not rely on the defendant's act of concealment.

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Here, Plaintiffs make no allegations that they were misled by Defendants' concealment of the alleged conspiracy and therefore have failed to meet the second element of fraudulent concealment. However, the Court will grant Plaintiffs leave to amend to adequately plead that they relied on the self-concealing nature of Defendants' conspiracy and/or pretextual justifications for Defendants' price increases. *See In re Burlington Coat Factory Litig.,* 114 F.3d at 1434.

### iii. Due Diligence

Defendants argue that Plaintiffs fail to satisfy the due diligence element of fraudulent concealment because they do not allege any due diligence performed during the Class Period, particularly that which led to the discovery of the alleged conspiracy. Plaintiffs counter that, under the fraudulent concealment doctrine, they need only plead that they would not have discovered their claim, even in the exercise of reasonable due diligence. Plaintiffs further argue that determinations of due diligence are fact-intensive and therefore not properly addressed on a motion to dismiss.

The parties cite somewhat differently worded standards to support their respective positions on what the due diligence prong requires. Defendants cite *In re Lower Lake Erie,* in which the Court of Appeals held that a plaintiff must show that he "exercised due diligence in investigating his cause of action." 998 F.2d at 1178–79. Plaintiffs, on the other hand cite *Matthews v. Kidder, Peabody & Co., Inc.,* where the Court of Appeals held that a plaintiff must show that his ignorance is not attributable to a lack of "reasonable due diligence in attempting to uncover the relevant facts." 260 F.3d 239, 256 (3d Cir.2001).

While the wording of the due diligence prong has differed slightly among Third Circuit case law, its substance has remained consistent. The due diligence prong is rooted in the notion of inquiry notice: that an injury accrues when a reasonable plaintiff under the circumstances would have discovered it. *See Matthews,* 260 F.3d at 251. As previously discussed, a federal antitrust injury accrues when an overt act is committed that injures the plaintiff, thereby triggering the four-year statute of limitations; however, one or more affirmative acts of concealment "may toll the statute of limitations [ ] if [they] mislead[ ] a plaintiff into thinking that he does not have a cause of action." *Davis v. Grusemeyer,* 996 F.2d 617, 624 (3d Cir.1993), *overruled on other grounds by Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644 (3d Cir.1998). Thus, to establish the due diligence prong of fraudulent concealment, a plaintiff must affirmatively show

that he was not on inquiry notice of the alleged antitrust conspiracy. *See id.* ("A key aspect of a plaintiff's case alleging fraudulent concealment is [ ] proof that the plaintiff was not previously on notice of the claim he now brings." (citations omitted)).

**\*24** In this Circuit, "inquiry notice [is] analyzed in two steps."[21] *Matthews,* 260 F.3d at 252. "First, the burden is on the defendant [s] to show the existence of 'storm warnings.' " *Id.* In this case, a storm warning would be information or data that would alert a reasonable MgO purchaser of ordinary intelligence to potentially culpable conduct. "Second, if the defendants establish the existence of storm warnings, the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discovery their injuries." *Id.* This requires Plaintiffs to show that (1) they investigated the storm warnings and (2) in their investigation, they exercised the due diligence expected of a reasonable DBM or CCM purchaser of ordinary intelligence. *See id.*

As Plaintiffs point out, this inquiry is necessarily bound up with the facts of the case because it "implicates factual questions as to when [a] plaintiff discovered or should have discovered the elements of the cause of action," *id.* at 250 (quotations and citation omitted); *see also Mercedez–Benz,* 157 F.Supp.2d at 373 ("At a minimum, this issue will involve assessing the factual circumstances surrounding the accused purchasing transactions and whether those circumstances would have put a reasonably diligent plaintiff on notice of a price-fixing conspiracy"), and, as a result, at the pleading stage, this court has been hesitant to dismiss an otherwise fraudulently concealed antitrust claim for failure to sufficiently allege due diligence. *See In re Electrical Carbon Prods.,* 333 F.Supp.2d at 317–18; *Mercedez–Benz,* 157 F.Supp.2d at 374.

Citing to *In re Publication Paper* and *Hinds County,* Defendants maintain that, at the pleading stage, the due diligence prong nonetheless requires that "Plaintiffs [ ] allege with particularity when the Named Plaintiffs or Class members became aware of the antitrust violations and what inquiries [they] made into the activities alleged in the complaint." (Sumitomo Reply Br., 18) (internal quotations omitted). In *In re Publication Paper,* the plaintiffs alleged that they were aware of certain suspicious activities two years before the end of the limitations period. *See* 2005 WL 2175139, at \*5. Accordingly, the court found that the plaintiffs were therefore required allege they steps they took to investigate those activities. *See id.* Here, however, Plaintiffs

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2012-1 Trade Cases P 77,878

do not allege any suspicious activities or storm warnings within the limitations period.

Defendants' citation to *Hinds County* is more persuasive. In that case, the plaintiffs attempted to satisfy the due diligence prong by alleging that they "did not discover, nor could have discovered through reasonable diligence, that [d]efendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced, because [d]efendants and their co-conspirators were using deceptive and secret methods to avoid detection and affirmatively conceal their violations." *Hinds County,* 620 F.Supp.2d at 521–22. The court found that allegation too vague to satisfy Rule 9(b) and further explained that to deem such an allegation sufficient would "allow[ ] the allegations required to satisfy the first prong of fraudulent concealment to also satisfy the third prong." *Id.* at 521–22.

**\*25** The Court finds this logic persuasive. Here, Plaintiffs allege that, due to the secretive nature of the alleged MgO conspiracy, "neither plaintiffs nor the class members had knowledge of any of the foregoing violations, and neither plaintiffs nor the class members, until recently, could have discovered through reasonable diligence that [D]efendants and their co-conspirators had engaged in the foregoing violations." (Direct CAC ¶ 49; Indirect CAC ¶ 56 .) This allegation cannot satisfy the requirements of Rule 9(b), particularly when it fails to encompass when and how Plaintiffs ultimately discovered the alleged MgO conspiracy—information that is certainly with Plaintiffs' control. *See In re Craftmatic,* 890 F.2d at 645. Without some level of specificity regarding Plaintiffs' discovery of the alleged conspiracy, it is impossible to discern whether Plaintiffs could or should have discovered it within the limitations period. Thus, Plaintiffs have failed to meet the due diligence prong of fraudulent concealment. However, Plaintiffs will be granted leave to amend to adequately plead, in accordance with Rule 9(b), (1) when and how they discovered the alleged MgO conspiracy, and (2) that the self-concealing nature of the conspiracy and/or pretextual justifications for Defendants' price increases made it so that they were not alerted to any storm warnings that would otherwise trigger an obligation to perform due diligence. *See In re Burlington Coat Factory Litig.,* 114 F.3d at 1434.

### E. IP Plaintiffs' Claims for Violations of Various States' Consumer Protection Laws

IP Plaintiffs assert claims under California, Florida, Hawaii, Massachusetts, Montana, Nebraska, New Hampshire, New York, South Carolina, and Vermont consumer protection and unfair competition laws. As with IP Plaintiffs' antitrust claims under state law, Defendants argue that IP Plaintiffs lack standing to assert their consumer protection claims, except that under California law, because they "do not allege purchases in any of the 10 states other than California." (Sumitomo (IP Pl.'s) Br., 5). Defendants further argue that these claims should be dismissed because IP Plaintiffs do not plead them with particularity in accordance with Federal Rule of Civil Procedure 9(b).

#### i. Standing

IP Plaintiffs' standing to sue under a state's consumer protection law is analogous to their standing under a state's antitrust law. As discussed in Point B, IP Plaintiffs' failure to tie their injuries or Defendants' unlawful conduct to a number of states was fatal to their standing to sue because the antitrust laws of those states require a showing that part of Defendants' conduct occurred or had an effect in-state. On the other hand, IP Plaintiffs have standing to sue under the antitrust laws that have no such requirement.

Similarly, many of the consumer protection and unfair competition laws asserted by IP Plaintiffs require that Defendants' unlawful conduct affect trade and commerce in the state under whose law they are suing, *see* MCA 30–14–103, 102 (Montana) ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.... [T]rade or commerce [must] directly or indirectly affect[ ] the people of this state."); MGLA §§ 93A 1, 2 (Massachusetts) (same); S.C.Code 1976 §§ 39–5–10, 20 (South Carolina) (same); Neb. Rev. St. §§ 59–1602, 1601 (Nebraska) ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful.... Trade and commerce shall mean the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska."); N.H.Rev.Stat. § 358–A:2 (New Hampshire) ("It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."); N.Y. Gen. Bus. Law § 349 (New York) ("Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."); *Sherman v. Ben & Jerry's Franchising, Inc.,* 08–CV–207, 2009 WL 2462539, at \*10 (D.Vt. Aug.10, 2009)* (Out of state plaintiffs alleging out of state conduct do not have standing to sue under Vermont Consumer Fraud

Protection Act), while others do not, *see* F.S.A. 501.204, 501.211 (Florida); HRS 480–2, 480–13 (Hawaii). [22]

**\*26** IP Plaintiffs' allegations that "Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes the above states, by affecting, fixing, controlling, and/or maintaining, at artificial and noncompetitive levels, the prices at which MgO and MgO Products were sold, distributed, or obtained in those states;" "MgO price competition was restrained, suppressed, and eliminated throughout the states;" and "MgO prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the states" (Indirect CAC ¶¶ 79, 81) are conclusory and do not tie their injuries to the alleged conspiracy's effect on trade and commerce in those specific states. Therefore, IP Plaintiffs' consumer protection claims under Montana, Massachusetts, Nebraska, New Hampshire, and New York law are dismissed for lack of standing.

### ii. Pleading Requirements

The consumer protection laws of Florida and Hawaii—under which IP Plaintiffs currently maintain standing to sue—require that they plead the circumstances of any alleged fraudulent conduct with particularity in accordance with Rule 9(b). *See Jovine v. Abbott Laboratories, Inc.,* 11–CV–80111, 2011 WL 1376029 (S.D.Fla. Apr.12, 2011) (applying Rule 9(b) to allegations of unfair or deceptive acts or practices under the Florida Deceptive and Unfair Trade Practices Act); *Cannon v. U.S. Bank, NA,* Civ. No. 11–00079, 2011 WL 1637415, (D.Hawai'i Apr.29, 2011) (applying Rule 9(b) to allegations of fraudulent business practices under the Hawaii State Unfair and Deceptive Business Practices Act); *Athena Feminine Techs., Inc. v. Wilkes,* No. C 10–4868, 2011 WL 4079927 (N.D.Cal. Sept.13, 2011) ("[A] claim brought under the fraudulent prong of the [Unfair Competition Law] must be pled with particularity under Rule 9(b)").

IP Plaintiffs' allegations that "Defendants deliberately failed to disclose material facts to Plaintiff and the classes concerning Defendants' unlawful activities and artificially inflated prices for MgO and MgO Products," and "misrepresented to all consumers during the Class Period that Defendants' MgO prices were competitive and fair" (Indirect CAC ¶ 80); *see also* (Indirect CAC ¶ 83) (alleging "affirmative misrepresentations and omissions concerning the price of MgO") are not set forth with any measure of particularity. *See In re Supreme Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 270 (3d Cir.2006) (Under Rule 9(b),

a plaintiff must allege fraud with particularity by pleading the following: "(1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his [or her] damage." (quotations and citation omitted)). Accordingly, IP Plaintiffs' consumer protection and unfair competition claims under Florida and Hawaii law are dismissed to the extent they are premised on Defendants' fraudulent conduct. However, IP Plaintiffs are granted leave to amend their allegations to comply with the requirements of Rule 9(b). Additionally, at this time, those claims may move forward to the extent they are premised on allegations of Defendants' engaging in unfair competition, as there is no indication that Rule 9(b) applies to such allegations.

## III. CONCLUSION

**\*27** For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED to the following extent only. The Court rules as follows:

(1) IP Plaintiffs' federal and state antitrust claims are dismissed without prejudice for lack of standing. IP Plaintiffs have thirty (30) days to amend their allegations to set forth (1) the specific products purchased containing DBM or CCM and (2) the nexus between an increase in the price of those products and the alleged conspiracy to fix prices in and allocate shares of the domestic DBM and CCM markets.

(2) IP Plaintiffs' antitrust claims under Arizona, the District of Columbia, Hawaii, Illinois, Maine, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, and West Virginia law are dismissed with prejudice for lack of standing.

(3) Plaintiffs' federal and state antitrust claims are dismissed without prejudice as time-barred under the applicable statutes of limitations. Plaintiffs have thirty (30) days to amend their allegations of fraudulent concealment to equitably toll those statutes of limitations.

(4) IP Plaintiffs' consumer protection and unfair competition claims under Montana, Massachusetts,

Case 1:19-md-02875-RMB-SAK    Document 1802-1    Filed 12/02/21    Page 134 of 182
PageID: 54387
In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2012-1 Trade Cases P 77,878

Nebraska, New Hampshire, and New York are dismissed with prejudice for lack of standing.

(5) IP Plaintiffs' consumer protection and unfair competition claims under Florida and Hawaii law are dismissed without prejudice to the extent they are premised on allegations of Defendants' fraudulent conduct. IP Plaintiffs have thirty (30) days to amend those allegations to comply with Federal Rule of Civil Procedure 9(b).

The Court will enter an order implementing this opinion.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5008090, 2012-1 Trade Cases P 77,878

## Footnotes

1   *See* Docket Nos. 10–cv–5174, 10–cv–5352, 10–cv–6095, and 10–cv–6093, and 10–cv–5943, all of which were consolidated under Docket No. 10–cv–5943.

2   To be sure, IP Plaintiffs seek only injunctive relief for Defendants' alleged violations of federal antitrust laws, as only direct purchasers may bring federal antitrust actions for damages. *Illinois Brick v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

3   In fact, Sumitomo, Premier, and YAS each filed separate motions to dismiss. However, each joined in the others' arguments. Therefore, for the sake of simplicity and brevity, the Court will treat them as a single motion.

4   CCM "is manufactured at lower temperatures than [DBM] and is used in products like animal feeds and fertilizers." (Direct CAC ¶ 25; Indirect CAC ¶ 31.) DBM, on the other hand, "is most often used in refractory applications." (*Id.*)

5   These prices were later restored.

6   MgO collectively refers to DBM and/or CCM. (Direct CAC ¶ 1.)

7   As discussed further below, standing to assert claims for injunctive relief under Section 16 of the Clayton Act are analyzed under a more relaxed standard. *See In re Warfarin,* 214 F.3d at 399.

8   Although that decision analyzed proximate causation in the context of a Section 4 claim for damages, the Court of Appeals has applied its analysis to Section 16 claims because proximate cause is an element of standing under both. *See In re Warfin Sodium Antitrust Litig.,* 214 F.3d 395, 400–01 (3d Cir.2000).

9   IP Plaintiffs also lack standing to assert their state antitrust claims because those claims are construed in accordance with federal antitrust principles. *See In re Digital Music Antitrust Litig.,* 592 F.Supp.2d 435, 448 n. 21 (S.D.N.Y.2008) (Arizona, California, District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, North Carolina, South Dakota, Vermont, West Virginia, Wisconsin), *rev'd on other grounds by, Starr v. Sony BMG Music Entm't.,* 592 F.3d 314 (2d Cir.2010); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 635–36 (9th Cir.1987) (Hawaii); *Gutnayer v. Cendant Corp.,* 116 Fed. App'x 758, 761 (7th Cir.2004) (Illinois); *Monsanto Co. v. Swann,* No. 4:00–CV–1481, 2001 WL 34079480, at *3 (E.D.Mo. Sept.19, 2001) (Mississippi); Neb.Rev.Stat. § 59–829 (2010) (Nebraska); Nev.Rev.Stat. § 598A.050 (2011) (Nevada); *Minuteman, LLC v. Microsoft Corp .,* 147 N.H. 634, 637, 795 A.2d 833 (N.H.2002) (New Hampshire); *Clough v. Rush,* 959 F.2d 182, 187 (10th Cir.1982) (New Mexico); *Fido's Fences v. Canine Fence Co.,* 672 F.Supp.2d 303, 313 (E.D.N.Y.2009) (New York); *Westgo Indus., Inc. v. W.J. King Co.,* Civil No. A3–75–82, 1981 WL 2064, at *6 (D.N.D. Mar.1, 1981) (North Dakota); *Oregon Laborers–Employees Health & Welfare Trust Fund v. Phili Morris, Inc.,* 185 F.3d 957, 963 n. 4 (9th Cir.1999) (Oregon); *In re Refalen Antitrust Litig.,* 221 F.R.D. 260, 278–79 (D.Mass.2004) (Tennessee); *Am. Airlines v. Christensen,* 967 F.2d 410, 414 (10th Cir.1992) (Utah).

10  At this time, IP Plaintiffs lack Article III standing to assert violations of the following state antitrust laws because they fail to allege a causal connection between their injuries and the conduct prohibited by the laws of those

states, which require a showing that such conduct occurred, or whose effect was felt, in-state. *See* A.R.S. § 44–1402 (Arizona) ("A contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within this state, is unlawful"); DC ST § 28–4502 (District of Columbia) (same); HRS § 480–4 (Hawaii) (same); 10 M.R.S.A. § 1101 (Maine) (same); SDCL § 37–1–3.1 (South Dakota) (same); K.S.A. § 50–101 (Kansas) ("A trust is a combination of capital, skill, or acts, by two or more persons," among other things, "[t]o fix any standard or figure, whereby such person's price to the public shall be, in any manner, controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, use or consumption in this state"); M.C.L.A. §§ 445.771, 445.772 (Michigan) ("A contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful.... Relevant market means the geographical area of actual or potential competition in a line of trade or commerce, all or any part of which is within this state"); M.S.A. § 325D.54 (Minnesota) (act applies to "(a) any contract, combination, or conspiracy when any part thereof was created, formed, or entered into in this state; and (b) any contract, combination, or conspiracy, wherever created, formed, or entered into; any establishment, maintenance, or use of monopoly power; and any attempt to establish, maintain, or use monopoly power; whenever any of the foregoing affects the trade or commerce of this state."). Neb. Rev. St. § 59–801 (Nebraska) ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, within this state, is hereby declared to be illegal."); N.R.S. § 598A.060 (Nevada) (same); N.M.S.A. § 1978, 57–1–1 (New Mexico) (same); W.Va.Code § 47–18–3 (West Virginia) (same); NY GBL § 340 (New York) (Every contract, agreement, arrangement or combination whereby ... [c]ompetition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained ... is hereby declared to be against public policy, illegal and void."); N.C.G.S.A. § 75–1 (North Carolina) ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal."; NDCC, 51–08.1–01, 02 (North Dakota) ("A contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful.... Relevant market means the geographical area of actual or potential competition in a line of commerce, all or any part of which is within this state."); O.R.S. 646.705 (Oregon) ( "As used in ORS 136.617 and 646.705 to 646.805, 'trade or commerce' means trade or commerce within the state; or between the state and any state, territory, or foreign nation."); (Tennessee) T .C.A. § 47–25–101 ("All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void."). IP Plaintiffs' allegations that "[P]rices for MgO and MgO Products were raised, fixed, maintained, and stabilized at artificially high levels throughout the states," and "Defendants' illegal conduct had a substantial effect on commerce in the above states" (Indirect CAC ¶¶ 72, 73) are conclusory and fail to specifically tie their injuries to the alleged MgO conspiracy occurring or its effects in those states.

IP Plaintiffs lack statutory standing to sue under Utah's antitrust laws because they have a citizenship/residency requirement. *See* U.C.A. §§ 1953 76–10–919 ("A person who is a citizen of this state or a resident of this state and who is injured or is threatened with injury in his business or property by a violation of the Utah Antitrust Act may bring an action for injunctive relief and damages, regardless of whether the person dealt directly or indirectly with the defendant."), and under Illinois's antitrust laws because they do not allow a private right of action. *See* 740 ILCS 10/7 ("This State, counties, municipalities, townships and any political subdivision organized under the authority of this State, and the United States, are considered a person having standing to bring an action under this subsection.").

However, IP Plaintiffs apparently have standing to sue under Mississippi, New Hampshire, Vermont, and Wisconsin antitrust laws, as they provide a private right of action and have no discernible requirement of

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2012-1 Trade Cases P 77,878

in-state conduct or effect, or residency. *See* Miss.Code Ann. §§ 75–21–1, 9 (Mississippi); N.H. Rev. Stat § 356:1 (New Hampshire); 9 V.S.A. §§ 2453, 2465 (Vermont); W.S.A. §§ 133.03, 133.18 (Wisconsin).

11    Moreover, the CACs specifically note at the outset that the term MgO can refer to DBM or CCM. *See* (Direct CAC ¶ 1; Indirect CAC ¶ 1 n. 1).

12    This also disposes of Sumitomo's contention that the Court should consider "certain relevant facts" noted in *Animal Science Prods., Inc. v. China Nat'l Metals & Minerals,* 596 F.Supp.2d 842 (D.N.J.2008) regarding the domestic DBM and CCM markets. (Sumitomo (DP Pl.'s) Br., 4.)

13    This is to be distinguished from the requirement to plead plus factors to rule out independent action "when a plaintiffs' claims of conspiracy rest on parallel conduct," *In re Ins. Brokerage,* 618 F.3d at 323, which is discussed below regarding the alleged CCM Agreement. Plaintiffs need not assert plus factors to establish the plausibility of the DBM Agreement because they set forth direct allegations of that agreement. *See In re Ins. Brokerage,* 618 F.3d at 323 ("Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate.").

14    Moreover, there is nothing "inherently implausible" about Sumitomo's attempt to assuage the Vannorsdels' concern about Premier's potential retaliation by stating that it speaks with Premier on a daily basis to set DBM prices and allocate shares of the DBM market. It is certainly plausible that Sumitomo was aware of the risk of retaliation by Premier but believed it could "enter the [CCM] market discreetly" (Direct CAC ¶ 39; Indirect CAC ¶ 48) because Premier's attention was focused on maintaining their agreement in the DBM market.

15    In any event, Plaintiffs allege Sumitomo's motive for entering the CCM market (filling excess barge capacity), and certain steps taken to enter that market (meeting with the Vannorsdels in Tulsa).

16    Citing to *Toledo Mack Sales & Serv. v. Mack Trucks, Inc.,* 530, F.3d 204 (3d Cir.2008), YAS further argues that Plaintiffs' failure to establish that YAS occupies the same level as Sumitomo and Premier on the MgO supply chain "precludes *per se* treatment of YAS' alleged antitrust violations." (YAS Br., 4 n. 5.) This argument misses the mark. While *Toledo Mack* noted that, "[i]n contrast to horizontal price-fixing agreements between entities at the same level of a product's distribution chain, the legality of a vertical agreement that imposes a restriction on the dealer's ability to sell the manufacturer's product is governed by the rule of reason," and that "[t]he rule of reason analysis applies even when ... the plaintiff alleges that the purpose of the vertical agreement between a manufacturer and its dealers is to support illegal horizontal agreements between multiple dealers," 530 F.3d at 225 (citation omitted), Plaintiffs do not allege YAS' arrangement with Sumitomo to source Chinese magnesite and MgO constitutes an unlawful vertical agreement to support a horizontal conspiracy between Sumitomo and Premier. Rather, Plaintiffs allege that YAS participated directly with Sumitomo and Premier in the alleged horizontal conspiracy to fix prices and allocate shares of the DBM market and allocate the CCM market to Premier. Moreover, "[t]he law is settled that where an upstream supplier participates in a conspiracy involving horizontal competitors, it is proper to analyze the entire restraint as one of horizontal price-fixing." *In re Mercedez–Benz,* 157 F.Supp.2d at 362.

17    Citing to *Howard Hess Dental Laboratories Inc. v. Dentsply Intern., Inc.,* 424 F.3d 363 (3d Cir.2005), YAS also argues that Plaintiffs' failure to allege that it sold DBM or CCM requires its dismissal from this case as a matter of law. While that case notes the well-settled proposition that only direct purchasers may recover damages in federal antitrust suits, it by no means indicates that only a seller of the product in question may be found liable in a Section 1 conspiracy. As previously discussed, YAS need not have participated in a particular act in furtherance of the conspiracy to be held liable.

