# EXHIBIT 1

Confidential Information - Subject to Protective Order

1     IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW JERSEY
2                    -   -   -
3     IN RE:  VALSARTAN,      :  MDL NO. 2875
      LOSARTAN, AND           :
4     IRBESARTAN PRODUCTS      :  HON. ROBERT
      LIABILITY LITIGATION     :  B. KUGLER
5     _____  :
                              :
6     THIS DOCUMENT APPLIES   :
      TO ALL CASES            :
7
          - CONFIDENTIAL INFORMATION -
8         SUBJECT TO PROTECTIVE ORDER
9                    -   -   -
10            September 14, 2021
11                   -   -   -
12                 VOLUME I
13        Videotaped remote deposition of
      LEE-JEN WEI, Ph.D., taken pursuant to
14    notice, was held via Zoom
      Videoconference, beginning at 9:08 a.m.,
15    on the above date, before Michelle L.
      Gray, a Registered Professional Reporter,
16    Certified Shorthand Reporter, Certified
      Realtime Reporter, and Notary Public.
17
18                   -   -   -
19
          GOLKOW LITIGATION SERVICES
20        877.370.3377 ph| 917.591.5672
             deps@golkow.com
21
22
23
24

Confidential Information - Subject to Protective Order

```
 1    ZOOM APPEARANCES:
 2
 3    LEVIN PAPANTONIO RAFFERTY PROCTOR
      BUCHANAN, O'BRIEN, BARR, MOUGEY, PA
 4    BY:  DANIEL NIGH, ESQ.
      MADELINE PENDLEY, ESQ.
 5    316 South Baylen Street, Suite 600
      Pensacola, Florida 32502
 6    (888) 435-7001
      dnigh@levinlaw.com
 7    Mpendley@levinlaw.com
      Representing the Plaintiffs
 8
 9    FARR LAW FIRM, P.A.
      BY:  GEORGE T. WILLIAMSON, ESQ.
10    99 Nesbit Street
      Punta Gorda, Florida 33950
11    (941) 639-1158
      gwilliamson@farr.com
12    Representing the Plaintiffs
13
      GOLDENBERG LAW, PLLC
14    BY:  MARLENE J. GOLDENBERG, ESQ.
      800 LaSalle Avenue, Suite 2150,
15    Minneapolis, Minnesota 55402
      (612) 436-5028
16    mjgoldenberg@goldenberglaw.com
      Representing the Plaintiffs
17
18    KANNER & WHITELEY, LLC
      BY:  LAYNE HILTON, ESQ.
19    701 Camp Street
      New Orleans, Louisiana  70130
20    (504) 524-5777
      l.hilton@kanner-law.com
21    Representing the Plaintiffs
22
23
24
```

Confidential Information - Subject to Protective Order

```
 1   ZOOM APPEARANCES:  (Cont'd.)
 2
     MARTIN HARDING & MAZZOTTI, LLP
 3   BY:  ROSEMARIE RIDDELL BOGDAN, ESQ.
     1 Wall Street
 4   Albany, New York 12205
     (800) LAW-1010
 5   Rosemarie.bogdan@1800law1010.com
     Representing the Plaintiffs
 6
 7   GREENBERG TRAURIG, LLP
     BY:  CLIFF MERRELL, ESQ.
 8   STEVEN M. HARKINS, ESQ.
     Terminus 200
 9   3333 Piedmont Road, NE
     Suite 2500
10   Atlanta, Georgia 30305
     (678) 553-2175
11   Merrellc@gtlaw.com
     Harkinss@gtlaw.com
12
             - and -
13
     GREENBERG TRAURIG, LLP
14   BY:  GEROND J. LAWRENCE, ESQ.
     Terminus 200
15   3333 Piedmont Road, NE
     Suite 2500
16   Atlanta, Georgia 30305
     (678) 553-2287
17   Lawrencege@gtlaw.com
     Representing the Defendants, Teva
18   Pharmaceutical Industries, Ltd., Teva
     Pharmaceuticals USA, Inc., Actavis LLC,
19   and Actavis Pharma, Inc.
20
21
22
23
24
```

Confidential Information - Subject to Protective Order

```
 1    ZOOM APPEARANCES:  (Cont'd.)

 2
      WALSH PIZZI O'REILLY FALANGA
 3    BY:  CHRISTINE I. GANNON, ESQ.
      Three Gateway Center
 4    100 Mulberry Street
      15th Floor
 5    Newark, New Jersey 07102
      (973) 757-1017
 6    Cgannon@walsh.law
      Representing the Defendants, Teva
 7    Pharmaceutical Industries, Ltd., Teva
      Pharmaceuticals USA, Inc., Actavis LLC,
 8    and Actavis Pharma, Inc.

 9
      DUANE MORRIS, LLP
10    BY:  PATRICK C. GALLAGHER, Ph.D., ESQ.
      1875 NW Corporate Boulevard
11    Suite 300
      Boca Raton, Florida 33431
12    (561) 962-2131
      Pcgallagher@duanemorris.com
13    Representing the Defendants, Zhejiang
      Huahai Pharmaceutical Co, Ltd., Prinston
14    Pharmaceutical Inc., Huahai U.S., Inc.,
      and Solco Healthcare US, LLC
15
16    BARNES & THORNBURG, LLP
      BY:  KARA KAPKE, ESQ.
17    11 S. Meridian Street
      Indianapolis, Indiana 46204
18    (317) 231-6491
      Kara.kapke@btlaw.com
19    Representing CVS Pharmacy, Inc., and Rite
      Aid Corporation
20

21

22

23

24
```

Confidential Information - Subject to Protective Order

```
 1   ZOOM APPEARANCES:  (Cont'd.)
 2
     HINSHAW & CULBERTSON, LLP
 3   BY:  KATHLEEN E. KELLY, ESQ.
     53 State Street, 27th Floor
 4   Boston, Massachusetts  02109
     (617) 213-7047
 5   Kekelly@hinshawlaw.com
     Representing the Defendant, ScieGen
 6   Pharmaceuticals, Inc.
 7
     BUCHANAN INGERSOLL ROONEY
 8   BY:  CHRISTOPHER B. HENRY, ESQ.
     Carillon Tower
 9   227 West Trade Street, Suite 600
     Charlotte, North Carolina 28202
10   (704) 444-3475
     Christopher.henry@bipc.com
11   Representing the Defendant, Albertson's
     LLC
12
13   PIETRAGALLO GORDON ALFANO BOSICK &
     RASPANTI, LLP
14   BY:  JASON M. REEFER, ESQ.
     One Oxford Centre, 38th Floor
15   Pittsburgh, Pennsylvania   15219
     (412) 263-1840
16   jmr@pietragallo.com
     Representing the Defendant, Mylan
17   Pharmaceuticals, Inc.
18
     CIPRIANI & WERNER
19   BY:  JESSICA HEINZ, ESQ.
     450 Sentry Parkway, Suite 200
20   Blue Bell, Pennsylvania 19422
     (610) 567-0700
21   jheinz@c-wlaw.com
     Representing the Defendants, Aurobindo
22   Pharma, USA, Inc., and
     Aurolife Pharma, LLC
23
24
```

Confidential Information - Subject to Protective Order

```
 1    ZOOM APPEARANCES:   (Cont'd.)

 2

 3    VIDEOTAPE TECHNICIAN:
      Judy Diaz
 4

      LITIGATION TECHNICIAN:
 5    Joe Wills

 6

 7    ALSO PRESENT:

 8

      Lauren Massey - Paralegal
 9    Levin Papantonio

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1                    -   -   -
2               I N D E X
3                    -   -   -
4

  Testimony of:
5

                      LEE-JEN WEI, Ph.D.
6
7        By Mr. Nigh                 12
8
9
10

                     -   -   -
11
              E X H I B I T S
12
                     -   -   -
13
```

```
14  NO.            DESCRIPTION          PAGE
15  Wei-1          Notice to Take        12
                   Videotaped Oral
16                 Deposition of
                   Lee-Jen Wei, Ph.D.
17
    Wei-2          Defendants Inc.'s     14
18                 Responses and Objections
                   to Plaintiffs' Notice of
19                 Videotaped Deposition of
                   Lee-Jen Wei, Ph.D.
20
    Wei-3          Dr. Wei's Expert      30
21                 Report 8/2/21
22  Wei-4          Dr. Madigan's Expert  43
                   Report 7/7/21
23
24
```

Confidential Information - Subject to Protective Order

```
1                        -   -   -
2              E X H I B I T S  (Cont'd.)
3                        -   -   -
4
5    NO.                DESCRIPTION              PAGE
6    Wei-5              Memo of Hours           44
                        Of Dr. Wei, 8/3/21
7
     Wei-6              2002 WHO report on      63
8                       NDMA
9    Wei-7              Expert Report of        76
                        Dr. Wei, In Re Bextra
10                      and Celebrex Marketing
                        Litigation
11
     Wei-8              Expert Report of        80
12                      Dr. Wei, In Re Taxotere
                        Products Liability
13                      Litigation
14   Wei-9              Expert Report of        82
                        Dr. Wei, Bone Care
15                      V. Pentech
                        Pharmaceuticals
16
     Wei-10             Deposition of           91
17                      Dr. Wei, A Woman's
                        Choice-East Side Women's
18                      Clinic V. Scott Newman
19   Wei-11             Active-comparator       301
                        design and new-user
20                      design in observational
                        studies, Yoshida, 2015
21
     Wei-12             The incident user       305
22                      design in comparative
                        effectiveness research,
23                      Johnson, 2013
24
```

Confidential Information - Subject to Protective Order

1                      -   -   -

2              E X H I B I T S  (Cont'd.)

3                      -   -   -

4

5   NO.              DESCRIPTION              PAGE

6   Wei-13           Use of NDMA              308

                     contaminated valsartan

7                    products and risk of

                     cancer: Danish nationwide

8                    cohort study, Pottegard,

                     2018

9

10

                            -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Confidential Information - Subject to Protective Order

```
 1                      -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                      -   -   -

 4

 5   Direction to Witness Not to Answer

 6   PAGE    LINE
     None.
 7

 8   Request for Production of Documents

 9   PAGE    LINE
     None.
10

11   Stipulations

12   PAGE    LINE
     None.
13

14   Questions Marked

15   PAGE    LINE
     None.
16

17

18

19

20

21

22

23

24
```

Confidential Information - Subject to Protective Order

1                    -   -   -

2            THE VIDEOGRAPHER:   We are

3       now on the record.  My name is

4       Judy Diaz.  I am a legal

5       videographer for Golkow Litigation

6       Services.

7            Today's date is

8       September 14, 2021, and the time

9       is 9:08 a.m.

10           This remote video deposition

11      is being held in the matter of

12      Valsartan, Losartan, and

13      Irbesartan Products Liability

14      Litigation MDL.

15           The deponent is Lee-Jen Wei

16      Ph.D.

17           All parties to this

18      deposition are appearing remotely

19      and have agreed to the witness

20      being sworn in remotely.

21           All counsel will be noted on

22      the stenographic record.

23           The court reporter is

24      Michelle Gray and will now swear

Confidential Information - Subject to Protective Order

1          in the witness.

2                    -   -   -

3          ... LEE-JEN WEI Ph.D.,

4          having been first duly sworn, was

5          examined and testified as follows:

6                    -   -   -

7                    EXAMINATION

8                    -   -   -

9   BY MR. NIGH:

10         Q.    Good morning.  My name is

11  Daniel Nigh, and I represent the

12  plaintiffs.

13              Dr. Wei, could you please

14  state and spell your name, your last

15  name?

16         A.    Name is W-E-I, Wei.  First

17  name Lee-Jen, L-E-E, hyphenation, J-E-N.

18         Q.    Okay.  Let's take a look at

19  LP-1556.

20              (Document marked for

21         identification as Exhibit

22         Wei-1.)

23  BY MR. NIGH:

24         Q.    That's how I'm going to call

Confidential Information - Subject to Protective Order

```
 1   them out, Doctor.  And then the
 2   videographer is growing to put the
 3   document up on the screen.  This will be
 4   marked as Exhibit -- Exhibit 1.
 5           Okay.  This is -- Doctor,
 6   this is your deposition here.  Have you
 7   seen this before today?
 8       A.    Yes, sir.  Would you mind
 9   blow up a little bit?
10       Q.    Sure.
11       A.    Thank you.  Yeah.  Thank
12   you.
13       Q.    Yeah.  And let's take a look
14   at the third page where it shows exhibit.
15   And let's go ahead and blow up document
16   requests, and the first couple -- the
17   first couple requests.
18           Do you see this here?  On
19   the third page of this deposition there
20   was an attachment called exhibits.
21           Do you see this?
22       A.    Yes, sir.
23       Q.    And did you review this
24   request for exhibits -- or request for
```

Confidential Information - Subject to Protective Order

1    documents I mean?

2         A.    Yes, I did, with the lawyer.

3         Q.    And you provided all of the

4    documents that you had that were

5    responsive to this to your lawyer?

6         A.    As much as I can.

7         Q.    Okay.  Let's take a look at

8    LP-1600.

9              (Document marked for

10        identification as Exhibit

11        Wei-2.)

12             MR. NIGH:  This will be

13        marked as Wei Exhibit Number 2.

14   BY MR. NIGH:

15        Q.    Let's blow up the first part

16   of this.  It says, "Defendants' responses

17   and objections to plaintiffs' notice of

18   videotaped deposition."

19             Do you see that?

20        A.    Yes.

21        Q.    And let's take a look at the

22   second page.  Here we ask for copies of

23   all invoices.  Let's look at Number 1,

24   the documents.

Confidential Information - Subject to Protective Order

1                    "Copies of all invoices" --

2    right at the very beginning -- "for work

3    performed in connection with any

4    consultation or expert work provided for

5    on behalf of any defendant."

6                    Do you see that?

7          A.    Yes, sir.

8          Q.    And on the second page,

9    there are some objections.

10                   The second page says,

11   "Subject to" -- or the next page says,

12   "Subject to" --

13                   MR. NIGH:  If we can blow

14        that part up.

15   BY MR. NIGH:

16         Q.    "Subject to and without

17   waiving these objections and any of the

18   foregoing general objections, defendants

19   will produce invoices in advance of

20   Dr. Wei's deposition."

21                   Do you see that?

22         A.    Yes, sir.

23         Q.    Okay.  Do you believe that

24   you provided all of your invoices for

Confidential Information - Subject to Protective Order

1  this case?

2       A.    Yes.   There is only one

3  invoice.

4       Q.    Okay.   Let's take a look at

5  the second request.   It says, "Copies of

6  any notes, written or electronic,

7  reflecting consulting or litigation work

8  that has not been documented in

9  invoices."

10       A.    Well, the only thing I have

11  is a draft of my report.   So that's about

12  it.

13       Q.    Okay.   All right.   Let's

14  take a look at Number 3.

15            Let me ask you this, when

16  you would be reviewing -- when you would

17  review literature articles, would you

18  keep notes on those literature articles

19  or would you keep notes anywhere, like in

20  a Word document?

21       A.    No, sir.

22       Q.    So you would only put your

23  notes into the draft of the report?

24       A.    Sometimes I just highlight

Confidential Information - Subject to Protective Order

1   the papers I'm reviewing.

2          Q.     You would only highlight

3   papers that you're reviewing, but you

4   wouldn't write anything on those papers?

5          A.     I don't think so for this

6   case.

7          Q.     Okay.  Number 3 says,

8   "Copies of any notes or other

9   documentation, including PowerPoints for

10  any presentations, seminars, or classes

11  given by Dr. Wei with regard to the risks

12  and benefits of any angiotensin blockers

13  or nitrosamines."

14             Did you have any notes or

15  other documentation for any

16  presentations, seminars, or classes --

17         A.     No, sir.

18         Q.     -- regarding ARBs or

19  nitrosamines?

20             No?  Okay.

21             Do you recall giving any

22  presentations for ARBs or nitrosamines?

23         A.     No, sir.

24         Q.     Okay.  Taking a look at

Confidential Information - Subject to Protective Order

1   Page 4 -- Number 4.  Sorry.

2            "Copies of any documents or
3   articles relied upon for the opinions set
4   forth in the report served."

5            At the bottom it says,
6   "Subject to and without waiving these
7   objections and any of the foregoing
8   general objections, defendants will
9   produce a copy of all electronically
10  available documents identified on
11  Dr. Wei's list of materials considered
12  prior to his deposition."

13           Did you also provide the
14  highlighted studies, studies that you
15  would put -- that you would highlight to
16  your attorneys?

17       A.   Yeah, I remember I send two
18  articles with highlighted portions to the
19  lawyers.

20       Q.   Are there only two articles
21  that you ever highlighted?

22       A.   Yeah, pretty much.

23       Q.   Okay.  What are those two
24  articles?

Confidential Information - Subject to Protective Order

1        A.     I don't remember.  I send it

2    to the lawyers last week.

3        Q.     Okay.  Let's take a look at

4    Number 5.  "Copies of any documents or

5    articles reviewed in connection with the

6    report thereto, whether or not listed in

7    the report."

8              And the answer at the end

9    says, "Subject to and without waiving

10   these objections and any of the foregoing

11   general objections, defendants will

12   produce a copy of all electronically

13   available documents identified on

14   Dr. Wei's list of materials considered."

15             How did you pull together

16   your -- these electronic documents?

17   What's the process that you undertook to

18   pull these together in order to respond

19   to these requests?

20        A.     Well, first, I got a list of

21   references that are recommended by the

22   lawyers.  And I downloaded to my

23   computer, and as a PDF file.  And

24   that's -- from there, I just used that

Confidential Information - Subject to Protective Order

1    copies and reviewed papers, documents and

2    et cetera.

3         Q.    Okay.  So I think you said

4    you got a list of references from the

5    lawyers?

6         A.    Yeah.  It is a listing.  It

7    actually is all the files.  They send me

8    a website.  I can just download it

9    easily.

10        Q.    Okay.  Was that like a

11   DropBox or some kind of platform where

12   you could download studies and internal

13   documents, that sort of thing from that

14   file?

15        A.    Probably it's like a

16   DropBox.  It's very convenient, actually.

17   I find it very nice.

18        Q.    Okay.  And is that where you

19   pulled all of your literature that you

20   reviewed in this case?

21        A.    Yes.

22        Q.    Okay.  So all the literature

23   that you reviewed in connection with your

24   report was provided to you by the defense

Confidential Information - Subject to Protective Order

1    attorneys?

2         A.    Yeah.   There's only one

3    thing that I did make a quick search

4    through the Google about other studies

5    directly related to impurity of valsartan

6    product.

7         Q.    Did you find any additional

8    documents that you reviewed with that

9    Google search?

10        A.    I did not.

11        Q.    Okay.   So if I understand

12   this correctly, you did a quick Google

13   search looking for anything related to

14   the impurity of the valsartan product,

15   and you didn't find any additional

16   documents that you reviewed with that

17   Google search, correct?

18        A.    That's correct, sir.   If I

19   may just add in one sentence.   For all

20   other studies, publications, when I read

21   Dr. Madigan's report, if Dr. Madigan is

22   citing some reference or publication, was

23   not on the list, I would ask the lawyer

24   to send to me.   That's what I did once to

Confidential Information - Subject to Protective Order

1    the lawyer.

2         Q.    Okay.  So if I understand

3    you correctly, you also looked at

4    Dr. Madigan's report, and there was one

5    study that you didn't see in that DropBox

6    that you asked the defense lawyers to

7    provide to you?

8         A.    Correct.

9         Q.    Okay.  So all of the

10   literature that you reviewed was provided

11   to you by your lawyers, correct?  I mean,

12   by the defense lawyers, correct?

13        A.    Yes.

14        Q.    Okay.  Let's take a look at

15   Number 6.  "Any illustrations,

16   PowerPoints, images, charts, tables or

17   demonstrative exhibits that may be used

18   by or with Dr. Wei in connection with the

19   Daubert hearing or trial testimony in

20   this litigation."

21             Other than what's contained

22   in your expert report, you don't have any

23   other illustrations, PowerPoints, images,

24   charts or tables or demonstrative

Confidential Information - Subject to Protective Order

1   exhibits that you're expecting to use,

2   correct?

3        A.    Not yet.

4        Q.    Not yet?

5        A.    Yeah, so I think in my

6   report I clearly state that maybe in the

7   future we may actually create a

8   PowerPoint presentation or tables or

9   graphic display.

10       Q.    Do you have any idea what

11  those tables or graphic displays would

12  look like --

13       A.    No.

14       Q.    -- at this time?  No?

15       A.    Not yet.

16       Q.    Okay.  So you understand

17  that I would have no ability to question

18  you regarding those demonstrative tables

19  or those charts here today if they're not

20  contained in your expert report and you

21  don't even know what they would be,

22  correct?

23       A.    They don't exist yet.

24       Q.    Right.  So I wouldn't have

Confidential Information - Subject to Protective Order

1  ability today to ask you questions today

2  regarding those charts or tables,

3  correct?

4        A.    Fair enough.

5        Q.    I'm sorry.  What was your

6  answer?

7        A.    I said fair enough.  What

8  you're saying, yes.

9        Q.    Okay.  Let's take a look at

10  Number 7.  Number 7, "Documentation of

11  any research grant the witness has been

12  provided to study any angiotensin

13  blockers, nitrosamines, and health

14  effects possibly related thereto."

15              You haven't received any

16  research grants related to ARBs, correct?

17        A.    Correct.

18        Q.    And you haven't received any

19  research grants related to nitrosamines,

20  correct?

21        A.    Correct.

22        Q.    Okay.  Take a look at Number

23  8.  "Documentation" -- "Documentation of

24  any research the witness has performed

Confidential Information - Subject to Protective Order

1    with regard to any ARB or nitrosamine."

2              You haven't done any

3    independent research -- other than in

4    connection with your expert opinions here

5    today, you haven't done any independent

6    research regarding ARBs or nitrosamines,

7    correct?

8         A.    Sir, let me make sure.  This

9    is a pretty broad question.  For the

10   safety or impurity of valsartan, I

11   haven't done anything except this report.

12             But if you're talking about

13   in general, the research regarding the

14   ARB, I did know something about it

15   because I work closely with Brigham and

16   Women's Hospital at Harvard cardiologists

17   for many years.

18        Q.    Okay.  Have you performed

19   research related to ARBs?

20        A.    I believe in some of my

21   papers, I utilize some research papers

22   regarding to ARB, ACE inhibitor, beta

23   blockers in the past.

24        Q.    Okay.  Have you done any

Confidential Information Subject to Protective Order

1  research regarding nitrosamines?

2          A.     I don't think so.

3          Q.     In terms of ARBs, what would

4  be the extent of your research?

5          A.     Well, mostly we are really

6  interested into combining ARB and ACE

7  inhibitor, see if we can get a better

8  treatment effect from this combination

9  compared with monotherapy, for example

10  ACE inhibitor or ARB alone.

11          Q.     Other than measuring whether

12  or not you would get a better effect when

13  combining ARB and ACE inhibitor compared

14  to ACE inhibitor or ARB alone, have you

15  done any other research regarding ARBs?

16          A.     I don't know exactly.  But

17  sometimes I writing for physical papers,

18  I may cite it in some papers related to

19  ARB publications, mostly related to

20  efficacy.  For example, reduced the

21  hospitalization, reduced the

22  cardiovascular death.  That's most of my

23  statistical papers are about.

24          Q.     Okay.  If I understand you

Confidential Information - Subject to Protective Order

1  correctly, you have cited to papers and

2  ARB publications, in large part as ARBs

3  are medications taken for hypertension

4  and help to reduce hospitalizations and

5  reduce cardiovascular death; is that

6  correct?

7       A.    Yes, sir, for heart failure

8  patients.  Mostly for heart failure, not

9  for blood pressure problem.

10       Q.    Mostly for heart patients?

11       A.    Heart failure.

12  F-A-I-L-U-R-E.

13       Q.    Oh, heart failure.  Okay.

14            And in terms of those

15  patients, if they were to stop taking

16  their ARB without any substitute, then at

17  the time that they're stopped taking the

18  ARB without any substitute, they would

19  lose the benefit of it helping to reduce

20  hospitalizations, reduce cardiovascular

21  death, correct?

22       A.    I don't know.  I'm not a

23  clinical person.  I cannot make -- either

24  way.

Confidential Information - Subject to Protective Order

1    Q.    Let's take a look at nine.

2          Nine asked for, "Copies of

3    any documents, including protocols or

4    information about medication side

5    effects, available to the witness from

6    any hospital or academic institution

7    where he has worked, had an appointment,

8    or had privileges which set forth

9    information related to the risks and

10   benefits of any ARB or nitrosamine."

11         Do you see that?

12   A.    Yes, sir.

13   Q.    Now, you didn't have any

14   copies of documents, including protocols

15   or information about medication side

16   effects, correct?

17   A.    I don't.

18   Q.    Okay.  Number 10, "Any

19   documents or other communications the

20   witness has received from any person or

21   entity with regard to nitrosamine

22   impurities in any ARB or other drug.

23         So other than the

24   documentation provided to you by your

Confidential Information - Subject to Protective Order

1  counsel, you didn't have any other

2  documents or review any other documents

3  from any other person or entity regarding

4  nitrosamine impurities in ARBs, correct?

5      A.   That's correct, sir.  The

6  only thing that I'm really concerned is

7  about all the publications, documents

8  cited by Dr. Madigan in his report.

9      Q.   Okay.  Number 11, "Any

10  communications from the witness to any

11  person or entity with regard to

12  nitrosamine impurities in any ARB or

13  other drug, outside of communications

14  through counsel."

15          So other than -- other than

16  defense counsel, you haven't had any

17  other communications with any other

18  witness or any other person regarding

19  your work here regarding nitrosamine

20  impurities and ARBs, correct?

21      A.   Correct.

22      Q.   Okay.  Number 12, "Any

23  textbook referenced by the witness in

24  forming his opinions."

Confidential Information - Subject to Protective Order

1          You didn't rely on -- did

2   you rely on any portion of any textbook

3   to form your opinions here today?

4          A.    Yes, sir.  There is one

5   book --

6          Q.    Which?

7          A.    -- by David DeMets, Clinical

8   Trials.  I cited in my report.

9          Q.    Which textbook was that

10  again?

11         A.    Do you have a list of

12  references?  I can point it to you.

13         Q.    We'll come back to that.

14         A.    Furberg.  I think the first

15  author is if Furberg, I think.

16         Q.    We can take this down.

17  We'll take a look at your expert report.

18              This is LP-1557.

19              (Document marked for

20         identification as Exhibit

21         Wei-3.)

22              MR. NIGH:  This will be

23         marked as Exhibit Wei-3.

24  BY MR. NIGH:

Confidential Information - Subject to Protective Order

1    Q.    Do you see this here?  This

2    appears to be your expert report that you

3    prepared for this litigation, correct?

4    A.    Yeah.  May I see my

5    signature, on -- toward last -- if you

6    don't mind.

7    Q.    Sure.  Let's take a look at

8    Page 24.

9    A.    Yes, sir.

10    Q.    Is that your signature?

11    A.    Yes, sir.

12    Q.    The date of this is

13    August 2, 2021, correct?

14    A.    Yes, sir.

15    Q.    Now, you understand that one

16    of the purposes of this expert report is

17    to put us on the other side, you know, on

18    the plaintiffs' side, plaintiffs'

19    counsel, on notice of your opinions,

20    correct?

21    A.    Yes, sir.

22    Q.    And if you don't include

23    certain opinions in this expert report,

24    then we would not be provided notice of

1    those opinions, correct?

2         A.    I don't know.  Whatever you

3    say.  I don't understand the rules

4    anyway, so I leave it up to you.

5         Q.    Okay.  Let's take a look at

6    Number 11 on Page 5.  And this says

7    "Assignment."

8              And under assignment, it

9    says, "I have been retained by defendants

10   to provide an expert opinion in the

11   litigation styled In Re Valsartan

12   Products Liability Litigation.

13   Specifically, I was asked by counsel for

14   defendants to review and assess the

15   opinions presented by David Madigan,

16   Ph.D., who submitted an expert report on

17   behalf of plaintiffs analyzing the

18   results from the Dietary and Occupational

19   Studies to infer potential risk of

20   carcinogenicity of ND" -- I think you

21   meant NDMA, as opposed to NDME, right?

22        A.    Yes.  It should be NDMA.

23        Q.    Okay.

24              -- "of NDMA or NDEA

Confidential Information - Subject to Protective Order

1    impurities in valsartan and to provide my

2    own assessment of those issues."

3              Correct?

4         A.    Yes, sir.

5         Q.    Okay.  And so is it your

6    understanding -- did you only become

7    involved after Dr. Madigan had completed

8    his expert report?

9         A.    I believe so.  I got

10   Dr. Madigan's report from the lawyer.

11        Q.    Okay.  And so when you

12   started, you had a completed report by

13   Dr. Madigan, correct?

14        A.    Correct.

15        Q.    Now, this isn't the first

16   time that you've been on the opposite

17   side of Dr. Madigan, correct?

18        A.    It's the first time, you're

19   saying, sir?

20        Q.    Right.  This isn't the first

21   time.  This is not the first time you've

22   been on the opposite side of Dr. Madigan,

23   correct?

24        A.    No.  I don't know how many

Confidential Information - Subject to Protective Order

1    times.

2          Q.    Okay.

3          A.    I don't recall how many

4    times we were on opposite sides.

5          Q.    Well, that's what I'm about

6    to ask you.  What are the other times --

7    what other litigation can you remember

8    being on the opposite side of

9    Dr. Madigan?

10         A.    I believe at least we had

11   Celebrex --

12         Q.    Okay.

13         A.    An injury case, and also

14   security case.  Dr. Madigan was on the

15   wrong side.  And I'm sorry.  That's not

16   politically correct.  I just -- he is on

17   the plaintiff's side.

18               Then you have Taxotere case

19   still ongoing.  Dr. Madigan is on the

20   opposite side.

21               I believe there are other

22   cases, sir.  I just don't remember.

23         Q.    So the ones that you can

24   remember -- I'll make sure that I've got

Confidential Information - Subject to Protective Order

1    this correctly.  The ones that you can
2    remember that you've been on the opposite
3    side of Dr. Madigan, there's Taxotere
4    which is -- that's a litigation that's
5    still ongoing, correct?
6         A.    Correct.
7         Q.    There's Celebrex.  Now,
8    that's a litigation that you got involved
9    in more than ten years ago, correct?
10        A.    Yeah.  Correct.
11        Q.    You said there's a
12   securities case?
13        A.    Yeah, it's actually economic
14   loss, in some way.  This -- the investor,
15   they claimed they lost the money,
16   whatever it is, because the safety issue
17   about Celebrex.
18        Q.    I see.  Okay.  And other
19   than those three, I think you mentioned
20   one or two more.  What were the other
21   two -- or the other ones?
22        A.    No, I -- I don't remember
23   other.  I don't remember, sir.
24        Q.    I see.  So you just remember

Confidential Information - Subject to Protective Order

```
1    those three?
2            A.    Yeah, that's as far as I can
3    tell.  But, you know, maybe there are
4    more.
5            Q.    Okay.  Now, who first
6    reached out to you in this case?
7    Which -- how was that contact made to
8    you?
9            A.    It's defendant lawyers.
10           Q.    Okay.  Defending lawyers.
11   Which defending lawyer reached out to
12   you?
13           A.    Steve -- Steven, right?
14   Steven.
15           Q.    Steve Harkins?
16           A.    Yeah.  Hartley.
17           Q.    Okay.  So Steve Harkins
18   reached out to you?
19           A.    Yes, sir.
20           Q.    Have you ever worked with
21   Steve Harkins on any other litigation?
22           A.    No, sir.
23           Q.    Okay.  All right.  Let's
24   take a look here.  You were asked to
```

Confidential Information - Subject to Protective Order

1    analyze the opinions by Dr. Madigan.  And

2    so a lot of your report will be basically

3    a response or criticism of Dr. Madigan's

4    report, correct?

5          A.    Yes, sir.

6          Q.    And then you put, "and to

7    provide my own assessment of those

8    issues."

9              Do you see that?

10         A.    Yes, sir.

11         Q.    Now, what do you mean --

12   other than responding or criticizing

13   Dr. Madigan, what did you do in terms of

14   providing your own assessment?

15         A.    For example, I made a

16   comment about observational studies

17   issue.  And I provide the valsartan

18   studies.  And Dr. Madigan didn't mention

19   it at all in his report.

20         Q.    Okay.  So those are a couple

21   of examples where you say you made a

22   comment about observational study.  And

23   then you reviewed the valsartan studies

24   and gave commentary on the valsartan

Confidential Information - Subject to Protective Order

1    studies, right?

2         A.    Yes, sir.

3         Q.    Other than those two

4    examples, is there any other original

5    work that you did that wasn't just a

6    response or criticism to Dr. Madigan's

7    report?

8         A.    Well, Counsel, if you don't

9    mind, maybe later on we can go through my

10   report.  We probably can pick up

11   something I can share with you what are

12   the -- actually from my own opinions,

13   which are not.  But right now, that's the

14   only two things that I remember.

15        Q.    Okay.  And we will go

16   through them further.  I'm just trying

17   to, you know, lay some structure here

18   first.

19             So other than those two,

20   those are the only two opinions that you

21   can think of that are original opinions

22   as opposed to responding to Dr. Madigan?

23        A.    Yeah.  At this point, yes.

24        Q.    Okay.  Now, Dr. Madigan

Confidential Information - Subject to Protective Order

```
 1    calculated lifetime cumulative exposures.
 2              Did you understand that?
 3         A.    Well, I understand it.  But
 4    I disagree with it.
 5         Q.    I understand that you
 6    disagree.  But do you understand that he
 7    was calculating cumulative exposures?
 8         A.    Yes.
 9         Q.    Okay.  Now, you didn't
10    provide any of your own calculations on
11    cumulative exposures, correct?
12         A.    No.
13         Q.    And you haven't done any of
14    your own calculations on cumulative
15    exposures, correct?
16         A.    No.
17         Q.    And you didn't provide any
18    criticisms of his calculations.  You
19    provided criticisms about extrapolating
20    those calculations, but you didn't
21    provide any criticisms on the
22    calculations themselves, correct?
23         A.    Well, I think that his basic
24    methods he rely to calculate exposure
```

Confidential Information - Subject to Protective Order

1  dosing level is flawed.  I don't think I

2  even needed to worry about his

3  mathematical calculation.

4        Q.    Right.  And when you said

5  his basic methods, you mean you have

6  concerns about him extrapolating those

7  results to NDMA and valsartan, correct?

8        A.    More than that, sir.  Even

9  within the dietary studies, I have a

10  great concern about his conclusion, even

11  without extrapolate the results from a

12  dietary study to valsartan.

13        Q.    Okay.  And that may be being

14  able to rely on the findings in the

15  dietary study itself, correct?

16        A.    Correct.

17        Q.    But in terms of the

18  calculations that he did, you didn't have

19  any criticisms of the calculations, just

20  how he would be able to use those

21  calculations, correct?

22        A.    Well, I don't have data to

23  verify exactly the number he calculate.

24  But I understand his mathematical

Confidential Information - Subject to Protective Order

1   formula.  But that doesn't mean that his

2   calculated values are valid.  I don't

3   know that part because I don't have the

4   data.

5        Q.    Okay.  I understand.  You

6   didn't -- you didn't provide any

7   criticisms on the math that he did,

8   correct?

9        A.    The formula he used.

10       Q.    Right.  You didn't provide

11  any criticisms on the math he did -- he

12  completed, or the formula that he used to

13  complete -- complete those calculations

14  of lifetime cumulative exposures,

15  correct?

16       A.    See, let me answer this

17  question to you, sir.  I have no problem

18  if he defines so-called a mean value of

19  this exposure time, okay, mathematically.

20  But I am not so sure that quantity can be

21  utilized to define the threshold of

22  value, beyond that value we have high

23  risk of cancer incidence.  I disagree

24  with that, the application.

Confidential Information - Subject to Protective Order

1           But, sir, if you ask me if

2    his mathematical formula to calculate

3    what he thinks is okay, I say, yes, his

4    mathematical formula is very simple.

5    Everybody can understand it.

6           Q.    Now, you just said, "I have

7    no problem if he defines a mean value of

8    this exposure time, okay, mathematically.

9    But I am not so sure that the quantity

10   can be utilized to define the threshold

11   value, beyond that value we have high

12   risk of cancer incidence."

13          So you disagree with that

14   application.

15          Now, that opinion is nowhere

16   to be found in your report, correct?

17          A.    Correct.

18          Q.    And so for the first time

19   here today, you're giving that criticism,

20   correct?

21          A.    Well, that's my concern.  I

22   don't mean to put in the report, because

23   basically I don't even think the way he

24   derived this lifetime exposure level is

Confidential Information Subject to Protective Order

1    correct.  So I don't even bother to go in

2    saying, "Your calculation is misleading,

3    even though mathematically it's correct."

4              MR. NIGH:  Okay.  Let's take

5         a look at LP-1558.

6              (Document marked for

7         identification as Exhibit

8         Wei-4.)

9              MR. NIGH:  Let's blow up

10        that first part.  This will be

11        marked as Exhibit 4, Wei

12        Exhibit 4.

13   BY MR. NIGH:

14        Q.    And you see the top part

15   says, "NDMA-Contaminated Valsartan, David

16   Madigan, Ph.D."  And it shows his

17   signature.

18              Do you see that?

19        A.    Yes, sir.

20        Q.    And this is the report that

21   you were speaking about in Number 11 in

22   terms of your report, your assignment,

23   was to review this report and provide

24   your response or criticisms of this

Confidential Information - Subject to Protective Order

1    report, correct?

2           A.    Yes, sir.

3           Q.    Okay.

4                 MR. NIGH:  Let's take a look

5           at LP-1576.

6                 (Document marked for

7           identification as Exhibit

8           Wei-5.)

9    BY MR. NIGH:

10          Q.    And can you see that this is

11   your invoice?

12          A.    Yes, sir.

13                MR. NIGH:  Let's go ahead

14          and blow up that top part, the

15          very top part there, right.

16   BY MR. NIGH:

17          Q.    And it starts out with

18   Bluenull LLC, and it gives an address

19   there.

20                Do you see that?

21          A.    Yes, sir.

22          Q.    What is Bluenull LLC?

23          A.    It's a small consulting

24   group I put together more than maybe

Confidential Information - Subject to Protective Order

1  15 years ago.  And the basic idea is we

2  provide statistical consultations to

3  folks like this case or pharmaceutical

4  industry and government university,

5  anything related to quantitative science,

6  we provide service.

7       Q.    Now, for that consulting

8  group, would you agree that the

9  pharmaceutical industry is your top

10  client?

11       A.    Well, we actually had a few

12  projects with pharmaceutical industries.

13       Q.    Right.  Bluenull LLC has

14  received more money from pharmaceutical

15  industry than any other sector, correct?

16       A.    For example, sir, as you

17  started out -- what is other sectors?

18       Q.    Government, university?

19       A.    Of course.  Of course.  We

20  don't do much for university professors.

21       Q.    Okay.  And so my question

22  is, you would agree that the

23  pharmaceutical industry is your top --

24  sorry.  Strike that question.

Confidential Information - Subject to Protective Order

1            You would agree that

2   Bluenull LLC has received more money from

3   pharmaceutical industry than any other

4   sector, correct?

5        A.    Well, not quite.  Depend on

6   which year.  One year we work as the

7   plaintiff side for Toyota braking system,

8   security issue.  The Bluenull was in the

9   plaintiffs side.

10            So we didn't work for

11   Toyota, for example.

12            So it is not really --

13   sorry, sir.  It's not only --

14        Q.    It's all right.

15        A.    -- for pharmaceutical area.

16   Actually it's more than that.  You know,

17   like, on this case, right, legal case, in

18   this sector.

19        Q.    Yeah, my question isn't just

20   one year.  You said that you started this

21   15 years ago.  So looking over the last

22   15 years, you would agree that Bluenull

23   LLC has received more money from

24   pharmaceutical industry than any other

1    sector, correct?

2         A.    Correct.

3         Q.    Okay.  Now, you just told me

4    about one time that Bluenull LLC

5    represented a plaintiff.  And that was

6    against Toyota; is that correct?

7         A.    Correct.

8         Q.    And when we say Bluenull

9    LLC, were you the expert in that -- were

10   you a disclosed expert in that Toyota

11   case where you were representing the

12   plaintiff?

13        A.    I was only -- I think I was

14   one of the consultant, because we have

15   many, many consultant at -- to Bluenull.

16   We probably roughly have ten professors

17   from Harvard, from Stanford, Northwestern

18   University.  People actually around the

19   country actually are members of a

20   consulting group.

21             So I believe for the Toyota

22   case, we actually had more than me

23   involved in that case.  That is usually

24   the case.  For example, Lipitor case for

1    Pfizer, we had five -- five faculty

2    members in the group working together for

3    the case.  So not only me.

4         Q.    Were you personally involved

5    in the Toyota case?

6         A.    Yes, sir.

7         Q.    Now, other than the Toyota

8    case, were you -- did you ever represent

9    any other plaintiff?

10        A.    Yes.  I remember a couple

11   times we represent people accused by

12   Medicare fraud.  I believe we were on the

13   plaintiff's side.

14        Q.    Okay.  So in a situation

15   where people are accused of Medicare

16   fraud, if you're on the plaintiff's side,

17   which party would you have been

18   representing?

19        A.    We have -- represent a

20   doctor, and he was accused by Medicare,

21   and, say, overcharge patients or

22   something like that.

23        Q.    So you represented the

24   doctor who is being accused of

Confidential Information - Subject to Protective Order

1   overcharging patients?

2        A.    Which is an inappropriate

3   accusation, in my opinion, but yes.

4        Q.    I see.  But in that

5   situation, you would have actually been

6   representing a defendant, correct?

7   Because he was being accused.  He was the

8   accused.  He was being accused of

9   overcharging patients, so he would have

10  been a defendant in that case, right?

11       A.    Yes.  Another case I cannot

12  release to you right now is ongoing.

13  It's from -- I also work for plaintiff,

14  because the other side is actually

15  accused.

16            I'm sorry.  I get it

17  confused.  It's still defendant.  The

18  plaintiff's side is government.

19       Q.    Okay.

20       A.    The commission.  But anyway,

21  I'm sorry.  I apologize for that.

22       Q.    So that other case that

23  you're thinking of, you actually

24  represent the defendant in that case,

Confidential Information - Subject to Protective Order

1    right?

2           A.    Yes.  Yes.

3           Q.    Okay.  Other than the

4    plaintiff that you represented in the

5    Toyota case, is there any other plaintiff

6    that you've represented in your career?

7           A.    For my, it's not.  But I'm

8    not for sure for other consultants

9    because I don't worry about other

10   consultant in the group.  Whether they

11   did, I have no idea.

12          Q.    Well, for right now, my

13   questions -- take away Bluenull for now.

14   I'm just asking about you.

15                Are you aware of

16   representing, in your career, other than

17   the plaintiff in the Toyota case, any

18   other plaintiff?

19          A.    No, not I can recall.

20          Q.    Okay.  Let's talk about the

21   Toyota case.  Tell me what your

22   involvement was in the Toyota case.

23          A.    Toyota case was very

24   interesting.  So many years ago, people

Confidential Information - Subject to Protective Order

<sup>1</sup> bought a Toyota with electronic braking

<sup>2</sup> system, which was new, replacing

<sup>3</sup> so-called mechanical braking system.

<sup>4</sup>                  Somehow when people step on

<sup>5</sup> the brake, and the car, instead of

<sup>6</sup> stopping, is accelerated.  So that caused

<sup>7</sup> some personal injury, also economic loss.

<sup>8</sup>                  Economic loss was the case

<sup>9</sup> plaintiff and -- submitted to the court.

<sup>10</sup> And we actually helping plaintiff's side

<sup>11</sup> to -- to actually -- against -- against

<sup>12</sup> the Toyota.  That's the case.

<sup>13</sup>          Q.    And when did you get first

<sup>14</sup> involved in that case?

<sup>15</sup>          A.    When?  Sir, I'm sorry?

<sup>16</sup>          Q.    Approximately when did you

<sup>17</sup> first got involved in that case?

<sup>18</sup>          A.    I don't remember now.  But

<sup>19</sup> we can Google easily the case, you know,

<sup>20</sup> using Toyota, the braking system.  It

<sup>21</sup> must pop up.

<sup>22</sup>          Q.    Is it more than ten years

<sup>23</sup> ago that you first became involved in

<sup>24</sup> that case?

Confidential Information - Subject to Protective Order

1      A.    I think it's less than ten
2  years, but it's close.
3      Q.    Close to ten years ago?
4      A.    I cannot tell exactly.
5      Q.    Okay.  Yeah, I'm not asking
6  for exactly.  Do you believe it was close
7  to ten years ago that you first became
8  involved in that Toyota braking case?
9      A.    Sir, I really want to
10 double-check before I answer your
11 question.
12     Q.    Okay.  And you said that you
13 would search Google, you would see when
14 they first brought those cases, but how
15 would that tell you when you first became
16 involved?  Because I don't think if we
17 search Google, it will say Dr. Wei became
18 involved -- first became involved in the
19 case at this time.
20           So how would you search
21 Google to tell when you first became
22 involved?
23     A.    No, no, sir.  What I'm
24 saying, you ask me when was that case.  I

Confidential Information Subject to Protective Order

1   said in general we can Google to find

2   out.

3           If you're asking me

4   specifically when I was involved, I have

5   to go back to check my e-mails, if I

6   still have it, and I can get back to you

7   on that issue.  I thought you were asking

8   me, when was the Toyota case, not asking

9   me when I got involved in that case.

10  Correct?

11          Q.    Actually.  I am asking you

12  when did you first become involved in

13  that Toyota case?

14          A.    Then I cannot Google.  You

15  said -- I'm not a famous person yet.  So

16  I think -- but I can easily -- if I still

17  keep the e-mails, I can probably tell you

18  exactly when I was involved in Toyota

19  case.

20          Q.    Would you feel comfortable

21  in saying it was between five to 10 years

22  ago?

23          A.    Sir, I don't know why you

24  want me to tell you exactly the timing.

Confidential Information — Subject to Protective Order

1   Is that very important to you?  If it's

2   so important, I can use lunch break to

3   figure out for you.

4          Q.    I'm asking you for your

5   memory.  You know, I'm not asking for

6   exact times.  So do you have any -- any

7   way of being able to describe about how

8   long ago that you first became involved

9   in that case?

10         A.    Okay.  That's fair question.

11  I don't know why it is so important for

12  this case.

13         Q.    You know, let's do this.  I

14  would appreciate if you don't try to

15  question why something is important.  If

16  I'm asking the question, I'm allowed to

17  ask the question.

18              So let's go forward again on

19  this again.

20              Do you have any way of being

21  able to describe about how long ago that

22  you first became involved in that case?

23         A.    I don't remember, sir.

24         Q.    Okay.  So you wouldn't be

Confidential Information - Subject to Protective Order

1  able to say if it was five years ago, ten

2  years ago, or 15 years ago, as you

3  remember here?

4       A.    No.  Less than 15 years,

5  that's for sure.

6       Q.    Less than 15.  Okay.  All

7  right.  Back to the billing.

8            MR. NIGH:  We can put that

9       back up there.

10 BY MR. NIGH:

11      Q.    Okay.  We can see the date

12 at the top again, if you don't mind.

13            Here we can see Bluenull,

14 and then we can see the date, August 3rd,

15 2021.  And then it says, "To:  Greenberg

16 Traurig," correct?

17      A.    Yes.

18      Q.    And it's your understanding

19 that it was Greenberg Traurig who

20 retained you for this case?

21      A.    I'm sorry, sir.  Say it

22 again, please.

23      Q.    Were you retained on behalf

24 of Greenberg -- on behalf of Teva or by

Confidential Information - Subject to Protective Order

1    Greenberg Traurig?

2         A.    Yes, sir.

3         Q.    Okay.  And taking a look

4    down, we can see your hours.  And it says

5    that you spent a total of 45.65 hours on

6    this project between July 9th and

7    August 2nd.

8              Do you see that?

9         A.    Yes, sir.

10        Q.    Now, that would be, you

11   know, over 45 hours in less than a month,

12   correct?

13        A.    Yes, sir.

14        Q.    And you only first became

15   involved July 9th after Dr. Madigan

16   submitted his expert report on July 6th,

17   correct?

18        A.    I don't remember on July 9th

19   I got exactly Dr. Madigan's report that

20   day or not.  But I remember I got a

21   listing of references from the lawyers on

22   July 9th asking me to review.

23        Q.    Okay.  So Dr. Madigan

24   submitted his report at the beginning of

Confidential Information - Subject to Protective Order

1    July.

2            MR. NIGH:  Actually, let's

3        go back to Madigan's report.

4        LP-1558.

5            Let's blow up the signature

6        and the date.

7    BY MR. NIGH:

8        Q.    Do you see that signature,

9    and, right below it, it's signed July 7,

10   2021?

11       A.    Yes, sir.

12       Q.    So you only -- you only

13   became involved a couple days after the

14   date of this expert report, correct?

15       A.    Correct.

16       Q.    Okay.  Let's go back to your

17   billing.  And when you first were

18   involved, my understanding is on

19   July 9th, you got a list of references

20   from the defense attorneys, correct?

21       A.    Correct.

22       Q.    And then you also had a

23   DropBox with those studies, correct?

24       A.    I don't think on July 9th I

Confidential Information - Subject to Protective Order

1  got a listing from the DropBox yet.

2         Q.    Okay.  Do you know

3  approximately when you got the DropBox of

4  studies?

5         A.    I'm not quite sure.  Maybe a

6  week afterward, like three or four days.

7  I don't recall, sir.

8         Q.    Okay.  If we take a look at

9  the bottom here, the next page.  It shows

10  August 2nd, .8 hours.

11              Do you see that?

12         A.    Yes, sir.

13         Q.    Now -- and that's the last

14  date on this invoice.

15              Between August 3rd and

16  today, how long -- how many more hours

17  have you spent on this case?

18         A.    I don't know exactly the

19  number of hours, sir.  I need to go back

20  and check my e-mails.  I haven't

21  tabulated the number of hours that I've

22  been working on this case after

23  August 3rd.

24         Q.    Okay.  Do you see how each

Confidential Information - Subject to Protective Order

1  of these dates has a number of hours,

2  7/23, three hours; 7/24, 6 hours; 7/25,

3  2.5 hours?

4            Would you be writing down

5  those hours simultaneously as doing the

6  work each day?

7       A.    No.  What happens in my

8  practice -- I don't know other

9  consultants.  At end of the day, I

10 just -- every time I had a conference

11 call, I roughly estimate how many minutes

12 I been on the call that day.

13           Usually I write it up right

14 away after the call and how many hours I

15 reviewed the documents right after I'm

16 recording how many hours, piece by piece.

17 Then end of the day, I actually put up a

18 number, add the total number of hours for

19 that day.

20      Q.    Okay.  And so at the end of

21 the day you would total up your number of

22 hours for each day that you spent time on

23 this case, correct?

24      A.    Yes, sir.

Confidential Information - Subject to Protective Order

1    Q.    Did you keep doing that

2  after August 3rd?

3    A.    I believe so, yes.

4    Q.    So where do you keep that

5  information, the number of hours that you

6  spent each day?

7    A.    I'm not very good at

8  lawyers.  I know my assigned lawyer, he

9  has very good software to doing this kind

10  of thing.

11    I usually just very casually

12  put in an e-mail, and I put it -- e-mail,

13  send it to myself, so I have a record.

14  And then towards the end of the day, I

15  just go through this and add it up.

16    Q.    So that's what I'm asking

17  for.  I'm not asking for each individual,

18  you know, e-mail.  I'm asking for where

19  do you tabulate at the end of the day,

20  where do you keep those hours?  You say

21  at the end of the day you add them up.

22  You put them somewhere.  Where do you put

23  those hours that you've added up at the

24  end of each day?

1       A.    Basically, for example, I

2    have three e-mails related to the case

3    today.  And end of the day, I look at

4    three, the last e-mail, I just put it

5    down the total number for that date,

6    that's it.

7       Q.    Oh, I see.  So what you're

8    doing is your last piece of work

9    assignment or last e-mail that you

10   received for the day, you will put your

11   total number of hours in that e-mail?

12      A.    Yes, sir.

13      Q.    Okay.  So you would need to

14   go back through each of those e-mails to

15   be able to get the total number of hours

16   that you've completed since August 3rd,

17   correct?

18      A.    Yeah, very inefficient, but

19   that's the way I did it for many years.

20      Q.    Okay.  What's your best

21   estimate in terms of your total number of

22   hours that you spent between August 3rd

23   and today?

24      A.    My best estimate, probably

Confidential Information - Subject to Protective Order

1    30 or 35 hours total.  But I'm not quite

2    sure.  I haven't counted today's yet.  I

3    don't know how many hours that you're

4    going to spend with me or even tomorrow.

5         Q.    No, I understand.  I'm

6    talking about -- let's -- your best

7    estimate before -- let's say between

8    August 3rd and yesterday, is it still 30

9    to 35 hours?

10        A.    Yeah.  Sorry.

11             Yeah, I think it's between

12   30 and 35.  That's my rough guess, sir.

13   Again, I apologize, I don't know exactly

14   the number.

15        Q.    Okay.  Do you believe the

16   valsartan -- the NDMA in dietary studies

17   or the NDMA is somehow different --

18   sorry.  Strike that.

19             Do you believe the NDMA --

20   exogenous NDMA in foods is somehow

21   different or acts differently than the

22   NDMA in valsartan?

23        A.    Sir, I am not a

24   toxicologist.  I cannot make that

Confidential Information - Subject to Protective Order

1    comment.  I have no opinion on this.

2         Q.    Okay.  And you're not a

3    pharmacologist either, so you haven't

4    looked at anything in regards to

5    pharmacokinetics, correct?

6         A.    Correct.

7         Q.    Okay.

8              MR. NIGH:  Let's take a look

9         at LP-1474.

10             (Document marked for

11        identification as Exhibit

12        Wei-6.)

13             MR. NIGH:  This will be

14        marked as Exhibit -- Wei

15        Exhibit 6.

16   BY MR. NIGH:

17        Q.    At the bottom, you can see

18   World Health Organization, Geneva 2002.

19             And in the center you can

20   see nitrosodimethylamine.

21             Do you see that?

22        A.    Yes, sir.

23        Q.    Do you know what

24   nitrosodimethylamine stands for -- or

Confidential Information - Subject to Protective Order

1    what that is?

2           A.    I thought that is the DM --

3    NDMA; is that correct?

4           Q.    Yes.  And so this is a

5    report from the WHO in 2002 on NDMA.

6                 Before today, have you ever

7    seen this?

8           A.    I did see it.  I didn't read

9    it word by word.  And I did a glance

10   over.

11          Q.    Okay.  So you have seen this

12   before today?

13          A.    Yes.

14          Q.    And you said that you

15   glanced over it?

16          A.    Yes.

17          Q.    Okay.  Let's take a look at

18   Page 4.

19                MR. NIGH:  Let's blow up the

20          paragraph on the right side, third

21          paragraph down.

22   BY MR. NIGH:

23          Q.    And here it says, "Based

24   upon laboratory studies in which tumors

Confidential Information - Subject to Protective Order

1    have been induced in all species,

2    examined at relatively low levels, NDMA

3    is clearly carcinogenic."

4                 Do you see that?

5         A.    Yes, sir.

6         Q.    Now, today, you're not

7    offering any opinions as to whether or

8    not NDMA is carcinogenic, correct?

9         A.    No.

10        Q.    Okay.  And also you didn't

11   review any of the laboratory studies in

12   which tumors were being induced in

13   species when administered NDMA, correct?

14        A.    Correct.

15        Q.    Okay.  Here, next it says,

16   "There is overwhelming evidence that NDMA

17   is mutagenic and clastogenic."

18                 Do you know what mutagenic

19   and clastogenic refer to?

20        A.    No, sir.

21        Q.    Okay.  At the bottom it

22   shows, "Qualitatively, the metabolism of

23   NDMA appears to be similar in humans and

24   animals.  As a result, it is considered

Confidential Information - Subject to Protective Order

1  highly likely that NDMA is carcinogenic

2  to humans, potentially at relatively low

3  levels of exposure."

4          Do you see that?

5      A.     Yes, sir.

6      Q.     And you did not review human

7  tissue studies where they were analyzing

8  the metabolism of NDMA, correct?

9      A.     Right.

10     Q.     Taking a look at the next

11  page, on the upper left corner.

12          It says, "Cancer is clearly

13  the critical endpoint for quantification

14  of exposure relationship for risk

15  characterization of NDMA.  In addition to

16  it being best characterized, in general,

17  tumors occur at lowest concentration

18  compared with those typically reported to

19  induce noncancer effects."

20          Do you see that?

21     A.     Yes, sir.

22     Q.     And you didn't perform any

23  sort of risk assessment analysis in terms

24  of looking at, you know, at what levels

Confidential Information - Subject to Protective Order

1    or concentrations of NDMA tumors would be

2    induced, either in animals or humans,

3    correct?

4         A.    No, sir.  But that was not

5    on my assignment.

6         Q.    Okay.  And then at the

7    bottom it says, "NDMA is a genotoxic

8    carcinogen and exposure should be reduced

9    to the extent possible."

10             Do you see that?

11        A.    Yes, sir.

12        Q.    And you have no reason to

13   disagree with the WHO when they say that

14   NDMA is a genotoxic carcinogen and

15   exposure should be reduced to the extent

16   possible, correct?

17        A.    Well, it depend on disagree,

18   or agree.  You asking me.  I said this

19   document is very old, almost 20 years

20   old.  I'm surprised they didn't even

21   up-to-date this website or the report.

22   I'm surprised this is 20 years old, the

23   document is still existing.

24        Q.    I'm sorry.  You're surprised

Confidential Information - Subject to Protective Order

1  they haven't updated this report since

2  then?

3        A.    You know it's 20 -- almost

4  20 years, right, sir.

5        Q.    Have you seen updated

6  reports from various --

7        A.    No.

8        Q.    -- agencies where they

9  updated their analysis on NDMA?

10        A.    I don't think they have

11  updated, as far as I know.

12        Q.    As far as you know, you are

13  not aware of any other agencies, health

14  agencies or regulatory agencies that have

15  updated their opinions on NDMA and

16  whether or not it's reasonably

17  anticipated to be carcinogenic?

18        A.    I don't think -- if there is

19  one, I would be happy to read it, sir.

20              MR. NIGH:  Let's take a look

21        at 23.

22  BY MR. NIGH:

23        Q.    Now, other than the update,

24  the question on whether or not it's been

Confidential Information - Subject to Protective Order

1    updated in 20 years, do you have any

2    other reasons to disagree?

3            A.    Well, I'm not a -- I'm

4    sorry, sir.  I don't mean to talk over

5    you.  I'm sorry.  Why don't you finish.

6            Q.    No, that's okay.  Do you

7    have any other reasons to disagree with

8    the WHO?

9            A.    No, sir.  I don't know this

10   WHO's position, you call this document,

11   or paper, whatever you want, right.  But

12   I'm saying in general, any animal study

13   trying transported to human study, and we

14   know very well, sometimes just doesn't

15   work.  It's trivial.

16                And that's why we need human

17   studies to confirm what the WHO, the

18   position papers, right.  But I'm

19   surprised, so many papers published

20   afterwards, WHO did not have updated

21   version.  That's my understanding, right.

22   If you have updated version, I'd be happy

23   to read it.

24           Q.    But my understanding is that

Confidential Information - Subject to Protective Order

1    you haven't reviewed any updated position

2    papers from any of the agencies that

3    have, you know, discussed NDMA and it

4    being a probable carcinogen and/or

5    reasonably anticipated to be a human

6    carcinogen, correct?

7          A.    Yeah, from human being --

8    from human being studies.

9          Q.    Okay.  Let's take a look

10   at -- now, if there were other regulatory

11   agencies that have looked at updated

12   epidemiological studies and included that

13   in their assessment, isn't that something

14   that you would want to review?

15         A.    Oh, yeah, for sure.  I'd

16   love to read it.

17               MR. NIGH:  Okay.  Let's take

18         a look at 23 on the right side.

19         First paragraph.

20   BY MR. NIGH:

21         Q.    And here they say, WHO says,

22   "Therefore, owing to the considerable

23   evidence of carcinogenicity of NDMA in

24   laboratory species, evidence of direct

Confidential Information Subject to Protective Order

1    interaction with DNA consistent with

2    tumor formation, and the apparent lack of

3    qualitative species-specific differences

4    in the metabolism of this substance, NDMA

5    is highly likely to be carcinogenic to

6    humans."

7              Do you see that?

8         A.    Yes, sir.

9         Q.    Now, I just want to confirm,

10   you didn't look at any studies on NDMA in

11   laboratory species, correct?

12        A.    Correct.

13        Q.    You didn't look at any

14   studies on the evidence of direct

15   interaction with DNA consistent with

16   tumor formation, correct?

17        A.    Correct.

18        Q.    And you didn't look at any

19   studies that showed whether or not there

20   was an apparent lack of qualitative

21   species-specific differences in the

22   metabolism of NDMA, correct?

23        A.    Correct.

24              MR. NIGH:   Okay.   We can put

Confidential Information - Subject to Protective Order

1          this away.

2     BY MR. NIGH:

3          Q.     We've been going over a

4     little over an hour.  Would you like to

5     take a break about now?

6          A.     No.  If you want to take a

7     break, you know, go ahead.  But I'm okay.

8          Q.     Okay.  Let's keep going.

9                 All right.  We'll take a

10    look at LP-1577.  This is your report

11    again.

12                Now, Doctor, during

13    Dr. Panigrahy's deposition, defense

14    counsel asked Dr. Panigrahy multiple

15    questions regarding a couple of sentences

16    that he had that were identical between

17    his Actos report and his valsartan

18    report, a couple sentences out of a

19    256 -- 250-plus-page report that he

20    submitted in valsartan.

21                Did you review that

22    testimony at all?

23         A.     No, I don't.

24         Q.     Now, would you be worried

Confidential Information - Subject to Protective Order

1    yourself about a criticism like that,

2    that there are identical sentences from

3    one past expert report versus a -- the

4    report that you produced here today?

5              MR. MERRELL:  Objection to

6         form.

7              THE WITNESS:  I'm not quite

8         sure of your question.  You said

9         am I worried about it?  I didn't

10        have access to other experts'

11        reports?  Is that what your

12        question?

13   BY MR. NIGH:

14        Q.    Would you personal --

15        A.    I don't understand your --

16        Q.    Would you be personally

17   worried if there was a problem with

18   cutting and pasting or having identical

19   sentences from a past expert report and

20   the expert report you've submitted in

21   valsartan?

22             MR. MERRELL:  Objection to

23        form.

24             THE WITNESS:  I'm not quite

Confidential Information - Subject to Protective Order

```
1          sure which part you're talking
2          about.  For example, for my
3          quantification, usually I usually
4          use older things.  I use it many,
5          many times for legal case, almost
6          identical, except for up-to-dated
7          the number of publications or new
8          award I received.
9               I just simply up-to-date it.
10         If you said, well, you know, you
11         shouldn't cut and paste from
12         previous report.  I say, well,
13         it's my report.  I can do anything
14         that I wanted to, right.  I can
15         copy every word I wanted to, as
16         long as it reflect the truth.
17    BY MR. NIGH:
18         Q.    So it's your belief that --
19    you know, not just qualifications, but if
20    you had it in a prior report, that you
21    could do anything you wanted with that
22    prior report and cut and paste or copy
23    any word that you wanted from a prior
24    report into this report, as long as it
```

Confidential Information - Subject to Protective Order

1  reflects the truth, correct?

2          A.    Well, you say any word.

3  That's a very strong word, sir.  I

4  just -- we can repeat many, many word,

5  right.  I mean, I don't mean to play the

6  word game here with you, sir.  I'm just

7  wondering what is wrong with me citing

8  the principle of statistical methods,

9  right?  That's the same old thing, right?

10 Why should I every time write a legal

11 expert witness report, I have to redo it

12 changing the wording with the time,

13 because the principle is there.

14              The same wording, we can use

15 repeatedly.  Then for this case, what's

16 new?  Then I'm going to add in my new

17 opinions, right?  I don't see anything

18 wrong with that, sir.

19          Q.    So it's your testimony that

20 if it's the same principle that's being

21 repeated from a past report into this new

22 report, that you don't have any problem

23 with it having the exact words, as long

24 as it's the same principle that's being

Confidential Information - Subject to Protective Order

```
1    applied for both reports, correct?

2         A.    Correct.

3         Q.    Fair enough.  Okay.

4               MR. NIGH:  Let's take a look

5         at -- let's take a look at

6         LP-1562.

7               (Document marked for

8         identification as Exhibit

9         Wei-7.)

10              MR. NIGH:  Let's go ahead

11        and blow up the In Re Bextra and

12        Celebrex Marketing.

13   BY MR. NIGH:

14        Q.    Do you see this, Doctor?

15        A.    Yes.

16        Q.    It says expert report of

17   Professor -- and it's you, right,

18   Dr. Wei?

19        A.    Yes, sir.

20        Q.    Okay.  And here it says,

21   "Name of expert, Dr. Wei."  And it says,

22   "Representing the defendant."

23              Is that accurate, that in

24   the Celebrex case, you were representing
```

Confidential Information - Subject to Protective Order

1    the pharmaceutical industry defendant?

2         A.    Yes, sir.

3         Q.    Okay.  And let's take a look

4    below.

5               MR. NIGH:  If we can blow up

6         the table of contents.

7    BY MR. NIGH:

8         Q.    Here, you had a table of

9    contents for this report.

10              Do you see that?

11        A.    Yes, sir.

12        Q.    And then we can take a look

13   at the next page.

14              MR. NIGH:  Let's blow up the

15        table of contents there as well.

16   BY MR. NIGH:

17        Q.    And that continues with the

18   table of contents that you have with this

19   report.

20              Do you see that?

21        A.    Yeah.

22        Q.    And then let's look at

23   introduction.

24              And it says, "1.  I received

Confidential Information - Subject to Protective Order

1  a Ph.D. degree in statistics in 1975 from

2  the University of Wisconsin.  I have been

3  a tenured professor of biostatistics at

4  Harvard University since 1991 and a

5  professor of biostatistical science and

6  computational biology at Dana Farber

7  Cancer Institute, Harvard Medical School,

8  since 1997."

9           Do you see that?

10      A.    Yes, sir.

11      Q.    This is describing you,

12 correct?

13      A.    Sorry, sir.  Say again.

14      Q.    I said this is -- these

15 qualifications are describing you,

16 correct?

17      A.    Yes, sir.

18      Q.    Okay.  And looking at

19 assignment, Number 4.  Assignment, it

20 says, "I have been asked to determine

21 whether Celebrex, at a daily dose of

22 200 milligrams, 400 milligrams, and

23 800 milligrams is associated with the

24 specific risk of cardiovascular events

Confidential Information - Subject to Protective Order

1    relative to placebo and non-selective

2    nonsteroidal antiinflammatory drugs based

3    on reliable datasets accessible to me

4    from comparative clinical trials."

5            Do you see that?

6        A.    Yes, sir.

7        Q.    And so in the Celebrex case

8    you had clinical trials that you were

9    analyzing, correct?

10       A.    Yes, sir.

11       Q.    Are you aware of any

12   clinical trials in this case that have

13   compared people contaminated with NDMA,

14   valsartan -- or people taking

15   contaminated NDMA valsartan compared to

16   people taking uncontaminated valsartan?

17       A.    No, sir.

18       Q.    There aren't any such

19   clinical trials that would be of

20   relevance in terms of your opinion for

21   this question that you've looked at in

22   valsartan, correct?

23       A.    I don't have it actually.

24   The only thing that I'm worried about

Confidential Information - Subject to Protective Order

1    is -- or concerned about is Dr. Madigan's

2    references.

3           Q.    Right.  And so in the

4    valsartan -- in the valsartan case, you

5    actually haven't looked at any data

6    regarding clinical trials, correct?

7           A.    No, sir.

8           Q.    Let's put that one to the

9    side.  We'll come back to it later.

10          MR. NIGH:  Let's take a look

11          at LP-1561.

12          (Document marked for

13          identification as Exhibit

14          Wei-8.)

15          MR. NIGH:  This will be

16          marked as Wei Exhibit 8.

17   BY MR. NIGH:

18          Q.    Here you see it says, "In Re

19   Taxotere Products Liability Litigation."

20          The date shows February 8,

21   2019.

22          Do you see that?

23          A.    Yes, sir.

24          Q.    Do you recall just giving

Confidential Information - Subject to Protective Order

1    your Taxotere expert report a little over

2    two years ago?

3           A.    I vaguely remember, but not

4    very detailed anymore.

5           Q.    Okay.  And here it says,

6    "Expert report of Dr. Wei," correct?

7           A.    Yes, sir.

8           Q.    Okay.  And again, you were

9    representing the defendant pharmaceutical

10   company in this case, correct?

11          A.    Correct.

12          Q.    And in the introduction --

13   if you see the introduction, which is the

14   first couple sentences, it says, "I

15   received a Ph.D. in statistics from the

16   University of Wisconsin.  I have been a

17   tenured professor of biostatistics at

18   Harvard University since 1991 and was a

19   professor of biostatistical science and

20   computational biology at Dana Farber

21   Cancer Institute, Harvard Medical School,

22   between 1997 and 2012."

23                Correct?

24          A.    Yes, sir.

Confidential Information - Subject to Protective Order

1    Q.    So this again, this is

2    describing you, correct?

3    A.    Yes, sir.

4          MR. NIGH:  Let's take a look

5    at LP-1579.

6          (Document marked for

7    identification as Exhibit

8    Wei-9.)

9          MR. NIGH:  This is being

10   marked as Exhibit 9.

11   BY MR. NIGH:

12   Q.    Here it says, "Bone Care

13   International LLC and Genzyme

14   Corporation."

15         Do you see that?

16   A.    Yes, sir.

17   Q.    And here it says, Doctor --

18   it's an expert report on October 30,

19   2009, correct?

20   A.    Yes, sir.

21   Q.    And Bone Care International

22   LLC, that's another -- that's a

23   corporation.  The plaintiff here is a

24   corporation, correct?

Confidential Information - Subject to Protective Order

1    A.    Sorry, back in 2009, my

2  memory is really fuzzy about this case.

3  So if you can remind me of what's going

4  on, I would really appreciate it.

5    Q.    Okay.  Let's take a look at

6  the -- let's take a look under summary of

7  opinion.

8          It says, "I have been asked

9  by counsel for Genzyme to investigate

10  whether there is a difference in

11  treatment of secondary hyperthyroidism

12  in" -- "hyperparathyroidism in patients

13  with end stage renal disease using

14  either" -- I'm not sure I can pronounce

15  that.  -- "doxercalciferol administered

16  intravenously or calcitriol administered

17  intravenously with respect to side

18  effects using data from two studies that

19  were reported."and then it gives those

20  cites.

21          Do you see that?

22    A.    Yes, sir.

23    Q.    Does that help refresh your

24  recollection?

Confidential Information - Subject to Protective Order

1      A.    No, not really.  It has been
2  too long.
3      Q.    Do you know that in this
4  case you were representing a corporation?
5      A.    Say it again, sir.
6      Q.    Do you know that in this
7  case you were representing a corporation?
8      A.    I'm not quite sure I
9  understand your question.  I mean, I'm
10 representing Genzyme here, right.
11     Q.    Genzyme.
12     A.    Right.
13     Q.    Do you know that Genzyme is
14 a corporation?
15     A.    Yeah, it used to be by
16 itself, an independent drug company.
17 They bought by Sanofi, I think.
18     Q.    I see.  So Genzyme is a
19 pharmaceutical industry corporation,
20 correct?
21     A.    Yes, sir.
22     Q.    Got it.  So this is another
23 case where you're representing
24 pharmaceutical industry, correct?

Confidential Information - Subject to Protective Order

1    A.    Well, sir, if I remember,

2  the plaintiff was also a corporation.

3    Q.    Right.

4    A.    It's not like -- it is fair

5  game.

6    Q.    It's pharmaceutical company

7  against pharmaceutical company, and you

8  were representing one of the

9  pharmaceutical companies, correct?

10    A.    Yes, sir.

11         MR. NIGH:  Okay.  Let's go

12      up on this expert report at the

13      top of the page, and it says --

14      where -- three and four, let's

15      highlight that all the way down to

16      summary of opinions, yes.

17  BY MR. NIGH:

18    Q.    Here it says, my CV -- I'm

19  not going to go into that.

20         Number 4, it says, "My

21  previous deposition and trial experience

22  is as follows."

23         And it shows Western

24  Division Cincinnati Services.

Confidential Information - Subject to Protective Order

1              Do you see that?

2       A.     Yes.

3       Q.     And you represented the

4  defendant in that case, correct?  Do you

5  see where it says defendant?

6       A.     Sorry, yeah.  I -- for the

7  defendant, yes, sir.

8       Q.     And next is Ortho Biotech

9  Products versus Amgen.

10             Do you see that?

11      A.     Yes, sir.

12      Q.     And you represented the

13 plaintiff, but here the plaintiff is a

14 pharmaceutical industry, correct?

15      A.     Yeah.  This is a corporation

16 against a corporation, yes.

17      Q.     Pharmacy industry against

18 pharmacy industry again, correct?

19      A.     Correct.

20      Q.     And next it says, Bracco

21 Diagnostics versus Amersham Health

22 Incorporated.

23             Do you see that?

24      A.     Correct.

Confidential Information - Subject to Protective Order

1       Q.    And here it says for
2  defendant and plaintiff.  Did you
3  represent both the defendants and the
4  plaintiffs in this case?
5       A.    Well, this is interesting
6  case.  Actually, they're suing each
7  other.
8             So in one case -- it's the
9  same company.
10      Q.    Right.  But this is
11  another -- this is another one of, you
12  know, pharmaceutical industry against
13  pharmaceutical industry, correct?
14      A.    Correct.
15      Q.    Okay.  And so you would have
16  represented pharmaceutical industry in
17  that case, correct?
18      A.    Against another one, yes.
19      Q.    And then next we have
20  Howmedica Osteonics versus Zimmer.
21            Do you see that?
22      A.    Yes.
23      Q.    And you represented Zimmer
24  here, correct?

Confidential Information - Subject to Protective Order

1        A.    I apologize.  I don't
2   remember now.   This is 2007.
3        Q.    It says, for defendant.
4              Do you see that?
5        A.    Yeah, I mean, again, if it's
6   against Zimmer, then I'm for the
7   defendant, yes.
8        Q.    But nonetheless, here again,
9   I know we keep saying pharmaceutical.
10  But medical device and pharmaceutical
11  company.  This is another one of those
12  where we see pharmaceutical/medical
13  device company against
14  pharmaceutical/medical device company,
15  correct?
16       A.    Correct.
17       Q.    Okay.  And so you've
18  represented again a pharmaceutical
19  company/medical device company, correct?
20       A.    Correct.
21       Q.    And then we saw Bextra and
22  Celebrex.  And you represented a
23  pharmaceutical company in that case,
24  correct?

Confidential Information - Subject to Protective Order

1      A.     Yes, sir.

2      Q.     And then In Re Pfizer, is

3  the next one, securities litigation.  And

4  you represented the pharmaceutical

5  company in that case as well, correct?

6      A.     Yes, sir.

7      Q.     Okay.  Is it fair to say

8  that the vast majority of your expert

9  opinions are on behalf of pharmaceutical

10  companies?

11      A.     Yeah, as you can see,

12  against another company, not really

13  against an individual cases.

14      Q.     Right.  But my question is

15  not necessarily who they are against.

16  But the vast majority of your

17  representation would be on behalf of

18  pharmaceutical companies or medical

19  device companies, correct?

20      A.     Yeah, for some -- you know,

21  I'm really impressed, sir, you dig out of

22  the interesting case that I was working.

23          The second -- the first one,

24  Western Division Cincinnati Women, that

Confidential Information - Subject to Protective Order

1    was a really interesting abortion case.

2    And I was not concerning about any

3    company or anything.  It's actually we

4    fight for women's right.

5              The other side -- you know,

6    that's a very interesting case, actually.

7         Q.    Well, interesting that you

8    brought that up.  But you about you were

9    actually on the side of the defendant,

10   where you were looking to uphold a law

11   that actually made it more difficult for

12   women to be able to have abortions after

13   a certain time frame, correct?

14        A.    Correct, yes.

15        Q.    Okay.  So you weren't

16   actually in that case fighting on behalf

17   of women's rights.  You were actually on

18   the other side, right?

19        A.    Yeah, you're right.

20        Q.    Okay.  Other than that case,

21   wouldn't you agree with me that the vast

22   majority of your opinions are on behalf

23   of pharmaceutical companies or on behalf

24   of medical device companies?

Confidential Information - Subject to Protective Order

1        A.    Yes, sir.

2              MR. NIGH:  Okay.  Let's go

3        ahead and take a look at LP-1577.

4        We'll mark this as Wei Exhibit 10.

5              (Document marked for

6        identification as Exhibit

7        Wei-10.)

8   BY MR. NIGH:

9        Q.    Here you can see it's called

10  A Woman's Choice East Side Women's Clinic

11  versus Scott Newman.

12             Do you see that?  It says,

13  et cetera, et al., defendants?

14       A.    Yep.

15       Q.    And this is the case that we

16  were just talking about, right?

17       A.    Yeah.

18       Q.    Okay.  And this is the case

19  where you were on the side of trying to

20  uphold the law that made it more

21  difficult for women to get abortions,

22  correct?

23       A.    Sir, I'm not so for sure

24  that I would use your word "more

Confidential Information - Subject to Protective Order

1  difficult" for women seeking abortion.  I

2  think that's not appropriate word.

3              We are asking the court

4  upheld the law established by the state

5  of Indiana, Ohio, was --

6        Q.    Well, this is a law.  Sorry.

7  I didn't mean to interrupt you.  Go

8  ahead.

9        A.    So if I remember, sir, this

10 is a 1999, right?

11       Q.    Yeah.

12       A.    That was a long, long time

13 ago.  And if I remember correctly, the

14 Indiana, example, state, had some kind of

15 abortion rules, right.  For example, in

16 Mississippi, I believe it's like 24 hours

17 or 48 hours waiting period.  Forgive me,

18 sir.  I don't remember detail anymore.

19             Basically, just saying,

20 look, if a woman looking for abortion

21 after first contact with the clinic, and

22 she should wait about a time -- I don't

23 know one day or two days.  Then go

24 backwards.

Confidential Information - Subject to Protective Order

1          Some people were just

2    wondering, maybe they can settle down and

3    reconsider the situation after they got

4    the information from the clinic and they

5    can actually make a better decision

6    instead of, like, walking into the

7    clinic, like I go to fast food store or

8    like a McDonalds, right?

9          If I want to have abortion,

10   then I'm going to do right away.  So

11   that's basically the principle, should we

12   have this waiting period.

13          And the state legislature

14   established and say could you please keep

15   this rule.

16          That's what my

17   understanding, my memory, my

18   recollection.

19      Q.   Do you recall stating in

20   here that you would agree with a law that

21   says banning abortions after 15 weeks of

22   pregnancy that you would support that?

23      A.   I don't remember exactly the

24   weeks of the pregnancy anymore, sir.

Confidential Information - Subject to Protective Order

1    This has been long time.

2         Q.    Okay.

3              MR. NIGH:  Let's move on

4         from that.  Let's go ahead and

5         take a break at this point.

6              THE VIDEOGRAPHER:   The time

7         right now is 10:34 a.m.  We're off

8         the record.

9              (Short break.)

10             THE VIDEOGRAPHER:   The time

11        right now is 10:54 a.m.  We're

12        back on the record.

13   BY MR. NIGH:

14        Q.    Now, doctor, remember we

15   were talking about cutting and pasting

16   from prior reports.  And you said that it

17   wouldn't be uncommon for you to cut and

18   paste information from your

19   qualifications into your reports,

20   correct?

21        A.    Sorry, Counsel, your picture

22   is so fuzzy.

23             Okay.  What I was saying,

24   sir, is this, like, my job description, I

Confidential Information - Subject to Protective Order

1  think it's perfectly all right to just

2  use the same old language, right.

3  Nothing wrong with that.

4             If I stated the principle,

5  the principle of a statistical method,

6  that never changes so far, it is all

7  right.

8             But if you're actually

9  dealing with a new case, if a new

10 situation, then I don't think we just

11 repeat what we said before, right, which

12 may not be relevant.

13       Q.    I'm not going to look at

14 your qualifications for now in terms of

15 comparing your results.  I'm going to

16 look at your analysis.  Okay.  We're

17 going to skip past qualifications.

18             I think you would agree with

19 me that you would commonly take the same

20 information in your qualifications in one

21 report and put it into other reports,

22 correct?

23       A.    Correct.  Sorry, Counsel.

24 Could you show your picture again?  Could

1   talk again.  I think I want to click

2   again.  It's very fuzzy somehow.

3              MR. MERRELL:  It's fuzzy for

4        me too.

5              MR. NIGH:  Okay.  Let's go

6        ahead and get off the record and

7        see if we can fix the fuzziness.

8              THE VIDEOGRAPHER:  The time

9        right now is 10:56 a.m.  We're off

10       the record.

11             (Brief pause.)

12             THE VIDEOGRAPHER:  The time

13       right now is 10:58 a.m.  We're

14       back on the record.

15  BY MR. NIGH:

16       Q.   Okay.  I think you would

17  agree with me that you would commonly

18  take the same information in your

19  qualifications in one report and put it

20  into other expert reports, correct?

21       A.   Correct.

22       Q.   Okay.  Let's -- what I want

23  to do is get past that and look at your

24  analyses between -- and compare it

Confidential Information - Subject to Protective Order

1    between these reports.

2            MR. NIGH:  So let's go ahead

3        and, side by side, I want to have

4        LP-1557 and LP-1561.

5    BY MR. NIGH:

6        Q.    Side by side, we're going to

7    look at your expert report that you

8    provided here in valsartan with your

9    expert report that you provided in

10   Taxotere.  Okay.

11           MR. NIGH:  Let's take a look

12       at Page 7 of the valsartan report.

13       Valsartan, go to Page 7.  Yes.

14       And then on Taxotere we will go to

15       Page 2.

16           Let's blow up this first

17       paragraph for valsartan that

18       starts with "Suppose."  Let's blow

19       that up.

20           And then let's blow up on

21       the other side Paragraph 12 that

22       starts with "Suppose."

23           And let's -- can we make

24       that just a tad bit, I'm not sure

Confidential Information - Subject to Protective Order

1          if it's to make that other

2          "suppose" bigger.

3    BY MR. NIGH:

4          Q.    What we see, on the left

5    side is your expert report, valsartan.

6    It starts off with, "Suppose that we are

7    interested in the rate of occurrence of a

8    certain clinical event, for example,

9    cancer, among subjects exposed to NDMA or

10   NDEA and their counterparts are control."

11          On the Taxotere side, it

12   says, "Suppose that we are interested in

13   the rate of occurrence of a certain

14   clinical event, for example, permanent

15   alopecia among patients treated with

16   Taxotere relative to its counterpart,

17   control, for patients who have been

18   exposed to other treatments."

19          Do you see that?

20          A.    Yes, sir.

21          Q.    Now, you would agree that

22   the structure of those sentences are very

23   similar, and essentially what it appears

24   you have done is take out what was

Confidential Information - Subject to Protective Order

1    relevant to Taxotere and plug in what's

2    relevant for valsartan, correct?

3         A.    Well, that's -- I change the

4    word here, right.  Not exactly copied the

5    same old thing like on the left --

6    right-hand side.

7         Q.    Right.  At the time that

8    you're doing your valsartan report, you

9    had your Taxotere report.  And you used

10   the Taxotere report as your framework for

11   the valsartan report, correct?

12        A.    For statistical principles

13   here.

14        Q.    Right.  But you used your

15   Taxotere report as your framework for

16   your valsartan report, correct?

17        A.    I used the same -- similar

18   format to describe statistical

19   methodologies from Taxotere case to the

20   valsartan case.

21        Q.    Okay.  And in fact, you used

22   a lot of similar word structure

23   throughout the report in Taxotere

24   compared to your report in valsartan,

Confidential Information - Subject to Protective Order

1    correct?

2         A.    For statistical principle,

3    yes.

4         Q.    Well, let's look at the next

5    line.  It says -- in the next line, it

6    says, "In the first step" -- on the

7    valsartan side.  "In the first step, and

8    we take a sample from a population of

9    subjects exposed and another example from

10   the population of subjects who were not

11   exposed."

12            On the Taxotere side, "In

13   the first step, we take a sample of the

14   population of patients treated with

15   Taxotere and another example from the

16   population of patients who did not

17   receive Taxotere."

18            You would agree those

19   sentences are very similar, correct?

20        A.    Correct.

21        Q.    On the left -- on the left

22   side, your valsartan report, you say,

23   "Assuming that these samples are valid

24   representatives of the two populations,

Confidential Information - Subject to Protective Order

1    quantitative analytic methods can be used

2    to determine whether the exposed group

3    has higher, lower, or similar event rate

4    than that for the control group."

5              On the other side, you say,

6    "Assuming" -- on Taxotere, you say,

7    "Assuming that the samples are valid

8    representatives of two populations,

9    quantitative analytic methods can be used

10   to determine whether the Taxotere group

11   has a higher, lower, or similar rate" --

12   "event rate than that for the

13   non-Taxotere group."

14             Do you see that?

15        A.    Yes, sir.

16        Q.    You would agree those

17   sentences are very similar, correct?

18        A.    Yes, sir.

19        Q.    Next, on the valsartan side,

20   it says, "Since we draw conclusions based

21   on a subset of subjects, any qualitative

22   or quantitative interpretation of the

23   result, whether the rate is higher or

24   not, is subject to sampling error."

Confidential Information - Subject to Protective Order

1            On the Taxotere side, you

2    say, "Since we draw conclusions based on

3    a subset of patients, any qualitative or

4    quantitative interpretation of the

5    result, whether the rate is higher or not

6    is subject to sampling error."

7            Correct?

8        A.    Yep.

9        Q.    Those are sentences that

10   appear in both these reports, correct?

11       A.    Correct.

12       Q.    On the valsartan side, you

13   say, "That is, the observed event rate

14   may be higher leading to a possible false

15   positive finding."

16           MR. NIGH:  And we can go

17       down to the next -- yep, very

18       good.  There.

19   BY MR. NIGH:

20       Q.    "That is, the observed event

21   rate may be higher, leading to a possible

22   false positive, or lower leading to a

23   possible false negative finding, than the

24   true event rate in the population."

Confidential Information - Subject to Protective Order

1           On the other side you have,

2    "That is" -- for Taxotere, you have,

3    "That is, the observed event rate may be

4    higher, leading to a possible false

5    positive finding or lower leading to a

6    possible false negative finding than the

7    event rate in the population."

8           Those are the exact

9    sentences, correct, in both reports?

10          A.    Yes, sir.

11          Q.    Next, going down on the

12   valsartan side, on Page 8, it shows, "An

13   efficient statistical method for

14   analyzing such data minimizes the chance

15   of making these two types of errors."

16          And then on the Taxotere

17   side, it says, "An efficient statistical

18   method for analyzing such data minimizes

19   the chance of making these two types of

20   errors."

21          Those are exact sentences in

22   each of those reports, correct?  Correct?

23          A.    Yes, sir.

24          Q.    On the left side it says,

Confidential Information - Subject to Protective Order

1    "It is important to note that except for

2    the exposure to NDMA or NDEA, the exposed

3    subjects in the sample should be similar

4    to the subjects in the non-exposed sample

5    with respect to important observable or

6    unobservable confounders."

7              On the right side you say,

8    "It is important to note that except for

9    treatment with Taxotere, Taxotere users

10   in the sample ideally should be similar

11   to patients in the non-Taxotere sample

12   with respect to important observable or

13   unobservable confounders."  And then you

14   list, "E.g., age, disease status, et al."

15             Do you see that?

16        A.    Yes, sir.

17        Q.    Those sentence -- that part

18   of the sentence is very, very similar in

19   both of the reports, correct?

20        A.    Well, I missed example age

21   and disease status.

22        Q.    Right.  You didn't list any

23   examples in valsartan.  You just listed

24   them in Taxotere, correct?

Confidential Information - Subject to Protective Order

1        A.     Yeah.  Well, it's not

2    identical.  But I missed that part.

3        Q.     Okay.  Let's take a look at

4    18 on valsartan.  And let's scroll down

5    to the next paragraph.

6             So you followed that

7    principle in your report in Taxotere with

8    the same principle that you followed in

9    your report with valsartan, Number 18 and

10   13.

11            It says, "After we have

12   determined how to draw a valid sample

13   size from the population of interest, one

14   has to determine what clinical endpoints

15   are most appropriate to quantify the

16   exposure effect."

17            On the other side, "After we

18   have determined how to draw a valid

19   sample from the patient population of

20   interest, one has to determine what

21   clinical endpoints are most appropriate

22   to quantify the side effect of the

23   treatment."

24            Do you see that?

Confidential Information - Subject to Protective Order

1    A.    Yes, sir.

2    Q.    Those are very similar

3  sentences, correct?

4    A.    Yes, sir.

5    Q.    Next you have, "For the

6  present legal case," on the other side --

7  in valsartan, you have, "For the present

8  legal case."

9          And on the other side, you

10 have, "For the present legal case."

11         Do you see that?

12   A.    Yeah.

13   Q.    And then on the valsartan

14 side, you say, "For the present legal

15 case, the endpoint is whether the subject

16 had a certain type of cancer or the time

17 to occurrence of cancer."

18         On the Taxotere side, you

19 say, "For the present case, the endpoint

20 is whether the patient had permanent

21 alopecia or not."

22         Do you see that?

23   A.    Yes, sir.

24   Q.    So you basically plugged in

Confidential Information - Subject to Protective Order

1   what's relevant for valsartan on one

2   report and what's relevant for Taxotere

3   on the other report, correct?

4       A.    I used the same language.

5       Q.    Same framework, correct?

6       A.    Yes, sir.

7       Q.    On the valsartan side, you

8   say, "Suppose that, based on the sample

9   of 100 patients, at the end of the study,

10  four patients experienced such events."

11              On the other side, you used

12  the same "suppose" identically.

13              "Suppose that based on a

14  sample of 100 patients at the end of the

15  study, four patients experienced such

16  events."

17              Correct?  Those are

18  identical sentences, right?

19      A.    Yes, sir.

20      Q.    Next you say, "Obvious

21  estimate of the event rate for the

22  underlying population is .04 or

23  4 percent."

24              On the Taxotere side, you

Confidential Information - Subject to Protective Order

1    say, "An obvious estimate of the event

2    rate for the underlying population is .04

3    or 4 percent."

4                Those are exact sentences in

5    each report, correct?

6          A.    Correct.

7          Q.    Next sentence, "This is

8    called a point estimate."

9                On the Taxotere side, you

10   have, "This is called a point estimate."

11               Those are exact sentences,

12   correct?

13         A.    Yep.

14         Q.    Next you have, "However,

15   this estimate is based on a sample of

16   patients."

17               On the other -- Taxotere

18   side, you have, "However this estimate is

19   based on a sample of patients?"

20               Those are exact sentences in

21   your Taxotere report and your valsartan

22   report, correct?

23         A.    Yep.

24         Q.    On the valsartan side, you

Confidential Information - Subject to Protective Order

1    have, "The true event rate for the entire

2    population may be more or less than 4

3    percent."

4                On the Taxotere side, "The

5    true event rate for the entire population

6    may be more or less than 4 percent."

7                Those are exact sentences,

8    correct?

9          A.    Yeah.

10         Q.    On the valsartan side, you

11   have, "Different studies generating

12   different samples may find a different

13   proportion of subjects with cancer."

14               On the Taxotere side, you

15   have, "A different study based on

16   different sample may find different

17   proportion of patients that experienced

18   alopecia events."

19               Very similar sentence,

20   correct?

21         A.    Yep.

22         Q.    Next sentence, you have,

23   "Therefore" --

24               MR. NIGH:  And we're going

Confidential Information - Subject to Protective Order

1          to move onto Page 9 of the

2          valsartan report.

3   BY MR. NIGH:

4          Q.    "Therefore, when observing

5   results of a single sample, it is

6   important to attach a level of confidence

7   to the observed point estimate."

8              On the Taxotere report,

9   "Therefore, when observing results from a

10  single sample, it is important to attach

11  a level of confidence to the observed

12  point estimate."

13             Those are exact sentences,

14  correct?

15         A.    Yep.

16         Q.    On the valsartan side, "This

17  quantitative scientific process is called

18  drawing or making inferences about the

19  true event rate."

20             On the Taxotere side, "This

21  quantitative scientific process is called

22  drawing or making inferences about the

23  true event rate.

24             Those are exact sentences,

Confidential Information - Subject to Protective Order

1    correct?

2         A.    Yep.

3              MR. NIGH:  Let's take a look

4         at Paragraph 19.  Let's compare to

5         this Paragraph 21 in Taxotere.

6    BY MR. NIGH:

7         Q.    Next you have, "Let me turn

8    to the issues of comparing two groups of

9    subjects, one having been exposed and the

10   other being in the control."

11             And on the Taxotere side,

12   "Let me turn to the issues of comparing

13   two groups of patients, one receiving

14   Taxotere and the other receiving a

15   control."

16             Very similar sentences,

17   correct?

18        A.    Yep.

19        Q.    On the valsartan side, "To

20   make sure that two samples of subjects

21   are comparable with respect to all

22   potential confounders, we often rely on a

23   randomized clinical trial setting."

24             On the Taxotere side, "To

Confidential Information - Subject to Protective Order

1   make sure that two samples of patients

2   are comparable with respect to all

3   potential confounders, we often rely on a

4   randomized clinical trial setting."

5          Do you see that?

6      A.    Yep.

7      Q.    Those are identical

8   sentences, correct?

9      A.    Yep.

10     Q.    And here, in valsartan, you

11  never looked at any clinical trials,

12  whereas you looked at clinical trials in

13  Taxotere, correct?

14     A.    I just gave the information.

15  The gold standard to investigate any

16  difference between the two groups would

17  be based on the clinical trial.  That's

18  the point.

19     Q.    Right.  But to try to set up

20  a clinical trial where you expose

21  patients to contaminated --

22  NDMA-contaminated valsartan, compared to

23  patients who are unexposed to -- or not

24  exposed to contaminated valsartan, but

Confidential Information - Subject to Protective Order

1    given uncontaminated valsartan, to set up

2    a trial setting where you were to give

3    patients contaminated with valsartan as

4    the test group, especially contaminated

5    with levels 200 times over the threshold

6    level set by the FDA, that sort of test

7    would not get approval from any IRB that

8    you know of, correct?

9         A.    Well, sir, I think this

10   paragraph is not really ask us to have

11   clinical trials on valsartan case.  I

12   just wanted to presenting what is the

13   gold standard, if we can do it.

14             The gold standard is using a

15   clinical trial randomized.  If we cannot

16   do it, then we go to the next level of

17   investigation.

18             I just want to point out why

19   the randomized clinical trial gives us a

20   gold -- so-called gold standard.

21        Q.    I understand.  My question

22   is -- I'm sorry.  Did I interrupt you?

23        A.    No.  No, sir.

24        Q.    Okay.

Confidential Information - Subject to Protective Order

1          A.     I'm just trying to explain

2     what your question.

3                 You asking me, can we do

4     clinical trials for valsartan case?

5                 I think this is -- in my

6     humble opinion, we cannot do that, right.

7                 I want to pointed out in

8     Paragraph 19 here, I simply indicate to

9     the judge, or to the court, I said,

10    listen, what is the gold standard if we

11    can do it, which is the randomized

12    clinical trial, right.

13         Q.     Well, as --

14         A.     But -- sorry, go ahead.

15         Q.     Sorry.  I didn't mean to

16    interrupt you.

17                As it relates to valsartan,

18    clinical trials would not be a gold

19    standard because it would be unethical to

20    give -- to try to setup a clinical trial

21    that tests whether or not people who are

22    getting contaminated valsartan over a

23    long period of time would get cancer or

24    have an increased risk of cancer compared

Confidential Information - Subject to Protective Order

1   to control group, because you can't --

2   you wouldn't get -- you wouldn't be able

3   to get approval for that sort of clinical

4   trial, right?

5          A.    Right.  I don't mean that I

6   said we needed to do it for randomized

7   trials for valsartan case.  Just in

8   general, the gold standard is to

9   conduct -- is to conduct a randomized

10  clinical trial.  If we cannot do it, then

11  what is the best next level?  That's what

12  I'm trying to say.

13         Q.    I understand.  As it applies

14  to valsartan, though, the gold standard

15  would not be randomized clinical trials,

16  because it would be unethical to conduct

17  such a trial where you're giving

18  people -- you're intentionally giving

19  people NDMA-contaminated valsartan,

20  correct?

21         A.    Sir, in that case, what is

22  the gold standard to evaluate valsartan

23  case then?  I have no idea what your

24  definition by gold standard.

Confidential Information - Subject to Protective Order

1              There is no gold standard.

2  If you cannot do randomized trial,

3  there's no gold standard anymore.

4        Q.    If you can't do a randomized

5  controlled clinical trial, what would be

6  the next best quality of evidence?

7        A.    In my --

8        Q.    If --

9        A.    Go ahead.

10        Q.    Sorry.

11              I added, if you can't -- let

12  me repeat my question.

13              If you can't do a randomized

14  clinical trial, what would be the next

15  best quality of evidence in the hierarchy

16  of scientific evidence?

17        A.    For this case?

18        Q.    For any case, if you're --

19  if it's unethical to conduct a randomized

20  clinical trial, what would be the next

21  best quality of evidence in the hierarchy

22  of scientific evidence?  It would be

23  epidemiological studies, correct?

24        A.    Well, I'm not an

Confidential Information - Subject to Protective Order

1  epidemiologist.  I cannot speak for

2  epidemiology.  I'm just speak as a

3  statistician.  If you're asking me an

4  epidemiology question, I cannot answer,

5  sir.

6        Q.    Okay.  So as a statistician,

7  you've given this statement that clinical

8  trials are the gold standard.

9            You use that same statement

10 in Taxotere where you're looking at

11 randomized clinical trials.  And then you

12 also plug it into valsartan where it's

13 unethical to do clinical trials.  So if

14 you can't use clinical trials, do you

15 know the scientific -- hierarchy of

16 scientific evidence would then next state

17 that epidemiological studies would be the

18 next best evidence?

19       A.    I would say observational

20 study instead of, quote, epidemiological

21 studies if that's okay with you?

22       Q.    That's okay.  Observational

23 studies correct?

24       A.    Yeah.  Yeah.  That's what I

Confidential Information - Subject to Protective Order

1    would say, observational studies.

2         Q.    Now, observational studies

3    are oftentimes commonly referred to as

4    epidemiological studies, correct?

5         A.    I don't know.  If you're

6    using your terminology, it's okay.  If

7    you think it's equivalent, that's in your

8    book, I'm saying I prefer to use

9    observational study.  Is that okay with

10   you?

11        Q.    Yes.  All right.  Let's take

12   a look at the next sentence.  19, if you

13   can see, "Such a clinical study" -- this

14   is for the valsartan -- your valsartan

15   report.

16             "Such a clinical study

17   yields a well designed experiment that

18   has the potential for generating reliable

19   prospective data on safety."

20             In your Taxotere report,

21   "Such a clinical study yields a well

22   designed experiment that has the

23   potential for generating reliable

24   prospective data on drug efficacy or

Confidential Information - Subject to Protective Order

1    safety."

2              Those are exact sentences,

3    correct?

4         A.    Yes, sir.

5         Q.    Next you say, such studies

6    are conducted and monitored according to

7    a pre-specified protocol which details

8    the exposure administered (example, form,

9    dosage, frequency), the clinical and

10   biological endpoint (example, lab value,

11   patient's quality of life, time to

12   remission, time to a toxicity event), the

13   study patient population and other

14   clinical and statistical considerations."

15             In the Taxotere report, you

16   put, "Such studies are conducted and

17   monitored according to pre-specified

18   protocol, which details the treatments

19   administered (example, form, dosage

20   frequency), the clinical or biological

21   endpoints (example, lab value, patient's

22   quality of life, time to remission, time

23   to a toxicity event), the study patient

24   population, and other clinical and

Confidential Information - Subject to Protective Order

1   statistical considerations."

2           Those are exact sentences in

3   your two reports, correct?

4       A.    Yes, sir.

5       Q.    Next, in valsartan, you put,

6   "The trial is usually randomized and

7   blinded."

8           On the other side, you put,

9   "The trial is usually randomized, which

10  means patients are assigned randomly to

11  one of the study arms."

12          Very similar start of each

13  of those sentences, correct?

14      A.    Looks like different to me.

15  But it's okay if you say similar.

16      Q.    Well, your next sentence

17  actually has the second half of the

18  sentence from Taxotere.  You put, "Such

19  subjects are assigned randomly to one of

20  the study arms."

21          That's very similar to the

22  end of your Taxotere sentence, correct?

23      A.    Yes, sir.

24          MR. NIGH: Then let's go down

Confidential Information - Subject to Protective Order

1       to the "this avoids."

2   BY MR. NIGH:

3       Q.    You put, "This avoids

4   selection bias or other experimental

5   bias."

6           On the Taxotere, "This

7   avoids selection bias or other

8   experimental bias."

9           Those are exact sentences,

10  correct?

11      A.    Yes, sir.

12      Q.    Your next sentence in

13  valsartan, "When appropriately designed,

14  results from a well conducted randomized

15  clinical trial are regarded as a gold

16  standard in controlled settings to

17  evaluate the efficacy and safety of an

18  exposure."

19          On the Taxotere side, "When

20  appropriately designed, results from a

21  well conducted randomized clinical trial

22  are regarded as a gold standard in

23  controlled settings to evaluate the

24  efficacy and safety of treatment."

Confidential Information - Subject to Protective Order

1        Those are almost identical,

2   correct?

3        A.    Yes, sir.

4             MR. NIGH:  Now, let's turn

5        to, in your valsartan report, Page

6        19.  Let's look at Paragraph 18 of

7        Taxotere.  And let's look at

8        page -- Paragraph 18 of Taxotere

9        and Paragraph 31 in valsartan.

10  BY MR. NIGH:

11       Q.    At 31 you say, "Even if we

12  accept Dr. Madigan's criteria with a

13  false positive of .05 as an arbitrary

14  threshold value."

15            And then I want to direct

16  your attention to, "This procedure was

17  generally used to establish the so-called

18  statistical significance of a result when

19  testing a single clinical endpoint in a

20  single study."

21            Do you see that?

22       A.    Yes, sir.

23       Q.    Then in 18 you put, on the

24  second part of that, after the comma, "Is

Confidential Information - Subject to Protective Order

1    typically used by a study investigators

2    and statisticians to establish the

3    statistical significance of a report when

4    testing a single clinical endpoint in a

5    single study."

6                    Do you see that?

7          A.    Yes, sir.

8          Q.    Do you see how both of those

9    sentences are similar?

10         A.    That's the basic principle,

11   sir.  This is a statistical principle.

12         Q.    Next, let's have -- sorry.

13   Go ahead.

14         A.    This is a basic, like, a

15   textbook language.

16         Q.    On 31, the second sentence.

17   "This level can be very liberal, i.e.,

18   can result in statements of statistical

19   significance when none exist, if multiple

20   statistical tests and/or studies are

21   examined simultaneously."

22                    On the right side, "The 5

23   percent level of significance for

24   hypothesis testing can be too liberal,

Confidential Information - Subject to Protective Order

1  can result in statements of statistical

2  significance where none exist if multiple

3  endpoints and/or studies are examined

4  simultaneously."

5            Do you see how those

6  sentences are almost identical?

7       A.    Yes, sir.

8       Q.    And this is in response to

9  criticizing Dr. Madigan in looking at

10  multiplicity, correct?

11       A.    You know, sir, this is very

12  interesting, because Dr. Madigan was the

13  other side for the Taxotere.

14            He actually utilized the

15  same methodology, observational study, in

16  Taxotere.

17            So those two legal cases,

18  Dr. Madigan's reports, yeah, very

19  similar.  So we have the similar

20  concerns, right.  That's basically -- he

21  is violating the fundamental statistical

22  principles to do his analysis.

23       Q.    Let me see if I have this

24  right, because I think what you're saying

Confidential Information - Subject to Protective Order

1    is his reports look almost identical.

2                But have you looked at the

3    report in Taxotere and looked at his

4    report in valsartan?  Have you seen that

5    they're actually very different?

6         A.    No, sir.  I'm trying to say

7    he used the same statistical principle to

8    analyze both legal cases.

9                And both have had the same

10   problem, a basic fundamental problem,

11   against the statistical principles.

12               So I use the same language.

13   I say, well, in the Taxotere, we already

14   raised the issue.  And you didn't answer

15   very well.  Why do you want to use the

16   same flawed argument in a new case?

17        Q.    Well, it's actually that you

18   commonly criticize experts for not using

19   or looking at multiplicity.

20               This is a common theme

21   across your expert reports.  It's not

22   just for Dr. Madigan.  We're going to

23   look at Celebrex and we're going to look

24   at several others.  You commonly raise

Confidential Information - Subject to Protective Order

1    the issue of multiplicity, because any

2    time someone is looking at results from

3    single studies, you want to make it a

4    multiplicity issue, correct?

5              MR. MERRELL:  Objection to

6         form.

7              THE WITNESS:  It's not for

8         me, sir.  If you check FDA's

9         principle of drug approval

10        process, they don't allow you to

11        use a single study or multiple

12        endpoint, right, without a

13        multiple adjustment.  Right.

14        Everyone knows.

15              And in New England Journal

16        of Medicine recently, saying you

17        cannot reporting so many different

18        P-values, if different endpoint

19        anymore.  You know, you can see

20        the latest articles published in

21        New England Journal of Medicine,

22        they don't report P-value

23        repeatedly for primary endpoint,

24        secondary endpoint, or different

Confidential Information - Subject to Protective Order

1    endpoint.

2           They said no way.  You are

3    going to violate the multiple

4    comparison principle.  It's not

5    for me -- you know, for me only,

6    sir.  It's actually fundamental

7    issue of the statistical methods,

8    right.

9           If you look at so many

10   things all together, and even

11   there is nothing cooking, nothing

12   going on, by chance, if you use

13   the same rule, like a .05 as a

14   threshold value, we actually have

15   lot of misinformative result or

16   misleading conclusions.

17          That's what my point.

18   BY MR. NIGH:

19          Q.    All right.  Well --

20          A.    It's not only for -- it's

21   actually from other agencies.  And you

22   can check easily, you know, the FDA's

23   website.  The book I cited by Furberg,

24   right, you just mentioned this book,

Confidential Information - Subject to Protective Order

1   right.  Everyone is worried about the

2   multiple comparison issues.

3          Q.    Well, I'm glad you raised

4   that.  You raised two different

5   references or two different societies,

6   the FDA and The New England Journal of

7   Medicine, correct?

8          A.    Yes, sir.

9          Q.    Now, aren't you aware that

10  the FDA says that it's improper to use

11  Bonferroni when looking at safety issues?

12              MR. MERRELL:  Objection to

13          form.

14              THE WITNESS:  I don't know

15          exactly what FDA's principle of

16          looking at safety endpoint with a

17          document or not.  I don't know.

18  BY MR. NIGH:

19          Q.    Do you recall -- you just

20  told me the FDA when they're looking at

21  the principle of drug approval, that they

22  will use multiplicity.  But do you

23  realize the FDA has actually condemned

24  the use of Bonferroni when looking at

Confidential Information - Subject to Protective Order

1    safety issues?

2         A.    Well, I think what I'm

3    trying to say for most NDA, which is new

4    drug applications, FDA insist that we

5    need to apply a multiple -- the

6    adjustment, comparison adjustment.

7              I believe in some trials

8    they use safety endpoint, which is no

9    surprise.  For example, you want to study

10   anti-diabetes drug, the heart attack,

11   stroke, CV death are the safety endpoint,

12   right.  So in that case, it's a safety

13   endpoint.

14             And I believe FDA also

15   insists that you needed to make

16   adjustment for multiple comparisons.

17        Q.    So you're not aware then

18   that the FDA has said that it's improper

19   to use Bonferroni multiplicity testing

20   when looking at safety issues?  Do you

21   know one way or the other?

22             MR. MERRELL:  Objection to

23        form.

24             THE WITNESS:  I said -- sir,

Confidential Information - Subject to Protective Order

1       anti-diabetes drug, you usually

2       would want to conduct a safety

3       trial to see the anti-diabetic the

4       drug would increase the MI,

5       stroke, or CV death.  That's

6       actually the safety endpoint.

7            And for this endpoint,

8       everybody knows what's called,

9       MACE, M-A-C-E, the major

10      cardiology -- cardiovascular

11      event, and we do need a multiple

12      comparison.

13           I believe in FDA's position,

14      they also like to have the

15      multiple comparisons.

16           But for your case, for

17      example, valsartan impurity, I'm

18      not for sure FDA has experienced

19      dealing with this kind of

20      situation yet.  It's pretty new,

21      right.  So I don't know what their

22      position, is.

23           I cannot speak with FDA.  I

24      am not expert in regulatory

Confidential Information - Subject to Protective Order

1        science.  I just use my basic

2        statistical principle to share

3        with you, even for safety

4        endpoint, if you don't take care

5        with the multiple comparison,

6        we're going to have a lot of false

7        positive claims.

8              That means the treatment

9        probably is safe, but because you

10       don't make adjustment, you find a

11       lot of toxicity models.

12             So that's a concern, right.

13       It's not really separated from

14       efficacy endpoint from a safety

15       endpoint.  I believe we should

16       apply similar principle to safety

17       and efficacy endpoint altogether.

18  BY MR. NIGH:

19       Q.    I understand your opinion is

20  that you should apply multiplicity to

21  safety endpoints.  I'm not asking you

22  about that.

23             You raised the FDA as one of

24  your references.  I'm now asking you

Confidential Information - Subject to Protective Order

1    about the FDA and Bonferroni

2    specifically.

3              Hasn't the FDA weighed in,

4    or are you aware of whether or not the

5    FDA has weighed in on whether or not it's

6    inappropriate to use Bonferroni when

7    looking at safety issues?

8         A.    I don't know, sir.  We've

9    already explored the Bonferroni

10   adjustment has been used by FDA

11   regulatory people.  We can find out.

12        Q.    But I'm here today asking

13   you.  You raised FDA, and I'm here today

14   asking you about your opinions.

15             You haven't seen anything

16   where the FDA says it's okay to use

17   Bonferroni for safety issues, correct?

18             MR. MERRELL:  Objection to

19        form.

20             THE WITNESS:  Well, I said

21        it for antidiabetes drug, they may

22        use a safety endpoint.  That's one

23        example.

24   BY MR. NIGH:

Confidential Information - Subject to Protective Order

1      Q.    In terms of the New England

2   Journal of Medicine, have you seen

3   multiple studies that have criticized

4   using Bonferroni adjustment for safety

5   issues?

6              MR. MERRELL:  Objection to

7         form.

8              THE WITNESS:  I cannot speak

9         with New England Journal of

10        Medicine.  They just issue a

11        guideline for statistical

12        analysis.  They said, well, all

13        the endpoints.  They didn't say

14        efficacy or safety endpoint by the

15        way, which we can go on the

16        website and look, right, to look

17        at carefully.

18             They are simply saying,

19        look, you have one study, you have

20        to tell me for primary endpoint

21        which is safety or efficacy.

22             I don't know exactly the

23        language they use.  But they say

24        for primary analysis, you utilize

Confidential Information - Subject to Protective Order

1      the P-value.  Pre-specify the

2      level you want it to.  Then the

3      next level for secondary endpoint,

4      you are not allowed to apply the

5      same principle, .05 anymore to

6      claim for the secondary endpoint,

7      there is issue or not.  That's my

8      understanding.

9  BY MR. NIGH:

10      Q.    I'm sorry, it's your

11  understanding that for a secondary

12  endpoint that The New England Journal of

13  Medicine says that you're no longer

14  allowed to apply .05 for as your P-value

15  for the secondary endpoint.  That's your

16  testimony?

17          MR. MERRELL:  Objection to

18      form.

19          THE WITNESS:  They don't --

20      they don't allow you to report in

21      the P-value anymore.

22  BY MR. NIGH:

23      Q.    Okay.  But when they report

24  as the secondary endpoint, they still

Confidential Information - Subject to Protective Order

1    show the confidence intervals for those

2    secondary endpoints at a 95 percent

3    confidence interval.  Right?

4         A.    Yeah, the confidence

5    interval contains more information than

6    the P-value --

7         Q.    Right.

8         A.    -- the size difference.

9         Q.    But the confidence interval

10   reflects the P-value.  In other words, if

11   you can see in that confidence,

12   95 percent confidence interval that it

13   doesn't cross one, then you know you have

14   a P-value less than .05, correct?

15        A.    Well, if you want to

16   interpret it that way, you can do that.

17   But confidence interval would provide you

18   more information than across the

19   boundary, null value or not, right?  You

20   can tell me how big the confidence

21   interval is.  If it's too wide, you know

22   you don't have enough information to tell

23   the truth, right?

24              If the size of the estimate,

Confidential Information - Subject to Protective Order

1  like in this case, odds ratio or relative

2  risk is very small, you say, well, you

3  know, you have a large trial and

4  thousands, thousands of patients in

5  cardiovascular trial, right.  And no

6  matter what, how low your odds ratio,

7  like 1.01, you still have a statistical

8  significance.  Your confidence interval

9  still excluded here, one, for example,

10  odds ratio, but the question is, is that

11  really interesting physically or

12  clinically speaking.  Right?  That's

13  confidence interval will tell you, right.

14      It's much more information

15  than just simply P less than .05.

16      Q.    Okay.  When I asked you

17  about multiplicity and Bonferroni, you

18  raised FDA and you raised New England

19  Journal of Medicine.  I'm only talking

20  now for this question, multiplicity and

21  the use of Bonferroni.

22      Do you believe the FDA and

23  The New England Journal of Medicine

24  support the use of Bonferroni as when it

1    comes to safety issues?

2          A.    Sir, I give you one example

3    for MACE event.  I do understand, I

4    repeat it three times for you.  That's a

5    safety endpoint.

6          Q.    Have you --

7          A.    Do you understand what I'm

8    trying to say, sir?  I mean --

9          Q.    I do.

10         A.    -- it's a MACE -- okay.

11               So why don't you take that

12   example and if we actually can get the

13   FDA, being the review for the past five

14   years, let's think about how many FDA is

15   concerning about the safety endpoint,

16   right.  How do they handle the safety

17   endpoint.  But I don't know the detail at

18   all, right.

19               I am just sharing with you,

20   sir, based on my experience dealing with

21   FDA, they don't want us to apply P less

22   than .05 for every endpoint.

23               I don't know if they

24   restrict at the efficacy endpoint and

1  they don't care about the safety

2  endpoint, I don't know their positions,

3  sir.  This is a principle we do.

4  Personally, as you know well, I set up

5  for safety and efficacy endpoints

6  together.  We need it to be helpful,

7  right.  Don't make a large, very large

8  unacceptable false positive rate.

9              For example, let me give

10  one -- ten seconds, give you one example.

11  If you have three studies, right,

12  independent study, if you apply the P

13  less than .05, clearly there is an issue,

14  right.

15              Then apply the three

16  clinical trials independently, the false

17  positive rate will become 14 percent

18  instead of 5 percent anymore.

19              I say well, do you really

20  think 14 percent is acceptable to be the

21  false positive rate, which to me is very

22  high, right.

23              You can apply the safety

24  endpoint here too.  If you say three

Confidential Information - Subject to Protective Order

1   studies, study the efficacy issue, well,

2   let's apply .05 for each study.  If there

3   is study, P-value less than .05, then

4   let's be clear, there is a safety issue.

5           I said, sir, wait a second,

6   if you apply this principle, you are

7   going to make a mistake.  14 percent

8   is -- 14.5 percent by the way, okay, to

9   make a mistake.  Claim something unsafe.

10  But actually the drug is safe.

11          Do you think that's

12  acceptable?  If you think acceptable, or

13  society, or FDA accept it.  Well, I have

14  no argument, that's their position,

15  right.  I just share with you my

16  experience with FDA and also New England

17  Journal of Medicine.

18      Q.    I'm not asking about, you

19  know, just multiplicity issues at this

20  point.  My question is simply Bonferroni

21  now for this question.

22          Are you aware that the FDA

23  has criticized the use of Bonferroni when

24  looking at multiplicity issues?

Confidential Information - Subject to Protective Order

1      A.      FDA, I don't think that they

2 criticize using Bonferroni, right.

3 Bonferroni may be applicable to efficacy

4 endpoint and they probably little bit of

5 liberal for the safety.

6          But my point is that I don't

7 know how liberal you want allow safety

8 say, well, forget about any adjustment.

9          By the way, Bonferroni

10 adjustment is just one adjustment.  You

11 can have other adjustment.  You don't

12 have to stay with Bonferroni adjustment.

13          The principle is a multiple

14 comparison issue.  Do you think that

15 there is a problem applied the same rule

16 for every single endpoint for every

17 study, right, with the same P less than

18 .05.  I said well, be careful.  This

19 could be a lot of misleading conclusions.

20 That's what I'm trying to say, right.

21 Nobody would argue with me.  You cannot

22 do that.  Even Dr. Madigan cannot

23 dispute, say, well, there is a higher,

24 much higher unacceptable false positive

Confidential Information - Subject to Protective Order

1    rate if you don't take care of multiple

2    comparison problem.  He just argue, say,

3    well, maybe for safety you can relax a

4    little bit.  The question is how much

5    relaxation you are waiting to do for

6    safety endpoint, right.  We don't know.

7              You know, you can ask Dr.

8    Madigan's opinion.  Do you think he say,

9    well, forget about any adjustment.  Just

10   stay with .05, for anything, for safety.

11   Do you think that is okay or it is not

12   okay?  Well, I'm not in position to

13   educate Dr. Madigan.  He knows this very

14   well.

15       Q.    I didn't ask you about

16   Dr. Madigan.  I simply -- and you gave me

17   a lot of information that I didn't ask

18   about.

19              So what I asked was, are you

20   aware that the FDA has criticized the use

21   of Bonferroni when looking at

22   multiplicity issues related to safety.

23              MR. MERRELL:  Objection to

24        form.

Confidential Information - Subject to Protective Order

```
 1                 THE WITNESS:  I think FDA
 2         would ask us to make multiple
 3         comparison adjustment.  Bonferroni
 4         just one of the tool to make
 5         adjustments, sir.  Okay.  If
 6         you --
 7  BY MR. NIGH:
 8         Q.    I think --
 9         A.    Specifically if you want to
10  put your words in my mouth, if you think
11  FDA against to using Bonferroni
12  adjustment, I say no, they don't have any
13  document saying that you cannot use
14  Bonferroni adjustment.
15                 If you have some document
16  issued by FDA saying Bonferroni
17  adjustment is no good, I will be willing
18  to learn.  Everyday I learn something
19  brand new, which is nothing new to me,
20  right.  We should learn something new.
21                 So if you say somebody
22  saying, FDA saying no, you shouldn't do
23  Bonferroni adjustment at all for safety.
24  That's fine.  That's their opinion,
```

Confidential Information — Subject to Protective Order

1    right.

2                  I said, well, look, whatever

3    you want to claim, that's regulatory

4    agency's claim.  I just speak for myself.

5    I say, well, my experience with FDA they

6    want to make multiple comparison

7    adjustment.

8                  But you say, are they

9    against using Bonferroni.  I said well,

10   where is any document.  They say we don't

11   like Bonferroni adjustment for safety

12   endpoint.  If you have this document I'd

13   be very happy to read it, sir.

14        Q.    It sounds to me from that

15   answer that you're not aware of any

16   document or any situation where the FDA

17   has criticized the use of Bonferroni when

18   looking at safety issues; is that

19   correct?

20        A.    Well, that's my knowledge.

21   I don't know where and when the FDA has

22   this issued such a statement or position,

23   right.  I don't know, sir.

24        Q.    Now let's take a look at --

Confidential Information - Subject to Protective Order

1    let's talk about New England Journal of

2    Medicine.  Are you aware of studies that

3    criticize the use of Bonferroni when

4    looking at safety issues?

5              MR. MERRELL:  Objection to

6         form.

7              THE WITNESS:  I don't know

8         offhand right now any paper they

9         criticize.  I think the best way,

10         we can go to the website of New

11         England Journal of Medicine,

12         right.  They have so-called

13         guidance for statistical analysis.

14         I know most associate

15         editors of statistics in New

16         England Journal of Medicine, they

17         all my colleagues at Harvard,

18         right, so we can easily get their

19         opinion and say what is the

20         position of New England Journal of

21         Medicine, right.

22         But first, sir, you can

23         Google their website.  They have

24         clearly stated what we should do

Confidential Information - Subject to Protective Order

1          from now on handling this

2          secondary endpoint.

3                 Like you said very well, we

4          use confidence interval, insert a

5          P-value, right.  I think that is

6          one step improve our scientific

7          investigation.

8                 The P-value is useless

9          information for us.  Maybe pass

10         the first hurdle.  But then after

11         pass the first hurdle, you ask

12         yourself, how do you interpret

13         clinical utility of your findings,

14         right, instead of telling me the

15         P-value is .04.

16    BY MR. NIGH:

17         Q.    My question, was let's talk

18    about The New England Journal of

19    Medicine.  Are you aware of studies in

20    The New England Journal of Medicine that

21    criticize the use of Bonferroni when

22    looking at safety issues?

23                MR. MERRELL:  Objection to

24         form.

Confidential Information - Subject to Protective Order

```
 1            THE WITNESS:  So I said many
 2       times, I don't have the paper
 3       right now I can show that to you.
 4       But the best way to go into the
 5       website to look for the guidance,
 6       right.
 7  BY MR. NIGH:
 8       Q.    It sounds to me like you're
 9  not aware of any journal articles or
10  studies in The New England Journal of
11  Medicine that criticize the use of
12  Bonferroni when looking at safety issues;
13  is that correct?
14       A.    Well, I don't know any paper
15  I know.  But I'd be happy to learn.
16       Q.    When you put your expert
17  report together, where you insisted upon
18  the use of Bonferroni for the data in
19  valsartan, did you do any research to see
20  whether or not that has now been
21  criticized in journal articles, or by
22  regulatory agencies when looking at
23  safety?
24            MR. MERRELL:  Objection to
```

Confidential Information - Subject to Protective Order

1        form.

2              THE WITNESS:  Well, that was

3        not in my assignment.  As you

4        noted very well, in several of my

5        reports, in the legal cases, I

6        raised the same issue, right.  I

7        said well, be careful to interpret

8        the safety issue.  Because this

9        multiplicity.

10             I don't think Bonferroni is

11       really important role here.

12       Bonferroni is just one of the

13       tools.  If we are smart enough, we

14       can figure out another way to make

15       adjustments, right.  Not using

16       Bonferroni adjustment.

17             Bonferroni adjustment some

18       people say maybe a little bit

19       conservative.  I say well, that's

20       okay.  Some say you have a way to

21       make adjustment for multiple

22       comparison, please do it, right.

23       At least so we can see it.

24             And instead of a one-way

Confidential Information - Subject to Protective Order

1        street, don't make any adjustment.

2        For me that's not very good.

3    BY MR. NIGH:

4        Q.    You commonly raise

5    Bonferroni as your go-to multiplicity in

6    many of your expert reports, correct?

7        A.    Yeah.  That's the obvious

8    way, straightforward way to handle

9    multiple comparisons, sir.

10        Q.    Well, actually false

11    discovery rate is used much more often.

12    False discovery rate computations are

13    used much more often when looking at

14    safety issues than Bonferroni, correct?

15        A.    I don't know much about

16    discovery rate, sir.  That's another

17    school of thought.  And I think that they

18    are essentially equivalent to using

19    P-value.  Just using different scale.

20        Q.    And also Fisher pooling is

21    one of the more -- much more common ways

22    of looking -- or looking at multiplicity

23    across clinical studies, correct?

24        A.    No, sir --

Confidential Information - Subject to Protective Order

1              MR. MERRELL:  Objection --

2              MR. NIGH:  Sorry.  Let's

3      strike that question.  Sorry.

4      Strike that question, please.

5              THE WITNESS:  Okay.

6  BY MR. NIGH:

7      Q.    And also Fisher pooling is

8  used much more often when looking at

9  safety issues than Bonferroni, correct?

10      A.    No, sir.  You misunderstand

11  Fisher pooling P-value now.  Fisher

12  P-value pooling is very similar to

13  meta-analysis.  They have several

14  studies, each study has a P-value.  They

15  wound up pooling that P-value across

16  several studies, getting a global

17  P-value.  Okay.  So that's similar to

18  methodology now.

19              So the -- you raise the

20  multiple comparison, is not really

21  similar to meta-analyses.

22              So, I'm sorry, I probably

23  missed your point.  But a pooling,

24  Fisher's pooling is quite different

Confidential Information - Subject to Protective Order

1    compared with multiple comparison

2    problem.

3            Q.     Fisher pooling allows you to

4    look at the rates of effect across a

5    collection of studies, correct?

6            A.     Yeah.  That meta-analysis,

7    essentially.

8            Q.     It's similar to a

9    meta-analysis, correct?

10           A.     Yeah.  So it is orange and

11   apples you are talking about here now,

12   right.  Before you are talking about

13   multiple studies looking individually.

14   Now you say wait a minute, let me pool it

15   all together now.  That's a different way

16   to answer your question, right.

17           Q.     Those are both -- those are

18   both ways to look at false positive rate.

19   You can look at Fisher pooling across a

20   pool of studies to look to see if that

21   Fisher pool rate still shows an effect

22   for the question and answer, correct?

23           A.     That's a meta-analysis, sir.

24           Q.     Now, you didn't choose to do

Confidential Information - Subject to Protective Order

1    a false positive rate in your opinion at

2    all, correct?

3           A.     No.   Because it didn't

4    matter considering the discovery rate.

5    My assignment is not really creating new

6    animals for you guys to evaluate, right.

7    So I stay with the P-value Dr. Madigan

8    used.

9           Q.     My problem here, I actually

10   worded the question wrong.

11                 You didn't choose to do a

12   false discovery rate in your opinion at

13   all, correct?

14          A.     Because Dr. Madigan didn't

15   do that either.

16          Q.     In fact, you chose the most

17   conservative or what has been widely

18   criticized for safety issues as the most

19   conservative approach for multiplicity,

20   for measuring multiplicity, correct?

21                 MR. MERRELL:  Objection to

22         form.

23                 THE WITNESS:  Sir, I

24         don't -- I don't understand your

Confidential Information Subject to Protective Order

1           language.  Why do we criticize the
2           Bonferroni adjustment?  What is
3           the -- what are you talking about,
4           why are you criticize?
5   BY MR. NIGH:
6           Q.    Sir, again, you haven't
7   reviewed any studies that criticize using
8   Bonferroni?  Not even just in the New
9   England Journal of Medicine.  But that
10  criticize using the Bonferroni adjustment
11  when looking at multiplicity issues.  You
12  haven't reviewed studies on that in
13  regards to safety?
14          A.    Well, sir, you have a
15  different school of thought, right, in
16  statistics even.  This is like your legal
17  profession.  There are so many different
18  ways to actually make a decision, right.
19              People have a different way
20  to make adjustment for multiple
21  comparisons.
22              You know, Bonferroni is one
23  of this, right.  Obvious,
24  straightforward, commonly used adjustment

Confidential Information - Subject to Protective Order

1    tool.  You can use the other adjustment,

2    right, if you wanted to.

3              I just choose one to

4    illustrate, this can be problematic if

5    you don't make multiple adjustment.  So

6    my point is that multiple comparison

7    adjustment, I'm not to say you should

8    have used always a Bonferroni adjustment.

9    If you don't like Bonferroni adjustment,

10   you can use alternative way.

11             But the question is, should

12   the way take care of multiple comparison

13   problem or not.  That's the issue.

14        Q.    Right.  You chose, in terms

15   of your example, Bonferroni, which would

16   actually be the most conservative way of

17   looking at multiplicity, a/k/a, the

18   friendliest measure to pharmaceutical

19   companies when it comes to looking at

20   safety issues, right?

21        A.    I'm not for sure when you

22   say conservativeness, this is just one of

23   the tools, sir.  I repeat it so many

24   times.  I said you don't have to use

1  Bonferroni adjustment.  My point is you

2  have to make some adjustment.  I just

3  give you example.

4           If you use Bonferroni

5  adjustment, then what kind of threshold

6  value you should use, right.  If you have

7  a smaller smarter way to handle multiple

8  comparison problem, I have no issue, sir.

9  At least you have to address this issue

10  of multiple comparison, right.  It

11  doesn't matter if it is an efficacy

12  endpoint or safety endpoint, right.  Both

13  are very important to us.  You don't want

14  to criticize the impurity in valsartan

15  has some issues.

16           If you look at 100 studies,

17  just happen to say one study show up with

18  a P-value less than .05, you say wow,

19  look, this is evidence.  It can be

20  helpful to interpret this, right, because

21  you're looking so many studies both

22  together, right.

23           If you stay with the same

24  rule for each study, you are going to

Confidential Information - Subject to Protective Order

1    make some wrong conclusions.  That's what

2    I said in my report.

3              I didn't say you have to use

4    Bonferroni.  I just say if you use the

5    Bonferroni, this is the threshold value

6    you should use, right.

7              If you disagree with this

8    approach, that's fine.  But my point is

9    you should make some adjustment, right.

10       Q.    The example that you give in

11   many of your expert reports, Bonferroni,

12   would actually be the most conservative

13   way of looking at multiplicity, a/k/a the

14   friendliest measure to pharmaceutical

15   companies when it comes to looking at

16   safety issues, correct?

17              MR. MERRELL:  Objection to

18         form.

19              THE WITNESS:  Well, I'm not

20         quite sure if this is most

21         conservative way to do it.  I

22         don't know.  Maybe.  But I'm --

23         will be very happy to learn what

24         is alternative way to dealing with

1    your present case, right, handling

2    multiple comparisons.

3  BY MR. NIGH:

4        Q.    Have you not seen numerous

5  studies talking about using false

6  discovery rates instead of Bonferroni

7  when discussing safety issues?

8        A.    Well, there are some.  But

9  again, I said before, sir, Dr. Madigan

10  didn't use discovery rate.  So he used

11  the P-value, right.  So my assignment say

12  could you actually review what

13  Dr. Madigan did in his report.  That's

14  what I'm responding to the report.

15            I'm not -- I was not in the

16  position to create another quantity for

17  discovery rate.  And because Dr. Madigan

18  didn't use it, why should I bother to go

19  to that route.

20        Q.    Well, what you've done is

21  you've cherry-picked the most

22  conservative measure, Bonferroni, when

23  looking -- as an example, when looking at

24  multiplicity issues.  And this is the

Confidential Information - Subject to Protective Order

1    same cherry-picking you've done for many

2    of your past expert reports, just looking

3    at Bonferroni as opposed to other

4    measures of multiplicity.

5              MR. MERRELL:  Objection to

6         form.

7              THE WITNESS:  I strongly

8         disagree with your word

9         "cherry-picking."  I didn't look

10        at the data to choose my

11        procedure, right.  That's what you

12        call cherry-picking.

13             I actually -- before I even

14        had Dr. Madigan report, I said you

15        should make some adjustment.

16        Bonferroni is one of the tool,

17        right.  That's not a cherry-pick

18        answer.  That's pre-specified,

19        right.

20             If you disagree with me

21        about Bonferroni adjustment,

22        that's fine.  Nobody said that you

23        cannot do that.

24             My point in my report, I say

Confidential Information - Subject to Protective Order

1          you need to make some adjustment

2          for multiple comparison.  If you

3          can show us through the discovery

4          rate to say, oh, this is a better

5          way to make adjustment, I say

6          fine, let's look at it, right.

7          Present it to us.  We're going to

8          look at it.

9     BY MR. NIGH:

10         Q.    You gave an example earlier

11    where you talked about three studies, and

12    if there was a, you know, P-value of .05.

13              And you said your chances of

14    getting one out of those three studies

15    would be 14 percent.  Do you remember

16    that example?

17         A.    Yes, sir.  It's in my report

18    by the way.

19         Q.    Right.

20              What are the chances of two,

21    if two of the three had a positive

22    finding, what would those chances be?

23         A.    Oh, it's very easy to do.

24    It's 1 minus .95 times .95.  If you had a

Confidential Information - Subject to Protective Order

1    calculator, you can do very quickly.

2          Q.    Right.  When you're looking

3    at more than one positive rate, there's a

4    way to calculate that fairly quickly,

5    right?

6          A.    Yeah.

7          Q.    Okay.  It's no longer

8    14 percent at that point, correct?

9          A.    Yeah.  If you have two

10   studies, I don't know, it's maybe

11   10 percent instead of 5 percent, right.

12   If you have four studies, then suddenly

13   it become 20 percent, right.  So the more

14   study that you're looking at, the higher

15   the positive rate now.

16          Q.    Right.  But you're telling

17   me right now -- I mean two positive

18   results.  I'm not talking about one

19   positive out of three.  Two positives out

20   of three.

21                Wouldn't that be important

22   to measure, that -- if you had two out of

23   three, that's a different measurement

24   than one out of three in terms of

Confidential Information - Subject to Protective Order

1    measuring the effect, though, right?

2         A.    Yeah, that's a fair --

3    that's a fair question.  But my position

4    is not really say out of the three there

5    are two truly positive result, right,

6    supposedly.

7              Now, you are asking me, say,

8    what is the point error now.  This is a

9    very interesting question now, right.

10   You say well, your null hypothesis go

11   along with -- the three trials are really

12   -- are not null, right, meaning there's

13   no difference between the two groups.  I

14   said, well, at least the one guy, he's

15   talking it up, he's saying what is the

16   chance, I say 14 percent.  Then you said,

17   what is the chance if two guys popped up.

18   I don't know.  We have to sit down and

19   figure this out.

20        Q.    Right.  When you're looking

21   at Bonferroni, Bonferroni is focused, in

22   terms of its math and its ideals, when

23   thinking about one false positive out of

24   a collection of studies, correct?

Confidential Information - Subject to Protective Order

1    A.    Yeah.  At least one.  You

2  pop it up, you claim positive.

3    Q.    But when there's two or

4  more, that's one of the main criticisms

5  of Bonferroni, is that dividing the

6  P-value by the number of studies, when

7  there's two or more positive findings,

8  would cause Bonferroni to be much too

9  conservative, right?

10    A.    Sir, you actually changing

11  the questions now, right.

12        My point I say in my report,

13  I said it would be helpful when you're

14  dealing with multiple studies, multiple

15  endpoints, to help with multiplicity

16  issue.

17        I give you one example.  I

18  said, well, if there is no difference

19  across all the studies, all the

20  endpoints, right, what is the chance

21  you're going to claim something is

22  positive.  I said this is the number,

23  right.  But if you say wait a minute, I'm

24  changing my story now.  I say out of

Confidential Information Subject to Protective Order

1    three study, I have two positive, more

2    than .05, then you're asking me, say hey,

3    what is the false positive rate now.  You

4    know, that change the story now, right.

5                  You can go on forever.  You

6    can say three positive out of three, that

7    is a different story now.  That is not

8    exactly what I said in my report.

9         Q.    I understand it's not what

10   you put in your report.  You gave the

11   hypothetical of one out of three.

12                  My point is, when it's two

13   out of three, it changes the findings

14   dramatically, it's no longer 14 percent.

15   It's much, much higher -- I mean much,

16   much lower that those chances would

17   happen, that you'd get two out of three

18   by chance when the P-values -- two out of

19   three studies have a P-value of less than

20   .05.  That'd be much lower than 14

21   percent, correct?

22        A.    Yeah, that's a fair thing to

23   say, yes.

24        Q.    In fact, you can do it off

Confidential Information - Subject to Protective Order

1   the top of your head, but that would

2   actually be much less to get two out of

3   three that are .05 or less, that -- that

4   chances of that pool would actually be

5   less than .05?

6          A.    I don't know the

7   mathematics, sir.  You are too smart for

8   me to calculate it so quickly.  I don't

9   know.

10         Q.    Well, when you're looking at

11  a rare event, and most of the -- when

12  you're looking at a rare event of

13  something less than .05 and most of the

14  events in a pooled data are coming up

15  positive as that rare event, in that

16  study, we know then that the -- when you

17  calculate a pool of data, that it's going

18  to be lower than the initial .05, right?

19  I mean that's just a general statistic,

20  general statistics statement.

21         A.    Yes, you are absolutely

22  right.  If everything go to the direction

23  you like, right, you're combining several

24  studies, of course, you can enhance your

Confidential Information - Subject to Protective Order

1    argument.  Unfortunately, if you look at

2    all the meta-analysis Dr. Madigan cited,

3    on the left-hand side, right-hand side of

4    null value, right, back and forth, back

5    and forth.  And it turns out the odds

6    ratio is really not that interesting,

7    1.2, you know, something lower than 2,

8    and, you know, that's the issue, right.

9    You're combining the negative study with

10   a positive study, hopefully the positive

11   study will dominate in your result.  You

12   know, people can play all kinds of games,

13   right.  I mean, it's unfortunate, right.

14         Q.    You know, right now I wasn't

15   asking about Madigan's report.  But it's

16   interesting that you brought that,

17   because you just brought up the

18   meta-analysis.

19              Let's set gastric cancer

20   aside in terms of the dietary studies.

21   Let's actually focus on lung cancer.

22              Did you have an opinion on

23   the lung cancer dietary studies?

24         A.    Can you show me the report

Confidential Information - Subject to Protective Order

1    so I can refresh my memory?

2         Q.    Well, lung cancer had an

3    effect size of 3.1, P-value of less than

4    .001 in the De Stefani study.  Goodman,

5    for men, had an effect of 3.3, P value of

6    .006 for males.  For females, Goodman had

7    an effect size of 2.7, .004.  And then

8    for Lowe, effect size of 1.1, P-value of

9    .6.

10         So can't you look at that

11   data and immediately realize that the

12   pooling of that data would be less -- a

13   P-value of less than .05?

14        A.    You are putting all the

15   study together you're saying, sir?

16        Q.    Yes.  For lung.

17        A.    Are they -- sorry, are they

18   pretty much in a similar population or

19   are they different population?

20        Q.    Well, do you know?

21        A.    Sorry, sir?

22        Q.    Do you know?

23        A.    Say it again?

24        Q.    Do you know?

Confidential Information - Subject to Protective Order

1          A.    I don't -- I don't know.

2    You just raised the issue.  I didn't

3    raise it, you know, saying that checking

4    every study they are similar or not.  The

5    meta-analysis are combining.

6               First thing you need to say,

7    well, you know, they are combinable,

8    right.  Some actual studies it is not

9    combinable.  So -- but people actually

10   just are lumping all the orange and

11   all -- the apples altogether, right,

12   getting a summary of statistics.  And

13   using that summary of statistics in a not

14   right way in my opinion, right.  So you

15   can combine it any way you want it to.

16              The things that are if you

17   have any negative trial for lung cancer,

18   yes, you do have, right, but if you are

19   only picking up the highly significant

20   event reporting to us, I don't know.

21   Because Dr. Madigan didn't show all the

22   negative trials in the lung cancer,

23   right.

24          Q.    I'm sorry, do you believe

Confidential Information Subject to Protective Order

1   there is another study that is negative

2   for dietary studies for lung cancer other

3   than what he reported?

4         A.    You just said -- the last

5   one, 1.1 or some alteration, you just

6   told me.

7         Q.    You give that a negative,

8   that's still an increase, it's more than

9   one, correct?

10        A.    Sorry, sir.  Using the

11  P-value of what, .6, something like that?

12        Q.    .6.  Yeah, 1.1 is still an

13  increased risk.

14        A.    Oh boy, I tell you, you

15  mixed the fundamental issue about the

16  inference of statistics, right.  You

17  cannot say my point estimate is 1.1, I've

18  got a problem, right.  Besides you have

19  those observational study, 1.1 odds ratio

20  can be easily changed to less than one if

21  you use different confounders in

22  adjustment.  Everybody knows that.

23              You have measurable

24  confounders.  If you just happen to

Confidential Information - Subject to Protective Order

1    measure those confounders, suddenly odds

2    ratio could be .8, .7.  So the very low

3    odds ratio really doesn't carry too much

4    weight, right.

5              That's why -- you guys have

6    a very interesting book.  I know you know

7    this book very well.  Called scientific

8    evidence, right, for lawyers, something

9    like that.

10             In that book, actually it is

11   written by a lawyer actually many years

12   ago.  He say, okay, this is our Bible.  I

13   look at it, it's very interesting.

14             If the odds ratio is less

15   than two, the guy said forget it, I'm not

16   interested.  I ask the lawyer, hey, why

17   are you using the threshold number two?

18   I said, listen, this is observational

19   study is all messed up already.  You make

20   all kinds of adjustment.  If you use a

21   different adjustment, if we can lower

22   odds ratio point estimate like you say,

23   1.1, right, I can easily swing around,

24   right.

Confidential Information - Subject to Protective Order

1          But if you have like five or
2    six odds ratio, then we don't have the
3    problem of robustness of your data.  This
4    actually, sir, this is the first
5    principle of the so-called Bradford Hill
6    criterion, right, for causation.
7          First one is that you need
8    to worry about the size of effect.  Not
9    just like the P-value, right.
10         Q.    You referred to it as a
11   negative study, that's why I asked you,
12   but negative would mean below one, in
13   terms of effect size when it comes to
14   statistics, correct?
15         A.    I would say it's a neutral
16   study.  It's not really called a
17   negative.
18         Q.    That's the reason I raised
19   it.  I don't disagree with you about the
20   amount of rate -- amount of weight to be
21   given to the effect size.  I raised it
22   because you used the word "negative
23   study," right?
24         A.    Okay, sorry.  I apologize.

Confidential Information - Subject to Protective Order

1  I use a negative word.

2      Q.    1.1 is technically an

3  increased risk, not statistically

4  significant in the study but it's still

5  technically an increased risk, correct?

6  I'm not talking about what inference to

7  be drawn from it.

8      A.    Well, if you don't have an

9  inference, then we just go home today.

10 You don't have to worry about anything

11 anymore, right.  Everything based on

12 point estimate, you make a decision, you

13 say wow, is that okay, judge.  You can

14 ask the court.

15     Q.    So you have three studies.

16 One is a 1.1 increased risk, not

17 statistically significant.

18          The De Stefani 3.1, more

19 than a doubling of the risk statistically

20 significant with a P-value of less than

21 .001.  And the other one, 3.3 increased

22 risk effect size with the P-value of

23 .0006.

24          You take those three

Confidential Information - Subject to Protective Order

1    studies, how do you view those three

2    studies together?

3            A.    How do I -- how do I do

4    that?

5            Q.    Yes.  How do you view those

6    three studies together?

7            A.    If I -- if I truly believe

8    those studies are well conducted and they

9    considered all the confounders,

10   adjustment, and it's a prospective -- now

11   be careful of the word "prospective,"

12   right, it's not a risk factor.  Okay?

13   Then I would say, yes, there's some

14   strong signal to show us, right, for this

15   case.

16           I don't believe those

17   studies are prospective.  Maybe I'm

18   wrong.  But if my memory tells me they

19   were not prospective.  Okay.

20           Q.    You don't believe that the

21   De Stefani or Goodman studies were

22   prospective studies?

23           A.    Say it again, I'm sorry,

24   sir.

Confidential Information - Subject to Protective Order

1          Q.     You don't believe that the
2    De Stefani or the Goodman -- the De
3    Stefani lung dietary study and the
4    Goodman dietary study that Dr. Madigan
5    cited, you don't believe that those were
6    actually prospective studies?
7          A.     Well, we can check easily.
8    If you put on the papers on the screen we
9    can look very carefully --
10         Q.     I'm asking you -- you viewed
11   these studies.  I'm asking you your
12   knowledge, before we look at the studies,
13   you don't believe that those were
14   prospective studies?
15         A.     Well, I cannot say yes or
16   no.  But we can easily check.
17         Q.     How about colorectal cancer.
18   You get a study that shows 2.1 increased
19   risk.  You get another study that shows
20   1.5 increased risk, P-value of .001, and
21   another study that shows 1.4 increased
22   risk, P-value .005.
23                How do you compare those
24   studies as a pool of studies?

Confidential Information - Subject to Protective Order

1            MR. MERRELL:  Objection to

2       form.

3  BY MR. NIGH:

4       Q.    Those results?

5       A.    I would -- I would say the

6  same thing, sir.  It is well conducted,

7  well balanced with a start of baseline

8  factors, prospectively I then would agree

9  with you, there is some signal indicated,

10 there is a chance the incidence increase,

11 right.

12      Q.    Okay.  Let's go back to the

13 two studies, I mean the two reports on

14 the screen.

15            Okay.  We were in Number 31.

16 And I draw your attention down to using

17 the 5 percent rule.  If we can go down to

18 Taxotere on the right side using the

19 5 percent rule.  Yep.

20            On the valsartan side, you

21 put "Using the 5 percent rule for

22 claiming statistical significance to

23 analyze simultaneously a large number of

24 tests in a study will yield a high rate

1    of false positive findings."  On the

2    right side, you put "Using the 5 percent

3    rule for claiming statistical

4    significance to analyze simultaneously a

5    large number of safety endpoints in a

6    study will yield a high rate of false

7    positive findings."

8              Those are identical

9    sentences in the two reports, correct?

10         A.    Yes, sir.

11         Q.    Next it says, "Often the

12   overall false positive rate could be as

13   high as 20 percent or more.  That is, a

14   very high chance of finding an exposure

15   is not safe with respect to control when,

16   in fact, there is no difference between

17   the two groups."

18             Let's take a look at

19   Number 32.  You have -- and let's go to

20   Paragraph 19 for Taxotere.  "A standard

21   procedure to handle the multiple

22   comparison issue is to use the Bonferroni

23   adjustment."

24             That's what you put in

Confidential Information - Subject to Protective Order

1    valsartan.

2            And in Taxotere you put "A

3    standard procedure to handle the multiple

4    comparison issue is to use the Bonferroni

5    adjustment."

6            Those are identical

7    sentences, correct?

8        A.    Yep.

9        Q.    Next you put, "For example

10   if there are 50 different types of tests

11   conducted, the false positive rate is

12   5 percent, then for each individual test

13   we should use a false positive rate of

14   .1 percent, 5 percent divided by 50, to

15   assess whether there is a potential

16   signal on the safety issue" -- "safety

17   concern."

18           On the other report you put,

19   "For example, there are 50 different

20   types of adverse events considered in the

21   trial.  If the total false positive rate

22   is 5 percent, then for each individual

23   adverse event we should use a false

24   positive rate of .1 percent, 5 percent

1    divided by 50, to assess whether there is

2    a potential safety" -- "there is a

3    potential signal on the safety concern."

4                Those are identical

5    sentences, correct?

6          A.    Yep.

7          Q.    I'm sorry, I missed the very

8    first sentence, which says, "A standard

9    procedure to handle the multiple" -- oh

10   no.  We went over that.

11               Next is "The corresponding

12   confidence interval level should be

13   99.89 percent, which is 100 percent minus

14   1 percent" -- or ".1 percent."

15               And on the other report you

16   say, "The corresponding confidence

17   interval level should be 99.9 percent

18   (100 percent minus .1 percent.)"

19               Those are identical

20   sentences, correct?

21         A.    Yes, sir.

22         Q.    Turning to Paragraph 33, and

23   Paragraph 20, the next paragraph.  The

24   next paragraph in valsartan, and then the

Confidential Information - Subject to Protective Order

1    next paragraph in Taxotere.

2              Next you have "The problem

3    of inflation of a Type I error or

4    positive" -- "false positive rate becomes

5    much worse when we examine the results of

6    several independent clinical studies at

7    the same time with a Type I error rate of

8    .05 for each study."

9              In Taxotere you put "The

10   problem of inflation of a Type I error or

11   false positive rate becomes much worse

12   when we examine the results of several

13   independent clinical trials of the same

14   type with a Type I error rate of .05 for

15   each study."

16             Those are identical

17   sentences, correct?

18        A.    Yep.

19        Q.    In valsartan you put "For

20   example, suppose there are three

21   independent studies which compare the

22   exposure group with control."

23             In Taxotere you put "For

24   example, suppose there are two

Confidential Information - Subject to Protective Order

1    independent studies which compare

2    Taxotere."

3             Do you see that?

4        A.    Yep.

5        Q.    Similar but you've gone to

6    three in valsartan instead of two in

7    Taxotere, correct?

8        A.    Sorry, sir, I missed what

9    you are saying.

10        Q.    I said similar sentences

11    except for you've gone with three in your

12    hypothetical for valsartan and two in

13    your hypothetical for Taxotere, correct?

14        A.    Yep.

15        Q.    The next sentence is

16    "Suppose that we claim that there is a

17    statistical significant difference

18    between these two groups when the P-value

19    of any one of these three trials is less

20    than .05."

21             In Taxotere you put "Suppose

22    that we claim there is a significant

23    difference between these two groups

24    P-value of any of these two trials is

Confidential Information - Subject to Protective Order

1    less than .05."

2              Almost identical except for

3    you use three in -- three trials in

4    valsartan and you used two trials in

5    Taxotere, correct?

6         A.    Yeah.  Because Taxotere only

7    has two clinical trials available at that

8    time.

9         Q.    I see.

10              Next you put, "If we apply

11   this decision rule, the total Type I

12   error rate would be 14.3 percent.  That

13   is, even if there were no differences

14   between the exposure and control with

15   respect to cancer incidence, the chance

16   of claiming either the exposed or control

17   is harmful is more than 14.3 percent."

18              In Taxotere you put, "If we

19   apply this decision rule, the total

20   Type I error rate would be 9.75 percent.

21   That is, even if there were no

22   differences between Taxotere and control

23   with respect to alopecia events, the

24   chance of claiming either Taxotere or

Confidential Information - Subject to Protective Order

```
1    control is harmful is more than
2    "9.75 percent in at least one study."
3              Correct?
4         A.    Yep.
5         Q.    Those sentences are fairly
6    similar, except for in valsartan you're
7    looking at the hypothetical of three
8    trials, and in Taxotere you're looking at
9    the hypothetical of two trials, correct?
10        A.    Yep.
11        Q.    Interesting that you use the
12   same word "trials" for both valsartan and
13   Taxotere when valsartan doesn't have any
14   clinical trials.
15             Why did you use the word
16   "trial" there?
17        A.    A trial and the study, I use
18   interchangeable.
19        Q.    I see.
20             So in a observation study
21   you would call those trials?
22        A.    Well, it depend on your
23   definition of a trial, right.  If it a
24   trial, if it's a experimental study
```

Confidential Information - Subject to Protective Order

1    prospective, and observational, we don't

2    call it observational trial, we call it

3    observational study.

4           Q.    Well, there are no

5    experimental study prospectives in --

6    strike that.

7                 Next is, "This problem is

8    compounded if we apply the same rule to a

9    large number of studies."

10                And in Taxotere, you put the

11   same statement, exact same statement,

12   "This problem is compounded if we apply

13   the same rule to a large number of

14   studies," correct?

15          A.    Yep.

16          Q.    And next you put,

17   "Therefore, when we analyze multiple

18   studies and statistical tests

19   simultaneously, any conclusion of

20   toxicity must be carefully interpreted

21   due to the multiplicity of tests."

22                On the other side you put,

23   "Therefore, when we analyze multiple

24   studies simultaneously, any conclusion of

Confidential Information - Subject to Protective Order

1    toxicity has to be carefully

2    interpreted."

3              Those are similar sentences,

4    correct?

5         A.   Yeah.  I like to point out,

6    you see the words I use, "carefully

7    interpreted," right.

8              I didn't say you have to do

9    Bonferroni or not.

10             I just say, you have to be

11   carefully interpreted.

12        Q.   Okay.

13             MR. MERRELL:  Counsel, I

14        just wanted to talk about lunch.

15        We're getting sort of close to the

16        lunch hour.  I don't know what you

17        have, if you're moving to

18        something else or what times makes

19        sense.

20             MR. NIGH:  I think right now

21        is a good time to take a break.

22        How long do you guys want for

23        lunch?

24             THE VIDEOGRAPHER:  The time

Confidential Information - Subject to Protective Order

1         right now is 12:20 p.m.  We are

2         off the record.

3                   -  -  -

4              (Whereupon, a luncheon

5         recess was taken.)

6                   -  -  -

7              THE VIDEOGRAPHER:  The time

8         right now is 1:17 p.m.  We're back

9         on the record.

10             MR. NIGH:  Okay.  Let's pull

11        up LP-1562, your Celebrex report.

12        And let's put that side by side

13        with your valsartan report.

14   BY MR. NIGH:

15        Q.    We'll do similar what we did

16   with Taxotere.

17             First, though, in Celebrex,

18   Dr. Madigan wasn't on the opposite side

19   of you in Celebrex, correct?

20        A.    Honestly, I don't remember.

21   Sorry.

22        Q.    Do you remember who was on

23   the opposite side of you on Celebrex?

24        A.    If I read in my report, I

Confidential Information Subject to Protective Order

```
 1   can refresh my memory.  Right now I'm not

 2   quite sure.

 3          Q.    Does Dr. Milton Packer give

 4   you an indication?  Does that sound

 5   familiar?

 6          A.    Milton Packer is our side,

 7   is not opposite side.

 8          Q.    Oh, he's on your side.

 9   Okay.

10          A.    Yeah.

11          Q.    But you don't recall who was

12   on the opposite side of you in Celebrex,

13   correct?

14          A.    I think probably Dr. Nick

15   Jewel was one of those guys.

16          Q.    Who did you say?

17          A.    Nick Jewel out of Berkeley.

18   University of California, in Berkeley

19   campus.  J-E-W-E-L.

20          Q.    Okay.  But you don't recall

21   Dr. Madigan being on the opposite side of

22   you in Celebrex, correct?

23          A.    I vaguely remember he was.

24   But, you know, I'm not quite sure.
```

Confidential Information - Subject to Protective Order

1          Q.    Okay.   Let's take a look at

2    your report side by side with Celebrex.

3                 Now, in Celebrex, you were

4    also -- just like in Taxotere and for

5    valsartan, you were also retained by the

6    defendants who were pharmaceutical

7    companies in each -- in Celebrex as well,

8    correct?

9          A.    Yes.

10         Q.    Okay.   Looking at the

11   screen, remember we talked about the

12   Celebrex report, we can pull that up so

13   we can quickly see it here.   We looked at

14   this earlier today.

15                Do you recall that?

16         A.    Yes, sir.

17         Q.    Okay.   Celebrex report,

18   that's dated March 30th, 2007.   So that's

19   over 14 years ago, 14 and a half years

20   ago, correct?

21         A.    Yeah.

22         Q.    Okay.   Let's go to paragraph

23   17 in valsartan.   Let's look at Paragraph

24   8 in Celebrex.   We'll do what we did

Confidential Information - Subject to Protective Order

1    before, look at the side-by-side

2    comparisons.

3              Okay.  Valsartan says,

4    "Suppose that we were interested in a

5    rate of occurrence" -- "Suppose that we

6    were interested in the rate of occurrence

7    of a certain clinical event, for example

8    cancer, among subjects exposed to NDMA or

9    NDEA to their counterparts (control)."

10             Next number for Celebrex, 14

11   and a half years ago, you put, "Suppose

12   that we are interested in the incidence

13   rate of a certain clinical event, for

14   example CV events, among patients treated

15   with Celebrex relative to the

16   corresponding rate for patients who have

17   been exposed to the drug."

18             Those are similar

19   sentences, correct?

20        A.    Yeah.  I believe this is

21   using the same statistical principle,

22   right, dealing with a similar case.

23        Q.    Sure.  The next sentence

24   says, "In the first step we take a sample

Confidential Information - Subject to Protective Order

1    from a population of subjects exposed and

2    another sample from the population of

3    subjects who were not exposed."

4              Your next sentence in

5    Celebrex says, "To do this, we take a

6    sample from a population of patients

7    treated with Celebrex and another sample

8    from the population of patients who did

9    not receive Celebrex."

10             Similar sentences, correct?

11        A.    You know, by changing a

12   word, right.  You're in the first step

13   now, right.

14        Q.    I recognize you changed a

15   word.

16             The next sentence says,

17   "Assuming that these samples are valid

18   representatives of the two populations,

19   quantitative analytic methods can be used

20   to determine whether the exposed group

21   has higher, lower, or similar event rate

22   than for the control group."

23

24

Confidential Information - Subject to Protective Order

1          Your sentence in Celebrex

2   starts off the same way, "Assuming that

3   these samples are representative of the

4   two populations, statistical methods can

5   be used to determine whether the Celebrex

6   group has a different rate of CV events

7   than the non-Celebrex group."

8          Those are similar sentences,

9   correct?

10      A.    Yes.

11      Q.    Next, it says, "Since we

12  draw conclusions based on a subset of

13  subjects, any qualitative or quantitative

14  interpretation of the result, i.e.,

15  whether the rate is higher or not, is

16  subject to sampling error."

17          On the other one, you say,

18  "Since we draw conclusions based on a

19  subset of patients only, the" -- "any

20  qualitative or quantitative

21  interpretation of the result, i.e.,

22  whether the rate is higher or not, is

23  subject to so-called sampling error."

24          Very similar sentences,

Confidential Information - Subject to Protective Order

1    correct?

2            A.    Yes, sir.

3            Q.    In valsartan, you put, "That

4    is, the observed event rate may be higher

5    leading to a false" -- "a possible false

6    positive finding, or lower, leading to a

7    possible false negative finding, than the

8    true event rate in the population."

9                 In Celebrex, you say, "In

10   other words, the observed incidence rate

11   may be higher, leading to a possible

12   false positive finding, or lower, leading

13   to a possible false negative finding,

14   than the true incidence rate in the

15   population."

16                Very similar sentences in

17   the two expert reports, correct?

18           A.    Yes, sir.

19           Q.    Next you say, in valsartan,

20   "An efficient statistical method for

21   analyzing such data minimizes the chance

22   of making these two types of error."

23                In your Celebrex report, 14

24   and a half years ago, you say, "An

Confidential Information - Subject to Protective Order

1    efficient statistical method for

2    analyzing such data minimizes the chance

3    of making these two types of errors."

4                   Exact sentence in both of

5    those, correct?

6          A.     Is that wonderful?  Because

7    my principle is the same, right, for

8    14 years.

9          Q.     I understand.  Exact

10   sentence in both of those reports,

11   correct?

12         A.     What's wrong with that, sir?

13   I don't understand your point.  You can

14   go on for whole day to compare the notes.

15   I'm not quite sure where we're going from

16   here.

17         Q.     Do you understand my

18   question?

19         A.     I understand your question

20   perfectly.  But I'm trying to say that

21   the principle of statistical methods are

22   valid.  20 years ago, today, they are the

23   same old thing.

24         Q.     I understand what you're --

Confidential Information - Subject to Protective Order

1    what you're saying.  That's not my

2    question.

3              A.    Could I finish?  Could I

4    finish, please?

5              Q.    Sure.

6              A.    Can I explain that?  Is that

7    okay I finish?

8              Q.    My question is, are those

9    exact sentences in the two reports?

10   What's your answer?

11             A.    I responded to you, I'm glad

12   that the same principle applied to

13   several cases.

14             Q.    So is your answer, yes,

15   those are exact sentences in the two

16   reports?

17             A.    Yeah, no problem.  It's all

18   similar.  They all the same.  I don't

19   even understand why you repeat

20   everything, again, again, again.

21             Q.    Next sentence, "It is

22   important to know that, except for the

23   exposure to NDMA or NDEA, the exposed

24   subjects in the sample should be similar

1    to the subjects in the non-exposed sample

2    with respect to important observable or

3    unobservable confounders."

4            In Celebrex, "It is

5    important to know that, except for the

6    usage of Celebrex, ideally the Celebrex

7    users in the sample should be similar to

8    the patients in the non-Celebrex sample

9    with respect to important observable or

10   unobservable confounders."

11           Gives two examples.

12           Those are very similar

13   sentences again, correct?

14       A.    Yep.

15       Q.    Looking at the next --

16   Number 18.  And looking at Paragraph

17   Number 9.  Looking at the next paragraph

18   in valsartan and the next paragraph in

19   Celebrex.

20           It says, "After we have

21   determined how to draw" -- in valsartan,

22   "After we have determined how to draw a

23   valid sample from the population of

24   interest, one has to determine what

Confidential Information - Subject to Protective Order

1  clinical endpoints are most appropriate

2  to quantify the exposure effect."

3            In Celebrex, "Once an

4  investigator has determined the patient

5  population of interest, he or she must

6  draw a valid sample from the population."

7            Similar sentence, correct?

8       A.    Yep.

9       Q.    Then you go down to,

10  "Suppose that based" -- in valsartan.

11  "Suppose that, based on the sample of 100

12  patients at the end of the study, four

13  patients experienced such events."

14            In Celebrex, "Suppose that

15  based on the sample of 100 patients, four

16  patients experienced similar" --

17  "experienced CV events."

18            Similar statement, correct?

19       A.    Well, one is for a CV event.

20  The other one is cancer, isn't it?  Are

21  they different?

22       Q.    They are very similar,

23  aren't they?

24       A.    Well, how do you define

Confidential Information - Subject to Protective Order

1    similar.  I said this one case is for CV

2    event.  The right-hand side is for cancer

3    incidence.

4         Q.    You don't think that when it

5    starts out -- the sentence says, "Suppose

6    that, based on a sample of 100 patients,"

7    and the other one says, "Suppose that,

8    based on the sample of 100 patients," and

9    that for both hypotheticals, you assumed

10   four patients that experienced an event,

11   that those are similar sentences?

12        A.    Well, whatever you say.

13   It's similar.  But I'm saying address

14   different legal cases, right.

15        Q.    Next sentence, "An obvious

16   estimate of the event rate for the

17   underlying population is .04 or

18   4 percent."

19             In Celebrex, "An obvious

20   estimate of the incident rate of toxicity

21   for the underlying population is .04, or

22   4 percent."

23             Those are very similar

24   sentences, correct?

Confidential Information - Subject to Protective Order

```
1          A.    Yep.
2          Q.    Next sentence, "This is
3    called a point estimate."
4                In Celebrex, exact sentence,
5    "This is called a point estimate."
6    Correct?
7          A.    Yep.
8          Q.    Next sentence in valsartan,
9    "However, this estimate is based on a
10   sample of patients."
11               Celebrex, "However, this
12   answer" -- "this estimate is based on a
13   relatively small set of patients."
14               Similar sentence, correct?
15         A.    Yep.
16         Q.    Next sentence, "The true
17   event rate for the entire population may
18   be more or less than 4 percent."
19               Next sentence in Celebrex,
20   the true incidence rate for the entire
21   population may be more or less than .04."
22               Very similar sentence,
23   correct?
24         A.    Yep.
```

Confidential Information - Subject to Protective Order

1          Q.    Next sentence, "Different

2    studies generating different samples may

3    find a different" -- "may find different

4    proportion of subjects with cancer."

5                Next sentence, "Another

6    investigator using a different sample or

7    study may find that none of the patients

8    experienced a CV event."

9                The following sentence,

10   "Therefore, when observing results from a

11   single sample, it is important to attach

12   a level of confidence to the observed

13   point estimate."

14               In Celebrex, 14 and a half

15   years ago, you put, "Therefore, when

16   observing results from a single sample,

17   it is important to attach a level of

18   confidence to the observed point

19   estimate."

20               Those are the exact same

21   sentence, correct?

22        A.    Yeah.  I'm glad I am

23   consistent.

24        Q.    Looking at valsartan, "This

Confidential Information - Subject to Protective Order

1    quantitative scientific process is called

2    drawing or making inferences about the

3    true event rate."

4              In Celebrex, "This

5    quantitative scientific process is called

6    drawing inferences about the true

7    incident rate."

8              Very similar sentences,

9    correct?

10         A.    Yep.

11             MR. NIGH:   Turning to Number

12        19, and Paragraph 15 in Celebrex.

13   BY MR. NIGH:

14        Q.    In valsartan, you start out,

15   "Let me turn to the issues of comparing

16   two groups of subjects, one having been

17   exposed and the other being in the

18   control."

19             In Celebrex, 14 and a half

20   years ago, you say, "Let me turn to the

21   issues of comparing two groups of

22   patients, one receiving Celebrex and the

23   other receiving a placebo."

24             Very similar sentences,

Confidential Information - Subject to Protective Order

1    correct?

2         A.    Mm-hmm.  Yes.

3         Q.    The next sentence, "To make

4    sure the two samples of subjects are

5    comparable with respect to all potential

6    confounders, we often rely on a

7    randomized clinical trial setting."

8               In Celebrex, "To make sure

9    the two samples of patients, example

10   Celebrex and placebo, are comparable with

11   respect to all potential confounders,

12   investigators often rely on a randomized

13   clinical trial setting."

14              Very similar sentences,

15   correct?

16        A.    Yep.

17        Q.    In valsartan, you say, "Such

18   a clinical study yields a well designed

19   experiment that has the potential for

20   generating reliable prospective data on

21   safety."

22              In Celebrex, you say, "Such

23   a medical study yields a well designed

24   experiment for generating reliable

Confidential Information - Subject to Protective Order

1    prospective data on drug efficacy or

2    safety."

3              Very similar sentences

4    again, correct?

5         A.    Yep.

6         Q.    And in valsartan, you say,

7    "Such studies were conducted and

8    monitored according to a pre-specified

9    protocol, which details the exposure

10   administered (for example, form, dosage

11   frequency), the clinical or biological

12   endpoints (example, lab value, patient's

13   quality of life, time to remission, time

14   to toxicity event), the study patient

15   population, and other clinical and

16   statistical considerations."

17             In Celebrex, you say, "Such

18   studies are conducted and monitored

19   according to a pre-specified protocol

20   which details the treatments administered

21   (example, form, dosage, frequency), the

22   clinical or biological endpoints (for

23   example, lab value, patient's quality of

24   life, time to remission, time to a

Confidential Information - Subject to Protective Order

1    toxicity event), the study patient

2    population (elderly, suffering from

3    rheumatoid arthritis), and other clinical

4    and statistical considerations."

5              Those sentences are very

6    similar, correct?

7         A.    No.  It's quite different in

8    my opinion, right.  I said elderly,

9    something like that.

10             Do I have that on the

11   left-hand side?

12        Q.    Yeah.  You don't think those

13   sentences are very similar, it's almost

14   identical, except for Celebrex you say

15   "elderly and suffering from rheumatoid

16   arthritis."

17        A.    Well, if you want to say

18   similar, that's fine with me.  I said a

19   while -- I always aim it at a specific

20   legal case, right.  I'm modifying my

21   words -- the words I use before, I'm so

22   glad and still confident that 14 years

23   ago I used it, still applicable today,

24   right.  That's a good thing, right?

Confidential Information - Subject to Protective Order

1   Staying with a --

2         Q.    It's a good thing for

3   pharmaceutical companies that they have a

4   cookie-cutter report and know what your

5   opinion is going to be before they hire

6   you, correct?

7               MR. MERRELL:  Objection to

8         form.  Argumentative.

9               THE WITNESS:  Sir, that's

10        not fair to say -- safe to say.

11  BY MR. NIGH:

12        Q.    Okay.  Let's take a look at

13  the next sentence.  "The trial is usually

14  randomized and blinded."

15              Do you see that?

16        A.    Yep.

17        Q.    And in Celebrex, it says,

18  "The trial is usually randomized and

19  blind."

20              Very similar sentences,

21  correct?

22        A.    Yep.

23        Q.    Next in valsartan, it says,

24  "Subjects are assigned randomly to one of

Confidential Information - Subject to Protective Order

1    the study arms and neither physicians nor

2    patients are told whether the patient is

3    receiving an active exposure or a

4    control."

5              In Celebrex, 14 and a half

6    years ago, you put, "Patients are

7    assigned randomly to one of the study

8    arms and neither physicians nor patients

9    are told whether the patient is receiving

10   an active drug, Celebrex, or a placebo."

11             Very similar sentences,

12   correct?

13        A.   No.  To me, they're quite

14   different.

15        Q.   Okay.  The wording is almost

16   in the exact same order in both

17   sentences.  All you've done is subbed out

18   what's relevant to Celebrex versus

19   valsartan, right?

20        A.   To me it's quite different,

21   isn't it?

22        Q.   Okay.  Well, we'll let the

23   jury look at that and decide.

24             The next sentence says,

Confidential Information - Subject to Protective Order

1    "This avoids selection bias or other

2    experimental bias."

3                In your other report you

4    say, "This avoids selection bias or other

5    experimental bias."

6                The exact same sentence,

7    correct?

8         A.    Yep.

9         Q.    Next, you say, "When

10   appropriately designed, results from a

11   well conducted randomized clinical trial

12   are regarded as a gold standard in

13   controlled settings to evaluate the

14   efficacy and safety of an exposure."

15               In Celebrex, you say,

16   "Results from a well conducted randomized

17   clinical trial are regarded as a gold

18   standard in controlled settings to

19   evaluate the efficacy and safety of a

20   treatment."

21               Very similar sentences,

22   correct?

23        A.    Yep.

24        Q.    And again, in valsartan, we

Confidential Information - Subject to Protective Order

1    don't have any clinical trials assessing

2    increased risk or whether there's an

3    increased risk with contaminated

4    valsartan, correct?

5        A.    I just point out what is the

6    gold standard for evaluating an exposure.

7    That's what I'm trying to say.  I didn't

8    say anything about valsartan case.  But

9    yeah, if you read the -- go on and read

10   my next paragraph, you can see it, right.

11           You can see there's a gold

12   standard.  Unfortunately, we cannot do

13   it.  As you said very well this morning,

14   we cannot randomize the patient, right.

15       Q.    Right.

16           MR. NIGH:  Looking at --

17       looking at Page 19, Paragraph 31,

18       and look at Paragraph 14 in

19       Celebrex.

20           31, please.  Those are the

21       references.  Paragraph 14.

22       Further up.

23   BY MR. NIGH:

24       Q.    In valsartan, you start off

Confidential Information - Subject to Protective Order

1    with, "Even if we accept Dr. Madigan's

2    criteria that the false positive rate of

3    .05 is an arbitrary threshold value, this

4    procedure was generally used to establish

5    the so-called statistical significance of

6    a report when testing a single clinical

7    endpoint in a single study."

8              In Celebrex, you put, "The

9    95 percent level for the confidence

10   interval or the 5 percent level of

11   significance for testing hypothesis is

12   typically used by investigators and

13   statisticians to establish the

14   statistical significance of a result when

15   testing a single clinical primary

16   endpoint."

17             Similar ideas quoted in each

18   of these, correct?

19        A.    No, I don't think it's

20   similar.  But it is the same principle.

21        Q.    Well, let's look at the next

22   sentence.

23             You put, "This level can be

24   very liberal."

Confidential Information - Subject to Protective Order

1              And on the other side, you

2   put, "This level can be very liberal."

3              That's identical thus far,

4   right?

5        A.    Yep.

6        Q.    And next in valsartan, you

7   wrote, "I.e., can result in statements of

8   statistical significance when none

9   exists."

10             In Celebrex, 14 and a half

11  years ago, you put, "I.e., can result in

12  statements of statistical significance

13  when none exist."

14             Those are identical,

15  correct?

16       A.    I'm glad it's still 14 years

17  after, still valid argument.

18       Q.    And in valsartan, you put,

19  "If multiple statistical tests and/or

20  studies are examined simultaneously."

21             In Celebrex, you put, "If

22  multiple endpoints are examined

23  simultaneously."

24             Very similar, correct?

1    A.    Yeah.

2    Q.    Looking next you've got,

3    "When using" -- using --

4              MR. NIGH:  Going down,

5         "Using the 5 percent rule."

6    BY MR. NIGH:

7    Q.    "Using the 5 percent rule

8    for claiming statistical significance to

9    analyze simultaneously a large number of

10   tests in a study will yield a high rate

11   of false positive findings."

12             In Celebrex, "Using the 5

13   percent rule for claiming statistical

14   significance to analyze simultaneously a

15   large number of endpoints in a study will

16   yield a high rate of false positive

17   findings across all endpoints."

18             Very similar statements,

19   correct?

20   A.    Yep.

21   Q.    Next you put, "Often, the

22   overall false positive rate could be as

23   high as 20 percent or more, that is, a

24   very high chance of finding exposure is

Confidential Information - Subject to Protective Order

1   not safe with respect to control, when in

2   fact there is no difference between the

3   two groups."

4                  Your next sentence in

5   Celebrex, "It is not unusual that when

6   the 5 percent test hypothesis rule is

7   applied simultaneously to a number of

8   endpoints in the study, the overall false

9   positive rate is as high as 20 percent,

10  that is, a very high chance of claiming a

11  drug is not safe with respect to placebo

12  when in fact there is no difference

13  between the two groups."

14                 Very similar statements,

15  correct?

16        A.     Okay.

17        Q.     Taking a look at 30 -- so

18  you've made the statement multiple times

19  that you're glad you're consistent

20  between your reports back in, you know,

21  14 and a half years ago.

22                 Have you been consistent

23  with reports even longer and earlier than

24  that?

Confidential Information - Subject to Protective Order

1     A.    Well, if you can show me,

2     I'd be happy to read it.

3          Q.    You don't know?  Do you --

4     were you continuing to use these

5     cookie -- a lot of these same

6     cookie-cutter statements in reports that

7     you did before Celebrex 14 and a half

8     years ago?

9               MR. MERRELL:  Objection to

10          form.

11               THE WITNESS:  You're asking

12          me if I did something earlier than

13          Celebrex study?  That's what your

14          question, sir?

15     BY MR. NIGH:

16          Q.    Yes.

17          A.    I don't remember, sir.

18          Q.    Now, you said earlier that

19     you don't hold yourself out to be a

20     toxicologist, correct?

21          A.    Correct.

22          Q.    And so you wouldn't consider

23     yourself to be an expert in toxicology,

24     correct?

Confidential Information - Subject to Protective Order

1    A.    Correct.

2    Q.    You said earlier that you

3    don't hold yourself out to be an

4    epidemiologist, correct?

5    A.    Correct.

6    Q.    So you wouldn't consider

7    yourself to -- you wouldn't hold yourself

8    out -- or being -- sorry.  Strike that.

9              So you wouldn't consider

10   yourself to be an expert in epidemiology,

11   correct?

12   A.    Correct.

13   Q.    You said earlier that you

14   don't hold yourself out to be a

15   pharmacologist, correct?

16   A.    I remember -- I didn't

17   remember you asking me about it.  But the

18   answer is no, I don't think I'm a

19   pharmacologist.

20   Q.    So you wouldn't consider

21   yourself to be an expert in -- my

22   question was pharmacologist.  Not

23   oncologist.

24              You wouldn't consider

Confidential Information - Subject to Protective Order

1    yourself to be an expert at pharmacology,

2    correct?

3         A.    That's correct.

4         Q.    Okay.  Now, Doctor, you said

5    that you analyzed two valsartan epi

6    studies, even though Dr. Madigan had not

7    looked at any valsartan epidemiology

8    studies, correct?

9         A.    Yes, sir.

10         Q.    What was your purpose for

11    looking at those two valsartan

12    epidemiology studies?

13         A.    Well, you know, when I read

14    Dr. Madigan's report, he used dietary

15    studies, he used occupational study, to

16    infer the safety issue about an impurity

17    in valsartan.

18              I ask myself right away, how

19    come Dr. Madigan did not use a direct

20    route and to understand the safety issue

21    of impurity in valsartan.

22              So I believe -- forgive me,

23    I don't know the sequence.  Either I ask

24    the lawyers or the lawyer actually

Confidential Information - Subject to Protective Order

1    already send the papers to me, which is

2    two studies.  One is being called a

3    Danish study, the other one we call the

4    German study.

5              And I read both.  I say,

6    wow, those directly addressed issue about

7    impurity questions, which are more

8    relevant to our question in this legal

9    case, compared with the way Dr. Madigan

10   approach.

11             That's why I think it's

12   important to point out there were studies

13   available directly addressed your

14   question.  Period.

15        Q.    What do you think the

16   purpose of Dr. Madigan's report -- expert

17   report was?

18        A.    The purpose of Dr. Madigan,

19   of course, obviously, he want people to

20   extrapolate the results from dietary

21   studies or occupational study to

22   valsartan case.  That's my understanding.

23        Q.    What kind of results was he

24   trying to extrapolate, what were the

Confidential Information - Subject to Protective Order

1  results referring to from the dietary

2  studies and the occupational exposure

3  studies?

4       A.    We can go over Dr. Madigan's

5  report, you know, line by line and figure

6  out, okay, what he wants to do.

7       Q.    No.  I'll bring up the

8  report if we need to.  But I'm asking

9  you, in terms of your knowledge, what

10  kind of -- the purpose or what kind --

11  strike that.  I'll start over.

12            What kind of results was he

13  trying to extrapolate?  What were the

14  results referring to from the dietary

15  studies and the occupational exposure

16  studies?

17       A.    Can we actually go to his

18  report?

19       Q.    This is a big picture

20  question.  It's not a line-by-line

21  question.

22       A.    What?

23       Q.    I said this is a big picture

24  question.  It's not a line-by-line

Confidential Information - Subject to Protective Order

1   question.

2               What was the purpose of his

3   report in terms of extrapolating results?

4   What kind of results was he trying to

5   extrapolate?

6        A.    Well, he did many things.

7   I'm not quite sure how I can use one

8   sentence to summarize for you.

9               I think the best way, if we

10  get both reports and we all can

11  understand what he wants us to understand

12  it, what my comments about it, right.

13  That's fair game.

14              Instead you're asking me,

15  what do you think about what Dr. Madigan

16  wants us to understand, right.

17              I mean, let's go through his

18  report.  And I'm going to answer you what

19  he wants us to understand.

20       Q.    Are you saying that without

21  looking at the report right now, you

22  can't answer the question as to what the

23  purpose of his report was in terms of

24  extrapolating results from dietary

Confidential Information - Subject to Protective Order

1    studies and occupational exposure

2    studies?

3             A.    Sir, he did so many things,

4    I cannot give you one sentence to

5    summarize what I got from his report.

6                  And if you wanted to know

7    my -- the overall disagreement, you can

8    just go back to my executive summary.

9    Also, my conclusions, right.  You can

10   understand exactly what my positions are

11   and what I have concerns about

12   Dr. Madigan's report.

13                  I can read it for you, if

14   you wanted to.  I can read my summary,

15   also my conclusion.

16            Q.    I've read your report and

17   your summary and your conclusions many

18   times.  Okay.  I don't need to read that

19   word for word during this deposition.

20   I've done it many times.  I don't need

21   the instruction on what to go to for your

22   opinions.

23                  I'm asking a simple

24   question.

Confidential Information - Subject to Protective Order

1          And the best that you can

2   answer it, what do you think he was

3   trying to extrapolate from the dietary

4   studies and occupational exposure

5   studies?

6          MR. MERRELL:  Objection to

7      form.  Asked and answered.

8          THE WITNESS:  I cannot

9      answer you.

10  BY MR. NIGH:

11      Q.    What was he looking at in

12  the dietary studies and the occupational

13  exposure studies?  What sort of figures?

14      A.    If you allow me to go

15  through his report, I can answer you.  I

16  cannot answer you without looking at the

17  report, and my report.

18      Q.    As you sit here right now,

19  you can't tell us, you know, what results

20  he was looking at, just in general, or

21  describe them in dietary and occupational

22  exposure studies?

23      A.    Well, sir, listen, why don't

24  you just go to my -- let me use mine.

Confidential Information - Subject to Protective Order

1    You don't have to read it.  You said you

2    read my report word by word, okay.

3              I'm going to read what I

4    wrote, and I'll tell you what he

5    translate from dietary to valsartan case.

6    Is that okay?

7         Q.    Sure.

8         A.    Conclusion.  Paragraph 37.

9              Right.  Dr. Madigan claimed

10   that NDMA statistically significantly

11   increased gastric cancer risk arise in

12   LCEs as low as 1,962 ug, is the number.

13   The equivalent threshold for lung cancer

14   so-and-so, for the other cancer, and et

15   cetera, right?  Blah, blah, blah, blah.

16             Based on the report by

17   Dr. Madigan, that's what you try to

18   convince us.  He said well, listen, guys,

19   if you have this ratio of so-and-so, you

20   have high risk to get cancer,  different

21   cancer.  Right.

22             I'm saying those claims

23   cannot be justified with the issues and

24   the concerns I raise in this report.

Confidential Information - Subject to Protective Order

1    That's 37, okay.

2              38, the same concerns apply

3    to the claims in Paragraph 34 in

4    Dr. Madigan's report.  Dr. Madigan's 34,

5    that's the methods, he want to send to

6    us, right.  That's -- answer your

7    question.

8              So moreover, those essential

9    values may not be transportable in the

10   case of impurity -- I shouldn't use

11   contaminated -- valsartan without

12   appropriate validation, okay.

13             But he wanted us to believe

14   the findings from dietary study or

15   occupation study can be transported

16   automatically to the valsartan case,

17   right, with those threshold numbers.

18             That's my understanding,

19   okay.

20        Q.   You understand that at no

21   time in all of Dr. Madigan's report does

22   he ever use the word "threshold values"

23   in describing those values, correct?

24        A.   I don't remember.  But I

Confidential Information - Subject to Protective Order

```
 1    quote here "the equivalent threshold for
 2    lung cancer" is so-and-so.  If I
 3    misquoted the word "threshold" I
 4    apologize.  Right.
 5          Q.    Back to my original
 6    question.  He was looking at -- what is
 7    the LCE?
 8          A.    The way I understand,
 9    lifetime exposure for the contaminant.
10          Q.    And that would be lifetime
11    exposure of what?
12          A.    From NDMA, for example.
13          Q.    And what would the ug refer
14    to?
15          A.    I'm sorry?
16          Q.    What would the ug refer to
17    in his report?  What was your
18    understanding of what that refers to?
19          A.    AOGE, you're talking about?
20          Q.    No, ug.  You used the words
21    "ug" in your reading you're --
22          A.    Oh, it's a measurement.
23    It's smaller than milligram, mg.
24          Q.    What does -- what does ug
```

Confidential Information - Subject to Protective Order

1   stand for?

2        A.    I don't remember exactly.  I

3   think it's smaller than mg.  I don't know

4   what its scale, smaller than mg.

5        Q.    You don't know ug refers to

6   or what he's referring to in this report,

7   when you put ug?

8        A.    I can copy what Dr. Madigan

9   say.

10       Q.    You just copied what

11  Dr. Madigan stated, but you don't know

12  what the ug means?

13       A.    Ug is a scale which measure

14  how much the exposure, right, like a g,

15  mg, like ug.  That's a different scale,

16  measure how much contamination in the

17  blood or whatever in your body.

18       Q.    Explain quantitatively what

19  ug means?

20       A.    I don't remember how to

21  define, sir.

22       Q.    Do you know what ng means?

23       A.    Mg?

24       Q.    N.  N as in Nancy.  Ng, do

Confidential Information - Subject to Protective Order

1    you know what ng means?

2         A.    I don't know.

3         Q.    Okay.  Do you know what mcg

4    would refer to?

5         A.    No.  I'm not a toxicologist.

6    I don't know the scale.

7         Q.    So when you see him put

8    4,000 -- or just -- sorry, the first one

9    that you have quoted in Number 37,

10   "Dr. Madigan claimed that for NDMA" --

11   actually let's do this.  Let's put this

12   up on the screen.

13             MR. NIGH:  LP -- so the jury

14        can see it too -- LP-1557.

15             This was previously marked

16        Exhibit 3.

17             And turn to number --

18        Paragraph 37.  And let's blow that

19        up.

20   BY MR. NIGH:

21        Q.    This is in your report.

22             MR. NIGH:  Blow up Paragraph

23        37.

24

Confidential Information - Subject to Protective Order

1   BY MR. NIGH:

2          Q.    So in your report you put in

3   Paragraph  Number 33 in the report,

4   "Dr. Madigan claimed that for NDMA

5   statistically significant increased

6   gastric cancer risk at LCEs as low as

7   1,962 ug."

8                What does that refer to

9   quantitatively, 1,962 ug?

10         A.    I am not a toxicologist.  I

11  cannot answer you how much is that

12  exposure.

13         Q.    That doesn't take a

14  toxicology opinion to know what ug means,

15  right?

16         A.    I don't know, sir.

17         Q.    So you don't know what

18  Dr. Madigan was referring to when he put

19  the word ug or the letters ug, and you

20  couldn't tell this jury quantitatively

21  what he's referring to when he says 1,962

22  ug, right?

23         A.    I don't know how much he's

24  mentioning to quantify this.

Confidential Information - Subject to Protective Order

1    Q.    Do you know how he

2  calculated these LCEs, what formula?

3    A.    Well, he calculate -- sorry.

4  Sorry, sir.  Say it again.

5    Q.    Do you know how he

6  calculated these LCEs or what formula he

7  used?

8    A.    Oh, yeah, yeah, I know

9  mathematic formula.  So what he did is

10  following:  He compared this Q1 to

11  quarter -- the lower dose, that exposure

12  against the Q4, which is the highest

13  dose.

14        Sometimes he use five set

15  instead of four.  And then he compared

16  the Q1 against the Q4.  Then if he says

17  it's statistically significant, then I'm

18  going to take this study, the exposure

19  level, whichever he described, that's

20  Study Number 1, right.

21        Then we go to another study.

22  If it's not a statistically significant,

23  he dropped it.

24        Then he go to the third

Confidential Information - Subject to Protective Order

1    study.  If he find a statistical

2    significant, he count -- he take the

3    highest, the Q4, the level, right, for

4    the lifetime exposure, which I don't know

5    how much to quantify.  That's what he

6    explains.

7               And then he added up, take

8    an average.  That's my understanding, he

9    calculated the so-called lifetime

10   threshold value.

11        Q.    Have you ever calculated

12   lifetime cumulative exposures in any of

13   the work that you've done?

14        A.    No.

15        Q.    So this is -- this is novel

16   to you, when you see these calculations

17   of lifetime cumulative exposures,

18   correct?

19        A.    Novel in a way.  Is not a

20   statistical novelty because statistical

21   is very straightforward.  That's what I'm

22   concerning about his statistical argument

23   and the claim.

24               I cannot interpret the

Confidential Information - Subject to Protective Order

1   physical meaning of this exposure, the

2   level we're talking about.

3        Q.    I'm not sure you understood

4   what he was doing, because you just

5   mentioned that if he found that it wasn't

6   statistically significant, he would drop

7   it.

8             Why do you think that?

9        A.    Well, that's my

10  understanding.  If I misunderstood what

11  he did, I apologize.

12       Q.    He has Table 1, and he's

13  calculated LCEs for nearly every single

14  dietary study.  Did you realize that?

15       A.    Hold on a second.  Let me

16  see the Table 1 here.  Okay.

17            MR. NIGH:  Yeah.  Let's go

18       ahead and show it.  LP-1558.

19       Table 1.

20  BY MR. NIGH:

21       Q.    It's important if you're

22  going to criticize an expert's opinion,

23  that you understand what they're doing,

24  correct?

Confidential Information - Subject to Protective Order

1        A.    Oh, absolutely.

2        Q.    Okay.  Looking at Table 1,

3   do you see here how he calculated LCE for

4   nearly every single dietary study?

5        A.    Yeah, he lists the LCE and

6   every study they have -- well, some is

7   missing.  But okay, yes.

8        Q.    Nearly every one.  He

9   doesn't have one for Knekt.

10             Do you see that?

11       A.    Yeah.

12       Q.    Do you know why he wouldn't

13  have one for Knekt?

14       A.    No, sir.

15       Q.    Do you know if Knekt gave

16  the value of NDMA in the fourth quartile?

17       A.    I'm sorry, sir.  I don't

18  understand your question.

19       Q.    Now, looking at this, can

20  you explain -- let's just take a look at

21  Palli.  And you see under LCE, it shows

22  5,260?

23             Do you see that?

24       A.    Yes, sir.

Confidential Information - Subject to Protective Order

1        Q.    And that's one -- that's SS.

2   What do you think SS stood for?

3        A.    The effect size, you're

4   talking about.

5        Q.    You think SS on his chart

6   stood for sample size?

7        A.    You mean the last two -- the

8   column statistical significance?  Is that

9   what you're talking about?  Or which one

10  are you talking about?

11       Q.    SS?

12            MR. NIGH:  Can we highlight

13       that column.

14  BY MR. NIGH:

15       Q.    What do you believe that

16  stood for, that SS?

17       A.    I don't know, the SS means.

18       Q.    Okay.  Did you happen to

19  pull these dietary studies to where you

20  could figure out what the SS meant in his

21  table?

22       A.    No, sir.

23       Q.    What do you think effect

24  size meant?

Confidential Information - Subject to Protective Order

1    A.    Effect size, if I interpret

2    it correctly, that's the one we are

3    talking about in the morning, about for

4    example the difference between the two,

5    you can use the hazard ratio, you can use

6    odds ratio, you can use risk ratio, et

7    cetera.

8        Q.    Right.  Odds ratio, risk

9    ratio and HRs, are are all commonly

10   referred to as effect, or effect size,

11   correct?

12       A.    Yes, sir.

13       Q.    Okay.  But you don't know

14   what the SS, right next to that stands

15   for in the table?

16       A.    I -- I don't know.  I better

17   not make a guess.  But I think I know

18   what is going on.  But I apologize.  I

19   don't want to say -- I'm not 100 percent

20   sure.  I don't want to say anything.

21       Q.    Well, you're commenting on

22   his report.  That's what you were hired

23   to do, correct?

24       A.    Yes, sir.

Confidential Information - Subject to Protective Order

```
 1          Q.    So I'm asking you, what do
 2   you think his report, the SS stood for?
 3          A.    I don't know.
 4          Q.    Okay.  Next, do you remember
 5   you asked about country, that second
 6   column on this table.  You raised
 7   country.  Doesn't he provide the
 8   countries here?
 9          A.    Provide country to me?
10   Sorry.
11          Q.    For each study.  Doesn't he
12   provide the countries for each study?
13          A.    In the table, yes.
14          Q.    Right.
15          A.    Yes, in the table.
16          Q.    And design, what do you
17   think the CC or the C stands for?
18          A.    Sorry.  Where is the CC?
19   I'm sorry.
20          Q.    Right underneath "Design."
21   Do you see CC and C?
22          A.    Oh, I have no idea what CC
23   means.
24          Q.    So as you reviewed his
```

Confidential Information - Subject to Protective Order

1   expert report and this table, you didn't

2   know what CC stood for or what C stood

3   for?

4          A.    Yeah, because that's not

5   relevant for statistical analysis.

6          Q.    The type of study or the

7   design of the study can be relevant,

8   right?

9          A.    Well, I don't know, what

10  kind of observational study or what,

11  because basically, he didn't tell us

12  exactly what's going on in the report.

13  Right.  Did he say anything about CC

14  here.  In the footnote, did he indicate

15  CC?

16         Q.    Did you pull the studies to

17  see what CC or C may refer to?

18         A.    No, because I am basically

19  using his report.  Anything he send to

20  me, I would read it very carefully.  But

21  if he skip it, I said well, that's your

22  problem.  It's not my problem.

23         Q.    But you don't understand

24  what he's referring to.  And commenting

Confidential Information - Subject to Protective Order

1   on his report, if you don't understand

2   it, isn't that your problem?

3          A.    I don't think so.  Because

4   he's got very important statistical

5   analysis, he would have put a footnote

6   underneath the table.  Say what do you

7   mean by CC, what do you mean by SS.

8          Q.    Why do you think -- what

9   makes you think he's required to do that?

10         A.    Otherwise, how in the world

11  the people outside the field understand

12  what he's talking about.

13         Q.    Show studies.  Just pull up

14  the studies, right.

15         A.    All right.  How in the world

16  would you --

17         Q.    Just pull up the studies to

18  see what it stands for.

19         A.    You talk over me.  If

20  that -- if you want to talk, I'll let you

21  talk first.

22                I just want to share with

23  you, you're asking me how come I don't

24  ask Dr. Madigan what CC means.  I say

Confidential Information - Subject to Protective Order

1    well, listen, he didn't even list it,

2    right.  He didn't explain to me in the

3    report.

4              And I was told my assignment

5    is to look at the report.  I don't have

6    to question about Dr. Madigan did.  I say

7    well, listen, if you give me the

8    information, I use it.  If you don't give

9    me information, I don't use it.

10         Q.    Well, he gives you the

11   information because he cites to every one

12   of these studies.  So you can simply --

13         A.    But what --

14         Q.    Hold on.  I was asking the

15   question that time.

16         A.    Yeah.

17         Q.    So you can pull up the study

18   to see what the design of that study is

19   and figure out what his CCs and Cs are

20   referring to on this chart, right?

21         A.    Nope.  I can't.

22         Q.    You don't think you can?

23         A.    Sorry?

24         Q.    You don't think you can do

Confidential Information - Subject to Protective Order

1    that?

2         A.     He should have for us.  Why

3    should we go into each study to check

4    what he mean by CC, what is a single C,

5    what is a double C?

6         Q.     Okay.  So you don't have any

7    criticism in terms of the designs of

8    these studies or how we look at design of

9    study in terms of extrapolating these

10   results?

11        A.     I don't have information

12   about his abbreviation.  Say -- this

13   study he gave a double C, the other one

14   is a single C.

15             But for most of studies, I

16   go into the study to understand what kind

17   of observational study they conducted.

18   Is it prospective or actually

19   retrospective?  Is it cohort study or

20   meta-analysis?

21             That's what I did.  I don't

22   have to go in to ask Dr. Madigan what

23   he's talking about, what is a CC, or what

24   does a C means.

Confidential Information - Subject to Protective Order

1    Q.    Okay.  Next column, base

2  high dose ug.

3              What does that refer to?

4    A.    That's, my understanding Q4,

5  whatever you want, base on high value.

6    Q.    Okay.  Your understanding is

7  that would be the highest quartile?

8    A.    Well, sometimes use

9  different topic, right, not only the

10  quartile, something else.

11    Q.    Okay.  How about average --

12  approximate average age.  What does that

13  refer to?

14    A.    That's probably obvious,

15  right.  That's -- everybody understands

16  average age.  That's the study

17  population, I believe.

18    Q.    You believe that's the

19  average age in the study?

20    A.    Of the subjects.

21    Q.    Okay.  Explain that to me

22  more.  You believe that's the average of

23  all the subjects in the study?

24    A.    Well, I better check the

Confidential Information - Subject to Protective Order

1    papers.  And I can confirm you the 60 is

2    exposure time of the age of exposure, or

3    the age of the subject, right, in the

4    study, right.

5         Q.    Okay.  But as you sit here

6    right now, looking at this table from his

7    chart, you couldn't tell me one way or

8    the other?

9         A.    Yeah.  I need to

10   double-check.

11        Q.    Okay.  Looking at LCE ug,

12   what does that mean?

13        A.    Well, as I explained before,

14   he took large -- the highest dose, right

15   tried to figure out the actual level,

16   LCE.  That's how he figure out lifetime

17   exposure.

18        Q.    Okay.  So explain to me what

19   you think his formula was in looking at

20   this table to come to 5,260 for Palli,

21   LCE?

22        A.    Well, this is -- my

23   understanding is he just copied from the

24   paper.  He didn't do himself.  He doesn't

1    have the data.  He doesn't have the data

2    for patient, right.

3         Q.    You think he copied the

4    5,260 LCE from the Palli study?

5         A.    I believe that's my

6    understanding.

7         Q.    Do you think that all of

8    these numbers under LCE --

9              MR. NIGH:  Let's highlight

10         all of those in yellow, all the

11         way down.

12              THE WITNESS:  Well, that's

13         what my understanding.

14              Otherwise, he should explain

15         to us how they calculate this

16         number, right.

17              With the individual patient

18         levels he calculated number, or

19         actually is it from the papers,

20         right.

21              He didn't explain too well.

22         He just give us a formula.  Say,

23         well, that's calculated lifetime

24         exposure.

Confidential Information - Subject to Protective Order

1              We said, do you have

2         individuals patient level?

3         Obviously, he didn't have it.

4         Right.

5              So those patients falling

6         into the Q4, for example, right,

7         he did not have those --

8         everybody's exposure level, right.

9              Okay.  So I doubt he can

10        actually calculate this number

11        using individual patient level.

12   BY MR. NIGH:

13        Q.   So is it your testimony that

14   you believe these numbers under LCE are

15   lifted from the papers?

16        A.   I believe he find out from

17   the papers.  Otherwise I'm not quite sure

18   how he calculated those numbers.

19        Q.   But as you sit here right

20   now, looking at this table, which is a

21   table in Dr. Madigan's report -- it takes

22   up the full page in his report -- you

23   don't know whether or not those LCE

24   values were lifted directly from the

Confidential Information - Subject to Protective Order

1    studies?

2          A.    You're asking me if those

3    numbers are from the papers, right?

4    That's what you are asking, right?

5          Q.    My question was, as you sit

6    here right now, looking at this table,

7    which is a table in Dr. Madigan's report,

8    it takes up the full page in his report.

9    You don't know whether or not those LCE

10   values were lifted directly from the

11   studies, correct?

12         A.    I'm saying he cannot

13   calculate this number using individual

14   patient-level exposure.

15         Q.    So do you know if they were

16   lifted directly from the studies or not?

17         A.    It must be somewhere.

18   Summary statistics from the paper.

19   Otherwise I don't know how he calculate

20   it.

21               MR. NIGH:  Okay.  Let's go

22         ahead and take this down.

23   BY MR. NIGH:

24         Q.    Okay.  Back to my questions

Confidential Information - Subject to Protective Order

1    earlier on -- Dr. Madigan's purpose was

2    to look at the cumulative exposure to

3    NDMA that led to increased risk of

4    cancers, correct?

5         A.    Yes, sir.

6         Q.    Now, the two valsartan

7    studies that you looked at, they don't

8    discuss how much exposure that the

9    patients had to NDMA?  They don't

10   quantify exposure to NDMA in Pottegard or

11   Gomm, the amount of exposure to NDMA,

12   correct?

13        A.    I have to read the paper

14   again.  But my recollection, they did not

15   give a specific individual patient

16   exposure level.  But again -- sorry.

17        Q.    So --

18        A.    But again, I needed --

19        Q.    Go ahead.

20        A.    Go back and read -- I'm

21   sorry.

22              I had to go back to read the

23   paper.

24        Q.    So if Pottegard and Gomm

Confidential Information - Subject to Protective Order

1  don't contain the amount of NDMA that

2  those patients -- that the patients were

3  exposed to in those studies, that would

4  not be useful to Madigan if his sole

5  purpose was to try to look at how much

6  NDMA it would take to lead to increased

7  risk of cancer, correct?

8        A.    Well, again, sir, I don't

9  know in those two papers they have

10  individual exposure value or not.  I

11  don't know.  I have to read again.

12        Q.    I started out with the

13  assumption that if Pottegard and Gomm do

14  not contain the amounts of NDMA that the

15  patients are exposed to -- so starting

16  with that hypothetical.

17              Follow me?

18        A.    Sir, I not answer a

19  hypothetical question.  I like to see the

20  fact.

21        Q.    I'm allowed to ask you

22  questions as an expert that you take the

23  assumptions, okay.

24              So my first part that I want

Confidential Information - Subject to Protective Order

1    you to assume that both Pottegard and

2    Gomm do not contain the amounts of NDMA

3    that its patients or subjects were

4    exposed to.

5            Do you follow me so far?

6        A.    Yes, sir.

7        Q.    If they do not contain the

8    amount of NDMA that they are exposed to,

9    then that would not be useful to

10   Dr. Madigan's question of how much NDMA

11   over a lifetime does it take to get

12   increased risk of cancer, correct?

13           MR. MERRELL:  Objection to

14       form.

15           THE WITNESS:  I'm not a

16       toxicologist, sir.  I cannot

17       answer this question.  I have no

18       opinion on this.

19   BY MR. NIGH:

20       Q.    This isn't a toxicology

21   opinion.

22           The question is, you're

23   reviewing and you're responding to

24   Dr. Madigan's report.  If those two

Confidential Information - Subject to Protective Order

1  valsartan epi studies do not contain the

2  amount of NDMA that the subjects are

3  exposed to, then that would not be useful

4  to Dr. Madigan's question of how much

5  NDMA over a lifetime does it take to get

6  increased risk of cancer, correct?

7          MR. MERRELL:  Objection to

8      form.

9          THE WITNESS:  I don't answer

10     hypothetical question, even though

11     you have every right to ask me,

12     sir.

13  BY MR. NIGH:

14     Q.   Are you refusing to answer

15  the question, in terms of assume

16  Pottegard and Gomm do not show how much

17  NDMA its subjects are exposed to?

18     A.    I told you, sir, I have no

19  opinion on this.

20     Q.   Okay.  I'm going to ask this

21  again.

22          Assume that Pottegard and

23  Gomm do not show or discuss the amount of

24  NDMA that its subjects are exposed to.

Confidential Information - Subject to Protective Order

1    If that's true, then those studies would

2    not be useful for Dr. Madigan in

3    calculating a cumulative amount of

4    exposure to NDMA that it takes to reach

5    increased risk of cancer, correct?

6                    MR. MERRELL:  Objection to

7         form.  Asked and answered.

8                    THE WITNESS:  I have no

9         opinion, sir.

10   BY MR. NIGH:

11        Q.    Do you have no opinion

12   because you believe that takes a

13   toxicology mindset to be able to answer

14   that question?

15        A.    Probably.

16        Q.    You believe that in order to

17   calculate a total amount of NDMA, that it

18   would be unuseful to try to use a study

19   that doesn't give you amounts of NDMA.

20   Is that your testimony?

21        A.    Yeah, sir, the problem that

22   I am having here, is that before you even

23   talk about the lifetime exposure, pose

24   the argument without this lifetime

Confidential Information - Subject to Protective Order

1    exposure for individual level, we have

2    trouble.  We have a concerns about

3    Dr. Madigan's analysis, right.

4                  You cannot even pass the

5    hurdle and say this exposed, this

6    unexposed.  Do you have any causality or

7    association interpretation?

8                  We couldn't even go through

9    that piece from the dietary studies or

10   occupational study.  How in the world you

11   can go down the next level and claim

12   there was a threshold value, and beyond

13   that we have a concern for cancer risk?

14                 So that's -- I said it very

15   clearly in my report.  We couldn't even

16   go through the first hurdle to convince

17   us there was issue, even exposure to

18   unexposed impurity of valsartan.  Right.

19                 Then how we can actually go

20   to next level?  That's my basic question

21   to Dr. Madigan, and also to you.

22        Q.    My question, if you

23   understand his report, because the word

24   "threshold" doesn't show up anywhere in

Confidential Information - Subject to Protective Order

1    his report, right?

2         A.    I apologize if I use the

3    word "threshold."  That's the number that

4    he used claiming, you know, beyond this

5    number we are in trouble, right.  That's

6    my understanding, that's the common

7    language, right?

8              If I use the word

9    "threshold" improperly, I apologize.  But

10   to me that's the same language we use all

11   the time to say what's the cutoff point,

12   what's cutoff value.  We call that a

13   threshold value.

14        Q.    He actually doesn't use the

15   word "cutoff" either.

16        A.    Okay.  That's fair.  Which

17   language does he use then, sir?

18        Q.    Do you understand that he's

19   not explaining a cutoff, a threshold,

20   line in the sand, none of those.  He

21   doesn't use any of that language, right?

22        A.    Okay.  Yeah, so he may -- if

23   the level -- if the patient's exposure

24   level, beyond that number he quoted, that

Confidential Information - Subject to Protective Order

1  means this guy have increased cancer

2  risk.  Is that correct?  That's what he

3  claimed, correct?

4      Q.    Do you see that claim

5  anywhere?

6      A.    Yeah, I mean, that's what he

7  is talking about in conclusion.

8      Q.    Okay.  Now, you talked about

9  causality.

10         As you read his report, did

11  you see a causation opinion that NDMA

12  causes cancer or that valsartan causes

13  cancer?

14      A.    Well, sir, unfortunately he

15  said also very well in the deposition, he

16  was not in the position to talk about

17  causality at all.  The most he can do is

18  talking about association.

19         Even association, we have

20  some question about it, right.  And from

21  association to causality, none of those

22  arguments can be -- hold true, right.  In

23  some sense we have no idea how to

24  interpret the causality now, right.

Confidential Information - Subject to Protective Order

1       Q.    Is it your testimony that

2    there is no association between NDMA and

3    cancer in humans?

4       A.    Sir, I am not in a position

5    to tell you either way.  I'm just

6    responding to my lawyers.  My assignment

7    is asked very simple, do you think

8    Dr. Madigan's argument in his report is

9    valid?  Okay.  I'm saying his argument

10   has a lot of holes, and I don't agree

11   with his argument.

12            I didn't say either way it

13   was association, not association.

14            My point is that at this

15   point, we don't have much evidence to

16   claim either way.  Because most

17   observational study, everybody has

18   limitation, okay.

19            So I'm not in the position

20   to tell you, sir, there's no association,

21   there is association.  I just say we

22   don't have enough data to tell us either

23   way for valsartan case, not dietary, but

24   for valsartan case.

Confidential Information - Subject to Protective Order

1    Q.    My question to you is, is it

2    your testimony that there isn't enough

3    evidence to establish an association

4    between NDMA and cancers in humans?

5            MR. MERRELL:  Objection to

6        form.

7            THE WITNESS:  Correct.  I

8        said there is not much evidence to

9        say there is association or there

10       is no association.  That's my

11       position right now.

12    BY MR. NIGH:

13    Q.    Now, you included Pottegard

14    and Gomm and looked at those studies.

15            Was that for you to form an

16    opinion on whether or not there's an

17    association between valsartan --

18    contaminated valsartan use and cancer?

19    A.    Well, let me say this, sir.

20            I think the two studies are

21    pretty relevant to address the issue

22    regarding the impurity in valsartan.

23    Okay.  It's very direct and to the point.

24    But everybody understands any observation

Confidential Information - Subject to Protective Order

1   study has a limitation.

2              Those two studies had a

3   limitation, right.

4              So at this point, I said,

5   well, if I have a choice to look at

6   information about a valsartan impurity, I

7   would have put a more emphasis on these

8   two studies, instead of using a detour

9   method using dietary studies,

10  occupational study to tell me there is

11  some issue about a valsartan impurity.

12             So that's my position.

13             I'm not in the position to

14  say, yes, these two studies told us there

15  was no association about the cancer risk

16  and the impurity of the valsartan.  And

17  I'm not in a position to say that either.

18        Q.    Dr. Madigan was looking at

19  cumulative exposure and potential

20  increased risk from cumulative exposures

21  to NDMA.

22             How would you use Pottegard

23  or Gomm to assess cumulative exposures?

24        A.    Well, sir, you asked me the

Confidential Information - Subject to Protective Order

1  same question before.  You said if they

2  didn't have -- under the hypothetical,

3  the assumption, there were no individual

4  exposure level using -- Dr. Madigan

5  cannot use their study or data to

6  calculate a so-called lifetime exposure.

7           I said I'm not in a position

8  to answer your question, because I would

9  really like to review that paper

10  carefully before I answer yours, right.

11      Q.    Well, there's not even --

12  not just NDMA.  But there's not even

13  enough data in terms of amount of

14  valsartan usage in Pottegard or Gomm to

15  try to draw any conclusions in the amount

16  of cumulative valsartan usage that it

17  would take to reach certain increased

18  risk in Pottegard or Gomm, correct?

19      A.    Well, again, sir, forgive

20  me, I needed to read the paper carefully

21  again, because I've been -- I've not read

22  any their papers about -- after I

23  submitted the August 2nd report.

24      Q.    So as you sit here right

Confidential Information - Subject to Protective Order

1  now, you can't answer whether or not

2  there was enough information in Pottegard

3  or Gomm to draw any conclusions in the

4  amount of cumulative valsartan usage that

5  it would take to reach certain increased

6  risk in those studies, correct?

7      A.    I don't recall, sir.

8      Q.    Now, you included valsartan

9  epi to see whether these valsartan epi

10  studies, Pottegard and Gomm, demonstrate

11  the contaminated valsartan had an

12  association or not with cancer, correct?

13      A.    Yes.  We just simply stated

14  what -- the conclusion from the papers,

15  right.  They didn't find association

16  between those two.

17      Q.    Now, there are other -- you

18  understand that there are other drugs

19  that are -- also have been shown to have

20  NDMA, correct?

21      A.    Well, I vaguely know a

22  little bit.  Not much.

23      Q.    Well, do you know that

24  losartan and irbesartan have been

Confidential Information - Subject to Protective Order

1    demonstrated to have nitrosamines inside

2    of them?

3           A.    I don't know, sir.

4           Q.    Have you reviewed any

5    literature or epi studies to see whether

6    or not there was an association between

7    the nitrosamines in losartan or

8    irbesartan and increased cancer risk?

9           A.    Well, if the reference are

10   not in Dr. Madigan's report, I don't

11   think I read it, except for those few

12   papers that I provide in my report.

13   Otherwise -- not an appendix -- Exhibit A

14   or B, if it's not in this, I didn't read

15   it.

16          Q.    Right.  Why wouldn't you

17   have looked at whether nor not other

18   drugs that are contaminated with

19   nitrosamines had increased risk?

20          A.    It was not in my assignment,

21   sir.

22          Q.    But you looked at Pottegard

23   and Gomm, even though that wasn't cited

24   by Dr. Madigan, correct?

1    A.    Well, you know, this is what

2  I said to you.  I'm really curious how

3  come Dr. Madigan didn't use a direct

4  approach to actually use the valsartan

5  impurity study, right, to answer this

6  issue.

7         So I Googled.  And it turns

8  out there were two, only two, that the

9  lawyers send to me, and I couldn't find

10  other studies available right now

11  directly address the issue.

12         So I thought, wow, gee, this

13  is interesting, how come Dr. Madigan did

14  not cite those two papers, right.  To me,

15  that's all relevant to this particular

16  issue, the legal case.

17    Q.    Well, you realize that it's

18  because they don't have any sort of

19  dosing to answer the question that he was

20  asked, right?  No NDMA, no amount of

21  cumulative valsartan, right?

22         MR. MERRELL:  Objection to

23      form.

24         THE WITNESS:  Well, if I

Confidential Information - Subject to Protective Order

1               were him, I would have mentioned

2               the papers about -- then you said

3               limitation of the two studies,

4               right.  Instead he just totally

5               ignored and didn't even mention

6               anything in his report.

7    BY MR. NIGH:

8          Q.    You realize there's four

9    other plaintiffs in this -- four other

10   plaintiff experts in this litigation, and

11   all the other four looked at valsartan

12   epi.  But Madigan was only asked to look

13   at dose, right, you saw that from his --

14   from his -- the question that he was

15   asked, right?

16         A.    Oh, no, sir.  No, no, no,

17   no, sir.  If you read Dr. Madigan's

18   report, first that he established this

19   so-called Q1 against Q4.  And he cited

20   all the papers using the dosing-response

21   relationship.  That's the first thing he

22   established.

23               You read this morning about

24   the lung cancer and other cancers, right.

Confidential Information - Subject to Protective Order

1    That's what he did, first place.

2              Then he go in to figure out

3    this lifetime exposure level, right.

4              So we have two pieces.  The

5    first piece, I have a serious concern

6    about his conclusion.  If you cannot sort

7    out exposure, any exposure or a Q4, like

8    for example had some issues, how can we

9    actually go down the next level to figure

10   out what's the value your concerning go

11   about, right.

12        Q.   Okay.  So your questioning

13   is -- you know, your response to that is

14   he was also evaluating the strength of

15   association first?

16        A.   Yeah.  All the odds ratio

17   he's talking about -- he's compare the Q1

18   against Q4 or Q -- whatever he used,

19   quintile or quartile, whatever it is,

20   right, lowest against the highest dose,

21   whether there is statistical significance

22   or not.  That's first step that he

23   established.

24        Q.   Okay.  Turning back to --

Confidential Information - Subject to Protective Order

1    you realize there are other drugs that

2    have also been demonstrated to be

3    contaminated with NDMA, correct?

4         A.    I don't know, sir.

5         Q.    Are you aware that Zantac,

6    generic form name ranitidine, has been

7    demonstrated to be contaminated or have

8    NDMA?

9         A.    I vaguely remember because I

10    was contacted by lawyers on the Zantac.

11    They actually -- I believe, either I

12    Googled or they send me some kind of

13    documents.

14              By the way, I was is not

15    retained for that case at all.

16              In any event, I notice

17    Zantac has impurity also.

18         Q.    It's NDMA for Zantac,

19    correct?

20         A.    Correct.

21         Q.    And also metformin, some

22    metformin drugs have been contaminated or

23    have NDMA, correct?

24         A.    That, I don't know.

Confidential Information - Subject to Protective Order

1    Q.    Did you review any

2    epidemiological studies for ranitidine

3    a/k/a Zantac, or metformin to see whether

4    they had increased risk of cancers?

5    A.    No, sir.

6    Q.    Why not?

7    A.    Well, first, I was not

8    retained by the Zantac team, the legal

9    team, so I don't think I have the time to

10   even begin to understand the impurity of

11   other medicine.

12   Q.    Well, you looked at studies

13   related to whether or not the NDMA in

14   valsartan, whether or not valsartan

15   showed increased risk of cancer.  Why

16   wouldn't you look at other drugs that

17   also have NDMA and see if there's an

18   increased risk of cancer?

19   A.    Well, because Dr. Madigan

20   didn't even mention about other

21   medicines, sir.

22         My job is mainly to address

23   an issue in Dr. Madigan's report.

24   Q.    Dr. Madigan didn't look at

1    Pottegard or Gomm either, right?

2         A.    Yeah.  I don't know why.

3    And he didn't mention anything about

4    Zantac, metformin.  I didn't see from his

5    report, unless I missed something.

6         Q.    Did you think it wasn't

7    important to consider the other drugs or

8    other medications that had NDMA in

9    thinking about whether or not NDMA in

10   valsartan could cause increased risk?

11        A.    Well, that's a very

12   interesting question.  You should ask

13   Dr. Madigan how come he didn't include it

14   in his report, if you think such an

15   important issue.  If you can actually

16   utilize to tally the evidence across all

17   the medicines, how come he didn't use it?

18        Q.    Well, I'm asking you right

19   now.

20              Dr. Madigan --

21        A.    Well --

22        Q.    He didn't include Pottegard

23   or Gomm either.

24        A.    Yeah.

Confidential Information - Subject to Protective Order

1      Q.    So I'm asking you.

2      A.    Yeah, that's right.

3      Q.    You included Pottegard and

4 Gomm.

5      A.    Yeah.

6      Q.    This question isn't for

7 Madigan.  This isn't in relation to

8 Madigan.  Let's throw Madigan out the

9 window right now.  My question is to you.

10 You included Pottegard and Gomm?

11     A.    Yeah.

12     Q.    Okay.  So you included those

13 two studies.  Why else -- why didn't you

14 include the other studies that showed

15 NDMA in medications?

16     A.    Sir, is this a case for the

17 valsartan impurity or is this a case for

18 Zantac impurity or metformin impurity

19 questions?

20          Is that -- I have to worry

21 about other medicine contamination to

22 answer your valsartan question?

23          You know, I have a problem

24 even to understand, you use a dietary

Confidential Information - Subject to Protective Order

1    study, extrapolate a result to valsartan.

2    I said, you actually can use the

3    metformin result to this valsartan case?

4    The population is so different.  The

5    patient population is so different,

6    right.

7              The Zantac population is

8    quite different than the valsartan

9    population.

10             So you are rounding a circle

11   here.  You say, well, how in the world I

12   can use other treatment, other drug

13   contamination to help me?  I said, well,

14   there's two studies.  Danish and German

15   study directly address this issue.

16             Why should I ignore?  Why

17   should I even bother to worry about other

18   drug contamination issue for this case.

19        Q.    Okay.  That's helpful.  I

20   think you're saying that you didn't look

21   at metformin or Zantac because they have

22   different populations than the valsartan

23   population, correct?

24        A.    Yeah.  Sir, I don't even

Confidential Information - Subject to Protective Order

1  know metformin had an issue.  I know

2  vaguely about Zantac issue.

3         Q.    Okay.

4         A.    Even that part I just

5  vaguely know a little bit.  I am not for

6  sure how much research I have to be doing

7  to answer your current question about

8  valsartan impurity, right.

9         Q.    Right.  So when you're

10 thinking about an impurity of NDMA in

11 valsartan, you felt like you didn't need

12 to look at Zantac or Metformin, because

13 they had different populations.  They

14 also have a different mechanism as to how

15 NDMA is formed.  Did you know that?

16        A.    No, I don't.

17        Q.    Zantac breaks down -- it's

18 been stated that Zantac breaks down not a

19 manufacturing defect.  So it's not in the

20 drug right off the assembly line.

21              Zantac breaks down due to

22 heat, humidity, time, possibly other

23 factors inside of the body.

24              That's what's been stated,

Confidential Information - Subject to Protective Order

1    right?

2              MR. MERRELL:  Objection to

3         form.

4              THE WITNESS:  Sir, I'm

5         sorry.  Go ahead.  I'm sorry, I

6         don't mean to cut you off, I'm

7         sorry.

8    BY MR. NIGH:

9         Q.    Do you recall seeing that,

10   that the way in which Zantac gets NDMA,

11   is much different than the way in which

12   valsartan has NDMA, correct?

13        A.    No, sir.  I'm so glad you

14   learn so much in the past few months,

15   right.  And I have no idea what is the

16   underlying process of this contamination

17   works, right, for each medicine.

18              I really admire you for you

19   to learn things so fast, right.

20        Q.    But if you were wanting to

21   think about whether or not to consider

22   Zantac epidemiological studies as to

23   whether or not that's beneficial for

24   valsartan epidemiology and the question

Confidential Information - Subject to Protective Order

1  at hand here, you would want to know that

2  the way in which they're getting NDMA is

3  similar, correct?

4       A.    I have no opinion, sir.  I

5  am not a toxicologist.  Besides, I have

6  not reviewed the papers in detail

7  regarding the Zantac impurity question.

8            I'm not quite sure where --

9  where the question right now, sir.  You

10  continue asking me the question about

11  other impurity, right, other drugs, which

12  was not in my assignment, which is not my

13  expertise.

14            I'm not quite sure how I can

15  actually help you on this case to figure

16  out that the valsartan -- we haven't

17  solved the valsartan issue again.  Why we

18  actually worried about other

19  contaminants, right.

20       Q.    Would you also, in

21  understanding the question between Zantac

22  and the amount of NDMA versus valsartan

23  and the amount of NDMA, that the amount

24  of NDMA that's been reported in Zantac,

Confidential Information - Subject to Protective Order

```
1   is much different than the amount of NDMA
2   that's been reported in valsartan.
3   That's something that you would also want
4   to consider as you're thinking about
5   whether or not you look at Zantac epi
6   studies for the question at hand here,
7   right?
8           A.    No.  I don't think it's
9   relevant.  It was not in my assignment.
10          Q.    You don't think that it
11  would be relevant -- when you're
12  questioning whether or not to include --
13  you didn't look at Zantac studies, right,
14  Zantac epi studies?
15          A.    Sir, my assignment was not
16  regarding the Zantac.  My assignment is
17  regarding the impurity in valsartan,
18  right.
19          Q.    Right.
20          A.    So I don't know that you can
21  transport the findings from Zantac to our
22  current case or not.  I have no idea,
23  sir.  I cannot say either way, right.
24  I'm not an epidemiologist.  I am not a
```

Confidential Information - Subject to Protective Order

1  toxicologist.  I cannot answer your

2  question.

3              If you can educate me here,

4  I'm happy to learn from you, right.

5        Q.    Nonetheless, you looked at

6  Madigan's report, and in thinking about

7  whether or not there's an association

8  between valsartan that's contaminated

9  with NDMA and increased cancer risk, you

10  decided to look at Pottegard and Gomm,

11  not any of the Zantac epi studies,

12  correct?

13        A.    The Danish study, German

14  studies are relevant to our current case.

15              Other medicine contamination

16  may be interesting, but it was not in my

17  assignment.

18        Q.    What do you mean by it

19  wasn't in your assignment?

20        A.    Well, sir, if you read in my

21  Section C, very clearly you helped me

22  this morning even read with me my

23  assignment, right.  Does my assignment

24  say anything about I should worry about

Confidential Information - Subject to Protective Order

```
 1    Zantac impurity?  Does it say anything?
 2         Q.    Let's take a look.  Number
 3    11.  We're going to pull up your expert
 4    report.  I want to be real clear here.
 5              MR. NIGH:  Number 11,
 6         Page 5.  Put that on the screen.
 7         Let's blow that up again.
 8    BY MR. NIGH:
 9         Q.    It says, "I have been
10    retained by defendants to provide an
11    expert opinion in the litigation
12    styled" -- and chose valsartan.
13    "Specifically, I was asked by counsel for
14    defendants to review and assess the
15    opinions presented by David Madigan, who
16    submitted an expert report on behalf of
17    the plaintiffs analyzing the results from
18    the dietary and occupational exposure
19    studies to infer potential risk of
20    carcinogenicity from NDME or NDEA
21    impurities in valsartan and to provide my
22    own assessment of those issues."
23              That's what it says,
24    correct?
```

Confidential Information - Subject to Protective Order

1    A.    Yes, sir.

2    Q.    Okay.  Now, that assignment

3  says "analyzing the results from the

4  dietary and occupational exposure studies

5  to infer potential risk of

6  carcinogenicity of NDME or NDEA

7  impurities in valsartan."  That's the

8  first part of that statement.  That

9  statement doesn't include Pottegard or

10 Gomm, correct?

11   A.    Correct.

12   Q.    The second part says, "And

13 to provide my own assessment of those

14 issues."

15        Is it that part of the

16 assignment that you felt authorized to

17 look at Gomm and Pottegard?

18   A.    I said in my report very

19 clearly after I raised some concerns

20 about Dr. Madigan's report, I said, well

21 why don't we actually directly address

22 the issue using the valsartan impurity

23 studies, right, instead of you go to the

24 bypass, somehow take a detour, right,

Confidential Information - Subject to Protective Order

1    using other studies.  So that's what I'm

2    try to.  I provide to you two studies

3    directly addressed issue here, right.

4           Q.    I understand.

5           A.    That's what I'm doing, yeah.

6           Q.    You made the determination

7    in your understanding in providing an

8    assessment of those issues, to go to the

9    valsartan epi studies Pottegard and Gomm,

10   right?

11          A.    Yes.

12          Q.    Why didn't you make the

13   determination to then also look at other

14   medications that were contaminated by

15   NDMA?

16          A.    I am not for sure I should

17   do it that way, sir.

18                If I have unlimited time in

19   my life, I wish I can learn a lot of

20   things from you guys.  You know, you guys

21   catch things so quickly.  I don't catch

22   things very quickly.  I need a lot of

23   time to understand the toxicology report,

24   even epidemiology report.

Confidential Information - Subject to Protective Order

1          Honestly, I have a day job.

2    I cannot afford it, right, to do

3    something is irrelevant to this case.

4          Q.    Okay.  The last part of your

5    sentence, you said, "Honestly I have a

6    day job, I cannot afford it to do

7    something irrelevant to this case."

8          Did you believe that that

9    would be looking at the other medications

10   that were contaminated by NDMA, those

11   epidemiology studies, looking at those

12   studies, would be something that is

13   irrelevant to this case?

14          MR. MERRELL:  Objection to

15       form.  Calls for a legal

16       conclusion.

17          THE WITNESS:  Well, I

18       apologize, sir.

19          You know, if you think that

20       this is very important, looking at

21       other medicine impurity, I wonder

22       how come your expert witness

23       didn't even take a look at it,

24       right.

1          If they take a look at it,

2     I'd be happy to make a comment

3     about their findings.  But they

4     didn't do anything.  They didn't

5     even bother to go to valsartan

6     study.

7          I actually made a little bit

8     of effort to bring up to you guys

9     to say, well, two studies directly

10    addressing issue.

11         You said, wow, that's very

12    good.  Why don't you go the next

13    mile and figure out what other

14    things like Zantac, Metformin.

15         I said, well, gee, you know,

16    sir, how many contaminated drug in

17    the world, how many drug I should

18    worry about before I submit my

19    report.

20         Sir, this is unrealistic

21    now, right.  It is really not

22    relevant anymore.

23  BY MR. NIGH:

24         Q.    Now, in your answer, I hope

Confidential Information - Subject to Protective Order

1    you understand that there -- we have more

2    experts than just Dr. Madigan, right?

3           A.    I don't know, sir.  I don't

4    know how many experts you have.

5           Q.    So you haven't seen the

6    opinions, you haven't seen the reports of

7    Dr. Etminan, Dr. Panigrahy, Dr. Lagana,

8    or Dr. Hecht, correct?

9           A.    The only report I read very

10   quickly, not very detailed, was the

11   epidemiologist that you mentioned, right.

12   Other than that, I didn't read the --

13   your expert witness report.

14          Q.    Dr. Etminan you reviewed

15   very quickly.  Is that what you just

16   said?

17          A.    Yes.  I did glance over.

18   Because I find out, interesting enough,

19   all his study he recommended Dr. Madigan

20   included.  I said well, gee, you know, in

21   that case I don't have to read the

22   epidemiology expert witness, because

23   Dr. Madigan solely depend on the

24   epidemiology.  Your other expert read the

Confidential Information - Subject to Protective Order

1    guidance, right, to say, wow,

2    Dr. Madigan, you should read X, Y, Z.

3              So Dr. Madigan say, oh,

4    yeah, yeah I take it.  So in his

5    deposition Dr. Madigan said, Yes, I only

6    consider those documents or papers

7    provided by the epidemiologist.  That's

8    my understanding.

9         Q.    So as you quickly reviewed

10   Dr. Etminan's report, you believe that he

11   doesn't have Pottegard -- Gomm or

12   Pottegard in his expert report as far as

13   you understand?

14        A.    No, sir, I apologize, I

15   don't remember exactly the report

16   anymore.  I'd be happy to read it and get

17   back to you.

18        Q.    But as you sit here today,

19   you wouldn't be able to say one way or

20   the other, right?

21        A.    Correct.

22        Q.    And also you wouldn't be

23   able to say one way or the other whether

24   or not Dr. Etminan, plaintiffs'

Confidential Information - Subject to Protective Order

1  epidemiologist expert, whether or not

2  he's included review of ranitidine

3  epidemiological studies, correct?

4        A.    Correct.

5              MR. MERRELL:  Counsel, we've

6        been going about an hour and a

7        half.  Can we take a break

8        shortly?

9              MR. NIGH:  Yeah, can you

10       give me just about two more

11       minutes and I think it will be a

12       good time for a break.

13             MR. MERRELL:  Of course.

14  BY MR. NIGH:

15       Q.    So I want to see if I

16  understand this correctly.

17             You found it relevant, in

18  terms of the questions here, to look at

19  Gomm and Pottegard, but you did not find

20  it to be relevant or close to the issues

21  at hand, I think you used the word

22  "irrelevant," that is, not a legal

23  conclusion, but you used that word.

24             You found it to be

Confidential Information - Subject to Protective Order

1    irrelevant to look at ranitidine or

2    Zantac epidemiology or Metformin

3    epidemiology studies, correct?

4         A.    I apologize to use the word

5    "irrelevant."  That's probably the wrong

6    word to use it.

7              I'm trying to say is my

8    assignment did not include taking a look

9    at other contaminants, right, in other

10   medicines.  That's my first answer to

11   you.

12             Second, honestly, I don't

13   have so much time on hand to deal with

14   all other medicines.  I have no idea how

15   much other medicine is contaminated, I

16   have no idea.  If you ask me, how come

17   you don't do Zantac, Metformin, somebody

18   else would say how come you don't do A,

19   B, C, other drugs.  That is the answer,

20   sir.

21             MR. NIGH:  Okay.  I think we

22        can take a break now.  Thank you.

23             THE VIDEOGRAPHER:  The time

24        right now is 2:51 p.m.  We are off

Confidential Information - Subject to Protective Order

1    the record.

2              (Short break.)

3              THE VIDEOGRAPHER:  The time

4    right now is 3:12 p.m.  We're back

5    on the record.

6    BY MR. NIGH:

7         Q.    Doctor, I want to ask you

8    about the levels of NDMA that were found

9    in valsartan, okay?

10        A.    Yes, sir.

11        Q.    Do you know what the levels

12   of NDMA were that were found in

13   valsartan?

14        A.    I don't know, sir.

15        Q.    Do you have any way of

16   describing the levels of NDMA that were

17   found in valsartan?

18        A.    No, sir.

19        Q.    Do you have any idea or any

20   way of describing how long the valsartan

21   medications were contaminated for in the

22   U.S.?

23        A.    No, sir.

24        Q.    So you haven't seen any

Confidential Information - Subject to Protective Order

1    internal testing or any FDA testing that

2    describes the amount of NDMA that was

3    found in the valsartan drugs, correct?

4         A.    The only information I got

5    is like you said for mainly from

6    Dr. Madigan's report.

7         Q.    Okay.  Well, what do you

8    know in terms of internal testing or FDA

9    testing of the amount of NDMA that's in

10   the valsartan drugs?

11        A.    No, sir.

12        Q.    You have no knowledge of

13   that, correct?

14        A.    No, sir.

15        Q.    Okay.  And how about the

16   amount of NDMA that was measured in

17   people's diets and the dietary levels?

18        A.    I have no idea, sir.

19        Q.    So as you sit here, you

20   can't make any statement or comparison of

21   the amount of NDMA that was in people's

22   diets and the dietary studies versus the

23   amount of NDMA found in the valsartan

24   pills, correct?

Confidential Information - Subject to Protective Order

1      A.      Well, I know a little bit
2   about a dietary, the food and recall.
3   You know, for example, someone can ask
4   me, last month, what did you eat, how
5   many strip of bacon you eat, right,
6   something like that.  And they
7   extrapolate those kind of things and
8   convert it to the level of exposure.
9   That is only the level I understand, sir.
10      Q.      Do you know how many -- how
11   much NDMA that they were reporting in
12   their daily diet in the various quartiles
13   in dietary studies?
14      A.      Well, this quartile, some
15   paper they describe the level.  So I know
16   the level, but I can't understand
17   biologically how much you are talking
18   about, right, in your body or your
19   bloodstream, whatever you define.
20      Q.      Do you know how much NDMA
21   that they were saying was in the foods in
22   those dietary studies, do you have any
23   way of describing that?
24      A.      No.

Confidential Information - Subject to Protective Order

1    Q.    So if I were to make the

2    statement that the amount of NDMA found

3    in valsartan pills was as high as 600

4    times the amount of NDMA in a person's

5    daily diet, you would have no way of

6    knowing if that was true or not, correct?

7                MR. MERRELL:  Objection to

8         form.

9                THE WITNESS:  Yeah, I have

10        no -- I don't know where I can get

11        that information from

12        Dr. Madigan's report.

13   BY MR. NIGH:

14        Q.    Is that something you looked

15   for in Dr. Madigan's report and you just

16   didn't find it or you don't recall

17   looking for that?

18        A.    Well, he maybe mention

19   something.  Maybe if I can read his

20   report again I can confirm.  What I think

21   is he did not mention or I forgot what he

22   mentioned.  Maybe somewhere he mentions

23   well, valsartan impurity probably is X

24   times higher than whatever is, right.

Confidential Information - Subject to Protective Order

1  That's probably what he said somewhere.

2  But I need to go back to his report.

3        Q.    But as you sit here right

4  now, you don't remember any comparison

5  that Madigan made or that you've seen in

6  terms of comparing the amount of NDMA in

7  the valsartan drugs versus the amount of

8  NDMA in these dietary studies, correct?

9        A.    I don't recall, sir.

10        Q.    And as you looked at the

11  dietary studies, you don't recall whether

12  or not, when dietary studies had lower

13  amounts of NDMA in the highest quartiles,

14  they were less likely to show effects

15  than when they had higher amounts of NDMA

16  in the quartiles, the highest quartile.

17  Do you recall ever looking at that?

18        A.    The analysis Dr. Madigan did

19  most is sort of transport from

20  publication.  For example, in a

21  publication, the majority of

22  publications, they compared the quartile,

23  right, the Q1 against the Q2, Q3, and Q4.

24  And most they are reporting on the trend

Confidential Information - Subject to Protective Order

1    test combining those three tests

2    altogether.  That's what Dr. Madigan

3    mainly depend on, right, using those

4    P-values, using this statistical

5    significance job and word, to claim there

6    is issue from this study for this cancer.

7                That's what I'm concerned,

8    from a statistical point of view, is this

9    a valid way to evaluate the safety of an

10   impurity in valsartan.

11          Q.    You don't recall looking at

12   dietary studies or even Madigan's report,

13   to see whether or not as dietary levels

14   are lower -- sorry.  Strike that.

15               You don't recall looking at

16   dietary studies or even Madigan's report

17   to assess whether or not if the dietary

18   levels are lower in the highest quartile

19   in various dietary studies, then it would

20   be less likely to show an effect than

21   dietary studies that had higher amounts

22   of NDMA in the dietary studies.  You

23   never looked at that or saw that in

24   Madigan's report?

Confidential Information - Subject to Protective Order

1    A.    I don't recall, sir.

2    Q.    That wasn't something that
3  was important to you in terms of the
4  findings or conclusions that you made in
5  your report, correct?

6    A.    I'm sorry.  I missed a few
7  words in the beginning.  Could you say it
8  again, please.

9    Q.    I said that wasn't something
10 that was important to you in the findings
11 or the conclusions that you made in your
12 report, correct?

13   A.    Yes, if I didn't say in my
14 report, then it is -- I either say it is
15 not relevant or something I don't think
16 is important.

17   Q.    And comparing the amount of
18 NDMA in the valsartan pills compared to
19 the amount of NDMA in the dietary
20 studies, that also wasn't important to
21 you in the findings or the conclusions
22 that you made in your report, correct?

23   A.    Well, first I have a concern
24 how can we use the dietary study even

Confidential Information - Subject to Protective Order

1    infer the issue on the impurity of

2    valsartan.  I have a hard time to

3    extrapolate the result from the dietary

4    studies or occupational study to

5    purity -- impurity valsartan study.

6          Q.    And you're not a

7    toxicologist, correct?

8          A.    No, sir.

9          Q.    So you're not commonly

10   experienced in looking at contaminations

11   or carcinogens or toxins in one source

12   and trying to make conclusions or

13   assumptions of that contamination and the

14   amount of that contamination in another

15   source, correct?  You don't do that?

16         A.     Not for the contamination,

17   but I have involved in many, many Phase I

18   trials for drug development which started

19   with animal study.  We figure out is it

20   highly significant, right, for the new

21   compound.

22              But unfortunately when we

23   transported this model to human beings,

24   sadly, most didn't work.  We cannot even

Confidential Information - Subject to Protective Order

1    transport the animal study result to

2    human beings either.

3                That was my understanding

4    beyond the use safety, right, or

5    contaminant.  I didn't deal with

6    contaminant issues before.

7        Q.    Now, let me rephrase that.

8    I see how you thought of animal studies.

9    So I'm just speaking of human

10   epidemiological studies.

11               You're not commonly --

12   you're not experienced in looking at

13   contamination or carcinogens or toxins in

14   one source of epidemiological studies and

15   trying to make conclusions or assumptions

16   of that contamination and the amount of

17   that contamination in another source.

18   That's not something that you do,

19   correct?

20       A.    I don't, but, sir, if you

21   allow me to say one thing.  Even within

22   the dietary studies, the studies are so

23   heterogenous, you know, as Dr. Madigan

24   indicated in his report, also deposition,

Confidential Information - Subject to Protective Order

1    right, even Song, S-O-N-G, paper, the

2    meta-analysis, they actually admitted

3    even the study involving meta-analysis is

4    so different, right.

5              If you look at the forest

6    plot of meta-analysis by Song, you can

7    see it.  The effect size, even

8    statistical significance, the changing

9    back and forth around this null value,

10   which is one, odds ratio, or OR.

11             You know, that indicates

12   even with the dietary study, I cannot use

13   the result from the one dietary study to

14   another one, right.  Easily it's not

15   applicable.

16             That's why they use

17   meta-analysis, to try to combine the

18   information to go together, get a single

19   summary to tell us if there is something

20   going on with this -- with the

21   contamination.

22        Q.    Okay.  Let me see if I

23   understand your testimony.

24             I believe you are agreeing

Confidential Information - Subject to Protective Order

1  with me that you're not experienced in

2  looking at contamination or carcinogens

3  or toxins in one source of

4  epidemiological studies and trying to

5  make conclusions or assumptions of that

6  contamination and the amount of that

7  contamination in another source.  That's

8  not something that you do, correct?

9       A.    Correct.  I don't do that.

10      Q.    So I think what you're

11  telling me is your concern is that, even

12  looking at the dietary studies, there's

13  so much heterogeneity and other issues

14  with those studies, that you don't

15  believe you can extrapolate even to other

16  dietary studies, those findings, correct?

17      A.    To valsartan, yes.  Okay.

18  Yes.

19      Q.    Right.  Not just to

20  valsartan, but even to other, you know,

21  dietary issues.  So if your question was,

22  does NDMA in diet cause cancer?  You

23  would raise, there's too much

24  heterogeneity between the dietary

Confidential Information - Subject to Protective Order

1    studies, and model fit issues and other

2    things of that nature, that you don't

3    think the dietary studies could even

4    answer the question, does NDMA in diet

5    increase the risk of cancer, right?

6         A.    Yeah.  For a specific

7    population.  If you ask yourself, for

8    this particular population, can you tell

9    me I have such contamination for NDMA,

10   right, I say, well, I'm not for sure how

11   to answer your question, right.  Even if

12   I use meta-analysis, I cannot, right.

13             Basically we cannot even

14   pre-specify population.  You telling me,

15   and those people what is the number, you

16   know, max number, whatever you want to

17   define as the cutoff, ratio or whatever

18   the number is, that is applicable to

19   everyone or to this particular

20   population, right.  We don't know.  We

21   cannot even use meta-analysis to helping

22   us.

23        Q.    When you say population, you

24   don't mean United States, because we're

Confidential Information - Subject to Protective Order

1    looking at people from the United States,

2    versus other countries, correct?

3           A.    Yeah, I'm talking about

4    population.  For example Danish

5    population, those are using so-called

6    Danish the -- registry database, health

7    -- so-called health registry.  That's

8    their population that they're talking

9    about.

10          Then you talk about the

11   German study.  And those guys deal with

12   insurance companies.  That's the

13   population that they're talking about.

14          So every study population,

15   they have well defined population, right,

16   of subjects they followed.  So that's

17   what I'm talking about in population.

18          Q.    So you would have difficulty

19   taking the findings, for example, in

20   Pottegard, a Danish population, and

21   giving meaning to what happens in the

22   U.S. population.  Is that what you're

23   saying?

24          A.    Yeah.  I agree -- agree with

Confidential Information - Subject to Protective Order

1    that.  I'm saying -- you're absolutely

2    right.  I cannot saying Danish findings

3    is automatically transportable to U.S.

4    particular population.  We don't know

5    that.  We have no idea.

6              Either way, I cannot -- like

7    I said before, sir, even with the two

8    studies, we -- we know they directly

9    address the issue, right.  However, like

10   every observational study, they had a

11   limitation, right.  So we don't know how

12   we can actually say definitely today,

13   sitting here, say impurity of valsartan

14   really caused the problem or not.  We are

15   not in a position even to make a decision

16   right now.   We really need a very well

17   conducted prospective study, not probably

18   with the valsartan contamination or

19   impurity population because that's

20   impossible to do anymore, right.

21              So that's the issue we're

22   facing.  We need to collect more data.

23   And we need more studies.

24              Almost every paper that

Confidential Information - Subject to Protective Order

1    Dr. Madigan cited in the dietary study,

2    towards the end of the day, you know,

3    there's one line, they said there's

4    limitation.  We should conduct a

5    prospective study, a long-term follow-up.

6              That's what they are saying.

7    Unifying words.  You know very well,

8    because you read those papers.  Worried

9    about words, right.

10         Q.    So it's your belief that

11   without that prospective study, it

12   doesn't matter how much contamination

13   there was in the valsartan pills, we

14   wouldn't be able to study the issue,

15   right, because we can't do a prospective

16   study at this point?

17         A.    Well, I think what -- if you

18   allow me to say a few words.  If I

19   were -- had a choice, having a choice, I

20   said either you follow the Danish

21   population a little longer, right.

22   Unfortunately, those population, the

23   patients will be contaminated by other

24   things, right.

Confidential Information - Subject to Protective Order

1          Maybe they started eating a

2    lot of food with contamination, et

3    cetera, right.  So we do need longer

4    follow-up, even though the study has

5    4.5 years immediate follow-up.  It's

6    pretty long.

7          But on the other hand we

8    cannot really go back to do a prospective

9    study anymore with this valsartan

10   impurity, anymore, right.

11         So what I think is the best

12   that we can do at this stage, you

13   actually design a trial, for example

14   using dietary, right.  And you say let's

15   use a tactic, just like follow the

16   patient from the beginning for many, many

17   years, right, for dietary.  And see how

18   much contamination you are talking about,

19   right.

20         Then you match the dietary

21   population patients closely to your

22   valsartan U.S. population, what kind of

23   patient are taking this impurity

24   contaminate, right, the valsartan.  So

Confidential Information - Subject to Protective Order

1    that would probably give us a signal to

2    find out what's going on.

3          Q.    So you would want to design

4    a clinical trial where the patients in

5    the dietary study are being given food

6    that has the amount of NDMA as the amount

7    of NDMA that people in valsartan were

8    getting each day in the contaminated

9    pill, is that what you're saying?

10          A.    No, you cannot afford people

11    taking a certain amount of contamination,

12    right.  That's not ethical at all.

13                But I'm saying first you

14    need to sort it out, if any association

15    with exposure and unexposure, right, or

16    the level of exposure, using dietary

17    study first, right.  You cannot force

18    people, say, hey, you give me the

19    equivalence of food contaminant, right,

20    equivalent to valsartan impurity level.

21    I'm not quite sure you can do that,

22    right.

23          Q.    Have you seen anything that

24    suggests that it would take about

Confidential Information - Subject to Protective Order

1   60 pounds of bacon, eating about

2   60 pounds of bacon a day to get the

3   amount of NDMA in your food that people

4   were getting in one pill of valsartan?

5        A.   Well, I don't know.  I never

6   heard about that piece.

7        Q.   Okay.  That's something that

8   you would want to know, right?

9             MR. MERRELL:  Objection to

10       form.

11            THE WITNESS:  Well, you

12       know, there are so many news this

13       day.  I'm just really not sure how

14       true it is.

15  BY MR. NIGH:

16       Q.   Well, if you did the math

17  from the FDA, and what they say the

18  amount of bacon and the amount of NDMA is

19  in bacon, and then you looked at the

20  amount of NDMA in valsartan, you could do

21  the math, you could see that it's 30 to

22  60 pounds of bacon.  You haven't done

23  that though, right?

24       A.   No, I have no idea.  Again,

Confidential Information - Subject to Protective Order

1    I'm not a toxicology or epidemiology.

2            Q.    Okay.  What do you know

3    about new user designs?

4            A.    Well, in the Danish study,

5    the authors did some sensitivity

6    analysis, also called supplementary

7    analysis.  And one thing they did are

8    called incident to users.  They don't use

9    the word "new users."  But anyway, that's

10   a similar term.

11            So they are talking about

12   for the new users they do analysis

13   between the two groups, one is exposed

14   and unexposed.  That's my understanding.

15            Q.    Right.  "New user" and

16   "incident user" are terms that are used

17   commonly to talk about new user design or

18   incident user design, those are used

19   interchangeably, correct?

20            A.    Well, we -- it is

21   interesting.  I think we use -- incidence

22   is a more mathematical term.  And using

23   new user is sort of like ordinary

24   language.

Confidential Information - Subject to Protective Order

1    Q.    Okay.  One is more technical
2  you think and the other -- or more
3  mathematical and the other is ordinary
4  language, but they are discussing the
5  same thing, correct?
6    A.    That's my understanding,
7  sir.
8    Q.    Okay.  And is it your
9  understanding that --
10    A.    I have some of my -- I'm
11  bleeding.
12        MR. MERRELL:  Do you want to
13    take a break?
14        THE WITNESS:  No, no, that's
15    okay.  I just scratched myself.
16        You talk to lawyers you get
17    nervous, right, so I started
18    scratching.  If you allow me to
19    call your first name --
20        MR. NIGH:  Sure.
21        THE WITNESS:  You are pretty
22    tough lawyer, aren't you, right,
23    you are famous for.
24  BY MR. NIGH:

Confidential Information - Subject to Protective Order

1    Q.    Famous?  Oh, like -- Bill

2    Nye the Science Guy.

3         A.    Well, anyway.  Sorry, I

4    apologize.

5         Q.    Okay.  Let's take a look

6    at -- my question is, in the last ten

7    years, aren't there, you know, a lot of

8    studies that are out there talking about

9    that it's helpful or useful to do new

10   user or incident user design in

11   observational studies?

12        A.    Well, the only thing

13   recently, I did -- helping a company

14   figure out using this so-called EPO

15   equivalent.  I don't know if you know

16   this EPO, this compound.

17             We actually helping chemo

18   patients, right, their hemoglobin level

19   is too low, we're giving them this EPO,

20   and it jack up their red cells.  Also the

21   hemoglobin level, right.  So there is

22   other alternative right now, and I'm

23   helping a biotech company to analyze the

24   data with the so-called incidence

Confidential Information - Subject to Protective Order

1  dialysis patient.  That means there's a

2  newly -- newly go to treatment for

3  dialysis patient.

4              Even in the beginning, they

5  didn't use it, right.  Then during the

6  trial start to use it.

7              So we are very interested to

8  find out the incident users they not have

9  any benefit by taking this oral EPO

10  equivalent compound.

11      Q.    Okay.  Describe the benefits

12  or advantages of using a new user design

13  or incident user design?

14      A.    Well, I think somehow, I'm

15  not quite sure in this case, why this

16  incident user becomes interesting.

17              I would say the primary

18  endpoint is for entire population, right.

19  They have 5,000 patients available in the

20  database.  That's their primary endpoint.

21              Then afterwards they can do

22  other so-called secondary analysis.  For

23  example, this is called a subgroup

24  analysis thing.

Confidential Information - Subject to Protective Order

```
 1                    So they can pick up anything
 2   they wanted to, right, the incident users
 3   or something else.  People do all the
 4   time.  But see the problem is for the
 5   subgroup analysis, we have to be careful
 6   how to interpret the results now.
 7   Because you cannot use a .05 anymore for
 8   all the subanalysis, right.  And that
 9   will be exactly falling into this
10   multiple comparison problem.
11                    So if you talking to people,
12   subsequent analysis, yes or no, people
13   always tell you, you have to make
14   adjustment.  To make adjustment, that's
15   exactly the same thing, we talking about
16   the whole day, multiple comparisons,
17   right.  So you have to be careful when
18   you interpret a result for all the
19   subgroup analysis.
20                    In this case we have to be
21   careful to interpret the incident users,
22   right, what is the hazard ratio, what is
23   it you are talking about, right.
24                    And for example, in this
```

Confidential Information - Subject to Protective Order

1   case, I believe at a rate of one point

2   something, you know, is not a really

3   pressing hazard ratio.

4           Q.    I asked you if you could

5   describe the benefits or advantages of

6   using a new user design or incident user

7   design.  Do you know what the benefits of

8   using a new user design or incident user

9   design when looking at observational

10  studies is?

11          A.    Well, in general, I have no

12  opinion on this, sir.  It is case by

13  case.  Depend on what kind of compound

14  you are interested in.  If something

15  existing for new users, of course that

16  would be a primary endpoint, primary

17  population, instead of using the entire

18  population you are interested, right.

19              So it all depends on your

20  question you want to answer.

21          Q.    Do you believe that the

22  benefits or disadvantages of using a new

23  user design or incident user design are

24  somehow different when it's the primary

Confidential Information - Subject to Protective Order

1    endpoint or the secondary endpoint?

2         A.    Well, I can -- I have a lot

3    of experience dealing with drug

4    development using so-called experience --

5    experience means those patients are

6    already using this compound for many

7    months, or something, right.

8              Now you have a new compound

9    now, right.  Then you ask yourself, say

10   do I need to get a naive patient, when I

11   say naive patient means exactly like you

12   said, the new user, right.  So when we do

13   a clinical trial, it's always interesting

14   to know, say, are you going to include

15   experienced patient and naive patient.

16             Most of the time we stratify

17   those two populations, right, to

18   understand what happened if the patient

19   had experience with this compound.  And

20   it turns out usually experienced patient,

21   their response for the extended treatment

22   is very low.  Basically, they already

23   pick it up by those -- the older

24   compound.

Confidential Information - Subject to Protective Order

1    So in a sense for new users,

2    sometimes you show something -- a big

3    difference between the two groups,

4    treating against control.  But

5    experienced sometimes we don't see this

6    very well.  The -- I take it back.  The

7    other way around.  That means the

8    experienced drug, right, the experienced

9    patient using the standard treatment,

10   usually you don't have a very good

11   response, right.  But in the new

12   treatment, it's very good.

13            So the difference is very

14   different.  But for the new user, usually

15   we don't see too much, because they sort

16   of balance out.

17            So it all depend on what you

18   wanted to do.  In this case, it's very

19   interesting.  The experienced user, if

20   you think about it, right, they probably

21   getting used to it and this is the

22   thought.  So you can ask yourself, if you

23   continue using it, what happened.  I

24   think both questions are interesting for

Confidential Information - Subject to Protective Order

1    this case.

2              But I'm not for sure if you

3    want me ranking which one is more

4    important.  I don't know.  It depend on

5    investigator or clinical question that

6    you want to ask.

7         Q.    In observational studies,

8    what are the benefits or advantages of

9    using a new user design or incident user

10   design?

11        A.    For observational study, I

12   don't know, sir.  I know as part of the

13   clinical trial setting.  I think probably

14   the same principle apply to observational

15   study.

16              I think basically, sir, it

17   all depend on your clinical question,

18   what kind of question you want answered.

19              MR. NIGH:  Let's take a look

20        at LP-1578.

21              (Document Marked for

22        identification as Exhibit

23        Wei-11.)

24              MR. NIGH:  This will be

1          marked as Exhibit 11.

2                    Let's blow up the opinion.

3     BY MR. NIGH:

4          Q.     Actually the a the bottom,

5     we can see that this is published in

6     Rheumatology.

7                    Do you see that?  It's

8     published 2015, Rheumatology.

9                    Do you see that?

10         A.     Yeah.  It's a little too

11    small for me, sir.

12                   MR. NIGH:  Let's blow that

13         up a little bit more, if we can.

14         We can do each one separately.

15    BY MR. NIGH:

16         Q.     Do you see Rheumatology,

17    Nature Reviews Rheumatology, July of

18    2015.

19                   Do you see that?

20         A.     Yes, sir.

21                   MR. NIGH:  And now, let's

22         pull up the abstract and the

23         title.  Blow up the title.  Yeah,

24         right there.

Confidential Information - Subject to Protective Order

1    BY MR. NIGH:

2          Q.    "Opinion:  Active comparator

3    design and new user design in

4    observational studies."

5               And you can see the authors

6    there, right?

7          A.    Yes.

8          Q.    And it says, "Over the past

9    decade, an increasing number of

10   observational studies have examined the

11   effectiveness or safety of treatments for

12   rheumatoid arthritis.  Unlike randomized

13   clinical" -- "controlled trials, however,

14   observational studies of drug effects

15   have methodological limitations, such as

16   confounding by indication."

17              Do you see that?

18         A.    Yes, sir.

19         Q.    "Active comparator designs

20   and new user designs can help mitigate

21   such biases in observational studies and

22   improve the validity of their findings by

23   making them more closely approximate

24   RCTs."

Confidential Information - Subject to Protective Order

1          Do you see that?

2          A.     Yes, sir.

3          Q.     Is this the first time that

4  you've seen papers that discuss using new

5  user designs can help mitigate these

6  sorts of biases in observational studies?

7          A.     Yeah, this is new to me.

8          Q.     Okay.  Next, it says -- I'll

9  go to, "This principle helps ensure that

10 treatment groups have similar treatment

11 indications, insinuating both measured

12 and unmeasured differences in patient

13 characteristics.

14          It next says, "The new user

15 study includes a cohort of patients from

16 the time of treatment initiation,

17 enabling assessment of patients'

18 pre-treatment characteristics and capture

19 all events occurring during follow-up."

20          Do you see that?

21         A.     Yes, sir.

22         Q.     Are you aware that there

23 were numerous studies over the last ten

24 years that talk about using new user or

Confidential Information - Subject to Protective Order

1   incident user designs in observational

2   studies and the benefits that it

3   provides?  Are you aware of that?

4        A.    No, sir.

5              MR. NIGH:  Let's take a look

6        at another one.  LP-1567.

7              (Document Marked for

8        identification as Exhibit

9        Wei-12.)

10             MR. NIGH:  This will be

11       marked as Exhibit 12.

12  BY MR. NIGH:

13       Q.    Let's take a look at the

14  second page.  At the very top, you can

15  see the name of the journal,

16  pharmacoepidemiology and drug safety,

17  published 2013.

18             Do you see that?

19       A.    Yes, sir.

20       Q.    And it says, in the

21  abstract, "Comparative effectiveness

22  research includes cohort studies and

23  registries of interventions.  When

24  investigators design such studies, how

1    important is it to follow patients from

2    the day they initiate a treatment with

3    the study interventions?

4              "Our article considers the

5    question and related issues to start a

6    dialogue on the value of the incident

7    user design in comparative effectiveness

8    research.

9              "By incident user design, we

10   mean a study that sets the cohort's

11   inception date according to patients' new

12   use of an intervention.  In contrast,

13   most epidemiological studies enroll

14   patients who are commonly or recently

15   using an intervention when follow-up

16   began."

17             Now with this, Pottegard had

18   the ability to do a new user design

19   analysis.  Had they made the decision to

20   make that their primary endpoint, the

21   data would not have changed for that

22   analysis, correct?

23        A.    You mean they're going to

24   switch the incident users, the subgroup

Confidential Information - Subject to Protective Order

1    as the population of interest?  That's

2    what you're asking me?

3         Q.    Yes.  They could have done

4    that?

5         A.    Yeah, well, they could.

6         Q.    And they would have all the

7    data to have been able to report on what

8    the findings would have been for the new

9    user analysis, correct?

10        A.    I believe so.  They did a

11   sensitivity analysis using the subgroup

12   analysis.

13        Q.    In looking at Page 5,

14   Number 4 -- actually, below, on the left

15   side it shows recommendations for

16   reporting.

17             Do you see that?

18             Recommendations for

19   reporting.

20             And Number 4 shows,

21   "Investigators should conduct sensitivity

22   analyses with varying definitions of

23   incident use to illustrate the stability

24   of findings with respect to validity and

Confidential Information - Subject to Protective Order

1    precision."

2              Do you see that?

3         A.    Yes, sir.

4         Q.    And that's what Pottegard

5    did, they had a new user design in their

6    study, correct?

7         A.    Yeah.  They did a subgroup

8    analysis, a sensitivity analysis.

9         Q.    Are you aware of whether or

10   not Gomm had a new user analysis?

11        A.    That, I don't know.

12        Q.    Okay.

13              MR. NIGH:  Okay.  Let's take

14        this down.  Let's look at

15        Pottegard.  LP-1573.

16              (Document Marked for

17        identification as Exhibit

18        Wei-13.)

19              MR. NIGH:  This will be

20        marked as Exhibit 13.

21   BY MR. NIGH:

22        Q.    Now you spent time in your

23   report talking about the American

24   Statistical Association.

1              Do you remember that?

2         A.    Yes, sir.

3         Q.    And their criticisms of

4    using P-value of less than .05 as a line

5    in the sand, so to speak, right?

6         A.    Yes.

7         Q.    In other words, if a P-value

8    in a study is .051 versus .049, those

9    don't have a large difference in how you

10   interpret that study, correct?

11        A.    Well, it's more than that.

12   Even you can stretch out a little bit.

13   You know, even say .07 and .04, aren't

14   different enough.  Basically, they are

15   the same.

16        Q.    Okay.  I think you used

17   also, if they are .07 and .04, they're

18   going to have a similar effect.

19             Now  -- right?  I mean, in

20   terms of your interpretation?

21        A.    Hold on.  Hold on a second,

22   sir.  Sorry to interrupt you.

23             The American Statistical

24   Association, if you read it very

Confidential Information Subject to Protective Order

1    carefully, they are just telling us,

2    don't use a single metric, which is P

3    less than .05, to make a black and white

4    claim for the statistical significance.

5              We should utilize other

6    judgment, for example, from clinical

7    input -- clinical input, right, and from

8    subject matter people.

9              And we all know very well

10   when Dr. Madigan in his deposition, the

11   defense lawyer showed us ASA statement

12   line by line.  Everything, she ask

13   Dr. Madigan, "Do you agree with ASA

14   statement?"  And Dr. Madigan always say

15   yes.

16             Okay.  So, basically, he

17   agrees with ASA statement, saying we

18   should not use P less than .05 or

19   95 percent confidence interval, excluding

20   null value or not, to make a decision.

21   And broader, we should look at the entire

22   totality of evidence to make a decision.

23             So that's the point.  So the

24   P-value is the what.  You know, it's not

Confidential Information - Subject to Protective Order

1    that interesting.  You should provide

2    more information to telling us this case,

3    telling actually a lot of information

4    regarding the impurity of the valsartan

5    or not, right.

6           Q.    I understand.  In terms of

7    interpreting data from a single study, if

8    it has a P-value of .04 or a P-value of

9    .07, as you spoke, your interpretation or

10   the weight that you give to those,

11   there's no bright line rule that says .05

12   makes the finding important, or under --

13   or over 0.5 makes the finding not

14   important, correct?

15          A.    That's correct.

16          Q.    Now, if the P-value is .04

17   and the other P-value, versus a P-value

18   of .00001, you don't believe that the

19   American Statistical Association is

20   saying to ignore a P-value of .0001, as

21   you think about the effect that that had

22   in that study, correct?

23          A.    Oh no, no, sorry.  This is

24   misleading.  You see a study with a huge

Confidential Information - Subject to Protective Order

1   sample size like cardiovascular trial.

2   As you know very well, right,

3   cardiovascular trial, they involve

4   thousands and thousands of patients,

5   right.  So even your treatment, the group

6   difference is so small, the P-value is

7   very, very small.  Because basically a

8   tiny little difference will grow up the

9   P-value or grow down the P-value, right.

10              Everybody knows the fact, we

11  have the cardiovascular trial, we have a

12  wonderful P-value, but the clinical

13  utility is very little.  I can give you

14  many, many examples.

15              But in any event, in a rare

16  disease, for example, the sample size is

17  limited.  If I have entire world have 500

18  kids, they have a problem, you said well,

19  I'll tell you what, I use 400 patients in

20  the study.

21              Basically you use entire

22  population now.  Even the P-value you

23  know because the sample size, the

24  population size, you're now going to get

Confidential Information Subject to Protective Order

1    .0001, but you're going to see clinical

2    utility, right.

3                So I don't think we should

4    have used a P-value of .001, versus .004.

5    .01 is highly significant.  It must be a

6    lot of clinical utility, right.  It's not

7    true at all.  This actually contradicts

8    what we are thinking.  That is the

9    problem of using P-value.

10               I bet you a dollar if I ask

11   you to explain to me what a P-value is

12   right now, I think you have a hard time

13   to explain to me, right.  Most clinical

14   people have a hard time to understand

15   what a P-value is.  Basically, they don't

16   even understand P less than .5, okay.  So

17   because the traditional way, in the

18   appropriate way, when everybody using

19   P-value .05 is for convenience.

20               But anyway, sorry for this

21   long response to your question.

22        Q.    I wouldn't make assumptions

23   about what I know for P-value, okay?  I

24   think that's inappropriate for this

1  questioning.

2            But my question is, as

3  you're considering the weight of a

4  particular study, if a P-value is .04

5  versus a P-value of .0001, you would give

6  more weight to the study that has a

7  P-value of .0001 than you would to the

8  study with the P-value of .04, all things

9  else equal?

10       A.    You're saying .04, in the

11  same population, the same treatment, the

12  same control, is that what you're saying?

13       Q.    Everything else equal.  Just

14  looking at the P-value between those two

15  studies.

16       A.    If they are identical

17  studies, one got a .04, and the other one

18  .001, we are in trouble.  That means

19  highly significant difference.  How come

20  you can translate the first study with

21  .04?  Then we have really concern now,

22  right.

23            That means FDA always ask

24  you to do two studies, confirm your

Confidential Information - Subject to Protective Order

1    so-called significance.  Now you are in

2    trouble.  One isn't so significant, the

3    other one is mediocre.  What are you

4    going to do?  It's inconsistent.

5         Q.    As you interpret P-values,

6    is it your statement that you don't think

7    that a P-value of .0001 in a study has

8    more effect or more weight than a P-value

9    of .04?

10              MR. MERRELL:  Objection to

11         form.

12              THE WITNESS:  When you say

13         treatment affect size, you see you

14         go back to clinical utility, or

15         clinical effectiveness, right.

16              Your .001, and you --

17         probably the difference only save

18         the patient a couple weeks, but

19         with huge study, you got a .0001,

20         right.

21              Then you say .04.  If I gave

22         you the differences of say, two

23         months, you say wow, which one you

24         really think we have more benefit,

Confidential Information - Subject to Protective Order

1      is the first study with .04 or the

2      second one with .0001.

3              You see the problem in

4      utilizing P-value as the sole

5      metric to make a decision, you

6      don't have the scientific evidence

7      at all.  You basically just tell

8      me the probabilities then, right,

9      which is not very helpful.

10  BY MR. NIGH:

11         Q.     So as you interpret the

12  study, and you see a study that has a

13  P-value of .04.  And another study -- and

14  I'll be very clear.  I'm saying a P-value

15  of .0000001, okay?

16              You wouldn't put more

17  interpretation or more weight on the

18  finding that has a P-value of .0000001

19  than you would the one that has a P-value

20  of .04?

21         A.     I need to look at the

22  confidence interval of the two studies.

23  The first one, your confidence interval

24  is very tight.  For example, hazard

Confidential Information - Subject to Protective Order

1    ratio, right.  Your hazard ratio is like

2    a .99, right, but because your P-value is

3    so good, your other finding of .998 is

4    still below one.  You say, wow, look,

5    this is highly significant.  But a hazard

6    ratio of .99, that's almost close to one,

7    right.

8              Then the other one is the

9    confidence interval 95 percent.  You say

10   wow, look, the hazard ratio is a .7.  The

11   other finding is .95, right.

12             So which one you prefer?

13             You need more -- you need

14   more evidence to enter in the P-value,

15   right.

16        Q.    Sure.  You would want to see

17   confidence intervals as well.  But

18   looking at just the P-value --

19        A.    Yeah.

20        Q.    -- of .04 versus a P-value

21   of .0000001, you can't make any

22   comparison between the effect you would

23   have just looking at P-values?

24        A.    No.  You look at a

Confidential Information - Subject to Protective Order

1    confidence interval, that would tell you

2    exactly the size of the difference.  Many

3    times what is the effect of size, what is

4    the effect of size you are talking about.

5    It's not only the P-value matters

6    anymore, right.

7              P-value is giving you the

8    first hurdle.  You pass the hurdle.  You

9    say, well, you know, it looked like my

10   assumption -- there is no difference

11   between two groups.  That's your

12   assumption.  You reject this assumption.

13   You say, what is the probability, I

14   observe this extreme value, I observe the

15   hazard ratio of .99, right.  What is the

16   chance it is .00001.  Because you have

17   thousands and thousands of patients,

18   right, so obviously you can detect a tiny

19   little bit of difference of .99 from one,

20   right.  I said who cares, who cares about

21   the difference of .01.  But because your

22   sample size is so big, you've got such a

23   good P-value.  But I said wait a second,

24   let's look at the size of your -- the

Confidential Information - Subject to Protective Order

```
 1    group before we jump into the conclusion.

 2              Do you think that's more

 3    informative than to only use P-value?

 4         Q.    I think in my question --

 5    you keep jumping to changing the effect

 6    size.  I haven't told you effect sizes

 7    yet.  I've only asked you to look at

 8    P-values.

 9              I'm not sure why you keep

10    trying to bring -- hold on, hold on.  Let

11    me ask my question.

12         A.    Okay.

13         Q.    I'm not sure why you keep

14    trying to bring the effect size.  It's

15    almost like a gotcha moment.

16              What I'm telling you is, in

17    this next question, since you have

18    difficulty just looking at the P-value

19    and want to run to effect size, my

20    question now is, if the effect size is

21    the same in both studies and one has a

22    P-value of .04, and the other one has a

23    P-value of .0000001, would you interpret

24    those any differently?
```

Confidential Information - Subject to Protective Order

1          MR. MERRELL:  Object to

2     form.

3          THE WITNESS:  Sorry, sir,

4     you are changing your story now.

5     You're saying solely based on

6     P-value multiplication.  Now you

7     are telling me the two studies are

8     the same size, right.

9          If the same size, the

10    confidence interval is .04 is

11    wider, right, then the P-value of

12    .001, right.  Of course, I said

13    choose the one that is .001,

14    because you already told me they

15    have the same size.  That's extra

16    information you're giving to me,

17    right.

18 BY MR. NIGH:

19         Q.    Let's take a look at

20 Pottegard.

21         Okay.  If you take a look at

22 Page 4.  Direct your attention to the

23 bottom of the first page, the writing

24 there.  You can see that paragraph there,

Confidential Information - Subject to Protective Order

1    and on over to the second -- to the left

2    column where it says "Results

3    Comparable."

4                    MR. NIGH:  If we can blow

5           that up to the next paragraph.

6           Just the next paragraph.  I don't

7           need all the rest of that.  So we

8           can blow this up bigger.

9    BY MR. NIGH:

10          Q.    When you look at this, you

11   can see "Results comparable to the main

12   analyses were found when we stratified by

13   sex and age, whereas a stronger

14   association was seen when we restricted

15   to incident users during the study period

16   (hazard ratio of 1.58 with a confidence

17   interval of .99 to 2.52) 95 percent

18   confidence interval."

19                  Do you see that?

20          A.    Yes, sir.

21          Q.    So they report on a

22   1.58 hazard ratio with a confidence

23   interval that just barely crosses one,

24   correct?

Confidential Information – Subject to Protective Order

1    A.    Yes, sir.

2    Q.    And had they set out as the

3  primary endpoint to be new user design or

4  incident user design, they would still

5  have that same finding, hazard ratio 1.58

6  on this population, with a 95 percent

7  confidence interval of .99 to 2.52,

8  correct?

9    A.    Yes, sir.

10    MR. NIGH:  Okay.  We can

11    take this off -- off the screen.

12    Actually, let's put

13    Pottegard back up.

14  BY MR. NIGH:

15    Q.    As you looked at Pottegard,

16  did you ever wonder or ask the questions,

17  was there contaminated products that were

18  being announced after the publication of

19  this study?

20    A.    I don't know.

21    Q.    Okay.  The point of

22  Pottegard is to compare uncontaminated

23  group to people who were possibly

24  contaminated or probably contaminated,

Confidential Information - Subject to Protective Order

1    correct?

2           A.    Yes.

3           Q.    So already in that study

4    design, we don't have a true test in that

5    study design, because even the people in

6    the test group are defined as possibly or

7    probably contaminated, right?

8           A.    Yes.

9           Q.    And to the extent that

10   people who are put into the test group

11   that were actually not contaminated, then

12   that would -- that would lead to bias

13   toward the null in the study, correct?

14          A.    Let me go little slower.

15   You're saying the control arm supposedly,

16   not a contaminant, that's a control arm,

17   correct?

18          Q.    No, no, the test group.  The

19   test group is defined -- the test group

20   is defined as possibly or probably

21   contaminated, right?

22          A.    Yeah.

23          Q.    And so if that test group

24   included patients or subjects who

Confidential Information - Subject to Protective Order

1    actually did not receive contaminated

2    valsartan, then that would lead to bias

3    towards the null, correct?

4         A.    Well, if you already have

5    this idea, the impurity in valsartan is

6    really hurting us, right.  You don't know

7    that.  You're running around in a circle

8    right now, right?

9              You're saying, well, now

10   suppose this impurity is really hurting

11   us for sure, right.  Then you're saying,

12   okay, I tell you what, part of this

13   contaminated group, actually they were

14   not contaminated, right.

15             You already said that you

16   were higher bias against this impurity.

17   You know what I'm saying?

18             If you actually truly

19   believe the impurity in valsartan is

20   harmful, you don't have to do a study.

21   You just say good-bye.  I don't need any

22   data.

23             But now you're saying, well,

24   wait a minute, let me just argue with

Confidential Information - Subject to Protective Order

1    you.   If this contaminated group, some

2    people did not have contamination, you're

3    saying that you actually bring this

4    towards null.

5              I say well, you already

6    believe the impurity is hurting people,

7    right.   That's your assumption, correct?

8         Q.    Do you know what bias

9    towards the null means, as that

10   terminology is used to review

11   epidemiological studies?

12        A.    Well, that's statistical

13   terminology.   It's not really an

14   epidemiology term.

15        Q.    What does bias toward the

16   null mean as you're reviewing

17   epidemiological studies?

18        A.    You mean the difference

19   between the two groups tend to be smaller

20   than supposed to be.   That's close to the

21   null value.   That's what you're saying.

22   It's all common language.

23        Q.    Your belief that when using

24   the terminology "bias towards the null"

Confidential Information - Subject to Protective Order

1   or that certain things would cause bias

2   towards the null, what do you think is

3   meant by that?

4        A.    Well, bias towards the null

5   means that you are in favor supporting

6   the null hypothesis.  The null hypothesis

7   in your case means impurity in valsartan

8   has no association with cancer incidence.

9   That's your null hypothesis, okay.

10            Now, you are saying, look,

11  if I do an analysis, bias towards null,

12  that means that your analysis result

13  actually helping me to demonstrate there

14  is no association.  That's what you're

15  saying.  That's what you -- your case you

16  are talking about, right, that's bias to

17  the null.

18       Q.    So in an epidemiology study,

19  when certain things occur that would lead

20  towards bias toward the null, what is

21  your interpretation as to bias toward the

22  null in that setting?

23       A.    All right.  Let me make it

24  clear, sir.  I'm not speaking with this

1    so-called degree of contamination or

2    contaminant, whatever you want to use,

3    the word, right.  Even the treatment or

4    testing group.  You say some patient

5    didn't even take it, the impurity, right.

6    Let's forget about this.

7                    In general, in general I say

8    what do you mean by a study biased

9    towards the null?  That means that your

10   study result actually helping me to

11   actually saying we cannot reject your

12   null hypothesis, right.  It's not very

13   powerful to reject a null hypothesis.

14   That is what exactly you are talking

15   about, bias towards the null.

16         Q.     That's not what I'm talking

17   about.  So let me explain.

18                    When certain things occur in

19   a study and they lead toward bias toward

20   the null in that study, doesn't that --

21   doesn't that infer that you're basically

22   watering down the results towards the

23   null when certain things happen in a

24   study?

Confidential Information - Subject to Protective Order

1    A.    Sir, listen to me.  That's

2  exactly I'm saying to you.  You lose the

3  power of detect -- you reject the null

4  hypothesis.  That's the same thing you're

5  saying.

6    Q.    I see.  So when you're

7  losing the power to reject the null

8  hypothesis, that would -- that would --

9    A.    Yes, that would be -- yeah.

10    Q.    When you include subjects in

11  the test group that don't have -- that

12  did not take contaminated valsartan, you

13  would lose power to be able to reject the

14  null hypothesis, correct?

15    A.    That's in general term, bias

16  toward the null, sir.  That's exactly the

17  same explanation as you did, right.  You

18  did it much nicer than I did, right,

19  because people don't understand the

20  power.  But you understand.

21    Q.    Yeah, let me ask this again.

22  When you include subjects in the test

23  group that do not have or did not take

24  contaminated valsartan, you would lose

Confidential Information - Subject to Protective Order

1  power to be able to reject the null

2  hypothesis, correct?

3          A.     Correct.

4          Q.     Now, on the flip side, if

5  you included in the control group,

6  patients who actually took contaminated

7  valsartan, you would also lose power to

8  be able to reject the null hypothesis,

9  correct?

10         A.     Yeah.  Either way.  Either

11 way you have a bias towards null.

12         Q.     As you reviewed the

13 Pottegard study, did you understand that

14 even in the way in which they defined the

15 test group, that they would be including

16 patients who never took contaminated

17 valsartan in the test group?

18         A.     I don't know that a fact or

19 not.  But even suppose hypothetically

20 that happened, but, sir, if you think

21 about any observational study, we have so

22 many confounders.  You have so many

23 unmeasured confounders, you probably

24 don't make a good adjustment, make the

Confidential Information - Subject to Protective Order

1    two groups comparable.

2              You know, this one thing is

3    also a confounder.  We have no idea how

4    much confounding effect what you describe

5    to us, right.

6              So this is part of it for

7    observational study, basically have issue

8    now, right.

9              And that's why I said many

10   times, I'm not in the position to say

11   impurity in valsartan has nothing to do

12   with the cancer incidence at this stage,

13   because we don't have a well-conducted

14   prospective study, right.  Because that's

15   not the case.  So that's what is my

16   position.

17             You can't say, well, the

18   contamination is probably all messed up.

19   I say, well, sorry, that is one of the

20   confounders.  Well, you can consider

21   other confounders.  I can tell you this

22   is probably not an interesting confounder

23   setting, right, balance between the

24   groups.  Probably is nothing, right.  So

Confidential Information - Subject to Protective Order

1   basically I'm not worried about this.

2        Q.    Let's -- let's talk about

3   that, the weight of confounding based on

4   the study design.

5             MR. NIGH:  Let's pull up

6        "Participants" on the first page.

7   BY MR. NIGH:

8        Q.    You don't know -- in terms

9   of understanding the weight of

10  confounding based on the study design,

11  you would want to know how many patients

12  that were contaminated, taking

13  contaminated valsartan, got put into the

14  no exposure group, and then how many

15  people got put into the control group or

16  no exposure, and then how many people who

17  were taking -- who never took

18  contaminated valsartan got put into the

19  test group.  Like you don't know -- you

20  don't know the numbers in each of those

21  groups, right?

22        A.    Yeah, if you say you switch

23  them around, we don't know how many guys.

24  Actually this is classified.  This is

Confidential Information - Subject to Protective Order

1    very common in clinical study.  When we

2    classify those guys, right, yeah.

3          Q.    This classification error

4    can be one of the worst errors in a study

5    design, correct?

6          A.    No.  I disagree.  It depend

7    on how much you have a misclassification,

8    right.  A tiny little bit doesn't really

9    matter much.  Other confounders are

10   probably highly correlated with outcome.

11         Q.    I'm glad you mentioned that.

12   It depends on how much misclassification

13   you have, right?

14         A.    Yeah.

15         Q.    Now, if we look at the

16   study, we can see that the study end date

17   is June 30, 2018, do you see that?

18   "Participants were followed from one year

19   after cohort entry until experiencing a

20   cancer outcome, death, migration, or end

21   of study period (June 30, 2018.)"

22              Do you see that?

23         A.    Yeah.

24         Q.    If we blow it out, we come

Confidential Information - Subject to Protective Order

1    back, I'll show the date of this, we can

2    blow that up as well.

3              And we can see the accepted

4    September 9, 2018.  Do you see that?

5         A.    Yeah.

6         Q.    So after June 30, 2018, and

7    after September 9th of 2018, do you have

8    any idea how many products were recalled

9    and found to have contaminated valsartan

10   either with NDMA or NDEA after the

11   conclusion of this study?

12        A.    I don't know, sir.

13        Q.    Would it bother you if more

14   than 50 percent of the products that were

15   thought to be uncontaminated were

16   actually later found to be contaminated

17   in terms of the study design?

18        A.    I don't know the number you

19   are quoting there, sir.

20        Q.    Well --

21        A.    But I think --

22        Q.    -- are you aware that

23   Torrent announced their contamination

24   after the end date of this study, are you

Confidential Information - Subject to Protective Order

1    aware of that?

2         A.    No, sir.

3         Q.    Are you aware that Hetero

4    announced their contamination after the

5    end date of this study?

6         A.    No, sir.

7         Q.    Are you aware that Aurobindo

8    announced their contamination after the

9    end of this study?

10        A.    No.

11        Q.    Are you aware that there

12   were multiple other companies in Europe

13   that announced the contamination of their

14   products after the end of this study?

15        A.    No, sir.

16        Q.    Wouldn't that be something

17   that you'd want to know in terms of

18   understanding just how much the

19   misclassification error has impacted the

20   findings of this Pottegard study?

21        A.    Well, that's a very good

22   question.  How come Dr. Madigan didn't

23   include in his report then.  If you think

24   this is such an important issue, how come

Confidential Information - Subject to Protective Order

1    you don't take to put into the report.

2          Q.    Dr. Madigan -- Dr. Madigan

3    is not an epidemiologist.  He didn't --

4          A.    Well --

5          Q.    -- for a reason.

6          A.    Okay.

7          Q.    Okay?  Did you see that

8    Dr. -- - sorry.

9                Did you see Dr. Etminan

10   included this in his report?

11         A.    No.  I said I just glanced

12   over it.  I didn't read it carefully.

13         Q.    Did you see --

14         A.    But I'm saying --

15         Q.    Did you see that several of

16   our other experts also included this in

17   their report or no?

18         A.    No, ma'am -- no -- yeah.

19         Q.    Okay.  You asked why

20   Dr. Madigan didn't include it in his

21   report.  But did you see these other

22   experts included that information in

23   their reports?

24         A.    Well, sir, my assignment is

Confidential Information Subject to Protective Order

1  only dealing with Dr. Madigan's report.

2  I'm not responsible for your other

3  reports, right.  Why should I put all my

4  energy -- sorry?

5        Q.    Dr. Madigan didn't have Gomm

6  or Pottegard.  You made the decision to

7  include Gomm and Pottegard in your

8  report.

9        A.    You're telling me, other

10 guys, expert witness, they know the

11 existence of those two studies.  How come

12 those guys don't communicate with

13 Dr. Madigan, "Hey, Dr. Madigan, there

14 were two studies that directly address

15 the issue the impurity of valsartan."

16 How come they don't --

17       Q.    I don't -- I don't think you

18 understand the purpose of Dr. Madigan's

19 report.

20             Dr. Madigan never gives

21 threshold.  He never gives conclusions on

22 causality, correct?

23       A.    If there is no causality,

24 what's the point to submit a report?

Confidential Information - Subject to Protective Order

1          Q.    Okay.  Did you read his

2    report to get what the point of his

3    report was?

4                    MR. MERRELL:  Object to

5          form.

6                    THE WITNESS:  Yeah, I mean,

7          he basically told us that there's

8          an association from the dietary

9          study, from an occupational study.

10         But he admitted he couldn't even

11         translate association to

12         causality.

13                   But here you are.  You're

14         looking for causality.  You say,

15         sorry, I cannot answer your

16         question because basically I

17         cannot answer causality question.

18                   I say, wow, okay, why do we

19         need to bother Dr. Madigan, he's a

20         busy guy, to write a report,

21         right.

22                   If your epidemiologist can

23         answer this question, why do you

24         need Dr. Madigan then?

Confidential Information - Subject to Protective Order

1    BY MR. NIGH:

2         Q.    Why do you think we used

3    Dr. Madigan?

4         A.    I don't know.  I'm very

5    curious.  I mean, if he in his deposition

6    said, ma'am, we cannot answer causality

7    question.

8              The first thing I said,

9    well, good-bye.  If you cannot answer

10   causality, why should I need you on the

11   panel, right?

12        Q.    So you would discard his

13   conclusion because he's not answering the

14   question of causality?  You would say

15   good-bye, why should I need you on the

16   panel?

17        A.    Sir, don't put your word in

18   my mouth.  I'm trying to say he couldn't

19   even establish association.  And then he

20   had admitted in public he cannot answer

21   the causality question, okay.

22              So my question for you, if

23   you cannot even say the impurity of the

24   valsartan caused the cancer, then what is

Confidential Information - Subject to Protective Order

1    the point for whole case then?

2         Q.    Do you believe that you can

3    answer the causality question?

4         A.    Sorry?

5         Q.    Do you believe that you can

6    answer the causality question?

7         A.    I can't.  That's why I don't

8    work for you, unfortunately.  You know,

9    you're a very good lawyer.  I know there

10   is a problem.  We cannot establish

11   causality.

12              If I can, sir, you know, I'd

13   be famous.  I would get a Nobel Prize

14   winner.  Nobody actually can jump in

15   association to causality that easily.

16   You need clinical input.  You need all

17   kinds of people, toxicologists, right.

18   You cannot rely on statistician to tell

19   you there's a causality.

20        Q.    Okay.  So are you admitting

21   in public now as well that you cannot

22   provide a causality opinion either?

23        A.    I didn't say any causality,

24   sir.  I didn't say any causality.  I

Confidential Information - Subject to Protective Order

1  didn't helping you to say, well, impurity

2  cause cancer.

3          Q.    You don't have a causality

4  opinion one way or the other though,

5  right?

6          A.    Why should I need another

7  part?  I cannot even establish an

8  association between the impurity and the

9  cancer risk.  I cannot even demonstrate

10  either way.  How in the world we can

11  actually jump into the wagon and say

12  there's a causality.

13              For my part in this, there's

14  no causality issue at all.

15          Q.    Did you review

16  Dr. Panigrahy's report at all?

17          A.    No, I don't think so.

18          Q.    Okay.  So as far as you

19  know, sitting here today, you have no

20  criticisms of Dr. Panigrahy's report or

21  the LCEs that he calculated, correct?

22          A.    You mean Dr. Madigan

23  computed LCE?

24          Q.    No.  No.  My question was

Confidential Information - Subject to Protective Order

1   not about Dr. Madigan.  It's about

2   Dr. Panigrahy.

3                As far as you know, sitting

4   here today, you have no criticisms of

5   Dr. Panigrahy's report or the LCEs that

6   he calculated, correct?

7        A.    I didn't read his report.

8   How in the world I can say I criticize or

9   not criticize.  It's not a logical

10  question, right?

11       Q.    I think it's a logical

12  question.  I think you're agreeing with

13  me.

14               Because you never read his

15  report, you don't have any criticisms

16  regarding Dr. Panigrahy's reports or the

17  LCEs that he calculated, correct?

18       A.    Better way to say, I have no

19  opinion of this.  I don't say I'm not

20  going to criticize.  Which way -- because

21  I don't know which way he did.  So I have

22  no opinion.  I cannot make any comments.

23               If that's a better way to

24  answer your question?

Confidential Information - Subject to Protective Order

1    Q.    Yes.

2          MR. NIGH:  Okay.  We've been

3    going on for a little bit more

4    than an hour.  Let's go ahead and

5    take a break at this time.

6          THE VIDEOGRAPHER:  The time

7    right now is 4:24 p.m.  We're off

8    the record.

9          (Short break.)

10          THE VIDEOGRAPHER:   The time

11    right now is 4:44 p.m.  We're back

12    on the record.

13  BY MR. NIGH:

14    Q.    Now, Doctor, in your report,

15  you provide no information on the

16  background rate of exogenous NDMA from

17  sources such as diet, beer, or smoke,

18  correct?

19    A.    Correct.

20    Q.    And in fact, that's

21  something that you hold no opinion about

22  or you don't have any knowledge in terms

23  of the amount of nanograms or the amount

24  of exposure that people have to exogenous

Confidential Information - Subject to Protective Order

1    NDMA from diet, beer, and smoke, correct?

2        A.    Yeah.  I have a hard time

3    even past the first hurdle, association

4    question.  I think the next step, I can't

5    even understand how we can establish.

6        Q.    And also in terms of

7    endogenous NDMA, you have no

8    understanding or any -- you haven't

9    looked at any materials that describe or

10   explain the amount of endogenous NDMA or

11   even endogenous nitrosamines, correct?

12       A.    Correct.

13       Q.    Okay.  Let's take a look at

14   your report.

15            MR. NIGH:  It's LP-1557

16       we're going to take a look at Page

17       17.  Actually Page 10, Paragraph

18       21.

19   BY MR. NIGH:

20       Q.    Here you say, "Even if we

21   can claim we collected all of the

22   relevance patients' baseline factors, the

23   modeling of the adjustments for those

24   factors may be questionable since the

Confidential Information - Subject to Protective Order

1    standard lack of fit test for the model

2    fitting does not provide clinically

3    meaningful interpretation via a P-value

4    of the test."

5              Do you see that?

6         A.    Yes, sir.

7         Q.    Do you recall giving similar

8    opinions both in Taxotere and Celebrex as

9    this?

10        A.    Sir, I don't recall.

11        Q.    Okay.  Next you say, "For

12   example, in a publication by Dr. Madigan,

13   heavily cited in his report, Loh, et al.,

14   claimed that dietary NDMA intake was

15   significantly associated with increased

16   cancer risk in men and women via Cox

17   proportional regression, adjusted for

18   age, sex, BMI, cigarette smoking status,

19   alcohol intake, energy intake, physical

20   activity status, education level, and

21   menopausal status in women."

22             The Loh study adjusted for

23   numerous potential confounding factors,

24   correct?

Confidential Information - Subject to Protective Order

1    A.    They tried.  Dr. Loh was

2  trying.  Was trying.

3    Q.    Now, what you say next is,

4  "However, it is not clear a thorough

5  model fitting assessment was conducted."

6          Do you see that?

7    A.    Correct.

8    Q.    You next say, "If the Cox

9  model does not fit the data well, it is

10  known that the resulting hazard ratio

11  does not have clinically meaningful

12  interpretation."

13          And you put, "For this

14  situation, the conclusions of the study

15  and inferences drawn by Dr. Madigan based

16  on the study would be invalid and

17  inherently unreliable."

18          Do you see that?

19    A.    Yes, sir.

20    Q.    Are you stating that Madigan

21  shouldn't rely on Loh because it is not

22  clear a thorough model fit assessment was

23  conducted?

24    A.    Well, sir, this is beyond

Confidential Information - Subject to Protective Order

1    Loh's paper.  Almost every paper, study,
2    Dr. Madigan cited in his report.  Sort of
3    lack of assessment of a model fitting.
4         Q.    I understand.  I'm asking
5    you just in regards to Loh.  Are you
6    stating that Madigan shouldn't rely on
7    Loh because it is not clear a thorough
8    model fit assessment was conducted?
9         A.    That is my opinion.
10         Q.    You recognize that the vast
11    majority of observational studies do not
12    include in the study or provide a
13    comprehensive description of model fit
14    assessment, correct?
15         A.    I'm sorry, sir, you say most
16    observational study won't including --
17         Q.    I'm saying you recognize
18    that the vast majority of observational
19    studies do not include in the study or
20    provide a comprehensive description of
21    model fit assessment, correct?
22         A.    Well, at least for those
23    papers that I read, they didn't give us a
24    very thorough assessment.  I don't know

Confidential Information - Subject to Protective Order

1    in general, sir.

2         Q.    Well, in general,

3    approximately what percent of

4    observational studies do you believe

5    provide a comprehensive description of

6    model fit assessment?

7         A.    I don't know.  But for all

8    the studies Dr. Madigan cited, I look at

9    carefully.  I couldn't find it.  I mean

10   that only concerned me.  I don't really

11   concern about other observational

12   studies.

13        Q.    You don't know whether or

14   not the vast majority of observational

15   studies provided do not provide a

16   comprehensive description of model fit

17   assessment?

18        A.    Well, sir, if they didn't

19   provide it, that means that the result is

20   not believable, right.

21        Q.    So --

22        A.    That's a common --

23        Q.    Go ahead, you can finish.

24        A.    It is common sense, sir.  If

Confidential Information - Subject to Protective Order

1    you cannot tell me if the model

2    adequately fit your data.  I said, well,

3    can you tell me -- in fact, you need a

4    validation set, right, to help me, the

5    model is okay or not.  You cannot use

6    only one single independent data.  The

7    independent data set you fit in the

8    model, right, Cox model in this case, but

9    you have to use another independent

10   observational study to validate the model

11   before clear or not.  That is a well

12   known fact now, right.  The training, the

13   validation set independent of datasets.

14        Q.    Let me be a little more

15   clear about my question.

16             When I am talking about vast

17   majority of observational studies, I

18   don't just mean these dietary studies.  I

19   mean the vast majority of observational

20   studies that are done do not include in

21   the study or provide a comprehensive

22   description of a model fit assessment,

23   correct?

24        A.    Well, sir, I don't know

Confidential Information - Subject to Protective Order

1    exactly the percentage you make in this.

2    But I'm really sorry to see that, right.

3    You are very smart lawyer.

4              If you're actually doing a

5    study without validating your assessment

6    appropriate of model, how can you sell

7    your model to outside world?

8              Right.  I mean there are

9    tons of papers, they all junk papers,

10   everybody knows that.  Right.  You

11   publish a paper with all kinds of

12   confounding, you can find out go fishing

13   trip, or whatever, cherry-picking, you

14   pick out a set of variants, you make

15   adjustment, you got a decent P-value and

16   say I'm done.  You see that's the

17   problem, right.

18              If you cannot tell me your

19   model is okay, you can do anything you

20   want to, tell me the story.  I don't even

21   know if the story is okay or not okay,

22   right.

23        Q.    So if the vast majority of

24   observational studies do not provide a

Confidential Information - Subject to Protective Order

1  comprehensive description of model fit

2  assessment, then you would disregard

3  those studies?

4       A.    Yeah, basically I think we

5  don't really believe this kind of study

6  anymore, right.

7            I mean, you know, you are a

8  good law firm.  Dr. Madigan is a

9  distinguished statistician.  And we need

10  a very high standard, right, to conduct

11  an analysis of observational study,

12  right.

13           Model checking is very

14  important step.  Without it, we cannot do

15  anything, right, down the road.

16       Q.    And in the absence of that

17  very high standard of conducting an

18  analysis of observational studies, you

19  believe that you cannot demonstrate an

20  association between NDMA and -- NDMA in

21  the diet and cancer, correct?

22       A.    Yeah, I can play game with

23  you, say, doctor.  You see the Loh paper,

24  he lists so many so-called covariates,

Confidential Information - Subject to Protective Order

1    right, which is baseline variables.

2                    If I have raw data, I can

3    play game and delete some covariates in

4    the model or adding something else, he

5    didn't include it.  I bet you I probably

6    can play the game with you, turns out my

7    P-value is greater than .05.  But that's

8    an association problem, right.  That's

9    the problem.

10                    Everybody can manipulate a

11    model and tell you a story.  They want

12    you to listen to story.

13            Q.    Is that your belief, that

14    Loh could have played games and simply

15    gotten a P-value that was greater than

16    .05?

17            A.    Sir, this is so common.

18    That's why it will be hazard ratio is so

19    low.  Usually we say, well, look, you can

20    manipulate your adjustments, okay, you

21    can make adjustment and make your P-value

22    significant.  We can make adjustment,

23    make your P-value not as significant,

24    right.  That's a well known fact.  That's

Confidential Information - Subject to Protective Order

1   why people usually don't believe

2   observational study.

3              It's like for example,

4   Covid-19, the pandemic, right, in the

5   beginning people submit all kind of

6   observational studies, say oh, yeah, you

7   know, this treatment is great, especially

8   our former president, right.  He said

9   without any evidence, hey, let's see,

10  this observational study show you this is

11  very good treatment.  It turns out in the

12  clinical trial, we don't see anything.

13             So you see, the society now,

14  they don't believe observational study

15  for the Covid-19 anymore.  You say

16  without a clinical trial, forget it, I'm

17  not going to use your treatment, even if

18  you have observational studies that will

19  state the statement of fact.

20             See, this is what happened,

21  right, in the last 18 months.  You know

22  better than I do, right.

23        Q.    All right.  Let me see if

24  I've got your testimony right.

Confidential Information - Subject to Protective Order

1    In general you believe that
2    you can't believe observational studies,
3    correct?
4    A.    If you have really nice
5    recent protocol, pre-specified
6    adjustment, then I have a training set to
7    fit in your model.  I have a validation
8    set to validate what you claim the model
9    is okay or not.  Then I believe you have
10    a story to tell.  You have a valid story
11    to tell us, right.
12    But right now, like you say,
13    I don't even give you the details, how do
14    I select this baseline covariates with
15    adjustment.  How do I select the spec?  I
16    have no idea how you select.  How many
17    covariates are you not including in the
18    covariate adjustment.  I don't know,
19    right.  You just publish.
20    Now, papers that are
21    published in the -- very few people even
22    pay much attention.  Very small group of
23    people, oh, yeah, yeah, yeah, this is
24    interesting.  But in reality, people

Confidential Information - Subject to Protective Order

1    don't take this seriously without a

2    rigorous assessment of your model of what

3    your process you are talking about,

4    right.

5              The -- this is actually --

6    you know, we need to hold a high

7    standard, right, for this legal case.

8    You can't set a legal case example in the

9    future.  How do we defend the people,

10   right.  You have to defend the people in

11   the right way, correct way.

12        Q.    Are you aware that most FDA

13   recalls have been prompted as a result of

14   observational studies and not clinical

15   trials?

16        A.    I don't recall, sir.

17        Q.    Have you ever seen data that

18   demonstrates that?

19        A.    I saw many cases FDA had

20   some concern about safety issue of -- for

21   example, and you finish Phase III trial,

22   right, you want to demonstrate your

23   treatment is okay.  But FDA still

24   concerned about the long-term toxicity

Confidential Information - Subject to Protective Order

1    profile.  Usually they ask the company to

2    do a marketing Phase IV trial to figure

3    out, do you have the safety issue.

4    That's very common.  You know, for

5    example, we did that important E-P-O,

6    EPO, 2000 -- 11 years, to actually sadly

7    say EPO is not safe.

8         Q.    Right.

9         A.    So you see people doing

10   that.  But I don't know exactly for this

11   case, sir, any like contaminant or

12   impurity in valsartan and what the FDA

13   did, I don't know.

14        Q.    In general, have you ever

15   seen data that most FDA recalls have been

16   prompted as a result of observational

17   studies and not clinical trials?

18        A.    Well, that's why people

19   criticize the result, right.

20        Q.    I'm sorry.  That's why

21   people criticize the FDA recalls?

22        A.    No, no, no.  You're saying

23   the observational study was conducted

24   because the recall.  And most of the

Confidential Information - Subject to Protective Order

1    people actually say, well, it's okay.

2    You're telling me, I don't really believe

3    you, right, whatever you say.  You know,

4    they don't take it seriously right away.

5              So that's what happened in

6    this society.  You can publish any paper

7    you wanted to.  In fact, my friend, is a

8    JAMA Open associate editor for

9    statistics.

10             He said -- he told me a few

11   months ago, he said that he got lots of

12   papers for different legal case for

13   safety stuff.  Everything is

14   observational study, right.

15             He was so surprised.  People

16   manipulate the modeling and actually

17   picking up the model they like and write

18   a paper.

19             So the editors very

20   carefully now to select those papers.

21   They just want to use JAMA, for example,

22   as a vehicle to tell all sides my drug is

23   safe or not safe.

24             He decide -- it's not only

Confidential Information - Subject to Protective Order

1  for safety issue.  If someone wants to

2  badmouth the other drug company, they

3  also publish papers.  So this whole world

4  is flooded with not reliable and

5  misleading studies.

6            But people publish.  If you

7  pay for it, this case, you can publish

8  your papers.

9        Q.    In general, have you ever

10  seen data that most FDA recalls have been

11  prompted by observational studies and not

12  clinical trials?

13            MR. MERRELL:  Objection to

14        form.  Asked and answered.

15            THE WITNESS:  I don't

16        recall.  I don't know, sir.  In

17        this moment, I don't know.

18  BY MR. NIGH:

19        Q.    I believe it's your

20  testimony that even if the vast majority

21  of observational studies do not provide a

22  comprehensive description of model

23  fitness assessment, you would not give

24  reliability to those observational

Confidential Information - Subject to Protective Order

1    studies, correct?

2         A.    I would put very little

3    weight on their findings.

4              I don't really trust the

5    result with just single study.  I

6    probably need a validation study.

7         Q.    Well, I mean, even if there

8    are numerous observational studies, but

9    numerous observational studies on an

10   issue and none of them provide a

11   comprehensive description of model

12   fitness assessment, you would throw out

13   or ignore the results of all those

14   studies, correct?

15        A.    I say I don't even care if

16   they published those papers or not.  I

17   don't take it seriously.

18        Q.    So you would ignore those

19   results, correct?

20        A.    Yeah, unless they have

21   another independent study validating what

22   they are claiming, right.  Then I say,

23   okay, that's correct.

24        Q.    So in this situation, when

Confidential Information - Subject to Protective Order

1   Loh doesn't tell you in the study whether

2   or not it used a thorough model fitting

3   assessment, you would ignore the results

4   of Loh, correct?

5          A.    I would probably say I'm not

6   going to take this seriously.

7          Q.    Okay.  Okay.  Now, let's

8   take a look at Zheng.  You have the same

9   -- your next paragraph, you say, "As

10  another example about the adequacy of

11  modeling, in the paper by Zheng, multiple

12  logistic regression models were

13  utilized."  And then you put again, "It

14  is not clear if the model fits the data

15  well.  Again, a lack of fit test for

16  model fitting is not informative since it

17  only provides a P-value."

18          And so again, because Zheng

19  does not provide a thorough model fitting

20  assessment in the study as to whether or

21  not that was conducted, you would ignore

22  the results of the Zheng study, correct?

23          A.    I wasn't excited about the

24  results at all.

1    Q.    You would give it little to

2    no weight, correct?

3    A.    Yeah.

4    Q.    And in fact, many of the

5    dietary studies here that did not make it

6    clear that a thorough model fitting

7    assessment was conducted, you would have

8    ignored those dietary studies or given

9    them little to no weight, correct?

10    A.    Correct.  But, sir, you

11    notice some dietary studies are very,

12    very old, right, more than 20 years.  And

13    at that time probably those guys were not

14    educated well or trained very well

15    statistically speaking.  They probably

16    didn't do it.  Okay.

17            But I believe a good well

18    conducted observational study this date,

19    they probably do a very good thorough job

20    to assess the adequacy of the model

21    fitting.

22    Q.    I'm sorry.  Many of these

23    dietary studies are not published more

24    than 20 years ago.  There's many of them

Confidential Information - Subject to Protective Order

1    that are more recent, right?

2          A.    You have one paper published

3    in 1999, right?

4          Q.    I know, but many of these

5    dietary studies, we've got some that are

6    published in 2019, 2012, 2011, 2012 --

7    20 -- 20 -- you know, many of these are

8    published in the last decade, correct?

9          A.    Yeah.

10         Q.    But even then, if they

11   didn't specifically put in the study and

12   describe, make it clear that a thorough

13   model fitting assessment was conducted,

14   then you would have ignored it or given

15   it little to no weight, correct?

16         A.    Yeah, I wouldn't pay much

17   attention to it.

18         Q.    Isn't that the main problem

19   in terms of your concern about whether or

20   not there's association between dietary

21   studies and the NDMA in diets and whether

22   or not they have an increased risk of

23   cancer?  Isn't that your main concern,

24   that they didn't include model fit, and

Confidential Information - Subject to Protective Order

1  as a result you've given little to no
2  weight or ignore them?
3        A.     Sorry.  Go ahead, sorry.  I
4  don't mean to --
5        Q.     That was the end of my
6  question.
7        A.     Okay.  No, sir.  This is a
8  part of it, right.  You can see my
9  report.  I have several concerns, right,
10 more than just the model fitting stuff.
11            My concern also, saying the
12 decisionmaking about so-called
13 statistical significance and we should do
14 better job than that, right.
15            Even if you have correct
16 model, you should providing more than
17 P-value for that application.  That's
18 another concern I have.
19            The third one is more
20 serious.  I said even if I believe what
21 you're saying from these publications,
22 how can we actually convince people you
23 can extrapolate the result from the
24 dietary study or occupational study to

Confidential Information - Subject to Protective Order

1    the impurity in -- in valsartan, right,

2    the issue we are dealing with right now.

3                 That's the issue and my

4    concern.

5         Q.    Yeah, but you don't -- you

6    don't -- you don't do that sort of work,

7    where you extrapolate results from one

8    exposure to another exposure setting,

9    correct?

10        A.    I think we have to be very

11   careful to actually figure out how we can

12   use one type of study, and we can

13   extrapolate the result to another

14   compound.  It's not relative to

15   valsartan, right.

16                And you cannot just directly

17   say, well, we see from association from

18   dietary.  It is not automatically

19   claiming we have issue with valsartan.

20        Q.    Yeah.  My question is not

21   that.  My question is really about your

22   experience and the work that you do.

23                You don't do that sort of

24   work where you extrapolate results from

Confidential Information - Subject to Protective Order

1    one exposure setting to another exposure

2    setting, correct?

3            A.    Oh, we do.  We do sometimes

4    from clinical trial result.  For example,

5    in a cardiovascular trial, the patient

6    usually is male patients, right.  And

7    especially in old age, very few female --

8    very few female patients involved.

9                 So we actually very

10   seriously need to know what the treatment

11   effect the female patient would uptake,

12   right.

13                So we actually utilize the

14   entire study helping us to understand

15   that extrapolation.  But we try to do a

16   good job, saying we establish a model for

17   prediction for women, right with the

18   baseline covariates.

19                And then we validate it.

20   And then we apply this model with one

21   dataset to another one.

22                So we do -- we do actually

23   do this kind of work.  But you have to be

24   careful to convince people you can

Confidential Information - Subject to Protective Order

1    transport your model from one study to

2    another one, right.

3         Q.     So the model that you're

4    talking about in the work that you've

5    done would be looking at exposure in male

6    patients and how that could be

7    extrapolated to exposure in female

8    patients, correct?

9         A.     Yeah.  That's a part of one

10   study we did before.

11        Q.     You're not talking about

12   exposure in one setting and extrapolating

13   to exposure in another setting, correct?

14        A.     No, not that I recall.

15        Q.     Okay.  For Loh and Zheng,

16   other than model fit, did you have any

17   other criticisms of those studies?

18        A.     Sir, this is just the two

19   examples, you know, we can go over all

20   the papers, publications that Dr. Madigan

21   cited.

22               Most of the paper, just to

23   follow the same -- like you're saying,

24   the majority of paper, they didn't even

Confidential Information - Subject to Protective Order

1  bother to evaluate how good the model is,

2  right.

3              So those older publications,

4  they sort of lack this kind of assessment

5  and process.  So it's not only for those

6  two papers, by the way.

7         Q.    Other than Loh -- you know,

8  for Loh and Zheng, did you have any other

9  specific criticisms of those studies?

10        A.    Oh, other studies -- oh,

11 these two particular studies that you're

12 talking about?

13        Q.    These two studies, any other

14 criticisms of those two studies?

15        A.    Well, I don't know they

16 actually use -- you see, Counsel, I

17 wanted to share with you, if you go back

18 to the Loh covariate adjustment, right,

19 you can come up how many covariates they

20 make adjustment.  If you have 11 or

21 12 covariates adjustment, for example,

22 for sake of argument, you put age as

23 adjustment, right, and the question is do

24 you think age squared is also an

1    important adjustment.  You say we don't

2    know.

3                 How about age cubed, do you

4    need to make adjustment.  Do you think

5    actions among the 11 covariates will be

6    included in the model?

7                 You see, model is a

8    simplified version of the truth.  The

9    true model is so complex.  We actually

10   try to approach the true model with a

11   simplified model.

12                Now the question is can we

13   actually assess your simplified model,

14   actually close to the truth, right.

15                So you see, you can see the

16   Loh and also Zheng papers, right.  You

17   say, well, I don't know, like we call

18   kitchen sink, right.  And do whatever the

19   result are coming up, right.  That's what

20   people usually do.

21                You see, they say well,

22   let's put everything in this disposal and

23   see what happens.  It's not a way to do

24   business or scientific investigation.

Confidential Information - Subject to Protective Order

1              If you want to use those

2    papers as legal cases, you know, please

3    do, but how in the world we can believe

4    one informing a thing, I don't know how

5    many people would believe it.  That's my

6    point.

7         Q.    So your point is you believe

8    that Loh and Zheng may have over adjusted

9    the findings, included too many

10   covariates or confounders that they

11   adjusted for?  Is that what you're

12   saying?

13        A.    No.  Could be under.  Who

14   knows?  Basically, I don't know what is

15   the right adjustment.  You need a

16   validation set to tell me, yes, this is

17   right amount of adjustment.  You cannot

18   adjust to put everything in the sink,

19   say, listen, let's do it.

20             You know, people in the real

21   world, they have hundreds and hundreds of

22   covariates, right.  They say using this

23   machine, learning the process.  Well,

24   let's see what's going on.  They end up

Confidential Information - Subject to Protective Order

1    with a model.  They say, well, okay,

2    believe it or not, this is my model.

3              I said, hold a second, if

4    you cannot validate this model, nobody is

5    going to believe you.

6              So that's the trend this

7    day, sir.  You know, unfortunately the

8    dietary papers are such older papers

9    probably mostly right.  They didn't even

10   bother -- in the modern world if you

11   don't have validation of the model,

12   nobody will even believe you.  If you

13   read a medical journal, everything

14   they're talking about modeling, they have

15   the validation set, independent

16   validation set, right.

17             So though you can see the

18   trend, the people really want to have a

19   valid scientific sort of conclusion from

20   your study.

21        Q.    There are many modern

22   observational studies that are published

23   that do not include a clear thorough

24   model fitting assessment described in the

Confidential Information - Subject to Protective Order

1   studies, correct?

2        A.    Well, if you find a paper in

3   New England Journal of Medicine or JAMA,

4   I would be very surprised, okay.  But if

5   you find it published in a mediocre

6   journal, anybody can publish this space,

7   as long as you pay a few thousand

8   dollars, right, you can publish.  A

9   publication doesn't mean this is a valid

10  argument, right.  It's not credible.

11       Q.    Okay.  So let's take New

12  England Journal of Medicine or JAMA.

13            You recognize that there are

14  many modern observational studies that

15  have been published in the New England

16  Journal of Medicine or JAMA that do not

17  include a clear thorough model fitting

18  assessment described in the study,

19  correct?

20       A.    Well, give me example.  In

21  the past six months, what kind of paper

22  are you talking about?

23       Q.    How many examples do you

24  want?

Confidential Information - Subject to Protective Order

1      A.     Yeah?  Well, the example --

2      Q.     How many examples do you

3  want to recognize that there are many

4  modern observational studies that have

5  been published in the New England Journal

6  of Medicine or JAMA that do not include a

7  clear thorough model fitting assessment

8  described in the study, how many

9  studies --

10              MR. MERRELL:  Object to

11          form.

12  BY MR. NIGH:

13      Q.     -- do you want to prove that

14  point?

15      A.     Well, it doesn't matter.  If

16  you give me a couple of really high

17  profile observational studies without

18  validation, I will be very happy to write

19  a letter to associate editor.  I know

20  those guys very well.  I say how in the

21  world you guys publish this junk paper,

22  okay.

23              You tell me.  You pick a

24  couple of papers.  I'm going to tell my

1    friend, say you guys better do a better

2    job.

3              Q.    Okay.  Taking a look at

4    Page 12, Number 23 in your opinion.  You

5    say, "Moreover, for the papers in

6    meta-analysis cited by Dr. Madigan, it is

7    not clear if the authors for the

8    individual papers in the meta-analysis

9    had carefully checked the adequacy of the

10   models utilized in the analysis.  Without

11   such analysis, the conclusion of the

12   meta-analysis and inferences drawn by

13   Dr. Madigan based on the meta-analysis

14   would be invalid and inherently

15   unreliable."

16              That is rarely done for any

17   meta-analysis of observational studies,

18   correct?

19        A.    That's why we got so many

20   meta-analysis papers floating around in

21   this world, counsel.  You know, how many

22   do you believe is a result of

23   meta-analysis?  I think of very few.

24              Q.    Can you name one

Confidential Information - Subject to Protective Order

1   meta-analysis of observational studies

2   that has carefully checked the adequacy

3   of the models of all the studies that

4   were utilized in its analysis?

5        A.    Well, you can check New

6   England Journal of Medicine.  We can go

7   through tomorrow.  We can get online to

8   check all the recent New England Journal

9   of Medicine -- meta-analysis New England

10  Journal of Medicine published.

11            I'll tell you the truth, New

12  England Journal of Medicine doesn't

13  publish any meta-analysis papers anymore

14  in the past two years anymore, because

15  they don't believe in meta-analysis,

16  right.

17            Then you say well, this is

18  not fair.  You say other journals publish

19  meta-analysis.  I say well, gee, you

20  know, look at the high standard of the

21  journal.  They actually don't believe

22  this meta-analysis anymore.

23            After they published the

24  Vioxx meta-analysis everything -- no, I'm

Confidential Information - Subject to Protective Order

1   sorry, it's for the GSK, Tanzeum, right,

2   so-called antidiabetes drug, and they

3   publish meta-analysis about maybe

4   12 years ago, maybe more than that.  That

5   was last paper.

6               New England Journal of

7   Medicine published meta-analysis, they

8   learned a bad experience from publish

9   that paper.

10              You can tell me if The New

11  England Journal of Medicine has published

12  a meta-analysis in the past few years,

13  I'll be very happy to share with my

14  associate editor friend at New England

15  Journal of Medicine.  I say, gee, how

16  come you guys change your policy.

17       Q.    Can you name one

18  meta-analysis of observational studies

19  that has carefully checked the adequacy

20  of the models of all the studies that

21  were utilized in its analysis?

22       A.    I don't know exactly there

23  is one.  You are a high standard lawyer.

24  You don't want to go with those people,

Confidential Information - Subject to Protective Order

1  what the majority say, hey, those guys

2  are not very good.  So if the majority of

3  people are not very good, it's okay.

4  But, sir, that's not okay, right.

5            You like to be in the small

6  minority, you do a good job.  You have a

7  high standard.  You actually set a good

8  example for next generation, correct?

9            Instead of using -- say,

10  hey, listen, nobody is doing this, so I

11  don't have to do it.  Why do we do that.

12  If society goes what you are trying to

13  do, we are in trouble.  We cannot find

14  truth anymore, right.

15            Why do you want to say

16  majority guy didn't do it, so I didn't do

17  it.  But you know they are not correct.

18  Why even bother to say I want to mingle

19  with those guys.

20      Q.    So is it your testimony that

21  you cannot name one meta-analysis of

22  observational studies that has carefully

23  checked the adequacy of the models of all

24  of the studies that were utilized in its

Confidential Information - Subject to Protective Order

1   analysis?

2          A.    Yeah, most meta-analysis I

3   dealing with using clinical trial result,

4   individual study.  So in that case you

5   don't have to make adjustment, because

6   basically they are balanced, right,

7   between the two groups comparatively.

8              So usually we don't worry

9   about this so-called model checking,

10  because there is no model.

11             But anything beyond that,

12  you needed to worry about it.  The

13  individual study is a good study or not.

14  You do a meta-analysis at this stage, you

15  have to check.  This study is a good

16  paper or not a good paper, right?

17  Everybody is doing now.

18             If it's not a really good

19  paper, you don't include this paper or

20  publication in your meta-analysis, right.

21  That's the practice now.

22          Q.    So do you agree that you

23  cannot name one meta-analysis of

24  observational studies that have carefully

Confidential Information - Subject to Protective Order

1    checked the adequacy of the models of all

2    the studies that were utilized in its

3    analysis?

4              MR. MERRELL:  Objection to

5         form.

6              THE WITNESS:  You're saying

7         observational studies; is that

8         correct?

9    BY MR. NIGH:

10        Q.    Yes.

11        A.    No, I don't -- I'm sitting

12   here.  I don't know.  Maybe I can do some

13   search afterwards and find out for you.

14        Q.    It's not the state of the

15   art for published meta-analyses of

16   observational studies to look at each

17   individual study that -- in the

18   meta-analysis and check whether or not

19   all of the studies described adequacy of

20   the models utilized in the analysis,

21   correct?

22             MR. MERRELL:  Objection to

23        form.

24             THE WITNESS:  Well, sir, I

Confidential Information - Subject to Protective Order

1          really don't understand.  Why do

2          you want to lower your standard?

3               I mean, you have a choice of

4          being very high standard, right?

5          Why do you want to say the

6          majority don't do it, so that's

7          okay and it's acceptable?

8               It's not acceptable.

9               You publish a lot of junk

10         papers in this world, is really

11         not helpful to the society.

12    BY MR. NIGH:

13         Q.    Is it your belief that

14    because New England -- you stated

15    multiple times that New England Journal

16    of Medicine no longer publishes

17    meta-analyses.

18               Is it your belief that they

19    are -- that you would give them -- that

20    you ignore them or give them little to no

21    weight?

22         A.    Well, they -- I think they

23    got a bad experience from this GSK

24    Avandia study by cardiovascular people in

Confidential Information - Subject to Protective Order

1    Cleveland Clinic, Steven Nissen.  They

2    got really hurt.  And the people actually

3    criticized that paper back and forth and

4    left and right.  So they feel so

5    embarrassed.

6                    So I still remember my old

7    friend, Steve Largaucous, was associate

8    editor, handled that paper for The New

9    England Journal of Medicine.  After it's

10   published, I ask Steve, I said, "Steve,

11   how in the world you publish this junk

12   paper?"  He said, "Well, I apologize.  We

13   didn't realize, you know, the guy used

14   the wrong methodology."

15                   Right.  Now, they even used

16   the clinical trial data, by the way.

17   It's not observational study.  But they

18   used the wrong statistical method to

19   combine in the meta-analysis, right.

20                   So everybody jumping up and

21   down.  And this is a famous example.

22                   Even Congress, you know, had

23   a public hearing.  It becomes a really

24   interesting public sort of, like, news,

Confidential Information - Subject to Protective Order

1    you know, in that days.

2              Anyway, I think New England

3    Journal of Medicine really pissed.  They

4    are -- I'm not going to publish any paper

5    in the future using meta-analysis.

6         Q.    So is it your belief -- I

7    understand what you're saying about New

8    England Journal of Medicine.  Is it your

9    belief that meta-analyses have little to

10   no weight and you would ignore them?

11        A.    I don't know why -- I cannot

12   speak for New England Journal of

13   Medicine.

14              If you really wanted to

15   know, I can introduce the editor of New

16   England Journal of Medicine.  He's a

17   professor in our school.

18        Q.    No, no.  I want to make sure

19   you understand my question.  I'm not

20   asking about New England Journal of

21   Medicine.  Throw that part out.

22              Is it your belief that

23   meta-analyses have little to no weight

24   and you would ignore them?

Confidential Information - Subject to Protective Order

1       A.    If they actually, each

2   individual study, if like we are saying,

3   is very good study, then you can combine

4   information using the so-called

5   well-conducted study, right, as a summary

6   of the so-called group difference.

7           But if you combining, no

8   matter what, the quality of the paper is

9   not very high, and that's really hurting

10  us.  Even though you win this legal case,

11  this won't help the society.  Right.

12      Q.    If a meta-analysis doesn't

13  carefully check the adequacy of the

14  models of every single study that are

15  utilized in the meta-analysis, then you

16  would give that meta-analysis little to

17  no weight and you would ignore it,

18  correct?

19           MR. MERRELL:  Objection to

20      form.

21           THE WITNESS:  Yeah, I

22      wouldn't take it seriously.

23  BY MR. NIGH:

24      Q.    I'm sorry.  You said, "Yeah,

Confidential Information - Subject to Protective Order

1   I wouldn't take it seriously," correct?

2       A.   I won't, yeah.  I won't take

3   it.

4       Q.   Let's take a look at Page

5   13 -- actually Number 12.

6            You can see it starts off

7   with, "In their paper Hidajat, et al.,

8   stated."  You can see that Number 24 is

9   talking about Hidajat.

10           On Page 13, you see that,

11  "Censoring" -- middle of the page where

12  it talks about censoring competing

13  events.

14           "Censoring competing events

15  violates the assumption that censoring

16  occurred at random and is independent

17  from the risk of dying from the cause of

18  death of interest, leading to a biased

19  Kaplan-Meier estimator."

20           Do you see that?

21      A.   Yes, sir.

22      Q.   Is it your belief that the

23  Hidajat study used a Kaplan-Meier

24  estimator?

Confidential Information - Subject to Protective Order

1          A.     No, sir.  This is from their

2     paper.  It's not my language.  I am

3     quoting what they are saying.

4          Q.     Yeah.  What I'm asking you,

5     is it your belief that the

6     Kaplan-Meier -- that the Hidajat paper

7     utilized a Kaplan-Meier estimator?

8          A.     No, no, they tried to avoid

9     using Kaplan-Meier.  That's the sentence

10    that you show to us.  That's why they

11    don't use Kaplan-Meier.  They use

12    cumulative incidence function.  These are

13    not my words.

14         Q.     Please ex -- Hidajat used

15    the method by Fine and Gray, correct?

16         A.     Sorry, say it again.

17         Q.     Hidajat used a method by

18    Fine and Gray, correct?

19         A.     Oh, yeah.  Jason Fine was my

20    student back in Harvard days.  You know,

21    he was my Ph.D. student.  I know that

22    paper very well.

23         Q.     Please explain what the

24    problem is with using the Fine and Gray

Confidential Information - Subject to Protective Order

1    method?

2         A.    You want me to explain to

3    you?

4         Q.    Yes.

5         A.    Okay.  Do you want to go to

6    the paper I cited, the Annals of Internal

7    Medicine.  I can take sweet time to

8    explain to you.  It's a beautiful paper

9    we wrote.

10             Do you want to do that?

11        Q.    Where is the paper that you

12   write about the problems with the Fine

13   and Gray method?

14        A.    Go down to reference.

15        Q.    I don't see a reference on

16   this page.  Is it on the next page?

17        A.    Next -- yeah, the next

18   paragraph, 25.  We have JAMA-Cardiology,

19   McCaw; New England Journal of Medicine,

20   Annals of Internal Medicine.

21             Those are all papers saying

22   Fine and Gray has a ratio for

23   subdistribution function is not

24   appropriate.

Confidential Information - Subject to Protective Order

1    You look at the journal we
2    published.  New England Journal of
3    Medicine, Annals of Internal Medicine.
4    JAMA-Cardiology.  That's really the
5    top -- really top clinical journals,
6    right.  It is so hard to get into those
7    journals.
8    As a statistical argument,
9    you can see it.  They knew that it was
10   such an important issue.  That's why they
11   publish.  I'll be more than happy to go
12   through this Internal Medicine paper with
13   you.  If you want to go on tomorrow, I'd
14   be happy to spend all day with you.
15   And you are a smart guy.
16   And towards the end of the day, I hope
17   you would support what we are finding,
18   right.
19        Q.    I'm not asking you -- I'm
20   not asking to go through the paper.  I'm
21   asking you to explain what the problem is
22   with using the Fine and Gray paper.  Can
23   you not do that without going through the
24   paper?

Confidential Information - Subject to Protective Order

1      A.    Well, sir, if I say

2  subdistribution function, do you

3  understand what I'm talking about?

4      Q.    Yes.

5      A.    Well, do you understand what

6  this guy is talking about,

7  subdistribution function?

8      Q.    If I'm -- you know, as the

9  attorney, I'm the one who needs to ask

10  you the questions.

11          So I'm asking you, can you

12  explain what the problem is with the Fine

13  and Gray method without utilizing the

14  paper?

15      A.    Okay.  So let me try.  Okay.

16  I guess you don't understand the

17  definition of subdistribution function.

18          So a patient died from

19  cancer, right.  And a patient could have

20  died from other causes, cardiovascular

21  events, right.  So it's a noncancer

22  death.

23          You have a typical signal

24  illustration.  You have two type of

Confidential Information - Subject to Protective Order

1    death.  One is due to cancer.  The other

2    one is due to noncancer, right.

3                So this paper is

4    interesting.  We said, well, the

5    mortality rate, the overall survival or

6    death rate is 94 percent, is very, very

7    high, almost everybody is dead, right,

8    toward the end of the study.

9                We said, well, the majority

10   of people, they died without a cancer

11   cause.  That means people died because of

12   either cardiovascular event or because of

13   kidney failure, whatever you define,

14   right.

15               So you have two types --

16   kinds of death.  If the guy says, well,

17   gee, you know, if you guys died from

18   noncancer, I have no idea if the guy

19   survived, how long will it take for him

20   to die from cancer, right.

21               This is what we call

22   competing risk.  Right.  The two causes

23   are competing with each other.  You can

24   observe either one, either die from

Confidential Information - Subject to Protective Order

1    cancer or die from cardiovascular, right.

2                    So I said, well, gee, you

3    know, how do we handle this?  So instead

4    of using Kaplan-Meier curve, we started

5    to estimate the distribution of those

6    guys.

7                    And I said listen, Counsel,

8    if the guy died from cardiovascular, the

9    reason, right, the cause, what is the

10   this guy's time to die from cancer.

11                   I say, man, you know, this

12   guy is already in heaven.  I don't know.

13   You know, the guy probably never died

14   from cancer anymore, right.  Who knows he

15   didn't have it.

16                   So that means if the guy

17   died from noncancer, basically, we have

18   no information about this patient died

19   from cancer anymore.

20                   Okay.  So that's competing

21   risk.

22                   So if you define this

23   cumulative incident curve, which is

24   called subdistribution now because you

Confidential Information - Subject to Protective Order

1  have the majority of people, they didn't

2  die from cancer.

3          Your distribution never

4  reached one towards the end of the day.

5  Otherwise the subdistribution function

6  should be from zero to one.

7          So that's why we have

8  subdistribution function.  Okay.

9          Then you say what is the

10 hazard ratio for this case.  I say, wow,

11 gee, well, that's interesting.  I'm only

12 interested in the death is due to the

13 cancer.  Right.  I'm not interested in

14 the death from the non-cancer.

15         I say, well, so how do you

16 define the hazard ratio now?

17         I don't want to -- I don't

18 know, sir -- this is not an insult at

19 all.

20         Do you understand the

21 definition of hazard ratio in general,

22 even without a competing risk, do you

23 understand the definition?  Yes or no?

24         Otherwise I can explain to

Confidential Information - Subject to Protective Order

1  you hazard ratio without a competing risk

2  first.

3       Q.    I'm following your answer.

4  But so far I have not heard your

5  explanation of the problem in using the

6  Fine and Gray method.

7       A.    Yeah, so obviously you don't

8  understand hazard ratio, right, without

9  competing risk.

10          Hazard ratio is actually is

11  intensity for mortality, force of the

12  mortality.  It's not a risk ratio.  It's

13  not an odds ratio.

14          So what is the hazard?

15  Hazard means that a person -- and still,

16  for example, six months right now, this

17  guy is still alive.

18          I say, well, gee, you know,

19  Counsel, what is the probability the guy

20  still survive at six months, then

21  suddenly drop dead next week?  Okay.

22          And I actually figured out a

23  standardized slope of intensity of this

24  guy what's called hazard.  So you go

1  along with six months, 12 months,

2  18 months and et cetera.  So you have a

3  curve.

4              That curve is called hazard

5  curve.  What is hazard ratio?  Hazard

6  ratio means that if -- two groups, they

7  have a two hazard function.

8              And I say what's the hazard

9  ratio?  You're assuming these two hazard

10 function are proportional.  That means

11 the ratio of the two hazard function is

12 constant over time.  You're estimating

13 that parameter.  That's why you got the

14 so-called .7, .75, the so-called hazard

15 ratio.  Right.  Okay.  That's for

16 non-competing risk.

17             Then you have a -- there's a

18 competing risk happening.  You say, well,

19 gee, you know, I'm only interested in

20 hazard, dying from the cancer.  Right.

21             I say okay, so what are

22 you -- what are you talking about now?

23 If a guy die from non-cancer, what are

24 you going to do with the patient?

Confidential Information - Subject to Protective Order

1          I say, well, I'm going to

2   put a limitation in my risk assess

3   forever.  Right.

4          Even the guy died from

5   non-cancer, I said, well, in heaven, the

6   guy is going to eventually develop a

7   death of cancer.

8          Do you think this is a

9   reasonable assumption?  Of course not.

10  Right.

11         That's what Jason Fine and

12  Bob Gray's paper, they even themselves

13  indicate it's an interpretation problem.

14         So we actually in the

15  Internal Medicine explain to people, this

16  is paper written for clinical people.

17  You know, it's well written.  I recommend

18  it if you cannot falling asleep some

19  night, to pick it up and read it.

20         And we explain to people,

21  this is not logical the quantity you can

22  use.  Right.

23         And people didn't know how

24  to do it.  So in the Internal Medicine

Confidential Information -- Subject to Protective Order

1    paper, we give alternative ways to help

2    us to understand, instead of using hazard

3    ratio, using something else, right.

4                    So that's why people started

5    picking up, oh, yeah, yeah, yeah, this is

6    actually very good.

7                    Is that okay with you now?

8    Or you still don't understand?

9        Q.    I still haven't heard you

10   explain what the problem is with using

11   the Fine and Gray method.

12       A.    I told you.  If the guy died

13   from non-cancer, what is the hazard the

14   guy is going to have a cancer death?  Can

15   you answer me?  No, you can't, right?

16                    Jason Fine actually put this

17   guy in the risk assess when they computed

18   the hazard.  That's the problem.

19       Q.    That's your --

20       A.    I don't know if it's too

21   complicated --

22       Q.    That's your criticism of the

23   Fine and -- have you -- do you feel like

24   you've given the full answer on your --

Confidential Information - Subject to Protective Order

1    what you believe to be the problem with

2    using the Fine and Gray method?

3            A.    Yeah, you know, this is such

4    complex situation, sir.  If you don't

5    read my paper, even I spend 20 minutes

6    with you, I don't think you can get it,

7    right.

8                If you read my paper, just

9    take ten minutes, you can understand the

10   underlying formula.  Okay.  So, you know,

11   I'd be happy to go through the paper

12   quickly with you if you wanted to, if you

13   really want to find out what's wrong with

14   Jason Fine's estimate.

15               In fact, he wrote this paper

16   asking me to be author.  I told him, I

17   say, Jason, this doesn't make sense.  And

18   I don't want to be co-author.  So he said

19   fine.  Okay.

20       Q.    Do you feel like you've

21   answered my question on what is the

22   problem with the Fine and Gray method?

23       A.    Are you asking me?

24       Q.    Yes.

Confidential Information - Subject to Protective Order

1        A.    I said it clearly, but you

2   don't understand.  I don't know what I

3   can do.

4              I mean, I said the guy in

5   heaven already, died from a

6   cardiovascular event.  And I said how are

7   you computing this guy's hazard for

8   cancer death?

9        Q.    Okay.  Let's take a look at

10   the next page.  Page 14, Number 26.

11              Next you have, "Based on the

12   information available and the content of

13   Dr. Madigan's report, we cannot use the

14   results from diet or occupational studies

15   to make an inference about the exposure

16   effects for the population with

17   valsartan.  For example, from the

18   meta-analysis by Song et al., regarding

19   gastric cancer" --

20        A.    I'm sorry.  Mr. Nigh, could

21   I stop here?

22        Q.    You want to take a break?

23        A.    Yeah.  I'd like to take a

24   break.  And we're going to decide we like

Confidential Information - Subject to Protective Order

1    to continue tonight or not.  Is that all

2    right with you?

3            Q.    Sure.  Yes.

4                  MR. MERRELL:  Is that all

5            right, Mr. Nigh?  We probably

6            should confer.  It's going pretty

7            late.

8                  THE VIDEOGRAPHER:  I'm

9            sorry.  Are we going off the

10           record?   I'm sorry.

11                 MR. NIGH:  Definitely.

12                 MR. MERRELL:  Yes.

13                 MR. NIGH:  Let's go off the

14           record.

15                 THE VIDEOGRAPHER:  The time

16           right now is 5:37 p.m.  We're off

17           the record.

18                 (Excused.)

19                 (Deposition adjourned at

20           approximately 5:37 p.m.)

21

22

23

24

Confidential Information - Subject to Protective Order

1

2                        CERTIFICATE

3

4

5              I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7

              It was requested before
8  completion of the deposition that the
   witness, LEE-JEN WEI, Ph.D., have the
9  opportunity to read and sign the
   deposition transcript.
10

11        *Michelle L Gray*

12        _____

          MICHELLE L. GRAY,
13        A Registered Professional
          Reporter, Certified Shorthand
14        Reporter, Certified Realtime
          Reporter and Notary Public
15        Dated:  September 17, 2021

16

17

18              (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)

23

24

Confidential Information - Subject to Protective Order

1        INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8              After doing so, please sign

9    the errata sheet and date it.

10             You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14             It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Confidential Information - Subject to Protective Order

```
1                  _   _   _   _   _   _

                     E R R A T A
2                  _   _   _   _   _   _

3

4    PAGE   LINE   CHANGE

5    _____  _____  _____

6         REASON: _____

7    _____  _____  _____

8         REASON: _____

9    _____  _____  _____

10        REASON: _____

11   _____  _____  _____

12        REASON: _____

13   _____  _____  _____

14        REASON: _____

15   _____  _____  _____

16        REASON: _____

17   _____  _____  _____

18        REASON: _____

19   _____  _____  _____

20        REASON: _____

21   _____  _____  _____

22        REASON: _____

23   _____  _____  _____

24        REASON: _____
```

Confidential Information - Subject to Protective Order

1

2                ACKNOWLEDGMENT OF DEPONENT

3

4            I,_____, do

5   hereby certify that I have read the

6   foregoing pages, 1 - 401, and that the

7   same is a correct transcription of the

8   answers given by me to the questions

9   therein propounded, except for the

10  corrections or changes in form or

11  substance, if any, noted in the attached

12  Errata Sheet.

13

14

15  _____

16   LEE-JEN WEI, Ph.D.                 DATE

17

18

19  Subscribed and sworn

    to before me this

20  _____ day of _____, 20_____.

21  My commission expires:_____

22

    _____

23  Notary Public

24

Confidential Information - Subject to Protective Order

1                      LAWYER'S NOTES

2    PAGE   LINE

3    _____  _____   _____

4    _____  _____   _____

5    _____  _____   _____

6    _____  _____   _____

7    _____  _____   _____

8    _____  _____   _____

9    _____  _____   _____

10   _____  _____   _____

11   _____  _____   _____

12   _____  _____   _____

13   _____  _____   _____

14   _____  _____   _____

15   _____  _____   _____

16   _____  _____   _____

17   _____  _____   _____

18   _____  _____   _____

19   _____  _____   _____

20   _____  _____   _____

21   _____  _____   _____

22   _____  _____   _____

23   _____  _____   _____

24   _____  _____   _____