18    IP Plaintiffs' state antitrust law claims similarly require dismissal for failure to establish fraudulent concealment, as their applicable statutes of limitations range from three to six years. *See* Ariz.Rev.Stat. Ann. § 44–1410(A) (Arizona) (2011) (four years); Cal. Bus. & Prof.Code § 16750.1 (2011) (California) (four years); D.C.Code § 28–4511(b) (2011) (four years); Haw.Rev.Stat. § 480–24(a) (2010) (Hawaii) (four years); Ill. Comp. Stat. ch. 740, § 10/7(2) (2010) (four years); Iowa Code § 553.16 (2011) (Iowa) (four years); *Four B Corp. v. Daicel Chem. Indus., Ltd.,* 253 F.Supp.2d 1147, 1156 (D.Kan.2003) (Kansas) (three years) (citing Kan. Stat. Ann. § 60–512(2) (2010)); *McKinnon v. Honeywell Int'l, Inc.,* 977 A.2d 420, 424 (Me.2009) (Maine) (six years) (citing Me.Rev.Stat. Ann. tit. 14 § 752 (2008)); Mich. Comp. Laws § 445.781 (2010) (Michigan)

(four years); *Am. Computer Trust Leasing v. Jack Farrell Implement Co.,* 763 F.Supp. 1473, 1491 n. 21 (D.Minn.1991) (Minnesota) (four years) (citing Minn.Stat. § 325D.64 (subdiv .1) (2010)); Miss.Code Ann. § 15–1–49(1) (2010) (three years); Neb.Rev.Stat. § 25–206 (2010) (Nebraska) (four years); Nev.Rev.Stat. § 598A.220(2)(a) (2010) (four years); N.H.Rev.Stat. § 356:12(II) (1973) (New Hampshire) (four years); N.M. Stat. § 57–1–12(B) (1978) (New Mexico) (four years); N.Y. Gen. Bus. Law § 340(5) (2004) (New York) (four years); N.C. Gen.Stat. § 75–16.2 (2010) (North Carolina) (four years); N.D. Century Code § 51–08.1–10(2) (1987) (four years); Or.Rev.Stat. § 646.800(2) (1975) (Oregone) (four years); S.D. Codified Laws § 37–1– 14.4 (1975) (South Dakota) (four years); *State ex rel. Leech v. Levi Strauss & Co.,* No. 79–722–III, 1980 WL 4696, at *3 (Tenn.Ch. Sept.25, 1980) (Tennessee) (three years) (citing Tenn. Stat. § 28–3–105(3) (2011)); Utah Code § 76–10–925(2) (1979) (Utah) (four years); Vt. Stat. Ann. tit. 12, § 511 (2010) (Vermont) (six years); W. Va.Code § 47–18–11 (1978) (West Virginia) (four years); Wis. Stat. § 133.18(2) (2011) (Wisconsin) (six years). However, to the extent that IP Plaintiffs sufficiently amend their allegations to establish fraudulent concealment of their federal antitrust claims, they will also have established fraudulent concealment of their state law antitrust claims. *See* Note 9.

19    Defendants further argue that Sumitomo's alleged admission to the Vannorsdels of the DBM Agreement cuts against their fraudulent concealment allegations. This is unpersuasive because the admission in no way put Plaintiffs on notice of their claims during the limitations period. *See Emerson Elec. Co. v. Le Carbon Lorraine, SA,* 500 F.Supp.2d 437, 448 (D.N.J.2007) ("Where fraudulent concealment of a federal antitrust claim has been shown, the four-year federal statute of limitations begins anew from the time the plaintiff knew or should have known of the existence of the federal claim." (quotations and citations omitted)).

20    Nor can Plaintiffs' conclusory allegation that "defendants met secretly and among themselves for the express purpose of fixing prices and allocating markets of domestically sold MgO" (Direct CAC ¶ 50; Indirect CAC ¶ 57) satisfy the affirmative act requirement.

21    While the following inquiry notice analysis is laid out in the context of a RICO case, it has also been applied in antitrust cases involving price-fixing. *See In re Aspartame Antitrust Litig.,* 416 Fed. App'x. 208, 211–12 (3d Cir.2011); *In re Electrical Carbon Prods. Antitrust Litig.,* 333 F.Supp.2d 303, 317 (D.N.J.2004).

22    Thus, contrary to Defendants' contention, the fact that IP Plaintiffs fail to allege that they reside or purchased an MgO product in a given state does not automatically deprive them of standing to sue under the state's consumer protection or unfair competition law. To be sure, the case Defendants cite in support of this contention held that the named plaintiffs in that case lacked standing to assert consumer protection and unfair competition claims under the laws of states in which they neither resided nor suffered an injury. *See In re Potash* 667 F.Supp.2d at 924. However, the Court cannot accept this holding as a bright line rule. Standing issues are intimately bound up with the elements of the particular claim asserted, as a plaintiff must establish that his injury is "fairly traceable to the challenged action of the defendant." *Lujan,* 504 U.S. at 560; *see also Blum,* 457 U.S. at 999 ("The complaining party must also show that he is within the class of persons who will be concretely affected."); *Allen,* 468 U.S. at 752 ("[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.").

---

**End of Document**                                  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Tab 5

2014 WL 2566132
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

William B. McGUIRE, on Behalf of Himself
and All Others Similarly Situated, Plaintiff,
v.
BMW OF NORTH AMERICA, LLC, Defendant.

Civil Action No. 13–7356 (JLL).
|
Signed June 6, 2014.

**Attorneys and Law Firms**

Donald A. Ecklund, James E. Cecchi, Carella Byrne Cecchi Olstein Brody & Agnello, P.C., Roseland, NJ, for Plaintiff.

Christopher J. Dalton, Rosemary Joan Bruno, Buchanan, Ingersoll & Rooney, PC, Newark, NJ, for Defendant.

**OPINION**

LINARES, District Judge.

**\*1** This matter comes before the Court by way of a motion to dismiss [CM/ECF No. 6] the Complaint ("Compl.") [CM/ECF No. 1] pursuant to Federal Rule of Civil Procedure 12(b)(6) by BMW of North America, LLC (hereafter "Defendant" or "BMW"). No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure. After considering the submissions of the parties in support of and in opposition to the instant motion, Defendant's motion to dismiss is granted in part and denied in part.

**I. BACKGROUND**

On December 6, 2013, Plaintiff brought this class action on behalf of himself and all others similarly situated who purchased or leased certain vehicles manufactured, distributed, marketed, and/or sold by BMW of North America, LLC, and/or its related subsidiaries or affiliates ("BMW") with defective navigation systems. The "Class Vehicles" include all BMW vehicles equipped with a current-generation BMW navigation system containing the "Advanced Real–Time Traffic Information" ("ARTTI")

feature (the "Navigation System"). (Compl.12.) Allegedly, BMW markets the Class Vehicles' Navigation System as reliable, accurate, detailed, and quick to update, promising local real-time traffic updated every three minutes and dynamic guidance to automatically re-route the Vehicle around traffic on the Vehicle's intended route. (*Id.* ¶¶ 4, 58, 59, 76–81.)

Plaintiff claims, however, that the Navigation System is defective in that it fails to display local real-time traffic information for the area where the Class Vehicle is located, and also fails to automatically re-route the Vehicle to avoid traffic incidents on the Vehicle's intended route (the "Defect"). (*Id.* ¶¶ 5, 62, 63.) Plaintiff alleges that BMW knew of the Defect prior to the sale of the Class Vehicles, possibly as early as June 2012 (*id.* ¶¶ 6, 65–74, 118), but nevertheless misrepresented the Navigation System to have qualities it did not have, and failed to disclose and actively concealed the Defect from Plaintiff and Class members. (*Id.* ¶¶ 7, 75–91, 119.) Plaintiff claims that had BMW disclosed the Defect to Plaintiff or Class members, they would not have purchased their Class Vehicles, or would not have purchased them at the price paid. (*Id.* ¶¶ 34, 83–87, 91(f), 122.)

Plaintiff also alleges that BMW breached its warranty when it failed to repair the Vehicles or remedy the Defect. (*Id.* ¶¶ 8–9.) BMW warrants the Class Vehicles with a four–year/50,000–mile "New Vehicle Limited Warranty" (the "Warranty"). (*Id.* ¶¶ 93–95.) The Warranty states that, "[t]o obtain warranty service coverage, the vehicle must be brought, upon discovery of a defect in material or workmanship, to the workshop of any authorized BMW center ... The BMW center will, without charge for parts or labor, either repair or replace the defective part(s) ..." (*Id.* ¶ 98.) But Plaintiff alleges that when he brought his Vehicle to BMW to remedy the Defect, BMW did not repair or replace the defective part or take any action whatsoever to remedy the Defect. (*Id.* ¶¶ 25–29, 132, 136, 137, 165–169.) He claims that BMW denied the existence of the Defect and insisted the Navigation System worked properly, and that despite BMW's official position, a BMW service person admitted to Plaintiff that BMW knew of the Defect but that no fix would be offered because it would cost BMW so much to remedy the problem. (*Id.* ¶¶ 26–31, 86.) Plaintiff claims that BMW's misconduct has imposed significant costs on Plaintiff and Class members, including substantial out-of-pocket expenses incurred by Plaintiff and Class members for a BMW Navigation System that does not work as advertised. (*Id.* ¶¶ 10–13, 123, 142, 160.)

**\*2** Individually and on behalf of the Class, Plaintiff asserts claims against BMW for violations of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8–1, *et seq.,* and the Magnuson–Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, *et seq.;* for breach of express and implied warranties and unjust enrichment under New Jersey law; and/ or for violations of similar consumer protection and warranty laws of the states where Class members purchased or leased their Class Vehicles. Plaintiff seeks to assert the foregoing claims on behalf of himself and "all persons in the United States who purchased or leased a BMW vehicle equipped with the Navigation System with the ARTTI feature." (Compl.¶ 102.) On February 18, 2014, Defendant moved to dismiss Plaintiff's unjust enrichment claim, his NJCFA and New Jersey breach of warranty claims on behalf of a nationwide class, and his multi-state class allegations.

## II. *LEGAL STANDARD*

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The plaintiff's short and plain statement of the claim must "give the defendants fair notice of what the ... claim is and the grounds upon which it rests." *Twombly,* 550 U.S. at 545 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

In evaluating the sufficiency of a complaint, a court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir.2008). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Further, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 557 (2007)). However, this " 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *West Penn Alleghen y*

*Health Sys. Inc. v. UPMC,* 627 F.3d 85, 98 (3d Cir.2010) (quoting *Phillips,* 515 F.3d at 234).

## III. *DISCUSSION*

### A. Unjust Enrichment
First, Defendant moves to dismiss Plaintiff's claim for unjust enrichment. To state a claim for unjust enrichment under New Jersey law, a Plaintiff must establish that the "defendant received a benefit and that retention of that benefit without payment would be unjust" and that Plaintiff "expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554, 641 A.2d 519 (1994).

**\*3** The Court has carefully reviewed Plaintiffs' unjust enrichment allegations. The crux of the claim is that "BMW has been unjustly enriched ... [because] BMW was aware of the Navigation System Defect, but failed to disclose it and misled Plaintiff and Class members regarding the features and quality of the Navigation System...." (Compl.¶ 185–86.) The Court finds that Plaintiff has failed to state a facially plausible claim of unjust enrichment because the conduct underlying Plaintiff's unjust enrichment claim sounds in tort. New Jersey does not recognize unjust enrichment as an independent tort cause of action. *See Castro v. NYT Television,* 370 N.J.Super. 282, 299, 851 A.2d 88 (App.Div.2004) (explaining that "the role of unjust enrichment in the law of torts is limited for the most part to its use as a justification for other torts such as fraud or conversion."); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 936 (3d Cir.1999) ("In the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched).").

Plaintiff has not alleged that he did not receive the product he purchased or otherwise conferred a benefit on the Defendant under a quasi-contractual relationship with the expectation of remuneration. Rather, he asserts that Defendant concealed certain defects in and misrepresented the qualities and functionality of the navigation system in the vehicle Plaintiff purchased. (*See, e.g.,* TAC ¶ 214.) Defendant's motion to dismiss this claim is therefore granted. *See, e.g., Pappalardo v. Combat Sports, Inc.,* 2011 U.S. Dist. LEXIS 147902, at \*31–35, 2011 WL 6756949 (D.N.J.2011) (granting motion to

dismiss unjust enrichment claim because "[i]t was presented as a tort-based theory of recovery, in that Plaintiffs d[id] not allege that they did not receive the composite barreled bats they purchased, but rather that the Manufacturer Defendants and League Defendants misrepresented that the composite barreled bats ... were suitable for use in organized youth baseball"); *Nelson v. Xacta 3000 Inc.,* No. 08–5426, 2009 WL 4119176, at \*7 (D.N.J. Nov.24, 2009) (dismissing unjust enrichment claim after finding that "New Jersey law does not recognize unjust enrichment as an independent tort cause of action"); *Warma Witter Kreisler, Inc. v. Samsung Elecs., Am., Inc.,* No. 08–5380, 2009 WL 4730187, at \*7 (D.N.J. Dec.3, 2009) (dismissing unjust enrichment claim and noting that "Plaintiff does not claim that it failed to receive the printer for which it conferred a benefit on the Defendant; rather, Plaintiff's theory of recovery is based on the assertion that it was misled by Samsung as to the fitness of the printer and that as a result of Samsung's tortious conduct, Plaintiff is allowed to recover damages. Such allegations sound in tort."). Plaintiff's unjust enrichment claim is dismissed without prejudice. Plaintiff may amend this claim only to extent he can allege an unjust enrichment claim that does not sound in tort.

### B. Class Allegations

**\*4** Next, Defendant urges the Court to dismiss certain of Plaintiff s class-action allegations. In particular, Defendant argues: (1) Plaintiff cannot pursue a nationwide consumer-fraud class action under the law of New Jersey; (2) Plaintiff cannot pursue a nationwide breach of warranty class action under the law of New Jersey; (3) Plaintiff cannot pursue a nationwide unjust enrichment class action under the law of New Jersey [1]; and (4) Plaintiff cannot pursue a multi-state class action under the laws of unnamed plaintiffs' home states because he is a resident of New Jersey and was injured in his home state.

Federal Rule of Civil Procedure 12(f) permits a party to strike "any redundant, immaterial, impertinent or scandalous matter" from the pleadings. Motions to strike are generally disfavored and are usually denied "unless the allegations have no relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case." *Kim v. Baik,* Civ. No. 06–3604, 2007 WL 674715, at \*5 (D.N.J Feb. 27, 2007) (quoting *River Road Dev. Corp. v. Carlson Corp.,* Civ No. 89–7037, 1990 WL 69085, at \*2 (E.D.Pa. May 23, 1990)).

The Court has carefully considered Defendant's arguments. Defendant does not argue that any of the foregoing class action allegations are "redundant, immaterial, impertinent, or scandalous." Fed.R.Civ.P. 12(f). Nor does Defendant cite to any binding legal authority requiring—or even warranting—the striking, or dismissing, of such class allegations at the motion to dismiss stage. To the contrary, with the exception of one argument—pertaining to the viability of Plaintiff's proposed multi-state class action—the Court concludes that the arguments raised by Defendant in support of its request to strike or dismiss Plaintiff's class action allegations are premature given the early stage of this litigation.

"Dismissal of class claims prior to discovery and a motion to certify the class by plaintiff is the exception rather than the rule," and is almost uniformly disfavored. *Durso v. Samsung Elecs. Am., Inc.,* 2013 U.S. Dist. LEXIS 160596, 2013 WL 5947005 (D.N.J. Nov. 6, 2013) (citing *Ehrhart v. Synthes (USA),* No. 07–01237, 2007 U.S. Dist. LEXIS 94760, \*7–9, 2007 WL 4591276 (D.N.J. Dec. 21, 2007); *Gutierrez v. Johnson & Johnson, Inc.,* No. 01–5302, 2002 U.S. Dist. LEXIS 15418, \*16 (D.N.J.2002)). The Court cannot meaningfully engage in a choice-of-law analysis when it is not even clear which other state laws would apply to unnamed plaintiff's claims. Absent factual content that would allow this Court to determine which other state laws are being asserted in the alternative, the Court is in no position to engage in the type of choice of law analysis engaged in by the Third Circuit in *Maniscalco v. Brother Int'l (USA) Corp.,* 709 F.3d 202, 210 (3d Cir.2013)—which is relied upon by Defendant. In that case, the Third Circuit affirmed the district court's grant of defendant's motion for summary judgment as to Plaintiff's NJCFA claim after concluding that the factors enumerated in subsection (2) of § 148 of the Restatement (Second) of Conflict of Laws point in favor of applying South Carolina law. [2] The Court cannot reasonably determine at this time whether Plaintiff can pursue claims of breach of express and written warranty and/or violation of the NJCFA on a nationwide class action basis, as such an analysis would be entirely speculative at this juncture.

**\*5** Defendant also argues that this Court should dismiss Plaintiff's alternative breach of warranty claims "under the laws of the states in which Class members purchased or leased their Class Vehicles," (Compl.¶¶ 162, 173), because Plaintiff, a New Jersey resident, "lacks standing to invoke the laws of other jurisdictions." (Def.Br.17–18.) The Court agrees.

The Third Circuit has summarized the requirements of Article III constitutional standing as follows:

> (1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Society Hill Towers Owners' Ass'n v. Rendell,* 210 F.3d 168, 175–76 (3d Cir.2000) (citing *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.,* 140 F.3d 478, 484–85 (3d Cir.1998) and *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "It is well-settled that a named plaintiff in a class action is required to establish Article III standing." *In re Magnesium Oxide Antitrust Litig.,* No. 10–5943, 2011 U.S. Dist. LEXIS 121373, at *7 (citing *Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)). "[A] plaintiff ... must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

"That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606(1996) (internal quotations omitted). "[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."

*O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). "The initial inquiry ... is whether the lead plaintiff individually has standing, not whether or not other class members have standing." *Winer Family Trust v. Queen,* 503 F.3d 319, 327 (3d Cir.2007).

The question of "whether, pre-class certification, named plaintiffs are required to establish standing for each and every claim set forth in a class action complaint, or whether it is sufficient to establish standing for a single claim because a court will determine if the named plaintiffs have standing to represent the unnamed class members seeking redress under the balance of asserted claims during the class certification process pursuant to Federal Rules of Procedure 23," has caused disagreement among district courts. *In Re Magnesium Oxide,* 2011 U.S. Dist. LEXIS 121373, at *25–6.

**\*6** A number of federal district courts have refused to dismiss claims brought under the laws of states in which no named plaintiff has standing. *See, e.g., Ramirez v. STI Prepaid LLC,* 644 F.Supp.2d 496, 505 (D.N.J. Mar.18, 2009). Under this approach, "the fact that the named Plaintiffs may not have individual standing to allege violations of consumer protection laws in states other than those in which they [were injured] is immaterial" because "[t]he issue ... is one of predominance—whether 'questions of law or fact common to class members predominate over any questions affecting only individual members." *Id.; In re Grand Theft Auto Video Game Consumer Litig.,* No. 06–1739, 2006 U.S. Dist. LEXIS 78064, at *3, 2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006); *In re Busipirone Patent Litig.,* 185 F.Supp.2d 363, 377 (S.D.N.Y. Feb.14, 2002).

In contrast, other federal district courts require that at least one plaintiff demonstrate standing for each claim asserted in the complaint prior to class certification. *See, e.g., In re Magnesium Oxide,* 2011 U.S. Dist. LEXIS 121373, at *7–10; *In re Packaged Ice Antitrust Litig.,* 779 F.Supp.2d 642, 2011 WL 891160, at *11 (E.D.Mich.2011) ("[N]amed plaintiffs lack standing to assert claims under the law of the states in which they do not reside or in which they suffered no injury."); *In re Terazosin Hydrochloride,* 160 F.Supp.2d at 1371 ("[T]he named plaintiffs cannot rely on unidentified persons within those states to state a claim for relief."); *Ulrich v. Walker,* No. 92–1078, 1992 U.S. Dist. LEXIS 13126, at *1–2, 1992 WL 212478 (E.D.Pa. Aug. 28, 1992); *In re Refrigerant Compressors Antitrust Litig.,* No. 09–2042, 2012 U.S. Dist. LEXIS 98827, at *1, 2012 WL 2917365 (E.D.Mich. July 17, 2012) ("[T]he named IP

Plaintiffs lack constitutional standing to bring claims under the laws of states/territories where named IP Plaintiff claims to reside or have been injured."). Under this approach, "[a] named plaintiff whose injuries have no causal relation to, or cannot be redressed by, the legal basis for a claim does not have standing to assert that claim." *In re Wellbutrin XL Antitrust Litig.,* 260 F.R.D. 143, 152 (E.D.Pa.2009) ("For example, a plaintiff whose injuries have no causal relation to Pennsylvania, or for whom the laws of Pennsylvania cannot provide redress, has no standing to assert a claim under Pennsylvania law, although it may have standing under the law of another state.").

After carefully considering these differing approaches, this Court agrees that the Plaintiff here lacks standing to assert claims under the laws of the states in which he does not reside, or in which he suffered no injury. This Court is persuaded by the reasoning of Judge Debevoise in *In re Magnesium Oxide.* As Judge Debevoise explained, courts must initially "review the standing of actual, not proposed plaintiffs" to assert the claims in a class action complaint because "the alternative would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union." *In re Magnesium Oxide,* 2011 U.S. Dist. LEXIS 121373, at *37–38 (citing *In re Wellbutrin XL Antitrust Litig.,* 260 F.R.D. 143, 154–56 (E.D.Pa.2009)).

 **\*7** Moreover, the Court finds Plaintiff's argument in favor of deferring the standing issue until after class certification unpersuasive. Plaintiff has cited no binding authority directing this Court to defer such considerations and no authority cautioning this Court that such a deferral would be in the interest of justice. "[A] plaintiff must demonstrate standing for each claim he seeks to press," and Supreme Court precedent, namely *Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), and *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), does not permit a court to defer such analysis when standing issues do not revolve around absent class members but rather around the named plaintiff himself. *See In re Wellbutrin XL Antitrust Litig., 260 F.R.D. at 154; In re Magnesium Oxide,* 2011 U.S. Dist. LEXIS 121373, at *10; *Lauren v. PNC Bank, N.A.,* 296 F.R.D. 389, 391 (W.D.Pa.2014); *In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.,* 2013 U.S. Dist. LEXIS 142466, at *33–38, 2013 WL 5503308 (D.N.J. Oct. 2, 2013). For the foregoing reasons, the Court grants Defendant's motion to dismiss Plaintiff's multi-state allegations without prejudice.

## IV. *CONCLUSION*

For the foregoing reasons, Defendant's motion to dismiss is granted in part and denied in part. The Court grants Defendant's motion insofar as it moved to dismiss Plaintiff's unjust enrichment claim and multi-state class allegations. Plaintiff may amend to the extent he is able to cure the noted pleading deficiencies by **July 31, 2014.** The remainder of Defendant's motion is denied.

## All Citations

Not Reported in F.Supp.3d, 2014 WL 2566132

---

## Footnotes

1    As the Court already dismissed the unjust enrichment claim, it need not address this alternative argument for dismissal of that count.

2    In particular, the Court held:
      While, to be sure, New Jersey has an interest in deterring misconduct by corporations headquartered within its borders, it is far from clear that this interest would be sufficient to outweigh other significant contacts with a plaintiffs home state. New Jersey's deterrent interest might well be served by actions involving in-state plaintiffs or actions involving additional contacts within New Jersey without opening the floodgates to nation-wide consumer fraud class actions brought by out-of-state plaintiffs involving transactions with no connection to New Jersey other than the location of the defendant's headquarters.
      *Maniscalco,* 709 F.3d at 210.

**McGuire v. BMW of North America, LLC, Not Reported in F.Supp.3d (2014)**

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

Tab 6

2020 WL 3468250
United States District Court, D. New Jersey.

Garner RICKMAN, Ziwen Li, Gary Reising, Jacob
Biggins, Tom Hoffman, Alexander Vandamme,
Seth Davis, Charles Chapman, Charles Rogers, Ion
Nicolescu, Werner Rogmans, Erica Olson, Algredo
Arias, Jesse White, Razmir Avic, Rickey Evans,
Mark Messina, Lukas Wildner, Miguel Fragoso,
Mark Smith, William Berbaum, Kyle Kern, Eric
Stenglein, Carlos Buendia, Tahani Ibrahim, John
Saviano, Gene Quint, Brian Hembling, Irving
Cohen, Christine Griffith, Tarrah Pee, Darshan
Patel, Brian Beckner, Joshua Hu, Jeffrey Price,
Dean Werner, Eric Sanchez, Charles Campbell,
Angela Hughes, James Turner, Ellis Goldfrit, Chad
Maccanelli, and Salomon Campos, individually and
on behalf of all others similarly situated, Plaintiffs,
v.
BMW OF NORTH AMERICA, Bayerische Motoren
Werke Aktiengesellschaft (BMW A.G.), Robert
Bosch GmbH, and Robert Bosch LLC, Defendants.

Civ. No. 18-4363(KM) (JBC)
|
Signed 06/25/2020

**Attorneys and Law Firms**

Christopher A. Seeger, Seeger Weiss LLP, Ridgefield Park,
NJ, Mark M. Makhail, Michael Andrew Innes, Caroline
F. Bartlett, James E. Cecchi, Carella Byrne Cecchi Olstein
Brody & Agnello, P.C., Roseland, NJ, Scott A. George,
Seeger Weiss, LLP, Newark, NJ, for Plaintiffs.

Kevin M. Mcdonough, Latham & Watkins LLP, Jeffrey A.
Rosenthal, Cleary Gottlieb Steen & Hamilton LLP, New York,
NY, Amy Danielle Luria, Michael D. Critchley, Critchley,
Kinum & DeNoia, LLC, Roseland, NJ, for Defendants.

**OPINION**

KEVIN MCNULTY, U.S.D.J.:

**\*1** The named plaintiffs in this case represent a putative
class of car buyers who each allegedly own a BMW X5
or BMW 335D vehicle. On behalf of the class, the named
plaintiffs sued BMW of North America ("BMW USA");
Bayerische Motoren Werke Aktiengesellschaft ("BMW AG")
(together, "BMW"); Robert Bosch GmbH; and Robert Bosch
LLC (together, "Bosch") for their alleged roles in the clean-
diesel emissions scandal. Plaintiffs' first amended complaint
("1AC", DE 65) [1] asserts one count under the federal RICO
statute and seventy-eight counts under the laws of various
states.

Now before the Court are the motions to dismiss, pursuant
to Fed. R. Civ. P. 12(b)(6), of defendants BMW USA (DE
68) and Robert Bosch LLC (DE 69). For the following
reasons, the motions are **GRANTED** in part and **DENIED**
in part. Plaintiffs have failed to allege standing to bring a
claim under the federal Racketeer Influenced and Corrupt
Organizations Act ("RICO"), 18 U.S.C. § 1962. Because
amendment would appear to be futile, the portion of the
complaint that purports to state a claim for RICO relief
(Count 1) is **DISMISSED**. Because federal-court jurisdiction
is unaffected by that dismissal, Plaintiffs may continue to
prosecute their state-law claims (Counts 2–79).

**I. BACKGROUND** [2]
Familiarity with this matter is presumed; I write for the parties
and do not repeat the factual background described in my
June 27, 2019 opinion (DE 59), which dismissed the original
consolidated class action complaint. Instead, I will briefly
summarize the new allegations contained in the first amended
complaint.

**A. New Allegations, Generally**
The linchpin issue that doomed the consolidated class action
complaint (DE 26) was the lack of "a straightforward
allegation that an identified plaintiff bought a car which, when
tested or analyzed, turned out to contain a defeat device." (DE
59 at 2). Instead, the consolidated class action complaint
relied on a single X5 vehicle that "seem[ed] to be proffered as
an exemplar." (DE 59 at 2). The first amended complaint also
does not allege facts to establish that any named plaintiff's
car contained a defeat device. It is true that the new pleadings
contain more robust allegations concerning the testing and
analysis of five "clean diesel" and one gasoline vehicle. (1AC
¶ 163). Still, no plaintiff claims to have owned any of the
tested vehicles; instead, Plaintiffs' theory is that each vehicle
is representative of the entire line of cars. (1AC ¶¶ 3 &73).

Case 1:19-md-02875-RMB-SAK    Document 1802-1    Filed 12/02/21    Page 147 of 182
PageID: 54400
Rickman v. BMW of North America, Slip Copy (2020)
RICO Bus.Disp.Guide 13,355

Plaintiffs emphasize that when a car manufacturer like BMW seeks regulatory approval for a new vehicle, the manufacturers submit to the EPA a single vehicle to stand in for the entire model line. (1AC ¶¶ 3 & 173). The theory is that each subject vehicle is materially and fundamentally identical to every other vehicle in the fleet, and therefore is properly the subject of the clean diesel testing fraud allegations. That theory is the foundation upon which the first amended complaint seeks to cure the deficiencies of the previously dismissed consolidated class action complaint. To that end, Plaintiffs note that after the class action complaint was dismissed, their experts performed tests using the portable emission measurement system ("PEMS") and a chassis dynamometer on several additional vehicles—although, again, none in particular is alleged to have belonged to any named plaintiff.

**\*2** The tested vehicles consisted of two 2012 BMW X5s, one 2011 BMW X5, two 2011 BMW 335ds, and a gasoline-powered 2012 X5.[3] (1AC ¶¶ 163 & 169–252). The first amended complaint also includes new information about the vehicles that were tested, including allegations that their mileage was close to the certification standard, that they had been properly maintained, and that none had any emission-system faults. (1AC ¶¶ 169, 171 & 172).

Plaintiffs maintain that the first amended complaint sets forth detailed, particularized allegations of:

(1) tests of five diesel vehicles (1AC ¶¶ 3, 20, 125–28 & 169–252);

(2) PEMS testing (1AC ¶¶ 2, 3, 4, 5, 17, 163 & 186–252);

(3) chassis dynamometer testing (1AC ¶¶ 17 & 174–85);

(4) with the test results showing use of defeat devices (1AC ¶¶ 18–24 & 174–252);

(5) the operation of the defeat devices (1AC ¶¶ 25 & 253–66); and

(6) Defendants' manipulation of the EDC17 system (1AC ¶¶ 25, 80, 84, 85, 203, 204, 253–66 & 269–308).

Plaintiffs have also submitted to the Court scientific literature, reports, and testing accounts from independent entities that purport to show that most "clean diesel" vehicles emit far more pollution on the road than in laboratory tests. (1AC ¶¶ 322–32). The first amended complaint also vouches for the reliability of the PEMS testing system.[4] (1AC ¶¶ 4 & 152–68).

Plaintiffs allege that their scientific evidence confirms the superior accuracy of PEMS testing as compared with chassis dynamometer testing.[5] The first amended complaint focuses on the weaknesses inherent in chassis dynamometer testing. These weaknesses of chassis dynamometer testing include that (1) during testing, the front wheels move but do not turn, which does not happen in real-world driving conditions; (2) on a two-wheel drive vehicle, the driven wheels are moving but the non-driven wheels are not; and (3) on a vehicle equipped with GPS, the vehicle's wheels move while the GPS position does not change. (1AC ¶ 166). According to Plaintiffs, an engine can be designed to detect that it is being tested on a chassis dynamometer, but the same is not true as to PEMS testing. Thus, according to Plaintiffs, "PEMS is not only accurate for detection and quantification of defeat devices, it is essential." (1AC ¶ 166).

Plaintiffs subjected all five subject vehicles to laboratory and real-world testing. The vehicles were first tested on a chassis dynamometer, adhering to federal test protocols in a CFR-compliant laboratory. (1AC ¶¶ 125–28 & 174). In this laboratory testing environment, the five vehicles all met or approached emissions standards. (1AC ¶¶ 180–85). During on-road PEMS testing, however, the vehicles did not meet the standard. The first amended complaint alleges that the defeat device drove the vehicles' on-road NOx emissions dramatically higher. Specifically, under city driving conditions, the vehicles' emissions were 1.4 to 7.5 times the standard and at, times, 9 to 73 times the standard. (1AC ¶¶ 19 & 192). Under highway-driving conditions, all but one diesel vehicle exceeded the standards. The 2012 X5, for example, exceeded the standard by a multiple of 3.4. (1AC¶ 195). The gasoline-powered BMW X5, by contrast, had an average NOx emission rate below the emissions standard in both chassis dynamometer and PEMS testing. (1AC ¶ 192).

**\*3** Plaintiffs also claim that the first amended complaint adequately alleges the use of a temperature defeat device, embodied in software programming. (1AC ¶ 197) The temperatures in vehicle test-certification cycles must be between 68°F and 86°F, but the first amended complaint details how emissions controls are turned down or off in temperatures outside that range. (1AC ¶¶ 196–210). According to Plaintiffs, PEMS testing revealed the use of a

Case 1:19-md-02875-RMB-SAK    Document 1802-1    Filed 12/02/21    Page 148 of 182
PageID: 54401
Rickman v. BMW of North America, Slip Copy (2020)
RICO Bus.Disp.Guide 13,355

temperature defeat device, yielding emissions as high as 526 mg/mile. (1AC ¶¶ 196–200).

The first amended complaint also alleges that the subject vehicles can reduce NOx to meet emissions standards so long as the effectiveness of the emissions-control system is not otherwise reduced, such as by instruction from the EDC17. (1AC ¶¶ 213 & 214). It also contains allegations that describe how the emissions systems were disabled. (1AC ¶¶ 215–19). Specifically, by isolating and testing laboratory-like conditions during PEMS testing, Plaintiffs' experts concluded that the subject vehicles are able to detect the certification test cycle and adjust the emissions performance when the EDC17 "knows" the test cycle is not being run. (1AC ¶ 218).

Moreover, the first amended complaint alleges that Plaintiffs' PEMS tests showed increased emissions during cold-start and hot-start conditions, and that the tested vehicles did not pass PEMS testing during the passive regeneration phase that removes diesel particulate matter. [6] (1AC ¶¶ 21–24, 220–28, 241 & 304).

All of these new allegations taken together, Plaintiffs assert, cure the deficiencies identified in the consolidated class action complaint.

### B. New Allegations Directed at Bosch

The first amended complaint also contains revised allegations regarding Bosch's participation in the scheme. According to Plaintiffs, Bosch in 2006 introduced the EDC17 as the "brain of diesel injection" that "controls every parameter that is important for effective, low-emission combustion," because it wanted to enter the lucrative diesel market. (1AC¶ 269). The EDC17 is a proprietary system over which Bosch exerts complete control to prevent its clients from changing the software without Bosch's participation. (1AC ¶¶ 258 & 271–73).

Plaintiffs allege that Bosch's control over the software allowed BMW to reduce or turn off emissions controls when the vehicle sensed it was not in a testing environment. (1AC ¶¶ 6 & 260). Moreover, Bosch actively marketed clean diesel technology throughout the United States. (DE ¶¶ 25 & 289–94). Plaintiffs allege that Bosch participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying the EDC17, which operated as a defeat device and turned off or turned down emissions controls in the BMW vehicles. (1AC ¶ 373). Bosch also allegedly concealed the

defeat devices in U.S. documentation and in communications with U.S. regulators. (1AC ¶ 373). Almost all manufacturers to whom Bosch sold the EDC17 are now known to have used defeat devices and to have misled consumers. Bosch was involved in the Volkswagen scandal, actively working to conceal manipulation in the software that it programmed in a collaborative scheme with Volkswagen. (1AC ¶¶ 83–84 & 267–83).

### C. Procedural History
**\*4**  On June 27, 2019, I filed an opinion (DE 59) and order (DE 60), dismissing without prejudice the consolidated class action complaint (DE 26). As discussed in that opinion, the dismissal rested on Plaintiffs' failure to allege Article III standing, and was entered without prejudice to the filing of an amended complaint. On September 20, 2019, Plaintiffs filed the first amended complaint. (DE 65). BMW and Bosch again moved to dismiss. (DE 68 & 69). BMW's motion to dismiss is accompanied by a request for judicial notice and seventeen exhibits, which consist primarily of news articles discussing BMW's role (or lack thereof) in the clean diesel emissions scandal. (DE 68-3 through 68-20).

## II. DISCUSSION AND ANALYSIS
This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 to the extent that Plaintiffs' claims arise under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. The Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367.

Alternatively, this Court has ordinary diversity jurisdiction because Plaintiffs and Defendants reside in different states and the amount in controversy exceeds $75,000. 28 U.S.C. 1332(a). This Court also has original diversity jurisdiction over this lawsuit pursuant to the pursuant to the Class Action Fairness Act of 2005. 28 U.S.C. § 1332(d). Plaintiffs and Defendants are citizens of different states; there are more than one-hundred members of the class; the aggregate amount in controversy exceeds $5 million; and class members reside across the United States.

### A. Standard of Review
Federal courts are courts of limited jurisdiction which are confined to the adjudication of "cases" or "controversies" as permitted by Article III of the Constitution. *See* U.S. Const., Art. III, § 2. The case-or-controversy requirement requires

RICO Bus.Disp.Guide 13,355

that a plaintiff possess constitutional standing. *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006). For a plaintiff to have constitutional standing, the following three elements must be present: "the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016); *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 272 (3d Cir. 2016). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo*, 136 S. Ct. 1540, 1547. "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed." *Taliaferro*, 458 F.3d 181, 188. Consequently, a motion to dismiss for lack of standing is properly brought under Federal Rule of Civil Procedure 12(b)(1). *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014); *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).

Federal Rule of Civil Procedure 12(b)(1) governs jurisdictional challenges to a complaint. These may be either facial or factual attacks. *See* 2 Moore's Federal Practice § 12.30[4] (3d ed. 2007); *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). A facial challenge asserts that the complaint does not allege sufficient grounds to establish subject matter jurisdiction. *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015); *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999). "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Lincoln Ben. Life*, 800 F.3d at 105 (citing *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)). As to a facial jurisdictional attack, then, the standard is similar to the one that applies to an ordinary motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). [7]

**\*5** Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *N.J. Carpenters & the Trustees Thereof v. Tishman Constr. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. 544, 556). While "[t]he plausibility standard is not akin to a 'probability requirement' ... it asks for more than a sheer possibility." *Iqbal*, 556 U.S. 662, 678.

With respect to allegations of fraud, "a party must state with particularity the circumstances constituting fraud," although "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see also U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) ("A plaintiff alleging fraud must therefore support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.' " (quoting *In re Rockefeller Ctr. Props., Inc. Securities Litig.*, 311 F.3d 198, 217 (3d Cir. 2002))). In doing so, "a party must plead [its] claim with enough particularity to place defendants on notice of the precise misconduct with which they are charged." *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017) (internal quotation and citation omitted).

**B. Article III Standing**

In this Court's opinion dismissing the consolidated class action complaint (DE 26), I determined, for two reasons, that Plaintiffs' reliance on the test results of single vehicle was insufficient to establish standing:

> I find inadequate the allegation that the Plaintiffs' vehicles contain a defeat device for two primary

RICO Bus.Disp.Guide 13,355

reasons. First, it depends on testing of a single vehicle which revealed discrepancies between laboratory and on-road emissions results, from which plaintiffs somewhat speculatively infer that the vehicle contained a defeat device. Second, it relies on a further inference that the tested vehicle is a valid exemplar—*i.e.*, that because it contained a defeat device, then the Plaintiffs' vehicles, too, must have contained such a device.

**\*6** (DE 59 at 16). Now, in the first amended complaint, Plaintiffs return to this Court having tested what they allege are five exemplar vehicles. (1AC). And again, BMW and Bosch challenge the sufficiency of the pleadings and assert that Plaintiffs have not established standing to bring their claims. (DE 68 & 69).

BMW broadly attacks the sufficiency of Plaintiffs' allegations. Specifically, BMW alleges that the first amended complaint does not allege an injury in fact because (1) none of Plaintiffs' vehicles were tested (DE 68-1 at 21–22); (2) the first amended complaint does not allege corroborating facts (DE 68-1 at 22–24); and (3) the first amended complaint does not identify a defeat device (DE 68-1 at 24–25). BMW also notes that some tested vehicle arguably passed PEMS testing. (DE 68-1 at 25–28). Finally, BMW insists that there is no injury fairly traceable to BMW's conduct. (DE 68-1 at 31–34).

Bosch generally adopts these arguments that, adding only that any overpayment by Plaintiffs would have been to BMW—not Bosch—and that Bosch had no control over the subject vehicles. (DE 69-1 at 5–6).

Defendants contend that Plaintiffs still lack standing because they have not alleged that any tested vehicle belonged to any plaintiff. However, Plaintiffs have alleged that the five tested vehicles represent, and are substantially identical to, those owned by Plaintiffs and which are the subject of Defendants' alleged scheme. The purpose of Rule 8(a) is to give a defendant "fair notice" of the claim against him and her, and the allegations here do just that. The allegations contained in the first amended complaint are sufficient to permit a plausible inference that BMW's vehicles, including those purchased by Plaintiffs, contained defeat devices.

Defendants also note that Plaintiffs do not allege specifics as to the driving history or maintenance record of the tested vehicles. This deficiency, they conclude, dooms Plaintiffs case, presumably under the theory that some intervening event could have caused the heightened emissions in Plaintiffs' vehicles. While some such intervening cause may favor Defendants' position at a later point in the proceeding, for now, Plaintiffs' allegations regarding ownership of specific BMW models is sufficient to notify Defendants which of its cars are alleged to contain defeat devices. Rule 8(a) requires no more than that. In any event, the first amended complaint alleges the mileage of each vehicle, that each was screened to ensure it been properly maintained, and that each was free of potential emission-control defects.

Defendants make too much of this Court's earlier observation that the Plaintiffs' lack of corroborating evidence of a defeat device did not move their allegations "across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570:

Plaintiffs have not (by analogy to the plaintiffs in *Mercedes I* or *Counts*) cited independent entities that have levied defeat-device accusations against BMW for the particular engines at issue. Rather, Plaintiffs allege more generally that "[i]n Europe, watchdog groups, NGOs, and government agencies have cited virtually every manufacturer, including BMW, for violating the lower European emissions standards." There is no allegation that pinpoints any particular European governmental agency's citation of BMW with respect to its diesel cars in general, or the Subject Vehicles in particular. Rather, Plaintiffs allege (1) that a non-profit organization called Transportation and Environment accused many diesel vehicles of employing defeat devices, including certain BMW models and engines, but did not cite the Subject Vehicles at issue here; and (2) that a group called the International Council on Clean Transportation ("ICCT") released a report analyzing the real world versus lab testing emissions of many manufacturers' vehicles and found a different BMW model (not any of the Subject Vehicles) to have polluted above the European standard. Plaintiffs do not allege that these different BMW models have the same engines or use the same deceptive technology as the Subject Vehicles.

**\*7** ...

The allegations here fall short of those in *Mercedes*. Plaintiffs have not alleged that any governmental organization has accused BMW of evading regulators with

defeat devices in their diesel cars, Plaintiffs also have not alleged that the Defendants admitted any wrongdoing. These corroborating allegations were essential to the *Mercedes I* court's finding that the plaintiffs' testing sufficed to make the defeat device inference plausible.

Ultimately, without sufficient corroborating allegations, I am persuaded to dismiss the Complaint because the Plaintiffs have presented little beyond emissions test results for a single vehicle—one used 2012 X5.

(DE 59 at 20–21). A closer reading of that opinion reveals that I did not view independent corroborating evidence as a necessary condition that Plaintiffs needed to allege to withstand a Rule 12(b) motion. Rather, the opinion states that in the absence of adequate testing (which Plaintiffs had failed alleged in the consolidated class action complaint), such evidence *might* suffice to burnish the one-vehicle sample size enough to state a claim for relief. To be sure, Defendants have submitted a trove of news articles that emphasize the BMW was never implicated in the clean diesel scandal like many of its competitors. (*See* DE 68-4 through -20). However, the lack of a governmental investigation does not, by itself, demonstrate the absence of a defeat device or, by extension, deprive Plaintiffs of Article III standing.

The first amended complaint also adequately alleges an injury fairly traceable to Defendants' conduct. Plaintiffs allege that Defendants misled them by advertising and failing to disclose material information, that they were exposed to these misrepresentations or nondisclosures, that but for Defendants' conduct they would not have bought the vehicles or would have paid less for them, and that all Plaintiffs overpaid for their vehicles. Each plaintiff has also pled reliance on misrepresentations and omissions, has alleged BMW's and Bosch's conduct in that enterprise, and claimed that he or she paid an artificially high market price because of Defendants' false advertisements and conduct. Taken together, these specific allegations demonstrate that Plaintiffs' alleged injuries are fairly and directly traceable to the conduct of BMW and Bosch.

Accordingly, I find that the first amended complaint has cured the deficiencies of the consolidated class action complaint with respect to the threshold issue of Article III standing.

### C. Federal Law Claim (RICO)

Plaintiffs allege that Defendants' conduct violates the federal RICO statute. *See* 18 U.S.C. § 1962(c)–(d); *see also* 18 U.S.C.

§ 1964 (granting civil remedies for RICO violation). The RICO enterprise is alleged to be one by which the BMW and Bosch defendants coordinated their operations through the design, manufacture, distribution, testing process, and sale of the subject vehicles.

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which effect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c)); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362–63 (3d Cir. 2010). Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." To establish a claim under section 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 482–83 (1985); *see also District 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F.Supp.2d 508, 518–19 (D.N.J. 2011) (citation omitted).

**\*8** The term "enterprise" for RICO purposes is exceedingly broad. *See Boyle v. United States*, 556 U.S. 938, 944 (2009). It includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Ins. Brokerage*, 618 F.3d at 362–63 (citing 18 U.S.C. § 1961(4)). With respect to the pattern of racketeering activity, the statute "requires at least two acts of racketeering activity within a ten-year period," which may include federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343. *Id.* (citations omitted). In addition, "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima*, 473 U.S. at 496.

The racketeering predicate acts alleged here are mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. Both statutes provide that "[w]hoever, having devised a scheme or artifice to defraud ... for the purpose of executing such scheme or artifice" either (a) "places in any post office or authorized depository for mail matter, any matter or thing," or (b) "transmits or causes to be transmitted by means of wire ... in interstate or foreign commerce" virtually any sort of material shall be guilty of an offense. *See* 18 U.S.C. §§ 1341 & 1343.

Case 1:19-md-02875-RMB-SAK    Document 1802-1    Filed 12/02/21    Page 152 of 182
PageID: 54405
Rickman v. BMW of North America, Slip Copy (2020)
RICO Bus.Disp.Guide 13,355

In addition to the requirements described above, a successful RICO plaintiff must also demonstrate standing to bring a RICO claim in the first place. This is not the minimal jurisdictional showing of Article III standing, but a judge-made limitation. One absolute bar to RICO standing is the so-called "indirect purchaser rule." The Supreme Court developed the indirect purchaser rule in the antitrust context, when it held that Clayton Act plaintiffs may not demonstrate injury by providing evidence only of indirect purchases. *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 737 (1977).

It must be acknowledged that the rule is somewhat arbitrary and policy-based; after all, if Smith is overcharged for an item and resells the item to Jones, then Jones, too, may be overcharged as a result. The *Illinois Brick* Court warned, however, that allowing Jones or other indirect purchasers down the line to recover under such a theory would "transform treble-damages actions into massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant." *Id.* at 739. Moreover, the indirect purchaser rule prevents defendants from being exposed to "multiple liability" should both indirect and direct purchasers in a distribution chain be permitted to assert claims arising out of a single overcharge. *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 851 (3d Cir. 1996).

Because 18 U.S.C. § 1964(c), RICO's private cause of action, was modeled on the Clayton Act, "antitrust standing principles apply equally to allegations of RICO violations." *McCarthy*, 80 F.3d at 855; *see also Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 270–74 (1992). In *Holmes*, the Court explicitly held that federal jurisprudence interpreting antitrust principles governs RICO claims, because Congress modeled RICO's civil action provision on a substantially similar provision in the Clayton Act:

> The key to better interpretation lies in some statutory history. We have repeatedly observed, *see Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 150-51, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) ... that Congress modeled § 1964(c) ... [of RICO after] the federal antitrust laws, § 4 of the Clayton Act ...

> In *Associated General Contractors* [*v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983)] ... we discussed how Congress enacted § 4 in 1914 with language borrowed from § 7 of the Sherman Act, passed 24 years earlier. Before 1914, lower federal courts had read § 7 to incorporate common-law principles of proximate causation ... and as

we reasoned, as many lower federal courts had done before us ... that congressional use of the § 7 language in § 4 presumably carried the intention to adopt "the judicial gloss that avoided a simple literal interpretation." ... Thus, we held that a plaintiff's right to sue under § 4 required a showing that the defendant's violation not only was a "but for" cause of his injury[ ] but was the proximate cause as well.

**\*9** The reasoning applies just as readily to § 1964(c) [of RICO]. We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4.... It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them.

*Holmes*, 503 U.S. at 267–68.

Here, none of the subject vehicles were acquired directly from BMW (or Bosch, for that matter). (1AC ¶¶ 31–70). Instead, the Plaintiffs allege that they acquired their vehicles from a dealer, from a private party, or at auction. In fact, very few of the subject vehicles were acquired from an authorized BMW dealer at all; most seem to have been acquired on the secondary market. [8] The Third Circuit and courts in this District have repeatedly held that such indirect purchasers lack standing to assert RICO claims. *See, e.g.*, *McCarthy*, 80 F.3d at 854 (plaintiffs were not direct purchasers of allegedly overpriced photocopies and therefore lacked antitrust and RICO standing); *Minnesota by Ellison v. Sanofi-Aventis U.S. LLC*, No. 18-14999, 2020 WL 2394155 at \*8–9 (D.N.J. Mar. 31, 2020) (plaintiffs lacked RICO standing because none purchased insulin directly from defendants); *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, No. 18-2211, 2019 WL 1418129 at \*16 (D.N.J. Mar. 29, 2019) (heightened coinsurance payments and fraudulent benchmark prices of insulin did not bestow RICO standing because plaintiffs failed to allege they directly purchased insulin from defendants); *In re Insulin Pricing Litig.*, No. 17-699, 2019 WL 643709 at (D.N.J. Feb. 15, 2019) (allegation that benchmark prices "directly" affected price paid by consumers did not overcome indirect purchaser bar to RICO standing; indirect purchaser rule applies even when alleged improper price inflation is passed along on a "dollar for dollar basis"). Under the law within this Circuit, then, Plaintiffs do not have standing to pursue their RICO claims against BMW and Bosch, because each plaintiff is an indirect purchaser of his or her vehicle. [9]

In response, Plaintiffs argue that Defendants are attempting "to graft a privity requirement into RICO by means of an indirect purchaser theory," (DE 73 at 8), and that both *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), and *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633 (3d Cir. 2015), carved out exceptions to the indirect purchaser rule in RICO cases. (DE 73 at 8–10).

First, there is no question of "grafting" anything. The Third Circuit has clearly and directly held that "only the purchaser immediately downstream from the alleged [RICO violator]" possesses standing to pursue an action. *McCarthy*, 80 F.3d at 848. If this be privity, make the most of it.

*10 Second, Plaintiffs' reliance on *Bridge* and *Avandia* conflates the standing and causation issues under RICO. Those are distinct issues which require discrete analyses. Thus, Plaintiffs' claim would still fail for lack of RICO standing even if *Bridge* and *Avandia* controlled the issue of causation.

*Bridge* at least addresses standing, but it does not undercut the indirect purchaser rule as it applies to Plaintiffs' RICO claims. In *Bridge*, the Court held that a plaintiff who is injured "by reason of" a pattern of mail fraud may have RICO standing "even if he [or she] has not relied on any misrepresentations." 553 U.S. at 649–50. The *Bridge* plaintiff, however, was not an indirect purchaser; the case does not support any argument for RICO standing on behalf of plaintiffs multiple levels down the consumer chain.

In *Avandia*, the Third Circuit explained that "if there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury, ... a RICO plaintiff who did not directly rely on a defendant's misrepresentation can still establish *proximate causation*." (DE 73 at 9 (quoting 804 F.3d at 643) (emphasis added)). Apart from the fact that *Avandia* speaks to reliance and causation, not standing, the case presents numerous factual differences. The *Avandia* plaintiffs were third-party payors who included the drug Avandia in their formulary decisions at favorable rates, relying on material misrepresentations made by the defendant manufacturer. *Avandia*, 804 F.3d at 636. By contrast, Plaintiffs here allege that their damages stem from inflated prices paid by car dealers and original owners before Plaintiffs purchased the vehicles from those intermediaries.

Critically, the *Avandia* plaintiffs did not seek a remedy for payments made to third parties based on misrepresentations made by a manufacturer. Instead, the claim there concerned the defendants' failure to disclose known health risks of various drugs ultimately included in their formularies:

> The conduct that allegedly caused plaintiffs' injuries is the same conduct forming the basis of the RICO scheme alleged in the complaint—the misrepresentation of the heart-related risks of taking Avandia that caused [third-party payors] and [pharmacy benefit managers] to place Avandia in the formulary. The injury alleged by the [third-party payors] is an economic injury independent of any physical injury suffered by Avandia users. *And, as far as we can tell, prescribing physicians did not suffer RICO injury from [the] marketing of Avandia.*

*Avandia*, 804 F.3d at 644 (emphasis added). *Avandia* suggests by analogy, that if there was a RICO injury in our case, it was the car dealer—not any Plaintiff—who suffered it.

Each Plaintiff here is an indirect purchaser and therefore lacks standing to maintain a RICO claim against Defendants. Accordingly, Plaintiffs' RICO claim (Count 1) is **DISMISSED**.

### D. State Law Claims

Plaintiffs also bring common-law and statutory claims under the laws of various states. Counts 2 through 53 allege fraudulent concealment and violations of the consumer-protection laws of the twenty-four states in which at least one named plaintiff resides. Counts 54 through 79 concern the statutory consumer-protection laws of the remaining twenty-six states.

Plaintiffs' common-law claims proceed on a fraudulent-concealment theory:

> *11 BMW understood that a consumer deciding between a gas BMW and a diesel BMW had to have a reason to pay more for a diesel. For this reason BMW made numerous

statements about lower emissions, the environment, and fuel economy that omitted material. BMW made these statements because it understood that information about lower emissions, fuel economy, and performance were material to potential consumers of diesel vehicles. The misrepresentations and omissions common to all state law claims can be summarized as follows:

> The vehicles "met emissions standards in all states." [false];

> "BMW Efficient Dynamics Means Less Emissions"; [false and misleading];

> Its engines "protect the environment every day." [misleading];

> Its engines turned nitric oxides "into environmentally friendly compatible nitrogen and water vapor." [false and misleading];

> Its engines offered "increased power with decreased fuel consumption and emissions." [misleading as in many circumstances with emissions manipulation there is no decrease in emissions.];

> BMW claimed its SCR catalyst ensured effective reduction of NOx, in part by urea dosing (¶ 123) [false as SCR efficiency was manipulated to allow increased emissions];

> BMW claimed its polluting vehicles generated "less emissions" [misleading as this is true only in certain circumstances and emissions are not less than a comparable BMW gas model].

> "Exemplary fuel economy" [false and misleading as fuel economy is decreased during active regeneration, and any fuel economy advantage only occurs when the emissions system is manipulated].

> "Consistent distribution of AdBlue ... is ensured by the SCR mixer [false as the SCR mixer is programmed to reduce admissions control].

(1AC ¶ 400).

Plaintiffs allege that both BMW and Bosch were required to disclose concealed facts:

> (1) [T]hey each made or were complicit in statements that were misleading for failure to disclose material facts; (2) Defendants knew the omitted facts were material to consumers which is why they made or were complicit in statements made about emissions, the environment and fuel economy; (3) Defendants were in a superior position and had exclusive knowledge of the true facts; and (4) these omissions related to the core function of a diesel vehicle. As to exclusive knowledge defendants had contractual agreements requiring strict confidentiality as to the software programming used to manipulate emissions performance.

(1AC ¶ 401).

Defendants argue that this Court should dismiss Plaintiffs' consumer-protection and fraudulent-concealment claims. BMW and Bosch claim that Plaintiffs have failed plead facts showing (1) standing to bring claims in states in which they do not reside (DE 68-1 at 42–43; DE 69-1 at 19); and (2) the requirements of Rule 9(b) (DE 68-1 at 45–47; DE 69-1 at 19). Bosch also alleges that Plaintiffs have not properly alleged a duty to disclose. (DE 69-1 at 19–21).

### 1. State-Law Standing Issues

Essentially, Defendants' first argument is that Counts 54–79—the claims relating to the consumer-protection statutes of the states in which no named plaintiff resides—should be dismissed because the named plaintiffs, as nonresidents of those states, lack standing to bring those claims. A more prudent approach would be to defer consideration of this argument until the certification stage. To the extent the proposed class is not certified, or is limited, many of these issues might be rendered moot. I here follow the lead of other cases that have declined to address similar issues in advance of class certification. *See, e.g., Sheet Metal Workers Nat. Health Fund v. Amgen Inc.,* No. 07–5295, 2008 WL 3833577 at *9 (D.N.J. Aug.13, 2008) (declining to address

Rickman v. BMW of North America, Slip Copy (2020)

RICO Bus.Disp.Guide 13,355

argument that plaintiff lacks standing to bring claims under laws of states in which plaintiff failed to allege an injury and explaining that "because class certification creates the jurisdictional issue, the Court must treat the statutory standing issue before it deals with Article III standing, as instructed by *Ortiz*") (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)); *In Re Hypodermic Prods. Antitrust Litig.,* No. 05-1602, 2007 WL 1959212 at *15 (D.N.J. June 29, 2007) (deferring consideration of argument that "Plaintiffs do not enjoy standing to raise state antitrust claims in jurisdictions in which they do not reside" until after class certification issues have been resolved); *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 204 (D.N.J.2003) (considering it appropriate to decide class certification before resolving Article III standing challenges where defendant had argued that "Clark does not enjoy standing to assert claims on behalf of class members regarding restaurants that Clark has not visited, or in states Clark has not visited").

### 2. Fraudulent Concealment and Rule 9(b)

**\*12** Defendants also seek dismissal of the common-law claims. The parties are less than specific about which states' common law applies, and do not point to any relevant distinctions between the laws of those states. I therefore default to the New Jersey law of fraudulent concealment, which has five essential elements: (1) a material misrepresentation or omission of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity or knowing the omission to be material; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 610 (1997); *Delaney v. Am. Express Co.*, No. 06-5134, 2007 WL 1420766 at *5 (D.N.J. May 11, 2007).

Rule 9(b)'s specificity requirement applies to fraudulent concealment claims. *GKE Enters., LLC v. Ford Motor Credit Co. LLC USA*, No. 09-4656, 2010 WL 2179094 at *4 (D.N.J. May 26, 2010). Fraud-by-omission claims, however, are by their nature less susceptible of precise formulation than affirmative misrepresentation claims.[10] *See Feldman v. Mercedes Benz USA*, No. 11-984, 2012 WL 6596830 at *10 (D.N.J. Dec. 18, 2012). A fraud-by-omission claim is sufficient so long as it places "the defendant on notice of the precise misconduct with which it is charged," *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 443 (D.N.J. 2012)

(quoting *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)).

BMW[11] contends that Plaintiffs have failed to specify the who, what, when, where, and how of the allegedly fraudulent scheme, as required by Rule 9(b). (DE 68-1 at 46). Here, however, BMW mistakenly focuses on the alleged affirmative misrepresentations to the claimed omissions. For example, BMW argues that "[r]ather than allege conduct specifically and separately as to each BMW entity, the FAC refers to supposed misrepresentations and omissions by 'BMW' or the 'Defendants,' which is insufficient under Rule 9(b)" and that "the FAC fails to identify with specificity the statements on which named Plaintiffs relied, when those statements were made, or who made them." (DE 68-1 at 46). BMW's argument asks too much of Rule 9(b), which imposes a less specific pleading standard on fraudulent omissions than it does on affirmatively fraudulent statements. The "who, what, when, where and how" is not so strictly required here, because Plaintiffs cite BMW's affirmative statements primarily to establish the context for what BMW should *also* have said to ensure that those statements did not mislead. Moreover, the first amended complaint does not engage in impermissible group pleading, because it distinctly pleads the roles that that BMW and Bosch allegedly played in carrying out the scheme. Plaintiffs cite numerous specific examples of how each defendant furthered the allegedly fraudulent conduct. (1AC ¶ 379).

Plaintiffs' allegations of misrepresentations, and particularly those involving omissions, have sufficiently notified BMW and Bosch of the precise misconduct with which they are charged: "Each Plaintiff alleges exposure to the materially deficient messaging because each 'selected and ultimately purchased [his or her vehicle], in part, because of the diesel system, as represented through advertisements and representations made by BMW,' including 'advertisements on BMW's website and representations from the dealership touting the efficiency, fuel economy, and power and performance of the engine.' " (DE 73 at 45–46).

**\*13** Moreover, Plaintiffs allege that Defendants designed the defeat device to provide the perception of reduced emissions while avoiding the cost of reduced emissions. These allegations are sufficient to permit an inference fraudulent intent, and they meet the specificity requirements of Rule 9(b). Similar allegations have been found in other automotive-defect cases, both within and without this district, to satisfy Rule 9(b). *See Counts v. Gen. Motors, LLC,*

RICO Bus.Disp.Guide 13,355

237 F. Supp. 3d 572, 599 (E.D. Mich. 2017) (plaintiffs sufficiently alleged that GM "actively concealed and had exclusive knowledge of the alleged 'defeat device' "); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 349 F. Supp. 3d 881, 915 (N.D. Cal. 2018) (finding that fraudulent omissions claims survived, because plaintiffs identified "the specifics of what VW failed to disclose: (1) that 'the Clean Diesel engine systems were not EPA-compliant,' and (2) that the class vehicles 'used software that caused the vehicles to operate in low-emission test mode during emissions testing' "); *Feldman*, 2012 WL 6596830 at *10 (holding that plaintiffs adequately stated a claim of fraud by omission where they "allege[d] specific facts showing Defendants' knowledge and concealment of the alleged defect").

This Court will not dismiss Plaintiffs' state-law fraudulent-concealment claims for failure to meet the standards of Rule 9(b).

### 3. Bosch's Duty to Disclose

Concerning Bosch, Plaintiffs' allegations of fraudulent concealment rest on a theory of fraud by omission. (1AC ¶¶ 414–15). Under New Jersey law, "courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a 'special relationship.' " *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993). The categories of relationships that give rise to a duty to disclose are: "(1) fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposes trust in another party, or else from the circumstances, such trust necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties." *Id.*

Plaintiffs also draw attention to a similar case which held that where an omission makes the representation misleading —that is, where "Plaintiffs allege active concealment of the truth"—then Plaintiffs "need not establish a duty to disclose." (DE 72 at 7 n.12):

Defendants contend that a number of states—namely, Massachusetts, Maryland, Maine, New Jersey, Nevada, Oregon, Pennsylvania, South Carolina, and Tennessee— recognize a fraudulent concealment claim only where

there is a fiduciary relationship between the plaintiff and defendant. *See* FCA/VM Mot. at 54. Defendants are incorrect. Although Defendants do cite some authority to support their position,

[T]here is substantial authority [that] a fiduciary relationship is not the only time a duty to disclose arises; also, an affirmative act of concealment by the defendant effectively negates the duty-to-disclose requirement (*i.e.*, there is a difference between silence, where a duty to disclose is required, and active concealment, where there is no such requirement). In this regard, Plaintiffs do not claim that Defendants were simply silent but rather that they took affirmative steps to conceal the defeat devices—including not identifying them for the EPA and CARB.... A duty to disclose thus may obtain in a variety of circumstances or indeed, may not even be required in some situations[.]

...

*See U. Jersey Bank v. Kensey*, 306 N.J. Super. 540, 704 A.2d 38, 45 (1997) (indicating agreement with Restatement (Second) of Torts that there is a duty "to disclose to another 'facts basic to the transaction, if he knows that the other is about to enter into it under a mistake ... and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts' ").

**\*14** *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 1009 (N.D. Cal. 2018).

Here, Plaintiffs do not assert that they fall into one of the special relationship categories with Bosch. The focus of the inquiry is only whether a duty to disclose existed to prevent a previous statement from being misleading.

Bosch claims that "Plaintiffs fail to allege facts to show that Bosch LLC owed a duty of disclosure to Plaintiffs," (DE 69-1 at 19–20), and that "[a]s far as Plaintiffs were concerned, Bosch LLC was 'a complete stranger' that 'dealt with [Plaintiffs] only through impersonal [and indirect] market transactions.' " (DE 69-1 at 21 (quoting *Chiarella v. United States*, 445 U.S. 222, 232–33 (1980)). Nevertheless, Plaintiffs' allegations here suffice to show that Bosch had a duty to Plaintiffs to disclose the falsity of its statements. Bosch is alleged to have knowingly participated in designing the fraudulent emissions system (1AC ¶¶ 268–78); developed

coded language about the defeat device and concealing the defeat device (1AC ¶¶ 279–80); and actively and knowingly deceived U.S. regulators about its diesel technology for the benefit of all affected vehicles (1AC ¶¶ 281–83). These allegations are sufficient to establish an obligation by Bosch to correct the record. *See In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-2765, 2017 WL 1902160 at *20 (D.N.J. May 8, 2017) (finding that the plaintiffs pled a partial disclosure after which the defendant had a duty to disclose "any and all information regarding the Timing Chain System" to plaintiffs, where the plaintiffs alleged that the defendant "represent[ed] in the maintenance schedules that the timing belt, which performs the same function as the Timing Chain System, will need service after a certain time but makes no representation that the Timing Chain System will need maintenance"); *Strawn v. Canuso*, 271 N.J. Super. 88, 104 (App. Div. 1994) (establishing a duty on buyers and brokers of real estate to disclose the existence of off-site conditions that were unknown to the buyer but that were known or should have been known to the seller and that would reasonably and foreseeably affect the value or desirability of the property), *aff'd*, 140 N.J. 43 (1995).

In *Strawn*, the New Jersey Supreme Court adopted the Restatement (Second) of Torts which imposes a "duty upon a party to disclose to another 'facts basic to the transaction, if he knows that the other is about to enter into it under a mistake ... and the other, because of the relationship between them, the customs of the trade[,] or other objective circumstances, would reasonably expect a disclosure of those facts,' " where the nondisclosure of those facts amounts to taking advantage of a plaintiff's ignorance, such that it would be "shocking to the ethical sense of the community, and [would be] so extreme and unfair, as to amount to a form of swindling.' " *U. Jersey Bank*, 306 N.J. Super. at 554 (citations omitted). Bosch's active concealment of the existence of the defeat device amounts to such a situation. *Cf. Chrysler-Dodge-Jeep*, 295 F. Supp. 3d at 1009 (finding that allegations of defendants' active concealment of the defeat devices was sufficient to establish a duty to disclose under); *Counts*, 237 F. Supp. 3d at 600 (noting that defendant's alleged active concealment of the defeat device was sufficient to establish a duty to disclose). Accordingly, Plaintiffs' claims of fraudulent concealment by Bosch will not be dismissed on this basis.

### 4. Statutory Consumer-Fraud Issues

#### i. New Jersey's Consumer Fraud Act (Count 32)

**\*15** Defendants allege that the New Jersey Consumer Fraud Act requires plaintiffs to plead "ascertainable loss." That element, Defendants say, "require[s] plaintiffs to specify the price paid for the product and the price of comparable products to adequately state a claim." (DE 68-1 at 48 (quoting *In re Riddell Concussion Reduction Litig.*, 77 F. Supp. 3d 422, 439 (D.N.J. 2015)); *see also* N.J. Stat. Ann. § 56:8-2).

Defendants are correct that a claim under the New Jersey Consumer Fraud Act requires an allegation of ascertainable loss. *See Riddell*, 77 F. Supp. 3d at 436–37. The plaintiff need not, however, plead ascertainable loss with pinpoint specificity. *See Maniscalco v. Brother Int'l Corp. (USA)*, 627 F.Supp.2d 494, 503 (D.N.J.2009) (citing *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99, 111 (App. Div. 2006)) ("Here, plaintiff alleged in her complaint that she suffered an ascertainable loss. She did not allege the nature of that loss, nor was she so required at that stage. Defendant's motion to dismiss, unlike the summary judgment procedure, did not require, in order to avoid dismissal, that the plaintiff provide evidential material to rebut defendant's contention that she had not sustained ascertainable loss ...."); *Lamont v. OPTA Corp.*, 2006 WL 1669019 (N.J. Super. Ct. App. Div. 2006) ("There is nothing ... that requires the pleading of an ascertainable loss element of a Consumer Fraud Act cause of action with any special specificity ...."). Even in opposition to a motion for summary judgment, "[a]n estimate of damages, calculated within a reasonable degree of certainty will suffice to demonstrate an ascertainable loss." *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 249 (2005) (internal quotation and citation omitted). At the motion to dismiss stage, alleging a diminution in value due to the defect is sufficient. *Maniscalco*, 627 F.Supp.2d at 503 (finding that conclusory statement about the replacement cost of a defective machine was an adequate allegation of ascertainable loss); *Strzakowlski v. GMC*, No. 04-4740, 2005 WL 2001912 at *6–7 (D.N.J. Aug. 16, 2005) (alleging diminution in value satisfies the CFA's loss requirement); *cf. Perkins*, 383 N.J. Super. at 110–11

Here, each New Jersey plaintiff alleges the actual price paid for the car and the amount of the price premium allegedly attributable to the fraud. The first amended complaint also alleges that these calculations are "based on analysis of other emissions cases." (1AC ¶ 319). The plaintiff need not adduce his evidence at this, the pleading stage. These allegations

Case 1:19-md-02875-RMB-SAK   Document 1802-1   Filed 12/02/21   Page 158 of 182
PageID: 54411
Rickman v. BMW of North America, Slip Copy (2020)
RICO Bus.Disp.Guide 13,355

satisfy the ascertainable loss element of the New Jersey Consumer Fraud Act.

### ii. Mississippi's Consumer Protection Act (Count 28)

Defendants argue that the Mississippi Consumer Protection Act claim must be dismissed for failure to comply with Mississippi's requirement of participation in settlement programs before filing suit. *See* Miss. Code Ann. § 75-24-15(2). [12]

The legal question boils down to one of federalism. A matter may proceed as a federal class action, regardless of a state procedural bar, so long as the application of Rule 23 does not "abridge, enlarge or modify any substantive right." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010) (quoting Rules Enabling Act, 28 U.S.C. § 2072(b)). Courts applying *Shady Grove* have gone so far as to hold that a federal class action may proceed on state-law claims despite state statutes prohibiting class action treatment. *See, e.g.*, *In re Hydroxycut Marketing and Sales Practices Litig.*, 299 F.R.D. 648 (S.D. Cal. 2014) (permitting claims under state consumer-protection statutes to proceed as class action under Rule 23 even where state statutes do not allow class actions); *see also Lisk v. Lumber One Wood Preserving, LLC*, 792 1331 (11th Cir. 2015) (same application).

 **\*16** Under the Supreme Court's decision in *Shady Grove*, state rules, even if procedural in form, may control in federal court when they are "part of a State's framework of substantive rights or remedies." 559 U.S. at 419 (Stevens, J., concurring). There is no consensus among the federal cases as to whether pre-suit notice or settlement requirements are "substantive" or "procedural." Some have applied such provisions, reasoning that failure to do so "would encourage forum shopping and the inequitable administration of laws." *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 387–88 (D.N.J. 2018) (quoting *In re Asacol Antitrust Litig.*, No. 15-12730, 2016 WL 4083333 at \*15 (D. Mass. July 20, 2016)); *see also In re Insulin Pricing Litigation*, No. 17-699, 2020 WL 831552 at 9 (D.N.J Feb. 20, 2020) (dismissing claim for failure to comply with Mississippi's pre-suit dispute resolution requirement); *In re Lipitor Antitrust Litigation*, 336 F.Supp.3d 395, 415–17 (D.N.J. 2018) ("In sum, the Court finds that the ... notice provisions ... are applicable here and Plaintiffs failed to comply."); *In re Chocolate Confectionary Antitrust Litig.*, 749 F.Supp.2d 224, 232 (M.D. Pa. 2010) (finding failure to comply with Hawaii notice requirement

"warrants dismissal"). Others have treated such provisions as procedural, *i.e.*, not sufficiently a part of the relevant states' framework of substantive rights or remedies to be controlling. *See In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F.Supp.3d 145, 156 (E.D.N.Y. 2018) ("Hawaii's law regulates only when private plaintiffs can litigate the case. It does not alter the substantive elements of plaintiffs' claims."); *In re Propranolol*, 249 F.Supp.3d at 728 n.24 (dismissal not required for failure to comply with Hawaii's procedural notice rule); *In re Broiler Chicken Antitrust Litig.*, 290 F.Supp.3d 772, 817 (N.D. Ill. 2017) (declining to dismiss Arizona antitrust claim notwithstanding late notice to attorney general); *In re Aggrenox Antitrust Litig.*, 94 F.Supp.3d 224, 254 (D. Conn. 2015) (declining to dismiss based on the plaintiffs' failure to plead compliance with the notice requirements of the Hawaii antitrust statute); *In re Aftermarket Filters Antitrust Litig.*, No. 08-4883, 2009 WL 3754041 at \*6 (N.D. Ill. Nov. 5, 2009) (finding Hawaii antitrust "statute does not provide for dismissal of the action for failure to comply [with the pre-suit notice requirement], and that dismissal is inconsistent with the remedial purposes of the statute").

Whether Rule 23 would abridge a substantive right, however, is an issue that need not be faced until the certification stage. The elements of a cause of action are set forth. The motion to dismiss the Mississippi claim is, at least for now, denied.

### iii. Alaska's Unfair Trade Practices and Consumer Protection Act (Count 54)

The first amended complaint pleads violations of the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. Ann. § 45.50.471 *et seq.*, "for notice purposes only." (1AC ¶ 1181). Defendants argue that because the complaint does not identify an Alaska plaintiff, the putative class does not have standing to bring this claim. (DE 68-1 at 49). Defendants have a point, but for the reasons discussed *supra*, the issue of standing to bring claims on behalf of unnamed plaintiffs, some of them potentially from Alaska, is more appropriately resolved at the certification stage.

### iv. West Virginia's Consumer Credit and Protection Act (Count 78)

Likewise, the first amended complaint pleads violations of the West Virginia Consumer Credit and Protection Act, W. Va.

Case 1:19-md-02875-RMB-SAK   Document 1802-1   Filed 12/02/21   Page 159 of 182
PageID: 54412
Rickman v. BMW of North America, Slip Copy (2020)
RICO Bus.Disp.Guide 13,355

Code § 46A-1-101 *et seq.*, "for notice purposes only." (1AC ¶ 1379). Again, I will defer consideration until the certification stage.

### v. Iowa's Private Right of Action for Consumer Frauds Act (Count 61)

Defendants argue that the Iowa Private Right of Action for Consumer Frauds Act, Iowa Code § 714H.1 *et seq.*, requires that class actions under that act secure pre-clearance from the attorney general. (DE 68-1 at 50). Plaintiffs have not alleged such preclearance. Whether Rule 23 would abridge a substantive right, *see Shady Grove*, 559 U.S. at 407, is an issue that need not be faced until the certification stage. At least for now, the motion to dismiss the Iowa claim is denied.

### vi. Georgia's Uniform Deceptive Trade Practices Act (Count 13)

The Georgia Uniform Deceptive Trade Practices Act does not authorize private damages lawsuits. *See* Ga. Code Ann. § 10-1-373. This lawsuit, however, is about injunctive relief at least as much as it is about damages. The first amended complaint sufficiently alleges that, for Rule 12(b)(6) purposes, the subject vehicles need to be fixed and that Plaintiffs' injuries can be redressed, at least in part, by a recall or a replacement. The motion to dismiss the Georgia UDTPA claim is therefore denied.

### vii. Minnesota's Deceptive Trade Practices Act (Count 26)

**\*17** Similarly, the Minnesota Deceptive Trade Practices Act does not permit private damages lawsuits. *See* Minn. Stat. Ann. § 325d.45. The motion to dismiss the Minnesota DTPA claim is denied. *See* subsection vi, immediately preceding.

### viii. Kentucky's Consumer Protection Act (Count 19)

Defendants point out that the Kentucky Consumer Protection Act, contains a privity requirement. *See* Ky. Rev. Stat. Ann. § 367.220(1). However, courts applying this statute have recognized an exception to the privity requirement when breach of an express warranty is alleged:

To maintain a private action under Kentucky's Consumer Protection Act, a plaintiff must generally be in privity of contract with the defendant. *Naiser* [*v. Unilever U.S., Inc.*], 975 F.Supp.2d [727,] 743 [ (2013) ] (citing *Ky. Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.*, 24 F.Supp.2d 755, 772–73 (W.D.Ky.1998) (noting that the KCPA "requires that privity of contract exist between the parties[ ]")). The statute typically cited for the KCPA's privity requirement states:

> *Action for recovery of money or property; when action may be brought*—(1) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property .. may bring an action ....

K.R.S. § 367.220(1). Kentucky courts have held that this language "plainly contemplates an action by a purchaser against his immediate seller." *Skilcraft Sheetmetal, Inc. v. Ky. Mach., Inc.*, 836 S.W.2d 907, 909 (Ky. App. 1992). *As noted in Naiser, however, there is an exception to the privity requirement when express representations are alleged.*

...

According to the Court in *Naiser,* since the plaintiffs had sufficiently alleged that the manufacturer made valid express warranties for Plaintiffs' benefit, ... [t]he plaintiffs were permitted to maintain a KCPA claim despite the absence of a direct buyer-seller relationship.

*Bosch v. Bayer Healthcare Pharm., Inc.*, 13 F. Supp. 3d 730, 750 (W.D. Ky. 2014) (emphasis added); *see also Skilcraft*, 836 S.W.2d at 909 (a subsequent purchaser could not "maintain an action against a seller with whom he did not deal *or who made no warranty for the benefit of the subsequent purchaser*") (emphasis added).

Here, Plaintiffs have alleged that Defendants made an express warranty with regard to the subject vehicles. That allegation is sufficient to overcome the privity requirement, and the motion to dismiss the Kentucky CPA claim is denied.

### III. CONCLUSION

For the foregoing reasons, the motions of BMW USA (DE 68) and Robert Bosch LLC (DE 69) are **GRANTED** in part and **DENIED** in part. Count 1 of the first amended complaint (1AC) is **DISMISSED**. The dismissal is with

Case 1:19-md-02875-RMB-SAK    Document 1802-1    Filed 12/02/21    Page 160 of 182
PageID: 54413
Rickman v. BMW of North America, Slip Copy (2020)
RICO Bus.Disp.Guide 13,355

prejudice because it appears that further amendment would be futile.

A separate order will issue.

**All Citations**

Slip Copy, 2020 WL 3468250, RICO Bus.Disp.Guide 13,355

## Footnotes

1    "DE —" refers to the docket entry in this case.

2    For purposes of this motion, the facts alleged in the first amended complaint, not yet tested by any fact finder, are assumed to be true.

3    Plaintiffs allege that for all material purposes, the tested models represent all makes and model years of the vehicles at issue here. (1AC ¶¶ 2, 3 & 172). All models at issue share a common diesel engine. (1AC ¶¶ 101–15).

4    European vehicle-emissions regulators use PEMS to test real-world driving conditions. (1AC ¶ 154). The EPA and the California Air Resources Board ("CARB") also use PEMS testing for their heavy-duty in-use compliance program to measure emissions against the not-to-exceed standards. The EPA and the CARB widely use PEMS to evaluate vehicles for defeat devices. (1AC ¶ 154).

5    One study concluded that because PEMS testing is designed for—and is conducted on the road in actual driving—it is in certain respects *more accurate* than chassis dynamometer testing. (DE ¶ 160).

6    Active regenerations should theoretically occur infrequently because of the increase in emissions and fuel economy impacts. (1AC ¶ 22). But expert testing reveals active regeneration far in excess of the permissible frequency, which is above the permissible certification frequency for all the tested diesel models. (1AC ¶¶ 21–24, 221 & 247–50).

7    A factual attack, on the other hand, permits the Court to consider evidence extrinsic to the pleadings. *Lincoln Ben. Life*, 800 F.3d at 105; *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000), *holding modified on other grounds by Simon v. United States*, 341 F.3d 193 (3d Cir. 2003).

8    Perhaps more appropriately stated, the vast majority of the subject vehicles were acquired on the *tertiary* market, because, for RICO purposes, car dealerships themselves are already considered a secondary market.

9    Practically speaking, of course, applying the indirect purchaser rule to car buyers forecloses all consumer RICO claims against car manufacturers, because state laws generally prohibit manufacturers' direct sales of automobiles. A RICO remedy would thus seem to be confined to car dealers, and there are no dealers (at least *qua* dealers) among the plaintiff class. So far as our research has disclosed, there is no automobile exception to the indirect purchaser rule.

10   We need not tarry over the paradoxes inherent in a requirement of stating the precise time, place, location, and manner in which something did not occur.

11   Bosch fully adopts BMW's argument on this point. (DE 69-1 at 19).

12   Defendants do not address—apart from the arguments that have already been discussed, *supra*—the sufficiency of the factual allegations.

End of Document                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Tab 7

2021 WL 2529847
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Jeff WITHROW and Kevin Nestor, Plaintiffs,

v.

FCA US LLC, Defendant.

Case No. 19-13214
|
Signed 06/21/2021

**Attorneys and Law Firms**

Bonnie J. Rickert, Lauren A. Akers, Robert Hilliard, Hilliard
Martinez Gonzalez, LLP, Corpus Christi, TX, Dennis A.
Lienhardt, Sharon S. Almonrode, E. Powell Miller, Emily E.
Hughes, The Miller Law Firm, P.C., Rochester, MI, Jerrod C.
Patterson, Steve W. Berman, Hagens Berman Sobol Shapiro
LLP, Seattle, WA, for Plaintiffs.

Brandi L. Burke, Charter Communications, Kathy A.
Wisniewski, Stephen A. D'Aunoy, Thompson Coburn
LLP, Matthew Dollan, ArchCity Defenders, Inc. Business
Litigation, Saint Louis, MO, Thomas L. Azar, Jr., Thompson
Coburn LLP, Saint Louis, MS, Thomas J. Murray, King &
Murray, PLLC, Birmingham, MI, for Defendant.

**OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART MOTION TO DISMISS [29]**

LAURIE J. MICHELSON, UNITED STATES DISTRICT
JUDGE

**\*1** This case involves an allegedly defective vehicle part.
A Bosch CP4 fuel-injection pump. Jeff Withrow owns a
diesel-powered Dodge Ram 1500. Kevin Nestor owns a
diesel-powered Jeep Grand Cherokee. Both vehicles are made
by FCA US LLC and both CP4 pumps failed. Nestor and
Withrow believe that their pumps failed due to the CP4's
fragile design and incompatibility with U.S. diesel fuel. In
other words, they believe the CP4 pump is defective. Nestor
and Withrow further believe that FCA was aware of this
defect when it sold their vehicles yet never disclosed the
defect to them.

So Nestor and Withrow sued FCA, alleging fraud, breach of
the implied warranty of merchantability, and violation of state
consumer protection acts (among other claims). Nestor and
Withrow also seek to represent owners and lessees of Rams
and Jeeps in the District of Columbia and 49 states. So their
complaint is hundreds of pages long and contains over 110
counts.

FCA has moved to dismiss them all. The auto manufacturer
seeks dismissal under Federal Rule of Civil Procedure 12(b)
(1), arguing that Plaintiffs lack Article III standing to pursue
many of the claims they have filed. On this point, the Court
agrees. FCA also seeks dismissal under Federal Rule of Civil
Procedure 12(b)(6), arguing that Plaintiffs have not stated a
claim upon which relief may be granted. On this point, the
Court only partly agrees. So FCA's motion will be granted
in part and denied in part as detailed at length below. A
table at the end of this opinion summarizes this Court's
determinations.

**I. Facts**

**A. The CP4 Pump**
To understand the parties' dispute, it helps to know a bit about
fuel-injection pumps and, in particular, the Bosch CP4 fuel-
injection pump.

In a diesel engine, a fuel-injection pump places fuel
under high pressure and forces it through a fuel injector.
(PageID.808.) [1] The injector is connected to the cylinder
chamber, and the process of forcing fuel through the injector
at high pressure causes the fuel to become mist-like when it
enters the cylinder chamber. (*See* PageID.808.) This fuel mist
is then combusted inside the cylinder chamber, which drives
one of the engine's pistons. The pistons rotate the crankshaft,
and the crankshaft (through a series of connections) turns the
vehicle's wheels.

Center stage in this case is a particular fuel-injection pump,
Bosch's CP4 pump. Although the CP4 pump has quite a
few subparts, three are key here: a cam (shaped like an
oval donut), a roller (similar in size and shape to a AAA
battery), and a tappet (a larger cylinder that holds the roller).
(PageID.812–813.) Below is a picture of the cam (on a cam
shaft), the roller, and the tappet (holding the roller).





**\*2** *Cam-Shafts & Rollers of CP4 Pump*, Sirini, https://perma.cc/63K9-PECZ. The CP4 pump has a pair of roller-tappet systems that operate identically. (*See* PageID.814.) In operation, the oval-shaped cam spins, and the battery-shaped roller rolls along the cam. (*See* PageID.814.) The picture below shows how the cam's rotation moves the tappet up and down and thus pumps fuel (on the left, the cam has pushed the tappet to the high position, while the tappet on the right is in the low position).



(PageID.814.)

According to the complaint, the CP4 has a "fragile" design. Unlike its predecessor, the CP3, the portion of the cam's surface that is in contact with the roller is very limited and that limited contact area is under very high force. (PageID.815.) Further, the lubrication at this contact area is very, very thin, meaning that contamination of the lubrication or a small change in lubricity can result in the roller sliding on the cam rather than (as designed) rolling on it. (PageID.814.) The tappet also contributes to the CP4's allegedly fragile design. The tappet can rotate out of position causing the roller to slide across the middle of the cam and damage the cam. (PageID.816.) An out-of-position tappet, roller, and damaged cam are shown below:

(PageID.821.) The limited contact area between the cam and roller, the high force at the contact area, the roller and cam's lubrication sensitivity, and the possibility of the tappet rotating out of position together contribute to an allegedly "fragile" design.

In addition to this allegedly fragile design, the CP4 pump is allegedly not compatible with U.S. diesel fuel. As noted, lubrication between the roller and cam ensures that the roller rolls along the cam's surface. By design, the vehicle's fuel—diesel—serves as the lubrication. (PageID.822.) In Europe (where the CP4 pump is also used in vehicles), diesel has enough lubricity to allow the roller to roll on the cam smoothly. (*See* PageID.832–833.) But diesel fuel in the United States is lower in sulfur and thus, has lower lubricity. (PageID.822–823.) And aside from low sulfur levels, during the manufacturing or shipping process, diesel can be contaminated with water or gasoline, both of which reduce the diesel's lubricity. (PageID.829–830.) While some gas stations in the United States provide diesel fuel that has sufficient lubricity for the CP4 pump, many—perhaps three in ten—do not. (PageID.828.) And given how fuel is supplied in the United States, a "consumer has no way of knowing the lubricity of the fuel at a standard retail refilling station." (PageID.829.) The result of all of this is that for many people who own vehicles with a CP4 pump, their pump may be operating without the required lubrication. This results in friction and wear between the roller and cam.

Whether due to the high force between the roller and cam, a tappet that has rotated out of position, inadequate lubricity between the roller and cam, or some combination of all three, the result is undesired rubbing of the roller and cam. One byproduct of the undesired rubbing is metal particles. These metal particles can spread throughout the fuel system. (PageID.819, 849–850.) One place the particles can end up is in the fuel injectors. (PageID.849–850.) If the particles prevent the injectors from closing, much more fuel

than necessary will be dispersed into the cylinder chamber. (PageID.850.) This reduces fuel economy. (PageID.850.)

**\*3** If the CP4's roller rubs on the cam rather than rotating around it, more serious problems can occur too. For one, the metal particles "can cause progressive or sudden damage to the pump, injectors, engine, turbocharger, and aftertreatment systems." (PageID.819.) And if the roller and cam become damaged from rubbing, the fuel pump will not create the necessary pressure and the engine will not start or, if it is running, will stop. (PageID.819.) In other words, the pump's failure can cause "catastrophic" engine failure, including while the vehicle is in operation. (PageID.819.) (As if to leave no doubt on this point, the complaint uses the word "catastrophic" or "catastrophically" 254 times.)

To summarize, the complaint asserts that the "CP4 pump's fragile design is not built to withstand U.S. diesel fuel specifications in terms of lubrication or water content." (PageID.795.) The pump "requires a cam and ... rollers designed to seamlessly roll together without skipping, sliding, sticking, or wearing in order to operate effectively." (PageID.795.) "If the fuel used with the CP4 pump is not sufficiently lubricious—which most U.S. diesel is not—the cam and rollers wear against each other and generate tiny metal shavings that disperse throughout the high-pressure fuel injection system." (PageID.796.) Additionally, wear on the cam or roller can result in "complete roller and tappet breakdown." (PageID.818.)

Several car manufacturers, including Volkswagen and Audi, have used the Bosch CP4 pump in their vehicles. In February 2011, the National Highway Traffic Safety Administration opened a safety investigation based on 160 complaints about CP4 pumps failing in Volkswagen and Audi vehicles. (PageID.830.) During the investigation, Volkswagen and Audi exchanged emails with Bosch. For instance, after Audi sent Bosch a failed CP4 pump for analysis in August 2009, Bosch responded to Audi, "Gentleman, [t]he pump mentioned below was analyzed. The result of the finding is sand-like particles in the fuel. Defect caused by customer." (PageID.832.) As another example, in June 2011, a Volkswagen representative told Bosch, "I have here a pump from a [Volkswagen car]. I have been testing a lot of these this week and many have an amount of 'metal Debris' or other metallic particles in them." (PageID.833–834.) As part of NHTSA's investigation, these emails and other documents were published on NHTSA's website. (PageID.831.)

General Motors also used the CP4 pump in its vehicles, and there have been at least four lawsuits asserting that GM sold vehicles knowing that they had defective CP4 pumps. *Chapman v. Gen. Motors LLC*, No. 19-12333, 2021 WL 1286612 (E.D. Mich. Mar. 31, 2021); *Click v. Gen. Motors LLC*, No. 18-455, 2020 WL 3118577 (S.D. Tex. Mar. 27, 2020); *Dawson v. Gen. Motors LLC*, No. 19-8680, 2019 WL 3283046 (D.N.J. July 22, 2019); *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871 (N.D. Cal. 2019).

**B. The Parties**

The defendant in this case is not Volkswagen or General Motors, but FCA US, LLC, the North American arm of what was formerly Fiat Chrysler Automobiles. (Fiat Chrysler Automobiles recently merged with PSA Group to form Stellantis, but the events giving rise to this suit mostly occurred before that merger.) FCA US, which the Court will refer to as "Fiat-Chrysler," began using the CP4 pump in its vehicles with 3.0L EcoDiesel engines in 2013, i.e., in 2014 model-year vehicles. (PageID.795, 851, 877.) Among these EcoDiesel vehicles are Jeep Grand Cherokees and Dodge Ram 1500s. (PageID.795.)

One of the two plaintiffs in this case is Kevin Nestor, a California resident. (PageID.801.) In 2014, Nestor bought a Jeep Grand Cherokee from a Fiat-Chrysler dealer in California. (PageID.801.) In April 2019, after driving the vehicle for five years and 68,000 miles, his Jeep "experienced a catastrophic failure of its CP4 fuel pump." (PageID.801–802.) Nestor brought his Jeep to a Fiat-Chrysler dealership, and the service center told him that metal shavings from the fuel pump had spread throughout the fuel system. (PageID.801.) The estimated repair cost was $7,600. (PageID.801.) Although Nestor's Jeep was still within the five-year, 100,000-mile warranty limits, Fiat-Chrysler refused to repair the vehicle. (PageID.801–802.) Nestor implies that Fiat-Chrysler refused warranty coverage because the company believed he had put contaminated fuel in the Jeep. (PageID.802.)

**\*4** Jeff Withrow, a Connecticut resident (PageID.799), is the other plaintiff in this case. In 2017, Withrow bought a used Dodge Ram 1500 from a dealer in New Jersey. (PageID.799.) At the time of Withrow's purchase, the Ram was only a year or two old and had only 19,000 miles on the odometer. (PageID.799.) After driving the truck for about a year, the Ram "quit" when Withrow was driving on the highway. (PageID.799.) The truck had 31,500 miles on it at the time. (PageID.799.) Withrow brought his Ram to a Fiat-Chrysler

dealer in Connecticut, and the dealer told him that there was metal debris in the fuel pump. (PageID.799.) Although Withrow does not say why Fiat-Chrysler would not repair his truck under the truck's warranty, he does say that he ended up paying $12,000 out of his own pocket to fix his Ram. (PageID.800.)

### C. Procedural History

In October 2019, Nestor and Withrow filed this lawsuit, and in March 2020 they filed an amended complaint. They allege that the CP4 fuel-injection pump is defective. And they assert that Fiat-Chrysler knew the pump was defective before they bought their vehicles. Plaintiffs say that despite that knowledge, Fiat-Chrysler either actively concealed the defect from them or, at minimum, did not fulfill its duty to disclose the defect to them. Based on these allegations, Plaintiffs assert that Fiat-Chrysler is liable for (1) common-law fraud, (2) common-law breach of contract, (3) breaching the implied warranty of merchantability, (4) violating the Magnuson-Moss Warranty Act, and (5) violating the consumer-protection acts of California, Connecticut, and New Jersey.

And Nestor and Withrow say they are not the only ones harmed by Fiat-Chrysler's failure to disclose the problems with the CP4 pump. They seek to represent a nationwide class of hundreds of thousands who purchased or leased a Jeep Grand Cherokee with a 3.0L EcoDiesel engine or a Dodge Ram 1500 with a 3.0L EcoDiesel engine. (PageID.795.) In addition to the nationwide class, Nestor and Withrow want this Court to certify 50 subclasses, one for the District of Columbia and one for each of 49 states. (There is already a separate lawsuit against Fiat-Chrysler over the CP4 pump for Texas consumers. *See Berry v. FCA US, LLC, No. 2:19-cv-00023 (S.D. Tex. filed Jan. 18, 2019).*) Nestor and Withrow's complaint thus includes one to three claims under the law of 50 different jurisdictions. In all, their complaint is comprised of over 1,600 paragraphs and over 110 counts. (*See* ECF No. 26.)

In May 2020, Fiat-Chrysler moved to dismiss the entire complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 29.) Their motion raises nearly 20 grounds for dismissal.

## II. Rule 12(b)(1)

First things first; jurisdiction before merits. Under Article III of the U.S. Constitution, federal courts are limited to deciding

"Cases" and "Controversies." And for there to be a case or controversy, the plaintiff must have standing to pursue the legal claims he raises. *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). In turn, the "irreducible constitutional minimum of standing consists of three elements": "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*

In Fiat-Chrysler's view, Nestor and Withrow lack Article III standing. Fiat-Chrysler argues that Plaintiffs have not pled facts showing that it was the cause of their injuries, and thus they have not satisfied the "traceability" requirement of Article III standing. Fiat-Chrysler also argues that Nestor and Withrow lack Article III standing to bring claims under the laws of any state other than California (Nestor's residence and where he bought his Jeep), Connecticut (Withrow's residence), and New Jersey (where Withrow bought his Ram).

### A. Traceability

**\*5** Fiat-Chrysler points out that in their complaint, Nestor and Withrow acknowledge that events outside of Fiat-Chrysler's control may contribute to the CP4 pump's failure. (ECF No. 29, PageID.1550, 1556.) For instance, Plaintiffs suggest that inadvertent misfuelling (gasoline instead of diesel), running out of fuel, or a late fuel-filter change might result in inadequate lubrication between the CP4 pump's cam and roller, thus contributing to the pump's failure. (PageID.811.) But, Fiat-Chrysler argues, none of those actions are attributable to it—those are consumer actions. (*See* ECF No. 29, PageID.1556–1557.) The complaint also alleges that water or gasoline might contaminate diesel fuel before it reaches the gas station. (PageID.830.) Also not Fiat-Chrysler's fault. Fiat-Chrysler stresses that both Nestor and Withrow put many thousands of miles on their vehicles before their pump broke (ECF No. 29, PageID.1556), apparently implying that any number of post-manufacturing events could have caused the CP4 pumps in their vehicles to fail. In fact, says Fiat-Chrysler, Nestor pleads that he was denied warranty coverage "based on alleged fuel contamination." (ECF No. 26, PageID.802; ECF No. 29, PageID.1556.) In Fiat-Chrysler's view, all of this shows that Nestor's and Withrow's injuries are not traceable to its conduct.

Fiat-Chrysler is correct that as part of their burden to establish subject-matter jurisdiction, Nestor and Withrow must show that their injuries are "fairly traceable" to its conduct. *Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 756 (6th Cir. 2019);

*see also Tuaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021) (finding no Article III standing where injury was the result of a third-party's actions, not the defendant's). And Fiat-Chrysler is correct that if Nestor or Withrow put gasoline in their vehicles or fueled up at a station selling contaminated diesel, those actions would not be traceable to Fiat-Chrysler.

Those points having been given their due, it remains that Nestor and Withrow have adequately alleged traceability.

To start, the law helps their cause. Article III's traceability requirement is not overly demanding. *See Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 713 (6th Cir. 2015) ("[T]he causation need not be proximate."). And when, as here, the defendant asserts that the allegations of the complaint do not establish standing, this Court must construe the factual allegations in the light most favorable to the plaintiffs and draw reasonable inferences from those allegations in their favor. *See Mosley v. Kohl's Dep't Stores*, Inc., 942 F.3d 752, 756 (6th Cir. 2019).

Heeding this law and taking the allegations in the light most favorable to Plaintiffs, Nestor and Withrow's point is that a reasonably prudent consumer will occasionally misfuel or tardily change their fuel-filter. (PageID.811; *see also* ECF No. 32, PageID.1677.) And because diesel in the United States is often contaminated with gasoline or water, they say it is inevitable that consumers will sometimes put less than pure diesel in their vehicles. (PageID.829.) In Plaintiffs' view, an occasional misfuelling, late filter change, or fueling at a station with contaminated diesel are all part of the normal, expected use of their vehicles. (*See* PageID.811; ECF No. 32, PageID.1677.) Thus, any decent fuel pump, they say, should be able to tolerate these sure-to-arise situations. (*See id.*) Indeed, Nestor and Withrow imply that the CP4 pump's predecessor, the CP3, was designed more robustly and had no issues with U.S. diesel. (PageID.811 ("The reliability of the CP3 became key to the 'million-mile' performance reputation of diesel truck engines in the United States.").) So even if actions not attributable to Fiat-Chrysler contributed to Nestor's or Withrow's CP4 pump failing, to the extent that those actions are part of normal vehicle use, Plaintiffs have adequately pled that their injuries stem from the CP4. And if their injuries stem from the CP4, they are fairly traceable to Fiat-Chrysler, the company that chose to use the CP4 in its vehicles.

In short, the complaint will not be dismissed on the grounds that Nestor's and Withrow's injuries are not fairly traceable to Fiat-Chrysler's use of the CP4 pump.

**B. Standing to Pursue Violations of 50 Jurisdictions' Laws**

Fiat-Chrysler makes a second Article III argument: that Nestor and Withrow—currently the only plaintiffs to this suit —have no standing to bring claims under the laws of any state other than the three where they reside or bought their vehicles (California, Connecticut, and New Jersey).

**\*6** A review of the case law reveals that this issue often arises in cases where a handful of named plaintiffs bring claims under dozens of states' laws. In fact, Nestor and Withrow cite many cases where courts deferred this standing question—whether named plaintiffs can pursue claims under the laws of states not their own—to the class-certification stage. *See Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 884 (E.D. Mich. 2019); *Bledsoe v. FCA US LLC*, 378 F. Supp. 3d 626, 641 (E.D. Mich. 2019); *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1089 (E.D. Mich. 2018); *Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 587–88 (E.D. Mich. 2017); *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2013 WL 2456612, at *11 (E.D. Mich. June 6, 2013); *Hoving v. Transnation Title Ins. Co.*, 545 F. Supp. 2d 662, 667 (E.D. Mich. 2008). Nestor and Withrow ask this Court to follow these cases and defer the standing question to the class-certification stage of the case.

For three reasons, the Court does not find the decisions Nestor and Withrow cite persuasive.

*One.* All of Nestor and Withrow's cases directly or indirectly rely on some combination of *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), and *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998). This is understandable. In each of *Amchem*, *Ortiz*, and *Fallick*, the court either found that the class-certification question should be answered before the standing question or otherwise found that the parties' dispute was a Rule 23 dispute rather than an Article III dispute. But on the facts of this case, the Court does not believe *Amchem*, *Ortiz*, and *Fallick* are instructive.

Consider *Amchem* first. There, a settlement for asbestos exposure was reached before the case was even filed, and a motion to certify a settlement class was docketed with the

complaint. "The class action thus initiated was not intended to be litigated." *521 U.S. at 601, 117 S.Ct. 2231*. That's not true here. And in *Amchem*, the objectors to class certification argued (among other things) that the "exposure only" class members lacked standing because they had not yet suffered injuries or, at least, redressable injuries. *Id.* at 612, 117 S.Ct. 2231. The Third Circuit declined to resolve this standing issue, reasoning that "the jurisdictional issues in this case would not exist but for the [class-action] certification"; on this point, the Supreme Court agreed. *Id.* at 612–13, 117 S.Ct. 2231. But here, the standing issue is not whether class members have injuries or redressable injuries; the issue is whether Nestor and Withrow may raise claims under the laws of states not their own. So *Amchem* is simply not instructive on the facts of this case.

In *Ortiz*, the Supreme Court found that "the class certification issues are, as they were in *Amchem*, 'logically antecedent' to Article III concerns." *527 U.S. at 831, 119 S.Ct. 2295*. But, like *Amchem*, *Ortiz* was "a class action prompted by the elephantine mass of asbestos cases," *id.* at 821, 119 S.Ct. 2295, the parties settled first then filed a settlement class action later, *id.* at 824–25, 119 S.Ct. 2295, and objectors claimed that the legal claims were contrived for settlement (and thus not justiciable) and that the "exposure only" class members did not have redressable injuries, *id.* at 831, 119 S.Ct. 2295. So as far as Article III standing, *Ortiz* is just like *Amchem*. Thus, for all the reasons *Amchem* is materially different than this case, so too is *Ortiz*.

That leaves *Fallick*. There, the plaintiff was a member of an employee healthcare plan and challenged how the plan administrator, Nationwide, calculated coverage for medical expenses. *162 F.3d at 412*. The plaintiff also sought to represent people who were members of other healthcare plans "administered or promulgated by" Nationwide. *Id.* The district court found that the plaintiff lacked standing to represent people who were not members of his healthcare plan. *Id.* at 421–22. The Sixth Circuit reversed. Because the plaintiff was challenging Nationwide's methodology for calculating coverage—the same methodology that Nationwide used for every one of the plans it administered—the plaintiff had standing to bring claims on behalf of those who were members of plans other than his. *Id.* at 423. Unlike in *Fallick*, where the legal claims were identical for members of the plaintiff's plan and for members of other plans, *id.* at 423, Nestor's claim under the California Unfair Competition Law is not likely to be identical to a claim under say, the Montana Unfair Trade Practices Act. And even if those two

legal claims happen to be identical, the same cannot be said of the laws of all 50 jurisdictions that Plaintiffs seek to represent. So *Fallick* is not on point, either.

**\*7** *Two*. Apart from the fact that the courts in Nestor and Withrow's cases relied on *Amchem*, *Ortiz*, and *Fallick*, those courts deferred the standing question to the class-certification stage without acknowledging that standing must be determined on a claim-by-claim, relief-by-relief basis. In the words of the Supreme Court: "[O]ur standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press.... We have insisted ... that a plaintiff must demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (internal quotation marks omitted). And in the words of the Sixth Circuit: "It is black-letter law that standing is a claim-by-claim issue." *Rosen v. Tennessee Com'r of Fin. & Admin.*, 288 F.3d 918, 928 (6th Cir. 2002); *see also Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 406 (6th Cir. 2019). In the cases cited by Nestor and Withrow, the courts did not expressly address this black-letter law. Instead, most say something like the following: "[a]ll of the named Plaintiffs in our case have Article III standing. If the class is certified, those Plaintiffs will be able to advance state law claims on behalf of unnamed Plaintiffs." *Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 884 (E.D. Mich. 2019); *see also Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 587 (E.D. Mich. 2017) ("Having determined that the named Plaintiffs have standing in their individual capacity, the question of whether the named Plaintiffs have standing to bring claims on behalf of the unnamed class members is analytically subsequent to the class certification analysis."). But, in this Court's opinion, the proper jurisdictional question is not whether the named plaintiffs have standing in some blanket sense. Nor is it whether they have standing to bring some claims. The proper jurisdictional question is whether the named plaintiffs have standing to pursue *each* and *every* claim of their complaint. *See DaimlerChrysler*, 547 U.S. at 352, 126 S.Ct. 1854; *Kanuszewski*, 927 F.3d at 406; *Rosen*, 288 F.3d at 928. Or to put it in terms of this case: Do Nestor and Withrow, haling from two states, have standing to pursue each of 110-plus claims under the laws of 50 jurisdictions?

*Three*. There is yet a third a reason that this Court is not persuaded by the cases Nestor and Withrow cite: the Rule 23 inquiry and the standing inquiry are not the same. Part of the rationale courts give for deferring the standing question to the class-certification stage is that the Rule 23 inquiry—questions

about adequacy of representation, typicality of claims, and commonality of issues—subsume the standing inquiry. True, if a claim under the law of the named plaintiff's state is not similar to a claim under the law of another state, then it is quite possible that his claims will not be typical of those he seeks to represent, there will not be common questions that can be resolved in one stroke, and the named plaintiff will not be an adequate representative. But insofar as standing focuses on whether the plaintiff's injury is traceable to the defendant's conduct, it is not too hard to imagine cases where Rule 23 would permit certification—for at least a limited set of issues —but Article III standing would be absent.

Take, for example, this case. Perhaps a nationwide class could be certified for the limited purpose of deciding whether Fiat-Chrysler knew that the CP4 pump was defective and, if so, when it knew. Fiat-Chrysler's knowledge of the defect is likely an element of most (if not all) jurisdictions' fraud-by-omission tort. So perhaps a class could be certified on that issue. In fact, Rule 23(c)(4) expressly provides for certification "with respect to particular issues." *See also* 2 Newberg on Class Actions § 4:90 (5th ed.) ("[Rule 23(c)(4)] may enable a court to achieve the economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action." (quoting David F. Herr, Manual Complex Lit. § 21.24 (4th ed.)); *see also Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 411–13 (6th Cir. 2018) (discussing Rule 23(c)(4)). But resolving the question of Fiat-Chrysler's knowledge on a class-wide basis would not mean that Nestor's injury from buying a defective Jeep in California is traceable to Fiat-Chrysler's deceptive trade practices in Montana. So it seems that the Rule 23 analysis does not always subsume a standing analysis.

Indeed, the standing inquiry and Rule 23 inquiry are fundamentally different. Standing is rooted in the Constitution. And the purpose of the doctrine is to protect the tripartite system of government set up by that founding document. *DaimlerChrysler*, 547 U.S. at 353, 126 S.Ct. 1854 ("With federal courts ... deciding issues they would not otherwise be authorized to decide, the tripartite allocation of power that Article III is designed to maintain would quickly erode; our emphasis on the standing requirement's role in maintaining this separation would be rendered hollow rhetoric."). Rule 23, on the other hand, is a procedural device. *See* 1 Newberg on Class Actions § 1:1 (5th ed.) ("Rule 23 is ... fundamentally a procedural device: it cannot ordinarily be construed to extend or limit the jurisdiction ... of federal

courts."). The purpose of Rule 23 is to efficiently resolve the claims of many, eliminate inconsistent rulings, and grant relief on a collection of small claims that, without aggregation, would not be brought to court. *See* 7A Charles Wright, Arthur Miller, and Mary Kane, Federal Practice and Procedure § 1754 (3d ed.). In short, different origins, different purposes.

**\*8** So for at least those three reasons, this Court does not find Nestor and Withrow's cases where courts have deferred the standing question to the class-certification stage to be persuasive.

The Court came across another opinion that is a bit more persuasive in support of Nestor and Withrow's standing argument. In *Langan v. Johnson & Johnson Consumer Companies, Inc.*, the plaintiff, a Connecticut resident, sued Johnson & Johnson for deceptive labeling under the Connecticut Unfair Trade Practices Act. 897 F.3d 88, 91 (2d Cir. 2018). The plaintiff also brought claims under "the state consumer protection laws of twenty other states," and sought to certify a plaintiff class." *Id.* According to the Second Circuit, the issue of whether the plaintiff could pursue claims under the laws of states other than her own should be resolved under Rule 23(b)(3) rather than under Article III. *Id.* at 95. That approach, said the appellate court, "acknowledges the obvious truth that class actions necessarily involve plaintiffs litigating injuries that they themselves would not have standing to litigate." *Id.* The court continued, "it makes little sense to dismiss the state law claims of unnamed class members for want of standing when there was no requirement that the named plaintiffs have individual standing to bring those claims in the first place." *Id.*

There is merit in the notion that in a class action, the named plaintiff always pursues relief for another's injury; but without briefing, the Court is not wholly persuaded by the Second Circuit's approach. The Second Circuit pointed to nothing suggesting that the drafters of Rule 23(b)(3)'s predominance standard sought to replace the traditional Article III standard. And the tests are different. Again, the "irreducible constitutional minimum of standing consists of three elements": "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). In contrast, Rule 23(b)(3) asks whether "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class

action is superior to other available methods for fairly and efficiently adjudicating the controversy." Moreover, Rule 23 provides for three types of class actions, only one of which is the predominance variety contemplated by Rule 23(b)(3). So Rule 23(b)(3)'s test would not come into play in all class actions.

All said, in this case, the Court elects to address the standing issue at the motion to dismiss stage rather than in the context of Rule 23. This approach has ample support in the case law. *See In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 656–57 (E.D. Mich. 2011) (citing numerous cases and reasoning, "[t]his Court chooses to follow what it finds to be the better-reasoned opinions on this issue which recognize and refuse to abandon the fundamental prudential standing requirements of Article III."); *see also In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 152 (E.D. Pa. 2009) (reasoning that deferring the standing question to class certification "would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union"); *Wozniak v. Ford Motor Co.*, No. 17-12794, 2019 WL 108845, at *1 (E.D. Mich. Jan. 4, 2019) (addressing Article III standing before class certification stage).

**\*9** So do Nestor and Withrow have standing to bring claims under the law of states other than their home states or the ones where they bought vehicles (California, Connecticut, and New Jersey)?

What has already been said gives away the answer. But an example drives the point home. Nestor lives in California, was exposed to Fiat-Chrysler's advertising in California, bought his Jeep in California, drove his Jeep in California, and had his CP4 pump repaired in California—the Golden State through and through. Yet, Plaintiffs bring claims on behalf of those who bought or leased a Ram or Jeep in Montana, i.e., Montana consumers. (*See* PageID.866, 1034, 1038.) And according to Plaintiffs, Fiat-Chrysler violated Montana law by using deceptive trade practices to sell to Montana consumers, breaching implied warranties owed to Montana consumers, defrauding Montana consumers, and breaking contracts with Montana consumers—Big Sky Country through and through. (*See* PageID.871–883, 1034–1039.) So, to the extent that Nestor pursues claims under Montana law, there is *no* casual connection between the "challenged conduct" (Fiat-Chrysler's violations of Montana law) and Nestor's injury (the

purchase of a defective Jeep in California). Or think of it this way: Fiat-Chrysler's sale of a defective Jeep in violation of Montana law did not make Nestor any worse off. It follows that to the extent Nestor pursues claims under Montana law, he has not "allege[d] personal injury fairly traceable to the defendant's allegedly *unlawful* conduct." *California v. Texas*, —— U.S. ——, ——, 141 S.Ct. 2104, —— L.Ed.2d ——, 2021 WL 2459255, at *7 (2021) (internal quotation marks omitted; emphasis in original).

So if neither Nestor nor Withrow can pursue a claim that Fiat-Chrysler violated Montana law, which claims can they bring?

As just stated, all of Fiat-Chrysler's alleged conduct leading to Nestor's alleged injuries occurred in California. So Nestor has standing to pursue a claim that Fiat-Chrysler violated California law. That includes Nestor's common-law fraud and breach-of-contract claims. And it includes Fiat-Chrysler's alleged violation of California statutory law: the Consumer Legal Remedies Act, the Unfair Competition Law, and the Song-Beverly Consumer Warranty Act. (PageID.903–912.) Additionally, because the Magnusson-Moss Warranty Act claim is a federal law and is based on the factual assertion that Fiat-Chrysler sold Nestor an unmerchantable Jeep (PageID.872), Nestor also has standing to pursue that claim.

For two counts in the complaint, Withrow's standing is similarly straightforward. Like Nestor, Withrow's injuries all stem from his purchase of a Fiat-Chrysler vehicle with an allegedly defective CP4 pump. And so, like Nestor, Withrow's injuries are fairly traceable to Fiat-Chrysler's alleged fraud and breach of contract. True, unlike Nestor, Withrow lived in one state (Connecticut) but bought his Jeep in another (New Jersey). So there is a question about whether Connecticut or New Jersey common law governs these two claims. But that is a choice-of-law question, not an Article III question.

The complaint also includes two claims brought "on behalf of" those who bought or leased a 3.0L EcoDiesel Ram or 3.0L EcoDiesel Jeep ("class vehicles") in Connecticut (PageID.919–924) and two claims brought "on behalf of" those who bought or leased class vehicles in New Jersey (PageID.1056–1062). Whether Withrow has Article III standing to pursue these four claims requires a more involved discussion.

**\*10** Plaintiffs bring a Connecticut Unfair Trade Practices Act count "on behalf of" those who bought or leased a

class vehicle in Connecticut. (PageID.919.) Under this count, Plaintiffs allege that Fiat-Chrysler made false representations about the performance of class vehicles and failed to disclose issues with the CP4 pump, both of which are practices prohibited by Connecticut's Act. (*See* PageID.919–922.) Withrow has standing to pursue this claim. He lived in Connecticut, and thus, would have been exposed to Fiat-Chrysler's representations or omissions in that state; and he says those representations and omissions induced him to buy a defective Ram. (PageID.800.) So Withrow's alleged injuries (the purchase of a defective Ram) are fairly traceable to Fiat-Chrysler's alleged violation of the Connecticut Unfair Trade Practices Act (false advertisements directed at, or a failure to disclose the CP4 pump issues to, Connecticuters).

Although more of a stretch, Withrow also has Article III standing to pursue the New Jersey Consumer Fraud Act count brought on behalf of those who bought or leased a class vehicle in New Jersey. (PageID.1057.) True, Withrow does not claim to have seen Fiat-Chrysler's ads in New Jersey, and Fiat-Chrysler's failure to disclose CP4 pump issues to New Jerseyans could not directly injure Withrow, a Connecticuter. But Withrow did buy his Ram from Autoland in New Jersey. (PageID.799.) And had Fiat-Chrysler disclosed the CP4-pump issues to New Jerseyans, Autoland might have decided to not buy the Ram or, at least, bought it for less. In turn, Autoland would not have sold the Ram to Withrow or, at least, sold it to Withrow for less. As noted, the "fairly traceable" requirement for Article III standing is not a proximate-cause requirement. *See Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 713 (6th Cir. 2015). So Withrow has also standing to pursue the New Jersey Consumer Fraud Act count.

The complaint also includes a breach-of-implied-warranty-of-merchantability count brought on behalf of those who bought or leased a class vehicle in New Jersey. (PageID.1060.) (The complaint does not include a like count for those who bought or leased a class vehicle in Connecticut. (*See* PageID.919–924.)) In this count, Plaintiffs allege that under New Jersey's version of the Uniform Commercial Code, Fiat-Chrysler impliedly warrantied that class vehicles were merchantable, but as it turned out, the class vehicles were not fit for their ordinary purpose. (PageID.1061 (citing N.J. Stat. Ann. § 12A:2-314).)) Withrow has standing to pursue this claim: Fiat-Chrysler concedes that privity is not required (ECF No. 29, PageID.1581), Withrow bought his Ram in New Jersey, and Withrow claims that his Ram is unmerchantable. So Withrow's alleged injury (the purchase of an unmerchantable Ram) is fairly traceable to the

challenged conduct (Fiat-Chrysler's manufacture and sale of an unmerchantable Ram that was ultimately sold to Withrow in New Jersey). Further, because Withrow's claim under the Magnuson-Moss Warranty Act is merely derivative of his breach-of-implied-warranty claim, Withrow also has standing to pursue a claim under the Magnuson-Moss Warranty Act.

The complaint also includes an unjust-enrichment count brought on behalf of those who bought or leased a class vehicle in Connecticut. (PageID.923.) But the complaint does not include an unjust-enrichment count under every state's law. For instance, there is no unjust-enrichment count brought on behalf of those who bought or leased a class vehicle in New Jersey. (*See* PageID.1056–1062.) So Plaintiffs have only asserted that Fiat-Chrysler was unjustly enriched as prohibited by Connecticut law (and the law of selected other states). That means for Withrow to have standing to pursue any of the complaint's unjust-enrichment claims, his injuries must be fairly traceable to Fiat-Chrysler's violation of Connecticut law (or one of the other states that Plaintiffs have pursued unjust-enrichment claims). But Withrow did not buy his Ram in Connecticut and he has not pled that Fiat-Chrysler originally sold the Ram in Connecticut. So Withrow's alleged injury (paying Fiat-Chrysler for a defective Ram) is not "fairly traceable to the defendant's allegedly *unlawful* conduct" (a violation of Connecticut law), *California v. Texas*, —— U.S. ——, 141 S.Ct. 2104, —— L.Ed.2d ——, 2021 WL 2459255, at *7 (2021) (internal quotation marks omitted; emphasis in original).

**\*11** In short, Withrow has Article III standing to pursue the following five claims: (1) fraud, (2) breach of contract, (3) violation of the Magnuson-Moss Warranty Act, (4) breach of implied warranty, (4) violation of the Connecticut Unfair Trade Practices Act, and (5) violation of the New Jersey Consumer Fraud Act. Nestor has Article III standing to pursue the following six claims: (1) fraud, (2) breach of contract, (3) violation of the California Consumer Legal Remedies Act, (4) violation of the California Unfair Competition Law, (5) violation of the Song-Beverly Consumer Warranty Act, and (6) violation of the Magnusson-Moss Warranty Act. The Court lacks subject-matter jurisdiction over all other counts of the complaint, and they will be dismissed.

### III. Rule 12(b)(6)

Having resolved issues relating to this Court's subject-matter jurisdiction, the Court turns to Fiat-Chrysler's efforts to dismiss the remainder of the case pursuant to Federal Rule of Civil Procedure 12(b)(6).

### A. Standard

In deciding a motion to dismiss under Rule 12(b)(6), the Court "construes the complaint in the light most favorable" to Nestor and Withrow and determines whether their "complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). What is plausible is "a context-specific task" requiring this Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937.

### B. Choice of Law (Withrow Only)

As noted, Withrow lived in Connecticut both before and after he bought his Dodge Ram, but he bought the truck in New Jersey. (PageID.799.) So Fiat-Chrysler argues that "under the applicable choice of law principles it is New Jersey, not Connecticut, law that must be applied to Withrow's claims." (ECF No. 29, PageID.1561.) Withrow does not really address this issue; in a footnote (of which there are far too many) he merely says that he can bring a claim under Connecticut's Unfair Trade Practices Act because he is a Connecticut resident. (ECF No. 32, PageID.1703.)

The parties have not adequately briefed how Michigan's choice-of-law rules apply to Withrow's claims. *See Nat'l Cont'l Ins. Co. v. Aiazbekov*, 818 F. App'x 468, 471 (6th Cir. 2020) (applying Michigan's choice-of-law rules where jurisdiction was based on diversity of citizenship); *Osborn v. Griffin*, 865 F.3d 417, 443 (6th Cir. 2017) (applying Michigan's choice-of-law rules where jurisdiction was based on federal question). For contract claims, those rules direct courts to identify the state with "the most significant relationship to the transaction and the parties," with relevant considerations including "the place of contracting," "the place of negotiation," "the place of performance," and the parties' domicile. *Aiazbekov*, 818 F. App'x at 471. The parties have not addressed how these factors apply to Withrow's breach-of-contract or breach-of-warranty claims. For tort claims, Michigan's choice-of-law rules default to Michigan law unless another state has a greater interest in having its law apply. *Yarber v. M.J. Elec., LLC*, 824 F. App'x 407, 410 (6th Cir. 2020). While Fiat-Chrysler has a significant presence in the "motor city," it is obvious that Michigan has little interest in a Connecticut resident's purchase of a Dodge Ram in New Jersey, and the parties do almost nothing to explain which

of Connecticut or New Jersey has the greater interest. Fiat-Chrysler does cite *McKee v. General Motors LLC*, but that case is not helpful because everything relevant happened in Florida and the parties agreed Florida law applied. *See* 376 F. Supp. 3d 751, 756 (E.D. Mich. 2019).

**\*12** Although the limited briefing justifies skipping over Fiat-Chrysler's assertion that Withrow can only pursue claims under New Jersey law, addressing the issue will eliminate the need to address other issues raised by Fiat-Chrysler's motion.

Fiat-Chrysler argues that Connecticut's Unfair Trade Practices Act does not extend beyond the state's borders, and since Withrow bought his Dodge Ram in New Jersey, he cannot have a claim under Connecticut's Act.

This strikes the Court as more of failure-to-state-a-claim argument than a choice-of-law argument. But either way, it fails. Connecticut's Unfair Trade Practices Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce," and "trade or commerce" includes "advertising" in Connecticut. *Western Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 146 Conn.App. 169, 78 A.3d 167, 187 (Conn. Ct. App. 2013). And Withrow alleges that Fiat-Chrysler's misleading advertisements induced him to buy his Dodge Ram. (PageID.800.) As discussed in relation to standing, given that Withrow lived in Connecticut before he bought his Ram, it is likely that he was exposed to Fiat-Chrysler's ad campaign in Connecticut—not New Jersey. So the Court is not persuaded by Fiat-Chrysler's argument that Withrow cannot pursue claims under Connecticut's Unfair Trade Practices Act.

Next consider Withrow's common-law fraud claim. The alleged fraud was Fiat-Chrysler's false advertisements or the company's failure to disclose problems with the CP4 pump. But this is primarily, if not exclusively, pre-purchase deception, which, as just stated, occurred in Connecticut. So the Court finds that Connecticut law governs Withrow's fraud claim.

That leaves Withrow's implied-warranty and common-law contract claims. Here, the choice-of-law rules favor New Jersey over Connecticut. In identifying the contract that was allegedly breached, Withrow says that the "sale constituted a contract." (ECF No. 32, PageID.1701.) Since the sale occurred in New Jersey, the alleged contract was formed there. And the primary breach is that the Ram's fuel-injection pump was not compatible with U.S. fuel. But if that is true,

then the breach occurred at the point of sale, which was in New Jersey. As for Withrow's implied-warranty claim, an implied warranty of merchantability is also breached at the time of sale. *Herbstman v. Eastman Kodak Co.*, 68 N.J. 1, 342 A.2d 181, 184 (N.J. 1975). And, in any event, the complaint contains no implied-warranty claim under Connecticut law. Accordingly, the Court finds that New Jersey law governs Withrow's breach-of-contract and implied-warranty claims.

The upshot of all this is that Withrow may pursue a claim under Connecticut's consumer protection act and that New Jersey law governs Withrow's fraud, breach-of-contract, and breach-of-implied-warranty claims.

### C. Statute of Limitations (Nestor Only)

Fiat-Chrysler argues that all of Nestor's claims are barred by the applicable statute of limitations. It asserts that the statute of limitations is four years for a breach-of-contract claim, an implied-warranty claim under California's Song-Beverly Act, and a claim under California's Unfair Competition Law. And, according to Fiat-Chrysler, the statute of limitations is three years for both common-law fraud and a claim under California's Consumer Legal Remedies Act. Fiat-Chrysler points out that Nestor bought his Jeep in April 2014, but that he did not sue until more than five years later, in October 2019. Thus, Fiat-Chrysler concludes that all of Nestor's claims are untimely.

**\*13** In response, Nestor does not dispute that he had only three or four years to bring his claims. Nor does Nestor dispute that he filed suit five years after he bought his Jeep. Instead, Nestor argues that his claims are timely under the discovery rule and the doctrine of fraudulent concealment.

Start with the law on fraudulent concealment. Fiat-Chrysler has cited a case suggesting that to toll the limitations period under California law, a manufacturer must do more than remain silent about facts underlying a legal claim. *See Garcia v. Gen. Motors LLC*, No. 1:18-01313, 2018 WL 6460196, at \*6 (E.D. Cal. Dec. 10, 2018) ("[T]he plaintiff must point to some fraudulent concealment, some active conduct by the defendant above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time." (internal quotation marks omitted)). The Court has reviewed the cases Nestor cites regarding fraudulent concealment, and none provides that under California law, mere silence about a legal claim is sufficient to toll the limitations period for that claim. (*See* ECF No. 32, PageID.1706–1708 (citing *Philips v. Ford Motor*

*Co.*, No. 14-CV-02989-LHK, 2015 WL 4111448 (N.D. Cal. July 7, 2015), *Aberin v. Am. Honda Motor Co.*, Inc., No. 16-CV-04384-JST, 2018 WL 1473085 (N.D. Cal. Mar. 26, 2018), and *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 962 (N.D. Cal. 2014)).) So the Court proceeds under the assumption that to toll the statute of limitations based on fraudulent concealment, Nestor must plead that Fiat-Chrysler took steps to prevent him from discovering that he had a legal claim based on the CP4 pump.

The complaint lacks such allegations. The complaint does allege that Fiat-Chrysler's advertisements included representations about the Jeep that Nestor bought. For instance, ads showed the diesel-powered vehicle on U.S. roadways, perhaps suggesting the Jeep was compatible with U.S. diesel fuel. (ECF No. 26, PageID.802, 852.) And Fiat-Chrysler claimed that the Jeep was "reliable" and "durable" (PageID.802, 852), perhaps suggesting that a critical engine part like the CP4 pump would not fail for a good while. But these were not representations about the CP4 pump specifically, and it is not plausible that these representations distracted Nestor from discovering issues with the CP4 pump.

The closest Nestor comes to alleging that Fiat-Chrysler actions prevented him from becoming aware of his legal claims is an allegation that Fiat-Chrysler's "company line" is that the pump failed because the consumer used "contaminated fuel." (PageID.797.) If Fiat-Chrysler blamed consumers for pump failures, that might be the type of affirmative conduct that prevented consumers from discovering the defect. But Nestor does not plead that he, personally, was aware of this "company line" and that it discouraged him, personally, from discovering issues with his CP4 pump within the four-year limitations period. True, a dealer allegedly gave Nestor this company line when his fuel pump broke—but that was already five years after Nestor had bought his Jeep.

In short, the Court finds that the complaint does not allege that Fiat-Chrysler's actions prevented Nestor from discovering that he had a cause of action based on the CP4 pump earlier than when he discovered it in April 2019. Based on the complaint, tolling based on fraudulent concealment is not plausible.

**\*14** That leaves the discovery rule. "The discovery rule postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action."

*Philips v. Ford Motor Co.*, No. 14-CV-02989, 2015 WL 4111448, at *7 (N.D. Cal. July 7, 2015) (internal quotation marks omitted). Fiat Chrysler argues that the discovery rule does not save Nestor's claims because he has neither pled when he discovered the defect or why he could not have discovered it earlier. (ECF No. 33, PageID.1767.)

The Court disagrees; reading the complaint in the light most favorable to Nestor, he has adequately pled a factual basis for the discovery rule. The alleged defect is not visible: it occurs inside the fuel-injection pump. And nothing in the complaint suggests that prior to his pump breaking, Nestor had learned that CP4 pumps were prone to early failure. It is thus reasonable to infer that Nestor would not have known his pump had issues until it broke. That was in April 2019. This suit followed six months later.

Given that Nestor has adequately pled facts to invoke the discovery rule, the question becomes whether the rule saves all of Nestor's claims? Nestor argues that it does. (ECF No. 32, PageID.1705.) But the cases he cites do not establish that. One of Nestor's cases applied the discovery rule to a fraud claim and claims under California's Unfair Competition Law and Consumer Legal Remedies Act. *Philips v. Ford Motor Co.*, No. 14-CV-02989, 2015 WL 4111448, at *7 (N.D. Cal. July 7, 2015). But none of Nestor's cases applied the discovery rule to a common-law breach of contract claim, and in a case so heavily litigated, the Court declines to conduct research for Nestor. So the Court finds that under California's discovery rule, Nestor's fraud, Unfair Competition Law, Consumer Legal Remedies Act claims are timely, but his common-law breach-of-contract claim is not.

Remaining then is whether the discovery rule applies to Nestor's implied-warranty claim under the Song-Beverly Act. The case law is mixed: some courts have applied the discovery rule to Song-Beverly Act claims, but others have declined to do so. Nestor relies on *Tanner v. Ford Motor Co.*, 424 F. Supp. 3d 666, 671 (N.D. Cal. 2019), to argue that the rule saves his implied-warranty claim. For its part, Fiat-Chrysler cites two cases finding that the discovery-rule does not delay the statute-of-limitations clock for a Song-Beverly Act claim. (ECF No. 33, PageID.1767 (citing *Mandani v. Volkswagen Group of America, Inc.*, No. 17-CV-07287, 2020 WL 3961975, at *2 (N.D. Cal. July 13, 2020); *Goldstein v. Gen. Motors LLC*, 445 F. Supp. 3d 1000, 1017 (S.D. Cal. 2020)).)

The parties have not attempted to reconcile the conflicting case law. From what this Court can tell, part of the division stems from a provision in California's version of the U.C.C. It reads in part, "A breach of warranty occurs when tender of delivery is made, *except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.*" Cal. Com. Code § 2725 (emphasis added). Some courts have found this language inapplicable to implied-warranty claims because an implied warranty never extends to future performance—by definition an implied warranty guarantees that the good, when purchased, is fit for its ordinary purpose. *See e.g.*, *Mandani*, 2020 WL 3961975, at *3. But other courts have pointed out that the Song-Beverly Act extends the implied warranty up to one year post-purchase, i.e., if an originally merchantable product becomes unmerchantable in its first year of use, there is still breach of the implied warranty of merchantability. *See Audo v. Ford Motor Co.*, No. 3:18-CV-00320, 2018 WL 3323244, at *2 (S.D. Cal. July 6, 2018). Under this view, the Song-Beverly Act apparently transforms all implied warranties into warranties for "future performance," thus triggering the clause, "the cause of action accrues when the breach is or should have been discovered," Cal. Com. Code § 2725.

**\*15** Absent briefing from the parties on how to resolve the conflicting authority, the Court finds that the discovery rule does not apply to Nestor's implied-warranty claim under the Song-Beverly Act. It appears the future-performance exception to the normal accrual-upon-tender rule is partly justified by having to wait for the future event to happen. For example, if a part is guaranteed to run for 20,000 miles before failure (a promise of future performance), a car will have to be driven 20,001 miles before deciding if there is a cause of action for breach of warranty. *See* 1 White, Summers, & Hillman, Uniform Commercial Code § 12:18 (6th ed.). It thus makes sense that a breach-of-warranty claim could accrue when the part breaks at 19,000 miles, rather than at tender of delivery. Here, under the Song-Beverly Act, the future event was at most one year after Nestor's purchase: to recover under the Act, a product must become unmerchantable, at the latest, one year after tender of delivery. *See* Cal. Civ. Code § 1791.1. But a year after Nestor's purchase was April 2015, which is still more than four years before he filed this lawsuit. In other words, to the extent that the purpose of the discovery rule is to delay starting the statute-of-limitations clock until a future event occurs, that rationale would only justify starting the limitations clock a year after Nestor bought his vehicle.

Accordingly, the Court finds that the discovery rule does not save Nestor's Song-Beverly Act claim from the four-year statute-of-limitations bar. It follows that Nestor's contingent Magnuson-Moss Warranty Act claim is also untimely. (*See* ECF No. 32, PageID.1683 (indicating that MMWA claim is derivative of implied-warranty claim).)

In sum, the Court finds that Nestor's breach-of-contract claim, implied-warranty claim under the Song-Beverly Act, and Magnuson-Moss Warranty Act claim are barred by the applicable statute of limitations and thus will be dismissed. Nestor's fraud, Unfair Competition Law, and Consumer Legal Remedies Act claims are timely under California's discovery rule.

#### D. Fraud Claims

The Court next examines Nestor's and Withrow's fraud claims.

Plaintiffs' fraud claims come in two forms: they assert that Fiat-Chrysler made affirmative misrepresentations and that Fiat-Chrysler failed to disclose a material fact about their vehicles. The Court starts with Fiat-Chrysler's efforts to dismiss Nestor's and Withrow's affirmative-misrepresentation claims and then turns to the fraud-by-omission claims.

#### 1. Affirmative Representations

Nestor and Withrow point to Fiat-Chrysler's advertisements in support of their claim that the car maker made affirmative misrepresentations about their vehicles. For instance, Nestor and Withrow point out that in its ads, Fiat-Chrysler showed Rams and Jeeps driving on American roadways, which say Plaintiffs, implies that the vehicles are compatible with U.S. diesel. (PageID.852.) As another example, Fiat-Chrysler said Rams and Jeeps with the 3.0L EcoDiesel engine (the engine that uses the CP4 pump) were more fuel efficient than comparable vehicles. (PageID.852–854.) Another ad references "durable engines." (PageID.855.) According to Nestor and Withrow, given the CP4's incompatibility with U.S. diesel and likelihood of early failure, Fiat-Chrysler's advertisements for EcoDiesel Rams and Jeeps were false or misleading.

In response, Fiat-Chrysler argues that Nestor and Withrow "do not plead a single affirmative representation that falls outside the bounds of puffery or opinion." (ECF No. 29,

PageID.1570.) Because puffery and opinion generally do not give rise to a viable fraud claim, Fiat-Chrysler asserts that any fraud claims based on affirmative misrepresentations must be dismissed.

The Court agrees. As an initial matter, Plaintiffs recount some statements Fiat-Chrysler made without adequately pleading how they are false or misleading. For instance, Plaintiffs complain that Fiat-Chrysler stated that the "3.0L EcoDiesel V6 utilizes dual-filtration technology for greater ... durability." Even if the CP4 pump is faulty, dual-filtration technology could still make the engine more durable than one without that technology. As another example, it may be true that the Ram has a "730-mile highway driving range" (PageID.853) even if the CP4 causes the Ram's engine to fail at say, 30,000 miles. And regardless of truth or falsity, none of the statements Nestor and Withrow recite in their complaint are representations about the CP4 pump specifically. Further, Fiat-Chrysler's statements about reliability and durability are relative statements (reliable and durable relative to what?). They are also subjective statements (is 100,000 miles or 200,000 miles durable?). All of this suggests that Fiat-Chrysler's advertisements are not affirmative misrepresentations about the CP4 pump that can give rise to a claim of fraud.

**\*16** Case law lends further support for this conclusion. In two other cases involving the CP4 pump (which Nestor and Withrow urge the Court to follow on other issues), courts found that statements similar to the ones pled here were non-actionable puffery or opinion. *Chapman v. Gen. Motors LLC*, No. 19-12333, 2021 WL 1286612, at \*14 (E.D. Mich. Mar. 31, 2021) ("The Court does not find any of the advertising descriptors cited by Plaintiffs—'11 percent more fuel efficient,' 'take[s] performance and fuel economy to the next level,' or 'proven durability'—to amount to anything other than puffery."); *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 877 (N.D. Cal. 2019) ("[T]he Court concludes that the representations Plaintiffs cite—including broad claims of 'reliability' and 'durability' as well as marginally more specific references to 'superior fuel economy,' 'torque,' 'horsepower,' and 'emission performance'—amount to mere sales puffery.").

True, two other CP4 cases that Nestor and Withrow have urged this Court to follow found that the manufacturers' ads were actionable misrepresentations. But in one case, the manufacturer made a representation about the performance of the fuel injectors—a part that works closely with the CP4

pump—and both cases involved Texas law, which allows fraud claims to be based on opinion. *See Stevens v. Ford Motor Co.*, No. 18-456, slip op. at 6 (S.D. Tex. Nov. 2, 2020) ("Plaintiffs set out the advertising materials that Ford published ... specifically representing that the engine and its fuel system are robust, with 'fuel injectors that achieve a clean, efficient burn.' "); *Click v. Gen. Motors LLC*, No. 2:18-CV-455, 2020 WL 3118577, at *4 (S.D. Tex. Mar. 27, 2020) ("Even an opinion may be actionable.").

In all, the Court finds that Nestor and Withrow have not adequately alleged that Fiat-Chrysler's promotional statements were affirmative misrepresentations giving rise to a common-law fraud claim.

### 2. Omissions

The Court thus turns to Nestor's and Withrow's fraud claims based on omission.

Fiat-Chrysler seeks to dismiss Plaintiffs' fraud-by-omission claims in several ways. According to Fiat-Chrysler, (1) the complaint lacks the particularity that Federal Rule of Civil Procedure 9(b) demands, (2) the complaint lacks factual allegations establishing its knowledge of the CP4 pump defect, and (3) even if it had knowledge of the defect, it did not have a duty to disclose it under California or Connecticut law.

*Rule 9(b).* The Court disagrees with Fiat-Chrysler that the complaint fails to meet the Rule 9(b)'s demand for specificity. "To maintain its fraud-by-omission claim under [Rule 9(b)'s] standard, [Nestor and Withrow] must specify the who, what, when, where, and how of the alleged *omission.*" *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 255–56 (6th Cir. 2012) (internal quotation marks omitted). The "who" is obvious, Fiat-Chrysler. As to "what" was not disclosed, Nestor and Withrow allege that the CP4 pump has a fragile design and that U.S. diesel fuel, depending on the source, is too dry to adequately lubricate the roller and cam in the pump; so, say Plaintiffs, Fiat-Chrysler should have disclosed that the CP4 pump had a fair chance of failing early in the vehicle's lifetime. (PageID.811, 822, 879–880.) Regarding "when" the omission occurred—Plaintiffs say that had they known about the CP4 pump defect before they bought their vehicles, they would not have bought them (or, at least, paid less for them). (PageID.880.) As for "where" the omissions occurred, they occurred in the various channels of information that Fiat-Chrysler used to sell its vehicles.

(*See* PageID.879 (referencing "marketing and advertising materials used nationally"); PageID.800.) This Court has previously found like allegations meet Rule 9(b)'s standard, *Gregorio v. Ford Motor Co.*, No. 20-11310, 2021 WL 778913, at *5 (E.D. Mich. Mar. 1, 2021) (Michelson, J.), and it sees no reason to deviate from that decision here.

**\*17** *Knowledge.* Fiat-Chrysler next claims that Nestor and Withrow have not adequately pled that it knew about the CP4 pump defect before they bought their vehicles. To address this argument, a summary of the complaint's allegations of Fiat-Chrysler's knowledge is in order.

One way the complaint seeks to establish Fiat-Chrysler's knowledge of the CP4 pump defect is by describing a 2011 investigation by the National Highway Traffic Safety Administration. NHTSA started the investigation based on 160 complaints of engine stalls in Volkswagens and Audis; the stalls appeared to be related to the Bosch CP4 pump. (PageID.830–831.) Among the documents produced to NHTSA during the investigation were communications between the two car makers and Bosch. For instance, in 2008, Audi asked Bosch if the reason pumps in European vehicles did not fail was because the fuel was different in Europe. (*See* PageID.833.) And in 2009, Audi reported to Bosch, "we only have a problem in certain markets[.] ... Depending on how poor the fuel currently on the market is." (PageID.833.) From February to May 2011, Audi, Volkswagen, and Bosch exchanged emails about a substantial increase in warranty claims in U.S. vehicles with the CP4 pump. (PageID.833.) And in September 2011, someone from Volkswagen emailed Bosch, "I think the [CP4.1] failures are well known." (PageID.1341.) These emails and other documents produced in the NHTSA investigation were published on NHTSA's website. (*See* PageID.831.) Thus, Nestor and Withrow allege, "[b]y the end of the 2011, it was well known that Bosch CP4 failures in the U.S. Audi and Volkswagen vehicles were widespread and catastrophic." (PageID.834.)

Although NHTSA only investigated Volkswagen and Audi, Nestor and Withrow allege that, for several reasons, Fiat-Chrysler knew of the investigation and saw the emails. For one, during its investigation, NHTSA not only requested documents from Volkswagen, but also requested documents from Fiat-Chrysler. (PageID.831.) And Nestor and Withrow allege that auto manufactures have departments that "track emerging trends which may impact their business," including "problems with commonly used components on other

manufacturer's products." (PageID.834.) And "[s]pecific departments ... monitor many public (and subscription) sites such as ... NHTSA.gov ... to ensure compliance with all standards, regulations." (PageID.835.) Plaintiffs further plead that auto manufacturers "maintain extensive bodies of knowledge such as 'lessons learned' ... databases," and " '[l]essons learned' from competitors are invaluable since they avoid similar problems during development and production." (PageID.835–836.) Thus, Withrow and Nestor allege, "information about the CP4 pump's problems would have been widely known throughout the industry, and certainly known to FCA." (PageID.837.)

Taking all of these allegations together and evaluating them in the light most favorable to Nestor and Withrow, it is reasonable to infer that Fiat-Chrysler knew that the CP4 pump was defective. Contrary to Fiat-Chrysler's assertion that the NHTSA investigation only shows "what the automotive industry knew in general" (ECF No. 29, PageID.1571–1572), Nestor and Withrow have alleged that as part of the 2011 investigation, NHTSA asked Fiat-Chrysler for documents. So it is reasonable to infer that Fiat-Chrysler knew that NHTSA was investigating complaints about CP4 pump failures. And Nestor and Withrow have alleged that Fiat-Chrysler has monitoring departments, so it reasonable to infer that Fiat-Chrysler would have tracked that investigation. Further, the complaint alleges that the documents produced in the investigation—including emails suggesting that the pump may have difficulties running on U.S. diesel—were made publicly available.

 **\*18** The Court also notes that another judge in this District concluded that allegations similar to Nestor and Withrow's made it plausible that General Motors knew about the CP4 defect. *See Chapman v. Gen. Motors LLC,* No. 19-12333, 2021 WL 1286612, at \*15 (E.D. Mich. Mar. 31, 2021). True, in *Chapman,* when NHTSA asked General Motors to produce documents as part of the 2011 investigation, "GM responded that in the 2nd quarter of 2011 alone, it was aware of at least ninety-nine field reports of high-pressure fuel pump failure" in its vehicles. Amended Complaint, *Chapman v. Gen. Motors LLC,* No. 19-12333 (E.D. Mich. May 22, 2020); *see also Chapman,* 2021 WL 1286612, at \*15 (citing paragraphs 180 and 181 of amended complaint). Nestor and Withrow do not make a similar allegation about Fiat-Chrysler's production to NHTSA. But the court in *Chapman* did not rely heavily on those allegations. Instead, it explained, "[W]hen GM and other OEMs were asked to submit data [to NHTSA], it seems implausible that GM would not have

carefully examined the rest of the investigation materials given its vested interest in knowing as much as possible about the possibility of problems with the fuel pump that was in its trucks." *Id.* at \*15. The court continued, "This investigation involves the same pump model that GM was using, made by the same manufacturer, and includes email communications between Volkswagen, Audi, and Bosch employees specifically discussing the pump, issues with fuel lubricity, and the presence of metal shavings in the pump housing. The Court finds it plausible that this kind of investigation would have put GM on notice about issues with its own CP4 pumps. *Id.* Swap "GM" for "Fiat-Chrysler" in the preceding quotes, and they remain accurate.

In short, it is reasonable to infer that Fiat-Chrysler knew that the CP4 pump was not compatible with the U.S. diesel provided at many gas stations or was otherwise prone to early failure.

*Duty to Disclose.* Fiat-Chrysler seeks dismissal of the fraud-by-omission claims a third way: even if it knew about the CP4 pump defect, neither California nor Connecticut law required it to disclose the defect under the circumstances alleged in the complaint.

As to Nestor's fraud claim under California law, the Court disagrees with Fiat-Chrysler.

Start with the law. Fiat-Chrysler admits that a manufacturer has a duty to disclose a defect if the defect is material and it has exclusive knowledge of the defect. (ECF No. 29, PageID.1574.) Nestor cites a pair of cases indicating that courts interpret "exclusivity" less strictly than the ordinary meaning of the word demands, i.e., merely "superior" knowledge of the defect can give rise to a duty to disclose. *See Edenborough v. ADT, LLC,* No. 16-CV-02233-JST, 2016 WL 6160174, at \*6 (N.D. Cal. Oct. 24, 2016); *Norcia v. Samsung Telecommunications Am., LLC,* No. 14-CV-00582, 2015 WL 4967247, at \*7 (N.D. Cal. Aug. 20, 2015). Because Fiat-Chrysler cites no case to the contrary, the Court proceeds under the assumption that superior knowledge suffices.

So has Nestor adequately alleged that Fiat-Chrysler has superior knowledge of the CP4 defect? Yes. As explained, it is reasonable to infer that Fiat-Chrysler knew about the 2011 NHTSA investigation and tracked its progress. And while some consumers were also aware of the history of the CP4 pump, that does not mean that all Jeep owners knew of the issue, let alone Nestor specifically. In fact,

the complaint suggests that the first time Nestor became aware of the CP4 pump issue is when his Jeep broke down and a dealer diagnosed metal shavings in the fuel system. (*See* PageID.802–803.) So it is plausible that Fiat-Chrysler's knowledge of the CP4 pump defect was superior to Nestor's.

The Court reaches a different conclusion as to the duty Fiat-Chrysler owed to Withrow. Fiat-Chrysler cites a case implying that under Connecticut's common law, a duty to disclose a known fact arises only if there is a need to clarify a half-truth or the parties have a "special relationship." *See DiMichele v. Perrella*, 158 Conn.App. 726, 120 A.3d 551, 555 (Conn. Ct. App. 2015). Plaintiffs cite around a dozen cases for the proposition that a duty to disclose arises in other circumstances, such as when the manufacturer has superior knowledge of the defect or when the defect poses a safety risk to the consumer. (ECF No. 32, PageID.1693–1700.) But the Court has examined each of these cases, and the overwhelming majority do not involve Connecticut law at all. And in the one or two cases that included a plaintiff from Connecticut, the court did not do a state-by-state analysis of when a duty to disclose arises and did not examine Connecticut law. So as far as the parties' briefing goes, Fiat-Chrysler's case is more persuasive. It follows that the question is whether Withrow has adequately alleged that Fiat-Chrysler made a partial disclosure that required clarification or whether Withrow and Fiat-Chrysler had a "special relationship." *See DiMichele*, 120 A.3d at 555.

**\*19** The answer is "no." According to the case cited by Fiat-Chrysler, a vendor-vendee relationship only gives rise to a duty to disclose if the relationship is one of "trust and confidence." *DiMichele*, 120 A.3d at 555. The complaint contains little suggesting that Fiat-Chrysler was some type of fiduciary to Withrow—Withrow simply bought a good that Fiat-Chrysler made (and not even from Fiat-Chrysler, directly). As for partial disclosures, the Court has already found that Fiat-Chrysler's advertising statements were true, puffery, opinion, or some combination and that the complaint does not recite any Fiat-Chrysler advertisement about the CP4 pump specifically. So under the law the parties have provided, Fiat-Chrysler owed no duty to Withrow to disclose the CP4 defect.

In arguing for a different result, Plaintiffs point to an ad where Fiat-Chrysler claimed that the Dodge Ram EcoDiesel offered "fuel-efficient performance" and "biodiesel (B20) capability." (ECF No. 32, PageID.1698; ECF No. 26, PageID.855.) But Plaintiffs have not adequately alleged

that the Ram did not have B20 capability—notably B20 biodiesel fuel has greater lubricity than ordinary diesel, and thus, perhaps, eliminates issues with the CP4 pump. *See* Troy Shoen, *How Biodiesel Can Solve Fleets' Lubricity Problems*, Fleet Equipment (Apr. 17, 2018), https://perma.cc/D8YW-YWQW; U.S. Dep't of Energy Efficiency & Renewable Energy, Diesel Vehicles Using Biodiesel, https://perma.cc/6T9Y-HMCX ("Biodiesel raises the cetane number of the fuel and improves fuel lubricity.") As for Fiat-Chrysler's claim of "fuel-efficient performance," it is true that Plaintiffs have alleged that once the CP4 pump starts to wear, fuel efficiency goes down. But the term "fuel efficient" is both subjective and relative. Even after the pump starts to wear, the Ram may still be "fuel efficient" relative to other vehicles, or it may still be fuel efficient in some people's opinion. Accordingly, Withrow's fraud-by-omission claim will be dismissed.

\* \* \*

In sum, Nestor's and Withrow's fraud claims based on affirmative misrepresentations will be dismissed because Fiat-Chrysler's advertisements were true, puffery, or opinion and because they were not specific to the CP4 pump. Withrow's fraud-by-omission claim will be dismissed because (1) the law provided to the Court indicates that under Connecticut law, Fiat-Chrysler had a duty to disclose only if it made a misleading partial disclosure or if it had special relationship with Withrow and (2) the complaint does not allege facts establishing partial disclosure or a special relationship. Nestor's fraud-by-omission claim will survive because Fiat-Chrysler plausibly had superior knowledge of the defect, which gives rise to a duty under California law.

**E. Consumer-Protection-Act Claims**

Fiat-Chrysler also asks this Court to dismiss Nestor's and Withrow's consumer-protection-act (CPA) claims.

Two of Plaintiffs' four CPA claims require no new analysis. Other than to argue that Withrow cannot bring a claim under the Connecticut Unfair Trade Practices Act (because he bought his Ram in New Jersey), Fiat-Chrysler treats Withrow's claim under Connecticut's CPA as if it were a common-law fraud claim. (*See* ECF No. 29, PageID.1565 (making same arguments for Counts A.II, F.I-II, H.I-II, FF.I); *see also* ECF No. 29-4, PageID.1605.) As for Nestor, Fiat-Chrysler treats his claim under the California Legal Remedies Act as if it were a common-law fraud claim. (*See* ECF No. 29, PageID.1565; ECF No. 29-4, PageID.1605.) So for the

reasons given, Withrow's claim under the Connecticut Unfair Trade Practices Act and Nestor's claim under the California Legal Remedies Act will not be dismissed.

Unlike those two CPA claims, Fiat-Chrysler does make arguments tailored to Withrow's claim under the New Jersey Consumer Fraud Act and Nestor's claim under California's Unfair Competition Law.

 **\*20**  As for New Jersey's Consumer Fraud Act, Fiat-Chrysler argues that Withrow must plead that it knew "with certainty" that the CP4 pump would fail prematurely. (ECF No. 29, PageID.1573.) Fiat-Chrysler even cites a case where the court dismissed a New Jersey CFA claim because the plaintiffs failed to allege that General Motors was certain that the CP4 pump had issues. (ECF No. 29, PageID.1569 (citing *Dawson v. Gen. Motors LLC*, No. 19-8680, 2019 WL 3283046, at \*5–6 (D.N.J. July 22, 2019)). Fiat-Chrysler argues that Plaintiffs' factual allegations do not establish that it knew "with certainty" that the CP4 pump was defective and, as such, Withrow has not stated a claim under the CFA. (ECF No. 29, PageID.1573.)

The Court disagrees. Fiat-Chrysler cites *Alban v. BMW of N. Am.*, No. CIV. 09-5398 DRD, 2011 WL 900114, at \*10 (D.N.J. Mar. 15, 2011), for the proposition that the NJ CFA requires a manufacturer to know "with certainty" that its product is defective. But the defect in *Alban* did not manifest until after the warranty had expired. *Id.* at \*2. Further, *Alban* relied on *Perkins v. DaimlerChrysler Corp.*, 383 N.J.Super. 99, 890 A.2d 997, 1005 (N.J. Super. App. Div. 2006), and *Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 501 (D.N.J. 2009), for the rule that the CFA requires a manufacturer to know "with certainty" that the product is defective. Yet in both *Perkins* and *Maniscalco*, the product also outlasted the warranty. *See Maniscalco*, 627 F. Supp. 2d at 497, 502; *Perkins*, 890 A.2d at 1004. Indeed, the court in *Perkins* was concerned that if courts allowed a CFA claim where the product had outlasted the warranty, courts would effectively renegotiate the parties' bargained-for warranty. 890 A.2d at 1004. Even the very case relied on by Fiat-Chrysler states, "where a good is covered by a warranty *and becomes defective after the warranty period has expired*, an NJCFA violation occurs only when the defendant has specific knowledge of the defect." *Dawson*, 2019 WL 3283046, at \*5 (emphasis added). Here, Withrow's Ram did not outlast the warranty. His Ram failed when it was about two years old and had 31,500 miles on the odometer, yet Fiat-Chrysler warrantied the Ram for 5 years or 100,000 miles.

(PageID.799–800.) As such, the Court is not persuaded that the knew-with-certainty test applies to Withrow's CFA claim. And the Court has already found that it is plausible that Fiat-Chrysler knew (perhaps not with certainty) that the CP4 pump was not compatible with U.S. diesel or otherwise would fail prematurely.

The Court is likewise not persuaded by Fiat-Chrysler's efforts to dismiss Nestor's claim under California's Unfair Competition Law. The UCL prohibits "unlawful," "unfair," and "fraudulent" acts and practices—"[e]ach of these three adjectives captures a separate and distinct theory of liability." *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214 (9th Cir. 2020). Fiat-Chrysler says, "[t]o the extent Plaintiffs intend to invoke the 'unlawful' prong of the UCL, that claim fails because Nestor's claims for violation of the [California Legal Remedies Act], MMWA and Song-Beverly Act all fail." (ECF No. 29, PageID.1579.) But the Court has just found that Nestor's claim under the California Legal Remedies Act is not subject to dismissal because Fiat-Chrysler had not treated the claim differently from Nestor's fraud claim (and Nestor's fraud claim is not subject to dismissal). So Fiat-Chrysler has not shown that Nestor has failed to adequately plead an "unlawful" practice under the UCL. *See Roper v. Big Heart Pet Brands, Inc.*, No. 119CV00406, 2020 WL 7769819, at \*13 (E.D. Cal. Dec. 30, 2020) ("[A] CLRA violation suffices as the predicate to a UCL unlawful prong claim." (internal quotation marks omitted)). As for the "fraudulent" prong of the UCL, the Court has found that Nestor has adequately pled a claim of common-law fraud, and Fiat-Chrysler has not explained why the same allegations do not satisfy the fraudulent prong of the UCL. The parties also debate whether Nestor has adequately established the "unfair" prong (ECF No. 29, PageID.157; ECF No. 32, PageID.1702; ECF No. 33, PageID.1777), but because Nestor's UCL claim survives via at least the "unlawful" and "fraudulent" prongs, the Court will entertain that debate at a later date.

 **\*21**  In short, Fiat-Chrysler has not persuaded the Court to dismiss Nestor's or Withrow's consumer-protection-act claims.

### F. Breach-of-Contract Claims

The Court next examines Withrow's common-law, breach-of-contract claim. (As explained above, Nestor's breach-of-contract claim is untimely.)

The Court agrees with Fiat-Chrysler that Withrow has not adequately pled a breach-of-contract claim. The complaint

makes a number of general allegations attempting to show that Fiat-Chrysler recognizes "FCA-authorized dealerships" as its sales agents. (PageID.858.) But Withrow bought his Dodge Ram from "Autoland in Springfield, New Jersey," and he does not plead that Autoland was an "FCA-authorized dealership." (PageID.799.) And the omission is telling given that Withrow made a point to allege that he brought his Ram to "an FCA US dealership" for repair. (PageID.799.) Moreover, Withrow bought his Ram used, meaning that Autoland may not have even bought the Ram from Fiat-Chrysler. Because Withrow did not buy his Ram from Fiat-Chrysler, and because Withrow alleges that the contract at issue was formed by his purchase of the Ram (PageID.882), the Court finds that Withrow has not adequately pled that Fiat-Chrysler formed a contract with Withrow. And without a contract between Fiat-Chrysler and Withrow, Withrow has no basis to claim Fiat-Chrysler breached the contract.

In resisting this result, Withrow cites two cases. Neither persuade. True, in *Bledsoe v. FCA US LLC*, the court allowed a breach-of-contract claim to survive past the pleading stage. *See* 378 F. Supp. 3d 626, 645 (E.D. Mich. 2019). But the court in *Bledsoe* did not address the issue of contract formation between Fiat-Chrysler and a consumer who buys his Fiat-Chrysler vehicle from a used-car dealer. *See id.* In fact, in a footnote, the court in *Bledsoe* suggested that the breach-of-contract analysis for a used-car purchase might differ from the analysis for a new-car purchase. *Id.* at 645 n.9. Withrow also cites *Joslyn v. Cadillac Automotive Co.*, 177 F. 863 (6th Cir. 1910). But there, the evidence suggested that the sole employee of Cadillac Automotive (it was 1910 after all) was involved in the transaction and that the local company was Cadillac Automotive's agent. *See id.* at 866. Here, the complaint does include facts attempting to show that "FCA-authorized dealerships" are Fiat-Chrysler's agents, but, again, Withrow has not pled that Autoland was an FCA-authorized dealership. *Joslyn* is thus of no help to Withrow.

In short, the Court cannot reasonably infer from the allegations of the complaint that Fiat-Chrysler was a party to any contract between Withrow and Autoland. As such, Withrow's breach-of-contract claim against Fiat-Chrysler will be dismissed.

### G. Implied-Warranty Claims

The Court turns to Fiat-Chrysler's efforts to dismiss Plaintiffs' implied-warranty claims. As discussed, Nestor's implied-warranty claim is untimely. So only Withrow's implied-warranty claim still needs to be addressed.

Fiat-Chrysler argues that it did not breach the implied warranty of merchantability because the Ram that Withrow bought was merchantable. Fiat-Chrysler points out that by the time the CP4 pump failed in Withrow's Ram, the truck was two years old and had 31,500 miles on the odometer. (ECF No. 29, PageID.1563; ECF No. 26, PageID.799.) Citing a host of cases, Fiat-Chrysler argues that courts have routinely dismissed implied-warranty claims when "the facts alleged show a plaintiff's vehicle was driven for multiple years and tens of thousands of miles without any problem." (ECF No. 29, PageID.1562); *see also Sheris v. Nissan N. Am. Inc.*, No. 07-2516, 2008 WL 2354908, at *6 (D.N.J. June 3, 2008) ("The weight of authority, from courts across the country, indicates that plaintiffs may not recover for breach of the implied warranty of merchantability under the facts where plaintiffs have driven their cars without problems for years." (internal quotation marks omitted)); *Suddreth v. Mercedes-Benz, LLC*, No. 10-CV-05130, 2011 WL 5240965, at *5 (D.N.J. Oct. 31, 2011) ("It is simply not plausible that a motor vehicle could be classified as not merchantable when it has been used for its intended purpose for 4 years and 50,000 miles.").

**\*22** The decisional law that Fiat-Chrysler cites does not persuade the Court to dismiss Withrow's implied-warranty claim at the pleading stage. Generally speaking, a good is merchantable if it "is reasonably fit for the general purpose for which it is manufactured and sold." *Henningsen v. Bloomfield Motors*, Inc., 32 N.J. 358, 161 A.2d 69, 76 (N.J. 1960). For trucks like Withrow's, its general purpose is to get someone from A to B safely (or, because it is a truck, to get someone *and something* from A to B safely). *See Gregorio v. Ford Motor Co.*, No. 20-11310, 2021 WL 778913, at *17 (E.D. Mich. Mar. 1, 2021). But trucks are also durable goods—they are supposed to last a while. They not only need to get people and things from A to B safely; trucks need to go from A to B safely a fair number of times to be fit for their general purpose. *See Roe v. Ford Motor Co.*, No. 18-12528, 2019 WL 3564589, at *12 (E.D. Mich. Aug. 6, 2019) ("Sure, cars are supposed to get people from A to B; but they, like other durable goods, are expected to work for a good while.").

But where to draw the line? A new vehicle that lasts only three months and 5,000 miles before requiring major repair is certainly not merchantable; but one that lasts ten years and 150,000 miles without requiring major repair certainly is. *Cf. Hornberger v. General Motors Corp.*, 929 F. Supp. 884, 888 (E.D. Pa. 1996) ("[A] material question of fact does

exist as to whether a normal transmission of a newly leased vehicle would fail after being driven approximately 40,000 miles, rendering the car unfit for the purpose of driving and, therefore, unmerchantable."). The "merchantable line" lies somewhere between those extremes.

While the Court draws no bright line, taking the factual allegations of the complaint as true and drawing reasonable inferences in Withrow's favor, it is plausible that his particular Ram was not merchantable because it stopped running several years and tens of thousands of miles before a reasonable consumer would expect it to fail. According to the complaint, diesel vehicles cost more than their gas counterparts because diesel engines are supposed to last a long time—500,000 to 800,000 miles. (PageID.797, 801.) Of course, the lifetime of the vehicle is less than the lifetime of the engine (non-engine parts may fail), but a reasonable inference is that a consumer expects a $40,000, diesel-powered Ram to last many years and well over the 31,500 miles of Withrow's Ram. (PageID.799.) And the repair was not cheap—it was $12,000. (PageID.800.) While discovery on consumer expectations and industry standards might prove that two years and 31,500 miles was long enough to deem the Ram merchantable, it is at least plausible that Withrow's Ram was not merchantable.

But, argues Fiat-Chrysler, after Withrow repaired the damage from the failed CP4 pump, he continued to drive his Ram. Indeed, as of March 2020, the Ram had logged about 17,000 miles since the repair. (PageID.799–800.) Fiat-Chrysler cites a few cases in support of the proposition that if a consumer continues to drive his vehicle, the vehicle is merchantable. (ECF No. 33, PageID.1768–1769.)

Fiat-Chrysler's cases are distinguishable. In each case, the defect did not prevent the vehicle from being driven. *See Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 743, 762 (E.D. Mich. 2017) (finding vehicle merchantable where named plaintiff drove his vehicle with the alleged defect); *Weidman v. Ford Motor Co.*, No. 18-CV-12719, 2020 WL 674348, at *4 (E.D. Mich. Feb. 11, 2020) ("None of the new Plaintiffs allege that their vehicle cannot brake nor that he or she cannot use his or her vehicle."); *accord Weidman v. Ford Motor Co.*, No. 18-CV-12719, 2019 WL 3003693, at *4 (E.D. Mich. July 10, 2019). Here, Withrow says that he was driving on the highway and his Ram "quit in the middle of the road." (PageID.799.) And from what the Court can glean from the complaint, the truck was, at that point, completely non-operational. Thus, the merchantability analysis in *Beck* and *Wiedman* is not persuasive on the facts of Withrow's case.

**\*23** In short, Fiat-Chrysler has not shown that it is implausible that Withrow's Ram was unmerchantable; so Withrow's implied-warranty claim is not subject to dismissal. Further, Withrow's claim under the Magnuson-Moss Warranty Act will survive because it is derivative of his implied-warranty claim. (*See* ECF No. 33, PageID.1768 ("There is no dispute Plaintiffs' MMWA claim stands or falls with their state-law warranty claims.").)

**H. Remedies**

In addition to moving to dismiss Plaintiffs' claims, Fiat-Chrysler also ask this Court to dismiss some of Plaintiffs' requested relief.

For one, Fiat-Chrysler argues that Nestor's and Withrow's allegations in support of punitive damages are conclusory, so that relief should be "stricken or dismissed." (ECF No. 29, PageID.1584.) Fiat-Chrysler also says that to obtain punitive damages under California law, Nestor must allege that the "conduct allegedly giving rise to punitive damages was that of, or was authorized or ratified by, an officer, director, or manager of the corporation." (ECF No. 29, PageID.1584.) This, says Fiat-Chrysler, Nestor has failed to do. (*Id.*)

The Court declines to bar punitive damages at this early stage of the case. First, Nestor and Withrow have plausibly alleged that Fiat-Chrysler knew the CP4 pump had issues with U.S. diesel or was otherwise prone to early failure and, despite this knowledge, decided to sell vehicles with the CP4 pump. And Nestor and Withrow have alleged that the CP4 pump failure can occur while driving, thus presenting a safety risk. A knowing wrong that can lead to physical injury lends some support to a claim of punitive damages. Second, this case will proceed to discovery even if this Court bars punitive damages. And the Court anticipates that discovery on other issues will largely answer whether Fiat-Chrysler acted with the malice required for punitive damages. So there is little to gain in barring punitive damages now. Indeed, the issue would become moot if Fiat-Chrysler prevails in this litigation.

But the Court will dismiss Nestor's claim for enhanced damages under the California Legal Remedies Act because Nestor is not a member of the class of people who may recover those enhanced damages. According to the complaint, "Plaintiffs and California Sub-Class members seek an additional award against FCA of up to $5,000 for each Plaintiff who qualifies as a 'senior citizen' or 'disabled person' under the CLRA." (PageID.906.) But this Court

has already explained that Withrow, a Connecticut resident who bought his Ram in New Jersey, has no standing to represent a class of people seeking relief under California law. And while Nestor has standing to pursue his own claim under the California Legal Remedies Act, there are no allegations that Nestor is a "senior citizen" or "disabled person" under the Act. So he has no standing to pursue the Act's enhanced damages (his injury is not fairly traceable to Fiat-Chrysler's conduct toward senior citizens of disabled individuals). And even if Nestor had Article III standing to seek enhanced damages, it is doubtful that he is the proper class representative to pursue that relief. *See* Fed. R. Civ. P. 23(a).

Accordingly, while the Court will not dismiss Nestor's and Withrow's request for punitive damages, it will dismiss Nestor's request for enhanced damages under the California Legal Remedies Act, Cal. Civ. Code § 1780(b).

### I. Other Arguments for Dismissal

Although anyone reading the entirety of this opinion will likely be exhausted by this point, Fiat-Chrysler makes three additional arguments for dismissal that should be briefly addressed.

**\*24** *One.* As discussed briefly above, in their complaint, Nestor and Withrow allege that a good fuel-pump design would be able to "withstand some level of customer abuse and neglect, such as inadvertent misfuelling, running out of fuel, delaying a filter change, or draining the water separator." (PageID.811.) Fiat-Chrysler seizes this allegation and argues that it simply cannot be true that a product is defective if it cannot withstand "abuse and neglect." (ECF No. 29, PageID.1559; *see also* ECF No. 33, PageID.1765.) On that point, the Court tends to agree with Fiat-Chrysler. But the Court fails to see how that point advances this litigation. Read in the light most favorable to Plaintiffs, the complaint merely alleges that a product should withstand normal wear and tear. A car owner may infrequently put a bit of gasoline in his tank as opposed to diesel. Or once in a while, a car owner may change his fuel filter 30 days late. The Court takes Plaintiffs' point to be that normal use of a vehicle is not perfect use of a vehicle, and the CP4 pump is defective if it cannot withstand common and expected misuse. (*See* ECF No. 32, PageID.1677–1678.) Accordingly, the Court sees no need to dismiss Plaintiffs' claim that the CP4 pump is defective if it cannot withstand "abuse and neglect"—that is simply not Plaintiffs' theory.

*Two.* Per this Court's suggestion, Fiat-Chrysler has undertaken the time-consuming task of creating charts setting out the law in 50 jurisdictions. (*E.g.*, ECF No. 29, PageID.1631–1652.) Relying on these charts, Fiat-Chrysler argues that Plaintiffs' claims under the laws of states other than California, Connecticut, and New Jersey fail. (ECF No. 29, PageID.1581.) In response, Plaintiffs have created a set of like charts. (ECF No. 32-1, PageID.1717–1756.) Because the Court has found that Nestor and Withrow only have standing to bring claims under the laws of California, Connecticut, and New Jersey, and because the Court has addressed every claim under those states' laws, the Court need not address the parties' extensive charting of the laws of other jurisdictions.

*Three.* Fiat-Chrysler argues that the "sheer breadth and diversity of law applicable to" Nestor and Withrow's "nationwide" claims—breach of contract, fraud, and Magnuson-Moss Warranty Act—"makes clear the requisites of Rule 23 could never be satisfied." (ECF No. 29, PageID.1582.) Perhaps; but that seems like an issue for class certification. And even if, as Fiat-Chrysler argues, it can be addressed on a motion to dismiss, the Court has found that Nestor and Withrow lack standing to bring claims under the laws of states not their own. So the Court need not address this argument either.

### IV. Conclusion and Order

For the reasons given, the Court GRANTS IN PART and DENIES IN PART Fiat-Chrysler's motion to dismiss (ECF No. 29). The claims that are dismissed and the claims that survive are summarized in the table below (shaded cells indicate claims that are dismissed).

The Court also GRANTS Plaintiffs' motions for leave to file supplemental authority (ECF Nos. 36, 40, 43).

The Court further ORDERS that in the future, any motion to file supplemental briefing is limited to two pages and responses are limited to two pages; replies are not permitted. Further, the parties should—in a non-argumentative fashion—simply point out how the supplemental authority is relevant to the issues before the Court.

No party is to file any motion until having a video conference with the Court on July 8, 2021 at 2:00 p.m. At the conference, the Court intends to discuss how this case can be managed efficiently, conserving not only counsel's time, but the Court's. Fiat-Chrysler has asserted, "It would be a herculean task for this Court to assess 50 different states' laws, and

the interpretations of them." (ECF No. 33, PageID.1779.) Indeed. And that would be on top of the herculean task of resolving this opening motion to dismiss. Thus, the parties are encouraged to come to the conference with creative solutions for making this case manageable by mortals.

Attachment

| | Nestor (CA Law) | Withrow (NJ law) | Withrow (CT law) |
|---|---|---|---|
| Common-Law Fraud | Survives. | Under choice of law analysis, Connecticut law governs. | Dismissed. Advertisements not actionable fraud and Withrow has not shown that Fiat-Chrysler had a duty to disclose the defect. |
| Consumer Protection Act | Survives. (California Legal Remedies Act.) Survives. (California Unfair Competition Law.) | Survives. (New Jersey Consumer Fraud Act.) | Survives. (Connecticut Unfair Trade Practices Act.) |
| Common-Law Breach of Contract | Dismissed. Barred by the statute of limitations. | Dismissed. Fiat-Chrysler not a party to the alleged contract. | Under choice of law analysis, New Jersey law governs. |
| Unjust Enrichment | Not alleged. | Not alleged. | Dismissed. Withrow lacks Article III standing. |
| Implied Warranty of Merchantability | Dismissed. Implied-warranty claim under the Song-Beverly Act barred by the statute of limitations. | Survives. | Not alleged. |
| Magnuson-Moss Warranty Act | Dismissed. Rises and falls with implied-warranty claim. | Survives. | |
| All Other Claims | Dismissed. Nestor and Withrow lack Article III standing to pursue these claims. | | |

**All Citations**

Slip Copy, 2021 WL 2529847

## Footnotes

1      Unless otherwise indicated, all record citations are to ECF No. 26, the amended complaint.

© 2021 Thomson Reuters. No claim to original U.S. Government Works.