# Exhibit 47

RESTRICTED CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT

                 DISTRICT OF NEW JERSEY

2    - - - - - - - - - - - - - - - - - x

     IN RE: VALSARTAN, LOSARTAN, AND   :  MDL NO. 2875

3    IRBESARTAN PRODUCTS LIABILITY     :

     LITIGATION,                       :

4                                      :

     THIS DOCUMENT RELATES TO          :

5    ALL ACTIONS                       :

     - - - - - - - - - - - - - - - - - x

6

7

8              ***RESTRICTED CONFIDENTIAL***

9

10             Veritext Virtual Zoom Videotaped

11   deposition of RENA M. CONTI, Ph.D., taken on

12   Thursday, February 10, 2022, in Glenside,

13   Pennsylvania, commencing at 10:17 a.m. Eastern

14   Standard Time, before Jamie I. Moskowitz, a

15   Certified Court Reporter and Certified Livenote

16   Reporter.

17

18

19

20

21

22

23

24

25

RESTRICTED CONFIDENTIAL

**Page 2**

```
 1  A P P E A R A N C E S :
 2
    HONIK LLC
 3  BY:  RUBEN HONIK, ESQUIRE
    ruben@honiklaw.com
 4  1515 Market Street - Suite 1100
    Philadelphia, Pennsylvania 19102
 5  267.435.1300
    Counsel for the Witness Rena M. Conti, Ph.D.
 6
 7  MAZIE SLATER KATZ FREEMAN
    BY:  ADAM M. SLATER, ESQUIRE
 8  aslater@mazieslater.com
    103 Eisenhower Parkway
 9  Roseland, New Jersey 07068
    973.228.9898
10  Counsel for the Plaintiffs
11
    SLACK DAVIS SANGER LLP
12  BY:  JOHN R. DAVIS, ESQUIRE
    jdavis@slaterdavis.com
13  6001 Bold Ruler Way - Suite 100
    Austin, Texas 78746
14  512.795.8686
    Counsel for the Plaintiffs
15
16  LIEFF CABRASER HYMAN & BERNSTEIN, LLP
    BY:  RACHEL J. GEMAN, ESQUIRE
17  rgeman@lchb.com
    250 Hudson Street
18  New York, New York 10013
    212.355.9500
19  Counsel for the Plaintiffs
20
    KANNER & WHITELEY, L.L.C.
21  BY:  CONLEE S. WHITELEY, ESQUIRE
    c.whiteley@kanner-law.com
22  BY:  DAVID J. STANOCH, ESQUIRE
    d.stanoch@kanner-law.com
23  BY:  LAYNE C. HILTON, ESQUIRE
    lhilton@kanner-law.com
24  701 Camp Street
    New Orleans, Louisiana 70130
25  504.524.5777
    Counsel for the Plaintiffs
```

**Page 3**

```
 1  A P P E A R A N C E S :
 2
    DUANE MORRIS LLP
 3  BY:  SETH A. GOLDBERG, ESQUIRE
    sagoldberg@duanemorris.com
 4  BY:  COLEEN W. HILL, ESQUIRE
    cwhill@duanemorris.com
 5  BY:  ALEK W. SMOLIJ, ESQUIRE
    awsmolij@duanemorris.com
 6  BY:  DANA B. KLINGES, ESQUIRE
    dklinges@duanemorris.com
 7  30 South 17th Street
    Philadelphia, Pennsylvania 19103
 8  215.979.1000
    Counsel for the Defendants Prinston Pharmaceutical
 9  Inc., Zhejiant Huahai Pharmaceutical Co., Ltd, Solco
    Healthcare U.S., LLC and Huahai U.S., Inc.
10
    DUANE MORRIS LLP
11  BY:  REBECCA E. BAZAN, ESQUIRE
    rebazan@duanemorris.com
12  BY:  DREW T. DORNER, ESQUIRE
    dtdorner@duanemorris.com
13  505 9th Street NW - Suite 1000
    Washington, DC 20004
14  202.776.7800
    Counsel for the Defendants Prinston Pharmaceutical
15  Inc., Zhejiant Huahai Pharmaceutical Co., Ltd, Solco
    Healthcare U.S., LLC and Huahai U.S., Inc.
16
17  MORGAN, LEWIS & BOCKIUS LLP
    BY:  JOHN K. GISLESON, ESQUIRE
18  john.gisleson@morganlewis.com
    BY:  STEVEN H. HUNCHUCK, ESQUIRE
19  steven.hunchuck@morganlewis.com
    One Oxford Centre - 32nd Floor
20  Pittsburgh, Pennsylvania 15219
    412.560.3300
21  Counsel for Defendant Aurobindo Pharma Ltd.
22
23
24
25
```

**Page 4**

```
 1  A P P E A R A N C E S :
 2
    GREENBERG TRAURIG, LLP
 3  BY:  TIFFANY M. ANDRAS, ESQUIRE
    andrast@gtlaw.com
 4  BY:  GREG E. OSTFELD, ESQUIRE
    osfeldg@gtlaw.com
 5  77 West Wacker Drive - Suite 3100
    Chicago, Illinois 60601
 6  312.456.1065
    Counsel for Defendant Teva Pharmaceuticals
 7  Industries Ltd.
 8
    NORTON ROSE FULBRIGHT US LLP
 9  BY:  ELLIE NORRIS, ESQUIRE
    ellie.norris@nortonrosefulbright.com
10  BY:  D'LESLI M. DAVIS, ESQUIRE
    dlesli.davis@nortonrosefulbright.com
11  2200 Ross Avenue - Suite 3600
    Dallas, Texas 75201-7932
12  214.855.8221
    Counsel for McKesson Corporation
13
14  HUSCH BLACKWELL
    BY:  MATTHEW D. KNEPPER, ESQUIRE
15  matt.knepper@huschblackwell.com
    190 Carondelet Plaza - Suite 600
16  St. Louis, Missouri 63105
    314.480.1500
17  Counsel for the Defendant Express Scripts
18
    BUCHANAN INGERSOLL & ROONEY PC
19  BY:  JONATHAN D. JANOW, ESQUIRE
    jonathan.janow@bipc.com
20  1700 K Street - Suite 300
    Washington, DC 20006
21  202.452.7900
    Counsel for the Defendant Albertsons LLC
22
23
24
25
```

**Page 5**

```
 1  A P P E A R A N C E S :
 2
    BUCHANAN INGERSOLL & ROONEY PC
 3  BY:  CHRISTOPHER B. HENRY, ESQUIRE
    christopher.henry@bipc.com
 4  227 West Trade Street - Suite 600
    Charlotte, North Carolina 28202
 5  704.444.3475
    Counsel for the Defendant Albertsons LLC
 6
 7  BARNES & THORNBURG LLP
    BY:  KARA M. KAPKE, ESQUIRE
 8  kara.kapke@btlaw.com
    11 South Meridian Street
 9  Indianapolis, Indiana 46204
    317.236.1313
10  Counsel for CVS and Rite Aid
11
    CROWELL & MORING LLP
12  BY:  LUKE J. BRESNAHAN, ESQUIRE
    lbresnahan@crowell.com
13  BY:  DANIEL T. CAMPBELL, ESQUIRE
    dcampbell@crowell.com
14  1001 Pennsylvania Avenue NW
    Washington, DC 20004
15  202.624.2500
    Counsel for the Defendant Cardinal Health Inc.
16
17  HILL WALLACK LLP
    BY:  WILLIAM E. MURTHA, ESQUIRE
18  wmurtha@hillwallack.com
    BY:  ERIC I. ABRAHAM, ESQUIRE
19  eabraham@hillwallack.com
    BY:  CARLO J. DEHART, ESQUIRE
20  cdehart@hillwallack.com
    21 Roszel Road
21  Princeton, New Jersey 08540
    609.924.0808
22  Counsel for the Defendants Hetero Drugs Limited and
    Hetero Labs Limited
23
24
25
```

2 (Pages 2 - 5)

RESTRICTED CONFIDENTIAL

Page 6

1  A P P E A R A N C E S :
2
   PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
3  BY:  FRANK H. STOY, ESQUIRE
   fhs@pietragallo.com
4  38th Floor - One Oxford Centre
   Pittsburgh, Pennsylvania 15219
5  412.263.4397
   Counsel for the Defendants Mylan Laboratories
6  Limited and Mylan Pharmaceuticals Inc.
7
   WALSH PIZZI O'REILLY FALANGA LLP
8  BY:  CHRISTINE I. GANNON, ESQUIRE
   cgannon@walshlaw.com
9  Three Gateway Center
   100 Mulberry Street - 15th Floor
10 Newark, New Jersey 07102
   973. 757.1100
11 Counsel for the Defendant Teva Pharmaceuticals
12
   HINSHAW & CULBERTSON LLP
13 BY:  GEOFFREY M. COAN, ESQUIRE
   gcoan@hinshawlaw.com
14 53 State Street - 27th Floor
   Boston, Massachusetts 02109
15 617.213.7045
   Counsel for the Defendant Sciegen Pharmaceuticals
16
   DORSEY & WHITNEY LLP
17 BY:  SHEVON D. ROCKETT, ESQUIRE
   rockett.shevon@dorsey.com
18 51 West 52nd Street
19 New York, New York 10019-6119
   212.415.9357
20 Counsel for the Defendant OptumRx
21
   FALKENBERG IVES LLP
22 BY:  KIRSTIN B. IVES, ESQUIRE
   kbi@falkenbergives.com
23 BY:  MEGAN A. ZMICK, ESQUIRE
   maz@falkenbergives.com
24 230 West Monroe - Suite 2220
   Chicago, Illinois 60606
25 312.566.4803
   Counsel for the Defendant Humana Pharmacy, Inc.

Page 7

1  A P P E A R A N C E S :
2
   ULMER & BERNE LLP
3  BY:  JEFFREY D. GEOPPINGER, ESQUIRE
   jgeoppinger@ulmer.com
4  312 Walnut Street - Suite 1400
   Cincinnati, Ohio 45202-4029
5  513.698.5000
   Counsel for the Defendant AmerisourceBergen
6
7  ALSO PRESENT:
8  JUSTIN BILY
   Legal Videographer
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1      E X H I B I T S
2
   EXHIBIT NUMBER   DESCRIPTION           PAGE
3
   Conti 1    Retention Agreement        43
4
   Conti 2    Defendant's Notice to      52
5          Videotaped Deposition of
           Dr. Conti
6
   Conti 3    Plaintiffs' Objections and   56
7          Responses to Defendants'
           Notice of Videotaped
8          Deposition of Rena Conti,
           Ph.D.
9
   Conti 4    Greylock McKinnon Invoices   58
10
   Conti 5    Declaration         74
11
   Conti 6    FDA Updates and Press      167
12         Announcements on
           Angiotensin II Receptor
13         Blocker (ARB) Recalls
           (Valsartan, Losartan, and
14         Irbesartan)
15
16
17
18
19
20
21
22
23
24
25

Page 9

1  REQUEST PAGE
2
3  INSTRUCTIONS NOT TO ANSWER:
4  Page Line
5  None
6  REQUEST FOR PRODUCTION OF DOCUMENTS:
7  Page  Line         Description
8  None
9  STIPULATIONS:
10 Page Line
11 None
12 QUESTIONS MARKED:
13 Page  Line
14
15
16
17
18
19
20
21
22
23
24
25

Page 10

1        TABLE OF CONTENTS
2    RENA M. CONTI, Ph.D.
3
     Examination
4
     By Mr. Goldberg.......................Page  12
5
     Index of Exhibits.....................Page   8
6
7    Reporter Certificate.................Page 242
8    Read and Sign.........................Page 243
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 11

1        THE VIDEOGRAPHER:  We are going on the
2    record at 10:17 on February 10th, 2022.  This
3    is Media Unit Number 1 of the video recorded
4    deposition of Rena Conti regarding the
5    valsartan litigation.
6        My name's Justin Bilely from the firm
7    Veritext, and I'm the videographer.  The court
8    reporter is Jamie Moskowitz from the firm
9    Veritext.
10       All counsel will be noted on the
11   stenographic record.  Will the court reporter
12   please swear in the witness, and then we can
13   begin.
14           *  *  *
15      P R O C E E D I N G S
16       THE COURT REPORTER:  The attorneys
17   participating in this deposition acknowledge
18   that I am not physically present in the
19   deposition room and that I will be reporting
20   this deposition remotely.
21       They further acknowledge that, in lieu
22   of an oath administered in person, the witness
23   will verbally declare his testimony in this
24   matter is under penalty of perjury.
25       The parties and their counsel consent

Page 12

1    to this arrangement and waive any objections to
2    this manner of reporting.  If there are any
3    objections, please state them at this time.
4           *  *  *
5        THE COURT REPORTER:  Hearing no
6    objections, I will swear in the witness.
7           *  *  *
8        RENA CONTI, after having been first
9    duly sworn, was examined and testified as
10   follows:
11          *  *  *
12       THE COURT REPORTER:  Okay, Counsel,
13   please proceed.
14       MR. GOLDBERG:  Thank you.
15   EXAMINATION BY MR. GOLDBERG:
16   Q     Good morning, Dr. Conti.  My name is
17   Seth Goldberg.  I'm with the law firm Duane Morris,
18   and we represent the ZHP parties in this action.
19   I'm going to be asking you questions during the
20   deposition today on behalf of all of the defendants
21   in the case, as well.
22       Can you state your name for the
23   record, and your current address?
24   A     Sure, Rena Conti, 2 Overlea Way,
25   Glenside, PA 19038.

Page 13

1    Q     Okay.  You've been deposed before,
2    Dr. Conti?
3    A     I have.
4    Q     You understand, throughout the day,
5    I'm going to ask you questions.  You're going to
6    provide answers.  And if -- during the day, if we
7    can try not to talk over one another, that would be
8    helpful.
9        Your counsel or plaintiff's counsel
10   may assert objections from time to time.  Unless
11   they instruct you not to answer, you're to answer
12   the question, okay, not withstanding the objection.
13   If you don't understand --
14   A     I understand.
15   Q     If you don't understand a question
16   I've asked, please ask me to clarify it or rephrase
17   it.  If you answer it, we'll assume that you
18   understood it.  Okay?
19   A     I understand.  Thank you.
20   Q     If you need to take a break at any
21   time, no problem.  Just ask.
22   A     Okay.
23   Q     Have you taken any medications this
24   morning that may impair your testimony today?
25   A     I took a couple of Tylenol, but I

4 (Pages 10 - 13)

RESTRICTED CONFIDENTIAL

Page 14

1  don't think that's going to --
2  Q      Hopefully -- okay.
3          Why don't we talk a little bit about
4  your professional background?
5          Can you explain what your current
6  position is at Boston University?
7  A      Sure.
8          I am associate professor in the
9  Department of Markets, Public Policy and Law at the
10 business school at Boston University.  It's called
11 Questrom School of Business.  In addition, I am
12 co-director of the institute -- of an institute
13 called Technology & Policy research Institute, which
14 is an institute across the business school and the
15 law school that focuses on issues related to
16 technological innovation, its -- and its regulation.
17 Q      Are you -- are you currently teaching
18 any courses?
19 A      Sadly, yes, I am.  I am --
20 Q      What courses?
21 A      I am teaching Strategy in the
22 Biopharmaceutical Industry --
23         COURT REPORTER:  I'm sorry.  You're
24 teaching...
25         THE WITNESS:  I teach Strategy in the

Page 15

1      Biopharmaceutical Industry.  That is the class
2      that I have taught for the better part of
3      20 years.
4  BY MR. GOLDBERG:
5  Q      What is that course about?  Just give
6  me a -- give me a thumbnail sketch of that course.
7  A      Sure.
8          It's about the financing, organization
9  and regulation of the pharmaceutical industry, and
10 how firms in this industry, most notably the --
11 pharmaceutical manufacturers themselves, innovate
12 price, get reimbursed and generate revenue.
13 Q      Did you write a textbook for that
14 course?
15 A      I'm in the process of writing a
16 textbook now.  Like I said, I have taught this class
17 for the better part of 20 years, at
18 Harvard University, at the University of Chicago and
19 now at Boston University.  And I developed many
20 materials, including case studies, that are now the
21 industry standard.
22         I have a number of textbooks --
23 Q      Hang on --
24 A      Wait.  Wait.  So I was the economist
25 on the National Academy of Science's recent report

Page 16

1  on drug pricing and regulation, and it's that report
2  that the committee developed that is actually the --
3  one of the textbooks that we use in my class.
4  Q      You said something about industry
5  standard.  I was trying to ask, industry standard
6  for what?  What -- you said something was the
7  industry standard.
8  A      Oh, the materials that -- that I've
9  developed for my course and developed in -- in other
10 contexts during my research, are very widely used to
11 teach about the industry, about the pharmaceutical
12 industry.
13 Q      In terms of your expert consulting,
14 you have an associate position at Greylock McKinnon?
15         COURT REPORTER:  Where?
16         MR. GOLDBERG:  Greylock McKinnon; is
17 that correct?
18         THE WITNESS:  I'm sorry, is that a
19 question?
20 BY MR. GOLDBERG:
21 Q      Yes.
22 A      Okay.  Right.  So I have worked with
23 Greylock McKinnon and Associates on -- on health
24 litigation matters, again, largely in the
25 pharmaceutical industry -- products, I guess, in the

Page 17

1  pharmaceutical industry, again, for the better part
2  of 20 years.
3  Q      And what do you do at
4  Greylock McKinnon?
5  A      I provide expert services for -- in
6  support of litigation.
7  Q      Do you do any consulting with
8  Greylock McKinnon that is not litigation related?
9  A      No.
10 Q      Are there particular kinds of
11 litigation that you work on for Greylock McKinnon?
12 A      Again, all of it's in -- on the
13 pharmaceutical industry, related to pricing,
14 reimbursement, coverage, competition and regulation.
15 And I have been involved in a variety of antitrust
16 matters, and a variety of -- of other types of legal
17 matters.
18 Q      On a -- on a, you know, given day or
19 given week, how many matters are you handling in
20 your capacity as an -- this academic affiliate at
21 Greylock?
22 A      It really depends on the time period
23 and the year.  Right now, I think I have maybe three
24 cases that I'm working on in various forms.
25 Q      Well, are you working as an -- as an

5 (Pages 14 - 17)

RESTRICTED CONFIDENTIAL

Page 18

1  expert in all three of those cases?
2      A      Yes.
3      Q      Okay.  And are those three cases
4  products liability cases?  Are they antitrust cases?
5  What's the subject matter of those cases?
6      A      One of them is a liability case,
7  and -- well, actually -- yeah.  One of them is a
8  liability case, and two others are antitrust cases.
9      Q      Generally, can you -- can you describe
10  the mix on a percentage basis, between antitrust,
11  patent, products liability, that you -- that you
12  generally have?
13      A      So do you mean in relation to the work
14  that I do at -- with Greylock McKinnon --
15      Q      Yes.
16      A      -- or other -- okay.
17      Q      Well, are you doing expert work
18  outside of Greylock McKinnon?
19      A      Yes, I am.
20      Q      Okay.  Is that -- I guess we'll --
21  we'll get to your CV, and maybe you can show me on
22  your CV where that is.
23          But why don't we take it first with
24  Greylock McKinnon, where your -- what the case mix
25  is from antitrust, patents and other subject

Page 19

1  matters?
2      A      I don't quite understand what you mean
3  by "patent."
4      Q      Patent, patent, patent or intellectual
5  property.  Are you doing any expert work in
6  intellectual property matters?
7      A      Not -- so patents are obviously an
8  important part of the industry.  But -- and they are
9  related to the work that I'm doing, but I'm not
10  doing any patent litigation work, if that is what
11  you're asking.
12      Q      Yeah.  So I'm asking, what is the --
13  you know, the -- the makeup of the different subject
14  matters that you're working on as an expert, as a
15  general matter.  You said antitrust.  You said
16  products liability.  Are there other types of
17  matters that you work on?
18      A      Okay.  So at Greylock McKinnon, I'm
19  largely working half and half on product liability
20  and antitrust.  I would say I have increasingly
21  worked on product liability over the past couple of
22  years, and -- but generally, there's a mix of that
23  now.
24      Q      And explain what your expert work is
25  when you're doing it not through Greylock McKinnon.

Page 20

1  Are you -- do you have an independent expert
2  consulting firm that you're just doing
3  independently?
4      A      I am working on a number of matters
5  that Greylock McKinnon has conflicts with, and
6  I'm -- they are largely either business disputes
7  between pharmaceutical firms --
8          COURT REPORTER:  Between what?
9          THE WITNESS:  Between pharmaceutical
10      firms.
11          COURT REPORTER:  Uh-huh.
12          THE WITNESS:  Or matters related to
13      government work that -- where I am serving as
14      an expert and there are government agencies
15      involved.
16  BY MR. GOLDBERG:
17      Q      Can you describe what that -- can you
18  give us a little bit more detail about what those
19  kinds of matters are?
20          MR. HONIK:  Dr. Conti -- Dr. Conti,
21      let me instruct you that while Mr. Goldberg's
22      questions are fine, not to reveal any matters,
23      particularly in the litigation sphere, in which
24      there may not have been a normal date to
25      disclose your involvement.  And so be very

Page 21

1  circumspect about that.  Thank you.
2          THE WITNESS:  Thank you.
3          On the government investigations
4      and -- I am serving as an expert and have
5      served as an expert in the past.  And I can't
6      provide any details.
7  BY MR. GOLDBERG:
8      Q      Are there matters that you worked in
9  terms of government investigations in the past that
10  you can provide details about what the -- what the
11  subject matter is of the investigation?  Are you
12  investigating cGMP practices?  Are you investigating
13  fraud?  Are you investigating, you know, something
14  related to the business?  I'm just trying to get a
15  sense of what you do as an expert in government
16  investigation.
17      A      Sure.  So every single day, all day
18  long, all I do is think about the financing, the
19  organization and the regulation of the
20  pharmaceutical industry.  So you can kind of fairly
21  surmise from that the work that I'm doing,
22  either in business disputes between industry members
23  is related to financing, organization and regulation
24  of these products, and in the government work that I
25  do, again, it's all related to financing,

6 (Pages 18 - 21)

RESTRICTED CONFIDENTIAL

Page 22

1  organization and regulation.
2        I have been a special consultant to
3  the Office of Generic Drugs for years, and have been
4  involved in the regulation of pharmaceuticals by the
5  Food and Drug Administration for a long time.
6        And so a lot of the -- a lot of the
7  work that I work on for government agencies is
8  related to the regulation of these products.
9    Q    Is there a particular aspect of the
10  regulation of these products that you focus on?  And
11  when you're -- let me qualify that.  Regulation of
12  pharmaceutical products that you focus on?
13    A    So I would say I have two broad
14  expertise.  The first is on pricing of these
15  products; how it is priced by the pharmaceutical
16  industry themselves, what are the factors that lead
17  to prices being high, changing over time, increasing
18  or decreasing with competition, both in the branded
19  and specialty -- or branded and generic market.
20        And then the second broad category of
21  expertise is on competition, and specifically what
22  are the factors that drive pharmaceutical companies
23  to enter specific types of markets, particularly
24  generic markets; what are the conditions upon which
25  they can enter those markets; how does competition

Page 23

1  evolve over time; and to what extent do regulatory
2  agencies support entry and sustained competition
3  over time.
4    Q    I just want to come back -- I'd just
5  like to clarify one thing.
6        Going back to when you were talking
7  about your coursework, and you -- the -- the
8  materials that you said, you know, are used and have
9  become an industry standard, when you -- when you're
10  talking about the industry standard, you're saying
11  the industry standard for teaching this stuff at
12  universities.  Is that -- is that what you mean?
13    A    Well, right.  So many of my articles
14  that I've published on the pricing of these products
15  and the regulation of these products are used by
16  myself to teach, but are also used by many other
17  experts in the field to teach about this industry.
18  And that's actually one of the conditions of tenure,
19  is that there is an industry standard that -- that
20  is met.
21        And then I have developed coursework
22  for materials that are used for teaching, case
23  studies, that type of stuff, that are used by
24  myself, and they are used by Harvard University
25  professors.  And they are used by Wharton professors

Page 24

1  and others.
2    Q    Okay.  Got it.
3        Back to the expert stuff, in terms of
4  working as an expert on behalf of plaintiffs, on
5  behalf of defendants, do you -- do you do more of
6  one or the other?
7    A    So I have worked on the defendant
8  side, largely in business disputes between different
9  firms.  In those cases, matters largely related to
10  production of products and the regulation of those
11  products have been domain.
12        And then I would say -- I mean,
13  obviously, in the government work I've done, it's
14  largely been on the side of the government and
15  taxpayers, consumers, that are insured by the
16  government.
17        And then -- and then I have done
18  plaintiff's work on -- largely on antitrust matters.
19    Q    And in products work, are you on
20  plaintiff's side more than defendant's side?
21    A    I'm sorry.  I didn't hear the first
22  part.
23    Q    In products -- in products liability
24  matters, or consumer class action matters, are you
25  on plaintiff's side more than defendant's side?

Page 25

1    A    I've largely worked on the plaintiff's
2  side on those matters.
3    Q    Have you represented any defendants
4  in -- as an -- as an expert, in a products liability
5  action or consumer class action?
6    A    What do you mean by "consumer class
7  action?" I'm sorry.
8    Q    Like -- like the claims that we're
9  here for today, the economic loss claim.  Consumers
10  are claiming they should get a refund for a product.
11    A    Right.  So I'm only -- I think I have
12  three cases right now, one settled, on products
13  liability.  Each one of those cases, I was working
14  on the plaintiff's side.
15    Q    So in your -- your expert consulting
16  experience, you've done three products liability
17  cases; is that correct?
18    A    Right, that I can talk about.  Right.
19    Q    And of those three, all three were on
20  behalf of plaintiffs?
21    A    Correct.
22    Q    How many other products liability
23  matters have you worked on that you can't talk
24  about?
25    A    At least one that comes to mind.

7 (Pages 22 - 25)

RESTRICTED CONFIDENTIAL

Page 26

1    Q    And in that one, can you tell us
2  whether it's on behalf of plaintiffs or defendants?
3    A    It was for the government.
4    Q    Okay.  In 2021, since we just finished
5  the year, how much of your income was generated from
6  your work as an expert witness versus your income as
7  a professor?
8    A    Somewhere maybe around a quarter.
9    Q    Can you quantify that in dollars, what
10 that expert work looks like on an annual basis?
11   A    Do you mean in 2021?
12   Q    Yes, sure.
13   A    Okay.  So pandemic year, I think I
14 made approximately $100,000, maybe $80,000,
15 somewhere around there, in 2021.  Much of that was
16 for cases that I worked on in previous years, not
17 in -- in 2021.
18   Q    Has the pandemic caused you to have
19 fewer cases or work?
20   A    Sadly, it's the reverse.  All I do is
21 sit in my house and work.  I know you all probably
22 feel the same way.
23   Q    We all share that -- we all share that
24 experience that we're working way more due to the
25 pandemic, especially in litigation.

Page 27

1    A    I'm hoping to not be like that in
2  2022.
3    Q    Yeah.  In terms of the -- the business
4  disputes where you've been an expert, have you
5  represented pharmaceutical companies in those
6  business disputes?
7    A    Yes.  Again, every single day, all I
8  do is think about this industry.  So in those
9  matters, they've been pharmaceutical companies.
10   Q    Are there -- are they generic
11 companies or branded companies?
12   A    Both.
13   Q    Were any of the companies that you've
14 represented in these matters, defendants in this
15 case?
16   A    No.
17   Q    Have you -- let's talk about your
18 retention in this matter.  How did you -- how did
19 you come about being retained in this matter?
20   A    I was contacted by one of the
21 principals at Greylock McKinnon and Associates, and
22 asked if I would be interested in discussing with
23 the attorneys the general outlines of the -- of the
24 matter.
25   Q    When was that first contact at

Page 28

1  Greylock and your first meetings with plaintiffs'
2  counsel?
3    A    I think it was the month, or maybe the
4  month previous, to when the pandemic started.
5    Q    February of '20?
6    A    February or March.  I remember it was
7  a very gray, cold day in Boston.
8    Q    Do you recall who the lawyers were for
9  the plaintiffs that you met with for the first time
10 when you met -- had that first meeting in this
11 matter?
12   A    I think Ruben Honik and
13 Conlee Whiteley and Layne Hilton were on that first
14 call.
15   Q    Have you --
16   A    Maybe misremembering --
17        THE COURT REPORTER:  I'm sorry,
18 Ms. who?
19        THE WITNESS:  Misremembering.
20        THE COURT REPORTER:  Misremembering?
21        THE WITNESS:  Misremembering.  Sorry.
22 My English.
23        MR. HONIK:  It's a thing, not a
24 person.
25        THE WITNESS:  Exactly.

Page 29

1  BY MR. GOLDBERG:
2    Q    Well, whoever those plaintiffs'
3  counsel were, had you known any of them before that
4  first meeting?
5    A    No.
6    Q    Had you worked with any of the
7  plaintiffs' counsel that are on -- on the
8  plaintiffs' executive committee in this case prior
9  to starting work on this matter?
10   A    Not -- not that I can recall.
11   Q    Do you know if Greylock McKinnon had a
12 prior relationship with any of the lawyers that
13 represent the plaintiffs in this matter?
14   A    I don't know.
15   Q    Do you have any matters currently
16 pending with any of the lawyers that represent
17 plaintiffs in this matter, any other matters that
18 you're working on?
19   A    I am sorry.  What do you mean by
20 "currently pending"?
21   Q    Are you an expert in any cases that
22 are currently pending where the lawyers who are
23 plaintiffs in this case are representing parties in
24 that case?
25   A    I'm sorry.  I don't -- I don't know

8 (Pages 26 - 29)

RESTRICTED CONFIDENTIAL

Page 30

1 what you mean by "currently pending".
2    Q    Okay. Are -- are you doing expert
3 work in any other case where the lawyers who
4 represent the plaintiffs in this case are involved?
5    A    Yes.
6    Q    What case is that?
7        MR. HONIK: Let me caution you,
8    Dr. Conti, that to the extent that there's no
9    disclosure requirement in those matters, you
10   should not reveal that today.
11       THE WITNESS: Thank you. I cannot
12   provide any details.
13 BY MR. GOLDBERG:
14   Q    Which lawyers in plaintiffs' committee
15 are involved in those matters?
16       MR. HONIK: Let me instruct you not to
17   answer that for the same reason posited
18   previously. It's effectively the same question
19   and would reveal something -- excuse me -- and
20   would reveal or disclose something that doesn't
21   require to be disclosed at present. Thank you.
22       THE WITNESS: I'm sorry. I cannot
23   provide an answer.
24       MR. GOLDBERG: Counsel, you can mark
25   this portion of the transcript "highly

Page 31

1 confidential" so that it doesn't have to be
2 disclosed outside of this matter, but I think
3 we're entitled to know if Dr. Conti is working
4 for the lawyers who represent the plaintiffs in
5 this case in another matter.
6        MR. HONIK: She's already answered
7    affirmatively to that question. But your
8    pending question, to which I objected and
9    instructed her not to answer, is -- is nearly a
10   backdoor way of disclosing formally her
11   involvement as an expert in cases in which
12   there's not presently a disclosure requirement.
13       Accordingly, I've instructed her, and
14   she's followed it, not to identify the lawyers
15   because that identification effectively reveals
16   the matter in which she's working. That's the
17   basis. So please ask another question.
18 BY MR. GOLDBERG:
19   Q    That matter, is that a products
20 liability matter?
21       MR. HONIK: I instruct you not to
22   answer.
23 BY MR. GOLDBERG:
24   Q    Is it a -- is it an antitrust matter?
25       MR. HONIK: I instruct you not to

Page 32

1 answer and reveal the type of matter, litigated
2 matter.
3 BY MR. GOLDBERG:
4    Q    In that matter, have you been asked to
5 render an opinion that's similar to the opinion
6 you've been -- provided in this case?
7        MR. GOLDBERG: Object to the form.
8        THE WITNESS: Are you asking whether
9    that matter is on the pharmaceutical industry
10   and its regulation and financing?
11 BY MR. GOLDBERG:
12   Q    Sure. Let's start with that.
13   A    Yes. Everything --
14       MR. HONIK: Excuse me.
15       THE WITNESS: Go ahead.
16       MR. HONIK: Without waiving the
17   objection, I'll permit you to answer that and
18   only that question.
19       THE WITNESS: Thank you.
20       Everything I work on in my teaching,
21   in my research and in the expert work that I
22   provide to the government and to other
23   entities, is related to the financing,
24   organization and regulation of the
25   pharmaceutical industry.

Page 33

1        THE COURT REPORTER: Of the
2    pharmacy -- of the pharmacy...
3        THE WITNESS: Of the pharmaceutical
4    industry.
5        THE COURT REPORTER: Thank you.
6        THE WITNESS: Thank you.
7 BY MR. GOLDBERG:
8    Q    When did you begin to work on that
9 matter?
10   A    I'm sorry, on -- on the industry?
11   Q    No, on the matter that we've been
12 discussing that you're working for plaintiffs'
13 counsel in.
14       MR. HONIK: I'll instruct you not to
15   answer that question for the same reason.
16       Seth, respectfully, these are just
17   backdoor ways to try to get at your essential
18   question, which is, tell me the other cases
19   that you're involved in. And I won't allow
20   Dr. Conti to reveal that.
21       MR. GOLDBERG: Well, I -- I disagree.
22   I don't need to know the name of the case. I
23   don't need to know the names of the other
24   parties, but I do think we're entitled to know
25   what Dr. Conti is doing for plaintiffs' counsel

9 (Pages 30 - 33)

RESTRICTED CONFIDENTIAL

Page 34

1    in this case in other matters.
2        MR. HONIK:  Yeah, I don't agree.  And
3    moreover, I don't understand the last part of
4    your observation.  I have permitted you to ask
5    her many questions about all of the matters
6    that she's involved with, for whom she's doing
7    these in terms of segments of industry and
8    otherwise.
9        But you know and I know that if you're
10   involved as an expert consultant in a case in
11   which the date for disclosure of experts has
12   not yet arrived, that that is information that
13   can't be revealed.  So please move on.
14   BY MR. GOLDBERG:
15   Q    How much money have you made from
16   plaintiffs' counsel in that case?
17       MR. HONIK:  Without waiving the
18   objection, you can answer.  I think you did,
19   didn't you?
20       THE WITNESS:  Thank you.  None.
21   BY MR. GOLDBERG:
22   Q    Do you have your retention in that
23   case through Greylock McKinnon?
24   A    Yes.
25   Q    Are you charging in that matter the

Page 35

1    same fee, hourly fee, that you're charging in this
2    matter?
3    A    I don't know.
4    Q    Have you generated an invoice yet in
5    that matter?
6    A    No.
7    Q    Okay.  Going back to the beginning of
8    your retention in this case, prior to being retained
9    or at least meeting plaintiffs' counsel in February,
10   March 2020, had you done any research into
11   valsartan?
12   A    Yes.
13   Q    In -- in what capacity did you do
14   research into valsartan prior to that February,
15   March 2020 time period?
16   A    In two separate capacities.  The first
17   is that I have a longstanding interest in some types
18   products --
19       COURT REPORTER:  In some what?
20       THE WITNESS:  In some types of
21   pharmaceutical products, which include drugs
22   that are used to treat heart disease, valsartan
23   being one of them, but there are many others.
24       And then, in the other capacity, I
25   have spent a fair amount of time thinking about

Page 36

1    generic entry in product markets, and have
2    thought a lot about -- I have thought about and
3    also researched the entry of manufacturers in
4    this particular market.
5    BY MR. GOLDBERG:
6    Q    When you say," in this particular
7    market," what were you -- define what you mean by
8    "in this particular market."
9    A    In the valsartan market.
10   Q    When you were studying or researching
11   valsartan in connection with your interest in heart
12   disease, what was the nature of the research?
13   A    Pricing, promotion and --
14       THE COURT REPORTER:  And -- and what?
15       THE WITNESS:  And access to these
16   products.
17   BY MR. GOLDBERG:
18   Q    What do you mean by "access"?
19   A    Patient use.
20   Q    Were you looking at it from an
21   efficacy standpoint?
22   A    Safety and efficacy are both part -
23   are both determinants of access.  So I guess,
24   generally, yes.
25   Q    But at that -- at that time, you

Page 37

1    became generally familiar with the safety and
2    efficacy of valsartan at that time?
3    A    I think I would think -- I think about
4    that differently as an economist.  So I am
5    interested, again, in the pricing and the
6    reimbursement and in the utilization of these drugs.
7    Safety and efficacy of products are one of the
8    determinants -- or two of the determinants of people
9    using these products.
10   Q    Okay.  So you -- you were kind of
11   thinking about how many people are using it, the
12   number of people who are using it, and that's sort
13   of indicative of its safety and efficacy in some
14   way?
15   A    No.
16   Q    Okay.  Do you want to explain?
17   A    Sure.
18       So I was thinking about the pricing of
19   this product market, which included the -- the
20   valsartan products, but not only the valsartan
21   products.  I've been thinking about the
22   reimbursement of those products, so who pays what
23   for them.  And then I have -- I researched the use
24   of those products, so what determines the use of
25   those products, what are the general patterns of use

10 (Pages 34 - 37)

RESTRICTED CONFIDENTIAL

Page 38

1  in national prescriptions, in dispensing of
2  prescriptions in certain -- by certain --
3          COURT REPORTER:  I'm sorry.  In
4  certain?
5          THE WITNESS:  Sorry.  In certain
6  markets, et cetera.
7  BY MR. GOLDBERG:
8      Q      And by "these products," you're -- you
9  said it's more than valsartan.  Are you talking
10  hypertension products generally, or -- or is it
11  heart disease products generally?
12     A      Correct, drugs that are used to treat
13  heart disease.
14     Q      What was the timeframe of doing this
15  kind of research?
16     A      So I would say it overlapped with
17  my -- the completion of my dissertation.  So I
18  finished my dissertation in 2007.  I was researching
19  the use of these products and their pricing before I
20  finished my dissertation, so probably 2003, 2005.
21  And then it continued on from there.
22          Similarly, I was very -- I've been
23  very interested in competition, so when these
24  products are expected to experience generic entry,
25  undergo patent expiration; what types of product --

Page 39

1  or what types of firms enter into these markets; how
2  much competition is there; to what extent do these
3  prices go down over time; who uses these types of
4  products.  I think I've been thinking about that
5  since at least 2010, 2011.
6      Q      How about nitrosamines?  Are you
7  familiar with nitrosamines?
8      A      Yes.
9      Q      Prior to the February, March 2020
10  timeframe, had you done any work in connection with
11  nitrosamines?
12     A      Yes.  There was -- President Bush had
13  a council on cancer that released a report in 2010
14  about toxins, and specifically chemicals that can
15  cause DNA damage and other types of human health
16  harms that people might be exposed to in the
17  United States.  I read that report when it came out.
18  I have been generally interested in -- in
19  determining -- in chemicals that might impact
20  consumer health.
21          As an expert in pharmaceutical
22  economics and policy, this is kind of part of my --
23  my job, is to understand what these things are.
24     Q      Have you done any -- authored any
25  articles relating to nitrosamines?

Page 40

1      A      No.  This is just part of, again, the
2  work -- this is all part of understanding a little
3  bit more -- understanding this market.  I was a
4  chemistry major when I entered college, so I
5  actually know what they are.  So I -- I am familiar
6  with what they are before I was an economist.
7      Q      And in between 2010 and 2020, did you
8  do any particular research on the occurrence of NDMA
9  or NDEA in pharmaceutical products?
10     A      Okay.  I'm sorry.  Can you restate the
11  question or just -- just ask the question again?
12     Q      Sure.
13          Between 2010, when you said that
14  article -- that article came out, and February 2020,
15  did you do any research in -- in the area of the
16  occurrence of NDMA or NDEA in pharmaceutical
17  products?
18     A      Right.  So there's a various body of
19  literature that was developing since, I think, at
20  least the early 2000s on -- and actually, probably,
21  before then, on -- on chemical contaminates that are
22  harmful to human health.  I did some coursework on
23  that in -- at Harvard when I was finishing my --
24  when I was doing my Ph.D.  And I have been
25  interested in the topic especially since -- since I

Page 41

1  did my dissertation.
2      Q      All right.  I think you said you
3  finished your dissertation before 2010?
4      A      Right.  I finished -- my dissertation
5  was awarded in -- or my Ph.D. was awarded in 2007.
6      Q      All right.  My -- my question was --
7  I'm trying to be little more specific.
8      A      Uh-huh.
9      Q      My question was, since 2010, between
10  2010 and February of 2020, have you done any focused
11  research on the occurrence of NDMA and NDEA, in
12  particular, in pharmaceutical drugs?
13     A      So I don't know what you mean by
14  "focused research."
15     Q      Well, has -- has the particular focus
16  of research that you've done been the occurrence of
17  NDMA or for NDEA in pharmaceutical drugs?
18     A      So -- so again, the occurrence of
19  these products and their threat to human health as
20  part of the pharmaceutical industry is something
21  that I have been aware of for a long time.  And
22  because of product contamination and adulteration in
23  other product categories, not in valsartan, but in
24  other drugs since at least 2007, 2008, that involve
25  products made by Ranbaxy, products made at the Cidra

11 (Pages 38 - 41)

RESTRICTED CONFIDENTIAL

Page 42

1  plant, products made by Mylan, I am aware that there
2  are a variety of chemicals that can contaminate
3  pharmaceuticals and are harmful to human health.
4  And NDMA is one of those products. It's not the
5  only one.
6      Q      And I'm asking about NDMA. Have you
7  studied NDMA prior to February of 2020?
8      A      NDMA and other products that have come
9  up in my work between 2010 and 2020. Just like --
10 so, again, I -- if you are an expert in this
11 industry, you know that there have been some very
12 significant quality manufacturing lapses in
13 pharmaceutical products. That includes contaminated
14 Heparin. It includes the products that were made at
15 Ranbaxy and ultimately at Mylan and the
16 products that were made at the Cidra plant --
17         COURT REPORTER: At the what?
18         THE WITNESS: By Glaxo -- by
19 GlaxoSmithKline.
20         COURT REPORTER: I'm sorry. That were
21 made at the...
22         THE WITNESS: Cidra plant at -- owned
23 by GlaxoSmithKline in Puerto Rico.
24         There have also been other lapses in
25 quality and in manufacturing that have occurred

Page 43

1  particularly around 2010, 2011, 2012. And I
2  have been very interested in what exactly those
3  quality lapses were and -- and what are the
4  nature of the -- what are the harms to human
5  health of those types of lapses.
6         So I am aware of nitrosamines, in
7  addition to many other chemicals, being harmful
8  to human health and have been aware of that
9  during this time period.
10         MR. GOLDBERG: Can we pull up Tab 66?
11 BY MR. GOLDBERG:
12     Q      Dr. Conti, I want to show you your
13 retention agreement in this case. I don't think you
14 need to take the time to go through the binder, but
15 if you want to, I just want to pull this up and mark
16 this as Conti 1.
17         (Whereupon, Exhibit Conti 1 was marked
18 for Identification.)
19 BY MR. GOLDBERG:
20     Q      This is -- can you see that okay? You
21 have it up on the screen?
22     A      Yeah. I'm going to go get my binder.
23     Q      It's going to be Tab 66 in that
24 binder.
25     A      Okay. Great.

Page 44

1      Q      Do you have Tab 66, what we have
2  marked as Conti 1, in front of you?
3      A      I do. If you can just give me a
4  second to read it, please.
5      Q      Okay. This is your retention
6  agreement with plaintiffs' counsel in this case?
7      A      This is GMA's retention agreement with
8  the attorneys on my behalf.
9         THE COURT REPORTER: I'm sorry?
10         THE WITNESS: On my behalf.
11 BY MR. GOLDBERG:
12     Q      And it says that, in the first
13 paragraph, that plaintiffs' executive committee has
14 retained Greylock McKinnon Associates to provide
15 consulting on economic issues and other related
16 services.
17         What -- what are the related services
18 that -- that you're providing?
19     A      I don't know.
20     Q      It goes on to say that you're going
21 to -- you've been retained to provide expert
22 testimony as it relates to issues of the calculation
23 of damages.
24     A      I see that.
25     Q      Are -- are you -- do you understand

Page 45

1  that that -- that to be the scope of your testimony,
2  the calculation of damages?
3         MR. HONIK: Object to the form and to
4  the extent that it calls for a legal expert
5  opinion.
6         You may answer.
7         THE WITNESS: I have produced a report
8  that is calculating damages in this matter.
9  BY MR. GOLDBERG:
10     Q      So the answer is, yes, you understand
11 the scope of your work to be in relation to the
12 calculation of damages?
13         MR. HONIK: Same objection.
14         You may answer.
15         THE WITNESS: Thank you.
16         So up until this period in time, what
17 I have largely worked on in this matter is
18 related to the calculation of damages.
19         MR. GOLDBERG: You can take that down,
20 put that aside.
21 BY MR. GOLDBERG:
22     Q      You generated a report in this matter
23 in November of 2021. Can you describe, generally,
24 what the process was for putting together that
25 report?

12 (Pages 42 - 45)

RESTRICTED CONFIDENTIAL

Page 46

1    A    I reviewed data. We --
2         THE COURT REPORTER: I'm sorry,
3    Doctor. Can you repeat that?
4         THE WITNESS: Sure.
5         I discussed with the attorneys the
6    availability of data to calculate damages in
7    this matter, and also theories of liability
8    that would determine how we calculated
9    damages -- or how I calculated damages. I
10   worked with my staff to -- and with -- and with
11   the attorneys, to cull materials that would be
12   helpful in the calculation of damages. And I
13   also reviewed regulatory documents and other
14   facts that are relevant to the calculation of
15   damages.
16        And there's -- hold on. And there was
17   lots of drafting, analysis, redrafting and
18   finally, the final report.
19   BY MR. GOLDBERG:
20   Q    How long do you think it took to
21   generate the report from when you started to work --
22   work on it?
23        MR. HONIK: Seth, can we agree that
24   when you use the word, "report," you're
25   referring to the expert declaration of

Page 47

1    Dr. Conti --
2         MR. GOLDBERG: Yes.
3         MR. HONIK: -- of November 10th of
4    last year.
5         MR. GOLDBERG: Yes, the expert
6    declaration.
7         MR. HONIK: Thank you.
8         THE WITNESS: I'm sorry. Can you ask
9    me the question --
10        MR. HONIK: How long did it take you?
11   That's what he asked.
12        THE WITNESS: To generate the report,
13   correct?
14   BY MR. GOLDBERG:
15   Q    Yes.
16   A    Okay. Many months.
17   Q    How many months?
18   A    A lot. A lot of time because we were
19   waiting -- we were discussing. We were waiting for
20   data. We were -- and then calculating damages and
21   then writing the report.
22   Q    Many, a lot, do you have -- was it
23   10 months, more than 10 months?
24   A    I would say -- I mean, we -- I was
25   working on this, and staff was working on this

Page 48

1    pretty intently, at least starting over the summer.
2    Q    Over which summer?
3    A    Last summer, 2021.
4    Q    You mentioned the staff. How big was
5    your staff for this matter, and who were they?
6    A    The people that I have worked most
7    closely with are Bennett Erickson and Sarah Stone,
8    both employees at Greylock McKinnon, both people
9    that I work with pretty closely, generally. There
10   might be some other staff that I don't know as well
11   that have worked on this case.
12   Q    Do you have a sense of how much time
13   Bennett put into this matter?
14   A    No. Bennett's worked a lot on this
15   matter. But I -- I don't know. I don't see his
16   billings.
17   Q    Do you see anybody's billings for this
18   matter, or does that all go to Greylock admins?
19   A    I am very grateful for the work that
20   Greylock does, and no, I don't see any of the
21   billings. I don't -- I'm not involved in any of the
22   administration.
23   Q    Do you have a sense of how many hours
24   you put into the declaration?
25   A    Frankly, no.

Page 49

1    Q    Do you expect it to be more than
2    25 hours?
3    A    Yes.
4    Q    More than 50 hours?
5    A    Yes.
6    Q    More than 100 hours?
7    A    I would say close to 100 hours, sounds
8    about right, but I don't --
9         THE COURT REPORTER: I'm sorry. One
10   more time.
11        THE WITNESS: I don't have an exact
12   accounting.
13   BY MR. GOLDBERG:
14   Q    Your -- the retention agreement, which
15   we marked as Conti 1, says your hourly rate is $675.
16   Does that sound right to you?
17   A    Hold on. Let me just look again.
18   Q    Sure.
19   A    So, yeah, it does. I think my hourly
20   rate has gone up a little bit over time, maybe by
21   $100, but I'm not exactly sure.
22   Q    And for -- you would invoice your time
23   to Greylock, as well?
24   A    Yes.
25   Q    What are -- what do Bennett -- what

13 (Pages 46 - 49)

RESTRICTED CONFIDENTIAL

Page 50

1 are Bennett and Sara's backgrounds? Are they
2 Ph.D.s? Are they -- what -- what do they do?
3      A      So Bennett and Sarah both have -- are
4 both highly trained quantitative people. I would
5 say Sarah largely assists me on research through
6 identifying documents and specific facts that might
7 be helpful. I would say Bennett largely works on
8 data cleaning, manipulation and analysis. I have
9 not seen either of their CVs, but I have worked very
10 closely with them for a long time.
11      Q      When you think about your expert
12 declaration, it's broken into -- sort of at the
13 beginning -- your calculations of damages kind of
14 appear at the end of the declaration. Did -- did
15 either Bennett or Sarah do more in terms of the
16 calculations of damages? How did the work break up
17 in terms of writing, drafting your report?
18      A      Okay. I think you're
19 mischaracterizing my report, number one.
20           So the estimate of damages is found in
21 the front, and then the discussion of how to
22 calculations -- how to calculate the report is kind
23 of in the middle. And then the actual -- actual
24 calculations are summarized at the end. And then
25 there are appendices that provide the details of the

Page 51

1 data and the specific calculations.
2           I wrote my report.
3      Q      What do you mean by that?
4      A      I mean I wrote my report.
5      Q      Okay. You mentioned that there were
6 lots of drafts and back and forth. You wrote it,
7 you shared it with your colleagues at
8 Greylock McKinnon to comment on it?
9      A      I think that's a mischaracterization.
10      Q      Did your colleagues at
11 Greylock McKinnon not comment on your draft report?
12      A      Again, I think that's a
13 mischaracterization.
14      Q      Okay. So just tell me. This isn't
15 too much of a mystery. I'm just trying to
16 understand.
17           Did you share your report with your
18 team at Greylock McKinnon so they could provide
19 edits to it and comment to it?
20      A      Okay. So I wrote my report, and
21 Greylock -- folks who work at Greylock McKinnon
22 helped me fill in citations where I asked them to
23 provide -- to identify full citations for certain
24 types of facts. They helped me fill in specific
25 numbers. They helped me construct certain exhibits,

Page 52

1 but I wrote my report. And they worked at my
2 direction.
3      Q      And then did you provide drafts to
4 plaintiff's counsel to obtain comments from them
5 about your report?
6           MR. HONIK: I'm sorry. I didn't hear
7 the question. May I have it back, Jamie?
8           THE COURT REPORTER: Sure.
9           (Whereupon, the question was read back
10 as requested.)
11           MR. HONIK: Thank you. It's a yes or
12 no.
13           THE WITNESS: Yes.
14 BY MR. GOLDBERG:
15      Q      Did anyone outside of
16 Greylock McKinnon or plaintiff's counsel provide
17 input to your report?
18      A      No.
19      Q      Did anyone at Boston University help
20 gather information for your report?
21      A      No.
22           MR. GOLDBERG: Can we pull up Tab 52?
23 I'm gonna mark as Tab 52 Defendant's Amended
24 Notice to Videotaped Deposition of Dr. Conti.
25           (Whereupon, Exhibit Conti 2 was marked

Page 53

1 for Identification.)
2           MR. HONIK: And we're calling that
3 Conti 2?
4           MR. GOLDBERG: And this is going to be
5 marked as Conti 2, yes.
6 BY MR. GOLDBERG:
7      Q      Do you recognize this document,
8 Dr. Conti?
9      A      Yes.
10      Q      Did you receive this document?
11      A      Yes.
12      Q      And this document, you understand,
13 made certain document requests of you?
14      A      Yes. I understand on Exhibit A,
15 Page 3, or actually, Page 2, 3 and 4.
16      Q      What did you do to respond to this set
17 of document requests?
18           MR. HONIK: Dr. Conti, I have no
19 objection to the question, but don't reveal
20 discussions with counsel. It's protected by
21 the work product privilege.
22           THE WITNESS: Thank you.
23           So there were 17 requests. They
24 included my current up-to-date resume or CV.
25 That, I worked on with Sarah Stone to get it to

14 (Pages 50 - 53)

RESTRICTED CONFIDENTIAL

Page 54

1  be updated, and then it was provided to counsel
2  to provide to you.
3      Number 2 was a list of all articles,
4  abstracts, studies, reports, seminar materials,
5  presentations, publications or other writings
6  authored or co-authored by me from 2022 to the
7  present, that relate to the use of data after
8  team members -- the use of pharmaceutical
9  data --
10  Q      Doctor. Doctor, I don't --
11  A      Hold on.
12  Q      Hang on. Hang on. Hang on.
13      MR. HONIK: Mr. Goldberg, let her
14  finish, and then you can interject whatever --
15      MR. GOLDBERG: Hang on a second. It's
16  not -- the answer is not responsive to the
17  question. And also, we really don't need to
18  waste -- just hang on, Doctor. We don't need
19  to waste the time. I'm not asking you to read
20  the request out loud. I'm not asking you to
21  read it. My question was what did you do to
22  respond.
23      MR. HONIK: Excuse me. Excuse me.
24  Seth, respectfully, she is completely
25  responsive to your question. It's within her

Page 55

1  province to answer it in whatever way she
2  thinks is appropriate. To frame her response,
3  she is going through each request and
4  identifying what she did.
5      Now, I'd like her to complete her
6  response which you cut off. If you'd like to
7  sharpen your question in some way and perhaps
8  give her an instruction, that's fine. I have
9  no objection.
10      MR. GOLDBERG: That's fine.
11      MR. HONIK: But -- but she was in the
12  middle -- she was in the middle of a response,
13  which was highly responsive, even if it didn't
14  satisfy what you wanted.
15      You can continue, Dr. Conti, and then
16  pause.
17      MR. GOLDBERG: Objection. I'm
18  withdrawing -- I'm withdrawing the question, so
19  there's no reason...
20      MR. HONIK: That's fine. Very good.
21  Thank you. Next question.
22  BY MR. GOLDBERG:
23  Q      Did you -- did you collect any
24  documents to respond to this request?
25  A      Yes. That's what I'm trying to answer

Page 56

1  in specifics. So -- so there's a --
2  Q      What did you --
3  A      Hold on, please let me finish.
4      You requested 17 separate items, so in
5  order to answer your question, I am happy to tell
6  you, for each request, how I answered -- how I
7  gathered documents and provided that information.
8  Q      Okay. We don't have to do that.
9  Okay. We'll -- we'll get to it.
10      MR. GOLDBERG: Can we pull up document
11  65, please?
12  BY MR. GOLDBERG:
13  Q      Do you recognize the document that's
14  on the screen?
15  A      No.
16      MR. GOLDBERG: Marking as Conti 3, the
17  document entitled, "Plaintiffs' Objections and
18  Responses to Defendants' Notice of Videotaped
19  Deposition of Rena Conti, Ph.D."
20      (Whereupon, Exhibit Conti 3 was marked
21  for Identification.)
22  BY MR. GOLDBERG:
23  Q      Is this the first time you're seeing
24  this document, Dr. Conti?
25  A      Well, let me look through in detail,

Page 57

1  please. I'm on Page 6. I think there are --
2  Q      Yeah, my question was --
3  A      -- 15 pages. You asked me if I had
4  seen this, and I'm saying I'm going to look through.
5  Q      We can go off the record while you do
6  that.
7      MR. HONIK: Are you nearly done,
8  Dr. Conti?
9      THE WITNESS: I'm on Page 8 now. If
10  you can just give me a little bit more time.
11      MR. GOLDBERG: Let's go off the
12  record.
13      THE VIDEOGRAPHER: The time is 11:29.
14  We're going off the record.
15      (Whereupon, a short break was taken.)
16      THE VIDEOGRAPHER: The time is 11:30.
17  We're back on the record.
18  BY MR. GOLDBERG:
19  Q      Dr. Conti, have you seen this document
20  before, what we've marked as Conti 3?
21  A      No, I have not.
22      MR. GOLDBERG: Can you pull up -- the
23  document -- the document that's Tab -- I
24  believe it's Tab 0. Do you have a copy of your
25  report handy? If not, there's one in the

15 (Pages 54 - 57)

RESTRICTED CONFIDENTIAL

Page 58

1  binder.
2    A    I didn't hear you with it.
3        THE COURT REPORTER:  I didn't hear
4  you.
5    Q    Your report is the first document in
6  Binder 1.  Do you have -- get that unless you have a
7  copy of it handy.
8    A    I have Tab 1 in front of me.
9    Q    Okay.  Actually, before we get to
10  that --
11        MR. GOLDBERG:  And that can come down,
12  sorry about that.
13        Could you please pull up
14  document 70 -- I'm sorry, not 70, document 67.
15        THE VIDEOGRAPHER:  This will be
16  Exhibit 4?
17        MR. GOLDBERG:  This will be, yes.
18        THE WITNESS:  I'm sorry.  Did you say
19  64?
20        MR. HONIK:  67.
21        MR. GOLDBERG:  Document 67, which we
22  are marking as Exhibit Conti 4.
23        (Whereupon, Exhibit Conti 4 was marked
24  for Identification.)
25

Page 59

1  BY MR. GOLDBERG:
2    Q    Do you recognize document -- the
3  document we have marked as Conti 4?
4    A    No.
5    Q    I'll represent to you that these were
6  the invoices of Greylock McKinnon Associates that
7  were provided in response to the document request.
8  Do you have any reason to disagree with that
9  representation?
10    A    No.
11    Q    And you can see that this is -- at
12  least on the first page, you can see it's an invoice
13  submitted to Conlee Whitely and David Stanoch.
14  Okay.  Do you see that?
15    A    Yes.
16    Q    And those are plaintiffs' counsel in
17  this case, right?
18    A    That's my understanding, yes.
19    Q    I just want to ask you about a few of
20  the invoices here, some entries on these, just so we
21  can understand.  It looks like -- looking at the
22  first page, and I do believe these are in
23  chronological order.  It looks like you first
24  started working on this back in January of 2020.  Is
25  that more or less correct?

Page 60

1    A    Right.  I think winter 2020 is when we
2  first started having discussions, like I said,
3  before the pandemic.
4    Q    Yeah.  Okay.  Yeah.  I know earlier
5  you said February, March, but it looks like it was
6  more like January that you got into this matter; is
7  that correct?
8    A    Well, that's what it says here, so
9  must be.
10    Q    And just going through -- at the time,
11  it looks like your hourly rate was $675 an hour if
12  we go to that column.  And you said that your hourly
13  rate is different now?
14    A    Is that a question?
15    Q    Well, I'm trying to -- do you know
16  what your hourly rate is now?  It looks like if you
17  go three or four pages in --
18    A    Yeah.
19    Q    What is your hourly rate now?
20    A    I think it's either 750 or 775.  I
21  think it has changed a little bit over time.
22    Q    Okay.  We'll get there, but it is 775.
23        Let's just go down this -- let's just
24  go through this so we can get some names here.  Who
25  is -- after -- so you have four entries for

Page 61

1  Dr. Conti in 2020.  And who is the next person?
2    A    Mike Augusteijn.
3    Q    What did Mike do?
4    A    It says that he discussed --
5    Q    Okay.  What -- what does -- what did
6  Mike do on the -- not in this particular entry.
7  What did Mike do for the project?
8    A    Mike is also an expert on data and --
9        THE COURT REPORTER:  And what?
10        THE WITNESS:  Data, acquisition in
11  cleaning, in manipulation, in analysis.  And so
12  I would expect that he would have worked on
13  this in that capacity.
14  BY MR. GOLDBERG:
15    Q    Going to the next person,
16  Bennett Erickson?
17    A    Correct.
18    Q    What did Bennett Erickson do,
19  generally, for the project?
20        MR. HONIK:  Objection, asked and
21  answered.
22        THE WITNESS:  Right.  So I've already
23  answered --
24        MR. GOLDBERG:  I'm sorry.
25        THE WITNESS:  So --

16 (Pages 58 - 61)

RESTRICTED CONFIDENTIAL

Page 62

1 BY MR. GOLDBERG:
2    Q    I can withdraw the question. I'm
3 sorry. You did talk about Bennett before.
4        The next person is Brian Hebert. What
5 did Brian do for the project, generally?
6    A    So it looks here that he billed time
7 for import checking of manufacturing data.
8    Q    Do you know what -- what manufacturing
9 data he looked at?
10    A    I don't.
11    Q    Do you know what -- what is meant by
12 the phrase "manufacturing data"?
13    A    I'm assuming it was data that was
14 related to the sale of these products.
15    Q    That's pretty broad. Do you -- is
16 there any particular data that you think he looked
17 at related to the sale of the products?
18    A    I don't know.
19    Q    If you go on into 2021, now you've got
20 Sarah Honan added to the invoices. Who is
21 Sarah Honan? Is that the Sarah we mentioned
22 earlier? No, that was Sarah Stone.
23    A    Right, Sarah Stone. So Sarah Stone
24 and Bennett Erickson are the people that I have been
25 working with at GMA on this matter. There are a

Page 63

1 handful of other people that generally support
2 Bennett and Sarah that I don't know as well. So
3 Sarah Honan is -- is one of those people.
4    Q    Do you know -- can you describe,
5 generally, what she did for the project?
6    A    It says here "Imported IQVIA data."
7    Q    If you -- on the third page of the
8 document, assuming you have double-sided copies,
9 it's -- it's invoice 21158.
10    A    Yes. That's not what's on the screen,
11 but I see -- I am on that.
12    Q    Okay. The first entry for Bennett
13 says, "Work on valsartan cGMP market share
14 analysis."
15        What -- do you know what that means?
16    A    I'm sorry, I'm a little confused,
17 because what's on the screen is not -- I don't think
18 what we're talking about, so can we just make sure
19 we're on the same page?
20        So invoice 21158, is that what we're
21 talking about right now?
22    Q    Right.
23    A    Okay. Good. So --
24    Q    The question is, Bennett says he
25 worked on valsartan cGMP market share analysis.

Page 64

1 What -- what was that?
2    A    I don't know.
3    Q    You don't know what he meant by "cGMP
4 market share analysis"?
5    A    I'm assuming it has something to do
6 with -- there are multiple manufacturers of these
7 products at issue in this matter. But I don't know
8 what he specifically meant on this date.
9    Q    Do you know if Bennett's cGMP market
10 share analyses were produced in this case?
11    A    I'm sorry, what do you mean by
12 "produced"?
13    Q    Provided to plaintiffs' counsel for
14 production in this case.
15    A    You mean did Bennett turn those
16 documents over to you?
17    Q    Well, did Greylock McKinnon or Bennett
18 provide them to plaintiffs' counsel to produce in
19 this case?
20    A    Well, I'm assuming -- so I -- I mean,
21 the short answer is I don't know. The longer answer
22 is by definition, my report contains the sales of
23 these products across different manufacturers over
24 time. And so I'm assuming that it's related to what
25 Bennett states here, and those -- all of that back

Page 65

1 up and -- have been produced. They are part of my
2 report.
3    Q    Did you rely on a market share
4 analysis in reaching your report -- in reaching your
5 opinions?
6    A    Again, by definition, the at-issue
7 products are valsartan drugs made by different
8 manufacturers. My report had to identify those
9 manufacturers in national data and then apportion
10 sales of those products across different
11 manufacturers.
12        If you go further down on the fourth
13 line, Bennett says, "Work on review of repackager
14 NDCs. Create comparison of FDA-recalled" --
15        COURT REPORTER: I'm sorry, Doctor.
16 Bennett says, "Work on review of..."
17        THE WITNESS: "Repackager NDCs.
18 Create comparison of FDA-recalled NDCs to IQVIA
19 NDCs."
20        I think that -- so -- so there is an
21 FDA list of recalled valsartan products, and --
22 that identifies products by NDC code in the
23 IQVIA data. I can identify products by NDC
24 code, but products are very commonly repackaged
25 and relabeled by private label -- by private

17 (Pages 62 - 65)

RESTRICTED CONFIDENTIAL

Page 66

1  label distributers and even retailers such as
2  CVS or Costco.
3          And so in order to go from the NDC
4  list produced by the -- by the FDA to Xponent
5  was actually sold into the U.S. market, there
6  is -- there is a job that needs to get done.
7  Because repackagers or relabelers will change
8  the NDC code by definition.
9          And so there was work that was done to
10  match NDC codes or drugs at issue in this
11  matter with the national sales that we had on
12  these products. All of that was produced in my
13  report.
14  BY MR. GOLDBERG:
15      Q      Let's just start at the beginning of
16  this. And if you go back to the first page of this
17  document, do you see it says, for you, Dr. Conti --
18          THE COURT REPORTER: I'm sorry, Seth.
19  Can you start that again?
20  BY MR. GOLDBERG:
21      Q      It looks like you invoiced two hours,
22  2.6 hours; is that correct?
23      A      Yes, I see that here.
24      Q      And if you go along with me to the
25  next invoice, there's -- there's no entry for

Page 67

1  Dr. Conti; am I correct?
2      A      You mean -- again, I don't know --
3      Q      Invoice --
4          COURT REPORTER: All right. I
5  cannot -- I can't take both of you down at the
6  same time. And you're both interrupting each
7  other, and so you're not giving me a chance to
8  do my job.
9          MR. GOLDBERG: Okay. Let's not worry
10  about the screen since you have the binder in
11  front of you, and that was the purpose of
12  giving you the document in hard copy. So can
13  you -- and the tech can follow along if the
14  tech can follow along.
15  BY MR. GOLDBERG:
16      Q      Right now I'm looking at
17  Invoice 21024, which is in your binder. Do you see
18  that.
19      A      Yes.
20      Q      Okay. And there's not an entry for
21  Dr. Conti in there, correct?
22          MR. HONIK: Seth, I think for the
23  benefit of myself and all other counsel, can
24  the tech bring up the specific document?
25          MR. GOLDBERG: Sure.

Page 68

1          MR. HONIK: Thank you.
2          MR. GOLDBERG: Sure.
3          MR. HONIK: I see it now. Thank you.
4  BY MR. GOLDBERG:
5      Q      And then if we go to --
6      A      It's two pages, actually. It's two
7  pages.
8      Q      Right. And there's no entry for
9  Dr. Conti on that invoice, correct?
10      A      Correct.
11      Q      And then the next invoice is 21158.
12  Do you see that?
13      A      Yes.
14      Q      And there's no invoice for Dr. Conti
15  there? There's no time invoiced for Dr. Conti in
16  that invoice, correct?
17      A      Correct, but there is mention of me
18  participating in calls with the attorney.
19      Q      So you participated in that call on
20  May 24th, 2021, right?
21      A      Yes.
22      Q      Let's turn to the next invoice, which
23  is 21617. There we see Dr. Conti, you billed
24  12.75 hours, right? Correct?
25      A      I'm just -- I didn't -- I didn't

Page 69

1  prepare this invoice, so I'm just looking through --
2      Q      Sure.
3      A      -- what is actually billed. That's
4  correct.
5      Q      And that invoice takes us through
6  12-29-21. It's the last date anyone billed time on
7  that invoice. Do you see that?
8      A      Well, it's the last time that some of
9  the staff billed time on the invoice. I can see
10  that.
11      Q      Based on my review of these invoices,
12  before December 29th, 2021, you billed, in total,
13  approximately 15 hours for your work in this matter;
14  is that a fair representation?
15          MR. HONIK: Object to form.
16          THE WITNESS: Well, again, I didn't
17  produce these documents, so I just simply
18  billed for the time that's listed here. But if
19  there's a different process for what I submit
20  and what GMA does in what is listed here if
21  there is time, I'm happy -- that I billed, I'm
22  happy to total it up. I haven't done that.
23          It looks like, in the first invoice,
24  there's about two-and-a-half hours.
25          COURT REPORTER: There is -- there's

18 (Pages 66 - 69)

RESTRICTED CONFIDENTIAL

Page 70

1  what?
2        THE WITNESS:  About two-and-a-half
3  hours.
4        In the last invoice there's about 12,
5  almost 13 hours.  So I think that's fair.  So
6  there's approximately 15 to 16 hours that I
7  billed for my time on these invoices.
8  BY MR. GOLDBERG:
9    Q    Are there other Greylock McKinnon
10  invoices that haven't been produced?
11    A    So I am woefully behind in my time on
12  this matter.  I have a list of the time that I have
13  worked on this, but it has not been completely
14  submitted to Greylock McKinnon or to the attorneys.
15    Q    But you were asked --
16  Greylock McKinnon was asked to produce your invoices
17  in this case, and you didn't comply with that
18  request?
19        MR. HONIK:  Object to the form.
20        THE WITNESS:  Of course I did.
21  BY MR. GOLDBERG:
22    Q    Well, why don't we have that time and
23  your invoices for that?
24    A    You mean -- you mean all the invoices?
25    Q    Yeah.

Page 71

1    A    Because I'm really busy, frankly.  I'm
2  teaching intensely.  I've been doing a lot of other
3  work to support government activity.  And I have a
4  very sick mother that I am managing her time and
5  also taking care of my kid.  So I've been very, very
6  busy over the past two months and --
7    Q    Well, I'm not -- I'm not --
8        MR. HONIK:  Don't interrupt her,
9  please.
10        THE WITNESS:  So I have been really,
11  really busy, and so my time is not complete.
12  BY MR. GOLDBERG:
13    Q    I'm not concerned about your time in
14  2022.  You --
15    A    I'm saying that my time in 2021, I
16  spent the majority of 2021 dealing with a very sick
17  mother, traveling in three separate cities and
18  taking care of my child, in addition to myself, in
19  addition to very intense teaching and other
20  activities.  I am behind in my time.
21    Q    Were you able to put your time in for
22  some invoices, but not others; is that what you're
23  saying?
24    A    What I'm saying is my mother became
25  very sick last summer, and so my time -- and I was

Page 72

1  also teaching intensely during that time.  I have
2  actually been teaching intensely since July.  And so
3  I have been actively working on this case, but I
4  have not submitted my time because I frankly did not
5  have the time to do it.
6    Q    Well, let's look at invoice 21617.
7  That's the last invoice in the -- in the packet.
8  That's your 2021 time.  And --
9    A    I'm sorry.  I'm sorry.  I'm not -- I'm
10  not following you.  Where are you?
11    Q    It's up on the screen, invoice 21617.
12  It's the last invoice in the packet.
13    A    I can see that.
14    Q    So you billed an hour in May of 2021,
15  correct?  You billed an hour in September 2021,
16  correct?  And -- am I correct?
17    A    I can see that there.
18    Q    And you billed 10.75 hours in
19  October 2021, correct?
20    A    Correct.
21    Q    How much time do you expect to bill
22  plaintiffs for 2021 in addition to these
23  12.75 hours?
24    A    So I have a preliminary listing of my
25  time, and it amounts to approximately 60 hours.

Page 73

1    Q    And that's for 2021?
2    A    Yes.  Oh, 2021 and 2022.
3    Q    And how much of that time is 2021
4  versus 2022?
5    A    I would say the majority.
6    Q    Is 2021?
7    A    Correct.
8    Q    How much time have you spent on this
9  matter -- excuse me -- in 2022?
10    A    In preparing for the deposition and
11  doing a handful of other things, maybe about
12  20 hours or so.  I don't have a specific accounting
13  yet.  Again, I've been going back and forth between
14  Boston, New York, Philadelphia and Chicago, because
15  my mother is really sick, for every single week
16  since the new year.
17    Q    Do you think you'd be able to provide
18  that preliminary list to your counsel so that we can
19  see it?
20    A    Sure.  I mean, my -- my plan is to --
21  to finish it.  I don't like to submit bills, and I
22  don't -- I don't like to submit bills that I don't
23  feel -- that aren't triple checked, and so I have a
24  process for doing that.
25        MR. GOLDBERG:  Why don't we go off the

19 (Pages 70 - 73)

RESTRICTED CONFIDENTIAL

Page 74

1  record and take a five-minute break just to
2  give everybody a minute?
3          MR. HONIK: Why don't we call it
4  10 minutes and come back at 10:07. Okay?
5          MR. GOLDBERG: Sounds good.
6          THE VIDEOGRAPHER: The time is 11:57.
7  This ends Media Unit Number 1.
8          (Whereupon, a short break was taken.)
9          THE VIDEOGRAPHER: The time is 12:11.
10  This begins Media Number 2, and back on the
11  record.
12  BY MR. GOLDBERG:
13      Q     Dr. Conti, if you could pull and put
14  in front of you your report -- or your declaration,
15  which we marked as -- which we are going to mark as
16  Conti 5.
17          (Whereupon, Exhibit Conti 5 was marked
18      for Identification.)
19  BY MR. GOLDBERG:
20      Q     And I'd like to start at the beginning
21  of your report.
22      A     Just give me a second to get it.
23      Q     Okay. Let's start at the beginning of
24  your report. I'm going to ask you questions about
25  it in different places, but I'd like to start just

Page 75

1  at Paragraph 1.
2          You said you were retained to provide
3  opinions and calculations regarding the -- the
4  injury and damages incurred by classes of consumers
5  and end-payers in this matter.
6          By "this matter," you're referring to
7  the amended economic class action complaint, which
8  is at Footnote 1, correct?
9      A     Yes.
10      Q     I'm just going to remind you to speak
11  up a little bit, or maybe the microphone needs to be
12  turned up.
13          And by "injury in this matter" -- you
14  use the phrase "injury" -- you're -- you're talking
15  about an economic injury of this matter, correct?
16      A     Correct.
17      Q     And your damages -- you're not
18  providing opinions on liability, you're providing
19  opinions on damages, right?
20          MR. HONIK: Object to form.
21          THE WITNESS: I'm providing opinions
22      on economic injury and damages.
23  BY MR. GOLDBERG:
24      Q     You're not -- you're not -- you
25  haven't reached an opinion as to -- well, strike

Page 76

1  that question.
2          Going to the next paragraph, you say,
3  "I have been asked by plaintiffs' counsel to assume
4  that the at-issue valsartan products manufactured
5  and sold by the defendants" -- and I'm gonna go now
6  to the bottom -- "were recalled" -- "that were
7  recalled in 2018 and 2019 were adulterated and
8  misbranded."
9          Do you see that?
10      A     Yes.
11      Q     What do you mean by "at-issue
12  valsartan products"?
13      A     The valsartan products that were
14  listed in Footnote 3 and Footnote 4.
15      Q     When you use the phrase "at-issue
16  valsartan products," are you limiting that to
17  valsartan products that contained NDMA or NDEA?
18      A     No.
19          COURT REPORTER: I'm sorry?
20          THE WITNESS: No.
21          MR. GOLDBERG: Can we go off the
22      record for one second?
23          THE VIDEOGRAPHER: The time is 12:16.
24  We're going off the record.
25          (Whereupon, a discussion was held off

Page 77

1  the record.)
2          THE VIDEOGRAPHER: The time is 12:18.
3  We're back on the record.
4  BY MR. GOLDBERG:
5      Q     So when you're using the phrase
6  "at-issue valsartan products" in Paragraph 2 of your
7  declaration and throughout your declaration,
8  you're -- you're including valsartan products that
9  may not have contained NDMA or NDEA?
10          MR. HONIK: Object to form, asked and
11      answered.
12          THE WITNESS: When I am referring to
13      "at-issue valsartan products," they are the
14      ones listed in Footnote 2 and Footnote -- I'm
15      sorry -- Footnote 3 and Footnote 4 of my
16      report.
17  BY MR. GOLDBERG:
18      Q     Footnote 3 and Footnote 4 refer to
19  recalled valsartan products, correct?
20          MR. HONIK: Object to form.
21          THE WITNESS: No, not solely. That's
22      a mischaracterization. So Footnote 3 and
23      Footnote 4 define at-issue valsartan products.
24      And they include products manufactured by --
25      I'm going to say this, and it's -- I'm going to

RESTRICTED CONFIDENTIAL

Page 78

1    butcher the name -- Zhejiang Huahai, Teva,
2    Hetero, Torrent, Mylan and Aurobindo. And it
3    includes the valsartan products marketed under
4    Diovan name and their generic equivalent and
5    then marketed under the Exforge name and their
6    generic equivalent during the time period
7    2020 -- 2012 through 2018.
8    BY MR. GOLDBERG:
9        Q    So you are including in at-issue
10   valsartan products all valsartan manufactured by
11   those defendants between 2012 and 2018?
12       A    Correct.
13       Q    That paragraph at the end talks
14   about -- it says that you -- you were asked to
15   assume that those products were adulterated and
16   misbranded. On what basis do you --
17       A    I'm sorry. I'm sorry. I don't
18   know -- what -- what do you mean by "at the end"?
19       Q    Okay. If you look at -- if you look
20   at the paragraph, it says, "I have been asked" --
21       A    Paragraph 2, okay.
22       Q    You were asked to assume that those
23   products were adulterated and misbranded, correct?
24       A    Correct.
25       Q    On what basis were you asked to make

Page 79

1    that assumption?
2        A    I'm sorry. I don't understand the
3    question.
4        Q    What were the -- what was the basis
5    for the adulteration that you were asked to assume?
6        A    My understanding is, that basis is
7    outlined in the complaint, which I reference in the
8    first paragraph of my report and also Footnote 1.
9        Q    Was there any particular aspect of
10   these drugs that made them -- that you were asked to
11   assume made them adulterated?
12       A    Again, the basis of adulteration and
13   misbranding is detailed in the complaint. And the
14   definition of "adulterated" and "misbranded" is also
15   outlined in the complaint, and is also outlined in
16   my report in later paragraphs.
17       COURT REPORTER: Is also outlined in
18   my report...
19       MR. HONIK: In later paragraphs, she
20   said.
21       COURT REPORTER: Thank you.
22       MR. GOLDBERG: Counsel, Counsel,
23   there's no need for you to testify.
24       MR. HONIK: I'm not testifying. It's
25   just that I heard her --

Page 80

1        MR. GOLDBERG: What you understand --
2        MR. HONIK: Excuse me. Excuse me.
3        MR. GOLDBERG: Counsel, don't
4    interrupt. Don't interrupt.
5        MR. HONIK: I'm going to protect this
6    record in every single way that I want to. And
7    as a courtesy to Ms. Moskowitz, I simply heard
8    a noncontroversial three words and offered them
9    to her to move things along. Thank you.
10       MR. GOLDBERG: Counsel, what do you
11   understand to be the -- the adulteration that
12   you assumed?
13       MR. HONIK: I'm not -- I'm not here to
14   answer your questions. If it's directed --
15       MR. GOLDBERG: I'm sorry. I'm sorry,
16   Dr. Conti.
17   BY MR. GOLDBERG:
18       Q    I'd like to -- I'd like you to explain
19   what you under- -- what you assumed.
20       A    So, again, the assumption of
21   adulteration and misbranding is detailed in the
22   complaint and cited in my Paragraph 1 and
23   Paragraph 2 in Footnotes 1, 2, 3 and 4.
24       Q    It's fair to say, since you assume
25   those facts that are in that complaint, you didn't

Page 81

1    reach any independent determination about whether
2    there was an adulteration, correct?
3        A    Again, I was asked to assume certain
4    facts about the adulteration and misbranding of
5    valsartan products at issue in this matter.
6        Q    So the answer to my question is yes,
7    you didn't independently conclude that there was an
8    adulterated drug?
9        MR. HONIK: Object to form.
10   BY MR. GOLDBERG:
11       Q    You were asked to make that
12   assumption?
13       MR. HONIK: Object to the form.
14   BY MR. GOLDBERG:
15       Q    Correct?
16       A    I was asked to make that assumption,
17   correct, as outlined in the complaint and in the
18   footnotes listed here.
19       Q    If you go on to Paragraph 4 of your
20   complaint -- of your report, sorry --
21       A    That's okay.
22       Q    The first few lines is where I'm
23   looking. It says, "The adulteration derives from
24   the defendant manufacturers' allowance of chronic
25   and pervasive deficiencies in the manufacturing of

21 (Pages 78 - 81)

RESTRICTED CONFIDENTIAL

Page 82

1  at-issue valsartan products."
2        What did you mean by "chronic and
3  pervasive deficiencies"?
4        A    My understanding is that there were --
5  there are systematic failures of cGMP in the
6  manufacturing of the at-issue valsartan products by
7  the manufacturers.
8        Q    What are those systematic failures
9  that you're referring to?
10       MR. HONIK:  Objection, asked and
11  answered.
12       THE WITNESS:  There -- there is -- my
13  understanding is that there are -- there are
14  many of them, and those are outlined in the
15  complaint and also supporting FDA documents of
16  cGMP violations that the manufacturers were
17  cited for.
18  BY MR. GOLDBERG:
19       Q    You wrote your report, correct?
20       A    I did.
21       Q    Okay.  So when you wrote "chronic and
22  pervasive deficiencies," what were you -- what were
23  you documenting?  What chronic and pervasive --
24       MR. HONIK:  Objection, asked and
25  answered.

Page 83

1  BY MR. GOLDBERG:
2        Q    What chronic and pervasive
3  deficiencies were you referring to?
4        MR. HONIK:  Object to form, asked and
5  answered.
6        THE WITNESS:  The ones that are
7  referred to in the complaint at issue in this
8  matter.
9  BY MR. GOLDBERG:
10       Q    Any others?
11       A    No.
12       Q    Could you -- I -- I should have done
13  this before, but if you could look at Attachment B
14  to your report, which is up on the screen, as well,
15  this -- this -- this attachment says, "Materials
16  relied upon."  Did you prepare this attachment?
17       A    My staff, under my direction, prepared
18  this document.
19       Q    And is it fair to say that these were
20  the materials you relied upon in reaching your
21  opinions?
22       A    In addition to my expertise and my
23  experience in this matter -- or my experience in
24  this industry.
25       Q    So there was a document that you

Page 84

1  looked at and relied upon in reaching your opinions,
2  that's listed here; is that correct?
3        A    I don't think that's accurate, because
4  again, I am in -- as an expert in the regulation of
5  the pharmaceutical industry, and in many other
6  contexts, I have spent a lot of time thinking about
7  the -- the requirements of manufacturers, that they
8  need to meet, in order to meet cGMP, and also
9  violation of cGMP.  I have also spent a lot of time
10  thinking about and thinking on adulteration and
11  misbranding of products, generally, in this
12  industry.
13       So again, it's -- the materials relied
14  upon or the ones listed here are the most germane to
15  this specific matter.  But my experience is also
16  germane.  That's in Attachment A.
17       Q    Okay.  So my question was, the
18  documents that you relied upon to reach your
19  opinions in this matter, leaving aside your
20  experience and your general knowledge, but the
21  specific documents that you relied upon to reach
22  your opinions in this matter, are set forth in
23  Attachment B, correct?
24       MR. HONIK:  Object to the form, asked
25  and answered.

Page 85

1        THE WITNESS:  I don't -- I mean,
2  again, I don't quite understand the distinction
3  you're making.  So again, my expertise and
4  experience in the regulation of this industry
5  informs everything I do, including the opinions
6  that -- and the calculations that I performed
7  in this matter.
8        Attachment A provides my CV, which has
9  an extensive list of things that I have
10  published on this industry.  But Attachment B
11  is enumerating the materials that I
12  specifically relied on in this matter.  But I
13  don't see how I could distinguish between my
14  experience generally in this industry and the
15  materials that I relied on.
16  BY MR. GOLDBERG:
17       Q    Well, you just -- you did, because
18  this document says, "Materials Relied Upon."  So
19  you're making a distinction between your CV and the
20  materials that you relied upon, right?
21       A    No, you are.  No, you are.  What I'm
22  saying is my experience informs the materials that I
23  relied upon, by definition.  I mean, I -- I know a
24  lot about cGMP and the regulation of the
25  products --

22 (Pages 82 - 85)

RESTRICTED CONFIDENTIAL

Page 86

1    Q    Did you --
2    A    Hold on, please, if I can finish.
3         I know a lot about the regulation of
4    these products in the U.S. market. But it's based
5    upon my experience working on many different aspects
6    of this market. And it's many different products.
7    That informs the documents that were selected and
8    thought about specifically or cited specifically in
9    my report.
10   Q    Did you review any deposition
11   testimony in reaching your opinions?
12   A    No.
13   Q    Did you --
14   A    As I -- hold on. As I understand
15   it --
16   Q    No. No. No. You answered the
17   question.
18   A    No. No. No. I didn't answer.
19       MR. HONIK: She has not finished her
20   response. Do not interrupt the witness.
21       THE WITNESS: So, as I understand it,
22   the reports that were produced that mention my
23   report, none of those people had been deposed
24   yet. So I would have liked to have seen their
25   depositions, because some of it -- what they

Page 87

1    say in the reports is confusing. But I have
2    not -- my understanding is they have not been
3    deposed yet.
4    BY MR. GOLDBERG:
5    Q    Did you review any depositions of any
6    witnesses in reaching your opinions in this case?
7    A    No. I mean, some of -- like I said,
8    the ones that I would have liked to have reviewed, I
9    wasn't able to because they haven't been deposed
10   yet.
11   Q    So you haven't read a deposition of a
12   plaintiff in this case?
13   A    No.
14   Q    Or a plaintiff --
15   A    I understand that the depositions
16   haven't been done of the economic experts.
17   Q    I'm asking you about the plaintiffs.
18   I'm not asking you about experts. You haven't read
19   a deposition of a plaintiff in this case, correct?
20   A    I have not.
21   Q    You haven't read the deposition of a
22   class representative in this case?
23   A    I have not.
24   Q    And you haven't read -- read the
25   deposition of any defendant witnesses or employees

Page 88

1    in this case?
2    A    My understanding, again, of the
3    defendant experts in this case is that they have
4    not -- they've produced reports, but they have not
5    been deposed yet. So I don't see how I could read a
6    deposition if it hasn't occurred yet.
7    Q    If you go back in your report to
8    Paragraph 4 --
9    A    I'm sorry. I didn't hear you. I
10   can't hear you.
11       THE COURT REPORTER: Seth, I can't
12   hear you either.
13       MR. GOLDBERG: Sorry about that.
14   BY MR. GOLDBERG:
15   Q    The third line refers to "a failure by
16   the defendant manufacturers to implement quality
17   assurance practices."
18       Do you have any specific understanding
19   of what those quality assurance practices were?
20       MR. HONIK: Objection, asked and
21   answered.
22       THE WITNESS: So manufacturers who are
23   legally allowed to supply products to the
24   pharmaceutical U.S. chains are required to
25   attest to a very significant number of quality

Page 89

1    assurance practices, which include but are not
2    limited to the risk, assessment and mitigation
3    of their -- of their product from end to end.
4    And there's also attestation of the practices
5    that the firms are required to provide to
6    the --
7        THE COURT REPORTER: To the -- I'm
8    sorry. To the what?
9        THE WITNESS: Are required to provide
10   to the U.S. Food and Drug Administration, upon
11   their initial application to get a license to
12   sell these products to the U.S. market, but
13   also over time. Yes, that's what I mean by
14   "quality assurance practices."
15   BY MR. GOLDBERG:
16   Q    Do you have any particular instances
17   of quality assurance practices or the failure to
18   implement quality assurance practices as to any of
19   the defendants in this case?
20       MR. HONIK: Object to form and asked
21   and answered.
22       THE WITNESS: Yes. They are detailed
23   in the complaint, and they are also detailed in
24   the FDA documents that are listed in --
25   detailing for each one of the defendants on the

23 (Pages 86 - 89)

RESTRICTED CONFIDENTIAL

Page 90

1    systematic --
2            THE COURT REPORTER: On the
3    systematic --
4            THE WITNESS: And pervasive quality
5    assurance.
6            COURT REPORTER: Excuse me, Counsel.
7    One second. Let me see if I can turn my volume
8    up.
9            THE VIDEOGRAPHER: Mr. Goldberg, I
10   think the -- the paper shuffling may be
11   distracting a little bit.
12           THE WITNESS: Correct. It's very hard
13   to hear.
14           COURT REPORTER: Okay. I put my
15   volume up.
16   BY MR. GOLDBERG:
17       Q    Did you review any document that --
18   that detailed for a failure to implement quality
19   assurance practices by the defendant manufacturers?
20           MR. HONIK: Object to form, asked and
21   answered.
22           THE WITNESS: Yes. The complaint
23   details systematic and pervasive deficiency
24   in -- in the cGMP. And then there are FDA
25   documents that are supportive of that for each

Page 91

1    of the defendant manufacturers that details
2    many different deficiencies in cGMP.
3    BY MR. GOLDBERG:
4        Q    Which FDA documents --
5        A    Hold on. In the manufacturing of
6    these products.
7        Q    Which FDA documents are you referring
8    to?
9        A    Hold on a second. We were just
10   looking at the materials relied upon. I think it's
11   in Attachment B.
12           So there's the complaint and
13   then -- and -- I don't see it assessed here, but I
14   have a binder of FDA documents that are specific to
15   each one of the manufacturers that I have reviewed
16   that are related to the at-issue products here.
17       Q    What binder are you referring to?
18       A    I'm happy to get it if you can just
19   give me a second.
20           MR. GOLDBERG: Let's go off the
21   record.
22           THE VIDEOGRAPHER: The time is 12:42.
23   We're going off the record.
24           (Whereupon, a discussion was held off
25   the record.)

Page 92

1            THE VIDEOGRAPHER: The time is 12:42.
2    We're back on the record.
3    BY MR. GOLDBERG:
4        Q    I want you to listen to the questions
5    I'm going to ask. I just want to you answer the
6    questions I'm going to ask. Okay?
7            The binder that -- the binder that you
8    have in front of you now --
9        A    Correct.
10       Q    -- you did not provide that binder to
11   your counsel before today, correct?
12           MR. HONIK: Object to the form of the
13   question.
14           THE COURT REPORTER: What was your
15   answer?
16           THE WITNESS: I mean, I did not -- I,
17   me, provide it. It's the complaint and the
18   backup and some of the documents listed in the
19   complaint. The complaint is listed in my
20   Attachment B, and the documents that are
21   related specifically to inspection reports,
22   FDA, failure notices to the -- to each of the
23   manufacturers are just the complaint. They're
24   just the backup to the complaint.
25

Page 93

1    BY MR. GOLDBERG:
2        Q    Okay. I understand.
3            So you're saying you looked at the
4    complaint and the exhibits to the complaint?
5        A    Correct.
6        Q    That's what is in that binder?
7        A    Yes. And specifically, I reviewed
8    the -- the backup material that the complaint
9    references related to the systematic and
10   persuasive [sic] failures of cGMP for each of the
11   defendants.
12           So I'm gonna say this incorrectly
13   again, Zhejiang Huahai --
14       Q    You don't have to -- you don't have to
15   name the defendants. We know who they are.
16       A    Okay. No, I'm just telling you -- I'm
17   saying to you, not the defendants, but for the
18   specific documents related to cGMP violations, the
19   products that I looked -- the manufacturers that I
20   looked at were Zhejiang --
21           MR. HONIK: You can say ZHP. ZHP.
22           THE WITNESS: ZHP. Thank you.
23           ZHP and the FDA warning letters
24   related to that. Mylan, in multiple ways, and
25   Aurobindo, Torrent, Hetero and Lantech.

24 (Pages 90 - 93)

RESTRICTED CONFIDENTIAL

Page 94

1    THE COURT REPORTER: What was the last
2    one?
3    THE WITNESS: And Lantech.
4    BY MR. GOLDBERG:
5    Q    Yes or no, the documents that you
6    relied on for the pervasive deficiencies that you
7    referred to, are the complaint and the exhibits
8    attached to the complaint?
9    MR. HONIK: Object to the form, asked
10    and answered.
11    THE WITNESS: Okay. So I have
12    answered your question a bunch of times. So
13    again, there's --
14    MR. GOLDBERG: I'm going to strike
15    the -- I'm going to withdraw the question.
16    Counsel, we're going to off the record.
17    THE VIDEOGRAPHER: The time is 12:46.
18    We are going off the record.
19    (Whereupon, a discussion was held off
20    the record.)
21    MR. HONIK: Let's proceed on the
22    stenographic record. Are we off the video
23    record?
24    THE VIDEOGRAPHER: We are off the
25    video.

Page 95

1    MR. HONIK: Okay. Before we go back
2    on the video, is there anything else you need
3    to say, Seth? I don't want to waste more time.
4    MR. GOLDBERG: Well, you want me to
5    put it on the record, so I'm going to.
6    MR. HONIK: That's fine. Do you want
7    it on the video record?
8    MR. GOLDBERG: Sure.
9    MR. HONIK: Okay. Queue us, please,
10    Justin.
11    THE VIDEOGRAPHER: The time is 12:48.
12    We're back on the record.
13    BY MR. GOLDBERG:
14    Q    Let's turn to Paragraph 23 of your
15    report. In this paragraph, you refer --
16    A    Hold on. I'm not there yet. Hold on.
17    Paragraph 23 or Page 23?
18    Q    Paragraph 23.
19    A    Great. Thank you. Okay. Just give
20    me one second.
21    Q    In this paragraph --
22    A    Just give me -- just give me one
23    second. Okay.
24    Q    In this paragraph, you're referring to
25    reasons the FDA deems a drug as misbranded. Do you

Page 96

1    see that?
2    A    Yes.
3    Q    Were there any particular reasons that
4    you were asked to assume that are listed here?
5    MR. HONIK: Object to the form of the
6    question.
7    THE WITNESS: All of them. So the --
8    my -- I was -- hold on.
9    MR. HONIK: She's responding to your
10    question. Please stop interrupting her.
11    THE WITNESS: So I -- thank you.
12    I was asked to assume these products
13    were misbranded. This paragraph, Paragraph 23
14    in my report, lists the definition of
15    "misbranding" according to the
16    Food and Drug Administration. And the
17    definition is inclusive.
18    BY MR. GOLDBERG:
19    Q    So you were asked to assume that all
20    of these particular reasons that a drug can be
21    misbranded applied to the valsartan in this case?
22    MR. HONIK: Objection to form.
23    THE WITNESS: That is -- that is a
24    mischaracterization of my testimony. I was
25    asked to assume that these products at issue

Page 97

1    were misbranded. And paragraph 23 is providing
2    a definition by the FDA of what "misbranded"
3    means.
4    BY MR. GOLDBERG:
5    Q    And my particular question is, were
6    you asked to assume that any of these particular
7    reasons occurred with respect to the at-issue
8    valsartan products?
9    MR. HONIK: Object to the form, asked
10    and answered.
11    THE WITNESS: I was asked to assume
12    that the at-issue valsartan products were
13    misbranded. "Misbranded" is defined by the
14    U.S. Food and Drug Administration in a very
15    particular way. And that definition is
16    provided in Paragraph 23 of my report.
17    BY MR. GOLDBERG:
18    Q    Looking at Paragraph 23, which of
19    these specific reasons for misbranding do you
20    believe applied in this -- with respect to the
21    at-issue valsartan products?
22    MR. HONIK: Object to the form, asked
23    and answered.
24    THE WITNESS: The complaint uses the
25    term "misbranded." From the perspective of

25 (Pages 94 - 97)

RESTRICTED CONFIDENTIAL

Page 98

1  regulation of pharmaceutical industry, there is
2  a particular definition of misbranding that the
3  U.S. Food and Drug Administration uses. My
4  understanding, and what I was asked to assume,
5  is that the term "misbranded" is specific to
6  the U.S. Food and Drug Administration's
7  definition. And the definition is listed here
8  and is inclusive.
9  BY MR. GOLDBERG:
10  Q    You -- you understand that a
11  misbranding can occur for any one of these reasons,
12  right?
13  A    Again, I was asked to assume that
14  these products were misbranded.
15       The definition of "misbranding" by the
16  U.S. Food and Drug Administration is provided here,
17  and it's inclusive.
18  Q    So you don't agree with my question?
19  You don't agree that any one of these that are
20  listed in 20 -- in Paragraph 23 could be a reason
21  for misbranding?
22       MR. HONIK: Object to form, asked and
23  answered.
24       THE WITNESS: Okay. The FDA has a
25  very specific definition of "misbranded." It

Page 99

1  is stated here. In my Paragraph 23 of my
2  report, it says, "Reasons that the FDA deems a
3  drug as misbranded include, but are not limited
4  to:" and then it enumerates the specifics. I'd
5  be happy to go on and provide those
6  specifics --
7  BY MR. GOLDBERG:
8  Q    So I'm asking you --
9       MR. HONIK: Don't interrupt the
10  witness. Don't interrupt the witness.
11  BY MR. GOLDBERG:
12  Q    I would like you to --
13       MR. GOLDBERG: I'm not interrupting
14  her.
15       MR. HONIK: Do not interrupt the
16  witness.
17  BY MR. GOLDBERG:
18  Q    I would like to you answer my
19  question.
20       MR. HONIK: If you persist in
21  interrupting the witness in the middle of her
22  responses, we will conclude the deposition.
23  She was in the middle of her response.
24       Ms. Moskowitz, can you please read
25  back the question and the answer?

Page 100

1       MR. GOLDBERG: No. Counsel --
2       MR. HONIK: No.
3       MR. GOLDBERG: Counsel, let me just
4  say that you -- you are interfering with this
5  deposition, and the witness is clearly
6  filibustering. And we will -- we will not
7  continue with this. Judge Vanaskie has been
8  very clear that he will not permit
9  filibustering by witnesses, period. He's
10  actually sanctioned witnesses for it. And if
11  we have to do it, we will get him on the phone
12  for this.
13       I tried to do this with you off the
14  record, but you refused. I tried to do this in
15  a way that would not color the testimony, but
16  you did not want to do that. You wanted it on
17  the record. The reality is, as the last five
18  questions will demonstrate, this witness is
19  filibustering and not answering the questions
20  that are being asked. Period.
21       MR. HONIK: It seems to me with the
22  last five questions --
23       MR. GOLDBERG: If you want to continue
24  in this way, we will conclude the deposition
25  with a call to Judge Vanaskie.

Page 101

1       MR. HONIK: What the last five
2  questions and responses revealed to me is your
3  ignorance in understanding the witness, full
4  stop. We will not proceed until and unless you
5  allow the witness to complete her responses,
6  even if you don't like them.
7       Accordingly, I will ask the reporter
8  to read the pending question and as much as
9  Dr. Conti's response as she has so that she may
10  complete her response. And then you should
11  feel free to ask another question.
12       Ms. Moskowitz?
13       COURT REPORTER: Sure.
14       (Whereupon, the answer was read back
15  as requested.)
16       MR. HONIK: Do you wish to complete
17  your response, Dr. Conti, or have you lost your
18  train of thought?
19       THE WITNESS: I have not lost my train
20  of thought, but I don't have to...
21       So, again, I was asked to assume that
22  these products were misbranded. "Misbranded"
23  from the FDA's perspective has its very
24  specific definition that's enumerated -- that's
25  listed in Paragraph 23. And that -- that

26 (Pages 98 - 101)

RESTRICTED CONFIDENTIAL

Page 102

1    definition of "misbranded" is inclusive.
2    BY MR. GOLDBERG:
3        Q    Let's try it like this:  Which --
4    which of these enumerated factors of misbranding
5    apply to the at-issue products -- the at-issue
6    valsartan products?
7        MR. HONIK:  Objection, asked and
8    answered and outside the scope of her report.
9        You may respond.
10        THE WITNESS:  I was asked to assume
11    these products were misbranded, and -- and
12    again, that the definition of "misbranded" was
13    inclusive of all, but -- but not limited to
14    these factors.
15    BY MR. GOLDBERG:
16        Q    So you weren't asked to assume any
17    particular fact -- any particular reason for
18    misbranding.  You were just asked to assume
19    misbranding based on the definition of
20    "misbranding"?
21        MR. HONIK:  Object to form, asked and
22    answered.
23    BY MR. GOLDBERG:
24        Q    And --
25        COURT REPORTER:  I'm sorry.  I didn't

Page 103

1    hear a response.
2        THE WITNESS:  Correct.
3        COURT REPORTER:  Thank you.
4    BY MR. GOLDBERG:
5        Q    And if you -- if you look at the --
6    the immediately preceding paragraph, Paragraph 22,
7    you provide the reasons the FDA deems a drug
8    adulterated, correct?
9        A    I -- no.  That is not what the
10    paragraph states.  The paragraph states the reasons
11    the FDA deems a drug adulterated to include, but not
12    be limited to factors that are listed here.
13        Q    And is the same true with respect to
14    adulteration, that you were asked to assume the
15    drugs were adulterated based on the definition of
16    "adulterated" as we see it here?
17        MR. HONIK:  Object to form.
18        THE WITNESS:  The FDA has a very
19    specific definition of "adulteration," which is
20    listed here, but again, it's inclusive.  I was
21    asked to assume that adulteration -- that the
22    use of the term "adulteration" in the -- in the
23    complaint is inclusive of these factors and the
24    other factors that the FDA considers a product
25    to be adulterated.

Page 104

1    BY MR. GOLDBERG:
2        Q    So you were asked to assume the drugs
3    were adulterated based on all of the different
4    factors the FDA might consider a drug adulterated?
5        MR. HONIK:  Object to the form.
6    BY MR. GOLDBERG:
7        Q    Those listed -- those listed here and
8    those that are not listed here?
9        MR. HONIK:  Object to the form, asked
10    and answered.
11        THE WITNESS:  Again, I was -- so any
12    one of these factors can make a product
13    adulterated in the view of the FDA, just like
14    any one of these factors could be considered --
15    would make a product misbranded, according to
16    Paragraph 23 and -- and beyond.
17        I was asked to assume that these
18    products are considered to be adulterated and
19    misbranded according to the FDA's definition,
20    which is inclusive of all of the factors
21    listed, both in my report and alluded to -- and
22    alluded to as additional.
23    BY MR. GOLDBERG:
24        Q    Let's turn back to Paragraph 6 of your
25    report.  It's on Page 3 of your report.

Page 105

1        Here you say -- and I'm looking in the
2    middle of the paragraph -- "Prescription drugs that
3    are adulterated and misbranded are neither
4    recognized by the United States government as
5    legitimate products to be sold by manufacturers nor
6    paid for by payors; nor are they considered
7    legitimate products by the pharmaceutical industry."
8        What do you mean by "legitimate
9    products"?
10        A    I mean that a product that does not
11    meet cGMP regulations cannot be entered into the
12    legal class of trade into the United States
13    pharmaceutical trade.  That means that pharmacies
14    can't sell products that don't meet cGMP practices
15    and standards, and nor can -- and nor do payors pay
16    for product --
17        COURT REPORTER:  And nor do payors...
18        THE WITNESS:  Pay for products that do
19    not meet cGMP.
20    BY MR. GOLDBERG:
21        Q    Is it -- is it the fact that there's a
22    cGMP violation that makes the product not
23    legitimate, or is it the fact that, as you put it,
24    pharmacies wouldn't pay for it, that consumers
25    wouldn't pay for it?  What makes the product not

27 (Pages 102 - 105)

RESTRICTED CONFIDENTIAL

Page 106

1  legitimate?
2        MR. HONIK: Object to form, asked an
3  answered.
4        THE WITNESS: Violation of cGMP.
5        Remember -- and -- and also just to
6  make sure that I understand your question,
7  payors pay for products, consumers and
8  insurers, right? Pharmacies may stock products
9  for sale.
10 BY MR. GOLDBERG:
11   Q    Is it your understanding that any cGMP
12 violation would make a product not legitimate?
13        MR. HONIK: Object to form, outside
14 the scope of her report.
15        You may answer.
16        THE WITNESS: Manufacturers must
17 attest to their compliance with cGMP practices
18 in order to enter their products into the U.S.
19 class of trade and then throughout the
20 pharmaceutical supply chain, both as a
21 condition of sale into the U.S. and then
22 yearly.
23 BY MR. GOLDBERG:
24   Q    Okay. Is it -- is it your
25 understanding that any cGMP violation would make the

Page 107

1  product not legitimate?
2        MR. HONIK: Object to form.
3  BY MR. GOLDBERG:
4    Q    In your view?
5        MR. HONIK: Object to form, asked and
6  answered, beyond the scope.
7        THE WITNESS: So, again -- again, my
8  understanding is that pharmaceutical
9  manufacturers that want to sell their product
10 into the closed pharmaceutical chain in the
11 United States must attest that their products
12 meet cGMP. But when they first enter and
13 launch into the market, that's a conditional on
14 launch -- that their launch is conditional on
15 that attestation. And then annually
16 thereafter.
17        THE COURT REPORTER: And then
18 annually, they're...
19        THE WITNESS: Thereafter.
20        COURT REPORTER: Okay.
21 BY MR. GOLDBERG:
22   Q    So it's your testimony that any cGMP
23 violation would make a product not legitimate?
24        MR. HONIK: Object to the form, asked
25 and answered.

Page 108

1        THE WITNESS: That is not my
2  testimony, sir.
3  BY MR. GOLDBERG:
4    Q    So a product that has a cGMP violation
5  could be a legitimate product, in your view?
6        MR. HONIK: Object to the form, asked
7  and answered, beyond the scope.
8        THE WITNESS: Again -- thank you.
9        Again, pharmacy manufacturers cannot
10 enter their products into the U.S. -- the
11 closed U.S. chain of pharmaceutical products
12 sold, bought, insured, consumed and -- by
13 pharmacies, et cetera, if they do not meet
14 cGMPs both upon launch -- they can't actually
15 enter the U.S. market, and they can't sell over
16 time unless they make the attestation that
17 their products are cGMP compliant.
18 BY MR. GOLDBERG:
19   Q    Is it your testimony that products
20 produced by a manufacturer where there are cGMP
21 violations cannot be sold in the U.S.?
22        MR. HONIK: Object to the form, asked
23 and answered.
24        THE WITNESS: Okay. Again, a
25 pharmaceutical manufacturer cannot --

Page 109

1  BY MR. GOLDBERG:
2    Q    My question is a yes or no question.
3        MR. HONIK: You're interrupting the
4  witness.
5        MR. GOLDBERG: I am because my
6  question is yes or no question.
7        MR. HONIK: The witness is permitted
8  to answer it in whatever manner she believes is
9  appropriate. You have interrupted her.
10        MR. GOLDBERG: Actually -- actually,
11 that's not what happens under the rules in this
12 case. If it's a yes or no question, the
13 witness should say yes or no and then qualify
14 their answer if need be.
15        MR. HONIK: Yeah. Whatever you
16 believe is -- is fine, Seth. You're not to
17 interrupt her. If you persist in interrupting
18 her, then we'll have to stop the deposition.
19 But as far as I can see, you have asked her the
20 same question a half dozen times. She's --
21 she's being quite level with you in responding.
22 I'm protecting the record.
23        Madam reporter, let's have the
24 question, and we'll have Dr. Conti answer it
25 again.

28 (Pages 106 - 109)

RESTRICTED CONFIDENTIAL

Page 110

1    (Whereupon, the question was read back
2  as requested.)
3    MR. HONIK:  And then I've noted my
4  objection.
5    You can respond, Dr. Conti.
6    THE WITNESS:  Thank you.
7    Pharmaceutical manufacturers are not
8  allowed to sell their products into the U.S.
9  without meeting cGMP standards both upon their
10  launch and over time.  And just to be really
11  clear, it is -- from -- from the
12  U.S. regulator's perspective, it is on the
13  manufacturer to ensure and to attest that they
14  are manufacturing their products to the gold
15  standard of cGMP that is -- as outlined by the
16  U.S. Food and Drug Administration.
17  BY MR. GOLDBERG:
18    Q    Is it -- do you -- is it your view
19  that -- is it your understanding that any cGMP
20  violation would prevent a manufacturer from selling
21  the product in the case -- in the U.S.?
22    MR. HONIK:  Object to form, asked and
23  answered and beyond the scope.
24    You may respond.
25    THE WITNESS:  Again --

Page 111

1    MR. GOLDBERG:  When you say "beyond
2  the scope" -- can I just get a clarification
3  counsel?  When you say "beyond the scope," what
4  do you mean?
5    MR. HONIK:  Happily.  You've
6  established that Dr. Conti was retained to
7  provide opinions and calculations regarding the
8  injury and damages incurred by classes of
9  consumers and end-payors in this matter.
10    To do so, she was assigned -- she must
11  assign an economic value to prescription drugs
12  that were adulterated and misbranded, two terms
13  that she's now defined for you, as outlined in
14  the complaint.  As such, she's not our cGMP
15  expert.  We have such an expert.  He's been
16  deposed.  And I'm merely pointing out to you
17  that if you want to drill down on cGPM
18  standards beyond what Dr. Conti, as a health
19  economist, needs to know, I think you're
20  wasting time.
21    But more importantly, it's beyond the
22  scope of her expertise and her report, which
23  you, yourself, established about two hours ago.
24    That's the basis for my objection when
25  I say "beyond the scope."  Let's proceed.

Page 112

1    MR. GOLDBERG:  Why don't we --
2    THE WITNESS:  I think there's a
3  pending question.  Would you like me the answer
4  it?
5    MR. GOLDBERG:  No, I will withdraw
6  that.  I can withdraw that question.
7    THE WITNESS:  Okay.  May I ask -- I'm
8  not sure what time it is in the real world.
9    MR. HONIK:  It's 1:12 p.m.  Is this a
10  good time to break for lunch, Dr. Conti?
11    MR. GOLDBERG:  Sure.
12    THE WITNESS:  That would be great.
13  Thank you.
14    MR. HONIK:  And for your comfort, how
15  much time would you like?
16    THE WITNESS:  Can we have half an
17  hour, please?
18    MR. HONIK:  Yes.  So we'll resume at
19  1:45.
20    THE WITNESS:  Thank you.
21    THE VIDEOGRAPHER:  The time is 1:13.
22  This ends Media Unit Number 2.  We're going off
23  the record.
24    (Whereupon, a lunch recess was taken.)
25    THE VIDEOGRAPHER:  The time is 1:53.

Page 113

1  This begins Media Unit Number 3.  We're back on
2  the record.
3  BY MR. GOLDBERG:
4    Q    Dr. Conti, if you look at Paragraph 6
5  of your report --
6    A    Just one second.  Let me get it.
7  Okay.
8    Q    The last sentence in this paragraph,
9  you use the phrase, "non-product status."  What do
10  you mean by "non-product status"?
11    A    Only prescription drugs -- only
12  products that have met the evidentiary standard for
13  cGMP, in addition to safety and efficacy, are
14  allowed to be sold into the U.S. market trade.
15    So products that do not meet that
16  standard of being manufactured to good manufacturing
17  practices -- or according to good manufacturing
18  practices, plus are safe and efficacious, are
19  allowed to be sold into the -- into the U.S. product
20  market.  Those that do not meet that standard are
21  not -- are not -- according -- according to the
22  U.S. Food and Drug Administration, would be not
23  allowed.
24    Q    When you use the terms "safety" and
25  "efficacy," can you explain what you mean by the

29 (Pages 110 - 113)

RESTRICTED CONFIDENTIAL

Page 114

1  term -- by each of those terms?
2      A      All right.  Again, this is a -- this
3  is one of the most highly regulated consumer product
4  markets, and so the FDA has very specific
5  definitions of "safety" and "efficacy."
6          What I mean here is that the product
7  is judged to be safe and efficacious according to
8  the U.S. Food and Drug Administration's rules.
9      Q      You don't have an independent
10  understanding of safety and efficacy?  It's just
11  based on what the FDA would determine to be safe and
12  effective?
13          MR. HONIK:  Object to the form.
14          THE WITNESS:  For my purposes in this
15  report, correct.  The definitions I'm using of
16  safety and efficacy and meeting cGMP are those
17  that relate to the
18  Food and Drug Administration's definitions.
19  BY MR. GOLDBERG:
20      Q      If you scroll down -- or if you go
21  down to Paragraph 7 -- I know you have a hard copy
22  in front of you.  The last sentence of this
23  paragraph, you say, "Prescription drugs that are
24  adulterated and misbranded have no economic value.
25  They are worthless."

Page 115

1          What do you mean by "worthless"?
2      A      I mean this is in --
3          COURT REPORTER:  You mean this in...
4          THE WITNESS:  Thank you.
5          I mean this in -- in economic sense,
6  that there is no legitimate supply curve of
7  products -- of products that do not meet the
8  standard of cGMP in addition to being --
9          THE COURT REPORTER:  In addition to
10  being...
11          THE WITNESS:  Judged safe and
12  efficacious by the
13  Food and Drug Administration.
14  BY MR. GOLDBERG:
15      Q      Is it -- is it your view that there's
16  no degree of adulteration when it comes to
17  worthlessness and that all adulterated drugs, for
18  any reason, are worthless?
19          MR. HONIK:  Object to form.
20          THE WITNESS:  So my understanding is
21  that in order to be allowed to be sold into the
22  U.S. supply chain of prescription drugs, the
23  manufacturer needs to attest that these
24  products are manufactured according to cGMP, at
25  minimum, and in addition, are safe and

Page 116

1  efficacious as -- as attested to in the drug's
2  manufacturing report to the
3  Food and Drug Administration.
4  BY MR. GOLDBERG:
5      Q      So products that have such an
6  attestation have value, right?
7          MR. HONIK:  Object to form.
8          THE WITNESS:  You mischaracterized my
9  testimony.
10  BY MR. GOLDBERG:
11      Q      I'm asking you a question.  Products
12  that have the attestation you described have value,
13  correct?
14          MR. HONIK:  Object to form.
15          THE WITNESS:  Okay.  Again,
16  prescription -- pharmaceutical manufacturers
17  are not allowed to sell products into the U.S.
18  market that are not produced in a manner of
19  cGMP compliant, plus are safe and efficacious
20  as judged by the Food and Drug Administration.
21          There is a long and very complicated
22  route for a product to be judged, a drug, a
23  prescription drug, that is allowed to be
24  entered into the U.S. class of trade.
25  Manufacturers have to meet all of those

Page 117

1  standards, both in terms of attestation -- in
2  other words, they can say these things, but
3  they -- but they are also judged by the
4  regulator itself about whether or not these
5  things are actually --
6          THE COURT REPORTER:  Are actually...
7          THE WITNESS:  True.
8  BY MR. GOLDBERG:
9      Q      So products that are sold with that
10  attestation have value?
11          MR. HONIK:  Object to form, asked and
12  answered.
13          THE WITNESS:  Okay.  Again, it's not
14  just the attestation that matters.  The U.S.
15  regulator requires that any products that want
16  to be sold into the U.S. market that is going
17  to be considered a prescription drug, must be
18  produced in accordance with cGMP and be safe
19  and efficacious.  And the manufacturer just --
20  can't just say that.  They actually have to
21  prove it to the regulator.
22          It is in that meaning that I mean that
23  those products have value.  In other words,
24  products that -- I can say it in a different
25  way, which is products have value.  There is a

30 (Pages 114 - 117)

RESTRICTED CONFIDENTIAL

Page 118

1  legitimate supply curve if and only if they are
2  produced according to cGMP and are safe and
3  efficacious, both by attestation and by
4  proof -- by empirical proof.
5  BY MR. GOLDBERG:
6      Q     If the FDA is permitting those
7  products to be sold, they have value?
8      A     For prescription drugs, drugs that are
9  actually called "drugs" by the
10 Food and Drug Administration, they -- and are sold
11 at pharmacies, and dispensed to American patients by
12 physicians or by pharmacy chains, those products
13 must meet the evidentiary standard of, they are
14 produced according to cGMP, they are not adulterated
15 or misbranded, and they are safe and efficacious,
16 for the -- for the disease -- specific indication
17 that the Food and Drug Administration approves that
18 product for.
19          COURT REPORTER:  I'm sorry.  The
20 Food and Drug Administration...
21          THE WITNESS:  Approves that product to
22 be sold for or used for.
23 BY MR. GOLDBERG:
24     Q     So if the FDA has permitted --
25 if -- permitted prescription drugs to be sold at

Page 119

1  pharmacies, you would agree that those drugs have a
2  value?
3          MR. HONIK:  Object to form, asked and
4      answered.
5          THE WITNESS:  Well, wait.  So it's not
6      just that.  So again, according to the
7      regulator, a prescription drug is not allowed
8      to enter into the U.S. class of trade, sold to
9      a consumer, covered by a manufacturer -- or by
10     an insurer, unless they meet the evidentiary
11     standard of -- of being produced in accordance
12     with cGMP at a minimum, and meet other
13     requirements, as well.
14 BY MR. GOLDBERG:
15     Q     Are you aware of any instance where a
16 drug was sold, but it did not meet the minimum, as
17 you put it, cGMP requirements?
18     A     Again, drugs cannot enter into the
19 U.S. class of trade without meeting the evidentiary
20 standard.  What I mean by that is the FDA will not
21 approve a drug to enter into the U.S. class of trade
22 without meeting the evidentiary standard and the
23 manufacturer attesting that they are meeting that
24 standard.
25          It is actually on the manufacturer --

Page 120

1  hold on.  It's actually on the manufacturer to
2  ensure that that product is what it says it is on
3  the product's -- on the product's label.
4  BY MR. GOLDBERG:
5      Q     Okay.  So you -- you seem to be
6  emphasizing the word "enter."  Is there some
7  particular emphasis you're putting on that?
8      A     I don't -- I'm not sure what you mean
9  by that question.
10     Q     You keep saying the FDA will not
11 allow -- a manufacturer cannot -- you -- you -- what
12 you said is drugs cannot enter into the U.S. class
13 of trade without meeting the evidentiary standard.
14 What do you mean by "enter into the U.S. class of
15 trade"?
16     A     I mean they are not allowed to be sold
17 into the U.S. market without meeting the evidentiary
18 standard of being produced, at minimum, by cGMP and
19 meeting other evidentiary standards, as well.
20     Q     So what are the evidentiary standards
21 that you're referring to?  You have cGMP violations.
22     A     I'm confused.
23     Q     You used the phrase "evidentiary
24 standard" in the four -- in your last four answers.
25 What are the evidentiary standards you're referring

Page 121

1  to?
2          MR. HONIK:  Object to form, asked and
3      answered and beyond the scope of her report.
4          THE WITNESS:  Okay.  So you can look
5      at Paragraph 6 of my report, "Federal law, as
6      codified by regulations of the
7      Food and Drug Administration, mandates that
8      prescription drugs be produced in accordance
9      with cGMP to ensure that the drugs meet the
10     legal requirements of safety and that they have
11     the quality, purity, identity and strength they
12     are represented to conduct."
13          That's what I mean by the evidentiary
14     standard of being sold into the U.S. or being
15     legitimate products.
16 BY MR. GOLDBERG:
17     Q     Let's take each one of those.  What do
18 you understand the term "quality," as you've used
19 it, to mean?
20     A     Quality is a process, from the
21 U.S. Food and Drug Administration's perspective, so
22 the print is both what it says it is, but it's also
23 manufactured in a process that is a quality
24 manufacturing process that meets cGMP.
25     Q     What do you understand the term

31 (Pages 118 - 121)

RESTRICTED CONFIDENTIAL

1  "purity" to mean, as you're using it?
2      A    I mean, again, it's in accordance with
3  the Food and Drug Administration's definition of it.
4  So purity, identity and strength are all the FDA's
5  definition.
6      Q    Okay.  You're -- so you're -- when
7  you're using the term, you're really -- you're just
8  saying based on how the FDA defines these terms?
9      A    Yes.
10     Q    Correct?
11     A    Exactly.  Just like my use of the term
12  "adulterated," my use of the term "misbranded," they
13  are all related to the U.S. government's definition
14  inclusive of how these terms are actually being --
15  being used.
16     Q    How these terms are being written in
17  the regulations, that's what you're referring to?
18     A    Correct.
19     Q    I still want to understand.  If a
20  drug -- if a prescription drug is being sold -- so
21  there's a supply for it.  And people are buying it,
22  so there's a demand for it.  Does it -- is it still
23  worthless if it doesn't meet some of these
24  evidentiary standards?
25         MR. HONIK:  Object to form.

1         THE WITNESS:  My statement is one
2  related to the supply curve, not the demand
3  curve.  By definition, there is no supply of
4  drugs -- of product that do not meet the
5  definition of a "drug" according to the
6  Food and Drug Administration.  In order for a
7  manufacturer to sell a product that meets the
8  definition of the term "drug," it must meet the
9  evidentiary standards of meeting and attesting
10  to the cGMP production and be safe and
11  efficacious for the indicated use.
12  BY MR. GOLDBERG:
13     Q    So the demand -- you're -- you're not
14  considering demand in that analysis, you're focusing
15  on --
16         THE COURT REPORTER:  Can you repeat
17  that question, please?
18  BY MR. GOLDBERG:
19     Q    You're not considering demand in your
20  analysis, you're focusing on the supply?
21     A    In my analysis, I don't know what you
22  mean by my -- "in my analysis."
23     Q    You said, "My statement is related to
24  the supply curve, not the demand curve.  By
25  definition, there is no supply of drugs."

1         And I am just confirming.  So you're
2  not thinking about it in terms of demand, you're
3  thinking about it in terms of supply?
4      A    What is "it" in your question?
5      Q    The -- the question of whether the
6  drug is -- a drug is worthless?
7      A    So, again, from an economic
8  perspective, there is no legitimate supply curve for
9  a product that is adulterated and misbranded.  That
10  is by statute.  Consumers can demand products that
11  are illegal or illegitimate, but they're -- but a
12  pharmacy can't sell a product that does not -- for
13  which the manufacturer has not met the evidentiary
14  standard and have been approved by the U.S.
15  regulator for use in that -- in that context.
16     Q    Do you have any -- I don't see it
17  here.  Did you cite to any economic treatise for the
18  notion that if there is -- there is no legitimate
19  supply curve for a product that is adulterated and
20  misbranded?
21     A    This is one of the most -- one of the
22  most highly regulated consumer product markets
23  that -- that exists in the United States.  U.S.
24  is -- maintains the gold standard for quality of its
25  prescription drug supply.

1         Every pharmaceutical manufacturer that
2  sells products through to pharmacies and ultimately
3  to American consumers, knows what the rules are.
4  The rules are they must meet the evidentiary
5  standard of permitting to quality manufacturing and
6  be safe and efficacious.
7         From an economic standpoint, that --
8  it is meeting those regulations that allow there to
9  be a supply of a product.  I don't need to -- you
10  can't think about the supply curve of prescription
11  drugs without understanding what the regulation is
12  that allows them to be sold to the U.S.  That's
13  your -- that's actually health economics 101.
14     Q    Well, I'm trying to understand which
15  health economics 101 treatise or authority you're
16  citing for the notion that -- because in your view,
17  there's no legitimate supply curve, a drug is
18  worthless?
19         MR. HONIK:  Object to form, asked and
20  answered.
21         I'm sorry.  Please answer, Dr. Conti.
22         THE WITNESS:  Thank you.
23         It's not my view.  This is the U.S.
24  regulator's perspective.  The U.S. regulator
25  does not -- does not view -- does not allow

RESTRICTED CONFIDENTIAL

Page 126

1    drugs to be sold into the U.S. market that do
2    not meet the evidentiary standard.  And it's
3    prescription drug manufacturers themselves that
4    have wanted that standard to be as it is.
5          And so I -- I mean, there's plenty of
6    published literature that talks about this, the
7    importance of the evidentiary standard to the
8    supply of these products, and I cite some of
9    that in my report.  But every pharmaceutical
10   manufacturer that is allowed to sell into the
11   U.S. market knows what the standard is.
12   BY MR. GOLDBERG:
13   Q    You're -- you're not answering my
14   question.  My question is what economic support do
15   you have for the notion that, if there's no supply,
16   the drug is worthless?
17         MR. HONIK:  Object to the form, asked
18   and answered.
19         THE WITNESS:  This is economics 101.
20   If you go -- I'm more than happy to show you
21   the picture.  But there can be no price for a
22   product that does not have a demand curve
23   meeting a supply curve.  There is no economic
24   price if there is no legitimate supply curve.
25         There are plenty of economic textbooks

Page 127

1    that explain that an economic price is related
2    to both demand and supply, and its -- and, you
3    know, its relationship to each other.
4    BY MR. GOLDBERG:
5    Q    Was it -- there was an economic --
6    there was an economic price that was paid for
7    valsartan between 2012 and 2018, right?
8          MR. HONIK:  Object to the form.  Are
9    you asking if consumers paid for it, paid for
10   this drug?
11         THE WITNESS:  I don't understand what
12   you're asking.
13         MR. GOLDBERG:  Counsel --
14   BY MR. GOLDBERG:
15   Q    I'm using your phrase, "economic
16   price."  There was an economic price paid for
17   valsartan between 2012 and 2018, right?
18         MR. HONIK:  Right.  And our lawsuit
19   seeks --
20         MR. GOLDBERG:  Counsel, you're not --
21   counsel, don't testify.  Don't interrupt.  Let
22   the witness answer the question.
23         MR. HONIK:  You have now asked the
24   same question six times.
25         MR. GOLDBERG:  Counsel, don't --

Page 128

1    counsel, don't coach the witness.  Don't
2    interfere.
3          MR. HONIK:  This witness needs to be
4    heard --
5          MR. GOLDBERG:  Counsel, don't say a
6    word.  The question is pending.  Witness will
7    answer without your interruption.  If you want
8    to say objection, you can say objection.
9          MR. HONIK:  I will say as many words
10   as I deem appropriate --
11         MR. GOLDBERG:  If you want to say
12   objection to form, say it, but don't --
13         MR. HONIK:  I will protect the record
14   in the manner in which I see fit.
15         MR. GOLDBERG:  No.  You will interfere
16   with the record.
17         MR. HONIK:  What I'm -- what I'm now
18   trying to do, because I believe you've asked
19   the witness the same exact question 6, 7, maybe
20   10 times, is to clarify.  And if -- and if
21   you're asking a different question, then
22   perhaps she can answer it differently.  I'm
23   simply trying to move things along.
24         Is your question whether or not
25   consumers, during the relevant period that

Page 129

1    you've now raised, actually --
2          MR. GOLDBERG:  I want to ask my
3    question.  Don't ask my question.
4          MR. HONIK:  I know.  I'm not --
5          MR. GOLDBERG:  No, stop.  Ruben, stop.
6    It's improper, and stop.
7          MR. HONIK:  Here is what we're going
8    to do.
9          MR. GOLDBERG:  Stop it.
10         MR. HONIK:  Here's what we're going to
11   do.  Here's what we're going to do.
12         MR. GOLDBERG:  Tell me what we're
13   going to do.
14         MR. HONIK:  If you persist in asking
15   the same question again, then we will have to
16   stop.  I think the witness has responded -- I
17   think the witness has responded completely to
18   your question.  You seem not to understand --
19         MR. GOLDBERG:  The objection is asked
20   and answered.  If that's your objection, say
21   it.
22         MR. HONIK:  Is there a pending
23   question?
24   BY MR. GOLDBERG:
25   Q    Dr. Conti -- Dr. Conti, there was an

33 (Pages 126 - 129)

RESTRICTED CONFIDENTIAL

Page 130

1  economic price that was paid for valsartan between
2  2012 and 2018, correct?
3        MR. HONIK:  Object to form, asked and
4  answered.
5        THE WITNESS:  Okay.  Again, let's
6  start at the beginning.  From my perspective,
7  prospectively, there may be a demand curve for
8  products that exist that cannot be met by a
9  legitimate supply curve.  In -- you can't get
10  an economic price if there is not both a demand
11  curve and a legitimate supply curve.
12        In this matter, I was asked to assume
13  that these products at issue between 2012 and
14  2018 were adulterated and misbranded according
15  to the Food and Drug Administration's
16  definition.
17        By definition, if they were both
18  adulterated and misbranded, there is no
19  legitimate supply curve.  And therefore, demand
20  and supply cannot meet, and there cannot be an
21  economic price.
22  BY MR. GOLDBERG:
23     Q     But demand and supply did meet, and an
24  economic price was paid for valsartan between 2012
25  and 2018, wasn't there?

Page 131

1        MR. HONIK:  Object to form, asked
2  and answered.
3        Go ahead, Dr. Conti.  You can explain
4  it again.
5        THE WITNESS:  Again, consumers and
6  payors did not know that these products were
7  adulterated and misbranded during the relevant
8  time period.  That's because, as I understand
9  it, the manufacturers, who are the defendants
10  in this case, were attesting that these
11  products were meeting the evidentiary standard
12  when they were not.
13        From my perspective in -- in analyzing
14  this market, if I assume that these products
15  are misbranded and adulterated, then there is
16  no legitimate supply curve.  And therefore,
17  there is no meeting of demand and supply and no
18  economic price.
19  BY MR. GOLDBERG:
20     Q     There was a supply for these drugs
21  between 2012 and 2018.  You don't dispute that, do
22  you?
23        MR. HONIK:  Object to form, asked
24  and answered.
25        Go ahead.

Page 132

1        THE WITNESS:  Again, I was asked to
2  assume that that supply was adulterated and
3  misbranded.
4  BY MR. GOLDBERG:
5     Q     So the answer is, yes, there was a
6  supply?  Leaving aside your assumptions, you agree
7  there was a supply of valsartan between 2012 and
8  2018?
9        MR. HONIK:  Object to the form, asked
10  and answered.
11        THE WITNESS:  I think what you're
12  asking is whether Diovan and Exforge, the
13  brand -- the branded products, plus the generic
14  drugs, were available to the U.S. market, were
15  available --
16        THE COURT REPORTER:  I'm sorry.  You
17  cut out, Doctor.
18        Were available to...
19        THE WITNESS:  To be purchased in the
20  U.S. supply chain between 2012 and 2018.  If
21  that is your question, then the answer is yes.
22  BY MR. GOLDBERG:
23     Q     Okay.  And between 2012 and 2018,
24  valsartan -- that valsartan was purchased by
25  consumers and third-party payors, right?

Page 133

1     A     So consumers purchased Diovan and
2  Exforge and it's generic equivalents during that
3  time period.  The at-issue drugs, I was asked to
4  assume were adulterated and misbranded during that
5  time period.
6     Q     Do you have experience assessing the
7  clinical value of drugs?
8     A     As an economist?  Yes.  As a doctor,
9  sadly, no.
10     Q     Got you.
11        Have you conducted any clinical trials
12  with respect to drug -- drugs, pharmaceutical
13  drugs?
14     A     Have I conducted any clinical trials?
15  I have been involved in clinical trials that
16  have -- that are conducted --
17        THE COURT REPORTER:  That are
18  conducted...
19        THE WITNESS:  On prescription drugs.
20  BY MR. GOLDBERG:
21     Q     Have you reviewed the -- the -- strike
22  that.
23        You understand that valsartan is -- an
24  intended use of valsartan is to treat hypertension,
25  right?

34 (Pages 130 - 133)

RESTRICTED CONFIDENTIAL

Page 134

1    A    Yes. I mean, it is a member of a
2  class of drug -- of a therapeutic class of drugs
3  that are all intended to treat hypertension.
4    Q    And another intended use of valsartan
5  is to treat heart failure?
6    A    I don't know that specifically.
7    Q    Are you aware that, if left untreated,
8  high blood pressure can lead to heart attacks?
9        MR. HONIK: Objection, outside the
10   scope.
11       THE WITNESS: I mean, like, as an
12   American citizen who's relatively well
13   informed, yes, I understand that.
14 BY MR. GOLDBERG:
15   Q    Okay. And -- yeah, I'm looking for
16 your understanding as Dr. Conti, whether that's in
17 your individual capacity as an expert. But you
18 understand that high blood pressure, if left
19 untreated, can lead to heart attacks, right?
20   A    Yes. And I understand that there are
21 many, many treatments to prevent heart attacks
22 available.
23   Q    And if left untreated, high blood
24 pressure can lead to strokes?
25       MR. HONIK: Same objection, outside

Page 135

1  the scope of her report.
2        THE WITNESS: Thank you.
3        Again, I understand as, a general
4    matter, that -- that high blood pressure is a
5    risk factor for stroke and that high blood
6    pressure can be treated in many different ways.
7  BY MR. GOLDBERG:
8    Q    And if somebody has a heart attack,
9  that can require hospitalization?
10       MR. HONIK: Same objection.
11       THE WITNESS: Yes. My mother had a
12   heart attack, and she was hospitalized. I am
13   generally aware of the facts.
14 BY MR. GOLDBERG:
15   Q    And if somebody has a stroke, it can
16 require hospitalization?
17       MR. HONIK: Same objection.
18       THE WITNESS: Yes. But again, there
19   are many treatments -- I mean, we are so
20   fortunate in the U.S. that there are so many
21   treatments that prevent heart attack and
22   strokes now from progressing to the point of
23   requiring hospitalization or even, more
24   tragically, death now. Deaths from strokes and
25   heart attacks have dramatically come down over

Page 136

1    the past two decades with the advent of stents,
2    but also the advent of many prescription drugs
3    that support their prevention and treatment.
4  BY MR. GOLDBERG:
5    Q    There would be medical expenses
6  attributable to a heart attack for most consumers,
7  right?
8        MR. HONIK: Same objection.
9        THE WITNESS: Are you saying as a
10   general matter that -- that heart attacks
11   entail costs?
12 BY MR. GOLDBERG:
13   Q    Yes.
14   A    Yes, definitively.
15   Q    And the same -- the same is true for
16 strokes?
17   A    The primary prevention and treatment
18 of strokes costs money.
19       COURT REPORTER: It what?
20       THE WITNESS: In the U.S.
21       COURT REPORTER: I'm sorry. The
22   primary prevention...
23       THE WITNESS: And treatment of strokes
24   in the U.S. costs money.
25       COURT REPORTER: Thank you.

Page 137

1  BY COURT REPORTER:
2    Q    You'd agree that avoiding the
3  complications from untreated hypertension could
4  provide a value to a patient?
5        MR. HONIK: Objection, outside the
6    scope.
7        THE WITNESS: As a general matter?
8  BY MR. GOLDBERG:
9    Q    Yeah.
10   A    I think a lot of Americans would view
11 the primary prevention and treatment of underlying
12 conditions to prevent strokes and heart attacks is
13 of value. I mean, I certainly view that as
14 valuable.
15   Q    So if valsartan were treating
16 someone's hypertension and that person, as a result,
17 was avoiding a heart attack or a stroke because of
18 their valsartan, that would be a value to that
19 consumer?
20       MR. HONIK: Object to form.
21       THE WITNESS: That has therapeutic
22   value. It doesn't have economic value from my
23   reports on that.
24 BY MR. GOLDBERG:
25   Q    So the consumer would get a

35 (Pages 134 - 137)

RESTRICTED CONFIDENTIAL

Page 138

1  therapeutic benefit from the treatment of
2  valsartan -- their treatment with valsartan?
3          MR. HONIK: Object to the form,
4  outside the scope.
5          THE WITNESS: Yeah. I think that's a
6  good question.
7          So, again, from the perspective of my
8  report, I was asked to assume that the
9  valsartan products at issue were adulterated
10  and misbranded, and therefore, they should not
11  have entered into the U.S. class of trade.
12          Whether those products provided
13  therapeutic value is -- is not of -- it's
14  not -- it doesn't matter for the purposes of my
15  calculation.
16  BY MR. GOLDBERG:
17      Q      Well, do you dispute that those
18  products provided therapeutic value?
19          MR. HONIK: Object to the form, asked
20  and answered, outside the scope.
21          THE WITNESS: I don't know. I
22  don't -- I don't have an opinion. You know, as
23  an economist, I don't have an opinion.
24  BY MR. GOLDBERG:
25      Q      Are you aware of any studies showing

Page 139

1  that between 2012 and 2018, valsartan was not
2  effective in treating hypertension?
3          MR. HONIK: Object to the form, beyond
4  the scope.
5          THE WITNESS: No. But it's -- again,
6  has no moment, in my analysis, because again, I
7  was asked to assume that those products at
8  issue were misbranded and adulterated, and
9  therefore would not have entered into the U.S.
10  class of trade.
11  BY MR. GOLDBERG:
12      Q      Are you aware of any warnings by the
13  FDA between 2012 and 2018 that patients shouldn't
14  take valsartan because it's not effective in
15  treating hypertension?
16          MR. HONIK: Object to form, outside
17  the scope.
18          THE WITNESS: So, again, it's of no
19  moment -- moment in my analysis and my
20  assignment in this case.
21          THE COURT REPORTER: What word are you
22  using? Moment?
23          THE WITNESS: It's no moment.
24          MR. HONIK: It's of no moment, she
25  said.

Page 140

1          COURT REPORTER: Of no moment.
2  M-o-m-e-n-t? Moment.
3          THE WITNESS: Yes.
4          THE COURT REPORTER: Thank you. Thank
5  you.
6  BY MR. GOLDBERG:
7      Q      Is it your testimony that positive
8  health outcomes have no economic value to consumers?
9          MR. HONIK: Object to the form, asked
10  and answered, outside the scope.
11          THE WITNESS: That is not my
12  testimony, sir.
13  BY MR. GOLDBERG:
14      Q      Do you agree that positive health
15  outcomes can have economic value to consumers?
16          MR. HONIK: Same objection.
17          THE WITNESS: That is not my
18  testimony, sir.
19  BY MR. GOLDBERG:
20      Q      Do you agree that positive outcomes,
21  health outcomes, can have economic value to
22  consumers, yes or no?
23          MR. HONIK: Same objection, asked and
24  answered.
25          THE WITNESS: Of what, sir?

Page 141

1  BY MR. GOLDBERG:
2      Q      Do you agree that controlled
3  hypertension due to valsartan could have economic
4  value to a consumer?
5      A      Same objection.
6          THE WITNESS: I think I'm gonna -- I
7  think I'm gonna ask just -- you to clarify.
8          So do you mean that prescription-based
9  control of hypertension could have value to
10  consumers?
11  BY MR. GOLDBERG:
12      Q      Yes.
13      A      There's my -- my -- my point is
14  there's lots of -- I mean, my understanding is
15  there's lots of ways that consumers can control
16  their hypertension that go well beyond the
17  availability of prescription valsartan.
18      Q      But my question dealt with
19  prescription valsartan.
20      A      Okay.
21      Q      Yes or no, if prescription valsartan
22  were controlling a patient's hypertension, could
23  that provide economic value to the patient?
24          MR. HONIK: Objection to form, asked
25  and answered, outside the scope.

36 (Pages 138 - 141)

RESTRICTED CONFIDENTIAL

Page 142

1    THE WITNESS: What do you mean by
2 "economic value"?
3    (Whereupon, there was a speaking
4 interruption.)
5    THE WITNESS: I'm sorry --
6    THE COURT REPORTER: I'm sorry, who's
7 speaking?
8    MR. HONIK: There was a question and
9 objection and a partial answer from the
10 witness. Did you get any of that?
11    THE COURT REPORTER: Yes.
12    MR. HONIK: Okay. Great.
13    THE WITNESS: And there was, like,
14 something -- someone else started speaking.
15    MR. HONIK: And then someone
16 interjected.
17    THE WITNESS: Correct. In the middle
18 of my answer.
19    MR. HONIK: Okay. So other than Seth,
20 everyone -- and myself, everyone should be
21 muted.
22 BY MR. GOLDBERG:
23    Q    Let me ask the question again.
24    Yes or no, prescription valsartan,
25 when controlling a patient's hypertension, could

Page 143

1 that provide an economic value to the patient?
2    MR. HONIK: Object to form, asked and
3 answered, beyond the scope.
4    You can answer.
5    THE WITNESS: Thank you. Seth --
6 Mr. Goldberg, what do you mean by "economic
7 value" in that question?
8 BY MR. GOLDBERG:
9    Q    Well, before you had said that that
10 kind of control would provide a therapeutic benefit,
11 not an economic value. And I'm just asking -- you
12 used the phrase "economic value." What do you
13 understand it to mean?
14    MR. HONIK: Object to the form.
15    THE WITNESS: Okay. Again, I -- we
16 are talking about my definition of "economic
17 value" in this specific matter based on
18 assumptions that I was asked to make. You are
19 using "economic value" in a way that is not
20 consistent with how I just defined "economic
21 value" for the purposes of my report. So in
22 that --
23 BY MR. GOLDBERG:
24    Q    Doctor --
25    THE WITNESS: Hold on.

Page 144

1    MR. HONIK: Don't interrupt her.
2    THE WITNESS: I'm going to ask again.
3 I don't understand how you're using the term
4 "economic value."
5 BY MR. GOLDBERG:
6    Q    If a patient saved money on their
7 health expenses because of their treatment with
8 at-issue valsartan products, would that have
9 provided economic value to the patient?
10    MR. HONIK: Is there a question?
11    MR. GOLDBERG: That is the question.
12 Should I ask it again?
13    MR. HONIK: No, Jamie can read it, and
14 we can all determine if it's a question. It
15 sounded like a statement.
16    But, Jamie, can you read it back.
17    MR. GOLDBERG: I'm going to
18 read -- I'm going to read the question.
19 BY MR. GOLDBERG:
20    Q    If a patient saved money on their
21 health expenses because of their treatment with
22 at-issue valsartan products, would that have
23 provided an economic value to the patient?
24    MR. HONIK: Object to form, beyond the
25 scope, asked and answered.

Page 145

1    You can respond.
2    THE WITNESS: Thank you.
3    MR. HONIK: As best you can.
4    THE WITNESS: Thank you.
5    So for the -- I mean, as a general
6 matter, if people are saving money, then there
7 is some economic -- there might be economic
8 value. That is not the way in which I am using
9 the term "economic value" or "worth" or
10 "worthlessness" in my report.
11 BY MR. GOLDBERG:
12    Q    If a patient is -- strike that.
13    So if consumers received that economic
14 value that you just described from their treatment
15 of valsartan, is, in your view, the product still
16 worthless?
17    MR. HONIK: Object to form, asked and
18 answered, beyond the scope.
19    THE WITNESS: Okay. So from the
20 Food and Drug Administration's perspective,
21 there are two values associated with a drug --
22 associated with a prescription drug. One is
23 related to the economic value. Is this product
24 actually available to be sold into the U.S.
25 market? Does supply meet demand?

37 (Pages 142 - 145)

RESTRICTED CONFIDENTIAL

Page 146

1    There is a separate value that is
2  related to its therapeutic benefit.  Only
3  products that are considered to be legitimate
4  products, they meet the evidentiary standard
5  for sale in the U.S., could have therapeutic
6  value, because you need to meet the evidentiary
7  standard of being actually allowed on the
8  market to be sold before you can have -- be
9  judged to have additional therapeutic --
10 therapeutic value because it only -- the only
11 way that you would know whether that product
12 has benefit is if -- for a given patient, is if
13 the product meets the evidentiary standard.
14    So in my analysis, that -- a product
15 has value, economic value, if it meets the
16 first part, that is there is a legitimate
17 supply curve.  Therapeutic value, whether that
18 product is -- provides value or clinical value
19 or maybe does have some economic value to a
20 consumer is all predicated on it meeting --
21    COURT REPORTER:  Is all predicated...
22    THE WITNESS:  That goes above and
23 beyond the economic value that I have been
24 asked to consider.
25    I'm sorry.  Is there a question?  I'm

Page 147

1  hearing voices.
2    MR. HONIK:  You're hearing background
3  noise.
4    THE WITNESS:  Okay.  Okay.
5  BY MR. GOLDBERG:
6    Q    Have you reviewed -- strike that.
7    You haven't reviewed any of the
8  deposition testimony of any of the plaintiffs or
9  class representatives in this case, correct?
10    MR. HONIK:  Objection, asked and
11 answered.
12    THE WITNESS:  I think you asked that
13 question to me this morning, and the answer --
14 my answer remains no.
15 BY MR. GOLDBERG:
16    Q    Okay.  So you're not aware of the
17 plaintiffs and class representatives who have
18 testified that they got therapeutic benefits from
19 the at-issue valsartan they took?  You're not aware
20 of that testimony, right?
21    MR. HONIK:  Object to the form, asked
22 and answered, beyond the scope.
23    THE WITNESS:  Again, it's of no moment
24 for my assignment in this case.  Therapeutic
25 value associated with a product's benefits and

Page 148

1  potential downside costs are all predicated on
2  the product being a legitimate product allowed
3  for sale --
4  BY MR. GOLDBERG:
5    Q    Of a product --
6    A    Hold on, please, let me finish.
7    Allowed for sale in the U.S. market.
8  I was asked to assume these -- these products were
9  not legitimate products.  They were not allowed into
10 the U.S. market -- or they were not -- did not meet
11 the evidentiary standard for sale.  And therefore,
12 that clinical value that they may have provided, is
13 a separate matter.
14    Q    That clinical value --
15    A    Hold on.  Hold on.
16    And not one that I evaluated.  It's
17 outside the scope of my report.
18    Q    That clinical value is meaningless to
19 you?
20    MR. HONIK:  Object to the form, asked
21 and answered.
22    THE WITNESS:  Okay.  Again, as, like,
23 a human being, obviously, pharmaceutical
24 products that are available for sale in the
25 U.S. have -- may have clinical value to

Page 149

1  individual patients.
2    But for the purposes of my report, I'm
3  using the term "economic value" in a very
4  specific way, which is that the products meet
5  the evidence -- either meet the evidentiary
6  standard for being allowed to be sold into the
7  U.S., or they don't.
8    I was asked to assume that they do
9  not.  And therefore, all the downstream
10 potential benefits and costs associated with
11 the products are of no moment -- excuse me --
12 are of no moment to me.
13 BY MR. GOLDBERG:
14    Q    Let's look at it just from a human
15 way, the human standpoint.
16    You agree that from a human
17 standpoint, consumers who took valsartan between
18 2012 and 2018 may have had a therapeutic benefit
19 from the drug, right?
20    MR. HONIK:  Object to the form.
21 BY MR. GOLDBERG:
22    Q    Human standpoint?  Not -- not --
23    MR. HONIK:  Object to the form.
24    THE WITNESS:  I'm not a doctor, sir.
25    I'm so sorry, Ruben.

38 (Pages 146 - 149)

RESTRICTED CONFIDENTIAL

Page 150

1    MR. HONIK: That's okay. I think
2 Jamie got it.
3    THE COURT REPORTER: I have not heard
4 anything clearly for the last 10 seconds.
5    MR. HONIK: Okay. Do you want to ask
6 that question again?
7    MR. GOLDBERG: We can strike that
8 question.
9    THE COURT REPORTER: I have --
10    MR. HONIK: It's stricken, Jamie.
11    COURT REPORTER: Can we go off the
12 record for a second, please?
13    THE VIDEOGRAPHER: The time is 2:44.
14 We're going off the record.
15    (Whereupon, a short break was taken.)
16    THE VIDEOGRAPHER: The time is 2:55.
17 We're back on the record.
18 BY MR. GOLDBERG:
19    Q    Dr. Conti, you'd agree that the
20 therapeutic benefits that consumers may have gotten
21 from valsartan between 2012 and 2018 would be
22 different from one consumer to the next, right?
23    MR. HONIK: Object to form, outside
24 the scope.
25    You can answer.

Page 151

1    THE WITNESS: Again, it's -- it's no
2 moment to my report -- or to my opinions in
3 this matter.
4 BY MR. GOLDBERG:
5    Q    I -- I understand. I understand your
6 view. But you've talked about the drug as being
7 worthless, and we're talking about the therapeutic
8 benefit of the drug and -- in the context of your
9 opinion related to worthlessness.
10    My question is, you would agree that
11 consumers would experience the therapeutic benefits
12 from the at-issue valsartan products differently
13 from consumer to consumer?
14    COURT REPORTER: Differently from
15 consumers...
16    MR. GOLDBERG: Differently from
17 consumer to consumer.
18    MR. HONIK: Object to form, asked and
19 answered and beyond the scope of her report.
20    THE WITNESS: Okay. So I think that
21 we are misunderstanding. I think you are
22 misunderstanding the way in which I'm using the
23 term "economic value" or "economic worth."
24    And so maybe if you would indulge me,
25 I can just go back to my report. On page -- on

Page 152

1 Paragraph 42, I state, "Federal law establishes
2 that non-safety and quality compliant
3 adulterated and misbranded prescription drugs
4 are not legitimate consumer products and cannot
5 be lawfully or" -- "lawfully sold or
6 distributed for sale."
7    It is in that context that I am
8 discussing the economic worth or value of the
9 at-issue products.
10    Whether or not an individual consumer,
11 or there were consumers that may have --
12    COURT REPORTER: Let me just -- excuse
13 me. Sorry. Let me just mute my microphone.
14    MR. HONIK: Go ahead. Go ahead.
15    THE WITNESS: Thank you. So the
16 economic value that I -- let me just start from
17 the beginning. Sorry, Jamie.
18    From my perspective, the economic
19 value that is at issue in my report, in my
20 opinions in this matter, are related to the
21 product -- to the products being either meeting
22 the evidentiary standard for sale or not.
23    Whether or not individual people --
24 there's a demand curve for these products, and
25 individual people within that demand curve --

Page 153

1 or that make up that demand curve, experience
2 therapeutic benefit or -- benefit or not, is of
3 no moment to my opinion.
4 BY MR. GOLDBERG:
5    Q    Is there -- is there some other
6 economic value that you're excluding from your
7 opinion that may have resulted from consumers taking
8 the at-issue valsartan?
9    MR. HONIK: Object to the form.
10    THE WITNESS: I am using the term
11 "economic value" in my report in the way in
12 which I've justified, multiple times, and in
13 the way that the judge in this case has defined
14 "economic value" and its converse, "economic
15 worthlessness."
16 BY MR. GOLDBERG:
17    Q    How do you understand the judge in
18 this case has defined "economic value"?
19    A    I think it would be easier if I just
20 read from my phone. I have his opinion in front of
21 me. He says --
22    COURT REPORTER: Please just read
23 slowly and clearly.
24    THE WITNESS: "This Court finds that
25 contaminated drugs are economically worthless

39 (Pages 150 - 153)

RESTRICTED CONFIDENTIAL

Page 154

1    at the point of sale by virtue of the
2    dangerousness caused by their contamination,
3    regardless whether the sold VCDs actually
4    achieve the medical purpose of lowering blood
5    pressure." I can go on.
6           "Put differently, contaminated drugs,
7    even if medically efficacious for their
8    purpose, cannot create a benefit of the bargain
9    because the contaminants, and their dangerous
10   effects, were never bargained for.
11          "Further, contaminated drugs do create
12   a present injury because their sale should
13   never have occurred."
14          THE COURT REPORTER: Doctor, just for
15   my clarification, what were you reading from?
16          THE WITNESS: I was reading from my
17   cell phone.
18   BY MR. GOLDBERG:
19   Q     And what were you -- what were you
20   reading from?
21   A     I was reading from an opinion of the
22   court.
23   Q     And who sent you that opinion?
24          MR. HONIK: Without waiving -- excuse
25   me, without waiving the objection, I'll permit

Page 155

1    her to answer.
2           THE WITNESS: So I have been aware of
3    this opinion for a while, and the opinion was
4    provided to me by counsel.
5    BY MR. GOLDBERG:
6    Q     When was that?
7    A     When did they -- when did I receive
8    this via text on my phone?
9    Q     Yes.
10   A     Five minutes ago. But I have been
11   aware of this before then.
12   Q     So counsel texted you five minutes ago
13   with the judge's opinion that you just read into the
14   record?
15          MR. HONIK: Without waiving -- excuse
16   me, without waiving the objection and
17   privilege, I'll permit her to answer.
18          THE WITNESS: Yes. It was just texted
19   to me. But again, I have been aware of this
20   opinion for a while.
21   BY MR. GOLDBERG:
22   Q     And which counsel texted that to you?
23          MR. HONIK: Without waiving the
24   objection, I'll permit her to answer.
25          THE WITNESS: John Davis.

Page 156

1    BY MR. GOLDBERG:
2    Q     And did John -- so we talked about the
3    therapeutic benefits that may have -- that -- that
4    consumers who took the at-issue valsartan products
5    may have experienced. You don't dispute that
6    consumers who took valsartan at-issue products may
7    have experienced therapeutic benefits?
8           MR. HONIK: Object to the form, asked
9    and answered, beyond the scope.
10          You may answer.
11          THE WITNESS: Again, the demand curve
12   for these products may exist. From an economic
13   theory perspective, the demand curve represents
14   individual assessments of benefits and costs of
15   prescription drugs. I am not disputing that
16   there may have been a demand curve for these
17   products. That is not my opinion.
18          My opinion is related to the supply
19   curve. In other words, that products that do
20   not meet the evidentiary standard are not
21   allowed into the U.S. products of trade, they
22   are not viewed as being legitimate products.
23   From my perspective, those products are
24   worthless.
25

Page 157

1    BY MR. GOLDBERG:
2    Q     Yeah. And the consumers in that
3    demand curve, as you have put it, those -- each
4    consumer has -- has their own individual demand for
5    the drug, right?
6           MR. HONIK: Object -- object to the
7    form, asked and answered and beyond the scope.
8           You may answer.
9           THE WITNESS: Yes.
10   BY MR. GOLDBERG:
11   Q     And --
12   A     I mean, predicated, of course, on
13   their doctor being willing to write a prescription
14   and their insurer being willing to -- to insure that
15   prescription, which is also predicated on FDA
16   approval of the product.
17          But -- I mean, consumer demand does
18   not live in a vacuum outside of physician
19   prescribing behavior in this context.
20   Q     And that physician prescribing
21   behavior and the consumer demand for the at-issue
22   valsartan products, that's individual from one
23   consumer to the next. Why I need the drug is
24   different from why someone else might need the drug,
25   and so on, right?

40 (Pages 154 - 157)

RESTRICTED CONFIDENTIAL

Page 158

1    MR. HONIK: Object to the form,
2    outside the scope, asked and answered, improper
3    hypothetical.
4        You may answer.
5        THE WITNESS: I don't know what you
6    mean by the term "need," sir.
7    BY MR. GOLDBERG:
8    Q    Why I might be prescribed valsartan
9    would likely be different than why someone else
10   might be prescribed valsartan, and these are really
11   individualized issues?
12       MR. HONIK: Same objection as
13   previously stated.
14       THE WITNESS: I mean, that is not
15   consistent with my understanding of demand for
16   prescription drugs. I'm sorry.
17   BY MR. GOLDBERG:
18   Q    Do you agree that therapeutic benefits
19   that consumers who have taken at-issue valsartan may
20   have been different from consumer to consumer?
21       MR. HONIK: Object to the form, asked
22   and answered, beyond the scope.
23       THE WITNESS: Again, demand for
24   prescription drugs is related, generally, to
25   their benefits and their costs, predicated on

Page 159

1    the supply of those products being legitimate.
2    In other words, the manufacturer actually
3    meeting the evidentiary standard.
4    BY MR. GOLDBERG:
5    Q    Yes or no -- yes or no, do you agree
6    the therapeutic benefit --
7    A    Sir --
8    Q    I thought you were finished with your
9    answer.
10       MR. HONIK: She's not.
11       THE WITNESS: I'm not. I'm not.
12   BY MR. GOLDBERG:
13   Q    Why don't you go ahead and finish your
14   answer, and then I'll ask my next question.
15   A    Why don't ask you your question again
16   because you interrupted me in mid-answer.
17   Q    Oh, okay.
18   A    Yeah.
19   Q    Yes or no, do you agree that the
20   therapeutic benefits that consumers who have
21   taken -- let me -- let me rephrase.
22       Yes or no, do you agree -- yes or no,
23   do you agree that the consumers who took at-issue
24   valsartan would have received -- would have received
25   different therapeutic benefits from consumer to

Page 160

1    consumer?
2        MR. HONIK: Objection, asked and
3    answered, beyond the scope. I think you've
4    asked her this four times already.
5        THE WITNESS: They may have received
6    exactly the same therapeutic benefit.
7    BY MR. GOLDBERG:
8    Q    And they may not, right?
9    A    You're -- I'm sorry, sir, but this is
10   impossible. You just interrupted me again,
11   mid-answer, to the same question.
12   Q    Go ahead.
13   A    No. Please answer your -- please ask
14   your question again, and then I'll answer it.
15   Q    Yes or no, do you agree that the
16   therapeutic benefits that consumers may have
17   realized from taking the at-issue valsartan products
18   would have differed from consumer to consumer?
19       MR. HONIK: Same objection.
20       THE WITNESS: Again, this is not a
21   yes-or-no-type question. Consumers may have
22   received exactly the same benefit from at-issue
23   valsartan products, or they may have received
24   different experiences of that product. It is
25   of no moment in my opinions in this matter

Page 161

1    because, again, demand -- their demand is
2    predicated on a legitimate supply curve. And
3    I've been asked to assume that there was no
4    legitimate supply curve.
5    BY MR. GOLDBERG:
6    Q    You would agree, Dr. Conti, that we
7    all have different risk tolerances for things we're
8    willing to put into our bodies?
9        MR. HONIK: Same objection as
10   previously, beyond the scope.
11       THE WITNESS: From the U.S.
12   regulator's perspective, risk tolerance is of
13   no moment. Again, only products that meet the
14   evidentiary standard are allowed to enter into
15   the prescription class of trade in the
16   United States.
17   BY MR. GOLDBERG:
18   Q    I'm asking you a different question.
19   Answer my question.
20       You'd agree that people have different
21   risk tolerances from what they're willing to put
22   into their bodies from person to person?
23       MR. HONIK: Same objection as
24   previously.
25       THE WITNESS: Okay. I'm going to

41 (Pages 158 - 161)

RESTRICTED CONFIDENTIAL

Page 162

1    answer your question again, which is, it is of
2    no moment whether people want to consume
3    illegitimate products.  If there is no
4    legitimate supply curve, those products cannot
5    enter into the U.S. class of trade.  That
6    is -- that is the position of the U.S.
7    government.  And it's --
8    BY MR. GOLDBERG:
9        Q    Is my answer, no, you --
10       A    Hold on.  Hold on.
11       Q    You're still going?
12       A    I am still going.
13       Q    Okay.  I mean, I would just say,
14   Dr. Conti, I don't mean to be rude.  But what
15   happens is you -- you kind of -- the way you do this
16   is you sort of get to the end of something.  It
17   seems like you're stopping, and then that's why I'm
18   starting.  I'm not trying to interrupt you.  And
19   then you --
20       A    Mr. Goldberg, that is not the case.
21   You just continue to talk over me.  The mansplaining
22   is a little bit challenging, frankly.  But I'll try
23   to do this again.
24       Q    Okay.
25       A    Again, Americans have a variation of

Page 163

1    their risk tolerance.  That is of no moment for the
2    legitimate class of trade for prescription drugs.
3    If the product -- if pharmaceutical companies want
4    to sell their products in the U.S., they must meet
5    the evidentiary standard.  Full stop.
6        Q    You would agree that some consumers
7    would be willing to accept a very low risk of a
8    probable human carcinogen, whereas other consumers
9    might not be willing to accept the risk of a
10   probable human carcinogen?
11       MR. HONIK:  Object to form, outside
12   the scope.
13       THE WITNESS:  It is of no moment in my
14   opinions in this matter.  The bottom line is
15   that these manufacturers attested to that there
16   was no contamination of these products by known
17   human carcinogens.
18   BY MR. GOLDBERG:
19       Q    Is the answer to my question, no, you
20   don't agree?
21       MR. HONIK:  Object to form, asked
22   and answered.
23       THE WITNESS:  I have answered your
24   question, sir, the best way that I know how.
25

Page 164

1    BY MR. GOLDBERG:
2        Q    Your methodology does not take into
3    consideration how consumers might have perceived the
4    value of the at-issue valsartan to them, correct?
5        MR. HONIK:  Object to the form.
6        THE WITNESS:  My analysis presumes
7    there is a demand curve for these products.
8    What my analysis also presumes is that there is
9    no legitimate supply curve for products that do
10   not meet the evidentiary standard of the U.S.
11   BY MR. GOLDBERG:
12       Q    What your analysis does not take into
13   consideration is whether any consumer perceived that
14   they received a therapeutic benefit that provided a
15   value to them, right?
16       MR. HONIK:  Object to the form, asked
17   and answered.
18       You may answer.
19       THE WITNESS:  Again, of course, it
20   does.  There is a demand curve for these
21   products.  That is not -- that is not the issue
22   in this case.  Of course, there's a demand
23   curve, and I -- I describe it in my report.
24   What my report is trying to explain is that
25   there is no legitimate supply curve for

Page 165

1    products that do not meet the evidentiary
2    standard of the U.S. government.
3        I was asked to assume that
4    products -- that these products at issue
5    between 2012 and 2018 did not meet the
6    evidentiary standard.  They were adulterated
7    and misbranded.  Therefore, there was no supply
8    curve, in my analysis.
9    BY MR. GOLDBERG:
10       Q    Are you familiar with what the FDA
11   advised patients to do when the recalls were
12   announced?
13       MR. HONIK:  Object to the form,
14   outside the scope.
15       THE WITNESS:  Specifically, what do
16   you mean?
17   BY MR. GOLDBERG:
18       Q    Are you aware that the FDA advised
19   people that they should not discontinue their use of
20   valsartan until they spoke with their doctor about
21   it?
22       MR. HONIK:  Object to the form, asked
23   and answered, outside the scope.
24       THE WITNESS:  Again, my understanding
25   is that there were multiple FDA communications

42 (Pages 162 - 165)

RESTRICTED CONFIDENTIAL

Page 166

1    when the contamination of these products and
2    their adulteration became known.  Is there a
3    specific communication that you are referring
4    to?
5 BY MR. GOLDBERG:
6    Q    Well, I think my first question
7 is -- and you can answer no if it's no.
8        Are you aware of the FDA telling
9 patients they should not discontinue the use of
10 their valsartan when the FDA announced the recalls?
11       MR. HONIK:  Same objection as
12    previously stated.
13       THE WITNESS:  Okay.  The FDA had
14    multiple communications with consumers and
15    other suppliers about these products.  I'm
16    asking you to be specific.
17 BY MR. GOLDBERG:
18    Q    Do you want to turn to Tab 2 in your
19 binder?
20    A    Which binder?
21    Q    Tab 2 is binder -- that would be
22 binder, I guess, Volume 1 of 3?
23       THE COURT REPORTER:  Will this be a
24    new exhibit?
25       MR. GOLDBERG:  Yeah -- we'll mark this

Page 167

1 as Conti 6.  This is a --
2        (Whereupon, Exhibit Conti 6 was marked
3    for Identification.)
4 BY MR. GOLDBERG:
5    Q    Dr. Conti, I'm marking as exhibit
6 Conti 6, a document entitled, "FDA Updates and Press
7 Announcements on Angiotensin II Receptor Blocker
8 Recalls."  Do you see that?
9        MR. HONIK:  Seth, what's Conti 5?
10       MR. GOLDBERG:  Her expert report.
11       MR. HONIK:  Thank you.
12 BY MR. GOLDBERG:
13    Q    Are you familiar with this document,
14 Dr. Conti?
15    A    I am aware of this document.
16    Q    This is a document that was cited in
17 your report, right?
18    A    There are many documents from the FDA
19 documented -- sorry, cited in my report.
20    Q    And this is one of those documents,
21 right?
22    A    I don't -- I don't recall.
23    Q    If you turn to the very end of this
24 document, it's the July 18th, 2018 statement.
25    A    I don't see that, sir.  I'm sorry.

Page 168

1    Q    It's probably --
2        MR. GOLDBERG:  For the tech -- it's
3    almost three pages to the end.  It's the last
4    three pages-- three pages from the end.
5        THE WITNESS:  Do you mean the one that
6    says July 13th, 2018?
7 BY MR. GOLDBERG:
8    Q    No, it's -- it's a page before it.
9 It's the page before that.
10    A    So that's three pages in.  So four
11 pages in, on July 18th, 2018, not the other --
12    Q    Right.
13    A    Okay.
14    Q    Okay.  And at the top of this page, it
15 says -- where it says, "7-18-2018," do you see that?
16    A    Yes.
17    Q    And this page is referring to the
18 recall of valsartan by ZHP.  Do you see that?
19    A    I don't see ZHP here.
20    Q    Yeah.  It's right in the second
21 paragraph.
22    A    You mean Zhejiang Huahai
23 Pharmaceuticals?
24    Q    Correct.  Correct.
25    A    Okay.  So, yes, I see that here.

Page 169

1    Q    Okay.  And at the bottom of that page,
2 there are two bullet points at the very bottom.  Do
3 you see those?  And --
4    A    Is that a question?
5    Q    The first bullet point --
6    A    Is that a question?
7    Q    The first bullet point -- the first
8 bullet point, the FDA is instructing patients taking
9 at-issue valsartan that they should continue taking
10 their current medicine until their doctor or
11 pharmacist provides a replacement or a different
12 treatment option.  Did I read that correctly?
13    A    I think you asked me two questions,
14 but I see that you have read that -- that text
15 correctly.
16    Q    Did you consider at all in your
17 assessment the FDA's instructing patients to
18 continue -- to continue taking their medicine until
19 they found an alternative?
20       MR. HONIK:  Object to form, asked and
21    answered, beyond the scope.
22       THE WITNESS:  Again, from my
23    perspective, there is a demand for these
24    products.  In my report, I was asked to assume
25    that these products were contaminated,

43 (Pages 166 - 169)

RESTRICTED CONFIDENTIAL

Page 170

1  adulterated and misbranded. And therefore,
2  there is no --
3       THE COURT REPORTER: I'm sorry. There
4  is no...
5       THE WITNESS: There is no legitimate
6  supply curve. The fact that the FDA reaffirms
7  that there is a demand curve for these products
8  and many other products that might treat
9  someone's hypertension, is in my report. It
10  is, by definition, considered.
11      My report is about the supply of these
12  products.
13 BY MR. GOLDBERG:
14  Q     The FDA is acknowledging that the
15 at-issue valsartan may be providing a therapeutic
16 benefit to the consumers who are taking it, right?
17      MR. HONIK: Object to the form, asked
18  and answered, beyond the scope.
19      THE WITNESS: That's not what it says
20  here on this -- on this document, sir.
21      MR. GOLDBERG: You can take down that
22  document.
23 BY MR. GOLDBERG:
24  Q     You're aware that there have been a
25 number of recalls of valsartan since that one in

Page 171

1  July of 2018 that -- that went through July -- went
2  through 2019, right?
3   A     I am aware, as I stated earlier, that
4  the FDA has had many communications with the
5  manufacturers about these products and also the
6  American public about these products over -- over
7  time.
8   Q     And in each of those recalls, the FDA
9  made the same directive to consumers, that they
10 should not discontinue their use of valsartan until
11 they spoke with their doctor about an alternative?
12      MR. HONIK: Object to form.
13 BY MR. GOLDBERG:
14  Q     Is it your testimony that the FDA saw
15 no therapeutic benefit in the at-issue valsartan?
16      MR. HONIK: Object to form, asked and
17  answered, beyond the scope.
18      THE WITNESS: So there were valsartan
19  products that were not contaminated or
20  adulterated or misbranded that were available
21  during this time period, most notably by the
22  manufacturer --
23      THE COURT REPORTER: I'm sorry. By
24  the manufacturer...
25      THE WITNESS: By the manufacturer

Page 172

1  Novartis.
2       There were also many other treatments
3  available for hypertension. I -- I haven't
4  studied all of these FDA communications
5  regarding all of the valsartan products, but my
6  understanding is that the FDA has said to
7  patients that they should discuss with their
8  doctor continuing on the contaminated products
9  and consider the use of non-contaminated or
10 non-adulterated products for their treatment,
11 which included valsartan, specifically the
12 valsartan that were not contaminated or
13 adulterated, but many other products as well.
14 BY MR. GOLDBERG:
15  Q     And it also included the valsartan at
16 issue, right, that the FDA was saying, don't
17 discontinue your use of at-issue valsartan, to use
18 your phrase "at-issue," until you talked with your
19 doctor, right?
20      MR. HONIK: Object to the form, beyond
21  the scope.
22      THE WITNESS: No. For example, in the
23  document that we were just talking about, the
24  FDA says -- the "FDA reminds consumers to
25  continue taking your current medication until

Page 173

1  you -- until your doctor or pharmacist gives
2  you a replacement or a different treatment
3  option."
4       That is my understanding of what the
5  FDA does, generally, when there are -- there
6  are concerns about the quality of the product,
7  and that is my understanding that that is what
8  happened here.
9 BY MR. GOLDBERG:
10  Q     And the products the FDA is referring
11 to in that sentence are the at-issue valsartan
12 products, right?
13      MR. HONIK: Object to form.
14      THE WITNESS: So, actually this -- the
15  statement I just read, but on 7-24-2018, FDA
16  publishes a list of valsartan-containing
17  products not part of the recall. So it's
18  actually talking about products that were not
19  contaminated, adulterated or misbranded.
20 BY MR. GOLDBERG:
21  Q     Why don't we go back to the statement
22 we were talking about, which was July 18th, 2018?
23 And that sentence appears --
24  A     You told me -- you told me to put that
25 away. I mean, just the one document, right?

44 (Pages 170 - 173)

RESTRICTED CONFIDENTIAL

Page 174

1    So like I said, to begin, when we
2 started this long line of questioning, there were
3 many, many communications the FDA had with American
4 consumers and physicians and pharmacists about
5 valsartan.
6    And so there are many products that
7 are available to treat high blood pressure and
8 hypertension in the U.S. market. We're very
9 fortunate. And the FDA was telling consumers that
10 they should talk to their doctor and talk to their
11 pharmacist about their treatment in the use of both
12 valsartan products, but also many other products
13 that could control their condition as well.
14    Q    The directive about the valsartan
15 recall, by the FDA on July 18, 2018, to consumers
16 about the valsartan recall, where the FDA says,
17 "Continue taking your current medicine until your
18 doctor or pharmacist gives you a replacement or a
19 different treatment option," the FDA is saying if
20 you are taking the at-issue valsartan products, you
21 should continue taking those until you talk to your
22 doctor, right?
23    MR. HONIK: Objection to form, asked
24 and answered, beyond the scope.
25    You may answer.

Page 175

1    THE WITNESS: Thank you.
2    So, again, just going back to your
3 specifically directed text, the FDA states,
4 "Valsartan is used to treat high blood pressure
5 and heart failure. Not all products containing
6 valsartan" -- "valsartan are recalled, and this
7 update will clarify which valsartan-containing
8 products are being recalled."
9    It then goes on to say there are three
10 current voluntary recalls, which involve Teva
11 products, Prinston products and some other.
12 And then they go on to say you should continue
13 taking your current medication until you talk
14 to your doctor about the treatment of your
15 condition, where your doctor can give you a
16 replacement or a different treatment option.
17    And then they go on to say, as you
18 highlighted, "Not all valsartan-containing
19 medications are affected and being recalled."
20 BY MR. GOLDBERG:
21    Q    And the current medicine that they're
22 referring to when they're saying "current medicine,"
23 could have been the at-issue valsartan products that
24 somebody had in a bottle of pills at their house,
25 right? And that the FDA is saying continue taking

Page 176

1 that until you speak with your doctor. Okay?
2    MR. HONIK: Object to form, beyond the
3 scope, asked and answered.
4    You may answer.
5    THE WITNESS: Thank you.
6    So, again, there are many valsartan
7 products, and there are valsartan products that
8 don't contain contamination or adulteration.
9 In fact, FDA says that in this specific wording
10 on July 18, 2018.
11    What it's communicating is, to
12 American consumers and their physicians and
13 pharmacists, is that, for those of you taking
14 valsartan products, go talk to your doctor
15 about continuing taking those products or
16 switching.
17 BY MR. GOLDBERG:
18    Q    Yeah. Okay. And so if those products
19 are some of the products that are at-issue now, you
20 don't deny that the FDA was saying keep taking them?
21    MR. HONIK: Object to the form, asked
22 and answered.
23    THE WITNESS: You mean the
24 non-recalled products?
25

Page 177

1 BY MR. GOLDBERG:
2    Q    No. I mean products that were
3 recalled. But remember, somebody -- okay. On
4 July 2018 -- on July 2018, if somebody had a bottle
5 of valsartan that is part of the at-issue valsartan
6 products that you're talking about, right? They're
7 sitting at home. They've got their bottle of
8 valsartan. It has NDMA in it. Okay? Just assume.
9 Okay? Accept my assumption. It's hypothetical.
10 Okay?
11    Somebody on July 2018, on
12 July 28, 2018, has a bottle of valsartan, that is
13 one of the at-issue products because it has NDMA in
14 it, you would agree that the FDA is instructing that
15 patient to continue to take that drug until they
16 talk to their doctor, right?
17    MR. HONIK: Object to form, object to
18 the hypothetical based upon facts not of
19 evidence, asked and answered.
20    THE WITNESS: So, again, there are
21 many communications the FDA had with American
22 consumers, physicians and pharmacists about
23 these products. In -- in this specific
24 communication, the FDA reminds consumers,
25 pharmacists and physicians, that there are

45 (Pages 174 - 177)

RESTRICTED CONFIDENTIAL

Page 178

1    valsartan products that are being recalled, and
2    there are valsartan products that are not part
3    of the recall. And it recommends to consumers
4    that they -- they continue taking their
5    product -- these products, and go talk to their
6    doctor about it.
7    BY MR. GOLDBERG:
8       Q    And that includes both valsartan that
9    is being recalled and valsartan that may not be
10   recalled, right?
11          MR. HONIK: Object to the form, asked
12   and answered.
13          THE WITNESS: Yes.
14   BY MR. GOLDBERG:
15      Q    Awesome.
16          And did you consider this FDA
17   statement in forming your opinion?
18      A    Again, I -- in my report, I assume
19   that there is a demand curve for -- for these
20   prescription drugs, including the at-issue products.
21      Q    Yes or no, did you consider this
22   specific statement in forming your opinion?
23          MR. HONIK: Objection, asked and
24   answered.
25          THE WITNESS: Sir, I'm sorry. A

Page 179

1    demand curve, by definition, includes that
2    consumers may -- pharmacists and physicians may
3    want to continue using these at-issue products.
4    The issue --
5    BY MR. GOLDBERG:
6       Q    Is the answer to my question, yes?
7          MR. HONIK: You're interrupting her.
8    You're interrupting the witness.
9    BY MR. GOLDBERG:
10      Q    Is the answer to my question yes?
11          MR. HONIK: Objection, asked and
12   answered. She's answered that question a dozen
13   times already.
14   BY MR. GOLDBERG:
15      Q    Did you consider this statement by the
16   FDA in forming your opinion?
17          MR. HONIK: Objection, asked and
18   answered.
19          THE WITNESS: Thank you.
20          Again, my opinion is that there was a
21   demand curve for valsartan products that
22   included the ones that were -- that are
23   at-issue, that are contaminated or adulterated
24   and misbranded, and others as well that were
25   not.

Page 180

1          All this statement is saying is
2    legitimating my presumption, which is there is
3    a demand curve. And the FDA goes on, in later
4    statements, to American consumers, saying there
5    is a demand curve. All that's supporting my
6    position.
7          MR. GOLDBERG: Why don't we take a
8    two-minute break, if we can. Okay?
9          THE VIDEOGRAPHER: The time is 3:37.
10   This ends Media Unit 3. We're going off the
11   record.
12          (Whereupon, a short break was taken.)
13          THE VIDEOGRAPHER: The time is 4:02.
14   This begins Media Unit Number 4. We're back on
15   the record.
16   BY MR. GOLDBERG:
17      Q    Dr. Conti, have you received any other
18   text messages from plaintiffs' counsel today during
19   the deposition?
20          MR. HONIK: Without waiver of the
21   privilege it attaches to work product, I'll
22   permit her to answer.
23          THE WITNESS: No.
24   BY MR. GOLDBERG:
25      Q    And have any other documents been sent

Page 181

1    to you by email during the day from plaintiffs'
2    counsel?
3          MR. HONIK: Same objection.
4          You may answer.
5          THE WITNESS: I'm a little afraid of
6    my email, but I haven't checked. So I don't
7    know.
8    BY MR. GOLDBERG:
9       Q    Okay. You've -- you've talked about
10   legitimate supply curve, and is -- is it your
11   testimony that no -- that there is no price that
12   could be paid where there's no legitimate supply?
13          MR. HONIK: Object to the form.
14          THE WITNESS: I don't understand your
15   question, sir. I'm sorry.
16   BY MR. GOLDBERG:
17      Q    Well, if -- thinking about your
18   Figure 2 where there's no supply curve --
19      A    Wait a minute. Wait a minute. Hold
20   on. Just let me get my report, so I can reference
21   what you're referring to.
22      Q    So Figure 2 of your -- in your report
23   shows "Demand with no Legitimatized Supply."
24   That's -- that's how you've titled this figure,
25   right?

46 (Pages 178 - 181)

RESTRICTED CONFIDENTIAL

Page 182

1  A    That's accurate.
2  Q    Is there -- is it -- is it your
3  testimony that there's -- that no price could be
4  paid under a scenario where there's, to use your
5  term, "no legitimate" -- "no legitimate supply"?
6  A    To be honest, it's a matter of
7  economic theory.  In order for there to be a price,
8  there needs to be both demand and supply.  What
9  we've been talking about for the past, at least,
10  hour, seems like more, is that in my model there is
11  demand for these products, although demand falls off
12  quite dramatically for these products when the
13  recalls start.
14       But I have been asked to assume that
15  the products at issue were adulterated and
16  misbranded.  Adulterated and misbranded products are
17  not allowed in the U.S. supply chain, and therefore,
18  there is no supply.  And therefore, there is no
19  meeting of demand and supply to arrive at a price.
20  Q    So there is -- is it your testimony
21  that there is no price that would -- could be paid
22  for a product where there is no legitimate supply?
23       MR. HONIK:  Object to the form, asked
24  and answered.
25       THE WITNESS:  As a matter of economic

Page 183

1  theory, price cannot be arrived at without
2  there being both demand and supply.  I have
3  been asked to assume there is -- these products
4  were adulterated and misbranded, and therefore,
5  there is no supply that is legitimate for these
6  products as -- as a matter of U.S. policy.  And
7  therefore, there can be no price.
8  BY MR. GOLDBERG:
9  Q    Is -- is -- in your opinion, is price
10  the same as value?
11  A    So according to the FDA alone, there
12  is both an economic price and a therapeutic -- well,
13  an economic value and a therapeutic value.  We've
14  also talked about this quite a lot today.
15       There might be therapeutic value, in
16  other words, that is encapsulated in the demand
17  curve.  People -- people trade off the benefits and
18  costs of products.  But there is no supply of
19  illegitimate, adulterated and misbranded products in
20  my -- in my model.  And therefore, there is no
21  price.
22  BY MR. GOLDBERG:
23  Q    You said, "According to the FDA alone,
24  there is both an economic price and a therapeutic
25  value."

Page 184

1  A    I meant economic value.  And I
2  corrected myself and said that there's a -- there's
3  an economic value, and then there's a therapeutic
4  value.
5  Q    What -- is there something in
6  particular that you're thinking about where the FDA
7  has said there is an economic value to a drug?
8       MR. HONIK:  Objection to the form.
9       THE WITNESS:  Sure.  I put it in my --
10  in my report.  Let me get to the right
11  paragraph, and I'll direct you to it.
12       Paragraph 26 of my report, "The FDA
13  explains the rationale for its central focus on
14  protecting consumers from adulterated and
15  misbranded drugs on the web page as follows:
16  At the turn of the 20th century, there were no
17  federal regulations to protect the public from
18  dangerous drugs.  'It was a menacing" --
19  "'menacing marketplace filled with products,
20  such as William Radam's Microbe Killer and
21  Benjamin Bye's'" --
22       COURT REPORTER:  I'm sorry, Doctor.  I
23  just -- I lost you there a little bit.
24       Marketplace filled with products such
25  as William...

Page 185

1       THE WITNESS:  Sure.  I'm sorry.
2       "'It was a menacing market'" -- so,
3  "'It was a menacing marketplace filled with
4  products such as William Radam's Microbe Killer
5  and Benjamin Bye's Soothing Balmy Oils to cure
6  cancer,' said John Swann, Ph.D., a historian at
7  the Food and Drug Administration.  Products
8  like these were, at minimum, remedies that
9  picked the pocket of the user."  That's what I
10  mean by "economic value."
11       "But they could also be downright
12  harmful."  That's what I mean by
13  "therapeutically harmful."
14       "I emphasize the text" -- "the text in
15  italics because the FDA's statement underscores
16  the harms from adulterated and misbranded
17  products as twofold:  First, economic losses
18  from purchasing products that are adulterated
19  and misbranded and second, the possibility of
20  clinical harm from consumption of adulterated
21  and misbranded products."
22       From my perspective, there are two
23  types of value, and therefore, two types of
24  usefulness or worthlessness.  There is the
25  economic value, and then there is a therapeutic

47 (Pages 182 - 185)

RESTRICTED CONFIDENTIAL

Page 186

1    value. The economic value, products such as
2    these -- and products that are adulterated and
3    misbranded should never have entered into the
4    U.S. class of trades. That is the position of
5    the U.S. government, that we do not allow
6    products such as these onto the U.S. market.
7    BY MR. GOLDBERG:
8        Q    I -- I thought you said that it was
9    the FDA's view that -- that there was no -- that
10   this term "economic value," you had said, "the FDA
11   alone." And then in your last answer, you referred
12   to you having two views of value, economic value and
13   therapeutic value.
14           Are you basing -- are you basing your
15   view of economic value on what the FDA says?
16           MR. HONIK: Object to the form. You
17   may answer.
18           THE WITNESS: My view is both a matter
19   of economic theory; there is demand that does
20   not meet supply, and therefore there is no
21   price. But also, it is predicated, as my
22   understanding of FDA regulation, and also,
23   frankly, regulation that the pharmaceutical
24   industry itself has -- has wanted, which is
25   that there is only the legitimate supply of

Page 187

1    products that are not adulterated and
2    misbranded into the U.S. market, those that are
3    valuable.
4    BY MR. GOLDBERG:
5        Q    Let's talk about the first part --
6        A    Wait. Wait. Wait. Wait. Wait.
7    Hold on. Let me just -- let me just finish.
8            So it is the -- it is the position of
9    the pharmaceutical industry in the United States
10   since at least the '60s, that they have wanted them
11   to be very clear guidance about what is a legitimate
12   product, that meets the evidentiary standards, and
13   what is a not legitimate product that does not.
14           It is their position that they do not
15   want products on the market that are misbranded,
16   adulterated or otherwise contaminated.
17       Q    Are you finished?
18       A    I am. Thank you for asking.
19       Q    So the first part of that question,
20   you said -- or answer, you said, "My view is more
21   the matter of economic theory. There is demand that
22   does not meet supply, and therefore, there is no
23   price." And then you went on to talk about the
24   FDA's view?
25       A    Yes.

Page 188

1        Q    Just in terms of the FDA --
2        A    And -- wait, and -- just so that
3    you're not mischaracterizing me.
4            It's also the pharmaceutical
5    industry's view that they want to be known as
6    producing and entering products into the U.S. and
7    selling products into the U.S. that are legitimate,
8    that do meet the evidentiary standard as
9    distinguished from products that do not.
10       Q    Just as you don't want me to interrupt
11   you, I'd appreciate it if you don't interrupt me.
12       A    I was just trying to clarify your
13   mischaracterization of my position.
14       Q    In your answer, going back, you refer
15   to the economic theory of supply and demand. What
16   economic treatises have you been relying on for the
17   theory that where there's no legitimate supply,
18   there -- there's no possibility for a delivery of
19   price?
20       A    That's Economics 101.
21           MR. HONIK: Objection, asked and
22   answered.
23           THE WITNESS: It's Economics 101.
24           MR. HONIK: I think you got your
25   answer, Seth.

Page 189

1            THE WITNESS: Thank you.
2            It is Economics 101. Literally, my
3    high school student was just taught that price
4    is a function of supply and demand. So that
5    is -- that is a familiar concept to anyone who
6    has taken elementary economics.
7    BY MR. GOLDBERG:
8        Q    What economic theory are you relying
9    on for the point that where there is a cGMP
10   violation in a drug, there is no legitimate supply?
11   Which economic theory are you relying on?
12           MR. HONIK: Objection,
13   mischaracterizes her previous response.
14           THE WITNESS: Okay. Again,
15   Economics 101. There can be a demand curve for
16   products that have no supply, legitimate
17   supply. If there is no legitimate supply,
18   there is no economic price. That -- that is
19   just -- that is just elementary economics.
20   BY MR. GOLDBERG:
21       Q    I'm asking you, what is the economic
22   theory for an adulterated drug equals no legitimate
23   supply? What's the economic theory for that?
24       A    Sure.
25           So this is the most highly -- one of

48 (Pages 186 - 189)

RESTRICTED CONFIDENTIAL

Page 190

1 the most highly regulated consumer products in
2 the -- in the U.S. marketplace. And it is the U.S.
3 regulator's perspective that products that do not
4 meet the evidentiary standard of cGMP are not
5 considered prescription drugs.
6           And I can point you to the orange book
7 where the FDA makes that statement. In other words,
8 in order for a prescription drug to be sold in the
9 U.S., to enter into the commercial class of trade
10 and be sold in a pharmacy, it must be produced in
11 accordance with the cGMP at minimum and attested to
12 by the manufacturer, and in addition, meet other
13 evidentiary standards for safety and efficacy.
14           That is the position of the U.S.
15 government.
16    Q    Would you agree that patients who
17 would not have taken the at-issue valsartan would
18 have -- because it was not supplied, in your view of
19 the world, would not -- would have needed to take
20 another medication to treat their hypertension?
21           MR. HONIK: Objection, beyond the
22 scope.
23           THE WITNESS: So are you saying
24 that -- because I think I'm -- I think what
25 you're asking is, would there be demand for

Page 191

1    treatment of hypertension and high blood
2    pressure regardless of whether these products
3    were on the market? Is that what you're
4    asking?
5 BY MR. GOLDBERG:
6    Q    Sure.
7    A    Okay. Consumers in America who suffer
8 from high blood pressure or hypertension or other
9 related conditions certainly seek treatment. They
10 demand treatment for those conditions.
11           My understanding, and as I understand
12 it, your own experts have suggested that there were
13 many treatments available for those conditions,
14 including uncontaminated, unadulterated valsartan
15 manufactured by Novartis, among others. And
16 other -- many other products and non-pharmaceutical
17 products --
18           THE COURT REPORTER: I'm sorry,
19    Doctor, can you repeat the end of that?
20           THE WITNESS: Sure.
21           Where -- so my understanding is that
22    there are many products that are
23    pharmaceutical, in addition to other
24    non-pharmaceutical products, that can treat the
25    underlying conditions to either mitigate the

Page 192

1    hyper -- high blood pressure or hypertension or
2    prevent sequella.
3           THE COURT REPORTER: Thank you.
4 BY MR. GOLDBERG:
5    Q    Would there have been a cost
6 associated with having to take one of those
7 alternative medications or treatments?
8           MR. HONIK: Object to the form, beyond
9    the scope.
10           THE WITNESS: It depends.
11 BY MR. GOLDBERG:
12    Q    If someone had to take a different
13 ARB, they might have had to pay for that ARB, right?
14           MR. HONIK: Object to the form.
15           THE WITNESS: They may have. They may
16    have decided to manage their -- their treatment
17    in many other ways. Physicians can choose to
18    do many things. We know that demand for
19    valsartan products that were recalled dropped
20    precipitously, and so those consumers went
21    elsewhere. Where they went, there are many,
22    many options available to them and their
23    physicians.
24 BY MR. GOLDBERG:
25    Q    Is it -- your analysis doesn't take

Page 193

1 into account the cost that a consumer might have had
2 to pay for a different medication?
3           MR. HONIK: Object to the form.
4           THE WITNESS: Or do you mean or other
5    management techniques? Because there are many
6    management techniques.
7 BY MR. GOLDBERG:
8    Q    Sure.
9    A    Some which would have cost less.
10    Q    Your -- your analysis doesn't take
11 into account any other -- any -- the cost of any
12 alternative treatment of medication, right?
13           MR. HONIK: Object to the form.
14           THE WITNESS: That is outside the
15    scope of my report, sir.
16 BY MR. GOLDBERG:
17    Q    Is it possible that if it
18 weren't -- if they hadn't taken the at-issue
19 valsartan products, consumers might have paid more
20 for a hypertension medication?
21           MR. HONIK: Object to the form.
22           THE WITNESS: I've learned in this
23    world anything is possible. I mean, there are
24    many, many ways of controlling high blood
25    pressure and -- and other related conditions

49 (Pages 190 - 193)

RESTRICTED CONFIDENTIAL

Page 194

1    that people may have taken valsartan for during
2    this time period. I have no opinion whether or
3    not those other therapeutic alternatives,
4    including doing nothing, were lostless or
5    costly.
6    BY MR. GOLDBERG:
7        Q    Why is the cost of an alternative
8    medication not pertinent to your analysis?
9            MR. HONIK: Object to the form, asked
10    and answered.
11           THE WITNESS: Because my damages
12    calculation is focused on the injury that
13    occurred to consumers and to end-party payors
14    for contaminated, adulterated and misbranded
15    valsartan products that were recalled during
16    the time period. Whether or not people went
17    elsewhere, the downstream economic costs to
18    that -- to that contamination are of no moment
19    in my economic calculation.
20           And maybe the way that I like to think
21    of it is this way, which is I was asked to
22    calculate damages associated with this injury,
23    the defendants selling adulterated, misbranded
24    products into the U.S. marketplace that
25    consumers --

Page 195

1            THE COURT REPORTER: That consumers...
2            THE WITNESS: And end-payors or
3    insurers didn't know about.
4            Injury occurs -- in other words, if
5    you get hit by a car, injury occurs at the time
6    of the car, being hit. If people go elsewhere
7    after they hit their -- after their car was
8    hit, maybe they buy a new car or it's more
9    costly, maybe they go without a car all
10    together, that's -- that's not related to my
11    calculation. It's of no moment. The
12    economic --
13    BY MR. GOLDBERG:
14       Q    You --
15       A    Hold on. The economic loss occurs at
16    the time of injury.
17       Q    You said that this drug should not
18    have been sold to those consumers, right?
19       A    That's not what I said, sir.
20       Q    So the drug could have been sold to
21    consumers?
22           MR. HONIK: Object to form.
23           THE WITNESS: That's not what I said
24    either, sir.
25

Page 196

1    BY MR. GOLDBERG:
2        Q    Okay. You said the drug shouldn't be
3    sold, and that it was an illegitimate supply, right?
4            MR. HONIK: Object to form.
5            THE WITNESS: They are not the same
6    thing, sir.
7    BY MR. GOLDBERG:
8        Q    Okay. If consumers would have paid
9    more for a different drug because
10    valsartan -- because the at-issue valsartan were not
11    sold, doesn't -- wouldn't that have mattered to your
12    analysis?
13           MR. HONIK: Object to the form, asked
14    and answered, improper hypothetical, facts not
15    in evidence.
16           You can answer.
17           THE WITNESS: Thank you.
18           You have asked this question four
19    times, and I have already answered it. But I'm
20    happy to answer it again.
21           Again, injury occurs at the time of
22    the accident, at the time of -- at the time of
23    the accident. Whether consumers would have
24    gone on to buy something else after the injury
25    occurred is of no moment. There was an

Page 197

1    economic loss. People bought things that
2    shouldn't -- they -- that under the assumptions
3    that were given to me, Counsel, should not have
4    entered into the legitimate class of trade.
5    BY MR. GOLDBERG:
6        Q    Okay. So I just asked you, your
7    testimony is that these drugs should not have
8    entered into the class of trade, right?
9        A    No. What I was asked --
10       Q    And my question is --
11       A    No. What I was asked to assume is
12    that these products were adulterated and misbranded.
13    If a product is adulterated and misbranded,
14    according to U.S. regulation and pharmaceutical
15    manufacturers, they are not allowed to enter into
16    the U.S. class of trade. And therefore, there was
17    no supply.
18       Q    Okay.
19       A    Injury occurs because these
20    products -- these contaminated products entered into
21    the U.S. class of trade and people bought them. And
22    insurers purchased -- insurers paid for them. The
23    economic loss arising, therefore, from the purchase
24    of products that, under this theory of damages,
25    should not have occurred.

50 (Pages 194 - 197)

RESTRICTED CONFIDENTIAL

Page 198

1    What people would have done after the
2 injury, they switched products to another
3 prescription drug, they managed their hypertension
4 by diet and exercise, they underwent stent therapy,
5 all of those other things are of no moment to my
6 assessment of economic loss.
7 BY MR. GOLDBERG:
8    Q    I'm not talking about after the injury
9 at this point. I'm talking about instead of the
10 injury. Instead of buying the at-issue valsartan
11 because it was not on the market and a consumer
12 bought a different ARB or a different drug and paid
13 more for that, that doesn't matter to your -- would
14 have paid more for that, that doesn't matter to your
15 analysis?
16    MR. HONIK: Objection, asked and
17 answered, improper hypothetical.
18    THE WITNESS: So -- I mean, really the
19 alternative here is not -- is that the
20 manufacturers actually sold unadulterated,
21 properly branded product, not that consumers
22 were forced to go elsewhere, in my economic
23 analysis.
24 BY MR. GOLDBERG:
25    Q    In an economic analysis where a

Page 199

1 consumer would have taken a different drug instead
2 of the at-issue valsartan, and they would have paid
3 the same or more for that different drug, did the
4 consumer have an economic injury?
5    MR. HONIK: Objection, asked and
6 answered, improper hypothetical.
7    THE WITNESS: From my perspective, if
8 the consumer did not buy adulterated or -- and
9 misbranded, illegitimate valsartan products,
10 they are not injured.
11    So all of those people between 2012
12 and 2018 that took Novartis-brand valsartan
13 that was not recalled or contaminated, they are
14 out of my class. They are out of the -- my
15 calculation of damages.
16    All of those people between 2012 and
17 2018 that used other therapeutic modalities to
18 treat their hypertension are of no moment to
19 me, in my economic analysis.
20    My economic analysis is only focused
21 on the people who purchased adulterated and
22 misbranded valsartan products that were
23 ultimately recalled.
24 BY MR. GOLDBERG:
25    Q    And if they didn't make that purchase,

Page 200

1 they would have had to purchase some other drug,
2 right?
3    MR. HONIK: Object to the form. It's
4 been asked and answered, I don't know, 15 times
5 already.
6    THE WITNESS: There are many, many
7 treatments for hypertension and high blood
8 pressure out there. Some of them are
9 pharmaceutical. Some of them are other things.
10 It's immaterial to my perspective. I am simply
11 focused on the people who actually bought or
12 insured the contaminated, misbranded and
13 adulterated products at-issue in this matter.
14 BY MR. GOLDBERG:
15    Q    Do you know the difference between
16 compensatory damages and punitive damages?
17    MR. HONIK: Object to the form,
18 outside the scope, calls for an expert legal
19 opinion.
20    THE WITNESS: No. I'm not a lawyer.
21 Maybe in my future life.
22 BY MR. GOLDBERG:
23    Q    In your view, the damages you
24 calculated, are you -- are you calculating damages
25 to compensate consumers or their loss or deter

Page 201

1 manufacturers from making drugs that have
2 adulterations or misbranding?
3    MR. HONIK: Same objection to the
4 extent it calls for a legal conclusion.
5    You may answer.
6    THE WITNESS: I'm sorry. I -- I
7 didn't quite follow. Can you slow down and ask
8 not a compound question, but in parts?
9 BY MR. GOLDBERG:
10    Q    Turn to Paragraph 45 of your report.
11    A    So we're moving on? You're not going
12 to ask that question?
13    Q    I'm moving on.
14    A    Oh, okay.
15    Q    Do you have Paragraph 45 up?
16    A    Uh-huh.
17    Q    In Paragraph 45, you write, "Assigning
18 a non-zero value to non-safety and quality compliant
19 products is perverse. To do so would be to
20 incentivize and legitimize cheating and
21 noncompliance by manufacturers and other members of
22 the United States pharmaceutical supply chain."
23    Did I read that correctly?
24    A    That's what it says.
25    Q    Is it your opinion that -- that the

51 (Pages 198 - 201)

RESTRICTED CONFIDENTIAL

Page 202

1  damages you calculated are intended to
2  disincentivize manufacturers from cheating and
3  noncompliance?
4      MR. HONIK:  Object to the form.
5  BY MR. GOLDBERG:
6      Q    Well, let me put it another way.
7          Are you -- are you suggesting that
8  manufacturers should be deterred from cheating and
9  noncompliance?
10     A    It is the U.S. government's position,
11  evolving over time, and also pharmaceutical
12  manufacturers' position, that the illegitimate,
13  misbranded, adulterated, contaminated, criminal
14  class of trade of prescription drugs should be
15  minimized at, if at all, at all possibilities.
16         There's 100 years of focus on reducing
17  products that pick the pocket of consumers, don't do
18  what they say or could even cause harm.  To allow
19  those products onto the market to legitimate this
20  type of cheating, goes against U.S. policy and,
21  frankly, the pharmaceutical industry's position, for
22  the better part of many decades.
23  BY MR. GOLDBERG:
24     Q    So in calculating the damages the way
25  you have, are you taking into account the need to

Page 203

1  deter manufacturers from wrongdoing, as you put it?
2      MR. HONIK:  Object to the form, calls
3  for a legal conclusion, beyond the scope of her
4  report.
5      THE WITNESS:  I'm sorry.  I don't
6  quite understand your question.  Can you please
7  repeat it?
8  BY MR. GOLDBERG:
9      Q    In calculating -- in calculating the
10  damages that you've calculated, are you trying to
11  also account for some punishment, if you will, of
12  manufacturers -- of the defendants for manufacturing
13  drugs that had an impurity in it?
14     MR. HONIK:  Same objection.  She's not
15  a lawyer, beyond the scope.
16     THE WITNESS:  I'm sorry.  I don't -- I
17  don't quite understand what you mean.  Am I
18  trying to punish the manufacturers?  Is that
19  what you're asking?
20  BY MR. GOLDBERG:
21     Q    Yes.
22     MR. HONIK:  Same objection.
23     THE WITNESS:  Again, that's no moment
24  to my -- that has no moment in my opinions in
25  this matter.  I was asked to calculate economic

Page 204

1  damages associated with misconduct.
2  BY MR. GOLDBERG:
3      Q    Right.  So --
4      A    Myself -- I mean, from, again, an
5  economic perspective, these products are worthless.
6  The court has agreed.  Consumers and third-party
7  payors suffered an economic harm.  And my analysis
8  calculates that economic harm, which is the full
9  price of the product that they paid at the pharmacy
10  counter.
11     Q    Why do you -- why is it necessary for
12  you to -- to say that a nonzero value is perverse
13  and would incentivize to you?  What -- what does
14  that have to do with your economic calculation?
15     A    It goes -- because it goes -- because
16  assigning a nonzero value goes against U.S. policy
17  and the pharmaceutical companies' own position on
18  the matter of illegitimate products for the better
19  part of 50 -- and if you count from 1906, the better
20  part of more than 100 years of U.S. policy.  But,
21  again, products that are illegitimate, that do not
22  meet cGMP, that would not be allowed to come into
23  the U.S. market, they have no economic value.  And
24  the court agrees with me.
25     THE COURT REPORTER:  And the -- I'm

Page 205

1  sorry.
2      THE WITNESS:  And the court agrees
3  with me on that point.
4      COURT REPORTER:  Thank you.
5      THE WITNESS:  Thank you.
6  BY MR. GOLDBERG:
7      Q    I just want to confirm, you have not
8  made any attempt to consider whether a consumer
9  would have paid a different co-payment for a
10  different drug but for their purchase of valsartan?
11     MR. HONIK:  Object to the form.
12     THE WITNESS:  I already answered this
13  question, sir.
14         But, again, all I considered in my
15  analysis is what consumers actually paid for
16  these at-issue products.
17  BY MR. GOLDBERG:
18     Q    And the same is true for TPPs?  All
19  you considered for end-payors or third-party payors
20  is what they actually paid for the product?
21     THE COURT REPORTER:  Is what they
22  actually...
23     MR. GOLDBERG:  Paid for the product.
24     THE WITNESS:  Correct.
25

52 (Pages 202 - 205)

RESTRICTED CONFIDENTIAL

Page 206

1 BY MR. GOLDBERG:
2    Q   Just moving on into another area of
3 your report --
4    THE WITNESS: Excuse me. If we're
5   moving on, before there's a question pending,
6   do you mind if we take a break, please?
7    MR. GOLDBERG: No, that's fine.
8    THE VIDEOGRAPHER: The time is 4:41.
9   We're going off the record.
10    (Whereupon, a short break was taken.)
11    THE VIDEOGRAPHER: The time is 4:52.
12   This begins Media Unit Number 5. We're back on
13   the record.
14 BY MR. GOLDBERG:
15    Q   Dr. Conti, can you turn in your report
16 to Paragraph 58?
17    A   I'm there.
18    Q   At the beginning of this paragraph,
19 you say, "Plaintiffs' counsel have asked me to
20 calculate damages for four different theories of
21 liability against the manufacturer defendants and
22 two different theories of liability and one theory
23 of unjust enrichment against the defendant
24 retailers."
25    Do you see that?

Page 207

1    A   Yes.
2    Q   The unjust enrichment damages that you
3 calculated, did you apply the same measure of
4 damages to all of the different theories of
5 liability?
6    A   They differ by the states included in
7 the calculations.
8    Q   To your knowledge, is that the only
9 difference that -- as between these different
10 theories of liability?
11    A   Generally, yes. And then -- I mean,
12 in terms of the defendants, the terms of the
13 retailers, there's both data and --
14    THE COURT REPORTER: And what? And
15   what, Doctor?
16    THE WITNESS: And states that are
17   different from the retailers.
18 BY MR. GOLDBERG:
19    Q   In terms of the measure of damages for
20 all of the liability, leaving aside unjust
21 enrichment, the measure of damages for all of them
22 is the same, which is a full refund of the price
23 paid at the point of sale?
24    MR. HONIK: Object to the form.
25    THE WITNESS: Correct. Yeah, correct.

Page 208

1 Again, the retailers are different. But --
2    THE COURT REPORTER: But from the
3   defendants...
4    MR. HONIK: I think she said the
5   retailers are different.
6    THE WITNESS: Right. For the
7   defendants, the measure of economic liability
8   is the same. It's the price that was paid.
9   And for the retailers, it's different.
10    THE COURT REPORTER: Thank you.
11 BY MR. GOLDBERG:
12    Q   And leaving aside unjust enrichment,
13 in what way is -- is it different for the retailers?
14    A   Let's go down and talk about it.
15   So the -- the retailers sold the
16 product to consumers, and they obtained their own
17 benefit from selling these products. So it's the
18 economic loss or economic gain associated with the
19 retailers' sale that's different than the
20 defendants' sale.
21    Q   Okay. I'm not going to get into the
22 economic damages for the retailers, at this point.
23 I'm -- I'm going to leave that for somebody else.
24   You have that -- you made that
25 statement. I just wanted to clarify that one point.

Page 209

1    In terms of the -- the manufacturer
2 damages, you -- you relied -- you're relying on data
3 from IQVIA? Am I correct?
4    A   Right. I'm relying on national sales
5 by product, manufacturer, month, state and payment
6 types of who the payor is. And I'm also relying on
7 national data related to the co-payment amounts, or
8 co-insurance amounts, that consumers paid. Again,
9 by product, payor, state, month, year.
10    Q   And how did you get the data that you
11 relied upon?
12    A   I instructed my staff to purchase the
13 data on my behalf.
14    THE COURT REPORTER: To purchase?
15    THE WITNESS: To purchase, yes.
16 BY MR. GOLDBERG:
17    Q   Did you provide a specific instruction
18 as to what -- what parameters you were looking for
19 for them to purchase?
20    A   I think I just made that clear in my
21 previous answer, sir.
22    I -- I look at IQVIA data every day in
23 my research, and they are known as the gold standard
24 for pharmaceutical sales of legitimate prescription
25 drugs in the U.S. consumer market.

53 (Pages 206 - 209)

RESTRICTED CONFIDENTIAL

Page 210

1    Q    Do you know whether there are any
2    limitations to the IQVIA data you relied upon or
3    purchased?
4    A    Oh, goodness, Mr. Goldberg, there are
5    always limitations, but they are the gold standard.
6    They are used by the pharmaceutical industry
7    themselves for assessing sales of products both in
8    their own market but also in competitor markets.
9    And, you know, I am not aware of a product that is
10   better.
11   Q    Do you know that there are some
12   sources of data that IQVIA is not able to obtain and
13   makes projections in place of the data that they
14   can't obtain?
15   A    So the Xponent data that I used is
16   comprised of approximately 92 percent of total
17   prescription sales for legitimate consumer
18   product -- legitimate pharmaceutical products in the
19   U.S. class of trade.  There are some holes in their
20   audit, but with prescription manufacturers and
21   pharmacies.  But those are not holes that are
22   particularly relevant to these specific products.
23       What I mean by that is that we know
24   that Xponent data does not have -- does not have
25   good purview into drugs that are sold to some

Page 211

1    hospitals in the U.S. and some specialty pharmacies.
2        But those are not -- these are
3    not -- these products at-issue here are not really
4    those drugs.  It's largely drugs that are -- that
5    are used in the inpatient setting to treat very,
6    very sick people in the ICU and -- and otherwise.
7        The retail class of trade from regular
8    pharmacies like CVS and Walgreens are the -- are the
9    products that are at-issue here and that -- in that
10   class of trade.
11       THE COURT REPORTER:  That class of --
12   that class of trade...
13       THE WITNESS:  That is at-issue in this
14   math certificate.
15       Xponent also doesn't capture all
16   co-insurance and co-payment amounts.  It
17   captures approximately 80 percent that are
18   purchased, not all that are purchased or all
19   that are paid in the legitimate consumer --
20   legitimate pharmaceutical market in the U.S.
21   And my methods account for that.
22   BY MR. GOLDBERG:
23   Q    How do your methods account for that?
24   How do you explain that?
25   A    So I explain the limitations of this

Page 212

1    data in -- in my report.  I've also written -- I've
2    used Xponent data for my own research in many, many
3    different contexts.  And so those limitations for
4    this type of data are very well known.  They're well
5    characterized, and I cite those in my report, the
6    fact that Xponent doesn't contain all consumer
7    co-insurance.
8        THE COURT REPORTER:  Co-insurance...
9        THE WITNESS:  Co-payment amounts that
10   consumers pay -- paid for these products is
11   accounted for in a specific way in this
12   analysis.  Specifically, I took average
13   insurance and co-payment amounts by product,
14   month, year, manufacturer and applied that to
15   the analysis --
16       THE COURT REPORTER:  The analysis...
17       THE WITNESS:  When appropriate.
18       THE COURT REPORTER:  One more time.
19       THE WITNESS:  When appropriate.
20       COURT REPORTER:  I'm sorry.  Thank
21   you.
22       THE WITNESS:  No problem.  It's the
23   end of a day.
24   BY MR. GOLDBERG:
25   Q    From the IQVIA data, the Xponent data,

Page 213

1    you -- that data does not identify the specific
2    patients who purchased valsartan, right?
3    A    It's inclusive of all patients that
4    purchased valsartan or who prescribed and dispensed
5    valsartan by definition.
6    Q    You can't use that data to identify
7    any particular patient, right?
8    A    Correct, it is inclusive of all.
9    Q    And you can't use that data to
10   identify any particular payor for valsartan?
11   A    That is -- that is incorrect.
12   Q    I thought - I thought I just heard you
13   say that, so maybe I misheard you.
14   A    No.
15       MR. HONIK:  Wait.  Wait.  Wait for a
16   question.  Wait for a question.
17       MR. GOLDBERG:  Okay.  I did mishear
18   you.  You said prescribe and dispense.
19   BY MR. GOLDBERG:
20   Q    Does the IQVIA -- does the IQVIA data
21   permit you to determine a particular class member's
22   damages in this case?
23   A    The IQVIA data allows me to
24   disaggregate sales of products by product, and by
25   payor type.

54 (Pages 210 - 213)

RESTRICTED CONFIDENTIAL

Page 214

1    Q     So no, you couldn't get to a
2    particular class member's data in this case through
3    the IQVIA data?
4        A     I'm not sure I understand what you
5    mean by "class member." I mean, my -- my -- excuse
6    me. My understanding is that class members are, by
7    definition, defined buy payor type and also by
8    state.
9        Q     Did you look at the IQVIA data and
10   determine what a particular consumer paid for
11   valsartan in cash?
12           MR. HONIK: Objection, asked and
13       answered.
14           THE WITNESS: It is inclusive of all
15       payments made by all consumers who are
16       presumable class members, and it's inclusive of
17       all payors that are inclusive of all payor
18       class members by month, state, year and
19       product.
20   BY MR. GOLDBERG:
21       Q     Right. It doesn't get -- it doesn't
22   allow you to drill down to what a particular
23   consumer paid --
24           MR. HONIK: Do you mean without more?
25       Do you mean without more? Is that what you

Page 215

1    mean, Seth?
2            MR. GOLDBERG: The question is
3        pending. I asked her about the Xponent data.
4            MR. HONIK: The problem is you've
5        asked it six times. I think she's answered it
6        as best she can. It's aggregate data is what
7        she's saying, and if you're asking --
8            MR. GOLDBERG: Are you testifying?
9            MR. HONIK: No. I'm just -- I think
10       you're going round and round.
11           But answer it as best you can.
12           THE WITNESS: Can you restate the
13       question, please?
14   BY MR. GOLDBERG:
15       Q     The IQVIA data doesn't allow you to
16   drill down to what a particular class member paid
17   for at-issue valsartan?
18           MR. HONIK: Object to form, asked and
19       answered.
20           THE WITNESS: So, again, IQVIA's data
21       is specific to the product, month, year, payor
22       and state. And therefore -- and across all the
23       U.S. And therefore, it is -- it is -- it
24       contains in it every single potential class
25       member, whether they be a consumer or a

Page 216

1    specific payor. There are payor variables that
2    are pretty specific in the IQVIA data that
3    would allow me to characterize or identify
4    payors to a pretty specific degree.
5    BY MR. GOLDBERG:
6        Q     What -- what is that specific degree?
7        A     So I know where the payor is located,
8    what the payor's type is, and also what the payor's
9    name is for each individual product, month, year,
10   combination.
11       Q     And by "payor," you're -- when you're
12   talking about -- you're talking about third-party
13   payors? When you're talking about getting to that
14   level of specificity, you're talking about
15   third-party payors or consumers?
16       A     Third-party payors.
17       Q     When you calculated average co-pays,
18   did you exclude co-pays -- 0-dollar co-pays in your
19   averaging?
20           MR. HONIK: Object to form.
21           THE WITNESS: I did not.
22   BY MR. GOLDBERG:
23       Q     Is it the -- you just mentioned the --
24   the specificity with respect to TPPs. Is it your
25   view and understanding that all TPPs are advised in

Page 217

1    the IQVIA data?
2        A     Well, the TPPs that I used for my
3    damage calculations met certain criteria.
4        Q     What were those criteria?
5        A     They're listed in my report.
6        Q     Do you want to point to that?
7        A     Sure, give me a second. Are you with
8    me?
9        Q     Uh-huh.
10       A     Okay, great. Page 29 of my report,
11   Paragraph 75, I define end-payor class damages. And
12   in Paragraph 75, I say, "...my calculation of
13   End-Payor Class damages includes three parts.
14   First, I limit both sets of Xponent data" -- both
15   the total national sales but also co-insurance
16   co-payments, they are actually two separate
17   datasets, "to exclude cash paid claims as well as
18   claims paid by the following state and federal
19   government entities (based on plan categories or
20   plan names in the Xponent data):"
21           "CHIP," Children's Health Insurance
22   Program, "federal assistance programs, Medicare
23   Parts A and B...", Medicare Part A is for hospital
24   plans, we were just talking about that before.
25   We're not talking about that class of trade here.

55 (Pages 214 - 217)

Page 218

1  And Medicare Part B, which is the insurance that
2  covers drugs that are infused or injected or
3  otherwise given to patients in a medical office.
4        State insurance programs -- assistance
5  programs, to include ADAP.  ADAPs are state
6  assistance programs with people with HIV or other
7  infectious disease.  Tricare, a military program --
8  a military insurance program, department of Veterans
9  Affairs, another -- another military insurance
10  program, the Indian Health Service, state employee
11  plans, which include city and county plans -- sorry.
12  Not -- I didn't exclude city and county plans.  And
13  Workers Compensation plans.
14        And you can see there's a note that
15  follows that.  This occurs for 464 distinct
16  combinations of manufacturer, product, state and
17  month out of the 36,000ish -- oh, no, I'm sorry.
18  Right.  It includes the valsartan class definitions
19  and exclusions.  It's -- it's Footnote 17.
20     Q     Why -- why did you -- what do you
21  understand your reason for excluding the claims paid
22  by those state and federal government entities?  Why
23  did you want to exclude those from your
24  calculations?
25     A     That was a --

Page 219

1        THE COURT REPORTER:  That was a what?
2        THE WITNESS:  A part of the
3  instruction of counsel.
4  BY MR. GOLDBERG:
5     Q     Do you understand that you're --
6  you're excluding them to avoid including claims in
7  your calculation by payors who are excluded from the
8  GPP class definition, such as --
9        THE COURT REPORTER:  Such as -- sorry.
10  Hold on.  I didn't hear the end of the
11  question.
12        MR. HONIK:  She needs you to repeat
13  it, Seth, the last part, the last part.  Jamie,
14  read what you have.
15        MR. GOLDBERG:  Such as government
16  payors.
17        MR. HONIK:  Object to form and object
18  to the extent it calls for a legal conclusion
19  or expertise.
20        You can answer.
21        THE WITNESS:  Thank you.
22        Again, the exclusion was based on
23  instruction from counsel.
24  BY MR. GOLDBERG:
25     Q     Do you have any view as to whether

Page 220

1  government payors should be included in your damages
2  calculation?
3        MR. HONIK:  Same objection as
4  previously stated.
5        THE WITNESS:  It's by instruction of
6  counsel.
7  BY MR. GOLDBERG:
8     Q     Whatever counsel told you to
9  calculate, that's what you calculated?
10        MR. HONIK:  Objection to form.
11        THE WITNESS:  That is not what I said,
12  sir.
13  BY MR. GOLDBERG:
14     Q     Whatever counsel told you to include
15  is what you included, and what they told you to
16  exclude is what you tried to exclude.
17        MR. HONIK:  Object to form.  That is
18  not her testimony.
19        THE WITNESS:  That is not my
20  testimony, sir.
21  BY MR. GOLDBERG:
22     Q     Going down into this paragraph, you
23  say, "I did not exclude Medicare Part D plan
24  sponsors because they are private entities that
25  offer prescription drug benefits, and I did not

Page 221

1  exclude federal employee plans because they are
2  provided by private insurers."
3     A     There's other things in that sentence
4  as well that you kind of skipped over.
5     Q     Again, just focusing on the first part
6  of the sentence, Medicare -- the Medicare Part D
7  plan, part of that --
8     A     Do you mean the second part of the
9  sentence?  Do you mean the second?
10     Q     No.
11     A     I mean, I'm just trying to follow,
12  sir.
13        So the first part of the sentence,
14  which you kind of skipped over half of it, I said,
15  "I also excluded prescriptions for which the
16  consumer is not covered by insurance but uses a
17  coupon that reduces their total costs, including
18  discount cards and vouchers.  I did not exclude
19  Medicare Part D plan sponsors because they are
20  private entities that offer prescription drug
21  benefits, and I did not exclude federal employee
22  plans because they are provided by private
23  insurers."
24     Q     I want to focus on the Medicare Part D
25  plan part of that.  Okay?

56 (Pages 218 - 221)

RESTRICTED CONFIDENTIAL

Page 222

1    In that part of this paragraph, you're
2 referring to third-party payors who are private
3 insurers that have, as part of their product mix, a
4 Medicare Part D plan; am I correct?
5    A    I don't quite understand your
6 question. I'm sorry.
7    Q    Your sentence says, "I did not exclude
8 Medicare part D plan sponsors because they are
9 private entities that offer prescription drug
10 benefits."
11    My question is, you're referring to
12 third-party payors who have Medicare Part D plans,
13 private entities that have Medicare Part D plans as
14 part of their -- their offerings to consumers,
15 correct?
16    A    No.
17    MR. HONIK: Object to form.
18 BY MR. GOLDBERG:
19    Q    What are you referring to then?
20    A    So there are third-party payors, so,
21 for example, Aetna. Aetna includes sales plans that
22 are to consumers that are -- for people who are
23 employed, for people who are in the individual
24 insurance market, and also sells plans to consumers
25 who may be Medicare eligible.

Page 223

1    A Medicare Part D plan is one that is
2 sold by commercial insurers such as Aetna, United,
3 et cetera, to seniors who are required to have
4 Part D prescription drug benefits.
5    Q    Are you familiar with how
6 Medicare Part D claims are reimbursed?
7    A    I am. But how is that relevant to
8 this case, sir?
9    Q    Do you believe that the TPPs that
10 provide Medicare Part D plans bear 100 percent of
11 the cost of reimbursement for enrollees of those
12 plans?
13    MR. HONIK: Object to the form.
14    THE WITNESS: I think -- okay. So
15 what insurance -- what defines a commercial
16 insurance plan is that consumers, you and me,
17 my mother, who is Medicare eligible, pay
18 premiums to a commercial insurer, as opposed to
19 paying premiums or are otherwise insured by a
20 private -- by a public insurer.
21    Part D plans receive premiums from the
22 people who are insured by them, just like the
23 plans that are sold to non-seniors receive
24 premiums from the people who are insured by
25 them. They're exactly the same.

Page 224

1 BY MR. GOLDBERG:
2    Q    Do you know whether those Part D plan
3 sponsors that are commercial entities receive
4 funding from the federal government?
5    MR. HONIK: Object to form.
6    THE WITNESS: They do under certain
7 circumstances, but that's separate from the
8 premiums that are paid by actual seniors for
9 their insurance coverage.
10 BY MR. GOLDBERG:
11    Q    Did you factor into your calculation
12 any amounts that the federal government might have
13 paid to private commercial third-party payors that
14 offer Medicare Part D plans?
15    MR. HONIK: Object to form, asked and
16 answered.
17    THE WITNESS: Again, consumers who are
18 seniors are required to have -- to purchase
19 prescription drug benefit from these Part D
20 plans. They pay premiums. And then they have
21 an insurance schedule on how much they are
22 required to pay out-of-pocket for each and
23 every prescription drug that is dispensed to
24 them.
25    Since injury occurs at the point of

Page 225

1 sale, it is the insurance price that is paid,
2 both by the payor itself, and by the consumer
3 at the pharmacy counter, than it is at issue in
4 my damage calculation.
5    Whether or not there are side payments
6 or subsidies or anything else that those plans
7 or those consumers may face, is of no moment to
8 my economic analysis.
9    And the way I like to think about it
10 is that if I am injured in a car accident, if I
11 receive side payments from my mother, for
12 example, to pay for my car repair or pay for
13 myself to the -- receive medical treatment,
14 that has nothing to do with the economic loss I
15 suffered from having -- from being injured,
16 from being in a car accident. And therefore,
17 those side payments, even if they exist, are of
18 no moment in my analysis. Injury occurs at the
19 point of sale.
20    COURT REPORTER: I'm sorry?
21    THE WITNESS: Injury occurs at the
22 point of sale.
23 BY MR. GOLDBERG:
24    Q    So did you not factor in that
25 third-party payors who offer Medicare Part D plans

57 (Pages 222 - 225)

RESTRICTED CONFIDENTIAL

Page 226

1 receive respective subsidies from the federal
2 government to cover their beneficiaries'
3 prescription drug purchases?
4         MR. HONIK: Object to form, asked and
5 answered.
6         THE WITNESS: Again, they only do so
7 sometimes in a prospective way. Largely, those
8 payments are made retrospectively and only for
9 certain types of prescription drugs. I have
10 not seen any evidence to suggest that the
11 valsartan products at issue in this case were
12 ones that were either directly paid by the
13 federal government or were part of those
14 retrospective payments that the government
15 might have made.
16         Usually, those type of direct
17 payments, or retrospective payments, are made
18 for really expensive specialty drugs used in
19 the cancer setting, in the immunology setting,
20 with prices of $10,000 or more for treatment.
21 That's not what we're talking about in this
22 case.
23 BY MR. GOLDBERG:
24     Q     But you haven't considered any amount
25 that the federal government might have paid to any

Page 227

1 TPPs for -- in connection with their Medicare Part D
2 plans, right?
3         MR. HONIK: Object to the form, asked
4 and answered.
5         THE WITNESS: Again, I'm not aware of
6 any evidence to suggest that third-party payors
7 receive direct payments from the federal
8 government to underwrite any senior's sale or
9 purchase of valsartan at-issue products in this
10 case.
11         Again, usually those type of payments
12 in the catastrophic limit, for example, of
13 Part D, those are pages that are made either
14 retrospectively after the injury would have
15 occurred, or are for products that are not at
16 issue here. They're for drugs that are really
17 expensive and for which patients have blown
18 through the donut hole, are in the catastrophic
19 phase of their benefit design. That's --
20 that's not what we're talking about here.
21         These are generic products that are --
22 I think, you know, the average co-insurance
23 amount that I -- that I calculated was
24 somewhere on the order of $12. Consumers
25 could, I think -- to get out of the -- into the

Page 228

1 donut hole, they would have to spend something
2 like $400, maybe a little bit more, in order to
3 even get into that phase of the benefit.
4         And I think the limit for catastrophic
5 coverage during this time period is more like
6 $8,000.
7         COURT REPORTER: Is what?
8         THE WITNESS: Is more like $8,000.
9 BY MR. GOLDBERG:
10     Q     Yes or no --
11     A     It's not a yes or no question, sir.
12     Q     This -- let me ask the question.
13         Yes or no, did you factor in any
14 payments made by the federal government to
15 third-party payors offering Medicare Part D plans?
16 Yes or no, did you factor that into your
17 calculation?
18         MR. HONIK: Object to form, asked and
19 answered. You can't direct the witness to
20 answer it in a manner in which you'd like. If
21 she tells you she's unable to answer it yes or
22 no, she can provide an answer.
23         Please do so.
24         THE WITNESS: Thank you.
25         So, again, the vast majority of

Page 229

1 seniors who have prescription drug benefits
2 through Part D -- my mother is one of them. I
3 might know more about this than I should. They
4 pay premiums, and they also pay at the pharmacy
5 counter when they get a prescription at a
6 low-cost generic, such as the at-issue
7 valsartan in this case.
8         So that -- whether -- if those TPPs,
9 those third-party payors receive side payments
10 from the federal government, or other types of
11 payments from the federal government, is really
12 not material to this because there's no
13 evidence to suggest that low-cost generics are
14 ever in that phase of the benefit where the
15 third-party payor would actually pay the side
16 payments.
17 BY MR. GOLDBERG:
18     Q     What do you understand the third-party
19 payors' point of sale to be? You mentioned the
20 consumer paying at the retail pharmacy. What do you
21 understand the TPPs' point of sale to be?
22     A     When the consumer goes to fill their
23 prescription at the pharmacy counter, the pharmacy
24 runs a check on what insurance that patient has and
25 how much the patient needs to pay out of pocket.

58 (Pages 226 - 229)

Page 230

1 The point of sale for both, what the pharmacy
2 expects to receive from the consumer and what the
3 pharmacy expects to receive from the insurer is
4 exactly the same.
5        Those transactions occur within
6 seconds, and the pharmacy dispenses the product to a
7 consumer predicated on their existence of insurance
8 and the insurance saying that, yes, they will pay
9 for that product, dispense that beneficiary.  It's
10 exactly the same.
11   Q    We were -- you talked a lot about
12 value and therapeutic value of the at-issue
13 valsartan, what the consumers receive.  And you
14 explained that there was an illegitimate supply for
15 at-issue valsartan, and therefore, even though there
16 was a demand, the drug was worthless.  Is that the
17 same -- that worthless as to consumers, is that the
18 same as to third-party payors?
19        MR. HONIK:  Object to the form.  It's
20 a little bit --
21        THE COURT REPORTER:  I'm sorry.  I
22 didn't hear the end of the question.
23        MR. HONIK:  Sorry.  You trailed off,
24 Seth.  Just cover the --
25

Page 231

1 BY MR. GOLDBERG:
2   Q    Is your view that there was an
3 illegitimate supply of valsartan as to consumers the
4 same for TPPs?
5        MR. HONIK:  Object to form.
6        THE WITNESS:  I don't think that's the
7 question you asked me, sir.
8 BY MR. GOLDBERG:
9   Q    Well, I'm asking you that question.
10   A    Okay.  Can you go back and ask that
11 question again because I was focused on trying to
12 get clarity on the previous question that you asked.
13   Q    Is your view that there was an
14 illegitimate supply of at-issue valsartan as to
15 consumers the same for TPPs?
16   A    I was asked to assume that there is no
17 legitimate supply of adulterated and misbranded
18 prescription drugs for the at-issue valsartan
19 products between 2012 and 2018 in order to calculate
20 damages in this matter.  For both consumers and
21 end-party payors that are -- that are included in
22 the class.
23        As we have already discussed, my
24 assessment assumes there's a demand curve.  What my
25 assessment does not do is assume that there is a

Page 232

1 legitimate supply curve based on the assumptions
2 given to me by counsel.
3   Q    And regardless of any benefit that a
4 TPP might have received, they got from their
5 insured's treatment with the at-issue valsartan,
6 your view is that the drug, as to that TPP, is still
7 worthless?
8        MR. HONIK:  Object to form, asked and
9 answered.
10        THE WITNESS:  I'm sorry.  I didn't --
11 really did not follow your question.  There's a
12 lot of compound phrases there.  Can you please
13 restate?
14 BY MR. GOLDBERG:
15   Q    Regardless of any benefit that a TPP
16 might have perceived they received from their
17 insured's treatment with the at-issue valsartan, as
18 to that TPP, the drug is still worthless in your
19 view?
20        MR. HONIK:  Object to the form, asked
21 and answered.
22        THE WITNESS:  I don't understand what
23 you mean by a third-party payor receiving value
24 or benefit.  Can you please define?
25

Page 233

1 BY MR. GOLDBERG:
2   Q    Does a third-party payor receive a
3 value when its insureds are effectively treated with
4 a drug?
5        MR. HONIK:  Object to the form.
6 They're not consuming -- they're not consuming
7 drugs.  I think -- I think that's the problem,
8 Seth.
9        THE WITNESS:  I don't follow.
10        MR. HONIK:  You're kind of mixing
11 apples and oranges, I think.
12        THE WITNESS:  There is no therapeutic
13 value to the third-party payor.
14 BY MR. GOLDBERG:
15   Q    Does a third-party payor --
16   A    I don't even understand that, that
17 context.
18   Q    Does a third-party payor receive an
19 economic value when its insureds are effectively
20 treated with at-issue valsartan?
21        MR. HONIK:  Object to the form of the
22 question.
23        THE WITNESS:  That's a lot -- again,
24 that's a lot of compound statements and
25 assumptions that you're making.

59 (Pages 230 - 233)

RESTRICTED CONFIDENTIAL

Page 234

1  BY MR. GOLDBERG:
2      Q    Well, let's just --
3      A    Again, third-party payors are not
4  consumers, so they don't receive any therapeutic
5  benefit from their beneficiaries consuming a
6  product. And they certainly don't receive any --
7  any benefit from consumers consuming a product that
8  was adulterated and misbranded and may have actually
9  caused clinical harm.
10     Q    Do you have any evidence that there
11 was any clinical harm in this case from 2012 to
12 2018?
13          MR. HONIK: Object to the form,
14     outside the scope.
15          THE WITNESS: I don't think that's the
16     issue. Again, that's why -- that's why I don't
17     understand at all. I mean --
18 BY MR. GOLDBERG:
19     Q    Just --
20     A    Okay. I'm sorry, Mr. Goldberg.
21 You've interrupted me over and over again today.
22 There is a word for that, it's mansplaining. Please
23 let me finish.
24          So, again, I don't understand the idea
25 that third-party payors could benefit from consumers

Page 235

1  taking adulterated prescription drugs. That should
2  not -- that, I was asked to assume, should not have
3  entered into the U.S. class of trade. That
4  is -- that is your assumption of your -- underlying
5  your hypothetical question.
6          THE COURT REPORTER: Seth, when you
7     get to a good point, can we take five minutes,
8     please?
9          MR. GOLDBERG: Yes, this is a good
10    time.
11         MR. HONIK: Okay. Let's take five,
12    and then we will reassess --
13         THE VIDEOGRAPHER: The time is 5:37.
14    This ends Media Unit Number 5. We're going off
15    the record.
16         (Whereupon, a short break was taken.)
17         THE VIDEOGRAPHER: The time is 5:50.
18    This begins Media Unit Number 6. We're back on
19    the record.
20 BY MR. GOLDBERG:
21     Q    So in your report, you talk about the
22 different levels of the pharmaceutical supply chain?
23     A    Where are you referring, Mr. Goldberg?
24     Q    I'm going to get you there. It starts
25 at Page 19 and goes through to Page 22.

Page 236

1          And in Paragraph 52, you describe
2  third-party payors.
3      A    Is that a question?
4      Q    Are you aware -- are you familiar with
5  the different contractual arrangements that
6  third-party payors have in terms of sourcing and
7  paying for and being reimbursed for at-issue
8  valsartan?
9      A    I think I'm -- that was a compound
10 question, right?
11          So what do you mean by third-party
12 payors being paid for?
13     Q    Okay. Are you -- are you familiar
14 with the contractual arrangements that third-party
15 payors have, say, with pharmacy benefit managers?
16     A    Pharmacy benefit managers are a member
17 of the supply chain of prescription drugs in the
18 United States. And some payors have their own PBM,
19 so there is no contractual relationship. They all
20 have a PBM, and some third-party payors contract
21 with PBMs to provide fund services to their
22 beneficiaries.
23     Q    These are differences from third-party
24 payor to third-party payor, right?
25     A    I really don't understand that

Page 237

1  question. I'm sorry.
2      Q    Each third-party payor has its own set
3  of contractual arrangements that control its
4  distribution and -- and insurance of at-issue
5  valsartan?
6          MR. HONIK: Object to form.
7          THE WITNESS: That is not my
8     testimony. Like I just said, the biggest
9     payors in the U.S. are their own PBM. They own
10    their own PBM, so there is no contractual
11    relationship. They are the PBM. There are
12    some payors that contract for external PBM
13    services, and there's some third-party payors
14    that directly go with pharmacies to dispense
15    drugs to their beneficiaries.
16 BY MR. GOLDBERG:
17     Q    Are there other -- are there other
18 arrangements that you can think of that third-party
19 payors have?
20     A    Not -- I mean, that -- those are
21 general buckets that characterize third-party
22 payment for prescription drugs sold in the pharmacy
23 setting.
24     Q    Do third-party payors pay pharmacies
25 directly, to your understanding?

60 (Pages 234 - 237)

RESTRICTED CONFIDENTIAL

Page 238

1    A    They can and do or dispense
2  prescription drugs every day.
3    Q    Are you aware of any contractual
4  arrangements a third-party payor was not able to
5  keep and satisfy as a result of the sale of at-issue
6  valsartan?
7        MR. HONIK:  Object to form, outside
8    the scope.
9        THE WITNESS:  I don't understand your
10    question at all.  I'm sorry, what does "keep"
11    mean here?
12  BY MR. GOLDBERG:
13    Q    Are you aware of any -- any
14  arrangement a third-party payor has that it's not
15  able to satisfy as a result of at-issue valsartan?
16        MR. HONIK:  Same objection.
17        THE WITNESS:  I don't know what you're
18    referring to.  I'm sorry.  I don't follow.
19  BY MR. GOLDBERG:
20    Q    Are you aware of whether any
21  third-party payor did not -- ended up reaching a
22  contract with a pharmacy benefits manager because of
23  their covering at-issue valsartan?
24        MR. HONIK:  Same objection.
25        And to the extent it calls for a legal

Page 239

1    conclusion, you may answer if you understand.
2        THE WITNESS:  I don't understand the
3    question.  I'm sorry.  Like I said there,
4    there a variety of different types of
5    arrangements.  Many third-party payors -- many
6    insurers pay pharmacies directly for dispensed
7    drugs.  Some third-party payors may contract
8    with pharmacy benefit managers for the coverage
9    of some drugs.
10        I think what you're referring to is
11    the latter category, but I really -- I don't
12    understand your question.  I don't know what
13    you mean by "keep a contract" in this setting.
14  BY MR. GOLDBERG:
15    Q    Does it matter to your analysis that
16  different -- there were different levels of NDMA or
17  NDEA in the manufacturer defendants' valsartan?
18        MR. HONIK:  Object to the form.  Facts
19    not in evidence.
20        You may answer.
21        THE WITNESS:  Thank you.
22        So my understanding is, during the
23    at-issue time period, between January 2012 and
24    2018, the manufacturers attested to the
25    Food and Drug Administration that there were no

Page 240

1    known contaminants of nitrosamines in these
2    products.
3  BY MR. GOLDBERG:
4    Q    Does it matter to your analysis that
5  the specifications for valsartan during that time
6  period did not -- or did not include
7  nitrosamines?
8        MR. HONIK:  Object to the form,
9    hypothetical, inappropriate, facts not in
10    evidence.
11        You can answer.
12        THE WITNESS:  Again, the manufacturers
13    themselves attested on their drug forms to the
14    Food and Drug Administration that there was no
15    contamination.
16  BY MR. GOLDBERG:
17    Q    My question is, does it matter to your
18  analysis that there -- that nitrosamines were not
19  included in the specifications for valsartan from
20  2012 to July 2018?
21        MR. HONIK:  Object to the form,
22    improper hypothetical.  Those are not
23    dispensed.
24        You may answer.
25        THE WITNESS:  Again, my understanding

Page 241

1    is that the manufacturers of the at-issue
2    valsartan products attested to the
3    Food and Drug Administration over and over
4    again that these products were manufactured to
5    be compliant, at minimum, with cGMP.  And they
6    also attested to the fact that there were no
7    contamination of nitrosamines in these at-issue
8    valsartan.
9        MR. GOLDBERG:  I see we're at
10    6 o'clock.
11        MR. HONIK:  Yeah.  Why don't we go off
12    the record, video and steno?
13        THE VIDEOGRAPHER:  The time is
14    6 o'clock.  We're going off the record.
15        (Whereupon, the deposition concluded
16    at 6 o'clock p.m.)
17
18
19
20
21
22
23
24
25

61 (Pages 238 - 241)

RESTRICTED CONFIDENTIAL

Page 242

1          C E R T I F I C A T E

2

3          I, Jamie I. Moskowitz, a Shorthand

4   (Stenotype) Reporter and Notary Public, do hereby

5   certify that the foregoing Deposition, of the

6   witness, RENA M. CONTI, Ph.D., taken at the time and

7   place aforesaid, is a true and correct transcription

8   of my shorthand notes.

9          I further certify that I am neither

10  counsel for nor related to any party to said action,

11  nor in any way interested in the result or outcome

12  thereof.

13         IN WITNESS WHEREOF, I have hereunto set

14  my hand this 16th day of February, 2022.

15

16

17         *Jamie Ilyse Moskowitz*

    Jamie Ilyse Moskowitz

    License No. XI01658

18

19

20

21

22

23

24

25

---

Page 243

1   Ruben Honik, Esq.

2   ruben@honiklaw.com

3          February 16, 2022.

4   RE: In Re: Valsartan, Losartan, et al.

5   2/10/22, Rena Conti, PH.D. (#5064909)

6   The above-referenced transcript is available for

7   review.

8   Within the applicable timeframe, the witness should

9   read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12  The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  cs-ny@veritext.com

16

17  Return completed errata within 30 days from

18  receipt of testimony.

19  If the witness fails to do so within the time

20  allotted, the transcript may be used as if signed.

21

22         Yours,

23         Veritext Legal Solutions

24

25

---

Page 244

1   In Re: Valsartan, Losartan, Et Al

2   Rena Conti, PH.D (#5064909)

3          E R R A T A  S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____  _____

24  Rena Conti, PH.D          Date

25

---

Page 245

1   In Re: Valsartan, Losartan, et al.

2   Rena Conti, PH.D (#5064909)

3          ACKNOWLEDGMENT OF DEPONENT

4   I, Rena Conti, PH.D, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11  _____  _____

12  Rena Conti, PH.D          Date

13  *If notary is required

14         SUBSCRIBED AND SWORN TO BEFORE ME THIS

15         _____ DAY OF _____, 20___.

16

17

18         _____

19         NOTARY PUBLIC

20

21

22

23

24

25

---

RESTRICTED CONFIDENTIAL

[& - 23]                                                                                    Page 1

| & |
|---|
| **&** 2:16,20 3:17 4:18 5:2,7,11 6:2 6:12,17 7:2 14:13 |

| 0 |
|---|
| **0** 57:24 216:18 |
| **02109** 6:14 |
| **07068** 2:9 |
| **07102** 6:10 |
| **08540** 5:21 |

| 1 |
|---|
| **1** 8:3 11:3 43:16 43:17 44:2 49:15 58:6,8 74:7 75:1,8 79:8 80:22,23 166:22 |
| **10** 1:12 47:23,23 74:4 128:20 150:4 |
| **10,000** 226:20 |
| **10.75** 72:18 |
| **100** 2:13 6:9 49:6 49:7,21 202:16 204:20 223:10 |
| **100,000** 26:14 |
| **1000** 3:13 |
| **1001** 5:14 |
| **10013** 2:18 |
| **10019-6119** 6:19 |
| **101** 125:13,15 126:19 188:20,23 189:2,15 |
| **103** 2:8 |
| **10:07** 74:4 |
| **10:17** 1:13 11:2 |
| **10th** 11:2 47:3 |
| **11** 5:8 |
| **1100** 2:4 |
| **1154** 242:16 |
| **11:29** 57:13 |

**11:30** 57:16
**11:57** 74:6
**12** 10:4 70:4 227:24
**12-29-21** 69:6
**12.75** 68:24 72:23
**12:11** 74:9
**12:16** 76:23
**12:18** 77:2
**12:42** 91:22 92:1
**12:46** 94:17
**12:48** 95:11
**13** 70:5
**13th** 168:6
**1400** 7:4
**15** 57:3 69:13 70:6 200:4
**1515** 2:4
**15219** 3:20 6:4
**15th** 6:9
**16** 70:6 243:3
**167** 8:11
**16th** 242:14
**17** 53:23 56:4 218:19
**1700** 4:20
**17th** 3:6
**18** 174:15 176:10
**18th** 167:24 168:11 173:22
**19** 235:25
**190** 4:15
**19038** 12:25
**1906** 204:19
**19102** 2:4
**19103** 3:7
**1:12** 112:9
**1:13** 112:21
**1:45** 112:19
**1:53** 112:25

| 2 |
|---|
| **2** 8:4 12:24 52:25 53:3,5,15 54:3 74:10 77:6,14 78:21 80:23,23 112:22 166:18,21 181:18,22 |
| **2.6** 66:22 |
| **2/10/22** 243:5 |
| **20** 15:3,17 17:2 28:5 73:12 98:20 245:15 |
| **20004** 3:13 5:14 |
| **20006** 4:20 |
| **2000s** 40:20 |
| **2003** 38:20 |
| **2005** 38:20 |
| **2007** 38:18 41:5,24 |
| **2008** 41:24 |
| **2010** 39:5,13 40:7 40:13 41:3,9,10 42:9 43:1 |
| **2011** 39:5 43:1 |
| **2012** 43:1 78:7,11 127:7,17 130:2,13 130:24 131:21 132:7,20,23 139:1 139:13 149:18 150:21 165:5 199:11,16 231:19 234:11 239:23 240:20 |
| **2018** 76:7 78:7,11 127:7,17 130:2,14 130:25 131:21 132:8,20,23 139:1 139:13 149:18 150:21 165:5 167:24 168:6,11 171:1 173:22 174:15 176:10 |

177:4,4,11,12
199:12,17 231:19
234:12 239:24
240:20
**2019** 76:7 171:2
**202.452.7900** 4:21
**202.624.2500** 5:15
**202.776.7800** 3:14
**2020** 35:10,15 39:9
40:7,14 41:10
42:7,9 59:24 60:1
61:1 78:7
**2021** 26:4,11,15,17
45:23 48:3 62:19
68:20 69:12 71:15
71:16 72:8,14,15
72:19,22 73:1,2,3
73:6
**2022** 1:12 11:2
27:2 54:6 71:14
73:2,4,9 242:14
243:3
**20th** 184:16
**21** 5:20
**21024** 67:17
**21158** 63:9,20
68:11
**212.355.9500** 2:18
**212.415.9357** 6:19
**214.855.8221** 4:12
**215.979.1000** 3:7
**21617** 68:23 72:6
72:11
**22** 103:6 235:25
**2200** 4:11
**2220** 6:24
**227** 5:4
**23** 95:14,17,17,18
96:13 97:1,16,18
98:20 99:1 101:25
104:16

RESTRICTED CONFIDENTIAL

**[230 - activities]**                                          Page 2

**230**  6:24
**242**  10:7
**243**  10:8
**24th**  68:20
**25**  49:2
**250**  2:17
**26**  184:12
**267.435.1300**  2:5
**27th**  6:14
**28**  177:12
**28202**  5:4
**2875**  1:2
**29**  217:10
**29th**  69:12
**2:44**  150:13
**2:55**  150:16

**3**

**3**  8:6 53:15,15
  56:16,20 57:20
  76:14 77:15,18,22
  80:23 104:25
  113:1 166:22
  180:10
**30**  3:6 243:17
**300**  4:20
**3100**  4:5
**312**  7:4
**312.456.1065**  4:6
**312.566.4803**  6:25
**314.480.1500**  4:16
**317.236.1313**  5:9
**32nd**  3:19
**36,000ish**  218:17
**3600**  4:11
**38th**  6:4
**3:37**  180:9

**4**

**4**  8:9 53:15 58:16
  58:22,23 59:3
  76:14 77:15,18,23

80:23 81:19 88:8
  180:14
**400**  228:2
**412.263.4397**  6:5
**412.560.3300**  3:20
**42**  152:1
**43**  8:3
**45**  201:10,15,17
**45202-4029**  7:4
**46204**  5:9
**464**  218:15
**4:02**  180:13
**4:41**  206:8
**4:52**  206:11

**5**

**5**  8:10 74:16,17
  167:9 206:12
  235:14
**50**  49:4 204:19
**504.524.5777**  2:25
**505**  3:13
**5064909**  243:5
  244:2 245:2
**51**  6:18
**512.795.8686**  2:14
**513.698.5000**  7:5
**52**  8:4 52:22,23
  236:1
**52nd**  6:18
**53**  6:14
**56**  8:6
**58**  8:9 206:16
**5:37**  235:13
**5:50**  235:17

**6**

**6**  8:11 57:1 104:24
  113:4 121:5
  128:19 167:1,2,6
  235:18 241:10,14
  241:16

**60**  72:25
**600**  4:15 5:4
**6001**  2:13
**60601**  4:5
**60606**  6:24
**609.924.0808**  5:21
**60s**  187:10
**617.213.7045**  6:15
**63105**  4:16
**64**  58:19
**65**  56:11
**66**  43:10,23 44:1
**67**  58:14,20,21
**675**  49:15 60:11

**7**

**7**  114:21 128:19
**7-18-2018**  168:15
**7-24-2018**  173:15
**70**  58:14,14
**701**  2:24
**70130**  2:24
**704.444.3475**  5:5
**74**  8:10
**75**  217:11,12
**750**  60:20
**75201-7932**  4:11
**757.1100**  6:10
**77**  4:5
**775**  60:20,22
**78746**  2:13

**8**

**8**  10:5 57:9
**8,000**  228:6,8
**80**  211:17
**80,000**  26:14

**9**

**92**  210:16
**973**  6:10
**973.228.9898**  2:9

**9th**  3:13

**a**

**a.m.**  1:13
**able**  71:21 73:17
  87:9 210:12 238:4
  238:15
**abraham**  5:18
**abstracts**  54:4
**academic**  17:20
**academy**  15:25
**accept**  163:7,9
  177:9
**access**  36:15,18,23
**accident**  196:22
  196:23 225:10,16
**account**  193:1,11
  202:25 203:11
  211:21,23
**accounted**  212:11
**accounting**  49:12
  73:12
**accuracy**  243:9
**accurate**  84:3
  182:1
**achieve**  154:4
**acknowledge**
  11:17,21
**acknowledgement**
  245:3
**acknowledging**
  170:14
**acknowledgment**
  243:12
**acquisition**  61:10
**action**  12:18 24:24
  25:5,5,7 75:7
  242:10
**actions**  1:5
**actively**  72:3
**activities**  71:20

RESTRICTED CONFIDENTIAL

[activity - andrast]                                                           Page 3

**activity** 71:3
**actual** 50:23,23
  224:8
**adam** 2:7
**adap** 218:5
**adaps** 218:5
**added** 62:20
**addition** 14:11
  43:7 71:18,19
  72:22 83:22
  113:13 115:8,9,25
  190:12 191:23
**additional** 104:22
  146:9
**additions** 245:6
**address** 12:23
**administered**
  11:22
**administration**
  22:5 48:22 89:10
  96:16 97:14 98:3
  98:16 110:16
  113:22 115:13
  116:3,20 118:10
  118:17,20 121:7
  123:6 185:7
  239:25 240:14
  241:3
**administration's**
  98:6 114:8,18
  121:21 122:3
  130:15 145:20
**admins** 48:18
**adulterated** 76:7
  78:15,23 79:11,14
  81:8 103:8,11,15
  103:16,25 104:3,4
  104:13,18 105:3
  111:12 114:24
  115:17 118:14
  122:12 124:9,19

130:14,18 131:7
131:15 132:2
133:4 138:9 139:8
152:3 165:6 170:1
171:20 172:10,13
173:19 179:23
182:15,16 183:4
183:19 184:14
185:16,18,20
186:2 187:1,16
189:22 194:14,23
197:12,13 199:8
199:21 200:13
202:13 231:17
234:8 235:1
**adulteration** 41:22
  79:5,12 80:11,21
  81:2,4,23 84:10
  103:14,19,21,22
  115:16 166:2
  176:8
**adulterations**
  201:2
**advent** 136:1,2
**advised** 165:11,18
  216:25
**aetna** 222:21,21
  223:2
**affairs** 218:9
**affiliate** 17:20
**affirmatively** 31:7
**aforesaid** 242:7
**afraid** 181:5
**agencies** 20:14
  22:7 23:2
**aggregate** 215:6
**ago** 111:23 155:10
  155:12
**agree** 34:2 46:23
  98:18,19 119:1
  132:6 137:2

140:14,20 141:2
149:16 150:19
151:10 158:18
159:5,19,22,23
160:15 161:6,20
163:6,20 177:14
190:16
**agreed** 204:6
**agreement** 8:3
  43:13 44:6,7
  49:14
**agrees** 204:24
  205:2
**ahead** 32:15 131:3
  131:25 152:14,14
  159:13 160:12
**aid** 5:10
**al** 243:4 244:1
  245:1
**albertsons** 4:21
  5:5
**alek** 3:5
**alfano** 6:2
**allotted** 243:20
**allow** 33:19 101:5
  120:11 125:8,25
  186:5 202:18
  214:22 215:15
  216:3
**allowance** 81:24
**allowed** 88:23
  110:8 113:14,19
  113:23 115:21
  116:17,23 119:7
  120:16 126:10
  146:7 148:2,7,9
  149:6 156:21
  161:14 182:17
  197:15 204:22
**allows** 125:12
  213:23

**alluded** 104:21,22
**alternative** 169:19
  171:11 192:7
  193:12 194:7
  198:19
**alternatives** 194:3
**amended** 52:23
  75:7
**america** 191:7
**american** 118:11
  125:3 134:12
  171:6 174:3
  176:12 177:21
  180:4
**americans** 137:10
  162:25
**amerisourceberg...**
  7:5
**amount** 35:25
  226:24 227:23
**amounts** 72:25
  209:7,8 211:16
  212:9,13 224:12
**analyses** 64:10
**analysis** 46:17
  50:8 61:11 63:14
  63:25 64:4 65:4
  123:14,20,21,22
  139:6,19 146:14
  164:6,8,12 165:8
  192:25 193:10
  194:8 196:12
  198:15,23,25
  199:19,20 204:7
  205:15 212:12,15
  212:16 225:8,18
  239:15 240:4,18
**analyzing** 131:13
**andras** 4:3
**andrast** 4:3

**angiotensin** 8:12
167:7
**announced** 165:12
166:10
**announcements**
8:12 167:7
**annual** 26:10
**annually** 107:15
107:18
**answer** 9:3 13:11
13:11,17 30:17,23
31:9,22 32:1,17
33:15 34:18 45:6
45:10,14 54:16
55:1,25 56:5
64:21,21 80:14
81:6 86:18 92:5
92:15 99:18,25
101:14 106:15
109:8,14,24 112:3
125:21 127:22
128:7,22 132:5,21
142:9,18 143:4
147:13,14 150:25
155:1,17,24
156:10 157:8
158:4 159:9,14,16
160:11,13,14
161:19 162:1,9
163:19 164:18
166:7 174:25
176:4 179:6,10
180:22 181:4
186:11,17 187:20
188:14,25 196:16
196:20 201:5
209:21 215:11
219:20 228:20,21
228:22 239:1,20
240:11,24

**answered** 31:6
56:6 61:21,23
77:11 82:11,25
83:5 84:25 86:16
88:21 89:21 90:21
94:10,12 97:10,23
98:23 102:8,22
104:10 106:3
107:6,25 108:7,23
110:23 117:12
119:4 121:3
125:20 126:18
129:20 130:4
131:2,24 132:10
138:20 140:10,24
141:25 143:3
144:25 145:18
147:11,22 148:21
151:19 156:9
157:7 158:2,22
160:3 163:22,23
164:17 165:23
169:21 170:18
171:17 174:24
176:3,22 177:19
178:12,24 179:12
179:12,18 182:24
188:22 194:10
196:14,19 198:17
199:6 200:4
205:12 214:13
215:5,19 224:16
226:5 227:4
228:19 232:9,21
**answering** 100:19
126:13
**answers** 13:6
120:24
**antitrust** 17:15
18:4,8,10,25 19:15
19:20 24:18 31:24

**anybody's** 48:17
**appear** 50:14
**appears** 173:23
**appended** 245:7
**appendices** 50:25
**apples** 233:11
**applicable** 243:8
**application** 89:11
**applied** 96:21
97:20 212:14
**apply** 102:5 207:3
**apportion** 65:9
**appreciate** 188:11
**appropriate** 55:2
109:9 128:10
212:17,19
**approval** 157:16
**approve** 119:21
**approved** 124:14
**approves** 118:17
118:21
**approximately**
26:14 69:13 70:6
72:25 210:16
211:17
**arb** 8:13 192:13,13
198:12
**area** 40:15 206:2
**arising** 197:23
**arrangement** 12:1
238:14
**arrangements**
236:5,14 237:3,18
238:4 239:5
**arrive** 182:19
**arrived** 34:12
183:1
**article** 40:14,14
**articles** 23:13
39:25 54:3

**aside** 45:20 84:19
132:6 207:20
208:12
**asked** 13:16 27:22
32:4 47:11 51:22
57:3 61:20 70:15
70:16 76:3 77:10
78:14,20,22,25
79:5,10 81:3,11,16
82:10,24 83:4
84:24 88:20 89:20
90:20 94:9 96:4
96:12,19,25 97:6,9
97:11,22 98:4,13
98:22 100:20
101:21 102:7,10
102:16,18,21
103:14,21 104:2,9
104:17 106:2
107:5,24 108:6,22
109:19 110:22
117:11 119:3
121:2 125:19
126:17 127:23
128:18 129:19
130:3,12 131:1,23
132:1,9 133:3
138:8,19 139:7
140:9,23 141:24
143:2,18 144:25
145:17 146:24
147:10,12,21
148:8,20 149:8
151:18 156:8
157:7 158:2,21
160:2,4 161:3
163:21 164:16
165:3,22 169:13
169:20,24 170:17
171:16 174:23
176:3,21 177:19

RESTRICTED CONFIDENTIAL

178:11,23 179:11
179:17 182:14,23
183:3 188:21
194:9,21 196:13
196:18 197:6,9,11
198:16 199:5
200:4 203:25
206:19 214:12
215:3,5,18 224:15
226:4 227:3
228:18 231:7,12
231:16 232:8,20
235:2
**asking**  12:19
19:11,12 32:8
42:6 54:19,20
87:17,18 99:8
116:11 127:9,12
128:21 129:14
132:12 143:11
161:18 166:16
187:18 189:21
190:25 191:4
203:19 215:7
231:9
**aslater**  2:8
**aspect**  22:9 79:9
**aspects**  86:5
**assert**  13:10
**assessed**  91:13
**assessing**  133:6
210:7
**assessment**  89:2
169:17 198:6
231:24,25
**assessments**
156:14
**assign**  111:11
**assigned**  111:10
**assigning**  201:17
204:16

**assignment**  139:20
147:24
**assistance**  217:22
218:4,6
**assists**  50:5
**associate**  14:8
16:14
**associated**  145:21
145:22 147:25
149:10 192:6
194:22 204:1
208:18
**associates**  16:23
27:21 44:14 59:6
**assume**  13:17 76:3
78:15,22 79:5,11
80:24 81:3 96:4
96:12,19,25 97:6
97:11 98:4,13
101:21 102:10,16
102:18 103:14,21
104:2,17 130:12
131:14 132:2
133:4 138:8 139:7
148:8 149:8 161:3
165:3 169:24
177:8 178:18
182:14 183:3
197:11 231:16,25
235:2
**assumed**  80:12,19
**assumes**  231:24
**assuming**  62:13
63:8 64:5,20,24
**assumption**  79:1
80:20 81:12,16
177:9 235:4
**assumptions**  132:6
143:18 197:2
232:1 233:25

**assurance**  88:17
88:19 89:1,14,17
89:18 90:5,19
**attached**  94:8
243:11
**attaches**  180:21
**attachment**  83:13
83:15,16 84:16,23
85:8,10 91:11
92:20
**attack**  135:8,12,21
136:6 137:17
**attacks**  134:8,19
134:21 135:25
136:10 137:12
**attempt**  205:8
**attest**  88:25
106:17 107:11
110:13 115:23
**attestation**  89:4
107:15 108:16
116:6,12 117:1,10
117:14 118:3
**attested**  116:1
163:15 190:11
239:24 240:13
241:2,6
**attesting**  119:23
123:9 131:10
**attorney**  68:18
243:13
**attorneys**  11:16
27:23 44:8 46:5
46:11 70:14
**attributable**  136:6
**audit**  210:20
**augusteijn**  61:2
**aurobindo**  3:21
78:2 93:25
**austin**  2:13

**authored**  39:24
54:6,6
**authority**  125:15
**availability**  46:6
141:17
**available**  132:14
132:15,18 134:22
145:24 148:24
171:20 172:3
174:7 191:13
192:22 243:6
**avenue**  4:11 5:14
**average**  212:12
216:17 227:22
**averaging**  216:19
**avoid**  219:6
**avoiding**  137:2,17
**awarded**  41:5,5
**aware**  41:21 42:1
43:6,8 119:15
134:7 135:13
138:25 139:12
147:16,19 155:2
155:11,19 165:18
166:8 167:15
170:24 171:3
210:9 227:5 236:4
238:3,13,20
**awesome**  178:15
**awsmolij**  3:5

**b**

**b**  3:6 5:3 6:22 8:1
83:13 84:23 85:10
91:11 92:20
217:23 218:1
**back**  23:4,6 24:3
35:7 51:6 52:7,9
57:17 59:24 64:25
66:16 73:13 74:4
74:10 77:3 88:7
92:2 95:1,12

RESTRICTED CONFIDENTIAL

**[back - break]**                                                              Page 6

99:25 101:14
104:24 110:1
113:1 144:16
150:17 151:25
173:21 175:2
180:14 188:14
206:12 231:10
235:18
**backdoor** 31:10
33:17
**background** 14:4
147:2
**backgrounds** 50:1
**backup** 92:18,24
93:8
**balmy** 185:5
**bargain** 154:8
**bargained** 154:10
**barnes** 5:7
**based** 69:11 86:4
102:19 103:15
104:3 114:11
122:8 141:8
143:17 177:18
217:19 219:22
232:1
**basing** 186:14,14
**basis** 18:10 26:10
31:17 78:16,25
79:4,6,12 111:24
**bazan** 3:11
**bear** 223:10
**beginning** 35:7
50:13 66:15 74:20
74:23 130:6
152:17 206:18
**begins** 74:10 113:1
180:14 206:12
235:18
**behalf** 12:20 24:4
24:5 25:20 26:2

44:8,10 209:13
**behavior** 157:19
157:21
**believe** 57:24
59:22 97:20
109:16 128:18
223:9
**believes** 109:8
**beneficiaries**
226:2 234:5
236:22 237:15
**beneficiary** 230:9
**benefit** 67:23
138:1 143:10
146:2,12 149:18
151:8 153:2,2
154:8 159:6 160:6
160:22 164:14
170:16 171:15
208:17 224:19
227:19 228:3
229:14 232:3,15
232:24 234:5,7,25
236:15,16 239:8
**benefits** 147:18,25
149:10 150:20
151:11 156:3,7,14
158:18,25 159:20
159:25 160:16
183:17 220:25
221:21 222:10
223:4 229:1
238:22
**benjamin** 184:21
185:5
**bennett** 48:7,13
49:25 50:1,3,7,15
61:16,18 62:3,24
63:2,12,24 64:15
64:17,25 65:13,16

**bennett's** 48:14
64:9
**berne** 7:2
**bernstein** 2:16
**best** 145:3 163:24
215:6,11
**better** 15:2,17
17:1 202:22
204:18,19 210:10
**beyond** 104:16
107:6 108:7
110:23 111:1,3,18
111:21,25 121:3
139:3 141:16
143:3 144:24
145:18 146:23
147:22 151:19
156:9 157:7
158:22 160:3
161:10 169:21
170:18 171:17
172:20 174:24
176:2 190:21
192:8 203:3,15
**big** 48:4
**biggest** 237:8
**bilely** 11:6
**bill** 72:21
**billed** 62:6 68:23
69:3,6,9,12,18,21
70:7 72:14,15,18
**billings** 48:16,17
48:21
**bills** 73:21,22
**bily** 7:8
**binder** 43:14,22
43:24 58:1,6
67:10,17 91:14,17
92:7,7,10 93:6
166:19,20,21,22

**biopharmaceutical**
14:22 15:1
**bipc.com** 4:19 5:3
**bit** 14:3 20:18 40:3
49:20 57:10 60:21
75:11 90:11
162:22 184:23
228:2 230:20
**blackwell** 4:14
**blocker** 8:13 167:7
**blood** 134:8,18,23
135:4,5 154:4
174:7 175:4 191:1
191:8 192:1
193:24 200:7
**blown** 227:17
**bockius** 3:17
**bodies** 161:8,22
**body** 40:18
**bold** 2:13
**book** 190:6
**bosick** 6:2
**boston** 6:14 14:6
14:10 15:19 28:7
52:19 73:14
**bottle** 175:24
177:4,7,12
**bottom** 76:6
163:14 169:1,2
**bought** 108:12
197:1,21 198:12
200:11
**brand** 132:13
199:12
**branded** 22:18,19
27:11 132:13
198:21
**break** 13:20 50:16
57:15 74:1,8
112:10 150:15
180:8,12 206:6,10

RESTRICTED CONFIDENTIAL

[break - cgpm]                                                                      Page 7

235:16
**bresnahan** 5:12
**brian** 62:4,5
**bring** 67:24
**broad** 22:13,20
  62:15
**broken** 50:12
**btlaw.com** 5:8
**buchanan** 4:18 5:2
**buckets** 237:21
**bullet** 169:2,5,7,8
**bunch** 94:12
**bush** 39:12
**business** 14:10,11
  14:14 20:6 21:14
  21:22 24:8 27:3,6
**busy** 71:1,6,11
**butcher** 78:1
**buy** 195:8 196:24
  199:8 214:7
**buying** 122:21
  198:10
**bye's** 184:21 185:5

**c**

**c** 2:1,23 3:1 4:1 5:1
  6:1 7:1 11:15
  242:1,1
**c.whiteley** 2:21
**cabraser** 2:16
**calculate** 46:6
  50:22 194:22
  203:25 206:20
  220:9 231:19
**calculated** 46:8,9
  200:24 202:1
  203:10 207:3
  216:17 220:9
  227:23
**calculates** 204:8
**calculating** 45:8
  47:20 200:24

202:24 203:9,9
**calculation** 44:22
  45:2,12,18 46:12
  46:14 138:15
  194:12,19 195:11
  199:15 204:14
  217:12 219:7
  220:2 224:11
  225:4 228:17
**calculations** 50:13
  50:16,22,24 51:1
  75:3 85:6 111:7
  207:7 217:3
  218:24
**call** 28:14 68:19
  74:3 100:25
**called** 14:10,13
  118:9
**calling** 53:2
**calls** 45:4 68:18
  200:16 201:4
  203:2 219:18
  238:25
**camp** 2:24
**campbell** 5:13
**cancer** 39:13
  185:6 226:19
**capacities** 35:16
**capacity** 17:20
  35:13,24 61:13
  134:17
**capture** 211:15
**captures** 211:17
**car** 195:5,6,7,8,9
  225:10,12,16
**carcinogen** 163:8
  163:10
**carcinogens**
  163:17
**cardinal** 5:15

**cards** 221:18
**care** 71:5,18
**carlo** 5:19
**carolina** 5:4
**carondelet** 4:15
**case** 12:21 15:20
  18:6,8,24 23:22
  27:15 29:8,23,24
  30:3,4,6,15 31:5
  32:6 33:22 34:1
  34:10,16,23 35:8
  43:13 44:6 48:11
  59:17 64:10,14,19
  70:17 72:3 87:6
  87:12,19,22 88:1,3
  89:19 96:21
  109:12 110:21
  131:10 139:20
  147:9,24 153:13
  153:18 162:20
  164:22 213:22
  214:2 223:8
  226:11,22 227:10
  229:7 234:11
**cases** 17:24 18:1,3
  18:4,4,5,8 24:9
  25:12,13,17 26:16
  26:19 29:21 31:11
  33:18
**cash** 214:11
  217:17
**catastrophic**
  227:12,18 228:4
**categories** 41:23
  217:19
**category** 22:20
  239:11
**cause** 39:15
  202:18
**caused** 26:18
  154:2 234:9

**caution** 30:7
**cdehart** 5:20
**cell** 154:17
**center** 6:9
**central** 184:13
**centre** 3:19 6:4
**century** 184:16
**certain** 38:2,2,4,5
  51:23,25 53:13
  81:3 217:3 224:6
  226:9
**certainly** 137:13
  191:9 234:6
**certificate** 10:7
  211:14
**certified** 1:15,15
**certify** 242:5,9
**cetera** 38:6 108:13
  223:3
**cgannon** 6:8
**cgmp** 21:12 63:13
  63:25 64:3,9 82:5
  82:16 84:8,9
  85:24 90:24 91:2
  93:10,18 105:11
  105:14,19,22
  106:4,11,17,25
  107:12,22 108:4
  108:17,20 110:9
  110:15,19 111:14
  113:13 114:16
  115:8,24 116:19
  117:18 118:2,14
  119:12,17 120:18
  120:21 121:9,24
  123:10 189:9
  190:4,11 204:22
  241:5
**cgmps** 108:14
**cgpm** 111:17

RESTRICTED CONFIDENTIAL

**[chain - competition]**

chain 106:20 107:10 108:11 115:22 132:20 182:17 201:22 235:22 236:17
chains 88:24 118:12
challenging 162:22
chance 67:7
change 66:7 244:4 244:7,10,13,16,19
changed 60:21
changes 243:10 245:6
changing 22:17
characterize 216:3 237:21
characterized 212:5
charging 34:25 35:1
charlotte 5:4
cheating 201:20 202:2,8,20
check 229:24
checked 73:23 181:6
checking 62:7
chemical 40:21
chemicals 39:14 39:19 42:2 43:7
chemistry 40:4
chicago 4:5 6:24 15:18 73:14
child 71:18
children's 217:21
chip 217:21
choose 192:17
christine 6:8

christopher 5:3
christopher.henry 5:3
chronic 81:24 82:2 82:21,23 83:2
chronological 59:23
cidra 41:25 42:16 42:22
cincinnati 7:4
circumspect 21:1
circumstances 224:7
citations 51:22,23
cite 124:17 126:8 212:5
cited 80:22 82:17 86:8 167:16,19
cities 71:17
citing 125:16
citizen 134:12
city 218:11,12
claim 25:9
claiming 25:10
claims 25:8 217:17 217:18 218:21 219:6 223:6
clarification 111:2 154:15
clarify 13:16 23:5 128:20 141:7 175:7 188:12 208:25
clarity 231:12
class 15:1,16 16:3 24:24 25:5,6 75:7 87:22 105:12 106:19 116:24 119:8,19,21 120:12,14 134:2,2 138:11 139:10

147:9,17 161:15 162:5 163:2 186:4 190:9 197:4,8,16 197:21 199:14 202:14 210:19 211:7,10,11,12 213:21 214:2,5,6 214:16,18 215:16 215:24 217:11,13 217:25 218:18 219:8 231:22 235:3
classes 75:4 111:8
cleaning 50:8 61:11
clear 100:8 110:11 187:11 209:20
clearly 100:5 150:4 153:23
clinical 133:7,11 133:14,15 146:18 148:12,14,18,25 185:20 234:9,11
close 49:7
closed 107:10 108:11
closely 48:7,9 50:10
coach 128:1
coan 6:13
code 65:22,24 66:8
codes 66:10
codified 121:6
cold 28:7
coleen 3:4
colleagues 51:7,10
collect 55:23
college 40:4
color 100:15
column 60:12

combination 216:10
combinations 218:16
come 23:4 27:19 42:8 58:11 74:4 135:25 204:22
comes 25:25 115:16
comfort 112:14
commencing 1:13
comment 51:8,11 51:19
comments 52:4
commercial 190:9 223:2,15,18 224:3 224:13
committee 16:2 29:8 30:14 44:13
commonly 65:24
communicating 176:11
communication 166:3 177:24
communications 165:25 166:14 171:4 172:4 174:3 177:21
companies 22:22 27:5,9,11,11,13 163:3 204:17
comparison 65:14 65:18
compensate 200:25
compensation 218:13
compensatory 200:16
competition 17:14 22:18,21,25 23:2

RESTRICTED CONFIDENTIAL

[competition - contaminated]    Page 9

38:23 39:2
**competitor** 210:8
**complaint** 75:7
  79:7,13,15 80:22
  80:25 81:17,20
  82:15 83:7 89:23
  90:22 91:12 92:17
  92:19,19,23,24
  93:4,4,8 94:7,8
  97:24 103:23
  111:14
**complete** 55:5
  71:11 101:5,10,16
  245:18
**completed** 243:17
**completely** 54:24
  70:13 129:17
**completion** 38:17
**compliance**
  106:17
**compliant** 108:17
  116:19 152:2
  201:18 241:5
**complicated**
  116:21
**complications**
  137:3
**comply** 70:17
**compound** 201:8
  232:12 233:24
  236:9
**comprised** 210:16
**concept** 189:5
**concerned** 71:13
**concerns** 173:6
**conclude** 81:7
  99:22 100:24
**concluded** 241:15
**conclusion** 201:4
  203:3 219:18
  239:1

**condition** 106:21
  174:13 175:15
**conditional** 107:13
  107:14
**conditions** 22:24
  23:18 137:12
  191:9,10,13,25
  193:25
**conduct** 121:12
**conducted** 133:11
  133:14,16,18
**confidential** 1:8
  31:1
**confirm** 205:7
**confirming** 124:1
**conflicts** 20:5
**confused** 63:16
  120:22
**confusing** 87:1
**conlee** 2:21 28:13
  59:13
**connection** 36:11
  39:10 227:1
**consent** 11:25
**consider** 104:4
  146:24 169:16
  172:9 178:16,21
  179:15 205:8
**consideration**
  164:3,13
**considered** 104:14
  104:18 105:6
  117:17 146:3
  170:10 190:5
  205:14,19 226:24
**considering**
  123:14,19
**considers** 103:24
**consistent** 143:20
  158:15

**construct** 51:25
**consultant** 22:2
  34:10
**consulting** 16:13
  17:7 20:2 25:15
  44:15
**consume** 162:2
**consumed** 108:12
**consumer** 24:24
  25:5,6 39:20
  114:3 119:9
  124:22 137:19,25
  141:4 146:20
  150:22 151:13,13
  151:17,17 152:4
  152:10 157:4,17
  157:21,23 158:20
  158:20 159:25
  160:1,18,18
  164:13 190:1
  193:1 198:11
  199:1,4,8 205:8
  209:25 210:17
  211:19 212:6
  214:10,23 215:25
  221:16 225:2
  229:20,22 230:2,7
**consumers** 24:15
  25:9 75:4 105:24
  106:7 111:9
  124:10 125:3
  127:9 128:25
  131:5 132:25
  133:1 136:6 140:8
  140:15,22 141:10
  141:15 145:13
  149:17 150:20
  151:11,15 152:11
  153:7 156:4,6
  157:2 158:19
  159:20,23 160:16

160:21 163:6,8
  164:3 166:14
  170:16 171:9
  172:24 174:4,9,15
  176:12 177:22,24
  178:3 179:2 180:4
  184:14 191:7
  192:20 193:19
  194:13,25 195:1
  195:18,21 196:8
  196:23 198:21
  200:25 202:17
  204:6 205:15
  208:16 209:8
  212:10 214:15
  216:15 222:14,22
  222:24 223:16
  224:17 225:7
  227:24 230:13,17
  231:3,15,20 234:4
  234:7,25
**consuming** 233:6
  233:6 234:5,7
**consumption**
  185:20
**contact** 27:25
**contacted** 27:20
**contain** 176:8
  212:6
**contained** 76:17
  77:9
**containing** 173:16
  175:5,7,18
**contains** 64:22
  215:24
**contaminants**
  154:9 240:1
**contaminate** 42:2
**contaminated**
  42:13 153:25
  154:6,11 169:25

171:19 172:8,9,12
173:19 179:23
187:16 194:14
197:20 199:13
200:12 202:13
**contaminates**
40:21
**contamination**
41:22 154:2
163:16 166:1
176:8 194:18
240:15 241:7
**contents** 10:1
**context** 124:15
151:8 152:7
157:19 233:17
**contexts** 16:10
84:6 212:3
**conti** 1:11 2:5 8:3
8:4,5,6,8,9,10,11
10:2 11:4 12:8,16
12:24 13:2 20:20
20:20 30:8 31:3
33:20,25 43:12,16
43:17 44:2 47:1
49:15 52:24,25
53:3,5,8,18 55:15
56:16,19,20,24
57:8,19,20 58:22
58:23 59:3 61:1
66:17 67:1,21
68:9,14,15,23
74:13,16,17 80:16
101:17 109:24
110:5 111:6,18
112:10 113:4
125:21 129:25,25
131:3 134:16
150:19 161:6
162:14 167:1,2,5,6
167:9,14 180:17

206:15 242:6
243:5 244:2,24
245:2,4,12
**conti's** 101:9
**continue** 55:15
100:7,23 162:21
169:9,18,18
172:25 174:17,21
175:12,25 177:15
178:4 179:3
**continued** 38:21
**continuing** 172:8
176:15
**contract** 236:20
237:12 238:22
239:7,13
**contractual** 236:5
236:14,19 237:3
237:10 238:3
**control** 141:9,15
143:10 174:13
237:3
**controlled** 141:2
**controlling** 141:22
142:25 193:24
**converse** 153:14
**copies** 63:8 243:14
**copy** 57:24 58:7
67:12 114:21
**corporation** 4:12
**correct** 16:17
25:17,21 38:12
47:13 59:25 60:7
61:17 66:22 67:1
67:21 68:9,10,16
68:17,24 69:4
72:15,16,16,19,20
73:7 75:8,15,16
77:19 78:12,23,24
81:2,15,17 82:19
84:2,23 87:19

90:12 92:9,11
93:5 103:2,8
114:15 116:13
122:10,18 130:2
142:17 147:9
164:4 168:24,24
205:24 207:25,25
209:3 213:8 222:4
222:15 242:7
245:8
**corrected** 184:2
**corrections** 245:6
**correctly** 169:12
169:15 201:23
**cost** 192:5 193:1,9
193:11 194:7
223:11 229:6,13
**costco** 66:2
**costly** 194:5 195:9
**costs** 136:11,18,24
148:1 149:10
156:14 158:25
183:18 194:17
221:17
**council** 39:13
**counsel** 2:5,10,14
2:19,25 3:8,14,21
4:6,12,17,21 5:5
5:10,15,22 6:5,11
6:15,20,25 7:5
11:10,25 12:12
13:9,9 28:2 29:3,7
30:24 33:13,25
34:16 35:9 44:6
52:4,16 53:20
54:1 59:16 64:13
64:18 67:23 73:18
76:3 79:22,22
80:3,10 90:6
92:11 94:16 100:1
100:3 111:3

127:13,20,21,25
128:1,5 155:4,12
155:22 180:18
181:2 197:3
206:19 219:3,23
220:6,8,14 232:2
242:10 243:14
**count** 204:19
**counter** 204:10
225:3 229:5,23
**county** 218:11,12
**couple** 13:25
19:21
**coupon** 221:17
**course** 15:5,6,14
16:9 70:20 157:12
164:19,22
**courses** 14:18,20
**coursework** 23:7
23:21 40:22
**court** 1:1,15 11:7
11:11,16 12:5,12
14:23 16:15 20:8
20:11 28:17,20
33:1,5 35:19
36:14 38:3 42:17
42:20 44:9 46:2
49:9 52:8 58:3
61:9 65:15 66:18
67:4 69:25 76:19
79:17,21 88:11
89:7 90:2,6,14
92:14 94:1 101:13
102:25 103:3
105:17 107:17,20
115:3,9 117:6
118:19 123:16
132:16 133:17
136:19,21,25
137:1 139:21
140:1,4 142:6,11

RESTRICTED CONFIDENTIAL

146:21 150:3,9,11
151:14 152:12
153:22,24 154:14
154:22 166:23
170:3 171:23
184:22 191:18
192:3 195:1 204:6
204:24,25 205:2,4
205:21 207:14
208:2,10 209:14
211:11 212:8,16
212:18,20 219:1,9
225:20 228:7
230:21 235:6
**courtesy** 80:7
**cover** 226:2
226:2
230:24
**coverage** 17:14
224:9 228:5 239:8
**covered** 119:9
221:16
**covering** 238:23
**covers** 218:2
**create** 65:14,18
154:8,11
**criminal** 202:13
**criteria** 217:3,4
**crowell** 5:11
**crowell.com** 5:12
5:13
**cs** 243:15
**culbertson** 6:12
**cull** 46:11
**cure** 185:5
**current** 12:23 14:5
53:24 169:10
172:25 174:17
175:10,13,21,22
**currently** 14:17
29:15,20,22 30:1

**curve** 115:6 118:1
123:2,3,24,24
124:8,19 125:10
125:17 126:22,23
126:24 130:7,9,11
130:11,19 131:16
146:17 152:24,25
153:1 156:11,13
156:16,19 157:3
161:2,4 162:4
164:7,9,20,23,25
165:8 170:6,7
178:19 179:1,21
180:3,5 181:10,18
183:17 189:15
231:24 232:1
**cut** 55:6 132:17
**cv** 18:21,22 53:24
85:8,19
**cvs** 5:10 50:9 66:2
211:8
**cwhill** 3:4

| **d** |
| --- |

**d** 4:14,19 6:17 7:3
11:15 220:23
221:6,19,24 222:4
222:8,12,13 223:1
223:4,6,10,21
224:2,14,19
225:25 227:1,13
228:15 229:2
**d'lesli** 4:10
**d.stanoch** 2:22
**dallas** 4:11
**damage** 39:15
217:3 225:4
**damages** 44:23
45:2,8,12,18 46:6
46:9,9,12,15 47:20
50:13,16,20 75:4
75:17,19,22 111:8

194:11,22 197:24
199:15 200:16,16
200:23,24 202:1
202:24 203:10
204:1 206:20
207:2,4,19,21
208:22 209:2
213:22 217:11,13
220:1 231:20
**dana** 3:6
**dangerous** 154:9
184:18
**dangerousness**
154:2
**daniel** 5:13
**data** 46:1,6 47:20
50:8 51:1 54:7,9
61:8,10 62:7,9,12
62:13,16 63:6
65:9,23 207:13
209:2,7,10,13,22
210:2,12,13,15,24
212:1,2,4,25,25
213:1,6,9,20,23
214:2,3,9 215:3,6
215:15,20 216:2
217:1,14,20
**datasets** 217:17
**date** 20:24 34:11
53:24 64:8 69:6
244:24 245:12
**david** 2:22 59:13
**davis** 2:11,12 4:10
155:25
**day** 13:4,6 17:18
21:17,17 27:7
28:7 181:1 209:22
212:23 238:2
242:14 245:15
**days** 243:17

**dc** 3:13 4:20 5:14
**dcampbell** 5:13
**dealing** 71:16
**dealt** 141:18
**death** 135:24
**deaths** 135:24
**decades** 136:1
202:22
**december** 69:12
**decided** 192:16
**declaration** 8:10
46:25 47:6 48:24
50:12,14 74:14
77:7,7
**declare** 11:23
245:4
**decreasing** 22:18
**deem** 128:10
**deemed** 245:6
**deems** 95:25 99:2
103:7,11
**defendant** 3:21
4:6,17,21 5:5,15
6:11,15,20,25 7:5
24:7 81:24 87:25
88:3,16 90:19
91:1 206:23
**defendant's** 8:4
24:20,25 52:23
**defendants** 3:8,14
5:22 6:5 8:7 12:20
24:5 25:3 26:2
27:14 56:18 76:5
78:11 89:19,25
93:11,15,17 131:9
194:23 203:12
206:21 207:12
208:3,7,20 239:17
**deficiencies** 81:25
82:3,22 83:3 91:2
94:6

RESTRICTED CONFIDENTIAL

[deficiency - discussed]                                                   Page 12

**deficiency** 90:23
**define** 36:7 77:23
  217:11 232:24
**defined** 97:13
  111:13 143:20
  153:13,18 214:7
**defines** 122:8
  223:15
**definition** 64:22
  65:6 66:8 79:14
  85:23 96:14,17
  97:2,15 98:2,7,7
  98:15,25 101:24
  102:1,12,19
  103:15,19 104:19
  122:3,5,13 123:3,5
  123:8,25 130:16
  130:17 143:16
  170:10 179:1
  213:5 214:7 219:8
**definitions** 114:5
  114:15,18 218:18
**definitively**
  136:14
**degree** 115:16
  216:4,6
**dehart** 5:19
**delivery** 188:18
**demand** 122:22
  123:2,13,14,19,24
  124:2,10 126:22
  127:2 130:7,10,19
  130:23 131:17
  145:25 152:24,25
  153:1 156:11,13
  156:16 157:3,4,17
  157:21 158:15,23
  161:1,1 164:7,20
  164:22 169:23
  170:7 178:19
  179:1,21 180:3,5

  181:23 182:8,11
  182:11,19 183:2
  183:16 186:19
  187:21 188:15
  189:4,15 190:25
  191:10 192:18
  230:16 231:24
**demonstrate**
  100:18
**deny** 176:20
**department** 14:9
  218:8
**depends** 17:22
  192:10
**deponent** 243:13
  245:3
**deposed** 13:1
  86:23 87:3,9 88:5
  111:16
**deposing** 243:13
**deposition** 1:11
  8:5,8 11:4,17,19
  11:20 12:20 52:24
  56:19 73:10 86:10
  87:11,19,21,25
  88:6 99:22 100:5
  100:24 109:18
  147:8 180:19
  241:15 242:5
**depositions** 86:25
  87:5,15
**derives** 81:23
**describe** 18:9
  20:17 45:23 63:4
  164:23 236:1
**described** 116:12
  145:14
**description** 8:2
  9:7
**design** 227:19

**detail** 20:18 56:25
**detailed** 79:13
  80:21 89:22,23
  90:18
**detailing** 89:25
**details** 21:6,10
  30:12 50:25 90:23
  91:1
**deter** 200:25 203:1
**determinants**
  36:23 37:8,8
**determination**
  81:1
**determine** 46:8
  114:11 144:14
  213:21 214:10
**determines** 37:24
**determining** 39:19
**deterred** 202:8
**developed** 15:19
  16:2,9,9 23:21
**developing** 40:19
**diet** 198:4
**differ** 207:6
**differed** 160:18
**difference** 200:15
  207:9
**differences** 236:23
**different** 19:13
  24:8 60:13 64:23
  65:7,10 69:19
  74:25 86:5,6 91:2
  104:3 117:24
  128:21 135:6
  150:22 157:24
  158:9,20 159:25
  160:24 161:7,18
  161:20 169:11
  173:2 174:19
  175:16 192:12
  193:2 196:9

  198:12,12 199:1,3
  205:9,10 206:20
  206:22 207:4,9,17
  208:1,5,9,13,19
  212:3 235:22
  236:5 239:4,16,16
**differently** 37:4
  128:22 151:12,14
  151:16 154:6
**diovan** 78:4
  132:12 133:1
**direct** 184:11
  226:16 227:7
  228:19
**directed** 80:14
  175:3
**direction** 52:2
  83:17
**directive** 171:9
  174:14
**directly** 226:12
  237:14,25 239:6
**director** 14:12
**disaggregate**
  213:24
**disagree** 33:21
  59:8
**disclose** 20:25
  30:20
**disclosed** 30:21
  31:2
**disclosing** 31:10
**disclosure** 30:9
  31:12 34:11
**discontinue**
  165:19 166:9
  171:10 172:17
**discount** 221:18
**discuss** 172:7
**discussed** 46:5
  61:4 231:23

RESTRICTED CONFIDENTIAL

discussing 27:22
33:12 47:19 152:8
discussion 50:21
76:25 91:24 94:19
discussions 53:20
60:2
disease 35:22
36:12 38:11,13
118:16 218:7
disincentivize
202:2
dispense 213:18
230:9 237:14
238:1
dispensed 118:11
213:4 224:23
239:6 240:23
dispenses 230:6
dispensing 38:1
dispute 131:21
138:17 156:5
disputes 20:6
21:22 24:8 27:4,6
disputing 156:15
dissertation 38:17
38:18,20 41:1,3,4
distinct 218:15
distinction 85:2,19
distinguish 85:13
distinguished
188:9
distracting 90:11
distributed 152:6
distributers 66:1
distribution 237:4
district 1:1,1
dlesli.davis 4:10
dna 39:15
doctor 46:3 54:10
54:10,18 65:15
132:17 133:8

143:24 149:24
154:14 157:13
165:20 169:10
171:11 172:8,19
173:1 174:10,18
174:22 175:14,15
176:1,14 177:16
178:6 184:22
191:19 207:15
document 1:4 53:7
53:10,12,13,17
56:10,13,17,24
57:19,23,23 58:5
58:14,14,21 59:2,3
59:7 63:8 66:17
67:12,24 83:18,25
85:18 90:17 167:6
167:13,15,16,24
170:20,22 172:23
173:25
documented
167:19
documenting
82:23
documents 9:6
46:13 50:6 55:24
56:7 64:16 69:17
82:15 84:18,21
86:7 89:24 90:25
91:4,7,14 92:18,20
93:18 94:5 167:18
167:20 180:25
doing 18:17 19:5,9
19:10,25 20:2
21:21 30:2 33:25
34:6 38:14 40:24
71:2 73:11,24
194:4
dollar 216:18
dollars 26:9

domain 24:11
donut 227:18
228:1
dorner 3:12
dorsey 6:17
dorsey.com 6:18
double 63:8
downright 185:11
downside 148:1
downstream
149:9 194:17
dozen 109:20
179:12
dr 8:5 12:16 13:2
20:20,20 30:8
31:3 33:20,25
43:12 47:1 52:24
53:8,18 55:15
56:24 57:8,19
61:1 66:17 67:1
67:21 68:9,14,15
68:23 74:13 80:16
101:9,17 109:24
110:5 111:6,18
112:10 113:4
125:21 129:25,25
131:3 134:16
150:19 161:6
162:14 167:5,14
180:17 206:15
draft 51:11
drafting 46:17
50:17
drafts 51:6 52:3
dramatically
135:25 182:12
drew 3:12
drill 111:17
214:22 215:16
drive 4:5 22:22

dropped 192:19
drug 16:1 22:5
81:8 89:10 95:25
96:16,20 97:14
98:3,6,16 99:3
103:7,11 104:4
110:16 113:22
114:8,18 115:13
116:3,20,22,23
117:17 118:10,17
118:20 119:7,16
119:21 121:7,21
122:3,20,20 123:5
123:6,8 124:6,6,25
125:17 126:3,16
127:10 130:15
133:12 134:2
145:20,21,22
149:19 151:6,8
157:5,23,24
177:15 184:7
185:7 189:10,22
190:8 195:17,20
196:2,9 198:3,12
199:1,3 200:1
205:10 220:25
221:20 222:9
223:4 224:19,23
226:3 229:1
230:16 232:6,18
233:4 239:25
240:13,14 241:3
drug's 116:1
drugs 5:22 22:3
35:21 37:6 38:12
41:12,17,24 65:7
66:10 79:10
103:15 104:2
105:2 111:11
113:11 114:23
115:17,22 118:8,8

RESTRICTED CONFIDENTIAL

**[drugs - enumerating]**                                                                    Page 14

118:9,25 119:1,18
120:12 121:8,9
123:4,25 125:11
126:1 131:20
132:14 133:3,7,12
133:13,19 134:2
136:2 152:3
153:25 154:6,11
156:15 158:16,24
163:2 178:20
184:15,18 190:5
197:7 201:1
202:14 203:13
209:25 210:25
211:4,4 218:2
226:9,18 227:16
231:18 233:7
235:1 236:17
237:15,22 238:2
239:7,9
**dtdorner** 3:12
**duane** 3:2,10
12:17
**duanemorris.com**
3:3,4,5,11,12
**due** 26:24 141:3
**duly** 12:9

**e**

**e** 2:1,1 3:1,1,11 4:1
4:1,4 5:1,1,17 6:1
6:1 7:1,1 8:1
11:15,15 140:2
242:1,1 244:3,3,3
**eabraham** 5:19
**earlier** 60:4 62:22
171:3
**early** 40:20
**easier** 153:19
**eastern** 1:13
**economic** 25:9
44:15 75:7,15,22

87:16 111:11
114:24 115:5
124:7,17 125:7
126:14,23,25
127:1,5,6,15,16
130:1,10,21,24
131:18 137:22
140:8,15,21 141:3
141:23 142:2
143:1,6,11,12,16
143:19,20 144:4,9
144:23 145:7,7,9
145:13,23 146:15
146:19,23 149:3
151:23,23 152:8
152:16,18 153:6
153:11,14,14,18
156:12 182:7,25
183:12,13,24
184:1,3,7 185:10
185:17,25 186:1
186:10,12,15,19
187:21 188:15,16
189:8,11,18,21,23
194:17,19 195:12
195:15 197:1,23
198:6,22,25 199:4
199:19,20 203:25
204:5,7,8,14,23
208:7,18,18,22
225:8,14 233:19
**economically**
153:25
**economics** 39:22
125:13,15 126:19
188:20,23 189:2,6
189:15,19
**economist** 15:24
37:4 40:6 111:19
133:8 138:23

**edits** 51:19
**effective** 114:12
139:2,14
**effectively** 30:18
31:15 233:3,19
**effects** 154:10
**efficacious** 113:18
114:7 115:12
116:1,19 117:19
118:3,15 123:11
125:6 154:7
**efficacy** 36:21,22
37:2,7,13 113:13
113:25 114:5,10
114:16 190:13
**eisenhower** 2:8
**either** 20:6 21:22
50:9,15 60:20
88:12 149:5
152:21 191:25
195:24 226:12
227:13
**elementary** 189:6
189:19
**eligible** 222:25
223:17
**ellie** 4:9
**ellie.norris** 4:9
**email** 181:1,6
**emphasis** 120:7
**emphasize** 185:14
**emphasizing**
120:6
**empirical** 118:4
**employed** 222:23
**employee** 218:10
221:1,21
**employees** 48:8
87:25
**encapsulated**
183:16

**ended** 238:21
**ends** 74:7 112:22
180:10 235:14
**english** 28:22
**enrichment**
206:23 207:2,21
208:12
**enrollees** 223:11
**ensure** 110:13
120:2 121:9
**entail** 136:11
**enter** 22:23,25
39:1 106:18
107:12 108:10,15
119:8,18,21 120:6
120:12,14 161:14
162:5 190:9
197:15
**entered** 40:4
105:11 116:24
138:11 139:9
186:3 197:4,8,20
235:3
**entering** 188:6
**entities** 32:23
217:19 218:22
220:24 221:20
222:9,13 224:3
**entitled** 31:3 33:24
56:17 167:6
**entries** 59:20
60:25
**entry** 23:2 36:1,3
38:24 61:6 63:12
66:25 67:20 68:8
**enumerated**
101:24 102:4
**enumerates** 99:4
**enumerating**
85:11

RESTRICTED CONFIDENTIAL

equals  189:22
equivalent  78:4,6
equivalents  133:2
eric  5:18
erickson  48:7
  61:16,18 62:24
errata  243:11,13
  243:17
especially  26:25
  40:25
esq  243:1
esquire  2:3,7,12
  2:16,21,22,23 3:3
  3:4,5,6,11,12,17
  3:18 4:3,4,9,10,14
  4:19 5:3,7,12,13
  5:17,18,19 6:3,8
  6:13,17,22,23 7:3
essential  33:17
established  111:6
  111:23
establishes  152:1
estimate  50:20
et  38:6 108:13
  223:3 243:4 244:1
  245:1
evaluated  148:16
everybody  74:2
evidence  149:5
  177:19 196:15
  226:10 227:6
  229:13 234:10
  239:19 240:10
evidentiary
  113:12 118:13
  119:10,19,22
  120:13,17,19,20
  120:23,25 121:13
  122:24 123:9
  124:13 125:4
  126:2,7 131:11

146:4,6,13 148:11
  149:5 152:22
  156:20 159:3
  161:14 163:5
  164:10 165:1,6
  187:12 188:8
  190:4,13
evolve  23:1
evolving  202:11
exact  49:11 128:19
exactly  28:25 43:2
  49:21 122:11
  160:6,22 223:25
  230:4,10
examination  10:3
  12:15
examined  12:9
example  172:22
  222:21 225:12
  227:12
exclude  216:18
  217:17 218:12,23
  220:16,16,23
  221:1,18,21 222:7
excluded  219:7
  221:15
excluding  153:6
  218:21 219:6
exclusion  219:22
exclusions  218:19
excuse  30:19
  32:14 54:23,23
  73:9 80:2,2 90:6
  149:11 152:12
  154:24 155:15
  206:4 214:5
executive  29:8
  44:13
exercise  198:4
exforge  78:5
  132:12 133:2

exhibit  8:2 43:17
  52:25 53:14 56:20
  58:16,22,23 74:17
  166:24 167:2,5
exhibits  10:5
  51:25 93:4 94:7
exist  130:8 156:12
  225:17
existence  230:7
exists  124:23
expect  49:1 61:12
  72:21
expected  38:24
expects  230:2,3
expenses  136:5
  144:7,21
expensive  226:18
  227:17
experience  25:16
  26:24 38:24 83:23
  83:23 84:15,20
  85:4,14,22 86:5
  133:6 151:11
  153:1
experienced  156:5
  156:7
experiences
  160:24
expert  16:13 17:5
  18:1,17 19:5,14,24
  20:1,14 21:4,5,15
  24:3,4 25:4,15
  26:6,10 27:4
  29:21 30:2 31:11
  32:21 34:10 39:21
  42:10 44:21 45:4
  46:25 47:5 50:11
  61:8 84:4 111:15
  111:15 134:17
  167:10 200:18

expertise  22:14,21
  83:22 85:3 111:22
  219:19
experts  23:17
  34:11 87:16,18
  88:3 191:12
expiration  38:25
explain  14:5 19:24
  37:16 80:18
  113:25 127:1
  131:3 164:24
  211:24,25
explained  230:14
explains  184:13
exposed  39:16
express  4:17
extensive  85:9
extent  23:1 30:8
  39:2 45:4 201:4
  219:18 238:25
external  237:12

f

f  242:1
face  225:7
fact  102:17 105:21
  105:23 170:6
  176:9 212:6 241:6
factor  135:5
  224:11 225:24
  228:13,16
factors  22:16,22
  102:4,14 103:12
  103:23,24 104:4
  104:12,14,20
facts  46:14 50:6
  51:24 80:25 81:4
  135:13 177:18
  196:14 239:18
  240:9
fails  243:19

RESTRICTED CONFIDENTIAL

[failure - form]    Page 16

| | | | |
|---|---|---|---|
| **failure** 88:15 | 184:6,12 186:10 | **finish** 54:14 56:3 | **folks** 51:21 |
| 89:17 90:18 92:22 | 186:15,22 188:1 | 73:21 86:2 148:6 | **follow** 67:13,14 |
| 134:5 175:5 | 190:7 | 159:13 187:7 | 201:7 221:11 |
| **failures** 82:5,8 | **fda's** 101:23 | 234:23 | 232:11 233:9 |
| 93:10 | 104:19 122:4 | **finished** 26:4 | 238:18 |
| **fair** 35:25 69:14 | 169:17 185:15 | 38:18,20 41:3,4 | **followed** 31:14 |
| 70:5 80:24 83:19 | 186:9 187:24 | 86:19 159:8 | **following** 72:10 |
| **fairly** 21:20 | **february** 1:12 | 187:17 | 217:18 |
| **falanga** 6:7 | 11:2 28:5,6 35:9 | **finishing** 40:23 | **follows** 12:10 |
| **falkenberg** 6:21 | 35:14 39:9 40:14 | **firm** 11:6,8 12:17 | 184:15 218:15 |
| **falkenbergives.c...** | 41:10 42:7 60:5 | 20:2 | **food** 22:5 89:10 |
| 6:22,23 | 242:14 243:3 | **firms** 15:10 20:7 | 96:16 97:14 98:3 |
| **falls** 182:11 | **federal** 121:5 | 20:10 24:9 39:1 | 98:6,16 110:16 |
| **familiar** 37:1 39:7 | 152:1 184:17 | 89:5 | 113:22 114:8,18 |
| 40:5 165:10 | 217:18,22 218:22 | **first** 12:8 18:23 | 115:13 116:3,20 |
| 167:13 189:5 | 221:1,21 224:4,12 | 22:14 24:21 27:25 | 118:10,17,20 |
| 223:5 236:4,13 | 226:1,13,25 227:7 | 28:1,9,10,13 29:4 | 121:7,21 122:3 |
| **far** 109:19 | 228:14 229:10,11 | 35:16 44:12 56:23 | 123:6 130:15 |
| **fda** 8:11 65:14,18 | **fee** 35:1,1 | 58:5 59:12,22,23 | 145:20 185:7 |
| 65:21 66:4 82:15 | **feel** 26:22 73:23 | 60:2 63:12 66:16 | 239:25 240:14 |
| 89:24 90:24 91:4 | 101:11 | 69:23 79:8 81:22 | 241:3 |
| 91:7,14 92:22 | **fewer** 26:19 | 107:12 146:16 | **footnote** 75:8 |
| 93:23 95:25 97:2 | **fhs** 6:3 | 166:6 169:5,7,7 | 76:14,14 77:14,14 |
| 98:24 99:2 103:7 | **field** 23:17 | 185:17 187:5,19 | 77:15,15,18,18,22 |
| 103:11,18,24 | **figure** 181:18,22 | 217:14 221:5,13 | 77:23 79:8 218:19 |
| 104:4,13 114:4,11 | 181:24 | **fit** 128:14 | **footnotes** 80:23 |
| 118:6,24 119:20 | **filibustering** 100:6 | **five** 74:1 100:17 | 81:18 |
| 120:10 122:8 | 100:9,19 | 100:22 101:1 | **forced** 198:22 |
| 139:13 157:15 | **fill** 51:22,24 | 155:10,12 235:7 | **foregoing** 242:5 |
| 165:10,18,25 | 229:22 | 235:11 | 245:5 |
| 166:8,10,13 167:6 | **filled** 184:19,24 | **floor** 3:19 6:4,9,14 | **form** 32:7 45:3 |
| 167:18 169:8 | 185:3 | **focus** 22:10,12 | 69:15 70:19 75:20 |
| 170:6,14 171:4,8 | **final** 46:18 | 41:15 184:13 | 77:10,20 81:9,13 |
| 171:14 172:4,6,16 | **finally** 46:18 | 202:16 221:24 | 83:4 84:24 89:20 |
| 172:24,24 173:5 | **financing** 15:8 | **focused** 41:10,14 | 90:20 92:12 94:9 |
| 173:10,15 174:3,9 | 21:18,23,25 32:10 | 194:12 199:20 | 96:5,22 97:9,22 |
| 174:15,16,19 | 32:23 | 200:11 231:11 | 98:22 102:21 |
| 175:3,25 176:9,20 | **finds** 153:24 | **focuses** 14:15 | 103:17 104:5,9 |
| 177:14,21,24 | **fine** 20:22 55:8,10 | **focusing** 123:14 | 106:2,13 107:2,5 |
| 178:16 179:16 | 55:20 95:6 109:16 | 123:20 221:5 | 107:24 108:6,22 |
| 180:3 183:11,23 | 206:7 | | 110:22 114:13 |

RESTRICTED CONFIDENTIAL

115:19 116:7,14
117:11 119:3
121:2 122:25
125:19 126:17
127:8 128:12
130:3 131:1,23
132:9 137:20
138:3,19 139:3,16
140:9 141:24
143:2,14 144:24
145:17 147:21
148:20 149:20,23
150:23 151:18
153:9 156:8 157:7
158:1,21 163:11
163:21 164:5,16
165:13,22 169:20
170:17 171:12,16
172:20 173:13
174:23 176:2,21
177:17 178:11
181:13 182:23
184:8 186:16
192:8,14 193:3,13
193:21 194:9
195:22 196:4,13
200:3,17 202:4
203:2 205:11
207:24 215:18
216:20 219:17
220:10,17 222:17
223:13 224:5,15
226:4 227:3
228:18 230:19
231:5 232:8,20
233:5,21 234:13
237:6 238:7
239:18 240:8,21
**formally** 31:10
**forming** 178:17,22
  179:16

**forms** 17:24
  240:13
**forth** 51:6 73:13
  84:22
**fortunate** 135:20
  174:9
**found** 50:20
  169:19
**four** 60:17,25
  120:24,24 160:4
  168:10 196:18
  206:20
**fourth** 65:12
**frame** 55:2
**frank** 6:3
**frankly** 48:25 71:1
  72:4 162:22
  186:23 202:21
**fraud** 21:13
**free** 101:11
**freeman** 2:7
**front** 44:2 50:21
  58:8 67:11 74:14
  92:8 114:22
  153:20
**fulbright** 4:8
**full** 51:23 101:3
  163:5 204:8
  207:22
**function** 189:4
**fund** 236:21
**funding** 224:4
**further** 11:21
  65:12 154:11
  242:9
**future** 200:21

**g**

**g** 11:15
**gain** 208:18
**gannon** 6:8

**gateway** 6:9
**gather** 52:20
**gathered** 56:7
**gcoan** 6:13
**geman** 2:16
**general** 19:15
  27:23 37:25 84:20
  135:3 136:10
  137:7 145:5
  237:21
**generally** 18:9,12
  19:22 36:24 37:1
  38:10,11 39:18
  45:23 48:9 61:19
  62:5 63:1,5 84:11
  85:14 135:13
  158:24 173:5
  207:11
**generate** 15:12
  46:21 47:12
**generated** 26:5
  35:4 45:22
**generic** 22:3,19,24
  27:10 36:1 38:24
  78:4,6 132:13
  133:2 227:21
  229:6
**generics** 229:13
**geoffrey** 6:13
**geoppinger** 7:3
**germane** 84:14,16
**getting** 216:13
**gisleson** 3:17
**give** 15:5,6 20:18
  44:3 55:8 57:10
  74:2,22 91:19
  95:19,22,22
  175:15 217:7
**given** 17:18,19
  146:12 197:3
  218:3 232:2 245:9

**gives** 173:1 174:18
**giving** 67:7,12
**glaxo** 42:18
**glaxosmithkline**
  42:19,23
**glenside** 1:12
  12:25
**gma** 62:25 69:20
**gma's** 44:7
**go** 32:15 39:3
  43:14,22 48:18
  57:5,11 60:12,17
  60:23,24 62:19
  65:12 66:3,16,24
  68:5 73:25 76:5
  76:21 81:19 88:7
  91:20 95:1 99:5
  114:20 126:20
  131:3,25 141:16
  150:11 151:25
  152:14,14 154:5
  159:13 160:12
  173:21 175:12,17
  176:14 178:5
  195:6,9 198:22
  208:14 231:10
  237:14 241:11
**goes** 44:20 146:22
  175:9 180:3
  202:20 204:15,15
  204:16 229:22
  235:25
**going** 11:1 12:19
  13:5,5 14:1 23:6
  35:7 43:22,23
  44:20 53:4 55:3
  57:4,14 60:10
  61:15 73:13 74:15
  74:24 75:10 76:2
  76:24 77:25,25
  80:5 91:23 92:5,6

RESTRICTED CONFIDENTIAL

**[going - guidance]**                                                  Page 18

94:14,15,16,18
95:5 112:22
117:16 129:7,10
129:11,13 144:2
144:17,18 150:14
161:25 162:11,12
175:2 180:10
188:14 201:11
206:9 208:21,23
215:10 220:22
235:14,24 241:14
**gold**   110:14
124:24 209:23
210:5
**goldberg**   3:3 10:4
12:14,15,17 15:4
16:16,20 20:16
21:7 29:1 30:13
30:24 31:18,23
32:3,11 33:7,21
34:14,21 36:5,17
38:7 43:10,11,19
44:11 45:9,19,21
46:19 47:2,5,14
49:13 52:14,22
53:4,6 54:13,15
55:10,17,22 56:10
56:12,16,22 57:11
57:18,22 58:11,17
58:21 59:1 61:14
61:24 62:1 66:14
66:20 67:9,15,25
68:2,4 70:8,21
71:12 73:25 74:5
74:12,19 75:23
76:21 77:4,17
78:8 79:22 80:1,3
80:10,15,17 81:10
81:14 82:18 83:1
83:9 85:16 87:4
88:13,14 89:15

90:9,16 91:3,20
92:3 93:1 94:4,14
95:4,8,13 96:18
97:4,17 98:9 99:7
99:11,13,17 100:1
100:3,23 102:2,15
102:23 103:4
104:1,6,23 105:20
106:10,23 107:3
107:21 108:3,18
109:1,5,10 110:17
111:1 112:1,5,11
113:3 114:19
115:14 116:4,10
117:8 118:5,23
119:14 120:4
121:16 123:12,18
126:12 127:4,13
127:14,20,25
128:5,11,15 129:2
129:5,9,12,19,24
130:22 131:19
132:4,22 133:20
134:14 135:7,14
136:4,12 137:8,24
138:16,24 139:11
140:6,13,19 141:1
141:11 142:22
143:6,8,23 144:5
144:11,17,19
145:11 147:5,15
148:4 149:13,21
150:7,18 151:4,16
153:4,16 154:18
155:5,21 156:1
157:1,10 158:7,17
159:4,12 160:7
161:5,17 162:8,20
163:18 164:1,11
165:9,17 166:5,17
166:25 167:4,10

167:12 168:2,7
170:13,21,23
171:13 172:14
173:9,20 175:20
176:17 177:1
178:7,14 179:5,9
179:14 180:7,16
180:24 181:8,16
183:8,22 186:7
187:4 189:7,20
191:5 192:4,11,24
193:7,16 194:6
195:13 196:1,7
197:5 198:7,24
199:24 200:14,22
201:9 202:5,23
203:8,20 204:2
205:6,17,23 206:1
206:7,14 207:18
208:11 209:16
210:4 211:22
212:24 213:17,19
214:20 215:2,8,14
216:5,22 219:4,15
219:24 220:7,13
220:21 222:18
224:1,10 225:23
226:23 228:9
229:17 231:1,8
232:14 233:1,14
234:1,18,20 235:9
235:20,23 237:16
238:12,19 239:14
240:3,16 241:9
**goldberg's**   20:21
**gonna**   52:23 76:5
93:12 141:6,7
**good**   12:16 55:20
63:23 74:5 112:10
113:16,17 138:6
210:25 235:7,9

**goodness**   210:4
**gordon**   6:2
**gotten**   150:20
**government**   20:13
20:14 21:3,9,15,24
22:7 24:13,14,16
26:3 32:22 71:3
105:4 162:7 165:2
186:5 190:15
217:19 218:22
219:15 220:1
224:4,12 226:2,13
226:14,25 227:8
228:14 229:10,11
**government's**
122:13 202:10
**gpp**   219:8
**grateful**   48:19
**gray**   28:7
**great**   43:25 95:19
112:12 142:12
217:10
**greenberg**   4:2
**greg**   4:4
**greylock**   8:9 16:14
16:16,23 17:4,8,11
17:21 18:14,18,24
19:18,25 20:5
27:21 28:1 29:11
34:23 44:14 48:8
48:18,20 49:23
51:8,11,18,21,21
52:16 59:6 64:17
70:9,14,16
**gtlaw.com**   4:3,4
**guess**   16:25 18:20
36:23 166:22
**guidance**   187:11

RESTRICTED CONFIDENTIAL

[h - honik]                                                                 Page 19

| h | 90:13 103:1 | hilton 2:23 28:13 | 97:9,22 98:22 |
|---|---|---|---|
| **h** 6:3 8:1 244:3 | 219:10 230:22 | **hinshaw** 6:12 | 99:9,15,20 100:2 |
| **half** 19:19,19 | **heard** 79:25 80:7 | **hinshawlaw.com** | 100:21 101:1,16 |
| 69:24 70:2 109:20 | 128:4 150:3 | 6:13 | 102:7,21 103:17 |
| 112:16 221:14 | 213:12 | **historian** 185:6 | 104:5,9 106:2,13 |
| **hand** 242:14 | **hearing** 12:5 | **hit** 195:5,6,7,8 | 107:2,5,24 108:6 |
| **handful** 63:1 | 147:1,2 | **hiv** 218:6 | 108:22 109:3,7,15 |
| 73:11 | **heart** 35:22 36:11 | **hold** 46:16 49:17 | 110:3,22 111:5 |
| **handling** 17:19 | 38:11,13 134:5,8 | 54:11 56:3 86:2 | 112:9,14,18 |
| **handy** 57:25 58:7 | 134:19,21 135:8 | 86:14 91:5,9 | 114:13 115:19 |
| **hang** 15:23 54:12 | 135:12,21,25 | 95:16,16 96:8 | 116:7,14 117:11 |
| 54:12,12,15,18 | 136:6,10 137:12 | 120:1 143:25 | 119:3 121:2 |
| **happened** 173:8 | 137:17 175:5 | 148:6,15,15 | 122:25 125:19 |
| **happens** 109:11 | **hebert** 62:4 | 162:10,10 181:19 | 126:17 127:8,18 |
| 162:15 | **held** 76:25 91:24 | 187:7 195:15 | 127:23 128:3,9,13 |
| **happily** 111:5 | 94:19 | 219:10 | 128:17 129:4,7,10 |
| **happy** 56:5 69:21 | **help** 52:19 | **hole** 227:18 228:1 | 129:14,22 130:3 |
| 69:22 91:18 99:5 | **helped** 51:22,24 | **holes** 210:19,21 | 131:1,23 132:9 |
| 126:20 196:20 | 51:25 | **home** 177:7 | 134:9,25 135:10 |
| **hard** 67:12 90:12 | **helpful** 13:8 46:12 | **honan** 62:20,21 | 135:17 136:8 |
| 114:21 | 50:7 | 63:3 | 137:5,20 138:3,19 |
| **harm** 185:20 | **henry** 5:3 | **honest** 182:6 | 139:3,16,24 140:9 |
| 202:18 204:7,8 | **heparin** 42:14 | **honik** 2:2,3 20:20 | 140:16,23 141:24 |
| 234:9,11 | **hereto** 245:7 | 28:12,23 30:7,16 | 142:8,12,15,19 |
| **harmful** 40:22 | **hereunto** 242:13 | 31:6,21,25 32:7,14 | 143:2,14 144:1,10 |
| 42:3 43:7 185:12 | **hetero** 5:22,22 | 32:16 33:14 34:2 | 144:13,24 145:3 |
| 185:13 | 78:2 93:25 | 34:17 45:3,13 | 145:17 147:2,10 |
| **harms** 39:16 43:4 | **high** 22:17 134:8 | 46:23 47:3,7,10 | 147:21 148:20 |
| 185:16 | 134:18,23 135:4,5 | 52:6,11 53:2,18 | 149:20,23 150:1,5 |
| **harvard** 15:18 | 174:7 175:4 189:3 | 54:13,23 55:11,20 | 150:10,23 151:18 |
| 23:24 40:23 | 191:1,8 192:1 | 57:7 58:20 61:20 | 152:14 153:9 |
| **health** 5:15 16:23 | 193:24 200:7 | 67:22 68:1,3 | 154:24 155:15,23 |
| 39:15,20 40:22 | **highlighted** | 69:15 70:19 71:8 | 156:8 157:6 158:1 |
| 41:19 42:3 43:5,8 | 175:18 | 74:3 75:20 77:10 | 158:12,21 159:10 |
| 111:18 125:13,15 | **highly** 30:25 50:4 | 77:20 79:19,24 | 160:2,19 161:9,23 |
| 140:8,14,21 144:7 | 55:13 114:3 | 80:2,5,13 81:9,13 | 163:11,21 164:5 |
| 144:21 217:21 | 124:22 189:25 | 82:10,24 83:4 | 164:16 165:13,22 |
| 218:10 | 190:1 | 84:24 86:19 88:20 | 166:11 167:9,11 |
| **healthcare** 3:9,15 | **hill** 3:4 5:17 | 89:20 90:20 92:12 | 169:20 170:17 |
| **hear** 24:21 52:6 | **hillwallack.com** | 93:21 94:9,21 | 171:12,16 172:20 |
| 58:2,3 88:9,10,12 | 5:18,19,20 | 95:1,6,9 96:5,9,22 | 173:13 174:23 |

RESTRICTED CONFIDENTIAL

176:2,21 177:17
178:11,23 179:7
179:11,17 180:20
181:3,13 182:23
184:8 186:16
188:21,24 189:12
190:21 192:8,14
193:3,13,21 194:9
195:22 196:4,13
198:16 199:5
200:3,17 201:3
202:4 203:2,14,22
205:11 207:24
208:4 213:15
214:12,24 215:4,9
215:18 216:20
219:12,17 220:3
220:10,17 222:17
223:13 224:5,15
226:4 227:3
228:18 230:19,23
231:5 232:8,20
233:5,10,21
234:13 235:11
237:6 238:7,16,24
239:18 240:8,21
241:11 243:1
**honiklaw.com** 2:3
243:2
**hopefully** 14:2
**hoping** 27:1
**hospital** 217:23
**hospitalization**
135:9,16,23
**hospitalized**
135:12
**hospitals** 211:1
**hour** 60:11 72:14
72:15 112:17
182:10

**hourly** 35:1 49:15
49:19 60:11,12,16
60:19
**hours** 48:23 49:2,4
49:6,7 66:21,22
68:24 69:13,24
70:3,5,6 72:18,23
72:25 73:12
111:23
**house** 26:21
175:24
**huahai** 3:8,9,15,15
78:1 93:13 168:22
**hudson** 2:17
**huh** 20:11 41:8
201:16 217:9
**human** 39:15
40:22 41:19 42:3
43:4,8 148:23
149:14,15,16,22
163:8,10,17
**humana** 6:25
**hunchuck** 3:18
**husch** 4:14
**huschblackwell....**
4:15
**hyman** 2:16
**hyper** 192:1
**hypertension**
38:10 133:24
134:3 137:3,16
139:2,15 141:3,9
141:16,22 142:25
170:9 172:3 174:8
190:20 191:1,8
192:1 193:20
198:3 199:18
200:7
**hypothetical**
158:3 177:9,18
196:14 198:17

199:6 235:5 240:9
240:22

**i**

**icu** 211:6
**idea** 234:24
**identification**
31:15 43:18 53:1
56:21 58:24 74:18
167:3
**identifies** 65:22
**identify** 31:14
51:23 65:8,23
213:1,6,10 216:3
**identifying** 50:6
55:4
**identity** 121:11
122:4
**ignorance** 101:3
**ii** 8:12 167:7
**illegal** 124:11
**illegitimate** 124:11
162:3 183:19
196:3 199:9
202:12 204:18,21
230:14 231:3,14
**illinois** 4:5 6:24
**ilyse** 242:17
**immaterial** 200:10
**immediately** 103:6
**immunology**
226:19
**impact** 39:19
**impair** 13:24
**implement** 88:16
89:18 90:18
**import** 62:7
**importance** 126:7
**important** 19:8
**importantly**
111:21

**imported** 63:6
**impossible** 160:10
**improper** 129:6
158:2 196:14
198:17 199:6
240:22
**impurity** 203:13
**inappropriate**
240:9
**incentivize** 201:20
204:13
**include** 35:21
77:24 89:1 99:3
103:11 218:5,11
220:14 240:6
**included** 37:19
53:24 172:11,15
179:22 207:6
220:1,15 231:21
240:19
**includes** 42:13,14
78:3 178:8 179:1
217:13 218:18
222:21
**including** 15:20
77:8 78:9 85:5
178:20 191:14
194:4 219:6
221:17
**inclusive** 96:17
98:8,17 102:1,13
103:20,23 104:20
122:14 213:3,8
214:14,16,17
**income** 26:5,6
**incorrect** 213:11
**incorrectly** 93:12
**increasing** 22:17
**increasingly** 19:20
**incurred** 75:4
111:8

RESTRICTED CONFIDENTIAL

**independent** 20:1
81:1 114:9
**independently**
20:3 81:7
**index** 10:5
**indian** 218:10
**indiana** 5:9
**indianapolis** 5:9
**indicated** 123:11
**indication** 118:16
**indicative** 37:13
**individual** 134:17
149:1 152:10,23
152:25 156:14
157:4,22 216:9
222:23
**individualized**
158:11
**indulge** 151:24
**industries** 4:7
**industry** 14:22
15:1,9,10,21 16:4
16:5,7,11,12,25
17:1,13 19:8
21:20,22 22:16
23:9,10,11,17,19
27:8 32:9,25 33:4
33:10 34:7 41:20
42:11 83:24 84:5
84:12 85:4,10,14
98:1 105:7 186:24
187:9 210:6
**industry's** 188:5
202:21
**infectious** 218:7
**information** 34:12
52:20 56:7
**informed** 134:13
**informs** 85:5,22
86:7

**infused** 218:2
**ingersoll** 4:18 5:2
**initial** 89:11
**injected** 218:2
**injured** 199:10
225:10,15
**injury** 75:4,13,14
75:15,22 111:8
154:12 194:12,22
195:4,5,16 196:21
196:24 197:19
198:2,8,10 199:4
224:25 225:18,21
227:14
**innovate** 15:11
**innovation** 14:16
**inpatient** 211:5
**input** 52:17
**inspection** 92:21
**instance** 119:15
**instances** 89:16
**institute** 14:12,12
14:13,14
**instruct** 13:11
20:21 30:16 31:21
31:25 33:14
**instructed** 31:9,13
209:12
**instructing** 169:8
169:17 177:14
**instruction** 55:8
209:17 219:3,23
220:5
**instructions** 9:3
**insurance** 209:8
211:16 212:7,8,13
217:15,21 218:1,4
218:8,9 221:16
222:24 223:15,16
224:9,21 225:1
227:22 229:24

230:7,8 237:4
**insure** 157:14
**insured** 24:15
108:12 200:12
223:19,22,24
**insured's** 232:5,17
**insureds** 233:3,19
**insurer** 119:10
157:14 223:18,20
230:3
**insurers** 106:8
195:3 197:22,22
221:2,23 222:3
223:2 239:6
**intellectual** 19:4,6
**intended** 133:24
134:3,4 202:1
**intense** 71:19
**intensely** 71:2
72:1,2
**intently** 48:1
**interest** 35:17
36:11
**interested** 27:22
37:5 38:23 39:18
40:25 43:2 242:11
**interfere** 128:2,15
**interfering** 100:4
**interject** 54:14
**interjected** 142:16
**interrupt** 71:8
80:4,4 86:20 99:9
99:10,15 109:17
127:21 144:1
162:18 188:10,11
**interrupted** 109:9
159:16 160:10
234:21
**interrupting** 67:6
96:10 99:13,21
109:3,17 179:7,8

**interruption** 128:7
142:4
**investigating**
21:12,12,13
**investigation**
21:11,16
**investigations**
21:3,9
**invoice** 35:4 49:22
59:12 63:9,20
66:25 67:3,17
68:9,11,14,16,22
69:1,5,7,9,23 70:4
72:6,7,11,12
**invoiced** 66:21
68:15
**invoices** 8:9 59:6
59:20 62:20 69:11
70:7,10,16,23,24
71:22
**involve** 41:24
175:10
**involved** 17:15
20:15 22:4 30:4
30:15 33:19 34:6
34:10 48:21
133:15
**involvement** 20:25
31:11
**iqvia** 63:6 65:18
65:23 209:3,22
210:2,12 212:25
213:20,20,23
214:3,9 215:15
216:2 217:1
**iqvia's** 215:20
**irbesartan** 1:3
8:14
**issue** 64:7 65:6
66:10 76:4,11,15
77:6,13,23 78:9

RESTRICTED CONFIDENTIAL

81:5 82:1,6 83:7
91:16 96:25 97:7
97:12,21 102:5,5
130:13 133:3
138:9 139:8 144:8
144:22 147:19
151:12 152:9,19
153:8 156:4,6
157:21 158:19
159:23 160:17,22
164:4,21 165:4
169:9 170:15
171:15 172:16,17
172:18 173:11
174:20 175:23
176:19 177:5,13
178:20 179:3,4,23
182:15 190:17
193:18 196:10
198:10 199:2
200:13 205:16
211:3,9,13 215:17
225:3 226:11
227:9,16 229:6
230:12,15 231:14
231:18 232:5,17
233:20 234:16
236:7 237:4 238:5
238:15,23 239:23
241:1,7
**issues**   14:15 44:15
44:22 158:11
**italics**   185:15
**items**   56:4
**ives**   6:21,22

**j**

**j**   2:16,22 5:12,19
**jamie**   1:14 11:8
52:7 144:13,16
150:2,10 152:17
219:13 242:3,17

**janow**   4:19
**january**   59:24
60:6 239:23
**jdavis**   2:12
**jeffrey**   7:3
**jersey**   1:1 2:9 5:21
6:10
**jgeoppinger**   7:3
**job**   39:23 66:6
67:8
**john**   2:12 3:17
155:25 156:2
185:6
**john.gisleson**   3:18
**jonathan**   4:19
**jonathan.janow**
4:19
**judge**   100:7,25
153:13,17
**judge's**   155:13
**judged**   114:7
115:11 116:20,22
117:3 146:9
**july**   72:2 167:24
168:6,11 171:1,1
173:22 174:15
176:10 177:4,4,11
177:12 240:20
**justified**   153:12
**justin**   7:8 11:6
95:10

**k**

**k**   3:17 4:20
**kanner**   2:20,21,22
2:23
**kapke**   5:7
**kara**   5:7
**kara.kapke**   5:8
**katz**   2:7
**kbi**   6:22

**keep**   120:10
176:20 238:5,10
239:13
**kid**   71:5
**killer**   184:20
185:4
**kind**   21:20 37:10
38:15 39:22 50:13
50:22 143:10
162:15 221:4,14
233:10
**kinds**   17:10 20:19
**kirstin**   6:22
**klinges**   3:6
**knepper**   4:14
**know**   17:18 19:13
21:13 23:8 26:21
29:11,14,25 31:3
33:22,23,24 34:9,9
35:3 40:5 41:13
42:11 44:19 48:10
48:15 60:4,15
62:8,11,18 63:2,4
63:15 64:2,3,7,9
64:21 67:2 78:18
85:23 86:3 93:15
111:19 114:21
123:21 127:3
129:4 131:6 134:6
138:21,22 146:11
158:5 163:24
181:7 192:18
195:3 200:4,15
210:1,9,11,23
216:7 224:2
227:22 229:3
238:17 239:12
**knowledge**   84:20
207:8
**known**   29:3
163:16 166:2

**keep**   188:5 209:23
212:4 240:1
**knows**   125:3
126:11

**l**

**l.l.c.**   2:20
**label**   65:25 66:1
120:3
**laboratories**   6:5
**labs**   5:22
**lantech**   93:25 94:3
**lapses**   42:12,24
43:3,5
**largely**   16:24
19:19 20:6 24:8,9
24:14,18 25:1
45:17 50:5,7
211:4 226:7
**launch**   107:13,14
107:14 108:14
110:10
**law**   12:17 14:9,15
121:5 152:1
**law.com**   2:21,22
2:23
**lawfully**   152:5,5
**lawsuit**   127:18
**lawyer**   200:20
203:15
**lawyers**   28:8
29:12,16,22 30:3
30:14 31:4,14
**layne**   2:23 28:13
**lbresnahan**   5:12
**lchb.com**   2:17
**lead**   22:16 134:8
134:19,24
**learned**   193:22
**leave**   208:23
**leaving**   84:19
132:6 207:20

RESTRICTED CONFIDENTIAL

208:12
**left** 134:7,18,23
**legal** 7:8 17:16
45:4 105:12
121:10 200:18
201:4 203:3
219:18 238:25
243:23
**legally** 88:23
**legitimate** 105:5,7
105:8,23 106:1,12
107:1,23 108:5
115:6 118:1
121:15 124:8,18
125:17 126:24
130:9,11,19
131:16 146:3,16
148:2,9 152:4
156:22 159:1
161:2,4 162:4
163:2 164:9,25
170:5 181:10,12
182:5,5,22 183:5
186:25 187:11,13
188:7,17 189:10
189:16,17,22
197:4 202:19
209:24 210:17,18
211:19,20 231:17
232:1
**legitimating** 180:2
**legitimatized**
181:23
**legitimize** 201:20
**letters** 93:23
**level** 109:21
216:14
**levels** 235:22
239:16
**lewis** 3:17

**lhilton** 2:23
**liability** 1:3 18:4,6
18:8,11 19:16,19
19:21 24:23 25:4
25:13,16,22 31:20
46:7 75:18 206:21
206:22 207:5,10
207:20 208:7
**license** 89:11
242:17
**lieff** 2:16
**lieu** 11:21
**life** 200:21
**liked** 86:24 87:8
**limit** 217:14
227:12 228:4
**limitations** 210:2
210:5 211:25
212:3
**limited** 5:22,22 6:6
89:2 99:3 102:13
103:12
**limiting** 76:16
**line** 9:4,7,10,13
65:13 88:15
163:14 174:2
244:4,7,10,13,16
244:19
**lines** 81:22
**list** 54:3 65:21
66:4 70:12 73:18
85:9 173:16
**listed** 69:18,20
76:14 77:14 81:18
84:2,14 89:24
92:18,19 96:4
98:7,20 101:25
103:12,20 104:7,7
104:8,21 217:5
**listen** 92:4

**listing** 72:24
**lists** 96:14
**literally** 189:2
**literature** 40:19
126:6
**litigated** 32:1
**litigation** 1:3 11:5
16:24 17:6,8,11
19:10 20:23 26:25
**little** 14:3 20:18
40:2 41:7 49:20
57:10 60:21 63:16
75:11 90:11
162:22 181:5
184:23 228:2
230:20
**live** 157:18
**livenote** 1:15
**llc** 2:2 3:9,15 4:21
5:5
**llp** 2:11,16 3:2,10
3:17 4:2,8 5:7,11
5:17 6:2,7,12,17
6:21 7:2
**located** 216:7
**long** 21:18 22:5
41:21 46:20 47:10
50:10 116:21
174:2
**longer** 64:21
**longstanding**
35:17
**look** 49:17 56:25
57:4 72:6 78:19
78:19 83:13 103:5
113:4 121:4
149:14 209:22
214:9
**looked** 62:9,16
84:1 93:3,19,20

**looking** 36:20
59:21 67:16 69:1
81:23 91:10 97:18
105:1 134:15
209:18
**looks** 26:10 59:21
59:23 60:5,11,16
62:6 66:21 69:23
**losartan** 1:2 8:13
243:4 244:1 245:1
**loss** 25:9 195:15
197:1,23 198:6
200:25 208:18
225:14
**losses** 185:17
**lost** 101:17,19
184:23
**lostless** 194:4
**lot** 22:6,6 36:2
47:18,18,22 48:14
71:2 84:6,9 85:24
86:3 137:10
183:14 230:11
232:12 233:23,24
**lots** 46:17 51:6
141:14,15
**loud** 54:20
**louis** 4:16
**louisiana** 2:24
**low** 163:7 229:6
229:13
**lowering** 154:4
**luke** 5:12
**lunch** 112:10,24

**m**

**m** 1:11 2:5,7 4:3
4:10 5:7 6:13 10:2
140:2,2 242:6
**madam** 109:23
**maintains** 124:24

RESTRICTED CONFIDENTIAL

**[major - mckinnon]**                                           Page 24

| | | | |
|---|---|---|---|
| **major** 40:4 | 64:23 65:8,9,11 | 146:8 148:7,10 | 69:13 70:12 73:9 |
| **majority** 71:16 | 81:24 82:7,16 | 174:8 185:2 186:6 | 75:5,6,13,15 81:5 |
| 73:5 228:25 | 84:7 88:16,22 | 187:2,15 191:3 | 83:8,23 84:15,19 |
| **makeup** 19:13 | 90:19 91:1,15 | 198:11 202:19 | 84:22 85:7,12 |
| **making** 85:3,19 | 92:23 93:19 105:5 | 204:23 209:25 | 111:9 130:12 |
| 201:1 233:25 | 106:16 107:9 | 210:8 211:20 | 135:4 136:10 |
| **manage** 192:16 | 108:9 110:7 | 222:24 | 137:7 138:14 |
| **managed** 198:3 | 116:16,25 126:3 | **marketed** 78:3,5 | 143:17 145:6 |
| **management** | 131:9 163:15 | **marketplace** | 148:13 151:3 |
| 193:5,6 | 171:5 197:15 | 184:19,24 185:3 | 152:20 160:25 |
| **manager** 238:22 | 198:20 201:1,21 | 190:2 194:24 | 163:14 182:6,25 |
| **managers** 236:15 | 202:2,8,12 203:1 | **markets** 14:9 | 183:6 186:18 |
| 236:16 239:8 | 203:12,18 210:20 | 22:23,24,25 36:1 | 187:21 198:13,14 |
| **managing** 71:4 | 239:24 240:12 | 38:6 39:1 114:4 | 200:13 203:25 |
| **mandates** 121:7 | 241:1 | 124:22 210:8 | 204:18 231:20 |
| **manipulation** 50:8 | **manufacturing** | **marking** 56:16 | 239:15 240:4,17 |
| 61:11 | 42:12,25 62:7,8,12 | 58:22 167:5 | **mattered** 196:11 |
| **manner** 12:2 | 81:25 82:6 91:5 | **massachusetts** | **matters** 16:24 |
| 109:8 116:18 | 110:14 113:16,17 | 6:14 | 17:16,17,19 19:1,6 |
| 128:14 228:20 | 116:2 121:24 | **match** 66:10 | 19:14,17 20:4,12 |
| **mansplaining** | 125:5 203:12 | **material** 93:8 | 20:19,22 21:8 |
| 162:21 234:22 | **march** 28:6 35:10 | 229:12 | 24:9,18,24,24 25:2 |
| **manufactured** | 35:15 39:9 60:5 | **materials** 15:20 | 25:23 27:9,14 |
| 76:4 77:24 78:10 | **mark** 30:24 43:15 | 16:8 23:8,22 | 29:15,17 30:9 |
| 113:16 115:24 | 52:23 74:15 | 46:11 54:4 83:15 | 34:1,5 117:14 |
| 121:23 191:15 | 166:25 | 83:20 84:13 85:11 | **matthew** 4:14 |
| 241:4 | **marked** 9:12 | 85:15,18,20,22 | **maz** 6:23 |
| **manufacturer** | 43:17 44:2 49:15 | 91:10 | **mazie** 2:7 |
| 108:20,25 110:13 | 52:25 53:5 56:20 | **math** 211:14 | **mazieslater.com** |
| 110:20 115:23 | 57:20 58:23 59:3 | **matt.knepper** | 2:8 |
| 117:19 119:9,23 | 74:15,17 167:2 | 4:15 | **mckesson** 4:12 |
| 119:25 120:1,11 | **market** 2:4 22:19 | **matter** 11:24 18:5 | **mckinnon** 8:9 |
| 123:7 124:13 | 36:4,7,8,9 37:19 | 19:15 21:11 27:18 | 16:14,16,23 17:4,8 |
| 125:1 126:10 | 40:3 63:13,25 | 27:19,24 28:11 | 17:11 18:14,18,24 |
| 159:2 171:22,24 | 64:4,9 65:3 66:5 | 29:9,13,17 31:2,5 | 19:18,25 20:5 |
| 171:25 190:12 | 86:4,6 89:12 | 31:16,19,20,24 | 27:21 29:11 34:23 |
| 206:21 209:1,5 | 107:13 108:15 | 32:1,2,4,9 33:9,11 | 44:14 48:8 51:8 |
| 212:14 218:16 | 113:14,20 116:18 | 34:25 35:2,5 45:8 | 51:11,18,21 52:16 |
| 239:17 | 117:16 120:17 | 45:17,22 46:7 | 59:6 64:17 70:9 |
| **manufacturers** | 126:1,11 131:14 | 48:5,13,15,18 60:6 | 70:14,16 |
| 15:11 36:3 64:6 | 132:14 145:25 | 62:25 64:7 66:11 | |

RESTRICTED CONFIDENTIAL

**[mdl - misbranded]**    Page 25

**mdl** 1:2
**mean** 18:13 19:2
  23:12 24:12 25:6
  26:11 29:19 30:1
  36:7,18 41:13
  47:24 51:3,4
  64:11,15,20 67:2
  70:24,24 73:20
  76:11 78:18 82:2
  85:1,23 87:7
  89:13 92:16 105:8
  105:10 111:4
  113:10,25 114:6
  115:1,2,3,5 117:22
  119:20 120:8,14
  120:16 121:13,19
  122:1,2 123:22
  126:5 134:1,11
  135:19 137:13
  141:8,14 142:1
  143:6,13 145:5
  157:12,17 158:6
  158:14 162:13,14
  165:16 168:5,22
  173:25 176:23
  177:2 185:10,12
  193:4,23 198:18
  203:17 204:4
  207:11 210:23
  214:5,5,24,25
  215:1 221:8,9,11
  232:23 234:17
  236:11 237:20
  238:11 239:13
**meaning** 117:22
**meaningless**
  148:18
**means** 63:15 97:3
  105:13
**meant** 62:11 64:3
  64:8 184:1

**measure** 207:3,19
  207:21 208:7
**media** 11:3 74:7
  74:10 112:22
  113:1 180:10,14
  206:12 235:14,18
**medical** 136:5
  154:4 218:3
  225:13
**medically** 154:7
**medicare** 217:22
  217:23 218:1
  220:23 221:6,6,19
  221:24 222:4,8,12
  222:13,25 223:1,6
  223:10,17 224:14
  225:25 227:1
  228:15
**medication** 172:25
  175:13 190:20
  193:2,12,20 194:8
**medications** 13:23
  175:19 192:7
**medicine** 169:10
  169:18 174:17
  175:21,22
**meet** 84:8,8
  105:11,14,19
  107:12 108:13
  113:15,20 115:7
  116:25 118:13
  119:10,12,16
  121:9 122:23
  123:4,8 125:4
  126:2 130:20,23
  145:25 146:4,6
  148:10 149:4,5
  156:20 161:13
  163:4 164:10
  165:1,5 186:20
  187:22 188:8

  190:4,12 204:22
**meeting** 28:10
  29:4 35:9 110:9
  114:16 119:19,22
  119:23 120:13,17
  120:19 123:9
  125:8 126:23
  131:11,17 146:20
  152:21 159:3
  182:19
**meetings** 28:1
**meets** 121:24
  123:7 146:13,15
  187:12
**megan** 6:23
**member** 134:1
  214:5 215:16,25
  236:16
**member's** 213:21
  214:2
**members** 21:22
  54:8 201:21 214:6
  214:16,18
**menacing** 184:18
  184:19 185:2,3
**mention** 68:17
  86:22
**mentioned** 48:4
  51:5 62:21 216:23
  229:19
**merely** 111:16
**meridian** 5:8
**messages** 180:18
**met** 23:20 28:9,10
  113:12 124:13
  130:8 217:3
**methodology**
  164:2
**methods** 211:21
  211:23

**microbe** 184:20
  185:4
**microphone** 75:11
  152:13
**mid** 159:16 160:11
**middle** 50:23
  55:12,12 99:21,23
  105:2 142:17
**mike** 61:2,3,6,7,8
**military** 218:7,8,9
**mind** 25:25 206:6
**minimized** 202:15
**minimum** 115:25
  119:12,16 120:18
  185:8 190:11
  241:5
**minute** 74:1,2
  180:8 181:19,19
**minutes** 74:4
  155:10,12 235:7
**misbranded** 76:8
  78:16,23 79:14
  95:25 96:13,21
  97:1,2,13,13,25
  98:5,14,25 99:3
  101:22,22 102:1
  102:11,12 104:15
  104:19 105:3
  111:12 114:24
  118:15 122:12
  124:9,20 130:14
  130:18 131:7,15
  132:3 133:4
  138:10 139:8
  152:3 165:7 170:1
  171:20 173:19
  179:24 182:16,16
  183:4,19 184:15
  185:16,19,21
  186:3 187:2,15
  194:14,23 197:12

RESTRICTED CONFIDENTIAL

**[misbranded - notice]**                                                    Page 26

197:13 199:9,22
200:12 202:13
231:17 234:8
**misbranding**
79:13 80:21 81:4
84:11 96:15 97:19
98:2,11,15,21
102:4,18,19,20
201:2
**mischaracterizat...**
51:9,13 77:22
96:24 188:13
**mischaracterized**
116:9
**mischaracterizes**
189:13
**mischaracterizing**
50:19 188:3
**misconduct** 204:1
**mishear** 213:17
**misheard** 213:13
**misremembering**
28:16,19,20,21
**missouri** 4:16
**misunderstanding**
151:21,22
**mitigate** 191:25
**mitigation** 89:2
**mix** 18:10,24
19:22 222:3
**mixing** 233:10
**modalities** 199:17
**model** 182:10
183:20
**moment** 139:6,19
139:19,22,23,24
140:1,2 147:23
149:11,12 151:2
153:3 160:25
161:13 162:2
163:1,13 194:18

195:11 196:25
198:5 199:18
203:23,24 225:7
225:18
**money** 34:15
136:18,24 144:6
144:20 145:6
**monroe** 6:24
**month** 28:3,4
209:5,9 212:14
214:18 215:21
216:9 218:17
**months** 47:16,17
47:23,23 71:6
**morgan** 3:17
**morganlewis.com**
3:18,19
**moring** 5:11
**morning** 12:16
13:24 147:13
**morris** 3:2,10
12:17
**moskowitz** 1:14
11:8 80:7 99:24
101:12 242:3,17
**mother** 71:4,17,24
73:15 135:11
223:17 225:11
229:2
**move** 34:13 80:9
128:23
**moving** 201:11,13
206:2,5
**mulberry** 6:9
**multiple** 64:6
93:24 153:12
165:25 166:14
**murtha** 5:17
**mute** 152:13
**muted** 142:21

**mylan** 6:5,6 42:1
42:15 78:2 93:24
**mystery** 51:15

**n**

**n** 2:1 3:1,18 4:1
5:1 6:1 7:1 11:15
140:2
**name** 12:16,22
33:22 78:1,4,5
93:15 216:9
**name's** 11:6
**names** 33:23 60:24
217:20
**national** 15:25
38:1 65:9 66:11
209:4,7 217:15
**nature** 36:12 43:4
**ndc** 65:22,23 66:3
66:8,10
**ndcs** 65:14,17,18
65:19
**ndea** 40:9,16
41:11,17 76:17
77:9 239:17
**ndma** 40:8,16
41:11,17 42:4,6,7
42:8 76:17 77:9
177:8,13 239:16
**nearly** 31:9 57:7
**necessary** 204:11
245:6
**need** 13:20 33:22
33:23 43:14 54:17
54:18 79:23 84:8
95:2 109:14 125:9
146:6 157:23,24
158:6 202:25
**needed** 190:19
**needs** 66:6 75:11
111:19 115:23
128:3 182:8

219:12 229:25
**neither** 105:3
242:9
**never** 154:10,13
186:3
**new** 1:1 2:9,18,18
2:24 5:21 6:10,19
6:19 73:14,16
166:24 195:8
**newark** 6:10
**nitrosamines** 39:6
39:7,11,25 43:6
240:1,7,18 241:7
**noise** 147:3
**non** 113:9,10
152:2 172:9,10
176:24 191:16,24
201:18,18 223:23
**noncompliance**
201:21 202:3,9
**noncontroversial**
80:8
**nonzero** 204:12,16
**normal** 20:24
**norris** 4:9
**north** 5:4
**norton** 4:8
**nortonrosefulbri...**
4:9,10
**notably** 15:10
171:21
**notary** 242:4
245:13,19
**note** 218:14
243:10
**noted** 11:10 110:3
245:7
**notes** 242:8
**notice** 8:4,7 52:24
56:18

RESTRICTED CONFIDENTIAL

[notices - okay]                                                    Page 27

**notices**  92:22

**notion**  124:18
  125:16 126:15

**novartis**  172:1
  191:15 199:12

**november**  45:23
  47:3

**number**  8:2 11:3
  15:22 20:4 37:12
  50:19 54:3 74:7
  74:10 88:25
  112:22 113:1
  170:25 180:14
  206:12 235:14,18

**numbers**  51:25

**nw**  3:13 5:14

**ny**  243:15

**o**

**o**  11:15 140:2

**o'clock**  241:10,14
  241:16

**o'reilly**  6:7

**oath**  11:22

**object**  32:7 45:3
  69:15 70:19 75:20
  77:10,20 81:9,13
  83:4 84:24 89:20
  90:20 92:12 94:9
  96:5 97:9,22
  98:22 102:21
  103:17 104:5,9
  106:2,13 107:2,5
  107:24 108:6,22
  110:22 114:13
  115:19 116:7,14
  117:11 119:3
  121:2 122:25
  125:19 126:17
  127:8 130:3 131:1
  131:23 132:9
  137:20 138:3,19

139:3,16 140:9
143:2,14 144:24
145:17 147:21
148:20 149:20,23
150:23 151:18
153:9 156:8 157:6
157:6 158:1,21
163:11,21 164:5
164:16 165:13,22
169:20 170:17
171:12,16 172:20
173:13 176:2,21
177:17,17 178:11
181:13 182:23
186:16 192:8,14
193:3,13,21 194:9
195:22 196:4,13
200:3,17 202:4
203:2 205:11
207:24 215:18
216:20 219:17,17
220:17 222:17
223:13 224:5,15
226:4 227:3
228:18 230:19
231:5 232:8,20
233:5,21 234:13
237:6 238:7
239:18 240:8,21

**objected**  31:8

**objection**  13:12
  32:17 34:18 45:13
  53:19 55:9,17
  61:20 82:10,24
  88:20 96:22 102:7
  110:4 111:24
  128:8,8,12 129:19
  129:20 134:9,25
  135:10,17 136:8
  137:5 140:16,23
  141:5,24 142:9

147:10 154:25
155:16,24 158:12
160:2,19 161:9,23
166:11 174:23
178:23 179:11,17
181:3 184:8
188:21 189:12
190:21 198:16
199:5 201:3
203:14,22 214:12
220:3,10 238:16
238:24

**objections**  8:6
  12:1,3,6 13:10
  56:17

**observation**  34:4

**obtain**  52:4 210:12
  210:14

**obtained**  208:16

**obviously**  19:7
  24:13 148:23

**occur**  98:11 230:5

**occurred**  42:25
  88:6 97:7 154:13
  194:13 196:25
  197:25 227:15

**occurrence**  40:8
  40:16 41:11,16,18

**occurs**  195:4,5,15
  196:21 197:19
  218:15 224:25
  225:18,21

**october**  72:19

**offer**  220:25
  221:20 222:9
  224:14 225:25

**offered**  80:8

**offering**  228:15

**offerings**  222:14

**office**  22:3 218:3

**oh**  16:8 73:2
  159:17 201:14
  210:4 218:17

**ohio**  7:4

**oils**  185:5

**okay**  12:12 13:1
  13:12,18,22 14:2
  16:22 18:3,16,20
  19:18 24:2 26:4
  26:13 30:2 35:7
  37:10,16 40:10
  43:20,25 44:5
  47:16 50:18 51:5
  51:14,20 56:8,9
  58:9 59:14 60:4
  60:22 61:5 63:12
  63:23 67:9,20
  74:4,23 78:19,21
  81:21 82:21 84:17
  90:14 92:6 93:2
  93:16 94:11 95:1
  95:9,19,23 98:24
  106:24 107:20
  108:24 112:7
  113:7 116:15
  117:13 120:5
  121:4 122:6 130:5
  132:23 134:15
  141:20 142:12,19
  143:15 145:19
  147:4,4,16 148:22
  150:1,5 151:20
  159:17 161:25
  162:13,24 166:13
  168:13,14,25
  169:1 176:1,18
  177:3,8,9,10 180:8
  181:9 189:14
  191:7 196:2,8
  197:6,18 201:14
  208:21 213:17

RESTRICTED CONFIDENTIAL

**[okay - parts]**                                                                 Page 28

217:10 221:25
223:14 231:10
234:20 235:11
236:13
**ones** 77:14 83:6
84:14 87:8 179:22
226:12
**opinion** 32:5,5
45:5 75:25 138:22
138:23 151:9
153:3,7,20 154:21
154:23 155:3,3,13
155:20 156:17,18
178:17,22 179:16
179:20 183:9
194:2 200:19
201:25
**opinions** 65:5 75:3
75:18,19,21 83:21
84:1,19,22 85:5
86:11 87:6 111:7
151:2 152:20
160:25 163:14
203:24
**opposed** 223:18
**option** 169:12
173:3 174:19
175:16
**options** 192:22
**optumrx** 6:20
**orange** 190:6
**oranges** 233:11
**order** 56:5 59:23
66:3 84:8 106:18
115:21 123:6
182:7 190:8
227:24 228:2
231:19
**organization** 15:8
21:19,23 22:1
32:24

**orleans** 2:24
**osfeldg** 4:4
**ostfeld** 4:4
**outcome** 242:11
**outcomes** 140:8,15
140:20,21
**outlined** 79:7,15
79:15,17 81:17
82:14 110:15
111:13
**outlines** 27:23
**outside** 18:18 31:2
52:15 102:8
106:13 134:9,25
137:5 138:4,20
139:16 140:10
141:25 148:17
150:23 157:18
158:2 163:11
165:14,23 193:14
200:18 234:14
238:7
**overlapped** 38:16
**overlea** 12:24
**owned** 42:22
**oxford** 3:19 6:4

**p**

**p** 2:1,1 3:1,1 4:1,1
5:1,1 6:1,1 7:1,1
11:15
**p.m.** 112:9 241:16
**pa** 12:25
**packet** 72:7,12
**page** 8:2 9:1,4,7,10
9:13 10:4,5,7,8
53:15,15 57:1,9
59:12,22 63:7,19
66:16 95:17
104:25 151:25
168:8,9,14,17
169:1 184:15

217:10 235:25,25
244:4,7,10,13,16
244:19
**pages** 57:3 60:17
68:6,7 168:3,4,4
168:10,11 227:13
**paid** 105:6 127:6,9
127:9,16 130:1,24
181:12 182:4,21
193:19 196:8
197:22 198:12,14
199:2 204:9 205:9
205:15,20,23
207:23 208:8
209:8 211:19
212:10 214:10,23
215:16 217:17,18
218:21 224:8,13
225:1 226:12,25
236:12
**pandemic** 26:13
26:18,25 28:4
60:3
**paper** 90:10
**paragraph** 44:13
75:1 76:2 77:6
78:13,20,21 79:8
80:22,23 81:19
88:8 95:14,15,17
95:18,21,24 96:13
96:13 97:1,16,18
98:20 99:1 101:25
103:6,6,10,10
104:16,24 105:2
113:4,8 114:21,23
121:5 152:1
168:21 184:11,12
201:10,15,17
206:16,18 217:11
217:12 220:22
222:1 236:1

**paragraphs** 79:16
79:19
**parameters**
209:18
**parkway** 2:8
**part** 15:2,17 17:1
19:8 24:22 34:3
36:22 39:22 40:1
40:2 41:20 65:1
146:16 173:17
177:5 178:2 187:5
187:19 202:22
204:19,20 217:23
218:1 219:2,13,13
220:23 221:5,6,7,8
221:13,19,24,25
222:1,3,4,8,12,13
222:14 223:1,4,6
223:10,21 224:2
224:14,19 225:25
226:13 227:1,13
228:15 229:2
**partial** 142:9
**participated** 68:19
**participating**
11:17 68:18
**particular** 17:10
22:9 36:4,6,8 40:8
41:12,15 61:6
62:16 79:9 89:16
96:3,20 97:5,6,15
98:2 102:17,17
120:7 184:6 213:7
213:10,21 214:2
214:10,22 215:16
**particularly** 20:23
22:23 43:1 210:22
**parties** 11:25
12:18 29:23 33:24
**parts** 201:8 217:13
217:23

RESTRICTED CONFIDENTIAL

**[party - pharma]**                                                                 Page 29

**party** 132:25
194:13 204:6
205:19 216:12,15
216:16 222:2,12
222:20 224:13
225:25 227:6
228:15 229:9,15
229:18 230:18
231:21 232:23
233:2,13,15,18
234:3,25 236:2,6
236:11,14,20,23
236:24 237:2,13
237:18,21,24
238:4,14,21 239:5
239:7 242:10
**patent** 18:11 19:3
19:4,4,4,10 38:25
**patents** 18:25 19:7
**patient** 36:19
137:4 141:23
143:1 144:6,9,20
144:23 145:12
146:12 177:15
213:7 229:24,25
**patient's** 141:22
142:25
**patients** 118:11
139:13 149:1
165:11 166:9
169:8,17 172:7
190:16 213:2,3
218:3 227:17
**patterns** 37:25
**pause** 55:16
**pay** 105:15,18,24
105:25 106:7
192:13 193:2
212:10 223:17
224:20,22 225:12
225:12 229:4,4,15

229:25 230:8
237:24 239:6
**payers** 75:5
**paying** 223:19
229:20 236:7
**payment** 205:9
209:5,7 211:16
212:9,13 237:22
**payments** 214:15
217:16 225:5,11
225:17 226:8,14
226:17,17 227:7
227:11 228:14
229:9,11,16
**payor** 209:6,9
213:10,25 214:7
214:17 215:21
216:1,1,7,11
217:11,13 225:2
229:15 232:23
233:2,13,15,18
236:24,24 237:2
238:4,14,21
**payor's** 216:8,8
**payors** 105:6,15
105:17 106:7
111:9 131:6
132:25 194:13
195:2 204:7
205:19,19 214:17
216:4,13,15,16
219:7,16 220:1
222:2,12,20
224:13 225:25
227:6 228:15
229:9,19 230:18
231:21 234:3,25
236:2,6,12,15,18
236:20 237:9,12
237:13,19,24
239:5,7

**pays** 37:22 216:17
216:18,18
**pbm** 236:18,20
237:9,10,11,12
**pbms** 236:21
**pc** 4:18 5:2
**penalty** 11:24
**pending** 29:16,20
29:22 30:1 31:8
101:8 112:3 128:6
129:22 206:5
215:3
**pennsylvania** 1:13
2:4 3:7,20 5:14
6:4
**people** 37:8,11,12
39:16 48:6,8 50:4
62:24 63:1,3
86:23 122:21
145:6 152:23,25
161:20 162:2
165:19 183:17,17
194:1,16 195:6
197:1,21 198:1
199:11,16,21
200:11 211:6
218:6 222:22,23
223:22,24
**perceived** 164:3
164:13 232:16
**percent** 210:16
211:17 223:10
**percentage** 18:10
**performed** 85:6
**period** 17:22
35:15 43:9 45:16
78:6 100:9,20
128:25 131:8
133:3,5 171:21
194:2,16 228:5
239:23 240:6

**perjury** 11:24
**permit** 32:17
100:8 154:25
155:17,24 180:22
213:21
**permitted** 34:4
109:7 118:24,25
**permitting** 118:6
125:5
**persist** 99:20
109:17 129:14
**person** 11:22
28:24 61:1,15
62:4 137:16
161:22,22
**perspective** 97:25
101:23 110:12
121:21 124:8
125:24 130:6
131:13 138:7
145:20 152:18
156:13,23 161:12
169:23 185:22
190:3 199:7
200:10 204:5
**persuasive** 93:10
**pertinent** 194:8
**pervasive** 81:25
82:3,22,23 83:2
90:4,23 94:6
**perverse** 201:19
204:12
**ph.d** 244:2,24
245:2,4,12
**ph.d.** 1:11 2:5 8:8
10:2 40:24 41:5
56:19 185:6 242:6
243:5
**ph.d.s** 50:2
**pharma** 3:21

RESTRICTED CONFIDENTIAL

[pharmaceutical - practices]                                                    Page 30

**pharmaceutical**
3:8,8,14,15 15:9
15:11 16:11,25
17:1,13 20:7,9
21:20 22:12,15,22
27:5,9 32:9,25
33:3 35:21 39:21
40:9,16 41:12,17
41:20 42:13 54:8
84:5 88:24 98:1
105:7,13 106:20
107:8,10 108:11
108:25 110:7
116:15 125:1
126:9 133:12
148:23 163:3
186:23 187:9
188:4 191:16,23
191:24 197:14
200:9 201:22
202:11,21 204:17
209:24 210:6,18
211:20 235:22
**pharmaceuticals**
4:6 6:6,11,15 22:4
42:3 168:23
**pharmacies**
105:13,24 106:8
108:13 118:11
119:1 125:2
210:21 211:1,8
237:14,24 239:6
**pharmacist**
169:11 173:1
174:11,18
**pharmacists** 174:4
176:13 177:22,25
179:2
**pharmacy** 6:25
33:2,2 108:9
118:12 124:12

190:10 204:9
225:3 229:4,20,23
229:23 230:1,3,6
236:15,16 237:22
238:22 239:8
**phase** 227:19
228:3 229:14
**philadelphia** 2:4
3:7 73:14
**phone** 100:11
153:20 154:17
155:8
**phrase** 62:12
75:14 76:15 77:5
113:9 120:23
127:15 143:12
172:18
**phrases** 232:12
**physically** 11:18
**physician** 157:18
157:20
**physicians** 118:12
174:4 176:12
177:22,25 179:2
192:17,23
**pick** 202:17
**picked** 185:9
**picture** 126:21
**pietragallo** 6:2
**pietragallo.com**
6:3
**pills** 175:24
**pittsburgh** 3:20
6:4
**pizzi** 6:7
**place** 210:13 242:7
**places** 74:25
**plaintiff** 87:12,14
87:19
**plaintiff's** 13:9
24:18,20,25 25:1

25:14 52:4,16
**plaintiffs** 2:10,14
2:19,25 8:6 24:4
25:20 26:2 28:1,9
29:2,7,8,13,17,23
30:4,14 31:4
33:12,25 34:16
35:9 44:6,13
56:17 59:16 64:13
64:18 72:22 76:3
87:17 147:8,17
180:18 181:1
206:19
**plan** 73:20 217:19
217:20 220:23
221:7,19,25 222:4
222:8 223:1,16
224:2
**plans** 217:24
218:11,11,12,13
221:1,22 222:12
222:13,21,24
223:10,12,21,23
224:14,20 225:6
225:25 227:2
228:15
**plant** 42:1,16,22
**plaza** 4:15
**please** 11:12 12:3
12:13 13:16 31:17
34:13 44:4 56:3
56:11 57:1 58:13
71:9 86:2 95:9
96:10 99:24
112:17 123:17
125:21 148:6
150:12 153:22
160:13,13 203:6
206:6 215:13
228:23 232:12,24
234:22 235:8

**plenty** 126:5,25
**plus** 113:18
116:19 132:13
**pocket** 185:9
202:17 224:22
229:25
**point** 135:22
141:13 154:1
169:5,7,8 189:9
190:6 198:9 205:3
207:23 208:22,25
217:6 224:25
225:19,22 229:19
229:21 230:1
235:7
**pointing** 111:16
**points** 169:2
**policy** 14:9,13
39:22 183:6
202:20 204:16,20
**portion** 30:25
**posited** 30:17
**position** 14:6
16:14 162:6 180:6
186:4 187:8,14
188:13 190:14
202:10,12,21
204:17
**positive** 140:7,14
140:20
**possibilities**
202:15
**possibility** 185:19
188:18
**possible** 193:17,23
**potential** 148:1
149:10 215:24
**practices** 21:12
88:17,19 89:1,4,14
89:17,18 90:19
105:14 106:17

RESTRICTED CONFIDENTIAL

113:17,18
preceding 103:6
precipitously
192:20
predicated 146:20
146:21 148:1
157:12,15 158:25
161:2 186:21
230:7
preliminary 72:24
73:18
premiums 223:18
223:19,21,24
224:8,20 229:4
prepare 69:1
83:16
prepared 83:17
preparing 73:10
prescribe 213:18
prescribed 158:8
158:10 213:4
prescribing
157:19,20
prescription 105:2
111:11 113:11
114:23 115:22
116:16,23 117:17
118:8,25 119:7
121:8 122:20
124:25 125:10
126:3 133:19
136:2 141:8,17,19
141:21 142:24
145:22 152:3
156:15 157:13,15
158:16,24 161:15
163:2 178:20
190:5,8 198:3
202:14 209:24
210:17,20 220:25
221:20 222:9

223:4 224:19,23
226:3,9 229:1,5,23
231:18 235:1
236:17 237:22
238:2
prescriptions 38:1
38:2 221:15
present 7:7 11:18
30:21 54:7 154:12
presentations 54:5
presently 31:12
president 39:12
press 8:11 167:6
pressure 134:8,18
134:24 135:4,6
154:5 174:7 175:4
191:2,8 192:1
193:25 200:8
presumable
214:16
presumes 164:6,8
presumption
180:2
pretty 48:1,9
62:15 216:2,4
prevent 110:20
134:21 135:21
137:12 192:2
prevention 136:3
136:17,22 137:11
previous 26:16
28:4 189:13
209:21 231:12
previously 30:18
158:13 161:10,24
166:12 220:4
price 15:12 126:21
126:24 127:1,6,16
127:16 130:1,10
130:21,24 131:18
181:11 182:3,7,19

182:21 183:1,7,9
183:12,21,24
186:21 187:23
188:19 189:3,18
204:9 207:22
208:8 225:1
priced 22:15
prices 22:17 39:3
226:20
pricing 16:1 17:13
22:14 23:14 36:13
37:5,18 38:19
primary 136:17
136:22 137:11
princeton 5:21
principals 27:21
prinston 3:8,14
175:11
print 121:22
prior 29:8,12 35:8
35:14 39:9 42:7
private 65:25,25
220:24 221:2,20
221:22 222:2,9,13
223:20 224:13
privilege 53:21
155:17 180:21
probable 163:8,10
probably 26:21
38:20 40:20 168:1
problem 13:21
212:22 215:4
233:7
proceed 12:13
94:21 101:4
111:25
process 15:15
45:24 69:19 73:24
121:20,23,24
produce 64:18
69:17 70:16

produced 45:7
64:10,12 65:1
66:4,12 70:10
86:22 88:4 108:20
116:18 117:18
118:2,14 119:11
120:18 121:8
190:10
producing 188:6
product 19:19,21
25:10 36:1 37:19
38:25 41:22,23
53:21 89:3 103:24
104:12,15 105:10
105:16,22,25
106:12 107:1,9,23
108:4,5 110:21
113:9,10,19 114:3
114:6 116:22
118:18,21 120:2
123:4,7 124:9,12
124:19,22 125:9
126:22 145:15,23
146:11,13,14,18
148:2,2,5 152:21
157:16 160:24
163:3 173:6 178:5
180:21 182:22
187:12,13 197:13
198:21 204:9
205:20,23 208:16
209:5,9 210:9,18
212:13 213:24
214:19 215:21
216:9 218:16
222:3 230:6,9
234:6,7
product's 120:3,3
147:25
production 9:6
24:10 64:14

123:10
**products** 1:3
16:25 18:4,11
19:16 21:24 22:8
22:10,12,15 23:14
23:15 24:10,11,19
24:23,23 25:4,12
25:16,22 31:19
35:18,21 36:16
37:7,9,20,21,22,24
37:25 38:8,10,11
38:19,24 39:4
40:9,17 41:19,25
41:25 42:1,4,8,13
42:14,16 62:14,17
64:7,23 65:7,10,21
65:22,23,24 66:12
76:4,12,13,16,17
77:6,8,13,19,23,24
78:3,10,15,23 81:5
82:1,6 84:11
85:25 86:4,6
88:23 89:12 91:6
91:16 93:19 96:12
96:25 97:8,12,21
98:14 101:22
102:5,6,11 104:18
105:5,7,9,14,18
106:7,8,18 107:11
108:10,11,17,19
110:8,14 113:12
113:15 115:7,7,24
116:5,11,17 117:9
117:15,23,24,25
118:7,12 121:15
124:10 125:2
126:8 130:8,13
131:6,11,14
132:13 138:9,12
138:18 139:7
144:8,22 146:3,4

148:8,9,24 149:4
149:11 151:12
152:4,9,21,24
156:4,6,12,17,19
156:21,22,23
157:22 159:1
160:17,23 161:13
162:3,4 163:4,16
164:7,9,21 165:1,4
165:4 166:1,15
169:24,25 170:7,8
170:12 171:5,6,19
172:5,8,10,13
173:10,12,17,18
174:6,12,12,20
175:5,8,11,11,23
176:7,7,14,15,18
176:19,24 177:2,6
177:13,23 178:1,2
178:5,20 179:3,21
182:11,12,15,16
183:3,6,18,19
184:19,24 185:4,7
185:17,18,21
186:1,2,6 187:1,15
188:6,7,9 189:16
190:1,3 191:2,16
191:17,22,24
192:19 193:19
194:15,24 197:12
197:20,20,24
198:2 199:9,22
200:13 201:19
202:17,19 204:5
204:18,21 205:16
208:17 210:7,18
210:22 211:3,9
212:10 213:24
226:11 227:9,15
227:21 231:19
240:2 241:2,4

**professional** 14:4
**professor** 14:8
26:7
**professors** 23:25
23:25
**program** 217:22
218:7,8,10
**programs** 217:22
218:4,5,6
**progressing**
135:22
**project** 61:7,19
62:5 63:5
**projections** 210:13
**promotion** 36:13
**proof** 118:4,4
**properly** 198:21
**property** 19:5,6
**prospective** 226:7
**prospectively**
130:7
**protect** 80:5
128:13 184:17
**protected** 53:20
**protecting** 109:22
184:14
**prove** 117:21
**provide** 13:6 17:5
21:6,10 30:12,23
32:22 44:14,21
50:25 51:18,23
52:3,16 54:2
64:18 73:17 75:2
89:5,9 92:10,17
99:5 103:7 111:7
137:4 141:23
143:1,10 209:17
223:10 228:22
236:21
**provided** 32:6
54:1 56:7 59:7

64:13 97:16 98:16
138:12,18 144:9
144:23 148:12
155:4 164:14
221:2,22
**provides** 85:8
146:18 169:11
**providing** 44:18
75:18,18,21 97:1
170:15
**province** 55:1
**public** 14:9 171:6
184:17 223:20
242:4 245:19
**publications** 54:5
**published** 23:14
85:10 126:6
**publishes** 173:16
**puerto** 42:23
**pull** 43:10,15
52:22 56:10 57:22
58:13 74:13
**punish** 203:18
**punishment**
203:11
**punitive** 200:16
**purchase** 197:23
199:25 200:1
205:10 209:12,14
209:15,19 224:18
227:9
**purchased** 132:19
132:24 133:1
197:22 199:21
210:3 211:18,18
213:2,4
**purchases** 226:3
**purchasing** 185:18
**purity** 121:11
122:1,4

RESTRICTED CONFIDENTIAL

[purpose - receive]                                                    Page 33

**purpose** 67:11
154:4,8
**purposes** 114:14
138:14 143:21
149:2
**purview** 210:25
**put** 45:20 48:13,24
71:21 74:13 90:14
95:5 105:23
119:17 154:6
157:3 161:8,21
173:24 184:9
202:6 203:1
**putting** 45:24
120:7

**q**

**qualify** 22:11
109:13
**quality** 42:12,25
43:3 88:16,19,25
89:14,17,18 90:4
90:18 121:11,18
121:20,23 124:24
125:5 152:2 173:6
201:18
**quantify** 26:9
**quantitative** 50:4
**quarter** 26:8
**question** 13:12,15
16:19 30:18 31:7
31:8,17 32:18
33:15,18 40:11,11
41:6,9 47:9 52:7,9
53:19 54:17,21,25
55:7,18,21 56:5
57:2 60:14 62:2
63:24 76:1 79:3
81:6 84:17 86:17
92:13 94:12,15
96:6,10 97:5
98:18 99:19,25

101:8,11 106:6
109:2,2,6,6,12,20
109:24 110:1
112:3,6 116:11
120:9 123:17
124:4,5 126:14,14
127:22,24 128:6
128:19,21,24
129:3,3,15,18,23
132:21 138:6
141:18 142:8,23
143:7 144:10,11
144:14,18 146:25
147:13 150:6,8
151:10 159:14,15
160:11,14,21
161:18,19 162:1
163:19,24 166:6
169:4,6 179:6,10
179:12 181:15
187:19 196:18
197:10 201:8,12
203:6 205:13
206:5 213:16,16
215:2,13 219:11
222:6,11 228:11
228:12 230:22
231:7,9,11,12
232:11 233:22
235:5 236:3,10
237:1 238:10
239:3,12 240:17
**questioning** 174:2
**questions** 9:12
12:19 13:5 20:22
34:5 74:24 80:14
92:4,6 100:18,19
100:22 101:2
169:13
**questrom** 14:11

**queue** 95:9
**quite** 19:2 85:2
109:21 182:12
183:14 201:7
203:6,17 222:5

**r**

**r** 2:1,12 3:1 4:1 5:1
6:1 7:1 11:15
242:1 244:3,3
**rachel** 2:16
**radam's** 184:20
185:4
**raised** 129:1
**ranbaxy** 41:25
42:15
**raspanti** 6:2
**rate** 49:15,20
60:11,13,16,19
**rationale** 184:13
**reach** 81:1 84:18
84:21
**reached** 75:25
**reaching** 65:4,4
83:20 84:1 86:11
87:6 238:21
**read** 10:8 39:17
44:4 52:9 54:19
54:21 87:11,18,21
87:24,24 88:5
99:24 101:8,14
110:1 144:13,16
144:18,18 153:20
153:22 155:13
169:12,14 173:15
201:23 219:14
243:9 245:5
**reading** 154:15,16
154:20,21
**reaffirms** 170:6
**real** 112:8

**reality** 100:17
**realized** 160:17
**really** 17:22 54:17
71:1,10,11 73:15
110:10 122:7
158:10 198:18
211:3 226:18
227:16 229:11
232:11 236:25
239:11
**reason** 30:17
33:15 55:19 59:8
98:20 102:17
115:18 218:21
243:11 244:6,9,12
244:15,18,21
**reasons** 95:25 96:3
96:20 97:7,19
98:11 99:2 103:7
103:10
**reassess** 235:12
**rebazan** 3:11
**rebecca** 3:11
**recall** 28:8 29:10
167:22 168:18
173:17 174:15,16
178:3
**recalled** 65:14,18
65:21 76:6,7
77:19 175:6,8,19
176:24 177:3
178:1,9,10 192:19
194:15 199:13,23
**recalls** 8:13
165:11 166:10
167:8 170:25
171:10 175:10
182:13
**receipt** 243:18
**receive** 53:10
155:7 223:21,23

RESTRICTED CONFIDENTIAL

[receive - report]                                                          Page 34

224:3 225:11,13
226:1 227:7 229:9
230:2,3,13 233:2
233:18 234:4,6
**received** 145:13
159:24,24 160:5
160:22,23 164:14
180:17 232:4,16
**receiving** 232:23
**receptor** 8:12
167:7
**recess** 112:24
**recognize** 53:7
56:13 59:2
**recognized** 105:4
**recommends**
178:3
**record** 11:2,11
12:23 57:5,12,14
57:17 74:1,11
76:22,24 77:1,3
80:6 91:21,23,25
92:2 94:16,18,20
94:22,23 95:5,7,12
100:14,17 109:22
112:23 113:2
128:13,16 150:12
150:14,17 155:14
180:11,15 206:9
206:13 235:15,19
241:12,14
**recorded** 11:3
**redrafting** 46:17
**reduces** 221:17
**reducing** 202:16
**refer** 77:18 95:15
188:14
**reference** 79:7
181:20
**referenced** 243:6

**references** 93:9
**referred** 83:7 94:7
186:11
**referring** 46:25
75:6 77:12 82:9
83:3 91:7,17
95:24 120:21,25
122:17 166:3
168:17 173:10
175:22 181:21
222:2,11,19
235:23 238:18
239:10
**refers** 88:15
**refund** 25:10
207:22
**refused** 100:14
**regarding** 11:4
75:3 111:7 172:5
**regardless** 154:3
191:2 232:3,15
**regular** 211:7
**regulated** 114:3
124:22 190:1
**regulation** 14:16
15:9 16:1 17:14
21:19,23 22:1,4,8
22:10,11 23:15
24:10 32:10,24
84:4 85:4,24 86:3
98:1 125:11
186:22,23 197:14
**regulations** 105:11
121:6 122:17
125:8 184:17
**regulator** 117:4,15
117:21 119:7
124:15 125:24
**regulator's** 110:12
125:24 161:12
190:3

**regulatory** 23:1
46:13
**reimbursed** 15:12
223:6 236:7
**reimbursement**
17:14 37:6,22
223:11
**relabeled** 65:25
**relabelers** 66:7
**relate** 54:7 114:17
**related** 14:15 17:8
17:13 19:9 20:12
21:14,23,25 22:8
24:9 32:23 44:15
44:17 45:18 62:14
62:17 64:24 91:16
92:21 93:9,18,24
122:13 123:2,23
127:1 145:23
146:2 151:9
152:20 156:18
158:24 191:9
193:25 195:10
209:7 242:10
**relates** 1:4 44:22
**relating** 39:25
**relation** 18:13
45:11
**relationship** 29:12
127:3 236:19
237:11
**relatively** 134:12
**released** 39:13
**relevant** 46:14
128:25 131:7
210:22 223:7
**relied** 83:16,20
84:1,13,18,21
85:12,15,18,20,23
91:10 94:6 209:2
209:11 210:2

**rely** 65:3
**relying** 188:16
189:8,11 209:2,4,6
**remains** 147:14
**remedies** 185:8
**remember** 28:6
106:5 177:3
**remind** 75:10
**reminds** 172:24
177:24
**remotely** 11:20
**rena** 1:11 2:5 8:8
10:2 11:4 12:8,24
56:19 242:6 243:5
244:2,24 245:2,4
245:12
**render** 32:5
**repackaged** 65:24
**repackager** 65:13
65:17
**repackagers** 66:7
**repair** 225:12
**repeat** 46:3 123:16
191:19 203:7
219:12
**rephrase** 13:16
159:21
**replacement**
169:11 173:2
174:18 175:16
**report** 15:25 16:1
39:13,17 45:7,22
45:25 46:18,21,24
47:12,21 50:17,19
50:22 51:2,4,11,17
51:20 52:1,5,17,20
57:25 58:5 64:22
65:2,4,8 66:13
74:14,21,24 77:16
79:8,16,18 81:20
82:19 83:14 86:9

RESTRICTED CONFIDENTIAL

**[report - reviewed]**                                                          Page 35

86:23 88:7 95:15
96:14 97:16 99:2
102:8 104:21,25
104:25 106:14
111:22 113:5
114:15 116:2
121:3,5 126:9
135:1 138:8
143:21 145:10
148:17 149:2
151:2,19,25
152:19 153:11
164:23,24 167:10
167:17,19 169:24
170:9,11 178:18
181:20,22 184:10
184:12 193:15
201:10 203:4
206:3,15 212:1,5
217:5,10 235:21
**reporter** 1:15,16
10:7 11:8,11,16
12:5,12 14:23
16:15 20:8,11
28:17,20 33:1,5
35:19 36:14 38:3
42:17,20 44:9
46:2 49:9 52:8
58:3 61:9 65:15
66:18 67:4 69:25
76:19 79:17,21
88:11 89:7 90:2,6
90:14 92:14 94:1
101:7,13 102:25
103:3 105:17
107:17,20 109:23
115:3,9 117:6
118:19 123:16
132:16 133:17
136:19,21,25
137:1 139:21

140:1,4 142:6,11
146:21 150:3,9,11
151:14 152:12
153:22 154:14
166:23 170:3
171:23 184:22
191:18 192:3
195:1 204:25
205:4,21 207:14
208:2,10 209:14
211:11 212:8,16
212:18,20 219:1,9
225:20 228:7
230:21 235:6
242:4
**reporting** 11:19
12:2
**reports** 54:4 86:22
87:1 88:4 92:21
137:23
**represent** 12:18
29:13,16 30:4
31:4 59:5
**representation**
59:9 69:14
**representative**
87:22
**representatives**
147:9,17
**represented** 25:3
27:5,14 121:12
**representing**
29:23
**represents** 156:13
**request** 9:1,6
54:20 55:3,24
56:6 59:7 70:18
**requested** 52:10
56:4 101:15 110:2
**requests** 53:13,17
53:23

**require** 30:21
135:9,16 240:6
**required** 88:24
89:5,9 223:3
224:18,22 245:13
**requirement** 30:9
31:12
**requirements** 84:7
119:13,17 121:10
**requires** 117:15
**requiring** 135:23
**research** 14:13
16:10 32:21 35:10
35:14 36:12 38:15
40:8,15 41:11,14
41:16 50:5 209:23
212:2
**researched** 36:3
37:23
**researching** 36:10
38:18
**respect** 97:7,20
103:13 133:12
216:24
**respectfully** 33:16
54:24
**respective** 226:1
**respond** 53:16
54:22 55:24 102:9
110:5,24 145:1
**responded** 129:16
129:17
**responding** 96:9
109:21
**response** 55:2,6,12
59:7 86:20 99:23
101:9,10,17 103:1
189:13
**responses** 8:7
56:18 99:22 101:2
101:5

**responsive** 54:16
54:25 55:13
**restate** 40:10
215:12 232:13
**restricted** 1:8
**result** 137:16
238:5,15 242:11
**resulted** 153:7
**resume** 53:24
112:18
**retail** 211:7
229:20
**retailers** 66:1
206:24 207:13,17
208:1,5,9,13,15,19
208:22
**retained** 27:19
35:8 44:14,21
75:2 111:6
**retention** 8:3
27:18 34:22 35:8
43:13 44:5,7
49:14
**retrospective**
226:14,17
**retrospectively**
226:8 227:14
**return** 243:13,17
**reveal** 20:22 30:10
30:19,20 32:1
33:20 53:19
**revealed** 34:13
101:2
**reveals** 31:15
**revenue** 15:12
**reverse** 26:20
**review** 65:13,16
69:11 86:10 87:5
90:17 243:7
**reviewed** 46:1,13
87:8 91:15 93:7

RESTRICTED CONFIDENTIAL

[reviewed - see]                                                                            Page 36

133:21 147:6,7
**rgeman**  2:17
**rico**  42:23
**right**  16:22 17:23
23:13 25:11,12,18
25:18 40:18 41:2
41:4,6 49:8,16
59:17 60:1 61:22
62:23 63:21,22
67:4,16 68:8,20,24
75:19 85:20 98:12
106:8 114:2 116:6
127:7,17,18
132:25 133:25
134:19 136:7
147:20 149:19
150:22 157:5,25
160:8 164:15
167:17,21 168:12
168:20 170:16
171:2 172:16,19
173:12,25 174:22
175:25 177:6,16
178:10 181:25
184:10 192:13
193:12 195:18
196:3 197:8 200:2
204:3 208:6 209:4
213:2,7 214:21
218:18 227:2
236:10,24
**risk**  89:2 135:5
161:7,12,21 163:1
163:7,9
**rite**  5:10
**road**  5:20
**rockett**  6:17
**rockett.shevon**
6:18
**room**  11:19

**rooney**  4:18 5:2
**rose**  4:8
**roseland**  2:9
**ross**  4:11
**roszel**  5:20
**round**  215:10,10
**route**  116:22
**ruben**  2:3,3 28:12
129:5 149:25
243:1,2
**rude**  162:14
**ruler**  2:13
**rules**  109:11 114:8
125:3,4
**runs**  229:24

**s**

**s**  2:1,21 3:1 4:1 5:1
6:1 7:1 8:1 11:15
244:3
**sadly**  14:19 26:20
133:9
**safe**  113:18 114:7
114:11 115:11,25
116:19 117:18
118:2,15 123:10
125:6
**safety**  36:22 37:1
37:7,13 113:13,24
114:5,10,16
121:10 152:2
190:13 201:18
**sagoldberg**  3:3
**sale**  62:14,17
106:9,21 146:5
148:3,7,11,24
152:6,22 154:1,12
207:23 208:19,20
225:1,19,22 227:8
229:19,21 230:1
238:5

**sales**  64:22 65:10
66:11 209:4,24
210:7,17 213:24
217:15 222:21
**sanctioned**  100:10
**sanger**  2:11
**sara's**  50:1
**sarah**  48:7 50:3,5
50:15 53:25 62:20
62:21,21,22,23,23
63:2,3
**satisfy**  55:14 238:5
238:15
**saved**  144:6,20
**saving**  145:6
**saw**  171:14
**saying**  23:10 57:4
71:15,23,24 85:22
93:3,17 120:10
122:8 136:9
172:16 174:19
175:22,25 176:20
180:1,4 190:23
215:7 230:8
**says**  44:12 49:15
60:8 61:4 63:6,13
63:24 65:13,16
66:17 78:14,20
81:23 83:15 85:18
99:2 120:2 121:22
153:21 168:6,15
168:15 170:19
172:24 174:16
176:9 186:15
201:24 222:7
**scenario**  182:4
**schedule**  224:21
**school**  14:10,11,14
14:15 189:3
**sciegen**  6:15

**science's**  15:25
**scope**  45:1,11
102:8 106:14
107:6 108:7
110:23 111:2,3,22
111:25 121:3
134:10 135:1
137:6 138:4,20
139:4,17 140:10
141:25 143:3
144:25 145:18
147:22 148:17
150:24 151:19
156:9 157:7 158:2
158:22 160:3
161:10 163:12
165:14,23 169:21
170:18 171:17
172:21 174:24
176:3 190:22
192:9 193:15
200:18 203:3,15
234:14 238:8
**screen**  43:21 56:14
63:10,17 67:10
72:11 83:14
**scripts**  4:17
**scroll**  114:20
**second**  22:20 44:4
54:15 74:22 76:22
90:7 91:9,19
95:20,23 113:6
150:12 168:20
185:19 217:7
221:8,9
**seconds**  150:4
230:6
**see**  43:20 44:24
48:15,17,20 59:11
59:12,14 63:11
66:17,23 67:17

RESTRICTED CONFIDENTIAL

**[see - sorry]**                                                                        Page 37

68:3,12,23 69:7,9
72:13,17 73:19
76:9 85:13 88:5
90:7 91:13 96:1
103:16 109:19
124:16 128:14
167:8,25 168:15
168:18,19,25
169:3,14 206:25
218:14 241:9
**seeing** 56:23
**seek** 191:9
**seeks** 127:19
**seen** 50:9 57:4,19
86:24 226:10
**segments** 34:7
**selected** 86:7
**sell** 89:12 105:14
107:9 108:15
110:8 116:17
123:7 124:12
126:10 163:4
**selling** 110:20
188:7 194:23
208:17
**sells** 125:2 222:24
**seminar** 54:4
**senior's** 227:8
**seniors** 223:3,23
224:8,18 229:1
**sense** 21:15 48:12
48:23 115:5
**sent** 154:23 180:25
243:14
**sentence** 113:8
114:22 173:11,23
221:3,6,9,13 222:7
**separate** 35:16
56:4 71:17 146:1
148:13 217:16
224:7

**september** 72:15
**sequella** 192:2
**served** 21:5
**service** 218:10
**services** 17:5
44:16,17 236:21
237:13
**serving** 20:13 21:4
**set** 53:16 84:22
237:2 242:13
**seth** 3:3 12:17
33:16 46:23 54:24
66:18 67:22 88:11
95:3 109:16
142:19 143:5
167:9 188:25
215:1 219:13
230:24 233:8
235:6
**sets** 217:14
**setting** 211:5
226:19,19 237:23
239:13
**settled** 25:12
**share** 26:23,23
51:17 63:13,25
64:4,10 65:3
**shared** 51:7
**sharpen** 55:7
**sheet** 243:11
**shevon** 6:17
**short** 57:15 64:21
74:8 150:15
180:12 206:10
235:16
**shorthand** 242:3,8
**show** 18:21 43:12
126:20
**showing** 138:25
**shows** 181:23

**shuffling** 90:10
**sic** 93:10
**sick** 71:4,16,25
73:15 211:6
**side** 24:8,14,20,20
24:25,25 25:2,14
225:5,11,17 229:9
229:15
**sided** 63:8
**sign** 10:8 243:12
**signature** 242:16
**signed** 243:20
**significant** 42:12
88:25
**similar** 32:5
**similarly** 38:22
**simply** 69:17 80:7
128:23 200:10
**single** 21:17 27:7
73:15 80:6 215:24
**sir** 108:2 140:12
140:18,25 149:24
158:6 159:7 160:9
163:24 167:25
170:20 178:25
181:15 193:15
195:19,24 196:6
205:13 209:21
220:12,20 221:12
223:8 228:11
231:7
**sit** 26:21
**sitting** 177:7
**six** 127:24 215:5
**sketch** 15:6
**skipped** 221:4,14
**slack** 2:11
**slater** 2:7,7
**slaterdavis.com**
2:12

**slow** 201:7
**slowly** 153:23
**smolij** 3:5
**solco** 3:8,15
**sold** 66:5 76:5
105:5 108:12,21
113:14,19 115:21
117:9,16 118:7,10
118:22,25 119:8
119:16 120:16
121:14 122:20
125:12 126:1
145:24 146:8
149:6 152:5 154:3
190:8,10 195:18
195:20 196:3,11
198:20 208:15
210:25 223:2,23
237:22
**solely** 77:21
**solutions** 243:23
**somebody** 135:8
135:15 175:24
177:3,4,11 208:23
**someone's** 137:16
170:9
**soothing** 185:5
**sorry** 14:23 16:18
24:21 25:7 28:17
28:21 29:19,25
30:22 33:10 38:3
38:5 40:10 42:20
44:9 46:2 47:8
49:9 52:6 58:12
58:14,18 61:24
62:3 63:16 64:11
65:15 66:18 72:9
72:9 76:19 77:15
78:17,17 79:2
80:15,15 81:20
88:9,13 89:8

RESTRICTED CONFIDENTIAL

**[sorry - stroke]**                                                    Page 38

102:25 118:19
125:21 132:16
136:21 142:5,6
146:25 149:25
152:13,17 158:16
160:9 167:19,25
170:3 171:23
178:25 181:15
184:22 185:1
191:18 201:6
203:5,16 205:1
212:20 218:11,17
219:9 222:6
225:20 230:21,23
232:10 234:20
237:1 238:10,18
239:3
**sort**  37:12 50:12
162:16
**sound**  49:16
**sounded**  144:15
**sounds**  49:7 74:5
**sources**  210:12
**sourcing**  236:6
**south**  3:6 5:8
**speak**  75:10 176:1
**speaking**  142:3,7
142:14
**special**  22:2
**specialty**  22:19
211:1 226:18
**specific**  22:23 41:7
50:6 51:1,24
67:24 73:12 84:15
84:21 88:18 91:14
93:18 97:19 98:5
98:25 101:24
103:19 114:4
118:16 143:17
149:4 166:3,16
176:9 177:23

178:22 209:17
210:22 212:11
213:1 215:21
216:1,2,4,6
**specifically**  22:21
39:14 64:8 85:12
86:8,8 92:21 93:7
134:6 165:15
172:11 175:3
212:12
**specifications**
240:5,19
**specificity**  216:14
216:24
**specifics**  56:1 99:4
99:6
**spend**  228:1
**spent**  35:25 71:16
73:8 84:6,9
**sphere**  20:23
**spoke**  165:20
171:11
**sponsors**  220:24
221:19 222:8
224:3
**st**  4:16
**staff**  46:10 47:25
48:4,5,10 69:9
83:17 209:12
**standard**  1:14
15:21 16:5,5,7
23:9,10,11,19
110:15 113:12,16
113:20 115:8
118:13 119:11,20
119:22,24 120:13
120:18,24 121:14
124:14,24 125:5
126:2,4,7,11
131:11 146:4,7,13
148:11 149:6

152:22 156:20
159:3 161:14
163:5 164:10
165:2,6 188:8
190:4 209:23
210:5
**standards**  105:15
110:9 111:18
117:1 120:19,20
120:25 122:24
123:9 187:12
190:13
**standpoint**  36:21
125:7 149:15,17
149:22
**stanoch**  2:22
59:13
**start**  32:12 66:15
66:19 74:20,23,25
130:6 152:16
182:13
**started**  28:4 46:21
59:24 60:2 142:14
174:2
**starting**  29:9 48:1
162:18
**starts**  235:24
**state**  6:14 12:3,22
152:1 209:5,9
214:8,18 215:22
217:18 218:4,5,10
218:16,22
**stated**  99:1 158:13
166:12 171:3
220:4
**statement**  123:1
123:23 144:15
167:24 173:15,21
178:17,22 179:15
180:1 185:15
190:7 208:25

**statements**  180:4
233:24
**states**  1:1 39:17
64:25 103:10,10
105:4,12 107:11
124:23 161:16
175:3 187:9
201:22 207:6,16
236:18
**status**  113:9,10
**statute**  124:10
**steno**  241:12
**stenographic**
11:11 94:22
**stenotype**  242:4
**stent**  198:4
**stents**  136:1
**steven**  3:18
**steven.hunchuck**
3:19
**stipulations**  9:9
**stock**  106:8
**stone**  48:7 53:25
62:22,23,23
**stop**  96:10 101:4
109:18 129:5,5,6,9
129:16 163:5
**stopping**  162:17
**stoy**  6:3
**strategy**  14:21,25
**street**  2:4,17,24
3:6,13 4:20 5:4,8
6:9,14,18 7:4
**strength**  121:11
122:4
**stricken**  150:10
**strike**  75:25 94:14
133:21 145:12
147:6 150:7
**stroke**  135:5,15
137:17

RESTRICTED CONFIDENTIAL

**[strokes - term]**                                                    Page 39

**strokes** 134:24
135:22,24 136:16
136:18,23 137:12
**student** 189:3
**studied** 42:7 172:4
**studies** 15:20
23:23 54:4 138:25
**studying** 36:10
**stuff** 23:11,23 24:3
**subject** 18:5,25
19:13 21:11
**submit** 69:19
73:21,22
**submitted** 59:13
70:14 72:4
**subscribed** 245:14
**subsidies** 225:6
226:1
**suffer** 191:7
**suffered** 204:7
225:15
**suggest** 226:10
227:6 229:13
**suggested** 191:12
**suggesting** 202:7
**suite** 2:4,13 3:13
4:5,11,15,20 5:4
6:24 7:4
**summarized** 50:24
**summer** 48:1,2,3
71:25
**supplied** 190:18
**suppliers** 166:15
**supply** 88:23
106:20 115:6,22
118:1 122:21
123:2,3,20,24,25
124:3,8,19,25
125:9,10,17 126:8
126:15,23,24
127:2 130:9,11,19

130:20,23 131:16
131:17,20 132:2,6
132:7,20 145:25
146:17 156:18
159:1 161:2,4
162:4 164:9,25
165:7 170:6,11
181:10,12,18,23
182:5,8,17,18,19
182:22 183:2,5,18
186:20,25 187:22
188:15,17 189:4
189:10,16,17,17
189:23 196:3
197:17 201:22
230:14 231:3,14
231:17 232:1
235:22 236:17
**support** 17:6 23:2
63:1 71:3 126:14
136:3
**supporting** 82:15
180:5
**supportive** 90:25
**sure** 12:24 14:7
15:7 21:17 26:12
32:12 37:17 40:12
46:4 49:18,21
52:8 63:18 67:25
68:2 69:2 73:20
95:8 101:13 106:6
112:8,11 120:8
184:9 185:1
189:24 191:6,20
193:8 214:4 217:7
**surmise** 21:21
**sustained** 23:2
**swann** 185:6
**swear** 11:12 12:6
**switched** 198:2

**switching** 176:16
**sworn** 12:9 245:14
**systematic** 82:5,8
90:1,3,23 93:9

**t**

**t** 3:12 5:13 8:1
140:2 242:1,1
244:3,3
**tab** 43:10,23 44:1
52:22,23 57:23,24
58:8 166:18,21
**table** 10:1
**take** 13:20 18:23
43:14 45:19 47:10
67:5 74:1 121:17
139:14 164:2,12
170:21 177:15
180:7 190:19
192:6,12,25
193:10 206:6
235:7,11
**taken** 1:11 13:23
57:15 74:8 112:24
150:15 158:19
159:21 180:12
189:6 190:17
193:18 194:1
199:1 206:10
235:16 242:6
**takes** 69:5
**talk** 13:7 14:3
25:18,23 27:17
62:3 162:21
174:10,10,21
175:13 176:14
177:16 178:5
187:5,23 208:14
235:21
**talked** 151:6 156:2
172:18 181:9
183:14 230:11

**talking** 23:6,10
38:9 63:18,21
75:14 143:16
151:7 172:23
173:18,22 177:6
182:9 198:8,9
216:12,13,13,14
217:24,25 226:21
227:20
**talks** 78:13 126:6
**taught** 15:2,16
189:3
**taxpayers** 24:15
**teach** 14:25 16:11
23:16,17
**teaching** 14:17,21
14:24 23:11,22
32:20 71:2,19
72:1,2
**team** 51:18 54:8
**tech** 67:13,14,24
168:2
**techniques** 193:5
193:6
**technological**
14:16
**technology** 14:13
**tell** 26:1 33:18
51:14 56:5 129:12
**telling** 93:16 166:8
174:9
**tells** 228:21
**tenure** 23:18
**term** 97:25 98:5
103:22 114:1
121:18,25 122:7
122:11,12 123:8
144:3 145:9 149:3
151:23 153:10
158:6 182:5
186:10

RESTRICTED CONFIDENTIAL

**[terms - time]**                                                                 Page 40

**terms** 16:13 21:9
24:3 27:3 34:7
50:15,17 111:12
113:24 114:1
117:1 122:8,14,16
124:2,3 188:1
207:12,12,19
209:1 236:6
**testified** 12:9
147:18
**testify** 79:23
127:21
**testifying** 79:24
215:8
**testimony** 11:23
13:24 44:22 45:1
86:11 96:24
100:15 107:22
108:2,19 116:9
140:7,12,18 147:8
147:20 171:14
181:11 182:3,20
197:7 220:18,20
237:8 243:9,18
245:8
**teva** 4:6 6:11 78:1
175:10
**texas** 2:13 4:11
**text** 155:8 169:14
175:3 180:18
185:14,14
**textbook** 15:13,16
**textbooks** 15:22
16:3 126:25
**texted** 155:12,18
155:22
**thank** 12:14 13:19
21:1,2 30:11,21
32:19 33:5,6
34:20 45:15 47:7
52:11 53:22 55:21

68:1,3 79:21 80:9
93:22 95:19 96:11
103:3 108:8 110:6
112:13,20 115:4
125:22 135:2
136:25 140:4,4
143:5 145:2,4
152:15 167:11
175:1 176:5
179:19 187:18
189:1 192:3
196:17 205:4,5
208:10 212:20
219:21 228:24
239:21
**theories** 46:7
206:20,22 207:4
207:10
**theory** 156:13
182:7 183:1
186:19 187:21
188:15,17 189:8
189:11,22,23
197:24 206:22
**therapeutic** 134:2
137:21 138:1,13
138:18 143:10
146:2,5,9,10,17
147:18,24 149:18
150:20 151:7,11
153:2 156:3,7
158:18 159:6,20
159:25 160:6,16
164:14 170:15
171:15 183:12,13
183:15,24 184:3
185:25 186:13
194:3 199:17
230:12 233:12
234:4

**therapeutically**
185:13
**therapy** 198:4
**thereof** 242:12
**thing** 23:5 28:23
196:6
**things** 39:23 73:11
80:9 85:9 117:2,5
128:23 161:7
192:18 197:1
198:5 200:9 221:3
**think** 14:1 17:23
21:18 25:11 26:13
27:8 28:3,12 31:2
33:24 34:18 37:3
37:3,3 39:4 40:19
41:2 43:13 46:20
49:19 50:11,18
51:9,12 57:1 60:1
60:20,21 62:16
63:17 65:20 67:22
70:5 73:17 84:3
90:10 91:10
111:19 112:2
125:10 129:16,17
132:11 137:10
138:5 141:6,7
147:12 150:1
151:20,21 153:19
160:3 166:6
169:13 188:24
190:24,24 194:20
208:4 209:20
215:5,9 223:14
225:9 227:22,25
228:4 231:6 233:7
233:7,11 234:15
236:9 237:18
239:10
**thinking** 35:25
37:11,18,21 39:4

84:6,10,10 124:2,3
181:17 184:6
**thinks** 55:2
**third** 63:7 88:15
132:25 204:6
205:19 216:12,15
216:16 222:2,12
222:20 224:13
225:25 227:6
228:15 229:9,15
229:18 230:18
232:23 233:2,13
233:15,18 234:3
234:25 236:2,6,11
236:14,20,23,24
237:2,13,18,21,24
238:4,14,21 239:5
239:7
**thornburg** 5:7
**thought** 36:2,2
86:8 101:18,20
159:8 186:8
213:12,12
**threat** 41:19
**three** 6:9 17:23
18:1,3 25:12,16,19
25:19 60:17 71:17
80:8 168:3,4,4,10
175:9 217:13
**thumbnail** 15:6
**thursday** 1:12
**tiffany** 4:3
**time** 1:14 12:3
13:10,10,21 17:22
22:5,17 23:1,3
28:9 35:15,25
36:25 37:2 39:3
41:21 43:9,14
45:16 47:18 48:12
49:10,20,22 50:10
54:19 56:23 57:10

57:13,16 60:10,21
62:6 64:24 67:6
68:15 69:6,8,9,18
69:21 70:7,11,12
70:22 71:4,11,13
71:15,20,21,25
72:1,4,5,8,21,25
73:3,8 74:6,9
76:23 77:2 78:6
84:6,9 89:13
91:22 92:1 94:17
95:3,11 108:16
110:10 111:20
112:8,10,15,21,25
131:8 133:3,5
150:13,16 171:7
171:21 180:9,13
194:2,16 195:5,16
196:21,22,22
202:11 206:8,11
212:18 228:5
235:10,13,17
239:23 240:5
241:13 242:6
243:19
**timeframe** 38:14
39:10 243:8
**times** 94:12
109:20 127:24
128:20 153:12
160:4 179:13
196:19 200:4
215:5
**titled** 181:24
**today** 12:20 13:24
25:9 30:10 92:11
180:18 183:14
234:21
**told** 173:24,24
220:8,14,15

**tolerance** 161:12
163:1
**tolerances** 161:7
161:21
**top** 168:14
**topic** 40:25
**torrent** 78:2 93:25
**total** 69:12,22
210:16 217:15
221:17
**toxins** 39:14
**tpp** 232:4,6,15,18
**tpps** 205:18
216:24,25 217:2
223:9 227:1 229:8
229:21 231:4,15
**trade** 5:4 105:12
105:13 106:19
113:14 116:24
119:8,19,21
120:13,15 138:11
139:10 156:21
161:15 162:5
163:2 183:17
190:9 197:4,8,16
197:21 202:14
210:19 211:7,10
211:12 217:25
235:3
**trades** 186:4
**tragically** 135:24
**trailed** 230:23
**train** 101:18,19
**trained** 50:4
**transactions** 230:5
**transcript** 30:25
243:6,20 245:5,8
**transcription**
242:7
**traurig** 4:2

**traveling** 71:17
**treat** 35:22 38:12
133:24 134:3,5
170:8 174:7 175:4
190:20 191:24
199:18 211:5
**treated** 135:6
233:3,20
**treating** 137:15
139:2,15
**treatise** 124:17
125:15
**treatises** 188:16
**treatment** 136:3
136:17,23 137:11
138:1,2 144:7,21
145:14 169:12
172:10 173:2
174:11,19 175:14
175:16 191:1,9,10
192:16 193:12
225:13 226:20
232:5,17
**treatments** 134:21
135:19,21 172:2
191:13 192:7
200:7
**trials** 133:11,14,15
**tricare** 218:7
**tried** 100:13,14
220:16
**triple** 73:23
**true** 103:13 117:7
136:15 205:18
242:7 245:8
**try** 13:7 33:17
102:3 162:22
**trying** 16:5 21:14
41:7 51:15 55:25
60:15 125:14
128:18,23 162:18

164:24 188:12
203:10,18 221:11
231:11
**turn** 64:15 68:22
90:7 95:14 104:24
166:18 167:23
184:16 201:10
206:15
**turned** 75:12
**two** 18:8 22:13
35:16 37:8 66:21
68:6,6 69:24 70:2
71:6 111:12,23
136:1 145:21
169:2,13 180:8
185:22,23 186:12
206:22 217:16
**twofold** 185:17
**tylenol** 13:25
**type** 23:23 32:1
160:21 202:20
212:4 213:25
214:7 216:8
226:16 227:11
**types** 17:16 19:16
22:23 35:17,20
38:25 39:1,3,15
43:5 51:24 185:23
185:23 209:6
226:9 229:10
239:4

| u |
|---|

**u.s.** 3:9,9,15,15
66:5 86:4 88:24
89:10,12 97:14
98:3,6,16 106:18
106:21 108:10,11
108:15,21 110:8
110:12,16,21
113:14,19,22
114:8 115:22

**[u.s. - valsartan]**                                                                 Page 42

116:17,24 117:14
117:16 119:8,19
119:21 120:12,14
120:17 121:14,21
122:13 124:14,23
125:12,23,24
126:1,11 132:14
132:20 135:20
136:20,24 138:11
139:9 145:24
146:5 148:7,10,25
149:7 156:21
161:11 162:5,6
163:4 164:10
165:2 174:8
182:17 183:6
186:4,5,6 187:2
188:6,7 190:2,2,9
190:14 194:24
197:14,16,21
202:10,20 204:16
204:20,23 209:25
210:19 211:1,20
215:23 235:3
237:9
**uh**  20:11 41:8
201:16 217:9
**ulmer**  7:2
**ulmer.com**  7:3
**ultimately**  42:15
125:2 199:23
**unable**  228:21
**unadulterated**
191:14 198:20
**uncontaminated**
191:14
**undergo**  38:25
**underlying**  137:11
191:25 235:4
**underscores**
185:15

**understand**  13:4
13:13,14,15,19
19:2 34:3 39:23
44:25 45:10 51:16
53:12,14 59:21
79:2 80:1,11 85:2
86:14,21 87:15
93:2 98:10 106:6
121:18,25 122:19
125:14 127:11
129:18 131:8
133:23 134:13,18
134:20 135:3
143:13 144:3
151:5,5 153:17
181:14 191:11
203:6,17 214:4
218:21 219:5
222:5 229:18,21
232:22 233:16
234:17,24 236:25
238:9 239:1,2,12
**understanding**
40:2,3 59:18 79:6
82:4,13 87:2 88:2
88:18 98:4 101:3
106:11,25 107:8
110:19 114:10
115:20 125:11
134:16 141:14
158:15 165:24
172:6 173:4,7
186:22 191:11,21
214:6 216:25
237:25 239:22
240:25
**understood**  13:18
**underwent**  198:4
**underwrite**  227:8
**unit**  11:3 74:7
112:22 113:1

180:10,14 206:12
235:14,18
**united**  1:1 39:17
105:4,12 107:11
124:23 161:16
187:9 201:22
223:2 236:18
**universities**  23:12
**university**  14:6,10
15:18,18,19 23:24
52:19
**unjust**  206:23
207:2,20 208:12
**untreated**  134:7
134:19,23 137:3
**update**  175:7
**updated**  54:1
**updates**  8:11
167:6
**use**  16:3 36:19
37:23,24,25 38:19
46:24 54:7,8
75:14 76:15
103:22 113:9,24
122:11,12 123:11
124:15 133:24
134:4 165:19
166:9 171:10
172:9,17,17
174:11 182:4
213:6,9
**usefulness**  185:24
**user**  185:9
**uses**  39:3 97:24
98:3 221:16
**usually**  226:16
227:11
**utilization**  37:6

**v**

**vacuum**  157:18
**valsartan**  1:2 8:13
11:5 35:11,14,22
36:9,11 37:2,20,20
38:9 41:23 63:13
63:25 65:7,21
76:4,12,13,16,17
77:6,8,13,19,23
78:3,10,10 81:5
82:1,6 96:21 97:8
97:12,21 102:6
127:7,17 130:1,24
132:7,24,24
133:23,24 134:4
137:15,18 138:2,2
138:9 139:1,14
141:3,17,19,21
142:24 144:8,22
145:15 147:19
149:17 150:21
151:12 153:8
156:4,6 157:22
158:8,10,19
159:24 160:17,23
164:4 165:20
166:10 168:18
169:9 170:15,25
171:10,15,18
172:5,11,12,15,17
173:11,16 174:5
174:12,14,16,20
175:4,6,6,7,18,23
176:6,7,14 177:5,5
177:8,12 178:1,2,8
178:9 179:21
190:17 191:14
192:19 193:19
194:1,15 196:10
196:10 198:10
199:2,9,12,22

205:10 213:2,4,5
213:10 214:11
215:17 218:18
226:11 227:9
229:7 230:13,15
231:3,14,18 232:5
232:17 233:20
236:8 237:5 238:6
238:15,23 239:17
240:5,19 241:2,8
243:4 244:1 245:1
**valuable** 137:14
187:3
**value** 111:11
114:24 116:6,12
117:10,23,25
118:7 119:2 133:7
137:4,13,18,22,22
138:13,18 140:8
140:15,21 141:4,9
141:23 142:2
143:1,7,11,12,17
143:19,21 144:4,9
144:23 145:8,9,14
145:23 146:1,6,10
146:15,15,17,18
146:18,19,23
147:25 148:12,14
148:18,25 149:3
151:23 152:8,16
152:19 153:6,11
153:14,18 164:4
164:15 183:10,13
183:13,15,25
184:1,3,4,7 185:10
185:23,25 186:1,1
186:10,12,12,13
186:15 201:18
204:12,16,23
230:12,12 232:23
233:3,13,19

**values** 145:21
**vanaskie** 100:7,25
**variables** 216:1
**variation** 162:25
**variety** 17:15,16
42:2 239:4
**various** 17:24
40:18
**vast** 228:25
**vcds** 154:3
**verbally** 11:23
**verify** 243:9
**veritext** 1:10 11:7
11:9 243:14,23
**veritext.com**
243:15
**versus** 26:6 73:4
**veterans** 218:8
**video** 11:3 94:22
94:25 95:2,7
241:12
**videographer** 7:8
11:1,7 57:13,16
58:15 74:6,9
76:23 77:2 90:9
91:22 92:1 94:17
94:24 95:11
112:21,25 150:13
150:16 180:9,13
206:8,11 235:13
235:17 241:13
**videotaped** 1:10
8:5,7 52:24 56:18
**view** 104:13 107:4
108:5 110:18
115:15 125:16,23
125:25 137:10,13
145:15 151:6
186:9,15,18
187:20,24 188:5
190:18 200:23

216:25 219:25
231:2,13 232:6,19
**viewed** 156:22
**views** 186:12
**violation** 84:9
105:22 106:4,12
106:25 107:23
108:4 110:20
189:10
**violations** 82:16
93:18 108:21
120:21
**virtual** 1:10
**virtue** 154:1
**voices** 147:1
**volume** 90:7,15
166:22
**voluntary** 175:10
**vouchers** 221:18

**w**

**w** 3:4,5
**wacker** 4:5
**wait** 15:24,24
119:5 181:19,19
187:6,6,6,6,6
188:2 213:15,15
213:15,16
**waiting** 47:19,19
**waive** 12:1
**waiver** 180:20
**waiving** 32:16
34:17 154:24,25
155:15,16,23
**walgreens** 211:8
**wallack** 5:17
**walnut** 7:4
**walsh** 6:7
**walshlaw.com** 6:8
**want** 23:4 37:16
43:12,15,15 59:19
80:6 92:4,5 95:3,4

95:6 100:16,23
107:9 111:17
117:15 122:19
128:7,11 129:2
150:5 162:2 163:3
166:18 179:3
187:15 188:5,10
205:7 217:6
218:23 221:24
**wanted** 55:14
100:16 126:4
186:24 187:10
208:25
**warning** 93:23
**warnings** 139:12
**washington** 3:13
4:20 5:14
**waste** 54:18,19
95:3
**wasting** 111:20
**way** 2:13 12:24
26:22,24 31:10
37:14 55:1,7 80:6
97:15 100:15,24
117:25 143:19
145:8 146:11
149:4,15 151:22
153:11,13 162:15
163:24 194:20,21
202:6,24 208:13
212:11 225:9
226:7 242:11
**ways** 33:17 93:24
135:6 141:15
192:17 193:24
**we've** 33:11 57:20
182:9 183:13
**web** 184:15
**week** 17:19 73:15
**went** 171:1,1
187:23 192:20,21

[went - worry]                                                                Page 44

194:16
**west**   4:5 5:4 6:18
  6:24
**wharton**   23:25
**whereof**   242:13
**whiteley**   2:20,21
  28:13
**whitely**   59:13
**whitney**   6:17
**widely**   16:10
**william**   5:17
  184:20,25 185:4
**willing**   157:13,14
  161:8,21 163:7,9
**winter**   60:1
**wish**   101:16
**withdraw**   62:2
  94:15 112:5,6
**withdrawing**
  55:18,18
**withstanding**
  13:12
**witness**   2:5 11:12
  11:22 12:6 14:25
  16:18 20:9,12
  21:2 26:6 28:19
  28:21,25 30:11,22
  32:8,15,19 33:3,6
  34:20 35:20 36:15
  38:5 42:18,22
  44:10 45:7,15
  46:4 47:8,12
  49:11 52:13 53:22
  57:9 58:18 61:10
  61:22,25 65:17
  69:16 70:2,20
  71:10 75:21 76:20
  77:12,21 82:12
  83:6 85:1 86:20
  86:21 88:22 89:9
  89:22 90:4,12,22

92:16 93:22 94:3
94:11 96:7,11,23
97:11,24 98:24
99:10,10,16,21
100:5,18 101:3,5
101:19 102:10
103:2,18 104:11
105:18 106:4,16
107:7,19 108:1,8
108:24 109:4,7,13
110:6,25 112:2,7
112:12,16,20
114:14 115:4,11
115:20 116:8,15
117:7,13 118:21
119:5 121:4 123:1
125:22 126:19
127:11,22 128:1,3
128:6,19 129:16
129:17 130:5
131:5 132:1,11,19
133:19 134:11
135:2,11,18 136:9
136:20,23 137:7
137:21 138:5,21
139:5,18,23 140:3
140:11,17,25
141:6 142:1,5,10
142:13,17 143:5
143:15,25 144:2
145:2,4,19 146:22
147:4,12,23
148:22 149:24
151:1,20 152:15
153:10,24 154:16
155:2,18,25
156:11 157:9
158:5,14,23
159:11 160:5,20
161:11,25 163:13
163:23 164:6,19

165:15,24 166:13
168:5 169:22
170:5,19 171:18
171:25 172:22
173:14 175:1
176:5,23 177:20
178:13,25 179:8
179:19 180:23
181:5,14 182:25
184:9 185:1
186:18 188:23
189:1,14 190:23
191:20 192:10,15
193:4,14,22
194:11 195:2,23
196:5,17 198:18
199:7 200:6,20
201:6 203:5,16,23
205:2,5,12,24
206:4 207:16,25
208:6 209:15
211:13 212:9,17
212:19,22 214:14
215:12,20 216:21
219:2,21 220:5,11
220:19 223:14
224:6,17 225:21
226:6 227:5 228:8
228:19,24 231:6
232:10,22 233:9
233:12,23 234:15
237:7 238:9,17
239:2,21 240:12
240:25 242:6,13
243:8,10,12,19
**witnesses**   87:6,25
  100:9,10
**wmurtha**   5:18
**woefully**   70:11
**word**   46:24 120:6
  128:6 139:21

234:22
**wording**   176:9
**words**   80:8 117:2
  117:23 128:9
  156:19 159:2
  183:16 190:7
  195:4
**work**   17:11 18:13
  18:17 19:5,9,10,17
  19:24 20:13 21:21
  21:24 22:7,7
  24:13,18,19 26:6
  26:10,19,21 29:9
  30:3 32:20,21
  33:8 39:10 40:2
  42:9 45:11 46:21
  46:22 48:9,19
  50:16 51:21 53:21
  63:13 65:13,16
  66:9 69:13 71:3
  180:21
**worked**   16:22
  19:21 21:8 24:7
  25:1,23 26:16
  29:6 45:17 46:10
  48:6,11,14 50:9
  52:1 53:25 61:12
  63:25 70:13
**workers**   218:13
**working**   17:24,25
  19:14,19 20:4
  24:4 25:13 26:24
  29:18 31:3,16
  33:12 47:25,25
  59:24 62:25 72:3
  86:5
**works**   50:7
**world**   112:8
  190:19 193:23
**worry**   67:9

RESTRICTED CONFIDENTIAL

**[worth - zoom]**                                                              Page 45

**worth**  145:9
151:23 152:8
**worthless**  114:25
115:1,18 122:23
124:6 125:18
126:16 145:16
151:7 153:25
156:24 204:5
230:16,17 232:7
232:18
**worthlessness**
115:17 145:10
151:9 153:15
185:24
**write**  15:13 157:13
201:17
**writing**  15:15
47:21 50:17
**writings**  54:5
**written**  122:16
212:1
**wrongdoing**  203:1
**wrote**  51:2,4,6,20
52:1 82:19,21

**x**

**x**  1:2,5 8:1
**xi01658**  242:17
**xponent**  66:4
210:15,24 211:15
212:2,6,25 215:3
217:14,20

**y**

**yeah**  18:7 19:12
27:3 34:2 43:22
49:19 57:2 60:4,4
60:18 70:25
109:15 134:15
137:9 138:5 157:2
159:18 166:25
168:20 176:18

207:25 241:11
**year**  17:23 26:5,13
47:4 73:16 209:9
212:14 214:18
215:21 216:9
**yearly**  106:22
**years**  15:3,17 17:2
19:22 22:3 26:16
202:16 204:20
**york**  2:18,18 6:19
6:19 73:14

**z**

**zero**  201:18
**zhejiang**  78:1
93:13,20 168:22
**zhejiant**  3:8,15
**zhp**  12:18 93:21
93:21,22,23
168:18,19
**zmick**  6:23
**zoom**  1:10

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit 48

REDACTED

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

             DISTRICT OF NEW JERSEY

2     - - - - - - - - - - - - - - - - x

      IN RE: VALSARTAN, LOSARTAN, AND   :  MDL NO. 2875

3     IRBESARTAN PRODUCTS LIABILITY      :

      LITIGATION,                        :

4                                        :

      THIS DOCUMENT RELATES TO           :

5     ALL ACTIONS                        :

      - - - - - - - - - - - - - - - - x

6

7

8          ***RESTRICTED CONFIDENTIAL***

9

10         Veritext Virtual Zoom Videotaped

11    deposition of RENA M. CONTI, Ph.D., taken on Friday,

12    February 11, 2022, in Glenside, Pennsylvania,

13    commencing at 9:04 a.m. Eastern Standard Time,

14    before Jamie I. Moskowitz, a Certified Court

15    Reporter and Certified Livenote Reporter.

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 2

1  A P P E A R A N C E S :
2
   HONIK LLC
3  BY:  RUBEN HONIK, ESQUIRE
   ruben@honiklaw.com
4  1515 Market Street - Suite 1100
   Philadelphia, Pennsylvania 19102
5  267.435.1300
   Counsel for the Witness Rena M. Conti, Ph.D.
6
7  MAZIE SLATER KATZ FREEMAN
   BY:  ADAM M. SLATER, ESQUIRE
8  aslater@mazieslater.com
   103 Eisenhower Parkway
9  Roseland, New Jersey 07068
   973.228.9898
10 Counsel for the Plaintiffs
11
   SLACK DAVIS SANGER LLP
12 BY:  JOHN R. DAVIS, ESQUIRE
   jdavis@slaterdavis.com
13 6001 Bold Ruler Way - Suite 100
   Austin, Texas 78746
14 512.795.8686
   Counsel for the Plaintiffs
15
16 LIEFF CABRASER HYMAN & BERNSTEIN, LLP
   BY:  RACHEL J. GEMAN, ESQUIRE
17 rgeman@lchb.com
   250 Hudson Street
18 New York, New York 10013
   212.355.9500
19 Counsel for the Plaintiffs
20
   KANNER & WHITELEY, L.L.C.
21 BY:  CONLEE S. WHITELEY, ESQUIRE
   c.whiteley@kanner-law.com
22 BY:  DAVID J. STANOCH, ESQUIRE
   d.stanoch@kanner-law.com
23 BY:  LAYNE C. HILTON, ESQUIRE
   lhilton@kanner-law.com
24 701 Camp Street
   New Orleans, Louisiana 70130
25 504.524.5777
   Counsel for the Plaintiffs

Page 3

1  A P P E A R A N C E S :
2
   DUANE MORRIS LLP
3  BY:  SETH A. GOLDBERG, ESQUIRE
   sagoldberg@duanemorris.com
4  BY:  COLEEN W. HILL, ESQUIRE
   cwhill@duanemorris.com
5  BY:  ALEK W. SMOLIJ, ESQUIRE
   awsmolij@duanemorris.com
6  BY:  DANA B. KLINGES, ESQUIRE
   30 South 17th Street
7  Philadelphia, Pennsylvania 19103
   215.979.1000
8  Counsel for the Defendants Prinston Pharmaceutical
   Inc., Zhejiant Huahai Pharmaceutical Co., Ltd, Solco
9  Healthcare U.S., LLC and Huahai U.S., Inc.
10
   DUANE MORRIS LLP
11 BY:  REBECCA E. BAZAN, ESQUIRE
   rebazan@duanemorris.com
12 BY:  DREW T. DORNER, ESQUIRE
   dtdorner@duanemorris.com
13 505 9th Street NW - Suite 1000
   Washington, DC 20004
14 202.776.7800
   Counsel for the Defendants Prinston Pharmaceutical
15 Inc., Zhejiant Huahai Pharmaceutical Co., Ltd, Solco
   Healthcare U.S., LLC and Huahai U.S., Inc.
16
17 MORGAN, LEWIS & BOCKIUS LLP
   BY:  JOHN K. GISLESON, ESQUIRE
18 john.gisleson@morganlewis.com
   BY:  STEVEN N. HUNCHUCK, ESQUIRE
19 steven.hunchuck@morganlewis.com
   One Oxford Centre - 32nd Floor
20 Pittsburgh, Pennsylvania 15219
   412.560.3300
21 Counsel for Defendant Aurobindo Pharma Ltd.
22
23
24
25

Page 4

1  A P P E A R A N C E S :
2
   GREENBERG TRAURIG, LLP
3  BY:  TIFFANY M. ANDRAS, ESQUIRE
   andrast@gtlaw.com
4  BY:  GREG E. OSTFELD, ESQUIRE
   ostfeldg@gtlaw.com
5  77 West Wacker Drive - Suite 3100
   Chicago, Illinois 60601
6  312.456.1065
   Counsel for Defendant Teva Pharmaceuticals
7  Industries Ltd.
8
   NORTON ROSE FULBRIGHT US LLP
9  BY:  ELLIE NORRIS, ESQUIRE
   ellie.norris@nortonrosefulbright.com
10 BY:  D'LESLI M. DAVIS, ESQUIRE
   dlesli.davis@nortonrosefulbright.com
11 2200 Ross Avenue - Suite 3600
   Dallas, Texas 75201-7932
12 214.855.8221
   Counsel for McKesson Corporation
13
14 HUSCH BLACKWELL
   BY:  MATTHEW D. KNEPPER, ESQUIRE
15 matt.knepper@huschblackwell.com
   190 Carondelet Plaza - Suite 600
16 St. Louis, Missouri 63105
   314.480.1500
17 Counsel for the Defendant Express Scripts
18
   BUCHANAN INGERSOLL & ROONEY PC
19 BY:  JONATHAN D. JANOW, ESQUIRE
   jonathan.janow@bipc.com
20 1700 K Street - Suite 300
   Washington, DC 20006
21 202.452.7900
   Counsel for the Defendant Albertsons LLC
22
23
24
25

Page 5

1  A P P E A R A N C E S :
2
   BUCHANAN INGERSOLL & ROONEY PC
3  BY:  CHRISTOPHER B. HENRY, ESQUIRE
   christopher.henry@bipc.com
4  227 West Trade Street - Suite 600
   Charlotte, North Carolina 28202
5  704.444.3475
   Counsel for the Defendant Albertsons LLC
6
7  BARNES & THORNBURG LLP
   BY:  KARA M. KAPKE, ESQUIRE
8  kara.kapke@btlaw.com
   11 South Meridian Street
9  Indianapolis, Indiana 46204
   317.236.1313
10 Counsel for CVS and Rite Aid
11
   CROWELL & MORING LLP
12 BY:  LUKE J. BRESNAHAN, ESQUIRE
   lbresnahan@crowell.com
13 BY:  DANIEL T. CAMPBELL, ESQUIRE
   dcampbell@crowell.com
14 1001 Pennsylvania Avenue NW
   Washington, DC 20004
15 202.624.2500
   Counsel for the Defendant Cardinal Health Inc.
16
17 HILL WALLACK LLP
   BY:  WILLIAM E. MURTHA, ESQUIRE
18 wmurtha@hillwallack.com
   BY:  ERIC I. ABRAHAM, ESQUIRE
19 eabraham@hillwallack.com
   BY:  CARLO J. DEHART, ESQUIRE
20 cdehart@hillwallack.com
   21 Roszel Road
21 Princeton, New Jersey 08540
   609.924.0808
22 Counsel for the Defendants Hetero Drugs Limited and
   Hetero Labs Limited
23
24
25

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1  A P P E A R A N C E S :
2
   PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
3  BY:  FRANK H. STOY, ESQUIRE
   fhs@pietragallo.com
4  38th Floor - One Oxford Centre
   Pittsburgh, Pennsylvania 15219
5  412.263.4397
   Counsel for the Defendants Mylan Laboratories
6  Limited and Mylan Pharmaceuticals Inc.
7
   WALSH PIZZI O'REILLY FALANGA LLP
8  BY:  CHRISTINE I. GANNON, ESQUIRE
   cgannon@walshlaw.com
9  BY:  LIZA M. WALSH, ESQUIRE
   lwalsh@walshlaw.com
10 Three Gateway Center
   100 Mulberry Street - 15th Floor
11 Newark, New Jersey 07102
   973. 757.1100
12 Counsel for the Defendant Teva Pharmaceuticals
13
   HINSHAW & CULBERTSON LLP
14 BY:  GEOFFREY M. COAN, ESQUIRE
   gcoan@hinshawlaw.com
15 53 State Street - 27th Floor
   Boston, Massachusetts 02109
16 617.213.7045
   Counsel for the Defendant Sciegen Pharmaceuticals
17
18 DORSEY & WHITNEY LLP
   BY:  SHEVON D. ROCKETT, ESQUIRE
19 rockett.shevon@dorsey.com
   51 West 52nd Street
20 New York, New York 10019-6119
   212.415.9357
21 Counsel for the Defendant OptumRx
22
23
24
25

Page 8

1        E X H I B I T S
2
   EXHIBIT NUMBER    DESCRIPTION        PAGE
3
   Conti 7      Retailer Damages Output      18
4             Excel Spreadsheet
5  Conti 8      Expert Report of Rena     208
             Conti, Ph.D in the Blue
6             Cross Blue Shield
             Association versus
7             GlaxoSmithKline Matter
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1  A P P E A R A N C E S :
2
   FALKENBERG IVES LLP
3  BY:  KIRSTIN B. IVES, ESQUIRE
   kbi@falkenbergives.com
4  BY:  MEGAN A. ZMICK, ESQUIRE
   maz@falkenbergives.com
5  230 West Monroe - Suite 2220
   Chicago, Illinois 60606
6  312.566.4803
   Counsel for the Defendant Humana Pharmacy, Inc.
7
8  ULMER & BERNE LLP
   BY:  JEFFREY D. GEOPPINGER, ESQUIRE
9  jgeoppinger@ulmer.com
   312 Walnut Street - Suite 1400
10 Cincinnati, Ohio 45202-4029
   513.698.5000
11 Counsel for the Defendant AmerisourceBergen
12
   ALSO PRESENT:
13
   JUSTIN BILY
14 Legal Videographer
15
16
17
18
19
20
21
22
23
24
25

Page 9

1  REQUEST PAGE
2
3  INSTRUCTIONS NOT TO ANSWER:
4  Page  Line
5  None
6  REQUEST FOR PRODUCTION OF DOCUMENTS:
7  Page  Line        Description
8  None
9  STIPULATIONS:
10 Page  Line
11 None
12 QUESTIONS MARKED:
13 Page  Line
14
15
16
17
18
19
20
21
22
23
24
25

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

1          TABLE OF CONTENTS
2   RENA M. CONTI, Ph.D.
3
    Examination
4
    By Ms. Kapke..........................Page  11
5
    By Mr. Campbell.......................Page 100
6
    By Mr. Ostfeld........................Page 182
7
    Index of Exhibits.....................Page   8
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 11

1          THE VIDEOGRAPHER:  The time is 9:04.
2   This begins Media Unit Number 1.  We're back on
3   the record.
4          MR. GOLDBERG:  Good morning, Doctor.
5   This is Seth Goldberg, again.  I'm not on
6   video.  I will be momentarily.  But at this
7   point, I'm going to pass the witness to the
8   next questioning counsel.  I am not concluding
9   my questioning, but in the interest of time, I
10  want to give other counsel an opportunity to
11  ask questions.
12         THE COURT REPORTER:  Kara, you're on
13  mute.
14  EXAMINATION BY MS. KAPKE:
15      Q    Good morning, Dr. Conti.  My name is
16  Kara Kapke.  I represent CVS and Rite Aid, and I'm
17  going to be asking you questions primarily about
18  your opinions vis-a-vis the retail pharmacy
19  defendants.
20         My first question is, do you
21  understand that you're still under oath here today?
22      A    Yes.
23      Q    Great.  Did you review any documents
24  or materials last night or this morning before
25  starting today's deposition?

Page 12

1      A    Yes.
2      Q    What did you review?
3      A    My report.
4      Q    Anything else?
5      A    I looked up some statistics regarding
6   the revenues of retailers and wholesalers in this
7   case.
8      Q    Statistics from your report or
9   statistics that were independent of references in
10  your report?
11     A    The shareholder reports of the -- the
12  retailers and the wholesalers.
13     Q    So, like, the 10-Ks?
14     A    Correct.
15     Q    Okay.  Okay.  Gotcha.
16         And I -- I honestly don't remember
17  that.  Are those cited in your report?  Are the --
18  are retailers' --
19     A    No, they're not.  No, they're not.
20  But there -- there are things that I do very
21  typically when I'm preparing for a deposition.
22  They're public.  They're also things that I -- I
23  spend time teaching, using.  In fact, some of the
24  defendants in this case are companies that my class
25  on Strategy in the Pharmaceutical Industry is

Page 13

1   currently studying, so part of my review was to get
2   ready for my class on Monday.
3      Q    Got it.  Okay.
4          Did you -- we talked about, yesterday,
5   you not reviewing any depositions, and I wanted to
6   confirm that you have not reviewed any depositions
7   of retailer pharmacy witnesses in this case; is that
8   correct?
9      A    That's correct.
10     Q    Did you review any deposition exhibits
11  from the depositions of the retail pharmacy 30(b)(6)
12  witnesses?
13     A    Why don't we check my Appendix B?
14  There's a lot of documents, so, let's just check.
15         So there is a declaration -- so are
16  you asking for declarations?  Is that correct?
17     Q    I'm asking if you reviewed any
18  written -- any -- strike that.
19         I'm asking if you reviewed any
20  deposition exhibits from the depositions of the
21  retail pharmacy deponents.
22     A    No, I did not, not that I'm aware of.
23     Q    How about any meet and confer letters
24  or correspondence from -- from counsel for the
25  retail pharmacy defendants?

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

1    A    No.
2    Q    Have you reviewed any opinions
3  relating to discovery from Special Master
4  Judge Vanaskie or Judge Schneider?
5        THE COURT REPORTER:  Or Judge...
6        MS. KAPKE:  Schneider.
7        THE COURT REPORTER:  Okay.
8        THE WITNESS:  There's a weird echo,
9    and I didn't hear half your sentence.  I'm
10   sorry.
11  BY MS. KAPKE:
12   Q    No, that's okay.
13        Have you reviewed any opinions
14  relating to discovery from Special Master
15  Judge Vanaskie or Judge Schneider?
16   A    No.  All I know is that I have very
17  limited data -- limited data from the retailers.
18   Q    And you mentioned yesterday that you
19  read one of Judge Kugler's opinions in -- in this
20  case.  What opinions of Judge Kugler's have you read
21  for purposes of this litigation?
22   A    Just what I read to you -- you all
23  yesterday.
24   Q    Okay.  Did you read the entire opinion
25  that -- that the snippet that you read yesterday

Page 15

1  came from, or just a portion of it?
2    A    I read the full paragraph that that
3  portion I read came from, but that's it.
4    Q    Okay.  I -- I want to turn to your
5  report, Conti Exhibit 5, and Attachment B, which we
6  just talked about.  And on Pages 4 to 8 of the
7  attachment, under the heading "Electronic Data," and
8  then the subheading, "Retailer Claims Data," you
9  have a listing of specific documents relating to
10  retail pharmacy defendants that you reviewed,
11  correct?
12   A    Yes.
13   Q    Is it okay if I refer to that group of
14  data by the subheading "Retailer Claims Data"?
15   A    Sure.
16   Q    Okay.  I -- I just want to make sure
17  that you'll understand that if I'm referring to
18  retailer claims data that that's what I'm referring
19  to.  B -- go ahead.
20   A    Okay.  Yeah.  Just one thing that I
21  should tell you is that -- so in my research, I have
22  spent a fair amount of time working with data from
23  CVS and also from Walgreens, specifically the
24  Walgreens -- Walgreens and the University of Chicago
25  had --

Page 16

1        THE COURT REPORTER:  I'm sorry,
2  Walgreens...
3        THE WITNESS:  Walgreens and the
4  University of Chicago had a long-standing data
5  collaborative, and I was in charge of that data
6  collaborative.  I wrote several papers with the
7  head of public economics at Walgreens when I
8  was faculty there.
9        THE THE COURT REPORTER:  When you were
10  faculty there?
11        THE WITNESS:  When I was faculty at
12  the University of Chicago.
13  BY MS. KAPKE:
14   Q    Did you rely on the data that you
15  reviewed in your faculty life relating to Walgreens
16  and CVS for purposes of your opinions in this
17  matter?
18   A    Well, so we talked about this
19  yesterday.  I primarily am a researcher, and I teach
20  about the pharmaceutical industry.  And so the
21  papers that I wrote with Walgreens data are in my
22  CV.  They're listed.  And to the extent that I know
23  something about how these pharmacies are collecting
24  information, what data they have on dispensing
25  prescriptions, is -- is informed both by the work

Page 17

1  that I do in research, but also the work that I've
2  done in --
3  BY MS. KAPKE:  That you've done in...
4        THE WITNESS:  This particular matter.
5  BY MS. KAPKE:
6    Q    In terms of the actual calculations
7  you made, not in your opinions, but the actual
8  calculations that you made, did you rely on any of
9  that, I'll call it faculty data, or did you solely
10  rely on the retailer claims data?
11   A    I relied on the retailer claims data
12  that was provided to me in this matter to do my
13  calculation.  But I have a broader understanding of
14  what is collected by the retail pharmacies that
15  included the ones that are named in this matter.
16   Q    Okay.
17   A    Due --
18        THE COURT REPORTER:  I'm sorry?
19        THE WITNESS:  Due to the research that
20  I have done with them.
21  BY MS. KAPKE:
22   Q    Understood.
23        The documents listed here for the
24  retailer claims data are not identified by a Bates
25  number, but is it your understanding that the

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

1  documents referenced there are the documents
2  produced by the retail pharmacy defendants in this
3  litigation with Bates numbers?
4      A    That is my understanding.
5          MS. KAPKE: I'm going to introduce,
6  and mark as Conti Exhibit 7, the retailer
7  damages output Excel spreadsheet file from the
8  materials that you provided. And it's on the
9  screen. And for the record --
10         (Whereupon, Exhibit Conti 7 was marked
11  for Identification.)
12         THE WITNESS: Can you refer me to a
13  specific one?
14  BY MS. KAPKE:
15     Q    I'm sorry. What?
16     A    Can you refer me to the specific
17  output that's listed on my Exhibit B?
18     Q    This is the retailer damages output
19  Excel spreadsheet that you provided.
20     A    I'm asking you, is it the backup, or
21  is it one of the documents that is listed --
22     Q    It's the backup.
23     A    -- in Exhibit B. I can't hear you.
24  I'm sorry.
25     Q    So if you -- this is something that

Page 19

1  you derived, and you -- I'm -- I'm not sure I
2  understand your --
3      A    I'm asking, is this the backup that we
4  provided to you, or is it one of the documents that
5  you listed here -- I'm sorry -- that I listed here
6  in Exhibit B?
7      Q    No. This is the backup that you
8  provided to us.
9      A    Just wanted to make sure.
10     Q    Yes. And so I will represent for the
11  record that this spreadsheet has 3,741 rows, and as
12  you can see --
13         MS. KAPKE: Maybe it can be made a
14  little bit larger.
15  BY MS. KAPKE:
16     Q    There are five columns across the top
17  reading retailer, entity, state, product name and
18  consumer impact. Do you --
19     A    Okay.
20         THE WITNESS: Can we -- can we scroll
21  all the way down so I can see -- make sure that
22  this is actually a full document, please?
23         Keep on going. Okay. Okay. So just
24  give me a second. And this is for -- the
25  backup for which exhibit?

Page 20

1  BY MS. KAPKE:
2      Q    So I'm marking it Conti Exhibit 7.
3  You, in the materials provided to us, labeled it,
4  entitled it "Retailer Damages Output."
5      A    But for -- for unjust enrichment or
6  liability?
7      Q    You did not make a distinction in what
8  materials were sent to us.
9      A    I see. Well, I'm going to have to
10  double check with my staff then, please.
11     Q    What are you double checking?
12     A    Whether this is this for the liability
13  claims or for the unjust enrichment calculation.
14     Q    Is it your suggestion that you have
15  two spreadsheets -- a backup data for those?
16     A    No. As I testified yesterday, the
17  unjust enrichment and liability estimates are
18  slightly different. You can see that in my Table 2
19  and Table 3 of my report. And -- and the difference
20  is largely related to the inclusion or exclusion of
21  specific states.
22         There is no indicater here for
23  whether -- for when the state is indicated for which
24  calculation. And so I just want to double check
25  with my staff. And I --

Page 21

1      Q    I'm -- and I'm sorry. I'm not trying
2  to be difficult. I just don't understand what you
3  need to double check.
4      A    All I want to know is whether this
5  backup is for the liability or for the unjust
6  enrichment calculations. That's all.
7          You'll see there's Table 2.
8      Q    Right.
9      A    Then there's Table 3. And they
10  are -- there's two theories of liability for
11  Table 2. They differ underlying Table 2. And then
12  in Table 3, there's an unjust enrichment
13  calculation. And each one in the series of damages
14  vary slightly for the retailers, related to what
15  states are included, which are not listed here.
16     Q    Right. Let's' -- we'll -- we'll get
17  to that.
18         Was there any dispensing or
19  prescription data that went into the creation of
20  this spreadsheet besides the retailer claims data?
21     A    I don't understand your question. I'm
22  sorry.
23     Q    Was there any prescription data or
24  dispensing data or any other data that went into the
25  creation of this output file, besides what we talked

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1 about earlier, being the retailer claims data?
2     A     Well, how do you define prescription
3 data versus claims data versus dispensing data? I'm
4 not -- I'm not familiar with those -- those are not
5 terms of art.
6     Q     Okay. That's -- that's fair. And
7 that's a bad question. Thank you for pointing out a
8 bad question.
9         I'm just trying to figure out if
10 there's any data that you used to generate this
11 spreadsheet besides what we talked about, being
12 retailer claims data?
13     A     So my understanding is that the
14 retailers provided my staff a -- data on spending by
15 consumers for the at-issue products by state, month
16 and year, and product -- and product subcategory,
17 really NDC code. And that they represented, the
18 retailers, that the dispensing fee, which I think is
19 what you've referred to by "dispensing data," was
20 already taken out, as was the payment made by the
21 third-party payor --
22     Q     Okay. I --
23     A     -- for the insured prescriptions.
24     Q     I think we're talking past each other,
25 because my -- my question just relates to, are there

Page 23

1 any -- any prescriptions, any fills, any -- I'm not
2 talking about individual fees. I'm just talking
3 about to, generate this spreadsheet, did you use any
4 type of document other than what's in the retailer
5 claims data?
6         THE COURT REPORTER: Did you use any
7     other type of...
8         MS. KAPKE: Document.
9         THE WITNESS: I have -- honestly, I
10     don't think I understand what you're saying at
11     all. So retailer pharmacies are sitting on an
12     incredible amount of data. So I think, you
13     know, there's millions of transactions that are
14     being done, all across the United States, every
15     single day, dispensed drugs.
16         What we were provided by the retailer
17     pharmacies in this setting were very simple.
18     There were co-insurance and co-payment,
19     customer-paid amounts by product, manufacturer,
20     month and year and state. They took out the
21     dispensing fees, which are usually charged when
22     a consumer goes and fills a prescription, and
23     the retailer pharmacies also took out the
24     payments that were made by the commercial
25     insurers when these -- when these prescriptions

Page 24

1 were dispensed.
2         All we had was the information that
3     was provided to us.
4 BY MS. KAPKE:
5     Q     That's -- that's what I'm trying to --
6 to make sure I understand.
7         When you generated this output file,
8 did you rely on anything other than what was
9 provided to you?
10     A     We relied on the names and NDC codes
11 and time periods of the at-issue valsartan and other
12 products.
13     Q     Okay. And that -- that makes sense.
14         Am I correct that this spreadsheet was
15 created using the SAS software?
16         THE COURT REPORTER: Using the what?
17         MS. KAPKE: The SAS software.
18         THE WITNESS: Do you mean SAS?
19 BY MS. KAPKE:
20     Q     Yes.
21     A     I don't know. Bennett programs in SAS
22 and in SETA. And also, as you can see, this is an
23 Excel file. So he may have actually done this
24 calculation in -- in Excel.
25     Q     I want to talk about the relevant time

Page 25

1 period used to generate this exhibit. It's my
2 understanding, from your report, that you did not
3 include any bills after the month of recall; is that
4 correct?
5     A     After the final month of recall for
6 each at-issue product. That's why the name of the
7 manufacturer and the product name at the NDC code
8 was so critical in our analysis. And what I already
9 mentioned, we used -- we used the date. We used the
10 month and year, plus the manufacturer and the
11 product name for each of our assessments.
12     Q     And for bills of Hetero NDCs, you did
13 not include any bills before May 2018, correct?
14     A     Correct. And we stopped at
15 August 2018.
16     Q     Logistically, how did you filter out
17 those dates? Was that something Bennett did?
18     A     Again, retail pharmacies provided the
19 data to us by month and year for every single
20 product and defined by NDC code, manufacturer and
21 state. It was the month variable that was provided
22 to us that allowed us to filter and confine it to
23 the specific time periods.
24         Again, pharmacies are -- in the
25 United States, such as the ones listed here, are

7 (Pages 22 - 25)

Page 26

1  at-issue here, are sitting on daily transactions
2  with a -- literally with a hour, minute stamp
3  associated with them.
4      Q    Okay. But --
5      A    Hold on.
6          So if -- my understanding is that the
7  information that was provided to us was aggregated
8  by the retail pharmacies themselves, up into a
9  particular time period, and then provided to us.
10 They could have given us the disaggregated data at
11 literally the minute, hour, second time period, if
12 they wanted to, so.
13     Q    Okay. But that wasn't my question.
14         My question was how -- how you or your
15 staff took the retailer claims data and turned it
16 into this output file, not -- not the inceptions
17 underlying that.
18     A    I answered that question. So I told
19 you we acquired information with month, year,
20 product -- product, NDC -- identified at the NDC
21 code level and the manufacturer and the state. What
22 we did was simply aggregate that information up
23 after limiting it to the relevant time period for
24 each specific product.
25     Q    Let's go to your --

Page 27

1          THE WITNESS: There -- there's, like,
2  a very loud stomping, or something else, noise,
3  in the background. It's very hard to hear. It
4  sounds like it stopped now.
5  BY MS. KAPKE:
6      Q    Okay. I want to go back to your
7  report, Conti Exhibit 5. In paragraph 60, you state
8  that "Expenditures by plaintiffs for the at-issue
9  valsartan products can be expressed as the product
10 of price and quantity over the relevant time period
11 of the alleged misconduct."
12         I want to ask you about the phrase
13 "time period of the alleged misconduct." What
14 misconduct are you referring to, if any, on the part
15 of the retail pharmacy defendants?
16     A    What I was asked to assume and what
17 was outlined in the complaint that I reference in
18 the first couple of paragraphs of my report.
19     Q    For unjust enrichment, you defined the
20 time period as each at-issue valsartan product sold
21 by the defendant retailers from January 1st, 2012
22 until the at-issue valsartan products were recalled
23 in 2018 and 2019 for being adulterated and
24 misbranded. That's in paragraph 63.
25     A    Yeah. I was going to say, I don't see

Page 28

1  that in the paragraph just referenced.
2      Q    Yeah. Sorry about that.
3      A    Let me just make sure I'm on the same
4  page with you.
5      Q    It is on the screen now, if that's
6  helpful.
7      A    Yeah. I prefer -- prefer the paper,
8  but thank you. So, right. And then there is a
9  footnote -- a footnote -- so there's a footnote that
10 ends that paragraph, which is 63. And that -- that
11 refers back to Footnote 3, as I mentioned in the
12 beginning of my report. And then in the beginning
13 of my report, I reference the complaint, and then go
14 onto reference the at-issue products.
15     Q    And --
16     A    Excuse me. And their time period.
17     Q    And -- and my question is, are the
18 relevant time periods the same for paragraphs 60 and
19 63?
20     A    Yes. The time periods relate to the
21 sale of prescription drugs from the relevant
22 manufacturers in the relevant time period as
23 enumerated in Footnote 3 and discussed in the
24 complaint. I do not make a distinction between
25 manufacturer and retailer.

Page 29

1      Q    Got it.
2          MS. KAPKE: Okay. I want to go back
3  to Conti Exhibit 7, the output file.
4  BY MS. KAPKE:
5      Q    I think I understand what each of
6  these columns represent, but I just want to go
7  through and double check that my understanding is
8  correct.
9          So Column A is going to represent the
10 retail pharmacy defendants in this case, correct?
11     A    That's what is listed, sure.
12     Q    Okay. And then Column B will
13 represent the manufacturer defendants at-issue in
14 the case, which you identified through the NDC code,
15 correct?
16     A    Well, it's -- it's listed from this
17 FDA recall list, the manufacturer.
18     Q    Okay. To -- when you were processing
19 the retailer claims data to create this output file,
20 did you exclude any prescription fills in the
21 retailer claims data based on NDC codes?
22     A    Yes, I already discussed this
23 yesterday. There were some -- we -- I was provided,
24 from attorneys, the list of manufacturers and NDC
25 codes from the FDA recall list, and then some of the

CONFIDENTIAL

1  NDCs were also -- that were at-issue, were
2  repackaged, relabeled or privately labeled by
3  manufacturers downstream.  That happens actually
4  quite frequently in the -- in the U.S. market.  We
5  picked up those NDC codes and included them here.
6      Q       Did you exclude any prescription
7  fills?
8      A       We didn't have prescription fill data.
9  You did not -- that's not what you gave us.  We had
10 aggregate sales to specific consumers, paid by
11 co-pays and co-insurance.  Fills are much larger --
12 or contain a lot more information, but you did not
13 provide that information.  Fills, again, provide the
14 dispensing fee, whether or not the individual used
15 their insurance to pay for a portion or the entirety
16 of the prescription, the date, the time, of the
17 dispensing.  It could include the -- the name of the
18 customer, their address, and on and on.  We
19 didn't -- we didn't have that aggregate of data.
20 You did not provide that to us.
21     Q       How much time did you spend looking at
22 the actual retailer claims data?
23     A       I spent some time with my staff.
24     Q       What does that mean?
25     A       I spent some time with my staff.

1      Q       What does "some time" mean?
2      A       I spent some time over the course of
3  the time that I was working on this case.  In
4  addition, I spoke with my staff on a regular basis
5  about the analysis that they were doing at my
6  direction.
7      Q       Did you --
8      A       That's kind of the normal course of
9  doing research and also working on these cases, is
10 that we look at data that was provided.  We clean
11 and double check the completion of the data.  We
12 look to see what fields are provided.  We look to
13 see what fields were not provided that we would
14 expect to provide -- to be provided.  We do some
15 double checks to make sure there's not missing data,
16 and if there is missing data, how do we think about
17 that, and on and on.  That's all part of the process
18 of doing the work that I do every day.
19     Q       Did you, yourself, ever open an actual
20 spreadsheet in the retailer claims data?
21     A       No, but Bennett and the rest of my
22 staff opened it.  And we discussed it at length and
23 multiple times -- and over multiple times, over the
24 time period of this analysis.
25     Q       Column C of Exhibit 7 is the state at

1  issue, correct?
2      A       It lists the state.
3      Q       Correct.  And your report, at
4  paragraph 78 --
5              MS. KAPKE:  And we can go --
6              THE WITNESS:  Hold on.  Hold on,
7      paragraph 78.
8              MS. KAPKE:  -- to that.
9              THE WITNESS:  Paragraph 78.  Okay.
10     Just give me a second to read.  Okay.
11 BY MS. KAPKE:
12     Q       It discusses how you used the state in
13 which the retail pharmacy was located for -- I
14 assume you're talking about physical brick and
15 mortar stores at that -- at that point, correct?
16     A       I'm assuming.
17     Q       And then for mail order pharmacy
18 claims, you used the state where the prescription
19 was mailed.  Does that mean the state where the
20 prescription was mailed to or where it was mailed
21 from?
22     A       It was mailed to because, again,
23 injury occurs at the point of sale.  So for retail
24 pharmacies, the dispensed prescription is the
25 location of the injury.  And for mail order, it's

1  the -- where the -- the prescription was mailed to.
2      Q       How did you and your staff group
3  particular fills to particular states to derive that
4  output file?
5      A       It is contained -- the state is
6  contained in the information -- in the information
7  that the retailers provided to us.
8      Q       What did you or your staff do when the
9  Excel spreadsheet and the retailer claims data left
10 the state field blank?
11     A       I don't recall.  And I don't know
12 the -- the occurrence of that.  Again, I'm more than
13 happy to check with my staff.
14     Q       Well, today is my -- my opportunity to
15 depose you about the contents of your report.  So
16 what did you or your staff do when an Excel
17 spreadsheet in the retailer claims data used a
18 question mark in the state field?
19     A       I'm not aware that that was -- yeah,
20 I'm not aware that that was -- that occurred at all.
21     Q       Same question if an abbreviation "AA"
22 was used in the state field?
23     A       Again, I'm not aware that that
24 occurred at all or at what frequency it occurred.
25 If it did, my assumption is that --

9 (Pages 30 - 33)

Page 34

1      THE THE COURT REPORTER:  Is that what?
2      THE WITNESS:  That it was excluded,
3   those scripts were excluded.
4   BY MS. KAPKE:
5      Q      Does the abbreviation "AA" mean
6   anything to you?
7      A      It does not, and I've never
8   encountered it in any of the research work I've
9   done.
10     Q      How about the abbreviation "AE"?
11     A      Same.  But, again, I suspect that
12  those were excluded for my analysis.  Without a
13  state attribution that actually means something, I
14  don't -- I wouldn't feel comfortable including that
15  information.  I'm a little Type A about data
16  analysis, as you probably have -- have surmised.
17     MS. KAPKE:  I want to go back to
18  Exhibit 7.
19  BY MS. KAPKE:
20     Q      Column D is the product name.  That --
21  the product name is just derived from the NDC --
22     A      I -- I don't know what you're talking
23  about, and you have --
24     Q      Yeah.
25     A      Okay.  Thank you.

Page 35

1      So I'm sorry.  This is -- I'm sorry.
2   I didn't hear the last -- is that -- was that a
3   question or a statement?
4      Q      I'm just asking you to confirm that
5   the product name is derived from the NDC code.
6      A      Yes.
7      Q      Okay.  And then I want to talk about
8   Column E, the customer impact column.
9      A      That's not what it says, ma'am.
10     Q      Oh, I'm sorry.  Consumer.  My -- my
11  apologies.  Thank you.
12     The consumer impact column.  To derive
13  that, you would total the full patient paid amount
14  for each qualifying prescription for the particular
15  retailer, manufacturer, state and script; is that
16  correct?
17     A      Correct.  And year -- and -- and time.
18     Q      And relevant time period.  And that is
19  just simple addition, correct?
20     A      So it's aggregated over quantity and
21  paid amount.
22     Q      The -- there's -- the aggregation is
23  just adding numbers up, correct?
24     A      Well, it's -- sure.
25     Q      Okay.  I want to go back to when it

Page 36

1   was appropriate -- strike that.
2      I want to go back and talk about when
3   you included fills.
4      A      I don't know what you mean by "fills,"
5   ma'am.
6      Q      Okay.  That's -- that's fair.  Thank
7   you for -- for clarifying that.  Did you -- I'll
8   strike that and ask a different question.
9      Did you ask plaintiffs' counsel
10  whether it was appropriate to assume that the data
11  in -- provided by the retail pharmacy defendants in
12  the retailer claims data were actually filled at one
13  of the defendant pharmacies?
14     A      I don't understand your question.  I'm
15  sorry.
16     Q      Did you ask plaintiffs' counsel --
17  I'll ask it again.
18     Did you ask plaintiffs' counsel about
19  any limitations in the retailer claims data?
20     A      I mean, there are significant
21  limitations in the claims data that was provided to
22  me.  So again, dispensing fees were not included.
23  Nor were the payments made by the insurer.  Nor were
24  any information provided about whether or not these
25  patients were insured at all.  Nor was any

Page 37

1   other -- I mean, there's -- again, retail pharmacies
2   are sitting on tons of data that they collect when
3   they're dispensing prescriptions.  We were provided
4   very limited data, considering the universe of data
5   that they have registered and are required to have
6   when they're dispensing prescription drugs in the
7   U.S. chain.
8      Q      Did you ask plaintiffs' counsel to ask
9   for additional data?
10     A      We had discussions about what
11  was -- what was the data that we wanted very early
12  on in this case, given the theories of liability and
13  damage, which included some of the information that
14  I provided -- I enumerated to you.
15     Q      Did you ask plaintiffs' counsel to
16  confirm to you that the data produced by the retail
17  pharmacy defendants in the retailer claims data only
18  reflected prescriptions that were actually filled at
19  a defendant pharmacy?
20     A      That was always represented to us as
21  being provided by the retail pharmacies, that they
22  were actually dispensed prescriptions.
23     Q      And when you say --
24     A      For the at-issue drugs in the at-issue
25  time periods by the at-issue manufacturers.  Again,

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

1  the retail pharmacies provided this information to
2  us.  They are sitting on much more information that
3  was not provided to us.  They did this cut of the
4  data, and we had to live with the cut that they
5  were -- they provided to us.
6     Q     When you say that was all that was
7  represented to us, who is the "us" in that sentence?
8     A     Myself and my staff.
9           MS. WHITELY:  Objection.  Counsel, to
10  the extent that you're asking for
11  attorney/client privileged information and work
12  product information, we're objecting to that.
13           The witness may answer.
14           THE WITNESS:  Thank you.
15  Myself and my staff.
16  BY MS. KAPKE:
17     Q     So who made that representation to
18  you?  Was that -- and I -- I don't want to get into
19  privileged communication, but it is an assumption
20  under proving your opinion.  So I want to confirm
21  whether that's an assumption that you got from
22  plaintiffs' counsel or if there's some document that
23  you read from -- from the retail pharmacy defendants
24  that confirms that.
25     A     I think we have already established

Page 39

1  this, ma'am.
2     Q     I -- then -- then answer the question
3  again.  I don't -- I don't know the answer.
4     A     I don't understand your question that
5  you just asked, frankly.  It was a multiple,
6  compound question.
7     Q     Okay.  Did plaintiffs' counsel tell
8  you to assume that the retailer claims data only
9  included prescriptions that were actually filled at
10  a defendant pharmacy?
11           MS. WHITELY:  Same objection.
12           You may answer.
13           THE WITNESS:  I don't understand your
14  question, ma'am.  I -- I know a lot about the
15  data that retail pharmacies generate when they
16  are dispensing a prescription.  There is a ton
17  of data that is generated, as I have already
18  alluded to.
19           There's the name of the consumer.
20  There's their address.  There's their telephone
21  number.  There is whether or not that
22  prescription is insured and by whom, by what
23  insurer.  Then there is the claim amount, and
24  then there is the paid amount.
25           And there's other information as well;

Page 40

1  the date, timestamp of when that prescription
2  is actually dispensed to the consumer, there is
3  the dispensing fee.  And -- and many other --
4  there's the name of the prescribing physician
5  and their -- usually their national prescriber
6  ID number, and on and on.
7           We were not provided that data, myself
8  and my staff.
9           The -- my understanding is that the
10  retail pharmacies provided a very limited view
11  of the data they have access to, that was
12  related, as we have already discussed, to
13  the -- the manufacturer name; the product name,
14  including the NDC code, the month, year and
15  state, and whether -- and whether and how much
16  the consumer paid out-of-pocket as a function
17  of co-insurance or co-payment analysis.
18           That's all we were provided out of
19  this universe of much more data that they must
20  collect for every single dispensed prescription
21  in America.
22  BY MS. KAPKE:
23     Q     Were you aware of whether the retailer
24  claims data included information from PBMs?
25     A     What do you mean by that?

Page 41

1     Q     I'm asking if, to your knowledge, the
2  retailer claims data includes PBM customer data?
3     A     What is PBM customer data?  Who is the
4  customer -- I mean, the consumer -- the patient is
5  the customer, right?  They're the person who's
6  dispensed the prescription.  They're the customer of
7  the pharmacy.  What is PBM customer data?
8     Q     Do you understand that there
9  are -- I'll -- I'll ask a different question.
10           Did the data you were provided include
11  prescriptions dispensed from pharmacies other than
12  the pharmacies who are defendants in this case?
13     A     I'm not sure I'm following your
14  question.  I'm sorry.
15     Q     So the retailer claims data has --
16     A     Right.
17     Q     -- has data from -- that -- that
18  reflects prescription fills at those defendant
19  pharmacies, CVS, Rite Aid, other -- other defendant
20  pharmacies.  Are you with me there?
21     A     I don't know -- I don't know what you
22  mean by "other defendant pharmacies."  The data that
23  I have are the -- are the retailer pharmacies that
24  we reviewed when we first started talking.  They're
25  listed in my Attachment B, right?  We established

11 (Pages 38 - 41)

Page 42

1 that those were the ones that were provided to me.
2    Q    Right.
3    A    I'm happy to go through them again.
4 So there's Albertsons, CVS, Kroger, Optum,
5 Express Scripts, Walgreens and Walmart.
6    Q    Correct. Does the data in -- in the
7 retailer claims data contain information about
8 prescriptions dispensed from pharmacies who are not
9 defendants in this case?
10    A    Are you asking me whether Albertsons
11 gave me data from non-Albertsons pharmacies?
12    Q    In general, yes.
13    A    I don't understand the question. I
14 don't understand -- I don't understand how
15 Albertsons would have data from CVS or CVS would
16 have data from Walmart or Walgreens.
17    Q    Okay.
18    A    I -- I mean, you know, I -- I don't
19 understand that. I'm sorry.
20    Q    Okay. So --
21    A    These are massive public companies. I
22 don't see how they would have access to other public
23 companies' dispensing data at the level of
24 aggregation that we were provided.
25    Q    Are you aware of the concept in the

Page 43

1 pharmaceutical industry of a data sale from one
2 pharmacy to another?
3    A    No.
4    Q    Did you consider whether any of the
5 retailer claims data included within it included
6 prescription fills from non-defendant pharmacies
7 that subsequently sold their consumer data to one of
8 the defendant pharmacies?
9    A    I -- I'm sorry. They may do that for
10 intelligence purposes, but I am not aware that that
11 is the data that was provided.
12       We were provided transaction data at
13 the pharmacy level. Each pharmacy has a pharmacy
14 identifier. It's standard. It's actually required
15 to be reported and kept by the regulators. And so
16 I'm assuming that the data that was provided, at
17 least the native format of the data, has that
18 pharmacy ID.
19       But, again, if the retail pharmacies
20 that -- were the ones who provided the data in the
21 form that they gave it to me, if they did not -- if
22 they mistakenly did not include their own pharmacy
23 ID or accurately counted their own pharmacy ID in
24 the data they had, that's upstream of -- there's no
25 way that I could check that in the data that was

Page 44

1 provided to me.
2    Q    I want to move now to how you used
3 Conti Exhibit 7, what you did with it.
4       Am I correct that the retailer damages
5 output file is the basis of the calculations that
6 are listed for the retail pharmacy defendants in
7 Attachments G, H and I of your report?
8    A    It's the output file that corresponds
9 to the exhibits.
10    Q    Okay. So let's -- let's go through
11 the --
12    A    It's not -- it's not the native data,
13 right?
14    Q    Correct.
15    A    And it's not the -- it's not the --
16 it's aggregated.
17    Q    Correct.
18       Okay. So let's -- I want to go
19 through Attachment -- Attachments G, H and I. So
20 let's take a look at G.1.
21    A    G.1.
22    Q    This the state grouping file --
23    A    Just one second. Just one second,
24 please. I'm not there yet. Okay. G.1, okay.
25    Q    That's the state grouping file

Page 45

1 provided to you by plaintiffs' counsel, correct?
2       THE COURT REPORTER: I'm sorry, was
3 there an answer?
4       THE WITNESS: I said correct.
5 BY MS. KAPKE:
6    Q    And you have no opinion on whether
7 these groupings are accurate, correct?
8    A    What do you mean by "accurate"?
9       MR. HONIK: Object to form and to the
10 extent it calls for a legal conclusion.
11       Good morning, Kara. I apologize for
12 joining late.
13       MS. KAPKE: No -- no worries.
14 BY MS. KAPKE:
15    Q    And I just want to make sure that
16 these groupings aren't a reflection of a legal
17 conclusion on your part. They're just information
18 and assumptions given to you by plaintiffs' counsel,
19 correct?
20       MR. HONIK: Thank you.
21       THE WITNESS: So in the notes of
22 Attachment G-1 -- please scroll down to the
23 next page. It states very clearly, "Retailer
24 Implied Warranty Table, provided by counsel."
25

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

1  BY MS. KAPKE:
2      Q      Right. I -- I understand that it was
3  provided to you by counsel. And I just want to
4  confirm that that also means that these groupings
5  are not a reflection of any opinions that you have
6  regarding liability or state laws or legal
7  ramifications?
8      MR. HONIK: Object to form.
9      THE WITNESS: I'm an economist and
10     expert on the pharmaceutical industry. I'm not
11     a lawyer. I don't have an opinion about these
12     groupings. They were provided to me by
13     counsel. I think we've established that.
14  BY MS. KAPKE:
15     Q      Okay. And the same is true for
16  Attachment H.1 and I.1 as well?
17     A      Let's look. So if you go to the next
18  page in H.1, same thing noted, "Retailer Consumer
19  Protection Act Claims Table, provided by counsel."
20     Q      So the answer to my question is yes,
21  you don't have an opinion about these groupings --
22     A      Actually, you didn't ask me a
23  question. Again, this information was provided to
24  me by counsel. I don't have a legal opinion. I'm
25  not a lawyer.

Page 47

1      Q      Okay. So --
2      A      And then you asked me for another
3  attachment, H.1. And then which other table?
4      Q      I.1.
5      A      I.1. So I.1, again, has the same
6  note, "Retailer Unjust Enrichment Table, provided by
7  counsel."
8      Q      So the same caveat as you made before,
9  that you don't have a legal opinion, you're not a
10  lawyer, would also apply to I.1, correct?
11     A      It's not a caveat. You asked me a
12  question, do I have a legal opinion. And I'm saying
13  I'm an economist. I'm not a lawyer. I don't have
14  an opinion on liability other than -- or the
15  inclusion, other than what was provided to me by
16  counsel to calculate.
17     Q      Right. Okay. So what I want to do is
18  make sure that I understand how you derived the
19  remainder of the Attachments to G, H and I. And
20  what I think you did to create the remainder of
21  those attachments is simply sum up the totals for
22  the relevant state and retailer found within
23  Conti Exhibit 7 where called for, according to
24  attachment G.1, H.1 or I.1.; is that correct?
25     A      Let's go back to my report and assess.

Page 48

1  It's -- it's explained. So in paragraphs 63 and 64,
2  I explain what I did for the defendant retailers for
3  unjust enrichment. I list, "Retailers profited from
4  the sale of at-issue valsartan products to consumers
5  at the point of sale. Profits are defined as
6  revenues minus cost for each at-issue valsartan
7  product sold by the defendant retailers from
8  January 1st until the at-issue valsartan products
9  were recalled in 2018 and 2019 for being adulterated
10  and misbranded."
11     I then have, again, a footnote where
12  we have established which of the products at-issue
13  and at what time periods. All I did was take the
14  information that was provided to me by the at-issue
15  retailers for the relevant time periods, the
16  relevant manufacturers and the relevant product
17  categories, and matched them with the states
18  relevant for the unjust enrichment damages and
19  summed them up.
20     I did the exact same thing for the
21  liability claims, and I think that is listed and
22  explained in my report, in the preceding section, in
23  Paragraphs 60, 61 and 62.
24     Q      And what I'm trying to -- to
25  understand and make sure that I -- I follow, is what

Page 49

1  you're doing is you're basically sorting and
2  filtering on the Excel spreadsheet that is
3  Conti Exhibit 7, correct?
4      MR. HONIK: Object to the form.
5      THE WITNESS: Okay. So it's probably
6  easiest just to go back to the paragraph where
7  I explained the procedure again. It's in
8  paragraph 78 under, "Defendant Retailer
9  Liability Damages and Unjust Enrichment
10  Damages."
11     So in the paragraph, I explain what we
12  did. To calculate defendant retailer theory of
13  liability damages and unjust enrichment
14  damages, I rely upon the defendant retailer
15  pharmacy claims data. These claims datasets
16  have been limited to the consumer paid amounts.
17  That is, they exclude the all third-party payor
18  amounts, and thus represent the revenues
19  described in the section previous. I already
20  provided that information.
21     The consumer paid amounts in the
22  defendant retailer pharmacy claim datasets
23  provided to me do not include data on
24  dispensing fees, nor any of the other
25  information that I already discussed as

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

1    potentially relevant but not -- again, that
2    they have but was not provided to me.
3            Therefore, I don't subtract page
4    dispensing fees to offset the cost of the
5    retailer pharmacies dispensing these products
6    to consumers.  This offset has already been
7    done by the defendant retailer.  For each set
8    of defendant retailer pharmacy claims, I limit
9    the claims to the at-issue valsartan product
10    NDC codes found in the IQVIA dataset and
11    provided to me by counsel.
12            I then sum the total consumer paid
13    amounts by product, defendant retailer and
14    state.  When there is a difference for retail
15    pharmacy claims, I use the state in which the
16    retailer pharmacy was located.  For mail order
17    pharmacy claims, I use the state where the
18    prescription was mailed.
19            I then -- and then all I did was match
20    that to the states at issue for the specific
21    theory of liability, whether it be liability 1,
22    2 or unjust enrichment claims.  And all they
23    are varying by is the states that are included
24    in that.  It's exactly the same procedure.
25

Page 51

1    Q    And I -- I appreciate that you're
2    trying to be helpful, but you don't need to -- to
3    read the report.  What -- what I'm -- what I'm
4    trying to -- to understand is if the state groupings
5    were to change, if plaintiffs gave you a different
6    version of G.1, H.1 or I.1 with different state
7    groupings, would we need your expertise to create a
8    subsequent version of attachments G, H and I, or
9    could we do that based on what you already gave us
10    with the Conti Exhibit 7, the output file, and
11    simply sort, filter, and subtotal to create new
12    Attachments G, H and I?
13    A    So my method is flexible to
14    accommodate other -- other assumptions, that
15    inclusion or exclusions of states.  I think you
16    would have to go back to the data that was provided
17    to me by the retailer pharmacies and the
18    manufacturer NDC groupings where we picked up --
19    remember, I mentioned we picked up repackager and --
20    and private label drugs that have recast or
21    relabeled NDC codes in order to make that
22    calculation.
23            But any trained analyst could -- could
24    do that calculation, following the -- following the
25    instructions that are provided in my report and the

Page 52

1    data that might be -- the data that was -- that
2    underlies each one of those steps.
3    Q    Is there anything that you just talked
4    about with manufacturer NDC groupings, or the
5    instructions in your report, that is not contained
6    already in Exhibit 7?
7            MR. HONIK:  Object to form.
8            THE WITNESS:  I'm sorry.  What's
9    Exhibit 7?
10    BY MS. KAPKE:
11    Q    The output file.
12    A    There's -- that data is -- there's
13    underlying data underneath that that you would
14    probably need.
15    Q    What data would you need underlying
16    the output file to create new Attachments G, H and I
17    if you were given new states at issue?
18    A    You would need the data that you, the
19    retailers, provided to me.
20    Q    Why?  Why isn't that already addressed
21    in your output file?
22            MR. HONIK:  Object to form.
23            THE WITNESS:  I'm not following your
24    question.  I'm sorry.
25

Page 53

1    BY MS. KAPKE:
2    Q    What I'm trying to understand is
3    say -- say we took out -- you know, we changed two
4    states in Attachment G, G.1.  Why can't I go to
5    the -- the output file and just do a sort and filter
6    and then create new numbers?  What -- what data are
7    you using?
8            I don't think you're using anything.
9    I think it's a simple sort and filter.  And so
10    that's what I'm trying to understand.  Is there
11    something you are doing or can -- can anyone do --
12    do it once you have the output file?
13            MR. HONIK:  Object to form, asked and
14    answered.
15            THE WITNESS:  So, Ms. Kapke, I don't
16    feel comfortable with the idea that you just
17    sort and filter.  That's not what good data
18    analysts do.  They build that -- if you're
19    going to redo the calculations to -- based
20    on -- on other assumptions, good data practices
21    is to go back to the original dataset, ensure
22    the data is complete, doesn't contain any
23    mistakes, and then go through the steps again
24    to get to the calculation that's at issue.
25            I told you that the steps that we went

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1    through are listed in my report. They're very
2    clear, and they're very simple. And so any
3    analyst, who is well trained, should be able to
4    follow the steps if the states change, if the
5    NDC codes change, if there are additional
6    calculations that need to get done.
7         I would never tell, even, like, my
8    undergrads where the IT stats are to, to just
9    sort and filter to get the right -- to get a
10   different data. That is bad data management
11   practice. You go back to the original data and
12   you would calculate it.
13   BY MS. KAPKE:
14   Q    Okay. I'm going to move on to --
15        THE WITNESS: So actually, I'd like to
16   take a break, please. So can I have
17   five minutes?
18        MS. KAPKE: Sure.
19        MR. HONIK: Let's resume at 10:20.
20        THE VIDEOGRAPHER: The time is 10:14.
21   This ends Media Unit Number 1. We're off the
22   record.
23        (Whereupon, a short break was taken.)
24        THE VIDEOGRAPHER: The time is 10:22.
25   This begins Media Unit Number 2. We're back on

Page 55

1    the record.
2    BY MS. KAPKE:
3    Q    Dr. Conti, during the break, did you
4    talk to any of your staff?
5    A    No.
6    Q    Okay. So I'm going to ask you about
7    what you were saying regarding deduplication of
8    damages in your report. I think I understand, but I
9    want to use an example to make sure that I'm -- I'm
10   following what you're saying. So let's look --
11   A    Can you -- can you direct me -- can
12   you direct me to where in my report you're focused
13   on?
14   Q    Sure.
15        So in your summary of damages in
16   paragraph 79, you say, "I present deduplicated
17   aggregate damages." And I'm just focused on the
18   word "deduplicated."
19   A    I don't see the -- that in paragraph
20   79. Hold on. You mean in reference to Table 1 and
21   then in reference to Table 2 and 3?
22   Q    Yes.
23   A    There are two footnotes and one
24   paragraph where deduplication is referred to.
25   Q    Right. I understand.

Page 56

1         And I -- I think I get it, but I'm --
2    I want to make sure that I do. So I want to use an
3    example to make sure that I understand. And -- and
4    if I get my example wrong, you can correct me.
5         So do you recall --
6    A    Wait. Hold on. I just want to make
7    sure that I understand. So are we focused on the
8    retailer damages, or are we focused on Table 1 where
9    the manufacturer damages is?
10   Q    I'm going to give you an example
11   that's focused on the retailer examples.
12   A    Okay. Table 2 and 3, correct?
13   Q    Yeah. I'm looking specifically at --
14   the attachment is what I want to look at. So what I
15   want to look at is -- let's say consumer protection
16   damages for CVS for Arizona. So that's in
17   Table H.2.
18   A    Wait. Hold on. So -- so I'm on
19   Table 2 where we talk about deduplication
20   and -- okay. So --
21   Q    I want you to go to Attachment H.2.
22   A    H.2, okay.
23   Q    And you've got a calculation there for
24   consumer protection damages for CVS for Arizona -- I
25   just picked a state at random -- for ███████

Page 57

1    right?
2    A    I see that.
3    Q    Okay. And -- and that is the sum
4    total, equal to the full patient paid amount, for
5    the at-issue valsartan for the relevant time period
6    as reflected in the retailer claims data produced by
7    CVS, correct?
8    A    Under this period of damage, correct.
9    Q    Okay.
10   A    And for all of the included --
11        THE COURT REPORTER: I'm sorry?
12        THE WITNESS: And for all of the
13   included NDC codes and manufacturers at-issue
14   in the relevant time period.
15   BY MS. KAPKE:
16   Q    Got it. We're on the same page here.
17   This shouldn't be controversial, I don't think. I
18   just want to make sure that I understand.
19   A    I just want to -- I just want to make
20   sure that I understand what you're saying because
21   there's clearly been some mismatch in the language
22   that you're using as opposed to what I understand is
23   this data or these analyses.
24   Q    And please. Please always --
25   that's -- that's one of the first things that

15 (Pages 54 - 57)

Page 58

1 Mr. Goldberg told you yesterday, was if you don't
2 understand a question, let us know.  And -- and we
3 definitely want that.
4     So let's go to Attachment I.2, which
5 is the unjust enrichment calculations.  And the
6 total is the exact same for CVS for Arizona on
7 unjust enrichment calculations, correct?
8     A    For Arizona, yes.
9     Q    So when you talk about total damages
10 across defendant manufacturers and retailers not
11 being intended to be summed, you're not intending
12 for anyone to sum both consumer protection damages
13 and unjust enrichment damages for Arizona or CVS; is
14 that correct?
15     MR. HONIK:  Note my objection to the
16 extent it calls for a legal conclusion.
17     But you may answer.
18     THE WITNESS:  So, the -- the -- that's
19 why I referred to Table 2 and Table 3, if we
20 could go back and explain the deduplication.
21 Right.  So the liability damages per state and
22 per manufacturer are deduplicated.
23     So what I mean by that is, if the
24 liability damages were calculated for one
25 state, let's just say Arizona, in one theory of

Page 59

1 liability, and then calculated for another --
2 for exactly the same state, for another theory
3 of liability for retailers, they were only
4 counted once in Table 2.
5     The unjust enrichment damages are a
6 separate calculation for every relevant state
7 manufacturer NDC code finding.  So you're
8 actually comparing apples to oranges.  The
9 unjust enrichment tables are their own thing.
10 And they are listed under Table 3.
11 Deduplication is referring to the liability
12 claims, and they are listed in Table 2.  That's
13 why the deduplication note is referencing
14 Table 2, not Table 3.
15 BY MS. KAPKE:
16     Q    Are you giving an opinion that a
17 consumer plaintiff would be entitled to unjust
18 enrichment and liability damages from a retail
19 pharmacy defendant for a particular state?
20     THE COURT REPORTER:  I'm sorry.  Can
21 I -- can I hear the end of the question,
22 please?
23     MS. KAPKE:  For a particular state.
24     MR. HONIK:  Note my objection to the
25 extent it requires a legal expert opinion or

Page 60

1 conclusion.
2     You may answer.
3     THE WITNESS:  Thank you.
4     Allocation and apportionment is
5 outside of the scope of my report.
6 BY MS. KAPKE:
7     Q    You would agree that they reflect the
8 same -- for a particular state and particular
9 manufacturer, they represent the same data which is
10 the full patient paid amount, correct?
11     MR. HONIK:  Object to the form.
12     THE WITNESS:  I disagree with that
13 characterization.
14 BY MS. KAPKE:
15     Q    Correct it then, please.
16     MR. HONIK:  Object to form.
17     You can answer.
18     THE WITNESS:  Okay.  So let's go back
19 to the basis of liability versus unjust
20 enrichment.
21     Liability is related to what was paid
22 at the point of sale.  In this case, by the --
23 by the consumer and TPP, if we're taking this
24 from a theoretical perspective.  And so the
25 full amount of retailer liability is the -- the

Page 61

1 full amount that -- that was paid by the
2 consumer and by the third-party payor at the
3 point of sale, and does not include offsets
4 such as rebates or discounts that might have
5 been applied later.
6     Whereas unjust enrichment, if you go
7 to Section C of my report, paragraph 64,
8 entails understanding what the retailer profits
9 from that sale are.  And that would include,
10 again, in theory, what the customer paid, what
11 the third-party payor paid, inclusive, minus
12 the retailer costs.
13     Now, those costs, the retailers have
14 already taken out the dispensing fee, but one
15 can imagine there would be potentially other
16 costs of dispensing those specific products
17 that may be related to the point of sale, and
18 might include other offsets that could have
19 occurred.
20     I discussed that in Footnote 84 where
21 I say, "When calculating profits, the other
22 offsets may be removed from gross profit should
23 the jury or court find these to be reasonable
24 deductions."  That is relevant to unjust
25 enrichment.  It's not relevant to liability.

16 (Pages 58 - 61)

Page 62

1  BY MS. KAPKE:
2  Q    In terms of the actual calculation in
3  Attachment I --
4  A    Which -- which attachment -- which
5  exhibit?
6  Q    I.
7  A    Right, which exhibit?
8  Q    Your report, Exhibit 5.
9  MR. HONIK:  I think there are multiple
10  Is.
11  THE WITNESS:  Yeah.  There are
12  multiple Is.  There are -- there are -- are
13  multiple -- there's -- I think there are five
14  Is.
15  BY MS. KAPKE:
16  Q    Okay.  We can pick any one of them,
17  I.2, I.3, I --
18  A    I can't hear you.  I'm sorry.
19  Q    We can just go to I.2.
20  A    Okay, I.2.  Okay.  That's the unjust
21  enrichment table.
22  Q    Correct.
23  A    Right --
24  Q    It's --
25  A    Right.  Which was -- which -- right?

Page 63

1  Which is enumerated in sum in Table 3.
2  Q    Correct.
3  In terms of the actual calculations
4  done in Attachment I.2 --
5  A    For CVS?
6  Q    For CVS.
7  A    Uh-huh.
8  Q    It is equal to the full patient paid
9  amount, correct?
10  A    Well, it's equal to the amount of
11  co-insurance and co-payments.  There might be other
12  payments that were made, including a dispense fee.
13  There might be other payments that are made or other
14  offsets that were made.  We just have what we were
15  provided by CVS, which is the consumer co-insurance
16  and co-payment amounts.
17  Q    If you look at the notes, if you --
18  you reference it being equal to the full patient
19  paid amount?
20  A    But, again, as I mentioned, there are
21  other amounts which include the dispensing fee that
22  consumers usually pay at the pharmacy counter.
23  Those were taken out to arrive at these sums.
24  And the point of unjust enrichment is
25  that it's based on the profit that CVS made, so

Page 64

1  there might be -- so this is the revenue paid for
2  this specific claim, aggregated over multiple drugs,
3  multiple --
4  THE COURT REPORTER:  Multiple what?
5  THE WITNESS:  Manufacturers, multiple
6  time periods.
7  But there might be additional costs
8  that CVS incurred in dispensing that product in
9  a particular time period.  All I have is what
10  was paid.  But from a theoretical perspective,
11  unjust enrichment should account for the cost
12  of dispensing that prescription, which might be
13  captured by the dispensing fee, but might have
14  additional costs on top of it.  That's very
15  different than the theory of liability.
16  BY MS. KAPKE:
17  Q    Putting aside this theoretical
18  perspective, in terms of the actual generation of
19  Attachment I.2, compared to the actual generation of
20  Attachment H.2 --
21  A    Wait.  Hold on.  Let's go back to H.2
22  because I'm not sure.  I just want to follow along
23  with you.
24  Okay.  So I.2 is unjust enrichment for
25  CVS, and H.2 is liability claim for CVS.  Okay.

Page 65

1  Q    So putting aside the theoretical
2  perspective, the numbers generated in both H.2 and
3  I.2 are both based on the CVS retail claims data
4  equal to full patient paid amount?
5  A    That's correct.
6  MR. HONIK:  Object to form.
7  BY MS. KAPKE:
8  A    So I mean, mechanically, they are the
9  same, but theoretically, they are not the same.  And
10  so for my calculation, I only had the data that was
11  provided to me.  When -- when and if a jury from
12  there to be -- an award to be made, there's a
13  different process that would go into consumers or
14  third-party payors claiming the amount that they are
15  owed.
16  And that's where the theory matters
17  because the liability amounts in the actual world
18  are going to be related to the paid amounts.
19  Whereas, the unjust enrichment claims would be paid
20  amounts minus cost or revenues minus the cost of
21  that prescription being dispensed, which might be --
22  which might have a particular offset associated with
23  it.
24  Q    I'm going to go back to Tables 1 and
25  2.

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1    A    Okay. Do you mean 2 and 3?
2    Q    No, I actually mean 1 and 2. I want
3  to understand the interplay between Table 1, the
4  aggregate manufacturer group damages and Table 2,
5  the aggregate retailer damages across liability
6  theories of damages.
7        By necessity, any damage you've
8  calculated in Table 2 for a retail pharmacy
9  defendant would already be included in the
10  manufacturer defendant calculations in Table 1,
11  correct?
12        MR. HONIK: Object to form.
13        You can answer.
14        THE WITNESS: Are you asking me
15    whether the IQVIA data that goes into the
16    calculation for Table 1 would include or be
17    inclusive of the retailer liability calculation
18    in Table 2 for each manufacturer retailer?
19  BY MS. KAPKE:
20    Q    Sure. You can answer that question.
21        THE COURT REPORTER: I'm sorry?
22  BY MS. KAPKE:
23    Q    Yeah. Please answer that question.
24    A    Yes, but not in entirety. Because,
25  again, the retailers are only focused on the -- the

Page 67

1  retailer liability claims are only focused on
2  consumers' co-insurance and co-payment amounts.
3  Whereas, the manufacturer liability claims are
4  related to total payments for the at-issue drugs in
5  the at-issue time periods and the at-issue data.
6    Q    So suppose a manufacturer -- strike
7  that.
8        Suppose the manufacturers paid to
9  consumers all of the damages in Table 1 under
10  "Consumer Damages." That would mean the consumers
11  were satisfied in full, correct? There'd be no
12  damages left for the retail pharmacy defendants to
13  pay?
14        MR. HONIK: Object to the form and to
15    the extent it calls for a legal conclusion
16    regarding ultimate allocation.
17        THE THE COURT REPORTER: Ultimate...
18        MR. HONIK: Allocation.
19        THE COURT REPORTER: Thank you.
20        THE WITNESS: Again, allocation
21    concerns are outside the scope of my analysis.
22  BY MS. KAPKE:
23    Q    And I -- and I understand that. And
24  actually that was going to be my next question.
25        Do you ever -- you know, do you make

Page 68

1  allocation determinations? And it's good to know
2  that you don't.
3    A    I have already testified to that -- to
4  that three times this morning.
5    Q    I appreciate that.
6        But -- but let's engage in a
7  hypothetical world where the manufacturers pay all
8  of the damages. So we're not in a -- in a world
9  where allocation needs to be made, because the
10  manufacturers have paid everything in the "Consumer
11  Damages" column of Table 1. If that's the
12  hypothetical position that you assume, are there any
13  damages left for the retail pharmacy defendants to
14  pay?
15        MR. HONIK: Note my -- excuse me --
16    note my objection on a couple of bases.
17        Number 1, in the statement that was in
18    your question, Kara, that confirmed at least in
19    your question, that Dr. Conti made no
20    allocations, that's not correct. She didn't
21    make legal allocations, but she made lots and
22    lots of mathematical allocations, and she spent
23    hours talking about that. That's number 1.
24        MS. KAPKE: Sure.
25        MR. HONIK: And number 2, I just want

Page 69

1  to preserve my ongoing objection that your
2  question really requires a legal conclusion
3  about what liability will yield in the way of
4  an allocation as directed by a court or a
5  jury's verdict or otherwise.
6        With that, she can answer.
7        THE WITNESS: Thank you.
8        So this is your hypothetical, and
9  these are your assumptions. They're not mine.
10        And my understanding is that -- that
11  those determinations are ones that will be
12  answered by a court and a jury. They are --
13  they are outside my purview as I've already
14  testified.
15  BY MS. KAPKE:
16    Q    Okay. I'm going to try to ask another
17  hypothetical question to get at it -- to get at it a
18  different way.
19        Assume a world in which all of -- all
20  that has occurred to date has occurred except the
21  filing of the lawsuit. And Aurobindo and Hetero and
22  Mylan and Teva and Torrent and ZHP paid to consumers
23  the sum total of ▮▮▮▮▮▮, whatever the number is
24  on the bottom of that --
25        MS. KAPKE: Which I should note, for

18 (Pages 66 - 69)

Page 70

1     the record, that that's considered -- that
2     number is considered a confidential number for
3     purposes -- thank you for zooming in -- for
4     purposes of the protective order. I'm going to
5     start my question over.
6         THE WITNESS: Thank you.
7 BY MS. KAPKE:
8     Q    Yeah. Assume a world in which
9 everything has occurred except for the filing of
10 the -- of this lawsuit. And independent of a
11 lawsuit, the manufacturers listed in Table 1 pay out
12 to consumers the damages listed in column -- the
13 column marked "Consumer Damages" in Table 1.
14         So outside of the legal realm, in that
15 instance, do the consumers have any damages left?
16         MR. HONIK: Note my objection on the
17     same basis as previously stated and insofar as
18     this is an improper hypothetical and well
19     beyond the scope of a health economist's
20     opinion as expressed here. Finally, I would
21     just add by way of objection that what you're
22     really getting at is a kind of reallocation,
23     not allocation. And I remind everyone that
24     what Dr. Conti has done is to simply present a
25     methodology for assessing damages, the

Page 71

1 allocation of which, at trial or otherwise, is
2 outside the scope of the purview of her
3 assignment.
4         You may answer.
5         THE WITNESS: I have no answer. I
6 mean, I have no -- I'm not a lawyer, and I have
7 no assessment of whether or not that payment --
8         THE THE COURT REPORTER: That
9 payment...
10         THE WITNESS: That payment is --
11 satisfies the claims or not. It's completely
12 outside the scope of my assignment in this
13 case.
14         MR. HONIK: Are you making an offer,
15     Kara?
16         MS. KAPKE: Sorry. I was chewing ice.
17     Oh, that was your attempt at being funny.
18     Sorry, Ruben. I should have laughed.
19 BY MS. KAPKE:
20     Q    Does Table 1, "Consumer Damages,"
21 represent a full refund of all the consumers spent
22 on the at-issue valsartan?
23         MR. HONIK: Object to the form and for
24     the reasons previously stated.
25         THE WITNESS: I don't understand your

Page 72

1     question. I'm sorry. Are we still in
2     that -- this weird hypothetical world?
3 BY MS. KAPKE:
4     Q    No.
5     A    I wasn't asked to calculate or do any
6 analysis of?
7     Q    No. I'm asking a separate question.
8     A    Oh, okay.
9     Q    Does -- would the -- the consumer
10 damages total represent a full refund of all the
11 money that the consumer spent on the at-issue
12 valsartan?
13         MR. HONIK: Same objection as
14     previously stated.
15         THE WITNESS: A full refund? What do
16     you mean by "a full refund"? I don't use that
17     term in my report, so I would like you
18     to -- I'd like you to define it for me.
19 BY MS. KAPKE:
20     Q    Would it -- I'll -- I'll withdraw that
21 question.
22         What do the numbers in the "Consumer
23 Damages" column of Table 1 represent?
24         MR. HONIK: Objection, asked and
25     answered.

Page 73

1         THE WITNESS: Let's go back to my
2     explanation of how Table 1 was calculated.
3 BY MS. KAPKE:
4     Q    You know what? I can withdraw that
5 question. That's okay.
6     A    I'm happy to go -- I mean, I'm on
7 paragraph 60. It's described as paragraph 60
8 through 62.
9     Q    And that's fine. Ruben's right. You
10 have -- you've answered that question.
11     A    I -- I want to ask about -- it says
12 right above Table 1, "Total damages across defendant
13 manufacturers and retailers are not intended to be
14 summed."
15         Can you elaborate on what you mean by
16 that?
17     A    I'm not there yet. Hold on.
18         So, again, this is about the
19 deduplication that we have been talking about for a
20 while now. Let's start from the beginning of the
21 paragraph. It's the -- it's the paragraph -- it's
22 the previous page. Thank you.
23         In paragraph 79, I explain, "The
24 following tables present aggregate damages across
25 all theories of liability. Details on aggregate

CONFIDENTIAL

Page 74

1  damages for defendant manufacturers and retailers at
2  the group, subgroup and state level are provided in
3  the attachments in this declaration. In Table 1, I
4  present deduplicated aggregate damages across all
5  theories of liability for the defendant
6  manufacturers. In Table 2, I prevent" -- "I present
7  deduplicated aggregate damages across all theories
8  of liability for the defendant retailers. In
9  Table 3, I present deduplicated aggregate unjust
10 enrichment damages for the defendant retailers. As
11 described in footnote 62 above, some claims fall
12 into multiple theories of liability. Therefore,
13 total damages across defendant manufacturers," full
14 stop, "and retailers are not intended to be summed."
15     What I mean by that is, the Table 1
16 damages are deduplicated. Table 2 damages, across
17 different theories of liability, are also
18 deduplicated. I also have footnotes, 72 and 73, for
19 Tables 1 and 2 that -- that make that clear as well.
20     Q     Do you have an estimation of what
21 percentage of the pharmacy market is covered by the
22 pharmacy defendants in this case?
23         MR. HONIK: Object to form.
24         THE WITNESS: Well, some of the
25         largest pharmacies in America are listed in the

Page 75

1  retailers table. CVS, Walgreens, Walmart are
2  absolutely enormous sellers of prescription
3  drugs in the U.S. market.
4  BY MS. KAPKE:
5      Q     And do you have an estimate of -- of
6  what percentage that is?
7      A     No.
8         THE COURT REPORTER: I'm sorry.
9  You're both talking on top of each other.
10        So I have, "Do you have an estimate of
11 what percentage that is" as a question. And I
12 have, "No" as an answer.
13        THE WITNESS: No. I said not off the
14 top of my head.
15 BY MS. KAPKE:
16     Q     That's fine.
17        Okay. I want to -- let's go back to
18 the formulas in your report on paragraph 60 and 61.
19     A     Are we changing topics?
20     Q     Yeah.
21     A     Okay. Great. I would like to take a
22 break, please.
23        MS. KAPKE: Okay.
24        THE VIDEOGRAPHER: The time is 10:55.
25 We're going off the record.

Page 76

1         (Whereupon, a short break was taken.)
2         THE VIDEOGRAPHER: The time is 11:03.
3  We're back on the record.
4  BY MS. KAPKE:
5      Q     Dr. Conti, during the last break, or
6  any breaks today, have you had any communications
7  with anyone?
8         MR. HONIK: Note my objection to the
9         extent it may reveal confidential and
10        privileged counsel communication.
11        But without waiver of the objection,
12 she may answer.
13        THE WITNESS: I have spoken to my
14 counsel.
15 BY MS. KAPKE:
16     Q     During both breaks?
17        MR. HONIK: Same objection.
18        You may answer.
19        THE WITNESS: Yes.
20 BY MS. KAPKE:
21     Q     Okay. Have you -- have you had any
22 communications with staff?
23     A     You already asked me that question at
24 the last break, and I said no. So at this same
25 break -- at this next break, no, I did not have any

Page 77

1  communications with my staff.
2      Q     Okay. Perfect.
3         So I have a couple of questions that,
4  again, I'm not really intending to be super
5  controversial. But I just want to make sure I
6  understand.
7         So let's go to your report. And
8  paragraph 60 and 61, you reference consumer class
9  expenditures by breaking down into full payments for
10 uninsured cash paying purchases on the one hand --
11        THE COURT REPORTER: I'm sorry, Kara.
12 I'm sorry. I lost you.
13        THE WITNESS: Yeah. I -- I don't see
14 it either.
15        THE COURT REPORTER: "Consumer class
16 expenditure by breaking it down into full
17 payments for the uninsured"...
18        MS. KAPKE: Cash paying purchases on
19 one hand, and this is the formula. And co-pays
20 for insurance -- or for insured consumers.
21        THE WITNESS: I'm sorry. You -- hold
22 on. I just want to try to understand what
23 you're asking. So you referenced paragraph 60.
24 Where do you see that? Because I don't see it.
25

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

BY MS. KAPKE:

1  Q    Your formula.

3  A    In paragraph -- in paragraph 60 on
4  Formula 1? It is not related -- it does not break
5  down into different types of payor types.

6  Q    I'm looking at Formula 2 in
7  paragraph 61.

8  A    Okay. So you said -- you directed me
9  to paragraph 60 and 61. I'm just trying to follow.

10  Q    Okay. Here's my question. When you
11  reference uninsured cash paying purchases, are you
12  referring to anyone who did not have a co-pay, or
13  are you referring to a subset of those who paid with
14  physical cash?

15  A    I don't understand your question. I'm
16  sorry.

17  Q    In other words, are you -- are you
18  including in your formula uninsured patients who
19  paid for valsartan with a credit card? Do
20  you -- what do you mean by cash?

21  A    Okay. Cash is cash, right? So what I
22  mean by this is they are paying out of pocket. The
23  method of payment, whether it be literally a $5 bill
24  or using a credit card, from the industry's
25  perspective, both of those types of payments, that

Page 79

1  people are paying out of pocket, they are paying in
2  cash.

3  Q    Okay. That's what I assumed. I need
4  to check all of my assumptions, and that's what
5  we're here to do here today.

6  So for the uninsured cash paying
7  purchases, the formula requires input of the full
8  purchase price of the product. How is that
9  determined for the uninsured cash paying purchaser?

10  MR. HONIK: Objection, asked and
11  answered.

12  You can answer.

13  THE WITNESS: It's the full amount
14  that they paid at the pharmacy counter for the
15  at-issue drugs.

16  BY MS. KAPKE:

17  Q    Okay. And then for the other part of
18  the formula, you're looking at insured co-pay or
19  co-insurance paying purchasers -- purchasers,
20  correct?

21  A    Right. That's what it says here.

22  Q    Yes. Here -- here is my question: Is
23  there a difference between insured co-pay or
24  co-insurance paying purchasers? Is there some sort
25  of delineation between those three groups?

Page 80

1  MR. HONIK: Object to form.

2  You can answer.

3  THE WITNESS: I'm not following. What
4  are the three groups?

5  BY MS. KAPKE:

6  Q    The insured, co-pay or co-insurance
7  pay group purchasers?

8  A    Hold on. Those are two groups, not
9  three.

10  MR. HONIK: Yeah.

11  BY MS. KAPKE:

12  Q    That's what I don't understand --

13  THE COURT REPORTER: I can't take this
14  down. I cannot do that. One at a time.

15  MR. HONIK: Kara, respectfully, I
16  think you misspoke. You said insured. I think
17  you meant cash. It's cash, co-pay,
18  co-insurance.

19  BY MS. KAPKE:

20  Q    No. So I'm looking at the third --
21  under where -- the third line there, it says, Qdt
22  co-pay equals the quantity of product d purchased at
23  time period t for, 1, insured, 2, co-pay or 3,
24  co-insurance paying purchasers.

25  I don't know and -- I don't know what

Page 81

1  you mean, if there is a distinction between those
2  three words, insured, co-pay or co-insurance. Or do
3  they all mean the same thing?

4  A    Are you asking me for the definition
5  of insured, co-pay, co-insurance?

6  Q    I'm asking if there's a difference
7  between those -- those three things.

8  A    Okay. There is a variable in the
9  Xponent data that delineates or distinguishes
10  between people who are paying cash -- they're
11  uninsured for that specific prescription -- and
12  people who are -- who are insured and still are
13  required to pay a co-insurance or co-pay amount.

14  So the first part of this last phrase,
15  "insured or cash" in the previous tab under
16  "quantity," delineates the distinction. Are these
17  people cash paying, or are these people insured and
18  paying a co-payment or a co-insurance? And the way
19  that you can tell the difference is if you go to the
20  term "Qdt cash," those are uninsured cash paying
21  purchasers.

22  THE WITNESS: And for the court
23  reporter, you should actually highlight the
24  first row. Dt cash equals uninsured cash
25  paying purchasers.

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1  BY MS. KAPKE:
2      Q    Okay.  And this --
3      A    Hold on, just to make sure that we're
4  on the same page.
5          And then for people who are insured,
6  sometimes they don't have to pay anything when they
7  get their prescription filled, particularly for
8  really low-cost generic drugs.  And sometimes they
9  are still required by their insurer to pay a
10 co-insurance and a -- or a co-payment amount, and
11 then their insurer may pay the remainder.
12         That is the distinction that we are
13 making here -- or that I am making here.
14     Q    Thank you.  That's helpful.
15         Is there a difference between a co-pay
16 and a co-insurance?
17     A    Yes.
18     Q    What is that?
19     A    So co-payments tend to be flat.  In
20 other words, $5 for every -- every generic
21 prescription or $1 for every generic prescription.
22 Whereas co-insurance is a percentage of the total
23 paid amount or the total charge for their
24 prescription.  So it's -- to make it really
25 concrete, it will be 15 percent of the total paid

Page 83

1  amount.
2      Q    Got it.  Thank you.
3          Okay.  Let's go to Paragraph 56 of
4  your report.  And can you read to yourself
5  the -- that paragraph?
6      A    So that's finished.
7      Q    Let me know when you're done.
8          MR. HONIK:  It's a request.  She'd
9  like you to read it.
10         THE WITNESS:  Oh, okay.  It's a
11 request, all right.  Just -- just following.
12         MR. HONIK:  Yeah.
13         THE WITNESS:  Okay.
14 BY MS. KAPKE:
15     Q    Are you alleging that the retail
16 pharmacy defendants committed fraud?
17         MR. HONIK:  Object to the form and to
18 the extent it calls for a legal conclusion.
19         You can answer.
20         THE WITNESS:  We already talked about
21 this multiple times.  I was asked to assume
22 what was in the complaint and discussed in my
23 Paragraphs 1, 2 and 3.
24 BY MS. KAPKE:
25     Q    Got it.

Page 84

1          So the economic price for damages
2  equals the price of each at-issue prescription sold
3  and paid.  That relates to the liability damages
4  that you offered up a formula for, not the unjust
5  enrichment damages that you offered an opinion on;
6  is that correct?
7          MR. HONIK:  Object to form.
8      A    I don't follow your question.
9  BY MS. KAPKE:
10     Q    Okay.  I'll -- I'll withdraw it.
11         Okay.  Let's go to the unjust
12 enrichment formula.  I don't remember what paragraph
13 that is.
14         MR. HONIK:  63.
15         MS. KAPKE:  Thanks.  Thank you, Ruben.
16 BY MS. KAPKE:
17     Q    The basic formula you list here is
18 revenue minus costs, and then you expand that out to
19 provide additional detail.  And I want to ask about,
20 first, revenue.
21         To determine revenue, you offer a
22 formula of average out-of-pocket costs for Unit 2
23 consumers of product d sold by the retailer over
24 time period t.  In this formula, does this average
25 out --

Page 85

1      A    I don't see that.  I'm sorry.
2          So actually, I -- I define retail
3  revenue of product -- product d, sold to consumers
4  over time period t.  Is that what you're referring
5  to?
6      Q    Uh-huh.
7      A    Okay.  And then I go on to talk about
8  revenue expressed in Formula 5.
9      Q    Correct.
10     A    Correct.  Okay.
11     Q    And in Formula 5, the consumer, PPU,
12 is the average out-of-pocket cost per unit to
13 consumers of product d sold by the retailer over
14 time period t?
15         MR. HONIK:  Object to form.
16         You can answer.
17         THE WITNESS:  That's what it says
18 here.
19 BY MS. KAPKE:
20     Q    Okay.  Does that average out-of-pocket
21 cost per unit to consumers in your formula include
22 only class members or all individuals who are
23 dispensed at-issue valsartan?
24         MR. HONIK:  Object to form and to the
25 extent it calls for a legal conclusion.

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1    You can answer.
2        THE WITNESS: I'm sorry, I don't
3    understand the question you're asking. Can you
4    please clarify?
5    BY MS. KAPKE:
6    Q    For purposes of your formula, when
7    you're calculating the average out-of-pocket cost
8    per unit to consumers, are you including in
9    consumers, in your theoretical world, all consumers
10   of at-issue valsartan or only class members?
11       MR. HONIK: Object to form, calls for
12   a legal conclusion.
13       You may answer.
14       THE WITNESS: I mean, as a -- as a
15   mechanical concern, we're only -- or I'm only
16   calculating based on consumers that paid for
17   the at-issue drugs in the at-issue time period,
18   their out-of-pocket cost.
19   BY MS. KAPKE:
20   Q    Would the average out-of-pocket cost
21   include consumers who paid nothing?
22       MR. HONIK: Object to the form, and
23   class membership is a legal matter, beyond the
24   scope.
25       THE WITNESS: I don't understand what

Page 87

1    you're asking. I'm sorry.
2        MS. KAPKE: Okay. And, Ruben, I'm
3    going to just ask a question that's untethered
4    to my prior questions.
5    BY MS. KAPKE:
6    Q    So in looking at this formula --
7        MR. HONIK: Does "untethered" mean
8    crazy?
9        MS. KAPKE: No.
10   BY MS. KAPKE:
11   Q    I just want to -- I want to try and
12   figure out this -- how you're deriving average
13   out-of-pocket cost per unit to consumers.
14       MR. HONIK: Okay.
15       THE WITNESS: There's a formula. Then
16   there's a mechanical calculation. Those are
17   two different things, right?
18       MR. HONIK: That's the mash-up
19   problem, Kara. You're mashing up two things.
20       THE WITNESS: Yeah. I don't --
21       MS. KAPKE: Okay.
22       MR. HONIK: I'm sure Dr. Conti can
23   explain it to you though.
24   BY MS. KAPKE:
25   Q    Okay. When you are, from a

Page 88

1    theoretical perspective, saying that you need to
2    factor in the average cost of product -- the average
3    out-of-pocket cost per unit to consumers, when
4    you're doing that average, are you including
5    consumers --
6    A    In theory -- in theory or in practice?
7    Q    In theory.
8    A    Okay.
9    Q    In theory, does your average include
10   those consumers who paid nothing?
11       MR. HONIK: Object to the form.
12       You can answer.
13       THE WITNESS: So by definition,
14   mechanically, they would contribute 0, right?
15   And so there is no payment made.
16   BY MS. KAPKE:
17   Q    So do you include them in the
18   denominator?
19   A    They fall out of the denominator in
20   theory because they pay 0.
21   Q    Okay. I want to go to the formula to
22   determine costs in your report.
23       So retailer costs of dispensing
24   product d to consumers over time period t, do you
25   see that?

Page 89

1    A    Yes.
2    Q    Are you referring in your formula
3    here, from the theoretical perspective, only to the
4    amount of money that a pharmacy would pay to a
5    wholesaler or directly to a manufacturer for the
6    dispensed product?
7    A    Go down to Formula 6 on the next page,
8    and you can see how I defined costs. Retail costs
9    of dispensing to consumers can be expressed in
10   Formula 6 as a function of the quantity of units of
11   product d sold to consumer over time period t and
12   the average retailer cost per unit of product d over
13   time period t to dispense to consumers. It is the
14   cost of dispensing.
15   Q    And that would include what?
16   A    Well, the retailers took
17   out -- interpreted that as the dispensing fee and
18   took the dispensing fee for each prescription out of
19   the data that was provided to us.
20   Q    I want to -- I want to remove the
21   mechanical aspects and just talk about this from a
22   theoretical perspective.
23       If you are -- are looking at this from
24   a purely academic perspective, what do you want to
25   see in terms of defining retailer costs for purposes

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1  of this formula?
2         MR. HONIK:  Object to form.
3         THE WITNESS:  I'm not calculating
4     retailer costs here.  I'm talking -- I'm
5     referring to dispensing costs.  They are
6     different things.
7  BY MS. KAPKE:
8     Q     Okay.
9     A     I mean, that's what's listed here.
10  Retailer cost of this dispensing to consumers,
11  that's -- that's what I'm -- that's the object in
12  theory that I'm referring to.
13    Q     Okay.  And the same question; taking
14  away the mechanical aspect of this, in theory, from
15  a purely academic perspective, what do you want to
16  see in terms of retailer cost of dispensing to
17  consumers?
18        MR. HONIK:  Object to form.
19        THE WITNESS:  It's the unit cost of
20    dispensing a given prescription to a given
21    patient.
22  BY MS. KAPKE:
23    Q     What goes into that?
24    A     The marginal cost of dispensing will
25  be the labor cost of filling the -- vial and

Page 91

1  actually giving it to the patient.  It might include
2  some additional costs as well.  But they are
3  marginal -- marginal to the dispensing of an actual
4  unit to a patient at the point of sale.
5         THE COURT REPORTER:  I'm sorry?
6         THE WITNESS:  At -- excuse me -- the
7     point of sale.
8         THE COURT REPORTER:  Thank you.
9         THE WITNESS:  It can be the cost of
10    the vial itself.  It can be the cost of a paper
11    bag.  It can be the cost of the clerk sitting
12    at the pharmacy counter actually giving it to
13    the patient and ringing them up for the charge.
14    It could be the incremental cost of the
15    pharmacist, actually their time inputting the
16    drug into the -- the unit, and then into the
17    bag that they get at the pharmacy counter.
18    Those are dispensing costs.
19  BY MS. KAPKE:
20    Q     Does your formula take into account,
21  in addition to dispensing costs, the actual cost of
22  the drug that retailer pharmacy defendants would pay
23  to whomever they obtained the drug for -- from?
24        MR. HONIK:  Object to form.
25        THE WITNESS:  Are you saying that

Page 92

1     those are point of sale costs, because my
2     understanding is that -- is that they are not.
3  BY MS. KAPKE:
4     Q     I'm asking you if -- what your formula
5  takes into consideration.
6     A     I already defined that.  It's the cost
7  of dispensing a product to the consumer.
8     Q     Okay.  So if -- and let's just take a
9  hypothetical --
10    A     Another hypothetical.
11    Q     -- outside -- outside of valsartan.
12        Say a drug -- say a pharmacy purchases
13  a drug from -- directly from a manufacturer for $10
14  and then sells that drug to an uninsured customer
15  for $20.  And say that the dispensing costs are $5,
16  and we're in this weird world where we know that the
17  dispensing costs are $5.  Is the profit, under your
18  formula, $5 or $10?
19        MR. HONIK:  Object to form.
20        THE WITNESS:  Okay.  So you have a
21    very -- that is -- that is a hypothetical that
22    is bizarre in many ways.  And I'm not aware of
23    a generic drug having a dispensing fee of $5
24    ever associated with it.  So let's just
25    dispense it.

Page 93

1         At the end of the day, it is the
2     cost -- the dispensing costs are the costs that
3     are incremental to a given patient in a given
4     drug at the point of sale.
5         So as I mentioned before, it's the
6     cost of putting the drug in the vial.  It's the
7     cost of putting it in the bag.  It's the cost
8     of printing the label and giving all the
9     consumer information to the consumer.  It might
10    be the labor cost of the pharmacist talking to
11    the patient about the benefits and side-effects
12    of taking this drug relative to others, and
13    side-effect profile of that drug at the point
14    of sale.  That's what I think dispensing cost
15    means.
16  BY MS. KAPKE:
17    Q     Thank you for that.
18        And I'm -- I'm just trying to
19  understand if your -- if the cost of procurement is
20  included in your formula for cost?
21    A     Where do you see in my report that the
22  cost of procurement is included in my definition of
23  dispensing costs?
24    Q     I'm asking you a question.
25    A     I have defined dispensing cost five

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1 separate times. It's also defined very clearly in
2 my report. This is a --
3    Q    I'm not asking you --
4    A    Excuse me. This is a term of art in
5 this field. I am using it correctly and precisely,
6 and I have restated over and over again the
7 definition of dispensing cost.
8    Q    I understand that.
9       I'm not asking you if your -- so your
10 formula is revenue minus costs?
11    A    No. My formula is retail cost of
12 dispensing to consumers. That is in Formula 6 --
13    Q    Okay. I'm looking at --
14    A    -- where I define the cost of
15 dispensing to the consumer at the point of sale.
16 It's the quantity of the unit times average retailer
17 cost per unit of dispensing to the consumer.
18 Dispensing to the consumer is a cost. Anyone who
19 knows anything about this industry knows what a
20 dispensing cost is. It's related to the labor and
21 capital that goes into handing a prescription of the
22 drug to a patient at the pharmacy counter. That is
23 what I am using here as cost.
24    Q    Let's look at Formula 4, please.
25    A    No. I'm not -- I mean, I'm happy to

Page 95

1 go back to Formula 4. But, again, I define the cost
2 in Formula 4 as related to Formula 6, the cost of
3 dispensing to consumers. They are one and the same.
4    Q    Okay. That's what I'm trying to
5 understand. And -- and I'm sorry if I am -- I -- I
6 don't under-- -- I don't understand the answer to
7 this question.
8       Does the formula in Formula 4, when it
9 says revenue minus costs, does costs there refer to
10 any costs other than the dispensing costs that you
11 have identified for me and explained?
12    A    Again, the cost defined in Formula 4,
13 cost dt, is defined underneath cost dt equals the
14 retailer cost of dispensing product d to consumers
15 over time period t.
16       I then go on to define cost in more
17 detail where I say, retailer costs of dispensing to
18 consumers can be expressed in Formula 6 as cost dt
19 equals Qdt, the quantity of units of product d sold
20 to consumers over time period t times the retailer
21 CPUdt, the average retailer cost per unit of product
22 d over time period t to dispense to consumers. I
23 can't -- I can't be any clearer than that.
24       And clearly, the retailers know what a
25 dispensing fee is because they actually took that

Page 96

1 out of the data they gave me. There's no -- this is
2 not a theoretical. This is an -- this relates to an
3 actual thing, that you, the retailers, know what it
4 is because you took it out of the data that was
5 provided to myself and my staff.
6    Q    What are DIR fees?
7    A    They are payments that can be made
8 between entities in the pharmaceutical industry.
9    Q    Is it your understanding that DIR fees
10 are typically collected retrospectively after the
11 point of sale?
12    A    My understanding is that there's a
13 range of different arrangements.
14       THE THE COURT REPORTER: There is or
15    there isn't a range?
16       THE WITNESS: There is a range of
17    different arrangements. And they only relate
18    to certain types of products and a certain type
19    of transaction and certain time periods. The
20    use of DIR fees have been growing over time.
21 BY MS. KAPKE:
22    Q    Are there other fees besides DIR fees
23 that are assessed after the point of sale?
24    A    For who to who?
25    Q    For commercial plans.

Page 97

1    A    I don't -- I don't understand -- I
2 don't understand the question.
3    Q    Okay. I'll withdraw it.
4       Can you explain, generally, what a
5 dispensing fee is?
6       MR. HONIK: Objection, asked and
7    answered.
8       THE WITNESS: Like, seven times, but
9    who's counting?
10       So a dispensing fee is a fee that is
11    charged to consumers and to third-party payors
12    for the dispensing of a prescription at the
13    point of sale.
14 BY MS. KAPKE:
15    Q    Who do you believe pays the dispensing
16 fee?
17    A    Well, I'll tell you that I went to the
18 pharmacy earlier this week, and I paid the
19 dispensing fee. So usually for oral drugs,
20 consumers at the point of sale pay dispensing fees
21 if they --
22       THE THE COURT REPORTER: If they what?
23       THE WITNESS: If they are required to.
24    If they have insurance that covers those
25    dispensing fees, insurers will pay for those

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

1    dispensing fees. It depends on the
2    arrangement.
3    BY MS. KAPKE:
4        Q    What pharmacy do you -- did you use?
5        A    CVS. They're my favorite.
6        Q    Who determines what the dispensing fee
7    is?
8        A    I don't know. I'm assuming the
9    pharmacy itself, but I don't know.
10       Q    Is it negotiated over time?
11           MR. HONIK: Object to form.
12           THE WITNESS: I don't know.
13    BY MS. KAPKE:
14       Q    How much do you think a dispensing fee
15    typically amounts to?
16       A    For an oral generic drug, it can be on
17    the order of cents or a dollar. Usually, it's
18    nominal, but it really depends.
19       Q    In terms of your profit calculations,
20    did the cost of the ingredients factor in in any
21    way?
22           MR. HONIK: Object to the form, asked
23    and answered.
24           THE WITNESS: Again, I have defined
25    the cost related to the dispensing fee.

Page 99

1    Dispensing fees, as I understand them, do not
2    relate to the cost of the ingredient, but might
3    relate to whether the product is generic or
4    branded or the formulation of the product.
5    Because, again, there's labor costs associated
6    with that dispensing fee, and some drugs
7    require more labor costs and more capital
8    to -- to deal with them.
9    BY MS. KAPKE:
10       Q    You mentioned a couple of times how
11    products are commonly repackaged and relabeled by
12    private label distributors and retailers. Are you
13    making any allegations in this case that CVS, or any
14    retail pharmacy defendant in this case, repackaged
15    or relabeled valsartan?
16           MR. HONIK: Object to the form.
17           THE WITNESS: I don't know.
18           MS. KAPKE: I am, for purposes of
19    time, am going to pass the witness.
20           MR. HONIK: Thank you.
21           THE WITNESS: Thank you.
22           I think now is a good time for me to
23    take a break then, please.
24           MR. HONIK: Okay. Five minutes
25    enough?

Page 100

1           THE WITNESS: That's great. Thank
2    you.
3           THE VIDEOGRAPHER: The time is 11:41.
4    This ends Media Number 2. We're going off the
5    record.
6           (Whereupon, a short break was taken.)
7           MR. HONIK: Plaintiffs are back at
8    11:46 and are ready to proceed.
9           THE VIDEOGRAPHER: The time is 11:49.
10    This begins Media Unit Number 3. We're back on
11    the record.
12    EXAMINATION BY MR. CAMPBELL:
13       Q    Okay. Good morning, still, Dr. Conti.
14    My name is Dan Campbell. I'm going to ask you some
15    questions about your opinions --
16           THE COURT REPORTER: I'm sorry. You
17    trailed off. You're going to ask questions...
18    BY MR. CAMPBELL:
19       Q    Regarding your opinions about the
20    wholesalers in this case.
21       A    Okay.
22       Q    Can you hear me okay, Dr. Conti?
23       A    Yes.
24       Q    Okay.
25           MR. CAMPBELL: And, Madam Court

Page 101

1    Reporter, can you hear me okay, also?
2           THE COURT REPORTER: You're a little
3    low, but I can hear you.
4           MR. CAMPBELL: Okay. I pulled the
5    microphone as close as I can get it here, so I
6    will do the best I can.
7    BY MR. CAMPBELL:
8        Q    So, Dr. Conti, you talked a lot
9    yesterday about your role as a professor, your
10    coursework, your class work. How much of that
11    coursework, that class work, involves
12    wholesaler-specific issues?
13       A    I have spent some time understanding a
14    wholesaler's role in this industry. I have had the
15    pleasure of working with some folks at Cardinal and
16    at AmerisourceBergen and in multiple contexts.
17           THE THE COURT REPORTER: Did you say
18    -- did you say Americsource?
19           THE WITNESS: AmerisourceBergen.
20           THE COURT REPORTER: Okay.
21    BY MR. CAMPBELL:
22       Q    In what sort of context --
23       A    And Cardinal.
24       Q    Thank you.
25       A    Yeah.

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

1    Q      In what context did you work with
2  those folks at Cardinal and AmerisourceBergen?
3    A      Again, just in the normal course of my
4  business, I spend a lot of time trying to understand
5  how this industry works and the role wholesalers has
6  is part of the -- part of the ecosystem.
7    Q      Were you --
8    A      So I can be -- I can be more specific.
9  I've been on -- I've been on panels and conferences.
10  I've been in closed-door meetings, discussing
11  various issues related to reimbursement, financing,
12  organization, regulation, where wholesaler
13  representatives have been there.  And I know
14  something about the wholesaler data that -- that
15  wholesalers such as Cardinal and AmerisourceBergen
16  maintain.  What else should I tell you?
17          I teach about the role of wholesalers
18  in this ecosystem and have had the pleasure of
19  reviewing shareholder reports of AmerisourceBergen,
20  Cardinal and other public wholesalers operating in
21  the U.S. market.
22    Q      And so you mentioned that earlier this
23  morning.  Those are the public finance reports that
24  you reviewed either last night or this morning?
25    A      No, I mean -- so, again, I'm talking

Page 103

1  generally.  So part of my course that I teach on
2  Strategy in the Pharmaceutical Industry requires
3  that my students do shareholder report analysis.
4  And we focus both on pharmaceutical manufacturers,
5  but also other entities that are important in the
6  supply chain, which include the wholesalers and also
7  include some of the retailers that we've talked
8  about.
9          There are a handful of shareholder
10  reports that I looked at over the past couple of
11  days that include Mylan, Teva -- I think maybe one
12  more of the defendant manufacturers.  And I
13  certainly looked over gross revenues of the retailer
14  pharmacies as well.
15    Q      Do you remember any specific
16  individuals at Cardinal or AmerisourceBergen at any
17  of those conferences or panels when you were there
18  with them?
19    A      Not off the top of my head.  I am in
20  email correspondence with a number of former
21  executives working on some work related to private
22  labeling activities for some drugs that went into
23  short supply, but not ones that are related in this
24  matter.  I'm more than happy to tell you who those
25  are.  I just don't have them off the top of my head.

Page 104

1    Q      Okay.  All right.  We may follow up
2  with your counsel on that.
3    A      Sure.
4    Q      Have you -- you mentioned earlier
5  today a study that you did, I think when you were a
6  professor at Chicago, involving Walgreens and data
7  that you were working with from -- from Walgreens.
8  Do you remember that discussion?
9    A      Yes.
10    Q      Okay.  Have you ever done any sort of
11  similar study with the wholesaler or with wholesaler
12  data like the Walgreens study?
13    A      I have -- so, I have never published
14  work in --
15          THE THE COURT REPORTER:  I'm sorry.  I
16  have never published working...
17          THE WITNESS:  Work in collaboration
18  with the wholesalers who are members in this
19  matter.  I have looked at wholesaler data where
20  the -- it was shared with me at a screen share.
21  BY MR. CAMPBELL:
22    Q      What sort of wholesale data was shared
23  with you on a screen share?
24    A      Transaction data for specific drugs.
25    Q      Related to the drugs at-issue in this

Page 105

1  case?
2    A      No.
3    Q      And do you remember the components of
4  the transaction data that were shared with you?
5    A      Yeah.  There were drug names, units
6  and --
7          THE COURT REPORTER:  And...
8          THE WITNESS:  Paid amounts.
9          And there were also, I think,
10  manufacturer names as well.  But in this
11  specific context, we were -- we were actually
12  looking at the differences in --
13          THE THE COURT REPORTER:  I'm sorry.
14  Somebody is shuffling papers.
15          We were looking at the differences
16  in...
17          THE WITNESS:  We were looking at
18  transactions -- I'm sorry.  There's a lot of
19  background noise.  I hear it too.
20          There's -- there were transactions
21  related to manufacturers and -- for specific
22  drugs.  And then the relabeling of certain
23  product by the wholesaler distributors for
24  certain types of product.
25

27 (Pages 102 - 105)

Page 106

BY MR. CAMPBELL:

1  BY MR. CAMPBELL:
2      Q      Were there any confidentiality
3  agreements related to that data that you were shown?
4      A      I -- in at least one interaction, I
5  did sign a confidentiality agreement.  But it wasn't
6  for any of the wholesalers that are named in this.
7      Q      You said that was a screen share.  So
8  did you take any documents back with you?  Do you
9  have any documents on your computer or on your desk
10 or anything like that?
11     A      No.  I wish, but no.  Yeah.
12     Q      And was it that experience and looking
13 at that data that informed your opinions here about
14 the damages calculation as to wholesalers?
15     A      Well, we talked about this yesterday,
16 that -- I mean, I've spent every day for the past
17 20 years thinking about how this -- how this system
18 works, and specifically how prescription drugs go
19 from base ingredients to -- to API to fill and
20 finish, manufacturing, you know, through the supply
21 chain, which includes distributers and then,
22 ultimately, to reach our pharmacies or to hospitals
23 or to medical groups and then, finally, to be
24 infused, injected or dispensed to consumers.
25             Certainly, the role of wholesalers is

Page 107

1  a very important one in this field, and one that I'm
2  involved -- I routinely understand and -- am
3  thinking about in -- in my academic roles.  So
4  therefore, by definition, it informs how I think
5  about their role in this case.  But...
6      Q      Got you.
7      A      I actually haven't spent that much
8  time writing about distributors and wholesalers, in
9  part because the data is all --
10             THE COURT REPORTER:  The what?
11             THE WITNESS:  The data is opaque.
12     It's not normally what we -- I have access to
13     in my -- in the course of my daily research --
14     research.
15 BY MR. CAMPBELL:
16     Q      You mentioned yesterday that the
17 report, which is, I think, Exhibit 5, that that
18 report took you, I think you said many months to
19 write.  Do you remember that?
20     A      Yes.
21     Q      Okay.  And we looked at some of the
22 hours yesterday, and let's just say dozens of hours
23 to write your report, right?
24     A      I don't understand your question.  I'm
25 sorry.

Page 108

1      Q      It took you many hours, also, to write
2  the report, correct?
3      A      Yes.
4      Q      Okay.  All right.  Do you remember how
5  much of that time you actually spent writing the
6  last two pages of the report, which has the formulas
7  for the wholesalers, the proposed formulas?
8      A      Yeah.  I thought a lot about those
9  last two -- those last two pages.
10     Q      Do you know the number of hours you
11 spent on those last two pages?
12     A      No, sorry, not off the top of my head.
13 As I told you, I -- I have been a little bit remiss
14 in getting my time together.  I like to double and
15 triple check it before I submit it, and it's been a
16 busy couple of months.  So I don't know.  I'm sorry.
17     Q      That's all right.
18             And in the records that you do have of
19 the time that you spent on the report, would they
20 indicate which parts of the report you were working
21 on?
22     A      Not really.
23     Q      So will we ever see an invoice, for
24 example, that breaks down which portions of the
25 report you were working on in a given time entry?

Page 109

1      A      Do you mean, like, Section 1, 2 and 3?
2      Q      Yes, or -- or by page number?
3      A      I haven't apportioned to that.  That's
4  just not how I work, so no.
5      Q      Okay.  If you --
6             MR. CAMPBELL:  If Mr. or Ms. Tech
7     could pull up the report, I think it's
8     Exhibit 5.  And, Dr. Conti, I'm going to refer
9     you to Attachment B to start with, please.
10 BY MR. CAMPBELL:
11     Q      Dr. Conti, let me know when you're at
12 Attachment B.
13     A      Just give me a second.
14     Q      Sure.
15     A      Okay.
16     Q      And I'm going to stay on the first
17 page of Attachment B, so you don't have to worry
18 about flipping pages here.  Do you see the section
19 that's the second section that's called "Case
20 Documents"?
21     A      Yes.
22     Q      All right.  So in this section of case
23 documents, is this a list of all the documents that
24 are -- in this matter, in this case, that you --
25 that you reviewed?

28 (Pages 106 - 109)

CONFIDENTIAL

1    A    Yes.
2    Q    So there are no documents coming out
3  of this case that you reviewed but did not list?
4    A    Right. Other than in the course of
5  normal events in my daily life, I know something
6  about all of these -- all of the defendants.
7  Defenses.
8    Q    Right. Okay. And so you list here
9  one declaration of Matthew Sample. Do you see that?
10  It's the second one listed.
11    A    Yes.
12    Q    Do you know who Matthew Sample is an
13  employee of?
14    A    I don't, not off the top of my head.
15  Oh, I do, actually. It's in Footnote 76, defendant
16  wholesaler AmerisourceBergen Corporation represented
17  that producing such data would be --
18    THE COURT REPORTER: I'm sorry,
19  Doctor. Producing such data would be...
20    THE WITNESS: Sorry. Footnote 76, if
21  we can go back to my main report.
22  BY MR. CAMPBELL:
23    Q    And, Dr. Conti, you don't need to read
24  it. I just wanted to ask you a simple question.
25  Did you review any other -- or any declarations from

1  any other wholesaler representatives --
2    A    Not -- not off the top --
3    Q    -- in this case?
4    A    Not off the top of my head.
5    Q    And did you review any documents that
6  were produced by either Cardinal Health or McKesson
7  or AmerisourceBergen?
8    A    No.
9    Q    Did you review any deposition
10  testimony from any representatives of
11  Cardinal Health, McKesson or AmerisourceBergen?
12    A    No.
13    Q    And a little bit further down, I
14  believe on this first page of Attachment B -- I'm
15  sorry. I misspoke earlier when I said we were going
16  to stick on Page 1 of the Attachment B.
17    If you can please go to Page 4 of
18  Attachment B. Do you see Page 4 here, Dr. Conti?
19  It has a section called "Electronic Data"?
20    A    I see that.
21    Q    And it goes over Page 5 for several
22  pages after that, correct?
23    A    Correct.
24    Q    I just want to confirm you did not
25  review any electronic data from either

1  Cardinal Health, McKesson or AmerisourceBergen in
2  this case, correct?
3    A    Correct.
4    Q    Did you ask to see any electronic data
5  from any of them?
6    A    Yes.
7    Q    All right. And so who did you ask?
8    A    Counsel.
9    Q    What were you told?
10    MR. HONIK: Let me note my -- note my
11  objection. It invades the attorney work
12  product and other privileges.
13    But without waiver of that objection,
14  she may answer.
15    THE WITNESS: That there were -- that
16  there was no --
17    THE THE COURT REPORTER: That there
18  was no...
19    THE WITNESS: Data produced.
20  BY MR. CAMPBELL:
21    Q    Let me refer you back in your report
22  to Paragraph 3, early on in your report --
23    MR. CAMPBELL: If the tech can get
24  back to that area, please.
25

1  BY MR. CAMPBELL:
2    Q    And I just want to ask you, Dr. Conti,
3  while -- I'll set it up for you while the tech is
4  going back. I want to ask you about some of the
5  assumptions regarding wholesalers specifically.
6  Okay?
7    A    Okay.
8    Q    So you say in Paragraph 3 that,
9  "Plaintiffs' counsel have also asked me to assume
10  that a subset of these at-issue valsartan products
11  were sold by defendants AmerisourceBergen Co,
12  Cardinal Health and McKesson Co, collectively
13  referred to as the defendant wholesalers."
14    Do you see that Paragraph 3?
15    A    I do.
16    Q    What do you mean in here when you
17  wrote the word "subset"?
18    A    That some of the at-issue products
19  were sold to -- in the...
20    THE THE COURT REPORTER: I'm sorry.
21  In the...
22    THE WITNESS: I said the at-issue
23  drugs were sold by the manufacturers to these
24  specific wholesalers. There were other --
25  there are other wholesalers, obviously,

29 (Pages 110 - 113)

Page 114

1  involved in the U.S. market.  And at a given
2  period in time, manufacturers are going to sell
3  specific drugs to specific wholesalers.
4  That's what I mean.
5  BY MR. CAMPBELL:
6  Q    And then there were also transactions
7  where the manufacturer sold directly to the retail
8  pharmacies?
9  A    Correct.
10  Q    Were you asked to assume any
11  particular percentage of this subset that were sold
12  through the wholesalers?
13  A    I was -- I was not, and that's because
14  during the at-issue time period, 2012 through 2018,
15  there was very significant asymmetric information.
16  And so the contamination of the products was
17  not -- was known by the manufacturers, but they were
18  not known by other members of the supply chain.
19  THE THE COURT REPORTER:  Of the...
20  THE WITNESS:  Supply chain.
21  BY MR. CAMPBELL:
22  Q    Were you told to -- in this case, in
23  rendering your opinions in this declaration, were
24  you told to assume anything about the wholesalers'
25  conduct?

Page 115

1  A    Other than what was laid out in the
2  complaint and listed in my Paragraphs 1, 2 and 3.
3  Q    So you are not offering any opinions
4  yourself in this declaration about the wholesalers'
5  conduct in this case, correct?
6  MR. HONIK:  Object to the form.
7  You can answer.
8  THE WITNESS:  Correct.  Correct.  This
9  is...
10  THE THE COURT REPORTER:  Can you
11  repeat that, please?
12  THE WITNESS:  Sure.
13  It's on instruction or for -- it's on
14  instruction by counsel.
15  BY MR. CAMPBELL:
16  Q    You're not offering any opinions
17  whether wholesalers are liable for unjust
18  enrichment?
19  A    I'm not a lawyer, sir, so no.  I was
20  asked to assume certain details for the purposes of
21  my report.
22  Q    So your opinions, with respect to the
23  wholesalers in this case, is limited to essentially
24  proposing a formula for calculating unjust
25  enrichment damages?

Page 116

1  MR. HONIK:  Object to the form.
2  THE WITNESS:  Correct.  I don't -- I
3  don't actually mechanically do any
4  calculations.  All I'm doing is laying out how
5  I would think about calculating unjust
6  enrichment in this matter for these specific
7  drugs at-issue in this specific period.
8  BY MR. CAMPBELL:
9  Q    In any of the prior cases where you
10  have been an expert, have you similarly attempted to
11  calculate unjust enrichment damages for wholesalers?
12  A    Not that I can recall off the top of
13  my head.
14  MR. CAMPBELL:  If I could please ask
15  the tech to go to Paragraph 50 of your report.
16  BY MR. CAMPBELL:
17  Q    And, Dr. Conti, please just let me
18  know when you're there.
19  A    Okay.
20  Q    And I actually want to refer you to
21  the second sentence in Paragraph 50, "Given that the
22  at-issue valsartan products are small molecule
23  orally formulated generic drugs, the majority of
24  purchases are made by pharmacies from
25  wholesalers/distributors."

Page 117

1  Do you see that sentence?
2  A    Yes.
3  Q    Why does the fact, as you write here,
4  that the at-issue valsartan products are small
5  molecule orally formulated generic drugs -- why does
6  that mean that the majority of purchases were made
7  by pharmacies from wholesalers and distributors?
8  A    Yeah.  So the -- for me, the context
9  is important.  So the supply chain for specialty
10  drugs that are infused or injected can be different.
11  And so those products can be handled by different
12  distributors or group purchasing organizations.
13  Usually, they have different storage requirements,
14  and their end consumer is different too.  It's
15  usually hospitals or outpatient clinics, maybe some
16  specialty pharmacies.  It's just a -- it's just a
17  different supply chain.
18  The orally formulated generic drugs
19  are the ones that are really at-issue in this
20  matter, and here, they are largely going through the
21  distributors, as listed here.
22  Q    And you just said, "largely."  And in
23  your report, you say, "majority," but you don't know
24  exactly what the percentage is, right?
25  A    I think in the Deloitte and Touche

30 (Pages 114 - 117)

Page 118

1  article, I -- I footnote to this paragraph. It has,
2  "A number of distributers handles 92 percent of
3  pharmaceutical sales in the U.S. market." And that
4  is largely related to orals. It's not related to
5  these specialty drugs. If you actually look at the
6  backup of the Deloitte paper, the Deloitte paper
7  also talks about 11 million prescription units being
8  sold each day and handled through the distributers
9  at-issue -- such as these in this case.
10     Q     That article is talking about industry
11  wide, right?
12     A     Industry wide, absolutely.
13     Q     Okay. So for the at-issue valsartan
14  products in this case, you have no idea what the
15  percentage is that were sold through the
16  wholesalers?
17     A     Well, so again, in that same footnote,
18  Footnote 47, the first paragraph, Mylan and Teva in
19  their public reporting talk about total sales going
20  through the -- through distributers. Shareholder
21  reports specifically report those type of sales in
22  aggregate and not for specific drug NDC codes, which
23  is really at-issue here. So we know one thing, but
24  we don't know at the actual NDC batch lot number
25  that we -- we might switch to.

Page 119

1     Q     Okay. So for the at-issue valsartan
2  products here, we don't know what the percentage is
3  that were sold through the wholesaler distributers?
4     A     Right. We just have these industry
5  averages and averages that are specific to the
6  manufacturers, not at the NDC code level.
7     Q     And just to confirm, wholesalers, they
8  don't sell these products into the consumer market,
9  correct?
10     MR. HONIK: Object to the form, it may
11     call for a legal conclusion.
12     THE WITNESS: I'm sorry. What do you
13     mean by that?
14  BY MR. CAMPBELL:
15     Q     I couldn't hear what you said. You
16  didn't know what I meant. So what was your
17  question?
18     A     Can you please ask it again? Thank
19  you.
20     Q     Yes. Yes. Just to confirm,
21  wholesalers do not sell these products directly to
22  patients, correct?
23     A     Okay. So I think what you mean is
24  that, as a general matter, retail pharmacies sell to
25  consumers. Wholesalers occupy a different art of

Page 120

1  the supply chain. Is that correct? Is that what
2  you're asking?
3     Q     Yes, if you could answer that
4  question; is that correct?
5     A     Yes, that is correct.
6     Q     Okay. All right.
7     A     Again, as a general matter.
8     Q     As a general matter. Great.
9     So with respect to its role in the
10  supply chain, wholesalers are not putting the
11  product out into the -- into the consumer market?
12     MR. HONIK: Object to the form, may
13     call for a legal conclusion.
14     You can answer.
15     THE WITNESS: Thank you.
16     So -- well, I mean, I guess -- I mean,
17  they are an important part of the supply chain,
18  and wholesalers do take --
19     THE COURT REPORTER: They do take
20  what?
21     THE WITNESS: Do take title from
22  manufacturers. They hold those drugs in a
23  warehouse, usually, and then hand them off to
24  the resale -- to the -- sorry -- to the retail
25  pharmacies. Or it might be a little bit of an

Page 121

1  accounting mix where they take title, but
2  actually, the manufacturers drop ship directly
3  from their warehouse to the --
4     THE COURT REPORTER: To the what?
5     THE WITNESS: To the retail
6  pharmacies.
7  BY MR. CAMPBELL:
8     Q     And then it's the retail pharmacies
9  that sell to the patients, correct?
10     A     That's my understanding -- well,
11  for -- for products that are sold in the retail
12  class of trade. There are -- there are drugs that
13  are sold to physicians and hospitals or specialty
14  pharmacies -- pharmacies that have a slightly
15  different distribution chain. But that's not what
16  we're -- that's largely not what we're talking about
17  here.
18     Q     These products at-issue in this case,
19  the at-issue valsartan products, were sold by the
20  retail pharmacies to the consumers, to patients?
21     A     Right. So there probably are
22  valsartan that were sold -- there are probably
23  at-issue valsartan products that were sold to
24  hospitals or sold to outpatient clinics for their
25  own stocking to take care of patients. But as a

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

1   mechanical matter, my damage estimation is focused
2   on largely the retail class of trade.
3          I can actually see a cross trade in
4   the IQVIA data, but we're largely focused on the
5   retail class of trade.
6   Q     All right.
7          MR. CAMPBELL:  If you can -- if the
8   tech can, please, go to Paragraph 80.
9   BY MR. CAMPBELL:
10  Q     And -- and if you could go there too,
11  Dr. Conti, please.
12  A     Sure.  I'm trying to follow.  Hold on.
13  Okay.
14  Q     All right.  And I'm really just going
15  to focus on this first sentence here at 80 where you
16  wrote, "I have also been asked by plaintiffs'
17  counsel to develop a methodology for calculating
18  defendant wholesaler unjust enrichment damages for
19  the at-issue valsartan products."
20         Do you see that?
21  A     Yes.
22  Q     What is your understanding of unjust
23  enrichment?
24         MR. HONIK:  Note my objection to the
25  extent it calls for a legal opinion.

Page 123

1          THE WITNESS:  Okay.  So, again, I'm
2   not a lawyer.  What I view is that the
3   wholesalers took title of these products and
4   then resold them into the retail class of
5   trade.  And it's the difference between what
6   they acquire the drugs at -- for -- from when
7   they purchase from the manufacturer to what
8   they received from the retailers when they sold
9   it into the market and the delta that is
10  at-issue here.
11         And later on in this section, I'm a
12  little bit more specific about the profit that
13  is made off -- through the wholesalers moving
14  these products from A to B.
15  BY MR. CAMPBELL:
16  Q     Okay.  And we'll get to those formulas
17  in just a couple of minutes, as you probably were
18  expecting.
19         Are you aware, when it comes to unjust
20  enrichment, that there are different elements of
21  proof from one state to another for an unjust
22  enrichment claim?
23  A     I am generally aware of -- that states
24  have different rules for unjust enrichment.
25  Q     And same for the proper measure of

Page 124

1   damages, are you aware that that might vary from
2   state to state, depending on the state law?
3          MR. HONIK:  Note my objection to the
4   extent it calls for a legal opinion.
5          THE WITNESS:  Nothing in the U.S. is
6   easy.  But basically, I would say, yes.  I
7   understand generally that state -- there are
8   state rules related to damage calculations and
9   specifically related to liability and also
10  unjust enrichment.  But, again, I'm not a
11  lawyer.  I understand these as a mechanical
12  issue.
13  BY MR. CAMPBELL:
14  Q     And did your proposed formula for
15  calculating unjust enrichment damages as to
16  wholesalers take into account, in any way, those
17  differences from one state to another?
18         MR. HONIK:  Same objection as
19  previously noted.
20         THE WITNESS:  So I didn't do this -- I
21  didn't have any data.  So I didn't do that at
22  the state level, but I expect if I had the
23  data, this would be limited by state law,
24  according to instructions from counsel for the
25  jury.

Page 125

1          THE COURT REPORTER:  For what?
2          THE WITNESS:  For the jury.  From
3   instruction of counsel, the court or the jury.
4   My -- my method is flexible to accommodate
5   those state-specific rules.
6   BY MR. CAMPBELL:
7   Q     Have you been given any descriptions
8   of those differences in a law from one state to
9   another so far?
10         MR. HONIK:  Note my objection to the
11  extent it may invade the attorney work product
12  privilege and other confidentiality privileges.
13         But with that and without waiver of
14  those objections, I'll allow her to answer.
15         THE WITNESS:  Again, I didn't have any
16  data to do this calculation mechanically, so it
17  wasn't really -- it wasn't a detail that I
18  focused on.
19  BY MR. CAMPBELL:
20  Q     When you say the detail that you were
21  focused on, you mean a difference between one state
22  versus another state and how the damages are
23  calculated for unjust enrichment?
24  A     No.  I mean by that, that I didn't
25  mechanically calculate anything for wholesalers.

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1  And so to the extent that unjust enrichment as
2  applied to the wholesalers in this matter for these
3  at-issue drugs might differ, I didn't do anything
4  with that information because I had nothing to do.
5  I don't have the data to do that based on the state.
6  That's kind of a different part of the calculation
7  even for what I did for retailers or for defendants
8  in the different theories of liability.
9      Q     Can you tell us now how you would
10  account in you formula for those differences from
11  one state to another, or is that something that you
12  would reserve for later?
13         MR. HONIK:  Note my objection to the
14     extent it calls for a legal conclusion and/or
15     instruction from judge, jury or counsel.
16         You may answer.
17         THE WITNESS:  Thank you.
18         Honestly, I think of it as a
19     mechanical issue and one that I would wait on
20     the instruction of counsel, the court or the
21     jury to -- to do.
22  BY MR. CAMPBELL:
23      Q     And the formula that you propose for
24  the unjust enrichment damages is essentially
25  profits.  And that's defined as revenues minus cost

Page 127

1  as you have there at the beginning of Paragraph 81,
2  right?
3      A     Correct.
4      Q     Why did you decide on that being the
5  formula for unjust enrichment damages?  Where did
6  that come from?
7      A     Because, again, as I understand it,
8  unjust enrichment is simply the amount of money made
9  off of the transaction for moving drugs from one
10  place to another net of cost.
11      Q     Did you rely on any written materials
12  that told you that was the proper measure of damages
13  for unjust enrichment?
14      A     I relied on counsel's instruction and
15  kind of general understanding of what I know of
16  unjust enrichment.
17      Q     So is counsel's instruction that the
18  proper calculation of damages for unjust enrichment
19  is revenues minus cost?
20         MR. HONIK:  Object to the form.
21         THE WITNESS:  Thank you.
22         I should wait.  Yes.
23  BY MR. CAMPBELL:
24      Q     If you could -- actually, go back real
25  quick to Paragraph 8 in the -- in your report,

Page 128

1  please.  And I just want to clarify one thing.
2         You see in this Paragraph 8,
3  "Consequently, the appropriate measure of damages in
4  this matter is the total amount paid by each
5  plaintiff for the at-issue valsartan products
6  manufactured and/or sold by the defendants."
7         Do you see that paragraph?
8      A     Yes.
9      Q     That's not referring to the proper
10  measure of damages for wholesalers, right?
11      A     Under the theory of unjust enrichment.
12         THE COURT REPORTER:  I'm sorry.
13         THE WITNESS:  Under the theory of
14     unjust enrichment, correct.
15  BY MR. CAMPBELL:
16      Q     So this -- what's described in
17  Paragraph 8 refers to other defendants, not
18  wholesalers?
19      A     That is correct.
20         MR. HONIK:  Object to form.
21         I think -- Jamie, did you get the
22     answer?
23         THE COURT REPORTER:  Yes.
24         MR. HONIK:  Thank you.
25

Page 129

1  BY MR. CAMPBELL:
2      Q     Okay.  Back to your calculation of
3  unjust enrichment damages, so we talked a lot
4  yesterday about the value of the product or about
5  the lack of value of the product in -- in your
6  opinion.  I don't want to get into any of that.  I
7  just want to ask you one simple question about the value
8  of the product.
9         Do you base your calculation of unjust
10  enrichment damages as to wholesalers on the basic
11  premise that the products are worthless?
12         THE COURT REPORTER:  That the profits
13     are worthless?
14         MR. CAMPBELL:  That the products.
15         THE COURT REPORTER:  Thank you.
16         THE WITNESS:  I am -- so in the
17     wholesaler context, really, all that's at play
18     here is the wholesalers moved at-issue products
19     from one place to another.  And therefore, they
20     profited off of that movement.
21         The full value of the products that
22     they moved from one place to another is related
23     to the price that they paid for them over every
24     unit that they paid for them minus their cost
25     of acquiring, storing, other --

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

1    THE COURT REPORTER: Other...
2    THE WITNESS: Other offsets that they
3    may -- may have experienced.
4    So, really, it's just the full price
5    that the wholesalers acquired those products at
6    minus all of their costs that -- that is -- is
7    related to my calculation here.
8  BY MR. CAMPBELL:
9    Q    And so your calculation as to the
10  wholesalers for unjust enrichment damages, it
11  doesn't matter if the products are -- are worthless
12  or not?
13    MR. HONIK: Object to the form.
14    THE WITNESS: For my purposes, I am --
15    I was asked to -- so for my purposes, it's just
16    the amount of money that the wholesalers made
17    off moving these products from one place to
18    another.
19  BY MR. CAMPBELL:
20    Q    Okay.
21    MR. CAMPBELL: And if the tech could
22    go back to Paragraph 80, and next -- next page
23    on Paragraph 80. Okay.
24  BY MR. CAMPBELL:
25    Q    You see the sentence that starts off

Page 131

1  with, "Like the defendant retailers"? We don't have
2  the first couple of words, but the first couple
3  words highlighted here are "like the"?
4    A    Yes.
5    Q    Okay. "Like the defendant retailers,
6  these companies profited from the distribution of
7  the at-issue valsartan products to pharmacies and
8  other entities."
9    On what do you base that statement
10  there, that these companies profited?
11    A    Right. So this is just the theory of
12  unjust enrichment that as -- so just kind of as a
13  general matter, we know that wholesalers move
14  drug -- they take title of drugs. And then they
15  move them to other purchasers, or they sell them to
16  other purchasers. So it's just the difference
17  between the -- the amount they sold and the amount
18  that they gained that is of issue here.
19    Q    Okay. So this is the theory. It's
20  not based on any actual records or documents that
21  you've seen so far?
22    MR. HONIK: Object to the form of the
23    question.
24    THE COURT REPORTER: I'm sorry, I
25    didn't hear an answer.

Page 132

1    THE WITNESS: I said correct. I said
2    correct. And these are -- I'm sorry. My
3    computer wants to reboot. Correct.
4    I mean, these are major Fortune 500 or
5    Fortune 1,000 companies. They have -- as you
6    know, AmerisourceBergen and Cardinal and others
7    have revenues, annual revenues, on the order of
8    Costco. And these are huge public -- publicly
9    traded companies. They must profit off their
10    business, or they wouldn't report revenue that
11    looks like that. But I have not been shown any
12    data to assess exactly how much they -- these
13    wholesalers made off of moving from point A to
14    point B, the specific issues in this matter.
15    THE COURT REPORTER: In what?
16    THE WITNESS: The specific drugs in
17    this matter.
18    THE VIDEOGRAPHER: Counsel, I'm
19    getting a lot of background noise. If we can
20    just try to reduce that as best we can.
21    Thank you.
22  BY MR. CAMPBELL:
23    Q    All right. And in the next couple of
24  sentences in Paragraph 80, you talk about,
25  "Wholesalers did not manufacture the products, nor

Page 133

1  did they sell the products to consumers and TPPs."
2    And then you say, "Consequently, the
3  data that could be used to calculate unjust
4  enrichment damages for defendant wholesalers differs
5  from that of the defendant retailers described
6  above."
7    Do you see that sentence?
8    A    Yes, that's what it says.
9    Q    Okay. In what ways does the data that
10  could be used to calculate unjust enrichment damages
11  for wholesalers differ from the retailers?
12    A    So, again, the -- the wholesalers
13  purchased these products at one price and -- in
14  aggregate and then sell them at another. It's just
15  the delta that matters.
16    And the -- the purchase price is going
17  to be reported in data just like -- and the products
18  themselves, the name of the manufacturers, the lot,
19  the batch, the NDC code, all of that should be
20  preserved in this data. But the actual cost of
21  sales will be -- will be different.
22    Q    And have you ever seen that sort of
23  data for -- for wholesalers other than -- I think
24  you mentioned the screen share earlier in the call.
25  But have you otherwise ever seen that sort of data

Page 134

1  for wholesalers?
2      A    Yeah.  I have seen that data,
3  and -- under Track and Trace and earlier versions of
4  Track and Trace that are maintained by the states
5  through the EPedigree system.  My understanding is
6  that wholesalers keep track of that data down to the
7  unit penny.
8      Q    And you're referring to the cost of
9  the -- you said the cost of the sales earlier.  So
10 you mean the sale to the retailer?
11     A    Yeah.  And -- and the price that the
12 wholesalers are paying to the manufacturers as well.
13 So they -- they know how much they're purchasing and
14 at what price for what.  And they know how much
15 they're selling for, by whom, for what, down to the
16 retailer level as well.
17     Q    And I just want to make sure I
18 understand.  On what is that based, your
19 understanding that they -- they know all those
20 things?
21     A    Again -- well, so under Track and
22 Trace, they are required -- wholesalers are required
23 to keep that information at that level of this
24 aggregation, at the NDC manufacturer level and the
25 unit level.  And then states, on top of Track and

Page 135

1  Trace, have EPedigree systems that require all
2  members of the supply chain in the United States to
3  maintain units sold or purchased, which types of
4  drugs by which types of manufacturers to ensure that
5  they are not counterfeit.
6      Q    Have you ever had any specific
7  conversations with someone who works for a
8  wholesaler about the input needed to calculate
9  profits on any given transaction or -- or drug?
10     A    I mean -- this field is awash in data,
11 and I am aware that wholesalers are keeping track of
12 their unit costs and their unit --
13         THE COURT REPORTER:  Their unit what?
14         THE WITNESS:  Or their revenues
15     for -- for each transaction that they are going
16     through every single day.  Again, 11 million
17     prescriptions units a day are going through the
18     wholesalers in the U.S. market.
19 BY MR. CAMPBELL:
20     Q    Have you ever had any specific
21 conversations with any of the wholesalers in this
22 case, employees of the wholesalers in this case,
23 that they are keeping that sort of data regarding
24 the at-issue valsartan?
25     A    Again, any product that is allowed to

Page 136

1  enter the retail class of trade in the U.S. has a
2  barcode and is -- is traced through the entire
3  system.  So by definition, if the manufacturers are
4  entering these products into the retail class of
5  trade, then downstream members of the supply chain,
6  whether it be wholesalers or retailers, are required
7  to keep track of that product at the barcode level,
8  which will contain information about the product,
9  the -- the unit and -- and the manufacturers.
10     Q    What about elements of price?  Does it
11 track the elements of price?
12     A    What do you mean by "elements of
13 price"?
14     Q    Well, the amounts received.  Let's
15 start, first of all, with the revenues.
16     A    Sure.
17     Q    Okay?  Which is -- let's go to that
18 part of your formula about the revenues, and that's
19 in Paragraph 82.
20     A    Yeah.
21     Q    Okay.
22     A    I have that.
23     Q    All right.  And it -- it says
24 wholesaler revenue can be expressed in Formula 10 as
25 Qdt multiplied by PPUdt.  Do you see that?

Page 137

1      A    Yes.
2      Q    Did you consider any other inputs in
3  determining revenue here for -- with respect to
4  wholesalers?
5      A    Like what?
6      Q    Well, that's what I'm asking you.  I'm
7  asking you.
8      A    I don't -- I don't understand.
9      Q    Sure.
10         You have QDt --
11     A    Right.
12     Q    -- and PPUdt as the two inputs that
13 you multiply together to get revenue, right?
14     A    Right.
15     Q    Okay.  Did you consider any other
16 things to multiply or include in this part of the
17 formula that you decided should not be included?
18     A    This is a general formula.  So it is
19 inclusive of the aggregate units and the transaction
20 prices for these units.  Transaction prices could
21 be -- are probably expressed in aggregate over
22 products.  And there may be a difference between
23 gross prices paid and net prices paid.  There might
24 be offsets, return of goods, et cetera, that
25 are -- that are part of either the revenue or part

35 (Pages 134 - 137)

Page 138

1  of the cost.
2      Q      And how does that factor into your
3  formula here?
4      A      It's inclusive.
5      Q      In what way?
6      A      And you can -- well, you can see
7  in -- in Footnote 75, when calculating profit,
8  offset may be removed from gross profit, so the jury
9  or court find these to be reasonable deductions.
10  These additional costs can be easily included.
11          THE COURT REPORTER: Can be easily...
12          THE WITNESS: Included.
13  BY MR. CAMPBELL:
14      Q      So your Paragraph 75 there, is that
15  referring to -- for example, if we start with inputs
16  to revenue, does that include rebates?
17      A      It could. It could, yes. So there's
18  a gross price, and then there's returned goods.
19  There's rebates that might be paid on aggregate
20  purchased products or sold products. All of those
21  would be considered, not gross revenue or not gross
22  prices, but net prices and could be a part of those
23  calculations if counsel or the court or the jury
24  find that they should be included.
25      Q      Do you have an opinion on whether they

Page 139

1  should be included?
2          MR. HONIK: Note my objection to the
3      extent it calls for a legal conclusion.
4          THE WITNESS: My method and the
5      formula that's listed here is -- is general.
6  BY MR. CAMPBELL:
7      Q      And I'm not asking you in a legal
8  opinion. I'm asking you as the expert health
9  economist here. If you were calculating profits for
10  a particular set of drugs for a wholesaler, would
11  you factor in rebates?
12          MR. HONIK: Note my objection. The
13      ultimate answer to the question requires,
14      respectfully, a legal determination, one that's
15      beyond the scope.
16          But with that, she can answer the
17      question.
18          THE WITNESS: Thank you.
19          So, again, I'm not a lawyer. I'm an
20      economist. I would say if I didn't think that
21      they -- that those factors should be
22      considered, I would not have dropped the
23      footnote that I did. We were just talking
24      about Footnote 75. And, again, the method that
25      is proposed is -- is flexible to accommodate

Page 140

1      those inclusions if the court or the jury or
2      counsel determined they should be included.
3  BY MR. CAMPBELL:
4      Q      Hypothetically, if a wholesaler came
5  to you and asked you to help them calculate profits
6  on a particular set of drugs outside the context of
7  any litigation, would you include rebates in that
8  calculation of profits?
9          MR. HONIK: Note my objection,
10      improper hypothetical.
11          THE WITNESS: Okay. I think we've all
12      established how much I love hypothetical
13      questions, and I think the answer to this one
14      is just, it depends. It depends on the
15      context.
16  BY MR. CAMPBELL:
17      Q      So in some context, you would include
18  rebates?
19          THE COURT REPORTER: I'm sorry, can
20      you repeat that question?
21          MR. CAMPBELL: Sure.
22  BY MR. CAMPBELL:
23      Q      In some context, you would include
24  rebates in the calculation of revenues?
25          MR. HONIK: Object to the form of the

Page 141

1      question.
2          THE WITNESS: And you mean profits?
3  BY MR. CAMPBELL:
4      Q      Profits, sure.
5      A      Possibly.
6      Q      And with respect to rebates, do you
7  understand that different customers have different
8  rebate structures? I should say different
9  wholesaler customers have different rebate
10  structures?
11      A      What do you mean by "customers"?
12      Q      Sure.
13          So one particular customer for a
14  wholesaler might have a rebate structure that has
15  these numbers or these incentives. And another
16  customer for that same wholesaler might have a
17  totally different rebate structure.
18          MR. HONIK: Object to the form.
19          THE WITNESS: I think I'm asking a
20      much more basic question, which is who is the
21      customer.
22  BY MR. CAMPBELL:
23      Q      It doesn't matter. Let's say --
24      A      Customer of whom?
25          THE COURT REPORTER: I'm sorry?

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1        MR. CAMPBELL: I'm sorry.
2        THE WITNESS: Let's start from the
3    beginning. Customer of whom?
4    BY MR. CAMPBELL:
5    Q    Yeah. A wholesaler customer.
6    A    Okay. So is that the manufacturer?
7    So remember, wholesalers operate a two-sided market.
8    So they are -- they have manufacturers that they are
9    purchasing products from. That is one type of
10   customer.
11       And then they are selling downstream
12   to other customers that are retail pharmacies and
13   other members of the supply chain. So that's
14   another type of customer. So I'm asking you which
15   customer.
16   Q    Okay. So now I'm in the category of
17   revenues, so I'm talking about the downstream
18   customers.
19   A    Okay. Great.
20   Q    Okay. The -- the retail pharmacies,
21   pick any two that you want to for the wholesalers.
22   Do you understand that different customers,
23   different retail or pharmacy customers, might have
24   different rebate structures?
25   A    So as a general matter, I understand

Page 143

1    that these contracts may include rebates that are
2    generally paid in aggregate and are contracted to an
3    advance of any specific transaction. So they're
4    contracts that cover a period prospectively.
5        If -- whether they differ materially
6    from each other, I -- I think that they may differ
7    in time. In other words, the contracting that
8    occurs in 2020 as a general rule looks different
9    than the contracting that might have occurred in
10   2012. But if a differ -- I mean, AmerisourceBergen
11   and Cardinal, they're really major players in this
12   market. And they have significant market power. So
13   I'm assuming that they have a pretty uniform
14   contract that they are -- they have for signing with
15   their downstream customers, the retailers.
16   Q    So your assumption is that, for
17   example, for Cardinal Health, its contracts are
18   going to look the same with respect to rebates with
19   its retailer customers, no matter who the retailer
20   costumer is?
21       MR. HONIK: Object to the form.
22   That's not her testimony.
23       THE WITNESS: No -- yeah, I think
24   you're mischaracterizing my testimony. What
25   I'm saying is that AmerisourceBergen, Cardinal,

Page 144

1    the other wholesalers at-issue here, they are
2    massive corporations. Again, they have annual
3    revenues larger than Costco. So they have --
4    they hold very significant market power over
5    their downstream retail customers.
6        So in that setting, as a general
7    matter, the entity that holds the more
8    significant market power gets to dictate the
9    terms of the contract. And so I'm assuming
10   that AmerisourceBergen dictates the terms of
11   the contract, and I expect those terms of
12   contract in a given period of time to not
13   differ very significantly between retail
14   customer or retail pharmacy -- between retail
15   pharmacy and the retail pharmacy.
16       Might there be slight deviations
17   between them? Sure. But the general content
18   is going to be driven by the entity that holds
19   the market power.
20   BY MR. CAMPBELL:
21   Q    So you agree that --
22   A    Which is the wholesaler.
23   Q    So you agree that there might be
24   slight variations in, for example, the amount of
25   rebates given to one retailer versus another?

Page 145

1    A    If they exist at all, right? I mean,
2    there could be just cost contracts all together. It
3    probably depends on the year and the products.
4    Q    And beyond just rebates, there might
5    be other terms in the contracts that might differ
6    from one retailer customer to another?
7        MR. HONIK: Object to the form, calls
8    for a legal conclusion.
9        THE WITNESS: Again, I haven't really
10   thought about that in this matter that much.
11   What I would say is, the contracts probably
12   dictate a variety of different terms that are
13   general -- that are general, amount sold at
14   prices over which types of products in a given
15   time period, what to do about charge backs or
16   spoiled goods, what to do about whether there's
17   aggregate volume discounts for purchasing a
18   very large quantity of their certain products.
19       There might also be wholesale rebates
20   for -- in aggregate after the products have
21   already been sold into the supply chain and
22   maybe even to customers that are freed up
23   later. Are all likely part of the contracts
24   and might differ over time.
25

37 (Pages 142 - 145)

Page 146

1 BY MR. CAMPBELL:
2      Q      Did you review any wholesaler and
3 retailer contracts produced in this litigation?
4      A      No, not in this matter, but I have
5 seen contracts between wholesalers and retail
6 pharmacies in the course of business.
7      Q      Any related to the products at-issue
8 in this litigation?
9      A      No. But, again, these are
10 really -- these are, you know, cheap generic drugs.
11 The -- and so I don't expect them to differ that
12 much or to be special in any way. Where I have seen
13 carve out or special considerations are for products
14 that have very special types of handling or shelf
15 life.
16      Q      And going to your formula for cost,
17 which is at the bottom of Page 33, it's Formula 11.
18      Well, one thing I wanted to --
19      A      Hold on. Hold on. Let me just get
20 there.
21      Q      One thing before I continue on that,
22 one of the elements of your formulas is -- is the
23 concept of unit, correct?
24      A      Yes.
25      Q      All right. What is your definition

Page 147

1 for -- for unit here in this formula for
2 wholesalers?
3      A      Yeah, it's -- it's quantity. It's
4 quantity, and usually at the wholesaler level,
5 they'll be -- it will be bottles or packages of
6 pills. But it might also be aggregated over larger
7 units, so, like, multiple pill packs or multiple
8 boxes of products.
9      Q      So a unit can be a different size,
10 basically?
11      A      Units can be different sizes, and the
12 size and the aggregate amounts contained in those
13 units are things that the wholesaler knows and keeps
14 track of. It's part of the requirements of Track
15 and Trace and also the EPedigree system that I
16 mentioned earlier.
17      Q      Does your formula account for the
18 differences in sizes between units?
19      A      Yes. And if I -- again, this
20 is -- this is a theoretical exercise. I have no
21 data. But I tend to be very anal about units sizes,
22 and so this would be done at a unit that may -- at
23 the most disaggregated unit that was appropriate.
24 And usually units for cost would match the units for
25 revenues, if I was doing this with data.

Page 148

1      Q      Okay. So let me go to your formula
2 for cost. For the formula for cost, Formula 11, I
3 guess it is. It continues on to the top of the next
4 page. In this part of your formula for cost, did
5 you consider including charge backs?
6      A      Again, this is what I mean by,
7 in -- in that Footnote 75, that there could be
8 offsets to profit that could be considered, either
9 in the cost side or in the revenue side.
10      I think I have already mentioned
11 charge backs as being an offset in the -- in our
12 earlier conversation. They may be related here or
13 important.
14      Q      And you would say the same thing for
15 rebates?
16      A      Again, I think of volume discounted as
17 being a more relevant term, but there might also be
18 rebates there.
19      Q      You mentioned discounts. You're
20 aware --
21      A      Wait a minute. I'm sorry. Just a
22 minute. Just to finish my thought.
23      Again, I didn't do this mechanically.
24 I didn't have any data to do that, and so my method
25 that's being proposed here is general. And it's

Page 149

1 really a different phase of the case, either upon
2 the instruction of counsel and upon of the
3 instruction from the court or jury, that those type
4 of offsets, if they exist, either for cost or for
5 revenue.
6      Q      But you would defer to the court or
7 the jury to decide whether those sorts of things
8 should be included?
9      A      Correct.
10      Q      And with the same -- you mentioned
11 discounts. Would the same thing apply, for example,
12 on the cost side, logistics fees or service fees?
13      A      For unjust enrichment calculations,
14 yes, that -- those also could potentially be
15 accounted for. My method is flexible to account for
16 them, again, upon the instruction of counsel, the
17 court or the jury.
18      Q      What about non-product-related costs,
19 for example, wholesaler overhead or employee costs
20 or IT costs, those sorts of things? Are those also
21 included in the offsets that you would defer to
22 whether the court or the jury says they should be
23 counted?
24      A      I think of all of these things -- so
25 to the extent that they're all related to cost of

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

1  goods, they would be related. Usually, I've seen
2  cost of goods break out those type of costs
3  separately.
4      Q     Employee costs, information technology
5  costs, store costs, those sort of things?
6      A     I mean there's -- they're -- they're
7  huge. They're so big. You know, they're their own
8  separate line items. They're -- they have their own
9  department that -- that accrues those costs and
10  accounts for those costs and that keeps track of
11  those costs and reports them to their shareholders.
12  I've -- I've used those as different cost of goods
13  for the unit being moved from one place to another.
14  Usually, that -- in gap accounting, they're
15  accounted for separately.
16     Q     Okay. And then on the other inputs
17  for the costs, of all the things that you said,
18  maybe offsets, and you would defer to the court or
19  the jury to decide whether they're -- they're
20  counted. Those also will, or could, vary from
21  manufacturer to manufacturer depending on the
22  contract, right?
23     A     Okay. So I think we're switching. So
24  I think what you mean is that -- so now the customer
25  is the upstream customer to the wholesaler, right?

Page 151

1  It's the manufacturer?
2      Q     That's right?
3      A     Is that right?
4      Q     Yes.
5      A     Okay. So, again, same general gist,
6  which is wholesalers are method in terms of revenue
7  and in terms of market share relative to each
8  individual pharmaceutical company that they're
9  dealing with. And so for the contract between
10  AmerisourceBergen, for example, and any specific
11  small generic manufacturer, the entity that holds
12  the bargaining power is the wholesaler, not
13  generally the -- the manufacturer.
14         So, again, I expect, just as a manner
15  of management, that the wholesalers here can dictate
16  the terms of purchase to these upstream
17  manufacturers, and they might differ a little bit by
18  time, by type of product, et cetera. But I don't
19  anticipate that within time and for a particular
20  type of product, there -- there to be very
21  significant differences.
22     Q     Did you review any of the contracts
23  between the wholesalers and the manufacturers that
24  were produced in this case?
25     A     No. Those are very closely held

Page 152

1  secrets in my general understanding of -- of how
2  this world works. I -- I wish I could see them, but
3  I haven't seen them in -- in -- in this matter. And
4  I have asked lots of questions of my wholesaler
5  friends about, kind of, generally how these work,
6  but I have never seen a contract.
7      Q     And do you agree that wholesalers
8  typically negotiate with the manufacturers when
9  they're entering into one of these contracts over a
10  bundle of goods and not with any one particular type
11  of product?
12     A     I mean, it depends on who the
13  wholesale -- I mean, it depends on who the
14  manufacturer is, right, and what the products are.
15  But -- so I do not -- I don't know the specifics of
16  the contracts between the wholesaler and the
17  specific manufacturers in this case.
18     Q     Okay. And I think you already
19  mentioned when you talked about the concept of time,
20  but it's your understanding that the contracts, both
21  types of contracts, the contracts between the
22  wholesalers and the manufacturers, and then the
23  wholesalers and the retail pharmacies, those
24  contracts can change over time, correct?
25     A     Yes. Typically, wholesalers would

Page 153

1  contract upstream and downstream prospectively, and
2  those contracts will have a term. So they'll be
3  for -- prospectively, for a year, two years.
4      Q     And the terms may vary from
5  manufacturer to manufacturer or from retail pharmacy
6  to retail pharmacy?
7         MR. HONIK: Objection, asked and
8  answered.
9         THE WITNESS: So, again, you're -- if
10  you're a Fortune 1,000 company, such as these
11  in the U.S., they tend to be pretty routinized,
12  and also it's important to be routinized for
13  the principles of gap reporting for
14  shareholders. Again, these are public
15  companies. So --
16         THE COURT REPORTER: They're to be
17  routinized?
18         THE WITNESS: Routinized.
19         THE COURT REPORTER: Routinized?
20         THE WITNESS: Yes.
21         THE COURT REPORTER: Okay.
22         THE WITNESS: Routinized.
23         But as a general matter, my
24  understanding is that the contracts are for a
25  year or two, both upstream and downstream.

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

1    MR. HONIK: And let me -- let me just
2    note that it's the 1 o'clock hour. I think we
3    had a hard stop at this time, but to the extent
4    y'all need more time, I think Dr. Conti will
5    make herself available at 4 p.m.
6    THE WITNESS: Yeah, I apologize. I'm
7    actually late to meet my Dean. That's not a
8    good -- that's not a good look for me.
9    MR. HONIK: Let's go off the record
10   and release the witness for now, and counsel
11   can confer.
12   THE VIDEOGRAPHER: The time is 1 p.m.
13   This ends Media Unit Number 3. We're going off
14   the record.
15   (Whereupon, a break was taken from
16   1 p.m. to 4 p.m.)
17   THE VIDEOGRAPHER: The time is 4:03.
18   This begins Media Unit Number 4. We're back on
19   the record.
20   BY MR. ABRAHAM:
21   Q    Good afternoon, Dr. Conti.
22   A    Good afternoon.
23   Q    My name is Eric Abraham -- Hetero Labs
24   and Hetero Drugs. Can you hear me? You're
25   making --

Page 155

1    A    No, I can't -- you just cut out again.
2    MR. HONIK: You briefly cut out, Eric.
3    Keep going. Let's see how it goes. We'll let
4    you know if it's a problem.
5    BY MR. ABRAHAM:
6    Q    Okay. Let's make sure we get the
7    important point. I represent Hetero Drugs and
8    Hetero Labs, and I'm going to be taking just a few
9    additional questions today. All right?
10   Do you still have your report in front
11   of you?
12   THE WITNESS: I'm sorry. Does
13   everyone hear the background noise? It's very
14   significant. There's -- it's like a computer
15   noise.
16   THE VIDEOGRAPHER: The time is 4:04.
17   We're going off the record.
18   (Whereupon, a discussion was held off
19   the record.)
20   THE VIDEOGRAPHER: The time is 4:05.
21   We're back on the record.
22   BY MR. ABRAHAM:
23   Q    Good afternoon, Dr. Conti. My name is
24   Eric Abraham from law firm Hill Wallack, and I
25   represent Hetero Labs and Hetero Drugs. I have just

Page 156

1    a few questions for you.
2    Do you still have your expert report
3    in front of you?
4    A    I do.
5    Q    Okay. I'd would like to draw your
6    attention, please, to Paragraph 60.
7    A    Just give me one second.
8    Q    It's on Page 23. Do you have it?
9    A    Just one minute.
10   Q    Okay.
11   A    Yeah. Okay. I'm there.
12   Q    Okay. And this -- in this, you
13   express the formula or the methodology for
14   calculating liability damages as -- effectively,
15   quantity as of the date and time for a particular
16   product over time period, times the price for that
17   product over the same time period; is that correct?
18   A    Correct.
19   Q    Okay. And I believe that you
20   testified earlier today that, for Hetero, you
21   confined your damages analysis to prescriptions that
22   were filled between May and August of 2018, correct?
23   A    That's correct.
24   Q    Okay. And that's consistent with
25   Footnote 67 of your report, right?

Page 157

1    A    Just give me one second. I have to
2    double check. Yes, that's correct.
3    Q    Did you do any investigation to
4    determine whether any of Hetero's valsartan was sold
5    within that timeframe, May through August of 2018,
6    that did not contain an alleged nitrosamine
7    impurity?
8    A    I did not, and that's because my
9    analysis is prospective and under the assumption
10   that consumers and third-party payors could not tell
11   whether a product was contaminated or not -- or
12   could not tell whether a product was contaminated or
13   not with the nitrosamines and other potential
14   products.
15   Q    So is it fair to say that you assumed,
16   for purposes of your analysis, that if a
17   prescription was filled within that timeframe, May
18   through August 2018, the valsartan contained the
19   nitrosamine impurity?
20   MR. HONIK: Object to form.
21   THE WITNESS: Right. So, again, and
22   as I write this -- I write in my report, there
23   is fundamental asymmetric information in this
24   market. In other words, while the manufacturer
25   might know the extent of the contamination of

40 (Pages 154 - 157)

Page 158

1    their products, consumers nor third-party
2    payors knew of at the time that they were
3    making --
4         THE COURT REPORTER:  That they were
5    making...
6         THE WITNESS:  At the time that they
7    were making those purchases.  And therefore,
8    because my perspective is prospective, I'm
9    doing the analysis from the -- from the
10   perspective that -- of them and their
11   asymmetric information.  I am counting all
12   products that were available for sale and
13   ultimately sold in the U.S. market.  That does
14   not count -- that does not take into account
15   that there may have been different levels of
16   contamination that the manufacturer might have
17   known about their own product.
18   BY MR. ABRAHAM:
19   Q     Okay.  So to the extent that there may
20   have been valsartan manufactured by Hetero without
21   the impurity that was still sitting on the shelf at
22   the pharmacy in the May to August timeframe, those
23   sales would be included with -- in your damages
24   analysis, correct?
25   A     Correct.  At --

Page 159

1    Q     I --
2    A     Wait.  At this point in time --
3    Q     Right.  I have very limited time,
4    Dr. Conti.
5    A     No.  No.  No.  I understand.  I just
6    need to -- but it's --
7    Q     You've answered my question.
8         MR. HONIK:  No, she hasn't.  She
9    hasn't finished her answer.
10        THE WITNESS:  So, again, from my
11   perspective, at this point in time, my
12   assignment was to think about damages in a
13   prospective way from the consumer and
14   third-party payors' perspective.  They did not
15   know whether the products that were being sold
16   and consumed by themselves or paid for by
17   themselves were contaminated or not, even if
18   the manufacturer did know.
19   BY MR. ABRAHAM:
20   Q     Can you please turn to Table 1 of your
21   report?
22   A     Yes.
23   Q     It's on Page 31.
24   A     Yeah.
25   Q     And you see you have a line here for

Page 160

1    both end-payor and consumer damages, attributable to
2    the Hetero Labs.  Do you see that?
3    A     I do.
4    Q     Does that calculation follow the
5    formula that we talked about a few moments ago?  It
6    was on Paragraph 60 of your report, in other words,
7    quantity times price?
8    A     Quantity times price, correct of all
9    products in that time period that are relevant for
10   that specific set of NDCs.
11   Q     Tell me what the quantity of pills you
12   used was for the Hetero Labs end-payor damages
13   calculation that resulted in roughly ███████ in
14   damages?
15   A     Sure.  Sales --
16   Q     No, just a number.  What was the
17   number?
18   A     So sales of the product as recorded in
19   the IQVIA data in the relevant time period among
20   consumers that were -- among payors -- among
21   prescriptions that were dispensed and paid for by
22   third-party payors.
23   Q     I may not have been clear.  I would
24   like to know what the number was that you used for
25   quantity within your equation.

Page 161

1    A     So I don't have it in my report, but
2    it is easily discernable in the data that I have.
3    I'm more than happy to provide that to you.
4    Q     Please do.  I'll ask your counsel to
5    provide me with that number.
6         And what was the price that you used
7    to calculate the ███████ number for end-payor
8    damages?
9    A     Same -- same answer, it was the price
10   that was paid by end-payors recorded in IQVIA data,
11   according to the inclusion/exclusion criteria for
12   the specific products that are Hetero -- that are
13   assigned to Hetero Labs.
14   BY MR. ABRAHAM:
15   Q     But I would like to know what the
16   number was.  Are you saying you don't know right now
17   what that number was?
18   A     I just said it's the same answer to
19   the question, which is -- by definition, it is price
20   times quantity that you're seeing here.  And that --
21   the native price recorded in the IQVIA data for each
22   product, month, year and payor is available in the
23   IQVIA data.  And I'm more than happy to provide it
24   to you.
25   Q     Okay.  So same questions for consumer

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1  damages, in other words, you would have to look back
2  at some data to tell me what the quantity was and
3  what the price was that you multiplied to come up
4  with your ████████.
5      A    Right, subject to the criteria of
6  inclusion and exclusion, and subject to the
7  methodology as outlined in my report, by definition,
8  these quantities represent actual quantities and
9  prices that were paid by consumers among the
10  at-issue drugs in the at-issue time period for the
11  at-issue payors.
12     Q    Right.
13         THE COURT REPORTER:  I'm sorry, the
14     at-issue...
15         THE WITNESS:  Payors.
16         THE COURT REPORTER:  Thank you.
17         THE WITNESS:  The prices for
18     consumers.
19  BY MR. ABRAHAM:
20     Q    But, Dr. Conti, I just want to make
21  sure, there's no place I can look in your report
22  that would tell me what the price and quantity
23  numbers are that you used for those two
24  calculations; is that fair?
25     A    Well, what we're providing -- what I'm

Page 163

1  providing in my report is the conjunction, price
2  times quantity.  I'm more than happy to provide you
3  the -- I think what you're asking for is what is the
4  native price and quantity for each -- for Hetero
5  underlying the consumer damages listed here.  And,
6  again, it's in my data.  I'm more than happy to
7  provide it to you.
8      Q    Thank you.
9          MR. ABRAHAM:  I'll make that request,
10     please, of your counsel, to provide me with the
11     quantity and price that went into your
12     end-payor damages and consumer damages
13     calculations.  I appreciate that.
14  BY MR. ABRAHAM:
15     Q    Do you know the quantity of Hetero's
16  valsartan that was recalled as a result of the
17  allegedly impure nature of the pills?
18     A    No.  And, again, it was of no moment
19  in my analysis because -- because of the significant
20  asymmetric information and the perspective of my
21  analysis, which was prospectively from the consumer
22  and third-party payors' perspective.  They had no
23  ability to know which products were recalled versus
24  which ones were not -- or which ones were
25  contaminated versus which ones were not,

Page 164

1  prospectively.
2      Q    Does your damages analysis address in
3  any way the impact of the recall upon damages to
4  either the end-payor or consumer classes?
5      A    Just in terms of the time period that
6  was used.
7      Q    Okay.  Do you know who Hetero's U.S.
8  repackager or distributor was in the chain of
9  comments?
10     A    Not off the top of my head, no.
11     Q    Okay.  Do you know what payments, if
12  any, were made by that repackager or distributor --
13         THE COURT REPORTER:  I'm sorry, can
14     you repeat that?  Can you repeat that?
15         MR. ABRAHAM:  Sure.
16  BY MR. ABRAHAM:
17     Q    Do you know what payments, if any,
18  were made by the repackager or distributer of
19  Hetero's product to any party in the chain of
20  distribution as a result of the recall?
21     A    I'm sorry, I don't completely
22  understand.  What do you mean -- do you mean
23  distributor of the wholesale distributor, just to be
24  specific?
25     Q    Let's take -- let's take that example.

Page 165

1      A    Yeah.  Okay.  So -- and are you asking
2  about payments that Hetero made to their distributor
3  or --
4      Q    I mean --
5      A    -- to other --
6          THE COURT REPORTER:  Okay.  I cannot
7     -- I can't have you both speaking at one time.
8     It's too fast, and I can't do it.
9          MR. ABRAHAM:  Sorry.  My fault.
10  BY THE WITNESS:
11     Q    I mean, not necessarily payments made
12  by Hetero's manufacturer, but made by Hetero's
13  United States repackager or distributor.
14     A    So do you mean that there were --
15  there were refunds that were made by the distributor
16  to consumers or to third-party payors for recalled
17  products?
18     Q    That's a fair hypothetical.  So in
19  other words, yes.  Did you, in any way in your
20  damages analysis, consider if those had occurred and
21  what the impact would be in your damages
22  calculation?
23     A    So, again, my -- my damage calculation
24  is flexible and could accommodate the possibility of
25  refunds that were made for recalled or contaminated

42 (Pages 162 - 165)

Page 166

1    product to end-payors. I did not have that data for
2    this analysis that I conducted. My understanding is
3    that whether or not that would be ultimately
4    included in damages for settlement purposes, that is
5    something that would be settled by counsel, court or
6    the judge.
7        Q    Okay. Did your damages analysis in
8    any way address the charge backs, rebates, bill
9    backs, administrative fees or cash discounts
10   attributable to sales of Hetero's valsartan that was
11   allegedly contaminated or unpure as a result of the
12   nitrosamine?
13       A    That's a really compound question. So
14   let's take that apart.
15           So if discounts were given to
16   consumers at the point of sale, then by definition,
17   they are included in my damages because they would
18   offset the actual payment that patients made at the
19   pharmacy counter. And that would be included in the
20   IQVIA data that's listed in my report.
21       Q    Did you analysis -- I'm sorry. Go
22   ahead. I didn't mean to interrupt.
23       A    No. It's okay.
24           We don't have rebate data. That is
25   something that is confidential and available from

Page 167

1    the manufacturers themselves. From a theory of
2    liability, rebates are not necessarily things that
3    would be considered to be offsets, because injury
4    occurs at the point of sale, and rebates are paid
5    after the products are sold at some other point in
6    time in aggregate and may not be directly related to
7    any specific transaction.
8            But to the extent that Hetero or their
9    agents negotiated prices with third-party payors,
10   that varied by product, they would be in the IQVIA
11   data. Because, by definition, the IQVIA data is
12   providing the price that was actually paid by the
13   third-party at the pharmacy counter for those
14   products.
15           So if discounts were given, if Hetero
16   gave discounts to, I don't know, let's say, take one
17   of the third-party payors in this case,
18   prospectively, that would be in my calculation -- in
19   the damages that are calculated here.
20       THE COURT REPORTER: And what?
21       THE WITNESS: That would be in the
22   damages that are calculated here.
23       MR. ABRAHAM: Okay. Subject to
24   receiving the information that you agreed to
25   provide, I have no further questions for the

Page 168

1    witness. Thank you very much for your time.
2        MR. HONIK: Eric, but for the benefit
3    of the record, I just would like to note that
4    the backup data that you asked of Dr. Conti
5    that pertains to Hetero and Table 1, the
6    aggregate of damages, was provided to you and
7    all defense counsel concomitantly with our
8    serving our class cert motion and brief. So if
9    you'll do nothing more than look at the files
10   that we served, you'll find the data points
11   that you're looking for there.
12       MR. ABRAHAM: Let's have this
13   discussion offline. I don't want to consume
14   the doctor's time.
15       MR. HONIK: Understood. I wanted the
16   record to reflect that it's already been served
17   on counsel.
18       Next -- next up?
19       MR. KNEPPER: Yes. This is
20   Matthew Knepper from Husch Blackwell. I will
21   go next.
22       THE WITNESS: I'm sorry. From where?
23       MR. KNEPPER: Husch Blackwell. I
24   represent Express Scripts.
25       THE WITNESS: -- as the pharmacy, just

Page 169

1    so I understand.
2        THE COURT REPORTER: I'm sorry?
3        THE WITNESS: I can't hear you.
4        THE COURT REPORTER: What was your
5    last question to Mr. Knepper?
6        THE WITNESS: As the pharmacy benefit
7    manager or as the mail order pharmacy?
8        MR. KNEPPER: As the pharmacy -- the
9    defendant in this case.
10       THE WITNESS: Thank you so much for
11   that clarification.
12   BY MR. KNEPPER:
13       Q    So I'd like to turn to Page 32 in your
14   report, Table 3. This is "Aggregate Retailer Unjust
15   Enrichment Damages." Dr. Conti, the dollar figures
16   reflected in Table 3 for unjust enrichment damages
17   represent your calculation of the profits each
18   pharmacy defendant had from the sale of at-issue
19   valsartan, right?
20       A    Correct.
21       Q    These dollar figures actually reflect
22   the retail pharmacies' profits if the pharmacies
23   obtained the drug for free, right?
24       A    No.
25       MR. HONIK: Object to form.

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

1  BY MR. KNEPPER:
2      Q    Can you show me where in your
3  report -- well, let me strike that.
4          Earlier, we talked about dispensing
5  fees and how those were removed from -- you said
6  removed from the dispensing data produced from the
7  retail pharmacies, right?
8          THE COURT REPORTER:  From the what?
9          MR. KNEPPER:  From the retail
10  pharmacies' data.
11          THE WITNESS:  Earlier when, sir?
12  BY MR. KNEPPER:
13      Q    Earlier in the deposition when you
14  were talking to Ms. Kapke.
15      A    Sorry, who's Ms. Kathy?
16      Q    Ms. Kapke, Kara, who questioned you
17  this morning.
18      A    You mean for CVS?
19      Q    Correct.
20      A    I am following you now.  Thank you for
21  the clarification.
22      Q    Okay.  You said that you removed or --
23  or took into account the fact that what you called
24  dispensing fees were not included in the data that
25  was provided by the retail pharmacy defendants in

Page 171

1  this case.  Do you remember that?
2      A    That's not what I said, sir.  That's a
3  mischaracterization of my testimony.
4      Q    Well, we will go -- I'm not -- I'm not
5  trying to be controversial.  We can go to page -- or
6  Paragraph 78 of the report?
7      A    No.  I mean, why don't we just go to
8  the methodology for calculation of unjust enrichment
9  in --
10      Q    Let's go to Page 78 first.
11      A    -- Paragraph 64 --
12      Q    Let's go to Paragraph 78.
13          THE COURT REPORTER:  I can't do this.
14          THE WITNESS:  In Paragraph 64, where I
15  explain that -- that dispensing fees to
16  consumers were removed from the calculation,
17  the retailer unjust enrichment claims that were
18  enumerated by -- offset by pharmacies in
19  Table 3.
20  BY MR. KNEPPER:
21      Q    Okay.  Other than the statement that
22  the -- the dispensing fees were removed, where in
23  your report are you taking into account the fact
24  that these pharmacies had to pay for the medication
25  before they dispensed it.

Page 172

1          MR. HONIK:  Object to the form.
2          THE WITNESS:  That is of no moment in
3  my analysis, sir.
4          MR. KNEPPER:  Okay.  Let's go to
5  Paragraph 64, if we could.
6  BY MR. KNEPPER:
7      Q    Okay.  Before I ask about
8  Paragraph 64, in your experience in this industry,
9  would you agree that, before a pharmacy can dispense
10  a medication, it has to purchase either a finished
11  dose or the active ingredient?
12      A    Well, most pharmacies, in my
13  understanding, have significant stores of
14  prescription drugs already available for dispensing.
15  Walgreens, for example, and CVS is moving millions
16  of prescriptions per day through the U.S. supply
17  chain.  So those things are not stocked in an
18  instantaneous way.  They are stocked in a warehouse
19  and ready to be dispensed immediately when consumers
20  come, especially among generic drugs as frequently
21  used as the ones at-issue here.
22      Q    All right.  Is it your understanding
23  that the medication that you just referenced, stored
24  in Walgreens' warehouse, had to be at one time
25  purchased by Walgreens and stored in that warehouse?

Page 173

1      A    How is that in any moment to me, sir?
2      Q    Is that a yes?  I need to know.  Do
3  you agree that Walgreens would have to purchase the
4  drug, or do you believe that they get it for free?
5      A    It's not something, sir, that I
6  considered -- it's not in my report.  Nowhere do I
7  talk about the purchasing of these products by these
8  retail pharmacies, because that is not of moment.
9          The only thing that is of moment to my
10  analysis is that injury occurred at the point of
11  sale, and the only cost at the point of sale that is
12  relevant is the dispensing fee, which you, the
13  retailer, has already taken out of the data.  So by
14  definition, you have already -- you have already
15  said that, yes, that is the cost to you for each
16  individual prescription that you moved out of your
17  store.  You took it out.
18      Q    Okay.  I'm going to move forward.
19  This is not my line of questioning.
20          Paragraph 63 that you referenced and
21  64, Paragraph 63 says, "Retailers profited from the
22  sale of the at-issue valsartan," all right?  And
23  profits are defined as revenue minus costs.
24          And so what I'm asking you about is
25  how you calculated the profit that is contained in

44 (Pages 170 - 173)

Page 174

1 Table 3. And what I understand --
2    A    I --
3    Q    I'm not done with my question.
4       What I understand is that you took the
5 revenue that was reflected as being paid by -- the
6 patient responsibility, and you added that up by
7 state. And then you note that the dispensing fee is
8 not present, but unless you're going to tell me
9 there's some other data about the cost to acquire
10 the data that you can speak of the drugs that you
11 considered, I don't see where you considered the
12 cost of purchasing the drug. So can you explain
13 where that is in your report?
14       MR. HONIK: Object -- hold on a
15 second.
16       Object to form. Asked and answered.
17       You may answer.
18       THE WITNESS: Thank you.
19       The retail pharmacies subtracted the
20 fee, their costs for dispensing the product at
21 the point of sale. From their --
22    Q    I'm not talking about --
23       MR. HONIK: You cannot interrupt --
24 you cannot interrupt the witness.
25       MR. KNEPPER: I'm limited on time.

Page 175

1       MR. HONIK: In doesn't matter.
2       MR. KNEPPER: She is answering a
3 question I am not asking.
4       MR. HONIK: You're not permitted to
5 cut off the witness. If you -- we can stop the
6 deposition. That's up to you, but you can't --
7 you can't prevent her from answering.
8       MR. KNEPPER: Proceed.
9       THE WITNESS: Can you please read back
10 the question?
11       MR. KNEPPER: I'm going to ask you a
12 different one.
13 BY MR. KNEPPER:
14    Q    Can you cite --
15       MR. HONIK: Are you withdrawing the
16 question?
17       MR. KNEPPER: I'm withdrawing the
18 question.
19       MR. HONIK: Thank you.
20 BY MR. KNEPPER:
21    Q    Can you cite any piece of literature
22 to support your idea that one can calculate retail
23 pharmacy profits without including, as a cost, the
24 pharmacy's cost from actually procuring the goods?
25       MR. HONIK: Objection, asked and

Page 176

1 answered.
2       THE WITNESS: Sir, I'm going to use
3 the -- I'm going to walk you through this as
4 best as I possibly can, and simply, so I think
5 it will be very clear.
6       We asked the pharmacies what their
7 profits were, the revenue from the products
8 that they sold and their cost. Each retailer
9 provided us with only the revenues they
10 received from consumer payments, not the amount
11 of money that they received from the
12 third-party payors, which by definition, would
13 be larger than the consumers in this case.
14       Instead, the retailers limited the
15 data that they produced to just the payments
16 that the consumers paid in the form of
17 co-insurance and co-payments. The retailers
18 also only provided to us information about
19 that -- the cost that they viewed as being
20 relevant were the dispensing costs.
21 BY MR. KNEPPER:
22    Q    I thought you said that --
23    A    Excuse me. Hold on, please, sir.
24 Please let me finish.
25    Q    That was a long pause.

Page 177

1    A    Therefore -- therefore, I calculated
2 the profits as a function of revenue minus cost,
3 where the retailers only provided the payments that
4 were made by consumers minus the costs that they
5 provided, that they consented to were -- that were
6 the dispensing costs. From my perspective, those
7 are the costs of dispensing a prescription to an
8 individual patient.
9    Q    So can you point to a treatise that
10 supports the idea that you can calculate retail
11 pharmacy profits without including a cost of -- that
12 the pharmacy spent to procure the goods? Can you
13 point to that treatise?
14    A    This is the retailers' data. It's
15 on -- it's on the retailers to provide a treatise to
16 support their subtraction of -- or accounting of
17 only the dispensing cost. It's not on me. Injury
18 occurs at the point of sale. So it's the only thing
19 that matters at the point of sale.
20    Q    To calculate profit?
21    A    From the retailers' own perspective.
22 That is not -- has nothing to do with my
23 perspective. That is the retailers' data that was
24 provided to me.
25    Q    All right. The --

45 (Pages 174 - 177)

CONFIDENTIAL

1    THE COURT REPORTER: I'm sorry?
2    MR. KNEPPER: I was talking to myself.
3    Withdraw that. Or strike it.
4    BY MR. KNEPPER:
5    Q    I'm going to take it that, sitting
6    here today, you are not going to name a piece of
7    literature or treatise that will support the idea
8    that you can calculate the -- the profits of a
9    pharmacy if you don't include the amount of money
10    that the pharmacy spent procuring the goods?
11    MR. HONIK: Object to form. It's been
12    asked and answered. It's painfully clear that
13    you don't understand, and I -- I -- she can't
14    answer it any differently.
15    MR. KNEPPER: Okay. Then we'll move
16    on. I withdraw the question. I withdraw the
17    question.
18    THE WITNESS: I don't --
19    MR. KNEPPER: I'm withdrawing the
20    question.
21    THE COURT REPORTER: I can't hear
22    anybody. I hear nobody.
23    THE WITNESS: I don't -- are you
24    withdrawing the question and striking the
25    question? Because I'm more than happy to

1    answer your question.
2    BY MR. KNEPPER:
3    Q    No, I'm going to withdraw.
4    I feel like if there was a treatise
5    available, or treatise or an article or piece of
6    literature to support it, you would have named it.
7    I'm going to move forward.
8    MR. HONIK: Move to strike. That's
9    not a -- excuse me. That's not a question.
10    You can't testify.
11    MR. KNEPPER: Got it.
12    BY MR. KNEPPER:
13    Q    You understand that a dispensing fee
14    is typically set by a pharmacy benefit manager as
15    part of a pharmacy being in that pharmacy benefit
16    manager's network, right?
17    MR. HONIK: Objection, asked and
18    answered.
19    THE WITNESS: That is not my
20    answer -- that is not my understanding, sir.
21    There are many, many transactions here that
22    have nothing to do with the existence of a
23    pharmacy benefit manager.
24    BY MR. KNEPPER:
25    Q    I asked about the setting of a

1    dispensing. I believe earlier you testified --
2    A    No, that's not --
3    Q    I'm not done asking my question.
4    Earlier, you testified that a pharmacy
5    sets the dispensing fee. And I want to clarify my
6    understanding as -- in this industry is that
7    typically, the dispensing fee is set by a PBM as
8    part of the network agreement. Is that true?
9    A    That is not my understanding because
10    there are many, many dispensing prescription drugs
11    that have nothing to do with a pharmacy benefit
12    manager.
13    Q    I don't understand that answer.
14    MR. HONIK: Are you just going to make
15    comments and speak to yourself and create a
16    record?
17    MR. KNEPPER: Is that an objection?
18    THE WITNESS: That's what you're
19    doing.
20    MR. HONIK: That's what you're doing.
21    You're just -- it's like a color commentary to
22    the testimony. You're here and permitted to
23    ask a question and receive an answer. That's
24    it. You're not supposed to -- you know, reveal
25    your own befuddlement at the answers.

1    BY MR. KNEPPER:
2    Q    Under the -- you went -- in order to
3    calculate your damages model, I believe earlier you
4    said you tallied up the total amount of patient
5    responsibilities by state. And then you put on the
6    charts other and attached it to your report, right?
7    That's how you got to the full amount of damages?
8    A    I don't understand your question.
9    MR. HONIK: Object to form.
10    BY MR. KNEPPER:
11    Q    Are you aware that in some
12    circumstances a pharmacy might end up actually being
13    reimbursed less than the amount it paid to acquire a
14    drug?
15    MR. HONIK: Object to form, asked and
16    answered.
17    You can respond.
18    THE WITNESS: I don't understand the
19    question, sir.
20    BY MR. KNEPPER:
21    Q    Are you aware as an -- as someone who
22    is familiar with the industry and these
23    circumstances, which -- because of the reimbursement
24    that is offered by a third-party payor otherwise,
25    that a pharmacy may end up receiving less than the

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1 amount indicated in the expense to acquire the drug?
2          MR. HONIK: Object to the form, asked
3     and answered. Are you referring to pre- and
4     post-point of sale transactions?
5          MR. KNEPPER: I mean, I'm asking the
6     question.
7          MR. HONIK: She answered you. She
8     said she doesn't --
9          MR. KNEPPER: No, you answered it.
10         MR. HONIK: No, I didn't answer it.
11         MR. KNEPPER: You answered another
12    question.
13         MR. HONIK: She didn't understand your
14    question. I'm trying -- I'm trying to help
15    you.
16         MR. KNEPPER: I'm going to stop.
17         MR. HONIK: Okay.
18         MR. OSTFELD: I think that means I'm
19    up.
20    EXAMINATION BY MR. OSTFELD:
21    Q     Good afternoon, Doctor.
22         THE COURT REPORTER: Hold on. Who's
23    going next?
24         MR. OSTFELD: This is Greg Ostfeld --
25         THE COURT REPORTER: Hold on.

Page 183

1          MR. OSTFELD: -- from Greenberg
2     Traurig.
3          THE WITNESS: I'm sorry, I'd like to
4     take a break. I'll take five minutes, please.
5          MR. HONIK: Okay.
6          THE VIDEOGRAPHER: The time is 4:34.
7     We're going off the record.
8          (Whereupon, a short break was taken.)
9          THE VIDEOGRAPHER: The time is 4:40.
10    We're back on the record.
11    BY MR. OSTFELD:
12    Q     Good afternoon, Dr. Conti. My name's
13    Greg Ostfeld. And I represent the Teva group of
14    defendants, which includes both Teva and Actavis.
15    The good news is you're almost done.
16         So --
17    A     I hope you don't yell at me like the
18    previous attorney, or bully me.
19    Q     I'm not a yeller, Dr. Conti.
20    A     That sounds good.
21    Q     I mean, if we can try to be nice to
22    each other for the last 15 minutes, we can end on an
23    upbeat note going into the weekend.
24    A     Okay.
25    Q     When you calculated damages for

Page 184

1     manufacturers like Teva, did you make any
2     adjustments to account for differences in different
3     states, measures and damages?
4          MR. HONIK: Note my objection, asked
5     and answered. And to the extent it calls for a
6     legal conclusion, I further object.
7          But you may answer.
8          THE WITNESS: We have already talked
9     about this numerous times. So the theories of
10    liability and unjust enrichment are by
11    definition state specific. And therefore, the
12    calculations are, for each of the damage
13    calculations that are presented in my report,
14    are month, year, product and state specific.
15    BY MR. OSTFELD:
16    Q     Okay. And those calculations are
17    agnostic with respect to the state law measure of
18    damage for each state, correct?
19         MR. HONIK: Object to the form, asked
20    and answered.
21         THE WITNESS: Again, my understanding
22    is that they are based on instruction from
23    counsel.
24    BY MR. OSTFELD:
25    Q     Okay. So when you get instructions

Page 185

1     from counsel, the court or a jury, that would be
2     when you would make adjustments to account for
3     state-specific differences?
4          MR. HONIK: Object to form.
5          THE WITNESS: I think I'm a little
6     confused.
7          What I'm saying is, my damage
8     calculations that are presented in this report
9     are already adjusted for state-specific issues.
10    And there might be additional adjustments that
11    are made. My method is flexible to account for
12    them and would be up to the court or the jury
13    to decide.
14    BY MR. OSTFELD:
15    Q     All right. In my client's case, you
16    calculated separate damages for their generic
17    versions of Diovan and Exforge; is that right?
18         THE COURT REPORTER: Diovan and -- I'm
19    sorry.
20         MR. OSTFELD: Exforge.
21         THE COURT REPORTER: Yes. Uh-huh.
22         THE WITNESS: That is my
23    understanding, yes.
24    BY MR. OSTFELD:
25    Q     Okay. Now, the brand-name versions of

47 (Pages 182 - 185)

Page 186

1  those two drugs, those were not adulterated or
2  misbranded under the assumptions you've applied to
3  your method, correct?
4      MR. HONIK:  Object to the form.
5      THE WITNESS:  I don't understand.  I'm
6  sorry.
7  BY MR. OSTFELD:
8      Q    That's okay.  You were not asked to
9  assume that brand-name Diovan was adulterated or
10 misbranded for purposes of your analysis of this
11 case, correct?
12     A    So the products that are at issue are
13 enumerated in Footnote 3 and discussed in -- at
14 length in the complaint.  The attorneys, the
15 counsel, gave me the NDC codes and the month, years
16 at issue.  And that's what was applied to the data
17 that I got from IQVIA or to the retailers as we've
18 already discussed at length.
19     Q    Okay.  And you have not applied the
20 assumptions of adulteration or misbranding to any
21 other forms of valsartan beyond those that
22 were -- that you just described that are delineated
23 in your footnote and that were provided to you by
24 counsel by NDC code?
25     MR. HONIK:  Object to form.

Page 187

1      THE WITNESS:  Again, counsel provided
2      me the list of NDC codes.  We picked up a
3      number of additional NDC codes that were
4      repackaged or private-labeled but were related
5      to the upstream at-issue products, and then
6      applied that forward to the calculation.
7  BY MR. OSTFELD:
8      Q    All right.  During the same time
9  period that the at-issue valsartan was sold, did
10 brand-name Diovan have a legitimate supply curve?
11     A    Again, my opinion related to the
12 legitimate supply curve is related to the products
13 at-issue.
14     Q    Right.  And that's all I'm asking you.
15 For one of the products that's not at issue,
16 brand-name Diovan, did it have a legitimate supply
17 curve?
18     MR. HONIK:  Object to the form.  It's
19     been asked and answered, and it's beyond the
20     scope.
21     You may respond.
22     THE WITNESS:  Yeah.  I don't quite
23     understand your question.  I'm sorry.
24 BY MR. OSTFELD:
25     Q    Okay.  I'm going to ask you to make a

Page 188

1  different assumption from the assumption that you
2  made in preparing your analysis in this case.
3  Plaintiffs' counsel asked you to make one
4  assumption, I'm going to now ask you to make a
5  different one.
6      I will ask you to assume, for the
7  purposes of my next few questions -- and I know you
8  don't love hypotheticals.  But we're talking about
9  assumptions here, so I'm going to have to ask you to
10 make a few.
11     So I will ask you to assume, for
12 purposes of my next questions, that some
13 manufacturers' versions of generic valsartan were
14 not adulterated and/or not misbranded.  Okay?
15 That's the assumption I'm asking you to make.  The
16 question is coming.
17     A    In what time period, sir?
18     Q    During the same time period that the
19 at-issue valsartan was being sold.
20     A    Okay.  And they were in the retail
21 profit trade in the U.S.?
22     Q    Yes.
23     A    And their non-contamination was known
24 by the manufacturer and also communicated to the
25 FDA?

Page 189

1      Q    That -- sure.  We can make that
2  assumption as well.
3      A    And it was also asserted to or
4  attested to by those manufacturers to the
5  Food and Drug Administration and the downstream
6  consumers?
7      Q    That they were not adulterated and not
8  misbranded, yes.  You can make that assumption as
9  well.
10     A    Great.  And those attestations were
11 not incorrect, in fact?
12     Q    That is -- that is the assumption I'm
13 asking to you make, yes.
14     A    Okay.  Just trying to understand
15 exactly what contours of the hypothetical are.
16     Q    Absolutely.  I like that you are
17 precise, and I want to make sure you have a good set
18 of assumptions.  So you're comfortable with those
19 assumptions?
20     MR. HONIK:  Object to the form.
21     THE WITNESS:  I'll let you know if I
22     have other questions.
23 BY MR. OSTFELD:
24     Q    Okay.  Using the assumptions that
25 we've just agreed to, would it be your opinion that

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

1 there was a legitimate supply curve for
2 non-adulterated, non-misbranded, generic valsartan
3 drugs, applying all of the assumptions you just
4 made?
5    A    Yes, from a -- from a prospective form
6 perspective, if the products were not adulterated,
7 not misbranded and -- and were cGMP compliant in
8 their material production, and met all of the rest
9 of the FDA requirements, safety, efficacy, purity,
10 et cetera, then yes, correct.  They would be a --
11 there is a legitimate supply curve for those
12 products.
13    Q    And would that apply retrospectively,
14 as well, to the products that were already sold and
15 ingested?
16    A    No.
17    Q    And why not?
18    A    Because my analysis is a prospective
19 one, not a retrospective one.
20    Q    Understood.
21       So your analysis could not apply
22 retrospectively.  Understood.
23    A    No.  That's not what I said, sir.
24 That's not my testimony.
25    Q    Okay.  That's okay.  I'll move on.

Page 191

1       Under the same changed assumptions
2 that we just agreed to, would you agree that
3 non-adulterated, non-misbranded, generic valsartan
4 drugs have economic value as well as therapeutic
5 value?
6       MR. HONIK:  Object to the form.
7       THE WITNESS:  I have no opinion on
8 therapeutic value.  It was not of any moment in
9 my analysis because therapeutic value is -- is
10 related to the demand curve.  And I'm not
11 analyzing the demand curve here.  I'm focused
12 on the supply curve.
13 BY MR. OSTFELD:
14    Q    Okay.  I'll exclude therapeutic value
15 from my question.
16       Under the same assumptions that we
17 just agreed to, would you agree that
18 non-adulterated, non-misbranded generic valsartan
19 drugs have economic value?
20    A    In -- where there was no asymmetric
21 information?
22    Q    Correct.
23    A    Yes.
24    Q    And that economic value was true --
25 would be true of both consumers and third-party

Page 192

1 payors?
2    A    I just asked you about the condition
3 of asymmetric information.  If -- if consumers and
4 third-party payors, plus the regulator, all knew the
5 exact same information that the manufacturer did
6 regarding the purity, strength, adulteration or
7 non-adulteration, non-misbranding, et cetera, if the
8 product was exactly what it said it was or what was
9 represented, and every consumer and third-party
10 payor had full transparency over that, then, yes,
11 prospectively, that would make absolute sense that
12 there was full economic value.
13    Q    Okay.
14    A    We, of course, don't live in a world
15 of full information.
16    Q    Okay.  I understand that you have
17 relied on the allegations of the complaint
18 referenced in Footnote 1 in the first paragraph of
19 your report as the basis for your assumption of
20 adulteration and misbranding; is that correct?
21    A    I'm sorry.  There's a -- there's
22 numerous things that you said in that sentence,
23 so --
24    Q    Okay.  I guess what I'm trying to --
25 I'm not asking to you repeat testimony, but I want

Page 193

1 to make sure I accurately understand your earlier
2 testimony.
3       I think I understood you earlier to
4 testify that the basis for your assumption that the
5 at-issue valsartan was adulterated and misbranded,
6 is what is contained in the complaint in this case;
7 is that correct?
8       MR. HONIK:  Object to form,
9 mischaracterizes the testimony.  You can
10 respond.
11       THE WITNESS:  As instructed by counsel
12 and laid out in my report, yes.
13       THE COURT REPORTER:  I'm sorry.  I've
14 been instructed by counsel...
15       MR. HONIK:  As instructed.
16       THE WITNESS:  As instructed by counsel
17 and laid out in my report.
18       THE COURT REPORTER:  Thank you.
19 BY MR. OSTFELD:
20    Q    Other than the complaint, is there any
21 other basis on which you have relied for your
22 assumption that the at-issue valsartan of my
23 clients, Teva, was adulterated and misbranded?
24       MR. HONIK:  Object to form, asked and
25 answered.

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

1    THE WITNESS: Well, I think we've
2  already talked about this, that the FDA had
3  very -- there was a lot of communications about
4  the products at-issue and the contamination,
5  which includes discussions of the contamination
6  and the recall for the Teva-specific products.
7  BY MR. OSTFELD:
8    Q    Do you have any personal knowledge of
9  whether Teva's valsartan was adulterated or
10  misbranded?
11    A    Define "personal knowledge," sir.
12    Q    Is it your opinion that Teva violated
13  good -- current good manufacturing practices?
14    MR. HONIK: Object to form.
15    THE WITNESS: I mean, we talked about
16  this earlier. I'd be more than happy to go
17  through what the FDA said. It's --
18    THE COURT REPORTER: I'm sorry. What
19  was just said?
20    MR. OSTFELD: Guys, somebody needs to
21  mute.
22    MR. HONIK: It's Eric Abraham.
23    THE COURT REPORTER: Okay. So we
24  talked about this earlier. I'm more than happy
25  to go through what the FDA said...

Page 195

1  BY MR. OSTFELD:
2    Q    Doctor, I'll withdraw my question. I
3  see that I'm running short on time, and there's one
4  more topic I wanted to cover.
5    MR. HONIK: I think there's only a
6  minute or so left.
7    MR. OSTFELD: I think 2:45 is what
8  I've got on my timer.
9  BY MR. OSTFELD:
10    Q    You told Mr. Goldberg yesterday that
11  you wrote your declaration in this case. Did you
12  write the entire declaration?
13    A    I'm sorry, is that a compound
14  question?
15    Q    No. I'm asking, did you write your
16  entire declaration in this case? It's one question.
17    A    Are you asking me about what I said to
18  Mr. Goldberg?
19    Q    I'm asking you a separate question.
20  Did you write your entire declaration in this case?
21    A    I wrote my declaration in this case.
22    Q    Did anyone else draft any --
23    A    Hold on. With the assistance of my
24  staff.
25    Q    All right. Is your declaration in

Page 196

1  this case an original document that you prepared
2  specifically for this case?
3    MR. HONIK: Object to form. What do
4  you mean by "original"?
5    THE WITNESS: Yeah. I don't
6  understand what that means.
7  BY MR. OSTFELD:
8    Q    Are there any parts of your
9  declaration in this case that you copied or adapted
10  from another report in your case?
11    A    What other case?
12    Q    I'm asking you. Are there any parts
13  of your declaration in this case that you copied or
14  adapted from an earlier report in another case?
15    A    I'm asking you to be specific, sir.
16    Q    Any case, any report in any other
17  case.
18    A    I mean, I'm happy to go through and
19  look. Certainly, there are parts of my
20  qualifications that are pretty standard. So if we
21  can go through -- so we go -- I'm answering your
22  question, sir.
23    Q    I'm not asking you to go through your
24  report. I'm asking --
25    A    I have asked you for specifics several

Page 197

1  times. You --
2    Q    All right. Well, I'm going to
3  withdraw my question.
4    A    -- and now I'm going to try to answer
5  it.
6    Q    I'm going to withdraw my question, and
7  ask you a more specific question.
8    You previously prepared an expert
9  report in Blue Cross Blue Shield Association versus
10  GlaxoSmithKline?
11    A    I'm sorry, what case is that, sir?
12    Q    Blue Cross Blue Shield Association
13  versus GlaxoSmithKline.
14    A    Can you refer to me in my CV which
15  case that is?
16    Q    Did you copy or adapt portions of your
17  expert report in this case from your report in
18  Blue Cross Blue Shield Association versus
19  GlaxoSmithKline?
20    A    I'm asking you which specific case is
21  that. Can you point to me in my CV or in my
22  declaration what case that is?
23    MR. HONIK: Excuse me. Or
24  alternatively, show the witness the other
25  document, and she will compare it and answer

50 (Pages 194 - 197)

CONFIDENTIAL

1    your question, either way.
2    BY MR. OSTFELD:
3        Q    That is the name of the case in your
4    CV, ma'am.
5        A    Okay. So show me where it is in my
6    CV.
7        Q    I don't have your CV in front of me,
8    but let me pull it up.
9        A    Okay.
10        Q    If you look on Page 5 of your CV, the
11    second to last --
12        A    Give me a second to get there.
13    Page 5. Okay. So there are multiple reports, June,
14    August, September 2018. Blue Cross Blue Shield
15    Association et al. versus GlaxoSmithKline. Is that
16    the one you're talking about?
17        Q    That is the case that I'm talking
18    about.
19        A    And it says, "Written reports," with
20    an S, "and deposition," correct?
21        Q    Correct.
22        A    Okay. So as I mentioned before,
23    before you interrupted me, my qualifications don't
24    change much. So I'm assuming if we go to Page 4 of
25    this report, of the current report, I expect that

1    Paragraph 12 and probably Paragraph 13, probably
2    Paragraph 14, in whole or in part -- I think that
3    changed a little over time. Certainly Paragraph 15
4    has changed over time, because I've added that I've
5    been a consultant for the FDA's office of generic
6    drugs, that I'm currently serving as an ad hoc
7    advisor to the national finance -- advisor to the
8    Engineering invention -- Medicine's Committee on the
9    security --
10        THE COURT REPORTER: I'm sorry, one
11    more -- you're serving as an ad hoc advisor to
12    the...
13        THE WITNESS: I am currently serving
14    as an ad hoc advisor to the National Academy of
15    Sciences, Engineering and Medicine's Committee
16    on Security of America's Medical Supply --
17    Product Supply Change. That's new.
18        So 16 has definitely been updated to
19    reflect the fact that I was -- that I have
20    submitted testimony in another cGMP violation
21    matter, which is the case that we were just
22    talking about, the Blue Cross Blue Shield
23    versus GlaxoSmithKline case. But also, that
24    I've been involved in a variety of other cases
25    since that case concluded. That information is

1    also provided in my CV.
2        17 probably hasn't changed so much.
3    18 definitely has changed. 19 may or may not
4    be in that report. Then we can go through the
5    institutional background on the regulation.
6    BY MR. OSTFELD:
7        Q    Okay.
8        A    So that other case was also a cGMP
9    case, and many of the institutions are obviously the
10    same. Probably, there is overlap.
11        Q    To complete this exercise, would it be
12    helpful to you if I put the other report in so you
13    can compare them side-by-side?
14        A    I mean, there are actually multiple
15    reports, and there's a deposition. So which -- I'd
16    like to see them all.
17        Q    Well, I only have one, but I'll put it
18    on the screen. And if you --
19        A    I'm sorry. If you're going to provide
20    new information to me and ask me to compare and
21    contrast and go through, then I'd like to see them
22    all.
23        Q    Dr. Conti, I only have one. I can
24    only give you what I have.
25        A    Then I think -- then I think that we

1    don't have enough time to do this, in all fairness.
2    I'm more than happy to go through, line-by-line, my
3    report and other reports. But, you know, if you're
4    going to refer me to the reports that I -- that I
5    wrote for the center case, I want to do them all,
6    not just one, and not just cherry pick things that
7    might be convenient for you, but everything.
8        MR. HONIK: Yeah. And I think our
9    time is up. Justin, can you report to us where
10    we are?
11        THE VIDEOGRAPHER: Do you want me to
12    go off the record and do that?
13        MR. HONIK: Sure, off the record.
14        THE VIDEOGRAPHER: We are going off
15    the record. The time is 5:00 p.m.
16        (Whereupon, a discussion was held off
17    the record.)
18        MR. HONIK: Counsel has exceeded the
19    10-hour limit, number 1. Number 2, with --
20    astonishingly, with about 60 or 30 seconds
21    left, he produced one of, apparently, multiple
22    reports that are revealed in Dr. Conti's CV,
23    and has asked her to determine what parts of
24    it, if any, are replicated or appear in the
25    current report. She's not had an opportunity

51 (Pages 198 - 201)

CONFIDENTIAL

1    to look at the document, and now defendants
2    exist -- insist, having exceeded the 10-hour
3    limit, to mark an exhibit that the witness has
4    not seen or been given an opportunity to
5    review. Therefore, I object to its being
6    marked.
7          It's sort of like piling on at the end
8    and clipping news articles and asking them to
9    be attached as exhibits. It's entirely
10   improper. You haven't asked the witness a
11   single question, nor has she had an opportunity
12   to look at it, and I object.
13         MR. OSTFELD: I will state, for the
14   record, that the question I asked the witness
15   was, "Did you copy or adapt portions of your
16   expert report from Blue Cross Blue Shield
17   Association versus GlaxoSmithKline for your
18   declaration in this case?"
19         The witness then indicated that she
20   wished to go, paragraph by paragraph, through
21   her report and to compare it to the reports
22   from Blue Cross Blue Shield Association.
23         MR. HONIK: She did no such thing.
24         THE WITNESS: -- mischaracterizing my
25   statement --

1          MR. OSTFELD: Excuse me. Excuse me.
2    Please -- please allow me to finish my
3    statement for record, Ruben. I didn't
4    interrupt you.
5          And, Dr. Conti, I didn't interrupt
6    you. And these are being -- these are -- these
7    are records that are being made for the court.
8          So I then put into the record the one
9    report that I have in my possession from that
10   case so that Dr. Conti could reference it to
11   complete her analysis. There was a question
12   pending. We were trying to answer it in the
13   manner in which she wanted to answer it, which
14   was going through her report. And Mr. Honik
15   has now taken the view that time has expired.
16         I would object to terminating the
17   deposition when there was a pending question
18   and where counsel was attempting to provide
19   Dr. Conti with the mechanism she asked for to
20   answer the question.
21         MR. HONIK: Yeah. Mr. Ostfeld, that
22   is about as big a distortion as one could --
23   could possibly state. The witness did not ask
24   to go line by line. You asked her a question
25   without the -- excuse me -- without the benefit

1    of the document. She merely asked to look at
2    the document. And for minutes that took you
3    past, as a matter of fact, the 10-hour limit,
4    it's not my position that you went past the
5    10-hour time limit. You went past the 10-hour
6    time limit.
7          And you then finally offered her one
8    of the multiple reports that she prepared. And
9    she tried to answer your question, and it
10   ended. That's an improper use of an exhibit.
11   It is beyond the pale to have done so with 30
12   or 60 seconds. It's the worst form of lawyerly
13   got you imaginable, and I object. And we'll
14   move to strike at the appropriate time.
15         I can't prevent you saying it's
16   being -- it's being marked, but we will move to
17   strike it. And it is really unseemly that you
18   have chosen to do that.
19         That concludes the deposition.
20         MR. OSTFELD: This report is being
21   marked, and I will provide --
22         THE COURT REPORTER: I can only do
23   this one at a time. Greg -- Greg, this report
24   is being marked...
25         MR. OSTFELD: Hang on. Madam Court

1    Reporter, can you please hang on? I'll let
2    you -- don't talk over me so that you can't
3    hear what I'm saying.
4          Ruben, we know you are concluding the
5    deposition, but you can't do it the way you are
6    doing it. Okay? We still have to finish the
7    deposition the right way. You can't just stop
8    it. Okay. Yes, we can't just go off the
9    record in a ladder.
10         MR. HONIK: Yes, we're --
11         MR. GOLDBERG: Now, I'm gonna say
12   something, Ruben.
13         Dr. Conti, during the deposition, you
14   were texted by counsel. I'm going to ask you
15   that you not delete that text. Do not delete
16   any text that you received from counsel during
17   this deposition.
18         MR. HONIK: You're mischaracterizing
19   the record.
20         MR. GOLDBERG: Ruben --
21         MR. HONIK: No. No. No. No.
22         MR. GOLDBERG: We will address this
23   issue later, but it is important that this
24   record be preserved. And I don't want
25   Dr. Conti to leave until we have made that

Page 206

1  record.
2      MR. HONIK: You can make whatever
3  record you want.
4      MR. GOLDBERG: Now --
5      THE COURT REPORTER: I can't do this.
6  I can't. I can't do it. One at a time. One
7  at a time.
8      MR. GOLDBERG: Okay. Now that we have
9  done that -- okay. Let the record reflect that
10 the witness has just walked away during the
11 deposition.
12     MR. HONIK: Are you 12 years old,
13 Seth?
14     MR. GOLDBERG: No.
15     MR. HONIK: As far as the witness is
16 concerned, it's over. There are no more
17 questions that you may be permitted to ask
18 Dr. Conti. She can get up and stretch her
19 legs, do whatever she wishes in the world,
20 number 1.
21     Number 2, Mr. Ostfeld apparently has
22 now attached as an exhibit a report that makes
23 reference to an Austin and Burke PowerPoint
24 that Teva clawed back. So Teva has now waived
25 their privilege as to that document being

Page 207

1  admitted into evidence into this case. Is
2  there anything else you need to say?
3      MR. GOLDBERG: Yeah, I do. And then
4  certainly Mr. Ostfeld can.
5      We are keeping this deposition open,
6  because the witness has now testified during
7  the deposition, potentially, to documents that
8  she has not produced, including her invoices.
9  It's not clear whether there were other
10 documents that she hasn't produced. We'll come
11 back to you on that, Ruben. But we are not
12 closing this deposition until we get a complete
13 record from Dr. Conti of the work she has done
14 in response to the deposition notice.
15     Now, I'll turn it -- turn it to
16 Mr. Ostfeld to address your last point.
17     MR. OSTFELD: I am putting into the
18 record as an exhibit a document titled, "Expert
19 Report of Rena Conti, Ph.D" from the case
20 Blue Cross Blue Shield Association versus
21 GlaxoSmithKline.
22     This is taken from the public court
23 file in that case. It has the court stamp at
24 the top of it. It is document 286-2 from that
25 court file. That is the only document that I

Page 208

1  am attaching as an exhibit and putting in.
2      And I will provide it to the court
3  reporter as an exhibit. And we certainly do
4  not waive anything that is not in the public
5  court file in that case.
6      (Whereupon, Exhibit Conti 8 was marked
7  for Identification.)
8      MR. HONIK: Anything else?
9      MR. OSTFELD: That's it for me.
10     MR. HONIK: We're concluded. Thank
11 you, Jamie.
12     (Whereupon, the deposition concluded
13 at 5:08 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 209

1      C E R T I F I C A T E
2
3      I, Jamie I. Moskowitz, a Shorthand
4  (Stenotype) Reporter and Notary Public, do hereby
5  certify that the foregoing Deposition, of the
6  witness, RENA M. CONTI, Ph.D., taken at the time and
7  place aforesaid, is a true and correct transcription
8  of my shorthand notes.
9      I further certify that I am neither
10 counsel for nor related to any party to said action,
11 nor in any way interested in the result or outcome
12 thereof.
13     IN WITNESS WHEREOF, I have hereunto set
14 my hand this 17 day of February 2022.
15
16
17     _Janie Ilyse Moskowitz_
       Jamie Ilyse Moskowitz
       License No. XI01658
18
19
20
21
22
23
24
25

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

1  RUBEN HONIK, ESQUIRE
2  ruben@honiklaw.com
3           February 17, 2022.
4  RE:   In Re: Valsartan, Losartan, Et Al v.
5      2/11/2022, Rena Conti, PH.D (#5073516)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25

Page 211

1  In Re: Valsartan, Losartan, Et Al v.
2  Rena Conti, PH.D (#5073516)
3       E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Rena Conti, PH.D              Date
25

Page 212

1  In Re: Valsartan, Losartan, Et Al v.
2  Rena Conti, PH.D (#5073516)
3       ACKNOWLEDGEMENT OF DEPONENT
4    I, Rena Conti, PH.D, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  Rena Conti, PH.D              Date
13  *If notary is required
14       SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

54 (Pages 210 - 212)

CONFIDENTIAL

**[& - 4:40]**                                                                Page 1

| & |
|---|
| **&** 2:16,20 3:17 4:18 5:2,7,11 6:2 6:13,18 7:8 |

| 0 |
|---|
| **0** 88:14,20 |
| **02109** 6:15 |
| **07068** 2:9 |
| **07102** 6:11 |
| **08540** 5:21 |

| 1 |
|---|
| **1** 11:2 45:22 50:21 54:21 55:20 56:8 65:24 66:2,3,10,16 67:9 68:11,17,23 70:11,13 71:20 72:23 73:2,12 74:3,15,19 78:4 80:23 82:21 83:23 109:1 111:16 115:2 154:2,12,16 159:20 168:5 192:18 201:19 206:20 |
| **1,000** 132:5 153:10 |
| **10** 12:13 92:13,18 136:24 201:19 202:2 204:3,5,5 |
| **100** 2:13 6:10 10:5 |
| **1000** 3:13 |
| **1001** 5:14 |
| **10013** 2:18 |
| **10019-6119** 6:20 |
| **103** 2:8 |
| **10:14** 54:20 |
| **10:20** 54:19 |
| **10:22** 54:24 |
| **10:55** 75:24 |
| **11** 1:12 5:8 10:4 118:7 135:16 |

146:17 148:2
**1100** 2:4
**1154** 209:16
**11:03** 76:2
**11:41** 100:3
**11:46** 100:8
**11:49** 100:9
**12** 199:1 206:12
**13** 199:1
**14** 199:2
**1400** 7:9
**15** 82:25 183:22 199:3
**1515** 2:4
**15219** 3:20 6:4
**15th** 6:10
**16** 199:18
**17** 200:2 209:14 210:3
**1700** 4:20
**17th** 3:6
**18** 8:3 200:3
**182** 10:6
**19** 200:3
**190** 4:15
**19102** 2:4
**19103** 3:7
**1st** 27:21 48:8

| 2 |
|---|
| **2** 20:18 21:7,11,11 50:22 54:25 55:21 56:12,19 58:19 59:4,12,14 65:25 66:1,2,4,8,18 68:25 74:6,16,19 78:6 80:23 83:23 84:22 100:4 109:1 115:2 201:19 206:21 |
| **2,532,769** 56:25 |

**2/11/2022** 210:5
**20** 92:15 106:17 212:15
**20004** 3:13 5:14
**20006** 4:20
**2012** 27:21 114:14 143:10
**2018** 25:13,15 27:23 48:9 114:14 156:22 157:5,18 198:14
**2019** 27:23 48:9
**202.452.7900** 4:21
**202.624.2500** 5:15
**202.776.7800** 3:14
**2020** 143:8
**2022** 1:12 209:14 210:3
**208** 8:5
**21** 5:20
**212.355.9500** 2:18
**212.415.9357** 6:20
**214.855.8221** 4:12
**215.979.1000** 3:7
**2200** 4:11
**2220** 7:5
**227** 5:4
**23** 156:8
**230** 7:5
**250** 2:17
**267.435.1300** 2:5
**27th** 6:15
**28202** 5:4
**286-2** 207:24
**2875** 1:2
**2:45** 195:7

| 3 |
|---|
| **3** 20:19 21:9,12 28:11,23 55:21 56:12 58:19 59:10 59:14 63:1 66:1 |

74:9 80:23 83:23 100:10 109:1 112:22 113:8,14 115:2 154:13 169:14,16 171:19 174:1 186:13
**3,741** 19:11
**30** 3:6 13:11 201:20 204:11 210:17
**300** 4:20
**31** 159:23
**3100** 4:5
**312** 7:9
**312.456.1065** 4:6
**312.566.4803** 7:6
**314.480.1500** 4:16
**317.236.1313** 5:9
**32** 169:13
**32nd** 3:19
**33** 146:17
**3600** 4:11
**38th** 6:4

| 4 |
|---|
| **4** 15:6 94:24 95:1 95:2,8,12 111:17 111:18 154:5,16 154:18 198:24 |
| **412.263.4397** 6:5 |
| **412.560.3300** 3:20 |
| **45202-4029** 7:10 |
| **46204** 5:9 |
| **47** 118:18 |
| **4:03** 154:17 |
| **4:04** 155:16 |
| **4:05** 155:20 |
| **4:34** 183:6 |
| **4:40** 183:9 |

[5 - added]                                                                    Page 2

**5**

**5**   15:5 27:7 62:8
78:23 82:20 85:8
85:11 92:15,17,18
92:23 107:17
109:8 111:21
162:4 198:10,13
**50**   116:15,21
**500**   132:4
**504.524.5777**   2:25
**505**   3:13
**5073516**   210:5
211:2 212:2
**51**   6:19
**512.795.8686**   2:14
**513.698.5000**   7:10
**52nd**   6:19
**53**   6:15
**56**   83:3
**58**   160:13 161:7
**5:00**   201:15
**5:08**   208:13

**6**

**6**   13:11 89:7,10
94:12 95:2,18
**60**   27:7 28:18
48:23 73:7,7
75:18 77:8,23
78:3,9 156:6
160:6 201:20
204:12
**600**   4:15 5:4
**6001**   2:13
**60601**   4:5
**60606**   7:5
**609.924.0808**   5:21
**61**   48:23 75:18
77:8 78:7,9
**617.213.7045**   6:16

**62**   48:23 73:8
74:11
**63**   27:24 28:10,19
48:1 84:14 173:20
173:21
**63105**   4:16
**64**   48:1 61:7
171:11,14 172:5,8
173:21
**67**   156:25

**7**

**7**   8:3 18:6,10 20:2
29:3 31:25 34:18
44:3 47:23 49:3
51:10 52:6,9
**701**   2:24
**70130**   2:24
**704.444.3475**   5:5
**72**   74:18
**73**   74:18
**75**   138:7,14 139:24
148:7
**75201-7932**   4:11
**757.1100**   6:11
**76**   110:15,20
**77**   4:5
**776**   69:23
**78**   32:4,7,9 49:8
171:6,10,12
**78746**   2:13
**79**   55:16,20 73:23

**8**

**8**   8:5 10:7 15:6
127:25 128:2,17
208:6
**80**   122:8,15 130:22
130:23 132:24
**81**   127:1
**82**   136:19

**84**   61:20

**9**

**92**   118:2
**973**   6:11
**973.228.9898**   2:9
**9:04**   1:13 11:1
**9th**   3:13

**a**

**a.m.**   1:13
**aa**   33:21 34:5
**abbreviation**
33:21 34:5,10
**ability**   163:23
**able**   54:3
**abraham**   5:18
154:20,23 155:5
155:22,24 158:18
159:19 161:14
162:19 163:9,14
164:15,16 165:9
167:23 168:12
194:22
**absolute**   192:11
**absolutely**   75:2
118:12 189:16
**academic**   89:24
90:15 107:3
**academy**   199:14
**access**   40:11 42:22
107:12
**accommodate**
51:14 125:4
139:25 165:24
**account**   64:11
91:20 124:16
126:10 147:17
149:15 158:14
170:23 171:23
184:2 185:2,11

**accounted**   149:15
150:15
**accounting**   121:1
150:14 177:16
**accounts**   150:10
**accrues**   150:9
**accuracy**   210:9
**accurate**   45:7,8
**accurately**   43:23
193:1
**acknowledgement**
212:3
**acknowledgment**
210:12
**acquire**   123:6
174:9 181:13
182:1
**acquired**   26:19
130:5
**acquiring**   129:25
**act**   46:19
**actavis**   183:14
**action**   209:10
**actions**   1:5
**active**   172:11
**activities**   103:22
**actual**   17:6,7
30:22 31:19 62:2
63:3 64:18,19
65:17 91:3,21
96:3 118:24
131:20 133:20
162:8 166:18
**ad**   199:6,11,14
**adam**   2:7
**adapt**   197:16
202:15
**adapted**   196:9,14
**add**   70:21
**added**   174:6 199:4

**[adding - answered]**    Page 3

| | | | |
|---|---|---|---|
| **adding** 35:23 | 133:14 137:19,21 | **allocations** 68:20 | **anal** 147:21 |
| **addition** 31:4 | 138:19 143:2 | 68:21,22 | **analyses** 57:23 |
| 35:19 91:21 | 145:17,20 147:12 | **allotted** 210:20 | **analysis** 25:8 31:5 |
| **additional** 37:9 | 167:6 168:6 | **allow** 125:14 | 31:24 34:12,16 |
| 54:5 64:7,14 | 169:14 | 203:2 | 40:17 67:21 72:6 |
| 84:19 91:2 138:10 | **aggregated** 26:7 | **allowed** 25:22 | 103:3 156:21 |
| 155:9 185:10 | 35:20 44:16 64:2 | 135:25 | 157:9,16 158:9,24 |
| 187:3 | 147:6 | **alluded** 39:18 | 163:19,21 164:2 |
| **additions** 212:6 | **aggregation** 35:22 | **alternatively** | 165:20 166:2,7,21 |
| **address** 30:18 | 42:24 134:24 | 197:24 | 172:3 173:10 |
| 39:20 164:2 166:8 | **agnostic** 184:17 | **america** 40:21 | 186:10 188:2 |
| 205:22 207:16 | **ago** 160:5 | 74:25 | 190:18,21 191:9 |
| **addressed** 52:20 | **agree** 60:7 144:21 | **america's** 199:16 | 203:11 |
| **adjusted** 185:9 | 144:23 152:7 | **americsource** | **analyst** 51:23 54:3 |
| **adjustments** 184:2 | 172:9 173:3 191:2 | 101:18 | **analysts** 53:18 |
| 185:2,10 | 191:17 | **amerisourceberg...** | **analyzing** 191:11 |
| **administration** | **agreed** 167:24 | 7:11 101:16,19 | **andras** 4:3 |
| 189:5 | 189:25 191:2,17 | 102:2,15,19 | **andrast** 4:3 |
| **administrative** | **agreement** 106:5 | 103:16 110:16 | **annual** 132:7 |
| 166:9 | 180:8 | 111:7,11 112:1 | 144:2 |
| **admitted** 207:1 | **agreements** 106:3 | 113:11 132:6 | **answer** 9:3 38:13 |
| **adulterated** 27:23 | **ahead** 15:19 | 143:10,25 144:10 | 39:2,3,12 45:3 |
| 48:9 186:1,9 | 166:22 | 151:10 | 46:20 58:17 60:2 |
| 188:14 189:7 | **aid** 5:10 11:16 | **amount** 15:22 | 60:17 66:13,20,23 |
| 190:2,6 191:3,18 | 41:19 | 23:12 35:13,21 | 69:6 71:4,5 75:12 |
| 193:5,23 194:9 | **al** 198:15 210:4 | 39:23,24 57:4 | 76:12,18 79:12 |
| **adulteration** | 211:1 212:1 | 60:10,25 61:1 | 80:2 83:19 85:16 |
| 186:20 192:6,7,20 | **albertsons** 4:21 | 63:9,10,19 65:4,14 | 86:1,13 88:12 |
| **advance** 143:3 | 5:5 42:4,10,11,15 | 79:13 81:13 82:10 | 95:6 112:14 115:7 |
| **advisor** 199:7,7,11 | **alek** 3:5 | 82:23 83:1 89:4 | 120:3,14 125:14 |
| 199:14 | **alfano** 6:2 | 127:8 128:4 | 126:16 128:22 |
| **ae** 34:10 | **allegations** 99:13 | 130:16 131:17,17 | 131:25 139:13,16 |
| **aforesaid** 209:7 | 192:17 | 144:24 145:13 | 140:13 159:9 |
| **afternoon** 154:21 | **alleged** 27:11,13 | 176:10 178:9 | 161:9,18 174:17 |
| 154:22 155:23 | 157:6 | 181:4,7,13 182:1 | 178:14 179:1,20 |
| 182:21 183:12 | **allegedly** 163:17 | **amounts** 23:19 | 180:13,23 182:10 |
| **agents** 167:9 | 166:11 | 49:16,18,21 50:13 | 184:7 197:4,25 |
| **aggregate** 26:22 | **alleging** 83:15 | 63:16,21 65:17,18 | 203:12,13,20 |
| 30:10,19 55:17 | **allocation** 60:4 | 65:20 67:2 98:15 | 204:9 |
| 66:4,5 73:24,25 | 67:16,18,20 68:1,9 | 105:8 136:14 | **answered** 26:18 |
| 74:4,7,9 118:22 | 69:4 70:23 71:1 | 147:12 | 53:14 69:12 72:25 |

CONFIDENTIAL

[answered - attorneys]                                                    Page 4

73:10 79:11 97:7
98:23 153:8 159:7
174:16 176:1
178:12 179:18
181:16 182:3,7,9
182:11 184:5,20
187:19 193:25
**answering** 175:2,7
196:21
**answers** 180:25
**anticipate** 151:19
**anybody** 178:22
**apart** 166:14
**api** 106:19
**apologies** 35:11
**apologize** 45:11
154:6
**apparently** 201:21
206:21
**appear** 201:24
**appended** 212:7
**appendix** 13:13
**apples** 59:8
**applicable** 210:8
**applied** 61:5 126:2
186:2,16,19 187:6
**apply** 47:10
149:11 190:13,21
**applying** 190:3
**apportioned** 109:3
**apportionment**
60:4
**appreciate** 51:1
68:5 163:13
**appropriate** 36:1
36:10 128:3
147:23 204:14
**area** 112:24
**arizona** 56:16,24
58:6,8,13,25

**arrangement** 98:2
**arrangements**
96:13,17
**arrive** 63:23
**art** 22:5 94:4
119:25
**article** 118:1,10
179:5
**articles** 202:8
**aside** 64:17 65:1
**asked** 27:16 39:5
47:2,11 53:13
72:5,24 76:23
79:10 83:21 97:6
98:22 113:9
114:10 115:20
122:16 130:15
140:5 152:4 153:7
168:4 174:16
175:25 176:6
178:12 179:17,25
181:15 182:2
184:4,19 186:8
187:19 188:3
192:2 193:24
196:25 201:23
202:10,14 203:19
203:24 204:1
**asking** 11:17
13:16,17,19 18:20
19:3 35:4 38:10
41:1 42:10 66:14
72:7 77:23 81:4,6
86:3 87:1 92:4
93:24 94:3,9
120:2 137:6,7
139:7,8 141:19
142:14 163:3
165:1 173:24
175:3 180:3 182:5
187:14 188:15

189:13 192:25
195:15,17,19
196:12,15,23,24
197:20 202:8
**aslater** 2:8
**aspect** 90:14
**aspects** 89:21
**asserted** 189:3
**assess** 47:25
132:12
**assessed** 96:23
**assessing** 70:25
**assessment** 71:7
**assessments** 25:11
**assigned** 161:13
**assignment** 71:3
71:12 159:12
**assistance** 195:23
**associated** 26:3
65:22 92:24 99:5
**association** 8:6
197:9,12,18
198:15 202:17,22
207:20
**assume** 27:16
32:14 36:10 39:8
68:12 69:19 70:8
83:21 113:9
114:10,24 115:20
186:9 188:6,11
**assumed** 79:3
157:15
**assuming** 32:16
43:16 98:8 143:13
144:9 198:24
**assumption** 33:25
38:19,21 143:16
157:9 188:1,1,4,15
189:2,8,12 192:19
193:4,22

**assumptions** 45:18
51:14 53:20 69:9
79:4 113:5 186:2
186:20 188:9
189:18,19,24
190:3 191:1,16
**astonishingly**
201:20
**asymmetric**
114:15 157:23
158:11 163:20
191:20 192:3
**attached** 181:6
202:9 206:22
210:11
**attaching** 208:1
**attachment** 15:5,7
41:25 44:19 45:22
46:16 47:3,24
53:4 56:14,21
58:4 62:3,4 63:4
64:19,20 109:9,12
109:17 111:14,16
111:18
**attachments** 44:7
44:19 47:19,21
51:8,12 52:16
74:3
**attempt** 71:17
**attempted** 116:10
**attempting** 203:18
**attention** 156:6
**attestations**
189:10
**attested** 189:4
**attorney** 38:11
112:11 125:11
183:18 210:13
**attorneys** 29:24
186:14

CONFIDENTIAL

[attributable - c]                                                                     Page 5

**attributable** 160:1
  166:10
**attribution** 34:13
**august** 25:15
  156:22 157:5,18
  158:22 198:14
**aurobindo** 3:21
  69:21
**austin** 2:13 206:23
**available** 154:5
  158:12 161:22
  166:25 172:14
  179:5 210:6
**avenue** 4:11 5:14
**average** 84:22,24
  85:12,20 86:7,20
  87:12 88:2,2,4,9
  89:12 94:16 95:21
**averages** 119:5,5
**award** 65:12
**aware** 13:22 33:19
  33:20,23 40:23
  42:25 43:10 92:22
  123:19,23 124:1
  135:11 148:20
  181:11,21
**awash** 135:10
**awsmolij** 3:5

**b**

**b** 3:6 5:3 7:3 8:1
  13:11,13 15:5,19
  18:17,23 19:6
  29:12 41:25 109:9
  109:12,17 111:14
  111:16,18 123:14
  132:14
**back** 11:2 27:6
  28:11 29:2 34:17
  35:25 36:2 47:25
  49:6 51:16 53:21
  54:11,25 58:20

60:18 64:21 65:24
  73:1 75:17 76:3
  95:1 100:7,10
  106:8 110:21
  112:21,24 113:4
  127:24 129:2
  130:22 154:18
  155:21 162:1
  175:9 183:10
  206:24 207:11
**background** 27:3
  105:19 132:19
  155:13 200:5
**backs** 145:15
  148:5,11 166:8,9
**backup** 18:20,22
  19:3,7,25 20:15
  21:5 118:6 168:4
**bad** 22:7,8 54:10
**bag** 91:11,17 93:7
**barcode** 136:2,7
**bargaining** 151:12
**barnes** 5:7
**base** 106:19 129:9
  131:9
**based** 29:21 51:9
  53:19 63:25 65:3
  86:16 126:5
  131:20 134:18
  184:22
**bases** 68:16
**basic** 84:17 129:10
  141:20
**basically** 49:1
  124:6 147:10
**basis** 31:4 44:5
  60:19 70:17
  192:19 193:4,21
**batch** 118:24
  133:19

**bates** 17:24 18:3
**bazan** 3:11
**befuddlement**
  180:25
**beginning** 28:12
  28:12 73:20 127:1
  142:3
**begins** 11:2 54:25
  100:10 154:18
**believe** 97:15
  111:14 156:19
  173:4 180:1 181:3
**benefit** 168:2
  169:6 179:14,15
  179:23 180:11
  203:25
**benefits** 93:11
**bennett** 24:21
  25:17 31:21
**berne** 7:8
**bernstein** 2:16
**best** 101:6 132:20
  176:4
**beyond** 70:19
  86:23 139:15
  145:4 186:21
  187:19 204:11
**big** 150:7 203:22
**bill** 78:23 166:8
**bills** 25:3,12,13
**bily** 7:13
**bipc.com** 4:19 5:3
**bit** 19:14 108:13
  111:13 120:25
  123:12 151:17
**bizarre** 92:22
**blackwell** 4:14
  168:20,23
**blank** 33:10
**blue** 8:5,6 197:9,9
  197:12,12,18,18

198:14,14 199:22
  199:22 202:16,16
  202:22,22 207:20
  207:20
**bockius** 3:17
**bold** 2:13
**bosick** 6:2
**boston** 6:15
**bottles** 147:5
**bottom** 69:24
  146:17
**boxes** 147:8
**brand** 185:25
  186:9 187:10,16
**branded** 99:4
**break** 54:16,23
  55:3 75:22 76:1,5
  76:24,25,25 78:4
  99:23 100:6 150:2
  154:15 183:4,8
**breaking** 77:9,16
**breaks** 76:6,16
  108:24
**bresnahan** 5:12
**brick** 32:14
**brief** 168:8
**briefly** 155:2
**broader** 17:13
**btlaw.com** 5:8
**buchanan** 4:18 5:2
**build** 53:18
**bully** 183:18
**bundle** 152:10
**burke** 206:23
**business** 102:4
  132:10 146:6
**busy** 108:16

**c**

**c** 2:1,23 3:1 4:1 5:1
  6:1 7:1 31:25 61:7
  209:1,1

CONFIDENTIAL

[c.whiteley - charge]                                          Page 6

**c.whiteley** 2:21
**cabraser** 2:16
**calculate** 47:16
  49:12 54:12 72:5
  116:11 125:25
  133:3,10 135:8
  140:5 161:7
  175:22 177:10,20
  178:8 181:3
**calculated** 58:24
  59:1 66:8 73:2
  125:23 167:19,22
  173:25 177:1
  183:25 185:16
**calculating** 61:21
  86:7,16 90:3
  115:24 116:5
  122:17 124:15
  138:7 139:9
  156:14
**calculation** 17:13
  20:13,24 21:13
  24:24 51:22,24
  53:24 56:23 59:6
  62:2 65:10 66:16
  66:17 87:16
  106:14 125:16
  126:6 127:18
  129:2,9 130:7,9
  140:8,24 160:4,13
  165:22,23 167:18
  169:17 171:8,16
  187:6
**calculations** 17:6
  17:8 21:6 44:5
  53:19 54:6 58:5,7
  63:3 66:10 98:19
  116:4 124:8
  138:23 149:13
  162:24 163:13
  184:12,13,16

185:8
**call** 17:9 119:11
  120:13 133:24
**called** 47:23
  109:19 111:19
  170:23
**calls** 45:10 58:16
  67:15 83:18 85:25
  86:11 122:25
  124:4 126:14
  139:3 145:7 184:5
**camp** 2:24
**campbell** 5:13
  10:5 100:12,14,18
  100:25 101:4,7,21
  104:21 106:1
  107:15 109:6,10
  110:22 112:20,23
  113:1 114:5,21
  115:15 116:8,14
  116:16 119:14
  121:7 122:7,9
  123:15 124:13
  125:6,19 126:22
  127:23 128:15
  129:1,14 130:8,19
  130:21,24 132:22
  135:19 138:13
  139:6 140:3,16,21
  140:22 141:3,22
  142:1,4 144:20
  146:1
**capital** 94:21 99:7
**captured** 64:13
**card** 78:19,24
**cardinal** 5:15
  101:15,23 102:2
  102:15,20 103:16
  111:6,11 112:1
  113:12 132:6
  143:11,17,25

**care** 121:25
**carlo** 5:19
**carolina** 5:4
**carondelet** 4:15
**carve** 146:13
**case** 12:7,24 13:7
  14:20 29:10,14
  31:3 37:12 41:12
  42:9 60:22 71:13
  74:22 99:13,14
  100:20 105:1
  107:5 109:19,22
  109:24 110:3
  111:3 112:2
  114:22 115:5,23
  118:9,14 121:18
  135:22,22 149:1
  151:24 152:17
  167:17 169:9
  171:1 176:13
  185:15 186:11
  188:2 193:6
  195:11,16,20,21
  196:1,2,9,10,11,13
  196:14,16,17
  197:11,15,17,20
  197:22 198:3,17
  199:21,23,25
  200:8,9 201:5
  202:18 203:10
  207:1,19,23 208:5
**cases** 31:9 116:9
  199:24
**cash** 77:10,18
  78:11,14,20,21,21
  79:2,6,9 80:17,17
  81:10,15,17,20,20
  81:24,24 166:9
**categories** 48:17
**category** 142:16

**caveat** 47:8,11
**cdehart** 5:20
**center** 6:10 201:5
**centre** 3:19 6:4
**cents** 98:17
**cert** 168:8
**certain** 96:18,18
  96:19 105:22,24
  115:20 145:18
**certainly** 103:13
  106:25 196:19
  199:3 207:4 208:3
**certified** 1:14,15
**certify** 209:5,9
**cetera** 137:24
  151:18 190:10
  192:7
**cgannon** 6:8
**cgmp** 190:7
  199:20 200:8
**chain** 37:7 103:6
  106:21 114:18,20
  117:9,17 120:1,10
  120:17 121:15
  135:2 136:5
  142:13 145:21
  164:8,19 172:17
**change** 51:5 54:4,5
  152:24 198:24
  199:17 211:4,7,10
  211:13,16,19
**changed** 53:3
  191:1 199:3,4
  200:2,3
**changes** 210:10
  212:6
**changing** 75:19
**characterization**
  60:13
**charge** 16:5 82:23
  91:13 145:15

CONFIDENTIAL

**[charge - concluded]**

148:5,11 166:8
**charged** 23:21
 97:11
**charlotte** 5:4
**charts** 181:6
**cheap** 146:10
**check** 13:13,14
 20:10,24 21:3
 29:7 31:11 33:13
 43:25 79:4 108:15
 157:2
**checking** 20:11
**checks** 31:15
**cherry** 201:6
**chewing** 71:16
**chicago** 4:5 7:5
 15:24 16:4,12
 104:6
**chosen** 204:18
**christine** 6:8
**christopher** 5:3
**christopher.henry**
 5:3
**cincinnati** 7:10
**circumstances**
 181:12,23
**cite** 175:14,21
**cited** 12:17
**claim** 39:23 49:22
 64:2,25 123:22
**claiming** 65:14
**claims** 15:8,14,18
 17:10,11,24 20:13
 21:20 22:1,3,12
 23:5 26:15 29:19
 29:21 30:22 31:20
 32:18 33:9,17
 36:12,19,21 37:17
 39:8 40:24 41:2
 41:15 42:7 43:5
 46:19 48:21 49:15

49:15 50:8,9,15,17
 50:22 57:6 59:12
 65:3,19 67:1,3
 71:11 74:11
 171:17
**clarification**
 169:11 170:21
**clarify** 86:4 128:1
 180:5
**clarifying** 36:7
**class** 12:24 13:2
 77:8,15 85:22
 86:10,23 101:10
 101:11 121:12
 122:2,5 123:4
 136:1,4 168:8
**classes** 164:4
**clawed** 206:24
**clean** 31:10
**clear** 54:2 74:19
 160:23 176:5
 178:12 207:9
**clearer** 95:23
**clearly** 45:23
 57:21 94:1 95:24
**clerk** 91:11
**client** 38:11
**client's** 185:15
**clients** 193:23
**clinics** 117:15
 121:24
**clipping** 202:8
**close** 101:5
**closed** 102:10
**closely** 151:25
**closing** 207:12
**coan** 6:14
**code** 22:17 25:7,20
 26:21 29:14 35:5
 40:14 59:7 119:6
 133:19 186:24

**codes** 24:10 29:21
 29:25 30:5 50:10
 51:21 54:5 57:13
 118:22 186:15
 187:2,3
**coleen** 3:4
**collaboration**
 104:17
**collaborative** 16:5
 16:6
**collect** 37:2 40:20
**collected** 17:14
 96:10
**collecting** 16:23
**collectively** 113:12
**color** 180:21
**column** 29:9,12
 31:25 34:20 35:8
 35:8,12 68:11
 70:12,13 72:23
**columns** 19:16
 29:6
**come** 127:6 162:3
 172:20 207:10
**comes** 123:19
**comfortable** 34:14
 53:16 189:18
**coming** 110:2
 188:16
**commencing** 1:13
**commentary**
 180:21
**comments** 164:9
 180:15
**commercial** 23:24
 96:25
**committed** 83:16
**committee** 199:8
 199:15
**commonly** 99:11

**communicated**
 188:24
**communication**
 38:19 76:10
**communications**
 76:6,22 77:1
 194:3
**companies** 12:24
 42:21,23 131:6,10
 132:5,9 153:15
**company** 151:8
 153:10
**compare** 197:25
 200:13,20 202:21
**compared** 64:19
**comparing** 59:8
**complaint** 27:17
 28:13,24 83:22
 115:2 186:14
 192:17 193:6,20
**complete** 53:22
 200:11 203:11
 207:12 212:8
**completed** 210:17
**completely** 71:11
 164:21
**completion** 31:11
**compliant** 190:7
**components** 105:3
**compound** 39:6
 166:13 195:13
**computer** 106:9
 132:3 155:14
**concept** 42:25
 146:23 152:19
**concern** 86:15
**concerned** 206:16
**concerns** 67:21
**concluded** 199:25
 208:10,12

CONFIDENTIAL

**[concludes - copy]**                                                        Page 8

concludes  204:19
concluding  11:8
  205:4
conclusion  45:10
  45:17 58:16 60:1
  67:15 69:2 83:18
  85:25 86:12
  119:11 120:13
  126:14 139:3
  145:8 184:6
concomitantly
  168:7
concrete  82:25
condition  192:2
conduct  114:25
  115:5
conducted  166:2
confer  13:23
  154:11
conferences  102:9
  103:17
confidential  1:8
  70:2 76:9 166:25
confidentiality
  106:2,5 125:12
confine  25:22
confined  156:21
confirm  13:6 35:4
  37:16 38:20 46:4
  111:24 119:7,20
confirmed  68:18
confirms  38:24
confused  185:6
conjunction  163:1
conlee  2:21
consented  177:5
consequently
  128:3 133:2
consider  43:4
  137:2,15 148:5
  165:20

consideration  92:5
considerations
  146:13
considered  70:1,2
  138:21 139:22
  148:8 167:3 173:6
  174:11,11
considering  37:4
consistent  156:24
consultant  199:5
consume  168:13
consumed  159:16
consumer  19:18
  23:22 35:10,12
  39:19 40:2,16
  41:4 43:7 46:18
  49:16,21 50:12
  56:15,24 58:12
  59:17 60:23 61:2
  63:15 67:10 68:10
  70:13 71:20 72:9
  72:11,22 77:8,15
  85:11 89:11 92:7
  93:9,9 94:15,17,18
  117:14 119:8
  120:11 159:13
  160:1 161:25
  163:5,12,21 164:4
  176:10 192:9
consumers  22:15
  30:10 48:4 50:6
  63:22 65:13 67:2
  67:9,10 69:22
  70:12,15 71:21
  77:20 84:23 85:3
  85:13,21 86:8,9,9
  86:16,21 87:13
  88:3,5,10,24 89:9
  89:13 90:10,17
  94:12 95:3,14,18
  95:20,22 97:11,20

106:24 119:25
  121:20 133:1
  157:10 158:1
  160:20 162:9,18
  165:16 166:16
  171:16 172:19
  176:13,16 177:4
  189:6 191:25
  192:3
contain  30:12 42:7
  53:22 136:8 157:6
contained  33:5,6
  52:5 147:12
  157:18 173:25
  193:6
contaminated
  157:11,12 159:17
  163:25 165:25
  166:11
contamination
  114:16 157:25
  158:16 188:23
  194:4,5
content  144:17
contents  10:1
  33:15
context  101:22
  102:1 105:11
  117:8 129:17
  140:6,15,17,23
contexts  101:16
conti  1:11 2:5 8:3
  8:5,5 10:2 11:15
  15:5 18:6,10 20:2
  27:7 29:3 44:3
  47:23 49:3 51:10
  55:3 68:19 70:24
  76:5 87:22 100:13
  100:22 101:8
  109:8,11 110:23
  111:18 113:2

116:17 122:11
  154:4,21 155:23
  159:4 162:20
  168:4 169:15
  183:12,19 200:23
  203:5,10,19
  205:13,25 206:18
  207:13,19 208:6
  209:6 210:5 211:2
  211:24 212:2,4,12
conti's  201:22
continue  146:21
continues  148:3
contours  189:15
contract  143:14
  144:9,11,12
  150:22 151:9
  152:6 153:1
contracted  143:2
contracting  143:7
  143:9
contracts  143:1,4
  143:17 145:2,5,11
  145:23 146:3,5
  151:22 152:9,16
  152:20,21,21,24
  153:2,24
contrast  200:21
contribute  88:14
controversial
  57:17 77:5 171:5
convenient  201:7
conversation
  148:12
conversations
  135:7,21
copied  196:9,13
copies  210:14
copy  197:16
  202:15

[corporation - court]                                                                        Page 9

**corporation** 4:12
110:16
**corporations**
144:2
**correct** 12:14 13:8
13:9,16 15:11
24:14 25:4,13,14
29:8,10,15 32:1,3
32:15 35:16,17,19
35:23 42:6 44:4
44:14,17 45:1,4,7
45:19 47:10,24
49:3 56:4,12 57:7
57:8 58:7,14
60:10,15 62:22
63:2,9 65:5 66:11
67:11 68:20 79:20
84:6 85:9,10
108:2 111:22,23
112:2,3 114:9
115:5,8,8 116:2
119:9,22 120:1,4,5
121:9 127:3
128:14,19 132:1,2
132:3 146:23
149:9 152:24
156:17,18,22,23
157:2 158:24,25
160:8 169:20
170:19 184:18
186:3,11 190:10
191:22 192:20
193:7 198:20,21
209:7 212:8
**corrections** 212:6
**correctly** 94:5
**correspondence**
13:24 103:20
**corresponds** 44:8
**cost** 48:6 50:4
64:11 65:20,20

82:8 85:12,21
86:7,18,20 87:13
88:2,3 89:12,14
90:10,16,19,24,25
91:9,10,11,14,21
92:6 93:2,6,7,7,10
93:14,19,20,22,25
94:7,11,14,17,18
94:20,23 95:1,2,12
95:13,13,14,16,18
95:21 98:20,25
99:2 126:25
127:10,19 129:24
133:20 134:8,9
138:1 145:2
146:16 147:24
148:2,2,4,9 149:4
149:12,25 150:2
150:12 173:11,15
174:9,12 175:23
175:24 176:8,19
177:2,11,17
**costco** 132:8 144:3
**costs** 61:12,13,16
64:7,14 84:18,22
88:22,23 89:8,8,25
90:4,5 91:2,18,21
92:1,15,17 93:2,2
93:23 94:10 95:9
95:9,10,10,17 99:5
99:7 130:6 135:12
138:10 149:18,19
149:20 150:2,4,5,5
150:9,10,11,17
173:23 174:20
176:20 177:4,6,7
**costumer** 143:20
**counsel** 2:5,10,14
2:19,25 3:8,14,21
4:6,12,17,21 5:5
5:10,15,22 6:5,12

6:16,21 7:6,11
11:8,10 13:24
36:9,16,18 37:8,15
38:9,22 39:7 45:1
45:18,24 46:3,13
46:19,24 47:7,16
50:11 76:10,14
104:2 112:8 113:9
115:14 122:17
124:24 125:3
126:15,20 132:18
138:23 140:2
149:2,16 154:10
161:4 163:10
166:5 168:7,17
184:23 185:1
186:15,24 187:1
188:3 193:11,14
193:16 201:18
203:18 205:14,16
209:10 210:14
**counsel's** 127:14
127:17
**count** 158:14
**counted** 43:23
59:4 149:23
150:20
**counter** 63:22
79:14 91:12,17
94:22 166:19
167:13
**counterfeit** 135:5
**counting** 97:9
158:11
**couple** 27:18
68:16 77:3 99:10
103:10 108:16
123:17 131:2,2
132:23
**course** 31:2,8
102:3 103:1

107:13 110:4
146:6 192:14
**coursework**
101:10,11
**court** 1:1,14 11:12
14:5,7 16:1,9
17:18 23:6 24:16
34:1 45:2 57:11
59:20 61:23 64:4
66:21 67:17,19
69:4,12 71:8 75:8
77:11,15 80:13
81:22 91:5,8
96:14 97:22
100:16,25 101:2
101:17,20 104:15
105:7,13 107:10
110:18 112:17
113:20 114:19
115:10 120:19
121:4 125:1,3
126:20 128:12,23
129:12,15 130:1
131:24 132:15
135:13 138:9,11
138:23 140:1,19
141:25 149:3,6,17
149:22 150:18
153:16,19,21
158:4 162:13,16
164:13 165:6
166:5 167:20
169:2,4 170:8
171:13 178:1,21
182:22,25 185:1
185:12,18,21
193:13,18 194:18
194:23 199:10
203:7 204:22,25
206:5 207:22,23
207:25 208:2,5

**cover** 143:4 195:4
**covered** 74:21
**covers** 97:24
**cpudt** 95:21
**crazy** 87:8
**create** 29:19 47:20
    51:7,11 52:16
    53:6 180:15
**created** 24:15
**creation** 21:19,25
**credit** 78:19,24
**criteria** 161:11
    162:5
**critical** 25:8
**cross** 8:6 122:3
    197:9,12,18
    198:14 199:22
    202:16,22 207:20
**crowell** 5:11
**crowell.com** 5:12
    5:13
**cs** 210:15
**culbertson** 6:13
**current** 194:13
    198:25 201:25
**currently** 13:1
    199:6,13
**curve** 187:10,12
    187:17 190:1,11
    191:10,11,12
**customer** 23:19
    30:18 35:8 41:2,3
    41:4,5,6,7 61:10
    92:14 141:13,16
    141:21,24 142:3,5
    142:10,14,15
    144:14 145:6
    150:24,25
**customers** 141:7,9
    141:11 142:12,18
    142:22,23 143:15

143:19 144:5
    145:22
**cut** 38:3,4 155:1,2
    175:5
**cv** 16:22 197:14,21
    198:4,6,7,10 200:1
    201:22
**cvs** 5:10 11:16
    15:23 16:16 41:19
    42:4,15,15 56:16
    56:24 57:7 58:6
    58:13 63:5,6,15,25
    64:8,25,25 65:3
    75:1 98:5 99:13
    170:18 172:15
**cwhill** 3:4

**d**

**d** 4:14,19 6:18 7:8
    34:20 80:22 84:23
    85:3,13 88:24
    89:11,12 95:14,19
    95:22
**d'lesli** 4:10
**d.stanoch** 2:22
**daily** 26:1 107:13
    110:5
**dallas** 4:11
**damage** 37:13
    57:8 66:7 122:1
    124:8 165:23
    184:12,18 185:7
**damages** 8:3 18:7
    18:18 20:4 21:13
    44:4 48:18 49:9
    49:10,13,14 55:8
    55:15,17 56:8,9,16
    56:24 58:9,12,13
    58:21,24 59:5,18
    66:4,5,6 67:9,10
    67:12 68:8,11,13
    70:12,13,15,25

71:20 72:10,23
    73:12,24 74:1,4,7
    74:10,13,16,16
    84:1,3,5 106:14
    115:25 116:11
    122:18 124:1,15
    125:22 126:24
    127:5,12,18 128:3
    128:10 129:3,10
    130:10 133:4,10
    156:14,21 158:23
    159:12 160:1,12
    160:14 161:8
    162:1 163:5,12,12
    164:2,3 165:20,21
    166:4,7,17 167:19
    167:22 168:6
    169:15,16 181:3,7
    183:25 184:3
    185:16
**dan** 100:14
**dana** 3:6
**daniel** 5:13
**data** 14:17,17 15:7
    15:8,14,14,18,22
    16:4,5,14,21,24
    17:9,10,11,24
    20:15 21:19,20,23
    21:24,24 22:1,3,3
    22:3,10,12,14,19
    23:5,12 25:19
    26:10,15 29:19,21
    30:8,19,22 31:10
    31:11,15,16,20
    33:9,17 34:15
    36:10,12,19,21
    37:2,4,4,9,11,16
    37:17 38:4 39:8
    39:15,17 40:7,11
    40:19,24 41:2,2,3
    41:7,10,15,17,22

42:6,7,11,15,16,23
    43:1,5,7,11,12,16
    43:17,20,24,25
    44:12 49:15,23
    51:16 52:1,1,12,13
    52:15,18 53:6,17
    53:20,22 54:10,10
    54:11 57:6,23
    60:9 65:3,10
    66:15 67:5 81:9
    89:19 96:1,4
    102:14 104:6,12
    104:19,22,24
    105:4 106:3,13
    107:9,11 110:17
    110:19 111:19,25
    112:4,19 122:4
    124:21,23 125:16
    126:5 132:12
    133:3,9,17,20,23
    133:25 134:2,6
    135:10,23 147:21
    147:25 148:24
    160:19 161:2,10
    161:21,23 162:2
    163:6 166:1,20,24
    167:11,11 168:4
    168:10 170:6,10
    170:24 173:13
    174:9,10 176:15
    177:14,23 186:16
**dataset** 50:10
    53:21
**datasets** 49:15,22
**date** 25:9 30:16
    40:1 69:20 156:15
    211:24 212:12
**dates** 25:17
**david** 2:22
**davis** 2:11,12 4:10

CONFIDENTIAL

**[day - different]**                                                                      Page 11

**day** 23:15 31:18
93:1 106:16 118:8
135:16,17 172:16
209:14 212:15
**days** 103:11
210:17
**dc** 3:13 4:20 5:14
**dcampbell** 5:13
**deal** 99:8
**dealing** 151:9
**dean** 154:7
**decide** 127:4 149:7
150:19 185:13
**decided** 137:17
**declaration** 13:15
74:3 110:9 114:23
115:4 195:11,12
195:16,20,21,25
196:9,13 197:22
202:18
**declarations** 13:16
110:25
**declare** 212:4
**deductions** 61:24
138:9
**deduplicated**
55:16,18 58:22
74:4,7,9,16,18
**deduplication**
55:7,24 56:19
58:20 59:11,13
73:19
**deemed** 212:6
**defendant** 3:21
4:6,17,21 5:5,15
6:12,16,21 7:6,11
27:21 36:13 37:19
39:10 41:18,19,22
43:6,8 48:2,7 49:8
49:12,14,22 50:7,8
50:13 58:10 59:19

66:9,10 73:12
74:1,5,8,10,13
99:14 103:12
110:15 113:13
122:18 131:1,5
133:4,5 169:9,18
**defendants** 3:8,14
5:22 6:5 11:19
12:24 13:25 15:10
18:2 27:15 29:10
29:13 36:11 37:17
38:23 41:12 42:9
44:6 67:12 68:13
74:22 83:16 91:22
110:6 113:11
126:7 128:6,17
170:25 183:14
202:1
**defense** 168:7
**defenses** 110:7
**defer** 149:6,21
150:18
**define** 22:2 72:18
85:2 94:14 95:1
95:16 194:11
**defined** 25:20
27:19 48:5 89:8
92:6 93:25 94:1
95:12,13 98:24
126:25 173:23
**defining** 89:25
**definitely** 58:3
199:18 200:3
**definition** 81:4
88:13 93:22 94:7
107:4 136:3
146:25 161:19
162:7 166:16
167:11 173:14
176:12 184:11

**dehart** 5:19
**delete** 205:15,15
**delineated** 186:22
**delineates** 81:9,16
**delineation** 79:25
**deloitte** 117:25
118:6,6
**delta** 123:9 133:15
**demand** 191:10,11
**denominator**
88:18,19
**department** 150:9
**depending** 124:2
150:21
**depends** 98:1,18
140:14,14 145:3
152:12,13
**deponent** 210:13
212:3
**deponents** 13:21
**depose** 33:15
**deposing** 210:13
**deposition** 1:11
11:25 12:21 13:10
13:20 111:9
170:13 175:6
198:20 200:15
203:17 204:19
205:5,7,13,17
206:11 207:5,7,12
207:14 208:12
209:5
**depositions** 13:5,6
13:11,20
**derive** 33:3 35:12
**derived** 19:1 34:21
35:5 47:18
**deriving** 87:12
**described** 49:19
73:7 74:11 128:16
133:5 186:22

**description** 8:2
9:7
**descriptions** 125:7
**desk** 106:9
**detail** 84:19 95:17
125:17,20
**details** 73:25
115:20
**determination**
139:14
**determinations**
68:1 69:11
**determine** 84:21
88:22 157:4
201:23
**determined** 79:9
140:2
**determines** 98:6
**determining** 137:3
**develop** 122:17
**deviations** 144:16
**dictate** 144:8
145:12 151:8
**dictates** 144:10
**differ** 21:11 126:3
133:11 143:5,6,10
144:13 145:5,24
146:11 151:17
**difference** 20:19
50:14 79:23 81:6
81:19 82:15 123:5
125:21 131:16
137:22
**differences** 105:12
105:15 124:17
125:8 126:10
147:18 151:21
184:2 185:3
**different** 20:18
36:8 41:9 51:5,6
54:10 64:15 65:13

69:18 74:17 78:5
87:17 90:6 96:13
96:17 117:10,11
117:13,14,17
119:25 121:15
123:20,24 126:6,8
133:21 141:7,8,9
141:17 142:22,23
142:24 143:8
145:12 147:9,11
149:1 150:12
158:15 175:12
184:2 188:1,5
**differently** 178:14
**differs** 133:4
**difficult** 21:2
**diovan** 185:17,18
186:9 187:10,16
**dir** 96:6,9,20,22
**direct** 55:11,12
**directed** 69:4 78:8
**direction** 31:6
**directly** 89:5
92:13 114:7
119:21 121:2
167:6
**disaggregated**
26:10 147:23
**disagree** 60:12
**discernable** 161:2
**discounted** 148:16
**discounts** 61:4
145:17 148:19
149:11 166:9,15
167:15,16
**discovery** 14:3,14
**discussed** 28:23
29:22 31:22 40:12
49:25 61:20 83:22
186:13,18

**discusses** 32:12
**discussing** 102:10
**discussion** 104:8
155:18 168:13
201:16
**discussions** 37:10
194:5
**dispense** 63:12
89:13 92:25 95:22
172:9
**dispensed** 23:15
24:1 32:24 37:22
40:2,20 41:6,11
42:8 65:21 85:23
89:6 106:24
160:21 171:25
172:19
**dispensing** 16:24
21:18,24 22:3,18
22:19 23:21 30:14
30:17 36:22 37:3
37:6 39:16 40:3
42:23 49:24 50:4
50:5 61:14,16
63:21 64:8,12,13
88:23 89:9,14,17
89:18 90:5,10,16
90:20,24 91:3,18
91:21 92:7,15,17
92:23 93:2,14,23
93:25 94:7,12,15
94:17,18,20 95:3
95:10,14,17,25
97:5,10,12,15,19
97:20,25 98:1,6,14
98:25 99:1,6
170:4,6,24 171:15
171:22 172:14
173:12 174:7,20
176:20 177:6,7,17
179:13 180:1,5,7

180:10
**distinction** 20:7
28:24 81:1,16
82:12
**distinguishes** 81:9
**distortion** 203:22
**distributer** 164:18
**distributers** 99:12
106:21 118:2,8,20
119:3
**distribution**
121:15 131:6
164:20
**distributor** 164:8
164:12,23,23
165:2,13,15
**distributors**
105:23 107:8
116:25 117:7,12
117:21
**district** 1:1,1
**dlesli.davis** 4:10
**doctor** 11:4
110:19 182:21
195:2
**doctor's** 168:14
**document** 1:4
19:22 23:4,8
38:22 196:1
197:25 202:1
204:1,2 206:25
207:18,24,25
**documents** 9:6
11:23 13:14 15:9
17:23 18:1,1,21
19:4 106:8,9
109:20,23,23
110:2 111:5
131:20 207:7,10
**doing** 31:5,9,18
49:1 53:11 88:4

116:4 147:25
158:9 180:19,20
205:6
**dollar** 98:17
169:15,21
**door** 102:10
**dorner** 3:12
**dorsey** 6:18
**dorsey.com** 6:19
**dose** 172:11
**double** 20:10,11
20:24 21:3 29:7
31:11,15 108:14
157:2
**downstream** 30:3
136:5 142:11,17
143:15 144:5
153:1,25 189:5
**dozens** 107:22
**dr** 11:15 55:3
68:19 70:24 76:5
87:22 100:13,22
101:8 109:8,11
110:23 111:18
113:2 116:17
122:11 154:4,21
155:23 159:4
162:20 168:4
169:15 183:12,19
200:23 201:22
203:5,10,19
205:13,25 206:18
207:13
**draft** 195:22
**draw** 156:5
**drew** 3:12
**drive** 4:5
**driven** 144:18
**drop** 121:2
**dropped** 139:22

CONFIDENTIAL

**drug** 91:16,22,23
  92:12,13,14,23
  93:4,6,12,13 94:22
  98:16 105:5
  118:22 131:14
  135:9 169:23
  173:4 174:12
  181:14 182:1
  189:5
**drugs** 5:22 23:15
  28:21 37:6,24
  51:20 64:2 67:4
  75:3 79:15 82:8
  86:17 97:19 99:6
  103:22 104:24,25
  105:22 106:18
  113:23 114:3
  116:7,23 117:5,10
  117:18 118:5
  120:22 121:12
  123:6 126:3 127:9
  131:14 132:16
  135:4 139:10
  140:6 146:10
  154:24 155:7,25
  162:10 172:14,20
  174:10 180:10
  186:1 190:3 191:4
  191:19 199:6
**dt** 81:24 95:13,13
  95:18
**dtdorner** 3:12
**duane** 3:2,10
**duanemorris.com**
  3:3,4,5,11,12
**due** 17:17,19

**e**

**e** 2:1,1 3:1,1,11 4:1
  4:1,4 5:1,1,17 6:1
  6:1 7:1,1 8:1 35:8
  209:1,1 211:3,3,3

**eabraham** 5:19
**earlier** 22:1 97:18
  102:22 104:4
  111:15 133:24
  134:3,9 147:16
  148:12 156:20
  170:4,11,13 180:1
  180:4 181:3 193:1
  193:3 194:16,24
  196:14
**early** 37:11 112:22
**easiest** 49:6
**easily** 138:10,11
  161:2
**eastern** 1:13
**easy** 124:6
**echo** 14:8
**economic** 84:1
  191:4,19,24
  192:12
**economics** 16:7
**economist** 46:9
  47:13 139:9,20
**economist's** 70:19
**ecosystem** 102:6
  102:18
**effect** 93:13
**effectively** 156:14
**effects** 93:11
**efficacy** 190:9
**eisenhower** 2:8
**either** 77:14
  102:24 111:6,25
  137:25 148:8
  149:1,4 164:4
  172:10 198:1
**elaborate** 73:15
**electronic** 15:7
  111:19,25 112:4
**elements** 123:20
  136:10,11,12

146:22
**ellie** 4:9
**ellie.norris** 4:9
**email** 103:20
**employee** 110:13
  149:19 150:4
**employees** 135:22
**encountered** 34:8
**ended** 204:10
**ends** 28:10 54:21
  100:4 154:13
**engage** 68:6
**engineering** 199:8
  199:15
**enormous** 75:2
**enrichment** 20:5
  20:13,17 21:6,12
  27:19 47:6 48:3
  48:18 49:9,13
  50:22 58:5,7,13
  59:5,9,18 60:20
  61:6,25 62:21
  63:24 64:11,24
  65:19 74:10 84:5
  84:12 115:18,25
  116:6,11 122:18
  122:23 123:20,22
  123:24 124:10,15
  125:23 126:1,24
  127:5,8,13,16,18
  128:11,14 129:3
  129:10 130:10
  131:12 133:4,10
  149:13 169:15,16
  171:8,17 184:10
**ensure** 53:21
  135:4
**entails** 61:8
**enter** 136:1
**entering** 136:4
  152:9

**entire** 14:24 136:2
  195:12,16,20
**entirely** 202:9
**entirety** 30:15
  66:24
**entities** 96:8 103:5
  131:8
**entitled** 20:4 59:17
**entity** 19:17 144:7
  144:18 151:11
**entry** 108:25
**enumerated** 28:23
  37:14 63:1 171:18
  186:13
**epedigree** 134:5
  135:1 147:15
**equal** 57:4 63:8,10
  63:18 65:4
**equals** 80:22 81:24
  84:2 95:13,19
**equation** 160:25
**eric** 5:18 154:23
  155:2,24 168:2
  194:22
**errata** 210:11,13
  210:17
**erratas** 210:15
**especially** 172:20
**esquire** 2:3,7,12
  2:16,21,22,23 3:3
  3:4,5,6,11,12,17
  3:18 4:3,4,9,10,14
  4:19 5:3,7,12,13
  5:17,18,19 6:3,8,9
  6:14,18 7:3,4,8
  210:1
**essentially** 115:23
  126:24
**established** 38:25
  41:25 46:13 48:12
  140:12

CONFIDENTIAL

[estimate - file]                                                                    Page 14

estimate  75:5,10
estimates  20:17
estimation  74:20
  122:1
et  137:24 151:18
  190:10 192:7
  198:15 210:4
  211:1 212:1
events  110:5
evidence  207:1
exact  48:20 58:6
  192:5
exactly  50:24 59:2
  117:24 132:12
  189:15 192:8
examination  10:3
  11:14 100:12
  182:20
example  55:9 56:3
  56:4,10 108:24
  138:15 143:17
  144:24 149:11,19
  151:10 164:25
  172:15
examples  56:11
exceeded  201:18
  202:2
excel  8:4 18:7,19
  24:23,24 33:9,16
  49:2
exclude  29:20 30:6
  49:17 191:14
excluded  34:2,3
  34:12
exclusion  20:20
  161:11 162:6
exclusions  51:15
excuse  28:16
  68:15 91:6 94:4
  176:23 179:9
  197:23 203:1,1,25

executives  103:21
exercise  147:20
  200:11
exforge  185:17,20
exhibit  8:2 15:5
  18:6,10,17,23 19:6
  19:25 20:2 25:1
  27:7 29:3 31:25
  34:18 44:3 47:23
  49:3 51:10 52:6,9
  62:5,7,8 107:17
  109:8 202:3
  204:10 206:22
  207:18 208:1,3,6
exhibits  10:7
  13:10,20 44:9
  202:9
exist  145:1 149:4
  202:2
existence  179:22
expand  84:18
expect  31:14
  124:22 144:11
  146:11 151:14
  198:25
expecting  123:18
expenditure  77:16
expenditures  27:8
  77:9
expense  182:1
experience  106:12
  172:8
experienced  130:3
expert  8:5 46:10
  59:25 116:10
  139:8 156:2 197:8
  197:17 202:16
  207:18
expertise  51:7
expired  203:15

explain  48:2 49:11
  58:20 73:23 87:23
  97:4 171:15
  174:12
explained  48:1,22
  49:7 95:11
explanation  73:2
express  4:17 42:5
  156:13 168:24
expressed  27:9
  70:20 85:8 89:9
  95:18 136:24
  137:21
extent  16:22 38:10
  45:10 58:16 59:25
  67:15 76:9 83:18
  85:25 122:25
  124:4 125:11
  126:1,14 139:3
  149:25 154:3
  157:25 158:19
  167:8 184:5

f

f  209:1
fact  12:23 117:3
  170:23 171:23
  189:11 199:19
  204:3
factor  88:2 98:20
  138:2 139:11
factors  139:21
faculty  16:8,10,11
  16:15 17:9
fails  210:19
fair  15:22 22:6
  36:6 157:15
  162:24 165:18
fairness  201:1
falanga  6:7
falkenberg  7:2

falkenbergives.c...
  7:3,4
fall  74:11 88:19
familiar  22:4
  181:22
far  125:9 131:21
  206:15
fast  165:8
fault  165:9
favorite  98:5
fda  29:17,25
  188:25 190:9
  194:2,17,25
fda's  199:5
february  1:12
  209:14 210:3
fee  22:18 30:14
  40:3 61:14 63:12
  63:21 64:13 89:17
  89:18 92:23 95:25
  97:5,10,10,16,19
  98:6,14,25 99:6
  173:12 174:7,20
  179:13 180:5,7
feel  34:14 53:16
  179:4
fees  23:2,21 36:22
  49:24 50:4 96:6,9
  96:20,22,22 97:20
  97:25 98:1 99:1
  149:12,12 166:9
  170:5,24 171:15
  171:22
fhs  6:3
field  33:10,18,22
  94:5 107:1 135:10
fields  31:12,13
figure  22:9 87:12
figures  169:15,21
file  18:7 21:25
  24:7,23 26:16

CONFIDENTIAL

**[file - function]**                                                                 Page 15

29:3,19 33:4 44:5
44:8,22,25 51:10
52:11,16,21 53:5
53:12 207:23,25
208:5
**files** 168:9
**filing** 69:21 70:9
**fill** 30:8 106:19
**filled** 36:12 37:18
39:9 82:7 156:22
157:17
**filling** 90:25
**fills** 23:1,22 29:20
30:7,11,13 33:3
36:3,4 41:18 43:6
**filter** 25:16,22
51:11 53:5,9,17
54:9
**filtering** 49:2
**final** 25:5
**finally** 70:20
106:23 204:7
**finance** 102:23
199:7
**financing** 102:11
**find** 61:23 138:9
138:24 168:10
**finding** 59:7
**finds** 65:11
**fine** 73:9 75:16
**finish** 106:20
148:22 176:24
203:2 205:6
**finished** 83:6
159:9 172:10
**firm** 155:24
**first** 11:20 27:18
41:24 57:25 81:14
81:24 84:20
109:16 111:14
118:18 122:15

131:2,2 136:15
171:10 192:18
**five** 19:16 54:17
62:13 93:25 99:24
183:4
**flat** 82:19
**flexible** 51:13
125:4 139:25
149:15 165:24
185:11
**flipping** 109:18
**floor** 3:19 6:4,10
6:15
**focus** 103:4 122:15
**focused** 55:12,17
56:7,8,11 66:25
67:1 122:1,4
125:18,21 191:11
**folks** 101:15 102:2
**follow** 48:25 54:4
64:22 78:9 84:8
104:1 122:12
160:4
**following** 41:13
51:24,24 52:23
55:10 73:24 80:3
83:11 170:20
**food** 189:5
**footnote** 28:9,9,9
28:11,23 48:11
61:20 74:11
110:15,20 118:1
118:17,18 138:7
139:23,24 148:7
156:25 186:13,23
192:18
**footnotes** 55:23
74:18
**foregoing** 209:5
212:5

**form** 43:21 45:9
46:8 49:4 52:7,22
53:13 60:11,16
65:6 66:12 67:14
71:23 74:23 80:1
83:17 84:7 85:15
85:24 86:11,22
88:11 90:2,18
91:24 92:19 98:11
98:22 99:16 115:6
116:1 119:10
120:12 127:20
128:20 130:13
131:22 140:25
141:18 143:21
145:7 157:20
169:25 172:1
174:16 176:16
178:11 181:9,15
182:2 184:19
185:4 186:4,25
187:18 189:20
190:5 191:6 193:8
193:24 194:14
196:3 204:12
**format** 43:17
**former** 103:20
**forms** 186:21
**formula** 77:19
78:2,4,6,18 79:7
79:18 84:4,12,17
84:22,24 85:8,11
85:21 86:6 87:6
87:15 88:21 89:2
89:7,10 90:1
91:20 92:4,18
93:20 94:10,11,12
94:24 95:1,2,2,8,8
95:12,18 115:24
124:14 126:10,23
127:5 136:18,24

137:17,18 138:3
139:5 146:16,17
147:1,17 148:1,2,2
148:4 156:13
160:5
**formulas** 75:18
108:6,7 123:16
146:22
**formulated** 116:23
117:5,18
**formulation** 99:4
**fortune** 132:4,5
153:10
**forward** 173:18
179:7 187:6
**found** 47:22 50:10
**frank** 6:3
**frankly** 39:5
**fraud** 83:16
**free** 169:23 173:4
**freed** 145:22
**freeman** 2:7
**frequency** 33:24
**frequently** 30:4
172:20
**friday** 1:11
**friends** 152:5
**front** 155:10 156:3
198:7
**fulbright** 4:8
**full** 15:2 19:22
35:13 57:4 60:10
60:25 61:1 63:8
63:18 65:4 67:11
71:21 72:10,15,16
74:13 77:9,16
79:7,13 129:21
130:4 181:7
192:10,12,15
**function** 40:16
89:10 177:2

[fundamental - growing]                                                 Page 16

**fundamental**
  157:23
**funny**  71:17
**further**  111:13
  167:25 184:6
  209:9

### g

**g**  44:7,19 45:22
  47:19 51:8,12
  52:16 53:4
**g.1**  44:24 47:24
  51:6
**g.1.**  44:20,21 53:4
**gained**  131:18
**gannon**  6:8
**gap**  150:14 153:13
**gateway**  6:10
**gcoan**  6:14
**geman**  2:16
**general**  42:12
  119:24 120:7,8
  127:15 131:13
  137:18 139:5
  142:25 143:8
  144:6,17 145:13
  145:13 148:25
  151:5 152:1
  153:23
**generally**  97:4
  103:1 123:23
  124:7 143:2
  151:13 152:5
**generate**  22:10
  23:3 25:1 39:15
**generated**  24:7
  39:17 65:2
**generation**  64:18
  64:19
**generic**  82:8,20,21
  92:23 98:16 99:3
  116:23 117:5,18

146:10 151:11
172:20 185:16
188:13 190:2
191:3,18 199:5
**geoffrey**  6:14
**geoppinger**  7:8
**getting**  70:22
  108:14 132:19
**gisleson**  3:17
**gist**  151:5
**give**  11:10 19:24
  32:10 56:10
  109:13 156:7
  157:1 198:12
  200:24
**given**  26:10 37:12
  45:18 52:17 90:20
  90:20 93:3,3
  108:25 114:1
  116:21 125:7
  135:9 144:12,25
  145:14 166:15
  167:15 202:4
  212:9
**giving**  59:16 91:1
  91:12 93:8
**glaxosmithkline**
  8:7 197:10,13,19
  198:15 199:23
  202:17 207:21
**glenside**  1:12
**go**  15:19 26:25
  27:6 28:13 29:2,6
  32:5 34:17 35:25
  36:2 42:3 44:10
  44:18 46:17 47:25
  49:6 51:16 53:4
  53:21,23 54:11
  56:21 58:4,20
  60:18 61:6 62:19
  64:21 65:13,24

73:1,6 75:17 77:7
81:19 83:3 84:11
85:7 88:21 89:7
95:1,16 106:18
110:21 111:17
116:15 122:8,10
127:24 130:22
136:17 148:1
154:9 166:21
168:21 171:4,5,7
171:10,12 172:4
194:16,25 196:18
196:21,21,23
198:24 200:4,21
201:2,12 202:20
203:24 205:8
**goes**  23:22 66:15
  90:23 94:21
  111:21 155:3
**going**  11:7,17 18:5
  19:23 20:9 27:25
  29:9 53:19 54:14
  55:6 56:10 65:18
  65:24 67:24 69:16
  70:4 75:25 87:3
  99:19 100:4,14,17
  109:8,16 111:15
  113:4 114:2
  117:20 118:19
  122:14 133:16
  135:15,17 143:18
  144:18 146:16
  154:13 155:3,8,17
  173:18 174:8
  175:11 176:2,3
  178:5,6 179:3,7
  180:14 182:16,23
  183:7,23 187:25
  188:4,9 197:2,4,6
  200:19 201:4,14
  203:14 205:14

**goldberg**  3:3 11:4
  11:5 58:1 195:10
  195:18 205:11,20
  205:22 206:4,8,14
  207:3
**gonna**  205:11
**good**  11:4,15
  45:11 53:17,20
  68:1 99:22 100:13
  154:8,8,21,22
  155:23 182:21
  183:12,15,20
  189:17 194:13,13
**goods**  137:24
  138:18 145:16
  150:1,2,12 152:10
  175:24 177:12
  178:10
**gordon**  6:2
**gotcha**  12:15
**great**  11:23 75:21
  100:1 120:8
  142:19 189:10
**greenberg**  4:2
  183:1
**greg**  4:4 182:24
  183:13 204:23,23
**gross**  61:22 103:13
  137:23 138:8,18
  138:21,21
**group**  15:13 33:2
  66:4 74:2 80:7
  117:12 183:13
**grouping**  44:22,25
**groupings**  45:7,16
  46:4,12,21 51:4,7
  51:18 52:4
**groups**  79:25 80:4
  80:8 106:23
**growing**  96:20

CONFIDENTIAL

**[gtlaw.com - hyman]**                                                      Page 17

---

gtlaw.com  4:3,4
**guess**  120:16
  148:3 192:24
**guys**  194:20

**h**

**h**  6:3 8:1 44:7,19
  47:19 51:8,12
  52:16 211:3
**h.1**  46:16,18 47:24
  51:6
**h.1.**  47:3
**h.2**  56:22 64:20,21
  64:25 65:2
**h.2.**  56:17,21
**half**  14:9
**hand**  77:10,19
  120:23 209:14
**handful**  103:9
**handing**  94:21
**handled**  117:11
  118:8
**handles**  118:2
**handling**  146:14
**hang**  204:25 205:1
**happens**  30:3
**happy**  33:13 42:3
  73:6 94:25 103:24
  161:3,23 163:2,6
  178:25 194:16,24
  196:18 201:2
**hard**  27:3 154:3
**head**  16:7 75:14
  103:19,25 108:12
  110:14 111:4
  116:13 164:10
**heading**  15:7
**health**  5:15 70:19
  111:6,11 112:1
  113:12 139:8
  143:17

**healthcare**  3:9,15
**hear**  14:9 18:23
  27:3 35:2 59:21
  62:18 100:22
  101:1,3 105:19
  119:15 131:25
  154:24 155:13
  169:3 178:21,22
  205:3
**held**  151:25
  155:18 201:16
**help**  140:5 182:14
**helpful**  28:6 51:2
  82:14 200:12
**henry**  5:3
**hereto**  212:7
**hereunto**  209:13
**hetero**  5:22,22
  25:12 69:21
  154:23,24 155:7,8
  155:25,25 156:20
  158:20 160:2,12
  161:12,13 163:4
  165:2 167:8,15
  168:5
**hetero's**  157:4
  163:15 164:7,19
  165:12,12 166:10
**highlight**  81:23
**highlighted**  131:3
**hill**  3:4 5:17
  155:24
**hillwallack.com**
  5:18,19,20
**hilton**  2:23
**hinshaw**  6:13
**hinshawlaw.com**
  6:14
**hoc**  199:6,11,14
**hold**  26:5 32:6,6
  55:20 56:6,18

64:21 73:17 77:21
  80:8 82:3 120:22
  122:12 144:4
  146:19,19 174:14
  176:23 182:22,25
  195:23
**holds**  144:7,18
  151:11
**honestly**  12:16
  23:9 126:18
**honik**  2:2,3 45:9
  45:20 46:8 49:4
  52:7,22 53:13
  54:19 58:15 59:24
  60:11,16 62:9
  65:6 66:12 67:14
  67:18 68:15,25
  70:16 71:14,23
  72:13,24 74:23
  76:8,17 79:10
  80:1,10,15 83:8,12
  83:17 84:7,14
  85:15,24 86:11,22
  87:7,14,18,22
  88:11 90:2,18
  91:24 92:19 97:6
  98:11,22 99:16,20
  99:24 100:7
  112:10 115:6
  116:1 119:10
  120:12 122:24
  124:3,18 125:10
  126:13 127:20
  128:20,24 130:13
  131:22 139:2,12
  140:9,25 141:18
  143:21 145:7
  153:7 154:1,9
  155:2 157:20
  159:8 168:2,15
  169:25 172:1

174:14,23 175:1,4
  175:15,19,25
  178:11 179:8,17
  180:14,20 181:9
  181:15 182:2,7,10
  182:13,17 183:5
  184:4,19 185:4
  186:4,25 187:18
  189:20 191:6
  193:8,15,24
  194:14,22 195:5
  196:3 197:23
  201:8,13,18
  202:23 203:14,21
  205:10,18,21
  206:2,12,15 208:8
  208:10 210:1
**honiklaw.com**  2:3
  210:2
**hope**  183:17
**hospitals**  106:22
  117:15 121:13,24
**hour**  26:2,11
  154:2 201:19
  202:2 204:3,5,5
**hours**  68:23
  107:22,22 108:1
  108:10
**huahai**  3:8,9,15,15
**hudson**  2:17
**huge**  132:8 150:7
**huh**  63:7 85:6
  185:21
**humana**  7:6
**hunchuck**  3:18
**husch**  4:14 168:20
  168:23
**huschblackwell....**
  4:15
**hyman**  2:16

---

[hypothetical - instruction]                                    Page 18

**hypothetical** 68:7
68:12 69:8,17
70:18 72:2 92:9
92:10,21 140:10
140:12 165:18
189:15
**hypothetically**
140:4
**hypotheticals**
188:8

**i**

**i.1** 46:16 47:5,10
51:6
**i.1.** 47:4,5,24
**i.2** 58:4 62:17 63:4
64:19,24 65:3
**i.2.** 62:19,20
**i.3** 62:17
**ice** 71:16
**idea** 53:16 118:14
175:22 177:10
178:7
**identification**
18:11 208:7
**identified** 17:24
26:20 29:14 95:11
**identifier** 43:14
**illinois** 4:5 7:5
**ilyse** 209:17
**imaginable** 204:13
**imagine** 61:15
**immediately**
172:19
**impact** 19:18 35:8
35:12 164:3
165:21
**implied** 45:24
**important** 103:5
107:1 117:9
120:17 148:13
153:12 155:7

205:23
**improper** 70:18
140:10 202:10
204:10
**impure** 163:17
**impurity** 157:7,19
158:21
**incentives** 141:15
**inceptions** 26:16
**include** 25:3,13
30:17 41:10 43:22
49:23 61:3,9,18
63:21 66:16 85:21
86:21 88:9,17
89:15 91:1 103:6
103:7,11 137:16
138:16 140:7,17
140:23 143:1
178:9
**included** 17:15
21:15 30:5 36:3
36:22 37:13 39:9
40:24 43:5,5
50:23 57:10,13
66:9 93:20,22
137:17 138:10,12
138:24 139:1
140:2 149:8,21
158:23 166:4,17
166:19 170:24
**includes** 41:2
106:21 183:14
194:5
**including** 34:14
40:14 63:12 78:18
86:8 88:4 148:5
175:23 177:11
207:8
**inclusion** 20:20
47:15 51:15
161:11 162:6

**inclusions** 140:1
**inclusive** 61:11
66:17 137:19
138:4
**incorrect** 189:11
**incredible** 23:12
**incremental** 91:14
93:3
**incurred** 64:8
**independent** 12:9
70:10
**index** 10:7
**indiana** 5:9
**indianapolis** 5:9
**indicate** 108:20
**indicated** 20:23
182:1 202:19
**indicater** 20:22
**individual** 23:2
30:14 151:8
173:16 177:8
**individuals** 85:22
103:16
**industries** 4:7
**industry** 12:25
16:20 43:1 46:10
94:19 96:8 101:14
102:5 103:2
118:10,12 119:4
172:8 180:6
181:22
**industry's** 78:24
**information** 16:24
24:2 26:7,19,22
30:12,13 33:6,6
34:15 36:24 37:13
38:1,2,11,12 39:25
40:24 42:7 45:17
46:23 48:14 49:20
49:25 93:9 114:15
126:4 134:23

136:8 150:4
157:23 158:11
163:20 167:24
176:18 191:21
192:3,5,15 199:25
200:20
**informed** 16:25
106:13
**informs** 107:4
**infused** 106:24
117:10
**ingersoll** 4:18 5:2
**ingested** 190:15
**ingredient** 99:2
172:11
**ingredients** 98:20
106:19
**injected** 106:24
117:10
**injury** 32:23,25
167:3 173:10
177:17
**input** 79:7 135:8
**inputs** 137:2,12
138:15 150:16
**inputting** 91:15
**insist** 202:2
**insofar** 70:17
**instance** 70:15
**instantaneous**
172:18
**institutional** 200:5
**institutions** 200:9
**instructed** 193:11
193:14,15,16
**instruction** 115:13
115:14 125:3
126:15,20 127:14
127:17 149:2,3,16
184:22

[instructions - keeps]                                                    Page 19

**instructions** 9:3
  51:25 52:5 124:24
  184:25
**insurance** 23:18
  30:11,15 40:17
  63:11,15 67:2
  77:20 79:19,24
  80:6,18,24 81:2,5
  81:13,18 82:10,16
  82:22 97:24
  176:17
**insured** 22:23
  36:25 39:22 77:20
  79:18,23 80:6,16
  80:23 81:2,5,12,15
  81:17 82:5
**insurer** 36:23
  39:23 82:9,11
**insurers** 23:25
  97:25
**intelligence** 43:10
**intended** 58:11
  73:13 74:14
**intending** 58:11
  77:4
**interaction** 106:4
**interest** 11:9
**interested** 209:11
**interplay** 66:3
**interpreted** 89:17
**interrupt** 166:22
  174:23,24 203:4,5
**interrupted**
  198:23
**introduce** 18:5
**invade** 125:11
**invades** 112:11
**invention** 199:8
**investigation**
  157:3

**invoice** 108:23
**invoices** 207:8
**involved** 107:2
  114:1 199:24
**involves** 101:11
**involving** 104:6
**iqvia** 50:10 66:15
  122:4 160:19
  161:10,21,23
  166:20 167:10,11
  186:17
**irbesartan** 1:3
**issue** 22:15 24:11
  25:6 26:1 27:8,20
  27:22 28:14 29:13
  30:1 32:1 37:24
  37:24,25 48:4,6,8
  48:12,14 50:9,20
  52:17 53:24 57:5
  57:13 67:4,5,5
  71:22 72:11 79:15
  84:2 85:23 86:10
  86:17,17 104:25
  113:10,18,22
  114:14 116:7,22
  117:4,19 118:9,13
  118:23 119:1
  121:18,19,23
  122:19 123:10
  124:12 126:3,19
  128:5 129:18
  131:7,18 135:24
  144:1 146:7
  162:10,10,11,14
  169:18 172:21
  173:22 186:12,16
  187:5,9,13,15
  188:19 193:5,22
  194:4 205:23
**issues** 101:12
  102:11 132:14

  185:9
**items** 150:8
**ives** 7:2,3

**j**

**j** 2:16,22 5:12,19
**jamie** 1:14 128:21
  208:11 209:3,17
**janow** 4:19
**january** 27:21
  48:8
**jdavis** 2:12
**jeffrey** 7:8
**jersey** 1:1 2:9 5:21
  6:11
**jgeoppinger** 7:9
**john** 2:12 3:17
**john.gisleson** 3:18
**joining** 45:12
**jonathan** 4:19
**jonathan.janow**
  4:19
**judge** 14:4,4,5,15
  14:15,19,20
  126:15 166:6
**june** 198:13
**jury** 61:23 65:11
  69:12 124:25
  125:2,3 126:15,21
  138:8,23 140:1
  149:3,7,17,22
  150:19 185:1,12
**jury's** 69:5
**justin** 7:13 201:9

**k**

**k** 3:17 4:20
**kanner** 2:20,21,22
  2:23
**kapke** 5:7 10:4
  11:14,16 14:6,11
  16:13 17:3,5,21

  18:5,14 19:13,15
  20:1 23:8 24:4,17
  24:19 27:5 29:2,4
  32:5,8,11 34:4,17
  34:19 38:16 40:22
  45:5,13,14 46:1,14
  52:10 53:1,15
  54:13,18 55:2
  57:15 59:15,23
  60:6,14 62:1,15
  64:16 65:7 66:19
  66:22 67:22 68:24
  69:15,25 70:7
  71:16,19 72:3,19
  73:3 75:4,15,23
  76:4,15,20 77:18
  78:1 79:16 80:5
  80:11,19 82:1
  83:14,24 84:9,15
  84:16 85:19 86:5
  86:19 87:2,5,9,10
  87:21,24 88:16
  90:7,22 91:19
  92:3 93:16 96:21
  97:14 98:3,13
  99:9,18 170:14,16
**kara** 5:7 11:12,16
  45:11 68:18 71:15
  77:11 80:15 87:19
  170:16
**kara.kapke** 5:8
**kathy** 170:15
**katz** 2:7
**kbi** 7:3
**keep** 19:23 134:6
  134:23 136:7
  155:3
**keeping** 135:11,23
  207:5
**keeps** 147:13
  150:10

CONFIDENTIAL

**kept** 43:15
**kind** 31:8 70:22
  126:6 127:15
  131:12 152:5
**kirstin** 7:3
**klinges** 3:6
**knepper** 4:14
  168:19,20,23
  169:5,8,12 170:1,9
  170:12 171:20
  172:4,6 174:25
  175:2,8,11,13,17
  175:20 176:21
  178:2,4,15,19
  179:2,11,12,24
  180:17 181:1,10
  181:20 182:5,9,11
  182:16
**knew** 158:2 192:4
**know** 14:16 16:22
  21:4 23:13 24:21
  33:11 34:22 36:4
  39:3,14 41:21,21
  42:18 53:3 58:2
  67:25 68:1 73:4
  80:25,25 83:7
  92:16 95:24 96:3
  98:8,9,12 99:17
  102:13 106:20
  108:10,16 109:11
  110:5,12 116:18
  117:23 118:23,24
  119:2,16 127:15
  131:13 132:6
  134:13,14,19
  146:10 150:7
  152:15 155:4
  157:25 159:15,18
  160:24 161:15,16
  163:15,23 164:7
  164:11,17 167:16

173:2 180:24
  188:7 189:21
  201:3 205:4
**knowledge** 41:1
  194:8,11
**known** 114:17,18
  158:17 188:23
**knows** 94:19,19
  147:13
**kroger** 42:4
**ks** 12:13
**kugler's** 14:19,20

**l**

**l.l.c.** 2:20
**label** 51:20 93:8
  99:12
**labeled** 20:3 30:2
  187:4
**labeling** 103:22
**labor** 90:25 93:10
  94:20 99:5,7
**laboratories** 6:5
**labs** 5:22 154:23
  155:8,25 160:2,12
  161:13
**lack** 129:5
**ladder** 205:9
**laid** 115:1 193:12
  193:17
**language** 57:21
**large** 145:18
**largely** 20:20
  117:20,22 118:4
  121:16 122:2,4
**larger** 19:14 30:11
  144:3 147:6
  176:13
**largest** 74:25
**late** 45:12 154:7
**laughed** 71:18

**law** 124:2,23
  125:8 155:24
  184:17
**law.com** 2:21,22
  2:23
**laws** 46:6
**lawsuit** 69:21
  70:10,11
**lawyer** 46:11,25
  47:10,13 71:6
  115:19 123:2
  124:11 139:19
**lawyerly** 204:12
**laying** 116:4
**layne** 2:23
**lbresnahan** 5:12
**lchb.com** 2:17
**leave** 205:25
**left** 33:9 67:12
  68:13 70:15 195:6
  201:21
**legal** 7:14 45:10,16
  46:6,24 47:9,12
  58:16 59:25 67:15
  68:21 69:2 70:14
  83:18 85:25 86:12
  86:23 119:11
  120:13 122:25
  124:4 126:14
  139:3,7,14 145:8
  184:6 210:23
**legitimate** 187:10
  187:12,16 190:1
  190:11
**legs** 206:19
**length** 31:22
  186:14,18
**letters** 13:23
**level** 26:21 42:23
  43:13 74:2 119:6
  124:22 134:16,23

134:24,25 136:7
  147:4
**levels** 158:15
**lewis** 3:17
**lhilton** 2:23
**liability** 1:3 20:6
  20:12,17 21:5,10
  37:12 46:6 47:14
  48:21 49:9,13
  50:21,21 58:21,24
  59:1,3,11,18 60:19
  60:21,25 61:25
  64:15,25 65:17
  66:5,17 67:1,3
  69:3 73:25 74:5,8
  74:12,17 84:3
  124:9 126:8
  156:14 167:2
  184:10
**liable** 115:17
**license** 209:17
**lieff** 2:16
**life** 16:15 110:5
  146:15
**limit** 50:8 201:19
  202:3 204:3,5,6
**limitations** 36:19
  36:21
**limited** 5:22,22 6:6
  14:17,17 37:4
  40:10 49:16
  115:23 124:23
  159:3 174:25
  176:14
**limiting** 26:23
**line** 9:4,7,10,13
  80:21 150:8
  159:25 173:19
  201:2,2 203:24,24
  211:4,7,10,13,16
  211:19

[list - market]                                                    Page 21

**list** 29:17,24,25
   48:3 84:17 109:23
   110:3,8 187:2
**listed** 16:22 17:23
   18:17,21 19:5,5
   21:15 25:25 29:11
   29:16 41:25 44:6
   48:21 54:1 59:10
   59:12 70:11,12
   74:25 90:9 110:10
   115:2 117:21
   139:5 163:5
   166:20
**listing** 15:9
**lists** 32:2
**literally** 26:2,11
   78:23
**literature** 175:21
   178:7 179:6
**litigation** 1:3
   14:21 18:3 140:7
   146:3,8
**little** 19:14 34:15
   101:2 108:13
   111:13 120:25
   123:12 151:17
   185:5 199:3
**live** 38:4 192:14
**livenote** 1:15
**liza** 6:9
**llc** 2:2 3:9,15 4:21
   5:5
**llp** 2:11,16 3:2,10
   3:17 4:2,8 5:7,11
   5:17 6:2,7,13,18
   7:2,8
**located** 32:13
   50:16
**location** 32:25
**logistically** 25:16

**logistics** 149:12
**long** 16:4 176:25
**look** 31:10,12,12
   44:20 46:17 55:10
   56:14,15 63:17
   94:24 118:5
   143:18 154:8
   162:1,21 168:9
   196:19 198:10
   202:1,12 204:1
**looked** 12:5
   103:10,13 104:19
   107:21
**looking** 30:21
   56:13 78:6 79:18
   80:20 87:6 89:23
   94:13 105:12,15
   105:17 106:12
   168:11
**looks** 132:11 143:8
**losartan** 1:2 210:4
   211:1 212:1
**lost** 77:12
**lot** 13:14 30:12
   39:14 101:8 102:4
   105:18 108:8
   118:24 129:3
   132:19 133:18
   194:3
**lots** 68:21,22 152:4
**loud** 27:2
**louis** 4:16
**louisiana** 2:24
**love** 140:12 188:8
**low** 82:8 101:3
**luke** 5:12
**lwalsh** 6:9

---
**m**
---
**m** 1:11 2:5,7 4:3
   4:10 5:7 6:9,14
   10:2 209:6

**ma'am** 35:9 36:5
   39:1,14 198:4
**madam** 100:25
   204:25
**mail** 32:17,25
   50:16 169:7
**mailed** 32:19,20
   32:20,22 33:1
   50:18
**main** 110:21
**maintain** 102:16
   135:3
**maintained** 134:4
**major** 132:4
   143:11
**majority** 116:23
   117:6,23
**making** 71:14
   82:13,13 99:13
   154:25 158:3,5,7
**management**
   54:10 151:15
**manager** 169:7
   179:14,23 180:12
**manager's** 179:16
**manner** 151:14
   203:13
**manufacture**
   132:25
**manufactured**
   128:6 158:20
**manufacturer**
   23:19 25:7,10,20
   26:21 28:25 29:13
   29:17 35:15 40:13
   51:18 52:4 56:9
   58:22 59:7 60:9
   66:4,10,18 67:3,6
   89:5 92:13 105:10
   114:7 123:7
   134:24 142:6

150:21,21 151:1
   151:11,13 152:14
   153:5,5 157:24
   158:16 159:18
   165:12 188:24
   192:5
**manufacturers**
   28:22 29:24 30:3
   37:25 48:16 57:13
   58:10 64:5 67:8
   68:7,10 70:11
   73:13 74:1,6,13
   103:4,12 105:21
   113:23 114:2,17
   119:6 120:22
   121:2 133:18
   134:12 135:4
   136:3,9 142:8
   151:17,23 152:8
   152:17,22 167:1
   184:1 188:13
   189:4
**manufacturing**
   106:20 194:13
**marginal** 90:24
   91:3,3
**mark** 18:6 33:18
   202:3
**marked** 9:12
   18:10 70:13 202:6
   204:16,21,24
   208:6
**market** 2:4 30:4
   74:21 75:3 102:21
   114:1 118:3 119:8
   120:11 123:9
   135:18 142:7
   143:12,12 144:4,8
   144:19 151:7
   157:24 158:13

CONFIDENTIAL

**[marking - mischaracterizing]**                                                    Page 22

marking  20:2
mash  87:18
mashing  87:19
massachusetts
  6:15
massive  42:21
  144:2
master  14:3,14
match  50:19
  147:24
matched  48:17
material  190:8
materially  143:5
materials  11:24
  18:8 20:3,8
  127:11
mathematical
  68:22
matt.knepper
  4:15
matter  8:7 16:17
  17:4,12,15 86:23
  103:24 104:19
  109:24 116:6
  117:20 119:24
  120:7,8 122:1
  126:2 128:4
  130:11 131:13
  132:14,17 141:23
  142:25 143:19
  144:7 145:10
  146:4 152:3
  153:23 175:1
  199:21 204:3
matters  65:16
  133:15 177:19
matthew  4:14
  110:9,12 168:20
maz  7:4
mazie  2:7

mazieslater.com
  2:8
mckesson  4:12
  111:6,11 112:1
  113:12
mdl  1:2
mean  24:18 30:24
  31:1 32:19 34:5
  36:4,20 37:1
  40:25 41:4,22
  42:18 45:8 55:20
  58:23 65:8 66:1,2
  67:10 71:6 72:16
  73:6,15 74:15
  78:20,22 81:1,3
  86:14 87:7 90:9
  94:25 102:25
  106:16 109:1
  113:16 114:4
  117:6 119:13,23
  120:16,16 125:21
  125:24 132:4
  134:10 135:10
  136:12 141:2,11
  143:10 145:1
  148:6 150:6,24
  152:12,13 164:22
  164:22 165:4,11
  165:14 166:22
  170:18 171:7
  182:5 183:21
  194:15 196:4,18
  200:14
means  34:13 46:4
  93:15 182:18
  196:6
meant  80:17
  119:16
measure  123:25
  127:12 128:3,10
  184:17

measures  184:3
mechanical  86:15
  87:16 89:21 90:14
  122:1 124:11
  126:19
mechanically  65:8
  88:14 116:3
  125:16,25 148:23
mechanism
  203:19
media  11:2 54:21
  54:25 100:4,10
  154:13,18
medical  106:23
  199:16
medication  171:24
  172:10,23
medicine's  199:8
  199:15
meet  13:23 154:7
meetings  102:10
megan  7:4
members  85:22
  86:10 104:18
  114:18 135:2
  136:5 142:13
membership
  86:23
mentioned  14:18
  25:9 28:11 51:19
  63:20 93:5 99:10
  102:22 104:4
  107:16 133:24
  147:16 148:10,19
  149:10 152:19
  198:22
merely  204:1
meridian  5:8
met  190:8
method  51:13
  78:23 125:4 139:4

139:24 148:24
  149:15 151:6
  185:11 186:3
methodology
  70:25 122:17
  156:13 162:7
  171:8
microphone  101:5
million  69:23
  118:7 135:16
  160:13 161:7
  162:4
millions  23:13
  172:15
mine  69:9
minus  48:6 61:11
  65:20,20 84:18
  94:10 95:9 126:25
  127:19 129:24
  130:6 173:23
  177:2,4
minute  26:2,11
  148:21,22 156:9
  195:6
minutes  54:17
  99:24 123:17
  183:4,22 204:2
misbranded  27:24
  48:10 186:2,10
  188:14 189:8
  190:2,7 191:3,18
  193:5,23 194:10
misbranding
  186:20 192:7,20
mischaracterizat...
  171:3
mischaracterizes
  193:9
mischaracterizing
  143:24 202:24
  205:18

**misconduct** 27:11
27:13,14
**mismatch** 57:21
**missing** 31:15,16
**missouri** 4:16
**misspoke** 80:16
111:15
**mistakenly** 43:22
**mistakes** 53:23
**mix** 121:1
**model** 181:3
**molecule** 116:22
117:5
**moment** 163:18
172:2 173:1,8,9
191:8
**momentarily** 11:6
**moments** 160:5
**monday** 13:2
**money** 72:11 89:4
127:8 130:16
176:11 178:9
**monroe** 7:5
**month** 22:15
23:20 25:3,5,10,19
25:21 26:19 40:14
161:22 184:14
186:15
**months** 107:18
108:16
**morgan** 3:17
**morganlewis.com**
3:18,19
**moring** 5:11
**morning** 11:4,15
11:24 45:11 68:4
100:13 102:23,24
170:17
**morris** 3:2,10
**mortar** 32:15

**moskowitz** 1:14
209:3,17
**motion** 168:8
**move** 44:2 54:14
131:13,15 173:18
178:15 179:7,8
190:25 204:14,16
**moved** 129:18,22
150:13 173:16
**movement** 129:20
**moving** 123:13
127:9 130:17
132:13 172:15
**mulberry** 6:10
**multiple** 31:23,23
39:5 62:9,12,13
64:2,3,4,5 74:12
83:21 101:16
147:7,7 198:13
200:14 201:21
204:8
**multiplied** 136:25
162:3
**multiply** 137:13
137:16
**murtha** 5:17
**mute** 11:13 194:21
**mylan** 6:5,6 69:22
103:11 118:18

**n**

**n** 2:1 3:1,18 4:1
5:1 6:1 7:1
**name** 11:15 19:17
25:6,7,11 30:17
34:20,21 35:5
39:19 40:4,13,13
100:14 133:18
154:23 155:23
178:6 185:25
186:9 187:10,16
198:3

**name's** 183:12
**named** 17:15
106:6 179:6
**names** 24:10 105:5
105:10
**national** 40:5
199:7,14
**native** 43:17 44:12
161:21 163:4
**nature** 163:17
**ndc** 22:17 24:10
25:7,20 26:20,20
29:14,21,24 30:5
34:21 35:5 40:14
50:10 51:18,21
52:4 54:5 57:13
59:7 118:22,24
119:6 133:19
134:24 186:15,24
187:2,3
**ndcs** 25:12 30:1
160:10
**necessarily** 165:11
167:2
**necessary** 212:6
**necessity** 66:7
**need** 21:3 51:2,7
52:14,15,18 54:6
79:3 88:1 110:23
154:4 159:6 173:2
207:2
**needed** 135:8
**needs** 68:9 194:20
**negotiate** 152:8
**negotiated** 98:10
167:9
**neither** 209:9
**net** 127:10 137:23
138:22
**network** 179:16
180:8

**never** 34:7 54:7
104:13,16 152:6
**new** 1:1 2:9,18,18
2:24 5:21 6:11,20
6:20 51:11 52:16
52:17 53:6 199:17
200:20
**newark** 6:11
**news** 183:15 202:8
**nice** 183:21
**night** 11:24 102:24
**nitrosamine** 157:6
157:19 166:12
**nitrosamines**
157:13
**noise** 27:2 105:19
132:19 155:13,15
**nominal** 98:18
**non** 42:11 43:6
149:18 188:23
190:2,2 191:3,3,18
191:18 192:7,7
**normal** 31:8 102:3
110:5
**normally** 107:12
**norris** 4:9
**north** 5:4
**norton** 4:8
**nortonrosefulbri...**
4:9,10
**notary** 209:4
212:13,19
**note** 47:6 58:15
59:13,24 68:15,16
69:25 70:16 76:8
112:10,10 122:24
124:3 125:10
126:13 139:2,12
140:9 154:2 168:3
174:7 183:23
184:4 210:10

**[noted - ones]**                                                      Page 24

**noted**  46:18
  124:19 212:7
**notes**  45:21 63:17
  209:8
**notice**  207:14
**number**  8:2 11:2
  17:25 39:21 40:6
  54:21,25 68:17,23
  68:25 69:23 70:2
  70:2 100:4,10
  103:20 108:10
  109:2 118:2,24
  154:13,18 160:16
  160:17,24 161:5,7
  161:16,17 187:3
  201:19,19 206:20
  206:21
**numbers**  18:3
  35:23 53:6 65:2
  72:22 141:15
  162:23
**numerous**  184:9
  192:22
**nw**  3:13 5:14

**o**

**o'clock**  154:2
**o'reilly**  6:7
**oath**  11:21
**object**  45:9 46:8
  49:4 52:7,22
  53:13 60:11,16
  65:6 66:12 67:14
  71:23 74:23 80:1
  83:17 84:7 85:15
  85:24 86:11,22
  88:11 90:2,11,18
  91:24 92:19 98:11
  98:22 99:16 115:6
  116:1 119:10
  120:12 127:20
  128:20 130:13

131:22 140:25
  141:18 143:21
  145:7 157:20
  169:25 172:1
  174:14,16 178:11
  181:9,15 182:2
  184:6,19 185:4
  186:4,25 187:18
  189:20 191:6
  193:8,24 194:14
  196:3 202:5,12
  203:16 204:13
**objecting**  38:12
**objection**  38:9
  39:11 58:15 59:24
  68:16 69:1 70:16
  70:21 72:13,24
  76:8,11,17 79:10
  97:6 112:11,13
  122:24 124:3,18
  125:10 126:13
  139:2,12 140:9
  153:7 175:25
  179:17 180:17
  184:4
**objections**  125:14
**obtained**  91:23
  169:23
**obviously**  113:25
  200:9
**occupy**  119:25
**occurred**  33:20,24
  33:24 61:19 69:20
  69:20 70:9 143:9
  165:20 173:10
**occurrence**  33:12
**occurs**  32:23
  143:8 167:4
  177:18
**offer**  71:14 84:21

**offered**  84:4,5
  181:24 204:7
**offering**  115:3,16
**office**  199:5
**offline**  168:13
**offset**  50:4,6 65:22
  138:8 148:11
  166:18 171:18
**offsets**  61:3,18,22
  63:14 130:2
  137:24 148:8
  149:4,21 150:18
  167:3
**oh**  35:10 71:17
  72:8 83:10 110:15
**ohio**  7:10
**okay**  12:15,15
  13:3 14:7,12,24
  15:4,13,16,20
  17:16 19:19,23,23
  22:6,22 24:13
  26:4,13 27:6 29:2
  29:12,18 32:9,10
  34:25 35:7,25
  36:6 39:7 42:17
  42:20 44:10,18,24
  44:24 46:15 47:1
  47:17 49:5 54:14
  55:6 56:12,20,22
  57:3,9 60:18
  62:16,20,20 64:24
  64:25 66:1 69:16
  72:8 73:5 75:17
  75:21,23 76:21
  77:2 78:8,10,21
  79:3,17 81:8 82:2
  83:3,10,13 84:10
  84:11 85:7,10,20
  87:2,14,21,25 88:8
  88:21 90:8,13
  92:8,20 94:13

95:4 97:3 99:24
  100:13,21,22,24
  101:1,4,20 104:1
  104:10 107:21
  108:4 109:5,15
  110:8 113:6,7
  116:19 118:13
  119:1,23 120:6
  122:13 123:1,16
  129:2 130:20,23
  131:5,19 133:9
  136:17,21 137:15
  140:11 142:6,16
  142:19,20 148:1
  150:16,23 151:5
  152:18 153:21
  155:6 156:5,10,11
  156:12,19,24
  158:19 161:25
  164:7,11 165:1,6
  166:7,23 167:23
  170:22 171:21
  172:4,7 173:18
  178:15 182:17
  183:5,24 184:16
  184:25 185:25
  186:8,19 187:25
  188:14,20 189:14
  189:24 190:25,25
  191:14 192:13,16
  192:24 194:23
  198:5,9,13,22
  200:7 205:6,8
  206:8,9
**old**  206:12
**once**  53:12 59:4
**ones**  17:15 25:25
  42:1 43:20 69:11
  103:23 117:19
  163:24,24,25
  172:21

**[ongoing - particular]** Page 25

**ongoing** 69:1
**opaque** 107:11
**open** 31:19 207:5
**opened** 31:22
**operate** 142:7
**operating** 102:20
**opinion** 14:24
　38:20 45:6 46:11
　46:21,24 47:9,12
　47:14 59:16,25
　70:20 84:5 122:25
　124:4 129:6
　138:25 139:8
　187:11 189:25
　191:7 194:12
**opinions** 11:18
　14:2,13,19,20
　16:16 17:7 46:5
　100:15,19 106:13
　114:23 115:3,16
　115:22
**opportunity** 11:10
　33:14 201:25
　202:4,11
**opposed** 57:22
**optum** 42:4
**optumrx** 6:21
**oral** 97:19 98:16
**orally** 116:23
　117:5,18
**orals** 118:4
**oranges** 59:8
**order** 32:17,25
　50:16 51:21 70:4
　98:17 132:7 169:7
　181:2
**organization**
　102:12
**organizations**
　117:12

**original** 53:21
　54:11 196:1,4
**orleans** 2:24
**ostfeld** 4:4 10:6
　182:18,20,24,24
　183:1,11,13
　184:15,24 185:14
　185:20,24 186:7
　187:7,24 189:23
　191:13 193:19
　194:7,20 195:1,7,9
　196:7 198:2 200:6
　202:13 203:1,21
　204:20,25 206:21
　207:4,16,17 208:9
**ostfeldg** 4:4
**outcome** 209:11
**outlined** 27:17
　162:7
**outpatient** 117:15
　121:24
**output** 8:3 18:7,17
　18:18 20:4 21:25
　24:7 26:16 29:3
　29:19 33:4 44:5,8
　51:10 52:11,16,21
　53:5,12
**outside** 60:5 67:21
　69:13 70:14 71:2
　71:12 92:11,11
　140:6
**overhead** 149:19
**overlap** 200:10
**owed** 65:15
**oxford** 3:19 6:4

**p**

**p** 2:1,1 3:1,1 4:1,1
　5:1,1 6:1,1 7:1,1
**p.m.** 154:5,12,16
　154:16 201:15
　208:13

**packages** 147:5
**packs** 147:7
**page** 8:2 9:1,4,7,10
　9:13 10:4,5,6,7
　28:4 45:23 46:18
　50:3 57:16 73:22
　82:4 89:7 109:2
　109:17 111:14,16
　111:17,18,21
　130:22 146:17
　148:4 156:8
　159:23 169:13
　171:5,10 198:10
　198:13,24 211:4,7
　211:10,13,16,19
**pages** 15:6 108:6,9
　108:11 109:18
　111:22
**paid** 23:19 30:10
　35:13,21 39:24
　40:16 49:16,21
　50:12 57:4 60:10
　60:21 61:1,10,11
　63:8,19 64:1,10
　65:4,18,19 67:8
　68:10 69:22 78:13
　78:19 79:14 82:23
　82:25 84:3 86:16
　86:21 88:10 97:18
　105:8 128:4
　129:23,24 137:23
　137:23 138:19
　143:2 159:16
　160:21 161:10
　162:9 167:4,12
　174:5 176:16
　181:13
**painfully** 178:12
**pale** 204:11
**panels** 102:9
　103:17

**paper** 28:7 91:10
　118:6,6
**papers** 16:6,21
　105:14
**paragraph** 15:2
　27:7,24 28:1,10
　32:4,7,9 49:6,8,11
　55:16,19,24 61:7
　73:7,7,21,21,23
　75:18 77:8,23
　78:3,3,7,9 83:3,5
　84:12 112:22
　113:8,14 116:15
　116:21 118:1,18
　122:8 127:1,25
　128:2,7,17 130:22
　130:23 132:24
　136:19 138:14
　156:6 160:6 171:6
　171:11,12,14
　172:5,8 173:20,21
　192:18 199:1,1,2,3
　202:20,20
**paragraphs** 27:18
　28:18 48:1,23
　83:23 115:2
**parkway** 2:8
**part** 13:1 27:14
　31:17 45:17 79:17
　81:14 102:6,6
　103:1 107:9
　120:17 126:6
　136:18 137:16,25
　137:25 138:22
　145:23 147:14
　148:4 179:15
　180:8 199:2
**particular** 17:4
　26:9 33:3,3 35:14
　59:19,23 60:8,8
　64:9 65:22 114:11

139:10 140:6
141:13 151:19
152:10 156:15
**particularly** 82:7
**parts** 108:20 196:8
196:12,19 201:23
**party** 22:21 49:17
61:2,11 65:14
97:11 157:10
158:1 159:14
160:22 163:22
164:19 165:16
167:9,13,17
176:12 181:24
191:25 192:4,9
209:10
**pass** 11:7 99:19
**patient** 35:13 41:4
57:4 60:10 63:8
63:18 65:4 90:21
91:1,4,13 93:3,11
94:22 174:6 177:8
181:4
**patients** 36:25
78:18 119:22
121:9,20,25
166:18
**pause** 176:25
**pay** 30:15 63:22
67:13 68:7,14
70:11 78:12 79:18
79:23 80:6,7,17,22
80:23 81:2,5,13,13
82:6,9,11,15 88:20
89:4 91:22 97:20
97:25 171:24
**paying** 77:10,18
78:11,22 79:1,1,6
79:9,19,24 80:24
81:10,17,18,20,25
134:12

**payment** 22:20
23:18 40:17 63:16
67:2 71:7,9,10
78:23 81:18 82:10
88:15 166:18
**payments** 23:24
36:23 63:11,12,13
67:4 77:9,17
78:25 82:19 96:7
164:11,17 165:2
165:11 176:10,15
176:17 177:3
**payor** 22:21 49:17
61:2,11 78:5
160:1,12 161:7,22
163:12 164:4
181:24 192:10
**payors** 65:14
97:11 157:10
158:2 159:14
160:20,22 161:10
162:11,15 163:22
165:16 166:1
167:9,17 176:12
192:1,4
**pays** 30:11 77:19
97:15
**pbm** 41:2,3,7
180:7
**pbms** 40:24
**pc** 4:18 5:2
**pending** 203:12,17
**pennsylvania** 1:12
2:4 3:7,20 5:14
6:4
**penny** 134:7
**people** 79:1 81:10
81:12,17,17 82:5
**percent** 82:25
118:2

**percentage** 74:21
75:6,11 82:22
114:11 117:24
118:15 119:2
**perfect** 77:2
**period** 25:1 26:9
26:11,23 27:10,13
27:20 28:16,22
31:24 35:18 57:5
57:8,14 64:9
80:23 84:24 85:4
85:14 86:17 88:24
89:11,13 95:15,20
95:22 114:2,14
116:7 143:4
144:12 145:15
156:16,17 160:9
160:19 162:10
164:5 187:9
188:17,18
**periods** 24:11
25:23 28:18,20
37:25 48:13,15
64:6 67:5 96:19
**permitted** 175:4
180:22 206:17
**person** 41:5
**personal** 194:8,11
**perspective** 60:24
64:10,18 65:2
78:25 88:1 89:3
89:22,24 90:15
158:8,10 159:11
159:14 163:20,22
177:6,21,23 190:6
**pertains** 168:5
**ph.d** 8:5 207:19
210:5 211:2,24
212:2,4,12
**ph.d.** 1:11 2:5 10:2
209:6

**pharma** 3:21
**pharmaceutical**
3:8,8,14,15 12:25
16:20 43:1 46:10
96:8 103:2,4
118:3 151:8
**pharmaceuticals**
4:6 6:6,12,16
**pharmacies** 16:23
17:14 23:11,17,23
25:18,24 26:8
32:24 36:13 37:1
37:21 38:1 39:15
40:10 41:11,12,19
41:20,22,23 42:8
42:11 43:6,8,19
50:5 51:17 74:25
103:14 106:22
114:8 116:24
117:7,16 119:24
120:25 121:6,8,14
121:14,20 131:7
142:12,20 146:6
152:23 169:22,22
170:7,10 171:18
171:24 172:12
173:8 174:19
176:6
**pharmacist** 91:15
93:10
**pharmacy** 7:6
11:18 13:7,11,21
13:25 15:10 18:2
27:15 29:10 32:13
32:17 36:11 37:17
37:19 38:23 39:10
41:7 43:2,13,13,13
43:18,22,23 44:6
49:15,22 50:8,15
50:16,17 59:19
63:22 66:8 67:12

[pharmacy - pretty]                                                              Page 27

68:13 74:21,22
79:14 83:16 89:4
91:12,17,22 92:12
94:22 97:18 98:4
98:9 99:14 142:23
144:14,15,15
153:5,6 158:22
166:19 167:13
168:25 169:6,7,8
169:18 170:25
172:9 175:23
177:11,12 178:9
178:10 179:14,15
179:15,23 180:4
180:11 181:12,25
**pharmacy's**
175:24
**phase** 149:1
**philadelphia** 2:4
3:7
**phrase** 27:12
81:14
**physical** 32:14
78:14
**physician** 40:4
**physicians** 121:13
**pick** 62:16 142:21
201:6
**picked** 30:5 51:18
51:19 56:25 187:2
**piece** 175:21 178:6
179:5
**pietragallo** 6:2
**pietragallo.com**
6:3
**piling** 202:7
**pill** 147:7
**pills** 147:6 160:11
163:17
**pittsburgh** 3:20
6:4

**pizzi** 6:7
**place** 127:10
129:19,22 130:17
150:13 162:21
209:7
**plaintiff** 59:17
128:5
**plaintiffs** 2:10,14
2:19,25 27:8 36:9
36:16,18 37:8,15
38:22 39:7 45:1
45:18 51:5 100:7
113:9 122:16
188:3
**plans** 96:25
**play** 129:17
**players** 143:11
**plaza** 4:15
**please** 19:22 20:10
44:24 45:22 54:16
57:24,24 59:22
60:15 66:23 75:22
86:4 94:24 99:23
109:9 111:17
112:24 115:11
116:14,17 119:18
122:8,11 128:1
156:6 159:20
161:4 163:10
175:9 176:23,24
183:4 203:2,2
205:1
**pleasure** 101:15
102:18
**plus** 25:10 192:4
**pocket** 40:16
78:22 79:1 84:22
85:12,20 86:7,18
86:20 87:13 88:3
**point** 11:7 32:15
32:23 48:5 60:22

61:3,17 63:24
91:4,7 92:1 93:4
93:13 94:15 96:11
96:23 97:13,20
132:13,14 155:7
159:2,11 166:16
167:4,5 173:10,11
174:21 177:9,13
177:18,19 182:4
197:21 207:16
**pointing** 22:7
**points** 168:10
**portion** 15:1,3
30:15
**portions** 108:24
197:16 202:15
**position** 68:12
204:4
**possession** 203:9
**possibility** 165:24
**possibly** 141:5
176:4 203:23
**post** 182:4
**potential** 157:13
**potentially** 50:1
61:15 149:14
207:7
**power** 143:12
144:4,8,19 151:12
**powerpoint**
206:23
**ppu** 85:11
**ppudt** 136:25
137:12
**practice** 54:11
88:6
**practices** 53:20
194:13
**pre** 182:3
**preceding** 48:22

**precise** 189:17
**precisely** 94:5
**prefer** 28:7,7
**premise** 129:11
**prepared** 196:1
197:8 204:8
**preparing** 12:21
188:2
**prescriber** 40:5
**prescribing** 40:4
**prescription** 21:19
21:23 22:2 23:22
28:21 29:20 30:6
30:8,16 32:18,20
32:24 33:1 35:14
37:6 39:16,22
40:1,20 41:6,18
43:6 50:18 64:12
65:21 75:2 81:11
82:7,21,21,24 84:2
89:18 90:20 94:21
97:12 106:18
118:7 157:17
172:14 173:16
177:7 180:10
**prescriptions**
16:25 22:23 23:1
23:25 37:3,18,22
39:9 41:11 42:8
135:17 156:21
160:21 172:16
**present** 7:12 55:16
70:24 73:24 74:4
74:6,9 174:8
**presented** 184:13
185:8
**preserve** 69:1
**preserved** 133:20
205:24
**pretty** 143:13
153:11 196:20

[prevent - provide]                                                                 Page 28

**prevent** 74:6
175:7 204:15
**previous** 49:19
73:22 81:15
183:18
**previously** 70:17
71:24 72:14
124:19 197:8
**price** 27:10 79:8
84:1,2 129:23
130:4 133:13,16
134:11,14 136:10
136:11,13 138:18
156:16 160:7,8
161:6,9,19,21
162:3,22 163:1,4
163:11 167:12
**prices** 137:20,20
137:23,23 138:22
138:22 145:14
162:9,17 167:9
**primarily** 11:17
16:19
**princeton** 5:21
**principles** 153:13
**prinston** 3:8,14
**printing** 93:8
**prior** 87:4 116:9
**private** 51:20
99:12 103:21
187:4
**privately** 30:2
**privilege** 125:12
206:25
**privileged** 38:11
38:19 76:10
**privileges** 112:12
125:12
**probably** 34:16
49:5 52:14 121:21
121:22 123:17

137:21 145:3,11
199:1,1 200:2,10
**problem** 87:19
155:4
**procedure** 49:7
50:24
**proceed** 100:8
175:8
**process** 31:17
65:13
**processing** 29:18
**procure** 177:12
**procurement**
93:19,22
**procuring** 175:24
178:10
**produced** 18:2
37:16 57:6 111:6
112:19 146:3
151:24 170:6
176:15 201:21
207:8,10
**producing** 110:17
110:19
**product** 19:17
22:16,16 23:19
25:6,7,11,20 26:20
26:20,24 27:9,20
34:20,21 35:5
38:12 40:13 48:7
48:16 50:9,13
64:8 79:8 80:22
84:23 85:3,3,13
88:2,24 89:6,11,12
92:7 95:14,19,21
99:3,4 105:23,24
112:12 120:11
125:11 129:4,5,8
135:25 136:7,8
149:18 151:18,20
152:11 156:16,17

157:11,12 158:17
160:18 161:22
164:19 166:1
167:10 174:20
184:14 192:8
199:17
**production** 9:6
190:8
**products** 1:3
22:15 24:12 27:9
27:22 28:14 48:4
48:8,12 50:5
61:16 96:18 99:11
113:10,18 114:16
116:22 117:4,11
118:14 119:2,8,21
121:11,18,19,23
122:19 123:3,14
128:5 129:11,14
129:18,21 130:5
130:11,17 131:7
132:25 133:1,13
133:17 136:4
137:22 138:20,20
142:9 145:3,14,18
145:20 146:7,13
147:8 152:14
157:14 158:1,12
159:15 160:9
161:12 163:23
165:17 167:5,14
173:7 176:7
186:12 187:5,12
187:15 190:6,12
190:14 194:4,6
**professor** 101:9
104:6
**profile** 93:13
**profit** 61:22 63:25
92:17 98:19
123:12 132:9

138:7,8 148:8
173:25 177:20
188:21
**profited** 48:3
129:20 131:6,10
173:21
**profits** 48:5 61:8
61:21 126:25
129:12 135:9
139:9 140:5,8
141:2,4 169:17,22
173:23 175:23
176:7 177:2,11
178:8
**programs** 24:21
**proof** 123:21
**proper** 123:25
127:12,18 128:9
**propose** 126:23
**proposed** 108:7
124:14 139:25
148:25
**proposing** 115:24
**prospective** 157:9
158:8 159:13
190:5,18
**prospectively**
143:4 153:1,3
163:21 164:1
167:18 192:11
**protection** 46:19
56:15,24 58:12
**protective** 70:4
**provide** 30:13,13
30:20 31:14 84:19
161:3,5,23 163:2,7
163:10 167:25
177:15 200:19
203:18 204:21
208:2

CONFIDENTIAL

[provided - really]                                                      Page 29

**provided** 17:12
18:8,19 19:4,8
20:3 22:14 23:16
24:3,9 25:18,21
26:7,9 29:23
31:10,12,13,14
33:7 36:11,21,24
37:3,14,21 38:1,3
38:5 40:7,10,18
41:10 42:1,24
43:11,12,16,20
44:1 45:1,24 46:3
46:12,19,23 47:6
47:15 48:14 49:20
49:23 50:2,11
51:16,25 52:19
63:15 65:11 74:2
89:19 96:5 168:6
170:25 176:9,18
177:3,5,24 186:23
187:1 200:1
**providing** 162:25
163:1 167:12
**proving** 38:20
**public** 12:22 16:7
42:21,22 102:20
102:23 118:19
132:8 153:14
207:22 208:4
209:4 212:19
**publicly** 132:8
**published** 104:13
104:16
**pull** 109:7 198:8
**pulled** 101:4
**purchase** 79:8
123:7 133:16
151:16 172:10
173:3
**purchased** 80:22
133:13 135:3

138:20 172:25
**purchaser** 79:9
**purchasers** 79:19
79:19,24 80:7,24
81:21,25 131:15
131:16
**purchases** 77:10
77:18 78:11 79:7
92:12 116:24
117:6 158:7
**purchasing** 117:12
134:13 142:9
145:17 173:7
174:12
**purely** 89:24
90:15
**purity** 190:9 192:6
**purposes** 14:21
16:16 43:10 70:3
70:4 86:6 89:25
99:18 115:20
130:14,15 157:16
166:4 186:10
188:7,12
**purview** 69:13
71:2
**put** 181:5 200:12
200:17 203:8
**putting** 64:17 65:1
93:6,7 120:10
207:17 208:1

**q**

**qdt** 80:21 81:20
95:19 136:25
137:10
**qualifications**
196:20 198:23
**qualifying** 35:14
**quantities** 162:8,8
**quantity** 27:10
35:20 80:22 81:16

89:10 94:16 95:19
145:18 147:3,4
156:15 160:7,8,11
160:25 161:20
162:2,22 163:2,4
163:11,15
**question** 11:20
21:21 22:7,8,25
26:13,14,18 28:17
33:18,21 35:3
36:8,14 39:2,4,6
39:14 41:9,14
42:13 46:20,23
47:12 52:24 58:2
59:21 66:20,23
67:24 68:18,19
69:2,17 70:5 72:1
72:7,21 73:5,10
75:11 76:23 78:10
78:15 79:22 84:8
86:3 87:3 90:13
93:24 95:7 97:2
107:24 110:24
119:17 120:4
129:7 131:23
139:13,17 140:20
141:1,20 159:7
161:19 166:13
169:5 174:3 175:3
175:10,16,18
178:16,17,20,24
178:25 179:1,9
180:3,23 181:8,19
182:6,12,14
187:23 188:16
191:15 195:2,14
195:16,19 196:22
197:3,6,7 198:1
202:11,14 203:11
203:17,20,24
204:9

**questioned** 170:16
**questioning** 11:8,9
173:19
**questions** 9:12
11:11,17 77:3
87:4 100:15,17
140:13 152:4
155:9 156:1
161:25 167:25
188:7,12 189:22
206:17
**quick** 127:25
**quite** 30:4 187:22

**r**

**r** 2:1,12 3:1 4:1 5:1
6:1 7:1 209:1
211:3,3
**rachel** 2:16
**ramifications** 46:7
**random** 56:25
**range** 96:13,15,16
**raspanti** 6:2
**reach** 106:22
**read** 14:19,20,22
14:24,25 15:2,3
32:10 38:23 51:3
83:4,9 110:23
175:9 210:9 212:5
**reading** 19:17
**ready** 13:2 100:8
172:19
**real** 127:24
**reallocation** 70:22
**really** 22:17 69:2
70:22 77:4 82:8
82:24 98:18
108:22 117:19
118:23 122:14
125:17 129:17
130:4 143:11
145:9 146:10

**[really - repackaged]** Page 30

149:1 166:13
204:17
**realm** 70:14
**reason** 210:11
211:6,9,12,15,18
211:21
**reasonable** 61:23
138:9
**reasons** 71:24
**rebate** 141:8,9,14
141:17 142:24
166:24
**rebates** 61:4
138:16,19 139:11
140:7,18,24 141:6
143:1,18 144:25
145:4,19 148:15
148:18 166:8
167:2,4
**rebazan** 3:11
**rebecca** 3:11
**reboot** 132:3
**recall** 25:3,5 29:17
29:25 33:11 56:5
116:12 164:3,20
194:6
**recalled** 27:22
48:9 163:16,23
165:16,25
**recast** 51:20
**receipt** 210:18
**receive** 180:23
**received** 123:8
136:14 176:10,11
205:16
**receiving** 167:24
181:25
**record** 11:3 18:9
19:11 54:22 55:1
70:1 75:25 76:3
100:5,11 154:9,14

154:19 155:17,19
155:21 168:3,16
180:16 183:7,10
201:12,13,15,17
202:14 203:3,8
205:9,19,24 206:1
206:3,9 207:13,18
**recorded** 160:18
161:10,21
**records** 108:18
131:20 203:7
**redo** 53:19
**reduce** 132:20
**refer** 15:13 18:12
18:16 95:9 109:8
112:21 116:20
197:14 201:4
**reference** 27:17
28:13,14 55:20,21
63:18 77:8 78:11
203:10 206:23
**referenced** 18:1
28:1 77:23 172:23
173:20 192:18
210:6
**references** 12:9
**referencing** 59:13
**referred** 22:19
55:24 58:19
113:13
**referring** 15:17,18
27:14 59:11 78:12
78:13 85:4 89:2
90:5,12 128:9
134:8 138:15
182:3
**refers** 28:11
128:17
**reflect** 60:7 168:16
169:21 199:19
206:9

**reflected** 37:18
57:6 169:16 174:5
**reflection** 45:16
46:5
**reflects** 41:18
**refund** 71:21
72:10,15,16
**refunds** 165:15,25
**regarding** 12:5
46:6 55:7 67:16
100:19 113:5
135:23 192:6
**registered** 37:5
**regular** 31:4
**regulation** 102:12
200:5
**regulator** 192:4
**regulators** 43:15
**reimbursed**
181:13
**reimbursement**
102:11 181:23
**relabeled** 30:2
51:21 99:11,15
**relabeling** 105:22
**relate** 28:20 96:17
99:2,3
**related** 20:20
21:14 40:12 60:21
61:17 65:18 67:4
78:4 94:20 95:2
98:25 102:11
103:21,23 104:25
105:21 106:3
118:4,4 124:8,9
129:22 130:7
146:7 148:12
149:18,25 150:1
167:6 187:4,11,12
191:10 209:10

**relates** 1:4 22:25
84:3 96:2
**relating** 14:3,14
15:9 16:15
**relative** 93:12
151:7
**release** 154:10
**relevant** 24:25
26:23 27:10 28:18
28:21,22 35:18
47:22 48:15,16,16
48:18 50:1 57:5
57:14 59:6 61:24
61:25 148:17
160:9,19 173:12
176:20
**relied** 17:11 24:10
127:14 192:17
193:21
**rely** 16:14 17:8,10
24:8 49:14 127:11
**remainder** 47:19
47:20 82:11
**remember** 12:16
51:19 84:12
103:15 104:8
105:3 107:19
108:4 142:7 171:1
**remind** 70:23
**remiss** 108:13
**remove** 89:20
**removed** 61:22
138:8 170:5,6,22
171:16,22
**rena** 1:11 2:5 8:5
10:2 207:19 209:6
210:5 211:2,24
212:2,4,12
**rendering** 114:23
**repackaged** 30:2
99:11,14 187:4

**repackager**  51:19
  164:8,12,18
  165:13
**repeat**  115:11
  140:20 164:14,14
  192:25
**replicated**  201:24
**report**  8:5 12:3,8
  12:10,17 15:5
  20:19 25:2 27:7
  27:18 28:12,13
  32:3 33:15 44:7
  47:25 48:22 51:3
  51:25 52:5 54:1
  55:8,12 60:5 61:7
  62:8 72:17 75:18
  77:7 83:4 88:22
  93:21 94:2 103:3
  107:17,18,23
  108:2,6,19,20,25
  109:7 110:21
  112:21,22 115:21
  116:15 117:23
  118:21 127:25
  132:10 155:10
  156:2,25 157:22
  159:21 160:6
  161:1 162:7,21
  163:1 166:20
  169:14 170:3
  171:6,23 173:6
  174:13 181:6
  184:13 185:8
  192:19 193:12,17
  196:10,14,16,24
  197:9,17,17
  198:25,25 200:4
  200:12 201:3,9,25
  202:16,21 203:9
  203:14 204:20,23
  206:22 207:19

**reported**  43:15
  133:17
**reporter**  1:15,15
  11:12 14:5,7 16:1
  16:9 17:18 23:6
  24:16 34:1 45:2
  57:11 59:20 64:4
  66:21 67:17,19
  71:8 75:8 77:11
  77:15 80:13 81:23
  91:5,8 96:14
  97:22 100:16
  101:1,2,17,20
  104:15 105:7,13
  107:10 110:18
  112:17 113:20
  114:19 115:10
  120:19 121:4
  125:1 128:12,23
  129:12,15 130:1
  131:24 132:15
  135:13 138:11
  140:19 141:25
  153:16,19,21
  158:4 162:13,16
  164:13 165:6
  167:20 169:2,4
  170:8 171:13
  178:1,21 182:22
  182:25 185:18,21
  193:13,18 194:18
  194:23 199:10
  204:22 205:1
  206:5 208:3 209:4
**reporting**  118:19
  153:13
**reports**  12:11
  102:19,23 103:10
  118:21 150:11
  198:13,19 200:15
  201:3,4,22 202:21

204:8
**represent**  11:16
  19:10 29:6,9,13
  49:18 60:9 71:21
  72:10,23 155:7,25
  162:8 168:24
  169:17 183:13
**representation**
  38:17
**representatives**
  102:13 111:1,10
**represented**  22:17
  37:20 38:7 110:16
  192:9
**request**  9:1,6 83:8
  83:11 163:9
**require**  99:7 135:1
**required**  37:5
  43:14 81:13 82:9
  97:23 134:22,22
  136:6 212:13
**requirements**
  117:13 147:14
  190:9
**requires**  59:25
  69:2 79:7 103:2
  139:13
**resale**  120:24
**research**  15:21
  17:1,19 31:9 34:8
  107:13,14
**researcher**  16:19
**reserve**  126:12
**resold**  123:4
**respect**  115:22
  120:9 137:3 141:6
  143:18 184:17
**respectfully**  80:15
  139:14
**respond**  181:17
  187:21 193:10

**response**  207:14
**responsibilities**
  181:5
**responsibility**
  174:6
**rest**  31:21 190:8
**restated**  94:6
**restricted**  1:8
**result**  163:16
  164:20 166:11
  209:11
**resulted**  160:13
**resume**  54:19
**retail**  11:18 13:11
  13:21,25 15:10
  17:14 18:2 25:18
  26:8 27:15 29:10
  32:13,23 36:11
  37:1,16,21 38:1,23
  39:15 40:10 43:19
  44:6 50:14 59:18
  65:3 66:8 67:12
  68:13 83:15 85:2
  89:8 94:11 99:14
  114:7 119:24
  120:24 121:5,8,11
  121:20 122:2,5
  123:4 136:1,4
  142:12,20,23
  144:5,13,14,14,15
  146:5 152:23
  153:5,6 169:22
  170:7,9,25 173:8
  174:19 175:22
  177:10 188:20
**retailer**  8:3 13:7
  15:8,14,18 17:10
  17:11,24 18:6,18
  19:17 20:4 21:20
  22:1,12 23:4,11,16
  23:23 26:15 28:25

29:19,21 30:22
31:20 33:9,17
35:15 36:12,19
37:17 39:8 40:23
41:2,15,23 42:7
43:5 44:4 45:23
46:18 47:6,22
49:8,12,14,22 50:5
50:7,8,13,16 51:17
56:8,11 57:6
60:25 61:8,12
66:5,17,18 67:1
84:23 85:13 88:23
89:12,25 90:4,10
90:16 91:22 94:16
95:14,17,20,21
103:13 134:10,16
143:19,19 144:25
145:6 146:3
169:14 171:17
173:13 176:8
**retailers** 12:6,12
12:18 14:17 21:14
22:14,18 27:21
33:7 48:2,3,7,15
52:19 58:10 59:3
61:13 66:25 73:13
74:1,8,10,14 75:1
89:16 95:24 96:3
99:12 103:7 123:8
126:7 131:1,5
133:5,11 136:6
143:15 173:21
176:14,17 177:3
177:14,15,21,23
186:17
**retrospective**
190:19
**retrospectively**
96:10 190:13,22

**return** 137:24
210:13,17
**returned** 138:18
**reveal** 76:9 180:24
**revealed** 201:22
**revenue** 64:1
84:18,20,21 85:3,8
94:10 95:9 132:10
136:24 137:3,13
137:25 138:16,21
148:9 149:5 151:6
173:23 174:5
176:7 177:2
**revenues** 12:6
48:6 49:18 65:20
103:13 126:25
127:19 132:7,7
135:14 136:15,18
140:24 142:17
144:3 147:25
176:9
**review** 11:23 12:2
13:1,10 110:25
111:5,9,25 146:2
151:22 202:5
210:7
**reviewed** 13:6,17
13:19 14:2,13
15:10 16:15 41:24
102:24 109:25
110:3
**reviewing** 13:5
102:19
**rgeman** 2:17
**right** 21:8,16 28:8
41:5,16,25 42:2
44:13 46:2 47:17
54:9 55:25 57:1
58:21 62:7,23,25
62:25 73:9,12
78:21 79:21 83:11

87:17 88:14 104:1
107:23 108:4,17
109:22 110:4,8
112:7 117:24
118:11 119:4
120:6 121:21
122:6,14 127:2
128:10 131:11
132:23 136:23
137:11,13,14
145:1 146:25
150:22,25 151:2,3
152:14 155:9
156:25 157:21
159:3 161:16
162:5,12 169:19
169:23 170:7
172:22 173:22
177:25 179:16
181:6 185:15,17
187:8,14 195:25
197:2 205:7
**ringing** 91:13
**rite** 5:10 11:16
41:19
**road** 5:20
**rockett** 6:18
**rockett.shevon**
6:19
**role** 101:9,14
102:5,17 106:25
107:5 120:9
**roles** 107:3
**rooney** 4:18 5:2
**rose** 4:8
**roseland** 2:9
**ross** 4:11
**roszel** 5:20
**roughly** 160:13
**routinely** 107:2

**routinized** 153:11
153:12,17,18,19
153:22
**row** 81:24
**rows** 19:11
**ruben** 2:3,3 71:18
84:15 87:2 203:3
205:4,12,20
207:11 210:1,2
**ruben's** 73:9
**rule** 143:8
**ruler** 2:13
**rules** 123:24 124:8
125:5
**running** 195:3

**s**

**s** 2:1,21 3:1 4:1 5:1
6:1 7:1 8:1 198:20
211:3
**safety** 190:9
**sagoldberg** 3:3
**sale** 28:21 32:23
43:1 48:4,5 60:22
61:3,9,17 91:4,7
92:1 93:4,14
94:15 96:11,23
97:13,20 134:10
158:12 166:16
167:4 169:18
173:11,11,22
174:21 177:18,19
182:4
**sales** 30:10 118:3
118:19,21 133:21
134:9 158:23
160:15,18 166:10
**sample** 110:9,12
**sanger** 2:11
**sas** 24:15,17,18,21
**satisfied** 67:11

CONFIDENTIAL

**satisfies** 71:11
**saying** 23:10 47:12
  55:7,10 57:20
  88:1 91:25 143:25
  161:16 185:7
  204:15 205:3
**says** 35:9 73:11
  79:21 80:21 85:17
  95:9 133:8 136:23
  149:22 173:21
  198:19
**schneider** 14:4,6
  14:15
**sciegen** 6:16
**sciences** 199:15
**scope** 60:5 67:21
  70:19 71:2,12
  86:24 139:15
  187:20
**screen** 18:9 28:5
  104:20,23 106:7
  133:24 200:18
**script** 35:15
**scripts** 4:17 34:3
  42:5 168:24
**scroll** 19:20 45:22
**second** 19:24
  26:11 32:10 44:23
  44:23 109:13,19
  110:10 116:21
  156:7 157:1
  174:15 198:11,12
**seconds** 201:20
  204:12
**secrets** 152:1
**section** 48:22
  49:19 61:7 109:1
  109:18,19,22
  111:19 123:11
**security** 199:9,16

**see** 19:12,21 20:9
  20:18 21:7 24:22
  27:25 31:12,13
  42:22 55:19 57:2
  77:13,24,24 85:1
  88:25 89:8,25
  90:16 93:21
  108:23 109:18
  110:9 111:18,20
  112:4 113:14
  117:1 122:3,20
  128:2,7 130:25
  133:7 136:25
  138:6 152:2 155:3
  159:25 160:2
  174:11 195:3
  200:16,21
**seeing** 161:20
**seen** 131:21
  133:22,25 134:2
  146:5,12 150:1
  152:3,6 202:4
**sell** 114:2 119:8,21
  119:24 121:9
  131:15 133:1,14
**sellers** 75:2
**selling** 134:15
  142:11
**sense** 92:14
**sent** 20:8 210:14
**sentence** 14:9 38:7
  116:21 117:1
  122:15 130:25
  133:7 192:22
**sentences** 132:24
**separate** 59:6 72:7
  94:1 150:8 185:16
  195:19
**separately** 150:3
  150:15

**september** 198:14
**series** 21:13
**served** 168:10,16
**service** 149:12
**serving** 168:8
  199:6,11,13
**set** 50:7 113:3
  139:10 140:6
  160:10 179:14
  180:7 189:17
  209:13
**seta** 24:22
**seth** 3:3 11:5
  206:13
**sets** 180:5
**setting** 23:17
  144:6 179:25
**settled** 166:5
**settlement** 166:4
**seven** 97:8
**share** 104:20,23
  106:7 133:24
  151:7
**shared** 104:20,22
  105:4
**shareholder** 12:11
  102:19 103:3,9
  118:20
**shareholders**
  150:11 153:14
**she'd** 83:8
**sheet** 210:11
**shelf** 146:14
  158:21
**shevon** 6:18
**shield** 8:6 197:9,12
  197:18 198:14
  199:22 202:16,22
  207:20
**ship** 121:2

**short** 54:23 76:1
  100:6 103:23
  183:8 195:3
**shorthand** 209:3,8
**show** 170:2 197:24
  198:5
**shown** 106:3
  132:11
**shuffling** 105:14
**side** 93:11,13
  148:9,9 149:12
  200:13,13
**sided** 142:7
**sign** 106:5 210:12
**signature** 209:16
**signed** 210:20
**significant** 36:20
  114:15 143:12
  144:4,8 151:21
  155:14 163:19
  172:13
**significantly**
  144:13
**signing** 143:14
**similar** 104:11
**similarly** 116:10
**simple** 23:17
  35:19 53:9 54:2
  110:24 129:7
**simply** 26:22
  47:21 51:11 70:24
  127:8 176:4
**single** 23:15 25:19
  40:20 135:16
  202:11
**sir** 115:19 170:11
  171:2 172:3 173:1
  173:5 176:2,23
  179:20 181:19
  188:17 190:23
  194:11 196:15,22

**[sir - state]**                                                                          Page 34

197:11
**sitting** 23:11 26:1
  37:2 38:2 91:11
  158:21 178:5
**size** 147:9,12
**sizes** 147:11,18,21
**slack** 2:11
**slater** 2:7,7
**slaterdavis.com**
  2:12
**slight** 144:16,24
**slightly** 20:18
  21:14 121:14
**small** 116:22
  117:4 151:11
**smolij** 3:5
**snippet** 14:25
**software** 24:15,17
**solco** 3:8,15
**sold** 27:20 43:7
  48:7 84:2,23 85:3
  85:13 89:11 95:19
  113:11,19,23
  114:7,11 118:8,15
  119:3 121:11,13
  121:19,22,23,24
  123:8 128:6
  131:17 135:3
  138:20 145:13,21
  157:4 158:13
  159:15 167:5
  176:8 187:9
  188:19 190:14
**solely** 17:9
**solutions** 210:23
**somebody** 105:14
  194:20
**sorry** 14:10 16:1
  17:18 18:15,24
  19:5 21:1,22 28:2
  35:1,1,10 36:15

41:14 42:19 43:9
  45:2 52:8,24
  57:11 59:20 62:18
  66:21 71:16,18
  72:1 75:8 77:11
  77:12,21 78:16
  85:1 86:2 87:1
  91:5 95:5 100:16
  104:15 105:13,18
  107:25 108:12,16
  110:18,20 111:15
  113:20 119:12
  120:24 128:12
  131:24 132:2
  140:19 141:25
  142:1 148:21
  155:12 162:13
  164:13,21 165:9
  166:21 168:22
  169:2 170:15
  178:1 183:3
  185:19 186:6
  187:23 192:21
  193:13 194:18
  195:13 197:11
  199:10 200:19
**sort** 51:11 53:5,9
  53:17 54:9 79:24
  101:22 104:10,22
  133:22,25 135:23
  150:5 202:7
**sorting** 49:1
**sorts** 149:7,20
**sounds** 27:4
  183:20
**south** 3:6 5:8
**speak** 174:10
  180:15
**speaking** 165:7
**special** 14:3,14
  146:12,13,14

**specialty** 117:9,16
  118:5 121:13
**specific** 15:9 18:13
  18:16 20:21 25:23
  26:24 30:10 50:20
  61:16 64:2 81:11
  101:12 102:8
  103:15 104:24
  105:11,21 113:24
  114:3,3 116:6,7
  118:22 119:5
  123:12 125:5
  132:14,16 135:6
  135:20 143:3
  151:10 152:17
  160:10 161:12
  164:24 167:7
  184:11,14 185:3,9
  194:6 196:15
  197:7,20
**specifically** 15:23
  56:13 106:18
  113:5 118:21
  124:9 196:2
**specifics** 152:15
  196:25
**spend** 12:23 30:21
  102:4
**spending** 22:14
**spent** 15:22 30:23
  30:25 31:2 68:22
  71:21 72:11
  101:13 106:16
  107:7 108:5,11,19
  177:12 178:10
**spoiled** 145:16
**spoke** 31:4
**spoken** 76:13
**spreadsheet** 8:4
  18:7,19 19:11
  21:20 22:11 23:3

24:14 31:20 33:9
  33:17 49:2
**spreadsheets**
  20:15
**st** 4:16
**staff** 20:10,25
  22:14 26:15 30:23
  30:25 31:4,22
  33:2,8,13,16 38:8
  38:15 40:8 55:4
  76:22 77:1 96:5
  195:24
**stamp** 26:2 207:23
**standard** 1:13
  43:14 196:20
**standing** 16:4
**stanoch** 2:22
**start** 70:5 73:20
  109:9 136:15
  138:15 142:2
**started** 41:24
**starting** 11:25
**starts** 130:25
**state** 6:15 19:17
  20:23 22:15 23:20
  25:21 26:21 27:7
  31:25 32:2,12,18
  32:19 33:5,10,18
  33:22 34:13 35:15
  40:15 44:22,25
  46:6 47:22 50:14
  50:15,17 51:4,6
  56:25 58:21,25
  59:2,6,19,23 60:8
  74:2 123:21 124:2
  124:2,2,7,8,17,22
  124:23 125:5,8,21
  125:22 126:5,11
  174:7 181:5
  184:11,14,17,18
  185:3,9 202:13

CONFIDENTIAL

**[state - take]**                                                    Page 35

203:23
**stated** 70:17 71:24
  72:14
**statement** 35:3
  68:17 131:9
  171:21 202:25
  203:2
**states** 1:1 20:21
  21:15 23:14 25:25
  33:3 45:23 48:17
  50:20,23 51:15
  52:17 53:4 54:4
  123:23 134:4,25
  135:2 165:13
  184:3
**statistics** 12:5,8,9
**stats** 54:8
**stay** 109:16
**stenotype** 209:4
**steps** 52:2 53:23
  53:25 54:4
**steven** 3:18
**steven.hunchuck**
  3:19
**stick** 111:16
**stipulations** 9:9
**stocked** 172:17,18
**stocking** 121:25
**stomping** 27:2
**stop** 74:14 154:3
  175:5 182:16
  205:7
**stopped** 25:14
  27:4
**storage** 117:13
**store** 150:5 173:17
**stored** 172:23,25
**stores** 32:15
  172:13
**storing** 129:25

**stoy** 6:3
**strategy** 12:25
  103:2
**street** 2:4,17,24
  3:6,13 4:20 5:4,8
  6:10,15,19 7:9
**strength** 192:6
**stretch** 206:18
**strike** 13:18 36:1,8
  67:6 170:3 178:3
  179:8 204:14,17
**striking** 178:24
**structure** 141:14
  141:17
**structures** 141:8
  141:10 142:24
**students** 103:3
**study** 104:5,11,12
**studying** 13:1
**subcategory** 22:16
**subgroup** 74:2
**subheading** 15:8
  15:14
**subject** 162:5,6
  167:23
**submit** 108:15
**submitted** 199:20
**subscribed** 212:14
**subsequent** 51:8
**subsequently** 43:7
**subset** 78:13
  113:10,17 114:11
**subtotal** 51:11
**subtract** 50:3
**subtracted** 174:19
**subtraction**
  177:16
**suggestion** 20:14
**suite** 2:4,13 3:13
  4:5,11,15,20 5:4
  7:5,9

**sum** 47:21 50:12
  57:3 58:12 63:1
  69:23
**summary** 55:15
**summed** 48:19
  58:11 73:14 74:14
**sums** 63:23
**super** 77:4
**supply** 103:6,23
  106:20 114:18,20
  117:9,17 120:1,10
  120:17 135:2
  136:5 142:13
  145:21 172:16
  187:10,12,16
  190:1,11 191:12
  199:16,17
**support** 175:22
  177:16 178:7
  179:6
**supports** 177:10
**suppose** 67:6,8
**supposed** 180:24
**sure** 15:15,16 19:1
  19:9,21 24:6 28:3
  29:11 31:15 35:24
  41:13 45:15 47:18
  48:25 54:18 55:9
  55:14 56:2,3,7
  57:18,20 64:22
  66:20 68:24 77:5
  82:3 87:22 104:3
  109:14 115:12
  122:12 134:17
  136:16 137:9
  140:21 141:4,12
  144:17 155:6
  160:15 162:21
  164:15 189:1,17
  193:1 201:13

**surmised** 34:16
**suspect** 34:11
**switch** 118:25
**switching** 150:23
**sworn** 212:14
**system** 106:17
  134:5 136:3
  147:15
**systems** 135:1

**t**

**t** 3:12 5:13 8:1
  80:23 84:24 85:4
  85:14 88:24 89:11
  89:13 95:15,20,22
  209:1,1 211:3,3
**tab** 81:15
**table** 10:1 20:18
  20:19 21:7,9,11,11
  21:12 45:24 46:19
  47:3,6 55:20,21
  56:8,12,17,19
  58:19,19 59:4,10
  59:12,14,14 62:21
  63:1 66:3,4,8,10
  66:16,18 67:9
  68:11 70:11,13
  71:20 72:23 73:2
  73:12 74:3,6,9,15
  74:16 75:1 159:20
  168:5 169:14,16
  171:19 174:1
**tables** 59:9 65:24
  73:24 74:19
**take** 44:20 48:13
  54:16 75:21 80:13
  91:20 92:8 99:23
  106:8 120:18,19
  120:21 121:1,25
  124:16 131:14
  158:14 164:25,25
  166:14 167:16

CONFIDENTIAL

**[take - third]**                                                                                   Page 36

178:5 183:4,4
**taken** 1:11 22:20
  54:23 61:14 63:23
  76:1 100:6 154:15
  173:13 183:8
  203:15 207:22
  209:6
**takes** 92:5
**talk** 24:25 35:7
  36:2 55:4 56:19
  58:9 85:7 89:21
  118:19 132:24
  173:7 205:2
**talked** 13:4 15:6
  16:18 21:25 22:11
  52:3 83:20 101:8
  103:7 106:15
  129:3 152:19
  160:5 170:4 184:8
  194:2,15,24
**talking** 22:24 23:2
  23:2 32:14 34:22
  41:24 68:23 73:19
  75:9 90:4 93:10
  102:25 118:10
  121:16 139:23
  142:17 170:14
  174:22 178:2
  188:8 198:16,17
  199:22
**talks** 118:7
**tallied** 181:4
**teach** 16:19
  102:17 103:1
**teaching** 12:23
**tech** 109:6 112:23
  113:3 116:15
  122:8 130:21
**technology** 150:4
**telephone** 39:20

**tell** 15:21 39:7
  54:7 81:19 97:17
  102:16 103:24
  126:9 157:10,12
  160:11 162:2,22
  174:8
**tend** 82:19 147:21
  153:11
**term** 72:17 81:20
  94:4 148:17 153:2
**terminating**
  203:16
**terms** 17:6 22:5
  62:2 63:3 64:18
  89:25 90:16 98:19
  144:9,10,11 145:5
  145:12 151:6,7,16
  153:4 164:5
**testified** 20:16
  68:3 69:14 156:20
  180:1,4 207:6
**testify** 179:10
  193:4
**testimony** 111:10
  143:22,24 171:3
  180:22 190:24
  192:25 193:2,9
  199:20 210:9,18
  212:8
**teva** 4:6 6:12
  69:22 103:11
  118:18 183:13,14
  184:1 193:23
  194:6,12 206:24
  206:24
**teva's** 194:9
**texas** 2:13 4:11
**text** 205:15,16
**texted** 205:14
**thank** 22:7 28:8
  34:25 35:11 36:6

38:14 45:20 60:3
  67:19 69:7 70:3,6
  73:22 82:14 83:2
  84:15 91:8 93:17
  99:20,21 100:1
  101:24 119:18
  120:15 126:17
  127:21 128:24
  129:15 132:21
  139:18 162:16
  163:8 168:1
  169:10 170:20
  174:18 175:19
  193:18 208:10
**thanks** 84:15
**theoretical** 60:24
  64:10,17 65:1
  86:9 88:1 89:3,22
  96:2 147:20
**theoretically** 65:9
**theories** 21:10
  37:12 66:6 73:25
  74:5,7,12,17 126:8
  184:9
**theory** 49:12
  50:21 58:25 59:2
  61:10 64:15 65:16
  88:6,6,7,9,20
  90:12,14 128:11
  128:13 131:11,19
  167:1
**therapeutic** 191:4
  191:8,9,14
**thereof** 209:12
**thing** 15:20 46:18
  48:20 59:9 81:3
  96:3 118:23 128:1
  146:18,21 148:14
  149:11 173:9
  177:18 202:23

**things** 12:20,22
  57:25 81:7 87:17
  87:19 90:6 134:20
  137:16 147:13
  149:7,20,24 150:5
  150:17 167:2
  172:17 192:22
  201:6
**think** 22:18,24
  23:10,12 29:5
  31:16 38:25 46:13
  47:20 48:21 51:15
  53:8,9 55:8 56:1
  57:17 62:9,13
  80:16,16 93:14
  98:14 99:22
  103:11 104:5
  105:9 107:4,17,18
  109:7 116:5
  117:25 119:23
  126:18 128:21
  133:23 139:20
  140:11,13 141:19
  143:6,23 148:10
  148:16 149:24
  150:23,24 152:18
  154:2,4 159:12
  163:3 176:4
  182:18 185:5
  193:3 194:1 195:5
  195:7 199:2
  200:25,25 201:8
**thinking** 106:17
  107:3
**third** 22:21 49:17
  61:2,11 65:14
  80:20,21 97:11
  157:10 158:1
  159:14 160:22
  163:22 165:16
  167:9,13,17

[third - typically]                                                                   Page 37

176:12 181:24
191:25 192:4,9
**thornburg**  5:7
**thought**  108:8
145:10 148:22
176:22
**three**  6:10 68:4
79:25 80:4,9 81:2
81:7
**tiffany**  4:3
**time**  1:13 11:1,9
12:23 15:22 24:11
24:25 25:23 26:9
26:11,23 27:10,13
27:20 28:16,18,20
28:22 30:16,21,23
30:25 31:1,2,3,24
35:17,18 37:25
48:13,15 54:20,24
57:5,14 64:6,9
67:5 75:24 76:2
80:14,23 84:24
85:4,14 86:17
88:24 89:11,13
91:15 95:15,20,22
96:19,20 98:10
99:19,22 100:3,9
101:13 102:4
107:8 108:5,14,19
108:25 114:2,14
143:7 144:12
145:15,24 151:18
151:19 152:19,24
154:3,4,12,17
155:16,20 156:15
156:16,17 158:2,6
159:2,3,11 160:9
160:19 162:10
164:5 165:7 167:6
168:1,14 172:24
174:25 183:6,9

187:8 188:17,18
195:3 199:3,4
201:1,9,15 203:15
204:5,6,14,23
206:6,7 209:6
210:19
**timeframe**  157:5
157:17 158:22
210:8
**timer**  195:8
**times**  31:23,23
68:4 83:21 94:1
94:16 95:20 97:8
99:10 156:16
160:7,8 161:20
163:2 184:9 197:1
**timestamp**  40:1
**title**  120:21 121:1
123:3 131:14
**titled**  207:18
**today**  11:21 33:14
76:6 79:5 104:5
155:9 156:20
178:6
**today's**  11:25
**told**  26:18 53:25
58:1 108:13 112:9
114:22,24 127:12
195:10
**ton**  39:16
**tons**  37:2
**top**  19:16 64:14
75:9,14 103:19,25
108:12 110:14
111:2,4 116:12
134:25 148:3
164:10 207:24
**topic**  195:4
**topics**  75:19
**torrent**  69:22

**total**  35:13 50:12
57:4 58:6,9 67:4
69:23 72:10 73:12
74:13 82:22,23,25
118:19 128:4
181:4
**totally**  141:17
**totals**  47:21
**touche**  117:25
**tpp**  60:23
**tpps**  133:1
**trace**  134:3,4,22
135:1 147:15
**traced**  136:2
**track**  134:3,4,6,21
134:25 135:11
136:7,11 147:14
147:14 150:10
**trade**  5:4 121:12
122:2,3,5 123:5
136:1,5 188:21
**traded**  132:9
**trailed**  100:17
**trained**  51:23 54:3
**transaction**  43:12
96:19 104:24
105:4 127:9 135:9
135:15 137:19,20
143:3 167:7
**transactions**  23:13
26:1 105:18,20
114:6 179:21
182:4
**transcript**  210:6
210:20 212:5,8
**transcription**
209:7
**transparency**
192:10
**traurig**  4:2 183:2

**treatise**  177:9,13
177:15 178:7
179:4,5
**trial**  71:1
**tried**  204:9
**triple**  108:15
**true**  46:15 180:8
191:24,25 209:7
212:8
**try**  69:16 77:22
87:11 132:20
183:21 197:4
**trying**  21:1 22:9
24:5 48:24 51:2,4
53:2,10 78:9
93:18 95:4 102:4
122:12 171:5
182:14,14 189:14
192:24 203:12
**turn**  15:4 159:20
169:13 207:15,15
**turned**  26:15
**two**  20:15 21:10
53:3 55:23 80:8
87:17,19 108:6,9,9
108:11 137:12
142:7,21 153:3,25
162:23 186:1
**type**  23:4,7 34:15
96:18 118:21
142:9,14 149:3
150:2 151:18,20
152:10
**types**  78:5,5,25
96:18 105:24
135:3,4 145:14
146:14 152:21
**typically**  12:21
96:10 98:15 152:8
152:25 179:14
180:7

CONFIDENTIAL

**u**

**u.s.** 3:9,9,15,15
30:4 37:7 75:3
102:21 114:1
118:3 124:5
135:18 136:1
153:11 158:13
164:7 172:16
188:21
**uh** 63:7 85:6
185:21
**ulmer** 7:8
**ulmer.com** 7:9
**ultimate** 67:16,17
139:13
**ultimately** 106:22
158:13 166:3
**undergrads** 54:8
**underlies** 52:2
**underlying** 21:11
26:17 52:13,15
163:5
**underneath** 52:13
95:13
**understand** 11:21
15:17 19:2 21:2
21:21 23:10 24:6
29:5 36:14 39:4
39:13 41:8 42:13
42:14,14,19 46:2
47:18 48:25 51:4
53:2,10 55:8,25
56:3,7 57:18,20,22
58:2 66:3 67:23
71:25 77:6,22
78:15 80:12 86:3
86:25 93:19 94:8
95:5,6 97:1,2 99:1
102:4 107:2,24
124:7,11 127:7
134:18 137:8

141:7 142:22,25
159:5 164:22
169:1 174:1,4
178:13 179:13
180:13 181:8,18
182:13 186:5
187:23 189:14
192:16 193:1
196:6
**understanding**
17:13,25 18:4
22:13 25:2 26:6
29:7 40:9 61:8
69:10 92:2 96:9
96:12 101:13
121:10 122:22
127:15 134:5,19
152:1,20 153:24
166:2 172:13,22
179:20 180:6,9
184:21 185:23
**understood** 17:22
168:15 190:20,22
193:3
**uniform** 143:13
**uninsured** 77:10
77:17 78:11,18
79:6,9 81:11,20,24
92:14
**unit** 11:2 54:21,25
84:22 85:12,21
86:8 87:13 88:3
89:12 90:19 91:4
91:16 94:16,17
95:21 100:10
129:24 134:7,25
135:12,12,13
136:9 146:23
147:1,9,22,23
150:13 154:13,18

**united** 1:1 23:14
25:25 135:2
165:13
**units** 89:10 95:19
105:5 118:7 135:3
135:17 137:19,20
147:7,11,13,18,21
147:24,24
**universe** 37:4
40:19
**university** 15:24
16:4,12
**unjust** 20:5,13,17
21:5,12 27:19
47:6 48:3,18 49:9
49:13 50:22 58:5
58:7,13 59:5,9,17
60:19 61:6,24
62:20 63:24 64:11
64:24 65:19 74:9
84:4,11 115:17,24
116:5,11 122:18
122:22 123:19,21
123:24 124:10,15
125:23 126:1,24
127:5,8,13,16,18
128:11,14 129:3,9
130:10 131:12
133:3,10 149:13
169:14,16 171:8
171:17 184:10
**unpure** 166:11
**unseemly** 204:17
**untethered** 87:3,7
**upbeat** 183:23
**updated** 199:18
**upstream** 43:24
150:25 151:16
153:1,25 187:5
**use** 23:3,6 50:15
50:17 55:9 56:2

72:16 96:20 98:4
176:2 204:10
**usually** 23:21 40:5
63:22 97:19 98:17
117:13,15 120:23
147:4,24 150:1,14

**v**

**v** 210:4 211:1
212:1
**valsartan** 1:2
24:11 27:9,20,22
48:4,6,8 50:9 57:5
71:22 72:12 78:19
85:23 86:10 92:11
99:15 113:10
116:22 117:4
118:13 119:1
121:19,22,23
122:19 128:5
131:7 135:24
157:4,18 158:20
163:16 166:10
169:19 173:22
186:21 187:9
188:13,19 190:2
191:3,18 193:5,22
194:9 210:4 211:1
212:1
**value** 129:4,5,7,21
191:4,5,8,9,14,19
191:24 192:12
**vanaskie** 14:4,15
**variable** 25:21
81:8
**variations** 144:24
**varied** 167:10
**variety** 145:12
199:24
**various** 102:11
**vary** 21:14 124:1
150:20 153:4

CONFIDENTIAL

**varying** 50:23
**verdict** 69:5
**verify** 210:9
**veritext** 1:10
   210:14,23
**veritext.com**
   210:15
**version** 51:6,8
**versions** 134:3
   185:17,25 188:13
**versus** 8:6 22:3,3
   60:19 125:22
   144:25 163:23,25
   197:9,13,18
   198:15 199:23
   202:17 207:20
**vial** 90:25 91:10
   93:6
**video** 11:6
**videographer** 7:14
   11:1 54:20,24
   75:24 76:2 100:3
   100:9 132:18
   154:12,17 155:16
   155:20 183:6,9
   201:11,14
**videotaped** 1:10
**view** 40:10 123:2
   203:15
**viewed** 176:19
**violated** 194:12
**violation** 199:20
**virtual** 1:10
**vis** 11:18,18
**volume** 145:17
   148:16

---

**w**

**w** 3:4,5
**wacker** 4:5
**wait** 56:6,18 64:21
   126:19 127:22

148:21 159:2
**waive** 208:4
**waived** 206:24
**waiver** 76:11
   112:13 125:13
**walgreens** 15:23
   15:24,24 16:2,3,7
   16:15,21 42:5,16
   75:1 104:6,7,12
   172:15,24,25
   173:3
**walk** 176:3
**walked** 206:10
**wallack** 5:17
   155:24
**walmart** 42:5,16
   75:1
**walnut** 7:9
**walsh** 6:7,9
**walshlaw.com** 6:8
   6:9
**want** 11:10 15:4
   15:16 20:24 21:4
   24:25 27:6,12
   29:2,6 34:17 35:7
   35:25 36:2 38:18
   38:20 44:2,18
   45:15 46:3 47:17
   55:9 56:2,2,6,14
   56:15,21 57:18,19
   57:19 58:3 64:22
   66:2 68:25 73:11
   75:17 77:5,22
   84:19 87:11,11
   88:21 89:20,20,24
   90:15 111:24
   113:2,4 116:20
   128:1 129:6,7
   134:17 142:21
   162:20 168:13
   180:5 189:17

192:25 201:5,11
   205:24 206:3
**wanted** 13:5 19:9
   26:12 37:11
   110:24 146:18
   168:15 195:4
   203:13
**wants** 132:3
**warehouse** 120:23
   121:3 172:18,24
   172:25
**warranty** 45:24
**washington** 3:13
   4:20 5:14
**way** 2:13 19:21
   43:25 69:3,18
   70:21 81:18 98:21
   124:16 138:5
   146:12 159:13
   164:3 165:19
   166:8 172:18
   198:1 205:5,7
   209:11
**ways** 92:22 133:9
**we've** 46:13 103:7
   140:11 186:17
   189:25 194:1
**week** 97:18
**weekend** 183:23
**weird** 14:8 72:2
   92:16
**went** 21:19,24
   53:25 97:17
   103:22 163:11
   181:2 204:4,5
**west** 4:5 5:4 6:19
   7:5
**whereof** 209:13
**whiteley** 2:20,21
**whitely** 38:9 39:11

**whitney** 6:18
**wholesale** 104:22
   145:19 152:13
   164:23
**wholesaler** 89:5
   101:12 102:12,14
   104:11,11,19
   105:23 110:16
   111:1 119:3
   122:18 129:17
   135:8 136:24
   139:10 140:4
   141:9,14,16 142:5
   144:22 146:2
   147:4,13 149:19
   150:25 151:12
   152:4,16
**wholesaler's**
   101:14
**wholesalers** 12:6
   12:12 100:20
   102:5,15,17,20
   103:6 104:18
   106:6,14,25 107:8
   108:7 113:5,13,24
   113:25 114:3,12
   114:24 115:4,17
   115:23 116:11,25
   117:7 118:16
   119:7,21,25
   120:10,18 123:3
   123:13 124:16
   125:25 126:2
   128:10,18 129:10
   129:18 130:5,10
   130:16 131:13
   132:13,25 133:4
   133:11,12,23
   134:1,6,12,22
   135:11,18,21,22
   136:6 137:4 142:7

CONFIDENTIAL

**[wholesalers - york]**                                                Page 40

142:21 144:1
146:5 147:2 151:6
151:15,23 152:7
152:22,23,25
**wide** 118:11,12
**william** 5:17
**wish** 106:11 152:2
**wished** 202:20
**wishes** 206:19
**withdraw** 72:20
73:4 84:10 97:3
178:3,16,16 179:3
195:2 197:3,6
**withdrawing**
175:15,17 178:19
178:24
**witness** 2:5 11:7
14:8 16:3,11 17:4
17:19 18:12 19:20
23:9 24:18 27:1
32:6,9 34:2 38:13
38:14 39:13 45:4
45:21 46:9 49:5
52:8,23 53:15
54:15 57:12 58:18
60:3,12,18 62:11
64:5 66:14 67:20
69:7 70:6 71:5,10
71:25 72:15 73:1
74:24 75:13 76:13
76:19 77:13,21
79:13 80:3 81:22
83:10,13,20 85:17
86:2,14,25 87:15
87:20 88:13 90:3
90:19 91:6,9,25
92:20 96:16 97:8
97:23 98:12,24
99:17,19,21 100:1
101:19 104:17
105:8,17 107:11

110:20 112:15,19
113:22 114:20
115:8,12 116:2
119:12 120:15,21
121:5 123:1 124:5
124:20 125:2,15
126:17 127:21
128:13 129:16
130:2,14 132:1,16
135:14 138:12
139:4,18 140:11
141:2,19 142:2
143:23 145:9
153:9,18,20,22
154:6,10 155:12
157:21 158:6
159:10 162:15,17
165:10 167:21
168:1,22,25 169:3
169:6,10 170:11
171:14 172:2
174:18,24 175:5,9
176:2 178:18,23
179:19 180:18
181:18 183:3
184:8,21 185:5,22
186:5 187:1,22
189:21 191:7
193:11,16 194:1
194:15 196:5
197:24 199:13
202:3,10,14,19,24
203:23 206:10,15
207:6 209:6,13
210:8,10,12,19
**witnesses** 13:7,12
**wmurtha** 5:18
**word** 55:18 113:17
**words** 78:17 81:2
82:20 131:2,3
143:7 157:24

160:6 162:1
165:19
**work** 16:25 17:1
31:18 34:8 38:11
101:10,11 102:1
103:21 104:14,17
109:4 112:11
125:11 152:5
207:13
**working** 15:22
31:3,9 101:15
103:21 104:7,16
108:20,25
**works** 102:5
106:18 135:7
152:2
**world** 65:17 68:7
68:8 69:19 70:8
72:2 86:9 92:16
152:2 192:14
206:19
**worries** 45:13
**worry** 109:17
**worst** 204:12
**worthless** 129:11
129:13 130:11
**write** 107:19,23
108:1 117:3
157:22,22 195:12
195:15,20
**writing** 107:8
108:5
**written** 13:18
127:11 198:19
**wrong** 56:4
**wrote** 16:6,21
113:17 122:16
195:11,21 201:5

| x |
|---|
| **x** 1:2,5 8:1 |
| **xi01658** 209:17 |
| **xponent** 81:9 |

| y |
|---|

**y'all** 154:4
**yeah** 15:20 27:25
28:2,7 33:19
34:24 56:13 62:11
66:23 70:8 75:20
77:13 80:10 83:12
87:20 101:25
105:5 106:11
108:8 117:8 134:2
134:11 136:20
142:5 143:23
147:3 154:6
156:11 159:24
165:1 187:22
196:5 201:8
203:21 207:3
**year** 22:16 23:20
25:10,19 26:19
35:17 40:14 145:3
153:3,25 161:22
184:14
**years** 106:17
153:3 186:15
206:12
**yell** 183:17
**yeller** 183:19
**yesterday** 13:4
14:18,23,25 16:19
20:16 29:23 58:1
101:9 106:15
107:16,22 129:4
195:10
**yield** 69:3
**york** 2:18,18 6:20
6:20

CONFIDENTIAL

**[zhejiant - zooming]**                                          Page 41

| z |
|---|
| **zhejiant**   3:8,15 |
| **zhp**   69:22 |
| **zmick**   7:4 |
| **zoom**   1:10 |
| **zooming**   70:3 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit 49

REDACTED

Page 1

1

2              UNITED STATES DISTRICT COURT

3             FOR THE DISTRICT OF NEW JERSEY

4                    MDL No. 2875

5      _____

6    IN RE: VALSARTAN, PRODUCTS              )

     LIABILITY LITIGATION                    )

7                                            )

                                             )

8    TESTIMONY OF EXPERT WITNESS             )

     LAURA R. CRAFT                          )

9    - - - - - - - - - - - - - - - - - -

10                        February 18, 2022

                          8:00 a.m.

11

12

13        TRANSCRIPT of the stenographic notes in

14    the above-entitled matter, as taken by and

15    before Sara K. Killian, a Registered

16    Professional Reporter, Certified Court

17    Reporter and Notary Public, remotely via

18    Zoom videoconferencing.

19

20

21

22

23

24

25

Page 2

```
 1
 2   A P P E A R A N C E S :
 3
 4   KANNER & WHITELEY, LLC
 5   Attorneys for Plaintiff
 6   701 Camp Street
 7   New Orleans, Louisiana  70310
 8   BY: DAVID STANOCH, ESQ.
 9      LAYNE HILTON, ESQ.
10
11
12
13   LEVIN SEDRAN & BERMAN, LLP
14   Attorneys for Plaintiffs
15   510 Walnut Street, #500
16   Philadelphia, Pennsylvania  19106
17   BY: CHARLES SCHAFFER, ESQ.
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2   A P P E A R A N C E S :
 3
 4   WALSH PIZZI O'REILLY FALANGA
 5   Attorneys for Teva Pharmaceuticals USA
 6   1037 Raymond Boulevard, 6th Floor
 7   Newark, New Jersey  07102
 8   BY: LIZA WALSH, ESQ.
 9      CHRISTINE GANNON, ESQ.
10
11
12   MORGAN LEWIS & BOCKIUS, LLP
13   Attorneys for Aurobindo Pharma USA, Inc.
14   One Oxford Centre, 32nd Floor
15   Pittsburgh, Pennsylvania  15219
16   BY: STEVEN HUNCHUCK, ESQ.
17
18
19   NORTON ROSE & FULBRIGHT US, LLP
20   Attorneys for McKesson
21   2200 Ross Avenue, Suite 3600
22   Dallas, Texas  75201
23   BY: D'LESLI DAVIS, ESQ.
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S :
 3
 4   DUANE MORRIS, LLP
 5   Attorneys for Prinston Pharmaceutical Inc.,
 6      Zhejiang Huahai Pharmaceutical Co., Ltd.,
 7      Solco Healthcare US, LLC, Huahai US, Inc.,
 8      Walmart Stores, Inc., and Walgreen Co.
 9   1875 N.W. Corporate Boulevard, Suite 300
10   Boca Raton, Florida  33431
11   BY: DREW DORNER, ESQ.
12      SETH GOLDBERG, ESQ.
13      DANA KLINGES, ESQ.
14      REBECCA BAZAN, ESQ.
15      ALEK SMOLIJ, ESQ.
16
17
18
19
20   GREENBERG TRAURIG, LLP
21   Attorneys for Teva Pharmaceuticals USA
22   333 SE 2nd Avenue, Suite 4400
23   Miami, Florida  33131
24   BY: TIFFANY ANDRAS, ESQ.
25
```

Page 5

```
 1
 2   A P P E A R A N C E S :
 3
 4   BUCHANAN INGERSOLL & ROONEY, P.C.
 5   Attorneys for Albertson Companies, LLC
 6   1700 K Street NW, Suite 300
 7   Washington, DC  20006
 8   BY: CHRISTOPHER HENRY, ESQ.
 9      DAN CAMPBELL, ESQ.
10
11
12   PIETROGALLO GORDON ALFANO BOSCIK & RASPANTI, LLP
13   Attorneys for Mylan
14   301 Grant Street, 38th Floor
15   One Oxford Centre
16   Pittsburgh, Pennsylvania  15219
17   BY: JASON M. REEFER, ESQ.
18
19
20   BARNES & THORNBURG, LLP
21   Attorneys for CVS and Rite Aid
22   11 South Meridian Street
23   Indianapolis, Indiana  46204
24   BY: KARA KAPKE, ESQ.
25      JAMES SPRUNG, ESQ.
```

2 (Pages 2 - 5)

Page 6

1
2  A P P E A R A N C E S :
3
4  ULMER & BERNE, LLP
5  Attorneys for AmerisourceBergen Corp.
6  600 Vine Street, Suite 2800
7  Cincinnati, Ohio 45202
8  BY: JEFFREY GEOPPINGER, ESQ.
9
10
11
12  DORSEY & WHITNEY, LLP
13  Attorneys for OptumRX
14  51 West 52nd Street, 9th Floor
15  New York, New York 10019
16  BY: SHEVRON ROCKETT, ESQ.
17
18
19
20  HINSHAW & CULBERTSON, LLP
21  Attorneys for Scigen
22  53 State Street, 27th Floor
23  Boston, Massachusetts 02109
24  BY: KATHLEEN E. KELLY, ESQ.
25

Page 8

1
2          I N D E X
3
4  WITNESS      EXAMINATION BY      PAGE
5  L. Craft    Mr. Dorner      9
6              Ms. Andras      322
7
8          E X H I B I T S
9  EXHIBITS    DESCRIPTION      PAGE
10 Exhibit 1   Defendants' Amended      14
             Notice of Videotaped
11            Deposition of Laura R.
             Craft
12
   Exhibit 2   Materials Relied Upon     21
13
   Exhibit 3   Summary of Retail      32
14            Pharmacy Data Claims
15 Exhibit 4   Expert Declaration of     37
             Laura R. Craft
16
   Exhibit 5   NDC List of Valsartan     47
17            Containing Drugs
18 Exhibit 6   On Point Analytics      101
             invoice packet
19
   Exhibit 7   Class Definitions for     201
20            Consumers, Third-Party
             Payors, and Medical
21            Monitoring
22 Exhibit 8   Excel spreadsheet      232
23
24
25

Page 7

1
2  A P P E A R A N C E S :
3
4  RIVERO MESTRE, LLP
5  Attorneys for MSP RECOVERY LAW FIRM
6  2525 Ponce de Leon #1000
7  Coral Gables, Florida 33134
8  BY: ZALMAN KASS, ESQ.
9
10
11
12  HILL WALLACK
13  21 Roszel Road
14  Princeton, New Jersey 08540
15  BY: WILLIAM MURTHA, ESQ.
16
17
18  ALSO PRESENT:
19     JUSTIN BILY, Veritext Videographer/Technician
20
21
22
23
24
25

Page 9

1
2          THE VIDEOGRAPHER:  We are going
3  on the record at 8:09 on February 18,
4  2022.  This is media unit one of the
5  video recorded deposition of Laura
6  Craft regarding the valsartan
7  litigation.
8          My name is Justin Bily from the
9  firm Veritext and I'm the videographer.
10 The court reporter is Sara Killian from
11 the same firm.
12         All counsel will be noted on
13 the stenographic record.
14         Will the court reporter please
15 swear in the witness and then we can
16 begin?
17 L A U R A  C R A F T, after having first been duly
18 sworn, was examined and testified as follows:
19 EXAMINATION BY
20 MR. DORNER:
21     Q.    Thank you very much.  My name
22 is Drew Dorner.  I'm counsel to a number of
23 entities involved in this case:  Prinston
24 Pharmaceutical, Zhejiang Huahai
25 Pharmaceutical, Solco Healthcare US and

3 (Pages 6 - 9)

L. Craft
Huahai US.
        Just before we get into this,
I'll note for the record that this
deposition is being taken for the purposes
of discovery and any other purposes allowed
under the Rules of Civil Procedure and the
Federal Rules of Evidence.
        So having gotten all of that
out of the way, Ms. Craft, it's nice to meet
you.
        Could you please state and
spell your full name for the record?
    A.    Sure.  It's Laura, L-A-U-R-A,
Richards, R-I-C-H-A-R-D-S, Craft C-R-A-F-T.
    Q.    Have you been known by any
other names in the past?
    A.    No.  Well, prior to 1980, I was
known simply as Laura Richards.
    Q.    Understood.  Okay.
        You're here testifying in the
capacity of an expert in today's case, is
that right, on behalf of the plaintiffs?
    A.    That's correct.
    Q.    I understand that you have

L. Craft
probably given a number of depositions in
the past.  I saw on your CV there's a few,
but just give me a sense generally career
wise of how many depositions do you think
you've done?
    A.    Roughly ten.
    Q.    Okay.
        Well, then since we're both
veterans of the deposition process, I'll try
not to belabor the point with a bunch of
protocols and whatnot.  I think we're both
well learned in that.
        In fact, you're actually a
licensed attorney in the State of
California; is that right?
    A.    That's true.
    Q.    Your license is still active?
    A.    Yes.
    Q.    Okay.
        Well, then, like I said, we
could skip a lot of the formalities.  The
real important ones that I will restate is
if there comes a time when you don't
understand a question that I'm asking, just

L. Craft
let me know that so I can ask it a different
way or explain it.
        Is that fair?
    A.    Yes.  I'll be happy to do that.
    Q.    Super.
        Then, of course, if I get an
answer, I'm going to assume that you
understood the question.
        Can we agree to that?
    A.    Yes.
    Q.    Okay.
        I am going to try to schedule
breaks throughout the day today.  It is a
Friday and I don't want to be here any
longer than anybody else on this call wants
to be here.  I'm sure that includes
yourself.
        So I'll try to keep them
somewhat tight, but certainly if there ever
comes a point where you need to step away,
that's perfectly fine.  I just ask that we
don't do it while a question is pending.
        Can we agree to that?
    A.    Yes.

L. Craft
    Q.    Excellent.
        I guess then before we get
going, do you have any questions for me
about how this deposition is going to
proceed today?
    A.    No, I don't.
    Q.    Okay.
        I will remind everybody on the
record today -- including you, Ms. Craft, I
think I'm obliged to notify you as well --
that any testimony given or documents that
go electronically between us could be
subject to the court's protective order.  So
please keep that in mind, anybody who is
listening in the call, that there's a
protective order in place and that there's
going to be information more than likely
that's going to exchanged that is subject to
that protective order.
        So having said all of that,
let's go ahead -- and Justin, if you could
pull up the exhibit, it's ID just A as in
alpha and we could enter that in as Exhibit
1.

4 (Pages 10 - 13)

Page 14

L. Craft

1  L. Craft
2        Ms. Craft, I'll let you know,
3  so these exhibits, as I understand the
4  system, will be uploaded to a confidential
5  folder that should be accessible to you and
6  to anybody on this video conference.  The
7  exhibits will also be shown to you on
8  your -- I guess your main Zoom screen when
9  you look at me and talk -- that one -- so I
10 hope that for many of these exhibits the
11 video conference tech will be able to sort
12 of highlight exactly where I'm talking
13 about, but to the extent you need to, you
14 can look at that folder if you need to look
15 at the entire document.
16       Understood?  Understand what I
17 mean?
18 A.    Yes.
19       (Whereupon, Exhibit 1 was marked for
20 identification.)
21 Q.    Great.  Perfect.  Thank you.
22       I'll ask you this:  Exhibit 1,
23 have you seen this document before?
24 A.    I have.
25 Q.    This is your notice of

Page 15

1  L. Craft
2  deposition that brought you here today?
3  A.    Yes, I believe so.
4  Q.    Can we go to page four of the
5  PDF?
6        You'll see there's a series of
7  document requests that we made of you.  If
8  you want to look at them, that's fine, but I
9  know you've seen this document before.
10       My question is just going to be
11 whether or not you personally went through
12 these to verify that all responsive
13 documents were actually produced to these
14 requests, subject to any objections that
15 your counsel might have had?
16       MR. STANOCH:  I'll put an
17 objection to the question to the extent
18 that there were written objections to
19 the deposition notice.
20       But go ahead, Ms. Craft.
21 A.    I didn't actually make the
22 production to opposing counsel, but I did
23 supply responsive documents to the counsel
24 who retained me in this matter.
25 Q.    Do you have any other notes

Page 16

1  L. Craft
2  with you for the deposition today?
3  A.    I have a clean copy of my
4  report with no annotations and that's it.
5  Q.    Okay.
6        That's the report that you
7  submitted -- I want to say the date was
8  November 10th of last year?
9  A.    That's correct.
10 Q.    Okay.  All right.
11       Are you taking any drugs or
12 medication today that could affect your
13 ability to testify, comprehend or remember
14 details?
15 A.    No, I am not.
16 Q.    Is there anybody in the room
17 with you today?
18 A.    No, there is not.
19 Q.    Are there any counsel for the
20 plaintiffs, I guess, in the building?  I see
21 it looks like you're in your office, but any
22 counsel for the plaintiffs in the building
23 near you today?
24 A.    Not that I know of.
25 Q.    And I believe we're about 2,500

Page 17

1  L. Craft
2  to 3,000 miles away.  You're coming to us
3  from Emeryville, California?
4  A.    That's correct.
5  Q.    Okay.  Well, hello from
6  Washington D.C.
7        In terms of electronic devices
8  that you have with you, I'm supposing that
9  you have a laptop and tablet at least.
10       Is that accurate?
11 A.    I'm viewing you now on a
12 desktop.  I also have a laptop open to the
13 secure document folder and the only other
14 electronic device capable of communicating
15 is I do have my cell phone in the room.
16 Q.    Okay.  Understood.
17       Can we agree that while we're
18 on the record you won't send or read any
19 communications?
20       MR. STANOCH:  Objection.
21 A.    Well, yes.  I'm not going to be
22 looking at my phone, if that's what you
23 mean, or at my email --
24 Q.    Sure.  And --
25 A.    I'll attempt to hear your

5 (Pages 14 - 17)

L. Craft

1
2  questions and answer them.
3      Q.    Understood.  And I guess I
4  should ask that question even better.
5          Other than communications shown
6  in exhibits and the conversations that we're
7  having today, you won't be looking at any
8  communications while we're on the record.
9          Is that fair?
10     A.    That's fair.
11     Q.    Okay.
12         What did you do to prepare for
13 your deposition today?
14     A.    I reviewed my report in this
15 case, I reviewed Mr. Kosty's report, I
16 looked at some of the sources that Mr. Kosty
17 had cited in that report and generally
18 refreshed my memory about the data that had
19 been produced by retailers and plaintiffs in
20 this case.
21     Q.    When you say retailers, are you
22 referring to the defendant pharmacies in
23 this matter?
24     A.    I am.
25     Q.    Okay.

L. Craft

1
2      A.    As well as Humana, which I
3  understand is not a defendant, but did
4  produce data.
5      Q.    Then I believe you said
6  plaintiffs' productions as well, right?
7      A.    That's correct.
8      Q.    What specifically within the
9  plaintiff -- well, can you give me a general
10 sense of what part of the plaintiffs'
11 production you reviewed before today?
12         MR. STANOCH:  Objection.
13         You could try to answer.
14     A.    I simply skimmed the raw data
15 files to remind myself of the field headers,
16 the names by which the various elements were
17 called out and the general record layouts.
18     Q.    Okay.
19         When you're talking about the
20 raw data, was that raw data from MSP
21 Recovery claims?
22     A.    Well, that's one of the
23 sources.  Of course, MADA has also produced
24 data and I reviewed that data.
25     Q.    Okay.

L. Craft

1
2          So the named plaintiffs, MSP --
3  I call them MSP for short -- MSP and MADA,
4  their documents that they produced in this
5  case?  That's what you reviewed in terms of
6  plaintiff production?
7      A.    Yes, that's correct.
8      Q.    Anything else?
9      A.    No.  That was the basic
10 preparation.
11     Q.    All right.
12         I assume you met with counsel,
13 but I don't want to put words in your mouth.
14         Did you meet with counsel for
15 purposes of today's deposition?
16     A.    I did.
17     Q.    About how long did you spend
18 doing that?
19     A.    A total of less than four
20 hours.
21     Q.    Does that include your document
22 review or was your document review in
23 addition to that four-hour timeframe?
24     A.    My document review was in
25 addition to that.  That's something I just

L. Craft

1
2  did on my own.
3      Q.    Okay.
4          About how much time did you
5  spend looking at documents?
6      A.    It would be difficult for me to
7  estimate because I did this over a period of
8  a couple of weeks and I attempted to read
9  slowly and thoroughly Mr. Kosty's report and
10 materials, but perhaps eight or ten hours.
11     Q.    I appreciate that.
12         When you met with counsel, I
13 assume there was nobody from outside On
14 Point and the plaintiffs' counsel; is that
15 right?
16     A.    That's correct.
17         MR. DORNER:  All right.  Can we
18 please mark and pull up the exhibit
19 that is letter B in what was uploaded?
20 We'll mark this as Exhibit 2.
21         (Whereupon, Exhibit 2 was marked for
22 identification.)
23         THE WITNESS:  This thing has
24 kicked me out.  I'm now going to sign
25 back in to attempt to bring these

L. Craft

1    documents back up.  Hopefully this
2    won't continue to be an issue.
3        MR. DORNER:  Were you able to
4    log back in or still working on it?
5        THE WITNESS:  Yes, I'm here
6    now.
7        MR. DORNER:  Okay.  Great.
8    Wonderful.  Okay.
9        The document before you is a
10   list -- let's go ahead and go to page
11   two, Justin.
12       All right.
13   Q.    This is a list of materials
14   that you relied upon in coming up with your
15   opinions in this matter, right?
16   A.    Yes.
17   Q.    And this list presents a full
18   and complete list of every document you
19   relied upon to form your opinions?
20   A.    As of the date of my report,
21   yes.
22   Q.    Okay.
23       Actually, I'm glad you brought
24   that up.

L. Craft

1        So other than the documents
2    listed in here, have you reviewed any other
3    expert materials, be that a report or a
4    declaration or expert testimony that's been
5    given in this matter?
6    A.    As I mentioned a moment ago, I
7    spent some time reviewing both Mr. Kosty's
8    report and some of the materials cited
9    therein.
10   Q.    Okay.
11       Other than Mr. Kosty's report
12   and the materials that he cited or some of
13   the materials that he cited, are there any
14   other expert materials that you've looked at
15   in this case?
16   A.    No.
17   Q.    Okay.
18       You haven't reviewed the expert
19   report of Dr. Rena Conti?
20   A.    No.  I neither received nor
21   reviewed that report.
22   Q.    Okay.
23       And fair to say you didn't
24   review her deposition testimony either?

L. Craft

1    A.    No.
2    Q.    Okay.
3        Are you aware of whether you
4    supplied facts to Dr. Conti for purposes of
5    her analysis, facts or data?
6        MR. STANOCH:  Objection.
7        Go ahead.
8    A.    I have no reason to believe
9    that anything from my office was supplied to
10   Dr. Conti or her staff in connection with
11   this case.
12   Q.    Okay.
13       After reviewing Mr. Kosty's
14   report, I guess does it affect your opinions
15   that you've given in this case in any way?
16   A.    It certainly does not change my
17   opinions in any way.  If anything, it
18   strengthens them.
19   Q.    Why is that?
20   A.    Dr. Kosty -- or Mr. Kosty; I'm
21   sorry -- does not dispute or contest the
22   basic facts that I lay out in my report.  He
23   neither contests the simultaneous collection
24   of all important data fields to confirm

L. Craft

1    purchases by third-party payers and
2    consumers, nor that those electronic files
3    are as to their essential elements
4    effectively duplicated across multiple
5    entities, nor that these data are retained
6    for long periods of time, nor that the data
7    exists.  Although he expresses some
8    non-footnoted, non-supported suggestions
9    that maybe it will be hard to get the data
10   or that working with multi-source data is
11   never perfect and is not -- cannot be
12   expected to be entirely easy -- two facts
13   that I think anyone working with data would
14   say apply to all circumstances with
15   multi-source data -- he raises no serious
16   challenge to the ability to merge data
17   across multiple sources and he really limits
18   his critique, in my opinion, to the -- in
19   any substantive way -- to the question of
20   how one identifies state government entities
21   and secondarily how one treats the existence
22   in pharmacy and PBM records of
23   intermediaries who are describes as
24   third-party administrators or ASOs to quite

Page 26

L. Craft

1    narrow issues that do not in any way
2    fundamentally way go to the robustness,
3    completeness and accuracy of the data
4    identifying class members in this case.
5         MR. DORNER:  Okay.
6         Well, certainly -- I'll preview
7    for you that you hit on a lot of the
8    issues that I'm sure we'll probably be
9    talking about today, so I appreciate
10   that rundown and I think we could go
11   ahead and move on to some of the other
12   material in this case.
13        Real quick, though, before we
14   take down Exhibit 2, could we go to
15   page numbered -- let's start with page
16   12.  There we go.  Thank you, Justin.
17        Just for Ms. Craft's sake, flip
18   it down -- just spend a couple
19   seconds -- 12316 on each page.
20   Q.    Ms. Craft, I'm showing you
21   pages 12 through 15 of your document in the
22   Materials Relied Upon list.  I'll represent
23   to you that these pages reflect various data
24   that are from the pharmacies including CVS,

Page 27

L. Craft

1    Express Scripts, Humana.  Basically, all the
2    pharmacy defendants in this case plus
3    Humana.
4         Do you understand what I mean?
5    A.    Yes.
6    Q.    In your back up file that was
7    produced to us, I think we got most all of
8    these spreadsheets.
9         So my first question is the
10   files that you sent back to defense counsel,
11   were those modified in any way from what was
12   provided by the pharmacy defendants and
13   Humana?
14   A.    Well, when you say the files
15   that I sent back, as in all data processing
16   and analytical exercises, you typically have
17   intermediate data sets, for example, in --
18   we may have merged time periods into a
19   single file.  We may have changed formats
20   slightly to make the data amenable to
21   processing its data, the statistical
22   analytic package that we used in this case.
23   Exercises such as that result in no
24   substantive change to the data, but format

Page 28

L. Craft

1    changes.
2         I know with regards to the
3    Kroger data that we supplied to you a file
4    which we had prepared from the raw data,
5    which, for example, had a V look up field
6    that does not appear in the original, but
7    that takes you back to the original entries
8    in the Kroger Excel files.
9         My recollection is that one or
10   more of these files was produced in CSV
11   format as opposed to Excel and so we would
12   have converted them for the purpose of
13   standardizing the presentation of the data
14   in a single way that could be then studied
15   using this data.
16        So the answer is sure, there
17   are always some changes and that's why we're
18   very careful to produce those intermediate
19   files, so you should be able to duplicate
20   everything we did.
21   Q.    Okay.
22        The CSV files, were those, by
23   chance, from Walmart?
24   A.    I bet I can tell by looking at

Page 29

L. Craft

1    this document that you have up because --
2    Q.    Page 16.
3    A.    Yeah.
4         Yes, that is correct.  The
5    Walmart files were produced in CSV format.
6    Q.    Okay.
7         So let me, I guess, make sure
8    that I understand your testimony.
9         The files that were produced
10   back to us as part of your expert report may
11   contain some formatting changes or -- I
12   guess mostly formatting changes.
13        But you didn't add any numbers
14   or add anything into those documents when
15   you sent them back short of the formatting
16   changes.
17        Is that accurate?
18   A.    So we also sent you the files
19   that show our analysis of that data.  So
20   those files then generate results, which is
21   added data that we are generating through
22   our programmatic treatment of the data.  So
23   we have -- there's some raw data as it was
24   produced by the defendants, there's the

8 (Pages 26 - 29)

Page 30

L. Craft

1
2  reformatting of that data, which we did, and
3  then there's analysis of is that data with
4  the outputs that are generated and the code
5  that is run to do that analysis and generate
6  those outputs.
7        We supplied everything except
8  the raw data, which I understood had already
9  been supplied to you in the course of
10 discovery. We may actually have included
11 the raw data in its initial format as well.
12       I don't recall.
13  Q.   Okay -- understood. Okay. I
14 wasn't referring to the data code or the
15 output files I think as you described them,
16 but more whatever sort of -- whatever was
17 made between the raw data and the output
18 files and the code that goes along with
19 that, all of that -- those intermediate
20 copies -- you're saying that was produced as
21 well?
22  A.   Yes, that's right.
23  Q.   Okay.
24       And that's what's reflected in
25 Exhibit 2?

Page 31

L. Craft

1
2  A.   No. When you say Exhibit 2,
3  this is document V, right? In my
4  materials --
5  Q.   Yes.
6  A.   -- the one that's on the
7  screen?
8  Q.   That's right.
9  A.   No. This is a list of
10 materials relied upon. This is not a list
11 of our work product. I understand those to
12 be two quite different things. Materials
13 relied upon are the sources of information
14 that the expert incorporates into their
15 thinking or their opinion and work product
16 is not materials relied upon, but we produce
17 it nonetheless to assure that you are able
18 to fully understand and replicate each step
19 of my process so that you know exactly how I
20 got to my conclusions.
21       So I would distinguish between
22 materials relied upon, which is what we see
23 on Exhibit 2, and work product, which we did
24 also produce for you.
25  Q.   Okay.

Page 32

L. Craft

1
2        So then the materials relied
3  upon reflected in Exhibit 2, that's the raw
4  data then that the pharmacies provided; is
5  that accurate?
6        MR. STANOCH: Objection.
7  A.   Yes, that's correct.
8        MR. DORNER: Okay.
9        Can we please pull up -- let's
10 mark what's exhibit -- what's labeled C
11 in the folder and do that as Exhibit 3
12 to today's proceeding.
13       We can go past the first page.
14 There we go.
15       (Whereupon, Exhibit 3 was marked for
16 identification.)
17  Q.   Ms. Craft, this is a summary
18 that I understand you generated and included
19 as Exhibit E to your expert report that I
20 guess purports to show a summary of your
21 analysis of retail pharmacy claims data, as
22 it says on the top.
23       Is that right?
24  A.   That's right. May I -- this is
25 not -- okay. There we go. It was not yet

Page 33

L. Craft

1
2  showing up in the folder, but it has
3  appeared.
4        Okay. Yes, this is the
5  activity from my report and does summarize
6  the retail pharmacy claims data.
7  Q.   Okay.
8        Other than for the purposes of
9  producing this table shown in Exhibit 3, did
10 you rely on the pharmacy-produced raw data
11 for anything else in coming up with your
12 opinion?
13       MR. STANOCH: Objection to
14 form.
15       Go ahead.
16  A.   Well, I wasn't simply
17 attempting to generate the numbers that
18 appear in Exhibit E. I was investigating
19 the retail data to confirm the adequacy of
20 data or of the data that it points to in
21 terms of personally identifying information
22 with names and addresses and such to
23 identify consumer class members who might
24 have claims against the pharmacy defendants
25 in this case. So this is just one set of

9 (Pages 30 - 33)

Page 34

L. Craft

1  numbers that are generated for illustrative
2  purposes out of that data.
3      The more important purpose for
4  reviewing the retailer data was to confirm
5  or investigate my basic understanding that
6  when retail pharmacies sell drugs to --
7  prescription drugs -- to consumers in the
8  US, they carry out their legal obligation to
9  record the identity of the person to whom
10  the drug is sold and to record the amount
11  that that individual has paid towards the
12  price of that drug and that they do
13  routinely retain those electronic records in
14  a form that is accessible and feasible to
15  interpret and manipulate.
16      That was why I looked at the
17  retailer data. These are merely some
18  illustrations of what we see in that
19  retailer data.
20    Q.    Okay.
21      Now, it's true, though, that
22  the retailer data that you looked at that we
23  showed in Exhibit 2, that didn't actually
24  contain any personal identifying information

Page 35

L. Craft

1  of any -- anybody, right?
2    A.    Right.
3    Q.    Any individuals?
4    A.    Yeah. If we're clear about
5  what the -- what the word personal identify
6  -- or phrase, personal identifying
7  information includes, the data with, I
8  believe, one exception do include -- and
9  that being Kroger -- do include anonymized
10  ID numbers for consumers.
11      Those anonymized ID numbers,
12  whether they are the store's original member
13  ID profile for the individual or one that
14  has then been transformed to further
15  anonymize it, those link directly back to
16  the personal profile in the pharmacy's
17  records.
18      For some of these defendants,
19  although they did not populate the fields,
20  they do show us very clearly that first
21  name, last name, address, state and date of
22  birth are included data elements, just as I
23  would have expected them to be in the
24  pharmacy's data that can be accessed using

Page 36

L. Craft

1  those anonymized member IDs.
2    Q.    Okay. I just want to be clear.
3      In the particular data that you
4  looked at, there were no actual names or
5  states or addresses and no information like
6  that? That's true, isn't it?
7    MR. STANOCH: Objection to
8  form.
9    A.    No. No. No. You said states.
10  Some of the files do include -- for example,
11  the ship to state, the member state, the
12  retail data generally -- I believe
13  invariably -- includes the store number and
14  state. So state, yes. Full addresses, no,
15  not produced.
16    Q.    As well as names then, right?
17    A.    Right. As well as names. But
18  that's not because that data doesn't exist.
19    MR. DORNER: Okay.
20      All right. I think we can put
21  Exhibit 3 away. Let's go ahead and
22  pull up -- I guess it'll be labeled D
23  and mark this as Exhibit 4 to your
24  deposition.

Page 37

L. Craft

1      (Whereupon, Exhibit 4 was marked for
2  identification.)
3    Q.    All right, Ms. Craft. This is
4  a copy of your report that you prepared in
5  connection with this case.
6      Is that right?
7    A.    I'm just going to scroll to the
8  end. I don't mean to be skeptical, but I
9  always like to check to make sure that this
10  looks familiar.
11    MR. STANOCH: While Ms. Craft
12  is doing that, Mr. Dorner, I'm just
13  stating for everyone's benefit that in
14  the exhibit access folder, the exhibits
15  are being named by letter. We have A,
16  B, C, D., they are not 1, 2, 3, 4 and I
17  don't care which you use -- obviously,
18  it's your deposition -- but for the
19  benefit of the record, we may want to
20  harmonize all that so we know what is
21  being referred to later when we read
22  the transcript.
23    MR. DORNER: Dave, I don't
24  think that's a bad idea at all. The

10 (Pages 34 - 37)

Page 38

L. Craft

1  reason for the lettering is because
2  I -- I lettered a number of exhibits
3  today and I hope I don't necessarily
4  have to use them all.  But for the sake
5  of telling the court reporter -- excuse
6  me, the video tech -- which exhibit to
7  pull up, they've all got a letter and
8  then I assigned them a number when I
9  enter them.  So I'm keeping track as
10  best I can of how the letters
11  correspond to numbers and I have no
12  problem -- shouldn't have a problem
13  harmonizing that at the end of the
14  proceeding, if think that'll be
15  helpful.
16         Fair enough?
17         MR. STANOCH:  Definitely.
18         MR. DORNER:  Great.
19   Q.    Okay.  So -- go ahead.
20   A.    I believe the question on the
21  floor was whether this was a copy of the
22  report that I had submitted in this matter
23  in November of 2021 and the answer is it's a
24  partial copy of the report that I submitted.

Page 39

L. Craft

1  It does not contain any of the exhibits.  It
2  goes to the signature page and then does not
3  attach the various exhibits to the report.
4   Q.    Understood.
5         I think maybe for today we can
6  call this the narrative portion of your
7  report.
8         Is that okay?
9   A.    Sure.
10   Q.    Super.
11         Then I also believe you
12  produced a very short errata containing a
13  couple of footnote changes to some
14  citations.
15         Is that right?
16   A.    That's correct.
17   Q.    Okay.
18         Since finalizing your report,
19  other than the errata that you provided, are
20  there any other changes that you want to
21  make to the substance of the narrative
22  portion of your report?
23   A.    Well, the only thing that I
24  would say is as I read it over the last two

Page 40

L. Craft

1  weeks in preparation for this deposition, I
2  looked at the code that had been run to
3  generate the minimum count of third-party
4  payors in the class, which is referenced in
5  the report.  In running that code and in
6  estimating plans and payors that were
7  specifically identified by IQVIA in the
8  Xponent data, I included all 426 of the NDC
9  codes that had been supplied by counsel and
10  which appear in one of the attachments to
11  this expert report that you have on the
12  screen.
13         And just out of an abundance of
14  caution, I wanted to go back and see if that
15  number would materially change if I
16  restricted the scope of the IQVIA Xponent
17  data to only those NDCs that were
18  manufactured either at API or as a finished
19  product by one of the defendants.
20         So I did update those numbers
21  and using exactly the same code and simply
22  limiting the scope to the at-issue
23  valsartan-containing drugs.  The numbers did
24  not, as I expected, materially change.

Page 41

L. Craft

1  There were 11,586 plans as opposed to
2  roughly 12,000 as cited in my report and
3  there were 2,949 identified -- separately
4  identified payors on those plans as opposed
5  to roughly 3,000 in my report.
6         But I did want -- so I did do
7  that one additional exercise to just confirm
8  that the numerosity issue had not in any
9  material way changed.
10   Q.    Okay.  I appreciate you
11  clarifying that.
12         I'd ask are those
13  calculations -- the code and the
14  calculations that you performed, would you
15  be amenable to producing that to us?
16         MR. STANOCH:  Objection to
17         form.
18         Go ahead, Ms. Craft, if you
19         want to try to answer that.
20   A.    I don't have any problem.  It's
21  the exact same code, just applied to a
22  smaller number of NDCs.  But I'd be happy to
23  supply it so that you could check for
24  yourself.

11 (Pages 38 - 41)

Page 42

L. Craft

1
2      Q.     Maybe I should ask it a
3   different way.  Let me ask it a different
4   way.
5           Do you intend to actually make
6   a revision to any portion of your report via
7   an attachment or the narrative portion to
8   account for this recalculation of TPPs?
9      A.     I don't -- counsel, I don't
10  know legally whether that would be
11  appropriate or not.  I don't think it's
12  necessary.  What I said in the report was
13  absolutely correct.  There's nothing wrong
14  with it.  It's just as applied to the 426
15  NDCs in the dataset -- which I think I make
16  explicit -- it's just that I'm supplementing
17  that now and telling you that it's roughly
18  the same outcome if you limit the NDCs that
19  are included in the analysis.
20     Q.     Okay.
21          Can we go to page seven --
22  excuse me -- page five of Exhibit 4?
23          All right, Ms. Craft.
24          So this paragraph here is just
25  generally describing the materials you

Page 43

L. Craft

1
2   relied upon.  I'm more -- I have the
3   question along this line of thinking and
4   it's were those documents that you reviewed
5   for this case, but you didn't rely on in
6   forming in your opinion?
7           MR. STANOCH:  Objection to
8      form.
9           Go ahead.
10     A.     No.
11     Q.     And it cut out.
12          You said no?
13     A.     I did.  I didn't -- yeah.  I
14  just listed all the documents that I
15  reviewed.
16     Q.     Okay.  Thank you.
17          All right.  Let's go ahead and
18  go back to page one of your report.
19     A.     Okay.
20     Q.     You're summarizing this case
21  saying "Plaintiffs allege that defendants in
22  this matter designed, manufactured, labeled,
23  marketed, distributed, packaged and sold
24  VCDs that were contaminated,
25  non-merchantable, not of the quality or

Page 44

L. Craft

1
2   purity represented and not qualified under
3   the FDA generic approvals that had been
4   granted for them."
5           My first question about that
6   passage is just, as a procedural matter, can
7   we agree today that for purposes of this
8   deposition, VCDs means the at-issue generic
9   valsartan, valsartan hydrochlorothiazide,
10  amlodipine valsartan and amlodipine
11  valsartan hydrochlorothiazide?
12          MR. STANOCH:  Objection.
13          Go ahead.
14     A.     I would just ask -- I see now
15  this Bates has been adjusted, but I had a
16  disconnect there because you had directed my
17  attention to page one and you were not, in
18  fact, reading from page one of my report.  I
19  did find the text and best as I can catch
20  up, I think you read it correctly, but I
21  think it's on page two, not page one.
22          MR. DORNER:  Super.  Well,
23      let's put page one and two side by side
24      then, just so there's no confusion.
25          Justin, can you help us out

Page 45

L. Craft

1
2   with that?
3      Q.     Ms. Craft, you're not offering
4   an opinion as to the truth of any of the
5   allegations that I read and that are
6   highlighted on your screen, right?
7           MR. STANOCH:  Objection.
8           Go ahead.
9      A.     No.  I think that's a fair
10  statement.  I'm not opining as to the
11  product quality and any of the legal
12  theories behind the claims.
13     Q.     If we could go and pull up
14  paragraph two of your report then put pages
15  two and three side by side, this paragraph
16  talks about the 428 National Drug Codes or
17  NDCs.
18          These are the codes that we
19  were talking about earlier, a few minutes
20  ago, right?
21     A.     Yes.
22     Q.     Okay.
23          Now in this paragraph, you note
24  that you were provided with a list of 428
25  National Drug Codes, which uniquely identify

12 (Pages 42 - 45)

Page 46

L. Craft

1        L. Craft
2 the VCD products that plaintiffs allege to
3 have been improperly manufactured and sold
4 and to have been both valueless and unsafe.
5       Again, you're not offering an
6 opinion as to improper manufacturing,
7 improper sale, value or safety of the VCDs;
8 is that correct?
9    A.   That is correct.
10    Q.   Now, I believe you testified a
11 minute ago that initially you ran an
12 analysis assuming that all 428 of these NDCs
13 were, in fact, at issue, but you've since
14 clarified that you understand that not all
15 428 are, in fact, at issue.
16       Is that right?
17       MR. STANOCH:  Objection to
18 form.
19       Go ahead.
20    A.   It is true that the initial
21 count for numerosity that I generated was
22 generated off of all 428.  That's the
23 exercise that I repeated prior to this
24 deposition, to see whether the results would
25 materially change.

Page 47

L. Craft

1        L. Craft
2       In fact, I have to say I don't
3 believe it affects any other analysis in my
4 report, nor does it affect that conclusion
5 about numerosity.
6       MR. DORNER:  Okay.
7       Let's go ahead and pull up the
8    document that's prelabeled E as in
9    echo, Justin.  We'll mark this as
10    Exhibit 5.
11       (Whereupon, Exhibit 5 was marked for
12    identification.)
13    Q.   All right.  Let's do this.
14 Here, let's just walk through this,
15 Ms. Craft.
16       On the screen in front of you
17 is, I believe, the list of NDCs that you
18 attached to your report as Exhibit B.
19       Is that right?
20    A.   Yes, that looks right.
21    Q.   Okay.
22       If we look on this first page,
23 we see under Entity, it's got a number of
24 line items for Aurobindo.  The next down,
25 about row 30, it says Hetero Labs and then

Page 48

L. Craft

1        L. Craft
2 below that, it says Mylan manufactured
3 drugs.
4       You understand all of them to
5 be defendants in this case, right?
6    A.   I do.
7    Q.   Okay.
8       So in the far right column
9 where you have NDCs, those are all NDCs that
10 you included in both your first and your
11 later analysis of -- I think you called it
12 numerosity.
13       Is that right?
14    A.   If you're referring to the ones
15 on this first page, yes.
16    Q.   Yeah.  That's what I'm
17 referring to.  Just the first page.
18    A.   Then the answer is yes.
19    Q.   Okay.
20       Can we scroll down to page two
21 of Exhibit 5?  Here, we see between rows 58
22 and 59 where the entity switches from Mylan
23 manufactured drugs to non-defendant drugs.
24       Do you see what I'm talking
25 about?

Page 49

L. Craft

1        L. Craft
2    A.   I do.
3    Q.   Okay.
4       Where it says non-defendant
5 drugs, do you now understand that those NDCs
6 associated with those line items are not at
7 issue in this litigation?
8       MR. STANOCH:  Objection to
9 form.
10       Go ahead.
11    A.   That is my understanding.
12    Q.   Okay.
13       So if we look at the NDC in row
14 58, that NDC would have been included in
15 your numerosity analysis both times,
16 correct?
17    A.   That's correct.
18    Q.   And then row 59 would have only
19 been included in your numerosity analysis
20 the first time, right?
21    A.   That's correct.
22       MR. DORNER:  Okay.
23       You could close the call out.
24       Leave the exhibit up.
25    Q.   An NDC -- I want to get your

13 (Pages 46 - 49)

Page 50

L. Craft

1    L. Craft
2    understanding a little bit about what that
3    means.
4         An NDC, it doesn't necessarily
5    identify the manufacturer of a drug, right?
6         MR. STANOCH:  Objection to
7    form.
8    A.    It necessarily allows you to
9    identify the manufacturer.  If the product
10   is sold by a relabeler, which has applied
11   for its own NDC and is selling using its own
12   NDC, then one must link to the application
13   for that relabeler to identify the maker of
14   the underlying product.
15        So it either -- it either
16   explicitly tells you who the manufacturer is
17   in the first segment of this 11-digit
18   code -- the labeler's segment of the code --
19   or if the identified labeler in that code is
20   merely a relabeler, repackager, then there's
21   one more step by going to that application
22   to identify the underlying manufacturer of
23   the drug product.
24   Q.    Okay.
25        I think I understand -- I'll

Page 51

1    L. Craft
2    just try to paraphrase.
3         Looking at an NDC, sometimes it
4    might actually -- the first three digits
5    might actually reflect a manufacturer.
6    Other times, you might need to look at an
7    additional source or two to figure out who
8    the manufacturer is as opposed to a
9    relabeler or repackager; is that accurate?
10        MR. STANOCH:  Objection to
11   form.
12   A.    I wouldn't say two sources.  I
13   would say one additional source and when you
14   say sometimes, I would say that in the vast
15   majority of the cases, the first segment of
16   this code is, in fact, identifying the
17   manufacturer.  So it's not a complicated
18   exercise, but yes, it is possible and in
19   some cases, it will point you to a relabeler
20   first.
21   Q.    Can you put a number on vast
22   majority for me as you've used in your last
23   answer?
24        MR. STANOCH:  Objection.
25   A.    I would -- I could probably sit

Page 52

1    L. Craft
2    and study this schedule and tell you, but
3    generally speaking, repackaging and
4    relabeling is not going to be the majority
5    of this.  So no, I can't give you an
6    estimated number as I sit here.
7    Q.    Okay.
8         Sort of as a follow on to this
9    last set of questions, an NDC also doesn't
10   necessarily identify the manufacturer of the
11   active pharmaceutical -- back up.
12        The NDC does not necessarily
13   identify the manufacturer of a drug's active
14   pharmaceutical ingredients, does it?
15   A.    No.  That would be in the
16   secondary file that I just described a
17   moment ago that approves that NDC and
18   identifies where the API is coming from.
19   Q.    I think we could go ahead and
20   close this exhibit.  Let's go ahead and go
21   back to Exhibit 4 at page three.
22        Ms. Craft, I want to direct
23   your attention -- I realize this is only a
24   portion of paragraph two to your report, but
25   I think it's in full on page three.  It

Page 53

1    L. Craft
2    says -- here we go.  Starting on the -- sort
3    of in the middle.
4         "Counsel for plaintiffs have
5    asked me to evaluate whether, given the
6    proposed class definitions and the various
7    exclusions applied, it is possible to
8    identify the individual consumers and TPPs
9    who meet their terms."
10        I'll stop reading there.
11        My first question is is that
12   the full -- what you've described in
13   paragraph two, is that the full extent of
14   the request that plaintiffs and their
15   counsel made to you with respect to class
16   certification?
17        MR. STANOCH:  Objection to
18   form.
19   A.    That's an overarching
20   description.  If you read on -- it's the
21   summary of the opinions -- you will obtain
22   further detail about the specific scope of
23   my opinions.  For example, I note that this
24   sentence does not refer to an opinion about
25   numerosity, but I clearly express one in

14 (Pages 50 - 53)

Page 54

```
 1              L. Craft
 2  this report and I did so because it was a
 3  topic that counsel asked me to address.
 4      Q.    Okay.
 5          So you're offering opinions
 6  today both on ascertainability and
 7  numerosity.
 8          Is that right?
 9          MR. STANOCH:  Objection to
10      form.
11      A.    I'm offering opinions on
12  everything that's in this report and both of
13  those are.
14      Q.    Okay.
15          Is there anything other than
16  those two things?
17          MR. STANOCH:  Objection to
18      form.  She just said what her opinions
19      are.
20          Go ahead.
21          MR. DORNER:  Let's keep the
22      objections to objection to form, as the
23      order requires.
24      Q.    I'm sorry.
25          Ms. Craft, do you need to
```

Page 55

```
 1              L. Craft
 2  question read back to you?
 3      A.    No, I don't.  I do need a
 4  moment to look at precisely the section I'm
 5  directing your attention to, which is the
 6  enumeration of the opinions commencing on
 7  page six of the report.
 8          So when you say are you
 9  limiting your opinions to ascertainability
10  and numerosity, I would say ascertainability
11  has a number of components to it and there
12  are separate opinions relating to those
13  components.
14          As you see, opinion one relates
15  to the function of the NDC.  Opinion two
16  relates to electronic recordkeeping and the
17  legal requirements of the government in the
18  United States.  Opinion three has to do with
19  the Drug Supply Chain Security Act and how
20  it encourages the tracing of product
21  throughout the supply chain.  Opinion four
22  discusses both the named plaintiff and
23  retailer data and evaluates them along the
24  benchmark that I've described for industry
25  data generation retention.  Opinion five
```

Page 56

```
 1              L. Craft
 2  discusses the application of class
 3  exclusions and opinion six discusses
 4  numerosity.  Those are the opinions I'm
 5  offering.
 6      Q.    All right.  I appreciate the
 7  summary.  Let me see if I can I guess
 8  confirm my understanding.
 9          Would it be fair to say or
10  accurate to say that opinions one through
11  five relate to the issue of ascertainability
12  and opinion six relates to the issue of
13  numerosity?
14          MR. STANOCH:  Objection to
15      form.
16          Asked and answered.
17          Compound.
18          Go ahead.
19      A.    I think all of those issues
20  relate to -- yes, one through five relate to
21  ascertainability.
22          You will note in opinion six
23  that what I'm counting here are named plans
24  and payors and so this also relates to
25  ascertainability, not just numerosity.  It
```

Page 57

```
 1              L. Craft
 2  is not as -- I have not, as Mr. Kosty
 3  incorrectly suggests -- attempted to say you
 4  can ascertain the entire TPP class using
 5  only the IQVIA data.  That would be a
 6  misstatement.  I did not at any time suggest
 7  that that was the case.
 8          But that doesn't mean that
 9  having roughly 3,000 of your TPP class
10  members identified by plan name and payor
11  isn't a big step up in the ascertainability
12  process.
13      Q.    All right.  I want to direct
14  your attention in paragraph two -- it's the
15  same sentence actually.
16          The sentence refers to
17  individual consumers and TPPs.  It doesn't
18  make a specific reference to the medical
19  monitoring class, so I just want to make
20  sure I understand the scope of your opinion.
21          Are you included persons who
22  would be within the proposed medical
23  monitoring class within the term "individual
24  consumers"?
25      A.    Yes.
```

15 (Pages 54 - 57)

Page 58

1          L. Craft
2     Q.    I think you said yes, but my
3  phone cut out.
4     A.    I did. Yes. I am.
5     Q.    Okay. Thank you, ma'am. I
6  appreciate that.
7          Other than numerosity and
8  ascertainability, you're not offering any
9  other opinions regarding any other element
10 of class certification.
11         Is that also accurate?
12         MR. STANOCH: Objection to form
13    to the extent it calls for a legal
14    opinion.
15         Go ahead, Ms. Craft.
16    A.    The reason I'm stumbling over
17 your questions that ask me generally to
18 state which of these opinions relate to
19 ascertainability is because I have heard
20 lawyers and courts disagree about what that
21 word means and I'm not here to express any
22 legal opinions about the standards for
23 ascertainability.
24         So when you ask me to tell you
25 whether my opinions are limited to

Page 59

1          L. Craft
2  ascertainability, I can say to you that I
3  have expressed opinions here and adduced the
4  facts that I believe would be helpful to a
5  court in determining the question of
6  ascertainability, but what the court will
7  consider to be the standard for
8  ascertainability is not for me to opine.
9     Q.    Okay.
10         I understand what you're saying
11 and I guess let me ask it a different way.
12         You're not offering an opinion
13 on whether class members -- be they economic
14 loss or medical monitoring -- suffered a
15 common injury, right?
16         MR. STANOCH: Objection to
17    form.
18         Go ahead.
19    A.    Well, I am taking as a given --
20 in other words, I am assuming for the
21 purpose of this exercise that the payment by
22 a TPP, a consumer for one of the contested
23 VCDs represents an impact or an injury to
24 that consumer or that TPP.
25         So I have not -- I've not

Page 60

1          L. Craft
2  attempted to further analyze that. I'm
3  assuming that paying for a drug that's
4  mislabeled or misbranded that is potentially
5  harmful that does not conform to warranties
6  is an injury and I'm presuming that that
7  happened -- I have not investigated the
8  contamination claims themselves.
9     Q.    Okay.
10         You're also then assuming
11 that -- I want to make sure I get your words
12 right -- you're assuming that any VCDs at
13 issue in this case were mislabeled or
14 misbranded or potentially harmful? Those
15 are all assumptions that you're working
16 with, right?
17         MR. STANOCH: Objection to
18    form.
19    A.    I've been asked to investigate
20 whether if plaintiffs claims are valid the
21 class that was adversely affected by them
22 is -- can be identified. That's what I'm
23 expressing an opinion about.
24         I said now I think a couple of
25 times I did not look into the question of

Page 61

1          L. Craft
2  nitrosamine content or the chemical
3  processes by which it got there or questions
4  of that sort. I do know that if there were
5  differences about which products were
6  contaminated and which were not, I would go
7  right back to home base, which is the NDCs,
8  and I would emphasize again -- and this is
9  important for so many aspects of a case like
10 this -- that the NDC follows the drug
11 product throughout its life and is
12 omnipresent as a labeling and tracing
13 mechanism.
14         So if one wanted to eliminate
15 just arbitrarily say ten of these NDCs, one
16 could do that. But it's not my job to
17 determine which products were affected and
18 whether there were any that were not.
19         MR. DORNER: Okay.
20         We've been going for about an
21 hour, so I was going to suggest a
22 five-minute break.
23         So Dave, Ms. Craft, if you're
24 good with that, let's reconvene at
25 12:12.

16 (Pages 58 - 61)

Page 62

1          L. Craft
2          THE WITNESS:  Sounds good.
3          MR. STANOCH:  That's great.
4          THE VIDEOGRAPHER:  The time is
5     9:07.
6          This ends media one.
7          We're going off the record.
8          (Recess taken)
9          THE VIDEOGRAPHER:  The time is
10    9:14.
11         This begins media unit two.
12         We're back on the record.
13    Q.    If we could go right back to
14    Exhibit 4, paragraph two, page three, I
15    think we were just there --
16         MR. STANOCH:  Again,
17    Mr. Dorner, Exhibit 4 is actually
18    Exhibit D in the folder, right?
19         MR. DORNER:  Yes.
20         MR. STANOCH:  Okay.
21    Q.    I want to focus on the last
22    sentence of this paragraph.  It says "This
23    declaration identifies the pharmaceutical
24    industry practices, legal regulations and
25    available data that make it possible to do

Page 63

1          L. Craft
2     so."
3          I think "do so" is referring to
4     the prior sentence, "It's possible to
5     identify the individual consumers and TPPs
6     who meet the terms of the proposed class
7     definitions."
8          Am I understanding that
9     correctly, Ms. Craft?
10    A.    Yes, you are.
11    Q.    So I want to focus on your
12    terms that you used there, pharmaceutical
13    industry practices, legal regulations and
14    available data.
15         Now, I get those are very broad
16    terms.  I also understand that all three of
17    those things are discussed in your report in
18    some form or some way.  I'll try to ask this
19    the best way I know how.
20         Other than the pharmaceutical
21    industry practices, legal regulations and
22    available data that you discuss elsewhere in
23    your report, are there any other, I guess,
24    bases for your opinions that you're offering
25    or is it all confined to those three silos?

Page 64

1          L. Craft
2          MR. STANOCH:  Objection to
3     form.
4          Vague.
5          Ambiguous.
6          Misstates the report.
7          Go ahead, Ms. Craft.
8     A.    I think those three categories
9     are broad enough to encompass the basic
10    mechanisms that make it possible to identify
11    class members.  I obviously have relied upon
12    and listed in an exhibit to my report
13    sources that I look at that are more
14    precise, but I believe -- so for example,
15    surveys, information of that sort, I would
16    group that under pharmaceutical industry
17    practices.
18         So as long as we recognize that
19    these are broad categories and that they
20    encompass a great deal of diverse
21    information, then I'm fine with the
22    characterization.  Something outside of
23    this, outside of practices, law, available
24    data that I'm generally discussing.
25    Q.    Honing in on your use of the

Page 65

1          L. Craft
2     term "available data," you're not only
3     referring to data that have been produced in
4     this case, but also additional data that
5     would have to be obtained.
6          Is that accurate?
7     A.    Available data that could be
8     obtained.  As I mentioned earlier, it is not
9     up to me to decide what the court decides
10    needs to be produced at particular phases of
11    litigation and what the proper standard of
12    proof is for ascertainability.
13    Q.    Okay.
14         So let me ask you generally
15    what specific data would have to be obtained
16    at any point in order to actually produce a
17    list of consumer and TPP class members?
18         MR. STANOCH:  Objection to
19    form.
20    A.    Okay.  So I want to start by
21    emphasizing as clearly and strongly as I can
22    that your question asks what do we need to
23    do in order to get a comprehensive list
24    prepared and I am not accepting the premise
25    that that is the standard for

17 (Pages 62 - 65)

Page 66

L. Craft

1  ascertainability. So to the extent that I
2  answer your questions about the preparation
3  of a single all encompassing list, I'm
4  answering that specific question and I am
5  not opining, conceding or assuming that to
6  be a necessary step.
7  So I want to be very, very
8  clear about this and hopefully, with that
9  understanding, I won't need to re-emphasize
10  this throughout today's deposition.
11  Now, with that in mind, to go
12  back to your question, which I believe was
13  what data would be necessary to compile a
14  list of all TPP and consumer class
15  members -- am I correct in understanding the
16  question?
17  Q.    I think you've summed it up
18  accurately. That's fine. Let's go with
19  that.
20  A.    Okay.
21  So the -- at the risk of
22  sounding as though I am nitpicking about
23  language, the word "necessary" is a problem
24  here because there's more than one way to

Page 67

L. Craft

1  skin this cat. There are multiple sources
2  of data which can be -- can very easily be
3  used in lieu of each other. So there is no
4  single source of data that I would consider
5  to be essential, which I would take as a
6  synonym for your word "necessary."
7  There are multiple ways at
8  confirming any given transaction and the
9  parties to that transaction, meaning the
10  third-party payor and the consumer. So I
11  would have to say there is no single source
12  that is essential.
13  As I've laid out in my report,
14  there are sources that are more consolidated
15  and more uniform and thus more efficient to
16  use than other sources, but that does not
17  mean that if they were unavailable for some
18  reason or otherwise not produced that there
19  aren't other sources that can achieve the
20  same objective. That's sort of the beauty
21  of the pharmaceutical industry, is that
22  everybody is recording very similar
23  information about a single transaction.
24  Q.    Let me ask it another way then

Page 68

L. Craft

1  and I'll try to avoid the word "necessary."
2  A.    Thank you.
3  Q.    Exactness is good, so I
4  appreciate the clarification.
5  Rather than saying that, let me
6  ask you -- if you were to -- if you wanted
7  to compile a list of all of the consumers
8  and the TPPs here, where would you start --
9  where would you seek data from? From whom
10  would you seek data?
11  MR. STANOCH: Objection to
12  form.
13  Vague -- I'm sorry.
14  Are you done, Mr. Dorner?
15  MR. DORNER: Yes.
16  MR. STANOCH: Objection to
17  form.
18  Vague.
19  Ambiguous.
20  Incomplete hypothetical.
21  Unintelligible.
22  Go ahead, Ms. Craft, if you
23  can.
24  A.    So as laid out in my report, I

Page 69

L. Craft

1  consider PBMs to be the single most
2  efficient consolidated and uniform source of
3  transactional data for prescription
4  dispensing and payment in the US and it
5  would therefore be my suggestion to start
6  there.
7  The statistics I cited in my
8  report, which are not in any way challenged
9  by Mr. Kosty, make clear that currently
10  the -- as of 2019, a very small number of
11  large PBMs process 96 to 98% of all
12  prescription drug claims in the US. So I
13  would start by obtaining PBM data, which is
14  something that is routinely done in
15  pharmaceutical litigation. This is not new
16  territory in any way, shape or form.
17  With regard to consumer's
18  claims against the specific retailers who
19  are named as defendants -- so pharmacies who
20  are named as defendants in this case -- I
21  would -- these are not -- this could be done
22  at any point in the process, including
23  claims adjudication or even thereafter just
24  to address possible disputes about claims.

18 (Pages 66 - 69)

Page 70

L. Craft

1  I would request that the personal
2  identifying information withheld by those
3  retailer pharmacies in their current
4  productions be supplemented. So take those
5  records that we already have, we've already
6  got the counts of transactions, we've got
7  the counts of uniquely identified consumers
8  for each of the defendants and I would say
9  now give me the names, the home addresses,
10 the dates of birth, the identifying
11 information associated with those files and
12 the deposition testimony of the retailer
13 defendants makes quite plain that they
14 certainly could do that.
15       So that would address -- that
16 would fill out and virtually complete the
17 claims data that would be relevant as to the
18 retailers since TPPs do not have claims
19 directly against the retailers.
20       Once I had the PBM data, if
21 indeed a court concluded that it were --
22 that it was necessary to comprehensively
23 resolve instances where the PBM client is
24 listed as a -- is an ASO or a TPA, which is

Page 71

L. Craft

1  to say an intermediary acting on behalf of
2  the underlying payor, I would first request
3  that the PBMs produce their plan set of
4  worksheets or other data that identifies
5  whether the particular plan and group are
6  being handled by an intermediary or whether
7  the client represents the underlying payor.
8       An alternative is to go
9  directly to the largest insurers in this
10 country and it's not as though we don't know
11 who they are. They are in numerous reports
12 and -- do we have someone who needs to mute
13 here? I'm getting -- okay -- and supply
14 them with the list of plans and groups that
15 they are listed as clients for and ask them
16 to identify which are ASOs and which are
17 TPAs and -- ASOs or TPAs and which, on the
18 contrary, are their own fully insured risk.
19       This is not a difficult
20 process. Every financial report that those
21 entities generate must be able automatically
22 to segregate those accounts and their
23 associated revenue and expenses.
24       So there is no question that

Page 72

L. Craft

1  that data not only exists electronically,
2  that it can be accessed programmatically and
3  that it is accurate enough to meet both
4  regulatory standards, as in reporting to
5  insurance commissioners, and to bill each
6  and every self-funded client who is
7  responsible for the payment of benefits and
8  to do so correctly.
9       So those would be the initial
10 sources that one would consult, assuming
11 that one wanted to -- rather than simply
12 identifying a plan, an identified client who
13 delivers the money to the PBM, but to
14 actually drill down and sort out which of
15 those have a separate underlying
16 self-funding plan sponsor.
17       I want to point out, again,
18 that PBMs frequently produce their claims
19 data with indications in either the account
20 or group file -- group field saying TPA or
21 ASO, but they do not invariably do so.
22       Those are some places that I
23 would suggest be tapped to dig into this
24 reservoir of redundant and comprehensive and

Page 73

L. Craft

1  have accurate electronic data.
2       Q.    I appreciate the rundown and
3  again, I think these are all topics that
4  we're going to probably get to. If you'll
5  indulge me just a moment, I just want to
6  look at my notes on that.
7       A.    Sure.
8       Q.    So the process -- the initial
9  steps I think you called them that you just
10 described in your last answer, is that a
11 process that you've actually done or
12 overseen before?
13       MR. STANOCH: Objection to
14 form.
15       Go ahead.
16       A.    Well, I talked about three
17 different data sources there. So I'm not
18 sure what part of that process you're
19 talking about. I'm not clear about your
20 question.
21       Q.    Okay. I'll try and rephrase.
22       Have you ever -- let me back
23 up.
24       You said you would start by

19 (Pages 70 - 73)

Page 74

L. Craft

1        L. Craft
2    obtaining PBM data because they're the -- I
3    think "most efficient" was your
4    characterization.
5            With regard to claims by
6    consumers against retailers, you would ask
7    for a supplementation of their already
8    produced information to include PII or
9    personally identifiable information and then
10   once you had PBM data, you would resolve
11   instances where a PBM's client is an ASO or
12   TPA or fully insured by asking the PBMs to
13   produce their plan set up worksheets.
14           Is that an accurate
15   characterization of the three sources you
16   talked about?
17           MR. STANOCH:  Objection to
18       form.
19           Misstates testimony.
20           Vague.
21           Ambiguous.
22           Compound.
23           Go ahead.
24       A.    Well, you skipped the last
25   part, which was to literally send to

Page 75

1        L. Craft
2    insurers a list of the plans and groups for
3    which they are recorded as clients in the
4    PBM data and say tell us which are
5    self-funded by the plan sponsor which you
6    insure.  For those self-funded, tell us the
7    funder's name.
8            So you left that part out.
9            Then the other thing is that I
10   do just once again want to make clear that
11   when you say you would get down to resolving
12   this question about the intermediaries, the
13   ASO or TPA, I think I was quite careful in
14   my statement to say if someone -- if a court
15   determined that that was necessary.
16           I want to stress that the
17   reason for that proviso is it is not as
18   though if faced with the PBM data the
19   defendants don't know exactly how many
20   prescriptions were paid for by a given plan
21   and exactly how much was paid for those
22   prescriptions, where they took place, when
23   they took place, what was dispensed, what
24   the total price was, what the allocation of
25   the price was between the third-party payer

Page 76

1        L. Craft
2    and the consumer.
3            So all of those facts that one
4    might suppose to be of interest to
5    defendants -- representing defendants in a
6    case like this -- would be fully known
7    regardless of the resolution of the ASO, TPA
8    issue.
9            So it's not as though there's a
10   question about the nature or the substance
11   or the enforceability of the claim.  The
12   issue is merely the administrative one of do
13   we need to know whether the representative,
14   who is an ASO, is the one to assert the
15   claim or whether the underlying funder is.
16           In other words, you want to put
17   a name in that blank that says and there is
18   a self-funded entity underneath this.  I'm
19   merely saying I am expressing no opinion
20   that that is a necessary step.  I am -- I
21   don't -- I will confess to you that I am
22   confused about why that's even relevant to
23   the ability to properly define a class and
24   to -- for defendants to properly represent
25   themselves in a case like this.  But I am

Page 77

1        L. Craft
2    saying that if it decided -- if a court said
3    you need to do that, there are ways to do
4    it.
5        Q.    Okay.  Let me -- I appreciate
6    the clarification.  You are right.  I did
7    leave out -- I guess I could call it number
8    of four, asking insurers directly.  You're
9    right.  I forgot and thank you for clearing
10   it up.  Let me break it down then.
11           Have you obtained -- the first
12   source of data was PBM data.
13           Have you actually reached out
14   in the past to a PBM and obtained the sort
15   of data that you would obtain for this case
16   to identify class members?
17           MR. STANOCH:  Objection to
18       form.
19           Go ahead.
20       A.    Over and over and over again,
21   yes.  I am frequently involved in preparing
22   requests for PBM data, defining fields that
23   would be sought in PBM data, reviewing PBM
24   sample productions to see how they conform
25   with those requests and then utilizing in

20 (Pages 74 - 77)

Page 78

L. Craft

1
2    one way or another whatever data is
3    produced. So yes, I am -- I do not
4    individually sit down and discuss this with
5    PBMs. I am always working through counsel,
6    but I work on that process regularly.
7        Q.    Okay.
8            Second source of data. PII to
9    supplement the pharmacy productions that are
10   already expent in this case.
11           Have you made such a request to
12   pharmacy defendants in the past?
13       A.    Yes, I have worked on
14   litigation where individual consumers ended
15   up being identified and although I don't
16   consider it particularly relevant because in
17   this case the retailer defendants have
18   themselves said in their declarations that
19   they have that data and could produce that
20   data if ultimately ordered to do so in a
21   HIPAA compliant order.
22       Q.    Third source, asking PBMs to
23   provide their plan set up worksheets, I
24   believe.
25           Let's assume for purposes of

Page 79

L. Craft

1
2    this question that it has been deemed
3    necessary, as you point out.
4            Okay?
5            MR. STANOCH: Objection to
6        form.
7        Q.    Third source, PBM plan set up
8    worksheets.
9            Have you obtained plan set up
10   worksheets from PBMs for the purpose of
11   excluding ASO providers and third-party
12   administrators?
13           MR. STANOCH: Objection to
14       form.
15           Vague.
16           Ambiguous.
17           Asked and answered.
18           Incomplete hypothetical.
19           Go ahead.
20       A.    So I want to clarify that -- if
21   I left the impression that one would
22   actually need the plan set up worksheet as
23   opposed to merely the payor identification
24   from that sheet, then I want to clarify that
25   because it's not as though we need all of

Page 80

L. Craft

1
2    the detail which some of which may be viewed
3    as confidential. In those plan set up
4    worksheets, there's lots and lots of benefit
5    structure information that is completely
6    irrelevant to this case that is contained in
7    those records.
8            We're merely here examining the
9    question if you had to figure out whether
10   the PBM's client was an ASO versus a
11   self-funding payor, then we would be looking
12   for that capacity designation and that is
13   electronic data. So when I say plan set up
14   worksheet, I want to make clear I don't mean
15   a piece of paper that somebody wrote in on
16   in pen. I mean electronic data that
17   includes that information.
18           In some cases, PBMs are, as I
19   said, recording that very type of
20   classification in the claims data that we
21   see produced. You see an ASO or TPA
22   designation. In other cases, that
23   designation may not be apparent in the
24   claims data, but may be linked to the group
25   number that helps to segregate claims, for

Page 81

L. Craft

1
2    example, for a single big insurer such as a
3    Blue Shield and there may be separate
4    groups.
5            So whether -- I have not had a
6    case where these worksheets, these plan set
7    up worksheets have been produced, but I
8    know, as does Mr. Kosty -- and he says this
9    in his report -- that those data exist.
10       Q.    Fair to say then that you've
11   never undertaken a review of these sort
12   of -- let me back up because I want to take
13   account of your explanation that you don't
14   need the whole thing.
15           I think you said there's
16   certain, you know, benefit packages and I
17   want to take account of that because I think
18   it's immaterial to my question. So I'll try
19   to ask this the right way.
20           If I'm understanding you
21   correctly, you have not had occasion in the
22   past to review the portion of set up
23   worksheets relating to identifying an ASO or
24   a TPA role? You've not had occasion to do
25   that in the past in connection with

21 (Pages 78 - 81)

Page 82

L. Craft

1    L. Craft
2    excluding ASO or TPA entities from a class;
3    is that accurate?
4         MR. STANOCH:  Objection to
5    form.
6         Vague.
7         Ambiguous.
8         Misstates prior testimony.
9         Compound.
10        Unintelligible.
11        Go ahead.
12   A.    That's not a process I've been
13   asked to perform.
14   Q.    Okay.
15        Then you also mentioned -- I
16   want to make sure I get it right -- in other
17   cases, it being the existence of an ASO or a
18   TPA relationship, it may be linked to group
19   number is what I wrote down, but -- am I
20   characterizing your testimony right?
21        MR. STANOCH:  Objection to
22   form.
23        Go ahead.
24   A.    Yes.  You've got that right,
25   which is to say that there are a number of

Page 83

1    L. Craft
2    ways that a large insurer that operates both
3    to provide fully insured benefits and also
4    operates as a service provider, may ask that
5    its data be segregated so that it can do two
6    things:  One, divide those claims that it is
7    responsible for paying, i.e. those where it
8    is the insurer, from those that it will be
9    billing to an underlying client, and second,
10   properly link those administrative claims to
11   the client who will have to be billed for
12   them.
13        It's important to just
14   understand the practical reality here that
15   when the insurer receives data that includes
16   data for claims related to ASO clients, it
17   has to be able to push a button and bill
18   those exact claims to each of its clients
19   correctly.
20        That requires that the data be
21   segregable based upon the underlying ASO
22   client.  You can't do this business if
23   that's not true because the data that the
24   ASO is receiving from -- and that it's using
25   to bill its clients is this very same PBM

Page 84

1    L. Craft
2    data.  It's not coming from another source
3    for them.  They're getting it from their
4    PBM.  So that data must be structured in a
5    way that allows for such segregation.  I've
6    seen that done in different way, but it is
7    an essential business function.
8         MR. DORNER:  Okay.
9         I want to move on.  I think we
10   might get into a little bit more of the
11   nitty-gritty on this later.  I do want
12   to go ahead and move on to other
13   aspects of your report.
14        I guess this is sort of
15   related.  In your report -- actually,
16   lest go to your report, paragraph five,
17   Exhibit 4, paragraph five.
18        Sorry, Justin.  I should have
19   told you to leave that up.
20   Q.    This paragraph lists the number
21   of cases that you have been involved with, I
22   think, in the last four years.  I want to
23   focus on two of them in particular.  One is
24   the in re: -- I'm going to butcher this --
25   Suboxone case.

Page 85

1    L. Craft
2    Am I pronouncing that correct?
3    A.    Yes.
4    Q.    Thank you.
5         In that case, I believe you
6    gave an opinion on ascertainability in that
7    case; is that correct?
8         MR. STANOCH:  Objection.
9         Go ahead.
10   Q.    Let me rephrase.
11        You gave an opinion with
12   respect to identifying class members in that
13   case.
14        Is that accurate?
15   A.    It was a very narrow opinion.
16   If you've read the report, you know that it
17   was -- it was a very narrow and very brief
18   report.  But it was relevant to the question
19   of assembling a list of class members.
20   Q.    Okay.
21        And admittedly, Ms. Craft, I've
22   not read that document.  I'm not even sure I
23   have access to your report for that case,
24   so -- and that's neither here nor there.
25        All I want to ask is as I

22 (Pages 82 - 85)

Page 86

L. Craft

1    understand that case, I believe any opinion
2    that you gave was not challenged in that
3    matter.
4
5         Is that accurate?
6    A.    I have no idea whether that's
7    true or not.  I don't --
8    Q.    Okay.
9    A.    -- spend my time tracking what
10   people say about opinions.
11   Q.    I guess that's what we do, huh?
12        So that's really all I wanted
13   to know about that case.  The other case is
14   Niaspan, which is down two lines.  Niaspan
15   Antitrust litigation.
16        Do you see the one I'm
17   referring to?
18   A.    I do.
19   Q.    In that case, I believe you
20   also gave an opinion with respect to
21   identifying third-party payors and
22   separating out ASOs, TPAs and fully insured
23   plans from that class because those three
24   entities were excluded.
25        Am I characterizing that

Page 87

L. Craft

1    accurate?
2
3         MR. STANOCH:  Objection.
4         I just caution the witness not
5         to divulge any information to the
6         extent it's subject to a protective
7         order in that case.
8         But please, you may answer.
9    A.    Yes, I think that's a correct
10   characterization.  In that case, the class
11   definition involved an explicit exclusion
12   for fully insured plans which is not present
13   here and that was the one topic that was
14   addressed in the course of my reports.
15   Q.    Now, I believe, though, that
16   you say later in your report that fully
17   insured plans would not be TPPs in this
18   case.
19        Isn't that right?
20   A.    Absolutely.  And as I made
21   clear in that language, that's not because
22   there's an exclusion that one needs to then
23   identify all of those falling within the
24   exclusion and take them out of the class.
25   It is because the initial qualifying

Page 88

L. Craft

1    condition for class membership is the
2    payment for one of the challenged VCDs and
3    in the case of a fully insured health plan,
4    that condition is never met because they
5    don't pay for the benefits that are supplied
6    to their members or enrollees.
7         So there's no reason in the
8    world to go out attempting to identify those
9    entities because they're not the payor in
10   the first place.  They fail to meet that
11   initial qualifying threshold.
12   Q.    The effect, though, is the
13   same.  Whether an entity is excluded or it's
14   just not included in the first place, a
15   fully insured plan in this case I believe
16   you're saying would not be included from the
17   get go, right?
18        MR. STANOCH:  Objection to
19        form.
20        Vague.
21        Ambiguous.
22        Misstates testimony.
23        Go ahead.
24   A.    Yes.  We have to be very

Page 89

L. Craft

1    careful about the language here because you
2    said a fully insured plan would not be
3    included within the get go.  So first of
4    all, class members are not plans.  Class
5    members are payors in the TPP class and
6    that's a critical distinction.
7         Second, the TPP -- the payor on
8    that plan is a class member.  That's the
9    insurance company.  The insurance company
10   that provides the coverage is a member of
11   the class, has paid for the claims and
12   that's what we need to know.  We're trying
13   to identify those insurance payors who are
14   providing the benefits under fully insured
15   plans.
16        So I don't think that I would
17   quite agree with your characterization
18   that's the same thing one way or another.
19   There is simply no need to go through the
20   roughly 88% of employer plans that fully
21   ensure their benefits and figure out who the
22   sponsors are on all of those plans.  Those
23   sponsors are not payors.  They're not
24   relevant to the class definition.

23 (Pages 86 - 89)

Page 90

L. Craft

1
2    Q.    Okay.
3         So comparing the work you did
4    in the Niaspan case, and this case, the work
5    that you've done so far -- let me back --
6    let me strike that that question.  Let me
7    ask it a different way.
8         The proposed methodology that
9    you offered in the Niaspan case for
10   identifying class members and the proposed
11   methodology you have in this case, do those
12   differ in any respect?
13        MR. STANOCH:  Objection to
14   form.
15        And again, I just caution the
16        witness not to divulge information
17        subject to a confidentiality order in a
18        different case.
19        Please proceed.
20   A.    Sure.  It's a different -- it's
21   a differently defined class in Niaspan.  The
22   data -- the very limited class data that was
23   produced in that case was different than the
24   data that has been produced here and I
25   believe that I am being particularly

Page 91

L. Craft

1
2    explicit here about how one would, if
3    necessary, go about revolving the
4    distinction between the ASO and insurer
5    payors.  So I would not describe them as the
6    same.
7    Q.    Okay.
8         Are those the only differences
9    that you're aware of, the ones you just
10   described?
11        MR. STANOCH:  Same objections.
12        Go ahead.
13   A.    It's an entirely different case
14   and it's a case that involved antitrust
15   allegations with all of the issues that that
16   implies, which are not relevant or germane
17   to this litigation.
18        In this case, we're only
19   trying, from my perspective, to identify who
20   paid for a specific, nicely delineated set
21   of products by their NDC codes.  We're just
22   trying to identify those payors.
23   Q.    You referred to the fact that
24   Niaspan was an antitrust case.
25        Is the methodology for -- your

Page 92

L. Craft

1
2    methodology for identifying TPPs and
3    consumers different in the antitrust context
4    than in a case involving the allegation made
5    herein?
6         MR. STANOCH:  Objection to
7    form.
8         Vague.
9         Ambiguous.
10        Go ahead.
11   A.    It can be because the antitrust
12   cases may involve changes in formulary
13   status or, you know, questions about the
14   difference between the plans, but for
15   treatment of a generic when only the brand
16   was in fact available.  The issues were
17   quite different.
18   Q.    How does that impact the
19   identification of class members?
20        MR. STANOCH:  Objection.
21        Incomplete hypothetical.
22        Go ahead.
23   A.    It may raise additional issues
24   that are addressed in the course of the
25   case.  Each case is different on its facts

Page 93

L. Craft

1
2    and depending upon the specific allegations,
3    so I can't generalize.
4    Q.    The court in the Niaspan case
5    concluded that PBM data alone cannot readily
6    identify fully insured plans.  If that
7    was -- let me pose it to you this way.
8         If that was, in fact, the
9    court's factual conclusion -- not legal,
10   just factual -- is that factually accurate?
11        MR. STANOCH:  Objection to
12   form.
13        Vague.
14        Ambiguous.
15        Incomplete hypothetical.
16        Unintelligible.
17        Go ahead.
18   A.    First of all, let me say that
19   it is not my position to label a federal
20   judge's order as accurate or inaccurate and
21   I am going to avoid any such
22   characterization.
23        I don't know what "readily"
24   means in the quote that you just supplied.
25   I don't know -- I know that there was only

24 (Pages 90 - 93)

Page 94

L. Craft

1    L. Craft
2    one limited sample of PBM data that was
3    supplied in that case and that sample was
4    missing a key relevant field, which is the
5    group number, so it was pretty seriously
6    incomplete.
7        I would not suggest that when
8    and if PBM data is gathered in this case
9    that the PBM be allowed to withhold the
10   group number. I would suggest that that be
11   included as it routinely is, by the way, in
12   many cases. So I'm not going to attempt to
13   get into the judge's head and figure out
14   what that sentence means, what the standard
15   of "readily" is.
16       I just told you that PBMs, I
17   think, generally have payment status
18   information and Mr. Kosty doesn't really
19   challenge that except to say maybe they
20   don't always and it's in a different
21   database.
22       The court addresses none of
23   this in the Niaspan opinion and does not
24   address the ability to obtain that same
25   information from the ASOs and TPAs.

Page 95

1    L. Craft
2    themselves as to who the underlying payors
3    are.
4    Q.    I'm going to unpack that a
5    little bit, Ms. Craft. The first thing I
6    want to clarify in your answer is just in
7    terms of terminology. You identified
8    "readily" as a concern, but I want to back
9    up a few words.
10       My question is to the phrase
11   PBM data. PBM data, as I believe you
12   understand it, is basically the NCPDP,
13   things like plan ID, BIN, processor control
14   number and group RX number.
15       Is that -- that's part of it,
16   right?
17       MR. STANOCH: Objection.
18   A.    Those are elements -- I'm
19   sorry.
20   Q.    Okay.
21   A.    Those are elements of PBM data.
22   Certainly not all of them.
23   Q.    Okay.
24   A.    Data fields.
25   Q.    Right. And that's where I want

Page 96

1    L. Craft
2    to go next.
3        The other part of PBM data that
4    I think you're referring to in your report
5    in various places is the -- like the set up
6    worksheets and the set up information that
7    you were talking about earlier.
8        Is that right?
9        MR. STANOCH: Objection.
10   A.    No. There's lots more in the
11   PBM claims data than what you just
12   described. As I've now mentioned I think
13   twice, it's not uncommon for a PBM to
14   delineate in that claims data ASO or TPA.
15   So you do see that delineation in claims
16   data. It's just that you don't see it
17   invariably in the claims data.
18       So I am merely pointing out in
19   this litigation that PBMs know their clients
20   and, generally speaking, should be expected
21   to be able to produce from their electronic
22   data, but not within the claims data set,
23   information about who the payor is, whether
24   a particular plan is an ASO plan or is
25   ASO -- I'm going to use the word ASO here

Page 97

1    L. Craft
2    just to make the communication clearer -- to
3    encompass also TPA plans. It's an
4    intermediary who has contracted with the
5    PBM.
6        I believe that the data is set
7    up specifically to delineate those accounts
8    separately so that they could be tracked by
9    the ASO who receives the data and proper
10   billing can be made to the clients. I don't
11   mean to limit this to a question of plan set
12   up sheets. I mean to say that the data is
13   structured to enable that process to happen.
14   Q.    Okay.
15       Let me back up then and I'm
16   going to ask my question in a little bit
17   different way.
18       Using your description of PBM
19   data and your understanding of PBM data that
20   you just laid out for us, I'm going to take
21   the word "readily" out of my question and
22   ask it this way.
23       If the court concluded in the
24   Niaspan case that PBM data alone cannot
25   identify fully insured plans, do you agree

25 (Pages 94 - 97)

Page 98

L. Craft

1    with that factual conclusion?
2
3        MR. STANOCH: Objection to
4    form.
5        Asked and answered.
6        Incomplete hypothetical.
7        Calls for legal conclusion.
8        I caution the witness not to
9    divulge any information subject to a
10   confidentiality order in a different
11   case in rendering her answer here, but
12   please proceed.
13   A.    Once again, I am loathe to take
14   issue with a judge's conclusions because I
15   don't know what facts inform them. I know
16   that that particular decision was based on
17   literally two examples and that is what the
18   judge based his conclusion on, not something
19   else, the two examples where group data was
20   not supplied and the field formats suggested
21   that these were fully insured prescription
22   drug benefits.
23       And years later, there was
24   website content that suggested that health
25   benefits generally for these two claimants

Page 99

L. Craft

1
2    literally comprising a handful of claims
3    might have been at least four or five years
4    later self-funded. I do not believe that
5    that evidence suggests that PBM data cannot
6    be used to adequately address the question
7    of self-funding sponsor identification for
8    ASO and TPA plans.
9        So my opinion is that those
10   facts which provide the narrow basis for the
11   court's ruling, as I read it, are in no way
12   dispositive or even particularly probative
13   of the question of the adequacy of PBM data
14   writ large.
15       I just want to remind you that
16   using the moniker PBM data is very
17   confusing. The PBMs swim in an ocean of
18   data. Their business is data. These are
19   the people who generate reports that track
20   individual human beings for ten years and
21   say what drug did they obtain, which drug
22   did they switch to. So there's lots and
23   lots of PBM data and what it had in front of
24   it there was a small sample that was missing
25   fields. So how that influences the court's

Page 100

L. Craft

1    decision, I cannot say.
2
3    Q.    In this case, there's no PBM
4    data that's supplied whatsoever, is there?
5        MR. STANOCH: Objection.
6    A.    Actually, I believe that one of
7    the retailers effectively pulled from PBM
8    data to be able to get the both mail order
9    and retail claims, but what -- once again,
10   I'm a little concerned about just calling it
11   PBM data.
12       The standard set of metrics
13   that I would expect would be collected from
14   PBMs in a case like this, as far as I know,
15   has not been subpoenaed or collected at this
16   point in the litigation.
17   Q.    Okay.
18       Can we go to page -- let's do
19   paragraph six on the next page of your
20   report, please.
21   A.    Okay.
22   Q.    Just briefly I just want to
23   discuss comp for a minute, Ms. Craft.
24       You're being paid $550 an hour
25   for your services?

Page 101

L. Craft

1
2        MR. STANOCH: Objection.
3    A.    No, I'm not. I'm not being
4    paid -- I'm not being paid anything. On
5    Point Analytics, my employer, is being paid
6    $550 an hour for my services.
7        (Whereupon, Exhibit 6 was marked for
8    identification.)
9    Q.    Okay. I appreciate the
10   clarification.
11       Let's go ahead and do exhibit
12   pre-labeled F. This will be Exhibit 6.
13       Ms. Craft, I don't intend to
14   spend a lot of time poring through your
15   invoices. I want to ask a couple questions
16   about this.
17       This is a collection of
18   invoices that you or On Point has produced
19   to us. On page one of the screen --
20   actually, I take that back.
21       Can we go all the way to page
22   23 of this exhibit?
23   A.    Okay.
24   Q.    It should be 23 of the PDF,
25   Ms. Craft. The exhibit shown on the screen

26 (Pages 98 - 101)

Page 102

```
 1            L. Craft
 2  is dated February 1, 2022 and it is for
 3  professional services through December 31,
 4  2021.
 5            Have you sent any additional
 6  invoices to plaintiff's counsel since
 7  February 1 -- I guess covering any periods
 8  post December 31, 2021?
 9       A.    No.
10       Q.    Okay.
11            Obviously there's been work
12  done since December 31, 2021.
13            Is that fair to say?
14       A.    Yes, but the January invoice
15  has not yet been sent.
16       Q.    Okay.  All right.
17            Now, I went through these
18  invoices and I'll just make some
19  representations to you.  All I'm looking for
20  here is not an exact math calculation, but
21  your sense as to whether or not it appears
22  accurate based on my bad lawyer math.
23            I went through it and it looks
24  like I arrived at your having spent
25  approximately 164 hours so far in this case.
```

Page 103

```
 1            L. Craft
 2            Does that roughly match your
 3  recollection of about how much time you've
 4  spent through December 31, 2021?
 5       MR. STANOCH:  Objection to
 6       form.
 7            Documents speak for themselves.
 8            Go ahead.
 9       A.    I have not summarized those
10  numbers myself.  That doesn't strike me as
11  inherently wrong.  The detail is accurately
12  reported on each invoice where the time is
13  broken out by timekeeper.  So 160 hours
14  doesn't strike me as wrong, but I'd have to
15  replicate the math and add them up to see.
16       Q.    So you're saying we could do
17  the same thing and get an accurate picture
18  of what both you and your staff have spent
19  on this case.
20            Is that fair?
21       A.    That's correct.
22       Q.    Okay.
23            Total collections I added up
24  appear to be $271,163.75 paid to On Point by
25  plaintiff's counsel so far.
```

Page 104

```
 1            L. Craft
 2            Is that consistent with your
 3  understanding of what's been received by On
 4  Point?
 5       MR. STANOCH:  Same as prior
 6       objections.
 7       A.    My understanding would be based
 8  upon review of these same documents that you
 9  are showing me.  So I don't have any
10  understanding independent of looking at
11  these same documents and tallying up the
12  payments, which I have not --
13       Q.    Does On Point -- sorry.  I
14  didn't mean to cut you off.
15            Were you finished with your
16  answer?
17       A.    Yes, I am.  Thank you.
18       Q.    Of course.
19            Has On Point worked with any of
20  the plaintiff's counsel in this case before?
21  Not getting into -- I don't want
22  attorney-client information.  I just want to
23  know if you worked with them before.
24       A.    I've consulted on one other
25  matter, but it's not one in which I'm
```

Page 105

```
 1            L. Craft
 2  identified as an expert.
 3       Q.    Go to page 15 of Exhibit 6.
 4  Here, I am going to try to read just a small
 5  portion of this invoice.
 6            In the top entry, a person
 7  designated as CW -- who I understand to be a
 8  Mr. or Ms. Wallace -- let me stop there.
 9            Do you know who I'm talking
10  about?
11       A.    Yes, that abbreviation stands
12  for Chandra Wallace.
13       Q.    So Ms. Wallace then?
14       A.    Yes, correct.
15       Q.    So Ms. Wallace here indicates
16  she researched and reviewed six segmented
17  orders on motions to dismiss and then below
18  that appears to have done that again the
19  next day on September 9th, 2021 where she
20  completed review of recent motions.
21            My question to you is this:
22  What was the purpose of her review of the
23  motions to dismiss?
24       A.    Well, what you see is, first of
25  all, that the top entry, September 8, refers
```

27 (Pages 102 - 105)

Page 106

L. Craft

1    L. Craft
2    to the orders.  The second entry on
3    September 9 refers to motions and I don't
4    know that those are the same motions.  It
5    refers to motions.
6        Q.    The next word is orders.
7            Let me clarify that.  The next
8    word is orders, so I guess I should have
9    drawn your attention there as well.
10           I'm referring specifically to
11   the orders on the motion to dismiss.  I
12   apologize.
13           MR. STANOCH:  Mr. Dorner, I'm
14       not accusing you, but just let her
15       answer.  Thanks.
16           MR. DORNER:  No problem.
17           Go ahead and continue.
18       A.    The September 9 entry I'm just
19   noting doesn't say anything specifically
20   about motions to dismiss.  You are drawing
21   the inference.
22           When you say she did the same
23   thing again on September 9, I don't think
24   you could draw that inference from this.
25   The September 9 entry merely says "Complete

Page 107

1    L. Craft
2    review of recent motions and orders."
3    You're correct in highlighting now that
4    latter word.
5            In general, although we're not
6    in the business of lawyering or thinking
7    about legal strategy, we stay pretty tightly
8    focused on the areas of expertise that are
9    expressed in our opinions.  That doesn't
10   mean that we don't try to procedurally keep
11   track of what's going on in a case.  So it's
12   not unusual in our firm for there to be a
13   docket review that is periodically
14   undertaken just involving pulling up from
15   the actual docket for a case using Case
16   Central and -- to just see what's going on.
17   Just to make sure we don't have any
18   surprises.  For example, the schedule has
19   changed and these counsel are fantastic, but
20   it does occasionally happen that some
21   lawyers don't keep us in the loop and we
22   find it's a good idea to just keep an eye on
23   the docket for our own purposes.
24           So beyond that, I can't comment
25   further.

Page 108

1    L. Craft
2        Q.    In forming your opinions, have
3    any of the substantive opinions in the
4    motions to dismiss expressed by Judge Kugler
5    -- let me strike this and reword it because
6    it's a horrible question.  Let me try that
7    again.
8            In forming the opinions
9    expressed in your reports, have you relied
10   upon any of the Court's decisions on the
11   defendants' motions to dismiss referenced in
12   this invoice?
13           MR. STANOCH:  Objection to
14       form.
15           Go ahead.
16       A.    No, I have not.
17           MR. DORNER:  So I know I -- I
18       think I'm at about an hour right now
19       and I'm sort of at a point where I can
20       transition and also I'd like to use the
21       restroom.  So if we don't mind taking a
22       quick five minutes, I'd appreciate
23       that.
24           Is that okay?
25           THE WITNESS:  Okay.

Page 109

1    L. Craft
2            MR. DORNER:  I'll see you back
3    here at 10:19 Pacific.
4            THE VIDEOGRAPHER:  Time is
5    10:13.
6            This ends media unit two.
7            We're going off the record.
8            (Recess taken)
9            THE VIDEOGRAPHER:  The time is
10   10:23.
11           This begins media unit three.
12           We're back on the record.
13           MR. DORNER:  Welcome back
14   everybody.  Ms. Craft -- tell you
15   what -- Justin, let's pull up Exhibit
16   4, go to page six, paragraph eight.
17       Q.    Really, before I even get to
18   questions about paragraphs eight and nine, I
19   wanted to ask you, Ms. Craft, for purposes
20   of identifying who class members would be,
21   would you agree it's immaterial whether the
22   valsartan that a consumer purchased was
23   actually recalled to your identification
24   methodology?
25           MR. STANOCH:  Objection to

28 (Pages 106 - 109)

L. Craft

1        form.
2            Vague.
3            Go ahead.
4        A.    Yes.  The recall status of the
5    product is not a factor that I've taken into
6    consideration.
7        Q.    Why is that?
8        A.    It's my understanding that some
9    of the product challenged in this case was
10    manufactured prior to the time that the
11    defendants initiated their recalls and some
12    of that product was expired, was no longer
13    being sold and so obviously whatever harm
14    those products may have caused due to
15    nitrosamine contamination was already -- had
16    already occurred prior to any recalls being
17    initiated.
18        So I don't think -- I did not
19    read the fact of a defendant recall as being
20    the dispositive indication that a product
21    was or was not contaminated.
22        Q.    And actually that's -- let me
23    jump off that answer.
24        Whether or not a particular

L. Craft

1    valsartan-containing drug that a consumer or
2    a TPP paid for, whether it actually even
3    contained NDMA or NDEA is also not pertinent
4    to your identification methodology; is that
5    also correct?
6        MR. STANOCH:  Objection to
7    form.
8            Misstates opinions.
9            Go ahead.
10        A.    It's not pertinent in the sense
11    that I didn't attempt to investigate the
12    contamination -- presence or absence of
13    contamination for particular products.  It
14    is pertinent in the sense that if one were
15    to determine that a particular NDC product
16    was not contaminated, that could be removed
17    from the challenged products very readily
18    using the data I have identified because all
19    of the data sources that I discuss in my
20    report are NDC specific.  So particular NDCs
21    could be removed if it were later determined
22    they were not contaminated and I think
23    that's a -- that's an important fact to be
24    aware of.

L. Craft

1        Did I attempt to make any
2    distinction between recalls and recalled
3    products in my report?  I did not.
4        Q.    I want to focus on NDCs that
5    you just brought up in paragraph -- let's
6    close this call out.  I think I meant
7    paragraph nine.  I apologize.
8        So here you've got a statement
9    that the -- I believe it's down near the
10    bottom -- the NDC is universally used to
11    identify the product at each step in the
12    distribution process, including in the final
13    sale to consumers.
14        When you say NDCs are used to
15    identify a product, first of all, you'd
16    agree that the term "product" isn't
17    referring to a specific bottle of a
18    medication, right?
19        MR. STANOCH:  Objection.
20        Q.    Let me ask this a different
21    way.
22        When you say product and you
23    refer to a product and an NDC used to
24    identify the product, an NDC code can't be

L. Craft

1    used to pick out an individual bottle of a
2    medication from any other bottle of a
3    medication that also has the same NDC.
4        Fair?
5        A.    The NDCs does not distinguish
6    between bottles of medication that has the
7    same NDC.  It's axiomatic that if the NDC on
8    those two bottles is the same, it's the same
9    product.  That's -- we refer to these as
10    drug products in the pharmaceutical industry
11    and a drug product is being defined by its
12    chemical composition, its strength, its
13    formulation.  Those are common elements that
14    link back to the manufacturer of the product
15    and then one step further, back to an IP
16    supplier.  That's what's getting captured as
17    the common characteristics, using the NDC.
18        Q.    Okay.
19        And then an NDC also doesn't
20    identify a specific -- again, let me
21    rephrase this question before I know what
22    happens.
23        An NDC can include -- would
24    include all lots or batches of any given

L. Craft

1
2  drug product, correct?
3          MR. STANOCH:  Objection to
4      form.
5          You may answer.
6      A.    Yes.  A lot is a further
7  subdivision of an NDC.
8      Q.    Can we go to paragraph ten,
9  please, on page seven?
10         I want to focus your attention,
11  Ms. Craft, on the phrase -- it's in the
12  middle of the paragraph -- "Multiple parties
13  exchange, record and maintain the
14  transaction-specific data for virtually all
15  insured prescriptions dispensed in this
16  country, including the identity of both the
17  patient, their health plan and the exact
18  amounts paid by each."
19         When you use the term "exact
20  amounts," that phrase would not take into
21  account any post-sale adjustments to the
22  consumer or the health plan's net cost,
23  would it?
24         MR. STANOCH:  Objection to the
25      form.

L. Craft

1
2      Vague.
3      Ambiguous.
4      Go ahead.
5      A.    I don't believe that post-sale
6  adjustments are, number one, specific to
7  individual purchases of an individual drug,
8  nor do I believe that they are germane to
9  the question of what was paid and by whom at
10  the point of sale, which I believe to be the
11  focus of this inquiry.  But I wish to
12  underscore that first point because I think
13  it has been very misleadingly described by
14  Mr. Kosty.
15      Q.    So I guess let me ask again.
16         The types of
17  transaction-specific data that you proposed
18  to use in this case would not reflect
19  post-sale adjustments, refunds, credits,
20  anything of that nature?  It solely focused
21  on the point of sale; is that right?
22         MR. STANOCH:  Objection to
23      form.
24         Asked and answered.
25         Vague.

L. Craft

1
2      A.    Nope.  That's not right.  So
3  first of all, refunds and credits are
4  frequently reported in the PBM data and in
5  TPP data because they are part of the
6  payment record for individual transactions.
7  So in a given PBM with claims data, you
8  might expect to see something approaching
9  20% of transactions as either canceled or
10  reversed.  Typically, those are returns to
11  stock based --
12      Q.    Ms. Craft, you froze.
13      A.    Oh, dear.  Okay.
14      Q.    Ms. Craft, I may be able to
15  help you.  I have sort of a realtime here.
16  You had said --
17         MR. HONIK:  No, no, no.  Let
18      the court reporter read back what she
19      has and the witness can pick up from
20      there.
21         THE WITNESS:  Yes.  And please
22      let me know if that happens again.
23      That's very unusual here in the office.
24         MR. DORNER:  Dave, was that you
25      speaking?

L. Craft

1
2         MR. STANOCH:  That was Ruben
3  Honik.
4         MR. DORNER:  Okay.
5         Well, if you're going to be
6  objecting on behalf of your witness,
7  you're supposed to be on video.
8         MR. HONIK:  I'm not objecting.
9  I'm only pointing out the obvious.
10  You're not the court reporter.  Let the
11  court reporter read what she has thus
12  far and the witness can pick up from
13  there.  That's all.
14         THE WITNESS:  That would be
15  helpful.  Thank you.
16         (Whereupon, the record was read
17      back by the reporter.)
18      A.    -- on the consumer failing to
19  pick up the prescription.  These are easily
20  identifiable in the data, typically with the
21  symbols R and X, returns and cancellations.
22         So I would agree with your
23  description of returns and credits; however,
24  I believe what you are referring to are
25  surrogate payment adjustments across entire

30 (Pages 114 - 117)

Page 118

```
1              L. Craft
2    portfolios of drugs that may be embedded in
3    some pharmacy contracts that, in my opinion,
4    are utterly and completely irrelevant to
5    what was paid for valsartan-containing
6    drugs.
7          Those accounting adjustments to
8    entire books of business are not drug
9    specific.  They do not change in any way --
10   the phrase you used was "net price" that was
11   paid for the valsartan-containing drug.
12   Q.    I was actually referring to the
13   other -- to the sort of refund or credit, as
14   we might use it in common terminology.
15         If, for example, a consumer
16   were to be given a refund or a credit for a
17   prescription, are you saying that would be
18   reflected in the transaction-specific data
19   that you would obtain in this case?
20         MR. STANOCH:  Objection to
21   form.
22         Misstates the testimony.
23         Incomplete hypothetical.
24         Compound.
25         Ambiguous.
```

Page 119

```
1              L. Craft
2          Go ahead, if you can.
3    A.    So are you asking in your
4    questions specifically about product returns
5    related to recalls?
6    Q.    Well, let's treat it like that.
7    Sure.
8    A.    Okay.
9          MR. STANOCH:  Same objections.
10   Go ahead.
11   A.    Yes.  Because it depends on
12   what kind of refund or credit you're talking
13   about here.  So if what you are discussing
14   is the return of product that has been
15   recalled and whether that particular -- that
16   generates a refund to the consumer, the --
17   in general, the records of such returns will
18   be maintained by the manufacturer that has
19   initiated the recall and that is paying the
20   refund or the entity that it has designated
21   to handle its recall effort on its behalf.
22         So an entity, that may be the
23   manufacturer, it may be its wholesaler, it
24   may be a specifically designated entity to
25   do recall management.  That entity is going
```

Page 120

```
1              L. Craft
2    to have a record of refunds paid.  You don't
3    send people money without keeping a record
4    of who you sent it to.
5    Q.    Now, I don't believe your
6    report provides for any methodology for
7    applying refunds that were paid either to
8    TPPs or to consumers for purposes of
9    identifying the class.
10         That's true, right?
11         MR. STANOCH:  Objection to
12   form.
13         Vague.
14         Ambiguous.
15         Compound.
16         Go ahead.
17   A.    I don't recall having discussed
18   the refund process in my report, nor do I
19   know whether it was -- the amount of refunds
20   paid were, in fact, material in this case.
21         So I don't have an opinion
22   about that, but I do know that these are --
23   if, for example, the PBM is linked to a
24   pharmacy and the pharmacy is paying out a
25   refund, that may appear in the PBM record.
```

Page 121

```
1              L. Craft
2    But there will be a master record of refunds
3    that will be electronically available
4    depending on who is handling the recall.
5          I was not -- I was not asked to
6    opine on returns triggered by the recall,
7    but they are, of course, electronically
8    documented.
9    Q.    So in order to identify a class
10   member, isn't it essential -- well, let me
11   back up.
12         In order to identify anybody
13   who, to use the class definition, paid money
14   for valsartan-containing drugs, don't you
15   have to know whether or not they got a
16   refund or a credit?
17         MR. STANOCH:  Objection to
18   form.
19         Vague.
20         Ambiguous.
21         Incomplete hypothetical.
22         Go ahead.
23   A.    Well, you are asking me a legal
24   question about what you'd have to know,
25   which implies what's the standard.  Is it,
```

31 (Pages 118 - 121)

Page 122

L. Craft

1    L. Craft
2    in fact, legally necessary to determine in
3    advance that someone was not fully refunded,
4    that a given consumer was not fully refunded
5    their purchase price?
6           This is the kind of thing that
7    one would ordinarily expect to see on a
8    claim form. When you say I bought this
9    product, yes, I did, and I paid for it, one
10   could easily see and I did not receive a
11   refund of this -- of these payments.
12          So whether it's necessary when
13   you say don't you have to, I think the
14   answer is no.
15   Q.    So your methodology then for
16   identifying class members is not going to
17   take into account whether or not the class
18   member received a refund or credit in
19   association with recalled valsartan?
20          MR. STANOCH: Objection to
21   form.
22          Asked and answered.
23          Misstates testimony.
24          Vague.
25          Ambiguous.

Page 123

1    L. Craft
2           Incomplete hypothetical.
3           Go ahead.
4    A.    If the method of refunds
5    records were -- it certainly would. Whether
6    that was a step that was necessary, given
7    that claim filing could include a statement
8    along the lines that I've suggested and that
9    if it were determined to be necessary,
10   refunds could be used to offset damage
11   numbers on an aggregate basis for the entire
12   class.
13          I'm not at all aware of
14   circumstances that would make it necessary
15   to link each refunds that was, in fact, paid
16   to an individual consumer.
17   Q.    Okay.
18          In your report, as you said, I
19   don't think it discusses application of
20   refund data in any respect, correct?
21          MR. STANOCH: Asked and
22   answered.
23   A.    Yeah, I think that's correct.
24   Q.    Let's go to page eight of your
25   report, paragraph 12. I want to focus here

Page 124

1    L. Craft
2    on your use of IQVIA -- that's I-Q-V-I-A --
3    data.
4           The IQVIA data you're referring
5    to in paragraph 12 would be the Xponent.
6           And for the benefit of the
7    court reporter, that's the word exponent,
8    but with an E at the beginning.
9           Is that right?
10   A.    That's correct.
11   Q.    You used Xponent data for
12   forming some of your opinions in this case,
13   right?
14   A.    I used them for the purpose of
15   forming the numerosity opinion.
16   Q.    Has IQVIA imposed any
17   limitations, to your knowledge, on the use
18   of its Xponent data for use of litigation
19   purposes?
20          MR. STANOCH: Objection to
21   form.
22   A.    Do you mean in this case?
23   Q.    I mean at all.
24          MR. STANOCH: Objection.
25          Vague.

Page 125

1    L. Craft
2           Ambiguous.
3           Unintelligible.
4    A.    Every IQVIA purchase comes with
5    a license agreement that specifies the
6    permitted uses of the data. That is
7    routinely the case. I do not know what the
8    license agreement says in this case.
9    Q.    Did you look into it?
10   A.    No. I use this data every day
11   of the week in a variety of cases. So no.
12   I have no reason to question whether it was
13   properly obtained and is being properly used
14   here.
15   Q.    Now, Xponent data like the kind
16   you used are aggregated to the monthly level
17   for each plan that is discussed in the data.
18          Is that right?
19   A.    Yes, but you failed to add the
20   other critical element, which is that they
21   are separated by NDC. So each product plan
22   and month and further, the state -- so we
23   have four variables there that are
24   accounting for each observation. So it is
25   aggregate data, but it's not terribly

32 (Pages 122 - 125)

Page 126

1            L. Craft
2    aggregate.  You're getting purchases of a
3    single NDC in a single state by an
4    identified plan over a single month.  So
5    that's the level of aggregation of the
6    Xponent data.
7        Q.    Then it doesn't go down to the
8    consumer level, right?
9        A.    It does not.  Consumers who pay
10   cash for their products are treated as cash
11   payors and so the number of prescriptions
12   filled in a given month for cash payors is
13   reported for each NDC.
14           There is additional data
15   available from Xponent.  I don't know
16   whether it was obtained in -- sorry, from
17   IQVIA -- which is called co-pay data, which
18   does go down to the consumer level and
19   report individual payments by consumers for
20   individual transaction fills.
21       Q.    I believe that to the extent
22   IQVIA has gaps in their data, they'll use
23   projections to fill out the rest of their
24   data.
25           Isn't that right?

Page 127

1            L. Craft
2        A.    Yes.  There is some projection.
3    It's less than 100% of transactions are
4    actually observed and IQVIA has an extremely
5    sophisticated methodology for projecting the
6    balance and assigning that balance to
7    particular classes of payors, locations and
8    NDCs on a monthly basis and it is the
9    standard comprehensive reporting database
10   relied upon almost universally by all
11   participants in the pharmaceutical industry
12   in the United States as an enumeration of
13   all filled transactions or filled
14   prescriptions, whether retail or
15   wholesale -- sorry -- retail or mail order.
16       Q.    Let's go ahead and move on to
17   page 12 of your report.  This is paragraph
18   20.
19           I apologize for the delay
20   there, Ms. Craft.
21           Just as a point of
22   clarification, here in paragraph 20, we see
23   the term TPPs.  I'm sure it appears earlier
24   in your report, but this is the first
25   occasion I have to bring it up.

Page 128

1            L. Craft
2        Just for purposes of this
3    deposition, I just want to make sure we're
4    on the same page.
5            When I say TPP, I'm referring
6    to the proposed TPP class member that would
7    ultimately be responsible for paying the
8    claim.
9            Is that -- we're on the same
10   page there?
11       A.    Yes.  I'm using this to mean
12   third-party payer, yes.
13       Q.    Okay.  Great.  And that could
14   be as opposed to a payor without the first T
15   and P before it, a payor might be some other
16   entity but isn't necessarily a TPP.
17           Fair enough?
18       A.    That's precisely the ASO/TPA
19   issue that we were discussing earlier this
20   morning.  There is the possibility for the
21   payor that is contracting with the PBM to be
22   acting in a representative capacity for the
23   TPP.
24       Q.    Okay.
25           I think I just want to ask a

Page 129

1            L. Craft
2    couple of questions to put some meat on the
3    bone here about that specific scenario.
4            So TPPs don't uniformly
5    contract with pharmacy benefit managers or
6    PBMs for claims adjudication, right?
7        MR. STANOCH:  Objection to
8    form.
9            Go ahead.
10       A.    I don't know what you mean by
11   uniformly.  If you mean -- if you mean
12   invariably, I would agree with you.
13       Q.    And I did.  That's what I
14   meant.
15           One of the -- I think maybe we
16   could -- earlier in the deposition you had
17   said we'll use the term ASO to include both
18   administrative services only and third-party
19   administrators.
20       A.    Mm-hmm.
21       Q.    So sometimes these TPPs will,
22   in fact, be under contract not with the PBM,
23   but rather the ASO for the claims
24   adjudication services, right?
25       A.    Yes, but let's be clear that

33 (Pages 126 - 129)

Page 130

L. Craft

1
2    the actions that the ASO then takes in
3    contracting with the PBM are on behalf of
4    the TPP.  The ASO is doing nothing, but
5    securing that service for them.  They are
6    operating in a representative capacity.
7        Q.    Now, sometimes it's possible
8    that instead of contracting directly with a
9    third party -- excuse me.  Let me back up.
10            Sometimes it's possible that
11    rather than be under contract with a
12    pharmacy benefits manager directly, an ASO
13    might contract with a second ASO or TPA who
14    then contracts with the PBM, right?
15        MR. STANOCH:  Objection to
16    form.
17        A.    I believe your hypothetical is
18    is it possible for an ASO to contract with a
19    second ASO, which then contracts with a PBM?
20            Is that the question you're
21    asking?
22        Q.    Yes.
23        A.    I would say that's extremely
24    rare if it occurs.
25        Q.    It does occur, though?

Page 131

L. Craft

1
2        A.    I can't -- no, I'm not going to
3    confirm that it occurs.  I'm saying it's not
4    theoretically impossible for it to occur.
5    I'm saying it's not -- it should not be
6    considered a significant issue.
7        Q.    And why shouldn't it be
8    considered a significant issue?
9        A.    Because as I just said, that
10    would be extremely rare.  And let's be very
11    clear here, there are all kinds of services
12    that I believe were referenced in the
13    earlier paragraph we were looking at and so
14    when we get into loose talk about TPAs and
15    PBMs -- and hopefully we'll get an
16    opportunity to discuss Mr. Kosty's reliance
17    on the PBMI surveys, which conflate these
18    issues -- it's possible to have a benefit
19    administrator who is really there to help
20    design the plan and who is there to
21    advise -- maybe to do customer service or a
22    variety of other things.
23            What we're concerned about here
24    with regard to ascertainability is the
25    procurement of claims adjudication services

Page 132

L. Craft

1
2    which generate this electronic record that
3    is used in billing and collection and
4    auditing individual claims.
5        So I think we see this in the
6    sense TPPs hire PBMs to perform a wide array
7    of services for them.  The same is true for
8    ASOs.  So you can't say just because there's
9    a benefit administrator involve in the mix
10    that that has somehow interrupted the
11    connection between the TPP and the PBM's
12    claims adjudication data.
13        Q.    I think I see what you're
14    saying.  So really, if you wanted to figure
15    out what the intermediary -- the ASO -- was
16    doing, you'd have to actually look at the
17    relationship between the ASO and either the
18    TPP or the other ASO that it's contracted
19    with, right?
20        MR. STANOCH:  Objection to
21    form.
22        Vague.
23        Ambiguous.
24        Go ahead.
25        A.    Absolutely not.  Absolutely

Page 133

L. Craft

1
2    not.  You do not need to look at all of
3    those relationships.  On the contrary, what
4    I'm talking about is a programmatic
5    data-driven exercise that identifies the
6    client account and group and then links that
7    to the entity that contracted with the PBM
8    and then says if that entity is not the
9    ultimate payor, the TPP, who then is that
10    entity's client on behalf of whom is acting.
11        I'm not suggesting that you
12    need to do any inquiry into the nature of
13    services, the numbers of intermediaries.  I
14    think that's a complete red herring.
15        Q.    I think you used the word
16    "programmatic" in your last response.
17        What do you define as
18    programmatic?
19        A.    Something that is executed
20    through software programming.
21        Q.    Can we go to paragraph 27,
22    which is on page 16, please?  There we go.
23        I want to focus on the first
24    sentence, specifically your reference to
25    additional fields about the payor that

34 (Pages 130 - 133)

Page 134

1          L. Craft
2    appear automatically when the incoming
3    pharmacy message is instantly linked to
4    information collected and maintained by
5    PBMs.
6          I'm going to stop reading
7    there, but the sentence continues.
8          When you used the term "payor"
9    here, payor can mean any entity?  It could
10   be a TPP or an ASO or a third-party
11   administrator or another PBM, right?
12         MR. STANOCH:  Objection.
13    A.    Specifically, I'm referring --
14   when I say about the payor, I'm referring to
15   the entity who has the contractual
16   relationship with the PBM and will be
17   required to pay money to the PBM, whether it
18   is acting as an ASO or whether it is acting
19   as the ultimate payor on a self-funded
20   employment plan or union plan.
21    Q.    So when we're talking about
22   this NCPDP set of information in these NCPDP
23   fields and linking to information maintained
24   by the PBMs about the payor, from the PBM's
25   perspective, the PBM just wants to get paid

Page 135

1          L. Craft
2    by whoever its client is, right?
3          MR. STANOCH:  Objection to
4    form.
5     A.    They care about lots of things.
6    When you say they just want to get paid by
7    whoever their client is, there's a lot more
8    to this than that.  They need to know
9    whether they've got a plan that's regulated
10   under Medicare, under Medicaid.  They need
11   to be able to generate reports of drug
12   usage, of compliance with formulary rules.
13         I don't know what you mean by
14   they just want to get paid.  Yeah, they want
15   to get paid, but they've got a lot of
16   business purposes that are being supported
17   by this data.
18    Q.    So let me ask that question in
19   a little bit different way.
20         The NCPDP fields that you've
21   referenced in paragraph 27 and the linking
22   to additional fields that you refer to in
23   27, the purpose of that is to direct the
24   claim to the entity that will be paying the
25   PBM directly; is that right?

Page 136

1          L. Craft
2          MR. STANOCH:  Objection to
3    form.
4     A.    That is one purpose for the
5    specific fields.
6     Q.    I want to refer specifically --
7    sorry, were you finished?
8     A.    Yes, I am.  Thank you.
9     Q.    My pleasure.
10         Let's drop this call out and
11   just look up a little higher on page 15.  I
12   want to focus on the second column of that
13   diagram, the one with the little building in
14   it.
15         So those fields of NCPDP data,
16   as well as the additional data that you
17   refer to in paragraph 27, considering only
18   those two things, the purpose of that
19   information is to ensure that the claim is
20   routed to the proper -- excuse me -- first
21   from the pharmacy to the proper PBM and then
22   from the proper PBM to whoever the PBM's
23   direct client is.
24         Is that accurate?
25         MR. STANOCH:  Objection to

Page 137

1          L. Craft
2    form.
3          Compound.
4          Unintelligible.
5          Go ahead.
6     A.    I'm sorry.  I can't -- I can't
7    agree with your characterization that
8    suggests that's all these data elements are
9    used for because it's not.  These data
10   elements are used for all kinds of services
11   performed by the PBM for underlying payors,
12   so I can't -- I mean, certainly that is part
13   of this.
14         These numbers that you see
15   here, these fields make it possible for the
16   PBM to uniquely identify not only who is
17   going to be writing a check, but to be able
18   to structure the data that it sends to that
19   client in a way that the client can then use
20   it to bill any underlying TPP who is
21   being -- who is being administered by an
22   ASO.
23         So there are lots of purposes
24   for this and the point of the paragraph you
25   were looking at a moment ago was merely to

                                        35 (Pages 134 - 137)

Page 138

L. Craft

1   make the point that the data transmitted in
2   this messaging system between the PBM and
3   the pharmacy is not the entirety of the
4   data. The PBM has incredibly rich data on
5   its clients that are accessed and organized
6   by the same fields and that can be
7   identified.
8
9           This is why when Mr. Kosty says
10  well, you don't always at the pharmacy level
11  write in the plan name, you don't need to
12  because it automatically pops up. It locks
13  into the data that the message -- that is
14  included in the message sent by the pharmacy
15  because these are relational databases
16  maintained by the PBM that are linked and
17  they're linked by using some of these
18  numbers.
19          So I hope that --
20      Q.    How are they -- sorry. I
21  didn't mean to cut you off.
22          What is the process to link --
23  you used the term "link." Tell me more
24  about that. What does that mean?
25      A.    Sure. So when we have the

Page 139

L. Craft

1   group member ID or cardholder ID, as its
2   described in this diagram, and the BIN and
3   PCN number, that is sufficient so that when
4   the PBM gets the message, they -- the
5   information there allows them to -- using
6   those fields, that's going to take you to
7   the -- to the client name, the client ID,
8   the account number set up with the PBM, the
9   account ID, the description of the group.
10          So that data effectively --
11  when we see claims data, all of that is
12  populated, we see all of these fields. We
13  see or we should. We should see client
14  name, client ID, account number, account
15  description, group number, group description
16  or employer description. We should see all
17  of those fields.
18          What I'm saying to you is that
19  the fact that not every one of those is
20  written out in the pharmacy messaging system
21  is irrelevant. They are automatically
22  populated. It's not like there's someone
23  sitting in a back room at a PBM matching up
24  the incoming records with this other data.

Page 140

L. Craft

1   These are linked data tables that
2   automatically generate claims data with the
3   specifics I've just described using
4   information that is supplied through the
5   NCPDP messaging system.
6       Q.    Have you developed a system --
7   have you ever developed a system to, as you
8   say, automatically links these NCPDP fields
9   with the other information that you're
10  saying the PBM maintains?
11          MR. STANOCH: Objection to
12      form.
13      A.    There's no need for me to do
14  so. It happens automatically. That's why
15  the claims data that PBMs produce
16  automatically includes this information.
17  It's there by default.
18      Q.    Okay.
19          Have you seen this process
20  occur, like, within a PBM? I want to know
21  have you ever actually seen this happen?
22          MR. STANOCH: Objection.
23      Seen it -- what?
24      Vague.

Page 141

L. Craft

1   Ambiguous.
2           Not to mention borderline
3   argumentative, but go ahead.
4       A.    Well, I'm not sure what you
5   mean by "seen it happen." It is an
6   automated software process which is
7   essential to the industry that it happened
8   instantaneously. It is the backbone of
9   clearing transactions. It's the backbone of
10  claims adjudication. If it doesn't occur,
11  then claims adjudication could not occur
12  instantaneously because one needs to be able
13  to determine the eligibility of the
14  individual, the benefit structure, the
15  formulary tier placement of the drug, the
16  individual's recorded purchases previously
17  in the year to determine whether there's an
18  unpaid deductible or whether the individual
19  has reached an out-of-pocket cap.
20          All of this has to happen in
21  seconds and the only way for that to occur
22  is for what's coming from the pharmacy to
23  automatically connect with, link with that
24  data at the PBM in order to perform claims

36 (Pages 138 - 141)

Page 142

1        L. Craft
2  adjudication and instantly return a
3  confirmation, including specific price and
4  its decomposition between the TPP and the
5  PBM.
6        So I don't know what there
7  is -- I've seen the byproduct of that
8  because I've seen claims data over and over
9  and over again and I know what it looks like
10 and I've also seen messages from pharmacies
11 back and forth using the NCPDP system. So
12 I'm not sure what I would see. It's not
13 like there's someone sitting there pressing
14 buttons. It's not a business process that
15 you watch take place.
16    Q.    Okay.
17        So you mentioned it's an
18 automated software process.
19        Is there a name of the software
20 that performs this?
21    A.    Everybody's got their own
22 little proprietary name, but it's the claims
23 adjudication software.
24    Q.    Okay.
25        Do you know any of the names of

Page 143

1        L. Craft
2  the proprietary ones?
3        MR. STANOCH: Objection to
4  form.
5    A.    It's just branding. The
6  functions are the same because the business
7  requirements are the same. Now, none occur
8  to me off the top of my head, terms used by
9  individual PBMs.
10       But let's just revert to the
11 fact that the essential business functions
12 that have to be performed by those systems
13 do not differ from one PBM to another. The
14 incoming data and the outgoing data has to
15 be consistent with the NCPDP format and the
16 business function of adjudication has to be
17 performed in the same way, taking into
18 account the same elements and being able to
19 generate the same kinds of outcomes,
20 regardless of which PBM you're talking to.
21 This is industry standard. This is not sui
22 generis from one PBM to another.
23    Q.    Okay.
24        So from where -- on what are
25 you basing your claim that this is an

Page 144

1        L. Craft
2  industry standard?
3        MR. STANOCH: Objection.
4        Misstates testimony.
5        Vague.
6        Asked and answered.
7    A.    So the industry standard I'm
8  talking about is -- let's not forget that
9  the NCPDP portion of this called an industry
10 standard. The NCPDP itself is a standard
11 setting organization for the industry. Its
12 procedures, including the switching systems
13 that are used to carry these messages, are
14 legally mandated to be observed under HIPAA.
15 So I think all of those facts speak to
16 standards.
17        Now, what the PBMs do with that
18 data in order to perform the claims
19 adjudication function? The requirements of
20 their TPP clients are absolutely the same
21 regardless of which PBM you're going to.
22 PBMs bid against each other to take clients
23 from each other. The data must be
24 consistent, it must be portable, it must be
25 programmatic, it must be readily

Page 145

1        L. Craft
2  interpretable and that's how, for example, a
3  large TPP may say "You know what? If you
4  don't improve your financial terms, PBM, I'm
5  going to take my business to another PBM"
6  and we're just going to literally on one day
7  of a year, we're going to cut over to a new
8  system.
9        That could not be true if they
10 weren't performing the same operations in a
11 way that generated the same or similar
12 outputs and of course their outputs do look
13 the same or similar.
14    Q.    Have you ever actually
15 discussed this automatic linking process
16 with anybody at a PBM?
17        MR. STANOCH: Objection to
18 form.
19        Vague.
20        At a PBM?
21    A.    Well, I mean I certainly have
22 sat in on a deposition from a representative
23 of a PBM that addressed this and other
24 topics about claims adjudication platforms.
25 I have not sat down and personally had a

37 (Pages 142 - 145)

Page 146

L. Craft

1    L. Craft
2    discussion with someone. There is obviously
3    a wealth of declarations filed in
4    pharmaceutical cases over the last ten years
5    where PBMs have stated under penalty of
6    perjury that their process involved
7    determination of the following fields. All
8    consistent, across all of these PBMs, you
9    will see little differences between them in
10   how they even describe the process.
11       I don't believe anyone says
12   here's our specific software methodology for
13   linking to the client file, nor does it
14   matter. The bottom line is it doesn't. You
15   get that data from all PBMs about client
16   account group as part of the claims data.
17       Q.    I want to focus on the first
18   half of the message, not client account
19   group, but rather what we see here in figure
20   three shown on your screen: Plan ID, group
21   ID, BIN or now IIN number, processor,
22   control number.
23            Those data -- specifically,
24   those data -- are not intended to identify
25   TPA or ASO relationships, right?

Page 147

1    L. Craft
2            (Reporter clarification)
3       A.    You've skipped highlighting
4    cardholder ID on the left, which I would
5    consider also one of the numeric fields
6    that's relevant to this.
7       MR. STANOCH: Ms. Craft, we
8    lost you again --
9       A.    -- automatic literally the PBM
10   to identify --
11       MR. DORNER: Ms. Craft, I'm
12   sorry. You cut out a second time. I
13   apologize for interrupting you and
14   cutting you off. Let's restart this
15   whole procedure. Okay?
16            We'll strike that question,
17   we'll strike whatever answer we were
18   able to hear and I'll ask it again.
19       Q.    The plan ID, group ID, BIN or
20   now IIN number, processor control number and
21   cardholder ID reflected in figure three of
22   your report are not intended to identify ASO
23   or TPA relationships.
24            Is that right?
25       A.    Not true. Not true because in

Page 148

1    L. Craft
2    some cases that structure, when it is
3    applied by the PBM is -- because this same
4    structure is going to identify the
5    particular client data product -- I
6    shouldn't describe it as a data product
7    because everybody is getting the same kind
8    of information, but if you recall, I
9    described earlier in my testimony today that
10   the data a PBM sends to ASO clients must be
11   structured in a way that is sufficient to
12   delineate ASO business versus insured
13   business. Data has to be sufficient to
14   support that.
15            Does it come with a label in
16   every case that says this is an ASO, this is
17   a TPA? No, it doesn't. But the data must
18   be structured in a way that is sufficient
19   not only to make that bifurcation between
20   insured and TPA so that that can be
21   implemented by the third party -- the
22   administrator, that intermediary, but it
23   must be sufficient to further decompose the
24   data so that the data can be used by that
25   ASO or TPA to bill its clients correctly, to

Page 149

1    L. Craft
2    attribute the individual claims.
3            What I'm telling you is that
4    the data that the ASO or PBM gets -- I'm
5    sorry -- the ASO or TPA gets from the PBM
6    must be sufficient to perform that
7    allocation.
8            So the identification -- if
9    what you mean is does the name -- the actual
10   name of the underlying payor for an ASO
11   always appear in that PBM data, the answer
12   is no. Sometimes it does, sometimes it
13   doesn't. But is it -- is this data
14   sufficient that participants in the industry
15   can automatically and programmatically sign
16   these individual claims to clients of an ASO
17   or TPA? Yes, it is. That's an essential
18   business function.
19       Q.    So I appreciate the
20   explanation, but I guess I want to go back
21   to what -- I think my question was more
22   directly getting at is, you know, these data
23   shown here in figure three -- specifically,
24   the card holder ID and all of the fields
25   shown in the second column -- you're saying

38 (Pages 146 - 149)

Page 150

L. Craft

1  
2 that those are designed to identify ASO and
3 TPA relationships?
4      MR. STANOCH: Objection to
5 form.
6      Misstates testimony.
7      Asked and answered.
8   A.   I'm saying they must be capable
9 of being used in that manner.
10   Q.   I'm sorry. I didn't hear that
11 answer. It cut out.
12   A.   I said that they must be --
13 these data fields must be capable of being
14 used in that manner in combination so that
15 the claims data, which is reported out to
16 the client, can be used in the event of an
17 ASO or TPA relationship to bill the
18 underlying client.
19      THE WITNESS: If you don't mind
20 holding on for just 20 seconds here,
21 I'm going to email my tech guy and ask
22 why we're having internet instability
23 because I do apologize for that.
24 That's extraordinarily rare and --
25      MR. DORNER: That's fine.

Page 151

L. Craft

1  
2      Let's go off the record then
3 and you could do that.
4      THE WITNESS: Literally 20
5 seconds.
6      MR. DORNER: It's okay. Let's
7 take a quick five. Let's go off.
8      MR. STANOCH: No, Drew. The
9 witness doesn't want to go off the
10 record. We are going to keep going.
11      MR. DORNER: Well, I do, Dave,
12 so we're going off the record.
13      Five minutes.
14      THE WITNESS: Well, can I
15 just --
16      MR. STANOCH: Wait. Hold on.
17 I'm not agreeing to go off the record,
18 Mr. Dorner.
19      The witness is trying to
20 accommodate you with internet and said
21 she needs to do something, much like
22 you refer to things and look at things
23 while you're doing it. She does not
24 need a break now. She's ready to
25 proceed. We can proceed.

Page 152

L. Craft

1  
2      THE WITNESS: I actually have
3 sent the message. It's done. I'm
4 ready.
5      MR. DORNER: Well, didn't we
6 agree you wouldn't communicate with
7 anybody on the record, Ms. Craft?
8      MR. STANOCH: Hold on. Mr.
9 Dorner -- no, no. Ms. Craft, stop.
10      Mr. Dorner, first, I don't
11 appreciate the smirk. Second, I don't
12 appreciate you're saying when Ms. Craft
13 is asking her IT person, as she said,
14 to help with an internet issue for the
15 Zoom deposition -- I do not
16 believe that's appropriate --
17      MR. DORNER: Can we go off the
18 record?
19      MR. STANOCH: No. I'm not off
20 the record.
21      MR. DORNER: We're off the
22 record.
23      MR. STANOCH: We're going to
24 keep going. We're not going off the
25 record. We don't agree.

Page 153

L. Craft

1  
2      MR. DORNER: Please take us off
3 the record.
4      MR. STANOCH: We're not
5 agreeing to go off the record.
6      THE VIDEOGRAPHER: Counsel, I
7 need you to agree.
8      MR. STANOCH: We need to agree.
9 I don't agree, Mr. Dorner.
10      The witness is ready to
11 proceed.
12      MR. DORNER: Why not? What if
13 I want a break?
14      MR. STANOCH: We're on the
15 record, Mr. Dorner.
16      MR. DORNER: Well, I'd like to
17 go refill my water because it's empty.
18 So may I please go off the record, Mr.
19 Stanoch?
20      MR. STANOCH: Mr. Dorner, we're
21 ready to proceed.
22      MR. DORNER: May I please go
23 off the record, Mr. Stanoch, so I can
24 refill my water so my throat doesn't
25 dry out?

39 (Pages 150 - 153)

Page 154

L. Craft

1
2      MR. STANOCH: Mr. Dorner, why
3  don't you go a few more minutes or have
4  one of the five people in your room
5  help you out?
6      MR. DORNER: Well, there's
7  not five people and I'd like to go off
8  the record. But if -- are you forcing
9  me to stay on?
10      MR. STANOCH: I'm saying the
11  witness has said she prefers to
12  continue with the questioning and to
13  proceed.
14      MR. DORNER: And I prefer to
15  take a quick break. Okay?
16      MR. STANOCH: I'm not -- we're
17  on the record, Mr. Dorner. Why don't
18  we go a few more minutes at the
19  witness's request?
20      MR. DORNER: All right.
21      We're going to go about three
22  more hours on the record and we're not
23  stopping.
24  Q.    All right, Ms. Craft.
25      Pharmaceutical wholesalers are

Page 155

L. Craft

1
2  not involved in the contracting process
3  between potential class member TPPs, and
4  their PBMs, ASOs or third-party
5  administrators.
6      Isn't that right?
7      MR. STANOCH: Objection to
8  form.
9  A.    Would you mind reading that
10  back? It sounds like you got it very
11  precisely written. I just -- you spoke
12  quite quickly and I want to make sure I've
13  got your question correctly.
14  Q.    Sure.
15      What I'm asking is you
16  wholesalers for pharmaceuticals are not
17  involved in the contracting process between
18  TPPs and either PBMs or other
19  intermediaries.
20      MR. STANOCH: Objection to
21  form.
22  A.    Yes. I think your basic
23  premise is correct, which is that the TPP's
24  contract with PBMs and that is separate from
25  the relationship with wholesalers.

Page 156

L. Craft

1
2  Q.    Wholesalers don't have direct
3  relationship with TPPS at all, right?
4      MR. STANOCH: Objection to
5  form.
6  A.    That's not necessarily true.
7  Q.    Why not?
8  A.    A TPP might have a relationship
9  with a wholesaler. That's not impossible.
10  But I don't think it's germane to this issue
11  when your basic premise is correct, that
12  wholesalers have separate relationships with
13  manufacturers from whom they purchase
14  product and pharmacies to whom they sell
15  product and they are not directly
16  contracting to sell product to third-party
17  payers.
18      I just -- I want to make clear
19  that there are instances -- so, for example,
20  you can have a clinic that direct -- that
21  purchases product to be then dispensed to
22  its patients that contracts to get their
23  product from a wholesaler.
24      MR. DORNER: Take down figure
25  three and move on to page 17 to 18 of

Page 157

L. Craft

1
2  your report. We can put those side by
3  side.
4  Q.    All right.
5      Ms. Craft, paragraph 29
6  introduces a table that you say shows the
7  share of total US prescriptions processed I
8  believe by six of the largest PBMs from 2015
9  to 2018, including entities that they've
10  subsequently acquired or merged with.
11      Let me ask a question first.
12      This table is not specific to
13  valsartan, correct?
14  A.    That's correct.
15  Q.    Have you done any analysis or
16  study with respect to whether the percentage
17  of VCD prescriptions of the top six PBMs
18  processed is equivalent or commensurate with
19  the amount of prescriptions that the top six
20  PBMs overall handle?
21      MR. STANOCH: Objection to
22  form.
23      Vague.
24      Ambiguous.
25      Compound.

40 (Pages 154 - 157)

Page 158

L. Craft

2  A.    I would expect it to be at
3  least as high as reported here and that's
4  based on the fact that the VCDs in question
5  here were -- the frequency of cash purchases
6  was quite small, which is to say that in the
7  ███████████████████████████
8  ███████████████████████████
9  ██████
10     You see the numbers for all
11  other PBMs in cash in the bottom row here,
12  right?  So cash prescription purchases in
13  general are higher than the rate that we see
14  for these VCDs.  So that's one fact.
15     The other is if we want to look
16  at discount plans as another form of cash
17  purchase because consumers pay the entirety
18  of the price, those are quite small too for
19  ███████████████████████████
20  █████████
21     So the fact that there's
22  comparatively little cash purchasing by
23  comparison to the industry metrics here
24  would suggest to me you're going to have
25  more claims adjudication on behalf of

Page 159

L. Craft

2  third-party payers and that generally goes
3  through the big PBMs.
4  Q.    What are you basing that last
5  part of your statement on, that it generally
6  goes through the big PBMs?
7  A.    The data you see here in this
8  table, which is sourced with a standard
9  industry summary that is generated or was
10  generated on an annual basis.
11     And I would point out that the
12  underlying source of this data -- and you
13  can come pretty close to replicating these
14  numbers -- is the publically filed
15  financials of PBMs, what they report, claims
16  lines processed and they convert those to
17  equivalent prescriptions in most cases,
18  which is to say a 30-day prescription as
19  opposed to a 90-day -- so a 90 would count
20  as three 30s -- so that they are
21  standardized metrics and they report in
22  general the number of claims that they have
23  processed on that basis.
24     So you can take data on the
25  total number of prescriptions in the US that

Page 160

L. Craft

2  are being dispensed and you can apply those
3  PBM specific metrics to come up with
4  something pretty close to what you see in
5  this table, which is put together and
6  published by Drug Channels Institute.
7  Q.    Why did you limit your table to
8  2015 to 2018?
9  A.    Because the published data --
10  first of all, I understood that the recalls
11  were happening starting in 2018 and the data
12  was readily available from a consistent
13  source, although as you see in the footnote,
14  we had to make an adjustment for 2015
15  because of a difference in reporting
16  methodology.
17     But it was available from Drug
18  Channels Institute for 2015, 2016, 2017,
19  2018 and to assure consistency, we wanted to
20  stay with a single source of data.
21  Q.    You're aware, though, that the
22  claims period in this case goes back to 2012
23  aren't you?
24  A.    Yes, but the reason that these
25  numbers are the relevant ones and not the

Page 161

L. Craft

2  share that was processed by each of these
3  PBMs in 2012, '13 or '14 is that the growing
4  share, the concentration in these PBMs is
5  the result of industry consolidation.  So
6  PBMs, the more diffuse list, the more
7  numerous list of PBMs operating in 2012, '13
8  and '14, for example, becomes shorter with
9  each passing year as these smaller PBMs are
10  gobbled up by bigger PBMs and what happens
11  when those smaller PBMs are gobbled up is
12  that their data is transferred to the
13  acquirer, PBMs 1 through 6 on this list.
14     So the data for those earlier
15  periods doesn't get burned and thrown away.
16  It is part of -- it is an essential asset in
17  the acquisition of the PBM.  It has enormous
18  value and so that data -- what I was
19  attempting to illustrate here is that the
20  targeted data sources -- and I'm just here
21  illustrating top six PBMs -- possess the
22  data for a huge amount of the market and
23  they have acquired data over time from the
24  entities that they absorbed.
25     So the value of this data is

41 (Pages 158 - 161)

Page 162

L. Craft

1  rather exuberantly and nicely demonstrated,
2  the article "Merger Mania" from Mr. Kosty
3  and his organization that talks about how
4  these acquisitions are so valuable because
5  of greater acts of data.
6  Q.    Now, when you refer to the data
7  that PBMs are acquiring from, I guess,
8  targets in those transactions, is it your
9  testimony that the acquired data is merged
10  in in every case into the acquiring PBM
11  system?
12          MR. STANOCH:  Objection.
13  Q.    In other words, it's made
14  completely uniform?
15          MR. STANOCH:  Objection to
16     form.
17          Vague and ambiguous.
18          Go ahead.
19  A.    No, that's not my testimony.
20  It is possible for there to -- for the data
21  to continue to be independently on an
22  independent platform.  It's not essential
23  that it all be merged.
24          So, for example, a PBM has a

Page 163

L. Craft

1  much greater interest in merging that
2  ongoing client relationships as opposed to
3  closed client relationships.
4          My testimony is that the data
5  still exists and the mere fact that it got
6  put on an archival hard storage device
7  doesn't change the data.  So it may mean
8  delivering -- so, for example, with Optum, I
9  sometimes get a Catamaran production and an
10  Optum RX production that is without
11  Catamaran, a large PBM that it acquired.
12          I will tell you that their
13  field names are exactly the same.  The data
14  is reported exactly the same way, but
15  it's -- they're sometimes produced
16  separately.
17  Q.    Let's go to paragraph 31 of
18  your report -- there it is, page 19.
19          Thank you.
20          Now here, paragraph 31 is
21  talking about pharmacies and it's saying the
22  top nine retail pharmacies collectively
23  accounted for approximately 72% of the
24  nation's prescription drug dispensing

Page 164

L. Craft

1  revenue and their data has already largely
2  been produced.
3          My first question is so in
4  contrast to your estimate of PBM market
5  share, pharmacies you're not measuring on
6  number of prescriptions, but rather by
7  revenue.
8          Is that accurate?
9  A.    Yes.
10  Q.    So aren't -- I mean, revenue
11  and prescription volume are two very
12  different metrics, are they not?
13          MR. STANOCH:  Objection to
14     form.
15  A.    They are different metrics.
16  Q.    And I believe you say here that
17  the revenues here also include specialty
18  drugs and mail order and storefront sales.
19          So what's your basis for saying
20  that the revenue can be a proxy for the
21  share of proposed class transaction?
22          MR. STANOCH:  Objection to
23     form.
24          Go ahead.

Page 165

L. Craft

1  A.    The fact that it is frequently
2  used as a proxy and that there's not readily
3  available data from the pharmacies in public
4  sources telling us the number of
5  prescriptions that they filled.  However, in
6  this case, you happen to have the retailer
7  defendant/pharmacy defendant data that quite
8  specifically enumerates each individual
9  prescription of the contested products
10  and the -- and tells us exactly how much
11  they dispensed for over the -- over the
12  class period.
13          So we know the actual number
14  and if you wanted to compare that number to
15  the total prescriptions reported by those
16  retailer defendants to the total volume sold
17  for those same NDCs from the Xponent data,
18  you could certainly do that and compute that
19  percentage.  I have not done that, but
20  certainly one could.
21  Q.    And that was going to be my
22  next question.
23          You haven't actually taken the
24  pharmacy data produced in this case to see

42 (Pages 162 - 165)

Page 166

L. Craft

1    L. Craft
2    if it actually accounts for 72% of the
3    nation's valsartan drug dispensing drug
4    dispenses, right?
5        A.    I have not, but that could be
6    done quite straightforwardly using the
7    Xponent data.
8        Q.    Now, if we go to paragraph 32,
9    here you say if you -- basically, if you
10   collected data from the top six PBMs and the
11   top nine pharmacies, that could be expected
12   to cover up to 98% of class purchases as
13   illustrated in figure six.
14       You say could be expected to
15   cover up 98%.  You haven't actually
16   performed this calculation, right?
17       A.    No.  I've performed the
18   calculation that gives you that result, the
19   98% result.  If what you're saying is do I
20   have the data from the largest PBMs, no,
21   I've made clear I don't have that data.
22       Q.    In the past, for any other
23   case, have you collected data from the top
24   six PBMs and the top nine pharmacies to
25   determine what percentage of claims they

Page 167

1    L. Craft
2    handled for any given pharmaceutical
3    product?
4        MR. STANOCH:  Objection.
5        Just caution the witness not to
6        divulge anything that may be subject to
7        a confidentiality order in a different
8        case, but you may try to answer.
9        A.    I have not yet in any case I've
10   worked on received that complete production.
11       Q.    Why do you use the phrase "up
12   to 98%"?
13       A.    Because these are averages that
14   are giving rise to this number, so I want to
15   be conservative.  I don't want to give you
16   the impression that I'm saying it's going to
17   be exactly 98%.  There's going to be some
18   variation around the particular products,
19   but based on these industry shares, I would
20   expect it to be up to 98%.
21       And the other reason is that
22   I'm using here the 2018 data and so if there
23   was a less concentrated coverage of these
24   drugs in earlier years, I would like to
25   account for that as a possibility, but I

Page 168

1    L. Craft
2    think this is a good approximation.
3        Q.    I asked you a moment ago about
4    whether or not you've obtained data from all
5    the entities in this table of your report.
6    I want to think a little bit more broadly
7    about a similar question.
8        Has On Point or you ever
9    actually obtained claims data of the type
10   you're proposing to use in this case just
11   from the top six PBMs shown in table five?
12       MR. STANOCH:  Objection to
13   form.
14       Again, caution the witness not
15   to divulge any information subject to a
16   confidentiality or consulting
17   arrangement in any other case, but you
18   may attempt to answer.
19       A.    I have received -- I have
20   received -- I believe your question is in
21   any single case do I have data from all six
22   of the top PBMs.
23       Am I correctly understanding
24   your question?
25       Q.    Let's go with that one first,

Page 169

1    L. Craft
2    sure.
3        A.    Yeah.  Okay.
4        So the answer is yes on a
5    rolling production basis, which is currently
6    based on subsets or samples of the data and
7    which is being augmented and I'm not at
8    liberty to discuss that case or to divulge
9    any further details about it.
10       Q.    I won't ask you about the
11   specifics of the case.
12       I'll ask you this:  Have you
13   actually merged the data from all the PBMs
14   that you received?  Have you merged it into
15   one data set?
16       MR. STANOCH:  Objection to
17   form.
18       Vague and ambiguous.
19       Same caution.
20       Please proceed.
21       A.    So that procedure went away.
22   The final production, I have identified the
23   procedures that would be used to account
24   for, which principally -- these are very
25   straightforward.  These are data processing

43 (Pages 166 - 169)

Page 170

L. Craft

1 exercises that exist in almost any large
2 commercial litigation, certainly antitrust
3 cases and anything in pharma. This is
4 nothing new to pharma, nothing specific to
5 pharma.
6 But when you get multisource
7 data, one of the things that you do is in
8 processing that data, you rename fields
9 where they represent the same thing, you
10 give them all a constant name. So six PBMs,
11 if one abbreviates the ingredient cost and
12 another calls it drug cost and another
13 spells it out, you reconcile all of those
14 and harmonize them. So it's a softer
15 process that involves just changing the name
16 so they're all the same.
17 I have specified the procedures
18 for that and reviewed all six and more PBM
19 data sets to assure that all of the
20 essential fields were present and to go back
21 and ask for missing fields if they were
22 needed. So I haven't actually programmed
23 it. I basically vetted the procedures for
24 doing so and identified any complications

Page 171

L. Craft

1 that needed to be resolved through data
2 production.
3 Q. The PBM -- and again, I'm not
4 asking for the specifics of the case. I
5 understand there are confidentiality
6 concerns.
7 Speaking generally about the
8 PBM data that you say you -- or the samples
9 of PBM data that you have received, are
10 fully insured plans -- ASOs, TPAs -- are
11 those either shown in those data -- well,
12 let me break it down.
13 Are TPA or ASOs shown in those
14 data from every single PBM that you have
15 collected from?
16 MR. STANOCH: Objection to
17 form.
18 Same caution.
19 A. Sometimes that information is
20 present and sometimes it is not. As an
21 explicit identifier that you can read and as
22 a lawyer looking at it say yeah, it says
23 here fully insured or it says here TPA.
24 Q. I think I understand.

Page 172

L. Craft

1 Then the data you've received
2 does not include, I believe, what we termed
3 as the set up documents. Do you remember
4 what I'm talking about?
5 A. Yeah. Yes, I do. It does not
6 include plan set up worksheets.
7 Q. Okay.
8 Do you have an estimate for how
9 long it would take in this case to merge
10 data from the six PBMs and nine pharmacies
11 in table four to make it uniform for the
12 entire seven-year period?
13 MR. STANOCH: Objection.
14 Form.
15 Vague and ambiguous.
16 A. So first of all, it is not
17 clear to me what the purpose of merging the
18 data would be for ascertainability. So, for
19 example, when I think of the objectives
20 associated with ascertainability, one might
21 say I want to identify an individual class
22 member, but that's different from saying I
23 want to know exactly how many prescriptions
24 a particular TPP wrote.

Page 173

L. Craft

1 Participation in class is gated
2 for TPPs is gated based on the payor having
3 paid for at least one prescription. So the
4 objective of merging data from the
5 perspective of the TPP clients is not clear
6 to me why we would need to do that.
7 I mean, of course it's
8 interesting and nice to have a clean and
9 consistent data set that rolls everything up
10 into one big package, but it's not really
11 necessary. So when you say how long would
12 it take you to do it, I would ask the
13 question first do we need to do it, do we
14 need to merge all of the PBM data sets.
15 The only place that this
16 becomes relevant, in my opinion, for this
17 specific factual configuration is where
18 we're looking at the medical monitoring
19 class because the same can be said of the
20 economic damage class for consumers, right?
21 If I paid for a prescription of a contested
22 product, I'm in the class for economic
23 damages.
24 The medical monitoring is the

44 (Pages 170 - 173)

Page 174

L. Craft

1 only place, I believe, where there's a need
2 to combine multiple transactions for a given
3 consumer -- and that's not TPP, that's just
4 consumer -- and to link those transactions
5 so that we know how much product was
6 actually purchased by these consumers,
7 dispensed to them of particular dosage
8 strengths over the class period.
9        So I hope that answered your
10 question. I don't know how long it would
11 take to merge all six PBMs' data, but I'm
12 not sure we would have the need. If we
13 wanted to doubt for the purpose of linking
14 records for individual consumers, we'd
15 probably just extract the consumer
16 identifying information from the PBM data
17 and then merge that, which would be a
18 smaller set of the data -- right? -- because
19 we're just looking at the consumer
20 participation and trying to figure out how
21 much product they bought and of what
22 particular dosage forms and strengths.
23   Q.    So you focused on medical
24 monitoring class, but I didn't actually hear

*(line numbering: lines 1–25; "Q." at line 24)*

Page 175

L. Craft

1 an amount of time in that whole answer, so
2 I'll ask it again.
3        How long would it take to merge
4 for the medical monitoring class, like you
5 said? How long would it take to compile all
6 that data and match up everybody's
7 prescription records within the PBM data set
8 so as to follow your methodology for the
9 medical monitoring class?
10       MR. STANOCH: Objection to
11 form.
12       Mischaracterizes testimony.
13       Asked and answered.
14       Hopelessly compound.
15       Vague and ambiguous.
16       You may try to answer.
17   A.    Okay. Well, I didn't
18 understand your question to go to medical
19 monitoring. I merely answered it in that
20 fashion because I don't see the utility of
21 merging the data, so to tell you how long it
22 would take, other than for this single
23 purpose, is a meaningless answer. I haven't
24 thought about it because I don't know that

Page 176

L. Craft

1 we would need to do it.
2        For the medical monitoring
3 class, if you're saying how long would it
4 take to extract all the consumer purchases
5 once their personal identifying information
6 is supplied and then attempt to match
7 identities across the PBMs -- the six PBMs'
8 productions -- maybe a month. It depends
9 upon how many levels of how perfect we want
10 to be with our identity matching.
11       I think we would start with a
12 rules-based algorithm that would give us
13 perfect matches and we would see what
14 percentage we achieved with perfect matches.
15 We would then probably go to what's called a
16 fuzzy match that would allow, for example,
17 changes in last name and see how much more
18 we got.
19       So there would be a couple of
20 iterations of name matching processes. We
21 would be obviously keying off of date of
22 birth, location and whatever other
23 personally identifying information is
24 present.

Page 177

L. Craft

1   Q.    Let's shift gears here and go
2 to paragraph 20 -- let's go back and go to
3 paragraph 29 of your report. Actually,
4 let's blow up note 30 rather than paragraph
5 29. Footnote 30. There we go.
6        All right, in this footnote
7 here, you talk about the use of IRS Form
8 5500 as a way of identifying third-party
9 payors.
10       Now, I want to make clear you
11 didn't actually review any IRS Form 5500
12 data in this matter in forming your opinion;
13 is that right?
14   A.    That's correct.
15   Q.    Not all plan sponsors are
16 required to file a Form 5500, are they?
17   A.    No. There are exceptions for
18 small population -- small employers who meet
19 certain requirements.
20   Q.    And you'd agree that Form 5500
21 just on their own aren't sufficient to
22 identify a proposed TPP class member; is
23 that right?
24       MR. STANOCH: Objection to

45 (Pages 174 - 177)

Page 178

L. Craft

1
2  form.
3      A.    It certainly wouldn't identify
4  them as the best source of that information,
5  but what you see in this footnote is the
6  discussion of how claims administrators have
7  built databases of TPPs that originally at
8  their core were developed off of Form 5500
9  data but are supplemented, clarified,
10  augmented with new data every year and with
11  every case that the claims administrators
12  handle.
13          So we -- this is not the first
14  rodeo in pharmaceutical litigation.  There
15  have been enumerable litigations that have
16  resulted in favorable judgments or
17  settlements that require distribution to
18  class members and there are established
19  processes for providing notice to those
20  class members and for managing their claims.
21  A lot of that does get updated based on Form
22  5500 data.  It is not data that I would
23  anticipate using to identify TPPs in this
24  case.
25      Q.    Okay.

Page 179

L. Craft

1
2          Given that, then you also
3  referred to claims administrators and pharma
4  end payor cases who have over time compiled
5  their own list of TPPs in operation each
6  year.
7          Do you see what I'm referring
8  to there in note 30?
9      A.    Yes.  That's actually what I
10  was referring to as well.
11      Q.    Okay.  Okay.
12          You haven't attached any of
13  those lists to your report or even -- right?
14      A.    No.  They don't belong to me.
15  They are the property and the work product
16  and the accumulated knowledge of the
17  established claims administrators who work
18  in this pharmaceutical field.
19      Q.    So I guess I'm confused about
20  their purpose.  Would you try to -- as part
21  of your methodology for identifying class
22  members, would you reach out, try to obtain
23  this list and then take names from it?
24      A.    I don't foresee any need to do
25  that.  I am saying there are these secondary

Page 180

L. Craft

1
2  sources that claims administrators structure
3  their notices using these lists and they
4  structure their claims administration
5  processes in part using these lists.
6          What I've outlined in this
7  report and what I've been outlining in the
8  course of my deposition today is what I
9  think is the most efficient and reliable
10  method to come up with a list of class
11  members and I'm merely saying this isn't the
12  only place where you get that information.
13  I'm just being asked to recommend a
14  methodology that works.
15      Q.    So do you know whether you
16  would need to use these lists from other
17  cases in identifying the class in this case?
18          MR. STANOCH:  Objection to
19  form.
20          Asked and answered.
21          Misstates testimony.
22          Go ahead.
23      A.    Well, I struggle a bit with
24  your word "need" because it may be useful --
25  the counsel and the court may decide to use

Page 181

L. Craft

1
2  such lists in generating notices or other
3  purposes.  The process I've outlined here
4  does not contemplate my having to access or
5  use those list.
6      Q.    But if you need to, then you'll
7  obtain and use them if the need arises?
8          MR. STANOCH:  Objection.
9      A.    Or the claims administrator.
10          So, for example, the claims
11  administrator might access its own list to
12  make sure we don't miss any TPPs who should
13  be allowed to participate in the class.
14  That doesn't necessarily mean they turn it
15  over to me.  They may do that themselves.
16  This is work product developed over, you
17  know, decades of time.
18      Q.    Have you ever used lists from
19  other cases in identifying class payors in
20  the past?
21          MR. STANOCH:  Objection.
22      Q.    Excuse me.  Identifying class
23  members in the past.
24      A.    Lists from other -- no.
25          MR. DORNER:  Mr. Stanoch, do I

46 (Pages 178 - 181)

Page 182

L. Craft

1    have your permission to go off the
2    record now?
3    MR. STANOCH:  Mr. Dorner, I
4    don't appreciate the cheekiness.
5    Ms. Craft, would you be
6    comfortable with a break at this
7    juncture?
8    THE WITNESS:  That would be
9    fine.  Could we make this our 20-minute
10   lunch break?  Is that acceptable to
11   all?  We get here back promptly in 20.
12   Is that workable?
13   MR. DORNER:  I'm probably going
14   to go longer than 20.
15   THE WITNESS:  Can you please
16   tell me what you need in terms of a
17   break, since this is clearly being
18   driven by your schedule, not mine.
19   MR. DORNER:  We'll take a half
20   hour.
21   THE VIDEOGRAPHER:  The time is
22   11:55.
23   This ends media unit three.
24   We're going off the record.

*Note: line numbers above correspond as shown*

Page 182 lines (corrected):
1    L. Craft
2    have your permission to go off the
3    record now?
4    MR. STANOCH:  Mr. Dorner, I
5    don't appreciate the cheekiness.
6    Ms. Craft, would you be
7    comfortable with a break at this
8    juncture?
9    THE WITNESS:  That would be
10   fine.  Could we make this our 20-minute
11   lunch break?  Is that acceptable to
12   all?  We get here back promptly in 20.
13   Is that workable?
14   MR. DORNER:  I'm probably going
15   to go longer than 20.
16   THE WITNESS:  Can you please
17   tell me what you need in terms of a
18   break, since this is clearly being
19   driven by your schedule, not mine.
20   MR. DORNER:  We'll take a half
21   hour.
22   THE VIDEOGRAPHER:  The time is
23   11:55.
24   This ends media unit three.
25   We're going off the record.

Page 183

L. Craft

1    L. Craft
2    (Recess taken)
3    THE VIDEOGRAPHER:  The time is
4    12:33.
5    This begins media unit four.
6    We're back on the record.
7    Q.    Let's pull up Exhibit 4, which
8    is your report, and go to page 21, paragraph
9    33.
10   Ms. Craft, this section of your
11   report deals with the DSCSA, which I
12   understand to be the Drug Supply Chain
13   Security Act.
14   You'd agree that the DSCSA does
15   not require tracing from the API
16   manufacturer to a finished dose
17   manufacturer, right?
18   MR. STANOCH:  Objection to
19   form.
20   A.    I don't know that -- yeah, I
21   hadn't thought about that question, but
22   you're correct.  It deals with finished dose
23   drugs and their circulation supply chain.
24   Q.    And then -- we can take off 33.
25   Let's blow up 34 instead.

Page 184

L. Craft

1    L. Craft
2    This is going to be on page 22,
3    Ms. Craft.
4    A.    Okay.
5    Q.    In this paragraph, you say that
6    the DSCSA was inactive in 2013 and is still
7    not fully operative.
8    What do you mean by not
9    operative?
10   A.    Well, what I mean by not fully
11   operative is that pharmacies obtained a
12   number of extensions in terms of the
13   effective date of the law and I believe the
14   implementing regulations and the -- so there
15   are some provisions of the law that are not
16   yet enforced.
17   Q.    So, for example, one of the
18   exemptions is that -- really from 2012 --
19   well, 2013 through today -- wholesalers --
20   excuse me.
21   Let me ask that question again.
22   One of the exemptions you're
23   referring to is from 2013 up to today,
24   wholesalers have not been required to give
25   lot number data to pharmacies when the

Page 185

L. Craft

1    L. Craft
2    wholesaler sells medications directly to the
3    pharmacy as long as the wholesaler bought it
4    from the manufacturer; is that true?
5    A.    Yes, there are particular
6    labeling conventions.  I'm not saying that
7    lot information is not supplied.  I'm saying
8    that the DSCSA has very specific formats in
9    which that data should accompany and be
10   electronically visible on the product.
11   Those conventions are not entirely effective
12   under those circumstances that you just
13   described.
14   Q.    And so then just to bring back
15   to what I asked, if a wholesaler sells
16   medication to a pharmacy, like any time from
17   2013 to 2019, that wholesaler was not
18   required to transmit the lot number of the
19   medication to the pharmacy, was it?
20   A.    That's correct.  That doesn't
21   mean they didn't do it.  It means they
22   weren't required to do it under this law.
23   Q.    Likewise, pharmacies during the
24   same timeframe and even up to the present
25   day aren't required to maintain the lot

47 (Pages 182 - 185)

Page 186

1          L. Craft
2    number for the prescriptions that they
3    dispense to consumers, are they?
4        A.    They're not required to
5    specifically link the lot number to the
6    individually dispensed prescription.  That
7    doesn't mean that they don't have lot
8    numbers and expiration dates in their
9    inventory control systems.  It merely means
10   that this doesn't print out electronically
11   or attach to the individual prescription in
12   some cases.
13       Q.    Well, it's also not going to be
14   in the pharmacy claims data, right?  Lot
15   number?
16       A.    Well, we saw some cases where
17   it was in the data that was produced by
18   retailer defendants here, but it is not
19   required to be.
20       Q.    In fact, in the majority of
21   cases in the pharmacy information that you
22   looked at, there was no lot number
23   information in there was there?
24           MR. STANOCH:  Objection to
25       form.

Page 187

1          L. Craft
2        A.    That would be fair to say.  The
3    majority did not include lot number.
4           Now, why they didn't include
5    it, I don't know.  But the majority did not
6    include lot number.
7        Q.    I understand.
8           Now, I want to kind of talk
9    about the relationship between NDCs and lot
10   numbers.
11          NDCs are separate from lot
12   numbers, right?
13       A.    A lot number is subsumed within
14   or is a subpart of an NDC, which is to say
15   they represent different things.  The lot
16   has to do with a particular duration of
17   manufacturers, so a chunk of that NDC being
18   manufactured, so --
19       Q.    Sorry.
20       A.    No, that's fine.  Go ahead.
21       Q.    I guess just to make sure I
22   understand then, a lot is going to be -- a
23   lot is maybe equivalent to, like, a batch of
24   medication all united under one NDC?
25           MR. STANOCH:  Objection to

Page 188

1          L. Craft
2    form.
3           A lot is not a batch, but go
4    ahead, Ms. Craft.
5        A.    I think those are different
6    terms, batch and lot conceptually.  If you
7    mean that in common English, it's a chunk of
8    that product being manufactured under that
9    NDC.  Then I would agree with your
10   characterization.
11       Q.    To be sure, I was going for the
12   common use of the term.
13          Is it your contention that to
14   identify the class members in this case, lot
15   number information isn't needed?
16           MR. STANOCH:  Objection to
17       form.
18       A.    Yes.  As I understand the class
19   definition, it is triggered by NDC and not
20   lot number.
21       Q.    Is it your contention that lot
22   numbers aren't needed to connect consumer
23   and TPP purchases of VCDs with sales of
24   those VCDs by wholesalers?
25           MR. STANOCH:  Objection to

Page 189

1          L. Craft
2    form.
3        A.    I don't know that that's lot
4    number specific.  What you're saying is is
5    the lot number the indispensable item that
6    will tell you where a particular source of
7    supply came from, through which wholesaler
8    was a particular quantity of the drug
9    product obtained and no, lot numbers are not
10   necessarily the essential element for doing
11   that.  There are, of course, purchase and
12   supply agreements that exist between
13   pharmacies and their sources of supply.
14       Q.    Without either looking at
15   those -- without looking at those
16   agreements, how do you propose to know
17   whether with respect to the wholesaler
18   subclasses a consumer actually purchased
19   something that came via a wholesaler to the
20   pharmacy?
21       A.    So I would expect that that
22   would depend upon the data and I don't mean
23   reading individual contracts, but the supply
24   data from the inventory control systems of
25   the pharmacies, which, of course, have

48 (Pages 186 - 189)

Page 190

L. Craft

1   inventory control systems that show when
2   they're getting low on a particular product
3   and need more and that then triggers a
4   reordering process. I believe Mr. Kosty
5   refers to that in his report.
6       Q.    And correct me if I'm wrong,
7   but I don't think there's any discussion of
8   these inventory control systems at
9   pharmacies or however you would leverage
10  those in your methodology for identifying
11  class members, is there?
12      A.    I don't recall if I mentioned
13  inventory control systems. They clearly
14  exist. That's, as Mr. Kosty points out, how
15  pharmacies decide to reorder and even
16  automatically reorder through a wholesaler
17  or manufacturer and how their supply is
18  tracked.
19          And this is because the
20  pharmaceutical industry is very, very
21  sensitive of the aging of product. We have
22  firm expiration dates. We can't sell
23  outdated product. Generally speaking, it
24  needs to have at least a year of life left
25

Page 191

L. Craft

1   on it at the time that it is dispensed to
2   the consumer. It's essential that those
3   inventory control mechanisms be in place.
4       Q.    So what data then do you
5   propose to get and use to determine whether
6   or not a consumer falls into one of the
7   wholesaler specific subclasses?
8       A.    Right. Well, in some cases,
9   the pharmacy may be able to identify that it
10  was exclusively supplied for these
11  particular products by one source, one
12  wholesaler during the period in question.
13          In other cases, they may have
14  mixed sources of supply. For example, in
15  one period, they may have bought all of
16  their product through a prime supplier
17  arrangement and in another, they change
18  their prime supplier. So in that case, the
19  data that simply says "Here are my supply
20  arrangements" would be sufficient and we
21  could match that to time periods.
22          So if a consumer is buying in
23  2018 and product has since 2017 been
24  acquired by a particular pharmacy only
25

Page 192

L. Craft

1   through wholesaler acts, then we know we've
2   got wholesaler acts there.
3       In other cases, there may be
4   multiple sources of the drug and then we
5   have to look more closely at the inventory
6   levels to see when product arrives from a
7   particular wholesaler, remembering we've
8   only got three wholesaler defendants, right?
9           So the wholesaler defendants
10  themselves have records of how much product
11  of the NDC they shipped to pharmacies over
12  the class period and within particular
13  timeframes within the class period.
14      Q.    Have you ever actually used
15  pharmacy information regarding who its prime
16  supplier is or wholesaler information about
17  who it's supplying to to identify in a set
18  of claims data which consumer bought via
19  which wholesaler?
20          MR. STANOCH: Objection to
21  form.
22          Go ahead.
23      A.    No, I have not.
24      Q.    And then another question that
25

Page 193

L. Craft

1   I had, you had mentioned -- I'll strike
2   that. I'll come back to it if I can recall.
3           Now, you're aware in this case
4   that not all manufacturers initiated a
5   recall of all lots of their VCDs, right?
6       A.    Yes. That's correct. I
7   believe I answered that question earlier.
8       Q.    So I guess to the extent that a
9   manufacturer's recall was lot specific as
10  opposed to all lots, wouldn't you need to
11  know the lot number of the medication that
12  was dispensed to actually know if the
13  consumer received recalled valsartan?
14          MR. STANOCH: Objection.
15          Misstates her opinions.
16          Incomplete hypothetical.
17      A.    I wasn't asked to analyze
18  whether a consumer received recalled
19  product. Manufacturers stage recalls when
20  they feel they're ready to stage a recall,
21  when they want to. What I tried to explain
22  this morning is that I understand the scope
23  of the case to be specific to NDCs and not
24  merely the portion that was recalled. We
25

49 (Pages 190 - 193)



Page 194

```
1              L. Craft
2    have years of consumption of these products
3    that predates the recall and some of the
4    NDCs were entirely sold pre-recall.
5              As a result, it is not -- I
6    have not examined or attempted to determine
7    how one might establish that a consumer got
8    a specifically recalled lot.
9        Q.    Right.  Again, just to bring
10   you back to what I was asking, you would
11   need the lot information to determine if a
12   consumer got a lot of recalled product, yes?
13             MR. STANOCH:  Objection.
14        Asked and answered.
15        A.    If the recall was of a limited
16   number of lots -- I mean, of course, let's
17   take into account the practical reality that
18   recalls routinely say of an expired product.
19   Right?  So if the dating of the prescription
20   is such that it would have been expired,
21   then we have a different question.  But I --
22        Q.    Understood.
23        A.    I'm not suggesting that I can
24   identify a lot without a lot number.
25        Q.    I understand.  Okay.  Okay.
```

Page 195

```
1              L. Craft
2    Let's move on to page 27 of your report,
3    paragraph 43.
4              Here, you say that "Pharmacies
5    collect and retain information on each
6    pharmaceutical transaction sufficient to
7    identify the patient for whom the
8    prescription is filled and thus, the
9    consumer paying in whole or in part for the
10   purchase."
11             I don't intend to dwell on this
12   very long, Ms. Craft.  My only question is
13   your statement here "and thus the consumer
14   paying in whole and in part for the
15   purchase," that assumes that the person
16   going to the pharmacy and paying for the
17   product is actually the person consuming the
18   product, right?
19        A.    Yes.  Fair enough.
20        Q.    Okay.  If I go and pick up a
21   prescription for my wife and I pay for it
22   with my money, it's still going to show her
23   name in the claims data?
24             MR. STANOCH:  Objection to
25        form.
```

Page 196

```
1              L. Craft
2        A.    You are correct.
3              MR. DORNER:  My wife will be
4    happy that I managed to work her into
5    this deposition.
6              MR. STANOCH:  Congratulations
7    on your nuptials, by the way.
8              MR. DORNER:  Oh, thank you,
9    Dave.  I actually do appreciate that.
10             MR. STANOCH:  I know it was
11   relatively recent.  Relatively.  COVID
12   time.
13             MR. DORNER:  Can we go to
14   paragraph 45, please?  It should be on
15   the next page.
16        Q.    Ms. Craft, in paragraph 45, you
17   discuss pharmacy data and you say that
18   "Pharmacies collect and retain information
19   on each pharmaceutical transaction,
20   sufficient to identify any TPP that provided
21   payment for the drug."
```

Veritext Legal Solutions

800-227-8440                                          973-410-4040

Page 198

Page 200

L. Craft

1
2    I think that was your firm,
3    actually, who obtained that ruling.
4        MR. DORNER: I'm not forcing
5    her. If she doesn't know, she can say
6    she doesn't know, Dave.
7        MR. STANOCH: I'm just stating
8    it's improper to ask a question a third
9    and fourth time requiring a yes or no
10    answer per the rulings of the Special
11    Master that the defendants themselves
12    have obtained in this case.
13        MR. GOLDBERG: Actually -- this
14    is Seth Goldberg for the record.
15        You're misstating the ruling
16    and the ruling is that a witness can be
17    asked a yes or no question. They
18    should answer yes or no and if there's
19    any information they need to provide to
20    qualify their answer, they could do
21    that.
22        MR. STANOCH: Very well.
23        Same objections: Lacks
24    foundation.
25        Asked and answered.

Page 199

Page 201

1        L. Craft
2        Assumes facts not in evidence.
3        Misstates prior testimony.
4        The witness has already
5    qualified her answer multiple times.
6        If you'd like to say it a
7    fourth time, Ms. Craft, go ahead.

1        L. Craft

9    Q.    Okay.
10        So that's a yes to my question?
11        MR. STANOCH: Objection again.
12        Asked and answered a third
13    time.
14        Presumes facts not in evidence.
15        Lacks foundation.
16        Misstates her prior testimony.
17    A.    I'm sorry. Is there a question
18    on the floor?
19    Q.    Yeah, I just asked if that's a
20    yes to my question, Mr. Stanoch noted his
21    objection.
22        MR. STANOCH: Same objection.
23        I believe Special Master
24    Vanaskie has indicated that witnesses
25    cannot be forced to answer yes or no.

18        MR. DORNER: Can we go to --
19    let's pull up Exhibit M, which we will
20    mark as Exhibit 7. Let's go ahead and
21    go to page 60 of this PDF.
22        (Whereupon, Exhibit 7 was marked for
23    identification.)
24    Q.    All right, Ms. Craft.
25        I want to look at your



51 (Pages 198 - 201)

Page 202

1              L. Craft
2    definition here, the Wholesaler Defendants
3    Unjust Enrichment Claim, specifically
4    the column dedicated to definition.
5              You've defined one of the
6    wholesaler defendant subclasses as -- well,
7    it's reflected in the third column of
8    Exhibit 7 on page 50, right?
9              MR. STANOCH:  Objection to
10   form.
11       Q.    You don't need to read the
12   whole thing --
13             MR. STANOCH:  Objection to
14   form.
15             Mischaracterizes the document,
16       that she defined anything.
17       A.    I'm sorry, Mr. Dorner.  I
18   just -- I needed a second to get this
19   document up on my screen and --
20       Q.    No problem and I think I can
21   restate it so that way it addresses
22   Mr. Stanoch's objection.
23             The third column from the left
24   on page 60 of Exhibit 7 sets forth the
25   definition in this case for one of the

Page 203

1              L. Craft
2    wholesaler defendants unjust enrichment
3    subclasses.
4              Fair enough?
5        A.    Yes, I would agree with your
6    characterization.
7              MR. DORNER:  You caught me on
8        that one, Dave.  I agree with you.
9        Q.    If you need to take the time to
10   read this definition, go right ahead.
11             My questions, I think, are
12   going to be fairly simple.
13             Would you agree that to fall
14   within this definition of the class you
15   would identify an individual must have
16   purchased VCDs that were either distributed
17   by Cardinal Health, McKesson or Amerisource
18   Bergen?
19             MR. STANOCH:  Objection to
20       form.
21             Misstates the document, but go
22       ahead.
23       A.    Yes, that's my understanding,
24   that an element of this particular subclass
25   is the identity of the wholesale

Page 204

1              L. Craft
2    distributor.
3        Q.    And then likewise if that
4    consumer, say, purchased from -- purchased
5    VCDs that the pharmacy obtained directly
6    from a manufacturer or from a different
7    wholesaler, to the extent there are any,
8    that person would also not fall within this
9    subclass, right?
10             MR. STANOCH:  Objection to
11   form.
12       A.    It's my understanding they
13   would not be part of this unjust enrichment
14   claim against the wholesalers, but of course
15   they would simultaneously be part of other
16   subclasses based on the manufacturer or API
17   supplier of the product or the retail
18   pharmacy at which they bought the product.
19   So in terms of ascertaining class
20   membership, there are a number of subclasses
21   here.  It's true.
22       Q.    Then for the wholesaler
23   subclasses that relate to third-party payors
24   as opposed to individual consumers, it would
25   be the same situation?

Page 205

1              L. Craft
2              What I mean by that is if they
3    didn't buy or -- excuse me -- pay for
4    product that wasn't provided by one of the
5    three wholesaler defendants to the pharmacy,
6    then those TPPs would not fall within their
7    subclass against wholesalers; is that right?
8              MR. STANOCH:  Objection to
9        form.
10             Go ahead.
11       A.    Yes, I believe the claims
12   against the wholesalers are limited to the
13   product they actually supplied.
14       Q.    I want to turn to a different
15   portion of your report.  This is going to be
16   page 32, paragraph 51.  Thank you for
17   blowing that up.
18             Paragraph 51 is a portion of
19   your report that relates to the medical
20   monitoring classes.
21             I want to focus on the third
22   sentence -- fourth sentence which says "This
23   makes it possible to construct a consumption
24   record for individual consumers and the
25   reason for that is because the NDC dosage

52 (Pages 202 - 205)

Page 206

L. Craft

1
2  strength quantity dispensed and dates of
3  each dispense are reported."
4      That's in the preceding
5  sentence. Do you see where I'm referring
6  to, Ms. Craft?
7      A.   I do.
8      Q.   Okay.
9           Are you familiar -- let me back
10 up.
11          I don't see it used in this
12 paragraph, so let me ask if you're familiar
13 generally with the term in this case of
14 "lifetime cumulative threshold."
15          Is that a term you're familiar
16 with?
17     A.   Yes.
18     Q.   Are you familiar with how
19 the -- and I might say LCT.
20          Is that okay?
21     A.   Sure.
22     Q.   All right. Great.
23          Are you familiar with how the
24 LCT thresholds were calculated in this case?
25          MR. STANOCH: Objection to

Page 207

L. Craft

1
2  form.
3          Vague and ambiguous.
4          Caution the witness to the
5      extent she has any information that
6      would be subject to privilege.
7      A.   It's my understanding that
8  the -- there's a functional definition here
9  that looks to be total quantity consumed of
10 VCDs by a consumer over the class period and
11 that that quantity is a function of the
12 dosage strength that is dispensed together
13 with the quantity that is dispensed so that
14 this is linked to the NDCs, that it
15 specifies quantity of product dispensed as
16 opposed to some other quantity metric to
17 that particular consumer.
18     Q.   And I guess -- and I'm not
19 saying you didn't answer my question here,
20 but let me ask it a slightly different way.
21          I can't tell you the lifetime
22 cumulative thresholds in this case off the
23 top of my head, but say hypothetically that
24 it's, you know, three months' worth of 150
25 milligram valsartan produced by Hetero Labs.

Page 208

L. Craft

1
2          Again, just making these
3  numbers up. Okay?
4          MR. STANOCH: Objection to
5      form.
6          Incomplete hypothetical.
7      Q.   Do you have an understanding of
8  how those specific numbers, the three
9  months, the 150 milligrams, how those
10 numbers were arrived at in determining what
11 the various lifetime cumulative threshold
12 would be?
13          MR. STANOCH: Objection again.
14          Incomplete hypothetical.
15          Caution the witness not to
16      divulge any information from privileged
17      communications.
18     A.   I certainly was not involved in
19 any discussions about or in the process of
20 defining what the thresholds should be. I
21 merely make the point here that those
22 thresholds are functionally defined based on
23 an observable quantity about which we need
24 have no speculation whatsoever, which is the
25 number of milligrams of a specific product

Page 209

L. Craft

1
2  added up over time for a given consumer and
3  combined across products.
4      Q.   Okay. All right. I
5  understand. I thank you for your
6  clarification.
7          Isn't the purpose of the
8  lifetime cumulative threshold to determine
9  how much NDMA or NDEA a person allegedly
10 ingested over the claims period?
11          MR. STANOCH: Objection to
12      form.
13     A.   It's not to me to define why
14 that threshold is being created. I'm just
15 saying it's one you could implement in terms
16 of ascertaining class membership. How that
17 will be used in the proof of increased
18 cancer risk is not a topic for me to
19 address.
20     Q.   So I guess let me ask you this
21 then: For each given NDC, at-issue NDC --
22 excuse me.
23          For each given at-issue NDC,
24 you would agree that the amount of NDMA or
25 NDEA varied across the lots and the

53 (Pages 206 - 209)

Page 210

L. Craft

1    L. Craft
2    individual pills and the individual
3    prescriptions, even under the same NDC,
4    right?
5        MR. STANOCH:  Objection to
6    form.
7            Lacks foundation.
8            Facts not in evidence.
9            Outside the scope.
10           Vague.
11           Go ahead.
12   A.    I wouldn't agree because I have
13   no opinion about variation in those levels
14   of contamination in the individual products.
15   That's beyond the scope of my report and my
16   expertise.
17   Q.    Okay.
18       You did review the economic
19   loss complaint in this case, right?
20   A.    Yes, I did.
21   Q.    I believe the economic loss
22   complaint makes allegations of various
23   ranges of NDMA or NDEA impurities in VCDs.
24   So I guess I want to assume that for
25   purposes of this question that there was

Page 211

1    L. Craft
2    variation in the various lots produced under
3    the same NDC.
4        Okay?
5        MR. STANOCH:  Objection.
6        I've lost the thread there.
7    Unintelligible.
8        Go ahead, if you could answer.
9    A.    Well, I don't think I have a
10   question yet, but I understand your
11   assumption.  You're asking me to assume
12   there was variation in the concentration of
13   these contaminants by lot number.
14   Q.    I think you nailed it.
15   A.    But what's the question?  You
16   told me to assume that.
17   Q.    Sure.  So my question is -- if
18   the amount of NDMA or NDEA in lots, if any,
19   differed, wouldn't you at least need to have
20   the lot information of the VCDs that the
21   consumer obtained to determine that
22   consumer's actual consumption of NDMA or
23   NDEA?
24       MR. STANOCH:  Objection to
25   form.

Page 212

1    L. Craft
2        Incomplete hypothetical.
3        Misstates the document.
4        I'm not even sure which
5    complaint we're talking about.
6        Vague and ambiguous.
7        Outside the scope.
8    A.    I suppose that the answer to
9    that question is it depends on how
10   absolutely precise you need to get to a
11   specific of NDMA or whatever the substance
12   may be and, you know, it is not uncommon in
13   all forms of a large transaction litigation
14   that we may have to make some estimates
15   based on averages over periods of time,
16   products, whatever it may be.
17       What you are asking is if I
18   want to know the exact amount of these
19   contaminants that were ingested by a
20   customer and you asked me to assume that
21   there was variation among the prescriptions.
22   Then if you need a precise, precise
23   estimate, then yes, it would be useful to
24   know the exact level of contaminants in each
25   pill that was ingested by the consumer.

Page 213

1    L. Craft
2        But, you know, there's not a
3    great deal of litigation that is undertaken
4    at that level of precision and I don't know
5    what the statistical methods are that are
6    being applied in this case to estimate the
7    exposure levels that are associated with a
8    30-day supply of a particular NDC and I
9    can't comment on their levels of precision
10   or their statistical variation.
11   Q.    You mentioned to get a very
12   precise estimate and I appreciate that.
13       Even by its nature, even if
14   you're trying to do an estimate of how much
15   NDMA or NDEA someone might have consumed, if
16   the various lots under a single NDC had
17   variable amounts of NDMA or NDEA in them,
18   that would even affect the accuracy of your
19   estimate, wouldn't it?
20       MR. STANOCH:  Objection to
21   form.
22       Asked and answered.
23       Incomplete hypothetical.
24       Lacks foundation.
25       Vague and ambiguous.

54 (Pages 210 - 213)

Page 214

L. Craft

1
2    Compound.
3        Go ahead, if you understand.
4    A.    I do. It's not a question I
5    could answer because I'm being asked here to
6    provide an opinion about the reasonableness
7    of combining lots in order to derive an
8    estimate of exposure for a given NDC and I
9    have not analyzed that subject. That is not
10   within the scope of my report. That's
11   somebody else's outlook and I really can't
12   opine about it. That might be a perfectly
13   reasonable procedure to use, but that's -- I
14   haven't attempted to assess that and won't.
15   Q.    Now, claims data -- be it PBM
16   or pharmacy-provided claims data -- don't
17   show whether the proposed class members
18   actually took their medication, do they?
19        MR. STANOCH: Objection to
20   form.
21        Vague.
22   A.    Of course not. Nor does any of
23   the scientific literature that addresses
24   adherence or compliance or thresholds
25   actually used in the estimation procedure

Page 215

L. Craft

1
2    individual consumption. Data in this
3    area -- studies, good academic studies,
4    including the Chang study that is cited and
5    relied upon by Mr. Kosty -- use
6    prescriptions dispensed, drugs that went
7    home with the consumer and they operate from
8    an assumption that the consumer didn't pay
9    for the drugs and then throw them in the
10   garbage, but, in fact, consumed the drugs.
11   Q.    So then if we look back --
12   actually, stay in paragraph 51.
13        Wouldn't it be more accurate
14   instead of calling it a consumption record,
15   you could say with certainty if you instead
16   tout it as a dispensing record, right?
17        MR. STANOCH: Objection to
18   form.
19        I guess incomplete hypothetical
20   in terms of writing report, but go
21   ahead.
22   A.    To treat that record as a
23   consumption record, one is operating under
24   the assumption that the consumer actually
25   ingested the product that they bought and of

Page 216

L. Craft

1
2    course that's the kind of thing that could
3    be easily validated in claim form by not
4    only purchased, but consumed XYZ.
5        So I'm telling you the science
6    in this area about drug compliance and
7    consumption is routinely oriented this way.
8    It makes the functional assumption that
9    prescribing results in complete consumption.
10   It is a limitation because there is a
11   possibility that someone bought their drugs,
12   took them home and didn't consume them and
13   that's a possibility that one could address
14   through a claim form, I would assume. So it
15   is not -- so I still treat this just as the
16   chain article would. I treat dispensing as
17   a proxy for consumption.
18   Q.    To be clear, you are not
19   proposing using a claim form to determine
20   actual consumption in order to identify
21   class members, are you?
22        MR. STANOCH: Objection.
23        Misstates testimony.
24   A.    I'm just suggesting that one
25   way to deal with this is if you want your

Page 217

L. Craft

1
2    consumer class members in the medical
3    monitoring class to attest to the fact that
4    they did, in fact, consume what they bought,
5    you could always do that when they submit
6    their claims at the conclusion of the case.
7    Q.    Now, have you ever in the past
8    in any case -- have you ever used claims
9    data, either from a pharmacy or a PBM, in
10   the past to determine the quantity of
11   product, either dispensed or consumed by
12   NDC?
13        MR. STANOCH: Objection to
14   form.
15        That's really compound in terms
16   of dispensed or consumed, Mr. Dorner,
17   if you'd like to break it up maybe.
18   But it's your question.
19        Objection. Form.
20        MR. DORNER: Sure. To be
21   clear, I was just trying to -- we just
22   had a discussion about consumption
23   versus dispensing, so I'll say -- I'll
24   say consumption in this case.
25   Q.    So in the past, in a case, have

55 (Pages 214 - 217)

L. Craft

1  L. Craft
2  you ever used NDC information either from
3  pharmacy or PBM data to construct a list of
4  class members and their amount of product
5  consumed?
6        MR. STANOCH:  Just caution the
7  witness not to divulge information
8  subject to a confidentiality order or a
9  consulting arrangement, if any.
10       Just go ahead and answer.
11       A.    Not on an order to prepare a
12  list, but in a number of antitrust cases in
13  which I've worked, the class definition
14  itself asks that we differentiate between
15  consumers who switched, for example, to a
16  generic product, when it became available
17  and analyzed whether they persisted on that
18  generic product.
19       So in other words, how long did
20  they continue taking it, how many
21  prescriptions, identify when that switch was
22  made, compare it to earlier purchases of the
23  brand product.
24       It is quite common to have to
25  analyze individual class member purchases

1  L. Craft
2  for -- to meet the contours of class
3  definitions when we're talking about
4  alternative products, switching between
5  generics and between -- between generics and
6  brands most typically.
7        So that is not precisely what
8  you're saying, but it is an analogous
9  exercise that is carried out by looking at
10  records across time for consumers.
11       Q.   In the antitrust context,
12  though, whether or not the medication was
13  consumed or how much of an impurity, if any,
14  that a consumer consumed, that is not a
15  factor in an antitrust case, is it?
16       A.    That's correct.  You're right.
17  I took -- I'm sorry.  Let me just clarify.
18  I took your question to refer to my personal
19  experience with tracking individual consumer
20  purchases across time and being able to
21  collect them on an individual level and I'm
22  merely making the point that that's
23  certainly something I've done numerous
24  times.
25       Q.   I appreciate the clarification.

1  L. Craft
2        Let's go ahead and move on to
3  page 34, paragraph 54 of your report in
4  Exhibit 4.  Okay?
5        In this paragraph, you're
6  describing what you call standard exclusions
7  common to almost all end payor class actions
8  and one of those two standard exclusions
9  deals with the defendants and their
10  affiliated entities and personnel and
11  defendants assignments and successors -- I
12  guess that's two to them -- and I believe
13  your proposal is that the defendants can
14  provide a list of those in the first two
15  categories.
16       Is that -- am I understanding
17  your position correctly?
18       A.    So yes, although I want to add
19  the proviso that in number one, my general
20  statement here was not only about entities
21  but about personnel and we should talk about
22  those separately because an affiliated
23  entity is a comparatively small number of
24  operations and those operations are only
25  third-party payors who might have claims if

1  L. Craft
2  they had self-funded health plans.
3        So if they had self-funded
4  health plans, the defendants can say so.
5  They can say I've got this affiliate and
6  that affiliate and this other affiliate with
7  self-funded health plans and then one would
8  simply programmatically exclude TPP claims
9  under those health plans.
10       Doing that also, of course,
11  links the individual employee purchases
12  under those health plans.  So the -- because
13  the health plan links to the member ID, then
14  we can -- without the defendants giving us a
15  list of their employees' names, but instead
16  giving us a list of their self-funded health
17  plans, we can make this determination.  That
18  was for one.
19       You also asked about
20  assignments and successors, which I would
21  treat the same as affiliated entities there.
22       Q.   Okay.
23       I guess I want to focus then
24  instead on personnel and personnel who are
25  not members of a self-funded plan by one of

56 (Pages 218 - 221)

Page 222

L. Craft

1    L. Craft
2    the defendants and their affiliates or
3    assignments or successors.
4         Okay?
5         MR. STANOCH:  Objection.
6         Go ahead.
7    A.    For example, an employee who is
8    a cash purchaser?  Is that what you're
9    thinking of?
10   Q.    That's one example, yes.  Or an
11   employee who -- just any employee who has a
12   co-pay and who doesn't have a co-pay
13   associated with a self-insured plan but
14   rather a fully insured plan.
15        Fair enough?
16   A.    Yes.  So what is your question?
17   Q.    So I guess my question is, you
18   know, your report merely says that the
19   defendants can provide a list of their
20   personnel.  So I don't actually see a
21   methodology as to how you would use that
22   list, so my question is how do you use that
23   list?
24        MR. STANOCH:  Objection to
25   form.

Page 223

1    L. Craft
2         Mischaracterizes the report and
3    the opinion.
4    A.    So let me then provide you with
5    further detail, which will hopefully clarify
6    this subject.
7         Defendants identify all their
8    affiliated entities, assignees and
9    successors.  That's step one.  Step two,
10   those defendants have those affiliated
11   entities and assignees and successors
12   identify their health plans.  Obviously, the
13   defendants are not going to have a claim
14   unless they're self-funding those benefits.
15   So they won't be a TPP, so we don't have to
16   worry about that.  But we get a complete
17   list of their health plans.
18        Those health plans can then be
19   used to identify personnel, i.e.
20   individuals, within PBM claims data because
21   we'll say health plan, you know, ABC was
22   processed and adjudicated by Express Scripts
23   and so we are going to eliminate the claims
24   of consumers under that health plan.
25        So the presumption there, which

Page 224

L. Craft

1    L. Craft
2    is a simplifying assumption, is that if the
3    individual is covered by that company's
4    health plan, then it is an excluded person
5    in this description.
6         Now, this is a pretty bare
7    bones description and there are a number of
8    ways that one could go about doing this.
9    That leaves you only with the residual
10   problem -- okay? -- but what if -- so all of
11   that is done without the need for a list of
12   employees.  You don't have to do any name
13   matching, you don't need a list of
14   employees, you just work backward from the
15   health plan.
16        This leaves you with the
17   possible exception that you've got an
18   employee who, for example, doesn't get
19   health benefits, isn't covered or for some
20   other reason goes in and pays cash without
21   processing through that health plan.  In
22   theory, without a list of employees, you're
23   not going to spot that rogue individual who
24   is going in and buying for cash.
25        Once again, it doesn't strike

Page 225

1    L. Craft
2    me as a difficult thing when and if claims
3    are ultimately processed at the outcome of
4    this case to have the claim forms say "I was
5    not at that time an employee of any of the
6    following."
7         These are not going to be
8    material numbers.  I'm telling you.  That
9    will be cash purchasers while employed by a
10   defendant.
11   Q.    Let me pose -- sorry.  Go
12   ahead.
13   A.    No, no.  I'm done.
14   Q.    Okay.  Let me pose a different
15   hypothetical.
16        Let's say that my firm, Duane
17   Morris, was a defendant in this case.  It's
18   not, but let's say it was.  Let's say
19   further that I, a Duane Morris employee,
20   purchased valsartan -- at-issue valsartan --
21   during the claims period, between 2012 and
22   the date of the final recall.  I'll
23   represent to you -- because this is true --
24   that I am not on Duane Morris's health care
25   plan.  I'm on my wife's health care plan.

57 (Pages 222 - 225)

Page 226

1            L. Craft
2        How does your methodology of
3    using the defendant's health care plan data
4    account for spouses, dependents and others
5    who may be on, you know, their spouse's
6    plan?
7            MR. STANOCH:  Objection to
8    form.
9            Incomplete hypothetical.
10           Vague.
11           Ambiguous.
12           Compound.
13           Go ahead, Ms. Craft.
14       A.    So short answer, it doesn't.
15   And so if one of defendants' employees who
16   is not covered by defendant but instead is
17   covered by some other insurance makes a
18   purchase, the process that I described,
19   which doesn't require a list of employees,
20   is not going to catch that individual, which
21   is the reason why you might want to have
22   some statement on an ultimate claim form
23   that says I wasn't an employee at the time.
24           I mean, I'm just dealing with
25   the class definition as I understand it to

Page 227

1            L. Craft
2    be currently drafted, but this could easily
3    be combined to and personnel who made
4    purchases under health plans provided by
5    that entity or health coverage provided by
6    that entity and then this problem goes away.
7    It is -- I mean, there will be some small
8    amount of persons who would fall within this
9    bucket for precisely the reason that you
10   just described.  They're not using the
11   defendant's health coverage, but they are an
12   employee of the defendant and without a list
13   of individuals, you won't find them.
14       Q.    I want to go back to the first
15   process you talked about with respect to
16   using a defendant's health care plan
17   information to -- I think you said
18   programmatically exclude employees of that
19   defendant.
20           Have you ever actually done
21   that in producing a list of class members?
22       A.    Well, I've certainly done that
23   in antitrust cases, identifying plans that
24   are sponsored by defendants and knocking
25   them out of the claims data, taking those

Page 228

1            L. Craft
2    claims out.
3        Q.    And then did you also take out
4    individuals associated with those plans from
5    any consumer class?
6        A.    We took out all of the plans
7    claims data.  I mean, it's --
8        Q.    I guess I'm not understanding
9    what you mean.
10       A.    Well, the claims --
11           MR. STANOCH:  Wait.  I'm sorry,
12   Mr. Dorner.  What's the question?  I'm
13   not understanding what you mean and
14   that's not a question.  You put a
15   question to her.  That's all I'm
16   saying.
17           MR. DORNER:  Okay.  Well, it
18   sounded like she had an explanation, so
19   let's let Ms. Craft say what it was.
20           MR. STANOCH:  Objection to
21   form.
22           No question.
23           Ms. Craft, if you think you can
24   answer something in what he asked, go
25   ahead.

Page 229

1            L. Craft
2        A.    When you eliminate all claims
3    associated with a particular health plan,
4    you eliminate the consumer portion as well
5    as the TPP portion because the claim is a
6    single unit that is then decomposed into
7    those portions.
8            Now, can I separately identify
9    the TPP and the consumer?  Yes.  But I'm
10   telling you that in the past, when I've been
11   asked to remove defendant health plans, it
12   has been for the purpose of removing all
13   claims under those plans, including consumer
14   portions.  That's all.
15       Q.    Okay.
16       A.    Once again, this data can be
17   used to eliminate the consumer, it can be
18   used to eliminate the TPP, it can be used to
19   eliminate both.  It's a question -- I'm
20   doing a little rough interpretation of what
21   these seven words mean, defendants and their
22   affiliated entities and personnel.
23       Q.    Sure.  Okay.
24           Now, second -- for those who,
25   as we discussed, for whatever reason aren't

58 (Pages 226 - 229)

Page 230

L. Craft

1  on the employer's health care or are cash
2  paying, have you ever actually obtained a
3  list of individuals from each defendant and
4  then removed them somehow from a list of
5  potential class members?
6      MR. STANOCH:  Objection to
7  form.
8      A.    No, I have not.  It has been my
9  experience that just as the court wouldn't
10 expect you to search records to see if the
11 judge, the magistrate, the court clerk,
12 their family members had claims, that it
13 would routinely be the case that one would
14 rely on a claim filing that says I'm not one
15 of those excluded persons at the end of the
16 case, that this is not an issue that is
17 routinely tackled prior to a settlement or
18 favorable judgment.
19     Q.    If a person -- strike that.
20         Under your methodology for
21 identifying defendants' employees, if a
22 person worked for a defendant for some but
23 not all of the claims period and paid for  a
24 VCD at issue during a time when he was not

Page 231

L. Craft

1  working for a defendant, would that person
2  be included within the class?
3      MR. STANOCH:  Objection to
4  form.
5          Incomplete hypothetical.
6      A.    The answer is I would need
7  instructions on which of those was true from
8  counsel.  I have presently in front of me
9  these four exclusions which you read here.
10 So what you're saying is would -- how should
11 I interpret number one?  Should I interpret
12 it to mean all purchases by that individual
13 or only those made during periods of
14 employment?  Should I interpret it to mean
15 only those purchases made during periods of
16 employment when there were health benefits
17 that were being used to make the purchase?
18 And the answer is I would need clarification
19 as to which of those rule sets to apply
20 before being able to do it.
21     MR. DORNER:  We've been going
22 for about an hour and I'm at a point
23 where I was going to switch gears, so I
24 suggest we take five.

Page 232

L. Craft

1      MR. STANOCH:  Are you okay with
2  that, Ms. Craft?
3      THE WITNESS:  I will
4  accommodate.  I'm ready -- I'm happy to
5  switch topics, too, I don't mind that.
6  But if you need a five-minute break,
7  that's fine.
8      MR. STANOCH:  Let's take a
9  break.
10     MR. DORNER:  Great.
11     THE VIDEOGRAPHER:  The time is
12 12:35.
13     This ends media four.
14     We're going off the record.
15     (Recess taken)
16     THE VIDEOGRAPHER:  The time is
17 1:45.
18     This begins media unit five.
19     We're back on the record.
20     (Whereupon, Exhibit 8 was marked for
21 identification.)
22     Q.    All right.
23         Can we go ahead and pull up --
24 this will be the exhibit pre-labeled G as in

Page 233

L. Craft

1  golf.  We'll mark this as Exhibit 8.  This
2  is an Excel spreadsheet we received from you
3  as part of your production.  It's a list of
4  third-party payors and associated plans with
5  those third-party payors.
6          Is that an accurate
7  characterization?
8      A.    Yes.  That's correct.
9      Q.    This list is all drawn from
10 IQVIA Xponent data, right?
11     A.    That's correct.
12     Q.    Let me ask just generally what
13 was the purpose of developing this list?
14     A.    To determine whether the TPP
15 class was numerous.
16     Q.    Okay.
17         So your list goes to your
18 numerosity opinion?
19     A.    Correct.
20     Q.    Okay.
21     Q.    When you were preparing this
22 list, did you attempt to apply any of the
23 proposed class exclusions to the entities
24 that, you know, I guess appeared in the

59 (Pages 230 - 233)

Page 234

```
1              L. Craft
2    IQVIA data and may have wound up in this
3    list?
4       A.    Yes.  I removed federal
5    government entities from this list and I
6    further removed the portion of Medicare --
7    sorry -- Medicaid claims which are paid
8    directly by the state.  So traditional
9    Medicaid in which the state as a government
10   entity is paying directly for members or
11   enrollee's benefits.
12      Q.    Okay.
13            If I'm -- if I'm remembering
14   the one article I've ever read about
15   Medicaid correctly, the one that is directly
16   paid by the state is known as -- I believe
17   it's Medicaid fee-for-service.
18            Is that right?
19      A.    Yes.  That's correct.
20      Q.    Okay.  Okay.  I'm no Medicaid
21   expert.
22            Then Medicaid managed care, if
23   I understand correctly, that is covered by a
24   private organization that then either prior
25   to or post delivery of the care receives a
```

Page 236

```
1              L. Craft
2    managed care organizations in Exhibit 8?
3       A.    Yes, you're exactly right.
4    Although it's very easy, given the
5    categorization of these plans to, for
6    example, say I'm going to remove all
7    Medicaid or I'm going to include different
8    sub categories of Medicaid that are
9    established in the IQVIA data.
10            So this was an illustration for
11   numerosity purposes that left in managed
12   Medicaid, but they can just as easily be
13   removed if that's ultimately what counsel
14   determines is appropriate.
15      Q.    Let me back up because I --
16   maybe I misheard you.
17            Did you say you left in -- you
18   left in managed Medicaid.  Okay.  But you
19   cut Medicare -- Medicaid fee-for-service?
20      A.    Correct.
21      Q.    Okay.
22            I understand from your prior
23   testimony that the only other expert
24   materials you've reviewed is the expert
25   report of Tim Kosty; is that true?
```

Page 235

```
1              L. Craft
2    fee?  I think it's known as a capitation; is
3    that also correct?
4       A.    That's right.  A capitation is
5    simply a fixed fee for each individual who
6    is receiving coverage.  So it's like a
7    premium.
8       Q.    Okay.
9             In both cases, whether or not
10   the state is directly paying the provider or
11   the state is paying a managed care
12   organization that then pays the provider,
13   the state is paying some sum of money for
14   Medicare care, right?
15      A.    Yes, but it is not providing
16   benefits directly to consumers in the fee --
17   in the managed care model.  Instead, the
18   price risk of products and services that are
19   covered is shifted to the insurance company
20   that provides that managed care coverage.
21      Q.    If I assume then -- but please,
22   correct me if I'm wrong -- that what you
23   just said, is that the basis for your
24   exclusion of fee for service plans from the
25   list shown in Exhibit 8 but the inclusion of
```

Page 237

```
1              L. Craft
2       A.    That's correct.
3       Q.    Okay.
4             If it is the case that one of
5    the plaintiffs' other experts on damages
6    excluded both Medicaid fee-for-service and
7    Medicare managed care payors from a damages
8    analysis, wouldn't that be inconsistent with
9    your inclusion of Medicaid managed care
10   organizations in your numerosity analysis?
11            MR. STANOCH:  Objection to
12   form.
13            Incomplete hypothetical.
14            Misstates opinions.
15            Vague.
16            Go ahead.
17      A.    Well, it couldn't be
18   inconsistent in the sense that I was here
19   only attempting to establish numerosity and
20   I do not know what -- precisely what the
21   scope of Medicaid claims would be in the
22   approved class definition.
23            Clearly, you would want the
24   ascertainability definition and scope to
25   correspond with the damage scope.  That's
```

60 (Pages 234 - 237)

Page 238

1           L. Craft
2    readily done using the available data.  So
3    it's -- a decision would have to be made.
4           I, on my own initiative, left
5    in managed care because that's typically
6    what I do, but that doesn't mean that that
7    needs to be the case ultimately and that's
8    decision that would have to be made, but
9    it's one that can be implemented whichever
10   direction you go using the available data.
11          Q.   As you prepared your opinion in
12   this list of TPPs that we have here in
13   Exhibit 8, did you count Medicare Part D
14   plans as federally funded?
15          A.   I didn't count anything about
16   funding sources.  What I counted was whether
17   they were government entities that were
18   undertaking the obligation to provide
19   benefits and as a result, I included in the
20   class Medicare Part D plans because those
21   are not government plans.  Those are
22   commercial plans, they are understood to be
23   commercial plans throughout the industry.
24   They are sponsored by commercial insurance
25   companies, registered to provide insurance

Page 239

1           L. Craft
2    benefits and the fact that there are
3    subsidies and reimbursements at various
4    levels that are ultimately after the fact
5    supplied to those plans typically in the --
6    to the largest extent based on their total
7    population in the plan, although there are
8    also payments in connection with the
9    individual drug purchases.
10          Those subsequent reimbursements
11   or contributions subsidies are, in my
12   opinion, irrelevant to the question what did
13   the payor who was obligated to provide the
14   benefit actually pay.
15          Q.   The various data then that
16   you've proposed using to identify the
17   class -- the economic class losses in this
18   case, would not reflect whatever subsidies
19   or other payments from the government that
20   Part D plans received?
21          MR. STANOCH:  Objection to
22   form.
23          Q.   Is that fair to say?
24          MR. STANOCH:  Objection to
25   form.

Page 240

1           L. Craft
2          A.   Yeah, that's generally correct.
3    The data sources I'm proposing to use here
4    do not include the CMS payments to Medicare
5    prescription drug plans.
6          Q.   I think we could take Exhibit 8
7    down for the time being.  Let's go back to
8    Exhibit 4, page 89, paragraph 60.
9          I want to ask you about this
10   Milliman, M-I-L-L-I-M-A-N, data that you
11   discuss in terms of identifying state plans
12   to exclude from the TPP class.
13          I guess right off the bat, you
14   haven't actually provided any Milliman Atlas
15   data as part of your report, right?
16          MR. STANOCH:  Objection to
17   form.
18          A.   No, I have not.  That data
19   would have to be purchased.
20          Q.   Okay.  Then I guess that
21   answers my next question.
22          You haven't actually gone and
23   obtained Milliman data for this case; is
24   that right?
25          A.   That's correct.

Page 241

1           L. Craft
2          Q.   Have you ever obtained it for
3    any reason in the past?
4          MR. STANOCH:  Objection.
5          Just, again, cautioning the
6    witness within the scope of other
7    confidentiality orders, consulting
8    arrangements, privilege, but go ahead.
9          A.   Not in connection with any
10   matter where I've been a designated expert.
11          Q.   Now, in this paragraph, it
12   says -- let me make sure we're on the right
13   page.  Let's do 39 onto 40.
14          Here, it says that the data is
15   considered authoritative and Milliman is
16   recognized as the preeminent national expert
17   in actuarial benefits analysis.
18          This case does not involve
19   actuarial benefits analysis, right?
20          MR. STANOCH:  Objection.
21          Go ahead.
22          A.   I think what this is saying,
23   actuarial is just being used as an adjective
24   to modify benefits and what that means is
25   the value of benefits over time and the

61 (Pages 238 - 241)

Page 242

L. Craft

1          L. Craft
2   amounts that are paid out in benefits
3   compared to the cost of those benefits.
4   Certainly we are looking at the product of
5   benefits being paid out over time every time
6   we see an insured claim that involves one of
7   the at-issue VCDs.
8       Q.    So let me ask you then how --
9   let's say you obtain Milliman data for this
10  case.
11          What do you do with it?
12          MR. STANOCH:  Objection to
13     form.
14          Incomplete hypothetical.
15      A.    So we come back to the question
16  of self-funding versus fully insured.  To
17  the extent that a state government plan is
18  fully insured, we don't have to do anything.
19  It's in the class.  What we're trying to do
20  here is to say okay, if there's a
21  self-funded government plan -- and by
22  government, I should make very clear that
23  what I mean is the state government entity.
24  I specifically do not mean towns, cities and
25  counties because they are not excluded in

Page 243

1   the class definition.  So they're still in
2   there.
3          But if we have a -- if we
4   identify those plans, those health plans,
5   that are self-funded by the state government
6   entities such that the state government is,
7   in fact, the payor of benefits, then we
8   would exclude those from the class.  I
9   identify them in PBM data the same way we
10  would for other plans:  Take the plan
11  number, the plan ID, the plan name, the plan
12  year and pull those claims out of the claims
13  data.
14      Q.    So I see in paragraph 60 you
15  indicated that the Milliman data provides an
16  indication of which agency or employee plans
17  are at least currently self-funded.
18          My question to you is what
19  actually -- like what does it say in the
20  Milliman data?  What does the text read?
21          MR. STANOCH:  Objection to
22     form.
23      A.    It specifically identifies who
24  is paying for the benefits.  Is it -- is it

Page 244

1          L. Craft
2   for a particular state agency or is it a
3   commercial insurer.  The reason for that
4   cautious language because the funding status
5   funding status data doesn't go all the way
6   back to 2010.  The descriptions of all the
7   plans that existed at the state level goes
8   back to 2010, but funding is only available
9   for the most recent probably two or three
10  years now.
11      Q.    Certainly funding status can
12  change over time, right?
13      A.    Well, that's a theoretical
14  possibility, but it's not common.
15  Government entities have a tendency --
16  insofar as government entities are
17  concerned.
18          Now, these are benefits that
19  are funded frequently through legislative
20  appropriations.  They are part of
21  slow-moving government programs that don't
22  just go to bid every year and say hey, I
23  think we'll take on this risk this year, we
24  had an insurer for it last year and then
25  they flipped back the next year.

Page 245

1          L. Craft
2          These tend to be pretty stable
3   funding relationships over time just because
4   you're talking about the bureaucracy and
5   process that goes into creating government
6   health plans.
7       Q.    Have you tracked the funding
8   status of government health -- state
9   government health plans over the last --
10  gosh, I don't know -- ten years to get an
11  estimate of how often these plans actually
12  do change their funding status?
13      A.    No, I haven't done that
14  analysis, except for in the Medicaid sector
15  where the shift towards managed Medicaid has
16  been large and rapid and we do have that
17  identified on an annual basis, but I have
18  not looked at government -- state employee
19  plans to see how frequently their funding
20  status has changed.
21      Q.    Let's go ahead and go to
22  paragraph 51 on page 40.
23          This is refers to the IQVIA
24  Xponent data that you used for excluding
25  some governmental plans from your list of

62 (Pages 242 - 245)

Page 246

L. Craft

1          L. Craft
2    TPPs, right?
3        A.    That's right.
4        Q.    Now, within -- you're
5    describing a model type in this paragraph
6    and I guess I want to be clear for laypeople
7    like myself, laypersons like myself that
8    what a model type is.
9              So a model type is one of the
10   data fields in IQVIA Xponent data.
11             Right?
12       A.    That's correct.
13       Q.    Okay.
14             So you can sort by model type,
15   for example?  Like you can add it to a
16   column and then sort, you know, I want
17   everything that's model type PBM, for
18   example, right?
19       A.    That's right.
20       Q.    Okay.



18             So there are -- that issue has
19   not been executed in the particular exhibit
20   you're looking at.  I did not attempt to
21   parse the state employee plans.  I merely
22   explained in my report that you could do so.
23       Q.    Okay.  I appreciate then the
24   clarification.
25             Let me ask it this way:  You

63 (Pages 246 - 249)

Page 250

L. Craft

1
2  mentioned Medicaid fee-for-service and you
3  mentioned federal -- what aspect of federal
4  plans did you exclude?  Can you remind me?
5      A.    Federal government payors.
6          MR. STANOCH:  Objection.
7      A.    So a federal government payor
8  is Veterans Authority, Indian Health
9  Services, CHIP, CHAMPUS or TRICARE.  Those
10 are the federal programs that provide
11 prescription drug coverage.
12          Some of those -- obviously,
13 CHIP is a jointly funded federal and state
14 program, but I took it out as a federal
15 payor.  I don't believe I saw any objection
16 to that treatment of federal government
17 payors in Mr. Kosty's report.  These are the
18 well known, established, readily
19 identifiable federal government payors.
20     Q.    Okay.
21         So other than the federal
22 government payors and the Medicaid
23 fee-for-service plans identifiable in
24 Xponent data, did you attempt to apply any
25 other exclusions for federal or state

Page 251

L. Craft

1
2  governmental entities?
3          MR. STANOCH:  Objection.
4          Asked and answered.
5      A.    No.  Those are the federal
6  exclusions, they were applied and I did not
7  attempt to parse the state employee plans.
8      Q.    Why is that or why didn't you
9  attempt to do that?
10         MR. STANOCH:  Objection.
11         Asked and answered.
12         Go ahead.
13     A.    I simply felt that it was
14 premature and unnecessary at this point.
15         I want to make clear to you
16 that I'm not proposing and never have
17 proposed that one rely solely on this IQVIA
18 Xponent data to ascertain class members.  I
19 merely performed this exercise in order to
20 show that the TPP class is numerous.  I was
21 not attempting to -- it's very easy to see
22 if you look at the state employee programs,
23 they're a comparatively small share of the
24 total that will not swing the analysis of
25 whether the class is numerous.  I never said

Page 252

L. Craft

1
2  use this and only this data source.
3          What I said is you've got a
4  huge leg up here because we've already got
5  about 3,000 payors identified associated
6  with about 11,600 plans that are identified
7  TPPs.  So you have to keep the purpose in
8  mind behind the exercise I was doing.
9      Q.    Let me ask you about the head
10 start that you're saying we have here.
11         Assuming that it is, in fact,
12 around 3,000 TPPs involved with some number
13 that would need to be excluded, how do you
14 intend to match that -- those IQVIA data
15 with PBM information that you obtain in an
16 attempt to also identify TPPs?
17         MR. STANOCH:  Objection to
18 form.
19     A.    I'm not sure one needs to match
20 it.  I'm just saying -- I can identify that
21 number of payors here, so we should have no
22 concerns about maybe having too small a
23 class that doesn't need the infrastructure
24 and the support of a class action format.
25 So I would use -- you recall that this

Page 253

L. Craft

1
2  morning as I was describing the data sources
3  that I would use to identify class members I
4  didn't say the IQVIA Xponent data.  I said I
5  had used that for the purpose of showing
6  numerosity.
7          It is a stellar example of the
8  availability of information in the
9  pharmaceutical industry derived from the
10 very sources that I'm using that allows
11 classification by various attributes of
12 plans and that's what you're describing
13 correctly as model types.  So there are
14 many, many model types as represented in the
15 managed care workbook -- effectively, the
16 glossary that we gave you -- and you can see
17 how those model types are subsets of
18 particular methods of payment.

64 (Pages 250 - 253)



Page 254

16    Q.    So is it your proposal in your
17  methodology for identifying TPP class
18  members, is it your proposal that you would
19  use IQVIA Xponent data?
20          MR. STANOCH:  Objection to
21    form.
22          Asked and answered.
23    A.    I have not proposed that I
24  would need to do that.  I think it's a good
25  idea to make sure that the damage

Page 255

1          L. Craft
2  calculation, which does use and rely upon
3  the IQVIA data, represents the same contours
4  of class definition as what I am proposing
5  to identify from the PBM data and
6  potentially retailer data, but I did not say
7  that I would use the Xponent data to
8  identify class members.
9          I can tell you right now you've
10  got several thousand of them, but that's not
11  a final step.  I was doing this as an
12  illustration of the size of the class.
13    Q.    Would you use IQVIA Xponent
14  data to exclude class members?
15          MR. STANOCH:  Objection to
16    form.
17    A.    If I saw that a particular
18  group of plans were, for example, identified
19  as directly funded by the state -- so a
20  state assistance program is an example -- a
21  state assistance program, yeah, I might
22  cross check against this list to make sure
23  that in the PBM data I was catching that
24  state assistance program to eliminate it.
25  This would just effectively be a double

Page 256

1          L. Craft
2  check, a reconciliation.
3    Q.    What would the initial source
4  be for the exclusion of state governmental
5  plan?
6          MR. STANOCH:  Objection to
7    form.
8          Go ahead.
9    A.    Right.  So as I explained in my
10  report, first stop would be to request that
11  the PBMs together with their claims data
12  flag the state and federal government plans,
13  although by which I mean federal and
14  government plans where the federal or state
15  government is the payor, is the obligor.
16  And ideally, you would like them to do that.
17          Then I explain in my report at
18  some length that PBMs have the capability to
19  do that because they have specific lines of
20  business that are government entity plans.
21  They market specifically -- because those
22  plans are subject to separate regulations
23  and separate rules, they are treated as a
24  distinct line of business so that the states
25  can be sure there are no anti-kickback

Page 257

1          L. Craft
2  violations in the way the plans are being
3  operated and that other regulations are
4  being complied with.
5          So the first step would be to
6  ask the PBMs to flag where the plan is a
7  government -- a federal or state government
8  entity.  I have no problem with the federal.
9  It's not really necessary to ask them to do
10  that because we can see them by name.  So we
11  can see VA, IHS, CHIP in the PBM plan data
12  where the client name and account are
13  described.
14          With regard to the state plans,
15  we would ask that the PBMs identify them.
16  But let's just say for some reason that data
17  is not complete or not supplied.  That flag
18  is not complete or not supplied.  Then the
19  various other sources that I identify in my
20  report, including things like the Milliman
21  Atlas or even potentially a cross check
22  against this IQVIA data, state legislature
23  list or if necessary, an inquiry to the
24  state personnel authority for each of the
25  states could be used to make that

65 (Pages 254 - 257)

Page 258

L. Craft

1    distinction if we had to go to those
2    secondary sources of information.
3        Q.    Can we go to paragraph 62, page
4    41 of Exhibit 4, please?  Actually, we don't
5    need to change the exhibit, Ms. Craft.  I
6    forgot to ask you one question.
7        We talked a minute ago about
8    which exclusions you tried to apply to the
9    list of TPPs in Exhibit 8.
10       Did you try to
11   exclude defendants and defendant affiliates
12   from Exhibit 8?
13       A.    No, I did not because I was not
14   supplied with a list of those entities that
15   I could apply.
16       Q.    We could go back to that
17   exhibit, Exhibit 4, page 41, paragraph 62.
18   I want to focus on the last sentence here.
19       "If any uncertainty remained, a
20   look up online or a contact to the state's
21   benefit office could confirm funding
22   information."
23       I guess my question is have you
24   ever contacted a state's benefits office to

Page 259

L. Craft

1    inquire about the funding information of any
2    of its employee insurance plans?
3        A.    Not by phone, but certainly
4    we've done web look ups to their personnel
5    sites.  Absolutely.
6        Q.    Was that for the purpose of
7    applying a class exclusion?
8        MR. STANOCH:  Objection.
9        Just caution you with any
10       protective order or consulting work
11       privilege.
12       THE WITNESS:  Thank you for
13       that reminder.
14       A.    I don't know whether it was
15   specifically for the purpose of applying
16   class exclusions.  I just know that
17   periodically we do have to investigate the
18   existence of plans and their funding status
19   from state entities and in some cases the
20   historical records are pretty good online
21   and in some cases they're incomplete and you
22   might have to go to the personnel office to
23   find out.
24       By the way, I don't personally

Page 260

L. Craft

1    consider making -- even if it was 50
2    outreaches to 50 states, that's not a hugely
3    burdensome or time consuming task.
4        Q.    All right.  Let's go ahead and
5    turn to paragraph 64 of your report.  I know
6    we talked about some of this information
7    earlier in your testimony today, Ms. Craft,
8    and so I'm going to do my level best to not
9    retrod old ground.  But bear with me if I
10   need to ask some questions to understand
11   what's going on here.
12       Okay?
13       A.    Sure.
14       Q.    I appreciate that.
15       Starting off in paragraph 64,
16   your report stays that the NCPDP system is
17   used to route data about the claim to the
18   appropriate PBM for adjudication and that
19   the transmitted data need to be sufficient
20   for the PBM to identify the proper billing
21   party, the one to whom it will charge the
22   drug cost net of consumer cost sharing.
23       As you use in this paragraph,
24   proper billing party is not necessarily a

Page 261

L. Craft

1    TPP, correct?
2        A.    It could be an ASO.  I call it
3    a proper billing party here.
4        Q.    Okay.
5        Can we go back to page 16 of
6    your report, figure three?
7        Now here, this is where on page
8    15 we've got this outline of various forms
9    of NCPDP data that are exchanged in the
10   course of a transaction at a pharmacy,
11   right?
12       A.    Yes.  These are some of the
13   fields that are exchanged.
14       Q.    I'm going to go one at a time
15   through these.
16       Cardholder ID, that is going to
17   be an alpha numeric combination of
18   characters, right?
19       A.    Yes.
20       Q.    Okay.
21       That's intended to basically
22   tell the PBM who was getting -- the patients
23   associated with the prescription, right?
24       A.    That's right.

66 (Pages 258 - 261)

Page 262

L. Craft

1
2     Q.    Okay.
3           Does it convey any other
4     information?
5     A.    No.  It just uniquely
6     identifies the individual for whom --
7     Q.    Okay.
8           So what might -- sorry about
9     that.  Go ahead and finish.
10    A.    Uniquely identifies the
11    individual for whom the prescription is
12    written.
13    Q.    Plan ID is the next one.
14    That's in column two.  Plan ID is also a
15    alpha numeric combination of characters,
16    right?
17    A.    That's right.
18    Q.    Is that something I would see
19    on my insurance card?
20    A.    It sure is.
21    Q.    Other than -- well, let me ask
22    you this:  Who assigns a plan ID?
23    A.    So the plan ID is assigned by
24    the plan itself and attaches to that plan.
25    Regardless of what claims are being

Page 263

L. Craft

1
2     processed, everything will be tied back to
3     that plan ID.
4     Q.    What do you mean, everything
5     will be tied back?
6     A.    All claims activity is -- will
7     be associated with -- for that plan will be
8     associated with that plan ID.
9     Q.    Now, a plan ID doesn't actually
10    list who the plan is, right?
11    A.    The plan ID does not list the
12    name in words that you and I could read.  I
13    mean, it may, but it may not include the
14    actual words associated.  So it may not say
15    Blue Shield PPO, although you'll see that on
16    your card.
17          I think Mr. Kosty says why type
18    that in, the pharmacist may not type in Blue
19    Shield PPO.  The reason they don't have to
20    type it in is because they've got the plan
21    ID and the plan ID specifically tells the
22    PBM which plan we're talking about and the
23    PBM records have the name of that plan, the
24    full name of that plan.  They have the
25    linked information for that plan ID.  That's

Page 264

L. Craft

1
2     what we were talking about this morning.
3     Q.    Okay.  I really just want to
4     focus on what goes -- right now, what goes
5     from pharmacy to PBM.  Okay?
6     A.    Okay.
7     Q.    That's what's represented here
8     in this NCPDP data --
9     A.    Yes.
10    Q.    Okay.  Great.  All right.
11          The same with --
12    A.    Sorry.  I'm sorry to interrupt
13    you, but I need to correct what I just said.
14          So obviously, the information
15    in the last box, that price allocation,
16    that's coming from the PBM back.  That is
17    not generated by the pharmacy.  The pharmacy
18    will put in a submitted cost for the
19    product, but that's just the "We think you
20    should pay us X."
21          What actually controls is this
22    total price field and the make up of price
23    in the return message from the PBM.
24          Does that make sense?
25    Understand?

Page 265

L. Craft

1
2     Q.    I think it does make sense.
3           So the first four boxes in
4     figure three are pharmacy to PBM, the
5     last -- the fifth box is PBM back to
6     pharmacy?
7     A.    Correct.
8     Q.    Great.  Easy enough.
9           So I don't know if I'm going
10    out of order here, I think I might.  BIN or
11    BIN number, that's also known as IIN now,
12    right?
13    A.    That's correct.
14    Q.    Okay.
15          The BIN is only going to
16    identify to which entity a claim needs to be
17    sent for processing and payment.  Well, is
18    that your understanding?
19    A.    I think that is exactly
20    Mr. Kosty's language.  It is a larger
21    category than plan ID.  It does identify
22    which PBM to send this claim to.  That's
23    correct.  It identifies which PBM to send it
24    to.  So you may have multiple plan IDs that
25    are routed using the same BIN number.  So

67 (Pages 262 - 265)

Page 266

1          L. Craft
2    they're getting to the same PBM, using the
3    same BIN number, but with different plan IDs
4    and group IDs associated with the claims.
5       Q.    Okay.
6          The BIN, again, is just going
7    to be some alpha numeric combination of
8    letters and numbers, yes?
9       A.    That's right.
10      Q.    Okay.
11         It's not going to reflect the
12   funding status of the plan?
13      A.    Standalone, it will not.
14      Q.    Nor will it even -- that's
15   right. It's not even going to list the name
16   of the plan, correct?
17         MR. STANOCH:  Objection.
18      A.    Correct.
19      Q.    Okay.
20         The plan ID -- I'm going to go
21   back. I missed a question.
22         The plan ID itself does not
23   indicate whether there's an ASO or TPA
24   relationship, does it?
25      A.    If you were just reading those

Page 267

1          L. Craft
2    code numbers, you wouldn't be able to say
3    whether that's an ASO or a TPA, but when
4    that plan ID is then used in combination of
5    these other items of information by the PBM,
6    that's when you break it into a specific
7    account that may be denominated as ASO or
8    TPA.
9       Q.    Okay. So on its own -- sorry,
10   I didn't mean to interrupt you. Were you
11   finished?
12      A.    Yes. Go ahead.
13      Q.    Okay.
14         On its own, the plan ID is not
15   going to indicate TPA or ASO or fully
16   insured or self-insured? None of those
17   things, right?
18      A.    You could not read that number
19   and glean that information from just the
20   plan ID number.
21      Q.    Let's move on to processor
22   control number or PCN.
23         PCN can identify a plan, it can
24   also identify something like a benefits
25   package, right?

Page 268

1          L. Craft
2       A.    Yes. It's routinely used to
3    identify benefit packages. So to
4    differentiate one group of claimants from
5    another based on the particular benefit
6    package that's going to be applied in
7    deciding who pays what.
8       Q.    I think that PCN is actually
9    just -- it's a possible field. It's not a
10   required field to be transmitted along from
11   the pharmacy, right?
12      A.    Right. And that's because if
13   we have a plan that only has one benefit
14   package, you don't really need a PCN because
15   there's only one benefit package it can
16   attach to. So the processor control number
17   is a discretionary number used by the PBM to
18   expedite its own claims processing by
19   marking which benefit structure the
20   particular claims should be applied to.
21      Q.    And again, that's just going to
22   be another code or number, right?
23      A.    That's right.
24      Q.    It's not going to reflect
25   funding status of the plan?

Page 269

1          L. Craft
2       A.    Standing independently, that
3    code number will not. It would simply
4    repeat my prior answer, that these
5    combinations of numbers allow the PBM to
6    segregate this claims processing data and
7    may link directly to an ASO or TPA account
8    or to a fully insured account.
9       Q.    Then would you say the same for
10   the last one, the group ID?
11         MR. STANOCH:  Objection to
12   form.
13      A.    I mean, yes, that's one of the
14   elements of information that the PBM gets
15   that locks it in with the correct payor, the
16   correct plan, the correct responsible party
17   and whatever information is in that plan set
18   up to be able to adjudicate the claim, as
19   well as all of the historical information
20   about the individual consumer represented by
21   that card holder ID.
22      Q.    Now, in your last answer -- and
23   I want to make sure that we're clear.
24         In your last answer that you
25   just gave, you said it's going to indicate

68 (Pages 266 - 269)

Page 270

1           L. Craft
2   the correct payor. Again, that payor is
3   just the -- the PBM's client is the payor
4   you're referring to in that answer, correct?
5       A.    Yes. I'll go back to the
6   language in the report. The proper billing
7   party.
8       Q.    Okay.
9           Is proper billing party and
10  client in terms of the PBM's client, are
11  those synonymous?
12          MR. STANOCH: Objection to
13      form.
14      A.    Not quite. Because there may
15  be differences in who you bill for different
16  accounts or groups within a client. So a
17  given client could have many plans and those
18  might have, for example, different billing
19  responsibilities and coordinates. So we
20  need these numbers to work in combination to
21  be able to identify as the PBMs
22  automatically and instantaneously do the
23  proper billing for any individual claim.
24      Q.    Can we go to paragraph 65 of
25  your report, please, to be on page, I think,

Page 271

1           L. Craft
2   43. I know we've danced around it a little
3   bit today about some of the additional data
4   PBMs maintain about their clients, as you
5   refer to in paragraph 65 in the first
6   sentence.
7           First off, I guess I kind of
8   want to differentiate. This is more
9   housekeeping than anything.
10          The information we were talking
11  about in figure three just a moment ago, I
12  like to call that NCPDP data. Is that -- to
13  refer to those elements -- the plan ID, the
14  group, the PCN and the BIN -- if I refer to
15  those as NCPDP data, is that agreeable to
16  you?
17      A.    Well, it's not accurate,
18  because NCPDP is the messaging standard that
19  governs the direction of -- the flow of
20  information in both directions. So I'm
21  happy if you want to describe that as the
22  pharmacy message to the PBM. That's what
23  we've been -- those first four out of five
24  boxes on the figure that we were just
25  looking at are elements of that pharmacy

Page 272

1           L. Craft
2   message to the PBM and then PBM is obviously
3   going to return a response.
4           What paragraph 65 is talking
5   about is what happens in the split second
6   when that pharmacy message reaches the PBM.
7       Q.    Right. Okay. And that's, I
8   guess, what I want to differentiate between.
9   So there's the pharmacy message, which is
10  what I'm calling the NCPDP data for purposes
11  of the next however many questions, and then
12  I guess I would just refer to the additional
13  data PBMs maintain about their clients. I
14  would call that the set up data. But is
15  there an appropriate -- okay. You're
16  shaking your head no.
17          So why is that not accurate?
18      A.    Because client name and account
19  name and group name and those unique ID
20  numbers associated with those are all
21  portions of the claims data. They're right
22  there, reported, printed out as part of the
23  claims data. So to say that that is plan
24  set up data is wrong.
25          Those elements are pulled as

Page 273

1           L. Craft
2   part of the claim adjudication process. You
3   need not leave the claim adjudication
4   database or engine in order to obtain those
5   values. They happen immediately.
6           So let's not get confused and
7   think that we have got to go to some other
8   database to link up to all of this
9   identifying information. It happens
10  immediately in the claims engine.
11          What we were talking about
12  before with the plan set up sheets is
13  details. So things like billing
14  coordinates, you know, full legal names,
15  contacts, then the information about ASO,
16  TPA, what's the funding status, that
17  information we're talking about in the
18  separate plan worksheets, but the
19  information you see described to you in 65
20  here is all part of the claims adjudication
21  database.
22      Q.    Okay.
23          So instead of referring to
24  those as set up data, I'll refer to them
25  instead as just the additional data in the

69 (Pages 270 - 273)

Page 274

L. Craft

1
2    collective.
3              Okay?
4      A.    Okay.
5      Q.    All right.  Great.
6              Is it your contention that all
7    PBMs follow this client account and group
8    hierarchy?
9      A.    Yes.  Yes.  I mean, there may
10   be clients where you don't have sub
11   accounts, so that doesn't mean that the
12   field is invariably used.  It does mean that
13   this kind of hierarchical structure is
14   routinely used.  There are --
15     Q.    Do all -- sorry.
16     A.    There are cases where I've seen
17   claims reported with collapsed values of
18   claim and client and account together and
19   grouped separate.  But generally, this is
20   the standard hierarchical structure used by
21   all of major PBMs.
22     Q.    So then if I'm understanding
23   you correctly, it's your contention that --
24   well, let me ask you this:  Do all PBMs
25   require the use of the group description?

Page 275

L. Craft

1
2              MR. STANOCH:  Objection to
3    form.
4      A.    I'm trying to think if I've
5    ever seen an entry without a group.  When
6    you say require it, if there's a single
7    group ensured under a plan ID that has only
8    a single benefit package, it wouldn't be an
9    essential number.  But that doesn't mean
10   that as an overall data structure in
11   hierarchy these don't exist, these fields
12   don't exist.  It just means you don't need
13   them in a particular case.
14     Q.    Sure.  Okay.  I guess let me
15   make sure I understand.
16             You would say all PBMs do at
17   least have a group field within this
18   additional data even if it's not used in a
19   particular client's case?
20             MR. STANOCH:  Objection to
21   form.
22     A.    Yes.  Yes, I would.  I want to
23   make clear to you that I'm using language
24   from the most commonly used language, but
25   for example, some PBMs call that client name

Page 276

L. Craft

1
2    payor name.  Some call it customer name.
3    They're immaterially different.  It's just
4    how those fields are labeled in the data.
5              Sometimes group description may
6    be called employer group by some PBMs.  It
7    is called employer group by some PBMs.
8              It's not at all difficult to
9    recognize which of these represent -- these
10   fields represent the same thing when
11   traveling from one PBM to another.  But
12   there are minor differences in naming
13   conventions that can both be observed in the
14   data and that are explained in the data
15   dictionaries that all PBMs keep.
16     Q.    For purposes of identifying
17   class members, have you actually taken this
18   additional data from multiple PBMs and
19   actually combined it together to produce a
20   list of class members?
21             MR. STANOCH:  Objection to
22   form.
23             Asked and answered.
24             Go ahead.
25     A.    I've certainly combined PBM

Page 277

L. Craft

1
2    data across multiple PBMs to demonstrate
3    that that can be done.  I have not had the
4    opportunity to carry out that exercise on
5    full productions, as I explained to you
6    earlier in the day, in order to arrive at a
7    list.
8              But the step that we're talking
9    about, the ability to merge data from
10   multiple PBM sources, is, contrary to what
11   Mr. Kosty says, not technologically or
12   intellectually hard.  It is -- these fields
13   are both intuitive, there are common
14   structures adopted by the PBMs because
15   that's what allows them to deliver the
16   functionality that all of these health plans
17   need and there are data dictionaries that if
18   you have any confusion can resolve that
19   confusion.
20             I have seen cases where the
21   components of a payment may be differently
22   labeled.  So ingredient cost may not be
23   called ingredient cost.  It may be something
24   else.  But I've never found that I was
25   unable to resolve those differences.

70 (Pages 274 - 277)

Page 278

L. Craft
2    And this is, as I mentioned
3 earlier today, a standard part of data
4 processing whenever you are engaged in a
5 multiple data source analysis, whether in
6 pharmaceuticals or any place else in the
7 world, it's a standard process that
8 everybody uses. So there's nothing --
9 sorry, go ahead. I'm done.
10    Q.    My fault.
11    The combination that you
12 referred to that you have done, I have two
13 quick questions about that.
14    Number one: Did that
15 combination include the additional data
16 referred to here in paragraph 65?
17    A.    The additional data being the
18 claim -- the client name and ID, the account
19 name and ID and the group description and
20 ID? Is that what you're --
21    Q.    That's right.
22    A.    Yes. Yes.
23    Q.    Are you able to -- and I'm
24 asking and I'm sure your counsel will tell
25 you not to if you can't -- but are you able

Page 279

L. Craft
2 to say a case where that happened, where
3 that's been done?
4    MR. STANOCH: Ms. Craft, I
5    caution you not to reveal any
6    information subject to a protective
7    order or a privilege of any kind.
8    A.    I can't reveal specific cases,
9 but I'm going to have to simply explain that
10 this is pretty routine. When we intake
11 data, whether it's from a third-party payor,
12 which it might be, a big insurance company
13 or a pharmacy or a PBM, the literally very
14 first thing we do after we inventory the
15 data to determine its completeness, its
16 coverage over time periods and products, the
17 next thing we do is attempt to reconcile the
18 naming conventions such that we know we're
19 looking at the same value in entity A's
20 production as we see somewhere else in
21 entity B's production.
22    So standardization of field
23 names is routine. It's also a routine part
24 of evaluating the adequacy and completeness
25 of the data. We look at the field reports

Page 280

L. Craft
2 and say do we have everything we need here,
3 do I see the consumer share, do I see the
4 dispensing fee, do I see the TPP share, do I
5 see the fill date, etc., etc., etc., and
6 it's just -- I mean, it's a little bit like
7 you're going to take off in a plane and you
8 check each of the controls, check, check,
9 check, check, it's here, it's here, it's
10 here. If there's any confusion, you go to
11 the data dictionary or you go back and say
12 you're missing some fields, which happens.
13    Q.    All right. Let's go to
14 paragraph 66 of your report --
15    MR. STANOCH: Mr. Dorner, is
16    everything good on your side.
17    MR. DORNER: Yes, just
18    conferring briefly.
19    Q.    Looking at paragraph 66 of your
20 report, Ms. Craft, you say here that "The
21 TPP (ultimate payor of claims) typically
22 appears in the client/carrier field of the
23 PBM data, whether it is self funded or fully
24 insured plan."
25    My first question is

Page 281

L. Craft
2 client/carrier, is that the same thing that
3 you were referring to in the previous
4 paragraph as the client field?
5    A.    Yes. Yes. This -- sometimes
6 it's reported as carrier because, of course,
7 most of the time, these are insurance
8 companies, and sometimes it's called client.
9 Those words are used interchangeably among
10 PBMs for that field.
11    Q.    Okay.
12    Then when you -- just beyond
13 that, you used the term PBM data, which is,
14 I know, a term we covered or talked about
15 earlier.
16    I guess I'm wondering what are
17 you referring to as PBM data here?
18    Let me withdraw that question
19 and ask it a different way.
20    When you refer to PBM data
21 here, is that the same thing as the
22 additional data that we were talking about
23 in paragraph 65?
24    A.    It's the claims data --
25    MR. STANOCH: Objection to

71 (Pages 278 - 281)

Page 282

L. Craft

1    L. Craft
2    form.
3         A.    I'm talking about the claims
4    data. The data that reports all of the
5    claims that came to the PBM for adjudication
6    and links each of them to their carrier
7    account group, divides up the price,
8    identifies the product. That claims data
9    includes this information. The same
10   information -- these same fields are present
11   elsewhere, but my reference here, in talking
12   about the PBM data, is PBM claims data.
13        Q.    Okay.
14             And so -- if this is wrong, you
15   can tell me I'm wrong.
16             When I see PBM data here, I
17   guess I'm hearing you to say that's the
18   NCPDP pharmacy message plus the additional
19   data -- talking about the client account and
20   group -- equals the PBM claims data.
21             Is that accurate?
22             MR. STANOCH:  Objection to
23   form.
24             Misstates testimony.
25             Go ahead.

Page 283

L. Craft

1         L. Craft
2         A.    The PBM claims data is
3    typically a limited set of fields that are
4    designed to run efficiently and to be suited
5    for billing purposes and therefore there may
6    be many pieces of information included in
7    the pharmacy message or the PBM return that
8    are not included in the claims data.
9             We don't need to know those
10   pieces of information for the purpose of
11   this or the other cases I'm involved in
12   typically. So -- but there are other
13   fields. For example, dispenses written
14   field, why was a particular brand dispensed
15   rather than a generic? That kind of thing.
16             There are messages -- the
17   pharmacy asks for one dollar amount, but the
18   PBM writes back in its return and says no,
19   it's going to be the following dollar
20   amount.
21             There's a lot of additional
22   information that is not necessarily
23   preserved in the claims data. Sometimes it
24   is produced with the claims data, sometimes
25   it's not, but it's not important to what

Page 284

L. Craft

1    we're trying to do here.
2         Q.    Now, in paragraph 66, you say,
3    about the middle of the paragraph, "The TPP
4    ultimate payor of claims typically appears
5    in the client/carrier field of the TPP
6    data."
7             I'll just stop reading there
8    because I think that's all that I need. I
9    don't actually see any support for that
10   contention in your report, so what is the
11   basis for that contention?
12             MR. STANOCH:  Objection to
13   form.
14        A.    The scope of the next sentence,
15   which tells you when that's not true.
16   You've got to read the two sentences
17   together.
18        Q.    Okay.
19             So is it your testimony that
20   the TPP will always appear in the
21   client/carrier field of PBM data unless that
22   TPP has hired an ASO or a TPA?
23             MR. STANOCH:  Objection to
24   form.

Page 285

L. Craft

1         L. Craft
2             Asked and answered.
3             Misstates the testimony.
4             Misstates the report.
5             Go ahead.
6         A.    But that is generally true,
7    that if the -- unless there's an
8    intermediary, unless there's a TPA or an ASO
9    in the middle of that relationship between
10   the PBM and the TPP, then it's going to be
11   the TPP who will appear in the client
12   carrier field because that's -- somebody's
13   got to contract with the PBM for these
14   services. Somebody is the PBM's client.
15   They don't just do this willy nilly. They
16   do it for specific clients for specific
17   purposes.
18             Your choice as to who that
19   client is either the TPP, i.e. the big
20   old insurance company that is paying the
21   claims, or a self-funding plan that's chosen
22   to contract directly with the PBM or -- so
23   those are the clients in that case, right?
24   They're going to show up in the
25   client/carrier field because they're the

72 (Pages 282 - 285)

Page 286

1                L. Craft
2    contracting entity that's going to get
3    billed directly by the PBM for the payment.
4            There is an exception to that
5    general rule, which is described in the next
6    sentence, which is if the third-party payor
7    hires an intermediary, either an ASO or a
8    third-party administrator, and assigns to
9    that entity the responsibility to contract
10   with the PBM for claims processing.  In that
11   case, you may have a situation where the
12   client field is the name of that ASO or TPA
13   rather than the underlying plan sponsor.
14   Q.    I just want to back up to --
15   what I was getting at was you mentioned it's
16   a general rule that the ultimate payor of
17   claims -- assuming there's not an ASO or a
18   TPA, it's a general rule, you said, that the
19   TPP would appear in the client/carrier
20   field.
21            How often is that not the case?
22            MR. STANOCH:  Objection to
23       form.
24            Asked and answered.
25            Misstates prior testimony.

Page 287

1                L. Craft
2            You may try to answer.
3    A.    Okay.  I'm going to have to
4    give you some numbers in order to do this.
5    So the exception is limited to situations
6    where a self-funding plan sponsor --
7    typically, an employee or a union that has
8    elected to pay for benefits -- directly
9    hires an ASO or a TPA.
10           So the first thing we want to
11   know is -- because this problem largely
12   doesn't rise in the Medicare or Medicaid
13   setting.  Right?  We know that.  It doesn't
14   arise with regard to health exchange
15   products because those are definitionally
16   fully insured and the insured is going to be
17   the client for the claims processing
18   services.
19           So what we're really talking
20   about here is the category of employer and
21   the union sponsored plans where we see this
22   issue with the ASO and the TPA.
23           So the first thing you have to
24   ask yourself is how many of those plans are
25   fully ensured.  So the plan sponsor has said

Page 288

1                L. Craft
2    I'm not bearing this risk, I'm going to go
3    buy insurance from an insurance company and
4    the answer is about 88% of the time, that's
5    what they do.  About 88% of the employer and
6    union plans are with regard to
7    pharmaceuticals.  The prescription drug
8    benefits are fully insuring those benefits.
9            So we start with the situation
10   where it is not impossible, but it is pretty
11   darned unusual where you are fully insuring
12   those benefits for the insurer not to appear
13   in the client or carrier field because
14   insurers normally have their own preexisting
15   relationships with PBMs.  In fact, many of
16   them are affiliated with or owned by or own
17   those -- the related entities.
18           So the tie between the insurer
19   that would be acting as an ASO and a
20   particular PBM is very strong.  So we would
21   typically expect that when we've got a fully
22   insured employee or -- employee or union
23   plan that it's going to be the insurer
24   that's going to show up in the client
25   carrier name.

Page 289

1                L. Craft
2            Now, it's not a 100%.  Yes, you
3    can find an exception where somebody went to
4    a benefits broker -- which is a TPA, not an
5    insurance company, a TPA -- and went out and
6    bought insurance for their clients and there
7    will be outliers like that.  But we start
8    with the fact that 88% are fully insured and
9    are -- generally, the insurer can have the
10   contracting relationship with the -- with
11   the PBM.
12           So what about the other 12%
13   that are self-funding their pharmaceutical
14   drug benefits?  For that 12% that are
15   self-funding, there's, of course, a higher
16   probability that they're hiring an
17   intermediary, whether there's an ASO or a
18   TPA, that they're hiring someone to manage
19   their benefit program.
20           So for those 12%, we have the
21   increased probability that what we're seeing
22   is the intermediary in the client/carrier
23   field.
24           Now, most commonly, that
25   intermediary is going to be an ASO, which is

73 (Pages 286 - 289)

Page 290

L. Craft

1    L. Craft
2    to say an insurance company that has two
3    lines of business, it sells insurance and it
4    sells administrative services.
5         So the ability -- and I'm not
6    going to go on and go on because I know you
7    heard this this morning -- because those
8    insurance companies have to segregate their
9    lines of business and can readily tell you
10   which accounts are which.
11        So that's why I would say that
12   this problem is one that is you peculiar to
13   employer and union plans, is really not a
14   major problem except when we get to
15   self-funded plans, which are about 12% of
16   those, and as a result, I would stand by my
17   statement here that the ultimate payor of
18   claims typically appears in the
19   client/carrier field.
20   Q.    Let's talk about the exception
21   in cases where the TPP has hired an ASO to
22   handle its PBM contracting.
23        I believe you said in that case
24   the TPA or the ASO's name is going to appear
25   in the client field; is that right?

Page 291

1         L. Craft
2         MR. STANOCH:  Objection to
3    form.
4         Asked and answered.
5         Mischaracterizes prior
6    testimony.
7         Go ahead.
8    A.    Yeah, it may.  Because remember
9    that there are self-funding suppliers, like
10   really big onces, that contract directly
11   with the PBM for services and they show
12   up -- if you look up American Express in the
13   client/carrier name, you're going to see
14   American Express.  So they're contracting
15   directly for the PBM services.
16        So just because a plan is
17   self-funding doesn't mean it's using an
18   intermediary to contract with the PBM.
19   Q.    And I understand, but I want to
20   talk about instances where there has been an
21   ASO or third-party administrator that has
22   been under contract.
23        Okay?
24   A.    Okay.
25   Q.    In that situation where there's

Page 292

1         L. Craft
2    a TPA who is actually under contract with
3    the PBM, it wouldn't be possible to look --
4    I'm just saying to look at the client field,
5    specifically, the client field -- and
6    determine who the end payor TPP is, right?
7         MR. STANOCH:  Objection to
8    form.
9         Asked and answered.
10        Mischaracterizes prior
11   testimony.
12        Incomplete hypothetical.
13        Go ahead.
14   A.    I wouldn't want to put on
15   blinders and look only at that one field.  I
16   would look at the other fields as well.
17   Q.    Of course.  We'll take them one
18   at a time certainly.  But I just want to
19   make sure with respect to the client field,
20   that's where the TPA is going to show up.
21   Right?
22        MR. STANOCH:  Same objections.
23   A.    If they are the contracting
24   entity with the PBM, then yes.
25   Q.    The next sentence here says "In

Page 293

1         L. Craft
2    some cases, descriptive fields in the PBM
3    data specifically identify either fully
4    insured or self-funded status."
5         What's this descriptive field
6    called?  You know, every field has a name.
7    What is this field called?
8    A.    So this variable or this value
9    that I'm describing here could appear in the
10   account field.  It could appear in the group
11   field.  In rare instances, it could even
12   appear in the client/carrier field.  There
13   are many ways that it may appear.
14        So it may -- for example, the
15   account may be described as fully or
16   insured, which means fully insured.  Either
17   of those means fully insured or full.  Or by
18   contrast, it may say ASO or it may say TPA.
19   It may say self, meaning self-funded.  The
20   practice with which that is recorded in the
21   account and group fields and client name
22   descriptions is -- I would be misleading you
23   if I said it was completely consistent
24   across TPAs -- I'm sorry -- across PBMs or
25   plans.  It varies.

74 (Pages 290 - 293)

Page 294

L. Craft

1
2       That's because that information
3  may not be particularly useful to the client
4  because the data is coming to them in a way
5  that they're going to segregate it for each
6  of their ASO or TPA clients.
7       But what I'm saying here is
8  that in some cases you already know because
9  the data is explicit.  You literally see the
10  descriptor in one of those fields.
11      Q.    How often is "some cases"?
12      A.    So it -- in my experience --
13  and it'll vary from one data set to another
14  and one PBM to another -- but in my
15  experience, you might see that value
16  populated 3% of the time, something like
17  that.  It could be less.
18      But I want to remind you that
19  that's of the total claims volume, right?  A
20  whole bunch of that, you would never have
21  that information because it's a health
22  exchange plan or it's a Medicare plan or
23  it's managed Medicaid and there's no
24  ambiguity.  They're fully insured.  There's
25  nothing to say about self or fully there.

Page 295

L. Craft

1
2       Q.    Let's go to paragraph 68 on
3  page 443 --
4       MR. DORNER:  We've been going
5  about an hour and a half.  Dave, I
6  think it'll be a good time to take five
7  here.  I'm going to see what I can
8  scratch from my notes.
9       MR. STANOCH:  Ms. Craft, are
10  you okay with that?
11      THE WITNESS:  Yes.
12      MR. STANOCH:  Let's do that.
13      THE VIDEOGRAPHER:  The time is
14  3:10.
15      We're going off the record.
16      (Recess taken)
17      THE VIDEOGRAPHER:  The time is
18  3:24.
19      This begins media unit six.
20      We're back on the record.
21      MR. DORNER:  I appreciate
22  everybody's indulgence on the
23  longer-than-intended break.  Thank you
24  very much.
25      Can we pull up Exhibit 4,

Page 296

L. Craft

1
2  paragraph 68?  I believe it's on page
3  59.
4       MR. STANOCH:  Tell me if you
5  find it.
6       Q.    All right.  So Ms. Craft, I
7  want to refer to the third sentence in this
8  paragraph.  It reads "The presence of an
9  additional intermediary does not change or
10  obscure the identity of the self-funded TPP,
11  which remains fully liable for claims and
12  whose name typically appears in PBM data
13  alongside the ASO or TPA."
14      My first question with respect
15  to this sentence is what do you mean by
16  "does not obscure the identity"?
17      A.    What I mean is what's stated in
18  the balance of that sentence, that when you
19  have an ASO or a TPA, it's quite common for
20  the name of the plan sponsor to sit right
21  next to it in the account name.  Sometimes
22  in the group name, but more commonly in the
23  account name.
24      So when we have both the ASO
25  named and the self-funding plan sponsor

Page 297

L. Craft

1
2  named, in my opinion, you have not obscured
3  the identity of the self-funding plan
4  sponsor.  You've merely moved it to a
5  different field.
6       Q.    Okay.
7       So these would be in -- I guess
8  if not in the client field, then you're
9  saying it would be in the account or the
10  group; is that right?
11      A.    Frequently so.  I'm not saying
12  invariably, but frequently so.
13      Q.    How frequently?
14      A.    I can't give you a precise
15  number, but it is quite common when you see
16  ASO and TPAs to see the self-funding plan
17  sponsor identified in one or the other of
18  those fields.  So we see both names in
19  parallel.
20      Q.    I want to make sure -- when we
21  were talking during the last session, we
22  were sort of limiting our discussion to
23  situations where there's a self-funded TPP
24  who has contracted with an ASO.  We're still
25  in that world for purposes of this

75 (Pages 294 - 297)

Page 298

L. Craft

1
2  discussion in paragraph 68, right?
3      A.    Yes.  I'm still thinking about
4  that same structure.
5      Q.    Okay.
6          So you've said it's quite
7  common and frequent.  Do you think it's --
8  is it more than 50% of the time that you'll
9  get these two -- both the identity of the
10  TPP and its ASO in the two different fields?
11      MR. STANOCH:  Objection to
12  form.
13          Asked and answered.
14      A.    I hesitate because sometimes
15  instead what you get in the account field is
16  contract numbers for the ASO contracts.  So
17  for example, contract blank, contract blank
18  for the ASO relationships.  So you may not
19  actually see the name printed out there in
20  that field.  Of course that means the
21  contract number is linking to the specific
22  TPP, but you may not see the full narrative
23  description or name.
24      Q.    Okay.
25          So I guess -- in your

Page 299

L. Craft

1
2  experience, can you approximate how often
3  you see the TPP and its name alongside the
4  ASO or the TPA with whom it is contracted?
5      MR. STANOCH:  Objection to
6  form.
7          Asked and answered.
8          Compound.
9          Misstates testimony.
10      A.    I haven't tried to do that
11  estimation.  It's something I could do,
12  looking at a large swath of PBM data, but
13  it's not something I've attempted to
14  calculate.
15      Q.    In this case, there's not a
16  large swath of PBM data to look at and
17  analyze, right?
18      MR. STANOCH:  Objection to
19  form.
20      A.    Not produced in this case at
21  this point in time.
22      Q.    I believe you said according to
23  paragraph 68, you would typically find the
24  name of the TPA or the ASO in the account
25  field if it were there?

Page 300

L. Craft

1
2      A.    No.
3      Q.    Okay.
4      A.    You're asking the name of the
5  TPA or the ASO and what I'm saying is that
6  the name of the TPA or ASO is likely to
7  appear in the client/carrier field.  If they
8  were the entity that contracted with the
9  PBM, then that's where that name would
10  appear.
11          On the contrary, it's their
12  client, the self-funding plan sponsor, so,
13  you know, union local whatever that appears
14  in the account field.
15      Q.    Okay.
16          So I flipped them?
17      A.    Yes.
18      Q.    It's possible in the PBM claims
19  data the self-funded TPP wouldn't appear at
20  all?  The only entity to appear would be
21  either the ASO or the third-party
22  administrator; isn't that right?
23      MR. STANOCH:  Objection to
24  form.
25          Calls for speculation.

Page 301

L. Craft

1
2          Lacks foundation.
3          Go ahead.
4      A.    Yes, it is possible for that to
5  happen.
6      Q.    You've seen that instance in
7  PBM claims data in the past?
8      A.    Rarely, but yes.
9      Q.    Well, how rarely?
10      A.    I just gave you a description a
11  moment ago of -- and I told you that I
12  couldn't quantify this -- but I gave you a
13  description where the ASO insurance company
14  appears in the client name field and then in
15  the account field, instead of the name of
16  the particular clients that they are
17  self-funding claim sponsors they're working
18  for, they have references to contract
19  numbers that represent those clients, but
20  without the name appearing in the data.  I
21  believe I just explained that.
22      Q.    I asked because -- I guess I'm
23  just trying to quantify how often we might
24  find ourselves in this situation.
25          If there are a million

76 (Pages 298 - 301)

Page 302

L. Craft

1        L. Craft
2  prescriptions for VCDs written and 1% of the
3  time -- let me back up.
4            If there are a million
5  prescriptions for VCDs that were covered by
6  self-insured TPPs who have contracted with
7  the TPA and ASO and even 1% of the time the
8  TPP's name doesn't appear in the claims
9  data, that would be 10,000 instances where
10  we don't know who the TPP is based on the
11  claims data, right?
12            MR. STANOCH:  Objection to
13    form.
14            Incomplete hypothetical.
15            Speculative.
16            Lacks foundation.
17            Compound.
18            Go ahead if you could answer.
19    A.    So the correct level of
20  aggregation to look at this for TPP claims
21  is at the plan level, so the payor level.
22  We don't care how many prescriptions.  It
23  doesn't matter if it's six or if it's 100.
24  The data is going to be consistently
25  presented for those prescriptions that are

Page 303

1        L. Craft
2  being processed for and reimbursed by that
3  particular TPP.
4            So your numbers are not
5  anywhere near the reality of what's
6  important here.  So if we said, for example,
7  that we think they're going to be 12,000
8  plans represent -- recognizing that a lot of
9  those are going the same payor.  Right?
10  There's, you know, the Aetna this plan and
11  the Aetna that plan and there are different
12  plans, but they're the same client name and
13  payor.
14            What we're talking about here
15  is a very small percent of the total TPP
16  records, i.e. payor records, that would be
17  subject to this confusion and that is true
18  for the reasons I previously explained that
19  we don't have this ambiguity with this -- we
20  typically only have this ambiguity with the
21  employer and union claims.  Most of those
22  are fully insured, not a self-funded TPP.
23  So only 12% of those claims are self-funded
24  and so it's a very small bite out of the
25  total TPP population where this ambiguity

Page 304

1        L. Craft
2  exists, just facially based upon the PBM
3  data.
4            Then that ambiguity can be
5  resolved by either getting the PBM to flag,
6  which are ASO/TPA relationships, or by
7  simply going directly to the -- what we know
8  are the ASOs and TPAs out there and saying
9  I've got this plan, this plan and this plan,
10  which of these are for self-funded plan
11  sponsors and by the way, give me the name of
12  the self-funded plan sponsor.
13            I mean, nobody -- nobody --
14  disputes the basic fact that every single
15  one of the ASO/TPA relationships generates
16  data that can be and is decomposed into
17  individual payor bills every month.  That
18  stuff is getting spun around and billed out
19  to the TPPs every single month and nobody
20  denies that that system works, that that
21  system is supported by data that makes it
22  possible to make that segregation and to
23  generate those invoices and to direct them
24  to the ultimate TPP reliably and rapidly in
25  a form that can be audited.

Page 305

1        L. Craft
2            So your questions go to can I
3  always see the identity of that TPP, the
4  self-funding plan sponsor in just the PBM
5  data.  What I'm saying to is you no, not
6  always.  Generally, you're going to have the
7  TPP payor.  It's going to be a small percent
8  where you don't.  But where you don't,
9  believe you me those records exist.  It's
10  not like anybody is guessing.  It's not like
11  you have to read contracts or subjectively
12  interpret facts.  You just would have a
13  second step in data gathering.  That's all.
14    Q.    You mentioned that this billing
15  happens every month and is auditable and all
16  of that.  But the billing to the TPP in the
17  case of a TPA or an ASO arrangement, the PBM
18  is not billing the third-party payor in that
19  instance.  It's the TPP or the ASO that is
20  getting reimbursed from the third-party
21  payor, right?
22    A.    Yes.  That's why I've
23  repeatedly explained that the data that the
24  ASO or TPA receives from the PBM needs to be
25  sufficient for them to programmatically,

77 (Pages 302 - 305)

Page 306

1          L. Craft
2    electronically, automatically bill each of
3    their underlying TPP clients.  I just -- I'm
4    saying this issue only arises when the PBM
5    data doesn't make the relationship explicit.
6    I'm saying in those cases, rather than
7    throwing up our hands and saying "I guess
8    we'll just never know," you have an
9    objectively verifiable relationship that
10   exists in the electronic data of that ASO or
11   TPA and that --
12       Q.    Sorry.  Go ahead.
13       A.    -- and that specifically and
14   automatically segregates the claims and
15   routes them to the ultimate TPP.
16          I just -- I do not want to get
17   lost on this point that the game's up if you
18   can't see the relationship explicitly in the
19   PBM data.  I never said you should refuse to
20   look at anything but PBM data.
21          If you really think that the
22   legal standard is it isn't good enough that
23   the defendants know every single vial of
24   drug that was purchased and every pill from
25   every pharmacy on every day, if you really

Page 307

1          L. Craft
2    think that the ability to defend against and
3    to sustain the class requires that you
4    assemble the actual name of the TPP where
5    there's an ASO or TPA relationship, what I'm
6    telling you is that's a secondary round of
7    information gathering, but it is absolutely
8    objectively determinable and could be done.
9        Q.    Now, I guess I want to go back
10   to your answer that you just gave.
11          You said that the data that the
12   PBM -- and I'm paraphrasing here -- the data
13   that the PBM transmits to the TPA or ASO, so
14   that way they can do their billing, it's
15   apparent to the TPP or the ASO who the
16   third-party payor is, right?  Obviously,
17   that's who they're billing.
18          Let me strike all this and work
19   my way through this question again.
20   Disregard all that.
21          In the case of a self-insured
22   plan that's retained a third-party
23   administrator or an ASO provider, for
24   purposes of -- for the PBM's purposes of
25   getting reimbursed from the TPA or the ASO,

Page 308

1          L. Craft
2    it need only know who the TPA or the ASO is,
3    correct?
4          MR. STANOCH:  Objection to
5    form.
6          Asked and answered.
7          Incomplete hypothetical.
8          Compound.
9          Ambiguous.
10       A.    Well, to send out the bill,
11   that might be true, but it's also true that
12   that PBM is not going to get hired unless it
13   can provide the data to the ASO or TPA who
14   retains it in a form that the ASO or TPA can
15   then turn around and use for billing.  So in
16   some cases, that may mean contracts with
17   names on them.  In some cases, it may mean
18   tell me the name of my particular ASO
19   client -- self-funding plan sponsor -- in
20   the account field or the group field.  There
21   are a variety of ways this can be done.
22          I'm merely saying that if the
23   PBM data ends up not being sufficient to
24   resolve the identity of the self-funding
25   plan sponsor in all cases, there's no rule

Page 309

1          L. Craft
2    that says you can't then ask that client
3    carrier who is acting as an ASO to identify
4    its underlying clients.
5        Q.    Okay.  All right.
6          Now, when we have a scenario
7    where an ASO has contracted with another
8    ASO.  What is your contention as to how that
9    appears in the additional data fields?
10          MR. STANOCH:  Objection to
11   form.
12          Speculative.
13          Lacks foundation.
14          Incomplete hypothetical.
15          Vague.
16          Go ahead if you can.
17       A.    Can you tell me what ASO number
18   one is contracting with ASO number two to
19   do?  Because, as I mentioned this morning,
20   there's a whole range of responsibilities
21   that first-in, first-out and in many cases,
22   those responsibilities are utterly
23   irrelevant to this question, so --
24       Q.    Sure.  Let's assume the
25   agreement is for claims adjudication.

78 (Pages 306 - 309)

Page 310

```
 1              L. Craft
 2         MR. STANOCH:  Same objections.
 3    A.    Uh-huh.  So --
 4    Q.    Yes.
 5    A.    An ASO contracts with another
 6  ASO to contract for claims adjudication?
 7    Q.    Yes.
 8    A.    I'm not familiar with a
 9  contract structure of that type or a
10  business relationship structure of that
11  type.
12    Q.    Okay.
13    A.    Can you point me to real-world
14  examples of that because that's --
15    Q.    I'm not professing to be an
16  expert in those sorts of relationships, so
17  let me ask it another way.
18         Let's say an ASO -- let's do
19  TPA.
20         A TPA has contracted with
21  another TPA who has, in turn, contracted
22  with the third-party payor.  The TPA, as
23  part of their contractual arrangement,
24  involves reimbursement from one third-party
25  administrator to the next, which then goes
```

Page 311

```
 1              L. Craft
 2  to the PBM.
 3         In that instance, how would
 4  these -- what would the client and
 5  accounting group field say with respect to
 6  the identities of the TPAs and the TPP?
 7         MR. STANOCH:  Objection to
 8    form.
 9         Incomplete hypothetical.
10         Lacks foundation.
11         Speculative.
12         Ambiguous.
13         Borderline unintelligible.
14         But go ahead, Ms. Craft.
15    A.    I'm trying to think of a
16  scenario that might actually happen that
17  would be analogous to what you're describing
18  and I'm using my imagination here because
19  this is not a structure that I'm familiar
20  with seeing, but it could, in theory, happen
21  that you would hire a benefit administrator
22  and advisor who would go out and -- so, for
23  example, a broker, which I think is the
24  example that Mr. Kosty uses in his report.
25  He says oh, you could hire a broker and then
```

Page 312

```
 1              L. Craft
 2  the broker might show up in there.
 3         Maybe then I'm thinking that
 4  your example might be an attempt to describe
 5  a relationship where that broker or benefit
 6  advisor then says hey, you should really
 7  self-fund your plans and so I'm going to
 8  advise you to contract with Blue Shield of
 9  Louisiana as your ASO and I'm going to bring
10  a bunch of clients to Blue Shield of
11  Louisiana in an ASO capacity and Blue Shield
12  of Louisiana is going to handle all your
13  business for all of you and it's going to be
14  a great deal.  So you're going to pay your
15  own claims, but we're going to use Blue
16  Shield of Louisiana.
17         In that situation, it's far
18  more likely that Blue Shield of Louisiana is
19  going to use Express Scripts, which it likes
20  to use for all of its business, than that
21  it's going to say "Hey, benefit advisor,
22  broker, coach on human relations benefits in
23  the office place, you go out and contract
24  with the PBM."  That's far less likely.
25         So I'm wondering if that is the
```

Page 313

```
 1              L. Craft
 2  kind of scenario -- I saw nothing that I
 3  could identify -- that I could clearly
 4  understand in Mr. Kosty's report about this
 5  speculation of layering of intermediaries on
 6  top of each other, so I have a little
 7  difficulty responding to it and determining
 8  whether it presents any actual real world
 9  complications or not or whether you have
10  your ASO, who is handling all your claims,
11  contracting with your PBM and then we're
12  back to go.
13    Q.    In paragraph 68, you say that
14  PBMs should be expected to know what their
15  client's contractual arrangements are.
16         What are you offering to actual
17  support that statement?
18         MR. STANOCH:  Objection to
19    form.
20         Go ahead.
21    A.    That there are multiple reasons
22  for wanting to know whether the contracting
23  entity is acting in a representative
24  capacity or is the actual payor.
25         The first thing is that if
```

79 (Pages 310 - 313)

Page 314

L. Craft

1 they're the actual payor, you're going to
2 care a whole lot more about their financial
3 wherewithal because they're the one and only
4 source of payment for the amounts that the
5 PBM is going to be delivering to the
6 pharmacies and Mr. Kosty gives this the back
7 of his hand by saying yeah, but sometimes
8 they set up an escrow and so nobody worries
9 because you know the money is there because
10 it's escrowed.
11        The reason they set up an
12 escrow is because they're concerned that the
13 payment flow may not be timely without the
14 escrow. So PBMs make decisions about credit
15 risk by knowing who is responsible to pay
16 them. When they're talking about a big
17 insurance company that is -- is doing both
18 ASO business and fully insured business, the
19 client itself is going to ultimately need to
20 have the data structured and set up so that
21 it can bill to two, four, 100 different
22 clients.
23        So the idea that the PBM would
24 be blind to that and would not be party to

*(line numbers 1–24 shown; see below)*

Page 315

L. Craft

1 setting up the data so that it can be used
2 in that way is, to me, incongruous.
3    Q.    But isn't there a different --
4 the PBM can have its data set up in a
5 certain way so as to allow an ASO or a TPA
6 to bill its clients, but that doesn't mean
7 that the PBM itself is going to know who the
8 TPA and ASO's clients are; isn't that right?
9        MR. STANOCH: Objection.
10   Q.    Let me preface my question --
11 let me withdraw me question and re-ask it in
12 one -- with one modification.
13        So the PBM can have its data
14 set up in a certain way so as to allow an
15 ASO or a TPA to bill its clients, but that
16 doesn't mean in all instances that the PBM
17 itself is going to know who the TPA or the
18 ASO's clients are; isn't that true?
19        MR. STANOCH: Objection to
20 form.
21        Incomplete hypothetical.
22        Vague.
23   A.    Sure, Mr. Dorner, it's possible
24 that there's some instances where a PBM is

Page 316

L. Craft

1 not privy to the underlying payor identity.
2 I don't think that is what I said here.
3        The sentence that you were
4 pointing me to is the following. On page
5 45, in paragraph 68, I say "However, PBM's
6 shouldn't be expected to know that capacity
7 in which their clients are contracting,
8 whether on behalf of themselves or as an ASO
9 TPA for a self-funding TPP."
10        I did not say, as your most
11 recent question seems to imply, that the PBM
12 would necessarily need the names of each of
13 those ASO clients in order to do its work.
14   Q.    Now, it's true that TPAs, at
15 least in some cases, are incentivized not to
16 provide their clients' identities to the
17 PBM, so that would the PBM can't go around the
18 TPA as the middleman and market its business
19 services directly to the TPP; isn't that
20 right?
21        MR. STANOCH: Objection to
22 form.
23   A.    Well, I certainly saw that
24 Mr. Kosty said that. I have not seen that

Page 317

L. Craft

1 in operation, but it's a plausible theory
2 that there might be reasons why an ASO of a
3 large insurance company, for example,
4 doesn't want to necessarily name all of its
5 ASO clients. There wasn't an illogical
6 proposition on Mr. Kosty's part. I've not
7 seen that dynamic at work, so I certainly
8 can't confirm that.
9    Q.    Right.
10        But then again, you haven't
11 worked for a PBM before; is that true?
12   A.    That is true.
13   Q.    You have never worked for an
14 insurance company, whether in a fully
15 insured or ASO role, correct?
16   A.    That's true.
17   Q.    You've never worked for a --
18 let me check my -- you've never worked for a
19 third-party administrator?
20   A.    That's also true.
21        You skipped retail pharmacy. I
22 also haven't worked for a retail pharmacy.
23   Q.    I have a feeling, Ms. Craft,
24 you've been asked these questions before.

80 (Pages 314 - 317)

Page 318

L. Craft

1
2   All right.  I appreciate your candor.
3       So Ms. Craft, we've testified
4   quite a bit about what can be done, what
5   data sources are out there.
6       Have you ever actually
7   identified class members in a medical
8   monitoring -- I want to focus on medical
9   monitoring right now.
10      Have you ever actually
11  identified class members in a medical
12  monitoring case based on the level of their
13  alleged lifetime cumulative exposure to a
14  pharmaceutical impurity?
15          MR. STANOCH:  Objection.
16          Asked and answered.
17          Vague.
18          Go ahead.
19  A.      I have never worked on a
20  medical monitoring class.  As I explained to
21  you earlier, the procedure is very similar
22  to what I have done in other cases, which is
23  to say to compile the historical record of
24  prescriptions for individual members and
25  track those over time, which I understand to

Page 319

L. Craft

1
2   be the mechanism proposed to be used here
3   for qualifying in the medical monitoring
4   class.
5   Q.      And that was in the antitrust
6   suit I believe you said, right?
7   A.      Yes.
8   Q.      Have you ever actually
9   identified class members in a consumer
10  economic loss class action involving
11  pharmaceutical products?
12          MR. STANOCH:  Objection to
13      form.
14          And I just caution you about
15      potential privilege consulting
16      protective orders.
17  A.      Well, you've asked if I've
18  identified consumers in an economic loss
19  claim.  I don't know what you call an
20  economic loss claim, but I think that
21  overcharge cases are economic loss claims in
22  the antitrust forum.
23          What do you mean by economic
24  loss claim?
25  Q.      Sure.  I guess that's a fair

Page 320

L. Craft

1
2   question, so let me clarify mine.
3       In a case that's seeking
4   monetary damages for the payment associated
5   with a prescription drug, have you ever
6   actually carried the methodology you propose
7   in your report through to produce a list of
8   class members with exclusions applied?
9       Let me back up.
10      Even with class members.
11  Forget about exclusion.
12          MR. STANOCH:  Objection to
13      form.
14          Hopelessly convoluted.
15          Go ahead, if you could try.
16  A.      As I think I testified a couple
17  times today, I have never reached the point
18  in a case in which I've been engaged where
19  it was necessary to compile a final list.
20  Some courts say that's an utter and complete
21  waste of time.  It's not a necessary process
22  at all and what the court wants to know is
23  the feasibility of doing so.  I have not had
24  a case where, for example, all of the, say,
25  top six PBMs have produced their data in a

Page 321

L. Craft

1
2   single piece of litigation.
3       So if what you mean when you
4   ask have I ever prepared a list, I mean,
5   I've certainly counted consumers in
6   subgroups of classes involving payments for
7   prescription drugs, but I think you're
8   asking the bigger question:  Did you ever
9   come up with a complete list of consumers
10  and TPPs in a case that involved a claim for
11  money damages and the answer is I've never
12  been required to finalize that process
13  because it's never been found by a court to
14  be necessary.
15          MR. DORNER:  What I'd like to
16      do is check with other counsel who are
17      listening to see if they'd like to take
18      a break to prepare any questions,
19      rather than -- or just go straight into
20      them.
21          So I guess I'll ask any
22      co-counsel right now would you like to
23      take a quick five to assemble your
24      thoughts or if you have questions --
25          MS. ANDRAS:  I could definitely

81 (Pages 318 - 321)

Page 322

L. Craft

1     use about five minutes.
2          MR. DORNER:  Okay.  All right.
3     Dave, I think I wrapped up my
4     primary examination here, so let's take
5     a quick five and let any other
6     co-counsel get organized and we'll go
7     back on for the last little bit here.
8          THE VIDEOGRAPHER:  Time is
9     3:58.
10         We're going off the record.
11         (Recess taken)
12         THE VIDEOGRAPHER:  The time is
13    4:06.
14         We are back on the record.
15    EXAMINATION BY
16    MS. ANDRAS:
17         Q.    Hi, Ms. Craft.  My name is
18    Tiffany Andras.  I represent Teva
19    Pharmaceuticals in this case.  I have a few
20    questions -- a couple minutes -- to ask you
21    today.
22         Earlier, you testified that
23    your opinions in this case referred to
24    ascertainability and numerosity.

Page 323

L. Craft

1          Is that correct?
2          MR. STANOCH:  Objection to
3     form.
4          Misstates previous testimony.
5          Go ahead.
6          A.    They do pertain to
7     ascertainability and numerosity.  Yes,
8     there's more to them.
9          That was the long colloquy
10    between myself and Mr. Dorner about the
11    specific opinions being, I think, related to
12    ascertainability.  But -- so yeah, it's
13    connected to ascertainability and
14    numerosity.
15         Q.    You're not offering an opinion
16    here on the appropriate measure of damages
17    for the legal claims that are being pursued
18    by the plaintiffs in this case, right?
19         A.    I am not.
20         Q.    So it is not your opinion that
21    the amounts paid by potential class members
22    are the proper measures of damages for
23    economic loss in this case?
24         MR. STANOCH:  Objection to

Page 324

L. Craft

1     form.
2          Outside the scope.
3          A.    Yes, I've not been asked to
4     form any opinion about what the proper
5     measure of damages is and I'm expressing no
6     such opinion.
7          Q.    You're not offering an opinion
8     that economic damages can be proven on a
9     class wide basis, are you?
10         MR. STANOCH:  Objection to form
11    to the extent that it touches on the
12    aspects of her report.
13         Go ahead, Ms. Craft.
14         A.    To the extent that that opinion
15    involves the question is there data showing
16    how much consumers and TPPs paid for these
17    products that are challenged during the
18    class period, I am definitely offering an
19    opinion that that data exists.  That's
20    fundamental to my ascertainability opinions.
21         So whether that's the right
22    calculus for damages, I express no opinion,
23    but I am definitely telling you that that
24    data exists to -- if out-of-pocket payments

Page 325

L. Craft

1     is the right measure, they are recorded in
2     the data.
3          Q.    You're not offering an opinion
4     that if there's a different measure of
5     damages applied that is not the
6     out-of-pocket amount for a class member,
7     your opinion is not that those damages
8     figures would be included in the available
9     data?
10         MR. STANOCH:  Objection.
11         Ambiguous.
12         Outside the scope.
13         Incomplete hypothetical.
14         Go ahead, Ms. Craft, if you
15    can.
16         A.    I can't answer that without
17    knowing what the alternative measure would
18    be.
19         Q.    As you sit here today, your
20    opinion and the work that you've done in
21    this case, you have not done an analysis
22    that would account for any alternative
23    measures of economic damages other than
24    amounts paid by potential class members,

82 (Pages 322 - 325)

Page 326

L. Craft

1    L. Craft
2    correct?
3        MR. STANOCH:  Objection to
4    form.
5        Go ahead.
6    A.    That's true.  I would agree
7    with that, Ms. Andras.
8    Q.    Earlier, Drew I think asked you
9    to define the word "programmatic" as you've
10   been using it to describe your
11   methodologies.
12       I believe your testimony was
13   that it was something that's executed
14   through software programming.
15       Is that an accurate description
16   of your testimony?
17       MR. STANOCH:  Objection.
18   A.    That's what I recall having
19   said.
20   Q.    Is there anything proprietary
21   about any of the services or software
22   programming that is offered by On Point?
23       MR. STANOCH:  Objection to
24   form.
25       Ambiguous.

Page 327

L. Craft

1    L. Craft
2        MS. ANDRAS:  I'll ask it a
3    different way.
4    Q.    Does On Point Analytics use any
5    proprietary software programming to conduct
6    its analysis?
7        MR. STANOCH:  Objection to
8    form.
9        Ambiguous.
10       Go ahead.
11   A.    We use standard software
12   packages, most typically Status, sometimes
13   Sass.  We run our work on standard
14   software -- statistical software packages so
15   that we can show that work and communicate
16   that work in our expert reports and so that
17   it can be vetted by opposing experts.
18   Q.    Okay.
19       So there's no proprietary
20   software that On Point necessarily uses to
21   perform its calculations when it's engaged
22   in litigation services like this?
23       MR. STANOCH:  Objection to
24   form.
25   A.    Well, certainly not in this

Page 328

L. Craft

1    L. Craft
2    case and not in cases like this.  I have --
3    I may have used proprietary software in a
4    few instances I could think of, but they're
5    absolutely not germane to this situation.
6    Q.    I want to talk about the
7    medical monitoring class.
8        In your report, you talk about
9    constructing a consumption record for
10   individual class members based on the
11   pharmacy data.
12       Is that right?
13       MR. STANOCH:  Objection to
14   form.
15       Asked and answered.
16       Go ahead.
17   A.    Actually, I talk about that
18   both for the pharmacy data and the PBM data.
19   Q.    Okay.
20       We can collectively refer to
21   that as the claims data for purposes of
22   these questions.
23       Is that fair?
24   A.    Sure.
25   Q.    There are various minimum

Page 329

L. Craft

1    L. Craft
2    criteria that plaintiffs have proposed for
3    inclusion in the medical monitoring class
4    based on dosage, length of time of
5    consumption and manufacturer of the API.
6        Is that your understanding?
7        MR. STANOCH:  Objection to
8    form.
9        Misstates the report.
10       Facts.
11       Go ahead.
12   A.    When you say length of time of
13   consumption, what do you mean?
14       MS. ANDRAS:  Well, can we pull
15   up the document that was marked as the
16   last exhibit?  I think it's Exhibit M
17   in the public share folder.
18       MR. DORNER:  This is Drew
19   Dorner.
20       That's going to be Exhibit 7 as
21   it was marked if you're referring to
22   the class definitions, Tiffany.
23       MS. ANDRAS:  Yes, class
24   definitions.  It's on page 69 of
25   Exhibit 7.

83 (Pages 326 - 329)

Page 330

L. Craft

1
2       THE VIDEOGRAPHER:  PDF page 69?
3       MS. ANDRAS:  Yes.  Okay.
4       If you could scroll down a
5   little bit, so we could get the last
6   paragraph -- there we go.
7       Q.    All right.  Ms. Craft, do you
8   see where the paragraph here -- last
9   paragraph on page one of what we're looking
10  at going to -- through the next page that
11  has the thresholds for inclusion in the
12  medical monitoring class?
13      A.    I do and none of them refer to
14  a duration of time.  They refer to
15  quantities.  So taking 64 months or taking
16  32 months of a product doesn't mean taking
17  it over 32 months, as I understand it, or
18  over 64 months.
19      The factor is -- the criteria
20  is how much of the product is consumed by
21  the consumer.  Right?  Not the duration over
22  which they took it.  This is -- when we talk
23  about 64 months, we're talking here about
24  quantities.  So 30 days is a month supply.
25  That's how I interpreted this at any rate.

Page 331

L. Craft

1
2       Q.    Okay.
3       A.    So, for example, I could take
4   six months of the product in 2014, take
5   another six months in 2016 and take another
6   six months in 2018 and that would be 18
7   months, even though that's not the duration
8   over which those pills are taken.
9       Q.    Right.  Sorry.  I guess I did
10  not mean to ask about consecutive
11  consumption, if that's what you were
12  interpreting my -- where I was going with
13  that.  I don't think it's any matter.
14      Do you agree that some class
15  members may have taken particular
16  manufacturers' product for periods of time
17  that are less than the quantities for these
18  minimum thresholds put forth for lifetime
19  cumulative threshold?
20      MR. STANOCH:  Objection to
21  form.
22      They are class members if they
23  did this, so if they didn't do --
24  objection to form.
25      A.    Yes, I imagine that there will

Page 332

L. Craft

1
2   be some consumers who bought the challenged
3   products but did not purchase sufficient
4   quantities of them in the class period to
5   qualify in accordance with this definition.
6       Q.    Well, my question was a little
7   bit different.  It was specific to different
8   manufacturers.
9       So do you agree that an
10  individual class member may have taken
11  valsartan that was manufactured by different
12  defendants?
13      A.    Yes, that is possible.
14      Q.    You agree that also that
15  individual class member may have taken
16  valsartan at different dosages?
17      A.    Yes.
18      Q.    So accordingly, if you're going
19  to construct a consumption record, that
20  would require an analysis of potentially
21  multiple NDCs, including the quantities
22  fills for those NDCs, to establish whether
23  they meet these criteria.
24      Correct?
25      MR. STANOCH:  Objection to

Page 333

L. Craft

1
2   form.
3       Misstates class definition.
4       Misstates testimony and
5   opinions.
6       Go ahead.
7       A.    Yes, but all of those data
8   elements are present.  We always have in the
9   data not only the label name of the drug,
10  but we have its dosage strength and we have
11  the days of supply that are being purchased.
12  So the fact that -- if your point is that
13  somebody might have taken less than the
14  requisite supply, yes, that is a
15  possibility.
16      If someone may have switched
17  products and taken one or the other at
18  different periods of time, that is also
19  possible.  But the fact that we need to look
20  at the dosage and days of supply is not in
21  any way problematic.  That's automatically
22  present in the data.
23      Q.    Okay.
24      Just to break that down a
25  little bit, I want to be a little more

84 (Pages 330 - 333)

Page 334

1    L. Craft
2  specific about the data that you're talking
3  about, that you need to determine if an
4  individual met the criteria.
5        So we need the NDCs numbers,
6  correct?
7    A.    Yes.
8    Q.    We need the quantity that was
9  filled for each NDC number, right?
10   A.    That's right.
11   Q.    And we need either the name of
12 the individual or a unique identifier that
13 could be used to isolate that individual's
14 consumption record, right?
15   A.    Yes.
16   Q.    And that data is present in the
17 information that you've reviewed that's been
18 produced in this litigation, correct?
19   A.    Yes. We have the
20 identification number but not the name, the
21 consumers. And we have one entity, one
22 retailer who didn't produce the
23 identification names, numbers either. But
24 they are present, so yes, your description
25 is correct.

Page 335

1    L. Craft
2    Q.    At least for the MSP data, that
3  claims data did include names of individual
4  insureds, right?
5    A.    Yes, it did.
6    Q.    Okay.
7        So I want to walk through an
8  example with you of a hypothetical class
9  member.
10       So looking at the amounts and
11 keeping those in mind here with the relative
12 LCT thresholds that plaintiffs have put
13 forward, if there was a consumer who started
14 taking seven months -- they started taking
15 valsartan -- seven months of ZHP's 40
16 milligram valsartan product, but then her
17 physician increases her dosage to
18 80 milligrams for six months and let's say
19 half of those fills are from Mylan and half
20 are from Aurobindo, which correspond to
21 different lengths of usage, according to
22 this threshold formula, Plaintiff's Exhibit
23 4, how do you construct that consumption
24 record in a systematic way to determine
25 whether that individual meets the threshold

Page 336

1    L. Craft
2  for inclusion in the class?
3        MR. STANOCH: Objection to
4    form.
5        Incomplete hypothetical.
6        Foundation.
7        Go ahead if you can.
8    A.    So the first thing you do is
9  you schedule all those purchases for the
10 consumer, which is -- by schedule, I mean
11 this as a simple programmatic exercise.
12 We've linked the records for the consumer.
13 So then we know that we've got X number of
14 months of one product, X number of another.
15 You would -- for the hypothetical I believe
16 that you just described, you would need to
17 know who the API manufacturer was. So you
18 would need to append the API manufacturer
19 identity to those records, which you can use
20 by walking backwards to the NDC.
21       So we've added one field to
22 what's already there, which is who the
23 manufacturer is. Then we've got our total
24 schedule of how many months of each at each
25 dosage the consumer has consumed. And I

Page 337

1    L. Craft
2  wasn't able - I apologize -- to clearly
3  track your example against these four sets
4  of alternatives.
5        So I have the sense that you're
6  asking what if they don't qualify within any
7  of these four examples individually, but
8  they've got half of example D and half of
9  example B or something of that sort. Is
10 that what you're asking?
11   Q.    Correct.
12       How would you in a systematic
13 way determine whether that person met the
14 cumulative threshold. I consider myself
15 pretty good at Excel -- I was a former
16 financial analyst -- and I couldn't come up
17 with a good methodology of doing this. So
18 I'm curious to see what your proposed
19 methodology would be for the specific
20 examples in terms of formula and things like
21 that. Very specific.
22       MR. STANOCH: Objection to
23    form -- objection to form to the
24    colloquy with the question and the
25    incomplete hypothetical.

85 (Pages 334 - 337)

L. Craft

1    Ambiguous.
2    Go ahead, Ms. Craft.
3    A.    Well, so I mean you can just
4    literal apply these rules.  Right?  So let's
5    just look at A.  At a dose of
6    320 milligrams, the class member needs to
7    have taken a combination of three months of
8    ZHP API or 18 months of Hetero API or 54
9    months of Mylan or Aurobindo API.
10       So if I literally apply that
11   rule, I only look at dosages of
12   320 milligrams.  So I look at the consumer's
13   purchases and I say which of these are
14   320 milligrams and I then look to see
15   whether we've got at least three months
16   where the API on those 320 milligram dosages
17   was ZHP or whether we've got 18 months where
18   there was Hetero API or whether there was 54
19   months of Mylan and/or Aurobindo API.
20       So now we've treated all of the
21   options for qualification under subpart A.
22   Using the data that I just described that
23   gives us the number of days supply for each
24   purchase at a particular dosage strength,

*(Note: lines 1–24 shown above; line numbers 1–25 run down the margin)*

L. Craft

1    appended with the identity of the API
2    manufacturer, you can flag each one of the
3    months of therapy that was purchased.  So
4    for every month, it is going to be
5    classified in one of those categories or is
6    not falling within one of these categories.
7        So I'm not -- if I just look at
8    example A here, I'm not sure what the
9    complexity is.  Every month is classified
10   based on its -- every month of treatment is
11   classified based upon who made the API in
12   this case -- right? -- and what the dosage
13   strength was.  So I've got two variables.
14   Was the API made by ZHP or Aurobindo and
15   then I'm simply summing up the months of
16   that therapy, so -- then I go on to B.  If I
17   didn't make it with A, now I'm going to look
18   at the number of months that a given
19   consumer had 160 milligram dose --
20   Q.    Can I interrupt you right
21   there, Ms. Craft?
22       It's this step in the equation
23   that I'm really wanting to know more
24   specifically about, is how on a massive

L. Craft

1    scale -- hundreds of thousands of claims on
2    prescription fills -- how are you going to
3    determine this on a mass scale -- if we're
4    looking at an individual consumer's record,
5    it is pretty complicated anyway to figure it
6    out, but, you know, you could do it after
7    some work.  We have all done it for the
8    medical monitoring for plaintiffs here and
9    it took some work.
10       How do you take it from that
11   individual level analysis and blow it out on
12   a systematic claims data with hundreds of
13   thousands of lines of code and, you know, 50
14   of them could be towards one plaintiff
15   alone?  What is that step and how does that
16   translate?
17       MR. STANOCH:  Objection to
18   form.
19       Incomplete hypothetical.
20       Compound.
21       Vague.
22       Ambiguous.
23       I think I heard a concession of
24   numerosity in my mind, but go ahead,

L. Craft

1    Ms. Craft.
2    A.    So the truth is that that is a
3    really hard exercise if you sit there and
4    read individual claim records and try to put
5    them into Excel.  It is not a hard exercise
6    to do if all you're doing is recounting
7    every claim to add the -- to add the API
8    manufacturer.  Okay?  So that's all I'm
9    doing here.  I'm adding the API
10   manufacturer, just using example one.
11       So that's pretty easy because
12   it's NDC based.  Right?  So we've just added
13   the identity of the API manufacturer and now
14   all we're doing is writing code that says
15   for each uniquely identified consumer, how
16   many months of 320 milligram ZHP API did
17   they have, how many months of Hetero API did
18   they have.
19       I mean, this data is all
20   presented in terms of months.  It's 30-day
21   supply, 60-day supply, 90-day supply.  I
22   guess you would convert your days to months
23   in the data to make it easy so that it
24   corresponded very cleanly with this.  But

Page 342

L. Craft

1  that's actually not a particularly hard
2  statistical programming exercise to do, the
3  counting.  That's all the software is doing
4  is it is counting the number of monthly
5  observations for each of those product
6  categories.
7     Q.    Okay.  If it -- this
8  calculation were -- strike that.
9        So in this case, despite having
10  the necessary data points to construct the
11  consumption record, you did not perform any
12  of that analysis to demonstrate that this
13  methodology could be programmatically
14  applied to determine which individuals
15  actually meet the threshold for inclusion in
16  the medical monitoring class, right?
17        MR. STANOCH:  Objection to
18  form.
19        Asked and answered.
20        Go ahead.
21     A.    I only had the unique
22  identifiers within each retailer because all
23  of the other identifying information that
24  consumers was withheld was not produced.  I
25

Page 343

L. Craft

1  was not able to match records for consumers
2  across pharmacies.  So I couldn't -- I could
3  have -- I could have performed that
4  exercise, but it would have been a gross
5  understatement because it wouldn't have
6  included prescriptions that were filled by
7  the same individual of these challenged
8  products that were sold at different
9  pharmacy chains and I didn't have the PBM
10  data that would be an alternative data
11  source for performing this exercise.
12     Q.    I thought you said earlier you
13  did have the necessary information to
14  perform the construction of a consumption
15  record.
16        Did I misunderstand your
17  earlier testimony?
18        MR. STANOCH:  Objection to
19  form.
20        Misstates prior testimony.
21        Asked and answered.
22     A.    Or I misunderstand your
23  question.  That's a possibility as well.
24        What I had was consumption
25

Page 344

L. Craft

1  record linked to unique member IDs within
2  each of the pharmacy chain defendants.  I
3  did not have any ability to crosswalk a
4  single individual across pharmacies because
5  none of the other personally identifying
6  information has yet been seen.
7     Q.    Okay.
8        In this case, we talked about
9  the recall of valsartan that occurred in
10  July of 2018 through March of 2019 briefly.
11  So my question is are you aware of what the
12  practice -- actually, strike that.
13        Another hypothetical I wanted
14  to ask you about, if the threshold fill for
15  inclusion in the medical monitoring class
16  based on plaintiffs' criteria for LCT was
17  the refill that occurred just prior to the
18  recall, then that class member filled a
19  replacement medication five days after its
20  valsartan recall, how would you account for
21  that in your consumption record?
22        MR. STANOCH:  Objection.
23        Excuse me.  I'm sorry,
24        Ms. Anders.
25

Page 345

L. Craft

1     Objection to form.
2     Incomplete hypothetical.
3     Lacks foundation.
4     Ambiguous.
5     Compound.
6        Ms. Craft, if you can follow it
7  the best, you can try to answer.
8     A.    I think I get the point, which
9  is that you are suggesting that the consumer
10  threw away all or part of that last
11  prescription and didn't consume it.
12     Q.    Correct.
13     A.    Well, you've changed the
14  assumption.  As I told you earlier in my
15  testimony today, I am using purchase as a
16  proxy for consumption, which is what's done
17  in the peer-reviewed scientific literature
18  is using the purchase as a proxy for
19  consumption.
20        If for some reason you decided
21  it was necessary to make a contrary
22  assumption and say gosh, we're going to say
23  that consumers stop taking the drug after it
24  was recalled, of course that's contrary to
25

87 (Pages 342 - 345)

Page 346

L. Craft

1
2    the recommendation that was issued, which is
3    repeatedly cited by Mr. Kosty, that take it
4    until you can get a replacement.
5         Yeah, I had not anticipated
6    looking to see when the consumer next filled
7    another anti-hypertensive.  I suppose one
8    could, but I had not planned to do that and
9    the data that has been supplied thus far
10   doesn't necessarily include all other
11   products that could be prescribed to treat
12   similar underlying conditions.
13       Q.    Well, it's not really a
14   changing the assumption that everything
15   dispensed was consumed if we have pharmacy
16   data that shows what the replacement
17   medication -- when it was actually filled,
18   right?
19            MR. STANOCH:  Objection to
20       form.
21            Incomplete hypothetical.
22            Assuming facts that such was in
23       that data.
24            Ambiguous.
25            Go ahead.

Page 347

L. Craft

1
2       A.    You're also assuming that when
3    you see another product prescribed that it
4    is prescribed as a replacement.
5         So my methodology as proposed
6    is to create a consumption record for the
7    challenged VCDs and to treat them as all
8    having been consumed.  If you decided that
9    for some reason you wanted to clip off the
10   portions that were -- would have been not
11   yet consumed on the data of recall because
12   it was a recent fill, you could certainly do
13   that.  The very same procedure that I
14   described a moment ago where I said you're
15   going to schedule all of the -- for each
16   consumer, we've got all of their linked
17   purchases, you could say don't count any
18   purchase of, you know, a recalled Aurobindo
19   product after the date of its recall.  You
20   could say that.  Or you could say if it's a
21   30-day fill, assume they didn't take the
22   days that overlap, that would have been
23   remaining in the bottle after the recall
24   occurred.  You could make it more
25   conservative by trimming those off.

Page 348

L. Craft

1
2         I don't know that that's the
3    right thing to do from a clinical point of
4    view, but from a data point of view, it's
5    not materially harder to add a limiting
6    factor that says but take the last
7    prescription and then if there's anything
8    that should have been still in the
9    consumer's possession on the recall date,
10   deduct that from the consumption record.
11       Q.    Do you acknowledge that you
12   have not accounted for situations where the
13   dispense record for recalled valsartan
14   should not, based on other available data of
15   replacement medications, it should not be
16   assumed that the valsartan was actually
17   consumed?
18            MR. STANOCH:  Objection to
19       form.
20            Misstates testimony.
21       A.    I'm not suggesting that you
22   should use a record of replacement.  I think
23   that adds a level of complication that's
24   inappropriate to the analysis.  I do think
25   that in addition to just having -- in the

Page 349

L. Craft

1
2    claims processing aspect of the case at the
3    end having consumers who seek to participate
4    in the medical monitoring class verify
5    whether they consumed all the medication
6    they bought is step one and very easy.
7         If you wanted a more
8    conservative analysis that says I'm going to
9    assume that any drug that would have been on
10   hand after the recall they didn't consume,
11   you could make that assumption and come up
12   with a more narrowly tailored set of medical
13   monitoring class members.  It would not be
14   materially harder to do that.  You would
15   just be adding one more limiting factor to
16   the aggregate quantities for each consumer.
17        So I don't see any scenario in
18   which one needs to look too the date of
19   prescription and fill of a potential
20   replacement drug.
21            MR. STANOCH:  With that
22       counsel, I understand that we've hit
23       the seven-hour mark, so I believe the
24       defense questioning is over now.
25            MS. ANDRAS:  I haven't

88 (Pages 346 - 349)

Page 350

1         L. Craft
2    concluded my questions. I didn't
3    realize we were up against the time
4    limit.
5         MR. STANOCH: Maybe we'll take
6    a break and we'll assess if we have any
7    questions at all and we're done.
8         MR. DORNER: Dave, just before
9    you go, don't forget that you had asked
10   to make sure that our exhibit letters
11   and numbers were harmonized. So if
12   y'all are going to go off, I ask that
13   you at least stick around so we can
14   take care of that.
15        MR. STANOCH: If you're okay,
16   Drew and Tiffany, we'll go off the
17   record.
18        Is that good?
19        MR. DORNER: Yes. Sure.
20        THE VIDEOGRAPHER: The time is
21   4:38.
22        We're going off the record.
23        (Recess taken)
24        THE VIDEOGRAPHER: The time is
25   4:43.

Page 351

1         L. Craft
2         We're back on the record.
3         MR. STANOCH: This is David
4    Stanoch, counsel for plaintiff and the
5    witness.
6         We have no questions. This
7    deposition is concluded. We'll read
8    and sign.
9         THE VIDEOGRAPHER: The time is
10   4:44. This ends today's deposition.
11        (Time noted: 4:44 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 352

1
2         CERTIFICATION
3         I, SARA K. KILLIAN, RPR, CCR, do
4    hereby certify that LAURA CRAFT,
5    the witness whose examination under oath
6    is hereinbefore set forth, was duly sworn,
7    and that such deposition is a true record
8    of the testimony given by such witness.
9         I FURTHER CERTIFY that I am not
10   related to any of the parties to this
11   action by blood or marriage, and that
12   I am in no way interested in the
13   outcome of this matter.
14        IN WITNESS WHEREOF, I have hereunto
15   set my hand this 18th day of January, 2022.
16
17
18        _Sara K. Killian_
19        SARA K. KILLIAN, RPR, CCR
20
21
22
23
24
25

Page 353

1    DAVID STANOCH, ESQ.
2    d.stanoch@kanner-law.com
3         February 28, 2022
4    RE:   In Re: Valsartan, Losartan, Et Al v.
5    2/18/2022, Laura Craft (#5092466)
6    The above-referenced transcript is available for
7    review.
8    Within the applicable timeframe, the witness should
9    read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   errata-tx@veritext.com.
16
17   Return completed errata within 30 days from
18   receipt of testimony.
19   If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

89 (Pages 350 - 353)

Page 354

```
 1   In Re: Valsartan, Losartan, Et Al v.
 2   Laura Craft (#5092466)
 3           E R R A T A  S H E E T
 4   PAGE_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Laura Craft              Date
25
```

Page 355

```
 1   In Re: Valsartan, Losartan, Et Al v.
 2   Laura Craft (#5092466)
 3          ACKNOWLEDGEMENT OF DEPONENT
 4     I, Laura Craft, do hereby declare that I
 5   have read the foregoing transcript, I have made any
 6   corrections, additions, or changes I deemed necessary as
 7   noted above to be appended hereto, and that the same is
 8   a true, correct and complete transcript of the testimony
 9   given by me.
10
11   _____  _____
12   Laura Craft              Date
13   *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15          _____ DAY OF _____, 20___.
16
17
18          _____
19          NOTARY PUBLIC
20
21
22
23
24
25
```

90 (Pages 354 - 355)

**[& - 428]**                                                                                      Page 1

| & | | | |
|---|---|---|---|

**&**  2:4,14 4:12,19
5:4,12,20 6:4,12
6:20

| 0 |
|---|

**02109**  6:23
**07102**  4:7
**08540**  7:14

| 1 |
|---|

**1**  8:10 13:25 14:19
14:22 37:17 102:2
102:7 161:13
302:2,7
**10,000**  302:9
**100**  127:3 289:2
302:23 314:22
**1000**  7:6
**10019**  6:15
**101**  8:18
**1037**  4:6
**10:13**  109:5
**10:19**  109:3
**10:23**  109:10
**10th**  16:8
**11**  5:22 50:17
**11,586**  41:2
**11,600**  252:6
**11:55**  182:23
**12**  26:17,22 123:25
124:5 127:17
289:12,14,20
290:15 303:23
**12,000**  41:3 303:7
**12316**  26:20
**12:12**  61:25
**12:33**  183:4
**12:35**  232:13
**13**  161:3,7
**14**  8:10 161:3,8

**15**  26:22 105:3
136:11 261:9
**150**  207:24 208:9
**15219**  4:15 5:16
**16**  29:3 133:22
261:6
**160**  103:13 339:20
**164**  102:25
**17**  156:25
**1700**  5:6
**18**  1:10 9:3 156:25
331:6 338:9,18
**1875**  3:9
**18th**  352:15
**19**  163:19
**19106**  2:17
**1980**  10:18
**1:45**  232:18

| 2 |
|---|

**2**  8:12 21:20,21
26:15 30:25 31:2
31:23 32:3 34:24
37:17 158:8,20
**2,500**  16:25
**2,949**  41:4
**2/18/2022**  353:5
**20**  116:9 127:18,22
150:20 151:4
177:3 182:10,12
182:15 355:15
**20006**  5:7
**201**  8:19
**2010**  244:6,8
**2012**  160:22 161:3
161:7 184:18
225:21
**2013**  184:6,19,23
185:17
**2014**  331:4
**2015**  157:8 160:8
160:14,18

**2016**  160:18 331:5
**2017**  160:18
191:24
**2018**  157:9 160:8
160:11,19 167:22
191:24 331:6
344:11
**2019**  69:11 185:17
344:11
**2021**  38:24 102:4,8
102:12 103:4
105:19
**2022**  1:10 9:4
102:2 352:15
353:3
**21**  7:13 8:12 183:8
**22**  184:2
**2200**  4:21
**23**  101:22,24
**232**  8:22
**2525**  7:6
**27**  133:21 135:21
135:23 136:17
195:2
**271,163.75**  103:24
**27th**  6:22
**28**  353:3
**2800**  6:6
**2875**  1:4
**29**  157:5 177:4,6
**2nd**  3:22

| 3 |
|---|

**3**  8:13 32:11,15
33:9 36:22 37:17
294:16
**3,000**  17:2 41:6
57:9 252:5,12
**30**  47:25 159:18
177:5,6 179:8
213:8 330:24
341:21 347:21

353:17
**300**  3:9 5:6
**301**  5:14
**30s**  159:20
**31**  102:3,8,12
103:4 163:18,21
**32**  8:13 166:8
205:16 330:16,17
**320**  338:7,13,15,17
341:17
**322**  8:6
**32nd**  4:14
**33**  183:9,24
**33131**  3:23
**33134**  7:7
**333**  3:22
**33431**  3:10
**34**  183:25 220:3
**3600**  4:21
**37**  8:15
**38th**  5:14
**39**  241:13
**3:10**  295:14
**3:24**  295:18
**3:58**  322:10

| 4 |
|---|

**4**  8:15 36:24 37:2
37:17 42:22 52:21
62:14,17 84:17
109:16 183:7
220:4 240:8 258:5
258:18 295:25
335:23
**40**  241:13 245:22
335:15
**41**  258:5,18
**426**  40:9 42:14
**4268**  352:18
**428**  45:16,24 46:12
46:15,22

**[43 - accurate]**                                                    Page 2

**43**  195:3 271:2
**4400**  3:22
**443**  295:3
**45**  196:14,16 316:6
**45202**  6:7
**46204**  5:23
**467**  247:17 248:2
**47**  8:16
**4:06**  322:14
**4:38**  350:21
**4:43**  350:25
**4:44**  351:10,11

**5**

**5**  8:16 47:10,11
  48:21
**50**  202:8 260:2,3
  298:8 340:14
**500**  2:16
**5092466**  353:5
  354:2 355:2
**51**  6:14 205:16,18
  215:12 245:22
**510**  2:16
**52nd**  6:14
**53**  6:22
**54**  220:3 338:9,19
**550**  100:24 101:6
**5500**  177:9,12,17
  177:21 178:8,22
**58**  48:21 49:14
**59**  48:22 49:18
  296:3

**6**

**6**  8:18 101:7,12
  105:3 161:13
**60**  201:21 202:24
  240:8 243:15
  341:22
**600**  6:6

**62**  258:4,18
**64**  260:6,16 330:15
  330:18,23
**65**  270:24 271:5
  272:4 273:19
  278:16 281:23
**66**  280:14,19 284:3
**68**  295:2 296:2
  298:2 299:23
  313:13 316:6
**69**  329:24 330:2
**6th**  4:6

**7**

**7**  8:19 201:20,22
  202:8,24 329:20
  329:25
**701**  2:6
**70310**  2:7
**72**  163:24 166:2
**75201**  4:22
**770**  247:11

**8**

**8**  8:22 105:25
  232:21 233:2
  235:25 236:2
  238:13 240:6
  247:7 248:2,8
  258:10,13
**80**  335:18
**88**  89:21 288:4,5
  289:8
**89**  240:8
**8:00**  1:10
**8:09**  9:3

**9**

**9**  8:5 106:3,18,23
  106:25
**90**  159:19,19
  341:22

**96**  69:12
**98**  69:12 166:12,15
  166:19 167:12,17
  167:20
**9:07**  62:5
**9:14**  62:10
**9th**  6:14 105:19

**a**

**a.m.**  1:10
**abbreviates**
  170:12
**abbreviation**
  105:11
**abc**  223:21
**ability**  16:13 25:17
  76:23 94:24 277:9
  290:5 307:2 344:4
**able**  14:11 22:4
  28:20 31:17 71:22
  83:17 96:21 100:8
  116:14 135:11
  137:17 141:13
  143:18 147:18
  191:10 219:20
  231:21 254:14
  267:2 269:18
  270:21 278:23,25
  337:2 343:2
**absence**  111:13
**absolutely**  42:13
  87:20 132:25,25
  144:20 212:10
  259:6 307:7 328:5
**absorbed**  161:24
**abundance**  40:14
**academic**  215:3
**acceptable**  182:11
**accepting**  65:24
**access**  37:15 85:23
  181:4,11

**accessed**  35:25
  72:3 138:6
**accessible**  14:5
  34:15
**accommodate**
  151:20 232:5
**accompany**  185:9
**account**  42:8
  72:20 81:13,17
  114:21 122:17
  133:6 139:9,10,15
  139:15 143:18
  146:16,18 158:7
  167:25 169:23
  194:17 226:4
  257:12 267:7
  269:7,8 272:18
  274:7,18 278:18
  282:7,19 293:10
  293:15,21 296:21
  296:23 297:9
  298:15 299:24
  300:14 301:15
  308:20 325:23
  344:21
**accounted**  163:24
  348:12
**accounting**  118:7
  125:24 311:5
**accounts**  71:23
  97:7 166:2 270:16
  274:11 290:10
**accumulated**
  179:16
**accuracy**  26:4
  213:18 353:9
**accurate**  17:10
  29:18 32:5 51:9
  56:10 58:11 65:6
  72:4 73:2 74:14
  82:3 85:14 86:5

[accurate - agree]                                                                    Page 3

87:2 93:10,20
102:22 103:17
136:24 164:9
215:13 233:7
271:17 272:17
282:21 326:15
**accurately** 66:19
103:11
**accusing** 106:14
**achieve** 67:20
**achieved** 176:15
**acknowledge**
348:11
**acknowledgement**
355:3
**acknowledgment**
353:12
**acquired** 157:10
161:23 162:10
163:12 191:25
**acquirer** 161:13
**acquiring** 162:8
162:11
**acquisition** 161:17
**acquisitions** 162:5
**act** 55:19 183:13
**acting** 71:2 128:22
133:10 134:18,18
288:19 309:3
313:23
**action** 252:24
319:10 352:11
**actions** 130:2
220:7
**active** 11:18 52:11
52:13
**activity** 33:5 263:6
**acts** 162:6 192:2,3
**actual** 36:5 107:15
149:9 165:14
211:22 216:20

263:14 307:4
313:8,16,24 314:2
**actuarial** 241:17
241:19,23
**add** 29:14,15
103:15 125:19
220:18 246:15
341:8,8 348:5
**added** 29:22
103:23 209:2
336:21 341:13
**adding** 341:10
349:15
**addition** 20:23,25
348:25
**additional** 41:8
51:7,13 65:4
92:23 102:5
126:14 133:25
135:22 136:16
271:3 272:12
273:25 275:18
276:18 278:15,17
281:22 282:18
283:21 296:9
309:9
**additions** 355:6
**address** 35:22
54:3 69:25 70:16
94:24 99:6 209:19
216:13
**addressed** 87:14
92:24 145:23
**addresses** 33:22
36:6,15 70:10
94:22 202:21
214:23
**adds** 348:23
**adduced** 59:3
**adequacy** 33:19
99:13 279:24

**adequately** 99:6
**adherence** 214:24
**adjective** 241:23
**adjudicate** 269:18
**adjudicated**
223:22
**adjudication**
69:24 129:6,24
131:25 132:12
141:11,12 142:2
142:23 143:16
144:19 145:24
158:25 260:19
273:2,3,20 282:5
309:25 310:6
**adjusted** 44:15
**adjustment**
160:14
**adjustments**
114:21 115:6,19
117:25 118:7
**administered**
137:21
**administration**
180:4
**administrative**
76:12 83:10
129:18 290:4
**administrator**
131:19 132:9
134:11 148:22
181:9,11 286:8
291:21 300:22
307:23 310:25
311:21 317:20
**administrators**
25:25 79:12
129:19 155:5
178:6,11 179:3,17
180:2

**admittedly** 85:21
**adopted** 277:14
**advance** 122:3
**adversely** 60:21
**advise** 131:21
312:8
**advisor** 311:22
312:6,21
**aetna** 303:10,11
**affect** 16:12 24:15
47:4 213:18
**affiliate** 221:5,6,6
**affiliated** 220:10
220:22 221:21
223:8,10 229:22
288:16
**affiliates** 222:2
258:12
**agency** 243:17
244:2
**aggregate** 123:11
125:25 126:2
349:16
**aggregated** 125:16
**aggregation** 126:5
302:20
**aging** 190:22
**ago** 23:7 45:20
46:11 52:17
137:25 168:3
258:8 271:11
301:11 347:14
**agree** 12:10,24
17:17 44:7 89:18
97:25 109:21
112:17 117:22
129:12 137:7
152:6,25 153:7,8,9
177:21 183:14
188:9 203:5,8,13
209:24 210:12

326:6 331:14
332:9,14
**agreeable** 271:15
**agreeing** 151:17
153:5
**agreement** 125:5,8
309:25
**agreements**
189:12,16
**ahead** 13:22 15:20
22:11 24:8 26:12
33:15 36:22 38:20
41:19 43:9,17
44:13 45:8 46:19
47:7 49:10 52:19
52:20 54:20 56:18
58:15 59:18 64:7
68:23 73:16 74:23
77:19 79:19 82:11
82:23 84:12 85:9
88:24 91:12 92:10
92:22 93:17
101:11 103:8
106:17 108:15
110:4 111:10
115:4 119:2,10
120:16 121:22
123:3 127:16
129:9 132:24
137:5 141:4
162:19 164:25
180:22 187:20
188:4 192:23
198:2 201:7,20
203:10,22 205:10
210:11 211:8
214:3 215:21
218:10 220:2
222:6 225:12
226:13 228:25
232:24 237:16

241:8,21 245:21
251:12 256:8
260:5 262:9
267:12 276:24
278:9 282:25
285:5 291:7
292:13 301:3
302:18 306:12
309:16 311:14
313:20 318:18
320:15 323:6
324:14 325:15
326:5 327:10
328:16 329:11
333:6 336:7 338:3
340:25 342:21
346:25
**aid** 5:21
**al** 353:4 354:1
355:1
**albertson** 5:5
**alek** 3:15
**alfano** 5:12
**algorithm** 176:13
**allegation** 92:4
**allegations** 45:5
91:15 93:2 210:22
**allege** 43:21 46:2
**alleged** 318:13
**allegedly** 209:9
**allocation** 75:24
149:7 264:15
**allotted** 353:20
**allow** 176:17
269:5 315:6,15
**allowed** 10:6 94:9
181:13
**allows** 50:8 84:5
139:6 253:10
277:15

**alongside** 296:13
299:3
**alpha** 13:24
261:18 262:15
266:7
**alternative** 71:9
219:4 325:18,23
343:11
**alternatives** 337:4
**ambiguity** 294:24
303:19,20,25
304:4
**ambiguous** 64:5
68:20 74:21 79:16
82:7 88:22 92:9
93:14 115:3
118:25 120:14
121:20 122:25
125:2 132:23
141:2 157:24
162:18 169:18
172:16 175:16
207:3 212:6
213:25 226:11
308:9 311:12
325:12 326:25
327:9 338:2
340:23 345:5
346:24
**amenable** 27:21
41:16
**amended** 8:10
**american** 291:12
291:14
**amerisource**
203:17
**amerisourceberg...**
6:5
**amlodipine** 44:10
44:10

**amount** 34:11
120:19 157:19
161:22 175:2
201:12 209:24
211:18 212:18
218:4 227:8
283:17,20 325:7
**amounts** 114:18
114:20 213:17
242:2 314:5
323:22 325:25
335:10
**analogous** 219:8
311:17
**analysis** 24:6
29:20 30:3,5
32:21 42:19 46:12
47:3 48:11 49:15
49:19 157:15
237:8,10 241:17
241:19 245:14
251:24 278:5
325:22 327:6
332:20 340:12
342:13 348:24
349:8
**analyst** 337:16
**analytic** 27:23
**analytical** 27:17
**analytics** 8:18
101:5 327:4
**analyze** 60:2
193:18 218:25
299:17
**analyzed** 214:9
218:17
**anders** 344:25
**andras** 3:24 8:6
321:25 322:17,19
326:7 327:2
329:14,23 330:3

349:25
**annotations** 16:4
**annual** 158:9
159:10 245:17
**anonymize** 35:16
**anonymized** 35:10
35:12 36:2
**answer** 12:8 18:2
19:13 28:17 38:24
41:20 48:18 51:23
66:3 73:11 87:8
95:6 98:11 104:16
106:15 110:24
114:5 122:14
147:17 149:11
150:11 167:8
168:18 169:4
175:2,17,24 199:6
199:25 200:10,18
200:20 201:5,8,15
201:16 207:19
211:8 212:8 214:5
218:10 226:14
228:24 231:7,19
269:4,22,24 270:4
287:2 288:4
302:18 307:10
321:11 325:17
345:8
**answered** 56:16
79:17 98:5 115:24
122:22 123:22
144:6 150:7
174:10 175:14,20
180:20 193:8
194:14 199:3,12
200:25 213:22
251:4,11 254:22
276:23 285:2
286:24 291:4
292:9 298:13

299:7 308:6
318:16 328:15
342:20 343:22
**answering** 66:5
**answers** 240:21
**anti** 256:25 346:7
**anticipate** 178:23
**anticipated** 346:5
**antitrust** 86:15
91:14,24 92:3,11
170:3 218:12
219:11,15 227:23
319:5,22
**anybody** 12:16
13:15 14:6 16:16
35:2 121:12
145:16 152:7
305:10
**anyway** 340:6
**api** 40:19 52:18
183:15 204:16
329:5 336:17,18
338:9,9,10,17,19
338:20 339:2,12
339:15 341:8,10
341:14,17,18
**apologize** 106:12
112:8 127:19
147:13 150:23
337:2
**apparent** 80:23
307:15
**appear** 28:7 33:18
40:11 103:24
120:25 134:2
149:11 284:21
285:11 286:19
288:12 290:24
293:9,10,12,13
300:7,10,19,20
302:8

**appeared** 33:3
233:25
**appearing** 301:20
**appears** 102:21
105:18 127:23
280:22 284:5
290:18 296:12
300:13 301:14
309:9
**append** 336:18
**appended** 339:2
355:7
**applicable** 353:8
**application** 50:12
50:21 56:2 123:19
**applied** 41:22
42:14 50:10 53:7
148:3 213:6 251:6
268:6,20 320:8
325:6 342:15
**apply** 25:15 160:2
231:20 233:23
249:4 250:24
258:9,16 338:5,11
**applying** 120:7
259:8,16
**appreciate** 21:11
26:10 41:11 56:6
58:6 68:5 73:3
77:5 101:9 108:22
149:19 152:11,12
182:5 196:9
213:12 219:25
249:23 260:15
295:21 318:2
**approaching**
116:8
**appropriate** 42:11
152:16 236:14
260:19 272:15
323:17

**appropriations**
244:20
**approvals** 44:3
**approved** 237:22
**approves** 52:17
**approximate**
299:2
**approximately**
102:25 163:24
**approximation**
168:2
**arbitrarily** 61:15
**archival** 163:7
**area** 215:3 216:6
**areas** 107:8
**argumentative**
141:4
**arises** 181:7 306:4
**arrangement**
168:17 191:18
218:9 305:17
310:23
**arrangements**
191:21 241:8
313:15
**array** 132:6
**arrive** 277:6
**arrived** 102:24
208:10
**arrives** 192:7
**article** 162:3
216:16 234:14
**ascertain** 57:4
251:18
**ascertainability**
54:6 55:9,10
56:11,21,25 57:11
58:8,19,23 59:2,6
59:8 65:12 66:2
85:6 131:24
172:19,21 237:24

322:25 323:8,13
323:14 324:21
**ascertaining**
204:19 209:16
**asked** 53:5 54:3
56:16 60:19 79:17
82:13 98:5 115:24
121:5 122:22
123:21 144:6
150:7 168:3
175:14 180:13,20
185:15 193:18
194:14 199:3,12
199:19 200:17,25
212:20 213:22
214:5 221:19
228:24 229:11
249:3 251:4,11
254:22 276:23
285:2 286:24
291:4 292:9
298:13 299:7
301:22 308:6
317:25 318:16
319:17 324:4
326:8 328:15
342:20 343:22
350:9
**asking** 11:25
74:12 77:8 78:22
119:3 121:23
130:21 152:13
155:15 171:5
194:10 211:11
212:17 278:24
300:4 321:8 337:6
337:10
**asks** 65:22 218:14
283:17
**aso** 70:25 72:22
74:11 75:13 76:7

76:14 79:11 80:10
80:21 81:23 82:2
82:17 83:16,21,24
91:4 96:14,24,25
96:25 97:9 99:8
128:18 129:17,23
130:2,4,12,13,18
130:19 132:15,17
132:18 134:10,18
137:22 146:25
147:22 148:10,12
148:16,25 149:4,5
149:10,16 150:2
150:17 261:3
266:23 267:3,7,15
269:7 273:15
284:23 285:8
286:7,12,17 287:9
287:22 288:19
289:17,25 290:21
291:21 293:18
294:6 296:13,19
296:24 297:16,24
298:10,16,18
299:4,24 300:5,6
300:21 301:13
302:7 304:6,15
305:17,19,24
306:10 307:5,13
307:15,23,25
308:2,13,14,18
309:3,7,8,17,18
310:5,6,18 312:9
312:11 313:10
314:19 315:6,16
316:9,14 317:3,6
317:16
**aso's** 290:24 315:9
315:19
**asos** 25:25 71:17
71:18 86:22 94:25

132:8 155:4
171:11,14 304:8
**aspect** 250:3 349:2
**aspects** 61:9 84:13
324:13
**assemble** 307:4
321:23
**assembling** 85:19
**assert** 76:14
**assess** 214:14
350:6
**asset** 161:16
**assigned** 38:9
262:23
**assignees** 223:8,11
**assigning** 127:6
**assignments**
220:11 221:20
222:3
**assigns** 262:22
286:8
**assistance** 255:20
255:21,24
**associated** 49:6
70:12 71:24
172:21 213:7
222:13 228:4
229:3 233:5
246:25 252:5
261:24 263:7,8,14
266:4 272:20
320:4
**association** 122:19
**assume** 12:8 20:12
21:13 78:25
210:24 211:11,16
212:20 216:14
235:21 309:24
347:21 349:9
**assumed** 348:16

**assumes** 195:15
201:2
**assuming** 46:12
59:20 60:3,10,12
66:6 72:11 252:11
286:17 346:22
347:2
**assumption**
211:11 215:8,24
216:8 224:2
345:15,23 346:14
349:11
**assumptions** 60:15
**assure** 31:17
160:19 170:20
**atlas** 240:14
257:21
**attach** 39:4 186:11
268:16
**attached** 47:18
179:12 353:11
**attaches** 262:24
**attachment** 42:7
**attachments** 40:11
**attempt** 17:25
21:25 94:12
111:12 112:2
168:18 176:7
233:23 249:2,20
250:24 251:7,9
252:16 279:17
312:4
**attempted** 21:8
57:3 60:2 194:6
214:14 249:9
299:13
**attempting** 33:17
88:9 161:19
237:19 251:21
**attention** 44:17
52:23 55:5 57:14

106:9 114:10
**attest** 217:3
**attorney** 11:15
  104:22 353:13
**attorneys** 2:5,15
  3:5,21 4:5,13,20
  5:5,13,21 6:5,13
  6:21 7:5
**attribute** 149:2
**attributes** 253:11
**auditable** 305:15
**audited** 304:25
**auditing** 132:4
**augmented** 169:7
  178:10
**aurobindo** 4:13
  47:24 335:20
  338:10,20 339:15
  347:18
**authoritative**
  241:15
**authority** 250:8
  257:24
**automated** 141:7
  142:18
**automatic** 145:15
  147:9
**automatically**
  71:22 134:2
  138:12 139:22
  140:3,9,15,17
  141:24 149:15
  190:17 270:22
  306:2,14 333:21
**availability** 253:8
**available** 62:25
  63:14,22 64:23
  65:2,7 92:16
  121:3 126:15
  160:12,17 165:4
  218:16 238:2,10

244:8 325:9
  348:14 353:6
**avenue** 3:22 4:21
**averages** 167:13
  212:15
**avoid** 68:2 93:21
**aware** 24:4 91:9
  111:25 123:13
  160:21 193:4
  198:3 344:12
**axiomatic** 113:8

| **b** |
| --- |

**b** 8:8 21:19 37:17
  47:18 337:9
  339:17
**b's** 279:21
**back** 21:25 22:2,5
  27:7,11,16 28:8
  29:11,16 35:16
  40:15 43:18 52:11
  52:21 55:2 61:7
  62:12,13 66:13
  73:23 81:12 90:5
  95:8 97:15 101:20
  109:2,12,13
  113:15,16 116:18
  117:17 121:11
  130:9 139:24
  142:11 149:20
  155:10 160:22
  170:21 177:3
  182:12 183:6
  185:14 193:3
  194:10 206:9
  215:11 227:14
  232:20 236:15
  240:7 242:15
  244:6,8,25 247:20
  258:17 261:6
  263:2,5 264:16
  265:5 266:21

270:5 280:11
  283:18 286:14
  295:20 302:3
  307:9 313:12
  314:7 320:9 322:8
  322:15 351:2
**backbone** 141:9
  141:10
**backward** 224:14
**backwards** 336:20
**bad** 37:25 102:22
**balance** 127:6,6
  296:18
**bare** 224:6
**barnes** 5:20
**base** 61:7
**based** 83:21 98:16
  98:18 102:22
  104:7 116:11
  158:4 167:19
  169:6 173:3
  176:13 178:21
  198:16 204:16
  208:22 212:15
  239:6 268:5
  302:10 304:2
  318:12 328:10
  329:4 339:11,12
  341:13 344:17
  348:14
**bases** 63:24
**basic** 20:9 24:23
  34:6 64:9 155:22
  156:11 304:14
**basically** 27:2
  95:12 166:9
  170:24 261:22
**basing** 143:25
  159:4
**basis** 99:10 123:11
  127:8 158:9

159:10,23 164:20
  169:5 235:23
  245:17 284:12
  324:10
**bat** 240:13
**batch** 187:23
  188:3,6
**batches** 113:25
**bates** 44:15
**bazan** 3:14
**bear** 260:10
**bearing** 288:2
**beauty** 67:21
**beginning** 124:8
**begins** 62:11
  109:11 183:5
  232:19 295:19
**behalf** 10:23 71:2
  117:6 119:21
  130:3 133:10
  158:25 316:9
**beings** 99:20
**belabor** 11:11
**believe** 15:3 16:25
  19:5 24:9 35:9
  36:13 38:21 39:12
  46:10 47:3,17
  59:4 64:14 66:13
  78:24 85:5 86:2
  86:19 87:15 88:16
  90:25 95:11 97:6
  99:4 100:6 112:10
  115:5,8,10 117:24
  120:5 126:21
  130:17 131:12
  146:11 152:16
  157:8 164:17
  168:20 172:3
  174:2 184:13
  190:5 193:8 199:8
  199:23 201:8,17

[believe - business]

205:11 210:21
220:12 234:16
250:15 290:23
296:2 299:22
301:21 305:9
319:6 326:12
336:15 349:23
**belong**  179:14
**benchmark**  55:24
**benefit**  37:14,20
80:4 81:16 124:6
129:5 131:18
132:9 141:15
239:14 258:22
268:3,5,13,15,19
275:8 289:19
311:21 312:5,21
**benefits**  72:8 83:3
88:6 89:15,22
98:22,25 130:12
223:14 224:19
231:17 234:11
235:16 238:19
239:2 241:17,19
241:24,25 242:2,3
242:5 243:8,25
244:18 258:25
267:24 287:8
288:8,8,12 289:4
289:14 312:22
**bergen**  203:18
**berman**  2:14
**berne**  6:4
**best**  38:11 44:19
63:19 178:4 260:9
345:8
**bet**  28:25
**better**  18:4
**beyond**  107:24
210:15 281:12

**bid**  144:22 244:22
**bifurcation**  148:19
**big**  57:11 81:2
159:3,6 173:11
279:12 285:19
291:10 314:17
**bigger**  161:10
321:8
**bill**  72:6 83:17,25
137:20 148:25
150:17 270:15
306:2 308:10
314:22 315:7,16
**billed**  83:11 198:8
286:3 304:18
**billing**  83:9 97:10
132:3 260:21,25
261:4 270:6,9,18
270:23 273:13
283:5 305:14,16
305:18 307:14,17
308:15
**bills**  304:17
**bily**  7:19 9:8
**bin**  95:13 139:3
146:21 147:19
265:10,11,15,25
266:3,6 271:14
**birth**  35:23 70:11
176:23
**bit**  50:2 84:10 95:5
97:16 135:19
168:6 180:23
271:3 280:6 318:4
322:8 330:5 332:7
333:25
**bite**  303:24
**blank**  76:17
298:17,17
**blind**  314:25

**blinders**  292:15
**blood**  352:11
**blow**  177:5 183:25
340:12
**blowing**  205:17
**blue**  81:3 263:15
263:18 312:8,10
312:11,15,18
**boca**  3:10
**bockius**  4:12
**bone**  129:3
**bones**  224:7
**books**  118:8
**borderline**  141:3
311:13
**borne**  198:12
**boscik**  5:12
**boston**  6:23
**bottle**  112:18
113:2,3 347:23
**bottles**  113:7,9
**bottom**  112:11
146:14 158:11
**bought**  122:8
174:22 185:3
191:16 192:19
204:18 215:25
216:11 217:4
289:6 332:2 349:6
**boulevard**  3:9 4:6
**box**  264:15 265:5
**boxes**  265:3
271:24
**brand**  92:15
218:23 283:14
**branding**  143:5
**brands**  219:6
**break**  61:22 77:10
151:24 153:13
154:15 171:13
182:7,11,18

217:17 232:7,10
267:6 295:23
321:18 333:24
350:6
**breaks**  12:14
**brief**  85:17
**briefly**  100:22
280:18 344:11
**bring**  21:25
127:25 185:14
194:9 312:9
**broad**  63:15 64:9
64:19
**broadly**  168:6
**broken**  103:13
**broker**  289:4
311:23,25 312:2,5
312:22
**brought**  15:2
22:24 112:6
**buchanan**  5:4
**bucket**  227:9
**building**  16:20,22
136:13
**built**  178:7
**bunch**  11:11
294:20 312:10
**burdensome**
198:17 260:4
**bureaucracy**
245:4
**burned**  161:15
**business**  83:22
84:7 99:18 107:6
118:8 135:16
142:14 143:6,11
143:16 145:5
148:12,13 149:18
256:20,24 290:3,9
310:10 312:13,20
314:19,19 316:19

**butcher** 84:24
**button** 83:17
**buttons** 142:14
**buy** 205:3 288:3
**buying** 191:23
  224:24
**byproduct** 142:7

**c**

**c** 2:2 3:2 4:2 5:2
  6:2 7:2 9:17 10:15
  10:15 32:10 37:17
**calculate** 299:14
**calculated** 206:24
**calculation** 102:20
  166:16,18 255:2
  342:9
**calculations** 41:14
  41:15 327:21
**calculus** 324:23
**california** 11:16
  17:3 248:3
**call** 12:16 13:16
  20:3 39:7 49:23
  77:7 112:7 136:10
  220:6 261:3
  271:12 272:14
  275:25 276:2
  319:19
**called** 19:17 48:11
  73:10 126:17
  144:9 176:16
  276:6,7 277:23
  281:8 293:6,7
**calling** 100:10
  215:14 272:10
**calls** 58:13 98:7
  170:13 300:25
**calpers** 248:2,7,9
  248:11,15,20
  249:14

**camp** 2:6
**campbell** 5:9
**canceled** 116:9
**cancellations**
  117:21
**cancer** 209:18
**candor** 318:2
**cap** 141:20
**capability** 256:18
**capable** 17:14
  150:8,13
**capacity** 10:22
  80:12 128:22
  130:6 312:11
  313:24 316:7
**capitation** 235:2,4
**captured** 113:17
**card** 149:24
  262:19 263:16
  269:21
**cardholder** 139:2
  147:4,21 261:17
**cardinal** 203:17
**care** 37:18 135:5
  225:24,25 226:3
  227:16 230:2
  234:22,25 235:11
  235:14,17,20
  236:2 237:7,9
  238:5 253:15
  302:22 314:3
  350:14
**career** 11:4
**careful** 28:19
  75:13 89:2
**carried** 219:9
  320:6
**carrier** 280:22
  281:2,6 282:6
  284:6,22 285:12
  285:25 286:19

288:13,25 289:22
290:19 291:13
293:12 300:7
309:3
**carry** 34:9 144:13
  277:4
**case** 9:23 10:22
  18:15,20 20:5
  23:16 24:12,16
  26:5,13 27:3,23
  33:25 37:6 43:5
  43:20 48:5 57:7
  60:13 61:9 65:4
  69:21 76:6,25
  77:15 78:10,17
  80:6 81:6 84:25
  85:5,7,13,23 86:2
  86:13,13,19 87:7
  87:10,18 88:4,16
  90:4,4,9,11,18,23
  91:13,14,18,24
  92:4,25,25 93:4
  94:3,8 97:24
  98:11 100:3,14
  102:25 103:19
  104:20 107:11,15
  107:15 110:10
  115:18 118:19
  120:20 124:12,22
  125:7,8 148:16
  160:22 162:11
  165:7,25 166:23
  167:8,9 168:10,17
  168:21 169:8,11
  171:5 172:10
  178:11,24 180:17
  188:14 191:19
  193:4,24 197:16
  198:23 200:12
  201:10 202:25
  206:13,24 207:22

210:19 213:6
217:6,8,24,25
219:15 225:4,17
230:14,17 237:4
238:7 239:18
240:23 241:18
242:10 275:13,19
279:2 285:23
286:11,21 290:23
299:15,20 305:17
307:21 318:12
320:3,18,24
321:10 322:20,24
323:19,24 325:22
328:2 339:13
342:10 344:9
349:2
**cases** 51:15,19
  80:18,22 82:17
  84:21 92:12 94:12
  125:11 146:4
  148:2 159:17
  170:4 179:4
  180:17 181:19
  186:12,16,21
  191:9,14 192:4
  218:12 227:23
  235:9 259:20,22
  274:16 277:20
  279:8 283:11
  290:21 293:2
  294:8,11 306:6
  308:16,17,25
  309:21 316:16
  318:22 319:21
  328:2
**cash** 126:10,10,12
  158:5,7,11,12,16
  158:22 222:8
  224:20,24 225:9
  230:2 253:21

**cat** 67:2
**catamaran** 163:10
  163:12
**catch** 44:19
  226:20
**catching** 255:23
**categories** 64:8,19
  220:15 236:8
  339:6,7 342:7
**categorization**
  236:5
**category** 265:21
  287:20
**caught** 203:7
**caused** 110:15
**caution** 40:15 87:4
  90:15 98:8 167:5
  168:14 169:19
  171:19 207:4
  208:15 218:6
  259:10 279:5
  319:14
**cautioning** 241:5
**cautious** 244:4
**ccr** 352:3,19
**cell** 17:15
**central** 107:16
**centre** 4:14 5:15
**certain** 81:16
  177:20 315:6,15
**certainly** 12:20
  24:17 26:7 70:15
  95:22 123:5
  137:12 145:21
  165:19,21 170:3
  178:3 208:18
  219:23 227:22
  242:4 244:11
  259:4 276:25
  292:18 316:24
  317:8 321:5

  327:25 347:12
**certainty** 215:15
**certification** 53:16
  58:10 352:2
**certified** 1:16
**certify** 352:4,9
**chain** 55:19,21
  183:12,23 216:16
  344:3
**chains** 343:10
**challenge** 25:17
  94:19
**challenged** 69:9
  86:3 88:3 110:10
  111:18 324:18
  332:2 343:8 347:7
**champus** 250:9
**chance** 28:24
**chandra** 105:12
**chang** 215:4
**change** 24:17
  27:25 40:16,25
  46:25 118:9 163:8
  191:18 244:12
  245:12 258:6
  296:9 354:4,7,10
  354:13,16,19
**changed** 27:20
  41:10 107:19
  245:20 345:14
**changes** 28:2,18
  29:12,13,17 39:14
  39:21 92:12
  176:18 353:10
  355:6
**changing** 170:16
  346:14
**channels** 160:6,18
**characteristics**
  113:18

**characterization**
  64:22 74:4,15
  87:10 89:18 93:22
  137:7 188:10
  203:6 233:8
**characterizing**
  82:20 86:25
**characters** 261:19
  262:15
**charge** 260:22
**charles** 2:18
**check** 37:10 41:24
  137:17 255:22
  256:2 257:21
  280:8,8,8,9,9
  317:19 321:16
**cheekiness** 182:5
**chemical** 61:2
  113:13
**chip** 250:9,13
  257:11
**choice** 285:18
**chosen** 285:21
**christine** 4:9
**christopher** 5:8
**chunk** 187:17
  188:7
**cincinnati** 6:7
**circulation** 183:23
**circumstances**
  25:15 123:14
  185:12
**citations** 39:15
**cited** 18:17 23:9
  23:13,14 41:3
  69:8 215:4 346:3
**cities** 242:24
**city** 249:13
**civil** 10:7
**claim** 76:11,15
  122:8 123:7 128:8

  135:24 136:19
  143:25 202:3
  204:14 216:3,14
  216:19 223:13
  225:4 226:22
  229:5 230:15
  242:6 260:18
  265:16,22 269:18
  270:23 273:2,3
  274:18 278:18
  301:17 319:19,20
  319:24 321:10
  341:5,8
**claimants** 98:25
  268:4
**claims** 8:14 19:21
  32:21 33:6,24
  45:12 60:8,20
  69:13,19,24,25
  70:18,19 72:19
  74:5 80:20,24,25
  83:6,10,16,18
  89:12 96:11,14,15
  96:17,22 99:2
  100:9 116:7 129:6
  129:23 131:25
  132:4,12 139:12
  140:3,16 141:11
  141:12,25 142:8
  142:22 144:18
  145:24 146:16
  149:2,16 150:15
  158:25 159:15,22
  160:22 166:25
  168:9 178:6,11,20
  179:3,17 180:2,4
  181:9,10 186:14
  192:19 195:23
  205:11 209:10
  214:15,16 217:6,8
  220:25 221:8

223:20,23 225:2
225:21 227:25
228:2,7,10 229:2
229:13 230:13,24
234:7 237:21
243:13,13 254:9
254:12 256:11
262:25 263:6
266:4 268:18,20
269:6 272:21,23
273:10,20 274:17
280:21 281:24
282:3,5,8,12,20
283:2,8,23,24
284:5 285:21
286:10,17 287:17
290:18 294:19
296:11 300:18
301:7 302:8,11,20
303:21,23 306:14
309:25 310:6
312:15 313:10
319:21 323:18
328:21 335:3
340:2,13 349:2
**clarification**  68:5
77:6 101:10
127:22 147:2
209:6 219:25
231:19 249:24
**clarified**  46:14
178:9
**clarify**  79:20,24
95:6 106:7 219:17
223:5 247:16
320:2
**clarifying**  41:12
**class**  8:19 26:5
33:23 40:5 53:6
53:15 56:2 57:4,9
57:19,23 58:10

59:13 60:21 63:6
64:11 65:17 66:15
76:23 77:16 82:2
85:12,19 86:23
87:10,24 88:2
89:5,5,6,9,12,25
90:10,21 92:19
109:20 120:9
121:9,13 122:16
122:17 123:12
128:6 155:3
164:22 165:13
166:12 172:22
173:2,20,21,23
174:9,25 175:5,10
176:4 177:23
178:18,20 179:21
180:10,17 181:13
181:19,22 188:14
188:18 190:12
192:13,14 203:14
204:19 207:10
209:16 214:17
216:21 217:2,3
218:4,13,25 219:2
220:7 226:25
227:21 228:5
230:6 231:3
233:16,24 237:22
238:20 239:17,17
240:12 242:19
243:2,9 248:22
249:4 251:18,20
251:25 252:23,24
253:3 254:17
255:4,8,12,14
259:8,17 276:17
276:20 307:3
318:7,11,20 319:4
319:9,10 320:8,10
323:22 324:10,19

325:7,25 328:7,10
329:3,22,23
330:12 331:14,22
332:4,10,15 333:3
335:8 336:2 338:7
342:17 344:16,19
349:4,13
**classes**  127:7
205:20 321:6
**classification**
80:20 253:11
**classifications**
254:7,15
**classified**  339:6,10
339:12
**clean**  16:3 173:9
**cleanly**  341:25
**clear**  35:5 36:3
66:9 69:10 73:20
75:10 80:14 87:21
129:25 131:11
156:18 166:21
172:18 173:6
177:11 198:21
201:13 216:18
217:21 242:22
246:6 251:15
269:23 275:23
**clearer**  97:2
**clearing**  77:9
141:10
**clearly**  35:21
53:25 65:21
182:18 190:14
237:23 313:3
337:2
**clerk**  230:12
**client**  70:24 71:8
72:7,13 74:11
80:10 83:9,11,22
104:22 133:6,10

135:2,7 136:23
137:19,19 139:8,8
139:14,15 146:13
146:15,18 148:5
150:16,18 163:3,4
257:12 270:3,10
270:10,16,17
272:18 274:7,18
275:25 278:18
280:22 281:2,4,8
282:19 284:6,22
285:11,14,19,25
286:12,19 287:17
288:13,24 289:22
290:19,25 291:13
292:4,5,19 293:12
293:21 294:3
297:8 300:7,12
301:14 303:12
308:19 309:2
311:4 314:20
**client's**  275:19
313:15
**clients**  71:16 75:3
83:16,18,25 96:19
97:10 138:6
144:20,22 148:10
148:25 149:16
173:6 271:4
272:13 274:10
285:16,23 289:6
294:6 301:16,19
306:3 309:4
312:10 314:23
315:7,9,16,19
316:8,14,17 317:6
**clinic**  156:20
**clinical**  348:3
**clip**  347:9
**close**  49:23 52:20
112:7 159:13

[close - concern]                                                          Page 12

160:4
**closed** 163:4
**closely** 192:6
**cms** 240:4
**coach** 312:22
**code** 30:4,14,18
  40:3,6,22 41:14,22
  50:18,18,19 51:16
  112:25 267:2
  268:22 269:3
  340:14 341:15
**codes** 40:10 45:16
  45:18,25 91:21
**collapsed** 274:17
**collect** 195:5
  196:18 219:21
**collected** 100:13
  100:15 134:4
  166:10,23 171:16
  196:23
**collection** 24:24
  101:17 132:3
**collections** 103:23
**collective** 274:2
**collectively** 163:23
  328:20
**colloquy** 323:10
  337:24
**column** 48:8
  136:12 149:25
  202:4,7,23 246:16
  247:13 262:14
**combination**
  150:14 261:18
  262:15 266:7
  267:4 270:20
  278:11,15 338:8
**combinations**
  269:5
**combine** 174:3

**combined** 209:3
  227:3 276:19,25
**combining** 214:7
**come** 148:15
  159:13 160:3
  180:10 193:3
  242:15 321:9
  337:16 349:11
**comes** 11:24 12:21
  125:4
**comfortable** 182:7
**coming** 17:2 22:15
  33:11 52:18 84:2
  141:23 264:16
  294:4
**commencing** 55:6
**commensurate**
  157:18
**comment** 107:24
  213:9
**commercial** 170:3
  238:22,23,24
  244:3
**commissioners**
  72:6
**common** 59:15
  113:14,18 118:14
  188:7,12 218:24
  220:7 244:14
  277:13 296:19
  297:15 298:7
**commonly** 275:24
  289:24 296:22
**communicate**
  152:6 327:15
**communicating**
  17:14
**communication**
  97:2
**communications**
  17:19 18:5,8

208:17
**comp** 100:23
**companies** 5:5
  238:25 281:8
  290:8
**company** 89:10,10
  235:19 279:12
  285:20 288:3
  289:5 290:2
  301:13 314:18
  317:4,15
**company's** 224:3
**comparatively**
  158:22 220:23
  251:23
**compare** 165:15
  218:22
**compared** 242:3
**comparing** 90:3
**comparison**
  158:23
**compile** 66:14
  68:8 175:6 318:23
  320:19
**compiled** 179:4
**complaint** 210:19
  210:22 212:5
**complete** 22:19
  70:17 106:25
  133:14 167:10
  216:9 223:16
  257:17,18 320:20
  321:9 355:8
**completed** 105:20
  353:17
**completely** 80:5
  118:4 162:15
  293:23
**completeness** 26:4
  279:15,24

**complexity** 339:10
**compliance**
  135:12 214:24
  216:6
**compliant** 78:21
**complicated** 51:17
  340:6
**complication**
  348:23
**complications**
  170:25 313:9
**complied** 257:4
**components** 55:11
  55:13 277:21
**composition**
  113:13
**compound** 56:17
  74:22 82:9 118:24
  120:15 137:3
  157:25 175:15
  214:2 217:15
  226:12 299:8
  302:17 308:8
  340:21 345:6
**comprehend**
  16:13
**comprehensive**
  65:23 72:25 127:9
**comprehensively**
  70:23
**comprising** 99:2
**compute** 165:19
**conceding** 66:6
**concentrated**
  167:23
**concentration**
  161:4 211:12
**conceptually**
  188:6
**concern** 95:8

[concerned - consumption]                                          Page 13

concerned 100:10
131:23 244:17
314:13
concerns 171:7
252:22
concession 340:24
concluded 70:22
93:5 97:23 350:2
351:7
conclusion 47:4
93:9 98:2,7,18
217:6 248:9
conclusions 31:20
98:14
condition 88:2,5
conditions 346:12
conduct 327:5
conference 14:6
14:11
conferring 280:18
confess 76:21
confidential 14:4
80:3
confidentiality
90:17 98:10 167:7
168:16 171:6
218:8 241:7
configuration
173:18
confined 63:25
confirm 24:25
33:19 34:5 41:8
56:8 131:3 258:22
317:9
confirmation
142:3
confirmations
254:12
confirming 67:9
conflate 131:17

conform 60:5
77:24
confused 76:22
179:19 273:6
confusing 99:17
confusion 44:24
277:18,19 280:10
303:17
congratulations
196:6
connect 141:24
188:22
connected 323:14
connection 24:11
37:6 81:25 132:11
239:8 241:9
consecutive
331:10
conservative
167:15 347:25
349:8
consider 59:7 67:5
69:2 78:16 147:5
260:2 337:14
consideration
110:7
considered 131:6
131:8 241:15
considering
136:17
consistency
160:19
consistent 104:2
143:15 144:24
146:8 160:12
173:10 293:23
consistently
302:24
consolidated
67:15 69:3

consolidation
161:5
constant 170:11
construct 205:23
218:3 332:19
335:23 342:11
constructing
328:9
construction
343:15
consult 72:11
consulted 104:24
consulting 168:16
218:9 241:7
259:11 319:15
consume 216:12
217:4 345:12
349:10
consumed 207:9
213:15 215:10
216:4 217:11,16
218:5 219:13,14
330:20 336:25
346:15 347:8,11
348:17 349:5
consumer 33:23
59:22,24 65:17
66:15 67:11 76:2
109:22 111:2
114:22 117:18
118:15 119:16
122:4 123:16
126:8,18 174:4,5
174:16,20 176:5
188:22 189:18
191:3,7,23 192:19
193:14,19 194:7
194:12 195:9,13
198:5,13 204:4
207:10,17 209:2
211:21 212:25

215:7,8,24 217:2
219:14,19 228:5
229:4,9,13,17
260:23 269:20
280:3 319:9
330:21 335:13
336:10,12,25
339:20 341:16
345:10 346:6
347:16 349:16
consumer's 69:18
211:22 338:13
340:5 348:9
consumers 8:20
25:3 34:8 35:11
53:8 57:17,24
63:5 68:8 70:8
74:6 78:14 92:3
112:14 120:8
126:9,19 158:17
173:21 174:7,15
186:3 204:24
205:24 218:15
219:10 223:24
235:16 319:18
321:5,9 324:17
332:2 334:21
342:25 343:2
345:24 349:3
consuming 195:17
260:4
consumption
194:2 205:23
211:22 215:2,14
215:23 216:7,9,17
216:20 217:22,24
328:9 329:5,13
331:11 332:19
334:14 335:23
342:12 343:15,25
344:22 345:17,20

347:6 348:10
**contact** 258:21
**contacted** 258:25
**contacts** 273:15
**contain** 29:12
  34:25 39:2
**contained** 80:6
  111:4
**containing** 8:17
  39:13 40:24 111:2
  118:5,11 121:14
**contaminants**
  211:13 212:19,24
**contaminated**
  43:24 61:6 110:22
  111:17,23
**contamination**
  60:8 110:16
  111:13,14 210:14
**contemplate** 181:4
**content** 61:2 98:24
**contention** 188:13
  188:21 274:6,23
  284:11,12 309:8
**contest** 24:22
**contested** 59:22
  158:9 165:10
  173:22
**contests** 24:24
**context** 92:3
  219:11
**conti** 23:20 24:5
  24:11
**continue** 22:3
  106:17 154:12
  162:22 218:20
**continues** 134:7
**contours** 219:2
  255:3
**contract** 129:5,22
  130:11,13,18

155:24 285:13,22
286:9 291:10,18
291:22 292:2
298:16,17,17,21
301:18 310:6,9
312:8,23
**contracted** 97:4
  132:18 133:7
  297:24 299:4
  300:8 302:6 309:7
  310:20,21
**contracting**
  128:21 130:3,8
  155:2,17 156:16
  286:2 289:10
  290:22 291:14
  292:23 309:18
  313:11,22 316:8
**contracts** 118:3
  130:14,19 156:22
  189:23 298:16
  305:11 308:16
  310:5
**contractual**
  134:15 310:23
  313:15
**contrary** 71:19
  133:3 277:10
  300:11 345:22,25
**contrast** 164:5
  293:18
**contributions**
  239:11
**control** 95:13
  146:22 147:20
  186:9 189:24
  190:2,9,14 191:4
  267:22 268:16
**controls** 264:21
  280:8

**conventions** 185:6
  185:11 276:13
  279:18
**conversations**
  18:6
**convert** 159:16
  341:23
**converted** 28:13
**convey** 262:3
**convoluted** 320:14
**coordinates**
  270:19 273:14
**copies** 30:20
  353:14
**copy** 16:3 37:5
  38:22,25
**coral** 7:7
**core** 178:8
**corp** 6:5
**corporate** 3:9
**correct** 10:24 16:9
  17:4 19:7 20:7
  21:16 29:5 32:7
  39:17 42:13 46:8
  46:9 49:16,17,21
  66:16 85:2,7 87:9
  103:21 105:14
  107:3 111:6 114:2
  123:20,23 124:10
  155:23 156:11
  157:13,14 177:15
  183:22 185:20
  190:7 193:7 196:2
  197:7 219:16
  233:9,12,20
  234:19 235:3,22
  236:20 237:2
  240:2,25 246:12
  261:2 264:13
  265:7,13,23
  266:16,18 269:15

269:16,16 270:2,4
302:19 308:3
317:16 323:2
326:2 332:24
334:6,18,25
337:11 345:13
355:8
**corrections** 355:6
**correctly** 44:20
  63:9 72:9 81:21
  83:19 148:25
  155:13 168:23
  220:17 234:15,23
  253:13 274:23
**correspond** 38:12
  237:25 335:20
**corresponded**
  341:25
**cost** 114:22 170:12
  170:13 198:9,12
  242:3 260:23,23
  264:18 277:22,23
**costs** 198:11
**counsel** 9:12,22
  15:15,22,23 16:19
  16:22 20:12,14
  21:12,14 27:11
  40:10 42:9 53:4
  53:15 54:3 78:5
  102:6 103:25
  104:20 107:19
  153:6 180:25
  231:9 236:13
  278:24 321:16,22
  322:7 349:22
  351:4 353:14
**count** 40:4 46:21
  159:19 238:13,15
  347:17
**counted** 238:16
  321:5

counties 242:25
counting 56:23
  342:4,5
country 71:11
  114:16
counts 70:7,8
county 249:13
couple 21:8 26:19
  39:14 60:24
  101:15 129:2
  176:20 320:16
  322:21
course 12:7 19:23
  30:9 87:14 92:24
  104:18 121:7
  145:12 173:8
  180:8 189:11,25
  194:16 204:14
  214:22 216:2
  221:10 261:11
  281:6 289:15
  292:17 298:20
  345:25
court 1:2,16 9:10
  9:14 38:6 59:5,6
  65:9 70:22 75:14
  77:2 93:4 94:22
  97:23 116:18
  117:10,11 124:7
  180:25 198:15
  230:10,12 320:22
  321:13
court's 13:14 93:9
  99:11,25 108:10
courts 58:20
  320:20
cover 166:12,15
coverage 89:11
  167:23 227:5,11
  235:6,20 250:11
  279:16

covered 224:3,19
  226:16,17 234:23
  235:19 281:14
  302:5
covering 102:7
covid 196:11
craft 1:8 8:5,11,15
  9:6 10:1,10,15
  11:1 12:1 13:1,10
  14:1,2 15:1,20
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1,21 27:1
  28:1 29:1 30:1
  31:1 32:1,17 33:1
  34:1 35:1 36:1
  37:1,4,12 38:1
  39:1 40:1 41:1,19
  42:1,23 43:1 44:1
  45:1,3 46:1 47:1
  47:15 48:1 49:1
  50:1 51:1 52:1,22
  53:1 54:1,25 55:1
  56:1 57:1 58:1,15
  59:1 60:1 61:1,23
  62:1 63:1,9 64:1,7
  65:1 66:1 67:1
  68:1,23 69:1 70:1
  71:1 72:1 73:1
  74:1 75:1 76:1
  77:1 78:1 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1,21
  86:1 87:1 88:1
  89:1 90:1 91:1
  92:1 93:1 94:1
  95:1,5 96:1 97:1
  98:1 99:1 100:1
  100:23 101:1,13
  101:25 102:1

103:1 104:1 105:1
106:1 107:1 108:1
109:1,14,19 110:1
111:1 112:1 113:1
114:1,11 115:1
116:1,12,14 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1,20 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1,7,11 148:1
149:1 150:1 151:1
152:1,7,9,12 153:1
154:1,24 155:1
156:1 157:1,5
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1,6 183:1,10
184:1,3 185:1
186:1 187:1 188:1
188:4 189:1 190:1
191:1 192:1 193:1
194:1 195:1,12
196:1,16 197:1
198:1 199:1 200:1
201:1,7,24 202:1
203:1 204:1 205:1
206:1,6 207:1
208:1 209:1 210:1

211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1,13 227:1
228:1,19,23 229:1
230:1 231:1 232:1
232:3 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1,8,14 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1,6 259:1
260:1,8 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
277:1 278:1 279:1
279:4 280:1,20
281:1 282:1 283:1
284:1 285:1 286:1
287:1 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
295:9 296:1,6
297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
311:14 312:1
313:1 314:1 315:1
316:1 317:1,24
318:1,3 319:1

320:1 321:1 322:1
322:18 323:1
324:1,14 325:1,15
326:1 327:1 328:1
329:1 330:1,7
331:1 332:1 333:1
334:1 335:1 336:1
337:1 338:1,3
339:1,22 340:1
341:1,2 342:1
343:1 344:1 345:1
345:7 346:1 347:1
348:1 349:1 350:1
351:1 352:4 353:5
354:2,24 355:2,4
355:12
**craft's** 26:18
**create** 347:6
**created** 209:14
**creating** 245:5
**credit** 118:13,16
119:12 121:16
122:18 314:15
**credits** 115:19
116:3 117:23
**criteria** 329:2
330:19 332:23
334:4 344:17
**critical** 89:7
125:20
**critique** 25:19
**cross** 255:22
257:21
**crosswalk** 344:4
**csv** 28:11,23 29:6
**culbertson** 6:20
**cumulative** 206:14
207:22 208:11
209:8 318:13
331:19 337:14

**curious** 337:18
**current** 70:4
**currently** 69:10
169:5 227:2
243:18
**customer** 131:21
212:20 276:2
**cut** 43:11 58:3
104:14 138:21
145:7 147:12
150:11 236:19
**cutting** 147:14
**cv** 11:3
**cvs** 5:21 26:25
**cw** 105:7

**d**

**d** 8:2 10:15 36:23
37:17 62:18
238:13,20 239:20
337:8
**d'lesli** 4:23
**d.c.** 17:6
**d.stanoch** 353:2
**dallas** 4:22
**damage** 123:10
173:21 237:25
254:25
**damages** 173:24
237:5,7 320:4
321:11 323:17,23
324:6,9,23 325:6,8
325:24
**dan** 5:9
**dana** 3:13
**danced** 271:2
**darned** 288:11
**data** 8:14 18:18
19:4,14,20,20,24
19:24 24:6,25
25:6,7,10,11,14,16
25:17 26:4,24

27:16,18,21,22,25
28:4,5,14,16 29:20
29:22,23,24 30:2,3
30:8,11,14,17 32:4
32:21 33:6,10,19
33:20,20 34:3,5,18
34:20,23 35:8,23
35:25 36:4,13,19
40:9,18 55:23,25
57:5 62:25 63:14
63:22 64:24 65:2
65:3,4,7,15 66:14
67:3,5 68:10,11
69:4,14 70:18,21
71:5 72:2,20 73:2
73:18 74:2,10
75:4,18 77:12,12
77:15,22,23 78:2,8
78:19,20 80:13,16
80:20,24 81:9
83:5,15,16,20,23
84:2,4 90:22,22,24
93:5 94:2,8 95:11
95:11,21,24 96:3
96:11,14,16,17,22
96:22 97:6,9,12,19
97:19,24 98:19
99:5,13,16,18,18
99:23 100:4,8,11
111:19,20 114:14
115:17 116:4,5,7
117:20 118:18
123:20 124:3,4,11
124:18 125:6,10
125:15,17,25
126:6,14,17,22,24
132:12 133:5
135:17 136:15,16
137:8,9,18 138:2,5
138:5,13 139:11
139:12,25 140:2,3

140:16 141:25
142:8 143:14,14
144:18,23 146:15
146:16,23,24
148:5,6,10,13,17
148:24,24 149:4
149:11,13,22
150:13,15 158:7
159:7,12,24 160:9
160:11,20 161:12
161:14,18,20,22
161:23,25 162:6,7
162:10,21 163:5,8
163:14 164:2
165:4,8,18,25
166:7,10,20,21,23
167:22 168:4,9,21
169:6,13,15,25
170:8,9,20 171:2,9
171:10,12,15
172:2,11,19 173:5
173:10,15 174:12
174:17,19 175:7,8
175:22 177:13
178:9,10,22,22
184:25 185:9
186:14,17 189:22
189:24 191:5,20
192:19 195:23
196:17 197:5,8,11
197:13,16 198:7
198:18 201:9,14
214:15,16 215:2
217:9 218:3
223:20 226:3
227:25 228:7
229:16 233:11
234:2 236:9 238:2
238:10 239:15
240:3,10,15,18,23
241:14 242:9

[data - definitionally]                                              Page 17

243:10,14,16,21      343:11,11 346:9      dealing   226:24       defendant's   226:3
244:5 245:24         346:16,23 347:11     deals   183:11,22        227:11,16
246:10,10 249:17     348:4,14               220:9                defendants   8:10
250:24 251:18        database   94:21     dear   116:13            27:3,13 29:25
252:2,14 253:2,4     127:9 273:4,8,21     decades   181:17         33:24 35:19 40:20
254:6,9,13,19        databases   138:15   december   102:3,8       43:21 48:5 69:20
255:3,5,6,7,14,23    178:7                  102:12 103:4           69:21 70:9,14
256:11 257:11,16     dataset   42:15      decide   65:9 180:25     75:19 76:5,5,24
257:22 260:18,20     date   16:7 22:21      190:16                 78:12,17 108:11
261:10 264:8         35:22 176:22         decided   77:2           110:12 165:17
269:6 271:3,12,15    184:13 225:22          345:21 347:8           186:18 192:9,10
272:10,13,14,21      280:5 347:19         decides   65:9           198:4 200:11
272:23,24 273:24     348:9 349:18         deciding   268:7         202:2 203:2 205:5
273:25 275:10,18     354:24 355:12        decision   98:16         220:9,11,13 221:4
276:4,14,14,18       dated   102:2          100:2 238:3,8          221:14 222:2,19
277:2,9,17 278:3,5   196:23               decisions   108:10       223:7,10,13
278:15,17 279:11     dates   70:11 186:8    314:15                 226:15 227:24
279:15,25 280:11     190:23 206:2         declaration   8:15       229:21 230:22
280:23 281:13,17     dating   194:19        23:5 62:23             258:12 306:23
281:20,22,24         dave   37:24 61:23   declarations   78:18     332:12 344:3
282:4,4,8,12,12,16   116:24 151:11          146:3                defense   27:11
282:19,20 283:2,8    196:9 200:6 203:8    declare   355:4          349:24
283:23,24 284:7      295:5 322:4 350:8    decompose   148:23     define   76:23
284:22 293:3         david   2:8 351:3    decomposed   229:6       133:17 209:13
294:4,9,13 296:12    353:1                  304:16                 326:9
299:12,16 300:19     davis   4:23         decomposition         defined   90:21
301:7,20 302:9,11    day   12:14 105:19     142:4                  113:12 197:4
302:24 304:3,16      125:10 145:6         dedicated   202:4        202:5,16 208:22
304:21 305:5,13      159:18,19 185:25     deduct   348:10        defining   77:22
305:23 306:5,10      213:8 277:6          deductible   141:19      208:20
306:19,20 307:11     306:25 341:21,22     deemed   79:2         definitely   38:18
307:12 308:13,23     341:22 347:21          355:6                 321:25 324:19,24
309:9 314:21         352:15 355:15        default   140:18      definition   87:11
315:2,5,14 318:5     days   330:24        defend   307:2          89:25 121:13
320:25 324:16,20     333:11,20 338:24     defendant   18:22       188:19 202:2,4,25
324:25 325:3,10      341:23 344:20        19:3 48:23 49:4         203:10,14 207:8
328:11,18,18,21      347:22 353:17        110:20 165:8,8          218:13 226:25
333:7,9,22 334:2     dc   5:7             202:6 225:10,17         237:22,24 243:2
334:16 335:2,3       de   7:6             226:16 227:12,19        255:4 332:5 333:3
338:23 340:13        deal   64:20 213:3   229:11 230:4,23       definitionally
341:20,24 342:11     216:25 312:14        231:2 258:12            287:15

[definitions - direct]                                                    Page 18

**definitions** 8:19
53:6 63:7 219:3
253:23 329:22,24
**delay** 127:19
**delineate** 96:14
97:7 148:12
**delineated** 91:20
**delineation** 96:15
**deliver** 277:15
**delivering** 163:9
314:6
**delivers** 72:14
**delivery** 234:25
**demonstrate**
277:2 342:13
**demonstrated**
162:2
**denies** 304:20
**denominated**
267:7
**depend** 189:22
**dependents** 226:4
**depending** 93:2
121:4
**depends** 119:11
176:9 212:9
**deponent** 353:13
355:3
**deposing** 353:13
**deposition** 8:11
9:5 10:5 11:10
13:5 15:2,19 16:2
18:13 20:15 23:25
36:25 37:19 40:2
44:8 46:24 66:11
70:13 128:3
129:16 145:22
152:15 180:8
196:5 351:7,10
352:7

**depositions** 11:2,5
**derive** 214:7
**derived** 253:9
**describe** 91:5
146:10 148:6
271:21 312:4
326:10
**described** 30:15
52:16 53:12 55:24
73:11 91:10 96:12
115:13 139:3
140:4 148:9
185:13 226:18
227:10 257:13
273:19 286:5
293:15 336:16
338:23 347:14
**describes** 25:24
**describing** 42:25
220:6 246:5 253:2
253:12 293:9
311:17
**description** 8:9
53:20 97:18
117:23 139:10,16
139:16,17 224:5,7
274:25 276:5
278:19 298:23
301:10,13 326:15
334:24
**descriptions** 244:6
293:22
**descriptive** 293:2
293:5
**descriptor** 294:10
**design** 131:20
**designated** 105:7
119:20,24 241:10
**designation** 80:12
80:22,23

**designed** 43:22
150:2 283:4
**desktop** 17:12
**despite** 342:10
**detail** 53:22 80:2
103:11 197:6
223:5
**details** 16:14
169:9 273:13
**determinable**
307:8
**determination**
146:7 221:17
**determine** 61:17
111:16 122:2
141:14,18 166:25
191:6 194:6,11
209:8 211:21
216:19 217:10
233:15 279:15
292:6 334:3
335:24 337:13
340:4 342:15
**determined** 75:15
111:22 123:9
**determines** 236:14
**determining** 59:5
208:10 313:7
**developed** 140:7,8
178:8 181:16
**developing** 233:14
**device** 17:14 163:7
**devices** 17:7
**diagram** 136:13
139:3
**dictionaries**
276:15 277:17
**dictionary** 280:11
**differ** 90:12
143:13 248:16

**differed** 211:19
**difference** 92:14
160:15
**differences** 61:5
91:8 146:9 270:15
276:12 277:25
**different** 12:2
31:12 42:3,3
59:11 73:18 84:6
90:7,18,20,23
91:13 92:3,17,25
94:20 97:17 98:10
112:21 135:19
164:13,16 167:7
172:23 187:15
188:5 194:21
197:14 204:6
205:14 207:20
225:14 236:7
266:3 270:15,18
276:3 281:19
297:5 298:10
303:11 314:22
315:4 325:5 327:3
332:7,7,11,16
333:18 335:21
343:9
**differentiate**
218:14 268:4
271:8 272:8
**differently** 90:21
277:21
**difficult** 21:6
71:20 225:2 276:8
**difficulty** 313:7
**diffuse** 161:6
**dig** 72:24
**digit** 50:17
**digits** 51:4
**direct** 52:22 57:13
135:23 136:23

156:2,20 304:23
**directed** 44:16
**directing** 55:5
**direction** 238:10
  271:19
**directions** 271:20
**directly** 35:16
  70:20 71:10 77:8
  130:8,12 135:25
  149:22 156:15
  185:2 204:5 234:8
  234:10,15 235:10
  235:16 254:11
  255:19 269:7
  285:22 286:3
  287:8 291:10,15
  304:7 316:20
**disagree** 58:20
**disclose** 198:18
**disconnect** 44:16
**discount** 158:16
  253:21
**discovery** 10:6
  30:10
**discretionary**
  268:17
**discuss** 63:22 78:4
  100:23 111:20
  131:16 169:8
  196:17 240:11
**discussed** 63:17
  120:17 125:17
  145:15 229:25
**discusses** 55:22
  56:2,3 123:19
**discussing** 64:24
  119:13 128:19
**discussion** 146:2
  178:6 190:8
  217:22 297:22
  298:2

**discussions** 208:19
**dismiss** 105:17,23
  106:11,20 108:4
  108:11
**dispense** 186:3
  206:3 348:13
**dispensed** 75:23
  114:15 156:21
  160:2 165:12
  174:8 186:6 191:2
  193:13 206:2
  207:12,13,15
  215:6 217:11,16
  247:2 283:14
  346:15
**dispenses** 166:4
  283:13
**dispensing** 69:5
  163:25 166:3
  215:16 216:16
  217:23 280:4
**dispositive** 99:12
  110:21
**dispute** 24:22
**disputes** 69:25
  304:14
**disregard** 307:20
**distinct** 256:24
**distinction** 89:7
  91:4 112:3 258:2
**distinguish** 31:21
  113:6
**distributed** 43:23
  203:16
**distribution**
  112:13 178:17
**distributor** 204:2
**district** 1:2,3
**diverse** 64:20
**divide** 83:6

**divides** 282:7
**divulge** 87:5 90:16
  98:9 167:6 168:15
  169:8 208:16
  218:7
**docket** 107:13,15
  107:23
**document** 14:15
  14:23 15:7,9
  17:13 20:21,22,24
  22:10,19 26:22
  29:2 31:3 47:8
  85:22 202:15,19
  203:21 212:3
  329:15
**documented** 121:8
**documents** 13:12
  15:13,23 20:4
  21:5 22:2 23:2
  29:15 43:4,14
  103:7 104:8,11
  172:4
**doing** 20:18 37:13
  130:4 132:16
  151:23 170:25
  189:10 221:10
  224:8 229:20
  252:8 254:8
  255:11 314:18
  320:23 337:17
  341:7,10,15 342:4
**dollar** 201:12
  283:17,19
**dorner** 3:11 8:5
  9:20,22 21:17
  22:4,8 26:6 32:8
  36:20 37:13,24
  38:19 44:22 47:6
  49:22 54:21 61:19
  62:17,19 68:15,16
  84:8 106:13,16

108:17 109:2,13
  116:24 117:4
  147:11 150:25
  151:6,11,18 152:5
  152:9,10,17,21
  153:2,9,12,15,16
  153:20,22 154:2,6
  154:14,17,20
  156:24 181:25
  182:4,14,20 196:3
  196:8,13 200:4
  201:18 202:17
  203:7 217:16,20
  228:12,17 231:22
  232:11 280:15,17
  295:4,21 315:24
  321:15 322:3
  323:11 329:18,19
  350:8,19
**dorsey** 6:12
**dosage** 174:8,23
  205:25 207:12
  329:4 333:10,20
  335:17 336:25
  338:25 339:13
**dosages** 332:16
  338:12,17
**dose** 183:16,22
  338:6 339:20
**double** 255:25
**doubt** 174:14
**dr** 23:20 24:5,11
  24:21
**drafted** 227:2
**draw** 106:24
**drawing** 106:20
  254:8,11
**drawn** 106:9
  233:10
**drew** 3:11 9:22
  151:8 326:8

329:18 350:16
**drill** 72:15
**driven** 133:5
  182:19
**drop** 136:10
**drug** 34:11,13
  45:16,25 50:5,23
  55:19 60:3 61:10
  69:13 98:22 99:21
  99:21 111:2
  113:11,12 114:2
  115:7 118:8,11
  135:11 141:16
  160:6,17 163:25
  166:3,3 170:13
  183:12 189:8
  192:5 196:21
  216:6 239:9 240:5
  250:11 260:23
  288:7 289:14
  306:24 320:5
  333:9 345:24
  349:9,20
**drug's** 52:13
**drugs** 8:17 16:11
  34:7,8 40:24 48:3
  48:23,23 49:5
  118:2,6 121:14
  164:19 167:24
  183:23 215:6,9,10
  216:11 321:7
**dry** 153:25
**dscsa** 183:11,14
  184:6 185:8
**duane** 3:4 225:16
  225:19,24
**due** 110:15
**duly** 9:17 352:6
**duplicate** 28:20
**duplicated** 25:5

**duration** 187:16
  330:14,21 331:7
**dwell** 195:11
**dynamic** 317:8

**e**

**e** 2:2,2 3:2,2 4:2,2
  5:2,2 6:2,2,24 7:2
  7:2 8:2,8 32:19
  33:18 47:8 124:8
  354:3,3,3
**earlier** 45:19 65:8
  96:7 127:23
  128:19 129:16
  131:13 148:9
  161:14 167:24
  193:8 218:22
  260:8 277:6 278:3
  281:15 318:21
  322:23 326:8
  343:13,18 345:15
**easily** 67:3 117:19
  122:10 216:3
  227:2 236:12
**easy** 25:13 236:4
  251:21 265:8
  341:12,24 349:6
**echo** 47:9
**economic** 59:13
  173:21,23 210:18
  210:21 239:17
  319:10,18,20,21
  319:23 323:24
  324:9 325:24
**effect** 88:13
**effective** 184:13
  185:11
**effectively** 25:5
  100:7 139:11
  253:15 255:25
**efficient** 67:16
  69:3 74:3 180:9

**efficiently** 283:4
**effort** 119:21
**eight** 21:10 109:16
  109:18 123:24
**either** 23:25 40:19
  50:15,15 72:20
  116:9 120:7
  132:17 155:18
  171:12 189:14
  198:7 201:11
  203:16 217:9,11
  218:2 234:24
  285:19 286:7
  293:3,16 300:21
  304:5 334:11,23
**elected** 287:8
**electronic** 17:7,14
  25:3 34:14 55:16
  73:2 80:13,16
  96:21 132:2
  306:10
**electronically**
  13:13 72:2 121:3
  121:7 185:10
  186:10 306:2
**element** 58:9
  125:20 189:10
  203:24
**elements** 19:16
  25:4 35:23 95:18
  95:21 113:14
  137:8,10 143:18
  269:14 271:13,25
  272:25 333:8
**eligibility** 141:14
**eliminate** 61:14
  223:23 229:2,4,17
  229:18,19 255:24
**else's** 214:11
**email** 17:23
  150:21

**embedded** 118:2
**emeryville** 17:3
**emp** 246:22
**emphasize** 61:8
  66:10
**emphasizing**
  65:21
**employed** 225:9
**employee** 221:11
  222:7,11,11
  224:18 225:5,19
  226:23 227:12
  243:17 245:18
  248:3 249:9,21
  251:7,22 259:3
  287:7 288:22,22
**employees** 221:15
  224:12,14,22
  226:15,19 227:18
  230:22 247:3
**employer** 89:21
  101:5 139:17
  276:6,7 287:20
  288:5 290:13
  303:21
**employer's** 230:2
**employers** 177:19
**employment**
  134:20 231:15,17
**empty** 153:17
**enable** 97:13
**encompass** 64:9
  64:20 97:3
**encompassing**
  66:4
**encourages** 55:20
**ended** 78:14
**ends** 62:6 109:6
  182:24 232:14
  308:23 351:10

enforceability
  76:11
enforced  184:16
engaged  278:4
  320:18 327:21
engine  273:4,10
english  188:7
enormous  161:17
enrichment  202:3
  203:2 204:13
enrollee's  234:11
enrollees  88:7
ensure  89:22
  136:19
ensured  275:7
  287:25
enter  13:24 38:10
entered  198:16
enterprises  249:14
entire  14:15 57:4
  117:25 118:8
  123:11 172:13
entirely  25:13
  91:13 185:11
  194:4
entirety  138:4
  158:17
entities  9:23 25:6
  25:21 71:22 82:2
  86:24 88:10 157:9
  161:24 168:5
  220:10,20 221:21
  223:8,11 229:22
  233:24 234:5
  238:17 243:7
  244:15,16 249:6
  251:2 258:15
  259:20 288:17
entitled  1:14
entity  47:23 48:22
  76:18 88:14

119:20,22,24,25
128:16 133:7,8
134:9,15 135:24
220:23 227:5,6
234:10 242:23
248:22 256:20
257:8 265:16
279:19,21 286:2,9
292:24 300:8,20
313:23 334:21
entity's  133:10
entries  28:8
entry  105:6,25
  106:2,18,25 275:5
enumerable
  178:15
enumerates  165:9
enumeration  55:6
  127:12
equals  282:20
equation  339:23
equivalent  157:18
  159:17 187:23
errata  39:13,20
  353:11,13,15,17
escrow  314:9,13
  314:15
escrowed  314:11
esq  2:8,9,18 3:11
  3:12,13,14,15,24
  4:8,9,16,23 5:8,9
  5:17,24,25 6:8,16
  6:24 7:8,15 353:1
essential  25:4 67:6
  67:13 84:7 121:10
  141:8 143:11
  149:17 161:16
  162:23 170:21
  189:10 191:3
  275:9

establish  194:7
  237:19 332:22
established  178:18
  179:17 236:9
  250:18
estimate  21:7
  164:5 172:9
  212:23 213:6,12
  213:14,19 214:8
  245:11
estimated  52:6
estimates  212:14
estimating  40:7
estimation  214:25
  299:11
et  353:4 354:1
  355:1
evaluate  53:5
evaluates  55:23
evaluating  279:24
event  150:16
everybody  13:9
  67:23 109:14
  148:7 278:8
everybody's
  142:21 175:7
  295:22
everyone's  37:14
evidence  10:8 99:5
  197:22 199:5,14
  201:2 210:8
exact  41:22 83:18
  102:20 114:17,19
  212:18,24
exactly  14:12
  31:19 40:22 75:19
  75:21 163:14,15
  165:11 167:17
  172:24 236:3
  265:19

exactness  68:4
examination  8:4
  9:19 322:5,16
  352:5
examined  9:18
  194:6
examining  80:8
example  27:18
  28:6 36:11 53:23
  64:14 81:2 107:18
  118:15 120:23
  145:2 156:19
  161:8 162:25
  163:9 172:20
  176:17 181:10
  184:17 191:15
  198:10 218:15
  222:7,10 224:18
  236:6 246:15,18
  249:13 253:7
  255:18,20 270:18
  275:25 283:13
  293:14 298:17
  303:6 311:23,24
  312:4 317:4
  320:24 331:3
  335:8 337:3,8,9
  339:9 341:11
examples  98:17,19
  310:14 337:7,20
excel  8:22 28:9,12
  233:3 247:12
  337:15 341:6
excellent  13:2
exception  35:9
  224:17 286:4
  287:5 289:3
  290:20
exceptions  177:18
exchange  114:13
  287:14 294:22

[exchanged - fact]                                                Page 22

**exchanged** 13:19
  261:10,14
**exclude** 221:8
  227:18 240:12
  243:9 250:4
  255:14 258:12
**excluded** 86:24
  88:14 224:4
  230:16 237:6
  242:25 248:22
  249:5,6 252:13
**excluding** 79:11
  82:2 245:24
**exclusion** 87:11,22
  87:24 235:24
  256:4 259:8
  320:11
**exclusions** 53:7
  56:3 220:6,8
  231:10 233:24
  249:4 250:25
  251:6 258:9
  259:17 320:8
**exclusively** 191:11
**excuse** 38:6 42:22
  130:9 136:20
  181:22 184:20
  205:3 209:22
  344:24
**executed** 133:19
  249:19 326:13
**exemptions**
  184:18,22
**exercise** 41:8
  46:23 51:18 59:21
  133:5 219:9
  251:19 252:8
  277:4 336:11
  341:4,6 342:3
  343:5,12

**exercises** 27:17,24
  170:2
**exhibit** 8:10,12,13
  8:15,16,18,19,22
  13:23,24 14:19,22
  21:18,20,21 26:15
  30:25 31:2,23
  32:3,10,11,15,19
  33:9,18 34:24
  36:22,24 37:2,15
  38:7 42:22 47:10
  47:11,18 48:21
  49:24 52:20,21
  62:14,17,18 64:12
  84:17 101:7,11,12
  101:22,25 105:3
  109:15 183:7
  201:19,20,22
  202:8,24 220:4
  232:21,25 233:2
  235:25 236:2
  238:13 240:6,8
  247:7 248:2,8
  249:19 258:5,6,10
  258:13,18,18
  295:25 329:16,16
  329:20,25 335:22
  350:10
**exhibits** 8:9 14:3,7
  14:10 18:6 37:15
  38:3 39:2,4
**exist** 36:19 81:9
  170:2 189:12
  190:15 275:11,12
  305:9
**existed** 244:7
**existence** 25:22
  82:17 259:19
**exists** 25:8 72:2
  163:6 304:2
  306:10 324:20,25

**expect** 100:13
  116:8 122:7 158:2
  167:20 189:21
  230:11 288:21
**expected** 25:13
  35:24 40:25 96:20
  166:11,14 313:14
  316:7
**expedite** 268:18
**expenses** 71:24
**expent** 78:10
**experience** 219:19
  230:10 294:12,15
  299:2
**expert** 1:8 8:15
  10:22 23:4,5,15,19
  29:11 31:14 32:19
  40:12 105:2
  234:21 236:23,24
  241:10,16 310:16
  327:16
**expertise** 107:8
  210:16
**experts** 237:5
  327:17
**expiration** 186:8
  190:23
**expired** 110:13
  194:18,20
**explain** 12:3
  193:22 256:17
  279:9
**explained** 249:22
  256:9 276:14
  277:5 301:21
  303:18 305:23
  318:20
**explanation** 81:13
  149:20 228:18
**explicit** 42:16
  87:11 91:2 171:22

  294:9 306:5
**explicitly** 50:16
  306:18
**exponent** 124:7
**exposure** 213:7
  214:8 318:13
**express** 27:2 53:25
  58:21 223:22
  291:12,14 312:19
  324:23
**expressed** 59:3
  107:9 108:4,9
**expresses** 25:8
**expressing** 60:23
  76:19 324:6
**extensions** 184:12
**extent** 14:13 15:17
  53:13 58:13 66:2
  87:6 126:21 193:9
  204:7 207:5 239:6
  242:17 248:19
  324:12,15
**extract** 174:16
  176:5
**extraordinarily**
  150:24
**extremely** 127:4
  130:23 131:10
**exuberantly** 162:2
**eye** 107:22

| f |
|---|

**f** 9:17 10:15
  101:12
**faced** 75:18
**facially** 304:2
**fact** 11:14 44:18
  46:13,15 47:2
  51:16 91:23 92:16
  93:8 110:20
  111:24 120:20
  122:2 123:15

129:22 139:20
143:11 158:4,14
158:21 163:6
165:2 186:20
201:13 215:10
217:3,4 239:2,4
243:8 252:11
288:15 289:8
304:14 333:12,19
**factor** 110:6
219:15 330:19
348:6 349:15
**facts** 24:5,6,23
25:13 59:4 76:3
92:25 98:15 99:10
144:15 197:22
199:5,14 201:2
210:8 305:12
329:10 346:22
**factual** 93:9,10
98:2 173:18
**factually** 93:10
**fail** 88:11
**failed** 125:19
**failing** 117:18
**fails** 353:19
**fair** 12:4 18:9,10
23:24 38:17 45:9
56:9 81:10 102:13
103:20 113:5
128:17 187:2
195:19 203:4
222:15 239:23
319:25 328:23
**fairly** 203:12
**falanga** 4:4
**fall** 203:13 204:8
205:6 227:8
**falling** 87:23 339:7
**falls** 191:7

**familiar** 37:11
206:9,12,15,18,23
249:14 310:8
311:19
**family** 230:13
**fantastic** 107:19
**far** 48:8 90:5
100:14 102:25
103:25 117:12
312:17,24 346:9
**fashion** 175:21
**faster** 247:24
**fault** 278:10
**favorable** 178:16
230:19
**fda** 44:3
**feasibility** 320:23
**feasible** 34:15
**february** 1:10 9:3
102:2,7 353:3
**federal** 10:8 93:19
234:4 249:5 250:3
250:3,5,7,10,13,14
250:16,19,21,25
251:5 256:12,13
256:14 257:7,8
**federally** 238:14
**fee** 234:17 235:2,5
235:16,24 236:19
237:6 249:7 250:2
250:23 280:4
**feel** 193:21 247:8
**feeling** 317:24
**felt** 251:13
**field** 19:15 28:6
72:21 94:4 98:20
163:14 179:18
196:24 264:22
268:9,10 274:12
275:17 279:22,25
280:22 281:4,10

283:14 284:6,22
285:12,25 286:12
286:20 288:13
289:23 290:19,25
292:4,5,15,19
293:5,6,7,10,11,12
297:5,8 298:15,20
299:25 300:7,14
301:14,15 308:20
308:20 311:5
336:21
**fields** 24:25 35:20
77:22 95:24 99:25
133:25 134:23
135:20,22 136:5
136:15 137:15
138:7 139:7,13,18
140:9 146:7 147:5
149:24 150:13
170:9,21,22
246:10 261:14
275:11 276:4,10
277:12 280:12
282:10 283:3,13
292:16 293:2,21
294:10 297:18
298:10 309:9
**fifth** 265:5
**figure** 51:7 80:9
89:22 94:13
132:14 146:19
147:21 149:23
156:24 166:13
174:21 261:7
265:4 271:11,24
340:6
**figures** 325:9
**file** 27:7,20 28:4
52:16 72:21
146:13 177:17

**filed** 146:3 159:14
**files** 19:15 25:3
27:11,15 28:9,11
28:20,23 29:6,10
29:19,21 30:15,18
36:11 70:12
**filing** 123:7 230:15
**fill** 70:17 126:23
280:5 344:15
347:12,21 349:19
**filled** 126:12
127:13,13 165:6
195:8 334:9 343:7
344:19 346:6,17
**fills** 126:20 332:22
335:19 340:3
**final** 112:13
169:22 225:22
255:11 320:19
**finalize** 321:12
**finalizing** 39:19
**financial** 71:21
145:4 314:3
337:16
**financials** 159:15
**find** 44:19 107:22
227:13 259:24
289:3 296:5
299:23 301:24
**fine** 12:22 15:8
64:21 66:19
150:25 182:10
187:20 232:8
**finish** 262:9
**finished** 40:19
104:15 136:7
183:16,22 267:11
**firm** 7:5 9:9,11
107:12 190:23
200:2 225:16

**first**  9:17 27:10
  32:13 35:21 44:5
  47:22 48:10,15,17
  49:20 50:17 51:4
  51:15,20 53:11
  71:3 77:11 88:11
  88:15 89:4 93:18
  95:5 105:24
  112:16 115:12
  116:3 127:24
  128:14 133:23
  136:20 146:17
  152:10 157:11
  160:10 164:4
  168:25 172:17
  173:14 178:13
  220:14 227:14
  256:10 257:5
  265:3 271:5,7,23
  279:14 280:25
  287:10,23 296:14
  309:21,21 313:25
  336:8
**five**  42:22 55:25
  56:11,20 61:22
  84:16,17 99:3
  108:22 151:7,13
  154:4,7 168:11
  231:25 232:7,19
  271:23 295:6
  321:23 322:2,6
  344:20
**fixed**  235:5
**flag**  256:12 257:6
  257:17 304:5
  339:3
**flip**  26:18
**flipped**  244:25
  300:16
**floor**  4:6,14 5:14
  6:14,22 38:22

  199:18
**florida**  3:10,23 7:7
**flow**  271:19
  314:14
**focus**  62:21 63:11
  84:23 112:5
  114:10 115:11
  123:25 133:23
  136:12 146:17
  205:21 221:23
  258:19 264:4
  318:8
**focused**  107:8
  115:20 174:24
**folder**  14:5,14
  17:13 32:11 33:2
  37:15 62:18
  329:17
**follow**  52:8 175:9
  274:7 345:7
**following**  146:7
  225:6 283:19
  316:5
**follows**  9:18 61:10
**footnote**  39:14
  160:13 177:6,7
  178:5
**footnoted**  25:9
**forced**  199:25
**forcing**  154:8
  200:4
**foregoing**  355:5
**foresee**  179:24
**forget**  144:8
  320:11 350:9
**forgive**  247:17
**forgot**  77:9 258:7
**form**  22:20 33:14
  34:15 36:9 41:18
  43:8 46:18 49:9
  50:7 51:11 53:18

  54:10,18,22 56:15
  58:12 59:17 60:18
  63:18 64:3 65:19
  68:13,18 69:17
  73:15 74:18 77:18
  79:6,14 82:5,22
  88:20 90:14 92:7
  93:12 98:4 103:6
  108:14 110:2
  111:8 114:4,25
  115:23 118:21
  120:12 121:18
  122:8,21 124:21
  129:8 130:16
  132:21 135:4
  136:3 137:2
  140:13 143:4
  145:18 150:5
  155:8,21 156:5
  157:22 158:16
  162:17 164:15,24
  168:13 169:17
  171:18 172:15
  175:12 177:8,12
  177:17,21 178:2,8
  178:21 180:19
  183:19 186:25
  188:2,17 189:2
  192:22 195:25
  197:20 199:2
  202:10,14 203:20
  204:11 205:9
  207:2 208:5
  209:12 210:6
  211:25 213:21
  214:20 215:18
  216:3,14,19
  217:14,19 222:25
  226:8,22 228:21
  230:8 231:5
  237:12 239:22,25

  240:17 242:13
  243:23 248:14,24
  252:18 254:21
  255:16 256:7
  269:12 270:13
  275:3,21 276:22
  282:2,23 284:14
  284:25 286:23
  291:3 292:8
  298:12 299:6,19
  300:24 302:13
  304:25 308:5,14
  309:11 311:8
  313:19 315:21
  316:23 319:13
  320:13 323:4
  324:2,5,11 326:4
  326:24 327:8,24
  328:14 329:8
  331:21,24 333:2
  336:4 337:23,23
  340:19 342:19
  343:20 345:2
  346:20 348:19
**formalities**  11:22
**format**  27:25
  28:12 29:6 30:11
  143:15 252:24
**formats**  27:20
  98:20 185:8
**formatting**  29:12
  29:13,16
**former**  337:15
**forming**  43:6
  108:2,8 124:12,15
  177:13
**forms**  174:23
  212:13 225:4
  261:9
**formula**  335:22
  337:20

**formulary** 92:12
  135:12 141:16
**formulation**
  113:14
**forth** 142:11
  202:24 331:18
  352:6
**forum** 319:22
**forward** 335:13
**found** 277:24
  321:13
**foundation** 197:21
  199:4,15 200:24
  210:7 213:24
  301:2 302:16
  309:13 311:10
  336:6 345:4
**four** 15:4 20:19,23
  55:21 77:8 84:22
  99:3 125:23
  172:12 183:5
  231:10 232:14
  265:3 271:23
  314:22 337:3,7
**fourth** 200:9 201:7
  205:22
**free** 247:8
**frequency** 158:5
**frequent** 298:7
**frequently** 72:19
  77:21 116:4 165:2
  244:19 245:19
  253:23,25 297:11
  297:12,13
**friday** 12:15
**front** 47:16 99:23
  231:9
**froze** 116:12
**fulbright** 4:19
**full** 10:13 22:18
  36:15 52:25 53:12

53:13 263:24
  273:14 277:5
  293:17 298:22
**fully** 31:18 71:19
  74:12 76:6 83:3
  86:22 87:12,16
  88:4,16 89:3,15,21
  93:6 97:25 98:21
  122:3,4 171:11,24
  184:7,10 222:14
  242:16,18 248:11
  267:15 269:8
  280:23 287:16,25
  288:8,11,21 289:8
  293:3,15,16,17
  294:24,25 296:11
  303:22 314:19
  317:15
**function** 55:15
  84:7 143:16
  144:19 149:18
  198:15 207:11
**functional** 207:8
  216:8
**functionality**
  277:16
**functionally**
  208:22
**functions** 143:6,11
**fund** 312:7
**fundamental**
  324:21
**fundamentally**
  26:3
**funded** 72:7 75:5,6
  76:18 99:4 134:19
  221:2,3,7,16,25
  238:14 242:21
  243:6,18 244:19
  248:12,20 250:13
  255:19 280:23

290:15 293:4,19
  296:10 297:23
  300:19 303:22,23
  304:10,12
**funder** 76:15
**funder's** 75:7
**funding** 72:17
  80:11 99:7 223:14
  238:16 242:16
  244:5,8,11 245:3,7
  245:12,19 248:16
  253:24 258:22
  259:2,19 266:12
  268:25 273:16
  285:21 287:6
  289:13,15 291:9
  291:17 296:25
  297:3,16 300:12
  301:17 305:4
  308:19,24 316:10
**further** 35:15
  53:22 60:2 107:25
  113:16 114:6
  125:22 148:23
  169:9 197:6 223:5
  225:19 234:6
  352:9
**fuzzy** 176:17

**g**

**g** 232:25
**gables** 7:7
**game's** 306:17
**gannon** 4:9
**gaps** 126:22
**garbage** 215:10
**gated** 173:2,3
**gathered** 94:8
**gathering** 305:13
  307:7
**gears** 177:2
  231:24

**general** 19:9,17
  107:5 119:17
  158:13 159:22
  220:19 286:5,16
  286:18
**generalize** 93:3
**generally** 11:4
  18:17 36:13 42:25
  52:3 58:17 64:24
  65:14 94:17 96:20
  98:25 159:2,5
  171:8 190:24
  206:13 233:13
  240:2 274:19
  285:6 289:9 305:6
**generate** 29:21
  30:5 33:17 40:4
  71:22 99:19 132:2
  135:11 140:3
  143:19 304:23
**generated** 30:4
  32:18 34:2 46:21
  46:22 145:11
  159:9,10 264:17
**generates** 119:16
  304:15
**generating** 29:22
  181:2
**generation** 55:25
**generic** 44:3,8
  92:15 218:16,18
  283:15
**generics** 219:5,5
**generis** 143:22
**geoppinger** 6:8
**germane** 91:16
  115:8 156:10
  328:5
**getting** 71:14 84:3
  104:21 113:17
  126:2 148:7

[getting - going]                                                        Page 26

149:22 190:3
261:23 266:2
286:15 304:5,18
305:20 307:25
**give**   11:4 19:9 52:5
  70:10 167:15
  170:11 176:13
  184:24 287:4
  297:14 304:11
**given**   11:2 13:12
  23:6 24:16 53:5
  59:19 67:9 75:20
  113:25 116:7
  118:16 122:4
  123:6 126:12
  167:2 174:3 179:2
  209:2,21,23 214:8
  236:4 247:14
  270:17 339:19
  352:8 355:9
**gives**   166:18 314:7
  338:24
**giving**   167:14
  221:14,16
**glad**   22:24
**glean**   267:19
**glossary**   253:16
**go**   13:13,22 15:4
  15:20 22:11,11
  24:8 26:3,11,15,17
  32:13,14,25 33:15
  36:22 38:20 40:15
  41:19 42:21 43:9
  43:17,18 44:13
  45:8,13 46:19
  47:7 49:10 52:19
  52:20,20 53:2
  54:20 56:18 58:15
  59:18 61:6 62:13
  64:7 66:12,19
  68:23 71:9 73:16

74:23 77:19 79:19
82:11,23 84:12,16
85:9 88:9,18,24
89:4,20 91:3,12
92:10,22 93:17
96:2 100:18
101:11,21 103:8
105:3 106:17
108:15 109:16
110:4 111:10
114:8 115:4 119:2
119:10 120:16
121:22 123:3,24
126:7,18 127:16
129:9 132:24
133:21,22 137:5
141:4 149:20
151:2,7,9,17
152:17 153:5,17
153:18,22 154:3,7
154:18,21 162:19
163:18 164:25
166:8 168:25
170:21 175:19
176:16 177:2,3,3,6
180:22 182:2,15
183:8 187:20
188:3 192:23
195:20 196:13
198:2 201:7,18,20
201:21 203:10,21
205:10 210:11
211:8 214:3
215:20 218:10
220:2 222:6 224:8
225:11 226:13
227:14 228:24
232:24 237:16
238:10 240:7
241:8,21 244:5,22
245:21,21 251:12

256:8 258:2,4,17
259:23 260:5
261:6,15 262:9
266:20 267:12
270:5,24 273:7
276:24 278:9
280:10,11,13
282:25 285:5
288:2 290:6,6
291:7 292:13
295:2 301:3
302:18 305:2
306:12 307:9
309:16 311:14,22
312:23 313:12,20
316:18 318:18
320:15 321:19
322:7 323:6
324:14 325:15
326:5 327:10
328:16 329:11
330:6 333:6 336:7
338:3 339:17
340:25 342:21
346:25 350:9,12
350:16
**gobbled**   161:10,11
**goes**   30:18 39:3
  159:2,6 160:22
  224:20 227:6
  233:18 244:7
  245:5 264:4,4
  310:25
**going**   9:2 12:8,13
  13:4,5,18,19 15:10
  17:21 21:24 37:8
  50:21 52:4 61:20
  61:21 62:7 73:5
  84:24 93:21 94:12
  95:4 96:25 97:16
  97:20 105:4

107:11,16 109:7
117:5 119:25
122:16 131:2
134:6 137:17
139:7 144:21
145:5,6,7 148:4
150:21 151:10,10
151:12 152:23,24
152:24 154:21
158:24 165:22
167:16,17 182:14
182:25 184:2
186:13 187:22
188:11 195:16,22
203:12 205:15
223:13,23 224:23
224:24 225:7
226:20 231:22,24
232:15 236:6,7
247:12,22 249:12
260:9,12 261:15
261:17 265:9,15
266:6,11,15,20
267:15 268:6,21
268:24 269:25
272:3 279:9 280:7
283:19 285:10,24
286:2 287:3,16
288:2,23,24
289:25 290:6,24
291:13 292:20
294:5 295:4,7,15
302:24 303:7,9
304:7 305:6,7
308:12 312:7,9,12
312:13,14,15,19
312:21 314:2,6,20
315:8,18 322:11
329:20 330:10
331:12 332:18
339:5,18 340:3

345:23 347:15
349:8 350:12,22
**goldberg** 3:12
200:13,14
**golf** 233:2
**good** 61:24 62:2
68:4 107:22 168:2
215:3 254:24
259:21 280:16
295:6 306:22
337:15,17 350:18
**gordon** 5:12
**gosh** 245:10
345:23
**gotten** 10:9
**government** 25:21
55:17 234:5,9
238:17,21 239:19
242:17,21,22,23
243:6,7 244:15,16
244:21 245:5,8,9
245:18 249:6
250:5,7,16,19,22
256:12,14,15,20
257:7,7
**governmental**
245:25 248:21
251:2 256:4
**governs** 271:19
**grant** 5:14
**granted** 44:4
**great** 14:21 22:8
38:19 62:3 64:20
128:13 206:22
213:3 232:11
247:11 264:10
265:8 274:5
312:14
**greater** 162:6
163:2

**greenberg** 3:20
**gritty** 84:11
**gross** 343:5
**ground** 260:10
**group** 64:16 71:6
72:21,21 80:24
82:18 94:5,10
95:14 98:19 133:6
139:2,10,16,16
146:16,19,20
147:19 255:18
266:4 268:4
269:10 271:14
272:19 274:7,25
275:5,7,17 276:5,6
276:7 278:19
282:7,20 293:10
293:21 296:22
297:10 308:20
311:5
**grouped** 274:19
**groups** 71:15 75:2
81:4 270:16
**growing** 161:3
**guess** 13:3 14:8
16:20 18:3 24:15
29:8,13 32:20
36:23 56:7 59:11
63:23 77:7 84:14
86:11 102:7 106:8
115:15 149:20
162:8 179:19
187:21 193:9
207:18 209:20
210:24 215:19
220:12 221:23
222:17 228:8
233:25 240:13,20
246:6 248:10,19
258:24 271:7
272:8,12 275:14

281:16 282:17
297:7 298:25
301:22 306:7
307:9 319:25
321:21 331:9
341:23
**guessing** 305:10
**guy** 150:21

**h**

**h** 8:8 10:15 354:3
**half** 146:18 182:20
295:5 335:19,19
337:8,8
**hand** 314:8 349:10
352:15
**handful** 99:2
**handle** 119:21
157:20 178:12
290:22 312:12
**handled** 71:7
167:2
**handling** 121:4
313:10
**hands** 306:7
**happen** 97:13
107:20 140:22
141:6,21 165:7
273:5 301:5
311:16,20
**happened** 60:7
141:8 279:2
**happening** 160:11
**happens** 113:23
116:22 140:15
161:10 272:5
273:9 280:12
305:15
**happy** 12:5 41:23
196:4 232:5
271:21

**hard** 25:10 163:7
277:12 341:4,6
342:2
**harder** 348:5
349:14
**harm** 110:14
**harmful** 60:5,14
**harmonize** 37:21
170:15
**harmonized**
350:11
**harmonizing**
38:14
**head** 94:13 143:8
207:23 252:9
272:16
**headers** 19:15
**health** 88:4 98:24
114:17,22 203:17
221:2,4,7,9,12,13
221:16 223:12,17
223:18,21,24
224:4,15,19,21
225:24,25 226:3
227:4,5,11,16
229:3,11 230:2
231:17 243:5
245:6,8,9 250:8
277:16 287:14
294:21
**healthcare** 3:7
9:25
**hear** 17:25 147:18
150:10 174:25
**heard** 58:19 290:7
340:24
**hearing** 282:17
**hello** 17:5
**help** 44:25 116:15
131:19 152:14
154:5

**helpful** 38:16 59:4
  117:15 254:8
**helps** 80:25
**henry** 5:8
**hereinbefore**
  352:6
**hereto** 355:7
**hereunto** 352:14
**herring** 133:14
**hesitate** 298:14
**hetero** 47:25
  207:25 338:9,19
  341:18
**hey** 244:22 312:6
  312:21
**hi** 322:18
**hierarchical**
  274:13,20
**hierarchy** 274:8
  275:11
**high** 158:3
**higher** 136:11
  158:13 289:15
**highlight** 14:12
**highlighted** 45:6
**highlighting** 107:3
  147:3
**hill** 7:12
**hilton** 2:9
**hinshaw** 6:20
**hipaa** 78:21
  144:14
**hire** 132:6 311:21
  311:25
**hired** 284:23
  290:21 308:12
**hires** 286:7 287:9
**hiring** 289:16,18
**historical** 259:21
  269:19 318:23

**hit** 26:8 349:22
**hmm** 129:20
**hold** 151:16 152:8
  247:15
**holder** 149:24
  269:21
**holding** 150:20
**home** 61:7 70:10
  215:7 216:12
**honik** 116:17
  117:3,8
**honing** 64:25
**hope** 14:10 38:4
  138:19 174:10
**hopefully** 22:2
  66:9 131:15 223:5
**hopelessly** 175:15
  320:14
**horrible** 108:6
**hour** 20:23 61:21
  100:24 101:6
  108:18 182:21
  231:23 295:5
  349:23
**hours** 20:20 21:10
  102:25 103:13
  154:22
**housekeeping**
  271:9
**huahai** 3:6,7 9:24
  10:2
**huge** 161:22 252:4
**hugely** 260:3
**huh** 86:11 246:23
  310:3
**human** 99:20
  312:22
**humana** 19:2 27:2
  27:4,14
**hunchuck** 4:16

**hundreds** 340:2
  340:13
**hydrochlorothia...**
  44:9,11
**hypertensive**
  346:7
**hypothetical**
  68:21 79:18 92:21
  93:15 98:6 118:23
  121:21 123:2
  130:17 193:17
  208:6,14 212:2
  213:23 215:19
  225:15 226:9
  231:6 237:13
  242:14 292:12
  302:14 308:7
  309:14 311:9
  315:22 325:14
  335:8 336:5,15
  337:25 340:20
  344:14 345:3
  346:21
**hypothetically**
  207:23

**i**

**i.e.** 83:7 223:19
  285:19 303:16
**idea** 37:25 86:6
  107:22 254:25
  314:24
**ideally** 256:16
**identifiable** 74:9
  117:20 250:19,23
**identification**
  14:20 21:22 32:16
  37:3 47:12 79:23
  92:19 99:7 101:8
  109:23 111:5
  149:8 201:23
  232:22 334:20,23

**identified** 40:8
  41:4,5 50:19
  57:10 60:22 70:8
  72:13 78:15 95:7
  105:2 111:19
  126:4 138:8
  169:22 170:25
  245:17 249:17
  252:5,6 255:18
  297:17 318:7,11
  319:9,18 341:16
**identifier** 171:22
  334:12
**identifiers** 342:23
**identifies** 25:21
  52:18 62:23 71:5
  133:5 243:24
  262:6,10 265:23
  282:8
**identify** 33:23
  35:6 45:25 50:5,9
  50:13,22 52:10,13
  53:8 63:5 64:10
  71:17 77:16 87:23
  88:9 89:14 91:19
  91:22 93:6 97:25
  112:12,16,25
  113:21 121:9,12
  137:16 146:24
  147:10,22 148:4
  150:2 172:22
  177:23 178:3,23
  188:14 191:10
  192:18 194:24
  195:7 196:20
  198:7 203:15
  216:20 218:21
  223:7,12,19 229:8
  239:16 243:5,10
  252:16,20 253:3
  255:5,8 257:15,19

260:21 265:16,21
267:23,24 268:3
270:21 293:3
309:3 313:3
**identifying** 26:5
33:21 34:25 35:7
51:16 70:3,11
72:13 81:23 85:12
86:21 90:10 92:2
109:20 120:9
122:16 174:17
176:6,24 177:9
179:21 180:17
181:19,22 190:11
227:23 230:22
240:11 254:17
273:9 276:16
342:24 344:6
**identities** 176:8
311:6 316:17
**identity** 34:10
114:16 176:11
197:17 201:11
203:25 296:10,16
297:3 298:9 305:3
308:24 316:2
336:19 339:2
341:14
**ids** 36:2 265:24
266:3,4 344:2
**ihs** 257:11
**iin** 146:21 147:20
265:11
**illogical** 317:6
**illustrate** 161:19
**illustrated** 166:13
**illustrating** 161:21
**illustration** 236:10
255:12
**illustrations** 34:19

**illustrative** 34:2
**imagination**
311:18
**imagine** 331:25
**immaterial** 81:18
109:21
**immaterially**
276:3
**immediately** 273:5
273:10
**impact** 59:23
92:18
**implement** 209:15
**implemented**
148:21 238:9
**implementing**
184:14
**implies** 91:16
121:25
**imply** 316:12
**important** 11:23
24:25 34:4 61:9
83:13 111:24
283:25 303:6
**imposed** 124:16
**impossible** 131:4
156:9 288:10
**impression** 79:21
167:16 198:14
**improper** 46:6,7
200:8
**improperly** 46:3
**improve** 145:4
**impurities** 210:23
**impurity** 219:13
318:14
**inaccurate** 93:20
**inactive** 184:6
**inappropriate**
348:24

**incentivized**
316:16
**include** 20:21 35:9
35:10 36:11 74:8
113:24,25 123:7
129:17 164:18
172:3,7 187:3,4,6
236:7 240:4
263:13 278:15
335:3 346:10
**included** 30:10
32:18 35:23 40:9
42:19 48:10 49:14
49:19 57:21 88:15
88:17 89:4 94:11
138:14 231:3
238:19 283:6,8
325:9 343:7
**includes** 12:17
35:8 36:14 80:17
83:15 140:17
196:23 282:9
**including** 13:10
26:25 69:23
112:13 114:16
142:3 144:12
157:9 215:4
229:13 257:20
332:21
**inclusion** 235:25
237:9 329:3
330:11 336:2
342:16 344:16
**incoming** 134:2
139:25 143:14
**incomplete** 68:21
79:18 92:21 93:15
94:6 98:6 118:23
121:21 123:2
193:17 208:6,14
212:2 213:23

215:19 226:9
231:6 237:13
242:14 259:22
292:12 302:14
308:7 309:14
311:9 315:22
325:14 336:5
337:25 340:20
345:3 346:21
**incongruous** 315:3
**inconsistent** 237:8
237:18
**incorporates**
31:14
**incorrectly** 57:3
**increased** 209:17
289:21
**increases** 335:17
**incredibly** 138:5
**independent**
104:10 162:23
**independently**
162:22 269:2
**indian** 250:8
**indiana** 5:23
**indianapolis** 5:23
**indicate** 196:25
197:2 266:23
267:15 269:25
**indicated** 199:24
243:16
**indicates** 105:15
**indication** 110:21
243:17
**indications** 72:20
**indispensable**
189:5
**individual** 34:12
35:14 53:8 57:17
57:23 63:5 78:14
99:20 113:2 115:7

115:7 116:6
123:16 126:19,20
132:4 141:15,19
143:9 149:2,16
165:9 172:22
174:15 186:11
189:23 203:15
204:24 205:24
210:2,2,14 215:2
218:25 219:19,21
221:11 224:3,23
226:20 231:13
235:5 239:9 262:6
262:11 269:20
270:23 304:17
318:24 328:10
332:10,15 334:4
334:12 335:3,25
340:5,12 341:5
343:8 344:5
**individual's**
141:17 334:13
**individually**  78:4
186:6 337:7
**individuals**  35:4
223:20 227:13
228:4 230:4
342:15
**indulge**  73:6
247:13
**indulgence**  295:22
**industry**  55:24
62:24 63:13,21
64:16 67:22
113:11 127:11
141:8 143:21
144:2,7,9,11
149:14 158:23
159:9 161:5
167:19 190:21
238:23 253:9

**inference**  106:21
106:24
**influences**  99:25
**inform**  98:15
**information**  13:18
31:13 33:21 34:25
35:8 36:6 64:15
64:21 67:24 70:3
70:12 74:8,9 80:5
80:17 87:5 90:16
94:18,25 96:6,23
98:9 104:22 134:4
134:22,23 136:19
139:6 140:5,10,17
148:8 168:15
171:20 174:17
176:6,24 178:4
180:12 185:7
186:21,23 188:15
192:16,17 194:11
195:5 196:18
200:19 207:5
208:16 211:20
218:2,7 227:17
252:15 253:8
258:3,23 259:2
260:7 262:4
263:25 264:14
267:5,19 269:14
269:17,19 271:10
271:20 273:9,15
273:17,19 279:6
282:9,10 283:6,10
283:22 294:2,21
307:7 334:17
342:24 343:14
344:7
**infrastructure**
252:23
**ingersoll**  5:4

**ingested**  209:10
212:19,25 215:25
**ingredient**  170:12
198:11 277:22,23
**ingredients**  52:14
**inherently**  103:11
**initial**  30:11 46:20
72:10 73:9 87:25
88:12 256:3
**initially**  46:11
**initiated**  110:12
110:18 119:19
193:5
**initiative**  238:4
**injury**  59:15,23
60:6
**inquire**  259:2
**inquiry**  115:11
133:12 257:23
**insofar**  244:16
**instability**  150:22
**instance**  301:6
305:19 311:3
**instances**  70:24
74:11 156:19
291:20 293:11
302:9 315:17,25
328:4
**instantaneously**
141:9,13 270:22
**instantly**  134:3
142:2
**institute**  160:6,18
**instructions**  231:8
**insurance**  72:6
89:10,10,14
226:17 235:19
238:24,25 259:3
262:19 279:12
281:7 285:20
288:3,3 289:5,6

**ingested**
290:2,3,8 301:13
314:18 317:4,15
**insure**  75:6
**insured**  71:19
74:12 83:3 86:22
87:12,17 88:4,16
89:3,15 93:6
97:25 98:21
114:15 148:12,20
171:11,24 222:13
222:14 242:6,16
242:18 248:11
267:16,16 269:8
280:24 287:16,16
288:22 289:8
293:4,16,16,17
294:24 302:6
303:22 307:21
314:19 317:16
**insureds**  335:4
**insurer**  81:2 83:2
83:8,15 91:4
244:3,24 288:12
288:18,23 289:9
**insurers**  71:10
75:2 77:8 288:14
**insuring**  288:8,11
**intake**  279:10
**intellectually**
277:12
**intend**  42:5 101:13
195:11 252:14
**intended**  146:24
147:22 261:22
295:23
**interchangeably**
281:9
**interest**  76:4 163:2
**interested**  352:12
**interesting**  173:9

**intermediaries**
25:24 75:12
133:13 155:19
313:5
**intermediary** 71:2
71:7 97:4 132:15
148:22 285:8
286:7 289:17,22
289:25 291:18
296:9
**intermediate**
27:18 28:19 30:19
**internet** 150:22
151:20 152:14
**interpret** 34:16
231:12,12,15
305:12
**interpretable**
145:2
**interpretation**
229:20
**interpreted**
330:25
**interpreting**
331:12
**interrupt** 264:12
267:10 339:21
**interrupted**
132:10
**interrupting**
147:13
**introduces** 157:6
**intuitive** 277:13
**invariably** 36:14
72:22 96:17
129:12 274:12
297:12
**inventory** 186:9
189:24 190:2,9,14
191:4 192:6
279:14

**investigate** 34:6
60:19 111:12
259:18
**investigated** 60:7
**investigating**
33:18
**invoice** 8:18
102:14 103:12
105:5 108:12
**invoices** 101:15,18
102:6,18 304:23
**involve** 92:12
132:9 241:18
**involved** 9:23
77:21 84:21 87:11
91:14 146:6 155:2
155:17 197:18
208:18 252:12
283:11 321:10
**involves** 170:16
242:6 310:24
324:16
**involving** 92:4
107:14 319:10
321:6
**ip** 113:16
**iqvia** 40:8,17 57:5
124:2,4,16 125:4
126:17,22 127:4
233:11 234:2
236:9 245:23
246:10 251:17
252:14 253:4
254:7,19 255:3,13
257:22
**irrelevant** 80:6
118:4 139:22
239:12 309:23
**irs** 177:8,12
**isolate** 334:13

**issue** 22:3 40:23
41:9 44:8 46:13
46:15 49:7 56:11
56:12 60:13 76:8
76:12 98:14
128:19 131:6,8
152:14 156:10
209:21,23 225:20
230:17,25 242:7
249:18 287:22
306:4
**issued** 346:2
**issues** 26:2,9 56:19
91:15 92:16,23
131:18
**it'll** 36:23 294:13
295:6
**item** 189:5
**items** 47:24 49:6
267:5
**iterations** 176:21

**j**

**james** 5:25
**january** 102:14
352:15
**jason** 5:17
**jeffrey** 6:8
**jersey** 1:3 4:7 7:14
**job** 61:16
**jointly** 250:13
**judge** 98:18 108:4
230:12
**judge's** 93:20
94:13 98:14
**judgment** 230:19
**judgments** 178:16
**july** 344:11
**jump** 110:24
**juncture** 182:8
**justin** 7:19 9:8
13:22 22:12 26:17

44:25 47:9 84:18
109:15

**k**

**k** 1:15 5:6 352:3
352:19
**kanner** 2:4 353:2
**kapke** 5:24
**kara** 5:24
**kass** 7:8
**kathleen** 6:24
**keep** 12:19 13:15
54:21 107:10,21
107:22 151:10
152:24 252:7
276:15
**keeping** 38:10
120:3 335:11
**kelly** 6:24
**key** 94:4
**keying** 176:22
**kickback** 256:25
**kicked** 21:24
**killian** 1:15 9:10
352:3,19
**kind** 119:12 122:6
125:15 148:7
187:8 216:2 254:3
254:4,13 271:7
274:13 279:7
283:15 313:2
**kinds** 131:11
137:10 143:19
**klinges** 3:13
**knocking** 227:24
**know** 12:2 14:2
15:9 16:24 28:3
31:19 37:21 42:10
61:4 63:19 71:11
75:19 76:13 81:8
81:16 85:16 86:13
89:13 92:13 93:23

93:25,25 96:19
98:15,15 100:14
104:23 105:9
106:4 108:17
113:22 116:22
120:19,22 121:15
121:24 125:7
126:15 129:10
135:8,13 140:21
142:6,9,25 145:3
149:22 165:14
172:24 174:6,11
175:25 180:15
181:17 183:20
187:5 189:3,16
192:2 193:12,13
196:10 200:5,6
207:24 212:12,18
212:24 213:2,4
222:18 223:21
226:5 233:25
237:20 245:10
246:16 247:16
249:15 259:15,17
260:6 265:9 271:2
273:14 279:18
281:14 283:9
287:11,13 290:6
293:6 294:8
300:13 302:10
303:10 304:7
306:8,23 308:2
313:14,22 314:10
315:8,18 316:7
319:19 320:22
336:13,17 339:24
340:7,14 347:18
348:2
**knowing**    314:16
325:18

**knowledge**    124:17
179:16
**known**    10:16,19
76:6 234:16 235:2
250:18 265:11
**kosty**    18:16 24:21
24:21 57:2 69:10
81:8 94:18 115:14
138:9 162:3 190:5
190:15 215:5
236:25 263:17
277:11 311:24
314:7 316:25
346:3
**kosty's**    18:15 21:9
23:8,12 24:14
131:16 250:17
265:20 313:4
317:7
**kroger**    28:4,9
35:10
**kugler**    108:4

**l**

**l**    8:5 9:17 10:1,14
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1

62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1

185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1,10,10
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
277:1 278:1 279:1
280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1 300:1
301:1 302:1 303:1
304:1 305:1 306:1

**[l - linking]**

307:1 308:1 309:1
310:1 311:1 312:1
313:1 314:1 315:1
316:1 317:1 318:1
319:1 320:1 321:1
322:1 323:1 324:1
325:1 326:1 327:1
328:1 329:1 330:1
331:1 332:1 333:1
334:1 335:1 336:1
337:1 338:1 339:1
340:1 341:1 342:1
343:1 344:1 345:1
346:1 347:1 348:1
349:1 350:1 351:1
**label**  93:19 148:15
   333:9
**labeled**  32:10
   36:23 43:22
   101:12 232:25
   276:4 277:22
**labeler**  50:19
**labeler's**  50:18
**labeling**  61:12
   185:6
**labs**  47:25 207:25
**lacks**  197:21 199:4
   199:15 200:23
   210:7 213:24
   301:2 302:16
   309:13 311:10
   345:4
**laid**  67:14 68:25
   97:20
**language**  66:24
   87:21 89:2 244:4
   265:20 270:6
   275:23,24
**laptop**  17:9,12
**large**  69:12 83:2
   99:14 145:3

163:12 170:2
   212:13 245:16
   299:12,16 317:4
**largely**  164:2
   287:11
**larger**  265:20
**largest**  71:10
   157:8 166:20
   239:6
**laura**  1:8 8:11,15
   9:5 10:14,19
   352:4 353:5 354:2
   354:24 355:2,4,12
**law**  7:5 64:23
   184:13,15 185:22
**law.com**  353:2
**lawyer**  102:22
   171:23
**lawyering**  107:6
**lawyers**  58:20
   107:21
**lay**  24:23
**layering**  313:5
**layne**  2:9
**layouts**  19:17
**laypeople**  246:6
**laypersons**  246:7
**lct**  206:19,24
   335:12 344:17
**learned**  11:13
**leave**  49:24 77:7
   84:19 273:3
**leaves**  224:9,16
**left**  75:8 79:21
   147:4 190:25
   202:23 236:11,17
   236:18 238:4
**leg**  252:4
**legal**  34:9 45:11
   55:17 58:13,22
   62:24 63:13,21

93:9 98:7 107:7
   121:23 273:14
   306:22 323:18
   353:23
**legally**  42:10
   122:2 144:14
**legislative**  244:19
**legislature**  257:22
**length**  256:18
   329:4,12
**lengths**  335:21
**leon**  7:6
**lest**  84:16
**letter**  21:19 37:16
   38:8
**lettered**  38:3
**lettering**  38:2
**letters**  38:11 266:8
   350:10
**level**  125:16 126:5
   126:8,18 138:10
   212:24 213:4
   219:21 244:7
   260:9 302:19,21
   302:21 318:12
   340:12 348:23
**levels**  176:10
   192:7 210:13
   213:7,9 239:4
**leverage**  190:10
**levin**  2:14
**lewis**  4:12
**liability**  1:6
**liable**  296:11
**liberty**  169:8
**license**  11:18
   125:5,8
**licensed**  11:15
**lieu**  67:4
**life**  61:11 190:25

**lifetime**  206:14
   207:21 208:11
   209:8 318:13
   331:18
**likes**  312:19
**likewise**  185:23
   204:3
**limit**  42:18 97:11
   160:7 350:4
**limitation**  216:10
**limitations**  124:17
**limited**  58:25
   90:22 94:2 194:15
   198:4 205:12
   283:3 287:5
**limiting**  40:23
   55:9 297:22 348:5
   349:15
**limits**  25:18
**line**  43:3 47:24
   49:6 146:14
   247:23,25 256:24
   354:4,7,10,13,16
   354:19
**lines**  86:14 123:8
   159:16 256:19
   290:3,9 340:14
**link**  35:16 50:12
   83:10 113:15
   123:15 138:22,23
   141:24 174:5
   186:5 269:7 273:8
**linked**  80:24 82:18
   120:23 134:3
   138:16,17 140:2
   207:14 263:25
   336:12 344:2
   347:16
**linking**  134:23
   135:21 145:15
   146:13 174:14

298:21
**links** 133:6 140:9
221:11,13 282:6
**list** 8:16 22:11,14
22:18,19 26:23
31:9,10 45:24
47:17 65:17,23
66:4,15 68:8
71:15 75:2 85:19
161:6,7,13 179:5
179:23 180:10
181:5,11 218:3,12
220:14 221:15,16
222:19,22,23
223:17 224:11,13
224:22 226:19
227:12,21 230:4,5
233:4,10,14,18,23
234:3,5 235:25
238:12 245:25
248:8,21 255:22
257:23 258:10,15
263:10,11 266:15
276:20 277:7
320:7,19 321:4,9
**listed** 23:3 43:14
64:12 70:25 71:16
197:9,17
**listening** 13:16
321:17
**lists** 84:20 179:13
180:3,5,16 181:2
181:18,24
**literal** 338:5
**literally** 74:25
98:17 99:2 145:6
147:9 151:4
279:13 294:9
338:11
**literature** 214:23
345:18

**litigation** 1:6 9:7
49:7 65:11 69:16
78:14 86:15 91:17
96:19 100:16
124:18 170:3
178:14 212:13
213:3 321:2
327:22 334:18
**litigations** 178:15
**little** 50:2 84:10
95:5 97:16 100:10
135:19 136:11,13
142:22 146:9
158:22 168:6
229:20 271:2
280:6 313:6 322:8
330:5 332:6
333:25,25
**liza** 4:8
**llc** 2:4 3:7 5:5
**llp** 2:14 3:4,20
4:12,19 5:12,20
6:4,12,20 7:4
**loathe** 98:13
**local** 300:13
**location** 176:23
**locations** 127:7
**locks** 138:12
269:15
**log** 22:5 247:20
**long** 20:17 25:7
64:18 172:10
173:12 174:11
175:4,6,22 176:4
185:3 195:12
218:19 323:10
**longer** 12:16
110:13 182:15
295:23
**look** 14:9,14,14
15:8 28:6 47:22

49:13 51:6 55:4
60:25 64:13 73:7
125:9 132:16
133:2 136:11
145:12 151:22
158:15 192:6
201:25 215:11
251:22 258:21
259:5 279:25
291:12 292:3,4,15
292:16 299:16
302:20 306:20
333:19 338:6,12
338:13,15 339:8
339:18 349:18
**looked** 18:16
23:15 34:17,23
36:5 40:3 186:22
245:18
**looking** 17:22 18:7
21:5 28:25 51:3
80:11 102:19
104:10 131:13
137:25 171:23
173:19 174:20
189:14,15 219:9
242:4 249:20
271:25 279:19
280:19 299:12
330:9 335:10
340:5 346:6
**looks** 16:21 37:11
47:20 102:23
142:9 207:9
**loop** 107:21
**loose** 131:14
**losartan** 353:4
354:1 355:1
**loss** 59:14 210:19
210:21 319:10,18
319:20,21,24

323:24
**losses** 239:17
**lost** 147:8 211:6
306:17
**lot** 11:22 26:8
101:14 114:6
135:7,15 178:21
184:25 185:7,18
185:25 186:5,7,14
186:22 187:3,6,9
187:11,13,15,22
187:23 188:3,6,14
188:20,21 189:3,5
189:9 193:10,12
194:8,11,12,24,24
211:13,20 283:21
303:8 314:3
**lots** 80:4,4 96:10
99:22,23 113:25
135:5 137:23
193:6,11 194:16
209:25 211:2,18
213:16 214:7
249:11,11
**louisiana** 2:7
312:9,11,12,16,18
**low** 190:3
**lunch** 182:11

**m**

**m** 5:17 201:19
240:10,10 329:16
**ma'am** 58:5
**mada** 19:23 20:3
**magistrate** 230:12
**mail** 100:8 127:15
164:19
**main** 14:8
**maintain** 114:13
185:25 271:4
272:13

[maintained - medicaid]                                                     Page 35

**maintained**
119:18 134:4,23
138:16
**maintains** 140:11
**major** 274:21
290:14
**majority** 51:15,22
52:4 186:20 187:3
187:5
**maker** 50:13
**making** 208:2
219:22 260:2
**manage** 289:18
**managed** 196:4
234:22 235:11,17
235:20 236:2,11
236:18 237:7,9
238:5 245:15
253:15 294:23
**management**
119:25
**manager** 130:12
**managers** 129:5
**managing** 178:20
**mandated** 144:14
**mania** 162:3
**manipulate** 34:16
247:21
**manner** 150:9,14
**manufactured**
40:19 43:22 46:3
48:2,23 110:11
187:18 188:8
332:11
**manufacturer**
50:5,9,16,22 51:5
51:8,17 52:10,13
113:15 119:18,23
183:16,17 185:4
190:18 204:6,16
329:5 336:17,18

336:23 339:3
341:9,11,14
**manufacturer's**
193:10
**manufacturers**
156:13 187:17
193:5,20 331:16
332:8
**manufacturing**
46:6
**march** 344:11
**mark** 21:18,20
32:10 36:24 47:9
201:20 233:2
349:23
**marked** 14:19
21:21 32:15 37:2
47:11 101:7
201:22 232:21
329:15,21
**market** 161:22
164:5 256:21
316:19
**marketed** 43:23
**marking** 268:19
**marriage** 352:11
**mass** 340:4
**massachusetts**
6:23
**massive** 339:25
**master** 121:2
199:23 200:11
**match** 103:2 175:7
176:7,17 191:22
252:14,19 343:2
**matches** 176:14,15
**matching** 139:24
176:11,21 224:13
**material** 26:13
41:10 120:20
225:8

**materially** 40:16
40:25 46:25 348:5
349:14
**materials** 8:12
21:10 22:14 23:4
23:9,13,14,15
26:23 31:4,10,12
31:16,22 32:2
42:25 236:24
**math** 102:20,22
103:15
**matter** 1:14 15:24
18:23 22:16 23:6
38:23 43:22 44:6
86:4 104:25
146:14 177:13
241:10 302:23
331:13 352:13
**mckesson** 4:20
203:17
**mdl** 1:4
**mean** 14:17 17:23
27:5 37:9 57:8
67:18 80:14,16
97:11,12 104:14
107:10 124:22,23
128:11 129:10,11
129:11 134:9
135:13 137:12
138:21,24 141:6
145:21 149:9
163:8 164:11
173:8 181:14
184:8,10 185:21
186:7 188:7
189:22 194:16
205:2 226:24
227:7 228:7,9,13
229:21 231:13,15
238:6 242:23,24
249:10 256:13

263:4,13 267:10
269:13 274:9,11
274:12 275:9
280:6 291:17
296:15,17 304:13
308:16,17 315:7
315:17 319:23
321:3,4 329:13
330:16 331:10
336:10 338:4
341:20
**meaning** 67:10
293:19
**meaningless**
175:24
**means** 44:8 50:3
58:21 93:24 94:14
185:21 186:9
241:24 275:12
293:16,17 298:20
**meant** 112:7
129:14
**measure** 323:17
324:6 325:2,5,18
**measures** 323:23
325:24
**measuring** 164:6
**meat** 129:2
**mechanism** 61:13
319:2
**mechanisms** 64:10
191:4
**media** 9:4 62:6,11
109:6,11 182:24
183:5 232:14,19
295:19
**medicaid** 135:10
234:7,9,15,17,20
234:22 236:7,8,12
236:18,19 237:6,9
237:21 245:14,15

249:7 250:2,22
253:20 287:12
294:23
**medical** 8:20
57:18,22 59:14
173:19,25 174:24
175:5,10,19 176:3
205:19 217:2
318:7,8,11,20
319:3 328:7 329:3
330:12 340:9
342:17 344:16
349:4,12
**medicare** 135:10
234:6 235:14
236:19 237:7
238:13,20 240:4
253:20 287:12
294:22
**medication** 16:12
112:19 113:3,4,7
185:16,19 187:24
193:12 214:18
219:12 344:20
346:17 349:5
**medications** 185:2
348:15
**meet** 10:10 20:14
53:9 63:6 72:4
88:11 177:19
219:2 332:23
342:16
**meets** 335:25
**member** 35:13
36:2,12 89:9,11
121:10 122:18
128:6 139:2 155:3
172:23 177:23
218:25 221:13
325:7 332:10,15
335:9 338:7 344:2

344:19
**members** 26:5
33:23 57:10 59:13
64:11 65:17 66:16
77:16 85:12,19
88:7 89:5,6 90:10
92:19 109:20
122:16 178:18,20
179:22 180:11
181:23 188:14
190:12 214:17
216:21 217:2
218:4 221:25
227:21 230:6,13
234:10 251:18
253:3 254:18
255:8,14 276:17
276:20 318:7,11
318:24 319:9
320:8,10 323:22
325:25 328:10
331:15,22 349:13
**membership** 88:2
204:20 209:16
**memory** 18:18
**mention** 141:3
**mentioned** 23:7
65:8 82:15 96:12
142:17 190:13
193:2 213:11
250:2,3 278:2
286:15 305:14
309:19
**merchantable**
43:25
**mere** 163:6
**merely** 34:18
50:20 76:12,19
79:23 80:8 96:18
106:25 137:25
175:20 180:11

186:9 193:25
208:21 219:22
222:18 249:21
251:19 297:4
308:22
**merge** 25:17
172:10 173:15
174:12,18 175:4
277:9
**merged** 27:19
157:10 162:10,24
169:13,14
**merger** 162:3
**merging** 163:2
172:18 173:5
175:22
**meridian** 5:22
**message** 134:3
138:13,14 139:5
146:18 152:3
264:23 271:22
272:2,6,9 282:18
283:7
**messages** 142:10
144:13 283:16
**messaging** 138:3
139:21 140:6
271:18
**mestre** 7:4
**met** 20:12 21:12
88:5 334:4 337:13
**method** 123:4
180:10 196:24
197:5 253:19
**methodologies**
326:11
**methodology** 90:8
90:11 91:25 92:2
109:24 111:5
120:6 122:15
127:5 146:12

160:16 175:9
179:21 180:14
190:11 222:21
226:2 230:21
254:17 320:6
337:17,19 342:14
347:5
**methods** 213:5
253:18
**metric** 207:16
**metrics** 100:12
158:23 159:21
160:3 164:13,16
**miami** 3:23
**middle** 53:3
114:12 284:4
285:9
**middleman**
316:19
**miles** 17:2
**milligram** 207:25
335:16 338:17
339:20 341:17
**milligrams** 208:9
208:25 335:18
338:7,13,15
**milliman** 240:10
240:14,23 241:15
242:9 243:16,21
257:20
**million** 301:25
302:4
**mind** 13:15 66:12
108:21 150:19
155:9 232:6 252:8
335:11 340:25
**mine** 182:19 320:2
**minimum** 40:4
328:25 331:18
**minor** 276:12

**minute** 46:11
61:22 100:23
182:10 232:7
258:8
**minutes** 45:19
108:22 151:13
154:3,18 322:2,21
**misbranded** 60:4
60:14
**mischaracterizes**
175:13 202:15
223:2 291:5
292:10
**misheard** 236:16
**mislabeled** 60:4
60:13
**misleading** 293:22
**misleadingly**
115:13
**missed** 266:21
**missing** 94:4 99:24
170:22 280:12
**misstatement** 57:6
**misstates** 64:6
74:19 82:8 88:23
111:9 118:22
122:23 144:4
150:6 180:21
193:16 199:16
201:3 203:21
212:3 216:23
237:14 248:25
282:24 285:3,4
286:25 299:9
323:5 329:9 333:3
333:4 343:21
348:20
**misstating** 200:15
**misunderstand**
343:17,23

**mix** 132:9
**mixed** 191:15
**mm** 129:20
**model** 235:17
246:5,8,9,14,17,21
246:25 253:13,14
253:17,22,23
**modification**
315:13
**modified** 27:12
**modify** 241:24
**moment** 23:7
52:17 55:4 73:6
137:25 168:3
271:11 301:11
347:14
**monetary** 320:4
**money** 72:14
120:3 121:13
134:17 195:22
235:13 314:10
321:11
**moniker** 99:16
**monitoring** 8:21
57:19,23 59:14
173:19,25 174:25
175:5,10,20 176:3
205:20 217:3
318:8,9,12,20
319:3 328:7 329:3
330:12 340:9
342:17 344:16
349:4,13
**month** 125:22
126:4,12 176:9
304:17,19 305:15
330:24 339:5,10
339:11
**monthly** 125:16
127:8 342:5

**months** 207:24
208:9 330:15,16
330:17,18,23
331:4,5,6,7 335:14
335:15,18 336:14
336:24 338:8,9,10
338:16,18,20
339:4,16,19
341:17,18,21,23
**morgan** 4:12
**morning** 128:20
193:23 253:2
264:2 290:7
309:19
**morris** 3:4 225:17
225:19
**morris's** 225:24
**motion** 106:11
**motions** 105:17,20
105:23 106:3,4,5
106:20 107:2
108:4,11
**mouth** 20:13
**move** 26:12 84:9
84:12 127:16
156:25 195:2
220:2 267:21
**moved** 297:4
**moving** 244:21
**msp** 7:5 19:20
20:2,3,3 335:2
**multi** 25:11,16
**multiple** 25:5,18
67:2,8 114:12
174:3 192:5 201:5
248:15 249:15,16
265:24 276:18
277:2,10 278:5
313:21 332:21
**multisource** 170:7

**murtha** 7:15
**mute** 71:13
**mylan** 5:13 48:2
48:22 335:19
338:10,20

**n**

**n** 2:2 3:2 4:2 5:2
6:2 7:2 8:2 240:10
**n.w.** 3:9
**nailed** 211:14
**name** 9:8,21 10:13
35:22,22 57:10
75:7 76:17 138:11
139:8,15 142:19
142:22 149:9,10
170:11,16 176:18
176:21 195:23
224:12 243:12
257:10,12 263:12
263:23,24 266:15
272:18,19,19
275:25 276:2,2
278:18,19 286:12
288:25 290:24
291:13 293:6,21
296:12,20,21,22
296:23 298:19,23
299:3,24 300:4,6,9
301:14,15,20
302:8 303:12
304:11 307:4
308:18 317:5
322:18 333:9
334:11,20
**named** 20:2 37:16
55:22 56:23 69:20
69:21 296:25
297:2
**names** 10:17 19:16
33:22 36:5,17,18
70:10 142:25

163:14 179:23
221:15 273:14
279:23 297:18
308:17 316:13
334:23 335:3
**naming** 276:12
279:18
**narrative** 39:7,22
42:7 298:22
**narrow** 26:2 85:15
85:17 99:10
**narrowly** 349:12
**nation's** 163:25
166:3
**national** 45:16,25
241:16
**nature** 76:10
115:20 133:12
213:13
**ncpdp** 95:12
134:22,22 135:20
136:15 140:6,9
142:11 143:15
144:9,10 260:17
261:10 264:8
271:12,15,18
272:10 282:18
**ndc** 8:16 40:9
49:13,14,25 50:4
50:11,12 51:3
52:9,12,17 55:15
61:10 91:21
111:16,21 112:11
112:24,25 113:4,8
113:8,18,20,24
114:7 125:21
126:3,13 187:14
187:17,24 188:9
188:19 192:12
205:25 209:21,21
209:23 210:3

211:3 213:8,16
214:8 217:12
218:2 334:9
336:20 341:13
**ndcs** 40:18 41:23
42:15,18 45:17
46:12 47:17 48:9
48:9 49:5 61:7,15
111:21 112:5,15
113:6 127:8
165:18 187:9,11
193:24 194:4
207:14 332:21,22
334:5
**ndea** 111:4 209:9
209:25 210:23
211:18,23 213:15
213:17
**ndma** 111:4 209:9
209:24 210:23
211:18,22 212:11
213:15,17
**near** 16:23 112:10
303:5
**necessarily** 38:4
50:4,8 52:10,12
128:16 156:6
181:14 189:10
260:25 283:22
316:13 317:5
327:20 346:10
**necessary** 42:12
66:7,14,24 67:7
68:2 70:23 75:15
76:20 79:3 91:3
122:2,12 123:6,9
123:14 173:12
257:9,23 320:19
320:21 321:14
342:11 343:14
345:22 355:6

**need** 12:21 14:13
14:14 51:6 54:25
55:3 65:22 66:10
76:13 77:3 79:22
79:25 81:14 89:13
89:20 133:2,12
135:8,10 138:11
140:14 151:24
153:7,8 173:7,14
173:15 174:2,13
176:2 179:24
180:16,24 181:6,7
182:17 190:4
193:11 194:11
200:19 202:11
203:9 208:23
211:19 212:10,22
224:11,13 231:7
231:19 232:7
252:13,23 254:24
258:6 260:11,20
264:13 268:14
270:20 273:3
275:12 277:17
280:2 283:9 284:9
308:2 314:20
316:13 333:19
334:3,5,8,11
336:16,18
**needed** 170:23
171:2 188:15,22
202:18
**needs** 65:10 71:13
87:22 141:13
151:21 190:25
238:7 252:19
265:16 305:24
338:7 349:18
**neither** 23:21
24:24 85:24

**net** 114:22 118:10
260:23
**never** 25:12 81:11
88:5 251:16,25
277:24 294:20
306:8,19 317:14
317:18,19 318:19
320:17 321:11,13
**new** 1:3 2:7 4:7
6:15,15 7:14
69:16 145:7 170:5
178:10
**newark** 4:7
**niaspan** 86:14,14
90:4,9,21 91:24
93:4 94:23 97:24
**nice** 10:10 173:9
**nicely** 91:20 162:2
**nilly** 285:15
**nine** 109:18 112:8
163:23 166:11,24
172:11
**nitpicking** 66:23
**nitrosamine** 61:2
110:16
**nitty** 84:11
**non** 25:9,9 43:25
48:23 49:4
**nope** 116:2
**normally** 288:14
**norton** 4:19
**notary** 1:17
355:13,19
**note** 10:4 45:23
53:23 56:22 177:5
179:8 196:22
247:25 353:10
**noted** 9:12 199:20
351:11 355:7
**notes** 1:13 15:25
73:7 295:8

**notice**  8:10 14:25
15:19 178:19
197:12
**notices**  180:3
181:2
**notify**  13:11
**noting**  106:19
**novel**  254:5
**november**  16:8
38:24
**number**  9:22 11:2
36:14 38:3,9
40:16 41:23 47:23
51:21 52:6 55:11
69:11 77:7 80:25
82:19,25 84:20
94:5,10 95:14,14
115:6 126:11
139:4,9,15,16
146:21,22 147:20
147:20 159:22,25
164:7 165:5,14,15
167:14 184:12,25
185:18 186:2,5,15
186:22 187:3,6,13
188:15,20 189:4,5
193:12 194:16,24
204:20 208:25
211:13 218:12
220:19,23 224:7
231:12 243:12
247:15 252:12,21
265:11,25 266:3
267:18,20,22
268:16,17,22
269:3 275:9
278:14 297:15
298:21 309:17,18
334:9,20 336:13
336:14 338:24
339:19 342:5

**numbered**  26:16
**numbers**  29:14
33:17 34:2 35:11
35:12 38:12 40:21
40:24 103:10
123:11 133:13
137:14 138:18
158:10 159:14
160:25 186:8
187:10,12 188:22
189:9 208:3,8,10
225:8 266:8 267:2
269:5 270:20
272:20 287:4
298:16 301:19
303:4 334:5,23
350:11
**numeric**  147:5
261:18 262:15
266:7
**numerosity**  41:9
46:21 47:5 48:12
49:15,19 53:25
54:7 55:10 56:4
56:13,25 58:7
124:15 233:19
236:11 237:10,19
253:6 322:25
323:8,15 340:25
**numerous**  71:12
161:7 219:23
233:16 251:20,25
**nuptials**  196:7
**nw**  5:6

**o**

**o'reilly**  4:4
**oath**  352:5
**objecting**  117:6,8
**objection**  15:17
17:20 19:12 24:7
32:6 33:13 36:8

41:17 43:7 44:12
45:7 46:17 49:8
50:6 51:10,24
53:17 54:9,17,22
56:14 58:12 59:16
60:17 64:2 65:18
68:12,17 73:14
74:17 77:17 79:5
79:13 82:4,21
85:8 87:3 88:19
90:13 92:6,20
93:11 95:17 96:9
98:3 100:5 101:2
103:5 108:13
109:25 111:7
112:20 114:3,24
115:22 118:20
120:11 121:17
122:20 124:20,24
129:7 130:15
132:20 134:12
135:3 136:2,25
140:12,23 143:3
144:3 145:17
150:4 155:7,20
156:4 157:21
162:13,16 164:14
164:23 167:4
168:12 169:16
171:17 172:14
175:11 177:25
180:18 181:8,21
183:18 186:24
187:25 188:16,25
192:21 193:15
194:13 195:24
197:19 198:25
199:11,21,22
202:9,13,22
203:19 204:10
205:8 206:25

208:4,13 209:11
210:5 211:5,24
213:20 214:19
215:17 216:22
217:13,19 222:5
222:24 226:7
228:20 230:7
231:4 237:11
239:21,24 240:16
241:4,20 242:12
243:22 248:13,23
250:6,15 251:3,10
252:17 254:20
255:15 256:6
259:9 266:17
269:11 270:12
275:2,20 276:21
281:25 282:22
284:13,24 286:22
291:2 292:7
298:11 299:5,18
300:23 302:12
308:4 309:10
311:7 313:18
315:10,20 316:22
318:15 319:12
320:12 323:3,25
324:11 325:11
326:3,17,23 327:7
327:23 328:13
329:7 331:20,24
332:25 336:3
337:22,23 340:18
342:18 343:19
344:23 345:2
346:19 348:18
**objections**  15:14
15:18 54:22 91:11
104:6 119:9
198:16 200:23
292:22 310:2

[objective - opine]

**objective** 67:21
173:5
**objectively** 306:9
307:8
**objectives** 172:20
**obligated** 239:13
**obligation** 34:9
238:18
**obliged** 13:11
**obligor** 256:15
**obscure** 296:10,16
**obscured** 297:2
**observable** 208:23
**observation**
125:24
**observations**
342:6
**observed** 127:4
144:14 276:13
**obtain** 53:21 77:15
94:24 99:21
118:19 179:22
181:7 242:9
252:15 273:4
**obtained** 65:5,8,15
77:11,14 79:9
125:13 126:16
168:4,9 184:11
189:9 200:3,12
204:5 211:21
230:3 240:23
241:2
**obtaining** 69:14
74:2
**obvious** 117:9
**obviously** 37:18
64:11 102:11
110:14 146:2
176:22 223:12
250:12 264:14
272:2 307:16

**occasion** 81:21,24
127:25
**occasionally**
107:20
**occur** 130:25
131:4 140:21
141:11,12,22
143:7
**occurred** 110:17
344:10,18 347:24
**occurs** 130:24
131:3
**ocean** 99:17
**offered** 90:9
326:22
**offering** 45:3 46:5
54:5,11 56:5 58:8
59:12 63:24
313:16 323:16
324:8,19 325:4
**office** 16:21 24:10
116:23 258:22,25
259:23 312:23
**offset** 123:10
**oh** 116:13 196:8
311:25
**ohio** 6:7
**okay** 10:20 11:8
11:20 12:12 13:8
16:5,10 17:5,16
18:11,25 19:18,25
21:3 22:8,9,23
23:11,18,23 24:3
24:13 26:6 28:22
29:7 30:13,13,23
31:25 32:8,25
33:4,7 34:21 36:3
36:20 38:20 39:9
39:18 41:11 42:20
43:16,19 45:22
47:6,21 48:7,19

49:3,12,22 50:24
52:7 54:4,14 58:5
59:9 60:9 61:19
62:20 65:13,20
66:21 71:14 73:22
77:5 78:7 79:4
82:14 84:8 85:20
86:8 90:2 91:7
95:20,23 97:14
100:17,21 101:9
101:23 102:10,16
103:22 108:24,25
113:19 116:13
117:4 119:8
123:17 128:13,24
140:19 142:16,24
143:23 147:15
151:6 154:15
169:3 172:8
175:18 178:25
179:11,11 184:4
194:25,25 195:20
199:9 206:8,20
208:3 209:4
210:17 211:4
220:4 221:22
222:4 224:10
225:14 228:17
229:15,23 232:2
233:17,21 234:12
234:20,20 235:8
236:18,21 237:3
240:20 242:20
246:13,20,24
247:5 248:6,18
249:23 250:20
260:13 261:5,21
262:2,7 264:3,5,6
264:10 265:14
266:5,10,19 267:9
267:13 270:8

272:7,15 273:22
274:3,4 275:14
281:11 282:13
284:19 287:3
291:23,24 295:10
297:6 298:5,24
300:3,15 309:5
310:12 322:3
327:18 328:19
330:3 331:2
333:23 335:6
341:9 342:8 344:8
350:15
**old** 260:10 285:20
**omnipresent**
61:12
**once** 70:21 74:10
75:10 98:13 100:9
176:6 224:25
229:16
**onces** 291:10
**ones** 11:23 48:14
91:9 143:2 160:25
**ongoing** 163:3
**online** 258:21
259:21
**open** 17:12
**operate** 215:7
**operated** 257:3
**operates** 83:2,4
**operating** 130:6
161:7 215:23
**operation** 179:5
317:2
**operations** 145:10
220:24,24
**operative** 184:7,9
184:11
**opine** 59:8 121:6
214:12

[opining - paragraph]                                                                            Page 41

opining   45:10 66:6
opinion   25:19
  31:15 33:12 43:6
  45:4 46:6 53:24
  55:14,15,18,21,25
  56:3,12,22 57:20
  58:14 59:12 60:23
  76:19 85:6,11,15
  86:2,20 94:23
  99:9 118:3 120:21
  124:15 173:17
  177:13 210:13
  214:6 223:3
  233:19 238:11
  239:12 297:2
  323:16,21 324:5,7
  324:8,15,20,23
  325:4,8,21
opinions   22:16,20
  24:15,18 53:21,23
  54:5,11,18 55:6,9
  55:12 56:4,10
  58:9,18,22,25 59:3
  63:24 86:10 107:9
  108:2,3,8 111:9
  124:12 193:16
  237:14 322:24
  323:12 324:21
  333:5
opportunity
  131:16 277:4
opposed   28:12
  41:2,5 51:8 79:23
  128:14 159:19
  163:3 193:11
  204:24 207:16
opposing   15:22
  327:17
options   338:22
optum   163:9,11

optumrx   6:13
order   13:14,17,20
  54:23 65:16,23
  78:21 87:7 90:17
  93:20 98:10 100:8
  121:9,12 127:15
  141:25 144:18
  164:19 167:7
  197:25 198:15
  214:7 216:20
  218:8,11 251:19
  259:11 265:10
  273:4 277:6 279:7
  287:4 316:14
ordered   78:20
orders   105:17
  106:2,6,8,11 107:2
  241:7 319:16
ordinarily   122:7
organization
  144:11 162:4
  234:24 235:12
organizations
  236:2 237:10
organized   138:6
  322:7
oriented   216:7
original   28:7,8
  35:13
originally   178:7
orleans   2:7
outcome   42:18
  225:3 352:13
outcomes   143:19
outdated   190:24
outgoing   143:14
outliers   289:7
outline   261:9
outlined   180:6
  181:3

outlining   180:7
outlook   214:11
output   30:15,17
outputs   30:4,6
  145:12,12
outreaches   260:3
outside   21:13
  64:22,23 210:9
  212:7 324:3
  325:13
overall   157:20
  275:10
overarching   53:19
overcharge   319:21
overlap   347:22
overseen   73:13
owned   288:16
oxford   4:14 5:15

**p**

p   2:2,2 3:2,2 4:2,2
  5:2,2 6:2,2 7:2,2
  128:15
p.c.   5:4
p.m.   351:11
pacific   109:3
package   27:23
  173:11 267:25
  268:6,14,15 275:8
packaged   43:23
packages   81:16
  268:3 327:12,14
packet   8:18
page   8:4,9 15:4
  22:11 26:16,16,20
  29:3 32:13 39:3
  42:21,22 43:18
  44:17,18,21,21,23
  47:22 48:15,17,20
  52:21,25 55:7
  62:14 100:18,19
  101:19,21 105:3

109:16 114:9
  123:24 127:17
  128:4,10 133:22
  136:11 156:25
  163:19 183:8
  184:2 195:2
  196:15 201:21
  202:8,24 205:16
  220:3 240:8
  241:13 245:22
  258:4,18 261:6,8
  270:25 295:3
  296:2 316:5
  329:24 330:2,9,10
  354:4,7,10,13,16
  354:19
pages   26:22,24
  45:14
paid   34:12 75:20
  75:21 89:12 91:20
  100:24 101:4,4,5
  103:24 111:3
  114:18 115:9
  118:5,11 120:2,7
  120:20 121:13
  122:9 123:15
  134:25 135:6,14
  135:15 173:4,22
  201:12 230:24
  234:7,16 242:2,5
  323:22 324:17
  325:25
paper   80:15
paragraph   42:24
  45:14,15,23 52:24
  53:13 57:14 62:14
  62:22 84:16,17,20
  100:19 109:16
  112:6,8 114:8,12
  123:25 124:5
  127:17,22 131:13

[paragraph - pays]                                                    Page 42

133:21 135:21
136:17 137:24
157:5 163:18,21
166:8 177:3,4,5
183:8 184:5 195:3
196:14,16 205:16
205:18 206:12
215:12 220:3,5
240:8 241:11
243:15 245:22
246:5 258:4,18
260:6,16,24
270:24 271:5
272:4 278:16
280:14,19 281:4
281:23 284:3,4
295:2 296:2,8
298:2 299:23
313:13 316:6
330:6,8,9
**paragraphs**
109:18
**parallel** 297:19
**paraphrase** 51:2
**paraphrasing**
307:12
**parse** 249:9,21
251:7
**part** 19:10 29:11
73:19 74:25 75:8
95:15 96:3 116:5
137:12 146:16
159:5 161:16
179:20 180:5
195:9,14 198:9
204:13,15 233:4
238:13,20 239:20
240:15 244:20
272:22 273:2,20
278:3 279:23
310:23 317:7

345:11
**partial** 38:25
**participants**
127:11 149:14
**participate** 181:13
349:3
**participation**
173:2 174:21
**particular** 36:4
65:10 71:6 84:23
96:24 98:16
110:25 111:14,16
111:21 119:15
127:7 148:5
167:18 172:25
174:8,23 185:5
187:16 189:6,8
190:3 191:12,25
192:8,13 203:24
207:17 213:8
229:3 244:2
249:19 253:18
255:17 268:5,20
275:13,19 283:14
288:20 301:16
303:3 308:18
331:15 338:25
**particularly** 78:16
90:25 99:12 294:3
342:2
**parties** 67:10
114:12 352:10
**party** 8:20 25:2,25
40:4 67:11 75:25
79:11 86:21
128:12 129:18
130:9 134:10
148:21 155:4
156:16 159:2
177:9 196:25
197:3,9 198:19,24

201:11 204:23
220:25 233:5,6
253:21 260:22,25
261:4 269:16
270:7,9 279:11
286:6,8 291:21
300:21 305:18,20
307:16,22 310:22
310:24 314:25
317:20
**passage** 44:6
**passing** 161:9
**patient** 114:17
195:7
**patients** 156:22
261:23
**pay** 88:6 126:9,17
134:17 158:17
195:21 205:3
215:8 222:12,12
239:14 264:20
287:8 312:14
314:16
**payer** 75:25
128:12 196:25
197:3,9
**payers** 25:2
156:17 159:2
**paying** 60:3 83:7
119:19 120:24
128:7 135:24
195:9,14,16 230:3
234:10 235:10,11
235:13 243:25
285:20
**payment** 59:21
69:5 72:8 88:3
94:17 116:6
117:25 196:21,24
197:5 253:18,19
265:17 277:21

286:3 314:5,14
320:4
**payments** 104:12
122:11 126:19
239:8,19 240:4
321:6 324:25
**payor** 57:10 67:11
71:3,8 79:23
80:11 88:10 89:8
96:23 128:14,15
128:21 133:9,25
134:8,9,14,19,24
149:10 173:3
179:4 198:24
201:11 220:7
239:13 243:8
250:7,15 254:4
256:15 269:15
270:2,2,3 276:2
279:11 280:21
284:5 286:6,16
290:17 292:6
302:21 303:9,13
303:16 304:17
305:7,18,21
307:16 310:22
313:24 314:2
316:2
**payors** 8:20 40:5,7
41:5 56:24 86:21
89:6,14,24 91:5,22
95:2 126:11,12
127:7 137:11
177:10 181:19
198:19 204:23
220:25 233:5,6
237:7 247:9 250:5
250:17,19,22
252:5,21
**pays** 224:20
235:12 268:7

**pbm** 25:23 69:14
70:21,24 72:14
74:2,10 75:4,18
77:12,14,22,23,23
79:7 83:25 84:4
93:5 94:2,8,9
95:11,11,21 96:3
96:11,13 97:5,18
97:19,24 99:5,13
99:16,23 100:3,7
100:11 116:4,7
120:23,25 128:21
129:22 130:3,14
130:19 133:7
134:11,16,17,25
135:25 136:21,22
137:11,16 138:3,5
138:16 139:5,9,24
140:11,21 141:25
142:5 143:13,20
143:22 144:21
145:4,5,16,20,23
147:9 148:3,10
149:4,5,11 160:3
161:17 162:11,25
163:12 164:5
170:19 171:4,9,10
171:15 173:15
174:17 175:8
214:15 217:9
218:3 223:20
243:10 246:17
249:17 252:15
255:5,23 257:11
260:19,21 261:23
263:22,23 264:5
264:16,23 265:4,5
265:22,23 266:2
267:5 268:17
269:5,14 271:22
272:2,2,6 276:11

276:25 277:10
279:13 280:23
281:13,17,20
282:5,12,12,16,20
283:2,7,18 284:22
285:10,13,22
286:3,10 288:20
289:11 290:22
291:11,15,18
292:3,24 293:2
294:14 296:12
299:12,16 300:9
300:18 301:7
304:2,5 305:4,17
305:24 306:4,19
306:20 307:12,13
308:12,23 311:2
312:24 313:11
314:6,24 315:5,8
315:14,17,25
316:12,18,18
317:12 328:18
343:10
**pbm's** 74:11 80:10
132:11 134:24
136:22 270:3,10
285:14 307:24
316:6
**pbmi** 131:17
**pbms** 69:2,12 71:4
72:19 74:12 78:5
78:22 79:10 80:18
94:16 96:19 99:17
100:14 129:6
131:15 132:6
134:5,24 140:16
143:9 144:17,22
146:5,8,15 155:4
155:18,24 157:8
157:17,20 158:11
159:3,6,15 161:3,4

161:6,7,9,10,11,13
161:21 162:8
166:10,20,24
168:11,22 169:13
170:11 172:11
174:12 176:8,8
254:10 256:11,18
257:6,15 270:21
271:4 272:13
274:7,21,24
275:16,25 276:6,7
276:15,18 277:2
277:14 281:10
288:15 293:24
313:14 314:15
320:25
**pcn** 139:4 267:22
267:23 268:8,14
271:14
**pdf** 15:5 101:24
201:21 330:2
**peculiar** 290:12
**peer** 345:18
**pen** 80:16
**penalty** 146:5
**pending** 12:23
**pennsylvania** 2:17
4:15 5:16
**people** 86:10
99:19 120:3 154:4
154:7
**percent** 158:8,19
158:20 303:15
305:7
**percentage** 157:16
165:20 166:25
176:15
**perfect** 14:21
25:12 176:10,14
176:15

**perfectly** 12:22
214:12
**perform** 82:13
132:6 141:25
144:18 149:6
327:21 342:12
343:15
**performed** 41:15
137:11 143:12,17
166:16,17 251:19
343:4
**performing**
145:10 343:12
**performs** 142:20
**period** 21:7
160:22 165:13
172:13 174:9
191:13,16 192:13
192:14 207:10
209:10 225:21
230:24 324:19
332:4
**periodically**
107:13 259:18
**periods** 25:7 27:19
102:7 161:15
191:22 212:15
231:14,16 279:16
331:16 333:18
**perjury** 146:6
**permission** 182:2
**permitted** 125:6
**persisted** 218:17
**person** 34:10
105:6 152:13
195:15,17 204:8
209:9 224:4
230:20,23 231:2
337:13
**personal** 34:25
35:6,7,17 70:2

176:6 219:18
**personally**  15:11
33:21 74:9 145:25
176:24 259:25
344:6
**personnel**  220:10
220:21 221:24,24
222:20 223:19
227:3 229:22
257:24 259:5,23
**persons**  57:21
227:8 230:16
**perspective**  91:19
134:25 173:6
**pertain**  323:7
**pertinent**  111:4,11
111:15
**pharma**  4:13
170:4,5,6 179:3
**pharmaceutical**
3:5,6 9:24,25
52:11,14 62:23
63:12,20 64:16
67:22 69:16
113:11 127:11
146:4 154:25
167:2 178:14
179:18 190:21
195:6 196:19
253:9 254:6
289:13 318:14
319:11
**pharmaceuticals**
3:21 4:5 155:16
278:6 288:7
322:20
**pharmacies**  18:22
26:25 32:4 34:7
69:20 70:4 142:10
156:14 163:22,23
164:6 165:4

166:11,24 172:11
184:11,25 185:23
189:13,25 190:10
190:16 192:12
195:4 196:18
201:10 254:10,12
314:7 343:3 344:5
**pharmacist**
263:18
**pharmacy**  8:14
25:23 27:3,13
32:21 33:6,10,24
78:9,12 118:3
120:24,24 129:5
130:12 134:3
136:21 138:4,10
138:14 139:21
141:23 165:8,25
185:3,16,19
186:14,21 189:20
191:10,25 192:16
195:16 196:17
197:12,16 198:22
201:14 204:5,18
205:5 214:16
217:9 218:3
261:11 264:5,17
264:17 265:4,6
268:11 271:22,25
272:6,9 279:13
282:18 283:7,17
306:25 317:22,23
328:11,18 343:10
344:3 346:15
**pharmacy's**  35:17
35:25
**phases**  65:10
**philadelphia**  2:17
**phone**  17:15,22
58:3 259:4

**phrase**  35:7 95:10
114:11,20 118:10
167:11
**physician**  335:17
**pick**  113:2 116:19
117:12,19 195:20
**picture**  103:17
**piece**  80:15 321:2
**pieces**  283:6,10
**pietrogallo**  5:12
**pii**  74:8 78:8
**pill**  212:25 306:24
**pills**  210:2 331:8
**pittsburgh**  4:15
5:16
**pizzi**  4:4
**place**  13:17 75:22
75:23 88:11,15
142:15 173:16
174:2 180:12
191:4 278:6
312:23
**placement**  141:16
**places**  72:23 96:5
**plain**  70:14
**plaintiff**  2:5 19:9
20:6 55:22 340:15
351:4
**plaintiff's**  102:6
103:25 104:20
335:22
**plaintiffs**  2:15
10:23 16:20,22
18:19 19:6,10
20:2 21:14 43:21
46:2 53:4,14
60:20 237:5
323:19 329:2
335:12 340:9
344:17

**plan**  57:10 71:4,6
72:13,17 74:13
75:5,20 78:23
79:7,9,22 80:3,13
81:6 88:4,16 89:3
89:9 95:13 96:24
96:24 97:11
114:17 125:17,21
126:4 131:20
134:20,20 135:9
138:11 146:20
147:19 172:7
177:16 221:13,25
222:13,14 223:21
223:24 224:4,15
224:21 225:25,25
226:3,6 227:16
229:3 239:7
242:17,21 243:11
243:12,12,12
254:3 256:5 257:6
257:11 262:13,14
262:22,23,24,24
263:3,7,8,9,10,11
263:20,21,22,23
263:24,25 265:21
265:24 266:3,12
266:16,20,22
267:4,14,20,23
268:13,25 269:16
269:17 271:13
272:23 273:12,18
275:7 280:24
285:21 286:13
287:6,25 288:23
291:16 294:22,22
296:20,25 297:3
297:16 300:12
302:21 303:10,11
304:9,9,9,10,12
305:4 307:22

[plan - prescription]                                                    Page 45

308:19,25
**plan's** 114:22
**plane** 280:7
**planned** 346:8
**plans** 40:7 41:2,5
56:23 71:15 75:2
86:23 87:12,17
89:5,16,21,23
92:14 93:6 97:3
97:25 99:8 158:16
171:11 221:2,4,7,9
221:12,17 223:12
223:17,18 227:4
227:23 228:4,6
229:11,13 233:5
235:24 236:5
238:14,20,21,22
238:23 239:5,20
240:5,11 243:5,5
243:11,17 244:7
245:6,9,11,19,25
248:15 249:9,15
249:16,21 250:4
250:23 251:7
252:6 253:12
255:18 256:12,14
256:20,22 257:2
257:14 259:3,19
270:17 277:16
287:21,24 288:6
290:13,15 293:25
303:8,12 312:7
**platform** 162:23
**platforms** 145:24
**plausible** 317:2
**please** 9:14 10:12
13:15 21:18 32:9
87:8 90:19 98:12
100:20 114:9
116:21 133:22
153:2,18,22

169:20 182:16
196:14 235:21
258:5 270:25
**pleasure** 136:9
**plus** 27:3 282:18
**pocket** 141:20
324:25 325:7
**point** 8:18 11:11
12:21 21:14 51:19
65:16 69:23 72:18
79:3 100:16 101:5
101:18 103:24
104:4,13,19
108:19 115:10,12
115:21 127:21
137:24 138:2
159:11 168:8
208:21 219:22
231:23 251:14
299:21 306:17
310:13 320:17
326:22 327:4,20
333:12 345:9
348:3,4
**pointing** 96:18
117:9 316:5
**points** 33:20
190:15 342:11
**ponce** 7:6
**pops** 138:12
**populate** 35:20
**populated** 139:13
139:23 294:16
**population** 177:19
239:7 303:25
**poring** 101:14
**portable** 144:24
**portfolios** 118:2
**portion** 39:7,23
42:6,7 52:24
81:22 105:5 144:9

193:25 198:5,9
201:14 205:15,18
229:4,5 234:6
**portions** 229:7,14
272:21 347:10
**pose** 93:7 225:11
225:14
**position** 93:19
220:17
**possess** 161:21
**possession** 348:9
**possibility** 128:20
167:25 216:11,13
244:14 333:15
343:24
**possible** 51:18
53:7 62:25 63:4
64:10 69:25 130:7
130:10,18 131:18
137:15 162:21
205:23 224:17
268:9 292:3
300:18 301:4
304:22 315:24
332:13 333:19
**post** 102:8 114:21
115:5,19 234:25
**potential** 155:3
230:6 319:15
323:22 325:25
349:19
**potentially** 60:4
60:14 255:6
257:21 332:20
**ppo** 263:15,19
**practical** 83:14
194:17
**practice** 293:20
344:13
**practices** 62:24
63:13,21 64:17,23

**pre** 101:12 194:4
232:25
**preceding** 206:4
**precise** 64:14
212:10,22,22
213:12 297:14
**precisely** 55:4
128:18 155:11
219:7 227:9
237:20
**precision** 213:4,9
**predates** 194:3
**preeminent**
241:16
**preexisting** 288:14
**preface** 315:11
**prefer** 154:14
**prefers** 154:11
**prelabeled** 47:8
**premature** 251:14
**premise** 65:24
155:23 156:11
**premium** 235:7
**preparation** 20:10
40:2 66:3
**prepare** 18:12
218:11 321:18
**prepared** 28:5
37:5 65:24 238:11
321:4
**preparing** 77:21
233:22
**prescribed** 346:11
347:3,4
**prescribing** 216:9
**prescription** 34:8
69:4,13 98:21
117:19 118:17
158:12 159:18
163:25 164:12
165:10 173:4,22

[prescription - produced]                                             Page 46

175:8 186:6,11
194:19 195:8,21
240:5 250:11
261:24 262:11
288:7 320:5 321:7
340:3 345:12
348:7 349:19
**prescriptions**
75:20,22 114:15
126:11 127:14
157:7,17,19
159:17,25 164:7
165:6,16 172:24
186:2 210:3
212:21 215:6
218:21 247:2
302:2,5,22,25
318:24 343:7
**presence**  111:13
296:8
**present**  7:18 87:12
170:21 171:21
176:25 185:24
282:10 333:8,22
334:16,24
**presentation**
28:14
**presented**  302:25
341:21
**presently**  231:9
**presents**  22:18
313:8
**preserved**  283:23
**pressing**  142:13
**presumes**  197:22
199:5,14
**presuming**  60:6
**presumption**
223:25
**pretty**  94:5 107:7
159:13 160:4

224:6 245:2
259:21 279:10
288:10 337:15
340:6 341:12
**preview**  26:7
**previous**  281:3
323:5
**previously**  141:17
303:18
**price**  34:13 75:24
75:25 118:10
122:5 142:3
158:18 198:9
235:18 264:15,22
264:22 282:7
**primary**  322:5
**prime**  191:17,19
192:16
**princeton**  7:14
**principally**  169:24
**prinston**  3:5 9:23
**print**  186:10
**printed**  272:22
298:19
**prior**  10:18 46:23
63:4 82:8 104:5
110:11,17 199:16
201:3 230:18
234:24 236:22
269:4 286:25
291:5 292:10
343:21 344:18
**private**  234:24
**privilege**  207:6
241:8 259:12
279:7 319:15
**privileged**  208:16
**privy**  316:2
**probability**
289:16,21

**probably**  11:2
26:9 51:25 73:5
174:16 176:16
182:14 244:9
**probative**  99:12
**problem**  38:13,13
41:21 66:24
106:16 202:20
224:10 227:6
247:19 257:8
287:11 290:12,14
**problematic**
333:21
**procedural**  44:6
**procedurally**
107:10
**procedure**  10:7
147:15 169:21
214:13,25 318:21
347:13
**procedures**  144:12
169:23 170:18,24
**proceed**  13:6
90:19 98:12
151:25,25 153:11
153:21 154:13
169:20
**proceeding**  32:12
38:15
**process**  11:10
31:19 57:12 69:12
69:23 71:21 73:9
73:12,19 78:6
82:12 97:13
112:13 120:18
138:22 140:20
141:7 142:14,18
145:15 146:6,10
155:2,17 170:16
181:3 190:5
208:19 226:18

227:15 245:5
254:3 273:2 278:7
320:21 321:12
**processed**  157:7
157:18 159:16,23
161:2 223:22
225:3 263:2 303:2
**processes**  61:3
176:21 178:19
180:5
**processing**  27:16
27:22 169:25
170:9 224:21
265:17 268:18
269:6 278:4
286:10 287:17
349:2
**processor**  95:13
146:21 147:20
267:21 268:16
**procurement**
131:25
**produce**  19:4
28:19 31:16,24
65:16 71:4 72:19
74:13 78:19 96:21
140:16 198:6,11
276:19 320:7
334:22
**produced**  15:13
18:19 19:23 20:4
27:8 28:11 29:6
29:10,25 30:20
33:10 36:16 39:13
65:3,10 67:19
74:8 78:3 80:21
81:7 90:23,24
101:18 163:16
164:3 165:25
186:17 197:13,16
197:23 198:12,23

199:8 201:9,15,17
207:25 211:2
283:24 299:20
320:25 334:18
342:25
**producing** 33:9
41:16 227:21
**product** 31:11,15
31:23 40:20 45:11
50:9,14,23 55:20
61:11 110:6,10,13
110:21 111:16
112:12,16,17,23
112:24,25 113:10
113:12,15 114:2
119:4,14 122:9
125:21 148:5,6
156:14,15,16,21
156:23 167:3
173:23 174:6,22
179:15 181:16
185:10 188:8
189:9 190:3,22,24
191:17,24 192:7
192:11 193:20
194:12,18 195:17
195:18 204:17,18
205:4,13 207:15
208:25 215:25
217:11 218:4,16
218:18,23 242:4
264:19 282:8
330:16,20 331:4
331:16 335:16
336:14 342:6
347:3,19
**production** 15:22
19:11 20:6 163:10
163:11 167:10
169:5,22 171:3
198:5 233:4

279:20,21
**productions** 19:6
70:5 77:24 78:9
176:9 277:5
**products** 1:6 46:2
61:5,17 91:21
110:15 111:14,18
112:4 113:11
126:10 158:9,19
165:10 167:18
191:12 194:2
209:3 210:14
212:16 219:4
235:18 279:16
287:15 319:11
324:18 332:3
333:17 343:9
346:11
**professing** 310:15
**professional** 1:16
102:3
**profile** 35:14,17
**program** 250:14
255:20,21,24
289:19
**programmatic**
29:23 133:4,16,18
144:25 326:9
336:11
**programmatically**
72:3 149:15 221:8
227:18 305:25
342:14
**programmed**
170:23
**programming**
133:20 326:14,22
327:5 342:3
**programs** 244:21
250:10 251:22

**projecting** 127:5
**projection** 127:2
**projections** 126:23
**promise** 247:24
**promptly** 182:12
**pronouncing** 85:2
**proof** 65:12
209:17
**proper** 65:11 97:9
136:20,21,22
260:21,25 261:4
270:6,9,23 323:23
324:5
**properly** 76:23,24
83:10 125:13,13
**property** 179:15
**proposal** 220:13
254:16,18
**propose** 189:16
191:6 320:6
**proposed** 53:6
57:22 63:6 90:8
90:10 115:17
128:6 164:22
177:23 214:17
233:24 239:16
251:17 254:23
319:2 329:2
337:18 347:5
**proposing** 168:10
216:19 240:3
251:16 255:4
**proposition** 317:7
**proprietary**
142:22 143:2
326:20 327:5,19
328:3
**protective** 13:14
13:17,20 87:6
259:11 279:6
319:16

**protocols** 11:12
**proven** 324:9
**provide** 78:23
83:3 99:10 200:19
214:6 220:14
222:19 223:4
238:18,25 239:13
250:10 308:13
316:17
**provided** 27:13
32:4 39:20 45:24
196:20 205:4
214:16 227:4,5
240:14
**provider** 83:4
235:10,12 307:23
**providers** 79:11
**provides** 89:11
120:6 235:20
243:16
**providing** 89:15
178:19 235:15
**provisions** 184:15
**proviso** 75:17
220:19
**proxy** 164:21
165:3 216:17
345:17,19
**public** 1:17 165:4
248:3 329:17
355:19
**publically** 159:14
**published** 160:6,9
**pull** 13:23 21:18
32:9 36:23 38:8
45:13 47:7 109:15
183:7 201:19
232:24 243:13
247:6 295:25
329:14

**pulled** 100:7
272:25
**pulling** 107:14
**purchase** 122:5
125:4 156:13
158:17 189:11
195:10,15 226:18
231:18 332:3
338:25 345:16,19
347:18
**purchased** 109:22
174:7 189:18
203:16 204:4,4
216:4 225:20
240:19 306:24
333:11 339:4
**purchaser** 222:8
**purchasers** 225:9
**purchases** 25:2
115:7 126:2
141:17 156:21
158:5,7,12 166:12
176:5 188:23
218:22,25 219:20
221:11 227:4
231:13,16 239:9
336:9 338:14
347:17
**purchasing** 158:22
**purity** 44:2
**purports** 32:20
**purpose** 28:13
34:4 59:21 79:10
105:22 124:14
135:23 136:4,18
172:18 174:14
175:24 179:20
209:7 229:12
233:14 252:7
253:5 259:7,16
283:10

**purposes** 10:5,6
20:15 24:5 33:8
34:3 44:7 78:25
107:23 109:19
120:8 124:19
128:2 135:16
137:23 181:3
210:25 236:11
272:10 276:16
283:5 285:17
297:25 307:24,24
328:21
**pursued** 323:18
**push** 83:17
**put** 15:16 20:13
36:21 44:23 45:14
51:21 76:16 129:2
157:2 160:5 163:7
228:14 254:14
264:18 292:14
331:18 335:12
341:5

---
**q**
---

**qualification**
338:22
**qualified** 44:2
201:5
**qualify** 200:20
332:5 337:6
**qualifying** 87:25
88:12 319:3
**quality** 43:25
45:11
**quantify** 301:12
301:23
**quantities** 330:15
330:24 331:17
332:4,21 349:16
**quantity** 189:8
206:2 207:9,11,13
207:15,16 208:23

217:10 334:8
**question** 11:25
12:9,23 15:10,17
18:4 25:20 27:10
38:21 43:3 44:5
53:11 55:2 59:5
60:25 65:22 66:5
66:13,17 71:25
73:21 75:12 76:10
79:2 80:9 81:18
85:18 90:6 95:10
97:11,16,21 99:6
99:13 105:21
108:6 113:22
115:9 121:24
125:12 130:20
135:18 147:16
149:21 155:13
157:11 158:4
164:4 165:23
168:7,20,24
173:14 174:11
175:19 183:21
184:21 191:13
192:25 193:8
194:21 195:12
198:20 199:10,17
199:20 200:8,17
201:16 207:19
210:25 211:10,15
211:17 212:9
214:4 217:18
219:18 222:16,17
222:22 228:12,14
228:15,22 229:19
239:12 240:21
242:15 243:19
258:7,24 266:21
280:25 281:18
296:14 307:19
309:23 315:11,12

316:12 320:2
321:8 324:16
332:6 337:24
343:24 344:12
**questioning**
154:12 349:24
**questions** 13:4
18:2 52:9 58:17
61:3 66:3 92:13
101:15 109:18
119:4 129:2
203:11 260:11
272:11 278:13
305:2 317:25
321:18,24 322:21
328:22 350:2,7
351:6
**quick** 26:14
108:22 151:7
154:15 278:13
321:23 322:6
**quickly** 155:12
**quite** 25:25 31:12
70:14 75:13 89:18
92:17 155:12
158:6,18 165:8
166:6 218:24
270:14 296:19
297:15 298:6
318:4
**quote** 93:24

---
**r**
---

**r** 1:8 2:2 3:2 4:2
5:2 6:2 7:2 8:11
8:15 9:17,17
10:14,15,15,15
117:21 354:3,3
**raise** 92:23
**raises** 25:16
**ran** 46:11

**range** 309:20
**ranges** 210:23
**rapid** 245:16
**rapidly** 304:24
**rare** 130:24
131:10 150:24
293:11
**rarely** 301:8,9
**raspanti** 5:12
**rate** 158:13 330:25
**raton** 3:10
**raw** 19:14,20,20
28:5 29:24 30:8
30:11,17 32:3
33:10
**raymond** 4:6
**reach** 179:22
**reached** 77:13
141:20 320:17
**reaches** 272:6
**read** 17:18 21:8
37:22 39:25 44:20
45:5 53:20 55:2
85:16,22 99:11
105:4 110:20
116:18 117:11,16
171:22 202:11
203:10 231:10
234:14 243:21
263:12 267:18
284:17 305:11
341:5 351:7 353:9
355:5
**readily** 93:5,23
94:15 95:8 97:21
111:18 144:25
160:12 165:3
238:2 250:18
290:9
**reading** 44:18
53:10 134:6 155:9

189:23 266:25
284:8
**reads** 296:8
**ready** 151:24
152:4 153:10,21
193:21 232:5
**real** 11:23 26:14
310:13 313:8
**reality** 83:14
194:17 303:5
**realize** 52:23
350:3
**really** 25:18 86:12
94:18 109:17
131:19 132:14
173:11 184:18
214:11 217:15
247:22 257:9
264:3 268:14
287:19 290:13
291:10 306:21,25
312:6 339:24
341:4 346:13
**realtime** 116:15
**reason** 24:9 38:2
58:16 67:19 75:17
88:8 125:12
160:24 167:21
201:15 205:25
224:20 226:21
227:9 229:25
241:3 244:3
257:16 263:19
314:12 345:21
347:9 353:11
354:6,9,12,15,18
354:21
**reasonable** 214:13
**reasonableness**
214:6

**reasons** 303:18
313:21 317:3
**rebecca** 3:14
**recalculation** 42:8
**recall** 30:12 110:5
110:20 119:19,21
119:25 120:17
121:4,6 148:8
190:13 193:3,6,10
193:21 194:3,4,15
225:22 252:25
326:18 344:10,19
344:21 347:11,19
347:23 348:9
349:10
**recalled** 109:23
112:3 119:15
122:19 193:14,19
193:25 194:8,12
345:25 347:18
348:13
**recalls** 110:12,17
112:3 119:5
160:10 193:20
194:18
**receipt** 353:18
**receive** 122:10
**received** 23:21
104:3 122:18
167:10 168:19,20
169:14 171:10
172:2 193:14,19
233:3 239:20
**receives** 83:15
97:9 234:25
305:24
**receiving** 83:24
235:6
**recess** 62:8 109:8
183:2 232:16
295:16 322:12

350:23
**recognize** 64:18
276:9
**recognized** 241:16
**recognizing** 303:8
**recollection** 28:10
103:3
**recommend**
180:13
**recommendation**
346:2
**reconcile** 170:14
279:17
**reconciliation**
256:2
**reconvene** 61:24
**record** 9:3,13 10:4
10:13 13:10 17:18
18:8 19:17 34:10
34:11 37:20 62:7
62:12 109:7,12
114:13 116:6
117:16 120:2,3,25
121:2 132:2 151:2
151:10,12,17
152:7,18,20,22,25
153:3,5,15,18,23
154:8,17,22 182:3
182:25 183:6
200:14 205:24
215:14,16,22,23
232:15,20 295:15
295:20 318:23
322:11,15 328:9
332:19 334:14
335:24 340:5
342:12 343:16
344:2,22 347:6
348:10,13,22
350:17,22 351:2
352:7

**recorded** 9:5 75:3
141:17 293:20
325:2
**recording** 67:23
80:19
**recordkeeping**
55:16
**records** 25:23
34:14 35:18 70:6
80:7 119:17 123:5
139:25 174:15
175:8 192:11
219:10 230:11
254:9,11 259:21
263:23 303:16,16
305:9 336:12,19
341:5 343:2
**recounting** 341:7
**recovery** 7:5 19:21
**red** 133:14
**redundant** 72:25
**reefer** 5:17
**refer** 53:24 112:24
113:10 135:22
136:6,17 151:22
162:7 219:18
271:5,13,14
272:12 273:24
281:20 296:7
328:20 330:13,14
**reference** 57:18
133:24 282:11
**referenced** 40:5
108:11 131:12
135:21 353:6
**references** 301:18
**referred** 37:22
91:23 179:3
278:12,16 322:24
**referring** 18:22
30:14 48:14,17

63:3 65:3 86:17
96:4 106:10
112:18 117:24
118:12 124:4
128:5 134:13,14
179:7,10 184:23
206:5 270:4
273:23 281:3,17
329:21
**refers** 57:16
105:25 106:3,5
190:6 245:23
248:2
**refill** 153:17,24
344:18
**reflect** 26:24 51:5
115:18 239:18
266:11 268:24
**reflected** 30:24
32:3 118:18
147:21 202:7
**reformatting** 30:2
**refreshed** 18:18
**refund** 118:13,16
119:12,16,20
120:18,25 121:16
122:11,18 123:20
**refunded** 122:3,4
**refunds** 115:19
116:3 120:2,7,19
121:2 123:4,10,15
**refuse** 306:19
**regard** 69:18 74:5
131:24 257:14
287:14 288:6
**regarding** 9:6 58:9
192:16 197:25
**regardless** 76:7
143:20 144:21
249:13 262:25

**regards** 28:3
**registered** 1:15
238:25
**regularly** 78:6
**regulated** 135:9
**regulations** 62:24
63:13,21 184:14
256:22 257:3
**regulatory** 72:5
**reimbursed** 303:2
305:20 307:25
**reimbursement**
310:24
**reimbursements**
239:3,10
**relabeler** 50:10,13
50:20 51:9,19
**relabeling** 52:4
**relate** 56:11,20,20
58:18 204:23
**related** 83:16
84:15 119:5
288:17 323:12
352:10
**relates** 55:14,16
56:12,24 205:19
**relating** 55:12
81:23
**relational** 138:15
**relations** 312:22
**relationship** 82:18
132:17 134:16
150:17 155:25
156:3,8 187:9
266:24 285:9
289:10 306:5,9,18
307:5 310:10
312:5
**relationships**
133:3 146:25
147:23 150:3

156:12 163:3,4
245:3 288:15
298:18 304:6,15
310:16
**relative** 335:11
**relatively** 196:11
196:11
**relevant** 70:18
76:22 78:16 85:18
89:25 91:16 94:4
147:6 160:25
173:17
**reliable** 180:9
**reliably** 304:24
**reliance** 131:16
**relied** 8:12 22:15
22:20 26:23 31:10
31:13,16,22 32:2
43:2 64:11 108:9
127:10 215:5
**rely** 33:10 43:5
230:15 251:17
255:2
**remained** 258:20
**remaining** 347:23
**remains** 296:11
**remember** 16:13
172:4 291:8
**remembering**
192:8 234:13
**remind** 13:9 19:15
99:15 250:4
294:18
**reminder** 259:14
**remotely** 1:17
**remove** 229:11
236:6
**removed** 111:17
111:22 230:5
234:4,6 236:13

**removing**  229:12
**rena**  23:20
**rename**  170:9
**rendering**  98:11
**reorder**  190:16,17
**reordering**  190:5
**repackager**  50:20
  51:9
**repackaging**  52:3
**repeat**  269:4
**repeated**  46:23
**repeatedly**  305:23
  346:3
**rephrase**  73:22
  85:10 113:22
**replacement**
  344:20 346:4,16
  347:4 348:15,22
  349:20
**replicate**  31:18
  103:15
**replicating**  159:13
**report**  16:4,6
  18:14,15,17 21:9
  22:21 23:4,9,12,20
  23:22 24:15,23
  29:11 32:19 33:5
  37:5 38:23,25
  39:4,8,19,23 40:6
  40:12 41:3,6 42:6
  42:12 43:18 44:18
  45:14 47:4,18
  52:24 54:2,12
  55:7 63:17,23
  64:6,12 67:14
  68:25 69:9 71:21
  81:9 84:13,15,16
  85:16,18,23 87:16
  96:4 100:20
  111:21 112:4
  120:6,18 123:18

123:25 126:19
  127:17,24 147:22
  157:2 159:15,21
  163:19 168:5
  177:4 179:13
  180:7 183:8,11
  190:6 195:2
  205:15,19 210:15
  214:10 215:20
  220:3 222:18
  223:2 236:25
  240:15 249:22
  250:17 256:10,17
  257:20 260:6,17
  261:7 270:6,25
  280:14,20 284:11
  285:4 311:24
  313:4 320:7
  324:13 328:8
  329:9
**reported**  103:12
  116:4 126:13
  150:15 158:3
  163:15 165:16
  206:3 272:22
  274:17 281:6
**reporter**  1:16,17
  9:10,14 38:6
  116:18 117:10,11
  117:17 124:7
  147:2
**reporting**  72:5
  127:9 160:15
**reports**  71:12
  87:14 99:19 108:9
  135:11 279:25
  282:4 327:16
**represent**  26:23
  76:24 170:10
  187:15 225:23
  276:9,10 301:19

303:8 322:19
**representations**
  102:19
**representative**
  76:13 128:22
  130:6 145:22
  313:23
**represented**  44:2
  253:14 264:7
  269:20
**representing**  76:5
**represents**  59:23
  71:8 255:3
**request**  53:14 70:2
  71:3 78:11 154:19
  256:10
**requested**  197:24
**requests**  15:7,14
  77:22,25
**require**  178:17
  183:15 226:19
  274:25 275:6
  332:20
**required**  134:17
  177:17 184:24
  185:18,22,25
  186:4,19 268:10
  321:12 355:13
**requirements**
  55:17 143:7
  144:19 177:20
**requires**  54:23
  83:20 307:3
**requiring**  200:9
**requisite**  333:14
**researched**  105:16
**reservoir**  72:25
**residual**  224:9
**resolution**  76:7
**resolve**  70:24
  74:10 277:18,25

308:24
**resolved**  171:2
  304:5
**resolving**  75:11
**respect**  53:15
  85:12 86:20 90:12
  123:20 157:16
  189:17 227:15
  292:19 296:14
  311:5
**responding**  313:7
**response**  133:16
  272:3
**responsibilities**
  270:19 309:20,22
**responsibility**
  286:9
**responsible**  72:8
  83:7 128:7 269:16
  314:16
**responsive**  15:12
  15:23
**rest**  126:23
**restart**  147:14
**restate**  11:23
  202:21
**restricted**  40:17
**restroom**  108:21
**result**  27:24 161:5
  166:18,19 194:5
  238:19 290:16
**resulted**  178:16
**results**  29:21
  46:24 216:9
**retail**  8:13 32:21
  33:6,19 34:7
  36:13 100:9
  127:14,15 163:23
  204:17 317:22,23
**retailer**  34:5,18,20
  34:23 55:23 70:4

70:13 78:17 165:7
165:17 186:18
198:4,23 255:6
334:22 342:23
**retailers** 18:19,21
69:19 70:19,20
74:6 100:7 198:16
**retain** 34:14 195:5
196:18
**retained** 15:24
25:6 307:22
**retains** 308:14
**retention** 55:25
**retirement** 248:4
**retrod** 260:10
**return** 119:14
142:2 264:23
272:3 283:7,18
353:13,17
**returns** 116:10
117:21,23 119:4
119:17 121:6
**reveal** 279:5,8
**revenue** 71:24
164:2,8,11,21
**revenues** 164:18
**reversed** 116:10
**revert** 143:10
**review** 20:22,22
20:24 23:25 81:11
81:22 104:8
105:20,22 107:2
107:13 177:12
197:15 210:18
353:7
**reviewed** 18:14,15
19:11,24 20:5
23:3,19,22 43:4,15
105:16 170:19
236:24 334:17
345:18

**reviewing** 23:8
24:14 34:5 77:23
**revision** 42:6
**revolving** 91:3
**reword** 108:5
**rich** 138:5
**richards** 10:15,19
**right** 10:23 11:16
16:10 19:6 20:11
21:15,17 22:13,16
30:22 31:3,8
32:23,24 35:2,3
36:17,18,21 37:4,7
39:16 42:23 43:17
45:6,20 46:16
47:13,19,20 48:5,8
48:13 49:20 50:5
54:8 56:6 57:13
59:15 60:12,16
61:7 62:13,18
77:6,9 81:19
82:16,20,24 87:19
88:18 95:16,25
96:8 102:16
108:18 112:19
115:21 116:2
120:10 124:9,13
125:18 126:8,25
129:6,24 130:14
132:19 134:11
135:2,25 146:25
147:24 154:20,24
155:6 156:3 157:4
158:12 166:4,16
173:21 174:19
177:7,14,24
179:13 183:17
186:14 187:12
191:9 192:9 193:6
194:9,19 195:18
197:3 198:24

201:24 202:8
203:10 204:9
205:7 206:22
209:4 210:4,19
215:16 219:16
232:23 233:11
234:18 235:4,14
236:3 240:13,15
240:24 241:12,19
244:12 246:2,3,11
246:18,19 247:3
248:4,22 249:12
255:9 256:9 260:5
261:12,19,24,25
262:16,17 263:10
264:4,10 265:12
266:9,15 267:17
267:25 268:11,12
268:22,23 272:7
272:21 274:5
278:21 280:13
285:23 287:13
290:25 292:6,21
294:19 296:6,20
297:10 298:2
299:17 300:22
302:11 303:9
305:21 307:16
309:5 315:9
316:21 317:10
318:2,9 319:6
321:22 322:3
323:19 324:22
325:2 328:12
330:7,21 331:9
334:9,10,14 335:4
338:5 339:13,21
341:13 342:17
346:18 348:3
**rise** 167:14 287:12

**risk** 66:22 71:19
209:18 235:18
244:23 288:2
314:16
**rite** 5:21
**rivero** 7:4
**road** 7:13
**robustness** 26:3
**rockett** 6:16
**rodeo** 178:14
**rogue** 224:23
**role** 81:24 317:16
**rolling** 169:5
**rolls** 173:10
**room** 16:16 17:15
139:24 154:4
**rooney** 5:4
**rose** 4:19
**ross** 4:21
**roszel** 7:13
**rough** 229:20
**roughly** 11:7 41:3
41:6 42:17 57:9
89:21 103:2
**round** 307:6
**route** 260:18
**routed** 136:20
265:25
**routes** 306:15
**routine** 279:10,23
279:23
**routinely** 34:14
69:15 94:11 125:7
194:18 216:7
230:14,18 268:2
274:14
**row** 47:25 49:13
49:18 158:11
247:11,13,15,17
**rows** 48:21

**rpr**  352:3,19
**ruben**  117:2
**rule**  231:20 286:5
  286:16,18 308:25
  338:12
**rules**  10:7,8
  135:12 176:13
  256:23 338:5
**ruling**  99:11 200:3
  200:15,16
**rulings**  200:10
**run**  30:5 40:3
  283:4 327:13
**rundown**  26:11
  73:3
**running**  40:6
**rx**  95:14 163:11

**s**

**s**  2:2 3:2 4:2 5:2
  6:2 7:2 8:8 10:15
  354:3
**safety**  46:7
**sake**  26:18 38:5
**sale**  46:7 112:14
  114:21 115:5,10
  115:19,21
**sales**  164:19
  188:23
**sample**  77:24 94:2
  94:3 99:24
**samples**  169:6
  171:9
**sara**  1:15 9:10
  352:3,19
**sass**  327:13
**sat**  145:22,25
**saw**  11:3 186:16
  250:15 255:17
  313:2 316:24
**saying**  30:20 43:21
  59:10 68:6 72:21

76:19 77:2 88:17
103:16 118:17
131:3,5 132:14
139:19 140:11
149:25 150:8
152:12 154:10
163:22 164:20
166:19 167:16
172:23 176:4
179:25 180:11
185:6,7 189:4
207:19 209:15
219:8 228:16
231:11 241:22
252:10,20 254:2
292:4 294:7 297:9
297:11 300:5
304:8 305:5 306:4
306:6,7 308:22
314:8
**says**  32:22 47:25
  48:2 49:4 53:2
  62:22 76:17 81:8
  106:25 125:8
  133:8 138:9
  146:11 148:16
  171:23,24 191:20
  197:6 205:22
  222:18 226:23
  230:15 241:12,14
  263:17 277:11
  283:18 292:25
  309:2 311:25
  312:6 341:15
  348:6 349:8
**scale**  340:2,4
**scenario**  129:3
  309:6 311:16
  313:2 349:17
**schaffer**  2:18

**schedule**  12:13
  52:2 107:18
  182:19 336:9,10
  336:24 347:15
**science**  216:5
**scientific**  214:23
  345:18
**scigen**  6:21
**scope**  40:17,23
  53:22 57:20
  193:23 210:9,15
  212:7 214:10
  237:21,24,25
  241:6 284:15
  324:3 325:13
**scratch**  295:8
**screen**  14:8 31:7
  40:13 45:6 47:16
  101:19,25 146:20
  202:19 247:23
**scripts**  27:2
  223:22 312:19
**scroll**  37:8 48:20
  247:8,11 330:4
**se**  3:22
**search**  230:11
**second**  78:8 83:9
  89:8 106:2 130:13
  130:19 136:12
  147:12 149:25
  152:11 202:18
  229:24 247:10,14
  247:15,21 272:5
  305:13
**secondarily**  25:22
**secondary**  52:16
  179:25 258:3
  307:6
**seconds**  26:20
  141:22 150:20
  151:5

**section**  55:4
  183:10
**sector**  245:14
**secure**  17:13
**securing**  130:5
**security**  55:19
  183:13
**sedran**  2:14
**see**  15:6 16:20
  31:22 34:19 40:15
  44:14 46:24 47:23
  48:21,24 55:14
  56:7 77:24 80:21
  80:21 86:16 96:15
  96:16 103:15
  105:24 107:16
  109:2 116:8 122:7
  122:10 127:22
  132:5,13 137:14
  139:12,13,14,14
  139:17 142:12
  146:9,19 158:10
  158:13 159:7
  160:4,13 165:25
  175:21 176:14,18
  178:5 179:7 192:7
  201:9,16 206:5,11
  222:20 230:11
  242:6 243:15
  245:19 249:11
  251:21 253:16
  257:10,11 262:18
  263:15 273:19
  279:20 280:3,3,4,5
  282:16 284:10
  287:21 291:13
  294:9,15 295:7
  297:15,16,18
  298:19,22 299:3
  305:3 306:18
  321:17 330:8

[see - show]                                                                    Page 54

337:18 338:15
346:6 347:3
349:17
**seeing** 289:21
311:20
**seek** 68:10,11
349:3
**seeking** 320:3
**seen** 14:23 15:9
84:6 140:20,22,24
141:6 142:7,8,10
198:22 199:7
274:16 275:5
277:20 301:6
316:25 317:8
344:7
**segment** 50:17,18
51:15
**segmented** 105:16
**segregable** 83:21
**segregate** 71:23
80:25 269:6 290:8
294:5
**segregated** 83:5
**segregates** 306:14
**segregation** 84:5
304:22
**self** 72:7,17 75:5,6
76:18 80:11 99:4
99:7 134:19 221:2
221:3,7,16,25
222:13 223:14
242:16,21 243:6
243:18 248:12,20
267:16 280:23
285:21 287:6
289:13,15 290:15
291:9,17 293:4,19
293:19 294:25
296:10,25 297:3
297:16,23 300:12

300:19 301:17
302:6 303:22,23
304:10,12 305:4
307:21 308:19,24
312:7 316:10
**sell** 34:7 156:14,16
190:23
**selling** 50:11
**sells** 185:2,15
290:3,4
**send** 17:18 74:25
120:3 265:22,23
308:10
**sends** 137:18
148:10
**sense** 11:4 19:10
102:21 111:11,15
132:6 237:18
264:24 265:2
337:5
**sensitive** 190:22
**sent** 27:11,16
29:16,19 102:5,15
120:4 138:14
152:3 265:17
353:14
**sentence** 53:24
57:15,16 62:22
63:4 94:14 133:24
134:7 205:22,22
206:5 258:19
271:6 284:15
286:6 292:25
296:7,15,18 316:4
**sentences** 284:17
**separate** 55:12
72:16 81:3 155:24
156:12 187:11
256:22,23 273:18
274:19

**separated** 125:21
**separately** 41:4
97:8 163:17
220:22 229:8
249:16
**separating** 86:22
**september** 105:19
105:25 106:3,18
106:23,25
**series** 15:6
**serious** 25:16
**seriously** 94:5
**service** 83:4 130:5
131:21 234:17
235:24 236:19
237:6 249:7 250:2
250:23
**services** 100:25
101:6 102:3
129:18,24 131:11
131:25 132:7
133:13 137:10
235:18 250:9
285:14 287:18
290:4 291:11,15
316:20 326:21
327:22
**session** 297:21
**set** 33:25 52:9 71:4
74:13 78:23 79:7
79:9,22 80:3,13
81:6,22 91:20
96:5,6,22 97:6,11
100:12 134:22
139:9 169:15
172:4,7 173:10
174:19 175:8
192:18 197:9,11
269:17 272:14,24
273:12,24 283:3
294:13 314:9,12

314:21 315:5,15
349:12 352:6,15
**seth** 3:12 200:14
**sets** 27:18 170:20
173:15 202:24
231:20 337:3
**setting** 144:11
287:13 315:2
**settlement** 230:18
**settlements** 178:17
**seven** 42:21 114:9
172:13 229:21
247:11,12 335:14
335:15 349:23
**shaking** 272:16
**shape** 69:17
**share** 157:7 161:2
161:4 164:6,22
198:12 251:23
280:3,4 329:17
**shares** 167:19
**sharing** 260:23
**sheet** 79:24 353:11
**sheets** 97:12
273:12
**shevron** 6:16
**shield** 81:3 263:15
263:19 312:8,10
312:11,16,18
**shift** 177:2 245:15
**shifted** 235:19
**ship** 36:12
**shipped** 192:12
**short** 20:3 29:16
39:13 226:14
**shorter** 161:8
**show** 29:20 32:20
35:21 190:2
195:22 214:17
247:22 251:20
285:24 288:24

[show - sources]                                              Page 55

291:11 292:20
312:2 327:15
**showed**  34:24
  197:17
**showing**  26:21
  33:2 104:9 198:23
  253:5 324:16
**shown**  14:7 18:5
  33:9 101:25
  146:20 149:23,25
  168:11 171:12,14
  235:25
**shows**  157:6
  196:24 346:16
**side**  44:23,23
  45:15,15 157:2,3
  280:16
**sign**  21:24 149:15
  351:8 353:12
**signature**  39:3
  352:18
**signed**  353:20
**significant**  131:6,8
**silos**  63:25
**similar**  67:23
  145:11,13 168:7
  318:21 346:12
**simple**  201:8
  203:12 336:11
**simplifying**  224:2
**simply**  10:19
  19:14 33:16 40:22
  72:12 89:20
  191:20 221:8
  235:5 251:13
  269:3 279:9 304:7
  339:16
**simultaneous**
  24:24
**simultaneously**
  204:15

**single**  27:20 28:15
  66:4 67:5,12,24
  69:2 81:2 126:3,3
  126:4 160:20
  168:21 171:15
  175:23 213:16
  229:6 275:6,8
  304:14,19 306:23
  321:2 344:5
**sit**  51:25 52:6 78:4
  296:20 325:20
  341:4
**sites**  259:6
**sitting**  139:24
  142:13
**situation**  204:25
  286:11 288:9
  291:25 301:24
  312:17 328:5
**situations**  287:5
  297:23 348:12
**six**  55:7 56:3,12,22
  100:19 105:16
  109:16 157:8,17
  157:19 161:21
  166:10,13,24
  168:11,21 170:11
  170:19 172:11
  174:12 176:8
  295:19 302:23
  320:25 331:4,5,6
  335:18
**size**  255:12
**skeptical**  37:9
**skimmed**  19:14
**skin**  67:2
**skip**  11:22
**skipped**  74:24
  147:3 317:22
**slightly**  27:21
  207:20

**slow**  244:21
**slowly**  21:9
**small**  69:11 99:24
  105:4 158:6,18
  177:19,19 220:23
  227:7 251:23
  252:22 303:15,24
  305:7
**smaller**  41:23
  161:9,11 174:19
**smirk**  152:11
**smolij**  3:15
**softer**  170:15
**software**  133:20
  141:7 142:18,19
  142:23 146:12
  326:14,21 327:5
  327:11,14,14,20
  328:3 342:4
**solco**  3:7 9:25
**sold**  34:11 43:23
  46:3 50:10 110:14
  165:17 194:4
  343:9
**solely**  115:20
  251:17
**solutions**  353:23
**somebody**  80:15
  214:11 285:14
  289:3 333:13
**somebody's**
  285:12
**somewhat**  12:20
**sophisticated**
  127:5
**sorry**  24:22 54:24
  68:14 84:18 95:19
  104:13 126:16
  127:15 136:7
  137:6 138:20
  147:12 149:5

150:10 187:19
199:17 202:17
219:17 225:11
228:11 234:7
262:8 264:12,12
267:9 274:15
278:9 293:24
306:12 331:9
344:24
**sort**  14:11 30:16
  52:8 53:2 61:4
  64:15 67:21 72:15
  77:14 81:11 84:14
  108:19 116:15
  118:13 246:14,16
  297:22 337:9
**sorts**  310:16
**sought**  77:23
**sounded**  228:18
**sounding**  66:23
**sounds**  62:2
  155:10
**source**  25:11,16
  51:7,13 67:5,12
  69:3 77:12 78:8
  78:22 79:7 84:2
  159:12 160:13,20
  178:4 189:6
  191:12 252:2
  256:3 278:5 314:5
  343:12
**sourced**  159:8
**sources**  18:16
  19:23 25:18 31:13
  51:12 64:13 67:2
  67:15,17,20 72:11
  73:18 74:15
  111:20 161:20
  165:5 180:2
  189:13 191:15
  192:5 238:16

240:3 253:2,10
257:19 258:3
277:10 318:5
**south** 5:22
**speak** 103:7
144:15
**speaking** 52:3
96:20 116:25
171:8 190:24
**special** 199:23
200:10
**specialty** 164:18
**specific** 53:22
57:18 65:15 66:5
69:19 91:20 93:2
111:21 112:18
113:21 114:14
115:6,17 118:9,18
129:3 136:5 142:3
146:12 157:12
160:3 170:5
173:18 185:8
189:4 191:8
193:10,24 198:8
201:10 208:8,25
212:11 256:19
267:6 279:8
285:16,16 298:21
323:12 332:7
334:2 337:19,21
**specifically** 19:8
40:8 97:7 106:10
106:19 119:4,24
133:24 134:13
136:6 146:23
149:23 165:9
186:5 194:8 198:4
202:3 242:24
243:24 256:21
259:16 263:21
292:5 293:3

306:13 339:25
**specifics** 140:4
169:11 171:5
**specified** 170:18
**specifies** 125:5
207:15
**speculation**
208:24 300:25
313:5
**speculative** 302:15
309:12 311:11
**spell** 10:13
**spells** 170:14
**spend** 20:17 21:5
26:19 86:9 101:14
**spent** 23:8 102:24
103:4,18
**split** 272:5
**spoke** 155:11
**sponsor** 72:17
75:5 99:7 286:13
287:6,25 296:20
296:25 297:4,17
300:12 304:12
305:4 308:19,25
**sponsored** 227:24
238:24 287:21
**sponsors** 89:23,24
177:16 301:17
304:11
**spot** 224:23
**spouse's** 226:5
**spouses** 226:4
**spreadsheet** 8:22
233:3 247:10
**spreadsheets** 27:9
**sprung** 5:25
**spun** 304:18
**stable** 245:2
**staff** 24:11 103:18

**stage** 193:20,21
**stand** 290:16
**standalone** 266:13
**standard** 59:7
65:11,25 94:14
100:12 121:25
127:9 143:21
144:2,7,10,10
159:8 220:6,8
271:18 274:20
278:3,7 306:22
327:11,13
**standardization**
279:22
**standardized**
159:21
**standardizing**
28:14
**standards** 58:22
72:5 144:16
**standing** 269:2
**stands** 105:11
**stanoch** 2:8 15:16
17:20 19:12 24:7
32:6 33:13 36:8
37:12 38:18 41:17
43:7 44:12 45:7
46:17 49:8 50:6
51:10,24 53:17
54:9,17 56:14
58:12 59:16 60:17
62:3,16,20 64:2
65:18 68:12,17
73:14 74:17 77:17
79:5,13 82:4,21
85:8 87:3 88:19
90:13 91:11 92:6
92:20 93:11 95:17
96:9 98:3 100:5
101:2 103:5 104:5
106:13 108:13

109:25 111:7
112:20 114:3,24
115:22 117:2
118:20 119:9
120:11 121:17
122:20 123:21
124:20,24 129:7
130:15 132:20
134:12 135:3
136:2,25 140:12
140:23 143:3
144:3 145:17
147:7 150:4 151:8
151:16 152:8,19
152:23 153:4,8,14
153:19,20,23
154:2,10,16 155:7
155:20 156:4
157:21 162:13,16
164:14,23 167:4
168:12 169:16
171:17 172:14
175:11 177:25
180:18 181:8,21
181:25 182:4
183:18 186:24
187:25 188:16,25
192:21 193:15
194:13 195:24
196:6,10 197:19
198:25 199:11,20
199:22 200:7,22
202:9,13 203:19
204:10 205:8
206:25 208:4,13
209:11 210:5
211:5,24 213:20
214:19 215:17
216:22 217:13
218:6 222:5,24
226:7 228:11,20

**[stanoch - subject]**                                           Page 57

230:7 231:4 232:2
232:9 237:11
239:21,24 240:16
241:4,20 242:12
243:22 248:13,23
250:6 251:3,10
252:17 254:20
255:15 256:6
259:9 266:17
269:11 270:12
275:2,20 276:21
279:4 280:15
281:25 282:22
284:13,24 286:22
291:2 292:7,22
295:9,12 296:4
298:11 299:5,18
300:23 302:12
308:4 309:10
310:2 311:7
313:18 315:10,20
316:22 318:15
319:12 320:12
323:3,25 324:11
325:11 326:3,17
326:23 327:7,23
328:13 329:7
331:20 332:25
336:3 337:22
340:18 342:18
343:19 344:23
346:19 348:18
349:21 350:5,15
351:3,4 353:1
**stanoch's** 202:22
**start** 26:16 65:20
68:9 69:6,14
73:25 176:12
252:10 288:9
289:7

**started** 335:13,14
**starting** 53:2
160:11 260:16
**state** 6:22 10:12
11:15 25:21 35:22
36:12,12,15,15
58:18 125:22
126:3 234:8,9,16
235:10,11,13
240:11 242:17,23
243:6,7 244:2,7
245:8,18 246:21
247:3 249:9,21
250:13,25 251:7
251:22 255:19,20
255:21,24 256:4
256:12,14 257:7
257:14,22,24
259:20
**state's** 258:21,25
**stated** 146:5
296:17
**statement** 45:10
75:14 112:9 123:7
159:5 195:13
220:20 226:22
290:17 313:17
**states** 1:2 36:6,10
55:18 127:12
256:24 257:25
260:3
**stating** 37:14
200:7
**statistical** 27:22
213:5,10 327:14
342:3
**statistics** 69:8
**status** 92:13 94:17
110:5 244:5,11
245:8,12,20
248:17 253:24

259:19 266:12
268:25 273:16
293:4 327:12
**stay** 107:7 154:9
160:20 215:12
**stays** 260:17
**stellar** 253:7
**stenographic** 1:13
9:13
**step** 12:21 31:18
50:21 57:11 66:7
76:20 112:12
113:16 123:6
223:9,9 255:11
257:5 277:8
305:13 339:23
340:16 349:6
**steps** 73:10
**steven** 4:16
**stick** 350:13
**stock** 116:11
**stop** 53:10 105:8
134:6 152:9
256:10 284:8
345:24
**stopping** 154:23
**storage** 163:7
**store** 36:14
**store's** 35:13
**storefront** 164:19
**stores** 3:8
**straight** 321:19
**straightforward**
169:25
**straightforwardly**
166:6
**strategy** 107:7
**street** 2:6,16 5:6
5:14,22 6:6,14,22
**strength** 113:13
206:2 207:12

333:10 338:25
339:14
**strengthens** 24:19
**strengths** 174:9,23
**stress** 75:16
**strike** 90:6 103:10
103:14 108:5
147:16,17 193:2
197:13 224:25
230:20 307:18
342:9 344:13
**strong** 288:20
**strongly** 65:21
**structure** 80:5
137:18 141:15
148:2,4 180:2,4
248:16 268:19
274:13,20 275:10
298:4 310:9,10
311:19
**structured** 84:4
97:13 148:11,18
314:21
**structures** 277:14
**struggle** 180:23
**studied** 28:15
**studies** 215:3,3
**study** 52:2 157:16
215:4
**stuff** 304:18
**stumbling** 58:16
**sub** 236:8 274:10
**subclass** 203:24
204:9 205:7
**subclasses** 189:18
191:8 202:6 203:3
204:16,20,23
**subdivision** 114:7
**subgroups** 321:6
**subject** 13:14,19
15:14 87:6 90:17

98:9 167:6 168:15
207:6 214:9 218:8
223:6 256:22
279:6 303:17
**subjectively**
305:11
**submit** 217:5
**submitted** 16:7
38:23,25 264:18
**suboxone** 84:25
**subpart** 187:14
338:22
**subpoenaed**
100:15
**subscribed** 355:14
**subsequent** 239:10
**subsequently**
157:10
**subsets** 169:6
253:17,22
**subsidies** 239:3,11
239:18
**substance** 39:22
76:10 212:11
**substantive** 25:20
27:25 108:3
**subsumed** 187:13
**successors** 220:11
221:20 222:3
223:9,11
**suffered** 59:14
**sufficient** 139:4
148:11,13,18,23
149:6,14 177:22
191:21 195:6
196:20 260:20
305:25 308:23
332:3
**suggest** 57:6 61:21
72:24 94:7,10
158:24 231:25

**suggested** 98:20
98:24 123:8
**suggesting** 133:11
194:23 216:24
345:10 348:21
**suggestion** 69:6
**suggestions** 25:9
**suggests** 57:3 99:5
137:8
**sui** 143:21
**suit** 319:6
**suite** 3:9,22 4:21
5:6 6:6
**suited** 283:4
**sum** 235:13
**summarize** 33:5
**summarized** 103:9
**summarizing**
43:20
**summary** 8:13
32:17,20 53:21
56:7 159:9
**summed** 66:18
**summing** 339:16
**super** 12:6 39:11
44:22
**supplement** 78:9
**supplementation**
74:7
**supplemented**
70:5 178:9
**supplementing**
42:16
**supplied** 24:5,10
28:4 30:7,9 40:10
88:6 93:24 94:3
98:20 100:4 140:5
176:7 185:7
191:11 205:13
239:5 257:17,18
258:15 346:9

**supplier** 113:17
191:17,19 192:17
204:17
**suppliers** 291:9
**supply** 15:23
41:24 55:19,21
71:14 183:12,23
189:7,12,13,23
190:18 191:15,20
213:8 330:24
333:11,14,20
338:24 341:22,22
341:22
**supplying** 192:18
**support** 148:14
196:22 252:24
284:10 313:17
**supported** 25:9
135:16 304:21
**suppose** 76:4
212:8 346:7
**supposed** 117:7
**supposing** 17:8
**sure** 10:14 12:17
17:24 26:9 28:17
29:8 37:10 39:10
57:20 60:11 73:8
73:19 82:16 85:22
90:20 107:17
119:7 127:23
128:3 138:25
141:5 142:12
155:12,14 169:2
174:13 181:12
187:21 188:11
198:20 206:21
211:17 212:4
217:20 229:23
241:12 252:19
254:25 255:22
256:25 260:14

262:20 269:23
275:14,15 278:24
292:19 297:20
309:24 315:24
319:25 328:24
339:9 350:10,19
**surprises** 107:18
**surrogate** 117:25
**surveys** 64:15
131:17
**sustain** 307:3
**swath** 299:12,16
**swear** 9:15
**swim** 99:17
**swing** 251:24
**switch** 99:22
218:21 231:24
232:6
**switched** 218:15
333:16
**switches** 48:22
**switching** 144:12
219:4
**sworn** 9:18 352:6
355:14
**symbols** 117:21
**synonym** 67:7
**synonymous**
270:11
**system** 14:4 138:3
139:21 140:6,7,8
142:11 145:8
162:12 248:4
260:17 304:20,21
**systematic** 335:24
337:12 340:13
**systems** 143:12
144:12 186:9
189:24 190:2,9,14
254:15

[t - theoretically]                                                      Page 59

**t**

**t**  8:8 9:17 10:15
    128:14 196:24
    197:2,4,6 354:3,3
**tab**  247:9,10
**table**  33:9 157:6
    157:12 159:8
    160:5,7 168:5,11
    172:12
**tables**  140:2
**tablet**  17:9
**tackled**  230:18
**tailored**  349:12
**take**  26:15 67:6
    70:5 81:12,17
    87:24 97:20 98:13
    101:20 114:20
    122:17 139:7
    142:15 144:22
    145:5 151:7 153:2
    154:15 156:24
    159:24 172:10
    173:13 174:12
    175:4,6,23 176:5
    179:23 182:20
    183:24 194:17
    203:9 228:3
    231:25 232:9
    240:6 243:11
    244:23 280:7
    292:17 295:6
    321:17,23 322:5
    331:3,4,5 340:11
    346:3 347:21
    348:6 350:5,14
**taken**  1:14 10:5
    62:8 109:8 110:6
    165:24 183:2
    232:16 276:17
    295:16 322:12
    331:8,15 332:10

332:15 333:13,17
    338:8 350:23
**takes**  28:8 130:2
**talk**  14:9 131:14
    177:8 187:8
    220:21 290:20
    291:20 328:6,8,17
    330:22
**talked**  73:17 74:16
    227:15 258:8
    260:7 281:14
    344:9
**talking**  14:12
    19:19 26:10 45:19
    48:24 73:20 96:7
    105:9 119:12
    133:4 134:21
    143:20 144:8
    163:22 172:5
    212:5 219:3 245:4
    254:13 263:22
    264:2 271:10
    272:4 273:11,17
    277:8 281:22
    282:3,11,19
    287:19 297:21
    303:14 314:17
    330:23 334:2
**talks**  45:16 162:4
**tallying**  104:11
**tapped**  72:24
**targeted**  161:20
**targets**  162:9
**task**  260:4
**tech**  14:11 38:7
    150:21
**technician**  7:19
**technologically**
    277:11
**tell**  28:25 52:2
    58:24 75:4,6

109:14 138:23
    163:13 175:22
    182:17 189:6
    207:21 249:8
    253:24 255:9
    261:23 278:24
    282:15 290:9
    296:4 308:18
    309:17
**telling**  38:6 42:17
    149:3 165:5 216:5
    225:8 229:10
    307:6 324:24
**tells**  50:16 165:11
    263:24 284:16
**ten**  11:7 21:10
    61:15 99:20 114:8
    146:4 245:10
**tend**  245:2
**tendency**  244:15
**term**  57:23 65:2
    112:17 114:19
    127:23 129:17
    134:8 138:23
    188:12 206:13,15
    281:13,14
**termed**  172:3
**terminology**  95:7
    118:14
**terms**  17:7 20:5
    33:21 53:9 63:6
    63:12,16 95:7
    143:8 145:4
    182:17 184:12
    188:6 204:19
    209:15 215:20
    217:15 240:11
    270:10 337:20
    341:21
**terribly**  125:25

**territory**  69:17
**testified**  9:18
    46:10 318:3
    320:16 322:23
**testify**  16:13
**testifying**  10:21
**testimony**  1:8
    13:12 23:5,25
    29:9 70:13 74:19
    82:8,20 88:23
    118:22 122:23
    144:4 148:9 150:6
    162:10,20 163:5
    175:13 180:21
    199:16 201:3
    216:23 236:23
    248:25 260:8
    282:24 284:20
    285:3 286:25
    291:6 292:11
    299:9 323:5
    326:12,16 333:4
    343:18,21 345:16
    348:20 352:8
    353:9,18 355:8
**teva**  3:21 4:5
    322:19
**texas**  4:22
**text**  44:19 243:21
**thank**  9:21 14:21
    26:17 43:16 58:5
    68:3 77:9 85:4
    104:17 117:15
    136:8 163:20
    196:8 205:16
    209:5 259:13
    295:23
**thanks**  106:15
**theoretical**  244:13
**theoretically**
    131:4

**theories** 45:12
**theory** 224:22
　311:20 317:2
**therapy** 339:4,17
**thing** 21:23 39:24
　75:9 81:14 89:19
　95:5 103:17
　106:23 122:6
　170:10 202:12
　216:2 225:2
　276:10 279:14,17
　281:2,21 283:15
　287:10,23 313:25
　336:8 348:3
**things** 31:12 54:16
　63:17 83:6 95:13
　131:22 135:5
　136:18 151:22,22
　170:8 187:15
　257:20 267:17
　273:13 337:20
**think** 11:5,12
　13:11 25:14 26:11
　27:8 30:15 36:21
　37:25 38:15 39:6
　42:11,15 44:20,21
　45:9 48:11 50:25
　52:19,25 56:19
　58:2 60:24 62:15
　63:3 64:8 66:18
　73:4,10 74:3
　75:13 81:15,17
　84:9,22 87:9
　89:17 94:17 96:4
　96:12 106:23
　108:18 110:19
　111:23 112:7
　115:12 122:13
　123:19,23 128:25
　129:15 132:5,13
　133:14,15 144:15

149:21 155:22
156:10 168:2,6
171:25 172:20
176:12 180:9
188:5 190:8 200:2
202:20 203:11
211:9,14 227:17
228:23 235:2
240:6 241:22
244:23 247:9
254:24 263:17
264:19 265:2,10
265:19 268:8
270:25 273:7
275:4 284:9 295:6
298:7 303:7
306:21 307:2
311:15,23 316:3
319:20 320:16
321:7 322:4
323:12 326:8
328:4 329:16
331:13 340:24
345:9 348:22,24
**thinking** 31:15
43:3 107:6 222:9
298:3 312:3
**third** 8:20 25:2,25
40:4 67:11 75:25
78:22 79:7,11
86:21 128:12
129:18 130:9
134:10 148:21
155:4 156:16
159:2 177:9
196:25 197:3,9
198:19,24 199:12
200:8 201:11
202:7,23 204:23
205:21 220:25
233:5,6 253:20

279:11 286:6,8
291:21 296:7
300:21 305:18,20
307:16,22 310:22
310:24 317:20
**thornburg** 5:20
**thoroughly** 21:9
**thought** 175:25
183:21 343:13
**thoughts** 321:24
**thousand** 255:10
**thousands** 340:2
340:14
**thread** 211:6
**three** 45:15 51:4
52:21,25 55:18
62:14 63:16,25
64:8 73:17 74:15
86:23 109:11
146:20 147:21
149:23 154:21
156:25 159:20
182:24 192:9
205:5 207:24
208:8 244:9 261:7
265:4 271:11
338:8,16
**threshold** 88:12
206:14 208:11
209:8,14 331:19
335:22,25 337:14
342:16 344:15
**thresholds** 206:24
207:22 208:20,22
214:24 330:11
331:18 335:12
**threw** 345:11
**throat** 153:24
**throw** 215:9
**throwing** 306:7

**thrown** 161:15
**tie** 288:18
**tied** 263:2,5
**tier** 141:16
**tiffany** 3:24
322:19 329:22
350:16
**tight** 12:20
**tightly** 107:7
**tim** 236:25
**time** 11:24 21:4
23:8 25:7 27:19
49:20 57:6 62:4,9
86:9 101:14 103:3
103:12 109:4,9
110:11 147:12
161:23 175:2
179:4 181:17
182:22 183:3
185:16 191:2,22
196:12 199:13
200:9 201:7 203:9
209:2 212:15
219:10,20 225:5
226:23 230:25
232:12,17 240:7
241:25 242:5,5
244:12 245:3
254:6 260:4
261:15 279:16
281:7 288:4
292:18 294:16
295:6,13,17 298:8
299:21 302:3,7
318:25 320:21
322:9,13 329:4,12
330:14 331:16
333:18 350:3,20
350:24 351:9,11
353:19

**timeframe** 20:23
185:24 353:8
**timeframes**
192:14
**timekeeper** 103:13
**timely** 314:14
**times** 49:15 51:6
60:25 201:5
219:24 320:17
**today** 12:14 13:6
13:10 15:2 16:2
16:12,17,23 18:7
18:13 19:11 26:10
38:4 39:6 44:7
54:6 148:9 180:8
184:19,23 260:8
271:3 278:3
320:17 322:22
325:20 345:16
**today's** 10:22
20:15 32:12 66:11
351:10
**told** 84:19 94:16
211:16 249:5
301:11 345:15
**top** 32:22 105:6,25
143:8 157:17,19
161:21 163:23
166:10,11,23,24
168:11,22 207:23
313:6 320:25
**topic** 54:3 87:13
209:18
**topics** 73:4 145:24
232:6
**total** 20:19 75:24
103:23 157:7
159:25 165:16,17
207:9 239:6
251:24 264:22
294:19 303:15,25

336:23
**touches** 324:12
**tout** 215:16
**towns** 242:24
**tpa** 70:25 72:21
74:12 75:13 76:7
80:21 81:24 82:2
82:18 96:14 97:3
99:8 128:18
130:13 146:25
147:23 148:17,20
148:25 149:5,17
150:3,17 171:14
171:24 266:23
267:3,8,15 269:7
273:16 284:23
285:8 286:12,18
287:9,22 289:4,5
289:18 290:24
292:2,20 293:18
294:6 296:13,19
299:4,24 300:5,6
302:7 304:6,15
305:17,24 306:11
307:5,13,25 308:2
308:13,14 310:19
310:20,21,22
315:6,9,16,18
316:10,19
**tpas** 71:18,18
86:22 94:25
131:14 171:11
293:24 297:16
304:8 311:6
316:15
**tpp** 57:4,9 59:22
59:24 65:17 66:15
89:6,8 111:3
116:5 128:5,6,16
128:23 130:4
132:11,18 133:9

134:10 137:20
142:4 144:20
145:3 156:8
172:25 173:6
174:4 177:23
188:23 196:20
197:17 198:8,10
221:8 223:15
229:5,9,18 233:15
240:12 251:20
254:17 261:2
280:4,21 284:4,6
284:21,23 285:10
285:11,19 286:19
290:21 292:6
296:10 297:23
298:10,22 299:3
300:19 302:10,20
303:3,15,22,25
304:24 305:3,7,16
305:19 306:3,15
307:4,15 311:6
316:10,20
**tpp's** 155:23 302:8
**tpps** 42:8 53:8
57:17 63:5 68:9
70:19 87:17 92:2
120:8 127:23
129:4,21 132:6
155:3,18 156:3
173:3 178:7,23
179:5 181:12
205:6 238:12
246:2 248:8 252:7
252:12,16 258:10
302:6 304:19
321:10 324:17
**tracing** 55:20
61:12 183:15
**track** 38:10 99:19
107:11 318:25

337:3
**tracked** 97:8
190:19 245:7
**tracking** 86:9
219:19
**traditional** 234:8
**transaction** 67:9
67:10,24 114:14
115:17 118:18
126:20 164:22
195:6 196:19
198:6 212:13
261:11
**transactional** 69:4
**transactions** 70:7
116:6,9 127:3,13
141:10 162:9
174:3,5
**transcript** 1:13
37:23 353:6,20
355:5,8
**transferred**
161:12
**transformed**
35:15
**transition** 108:20
**translate** 340:17
**transmit** 185:18
**transmits** 307:13
**transmitted** 138:2
254:10 260:20
268:10
**traurig** 3:20
**traveling** 276:11
**treat** 119:6 215:22
216:15,16 221:21
346:11 347:7
**treated** 126:10
256:23 338:21
**treatment** 29:23
92:15 250:16

[treatment - unique]                                                    Page 62

339:11

**treats** 25:22

**tricare** 250:9

**tried** 193:22 258:9
299:10

**triggered** 121:6
188:19

**triggers** 190:4

**trimming** 347:25

**true** 11:17 34:22
36:7 46:20 83:23
86:7 120:10 132:7
145:9 147:25,25
156:6 185:4
204:21 225:23
231:8 236:25
246:22 284:16
285:6 303:17
308:11,11 315:19
316:15 317:12,13
317:17,21 326:6
352:7 355:8

**truth** 45:4 341:3

**try** 11:10 12:13,19
19:13 41:20 51:2
63:18 68:2 73:22
81:18 105:4
107:10 108:6
167:8 175:17
179:20,22 249:4
258:11 287:2
320:15 341:5
345:8

**trying** 89:13 91:19
91:22 151:19
174:21 213:14
217:21 242:19
275:4 284:2
301:23 311:15

**turn** 181:14
205:14 260:6

308:15 310:21

**twice** 96:13

**two** 22:12 25:13
31:12 39:25 44:21
44:23 45:14,15
48:20 51:7,12
52:24 53:13 54:16
55:15 57:14 62:11
62:14 83:5 84:23
86:14 98:17,19,25
109:6 113:9
136:18 164:12
220:8,12,14 223:9
244:9 262:14
278:12 284:17
290:2 298:9,10
309:18 314:22
339:14

**tx** 353:15

**type** 80:19 168:9
246:5,8,9,14,17,25
253:22,23 263:17
263:18,20 310:9
310:11

**types** 115:16
246:21 253:13,14
253:17

**typically** 27:17
116:10 117:20
219:6 238:5 239:5
280:21 283:3,12
284:5 287:7
288:21 290:18
296:12 299:23
303:20 327:12

**u**

**u** 9:17 10:14

**uh** 246:23 310:3

**ulmer** 6:4

**ultimate** 133:9
134:19 226:22

280:21 284:5
286:16 290:17
304:24 306:15

**ultimately** 78:20
128:7 225:3
236:13 238:7
239:4 314:20

**unable** 277:25

**unavailable** 67:18

**uncertainty**
258:20

**uncommon** 96:13
212:12

**underlying** 50:14
50:22 71:3,8
72:16 76:15 83:9
83:21 95:2 137:11
137:20 149:10
150:18 159:12
286:13 306:3
309:4 316:2
346:12

**underneath** 76:18

**underscore** 115:12

**understand** 10:25
11:25 14:3,16
19:3 27:5 29:9
31:11,18 32:18
46:14 48:4 49:5
50:25 57:20 59:10
63:16 83:14 86:2
95:12 105:7 171:6
171:25 175:19
183:12 187:7,22
188:18 193:23
194:25 209:5
211:10 214:3
226:25 234:23
236:22 248:3
260:11 264:25
275:15 291:19

313:4 318:25
330:17 349:22

**understanding**
34:6 49:11 50:2
56:8 63:8 66:10
66:16 81:20 97:19
104:3,7,10 110:9
168:23 203:23
204:12 207:7
208:7 220:16
228:8,13 254:3
265:18 274:22
329:6

**understatement**
343:6

**understood** 10:20
12:9 14:16 17:16
18:3 30:8,13 39:5
160:10 194:22
238:22

**undertaken** 81:11
107:14 213:3

**undertaking**
238:18

**uniform** 67:16
69:3 162:15
172:12

**uniformly** 129:4
129:11

**unintelligible**
68:22 82:10 93:16
125:3 137:4 211:7
311:13

**union** 134:20
287:7,21 288:6,22
290:13 300:13
303:21

**unique** 272:19
334:12 342:22
344:2

[uniquely - vine]                                    Page 63

**uniquely** 45:25
70:8 137:16 262:5
262:10 341:16
**unit** 9:4 62:11
109:6,11 182:24
183:5 229:6
232:19 295:19
**united** 1:2 55:18
127:12 187:24
**universally** 112:11
127:10
**unjust** 202:3 203:2
204:13
**unnecessary**
251:14
**unpack** 95:4
**unpaid** 141:19
**unsafe** 46:4
**unusual** 107:12
116:23 288:11
**update** 40:21
**updated** 178:21
**uploaded** 14:4
21:19
**ups** 259:5
**usa** 3:21 4:5,13
**usage** 135:12
335:21
**use** 37:18 38:5
64:25 67:17 96:25
108:20 114:19
115:18 118:14
121:13 124:2,17
124:18 125:10
126:22 129:17
137:19 167:11
168:10 177:8
180:16,25 181:5,7
188:12 191:6
214:13 215:5
222:21,22 240:3

252:2,25 253:3
254:19 255:2,7,13
260:24 274:25
308:15 312:15,19
312:20 322:2
327:4,11 336:19
348:22
**useful** 180:24
212:23 294:3
**uses** 125:6 278:8
311:24 327:20
**utility** 175:21
**utilizing** 77:25
**utter** 320:20
**utterly** 118:4
309:22

**v**

**v** 28:6 31:3 124:2
353:4 354:1 355:1
**va** 257:11
**vague** 64:4 68:14
68:19 74:20 79:15
82:6 88:21 92:8
93:13 110:3 115:2
115:25 120:13
121:19 122:24
124:25 132:22
140:25 144:5
145:19 157:23
162:18 169:18
172:16 175:16
207:3 210:10
212:6 213:25
214:21 226:10
237:15 309:15
315:23 318:17
340:22
**valid** 60:20
**validated** 216:3
**valsartan** 1:6 8:16
9:6 40:24 44:9,9

44:10,11 109:22
111:2 118:5,11
121:14 122:19
157:13 166:3
193:14 207:25
225:20,20 332:11
332:16 335:15,16
344:10,21 348:13
348:16 353:4
354:1 355:1
**valuable** 162:5
**value** 46:7 161:18
161:25 241:25
279:19 293:8
294:15
**valueless** 46:4
**values** 273:5
274:17
**vanaskie** 199:24
**variable** 213:17
293:8
**variables** 125:23
339:14
**variation** 167:18
210:13 211:2,12
212:21 213:10
**varied** 209:25
**varies** 293:25
**variety** 125:11
131:22 308:21
**various** 19:16
26:24 39:4 53:6
96:5 208:11
210:22 211:2
213:16 239:3,15
253:11 257:19
261:9 328:25
**vary** 294:13
**vast** 51:14,21
**vcd** 46:2 157:17
230:25

**vcds** 43:24 44:8
46:7 59:23 60:12
88:3 158:4,14
188:23,24 193:6
203:16 204:5
207:10 210:23
211:20 242:7
302:2,5 347:7
**verifiable** 306:9
**verify** 15:12 349:4
353:9
**veritext** 7:19 9:9
353:14,23
**veritext.com.**
353:15
**versus** 80:10
148:12 217:23
242:16
**veterans** 11:10
250:8
**vetted** 170:24
327:17
**vial** 306:23
**video** 9:5 14:6,11
38:7 117:7
**videoconferenci...**
1:18
**videographer** 7:19
9:2,9 62:4,9 109:4
109:9 153:6
182:22 183:3
232:12,17 295:13
295:17 322:9,13
330:2 350:20,24
351:9
**videotaped** 8:10
**view** 348:4,4
**viewed** 80:2
**viewing** 17:11
**vine** 6:6

[violations - withdraw]                                                    Page 64

**violations** 257:2
**virtually** 70:17
  114:14
**visible** 185:10
**volume** 164:12
  165:17 294:19

**w**

**wait** 151:16
  228:11
**walgreen** 3:8
**walgreens** 196:23
  197:8
**walk** 47:14 335:7
**walking** 336:20
**wallace** 105:8,12
  105:13,15
**wallack** 7:12
**walmart** 3:8 28:24
  29:6
**walnut** 2:16
**walsh** 4:4,8
**want** 12:15 15:8
  16:7 20:13 36:3
  37:20 39:21 41:7
  41:20 49:25 52:22
  57:13,19 60:11
  62:21 63:11 65:20
  66:8 72:18 73:6
  75:10,16 76:16
  79:20,24 80:14
  81:12,17 82:16
  84:9,11,22 85:25
  95:6,8,25 99:15
  100:22 101:15
  104:21,22 112:5
  114:10 123:25
  128:3,25 133:23
  135:6,14,14 136:6
  136:12 140:21
  146:17 149:20
  151:9 153:13

155:12 156:18
158:15 167:14,15
168:6 172:22,24
176:10 177:11
187:8 193:22
198:18,20 201:25
205:14,21 210:24
212:18 216:25
220:18 221:23
226:21 227:14
237:23 240:9
246:6,16 247:25
251:15 258:19
264:3 269:23
271:8,21 272:8
275:22 286:14
287:10 291:19
292:14,18 294:18
296:7 297:20
306:16 307:9
317:5 318:8 328:6
333:25 335:7
**wanted** 40:15
  61:14 68:7 72:12
  86:12 109:19
  132:14 160:19
  165:15 174:14
  344:14 347:9
  349:7
**wanting** 313:22
  339:24
**wants** 12:16
  134:25 320:22
**warranties** 60:5
**washington** 5:7
  17:6
**waste** 320:21
**watch** 142:15
**water** 153:17,24
**way** 10:10 12:3
  24:16,18 25:20

26:2,3 27:12
28:15 41:10 42:3
42:4 59:11 63:18
63:19 66:25 67:25
69:9,17 78:2
81:19 84:5,6
89:19 90:7 93:7
94:11 97:17,22
99:11 101:21
112:22 118:9
135:19 137:19
141:22 143:17
145:11 148:11,18
163:15 177:9
196:7 197:14
202:21 207:20
216:7,25 243:10
244:5 249:25
257:2 259:25
281:19 294:4
304:11 307:14,19
310:17 315:3,6,15
316:18 327:3
333:21 335:24
337:13 352:12
**ways** 67:8 77:3
  83:2 224:8 293:13
  308:21
**we've** 61:20 70:6,7
  192:2,8 231:22
  252:4 259:5 261:9
  271:2,23 288:21
  295:4 318:3
  336:12,13,21,23
  338:16,18,21
  341:13 347:16
  349:22
**wealth** 146:3
**web** 259:5
**website** 98:24

**week** 125:11
**weeks** 21:8 40:2
**welcome** 109:13
**went** 15:11 102:17
  102:23 169:21
  198:10 215:6
  289:3,5
**west** 6:14
**whatnot** 11:12
**whatsoever** 100:4
  208:24
**whereof** 352:14
**wherewithal**
  314:4
**whichever** 238:9
**whiteley** 2:4
**whitney** 6:12
**wholesale** 127:15
  203:25
**wholesaler** 119:23
  156:9,23 185:2,3
  185:15,17 189:7
  189:17,19 190:17
  191:8,13 192:2,3,8
  192:9,10,17,20
  202:2,6 203:2
  204:7,22 205:5
**wholesalers**
  154:25 155:16,25
  156:2,12 184:19
  184:24 188:24
  204:14 205:7,12
**wide** 132:6 324:10
**wife** 195:21 196:3
**wife's** 225:25
**william** 7:15
**willy** 285:15
**wise** 11:5
**wish** 115:11
**withdraw** 281:18
  315:12

**[withheld - zoom]**                                                Page 65

**withheld**  70:3
  342:25
**withhold**  94:9
**witness**  1:8 8:4
  9:15 21:23 22:6
  62:2 87:4 90:16
  98:8 108:25
  116:19,21 117:6
  117:12,14 150:19
  151:4,9,14,19
  152:2 153:10
  154:11 167:5
  168:14 182:9,16
  200:16 201:4
  207:4 208:15
  218:7 232:4 241:6
  259:13 295:11
  351:5 352:5,8,14
  353:8,10,12,19
**witness's**  154:19
**witnesses**  199:24
**wonderful**  22:9
**wondering**  281:16
  312:25
**word**  35:6 58:21
  66:24 67:7 68:2
  96:25 97:21 106:6
  106:8 107:4 124:7
  133:15 180:24
  326:9
**words**  20:13 59:20
  60:11 76:16 95:9
  162:14 218:19
  229:21 263:12,14
  281:9
**work**  31:11,15,23
  78:6 90:3,4
  102:11 179:15,17
  181:16 196:4
  224:14 259:11
  270:20 307:18

316:14 317:8
  325:21 327:13,15
  327:16 340:8,10
**workable**  182:13
**workbook**  253:15
**worked**  78:13
  104:19,23 167:10
  218:13 230:23
  317:12,14,18,19
  317:23 318:19
**working**  22:5
  25:11,14 60:15
  78:5 231:2 301:17
**works**  180:14
  304:20
**worksheet**  79:22
  80:14
**worksheets**  71:5
  74:13 78:23 79:8
  79:10 80:4 81:6,7
  81:23 96:6 172:7
  273:18
**world**  88:9 278:7
  297:25 310:13
  313:8
**worries**  314:9
**worry**  223:16
**worth**  207:24
**wound**  234:2
**wrapped**  322:4
**writ**  99:14
**write**  138:11
**writes**  283:18
**writing**  137:17
  215:20 341:15
**written**  15:18
  139:21 155:11
  262:12 283:13
  302:2
**wrong**  42:13
  103:11,14 190:7

235:22 247:15,17
  272:24 282:14,15
**wrote**  80:15 82:19
  172:25

**x**

**x**  8:2,8 117:21
  264:20 336:13,14
**xponent**  40:9,17
  124:5,11,18
  125:15 126:6,15
  158:7 165:18
  166:7 233:11
  245:24 246:10
  250:24 251:18
  253:4 254:19
  255:7,13
**xyz**  216:4

**y**

**y'all**  350:12
**yeah**  29:4 35:5
  43:13 48:16
  123:23 135:14
  169:3 171:23
  172:6 183:20
  199:19 240:2
  255:21 291:8
  314:8 323:13
  346:5
**year**  16:8 141:18
  145:7 161:9
  172:13 178:10
  179:6 190:25
  243:13 244:22,23
  244:24,25
**years**  84:22 98:23
  99:3,20 146:4
  167:24 194:2
  244:10 245:10
**york**  6:15,15

**z**

**zalman**  7:8
**zero**  247:12
**zhejiang**  3:6 9:24
**zhp**  338:9,18
  339:15 341:17
**zhp's**  335:15
**zoom**  1:18 14:8
  152:15

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# Exhibit 50

Page 1

1

                    UNITED STATES DISTRICT COURT
2                   FOR THE DISTRICT OF NEW JERSEY
                          CAMDEN VICINAGE
3

     IN RE:  VALSARTAN, LOSARTAN, AND  ) MDL No. 2875
4    IRBESARTAN PRODUCTS LIABILITY      )
     LITIGATION                         )
5

6

7

                    VIDEOTAPED DEPOSITION OF:
8

                      EDWARD H. KAPLAN, M.D.
9

                   WEDNESDAY, JANUARY 19, 2022
10

                  9:14 a.m. Central Standard Time
11

12

              TRANSCRIPT of the stenographic notes of the
13

     proceedings in the above-entitled matter as taken by and
14

     before KELLY A. BRICHETTO, a Certified Court Reporter of
15

     the State of Illinois, held at 77 West Wacker Drive,
16

     Suite 3100, Chicago, Illinois, on Wednesday, January 19,
17

     2022, commencing at approximately 9:14 a.m. pursuant to
18

     notice.
19
20
21
22
23
24

Page 2

```
 1   A P P E A R A N C E S :
 2   On behalf of the Plaintiffs:
 3        RACHEL J. GEMAN (In person)
          LIEFF CABRASER HEIMANN & BERNSTEIN
 4        250 Hudson Street
          8th Floor
 5        New York, New York  10013
          (212) 355-9500
 6        rgeman@lchb.com
 7
          On behalf of the Plaintiffs:
 8
          NICHOLAS A. MIGLIACCIO (Via Zoom)
 9        MIGLIACCIO & RATHOD, LLP
          412 H Street NE
10        Suite 302
          Washington, D.C.  20002
11        (202) 470-3520
          nmigliaccio@classlawdc.com
12
13   On behalf of the Plaintiffs Executive
     Committee:
14
          BRETT VAUGHN (Via Zoom)
15        HOLLIS LAW FIRM
          8101 College Boulevard
16        Suite 260
          Overland Park, Kansas  66210
17        (913) 385-5400
          brett@hollislawfirm.com
18
19   On behalf of the Brown Plaintiff:
20        DANIEL NIGH (Via Zoom)
          LEVIN PAPANTONIO THOMAS MITCHELL
21        RAFFERTY & PROCTOR, PA
          316 South Baylen Street
22        Suite 600
          Pensacola, Florida  32501
23
24
```

Page 3

```
 1   On behalf of the Defendant Camber
     Pharmaceuticals, Inc.:
 2
          ANDREW ALBERTO (Via Zoom)
 3        LEWIS BRISBOIS
          550 East Swedesford Road
 4        Suite 270
          Wayne, Pennsylvania  19087
 5        (215) 977-4058
          Andrew.Alberto@lewisbrisbois.com.
 6
 7   On behalf of the Defendant Teva
     Pharmaceuticals USA, Inc.:
 8        GLENN S. KERNER (In person)
          NILDA ISIDRO (In person)
 9        GREENBERG TRAURIG, LLP
          One Vanderbilt Avenue
10        New York, New York 10017
          (212) 801-9200
11        kernerg@gtlaw.com
          isidron@gtlaw.com
12
13   On behalf of the Defendant Teva
     Pharmaceuticals USA, Inc.:
14        KATE WITTLAKE (Via Zoom)
          GREENBERG TRAURIG, LLP
15        Terminus 200
          3333 Piedmont Road NE
16        Suite 2500
          Atlanta, Georgia  30305
17        wittlakek@gtlaw.com
18   On behalf of the Defendant McKesson
     Corporation:
19
          ELLIE NORRIS (Via Zoom)
20        D'LESLI DAVIS (Via Zoom)
          NORTON ROSE FULBRIGHT, LLP
21        2200 Ross Avenue
          Suite 3600
22        Dallas, Texas  75201
          (214) 855-8000
23        ellie.norris@nortonrosefulbright.com
          dlesli.davis@nortonrosefulbright.com
24
```

Page 4

```
 1   On behalf of the Defendant Express
     Scripts:
 2
          JAMES SPUNG (Via Zoom)
 3        HUSCH BLACKWELL, LLP
          736 Georgia Avenue
 4        Suite 300
          Chattanooga, Tennessee  37402
 5        (423) 755-2652
          James.Spung@huschblackwell.com
 6
 7   On behalf of the Defendant Sciegen
     Pharmaceuticals:
 8        GEOFFREY M. COAN (Via Zoom)
          HINSHAW & CULBERTSON, LLP
 9        53 State Street
          27th Floor
10        Boston, Massachusetts  02109
          (617) 213-7045
11        GCoan@hinshawlaw.com
12   On behalf of the Defendants Zhejiang Huahai
13   Pharmaceutical Co., Ltd., Prinston
     Pharmaceutical, Inc. and Solco Healthcare US,
     LLC:
14
          ALYSON LOTMAN (Via Zoom)
15        DUANE MORRIS, LLP
          30 South 17th Street
16        Philadelphia, Pennsylvania 19103
          (215) 979-1177
17        ALotman@duanemorris.com
18   On behalf of Mylan Laboratories, Ltd. and
     Mylan Pharmaceuticals, Inc.:
19
          PIETRAGALLO GORDON ALFANO BOSICK &
20        RASPANTI, LLP
          FRANK STOY (Via Zoom)
21        JASON REEFER
          301 Grant Street
22        38th Floor
          One Oxford Centre
23        Pittsburgh, Pennsylvania  15219
          fhs@pietragallo.com
24
```

Page 5

```
 1   On behalf of the Defendant Amerisource Bergen:
 2        JEFF D. GEOPPINGER (Via Zoom)
          ULMER & BERNE, LLP
 3        600 Vine Street
          Suite 2800
 4        Cincinnati, Ohio  45202
          (513) 698-5000
 5        jgeoppinger@ulmer.com
 6
     On behalf of the Defendant CVS Pharmacy, Inc.
 7   and Rite Aid Corporation:
 8        MITCHELL CHARCHALIS (Via Zoom)
          BARNES & THORNBURG
 9        2029 Century Park East
          Suite 300
10        Los Angeles, California  90067
          mcharchalis@btlaw.com
11
12        - - - - - - - -
13
14   ALSO PRESENT:
          BEN PELTA-HELLER, Videographer
15        SCOTT ZIARKO, Videographer
16
17
18
19
20
21
22
23
24
```

2 (Pages 2 - 5)

Page 6

```
 1              TRANSCRIPT INDEX
 2    APPEARANCES . . . . . . . . . . . . . . . . . . . . . . 2
 3
 4    INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . 4
 5
 6    EXAMINATION OF EDWARD H. KAPLAN, M.D.
 7    BY MR. KERNER . . . . . . . . . . . . . . . . . . . 11
 8    BY MS. LOTMAN . . . . . . . . . . . . . . . . . . 107
 9    BY MR. KERNER . . . . . . . . . . . . . . . . . . 115
10    BY MR. GEOPPINGER . . . . . . . . . . . . . . . 121
11    BY MS. LOTMAN . . . . . . . . . . . . . . . . . . 126
12    BY MS. GEMAN . . . . . . . . . . . . . . . . . . 128
13
14    REPORTER'S CERTIFICATE . . . . . . . . . . . . . 131
15
16
17    EXHIBIT CUSTODY
18    COURT REPORTER
19
20
21
22
23
24
```

Page 7

```
 1              INDEX OF EXHIBITS
 2    NUMBER        DESCRIPTION            IDENTIFIED
 3    Exhibit 1     Notice of Deposition        29
 4    Exhibit 2     Curriculum Vitae            37
 5    Exhibit 3     Report of Dr. Kaplan        44
 6    Exhibit 4     Thumb drive              104
 7    Exhibit 5     Dr. Kaplan's Invoices      115
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 8

```
 1          THE VIDEOGRAPHER:  Good morning.  We are now
 2    on the record.  My name is Scott Ziarko.  I'm the
 3    videographer representing Veritext Legal Solutions.
 4          Today's date is January 19th, 2022.  The
 5    time is approximately 9:14 a.m.  This deposition is being
 6    held at 77 West Wacker Drive in Chicago, Illinois as well
 7    as by Zoom meetings in the matter of In Re:  Valsartan,
 8    Losartan, et al.  The name of the witness is Edward H.
 9    Kaplan, M.D.
10          Our court reporter is Kelly Brichetto who
11    is also with Veritext Legal Solutions.
12          All counsel will be noted in the written
13    record.
14          Would the court reporter please swear in
15    the witness.
16               (Witness sworn.)
17          You may begin.
18          MR. KERNER:  Before we get started, Scott, can
19    we move the video camera just a touch to get the laptops
20    out of the screen since I can't get any closer?
21          THE VIDEOGRAPHER:  There you go.
22          MR. KERNER:  Great.
23          THE WITNESS:  And I have to look at myself.
24          MS. GEMAN:  I'm sorry.  My pen literally just
```

Page 9

```
 1    died.  Using the word literally correctly.  Is there one
 2    back here?
 3          MR. KERNER:  We're off to an auspicious
 4    beginning.
 5          MS. GEMAN:  Indeed.  I have others in my room.
 6    I can go get it.
 7          MR. KERNER:  You need a pen?
 8          MS. GEMAN:  I need a pen.
 9          MR. KERNER:  Do we need this on video?
10          THE VIDEOGRAPHER:  Want to go off the record?
11          MR. KERNER:  Yeah, go off the record.
12          THE VIDEOGRAPHER:  The time is 9:15.  We're
13    off the record.
14               (Discussion had off the
15               record.)
16          The time is 9:16 a.m.  We're back on the
17    record.  This is media two.
18          Will the court reporter please swear in
19    the witness.
20
21
22
23
24
```

Page 10

1            (Witness sworn.)
2    WHEREUPON:
3            EDWARD H. KAPLAN, M.D.,
4    called as a witness herein, having been first duly sworn,
5    was examined and testified as follows:
6            DIRECT EXAMINATION
7    BY MR. KERNER:
8        Q.    Good morning, Dr. Kaplan.
9        A.    Good morning.
10       Q.    My name is Glenn Kerner.  We met a new
11   minutes ago.  I am an attorney representing Teva
12   Pharmaceuticals in this litigation.  I'm here with
13   Greenberg Traurig.  My partner Nilda Isidro is here as
14   well, and I'm going to be asking you a bunch of questions
15   this morning, possibly into this afternoon as well about
16   your report and the litigation and your opinions in the
17   litigation.
18            Have you ever had your deposition taken
19   before?
20       A.    Yes.
21       Q.    How many times?
22       A.    Three or four times, maybe more.  Six times.
23       Q.    Okay.  So then you know how it goes.  You're
24   under oath, so you have sworn to tell the truth.

Page 11

1            The way this works obviously is I'm going to
2    ask you questions.  You're going to answer my questions.
3    It will be recorded by both the videographer and the
4    stenographer here, so there will be a booklet that has --
5    there'll be a transcript that will have all of your
6    testimony in it.  Do you understand that?
7        A.    I do.  Since this is video and I've not been
8    videoed, when I nod my head, that works because in the
9    past --
10       Q.    It doesn't.  No, you still need to answer
11   verbally so the stenographer can get it.
12       A.    Got it.  Okay.
13       Q.    But thank you for asking.
14            If I ask a question and you're not quite sure
15   what I mean, please tell me.
16       A.    Okay.
17       Q.    Because if you answer my question, I'm going
18   to assume that you understood it, and then it will go
19   into the record.  We don't want to have any
20   misunderstandings.  Okay?
21       A.    Okay.
22       Q.    Also, I do have a habit sometimes of speaking
23   quickly, so I want to warn you in advance of that, so
24   let's try not to talk over each other, and I will try as

Page 12

1    well.
2        A.    Okay.
3        Q.    In the prior depositions that you've taken or
4    that you've been deposed, can you tell me when the first
5    one was, approximately?
6        A.    Twenty years ago.
7        Q.    What kind of case was it?
8        A.    Malpractice.
9        Q.    Medical malpractice?
10       A.    Medical malpractice.
11       Q.    And were you a party in that case or were you
12   a witness?
13       A.    A witness.
14       Q.    Were you an expert witness in that case?
15       A.    I believe I was an expert witness in that
16   case.
17       Q.    Were you paid to testify?
18       A.    Yes.
19       Q.    And can you give me some of the details of
20   that case?
21       A.    I can't remember exactly because it's been
22   more than ten years since I've done any, but if it's the
23   one I'm thinking of then, it was -- it was a woman with
24   breast cancer, and I was asked to be an expert for the

Page 13

1    plaintiff.
2        Q.    And what was the claim in that case?
3        A.    The claim was -- was that she was
4    misdiagnosed.  Late diagnosis caused her -- her disease
5    to progress and ultimately caused her demise.
6        Q.    You say that was about 20 years ago you
7    think?
8        A.    I believe it was about 20 years ago.
9        Q.    Where was that case?
10       A.    It was in -- it was on the west -- it was on
11   the north -- in the northwestern United States.
12       Q.    Oregon, Washington, something like that?
13       A.    One of those places.
14       Q.    You don't remember though?
15       A.    I will later on I'm sure.
16       Q.    Okay.  Well, if you remember, please let us
17   know.
18       A.    Okay.
19       Q.    Do you remember the name of the attorney that
20   retained you?
21       A.    I do not.
22       Q.    Do you remember the name of the firm?
23       A.    It was an independent person.  He was not
24   generally a malpractice attorney.  That much I remember.

                                    4 (Pages 10 - 13)

Page 14

1  I don't remember his name.
2      Q.  How did he find you?
3      A.  Through a radiologist friend of mine who was
4  asked -- who had done a lot of this and was asked to find
5  a medical oncologist that could review the case and
6  opine.
7      Q.  And when you say "review the case," did you
8  testify in that case as well?
9      A.  Yes.
10     Q.  At deposition, as you said you did?
11     A.  I testified in court.
12     Q.  And at deposition, both?
13     A.  And in deposition.
14     Q.  And what was the result of that case?
15     A.  I believe that the case was dropped.  I don't
16 think it -- it went to court, but I don't think it -- it
17 progressed after the time I was in the courtroom.
18     Q.  When you say it was dropped, do you know what
19 you mean by that or is that just a layman's term?
20     A.  Honestly I --
21         MS. GEMAN:  I just want to caution you both.
22 Please let him finish his question --
23         THE WITNESS:  Oh.
24         MS. GEMAN:  -- and likewise.

Page 15

1          MR. KERNER:  I warned you.
2          MS. GEMAN:  Right, but there was --
3          MR. KERNER:  Almost.
4          MS. GEMAN:  No, there was one cutoff of the
5  answer.  Thank you, both.
6          THE WITNESS:  Could you repeat the question?
7  BY MR. KERNER:
8      Q.  Sure.  You said the case was dropped.  Do you
9  know what you meant by that?
10     A.  So I can't remember if that case was -- was
11 withdrawn or if it was that they found in favor of the
12 defendant.  I don't -- and it came to conclusion, but
13 after my testimony I didn't have any more interaction.  I
14 think they had -- the attorney and the client had some
15 issues, and I think they may have got other counsel.  I
16 can't remember all the details.
17     Q.  Okay.  Do you remember the name of the case?
18     A.  No, I do not.
19     Q.  Do you remember the name of the defendant --
20     A.  I do not.
21     Q.  -- the name of the doctor?
22     A.  I do not.
23     Q.  Was it a doctor?  Sorry.
24     A.  It was -- it was a doctor, a group of doctors

Page 16

1  and a medical center I believe or a hospital.
2      Q.  Do you know what hospital that was or what
3  medical center it was?
4      A.  I don't remember any of the details.
5      Q.  Okay.  Do you remember anything else about
6  that particular case?
7      A.  No, I really don't.
8      Q.  Okay.  When was the next time you had your
9  deposition taken?
10     A.  I really can't remember the times of these.
11 I know I have had nothing within the last ten years.
12 That's really what I can tell you.
13     Q.  Okay.  I believe you testified that your
14 deposition has been taken three or four times.  So you
15 told us about one.
16     A.  Right.
17     Q.  Can you tell us about another one?
18         MS. GEMAN:  Just objection to the extent it
19 misstates testimony.
20         MR. KERNER:  I'm sorry.  I didn't hear it.
21         MS. GEMAN:  Maybe I should take this off.
22 Sorry.
23         Objection to the extent it misstates
24 testimony.

Page 17

1
2  BY THE WITNESS:
3      A.  I had a deposition taken on a patient that I
4  was caring for.  In fact, this was probably even before
5  that case, so it may have been more like 25 years ago.
6  And it was a young woman who had gastroesophageal cancer
7  or stomach cancer.  I can't remember exactly.  She was my
8  patient for a brief time.  It was towards the end of
9  her -- of her life, and I was asked -- I was deposed
10 to -- as to her condition and to the -- and to the issues
11 surrounding her diagnosis.  I wasn't opining as to -- as
12 to causation or -- or fault.  I was just deposed as her
13 treating doctor.
14 BY MR. KERNER:
15     Q.  Were you a party in that case?
16     A.  No.
17     Q.  You weren't a defendant in that case?
18     A.  No, I was not.
19     Q.  So you were just a fact witness?
20     A.  I was a -- I was a treating physician at the
21 time of her death.
22     Q.  Okay.  Do you remember where that case was
23 pending?
24     A.  It was in my office in Skokie.

5 (Pages 14 - 17)

Page 18

1    Q.   Do you remember the name of the attorney who
2    took your deposition?
3    A.   I do not.
4    Q.   Do you remember the name of the doctor who
5    was the -- was the doctor -- was there a doctor as the
6    defendant in the case?
7    A.   There probably was, but I wasn't -- I wasn't
8    really asked to look at any of that.  It just was my own
9    records and my own treatment of the patient.
10   Q.   Okay.  And again just to be clear, you don't
11   remember the name of either party or any of the parties
12   in that case?
13   A.   I do not.
14   Q.   Any other depositions that you've taken or
15   you've had rather?
16   A.   I've done other depositions.  I was deposed
17   as an expert reviewing a patient -- it wasn't a -- he
18   became a patient but it was a -- a person who was
19   claiming exposure to toxins in the workplace, and his
20   attorney wanted me to review that and to opine as to
21   whether any of the chemicals that he was exposed to could
22   have been related to his ultimate development of cancer.
23   Q.   What kind of cancer did this person have?
24   A.   I believe it was a soft tissue sarcoma.

Page 19

1    Q.   So he was the plaintiff in that case?
2    A.   He was the -- he was the plaintiff, correct.
3    Q.   And his attorney asked you to review the
4    medical records?
5    A.   To review the -- to review the medical
6    records but also to review the -- the various agents that
7    he was exposed to and see if I could find any -- any
8    specific link or causation for his ultimate cancer.
9    Q.   And were you able to?
10   A.   I was not able to find anything specifically
11   linked.
12   Q.   Do you recall what agents you looked at?
13   A.   I just recall that there were a lot of --
14   of -- of cleaning agents.  He was involved in -- in a
15   factory that used a lot of solvents that were for -- for
16   sterilization and cleaning, and I know I reviewed a lot
17   of -- a lot of literature about those agents, and there
18   was not any specific -- they were all -- they were all
19   pretty much doing all the precautionary things that they
20   needed to do in the work -- in the workforce.
21   Q.   Do you remember what any of the agents were?
22   A.   I really don't.
23   Q.   Do you remember any of the classifications of
24   any of those agents?

Page 20

1    A.   Just that there were some -- some
2    benzene-type products that were -- there were some fairly
3    toxic substances that are used commonly in -- in cleaning
4    solutions in the workplace and at home, but I don't
5    remember specifics.
6    Q.   And I'm sorry if I asked you this already.
7    Do you remember the name of any of the parties in that
8    case?
9    A.   I -- I do not.
10   Q.   What about any of the attorneys that you
11   dealt with?
12   A.   I -- I don't offhand remember the names.  If
13   I need to look --
14   Q.   Why do you say it like that?
15   A.   Because I can't --
16   MS. GEMAN:  Objection.
17   BY THE WITNESS:
18   A.   I can't remember the names.  If I knew that I
19   was going to be asked for depositions from before ten
20   years, I would have reviewed whatever I could find in my
21   old records to -- to get names and dates and places.
22   BY MR. KERNER:
23   Q.   Okay.  And so is it your testimony that you
24   have some old records either at home or in your office

Page 21

1    that you would have reviewed?
2    MS. GEMAN:  Objection, misstates the
3    testimony.
4    BY THE WITNESS:
5    A.   It's -- could you repeat that, please.
6    BY MR. KERNER:
7    Q.   Sure.  Do I understand your testimony to be
8    that you have old records that you didn't review from
9    prior to ten years ago?
10   A.   What I'm saying is I could very well have
11   something like that laying around since I tend not to
12   throw things away, but I haven't looked in certain
13   closets in the house for many years, so I would have to
14   go looking through those if -- if I was being asked or
15   knew I was going to be asked about them.
16   Q.   Okay.  Any other occasions where your
17   deposition was taken?
18   A.   I can't recall any -- any specifics of any
19   other depositions, but I know I've been in my office
20   deposed before.
21   Q.   And before this litigation -- you've been
22   retained as an expert witness in this litigation;
23   correct?
24   A.   Correct.

6 (Pages 18 - 21)

Page 22

1   Q.  For the Plaintiffs; correct?

2   A.  Correct.

3   Q.  Before this litigation how many times have

4 you been retained as an expert witness?

5   A.  Again, it's been awhile.  The last -- last 15

6 years was doing nothing in this regard because I was

7 taking care of my wife who suffered from breast cancer

8 and then ultimately passed away from it, so I was kind of

9 out of the picture, and this is the first I've done in a

10 long time.  But your question was how -- how many times

11 was I an expert?

12   Q.  Correct.

13   A.  Aside from the case that I just mentioned to

14 you, I've been an expert in malpractice cases.  Mostly

15 record review rather than -- rather than deposition.

16 Only a couple times did it actually go to deposition.

17   Q.  Can you ballpark or estimate for me how many

18 times you've been retained as an expert witness either to

19 review documents or testify, a number?

20   A.  In my lifetime?

21   Q.  Yeah.

22   A.  Seven or eight times.

23   Q.  And out of that seven or eight total times,

24 how many times do you think it went to deposition?

Page 23

1   A.  Three.

2   Q.  Okay.  In those seven or eight total times

3 where you've been retained as an expert witness, how many

4 times were you retained for the defendant -- by the

5 defendant?

6   A.  It was about 50/50 percent.

7   Q.  And in the times that you were retained by

8 the defendant, were those defendants physicians?

9   A.  Yes.

10   Q.  Were there any occasions where the defendant

11 was not a physician, where you were retained by a

12 defendant who was not a physician?

13   A.  I don't believe so.

14   Q.  And so those would have been malpractice

15 cases?

16   A.  Correct.

17   Q.  And in the times that you were retained by

18 the plaintiff or plaintiffs, putting aside this

19 litigation, how many of those were medical malpractice

20 cases?

21   A.  All.

22   Q.  All?

23   A.  Um-hum.  Yes.

24   Q.  So is this the first time that you have been

Page 24

1 retained as an expert witness in a case that is not a

2 medical malpractice case?

3   A.  Yes.

4   Q.  And so now you've given us all of the

5 depositions that you can remember as you sit here;

6 correct?

7   A.  Correct.

8   Q.  What's your current professional address?

9   A.  9 -- 9631 Gross Point Road, Skokie, Illinois,

10 60076.

11   Q.  Is that an office or a hospital?

12   A.  It's an office building.

13   Q.  And you have a practice that's just you?

14 What is there?

15   A.  It's a private practice that includes myself,

16 one employed physician and then nurses and physician

17 assistant and staff.

18   Q.  And is it an oncology practice?

19   A.  Yes, hematology and oncology.

20   Q.  Tell me what hematology is.

21   A.  Hematology is the study of -- of

22 blood-related disorders.

23   Q.  So is the practice primarily involved with

24 blood cancers?

Page 25

1   A.  No.

2   Q.  What type of cancers does this practice deal

3 with?  Strike that.

4       Hematology and oncology.  So does the

5 practice deal with more than just cancer?

6   A.  Yes.

7   Q.  Does it deal with blood disorders and

8 cancers?

9   A.  Correct.

10   Q.  What kind of blood disorders does it deal

11 with?

12   A.  Well, aside from the malignant blood

13 disorders such as lymphomas, leukemias there are --

14   Q.  And those are cancers?

15   A.  Those are cancers.  So you want the

16 non-cancers?

17   Q.  Correct.

18   A.  So that would be -- that would be anemia,

19 problems with other blood issues such as low platelet

20 count, thrombocytopenia, bone marrow disorders such as

21 mild dysplastic syndrome, mild proliferative neoplasms,

22 multiple myeloma or plasma self dysplasias which kind of

23 is the broad term for -- for that class of illnesses.

24 Many things called monoclonal gammopathy of uncertain

7 (Pages 22 - 25)

Page 26

1  significance or MGUS which is pre-cursor to multiple
2  myeloma, problems with just low blood counts in general,
3  sickle cell disease, hemophilia. Those conditions are
4  taken care of by my associate.
5      Q.  You anticipated my question. So those blood
6  disorders are dealt with by your associate?
7      A.  Correct.
8      Q.  And what is his or her name?
9      A.  Dr. Marlon Kleinman. Marlon like Brando.
10 Kleinman like Kleinman.
11     Q.  And are you the only oncologist in the
12 practice?
13     A.  He's also an oncologist.
14     Q.  Okay. And in that practice, do you deal
15 exclusively with cancers?
16     A.  No. I also do some hematology. We cover for
17 each other. I do have some patients with those
18 conditions I mentioned.
19     Q.  Okay. What kind of cancers do you deal with
20 in that practice?
21     A.  Pretty much any cancer that there is except
22 mostly I do not take care of acute leukemia. My partner
23 sometimes will. My associate sometimes will, but mostly
24 I take care of everything else. The majority of what I

Page 27

1  do though is solid tumors which would include
2  gastrointestinal malignancies, lung cancer, breast
3  cancer, lymphomas, other -- other GI -- oh, I mentioned
4  gastrointestinal cancers. That could be -- that could be
5  anywhere from the esophagus to the stomach to the small
6  bowel to the large bowel, pancreas, gallbladder, biliary
7  tree cancers, liver cancers.
8      Q.  Why don't you handle acute leukemia cases?
9      A.  Most of the time I believe that that disease
10 requires the facilities of a tertiary care center, and
11 while we may see patients that are also being treated in
12 one of those centers, the majority of the treatment is
13 administered and followed at those centers.
14     Q.  Are there any other cancers you'd put into
15 that same category?
16     A.  No.
17     Q.  What's so unique about acute leukemia that
18 requires that?
19     A.  Acute leukemia requires oftentimes inpatient
20 treatments with close monitoring. It could -- it could
21 require bone marrow transplantation and -- and other
22 procedures that we're just not equipped to handle in
23 an -- an in outpatient clinic, outpatient office.
24     Q.  So you refer them to another facility?

Page 28

1      A.  Most of the time, yes.
2      Q.  By the way, a couple of preliminary questions
3  I should have asked at the beginning.
4          You're not taking any medication that affects
5  your memory today?
6      A.  I don't think so. No, I'm not taking any.
7  I'm sorry.
8      Q.  And you're capable of testifying fully and
9  truthfully today?
10     A.  I better be, yes.
11     Q.  That's a yes?
12     A.  I've already started. Yes. Yes.
13     Q.  I am going to hand you what the court
14 reporter first -- we'll have her mark as Exhibit 1, the
15 Notice of Videotaped Deposition today.
16          (Exhibit No. 1 marked as
17              requested.)
18     MR. KERNER:  Rachel, are you looking at the
19 same thing?
20     MS. GEMAN:  Yes.
21 BY MR. KERNER:
22     Q.  Dr. Kaplan, have you ever seen what's been
23 marked as Exhibit 1 prior to right now?
24     A.  Yes.

Page 29

1      Q.  When was the first time you saw it?
2      A.  I believe it was about three or four weeks
3  ago.
4      Q.  How did you come to see it?
5      A.  It was given to me by the attorneys.
6      Q.  Which attorney?
7      A.  Rachel or one of her colleagues.
8      Q.  You don't remember?
9      A.  I don't -- I don't remember, no.
10     Q.  And you see that it calls for your deposition
11 right here today. So you're here pursuant to this Notice
12 of Deposition; correct?
13     A.  Correct.
14     Q.  There's also a request for some documents
15 here. Did you review that before today?
16     A.  Yeah.
17     Q.  On Monday we received some documents. Were
18 the documents that you provided in response to these
19 requests?
20     A.  Yes.
21     Q.  Any documents in these requests that you
22 didn't provide?
23     A.  Not that I know of, no.
24     Q.  So everything in these requests you provided

8 (Pages 26 - 29)

Page 30

1  on Monday to us; correct?
2      MS. GEMAN:  Objection to the extent it calls
3  for a legal conclusion subject to the responses and
4  objections.
5      MR. KERNER:  Okay.  Let me ask it a different
6  way.
7  BY MR. KERNER:
8      Q.  Is there anything in this set of requests,
9  these 13 requests that you have not provided to us?
10     A.  I -- I do not believe so.
11     Q.  So I asked that as a double negative there.
12  Have you provided everything that was requested in these
13  13 requests --
14     MS. GEMAN:  Same objection.
15  BY MR. KERNER:
16     Q.  -- that was in your -- that's in your
17  possession?
18     A.  Yes.
19     Q.  And so request number 6 is for your complete
20  and entire file for the case.  You provided that?
21     A.  Yes.
22     Q.  So there's nothing that you have in
23  connection with this case that you haven't provided; is
24  that accurate?

Page 31

1      MS. GEMAN:  Same objection.
2  BY THE WITNESS:
3      A.  There -- there were preliminary drafts which
4  I was told I did not need to -- to provide.
5      MS. GEMAN:  And I'm just going to caution the
6  witness not to disclose communications with counsel.
7      MR. KERNER:  Right.
8  BY THE WITNESS:
9      A.  And communication with counsel.
10  BY MR. KERNER:
11     Q.  I don't want to know about your
12  communications with your counsel.  Although I believe
13  counsel here is Plaintiffs' counsel, so you're actually
14  not -- there's not an attorney/client relationship, but
15  we don't need to get into that now.
16     And I'm not looking for your drafts.
17     A.  I'm sorry?
18     Q.  I'm not looking for your drafts today.
19     A.  Okay.
20     Q.  Is there anything else that you didn't
21  provide that was requested --
22     A.  No.
23     Q.  -- in these 13 requests?
24     A.  No, there isn't.

Page 32

1      THE WITNESS:  Can I take a break for one
2  second --
3      MR. KERNER:  Yeah, of course.
4      THE WITNESS:  -- just to ask a question?
5      MR. KERNER:  Hang on.  Hang on.  Do you want
6  to go off the record?  Yeah.
7      THE VIDEOGRAPHER:  The time is 9:41 a.m.  This
8  is the end of media two.  We're off the record.
9          (Discussion had off the
10          record.)
11     The time is 9:43 a.m.  This is the
12  beginning of media three.  We're back on the record.
13  BY MR. KERNER:
14     Q.  We all set?
15     A.  Yes.
16     Q.  Okay.  Dr. Kaplan, how did you first become
17  aware of this litigation?
18     A.  I was approached by or I was -- I was
19  contacted by Expert Institute which is a company that has
20  my -- my credentials, my information and they asked me if
21  I'd be interested in discussing and reviewing this case
22  and introduced me to the -- to the legal team that was
23  involved in it.
24     Q.  Who did they introduce you to?

Page 33

1      A.  To -- to the law firm that -- that I'm --
2  that I'm with right now.
3      Q.  Rachel's law firm?
4      A.  Rachel's law firm.
5      Q.  Lieff Cabraser, does that sound familiar?
6      A.  Yeah, that's one of the law firms.
7      Q.  What were the other ones?
8      A.  I don't have the names in front of me.
9      Q.  What did they tell you that they wanted you
10  to do?
11     A.  They asked if I could review or -- or develop
12  a monitoring program for patients that had been shown to
13  be exposed to known carcinogens?
14     Q.  How do you define known carcinogens?
15     A.  Products that have been identified to
16  increase risk of developing malignancies when someone's
17  been exposed to them in certain levels.
18     Q.  And you said the Expert Institute put you in
19  contact with Lieff Cabraser?
20     A.  Correct.
21     Q.  How did they have your contact information?
22     A.  I had responded to e-mail requests awhile ago
23  for somebody who would be interested -- for people who
24  would be interested in being expert witness and sent them

9 (Pages 30 - 33)

Page 34

1  my information, my curriculum vitae, so I was on their
2  file. I don't remember how long ago I did it, but this
3  was the first time I had been contacted by them.
4      Q.  How long ago did Plaintiffs' lawyers contact
5  you?
6      A.  I believe it was October of 2021, September
7  or October.
8      Q.  Just a few months ago?
9      A.  Correct. Actually, it may have been a little
10  before. It may have been August.
11      Q.  And they asked you to develop a monitoring
12  program for patients exposed to known carcinogens. How
13  did you respond?
14          MS. GEMAN: Objection to the extent it
15  misstates the testimony.
16  BY MR. KERNER:
17      Q.  If that's not what you said, please correct
18  it, but I think that's what you said.
19      A.  Could you repeat the question?
20      Q.  How did you respond to Plaintiffs' request to
21  retain you as an expert?
22      A.  I agreed to review the information.
23      Q.  What information did you agree to review?
24      A.  The testimony of experts that discussed the

Page 35

1  risks associated with nitrosamine products from tainted
2  Valsartan.
3      Q.  Which specific expert's testimony did you
4  review?
5      A.  I have it in my --
6      Q.  In your report?
7      A.  -- report.
8      Q.  So the experts' testimony that you reviewed
9  are the experts that you've identified in your report?
10      A.  Correct.
11      Q.  Any others?
12      A.  No.
13      Q.  And in addition to reviewing their testimony,
14  did you review anything else?
15      A.  At that time?
16      Q.  Yes.
17      A.  No.
18      Q.  In preparing your report, did you review
19  anything else or just that testimony?
20      A.  No. In preparing my report, I reviewed
21  various articles and resources.
22      Q.  And are those articles and resources attached
23  to your report?
24      A.  Yes, they are.

Page 36

1          MR. KERNER: Let's mark this next exhibit. I
2  think this is 2; right?
3              (Exhibit No. 2 marked as
4              requested.)
5  BY MR. KERNER:
6      Q.  Doctor, we've marked as Exhibit -- well,
7  we've just handed you Exhibit 2. Can you tell me what
8  that is?
9      A.  This is a copy of my curriculum vitae.
10      Q.  And can you tell me if that's your most
11  current CV?
12      A.  I believe it is.
13      Q.  And this was attached to your report?
14      A.  Yes.
15          MR. KERNER: How do we want to handle exhibits
16  with the Zoom? I realize we didn't do that for the
17  Notice of Deposition. Do we want to get the CV up on the
18  Zoom for folks that are remote?
19          MS. ISIDRO: Yes. That's in progress.
20          MR. KERNER: Great.
21  BY MR. KERNER:
22      Q.  So, Doctor, let's go backwards. Let's start
23  with your medical school. Where did you go and when did
24  you graduate?

Page 37

1      A.  I went to Loyola University Medical Center in
2  Maywood, Illinois, and I graduated in 1982.
3      Q.  Did you have a residency after that?
4      A.  I had a residency -- internship and residency
5  at Northwestern University in Chicago.
6      Q.  What did you do after the internship and the
7  residency?
8      A.  I went on to a hematology/oncology fellowship
9  at Northwestern University in Chicago.
10      Q.  And the residency was in internal medicine;
11  correct?
12      A.  Correct.
13      Q.  And the fellowship was you said at
14  Northwestern --
15      A.  Yes.
16      Q.  -- in hematology and oncology?
17          That was according to your CV from 1983 to
18  1985?
19      A.  The fellowship was 1985 to 1988.
20      Q.  Ahh, okay. And so after the fellowship, when
21  it concluded in 1988, what did you do next?
22      A.  I joined the faculty at Rush University in
23  Chicago.
24      Q.  In what role?

10 (Pages 34 - 37)

Page 38

1    A.    As a medical -- as a hematology/oncology
2    attending physician.
3        Q.    Is that still your role there?
4        A.    No.  I was -- I was full-time there for five
5    years and then went into private practice after that but
6    maintained my -- my teaching role at Rush University and
7    am still an Assistant Professor of Medicine at Rush
8    University.
9        Q.    And you've been an Assistant Professor of
10   Medicine at Rush since 1988?
11       A.    Correct.
12       Q.    What do your responsibilities at Rush entail
13   now?
14       A.    My responsibilities at Rush would entail
15   allowing residents and students to rotate through our
16   office to acquire clinical experience.  There's been
17   teaching roles.  There's been clinical clerkships, but I
18   have had no responsibilities on the campus for a number
19   of years.
20       Q.    When you say "allow them to rotate," what do
21   you mean by that?
22       A.    Providing them a rotation, a clinical
23   rotation in our -- in our -- in our practice for the --
24   for the residents or -- or fellows that wish to have a

Page 39

1    community oncology experience.
2        Q.    Do you supervise them?
3        A.    Yes.
4        Q.    Do you teach them?
5        A.    Yes.
6        Q.    What do you teach them?
7        A.    Teach them clinical -- clinical oncology.
8    For -- for ten years -- until 1995 I was assigned as
9    the -- the Chairman of Oncology at NorthShore
10   University -- at -- sorry -- at Rush NorthShore in
11   Skokie.  That was part of my role at Rush.  After I left
12   full-time faculty at Rush I maintained that role until
13   the hospital was sold to NorthShore University.
14       Q.    Okay.  Now, in looking at your CV, there are
15   a bunch of publications, and I see there's some patents
16   as well and some abstracts and invited lectures and
17   presentations.  How many of these publications dealt with
18   NDMA or NDEA?
19       A.    None.
20       Q.    How about Valsartan or any of the Valsartan
21   drugs?
22       A.    None.
23       Q.    What about the abstracts?
24       A.    None.

Page 40

1        Q.    And the invited lectures and presentations --
2        A.    Concerning?
3        Q.    -- any of them concerning NDMA or NDEA?
4        A.    No.
5        Q.    Or Valsartan?
6        A.    No.
7        Q.    Or the Valsartan drugs?
8        A.    Correct.
9        Q.    Other than the report that the Plaintiffs'
10   attorneys asked you to draft and develop in this
11   litigation have you ever written or presented or spoke
12   outside the litigation on NDMA, NDEA or any of the
13   Valsartan drugs?
14       A.    No, I haven't.
15       Q.    Since the litigation began other than your
16   report, have you written or presented or spoken on NDMA,
17   NDEA or any of the Valsartan drugs?
18       A.    No, I haven't.
19       Q.    So it's limited to this report; correct?
20       A.    Yes.
21       Q.    When the Plaintiffs asked -- Plaintiffs'
22   counsel -- excuse me.  Okay.  I misspoke earlier.
23           When Plaintiffs' counsel asked you to develop
24   a monitoring program, did they give you any more guidance

Page 41

1    or instruction as to how to do it?
2        A.    No.
3        Q.    What they were looking for?
4        A.    No.
5        Q.    They just said develop a program and --
6        A.    They -- they --
7            MR. KERNER:  Go ahead.  I'm sorry.
8            MS. GEMAN:  I just want to caution you.  You
9    can speak to any facts or assumptions provided, but I
10   don't -- I don't see Mr. Kerner is asking beyond that.
11           MR. KERNER:  I think I heard you.
12           MS. GEMAN:  Sorry.
13           MR. KERNER:  That's okay.  I know.
14           THE WITNESS:  Could you repeat the question?
15           MR. KERNER:  I'm not sure that I could.
16   BY MR. KERNER:
17       Q.    When Plaintiffs' counsel asked you to develop
18   a monitoring program, did they give you any instruction
19   or guidance as to what they wanted?
20           MS. GEMAN:  Objection, asked and answered.
21   BY THE WITNESS:
22       A.    They advised me as to the -- the details of
23   the case and asked if I felt that I could present a
24   monitoring program for the group of patients that were

11 (Pages 38 - 41)

Page 42

1  identified as being at high risk for developing a group
2  of cancers.
3  BY MR. KERNER:
4      Q.   And when you said they gave you the details
5  of the case, what did they tell you were the details?
6      A.   The details were that it had been established
7  by their expert reviewers and by the history of the
8  litigation that the Valsartan tainted materials when
9  exposed in certain amounts to patients was considered a
10  risk for the patients ultimately developing malignancies,
11  that these were carcinogens and then the levels that they
12  were exposed to, that they were at risk.  And part of
13  this kind of evaluation or legal review does allow for
14  monitoring, medical monitoring in situation, and my
15  experience with patient care and patient -- patient --
16  review patient care would allow me to develop an
17  appropriate monitoring program in that situation.
18      Q.   Okay.  You said -- and I don't want to
19  misstate your testimony.  I'm trying to remember what you
20  just said -- that their expert reviewers established that
21  Valsartan was considered an increased risk.  Did you do
22  any independent analysis as to Valsartan or NDMA other
23  than what their other experts had established?
24      A.   So my understanding, it wasn't Valsartan that

Page 43

1  was putting the patients at risk.  It was the Valsartan
2  that was manufactured in a way that had been tainted with
3  these dangerous substances.  I did not do independent
4  review.  That's not what I was asked to do.  I was asked
5  to just develop a monitoring program.
6      Q.   Okay.  And -- and to your point, you don't
7  have any criticism of the drug Valsartan; correct?
8      A.   Correct.
9      Q.   And you're relying on the Plaintiffs' other
10  experts for their analysis of any carcinogenic effect of
11  the, as I think you put it, the tainted Valsartan;
12  correct?
13      A.   Correct.
14      Q.   Okay.  Let's get to what we're going to mark
15  as Exhibit 3.
16           (Exhibit No. 3 marked as
17            requested.)
18      The Zoom folks be aware of that as well.
19      Okay.  Doctor, can you tell me what Exhibit 3
20  is?
21      A.   This was the report that I provided to the --
22  to -- to Mr. Slater and the other attorneys.
23      Q.   Who's Mr. Slater?
24      A.   Mr. Slater is the one I was told to -- to

Page 44

1  address.  One of the attorneys -- one of the attorneys
2  for the Plaintiff.
3      Q.   Somebody told you to address it to
4  Mr. Slater?
5      A.   Correct.
6      Q.   Do you remember who told you that?
7      A.   No.
8      Q.   Okay.  You said a moment ago that -- I think
9  you said a moment ago that you were asked to develop a
10  medical monitoring program, and then I think you said the
11  legal review allows for medical monitoring in this case.
12  That's what you said; correct?
13      A.   I think that's what my terminology was, yes.
14      Q.   Prior to this case have you ever created a
15  medical monitoring program?
16      A.   I've not developed a public medical
17  monitoring program but I've been involved in my own
18  patient care of -- of developing monitoring programs.
19      Q.   What do those monitoring programs consist of?
20  And what do you mean by monitoring programs for your
21  patients?
22      A.   So to get into detail, my experience in my
23  practice includes patients that have high risk of
24  developing cancer usually because of genetic

Page 45

1  abnormalities such as BRCA gene or Lynch syndrome.  I
2  follow patients and families of patients that haven't
3  developed cancer that -- but do carry these genetic
4  abnormalities and monitor them for malignancies.
5      Q.   How do you do that?
6      A.   Various ways depending on the situation.
7      Q.   Can you explain that to me?
8      A.   Certainly.  In -- for example, in Lynch
9  syndrome which is genetic abnormality that predisposes to
10  gastrointestinal malignancies, I will follow the patients
11  twice a year.  The ones that do not have cancer, have not
12  developed cancer we'll follow them twice a year with
13  clinical exam, routine exams that include physical exam,
14  history and basic blood analysis.  I will assure that
15  they're getting annual colonoscopies because of the high
16  risk of developing polyposis and ultimately
17  gastrointest -- colonic carcinoma.  I will also follow
18  them for development of uterine cancer by referring them
19  to gynecologist by ordering radiographic studies such as
20  ultrasounds, occasionally CAT scans.
21      Q.   Let me interrupt you for one second, sir.
22  For Lynch syndrome, one of the things you just said I
23  think is that you -- you have them have an annual
24  colonoscopy --

12 (Pages 42 - 45)

Page 46

1     A.   Correct.
2     Q.   -- correct?
3          Do you have all of your patients who are --
4   is it -- are they -- do they have Lynch syndrome or are
5   they susceptible to Lynch syndrome?
6     A.   No.  These are patients --
7          MS. GEMAN:  I just want to --
8   BY THE WITNESS:
9     A.   -- with --
10         MS. GEMAN:  I just want to object.  The
11  witness was not done answering the previous question, so
12  I just want to make sure the record's clear that that
13  wasn't an answer -- a complete answer.
14         MR. KERNER:  Sure, and we'll come back to that
15  in a second.  I appreciate that.
16         MS. GEMAN:  Yeah.
17  BY MR. KERNER:
18    Q.   Lynch syndrome.
19    A.   Thank you.  Patients that have identified
20  Lynch syndrome, it's recommended that they get annual
21  colonoscopies.
22    Q.   Are there patients who perhaps for other
23  reasons, whether it's other history or comorbidities or
24  something, might not be -- might not be appropriate to

Page 47

1   have an annual colonoscopy?
2     A.   Yes.
3     Q.   Can you give me an example or two of a type
4   of patient where you wouldn't -- with Lynch syndrome
5   where you wouldn't provide an annual colonoscopy for?
6     A.   An elderly patient with severe cardiovascular
7   disease, somebody that had a colonoscopy and had a
8   complication such as a perforation, someone that just
9   refuses.
10    Q.   How common are perforations during
11  colonoscopies?
12    A.   Very uncommon.
13    Q.   I'm sorry?
14    A.   Very uncommon.  I believe less than 1
15  percent.  I believe less than .1 percent, but I don't
16  know exactly.
17    Q.   Less than .1 percent?
18    A.   I believe so, but I don't know exactly.
19    Q.   You don't happen to have any data or support
20  that you can cite to me for that figure, do you?
21    A.   No, I don't.
22    Q.   Do you know where that figure comes from?
23    A.   Just from my own experience in -- in
24  practice.

Page 48

1     Q.   So you don't know if it's a national
2   statistic or a worldwide statistic?  It's just a Kaplan
3   statistic of less than .1 percent of perforated colons?
4     A.   As I said, I was guessing it was either 1
5   percent or maybe even .1 percent.  I was not opining as
6   to the exact statistic.  I know that there's literature
7   that could answer that question.
8     Q.   So to be fair, as you sit here right now, you
9   don't really know how many -- what the percentage is of
10  colonoscopy patients who have perforated colons during
11  the procedure?
12    A.   I know it's very rare.
13    Q.   But you don't know what you mean by "very
14  rare"?
15         MS. GEMAN:  Objection.
16  BY MR. KERNER:
17    Q.   What do you mean by "very rare?"
18    A.   I've taken care of over 1,000 patients that
19  have had colonoscopies, probably more like 3,000 patients
20  in my career that have had colonoscopies and I've seen 2
21  perforations.
22    Q.   But, again, as a good doctor who cares about
23  his patients, you consider that as to whether a patient
24  should have an annual colonoscopy; correct?

Page 49

1     A.   Could you repeat that?  I just got stopped at
2   the "good doctor" because I'm glad you said that.
3     Q.   Yeah.  Strike that.
4          As a doctor who's concerned about his
5   patients, I think you testified a few minutes ago that
6   one of the reasons why you may not recommend an annual
7   colonoscopy is if it's an elderly patient, the risk
8   of -- the risk of a perforated colon and some other
9   possible reasons?
10    A.   What I said was if someone had had a
11  perforation in their colon I would not recommend going
12  back necessarily with a colonoscopy.
13    Q.   Any other reasons why you might not recommend
14  the annual colonoscopy for a Lynch syndrome patient?
15    A.   Aside from comorbidities, risk of problems
16  related to anesthesia, I can't think of any other reason
17  I would not recommend an annual colonoscopy.
18    Q.   So there are some risks that are -- that come
19  along with a colonoscopy; correct?
20    A.   Correct.
21    Q.   And so what you do with your patients with
22  Lynch syndrome is you weigh the risks versus the
23  benefits?
24    A.   Correct.

13 (Pages 46 - 49)

Page 50

1    Q.    And in your medical judgment, as a treating
2    physician of those patients, you make the recommendation
3    one way or the other; correct?
4        A.    Correct.
5        Q.    One of the things I think you said is that --
6    I'll let you finish taking your notes.
7        A.    I was saying you said I was a good doctor.
8    Sorry.
9        Q.    One of the things I think you said with
10    respect to Lynch syndrome is that it is recommended that
11    they have annual colonoscopies?
12        A.    Correct.
13        Q.    By whom?
14        A.    By I believe a number of agencies.  The NCCN
15    has it in their guidelines.
16        Q.    What's the NCCN?
17        A.    The NCCN is the National -- I knew you were
18    going to ask me this.  I can't remember what it stands
19    for.  It's a -- it's a -- it's an organization that's --
20    that reviews every malignancy class and has experts from
21    around the country and even around the world will meet
22    regularly and create algorithms for how many conditions
23    are treated but also for screening and for -- and for
24    monitoring.

Page 51

1        Q.    Is it the National Comprehensive Cancer
2    Network?
3        A.    That's it.  Thank you.
4        Q.    And they develop screening protocols, is that
5    what --
6        A.    They have recommendations in their algorithm
7    for what should be done with patients.
8        Q.    They're pretty well-regarded; right?
9        A.    Yes.
10        Q.    Do you generally follow their guidelines?
11        A.    Generally.
12        Q.    Are there specific guidelines that you don't
13    follow?
14        A.    On an individual basis I will review -- and
15    this is usually for treating patients.  I will review
16    their recommendations, and they usually have more than
17    one suggested direction, but we use them to -- help
18    decide on appropriate treatments for patients.
19        Q.    What else do you use to decide on appropriate
20    treatments for patients?
21        A.    My own experience, the literature, any
22    investigational trials that we're involved in or that
23    we've reviewed.
24        Q.    What about the patient him or herself?

Page 52

1        A.    Well, of course, the patient.
2        Q.    What do you look at with respect to the
3    patient?
4        A.    This is when deciding on treatment for the
5    patient?
6        Q.    Yes.
7        A.    The -- the details of the patient's specific
8    situation, the disease itself, of course, the performance
9    status of the patient which is a measure of how
10    functional and how sick they are, the comorbidities,
11    patient's desires themselves.
12        Q.    Family history?
13        A.    In deciding on treatment, usually not.
14        Q.    Would you take family history into account in
15    determining whether a certain procedure is appropriate
16    and may be more likely to be appropriate because of
17    family history?
18        A.    Could you explain that question?
19        Q.    Sure.  For colonoscopy would you be more
20    likely to think a colonoscopy is appropriate annually
21    because they have Lynch syndrome?
22        A.    Yes.  I already mentioned that Lynch --
23        Q.    Right.
24        A.    -- syndrome, but Lynch syndrome, although

Page 53

1    it's linked to family history, it's specific to that
2    patient because they've been diagnosed with carrying the
3    gene.
4        Q.    Fair.  What about a patient who has a first
5    degree relative who has had colon cancer?
6        A.    That would --
7        MS. GEMAN:  Objection, vague.
8    BY THE WITNESS:
9        A.    That would factor into my -- my assessment of
10    the patient's own risk and the need for that patient to
11    undergo genetic testing but wouldn't necessarily --
12    wouldn't necessarily at all factor into my decision about
13    putting them through colonoscopy or any other test.  It's
14    part of the general evaluation of the patient.
15    BY MR. KERNER:
16        Q.    Okay.  So in terms of treatment which is what
17    you're talking about?
18        A.    Correct.
19        Q.    You mentioned comorbidities.  You mentioned
20    the patient's desires.  You mentioned the performance
21    status of the patient.  What do you mean by that?
22        A.    So in part of the evaluation of a patient,
23    and especially oncology patients that are going through
24    treatments or are anticipating going through treatments,

14 (Pages 50 - 53)

Page 54

1  one of the ways to quantitate how the patient is doing is
2  using a -- table, a gauge based on a number of factors
3  to determine how fit they are. There's two accepted
4  methods. One is called the ECOG, Eastern Cooperative
5  Oncology Group Performance Status, and the other is the
6  Karnofsky Performance Status. We usually use the ECOG
7  criteria. It's pretty straightforward. It's from zero
8  to four. Zero is somebody that's totally asymptomatic
9  and performing their normal day-to-day activities. One
10 is somebody that's functional and doing everything but
11 probably at better than 50 percent of their normal
12 activities. Two is -- two and three and four are then
13 progressively worse, with four being near death.
14     Q.  And so that will help guide you with the
15 treatment that you're going to provide for the patient;
16 correct?
17     A.  Correct.
18     Q.  One of the things?
19     A.  Correct.
20     Q.  And is that something that NCCN also -- it's
21 also part of their guidelines?
22     A.  I'm not exactly sure how -- how they would
23 use it in their guidelines. I believe they do. I think
24 there's many studies suggesting that someone that is a

Page 55

1  performance status of three or worse is not likely to
2  benefit from some of the aggressive treatments we might
3  otherwise use that's been established. Although a lot of
4  that's changing because of new therapies that have come
5  out that are even appropriate for very ill patients.
6      Q.  Okay. Let's take a look at your report.
7      A.  Okay.
8      Q.  And we've marked that as Exhibit 3.
9          You want to get that back up for the Zoom?
10         Okay. Did you draft this report?
11     A.  Yes.
12     Q.  Did Plaintiffs' counsel provide any input in
13 the report?
14     A.  Only typographically.
15     Q.  And you mean literally typos --
16     A.  Correct.
17     Q.  -- if there were errors? That's it?
18     A.  Yeah.
19     Q.  Nothing else?
20     A.  I don't believe so, no.
21     Q.  Okay. Let's go -- in the first paragraph,
22 "Expert Background Qualifications," you mention that you
23 "designed screening programs for the patient I treat and
24 frequently monitor patients at high risk for cancer or

Page 56

1  cancer recurrence." We've talked a little bit about that
2  already; correct?
3      A.  Yes.
4      Q.  Anything about the screening programs that
5  you said you designed for your patients that you haven't
6  told us yet?
7          MS. GEMAN: Objection.
8  BY THE WITNESS:
9      A.  We didn't talk about patients that have been
10 treated for cancer, and so they're in a unique group
11 that's going to be monitored a little differently than a
12 healthy person that walks in that needs to be evaluated
13 with cancer.
14 BY MR. KERNER:
15     Q.  And that's where you're talking about cancer
16 recurrence; correct?
17     A.  Correct.
18     Q.  So tell me what the difference is in your
19 view with a patient who you're screening for a risk of
20 cancer versus a cancer recurrence. Because I would
21 assume, I shouldn't, but that somebody you're treating
22 for cancer recurrence you might be a little bit more
23 aggressive in terms of your -- in terms of your
24 screening?

Page 57

1      A.  I'm not sure what aggressive --
2      Q.  Strike that.
3      A.  -- means. From where?
4      Q.  Tell me -- tell me how your screening is
5  different for patients at high risk for cancer versus
6  patients with cancer recurrence.
7      A.  All of the patients will receive general
8  evaluation. By that I mean history, a physical exam,
9  basic laboratory studies. Patients with specific
10 conditions will have blood tests that are designed
11 specifically for that cancer. For example, ovarian
12 cancer with a tumor marker called CA125 or pancreatic
13 cancer with a tumor marker called CA929, I won't do that
14 on a patient who didn't have the history of pancreatic
15 cancer necessarily.
16     Q.  Why not?
17     A.  Because that test is designed specifically
18 to -- to detect pancreatic cancer recurrence.
19     Q.  Okay.
20     A.  The other thing might be, as you alluded to,
21 more aggressive procedures, so that might include doing
22 CAT scans more frequently. Somebody that's had lung
23 cancer that's been treated that had surgery but is high
24 risk for recurrence will get CAT scans frequently.

15 (Pages 54 - 57)

Page 58

1    Q.   What do you mean "frequently"?
2    A.   I mean depending on where they are from their
3  treatment and what their situation is and what their
4  symptoms are.  It could be -- it could be every three
5  months, every four months, every six months, every year.
6  It's not set in stone.  It depends on the patient.
7    Q.   And that would be true for patients who you
8  believe are at high risk for cancer.  It depends on the
9  patient in terms of what the screening will be; correct?
10    A.   Well, not necessarily.  Patients that are at
11  high risk for cancer that have no other symptoms or
12  problems I will have a specific general monitoring scheme
13  in mind which is exactly what this is all about.  While
14  as patients that have had a specific problem or have a
15  symptom will necessitate getting additional testing done.
16    Q.   Okay.  So there are -- at least in this first
17  section of your report, there are screening programs for
18  patients at high risk for cancer and for cancer
19  recurrence.  Do you make any other distinctions between
20  asymptomatic or symptomatic patients or patients with
21  specific exposures?
22       MS. GEMAN:  Objection.
23  BY THE WITNESS:
24    A.   I'm not sure I understand the question.

Page 59

1
2  BY MR. KERNER:
3    Q.   Okay.  In your practice, when you're
4  screening your patients, do you make any distinctions if
5  a patient is symptomatic or asymptomatic in terms of the
6  screening?
7    A.   The basic screening there will be no
8  distinction.  If someone's symptomatic, that goes from
9  screening to evaluation.  So somebody, for example, that
10  has a cough is going to have something done more to
11  evaluate that than someone that comes in without any
12  symptoms, but there's a basic screening that would be
13  provided to anybody that I identified as being at risk.
14    Q.   At risk for what?
15    A.   Developing cancer.
16    Q.   Which type of cancer?
17    A.   All -- all -- I mean it depends on what I'm
18  seeing the patient for.
19    Q.   Sure.  So are there different screening
20  protocols for different risks -- different cancer risks?
21    A.   There are screening programs for -- there's
22  individual decisions that are made based on a patient and
23  the reason the patient's seeing me.  For someone that has
24  a high risk of developing malignancies, that could be one

Page 60

1  or could be many different types, there's going to be
2  general screening protocols that I'll provide.  An
3  example would be someone with tobacco exposure's not just
4  at risk for one cancer, so it would be a number of -- of
5  procedures that are done to monitor them.
6       MR. KERNER:  Okay.  Let's take a five-minute
7  break if we can.  We've been at it a little over an hour.
8       THE VIDEOGRAPHER:  The time is now 10:21 a.m.
9  This is the end of media three.  We're off the record.
10           (WHEREUPON, a break was
11           taken.)
12       The time is now 10:39 a.m.  This is the
13  beginning of media four.  We're back on the record.
14  BY MR. KERNER:
15    Q.   Okay, Doctor.  A few more questions
16  obviously.
17       We're talking about paragraph 1 in your
18  report, and I want to talk about your practice.  You
19  mentioned that you designed screening programs for
20  certain patients.  I think you testified that you have
21  designed screening programs for patients with genetic
22  predisposition such as BRCA or Lynch syndrome; is that
23  correct?
24    A.   Correct.

Page 61

1    Q.   And also I think you said for heavy smokers?
2  Did you say that?  Do you design screening programs for
3  patients of yours that are heavy smokers?
4    A.   I follow guidelines for patients that have --
5  that are heavy smokers.
6    Q.   Which guidelines do you follow?
7    A.   The recommendation to do low-dose CAT scan
8  annually which is an accepted screening protocol.  It's
9  in NCCN and I think other places as well.
10    Q.   Are there any other categories of patients,
11  your patients that you screen regularly?
12    A.   I'm not sure I -- I understand the question,
13  how to answer the question.  Every patient I'm seeing is
14  being screened regularly.
15    Q.   Okay.  Well, you mentioned that you've
16  designed screening programs for patients.  Are there any
17  other categories of patients other than what we've just
18  spoken about that you have designed screening programs
19  for in your practice?
20    A.   Patients that have family -- that have had
21  family histories and -- of -- of -- of genetic
22  abnormalities in high risk cancer that they themselves
23  haven't had but because there's unknown mutations or
24  there have been unknown mutations that may put those

16 (Pages 58 - 61)

Page 62

1  patients at risk, I will create a more intense screening
2  program for that group of patients than for somebody that
3  didn't have any of that history.
4      Q.  Any other categories?
5      A.  Not that I can think of.
6      Q.  Okay.  Scroll down to or move down to the
7  next paragraph.  You say you're compensated for this
8  matter at an hourly rate.  What is your hourly rate?
9      A.  My hourly rate for reviewing records is $500
10 per hour.  For deposition or courtroom testimony it's
11 $600 per hour.
12     Q.  So you're getting paid $600 an hour to be
13 here today?
14     A.  I believe so, yes.
15     Q.  Are you confirming that?  Is that what you're
16 doing now?
17     A.  No.
18     Q.  What are you looking at -- is that your
19 report?
20     A.  That's the -- my -- my report.
21     Q.  Okay.  You also state in that paragraph that
22 the opinions you "state in this report are stated within
23 a reasonable degree of professional certainty."  What
24 does that mean?

Page 63

1      MS. GEMAN:  You can take the time you need to
2  look at the language.
3  BY THE WITNESS:
4      A.  I think that's going to be true of any
5  opinions I have about anything.  Nothing is set in stone.
6  It's going to be within what I consider -- what's
7  considered reasonable based on my profession.
8  BY MR. KERNER:
9      Q.  Tell me what you mean by "professional
10 certainty."
11     A.  In other words, based on my medical expertise
12 rather than just assumptions, lay assumptions.
13     Q.  Is professional certainty different than
14 medical certainty?
15     A.  Probably not.
16     Q.  Did someone tell you to use that phrase?
17     A.  No.
18     Q.  Have you ever used it before?
19     A.  I can't -- I can't recall.
20     Q.  If you go to the top of the next page, you
21 say that in forming your opinions you've "assumed that
22 the people who took the Valsartan in question can be
23 identified along with identification of the manufacturers
24 of their pills, the dosage and levels of NDMA/NDEA and

Page 64

1  duration of use."  What is that assumption based on?
2      A.  Based on the information I was provided by
3  counsel.
4      Q.  What information was that?
5      A.  Information we've already discussed.  It was
6  the reports of their experts.
7      Q.  So that assumption in Section 2 is based on
8  the reports of their experts; correct?
9      A.  Correct.
10     Q.  Anything else?
11     A.  No.
12     Q.  Okay.  And you also assume "that the medical
13 monitoring fund/program to be established can be
14 efficiently administered to ensure that people will only
15 receive funding for appropriate tests or intervention."
16 What is that based on?
17     A.  So my charge was to create a medical
18 monitoring program for a class of patients.  When I put
19 that together, I have no knowledge as to how -- how these
20 types of things are funded or -- or arranged
21 logistically.  I just know that -- what medically makes
22 sense and that's what I put together in my report.
23     MR. KERNER:  Could you read that answer back,
24 please.

Page 65

1          (Requested portion of the
2          record read.)
3  BY MR. KERNER:
4      Q.  And when you say "what medically makes
5  sense," is that based on your review of the reports from
6  Plaintiffs' experts?
7      A.  No.  What medically makes sense is based on
8  my -- my development of what I consider to be appropriate
9  screening for the patients that are at risk.
10     Q.  And what you consider to be appropriate for
11 screening is based on what?
12     A.  Is based on my understanding of the diseases
13 and my review of the literature as outlined.
14     Q.  I'm sorry.  I didn't hear it.
15     A.  As outlined in my report.
16     Q.  What about any of the guidelines that are --
17 the NCCN guidelines, was that something you considered?
18     A.  Yes.
19     Q.  Does your screening program here vary from
20 the NCCN guidelines?
21     A.  The NCCN guidelines don't specifically
22 outline the screening program especially for this
23 particular class of patients.  It just outlines details
24 about risks and how they should be monitored.

17 (Pages 62 - 65)

Page 66

1    Q.   In paragraph 3, "Background," you say: "It's
2  been established that Valsartan API manufactured by
3  certain manufacturers here and sold to other companies
4  was contaminated with carcinogens, NDMA and NDEA."  Do
5  you see that?
6    A.   Yes.
7    Q.   And who established that?
8    A.   I don't know who established that.  I know
9  that it's been established based on the -- on the reports
10  that I was given.
11    Q.   Okay.  Anything else -- based on anything
12  else or just the reports that you were given?
13    A.   Just on the reports that I was given.
14    Q.   Okay.  Now, a little further down in
15  paragraph 3 you mention that you constructed a monitoring
16  protocol.  The first thing you did was identify certain
17  cancers; correct?
18    A.   Correct.
19    Q.   And you did that based on the review of four
20  Plaintiffs' experts; correct?
21    A.   Correct.
22    Q.   So how did you do that?  Explain how you did
23  that, please.
24    A.   Explain how I did what?

Page 67

1    Q.   How you identified -- you said: "The
2  following cancers merit monitoring."  You reviewed the
3  reports of these four experts, and what led you to
4  conclude that these nine cancers merited monitoring?
5    A.   These nine cancers were identified as those
6  that were at higher risk based on the exposure to NDMA
7  and NDEA.
8    Q.   By the experts that you relied on; correct?
9    A.   Correct.
10    Q.   Did you consider any other cancers?
11    A.   No.
12    Q.   So is it your opinion, Doctor, that every
13  proposed medical monitoring class member be screened for
14  each of these nine cancers?
15    A.   The screening program that I outlined would
16  cover those nine cancers, nine classes of cancers.
17    Q.   I understand that.  We'll get to that
18  actually, but is it your testimony and is it your opinion
19  that all class members, proposed class members be
20  screened for all of the nine cancers?
21    A.   Yes.
22    Q.   Every single class member should be screened
23  for all nine cancers?
24        MS. GEMAN:  Objection, asked and answered.

Page 68

1  BY THE WITNESS:
2    A.   Yes.
3  BY MR. KERNER:
4    Q.   What's your basis for that opinion?
5    A.   My basis for the opinion is the evidence
6  provided that suggests that these cancers are at
7  increased risk of patients that have had exposure to that
8  carcinogen and the levels they had exposure to, so they
9  deserve to be monitored for those.
10    Q.   And again that's based on the four
11  Plaintiffs' experts that you referred to?
12    A.   Correct.
13    Q.   Is there potential for some of the proposed
14  class members to be excluded from the screening for one
15  or more of the nine cancers that you outlined?
16        MS. GEMAN:  Objection to the extent it calls
17  for a legal conclusion.
18  BY THE WITNESS:
19    A.   Could you repeat the question?
20  BY MR. KERNER:
21    Q.   Sure.  Is there a potential for some of these
22  proposed class members to be excluded from screening, to
23  not be screened for one or more of the nine cancers you
24  outlined?

Page 69

1        MS. GEMAN:  Same objection.
2  BY THE WITNESS:
3    A.   I don't understand -- I don't understand the
4  question.
5  BY MR. KERNER:
6    Q.   Do you think there are any circumstances
7  where any of the potential class members wouldn't need to
8  be screened for all nine of these cancers?
9        MS. GEMAN:  Objection.
10  BY THE WITNESS:
11    A.   I think the basic screening is necessary for
12  every patient.  I think individual patients which then
13  behoove us to look at different things based on that
14  patient, but the basic screening should be true for every
15  patient.
16    Q.   Let's explore that.  What would you look at
17  with respect to individual patients?
18        MS. GEMAN:  Objection.
19  BY THE WITNESS:
20    A.   You mean above and beyond the screening
21  program that's outlined?
22        MR. KERNER:  Can you just read back his last
23  answer, please.
24

18 (Pages 66 - 69)

Page 70

1    (Requested portion of the
2    record read.)
3    BY MR. KERNER:
4       Q.   Okay, Doctor.  You said it would behoove us
5    to look at different things for different patients.  What
6    things would you look at?
7       A.   Well, I think I mentioned in my report if
8    somebody was a heavy smoker I may focus also on diseases
9    associated with tobacco as I would do anyway even if they
10   hadn't had this exposure, but this exposure may increase
11   the risks that they have based on their own history, but
12   yet everybody deserves at least the basic screening
13   whatever their own history is.  But any doctor's gonna
14   look at a patient's individual problem.  Someone has a
15   pain in his arm, he's going to look at the arm.
16      Q.   Sure.  And different patients might require
17   different screening?
18      MS. GEMAN:  Objection.
19   BY THE WITNESS:
20      A.   No.  Different patients may require
21   additional testing to the basic screening.
22   BY MR. KERNER:
23      Q.   Is there any reason or could there be --
24   Strike that.

Page 71

1       Would there be any reason that you can think
2    of based on medical history or comorbidities or anything
3    like that for an individual patient where you wouldn't
4    conduct the same screening for that patient?  For
5    example, would you recommend a colonoscopy every five
6    years for someone who had a prior perforation?
7       MS. GEMAN:  Objection.
8    BY THE WITNESS:
9       A.   Well, as discussed before, a patient that's
10   had a comorbidity or a problem related to a test would
11   not be offered that test.
12   BY MR. KERNER:
13      Q.   Sure.  Okay.  And say, for instance, giving
14   another example, you list prostate cancer here in number
15   6.  What's the appropriate screening that you propose for
16   prostate cancer?
17      A.   Well, first I would limit it to males.
18      Q.   Okay.
19      A.   The appropriate screening for prostate cancer
20   would include a history to determine if there's any
21   urinary symptoms, would include a physical examination
22   which would include prostate exam as part of a regular
23   physical and may include a blood test called a PSA.
24      Q.   And if the person is 80 years old, would you

Page 72

1    recommend PSA?
2       A.   Yes.
3       Q.   What if they're 85 years old?
4       A.   Depends on the clinical status of the
5    patient.  If they're 85 and fit with a good performance
6    status, yes.
7       Q.   Are there any male patients that you would
8    not recommend a PSA for?
9       A.   Patient that declined to have it.  Someone
10   that's had a -- No, strike that.  I -- I can't think of
11   any other specific situations where I would not do PSA
12   unless there -- as we mentioned someone, that was
13   suffering from other medical conditions that would not
14   allow for expectation of longevity.
15      Q.   What's the basis for performing a PSA on an
16   80-year old man?  What's the data or the support for
17   that?
18      A.   Since there's no data on patients that are 80
19   exposed to these carcinogens and since I have seen as
20   others have elderly patients who have developed very
21   aggressive prostate cancer and if caught early could
22   be -- could be given the chance not to have to suffer
23   from progressive metastatic disease, I would recommend
24   doing PSA even in those patients because of the unique

Page 73

1    situation where they've been exposed to these
2    carcinogens.
3       Q.   So you'd recommend a PSA for a fit 90-year
4    old man?
5       A.   Most likely, yes.
6       Q.   Okay.  Are there any risks to the screening
7    procedures that you're proposing?
8       A.   There are risks --
9       MS. GEMAN:  Objection.
10   BY THE WITNESS:
11      A.   There are risks to everything.  A blood draw,
12   the needle could break off, you could get infection, you
13   could have pain.  Most of the things I'm recommending are
14   within the limits of accepted risk for general
15   population.
16   BY MR. KERNER:
17      Q.   Are the risks the same for all individuals?
18      A.   No, of course not.
19      Q.   Why not?
20      A.   Because someone that's had a perforation from
21   a colonoscopy may be at risk for that happening again.
22   Someone that has other conditions of the colon which you
23   didn't mention before like severe diverticulitis or
24   diverticulosis may not be a good candidate for some of

19 (Pages 70 - 73)

Page 74

1 the screening. So, of course, every person has to be
2 evaluated individually.
3    Q.   Okay. Are there cases where the risks will
4 outweigh the benefits?
5    A.   We've already alluded to some of those, yes.
6    Q.   And the answer's yes?
7    A.   Yes.
8    Q.   In paragraph 4 you talk about in conducting
9 the analysis you "assumed the Plaintiffs' experts are
10 correct that the levels, dosage and duration of use
11 were/are sufficient to increase one's risk of certain
12 cancers and to cause or contribute to causing cancers in
13 users," and you prepared this report consistent with
14 those assumptions. And you're relying on those
15 assumptions for your opinions in this report; correct?
16    A.   Correct.
17    Q.   In the next paragraph you say: "In order to
18 qualify for medical monitoring, class members must have
19 ingested a cumulative amount of NDMA from both the
20 Valsartan pills and their diet and they've reached the
21 lifetime cumulative exposures associated with
22 statistically significant increased risks in dietary and
23 other studies." Did I read that correctly?
24    A.   Yes.

Page 75

1    Q.   What is lifetime cumulative exposure?
2    A.   The amount of exposure they've had to NDMA
3 and NDEA.
4    Q.   Is that a term that you've used in your
5 medical practice over the years?
6    A.   What's that?
7    Q.   Lifetime cumulative exposure.
8    A.   I've used that in regards to many things --
9 exposure to tobacco, exposure to certain chemotherapeutic
10 drugs where the cumulative toxicity has to do with
11 lifetime exposure, a drug called Adriamycin. Your whole
12 life you're at certain risk if you've had cumulative
13 exposure, so yes, I use that term all the time.
14    Q.   Are you familiar with the term lifetime
15 cumulative threshold?
16    A.   I'm -- I know what that means but what do you
17 mean am I --
18    Q.   So you know what it means. What does it mean
19 to you?
20    A.   Could you repeat the question?
21    Q.   Lifetime cumulative threshold.
22    A.   My assumption is that that means that when
23 someone's reached a certain level of exposure like with
24 radiation exposure, like with the drugs, like with these

Page 76

1 toxins, that they are in a class that may be at risk for
2 developing certain things.
3    Q.   You say that's your assumption. What is that
4 assumption based on?
5    A.   That's my understanding.
6    Q.   What is that understanding based on?
7    A.   What -- my knowledge of the English language.
8    Q.   Okay. So is lifetime cumulative threshold a
9 term that you've used in your medical practice over the
10 years?
11    A.   No. It's a term I've seen in the reports.
12    Q.   And that's the first time you've seen it was
13 in this report?
14    A.   Probably.
15    Q.   Now you talk about the cumulative amount of
16 NDMA from both the Valsartan pills and their diet reached
17 a lifetime cumulative exposure. You see that in that
18 paragraph; right?
19    A.   Can you repeat that, please.
20    Q.   Sure. I'm sorry. In that same paragraph,
21 you talk about that "the class member must have ingested
22 a cumulative amount of NDMA from both the Valsartan pills
23 and their diet that they've reached lifetime cumulative
24 exposures." Do you see that?

Page 77

1    A.   I do.
2    Q.   Is NDMA something that you can be exposed to
3 from your diet?
4    A.   I believe that the nitrosamine -- the
5 nitrosamines you're exposed to in -- in certain food
6 types.
7    Q.   What food types?
8    A.   Prepared foods, coldcuts, bacon, things where
9 nitrates are used as preservative or naturally occurring.
10    Q.   What about fresh fruit?
11    A.   I'm not -- I'm not certain.
12    Q.   Vegetables?
13    A.   I don't know.
14    Q.   How can you tell the level of NDMA -- Strike
15 that.
16       How can you tell whether the level of NDMA is
17 from the Valsartan pill or your diet?
18    A.   I don't -- I don't know that you can tell.
19    Q.   And are you familiar with indigenous NDMA?
20    A.   Yes.
21    Q.   What is that?
22    A.   NDMA that's just present in the body.
23    Q.   You don't mention that in your report?
24    A.   No.

20 (Pages 74 - 77)

Page 78

1    Q.   Is indigenous NDMA, can that be part of a
2  lifetime cumulative exposure?
3    A.   Yes.
4    Q.   So it's the Valsartan pill, it's your diet
5  and it's the indigenous NDMA; correct --
6    A.   Correct.
7       MS. GEMAN:  Objection, vague.
8  BY MR. KERNER:
9    Q.   -- that are all -- that all can be part of
10 lifetime cumulative exposure as you used that term here
11 in your report; correct?
12   A.   Correct.
13   Q.   And am I correct that there's no way to
14 identify what percentage of NDMA comes from which
15 factor -- the Valsartan pill, the diet or the indigenous
16 NDMA?
17   A.   I think and my understanding of the experts'
18 evaluation is that the amount of NDMA found in the vast
19 majority of people from indigenous or naturally occurring
20 substances is quite lower than from a toxic -- the toxic
21 levels that were found in the product that we're
22 discussing, so --
23   Q.   What -- sorry.
24   A.   -- it's unlikely that somebody would have

Page 79

1  just from those other things enough exposure, enough
2  levels to render them at significant risk.  While there's
3  so much more exposure from the tainted Valsartan, that
4  it's -- it makes it a much more important issue.
5    Q.   What's your basis for that statement?
6    A.   The experts' review of this.
7    Q.   So other than the Plaintiffs' other experts
8  you have no idea what percentage of NDMA comes from
9  Valsartan, diet or indigenous production; correct?
10   A.   Correct.
11   Q.   And, by the way, with respect to lifetime
12 cumulative exposure, you have not independently evaluated
13 or determined the lifetime cumulative exposure for NDMA
14 or NDEA; correct?
15   A.   That was not my -- my role in that.  I have
16 not done that.
17   Q.   So I'm correct?
18   A.   Yes.
19   Q.   Prior to this litigation -- Strike that.
20      Let's go to the bottom of Page 3, please,
21 your "Opinion on Medical Monitoring."  Do you see that
22 paragraph?
23   A.   Yes.
24   Q.   You say that it's your "opinion to a

Page 80

1  reasonable degree of medical certainty that there exists
2  diagnostic tests that can mitigate the risks of
3  developing cancer faced by the class of people because of
4  their exposure to contaminated Valsartan who have a level
5  of exposure equal to the LTC and this program --" meaning
6  your program; correct?
7    A.   Yes.
8    Q.   "-- is different than the one that would have
9  been prescribed in the absence of that particular
10 exposure and increased risk."  Did I read that correctly?
11   A.   Yes.
12   Q.   So a few things I want to talk to you about
13 in that sentence.  You hold an opinion to a reasonable
14 degree of medical certainty that there are diagnostic
15 tests that mitigate the risk of developing cancer;
16 correct?
17   A.   Correct.
18   Q.   Now, you don't mean that there are tests that
19 can prevent you from developing cancer, do you?
20   A.   There are.
21   Q.   What are they?
22   A.   Colonoscopy, for example.
23   Q.   Any others?
24   A.   Repeat -- can you repeat the question?

Page 81

1       MR. KERNER:  Can you read it back, please.
2          (Requested portion of the
3          record read.)
4  BY THE WITNESS:
5    A.   Yes.  Upper endoscopy, detection of Barrett's
6  esophagus, Pap smear, detection of pre-malignant changes.
7  Mammogram even can detect ductal carcinoma insitu or
8  other conditions that are considered pre-malignant.
9  Evaluation of the liver to look for cirrhosis can
10 predispose to the -- or fatty liver can be a precursor to
11 developing -- to developing hepatocellular cancer.
12 Evaluation of the pancreas can find -- can find certain
13 ductal cystic changes that may be precursors to cancer.
14 That's off the top of my head things that I can think of
15 where it would predict or even prevent cancer.
16 BY MR. KERNER:
17   Q.   And you talk about class of people because of
18 their exposure to contaminated Valsartan?
19   A.   Correct.
20   Q.   And to that you're talking about people who
21 have an exposure greater than or equal to the LCT which
22 is a term you learned in your report for the first time?
23   A.   Correct.
24      MS. GEMAN:  Objection, misstates the

21 (Pages 78 - 81)

Page 82

1 testimony.
2 BY MR. KERNER:
3    Q.   You say: "This program is different than the
4 one that would have been prescribed in the absence of
5 that particular exposure."  Can you -- can you tell me
6 what that sentence means?
7    A.   The whole point of a medical monitoring
8 program for people that have been exposed is that we're
9 doing more than I would do with a normal, healthy person
10 that just came in the office.
11   Q.   Okay.  But what this says is that "The
12 program is different than one that would have been
13 prescribed in the absence of that particular exposure."
14 I think you mean Valsartan; correct --
15   A.   Correct.
16   Q.   -- and increased risk?
17        And you link that to the exposure being
18 greater than or equal to the LCT; correct?
19   A.   Correct.
20   Q.   Do you know if it's possible to reach the LCT
21 based on endogenous NDMA and diet without Valsartan?
22   A.   I do not know the answer to that, but as I
23 stated in my report, I could modify my opinion.  At this
24 point I would think that if somebody does show that

Page 83

1 they've reached the LCT wherever their exposure to the
2 nitrosamines is that they would be appropriate for the
3 screening tests that I --
4    Q.   Even without Valsartan?
5    A.   Yes.  Yes.
6    Q.   And so you would -- you would agree with me
7 then that it's possible to -- Strike that.
8        You don't know whether it's possible to reach
9 the lifetime cumulative threshold without Valsartan;
10 correct?
11   A.   Correct.
12   Q.   And you have no idea; correct?
13   A.   From what I've read, it sounds like it's not
14 likely to reach the levels that were reached with the
15 Valsartan exposure.
16   Q.   And to be clear, when you say "from what I've
17 read," it's from relying on Plaintiffs' other experts --
18   A.   Correct.
19   Q.   -- correct?
20        But your opinion now it sounds like has been
21 modified to now say that if you've reached the LCT
22 without any Valsartan exposure, you would propose the
23 same program; correct?
24        MS. GEMAN:  No.  Objection, misstates the

Page 84

1 testimony.
2        MR. KERNER:  Can you read back my question,
3 please.
4            (Requested portion of the
5            record read.)
6        MS. GEMAN:  Vague as to --
7        MR. KERNER:  I will rephrase that.
8        MS. GEMAN:  Yeah.
9 BY MR. KERNER:
10   Q.   If a patient reached the LCT without any
11 Valsartan exposure, would you recommend the same program?
12        MS. GEMAN:  Objection, vague, incomplete
13 hypothetical.
14 BY THE WITNESS:
15   A.   I was not asked to consider that, but I think
16 it's worth evaluating.
17 BY MR. KERNER:
18   Q.   And you just said you're modifying your
19 opinion.  What were you modifying your opinion to?
20        MS. GEMAN:  Objection, misstates testimony.
21 BY THE WITNESS:
22   A.   I didn't say I was modifying my opinion.  I
23 was saying I would -- I would likely include anybody that
24 could be shown to -- as I said, someone that reached

Page 85

1 those levels should have this monitoring, so if that
2 level came from somewhere else, I don't see why I
3 wouldn't include them in that.
4 BY MR. KERNER:
5    Q.   And do you do that with your patients now?
6    A.   Do I do what?
7    Q.   Do you screen your patients with this kind of
8 exposure now?  Do you screen your patients the way you're
9 describing it for anybody who has achieved this LCT?
10       MS. GEMAN:  Objection, vague.
11 BY THE WITNESS:
12   A.   No, I have no way of monitoring that.  I have
13 no way of evaluating for that.
14 BY MR. KERNER:
15   Q.   You have no way of evaluating what -- whether
16 they reached the LCT?
17   A.   Routinely -- routinely testing for levels of
18 nitrosamines in a person's body.
19   Q.   You're not aware of any test that can
20 determine the lifetime cumulative threshold, are you?
21   A.   I'm not aware of clinically available tests
22 to monitor for that.
23   Q.   And, again, to be specific, lifetime
24 cumulative threshold of nitrosamine or NDMA --

22 (Pages 82 - 85)

Page 86

1    A.  Correct.
2    Q.  -- or NDEA; correct?
3        MS. GEMAN:  I was going to jump in to say can
4    I have that question read.  You were speaking very
5    quickly.  I'm sorry.
6        (Requested portion of the
7        record read.)
8        MS. GEMAN:  Objection.
9        MR. KERNER:  Read that back again, please.
10        (Requested portion of the
11        record read.)
12   BY MR. KERNER:
13   Q.   Let's move on to Page 4.  You talk about
14   specialized testing in Section 2 there.  Do you see that?
15   A.   Yes.
16   Q.   You talk about -- is it Galleri or Galleri?
17   A.   Galleri.
18   Q.   And you say that "early detection or similar
19   liquid biopsy should be performed annually."  On Page 5
20   you again mention Galleri, and you say that "it has been
21   shown to detect certain cancers such as pancreatic and
22   esophageal cancer."  Where is the -- what is the data to
23   support annual Galleri testing?
24       MS. GEMAN:  Objection.

Page 87

1    BY THE WITNESS:
2    A.   The recommendation to do annual testing is
3    based on my own program recommending screening, and I'm
4    recommending the patient be seen by a physician at least
5    annually, so I would include that as part of the routine
6    blood tests and evaluations.
7    Q.   Right.  And my question is a little
8    different.  Other than your own recommendation, and I
9    appreciate that, what is the data that supports Galleri,
10   Galleri's annual testing?
11       MS. GEMAN:  Vague.
12   BY THE WITNESS:
13   A.   There's data that shows Galleri can detect
14   cancers in earlier stages.
15   BY MR. KERNER:
16   Q.   And is that part of any guidelines from NCCN
17   or any other organization?
18   A.   No.
19   Q.   Do you know of any organization that
20   recommends annual testing with Galleri?
21   A.   I know that the American Cancer Society
22   has -- has suggested utilizing this test for evaluating
23   patients, and they're involved in -- in co -- in
24   sponsoring of a bill that -- that was brought to Congress

Page 88

1    in August to allow Medicare to -- to insist that Medicare
2    cover this testing because of its -- its ability to
3    detect cancers earlier.
4        MR. KERNER:  Great.  I move to strike that as
5    nonresponsive.
6    BY MR. KERNER:
7    Q.   My question is do you know of any guidelines
8    or any organization that supports annual testing of
9    Galleri.
10   A.   No.
11       MS. GEMAN:  Objection, asked and answered.
12       MR. KERNER:  Now it's been answered.
13   BY MR. KERNER:
14   Q.   You mentioned that Galleri has been shown to
15   detect certain cancers such as pancreatic and esophageal
16   cancer; correct?
17   A.   Correct.
18   Q.   That's what it says.
19       Okay.  You also recommend Cologuard for colon
20   cancer?
21   A.   Correct.
22   Q.   And you recommend colonoscopy every five
23   years and an upper endoscopy every five years; correct?
24   A.   Correct.

Page 89

1    Q.   So for every patient who has -- every patient
2    on the planet who has achieved this LCT that you've
3    learned of in this litigation for the first time, you
4    want them to have a colonoscopy and an upper GI endoscopy
5    every five years?
6        MS. GEMAN:  Objection, misstates the opinion,
7    misstates testimony, misstates the report, calls for a
8    legal conclusion by the class definition.
9    BY MR. KERNER:
10   Q.   Is that correct?
11   A.   I don't understand.
12   Q.   Any class member, any proposed class member
13   you're suggesting -- Strike that.
14       You're recommending that every single
15   proposed class member has a colonoscopy and an upper
16   endoscopy every five years regardless of comorbidities,
17   regardless of other past history; correct?
18   A.   My recommendations are guidelines that are
19   recommendations for patients and their doctors to
20   consider using, so that would be taken into account when
21   deciding on that test.
22   Q.   So -- okay.  I appreciate that.  And so am I
23   correct that you think ultimately the decision is to be
24   made by the individual and his or her treating physician

23 (Pages 86 - 89)

Veritext Legal Solutions
800-227-8440                                    973-410-4040

Page 90

1  as to what particular procedure is appropriate for them,
2  for that person?
3      A.  I'm -- I'm outlining a guideline because of
4  the exposure that can help guide the patient and the
5  doctor in determining -- in determining whether to follow
6  exactly the guideline or make individual recommendations,
7  yes.
8      Q.  And I didn't include the low-dose CT chest
9  scan annually.  It's your recommendation that any
10  proposed class member has a CT scan once a year?
11     A.  No, I don't believe I said that.
12         (Witness peruses document.)
13     Q.  Page 4.
14     A.  Okay.
15     Q.  You do say that; correct?
16     A.  Yes.  I'm sorry.  Because of the exposure
17  that put them at the same risk as someone who'd been a
18  smoker.
19     Q.  And your opinion -- that's your opinion, that
20  the exposure to NDMA or nitrosamines puts them at the
21  same risk as a smoker?
22     A.  Based on the estimate of exposure and risk of
23  lung cancer from that exposure, yes.
24     Q.  On whose estimate?  Based on whose estimate?

Page 91

1      A.  The Plaintiff experts that estimated the
2  relative risk of 1.05 to 3.3 for lung cancer.
3      Q.  So, again, this is basically just based on
4  what the Plaintiffs' experts have opined; correct?
5      A.  Correct.
6      Q.  So, Doctor, what I see in your report is you
7  seem to be recommending in some form or another the
8  Galleri which you say can detect certain cancers such as
9  pancreatic and esophageal; correct?
10     A.  Can you tell me where you're looking, please.
11     Q.  Yeah.  That's on Page 5.  Under "Colonoscopy
12  and Fecal DNA testing" you mention that -- I'm sorry.
13  Under "Galleri" you mention that Galleri is known to
14  detect certain cancers such as pancreatic and esophageal.
15  Do you see that?
16     A.  Yes.
17     Q.  Okay.  And you also have a section on
18  colonoscopy for detecting colon or rectal cancer;
19  correct?
20     A.  Correct.
21     Q.  And then you also discuss a little further up
22  I believe, and we just talked about it briefly, the CT
23  chest scan.  Is that for lung cancer?
24     A.  Yes.

Page 92

1      Q.  Okay.  I don't see any other screening
2  identified in your report.  Do you -- do you think that
3  those are the -- are those the cancers that you would
4  screen for -- pancreatic, esophageal, colorectal and lung
5  cancer?
6          MS. GEMAN:  Objection, misstates testimony,
7  asked and answered.
8  BY THE WITNESS:
9      A.  There's two things there.  There's -- the
10  first is that the Galleri, what you're reading is using
11  pancreatic and esophageal as examples.  It's not listing
12  all the cancers it's screening for, and the reason it was
13  listed as examples is because there's not good
14  screening -- screening tests for detecting those early.
15  The Galleri could, but the Galleri's good for almost
16  every cancer.  That's the point of the Galleri.  The --
17  the other thing is that's not the only testing.  If you
18  look in my program, it includes the annual laboratory
19  studies, exam, history, and those that you're referring
20  to are just specialized testing in addition that I felt
21  was -- was appropriate in order to help detect cancer in
22  earlier stages.
23  BY MR. KERNER:
24     Q.  Where in your report do you talk about

Page 93

1  screening for bladder cancer?
2      A.  So I don't talk specifically about bladder
3  cancer.  It's listed with the other cancers in here, and
4  that would be included in the history because there'll be
5  unique things to -- to patients that have bladder cancer.
6  In the physical examination, laboratory tests could
7  determine -- could be a way to screen for bladder along
8  with others and then the Galleri which can also detect
9  urinary tract cancers and other cancers in earlier
10  stages.
11     Q.  And what about liver cancer?
12     A.  And liver cancer as well.
13     Q.  Galleri?
14     A.  Galleri, but also the things we mentioned.
15  Liver cancer would have signs usually of cirrhosis or
16  hepatic steatosis, fatty liver, and that can be detected
17  by examinations and by laboratory tests and by history.
18     Q.  And if you can help me out here.  Which
19  laboratory tests in your report are you referring to with
20  respect to liver cancer?
21     A.  Liver enzymes.
22     Q.  Where is that?
23     A.  1C:  "Laboratory tests to include blood
24  smear, basic chemistry profile which includes liver

24 (Pages 90 - 93)

Page 94

1  enzymes, kidney function and other labs."
2      Q.  Okay.  Doctor, in paragraph 6 or Section 6,
3  you say midway through the paragraph that you "certify
4  that the monitoring proposals detailed above have the
5  potential to significantly improve the outcomes of
6  patients that may be destined to develop malignancies due
7  to their exposures and do not pose any significant risks
8  or negative consequences."  Do you see that?
9      MS. GEMAN:  Just object to the extent --
10     MR. KERNER:  Excuse me?
11     MS. GEMAN:  I just note that the report speaks
12 for itself.
13     MR. KERNER:  Sure.
14     MS. GEMAN:  You're paraphrasing.
15 BY MR. KERNER:
16     Q.  Well, what I read, did I read that correctly?
17     A.  Yes.
18     Q.  Okay.  What do you mean by "I certify that
19 the monitoring proposals have the potential to
20 significantly improve the outcomes?"  Are you
21 guaranteeing it?
22     MS. GEMAN:  Objection.
23 BY THE WITNESS:
24     A.  Is your question what do I mean by "certify"?

Page 95

1  BY MR. KERNER:
2      Q.  Yes, sir.
3      A.  It means that to the best of my medical
4  knowledge and ability I believe that this does what it's
5  stated to do.
6      Q.  It's your opinion?
7      A.  Correct.
8      Q.  Did somebody tell you to use the word
9  "certify" in there?
10     A.  No.
11     Q.  You also say that:  "These exposures do not
12 pose any --" I'm sorry.  "This monitoring proposal do not
13 pose any significant risks or negative consequences."
14     MS. GEMAN:  Objection.  Again, it misstates
15 the report.  It says:  "As detailed in Dr. Catenacci's
16 report."
17     MR. KERNER:  Yes.
18 BY THE WITNESS:
19     A.  There's a report that's been stricken, and
20 the details of that report is what I was addressing.
21 BY MR. KERNER:
22     Q.  But we would agree, I think you've already
23 agreed, that there could be risks or negative
24 consequences to certain procedures; correct?

Page 96

1      MS. GEMAN:  Objection, vague.
2  BY THE WITNESS:
3      A.  As I stated before, anything you do including
4  a needle stick or walking in a room -- I didn't state
5  that before; I'm stating it now -- has risks.
6      Q.  And that's all I'm asking, right.
7      MS. GEMAN:  Objection, calls for speculation.
8  BY MR. KERNER:
9      Q.  Doctor, in your practice, have you ever
10 concluded that any patient's cancer was caused by NDMA or
11 NDEA?
12     A.  I've never had the opportunity to do that,
13 no.
14     Q.  So the answer's no, you have not?
15     MS. GEMAN:  Objection, asked and answered.
16 BY THE WITNESS:
17     A.  No.
18 BY MR. KERNER:
19     Q.  Over the course of your career how many
20 patients have you treated ballpark?
21     A.  20,000 to 30,000.
22     Q.  Out of that universe of patients, how many of
23 them were cancer patients?
24     A.  Eighty percent.

Page 97

1      Q.  Okay.  Out of that number, how many of those
2  patients did you make a determination as to the actual
3  cause of their cancer?
4      A.  I'm actually not in the habit of making
5  determination as to cause of cancers usually.
6      Q.  And you're not opining here about causation
7  of any of the proposed class members; correct?
8      A.  Correct.
9      Q.  In your report on Page 4, in C you talk about
10 "Periodic testing."  Do you see that?
11     A.  Yes.
12     Q.  And for the colonoscopy you do say every five
13 years as for screening in moderately high risk patients?
14     A.  Correct.
15     Q.  What makes a patient moderately high risk?
16     A.  I believe that's outlined in the NCCN
17 guidelines, but moderately high risk patients would be
18 somebody that had had a polyp, a pre-malignant polyp, an
19 adenomatous polyp.  I think that would be the main
20 definition.
21     Q.  With the proposed class members, have you
22 considered in your program the likelihood of reduced
23 mortality?
24     A.  Could you --

25 (Pages 94 - 97)

Page 98

1    Q.  Are you considering whether the screening is
2  appropriate?
3    A.  Could you repeat the question?
4      MR. KERNER:  Can you read it back, please.
5      (Requested portion of the
6      record read.)
7  BY THE WITNESS:
8    A.  I believe by definition of what we're doing
9  the point is to reduce mortality and morbidity.
10  BY MR. KERNER:
11    Q.  And do we have -- do you have, Doctor, any
12  specific data for each of the tests that you're proposing
13  on whether it, in fact, does that?
14    A.  Not specifically, no.
15    Q.  This is just your -- Well, strike that.
16  Okay.
17    A.  Could we go back to that last question?
18    Q.  Sure.
19      THE WITNESS:  Can you read that back?
20      (Requested portion of the
21      record read.)
22  BY THE WITNESS:
23    A.  I mean there is data, for example, with
24  low-dose CAT scans for lung cancer that it does reduce

Page 99

1  morbidity and mortality by detecting cancer earlier, so
2  there is data.  You asked if I specifically had data for
3  this, so that's the answer.
4      MR. KERNER:  Okay.  I actually need to take a
5  two-minute comfort break, and we'll come right back.
6      THE VIDEOGRAPHER:  The time now is 11:34 a.m.
7  This is the end of media four.  We're off the record.
8      (WHEREUPON, a break was
9      taken.)
10      The time is now 11:56 a.m.  This is the
11  beginning of media five.  We're back on the record.
12  BY MR. KERNER:
13    Q.  Dr. Kaplan, we're not quite there yet, so
14  we're going to just keep chugging along.  All right?
15    A.  Yes, sir.
16    Q.  All right.  A few questions here.
17      You can't point to any medical literature or
18  authoritative source that has actually determined that
19  exposure to NDMA or NDEA reasonably necessitates any sort
20  of medical monitoring for cancer in humans, can you?
21      MS. GEMAN:  Objection.
22  BY THE WITNESS:
23    A.  Can you repeat that, please.
24

Page 100

1  BY MR. KERNER:
2    Q.  Sure.  You can't point to any medical
3  literature or authoritative source that has actually
4  determined that exposure to NDMA or NDEA reasonably
5  necessitates the kind of medical monitoring for cancer in
6  humans, can you?
7      MS. GEMAN:  Objection.
8  BY THE WITNESS:
9    A.  I haven't investigated that.  I know
10  literature exists because the reports that have come out
11  were based on it.  Plus I know the FDA withdrew the drug
12  in a -- in a rapid manner because of their determination
13  there was some risk.  That's all I know.
14  BY MR. KERNER:
15    Q.  Okay.  So but my question is are you aware of
16  any medical literature or authoritative source that
17  determined the kind of medical monitoring that you're
18  proposing for cancer in humans is appropriate for --
19  because of exposure to NDMA or NDEA.
20      MS. GEMAN:  Objection, asked and answered,
21  vague.
22  BY THE WITNESS:
23    A.  There's medical literature to support the
24  monitoring for patients at risk, at similar risk to what

Page 101

1  we've determined or what has been determined for the risk
2  for the specific agents but no, not literature
3  specifically that I know of addressing that and the
4  monitoring.
5  BY MR. KERNER:
6    Q.  And by "that" you mean NDMA and NDEA?
7    A.  NDMA and NDEA, correct.
8    Q.  So the answer to my question is no, you're
9  not aware of any medical literature or authoritative
10  source that determined medical monitoring for NDMA -- as
11  a result of NDMA and NDEA exposure is appropriate --
12      MS. GEMAN:  Objection.
13  BY MR. KERNER:
14    Q.  -- correct?
15    A.  I've never seen literature that -- yes.
16      MR. KERNER:  Did you get that?
17      THE REPORTER:  Yes.
18      MR. KERNER:  I just saw you tilt your head.
19  BY MR. KERNER:
20    Q.  Doctor, you're not offering any specific
21  criticisms or opinions about what a specific Defendant
22  did or didn't do with respect to Valsartan, are you?
23    A.  I'm not opining to that, no.
24    Q.  And you're not offering any opinion that NDMA

26 (Pages 98 - 101)

Page 102

1    or NDEA causes cancer, are you?
2        A.   I'm not being asked to opine to that.
3        Q.   So you're not?
4        A.   I'm using that assumption.
5        Q.   But you -- you're not offering the opinion
6    that NDMA or NDEA causes cancer; correct?
7        A.   I'm suggesting that that's a truism which is
8    why I've created this monitoring, so I guess I'm offering
9    that opinion based on -- I'm offering that as a statement
10   of fact.
11       Q.   Based on what?
12       A.   Based on the reports I've read.
13       Q.   You haven't independently assessed the
14   carcinogenicity of NDMA or NDEA; correct?
15       A.   Correct, I have not independently assessed
16   any of that.
17       Q.   And you're not offering any opinion that
18   Defendants' Valsartan products cause cancer; correct?
19       A.   Could you repeat that, please.
20       Q.   Sure.  I'm going to do it this way.  You
21   haven't independently assessed the -- whether or not the
22   Defendants' Valsartan products cause cancer?
23       A.   I have not independently assessed that.
24       Q.   So you won't be opining on that; correct?

Page 103

1        A.   I won't be opining on -- I won't -- I
2    really --
3        MS. GEMAN:  Do you understand the question?
4        MR. KERNER:  Yeah.
5        MS. GEMAN:  Answer it.
6    BY THE WITNESS:
7        A.   Well, not exactly.  I'm not specifically
8    looking at the data to opine that the drugs with the
9    contaminants have led to cancer, but I'm using others who
10   have done that in order to -- to justify and create my
11   program.
12   BY MR. KERNER:
13       Q.   I understand that.  And the others, again, I
14   want to be specific, are the Plaintiffs' experts --
15       A.   Correct.
16       Q.   -- correct?
17       Doctor, I'm going to move -- I'm going to end
18   my testimony -- end my questioning for the time being,
19   but a couple of ministerial things first.
20       Rachel, as we talked about, we've got -- I
21   want to mark as Exhibit 4 the thumb drive that we
22   discussed which contains the files that you produced on
23   Monday.  So we'll mark that as Exhibit 4.  You can review
24   it.  You can look at it to make sure it is what we tell

Page 104

1    you it is, and I know we discussed this off the record.
2    I don't want to take a lot of time.
3        And, Doctor, I just want to make sure.
4    You've told me all of your opinions that you hold with
5    respect to the case now; correct?
6        A.   I've -- all that I've been asked about, yes.
7        Q.   Well, are there other opinions that you hold
8    that you are going to testify to?
9        A.   Not that I know of.
10       Q.   Okay.  And so we've discussed the facts that
11   support those opinions; correct?
12       A.   Correct.
13       Q.   And you feel like you've had a chance to
14   state your opinions during this deposition?
15       MS. GEMAN:  Objection.
16   BY THE WITNESS:
17       A.   Yes.
18       MR. KERNER:  Okay.  I'm going to pass the
19   witness now.
20       MS. ISIDRO:  Are there others on the Zoom who
21   would like to ask any questions?
22       MS. LOTMAN:  Yes.  This is Alyson Lotman.  I'm
23   going to have a few.  Give me one minute.
24       MS. GEMAN:  Alyson, can you state your

Page 105

1    appearance and which Defendant you represent and firm?
2    This is Rachel Geman speaking.  Thank you.
3        MS. LOTMAN:  Alyson Lotman from Duane Morris.
4    I represent the HP Defendants.
5        I apologize.  If someone else has a few,
6    wants to go before me.  I'm just trying to close some
7    screens before I can get on.
8        Are we still on the record?
9        THE VIDEOGRAPHER:  Yes.
10       MR. KERNER:  Yes.
11       MS. GEMAN:  Yes.
12       MS. LOTMAN:  Thanks.
13       Good afternoon, Dr. Kaplan.  Can you hear
14   me and see me okay?
15       THE WITNESS:  I can hear you.  You're a little
16   picture up there, yeah.
17       MS. LOTMAN:  It might be better that way.
18       THE WITNESS:  I'd rather not look at myself
19   so.
20       MS. LOTMAN:  I understand that feeling.
21   Happens to me a lot when I'm on Zoom.
22       A few questions for you then, Doctor.
23
24

27 (Pages 102 - 105)

Page 106

1          CROSS EXAMINATION
2  BY MS. LOTMAN:
3      Q.   How long did it take for you to develop this
4  plan, medical monitoring plan in your report?
5      A.   I would say about -- about a month, three or
6  four weeks.
7      Q.   Okay.  And over the course of that time how
8  many -- how many hours do you think you actually spent on
9  it?
10     A.   It should be documented.  I think it was
11 probably about 12 to -- probably about 20 hours.
12     Q.   Okay.  And that includes -- does that include
13 reviewing literature?
14     A.   Yes.
15     Q.   And writing the report itself?
16     A.   Correct.
17     Q.   How long do you think it took you to actually
18 formulate your opinions?
19         MS. GEMAN:  Objection.
20 BY THE WITNESS:
21     A.   Ten, twelve hours.
22 BY MS. LOTMAN:
23     Q.   And, Doctor, have you ever -- have you ever
24 crafted a medical monitoring plan such as this for

Page 107

1  litigation before?
2      A.   No.
3      Q.   Have you ever published on medical
4  monitoring?
5      A.   I have not.
6      Q.   Then, Doctor, you talked before about you
7  have your private practice.  You have patients who are
8  asymptomatic but they have certain genetic issues like
9  BRCA; right?
10     A.   Correct.
11     Q.   And so you are conducting additional
12 monitoring because of that genetic issue; right?
13     A.   Correct.
14     Q.   Okay.  For patients who -- do you see any
15 other patients who are asymptomatic who don't have
16 genetic issues?
17     A.   Could you -- could you rephrase it?  Do I see
18 any patients?
19     Q.   Sure.  Sure.  So do you also have any other
20 patients who treat with you who are asymptomatic but did
21 not have a prior cancer who do not have genetic issues?
22         MS. GEMAN:  Objection, vague.
23 BY THE WITNESS:
24     A.   Do I have --

Page 108

1  BY MS. LOTMAN:
2      Q.   Let me reask it --
3      A.   Okay.
4      Q.   -- because I think it's a little unclear.
5  You have patients who have cancer at your practice;
6  right?
7      A.   Correct.
8      Q.   Do you have patients who have certain genetic
9  issues or mutations or elements that you are concerned
10 about like BRCA?
11     A.   Do I -- I couldn't hear you.
12     Q.   You also treat -- sorry.  You also treat
13 patients who have certain genetics like BRCA that you
14 treat as well, you're monitoring?
15     A.   Yes.
16     Q.   Are there any other types of patients that
17 you see?
18     A.   Yes.
19     Q.   Okay.  What are they or who are they?
20     A.   You want their names and phone numbers?
21     Q.   No, Doctor.  I'm just looking for what is
22 their concern that they're seeing an oncologist.
23     A.   So I happen to have a handful of patients
24 that do not see me for oncology, that see me for internal

Page 109

1  medicine either because they were related to a member of
2  the family that I took care of or I know them from the
3  community or from other people, so I do have some general
4  internal medicine patients but not very many.  I don't
5  consider myself a general internist, but you have to be
6  to some degree a general internist in order to be a
7  medical oncologist.  I do see patients that have had
8  abnormal findings, for example, Barrett's esophagus
9  or -- well, we mentioned genetic like Lynch syndrome,
10 people have had multiple polyps that haven't been
11 identified as having a genetic -- a genetic condition
12 that's been identified.  I do follow patients that have
13 had variants of the genetic -- like the BRCA that are
14 variants of uncertain significance and so they'll be
15 monitored to a certain degree, not the same as a known
16 deleterious mutation or known risk mutation but the
17 possibility that it is going to be identified as one, so
18 they're -- they're followed, and then other patients are
19 just concerned.  I've had people come in that are just
20 concerned about their cancer risk, and I also take care
21 of some patients with blood disorders.
22     Q.   Okay.  Doctor, for your patients who smoke,
23 you follow the USPSTF guidelines for screening?
24     A.   I do.

28 (Pages 106 - 109)

Page 110

1    Q.   Are you aware that tobacco is a known human
2  carcinogen?
3    A.   I am.
4    Q.   Okay.  And you don't recommend any extra
5  screening for those patients who have exposures to
6  tobacco?
7    A.   No, I do.  I -- I recommend a number of
8  screening procedures for them, mostly the things we've
9  outlined before -- the annual exams or blood tests, urine
10  tests.
11    Q.   But you don't go to the same specialized plan
12  that you do for the patients in this case?
13        MS. GEMAN:  Objection.
14  BY THE WITNESS:
15    A.   I have not developed a specialized program
16  for that group of patients at this time.
17  BY MS. LOTMAN:
18    Q.   So you treat patients who have exposure to
19  tobacco, a known human carcinogen, and you don't
20  recommend that they have the same types of tests, the
21  specialized testing that you've recommended for the
22  patients who have alleged exposure to nitrosamines?
23        MS. GEMAN:  Objection, misstates the
24  testimony.

Page 111

1  BY THE WITNESS:
2    A.   I don't have a class program for those
3  patients I've -- that I've recommended.  I don't have
4  large enough numbers that I'm seeing, and I haven't been
5  asked to do that.
6  BY MS. LOTMAN:
7    Q.   So for your patients who smoke, you don't
8  have them go through the Galleri?  They don't have
9  Galleri testing, do they?
10    A.   No, but that's something that I intend to
11  start doing.
12    Q.   When do you intend to start doing that?
13    A.   Soon.  I've already ordered the test a few
14  times.  I've recently learned about the test and
15  evaluated its usefulness and have learned more about it,
16  and so I'm starting to order it or recommend it for
17  patients.
18    Q.   How do you order it?
19    A.   It's a prescription.  It's a kit.  You draw
20  blood and you send it off in a kit to the company.
21    Q.   Does Galleri currently have FDA approval?
22    A.   Galleri does not yet have FDA approval.  It
23  does have CLIA certification.
24    Q.   But does not have FDA approval?

Page 112

1    A.   Not yet, no.  But many tests that we do don't
2  have FDA approval, blood tests in the office, other
3  things, but yeah, you're right.  It does not yet have FDA
4  approval.  They're attempting to get FDA approval.
5    Q.   Doctor, do you know the difference between a
6  known human carcinogen and a probable human carcinogen?
7    A.   I'm assuming a known human carcinogen has
8  been proven to cause cancer.  Usually -- I mean in humans
9  most of the probable human carcinogens are based on
10  animal studies and epidemiologic studies.
11    Q.   Okay.  Do you know what a probable human
12  carcinogen is?
13    A.   So I'm saying probable is something that's
14  been shown in, probably in animal studies to increase
15  risk of cancer and to suggest that there's a human risk
16  as well.
17    Q.   Suggest not -- not a -- not know?
18    A.   I'm sorry?
19    Q.   You said suggest and probable; right, for the
20  probable one?  There's not a known carcinogen?  There's a
21  difference; right?
22    A.   Well, known human carcinogen may be a proven
23  carcinogen in the laboratory or in animal studies.
24    Q.   Okay.  Would you make the same about say

Page 113

1  medical monitoring for a probable human carcinogen as you
2  would for a known human carcinogen?
3        MS. GEMAN:  Objection, incomplete
4  hypothetical.
5  BY THE WITNESS:
6    A.   I haven't thought of that, so I don't have an
7  answer.
8        MS. LOTMAN:  Okay.  Those are all of my
9  questions.
10        Thank you very much for your time, Doctor.
11    THE WITNESS:  Sure.
12    MR. KERNER:  Anybody else have any questions?
13        (No response.)
14        Well, if nobody else has any questions, I
15  do very quickly.
16        I just want to mark another exhibit.
17        (Exhibit No. 5 marked as
18        requested.)
19    MS. GEMAN:  This is 5.
20    MR. KERNER:  This is 5.  For the Zoom folks,
21  it says "Invoices."
22    MS. GEMAN:  So in my copy it's three -- yeah,
23  it's three identical pages of October 22nd.
24    THE WITNESS:  I have the same thing.  Oh, it's

29 (Pages 110 - 113)

Page 114

1  October 7th -- I mean November 7th to November 10th.
2      MR. KERNER:  Okay.  Let's do it this way.
3      MS. ISIDRO:  Go off the record.
4      MR. KERNER:  Yeah.  Let's go off the record
5  for a second.
6      THE VIDEOGRAPHER:  The time now is 12:15.
7  This is the end of media five.  We're off the record.
8          (WHEREUPON, a break was
9          taken.)
10      The time is 12:17 p.m.  This is the
11  beginning of media six.  We're back on the record.
12      REDIRECT EXAMINATION
13  BY MR. KERNER:
14      Q.  Okay, Doctor.  We just wanted to mark Exhibit
15  5 and talk about them real quickly.  Can you tell us what
16  Exhibit 5 is?
17      A.  My invoices to -- to the lawyers.
18      Q.  And how many invoices are there?
19      A.  There are four in front of me.
20      Q.  Okay.  And they're all addressed to Nicholas
21  Migliaccio?
22      A.  Correct.
23      Q.  Does that sound right?
24      A.  Correct.

Page 115

1      Q.  Who is that?
2      A.  It's the attorney that is -- one of the
3  attorneys involved in this case.
4      Q.  Okay.  But he's not the one who contacted you
5  initially?
6      A.  No, I think he's the first one that I spoke
7  to or one of the first ones that I spoke to.  I can't
8  recall.
9      Q.  Okay.  So it was not at Lieff Cabraser as you
10  testified earlier?
11      MS. GEMAN:  Objection, misstates testimony.
12  BY THE WITNESS:
13      A.  She's one of the attorneys also that I -- I
14  didn't remember who it was that contacted me first, but
15  she's one that's been on all of our meetings.
16  BY MR. KERNER:
17      Q.  But Mr. Migliaccio was the first one to
18  contact you?
19      MS. GEMAN:  Objection.
20  BY THE WITNESS:
21      A.  I don't recall exactly who was the first one
22  to contact.  That's the one who I was told to send the
23  invoices to.
24

Page 116

1  BY MR. KERNER:
2      Q.  Okay.  Fair enough.  So you -- on October
3  22nd, 2001 you sent an invoice for a retainer of $2,000?
4      MS. GEMAN:  2021 not 2001.
5      MR. KERNER:  Oh, gosh, yeah.  October 22nd,
6  2021.
7      MS. GEMAN:  We're not that slow.
8  BY MR. KERNER:
9      Q.  And that was for $2,000; correct?
10      A.  Correct.
11      Q.  Has that been paid?
12      A.  Yes.
13      Q.  And then the next invoice is November 5th,
14  2021 and that looks to be for time spent from
15  October 20th to November 5th, and you spent 20 hours
16  during that time frame for teleconferences and
17  communication, review of literature, analyses and report
18  review; correct?
19      A.  Correct.
20      Q.  Okay.  And you billed that out at $450 an
21  hour?
22      A.  Correct.
23      Q.  And so the invoice is for $11,250; correct?
24      A.  Correct.

Page 117

1      Q.  Was that paid?
2      A.  Yes, I believe so.
3      Q.  And the third invoice is five days later
4  dated November 10th, and that was for time spent from
5  November 7th to November 10th of 2021; correct?
6      A.  Correct.
7      Q.  And that also was for teleconferences and
8  communication, review of literature, analyses and report
9  review and writing and correcting reports; correct?
10      A.  Correct.
11      Q.  And you spent 11 hours?
12      A.  Correct.
13      Q.  Also billed out at $450 an hour.  I guess
14  there's a .25 percent charge added onto it?
15      A.  Right.
16      Q.  What's that?
17      A.  It was because it was -- there was a time
18  limit.  It was rushed, not rushed, but there was a
19  deadline to get it in, so I had to work within a shorter
20  time frame.
21      Q.  Got it.  And, by the way, the prior invoice
22  on November 5th had that same --
23      A.  Correct.
24      Q.  -- .25 percent?

30 (Pages 114 - 117)

Page 118

1    A.   Correct.

2        Q.   So this third invoice was for $6,187.50, also

3    billed out at $450 an hour; correct?

4        A.   Correct.

5        Q.   And the final invoice that we have is dated

6    December 31st, 2021 for time spent from December 16th to

7    December 31st for teleconference and review of records;

8    correct?

9        A.   Correct.

10       Q.   What records did you review?

11       A.   I don't know the exact records. It's all the

12   references that we had. It was discussing my report with

13   the lawyers. I can't remember specifically.

14       Q.   Okay. And you spent 11 hours according to

15   the invoice?

16       A.   Correct.

17       Q.   And there was no .25 percent charge on this

18   one; correct?

19       A.   Correct.

20       Q.   And so the total amount due was 5500?

21       A.   Correct.

22       Q.   Has that been paid?

23       A.   I don't think so. I don't -- I don't

24   remember.

Page 119

1        Q.   Okay. So -- so overall it looks as though

2    you spent 44 hours --

3        A.   Okay.

4        Q.   -- correct?

5             And you charged approximately $24,000 and

6    change; correct?

7        A.   Okay. I hadn't added it up.

8        Q.   Will you be providing any additional invoices

9    for time since December 31st?

10       A.   Yes.

11       Q.   Do you have any idea how many hours you've

12   spent since then?

13       A.   In preparing for the deposition, probably

14   another 20 hours --

15       Q.   And --

16       A.   -- including the deposition.

17       Q.   Including the deposition.

18            Okay. And I think you told us your rate for

19   the deposition was $600 an hour?

20       A.   Correct.

21       Q.   By the way, I note that on the last invoice

22   dated December 31st you billed 11 hours at $500 an hour,

23   so your rate went up from November 10th to December 16th?

24       A.   Inflation.

Page 120

1        Q.   An extra 50 bucks an hour?

2        A.   Yeah.

3             MR. KERNER: Okay. That's all I have.

4             THE WITNESS: Okay.

5             MR. KERNER: Anybody else has anything, speak

6    now.

7             MR. GEOPPINGER: Yeah, I have a couple

8    questions, if I may. Good afternoon, Doctor. My name is

9    Jeff Geoppinger. I'm here on behalf of Amerisource

10   Bergen. Can you see me now?

11            THE WITNESS: Sort of, yes.

12            MR. GEOPPINGER: Good afternoon. Again, my

13   name is Jeff Geoppinger. I represent Amerisource Bergen

14   in this litigation. I just have a real quick couple

15   follow-up questions.

16            CROSS EXAMINATION

17   BY MR. GEOPPINGER:

18       Q.   Earlier when you were talking to Ms. Lotman,

19   you mentioned you have patients who you treat who are

20   just concerned about cancer risk. Did I hear that

21   correctly?

22       A.   Yes.

23       Q.   Are those patients asymptomatic?

24       A.   I think many of them are. There aren't a lot

Page 121

1    of them in that category, but there are some who are

2    asymptomatic.

3        Q.   I understand. They don't have an active

4    cancer diagnosis; correct?

5        A.   Correct.

6        Q.   And they don't have any genetic conditions

7    that would predispose them to cancer that they're

8    concerned about or that you're concerned about; correct?

9        A.   None that had been identified, yes.

10       Q.   Okay. So for those patients, what do you do

11   to treat them?

12       A.   So they're not being treated. They're being

13   monitored, and it includes basic -- basic exam, something

14   they may get from their internist but with more focus on

15   cancers.

16       Q.   And is that screening the same for all of

17   those patients or does it vary by, you know, individual

18   patient?

19       A.   The basic screening is the same for all of

20   them because they need to have a good exam, they need to

21   have basic laboratory tests, and they need a good

22   history, and I'm finding many of them aren't getting

23   those things done in their general practices, in the

24   primary practice because of very busy doctors, so I'll be

31 (Pages 118 - 121)

Page 122

1  a little more -- I'll take longer, and I'll be a little
2  more detailed, but everybody will get a basic screening.
3  If there's anything discovered, then they would go on to
4  get more unique tests done.
5      Q.  I'm sorry.  I didn't hear the end of that
6  answer.  What was that you said, Doctor?
7      A.  They're all screened the same way.  That's
8  what I wanted to say.
9      Q.  Okay.  And do -- after the basic screening
10  that they all get the same way do some of those patients
11  get additional screening based upon what you find after
12  you do the basic screening?
13      A.  Yes.
14      Q.  Okay.  And do they all get the same
15  additional screening or does it vary by patient?
16      A.  It would vary by what the reason is for doing
17  the additional screening.
18      Q.  Okay.  Now I'm going to ask you a
19  hypothetical.  If one of those asymptomatic patients
20  provided you information that they had -- they ate a lot
21  of bacon or that they had taken Valsartan between 2012
22  and 2018, would your screening of that patient change in
23  any way?
24      MS. GEMAN:  Objection, incomplete

Page 123

1  hypothetical, compound.
2  BY THE WITNESS:
3      A.  It would depend.  I'd have to be there with
4  the patient and see -- hear everything about it.  I can't
5  answer that question with what you've told me.
6  BY MR. GEOPPINGER:
7      Q.  Would it be accurate to say that you would
8  make an individual determination about the screening in
9  that case --
10      MS. GEMAN:  Objection.
11  BY MR. GEOPPINGER:
12      Q.  -- for the patient?
13      A.  After the initial evaluation I would make an
14  independent decision just like with any patient including
15  Valsartan-exposed patients after they've gone through the
16  screening I've recommended.
17      Q.  Okay.  So in my hypothetical I have an
18  asymptomatic patient who tells you that they have -- that
19  they had foods in their diet that may include NDMA, that
20  they may have been taking Valsartan-containing products
21  from 2012 to 2018.  In that situation, would your process
22  for treating an asymptomatic patient be any different
23  than it would be in treating the asymptomatic patients
24  you see right now?

Page 124

1      MS. GEMAN:  Objection, asked and answered,
2  incomplete hypothetical, vague.
3  BY THE WITNESS:
4      A.  The Valsartan is not -- is not a deal -- a
5  detail that I can answer to because the patients we're
6  dealing with have levels that have been proven, have been
7  identified to be in a class.  You're talking about an
8  individual person who's taking the drug.  I wouldn't have
9  any -- right now any -- a plan of how to specifically
10  address that patient.  They would need the same
11  monitoring and the same -- I mean the same evaluation
12  that the patients in the class have had to determine
13  their level of -- of exposure, et cetera.
14  BY MR. GEOPPINGER:
15      Q.  Would it be accurate to say you would treat
16  that patient just like you do the asymptomatic patients
17  you treat now?
18      MS. GEMAN:  Objection.
19  BY THE WITNESS:
20      A.  Again, it depends on -- on the situation of
21  the patient that I have in front of me.  To take one
22  patient is very difficult to answer.  It's not a real
23  patient.
24

Page 125

1  BY MR. GEOPPINGER:
2      Q.  Would you give -- would you recommend for
3  that patient who reveals to you the -- their history of
4  dietary intake of NDMA and potential history of VCB usage
5  and NDMA, would you automatically screen them for all the
6  conditions that you've listed in your report?
7      MS. GEMAN:  Objection, incomplete
8  hypothetical.
9  BY THE WITNESS:
10      A.  Just on the basis of that history I wouldn't
11  necessarily do anything different than what we've already
12  discussed.
13      MR. GEOPPINGER:  Thank you, Doctor.  I don't
14  have any further questions.
15      MR. KERNER:  Anyone else?
16      MS. GEMAN:  If I may, Doctor.  This is Alyson
17  Lotman.  I have one more question.  I think it's just
18  one.
19      RECROSS EXAMINATION
20  BY MS. LOTMAN:
21      Q.  Who do you recommend to do these screenings?
22      MS. GEMAN:  Objection.
23  BY THE WITNESS:
24      A.  I don't understand your question.  Who do I

32 (Pages 122 - 125)

Page 126

1  recommend?
2  BY MS. LOTMAN:
3      Q.   If these -- if the patients were to get the
4  screening that you recommended here, who should be
5  administering it?
6      A.   Well, as I outlined in my report, it would be
7  either the primary care doctor or an oncologist or a
8  general practitioner, a family practitioner, somebody
9  that would be made aware usually through the patient
10  telling them that they have this exposure, this risk and
11  they have this recommended guideline for screening.
12      Q.   And if their doctor decided that based upon
13  their comorbidities or their medical history that these
14  were unnecessary, do you believe that your plan should
15  stand in place of that doctor's judgment?
16      MS. GEMAN:  Objection, incomplete
17  hypothetical.
18  BY THE WITNESS:
19      A.   My plan is a guideline, just like the NCCN
20  has their guidelines, and it's up to the individual
21  practitioner to -- to decide based on the individual
22  patient what is appropriate for them.
23      MS. LOTMAN:  Thank you very much, Doctor.
24      MS. GEMAN:  Are there any other questions from

Page 127

1  the Defendants?
2              (No response.)
3          Do you have it on your screen?  Did people
4  write in?
5      MS. ISIDRO:  No one else on the Zoom?
6      MS. GEMAN:  Do you formally conclude it and
7  pass it to me?  How are we doing this?
8      MR. KERNER:  Yeah, if none of the Defendants
9  have any questions and you have questions, ask away.
10      MS. GEMAN:  Thank you.
11          CROSS EXAMINATION
12  BY MS. GEMAN:
13      Q.   Dr. Kaplan, what is CLIA certification?
14      A.   CLIA certification is -- is certification
15  that's given by a board that -- that attests to the
16  accuracy and the usefulness of a particular test, that
17  it's considered accurate and it does have some impact for
18  the patient.
19      Q.   Okay.  Can you please take out what's been
20  marked as Exhibit 3 and turn to Page 3.  Does the class
21  as set forth on Page 3 capture the population of people
22  for whom you are recommending your monitoring program?
23      A.   Yes.
24      Q.   I think there was some confusion before.

Page 128

1  You're not recommending that this monitoring program be
2  provided to people who did not take the contaminated
3  Valsartan, i.e. you are not recommending this program to,
4  this exact program to non-class members; correct?
5      A.   The point of this program was medical
6  monitoring for those that had been identified as being at
7  risk because of their intake of Valsartan-contaminated
8  products.
9      MS. GEMAN:  Okay.  Thank you for the
10  clarification.
11          Okay.  We'd like to read and sign.
12      MR. KERNER:  Yeah.
13      THE VIDEOGRAPHER:  The time is now 12:33 p.m.
14  This is the end of media six.
15          This concludes this deposition.  We're off
16  the record.
17      THE REPORTER:  Would anyone like a copy of the
18  transcript?
19      MR. STOY:  This is Frank Stoy.  I'd like an
20  electronic copy, please.
21      MS. LOTMAN:  Alyson Lotman.  I'd like the
22  same.
23      MR. CHARCHALIS:  (Inaudible).
24      MS. ISIDRO:  Mitchell wants an electronic.

Page 129

1  STATE OF ILLINOIS      )
                          ) SS:
2  COUNTY OF C O O K      )
3
       I, KELLY A. BRICHETTO, a Certified Shorthand
4  Reporter of said state, do hereby certify
5  that the within named witness, EDWARD H. KAPLAN, M.D.,
6  was by me first duly sworn to testify the truth, the
7  whole truth and nothing but the truth in the cause
8  aforesaid; that the testimony then given by the
9  above-referenced witness was by me reduced to stenotype
10  in the presence of said witness; afterwards transcribed,
11  and that the foregoing is a true and correct
12  transcription of the testimony so given by the
13  above-referenced witness.
14       I do further certify that this deposition was
15  taken at the time and place in the foregoing caption
16  specified and was completed without adjournment.
17       I do further certify that I am not a relative,
18  counsel or attorney for either party or otherwise
19  interested in the event of this action.
20
21
22
23
24

Veritext Legal Solutions
800-227-8440                                         973-410-4040

Page 130

1    IN WITNESS WHEREOF, I do hereunto set my hand
2  this 21st day of January, 2022.
3
4
5
6
               *Kelly Brichetto*
7    KELLY A. BRICHETTO
8    CSR License No. 84-3252
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 131

1  RACHEL J. GEMAN
2  rgeman@lchb.com
3    January 26, 2022
4  RE:   In Re: Valsartan, Losartan, Et Al
5    1/19/2022, Edward  H Kaplan , MD (#5025121)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22      Yours,
23      Veritext Legal Solutions
24

Page 132

1  In Re: Valsartan, Losartan, Et Al v.
2  Edward  H Kaplan , MD (#5025121)
3    E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Edward  H Kaplan , MD              Date

Page 133

1  In Re: Valsartan, Losartan, Et Al v.
2  Edward  H Kaplan , MD (#5025121)
3    ACKNOWLEDGEMENT OF DEPONENT
4    I, Edward  H Kaplan , MD, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  Edward  H Kaplan , MD              Date
13  *If notary is required
14    SUBSCRIBED AND SWORN TO BEFORE ME THIS
15    _____ DAY OF _____, 20___.
16
17
18    _____
19    NOTARY PUBLIC
20
21
22
23
24

34 (Pages 130 - 133)

[& - 75201]                                                                      Page 1

**&**

**&** 2:3,9,21 4:8,19
5:2,8

**0**

**02109** 4:10

**1**

**1** 7:3 28:14,16,23
47:14,15,17 48:3,4
48:5 60:17
**1,000** 48:18
**1.05** 91:2
**1/19/2022** 131:5
**10013** 2:5
**10017** 3:10
**104** 7:6
**107** 6:8
**10:21** 60:8
**10:39** 60:12
**10th** 114:1 117:4,5
119:23
**11** 6:7 117:11
118:14 119:22
**11,250** 116:23
**115** 6:9 7:7
**11:34** 99:6
**11:56** 99:10
**12** 106:11
**121** 6:10
**12498** 130:6
**126** 6:11
**128** 6:12
**12:15** 114:6
**12:17** 114:10
**12:33** 128:13
**13** 30:9,13 31:23
**131** 6:14
**15** 22:5
**15219** 4:23
**16th** 118:6 119:23

**17th** 4:15
**19** 1:9,16
**19087** 3:4
**19103** 4:16
**1982** 37:2
**1983** 37:17
**1985** 37:18,19
**1988** 37:19,21
38:10
**1995** 39:8
**19th** 8:4
**1c** 93:23

**2**

**2** 6:2 7:4 36:2,3,7
48:20 64:7 86:14
**2,000** 116:3,9
**20** 13:6,8 106:11
116:15 119:14
133:15
**20,000** 96:21
**200** 3:15
**20002** 2:10
**2001** 116:3,4
**2012** 122:21
123:21
**2018** 122:22
123:21
**202** 2:11
**2021** 34:6 116:4,6
116:14 117:5
118:6
**2022** 1:9,17 8:4
130:2 131:3
**2029** 5:9
**20th** 116:15
**212** 2:5 3:10
**213-7045** 4:10
**214** 3:22
**215** 3:5 4:16
**21st** 130:2

**2200** 3:21
**22nd** 113:23 116:3
116:5
**24,000** 119:5
**25** 17:5 117:14,24
118:17
**250** 2:4
**2500** 3:16
**26** 131:3
**260** 2:16
**270** 3:4
**27th** 4:9
**2800** 5:3
**2875** 1:3
**29** 7:3

**3**

**3** 7:5 43:15,16,19
55:8 66:1,15
79:20 127:20,20
127:21
**3,000** 48:19
**3.3** 91:2
**30** 4:15 131:17
**30,000** 96:21
**300** 4:4 5:9
**301** 4:21
**302** 2:10
**30305** 3:16
**3100** 1:16
**316** 2:21
**31st** 118:6,7 119:9
119:22
**32501** 2:22
**3333** 3:15
**355-9500** 2:5
**3600** 3:21
**37** 7:4
**37402** 4:4
**385-5400** 2:17
**38th** 4:22

**4**

**4** 6:4 7:6 74:8
86:13 90:13 97:9
103:21,23
**412** 2:9
**423** 4:5
**44** 7:5 119:2
**450** 116:20 117:13
118:3
**45202** 5:4
**470-3520** 2:11

**5**

**5** 7:7 86:19 91:11
113:17,19,20
114:15,16
**50** 54:11 120:1
**50/50** 23:6
**500** 62:9 119:22
**5025121** 131:5
132:2 133:2
**513** 5:4
**53** 4:9
**550** 3:3
**5500** 118:20
**5th** 116:13,15
117:22

**6**

**6** 30:19 71:15 94:2
94:2
**6,187.50** 118:2
**600** 2:22 5:3 62:11
62:12 119:19
**60076** 24:10
**617** 4:10
**66210** 2:16
**698-5000** 5:4

**7**

**736** 4:3
**75201** 3:22

[755-2652 - answered]                                                    Page 2

**755-2652** 4:5
**77** 1:15 8:6
**7th** 114:1,1 117:5

**8**

**80** 71:24 72:16,18
**801-9200** 3:10
**8101** 2:15
**84-3252** 130:8
**85** 72:3,5
**855-8000** 3:22
**8th** 2:4

**9**

**9** 24:9
**90** 73:3
**90067** 5:10
**913** 2:17
**9631** 24:9
**977-4058** 3:5
**979-1177** 4:16
**9:14** 1:10,17 8:5
**9:15** 9:12
**9:16** 9:16
**9:41** 32:7
**9:43** 32:11

**a**

**a.m.** 1:10,17 8:5
  9:16 32:7,11 60:8
  60:12 99:6,10
**ability** 88:2 95:4
**able** 19:9,10
**abnormal** 109:8
**abnormalities**
  45:1,4 61:22
**abnormality** 45:9
**absence** 80:9 82:4
  82:13
**abstracts** 39:16,23
**accepted** 54:3 61:8
  73:14

**account** 52:14
  89:20
**accuracy** 127:16
  131:9
**accurate** 30:24
  123:7 124:15
  127:17
**achieved** 85:9 89:2
**acknowledgement**
  133:3
**acknowledgment**
  131:12
**acquire** 38:16
**action** 129:19
**active** 121:3
**activities** 54:9,12
**actual** 97:2
**acute** 26:22 27:8
  27:17,19
**added** 117:14
  119:7
**addition** 35:13
  92:20
**additional** 58:15
  70:21 107:11
  119:8 122:11,15
  122:17
**additions** 133:6
**address** 24:8 44:1
  44:3 124:10
**addressed** 114:20
**addressing** 95:20
  101:3
**adenomatous**
  97:19
**adjournment**
  129:16
**administered**
  27:13 64:14
**administering**
  126:5

**adriamycin** 75:11
**advance** 11:23
**advised** 41:22
**aforesaid** 129:8
**afternoon** 10:15
  105:13 120:8,12
**agencies** 50:14
**agents** 19:6,12,14
  19:17,21,24 101:2
**aggressive** 55:2
  56:23 57:1,21
  72:21
**ago** 10:11 12:6
  13:6,8 17:5 21:9
  29:3 33:22 34:2,4
  34:8 44:8,9 49:5
**agree** 34:23 83:6
  95:22
**agreed** 34:22
  95:23
**ahead** 41:7
**ahh** 37:20
**aid** 5:7
**al** 8:8 131:4 132:1
  133:1
**alberto** 3:2
**alfano** 4:19
**algorithm** 51:6
**algorithms** 50:22
**alleged** 110:22
**allotted** 131:20
**allow** 38:20 42:13
  42:16 72:14 88:1
**allowing** 38:15
**allows** 44:11
**alluded** 57:20 74:5
**alotman** 4:17
**alyson** 4:14 104:22
  104:24 105:3
  125:16 128:21

**adriamycin** 75:11
**american** 87:21
**amerisource** 5:1
  120:9,13
**amount** 74:19
  75:2 76:15,22
  78:18 118:20
**amounts** 42:9
**analyses** 116:17
  117:8
**analysis** 42:22
  43:10 45:14 74:9
**andrew** 3:2
**andrew.alberto**
  3:5
**anemia** 25:18
**anesthesia** 49:16
**angeles** 5:10
**animal** 112:10,14
  112:23
**annual** 45:15,23
  46:20 47:1,5
  48:24 49:6,14,17
  50:11 86:23 87:2
  87:10,20 88:8
  92:18 110:9
**annually** 52:20
  61:8 86:19 87:5
  90:9
**answer** 11:2,10,17
  15:5 46:13,13
  48:7 61:13 64:23
  69:23 82:22 99:3
  101:8 103:5 113:7
  122:6 123:5 124:5
  124:22
**answer's** 74:6
  96:14
**answered** 41:20
  67:24 88:11,12
  92:7 96:15 100:20
  124:1

**answering** 46:11
**anticipated** 26:5
**anticipating** 53:24
**anybody** 59:13
   84:23 85:9 113:12
   120:5
**anyway** 70:9
**api** 66:2
**apologize** 105:5
**appearance** 105:1
**appearances** 6:2
**appended** 133:7
**applicable** 131:8
**appreciate** 46:15
   87:9 89:22
**approached** 32:18
**appropriate** 42:17
   46:24 51:18,19
   52:15,16,20 55:5
   64:15 65:8,10
   71:15,19 83:2
   90:1 92:21 98:2
   100:18 101:11
   126:22
**approval** 111:21
   111:22,24 112:2,4
   112:4
**approximately**
   1:17 8:5 12:5
   119:5
**arm** 70:15,15
**arranged** 64:20
**articles** 35:21,22
**aside** 22:13 23:18
   25:12 49:15
**asked** 12:24 14:4,4
   17:9 18:8 19:3
   20:6,19 21:14,15
   28:3 30:11 32:20
   33:11 34:11 40:10
   40:21,23 41:17,20

41:23 43:4,4 44:9
   67:24 84:15 88:11
   92:7 96:15 99:2
   100:20 102:2
   104:6 111:5 124:1
**asking** 10:14
   11:13 41:10 96:6
**assessed** 102:13,15
   102:21,23
**assessment** 53:9
**assigned** 39:8
**assistant** 24:17
   38:7,9
**associate** 26:4,6,23
**associated** 35:1
   70:9 74:21
**assume** 11:18
   56:21 64:12
**assumed** 63:21
   74:9
**assuming** 112:7
**assumption** 64:1,7
   75:22 76:3,4
   102:4
**assumptions** 41:9
   63:12,12 74:14,15
**assure** 45:14
**asymptomatic**
   54:8 58:20 59:5
   107:8,15,20
   120:23 121:2
   122:19 123:18,22
   123:23 124:16
**ate** 122:20
**atlanta** 3:16
**attached** 35:22
   36:13 131:11
**attempting** 112:4
**attending** 38:2
**attests** 127:15

**attorney** 10:11
   13:19,24 15:14
   18:1,20 19:3 29:6
   31:14 115:2
   129:18 131:13
**attorneys** 20:10
   29:5 40:10 43:22
   44:1,1 115:3,13
**august** 34:10 88:1
**auspicious** 9:3
**authoritative**
   99:18 100:3,16
   101:9
**automatically**
   125:5
**available** 85:21
   131:6
**avenue** 3:9,21 4:3
**aware** 32:17 43:18
   85:19,21 100:15
   101:9 110:1 126:9
**awhile** 22:5 33:22

**b**

**back** 9:2,16 32:12
   46:14 49:12 55:9
   60:13 64:23 69:22
   81:1 84:2 86:9
   98:4,17,19 99:5,11
   114:11
**background** 55:22
   66:1
**backwards** 36:22
**bacon** 77:8 122:21
**ballpark** 22:17
   96:20
**barnes** 5:8
**barrett's** 81:5
   109:8
**based** 54:2 59:22
   63:7,11 64:1,2,7
   64:16 65:5,7,11,12

66:9,11,19 67:6
   68:10 69:13 70:11
   71:2 76:4,6 82:21
   87:3 90:22,24
   91:3 100:11 102:9
   102:11,12 112:9
   122:11 126:12,21
**basic** 45:14 57:9
   59:7,12 69:11,14
   70:12,21 93:24
   121:13,13,19,21
   122:2,9,12
**basically** 91:3
**basis** 51:14 68:4,5
   72:15 79:5 125:10
**baylen** 2:21
**began** 40:15
**beginning** 9:4 28:3
   32:12 60:13 99:11
   114:11
**behalf** 2:2,7,13,19
   3:1,6,12,18 4:1,6
   4:12,18 5:1,6
   120:9
**behoove** 69:13
   70:4
**believe** 12:15 13:8
   14:15 16:1,13
   18:24 23:13 27:9
   29:2 30:10 31:12
   34:6 36:12 47:14
   47:15,18 50:14
   54:23 55:20 58:8
   62:14 77:4 90:11
   91:22 95:4 97:16
   98:8 117:2 126:14
**ben** 5:14
**benefit** 55:2
**benefits** 49:23
   74:4

[benzene - catenacci's]    Page 4

**benzene** 20:2
**bergen** 5:1 120:10
 120:13
**berne** 5:2
**bernstein** 2:3
**best** 95:3
**better** 28:10 54:11
 105:17
**beyond** 41:10
 69:20
**biliary** 27:6
**bill** 87:24
**billed** 116:20
 117:13 118:3
 119:22
**biopsy** 86:19
**bit** 56:1,22
**blackwell** 4:3
**bladder** 93:1,2,5,7
**blood** 24:22,24
 25:7,10,12,19 26:2
 26:5 45:14 57:10
 71:23 73:11 87:6
 93:23 109:21
 110:9 111:20
 112:2
**board** 127:15
**body** 77:22 85:18
**bone** 25:20 27:21
**booklet** 11:4
**bosick** 4:19
**boston** 4:10
**bottom** 79:20
**boulevard** 2:15
**bowel** 27:6,6
**brando** 26:9
**brca** 45:1 60:22
 107:9 108:10,13
 109:13
**break** 32:1 60:7,10
 73:12 99:5,8

 114:8
**breast** 12:24 22:7
 27:2
**brett** 2:14,17
**brichetto** 1:14
 8:10 129:3 130:7
**brief** 17:8
**briefly** 91:22
**brisbois** 3:3
**broad** 25:23
**brought** 87:24
**brown** 2:19
**btlaw.com.** 5:10
**bucks** 120:1
**building** 24:12
**bunch** 10:14 39:15
**busy** 121:24

**c**

**c** 2:1 97:9 129:2
**ca125** 57:12
**ca929** 57:13
**cabraser** 2:3 33:5
 33:19 115:9
**california** 5:10
**called** 10:4 25:24
 54:4 57:12,13
 71:23 75:11
**calls** 29:10 30:2
 68:16 89:7 96:7
**camber** 3:1
**camden** 1:2
**camera** 8:19
**campus** 38:18
**cancer** 12:24 17:6
 17:7 18:22,23
 19:8 22:7 25:5
 26:21 27:2,3
 44:24 45:3,11,12
 45:18 51:1 53:5
 55:24 56:1,10,13
 56:15,20,20,22

 57:5,6,11,12,13,15
 57:18,23 58:8,11
 58:18,18 59:15,16
 59:20 60:4 61:22
 71:14,16,19 72:21
 80:3,15,19 81:11
 81:13,15 86:22
 87:21 88:16,20
 90:23 91:2,18,23
 92:5,16,21 93:1,3
 93:5,11,12,15,20
 96:10,23 97:3
 98:24 99:1,20
 100:5,18 102:1,6
 102:18,22 103:9
 107:21 108:5
 109:20 112:8,15
 120:20 121:4,7
**cancers** 24:24 25:2
 25:8,14,15,16
 26:15,19 27:4,7,7
 27:14 42:2 66:17
 67:2,4,5,10,14,16
 67:16,20,23 68:6
 68:15,23 69:8
 74:12,12 86:21
 87:14 88:3,15
 91:8,14 92:3,12
 93:3,9,9 97:5
 121:15
**candidate** 73:24
**capable** 28:8
**caption** 129:15
**capture** 127:21
**carcinogen** 68:8
 110:2,19 112:6,6,7
 112:12,20,22,23
 113:1,2
**carcinogenic**
 43:10

**carcinogenicity**
 102:14
**carcinogens** 33:13
 33:14 34:12 42:11
 66:4 72:19 73:2
 112:9
**carcinoma** 45:17
 81:7
**cardiovascular**
 47:6
**care** 22:7 26:4,22
 26:24 27:10 42:15
 42:16 44:18 48:18
 109:2,20 126:7
**career** 48:20 96:19
**cares** 48:22
**caring** 17:4
**carry** 45:3
**carrying** 53:2
**case** 12:7,11,14,16
 12:20 13:2,9 14:5
 14:7,8,14,15 15:8
 15:10,17 16:6
 17:5,15,17,22 18:6
 18:12 19:1 20:8
 22:13 24:1,2
 30:20,23 32:21
 41:23 42:5 44:11
 44:14 104:5
 110:12 115:3
 123:9
**cases** 22:14 23:15
 23:20 27:8 74:3
**cat** 45:20 57:22,24
 61:7 98:24
**categories** 61:10
 61:17 62:4
**category** 27:15
 121:1
**catenacci's** 95:15

caught 72:21
causation 17:12
  19:8 97:6
cause 74:12 97:3,5
  102:18,22 112:8
  129:7
caused 13:4,5
  96:10
causes 102:1,6
causing 74:12
caution 14:21 31:5
  41:8
cell 26:3
center 16:1,3
  27:10 37:1
centers 27:12,13
central 1:10
centre 4:22
century 5:9
certain 21:12
  33:17 42:9 52:15
  60:20 66:3,16
  74:11 75:9,12,23
  76:2 77:5,11
  81:12 86:21 88:15
  91:8,14 95:24
  107:8 108:8,13
  109:15
certainly 45:8
certainty 62:23
  63:10,13,14 80:1
  80:14
certificate 6:14
certification
  111:23 127:13,14
  127:14
certified 1:14
  129:3
certify 94:3,18,24
  95:9 129:4,14,17

cetera 124:13
chairman 39:9
chance 72:22
  104:13
change 119:6
  122:22 132:4,7,10
  132:13,16,19
changes 81:6,13
  131:10 133:6
changing 55:4
charchalis 5:8
  128:23
charge 64:17
  117:14 118:17
charged 119:5
chattanooga 4:4
chemicals 18:21
chemistry 93:24
chemotherapeutic
  75:9
chest 90:8 91:23
chicago 1:16 8:6
  37:5,9,23
chugging 99:14
cincinnati 5:4
circumstances
  69:6
cirrhosis 81:9
  93:15
cite 47:20
claim 13:2,3
claiming 18:19
clarification
  128:10
class 25:23 50:20
  64:18 65:23 67:13
  67:19,19,22 68:14
  68:22 69:7 74:18
  76:1,21 80:3
  81:17 89:8,12,12
  89:15 90:10 97:7

97:21 111:2 124:7
  124:12 127:20
  128:4
classes 67:16
classifications
  19:23
classlawdc.com
  2:11
cleaning 19:14,16
  20:3
clear 18:10 46:12
  83:16
clerkships 38:17
clia 111:23 127:13
  127:14
client 15:14 31:14
clinic 27:23
clinical 38:16,17
  38:22 39:7,7
  45:13 72:4
clinically 85:21
close 27:20 105:6
closer 8:20
closets 21:13
coan 4:8
coldcuts 77:8
colleagues 29:7
college 2:15
cologuard 88:19
colon 49:8,11 53:5
  73:22 88:19 91:18
colonic 45:17
colonoscopies
  45:15 46:21 47:11
  48:19,20 50:11
colonoscopy 45:24
  47:1,5,7 48:10,24
  49:7,12,14,17,19
  52:19,20 53:13
  71:5 73:21 80:22
  88:22 89:4,15

91:11,18 97:12
colons 48:3,10
colorectal 92:4
come 29:4 46:14
  49:18 55:4 99:5
  100:10 109:19
comes 47:22 59:11
  78:14 79:8
comfort 99:5
commencing 1:17
committee 2:13
common 47:10
commonly 20:3
communication
  31:9 116:17 117:8
communications
  31:6,12
community 39:1
  109:3
comorbidities
  46:23 49:15 52:10
  53:19 71:2 89:16
  126:13
comorbidity 71:10
companies 66:3
company 32:19
  111:20
compensated 62:7
complete 30:19
  46:13 133:8
completed 129:16
  131:17
complication 47:8
compound 123:1
comprehensive
  51:1
concern 108:22
concerned 49:4
  108:9 109:19,20
  120:20 121:8,8

[concerning - data]                                                        Page 6

**concerning** 40:2,3
**conclude** 67:4
  127:6
**concluded** 37:21
  96:10
**concludes** 128:15
**conclusion** 15:12
  30:3 68:17 89:8
**condition** 17:10
  109:11
**conditions** 26:3,18
  50:22 57:10 72:13
  73:22 81:8 121:6
  125:6
**conduct** 71:4
**conducting** 74:8
  107:11
**confirming** 62:15
**confusion** 127:24
**congress** 87:24
**connection** 30:23
**consequences** 94:8
  95:13,24
**consider** 48:23
  63:6 65:8,10
  67:10 84:15 89:20
  109:5
**considered** 42:9
  42:21 63:7 65:17
  81:8 97:22 127:17
**considering** 98:1
**consist** 44:19
**consistent** 74:13
**constructed** 66:15
**contact** 33:19,21
  34:4 115:18,22
**contacted** 32:19
  34:3 115:4,14
**containing** 123:20
**contains** 103:22

**contaminants**
  103:9
**contaminated**
  66:4 80:4 81:18
  128:2,7
**contribute** 74:12
**cooperative** 54:4
**copies** 131:14
**copy** 36:9 113:22
  128:17,20
**corporation** 3:18
  5:7
**correct** 19:2 21:23
  21:24 22:1,2,12
  23:16 24:6,7 25:9
  25:17 26:7 29:12
  29:13 30:1 33:20
  34:9,17 35:10
  37:11,12 38:11
  40:8,19 43:7,8,12
  43:13 44:5,12
  46:1,2 48:24
  49:19,20,24 50:3,4
  50:12 53:18 54:16
  54:17,19 55:16
  56:2,16,17 58:9
  60:23,24 64:8,9
  66:17,18,20,21
  67:8,9 68:12
  74:10,15,16 78:5,6
  78:11,12,13 79:9
  79:10,14,17 80:6
  80:16,17 81:19,23
  82:14,15,18,19
  83:10,11,12,18,19
  83:23 86:1,2
  88:16,17,21,23,24
  89:10,17,23 90:15
  91:4,5,9,19,20
  95:7,24 97:7,8,14
  101:7,14 102:6,14

102:15,18,24
103:15,16 104:5
104:11,12 106:16
107:10,13 108:7
114:22,24 116:9
116:10,18,19,22
116:23,24 117:5,6
117:9,10,12,23
118:1,3,4,8,9,16
118:18,19,21
119:4,6,20 121:4,5
121:8 128:4
129:11 133:8
**correcting** 117:9
**corrections** 133:6
**correctly** 9:1
  74:23 80:10 94:16
  120:21
**cough** 59:10
**counsel** 8:12 15:15
  31:6,9,12,13,13
  40:22,23 41:17
  55:12 64:3 129:18
  131:14
**count** 25:20
**country** 50:21
**counts** 26:2
**county** 129:2
**couple** 22:16 28:2
  103:19 120:7,14
**course** 32:3 52:1,8
  73:18 74:1 96:19
  106:7
**court** 1:1,14 6:18
  8:10,14 9:18
  14:11,16 28:13
**courtroom** 14:17
  62:10
**cover** 26:16 67:16
  88:2

**crafted** 106:24
**create** 50:22 62:1
  64:17 103:10
**created** 44:14
  102:8
**credentials** 32:20
**criteria** 54:7
**criticism** 43:7
**criticisms** 101:21
**cross** 106:1 120:16
  127:11
**cs** 131:15
**csr** 130:8
**ct** 90:8,10 91:22
**culbertson** 4:8
**cumulative** 74:19
  74:21 75:1,7,10,12
  75:15,21 76:8,15
  76:17,22,23 78:2
  78:10 79:12,13
  83:9 85:20,24
**current** 24:8 36:11
**currently** 111:21
**curriculum** 7:4
  34:1 36:9
**cursor** 26:1
**custody** 6:17
**cutoff** 15:4
**cv** 36:11,17 37:17
  39:14
**cvs** 5:6
**cystic** 81:13

---
                d
---

**d** 5:2
**d'lesli** 3:20
**d.c.** 2:10
**dallas** 3:22
**dangerous** 43:3
**daniel** 2:20
**data** 47:19 72:16
  72:18 86:22 87:9

[data - diseases]                                                                 Page 7

87:13 98:12,23
99:2,2 103:8
**date** 8:4 132:24
133:12
**dated** 117:4 118:5
119:22
**dates** 20:21
**davis** 3:20
**day** 54:9,9 130:2
133:15
**days** 117:3 131:17
**deadline** 117:19
**deal** 25:2,5,7,10
26:14,19 124:4
**dealing** 124:6
**dealt** 20:11 26:6
39:17
**death** 17:21 54:13
**december** 118:6,6
118:7 119:9,22,23
**decide** 51:18,19
126:21
**decided** 126:12
**deciding** 52:4,13
89:21
**decision** 53:12
89:23 123:14
**decisions** 59:22
**declare** 133:4
**declined** 72:9
**deemed** 133:6
**defendant** 3:1,6,12
3:18 4:1,6 5:1,6
15:12,19 17:17
18:6 23:4,5,8,10
23:12 101:21
105:1
**defendants** 4:12
23:8 102:18,22
105:4 127:1,8

**define** 33:14
**definition** 89:8
97:20 98:8
**degree** 53:5 62:23
80:1,14 109:6,15
**deleterious** 109:16
**demise** 13:5
**depend** 123:3
**depending** 45:6
58:2
**depends** 58:6,8
59:17 72:4 124:20
**deponent** 131:13
133:3
**deposed** 12:4 17:9
17:12 18:16 21:20
**deposing** 131:13
**deposition** 1:7 7:3
8:5 10:18 14:10
14:12,13 16:9,14
17:3 18:2 21:17
22:15,16,24 28:15
29:10,12 36:17
62:10 104:14
119:13,16,17,19
128:15 129:14
**depositions** 12:3
18:14,16 20:19
21:19 24:5
**describing** 85:9
**description** 7:2
**deserve** 68:9
**deserves** 70:12
**design** 61:2
**designed** 55:23
56:5 57:10,17
60:19,21 61:16,18
**desires** 52:11
53:20
**destined** 94:6

**detail** 44:22 124:5
**detailed** 94:4
95:15 122:2
**details** 12:19
15:16 16:4 41:22
42:4,5,6 52:7
65:23 95:20
**detect** 57:18 81:7
86:21 87:13 88:3
88:15 91:8,14
92:21 93:8
**detected** 93:16
**detecting** 91:18
92:14 99:1
**detection** 81:5,6
86:18
**determination**
97:2,5 100:12
123:8
**determine** 54:3
71:20 85:20 93:7
124:12
**determined** 79:13
99:18 100:4,17
101:1,1,10
**determining** 52:15
90:5,5
**develop** 33:11
34:11 40:10,23
41:5,17 42:16
43:5 44:9 51:4
94:6 106:3
**developed** 44:16
45:3,12 72:20
110:15
**developing** 33:16
42:1,10 44:18,24
45:16 59:15,24
76:2 80:3,15,19
81:11,11

**development**
18:22 45:18 65:8
**diagnosed** 53:2
**diagnosis** 13:4
17:11 121:4
**diagnostic** 80:2,14
**died** 9:1
**diet** 74:20 76:16
76:23 77:3,17
78:4,15 79:9
82:21 123:19
**dietary** 74:22
125:4
**difference** 56:18
112:5,21
**different** 30:5 57:5
59:19,20,20 60:1
63:13 69:13 70:5
70:5,16,17,20 80:8
82:3,12 87:8
123:22 125:11
**differently** 56:11
**difficult** 124:22
**direct** 10:6
**direction** 51:17
**disclose** 31:6
**discovered** 122:3
**discuss** 91:21
**discussed** 34:24
64:5 71:9 103:22
104:1,10 125:12
**discussing** 32:21
78:22 118:12
**discussion** 9:14
32:9
**disease** 13:4 26:3
27:9 47:7 52:8
72:23
**diseases** 65:12
70:8

disorders  24:22
  25:7,10,13,20 26:6
  109:21
distinction  59:8
distinctions  58:19
  59:4
district  1:1,2
diverticulitis
  73:23
diverticulosis
  73:24
dlesli.davis  3:23
dna  91:12
doctor  15:21,23,24
  17:13 18:4,5,5
  36:6,22 43:19
  48:22 49:2,4 50:7
  60:15 67:12 70:4
  90:5 91:6 94:2
  96:9 98:11 101:20
  103:17 104:3
  105:22 106:23
  107:6 108:21
  109:22 112:5
  113:10 114:14
  120:8 122:6
  125:13,16 126:7
  126:12,23
doctor's  70:13
  126:15
doctors  15:24
  89:19 121:24
document  90:12
documented
  106:10
documents  22:19
  29:14,17,18,21
doing  19:19 22:6
  54:1,10 57:21
  62:16 72:24 82:9
  98:8 111:11,12

122:16 127:7
dosage  63:24
  74:10
dose  61:7 90:8
  98:24
double  30:11
dr  7:5,7 10:8 26:9
  28:22 32:16 95:15
  99:13 105:13
  127:13
draft  40:10 55:10
drafts  31:3,16,18
draw  73:11 111:19
drive  1:15 7:6 8:6
  103:21
dropped  14:15,18
  15:8
drug  43:7 75:11
  100:11 124:8
drugs  39:21 40:7
  40:13,17 75:10,24
  103:8
duane  4:15 105:3
duanemorris.com
  4:17
ductal  81:7,13
due  94:6 118:20
duly  10:4 129:6
duration  64:1
  74:10
dysplasias  25:22
dysplastic  25:21

e

e  2:1,1 33:22 132:3
  132:3,3
earlier  40:22
  87:14 88:3 92:22
  93:9 99:1 115:10
  120:18
early  72:21 86:18
  92:14

east  3:3 5:9
eastern  54:4
ecog  54:4,6
edward  1:8 6:6
  8:8 10:3 129:5
  131:5 132:2,24
  133:2,4,12
effect  43:10
efficiently  64:14
eight  22:22,23
  23:2
eighty  96:24
either  18:11 20:24
  22:18 48:4 109:1
  126:7 129:18
elderly  47:6 49:7
  72:20
electronic  128:20
  128:24
elements  108:9
ellie  3:19
ellie.norris  3:23
employed  24:16
endogenous  82:21
endoscopy  81:5
  88:23 89:4,16
english  76:7
ensure  64:14
entail  38:12,14
entire  30:20
entitled  1:13
enzymes  93:21
  94:1
epidemiologic
  112:10
equal  80:5 81:21
  82:18
equipped  27:22
errata  131:11,13
  131:17

erratas  131:15
errors  55:17
esophageal  86:22
  88:15 91:9,14
  92:4,11
esophagus  27:5
  81:6 109:8
especially  53:23
  65:22
established  42:6
  42:20,23 55:3
  64:13 66:2,7,8,9
estimate  22:17
  90:22,24,24
estimated  91:1
et  8:8 124:13
  131:4 132:1 133:1
evaluate  59:11
evaluated  56:12
  74:2 79:12 111:15
evaluating  84:16
  85:13,15 87:22
evaluation  42:13
  53:14,22 57:8
  59:9 78:18 81:9
  81:12 123:13
  124:11
evaluations  87:6
event  129:19
everybody  70:12
  122:2
evidence  68:5
exact  48:6 118:11
  128:4
exactly  12:21 17:7
  47:16,18 54:22
  58:13 90:6 103:7
  115:21
exam  45:13,13
  57:8 71:22 92:19
  121:13,20

examination 6:6 10:6 71:21 93:6 106:1 114:12 120:16 125:19 127:11
examinations 93:17
examined 10:5
example 45:8 47:3 57:11 59:9 60:3 71:5,14 80:22 98:23 109:8
examples 92:11,13
exams 45:13 110:9
excluded 68:14,22
exclusively 26:15
excuse 40:22 94:10
executive 2:13
exhibit 6:17 7:3,4 7:5,6,7 28:14,16 28:23 36:1,3,6,7 43:15,16,19 55:8 103:21,23 113:16 113:17 114:14,16 127:20
exhibits 6:4 7:1 36:15
exists 80:1 100:10
expectation 72:14
experience 38:16 39:1 42:15 44:22 47:23 51:21
expert 12:14,15,24 18:17 21:22 22:4 22:11,14,18 23:3 24:1 32:19 33:18 33:24 34:21 42:7 42:20 55:22
expert's 35:3

expertise 63:11
experts 34:24 35:8 35:9 42:23 43:10 50:20 64:6,8 65:6 66:20 67:3,8 68:11 74:9 78:17 79:6,7 83:17 91:1 91:4 103:14
explain 45:7 52:18 66:22,24
explore 69:16
exposed 18:21 19:7 33:13,17 34:12 42:9,12 72:19 73:1 77:2,5 82:8 123:15
exposure 18:19 67:6 68:7,8 70:10 70:10 75:1,2,7,9,9 75:11,13,23,24 76:17 78:2,10 79:1,3,12,13 80:4 80:5,10 81:18,21 82:5,13,17 83:1,15 83:22 84:11 85:8 90:4,16,20,22,23 99:19 100:4,19 101:11 110:18,22 124:13 126:10
exposure's 60:3
exposures 58:21 74:21 76:24 94:7 95:11 110:5
express 4:1
extent 16:18,23 30:2 34:14 68:16 94:9
extra 110:4 120:1

**f**
faced 80:3
facilities 27:10
facility 27:24
fact 17:4,19 98:13 102:10
factor 53:9,12 78:15
factors 54:2
factory 19:15
facts 41:9 104:10
faculty 37:22 39:12
fails 131:19
fair 48:8 53:4 116:2
fairly 20:2
familiar 33:5 75:14 77:19
families 45:2
family 52:12,14,17 53:1 61:20,21 109:2 126:8
fatty 81:10 93:16
fault 17:12
favor 15:11
fda 100:11 111:21 111:22,24 112:2,3 112:4
fecal 91:12
feel 104:13
feeling 105:20
fellows 38:24
fellowship 37:8,13 37:19,20
felt 41:23 92:20
fhs 4:23
figure 47:20,22
file 30:20 34:2
files 103:22

final 118:5
find 14:2,4 19:7,10 20:20 81:12,12 122:11
finding 121:22
findings 109:8
finish 14:22 50:6
firm 2:15 13:22 33:1,3,4 105:1
firms 33:6
first 10:4 12:4 22:9 23:24 28:14 29:1 32:16 34:3 53:4 55:21 58:16 66:16 71:17 76:12 81:22 89:3 92:10 103:19 115:6,7,14 115:17,21 129:6
fit 54:3 72:5 73:3
five 38:4 60:6 71:5 88:22,23 89:5,16 97:12 99:11 114:7 117:3
floor 2:4 4:9,22
florida 2:22
focus 70:8 121:14
folks 36:18 43:18 113:20
follow 45:2,10,12 45:17 51:10,13 61:4,6 90:5 109:12,23 120:15
followed 27:13 109:18
following 67:2
follows 10:5
food 77:5,7
foods 77:8 123:19
foregoing 129:11 129:15 133:5

**form** 91:7
**formally** 127:6
**forming** 63:21
**formulate** 106:18
**forth** 127:21
**found** 15:11 78:18
  78:21
**four** 10:22 16:14
  29:2 54:8,12,13
  58:5 60:13 66:19
  67:3 68:10 99:7
  106:6 114:19
**frame** 116:16
  117:20
**frank** 4:20 128:19
**frequently** 55:24
  57:22,24 58:1
**fresh** 77:10
**friend** 14:3
**front** 33:8 114:19
  124:21
**fruit** 77:10
**fulbright** 3:20
**full** 38:4 39:12
**fully** 28:8
**function** 94:1
**functional** 52:10
  54:10
**fund** 64:13
**funded** 64:20
**funding** 64:15
**further** 66:14
  91:21 125:14
  129:14,17

**g**

**gallbladder** 27:6
**galleri** 86:16,16,17
  86:20,23 87:9,13
  87:20 88:9,14
  91:8,13,13 92:10
  92:15,16 93:8,13

93:14 111:8,9,21
  111:22
**galleri's** 87:10
  92:15
**gammopathy**
  25:24
**gastroesophageal**
  17:6
**gastrointest** 45:17
**gastrointestinal**
  27:2,4 45:10
**gauge** 54:2
**gcoan** 4:11
**geman** 2:3 6:12
  8:24 9:5,8 14:21
  14:24 15:2,4
  16:18,21 20:16
  21:2 28:20 30:2
  30:14 31:1,5
  34:14 41:8,12,20
  46:7,10,16 48:15
  53:7 56:7 58:22
  63:1 67:24 68:16
  69:1,9,18 70:18
  71:7 73:9 78:7
  81:24 83:24 84:6
  84:8,12,20 85:10
  86:3,8,24 87:11
  88:11 89:6 92:6
  94:9,11,14,22
  95:14 96:1,7,15
  99:21 100:7,20
  101:12 103:3,5
  104:15,24 105:2
  105:11 106:19
  107:22 110:13,23
  113:3,19,22
  115:11,19 116:4,7
  122:24 123:10
  124:1,18 125:7,22
  126:16,24 127:6

127:10,12 128:9
  131:1
**gene** 45:1 53:3
**general** 26:2 53:14
  57:7 58:12 60:2
  73:14 109:3,5,6
  121:23 126:8
**generally** 13:24
  51:10,11
**genetic** 44:24 45:3
  45:9 53:11 60:21
  61:21 107:8,12,16
  107:21 108:8
  109:9,11,11,13
  121:6
**genetics** 108:13
**geoffrey** 4:8
**geoppinger** 5:2
  6:10 120:7,9,12,13
  120:17 123:6,11
  124:14 125:1,13
**georgia** 3:16 4:3
**getting** 45:15
  58:15 62:12
  121:22
**gi** 27:3 89:4
**give** 12:19 40:24
  41:18 47:3 104:23
  125:2
**given** 24:4 29:5
  66:10,12,13 72:22
  127:15 129:8,12
  133:9
**giving** 71:13
**glad** 49:2
**glenn** 3:8 10:10
**go** 8:21 9:6,10,11
  11:18 21:14 22:16
  32:6 36:22,23
  41:7 55:21 63:20
  79:20 98:17 105:6

110:11 111:8
  114:3,4 122:3
**goes** 10:23 59:8
**going** 10:14 11:1,2
  11:17 20:19 21:15
  28:13 31:5 43:14
  49:11 50:18 53:23
  53:24 54:15 56:11
  59:10 60:1 63:4,6
  70:15 86:3 99:14
  102:20 103:17,17
  104:8,18,23
  109:17 122:18
**gonna** 70:13
**good** 8:1 10:8,9
  48:22 49:2 50:7
  72:5 73:24 92:13
  92:15 105:13
  120:8,12 121:20
  121:21
**gordon** 4:19
**gosh** 116:5
**graduate** 36:24
**graduated** 37:2
**grant** 4:21
**great** 8:22 36:20
  88:4
**greater** 81:21
  82:18
**greenberg** 3:9,14
  10:13
**gross** 24:9
**group** 15:24 41:24
  42:1 54:5 56:10
  62:2 110:16
**gtlaw.com** 3:11,11
  3:17
**guaranteeing**
  94:21
**guess** 102:8
  117:13

**guessing** 48:4
**guidance** 40:24
  41:19
**guide** 54:14 90:4
**guideline** 90:3,6
  126:11,19
**guidelines** 50:15
  51:10,12 54:21,23
  61:4,6 65:16,17,20
  65:21 87:16 88:7
  89:18 97:17
  109:23 126:20
**gynecologist** 45:19

**h**

**h** 1:8 2:9 6:6 8:8
  10:3 129:5 131:5
  132:2,3,24 133:2,4
  133:12
**habit** 11:22 97:4
**hand** 28:13 130:1
**handed** 36:7
**handful** 108:23
**handle** 27:8,22
  36:15
**hang** 32:5,5
**happen** 47:19
  108:23
**happening** 73:21
**happens** 105:21
**head** 11:8 81:14
  101:18
**healthcare** 4:13
**healthy** 56:12 82:9
**hear** 16:20 65:14
  105:13,15 108:11
  120:20 122:5
  123:4
**heard** 41:11
**heavy** 61:1,3,5
  70:8

**heimann** 2:3
**held** 1:15 8:6
**heller** 5:14
**help** 51:17 54:14
  90:4 92:21 93:18
**hematology** 24:19
  24:20,21 25:4
  26:16 37:8,16
  38:1
**hemophilia** 26:3
**hepatic** 93:16
**hepatocellular**
  81:11
**hereto** 133:7
**hereunto** 130:1
**high** 42:1 44:23
  45:15 55:24 57:5
  57:23 58:8,11,18
  59:24 61:22 97:13
  97:15,17
**higher** 67:6
**hinshaw** 4:8
**hinshawlaw.com**
  4:11
**histories** 61:21
**history** 42:7 45:14
  46:23 52:12,14,17
  53:1 57:8,14 62:3
  70:11,13 71:2,20
  89:17 92:19 93:4
  93:17 121:22
  125:3,4,10 126:13
**hold** 80:13 104:4,7
**hollis** 2:15
**hollislawfirm.com**
  2:17
**home** 20:4,24
**honestly** 14:20
**hospital** 16:1,2
  24:11 39:13

**hour** 60:7 62:10
  62:11,12 116:21
  117:13 118:3
  119:19,22 120:1
**hourly** 62:8,8,9
**hours** 106:8,11,21
  116:15 117:11
  118:14 119:2,11
  119:14,22
**house** 21:13
**hp** 105:4
**huahai** 4:12
**hudson** 2:4
**hum** 23:23
**human** 110:1,19
  112:6,6,7,9,11,15
  112:22 113:1,2
**humans** 99:20
  100:6,18 112:8
**husch** 4:3
**huschblackwell....**
  4:5
**hypothetical**
  84:13 113:4
  122:19 123:1,17
  124:2 125:8
  126:17

**i**

**i.e.** 128:3
**idea** 79:8 83:12
  119:11
**identical** 113:23
**identification**
  63:23
**identified** 7:2
  33:15 35:9 42:1
  46:19 59:13 63:23
  67:1,5 92:2
  109:11,12,17
  121:9 124:7 128:6

**identify** 66:16
  78:14
**illinois** 1:15,16 8:6
  24:9 37:2 129:1
**illnesses** 25:23
**impact** 127:17
**important** 79:4
**improve** 94:5,20
**inaudible** 128:23
**include** 27:1 45:13
  57:21 71:20,21,22
  71:23 84:23 85:3
  87:5 90:8 93:23
  106:12 123:19
**included** 93:4
**includes** 24:15
  44:23 92:18 93:24
  106:12 121:13
**including** 96:3
  119:16,17 123:14
**incomplete** 84:12
  113:3 122:24
  124:2 125:7
  126:16
**increase** 33:16
  70:10 74:11
  112:14
**increased** 42:21
  68:7 74:22 80:10
  82:16
**independent** 13:23
  42:22 43:3 123:14
**independently**
  79:12 102:13,15
  102:21,23
**index** 6:1,4 7:1
**indigenous** 77:19
  78:1,5,15,19 79:9
**individual** 51:14
  59:22 69:12,17
  70:14 71:3 89:24

90:6 121:17 123:8
124:8 126:20,21
**individually** 74:2
**individuals** 73:17
**infection** 73:12
**inflation** 119:24
**information** 32:20
33:21 34:1,22,23
64:2,4,5 122:20
**ingested** 74:19
76:21
**initial** 123:13
**initially** 115:5
**inpatient** 27:19
**input** 55:12
**insist** 88:1
**insitu** 81:7
**instance** 71:13
**institute** 32:19
33:18
**instruction** 41:1
41:18
**intake** 125:4 128:7
**intend** 111:10,12
**intense** 62:1
**interaction** 15:13
**interested** 32:19
33:23,24 129:19
**internal** 37:10
108:24 109:4
**internist** 109:5,6
121:14
**internship** 37:4,6
**interrupt** 45:21
**intervention** 64:15
**introduce** 32:24
**introduced** 32:22
**investigated** 100:9
**investigational**
51:22

**invited** 39:16 40:1
**invoice** 116:3,13
116:23 117:3,21
118:2,5,15 119:21
**invoices** 7:7
113:21 114:17,18
115:23 119:8
**involved** 19:14
24:23 32:23 44:17
51:22 87:23 115:3
**irbesartan** 1:4
**isidro** 3:8 10:13
36:19 104:20
114:3 127:5
128:24
**isidron** 3:11
**issue** 79:4 107:12
**issues** 15:15 17:10
25:19 107:8,16,21
108:9

**j**

**j** 2:3 131:1
**james** 4:2
**james.spung** 4:5
**january** 1:9,16 8:4
130:2 131:3
**jason** 4:21
**jeff** 5:2 120:9,13
**jersey** 1:2
**jgeoppinger** 5:5
**joined** 37:22
**judgment** 50:1
126:15
**jump** 86:3
**justify** 103:10

**k**

**k** 129:2
**kansas** 2:16
**kaplan** 1:8 6:6 7:5
8:9 10:3,8 28:22

32:16 48:2 99:13
105:13 127:13
129:5 131:5 132:2
132:24 133:2,4,12
**kaplan's** 7:7
**karnofsky** 54:6
**kate** 3:14
**keep** 99:14
**kelly** 1:14 8:10
129:3 130:7
**kerner** 3:8 6:7,9
8:18,22 9:3,7,9,11
10:7,10 15:1,3,7
16:20 17:14 20:22
21:6 28:18,21
30:5,7,15 31:7,10
32:3,5,13 34:16
36:1,5,15,20,21
41:7,10,11,13,15
41:16 42:3 46:14
46:17 48:16 53:15
56:14 59:2 60:6
60:14 63:8 64:23
65:3 68:3,20 69:5
69:22 70:3,22
71:12 73:16 78:8
81:1,16 82:2 84:2
84:7,9,17 85:4,14
86:9,12 87:15
88:4,6,12,13 89:9
92:23 94:10,13,15
95:1,17,21 96:8,18
98:4,10 99:4,12
100:1,14 101:5,13
101:16,18,19
103:4,12 104:18
105:10 113:12,20
114:2,4,13 115:16
116:1,5,8 120:3,5
125:15 127:8
128:12

**kernerg** 3:11
**kidney** 94:1
**kind** 12:7 18:23
22:8 25:10,22
26:19 42:13 85:7
100:5,17
**kit** 111:19,20
**kleinman** 26:9,10
26:10
**knew** 20:18 21:15
50:17
**know** 10:23 13:17
14:18 15:9 16:2
16:11 19:16 21:19
29:23 31:11 41:13
47:16,18,22 48:1,6
48:9,12,13 64:21
66:8,8 75:16,18
77:13,18 82:20,22
83:8 87:19,21
88:7 100:9,11,13
101:3 104:1,9
109:2 112:5,11,17
118:11 121:17
**knowledge** 64:19
76:7 95:4
**known** 33:13,14
34:12 91:13
109:15,16 110:1
110:19 112:6,7,20
112:22 113:2

**l**

**laboratories** 4:18
**laboratory** 57:9
92:18 93:6,17,19
93:23 112:23
121:21
**labs** 94:1
**language** 63:2
76:7

laptops  8:19
large  27:6 111:4
late  13:4
law  2:15 33:1,3,4
 33:6
lawyers  34:4
 114:17 118:13
lay  63:12
laying  21:11
layman's  14:19
lchb.com  2:6
 131:2
lct  81:21 82:18,20
 83:1,21 84:10
 85:9,16 89:2
learned  81:22 89:3
 111:14,15
lectures  39:16
 40:1
led  67:3 103:9
left  39:11
legal  8:3,11 30:3
 32:22 42:13 44:11
 68:17 89:8 131:23
leukemia  26:22
 27:8,17,19
leukemias  25:13
level  75:23 77:14
 77:16 80:4 85:2
 124:13
levels  33:17 42:11
 63:24 68:8 74:10
 78:21 79:2 83:14
 85:1,17 124:6
levin  2:20
lewis  3:3
lewisbrisbois.co...
 3:5
liability  1:4
license  130:8

lieff  2:3 33:5,19
 115:9
life  17:9 75:12
lifetime  22:20
 74:21 75:1,7,11,14
 75:21 76:8,17,23
 78:2,10 79:11,13
 83:9 85:20,23
likelihood  97:22
likewise  14:24
limit  71:17 117:18
limited  40:19
limits  73:14
line  132:4,7,10,13
 132:16,19
link  19:8 82:17
linked  19:11 53:1
liquid  86:19
list  71:14
listed  92:13 93:3
 125:6
listing  92:11
literally  8:24 9:1
 55:15
literature  19:17
 48:6 51:21 65:13
 99:17 100:3,10,16
 100:23 101:2,9,15
 106:13 116:17
 117:8
litigation  1:4
 10:12,16,17 21:21
 21:22 22:3 23:19
 32:17 40:11,12,15
 42:8 79:19 89:3
 107:1 120:14
little  34:9 56:1,11
 56:22 60:7 66:14
 87:7 91:21 105:15
 108:4 122:1,1

liver  27:7 81:9,10
 93:11,12,15,16,20
 93:21,24
llc  4:13
llp  2:9 3:9,14,20
 4:3,8,15,20 5:2
logistically  64:21
long  22:10 34:2,4
 106:3,17
longer  122:1
longevity  72:14
look  8:23 18:8
 20:13 52:2 55:6
 63:2 69:13,16
 70:5,6,14,15 81:9
 92:18 103:24
 105:18
looked  19:12
 21:12
looking  21:14
 28:18 31:16,18
 39:14 41:3 62:18
 91:10 103:8
 108:21
looks  116:14 119:1
los  5:10
losartan  1:3 8:8
 131:4 132:1 133:1
lot  14:4 19:13,15
 19:16,17 55:3
 104:2 105:21
 120:24 122:20
lotman  4:14 6:8,11
 104:22,22 105:3,3
 105:12,17,20
 106:2,22 108:1
 110:17 111:6
 113:8 120:18
 125:16,17,20
 126:2,23 128:21
 128:21

low  25:19 26:2
 61:7 90:8 98:24
lower  78:20
loyola  37:1
ltc  80:5
lung  27:2 57:22
 90:23 91:2,23
 92:4 98:24
lymphomas  25:13
 27:3
lynch  45:1,8,22
 46:4,5,18,20 47:4
 49:14,22 50:10
 52:21,22,24 60:22
 109:9

**m**

m  4:8
m.d.  1:8 6:6 8:9
 10:3 129:5
mail  33:22
main  97:19
maintained  38:6
 39:12
majority  26:24
 27:12 78:19
making  97:4
male  72:7
males  71:17
malignancies  27:2
 33:16 42:10 45:4
 45:10 59:24 94:6
malignancy  50:20
malignant  25:12
 81:6,8 97:18
malpractice  12:8
 12:9,10 13:24
 22:14 23:14,19
 24:2
mammogram  81:7
man  72:16 73:4

**manner**  100:12
**manufactured**
  43:2 66:2
**manufacturers**
  63:23 66:3
**mark**  28:14 36:1
  43:14 103:21,23
  113:16 114:14
**marked**  28:16,23
  36:3,6 43:16 55:8
  113:17 127:20
**marker**  57:12,13
**marlon**  26:9,9
**marrow**  25:20
  27:21
**massachusetts**
  4:10
**materials**  42:8
**matter**  1:13 8:7
  62:8
**maywood**  37:2
**mcharchalis**  5:10
**mckesson**  3:18
**md**  131:5 132:2,24
  133:2,4,12
**mdl**  1:3
**mean**  11:15 14:19
  38:21 44:20 48:13
  48:17 53:21 55:15
  57:8 58:1,2 59:17
  62:24 63:9 69:20
  75:17,18 80:18
  82:14 94:18,24
  98:23 101:6 112:8
  114:1 124:11
**meaning**  80:5
**means**  57:3 75:16
  75:18,22 82:6
  95:3
**meant**  15:9

**measure**  52:9
**media**  9:17 32:8
  32:12 60:9,13
  99:7,11 114:7,11
  128:14
**medical**  12:9,10
  14:5 16:1,3 19:4,5
  23:19 24:2 36:23
  37:1 38:1 42:14
  44:10,11,15,16
  50:1 63:11,14
  64:12,17 67:13
  71:2 72:13 74:18
  75:5 76:9 79:21
  80:1,14 82:7 95:3
  99:17,20 100:2,5
  100:16,17,23
  101:9,10 106:4,24
  107:3 109:7 113:1
  126:13 128:5
**medically**  64:21
  65:4,7
**medicare**  88:1,1
**medication**  28:4
**medicine**  37:10
  38:7,10 109:1,4
**meet**  50:21
**meetings**  8:7
  115:15
**member**  67:13,22
  76:21 89:12,12,15
  90:10 109:1
**members**  67:19,19
  68:14,22 69:7
  74:18 97:7,21
  128:4
**memory**  28:5
**mention**  55:22
  66:15 73:23 77:23
  86:20 91:12,13

**mentioned**  22:13
  26:18 27:3 52:22
  53:19,19,20 60:19
  61:15 70:7 72:12
  88:14 93:14 109:9
  120:19
**merit**  67:2
**merited**  67:4
**met**  10:10
**metastatic**  72:23
**methods**  54:4
**mgus**  26:1
**midway**  94:3
**migliaccio**  2:8,9
  114:21 115:17
**mild**  25:21,21
**mind**  58:13
**mine**  14:3
**ministerial**  103:19
**minute**  60:6 99:5
  104:23
**minutes**  10:11
  49:5
**misdiagnosed**  13:4
**misspoke**  40:22
**misstate**  42:19
**misstates**  16:19,23
  21:2 34:15 81:24
  83:24 84:20 89:6
  89:7,7 92:6 95:14
  110:23 115:11
**misunderstandin...**
  11:20
**mitchell**  2:20 5:8
  128:24
**mitigate**  80:2,15
**moderately**  97:13
  97:15,17
**modified**  83:21
**modify**  82:23

**modifying**  84:18
  84:19,22
**moment**  44:8,9
**monday**  29:17
  30:1 103:23
**monitor**  45:4
  55:24 60:5 85:22
**monitored**  56:11
  65:24 68:9 109:15
  121:13
**monitoring**  27:20
  33:12 34:11 40:24
  41:18,24 42:14,14
  42:17 43:5 44:10
  44:11,15,17,18,19
  44:20 50:24 58:12
  64:13,18 66:15
  67:2,4,13 74:18
  79:21 82:7 85:1
  85:12 94:4,19
  95:12 99:20 100:5
  100:17,24 101:4
  101:10 102:8
  106:4,24 107:4,12
  108:14 113:1
  124:11 127:22
  128:1,6
**monoclonal**  25:24
**month**  106:5
**months**  34:8 58:5
  58:5,5
**morbidity**  98:9
  99:1
**morning**  8:1 10:8
  10:9,15
**morris**  4:15 105:3
**mortality**  97:23
  98:9 99:1
**move**  8:19 62:6
  86:13 88:4 103:17

**multiple** 25:22
26:1 109:10
**mutation** 109:16
109:16
**mutations** 61:23
61:24 108:9
**myeloma** 25:22
26:2
**mylan** 4:18,18

**n**

**n** 2:1
**name** 8:2,8 10:10
13:19,22 14:1
15:17,19,21 18:1,4
18:11 20:7 26:8
120:8,13
**named** 129:5
**names** 20:12,18,21
33:8 108:20
**national** 48:1
50:17 51:1
**naturally** 77:9
78:19
**nccn** 50:14,16,17
54:20 61:9 65:17
65:20,21 87:16
97:16 126:19
**ndea** 39:18 40:3
40:12,17 63:24
66:4 67:7 75:3
79:14 86:2 96:11
99:19 100:4,19
101:6,7,11 102:1,6
102:14
**ndma** 39:18 40:3
40:12,16 42:22
63:24 66:4 67:6
74:19 75:2 76:16
76:22 77:2,14,16
77:19,22 78:1,5,14
78:16,18 79:8,13

82:21 85:24 90:20
96:10 99:19 100:4
100:19 101:6,7,10
101:11,24 102:6
102:14 123:19
125:4,5
**ne** 2:9 3:15
**near** 54:13
**necessarily** 49:12
53:11,12 57:15
58:10 125:11
**necessary** 69:11
133:6
**necessitate** 58:15
**necessitates** 99:19
100:5
**need** 9:7,8,9 11:10
20:13 31:4,15
53:10 63:1 69:7
99:4 121:20,20,21
124:10
**needed** 19:20
**needle** 73:12 96:4
**needs** 56:12
**negative** 30:11
94:8 95:13,23
**neoplasms** 25:21
**network** 51:2
**never** 96:12
101:15
**new** 1:2 2:5,5 3:10
3:10 10:10 55:4
**nicholas** 2:8
114:20
**nigh** 2:20
**nilda** 3:8 10:13
**nine** 67:4,5,14,16
67:16,20,23 68:15
68:23 69:8
**nitrates** 77:9

**nitrosamine** 35:1
77:4 85:24
**nitrosamines** 77:5
83:2 85:18 90:20
110:22
**nmigliaccio** 2:11
**nod** 11:8
**non** 25:16 128:4
**nonresponsive**
88:5
**normal** 54:9,11
82:9
**norris** 3:19
**north** 13:11
**northshore** 39:9
39:10,13
**northwestern**
13:11 37:5,9,14
**norton** 3:20
**nortonrosefulbri...**
3:23,23
**notary** 133:13,19
**note** 94:11 119:21
131:10
**noted** 8:12 133:7
**notes** 1:12 50:6
**notice** 1:18 7:3
28:15 29:11 36:17
**november** 114:1,1
116:13,15 117:4,5
117:5,22 119:23
**number** 7:2 22:19
30:19 38:18 50:14
54:2 60:4 71:14
97:1 110:7
**numbers** 108:20
111:4
**nurses** 24:16

**o**

**o** 129:2,2
**oath** 10:24
**object** 46:10 94:9
**objection** 16:18,23
20:16 21:2 30:2
30:14 31:1 34:14
41:20 48:15 53:7
56:7 58:22 67:24
68:16 69:1,9,18
70:18 71:7 73:9
78:7 81:24 83:24
84:12,20 85:10
86:8,24 88:11
89:6 92:6 94:22
95:14 96:1,7,15
99:21 100:7,20
101:12 104:15
106:19 107:22
110:13,23 113:3
115:11,19 122:24
123:10 124:1,18
125:7,22 126:16
**objections** 30:4
**obviously** 11:1
60:16
**occasionally** 45:20
**occasions** 21:16
23:10
**occurring** 77:9
78:19
**october** 34:6,7
113:23 114:1
116:2,5,15
**offered** 71:11
**offering** 101:20,24
102:5,8,9,17
**offhand** 20:12
**office** 17:24 20:24
21:19 24:11,12
27:23 38:16 82:10

[office - patient's]                                                      Page 16

112:2
**oftentimes** 27:19
**oh** 14:23 27:3
  113:24 116:5
**ohio** 5:4
**okay** 10:23 11:12
  11:16,20,21 12:2
  13:16,18 15:17
  16:5,8,13 17:22
  18:10 20:23 21:16
  23:2 26:14,19
  30:5 31:19 32:16
  37:20 39:14 40:22
  41:13 42:18 43:6
  43:14,19 44:8
  53:16 55:6,7,10,21
  57:19 58:16 59:3
  60:6,15 61:15
  62:6,21 64:12
  66:11,14 70:4
  71:13,18 73:6
  74:3 76:8 82:11
  88:19 89:22 90:14
  91:17 92:1 94:2
  94:18 97:1 98:16
  99:4 100:15
  104:10,18 105:14
  106:7,12 107:14
  108:3,19 109:22
  110:4 112:11,24
  113:8 114:2,14,20
  115:4,9 116:2,20
  118:14 119:1,3,7
  119:18 120:3,4
  121:10 122:9,14
  122:18 123:17
  127:19 128:9,11
**old** 20:21,24 21:8
  71:24 72:3,16
  73:4

**once** 90:10
**oncologist** 14:5
  26:11,13 108:22
  109:7 126:7
**oncology** 24:18,19
  25:4 37:8,16 38:1
  39:1,7,9 53:23
  54:5 108:24
**one's** 74:11
**ones** 33:7 45:11
  115:7
**opine** 14:6 18:20
  102:2 103:8
**opined** 91:4
**opining** 17:11 48:5
  97:6 101:23
  102:24 103:1
**opinion** 67:12,18
  68:4,5 79:21,24
  80:13 82:23 83:20
  84:19,19,22 89:6
  90:19,19 95:6
  101:24 102:5,9,17
**opinions** 10:16
  62:22 63:5,21
  74:15 101:21
  104:4,7,11,14
  106:18
**opportunity** 96:12
**order** 74:17 92:21
  103:10 109:6
  111:16,18
**ordered** 111:13
**ordering** 45:19
**oregon** 13:12
**organization**
  50:19 87:17,19
  88:8
**outcomes** 94:5,20
**outline** 65:22

**outlined** 65:13,15
  67:15 68:15,24
  69:21 97:16 110:9
  126:6
**outlines** 65:23
**outlining** 90:3
**outpatient** 27:23
  27:23
**outside** 40:12
**outweigh** 74:4
**ovarian** 57:11
**overall** 119:1
**overland** 2:16
**oxford** 4:22

## p

**p** 2:1,1
**p.m.** 114:10
  128:13
**pa** 2:21
**page** 63:20 79:20
  86:13,19 90:13
  91:11 97:9 127:20
  127:21 132:4,7,10
  132:13,16,19
**pages** 113:23
**paid** 12:17 62:12
  116:11 117:1
  118:22
**pain** 70:15 73:13
**pancreas** 27:6
  81:12
**pancreatic** 57:12
  57:14,18 86:21
  88:15 91:9,14
  92:4,11
**pap** 81:6
**papantonio** 2:20
**paragraph** 55:21
  60:17 62:7,21
  66:1,15 74:8,17
  76:18,20 79:22

94:2,3
**paraphrasing**
  94:14
**park** 2:16 5:9
**part** 39:11 42:12
  53:14,22 54:21
  71:22 78:1,9 87:5
  87:16
**particular** 16:6
  65:23 80:9 82:5
  82:13 90:1 127:16
**parties** 18:11 20:7
**partner** 10:13
  26:22
**party** 12:11 17:15
  18:11 129:18
**pass** 104:18 127:7
**passed** 22:8
**patents** 39:15
**patient** 17:3,8 18:9
  18:17,18 42:15,15
  42:15,16 44:18
  47:4,6 48:23 49:7
  49:14 51:24 52:1
  52:3,5,9 53:2,4,10
  53:14,21,22 54:1
  54:15 55:23 56:19
  57:14 58:6,9 59:5
  59:18,22 61:13
  69:12,14,15 71:3,4
  71:9 72:5,9 84:10
  87:4 89:1,1 90:4
  97:15 121:18
  122:15,22 123:4
  123:12,14,18,22
  124:10,16,21,22
  124:23 125:3
  126:9,22 127:18
**patient's** 52:7,11
  53:10,20 59:23
  70:14 96:10

**patients** 26:17
27:11 33:12 34:12
41:24 42:9,10
43:1 44:21,23
45:2,2,10 46:3,6
46:19,22 48:10,18
48:19,23 49:5,21
50:2 51:7,15,18,20
53:23 55:5,24
56:5,9 57:5,6,7,9
58:7,10,14,18,20
58:20 59:4 60:20
60:21 61:3,4,10,11
61:16,17,20 62:1,2
64:18 65:9,23
68:7 69:12,17
70:5,16,20 72:7,18
72:20,24 85:5,7,8
87:23 89:19 93:5
94:6 96:20,22,23
97:2,13,17 100:24
107:7,14,15,18,20
108:5,8,13,16,23
109:4,7,12,18,21
109:22 110:5,12
110:16,18,22
111:3,7,17 120:19
120:23 121:10,17
122:10,19 123:15
123:23 124:5,12
124:16 126:3
**pelta** 5:14
**pen** 8:24 9:7,8
**pending** 17:23
**pennsylvania** 3:4
4:16,23
**pensacola** 2:22
**people** 33:23
63:22 64:14 78:19
80:3 81:17,20
82:8 109:3,10,19

127:3,21 128:2
**percent** 23:6 47:15
47:15,17 48:3,5,5
54:11 96:24
117:14,24 118:17
**percentage** 48:9
78:14 79:8
**perforated** 48:3
48:10 49:8
**perforation** 47:8
49:11 71:6 73:20
**perforations** 47:10
48:21
**performance** 52:8
53:20 54:5,6 55:1
72:5
**performed** 86:19
**performing** 54:9
72:15
**periodic** 97:10
**person** 2:3 3:8,8
13:23 18:18,23
56:12 71:24 74:1
82:9 90:2 124:8
**person's** 85:18
**peruses** 90:12
**pharmaceutical**
4:12,13
**pharmaceuticals**
3:1,7,13 4:7,18
10:12
**pharmacy** 5:6
**philadelphia** 4:16
**phone** 108:20
**phrase** 63:16
**physical** 45:13
57:8 71:21,23
93:6
**physician** 17:20
23:11,12 24:16,16
38:2 50:2 87:4

89:24
**physicians** 23:8
**picture** 22:9
105:16
**piedmont** 3:15
**pietragallo** 4:19
**pietragallo.com**
4:23
**pill** 77:17 78:4,15
**pills** 63:24 74:20
76:16,22
**pittsburgh** 4:23
**place** 126:15
129:15
**places** 13:13 20:21
61:9
**plaintiff** 2:19 13:1
19:1,2 23:18 44:2
91:1
**plaintiffs** 2:2,7,13
22:1 23:18 31:13
34:4,20 40:9,21,21
40:23 41:17 43:9
55:12 65:6 66:20
68:11 74:9 79:7
83:17 91:4 103:14
**plan** 106:4,4,24
110:11 124:9
126:14,19
**planet** 89:2
**plasma** 25:22
**platelet** 25:19
**please** 8:14 9:18
11:15 13:16 14:22
21:5 34:17 64:24
66:23 69:23 76:19
79:20 81:1 84:3
86:9 91:10 98:4
99:23 102:19
127:19 128:20

**plus** 100:11
**point** 24:9 43:6
82:7,24 92:16
98:9 99:17 100:2
128:5
**polyp** 97:18,18,19
**polyposis** 45:16
**polyps** 109:10
**population** 73:15
127:21
**portion** 65:1 70:1
81:2 84:4 86:6,10
98:5,20
**pose** 94:7 95:12,13
**possession** 30:17
**possibility** 109:17
**possible** 49:9
82:20 83:7,8
**possibly** 10:15
**potential** 68:13,21
69:7 94:5,19
125:4
**practice** 24:13,15
24:18,23 25:2,5
26:12,14,20 38:5
38:23 44:23 47:24
59:3 60:18 61:19
75:5 76:9 96:9
107:7 108:5
121:24
**practices** 121:23
**practitioner** 126:8
126:8,21
**pre** 26:1 81:6,8
97:18
**precautionary**
19:19
**precursor** 81:10
**precursors** 81:13
**predict** 81:15

[predispose - quick]                                              Page 18

**predispose** 81:10
121:7
**predisposes** 45:9
**predisposition**
60:22
**preliminary** 28:2
31:3
**prepared** 74:13
77:8
**preparing** 35:18
35:20 119:13
**prescribed** 80:9
82:4,13
**prescription**
111:19
**presence** 129:10
**present** 5:14 41:23
77:22
**presentations**
39:17 40:1
**presented** 40:11
40:16
**preservative** 77:9
**pretty** 19:19 26:21
51:8 54:7
**prevent** 80:19
81:15
**previous** 46:11
**primarily** 24:23
**primary** 121:24
126:7
**prinston** 4:12
**prior** 12:3 21:9
28:23 44:14 71:6
79:19 107:21
117:21
**private** 24:15 38:5
107:7
**probable** 112:6,9
112:11,13,19,20
113:1

**probably** 17:4
18:7 48:19 54:11
63:15 76:14
106:11,11 112:14
119:13
**problem** 58:14
70:14 71:10
**problems** 25:19
26:2 49:15 58:12
**procedure** 48:11
52:15 90:1
**procedures** 27:22
57:21 60:5 73:7
95:24 110:8
**proceedings** 1:13
**process** 123:21
**proctor** 2:21
**produced** 103:22
**product** 78:21
**production** 79:9
**products** 1:4 20:2
33:15 35:1 102:18
102:22 123:20
128:8
**profession** 63:7
**professional** 24:8
62:23 63:9,13
**professor** 38:7,9
**profile** 93:24
**program** 33:12
34:12 40:24 41:5
41:18,24 42:17
43:5 44:10,15,17
62:2 64:13,18
65:19,22 67:15
69:21 80:5,6 82:3
82:8,12 83:23
84:11 87:3 92:18
97:22 103:11
110:15 111:2
127:22 128:1,3,4,5

**programs** 44:18
44:19,20 55:23
56:4 58:17 59:21
60:19,21 61:2,16
61:18
**progress** 13:5
36:19
**progressed** 14:17
**progressive** 72:23
**progressively**
54:13
**proliferative**
25:21
**proposal** 95:12
**proposals** 94:4,19
**propose** 71:15
83:22
**proposed** 67:13,19
68:13,22 89:12,15
90:10 97:7,21
**proposing** 73:7
98:12 100:18
**prostate** 71:14,16
71:19,22 72:21
**protocol** 61:8
66:16
**protocols** 51:4
59:20 60:2
**proven** 112:8,21
124:6
**provide** 29:22
31:4,21 47:5
54:15 55:12 60:2
**provided** 29:18,24
30:9,12,20,23 41:9
43:21 59:13 64:2
68:6 122:20 128:2
**providing** 38:22
119:8
**psa** 71:23 72:1,8
72:11,15,24 73:3

**public** 44:16
133:19
**publications** 39:15
39:17
**published** 107:3
**pursuant** 1:17
29:11
**put** 27:14 33:18
43:11 61:24 64:18
64:22 90:17
**puts** 90:20
**putting** 23:18 43:1
53:13

<hr>

## q

**qualifications**
55:22
**qualify** 74:18
**quantitate** 54:1
**question** 11:14,17
14:22 15:6 22:10
26:5 32:4 34:19
41:14 46:11 48:7
52:18 58:24 61:12
61:13 63:22 68:19
69:4 75:20 80:24
84:2 86:4 87:7
88:7 94:24 98:3
98:17 100:15
101:8 103:3 123:5
125:17,24
**questioning**
103:18
**questions** 10:14
11:2,2 28:2 60:15
99:16 104:21
105:22 113:9,12
113:14 120:8,15
125:14 126:24
127:9,9
**quick** 120:14

**quickly** 11:23 86:5
  113:15 114:15
**quite** 11:14 78:20
  99:13

## r

**r** 2:1 132:3,3
**rachel** 2:3 28:18
  29:7 103:20 105:2
  131:1
**rachel's** 33:3,4
**radiation** 75:24
**radiographic**
  45:19
**radiologist** 14:3
**rafferty** 2:21
**rapid** 100:12
**rare** 48:12,14,17
**raspanti** 4:20
**rate** 62:8,8,9
  119:18,23
**rathod** 2:9
**reach** 82:20 83:8
  83:14
**reached** 74:20
  75:23 76:16,23
  83:1,14,21 84:10
  84:24 85:16
**read** 64:23 65:2
  69:22 70:2 74:23
  80:10 81:1,3
  83:13,17 84:2,5
  86:4,7,9,11 94:16
  94:16 98:4,6,19,21
  102:12 128:11
  131:9 133:5
**reading** 92:10
**real** 114:15 120:14
  124:22
**realize** 36:16
**really** 16:7,10,12
  18:8 19:22 48:9

103:2
**reask** 108:2
**reason** 49:16
  59:23 70:23 71:1
  92:12 122:16
  131:11 132:6,9,12
  132:15,18,21
**reasonable** 62:23
  63:7 80:1,13
**reasonably** 99:19
  100:4
**reasons** 46:23 49:6
  49:9,13
**recall** 19:12,13
  21:18 63:19 115:8
  115:21
**receipt** 131:18
**receive** 57:7 64:15
**received** 29:17
**recommend** 49:6
  49:11,13,17 71:5
  72:1,8,23 73:3
  84:11 88:19,22
  110:4,7,20 111:16
  125:2,21 126:1
**recommendation**
  50:2 61:7 87:2,8
  90:9
**recommendations**
  51:6,16 89:18,19
  90:6
**recommended**
  46:20 50:10
  110:21 111:3
  123:16 126:4,11
**recommending**
  73:13 87:3,4
  89:14 91:7 127:22
  128:1,3
**recommends**
  87:20

**record** 8:2,13 9:10
  9:11,13,15,17
  11:19 22:15 32:6
  32:8,10,12 60:9,13
  65:2 70:2 81:3
  84:5 86:7,11 98:6
  98:21 99:7,11
  104:1 105:8 114:3
  114:4,7,11 128:16
**record's** 46:12
**recorded** 11:3
**records** 18:9 19:4
  19:6 20:21,24
  21:8 62:9 118:7
  118:10,11
**recross** 125:19
**rectal** 91:18
**recurrence** 56:1
  56:16,20,22 57:6
  57:18,24 58:19
**redirect** 114:12
**reduce** 98:9,24
**reduced** 97:22
  129:9
**reefer** 4:21
**refer** 27:24
**referenced** 129:9
  129:13 131:6
**references** 118:12
**referred** 68:11
**referring** 45:18
  92:19 93:19
**refuses** 47:9
**regard** 22:6
**regarded** 51:8
**regardless** 89:16
  89:17
**regards** 75:8
**regular** 71:22
**regularly** 50:22
  61:11,14

**related** 18:22
  24:22 49:16 71:10
  109:1
**relationship** 31:14
**relative** 53:5 91:2
  129:17
**relied** 67:8
**relying** 43:9 74:14
  83:17
**remember** 12:21
  13:14,16,19,22,24
  14:1 15:10,16,17
  15:19 16:4,5,10
  17:7,22 18:1,4,11
  19:21,23 20:5,7,12
  20:18 24:5 29:8,9
  34:2 42:19 44:6
  50:18 115:14
  118:13,24
**remote** 36:18
**render** 79:2
**repeat** 15:6 21:5
  34:19 41:14 49:1
  68:19 75:20 76:19
  80:24,24 98:3
  99:23 102:19
**rephrase** 84:7
  107:17
**report** 7:5 10:16
  35:6,7,9,18,20,23
  36:13 40:9,16,19
  43:21 55:6,10,13
  58:17 60:18 62:19
  62:20,22 64:22
  65:15 70:7 74:13
  74:15 76:13 77:23
  78:11 81:22 82:23
  89:7 91:6 92:2,24
  93:19 94:11 95:15
  95:16,19,20 97:9
  106:4,15 116:17

[report - screening]                                                    Page 20

117:8 118:12
125:6 126:6
**reporter** 1:14 6:18
8:10,14 9:18
28:14 101:17
128:17 129:4
**reporter's** 6:14
**reports** 64:6,8
65:5 66:9,12,13
67:3 76:11 100:10
102:12 117:9
**represent** 105:1,4
120:13
**representing** 8:3
10:11
**request** 29:14
30:19 34:20
**requested** 28:17
30:12 31:21 36:4
43:17 65:1 70:1
81:2 84:4 86:6,10
98:5,20 113:18
**requests** 29:19,21
29:24 30:8,9,13
31:23 33:22
**require** 27:21
70:16,20
**required** 133:13
**requires** 27:10,18
27:19
**residency** 37:3,4,4
37:7,10
**residents** 38:15,24
**resources** 35:21
35:22
**respect** 50:10 52:2
69:17 79:11 93:20
101:22 104:5
**respond** 34:13,20
**responded** 33:22

**response** 29:18
113:13 127:2
**responses** 30:3
**responsibilities**
38:12,14,18
**result** 14:14
101:11
**retain** 34:21
**retained** 13:20
21:22 22:4,18
23:3,4,7,11,17
24:1
**retainer** 116:3
**return** 131:13,17
**reveals** 125:3
**review** 14:5,7
18:20 19:3,5,5,6
21:8 22:15,19
29:15 33:11 34:22
34:23 35:4,14,18
42:13,16 43:4
44:11 51:14,15
65:5,13 66:19
79:6 103:23
116:17,18 117:8,9
118:7,10 131:7
**reviewed** 19:16
20:20 21:1 35:8
35:20 51:23 67:2
**reviewers** 42:7,20
**reviewing** 18:17
32:21 35:13 62:9
106:13
**reviews** 50:20
**rgeman** 2:6 131:2
**right** 15:2 16:16
28:23 29:11 31:7
33:2 36:2 48:8
51:8 52:23 76:18
87:7 96:6 99:5,14
99:16 107:9,12

108:6 112:3,19,21
114:23 117:15
123:24 124:9
**risk** 33:16 42:1,10
42:12,21 43:1
44:23 45:16 49:7
49:8,15 53:10
55:24 56:19 57:5
57:24 58:8,11,18
59:13,14,24 60:4
61:22 62:1 65:9
67:6 68:7 73:14
73:21 74:11 75:12
76:1 79:2 80:10
80:15 82:16 90:17
90:21,22 91:2
97:13,15,17
100:13,24,24
101:1 109:16,20
112:15,15 120:20
126:10 128:7
**risks** 35:1 49:18
49:22 59:20,20
65:24 70:11 73:6
73:8,11,17 74:3,22
80:2 94:7 95:13
95:23 96:5
**rite** 5:7
**road** 3:3,15 24:9
**role** 37:24 38:3,6
39:11,12 79:15
**roles** 38:17
**room** 9:5 96:4
**rose** 3:20
**ross** 3:21
**rotate** 38:15,20
**rotation** 38:22,23
**routine** 45:13 87:5
**routinely** 85:17,17
**rush** 37:22 38:6,7
38:10,12,14 39:10

39:11,12
**rushed** 117:18,18

**s**

**s** 2:1 3:8 132:3
**sarcoma** 18:24
**saw** 29:1 101:18
**saying** 21:10 50:7
84:23 112:13
**says** 82:11 88:18
95:15 113:21
**scan** 61:7 90:9,10
91:23
**scans** 45:20 57:22
57:24 98:24
**scheme** 58:12
**school** 36:23
**sciegen** 4:6
**scott** 5:15 8:2,18
**screen** 8:20 61:11
85:7,8 92:4 93:7
125:5 127:3
**screened** 61:14
67:13,20,22 68:23
69:8 122:7
**screening** 50:23
51:4 55:23 56:4
56:19,24 57:4
58:9,17 59:4,6,7,9
59:12,19,21 60:2
60:19,21 61:2,8,16
61:18 62:1 65:9
65:11,19,22 67:15
68:14,22 69:11,14
69:20 70:12,17,21
71:4,15,19 73:6
74:1 83:3 87:3
92:1,12,14,14 93:1
97:13 98:1 109:23
110:5,8 121:16,19
122:2,9,11,12,15
122:17,22 123:8

123:16 126:4,11
**screenings** 125:21
**screens** 105:7
**scripts** 4:1
**scroll** 62:6
**second** 32:2 45:21
46:15 114:5
**section** 58:17 64:7
86:14 91:17 94:2
**see** 19:7 27:11
29:4,10 39:15
41:10 66:5 76:17
76:24 79:21 85:2
86:14 91:6,15
92:1 94:8 97:10
105:14 107:14,17
108:17,24,24
109:7 120:10
123:4,24
**seeing** 59:18,23
61:13 108:22
111:4
**seen** 28:22 48:20
72:19 76:11,12
87:4 101:15
**self** 25:22
**send** 111:20
115:22
**sense** 64:22 65:5,7
**sent** 33:24 116:3
131:14
**sentence** 80:13
82:6
**september** 34:6
**set** 30:8 32:14 58:6
63:5 127:21 130:1
**seven** 22:22,23
23:2
**severe** 47:6 73:23
**sheet** 131:11

**shorter** 117:19
**shorthand** 129:3
**show** 82:24
**shown** 33:12 84:24
86:21 88:14
112:14
**shows** 87:13
**sick** 52:10
**sickle** 26:3
**sign** 128:11 131:12
**signature** 130:6
**signed** 131:20
**significance** 26:1
109:14
**significant** 74:22
79:2 94:7 95:13
**significantly** 94:5
94:20
**signs** 93:15
**similar** 86:18
100:24
**single** 67:22 89:14
**sir** 45:21 95:2
99:15
**sit** 24:5 48:8
**situation** 42:14,17
45:6 52:8 58:3
73:1 123:21
124:20
**situations** 72:11
**six** 10:22 58:5
114:11 128:14
**skokie** 17:24 24:9
39:11
**slater** 43:22,23,24
44:4
**slow** 116:7
**small** 27:5
**smear** 81:6 93:24
**smoke** 109:22
111:7

**smoker** 70:8 90:18
90:21
**smokers** 61:1,3,5
**society** 87:21
**soft** 18:24
**solco** 4:13
**sold** 39:13 66:3
**solid** 27:1
**solutions** 8:3,11
20:4 131:23
**solvents** 19:15
**somebody** 33:23
44:3 47:7 54:8,10
56:21 57:22 59:9
62:2 70:8 78:24
82:24 95:8 97:18
126:8
**someone's** 33:16
59:8 75:23
**soon** 111:13
**sorry** 8:24 15:23
16:20,22 20:6
28:7 31:17 39:10
41:7,12 47:13
50:8 65:14 76:20
78:23 86:5 90:16
91:12 95:12
108:12 112:18
122:5
**sort** 99:19 120:11
**sound** 33:5 114:23
**sounds** 83:13,20
**source** 99:18
100:3,16 101:10
**south** 2:21 4:15
**speak** 41:9 120:5
**speaking** 11:22
86:4 105:2
**speaks** 94:11
**specialized** 86:14
92:20 110:11,15

110:21
**specific** 19:8,18
35:3 51:12 52:7
53:1 57:9 58:12
58:14,21 72:11
85:23 98:12 101:2
101:20,21 103:14
**specifically** 19:10
57:11,17 65:21
93:2 98:14 99:2
101:3 103:7
118:13 124:9
**specifics** 20:5
21:18
**specified** 129:16
**speculation** 96:7
**spent** 106:8
116:14,15 117:4
117:11 118:6,14
119:2,12
**spoke** 40:11 115:6
115:7
**spoken** 40:16
61:18
**sponsoring** 87:24
**spung** 4:2
**ss** 129:1
**staff** 24:17
**stages** 87:14 92:22
93:10
**stand** 126:15
**standard** 1:10
**stands** 50:18
**start** 36:22 111:11
111:12
**started** 8:18 28:12
**starting** 111:16
**state** 1:15 4:9
62:21,22 96:4
104:14,24 129:1,4

[stated - testimony]                                                                                    Page 22

**stated**  62:22 82:23
   95:5 96:3
**statement**  79:5
   102:9
**states**  1:1 13:11
**stating**  96:5
**statistic**  48:2,2,3,6
**statistically**  74:22
**status**  52:9 53:21
   54:5,6 55:1 72:4,6
**steatosis**  93:16
**stenographer**  11:4
   11:11
**stenographic**  1:12
**stenotype**  129:9
**sterilization**  19:16
**stick**  96:4
**stomach**  17:7 27:5
**stone**  58:6 63:5
**stopped**  49:1
**stoy**  4:20 128:19
   128:19
**straightforward**
   54:7
**street**  2:4,9,21 4:9
   4:15,21 5:3
**stricken**  95:19
**strike**  25:3 49:3
   57:2 70:24 72:10
   77:14 79:19 83:7
   88:4 89:13 98:15
**students**  38:15
**studies**  45:19
   54:24 57:9 74:23
   92:19 112:10,10
   112:14,23
**study**  24:21
**subject**  30:3
**subscribed**  133:14
**substances**  20:3
   43:3 78:20

**suffer**  72:22
**suffered**  22:7
**suffering**  72:13
**sufficient**  74:11
**suggest**  112:15,17
   112:19
**suggested**  51:17
   87:22
**suggesting**  54:24
   89:13 102:7
**suggests**  68:6
**suite**  1:16 2:10,16
   2:22 3:4,16,21 4:4
   5:3,9
**supervise**  39:2
**support**  47:19
   72:16 86:23
   100:23 104:11
**supports**  87:9 88:8
**sure**  11:14 13:15
   15:8 21:7 41:15
   46:12,14 52:19
   54:22 57:1 58:24
   59:19 61:12 68:21
   70:16 71:13 76:20
   94:13 98:18 100:2
   102:20 103:24
   104:3 107:19,19
   113:11
**surgery**  57:23
**surrounding**
   17:11
**susceptible**  46:5
**swear**  8:14 9:18
**swedesford**  3:3
**sworn**  8:16 10:1,4
   10:24 129:6
   133:14
**symptom**  58:15
**symptomatic**
   58:20 59:5,8

**symptoms**  58:4,11
   59:12 71:21
**syndrome**  25:21
   45:1,9,22 46:4,5
   46:18,20 47:4
   49:14,22 50:10
   52:21,24,24 60:22
   109:9

**t**

**t**  132:3,3
**table**  54:2
**tainted**  35:1 42:8
   43:2,11 79:3
**take**  16:21 26:22
   26:24 32:1 52:14
   55:6 60:6 63:1
   99:4 104:2 106:3
   109:20 122:1
   124:21 127:19
   128:2
**taken**  1:13 10:18
   12:3 16:9,14 17:3
   18:14 21:17 26:4
   48:18 60:11 89:20
   99:9 114:9 122:21
   129:15
**talk**  11:24 56:9
   60:18 74:8 76:15
   76:21 80:12 81:17
   86:13,16 92:24
   93:2 97:9 114:15
**talked**  56:1 91:22
   103:20 107:6
**talking**  53:17
   56:15 60:17 81:20
   120:18 124:7
**teach**  39:4,6,7
**teaching**  38:6,17
**team**  32:22
**teleconference**
   118:7

**teleconferences**
   116:16 117:7
**tell**  10:24 11:15
   12:4 16:12,17
   24:20 33:9 36:7
   36:10 42:5 43:19
   56:18 57:4,4 63:9
   63:16 77:14,16,18
   82:5 91:10 95:8
   103:24 114:15
**telling**  126:10
**tells**  123:18
**ten**  12:22 16:11
   20:19 21:9 39:8
   106:21
**tend**  21:11
**tennessee**  4:4
**term**  14:19 25:23
   75:4,13,14 76:9,11
   78:10 81:22
**terminology**  44:13
**terminus**  3:15
**terms**  53:16 56:23
   56:23 58:9 59:5
**tertiary**  27:10
**test**  53:13 57:17
   71:10,11,23 85:19
   87:22 89:21
   111:13,14 127:16
**testified**  10:5
   14:11 16:13 49:5
   60:20 115:10
**testify**  12:17 14:8
   22:19 104:8 129:6
**testifying**  28:8
**testimony**  11:6
   15:13 16:19,24
   20:23 21:3,7
   34:15,24 35:3,8,13
   35:19 42:19 62:10
   67:18 82:1 84:1

[testimony - two]                                                      Page 23

84:20 89:7 92:6
103:18 110:24
115:11 129:8,12
131:9,18 133:8
**testing**  53:11
58:15 70:21 85:17
86:14,23 87:2,10
87:20 88:2,8
91:12 92:17,20
97:10 110:21
111:9
**tests**  57:10 64:15
80:2,15,18 83:3
85:21 87:6 92:14
93:6,17,19,23
98:12 110:9,10,20
112:1,2 121:21
122:4
**teva**  3:6,12 10:11
**texas**  3:22
**thank**  11:13 15:5
46:19 51:3 105:2
113:10 125:13
126:23 127:10
128:9
**thanks**  105:12
**therapies**  55:4
**thing**  28:19 57:20
66:16 92:17
113:24
**things**  19:19 21:12
25:24 45:22 50:5
50:9 54:18 64:20
69:13 70:5,6
73:13 75:8 76:2
77:8 79:1 80:12
81:14 92:9 93:5
93:14 103:19
110:8 112:3
121:23

**think**  13:7 14:16
14:16 15:14,15
22:24 28:6 34:18
36:2 41:11 43:11
44:8,10,13 45:23
49:5,16 50:5,9
52:20 54:23 60:20
61:1,9 62:5 63:4
69:6,11,12 70:7
71:1 72:10 78:17
81:14 82:14,24
84:15 89:23 92:2
95:22 97:19 106:8
106:10,17 108:4
115:6 118:23
119:18 120:24
125:17 127:24
**thinking**  12:23
**third**  117:3 118:2
**thomas**  2:20
**thornburg**  5:8
**thought**  113:6
**three**  10:22 16:14
23:1 29:2 32:12
54:12 55:1 58:4
60:9 106:5 113:22
113:23
**threshold**  75:15
75:21 76:8 83:9
85:20,24
**thrombocytopenia**
25:20
**throw**  21:12
**thumb**  7:6 103:21
**tilt**  101:18
**time**  1:10 8:5 9:12
9:16 14:17 16:8
17:8,21 22:10
23:24 27:9 28:1
29:1 32:7,11 34:3
35:15 38:4 39:12

60:8,12 63:1
75:13 76:12 81:22
89:3 99:6,10
103:18 104:2
106:7 110:16
113:10 114:6,10
116:14,16 117:4
117:17,20 118:6
119:9 128:13
129:15 131:19
**timeframe**  131:8
**times**  10:21,22,22
16:10,14 22:3,10
22:16,18,22,23,24
23:2,4,7,17 111:14
**tissue**  18:24
**tobacco**  60:3 70:9
75:9 110:1,6,19
**today**  28:5,9,15
29:11,15 31:18
62:13
**today's**  8:4
**told**  16:15 31:4
43:24 44:3,6 56:6
104:4 115:22
119:18 123:5
**top**  63:20 81:14
**total**  22:23 23:2
118:20
**totally**  54:8
**touch**  8:19
**toxic**  20:3 78:20
78:20
**toxicity**  75:10
**toxins**  18:19 76:1
**tract**  93:9
**transcribed**
129:10
**transcript**  1:12
6:1 11:5 128:18
131:6,20 133:5,8

**transcription**
129:12
**transplantation**
27:21
**traurig**  3:9,14
10:13
**treat**  55:23 107:20
108:12,12,14
110:18 120:19
121:11 124:15,17
**treated**  27:11
50:23 56:10 57:23
96:20 121:12
**treating**  17:13,20
50:1 51:15 56:21
89:24 123:22,23
**treatment**  18:9
27:12 52:4,13
53:16 54:15 58:3
**treatments**  27:20
51:18,20 53:24,24
55:2
**tree**  27:7
**trials**  51:22
**true**  58:7 63:4
69:14 129:11
133:8
**truism**  102:7
**truth**  10:24 129:6
127:7,7
**truthfully**  28:9
**try**  11:24,24
**trying**  42:19 105:6
**tumor**  57:12,13
**tumors**  27:1
**turn**  127:20
**twelve**  106:21
**twenty**  12:6
**twice**  45:11,12
**two**  9:17 32:8 47:3
54:3,12,12 92:9

99:5
**type** 20:2 25:2
  47:3 59:16
**types** 60:1 64:20
  77:6,7 108:16
  110:20
**typographically**
  55:14
**typos** 55:15

## u

**ulmer** 5:2
**ulmer.com** 5:5
**ultimate** 18:22
  19:8
**ultimately** 13:5
  22:8 42:10 45:16
  89:23
**ultrasounds** 45:20
**um** 23:23
**uncertain** 25:24
  109:14
**unclear** 108:4
**uncommon** 47:12
  47:14
**undergo** 53:11
**understand** 11:6
  21:7 58:24 61:12
  67:17 69:3,3
  89:11 103:3,13
  105:20 121:3
  125:24
**understanding**
  42:24 65:12 76:5
  76:6 78:17
**understood** 11:18
**unique** 27:17
  56:10 72:24 93:5
  122:4
**united** 1:1 13:11
**universe** 96:22

**university** 37:1,5
  37:9,22 38:6,8
  39:10,13
**unknown** 61:23,24
**unnecessary**
  126:14
**upper** 81:5 88:23
  89:4,15
**urinary** 71:21
  93:9
**urine** 110:9
**usa** 3:7,13
**usage** 125:4
**use** 51:17,19 54:6
  54:23 55:3 63:16
  64:1 74:10 75:13
  95:8
**usefulness** 111:15
  127:16
**users** 74:13
**uspstf** 109:23
**usually** 44:24
  51:15,16 52:13
  54:6 93:15 97:5
  112:8 126:9
**uterine** 45:18
**utilizing** 87:22

## v

**v** 132:1 133:1
**vague** 53:7 78:7
  84:6,12 85:10
  87:11 96:1 100:21
  107:22 124:2
**valsartan** 1:3 8:7
  35:2 39:20,20
  40:5,7,13,17 42:8
  42:21,22,24 43:1,7
  43:11 63:22 66:2
  74:20 76:16,22
  77:17 78:4,15
  79:3,9 80:4 81:18

82:14,21 83:4,9,15
  83:22 84:11
  101:22 102:18,22
  122:21 123:15,20
  124:4 128:3,7
  131:4 132:1 133:1
**vanderbilt** 3:9
**variants** 109:13,14
**various** 19:6 35:21
  45:6
**vary** 65:19 121:17
  122:15,16
**vast** 78:18
**vaughn** 2:14
**vcb** 125:4
**vegetables** 77:12
**verbally** 11:11
**verify** 131:9
**veritext** 8:3,11
  131:14,23
**veritext.com**
  131:15
**versus** 49:22 56:20
  57:5
**vicinage** 1:2
**video** 8:19 9:9
  11:7
**videoed** 11:8
**videographer** 5:14
  5:15 8:1,3,21 9:10
  9:12 11:3 32:7
  60:8 99:6 105:9
  114:6 128:13
**videotaped** 1:7
  28:15
**view** 56:19
**vine** 5:3
**vitae** 7:4 34:1 36:9

## w

**wacker** 1:15 8:6
**walking** 96:4
**walks** 56:12
**want** 9:10 11:19
  11:23 14:21 25:15
  31:11 32:5 36:15
  36:17 41:8 42:18
  46:7,10,12 55:9
  60:18 80:12 89:4
  103:14,21 104:2,3
  108:20 113:16
**wanted** 18:20 33:9
  41:19 114:14
  122:8
**wants** 105:6
  128:24
**warn** 11:23
**warned** 15:1
**washington** 2:10
  13:12
**way** 11:1 28:2
  30:6 43:2 50:3
  78:13 79:11 85:8
  85:12,13,15 93:7
  102:20 105:17
  114:2 117:21
  119:21 122:7,10
  122:23
**wayne** 3:4
**ways** 45:6 54:1
**we've** 36:6,7 51:23
  55:8 56:1 60:7
  61:17 64:5 74:5
  101:1 103:20
  104:10 110:8
  125:11
**wednesday** 1:9,16
**weeks** 29:2 106:6
**weigh** 49:22

[went - zoom]

**went** 14:16 22:24
  37:1,8 38:5
  119:23
**west** 1:15 8:6
  13:10
**whereof** 130:1
**wife** 22:7
**wish** 38:24
**withdrawn** 15:11
**withdrew** 100:11
**witness** 8:8,15,16
  8:23 9:19 10:1,4
  12:12,13,14,15
  14:23 15:6 17:2
  17:19 20:17 21:4
  21:22 22:4,18
  23:3 24:1 31:2,6,8
  32:1,4 33:24
  41:14,21 46:8,11
  53:8 56:8 58:23
  63:3 68:1,18 69:2
  69:10,19 70:19
  71:8 73:10 81:4
  84:14,21 85:11
  87:1,12 90:12
  92:8 94:23 95:18
  96:2,16 98:7,19,22
  99:22 100:8,22
  103:6 104:16,19
  105:15,18 106:20
  107:23 110:14
  111:1 113:5,11,24
  115:12,20 120:4
  120:11 123:2
  124:3,19 125:9,23
  126:18 129:5,9,10
  129:13 130:1
  131:8,10,12,19
**wittlake** 3:14
**wittlakek** 3:17

**woman** 12:23 17:6
**word** 9:1 95:8
**words** 63:11
**work** 19:20 117:19
**workforce** 19:20
**workplace** 18:19
  20:4
**works** 11:1,8
**world** 50:21
**worldwide** 48:2
**worse** 54:13 55:1
**worth** 84:16
**write** 127:4
**writing** 106:15
  117:9
**written** 8:12 40:11
  40:16

| y |
|---|

**yeah** 9:11 22:21
  29:16 32:3,6 33:6
  46:16 49:3 55:18
  84:8 91:11 103:4
  105:16 112:3
  113:22 114:4
  116:5 120:2,7
  127:8 128:12
**year** 45:11,12 58:5
  72:16 73:3 90:10
**years** 12:6,22 13:6
  13:8 16:11 17:5
  20:20 21:9,13
  22:6 38:5,19 39:8
  71:6,24 72:3 75:5
  76:10 88:23,23
  89:5,16 97:13
**york** 2:5,5 3:10,10
**young** 17:6

| z |
|---|

**zero** 54:7,8

**zhejiang** 4:12
**ziarko** 5:15 8:2
**zoom** 2:8,14,20
  3:2,14,19,20 4:2,8
  4:14,20 5:2,8 8:7
  36:16,18 43:18
  55:9 104:20
  105:21 113:20
  127:5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# Exhibit 51

Page 1

1                    UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF NEW JERSEY

2                         CAMDEN VICINAGE

3

4     IN RE: VALSARTAN, LOSARTAN, AND        MDL No. 2875

      IRBESARTAN PRODUCTS LIABILITY

5     LITIGATION

6

      This Document Relates to All Actions

7

8     _____/

9

      VIDEOTAPED

10    DEPOSITION OF:   KALI PANAGOS, PHARM.D., R.PH

11    DATE:            JANUARY 21, 2022

12    TIME:            9:32 a.m. - 5:52 p.m.

13    TAKEN BY:        DEFENDANT

14    PLACE:           RIVERO MESTRE LLP

                       2525 PONCE DE LEON BLVD. SUITE 1000

15                     MIAMI, FL 33134

16    REPORTED BY:     CHELSEA HLAVACH, NOTARY PUBLIC, STATE

                       OF FLORIDA

17

18

19

20

21

22

23

24

25

Page 2

```
 1   A P P E A R A N C E S :
 2
     NILDA ISIDRO, ESQUIRE
 3   OF:  Greenberg Traurig
         One Vanderbilt Avenue
 4       New York, NY 10017
         isidron@gtlaw.com
 5
         Attorney for Teva
 6
     GLENN CERNER, ESQUIRE
 7   OF:  Greenberg Traurig
         One Vanderbilt Avenue
 8       New York, NY 10017
 9       Attorney for Teva
10   JORGE MESTRE, ESQUIRE
     OF:  Rivero Mestre, LLP
11       2525 Ponce de Leon Boulevard, Suite 1000
         Miami, FL 33134
12       jmestre@riveromestre.com
13       Attorney for the Plaintiffs
14   GREGORY HANSEL, ESQUIRE
     OF:  Preti, Flaherty, Beliveau & Pachios, Chartered, LLP
15       One City Center
         Portland, ME 04101
16       ghansel@preti.com
17       Attorney for Maine Automobile Dealers Association
18   CONLEE WHITELEY, ESQUIRE
     OF:  Kanner and Whiteley
19       701 Camp Street
         New Orleans, LA 70130
20
21       Attorney for the Plaintiffs
22   CHARLIE WHARTON, ESQUIRE
     OF:  Rivero Mestre, LLP
23       2525 Ponce de Leon Boulevard, Suite 1000
         Miami, FL 33134
         cwhorton@riveromestre.com
24
25       Attorney for the Plaintiffs
```

Page 3

```
 1   ASHER BLOCK, ESQUIRE
     OF:  Lewis Brisbois
 2       550 E. Swedesford Road, Suite 270
         Wayne, PA 19087
 3
         Attorney for Camber Pharmaceuticals appeared via Zoom
 4
     CHRIS HENRY, ESQUIRE
 5   OF:  Buchanan Ingersoll & Rooney PC
         227 West Trade Street, Suite 600
 6       Charlotte, NC  28202
         704 444 3475 (o)
 7       Christopher.henry@bipc.com
 8       Attorney for Albertson™s LLC appeared via Zoom
 9   CHRISTINE GANNON, ESQUIRE
     OF:  Three Gateway Center
10       100 Mulberry Street, 15th Floor
         Newark, New Jersey 07102
11       Lwalsh@walsh.law
         Cgannon@walsh.law
12
         Attorneys for Teva Pharmaceuticals USA, Inc., Teva
13       Pharmaceutical Industries Ltd., Actavis Pharma, Inc.,
         and Actavis, LLC, appeared via Zoom
14
     CHARLES SCHAFFER, ESQUIRE
15   OF:  Walter Haverfield, LLP
         16990 Savage Road
16       Chagrin Falls, OH 44023-4536
         Crs7270@gmail.com
17
         Attorney for Steamfitters Local 300 and Employers and
18       Laborers Local 100 appeared via Zoom
19   DANA KLINGES, ESQUIRE
     OF:  Duane Morris, LLP
20       30 South 17th Street
         Philadelphia, PA 19103-4196
21       dklinges@duanemorris.com
22       Attorney for ZHP appeared via Zoom
23
24
25
```

Page 4

```
 1   DREW DORNER, ESQUIRE
     OF:  Duane Morris, LLP
 2       505 9th Street, N.W., Suite 1000
         Washington, DC 20004-2166
 3       dtdorner@duanemorris.com
 4       Attorney for ZHP, Prinston, Solco, and Huahai U.S.
         appeared via Zoom
 5
     D'LESLI DAVIS, ESQUIRE
 6   OF:  Norton Rose Fulbright US LLP
         2200 Ross Avenue, Suite 3600
 7       Dallas, Texas  75201-7932
         Ellie.norris@nortonrosefulbright.com
 8
         Attorney for McKesson Corporation appeared via Zoom
 9
     FRANK STOY, ESQUIRE
10   OF:  Pietragallo Gordon Alfano Bosick & Raspanti, LLP
         38th Floor, One Oxford Centre
11       Pittsburgh, PA  15219
         FHS@Pietragallo.com
12
13       Attorney for Mylan Laboratories Ltd. and Mylan
         Pharmaceuticals, Inc., appeared via Zoom
14   JASON REEFER, ESQUIRE
     OF:  Pietragallo Gordon Alfano Bosick & Raspanti, LLP
15       38th Floor, One Oxford Centre
         Pittsburgh, PA  15219
16       FHS@Pietragallo.com
17       Attorney for Mylan Laboratories Ltd. and Mylan
         Pharmaceuticals, Inc., appeared via Zoom
18
     GEOFFREY COAN, ESQUIRE
19   OF:  Hinshaw & Culberston LLP
         53 State Street, 27th Floor, Boston, MA, 02109
20       Tel: 617-213-7045 | Fax: 617-213-7001
         Gcoan@hinshawlaw.com
21
         Attorney for Sciegen Pharmaceuticals appeared via Zoom
22
     GREG COATES, ESQUIRE
23   OF:  Greenberg Traurig
         500 Campus Drive, Suite 400
24       Florham Park, NJ 07932
         Coatesg@gtlaw.com
25
         Attorney appeared via Zoom
```

Page 5

```
 1   JEFF GEOPPINGER, ESQUIRE
     OF:  Ulmer
 2       312 Walnut Street, Suite 1400
         Cincinnati, Ohio 45202-4029
 3       Jgeoppinger@ulmer.com
 4       Attorney appeared via Zoom
 5   JOHN GISLESON, ESQUIRE
     OF:  Morgan Lewis & Bockius, LLP
 6       One Oxford Centre, 32nd Fl.
         Pittsburgh, PA 15219-6401
 7       john.gisleson@morganlewis.com
 8       Attorney for Aurobindo appeared via Zoom
 9   KARA KAPKE, ESQUIRE
     OF:  Barnes & Thornburg, LLP
10       11 South meridian Street
         Indianapolis, IN 46204-3535
11
         Attorney for CVS and Rite Aid appeared via Zoom
12
     KRISTIN IVES, ESQUIRE
13   OF:  Falkenberg Ives LLP
         230 W. Monroe, Suite 2220
14       Chicago, IL 60606
         Kbi@falkenbergives.com
15
         Attorney for Humana Pharmacy, Inc., appeared via Zoom
16
     LAYNE HILTON, ESQUIRE
17   OF:  Kanner & Whiteley, L.L.C.
         701 Camp Street
18       New Orleans, LA  70130
         Www.kanner-law.com
19
         Attorney for Plaintiffs appeared via Zoom
20
     LUKE BRESNAHAN, ESQUIRE
21   OF:  Crowell & Moring
         1001 Pennsylvania Avenue, NW
22       Washington, DC 20004
         lbresnahan@crowell.com
23
         Attorney appeared via Zoom
24
25
```

2 (Pages 2 - 5)

Page 6

1   RUBEN HONIK, ESQUIRE
      OF:  Honik, LLC
2     Mass Torts Made Perfect
      316 South Baylen Street, Number 400
3     Pensacola, FL 32502
      ruben@honiklaw.com
4
      Attorney for the Plaintiffs appeared via Zoom
5
    SARAH ZIMMERMAN, ESQUIRE
6   OF:  Husch Blackwell, LLP
      190 Carondelet Plaza, Suite 600
7   St. Louis, MO 63105-3443
      Sarah.Zimmerman@huschblackwell.com
8
      Attorney for Express Scripts appeared via Zoom
9
    STEVEN HARKINS, ESQUIRE
10  OF:  Greenberg Traurig
      Terminus 200
11    3333 Piedmont Road NE, Suite 2500
      Atlanta, GA 30305
12    Harkinss@gtlaw.com
13    Attorney for Teva appeared via Zoom
14  WILLIAM MURTHA, ESQUIRE
      OF:  William Murtha, Hill Wallack, LLP
15    21 Roszel Road
      Princeton, NJ 08540
16    wmurtha@hillwallack.com
17    Attorney for Hetero Drugs and Hetero Labs appeared via
      zoom
18
    ELLIE NORRIS, ESQUIRE
19  OF:  Norton Rose Fulbright US LLP
      2200 Ross Avenue, Suite 3600
20    Dallas, Texas  75201-7932
      Ellie.norris@nortonrosefulbright.com
21
      Attorney for McKesson Corporation appeared via Zoom
22
23
24
25

Page 7

1   C. BRETT VAUGGN, ESQUIRE
      OF:  Hollis Law Firm
2     8101 College Blvd, Suite 260
      Overland Park, KS 66210
3
4     Attorney appeared via Zoom

    DAN CAMPBELL, ESQUIRE
5   OF  Crowell & Moring
      1001 Pennsylvania Avenue, NW
6   Washington, DC 20004
      lbresnahan@crowell.com
7
      Attorney appeared via Zoom
8
9
    ALSO PRESENT
10
    BEN PELTA-HELLER, Videographer, appeared via Zoom
11  JAVIER ORDONEZ, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1          I N D E X
2        * * * * *
3   TESTIMONY OF KALI PANAGOS, PHARM.D., R.PH
4     Direct Examination by Ms. Isidro .............. 13
      Cross-Examination by Mr. Gisleson ........... 154
5     Redirect Examination Mr. Geoppinger .......... 175
      Recross-Examination Ms. Isidro ................ 184
6     Further Direct Examination Mr. Hansel ........ 185
      Further Cross-Examination Mr. Gisleson ........ 189
7     Further Further Direct Examination Mr. Dorner . 194
8
    CERTIFICATE OF OATH ............................... 200
9   CERTIFICATE OF REPORTER .......................... 201
    ERRATA SHEET ...................................... 202
10  NOTIFICATION LETTER ............................... 203
11
12        E X H I B I T S
13
      * * * * * *
14  Exhibit No. 1 ....................................... 16
      (Notice of Deposition)
15  Exhibit No. 2 ....................................... 17
      (CV)
16
      Exhibit No. 3 ....................................... 85
17    (Report)
18  Exhibit No. 4 ....................................... 90
      (Engagement Letter)
19
      Exhibit No. 5 ..................................... 125
20    (ASHP Report)
21
22
23
24
25

Page 9

1
2
3
4
5
6
7
8
9
10
11
12
13        * * * * * *
14      S T I P U L A T I O N S
15      It is hereby stipulated and agreed by and between
16  counsel present for the respective parties, and the
17  deponent, that the reading and signing of the deposition
18  are hereby reserved.
19
20
21
22
23
24
25

3 (Pages 6 - 9)

Page 10

1    P R O C E E D I N G S
2          * * * * *
3         THE VIDEOGRAPHER:  Good morning.  We are going on
4    the record at 9:32 a.m. on January 21st, 2022.
5         This is Media Unit Number 1 of the video recorded
6    deposition of Kali -- Dr. Kali Panagos.  This
7    deposition is being held at 2525 Ponce de Leon
8    Boulevard, Suite 1000, in Miami, Florida.
9         My name is Javier Ordonez and I am the
10   videographer.  The court reporter is Chelsea Hlavach;
11   both Veritext.  Will the court reporter please
12   swear in the witness?
13        THE COURT REPORTER:  Can we have counsel please
14   state their appearances?
15        THE VIDEOGRAPHER:  Oh, can counsel please state
16   your name and who you're -- I'm sorry.  State your
17   appearance and who you represent.
18        MS. ISIDRO:  Nilda Isidro from Greenberg Traurig
19   on behalf of Teva.
20        MR. KERNER:  Glenn Kerner from Greenberg Traurig
21   also on behalf of Teva.
22        MR. HANSEL:  Greg Hansel from Preti Flaherty on
23   behalf of Maine Automobile Dealers Association.
24        MR. WHARTON:  Hi.  Charlie Wharton on behalf of
25   Plaintiffs.

Page 11

1         MS. WHITELEY:  Conlee Whiteley on behalf of
2    Plaintiffs.
3         MR. HANSEL:  Before we go on the record further,
4    I guess I have a couple of preliminaries.  First,
5    Jorge Mestre is also here, Chelsea, on behalf of the
6    Plaintiffs.
7         And I see I'm being asked on the Zoom to agree
8    that this be recorded on Zoom, and I don't think
9    that's necessary because we have a videographer and a
10   court reporter.  So I would request that the Zoom not
11   be recorded.
12        MS. ISIDRO:  The Zooms, I believe, have been
13   recorded at prior depositions, and in the event anyone
14   on Zoom asks questions, et cetera, that's -- that's
15   part of the purpose of -- of the Zoom recording, is my
16   understanding.
17        MR. HANSEL:  That would also be audible in the
18   room and would be picked up on the video, the
19   videographer, the court -- the official videographer,
20   as well as by the court reporter.
21        Is that really necessary?
22        MR. KERNER:  Well, let me just ask you a quick
23   question.  My understanding is that the prior
24   depositions have all been recorded on Zoom as well,
25   and this is for you folks and anybody actually on Zoom

Page 12

1    right now, have there been any objections to the
2    depositions being recorded on Zoom or has there been
3    any agreement for this litigation to have the
4    depositions recorded on Zoom?  Because that was my
5    understanding, but I'm asking the group.
6         MS. ISIDRO:  And further --
7         MR. COTES:  Glenn, it's Greg -- it's Greg Cotes.
8    I mean, I've been on dozens and dozens of these in the
9    past six months and I get that recording message every
10   single time and no one's ever said a word about that.
11        MS. ISIDRO:  Yeah.  I would also add that
12   Plaintiffs have -- have raised objections to the
13   number of folks in the room in person, and this was
14   something that was discussed at the recent status
15   conference, and that is also part of the reason why
16   there is the Zoom setup, just in light of the pandemic
17   and concerns about safety that have been raised by
18   Plaintiffs, just as much as by anyone else.
19        And so, again, I don't see the -- the problem
20   with recording the Zoom consistent with all of that.
21        MR. HANSEL:  Okay.  All right.  In that case
22   we'll -- we'll allow it.
23        MS. ISIDRO:  Thank you.
24        THE COURT REPORTER:  Okay.  Will you raise your
25   right hand, please?

Page 13

1         Do you swear or affirm the testimony you are
2    about to give in this matter will be the truth, the
3    whole truth, and nothing but the truth?
4         THE WITNESS:  I do.
5             KALI PANAGOS, PHARM.D., R.PH,
6         having been first duly sworn, was examined and
7    testified as follows:
8             DIRECT EXAMINATION
9    BY MS. ISIDRO:
10        Q.  Good morning, Dr. Panagos.
11        A.  Good morning.
12        Q.  My name is Nilda Isidro.  I'm with the law firm
13   of Greenberg Traurig and I represent Defendant, Teva.
14        A.  Uh-huh.
15        Q.  We're just meeting for the first time this
16   morning, correct?
17        A.  Yes, we are.
18        Q.  Can you please state your full name for the
19   record?
20        A.  My full name is Dr. Kali Panagos.
21        Q.  And what is your current professional address?
22        A.  My current professional address is 105 Down
23   Court, Windermere, Florida -- Florida.
24        Q.  Thank you.  Where do you currently reside?
25        A.  New York.

4 (Pages 10 - 13)

Page 14

1    Q.  Have you ever been deposed before?
2    A.  No, I have not.
3    Q.  Okay.  So I'll just go over a few ground rules on
4  how -- on how this works --
5    A.  Sure.
6    Q.  -- since this is your first deposition.
7        As you can see there's a court reporter to your
8  right who's taking down everything that we say.
9    A.  Uh-huh.
10    Q.  So for that reason, it's very important that you
11  answer verbally, meaning yes -- saying yes or no rather
12  than nodding your head or saying --
13    A.  I understand.
14    Q.  -- uh-huh or huh-uh, and for that same reason,
15  it's important that -- that we not talk over each other,
16  right?  So that you wait that -- until I finish my question
17  before you start to answer, and I'll do the same.  I'll try
18  to wait until you finish your answer before I start the
19  next question, just so that the court reporter isn't trying
20  to take both of us -- what both of us are saying down at
21  the same time.  Is that all right?
22    A.  That's right.
23    Q.  Great.  As -- as you've seen this morning, there
24  are some folks who are also on Zoom and so there's that
25  setup as well.  There you may hear -- you may hear

Page 15

1  objections or something coming from Zoom.  You may also
2  later today get questions from folks on -- on -- on the
3  Zoom.
4        If at any time you don't understand my question,
5  please let me know.  If you don't hear my question, please
6  let me know.  If -- however, if you do answer my question,
7  I'm -- I'm going to take that to mean that you understood
8  my questions.  Is that fair?
9    A.  Yes.
10    Q.  Okay.  If at any time you need to take a break,
11  just let me know and -- and we can do that.  I would just
12  ask that if there's a question pending, that that question
13  be answered before we go on a break.
14    A.  Okay.
15    Q.  Do you have any questions about the -- how
16  this -- about how -- the procedures or how this will work
17  today?
18    A.  Not at this time.
19    Q.  Okay.  And as you know you're here to testify
20  under oath.  Is there any reason that you would not -- you
21  would not be able to give truthful and accurate testimony
22  today?
23    A.  No.
24    Q.  You're not on any medications that might
25  interfere with your ability to testify or anything like

Page 16

1  that?
2    A.  No.
3    Q.  Okay.  And do you want to read and sign this
4  deposition?
5    A.  Sure.
6    Q.  Okay.  Now, Doctor, you're appearing here today
7  pursuant to a notice of deposition; is that right?
8    A.  Yes.
9    Q.  Okay.  We're going to go ahead and mark that
10  notice of deposition as Exhibit 1.  And, again, as I
11  mentioned, because of the Zoom, someone's going to be
12  loading these exhibits up on the Zoom as well, so we may
13  just give a little bit of a pause when we mark an exhibit
14  so that they can get caught up as well.
15    (Exhibit No. 1 was marked for identification.)
16        All right.  Doctor, have you seen this document
17  before?
18    A.  No.
19    Q.  Okay.  I'm going to ask you to take a look at
20  Page 6.  There are a number of requests there.  And just if
21  you could take a look at those and let me know, did anyone
22  ask you whether you had any of these documents that are
23  requested here in your possession?
24        MR. HANSEL:  I'm going to object on grounds of
25    work product privilege to any requests for

Page 17

1    communications between counsel and the witness as, you
2    know, we have also responded to this request in
3    writing, as you know.
4        MS. ISIDRO:  I'll rephrase my question.
5  BY MS. ISIDRO:
6    Q.  Prior to the deposition today, did you check
7  whether you had any of the documents that are listed in
8  these requests in your possession?
9    A.  Yes.
10    Q.  Okay.  We're going to go through them one by one.
11    A.  Sure.
12    Q.  And -- and we'll talk about each one.  So the
13  first one is your current up-to-date resume or CV.  There
14  was a CV attached as an exhibit to your report, correct?
15    A.  Correct.
16    Q.  Is that your current CV?
17    A.  Yes.
18    Q.  Since -- since producing your report, have --
19  have there been any updates to the information on that CV?
20    A.  No.
21    Q.  Okay.  Let's go ahead and mark that CV as Exhibit
22  Number 2 and then we'll go through later on the rest of the
23  items on this list.
24    (Exhibit No. 2 was marked for identification.)
25        Okay.  Doctor, so it notes on your CV that you

5 (Pages 14 - 17)

Page 18

1 received a bachelor of science from St. John's University
2 in 1997; is that right?
3    A. Yes.
4    Q. What was your major?
5    A. Biology.
6    Q. Did you have any minors?
7    A. Computer science.
8    Q. How long did it take you to complete that
9 bachelor of science?
10    A. Four years.
11    Q. And then after that you pursued a second
12 bachelor's degree; is that right?
13    A. Yes.
14    Q. That was from St. John's University in 2000?
15    A. Yes.
16    Q. What was your major then?
17    A. Pharmacy.
18    Q. And did you have any minors at that time?
19    A. No.
20    Q. How long did it take you to complete that
21 bachelor's degree?
22    A. That was completed in 2000.
23    Q. When did you -- when did you begin pursuing that
24 bachelor's degree?
25    A. In '97.

Page 19

1    Q. Okay. And -- and then you received a doctorate
2 from Shenandoah University in 2006?
3    A. Yes.
4    Q. That was also in pharmacy?
5    A. That was a doctorate in pharmacy, yes.
6    Q. Okay. And when did you begin pursuing that
7 doctorate?
8    A. Two years prior to the graduation date.
9    Q. Have you had any other formal education beyond
10 those degrees that we've just discussed?
11    A. No.
12    Q. Okay. So in 2002 you joined the Long Island
13 University's faculty; is that right?
14    A. Yes.
15    Q. And you were on that faculty until 2009?
16    A. Yes, I was part of the faculty and administration
17 till 2009.
18    Q. What -- what was your first role within Long
19 Island University's faculty and administration?
20    A. Director of pharmacy services.
21    Q. And how long did you hold that position?
22    A. I held that until, you know, 2009.
23    Q. Okay. What were your roles and responsibilities
24 under that title?
25    A. My roles and responsibilities were to oversee the

Page 20

1 curriculum of the pharmacy program, the pharmacy advisors
2 reported to me with regards to students -- student
3 advisement for coursework in the pharmacy program, and I
4 also evaluated student progress for remaining and -- within
5 the program as well.
6    Q. Okay. And did you have any other titles or roles
7 within the Long Island University?
8    A. Yes, I served as an adjunct faculty in the
9 department of social sciences.
10    Q. From --
11    A. In the pharmacy program.
12    Q. From what year to what year?
13    A. 2000 and -- jeez. I was -- 2005 about until
14 2009.
15    Q. Okay. Did you teach classes as part of that
16 role?
17    A. I certainly did.
18    Q. What classes did you teach?
19    A. I taught pharmacy orientation, which is an
20 introduction course to pharmacy. I also taught or was part
21 of the recitation courses, which are laboratory type
22 courses in the social sciences division of pharmacy
23 program.
24    Q. Okay. Any other courses that you taught?
25    A. No.

Page 21

1    Q. And other than these two roles that we've just
2 discussed, did you have any other roles or titles within
3 the Long Island University?
4    A. No.
5    Q. You're currently a registered pharmacist in the
6 State of New York?
7    A. Yes, I am.
8    Q. Are you registered or licensed as a pharmacist in
9 any other state?
10    A. No.
11    Q. Do you have any other certifications --
12 professional certifications or qualifications?
13    A. I do.
14    Q. What are they?
15    A. I have an immunizer certification; I am certified
16 in first aid or CPR for infant, child, and adults; I am
17 also certified as an MTM pharmacist; and I also have a New
18 York State Department Adjuster License as well.
19    Q. Okay. You mentioned an immunizer certification.
20 What does that -- what does that mean?
21    A. That means I am permitted to administer
22 immunizations to patients.
23    Q. And what is an MTM pharmacist?
24    A. Medication therapy management.
25    Q. What -- what does medication therapy management

6 (Pages 18 - 21)

Page 22

1  entail?
2      A.  It entails being able to counsel patients on
3  their -- the drugs that they're on and their overall
4  profile and provide them guidance for compliance and
5  adherence.
6      Q.  What do you mean by compliance and adherence?
7      A.  So that they know how to properly take their
8  medication, what the medication is for, and review with
9  them the -- their overall drug profile.
10     Q.  And then you also mentioned New York State
11 Department Adjuster.  What does that entail?
12     A.  At this time I don't have any requirements that
13 it -- that I'm required for that, so it's there, but I
14 don't have any requirements for it.
15     Q.  What does a New York State Department Adjuster
16 do?
17     A.  That is used in the managed care field or in the
18 pharmacy management or if you needed to -- it's more on the
19 business side.  So it's not directly patient care.  It's on
20 the business side of the pharmacy.
21     Q.  What does that mean, more on -- more on the
22 business side?  What types of things?
23     A.  The organization I was employed with, Broadreach
24 Medical Resources, it was beneficial to them if I had this
25 adjuster license.

Page 23

1      Q.  In what way was it beneficial?
2      A.  To adhere with requirements by New York State for
3  the -- their type of business.
4      Q.  What responsibilities did you have with that
5  employer as -- as an adjuster?
6      A.  My responsibilities to that employer were in the
7  capacity of a clinical pharmacist and director of clinical
8  operations, as well as client oversight as well.
9      Q.  Okay.  I'm just trying to understand how the --
10 the New York State Department Adjuster certification comes
11 into play.
12     A.  Uh-huh.
13     Q.  What it allows you to do that you wouldn't be
14 able to do if you had -- if you did not have that
15 certification.
16     A.  It allows the organization to adhere with the
17 requirements of New York State by having an adjuster's
18 license -- an employee with an adjuster's license on staff.
19     Q.  Now, you also mentioned certain clinical
20 affiliations in your CV?
21     A.  Yep.
22     Q.  And -- and those -- one of those is with Hospital
23 of Special Surgery, correct?
24     A.  Correct.
25     Q.  You mention in your report that you have a

Page 24

1  clinical affiliation in pain management and anesthesia at
2  the Hospital for Special Surgery, correct?
3      A.  That is correct.
4      Q.  What does that position entail?
5      A.  That position required me to participate and
6  understand the functions of anesthesiology and pain
7  management of patients as it regards to their procedures
8  that they were -- with regards to their procedures that
9  they were having and work closely with the anesthesia team
10 and pain management -- management team for management of
11 that patient while they were in the hospital.
12     Q.  Did you have any sort of patient facing role in
13 that position?
14     A.  The patients were in surgery, so I was in the
15 surgery room with the anesthesiologists and then we would
16 visit the patient in the post-op.
17     Q.  Okay.  You didn't -- you didn't prescribe any
18 medication or anything like that, correct?
19     A.  No, I did not.
20     Q.  Do you have the ability to prescribe medication?
21     A.  No, I do not.
22     Q.  Okay.  And during what time did you have that
23 clinical affiliation?
24     A.  That was during my time at St. John's pursuing
25 the pharmacy -- my bachelor's of pharmacy degree.

Page 25

1      Q.  Okay.  And then you also list a clinical
2  affiliation with Bellevue Medical Center.
3      A.  Yes.
4      Q.  And during what time did you hold that clinical
5  affiliation?
6      A.  That clinical affiliation was done during my time
7  pursuing my doctorate degree in pharmacy.
8      Q.  Okay.  And what was your role with Bellevue
9  Medical Center?
10     A.  My primary role was participation in the lipid
11 and anticoagulation clinics, participation with the medical
12 and pharmacy teams there to manage patients.
13     Q.  And then you've also listed a clinical
14 affiliation with Northwell Health University.
15     A.  Correct.
16     Q.  During what time frame did you hold that clinical
17 affiliation?
18     A.  That affiliation was done during my time at
19 St. John's University pursuing the bachelor's of pharmacy
20 degree.
21     Q.  And what was your role with Northwell Health?
22     A.  That was an internal medicine rotation with a
23 focus on diabetes, participating in medical rounds and with
24 physicians and pharmacists to manage patients with
25 different diagnoses and conditions for which they were in

7 (Pages 22 - 25)

Page 26

1  the hospital.
2      Q.  And, finally, you list as -- under clinical
3  affiliations, advisory panel member, AMGEN for Repatha?
4      A.  Correct.
5      Q.  During what time frame did you hold that
6  position?
7      A.  2019.
8      Q.  And what were your roles and responsibilities as
9  an advisory panel member?
10     A.  I was asked to participate in the advisory panel
11 for evaluation of Repatha and discussion about the use of
12 the drug and -- in all capacities.
13     Q.  What type of drug is Repatha?
14     A.  Repatha is a lipid lowering drug or
15 hypercholesterolemia drug intended for certain populations
16 that meet the criteria for intended use.
17     MR. MESTRE:  If you're taking a pause, I just
18 wanted to make my appearance.  Jorge Mestre on behalf
19 of the Plaintiffs.  And I also wanted to make sure
20 that we're not recording on the Zoom, correct?
21     MR. KERNER:  We are and we had that discussion.
22     MR. MESTRE:  Oh, we did?
23     MS. ISIDRO:  We had that discussion already.
24 Yes.
25     MR. MESTRE:  Okay.  Okay.

Page 27

1      MR. KERNER:  And your co-counsel noted your
2  appearance earlier as well.
3      MR. MESTRE:  Thank you.
4  BY MS. ISIDRO:
5      Q.  Dr. Panagos, you worked as a pharmacist at
6  Walgreens in New York from 2000 to 2015; is that correct?
7      A.  That is correct.
8      Q.  Were you the lead pharmacist during that time?
9      A.  I was a staff pharmacist.
10     Q.  Okay.  Besides staff pharmacist, did you ever
11 have any other roles with Walgreens?
12     A.  No.
13     Q.  What were your duties and responsibilities as a
14 staff pharmacist?
15     A.  To manage the pharmacy, so that's all aspects of
16 the pharmacy at the time where I'm assigned, my hours of
17 work, and so that includes the prescriptions, filling the
18 prescriptions, reviewing, filling, dispensing, and
19 counseling the -- the prescriptions that are coming in and
20 for the patients that are coming in.
21     I also supervise the technicians that are working
22 in the pharmacy during that time.  They fall under my
23 supervision, including the interns that are on shift at the
24 same time as I am.  I'm also responsible that the drug
25 product is the correct drug product is being filled and

Page 28

1  verifying that that is the right medication, the right
2  patient, and ensuring that there aren't any
3  contraindications for the -- for the patient so.
4      Q.  And during part of this same time period you also
5  worked at Broadreach Medical Resources; is that right?
6      A.  Correct.
7      Q.  That was from 2008 to 2018?
8      A.  Correct.
9      Q.  And what was your role at Broadreach?
10     A.  I had several roles -- roles there.  I was a
11 clinical pharmacist and then became the director of
12 clinical operations and also the head of client management
13 as well.
14     Q.  From what year to what year were you a clinical
15 pharmacist at Broadreach?
16     A.  The entire time.
17     Q.  And from what year to what year were you director
18 of clinical operation?
19     A.  As it states in my CV, 2008 through 2018.
20     Q.  So for the full time period?
21     A.  Yes.
22     Q.  Okay.  And from what year to what year were you
23 head of account services and client management?
24     A.  It was a couple years later so 2009 or 2010.
25 Shortly thereafter.

Page 29

1      Q.  Okay.  So within a couple of years of starting at
2  Broadreach through the end of your time there?
3      A.  Correct.
4      Q.  Okay.  What was the split on your time between
5  Broadreach and Walgreens during this time frame?
6      A.  I began my time with Broadreach initially
7  part-time.
8      Q.  Uh-huh.
9      A.  And I was also part-time or per diem -- well,
10 part-time with Walgreens at that time.
11     Q.  What were your duties and responsibilities as a
12 clinical pharmist- -- pharmacist at Broadreach?
13     A.  My duties included review of prior authorization
14 requests, collaboration with prescribers as needed on
15 behalf of those requests, collaboration with -- or outreach
16 to patients as needed on behalf of those requests.  So
17 review of the prior authorization, completing that request,
18 documenting the results or the findings, tracking that, and
19 communicating appropriately.
20     Q.  What were your roles and responsibilities as
21 director of clinical operations at Broadreach?
22     A.  My roles and responsibilities as clinical
23 operations included ensuring that management of the
24 formulary, management of the prior authorizations,
25 management of every clinical aspect with regards to the

8 (Pages 26 - 29)

Page 30

1  prescription benefit was done efficiently in a proper
2  workflow.
3      Q.  And what were your roles and responsibilities as
4  head of client services and account management at
5  Broadreach?
6      A.  My roles and responsibilities included advising
7  patient -- clients on all aspects of their pharmacy
8  program, which includes their formulary, their plan design,
9  drugs covered and not covered, and providing them with
10 guidance on how to best do that.
11     Q.  Your CV states that you developed industry
12 exclusive prescription indemnity/reference based program
13 during your time at Broadreach.  Can you tell us more about
14 that, what that entailed?
15     A.  That is a prescription type program that is --
16 takes a subset of drugs and applies -- creates a -- a plan
17 that clients or employers may choose if it's appropriate
18 for their employees as a prescription drug offering.  It is
19 structured to allow kind of a different option for
20 employers to take for prescription benefits.
21     Q.  And what was your role in developing that
22 program?
23     A.  My role in developing that program included
24 choice of the medications that would be part of the product
25 offering and that includes both brands and generics, and

Page 31

1  how those medications would be structured within that
2  program for tiering or payments, et cetera.
3      Q.  Your CV also states that you designed evidence
4  based market competitive clinical programs with documented
5  ROI.  Can you tell us what that refers to?
6      A.  Sure.  Clinical programs are a part of a pharmacy
7  benefit offering and they are designed based on evidence
8  based guidelines, which are accepted in the healthcare
9  community as how you -- patients would be treated according
10 to the conditions that they have.  So when you create a
11 clinical program, you do so on clinical merit but in the --
12 you structure it on clinical merit, but you also
13 incorporate other components essential to the prescription
14 drug benefit to help clients manage their population
15 and -- and it's linked to the formulary.
16     Q.  You referenced some evidence-based guidelines.
17 Are there specific evidence-based guidelines that you used
18 in putting together those programs?
19     A.  Yes.
20     Q.  Which ones?
21     A.  There were many.
22     Q.  Can you give some examples?
23     A.  Asthma, diabetes, cardiovascular, just to name a
24 few.  There are many.
25     Q.  So when you say asthma, what does that refer to

Page 32

1  in terms of an evidence-based guidelines?
2      A.  The guidelines set forth by the medical community
3  for treatment of a patient with a diagnosis of asthma.
4      Q.  And for the other conditions that you mentioned,
5  is it the same --
6      A.  The same.
7      Q.  Okay.  Your CV also states that you manage
8  integration of data across medical and prescription,
9  including population, health, and enrollment analytics?
10     A.  Correct.
11     Q.  Can you tell us more about what that entailed?
12     A.  Yes.  My role included review and analysis of the
13 data that -- both on the prescription side and where
14 available on the medical side and being able to evaluate
15 that on behalf of our clients.
16     Q.  What do you mean by the data on the prescription
17 side?
18     A.  Claims data.
19     Q.  And what do you mean by the data on the medical
20 side?
21     A.  Likewise.
22     Q.  Where would you get that data?
23     A.  The data would come from the PBM or the medical
24 carrier.
25     Q.  And finally your CV states that you served as

Page 33

1  subject matter expert on all PBM clinical drug and
2  specialty items.
3      A.  That is correct.
4      Q.  What did you mean by served as a subject matter
5  expert on PBMs?
6      A.  So for our clients and -- I was the person who
7  they would come to for questions about determining -- any
8  question on PBM, actually.  So I served as a subject matter
9  expert to advise on PBM and yeah.
10     Q.  And those clients were -- not -- not specific
11 names, but, you know, what -- what type of entities --
12     A.  Self-insured --
13     Q.  -- were those clients?
14     A.  -- clients, self-insured employer groups.
15         MR. HANSEL:  Please remember to let her finish
16 her question before you begin your answer.
17         THE WITNESS:  Okay.  Thank you.
18 BY MS. ISIDRO:
19     Q.  And what do you mean by served as a subject
20 matter expert on clinical, drug, and specialty items?
21     A.  Again, I would provide guidance and advisement on
22 drugs that are -- were on the formulary or even not on the
23 formulary.  I'd provide the -- would answer any questions
24 related to those drugs.
25     Q.  What does the clinical refer to?

9 (Pages 30 - 33)

Page 34

1    A.  The clinical refers to the medication and the use
2  of the medication from my background and experience as a
3  pharmacist of being able to provide that thought process
4  around the discussion of the medication.
5    Q.  And what do you mean by specialty items?
6    A.  Specialty medications are part of a formulary and
7  they are -- there's -- there's no universal accepted
8  definition for specialty but they're -- tend to be for more
9  complex conditions.
10    Q.  Is that what you're referring to when you use
11  that term in your CV?
12    A.  Correct.
13    Q.  Okay.  You also spent it seems like a year or
14  maybe less than a year at Smith Rx in San Francisco; is
15  that right?
16    A.  That is right.
17    Q.  How -- how -- what is the precise amount of time
18  that you spent at Smith Rx?
19    A.  I think it was from February to December.  Yeah.
20    Q.  What was your role or roles within Smith Rx?
21    A.  Director of clinical services.
22    Q.  That was the only role you held there?
23    A.  Yes.
24    Q.  What were your -- your responsibilities under
25  that role?

Page 35

1    A.  To set up the pharmacy benefits with regards to
2  formulary, prior authorization, reviews to ensure that
3  those were done appropriately and manage the formulary.
4    Q.  Why did you leave that position?
5    A.  There are several reasons.  One, distance from my
6  home.
7    Q.  Your home was in New York at that time?
8    A.  Correct.
9    Q.  What were some of the other reasons?
10    A.  Primarily distance from my home.
11    Q.  And you've been on the Council of Strategic
12  Healthcare Advisors since 2018?
13    A.  Yes.
14    Q.  What are your roles and responsibilities there?
15    A.  They call upon my expertise as needed for cases
16  or surveys, clinical related items for which they deem my
17  qualification's appropriate for response.
18    Q.  Who are you advising in that role?
19    A.  Whatever the particular project at that time
20  calls for, who -- whomever that may be.
21    Q.  What -- are these -- are these all different
22  types of business entities?
23    A.  It could be.
24    Q.  What else could it be?
25    A.  It could be other healthcare professionals,

Page 36

1  industry experts, industry colleagues.  Yeah.
2    Q.  You're the founder of AristaRx Wellness; is that
3  right?
4    A.  That is right.
5    Q.  And you began that in 2018 as well?
6    A.  Correct.
7    Q.  What is AristaRx Wellness?
8    A.  AristaRx Wellness is my LLC that I created.
9    Q.  What does -- what services does AristaRx Wellness
10  offer?
11    A.  Pharmacy benefit consulting.
12    Q.  And to whom do you offer that pharmacy benefit
13  consulting?
14    A.  To primarily self-insured employer groups but
15  could be any group that needs pharmacy benefit consulting.
16    Q.  Do you have any employees?
17    A.  No.
18    Q.  Are you the sole member of that LLC?
19    A.  Yes.
20    Q.  And what are your duties and responsibilities
21  within AristaRx Wellness?
22    A.  To provide pharmacy benefit consulting to my
23  clients.
24    Q.  Is that still an active company?
25    A.  Yes.

Page 37

1    Q.  And the business address that you gave earlier
2  here in Florida, is that for AristaRx Wellness?
3    A.  No.
4    Q.  Okay.  What entity was that address for?
5    A.  ARMSRx.
6    Q.  ARMSRx.  And you've been with ARMSRx since 2019?
7    A.  Yes.
8    Q.  What is -- what roles have you held within
9  ARMSRx?
10    A.  Senior vice president and executive vice
11  president.
12    Q.  And during what time frame were you senior vice
13  president?
14    A.  2019 through 2021, as listed on my CV.
15    Q.  And executive vice president during what time
16  frame?
17    A.  2021 till present.
18    Q.  Okay.  What were your roles and responsibilities
19  as senior VP?
20    A.  To provide advice and guidance to our clients
21  with regards to their pharmacy benefit program, all aspects
22  of their pharmacy benefit program.
23    Q.  And what are your roles and responsibilities as
24  executive vice president?
25    A.  To provide advisement and guidance to our clients

10 (Pages 34 - 37)

Page 38

1  with respect to their pharmacy benefit program, all
2  aspects, and I also oversee or have individuals within our
3  organization who report up to me.
4      Q.  Okay.  So you didn't have individuals who
5  reported up to you as a senior VP?
6      A.  I -- right.
7      Q.  Okay.
8      A.  They -- they report up to me now.
9      Q.  Okay.  Was that the only way in which your role
10  changed from senior VP to executive VP?
11      A.  Yes.
12      Q.  How many people report to you as EVP at ARMSRx?
13      A.  Two.
14      Q.  And what are their roles?
15      A.  They are in account management and PBM
16  operations.
17      Q.  Doctor, you mention in your report that you have
18  20 years of experience, half of which has been dedicated to
19  the managed care and pharmacy consulting industry
20  overseeing clinical development, overall PBM operations,
21  and client services/management, working primarily with
22  self-insured clients, third-party administrators, and TPPs;
23  is that right?
24      A.  That is right.
25      Q.  What is a TPP?

Page 39

1      A.  A third-party payer.
2      Q.  And can you describe what a third-party payer is
3  or does?
4      A.  They are responsible for reimbursement or
5  management of the health care claims, including the
6  prescription benefit.
7      Q.  And how, if at all, is a TPP different from a
8  self-insured employer?
9          MR. HANSEL:  Object to the form.
10      A.  Could you be more specific?
11  BY MS. ISIDRO:
12      Q.  Are there any ways in which a TPP differs from a
13  self-insured employer?
14      A.  There could be.
15      Q.  What are some of the ways in which they could
16  differ?
17      A.  Could you be more specific?
18      Q.  You said there could be differences, so I'm just
19  asking you to elaborate on that.
20          What are some of the differences that could
21  exist?
22      A.  Third-party payers are responsible for the
23  management and reimbursement of the healthcare claims,
24  including the prescription benefit.  Self-insured employers
25  would also be responsible in that same capacity but within

Page 40

1  the confines of their organization.
2      Q.  Okay.  What is a TPA?
3      A.  Third-party administrator.
4      Q.  What does a third-party administrator do?
5      A.  They would administer the benefits, you know, on
6  behalf of an entity or a group.
7      Q.  And how does that differ from a TPP, if at all?
8      A.  So the third-party payer has ultimate
9  responsibility for -- at risk for those claims.  A TPA will
10  manage the claims processing and the functions associated
11  with the benefit but may not have ultimate responsibility
12  or at risk for the claims.
13      Q.  Okay.  Now, I see you have a few documents in
14  front of you right now.  One of them is Exhibit 1, another
15  one is Exhibit 2, but it looks like you might have a few
16  other documents as well; is that right?
17      A.  Yes.
18      Q.  What are the other documents that you have in
19  front of you?
20      A.  My statement, my opinion, my expert report.
21      Q.  Okay.  Anything else that you have in front of
22  you right now?
23      A.  Not document-wise.
24      Q.  Okay.  And this copy of your expert report is one
25  that you've brought with you today, yourself?

Page 41

1      A.  Yes.
2      Q.  Okay.  What is the nature of your work with TPPs?
3      A.  The nature of my work in my role or as a pharmacy
4  benefit consultant -- consultant is to advise on the
5  benefits in all aspects, including formulary, design, and
6  formulary ongoing management, utilization management
7  programs, plan design updates, and -- all functions
8  related to the pharmacy benefit program.
9      Q.  Do you have any experience with P&T committees?
10      A.  I do.
11      Q.  What is the nature of your experience with P&T
12  committees?
13      A.  Throughout my -- my career as a pharmacist, being
14  intimately familiar with P&T committees is -- and
15  understanding what their function is, has been integral in
16  all aspects of my career.
17          I have reviewed countless minutes from P&T
18  committees.  I do that on an ongoing basis to keep track
19  of, if you will, what the progress is and what the
20  functions and what -- the ongoing developments of the P&T
21  committee, and so I'm -- you know, I'm very familiar with
22  what they do and I have, you know, visibility into the P&T
23  committees with whom my clients are engaged with, are
24  involved with.
25      Q.  How do you obtain these minutes from P&T

11 (Pages 38 - 41)

Page 42

1  committees?
2      A.  I request them.
3      Q.  From whom?
4      A.  Whomever the P&T committee is with.
5      Q.  And what -- what entities have you requested P&T
6  committee's minutes from?
7      A.  PBMs and health plans.
8      Q.  Which specific ones?
9      A.  That's confidential information.
10     Q.  Why is that confidential information?
11     A.  It's tied into the clients that I provide
12  counseling -- consulting for.
13     Q.  In connection with which company or which of your
14  roles?
15     A.  My current role at ARMSRx.
16     Q.  Only at ARMSRx?
17     A.  Yes.
18     Q.  Have you ever been a TPP employee?
19     A.  No.
20     Q.  Have you ever been a member of a P&T committee?
21     A.  No.
22     Q.  Do you consider MSP to be a TPP committee?
23     A.  No.
24     Q.  And is it possible sometimes for both a TPA and a
25  TPP to be involved in processing a particular claim?

Page 43

1      MR. WHARTON:  Can I hear that question again,
2  please?
3      MS. ISIDRO:  Can you read it back, please?
4      (The requested portion was read back.)
5      A.  TPAs manage the claims.  They are not processing
6  claims.
7  BY MS. ISIDRO:
8      Q.  Who -- who does the pharmacy expect payment from
9  among a TPA or a TPP?
10     A.  It depends on the structure of the arrangement
11  and who's ultimately -- oh -- responsible for the payments.
12     Q.  So sometimes the pharmacy might expect payment
13  from the TPA first, right?
14     A.  Could you be more specific?
15     Q.  You mentioned it depends on the structure of the
16  particular arrangement, correct?
17     A.  Correct.
18     Q.  Are there sometimes arrangements where the
19  pharmacy might expect payment from the TPA first?
20     A.  That wasn't the focus of my opinion that I'm
21  rendering here today, but to answer the question, it could
22  be.
23     Q.  In your experience with claim adjudication
24  platforms, would both the TPA and the TPP be listed in the
25  claims data?

Page 44

1      A.  No.
2      Q.  Which would be listed?
3      A.  Standard industry claims data for prescriptions
4  would list the client as part of, you know, the fields, the
5  client -- whoever the client is.
6      Q.  And would the client -- am I understanding
7  correctly that the client would be either the TPA or the
8  TPP?
9      A.  If you're asking with regards to claims data, the
10  information within the industry claims data extract would
11  include the client that have -- that is receiving the
12  prescription benefit.  So it's tied directly into the
13  client, whoever that entity is.
14     Q.  Okay.  So it may not be possible from that
15  information alone to tell whether the third party in each
16  claim is a TPP or a TPA?
17     A.  From that data alone, no.
18     Q.  Okay.  Dr. Panagos, you also list on your CV
19  certain professional organizations that you're a member of;
20  is that right?
21     A.  Yes.
22     Q.  You're a member of the American College of
23  Healthcare Executives?
24     A.  Yes.
25     Q.  When did you first become a member?

Page 45

1      A.  2019.
2      Q.  And you're still a member currently?
3      A.  Yes.
4      Q.  What is required to become a member of that
5  organization?
6      A.  The requirements are listed on the website.
7  There are certain qualifications and criteria that you must
8  meet, and I don't recall them all at this moment.
9      Q.  Okay.  Do you --
10     A.  But they are listed there.
11     Q.  Do you recall any?
12     A.  Must be a pharmacist in good standing or a
13  healthcare professional in good standing.
14     Q.  Okay.
15     A.  Uh-huh.
16     Q.  And you're also a member of the Academy of
17  Managed Care Pharmacy; is that right?
18     A.  Yes.
19     Q.  When did you become a member of that
20  organization?
21     A.  When I was in pharmacy school.
22     Q.  And you're still a member currently?
23     A.  Yes.
24     Q.  What is required to become a member of that
25  organization?

12 (Pages 42 - 45)

Page 46

1    A.  Again, those requirements are listed on the
2  website and they -- it's a professional license or
3  non- -- non-licensed individuals listed on the website.
4    Q.  Okay.  You're a member of Women Leading
5  Healthcare; is that right?
6    A.  Yes.
7    Q.  When did you become a member of that
8  organization?
9    A.  2020.  Yeah.  More recent.
10    Q.  And what is required to become a member of Women
11  Leading Healthcare?
12    A.  Yes.  That requires an appointment.  You have to
13  be invited to join by a current member.
14    Q.  And whom were you invited by?
15    A.  I was invited by a colleague who worked with me
16  at the time.
17    Q.  Worked with you at which of your --
18    A.  At ARMSRx.
19    Q.  You're also a member of Healthcare
20  Businesswomen's Association?
21    A.  Yes.
22    Q.  When did you become a member?
23    A.  I don't remember exactly the year.
24    Q.  Do you remember approximately?
25    A.  Maybe 2019, around that time.

Page 47

1    Q.  Okay.
2    A.  2019.
3    Q.  So recently, in the last few years?
4    A.  Uh-huh.
5    Q.  Okay.  What is required to become a member of
6  Healthcare Businesswomen's Association?
7    A.  It would be -- again, it's listed on the website,
8  all the criteria, but be in the healthcare field, be a
9  woman in the healthcare field.
10    Q.  You're also a member of the American Association
11  of Consultant Pharmacists?
12    A.  Correct.
13    Q.  When did you become a member?
14    A.  2019 as well.  2018 perhaps.  I don't remember
15  exactly.
16    Q.  Okay.  What is required to become a member of
17  that organization?
18    A.  Again, those requirements are listed on the
19  organization's site and among them include being a
20  pharmacist in good standing.
21    Q.  And, finally, you're a member of the American
22  Society of Health Systems Pharmacists?
23    A.  Correct.
24    Q.  When did you become a member?
25    A.  I initially became a member when I was in

Page 48

1  pharmacy school.
2    Q.  Okay.  And you're still a member today?
3    A.  Correct.
4    Q.  What is required to become a member of that
5  organization?
6    A.  It's listed on the site.  A professional licensed
7  or non-licensed individuals may join and they -- a
8  pharmacist in good standing.
9    Q.  Are you a member of any other professional
10  organization besides the ones we've just discussed?
11    A.  No.
12    Q.  During your professional career, have you been a
13  member of any other professional organization besides the
14  ones we've just discussed?
15    A.  No.
16    Q.  Okay.  And do you know whether there are any
17  protocols, standards, or guidelines relating to the
18  practice of pharmacy that are promulgated by any of these
19  professional organizations?
20    A.  Would you please restate the question?
21    Q.  Sure.  Why don't we start with the American
22  College of Healthcare Executives.  Does the American
23  College of Healthcare Executives have any protocols,
24  standards, or guidelines relating to the practice of
25  pharmacy?

Page 49

1    A.  No.
2    Q.  Does the Academy of Managed Care Pharmacy have
3  any protocols, standards, or guidelines relating to the
4  practice of pharmacy?
5    A.  Could you restate that question?
6    Q.  Do you know whether the Academy of Managed Care
7  Pharmacy has any guidelines relating to the practice of
8  pharmacy?
9    A.  Within the scope of managed care, they may
10  provide recommendations or guidance.
11    Q.  Are there any that -- that you are personally
12  aware of?
13    A.  As part of my role in my -- in my day-to-day
14  functions, I review guidance and literature from these
15  organizations and part of up -- keeping up with industry
16  practice, and so it's always evolving, changing, and
17  there's -- based on what's happening in the pharmacy
18  practice and managed care world.
19    Q.  Does the Women Leading Healthcare organization
20  issue any guidelines, protocols, or standards with respect
21  to the practice of pharmacy?
22    A.  Not that I'm aware of.
23    Q.  How about the Healthcare Businesswomen's
24  Association?
25    A.  Not that I am aware of.

13 (Pages 46 - 49)

Page 50

1    Q.   Does the American Association of Consultant
2   Pharmacists issue any guidelines relating to the practice
3   of pharmacy?
4    A.   No, not guidelines.
5    Q.   Any protocols relating to the practice of
6   pharmacy?
7    A.   No.
8    Q.   Any standards relating to the proto- -- to the
9   practice of pharmacy?
10    A.   No.
11    Q.   Does the American Association of Consultant
12   Pharmacists issue any sort of statements at all with
13   respect to the practice of pharmacy?
14    A.   Yes.  They provide information with regards to
15   consultant -- consulting pharmacy, yeah, so.
16    Q.   What type of information?
17    A.   Relevant to the field of consulting -- consultant
18   pharmacists, and that could be all -- anything related to
19   the pharmacy field.
20    Q.   Is that in the nature of continuing education
21   information?
22    A.   They do have continuing education, yes.
23    Q.   What other types of information?
24    A.   Industry information, clinical information as it
25   regards for consultant pharmacists.  So anything tied into

Page 51

1   the pharmacy practice before consulting is -- could be
2   on -- could be on their site or available.
3    Q.   And does the American Society of Health System
4   Pharmacists issue any protocol, standards, or guidelines
5   relating to the practice of pharmacy?
6    A.   Yes, they could.
7    Q.   Are you personally aware of any protocols,
8   standards, or guidelines that they've issued with respect
9   to the practice of pharmacy?
10    A.   They provide, you know, recommendations with
11   regards to health system pharmacists and function within
12   that capacity.
13    Q.   Are you aware whether any of the professional
14   organizations that you're a member of issue any protocol,
15   standards, or guidelines with respect to litigation
16   consulting?
17    A.   No.
18    Q.   No you're not aware or you know that they don't?
19    A.   No, I'm not aware.
20    Q.   Okay.  And do you know whether any of the
21   professional organizations that you're a member of issue
22   any protocols, standards, or guidelines with respect to
23   providing expert testimony?
24    A.   No, I'm not aware.
25    Q.   Okay.  Have you ever engaged in any academic

Page 52

1   research regarding nitrosamines?
2    A.   No.
3    Q.   Have you ever engaged in any professional
4   research regarding nitrosamines?
5    A.   No.
6    Q.   Have you ever published any articles relating to
7   nitrosamines?
8    A.   No.
9    Q.   Have you ever published any articles addressing
10   warranties?
11    A.   No.
12    Q.   Have you ever published any articles relating to
13   Valsartan or Valsartan-containing drugs?
14    A.   No.
15    Q.   Have you ever published any articles relating to
16   bioequivalence?
17    A.   No.
18    Q.   Have you ever published any articles relating to
19   the FDA regulatory requirements that apply to
20   pharmaceutical products?
21    A.   No.
22    Q.   Have you ever engaged in any academic or
23   professional research relating to Valsartan or
24   Valsartan-containing drugs?
25        MR. HANSEL:  Object to the form.

Page 53

1    A.   Could you restate the question, please?
2   BY MS. ISIDRO:
3    Q.   Sure.  Have you ever engaged in any academic
4   research relating to Valsartan or Valsartan-containing
5   drugs?
6        MR. HANSEL:  Object to the form.
7    A.   No.
8   BY MS. ISIDRO:
9    Q.   Have you ever engaged in any professional
10   research relating to Valsartan or Valsartan-containing
11   drugs?
12        MR. HANSEL:  Object to the form.
13    A.   Could you be more specific?
14   BY MS. ISIDRO:
15    Q.   Have you ever researched Valsartan in connection
16   with your professional responsibilities?
17    A.   Yes.
18    Q.   In what context?
19    A.   Again, I, in my role as a clinical pharmacist and
20   consultant, I am staying, you know, up to date with all
21   clinical information, pharmacy updates, medication updates,
22   new to drug -- new to market generic brands, generic
23   specialty, and so -- I am knowledgeable on the drug.
24    Q.   So when you say you're knowledgeable on the drug,
25   what are you referring to?

14 (Pages 50 - 53)

Page 54

1    A.  I understand what its intended use is for, what
2   category, therapeutic category it's in, the -- its
3   current -- its standing for inclusion in a formulary, and
4   all components, you know, related to the medication in
5   terms of formulary placement.
6       Q.  Anything else?
7          MR. HANSEL:  Object to the form.
8       A.  Could you be more specific?
9   BY MS. ISIDRO:
10      Q.  Have you conducted any research in Valsartan
11  other -- on Valsartan other than the categories that you
12  just mentioned?
13      A.  No.
14      Q.  Have you ever engaged in any academic or
15  professional research regarding bioequivalence?
16         MR. HANSEL:  Object to the form.
17      A.  My education and my experience are -- involve
18  those -- aspects of bioequivalence, and those are part of
19  the components.
20  BY MS. ISIDRO:
21      Q.  Sorry, part of the components of your
22  education?
23      A.  It's part of the curriculum in some way --
24  throughout the pharmacy program.  So it is -- it's not
25  unfamiliar to me.

Page 55

1       Q.  Did you take any courses on bioequivalence during
2   your pharmacy education?
3       A.  Bioequivalence was incorporated into many courses
4   within the pharmacy program as it relates to the
5   medications we were studying at the time.
6       Q.  So bioequivalence -- bioequivalence is a concept
7   that you're familiar with from your education as a
8   pharmacist, but you haven't taken any courses specifically
9   on bioequivalence; is that correct?
10         MR. HANSEL:  Object to the form.
11      A.  The -- I completed all the coursework required
12  for pharm- -- the pharmacy degree, both the bachelor's
13  degree and the doctor of pharmacy degree and fulfilled all
14  the requirements that those entail.
15  BY MS. ISIDRO:
16      Q.  As you sit here today, you can't specifically
17  recall whether that entailed a course specifically on
18  bioequivalence?
19         MR. HANSEL:  Object to the form.
20      A.  Again, I completed all of the coursework required
21  for a pharmacy degree and I fulfilled all the requirements
22  for both bachelor's and doctorate of pharmacy degree,
23  including licensure in the State of New York   that -- I
24  sufficed all of the academic requirements for all the
25  classwork.

Page 56

1   BY MS. ISIDRO:
2       Q.  As you sit here today, can you recall whether any
3   of those requirements including a course specifically on
4   bioequivalence?
5          MR. HANSEL:  Object to the form.
6       A.  No.
7   BY MS. ISIDRO:
8       Q.  Have you ever authored any publications relating
9   to epidemiology?
10      A.  No.
11      Q.  Have you published any -- withdrawn.  Let me
12  rephrase that.
13         Have you authored any publications in the last
14  ten years?
15      A.  No.
16      Q.  Have you ever authored any publications?
17      A.  No.
18      Q.  Have you ever given any presentations relating to
19  nitrosamines?
20      A.  No.
21      Q.  Have you ever given any presentations relating to
22  product warranties?
23         MR. HANSEL:  Object to the form.
24      A.  I advise my clients on drugs standing -- approval
25  standing, standing, and with regards to helping them with

Page 57

1   the formulary.
2   BY MS. ISIDRO:
3       Q.  And how does that relate to product warranties?
4       A.  That the drug is in good standing and meets the
5   criteria for approval approved by the FDA.
6       Q.  So you've never given a presentation, the focus
7   of which is product warranties?
8          MR. HANSEL:  Object to the form.
9       A.  My professional capacity includes advising my
10  clients and providing them guidance on -- on various drug
11  products, structure of their prescription benefit program,
12  and approvals and drugs in good standing for consideration
13  on the formulary.
14  BY MS. ISIDRO:
15      Q.  Okay.  I'm not asking you though about your
16  responsibilities in your client work.  I'm asking about
17  whether you have ever given a verbal presentation to a
18  group of people with a topic focus on product warranties.
19         MR. HANSEL:  Object to the form.
20      A.  I have given a -- I have spoken to groups of
21  people with regards to the promises that a -- a drug is
22  listed to have or the approval that it has.
23  BY MS. ISIDRO:
24      Q.  How many times have you given that presentation?
25      A.  Many.

15 (Pages 54 - 57)

Page 58

1    Q.   To whom?
2    A.   To my clients.
3    Q.   Your clients in connection with which of your
4    jobs?
5    A.   All of them.
6    Q.   And do you have Power Points that you use for
7    those presentations?
8    A.   I have used Power Points.
9    Q.   Do you keep those Power Points?
10   A.   I share those with the clients.
11   Q.   What have the titles of those presentations been?
12   A.   Those are specific to the client and tied into
13   their prescription benefit program.
14   Q.   And has any of those presentations been
15   specifically focused on the topic of product warranties?
16       MR. HANSEL:  Object to the form.
17   A.   Product warranties are the promises that products
18   make for consideration for inclusion on the pharmacy
19   formulary is a component of that discussion.
20   BY MS. ISIDRO:
21   Q.   What do you understand by the term product
22   warranties?
23   A.   Product warranty is the promise that that product
24   makes that it is safe and effective and meets the criteria
25   for approval, as established by the FDA.

Page 59

1    Q.   What is the basis of your understanding as to the
2    meaning of the term product warranties?
3    A.   The basis of my understanding pulls in my many
4    years of education, my many years of experience in the
5    pharmacy roles that I've held, and my many years of
6    experience in my consulting role, providing guidance to
7    clients about their prescription benefit program and all
8    aspects related to that.
9    Q.   Is it based on anything else or have we just
10   fully discussed your basis for your understanding of that
11   term?
12   A.   I've provided you the basis for that.
13       THE WITNESS:  May I take a break?
14   MR. HANSEL:  Yes.
15   MS. ISIDRO:  Sure.
16       THE WITNESS:  Thank you.
17       THE VIDEOGRAPHER:  The time is 10:49 a.m., and
18   we're going off record.
19       (Break taken.)
20       THE VIDEOGRAPHER:  The time is 11:08 a.m., and
21   we're back on the record.
22   BY MS. ISIDRO:
23   Q.   Dr. Panagos, outside of your client work, have
24   you ever given any formal presentations on product
25   warranties?

Page 60

1    A.   I have given presentations on drug products that
2    are approved for use by the FDA.
3        MS. ISIDRO:  Sorry, can you read back my
4    question, please?
5        (The requested portion was read back.)
6        MR. HANSEL:  I object to the form of the
7    question.  Calls for a legal conclusion; asked and
8    answered.
9    A.   I have given presentations with regard to
10   approved drug products for consideration on product
11   formularies, pharmacy benefit programs.
12   BY MS. ISIDRO:
13   Q.   So is that a no, outside of your client work
14   you've never given formal presentations on product
15   warranties?
16       MR. HANSEL:  Object to the form.
17   A.   I have spoken about drug products that are
18   approved for use to individuals and groups outside of my
19   client base as well.
20   BY MS. ISIDRO:
21   Q.   And to whom have you given those presentations?
22   A.   My patient to patient interactions, as well as my
23   academic work with students.
24   Q.   So you consider your patient to patient
25   interactions to be formal presentations?

Page 61

1    A.   The patient to patient ones are -- the one on one
2    ones are not formal.
3    Q.   Are you --
4    A.   But they are a presentation to the patient about
5    their drug.
6    Q.   So when you refer to your patient to patient
7    interactions, are you referring to any that are not one on
8    one?
9    A.   In that respect it would be members that are part
10   of my client base.  So it could be more than one.
11   Q.   Sorry.  We were talking about outside of your
12   client base?
13       MR. HANSEL:  Object to the form.
14   BY MS. ISIDRO:
15   Q.   Isn't that right?
16       MR. HANSEL:  Object to the form.
17   A.   When consulting a patient regarding their
18   medication it is pharmacist to patient.
19   BY MS. ISIDRO:
20   Q.   Okay.  And that's one on one?
21   A.   Yes.
22   Q.   Other than that, can you think of any formal
23   presentations that you've given outside of your client work
24   relating to -- to product warranties?
25       MR. HANSEL:  Object to the form.

16 (Pages 58 - 61)

Page 62

1    A.  The presentations that I have done are listed in
2  my CV and what I've expressed to you just now.
3  BY MS. ISIDRO:
4    Q.  Okay.  So if it's not listed in your CV, you
5  haven't given a formal presentation on it?
6        MR. HANSEL:  Objection.  That's not what she just
7  said.
8        MS. ISIDRO:  Can you read back the last response,
9  please?
10       (The requested portion was read back.)
11 BY MS. ISIDRO:
12   Q.  So am I understanding correctly that you have not
13 given any formal presentations outside of what is listed in
14 your CV?
15       MR. HANSEL:  Object to the form.
16   A.  No, that's not what I said.  I said what is
17 listed in my CV and what I have just expressed to you in
18 terms of presentations to my clients regarding their drug
19 product or prescription benefit program.
20 BY MS. ISIDRO:
21   Q.  Okay.  And outside of those two categories, there
22 aren't any other formal presentations that you've given?
23       MR. HANSEL:  Object to the form.
24   A.  Formal presentations may include the work I did
25 in academia with my students regarding drug products that

Page 63

1  are approved.
2  BY MS. ISIDRO:
3    Q.  Have you ever taught a course relating to --
4  withdrawn.
5        What are the titles of the courses you've taught?
6    A.  One of the --
7        MR. HANSEL:  Objection:  Asked and answered.
8    A.  Pharmacy orientation is one course.
9  BY MS. ISIDRO:
10   Q.  Any others?
11   A.  The others were recitation courses and the
12 department of social sciences and administrative services
13 within the pharmacy program.
14   Q.  What were the titles of those courses?
15   A.  Those are listed in my CV.
16   Q.  Can -- on which page?
17   A.  Page 2.
18   Q.  Can you show me where it lists the titles of the
19 courses?
20   A.  It lists that I was an adjunct assistant
21 professor of pharmacy in the division of social and
22 administrative sciences.
23   Q.  So it doesn't list the titles of the courses that
24 you taught in that role?
25   A.  Correct.  Those were recitation courses tied into

Page 64

1  the courses that fall under that division so.
2    Q.  And what were the titles of you -- of the courses
3  that you taught in that role?
4    A.  I cannot recall at this time.
5    Q.  Is there anywhere that you would be able to find
6  that information?
7    A.  Yes.
8    Q.  Where?
9    A.  In the records during my time there.  It's
10 information that I've had -- I had with respect to the
11 courses.
12   Q.  You say records of your time there.  Are you
13 referring to your personal records or the organization's
14 records?
15   A.  They would be in both.
16   Q.  Now, looking at Page 3 of your CV, under
17 communication, you state that you were a presenter PBMI
18 Opioid epidemic, Health Underwriters organizations?
19   A.  Correct.
20   Q.  Can you describe what that refers to?
21   A.  PBI (sic) is the Pharmacy Benefit Management
22 Institute and they hold webinars of -- related to the
23 profession and I was a presenter along with my colleague at
24 the time for a presentation on the Opioid epidemic.
25   Q.  When was that presentation?

Page 65

1    A.  2016.
2    Q.  Do you still have the materials from that
3  presentation?
4    A.  No, I do not.
5    Q.  Were you paid to give that presentation?
6    A.  No, I was not.
7    Q.  And was that presentation via webinar you said?
8    A.  Yes.
9    Q.  Do you know how many people attended that
10 presentation?
11   A.  No.
12   Q.  Other than your pharmacy license in New York, do
13 you hold any other professional licenses?
14   A.  No.
15   Q.  Have you ever had your license suspended?
16   A.  No.
17   Q.  Have you ever been punished or sanctioned in any
18 way by a professional board?
19   A.  No.
20   Q.  Have you ever worked or consulted with FDA?
21   A.  No.
22   Q.  Do you hold yourself out as an FDA regulatory
23 expert?
24       MR. HANSEL:  Object to the form of the question.
25   A.  I hold myself as an expert on what the FDA has

17 (Pages 62 - 65)

Page 66

1  approved for drug products, both brand and generics.
2  BY MS. ISIDRO:
3      Q.  Do you hold yourself out as an expert on the
4  process for approval of pharmaceutical products by the FDA?
5      MR. HANSEL:  Object to the form.
6      A.  I understand what the process entails by the FDA.
7  BY MS. ISIDRO:
8      Q.  That wasn't my question.  My question was do you
9  hold yourself out as an expert on the process for approval
10  of pharmaceutical products by the FDA?
11      MR. HANSEL:  Objection.
12      A.  Could you be more specific?
13      MR. HANSEL:  Excuse me.  Asked and answered and
14  that's -- that's getting into a little bit of
15  harassment territory.  She answered the question.
16      MS. ISIDRO:  I take issue with your
17  characterization of that question as harassing.  The
18  witness is consistently failing to answer the question
19  that is asked.  This deposition is going to go for a
20  really long time if that continues.
21      The witness is being asked a question.  If she
22  doesn't understand the question, she can let me know
23  that she doesn't understand the question, but,
24  otherwise, I expect the witness to answer the question
25  that's been asked.

Page 67

1      Can you please read back the last question?
2      MR. HANSEL:  Please also read back the answer
3  when you do that.
4      (The requested portion was read back.)
5      A.  The process for drug approval varies between
6  brand and generics and I have an understanding of the
7  process for -- for both of those drugs to be approved.
8  BY MS. ISIDRO:
9      Q.  Is it your position that having an understanding
10  of the process is all that it takes to be an expert on that
11  process?
12      MR. HANSEL:  Objection.  Calls for a legal
13  conclusion.  Object to the form of the question.
14      A.  I have been asked here today to render an opinion
15  on what TPPs rely on when TPPs rely on or -- or consult
16  when they're making -- with respect -- specifically to
17  generic drugs for formulary decisions, and specific to
18  generic drugs, that process involves an approval by the FDA
19  tied to an ANDA application whereby the manufacturer has to
20  meet the criteria for approval in order for that generic
21  drug to gain their approval.  That's what I've been asked
22  to render an opinion on.
23      Was there something more you were looking for?
24      MS. ISIDRO:  Can you read back the question and
25  the answer, please?

Page 68

1      (The requested portion was read back.)
2  BY MS. ISIDRO:
3      Q.  Dr. Panagos, are you offering any expert opinions
4  in this litigation on the process for approval of
5  pharmaceutical products by the FDA?
6      A.  The process by -- for approval is established by
7  the FDA --
8      Q.  Doctor, I'm going to stop you right there.
9      MR. HANSEL:  Excuse me.  Let her finish her
10  answer.
11  BY MS. ISIDRO:
12      Q.  I'm asking you yes or no questions --
13      MR. HANSEL:  Objection.  No.  You just
14  interrupted the witness.  That's unacceptable.
15      MS. ISIDRO:  I am asking you yes or no questions.
16  You're making speaking objections, which are
17  unacceptable.
18      MR. HONIK:  Let's go off the record.  This is
19  Ruben Honik.  Is the court reporter taking down my
20  comment?
21      THE VIDEOGRAPHER:  The time is 11:24.  We're
22  going off record.
23      (Off the record.)
24      MR. HANSEL:  This is Greg Hansel.  We're going
25  back on the stenographic record.  We are on the record

Page 69

1  stenographically.
2      On behalf of the Plaintiffs, we object pursuant
3  to Federal Rule of Civil Procedure 30(d)(3), motion to
4  terminate or limit which states in part:  A, at any
5  time during a deposition the deponent or a party may
6  move to terminate or limit it on the ground that it is
7  being conducted in bad faith or in a manner that
8  unreasonably annoys, embarrasses, or oppresses the
9  deponent or party.
10      On behalf of the Plaintiffs, Defendants have
11  questioned Dr. Panagos for over two hours or
12  approximately two hours on qualifications only.  In
13  addition to that, Defense counsel has repeatedly
14  re-asked the same question on numerous occasions, in
15  particular a question about whether the witness is
16  qualified as an expert witness under federal procedure
17  in effect.  That question is a legal conclusion, calls
18  for a legal conclusion.  It's a question for the
19  Court.
20      The witness is not an attorney.  The witness does
21  not know standards for acceptance of expert witnesses
22  by federal courts under Daubert and other law.  It is
23  the parties, the Plaintiffs who have offered the
24  expert, and even if the Defendants are not happy with
25  the answer provided by the expert, that is not a

18 (Pages 66 - 69)

Page 70

1  ground to badger the witness, to repeatedly ask the
2  question calling for a legal conclusion, and, in
3  effect, harassing Dr. Panagos.
4      It's discourteous, it's not civil, and the
5  Plaintiffs will not permit it to continue. We would
6  like to request the Defendants for an offer of proof
7  at this time of how much longer they intend to ask the
8  witness about her qualifications and on which topics
9  of her qualifications they intend to examine the
10  witness.
11      We will consider that, and if it is unacceptable
12  under Rule 30(d)(3), we will terminate the portion of
13  the examination on qualifications to the extent only
14  that we believe it is impermissible.
15      Is there anything else you'd like to add, Conlee,
16  Charlie, Jorge?
17      MS. WHITELEY: No.
18      MR. HANSEL: Ruben? Anyone? Thank you.
19      MR. KERNER: The only thing I'd like to say is I
20  would like an opportunity to confer with Defense
21  counsel.
22      MR. HANSEL: Of course.
23      MR. KERNER: So we're going to need a couple of
24  minutes.
25      MR. HANSEL: Sure. We'll step out.

Page 71

1      MR. KERNER: Yeah. I'd appreciate that.
2          (Break taken.)
3      MR. KERNER: And so we will respond to your
4  statements earlier.
5      MS. ISIDRO: So, Counsel, I would like to state
6  for the record that I categorically disagree with any
7  suggestion that the questions that have been -- that
8  have been asked here today are harassing or designed
9  to embarrasses the witness in any way.
10      Unfortunately, the witness has repeatedly
11  answered the question that she has wanted to answer
12  rather than the question that has been asked.
13      In addition, there has been a pattern of speaking
14  objections from Plaintiff's counsel, culminating in
15  this inappropriate attempt to baselessly terminate or
16  limit this deposition and to interfere with
17  Defendant's rights to thoroughly explore the
18  qualifications, as well as the -- the qualifications
19  of the expert that Plaintiffs are offering, as well as
20  the content and the bases for her opinions that she
21  intends to offer in this litigation.
22      I note that you threatened to suspend the
23  deposition of the witness after she was asked not a
24  question about her qualifications but a question about
25  whether she intended to offer specific opinions in

Page 72

1  this litigation. A yes or no question about whether
2  she intended to offer specific opinions regarding the
3  FDA process for drug approval in this litigation.
4      So, with that in mind, I would suggest that we
5  continue with the deposition at this time, and as long
6  as the witness answers the questions that have been
7  asked, bearing in mind that you have an opportunity to
8  Redirect after Defendants have asked their
9  questions -- and so as long as she answers the
10  questions that have been asked, I don't see any reason
11  why there should be any problem continuing with the
12  deposition at this time.
13      MS. WHITELEY: May I ask a question rather
14  than -- do you have an amount of time that you have an
15  idea of how long that you think it will continue on
16  qualifications?
17      MS. ISIDRO: It should not be much longer,
18  assuming the witness does answer the questions that
19  have been asked. But if the witness continues to be
20  evasive and, you know, we continue to have to ask the
21  question ten different ways so that the original
22  question can be answered by the witness, then it -- it
23  will need to go much -- it will need to go longer and
24  it's not on me to -- it's not within my power to be
25  able to determine that. It's -- it's much more within

Page 73

1  the witness's power to determine how she's going to be
2  answering questions.
3      MR. KERNER: Anybody else on the Defense side
4  have anything that they want to add?
5      MR. GISLESON: Yeah. This is John Gisleson from
6  Morgan Lewis on behalf of Aurobindo.
7      We do not believe that the questioning has been
8  in any way inappropriate. The tone has been fair and
9  balanced, and in our view the witness has been
10  nonresponsive and evasive.
11      MR. KERNER: Anyone else on the Defense side?
12      The only thing I'll add is our intention is to
13  move forward efficiently, to continue to ask
14  appropriate questions, to continue to ask
15  professionally, as counsel's been doing all morning,
16  and to treat the witness with respect, as counsel has
17  done all morning, and move forward with the deposition
18  and get through it as quickly as we can.
19      There's no intent to keep this witness here one
20  minute longer than necessary.
21      MR. HANSEL: Anything else from the Defendants?
22      MS. ISIDRO: Not at this time.
23      MR. HANSEL: All right. On behalf of the
24  Plaintiffs, we disagree with your statements that the
25  witness has been nonresponsive or evasive and we stand

19 (Pages 70 - 73)

Page 74

1    by our statements earlier, which I will not repeat.
2        Based on your representations, particularly to
3    Attorney Whiteley's questions, that you intend to
4    reach a conclusion to the questioning about
5    qualifications with reasonable efficiency, we will
6    allow the questioning of Dr. Panagos to continue now,
7    including to a limited extent on qualifications, and
8    I -- I guess if there's one thing I want to reiterate,
9    it's that she is not -- we're not holding her out as
10   an expert on Daubert and on what Federal Court
11   standards are for the acceptance of expert witnesses,
12   which is a legal question for the Court.
13       So, having said that, I will go get Dr. Panagos
14   to -- to get started.  Thank you.
15       MS. ISIDRO:  Thank you.
16           (Off the record.)
17       THE VIDEOGRAPHER:  The time is 12:17 p.m., and we
18   are back on record.
19   BY MS. ISIDRO:
20   Q.  Dr. Panagos, are you intending to offer any
21   opinions in this litigation on the process for obtaining
22   approvals from FDA for pharmaceutical products?
23       MR. HANSEL:  Object to the form.
24   A.  The process has already been established by the
25   FDA for approval of drugs.

Page 75

1        Could you restate the question?
2    BY MS. ISIDRO:
3    Q.  Are you intending to offer any opinions in this
4    litigation on the process of obtaining approvals from FDA
5    for generic pharmaceutical products?
6        MR. HANSEL:  Object to the form.
7    A.  I am rendering an opinion on what TPPs,
8    third-party payers, rely on with respect to generic drugs
9    for consideration to a drug formulary.
10   BY MS. ISIDRO:
11   Q.  So you're not intending to offer any opinions on
12   the process for obtaining approvals from FDA for generic
13   pharmaceutical products?
14       MR. HANSEL:  Object to the form:  Asked and
15       answered, argumentative.
16   A.  The process for approval of generic drug products
17   is already established by the FDA.
18   BY MS. ISIDRO:
19   Q.  Would you defer to FDA on that process?
20       MR. HANSEL:  Object to the form.
21   A.  Would you please be more specific?
22   BY MS. ISIDRO:
23   Q.  Would you defer to FDA with respect to matters
24   involving the process for obtaining approvals for
25   pharmaceutical products?

Page 76

1        MR. HANSEL:  Object to the form.
2    A.  As a pharmacist, I understand the process
3    involved for approval of generic drug products as it
4    entails how those decisions are tied into a formulary
5    placement.
6    BY MS. ISIDRO:
7    Q.  And will you be offering expert opinions in this
8    litigation involving that process?
9        MR. HANSEL:  Object to the form.  Her report
10       speaks for itself.
11   A.  My expert opinion is what TPPs rely on and
12   consider with respect to generic drugs for placement to the
13   drug formulary.
14   BY MS. ISIDRO:
15   Q.  That is the only category of information on which
16   you intend to offer expert opinions in this litigation?
17       MR. HANSEL:  Object to the form.
18   A.  My expert opinion is on what TPPs rely on when
19   consideration -- for consideration of generic drugs as --
20   for consideration to be placed on the formulary and it --
21   reimburse as part of prescription drug program.
22   BY MS. ISIDRO:
23   Q.  That is the only category on which you are -- you
24   will be opining in this litigation?
25       MR. HANSEL:  I object to the form of the

Page 77

1    question.
2    BY MS. ISIDRO:
3    Q.  You can answer.
4    A.  As I understand your question, that is what my
5    opinion will be rendered upon.
6    Q.  Have you ever had any formal training in
7    economics?
8    A.  What do you mean by formal?  Could you define
9    that?
10   Q.  Have you ever done any coursework in economics?
11   A.  As part of my college degrees, some of the
12   coursework entailed economics.
13   Q.  Was that as part of one of your majors?
14   A.  Yes.
15   Q.  Which ones?
16   A.  Biology and as well as pharmacy.
17   Q.  Have you ever obtained any certifications in
18   economics?
19   A.  No.
20   Q.  Have you ever obtained any degrees in economics?
21   A.  No.
22   Q.  Have you ever had any formal training in business
23   principles?
24   A.  Business coursework was also part of my college
25   education.

20 (Pages 74 - 77)

Page 78

1    Q.  In connection with which of your majors or
2    minors?
3    A.  Both biology, computer science, and pharmacy.  So
4    all -- all -- both majors and the minor.
5    Q.  Outside of your college degrees, have you had any
6    other coursework in business?
7    A.  Only as it pertains to my continuing education
8    credits for upholding my pharmacy degree, so business
9    related to pharmacy continuing education.
10   Q.  Have you received any certificates in business?
11   A.  No.
12   Q.  Have you received any degrees in business?
13   A.  No.
14   Q.  You are not a medical doctor, correct?
15   A.  No.
16   Q.  You're not a pharmacologist?
17   A.  No.
18   Q.  And you're not a toxicologist?
19   A.  No.
20   Q.  Aside from this litigation, have you ever been
21   retained as an expert witness or an expert consultant in
22   connection with litigation?
23   A.  No.
24   Q.  And you testified you've never been
25   deposed before.  Have you ever testified at trial

Page 79

1    before?
2    A.  No.
3    Q.  Have you ever done consulting work for any
4    pharmaceutical company?
5    A.  No.
6    Q.  Have you ever done consulting work for any
7    medical device company?
8    A.  No.
9    Q.  What percent of your income is currently derived
10   from expert testimony or expert consulting in connection
11   with litigation?
12   A.  I have not calculated the percentage, but it's
13   only with regards to the case I'm providing an expert
14   report for here.
15   Q.  Okay.  Doctor, if we could turn back to  Exhibit
16   1, which was your notice of deposition.
17   A.  Uh-huh.
18   Q.  You can pass Exhibit 2 back to me, just so you
19   don't have too many papers in front of you.
20   MR. HANSEL:  She may want to refer to the other
21   exhibits.
22   MS. ISIDRO:  Oh, certainly.  If -- if you would
23   like --
24   MR. HANSEL:  If she could keep them there, I
25   would appreciate it.

Page 80

1    BY MS. ISIDRO:
2    Q.  If you'd like to refer back to them at any point,
3    you're welcome to.  I'm happy to take them back if it's too
4    cluttered.
5    A.  It's okay.
6    MR. HANSEL:  Why don't you leave them nearby.
7    THE WITNESS:  I'm fine.
8    MS. ISIDRO:  Okay.
9    THE WITNESS:  I'm good.  Thank you.
10   BY MS. ISIDRO:
11   Q.  Okay.  And you're I believe still on Page 6,
12   correct?
13   A.  Correct.  Uh-huh.
14   Q.  Okay.  Item Number 2 asks for articles,
15   abstracts, studies, reports, et cetera, and am I
16   understanding your testimony correct, you don't have any
17   items responsive to Number 2?
18   MR. HANSEL:  Excuse me.  I'm going to object.  I
19   object to the form of the question because we've
20   provided a written response as well.
21   A.  Everything is included in my expert report, in my
22   CV.  All the materials necessary for this expert opinion
23   that I'm providing are within the report and my CV.
24   BY MS. ISIDRO:
25   Q.  Okay.  But, Doctor, you've never authored any

Page 81

1    articles, correct?
2    A.  Correct.
3    MR. HANSEL:  Object to the form.
4    BY MS. ISIDRO:
5    Q.  And you've never authored or co-authored any
6    abstracts, correct?
7    A.  Correct.
8    Q.  And you've never authored or co-authored any
9    published studies, correct?
10   A.  Correct.
11   Q.  You've never authored or co-authored any
12   published reports, correct?
13   A.  Correct.
14   Q.  You've never authored or co-authored any
15   publications, correct?
16   A.  Right.
17   Q.  Okay.  You've never authored or co-authored any
18   book chapters?
19   A.  No.
20   Q.  Or any books in their entirety, correct?
21   A.  That is correct.
22   Q.  Do you have in your possession, Doctor, any
23   presentations -- withdrawn.  Let me ask a different
24   question.
25   Have you ever given any presentations or speeches

21 (Pages 78 - 81)

Page 82

1    regarding drug safety and cancer risk?
2        A.   That's a broad question but I have spoken about
3    drug safety and the potential for side effects or adverse
4    effects as related to that drug.  Those can include cancer.
5        Q.   And in what context have -- have those speaking
6    engagements been?
7        A.   In every context as my professional -- in my
8    professional career as a pharmacist.  So in my current
9    role, in my academic role, and in my previous roles in
10   my -- with my previous employment.
11       Q.   So has -- have those been specifically with and
12   for your clients?
13           MR. HANSEL:  Object to the form.
14       A.   Primarily for my clients.  But also for, if I was
15   involved in a speaking engagement with my organization, it
16   could have been to an audience that was not my client.
17   BY MS. ISIDRO:
18       Q.   On how many occasions would you have spoken to an
19   audience that went beyond your clients?
20       A.   A few times a year.  A few times a year, once a
21   quarter maybe.
22       Q.   During what time frame?
23       A.   Again, it's been throughout my career.  So I've
24   been doing this work here now for 20 plus years and so it's
25   been throughout my career, sometimes more, sometimes less.

Page 83

1        Q.   What was most recent one?
2        A.   The most recent engagement was to the Chicago
3    Healthcare Underwriters speaking about pharmacy benefit
4    programs.
5        Q.   When was that?
6        A.   That was, goodness, before COVID.  So I'm trying
7    to think of the date.  I can't recall the exact date, but
8    it was before the -- the COVID lockdown.
9        Q.   Okay.  And were you discussing cancer risk in
10   connection with pharmaceutical products during that
11   presentation?
12       A.   We were discussing pharmacy benefit information,
13   drug safety, drug formulary plan designs.
14       Q.   So you don't specifically recall discussing
15   cancer risk?
16       A.   It was not the focus of the presentation.
17       Q.   To the best of your recollection, was it
18   discussed during the presentation?
19       A.   Again, it was not the focus, but whenever you
20   talk about a drug, you bring in I guess a clinical
21   pharmacist for the side effects or adverse effects or any
22   concerns.
23       Q.   So it's possible that you may have discussed it,
24   but you don't specifically recall discussing it; is that
25   correct?

Page 84

1        A.   Right.  That was not the focus of the
2    presentation.
3        Q.   I understand you're saying it's not the focus and
4    I just want to make sure that I'm understanding your
5    answer.
6        A.   Uh-huh.
7        Q.   It was not the focus and you don't specifically
8    recall discussing it, although it's possible you may have
9    discussed it?
10           MR. HANSEL:  Objection.  I object to the form.
11       Asked and answered, repeatedly.
12   BY MS. ISIDRO:
13       Q.   Is that --
14       A.   My --
15       Q.   -- is my understanding correct?
16       A.   My professional responsibility as a pharmacist
17   when speaking about medications includes discussion of any
18   potential concerns with the drug, including cancer, if it's
19   relevant to the discussion.  So I believe I'm answering
20   your question.
21       Q.   Okay.  So I'll take that to mean that my
22   understanding is correct and you may have discussed it but
23   you don't specifically recall discussing it.
24           MR. HANSEL:  Objection and move to strike.
25       Object to the form.

Page 85

1    BY MS. ISIDRO:
2        Q.   And please feel free to correct me if I'm wrong
3    in my interpretation.
4            MR. HANSEL:  Again, object to the form.
5    BY MS. ISIDRO:
6        Q.   Am I correct that your -- that all of the
7    materials that you have relied on in forming your opinions
8    in this case have been listed in the attachments to -- to
9    your report?
10       A.   All the materials have been listed, yes, in the
11   attachment.
12       Q.   Okay.  And let's go ahead and mark a copy of your
13   report and its exhibits as Exhibit Number 3.
14           MS. ISIDRO:  She just needs to mark it first.
15       Sorry.
16           MR. HANSEL:  Can I have a copy?
17           MS. ISIDRO:  Oh, I have it here.  Sorry about
18       that.
19           MR. KERNER:  Yeah.
20           MR. HANSEL:  I'm sorry.
21           (Exhibit No. 3 was marked for identification.)
22   BY MS. ISIDRO:
23       Q.   And, Doctor, if you could turn to exhibit --
24   excuse me, Appendix A --
25       A.   Uh-huh.

22 (Pages 82 - 85)

Page 86

1    Q. -- attached to your report. If you could just
2  take a moment to review that and confirm for me that that
3  is a complete list of the materials that you have relied on
4  in forming your opinions in connection with this
5  litigation.
6    A. This is a list of my materials that I've
7  reviewed. My expert opinion is based on my experience, my
8  education, my day-to-day upkeep of my profession to stay up
9  to date with what's happening, and -- and the materials
10  that I've reviewed are included here.
11    Q. Okay. And as far as the materials that you've
12  reviewed, Appendix B -- excuse me --
13    A. A.
14    Q. -- Appendix A to your report is a complete list
15  of the materials you've reviewed in connection with this --
16  with your opinions in this litigation?
17    MR. HANSEL: Object to the form.
18    A. My day-to-day responsibilities include reviewing
19  many pharmacy and industry articles, data, and information,
20  but with regards to this expert opinion the materials that
21  I reviewed are listed in Appendix A.
22  BY MS. ISIDRO:
23    Q. You haven't reviewed any medical records in
24  connection with this litigation, correct?
25    MR. HANSEL: Object to the form.

Page 87

1    A. Would you please be more specific than medical
2  records?
3  BY MS. ISIDRO:
4    Q. Have you -- I'll rephrase the question.
5    Have you reviewed any medical records pertaining
6  to the Plaintiffs in this litigation?
7    A. No.
8    Q. Have you spoken to any of the Plaintiffs in this
9  litigation?
10    A. No.
11    Q. Have you spoken to any of the other experts that
12  Plaintiffs have disclosed in this litigation?
13    A. No.
14    Q. Have you issued any invoices in connection with
15  your work in this litigation?
16    A. I will -- I have not issued any invoices, but I
17  did receive a retainer at the onset.
18    Q. And what was the amount of the retainer that you
19  received at -- at the outset?
20    A. $4,500.
21    Q. Has that retainer been -- let me rephrase that.
22    Have -- have there been amounts consumed from
23  that retainer?
24    A. Are you asking if I've used the monies?
25    Q. No, Doctor.

Page 88

1    A. I mean, consumed is -- you've used the word
2  consumed. I'm not --
3    Q. Doctor, have you been tracking your charges in
4  connection with this litigation?
5    A. Yes. I keep a record of my -- the time I spend
6  on this case. Absolutely.
7    Q. How do you track the time that you spend on this
8  case?
9    A. I keep a record of the time I spent in my own
10  personal file.
11    Q. Are they written notes? Do you use a program or
12  an app to track your time? How exactly do you keep those
13  records?
14    A. It's a combination of written and tracked through
15  an Excel.
16    Q. An Excel spreadsheet that -- that you populate?
17    A. That's correct.
18    Q. Okay. What is your hourly -- what is the hourly
19  rate at which you are being compensated in connection with
20  this litigation?
21    A. The hourly rate for non-testifying work is $375
22  an hour and for testifying work it's $400 an hour.
23    Q. What is your arrangement with respect to the
24  retainer? And I'll explain what I mean. Is it -- is it
25  something that's just there to guarantee payment or is it

Page 89

1  something on which you collect your fees as they are
2  incurred up to the extent of the retainer or a different
3  arrangement with respect to the retainer?
4    A. The retainer was for my expert report.
5    Q. Okay. And have you calculated the total amount
6  of fees that you have incurred based on your time spent
7  and -- and your hourly rate, up until today?
8    A. I have kept a report of the time I've spent for
9  this expert report and case and I have that -- I have that
10  recordkeeping, if you will.
11    Q. What is the total number of non-testifying hours
12  that you have spent to date on this litigation?
13    A. Approximately 50 to 60 hours.
14    Q. I'm sorry? I didn't hear you.
15    A. Fifty to -- about approximately fifty hours.
16    Q. Approximately 50 hours. So at your
17  non-testifying rate of $375 an hour, that would be
18  approximately $18,750 in fees in connection with your
19  non-testifying work so far; is that right?
20    A. You calculated it so.
21    Q. So that exceeds the amount of -- of the retainer,
22  correct?
23    A. Yes.
24    Q. Will that retainer remain in place and you will
25  invoice Plaintiffs for the full amount of -- of the fees

23 (Pages 86 - 89)

Page 90

1  that you have incurred so far, or will you reduce the
2  amount that you invoice by the amount of the retainer?
3      A.  I will reduce it by the amount of the retainer.
4      Q.  Okay.  When were you first retained in connection
5  with this litigation?
6      A.  The exact date I'm -- I have to look at the exact
7  date, but it was in October I want to say or maybe late
8  September of '21.
9      Q.  Who first contacted you in connection with this
10 litigation?
11     A.  Greg Hansel.
12     Q.  Did you know Greg Hansel before he contacted you
13 in connection with this litigation?
14     A.  No.
15     Q.  Do you know how you came to be contacted in
16 connection with this litigation?
17     A.  I was told it was through my LinkedIn profile.
18     Q.  When you do issue an invoice in connection with
19 your work in this litigation, who will you be sending that
20 invoice to?
21     A.  Preti Flaherty.
22     Q.  I'm going to go ahead and mark this document as
23 Exhibit 4.
24     (Exhibit No. 4 was marked for identification.)
25     Do you recognize this document, Doctor?

Page 91

1      A.  Yes.
2      Q.  And what is it?
3      A.  It is the engagement letter.
4      Q.  Your engagement letter in connection with this
5  litigation?
6      A.  Yes.
7      Q.  All right.  What materials did you initially
8  review in connection with this litigation?
9      A.  All of the materials I reviewed are in the
10 appendix.
11     Q.  Let me ask my question a different way.
12     Did you review any materials prior to making a
13 determination as to whether or not you would agree to your
14 engagement in connection with this litigation?
15     A.  So, again, my day-to-day functions in my
16 professional role include reviewing pharmacy literature and
17 materials, industry relevant information so that I am aware
18 of -- so I can best advise my clients in -- in my
19 professional capacity so.
20     Q.  In making a decision as to whether or not you
21 would agree to be engaged in connection with this
22 litigation, did you review any materials relating to the
23 litigation itself?
24     A.  No.
25     Q.  Did you review any materials relating to the

Page 92

1  claims at issue in the litigation?
2      A.  No.
3      Q.  Has anyone assisted you in doing research or
4  gathering information in connection with the opinions that
5  you're offering in this litigation?
6      A.  No.
7      Q.  What were you asked to do when you were retained
8  in connection with this litigation?
9      A.  I would ask -- I was asked to render an opinion
10 on what TPPs rely on when -- with respect to generic
11 medications.
12     Q.  Other than Plaintiff's counsel, have you spoken
13 to anyone about this litigation?
14     A.  No.
15     MS. ISIDRO:  Counsel, I'm about to start getting
16 into Dr. Panagos's report.  Should we break for lunch
17 at this time and -- and then come back or should we
18 get started and break at a later time?
19     MR. HANSEL:  Let's break.
20     MS. ISIDRO:  Okay.
21     MR. KERNER:  How long?  What do you think?
22     THE VIDEOGRAPHER:  The time is 12:53 p.m., and we
23 are off record.
24     (Break taken.)
25     THE VIDEOGRAPHER:  The time is 1:56 p.m., and we

Page 93

1  are back on the record.
2  BY MS. ISIDRO:
3      Q.  Good afternoon, Dr. Panagos.  Do you still have
4  in front of you Exhibit Number 3, your report with its
5  Appendixes?
6      A.  I do.
7      Q.  All right.  We're going to spend some time going
8  through your opinions as -- as stated in your report.  So
9  I'm going to have you turn to Page 2, and specifically the
10 fourth section of your report in Paragraph 12, you don't
11 have any opinions that are stated in the earlier parts of
12 your report prior to this paragraph; is that correct?
13     A.  Correct.
14     Q.  In Paragraph 12 you state that in July 2018 the
15 FDA announced a voluntary recall of Valsartan, including
16 Valsartan-containing drugs, due to contaminants NDEA and
17 NDMA.  What is your basis for that statement?
18     A.  That information is found on the FDA website.
19     Q.  What do you understand the term contaminants to
20 mean?
21     A.  These contaminants were found in unacceptable
22 levels and probable human carcinogens and do not belong in
23 the medication.
24     Q.  I want to make sure I understood your answer.
25     MS. ISIDRO:  Can you read back the question and

24 (Pages 90 - 93)

Page 94

1 the answer for me, please?
2      (The requested portion was read back.)
3 BY MS. ISIDRO:
4      Q.  Am I understanding you correctly that you
5 understand the term contaminants to mean any substance that
6 does not belong in the medication?
7      MR. HANSEL:  Object to the form.
8      A.  In the scope of this case, a -- the contaminant
9 is a substance that was -- should not have been in the
10 medication and not consistent with the referenced labeled
11 product.
12 BY MS. ISIDRO:
13      Q.  So that is how you are using the word
14 contaminants in this report?
15      MR. HANSEL:  Object to the form.  Asked and
16 answered.
17      A.  I've answered the question.
18 BY MS. ISIDRO:
19      Q.  I just want to make sure I'm understanding your
20 answer.
21      MR. HANSEL:  Object to form.
22 BY MS. ISIDRO:
23      Q.  Have I stated that correctly?
24      MR. HANSEL:  Object to form.
25      A.  Please restate so I can be sure I -- I understand

Page 95

1 the way you restated it.
2      MS. ISIDRO:  Can you read it back, please?
3      (The requested portion was read back.)
4 BY MS. ISIDRO:
5      Q.  I just want to understand, Doctor, whether --
6 what you've discussed in that prior response is a
7 description of how you personally are using the term
8 contaminants in your report.
9      A.  Uh-huh.  So a contaminant is any substance that
10 is in the medication that should not have been there, not
11 consistent with the referenced label product, and
12 inconsistent with the safety and efficacy of the referenced
13 labeled product.
14      Q.  Thank you.  What are you relying on for purposes
15 of your definition of contaminants?
16      A.  My industry knowledge, my pharmacy background, my
17 education, studies, and professional scope in my career.
18      Q.  Anything else?
19      A.  No.
20      Q.  You're not relying on any specific FDA
21 regulations for the purpose of that definition?
22      A.  The scope of my career relies -- you know,
23 involves referring to FDA information so.
24      Q.  Are there specific FDA regulations that you are
25 referring to in terms of your understanding of the

Page 96

1 definition of the term contaminants?
2      A.  Specifically, no.
3      Q.  In the next sentence you say these contaminants
4 are probable human carcinogens according to the
5 International Agency for Research on Cancer classification.
6 Are -- so are you relying on IARC's classification in that
7 statement?
8      A.  Yes.
9      Q.  Have you independently assessed the
10 carcinogenicity of NDEA or NDMA?
11      A.  Not independently.
12      Q.  Are you relying on anything other than the IARC
13 classification in making that statement in your report?
14      MR. HANSEL:  Object to the form.
15      A.  The IARC classification is public information
16 which is what I relied on to make that statement.
17 BY MS. ISIDRO:
18      Q.  Okay.  And you didn't rely on anything else for
19 purposes of that statement?
20      MR. HANSEL:  Object to the form.
21      A.  Yes.
22 BY MS. ISIDRO:
23      Q.  Yes.  I'm sorry, yes, that's correct?
24      A.  Yes.
25      MR. HANSEL:  Object to the form.

Page 97

1 BY MS. ISIDRO:
2      Q.  Okay.  Apart from any alleged presence of NDEA or
3 NDMA in Valsartan-containing drugs, are you offering any
4 criticism of Valsartan-containing drugs?
5      A.  Valsartan -- as long as they're being used for
6 their intended FDA labeled use, no.
7      Q.  The next section, Section 5, talks about
8 background on TPP pharmacy benefits and Paragraphs 14
9 through 18 specifically talk about TPPs; is that correct?
10      A.  Yes.
11      Q.  What are you relying on in making the statements
12 that you make in Paragraphs 14 through 18 with respect to
13 TPPs?
14      A.  I'm relying on the information I've listed in
15 Appendix A.
16      Q.  Can we -- can you please look at that appendix
17 and identify for me which of the items listed on Appendix A
18 you're relying on for purposes of paragraphs 14 through 18
19 of your report?
20      A.  Yeah.  So I have listed in the appendix
21 experts -- excerpts, excuse me, of data, MSP data --
22      Q.  That's the one that says Detail Claim Report, HMO
23 fields added, July 6, 2021?
24      A.  Yes.  And the other items would be the
25 coordination of benefits, third-party liability.

25 (Pages 94 - 97)

Page 98

1    Q.  Okay.  That's further up on the list on Page 1 of
2   Appendix A?
3    A.  Yes.
4    Q.  Okay.  Anything else?
5    A.  And then further down where it says MADA claims
6   for the recalled Valsartan.
7    Q.  Okay.  That's the last item on -- on that page,
8   MADA claims data for recalled Valsartan --
9    A.  Yes.
10    Q.  -- four spreadsheets?
11    A.  Yes.  And then on the next page there are
12   additional items referenced, fourth and fifth down.  The
13   recall status of NDCs.
14    Q.  So you mentioned fourth and fifth down.  Is that
15   MADA Third Party Payor Plaintiff's Fact Sheet, and MSP
16   Third Party Payor Plaintiff's Fact Sheet?
17    A.  Yeah.
18    Q.  And then two down from that, was it the recall
19   status of NDCs listed?  Is that the one you referred to?
20    A.  Uh-huh.
21    Q.  Okay.
22    A.  Yes.
23    Q.  Anything else?
24    A.  My own experience from being an expert in this
25   field and consulting and knowing how these entities work.

Page 99

1    Q.  Have we now discussed all of the bases for your
2   statements in Paragraphs 14 through 18 --
3    MR. HANSEL:  Object to the form.
4   BY MS. ISIDRO:
5    Q.  -- of your report?
6    A.  All of my materials reviewed are in the appendix,
7   so for my -- for the entirety of my expert report.  So I've
8   answered your question, you know, to the best of my
9   knowledge at this point, but I have -- I'd have to go back
10   and study each of the items in the appendix very closely to
11   ensure that I haven't missed a point in those sections, but
12   for purposes of our discussion, I have pointed out those
13   that I believe are relevant.
14    Q.  All right.  The next section of your report,
15   Paragraphs 19 and 20, deals with PBMs; is that correct?
16    A.  Right.
17    Q.  And what did you rely on in formulating the
18   statements that you've included on Paragraphs 19 and 20 of
19   your report?
20    A.  My professional experience, my pharmacy knowledge
21   and education, and the materials in Appendix A.
22    Q.  And with respect to the materials in Appendix A,
23   which of the materials listed in Appendix A formed the
24   basis for your statements in Paragraphs 19 and 20 of your
25   report?

Page 100

1    A.  The American Journal of Managed Care, ASHP,
2   Coordination of Benefits, Formulary Development, The
3   Journal of Managed Care, Drug -- Navigating Drug
4   Formularies and Pharmacy Benefit Management, the Orange
5   Book, Principles of a Sound Drug Formulary, and the U.S.
6   Food and Drug Administration Development Approval Process.
7    Q.  The next section of your report, Paragraphs 21
8   through 28, discusses prescription drug formularies; is
9   that right?
10    A.  Yes.
11    Q.  What did you rely on in formulating the
12   statements in paragraphs 21 through 28 of your report?
13    A.  The same ones I gave you for PBM.
14    Q.  Okay.
15    A.  Including my knowledge, experience, and education
16   in my professional capacity.
17    Q.  Okay.  And nothing additional with respect to
18   Paragraphs 21 and 28, is that correct, as compared with
19   Paragraphs 19 and 20?
20    A.  Just whatever falls under the scope of my
21   professional capacity and my day-to-day functions.
22    Q.  And would you consider Paragraphs 14 through 28
23   to be background for your opinions in this litigation?
24    MR. HANSEL:  Object to the form.  Calls for a
25   legal conclusion.

Page 101

1    A.  Please repeat the question?
2    MS. ISIDRO:  Could you read it back, please?
3    (The requested portion was read back.)
4    MR. HANSEL:  Same objection.
5    A.  They can serve as a background or they're
6   information pertinent to the -- the opinion, relevant and
7   pertinent.
8   BY MS. ISIDRO:
9    Q.  In Paragraphs 29 to 32 you make various
10   statements concerning the Orange Book, correct?
11    A.  29 through -- well, it goes beyond 32.
12   BY MS. ISIDRO:
13    Q.  Okay.
14    A.  But yes.
15    Q.  Okay.  You have a Section D in your report titled
16   Orange Book and that goes 29 through 32; is that correct?
17    A.  In Section D, yes.
18    Q.  Okay.  What is the Orange Book?
19    A.  The Orange Book, also known as the Approved Drug
20   Products with Therapeutic Equivalence Evaluation, is a list
21   of FDA approved drug products and they're -- approved for
22   marketing as -- in the United States as they're labeled --
23   as their label indication.
24    Q.  Doctor, as part of what PBMs do, do PBMs develop
25   formularies?

26 (Pages 98 - 101)

Page 102

1    A. Yes.
2    Q. In doing so, do TP -- excuse me. Withdrawn.
3        Do TPPs review and either adopt a formulary as is
4    or do they customize the PBM formulary?
5        MR. HANSEL: Object to the form.
6    A. Could you be more specific?
7    BY MS. ISIDRO:
8    Q. What specificity are you looking for?
9    A. When you say customize.
10    Q. Do TPPs make any changes to the formularies that
11    PBMs develop?
12    A. TPPs, they're prescription -- the prescription
13    benefit design is up to the client and they're -- what's
14    included or excluded in that benefit design can be tied
15    into the formulary.
16    Q. Is it possible for a TPP to use its own P&T
17    committee?
18    A. If they have a P&T committee.
19    Q. In fact, you note in your Footnote 2 of your
20    report that in some cases the development and management of
21    a drug formulary is done in-house where the TPP will use
22    its own P&T committee and might consult with the PPM,
23    correct?
24    A. If they have their own P&T committee.
25    Q. And you do state that in Footnote 2 of your

Page 103

1    report, correct?
2    A. I have agreed.
3    Q. Do you have any knowledge as to what share of the
4    proposed TPP class members developed their own formularies
5    versus using a formulary developed by a PBM?
6    A. No, I do not.
7    Q. Short of making an inquiry into each -- each TPP
8    class members whose formulary included the at issue
9    Valsartan, is there any way to tell whether it was the PBM
10    or the TPP to decided whether Valsartan should be included?
11    A. No, I will not speculate.
12    Q. In Paragraph 25 of your report -- it's the bottom
13    of Page 4 and top of Page 5.
14    A. Uh-huh.
15    Q. You mention that the P&T committee is required to
16    base formulary decisions on scientific evidence, standards
17    of practice, peer reviewed medical literature, accepted
18    clinical practice guidelines, and other appropriate
19    information.
20        What is other appropriate information?
21    A. Data specific to the drug they are reviewing. It
22    could include clinical studies.
23    Q. Anything else?
24    A. Yes. It could include other items.
25    Q. Such as?

Page 104

1    A. Drug monographs, product labels, submitted
2    applications for approval, status within the Orange
3    Brook -- Book.
4    Q. Is cost a factor?
5    A. P&T committees make their decisions based on
6    clinical merit.
7    Q. So in your -- the diagram that you include in
8    Paragraph 28 in the fourth tier down --
9    A. Uh-huh.
10    Q. -- it's titled P&2 -- P&T review meetings. Do
11    you see that?
12    A. Yes.
13    Q. It lists safety, efficacy, and cost. What does
14    that refer to, that reference to cost there?
15    A. P&T committees make their decisions primarily
16    based on clinical efficacy, ensuring that the drug that is
17    going to be considered for placement on the formulary is
18    safe and effective. Additional functions may include cost
19    as it pertains to reimbursement of the claim.
20    Q. So that is one of the factors that can be
21    considered via a P&T committee, correct?
22    A. The primary factors are based on clinical merit
23    and not cost.
24    Q. So you would not consider cost a primary factor,
25    correct?

Page 105

1    A. P&T committees are unbiased advisory boards
2    reviewing drug information based on the clinical merit of
3    the -- that's their primary function. Once that is
4    completed, they can include costs or may -- may or may not
5    include that as part of their discussion.
6    Q. Okay. And you did include it as part of the
7    diagram in Paragraph 28?
8    A. Uh-huh.
9    Q. Correct?
10    A. Yes.
11    Q. At the bottom of that diagram, the very last tier
12    of that diagram, you refer to relevant stakeholders. Who
13    are those relevant stakeholders?
14    A. Whoever the entity is deciding on the formulary,
15    whether to adopt that formulary as part of their
16    prescription benefit.
17    Q. The Orange Book is published by the FDA, correct?
18    A. Correct.
19    Q. And the Orange Book lists drug products that are
20    approved by FDA on the basis of safety and effectiveness;
21    is that correct?
22    A. Correct.
23    Q. The Orange Book also contains therapeutic
24    equivalence evaluations for approved generic prescription
25    drug products; is that correct?

27 (Pages 102 - 105)

Page 106

1    A.  Yes.
2    Q.  Who makes those therapeutic equivalence
3  evaluations?
4    A.  The FDA.
5    Q.  When a generic drug manufacturer files an ANDA,
6  one of the things that they must demonstrate to FDA in that
7  ANDA is bioequivalence, correct?
8    A.  That was not within the scope of my report, but I
9  understand that to be part of the requirement.
10    Q.  Okay.  So that consideration is -- outside the
11  scope of your report and your opinions in this litigation,
12  correct?
13    MR. HANSEL:  Object to the form.
14    A.  As I said, it is part of the process for filing
15  an ANDA or applying for ANDA.
16    MS. ISIDRO:  Can you please read back the answer
17    that mentioned outside of the scope of the report?
18    MR. HANSEL:  And the question also.
19    MS. ISIDRO:  Sure.  Please.
20    (The requested portion was read back.)
21  BY MS. ISIDRO:
22    Q.  For Section D of your report, Paragraphs 29
23  through 32, what did you rely on in formulating those
24  paragraphs of your report?
25    A.  FDA information.

Page 107

1    Q.  Which specific FDA information?
2    A.  On ANDA process, on NDA generic drugs.
3    Q.  Would the FDA information that you relied on be
4  listed in Appendix A of your report?
5    A.  I believe it is listed at -- that's Page 2, U.S.
6  Food and Drug Administration Development Approval Process.
7    Q.  Okay.  Anything else?
8    A.  I relied on my knowledge and experience in the
9  industry, knowing how the process works.
10    Q.  Okay.  Did you also rely on the Orange Book
11  preface that's listed in your Appendix A?
12    A.  Yes, I referenced the Orange Book.
13    Q.  I'm sorry, I miss -- I think I misheard you.  I
14  thought the only item that you had mentioned from
15  Appendix A was the U.S. Food and Drug Administration
16  Development Approval process?
17    A.  Clearly the Orange Book is listed in the
18  Appendix A as well, so let me clarify and say that I
19  referenced that in addition.  I think that's --
20    Q.  Okay.
21    A.  -- quite obvious.
22    Q.  So it would be those two items from Appendix A,
23  correct?
24    A.  In addition to my knowledge and experience,
25  understanding how the process works.

Page 108

1    Q.  Okay.  But not any of the other items listed on
2  Appendix A, other --
3    A.  It could have been --
4    Q.  -- than the two that we've discussed?
5    A.  It could have been -- all of the items in the
6  appendix can have played a role in forming the entirety of
7  my discussion and expert opinion.  That's why they're
8  listed there.
9    Q.  Okay.  Did the MADA Third Party Payor Plaintiff's
10  Fact Sheet form the basis for any of your -- any of the
11  information stated in Paragraphs 29 through 32 of your
12  report?
13    A.  Not as it pertains to the explanation of the
14  Orange Book, the description of the Orange Book.
15    Q.  Is there another aspect to Paragraphs 29 through
16  32 that it does touch upon?
17    A.  By it, you mean -- can you be more clear?
18    Q.  The MADA Third Party Payor Plaintiff's Fact
19  Sheet.
20    MR. HANSEL:  Object to the form.
21    A.  Could you please repeat the question?
22    MS. ISIDRO:  Sorry, could you read the question?
23  I think you were asking for the court reporter to read
24    the question back.
25    (The requested portion was read back.)

Page 109

1    MS. ISIDRO:  I'll restate the question.
2  BY MS. ISIDRO:
3    Q.  Does the MADA Third Party Payor Plaintiff's
4  Sheet form the basis of any aspect of your statements in
5  Paragraphs 29 through 32 of your report?
6    A.  No.  Not the basis.
7    Q.  In Paragraphs 33 through 41 of your report, you
8  discuss definitions and significance of therapeutic
9  equivalence code; is that correct?
10    A.  That is correct.
11    Q.  What did you rely on in formulating your
12  Paragraphs 33 through 41 of your report?
13    MR. HANSEL:  Object to the form.
14    A.  The FDA information on the Orange Book.
15  BY MS. ISIDRO:
16    Q.  Uh-huh.
17    A.  And the explanation of therapeutic equivalence
18  codes, public information.
19    Q.  And just to make sure I understand the
20  explanation of therapeutic equivalence codes, do you mean
21  within the Orange Book itself or are you referring to
22  something different?
23    A.  The TE codes or therapeutic equivalence codes are
24  present in the Orange Book.
25    Q.  Okay.  So the -- so those are the -- that's what

28 (Pages 106 - 109)

Page 110

1  you're referring to?
2      A.  As I understand your question, yes.
3      Q.  Okay.  In Paragraphs 42 and 43 you discuss
4  criteria for entry into the Orange Book; is that correct?
5      A.  Yes.
6      Q.  What is the basis for your statements in
7  Paragraphs 42 and 43?
8      A.  The FDA process established for drugs seeking
9  approval.
10     Q.  Is that the last item listed on Appendix A of
11  your report?
12         MR. HANSEL:  Object to the form.
13     A.  That has the FDA item on the -- on the appendix,
14  yes, but as I said, all of the items in my appendix
15  could've played a role in my -- all of my -- entirety of my
16  expert opinion.
17  BY MS. ISIDRO:
18     Q.  I was asking specifically the response you gave
19  to the prior question.
20         MS. ISIDRO:  So could you read it back, that
21     prior question and answer?
22         (The requested portion was read back.)
23         MR. HANSEL:  Object to the form.
24  BY MS. ISIDRO:
25     Q.  So, Dr. Panagos, in that response when you said

Page 111

1  the FDA process established for drugs seeking approval,
2  were you referring to the last item that's listed in the
3  Appendix A of your report or were you referring to
4  something else?
5         MR. HANSEL:  Object to the form.  Asked and
6     answered repeatedly.
7         The -- the witness has testified numerous times
8     about things she relied on for the entirety of her
9     report, and this repeated attempt to pigeonhole her is
10    just unfair and it -- could we stipulate that her
11    previous testimony about what she's relied on for her
12    entire report will apply to each question about what
13    she relied on for a particular paragraph?
14         MS. ISIDRO:  Let the record reflect that counsel
15    is making an inappropriate speaking objection.
16    Defendants are entitled to explore the basis for the
17    statements and conclusions in Dr. Panagos's report as
18    a proffered expert in this litigation.
19         MR. HANSEL:  Will you stipulate?
20         MS. ISIDRO:  So -- we will not stipulate to waive
21    our rights to explore the basis for her statements and
22    conclusions in her report.
23         MR. DORNER:  Hello.  This is Drew Dorner.  ZHP
24    will not stipulate either to your proposed
25    stipulation.

Page 112

1         MS. ISIDRO:  Could you please read back the last
2     question before the speaking objection, and I don't
3     believe there was an answer, but if there was please
4     read that too.
5         (The requested portion was read back.)
6         MR. HANSEL:  Object to the form.
7     A.  You're referring to the Orange Book, the process
8  by which a drug can gain approval and list -- to be listed
9  in the Orange Book is public information on brand and
10  generic drugs and the processing must follow as established
11  by the FDA.  It's an authoritative source.
12  BY MS. ISIDRO:
13     Q.  So, Doctor, in making your statements in
14  Paragraph 42 of your report, I understand your response to
15  be that you have relied on the U.S. Food and Drug
16  Administration Development Approval Process.  Am I
17  understanding that to be -- am I correctly understanding
18  that to be one of the bases for your statement in Paragraph
19  42 of your report?
20     A.  One of the bases.
21     Q.  Okay.  What are the other bases for your
22  statement in Paragraph 42 of your report?
23     A.  The Orange Book itself, my experience, education,
24  and professional capacity and -- and -- and my day-to-day
25  experience in this field.

Page 113

1     Q.  Any other bases that you're relying on for your
2  statements in Paragraph 42 of your report?
3     A.  No.
4     Q.  And what are you relying on for your statements
5  in Paragraph 43 of your report?
6     A.  The same.
7     Q.  Okay.  You state in Paragraph 44 that a generic
8  drug is a copy of a branded drug in terms of dosage,
9  administration, and performance.  What is your basis for
10  that statement?
11     A.  My understanding of a generic drug from my
12  education, my experience, and the information on -- in --
13  I've listed in Appendix A.
14     Q.  And which of the items listed in Appendix A are
15  you relying on for the statement that a generic drug is a
16  copy of a branded drug in terms of dosage, administration,
17  and performance?
18     A.  All of the information except for the claims
19  data.
20     Q.  So that includes -- so you are relying for
21  purposes of that statement on the MADA Third Party
22  Player -- Third Party Payor Plaintiff's Fact Sheet?
23     A.  No.  I include that as part of the claim, so let
24  me clarify.
25     Q.  Okay.

29 (Pages 110 - 113)

Page 114

1    A.  Not the Plaintiff Fact Sheet.
2    Q.  Okay.  Because you also have an item called MADA
3  Claims Data for Recalled Valsartan.
4    A.  Those go together.
5    Q.  Okay.  So you did not rely on that?  You did
6  not -- did you rely on the MSP Third Party Payor
7  Plaintiff's Fact Sheet?
8    A.  No.
9    Q.  Okay.  Other than those three items in Appendix A
10  to your report, you relied on all of the other items for
11  purposes of the statement that a generic drug is a copy of
12  a branded drug in terms of dosage, administration, and
13  performance?
14    A.  Including my knowledge, education, all --
15    Q.  Did --
16    A.  -- and -- yeah.
17    Q.  Did you rely on the FIN Declaration for purposes
18  of that statement?
19    A.  No.
20    Q.  Okay.  In Paragraph 44 you go on to say that
21  generic drugs must be bioequivalent to the branded drug,
22  meaning the generic drug will work the same way in the body
23  and be as safe and effective as the brand name drug.
24    A.  That is correct.
25    Q.  What are you relying on in making that statement

Page 115

1  in Paragraph 44?
2    MR. HANSEL:  Object to the form.
3    A.  Relying on my education, my degrees, my licensure
4  as a pharmacist.  It's a critical component to performing
5  my day-to-day functions and understanding that foundational
6  component, what a generic drug is.  So I -- I rely on my
7  education and my experience and the items I've listed in
8  the appendix.
9  BY MS. ISIDRO:
10    Q.  What FDA regulation or regulations define the
11  term bioequivalent?
12    A.  I was not asked to study that, so -- so I'm not
13  going to answer that at this time.  I'd have to study the
14  FDA regulations very closely to be able to give a
15  thoughtful and complete answer to -- to that question.
16    Q.  Paragraph 45 you state that the substitution of
17  generic equivalents, drugs considered bioequivalent by FDA,
18  are encouraged by PBMs to provide the best care at an
19  affordable cost.
20    What is your basis for that statement?
21    MR. HANSEL:  Object to the form.
22    A.  The Orange Book lists drugs that are approved to
23  their referenced listed drug product to be the same and
24  effective and to be considered -- a consideration for the
25  formulary.  Those drugs are considered substitutable

Page 116

1  because they are deemed to be safe and effective.  It is
2  really -- the -- the foundation or the basis that
3  determined whether a generic drug meets the criteria for
4  inclusion on a -- for consideration on a formulary, they
5  are listed in the Orange Book or not.
6  BY MS. ISIDRO:
7    Q.  Is it specifically the FDA's therapeutic
8  equivalence evaluation that -- that determines whether a
9  generic equivalent can be substituted?
10    MR. HANSEL:  Object to the form.
11    A.  They must have an approved ANDA and have a
12  therapeutic equivalence code assigned to the medication
13  that allows them to be considered substitutable.
14  BY MS. ISIDRO:
15    Q.  And which are the codes that allow them to be
16  considered substitutable?
17    A.  AB.
18    Q.  You state in Paragraph 46 that TPPs and P&T
19  committees expressly rely upon the manufacturer's
20  compliance with all applicable standards, obligations, and
21  regulations.
22    What is your basis for that statement in
23  Paragraph 46?
24    MR. HANSEL:  Object to the form.
25    A.  The information presented to the FDA for approval

Page 117

1  by an ANDA application is presented by the manufacturer who
2  is responsible for the information they provide.
3  BY MS. ISIDRO:
4    Q.  And what is your answer based on?
5    MR. HANSEL:  Object to the form.
6    A.  The application is submitted by the manufacturer
7  who is responsible for the information they provide the FDA
8  to be considered for approval.  That includes all aspects
9  related to that application.
10  BY MS. ISIDRO:
11    Q.  What is your support for that response?
12    MR. HANSEL:  Object to the form.
13    A.  Manufacturers are responsible for their
14  medication.  They're responsible for the quality control,
15  ensuring that that medication is safe and effective to --
16  when they're applying for that approval -- seeking approval
17  by the FDA.  It's their responsibility to ensure that it's
18  safe and effective.
19  BY MS. ISIDRO:
20    Q.  Is that your own opinion?
21    MR. HANSEL:  Object to the form.
22    A.  In my professional capacity, that is what I
23  believe to be correct.
24  BY MS. ISIDRO:
25    Q.  Within Paragraph 46 of your report, what are you

30 (Pages 114 - 117)

Page 118

1  relying on in making a representation as to what TPPs
2  expressly rely upon?
3      MR. HANSEL:  Object to the form.
4      A.  So 46 refers to the P&T committee, which the P&T
5  committee will make the decision whether the drug will be
6  considered for the formulary or not.
7      I don't understand your question if you're asking
8  something else.
9  BY MS. ISIDRO:
10     Q.  Sure.  There's -- there's a statement in
11 Paragraph 46 of your report that TPPs and P&T committees
12 expressly rely upon the manufacturer's compliance with all
13 applicable standards, obligations, and regulations.
14     A.  Correct.  Via the NDA.  The manufacturer has to
15 provide that information to the FDA via their ANDA
16 application to be considered for approval and that's the
17 information that's relied upon for the approval.
18     Q.  Okay.  And you say that that information is -- is
19 expressly relied upon by the TPPs and the P&T committees,
20 correct?
21     A.  That information is relied upon as it's provided
22 in their application submitted to the FDA for approval.
23     Q.  But am I correct in saying that Paragraph 46 of
24 your report states that that information is expressly
25 relied upon by TPPs and P&T committees?

Page 119

1      A.  It's relied upon in that it -- it's provided to
2  the applic-- -- in the application for approval.
3      Q.  Okay.  Do you see the word expressly in Paragraph
4  46 of your report?
5      A.  Yes.
6      Q.  What did you mean by the word expressly in
7  Paragraph 46 of your report?
8      A.  That it is -- that it is the responsibility of
9  the manufacturer to provide all the information, in
10 conjunction with their medication, seeking approval by the
11 FDA.  It is their responsibility to do that.
12     Q.  And Paragraph 46 says that TPPs and P&T
13 committees expressly rely, correct?
14     A.  Right.  Because the manufacturers are providing
15 that information on their ANDA application seeking approval
16 by the FDA.
17     Q.  So am I not understanding your sentence in
18 Paragraph 46 correctly, that the TPPs and the P&Ts are the
19 ones who expressly rely upon the information you're
20 referencing?
21     A.  Once that medication is approved, because they
22 have provided that -- the manufacturer has complied with
23 all the requirements needed for approval, that medication
24 is listed in the Orange Book as having complied and so they
25 will -- that suffices the requirement for consideration to

Page 120

1  the formulary.
2      Q.  Can you point to any document in which a TPP
3  expressly relies upon the manufacturer's compliance with
4  all applicable standards, obligations and regulations?
5      A.  That is done via -- referencing the Orange Book
6  and the approval status of the drugs.
7      Q.  So when you say that they expressly rely upon
8  that information, am I understanding correctly that what
9  you mean by that statement is that they --
10     A.  It is the responsibility of the manufacturer to
11 provide that information on their drug application, follow
12 the process established by the FDA for their drugs to be
13 considered for approval in the United States and considered
14 for coverage on the drug formulary.
15     MS. ISIDRO:  Can you please read back the prior
16 question and answer, not this one.
17     (The requested portion was read back.)
18 BY MS. ISIDRO:
19     Q.  Can you point to any document in which a P&T
20 committee expressly relies upon the manufacturer's
21 compliance with all applicable standards, obligations, and
22 regulations?
23     MR. HANSEL:  Object to the form.
24     A.  The Orange Book is a representation of a list of
25 drugs approved safe and effective for use in the United

Page 121

1  States.
2  BY MS. ISIDRO:
3      Q.  Is the Orange Book issued by P&T committees?
4      A.  No.  It's issued by the FDA.
5      Q.  Right.  So the P&T committee is not making any
6  express statements in the Orange Book, correct?
7      A.  No, they're not.
8      Q.  Have you read the ANDA for any
9  Valsartan-containing drug?
10     A.  No.
11     Q.  You state in Paragraph 47 that the AB rating in
12 the FDA Orange Book based as it is on the generic drug
13 manufacturer's ANDA represents a manufacturer's warranty to
14 TPPs and P&T committees for placement on a prescription
15 drug formulary.
16     What do you mean by the term warranty in
17 Paragraph 47?
18     MR. HANSEL:  Objection.  Calls for a legal
19 conclusion.
20     MS. ISIDRO:  It's a term she's used in her
21 report.  I'm entitled to ask her what she means by it
22 when she uses it in her report.
23     Can you please read back the question?
24     MR. HANSEL:  Can we stipulate that every time you
25 ask a question about warranty I'm making a continuing

31 (Pages 118 - 121)

Page 122

1    objection that it's -- I object to the form because it
2    is calling for a legal conclusion? Will you stipulate
3    to that continuing objection so I don't have to repeat
4    myself every time you ask a question about warranty.
5        MS. ISIDRO: No. I will not stipulate to that
6    unless she will withdraw the use of the term warranty
7    from her report in which case I don't have to ask
8    about it anymore.
9        ZOOM PARTICIPANT: There's a pending question.
10   Does the witness remember the question?
11       MS. ISIDRO: I was just going to ask that it be
12   read back, please.
13       THE WITNESS: Thank you.
14       ZOOM PARTICIPANT: Ask her if she remembers it
15   and let her answer it. Do you remember the
16   question?
17       THE WITNESS: I'd like for it to be read back.
18       ZOOM PARTICIPANT: Thank you.
19       THE WITNESS: Thank you.
20       (The requested portion was read back.)
21       MR. HANSEL: Object to the form.
22   A. The warranty represents their promise or
23   assurance that their drug is safe and effective and
24   equivalent to the referenced listed drug product; the same
25   as the referenced listed drug product.

Page 123

1    BY MS. ISIDRO:
2        Q. When you use the term warranty in your report, do
3    you understand that to be a legal term?
4        MR. HANSEL: Object to the form.
5        A. No. It's a term that refers to a promise, an
6    assurance, a guarantee that that manufacturer has set
7    forth.
8    BY MS. ISIDRO:
9        Q. What are you relying on in making the statements
10   that you've made in Paragraph 47 of your report?
11       MR. HANSEL: Object to the form.
12       A. When an ANDA is approved, it means that the
13   manufacturer has fulfilled the requirements, including
14   safety and effectiveness, for their drug to be approved.
15   BY MS. ISIDRO:
16       Q. You reference -- you reference a document in
17   Footnote 6 at the end of Paragraph 47?
18       A. Uh-huh.
19       Q. Is that correct?
20       A. Yes.
21       Q. Are you relying on that document for purposes of
22   the statement that you've made in Paragraph 47 of your
23   report?
24       MR. HANSEL: Object to the form.
25       A. Not exclusively.

Page 124

1    BY MS. ISIDRO:
2        Q. But does it form part of what you're relying on
3    in making the statement in Paragraph 47 of your report?
4        A. It refers -- Footnote 6 refers to P&T committees.
5    What manufacturers represent in their ANDA is -- when the
6    ANDA's approved, it's -- it means that the manufacturer has
7    sufficed and is compliant to receive approval of a
8    medication deemed safe and effective.
9        Q. Why do you reference -- withdrawn.
10       Why did you include Footnote 6 on Paragraph 47?
11       A. As a reference for P&T committees.
12       Q. And what is the purpose of including that in
13   Paragraph 47?
14       MR. HANSEL: Objection: Asked and answered.
15       A. ASHP or the guidelines that they -- or
16   they're -- they're a respected industry organization,
17   pharmacy organization that have credible information.
18   BY MS. ISIDRO:
19       Q. How does the document that is referenced in
20   Footnote 6 relate to your statement in Paragraph 47 of your
21   report?
22       MR. HANSEL: Object to the form. Asked and
23   answered, repeatedly.
24       A. Again, when a manufacturer's ANDA's approved, it
25   represents that they've met all the requirements needed for

Page 125

1    approval of that drug. That information is public
2    information, industry accepted among professionals.
3    BY MS. ISIDRO:
4        Q. Does the document referenced in Footnote 6
5    mention warranties at all?
6        MR. HANSEL: Object to the form.
7        A. I don't recall.
8    BY MS. ISIDRO:
9        Q. Okay.
10       MS. ISIDRO: Can we mark this as Exhibit 5?
11       (Exhibit No. 5 was marked for identification.)
12       THE WITNESS: Thank you.
13   BY MS. ISIDRO:
14       Q. Doctor, you've just been handed Exhibit 5. Is
15   that the document that's referenced in Footnote 6?
16       A. Yes.
17       Q. I'll give you a moment to look it over so that
18   you can refresh your recollection as to whether that
19   document mentions warranties at all.
20       MR. HANSEL: Objection. It takes more than a
21   moment to determine whether a 12-paged document with 3
22   columns on each page contains a single word at least
23   once.
24       MS. ISIDRO: I'll give her as much time as she
25   needs.

32 (Pages 122 - 125)

Page 126

1        MR. HANSEL:  Great.
2        THE WITNESS:  Okay.  What would you like me to
3    answer?
4    BY MS. ISIDRO:
5        Q.  Does Exhibit 5 discuss warranties at all?
6        A.  Exhibit 5 discusses P&T committee's formulary
7    systems process for the formulary system, which includes
8    safe and effective medications, which safe and effective
9    medications are the responsibility of the manufacturer to
10   uphold as part of their application process in seeking
11   approval, and then for review by a P&T committee and
12   consideration for the formulary.  Exhibit 5 speaks to all
13   of that.
14       Q.  But it doesn't speak to warranties, does it?
15       A.  A warranty is the promise that that manufacturer
16   makes to -- to the people, to the world that their drug is
17   safe and effective.  It is by that promise that they
18   suffice in doing that, that they obtain approval by the
19   FDA.
20       Q.  Can you show me where Exhibit 5 discusses the
21   promise that a manufacturer makes to the world?
22       A.  If you're looking for those words verbatim, you
23   would not find them, but --
24       Q.  Okay.
25       A.  -- if you are a clinical person or someone

Page 127

1    familiar with the ASHP or the formulary process, you would
2    understand the process around brand and generic drug
3    approvals, formulary process, P&T committees, this is what
4    we do, and it is industry practice that the drug must meet
5    safe and effective -- be in compliance in order to gain
6    approval by the FDA.  Drugs that are not FDA approved would
7    never be part of a drug formulary.
8        Q.  Okay.  And even if not in those specific words, a
9    promise that a manufacturer makes to the world, can you
10   show me where in Exhibit 5 that concept is discussed?
11       A.  Page 910 talks about evaluating medications for
12   inclusion on the -- in the formulary.  That entire section
13   refers to the process by which evidence based data should
14   be used as part of the process.
15       Let me go back over here.  The section on P&T
16   committee, the section on managing formulary systems, all
17   of those sections include the process that is accepted for
18   drugs that have -- that can be considered for formulary.
19       Q.  Okay.  Any other sections of Exhibit 5?
20       A.  There is sections on Page 9 on -- Page 911,
21   sorry, generic drugs, formulary exceptions, subformularies,
22   therapeutic --
23       MR. MESTRE:  Are you getting close to a moment
24   where you can --
25       A.  Yeah.  I'll just finish this.

Page 128

1        The entire document is a well constructed
2    document industry accepted by professionals as capturing
3    the process for -- capturing the process for medication
4    strategies, approvals, P&T functions, and placement on the
5    formulary.  It really is -- provides a lot of insight that
6    the process is established and followed so that drugs can
7    be considered on the formulary if they have obtained FDA
8    approval by demonstrating that they are safe and effective
9    and it's throughout the document that that can be picked up
10   on.
11   BY MS. ISIDRO:
12       Q.  And you cited Exhibit 5 as support for your
13   statement in Paragraph 47 of your report, correct?
14       A.  Yes.
15       MR. HANSEL:  Take a break?
16       MS. ISIDRO:  We can go ahead and take a break
17   now.
18       THE VIDEOGRAPHER:  The time is 3:09 p.m., and we
19   are going off record.
20           (Break taken.)
21       THE VIDEOGRAPHER:  The time is 3:21 p.m., and we
22   are back on the record.
23   BY MS. ISIDRO:
24       Q.  Doctor, in Paragraph 52 of your report, you state
25   that manufacturers are responsible for understanding their

Page 129

1    processes which includes presenting the presence of
2    unacceptable -- of unacceptable and impurities.
3        A.  Right.
4        Q.  What do you mean by the term impurities in that
5    paragraph?
6        A.  Any substance that does not belong in the
7    medication.
8        Q.  Do you understand -- let me rephrase that.
9        As you use them in your report, are the terms
10   contaminants and impurities interchangeable?
11       A.  They --
12       MR. HANSEL:  Object to the form.
13       A.  They could be.
14   BY MS. ISIDRO:
15       Q.  But I -- I'd like to know, specifically as you've
16   used them in your report, are you using the terms as
17   interchangeable?
18       A.  Impurities or contaminants are items or things
19   present that should not be there and potentially dangerous,
20   not safe, and not effective.
21       Q.  In your report are you referring to different
22   things when you use the term impurities than when you use
23   the term contaminants?
24       A.  Within the scope of this case and this report
25   they can be looked at similar.

33 (Pages 126 - 129)

Page 130

1    Q.   Is there any distinction to you in your use of
2    the term impurities in your report versus your use of the
3    term contaminants in your report?
4    A.   No.
5    Q.   Do you know whether FDA views the terms
6    impurities and contaminants as interchangeable?
7    A.   I do not know if they view them as
8    interchangeable.
9    Q.   Okay.  What is your basis for the statement in
10   Paragraph 52 that manufacturers are responsible for
11   understanding their processes, which includes preventing
12   the presence of unacceptable and impurities?
13   A.   Manufacturers are the ones submitting their
14   application requesting approval; therefore, they are
15   responsible for all the information they provide within
16   that application.
17   Q.   And what are you relying on in stating that
18   conclusion?
19   A.   Manufacturers are submitting an ANDA in this --
20   in this case.  They are requesting that approval.  They are
21   providing the information.
22   Q.   So is that your personal opinion based on the
23   fact that they're the ones submitting the information?
24   A.   They are applying for approval, so they must
25   adhere to the requirements set forth by the FDA in order to

Page 131

1    obtain that approval.  So they must provide all of the
2    information required.  Manufacturers must provide that.
3    Q.   Must provide all of the information required
4    by --
5    A.   Required for consideration for approval of their
6    drug by the FDA, yes.
7    Q.   And that is what you are relying on in stating --
8    let me rephrase.
9        And that is what you are relying on in making
10   your statement in Paragraph 52?
11   A.   I'm relying on the fact that manufacturers submit
12   applications for drug approval.  It's a common, known fact.
13   Q.   Are you relying on any specific FDA regulations
14   in making your statement in Paragraph 52?
15   A.   I don't understand your question.
16   Q.   Are there any specific FDA regulations that
17   you're relying on in making your statement in Paragraph 52
18   of your report?
19   A.   The FDA regulates that if a manufacturer is
20   seeking approval of their drug, they must file -- if it's a
21   generic drug, which we're talking about specifically, they
22   must file an ANDA application and meet the requirements for
23   approval.
24   Q.   And is that a specific FDA regulation that you're
25   referring to or is that your general understanding?

Page 132

1    A.   That is the industry accepted understanding of
2    what -- if a manufacturer is seeking approval of their
3    drug, they must file an application with the FDA.  In the
4    case of a generic drug the application is called an ANDA
5    and that is filed with the FDA by the manufacturer who is
6    seeking approval of their drug.  That application must meet
7    the requirements set forth by the FDA to be compliant,
8    safe, and effective.
9    Q.   In Paragraph 55 you state that P&T committees and
10   TPPs rely on an Orange Book listing that a manufacturer™s
11   compliance means their drugs meet FDA regulations and as
12   such are suitable for formulary placement and reimbursable
13   under a prescription drug benefit plan.
14       What is the basis for this statement in Paragraph
15   55 of your report?
16       MR. HANSEL:  Object to the form.
17   A.   My education, experience, and familiarity with
18   P&T committees.
19   BY MS. ISIDRO:
20   Q.   Anything else?
21       MR. HANSEL:  Object to the form.
22   A.   I've answered the question.
23   BY MS. ISIDRO:
24   Q.   Okay.  So that is -- that is the only thing that
25   you're relying on making your statement in Paragraph 55 of

Page 133

1    your report?
2        MR. HANSEL:  Object to the form.
3    A.   As it pertains to generic drugs, yes.
4    BY MS. ISIDRO:
5    Q.   Okay.  And as it pertains to brand drugs?
6    A.   Brand drugs follow another process by the P&T
7    committee which is not the scope of this opinion.
8    Q.   Okay.  So does Paragraph 55 refer to anything
9    other than generic drugs, any other categories of drugs?
10   A.   Again, the Orange Book lists drugs that are
11   approved in the United States.  That's -- also includes
12   brand drugs as well as their generic approved drug product.
13       So to the extent that I understand your question,
14   P&T committees and TPPs will rely on the information in
15   part listed in the Orange Book that lists the approved
16   medications approved by the FDA for sale in the United
17   States or marketing in the United States.
18   Q.   And are you relying on anything other than your
19   education and experience in making that statement?
20       MR. HANSEL:  Object to the form.
21   A.   My experience with P&T committees.  Again, my
22   day-to-day functions are keeping knowledgeable with the
23   industry practice, functions, drug information.  That's all
24   part of what I do so I'm comfortable with what's required
25   or what components are essential.

34 (Pages 130 - 133)

Page 134

1  BY MS. ISIDRO:
2      Q.  And that is what you are relying on in making
3  your statements in Paragraph 55 of your report and nothing
4  else?
5          MR. HANSEL:  Object to the form.
6      A.  If we're being specific on a generic drug, the --
7  they will -- P&T committees will look to the Orange Book
8  for that substitutability rating.  Once that rating is --
9  once that drug has established that classification, it can
10  be considered for the formulary, if it has -- can -- it has
11  met FDA approval and it, in terms of generic drugs, is
12  really what the reference point is so.
13  BY MS. ISIDRO:
14     Q.  Okay.  And -- and what are you basing that answer
15  on?
16         MR. HANSEL:  Object to the form.
17     A.  Understanding how P&T committees work --
18  BY MS. ISIDRO:
19     Q.  Did --
20     A.  -- when -- with regards to generic drugs.
21     Q.  And the basis for that understanding?
22         MR. HANSEL:  Object to the form.
23     A.  My experience with P&T committees.
24  BY MS. ISIDRO:
25     Q.  Anything else?

Page 135

1          MR. HANSEL:  Object to the form.
2      A.  My education, experience, knowledge.
3  BY MS. ISIDRO:
4      Q.  Any specific documents or regulations?
5      A.  I've listed all the documents I've reviewed in
6  Appendix A.
7      Q.  Are there any documents listed in Appendix A that
8  you're relying on for purposes of the statement that you've
9  made in Paragraph 55 of your report?
10     A.  My entire report is based on all of the data and
11  documents in Appendix A and in addition to my education and
12  experience so.
13     Q.  Well, Doctor, I think we've identified specific
14  examples of paragraphs within your report that don't rely
15  on every document listed in Appendix A, correct?
16         MR. HANSEL:  Objection.  Mischaracterizes
17     previous testimony over and over again.  Object to the
18     form.
19  BY MS. ISIDRO:
20     Q.  You can answer the question.
21         MR. HANSEL:  Same objection.
22     A.  Appendix A lists the documents, materials that I
23  reviewed in putting together my expert opinion, a report.
24  I've reviewed all of those documents and taken them into
25  consideration for putting together my expert opinion,

Page 136

1  including my education and 20 plus years of experience
2  within this industry, including familiarity and knowledge
3  on P&T committees.
4  BY MS. ISIDRO:
5      Q.  Paragraph 56 again uses the term warranties.  Is
6  your use of the term warranties in Paragraph 56 referring
7  to the same thing that your use of the term warranty of
8  Paragraph 47 of your report refers to?
9          MR. HANSEL:  Object to the form.
10     A.  Yes.  It refers to the same.
11  BY MS. ISIDRO:
12     Q.  Okay.  What is the basis for your statement in
13  Paragraph 56 of your report?
14         MR. HANSEL:  Objection to form.
15     A.  When a drug is placed on the formulary, it's met
16  the -- it's met the approval criteria approved by the FDA,
17  so it's met that requirement.  It can be considered for
18  placement on the formulary, and based on that consideration
19  or inclusion on the formulary, third-party payors will
20  reimburse that on -- for that drug because it is included
21  on the formulary because it has met FDA approval for being
22  safe and effective.
23  BY MS. ISIDRO:
24     Q.  In Paragraph 57 you state in the case of
25  Valsartan, including VCDs warranties by the manufacturers

Page 137

1  were false.  What time frame are you referring to in that
2  statement?
3      A.  All of the time frame from which contaminants
4  were found in the drug.
5      Q.  And what was that time frame?
6          MR. HANSEL:  Object to the form.  Foundation.
7      Beyond the scope of the report.
8      A.  The time frame is beyond the scope of this report
9  and any of the time that the contaminants were in the drug
10  is -- you know, can be considered.
11  BY MS. ISIDRO:
12     Q.  So in -- in formulating your opinions in this
13  report, you didn't consider the time frame in which the
14  purported contaminants were found; is that correct?
15         MR. HANSEL:  Object to the form.
16     A.  I'm not sure I understand your question.  Could
17  you rephrase that?
18  BY MS. ISIDRO:
19     Q.  I'm just trying to understand your answer that
20  the time frame is outside of the scope of the report.
21     A.  I believe the time frame for the contaminants --
22  it's -- the time frame for the contaminants has been
23  questioned as to when the original contaminants were there,
24  how long they were there, length of time, and so on.  So I
25  cannot comment on -- on that, other than the fact that

35 (Pages 134 - 137)

Page 138

1 there were contaminants within the drug product.
2    Q. Do you know when presence of NDMA in Valsartan or
3 any VCD was first reported?
4    A. When it was first reported? Can you be more
5 specific? Reported by whom?
6    Q. By anyone.
7    A. Again, the time frame on -- I will not speculate
8 on -- on that time frame. You're not being specific enough
9 when you say anyone.
10    Q. When is the first report of NDMA in Valsartan or
11 a VCD that you are aware of?
12    MR. HANSEL: Object to the form.
13    A. In our -- in my professional capacity, we -- the
14 FDA had reported the contaminants to the world basically
15 so.
16 BY MS. ISIDRO:
17    Q. When did that occur?
18    A. I believe it was 2018 or thereabout. I have
19 to -- I'd have to go back and reference the exact date.
20    Q. Is that also the first report that you're aware
21 of with respect to NDEA in Valsartan or VCDs?
22    MR. HANSEL: Object to the form.
23    A. Yeah. I can't speculate on those precise dates
24 of those -- each of those components. I do know that they
25 were present though in the medication.

Page 139

1 BY MS. ISIDRO:
2    Q. My question --
3    A. I believe the dates are irrelevant.
4    Q. Let me clarify my question because my question
5 didn't refer to dates and wasn't calling for dates, so let
6 me restate my question a different way.
7       You referenced a report by FDA to the industry or
8 the world with respect to called contaminants in Valsartan
9 or in VCDs, correct?
10    A. The FDA issued a recall. That's what I mean by
11 report. They issued a recall on those drugs.
12    Q. Is it your understanding that the recall that you
13 reference was initiated by FDA?
14    A. The FDA issued the recall. That's what I am
15 attesting to. Who initiated the recall, again, what
16 matters is the FDA issued the -- the recall.
17    Q. What do you mean by the term issued?
18    A. They provided the guidance that this recall is
19 being set forth.
20    Q. What is your understanding -- or what is the
21 basis for that statement?
22    A. Public information found on the FDA website.
23    Q. And the announcement of a recall was -- is that
24 the first report that you're aware of with respect to
25 presence of NDEA in Valsartan or VCDs?

Page 140

1    A. Yes.
2    Q. Do you know when FDA first set interim limits for
3 nitrosamines?
4    A. No.
5    Q. Do you know when FDA first established guidance
6 on control of nitrosamines?
7    A. Nope. That was not within the scope of my
8 report.
9    Q. Okay. In Paragraph 59 of your report you state
10 that the presence of the contaminant rendered the
11 manufacturer Defendant's versions of VCDs not equivalent to
12 the branded product.
13       What do you mean by the term contaminant in
14 Paragraph 59?
15    MR. HANSEL: Object to the form. That doesn't
16 read the entire sentence.
17 BY MS. ISIDRO:
18    Q. Would you prefer if I read the entire sentence,
19 Dr. Panagos?
20    A. You don't have to.
21    Q. Okay. What did you mean by the term contaminant
22 in Paragraph 59 of your report?
23    A. I referred to item present that should not have
24 been present, not consistent with the reference listed drug
25 product, and in this case unacceptable levels of a probable

Page 141

1 human carcinogen.
2    Q. Is there a specific probable human carcinogen
3 that you are referring to?
4    A. The ones found within the drug that should not
5 have been there.
6    Q. And which ones were those?
7    A. Both of the contaminants that are -- you've
8 referenced.
9    Q. I'm sorry, I didn't reference any specific
10 contaminants in my question.
11    A. You asked me about the contaminants in the
12 previous question where you asked if I -- something about
13 the FDA process around those.
14       So to the extent that I understand your question,
15 I will answer and say that both of the contaminants in the
16 case of these drugs represent a deviation from the
17 reference listed drug product and not equivalent.
18    Q. Do you remember the names of those two
19 contaminants that you're referring to in your response?
20    A. They are listed within my report in Section 4,
21 Number 12. NDA- -- NDEA and NDMA.
22    Q. Okay. In Paragraph 59 of your report -- let me
23 rephrase that.
24       What is the basis for your opinion that the
25 presence of the contaminant rendered the manufacturer

36 (Pages 138 - 141)

Page 142

1  Defendant's versions of VCDs not equivalent to the branded
2  product?
3      A.  The contaminants were not in the branded product
4  and therefore the generic drug could not have been
5  equivalent to the branded product by the presence of the
6  contaminants within the product, within the medication.
7      Q.  In the first half of 2018 do you know whether the
8  branded product was being tested for NDMA?
9      A.  No.  That was not within the scope of this
10  report.
11     Q.  In the first half of 2018 do you know whether the
12  branded product was being tested for NDEA?
13     A.  No.  That was not within the scope of this
14  report.
15     Q.  At any point prior to 2018 do you know whether
16  the branded product was being tested for NDMA?
17     A.  Same response; not within the scope of this
18  report.
19     Q.  And at any point prior to 2018 do you know
20  whether the branded product was being tested for NDEA?
21     A.  Again, not within the scope of this report.
22     Q.  Section 6 of your report you provide summary of
23  your opinions; is that correct?
24     A.  Yep.
25     Q.  And Item B under this summary of opinions again

Page 143

1  mentions the term warranty.  Is the term warranty being
2  used in that item 6B in the same way as it is being used in
3  Paragraph 47 of your report.
4      MR. HANSEL:  Object to the form.
5      A.  Yes.
6  BY MS. ISIDRO:
7      Q.  In Item D under Section 6, you state that the
8  generic manufacturer -- that -- excuse me.  You state that
9  if the generic manufacturer of product changes in any way
10  from the original product on the ANDA approval, then this
11  changed product is not the same as the brand name
12  medication.
13         What is your basis for that statement in Item D
14  under Section 6 of your report?
15     MR. HANSEL:  Object to the form.
16     A.  Any changes to a generic drug product should be
17  reported to the FDA.  The ANDA in -- in this case or the
18  medications in this case with the contaminants inconsistent
19  with the ANDA submitted for approval.
20     MS. ISIDRO:  Can you read back that last sentence
21  in the answer?  I didn't hear the whole thing.  I'm
22  sorry.
23         (The requested portion was read back.)
24  BY MS. ISIDRO:
25     Q.  Are ANDA holders permitted to make changes to

Page 144

1  their original ANDA submissions, if you know?
2      A.  They must be reported to the FDA.  Any changes
3  must be reported to the FDA, submitted to the FDA.
4      Q.  In the second part of Statement D under Section 6
5  of summary opinions, you state that equivalence is nulled
6  and the generic manufacturer may no longer rely on the
7  brand name drug label?
8      A.  Right.
9      Q.  What is the basis for that statement in Section
10  6D of your report?
11     A.  Uh-huh.  The two --
12     MR. HANSEL:  Object to the form.
13     A.  The generic drug label no longer is identical or
14  matches the -- brand drug label is -- is inaccurate and
15  cannot be deemed equivalent, safe, or effective.
16  BY MS. ISIDRO:
17     Q.  And what is your basis for that statement?
18     MR. HANSEL:  Object to the form.
19     A.  For a substitutability to be applied to a
20  particular drug, they must demonstrate that they are safe
21  and effective.  Deviation from that would thereby not
22  demonstrate that.
23  BY MS. ISIDRO:
24     Q.  In Statement I under Section 6 you state that the
25  warranty from manufacturers for this products -- for these

Page 145

1  products turned out to false.  Is your use --
2      A.  To be false.  Yes.
3      Q.  So it should say to be false there?
4      A.  Uh-huh.
5      Q.  Okay.  Is your use of the term warranty here in
6  this Statement 6I of your report, are you using that term
7  warranty there in the same way -- let me rephrase that
8  question.
9         Are you using the term warranty in Section 6I of
10  your report in the same way that you're using it in
11  Paragraph 47 of your report?
12     MR. HANSEL:  Object to the form.
13     A.  Yes.
14  BY MS. ISIDRO:
15     Q.  What is your basis for the statement in Paragraph
16  6I of your report that the warranty from manufacturers for
17  these products turned out to be false?
18     MR. HANSEL:  Object to the form.
19     A.  The presence of the contaminants in unacceptable
20  levels of probable human carcinogens, misrepresented with
21  inaccurate -- did not adhere to the promise they made,
22  stating that their drug met the criteria set forth by the
23  FDA for approval, which includes that to be that the drug
24  is safe and effective and identical to the brand drug --
25  reference listed drug.

37 (Pages 142 - 145)

Page 146

1 BY MS. ISIDRO:
2    Q.  You used the phrase unacceptable levels --
3    A.  Uh-huh.
4    Q.  -- in your response.  What do you mean by
5 unacceptable levels?
6    A.  Unacceptable levels is a -- what the FDA
7 referenced in referring to the contaminants, and I will --
8 I adhere to the terms that they use.
9    Q.  And you say what -- what the FDA referenced.
10 Where do you mean --
11    A.  When they --
12    Q.  -- that the FDA referenced that?
13    A.  Sorry.
14    Q.  If you could just let me finish my question.
15 Sorry.
16    A.  Uh-huh.
17    Q.  Where are you referring to that the FDA
18 referenced that?
19    A.  On their website.
20    Q.  In what context?
21    A.  In the context of the recall.
22    Q.  In the context of the recall.  The 2018 recall?
23    A.  The recall of Valsartan.
24    Q.  You also state in Paragraph 6I of your report
25 that TPPs paid for medications that they should not have

Page 147

1 based on the manufacturer's false representation?
2    A.  That is correct.
3    Q.  What is your basis for that statement?
4        MR. HANSEL:  Object to the form.
5    A.  Medication would not have been approved with the
6 contaminant and it would not have been considered for an
7 inclusion on a drug formulary and it would not have been
8 reimbursed in any way by a TPP if it was not approved.
9 BY MS. ISIDRO:
10    Q.  Okay.  Is there anything else that you're basing
11 the statement in Paragraph 6I, that TPPs paid for
12 medications that they should not have based -- should not
13 have based on the manufacturer's false representation?
14        MR. HANSEL:  Object to the form.
15    A.  TPPs should not have paid for contaminated
16 medication.
17 BY MS. ISIDRO:
18    Q.  What is your basis for that statement?
19        MR. HANSEL:  Object to the form.
20    A.  The presence of the contaminants within the
21 medications.
22 BY MS. ISIDRO:
23    Q.  Anything else?
24    A.  My statement I -- is accurate the way it's
25 written.

Page 148

1    Q.  Are you aware that FDA has said patients taking
2 prescription medications with potential nitrosamine
3 impurities should not stop taking their medications?
4        MR. HANSEL:  Object to the form.
5    A.  I am aware.
6 BY MS. ISIDRO:
7    Q.  Do you have any knowledge as to the levels of
8 NDMA or NDEA that were found in any particular lot of
9 Valsartan-containing drugs?
10    A.  That was not within the scope of this report.
11    Q.  So, no, you don't have any knowledge as to those
12 levels?
13        MR. HANSEL:  Object to the form.
14    A.  The specific levels, no.
15 BY MS. ISIDRO:
16    Q.  Do you know whether there were certain lots of
17 recalled Valsartan that did not contain any detectable NDMA
18 or NDEA?
19        MR. HANSEL:  Object to the form.
20    A.  Again, not within the scope of this report.  I
21 cannot speculate.
22 BY MS. ISIDRO:
23    Q.  Okay.  So you don't know one way or the other?
24        MR. HANSEL:  Object to the form.  Assumes facts
25 not in evidence.

Page 149

1    A.  I would have to review.  I cannot speculate to
2 that.
3 BY MS. ISIDRO:
4    Q.  So because you're saying you cannot speculate,
5 that means you don't know for a fact one way or the other,
6 correct?
7        MR. HANSEL:  Object to the form.
8    A.  I'm not sure what you mean by one way or another.
9 Could you clarify?
10 BY MS. ISIDRO:
11    Q.  Do you know one way or another whether there were
12 certain lots of recalled Valsartan that did not contain any
13 detectable NDMA or NDEA?
14    A.  No.
15    Q.  Dr. Panagos, would you agree that the main
16 criterion for the inclusion of any product in the Orange
17 Book is that the product is the subject of an application
18 with an approval that has not been withdrawn for safety or
19 efficacy reasons?
20    A.  Current approval, yes.
21    Q.  And you would agree that FDA determines
22 bioequivalence, correct?
23    A.  It's one of the factors that they look for when
24 evaluating drug applications.
25    Q.  In order to -- in order for a prescription drug

38 (Pages 146 - 149)

Page 150

1  product to be considered bioequivalent to another drug
2  product, FDA has to make that determination, correct?
3      A.  It's part of the --
4      MR. HANSEL:  Objection to form.
5      A.  It's part of their consideration.
6  BY MS. ISIDRO:
7      Q.  Is there any other entity that is tasked with
8  determining bioequivalence for prescription drug products
9  in the United States besides FDA?
10     A.  Not to my knowledge.
11     Q.  And FDA's determination as to bioequivalence is
12 made individually for each manufacturer and each product,
13 correct?
14     A.  For each submitted application, each ANDA is
15 evaluated individually.
16     Q.  Okay.  FDA may change a product's therapeutic
17 equivalence rating if the circumstances giving rise to a
18 violation call into question the agency's assessment of
19 whether a product meets the criteria for therapeutic
20 equivalence, correct?
21     A.  Yes.
22     Q.  During the time frame that -- let me rephrase
23 that.
24        Prior to the Valsartan recall in 2018, FDA did
25 not take any steps that would reflect a determination that

Page 151

1  the products were no longer therapeutically equivalent,
2  correct?
3      A.  Not to my knowledge.
4      Q.  You didn't review bioequivalence studies for any
5  manufacturer Defendant's Valsartan-containing products, did
6  you?
7      A.  No.
8      Q.  Did you consult with any actual P&T committees
9  about the inclusion of Valsartan on a formulary?
10     A.  Could you be more specific?
11     Q.  How do you mean?
12     A.  Valsartan is a generic drug.
13     Q.  Uh-huh.
14     A.  It would meet criteria for inclusion on the
15 formulary if it is approved by the FDA following an ANDA
16 application that meets the criteria for approval set forth
17 by the FDA which -- including safety and effectiveness.
18     Q.  Have you personally consulted with any actual P&T
19 committees about the inclusion of Valsartan on a formulary?
20     A.  I'm going to ask you to specify on time frame.
21     Q.  Ever.
22     A.  Following the recall it is -- the -- P&T
23 committees had to kind of create a strategy around how to
24 move forward with that information as it pertains to their
25 drug formularies, and on behalf of my clients I was -- it

Page 152

1  was important to me to know what their strategy was going
2  to be.
3      Q.  In coming up with your opinions in this
4  litigation, did you consult with any P&T committees about
5  the inclusion of Valsartan on a formulary?
6      A.  No.
7      Q.  And in coming up with your opinions in this
8  litigation, did you consult with any P&T committee about
9  its use of the Orange Book?
10     A.  No.  Because I -- I know that's what they use.
11     Q.  And in coming up with your opinions in this
12 litigation, did you consult with any TPPs about the
13 inclusion of Valsartan on a formulary?
14     A.  No.
15     Q.  In coming up with your opinions in this
16 litigation did you consult with any TPP about its use of
17 the Orange Book?
18     MR. HANSEL:  Object to form.
19     A.  Let me clarify that TPPs and committees, it is
20 industry practice that they refer to the authoritative
21 source known as the Orange Book for substitutability, for a
22 list of drugs that are approved by the FDA marketed in the
23 United States.
24        This is an ongoing, continual process, and in my
25 day-to-day functions in my role as a clinical pharmacist

Page 153

1  and a consultant, those are the responsibilities that are
2  consistent in industry and what are adhered -- are adhered
3  to.
4  BY MS. ISIDRO:
5      Q.  In formulating your opinions in this litigation,
6  did you consult with any TPP about its use of the Orange
7  Book?
8      A.  The use of the Orange Book is an established
9  process that is widely accepted and respected.  It is the
10 source of truth in terms of approved products, approved by
11 the FDA and substitutable.  It is the source of truth.  It
12 is relied upon by P&T committees for their generic
13 medications to be considered for inclusion on the
14 formulary.  That does not change.
15     Q.  Dr. Panagos, at this time I'm not asking you
16 about the basis of your opinions with respect to a TPP's
17 use of the Orange Book in general.  I am asking you
18 whether, in formulating your opinions in this litigation,
19 did you consult with any TPP about its use of the Orange
20 Book?
21     A.  No, I did not need to consult with them because
22 I'm confident that is the process that is adhered to.
23     Q.  Let's -- let's go ahead and take a break.
24     THE VIDEOGRAPHER:  It's 4:10 p.m., and we're
25 going off the record.

39 (Pages 150 - 153)

Page 154

1    (Break taken.)
2    THE VIDEOGRAPHER: It is 4:34 p.m., and we are
3    back on the record.
4    MS. ISIDRO: Dr. Panagos, I may have some further
5    follow-up for you at -- in a little bit, but I don't
6    have any further questions for you right now.
7    As I mentioned previously, there are some folks
8    on Zoom and I'm not sure whether any of them have any
9    questions for you right now.
10    MR. GISLESON: Actually, I do have a few
11    questions. Can you hear me?
12    MR. KERNER: We can.
13    THE WITNESS: Yes.
14    CROSS-EXAMINATION
15    BY MR. GISLESON:
16    Q. Hey, Doctor. My name is John Gisleson. I
17    represent a manufacturer named Aurobindo. Have you heard
18    of Aurobindo before?
19    A. Yes.
20    Q. And are you aware that Aurobindo is a
21    manufacturer of Valsartan and Valsartan-containing drugs?
22    A. Yes, I'm aware.
23    Q. Did you become aware of any public information
24    that certain batches of Aurobindo Valsartan or
25    Valsartan-containing drugs contained nitrosamine

Page 155

1    A. I was aware that there were contaminants within
2    Valsartan products.
3    Q. Did you learn what those contaminants were?
4    A. The contaminants are referenced within my report,
5    Section 4 --
6    Q. What was the name of the contaminants?
7    A. -- Page -- Section 4, excuse me, Page 2, Number
8    12, NDEA and NDMA.
9    Q. Before this lawsuit and you were hired as an
10    expert, had you ever heard the word nitrosamine before?
11    A. Yes.
12    Q. In what context?
13    A. I am a New York State licensed pharmacist,
14    clinical pharmacist, and in my role, my day-to-day
15    functions, it is my responsibility to understand
16    medications -- FDA medications, approved medications, and
17    any concerns surrounding those medications is part of my
18    responsibility.
19    Q. And how did you learn what nitrosamine are?
20    A. There is a component of toxicology that is
21    included in our pharmacy education; however, that was --
22    that is not within the scope of my report or the opinion
23    that I'm rendering here.
24    With regards --
25    Q. Do you know how nitrosamine perform --

Page 156

1    MR. HANSEL: Excuse me. Excuse me, Mr. Gisleson?
2    MR. GISLESON: Yes?
3    MR. HANSEL: Please let Dr. Panagos finish her
4    answer. This is the second --
5    MR. GISLESON: I'm sorry. I thought she was
6    finished.
7    MR. HANSEL: This is the second time you've
8    interrupted her and perhaps there's a lag. So please
9    give her a moment to make sure -- sometimes she thinks
10    about her answer carefully before she's finished.
11    Thank you.
12    MR. GISLESON: That's helpful. Thanks for
13    letting me know.
14    BY MR. GISLESON:
15    Q. I'm sorry, you can continue.
16    A. I just want to make -- go back the original
17    question.
18    THE WITNESS: Could you please restate his
19    original question?
20    MR. HANSEL: And could you please restate her
21    partial answer. Thank you.
22    (The requested portion was read back.)
23    A. Okay. So any time there is a contaminant or
24    there is an issue with a medication, it is my
25    responsibility to understand that as it pertains to the

Page 157

1    scope of my work and my responsibilities as a pharmacist
2    and as a prescription -- a pharmacy benefit consultant.
3    And so with regards to the generic drugs in this case,
4    those contaminants should not have been there.
5    BY MR. GISLESON:
6    Q. When did you learn of the presence of
7    nitrosamines in Valsartan-containing drugs?
8    A. When the FDA issued the recall.
9    Q. Do you know whether that became publicized in the
10    third-party payor and PBM industries about the recall or
11    voluntary recall of Valsartan-containing drugs?
12    A. Yes.
13    Q. Did you speak with different individuals in the
14    industry about the recall?
15    A. Yes. As it pertains to my clients.
16    Q. Did you, personally, recommend that any of your
17    clients remove a Valsartan-containing drug from their
18    formulary because it was reported to have the presence of
19    nitrosamines?
20    MR. HANSEL: Objection. This gets into a number
21    of areas that I want to comment on. This is
22    confidential and Dr. Panagos appears today in her
23    capacity as an expert witness, not in her capacity as
24    a senior vice president or executive vice president of
25    ARMSRx, and to ask her about her advice to her

40 (Pages 154 - 157)

Page 158

1    confidential clients is outside the permitted scope of
2    this examination.
3    BY MR. GISLESON:
4        Q.  Can you identify any of the clients for whom you
5    work pertaining to formulary issues?
6        A.  I don't think I understand your question.
7           Do you want me to --
8        Q.  Do you consider all of your clients to be
9    confidential?
10       A.  Yes, I do.
11       Q.  Is it correct that you can't identify then any
12   client for whom you have done work concerning a formulary
13   because you consider all of your clients to be
14   confidential?
15       A.  You have to rephrase that question.  It did not
16   make sense.
17       Q.  Do you consider every single one of the clients
18   for whom you have provided counseling on formulary issues
19   to be confidential?
20       A.  My clients that I provide consulting on, that
21   information is confidential, but if you're -- so I'm not
22   sure what you're asking exactly.
23       Q.  Are there any clients that you can identify for
24   whom you have provided consultation or advice concerning
25   inclusion of drugs in a formulary?

Page 159

1        MR. HANSEL:  Object to the form.  Do you mean
2    identify in her mind or --
3        MR. GISLESON:  The names.
4        MR. HANSEL:  -- or testify to because they're
5    confidential -- you know, because they're not
6    confidential?
7        MR. GISLESON:  Correct.
8    BY MR. GISLESON:
9        Q.  Are there any that you can identify that you do
10   not consider to be confidential so that we can have an idea
11   of the kinds of companies that you have counseled on
12   formulary issues?
13       MR. HANSEL:  Just on the confidentiality issue,
14   she can testify about the kinds of companies.
15   BY MR. GISLESON:
16       Q.  Can you identify any third-party payor for who
17   you have -- for whom you have performed work?
18       MR. HANSEL:  Object to the form.
19       A.  My clients include self-insured employers,
20   third-party payers.  I've -- I've indicated those within my
21   expert report.
22   BY MR. GISLESON:
23       Q.  Can you identify any of them by name?
24       MR. HANSEL:  Objection.  Asked and answered.
25   Confidential.

Page 160

1        A.  That information is confidential and does --
2    isn't pertinent to -- or within the scope of this opinion.
3    BY MR. GISLESON:
4        Q.  So you are -- are refusing to identify the names
5    of any third-party payors in any prescription benefit
6    management companies for whom you have done work; is that
7    correct?
8        MR. HANSEL:  Object to the form.  It's not a
9    refusal.  She is bound by client confidentiality, so
10   she is complying with her obligation to maintain
11   client confidentiality.
12          She's not refusing to do anything, Counselor.
13   BY MR. GISLESON:
14       Q.  You will not answer or identify the names of any
15   of the TPPs or PBMs for whom you have done work because, in
16   your view, you're bound by confidentiality agreements that
17   prohibit you from identifying the names of those companies;
18   is that right?
19       A.  Yes.  And I will respect those.
20       Q.  Now, since the time that it became public that
21   certain manufacturers of Valsartan-containing drugs found
22   the presence of nitrosamines in certain batches of their
23   products, are you aware of any TPP anywhere in the country
24   that removed a drug manufacturer from its formulary based
25   on recall?

Page 161

1        MR. HANSEL:  Object to the form.
2        A.  Based on the recall there were strategies put
3    into place, thoughtful, careful strategies put into place
4    with guidance from the FDA.
5    BY MR. GISLESON:
6        Q.  Strategies to do what?
7        A.  How to best manage the recall as it pertains to
8    patients who were taking those drugs and the best way
9    for -- you know, to handle that.
10       Q.  Can you identify any TPP anywhere in the country
11   that removed one of the Defendant's VCDs from their
12   formulary because of the recall?
13       A.  In which time frame?
14       Q.  At any point after the recall was publicized.
15       A.  That was not within the scope of this report.
16   Again, strategies were put into place to efficiently manage
17   the recall, ensure that patients are not hurt by that.
18       Q.  Right.  But this goes to your opinion that the
19   manufacturer warranty for these VCDs was false.  TPPs
20   unjustly paid for medications for which they have not have
21   paid.
22       A.  Right.
23       Q.  My question is:  Can you identify any TPP
24   anywhere in the country, in the United States, that removed
25   one of the Defendant's products from its formulary

41 (Pages 158 - 161)

Page 162

1  following the recall?
2      A.  Following the recall, there were strategies put
3  in place that included those particular NDCs no longer
4  being a part of the formulary.
5      Q.  Were they removed formally from the formularies?
6      A.  I cannot speculate.  They -- they were just
7  not -- they were blocked.
8      Q.  Okay.  So the question's specific.  Can you
9  identify any TPP anywhere in the country that, in fact,
10  removed a manufacturer's VCD from its formulary following
11  the recall?
12      A.  I will go back and say that TPPs or PBMs blocked
13  the -- the drugs that were contaminated.  That time frame
14  is some point after the recall, after sufficient or
15  adequate strategy was put through to -- based on the
16  recommendations and guidance of the FDA.
17      Q.  What do you mean by blocked?
18      A.  The claims were no longer being adjudicated.
19      Q.  What do you mean by no longer adjudicated?
20      A.  If a patient went to the pharmacy with an NDC --
21  with a drug that had an NDC -- for a drug that had an NDC
22  that was a contaminated product, those NDCs would not
23  process -- they would not process on the claim's
24  adjudication so that -- because they were contaminated.
25      Q.  So because the VCDs were blocked, at that point

Page 163

1  the TPP did not pay for any of the VCDs at that point?
2  Strike that.
3          Because the NDC for the BDC was blocked, did that
4  mean that the TPP did not pay for a prescription for that
5  patient?
6      A.  I cannot speculate and that was not within the
7  scope of this report or the opinion that I'm rendering here
8  today.  I do know that the TPPs paid for contaminated
9  products where they should not have because they were not
10  safe and effective.
11          At -- after the FDA issued the recall, there had
12  to be a careful, thoughtful strategy, there was guidance,
13  and so I can't say with certainty that they didn't continue
14  to pay for those claims.
15      Q.  Well, based on your industry expertise, can you
16  identify any TPP who, in fact, paid for a VCD that had the
17  presence of nitrosamine?
18          MR. HANSEL:  Object to the form.  Beyond the
19      scope of the report.  Asked and answered.
20  BY MR. GISLESON:
21      Q.  You can answer.
22      A.  As part of my day-to-day responsibilities, I
23  review claims data that consists of medications and --
24  including possibly these medications with the contaminants.
25      Q.  Can you identify by name any TPP that paid for a

Page 164

1  VCD that had the presence of nitrosamine?
2      A.  If a TPP had the generic drug on their formulary
3  during the time frame for which the contaminants were
4  found, they, in that entirety of that time frame, they
5  essentially paid for something they should not have.
6      Q.  Can you identify any TPP anywhere in the United
7  States that sought a refund from a manufacturer as a result
8  of a beneficiary consuming a VCD that contained a
9  nitrosamine?
10      A.  That's not within the scope of my report or
11  opinion I've been asked to render.
12      Q.  Can you identify any such TPP or PBM anywhere in
13  the country who sought a refund because a patient consumed
14  a VCD that had the presence of nitrosamine?
15      A.  What do you mean by a refund?
16      Q.  Said that they paid for a VCD for one of their
17  beneficiaries and should not have because it contained
18  nitrosamine?
19          MR. HANSEL:  Objection.  Calls for a legal
20      conclusion.
21      A.  I'll go back and say that TPPs paid for a drug
22  that was placed on the formulary because it had sufficed
23  the criteria for approval as set forth by the FDA, and, as
24  such, paid for the claims for those drugs where they should
25  not have.

Page 165

1  BY MR. GISLESON:
2      Q.  Well, you say they shouldn't have, but my
3  question is are you aware of any TPP anywhere in the United
4  States that sought to be reimbursed from a manufacturer
5  because the manufacturer's VCD contained nitrosamine?
6          MR. HANSEL:  Objection.  Calls for a legal
7      conclusion.
8      A.  It is my understanding that TPPs are -- were,
9  from the economic standpoint, negatively affected by
10  these -- payment of these drugs.
11  BY MR. GISLESON:
12      Q.  Understanding.  How?
13      A.  They paid for the drugs during the time period
14  for which they should not have because they were
15  contaminated.  That information is found within claims
16  data.
17      Q.  Can you identify a single TPP that sought a
18  refund prior to this lawsuit being filed because it paid
19  for a VCD consumed by a beneficiary that contained
20  nitrosamine?  And if you can't, that's fine.  I'm just
21  asking based on your industry experience and contacts if
22  you're aware of any TPP that sought a refund.
23      A.  I believe that information is within the
24  complaint.
25      Q.  And that's the only basis for that information

42 (Pages 162 - 165)

Page 166

1  that you have? None from your own personal experience?
2      A. That is correct.
3      Q. Now, you said that once the recall was announced,
4  it was necessary for TPPs to manage how to respond to the
5  recall; is that right?
6      A. They needed to understand the recall and then
7  determine a strategy.
8      Q. Did you have an understanding as to what the
9  strategies were that were implemented by TPPs as a result
10  of the recall?
11      A. Based on FDA guidance.
12      Q. What do you mean?
13      A. The recommendations that FDA made as a response
14  to the recall and the concern about the safety of the drug
15  and how to handle that.
16      Q. Did you become aware that the FDA issued
17  acceptable intake levels?
18          MR. HANSEL: Objection. Beyond the scope.
19      Object to the form.
20  BY MR. GISLESON:
21      Q. You can answer.
22      A. The FDA commented that the recall was attributed
23  to unacceptable levels of a probable human carcinogen
24  within the medication.
25      Q. In your experience, did the third-party payors

Page 167

1  and the PBMs become aware that there were acceptable intake
2  levels of nitrosamine impurities in Valsartan and
3  Valsartan-containing drugs?
4          MR. HANSEL: Object to the form. Foundation.
5      Object to the foundation.
6      A. Are you --
7  BY MR. GISLESON:
8      Q. Let me start over.
9          You communicate with TPPs, right?
10      A. Yes.
11      Q. And on and after the recall of
12  Valsartan-containing drugs, you communicated with TPPs; is
13  that correct?
14      A. Yes.
15      Q. Approximately how many different TPPs have you
16  communicated with following the recall of the -- of the
17  VCDs?
18      A. Not sure.
19      Q. Can you approximate in any way?
20      A. I do not wish to do that.
21      Q. Being conservative, is it more than a hundred?
22      A. No.
23      Q. Is it more than fifty?
24      A. No.
25      Q. Is it more than ten?

Page 168

1      A. No.
2      Q. So following the recall, is it more than --
3  strike that.
4          Is it more than five TPPs with whom you've had
5  contact since the recall of -- of VCDs?
6      A. Again, my clients can include TPPs, self-insured
7  employer groups. So I've been in contact -- I was in
8  contact with all of them. I think the number is
9  irrelevant.
10      Q. In your experience, you certainly advise all
11  those different clients that there were acceptable intake
12  levels for VCDs containing nitrosamines, right?
13          MR. HANSEL: Object to the form.
14      A. I advised the clients what the FDA set forth in
15  terms of the recall, the strategy, their recommendation,
16  and guidance.
17  BY MR. GISLESON:
18      Q. So understood then that for VCDs that
19  contained nitrosamines within the acceptable intake level,
20  that patients could continue to consume those VCDs,
21  correct?
22          MR. HANSEL: Object to the form.
23      A. Those -- that drug is taken for cardiovascular
24  issues, hypertension. A very serious health condition, one
25  for which a patient has to be closely followed, monitored

Page 169

1  by their prescriber, and it is never advisable to abruptly
2  stop a medication like that because of the critical nature
3  for which it's used.
4          How to carefully mitigate the recall and the
5  issues surrounding the recall at the time were of --
6  paramount of importance to my clients, and that's what I
7  did.
8  BY MR. GISLESON:
9      Q. So what you're saying is that TPPs wanted to
10  ensure the health and safety of their beneficiaries who
11  needed to take VCDs, right?
12          MR. HANSEL: Objection. Mr. Gisleson, I'm going
13      to cut off this line of questioning.
14      I object to the form. It is outside the scope of
15      her report. You have asked about this issue 12
16      different Ways. The witness has attempted to be
17      cooperative, even though testifying that it is outside
18      the scope of her report.
19          The report does not get into this. You're asking
20      about her professional activities for a company that
21      is not the expert in this case. Dr. Panagos is
22      appearing individually, not on behalf of her employer
23      for whom she did that work. The work is also
24      confidential. So we're going to need to move on to
25      another topic.

43 (Pages 166 - 169)

Page 170

1  BY MR. GISLESON:
2      Q.  You said that the manufacturer warranty for these
3  VCDs was false.  TPPs unjustly paid for medications for
4  which they should not have paid.  Based on your serving as
5  an expert in this case, are you aware that there were TPPs
6  who paid for medications containing nitrosamines because
7  the patients needed those medications for health reasons?
8      A.  I understand that there -- in the strategy, that
9  some strategies that took place were advising patients
10  never to abruptly stop their medication and to consult with
11  their prescriber as to a suitable transition.
12      Q.  Did different patients have different transition
13  periods?
14      MR. HANSEL:  Excuse me.  Mr. Gisleson, I have
15      really tried to accommodate your questioning.  I know
16      you're trying to tie it to the report.  Asking about
17      patients of her clients now is unacceptable.
18      MR. GISLESON:  I'm not asking about her client's
19      patients.
20      MR. HANSEL:  Well, I'm going to instruct the
21      witness not to answer any questions about the patients
22      of her clients of ARMSRx, which is not the testifying
23      entity here.
24      Do not answer any questions about patients of
25      ARMSRx clients.

Page 171

1  BY MR. GISLESON:
2      Q.  Well, Doctor, do you know anything about TPPs and
3  how they managed for the recall who are not your clients?
4      A.  In general TPPs were managing the recall in a --
5  in a way that would allow access.  As I said before, we --
6  not -- access, ensuring that patients can have time frame
7  to transition to a non-contaminated product.
8      Q.  Over what time period did that transition occur,
9  to your knowledge?
10      A.  That's not within the scope of my report and
11  that -- that's very patient specific information on how and
12  when a patient consults with their prescriber and
13  pharmacist in their individual case on how to transition to
14  a non-contaminated FDA approved product.
15      Q.  Do you know what the FDA definition of
16  bioequivalence is?
17      MR. HANSEL:  Objection.  Asked and answered.
18      This was gone over in great detail by Attorney Isidro.
19      MR. GISLESON:  I don't think we got a clear
20      answer to it.
21  BY MR. GISLESON:
22      Q.  Do you know what the FDA definition is of
23  bioequivalence?
24      MR. HANSEL:  Object to the form.
25      A.  Page 6, Section E under 33 has the definition for

Page 172

1  bioequivalent drug products.
2  BY MR. GISLESON:
3      Q.  You looked at that definition before preparing
4  your report?
5      MR. HANSEL:  Object to the form.  It's in the
6      report.
7      A.  I'm not --
8  BY MR. GISLESON:
9      Q.  Did you ever have occasion before being retained
10  as an expert in this case to look at the FDA definition of
11  bioequivalence?
12      A.  It's part of the scope of my profession.
13      Q.  Pardon me?
14      A.  It's within the scope of my profession as a
15  pharmacist that bioequivalent is within that knowledge
16  base.
17      Q.  Right.  But did you read the FDA definition of
18  bioequivalence at any point before you became retained as
19  an expert in this lawsuit?
20      A.  Possibly.  I read many, many data, information,
21  articles, studies, part of what I do day-to-day.  I mean.
22      Q.  Do you have any personal experience with the
23  manufacturing of pharmaceutical products?
24      A.  No.
25      Q.  You said in your report at Paragraph 46 TPPs and

Page 173

1  P&T committees expressly rely upon the manufacturers
2  compliance with all applicable standards, obligations, and
3  regulations.  What actions, in your experience, do TPPs
4  take to determine whether manufacturer's complied with
5  applicable standards, obligations, and regulations?
6      A.  They reference the Orange Book, that if a drug is
7  listed in the Orange Book, it means that it has been
8  assigned FDA approval, been given FDA approval, which means
9  that they had sufficed -- fulfilled the requirements of the
10  ANDA, which includes that their drug is safe and effective.
11      Q.  Anything else?
12      A.  If we're referring to generic drugs, this is the
13  authoritative source.
14      Q.  When did TPPs begin to implement a block on VCDs
15  based on the recall?
16      MR. HANSEL:  Objection.  This is beyond the scope
17      of her report.  I permitted some questions about this.
18      I believe you've beaten that horse pretty thoroughly.
19      It's not part of her report, she's not being proffered
20      as an expert on that issue, and I would just ask you
21      to please move on.
22      MR. GISLESON:  No.  I haven't beaten this horse.
23      I'm still riding it and it's still healthy and in good
24      shape.  This goes directly to her opinion that TPPs
25      unjustly paid for medications which they should not

44 (Pages 170 - 173)

Page 174

1    have paid; if there was a block, they didn't pay.
2    BY MR. GISLESON:
3        Q.  So do you have an understanding as to what period
4    of time TPPs implemented blocks concerning VCDs that were
5    found to have the presence of nitrosamines?
6        MR. HANSEL:  Object to the form.
7        A.  The strategy that TPPs put in place following the
8    recall is not a universal strategy across all TPPs and how
9    they did that and when they did that is very much within
10   that entity and was -- is not within the scope of my
11   report, nor what -- what I was asked to render an opinion
12   on.
13       What I do attest to is that TPPs paid for the
14   drugs that were contaminated, would not have been FDA
15   approved with the contaminant because they would not have
16   been the same as the referenced labeled drug.  So it's
17   really as simple as that.
18   BY MR. GISLESON:
19       Q.  If someone wants to know what strategy a
20   particular TPP followed in response to the recall of VCDs,
21   it's necessary to ask that TPP?
22       MR. HANSEL:  Object to the form.  Again, this is
23   outside the scope of her report.
24   BY MR. GISLESON:
25       Q.  You can answer.

Page 175

1        A.  I don't know that that would be public
2    information, but if you were a member or a -- engaged with
3    a TPP, I would -- that information would be available to
4    you.
5        Q.  Are you aware of any public documents that
6    identify the different strategies that TPPs took in
7    response to the VCD recall?
8        A.  Public information?
9        Q.  Yes.
10       A.  No.  The FDA offered guidance on the recall.
11   That was public information.
12       MR. GISLESON:  Those are the questions I have.
13   Thank you very much for your time.
14       THE WITNESS:  You're welcome.
15       MR. KERNER:  Any other Defendants on the Zoom?
16       MR. GEOPPINGER:  Yes.  Yes.  I just have a couple
17   brief follow-up questions.  I just want to clarify
18   something for the record.
19           REDIRECT EXAMINATION
20   BY MR. GEOPPINGER:
21       Q.  Good afternoon, Doctor.  I know it's getting
22   late, so I'll be brief.  My name's Jeff Geoppinger.  I
23   represent AmeriSourceBergen.
24       Doctor, you would agree with me that the
25   definition of bioequivalent can be found in the Code of

Page 176

1    Federal Regulations, correct?
2        MR. HANSEL:  Object to the form.
3        A.  The FDA, yes, does have a definition for
4    bioequivalence.
5    BY MR. GEOPPINGER:
6        Q.  And the FDA's definition is found in the code of
7    federal regulations, correct?
8        A.  Could you be more specific when you say federal
9    regulations?
10       Q.  The Code of Federal Regulations 21CFR of the FDA
11   promulgates its regulations.
12       A.  I did not review.
13       Q.  Are you aware that the definition of
14   bioequivalence is contained -- the FDA's definition is
15   contained within the Code of Federal Regulations?
16       A.  That was not within the scope of my report and I
17   did not review that document, but it's my understanding
18   though that it should be there but I did not review it.  I
19   cannot speculate.
20       Q.  You did not review that definition prior to
21   preparing your report, correct?
22       A.  No.  I reviewed the definition.  I did not -- if
23   you're referring to a particular document that's not
24   consistent in my report, that's what I'm referring to.
25       Q.  I'm sorry, I don't understand the answer.

Page 177

1        MR. HANSEL:  Do you have a document you can show
2    the witness to ask her if she reviewed it?
3        MR. GEOPPINGER:  No.
4    BY MR. GEOPPINGER:
5        Q.  My question is, Doctor, in a -- in the -- in the
6    process of preparing your report, did you review the
7    definition of bioequivalent contained within the Code of
8    Federal Regulations?
9        A.  Yes.
10       Q.  Okay.  On -- in -- a moment ago you referenced
11   Paragraph 33 of your report when asked about that
12   definition.
13       A.  Uh-huh.
14       Q.  Would you agree with me, Doctor, that the
15   language in Paragraph 33 of your report is not the
16   definition of bioequivalence from the Code of Federal
17   Regulations?
18       A.  No, I don't agree with you.
19       Q.  Is it your testimony that the language in
20   Paragraph 33 of your report is the definition of
21   bioequivalence from the Code of Federal Regulations?
22       A.  To my knowledge.
23       Q.  Okay.  When using the term bioequivalence in your
24   report, did you intend to use it as it is defined by the
25   FDA in the Code of Federal Regulations?

45 (Pages 174 - 177)

Page 178

1    MR. HANSEL: Object to the form. Calls for a
2  legal conclusion. Beyond the scope.
3    A. I believe my definition in my report captures
4  what a bioequivalent drug product -- captures the
5  definition appropriately.
6  BY MR. GEOPPINGER:
7    Q. I will agree that Paragraph 33 of your report
8  cites a therapeutic equivalence code from the Orange Book
9  for bioequivalent drug products. My question is about the
10  term bioequivalence as used in the CFR.
11    When you used the term bioequivalence in your
12  report, are you using it as defined in the Code of Federal
13  Regulations?
14    MR. HANSEL: I -- I object. It has -- there's no
15  foundation.
16    A. Since I'm unclear of your question, I prefer not
17  to answer.
18  BY MR. GEOPPINGER:
19    Q. I'll try to answer -- ask it again and make it
20  more clear. When you used the word bioequivalence in your
21  report, did you -- are you using it as it is defined by the
22  Code of Federal Regulations?
23    MR. HANSEL: I -- I object. Mr. Geoppinger, are
24  you asking the witness to assume that the word
25  bioequivalent is only defined one time in the entire

Page 179

1  Code of Federal Regulations?
2    MR. GEOPPINGER: I'm not asking her to assume. I
3  think she already testified that she's aware that the
4  word is defined in the -- by the FDA in the Code of
5  Federal Regulations.
6    A. I believe my definition captures what a bio- --
7  is accurate as to what a bioequivalent drug product is.
8    If you're asking if I've memorized the Federal
9  Regulation's definition for bioequivalence word for word,
10  that was -- that's -- I don't have that memorized word for
11  word but I'm confident that my definition here captures the
12  appropriate definition for bioequivalent drug product.
13  BY MR. GEOPPINGER:
14    Q. I'm not asking, Doctor, I'm not asking you if
15  you've memorized it and I'm not asking about the -- the
16  term bioequivalent drug products. That's not what I'm
17  asking about.
18    I'm asking about the word bioequivalence.
19    MR. MESTRE: Can we get an update on the time,
20  please?
21  BY MR. GEOPPINGER:
22    Q. Doctor, when you use the --
23    MR. HANSEL: Just a minute, Mr. Geoppinger.
24  We're just doing a time check here.
25    MR. KERNER: You're also doing it while the

Page 180

1  question is pending.
2    MR. MESTRE: I just want to know the time, so we
3  don't go over.
4    MR. GEOPPINGER: I'm sorry. I'm in the middle of
5  my questions. Why do we need a time check?
6    MR. HANSEL: Well, not if the time's almost up.
7    MR. MESTRE: I just don't know.
8    MR. KERNER: Until she answers the questions
9  rather than interrupting him in the middle of his
10  examination.
11    MR. GEOPPINGER: Excuse me. I have a question
12  pending. Is we -- are we still on the record?
13    MS. ISIDRO: We are.
14    MR. KERNER: Yes, we are.
15    MR. GEOPPINGER: Okay. Thank you.
16  BY MR. GEOPPINGER:
17    Q. Doctor, my -- my question -- I just want to
18  clarify because I think we're missing each other here.
19    My question is about the term bioequivalence, not
20  the term bioequivalent drug products.
21    MR. HANSEL: Excuse me, did you say bioequivalent
22  with a T or bioequivalence with a C-E?
23    MR. GEOPPINGER: I'm talking about the word used
24  on -- in Paragraph 59, the last word of that
25  paragraph: B-I-O-E-Q-U-I-V-A-L-E-N-C-E,

Page 181

1  bioequivalence.
2  BY MR. GEOPPINGER:
3    Q. When you use that word, Doctor, in Paragraph 59,
4  are you using it in the sense that it is defined in the --
5  in the Code of Federal Regulations?
6    MR. HANSEL: Object to the form. Foundation.
7  You have not told her how it's defined in the Code of
8  Federal Regulations. You have not shown her the
9  purported definition in the vast Code of Federal
10  Regulations to which you are alluding.
11    I object to the form of the question.
12    MR. GEOPPINGER: Counsel, I -- she's already
13  testified she -- she's aware of the definition in the
14  Code of Federal Regulations. Additionally --
15    MR. HANSEL: Well, you have represented that the
16  definition that she used from the FDA Orange Book of
17  bioequivalent drug products is not in the Code of
18  Federal Regulations. There's no foundation here.
19    But please go ahead and answer, if you can.
20    THE WITNESS: Okay.
21    MR. KERNER: Now that you're done coaching the
22  witness.
23    MR. GEOPPINGER: Yeah. Counsel, there's a
24  deposition protocol, Counsel, and the Plaintiffs in
25  this case have taken great issue with speaking

46 (Pages 178 - 181)

Page 182

1    objections. So I caution you that you should probably
2    review that protocol and understand what the scope of
3    your objections can be because that was way outside of
4    the protocol here.
5        MR. HANSEL: I'm glad you brought that up. Part
6    of the --
7        MR. KERNER: Why don't we let her answer this
8    question?
9        MR. HANSEL: Part of the guidelines in this court
10   are that follow-up questions such as yours,
11   Mr. Geoppinger, are limited to questions not covered
12   earlier or questions specific to a Defendant.
13   Attorney Isidro covered bioequivalence extensively in
14   her -- her examination and so I don't believe your
15   questioning is within the permitted scope.
16       So please, please wrap it up.
17   BY MR. GEOPPINGER:
18       Q. Doctor, I'll ask the question hopefully for the
19   last time.
20       A. Okay.
21       Q. When you use the word bioequivalence as it is
22   written in -- as the last word of Paragraph 59 of your
23   report, are you using that word as it is defined in the
24   Code of Federal Regulations?
25       A. I am using that word in the context of sameness,

Page 183

1    that the generic drug was the same as the reference listed
2    drug product for safety and effectiveness.
3        MR. MESTRE: So hold on. This should not be
4    controversial now. There's no pending question. It's
5    5:30 in the afternoon. I'd like to know the amount of
6    time that's left.
7        THE COURT REPORTER: Five hours seven minutes.
8        MR. MESTRE: Thank you.
9    BY MR. GEOPPINGER:
10       Q. Doctor, that's your definition of bioequivalence?
11       A. You asked me how I used it in the context of the
12   sentence in Number 59 where it says the presence of the
13   contaminant rendered the Manufacturer Defendants' versions
14   of VCDs not equivalent to the branded product as indicated
15   in the Orange Book which serves as the source of truth for
16   bioequivalence and permits substitutability of the generic
17   drug when it meets those -- that criteria.
18       The drug did -- that we're -- so it did not meet
19   the criteria by presence of the contaminants, was not the
20   same as the branded drug, would not have met FDA approval
21   for bioequivalence, and not the same as the referenced
22   listed product, would not have been listed in the Orange
23   Book.
24       Q. Doctor, have you now told me how you've defined
25   bioequivalence in your report?

Page 184

1        MR. HANSEL: Object to the form.
2        A. As it pertains to Number 59 which you
3    specifically asked me about, I have answered your question.
4        MR. GEOPPINGER: Thank you, Doctor. I don't have
5    any more questions.
6        MR. KERNER: Any other Defendants on the -- the
7    Zoom have questions?
8        MR. HANSEL: Hearing none, it's -- do the
9    Defendants have any further questions?
10       MS. ISIDRO: I have just a couple more questions.
11            RECROSS-EXAMINATION
12   BY MS. ISIDRO:
13       Q. Without identifying any names, are any of the
14   TPPs who are involved in this litigation current clients of
15   yours?
16       A. No.
17       Q. Without identifying any names, are any of the
18   TPPs involved in this litigation former clients of yours?
19       A. No.
20       Q. And have you ever worked for any of the entities
21   who are Defendants in this litigation?
22       A. No.
23       MS. ISIDRO: Any questions?
24       MR. HANSEL: Yes. Yes, I do. Are you finished?
25       MS. ISIDRO: For the moment, yes. I may have

Page 185

1    some follow-up after you.
2        MR. HANSEL: Okay. Thank you.
3            FURTHER DIRECT EXAMINATION
4    BY MR. HANSEL:
5        Q. Dr. Panagos, thank you for your patience on a
6    long day. I have a few questions for you on behalf of the
7    Plaintiffs.
8        You may recall that Mr. Gisleson asked you some
9    questions regarding whether you were aware of any
10   third-party payors in particular who -- who paid for
11   contaminated Valsartan and who were seeking a refund.
12   Before he asked you about that after the lawsuit was filed,
13   he asked you about it in general.
14       Are you aware that Plaintiffs Maine Automobile
15   Dealers Association Insurance Trust and MSP Recovery Series
16   allege in the complaint that they or their assignors in the
17   case of MSP paid for contaminated Valsartan?
18       MS. ISIDRO: Objection.
19       A. Yes. That's within the complaint.
20   BY MR. HANSEL:
21       Q. And in your report in Appendix A you list various
22   materials you reviewed for your report, right?
23       A. Yes.
24       Q. And among those materials are four categories of
25   materials that contain data showing payments by MADA and

47 (Pages 182 - 185)

Page 186

1   MSP and those are the MADA Third Party Payor Plaintiff's
2   Fact Sheet, the MSP Third Party Payor Plaintiff's Facts
3   Sheet --
4        MS. ISIDRO: Objection.
5   BY MR. HANSEL:
6        Q. -- the --
7        MR. KERNER: Objection. Leading.
8        MR. HANSEL: I'm not finished.
9   BY MR. HANSEL:
10       Q. -- the MADA claims data for recalled Valsartan,
11  and excerpts from MSP data July 6th, 2021.
12       Did you -- did you review that data?
13       MS. ISIDRO: Objection.
14       A. Yes.
15  BY MR. HANSEL:
16       Q. Is that the type of data that you ordinarily
17  review in the course of your professional career?
18       A. Yes, it is.
19       MR. KERNER: Hang on a second. There seems to be
20  a bit of echo in the room now. If somebody who is on
21  the Zoom could mute themselves, that would be helpful.
22  BY MR. HANSEL:
23       Q. Did that data show in the case of MADA that --
24  that it paid for contaminated lots of Valsartan that were
25  subject to the contamination alleged in the complaint?

Page 187

1        ZOOM PARTICIPANT: Objection: Foundation.
2        A. The data showed that the claims -- there were
3   paid claims.
4   BY MR. HANSEL:
5        Q. And did the -- did the MSP data show paid claims
6   of MSP's assignors?
7        A. Yes.
8        Q. Do you understand that MSP's assignors are
9   third-party payors?
10       A. Yes.
11       Q. Do you understand that MSP is an -- is an
12  assignee of third-party payors for Valsartan?
13       A. Yes, I do.
14       Q. Do you understand that MSP is suing in its
15  capacity as a holder of valid assignments of those -- of
16  the claims of its assignors?
17       MS. ISIDRO: Objection.
18       ZOOM PARTICIPANT: Objection. Legal conclusion
19  and leading.
20       A. Yes.
21  BY MR. HANSEL:
22       Q. And do you understand that MSP alleges in the
23  complaint that it stands in the shoes in effect of its
24  assignor TPPs?
25       MS. ISIDRO: Objection.

Page 188

1        A. Yes.
2   BY MR. HANSEL:
3        Q. Do you understand that the proposed third-party
4   payor class consists of third-party payors as defined in
5   Paragraph 14 of your report?
6        A. Yes.
7        Q. Specifically all third-party payors in the United
8   States and its territories and possessions that, since at
9   least January 1, 2012, to the present, paid any amount of
10  money for Valsartan-containing drug, intended for personal
11  or household use, that was manufactured, distributed, or
12  sold by any Active Pharmaceutical Ingredient, Finished
13  Dose, Wholesaler, or Repackager/Relabeler Defendant.
14       MS. ISIDRO: Objection.
15  BY MR. HANSEL:
16       Q. Is that your understanding?
17       A. Yes.
18       Q. Do you understand that the proposed class so
19  defined is in effect, at least in part, suing for a refund,
20  the word used by Attorney Gisleson, suing for a refund, at
21  least in part in this lawsuit?
22       A. Yes.
23       Q. Today you've heard a lot of questions and
24  objections about whether certain topics were within the
25  scope of your report. Do you remember that?

Page 189

1        A. Yes.
2        Q. Does your report set forth the scope of your
3   report accurately?
4        A. Yes.
5        MS. ISIDRO: Objection.
6        MR. HANSEL: Let me take a short break and see if
7   I have any more questions.
8        MR. KERNER: How long --
9        MR. HANSEL: Under five minutes.
10       THE VIDEOGRAPHER: The time is 5:33, and we're
11  going off record.
12       (Break taken.)
13       THE VIDEOGRAPHER: The time is 5:38 p.m., and
14  we're back on record.
15       MR. HANSEL: No further questions.
16  Thank you, Dr. Panagos.
17       THE WITNESS: You're welcome.
18       MR. KERNER: Anybody else on the phone?
19       MR. GISLESON: Yeah. Just a brief follow-up.
20  This is John Gisleson again for Aurobindo.
21       FURTHER CROSS-EXAMINATION
22  BY MR. GISLESON:
23       Q. You were asked about the MADA, M-A-D-A, claims
24  data. Do you have any understanding as to how MADA managed
25  its beneficiaries' prescriptions following the VCD recall?

48 (Pages 186 - 189)

Page 190

1    A.  The claims data demonstrates -- shows claims that
2    were paid for.
3    Q.  Do you know what strategy MADA followed in
4    response to the VCD recall?
5    A.  That was not within the scope of my review.
6    Q.  Did you do any investigation to determine how
7    MADA managed its patients, its beneficiaries' prescriptions
8    following the VCD recall in connection with your review of
9    the claims data?
10    A.  I reviewed the claims data which showed that the
11    claims were paid for.  That's it.
12    Q.  Did you seek to learn how MADA managed the recall
13    of VCDs?
14    A.  That's not within the scope of my -- of the
15    opinion I was asked to render.
16    Q.  So you didn't do it?
17    A.  I do not wish to comment or speculate on the
18    strategy that they took.  I reviewed the claims data which
19    showed that they paid for claims for those drugs.
20    Q.  Do you know whether MADA at any point implemented
21    a block concerning NDCs or VCDs that contained nitrosamine
22    impurities?
23    A.  I do not know.
24    Q.  Pardon me?
25    A.  I do not know.

Page 191

1    Q.  And as to MSP's assignors, do you know whether --
2    strike that.
3    Did you do any investigation to determine how any
4    of MSP's assignors managed the VCD recall -- recalls
5    following the identification of nitrosamine impurities?
6    A.  That was not within the scope of my report.  I
7    reviewed the claims data that -- that showed that they paid
8    for the claims.
9    Q.  So as a result of the work that you did in this
10    case, you have no understanding as to how MSP's assignors
11    managed the VCD recall following the discovery of
12    nitrosamine impurities, correct?
13    MR. HANSEL:  Object to the form.  Outside the
14    scope.  Asked and answered.
15    MR. GISLESON:  It hasn't been answered.
16    BY MR. GISLESON:
17    Q.  You can answer the question, please.
18    MR. HANSEL:  Same objection.
19    A.  They were assigned claims data.  I did not review
20    any further assignments or agreements.
21    BY MR. GISLESON:
22    Q.  Including any strategies that any of those
23    assignors followed to manage the recalls, correct?
24    A.  That was not in the scope of my review.  I
25    reviewed the claims data that shows that those claims were

Page 192

1    paid for.
2    Q.  Did you do any investigation to determine whether
3    any of MSP's assignors, assignor TPPs, implemented blocks
4    at any point concerning VCDs containing nitrosamine
5    impurities?
6    MR. HANSEL:  Asked and answered.
7    A.  I was not asked to review their strategies.  I
8    reviewed the claims data.
9    BY MR. GISLESON:
10    Q.  And as a result, you have no knowledge as to what
11    those strategies were, correct?
12    MR. HANSEL:  Objection.
13    A.  That was not --
14    MR. HANSEL:  Asked and answered.  Object to the
15    form.  Repetitive.
16    MR. GISLESON:  I'm just looking for a direct
17    answer to a clear question.
18    MR. HANSEL:  Your question assumes that whatever
19    payment data she already told you she reviewed can be
20    completely divorced from whatever their strategy is,
21    since you brought it up.
22    BY MR. GISLESON:
23    Q.  You can answer the question.
24    A.  If and when they had a strategy, I was not a
25    participant or have knowledge of what that was.  I have

Page 193

1    reviewed the claims data that shows that the claims were
2    paid for.
3    Q.  Any other information than claims data?
4    MR. HANSEL:  Objection.  Asked and answered.
5    A.  Could you be more specific?
6    BY MR. GISLESON:
7    Q.  Sure.  What was the information in the claims
8    data that was important to you?
9    A.  Claims data demonstrated that the plan paid a
10    portion of the medication and the member paid a portion.
11    Q.  Anything else?
12    A.  Indicating that that was re- -- medication was
13    reimbursed or plan paid for.
14    Q.  Anything else?
15    MR. HANSEL:  Object to the form.
16    A.  I -- the claims data followed a standard claims
17    data format, typical of what we see in the industry when
18    you're reviewing claims.
19    BY MR. GISLESON:
20    Q.  Did the claims data identify specific
21    individual -- the names of specific individuals?
22    A.  If you're asking in general if claims data can
23    include those fields, those fields -- can you be more
24    specific as to how you're asking the question and with
25    which --

49 (Pages 190 - 193)

Page 194

1    Q.   Sure.  Did the claims data that you reviewed
2  identify the names of the patients who consumed the VCDs?
3    A.   Not that I recall, no.
4    Q.   I'm sorry, no?
5        MR. HANSEL:  Would you like the court reporter to
6  read back the answer?
7        MR. GISLESON:  I couldn't hear.
8        MR. HANSEL:  Would the court reporter please read
9  back the answer?
10        (The requested portion was read back.)
11        MR. GISLESON:  Thank you very much.
12        Those are all the questions I have.  Thank you
13  for your time and your patience.
14        THE WITNESS:  All right.  Thank you.
15        MR. DORNER:  I have questions within the scope of
16  that.
17        FURTHER FURTHER DIRECT EXAMINATION
18  BY MR. DORNER:
19    Q.   Doctor, my name is Drew Dorner.  I'm here on
20  behalf of CHP.
21        The claims data that you just referred to would
22  only reflect costs associated with the transaction at the
23  time of the adjudication of the claim; is that right?
24        MR. HANSEL:  Object to the form.  Lack of
25  foundation.

Page 195

1        Mr. Dorner, do you have an exhibit?
2        MR. DORNER:  The witness has seen the exhibits,
3  the claims data that she's referring to that she's
4  reviewed.
5        MR. HANSEL:  Well, it's not an exhibit to this
6  deposition.
7        MR. DORNER:  I'm not making it an exhibit.  I'd
8  like an answer to my question.
9    A.   I will answer generally that claims data that has
10  a plan paid amount or claims data that it's at the point of
11  adjudication.
12  BY MR. DORNER:
13    Q.   Okay.  And that only reflects some -- some of --
14  some amount of money that exchanges at the time of that
15  adjudication, but not, for example, any payments that might
16  be made to a TPP well before the adjudication or any
17  payments that might be made to a TPP after the
18  adjudication; is that accurate?
19        MR. HANSEL:  Object to the form.  Lack of
20  foundation.
21    A.   I'm not sure what you're asking.
22  BY MR. DORNER:
23    Q.   Sure.  If a member of a TPP makes a claim for a
24  medication, it's your testimony that there is claims data
25  associated with that that would be reflected in the TPP's

Page 196

1  records.  Am I understanding that correctly?
2    A.   Yes.
3    Q.   Okay.  Where the claims data reflect that
4  particular claim, any amount of money associated with that
5  transaction is -- it reflects only money exchanged at the
6  time of that transaction, right?
7    A.   It reflects the plan paid and any member paid
8  amounts at the date of service.
9    Q.   Okay.  I understand.  And so if either prior to
10  or subsequent to the date of service some amount of money
11  was also exchanged that is related to the -- indirectly or
12  directly related to the claim, that would not be reflected
13  in the particular set of claims data that you were
14  referring to when you were talking with Mr. Gisleson; is
15  that right?
16        MR. HANSEL:  I object to the form of the
17  question.  Lack of foundation.
18  BY MR. DORNER:
19    Q.   You can answer.
20    A.   Could you be more specific when you say exchange
21  of money before or following outside of a claims data?
22    Q.   Sure.  And let me give an example.  In -- in some
23  cases a PBM or a TPP might benefit from a rebate, for
24  example, from a drug manufacturer; is that right?
25        MR. HANSEL:  Objection.  Objection.  This is

Page 197

1  beyond the scope of her report.
2        MR. DORNER:  Hold on.  This is -- no.  No.  We're
3  not getting into speaking objections.  She asked for a
4  specific example.  I'm giving her one.  All right.
5  You can object to the form.
6        THE WITNESS:  Okay.
7        MR. HANSEL:  I object to the form.  It's beyond
8  the scope of her report.  It has nothing to do with
9  her report.  Other experts are addressing this issue.
10  BY MR. DORNER:
11    Q.   You can answer the question, ma'am.
12    A.   The claims data reflects what the plan paid.
13    Q.   On the date of service, right?
14    A.   On the date of service.
15    Q.   It would not reflect in the example that I gave
16  something like a refund; is that right?
17        MR. HANSEL:  Object to the form.
18    A.   Are you referring -- your question is unclear.
19  Are you referring to refund?  You said rebate.  I think
20  you're --
21  BY MR. DORNER:
22    Q.   Yeah.  I -- I -- I caught the same error.  So the
23  example I gave was a rebate.  I apologize.  It wouldn't
24  reflect a -- rebate subsequent to the date of
25  adjudication; is that right?

50 (Pages 194 - 197)

Page 198

1    MR. HANSEL: Objection: Beyond the scope.
2    A. I've answered that the claims data represents
3  what the plan paid at the date of service. That amount is
4  found clearly within the claims data.
5  BY MR. DORNER:
6    Q. Well, I appreciate your answer, but I would like
7  an answer to my question. My question was: The -- a
8  subsequent rebate would not be reflected in the type of
9  claims data that you were referring to in your prior
10  testimony to Mr. Gisleson; is that accurate?
11    MR. HANSEL: Object to the form. Calls for
12    speculation, beyond the scope, asked and answered, no
13    foundation.
14  BY MR. DORNER:
15    Q. You can answer.
16    A. To the best of my knowledge, if a rebate applied
17  to these type of drugs, it would not be within the claims
18  data.
19    Q. And if there were similar payments, not
20  necessarily rebates but things like governmental subsidies
21  that might also be paid well after the date of
22  adjudication, that also wouldn't be reflected in the claims
23  data you were referring to; is that accurate?
24    MR. HANSEL: Object to the form. Lack of
25    foundation, calls for speculation, beyond the scope of

Page 199

1    the report, asked and answered.
2    You need to wrap this up, Mr. Dorner. It has
3  nothing to do with Dr. Panagos's report.
4  BY MR. DORNER:
5    Q. You can answer.
6    A. I don't know.
7    MR. DORNER: Okay. I have no further questions.
8    MR. KERNER: Anybody else on the Zoom?
9    MR. HANSEL: Anyone else in the room?
10    MS. ISIDRO: Nothing from me, no.
11    MR. HANSEL: We will read and sign.
12    Thank you very much, Dr. Panagos, and Chelsea,
13  videographer, thanks very much, and for your
14  hospitality, Jorge, thank you.
15    THE VIDEOGRAPHER: That concludes today's
16  deposition. The time is 5:52 p.m., and we're going
17  off record.
18    (The deposition concluded at 5:52 p.m.)
19
20
21
22
23
24
25

Page 200

1    CERTIFICATE OF OATH
2
   STATE OF FLORIDA
3  COUNTY OF MIAMI-DADE
4
5
6    I, CHELSEA HLAVACH, shorthand reporter and Notary
7  Public, State of Florida, certify that KALI PANAGOS,
8  PHARM.D., R.PH, appeared before me and was duly
9  sworn/affirmed Witness my hand and official seal this 21st
10  day of January, 2022.
11
12    Witness my hand and official seal this 1st day of
13  February, 2022.
14
15
16
17    Chelsea Hlavach, Notary Public
18    State of Florida, My Commission:
   GG352672, Expires: August 11, 2023
19
20
21
22
23
24
25

Page 201

1    CERTIFICATE OF REPORTER
2
   STATE OF FLORIDA
3  COUNTY OF MIAMI-DADE
4
5    I, CHELSEA HLAVACH, Shorthand Reporter and Notary
6  Public, State of Florida, HEREBY CERTIFY that I was
7  authorized to and did stenographically report the
8  deposition of KALI PANAGOS, PHARM.D., R.PH; that a review
9  of the transcript was requested; and the foregoing
10  transcript, pages 10 through 199, inclusive, is a true and
11  accurate record of my stenographic notes.
12    I FURTHER CERTIFY that I am not a relative,
13  employee, attorney, or counsel to any of the parties, nor
14  am I a relative or employee of any of the parties' attorney
15  or counsel connected with the action, nor am I financially
16  interested in the action.
17    Dated this 21st day of January, 2022.
18
19
20
21
22    Chelsea Hlavach, Notary Public,
23    State of Florida at Large
24
25

51 (Pages 198 - 201)

Page 202

1  GREGORY HANSEL, ESQUIRE
2  ghansel@preti.com
3         February 4, 2022
4  RE:   In Re: Valsartan, Losartan, Et Al
5     1/21/2022, Kali Panagos, Pharm.D (#5024986)
6     The above-referenced transcript is available for
7  review.
8        Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22         Yours,
23         Veritext Legal Solutions
24
25

Page 204

1  In Re: Valsartan, Losartan, Et Al
2  Kali Panagos, Pharm.D (#5024986)
3        ACKNOWLEDGEMENT OF DEPONENT
4     I, Kali Panagos, Pharm.D, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____    _____
12  Kali Panagos, Pharm.D           Date
13  *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

Page 203

1  In Re: Valsartan, Losartan, Et Al
2  Kali Panagos, Pharm.D (#5024986)
3        E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____   _____
24  Kali Panagos, Pharm.D           Date
25

52 (Pages 202 - 204)

**[& - 4]**                                                                     Page 1

**&**

**&**   2:14 3:5 4:10,14
  4:19 5:5,9,17,21
  7:5

**0**

**02109**   4:19
**04101**   2:15
**07102**   3:10
**07932**   4:24
**08540**   6:15

**1**

**1**   8:13 10:5 16:10
  16:15 40:14 79:16
  98:1 188:9
**1/21/2022**   202:5
**10**   201:10
**100**   3:10,18
**1000**   1:14 2:11,22
  4:2 10:8
**1001**   5:21 7:5
**10017**   2:4,8
**105**   13:22
**10:49**   59:17
**11**   5:10 200:18
**11:08**   59:20
**11:24**   68:21
**12**   93:10,14 125:21
  141:21 155:8
  169:15
**125**   8:19
**12:17**   74:17
**12:53**   92:22
**13**   8:4
**14**   97:8,12,18 99:2
  100:22 188:5
**1400**   5:2
**15219**   4:11,15
**15219-6401**   5:6
**154**   8:4

**15th**   3:10
**16**   8:13
**16990**   3:15
**17**   8:15
**175**   8:5
**17th**   3:20
**18**   97:9,12,18 99:2
**18,750**   89:18
**184**   8:5
**185**   8:6
**189**   8:6
**19**   99:15,18,24
  100:19
**190**   6:6
**19087**   3:2
**19103-4196**   3:20
**194**   8:7
**199**   201:10
**1997**   18:2
**1:56**   92:25
**1st**   200:12

**2**

**2**   8:15 17:22,24
  40:15 63:17 79:18
  80:14,17 93:9
  102:19,25 107:5
  155:7
**20**   38:18 82:24
  99:15,18,24
  100:19 136:1
  204:15
**200**   6:10 8:8
**2000**   18:14,22
  20:13 27:6
**20004**   5:22 7:6
**20004-2166**   4:2
**2002**   19:12
**2005**   20:13
**2006**   19:2
**2008**   28:7,19

**2009**   19:15,17,22
  20:14 28:24
**201**   8:9
**2010**   28:24
**2012**   188:9
**2015**   27:6
**2016**   65:1
**2018**   28:7,19 35:12
  36:5 47:14 93:14
  138:18 142:7,11
  142:15,19 146:22
  150:24
**2019**   26:7 37:6,14
  45:1 46:25 47:2
  47:14
**202**   8:9
**2020**   46:9
**2021**   37:14,17
  97:23 186:11
**2022**   1:11 10:4
  200:10,13 201:17
  202:3
**2023**   200:18
**203**   8:10
**21**   1:11 6:15 90:8
  100:7,12,18
**21cfr**   176:10
**21st**   10:4 200:9
  201:17
**2200**   4:6 6:19
**2220**   5:13
**22695**   200:16
  201:22
**227**   3:5
**230**   5:13
**25**   103:12
**2500**   6:11
**2525**   1:14 2:11,22
  10:7
**260**   7:2

**270**   3:2
**27th**   4:19
**28**   100:8,12,18,22
  104:8 105:7
**28202**   3:6
**2875**   1:4
**29**   101:9,11,16
  106:22 108:11,15
  109:5

**3**

**3**   8:16 64:16 69:3
  70:12 85:13,21
  93:4 125:21
**30**   3:20 69:3 70:12
  202:17
**300**   3:17
**30305**   6:11
**312**   5:2
**316**   6:2
**32**   101:9,11,16
  106:23 108:11,16
  109:5
**32502**   6:3
**32nd**   5:6
**33**   109:7,12 171:25
  177:11,15,20
  178:7
**33134**   1:15 2:11,23
**3333**   6:11
**3475**   3:6
**3600**   4:6 6:19
**375**   88:21 89:17
**38th**   4:10,15
**3:09**   128:18
**3:21**   128:21

**4**

**4**   8:18 90:23,24
  103:13 141:20
  155:5,7 202:3

**[4,500 - adjudicated]**                                                      Page 2

**4,500**  87:20
**400**  4:23 6:2 88:22
**41**  109:7,12
**42**  110:3,7 112:14
  112:19,22 113:2
**43**  110:3,7 113:5
**44**  113:7 114:20
  115:1
**44023-4536**  3:16
**444**  3:6
**45**  115:16
**45202-4029**  5:2
**46**  116:18,23
  117:25 118:4,11
  118:23 119:4,7,12
  119:18 172:25
**46204-3535**  5:10
**47**  121:11,17
  123:10,17,22
  124:3,10,13,20
  128:13 136:8
  143:3 145:11
**4:10**  153:24
**4:34**  154:2

**5**

**5**  8:19 97:7 103:13
  125:10,11,14
  126:5,6,12,20
  127:10,19 128:12
**50**  89:13,16
**500**  4:23
**5024986**  202:5
  203:2 204:2
**505**  4:2
**52**  128:24 130:10
  131:10,14,17
**53**  4:19
**55**  132:9,15,25
  133:8 134:3 135:9
**550**  3:2

**56**  136:5,6,13
**57**  136:24
**59**  140:9,14,22
  141:22 180:24
  181:3 182:22
  183:12 184:2
**5:30**  183:5
**5:33**  189:10
**5:38**  189:13
**5:52**  1:12 199:16
  199:18

**6**

**6**  16:20 80:11
  97:23 123:16
  124:4,10,20 125:4
  125:15 142:22
  143:7,14 144:4,24
  171:25
**60**  89:13
**600**  3:5 6:6
**60606**  5:14
**617-213-7001**  4:20
**617-213-7045**  4:20
**63105-3443**  6:7
**66210**  7:2
**6b**  143:2
**6d**  144:10
**6i**  145:6,9,16
  146:24 147:11
**6th**  186:11

**7**

**701**  2:19 5:17
**70130**  2:19 5:18
**704**  3:6
**75201-7932**  4:7
  6:20

**8**

**8101**  7:2
**85**  8:16

**9**

**9**  127:20
**90**  8:18
**910**  127:11
**911**  127:20
**97**  18:25
**9:32**  1:12 10:4
**9th**  4:2

**a**

**a.m.**  1:12 10:4
  59:17,20
**ab**  116:17 121:11
**ability**  15:25 24:20
**able**  15:21 22:2
  23:14 32:14 34:3
  64:5 72:25 115:14
**abruptly**  169:1
  170:10
**absolutely**  88:6
**abstracts**  80:15
  81:6
**academia**  62:25
**academic**  51:25
  52:22 53:3 54:14
  55:24 60:23 82:9
**academy**  45:16
  49:2,6
**acceptable**  166:17
  167:1 168:11,19
**acceptance**  69:21
  74:11
**accepted**  31:8 34:7
  103:17 125:2
  127:17 128:2
  132:1 153:9
**access**  171:5,6
**accommodate**
  170:15
**account**  28:23
  30:4 38:15

**accuracy**  202:9
**accurate**  15:21
  147:24 179:7
  195:18 198:10,23
  201:11
**accurately**  189:3
**acknowledgement**
  204:3
**acknowledgment**
  202:12
**actavis**  3:13,13
**action**  201:15,16
**actions**  1:6 173:3
**active**  36:24
  188:12
**activities**  169:20
**actual**  151:8,18
**add**  12:11 70:15
  73:4,12
**added**  97:23
**addition**  69:13
  71:13 107:19,24
  135:11
**additional**  98:12
  100:17 104:18
**additionally**
  181:14
**additions**  204:6
**address**  13:21,22
  37:1,4
**addressing**  52:9
  197:9
**adequate**  162:15
**adhere**  23:2,16
  130:25 145:21
  146:8
**adhered**  153:2,2
  153:22
**adherence**  22:5,6
**adjudicated**
  162:18,19

[adjudication - answers]    Page 3

**adjudication**
43:23 162:24
194:23 195:11,15
195:16,18 197:25
198:22
**adjunct** 20:8
63:20
**adjuster** 21:18
22:11,15,25 23:5
23:10
**adjuster's** 23:17
23:18
**administer** 21:21
40:5
**administration**
19:16,19 100:6
107:6,15 112:16
113:9,16 114:12
**administrative**
63:12,22
**administrator**
40:3,4
**administrators**
38:22
**adopt** 102:3
105:15
**adults** 21:16
**adverse** 82:3
83:21
**advice** 37:20
157:25 158:24
**advisable** 169:1
**advise** 33:9 41:4
56:24 91:18
168:10
**advised** 168:14
**advisement** 20:3
33:21 37:25
**advising** 30:6
35:18 57:9 170:9

**advisors** 20:1
35:12
**advisory** 26:3,9,10
105:1
**affiliation** 24:1,23
25:2,5,6,14,17,18
**affiliations** 23:20
26:3
**affirm** 13:1
**affirmed** 200:9
**affordable** 115:19
**afternoon** 93:3
175:21 183:5
**agency** 96:5
**agency's** 150:18
**ago** 177:10
**agree** 11:7 91:13
91:21 149:15,21
175:24 177:14,18
178:7
**agreed** 9:15 103:2
**agreement** 12:3
**agreements**
160:16 191:20
**ahead** 16:9 17:21
85:12 90:22
128:16 153:23
181:19
**aid** 5:11 21:16
**al** 202:4 203:1
204:1
**albertson** 3:8
**alfano** 4:10,14
**allege** 185:16
**alleged** 97:2
186:25
**alleges** 187:22
**allotted** 202:20
**allow** 12:22 30:19
74:6 116:15 171:5

**allows** 23:13,16
116:13
**alluding** 181:10
**american** 44:22
47:10,21 48:21,22
50:1,11 51:3
100:1
**amerisourceberg...**
175:23
**amgen** 26:3
**amount** 34:17
72:14 87:18 89:5
89:21,25 90:2,2,3
183:5 188:9
195:10,14 196:4
196:10 198:3
**amounts** 87:22
196:8
**analysis** 32:12
**analytics** 32:9
**anda** 67:19 106:5
106:7,15,15 107:2
116:11 117:1
118:15 119:15
121:8,13 123:12
124:5 130:19
131:22 132:4
143:10,17,19,25
144:1 150:14
151:15 173:10
**anda's** 124:6,24
**anesthesia** 24:1,9
**anesthesiologists**
24:15
**anesthesiology**
24:6
**announced** 93:15
166:3
**announcement**
139:23

**annoys** 69:8
**answer** 14:11,17
14:18 15:6 33:16
33:23 43:21 66:18
66:24 67:2,25
68:10 69:25 71:11
72:18 77:3 84:5
93:24 94:1,20
106:16 110:21
112:3 115:13,15
117:4 120:16
122:15 126:3
134:14 135:20
137:19 141:15
143:21 156:4,10
156:21 160:14
163:21 166:21
170:21,24 171:20
174:25 176:25
178:17,19 181:19
182:7 191:17
192:17,23 194:6,9
195:8,9 196:19
197:11 198:6,7,15
199:5
**answered** 15:13
60:8 63:7 66:13
66:15 71:11 72:22
75:15 84:11 94:16
94:17 99:8 111:6
124:14,23 132:22
159:24 163:19
171:17 184:3
191:14,15 192:6
192:14 193:4
198:2,12 199:1
**answering** 73:2
84:19
**answers** 72:6,9
180:8

[anticoagulation - aspects]                                                    Page 4

**anticoagulation**
  25:11
**anybody**  11:25
  73:3 189:18 199:8
**anymore**  122:8
**apart**  97:2
**apologize**  197:23
**app**  88:12
**appearance**  10:17
  26:18 27:2
**appearances**
  10:14
**appeared**  3:3,8,13
  3:18,22 4:4,8,13
  4:17,21,25 5:4,8
  5:11,15,19,23 6:4
  6:8,13,17,21 7:3,7
  7:10 200:8
**appearing**  16:6
  169:22
**appears**  157:22
**appended**  204:7
**appendix**  85:24
  86:12,14,21 91:10
  97:15,16,17,20
  98:2 99:6,10,21,22
  99:23 107:4,11,15
  107:18,22 108:2,6
  110:10,13,14
  111:3 113:13,14
  114:9 115:8 135:6
  135:7,11,15,22
  185:21
**appendixes**  93:5
**applic**  119:2
**applicable**  116:20
  118:13 120:4,21
  173:2,5 202:8
**application**  67:19
  117:1,6,9 118:16
  118:22 119:2,15

**anticoagulation**
  120:11 126:10
  130:14,16 131:22
  132:3,4,6 149:17
  150:14 151:16
**applications**  104:2
  131:12 149:24
**applied**  144:19
  198:16
**applies**  30:16
**apply**  52:19
  111:12
**applying**  106:15
  117:16 130:24
**appointment**
  46:12
**appreciate**  71:1
  79:25 198:6
**appropriate**  30:17
  35:17 73:14
  103:18,20 179:12
**appropriately**
  29:19 35:3 178:5
**approval**  56:24
  57:5,22 58:25
  66:4,9 67:5,18,20
  67:21 68:4,6 72:3
  74:25 75:16 76:3
  100:6 104:2 107:6
  107:16 110:9
  111:1 112:8,16
  116:25 117:8,16
  117:16 118:16,17
  118:22 119:2,10
  119:15,23 120:6
  120:13 124:7
  125:1 126:11,18
  127:6 128:8
  130:14,20,24
  131:1,5,12,20,23
  132:2,6 134:11
  136:16,21 143:10

**anticoagulation**
  143:19 145:23
  149:18,20 151:16
  164:23 173:8,8
  183:20
**approvals**  57:12
  74:22 75:4,12,24
  127:3 128:4
**approved**  57:5
  60:2,10,18 63:1
  66:1 67:7 101:19
  101:21,21 105:20
  105:24 115:22
  116:11 119:21
  120:25 123:12,14
  124:6,24 127:6
  133:11,12,15,16
  136:16 147:5,8
  151:15 152:22
  153:10,10 155:16
  171:14 174:15
**approximate**
  167:19
**approximately**
  46:24 69:12 89:13
  89:15,16,18
  167:15
**areas**  157:21
**argumentative**
  75:15
**aristarx**  36:2,7,8,9
  36:21 37:2
**armsrx**  37:5,6,6,9
  38:12 42:15,16
  46:18 157:25
  170:22,25
**arrangement**
  43:10,16 88:23
  89:3
**arrangements**
  43:18

**articles**  52:6,9,12
  52:15,18 80:14
  81:1 86:19 172:21
**asher**  3:1
**ashp**  8:20 100:1
  124:15 127:1
**aside**  78:20
**asked**  11:7 26:10
  60:7 63:7 66:13
  66:19,21,25 67:14
  67:21 69:14 71:8
  71:12,23 72:7,8,10
  72:19 75:14 84:11
  92:7,9 94:15
  111:5 115:12
  124:14,22 141:11
  141:12 159:24
  163:19 164:11
  169:15 171:17
  174:11 177:11
  183:11 184:3
  185:8,12,13
  189:23 190:15
  191:14 192:6,7,14
  193:4 197:3
  198:12 199:1
**asking**  12:5 39:19
  44:9 57:15,16
  68:12,15 87:24
  108:23 110:18
  118:7 153:15,17
  158:22 165:21
  169:19 170:16,18
  178:24 179:2,8,14
  179:14,15,17,18
  193:22,24 195:21
**asks**  11:14 80:14
**aspect**  29:25
  108:15 109:4
**aspects**  27:15 30:7
  37:21 38:2 41:5

41:16 54:18 59:8
117:8
**assessed** 96:9
**assessment** 150:18
**assigned** 27:16
116:12 173:8
191:19
**assignee** 187:12
**assignments**
187:15 191:20
**assignor** 187:24
192:3
**assignors** 185:16
187:6,8,16 191:1,4
191:10,23 192:3
**assistant** 63:20
**assisted** 92:3
**associated** 40:10
194:22 195:25
196:4
**association** 2:17
10:23 46:20 47:6
47:10 49:24 50:1
50:11 185:15
**assume** 178:24
179:2
**assumes** 148:24
192:18
**assuming** 72:18
**assurance** 122:23
123:6
**asthma** 31:23,25
32:3
**atlanta** 6:11
**attached** 17:14
86:1 202:11
**attachment** 85:11
**attachments** 85:8
**attempt** 71:15
111:9

**attempted** 169:16
**attended** 65:9
**attest** 174:13
**attesting** 139:15
**attorney** 2:5,9,13
2:17,20,24 3:3,8
3:17,22 4:4,8,12
4:17,21,25 5:4,8
5:11,15,19,23 6:4
6:8,13,17,21 7:3,7
69:20 74:3 171:18
182:13 188:20
201:13,14 202:13
**attorneys** 3:12
**attributed** 166:22
**audible** 11:17
**audience** 82:16,19
**august** 200:18
**aurobindo** 5:8
73:6 154:17,18,20
154:24 189:20
**authored** 56:8,13
56:16 80:25 81:5
81:5,8,8,11,11,14
81:14,17,17
**authoritative**
112:11 152:20
173:13
**authorization**
29:13,17 35:2
**authorizations**
29:24
**authorized** 201:7
**automobile** 2:17
10:23 185:14
**available** 32:14
51:2 175:3 202:6
**avenue** 2:3,7 4:6
5:21 6:19 7:5
**aware** 49:12,22,25
51:7,13,18,19,24

91:17 138:11,20
139:24 148:1,5
154:20,22,23
155:1 160:23
165:3,22 166:16
167:1 170:5 175:5
176:13 179:3
181:13 185:9,14

**b**

**b** 8:11 86:12
142:25 180:25
**bachelor** 18:1,9
**bachelor's** 18:12
18:21,24 24:25
25:19 55:12,22
**back** 43:3,4 59:21
60:3,5 62:8,10
67:1,2,4,24 68:1
68:25 74:18 79:15
79:18 80:2,3
92:17 93:1,25
94:2 95:2,3 99:9
101:2,3 106:16,20
108:24,25 110:20
110:22 112:1,5
120:15,17 121:23
122:12,17,20
127:15 128:22
138:19 143:20,23
154:3 156:16,22
162:12 164:21
189:14 194:6,9,10
**background** 34:2
95:16 97:8 100:23
101:5
**bad** 69:7
**badger** 70:1
**balanced** 73:9
**barnes** 5:9
**base** 60:19 61:10
61:12 103:16

172:16
**based** 30:12 31:4,7
31:8,16,17 32:1
49:17 59:9 74:2
86:7 89:6 104:5
104:16,22 105:2
117:4 121:12
127:13 130:22
135:10 136:18
147:1,12,13
160:24 161:2
162:15 163:15
165:21 166:11
170:4 173:15
**baselessly** 71:15
**bases** 71:20 99:1
112:18,20,21
113:1
**basically** 138:14
**basing** 134:14
147:10
**basis** 41:18 59:1,3
59:10,12 93:17
99:24 105:20
108:10 109:4,6
110:6 111:16,21
113:9 115:20
116:2,22 130:9
132:14 134:21
136:12 139:21
141:24 143:13
144:9,17 145:15
147:3,18 153:16
165:25
**batches** 154:24
160:22
**baylen** 6:2
**bdc** 163:3
**bearing** 72:7
**beaten** 173:18,22

**began** 29:6 36:5
**behalf** 10:19,21,23
  10:24 11:1,5
  26:18 29:15,16
  32:15 40:6 69:2
  69:10 73:6,23
  151:25 169:22
  185:6 194:20
**believe** 11:12
  70:14 73:7 80:11
  84:19 99:13 107:5
  112:3 117:23
  137:21 138:18
  139:3 165:23
  173:18 178:3
  179:6 182:14
**beliveau** 2:14
**bellevue** 25:2,8
**belong** 93:22 94:6
  129:6
**ben** 7:10
**beneficial** 22:24
  23:1
**beneficiaries**
  164:17 169:10
  189:25 190:7
**beneficiary** 164:8
  165:19
**benefit** 30:1 31:7
  31:14 36:11,12,15
  36:22 37:21,22
  38:1 39:6,24
  40:11 41:4,8
  44:12 57:11 58:13
  59:7 60:11 62:19
  64:21 83:3,12
  100:4 102:13,14
  105:16 132:13
  157:2 160:5
  196:23

**benefits** 30:20
  35:1 40:5 41:5
  97:8,25 100:2
**best** 30:10 83:17
  91:18 99:8 115:18
  161:7,8 198:16
**beyond** 19:9 82:19
  101:11 137:7,8
  163:18 166:18
  173:16 178:2
  197:1,7 198:1,12
  198:25
**bio** 179:6
**bioequivalence**
  52:16 54:15,18
  55:1,3,6,6,9,18
  56:4 106:7 149:22
  150:8,11 151:4
  171:16,23 172:11
  172:18 176:4,14
  177:16,21,23
  178:10,11,20
  179:9,18 180:19
  180:22 181:1
  182:13,21 183:10
  183:16,21,25
**bioequivalent**
  114:21 115:11,17
  150:1 172:1,15
  175:25 177:7
  178:4,9,25 179:7
  179:12,16 180:20
  180:21 181:17
**biology** 18:5 77:16
  78:3
**bipc.com** 3:7
**bit** 16:13 66:14
  154:5 186:20
**blackwell** 6:6
**block** 3:1 173:14
  174:1 190:21

**blocked** 162:7,12
  162:17,25 163:3
**blocks** 174:4 192:3
**blvd** 1:14 7:2
**board** 65:18
**boards** 105:1
**bockius** 5:5
**body** 114:22
**book** 81:18 100:5
  101:10,16,18,19
  104:3 105:17,19
  105:23 107:10,12
  107:17 108:14,14
  109:14,21,24
  110:4 112:7,9,23
  115:22 116:5
  119:24 120:5,24
  121:3,6,12 132:10
  133:10,15 134:7
  149:17 152:9,17
  152:21 153:7,8,17
  153:20 173:6,7
  178:8 181:16
  183:15,23
**books** 81:20
**bosick** 4:10,14
**boston** 4:19
**bottom** 103:12
  105:11
**boulevard** 2:11,22
  10:8
**bound** 160:9,16
**brand** 66:1 67:6
  112:9 114:23
  127:2 133:5,6,12
  143:11 144:7,14
  145:24
**branded** 113:8,16
  114:12,21 140:12
  142:1,3,5,8,12,16
  142:20 183:14,20

**brands** 30:25
  53:22
**break** 15:10,13
  59:13,19 71:2
  92:16,18,19,24
  128:15,16,20
  153:23 154:1
  189:6,12
**bresnahan** 5:20
**brett** 7:1
**brief** 175:17,22
  189:19
**bring** 83:20
**brisbois** 3:1
**broad** 82:2
**broadreach** 22:23
  28:5,9,15 29:2,5,6
  29:12,21 30:5,13
**brook** 104:3
**brought** 40:25
  182:5 192:21
**buchanan** 3:5
**business** 22:19,20
  22:22 23:3 35:22
  37:1 77:22,24
  78:6,8,10,12
**businesswomen's**
  46:20 47:6 49:23

**c**

**c** 2:1 7:1 10:1
  180:22,25
**calculated** 79:12
  89:5,20
**call** 35:15 150:18
**called** 114:2 132:4
  139:8
**calling** 70:2 122:2
  139:5
**calls** 35:20 60:7
  67:12 69:17
  100:24 121:18

[calls - classification]                                                  Page 7

164:19 165:6
178:1 198:11,25
**camber** 3:3
**camden** 1:2
**camp** 2:19 5:17
**campbell** 7:4
**campus** 4:23
**cancer** 82:1,4 83:9
83:15 84:18 96:5
**capacities** 26:12
**capacity** 23:7
39:25 51:12 57:9
91:19 100:16,21
112:24 117:22
138:13 157:23,23
187:15
**captures** 178:3,4
179:6,11
**capturing** 128:2,3
**carcinogen** 141:1
141:2 166:23
**carcinogenicity**
96:10
**carcinogens** 93:22
96:4 145:20
**cardiovascular**
31:23 168:23
**care** 22:17,19
38:19 39:5 45:17
49:2,6,9,18 100:1
100:3 115:18
**career** 41:13,16
48:12 82:8,23,25
95:17,22 186:17
**careful** 161:3
163:12
**carefully** 156:10
169:4
**carondelet** 6:6
**carrier** 32:24

**case** 12:21 79:13
85:8 88:6,8 89:9
94:8 122:7 129:24
130:20 132:4
136:24 140:25
141:16 143:17,18
157:3 169:21
170:5 171:13
172:10 181:25
185:17 186:23
191:10
**cases** 35:15 102:20
196:23
**categorically** 71:6
**categories** 54:11
62:21 133:9
185:24
**category** 54:2,2
76:15,23
**caught** 16:14
197:22
**caution** 182:1
**center** 2:15 3:9
25:2,9
**centre** 4:10,15 5:6
**cerner** 2:6
**certain** 23:19
26:15 44:19 45:7
148:16 149:12
154:24 160:21,22
188:24
**certainly** 20:17
79:22 168:10
**certainty** 163:13
**certificate** 8:8,9
200:1 201:1
**certificates** 78:10
**certification** 21:15
21:19 23:10,15
**certifications**
21:11,12 77:17

**certified** 21:15,17
**certify** 200:7
201:6,12
**cetera** 11:14 31:2
80:15
**cfr** 178:10
**cgannon** 3:11
**chagrin** 3:16
**change** 150:16
153:14 203:4,7,10
203:13,16,19
**changed** 38:10
143:11
**changes** 102:10
143:9,16,25 144:2
202:10 204:6
**changing** 49:16
**chapters** 81:18
**characterization**
66:17
**charges** 88:3
**charles** 3:14
**charlie** 2:21 10:24
70:16
**charlotte** 3:6
**chartered** 2:14
**check** 17:6 179:24
180:5
**chelsea** 1:16 10:10
11:5 199:12 200:6
200:17 201:5,22
**chicago** 5:14 83:2
**child** 21:16
**choice** 30:24
**choose** 30:17
**chp** 194:20
**chris** 3:4
**christine** 3:9
**christopher.henry**
3:7

**cincinnati** 5:2
**circumstances**
150:17
**cited** 128:12
**cites** 178:8
**city** 2:15
**civil** 69:3 70:4
**claim** 42:25 43:23
44:16 97:22
104:19 113:23
194:23 195:23
196:4,12
**claim's** 162:23
**claims** 32:18 39:5
39:23 40:9,10,12
43:5,6,25 44:3,9
44:10 92:1 98:5,8
113:18 114:3
162:18 163:14,23
164:24 165:15
186:10 187:2,3,5
187:16 189:23
190:1,1,9,10,11,18
190:19 191:7,8,19
191:25,25 192:8
193:1,1,3,7,9,16
193:16,18,20,22
194:1,21 195:3,9
195:10,24 196:3
196:13,21 197:12
198:2,4,9,17,22
**clarify** 107:18
113:24 139:4
149:9 152:19
175:17 180:18
**class** 103:4,8 188:4
188:18
**classes** 20:15,18
**classification** 96:5
96:6,13,15 134:9

**classwork** 55:25
**clear** 108:17
171:19 178:20
192:17
**clearly** 107:17
198:4
**client** 23:8 28:12
28:23 30:4 38:21
44:4,5,5,6,7,11,13
57:16 58:12 59:23
60:13,19 61:10,12
61:23 82:16
102:13 158:12
160:9,11
**client's** 170:18
**clients** 30:7,17
31:14 32:15 33:6
33:10,13,14 36:23
37:20,25 38:22
41:23 42:11 56:24
57:10 58:2,3,10
59:7 62:18 82:12
82:14,19 91:18
151:25 157:15,17
158:1,4,8,13,17,20
158:23 159:19
168:6,11,14 169:6
170:17,22,25
171:3 184:14,18
**clinical** 23:7,7,19
24:1,23 25:1,4,6
25:13,16 26:2
28:11,12,14,18
29:12,21,22,25
31:4,6,11,11,12
33:1,20,25 34:1,21
35:16 38:20 50:24
53:19,21 83:20
103:18,22 104:6
104:16,22 105:2
126:25 152:25

155:14
**clinics** 25:11
**close** 127:23
**closely** 24:9 99:10
115:14 168:25
**cluttered** 80:4
**coaching** 181:21
**coan** 4:18
**coates** 4:22
**coatesg** 4:24
**code** 109:9 116:12
175:25 176:6,10
176:15 177:7,16
177:21,25 178:8
178:12,22 179:1,4
181:5,7,9,14,17
182:24
**codes** 109:18,20
109:23,23 116:15
**collaboration**
29:14,15
**colleague** 46:15
64:23
**colleagues** 36:1
**collect** 89:1
**college** 7:2 44:22
48:22,23 77:11,24
78:5
**columns** 125:22
**combination**
88:14
**come** 32:23 33:7
92:17
**comes** 23:10
**comfortable**
133:24
**coming** 15:1 27:19
27:20 152:3,7,11
152:15
**comment** 68:20
137:25 157:21

190:17
**commented**
166:22
**commission**
200:17
**committee** 41:21
42:4,20,22 102:17
102:18,22,24
103:15 104:21
118:4,5 120:20
121:5 126:11
127:16 133:7
152:8
**committee's** 42:6
126:6
**committees** 41:9
41:12,14,18,23
42:1 104:5,15
105:1 116:19
118:11,19,25
119:13 121:3,14
124:4,11 127:3
132:9,18 133:14
133:21 134:7,17
134:23 136:3
151:8,19,23 152:4
152:19 153:12
173:1
**common** 131:12
**communicate**
167:9
**communicated**
167:12,16
**communicating**
29:19
**communication**
64:17
**communications**
17:1
**community** 31:9
32:2

**companies** 159:11
159:14 160:6,17
**company** 36:24
42:13 79:4,7
169:20
**compared** 100:18
**compensated**
88:19
**competitive** 31:4
**complaint** 165:24
185:16,19 186:25
187:23
**complete** 18:8,20
86:3,14 115:15
204:8
**completed** 18:22
55:11,20 105:4
202:17
**completely** 192:20
**completing** 29:17
**complex** 34:9
**compliance** 22:4,6
116:20 118:12
120:3,21 127:5
132:11 173:2
**compliant** 124:7
132:7
**complied** 119:22
119:24 173:4
**complying** 160:10
**component** 58:19
115:4,6 155:20
**components** 31:13
54:4,19,21 133:25
138:24
**computer** 18:7
78:3
**concept** 55:6
127:10
**concern** 166:14

[concerning - continue]                                                Page 9

**concerning** 101:10
158:12,24 174:4
190:21 192:4
**concerns** 12:17
83:22 84:18
155:17
**concluded** 199:18
**concludes** 199:15
**conclusion** 60:7
67:13 69:17,18
70:2 74:4 100:25
121:19 122:2
130:18 164:20
165:7 178:2
187:18
**conclusions**
111:17,22
**condition** 168:24
**conditions** 25:25
31:10 32:4 34:9
**conducted** 54:10
69:7
**confer** 70:20
**conference** 12:15
**confident** 153:22
179:11
**confidential** 42:9
42:10 157:22
158:1,9,14,19,21
159:5,6,10,25
160:1 169:24
**confidentiality**
159:13 160:9,11
160:16
**confines** 40:1
**confirm** 86:2
**conjunction**
119:10
**conlee** 2:18 11:1
70:15

**connected** 201:15
**connection** 42:13
53:15 58:3 78:1
78:22 79:10 83:10
86:4,15,24 87:14
88:4,19 89:18
90:4,9,13,16,18
91:4,8,14,21 92:4
92:8 190:8
**conservative**
167:21
**consider** 42:22
60:24 70:11 76:12
100:22 104:24
137:13 158:8,13
158:17 159:10
**consideration**
57:12 58:18 60:10
75:9 76:19,19,20
106:10 115:24
116:4 119:25
126:12 131:5
135:25 136:18
150:5
**considered** 104:17
104:21 115:17,24
115:25 116:13,16
117:8 118:6,16
120:13,13 127:18
128:7 134:10
136:17 137:10
147:6 150:1
153:13
**consistent** 12:20
94:10 95:11
140:24 153:2
176:24
**consistently** 66:18
**consists** 163:23
188:4

**constructed** 128:1
**consult** 67:15
102:22 151:8
152:4,8,12,16
153:6,19,21
170:10
**consultant** 41:4,4
47:11 50:1,11,15
50:17,25 53:20
78:21 153:1 157:2
**consultation**
158:24
**consulted** 65:20
151:18
**consulting** 36:11
36:13,15,22 38:19
42:12 50:15,17
51:1,16 59:6
61:17 79:3,6,10
98:25 158:20
**consults** 171:12
**consume** 168:20
**consumed** 87:22
88:1,2 164:13
165:19 194:2
**consuming** 164:8
**contact** 168:5,7,8
**contacted** 90:9,12
90:15
**contacts** 165:21
**contain** 148:17
149:12 185:25
**contained** 154:25
164:8,17 165:5,19
168:19 176:14,15
177:7 190:21
**containing** 52:13
52:24 53:4,10
93:16 97:3,4
121:9 148:9 151:5
154:21,25 157:7

157:11,17 160:21
167:3,12 168:12
170:6 188:10
192:4
**contains** 105:23
125:22
**contaminant** 94:8
95:9 140:10,13,21
141:25 147:6
156:23 174:15
183:13
**contaminants**
93:16,19,21 94:5
94:14 95:8,15
96:1,3 129:10,18
129:23 130:3,6
137:3,9,14,21,22
137:23 138:1,14
139:8 141:7,10,11
141:15,19 142:3,6
143:18 145:19
146:7 147:20
155:1,3,4,6 157:4
163:24 164:3
183:19
**contaminated**
147:15 162:13,22
162:24 163:8
165:15 171:7,14
174:14 185:11,17
186:24
**contamination**
186:25
**content** 71:20
**context** 53:18 82:5
82:7 146:20,21,22
155:12 182:25
183:11
**continual** 152:24
**continue** 70:5 72:5
72:15,20 73:13,14

[continue - cwhorton]                                                                 Page 10

74:6 156:15
163:13 168:20
**continues** 66:20
72:19
**continuing** 50:20
50:22 72:11 78:7
78:9 121:25 122:3
**contraindications**
28:3
**control** 117:14
140:6
**controversial**
183:4
**cooperative**
169:17
**coordination**
97:25 100:2
**copies** 202:14
**copy** 40:24 85:12
85:16 113:8,16
114:11
**corporation** 4:8
6:21
**correct** 13:16
17:14,15 23:23,24
24:2,3,18 25:15
26:4,20 27:6,7,25
28:6,8 29:3 32:10
33:3 34:12 35:8
36:6 43:16,17
47:12,23 48:3
55:9 63:25 64:19
78:14 80:12,13,16
81:1,2,6,7,9,10,12
81:13,15,20,21
83:25 84:15,22
85:2,6 86:24
88:17 89:22 93:12
93:13 96:23 97:9
99:15 100:18
101:10,16 102:23

103:1 104:21,25
105:9,17,18,21,22
105:25 106:7,12
107:23 109:9,10
110:4 114:24
117:23 118:14,20
118:23 119:13
121:6 123:19
128:13 135:15
137:14 139:9
142:23 147:2
149:6,22 150:2,13
150:20 151:2
158:11 159:7
160:7 166:2
167:13 168:21
176:1,7,21 191:12
191:23 192:11
204:8
**corrections** 204:6
**correctly** 44:7
62:12 94:4,23
112:17 119:18
120:8 196:1
**cost** 104:4,13,14
104:18,23,24
115:19
**costs** 105:4 194:22
**cotes** 12:7,7
**could've** 110:15
**council** 35:11
**counsel** 9:16 10:13
10:15 17:1 22:2
27:1 69:13 70:21
71:5,14 73:16
92:12,15 111:14
181:12,23,24
201:13,15 202:14
**counsel's** 73:15
**counseled** 159:11

**counseling** 27:19
42:12 158:18
**counselor** 160:12
**countless** 41:17
**country** 160:23
161:10,24 162:9
164:13
**county** 200:3
201:3
**couple** 11:4 28:24
29:1 70:23 175:16
184:10
**course** 20:20
55:17 56:3 63:3,8
70:22 186:17
**courses** 20:21,22
20:24 55:1,3,8
63:5,11,14,19,23
63:25 64:1,2,11
**coursework** 20:3
55:11,20 77:10,12
77:24 78:6
**court** 1:1 10:10,11
10:13 11:10,19,20
12:24 13:23 14:7
14:19 68:19 69:19
74:10,12 108:23
182:9 183:7 194:5
194:8
**courts** 69:22
**coverage** 120:14
**covered** 30:9,9
182:11,13
**covid** 83:6,8
**cpr** 21:16
**create** 31:10
151:23
**created** 36:8
**creates** 30:16
**credible** 124:17

**credits** 78:8
**criteria** 26:16 45:7
47:8 57:5 58:24
67:20 110:4 116:3
136:16 145:22
150:19 151:14,16
164:23 183:17,19
**criterion** 149:16
**critical** 115:4
169:2
**criticism** 97:4
**cross** 8:4,6 154:14
189:21
**crowell** 5:21 7:5
**crowell.com** 5:22
7:6
**crs7270** 3:16
**cs** 202:15
**culbertson** 4:19
**culminating** 71:14
**current** 13:21,22
17:13,16 42:15
46:13 54:3 82:8
149:20 184:14
**currently** 13:24
21:5 45:2,22 79:9
**curriculum** 20:1
54:23
**customize** 102:4,9
**cut** 169:13
**cv** 8:15 17:13,14
17:16,19,21,25
23:20 28:19 30:11
31:3 32:7,25
34:11 37:14 44:18
62:2,4,14,17 63:15
64:16 80:22,23
**cvs** 5:11
**cwhorton** 2:23

| | | | |
|---|---|---|---|
| **d** | **daubert** 69:22 | 151:5 161:11,25 | **department** 20:9 |
| **d** 8:1 10:1 69:3 | 74:10 | **defendants** 69:10 | 21:18 22:11,15 |
| 70:12 101:15,17 | **davis** 4:5 | 69:24 70:6 72:8 | 23:10 63:12 |
| 106:22 143:7,13 | **day** 49:13,13 86:8 | 73:21 111:16 | **depends** 43:10,15 |
| 144:4 189:23 | 86:8,18,18 91:15 | 175:15 183:13 | **deponent** 9:17 |
| **d'lesli** 4:5 | 91:15 100:21,21 | 184:6,9,21 | 69:5,9 202:13 |
| **dade** 200:3 201:3 | 112:24,24 115:5,5 | **defense** 69:13 | 204:3 |
| **dallas** 4:7 6:20 | 133:22,22 152:25 | 70:20 73:3,11 | **deposed** 14:1 |
| **dan** 7:4 | 152:25 155:14,14 | **defer** 75:19,23 | 78:25 |
| **dana** 3:19 | 163:22,22 172:21 | **define** 77:8 115:10 | **deposing** 202:13 |
| **dangerous** 129:19 | 172:21 185:6 | **defined** 177:24 | **deposition** 1:10 |
| **data** 32:8,13,16,18 | 200:10,12 201:17 | 178:12,21,25 | 8:14 9:17 10:6,7 |
| 32:19,22,23 43:25 | 204:15 | 179:4 181:4,7 | 14:6 16:4,7,10 |
| 44:3,9,10,17 86:19 | **days** 202:17 | 182:23 183:24 | 17:6 66:19 69:5 |
| 97:21,21 98:8 | **dc** 4:2 5:22 7:6 | 188:4,19 | 71:16,23 72:5,12 |
| 103:21 113:19 | **de** 1:14 2:11,22 | **definition** 34:8 | 73:17 79:16 |
| 114:3 127:13 | 10:7 | 95:15,21 96:1 | 181:24 195:6 |
| 135:10 163:23 | **dealers** 2:17 10:23 | 171:15,22,25 | 199:16,18 201:8 |
| 165:16 172:20 | 185:15 | 172:3,10,17 | **depositions** 11:13 |
| 185:25 186:10,11 | **deals** 99:15 | 175:25 176:3,6,13 | 11:24 12:2,4 |
| 186:12,16,23 | **december** 34:19 | 176:14,20,22 | **derived** 79:9 |
| 187:2,5 189:24 | **decided** 103:10 | 177:7,12,16,20 | **describe** 39:2 |
| 190:1,9,10,18 | **deciding** 105:14 | 178:3,5 179:6,9,11 | 64:20 |
| 191:7,19,25 192:8 | **decision** 91:20 | 179:12 181:9,13 | **description** 95:7 |
| 192:19 193:1,3,8,9 | 118:5 | 181:16 183:10 | 108:14 |
| 193:16,17,20,22 | **decisions** 67:17 | **definitions** 109:8 | **design** 30:8 41:5,7 |
| 194:1,21 195:3,9 | 76:4 103:16 104:5 | **degree** 18:12,21 | 102:13,14 |
| 195:10,24 196:3 | 104:15 | 18:24 24:25 25:7 | **designed** 31:3,7 |
| 196:13,21 197:12 | **declaration** | 25:20 55:12,13,13 | 71:8 |
| 198:2,4,9,18,23 | 114:17 | 55:21,22 78:8 | **designs** 83:13 |
| **date** 1:11 17:13 | **declare** 204:4 | **degrees** 19:10 | **detail** 97:22 |
| 19:8 53:20 83:7,7 | **dedicated** 38:18 | 77:11,20 78:5,12 | 171:18 |
| 86:9 89:12 90:6,7 | **deem** 35:16 | 115:3 | **detectable** 148:17 |
| 138:19 196:8,10 | **deemed** 116:1 | **demonstrate** | 149:13 |
| 197:13,14,24 | 124:8 144:15 | 106:6 144:20,22 | **determination** |
| 198:3,21 203:24 | 204:6 | **demonstrated** | 91:13 150:2,11,25 |
| 204:12 | **defendant** 1:13 | 193:9 | **determine** 72:25 |
| **dated** 201:17 | 13:13 182:12 | **demonstrates** | 73:1 125:21 166:7 |
| **dates** 138:23 139:3 | 188:13 | 190:1 | 173:4 190:6 191:3 |
| 139:5,5 | **defendant's** 71:17 | **demonstrating** | 192:2 |
| | 140:11 142:1 | 128:8 | |

**determined** 116:3
**determines** 116:8
  149:21
**determining** 33:7
  150:8
**develop** 101:24
  102:11
**developed** 30:11
  103:4,5
**developing** 30:21
  30:23
**development**
  38:20 100:2,6
  102:20 107:6,16
  112:16
**developments**
  41:20
**deviation** 141:16
  144:21
**device** 79:7
**diabetes** 25:23
  31:23
**diagnoses** 25:25
**diagnosis** 32:3
**diagram** 104:7
  105:7,11,12
**diem** 29:9
**differ** 39:16 40:7
**differences** 39:18
  39:20
**different** 25:25
  30:19 35:21 39:7
  72:21 81:23 89:2
  91:11 109:22
  129:21 139:6
  157:13 167:15
  168:11 169:16
  170:12,12 175:6
**differs** 39:12
**direct** 8:4,6,7 13:8
  185:3 192:16

194:17
**directly** 22:19
  44:12 173:24
  196:12
**director** 19:20
  23:7 28:11,17
  29:21 34:21
**disagree** 71:6
  73:24
**disclosed** 87:12
**discourteous** 70:4
**discovery** 191:11
**discuss** 109:8
  110:3 126:5
**discussed** 12:14
  19:10 21:2 48:10
  48:14 59:10 83:18
  83:23 84:9,22
  95:6 99:1 108:4
  127:10
**discusses** 100:8
  126:6,20
**discussing** 83:9,12
  83:14,24 84:8,23
**discussion** 26:11
  26:21,23 34:4
  58:19 84:17,19
  99:12 105:5 108:7
**dispensing** 27:18
**distance** 35:5,10
**distinction** 130:1
**distributed** 188:11
**district** 1:1,1
**division** 20:22
  63:21 64:1
**divorced** 192:20
**dklinges** 3:21
**doctor** 16:6,16
  17:25 38:17 55:13
  68:8 78:14 79:15
  80:25 81:22 85:23

87:25 88:3 90:25
95:5 101:24
112:13 125:14
128:24 135:13
154:16 171:2
175:21,24 177:5
177:14 179:14,22
180:17 181:3
182:18 183:10,24
184:4 194:19
**doctorate** 19:1,5,7
  25:7 55:22
**document** 1:6
  16:16 40:23 90:22
  90:25 120:2,19
  123:16,21 124:19
  125:4,15,19,21
  128:1,2,9 135:15
  176:17,23 177:1
**documented** 31:4
**documenting**
  29:18
**documents** 16:22
  17:7 40:13,16,18
  135:4,5,7,11,22,24
  175:5
**doing** 73:15 82:24
  92:3 102:2 126:18
  179:24,25
**dorner** 4:1 8:7
  111:23,23 194:15
  194:18,19 195:1,2
  195:7,12,22
  196:18 197:2,10
  197:21 198:5,14
  199:2,4,7
**dosage** 113:8,16
  114:12
**dose** 188:13
**dozens** 12:8,8

**dr** 10:6 13:10,20
  27:5 44:18 59:23
  68:3 69:11 70:3
  74:6,13,20 92:16
  93:3 110:25
  111:17 140:19
  149:15 153:15
  154:4 156:3
  157:22 169:21
  185:5 189:16
  199:3,12
**drew** 4:1 111:23
  194:19
**drive** 4:23
**drug** 22:9 26:12
  26:13,14,15 27:24
  27:25 30:18 31:14
  33:1,20 53:22,23
  53:24 57:4,10,21
  60:1,10,17 61:5
  62:18,25 66:1
  67:5,21 72:3 75:9
  75:16 76:3,13,21
  82:1,3,4 83:13,13
  83:20 84:18 100:3
  100:3,5,6,8 101:19
  101:21 102:21
  103:21 104:1,16
  105:2,19,25 106:5
  107:6,15 112:8,15
  113:8,8,11,15,16
  114:11,12,21,22
  114:23 115:6,23
  116:3 118:5
  120:11,14 121:9
  121:12,15 122:23
  122:24,25 123:14
  125:1 126:16
  127:2,4,7 131:6,12
  131:20,21 132:3,4
  132:6,13 133:12

133:23 134:6,9
136:15,20 137:4,9
138:1 140:24
141:4,17 142:4
143:16 144:7,13
144:14,20 145:22
145:23,24,25
147:7 149:24,25
150:1,8 151:12,25
157:17 160:24
162:21,21 164:2
164:21 166:14
168:23 172:1
173:6,10 174:16
178:4,9 179:7,12
179:16 180:20
181:17 183:1,2,17
183:18,20 188:10
196:24
**drugs**  6:17 22:3
30:9,16 33:22,24
52:13,24 53:5,11
56:24 57:12 67:7
67:17,18 74:25
75:8 76:12,19
93:16 97:3,4
107:2 110:8 111:1
112:10 114:21
115:17,22,25
120:6,12,25 127:6
127:18,21 128:6
132:11 133:3,5,6,9
133:9,10,12
134:11,20 139:11
141:16 148:9
152:22 154:21,25
157:3,7,11 158:25
160:21 161:8
162:13 164:24
165:10,13 167:3
167:12 173:12

174:14 190:19
198:17
**dtdorner**  4:3
**duane**  3:19 4:1
**duanemorris.com**
3:21 4:3
**due**  93:16
**duly**  13:6 200:8
**duties**  27:13 29:11
29:13 36:20

**e**

**e**  2:1,1 3:2 8:1,11
10:1,1 171:25
180:22,25,25,25
203:3,3,3
**earlier**  27:2 37:1
71:4 74:1 93:11
182:12
**echo**  186:20
**economic**  165:9
**economics**  77:7,10
77:12,18,20
**education**  19:9
50:20,22 54:17,22
55:2,7 59:4 77:25
78:7,9 86:8 95:17
99:21 100:15
112:23 113:12
114:14 115:3,7
132:17 133:19
135:2,11 136:1
155:21
**effect**  69:17 70:3
187:23 188:19
**effective**  58:24
104:18 114:23
115:24 116:1
117:15,18 120:25
122:23 124:8
126:8,8,17 127:5
128:8 129:20

132:8 136:22
144:15,21 145:24
163:10 173:10
**effectiveness**
105:20 123:14
151:17 183:2
**effects**  82:3,4
83:21,21
**efficacy**  95:12
104:13,16 149:19
**efficiency**  74:5
**efficiently**  30:1
73:13 161:16
**either**  44:7 102:3
111:24 196:9
**elaborate**  39:19
**ellie**  6:18
**ellie.norris**  4:7
6:20
**embarrasses**  69:8
71:9
**employed**  22:23
**employee**  23:18
42:18 201:13,14
**employees**  30:18
36:16
**employer**  23:5,6
33:14 36:14 39:8
39:13 168:7
169:22
**employers**  3:17
30:17,20 39:24
159:19
**employment**  82:10
**encouraged**
115:18
**engaged**  41:23
51:25 52:3,22
53:3,9 54:14
91:21 175:2

**engagement**  8:18
82:15 83:2 91:3,4
91:14
**engagements**  82:6
**enrollment**  32:9
**ensure**  35:2 99:11
117:17 161:17
169:10
**ensuring**  28:2
29:23 104:16
117:15 171:6
**entail**  22:1,11 24:4
55:14
**entailed**  30:14
32:11 55:17 77:12
**entails**  22:2 66:6
76:4
**entire**  28:16
111:12 127:12
128:1 135:10
140:16,18 178:25
**entirety**  81:20
99:7 108:6 110:15
111:8 164:4
**entities**  33:11
35:22 42:5 98:25
184:20
**entitled**  111:16
121:21
**entity**  37:4 40:6
44:13 105:14
150:7 170:23
174:10
**entry**  110:4
**epidemic**  64:18,24
**epidemiology**  56:9
**equivalence**
101:20 105:24
106:2 109:9,17,20
109:23 116:8,12
144:5 150:17,20

178:8
**equivalent** 116:9
 122:24 140:11
 141:17 142:1,5
 144:15 151:1
 183:14
**equivalents**
 115:17
**errata** 8:9 202:11
 202:13,17
**erratas** 202:15
**error** 197:22
**esquire** 2:2,6,10
 2:14,18,21 3:1,4,9
 3:14,19 4:1,5,9,14
 4:18,22 5:1,5,9,12
 5:16,20 6:1,5,9,14
 6:18 7:1,4 202:1
**essential** 31:13
 133:25
**essentially** 164:5
**established** 58:25
 68:6 74:24 75:17
 110:8 111:1
 112:10 120:12
 128:6 134:9 140:5
 153:8
**et** 11:14 31:2
 80:15 202:4 203:1
 204:1
**evaluate** 32:14
**evaluated** 20:4
 150:15
**evaluating** 127:11
 149:24
**evaluation** 26:11
 101:20 116:8
**evaluations**
 105:24 106:3
**evasive** 72:20
 73:10,25

**event** 11:13
**evidence** 31:3,7,16
 31:17 32:1 103:16
 127:13 148:25
**evolving** 49:16
**evp** 38:12
**exact** 83:7 90:6,6
 138:19
**exactly** 46:23
 47:15 88:12
 158:22
**examination** 8:4,4
 8:5,5,6,6,7 13:8
 70:13 154:14
 158:2 175:19
 180:10 182:14
 184:11 185:3
 189:21 194:17
**examine** 70:9
**examined** 13:6
**example** 195:15
 196:22,24 197:4
 197:15,23
**examples** 31:22
 135:14
**exceeds** 89:21
**excel** 88:15,16
**exceptions** 127:21
**excerpts** 97:21
 186:11
**exchange** 196:20
**exchanged** 196:5
 196:11
**exchanges** 195:14
**excluded** 102:14
**exclusive** 30:12
**exclusively** 123:25
**excuse** 66:13 68:9
 80:18 85:24 86:12
 97:21 102:2 143:8
 155:7 156:1,1

170:14 180:11,21
**executive** 37:10,15
 37:24 38:10
 157:24
**executives** 44:23
 48:22,23
**exhibit** 8:13,15,16
 8:18,19 16:10,13
 16:15 17:14,21,24
 40:14,15 79:15,18
 85:13,21,23 90:23
 90:24 93:4 125:10
 125:11,14 126:5,6
 126:12,20 127:10
 127:19 128:12
 195:1,5,7
**exhibits** 16:12
 79:21 85:13 195:2
**exist** 39:21
**expect** 43:8,12,19
 66:24
**experience** 34:2
 38:18 41:9,11
 43:23 54:17 59:4
 59:6 86:7 98:24
 99:20 100:15
 107:8,24 112:23
 112:25 113:12
 115:7 132:17
 133:19,21 134:23
 135:2,12 136:1
 165:21 166:1,25
 168:10 172:22
 173:3
**expert** 33:1,5,9,20
 40:20,24 51:23
 65:23,25 66:3,9
 67:10 68:3 69:16
 69:21,24,25 71:19
 74:10,11 76:7,11
 76:16,18 78:21,21

79:10,10,13 80:21
 80:22 86:7,20
 89:4,9 98:24 99:7
 108:7 110:16
 111:18 135:23,25
 155:10 157:23
 159:21 169:21
 170:5 172:10,19
 173:20
**expertise** 35:15
 163:15
**experts** 36:1 87:11
 97:21 197:9
**expires** 200:18
**explain** 88:24
**explanation**
 108:13 109:17,20
**explore** 71:17
 111:16,21
**express** 6:8 121:6
**expressed** 62:2,17
**expressly** 116:19
 118:2,12,19,24
 119:3,6,13,19
 120:3,7,20 173:1
**extensively** 182:13
**extent** 70:13 74:7
 89:2 133:13
 141:14
**extract** 44:10

|  **f**  |

**facing** 24:12
**fact** 98:15,16
 102:19 108:10,18
 109:3 113:22
 114:1,7 130:23
 131:11,12 137:25
 149:5 162:9
 163:16 186:2
**factor** 104:4,24

**factors** 104:20,22
149:23
**facts** 148:24 186:2
**faculty** 19:13,15
19:16,19 20:8
**failing** 66:18
**fails** 202:19
**fair** 15:8 73:8
**faith** 69:7
**falkenberg** 5:13
**falkenbergives.c...**
5:14
**fall** 27:22 64:1
**falls** 3:16 100:20
**false** 137:1 145:1,2
145:3,17 147:1,13
161:19 170:3
**familiar** 41:14,21
55:7 127:1
**familiarity** 132:17
136:2
**far** 86:11 89:19
90:1
**fax** 4:20
**fda** 52:19 57:5
58:25 60:2 65:20
65:22,25 66:4,6,10
67:18 68:5,7 72:3
74:22,25 75:4,12
75:17,19,23 93:15
93:18 95:20,23,24
97:6 101:21
105:17,20 106:4,6
106:25 107:1,3
109:14 110:8,13
111:1 112:11
115:10,14,17
116:25 117:7,17
118:15,22 119:11
119:16 120:12
121:4,12 126:19

127:6,6 128:7
130:5,25 131:6,13
131:16,19,24
132:3,5,7,11
133:16 134:11
136:16,21 138:14
139:7,10,13,14,16
139:22 140:2,5
141:13 143:17
144:2,3,3 145:23
146:6,9,12,17
148:1 149:21
150:2,9,16,24
151:15,17 152:22
153:11 155:16
157:8 161:4
162:16 163:11
164:23 166:11,13
166:16,22 168:14
171:14,15,22
172:10,17 173:8,8
174:14 175:10
176:3,10 177:25
179:4 181:16
183:20
**fda's** 116:7 150:11
176:6,14
**february** 34:19
200:13 202:3
**federal** 69:3,16,22
74:10 176:1,7,8,10
176:15 177:8,16
177:21,25 178:12
178:22 179:1,5,8
181:5,8,9,14,18
182:24
**feel** 85:2
**fees** 89:1,6,18,25
**fhs** 4:11,16
**field** 22:17 47:8,9
50:17,19 98:25

112:25
**fields** 44:4 97:23
193:23,23
**fifth** 98:12,14
**fifty** 89:15,15
167:23
**file** 88:10 131:20
131:22 132:3
**filed** 132:5 165:18
185:12
**files** 106:5
**filing** 106:14
**filled** 27:25
**filling** 27:17,18
**fin** 114:17
**finally** 26:2 32:25
47:21
**financially** 201:15
**find** 64:5 126:23
**findings** 29:18
**fine** 80:7 165:20
**finish** 14:16,18
33:15 68:9 127:25
146:14 156:3
**finished** 156:6,10
184:24 186:8
188:12
**firm** 7:1 13:12
**first** 11:4 13:6,15
14:6 17:13 19:18
21:16 43:13,19
44:25 85:14 90:4
90:9 138:3,4,10,20
139:24 140:2,5
142:7,11
**five** 168:4 183:7
189:9
**fl** 1:15 2:11,23 5:6
6:3
**flaherty** 2:14
10:22 90:21

**floor** 3:10 4:10,15
4:19
**florham** 4:24
**florida** 1:16 10:8
13:23,23 37:2
200:2,7,17 201:2,6
201:23
**focus** 25:23 43:20
57:6,18 83:16,19
84:1,3,7
**focused** 58:15
**folks** 11:25 12:13
14:24 15:2 154:7
**follow** 112:10
120:11 133:6
154:5 175:17
182:10 185:1
189:19
**followed** 128:6
168:25 174:20
190:3 191:23
193:16
**following** 151:15
151:22 162:1,2,10
167:16 168:2
174:7 189:25
190:8 191:5,11
196:21
**follows** 13:7
**food** 100:6 107:6
107:15 112:15
**footnote** 102:19,25
123:17 124:4,10
124:20 125:4,15
**foregoing** 201:9
204:5
**form** 39:9 52:25
53:6,12 54:7,16
55:10,19 56:5,23
57:8,19 58:16
60:6,16 61:13,16

61:25 62:15,23
65:24 66:5 67:13
74:23 75:6,14,20
76:1,9,17,25 80:19
81:3 82:13 84:10
84:25 85:4 86:17
86:25 94:7,15,21
94:24 96:14,20,25
99:3 100:24 102:5
106:13 108:10,20
109:4,13 110:12
110:23 111:5
112:6 115:2,21
116:10,24 117:5
117:12,21 118:3
120:23 122:1,21
123:4,11,24 124:2
124:22 125:6
129:12 132:16,21
133:2,20 134:5,16
134:22 135:1,18
136:9,14 137:6,15
138:12,22 140:15
143:4,15 144:12
144:18 145:12,18
147:4,14,19 148:4
148:13,19,24
149:7 150:4
152:18 159:1,18
160:8 161:1
163:18 166:19
167:4 168:13,22
169:14 171:24
172:5 174:6,22
176:2 178:1 181:6
181:11 184:1
191:13 192:15
193:15 194:24
195:19 196:16
197:5,7,17 198:11
198:24

**formal**  19:9 59:24
60:14,25 61:2,22
62:5,13,22,24 77:6
77:8,22
**formally**  162:5
**format**  193:17
**formed**  99:23
**former**  184:18
**forming**  85:7 86:4
108:6
**formularies**  60:11
100:4,8 101:25
102:10 103:4
151:25 162:5
**formulary**  29:24
30:8 31:15 33:22
33:23 34:6 35:2,3
41:5,6 54:3,5 57:1
57:13 58:19 67:17
75:9 76:4,13,20
83:13 100:2,5
102:3,4,15,21
103:5,8,16 104:17
105:14,15 115:25
116:4 118:6 120:1
120:14 121:15
126:6,7,12 127:1,3
127:7,12,16,18,21
128:5,7 132:12
134:10 136:15,18
136:19,21 147:7
151:9,15,19 152:5
152:13 153:14
157:18 158:5,12
158:18,25 159:12
160:24 161:12,25
162:4,10 164:2,22
**formulating**  99:17
100:11 106:23
109:11 137:12
153:5,18

**forth**  32:2 123:7
130:25 132:7
139:19 145:22
151:16 164:23
168:14 189:2
**forward**  73:13,17
151:24
**found**  93:18,21
137:4,14 139:22
141:4 148:8
160:21 164:4
165:15 174:5
175:25 176:6
198:4
**foundation**  116:2
137:6 167:4,5
178:15 181:6,18
187:1 194:25
195:20 196:17
198:13,25
**foundational**
115:5
**founder**  36:2
**four**  18:10 98:10
185:24
**fourth**  93:10 98:12
98:14 104:8
**frame**  25:16 26:5
29:5 37:12,16
82:22 137:1,3,5,8
137:13,20,21,22
138:7,8 150:22
151:20 161:13
162:13 164:3,4
171:6
**francisco**  34:14
**frank**  4:9
**free**  85:2
**front**  40:14,19,21
79:19 93:4

**fulbright**  4:6 6:19
**fulfilled**  55:13,21
123:13 173:9
**full**  13:18,20 28:20
89:25
**fully**  59:10
**function**  41:15
51:11 105:3
**functions**  24:6
40:10 41:7,20
49:14 91:15
100:21 104:18
115:5 128:4
133:22,23 152:25
155:15
**further**  8:6,6,7,7
11:3 12:6 98:1,5
154:4,6 184:9
185:3 189:15,21
191:20 194:17,17
199:7 201:12

**g**

**g**  10:1
**ga**  6:11
**gain**  67:21 112:8
127:5
**gannon**  3:9
**gateway**  3:9
**gathering**  92:4
**gcoan**  4:20
**general**  131:25
153:17 171:4
185:13 193:22
**generally**  195:9
**generic**  53:22,22
67:17,18,20 75:5,8
75:12,16 76:3,12
76:19 92:10
105:24 106:5
107:2 112:10
113:7,11,15

114:11,21,22
115:6,17 116:3,9
121:12 127:2,21
131:21 132:4
133:3,9,12 134:6
134:11,20 142:4
143:8,9,16 144:6
144:13 151:12
153:12 157:3
164:2 173:12
183:1,16
**generics** 30:25
66:1 67:6
**geoffrey** 4:18
**geoppinger** 5:1
8:5 175:16,20,22
176:5 177:3,4
178:6,18,23 179:2
179:13,21,23
180:4,11,15,16,23
181:2,12,23
182:11,17 183:9
184:4
**getting** 66:14
92:15 127:23
175:21 197:3
**gg352672** 200:18
**ghansel** 2:16 202:2
**gisleson** 5:5 8:4,6
73:5,5 154:10,15
154:16 156:1,2,5
156:12,14 157:5
158:3 159:3,7,8,15
159:22 160:3,13
161:5 163:20
165:1,11 166:20
167:7 168:17
169:8,12 170:1,14
170:18 171:1,19
171:21 172:2,8
173:22 174:2,18

174:24 175:12
185:8 188:20
189:19,20,22
191:15,16,21
192:9,16,22 193:6
193:19 194:7,11
196:14 198:10
**give** 13:2 15:21
16:13 31:22 65:5
115:14 125:17,24
156:9 196:22
**given** 56:18,21
57:6,17,20,24
59:24 60:1,9,14,21
61:23 62:5,13,22
81:25 173:8 204:9
**giving** 150:17
197:4
**glad** 182:5
**glenn** 2:6 10:20
12:7
**gmail.com** 3:16
**go** 11:3 14:3 15:13
16:9 17:10,21,22
66:19 68:18 72:23
72:23 74:13 85:12
90:22 99:9 114:4
114:20 127:15
128:16 138:19
153:23 156:16
162:12 164:21
180:3 181:19
**goes** 101:11,16
161:18 173:24
**going** 10:3 15:7
16:9,11,19,24
17:10 59:18 66:19
68:8,22,24 70:23
73:1 80:18 90:22
93:7,7,9 104:17
115:13 122:11

128:19 151:20
152:1 153:25
169:12,24 170:20
189:11 199:16
**good** 10:3 13:10
13:11 45:12,13
47:20 48:8 57:4
57:12 80:9 93:3
173:23 175:21
**goodness** 83:6
**gordon** 4:10,14
**governmental**
198:20
**graduation** 19:8
**great** 14:23 126:1
171:18 181:25
**greenberg** 2:3,7
4:23 6:10 10:18
10:20 13:13
**greg** 4:22 10:22
12:7,7 68:24
90:11,12
**gregory** 2:14
202:1
**ground** 14:3 69:6
70:1
**grounds** 16:24
**group** 12:5 36:15
40:6 57:18
**groups** 33:14
36:14 57:20 60:18
168:7
**gtlaw.com** 2:4
4:24 6:12
**guarantee** 88:25
123:6
**guess** 11:4 74:8
83:20
**guidance** 22:4
30:10 33:21 37:20
37:25 49:10,14

57:10 59:6 139:18
140:5 161:4
162:16 163:12
166:11 168:16
175:10
**guidelines** 31:8,16
31:17 32:1,2
48:17,24 49:3,7,20
50:2,4 51:4,8,15
51:22 103:18
124:15 182:9

**h**

**h** 8:11 203:3
**half** 38:18 142:7
142:11
**hand** 12:25 200:9
200:12
**handed** 125:14
**handle** 161:9
166:15
**hang** 186:19
**hansel** 2:14 8:6
10:22,22 11:3,17
12:21 16:24 33:15
39:9 52:25 53:6
53:12 54:7,16
55:10,19 56:5,23
57:8,19 58:16
59:14 60:6,16
61:13,16,25 62:6
62:15,23 63:7
65:24 66:5,11,13
67:2,12 68:9,13,24
68:24 70:18,22,25
73:21,23 74:23
75:6,14,20 76:1,9
76:17,25 79:20,24
80:6,18 81:3
82:13 84:10,24
85:4,16,20 86:17
86:25 90:11,12

92:19 94:7,15,21
94:24 96:14,20,25
99:3 100:24 101:4
102:5 106:13,18
108:20 109:13
110:12,23 111:5
111:19 112:6
115:2,21 116:10
116:24 117:5,12
117:21 118:3
120:23 121:18,24
122:21 123:4,11
123:24 124:14,22
125:6,20 126:1
128:15 129:12
132:16,21 133:2
133:20 134:5,16
134:22 135:1,16
135:21 136:9,14
137:6,15 138:12
138:22 140:15
143:4,15 144:12
144:18 145:12,18
147:4,14,19 148:4
148:13,19,24
149:7 150:4
152:18 156:1,3,7
156:20 157:20
159:1,4,13,18,24
160:8 161:1
163:18 164:19
165:6 166:18
167:4 168:13,22
169:12 170:14,20
171:17,24 172:5
173:16 174:6,22
176:2 177:1 178:1
178:14,23 179:23
180:6,21 181:6,15
182:5,9 184:1,8,24
185:2,4,20 186:5,8

186:9,15,22 187:4
187:21 188:2,15
189:6,9,15 191:13
191:18 192:6,12
192:14,18 193:4
193:15 194:5,8,24
195:5,19 196:16
196:25 197:7,17
198:1,11,24 199:9
199:11 202:1
**happening** 49:17
86:9
**happy** 69:24 80:3
**harassing** 66:17
70:3 71:8
**harassment** 66:15
**harkins** 6:9
**harkinss** 6:12
**haverfield** 3:15
**head** 14:12 28:12
28:23 30:4
**health** 25:14,21
32:9 39:5 42:7
47:22 51:3,11
64:18 168:24
169:10 170:7
**healthcare** 31:8
35:12,25 39:23
44:23 45:13 46:5
46:11,19 47:6,8,9
48:22,23 49:19,23
83:3
**healthy** 173:23
**hear** 14:25,25 15:5
43:1 89:14 143:21
154:11 194:7
**heard** 154:17
155:10 188:23
**hearing** 184:8
**held** 10:7 19:22
34:22 37:8 59:5

**heller** 7:10
**hello** 111:23
**help** 31:14
**helpful** 156:12
186:21
**helping** 56:25
**henry** 3:4
**hereto** 204:7
**hetero** 6:17,17
**hey** 154:16
**hi** 10:24
**hill** 6:14
**hillwallack.com**
6:16
**hilton** 5:16
**hinshaw** 4:19
**hinshawlaw.com**
4:20
**hired** 155:9
**hlavach** 1:16
10:10 200:6,17
201:5,22
**hmo** 97:22
**hold** 19:21 25:4,16
26:5 64:22 65:13
65:22,25 66:3,9
183:3 197:2
**holder** 187:15
**holders** 143:25
**holding** 74:9
**hollis** 7:1
**home** 35:6,7,10
**honik** 6:1,1 68:18
68:19
**honiklaw.com** 6:3
**hopefully** 182:18
**horse** 173:18,22
**hospital** 23:22
24:2,11 26:1
**hospitality** 199:14

**hour** 88:22,22
89:17
**hourly** 88:18,18
88:21 89:7
**hours** 27:16 69:11
69:12 89:11,13,15
89:16 183:7
**house** 102:21
**household** 188:11
**huahai** 4:4
**huh** 13:14 14:9,14
14:14 23:12 29:8
45:15 47:4 79:17
80:13 84:6 85:25
95:9 98:20 103:14
104:9 105:8
109:16 123:18
144:11 145:4
146:3,16 151:13
177:13
**human** 93:22 96:4
141:1,2 145:20
166:23
**humana** 5:15
**hundred** 167:21
**hurt** 161:17
**husch** 6:6
**huschblackwell....**
6:7
**huschblackwell....**
6:7
**hypercholesterol...**
26:15
**hypertension**
168:24

**i**

**iarc** 96:12,15
**iarc's** 96:6
**idea** 72:15 159:10
**identical** 144:13
145:24
**identification**
16:15 17:24 85:21

[identification - intention]                                                    Page 19

90:24 125:11
191:5
**identified** 135:13
**identify** 97:17
158:4,11,23 159:2
159:9,16,23 160:4
160:14 161:10,23
162:9 163:16,25
164:6,12 165:17
175:6 193:20
194:2
**identifying** 160:17
184:13,17
**il** 5:14
**immunizations**
21:22
**immunizer** 21:15
21:19
**impermissible**
70:14
**implement** 173:14
**implemented**
166:9 174:4
190:20 192:3
**importance** 169:6
**important** 14:10
14:15 152:1 193:8
**impurities** 129:2,4
129:10,18,22
130:2,6,12 148:3
167:2 190:22
191:5,12 192:5
**inaccurate** 144:14
145:21
**inappropriate**
71:15 73:8 111:15
**include** 44:11
47:19 62:24 82:4
86:18 91:16
103:22,24 104:7
104:18 105:4,5,6

113:23 124:10
127:17 159:19
168:6 193:23
**included** 29:13,23
30:6,23 32:12
80:21 86:10 99:18
102:14 103:8,10
136:20 155:21
162:3
**includes** 27:17
30:8,25 57:9
84:17 113:20
117:8 126:7 129:1
130:11 133:11
145:23 173:10
**including** 27:23
32:9 39:5,24 41:5
55:23 56:3 74:7
84:18 93:15
100:15 114:14
123:13 124:12
136:1,2,25 151:17
163:24 191:22
**inclusion** 54:3
58:18 116:4
127:12 136:19
147:7 149:16
151:9,14,19 152:5
152:13 153:13
158:25
**inclusive** 201:10
**income** 79:9
**inconsistent** 95:12
143:18
**incorporate** 31:13
**incorporated** 55:3
**incurred** 89:2,6
90:1
**indemnity** 30:12
**independently**
96:9,11

**indianapolis** 5:10
**indicated** 159:20
183:14
**indicating** 193:12
**indication** 101:23
**indirectly** 196:11
**individual** 171:13
193:21
**individually**
150:12,15 169:22
**individuals** 38:2,4
46:3 48:7 60:18
157:13 193:21
**industries** 3:13
157:10
**industry** 30:11
36:1,1 38:19 44:3
44:10 49:15 50:24
86:19 91:17 95:16
107:9 124:16
125:2 127:4 128:2
132:1 133:23
136:2 139:7
152:20 153:2
157:14 163:15
165:21 193:17
**infant** 21:16
**information** 17:19
42:9,10 44:10,15
50:14,16,21,23,24
50:24 53:21 64:6
64:10 76:15 83:12
86:19 91:17 92:4
93:18 95:23 96:15
97:14 101:6
103:19,20 105:2
106:25 107:1,3
108:11 109:14,18
112:9 113:12,18
116:25 117:2,7
118:15,17,18,21

118:24 119:9,15
119:19 120:8,11
124:17 125:1,2
130:15,21,23
131:2,3 133:14,23
139:22 151:24
154:23 158:21
160:1 165:15,23
165:25 171:11
172:20 175:2,3,8
175:11 193:3,7
**ingersoll** 3:5
**ingredient** 188:12
**initially** 29:6
47:25 91:7
**initiated** 139:13
139:15
**inquiry** 103:7
**insight** 128:5
**institute** 64:22
**instruct** 170:20
**insurance** 185:15
**insured** 33:12,14
36:14 38:22 39:8
39:13,24 159:19
168:6
**intake** 166:17
167:1 168:11,19
**integral** 41:15
**integration** 32:8
**intend** 70:7,9 74:3
76:16 177:24
**intended** 26:15,16
54:1 71:25 72:2
97:6 188:10
**intending** 74:20
75:3,11
**intends** 71:21
**intent** 73:19
**intention** 73:12

**interactions** 60:22
  60:25 61:7
**interchangeable**
  129:10,17 130:6,8
**interested** 201:16
**interfere** 15:25
  71:16
**interim** 140:2
**internal** 25:22
**international** 96:5
**interns** 27:23
**interpretation**
  85:3
**interrupted** 68:14
  156:8
**interrupting** 180:9
**intimately** 41:14
**introduction**
  20:20
**investigation**
  190:6 191:3 192:2
**invited** 46:13,14
  46:15
**invoice** 89:25 90:2
  90:18,20
**invoices** 87:14,16
**involve** 54:17
**involved** 41:24
  42:25 76:3 82:15
  184:14,18
**involves** 67:18
  95:23
**involving** 75:24
  76:8
**irbesartan** 1:4
**irrelevant** 139:3
  168:9
**isidro** 2:2 8:4,5
  10:18,18 11:12
  12:6,11,23 13:9,12
  17:4,5 26:23 27:4

33:18 39:11 43:3
43:7 53:2,8,14
54:9,20 55:15
56:1,7 57:2,14,23
58:20 59:15,22
60:3,12,20 61:14
61:19 62:3,8,11,20
63:2,9 66:2,7,16
67:8,24 68:2,11,15
71:5 72:17 73:22
74:15,19 75:2,10
75:18,22 76:6,14
76:22 77:2 79:22
80:1,8,10,24 81:4
82:17 84:12 85:1
85:5,14,17,22
86:22 87:3 92:15
92:20 93:2,25
94:3,12,18,22 95:2
95:4 96:17,22
97:1 99:4 101:2,8
101:12 102:7
106:16,19,21
108:22 109:1,2,15
110:17,20,24
111:14,20 112:1
112:12 115:9
116:6,14 117:3,10
117:19,24 118:9
120:15,18 121:2
121:20 122:5,11
123:1,8,15 124:1
124:18 125:3,8,10
125:13,24 126:4
128:11,16,23
129:14 132:19,23
133:4 134:1,13,18
134:24 135:3,19
136:4,11,23
137:11,18 138:16
139:1 140:17

143:6,20,24
144:16,23 145:14
146:1 147:9,17,22
148:6,15,22 149:3
149:10 150:6
153:4 154:4
171:18 180:13
182:13 184:10,12
184:23,25 185:18
186:4,13 187:17
187:25 188:14
189:5 199:10
**isidron** 2:4
**island** 19:12,19
  20:7 21:3
**issue** 49:20 50:2
  50:12 51:4,14,21
  66:16 90:18 92:1
  103:8 156:24
  159:13 169:15
  173:20 181:25
  197:9
**issued** 51:8 87:14
  87:16 121:3,4
  139:10,11,14,16
  139:17 157:8
  163:11 166:16
**issues** 158:5,18
  159:12 168:24
  169:5
**item** 80:14 98:7
  107:14 110:10,13
  111:2 114:2
  140:23 142:25
  143:2,7,13
**items** 17:23 33:2
  33:20 34:5 35:16
  80:17 97:17,24
  98:12 99:10
  103:24 107:22
  108:1,5 110:14

113:14 114:9,10
115:7 129:18
**ives** 5:12,13

**j**

**january** 1:11 10:4
  188:9 200:10
  201:17
**jason** 4:14
**javier** 7:11 10:9
**jeez** 20:13
**jeff** 5:1 175:22
**jersey** 1:1 3:10
**jgeoppinger** 5:3
**jmestre** 2:12
**jobs** 58:4
**john** 5:5 73:5
  154:16 189:20
**john's** 18:1,14
  24:24 25:19
**john.gisleson** 5:7
**join** 46:13 48:7
**joined** 19:12
**jorge** 2:10 11:5
  26:18 70:16
  199:14
**journal** 100:1,3
**july** 93:14 97:23
  186:11

**k**

**kali** 1:10 8:3 10:6
  10:6 13:5,20
  200:7 201:8 202:5
  203:2,24 204:2,4
  204:12
**kanner** 2:18 5:17
**kapke** 5:9
**kara** 5:9
**kbi** 5:14
**keep** 41:18 58:9
  73:19 79:24 88:5

88:9,12
**keeping** 49:15
  133:22
**kept** 89:8
**kerner** 10:20,20
  11:22 26:21 27:1
  70:19,23 71:1,3
  73:3,11 85:19
  92:21 154:12
  175:15 179:25
  180:8,14 181:21
  182:7 184:6 186:7
  186:19 189:8,18
  199:8
**kind** 30:19 151:23
**kinds** 159:11,14
**klinges** 3:19
**know** 15:5,6,11,19
  16:21 17:2,3
  19:22 22:7 33:11
  40:5 41:21,22
  44:4 48:16 49:6
  51:10,18,20 53:20
  54:4 65:9 66:22
  69:21 72:20 90:12
  90:15 95:22 99:8
  129:15 130:5,7
  137:10 138:2,24
  140:2,5 142:7,11
  142:15,19 144:1
  148:16,23 149:5
  149:11 152:1,10
  155:25 156:13
  157:9 159:5 161:9
  163:8 170:15
  171:2,15,22
  174:19 175:1,21
  180:2,7 183:5
  190:3,20,23,25
  191:1 199:6

**knowing** 98:25
  107:9
**knowledge** 95:16
  99:9,20 100:15
  103:3 107:8,24
  114:14 135:2
  136:2 148:7,11
  150:10 151:3
  171:9 172:15
  177:22 192:10,25
  198:16
**knowledgeable**
  53:23,24 133:22
**known** 101:19
  131:12 152:21
**kristin** 5:12
**ks** 7:2

**l**

**l** 9:14 180:25
**l.l.c.** 5:17
**la** 2:19 5:18
**label** 95:11 101:23
  144:7,13,14
**labeled** 94:10
  95:13 97:6 101:22
  174:16
**labels** 104:1
**laboratories** 4:12
  4:17
**laboratory** 20:21
**laborers** 3:18
**labs** 6:17
**lack** 194:24
  195:19 196:17
  198:24
**lag** 156:8
**language** 177:15
  177:19
**large** 201:23
**late** 90:7 175:22

**law** 7:1 13:12
  69:22
**law.com** 5:18
**lawsuit** 155:9
  165:18 172:19
  185:12 188:21
**layne** 5:16
**lbresnahan** 5:22
  7:6
**lead** 27:8
**leading** 46:4,11
  49:19 186:7
  187:19
**learn** 155:3,19
  157:6 190:12
**leave** 35:4 80:6
**left** 183:6
**legal** 60:7 67:12
  69:17,18 70:2
  74:12 100:25
  121:18 122:2
  123:3 164:19
  165:6 178:2
  187:18 202:23
**length** 137:24
**leon** 1:14 2:11,22
  10:7
**letter** 8:10,18 91:3
  91:4
**letting** 156:13
**level** 168:19
**levels** 93:22
  140:25 145:20
  146:2,5,6 148:7,12
  148:14 166:17,23
  167:2 168:12
**lewis** 3:1 5:5 73:6
**liability** 1:4 97:25
**license** 21:18
  22:25 23:18,18
  46:2 65:12,15

**licensed** 21:8 46:3
  48:6,7 155:13
**licenses** 65:13
**licensure** 55:23
  115:3
**light** 12:16
**likewise** 32:21
**limit** 69:4,6 71:16
**limited** 74:7
  182:11
**limits** 140:2
**line** 169:13 203:4
  203:7,10,13,16,19
**linked** 31:15
**linkedin** 90:17
**lipid** 25:10 26:14
**list** 17:23 25:1
  26:2 44:4,18
  63:23 86:3,6,14
  98:1 101:20 112:8
  120:24 152:22
  185:21
**listed** 17:7 25:13
  37:14 43:24 44:2
  45:6,10 46:1,3
  47:7,18 48:6
  57:22 62:1,4,13,17
  63:15 85:8,10
  86:21 97:14,17,20
  98:19 99:23 107:4
  107:5,11,17 108:1
  108:8 110:10
  111:2 112:8
  113:13,14 115:7
  115:23 116:5
  119:24 122:24,25
  133:15 135:5,7,15
  140:24 141:17,20
  145:25 173:7
  183:1,22,22

**listing** 132:10
**lists** 63:18,20
　104:13 105:19
　115:22 133:10,15
　135:22
**literature** 49:14
　91:16 103:17
**litigation** 1:5 12:3
　51:15 68:4 71:21
　72:1,3 74:21 75:4
　76:8,16,24 78:20
　78:22 79:11 86:5
　86:16,24 87:6,9,12
　87:15 88:4,20
　89:12 90:5,10,13
　90:16,19 91:5,8,14
　91:22,23 92:1,5,8
　92:13 100:23
　106:11 111:18
　152:4,8,12,16
　153:5,18 184:14
　184:18,21
**little** 16:13 66:14
　154:5
**llc** 3:8,13 6:1 36:8
　36:18
**llp** 1:14 2:10,14,22
　3:15,19 4:1,6,10
　4:14,19 5:5,9,13
　6:6,14,19
**loading** 16:12
**local** 3:17,18
**lockdown** 83:8
**long** 18:8,20 19:12
　19:18,21 20:7
　21:3 66:20 72:5,9
　72:15 92:21 97:5
　137:24 185:6
　189:8
**longer** 70:7 72:17
　72:23 73:20 144:6

144:13 151:1
　162:3,18,19
**look** 16:19,21 90:6
　97:16 125:17
　134:7 149:23
　172:10
**looked** 129:25
　172:3
**looking** 64:16
　67:23 102:8
　126:22 192:16
**looks** 40:15
**losartan** 1:4 202:4
　203:1 204:1
**lot** 128:5 148:8
　188:23
**lots** 148:16 149:12
　186:24
**louis** 6:7
**lowering** 26:14
**luke** 5:20
**lunch** 92:16
**lwalsh** 3:11

**m**

**m** 189:23
**ma** 4:19
**ma'am** 197:11
**mada** 98:5,8,15
　108:9,18 109:3
　113:21 114:2
　185:25 186:1,10
　186:23 189:23,24
　190:3,7,12,20
**main** 149:15
**maine** 2:17 10:23
　185:14
**maintain** 160:10
**major** 18:4,16
**majors** 77:13 78:1
　78:4

**making** 67:16
　68:16 91:12,20
　96:13 97:11 103:7
　111:15 112:13
　114:25 118:1
　121:5,25 123:9
　124:3 131:9,14,17
　132:25 133:19
　134:2 195:7
**manage** 25:12,24
　27:15 31:14 32:7
　35:3 40:10 43:5
　161:7,16 166:4
　191:23
**managed** 22:17
　38:19 45:17 49:2
　49:6,9,18 100:1,3
　171:3 189:24
　190:7,12 191:4,11
**management**
　21:24,25 22:18
　24:1,7,10,10,10
　28:12,23 29:23,24
　29:25 30:4 38:15
　38:21 39:5,23
　41:6,6 64:21
　100:4 102:20
　160:6
**managing** 127:16
　171:4
**manner** 69:7
**manufactured**
　188:11
**manufacturer**
　67:19 106:5 117:1
　117:6 118:14
　119:9,22 120:10
　123:6,13 124:6
　126:9,15,21 127:9
　131:19 132:2,5,10
　140:11 141:25

143:8,9 144:6
　150:12 151:5
　154:17,21 160:24
　161:19 164:7
　165:4 170:2
　183:13 196:24
**manufacturer's**
　116:19 118:12
　120:3,20 121:13
　121:13 124:24
　147:1,13 162:10
　165:5 173:4
**manufacturers**
　117:13 119:14
　124:5 128:25
　130:10,13,19
　131:2,11 136:25
　144:25 145:16
　160:21 173:1
**manufacturing**
　172:23
**mark** 16:9,13
　17:21 85:12,14
　90:22 125:10
**marked** 16:15
　17:24 85:21 90:24
　125:11
**market** 31:4 53:22
**marketed** 152:22
**marketing** 101:22
　133:17
**mass** 6:2
**matches** 144:14
**materials** 65:2
　80:22 85:7,10
　86:3,6,9,11,15,20
　91:7,9,12,17,22,25
　99:6,21,22,23
　135:22 185:22,24
　185:25

**matter** 13:2 33:1,4
  33:8,20
**matters** 75:23
  139:16
**mckesson** 4:8 6:21
**mdl** 1:4
**mean** 12:8 15:7
  21:20 22:6,21
  32:16,19 33:4,19
  34:5 77:8 84:21
  88:1,24 93:20
  94:5 108:17
  109:20 119:6
  120:9 121:16
  129:4 139:10,17
  140:13,21 146:4
  146:10 149:8
  151:11 159:1
  162:17,19 163:4
  164:15 166:12
  172:21
**meaning** 14:11
  59:2 114:22
**means** 21:21
  121:21 123:12
  124:6 132:11
  149:5 173:7,8
**media** 10:5
**medical** 22:24
  25:2,9,11,23 28:5
  32:2,8,14,19,23
  78:14 79:7 86:23
  87:1,5 103:17
**medication** 21:24
  21:25 22:8,8
  24:18,20 28:1
  34:1,2,4 53:21
  54:4 61:18 93:23
  94:6,10 95:10
  116:12 117:14,15
  119:10,21,23

124:8 128:3 129:7
  138:25 142:6
  143:12 147:5,16
  156:24 166:24
  169:2 170:10
  193:10,12 195:24
**medications** 15:24
  30:24 31:1 34:6
  55:5 84:17 92:11
  126:8,9 127:11
  133:16 143:18
  146:25 147:12,21
  148:2,3 153:13
  155:16,16,16,17
  161:20 163:23,24
  170:3,6,7 173:25
**medicine** 25:22
**meet** 26:16 45:8
  67:20 127:4
  131:22 132:6,11
  151:14 183:18
**meeting** 13:15
**meetings** 104:10
**meets** 57:4 58:24
  116:3 150:19
  151:16 183:17
**member** 26:3,9
  36:18 42:20 44:19
  44:22,25 45:2,4,16
  45:19,22,24 46:4,7
  46:10,13,19,22
  47:5,10,13,16,21
  47:24,25 48:2,4,9
  48:13 51:14,21
  175:2 193:10
  195:23 196:7
**members** 61:9
  103:4,8
**memorized** 179:8
  179:10,15

**mention** 23:25
  38:17 103:15
  125:5
**mentioned** 16:11
  21:19 22:10 23:19
  32:4 43:15 54:12
  98:14 106:17
  107:14 154:7
**mentions** 125:19
  143:1
**meridian** 5:10
**merit** 31:11,12
  104:6,22 105:2
**message** 12:9
**mestre** 1:14 2:10
  2:10,22 11:5
  26:17,18,22,25
  27:3 127:23
  179:19 180:2,7
  183:3,8
**met** 124:25 134:11
  136:15,16,17,21
  145:22 183:20
**miami** 1:15 2:11
  2:23 10:8 200:3
  201:3
**middle** 180:4,9
**mind** 72:4,7 159:2
**minor** 78:4
**minors** 18:6,18
  78:2
**minute** 73:20
  179:23
**minutes** 41:17,25
  42:6 70:24 183:7
  189:9
**mischaracterizes**
  135:16
**misheard** 107:13
**misrepresented**
  145:20

**missed** 99:11
**missing** 180:18
**mitigate** 169:4
**mo** 6:7
**moment** 45:8 86:2
  125:17,21 127:23
  156:9 177:10
  184:25
**money** 188:10
  195:14 196:4,5,10
  196:21
**monies** 87:24
**monitored** 168:25
**monographs**
  104:1
**monroe** 5:13
**months** 12:9
**morgan** 5:5 73:6
**morganlewis.com**
  5:7
**moring** 5:21 7:5
**morning** 10:3
  13:10,11,16 14:23
  73:15,17
**morris** 3:19 4:1
**motion** 69:3
**move** 69:6 73:13
  73:17 84:24
  151:24 169:24
  173:21
**msp** 42:22 97:21
  98:15 114:6
  185:15,17 186:1,2
  186:11 187:5,11
  187:14,22
**msp's** 187:6,8
  191:1,4,10 192:3
**mtm** 21:17,23
**mulberry** 3:10
**murtha** 6:14,14

**mute** 186:21
**mylan** 4:12,12,17
  4:17

**n**

**n** 2:1 8:1 9:14 10:1
  180:25
**n.w.** 4:2
**name** 10:9,16
  13:12,18,20 31:23
  114:23 143:11
  144:7 154:16
  155:6 159:23
  163:25 194:19
**name's** 175:22
**named** 154:17
**names** 33:11
  141:18 159:3
  160:4,14,17
  184:13,17 193:21
  194:2
**nature** 41:2,3,11
  50:20 169:2
**navigating** 100:3
**nc** 3:6
**nda** 107:2 118:14
  141:21
**ndc** 162:20,21,21
  163:3
**ndcs** 98:13,19
  162:3,22 190:21
**ndea** 93:16 96:10
  97:2 138:21
  139:25 141:21
  142:12,20 148:8
  148:18 149:13
  155:8
**ndma** 93:17 96:10
  97:3 138:2,10
  141:21 142:8,16
  148:8,17 149:13
  155:8

**ne** 6:11
**nearby** 80:6
**necessarily** 198:20
**necessary** 11:9,21
  73:20 80:22 166:4
  174:21 204:6
**need** 15:10 70:23
  72:23,23 153:21
  169:24 180:5
  199:2
**needed** 22:18
  29:14,16 35:15
  119:23 124:25
  166:6 169:11
  170:7
**needs** 36:15 85:14
  125:25
**negatively** 165:9
**never** 57:6 60:14
  78:24 80:25 81:5
  81:8,11,14,17
  127:7 169:1
  170:10
**new** 1:1 2:4,8,19
  3:10 5:18 13:25
  21:6,17 22:10,15
  23:2,10,17 27:6
  35:7 53:22,22
  55:23 65:12
  155:13
**newark** 3:10
**nilda** 2:2 10:18
  13:12
**nitrosamine** 148:2
  154:25 155:10,19
  155:25 163:17
  164:1,9,14,18
  165:5,20 167:2
  190:21 191:5,12
  192:4

**nitrosamines** 52:1
  52:4,7 56:19
  140:3,6 157:7,19
  160:22 168:12,19
  170:6 174:5
**nj** 4:24 6:15
**nodding** 14:12
**non** 46:3,3 48:7
  88:21 89:11,17,19
  171:7,14
**nonresponsive**
  73:10,25
**nope** 140:7
**norris** 6:18
**northwell** 25:14
  25:21
**norton** 4:6 6:19
**nortonrosefulbri...**
  4:7 6:20
**notary** 1:16 200:6
  200:17 201:5,22
  204:13,19
**note** 71:22 102:19
  202:10
**noted** 27:1 204:7
**notes** 17:25 88:11
  201:11
**notice** 8:14 16:7
  16:10 79:16
**notification** 8:10
**nulled** 144:5
**number** 6:2 10:5
  12:13 16:20 17:22
  80:14,17 85:13
  89:11 93:4 141:21
  155:7 157:20
  168:8 183:12
  184:2
**numerous** 69:14
  111:7

**nw** 5:21 7:5
**ny** 2:4,8

**o**

**o** 3:6 9:14 10:1
  180:25
**oath** 8:8 15:20
  200:1
**object** 16:24 39:9
  52:25 53:6,12
  54:7,16 55:10,19
  56:5,23 57:8,19
  58:16 60:6,16
  61:13,16,25 62:15
  62:23 65:24 66:5
  67:13 69:2 74:23
  75:6,14,20 76:1,9
  76:17,25 80:18,19
  81:3 82:13 84:10
  84:25 85:4 86:17
  86:25 94:7,15,21
  94:24 96:14,20,25
  99:3 100:24 102:5
  106:13 108:20
  109:13 110:12,23
  111:5 112:6 115:2
  115:21 116:10,24
  117:5,12,21 118:3
  120:23 122:1,21
  123:4,11,24
  124:22 125:6
  129:12 132:16,21
  133:2,20 134:5,16
  134:22 135:1,17
  136:9 137:6,15
  138:12,22 140:15
  143:4,15 144:12
  144:18 145:12,18
  147:4,14,19 148:4
  148:13,19,24
  149:7 152:18
  159:1,18 160:8

161:1 163:18
166:19 167:4,5
168:13,22 169:14
171:24 172:5
174:6,22 176:2
178:1,14,23 181:6
181:11 184:1
191:13 192:14
193:15 194:24
195:19 196:16
197:5,7,17 198:11
198:24
**objection**  62:6
63:7 66:11 67:12
68:13 84:10,24
101:4 111:15
112:2 121:18
122:1,3 124:14
125:20 135:16,21
136:14 150:4
157:20 159:24
164:19 165:6
166:18 169:12
171:17 173:16
185:18 186:4,7,13
187:1,17,18,25
188:14 189:5
191:18 192:12
193:4 196:25,25
198:1
**objections**  12:1,12
15:1 68:16 71:14
182:1,3 188:24
197:3
**obligation**  160:10
**obligations**  116:20
118:13 120:4,21
173:2,5
**obtain**  41:25
126:18 131:1

**obtained**  77:17,20
128:7
**obtaining**  74:21
75:4,12,24
**obvious**  107:21
**occasion**  172:9
**occasions**  69:14
82:18
**occur**  138:17
171:8
**october**  90:7
**offer**  36:10,12
70:6 71:21,25
72:2 74:20 75:3
75:11 76:16
**offered**  69:23
175:10
**offering**  30:18,25
31:7 68:3 71:19
76:7 92:5 97:3
**official**  11:19
200:9,12
**oh**  3:16 10:15
26:22 43:11 79:22
85:17
**ohio**  5:2
**okay**  12:21,24
14:3 15:10,14,19
16:3,6,9,19 17:10
17:21,25 19:1,6,12
19:23 20:6,15,24
21:19 23:9 24:17
24:22 25:1,8
26:25,25 27:10
28:22 29:1,4 32:7
33:17 34:13 37:4
37:18 38:4,7,9
40:2,13,21,24 41:2
44:14,18 45:9,14
46:4 47:1,5,16
48:2,16 51:20,25

57:15 61:20 62:4
62:21 79:15 80:5
80:8,11,14,25
81:17 83:9 84:21
85:12 86:11 88:18
89:5 90:4 92:20
96:18 97:2 98:1,4
98:7,21 100:14,17
101:13,15,18
105:6 106:10
107:7,10,20 108:1
108:9 109:25
110:3 112:21
113:7,25 114:2,5,9
114:20 118:18
119:3 125:9 126:2
126:24 127:8,19
130:9 132:24
133:5,8 134:14
136:12 140:9,21
141:22 145:5
147:10 148:23
150:16 156:23
162:8 177:10,23
180:15 181:20
182:20 185:2
195:13 196:3,9
197:6 199:7
**once**  82:20 105:3
119:21 125:23
134:8,9 166:3
**one's**  12:10
**ones**  31:20 42:8
48:10,14 61:1,2
77:15 100:13
119:19 130:13,23
141:4,6
**ongoing**  41:6,18
41:20 152:24
**onset**  87:17

**op**  24:16
**operation**  28:18
**operations**  23:8
28:12 29:21,23
38:16,20
**opining**  76:24
**opinion**  40:20
43:20 67:14,22
75:7 76:11,18
77:5 80:22 86:7
86:20 92:9 101:6
108:7 110:16
117:20 130:22
133:7 135:23,25
141:24 155:22
160:2 161:18
163:7 164:11
173:24 174:11
190:15
**opinions**  68:3
71:20,25 72:2
74:21 75:3,11
76:7,16 85:7 86:4
86:16 92:4 93:8
93:11 100:23
106:11 137:12
142:23,25 144:5
152:3,7,11,15
153:5,16,18
**opioid**  64:18,24
**opportunity**  70:20
72:7
**oppresses**  69:8
**option**  30:19
**orange**  100:4
101:10,16,18,19
104:2 105:17,19
105:23 107:10,12
107:17 108:14,14
109:14,21,24
110:4 112:7,9,23

115:22 116:5
119:24 120:5,24
121:3,6,12 132:10
133:10,15 134:7
149:16 152:9,17
152:21 153:6,8,17
153:19 173:6,7
178:8 181:16
183:15,22
**order**  67:20 127:5
130:25 149:25,25
**ordinarily**  186:16
**ordonez**  7:11 10:9
**organization**
22:23 23:16 38:3
40:1 45:5,20,25
46:8 47:17 48:5
48:10,13 49:19
82:15 124:16,17
**organization's**
47:19 64:13
**organizations**
44:19 48:19 49:15
51:14,21 64:18
**orientation**  20:19
63:8
**original**  72:21
137:23 143:10
144:1 156:16,19
**orleans**  2:19 5:18
**outreach**  29:15
**outset**  87:19
**outside**  59:23
60:13,18 61:11,23
62:13,21 78:5
106:10,17 137:20
158:1 169:14,17
174:23 182:3
191:13 196:21
**overall**  22:3,9
38:20

**overland**  7:2
**oversee**  19:25 38:2
**overseeing**  38:20
**oversight**  23:8
**oxford**  4:10,15 5:6

**p**

**p**  2:1,1 9:14 10:1
**p&2**  104:10
**p&t**  41:9,11,14,17
41:20,22,25 42:4,5
42:20 102:16,18
102:22,24 103:15
104:5,10,15,21
105:1 116:18
118:4,4,11,19,25
119:12 120:19
121:3,5,14 124:4
124:11 126:6,11
127:3,15 128:4
132:9,18 133:6,14
133:21 134:7,17
134:23 136:3
151:8,18,22 152:4
152:8 153:12
173:1
**p&ts**  119:18
**p.m.**  1:12 74:17
92:22,25 128:18
128:21 153:24
154:2 189:13
199:16,18
**pa**  3:2,20 4:11,15
5:6
**pachios**  2:14
**page**  16:20 63:16
63:17 64:16 80:11
93:9 98:1,7,11
103:13,13 107:5
125:22 127:11,20
127:20 155:7,7
171:25 203:4,7,10

203:13,16,19
**paged**  125:21
**pages**  201:10
**paid**  65:5 146:25
147:11,15 161:20
161:21 163:8,16
163:25 164:5,16
164:21,24 165:13
165:18 170:3,4,6
173:25 174:1,13
185:10,17 186:24
187:3,5 188:9
190:2,11,19 191:7
192:1 193:2,9,10
193:13 195:10
196:7,7 197:12
198:3,21
**pain**  24:1,6,10
**panagos**  1:10 8:3
10:6 13:5,10,20
27:5 44:18 59:23
68:3 69:11 70:3
74:6,13,20 93:3
110:25 140:19
149:15 153:15
154:4 156:3
157:22 169:21
185:5 189:16
199:12 200:7
201:8 202:5 203:2
203:24 204:2,4,12
**panagos's**  92:16
111:17 199:3
**pandemic**  12:16
**panel**  26:3,9,10
**papers**  79:19
**paragraph**  93:10
93:12,14 103:12
104:8 105:7
111:13 112:14,18
112:22 113:2,5,7

114:20 115:1,16
116:18,23 117:25
118:11,23 119:3,7
119:12,18 121:11
121:17 123:10,17
123:22 124:3,10
124:13,20 128:13
128:24 129:5
130:10 131:10,14
131:17 132:9,14
132:25 133:8
134:3 135:9 136:5
136:6,8,13,24
140:9,14,22
141:22 143:3
145:11,15 146:24
147:11 172:25
177:11,15,20
178:7 180:24,25
181:3 182:22
188:5
**paragraphs**  97:8
97:12,18 99:2,15
99:18,24 100:7,12
100:18,19,22
101:9 106:22,24
108:11,15 109:5,7
109:12 110:3,7
135:14
**paramount**  169:6
**pardon**  172:13
190:24
**park**  4:24 7:2
**part**  11:15 12:15
19:16 20:15,20
28:4 29:7,9,10
30:24 31:6 34:6
44:4 49:13,15
54:18,21,23 61:9
69:4 76:21 77:11
77:13,24 101:24

105:5,6,15 106:9
106:14 113:23
124:2 126:10
127:7,14 133:15
133:24 144:4
150:3,5 155:17
162:4 163:22
172:12,21 173:19
182:5,9 188:19,21
**partial** 156:21
**participant** 122:9
122:14,18 187:1
187:18 192:25
**participate** 24:5
26:10
**participating**
25:23
**participation**
25:10,11
**particular** 35:19
42:25 43:16 69:15
111:13 144:20
148:8 162:3
174:20 176:23
185:10 196:4,13
**particularly** 74:2
**parties** 9:16 69:23
201:13,14
**parts** 93:11
**party** 38:22 39:1,2
39:22 40:3,4,8
44:15 69:5,9 75:8
97:25 98:15,16
108:9,18 109:3
113:21,22 114:6
136:19 157:10
159:16,20 160:5
166:25 185:10
186:1,2 187:9,12
188:3,4,7

**pass** 79:18
**patience** 185:5
194:13
**patient** 22:19
24:11,12,16 28:2,3
30:7 32:3 60:22
60:22,24,24 61:1,1
61:4,6,6,17,18
162:20 163:5
164:13 168:25
171:11,12
**patients** 21:22
22:2 24:7,14
25:12,24 27:20
29:16 31:9 148:1
161:8,17 168:20
170:7,9,12,17,19
170:21,24 171:6
190:7 194:2
**pattern** 71:13
**pause** 16:13 26:17
**pay** 163:1,4,14
174:1
**payer** 39:1,2 40:8
**payers** 39:22 75:8
159:20
**payment** 43:8,12
43:19 88:25
165:10 192:19
**payments** 31:2
43:11 185:25
195:15,17 198:19
**payor** 98:15,16
108:9,18 109:3
113:22 114:6
157:10 159:16
186:1,2 188:4
**payors** 136:19
160:5 166:25
185:10 187:9,12
188:4,7

**pbi** 64:21
**pbm** 32:23 33:1,8
33:9 38:15,20
100:13 102:4
103:5,9 157:10
164:12 196:23
**pbmi** 64:17
**pbms** 33:5 42:7
99:15 101:24,24
102:11 115:18
160:15 162:12
167:1
**pc** 3:5
**peer** 103:17
**pelta** 7:10
**pending** 15:12
122:9 180:1,12
183:4
**pennsylvania** 5:21
7:5
**pensacola** 6:3
**people** 38:12
57:18,21 65:9
126:16
**percent** 79:9
**percentage** 79:12
**perfect** 6:2
**perform** 155:25
**performance**
113:9,17 114:13
**performed** 159:17
**performing** 115:4
**period** 28:4,20
165:13 171:8
174:3
**periods** 170:13
**permit** 70:5
**permits** 183:16
**permitted** 21:21
143:25 158:1
173:17 182:15

**person** 12:13 33:6
126:25
**personal** 64:21
88:10 130:22
166:1 172:22
188:10
**personally** 49:11
51:7 95:7 151:18
157:16
**pertaining** 87:5
158:5
**pertains** 78:7
104:19 108:13
133:3,5 151:24
156:25 157:15
161:7 184:2
**pertinent** 101:6,7
160:2
**pharm** 55:12
**pharm.d** 202:5
203:2,24 204:2,4
204:12
**pharm.d.** 1:10 8:3
13:5 200:8 201:8
**pharma** 3:13
**pharmaceutical**
3:13 52:20 66:4
66:10 68:5 74:22
75:5,13,25 79:4
83:10 172:23
188:12
**pharmaceuticals**
3:3,12 4:13,17,21
**pharmacist** 21:5,8
21:17,23 23:7
27:5,8,9,10,14
28:11,15 29:12
34:3 41:13 45:12
47:20 48:8 53:19
55:8 61:18 76:2
82:8 83:21 84:16

115:4 152:25
155:13,14 157:1
171:13 172:15
**pharmacists** 25:24
47:11,22 50:2,12
50:18,25 51:4,11
**pharmacologist**
78:16
**pharmacy** 5:15
18:17 19:4,5,20
20:1,1,3,11,19,20
20:22 22:18,20
24:25,25 25:7,12
25:19 27:15,16,22
30:7 31:6 35:1
36:11,12,15,22
37:21,22 38:1,19
41:3,8 43:8,12,19
45:17,21 48:1,18
48:25 49:2,4,7,8
49:17,21 50:3,6,9
50:13,15,19 51:1,5
51:9 53:21 54:24
55:2,4,12,13,21,22
58:18 59:5 60:11
63:8,13,21 64:21
65:12 77:16 78:3
78:8,9 83:3,12
86:19 91:16 95:16
97:8 99:20 100:4
124:17 155:21
157:2 162:20
**pharmist** 29:12
**philadelphia** 3:20
**phone** 189:18
**phrase** 146:2
**physicians** 25:24
**picked** 11:18
128:9
**piedmont** 6:11

**pietragallo** 4:10
4:14
**pietragallo.com**
4:11,16
**pigeonhole** 111:9
**pittsburgh** 4:11,15
5:6
**place** 1:14 89:24
161:3,3,16 162:3
170:9 174:7
**placed** 76:20
136:15 164:22
**placement** 54:5
76:5,12 104:17
121:14 128:4
132:12 136:18
**plaintiff** 114:1
**plaintiff's** 71:14
92:12 98:15,16
108:9,18 109:3
113:22 114:7
186:1,2
**plaintiffs** 2:13,20
2:24 5:19 6:4
10:25 11:2,6
12:12,18 26:19
69:2,10,23 70:5
71:19 73:24 87:6
87:8,12 89:25
181:24 185:7,14
**plan** 30:8,16 41:7
83:13 132:13
193:9,13 195:10
196:7 197:12
198:3
**plans** 42:7
**platforms** 43:24
**play** 23:11
**played** 108:6
110:15

**player** 113:22
**plaza** 6:6
**please** 10:11,13,15
12:25 13:18 15:5
15:5 33:15 43:2,3
48:20 53:1 60:4
62:9 67:1,2,25
75:21 85:2 87:1
94:1,25 95:2
97:16 101:1,2
106:16,19 108:21
112:1,3 120:15
121:23 122:12
156:3,8,18,20
173:21 179:20
181:19 182:16,16
191:17 194:8
**plus** 82:24 136:1
**point** 80:2 99:9,11
120:2,19 134:12
142:15,19 161:14
162:14,25 163:1
172:18 190:20
192:4 195:10
**pointed** 99:12
**points** 58:6,8,9
**ponce** 1:14 2:11,22
10:7
**populate** 88:16
**population** 31:14
32:9
**populations** 26:15
**portion** 43:4 60:5
62:10 67:4 68:1
70:12 94:2 95:3
101:3 106:20
108:25 110:22
112:5 120:17
122:20 143:23
156:22 193:10,10
194:10

**portland** 2:15
**position** 19:21
24:4,5,13 26:6
35:4 67:9
**possession** 16:23
17:8 81:22
**possessions** 188:8
**possible** 42:24
44:14 83:23 84:8
102:16
**possibly** 163:24
172:20
**post** 24:16
**potential** 82:3
84:18 148:2
**potentially** 129:19
**power** 58:6,8,9
72:24 73:1
**ppm** 102:22
**practice** 48:18,24
49:4,7,16,18,21
50:2,5,9,13 51:1,5
51:9 103:17,18
127:4 133:23
152:20
**precise** 34:17
138:23
**preface** 107:11
**prefer** 140:18
178:16
**preliminaries** 11:4
**preparing** 172:3
176:21 177:6
**prescribe** 24:17,20
**prescriber** 169:1
170:11 171:12
**prescribers** 29:14
**prescription** 30:1
30:12,15,18,20
31:13 32:8,13,16
39:6,24 44:12

57:11 58:13 59:7
62:19 76:21 100:8
102:12,12 105:16
105:24 121:14
132:13 148:2
149:25 150:8
157:2 160:5 163:4
**prescriptions**
27:17,18,19 44:3
189:25 190:7
**presence** 97:2
129:1 130:12
138:2 139:25
140:10 141:25
142:5 145:19
147:20 157:6,18
160:22 163:17
164:1,14 174:5
183:12,19
**present** 7:9 9:16
37:17 109:24
129:19 138:25
140:23,24 188:9
**presentation** 57:6
57:17,24 61:4
62:5 64:24,25
65:3,5,7,10 83:11
83:16,18 84:2
**presentations**
56:18,21 58:7,11
58:14 59:24 60:1
60:9,14,21,25
61:23 62:1,13,18
62:22,24 81:23,25
**presented** 116:25
117:1
**presenter** 64:17
64:23
**presenting** 129:1
**president** 37:10,11
37:13,15,24

157:24,24
**preti** 2:14 10:22
90:21
**preti.com** 2:16
202:2
**pretty** 173:18
**preventing** 130:11
**previous** 82:9,10
111:11 135:17
141:12
**previously** 154:7
**primarily** 35:10
36:14 38:21 82:14
104:15
**primary** 25:10
104:22,24 105:3
**princeton** 6:15
**principles** 77:23
100:5
**prinston** 4:4
**prior** 11:13,23
17:6 19:8 29:13
29:17,24 35:2
91:12 93:12 95:6
110:19,21 120:15
142:15,19 150:24
165:18 176:20
196:9 198:9
**privilege** 16:25
**probable** 93:22
96:4 140:25 141:2
145:20 166:23
**probably** 182:1
**problem** 12:19
72:11
**procedure** 69:3,16
**procedures** 15:16
24:7,8
**process** 34:3 66:4
66:6,9 67:5,7,10
67:11,18 68:4,6

72:3 74:21,24
75:4,12,16,19,24
76:2,8 100:6
106:14 107:2,6,9
107:16,25 110:8
111:1 112:7,16
120:12 126:7,10
127:1,2,3,13,14,17
128:3,3,6 133:6
141:13 152:24
153:9,22 162:23
162:23 177:6
**processes** 129:1
130:11
**processing** 40:10
42:25 43:5 112:10
**producing** 17:18
**product** 16:25
27:25,25 30:24
56:22 57:3,7,18
58:15,17,21,23,23
59:2,24 60:10,14
61:24 62:19 94:11
95:11,13 104:1
115:23 122:24,25
133:12 138:1
140:12,25 141:17
142:2,3,5,6,8,12
142:16,20 143:9
143:10,11,16
149:16,17 150:1,2
150:12,19 162:22
171:7,14 178:4
179:7,12 183:2,14
183:22
**product's** 150:16
**products** 1:4
52:20 57:11 58:17
60:1,10,17 62:25
66:1,4,10 68:5
74:22 75:5,13,16

75:25 76:3 83:10
101:20,21 105:19
105:25 144:25
145:1,17 150:8
151:1,5 153:10
155:2 160:23
161:25 163:9
172:1,23 178:9
179:16 180:20
181:17
**profession** 64:23
86:8 172:12,14
**professional** 13:21
13:22 21:12 44:19
45:13 46:2 48:6,9
48:12,13,19 51:13
51:21 52:3,23
53:9,16 54:15
57:9 65:13,18
82:7,8 84:16
91:16,19 95:17
99:20 100:16,21
112:24 117:22
138:13 169:20
186:17
**professionally**
73:15
**professionals**
35:25 125:2 128:2
**professor** 63:21
**proffered** 111:18
173:19
**profile** 22:4,9
90:17
**program** 20:1,3,5
20:11,23 30:8,12
30:15,22,23 31:2
31:11 37:21,22
38:1 41:8 54:24
55:4 57:11 58:13
59:7 62:19 63:13

76:21 88:11
**programs** 31:4,6
  31:18 41:7 60:11
  83:4
**progress** 20:4
  41:19
**prohibit** 160:17
**project** 35:19
**promise** 58:23
  122:22 123:5
  126:15,17,21
  127:9 145:21
**promises** 57:21
  58:17
**promulgated**
  48:18
**promulgates**
  176:11
**proof** 70:6
**proper** 30:1
**properly** 22:7
**proposed** 103:4
  111:24 188:3,18
**proto** 50:8
**protocol** 51:4,14
  181:24 182:2,4
**protocols** 48:17,23
  49:3,20 50:5 51:7
  51:22
**provide** 22:4
  33:21,23 34:3
  36:22 37:20,25
  42:11 49:10 50:14
  51:10 115:18
  117:2,7 118:15
  119:9 120:11
  130:15 131:1,2,3
  142:22 158:20
**provided** 59:12
  69:25 80:20
  118:21 119:1,22

139:18 158:18,24
**provides** 128:5
**providing** 30:9
  51:23 57:10 59:6
  79:13 80:23
  119:14 130:21
**public** 1:16 96:15
  109:18 112:9
  125:1 139:22
  154:23 160:20
  175:1,5,8,11 200:7
  200:17 201:6,22
  204:19
**publications** 56:8
  56:13,16 81:15
**publicized** 157:9
  161:14
**published** 52:6,9
  52:12,15,18 56:11
  81:9,12 105:17
**pulls** 59:3
**punished** 65:17
**purported** 137:14
  181:9
**purpose** 11:15
  95:21 124:12
**purposes** 95:14
  96:19 97:18 99:12
  113:21 114:11,17
  123:21 135:8
**pursuant** 16:7
  69:2
**pursued** 18:11
**pursuing** 18:23
  19:6 24:24 25:7
  25:19
**put** 161:2,3,16
  162:2,15 174:7
**putting** 31:18
  135:23,25

**q**

**qualification's**
  35:17
**qualifications**
  21:12 45:7 69:12
  70:8,9,13 71:18,18
  71:24 72:16 74:5
  74:7
**qualified** 69:16
**quality** 117:14
**quarter** 82:21
**question** 11:23
  14:16,19 15:4,5,6
  15:12,12 17:4
  33:8,16 43:1,21
  48:20 49:5 53:1
  60:4,7 65:24 66:8
  66:8,15,17,18,21
  66:22,23,24 67:1
  67:13,24 69:14,15
  69:17,18 70:2
  71:11,12,24,24
  72:1,13,21,22
  74:12 75:1 77:1,4
  80:19 81:24 82:2
  84:20 87:4 91:11
  93:25 94:17 99:8
  101:1 106:18
  108:21,22,24
  109:1 110:2,19,21
  111:12 112:2
  115:15 118:7
  120:16 121:23,25
  122:4,9,10,16
  131:15 132:22
  133:13 135:20
  137:16 139:2,4,4,6
  141:10,12,14
  145:8 146:14
  150:18 156:17,19
  158:6,15 161:23

165:3 177:5 178:9
  178:16 180:1,11
  180:17,19 181:11
  182:8,18 183:4
  184:3 191:17
  192:17,18,23
  193:24 195:8
  196:17 197:11,18
  198:7,7
**question's** 162:8
**questioned** 69:11
  137:23
**questioning** 73:7
  74:4,6 169:13
  170:15 182:15
**questions** 11:14
  15:2,8,15 33:7,23
  68:12,15 71:7
  72:6,9,10,18 73:2
  73:14 74:3 154:6
  154:9,11 170:21
  170:24 173:17
  175:12,17 180:5,8
  182:10,11,12
  184:5,7,9,10,23
  185:6,9 188:23
  189:7,15 194:12
  194:15 199:7
**quick** 11:22
**quickly** 73:18
**quite** 107:21

**r**

**r** 2:1 10:1 203:3,3
**r.ph** 1:10 8:3 13:5
  200:8 201:8
**raise** 12:24
**raised** 12:12,17
**raspanti** 4:10,14
**rate** 88:19,21 89:7
  89:17

**rating** 121:11
134:8,8 150:17
**reach** 74:4
**read** 16:3 43:3,4
60:3,5 62:8,10
67:1,2,4,24 68:1
93:25 94:2 95:2,3
101:2,3 106:16,20
108:22,23,25
110:20,22 112:1,4
112:5 120:15,17
121:8,23 122:12
122:17,20 140:16
140:18 143:20,23
156:22 172:17,20
194:6,8,10 199:11
202:9 204:5
**reading** 9:17
**really** 11:21 66:20
116:2 128:5
134:12 170:15
174:17
**reason** 12:15
14:10,14 15:20
72:10 202:11
203:6,9,12,15,18
203:21
**reasonable** 74:5
**reasons** 35:5,9
149:19 170:7
**rebate** 196:23
197:19,23,24
198:8,16
**rebates** 198:20
**recall** 45:8,11
55:17 56:2 64:4
83:7,14,24 84:8,23
93:15 98:13,18
125:7 139:10,11
139:12,14,15,16
139:18,23 146:21

146:22,22,23
150:24 151:22
157:8,10,11,14
160:25 161:2,7,12
161:14,17 162:1,2
162:11,14 163:11
166:3,5,6,10,14,22
167:11,16 168:2,5
168:15 169:4,5
171:3,4 173:15
174:8,20 175:7,10
185:8 189:25
190:4,8,12 191:4
191:11 194:3
**recalled** 98:6,8
114:3 148:17
149:12 186:10
**recalls** 191:4,23
**receipt** 202:18
**receive** 87:17
124:7
**received** 18:1 19:1
78:10,12 87:19
**receiving** 44:11
**recitation** 20:21
63:11,25
**recognize** 90:25
**recollection** 83:17
125:18
**recommend**
157:16
**recommendation**
168:15
**recommendations**
49:10 51:10
162:16 166:13
**record** 10:4 11:3
13:19 59:18,21
68:18,22,23,25,25
71:6 74:16,18
88:5,9 92:23 93:1

111:14 128:19,22
153:25 154:3
175:18 180:12
189:11,14 199:17
201:11
**recorded** 10:5
11:8,11,13,24 12:2
12:4
**recording** 11:15
12:9,20 26:20
**recordkeeping**
89:10
**records** 64:9,12,13
64:14 86:23 87:2
87:5 88:13 196:1
**recovery** 185:15
**recross** 8:5 184:11
**redirect** 8:5 72:8
175:19
**reduce** 90:1,3
**reefer** 4:14
**refer** 31:25 33:25
61:6 79:20 80:2
104:14 105:12
133:8 139:5
152:20
**reference** 30:12
104:14 123:16,16
124:9,11 134:12
138:19 139:13
140:24 141:9,17
145:25 173:6
183:1
**referenced** 31:16
94:10 95:11,12
98:12 107:12,19
115:23 122:24,25
124:19 125:4,15
139:7 141:8 146:7
146:9,12,18 155:4
174:16 177:10

183:21 202:6
**referencing**
119:20 120:5
**referred** 98:19
140:23 194:21
**referring** 34:10
53:25 61:7 64:13
95:23,25 109:21
110:1 111:2,3
112:7 129:21
131:25 136:6
137:1 141:3,19
146:7,17 173:12
176:23,24 195:3
196:14 197:18,19
198:9,23
**refers** 31:5 34:1
64:20 118:4 123:5
124:4,4 127:13
136:8,10
**reflect** 111:14
150:25 194:22
196:3 197:15,24
**reflected** 195:25
196:12 198:8,22
**reflects** 195:13
196:5,7 197:12
**refresh** 125:18
**refund** 164:7,13
164:15 165:18,22
185:11 188:19,20
197:16,19
**refusal** 160:9
**refusing** 160:4,12
**regard** 60:9
**regarding** 52:1,4
54:15 61:17 62:18
62:25 72:2 82:1
185:9
**regards** 20:2 24:7
24:8 29:25 35:1

37:21 44:9 50:14
50:25 51:11 56:25
57:21 79:13 86:20
134:20 155:24
157:3
**registered** 21:5,8
**regulates** 131:19
**regulation** 115:10
131:24
**regulation's** 179:9
**regulations** 95:21
95:24 115:10,14
116:21 118:13
120:4,22 131:13
131:16 132:11
135:4 173:3,5
176:1,7,9,10,11,15
177:8,17,21,25
178:13,22 179:1,5
181:5,8,10,14,18
182:24
**regulatory** 52:19
65:22
**reimbursable**
132:12
**reimburse** 76:21
136:20
**reimbursed** 147:8
165:4 193:13
**reimbursement**
39:4,23 104:19
**reiterate** 74:8
**relabeler** 188:13
**relate** 57:3 124:20
**related** 33:24
35:16 41:8 50:18
54:4 59:8 64:22
78:9 82:4 117:9
196:11,12
**relates** 1:6 55:4

**relating** 48:17,24
49:3,7 50:2,5,8
51:5 52:6,12,15,18
52:23 53:4,10
56:8,18,21 61:24
63:3 91:22,25
**relative** 201:12,14
**relevant** 50:17
84:19 91:17 99:13
101:6 105:12,13
**relied** 85:7 86:3
96:16 107:3,8
111:8,11,13
112:15 114:10
118:17,19,21,25
119:1 153:12
**relies** 95:22 120:3
120:20
**rely** 67:15,15 75:8
76:11,18 92:10
96:18 99:17
100:11 106:23
107:10 109:11
114:5,6,17 115:6
116:19 118:2,12
119:13,19 120:7
132:10 133:14
135:14 144:6
173:1
**relying** 95:14,20
96:6,12 97:11,14
97:18 113:1,4,15
113:20 114:25
115:3 118:1 123:9
123:21 124:2
130:17 131:7,9,11
131:13,17 132:25
133:18 134:2
135:8
**remain** 89:24

**remaining** 20:4
**remember** 33:15
46:23,24 47:14
122:10,15 141:18
188:25
**remembers**
122:14
**remove** 157:17
**removed** 160:24
161:11,24 162:5
162:10
**render** 67:14,22
92:9 164:11
174:11 190:15
**rendered** 77:5
140:10 141:25
183:13
**rendering** 43:21
75:7 155:23 163:7
**repackager**
188:13
**repatha** 26:3,11
26:13,14
**repeat** 74:1 101:1
108:21 122:3
**repeated** 111:9
**repeatedly** 69:13
70:1 71:10 84:11
111:6 124:23
**repetitive** 192:15
**rephrase** 17:4
56:12 87:4,21
129:8 131:8
137:17 141:23
145:7 150:22
158:15
**report** 8:17,20
17:14,18 23:25
38:3,8,12,17 40:20
40:24 76:9 79:14
80:21,23 85:9,13

86:1,14 89:4,8,9
92:16 93:4,8,10,12
94:14 95:8 96:13
97:19,22 99:5,7,14
99:19,25 100:7,12
101:15 102:20
103:1,12 106:8,11
106:17,22,24
107:4 108:12
109:5,7,12 110:11
111:3,9,12,17,22
112:14,19,22
113:2,5 114:10
117:25 118:11,24
119:4,7 121:21,22
122:7 123:2,10,23
124:3,21 128:13
128:24 129:9,16
129:21,24 130:2,3
131:18 132:15
133:1 134:3 135:9
135:10,14,23
136:8,13 137:7,8
137:13,20 138:10
138:20 139:7,11
139:24 140:8,9,22
141:20,22 142:10
142:14,18,21,22
143:3,14 144:10
145:6,10,11,16
146:24 148:10,20
155:4,22 159:21
161:15 163:7,19
164:10 169:15,18
169:19 170:16
171:10 172:4,6,25
173:17,19 174:11
174:23 176:16,21
176:24 177:6,11
177:15,20,24
178:3,7,12,21

[report - right]                                                                                    Page 33

182:23 183:25
185:21,22 188:5
188:25 189:2,3
191:6 197:1,8,9
199:1,3 201:7
**reported**  1:16 20:2
38:5 138:3,4,5,14
143:17 144:2,3
157:18
**reporter**  8:9 10:10
10:11,13 11:10,20
12:24 14:7,19
68:19 108:23
183:7 194:5,8
200:6 201:1,5
**reports**  80:15
81:12
**represent**  10:17
13:13 124:5
141:16 154:17
175:23
**representation**
118:1 120:24
147:1,13
**representations**
74:2
**represented**
181:15
**represents**  121:13
122:22 124:25
198:2
**request**  11:10 17:2
29:17 42:2 70:6
**requested**  16:23
42:5 43:4 60:5
62:10 67:4 68:1
94:2 95:3 101:3
106:20 108:25
110:22 112:5
120:17 122:20
143:23 156:22

194:10 201:9
**requesting**  130:14
130:20
**requests**  16:20,25
17:8 29:14,15,16
**required**  22:13
24:5 45:4,24
46:10 47:5,16
48:4 55:11,20
103:15 131:2,3,5
133:24 204:13
**requirement**
106:9 119:25
136:17
**requirements**
22:12,14 23:2,17
45:6 46:1 47:18
52:19 55:14,21,24
56:3 119:23
123:13 124:25
130:25 131:22
132:7 173:9
**requires**  46:12
**research**  52:1,4,23
53:4,10 54:10,15
92:3 96:5
**researched**  53:15
**reserved**  9:18
**reside**  13:24
**resources**  22:24
28:5
**respect**  38:1 49:20
50:13 51:8,15,22
61:9 64:10 67:16
73:16 75:8,23
76:12 88:23 89:3
92:10 97:12 99:22
100:17 138:21
139:8,24 153:16
160:19

**respected**  124:16
153:9
**respective**  9:16
**respond**  71:3
166:4
**responded**  17:2
**response**  35:17
62:8 80:20 95:6
110:18,25 112:14
117:11 141:19
142:17 146:4
166:13 174:20
175:7 190:4
**responsibilities**
19:23,25 23:4,6
26:8 27:13 29:11
29:20,22 30:3,6
34:24 35:14 36:20
37:18,23 53:16
57:16 86:18 153:1
157:1 163:22
**responsibility**
40:9,11 84:16
117:17 119:8,11
120:10 126:9
155:15,18 156:25
**responsible**  27:24
39:4,22,25 43:11
117:2,7,13,14
128:25 130:10,15
**responsive**  80:17
**rest**  17:22
**restate**  48:20 49:5
53:1 75:1 94:25
109:1 139:6
156:18,20
**restated**  95:1
**result**  164:7 166:9
191:9 192:10
**results**  29:18

**resume**  17:13
**retained**  78:21
90:4 92:7 172:9
172:18
**retainer**  87:17,18
87:21,23 88:24
89:2,3,4,21,24
90:2,3
**return**  202:13,17
**review**  22:8 29:13
29:17 32:12 49:14
86:2 91:8,12,22,25
102:3 104:10
126:11 149:1
151:4 163:23
176:12,17,18,20
177:6 182:2
186:12,17 190:5,8
191:19,24 192:7
201:8 202:7
**reviewed**  41:17
86:7,10,12,15,21
86:23 87:5 91:9
99:6 103:17 135:5
135:23,24 176:22
177:2 185:22
190:10,18 191:7
191:25 192:8,19
193:1 194:1 195:4
**reviewing**  27:18
86:18 91:16
103:21 105:2
193:18
**reviews**  35:2
**riding**  173:23
**right**  12:1,21,25
14:8,16,21,22 16:7
16:16 18:2,12
19:13 28:1,1,5
34:15,16 36:3,4
38:6,23,24 40:14

[right - served]                                                                Page 34

40:16,22 43:13
44:20 45:17 46:5
61:15 68:8 73:23
81:16 84:1 89:19
91:7 93:7 99:14
99:16 100:9
119:14 121:5
129:3 144:8 154:6
154:9 160:18
161:18,22 166:5
167:9 168:12
169:11 172:17
185:22 194:14,23
196:6,15,24 197:4
197:13,16,25
**rights** 71:17
111:21
**rise** 150:17
**risk** 40:9,12 82:1
83:9,15
**rite** 5:11
**rivero** 1:14 2:10
2:22
**riveromestre.com**
2:12,23
**road** 3:2,15 6:11
6:15
**roi** 31:5
**role** 19:18 20:16
24:12 25:8,10,21
28:9 30:21,23
32:12 34:20,22,25
35:18 38:9 41:3
42:15 49:13 53:19
59:6 63:24 64:3
82:9,9 91:16
108:6 110:15
152:25 155:14
**roles** 19:23,25
20:6 21:1,2 26:8
27:11 28:10,10

29:20,22 30:3,6
34:20 35:14 37:8
37:18,23 38:14
42:14 59:5 82:9
**room** 11:18 12:13
24:15 186:20
199:9
**rooney** 3:5
**rose** 4:6 6:19
**ross** 4:6 6:19
**roszel** 6:15
**rotation** 25:22
**rounds** 25:23
**ruben** 6:1,3 68:19
70:18
**rule** 69:3 70:12
**rules** 14:3
**rx** 34:14,18,20

**s**

**s** 2:1 3:8 8:11 9:14
9:14 10:1 132:10
203:3
**safe** 58:24 104:18
114:23 116:1
117:15,18 120:25
122:23 124:8
126:8,8,17 127:5
128:8 129:20
132:8 136:22
144:15,20 145:24
163:10 173:10
**safety** 12:17 82:1
82:3 83:13 95:12
104:13 105:20
123:14 149:18
151:17 166:14
169:10 183:2
**sale** 133:16
**sameness** 182:25
**san** 34:14

**sanctioned** 65:17
**sarah** 6:5
**sarah.zimmerman**
6:7
**savage** 3:15
**saying** 14:11,12,20
84:3 118:23 149:4
169:9
**says** 97:22 98:5
119:12 183:12
**schaffer** 3:14
**school** 45:21 48:1
**sciegen** 4:21
**science** 18:1,7,9
78:3
**sciences** 20:9,22
63:12,22
**scientific** 103:16
**scope** 49:9 94:8
95:17,22 100:20
106:8,11,17
129:24 133:7
137:7,8,20 140:7
142:9,13,17,21
148:10,20 155:22
157:1 158:1 160:2
161:15 163:7,19
164:10 166:18
169:14,18 171:10
172:12,14 173:16
174:10,23 176:16
178:2 182:2,15
188:25 189:2
190:5,14 191:6,14
191:24 194:15
197:1,8 198:1,12
198:25
**scripts** 6:8
**seal** 200:9,12
**second** 18:11
144:4 156:4,7

186:19
**section** 93:10 97:7
97:7 99:14 100:7
101:15,17 106:22
127:12,15,16
141:20 142:22
143:7,14 144:4,9
144:24 145:9
155:5,7 171:25
**sections** 99:11
127:17,19,20
**see** 11:7 12:19
14:7 40:13 72:10
104:11 119:3
189:6 193:17
**seek** 190:12
**seeking** 110:8
111:1 117:16
119:10,15 126:10
131:20 132:2,6
185:11
**seen** 14:23 16:16
195:2
**self** 33:12,14 36:14
38:22 39:8,13,24
159:19 168:6
**sending** 90:19
**senior** 37:10,12,19
38:5,10 157:24
**sense** 158:16 181:4
**sent** 202:14
**sentence** 96:3
119:17 140:16,18
143:20 183:12
**september** 90:8
**series** 185:15
**serious** 168:24
**serve** 101:5
**served** 20:8 32:25
33:4,8,19

serves  183:15
service  196:8,10
  197:13,14 198:3
services  19:20
  28:23 30:4 34:21
  36:9 38:21 63:12
serving  170:4
set  32:2 35:1 123:6
  130:25 132:7
  139:19 140:2
  145:22 151:16
  164:23 168:14
  189:2 196:13
setup  12:16 14:25
seven  183:7
shape  173:24
share  58:10 103:3
sheet  8:9 98:15,16
  108:10,19 109:4
  113:22 114:1,7
  186:2,3 202:11
shenandoah  19:2
shift  27:23
shoes  187:23
short  103:7 189:6
shorthand  200:6
  201:5
shortly  28:25
show  63:18 126:20
  127:10 177:1
  186:23 187:5
showed  187:2
  190:10,19 191:7
showing  185:25
shown  181:8
shows  190:1
  191:25 193:1
sic  64:21
side  22:19,20,22
  32:13,14,17,20
  73:3,11 82:3

83:21
sign  16:3 199:11
  202:12
signature  200:16
  201:22
signed  202:20
significance  109:8
signing  9:17
similar  129:25
  198:19
simple  174:17
single  12:10
  125:22 158:17
  165:17
sit  55:16 56:2
site  47:19 48:6
  51:2
six  12:9
smith  34:14,18,20
social  20:9,22
  63:12,21
society  47:22 51:3
solco  4:4
sold  188:12
sole  36:18
solutions  202:23
somebody  186:20
someone's  16:11
sorry  10:16 54:21
  60:3 61:11 85:15
  85:17,20 89:14
  96:23 107:13
  108:22 127:21
  141:9 143:22
  146:13,15 156:5
  156:15 176:25
  180:4 194:4
sort  24:12 50:12
sought  164:7,13
  165:4,17,22

sound  100:5
source  112:11
  152:21 153:10,11
  173:13 183:15
south  3:20 5:10
  6:2
speak  126:14
  157:13
speaking  68:16
  71:13 82:5,15
  83:3 84:17 111:15
  112:2 181:25
  197:3
speaks  76:10
  126:12
special  23:23 24:2
specialty  33:2,20
  34:5,6,8 53:23
specific  31:17
  33:10 39:10,17
  42:8 43:14 53:13
  54:8 58:12 66:12
  67:17 71:25 72:2
  75:21 87:1 95:20
  95:24 102:6
  103:21 107:1
  127:8 131:13,16
  131:24 134:6
  135:4,13 138:5,8
  141:2,9 148:14
  151:10 162:8
  171:11 176:8
  182:12 193:5,20
  193:21,24 196:20
  197:4
specifically  55:8
  55:16,17 56:3
  58:15 67:16 82:11
  83:14,24 84:7,23
  93:9 96:2 97:9
  110:18 116:7

129:15 131:21
  184:3 188:7
specificity  102:8
specify  151:20
speculate  103:11
  138:7,23 148:21
  149:1,4 162:6
  163:6 176:19
  190:17
speculation
  198:12,25
speeches  81:25
spend  88:5,7 93:7
spent  34:13,18
  88:9 89:6,8,12
split  29:4
spoken  57:20
  60:17 82:2,18
  87:8,11 92:12
spreadsheet  88:16
spreadsheets
  98:10
st  6:7 18:1,14
  24:24 25:19
staff  23:18 27:9,10
  27:14
stakeholders
  105:12,13
stand  73:25
standard  44:3
  193:16
standards  48:17
  48:24 49:3,20
  50:8 51:4,8,15,22
  69:21 74:11
  103:16 116:20
  118:13 120:4,21
  173:2,5
standing  45:12,13
  47:20 48:8 54:3
  56:24,25,25 57:4

57:12
**standpoint** 165:9
**stands** 187:23
**start** 14:17,18
48:21 92:15 167:8
**started** 74:14
92:18
**starting** 29:1
**state** 1:16 4:19
10:14,15,16 13:18
21:6,9,18 22:10,15
23:2,10,17 55:23
64:17 71:5 93:14
102:25 113:7
115:16 116:18
121:11 128:24
132:9 136:24
140:9 143:7,8
144:5,24 146:24
155:13 200:2,7,17
201:2,6,23
**stated** 93:8,11
94:23 108:11
**statement** 40:20
93:17 96:7,13,16
96:19 112:18,22
113:10,15,21
114:11,18,25
115:20 116:22
118:10 120:9
123:22 124:3,20
128:13 130:9
131:10,14,17
132:14,25 133:19
135:8 136:12
137:2 139:21
143:13 144:4,9,17
144:24 145:6,15
147:3,11,18,24
**statements** 50:12
71:4 73:24 74:1

97:11 99:2,18,24
100:12 101:10
109:4 110:6
111:17,21 112:13
113:2,4 121:6
123:9 134:3
**states** 1:1 28:19
30:11 31:3 32:7
32:25 69:4 101:22
118:24 120:13
121:1 133:11,17
133:17 150:9
152:23 161:24
164:7 165:4 188:8
**stating** 130:17
131:7 145:22
**status** 12:14 98:13
98:19 104:2 120:6
**stay** 86:8
**staying** 53:20
**steamfitters** 3:17
**stenographic**
68:25 201:11
**stenographically**
69:1 201:7
**step** 70:25
**steps** 150:25
**steven** 6:9
**stipulate** 111:10
111:19,20,24
121:24 122:2,5
**stipulated** 9:15
**stipulation** 111:25
**stop** 68:8 148:3
169:2 170:10
**stoy** 4:9
**strategic** 35:11
**strategies** 128:4
161:2,3,6,16 162:2
166:9 170:9 175:6
191:22 192:7,11

**strategy** 151:23
152:1 162:15
163:12 166:7
168:15 170:8
174:7,8,19 190:3
190:18 192:20,24
**street** 2:19 3:5,10
3:20 4:2,19 5:2,10
5:17 6:2
**strike** 84:24 163:2
168:3 191:2
**structure** 31:12
43:10,15 57:11
**structured** 30:19
31:1
**student** 20:2,4
**students** 20:2
60:23 62:25
**studies** 80:15 81:9
95:17 103:22
151:4 172:21
**study** 99:10
115:12,13
**studying** 55:5
**subformularies**
127:21
**subject** 33:1,4,8
33:19 149:17
186:25
**submissions** 144:1
**submit** 131:11
**submitted** 104:1
117:6 118:22
143:19 144:3
150:14
**submitting** 130:13
130:19,23
**subscribed** 204:14
**subsequent** 196:10
197:24 198:8

**subset** 30:16
**subsidies** 198:20
**substance** 94:5,9
95:9 129:6
**substitutability**
134:8 144:19
152:21 183:16
**substitutable**
115:25 116:13,16
153:11
**substituted** 116:9
**substitution**
115:16
**suffice** 126:18
**sufficed** 55:24
124:7 164:22
173:9
**suffices** 119:25
**sufficient** 162:14
**suggest** 72:4
**suggestion** 71:7
**suing** 187:14
188:19,20
**suitable** 132:12
170:11
**suite** 1:14 2:11,22
3:2,5 4:2,6,23 5:2
5:13 6:6,11,19 7:2
10:8
**summary** 142:22
142:25 144:5
**supervise** 27:21
**supervision** 27:23
**support** 117:11
128:12
**sure** 14:5 16:5
17:11 26:19 31:6
48:21 53:3 59:15
70:25 84:4 93:24
94:19,25 106:19
109:19 118:10

137:16 149:8
154:8 156:9
158:22 167:18
193:7 194:1
195:21,23 196:22
**surgery**   23:23
24:2,14,15
**surrounding**
155:17 169:5
**surveys**   35:16
**suspend**   71:22
**suspended**   65:15
**swear**   10:12 13:1
**swedesford**   3:2
**sworn**   13:6 200:9
204:14
**system**   51:3,11
126:7
**systems**   47:22
126:7 127:16

**t**

**t**   8:11 9:14,14
180:22 203:3,3
**take**   14:20 15:7,10
16:19,21 18:8,20
22:7 30:20 55:1
59:13 66:16 80:3
84:21 86:2 128:15
128:16 150:25
153:23 169:11
173:4 189:6
**taken**   1:13 55:8
59:19 71:2 92:24
128:20 135:24
154:1 168:23
181:25 189:12
**takes**   30:16 67:10
125:20
**talk**   14:15 17:12
83:20 97:9

**talking**   61:11
131:21 180:23
196:14
**talks**   97:7 127:11
**tasked**   150:7
**taught**   20:19,20,24
63:3,5,24 64:3
**te**   109:23
**teach**   20:15,18
**team**   24:9,10
**teams**   25:12
**technicians**   27:21
**tel**   4:20
**tell**   30:13 31:5
32:11 44:15 103:9
179:16 180:19,20
**ten**   56:14 72:21
167:25
**tend**   34:8
**term**   34:11 58:21
59:2,11 93:19
94:5 95:7 96:1
115:11 121:16,20
122:6 123:2,3,5
129:4,22,23 130:2
130:3 136:5,6,7
139:17 140:13,21
143:1,1 145:5,6,9
177:23 178:10,11
179:16 180:19,20
**terminate**   69:4,6
70:12 71:15
**terminus**   6:10
**terms**   32:1 54:5
62:18 95:25 113:8
113:16 114:12
129:9,16 130:5
134:11 146:8
153:10 168:15
**territories**   188:8
**territory**   66:15

**tested**   142:8,12,16
142:20
**testified**   13:7
78:24,25 111:7
179:3 181:13
**testify**   15:19,25
159:4,14
**testifying**   88:21,22
89:11,17,19
169:17 170:22
**testimony**   8:3 13:1
15:21 51:23 79:10
80:16 111:11
135:17 177:19
195:24 198:10
202:9,18 204:8
**teva**   2:5,9 3:12,12
6:13 10:19,21
13:13
**texas**   4:7 6:20
**thank**   12:23 13:24
27:3 33:17 59:16
70:18 74:14,15
80:9 95:14 122:13
122:18,19 125:12
156:11,21 175:13
180:15 183:8
184:4 185:2,5
189:16 194:11,12
194:14 199:12,14
**thanks**   156:12
199:13
**therapeutic**   54:2
101:20 105:23
106:2 109:8,17,20
109:23 116:7,12
127:22 150:16,19
178:8
**therapeutically**
151:1

**therapy**   21:24,25
**thereabout**   138:18
**thing**   70:19 73:12
74:8 132:24 136:7
143:21
**things**   22:22 106:6
111:8 129:18,22
198:20
**think**   11:8 34:19
61:22 72:15 83:7
92:21 107:13,19
108:23 135:13
158:6 168:8
171:19 179:3
180:18 197:19
**thinks**   156:9
**third**   38:22 39:1,2
39:22 40:3,4,8
44:15 75:8 97:25
98:15,16 108:9,18
109:3 113:21,22
114:6 136:19
157:10 159:16,20
160:5 166:25
185:10 186:1,2
187:9,12 188:3,4,7
**thornburg**   5:9
**thoroughly**   71:17
173:18
**thought**   34:3
107:14 156:5
**thoughtful**   115:15
161:3 163:12
**threatened**   71:22
**three**   3:9 114:9
**tie**   170:16
**tied**   42:11 44:12
50:25 58:12 63:25
67:19 76:4 102:14
**tier**   104:8 105:11

**tiering** 31:2
**till** 19:17 37:17
**time** 1:12 12:10
  13:15 14:21 15:4
  15:10,18 18:18
  22:12 24:22,24
  25:4,6,16,18 26:5
  27:8,16,22,24 28:4
  28:16,20 29:2,4,5
  29:6,7,9,10,10
  30:13 34:17 35:7
  35:19 37:12,15
  46:16,25 55:5
  59:17,20 64:4,9,12
  64:24 66:20 68:21
  69:5 70:7 72:5,12
  72:14 73:22 74:17
  82:22 88:5,7,9,12
  89:6,8 92:17,18,22
  92:25 93:7 115:13
  121:24 122:4
  125:24 128:18,21
  137:1,3,5,8,9,13
  137:20,21,22,24
  138:7,8 150:22
  151:20 153:15
  156:7,23 160:20
  161:13 162:13
  164:3,4 165:13
  169:5 171:6,8
  174:4 175:13
  178:25 179:19,24
  180:2,5 182:19
  183:6 189:10,13
  194:13,23 195:14
  196:6 199:16
  202:19
**time's** 180:6
**timeframe** 202:8
**times** 57:24 82:20
  82:20 111:7

**title** 19:24
**titled** 101:15
  104:10
**titles** 20:6 21:2
  58:11 63:5,14,18
  63:23 64:2
**today** 15:2,17,22
  16:6 17:6 40:25
  43:21 48:2 55:16
  56:2 67:14 71:8
  89:7 157:22 163:8
  188:23
**today's** 199:15
**told** 90:17 181:7
  183:24 192:19
**tone** 73:8
**top** 103:13
**topic** 57:18 58:15
  169:25
**topics** 70:8 188:24
**torts** 6:2
**total** 89:5,11
**touch** 108:16
**toxicologist** 78:18
**toxicology** 155:20
**tp** 102:2
**tpa** 40:2,9 42:24
  43:9,13,19,24 44:7
  44:16
**tpas** 43:5
**tpp** 38:25 39:7,12
  40:7 42:18,22,25
  43:9,24 44:8,16
  97:8 102:16,21
  103:4,7,10 120:2
  147:8 152:16
  153:6,19 160:23
  161:10,23 162:9
  163:1,4,16,25
  164:2,6,12 165:3
  165:17,22 174:20

174:21 175:3
  195:16,17,23
  196:23
**tpp's** 153:16
  195:25
**tpps** 38:22 41:2
  67:15,15 75:7
  76:11,18 92:10
  97:9,13 102:3,10
  102:12 116:18
  118:1,11,19,25
  119:12,18 121:14
  132:10 133:14
  146:25 147:11,15
  152:12,19 160:15
  161:19 162:12
  163:8 164:21
  165:8 166:4,9
  167:9,12,15 168:4
  168:6 169:9 170:3
  170:5 171:2,4
  172:25 173:3,14
  173:24 174:4,7,8
  174:13 175:6
  184:14,18 187:24
  192:3
**track** 41:18 88:7
  88:12
**tracked** 88:14
**tracking** 29:18
  88:3
**trade** 3:5
**training** 77:6,22
**transaction**
  194:22 196:5,6
**transcript** 201:9
  201:10 202:6,20
  204:5,8
**transition** 170:11
  170:12 171:7,8,13

**traurig** 2:3,7 4:23
  6:10 10:18,20
  13:13
**treat** 73:16
**treated** 31:9
**treatment** 32:3
**trial** 78:25
**tried** 170:15
**true** 201:10 204:8
**trust** 185:15
**truth** 13:2,3,3
  153:10,11 183:15
**truthful** 15:21
**try** 14:17 178:19
**trying** 14:19 23:9
  83:6 137:19
  170:16
**turn** 79:15 85:23
  93:9
**turned** 145:1,17
**two** 19:8 21:1
  38:13 62:21 69:11
  69:12 98:18
  107:22 108:4
  141:18 144:11
**type** 20:21 23:3
  26:13 30:15 33:11
  50:16 186:16
  198:8,17
**types** 22:22 35:22
  50:23
**typical** 193:17

**u**

**u** 9:14 180:25
**u.s.** 4:4 100:5
  107:5,15 112:15
**uh** 13:14 14:9,14
  14:14 23:12 29:8
  45:15 47:4 79:17
  80:13 84:6 85:25
  95:9 98:20 103:14

104:9 105:8
109:16 123:18
144:11 145:4
146:3,16 151:13
177:13
**ulmer** 5:1
**ulmer.com** 5:3
**ultimate** 40:8,11
**ultimately** 43:11
**unacceptable**
68:14,17 70:11
93:21 129:2,2
130:12 140:25
145:19 146:2,5,6
166:23 170:17
**unbiased** 105:1
**unclear** 178:16
197:18
**understand** 14:13
15:4 23:9 24:6
54:1 58:21 66:6
66:22,23 76:2
77:4 84:3 93:19
94:5,25 95:5
106:9 109:19
110:2 112:14
118:7 123:3 127:2
129:8 131:15
133:13 137:16,19
141:14 155:15
156:25 158:6
166:6 170:8
176:25 182:2
187:8,11,14,22
188:3,18 196:9
**understanding**
11:16,23 12:5
41:15 44:6 59:1,3
59:10 62:12 67:6
67:9 80:16 84:4
84:15,22 94:4,19

95:25 107:25
112:17,17 113:11
115:5 119:17
120:8 128:25
130:11 131:25
132:1 134:17,21
139:12,20 165:8
165:12 166:8
174:3 176:17
188:16 189:24
191:10 196:1
**understood** 15:7
93:24 168:18
**underwriters**
64:18 83:3
**unfair** 111:10
**unfamiliar** 54:25
**unfortunately**
71:10
**unit** 10:5
**united** 1:1 101:22
120:13,25 133:11
133:16,17 150:9
152:23 161:24
164:6 165:3 188:7
**universal** 34:7
174:8
**university** 18:1,14
19:2 20:7 21:3
25:14,19
**university's** 19:13
19:19
**unjustly** 161:20
170:3 173:25
**unreasonably**
69:8
**update** 179:19
**updates** 17:19
41:7 53:21,21
**uphold** 126:10

**upholding** 78:8
**upkeep** 86:8
**usa** 3:12
**use** 26:11,16 34:1
34:10 54:1 58:6
60:2,18 88:11
97:6 102:16,21
120:25 122:6
123:2 129:9,22,22
130:1,2 136:6,7
145:1,5 146:8
152:9,10,16 153:6
153:8,17,19
177:24 179:22
181:3 182:21
188:11
**uses** 121:22 136:5
**utilization** 41:6

**v**

**v** 180:25
**valid** 187:15
**valsartan** 1:4
52:13,13,23,24
53:4,4,10,10,15
54:10,11 93:15,16
97:3,4,5 98:6,8
103:9,10 114:3
121:9 136:25
138:2,10,21 139:8
139:25 146:23
148:9,17 149:12
150:24 151:5,9,12
151:19 152:5,13
154:21,21,24,25
155:2 157:7,11,17
160:21 167:2,3,12
185:11,17 186:10
186:24 187:12
188:10 202:4
203:1 204:1

**vanderbilt** 2:3,7
**varies** 67:5
**various** 57:10
101:9 185:21
**vast** 181:9
**vauggn** 7:1
**vcd** 138:3,11
162:10 163:16
164:1,8,14,16
165:5,19 175:7
189:25 190:4,8
191:4,11
**vcds** 136:25
138:21 139:9,25
140:11 142:1
161:11,19 162:25
163:1 167:17
168:5,12,18,20
169:11 170:3
173:14 174:4,20
183:14 190:13,21
192:4 194:2
**verbal** 57:17
**verbally** 14:11
**verbatim** 126:22
**verify** 202:9
**verifying** 28:1
**veritext** 10:11
202:14,23
**veritext.com**
202:15
**versions** 140:11
142:1 183:13
**versus** 103:5 130:2
**vice** 37:10,10,12
37:15,24 157:24
157:24
**vicinage** 1:2
**video** 10:5 11:18
**videographer** 7:10
7:11 10:3,10,15

11:9,19,19 59:17
59:20 68:21 74:17
92:22,25 128:18
128:21 153:24
154:2 189:10,13
199:13,15
**videotaped** 1:9
**view** 73:9 130:7
160:16
**views** 130:5
**violation** 150:18
**visibility** 41:22
**visit** 24:16
**voluntary** 93:15
157:11
**vp** 37:19 38:5,10
38:10

**w**

**w** 5:13
**wait** 14:16,18
**waive** 111:20
**walgreens** 27:6,11
29:5,10
**wallack** 6:14
**walnut** 5:2
**walsh.law** 3:11,11
**walter** 3:15
**want** 16:3 73:4
74:8 79:20 84:4
90:7 93:24 94:19
95:5 156:16
157:21 158:7
175:17 180:2,17
**wanted** 26:18,19
71:11 169:9
**wants** 174:19
**warranties** 52:10
56:22 57:3,7,18
58:15,17,22 59:2
59:25 60:15 61:24
125:5,19 126:5,14

136:5,6,25
**warranty** 58:23
121:13,16,25
122:4,6,22 123:2
126:15 136:7
143:1,1 144:25
145:5,7,9,16
161:19 170:2
**washington** 4:2
5:22 7:6
**way** 23:1 38:9
54:23 65:18 71:9
73:8 91:11 95:1
103:9 114:22
139:6 143:2,9
145:7,10 147:8,24
148:23 149:5,8,11
161:8 167:19
171:5 182:3
**wayne** 3:2
**ways** 39:12,15
72:21 169:16
**we've** 19:10 21:1
48:10,14 80:19
108:4 135:13
**webinar** 65:7
**webinars** 64:22
**website** 45:6 46:2
46:3 47:7 93:18
139:22 146:19
**welcome** 80:3
175:14 189:17
**wellness** 36:2,7,8,9
36:21 37:2
**went** 82:19 162:20
**west** 3:5
**wharton** 2:21
10:24,24 43:1
**whiteley** 2:18,18
5:17 11:1,1 70:17
72:13

**whiteley's** 74:3
**wholesaler** 188:13
**widely** 153:9
**william** 6:14,14
**windermere** 13:23
**wise** 40:23
**wish** 167:20
190:17
**withdraw** 122:6
**withdrawn** 56:11
63:4 81:23 102:2
124:9 149:18
**witness** 10:12 13:4
17:1 33:17 59:13
59:16 66:18,21,24
68:14 69:15,16,20
69:20 70:1,8,10
71:9,10,23 72:6,18
72:19,22 73:9,16
73:19,25 78:21
80:7,9 111:7
122:10,13,17,19
125:12 126:2
154:13 156:18
157:23 169:16
170:21 175:14
177:2 178:24
181:20,22 189:17
194:14 195:2
197:6 200:9,12
202:8,10,12,19
**witness's** 73:1
**witnesses** 69:21
74:11
**wmurtha** 6:16
**woman** 47:9
**women** 46:4,10
49:19
**word** 12:10 88:1
94:13 119:3,6
125:22 155:10

178:20,24 179:4,9
179:9,10,11,18
180:23,24 181:3
182:21,22,23,25
188:20
**words** 126:22
127:8
**work** 15:16 16:25
24:9 27:17 41:2,3
57:16 59:23 60:13
60:23 61:23 62:24
79:3,6 82:24
87:15 88:21,22
89:19 90:19 98:25
114:22 134:17
157:1 158:5,12
159:17 160:6,15
169:23,23 191:9
**worked** 27:5 28:5
46:15,17 65:20
184:20
**workflow** 30:2
**working** 27:21
38:21
**works** 14:4 107:9
107:25
**world** 49:18
126:16,21 127:9
138:14 139:8
**wrap** 182:16 199:2
**writing** 17:3
**written** 80:20
88:11,14 147:25
182:22
**wrong** 85:2
**www.kanner** 5:18

**x**

**x** 8:1,11

[yeah - zooms]                                                    Page 41

| y | zooms  11:12 |
|---|---|
| **yeah**  12:11 33:9 | |
| 34:19 36:1 46:9 | |
| 50:15 71:1 73:5 | |
| 85:19 97:20 98:17 | |
| 114:16 127:25 | |
| 138:23 181:23 | |
| 189:19 197:22 | |
| **year**  20:12,12 | |
| 28:14,14,17,17,22 | |
| 28:22 34:13,14 | |
| 46:23 82:20,20 | |
| **years**  18:10 19:8 | |
| 28:24 29:1 38:18 | |
| 47:3 56:14 59:4,4 | |
| 59:5 82:24 136:1 | |
| **yep**  23:21 142:24 | |
| **york**  2:4,8 13:25 | |
| 21:6,18 22:10,15 | |
| 23:2,10,17 27:6 | |
| 35:7 55:23 65:12 | |
| 155:13 | |

| z |
|---|
| **zhp**  3:22 4:4 |
| 111:23 |
| **zimmerman**  6:5 |
| **zoom**  3:3,8,13,18 |
| 3:22 4:4,8,13,17 |
| 4:21,25 5:4,8,11 |
| 5:15,19,23 6:4,8 |
| 6:13,17,21 7:3,7 |
| 7:10 11:7,8,10,14 |
| 11:15,24,25 12:2,4 |
| 12:16,20 14:24 |
| 15:1,3 16:11,12 |
| 26:20 122:9,14,18 |
| 154:8 175:15 |
| 184:7 186:21 |
| 187:1,18 199:8 |

```
            Federal Rules of Civil Procedure

                      Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the

deponent or a party before the deposition is

completed, the deponent must be allowed 30 days

after being notified by the officer that the

transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to

sign a statement listing the changes and the

reasons for making them.

(2) Changes Indicated in the Officer's Certificate.

The officer must note in the certificate prescribed

by Rule 30(f)(1) whether a review was requested

and, if so, must attach any changes the deponent

makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.
```

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# Exhibit 52

Page 1

1              UNITED STATES DISTRICT COURT
                DISTRICT OF NEW JERSEY
2                    MDL NO. 2875
3       -------------------------------------X
        IN RE: VALSARTAN, LOSARTAN, AND
4       IRBESARTAN PRODUCTS LIABILITY
        LITIGATION
5

        THIS DOCUMENT RELATES TO:
6

        All Actions
7

        Case No. 1:19-md-02875-RBK-SAK
8       -------------------------------------X
9
              VIDEO DEPOSITION OF : RON NAJAFI
10                  February 3, 2022
11              *   *   *   *   *   *
12          TRANSCRIPT of the videotaped deposition of the
13      above-named witness, called for Oral Examination in
14      the above-entitled matter, said deposition being
15      taken pursuant to Superior Court Rules of Civil
16      Practice and Procedure, by and before MICHELLE L.
17      DAWKINS, CSR, RPR, a Certified Court Reporter and
18      Notary Public of the State of New Jersey, held
19      REMOTELY VIA ZOOM on Thursday, February 3, 2022,
20      commencing at 9:09 a.m. Pacific Standard Time.
21
22
23
24
25

Page 2

```
1   A P P E A R A N C E S :
2
    For the Plaintiffs:
3
        KANNER & WHITELEY LLC
4       BY: LAYNE HILTON, ESQ.
          DAVID STANOCH, ESQ.
5         CONLEE SCHELL WHITELEY, ESQ.
        701 Camp Street
6       New Orleans, LA 70130
        504.524.5777
7       l.hilton@kanner-law.com
        d.stanoch@kanner-law.com
8       c.whiteley@kanner-law.com
9   LEVIN PAPANTONIO THOMAS MITCHELL
    RAFFERTY & PROCTOR P.A.
10      BY: DANIEL NIGH, ESQ.
        316 South Baylen Street
11      Pensacola, FL 32502
        850.435.7013
12      dnigh@levinlaw.com
13  LEVIN SEDRAN & BERMAN LLP
    BY: CHARLES E. SCHAFFER, ESQ.
14      510 Walnut Street - Suite 500
        Philadelphia, PA 19106
15      215.592.1500
        cschaffer@lfsblaw.com
16
    SLACK DAVIS SANGER LLP
17      BY: JOHN R. DAVIS, ESQ.
        6001 Bold Ruler Way - Suite 100
18      Austin, TX 78746
        866.531.2048
19      jdavis@slackdavis.com
20
21
22
23
24
25
```

Page 3

```
1   A P P E A R A N C E S (Continued):
2   For the Defendants, Mylan Pharmaceuticals Inc.,
    Mylan Laboratories Ltd., Mylan Inc., and Mylan N.V.:
3
        PIETRAGALLO GORDON ALFANO
4       BOSICK & RASPANTI, LLP
        BY: CLEM TRISCHLER, ESQ.
5         FRANK STOY, ESQ.
          JASON M. REEFER, ESQ.
6       One Oxford Centre
        301 Grant Street - 38th Floor
7       Pittsburgh, PA 15219
        412.263.4385
8       cct@pietragallo.com
        fhs@pietragallo.com
9       jmr@pietragallo.com
10  For the Defendants, Aurobindo Pharma USA, Inc.,
    Aurobindo Pharma Ltd., and Aurolife Pharma LLC:
11
        MORGAN LEWIS & BOCKIUS LLP
12      BY: JOHN GISLESON, ESQ.
          STEVEN HUNCHUCK, ESQ.
13      One Oxford Centre - 32nd Floor
        Pittsburgh, PA 15219
14      412.560.7466
        john.gisleson@morganlewis.com
15      steven.hunchuck@morganlewis.com
16  For the Defendants, Zhejiang Huahai Pharmaceutical
    Co., Ltd., Solco Healthcare U.S., LLC, and Prinston
17  Pharmaceutical Inc.:
18      DUANE MORRIS LLP
        BY: ALYSON WALKER LOTMAN, ESQ.
19        COLEEN HILL, ESQ.
        30 S. 17th Street
20      Philadelphia PA 19103
        215.979.1177
21      alotman@duanemorris.com
        cwhill@duanemorris.com
22
23
24
25
```

Page 4

```
1   A P P E A R A N C E S (Continued):
2   For the Defendant, Cygnet Pharmaceuticals, Inc.:
3       HINSHAW & CULBERTSON LLP
        BY:  GEOFFREY M. COAN, ESQ.
4       53 State Street - 27th Floor
        Boston, MA 02109
5       617.213.7000
        gcoan@hinshawlaw.com
6
    For the Defendant, Camber Pharmaceuticals:
7
        LEWIS BRISBOIS BISGAARD & SMITH LLP
8       BY: ASHER A. BLOCK, ESQ.
        500 East Swedesford Road - Suite 270
9       Wayne, PA 19087
        215.977.4066
10      asher.block@lewisbrisbois.com
11  For the Defendants, CVS Pharmacy Inc. and Rite Aid:
12      BARNES & THORNBERG
        BY: KARA KAPKE, ESQ.
13      11 S. Meridian Street
        317.231.6491
14      kkapke@btlaw.com
15  For the Defendant, Humana:
16      FALKENBERG IVES LLP
        BY: MEGAN A. ZMICK, ESQ.
17      230 West Monroe - Suite 2220
        Chicago, IL 60606
18      312.566.4801
        maz@falkenbergives.com
19
20
21
22
23
24
25
```

Page 5

```
1   A P P E A R A N C E S (Continued)
2   For the Defendants, Teva Pharmaceuticals USA, Inc.,
    Teva Pharmaceutical Industries Ltd., Actavis LLC,
3   and Actavis Pharma, Inc.:
        GREENBERG TRAURIG, LLP
4       BY: STEVEN M. HARKINS, ESQ.
          VICTORIA LOCKARD, ESQ.
5         BRIAN RUBENSTEIN, ESQ.
        Terminus 200
6       3333 Piedmont Road NE - Suite 2500
        Atlanta, GA 30305
7       678.533.2312
        harkinss@gtlaw.com
8       lockardv@gtlaw.com
        rubensteinb@gtlaw.com
9
10  MARTIN, HARDING & MAZZOTTI
    BY: ROSEMARIE RIDDELL BOGDAN, ESQ.
11      100 Park Avenue Center - 16th Floor
        New York, NY 10017
12      518.724.2207
        rosemarie.bogdan@1800law1010.com
13
    WALSH PIZZI O'REILLY FALANGA LLP
14      BY: CHRISTINE GANNON, ESQ.
        Three Gateway Center
15      100 Mulberry Street - 15th Floor
        Newark, NJ 07102
16      973.757.1017
        cgannon@walsh.law
17
    For the Defendant, Albertson's LLC:
18
        BUCHANAN, INGERSOLL & ROONEY P.C.
19      BY: CHRISTOPHER B. HENRY, ESQ.
        Carillon Tower
20      227 W. Trade Street - Suite 600
        Charlotte, NC 28202
21      704.444.3475
        christopher.henry@bipc.com
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1    A P P E A R A N C E S (Continued):
2    For the Defendant, McKesson Products:
3         NORTON ROSE FULBRIGHT U.S. LLP
          BY: ELLIE NORRIS, ESQ.
4         2200 Ross Avenue - Suite 3600
          Dallas, TX 75201
5         214.855.8135
          ellie.norris@nortonrosefulbright.com
6
7
8    ALSO PRESENT:  WILLIAM MILLER, Videographer
          Veritext Legal Solutions
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

PREMARKED EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | R. Najafi Expert Declaration | |
| Exhibit 2 | Emery Pharma Proposal | |
| Exhibit 3 | Emery Invoice 8/2/2021 | |
| Exhibit 4 | Emery Invoice 1/28/2022 | |
| Exhibit 5 | Emery Invoice 1/31/2022 | |
| Exhibit 6 | Emery Invoice 2/1/2022 | |
| Exhibit 7 | Najafi C.V. | |
| Exhibit 8 | Emery Article 4/6/2020 | |
| Exhibit 13 | Diovan Label | |
| Exhibit 17 | Valsartan Label | |
| Exhibit 27 | Article | |
| Exhibit 28 | Valisure Letter 6/13/2019 | |
| Exhibit 29 | Information Sheet | |
| Exhibit 30 | Valsartan specifications | |
| Exhibit 31 | Article - Canada | |
| Exhibit 32 | Nitrosamine Article | |

Page 7

1              INDEX TO WITNESSES
2    WITNESS                          PAGE
3         Ron Najafi, PhD
4
     By Mr. Trischler:
5    Direct Examination              10
6    By Mr. Gisleson:
     Cross-examination               170
7
     By Mr. Harkins:
8    Cross-examination               201
9    By Mr. Nigh:
     Cross-examination               219
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 9

1         THE VIDEOGRAPHER:  Good morning.  We
2    are going on the record at 9:09 a.m. Pacific time on
3    February 3, 2022.  This is Media Unit 1 of the video
4    recorded deposition of Ron Najafi, PhD in regards to
5    the valsartan/losartan litigation which is found in
6    United States District Court, district of New
7    Jersey, NDL No. 2875.  My name is William Miller
8    from the firm Veritext Legal Solutions and I am the
9    videographer.  The court reporter is Michelle
10   Dawkins from the firm Veritext Legal Solutions.  All
11   counsel is noted on the stenographic record.  Will
12   the court reporter please swear in the witness.
13   You're on mute, Michelle.
14        THE COURT REPORTER:  Sorry.  Good
15   morning.  My name is Michelle Dawkins and I am the
16   court reporter.  The attorneys participating in this
17   deposition acknowledge that I am not physically
18   present in the deposition room and that I will be
19   reporting this deposition remotely.
20        They further acknowledge that in lieu
21   of an oath administered in person, I will administer
22   the oath remotely.  The parties and their counsel
23   consent to this arrangement and waive any objections
24   to this manner of reporting.
25        Please indicate your agreement by

3 (Pages 6 - 9)

Page 10

1  stating your name and your agreement on the record.
2        MR. TRISCHLER:  Clem Trischler.  So
3  agreed on behalf of the defendants.
4        MR. NIGH:  Daniel Nigh, agreed on
5  behalf of the plaintiffs.
6        THE COURT REPORTER:  Would the witness
7  please state his full name.
8        THE WITNESS:  My name is Ron Najafi.
9        THE COURT REPORTER:  Mr. Najafi, would
10  you please raise your right hand.  Do you solemnly
11  swear or affirm the testimony you will give at this
12  deposition will be the truth, the whole truth and
13  nothing but the truth?
14        THE WITNESS:  Yes, I do.
15        THE COURT REPORTER:  Thank you.
16        DIRECT EXAMINATION
17  BY MR. TRISCHLER:
18     Q     Sir, let me start by saying good
19  morning.  I think it's morning where you're located,
20  so I'll say good morning to you.
21     A     Good morning to you.
22     Q     Thank you.  My name is Clem Trischler.
23  I am an attorney.  I represent one of many
24  defendants in litigation that's pending in the
25  United States District Court for the district of New

Page 11

1  Jersey involving valsartan.
2        I understand that you've been identified and
3  designated an expert witness in this litigation; is
4  that correct?
5     A     That's correct.
6     Q     I'd like to maybe start today by
7  covering some basic concepts and see if we can get
8  an agreement on a few basic points.  Okay?
9     A     Okay.
10     Q     Number one, it is an established fact
11  that all drug products contain impurities, agreed?
12     A     Yes, they do.
13     Q     A drug or a drug substance is not
14  considered misbranded simply because it contains
15  impurities, true?
16        MR. NIGH:  Form objection.  Outside
17  the scope.
18     A     A drug product contains impurities
19  that are harmless and they could also contain
20  impurities that could be extremely hazardous.
21     Q     That wasn't my question, sir.  See if
22  you can listen to my question and give me an answer
23  to my question, please.
24        A drug product is not considered misbranded
25  simply because it contains impurities; isn't that

Page 12

1  true?
2        MR. NIGH:  Form objection.  Outside
3  the scope.
4     A     A drug, as I mentioned to you,
5  Mr. Trischler, drug product contains impurities that
6  could be harmless or could be hazardous.
7     Q     Is a drug product considered
8  misbranded under federal law merely because it
9  contains impurities?
10        MR. NIGH:  Form objection.  Outside
11  the scope.
12     A     A drug product, as I mentioned,
13  contains impurities that could be harmless or could
14  be hazardous and they could be misbranded because of
15  the hazardous nature of the impurities.
16     Q     If a drug product contains impurities
17  that are not harmful to public health, are those
18  drug products considered to be misbranded?
19     A     No.
20        MR. NIGH:  Form objection.  Outside
21  the scope.
22     Q     If a drug substance -- every drug
23  substance ever made in America has impurities,
24  correct?
25     A     Every drug product that is made in

Page 13

1  America or anywhere on the planet could contain
2  impurities that are harmless or could be hazardous.
3     Q     I didn't ask you that question, sir.
4  I said, isn't it a fact that every drug product ever
5  made in America or on the planet does contain some
6  impurities?
7        MR. NIGH:  He answered the question.
8  He answered the question previously and it's outside
9  the scope.
10        MR. TRISCHLER:  It's not an
11  appropriate objection.  It's not an appropriate
12  instruction, if that's what it was.  My question
13  stands -- excuse me.  And I'd like an answer.
14        MR. NIGH:  Objection.  Asked and
15  answered.
16        MR. TRISCHLER:  I don't know how you
17  know that, since I haven't asked it yet, but let me
18  try again.
19     Q     Every drug product ever made in the
20  United States made for sale in the United States of
21  America contains some impurities.  Can we agree on
22  that?
23        MR. NIGH:  Objection.  Asked and
24  answered.
25     A     I already responded to that question,

4 (Pages 10 - 13)

Page 14

1  sir.
2      Q    I'm asking it again, then, sir.  I ask
3  you to answer my question, sir.
4      A    Sir, I will give you the same answer.
5      Q    What is the answer to my question?
6      A    I just gave you the answer to your
7  question.  Every drug product or every drug
8  substance that's produced on the planet contains
9  harmless and harmful impurities.
10     Q    If the mere presence of an impurity
11  rendered a drug product adulterated and misbranded,
12  then virtually pharmaceutical produced today would
13  be deemed misbranded and adulterated, do you agree?
14         MR. NIGH:  Form objection.  Outside
15  the scope.
16     A    I did not say that.  I said --
17     Q    I didn't -- sir, let me stop you.  I
18  didn't ask you what you said.  I asked you a
19  question.  Do you understand that this is a question
20  and answer session and I am permitted to ask you
21  questions and you're required to give me responsive
22  answers to those questions; is that a concept you
23  understand?
24         MR. NIGH:  Mr. Trischler, you just now
25  interrupted the witness in the middle of his answer.

Page 15

1  It wasn't completed.
2      Q    Do you understand that I am entitled
3  to answers to my questions, sir?
4         MR. NIGH:  Do you understand not to
5  interrupt the witness when he's answering your
6  question?
7         MR. TRISCHLER:  I'm not going to get
8  into a colloquy with you.  I'm talking to the
9  witness.  Do you understand --
10         MR. NIGH:  Well, please don't
11  interrupt the witness in the middle of his
12  question -- I mean, in the middle of his answer.
13     Q    Do you understand that I'm entitled to
14  responsive answers to my question, sir?
15     A    Clem, every drug product or drug
16  substance that's produced on the planet contains
17  harmless or harmful impurities.  They could be
18  misbranded if it contains extremely harmful
19  impurities and they could not be misbranded if they
20  are not harmful.
21     Q    So then you would agree with me that
22  the mere presence of some impurity does not render a
23  drug product misbranded or adulterated, right?
24         MR. NIGH:  Scope.
25     A    I already responded to your question.

Page 16

1  I think you should -- I think it's -- the answer is
2  clear.
3      Q    Do you agree that the mere presence of
4  an impurity does not render a drug adulterated or
5  misbranded?
6         MR. NIGH:  Objection.  Scope.
7      A    I responded to your question.
8      Q    Sir, I am entitled to an answer to the
9  question.  I don't know if there was an internet
10  issue.  If there is was an answer, I didn't hear it.
11     A    There is no internet issues.
12     Q    I said I didn't hear.  If there was an
13  answer, I did not hear it.
14         MR. NIGH:  Was there an answer to the
15  last question, Michelle?
16     A    I already answered it.
17     Q    I'm not talking to you, sir.
18     A    Let's move on to the next question.
19         (The previous testimony as requested
20  was read by the reporter.)
21         MR. TRISCHLER:  Okay.  Thank you.
22     Q    It's not clear to me, so I would like
23  an answer, please.  Is it your testimony that the
24  mere presence of an impurity renders a drug
25  misbranded or adulterated; yes or no?

Page 17

1         MR. NIGH:  Again, it's outside the
2  scope.
3      A    I already responded to your question.
4  Just look at the record.  Go back to the records and
5  you'll see my answer.
6      Q    So are you refusing to answer my
7  question, sir?
8      A    I already responded to your question.
9      Q    No, you didn't.  No you didn't.  I
10  asked a different question, sir.  This is going to
11  be a long day or else we're going to come back and
12  I'm going to get fees, because Magistrate Judge
13  Menaski has talked about obstructionist witnesses
14  like this.  So if you don't want to answer the
15  question, that's fine.  We'll halt the deposition,
16  I'll get fees for it, and we'll come back here
17  again.
18         The question is pretty simple.  Is it your
19  position that the mere presence of an impurity
20  renders a drug adulterated or misbranded; yes or no?
21         MR. NIGH:  Object to the colloquy
22  given to the witness.  Disagree, but I will ask the
23  witness to answer this question again.
24     A    Again, this is not a "yes" or "no"
25  answer, because mere presence of an impurity, if

5 (Pages 14 - 17)

Page 18

1 it's safe impurity if it's determined safe, then
2 it's not misbranded, but if it's an unsafe impurity
3 then, yes, it is misbranded.
4    Q    Does FDA require the supplier of an
5 active pharmaceutical ingredient used in generic
6 drug to use the same synthetic process used by the
7 RLB holder?
8         MR. NIGH:  Form objection.
9    A    The FDA does not require the generic
10 manufacturers to use exact procedure of the branded
11 drug.
12    Q    When you say "exact procedure," my
13 question as are they required to use the same
14 synthetic process for developing and producing API.
15 The answer is no, correct?
16         MR. NIGH:  Form objection.  Outside
17 the scope.
18    A    Mr. Trischler, am I pronouncing your
19 name right?
20    Q    Close enough, sir.
21    A    Mr. Trischler, FDA does not require a
22 generic manufacturer to use exact chemical procedure
23 as the brand to synthesize the generic drug.
24    Q    And because the synthetic process used
25 by an RLD holder in a generic manufacturer may be

Page 19

1 different, it's not uncommon or unexpected that the
2 API used in an ANDA will have a different impurity
3 profile than the reference listed drug, is it?
4         MR. NIGH:  Form objection.  Outside
5 the scope.
6    A    It is entirely possible that the
7 impurity profile of the generic drug may be
8 different.
9    Q    In fact, there's absolutely no
10 requirement anywhere in the FDA regulations that
11 mandate that an RLD match or mirror the impurity
12 profile of the generic alternative, is there?
13    A    The FDA does not require that the
14 generic drug manufacturer to match every impurity of
15 the branded drug.
16         However, they do require that the impurity is
17 to be determined safe.  They do require that a
18 generic drug does sufficient due diligence to
19 determine the synthetic path is safe.
20    Q    A generic manufacturer can establish
21 and satisfy FDA requirements for bio equivalents
22 even where the impurity profiles between the RLD and
23 the generic equivalent product are different,
24 correct?
25    A    Could you repeat your question.

Page 20

1    Q    Yes.  A generic drug manufacturer can
2 establish and satisfy FDA requirements for bio
3 equivalents even where the impurity profiles between
4 the RLD and generic equivalent product are
5 different.
6    A    The generic drugs have to establish
7 bio equivalence when they make a generic drug.
8    Q    Right.  And you can --
9    A    A bio equivalence does not refer to,
10 you know, impurity profile.
11    Q    I understand.  My question was bio
12 equivalence can be established in having impurity
13 profiles that match as between the reference listed
14 drug and the generic applicant, correct?
15    A    No, I didn't say that.
16    Q    Then answer the question.
17    A    Repeat your question please.
18    Q    Sure.  I said that a generic drug
19 manufacturer can meet FDA requirements for bio
20 equivalence without having an impurity profile that
21 matches the impurity profile of the reference listed
22 drug.
23    A    The generic manufacturer can establish
24 bio equivalence or a synthetic process irrespective
25 of whether they have -- what kind of impurities they

Page 21

1 have.  They could have harmful impurities, they
2 could have harmless impurities, and they can still
3 establish bio equivalence, but that's irrespective
4 of what kind of impurities they have.
5    Q    Does the Food, Drug, and Cosmetic Act
6 contain a definition of an adulterated product?
7         MR. NIGH:  Form.  Outside the scope.
8    A    To me, adulterated products are
9 products that have been contaminated.
10    Q    Well, I appreciate your definition,
11 but I'm really not interested in it.  My question
12 was, does the Food, Drug, and Cosmetic Act contain a
13 definition of what constitutes adulterated product?
14    A    Yes, they do.
15         MR. NIGH:  Hold on.  Hold on.  Object
16 to the colloquy.  It's inappropriate.  You can
17 answer.
18    A    Adulterated products are products that
19 are mislabeled.  They don't have proper label and
20 they could have toxic impurity in it, either
21 intentionally or inadvertently, and they could be
22 called adulterated.
23    Q    Have you ever read the definition of
24 an adulterated drug product under the Food, Drug,
25 and Cosmetic Act?

6 (Pages 18 - 21)

Page 22

1    A    Yes, I have.
2    Q    Are you familiar with the definition
3 under Section 351 of the Food, Drug, and Cosmetic
4 Act?
5    A    I haven't looked at it exactly today,
6 but I am familiar with that.
7    Q    Section 351 defined an adulterated
8 drug as one where its strength differs from or its
9 quality impurity fall below the standards set forth
10 in the compendium.
11    A    I agree with that.
12       MR. NIGH:  Hold on.  Was there a
13 question?
14       MR. TRISCHLER:  There was.
15    A    You just read the definition.
16    Q    Right.  And you would agree with that
17 definition, right?
18       MR. NIGH:  Form objection.  Outside
19 the scope.
20    Q    You agree with that definition, sir?
21    A    If you're reading it from the regs,
22 yes.
23    Q    And where there is a USP monograph,
24 any article marketed in the United States must meet
25 the requirements and specifications of the

Page 23

1 monograph.  Agreed?
2    A    Would you repeat your question?
3    Q    Sure.  Where there is a USP monograph,
4 any drug product marketed in the United States must
5 meet the requirements and specifications of that
6 monograph?
7    A    USP drug is the minimum requirement
8 that is required, absolute minimum.  Manufacturers
9 are required to go above and beyond those
10 requirements.
11    Q    Are they required to meet -- where a
12 monograph exists and applies, are manufacturers
13 required to meet their specifications of the
14 monograph?
15    A    You spoke too fast.  You got cut out.
16 Could you repeat?
17    Q    I'll try.  Where there is a USP
18 monograph that applies to a drug product are
19 manufacturers required to meet those specifications
20 and criteria in the monograph?
21       MR. NIGH:  Objection.  Asked and
22 answered.
23    A    I answered that question already.  USP
24 monograph is the minimum standards and manufacturers
25 are required to go above and beyond that.

Page 24

1    Q    Can you cite me an authority for the
2 proposition that you just stated, that the USP
3 monograph is a minimum standard?  Where is that
4 specified anywhere in the public literature?
5    A    I can't put my fingers on it right
6 now, but I can look it up for you and show you.
7    Q    Well, we'll take multiple breaks
8 during this day and so I'd like you to find me --
9    A    I will.
10    Q    Let me finish, please.  Can I finish,
11 please?
12    A    Absolutely.
13    Q    Sir, this is really difficult if we
14 talk over one another.  I'll do my best not to talk
15 over you, but please let me finish my statement and
16 my question.
17       I'd like you to cite for me the authority for
18 that novel proposition that you just offered, because
19 I've not seen it.
20    A    I will.
21       MR. NIGH:  Hold on.  Hold on.  Hold
22 on.  Form objection and now I would object to
23 whatever exercise there is that is supposed to do
24 something during the breaks while he's trying to
25 take restroom breaks.  We are going far outside the

Page 25

1 scope of his opinion and he has authority in his
2 expert report if you want to read his certification.
3    A    Sir, can I respond to that question?
4 I think that I can refer you to USP's website and
5 under, basically, overview, USP monograph basically
6 articulates that there is a minimum quality
7 standards and the companies have to go above and
8 beyond that.
9    Q    So I will find that on USP website?
10    A    You should able to find that on USP
11 website, usp.com.  Go to about USP and you should be
12 able to find that.
13    Q    Will I find that requirement posted
14 anywhere else?
15    A    I don't know.  I'm sure there are.  If
16 you Google it, you will find it.
17    Q    Is there any requirement anywhere in
18 the USP mandating that a generic equivalent product
19 match or mirror the impurity profile of the RLD?
20       MR. NIGH:  Form objection.
21    A    There is the regs -- first of all, USP
22 is not a regulatory body.  USP is an independent
23 company.  The regs are clear.  There is the concept
24 of sameness, chemical equivalents, active
25 equivalents, impurity equivalents, and there is the

7 (Pages 22 - 25)

Page 26

1 concept of bio equivalents, therapeutic equivalents.
2 I can't comment on a lot of those things because I
3 am not a physician, but those are all spelled out in
4 the regs and you can look that up.
5      Q    Where is the requirement for what you
6 call chemical equivalent, where is that term used in
7 the Food, Drug, and Cosmetic Act or the regulations
8 of the FDA?
9      A    It's cited in my report, sir.
10     Q    No, it's not.  You don't provide any
11 citation for what constitutes chemical equivalents
12 in your report.
13          MR. NIGH:  Objection.  Hold on.  I
14 don't know if that was a question.
15     A    I responded to your question.
16     Q    Show me in your report --
17     A    Look at my report.
18     Q    Show me in your report where there is
19 a regulatory definition of what you just called
20 chemical equivalence.  You can look at your -- take
21 your time.  Look at your report and show me where
22 there is a definition of chemical equivalence either
23 in Food, Drug, and Cosmetic Act or regulations in
24 the FDA or in any guidance in the FDA, for that
25 matter.

Page 27

1      A    Okay.  Hang on one second.  I've got
2 to get the report from my desk.
3          THE VIDEOGRAPHER:  Would you like to
4 go off the video record or would you like to stay
5 on?
6          MR. TRISCHLER:  I don't care.
7      A    Okay.  I'm back.  Sorry.  I put this
8 on my computer.  Basically, the generic drug
9 manufacturers have an ongoing federal duty of
10 sameness in their product and their reference is
11 reference No. 2.  What that refers to is that the
12 identity of the active ingredients need to be
13 exactly the same.  The chemical synthesis of the
14 actual ingredients need to be the same.  And also,
15 this refers to the impurities that are present need
16 to be impurities that are either established by the
17 brand, established by the USP or impurities that are
18 established by the generic manufacturers; and those
19 impurities, if the generic is using exactly the
20 brand chemical procedure, if they are using the same
21 recipe with the same, basically, various ingredients
22 that they're using; different intermediates,
23 different reagents, if they are using the same, then
24 they should expect to have the same chemical
25 impurities.

Page 28

1          If they are modifying the chemical procedure,
2 in which case in the case of your clients they are
3 modifying their brand's chemical procedure, then they
4 should expect a different chemical impurities.  And
5 because they are modifying those chemical procedures
6 and the reagents, then they have an obligation to
7 identify those impurities and determine that they are
8 not genotoxic.
9          It's a very long winded question to my,
10 basically, one paragraph.  It's No. 18 in my expert
11 report.
12          MR. TRISCHLER:  Object and move to
13 strike as nonresponsive.
14     Q    Do you remember what they question
15 was?
16          MR. NIGH:  Hold on.  This has already
17 been discussed that it's inappropriate during the
18 deposition.  It's already been ruled on to object as
19 nonresponsive.  The colloquies that you're giving,
20 Mr. Trischler, have been ruled on previously as
21 inappropriate.
22          You've also threatened sanctions.
23 That's also been ruled on as being inappropriate.
24 These are all the things that the defendants argued
25 that Mr. Slater was doing that was inappropriate and

Page 29

1 now you're doing it yourself after Judge Menaski
2 ruled that all these issues are inappropriate.
3 We've got to put some brakes on this.
4          MR. TRISCHLER:  Are you done with your
5 speech, Daniel?  I just asked him.
6          MR. NIGH:  No, no, no, no.  You can't
7 ask him --
8          MR. TRISCHLER:  All I am asking is if
9 he remember --
10          MR. NIGH:  You can't move to strike.
11 It's inappropriate, and the combativeness with this
12 witness is completely inappropriate.  It's not just
13 the speech.  We can have a conversation with the
14 judge if we need to.
15          MR. TRISCHLER:  Are you done?
16          MR. NIGH:  No, I'm not done.  I don't
17 think you're recognizing it.  You're doing so many
18 inappropriate things.  We have to not do this.  You
19 can't badger this witness.
20          MR. TRISCHLER:  If you need to call
21 the judge, go ahead.  I welcome it.
22          MR. NIGH:  Okay.
23          MR. TRISCHLER:  I welcome it.
24          MR. NIGH:  Are you going to keep doing
25 the things you're doing?

8 (Pages 26 - 29)

Page 30

1    MR. TRISCHLER:  Because I would love
2  the judge to read this transcript.
3    MR. NIGH:  Do you have every intention
4  to keep threatening for sanctions?  Do you have
5  every intention to keep moving to strike as
6  nonresponsive, because if you do, then we might as
7  well call the judge now, because he's already ruled
8  that that's inappropriate.
9    MR. TRISCHLER:  I have already
10  intention of asking relevant questions and I'm
11  hoping to get some responsive answers to those
12  questions.
13    MR. NIGH:  Okay.  Well, I hope that
14  you stop moving to strike as nonresponsive and
15  threatening sanctions.
16    MR. TRISCHLER:  If you want to call
17  the judge, I'd welcome it, because I would love for
18  him to have the opportunity to read this transcript.
19    A    Please repeat your question.
20    Q    You used the term "chemical
21  equivalents" and suggested that generic
22  manufacturers have an obligation to establish
23  chemical equivalents and my question to you, sir,
24  was where in the Food, Drug, and Cosmetic Act or the
25  regulations of the FDA is the term "chemical

Page 31

1  equivalents" anywhere defined and where would that
2  requirement be established?  That was what led you
3  to look at your report.  That's the question that
4  I'm looking for an answer to.
5    A    Okay.  Let me go back to my report
6  again, okay.  So I'm going to read back from my
7  report, okay.  Generic drug manufacturers have an
8  ongoing federal duty of sameness in their product,
9  reference No. 2.  The generic manufacturers must
10  demonstrate that their active ingredients are -- and
11  have identical strength quality, purity -- I
12  underlined that purity -- and potency and were
13  applicable other characteristics as the reference
14  listed drug.
15      (Clarification requested by the
16    reporter.)
17    A    I will repeat.  Generic drug
18  manufacturers have an ongoing federal duty of
19  sameness, meaning equivalence, in their products.
20  The generic manufacturers must demonstrate that
21  their active ingredients -- in this case active
22  compounds, the compound that's responsible for its
23  therapeutic potential -- are the same as reference
24  listed drug.  "Same" here, Mr. Trischler, means
25  identical; identical chemical structure, identical

Page 32

1  molecular weight, identical to every sense of
2  chemical sense.  They should have same strength,
3  same quality, purity.
4    Purity here refers to the chemical purity of
5  the drug and the impurity profiles of those drugs;
6  and both potency.  And potency is really a function
7  of, you know, excipients and what excipients it's in
8  and whether it's going to be released properly.
9    So you get into a -- you know, I could talk
10  about this for a couple hours, but that's what that
11  is.  And I'm referencing No. 2, No. 3, No. 4, these
12  are basically the regs that are there.
13    And the regs, as you well know, are vague
14  enough and that can be -- you know, they are really
15  the minimum standards.  You know there is a concept
16  that they say CGMP.  C talks about current good
17  manufacturing practices and "current" means the
18  highest technology, technologies, of today; and the
19  generic are responsible to living up to that standard
20  of the latest standards.
21    I hope -- that was a long answer to your
22  question.  I hope that I answered it.
23    Q    It was long.  It was not an answer to
24  the question, but I'll ask it again.
25    A    Well, you know, that's my answer.  If

Page 33

1  you want, I can repeat the same thing that I just
2  gave you.
3    Q    If you could stop talking for a
4  minute, I'll try to ask another question.  What you
5  read from was paragraph 18 of your report, correct?
6    A    Correct.
7    Q    In paragraph 18 the words "chemical
8  equivalent" never appear, do they?
9    A    Chemical equivalents --
10    Q    Do the words chemical equivalent
11  appear?
12    MR. NIGH:  No, no, no, no, no, no, no,
13  no.
14    Mr. Trischler, he was clearly not
15  finished with his answer there.  No, no, no.  That
16  is completely inappropriate.  You can finish your
17  answer, Dr. Najafi.
18    MR. TRISCHLER:  He has to answer it
19  first and then he can --
20    MR. NIGH:  No, he does not.  Let him
21  answer the question.  Let him answer the question.
22  That's completely inappropriate.
23    MR. TRISCHLER:  Now you're saying he
24  can't answer the question?
25    MR. NIGH:  You're interrupting the

9 (Pages 30 - 33)

Page 34

1 witness over and over and over again. He was not
2 done and he was starting to answer your question.
3 He got two words out and you interrupted him; two
4 words out. The video record is very clear on this.
5      MR. TRISCHLER: You just said he
6 doesn't have to answer the question. That's what
7 you just said.
8      A    No, I did not say he doesn't have to
9 answer the question. I said he doesn't have to
10 answer it in the way that you want him to answer it
11 at the very beginning of the answer.
12      MR. TRISCHLER: Let's try it again.
13      MR. NIGH: How about you ask the
14 question and don't interrupt him, please.
15      MR. TRISCHLER: Let's try again.
16      MR. NIGH: That's pretty
17 inappropriate.
18 BY MR. TRISCHLER:
19      Q    Do the words "chemically equivalent"
20 appear anywhere in paragraph 18 of your report?
21      A    The word "equivalence" doesn't need to
22 appear in No. 18. Sameness is chemical equivalence.
23      Q    Is there a definition of chemical
24 equivalence in the Food, Drug, and Cosmetic Act?
25      A    I don't know.

Page 35

1      Q    Is there a definition of chemical
2 equivalence in the regulations established by the
3 FDA?
4      A    I don't know.
5      Q    Is there a -- you used the term
6 "impurity equivalence." Is there a definition of
7 impurity equivalence under the Food, Drug, and
8 Cosmetic Act?
9      A    The definition I just read, it's
10 the -- regs are clear the active ingredients need to
11 be the same. They need to be identical. The
12 quality, purity; you know, the identity of the drug
13 needs to be identical; potency, those are what
14 chemical equivalence is referring to. Perhaps I'm
15 not giving you the answer you like to hear, but
16 that's the answer.
17      Q    Is impurity equivalence a defined term
18 under the Food, Drug, and Cosmetic Act?
19      A    I gave you my answer, you know. You
20 have to have -- you know, the purity profile need to
21 have -- you either following the brand procedure
22 and recipe, then you're going to end up with the
23 same impurity profile. If you're not following the
24 brand's procedure, you're going to end up with
25 different impurity profile. Those impurities can be

Page 36

1 safe, can be harmful.
2      Q    Sir, I didn't ask you any of that.
3 All I simply asked you is you used the term
4 "impurity equivalence" earlier in your testimony and
5 my question is the term impurity equivalence a
6 defined term under the Food, Drug, and Cosmetic Act?
7      A    I have to -- you know, I can look that
8 up during the break and get back to you.
9      Q    Do you know if the term impurity
10 equivalence is defined in the FDA regulations or FDA
11 guidance?
12      A    Purity profile is the same. You know,
13 basically you have to have -- you know, I responded
14 to the question. You're either following the
15 brand's recipe and you get the same purity/impurity
16 profile and the same purity or you're not following
17 brand's procedure.
18      If you're not following brand's procedure
19 you're going to get a different impurity profile and
20 those impurity profiles could have genotoxic compound
21 in it and it could be non-genotoxic compound in it.
22      Q    Not my question again, sir. My
23 question was simply do you know whether the term
24 that you used "impurity equivalence" is a term that
25 is defined in any FDA guidance document or FDA

Page 37

1 regulations?
2      A    It may --
3      MR. NIGH: Hold on. Form objection.
4 Just give a little bit of time between his question
5 and your answer, because I may have an objection,
6 form objection. You can answer.
7      A    It may or may not.
8      Q    Does FDA ever establish a requirement
9 that a drug manufacturer identify all impurities in
10 its drug label?
11      A    Would you repeat your question?
12      Q    Is there any FDA requirement for a
13 drug manufacturer to identify all impurities in its
14 drug label?
15      A    There is a requirement that the
16 manufacturers identify all impurities that are
17 greater than certain percentage, and also there is a
18 requirement that the manufacturers identify any
19 potential genotoxic impurities. And typically those
20 are considered impurities of concern because of
21 their genotoxicity and those impurities are
22 predetermined or pre -- sort of predicted by the
23 expert chemist at the manufacturers based on certain
24 ingredients and based on certain chemical structures
25 that may be used.

10 (Pages 34 - 37)

1    Q    You know what I mean by labeling?
2    A    Please define it.
3    Q    Labeling is a defined term under the
4 Food, Drug, and Cosmetic Act. Are you familiar with
5 the FDA definition of the term?
6    A    Why don't you give me the FDA
7 definition.
8    Q    I don't have it in front of me, but
9 for purposes of today I'm talking about the full
10 prescribing information provided to prescribers and
11 patients when their drug is dispensed. Okay?
12    A    Right.
13    Q    Do manufacturers identify impurities
14 in their FDA-approved labeling?
15    A    They do. Manufacturers do identify
16 impurities --
17    Q    Okay.
18    A    -- in their drug.
19    Q    As part of your work in this case, did
20 you review the Diovan labeling?
21    A    No, I haven't.
22    Q    Have you reviewed the Exforge
23 labeling?
24    A    No, I haven't.
25    Q    I think I sent some potential exhibits

1 ahead of time to the court reporter that we
2 premarked. I think I premarked Exhibit 13 as a
3 Diovan label.
4    A    I was told -- I got a piece of mail
5 here. I was told not to open it until you guys
6 instruct me. Is that the one you want me to open
7 it?
8    Q    No, I didn't ask you to open anything.
9    A    Okay. You want me to open it?
10    Q    No. I have no idea what you're
11 talking about. I didn't ask you to do anything.
12        MS. HILTON: Just for the record,
13 Clem, this was something that John Giselson and the
14 Aurobindo counsel had sent to Dr. Najafi and
15 instructed him not to open it. So Dr. Najafi, I
16 think, continue to keep that box unopened until
17 Mr. Giselson and the lawyers for Aurobindo question
18 you.
19 BY MR. TRISCHLER:
20    Q    What we marked as Exhibit 13 is a copy
21 of the FDA approved labeling for Diovan.
22    A    Okay.
23    Q    Have you ever seen this before, sir?
24    A    Could you make it bigger?
25        THE VIDEOGRAPHER: Sir, we just lost

1 your video feed.
2        MR. NIGH: Is this document going to
3 also be disclosed, because he can look at the full
4 label and I don't see it here yet in the share file.
5        MR. TRISCHLER: Frank -- hold on a
6 second. I'm talking to Frank Stoy from my office
7 who I also think is listening in. Frank, why don't
8 you put in the chat all the things that we
9 premarked.
10    A    I can't see this. I need to print
11 this. So if you could email it to me, Daniel or
12 Rosemarie, that would be great. I can print it so I
13 can look at it. I can't read it.
14        MR. STOY: I could try to draw up
15 these documents in the chat as we use it. There is
16 also a share file link that I think Layne just put
17 in the chat where, Dr. Najafi, you should be able to
18 download the exhibits as they're marked.
19        THE WITNESS: Great.
20 BY MR. TRISCHLER:
21    Q    So you can't see this, is that what
22 you're telling me?
23    A    I can't see it, no. I have a -- it's
24 very small on my screen.
25    Q    Well, then I guess --

1    A    What are you referring to?
2    Q    Well, I guess -- hold on. I guess we
3 need to take a break until you can see it.
4        THE VIDEOGRAPHER: Going off the
5 record, yes?
6        MR. TRISCHLER: Yes.
7        THE VIDEOGRAPHER: The time is 9:58.
8 This concludes Media 1.
9        (A recess was taken.)
10        (After the recess the following
11 occurred:)
12        THE VIDEOGRAPHER: The time is now
13 10:14. We are back on the video record. This
14 begins Media 2. And counsel, would you like me to
15 put the document that was on the screen up again?
16        MR. TRISCHLER: Yes, please.
17 BY MR. TRISCHLER:
18    Q    Doctor, earlier we had talked about
19 the definition of "adulterated" under the Food, Drug
20 and Cosmetic Act. Would you agree with me that the
21 term "misbranded" is also defined under the statute?
22        MR. NIGH: Objection. Scope.
23    A    Would you repeat your question?
24    Q    Is the term "misbranded" defined in
25 the Food, Drug, and Cosmetic Act?

11 (Pages 38 - 41)

Page 42

1          MR. NIGH:  Objection to form.
2     A     Yes, I believe it is defined.
3     Q     And under the Food, Drug, and Cosmetic
4  Act a drug is deemed misbranded when its labeling
5  proves to be false or misleading.  Can we agree on
6  that definition?
7          MR. NIGH:  Objection.  Scope.
8     A     I agree that a misbranded drug
9  contains something that shouldn't be there.
10    Q     Is that your definition or are you
11 suggesting that's the definition provided in the
12 Food, Drug, and Cosmetic Act?
13         MR. NIGH:  Objection.  Form.
14    A     A misbranded drug is a drug that has
15 false or misleading label.
16    Q     Okay.  Thank you.  So now we are
17 looking at the labeling for Diovan.  I have marked
18 it as Exhibit 13.  Are you now able to see it?
19    A     Yes.  I have it on my second monitor
20 here so I can actually see it.  I am going to be
21 looking at my own version, but I have it.  I am
22 looking at the same area.
23    Q     All right.  And can you go through
24 this -- the label that we marked as Exhibit No. 13
25 and tell me where Novartis discloses the impurities

Page 43

1  in its Diovan product?
2     A     Okay.  Let me look.
3          MR. NIGH:  Objection.  Scope.
4     A     So Novartis does not mention this
5  particular genotoxic impurities, because their
6  product didn't have any.
7     Q     That wasn't my question.  My question
8  was where do they list any impurities.
9          MR. NIGH:  Form objection.  Scope.
10    A     This is not the place where they would
11 list their impurities.
12    Q     Is there any requirement that
13 impurities -- that a drug manufacturer list
14 impurities in its label, FDA labeling?
15         MR. NIGH:  Objection.  Scope.
16    A     I don't think there is any
17 requirement, per se, to list it.  You know, if
18 you're looking at this label, you know, the only
19 thing you see is the active compound.
20    Q     And that's my question, sir.  Does any
21 drug manufacturer list or identify impurities in its
22 labeling?
23         MR. NIGH:  Objection.  Scope.
24    A     I don't believe they do, but they need
25 to file it with the FDA.  They need to let FDA know.

Page 44

1  They need to disclose it on their batch record.
2  They need to identify it, all their degradation
3  products, and disclose it to the FDA in their
4  filing.
5     Q     In their -- sorry.  I thought you were
6  finished.  Well, that's true in part, but isn't it
7  also true that all -- that there is an allowance for
8  unknown and unidentified impurities in every drug
9  product made and sold in America?
10         MR. NIGH:  Was that a question?
11         MR. TRISCHLER:  Yes, sir.
12         MR. NIGH:  Objection.  Scope.
13    A     What was your question?
14    Q     I said isn't it true that there is an
15 allowance for unknown impurities in every drug
16 product?
17         MR. NIGH:  Objection.  Scope.
18    A     There is an allowance for unknown
19 impurities for every drug, provided they are not
20 genotoxic.
21    Q     And prior to June of 2018, can we
22 agree that there was no requirement established by
23 the FDA or specified in USP for nitrosamine-specific
24 testing?
25         MR. NIGH:  Objection.  Scope.

Page 45

1     Q     Are you referring to particular
2  valsartan drug?
3     A     No, I'm talking about any drug.  I
4  said prior to June of 20-- 18, are you aware of any
5  requirement that was established by the FDA or
6  specified in USP that required nitrosamine-specific
7  impurity testing.
8          MR. NIGH:  Objection.  Scope.
9     A     So my answer is genotoxic compounds
10 need to be identified per the ICH guideline M7, and
11 I refer you to that.  They need to be identified and
12 they need to be reported and they need to be
13 controlled and managed and, you know, the whole
14 nine yards.  And yes, they would have to be -- they
15 would have to be measured and by various
16 instrumentation:  GC, GCMS, LCMS, they need to know
17 the amount; and there was a limit on the amount
18 allowable for various impurities genotoxic
19 impurities, I should say.
20         UNIDENTIFIED SPEAKER:  Excuse me,
21 counsel.  Are you in need of another court reporter
22 or are you all set, Michelle?  I was just told to
23 join the meeting.
24         (Off the record.)
25    Q     Do you know what the acceptance

12 (Pages 42 - 45)

Page 46

1  criteria was for impurities under the valsartan USP
2  monograph in the summer of 2018?
3       MR. NIGH: Objection. Form.
4       Q   The acceptance criteria was to produce
5  the active compound and have impurities that are
6  safe, that are inert and have a safe drug. That was
7  the requirement, and there were impurities that were
8  listed that could potentially be formed and those
9  impurities are typically impurities that the brand
10 discloses to the USP or USP also, you know, acquires
11 it through their own research.
12      MR. TRISCHLER: Can you put up what
13 was premarked as Exhibit 17, please.
14      A   Okay.
15      Q   Have you seen this document before,
16 sir?
17      A   Hang on a second. Let me -- this is
18 you is -- yes I have.
19      Q   What is it?
20      A   It's a USP, you know, monograph for
21 the -- basically, limits of different impurities and
22 different -- you know, the acceptance criteria from
23 USP's point of view.
24      Q   And what's the acceptance criteria for
25 impurities under the USP standards as set forth in

Page 47

1  Exhibit 17?
2       MR. NIGH: Objection. Scope.
3       A   The acceptance criteria is to have,
4  you know, basically each total -- each individual
5  impurities not basically greater than .2 percent or
6  not important .2 or .4, various impurities that are
7  listed, and that would be the accepted criteria.
8       Q   If you go to the next page of
9  Exhibit 17, in particular Table 1, it lists the
10 specification and acceptance criteria for unknown
11 impurities is 0.1 percent, correct?
12      MR. NIGH: Objection. Scope.
13      A   Let me. Are you -- okay. Thank you
14 for making it bigger. So, yeah. As you can see
15 from this impurity profile, there is no genotoxic
16 impurity mentioned here.
17      Q   I didn't ask you that, sir. I said,
18 what's the acceptance -- was the criteria in the USP
19 monograph for unknown impurities 0.1 percent.
20 That's the only question I asked.
21      MR. NIGH: Form objection. His answer
22 was responsive and I object to the colloquy. You
23 could answer.
24      A   The acceptance criteria presupposes
25 that the compound in question has no genotoxic

Page 48

1  compound such as NDMA or NDEA, presupposes.
2       Q   Where does it say that in the USP
3  monograph?
4       A   You don't see that on the screen. If
5  it was part of the impurity profile, it would have
6  been mentioned. Since it's not, it means it
7  shouldn't have any.
8       Q   Today in 2021 what does the USP for
9  valsartan provide as to the impurity acceptance
10 criteria?
11      MR. NIGH: Objection. Scope.
12      A   I haven't looked at the latest -- I
13 don't have access to that document but, you know, it
14 presupposes there is no genotoxic compound in
15 valsartan.
16      Q   I'm puzzled by that, sir. Where is it
17 written anywhere in regulations, guidance or USP
18 acceptance criteria that these numbers presuppose no
19 genotoxic impurities; does anyone say that other
20 than Ron Najafi?
21      MR. NIGH: Object to the colloquy and
22 object to scope.
23      MR. TRISCHLER: There was no colloquy.
24 That was a question.
25      MR. NIGH: No, but beginning part of

Page 49

1  that question started out with, "I'm puzzled." That
2  is a colloquy.
3       Q   So this -- I will ask it again, sir.
4  This idea that these acceptance criteria presuppose
5  that there is no genotoxic impurities, where is that
6  coming from?
7       MR. NIGH: Objection.
8       Q   Where --
9       MR. NIGH: Form objection.
10      Q   Where is that?
11      MR. NIGH: Sorry. Scope.
12      A   I refer you to USP website and
13 specifically there is a specific mention that for
14 impurities known that are suspected carcinogen that
15 are toxic, that are genotoxic, a quantitation and
16 detection limit shall be established. This is USP.
17 It is ICH guideline, ICH M7. It's FDA. You know,
18 if you want me, I can specifically cite you page and
19 the language during the break.
20      Q   We don't have to. I would like that,
21 but we don't have to do it right now, because during
22 the last break I did some homework and I would ask
23 you to take a look at Exhibit 27. This is the USP
24 website you were telling me about, right?
25      A   Right.

13 (Pages 46 - 49)

Page 50

1      MR. NIGH:  Objection to the colloquy.
2      Q    And you said this is the site where I
3  can go to where there is going to be a statement and
4  public pronouncement that the USP specifications are
5  minimum standards, so look at Exhibit 27 and tell me
6  where it says that, sir.
7      MR. NIGH:  Form objection.  Outside
8  the scope.  Mischaracterizes his testimony.  You can
9  answer.
10     A    I am not sure what you found on USP
11 website, if you found the right page, but I will
12 point that to you later.
13     Q    I'm asking you to take a look at
14 Exhibit 27 and tell me if there is anything on
15 Exhibit 27 that suggests that the USP monographs
16 specifications are minimum standards.
17     A    So, specifically monograph articulates
18 the quality expectation for medicines, including for
19 its identity, strength and performance.  They are
20 also described a test to validate that in medicine
21 that its ingredients meet these criteria and
22 basically, I would have to do my own search to show
23 you that specific language.  I'm not sure if you
24 have it in the documents you gave to me.
25     Q    Exhibit 27 is a multipage document.

Page 51

1  Do you want to look at the whole thing and see if
2  there's anything in there to suggest that USP
3  requirements are minimum standards?
4      A    If you give me a second, I will look
5  it up for you.
6      Q    Sure.  Let's go off the record.
7      A    Let's go off line.
8      MR. NIGH:  Hold on.  What are you
9  looking up at this point, Dr. Najafi, the exhibit?
10 You're looking at the exhibit or you're looking it
11 up online?
12     THE WITNESS:  No.  I want to go online
13 and look up something for him.
14     THE VIDEOGRAPHER:  Are we all okay to
15 go off the record?
16     MR. TRISCHLER:  Yes.
17     MR. NIGH:  No.  Do you want him to go
18 online and look this up for you, Mr. Trischler?
19     MR. TRISCHLER:  The witness said he
20 wants to, so let's go off the record and we will
21 come back when he's ready.
22     THE VIDEOGRAPHER:  The time is 10:32.
23 We are going off the video record.
24     (A recess was taken.)
25     (After the recess the following

Page 52

1  occurred:)
2      THE VIDEOGRAPHER:  The time is 10:46.
3  We are back on the video record.  You may proceed.
4  BY MR. TRISCHLER:
5      Q    Okay.  We just took a break.  Doctor,
6  you said that you wanted to take some time to review
7  some material.  Have you had the chance to do that?
8      A    Okay.
9      Q    Have you had the chance to look at
10 whatever it was?
11     A    Yes, I did.  I did.
12     Q    Hold on.  That's the only question I
13 asked you right now.  Did you talk to anyone while
14 we were on that break?
15     A    No, I didn't.
16     Q    You reviewed while we were on that
17 break?
18     A    Yes.
19     MR. NIGH:  It wasn't really a break
20 for Dr. Najafi.
21     Q    What did we review at the time we went
22 off the record at your request?
23     A    I looked at the USP website.
24     Q    Okay.  And did you find anything on
25 the USP website suggesting that the USP monographs

Page 53

1  were minimum standards?
2      A    So I looked at exact same page that
3  you're looking at, which is USP.org.  It's about USP
4  public policy overview of monograph.
5      Q    Did you find anything on that website
6  that we marked the pages of which we marked
7  Exhibit 27 that indicate the USP monographs are
8  minimum standards?
9      MR. NIGH:  Form objection.  That
10 document is just one small part of the entire
11 USP.org.  You can see the site map which has much
12 more than this little snippet from the website.
13     MR. TRISCHLER:  Is that a proper
14 objection?
15     MR. NIGH:  It actually is, because you
16 misrepresented the document, so absolutely it is.
17     MR. TRISCHLER:  You know better.
18     MR. NIGH:  No.  You misrepresented the
19 document in your question just now.
20     Q    Sir, I'm just asking you to tell me
21 where it is published that USP monographs are
22 minimum standards.  You made that representation.
23 Where is it published?
24     A    Yes.  So I would like to point you to
25 No. 1 where it says (1) monograph in your exhibit.

14 (Pages 50 - 53)

Page 54

1  Monograph articulates the quality expectations,
2  quality expectations to anybody familiar with the
3  art; art of synthesis and manufacturing.  It means
4  minimum expectation.  That's my understanding and
5  that's my pure understanding.
6      Those quality expectations, it's like, you
7  know, just like the bar that you have to have, you
8  know, and that's a starting point for a medicine
9  including for its identity, strength, purity,
10 performance.  They also describe the tests to
11 validate and so forth and so on, which is all -- you
12 can read it as well.  That's the minimum standard.
13     Q     And so if we go back to the monograph
14 itself which we had previously marked, I think, as
15 Exhibit 17, you remember the table told us that
16 under that -- it is the next page.  Thank you.
17     The table told us that the acceptance criteria
18 for unknown impurities was 0.1 percent, right?
19     A     Right.
20     Q     And 0.1 percent, that translates to
21 about 1,000 parts per million, right?
22     A     Right.
23     Q     And if we're talking about a 320
24 milligram tablet and we wanted to convert that to
25 nanograms, that would be about 320,000 nanograms,

Page 55

1  right?
2      A     Yes.
3          MR. NIGH:  Objection.  Scope.
4      Q     So, according to USP, whether it's
5  standards or minimum, maximum or something in
6  between, it's acceptable to have a drug product with
7  unknown impurities of as high as 320 nanograms in a
8  320-milligram tablet, right?
9          MR. NIGH:  Objection.  Scope.
10     A     USP also refers you to ICH guidelines
11 and genotoxic guidelines, and those genotoxic
12 compounds could be as low as, you know, zero.
13     Q     But it could be as high as 320,000
14 nanograms?
15     A     Could be as high as that level, but
16 the drug would not probably get approved.
17     Q     Well, it would meet USP acceptance
18 criteria, right?
19     A     No, it wouldn't.
20     Q     An unknown impurity -- we just went
21 through the table.  An unknown impurity in a
22 320-milligram drug product can be as high as 320,000
23 nanograms, right?
24     A     Unknown impurities that are not
25 genotoxic can be as high as, you know, 300,000

Page 56

1  nanograms.  If they are genotoxic, no.
2      Q     I am going to switch gears for a
3  minute.
4      A     And you can refer you to my reference
5  on ICH guideline M7.
6      Q     I didn't even ask you a question.
7      A     It's part of the previous question.
8      Q     You told me at the beginning of this
9  deposition that you'd been retained in the valsartan
10 MDL to offer expert testimony right?
11     A     Yes.
12     Q     Do you remember when you were first
13 retained in the valsartan matters?
14     A     Repeat your question, please.
15     Q     Do you remember when you were first
16 retained in the valsartan matters?
17     A     I think I was retained sometime in
18 2019; October, maybe September, October 2019.
19     Q     Can you identify the plaintiff's
20 lawyer or lawyers who retained you?
21     A     Yes.
22     Q     Can you identify them?
23     A     They're on the phone.  They're on the
24 Zoom.
25     Q     Well, I'd like you to tell me their

Page 57

1  names, please.
2      A     Daniel, Rosemarie and Brad.
3      Q     Daniel Nigh -- for the record, Daniel
4  Nigh, Rosemarie -- what is Rosemaries' last name?
5      A     Bogdan.
6      Q     And who is the third person you
7  mentioned?
8      A     Brad Vaughn.
9      Q     I'm sorry.  Did you say Vaughn?
10     A     Yes.  It's the firm Pendley Bovin &
11 Hoffman, I think, or --
12     Q     All right.  Have you also been
13 retained by plaintiff's counsel as a consultant in
14 the ranitidine MDL?
15         MR. NIGH:  Hold on.  I am going to
16 instruct him not to answer.
17         MR. TRISCHLER:  Can I ask on what
18 basis?
19         MR. NIGH:  Actually, we have disclosed
20 an opinion, so you can ask him.  Go ahead.
21     Q     Have you also been retained as a
22 plaintiff's consultant in the ranitidine MDL?
23     A     I have been retained as a consultant
24 in the ranitidine matter.
25     Q     And in this litigation, the valsartan

Page 58

1  cases, do you understand that claims have been
2  brought against -- well, strike that.
3      Let me ask you this first:  In the ranitidine
4  litigation, do you understand that claims have been
5  brought against brand and generic manufacturers based
6  on the presence of nitrosamines in
7  ranitidine-containing products?
8      A  Could you repeat your question?
9      Q  Sure.  In connection with your work in
10  the ranitidine litigation, I'm simply asking you if
11  you have an understanding that in that lawsuit there
12  have been claims brought against both brand and
13  generic drug manufacturers based on the presence of
14  nitrosamines in drugs made by both brand
15  manufacturers and generic.
16      A  I believe so.
17      Q  Do you know how many drug
18  manufacturers and drug suppliers have been sued by
19  plaintiffs in the ranitidine MDL stating their
20  products contain nitrosamines?
21      A  There are many, many.  I can't tell
22  you.
23      Q  Is the number more than 75?
24      A  I don't think so.
25      Q  More than 65?

Page 59

1      A  I don't think so.
2      Q  More than 50?
3      A  I don't think so.
4      Q  Can you give me an estimate of how
5  many drug manufacturers and drug suppliers you
6  understand to be part of that case?
7      A  Probably a dozen.
8      Q  Do you know how many drug
9  manufacturers and drug suppliers are part of this
10  case, the valsartan MDL?
11      A  I don't, perhaps a dozen.
12      Q  In addition to the ranitidine MDL and
13  this lawsuit, is it true you're also working for
14  plaintiffs' lawyers in the metformin MDL?
15      MR. NIGH:  Form objection.  I am going
16  to instruct him not to answer.
17      MR. TRISCHLER:  What's the basis,
18  Daniel, just so I have it on the record?
19      MR. NIGH:  If he is a consulting
20  witness, there is no opinion that's been disclosed
21  of metformin.
22      MR. TRISCHLER:  Well, I don't know.
23  I'm asking.  Are you suggesting he's not a disclosed
24  expert in that case?
25      MR. NIGH:  There's been no experts

Page 60

1  disclosed in the metformin litigation.
2      Q  Aside from the valsartan MDL and the
3  ranitidine MDL, are there any nitrosamine litigation
4  matters that you're working on where you have been
5  retained to offer expert testimony?
6      MR. NIGH:  And I would instruct that
7  if you were working on any other matters where your
8  expert opinion hasn't been disclosed, that you not
9  answer that question, because it's privileged.
10      Q  Can you answer that question, Doctor?
11      MR. NIGH:  Can you ask the question,
12  any other litigations where his expert opinion has
13  been disclosed?
14      MR. TRISCHLER:  I thought that was the
15  question I did ask.  Do you want me to ask it again?
16      MR. NIGH:  No, you actually didn't ask
17  that way, but if you ask that way, then we don't
18  have to worry about the privilege objection.
19      Q  Other than ranitidine and valsartan,
20  have you been retained by plaintiffs in other
21  litigation where your opinions have been disclosed
22  to provide testimony on matters relating to
23  nitrosamines?
24      A  So we are a contract lab and, you
25  know, less than 10 percent of our business comes

Page 61

1  from litigation support but, yes, we have been
2  retained by other firms regarding nitrosamines.
3      Q  And what other firms would that be?
4      MR. NIGH:  Again, was there an opinion
5  disclosed in any other litigation other than
6  ranitidine and valsartan, any expert reports?
7  Otherwise, this is privileged material and I would
8  instruct you not to answer.
9      MR. TRISCHLER:  I'm just trying to ask
10  a predicate question, whether there are any others.
11      MR. NIGH:  He just said no.  I don't
12  know if you heard him.
13      MR. TRISCHLER:  I did not.
14      A  I did not disclose any expert opinion
15  on any other matters.
16      Q  Except ranitidine and valsartan,
17  that's your testimony?
18      A  Valsartan we have not disclosed any
19  expert opinion either.  We have not finalized our
20  expert opinion as of yet.
21      Q  Well, that's news to me, because I
22  thought you did file a declaration that brings us
23  here today that contains some opinions and that's
24  what we're here to talk about.
25      In any event, I think what you're suggesting

16 (Pages 58 - 61)

Page 62

1  to me is that you may have valsartan at a later date
2  and you may have other reports and other opinions; is
3  that what you're telling me?
4      A    That's correct.
5      Q    My only question -- only thing I am
6  trying to get to the bottom of is whether there is
7  any other litigation matters involving nitrosamines
8  that you have been involved in where you've
9  disclosed an expert opinion other than ranitidine
10  and valsartan?
11     A    No.
12     Q    The company that you own and operate,
13  as I understand it, is called Najafi Pharma Inc; is
14  that right?
15     A    Najafi Pharma Inc.
16     Q    Najafi Pharma.  Sorry about that.
17     A    Same as my last name.
18     Q    Yes, and Najafi Pharma does businesses
19  as Emery Pharma?
20     A    Yes, that's correct.
21     Q    Is Najafi Pharma Inc. a corporation?
22     A    Yes, that's correct.
23     Q    Is it publicly or privately held?
24     A    It's a privately held corporation.
25     Q    Who are the shareholders of that

Page 63

1  corporation?
2      A    My wife and me.
3      Q    How much of the stock do you own?
4      A    Fifty-fifty.
5      Q    I presume your wife then owns the
6  other 50 percent?
7      A    That's correct.
8      Q    And what is her name?
9      A    Kelly Faranghi.
10     Q    Do you mind spelling that for my
11  benefit?
12     A    Sure.  It's F as in Frank
13  A-R-H-A-N-G-I -- G-H-I, and first name K-E-L-L-Y.
14     Q    Since you and Kelly are the sole
15  shareholders of Najafi Pharma Inc, I assume, then,
16  that all revenues generated after expenses go to you
17  and your wife?
18     A    That's correct.
19     Q    In connection with your work as a
20  litigation consultant in nitrosamine litigation, are
21  the fees that you generate and the income that you
22  receive paid to you through the company or is this
23  litigation work something that you do independent of
24  Emery Pharma?
25     A    No, it's paid through the company.

Page 64

1      Q    Can you tell us what total revenues
2  have been generated by Emery Pharma by your work as
3  a paid consultant for plaintiffs in nitrosamine
4  litigation?
5      A    I don't have the exact number, but
6  it's around 200.
7      MR. NIGH:  No, no, no.  Sorry.  Sorry.
8  I would object.  You can ask what percentage of his
9  revenue over the last few years, but you can't ask
10  total revenue numbers.
11     Q    Who would --
12     MR. NIGH:  If you want to ask for this
13  litigation, that's fair, but you can't ask for all
14  litigations.
15     A    No, no.
16     MR. TRISCHLER:  And that's not even a
17  proper instruction for you to give, so just keep
18  putting on the robe as well as acting as an
19  advocate.  It's improper, but it doesn't appear that
20  you're ready to stop.
21     Q    Did you -- who would have the
22  information about your company about what revenues
23  Emery Pharma has generated from work in nitrosamine
24  litigation?
25     MR. NIGH:  Again, this goes outside

Page 65

1  the scope of what is allowable.  You can ask about
2  valsartan and the revenues for valsartan, but not
3  for all nitrosamine litigations.
4      MR. TRISCHLER:  Only thing I've asked
5  for the name of a person at the company who would
6  have that information.
7      A    I have that information.
8      Q    So you know the exact dollar amount?
9  I thought you said a few minutes ago you didn't know
10  it.
11     A    No, I didn't say that.
12     Q    Let me ask about some of the records
13  that I received specific to your valsartan work.
14     MR. TRISCHLER:  Can you display what I
15  premarked as Exhibit No. 2, please?
16     A    Yes.
17     Q    Exhibit No. 2 looks to be some form of
18  a retainer agreement.  Do I understand that
19  correctly?
20     A    That's correct.
21     Q    And is this the retainer agreement
22  that confirms your engagement --
23     A    That's correct.
24     Q    You've got to let me finish the
25  question, sir; confirms your engagement as a

17 (Pages 62 - 65)

Page 66

1  litigation consultant for the plaintiffs in the
2  valsartan litigation?
3      A    That's right.
4      Q    It looks like, if we go to page 4 of
5  this exhibit, it looks like it was signed in October
6  of 2019. Do I have that right?
7      A    That's correct.
8      Q    And somewhere in here I think you
9  requested or your company requested a retainer of
10 $5,000; is that right?
11     A    I guess so, yes.
12     Q    Is that your usual retainer or would
13 that be something that was different for this case?
14     A    It varies.
15     Q    Was that retainer paid, if you know?
16     A    Yes, it had.
17     Q    And the retainer agreement says -- I
18 have to find the right spot, so bear with me.
19     A    All right.
20     Q    I'm looking at page 3, if you could
21 turn there. Thank you. There is a paragraph under
22 background and scope of work. Do you see that, sir?
23     A    Yes, I do.
24     Q    And it says you're being -- Hollis Law
25 is engaging Ron Najafi as a consultant expert

Page 67

1  witness and Emery Pharma for laboratory activities
2  relating to valsartan NDMA, NDEA, NBMA and DMF.
3      That's correct.
4      Q    What is NBMA?
5      A    That's another nitrosamine impurity.
6      Q    Do you know what NBMA stands for?
7      A    Not off the top of my head, but it
8  is -- it could be butyl nitrosol -- n-methyl butyl
9  nitrosamine. It could be n-methyl for amino, so I
10 have to check with my chemistry team what is part of
11 the proposal.
12     Q    Is part of the proposal DMF; what is
13 DMF?
14     A    DMF stands for dimethyl fumarate.
15     Q    And the second part of that or second
16 paragraph under that background and scope section of
17 the retainer agreement says, "While not currently in
18 the scope of work, if any testing of valsartan pills
19 is ordered by clients in the future, such testing
20 will be performed under CGMP/GLP."
21     A    Right.
22     Q    Did I read that correctly?
23     A    That's correct.
24     Q    And the -- see, I'm pretty sure I know
25 what CGMP stands for. That's current good

Page 68

1  manufacturing practices, right?
2      A    Yes.
3      Q    What does GLP stand for?
4      A    Good laboratory practices.
5      Q    And CGMP and GLP guidelines that you
6  reference in this retainer guidelines specific --
7  that would have been developed specific by you for
8  your lab or are you referencing or intending to
9  reference general standards for GMP and GLP?
10     A    So Emery Pharma is an FDA-registered,
11 FDA inspected GLP, GMP compliant laboratory and we
12 do perform work that is under GLP, GMP to those
13 standards. It means that you maintain good
14 laboratory notebooks. It means that your
15 equipment -- that their products is going to be
16 tested. It's qualified. It's calibrated. So those
17 are some of the things that, you know, this sentence
18 effectively promises.
19     Q    And I understand that. I guess my
20 question was, are the guidelines that you are
21 referring to in this retainer a guideline of general
22 applicability for all registered labs or are they
23 specifically developed for your lab?
24     A    No, there are a lot of general labs
25 that contract labs could follow GLP, GMP; could be

Page 69

1  compliant with GLP, GMP and maybe not compliant with
2  GLP, GMP and may do things under R&D condition, so
3  it really depends on the lab.
4      Q    And who published the CGMP and GLP
5  guidelines that are referenced in your retainer
6  agreement?
7      A    This particular -- are you referring
8  to this particular retainer agreement?
9      Q    Well, yes, because that's the only
10 retainer agreement I have.
11     A    I put it together.
12     Q    I know you put it together.
13     A    I have my signature on it.
14     Q    You're not following me. Hold on.
15 You're not following my question, sir. My question
16 was who has published the guidelines that you make
17 reference to in this?
18     A    The guidelines are set by the FDA, by
19 European medical authorities, by ICH.
20     Q    And you go on to, in this retainer
21 agreement, state that if any testing of valsartan
22 pills is ordered in the future, such testing is
23 going to be performed under the guidelines. Do you
24 see what I am referring to?
25     A    Right.

18 (Pages 66 - 69)

Page 70

1    Q    Prior to the time that you entered
2 into this retainer agreement in October of 2019, had
3 your lab ever conducted any testing of
4 valsartan-containing medications produced by Mylan
5 Pharmaceuticals?
6    A    The answer is we have conducted
7 valsartan testing prior to this retainer agreement.
8    Q    And was the valsartan testing that you
9 conducted, was it using valsartan tablets produced
10 by Mylan?
11    A    I don't recall.
12    Q    Was the valsartan -- and right now I
13 am only asking you about testing you did prior to
14 entering this agreement. Was the valsartan lab
15 testing that was done at Emery prior to the entry of
16 this agreement, did it involve any valsartan
17 containing medications produced by ZHP?
18    A    I do not recall.
19    Q    Did it involve what I'll call the
20 pre-retainer testing, okay?
21    A    Right.
22    Q    Did any valsartan testing that you
23 made reference to that was conducted at the Emery
24 lab involve any other valsartan-containing
25 medications produced by Hetero?

Page 71

1    A    I do not recall and if I did, it would
2 be privileged. It would be under a different, you
3 know, agreement with another law firm.
4    Q    Did any of the testing that you did
5 prior to this retainer agreement involve
6 Aurobindo-manufactured products?
7    A    I do not recall. I don't know.
8    Q    Do you recall if any of the
9 pre-retainer valsartan testing done at your
10 laboratory involved any valsartan-containing
11 medications produced by any of the defendants to
12 this litigation?
13    A    I do not recall the manufacturer's
14 name that we tested prior to this agreement. It
15 could have been any one of those companies.
16    Q    Since you entered into this retainer
17 agreement and became a consultant in this valsartan
18 litigation in October of 2019, have you ever
19 conducted any lab testing on any valsartan
20 medications produced by Mylan?
21    A    I do not recall. We test valsartan.
22 We assign numbers to pills. We have very good chain
23 of custody. We typically -- the operators who do
24 the testing, they have no idea who is manufacturing
25 the pills. There simply there is an ID to it and

Page 72

1 chain of custody and they get it tested, and I
2 honestly don't know. I don't pay attention to who
3 the manufacturers are.
4    Q    So your lab has done valsartan testing
5 of valsartan medications since entering into this
6 retainer agreement, correct?
7    A    We have done lots of valsartan testing
8 prior to this agreement and we've done more
9 valsartan testing post this agreement.
10    Q    And if I understand your testimony --
11 I am going to get into the details of it more, but
12 if I understand your testimony so far, what you're
13 suggesting is that as you sit here today providing
14 testimony under oath, you're not able to tell us
15 whose valsartan product you tested in terms of who
16 the manufacturer was?
17    A    No, I don't have that information.
18    Q    Would there be records available in
19 your lab records that would tell you that?
20    A    Yes, there would be records available
21 at our lab that would tell me exactly what the
22 manufacturers are.
23    Q    When did your lab first start doing
24 valsartan testing?
25    A    I think around maybe May of -- April,

Page 73

1 May of 2019.
2    Q    What was the reason that your lab
3 started to do valsartan testing in April or May of
4 2019?
5    A    I think it was initiated primarily by
6 the recall of valsartan products.
7    Q    And is it something that your lab did
8 on its own initially or were you retained by
9 somebody to do that testing in April and May of
10 2019?
11    A    We were retained.
12    Q    And who retained you in April or May
13 of 2019 to do that testing?
14        MR. NIGH:  Again, if this is
15 privileged information and has nothing to do with
16 this case, then I would instruct you not to answer
17 and waive whoever else's privilege you have.
18    A    It is confidential and privileged.
19        MR. TRISCHLER:  Well, I think -- you
20 know, in fairness, I think I am entitled to know who
21 it was in order to determine whether there is any
22 claim of privilege.
23    A    It was a law firm.
24    Q    Was it a law firm representing a
25 plaintiff, representing a manufacturer, a drug

19 (Pages 70 - 73)

Page 74

1  supplier; do you know?
2      A    It was a law firm representing
3  plaintiffs.
4      Q    Is that firm that retained you in
5  April or May of 2191 of the law firms that are
6  involved in the valsartan MDL?
7      A    I don't know.
8      Q    Do you know if the lawyer for the firm
9  that retained you is involved in the valsartan MDL?
10     A    We do the testing. We know the
11  nitrosamine. We know the chemistry. We don't
12  really get involved with, you know, sort of the
13  legal aspects of what's going on.
14     Q    I understand. My question was
15  simply -- and if you don't know you can tell me you
16  don't know, but my question --
17     A    I don't know. I don't know, honestly.
18  They may be involved with MDL. They may not.
19     Q    And so are you able to describe for me
20  what type of testing you were retained to do in
21  April or May of 2019?
22     MR. NIGH: Let me in for a second
23  here. I am going to object. I think all this
24  information is privileged. I appreciate, Clem,
25  Mr. Trischler, trying to understand who the parties

Page 75

1  are and I think Dr. Najafi just doesn't know whether
2  or not they are related to MDL. I think we do know.
3  It has no bearing on any of plaintiff's counsel and
4  no relation to this MDL, but I don't think that he
5  knows that. Why you ask him sitting here today.
6      MR. TRISCHLER: I understand and I am
7  not trying to be unfair, Daniel. I'm just trying
8  to -- if we need to raise the issue, I'm trying to
9  understand some of the basic facts of what was done
10  and when so that -- and sort of making a record. I
11  assume if we get into it later, I don't think
12  there's any dispute that we ought to be entitled to
13  know the basic facts of what he did so we can argue
14  relevance and privilege to the Court, and that's all
15  I am really trying to do here.
16     I think the only question pending at
17  this point is are you able to describe the type of
18  testing that was done in April or May of 2019.
19     MR. NIGH: No, I think that that's
20  privileged.
21  BY MR. TRISCHLER:
22     Q    Were reports of -- whatever testing
23  was done, were reports generated?
24     MR. NIGH: Again, privileged.
25     MR. TRISCHLER: Well, I didn't ask

Page 76

1  what the reports disclosed, just whether reports
2  were generated.
3      MR. NIGH: Again, privileged.
4      MR. TRISCHLER: So you're instructing
5  him not to answer that question?
6      MR. NIGH: Yes.
7  BY MR. TRISCHLER:
8      Q    Were there established lab protocols
9  that Emery had created pursuant to which the April,
10  May 2019 testing was conducted?
11     MR. NIGH: Again, privileged.
12     MR. TRISCHLER: See, Dan, I disagree
13  with you there. If there is an established protocol
14  that they have that's part of their everyday, work I
15  think I'm clearly entitled to that. I'm not asking
16  him the results of the testing, but just the
17  protocols that were followed. Those are lab
18  procedures. I don't think -- that's not privileged.
19     MR. NIGH: You know, for the
20  certification he doesn't rely on testing of the
21  valsartan pills at all whatsoever in any of his
22  testing that he has done, so it's outside the scope
23  and privileged.
24     MR. TRISCHLER: And I don't want to
25  argue relevancy or privilege with you right now. I

Page 77

1  am just trying to understand the facts so that we
2  can seek the information later, but the fact that
3  he's not relying on it for whatever opinions he
4  intends to offer at this stage of the proceedings is
5  not determinative. For all we know there may be
6  information that undermines his opinions, but we
7  don't know until we have an opportunity to discover
8  it.
9      Again, the only question pending at
10  this point -- you've made your objections where you
11  think they are appropriate and I am not arguing any
12  of them, Dan. I am just asking you to reconsider
13  the objection to the question I just asked about
14  whether there are existing lab protocols pursuant to
15  which this work in 2019 was done. I don't think
16  that's privileged at all.
17     MR. NIGH: I think you asked that
18  question a little bit differently and I think he can
19  answer that question.
20     MR. TRISCHLER: Tell me how you think
21  it should be asked differently and I will accept
22  that.
23     MR. NIGH: No, no. I think you asked
24  it differently. My understanding is you're asking
25  do they have guidelines as to how this testing would

20 (Pages 74 - 77)

Page 78

1  be conducted. That's different.
2        MR. TRISCHLER: Well, that was --
3        MS. HILTON: Not developed for the
4  testing, but do they have guidelines that were in
5  place or existing at the time of the testing.
6        MR. TRISCHLER: Yes. That's what I'm
7  looking for.
8     A    So what's the question?
9     Q    The question was at the time this
10  testing was done in April or May of 2019, did your
11  lab have existing protocols and guidelines in place
12  that would have governed that testing.
13     A    We follow several guidelines, several
14  procedures from FDA on testing of, basically,
15  nitrosamines, and that's what we use. So it's
16  established testing guideline, you know, with the
17  full following the same guideline procedure
18  controls.
19     Q    Do you have any information --
20  whatever the valsartan that was tested in April or
21  may of 2019, do you have any idea where it came
22  from?
23        MR. NIGH: I am going to object to
24  privilege and instruct him not to answer. Actually,
25  I think we have gone far beyond. I think we are

Page 79

1  going to have to brief this at this point,
2  Mr. Trischler, because even his last answer
3  contained, you know, essentially privileged
4  information. Anything that has to do with testing
5  that has no nexus to this litigation is privileged.
6        MR. TRISCHLER: Okay. I disagree.
7  You've disclosed this witness as a testifying
8  expert. He's now indicated that he conducted
9  valsartan testing to ascertain nitrosamine levels.
10  He did it in 2019. He's been doing it on an ongoing
11  basis and the suggestion has nothing to do with this
12  litigation. I think it has no factual merit
13  whatsoever, no disrespect intended. So we obviously
14  have a disagreement, but if --
15        MR. NIGH: We do, and I am going to
16  instruct him not to answer any further. I would
17  just redirect to his opinion. It's simply not how
18  NDMA, how much products have NDMA. His opinion
19  boils down to valsartan-containing products that
20  contain NDMA OR NDEA but the generic equivalent of
21  Diovan or Exforge because they contained NDMA, NDEA.
22  It's as limited as to that. So whatever tests that
23  he's done in other litigations, there is no
24  relevancy stacked on top of the fact that it's
25  privileged. So I am going to instruct him not to

Page 80

1  answer about any testing that he has done outside of
2  this litigation.
3        MR. TRISCHLER: Also your instruction
4  applies to what he described and what we have been
5  calling as the April/May 2019 testing. I think he's
6  also indicated they have been testing valsartan on
7  an ongoing basis.
8        MR. NIGH: That's correct, and my
9  instruction would apply equally to that testing that
10  has no basis in this MDL.
11        MR. TRISCHLER: So your position, just
12  so I'm clear and I don't have to belabor the record,
13  is that we can agree that the witness operates a
14  research lab that's done testing on
15  valsartan-containing medication for nitrosamine
16  content on a fairly consistent basis since April and
17  May of 2019, some of which may include
18  valsartan-containing medications produced by the
19  defendant in this litigation, some of which may
20  include valsartan containing medications produced by
21  manufacturers and suppliers that are not parties to
22  this litigation, but your instruction is a global
23  one that all of that testing is off limits,
24  according to the plaintiff and that the witness will
25  be instructed not to answer any questions at all

Page 81

1  about it. Is that your position?
2        MR. NIGH: I think he's answered he
3  doesn't know which manufacturer, so that's been
4  established already right. Other than that, my
5  instruction would be no further testimony, and I
6  would instruct him not to answer about any further
7  testimony about testing that he has done, since none
8  of that testing was done for the MDL on behalf of
9  the MDL and has no nexus to the MDL. Actually, if
10  we need to brief it, we can.
11        MR. TRISCHLER: Right. I will just
12  say we disagree. I think it's clearly relevant and
13  probative, but we can save it for a future date. I
14  don't want to belabor the record on it, so let me
15  move on.
16        MR. NIGH: I understand.
17  BY MR. TRISCHLER:
18     Q    You talked about or I was asking you
19  about your work in the valsartan MDL. In addition
20  to that retainer, I wanted to ask you about some
21  documents that I received. I received a few
22  invoices from your firm, Doctor, and I've had those
23  invoices marked Exhibits 3, 4, 5 and 6, okay.
24        MR. TRISCHLER: Can you put up -- I
25  guess we'll start with Exhibit 3.

21 (Pages 78 - 81)

Page 82

1    A    Okay.
2    Q    It looks like Exhibit 3 is an invoice
3    that's dated August 2, 2001, correct?
4    A    That's correct.
5    Q    This that August invoice you've
6    submitted a bill for six hours of time for document
7    reviews that were apparently done in July of last
8    year; is that right?
9    A    Right.
10    Q    And then Exhibit 4 is dated
11    January 28, 2022; just last week, right?
12    A    Right.
13    Q    And there you billed, submitted an
14    invoice for two hours worth of time that you spent
15    back in October of last year, right?
16    A    Not October, November.
17    Q    Well, it says class certification
18    review October 25, 2021?
19    A    Right. Right. Exactly.
20    Q    So what does that mean, class
21    certification review October 25, 2021?
22    A    So this is the -- pertains to my
23    expert report on the class certification primarily.
24    Q    I wasn't sure. Is there some -- I
25    don't know what "class certification review" means.

Page 83

1    What did you do over those hours?
2    A    The expert report that you were
3    looking at earlier, essentially, review of
4    documents, review -- you know, putting that
5    together, putting the expert report together and
6    putting the package of citations and everything that
7    needs to be that you all have in your hands
8    together.
9    Q    Okay. And then the other invoice that
10    I have is Exhibit 5. It's dated January 31, 2022,
11    which is just a few days ago, right?
12    A    Right.
13    Q    And you've got two more hours that you
14    billed for review of class certification final
15    declaration review in November -- on November 4,
16    2021, right?
17    A    Right.
18    Q    I guess you spent two hours reviewing
19    that declaration on that date?
20    A    Right, but this is reviewing a lot of
21    the citations, reviewing the -- you know, just
22    preparing. This is just preparation for today's
23    call.
24    Q    Okay. And then the final invoice that
25    I received is Exhibit 6. We marked that. It's

Page 84

1    dated February 1, 2022, and you've got a bill for
2    about 15 hours of time?
3    A    It's, again, reviewing for today's
4    call and refreshing my memory on the various
5    citations that I'm quoting and all of that.
6    Q    Right. So it looks like you spent
7    about 15 hours --
8    A    Right.
9    Q    -- preparing for this deposition?
10    A    Exactly.
11    Q    And when you were preparing for this
12    deposition, who were you preparing with?
13    A    Myself --
14    Q    And --
15    A    -- and I also spent some time with the
16    plaintiff's lawyer discussing the deposition.
17    Q    And which lawyer would that be on the
18    plaintiff's side?
19    A    Rosemarie, Daniel, Brad and Layne.
20    Q    So I assume these invoices, then, that
21    we have that we marked as exhibits 3 through 6 would
22    accurately reflect the time that you spent and that
23    you devoted to this valsartan project since you were
24    retained in October of 2019, right?
25    A    This is not all of them. This is

Page 85

1    primarily just specific to this expert report that
2    we did.
3    Q    Well, I am interested in all the time
4    and work and billing that you have submitted in
5    connection with your working in valsartan MDL. So
6    this is just a drop-in the bucket?
7    A    This is a portion of the bills that we
8    have given. We haven't shared all the bills.
9    Q    Why not?
10    MR. NIGH: That's a legal question.
11    We objected and provided the reasons for that
12    objection. His opinion here today is limited on his
13    class certification and not his liability on things.
14    Q    So let me ask you about the
15    declaration itself. You have -- I marked the
16    declaration as Exhibit No. 1. Do you have a copy of
17    it there or do you need to have the --
18    A    I have it.
19    Q    You have it?
20    A    Yes, I do.
21    Q    All right. And so this is a
22    declaration that has your name and your signature
23    attached to it, correct?
24    A    Correct.
25    Q    And it's not on the letterhead of

22 (Pages 82 - 85)

Page 86

1  Emery Pharma, is it?
2      A   No, it's not.
3      Q   It's not on your personal letterhead,
4  is it?
5      A   No, it's not.
6      Q   Was this something that you personally
7  prepared or was this prepared by the lawyers?
8      A   No, I personally prepared the
9  document.
10     Q   Every word of this is your words?
11     A   Yes, it is.
12     Q   No help from the lawyers?
13     A   No help.
14     Q   And as I read the declaration, it
15  appeared to me that there were two opinions
16  contained in this declaration.  The first one was
17  that you suggest that NDMA and NDEA should not be
18  present in any drug, am I correct that in stating
19  that sort of opinion that you hold and you expressed
20  in this declaration?
21     A   Please repeat your question.  I lost
22  track.
23     Q   Yeah.  I was just trying to summarize
24  what I think your opinions are that are contained in
25  this declaration and I want to make sure I got it

Page 87

1  correct.  So what I was saying was --
2      A   Yeah.
3      Q   -- in this declaration --
4      A   Yeah.
5      Q   -- you state that NDMA and NDEA should
6  not be present in any drug.  Is that an opinion that
7  you hold?
8      A   NDMA and NDEA are carcinogenic
9  mutagenic compound that should not be present in any
10  drug period.
11     Q   And then the second opinion that I saw
12  in this declaration was that you suggest that the
13  presence of a nitrosamine impurity in a generic drug
14  product renders that --
15     A   Could you point to that?  Your screen
16  is frozen.
17     Q   Point to what, sir?
18     A   Point to -- you're showing me a
19  document on this screen.
20     Q   No, I wasn't.  We can take the
21  document down.
22     A   Okay.
23     Q   You have the report in front of you.
24     A   I thought you were quoting from my
25  declaration, but go ahead.

Page 88

1      Q   No.
2      A   What's your question?
3      Q   I am trying to ask you a question.  In
4  your declaration do you offer the opinion that the
5  presence of any nitrosamine impurity in a generic
6  drug product renders that product not equivalent to
7  the reference listed drug?
8      A   Absolutely.
9      Q   And do you agree that those are the
10  opinions that you set forth in your declaration and
11  that you intend to offer in this matter?
12     A   Absolutely.
13     Q   Are there any others?
14     A   No generic drug should contain any
15  mutagenic compound, particularly NDMA and NDEA and,
16  essentially, any nitroso compound.  They are cohorts
17  of concerns and their limits should be zero.
18     Q   And that was the first opinion that we
19  went over.  Other than those two opinions, are there
20  any others that you intend to offer?
21     A   I might have opinions to offer in my
22  full expert report which will be coming shortly, but
23  what you see for now is what I think I have, but I
24  will have other opinions as well.
25     Q   I'm sure we will all wait with bated

Page 89

1  breath for the next report, but at this time at this
2  state of litigation, those two opinions are the
3  stated opinions that you intend to offer; is that
4  right?
5      A   Yes.
6          MR. TRISCHLER:  Dan, can we take a
7  five minute comfort break?
8          MR. NIGH:  Yes.  Let's take ten
9  minutes.
10         THE VIDEOGRAPHER:  The time is 11:41.
11  This concludes Media No. 2.
12         (A recess was taken.)
13         (After the recess the following
14  occurred:)
15         THE VIDEOGRAPHER:  The time is now
16  12:03.  This begins Media No. 3.  You may proceed.
17  BY MR. TRISCHLER:
18     Q   Doctor, allow me to cover a few
19  additional background issues with you, if I can.  As
20  I understand it, your background and education is in
21  the field of chemistry, correct?
22     A   That's correct.
23     Q   I was provided with a copy of a CV.
24  I've marked it as Exhibit 7.
25     A   Okay.

23 (Pages 86 - 89)

Page 90

1    MR. TRISCHLER: Can someone put it up
2 for me, please. Can you go to the next page.
3    Q    If you need more time, tell me and
4 continue, please.
5    A    I am familiar with my CV.
6    Q    All right. And is this a -- what we
7 marked as Exhibit 7 a true, correct and accurate
8 summary of your qualifications and credentials?
9    A    That's correct.
10    Q    In the copy of the CV that I received,
11 I did not see any list of publications. Do you
12 maintain a list of publications?
13    A    It should be. It should be there.
14    Q    Can you flip through? Maybe this is a
15 different one than what I had with the report.
16    A    Maybe this is a different one.
17    Q    Is that the end of the document there?
18    THE VIDEOGRAPHER: There are 13 pages.
19 Do you want me to keep flipping through or do you
20 want me to when you're ready for the next one?
21    MR. TRISCHLER: Yes. Keep flipping
22 through, because if it's more than five pages, then
23 it's different than one I have.
24    A    Now you see the publication.
25    Q    Yes. Okay. The copy that I was

Page 91

1 looking at did not have that. All right. Thank
2 you.
3    A    What is your question?
4    Q    As far as you know, this version of
5 the CV we marked as Exhibit 7 is current, up to date
6 and accurate, right?
7    A    Right, as long as you can show me
8 everything else, because it sounded like you were
9 missing some parts of it. I only see two
10 publications on your exhibit.
11    Q    Well, we said we can flip through the
12 rest if you like. That's why I asked if you wanted
13 to.
14    A    Yes, flip through it.
15    THE VIDEOGRAPHER: This is page 6,
16 Doctor. Just let me know when you're ready for the
17 next page.
18    THE WITNESS: Yes. Go ahead. Go
19 ahead. Yes. Uh-huh. Okay. Yes.
20    THE VIDEOGRAPHER: There's two more
21 pages.
22    A    Okay. I think you have everything.
23    Q    So we're good? In terms of what we
24 marked as Exhibit 7 is the up to date, current and
25 accurate summary of your qualifications, right?

Page 92

1    A    Correct.
2    Q    Good. And what I remember reading is
3 that you obtained a bachelor's and master's in
4 organic chemistry from the University of San
5 Francisco, right?
6    A    Correct.
7    Q    And I think it was in 1998 you got
8 your PhD in organic chemistry from U.C. Davis?
9    A    That's correct.
10    Q    And after completing your PhD you went
11 to work as a research scientist for a few chemical
12 and pharmaceutical companies before starting your
13 own business around 1996?
14    A    That's correct.
15    Q    And the company that you started in
16 1996 was a company called CP Lab Safety; do I have
17 that right?
18    A    That's correct.
19    MR. TRISCHLER: You could take the CV
20 down, sir.
21    Q    How long did you run CP Lab Safety?
22    A    Probably around two years, two or
23 three years.
24    Q    Did CP Lab Safety develop or
25 manufacture drug products?

Page 93

1    A    No.
2    Q    Did CP Labs hold any new drug
3 applications?
4    A    No.
5    Q    Did CP Labs hold any abbreviated drug
6 applications.
7    A    No.
8    Q    Did CP Labs hold any or were they
9 responsible for any drug master files?
10    A    No.
11    Q    While at CP Labs, were you or was your
12 company at all involved in the synthesis,
13 manufacture or testing of API for drug products?
14    A    No.
15    Q    At CP Labs did your company have any
16 role in the formulation, synthesis, manufacture,
17 production or testing of angio tensin receptor
18 blocker medications like valsartan?
19    A    So at CP lab I started another
20 pharmaceutical company called NovaBay
21 Pharmaceuticals and that is immediately following CP
22 Lab and that company effectively was incubated
23 within CP Lab and within NovaBay I had multiple
24 interactions with the FDA. We manufactured product
25 according to CGMP and we put products on the market.

24 (Pages 90 - 93)

Page 94

1 And prior to CP Lab, I worked at a pharmaceutical
2 company that was heavily involved in GMP
3 manufacturing and drug product, drug substance and
4 that one of the companies I worked for, Applied
5 Biosystems, in fact, you know, we had a challenging
6 impurity that was causing a lot of problem and I was
7 responsible for finding that impurity and solving a
8 major problem that led to an award, you know,
9 amongst 1,300 PhDs. This is back in 1994.
10     So -- but, you know, I don't have to have
11 experience in, you know, ARBs to know the molecule.
12 I can synthesize ARB personally.
13     Q     Are you finished?
14     A     Yes, I am.
15     Q     All right. Then let me see if I can
16 get you to answer my question. At CP Labs did your
17 company have any role in the formulation, synthesis,
18 manufacture, production or testing of ARBs like
19 valsartan?
20     A     No. At CP lab we did not have any ARB
21 manufacture.
22     Q     You said that -- if I can unfold some
23 of that commentary that you gave me, was that CP
24 Labs was eventually folded into NovaBay
25 Pharmaceuticals, another company that you started?

Page 95

1     A     No. CP Lab is, you know, existing
2 company right now and it's a standalone company.
3 NovaBay was incubated within CP Lab and NovaBay got
4 its start from CP Lab.
5     Q     So CP Lab still exists today?
6     A     Yes it does.
7     Q     Do you have any affiliation with CP
8 Lab?
9     A     I own 50 percent of CP Lab.
10     Q     Who owns the other half?
11     A     My wife.
12     Q     What's the business of CP Labs today,
13 do you know?
14     A     CP Lab manufactures patented product
15 called ecological funnel, which is product that I
16 invented while I was at Applied Biosystem and that
17 patented product is the major product of CP Lab and
18 they manufacture it in the United States and they
19 export it around the world including China, Korea,
20 Japan and elsewhere.
21     They also distribute chemicals, distribute
22 safety product. So you can visit CPlab.com and take
23 a look at it.
24     Q     What is an ecological funnel?
25     A     It's a tunnel that prevents

Page 96

1 evaporation of solvents from the fume. It's an
2 environmental product that prevents pollution
3 outside of laboratory. It prevents evaporation of
4 toxic substances, including mutagenic -- potentially
5 mutagenic compounds going into the atmosphere and
6 into the neighboring localities. And ecological
7 funnel is in use right now in, I would say,
8 90 percent of pharmaceutical companies worldwide.
9     Q     When did you start NovaBay?
10     A     NovaBay was incubated within CP Lab
11 around probably 1998; '97, '98 and officially it
12 became a company in the year 2000, and I took the
13 company public in 2007 and I left. I sold my shares
14 and left NovaBay in 2015 and started Emery Pharma.
15 And Emery Pharma, actually, again was incubated
16 within NovaBay starting at 2011.
17     Q     Am I correct that NovaBay produces
18 antibacterial products for the eye care and skincare
19 markets?
20     A     That's correct. That's some of their
21 products.
22     Q     While you were at NovaBay, did the
23 company do any work on the formulation synthesis,
24 manufacture, production or testing of ARBs?
25     A     We did not manufacture, synthesize,

Page 97

1 formulate any ARBs at NovaBay.
2     Q     Did -- while at NovaBay, did that
3 company ever prepare or submit an abbreviated new
4 drug application for any drug product?
5     A     We did not prepare or submit any
6 abbreviated new drug application. However, we
7 submitted many INDs, investigation of new drug, and
8 we also submitted many 510-Ks from the drug or
9 device division of the FDA.
10     Q     I guess was that because the focus at
11 NovaBay was to try to develop its own line of --
12     A     Product.
13     Q     -- probial products?
14     A     Right. We were not a generic
15 manufacturing -- we were not a generic
16 pharmaceutical company.
17     Q     So at no time at NovaBay were you
18 involved in synthesizing API for a generic
19 formulation, correct?
20     A     We could have, but that was not the
21 mission of the company.
22     Q     So it was never done?
23     A     Never done.
24     Q     And then at some point did you say
25 Emery Pharma was intubated?

25 (Pages 94 - 97)

Page 98

1    A    Incubated.
2    Q    I'm sorry?
3    A    Incubated.
4    Q    Incubated. I said intubate. That
5    would not be correct.
6    A    I heard "intubated."
7    Q    Right. That's what I said. I did say
8    that. That was not correct, so I apologize.
9        And then eventually Emery Pharma became a
10   standalone company that you operate to this day,
11   correct?
12   A    Correct.
13   Q    And I think that if I understand what
14   you've previously described for us, the mission
15   statement and the function of Emery Pharma is to
16   provide research laboratory services that meet the
17   CGMP and GLP standards for quality?
18   A    Emery Pharma is a FDA registered, FDA
19   inspected DMB, GLP compliant contract research
20   organization and our mission is to help save lives
21   and save the environment.
22   Q    Does Emery Pharma develop or
23   manufacture drug products?
24   A    Emery Pharma? That's not within the
25   mission of the Emery Pharma, no. We can, but we do

Page 99

1    not.
2    Q    Does Emery Pharma hold any new drug
3    applications?
4    A    No, we do not. Our clients do.
5    Q    Does Emery Pharma hold any abbreviated
6    new drug applications?
7    A    We do not, but our clients do.
8    Q    Has Emery Pharma ever prepared a DMF,
9    submitted a DMF?
10   A    We do not, but we help our clients
11   essentially submit DMF and NDA and IMD and we
12   participate in their FDA meetings when necessary.
13   Q    And I'm sorry. I think it was
14   probably due to sometimes there's sound that goes in
15   and out the computer. You said you help clients
16   with submissions of what was that again?
17   A    New drug application, abbreviated new
18   drug application; DMF filings; you know, support.
19   Just about anything that the client needs, we help.
20   We support them.
21   Q    And how long has Emery Pharma been in
22   business?
23   A    Since 2011, ten years.
24   Q    Who are the clients for whom you've
25   help submit new drug applications or abbreviated new

Page 100

1    drug applications?
2    A    That's confidential information. I
3    wouldn't be able to share with you.
4    Q    So you'll say that you have experience
5    helping to prepare ANDAs and NDAs, but you won't
6    tell us who you did it for?
7    A    Yes.
8    Q    Have you ever assisted a client in
9    preparing a DMF?
10   A    Personally, no, but some of my
11   employees might have.
12   Q    In your career, sir, have you ever
13   published any peer-reviewed literature related to
14   nitrosamine impurities in pharmaceuticals?
15   A    Yes, we have. We filed a citizen
16   petition which was previewed by FDA and the response
17   we got from the FDA was they had agreed with our
18   findings, so I just would consider that very
19   peer-reviewed.
20   Q    My question wasn't have you ever
21   submitted a citizens petition. My question was have
22   you submitted literature for publication in a
23   scientific journal that's been peer reviewed and
24   accepted that related to nitrosamine impurities in
25   pharmaceuticals?

Page 101

1        MR. NIGH: Objection. You can answer.
2    A    We have not filed any
3    nitrosamine-related publications in a peer reviewed
4    journals of our FDF filing.
5    Q    The list of publications that were
6    attached to your CV that we marked as Exhibit 7, do
7    any of them feel with nitrosamine impurities in
8    pharmaceuticals in any manner or form?
9    A    I do not believe they do.
10   Q    Have you ever drafted a manuscript
11   related to nitrosamine impurities in valsartan for
12   publication in a peer review journal?
13   A    We have drafted publication regarding
14   NDMA and nitrosamines, but not published.
15   Q    Have you submitted a manuscript for
16   publication?
17   A    No.
18   Q    Why not?
19   A    It's confidential. It's related to
20   another matter that we are working on related to
21   ranitidine.
22   Q    Will you provide it to me?
23   A    Daniel? I suppose I can.
24       MR. NIGH: We would have to see what
25   the document is. I think he just amended his answer

26 (Pages 98 - 101)

Page 102

1 at the end to say it's for ranitidine and your
2 question is for valsartan.
3        MR. TRISCHLER: I think the question
4 was --
5     A    It's under --
6        MR. TRISCHLER: Hold on. Hold on. I
7 think my memory is not infallible, Daniel, but what
8 I was basically asking is whether he's ever drafted
9 a manuscript that relates to nitrosamine impurities
10 in pharmaceuticals. I may have said valsartan, but
11 my intent was broader, and so it sounds like
12 something. The question is can I see it. It's not
13 been produced thus far.
14        MR. NIGH: We would examine the
15 document before we respond and answer to that.
16        MR. TRISCHLER: Well, it was subject
17 to the notice of deposition in this case. In the
18 deposition notice served in connection with this
19 deposition, I asked that the witness come here with
20 all publications relating to nitrosamines. That
21 would clearly -- this manuscript that he's described
22 would clearly be responsive.
23        MR. NIGH: I think you had our
24 response an hour ago.
25        MR. TRISCHLER: I'm sorry. Unless you

Page 103

1 want to continue the deposition, I mean, this is my
2 chance to depose him on it.
3        MR. NIGH: I believe that 48 hours ago
4 we served our objections as clearly outside of the
5 scope of anything that is he's proffered in terms of
6 testimony in his expert here today.
7        MR. TRISCHLER: Well, as far as
8 outside the scope of his declaration, I disagree,
9 but I guess we will be taking it up again.
10     Q    So you do have a manuscript --
11        MR. NIGH: And just to be clear --
12 sorry. Since you're saying something about taking
13 it up again, just so you understood too, I haven't
14 even looked at this document. So to the degree
15 you're asking about draft documents and
16 publications, obviously it would have potential
17 privilege as well.
18     A    It's ranitidine related, but it's
19 nitrosamine.
20     Q    Well, you've publicly disclosed the
21 existence of this manuscript, have you not?
22     A    No.
23     Q    Well, can you put up Exhibit 8 for us,
24 please. Do you recognize Exhibit 8?
25     A    Yes, I do.

Page 104

1     Q    What is it?
2     A    It's sort of a summary that one of my
3 team members wrote regarding our filing of our
4 citizen petition regarding ranitidine and how we
5 came about it, how we found the problem and how we
6 reported it to the FDA and how FDA actually agreed
7 with us and responded to our petition in a positive
8 manner. So that's really just the story of that.
9 There's nothing about this that contains anything
10 about that draft publication.
11     Q    So this is what we have marked as
12 Exhibit 8, is basically a press release that was
13 issued by Emery Pharma, correct?
14     A    Correct.
15     Q    And I think this press release is
16 available on your website?
17     A    Website. It's not a press release.
18 It's a blog.
19     Q    All right, but this document and this
20 disclosure is on your website --
21     A    That's correct.
22     Q    -- for the public at large to view?
23     A    Yes.
24     Q    And in this document don't you state
25 or indicate that you're preparing a manuscript for

Page 105

1 publication on the issue of nitrosamines in
2 pharmaceuticals?
3     A    Right.
4     Q    And if you could go to page 2 of this
5 document.
6     A    Okay.
7     Q    Can you highlight the second full
8 paragraph for me, please. Thank you. Are you able
9 to read that, sir?
10     A    I'm reading it. Yes, I'm reading it.
11     Q    So. Emery Pharma has publicly
12 disclosed that it's been testing valsartan, losartan
13 and other ARBs for nitrosamines since the early 2018
14 time period, correct?
15     A    That's correct.
16     Q    And there's nothing in these public
17 comments that you've made that we've
18 not been provided with it's something that's done
19 for litigation or confidential. You've told the
20 free world about it, right?
21     A    We mentioned that we have been doing
22 that, but we haven't disclosed the results. The
23 results are confidential.
24     Q    You are not a pathologist, true?
25     A    Say that again, please?

27 (Pages 102 - 105)

Page 106

1    Q    You are not a pathologist?
2    A    Pathologist?
3    Q    That was my question.
4    A    No, I'm not a pathologist.
5    Q    Are you a medical doctor?
6    A    I'm not a medical doctor.
7    Q    Are you a toxicologist?
8    A    I'm not a toxicologist.
9    Q    Is it fair to say you're not a
10   epidemiologist and you do not have any specialized
11   training or expertise in the field of pharma
12   epidemiology?
13       A    I am not a epidemiologist or any of
14   that.
15       Q    Have you ever conducted and published
16   any peer-reviewed research on the carcinogenicity of
17   NDMA?
18       A    No, I have not.
19       Q    Have you ever conducted and published
20   any peer-reviewed research on the carcinogenicity of
21   NDEA?
22       A    No, I have not.
23       Q    Since you have no medical training, I
24   assume you do not diagnose cancer in patients; fair
25   to say?

Page 107

1    A    I am not a doctor.
2    Q    And in this litigation I understand
3    you have not been designated as a witness on the
4    issue of causation, true?
5    A    I am not a medical doctor.
6    Q    Right.  And you're not going to
7    testify -- well, we can agree you're going to be
8    offering causation opinions in this matter, correct?
9    A    Explain to me what causation, what
10   your definition of causation here.
11   Q    You're not going to be offering any
12   opinions that exposure to NDEA or NDMA did or can
13   cause cancer in humans?
14   A    No, I am not offering any opinion on
15   the toxicology opinion on the NDEA or NDMA.
16   Q    Have you ever published anything on
17   the requirements for a proper drug master file?
18   A    No, I have not published any
19   requirement on anything on the requirements for drug
20   master file.
21   Q    Have you ever published anything on
22   outlining the regulatory duties and responsibilities
23   of a generic drug manufacturer?
24   A    We're not in the publication business.
25   We have not published anything.  We are a contract

Page 108

1    research laboratory testing facility with a lot of
2    experience in drug testing and impurity testing and
3    genotoxic testing.
4    Q    Have you ever published anything or
5    given any lectures or speeches on the critical
6    review of the CMC sections and requirements for a
7    abbreviated new drug application?
8    A    I have.  I was invited to give a
9    presentation at a drug impurity symposium for
10   generic manufacturers and that presentation is
11   actually available.  It's on the -- it should be
12   online YouTube or various other places.
13   Q    Is it referenced on your CV?
14   A    No.
15   Q    When did you speak at this symposium?
16   A    Probably early 2020, maybe mid 2020.
17   I can't recall.
18   Q    We talked a little bit about Emery
19   Pharma's status as an FDA registered research lab.
20   What did you have to do in order to obtain that
21   registration, if anything?
22   A    You basically submit an application to
23   the FDA and you register yourself with the FDA, and
24   as a result you become subject to FDA inspection.
25   Q    When did you -- when did your lab

Page 109

1    complete that application?
2    A    I think maybe 2016, 2015, some time
3    frame.
4    Q    When did you obtain the registration;
5    do you know?
6    A    No, I don't, probably within a few
7    months.
8    Q    How many FDA inspections have taken
9    place at your facility since?
10   A    We've had two inspections from the
11   FDA.
12   Q    When were those inspections?
13   A    I can't recall; 2018 maybe one, 2021.
14   Q    Were there any Form 483 issues
15   following those inspections?
16   A    In our second inspection we had a Form
17   483 filled, yes.
18   Q    That was the most recent one in 2021?
19   A    That's right.
20   Q    What was that for?
21   A    It was primarily for, you know, making
22   sure our data gets backed up and we have -- we do
23   sufficient due diligence to make sure the data that
24   we generate gets backed up into a secondary backup
25   drive.  So we have remedied that, and also to make

28 (Pages 106 - 109)

Page 110

1 sure that our bend were open when we go to various
2 instruments, every user will have its own individual
3 log in, but we had no issues whatsoever on any of
4 our testing, any of our releases, any of our
5 products that are on the market.
6    There were just no issues on testing, but just
7 procedurally just data management, primarily backup,
8 and also specific user log-in, and both of those have
9 been remedied.
10   Q    You said something that piqued my
11 curiosity, because I did not understand this to be
12 within the scope of anything you did.  You said
13 something about our products.  It was my
14 understanding that Emery Pharma does not manufacture
15 or sell any drug products.  Am I wrong?
16   A    No, you're not.  We do not sell or
17 manufacture any drug product.  However, we do
18 release them.  So, another contract manufacturer
19 comes to us for a manufacture or a manufacturer
20 comes to us and says, please test my compound and
21 release them according to the guidance, ASP guidance
22 or GMP/GLP guidance.
23    So we officially release them and we identify
24 the drug, we identify their impurities and we release
25 them.  So releasing is a terminology that's known to

Page 111

1 the FDA.  It means it is ready to be sold into the
2 market.
3    Q    Okay.  And what you've suggested to me
4 is that in connection with the 2021 inspection, FDA
5 issued a 483 to Emery Pharma finding that certain
6 aspects of it or recordkeeping did not comply with
7 good laboratory practices, correct?
8   A    What I said was that certain parts of
9 our data backup, data storage and backup did not
10 comply with the regs, and really it was a risk
11 management issue and their question was what happens
12 if there is an earthquake and then we lose all the
13 data.
14    So it needs to be backed up into the cloud so
15 in case of an earthquake, in case of fire we have
16 data that we can go back to.
17   Q    Right.  A form 483 is issued by an FDA
18 inspector after an inspection when that investigator
19 observes any condition that in his or her judgment
20 might constitute a violation of the Food, Drug, and
21 Cosmetic Act or its related regulations, right?
22   A    That's correct.
23   Q    And so what you're telling me is that
24 in 2021, your FDA-registered lab was found to have
25 conditions that in the opinion of the investigator,

Page 112

1 constituted violations of the Food, Drug and
2 Cosmetic Act and its regulations as it related to
3 data management and data maintenance.
4   A    What I said was the 483 -- first of
5 all, in our first inspection 2018 we had no problem,
6 no issues.  In 2021 this issue came up that we need
7 to back up our data into the Cloud and it is really
8 part of the data management.  And they basically
9 said we can continue our, you know, releasing
10 commercial products; we can continue our work.  We
11 just need a commitment for you to get that done; and
12 since then we have gotten it done.
13   Q    And so were any warning letters issued
14 following 483s?
15   A    No.
16   Q    Did -- what is Emery Pharma's status
17 with the FDA today?
18   A    We are in the process of making those
19 data managements happen and they're completely
20 satisfied with that.
21   Q    And so one of the things I take it you
22 learned from that most recent inspection, if not
23 earlier, was that data management, data preservation
24 and documentation are extremely important as it
25 relates to product testing, product release and

Page 113

1 product validation measures.
2   A    Data storage and back up are important
3 primarily -- you know, it's part of their risk
4 management strategy data integrity program making
5 sure the data is always there.  You know, if God
6 forbid the facility catches fire or there is an
7 earthquake, we want to make sure the client's data
8 are there somewhere else.  And that's something that
9 we had a backup system on the premises, but that was
10 not acceptable to them.
11   Q    So, understanding the importance of
12 data preservation --
13   A    Into the cloud.  They wanted an offer
14 side data storage.
15   Q    Let me ask my question, please.
16   A    Sorry.
17   Q    You're understanding the importance of
18 data preservation, I'm sure, then, you can tell us
19 with absolute certainty that all of the records --
20 that there will be records relating to all of the
21 valsartan testing that your lab has been doing since
22 early 2018, correct?
23   A    That includes every data preservation
24 that that we have ever generated needs to including
25 valsartan that needs to have it back, have a back up

29 (Pages 110 - 113)

Page 114

1 outside of our facility.
2    Q    That would mean you'd have data on the
3 acquisition of samples, correct?
4    A    Data on everything; acquisition. You
5 know even if somebody deletes the data or what have
6 you, everything needs to be backed up.
7    Q    And so it needs to be backed up and
8 you've done that on the valsartan testing you have
9 data on acquisition of samples, correct?
10    A    Acquisition of all samples including
11 valsartan. All samples need to have an off site
12 backup facility.
13    Q    You'll have data of custody for all
14 valsartan samples?
15    A    Yes, we do.
16    Q    You'll have standard point operating
17 procedures and policies outlining the protocol that
18 weren't followed in connection with the test methods
19 that were used on the valsartan products, right?
20    A    As an FDA registered, FDA inspected
21 GLP/gmp-compliant lab, everything we do is SOP
22 driven. So we have SOP's on everything.
23    Q    Because you can't conduct a test and
24 then develop the protocol later, right?
25    A    No.

Page 115

1        MR. NIGH: Objection.
2    Q    So you would be able to provide us
3 with a protocol pursuant to which all this testing
4 was done, correct?
5    A    If it's not privileged, yes.
6    Q    And do you have -- and you certainly
7 have all the test results for all of valsartan
8 samples that have been tested since the early 2018,
9 right?
10    A    Absolutely. We have the test results
11 and we have reports, everything. If it is not
12 privileged, it would be available.
13    Q    I'll represent to you that the
14 valsartan issue came to the attention of the FDA in
15 June of 2018.
16    A    Right.
17    Q    And your public statements that -- one
18 of which we marked as Exhibit 8 is you started
19 testing valsartan in early 2018. Are you suggesting
20 that you were doing valsartan testing for
21 nitrosamines prior to the time the FDA even
22 aware that there was a potential issue?
23        MR. NIGH: Form objection.
24        THE WITNESS: Should I answer?
25        MR. NIGH: Yes.

Page 116

1    A    So initially the valsartan issue was
2 brought to our attention by a pharmacy out of
3 Connecticut called Valisure. I think we mentioned
4 their name in some of our blogs and big releases and
5 they brought it to our attention. They wanted to
6 test valsartan and they wanted us to test it for
7 them. They had some testing mechanisms and they
8 wanted us to confirm that. We did draw some samples
9 for them, some pills and we did confirm that.
10 That's our beginning of our engagement in the
11 valsartan arena and that was in 2018.
12        In 2019 we got engaged by law firm that is not
13 on this call, I believe, and they are -- so a lot of
14 the work we did relates to that but, yes, 2018 was
15 our initial work with valsartan.
16    Q    And so -- thank you. That makes more
17 sense to me now. So the initial work that your lab
18 was doing with respect to analysis of valsartan was
19 done at the request of Valisure, not a lawyer?
20    A    No.
21    Q    Bad question on my part.
22    A    That's correct. The initial work we
23 did on valsartan was done at the request of
24 Valisure.
25    Q    And you would have, consistent with

Page 117

1 your labs, stated desire to follow good laboratory
2 practices, you would have all of the chain of
3 custody sample, acquisition data, protocol data,
4 test validation data and testing summaries from that
5 Valisure work?
6    A    Yes, I do.
7    Q    None of which has been provided to me,
8 right?
9    A    I don't believe so.
10    Q    Do you know what the results of that
11 work was, what nitrosamine did you test and what
12 were the results?
13    A    You know, I wasn't sure if any of
14 these things are subject of our -- you know, my
15 declaration, but the results were very high levels
16 of nitrosamines, high levels of NDMA in the
17 thousands of nanograms.
18    Q    Do you know whose valsartan you were
19 testing?
20    A    No.
21    Q    In 2018 at the request of Valisure?
22    A    No, I don't. We have records of that.
23 We should be able. Right off the bat, I don't. It
24 might have been Mylan, Teva, Aurobindo, a number of
25 manufacturers we might have been testing.

30 (Pages 114 - 117)

Page 118

1    Q    If we go back to your declaration for
2  a minute -- bear with me a minute.  My exhibits
3  disappeared from my screen, so we have to find it
4  again.  If we go to your declaration, we marked it
5  as Exhibit No. 1?
6    A    Would you mind?  I'd like to take a
7  quick break, five minute break.
8         MR. NIGH:  Yeah, let's take a ten
9  minute break.
10        THE WITNESS:  Ten minute break?  Okay.
11        THE VIDEOGRAPHER:  The time is 12:47.
12  This ends Media 3.
13        (A recess was taken.)
14        (After the recess the following
15  occurred:)
16        THE VIDEOGRAPHER:  The time is now
17  1:00.  This begins Media 4.  You may proceed.
18  BY MR. TRISCHLER:
19    Q    I wanted to ask you a couple followup
20  questions on some of the issues that we covered
21  before the last break, Doctor.  We talked about the
22  2021 FDA inspection of Emery Pharma.  Do you recall
23  that?
24    A    Yes.
25    Q    And what I wasn't clear about is what

Page 119

1  is the current status of that 483, is it open or
2  closed?
3    A    It's in the process of closing,
4  because what happens is you're working toward
5  getting, basically, backup system, Cloud system
6  essentially working, you know, and validated an all
7  of that.  So that's been in the process of
8  implementation and validation as we speak.
9    Q    So "in the process" means that it's
10  still open?
11    A    It's still open.
12    Q    And is your lab on OAI status?
13    A    What's OAI?
14    Q    Official action indicated, I think is
15  what it stands for.
16    A    I have to check with my QA people.
17    Q    Was an establishment inspection report
18  issued; do you know?
19    A    I don't know.
20    Q    What -- and then going back to your
21  early valsartan work in the early part of 2018, you
22  said that that was prompted by a contact from
23  Valisure that asked you to do some testing.  Can you
24  tell me who or what information you received from
25  Valisure that caused them to be interested in

Page 120

1  testing valsartan before the FDA was even aware of
2  an issue?
3    A    So, you know, to be very frank to you,
4  I don't know whether it was done before FDA official
5  recall or after.  I would have to check on that, but
6  I was contacted by the president of Valisure David
7  Light and he wanted us to check the levels of NDMA
8  in valsartan.
9    Q    And you agreed to do that at his
10  request?
11    A    And he had data already.  He also had
12  GCMS data that showed high levels of NDMA genotoxic
13  compound, and so I was very concerned because
14  actually my mom was taking valsartan a few years
15  ago, so I agreed to do the work.  We might not have
16  even charged them.
17    I think we probably charged them, I don't
18  know, but we ran the same pills that they had ran and
19  we corroborated their data that indeed there were
20  high levels of NDMA in valsartan, and we might have
21  tested for NDEA as well.  I'm not sure.
22    Q    What test method did you utilize
23  during that initial testing?
24    A    We used two or three official FDA
25  methods that has been published.  I think we used

Page 121

1  one of those methods.
2    Q    Well, the FDA didn't publish -- this
3  is the thing that's confusing to me trying to piece
4  together the timeline.  FDA didn't publish a test
5  method for nitrosamine testing until the fall of
6  2018.
7    A    Right.
8         MR. NIGH:  Form objection.
9    Q    So that's why I asked what test method
10  were you and Valisure running.
11    A    I would have to get that.  I don't
12  know.  For the purpose of this deposition I really
13  was not prepared to discuss any of that, but I am
14  not prepared.  It's not in my declaration.
15    Q    So let's go to the declaration, if I
16  can.  It's paragraph -- first part I want to talk to
17  you about is paragraph 2 of the declaration I think
18  you said you have in front of you, Doctor.
19    A    If you want me to elaborate on that, a
20  lot of that was published in citizen petition by
21  Valisure and I think some of our data I think he
22  mentioned the data levels and all of that and the
23  methods may be actually there as well.
24    Q    Were you talking about the Valisure
25  petition relating to ranitidine?

31 (Pages 118 - 121)

Page 122

1      A      Valsartan. I think they did have
2  something on valsartan as well.
3      Q      Did you ever file a citizens petition
4  related to valsartan?
5      A      No.
6      Q      And when I say "you," I also mean
7  Emery Pharma?
8      A      No.
9      Q      You think Valisure did?
10      A      Maybe I'm mistaken. I think they
11  have. You can Google it. I may be mixing it with
12  their citizen petition relating to ranitidine.
13      Q      I'm glad you brought it up, because it
14  sort of led to another question that I had that
15  wasn't clear to me.
16          You were quick to tell me that part of the
17  mission statement of Emery Pharma is to save lives
18  and preserve the environment. Do you remember
19  telling me that?
20      A      FDA -- I mean Emery Pharma's mission
21  is to helping our client save lives and save the
22  environment.
23      Q      And that was part of the rationale
24  behind your issuance or decision to prepare and
25  submit a citizens petition relating to ranitidine?

Page 123

1      A      We filed -- a lot of the work we did
2  on ranitidine was done at our own expense, at our
3  own behest primarily for the safety of the public.
4  And we do that all the time; public comes to us and
5  they want us to look at something. If they don't
6  have the proper funding, we do it at pro bono and we
7  check the drug for various impurities and problems.
8      Q      But the work you're doing in
9  ranitidine and valsartan is not pro bono, is it?
10      A      So some of the work may be pro bono.
11  A lot of the work that we did on ranitidine citizen
12  petition, almost 100 percent of the work that was
13  done for citizen petition was pro bono.
14      Q      Okay. Why did you never submit a
15  citizens petition with respect to valsartan?
16      A      I think there wasn't any necessity for
17  that. I think there was -- you know, obviously
18  valsartan, it was recalled and I think Valisure was
19  making a lot of noise, so it was already the public
20  was alerted. And my goal as the CEO of Emery Pharma
21  is if there is a problem with a drug, I will alert
22  the FDA through some form of petition, and we
23  recently actually filed a citizen petition on
24  vitamin B6. You may be taking vitamin B6. You may
25  want to read it; and, again, entirely at our own

Page 124

1  expense.
2      Q      Is that your second citizens petition
3  then that you were submitting?
4      A      Yes.
5      Q      Have there been any others since then?
6      A      No.
7      Q      And you said Valisure was making a lot
8  of noise about valsartan, but have you ever seen a
9  citizens petition from them?
10      A      I don't recall.
11      Q      With regard to valsartan?
12      A      My memory is failing. I think -- I
13  don't think valsartan -- I mean, you guys can google
14  it, whether Valisure filed any citizen petition on
15  valsartan. I don't think so. I think they just
16  made a lot of press release, but I think the
17  valsartan was removed from the market primarily due
18  to Novartis finding genotoxic compound NDMA in
19  valsartan from GMP and then effectively FDA was
20  alerted. I think that's how the things kind of --
21  how sort of everything fell into the, you know,
22  basically the recall.
23      Q      Did you have any -- have you ever had
24  any communications with Novartis about valsartan
25  testing?

Page 125

1      A      None.
2      Q      Have you ever had any communications
3  with Novartis about Diovan testing?
4      A      None.
5      Q      Have you ever had any communications
6  with Novartis about Exforge testing?
7      A      None.
8      Q      So going to paragraph 2 of your
9  disclosure or declaration -- excuse me, I want to
10  ask you about the last sentence in particular where
11  you talk about the methodologies that you employed
12  in formulating your opinions in this case and you
13  write, "These methodologies used in formation of my
14  opinions are also used by Emery Pharma in making
15  recommendations to our pharmaceutical clients." Did
16  I read that correctly?
17      A      Yes. Just let me read it. Yes, I
18  agreed with that.
19      Q      And based on what you already told me,
20  I take it you're not going to tell me who your
21  pharmaceutical clients are you are referring to in
22  paragraph 2?
23      A      I cannot. We are under
24  confidentiality.
25      Q      So you can suggest that you're

32 (Pages 122 - 125)

Page 126

1  following a methodology that you employ about your
2  clients but then conveniently not tell me who the
3  clients are, right?
4       A    We are under obligation from the
5  clients not to disclose their name.
6          MR. NIGH: Form objection.
7       Q    Are any of these clients defendants to
8  the ranitidine litigation?
9       A    No.
10      Q    Are any of them defendants to the
11 metformin litigation?
12      A    No.
13      Q    Are any of them defendants to this
14 litigation, if you know?
15      A    No.
16      Q    Are any of the unknown undescribed
17 clients that you make reference to, are any of them
18 generic drug manufacturers?
19      A    No.
20      Q    Did any of them manufacture ARBs?
21      A    No.
22      Q    So you don't have any clients that you
23 would be advising on the contents of an abbreviated
24 new drug application, correct?
25      A    We do have clients that we advised on

Page 127

1  the contents of new drug application and abbreviated
2  new drug application. However, none of them are the
3  defendants. None of them are the plaintiffs. None
4  of them are manufacturing ARBs as far as I know and,
5  you know, these are -- we work on mostly branded
6  products, some generic, sort of modified generic,
7  branded generic but nothing to do with ARBs.
8       Q    Well, what generic -- excuse me. What
9  generic products are you working on with generic
10 drug manufacturers?
11      A    I can't think of it right now. I mean
12 a number of them -- there are a number of products
13 that we are working on.
14      Q    Well, if these products have a patent
15 there is no secrecy to the identity of the active
16 pharmaceutical ingredient that you're working on
17 with the --
18      A    I can't recall off the top of my head
19 what generics we're working on.
20      Q    So as you sit here today you can't
21 tell me a single generic product you're advising a
22 client about?
23      A    No.
24      Q    Have you ever told any of your
25 pharmaceutical clients who manufactured generic

Page 128

1  drugs that their products are adulterated if their
2  impurity profiles do not match the RLD?
3       A    I have told our clients that if their
4  impurity profile contains a genotoxic compound, we
5  will let them know.
6       Q    Thanks. That wasn't my question. My
7  question is have you ever told your clients that
8  they will be producing an adulterated generic
9  product if they have an impurity profile that does
10 not match the RLD; is that advice that you've ever
11 given to your pharmaceutical clients in the real
12 world?
13      A    Okay. So, here is my answer. If
14 their impurity profile -- you know, their impurity
15 profile may not match the RLD. However, if their
16 impurity profile contains genotoxic compound, we
17 will let them know and we will help them to prevent
18 formation of genotoxic compound.
19      Q    Okay. That's fair. So the mere
20 differences in the impurity profile alone does not
21 make a drug adulterated?
22      A    Right.
23          MR. NIGH: Form objection.
24      A    Mere --
25          THE WITNESS: Can I respond, Daniel?

Page 129

1          MR. NIGH: Yes.
2       A    A mere difference -- we have repeated
3  this question many times. I will repeat it.
4  Hopefully you guys can go back and see I am very
5  consistent. Mere difference in the impurity profile
6  so long as there is no genotoxic compound, it's
7  fine.
8       Q    And the fact of the matter is the FDA
9  permits variability in purity, size, strength and
10 other parameters when evaluating an abbreviated new
11 drug application, agreed?
12      A    FDA allows variability in the impurity
13 profile with respect to the reference listed drug as
14 long as it does not contain genotoxic compound --
15      Q    And we talked about --
16      A    -- namely nitrosamines.
17      Q    We talked about the acceptance
18 criteria for impurities as published in the USP
19 being no more than 0.1 percent. Do you remember
20 that?
21      A    I remember the acceptance criteria of
22 the USP not showing any NDMA and not having any
23 limits on the NDMA. To me that means zero NDMA.
24      Q    So the fact that what the USP monitor
25 says is that unknown impurities can be no more than

33 (Pages 126 - 129)

Page 130

1    0.1 percent, right?
2        A    Unknown non genotoxic impurities can
3    be around .1 percent or a little higher.
4        Q    But what you're saying is the
5    monograph itself is silent as to genotoxic
6    impurities, correct?
7        A    Their silence is because they assume
8    zero NDMA. They assume zero genotoxic brought.
9        Q    And that's written nowhere in the
10   monograph itself or in any USP publication, correct?
11       A    Exactly. Because it's not written, it
12   means it should be nonexistent.
13       Q    And --
14       A    Because the RLD was nonexistent,
15   because the Diovan and Exforge had no NDMA.
16       Q    Are you aware of any drug manufacturer
17   anywhere in the world that was doing
18   nitrosamine-specific impurity testing prior to FDA's
19   notification of the potential for nitrosamine?
20       A    Yes, I am. I am aware.
21       Q    In 2018?
22       A    Yes, I aware of a pharmaceutical
23   company that does test for NDMA.
24       Q    And who is that?
25       A    Novartis, at least one which is

Page 131

1    Novartis.
2        Q    How do you know -- excuse me. How do
3    you know what test methods Novartis was using prior
4    to June of 2018, what's your source of information?
5        MR. NIGH: Outside the scope.
6        A    Prior to 2015 -- sorry, 2018, all I am
7    aware is that Novartis discovered the NDMA in the
8    ZHP product and it's because they were looking for
9    it. They found it. They were testing it. They had
10   space and they saw the impurity and identified the
11   impurity. It takes no more than 10 minutes by
12   running a GCMS to identify NDMA.
13       Q    My question is what is your source of
14   information that Novartis was doing nitrosamine
15   testing prior to June --
16       A    Public information.
17       MR. NIGH: Outside the scope.
18       Q    Can you cite me to that public
19   information, because I've never seen it.
20       MR. NIGH: Outside the scope.
21       A    European medical authority has written
22   about it. It was to, you know, basically -- I think
23   that's part of EMEA in one of their reports I recall
24   seeing it that they mentioned that Novartis saw it
25   or maybe it was chemical engineering news, but I

Page 132

1    think you can Google it. You should be able to see
2    Novartis. Just type in Novartis nitrosamine
3    impurity. I think you will run into chemical
4    engineering news. I might have been cited there was
5    well.
6        Q    Didn't you develop specialized test
7    methods to test for nitrosamines in the latter parts
8    of 2018 and 2019?
9        A    I don't believe so.
10       MR. NIGH: Objection. Outside the
11   scope.
12       A    I don't believe so. I think I used a
13   standard nitrosamine methodology.
14       Q    Did you develop a liquid LCMS method?
15       A    We did. We developed our own LCMS
16   method primarily not for valsartan, but for other
17   drugs.
18       Q    For Zantac?
19       A    Yes.
20       Q    So if we look at --
21       A    And beyond Zantac. We also tested
22   probably 20 other drugs as well.
23       Q    Twenty other drugs for nitrosamines?
24       A    Yes.
25       Q    How did you pick what 20 drugs you

Page 133

1    were going to test?
2        A    We look at structural clues. You look
3    at structural clues in a pharmaceutical molecule and
4    you say this molecule could be prone to NDMA
5    formation and that's called structural clues. If
6    someone skilled in the art of chemistry looks at
7    valsartan synthesis, there are -- it's shouting.
8    That synthetic route is shouting that it's going to
9    be forming a NDMA. We use those kinds of structural
10   clues to look at other compounds to see whether they
11   form NDMA or not.
12       Q    What are the 20 other drugs you
13   tested?
14       A    I can't -- off the top of my head I
15   can't recall.
16       Q    Can you recall any of them?
17       A    We looked at -- obviously we looked at
18   nizatidine, which is a cousin of ranitidine. We
19   looked at famotidine, which is also an anti-acid.
20   We looked at a whole bunch of antacids, you know,
21   and we might have looked at some over-the-counter
22   sort of diphenyl hydramine; you know, things like
23   that.
24       MR. TRISCHLER: I'm sorry. I need to
25   take a break. I've got something I need to take

34 (Pages 130 - 133)

Page 134

1  care of. I had an appointment scheduled for 4:30
2  that I realize I'm going to have to cancel, so I
3  need a couple minutes to take care of that. Sorry,
4  Dan.
5          MR. NIGH: What's the problem? Let's
6  take a ten minute break.
7          THE VIDEOGRAPHER: The the time is
8  4:24. We are going off the record.
9          (A recess was taken.)
10          (After the recess the following
11  occurred:)
12          THE VIDEOGRAPHER: The time is now
13  1:36. We're back on the video record.
14  BY MR. TRISCHLER:
15      Q    So, Doctor, you have told me that it
16  is -- that it's your opinion that a drug company
17  should not sell a product with any nitrosamines,
18  correct?
19      A    That's what I said.
20      Q    And we talked about the fact that the
21  regulations allow unknown impurities as high as
22  300,000 nanograms for a 320-milligram tablet
23  product, you interpret that requirement as USP
24  specification as saying it applies only to non geo
25  toxic?

Page 135

1      A    Genotoxic.
2          MR. NIGH: Form objection.
3      Q    Right. It applies only to non
4  genotoxic?
5          MR. NIGH: Form objection.
6      A    I don't understand your question. My
7  apologies. Could you repeat?
8      Q    Yes, I will ask again.
9      A    Could you ask a specific question?
10      Q    I will ask it again. I was trying to
11  make sure I understood your testimony. I think I
12  do, but what you've told us is the USP specification
13  that allows for unidentified impurities to be as
14  high as 300,000 nanograms in a 320 milligram product
15  only applies to non genotoxic impurities?
16          MR. NIGH: Form objection.
17      A    That applies to non genotoxic
18  impurities.
19      Q    Right. If I misspoke, I apologize.
20      A    Right.
21      Q    That's what I understood, and that's
22  because you interpret the absence of any
23  specification in USP as a dictate or a mandate that
24  the requirement for genotoxic impurities must be
25  zero?

Page 136

1          MR. NIGH: Form objection.
2      A    Let me explain. So requirement for
3  genotoxic impurities are far lower than regular
4  impurities. So you must have a lot less genotoxic
5  impurities in your drug and the levels are listed.
6  In the case of specifically nitrosamines and
7  specifically NDMA, the requirements should be zero.
8      Q    And you indicated that you were aware
9  of at least one company prior to 2018 that was
10  testing its product and making sure that its
11  valsartan nitrosamine levels were zero, and that
12  company was Novartis?
13          MR. NIGH: Form objection.
14      A    As far as I know, there may be many,
15  many more companies testing their compounds for
16  nitrosamines, but as far as I can tell from,
17  basically, public records, you know, NDMA --
18  obviously Novartis looked for NDMA. Novartis found
19  NDMA in their API, and I can only give you my
20  opinion that Novartis perhaps -- they buy a lot of
21  APIs from China and India. Perhaps they look for
22  NDMA in every API they buy.
23      Q    And do you -- you indicated that or
24  you offered the opinion that a drug company that
25  sells a pharmaceutical product that contains a

Page 137

1  genotoxic impurity at any level or any concentration
2  is not equivalent to the reference listed drug
3  because the reference listed drug does not have
4  genotoxic impurities, right?
5          MR. NIGH: Form objection. You could
6  answer.
7      A    The genotoxic drugs, you know, have
8  limits that they need to abide by in an active
9  pharmaceutical ingredients and there are specific
10  numbers and the numbers, Clem, is not 300,000 parts
11  per million. It's in the hundreds of parts per
12  million, maybe even much less.
13      In the case of nitroso, nitrosamines and the
14  n-dimethyl nitrosamine the requirements are zero
15  because this is a genotoxic, DNA reactive,
16  cancer-causing molecule. And furthermore, FDA says
17  the levels should be zero because there are synthetic
18  methodologies. In layman's terms there are recipes
19  to make valsartan without any NDMA, so manufacturers
20  should use that recipe. And, you know, that's my
21  opinion and I think the levels should be zero for
22  NDMA.
23      For other genotoxic compounds there are
24  specific levels and one has to consult with ICH
25  guidelines, ICH M7 for those levels.

35 (Pages 134 - 137)

Page 138

1    Q    Okay. Well, that's fair. I'll try to
2  confine my questions to NDMA and NDEA. Okay?
3    A    Thank you.
4    Q    And if I understand your opinion, what
5  you've told us is that you're of the opinion that a
6  generic formulation that contains NDMA or NDEA is
7  not equivalent to Diovan or Exforge, because those
8  reference listed drugs have zero NDMA and zero NDEA?
9    A    The generic drugs that contain NDMA do
10  not meet the requirement. I have not tested Diovan
11  or I have not tested Exforge. I can only assume
12  that they are -- they have zero NDMA because they
13  were not recalled, so that's what I said.
14    Q    Well, yeah, and that's what I wanted
15  to get at in terms of trying to understand what we
16  have here today.
17    The opinion that we framed earlier was -- that
18  you intend to offer is that the generic drugs made by
19  valsartan-containing medications made by my client
20  and some of the other defendants for this litigation,
21  you do not believe those drugs are equivalent to the
22  reference listed drug, because you have assumed that
23  the defendant's generic products contained NDMA and
24  NDEA and you assumed that the Diovan and Exforge did
25  not?

Page 139

1    MR. NIGH: Form objection.
2    Q    Right?
3    A    If the manufacturer does not comply
4  with the impurity limits which is really zero, they
5  are responsible -- and they change their procedure,
6  they change their recipe, they change the way they
7  make something, then they need to -- there are these
8  alerting structures. I'm kind of giving away a lot
9  of my opinion that will come later, which is there
10  are alerting structures. These are clues for you.
11  Those alerting structures were ignored and, hence,
12  they now have to deal with NDMA and all the issues
13  and --
14    Q    I appreciate the sneak preview, but I
15  honestly don't want to go there. What I just want
16  to understand is --
17    A    The assumption.
18    Q    Perhaps if you will let me explain, I
19  can ask a question that's fair and easy to
20  understand, Doctor. I just want to make sure I
21  understand the assumption that forms the basis for
22  your opinion that you've offered so far in the
23  declaration we have.
24    You told me that there's two core opinions.
25  One of them is that generic drugs at issue in this

Page 140

1  litigation are not equivalent to the reference listed
2  drug and you have reached that opinion based on the
3  assumption that the reference listed drugs contain
4  zero NDMA and zero NDEA, right?
5    A    Mm-hmm.
6    Q    Is that "yes"?
7    A    Yes.
8    Q    Okay. And one of the things that
9  jump-started you in this arena and I presume
10  provides you some basis for that assumption is you
11  started working with Valisure on nitrosamine testing
12  of valsartan before there was even litigation,
13  right?
14    A    So, Clem, as I have stated before, I'm
15  not sure when we have actually officially started
16  with Valisure. It might have been before, it might
17  have been after, but that's what I can tell you.
18    Q    Fair enough.
19    A    I'm sure if Daniel would be okay, I
20  can, you know, get that information to you.
21    Q    Fair enough.
22    A    But the fact remains that whether if
23  before or after we tested your client's pills, maybe
24  your client's pills, honestly I don't know, I'm not
25  prepared to tell you what we have until I can give

Page 141

1  you reports of those, but they had high, high levels
2  of these genotoxic compounds. And I wouldn't want
3  anybody to be taking those drugs, you know, on long
4  term basis because that would be -- you know, that
5  wouldn't be good whether it would be my mother or
6  your mother.
7    Q    Well, my mother already passed, so I'd
8  be happy to have her take valsartan with or without
9  genotoxic impurities right now.
10    A    I'm sorry to hear that.
11    Q    But be that as it may, what I was --
12  and I didn't mean to misstate your testimony about
13  the timing of your work with Valisure. You did tell
14  me you couldn't be sure whether it was before or
15  after the FDA involvement, so I grant you that.
16    A    Yes.
17    Q    But what you did talk about and what
18  you did explain to me was that Valisure brought the
19  issue of the potential for nitrosamines in valsartan
20  to your attention and sort of asked you to help with
21  the testing and evaluation, right?
22    A    One hundred percent.
23    Q    Okay. And so you had a chance to look
24  at the testing that was done by Valisure early on on
25  the valsartan and to independently validate it

36 (Pages 138 - 141)

Page 142

1 through the work of your own lab?
2    A    Yes, we did.
3    Q    So there is no question in your mind
4 that the results of testing as documented by
5 Valisure and its findings on nitrosamine contents in
6 valsartan were accurate?
7    A    We repeated Valisure's work according
8 to our own procedures and we, I think we -- the
9 result what we told Valisure was that the numbers
10 they got was pretty much in the ballpark.
11    MR. TRISCHLER:  Did anyone hear the
12 doctors' answer?  I saw his lips moving but didn't
13 hear anything.
14    MR. NIGH:  I could hear it.
15    A    I said.  Let me repeat.  Can you hear
16 me okay?
17    Q    Now I can.
18    A    Okay.  What I said was we concurred
19 with Valisure that they had correct nitrosamine
20 numbers for their valsartan pills and they sent to
21 us the same pills that they tested.  I specifically
22 warned Valisure to get it tested at a third-party
23 lab.  He called me, asked me for my advice.  I said
24 you want to get it at a third party lab to make
25 sure.  I think he was planning to do some press

Page 143

1 release or something, and that's what we did.  And
2 we told them yes, I think, and then he basically did
3 something with that data.  So...
4    Q    Okay.  And then you mentioned -- and
5 so essentially I think you just answered what my
6 question was.  My question was, did you have the
7 opportunity and did in fact independently
8 corroborate the Valisure data as it related to
9 valsartan nitrosamine quantification?
10    A    That's correct.  We corroborated their
11 data.
12    Q    And then you made mention early on --
13 I shouldn't say early on.  You paid mention before
14 our last break about a citizens petition and you
15 suggested that you thought somewhere in your memory
16 bank that Valisure might have done a citizens
17 petition that might have related some way or somehow
18 to valsartan.  Do you remember that?
19    A    Yes.  I don't think they have.
20    Q    I found something I want to ask you
21 about, and Frank from my office is there.
22    MR. TRISCHLER:  Frank, do you have the
23 June 13, 2019, Valisure citizens petition and can
24 you have that marked as the next numbered exhibit?
25    MR. STOY:  Yes.  I just uploaded it a

Page 144

1 minute ago.  Bill, do you have it?
2    THE VIDEOGRAPHER:  I have it.  I am
3 downloading it.  Just give me one moment.  For the
4 record, that would be Exhibit 28 is the next one in
5 line.
6    MR. TRISCHLER:  Okay.  Can you put up
7 Exhibit 28, please.
8    Q    This is on the Valisure letterhead
9 dated June 13, 2009.
10    A    Right.
11    Q    Take a look at the first couple
12 paragraphs.  Does it refresh your recollection at
13 all?
14    A    Now I recall.  I think they did file
15 something with the FDA, but this is regarding DMF, I
16 think.
17    Q    You're correct that it does relate to
18 dimethylforamide which is DMF, right?
19    A    Dimethylformamide.
20    Q    Formamide, okay?  I'll try to do
21 better.  I didn't do very well in chemistry.
22    A    No, no.  I just get insulted when they
23 mispronounce these chemical names, that's all.  No
24 worries.
25    Q    I was trying to say the chemical name

Page 145

1 to distinguish from DMF to refer to drug --
2    A    Yeah.
3    Q    So dimethylformamide is subject of
4 Exhibit 28, correct?
5    A    Correct.
6    Q    But there's also reference to NDEA
7 testing was done by Valisure IN this citizens
8 petition, correct?
9    A    Right.
10    Q    As I said, you saw this citizens
11 position before.
12    A    Right.
13    Q    And you had validated the test results
14 that are reported in here?
15    A    Yes.
16    Q    And if we look at Appendix A to the
17 report, what we have is a summary of NDMA levels and
18 DMF levels in valsartan tested by Valisure and
19 confirmed by your lab?
20    A    Did they mention our name in this
21 report, can you Google it?
22    Q    I don't know, but --
23    A    If they didn't mention our name, then
24 we didn't have anything to do with it.
25    Q    Well, you already told me that you had

37 (Pages 142 - 145)

Page 146

1  validated their testing and corroborated the
2  results, right?
3      A    NDMA?
4      Q    Right.
5      A    NDMA, but that's if they mentioned our
6  name, then it would be corroborated, but if they
7  didn't mention our name, it was on its own.
8      Q    Well, I only planned on asking you
9  about the NDMA results reported in this.
10     A    Please.
11     Q    As you said at least five or six times
12  it's called by Valisure to corroborate their data?
13     A    Yes, but you know -- okay.  Go ahead.
14         MR. NIGH:  Form objection.
15     Q    So if you look at the Appendix A,
16  you're looking at the first page there.  If you flip
17  to the next page, page 10, there's more results
18  reported.  Do you see that?
19     A    Right.
20     Q    Page 111 there's more results
21  reported?
22     A    I don't think we tested that many
23  different pills and lots for them.
24     Q    I am only asking about what's shown
25  here in the document.  There's more testing

Page 147

1  reported, correct?
2      A    Okay.
3      Q    And the manufacturers whose product
4  was tested was also identified in Appendix A,
5  correct?
6      A    Mm-hmm.
7      Q    Is that "yes"?
8      A    Yes.
9      Q    Interestingly, one of the
10  manufacturers is Novartis.
11     A    Okay.
12     Q    And if you look at page 12, there is
13  results of seven test samples of Novartis product
14  listed, correct?
15     A    Right.
16     Q    There was NDMA found in every single
17  Novartis tablet, correct?
18     A    Yes.
19     Q    Is that correct?
20     A    That's what you're showing me.
21     Q    So your assumption that underlies your
22  opinion in this case that Novartis' valsartan
23  contained zero NDMA is not supported in the testing
24  done by Valisure and it was validated by your lab.
25         MR. NIGH:  Form objection.

Page 148

1         MR. TRISCHLER:  What's that?
2         MR. NIGH:  I just said "form
3  objection."
4         MR. TRISCHLER:  I meant what's that to
5  the witness.
6      A    And I respond to that I'm not -- I
7  cannot confirm to you that we corroborated it
8  everything that Valisure is presenting in this
9  report vis-a-vis the fact that our name has not been
10  mentioned on this citizen petition.
11         Typically if we do not corroborate something,
12  they shouldn't put our name.  If they are not putting
13  our name, it means we didn't have anything to do with
14  these.
15     Q    Your assumption that Novartis, Exforge
16  and Diovan formulations contained zero NDMA is not
17  supported in the data from the citizens petition of
18  Valisure, is it?
19     A    Based on what Valisure is reporting
20  to, you know, I cannot corroborate their data
21  because we didn't do it.  This is their data.
22     Q    And their data does not support your
23  assumption.  That's all I asked.
24     A    If their data is correct -- you know,
25  I don't know if they are data are correct.  Now

Page 149

1  having said that, you know, Clem, the levels that
2  were -- the interim allowable limit of NDMA, as you
3  know, is 96 nanograms.  So under the recall,
4  official recall and notice, anything under 96
5  nanograms would not be recalled.  So Novartis would
6  not be a recalled product.
7      Q    I didn't ask you if it would be a
8  recalled product and you were also very clear to me,
9  Doctor, that NDMA and NDEA content in its drug
10  product must be zero.  You said that five times to
11  me.
12     A    That should be the goal of the
13  manufacturers to have zero NDMA and NDEA.
14     Q    And you criticized my clients because
15  they had NDMA and NDEA levels higher than zero.
16     A    They had levels of 2,000 and 3,000
17  nanograms.
18         MR. NIGH:  Hold on.  Hold on.  Hold
19  on.  Hold on.  Form objection.  Does he even know
20  your client?
21         MR. TRISCHLER:  He's your expert.  I
22  don't know.
23         MR. NIGH:  Okay, because we are
24  getting way off comment on some of these topics.  He
25  has not said in terms of your client.

38 (Pages 146 - 149)

Page 150

1    MR. TRISCHLER: He just said my
2  client.
3    Q    Dose levels of 2,000 nanograms; is
4  that your testimony, sir?
5    A    I don't -- I am goin on what was
6  published by FDA. So you can Google that and see
7  what FDA was published and double check that to see
8  if your clients is part of that FDA recall and FDA
9  numbers.
10    Q    I can do a lot of things, Doctor. I
11  spend way too much time online. What I'd like to do
12  is ask you questions. And my question is, is it
13  your testimony that Mylan had NDEA reported at
14  levels of 2,000 to 3,000 nanograms in its
15  valsartan-containing products?
16    MR. NIGH: This is far outside the
17  scope of his certification and declaration at this
18  point. I mean, you can read it. He doesn't mention
19  a single thing about Mylan.
20    MR. TRISCHLER: He volunteered and I
21  am allowed to follow that up.
22    MR. NIGH: No, that's not actually
23  true. I have a lot of questions to go far outside
24  the scope at this point, but this is way outside of
25  the scope of his seven page declaration. Not a

Page 151

1  single place in here does he ever mention any of the
2  defendants' testing levels and I think you know
3  that. So, again, at this point we're getting way
4  outside. I have allowed some exploration at some
5  point, but this has no basis in his declaration at
6  this point.
7    MR. TRISCHLER: I think I'm entitled
8  to an answer to the question. You've objected. You
9  can argue whether --
10    MR. NIGH: I am going to instruct him
11  not to answer at this point. We have gone far
12  outside the scope.
13    MR. TRISCHLER: Just so that I'm
14  clear, the witness stated that my client had levels
15  of 2,000 to 3,000 nanograms and you are not allowing
16  me to follow up on that?
17    MR. NIGH: Just so you're clear, I
18  think that question was far outside the scope in the
19  first place. He is not here to offer an opinion as
20  to what the levels are or your client's levels. He
21  is not here to offer an opinion as to what any of
22  the clients' levels are. His opinion clearly states
23  valsartan which contaminated NDMA or NDEA, period,
24  not about levels.
25    Q    You told us, Doctor, generic drug

Page 152

1  products contain any NDMA, NDEA is not equivalent to
2  Novartis who is the reference listed drug holder,
3  because Novartis' levels are zero. The data from
4  Valisure suggests that that's not true. Agreed?
5    A    My position is that levels of NDMA and
6  NDEA should be zero in any valsartan pills.
7  Novartis might have some valsartan at higher level,
8  have some NDMA in it. They might have had -- in
9  fact, they were buying -- from my understanding they
10  were buying ZHP's API and they were using ZHP's API,
11  so I am not surprised they ended up with some NDMA,
12  but prior to ZHP and any of the defendants' products
13  Diovan and, you know, Exforge going generic, I
14  believe they had their procedure, their process
15  produced no NDMA.
16    Q    Have you ever reviewed the new drug
17  application for Diovan?
18    A    I have reviewed a lot of documents,
19  yes.
20    Q    I didn't ask if you reviewed a lot of
21  documents. Have you ever reviewed the new drug
22  application for Diovan?
23    A    I have reviewed it.
24    Q    Where did you get it?
25    A    You know, I think maybe, you know, the

Page 153

1  plaintiff's lawyer shared it with me.
2    Q    I'm surprised that Novartis would turn
3  over their proprietary documents to the plaintiff's
4  lawyers. So your testimony is you've seen the new
5  drug application?
6    A    I might have seen it. I reviewed a
7  lot of different documents.
8    Q    Well, it was not disclosed or provided
9  in any of the materials that were given here to me.
10    A    I cannot recall, but I reviewed a lot
11  of different documents relating to valsartan
12  manufacturing; valsartan -- you know, there is a lot
13  of public information regarding the manufacturing
14  process.
15    Q    Chemistry manufacturing controls
16  submissions as part of Novartis' new drug
17  application. It's not public information, is it?
18    A    What is your question?
19    Q    I just asked you that one. There is a
20  CMC section a new drug application, public
21  information.
22    A    What is your question?
23    Q    I will ask it a third time. Is the
24  CMC section of a new drug application public
25  information?

39 (Pages 150 - 153)

Page 154

1     A     CMC section shouldn't be public
2  information.
3     Q     So I am trying to understand your
4  testimony under oath that you've seen and been
5  provided with the NDA for Diovan.  Where did you get
6  it?
7     A     I said I have reviewed.  I didn't say
8  I've seen it.  I said I have reviewed a lot of
9  documents, you know, from different manufacturers,
10  perhaps including Novartis' procedures, but
11  Novartis' procedures and chemical manufacturing
12  procedures has been disclosed in their patents.
13  It's been published.  There's plenty of literature
14  on it.
15     Q     So if I hear what you're saying now
16  and if we're looking for honest, forthright
17  testimony, it sounds like you don't know whether
18  you've seen the NDA for Diovan, correct?
19        MR. NIGH:  Form objection.
20     A     I don't know if I've seen it.
21     Q     All right.  In your career, sir, have
22  you ever prepared an abbreviated new drug
23  application seeking to obtain FDA approval to market
24  any generic equivalent drug product?
25     A     In my career I have been involved in

Page 155

1  many IND filings, CMC sections of IND, CMC sections
2  of NDA, ANDA for my clients, not specifically for
3  any of my own specific products.
4     Q     My question was have you ever been
5  involved in preparing --
6     A     Yes, I have.
7        MR. NIGH:  Hold on.  Dr. Najafi.  Wait
8  until he finishes his question.
9     A     Sorry.
10        MR. NIGH:  And then answer.  We're
11  getting --
12        MR. TRISCHLER:  Sorry, Dan.
13     Q     What abbreviated drug applications did
14  you prepare and submit to the FDA?
15     A     Confidential.
16     Q     For what drugs?
17     A     For drugs that -- from our clients'
18  drugs.
19     Q     Tell me the names of the drugs.  The
20  active pharmaceutical ingredients are not
21  confidential.
22     A     I can not recall right now.  Also,
23  it's client-specific and a lot of our clients don't
24  want to have their names disclosed.
25     Q     I haven't asked your client's names.

Page 156

1     A     I know.
2     Q     Sitting here today providing -- let me
3  finish before you start.
4        Sitting here today providing testimony under
5  oath, you can't name one drug product where you were
6  involved in submitting the abbreviated new drug
7  applications for its generic formulation, right?
8     A     I cannot recall.
9     Q     Have you ever worked in regulatory
10  affairs for a generic drug manufacturer?
11     A     No.
12     Q     Have you ever --
13     A     I have not worked in regulatory
14  affairs for any generic manufacturers.
15     Q     Have you ever worked or been employed
16  by the FDA?
17     A     I have never been employed by the FDA.
18     Q     Have you ever -- are you familiar with
19  the Center for Drug Evaluation and Research, CDER?
20     A     I have attended many meetings at CDER.
21     Q     Have you ever worked with CDER where
22  you've had responsibility for evaluating new drug or
23  new drug applications?
24     A     I have not been involved with CDER.
25  You should restate your question.

Page 157

1     Q     I should or you need me to?
2     A     Please restate your question.
3     Q     Have you ever worked with CDER where
4  you had responsibility for evaluating new drug or
5  abbreviated new drug applications?
6     A     I have not worked with CDER in
7  evaluating any new drug application.
8     Q     Have you ever been retained as a
9  consultant by FDA office of generic drugs to assist
10  in evaluating any portion of an abbreviated new drug
11  application?
12     A     I have not been involved in generic
13  drug division of the FDA.
14     Q     And I think it's Section 4 of your
15  report -- your declaration you describe FDA
16  expectations and requirements for generic drug
17  manufacturers.  Do you recall that?
18     A     Could you show it to me?
19     Q     Sure.
20     A     Put it on the screen.
21        MR. TRISCHLER:  It's Exhibit 1.  Can
22  you put it up, please.
23     A     Highlight it.
24     Q     Can you flip through it?  I think it's
25  section 4.  I think it starts on page 5, maybe, if I

40 (Pages 154 - 157)

Page 158

1  recall correctly.  There we go.  Do you see that?
2      A    Yes.
3      Q    And as I was saying, this is the
4  section of your report where I think you proceed to
5  describe what you consider to be the expectations or
6  some of the expectations and requirements for a
7  generic drug manufacturer, right?
8      A    Mm-hmm.
9      Q    Is that "yes"?
10     A    Yes.
11     Q    The fact of the matter is, though,
12 Doctor, that you're never had personal
13 responsibility for synthesizing API that was used
14 for generic drug formulation, correct?
15     A    I have not had responsibility in
16 synthesizing an API for a generic drug manufacturer,
17 but I have been involved in, you know, drug
18 development and I've been involved with lots of
19 FDA-related activities and the spirit of what I have
20 put in is if and when you change the chemical
21 process, if you make lasagna by following step one,
22 step two, step three, and if you change that and you
23 create your own recipe, you have responsibility to
24 do proper due diligence to look at structural
25 molecules that give you structural clue to

Page 159

1  protection problem and you need to disclose that to
2  the FDA and you need to do proper due diligence and
3  effectively look for those, you know, potential
4  problem and look for genotoxic compounds and report
5  it.
6      Q    Have you ever developed a synthetic
7  process used for the API of a generic drug
8  formulation?
9      A    I have developed synthetic process of
10 hundreds of molecules in my time and I continue to
11 develop processes for hundreds of molecules, but not
12 for a generic drug, but I can assure you I
13 understand the synthesis synthetic procedure of
14 valsartan.
15     Q    Have you ever had oversight
16 responsibility for manufacturing a generic drug
17 product?
18     A    No.  I have not had oversight
19 responsibilities for a synthesis of a generic drug
20 product or drug substance, but I've had
21 manufacturing responsibilities for lots of synthetic
22 molecules in large scale at my previous company,
23 Aldridge Chemical, at Rhone-Poulence
24 Pharmaceuticals, et cetera, and NovaBay.
25     Q    Have you ever prepared a drug master

Page 160

1  file in connection with an API for a generic drug?
2      A    Not personally.
3      Q    In the notes of deposition that
4  brought us here today, I asked you to provide
5  certain materials to me at the time of the
6  deposition.  One of the things I asked for were any
7  and all papers that you prepared on the topic of
8  drug safety and cancer risk.  Do you remember seeing
9  that request in the notice?
10     A    Yes, I have.
11     Q    I did not receive any papers or
12 publications on those topics, so I have to assume
13 that you have never published on those issues.
14 Would that be a fair assumption on my part?
15     A    I have not published on anything, any
16 genotoxic compound, nitrosamines except the citizen
17 petition which we filed with the FDA regarding
18 nitrosamine which FDA corroborated 100 percent, and
19 I've also presented at a generic manufacturing
20 symposium where my audience was a whole huge number
21 of generic manufacturing people.
22     Q    I appreciate that, but my question was
23 a little broader than that.  I had asked for all
24 papers and publications prepared on the broader
25 topic of drug safety and cancer risk.  Have you ever

Page 161

1  published on those topics?
2      A    I haven't published on those topics
3  and what I can -- you know, there are lot of
4  publications.  That's really a toxicologist and
5  epidemiologist sort of activity.  I rely on them.
6      Q    And what you were answering on the
7  topic of nitrosamines what you told me is that
8  you've not submitted any peer-reviewed publications
9  on the issue of nitrosamines and drug products,
10 correct?
11     A    So what's your definition of peer
12 reviewed?
13     Q    My definition of peer review would be
14 a publication in a scientific journal that is
15 reviewed by scientists in the field for accuracy,
16 quality and reliability of methods prior to the time
17 that it's published.
18     A    Our citizen physician, my citizen
19 petition for ranitidine Zantac meets those
20 criterias, so under that circumstance it is peer
21 reviewed.
22     Q    So you consider a citizens petition to
23 be a peer-reviewed publication?
24     A    Absolutely.
25     Q    Who can submit a citizens petition?

41 (Pages 158 - 161)

Page 162

1    A    Anybody can submit a citizen petition.
2    Q    If I sent a citizens petition saying
3  Dr. Najafi's declaration in this case is unreliable,
4  has that been peer reviewed?
5    A    You can certainly do that and it will
6  be peer reviewed by FDA scientists and they will
7  then respond to you that Clem, you're wrong.
8    Q    In formulating the opinions that are
9  contained in this declaration that we're looking at
10  now, did you review any internal Mylan documents?
11    A    In formulating this last declaration,
12  I don't believe so.
13    Q    Did you review by ZHP documents?
14    A    I have reviewed both Mylan and ZHP
15  documents months ago but not in formulating this
16  declaration.
17    Q    And if I ask the same question for the
18  other manufacturer defendants to this litigation:
19  Teva, Aurobindo, Hetero, Torrent; have you reviewed
20  any of their documents?
21    A    I have reviewed. I've spent hours and
22  hours looking at their manufacturing issues, looking
23  at their, you know, all of that, but not for this,
24  you know, putting this declaration together.
25    Q    So in terms of those two core opinions

Page 163

1  we talked about, you don't plan to -- you're not
2  relying upon and did not consider any of the -- any
3  internal documents from any of the manufacturers?
4    A    I did not, no.
5    Q    I asked you before if you reviewed the
6  new drug application for Diovan and you said you
7  could not. Just for completeness sake, do you know
8  if you ever reviewed the new drug application for
9  Exforge or Exforge HCT?
10    A    I cannot recall. I believe I've
11  reviewed a lot of the defendants' material. I might
12  have reviewed some of the publicly available
13  information on the work Ciba-Geigy did which led to
14  Diovan.
15    I've looked at their patents. I've looked at
16  their procedures, their recipes, their synthesis,
17  published data, a lot of that. I have looked at a
18  lot of documents over the last year and a half or so.
19    MR. TRISCHLER: Let's take a break,
20  please. I want to look at some notes and see what I
21  want to do next.
22    MR. NIGH: Take a ten minute break?
23    MR. TRISCHLER: Sure.
24    THE VIDEOGRAPHER: The time is 2:22.
25  This concludes Media No. 4.

Page 164

1    (A recess was taken.)
2    (After the recess the following
3  occurred:)
4    THE VIDEOGRAPHER: The time is now
5  2:48. This begins Media unit 5. You may proceed.
6  BY MR. TRISCHLER:
7    Q    Doctor, I just have a few other things
8  I want to cover with you. One of the documents that
9  was in your file that I was provided with was a
10  chart entitled "valsartan products not currently
11  recalled." Are you familiar with that chart?
12    A    Would you bring it up so we can be
13  looking at the same thing?
14    Q    Sure.
15    MR. TRISCHLER: Frank, are you able
16  to -- it was not in the group of exhibits that I
17  premarked. Are you able to pull it up, Frank, and
18  get it in front of the witness?
19    MR. STOY: Yes. Let me try to find it
20  here. I am going to attempt to share my screen. Is
21  this the document?
22    MR. TRISCHLER: Yes, that's it. Thank
23  you, Frank. I guess we will have this marked as an
24  exhibit and sent to the reporter through the chart,
25  but whatever the next numbered exhibit is.

Page 165

1    THE VIDEOGRAPHER: That will be 29.
2    MR. TRISCHLER: Thank you.
3  BY MR. TRISCHLER:
4    Q    Doctor, can you see this Exhibit 29?
5    A    It is very tiny. Yes, I do.
6    Q    It's a 15 page document. At the top
7  it says "valsartan products not currently recalled"
8  dated September 21, 2015, and it was provided to me
9  by your counsel as part of your file. Do you recall
10  that?
11    A    Yes.
12    Q    And if I understand correctly this
13  would be a list of valsartan products, marketed and
14  sold in the United States that were not subject to
15  any recall at least as of September 2018, right?
16    A    I believe so.
17    Q    And you had mentioned earlier that
18  under the valsartan recalls, products were recalled
19  if they had NDMA content above 96 nanograms per
20  milliliter, right?
21    MR. NIGH: Objection. Go ahead.
22    Q    You can answer.
23    A    Ninety-six nanograms dosage you end up
24  consuming per day.
25    Q    The limit for NDEA, there was a

42 (Pages 162 - 165)

Page 166

1 separate limit for NDEA, right?
2     A    I think NDEA was far lower, maybe 12
3 or 20, something like that.
4     Q    Does 26.5 sound right?
5     A    Yes.
6     Q    And so if valsartan products were
7 tested and the limits observed were above those
8 levels of 96 nanograms for NDMA and 26.5 nanograms
9 for NDEA, they were recalled, is that your
10 understanding?
11     A    That's my understanding.
12     Q    And so this list would be a list of
13 products that had NDEA content of either zero or
14 less than 96 or somewhere in between?
15     A    Right.
16     Q    And these would be -- this list that
17 we will mark as Exhibit 29 is a list of product that
18 would have been tested and had NDEA content of
19 either zero or 26.5 or something in between.
20     A    Right.
21     Q    To your knowledge, have you
22 independently tested any of these
23 valsartan-containing medications that appear on this
24 Exhibit 29?
25     A    I have not.  I'm not prepared in this

Page 167

1 meeting to to take a look at these and compare it
2 with what we have or have not listed, because I'm
3 just -- I don't have the documentations in front of
4 me to tell you what got tested and what didn't.
5     Q    Okay, but based on what we know right
6 now, all of the drug products listed on Exhibit 29
7 may very well have had some NDMA or NDEA in the
8 product, it was simply below the limit established
9 by FDA?
10     A    That's what FDA has obviously done.
11 They have made those determinations based on this
12 interim level, interim level which is 96 or
13 20-something nanograms of NDEA.
14     Q    So as far as we know, every drug
15 listed on Exhibit 29 had some NDMA or NDEA in it,
16 right?
17     A    As far as I can tell you, I have no
18 knowledge of what the exact numbers of NDMA or NDEA
19 is in any of these products.  All I can attest to is
20 that they were not recalled by the FDA.
21     Q    And so you cannot rule out the
22 possibility that every drug listed on Exhibit 29 had
23 some NDMA or NDEA?
24     A    I cannot rule out.  Let me just
25 restate my position.  I believe no NDMA or NDEA

Page 168

1 should be allowed in any valsartan product, period.
2 Zero.  So if they contain NDMA and NDEA and FDA is
3 allowing it above certain limit, that's FDA's
4 prerogative, but in my expert opinion, no NDMA or
5 NDEA should be allowed.
6         I am not a toxicologist, but I know something
7 about the chemistry of NDMA and the fact that it
8 comes a methylating agent, and methylating agents are
9 a fantastic cancer causing agent.
10         MR. NIGH:  Dr. Najafi, make sure you
11 let him finish your question before you answer.
12         THE WITNESS:  My apologies.
13     Q    The limits established by FDA that
14 you've referenced --
15     A    Right.
16     Q    -- 96 nanograms per millimeter for
17 NDMA, that limit remains in effect to this day, does
18 it not?
19         MR. NIGH:  Object to form.
20     A    As far as I know, FDA currently is
21 accepting 96 nanograms as an interim sort of level,
22 but their goal is going to be zero and their goal is
23 going to be basically FDA -- I'm reading from FDA's
24 guidance.  It says FDA advises that nitrosamines
25 should be absent, not detectable for ARBs, API or

Page 169

1 ARB product period, stop.  It's been cited in my FDA
2 general advice document which is actually cited in
3 my report.
4     Q    All I asked you was that the limit of
5 permissible NDMA content of 96 nanograms per
6 milliliter remains in effect to this day.
7     A    As far as I know, 96 nanograms remains
8 in effect and is acceptable today, but may not be
9 acceptable tomorrow.
10     Q    And the 26.5 nanograms limit for NDEA
11 remains in effect to this day?
12     A    As far as I can tell, that remains as
13 an interim acceptable level today but, again, their
14 guidance says they are going to go to zero.  So I am
15 answering your question.
16         MR. TRISCHLER:  All right.  I have no
17 further questions of the witness at this time.  I do
18 think that there are documents that we have
19 requested that have been -- excuse me, documents
20 that have been identified worked on by this witness
21 that were identified during the course of this
22 deposition that are relevant to the witness that
23 have been disclosed in this case and that the
24 witness has been offered.
25         I am going to reserve the right to

43 (Pages 166 - 169)

Page 170

1  bring a motion on that issue to obtain those
2  documents and those records and to redepose the
3  witness on those issues, but for now I don't have
4  any further questions, although I believe there may
5  be a few other people on my side that have some
6  followup.
7        MR. NIGH:  Mr. Trischler, I am going
8  to put my position briefly.  I think at this point
9  we've gone over four hours of record time which is,
10 in many of these questions, have been far outside of
11 the scope.  And the vast majority of documents, if
12 there are any, we presented those objections 48
13 hours ago and do not believe there is a basis to
14 come back for this deposition.
15       In addition, I'm surprised that it's
16 even gone four hours, but it sounds like it's going
17 to go even further and so I don't even know if there
18 will be any time at the end of this.  And to the
19 extent that there is an argument being raised of
20 missing documents, really, the timing here has just
21 gone far longer than we think was necessary.  That's
22 my position.
23       CROSS-EXAMINATION
24 BY MR. GISLESON:
25    Q     Good afternoon, Doctor.  My name is

Page 171

1  John Gisleson and I represent Aurobindo.
2        MR. GISLESON:  If we could go back
3  please, Bill, and pull up Exhibit 17, which is the
4  valsartan USP monograph.
5    Q     So, Doctor, in your career to what
6  extent have you utilized USP monographs in your
7  work?
8    A     We use it almost every day, every week
9  at Emery Pharma to effectively follow, you know, and
10 release drug product and drug substance at Emery.
11   Q     To your knowledge are the USP
12 monographs utilized in connection with
13 manufacturing?
14   A     USP monographs are utilized in
15 connection with manufacturing, yes.
16   Q     Do you know whether the FDA relies at
17 all on USP monographs?
18   A     To some extent they do.  FDA and USP
19 have sort of a tangential relationship with the USP.
20 USP is an independent company and it was formed 200
21 years ago for the purpose of, essentially,
22 standardizing our drug supplies and trying to
23 develop a standardized quality system for the drug
24 on the market.
25   Q     Do you have an understanding as to how

Page 172

1  FDA utilizes USP monographs?
2    A     Can you be specific?  You know, what
3  do you mean by to what extent FDA utilizes?
4    Q     Do you have an understanding as to how
5  FDA utilizes USP monographs?
6        MR. NIGH:  Objection.  Form.
7    A     USP primarily works with the sponsor
8  of the innovators to get the -- you know, basically
9  to get the drug, the generic drugs, you know,
10 effectively easing the generic drug availability.
11       So, for example USP toward the end of the drug
12 patent, USP contacts the brand and says "share with
13 me your protocol.  Share with me your standard.
14 Share with me your impurities," and the drug -- the
15 brand usually does that.  If they don't do it, USP
16 develops its own standards and then everybody has to
17 meet that minimum standard.
18   Q     In your experience, are the USP
19 standards reliable for manufacturers?
20       MR. NIGH:  Form objection.
21   A     Could you repeat your question?
22   Q     Sure.  In your experience, are USP
23 monographs accurate in their prescription of the
24 drug products addressed in the monographs?
25       MR. NIGH:  Form objection.

Page 173

1    A     In terms of reliability, it's a
2  minimum standard that you have to meet, but we often
3  go above and beyond USP.
4    Q     And in your experience, are the USP
5  monographs reliable in terms of the accuracy of the
6  information that they contain?
7        MR. NIGH:  Objection.
8    A     In my experience, USP monograph is the
9  starting point for, you know, for basically looking
10 at the impurity profile.
11   Q     And if we look at Exhibit 17, does
12 this identify specific impurities that have been
13 found in the valsartan product?
14   A     They do.
15   Q     What are the specific impurities that
16 are identified there?
17   A     There are a couple of impurities
18 listed; impurity A, impurity B, but in fact there
19 are more impurities.
20   Q     Do you have an understanding why,
21 then, the USP monograph didn't identify all
22 impurities?
23       MR. NIGH:  Form objection.
24   A     We often find other impurities and we
25 bring it to the attention of the sponsor and show

44 (Pages 170 - 173)

Page 174

1  them that these impurities need to be identified or
2  if the levels are -- meet certain standards, they
3  need to be identified or they need to be, you know,
4  purified, tested, quantified. Really, there are
5  different standards, but no, USP -- how can I say
6  it, it's really just -- it's really an entry point,
7  you know. It's really a starting point. It's a
8  guidance.
9      Q    In your experience are USP monographs
10 updated from time to time?
11     A    I believe they are.
12     Q    In your experience, when USP
13 monographs are updated, would they also include
14 additional impurities that weren't previously known?
15     A    They often do, but they are very slow
16 in doing that. A company such as ours would
17 actually need to contact USP and say, hey, we
18 actually found additional impurities, you know, you
19 should list that and it might take them a couple of
20 years to bring that up and do their own testing and
21 corroborate and all of that and then it might get
22 into that, you know it might get into sort of USP
23 monograph.
24     Q    And in your experience it's good
25 practice when new impurities are identified to

Page 175

1  report those impurities to the FDA; is that right?
2      A    Absolutely. Reporting them to USP is
3  a good practice. If it's a genotoxic compound, I
4  think you want to make an more urgent case reporting
5  it to the manufacturer, reporting it to the USP,
6  reporting it to the FDA in the case of, for example,
7  sartans or ranitidine, Zantac and others.
8      Q    Does the -- and we'll look at
9  Exhibit 17 specifically. Does this USP monograph
10 identify how to test for impurities?
11     A    This USP monograph does provide you
12 with a basic methodology to identify some of the
13 impurities.
14     Q    What is the methodology that's
15 identified on this USP monograph?
16     A    Thank on hang on a second. There
17 is -- to identify impurities you have to go through
18 set up either HPLC or gas chromatography, various
19 instrumentation and set it up, set up the instrument
20 and run it according to the basic principle that USP
21 lays down.
22     Q    What are the specific tests or tests
23 that are identified in this USP monograph for
24 testing for the presence of impurities?
25     A    So they use -- basically to assess

Page 176

1  impurity profile, they are using chromatographic
2  technique. Chromatographic technique means --
3  meaning in this case high pressure liquid
4  chromatography and that's it.
5      Q    If we look under the impurities
6  section on this first page, there's a reference to
7  chromatographic system, see chromatography 621
8  system suitability and then it has mode LC detector
9  UV 230 NM.
10     So what is the information that provides to a
11 manufacturer as to how to test for an impurity?
12     A    You're getting fairly technical here.
13 I don't know whether this is useful for this
14 conversation, but the HPLC is an instrument that
15 there are pumps attached to it. The pumps are
16 pushing. There are two pumps pushing some vents
17 into a column. There's solvent A, solvent B, and
18 depending on what's in the solvent A and B, the
19 column gets conditioned so that the column is a
20 stationery phase. And so the separation happens
21 through the HPLC column and then it goes through a
22 detector and then that detector would be, you know,
23 UV detector. It could be, you know, CHAD detector
24 which stands for charge aerosol detector. It could
25 be ELT detector. It could be a mass spec detector.

Page 177

1      So it goes through the detector and comes out
2  and out of that detector. So any UV active compound
3  gets detected. So in this case they are looking at
4  for UV active compound.
5      Q    How much -- I'm sorry. Continue. Are
6  nitrosamines UV active compounds?
7      A    Nitrosamines are not UV active
8  compounds. So they become invisible, so UV.
9      Q    Using the chromatographic system with
10 liquid chromatography and a UV detector, in your
11 experience is that capable of identifying
12 nitrosamines?
13     A    In my experience you have detectors
14 are not capable of detecting nitrosamines.
15     Q    Does this USP monograph identify that
16 a manufacturer should use gas chromatography, mass
17 spectrometry to test for the presence of nitrosamine
18 impurities?
19         MR. NIGH: Form objection.
20     A    So this specific monograph does not
21 provide you with the, you know, HPLC mass spec
22 detector detection.
23     However, you know, the chemist and the
24 synthetic chemist who is involved with the synthesis
25 of the drug should consider, you know, methods that

45 (Pages 174 - 177)

Page 178

1  do not -- that can potentially show the none UV
2  active compound such as nitrosamine and use of mass
3  spec. For example, HPLC connected to a mass spec or
4  GC connected to a mass spec, that's been around since
5  I was an undergraduate in 1979.
6       Q    How many to your knowledge -- strike
7  that.
8       What drugs prior to June 2018 were found to
9  contain nitrosamine impurities?
10      MR. NIGH: Form objection.
11      A    To my knowledge, you know, the drugs
12  that contained nitrosamine impurities, perhaps not
13  known to me. That doesn't mean that it exists, but
14  nitrosamines have been around since 1970s and
15  knowledge of NDMA has been around since 1970s and
16  WHO has been warning drug companies to look for NDMA
17  through various guidances regarding nitrosamine.
18      And ICH M7 guidelines specifically mentions
19  nitrosamine as the drug of concern as they have -- as
20  the impurities of concerns as a mutagen of concerns.
21  So just because they haven't been shown before 2018
22  doesn't, you know, basically give these guys a pass.
23      Q    You said that you were familiar with
24  current good manufacturing practices. Are you aware
25  of any current good manufacturing practice that

Page 179

1  existed in or before June 2018 that required a
2  manufacturer to test for nitrosamine impurities in
3  pharmaceutical products?
4       A    In current and good manufacturing
5  practices really refers to using the latest
6  technology and in looking for impurities, making
7  sure your drug is safe.
8       And this is exactly to the point I was trying
9  to make earlier, that basically the USP monograph is
10  really just opens the door to you. So this is a
11  common mistake and I also mention that in my
12  presentation to this symposium that I was presenting
13  regarding which is online, actually. You know,
14  companies need to be looking for structures of
15  concern which is mentioned in ICH M7, and those
16  structures of concern should actually give you sort
17  of a window toward compounds you should be looking
18  for.
19      Q    Can you identify any publication that
20  was issued before June 2018 that advised
21  pharmaceutical manufacturers that testing for
22  nitrosamines was part of current good manufacturing
23  practices?
24      MR. NIGH: Form objection.
25      A    I can refer you to international

Page 180

1  committee to -- IRAC. It's a part of WHO that
2  specifically warns the manufacturers to look for
3  nitrosamines and there is a specific test that they
4  ask a lot of manufacturers to do which is called --
5  basically it's called NAP testing, N-A-P testing,
6  which in fact they encourage manufacturers to test
7  their compounds to see if it's prone to developing
8  nitrosamine. And you can look that up under NAP
9  testing or basically WHO testing for nitrosamine
10  and -- nitrosamine and NDMA.
11      Just one second. I actually have somebody
12  here. I have to give them the key to my car.
13      MR. NIGH: Let's take a quick break.
14      MR. GISLESON: Okay.
15      THE VIDEOGRAPHER: Time is 3:18. We
16  are going off the video record.
17      (A recess was taken.)
18      (After the recess the following
19  occurred:)
20      THE VIDEOGRAPHER: The time is 3:18.
21  We are back on the video record.
22  BY MR. GISLESON:
23      Q    Did the FDA ever issue any guidance
24  like what you have just described from that
25  international organization?

Page 181

1       A    Has FDA ever issued any guidance
2  regarding NDMA or nitrosamine?
3       Q    Similar to the international guidance
4  you just identified.
5       A    Post 2018 or pre 2018?
6       Q    Pre 2018.
7       A    I don't know, honestly.
8       Q    You received an envelope and I think
9  you started to open it earlier that contained some
10  documents that we sent to you.
11      A    Right.
12      MR. GISLESON: Bill, it's the document
13  behind Tab 6. It's a USP monograph, this one for
14  valsartan and --
15      THE WITNESS: Should I open it?
16      MR. GISLESON: Please.
17      THE VIDEOGRAPHER: For the record, it
18  would be marked as Exhibit 30.
19      Q    Doctor, it's behind Tab 6.
20      MR. NIGH: Mr. Gisleson, how am I
21  getting a copy of this document?
22      MR. GISLESON: It's in the Exhibit
23  File Share, Paul.
24      MR. NIGH: Okay. Okay. Tab 6. I see
25  it now.

46 (Pages 178 - 181)

Page 182

1     Q     Have you, Doctor, reviewed the USP
2  monographs for all the different valsartan products
3  that are at issue in this lawsuit?
4     A     I have reviewed a number of them, yes.
5     Q     And have you also reviewed the USP
6  monograph for the valsartan hydrochlorothiazide
7  tablets?
8     A     Yes, I believe so.
9     Q     Looking at Exhibit 30, is it correct
10  that you have reviewed this USP monograph
11  previously?
12    A     This is --
13    Q     Tab 6.
14    A     Tab 6? Okay.  Okay.  I need a
15  refresher.  Just give me a second.
16    Q     No problem.
17    A     Okay.  I scanned through it.  Go ahead
18  with your question.
19    Q     So this USP monograph became effective
20  as of May 1, 2015; is that right?
21    A     Okay.
22    Q     Looking at the upper left-hand corner
23  of the first page.
24    A     Uh-huh.
25    Q     Is that correct?

Page 183

1     A     Yes, May 2015.
2     Q     And then if you can go to the section,
3  please, on impurities which I believe is the third
4  or actually the fifth page.
5     A     Okay.  Yes.  I'm on it.
6     Q     Thank you.  Does this identify
7  specific impurities that had been identified in the
8  valsartan and hydrochlorothiazide tablets?
9     A     It looks like it, yeah.
10    Q     And what were the specific impurities
11  that were identified?
12    A     There is hydrochlorothiazide,
13  benzothiadiazine related compound A.  There's
14  hydrochlorothiazide RS; there's USP valsartan RS;
15  there's USP valsartan related compound and so forth.
16    Q     To your knowledge are there any health
17  effects or health hazard associated with those
18  impurities?
19          MR. NIGH:  Form objection.
20    A     I don't know.
21    Q     Then this also shows that there are
22  acceptance criteria for those impurities that allow
23  them to be present in the finished drug product at
24  certainly no more than percentages; is that correct?
25    A     Right.

Page 184

1     Q     When it says in here that NMT
2  0.2 percent of any other impurity excluding
3  valsartan-related compound A, does that include
4  unidentified impurities?
5          MR. NIGH:  Form objection.
6     Q     Let me rephrase the question.  Do you
7  have an understanding of what's meant by not more
8  than 0.2 percent of any other impurity?
9     A     Yes.
10    Q     What does that mean?
11    A     So it means there are other
12  unidentified impurities potentially that should not
13  be more than .2 percent, not more than .2 percent in
14  the chromatogram.
15    Q     Does this monograph identified the
16  testing procedure that a manufacturer should use to
17  identify any impurities for this
18  valsartan-containing drug?
19    A     So, basically, again, it goes back to
20  this question the whole concept that I tried to
21  explain with Clem.  There are impurities that -- you
22  could have up to maybe a hundred different
23  impurities, John, in valsartan in this chromatogram,
24  hundred little peaks, right?
25          You can't identify.  You can't tell which one

Page 185

1  is which.  You just go after picking up a few of
2  them, you know, and USP effectively provides those
3  impurities as reference standards and so forth, but
4  it's really the duty of the manufacturer to look at
5  the drug synthesis and identify and look for their
6  structural entities of concern.
7          You know, for example, when I look at a
8  molecule, John, when I look at c double bond o, c
9  carbon and chlorine, I know this chloromethyl ketone
10  is like a tear gas.  It's going to burn your eyes.
11  If I see a molecule that has nitrite in it, I'm going
12  to say "Oh, shit.  This is going to --" pardon my
13  language -- "this is going to be created
14  nitrosamine."
15         So when you look at these types of -- you
16  know, this is like the recipe that USP gives you is
17  more or less like a TikTok video cookbook.  Have you
18  seen these TikTok videos that give you direction on
19  how to make, you know, a certain dish?  This is a
20  TikTok video.  So what you need to do is you need to
21  do your own due diligence.  You can talk to any
22  chemist.  At my company or at any other company, they
23  tell you this is just an entry level stuff.
24         So it's the duty of the organic chemist at the
25  company, synthetic organic chemist to say there are

47 (Pages 182 - 185)

Page 186

1 structural concerns in my recipe and I am worried
2 about this impurity; therefore, look into it, okay.
3 So, this is very little and you cannot just say here
4 is TikTok video, you know, are you going to be able
5 to do this. You can't. And in fact every -- this is
6 just a starting point.
7     Q     So when this refers to acceptance
8 criteria no more than 0.2 percent of any other
9 impurity, the manufacturer is to add up the
10 different unidentified impurities to determine
11 whether the total amount exceeds 0.2 percent?
12     A     It means you could have lots of little
13 impurities as long as they are not over a certain
14 level, as long as they are not over .2 or
15 .1 percent, but you also need to consider if these
16 impurities are growing or not as a function of time.
17     Often we get a call from a frantic
18 manufacturer that says my drug is on the market and
19 we have -- we got report from our retained testing
20 that our drug is producing an impurity and we need to
21 figure out what that impurity is, and they tell us
22 drop everything, work on this, figure out what this
23 impurity is, you know, and we've been doing -- we
24 have done this.
25     So this is -- just to show me a few impurities

Page 187

1 here, I can assure you if you look at some of the
2 chromatograms of valsartan or this, the one that
3 you're showing me, there are going to be many, many,
4 many different impurities in the chromatogram.
5     Q     What is the testing method in this
6 monograph that a manufacturer should use to
7 determine whether there are any impurities?
8     A     They need to follow current good
9 manufacturing practices and the current, you know
10 has -- you know, it means you gotta LCMS. HPLC
11 alone, it is a 1960's technology and unfortunately
12 FDA has been very lax about it and we've had
13 discussions with them. And companies are saying we
14 can't afford LCMS. Are you kidding me?
15     Q     What is the testing method identified
16 in this specific monograph for how a manufacturer
17 should test for impurities?
18     A     The testing method they are
19 identifying is HPLC with UV detector.
20     Q     Is that shown on the prior page?
21     A     Yeah.
22     Q     Under chromatographic system?
23     A     Yes.
24     Q     Can you go to the prior page, please?
25     A     Yeah, I am looking at it. Yeah. It's

Page 188

1 UV.
2     Q     And it says chromatographic system?
3     A     Yes.
4     Q     See chromatography 621 system
5 suitability mode LC detector UV.
6     A     You see the detector is UV, which
7 means it's ultra violet detector. So in my opinion,
8 USP is not following CGMP. USP is behind time and
9 these companies are hiding behind USP and I think
10 they are violating FDA's current good manufacturing
11 practices. And I have mentioned this to, you know,
12 drug manufacturers, the generic people as well and
13 they agree. I've had conversations with many of
14 them.
15     Q     The test that's identified here, the
16 chromatographic system using the LC mode with a UV
17 detector, that test is the starting point, you said,
18 for what a manufacturer should do to test for
19 impurities?
20     A     Exactly.
21     Q     And that test does not identify
22 nitrosamine impurities, does it?
23     A     No, it doesn't. You could have a lot
24 of nitrosamine in this compound and this LC test
25 will not show it. It will be invisible.

Page 189

1     Q     So it's your opinion, as you said,
2 that none of the defendants' valsartan products
3 should have contained any NDMA or any NDEA; is it
4 correct that you believe FDA is wrong in permitting
5 the defendants' valsartan products to be sold so
6 long as they are -- they have less than 96 nanograms
7 of NDMA or 26.5 nanograms of NDEA?
8         MR. NIGH: Form objection.
9     A     John, I cannot comment for FDA, but I
10 have stated this in our previous conversations as
11 well. I believe the levels of NDMA and NDEA should
12 be zero. These are mutagenic DNA reactive molecules
13 that knocks the hell out of your DNA, and in fact
14 the NDMA is used to create cancer in laboratory
15 animals.
16     Q     So your opinion, then, directly
17 contradicts the FDA's determination that patients
18 may use the defendants valsartan products so long as
19 they contain less than either 96 nanograms of NDMA
20 or 26.5 nanograms of NDEA, correct?
21         MR. NIGH: Form objection.
22     A     I'm going to reiterate what I said,
23 John. I believe in zero NDMA and NDEA. I think
24 FDA's thinking is also zero NDMA, NDEA. In my
25 opinion, perhaps maybe it's because it's political,

48 (Pages 186 - 189)

Page 190

1 I don't know, but you're asking my opinion. I
2 cannot speak on behalf of FDA. I told you what I
3 think.
4     Q    All right. Your opinion contradicts
5 the FDA's determination that these valsartan
6 products can be sold to and consumed by patients so
7 long as the nitrosamine levels are less than the
8 accepted intake levels identified by the FDA,
9 correct?
10         MR. NIGH: Form objection. Hold on.
11 Form objection. Mischaracterizes testimony. It's
12 been asked and answered multiple times.
13         MR. GISLESON: It's been asked. It
14 hasn't been answered.
15         MR. NIGH: It has been answered. It's
16 just not the way you want it answered.
17     Q    Your opinion directly contradicts what
18 the FDA has said; namely, the defendant's products
19 can be sold to and consumed by patients so long as
20 the nitrosamine levels are less than the FDA's
21 determined acceptable intake levels or limits?
22     A    So --
23         MR. NIGH: Form objection. Asked and
24 answered. Mischaracterizes testimony.
25     A    John, I have already mentioned what's

Page 191

1 my opinion. I have also and FDA has also made its
2 ruling. FDA is saying 96 nanograms is the interim
3 level, but FDA in their most recent filing which
4 is -- I'd like to quote you my -- the FDA guidance
5 which is called FDA general advice and I'd like to
6 actually make -- put that as part of the record if
7 you could -- I don't know. It's page 1 and it's
8 paragraph number -- it's page 1, paragraph 2 of
9 background. I'd like to make that as part of the
10 record and I'd like to read it that to you.
11         It says, "Due to their known potent
12 carcinogenic effect and because it is feasible to
13 limit these impurities," because it's feasible to
14 limit these impurities "by taking reasonable steps,"
15 meaning chemical synthesis, chemical synthetic steps
16 "to prevent or eliminate their presence, FDA has
17 determined that there is no acceptable specification
18 for nitrosamine in ARBs, API or drug product."
19 Period. Full stop.
20         This is FDA. If you want to misquote me, you
21 can go ahead and do that but, please, when you do,
22 make sure you put this next to it. Therefore, FDA
23 goes on and says, "FDA advises that nitrosamines
24 should be absent in practices; i.e. not detectable as
25 described below from ARB API and API brought

Page 192

1 product," should be absent.
2         This is the key thing. As an initial measure,
3 FDA published levels of impurity exceeding these
4 interim levels recommended for recall before the
5 market. So they said they recommended anything above
6 certain level to be recalled, but their goal is zero.
7 Zero. I hope I've answered the question.
8     Q    Doctor, what's the date of the
9 document you just read from?
10     A    The date of this document? Let me
11 look it up. It's part of the submission of the -- I
12 don't know. I think that's for you guys to figure
13 out. This was -- there is no date on it.
14     Q    Can you show us the first page of the
15 document, please, on the camera so we can see what
16 it says? It looks like it's a letter from the
17 Department of Health and Services.
18     A    Is this part of the record? I think
19 that was submitted.
20     Q    No, because I didn't offer it and I've
21 never seen it before.
22     A    It was part of my testimony. It's
23 there.
24     Q    Even with the presence of NDMA or
25 NDEA, do the defendant's valsartan products still

Page 193

1 lower blood pressure in adults and children who
2 still use the products?
3         MR. NIGH: Form objection.
4     A    John, you want my honest opinion? I
5 don't know. I don't know, because there is no
6 doubt -- I have no doubt that there is valsartan
7 molecule there, but I have no idea what the
8 interaction of NDMA, NDEA at those high levels could
9 be, because I consider NDMA and NDEA as an active
10 compound.
11         A lot of the impurities that you saw in the
12 USP monogram, a lot of the excipients: The sugar,
13 the magnesium citrate and various just binding agent
14 that makes them feel inactive, nitrosamines are
15 extremely active and so I don't know whether actually
16 they will help or hurt or they will cause certain --
17 you know, bind something to some receptors.
18         I'm not a toxicologist. I'm not a physician
19 to know, but that's for another expert to comment.
20     Q    Have you done any analysis as part of
21 your work in this case to determine whether NDMA or
22 NDEA interferes with the chemical ability of
23 valsartan to perform its intended purpose of
24 lowering blood pressure and of reducing
25 hospitalization for heart failure?

49 (Pages 190 - 193)

Page 194

1    A    We have not done any testing that
2  shows that in DNA inhibits the effectiveness of
3  valsartan or promotes its effectiveness of valsartan
4  or any of that. We have not done any of those
5  tests.
6    Q    And you also didn't do that testing
7  for NDEA to determine whether it had such an effect,
8  correct?
9    A    We have not done any testing to show
10  whether NDEA promotes the pharmaco dynamics of the
11  drug or actually inhibits the pharmaco dynamics of
12  the drug. You could actually increase the activity
13  of the valsartan or reduce its activity, any of
14  those things. I don't know. We haven't done any
15  testing. Nobody has asked us. Plaintiffs' lawyers
16  have not asked us to do any of that.
17    Q    Nor have you used your knowledge and
18  experience simply to analyze without testing whether
19  NDMA or NDEA interferes with the ability of
20  valsartan to function as intended according to the
21  label?
22    A    We have not done any of those testings
23  and it's not part of our plan to do any of those
24  testings.
25    Q    Are you familiar with the phrase

Page 195

1  compendial standards?
2    A    Yes, I am.
3    Q    To what does that refer?
4    A    Compendial standards are standards,
5  basically official quality standards used for drugs
6  sold and reference standards.
7    Q    Are those the standards in the USP
8  monographs?
9    A    Yes.
10    Q    You said that you've been involved
11  with the preparation and submission of ANDAs,
12  A-N-D-A-S; is that correct?
13    A    Mm-hmm.
14    Q    Yes?
15    A    Yes.
16    Q    Have you ever created a connection
17  with a ANDA risk assessment?
18    A    Have I created a risk assessment
19  document?
20    Q    Yes.
21    A    We've done many risk assessments in
22  connection with and ANDA, in connection with NDA,
23  new drug application; we have developed a risk
24  assessment for any of our release testing. We do
25  this on routine basis.

Page 196

1    Q    In your experience do risk assessments
2  that are submitted in connection with an ANDA to the
3  FDA address the presence of impurities?
4    A    Sometimes. Sometimes they do,
5  sometimes they don't. It really depends on how good
6  at CMC a person a company has and how good a chemist
7  they have and how they can -- if they, for example,
8  you have a drug that all of a sudden develops odor,
9  you know, sitting and it's causing odor or the drug
10  is changing, you've got to do risk assessment and
11  you need to submit it to the FDA.
12    And those risk assessments also, I would call
13  them a root cause analysis. They would need to go
14  to -- they could be very narrow. They could be very
15  extensive. It really depends on the company and it
16  depends on the team that's involved.
17    Q    In your experience, does the drug
18  manufacturer identify the tests that the
19  manufacturer performed to evaluate risks associated
20  with the drug product at issue in the ANDA?
21    A    Could you repeat your question? I
22  kind of lost my train of thought.
23    Q    Sure. Does the drug manufacturer have
24  to identify in the risk assessment the specific
25  tests it performed in developing the assessment?

Page 197

1    A    Yeah. They should. They should. For
2  example, at any time you change the chemical
3  process, you change your synthetic route, any time
4  you change the cap of -- let's say you go from glass
5  to plastic, you need to do risk assessment; how is
6  that going to impact your drug.
7    You go from, you know, a prefilled syringe to
8  another prefilled syringe, you need to do risk
9  assessment. In this case, you know, we're getting
10  into the really nitty gritty of sort of liability
11  issues, Daniel but, you know, in this case they
12  should have -- they changed the chemical process.
13  They should have done what I call the structural sort
14  of drugs, they should look at the structural
15  concerned molecule and they should look at those
16  structural concerns and say what are the chances of
17  something going wrong with this and then do a proper
18  risk analysis and not just brush it under the table
19  or say this is just minor thing and go on with it.
20    You know, using, for example, John, sodium
21  nitrite, in the original process they didn't use
22  sodium nitrite, whereas in the, you know, in the
23  defendant's process almost invariably everybody used
24  sodium nitrite. Sodium nitrate is the same molecule
25  that you find in a lot of, you know -- it's a

50 (Pages 194 - 197)

Page 198

1  nitrated food; you know. You get potential formation
2  of NDMA. That's where nitrosamine comes from, and
3  sodium nitrite are known to cause nitrosamine and
4  NDMA. So that's where the risk analysis went wrong.
5         MR. NIGH: I need to interject
6  something at this time. As you can see, there is a
7  seven page declaration. He has not gone into detail
8  in terms of his liability opinions and I would warn
9  counsel at this point if we are going into liability
10  opinions, we're not going to cover this ground
11  again. There's not going to be a second bite of the
12  apple at those topics.
13         MR. GISLESON: I am not going into
14  liability issues at all. I am specifically
15  addressing his point he's made a couple of times,
16  that in his view the defendants didn't do what they
17  should have done in connection with evaluating or
18  testing for NDMA and NDEA, and so I'm following up
19  on that.
20         MR. NIGH: Yeah. That's in large part
21  because of the questions that occurred earlier that
22  also touched upon liability. So to the extent we
23  are going to continue further and follow up on
24  liability, defense counsel could do so at their own
25  closing.

Page 199

1         MR. TRISCHLER: And as you are aware,
2  the witness just went well beyond the scope of my
3  question to volunteer a bunch of information, which
4  is why I am also following up on it.
5     Q     The bottom line, in your experience
6  the ability to instruct the manufacturer to perform
7  additional tests if the FDA believes the risk
8  assessment did not appropriately evaluate certain
9  risks; is that true?
10         MR. NIGH: Again, this is clearly
11  liability. The more you want to follow down that
12  tunnel, the more you are following up on liability
13  opinions. This is far outside the scope of his
14  declaration.
15     A     Let's talk about NDMA levels, John.
16         MR. NIGH: Just because he voluntarily
17  gives information in response to one of your
18  questions that's also a liability question and
19  continue to go down that tunnel doesn't mean that
20  defense counsel is not opening the door to this
21  questioning, and they are not going to get a second
22  bite at the apple.
23  BY MR. GISLESON:
24     Q     The FDA can direct additional tests if
25  it believes it appropriate when it evaluates a risk

Page 200

1  assessment in an ANDA, correct?
2         MR. NIGH: Form objection.
3     A     The FDA can ask for additional tests
4  if they determine it's necessary. By and large they
5  rely on the manufacturer's own risk assessment and
6  whether the manufacturer considers that a low risk,
7  medium risk, high risk.
8         So if the manufacturer says this is low risk
9  and CMC reviewer at the FDA reviews it and if they
10  also miss it, you know, so, John, it's really a
11  question of they miss it, these guys miss it, yeah,
12  but at the end of the day it's the manufacturer's
13  responsibility.
14     Q     You testified that in your view, the
15  defendant's product shouldn't contain any NDMA or
16  NDEA. Are you aware that nitrosamines have been
17  found in cosmetics?
18     A     Yes, I have been aware.
19     Q     Are you wear that nitrosamines have
20  been found in tobacco and cigarette smoke?
21     A     Yes.
22     Q     Are you aware that nitrosamines have
23  been found in drinking water?
24     A     Yes, I am aware of that.
25     Q     Are you aware that people consume

Page 201

1  processed foods that include nitrosamines?
2     A     Yes, I am aware of that.
3     Q     Including bacon, sausage and ham?
4     A     Yes, I am aware.
5     Q     Are you aware that beer can contain
6  nitrosamines?
7     A     John, we have to qualify and put me on
8  record as saying the levels of nitrosamines are
9  extremely low in many of these instances. For
10  example, do you know this minimum level that's
11  acceptable to have nitrosamine in water?
12     Q     It's a low level, but it exists,
13  correct?
14     A     It's extremely low level. So
15  nitrosamine, every time you eat bacon, you may get a
16  little bit of nitrosamine. Your body has the
17  ability to detoxify so much. I don't want to get
18  outside of my area but, you know, low levels of
19  nitrosamine and high levels are different stories.
20     Q     Those are the questions I have. Thank
21  you for your time.
22     A     Thank you.
23         CROSS-EXAMINATION
24  BY MR. HARKINS:
25     Q     Good evening, Dr. Najafi. Can you

51 (Pages 198 - 201)

Page 202

1  hear me okay?
2      A    Yes.
3      Q    My name is Steven Harkins. I represent
4  the Teva defendants and I just have a few followup
5  questions for you here.
6      You mentioned a few guidances today both for
7  unidentified impurities and then for genotoxic
8  impurities. Do you recall that?
9      A    Yes.
10     Q    Are you aware of ICH, Q3A and Q3B?
11     A    Yes, I am.
12     Q    And those provides guidance on the
13 levels at which any impurity needs to be assessed to
14 the extent it's not in a drug substance, right?
15     A    That's correct.
16     Q    Are you comfortable with the term
17 qualification threshold?
18     A    Yes.
19     Q    And the qualification threshold in
20 ICH, Q3A and Q3B defines the level at which any
21 impurity; harmless, hazardous, needs to be assessed
22 and then analyzed, right?
23     A    Mm-hmm.
24     Q    And unknown impurities that don't meet
25 that threshold strictly under Q3A and Q3B don't get

Page 203

1  assessed further --
2          MR. NIGH: Form objection.
3      Q    -- is that correct?
4      A    No, that's not correct. Again, it
5  goes back to -- I didn't catch. You're Steven.
6  Steven, it goes back to looking at the structure --
7  you know, the changes you're making; looking at the
8  structures that are involved in the chemistry, and
9  you need to anticipate these impurities.
10     If you are anticipating certain genotoxic
11 impurities, you need to test for it. It could be
12 extremely low levels that doesn't meet the ICH
13 guidelines you are referring to. That's where you
14 end up going to ICH M7. ICH M7 take effect here
15 where they talk about extremely low levels of
16 genotoxic compound. They talk about testing those
17 genotoxic compounds in aims test and various tests
18 and they set limits. And it also -- it's a matter of
19 how -- whether you have an episodic drug or a chronic
20 drug.
21     For example valsartan, my mom was taking
22 valsartan for ten years. Now she is taking, you
23 know, lisinopril for the last few years. So, you
24 know, it really depends. Once the drug becomes a
25 drug -- I call it life styling drug, then your

Page 204

1  exposure time -- so you need to consider all of that.
2  And it goes back to the fact that you need to
3  anticipate this impurity and then look for them.
4  Otherwise, you know, you're chromatogram -- you have
5  this valsartan compound is like a huge peak and then
6  there are lots of little peaks and they don't test
7  for it because they are actually below the levels of
8  .1 percent, .2 percent. So they don't test for it
9  and it doesn't require it.
10     Q    Doctor, I promise we will get to where
11 you want to go, but I was just asking specifically
12 under Q3A and Q3B, not subsequent guidelines which
13 we will address in just a minute. If the
14 qualification threshold for an unidentified impurity
15 is not met, then testing further on those unknown
16 impurities is not conducted pursuant to that
17 guideline; is that right?
18         MR. NIGH: Form objection.
19     A    This is correct with the qualification
20 that I previously state. You need to anticipate
21 based on structures of concern and then test some of
22 those anticipated genotoxic compounds.
23     Q    And you previously testified that the
24 levels for testing of genotoxic or potential
25 genotoxic impurities are far lower?

Page 205

1      A    Far lower, less than .1 part per
2  million, less than 0.1 parts per million, in the
3  case of nitrosamines, zero.
4      Q    And that guidance is at least
5  generally laid out in ICH M7 which you laid out?
6      A    ICH M7.
7      Q    Roughly a thousand full difference
8  between the levels you might be looking at there?
9      A    Yeah.
10     Q    You also testified and you just
11 mentioned again there could be 100 little identified
12 impurities, 100 little unidentified peaks if you ran
13 it over, correct?
14     A    Yes.
15     Q    And even an HPLC test that you used
16 that showed those peaks, that would not be
17 identifying and quantifying each of those impurities
18 just by running a single test with a single set of
19 settings, right?
20     A    You might see 100 little impurities.
21 Those are only UV ultraviolet active compounds. You
22 could also have another 100 that are not ultraviolet
23 active compounds. So now you see that's where, you
24 know, that's where people in need to anticipate
25 certain impurities.

52 (Pages 202 - 205)

Page 206

1     Q     And to actually assess or quantify any
2  of those, maybe, hundreds of tiny little peaks, you
3  would need specialized testing that was specifically
4  tuned to the impurity that you were looking at and
5  looking for?
6     A     You need to have specialized
7  equipment. That's where we go to CGMP, current good
8  manufacturing practices, which really states that
9  don't use a typewriter to type your letter. Use a
10 computer to type your letter. You see, it's like
11 these manufacturers are still using typewriters in
12 the age of computer and word processor.
13    We have GCMS which is extremely easy to
14 operate, extremely simple and it comes with a library
15 of molecules stored in it, so all you have to do is
16 just point your cursor to certain impurity and it
17 tells you the molecular weight and it tells you
18 several possible compounds that might be.
19    Q     And you would -- I'm sorry. Are you
20 finished?
21    A     Yes.
22    Q     So you would need a specialized test
23 to identify, for example here, the NDMA or NDEA
24 compound among all of those other little peaks you
25 might see?

Page 207

1     A     I wouldn't call it specialized
2  instrument. These are routine instruments that
3  almost every lab, every university, every company
4  has including, in fact I would hesitate to guess
5  that your clients -- you're representing Teva,
6  right?
7     Q     I am.
8     A     I know for a fact that Teva has
9  probably dozens and dozens of GCMS and LCMS at their
10 facility.
11    Q     And simply running those tests over a
12 drug substance without having them specifically set
13 to the impurity that you are attempting to identify
14 would not allow you to identify and quantify that
15 impurity, correct?
16    A     Repeat your question? I missed it.
17    Q     Running an HPLC or any other test
18 method over an impurity without having that machine
19 specifically set to identify and quantify an
20 impurity that you are trying to identify like in DNA
21 or NDEA would not allow you to identify and quantify
22 that impurity is that correct?
23    A     Running an HPLC would not help you
24 with those impurities that's correct.
25    Q     And, for example, specialized test

Page 208

1  methods like the ones you used in your work for
2  Valisure later were published eventually that
3  allowed those specific settings to be employed to
4  identify these impurities, correct?
5        MR. NIGH: Form objection.
6     A     Steven, I would strike the word
7  specialized equipment, because to someone trained in
8  the art, specialized equipment means something that
9  only Lawrence Livermore laboratory has or some
10 cyclotron or something has. These are not
11 specialized equipment, but they need to be thinking
12 about and anticipating NDMA and NDEA and look at it,
13 that's all.
14    Q     You're familiar with the testing
15 methods that were published by the FDA in connection
16 with nitrosamine recalls?
17    A     Yes, I am.
18    Q     Are you aware of those methods having
19 been published anywhere else before they were
20 published by the FDA in connection with the recalls
21 in 2018?
22        MR. NIGH: Form objection.
23    A     I am not aware, but the methods -- you
24 know, don't need a method. You develop your
25 methods. There are hundreds of methods for testing

Page 209

1  NDMA if you search the literature. There is a
2  method as early as 1970 for certain testing for
3  NDMA; very validated, very good method.
4     Q     Doctor, imagine my question was
5  specifically with regard to methods for identifying
6  NDMA and NDEA which were published by the FDA in
7  2018 with respect to the nitrosamine issue. You're
8  familiar with those?
9     A     Yes, I am.
10    Q     And just to clarify, you're not aware
11 of those methods having been published anywhere
12 before that, are you?
13        MR. NIGH: Form objection.
14    A     I am not aware of FDA publishing
15 method for NDMA. FDA doesn't publish methods to
16 test a lot of drugs. They get involved and, you
17 know, basically somebody when basically something
18 bad happens. A lot of methods that are developed,
19 are developed by industry such as companies like us.
20 We develop the method, we validate the method and
21 then we submit it as part of a CMC package for NDA
22 filing or ANDA filing to the FDA and those methods
23 go into the system.
24    FDA doesn't really get involved in developing
25 testing. And then ultimately USP gets ahold of those

53 (Pages 206 - 209)

Page 210

1    methods and puts it into their, you know, monograph.
2        Q    Doctor, you had never seen those
3    methods published anywhere else before 2018,
4    correct?
5            MR. NIGH:  Form objection.
6        A    I did not see FDA publishing those
7    methods.  I am not aware.  There might be -- there
8    might have been issued something before.  I am not
9    aware, but there are other methods that you can go
10   to besides FDA for nitrosamine analysis.
11       Q    Specifically those methods and I know
12   with respect to FDA you are not aware of anyone else
13   publishing those mods before 2018 are you?
14       A    There are some methods outside of FDA.
15       Q    Dr. Najafi, my question is specific to
16   those methods, just those methods for identified
17   NDMA and NDEA.  You have not seen them anywhere else
18   FDA or otherwise before 2018, right?
19           MR. NIGH:  Form objection.
20       A    I answered the question already.
21       Q    I believe you did, but can you please
22   just answer it for me so we have a clear record?
23   You hadn't seen those before 2018?
24       A    I have not seen FDA publishing any
25   methods before prior to 2018, but I may have missed

Page 211

1    it, but there are other methods on NDMA by other --
2    by admissions, by industry by other people and there
3    are multiple methods for NDEA analysis.
4        Q    Dr. Najafi, I am not asking about
5    other methods.  I am not asking about something that
6    you haven't seen.  I am asking you, Dr. Ron Najafi,
7    had never seen any of those methods published
8    anywhere before 2018, correct?
9            MR. NIGH:  Form objection.
10       A    Steven, I think you're trying to get
11   your own, you know, question answered.  You can go
12   ahead and answer it.
13       Q    I am not trying to get -- you have
14   not, correct?
15           MR. NIGH:  Form.
16       A    What would you like to hear?
17           MR. NIGH:  Form objection.
18       Q    Whether you had seen those methods
19   published anywhere prior to 2018.
20       A    I mentioned --
21           MR. NIGH:  Form objection.
22       A    -- I have not seen FDA publishing any
23   methods prior to 2018, but I may be wrong, you know.
24   It requires some diligence.  There are many other
25   methods that have been published for NDMA analysis

Page 212

1    by GCMS by other means that are in the literature.
2        Q    Do you think you missed it or that you
3    are wrong?
4        A    Next question, Steven.
5            MR. NIGH:  Well, hold on.  Let me do
6    the objection.  I am going to say it's asked and
7    answered.  I think we asked this question many times
8    and I will continue to warn that he doesn't have
9    anything in his declaration about testing methods
10   and this is really going down the liability path
11   even further.
12           I would just warn that to the extent
13   he discloses opinions that starts talking about
14   testing methods in the future, I think you all
15   covered this topic.
16       Q    Dr. Najafi, there are other compounds
17   within the nitrosamine class, right?
18       A    Yes.
19       Q    And the nitrosamine class is just one
20   class of potential genotoxic compounds that are
21   addressed by GCMS and other guidelines, correct?
22       A    Yes.
23       Q    Do you know how many classes of
24   compounds or types of covered structure alerts there
25   are?

Page 213

1        A    There are at least five different
2    classes, four or five different classes of compounds
3    by FDA.  It's mentioned in the ICH guidelines.
4        Q    And there are other sources that
5    identify potential genotoxic compounds as well,
6    right?
7        A    Yes.
8        Q    And within each of those classes there
9    are numerous individual compounds, right?
10       A    Correct.
11       Q    It's not your testimony that a drug
12   manufacturer is required to perform testing for
13   every type of potential genotoxic compound on every
14   drug substance, is it?
15           MR. NIGH:  Form objection.  We're
16   getting way into the liability.  At this point I am
17   going to instruct him not to answer, because I think
18   it goes far outside the scope of his opinion.
19       Q    Dr. Najafi, is it your opinion that
20   the reason that these drugs are not equivalent to
21   the reference listed drug is because of the presence
22   of these impurities NDMA and NDEA?
23       A    I believe the fact that they contain
24   these highly DNA active genotoxic impurities, it
25   makes the drug not equivalent and not the same and I

54 (Pages 210 - 213)

Page 214

1  think it could have, you know, significant impact on
2  the drug's performance.
3      Q    And correct me if I'm
4  misunderstanding, but I believe it's your testimony
5  that someone looking at the underlying route of
6  synthesis here should have identified the potential
7  for this specific compound and conducted testing for
8  it; is that right?
9          MR. NIGH: Objection. Scope.
10     Q    I'm sorry. I didn't hear the answer.
11         THE WITNESS: Should I answer, Daniel?
12         MR. NIGH: Yeah, you can answer.
13     A    Someone should have anticipated. Once
14  they changed the route of synthesis and given those
15  structural concern the molecules of structural
16  concern, they should have anticipated NDMA and they
17  didn't.
18     Also, Steven, I want to just to answer your
19  question on methods that are available, there is EPA
20  methods for NDMA testing that goes well before 2018,
21  well before. There are food testing, you know,
22  testing NDMA for food and they are all using
23  GCMS.
24     Q    I believe you testified actually that
25  someone skilled in the art of chemistry, I think

Page 215

1  that was your phrase, it would have been obvious to
2  look for this, right?
3      A    Right.
4      Q    FDA had access to information on the
5  valsartan synthesis for all the API manufacturers
6  prior to 2018, correct?
7      A    Yes, correct.
8      Q    And just to confirm your testimony
9  that I believe you gave to Mr. Gisleson just a
10  moment ago, you're not aware of any statements from
11  the FDA prior to June 2018 to the manufacturers of
12  valsartan drug products that they should just test
13  their products for potential presence of
14  nitrosamines, are you?
15     A    I am not aware of FDA stating that
16  they should be aware, but WHO has been on record for
17  stating to all manufacturers of drugs to watch for
18  NDMA. If you have compounds of structures of
19  interest such as sodium nitrite, they need to look
20  for NDMA and just because FDA reviewer missed it
21  doesn't mean the manufacturer should say okay, FDA
22  by and large relies on the manufacturer.
23     Q    The FDA would have had the information
24  for the ZHP product, right?
25     A    Yes.

Page 216

1      Q    They would have had the information
2  for the Mylan product?
3          MR. NIGH: Object to form. Outside
4  the scope.
5      Q    I believe -- was that a "yes?"
6      A    I assume.
7      Q    Finally, I understand it's your
8  opinion that the level of NDMA or NDEA in the
9  product should be zero, right?
10     A    That's correct.
11     Q    And it's your opinion that any product
12  containing NDMA or NDEA at any level is not the
13  equivalent of RLD and, therefore, be misbranded,
14  adulterated and should be recalled?
15         MR. NIGH: Form objection. Outside
16  the scope.
17     A    That is my position.
18     Q    Do you recall being shown the Valisure
19  document which indicated that Novartis' valsartan
20  product contained NDMA earlier?
21     A    Yes, I did see that.
22     Q    Assuming that Valisure's data showing
23  levels of NDMA in Novartis' valsartan drug product
24  is correct, it's your opinion that Novartis
25  drug product containing NDMA would be misbranded,

Page 217

1  adulterated and should be recalled?
2      A    Assuming that Valisure's testing is
3  correct, which I have no knowledge of whether that
4  testing was correct and I also do not have any
5  knowledge that Novartis is using their old synthesis
6  and they may be using a generic drug manufacturer to
7  make that drug product; assuming that data is
8  correct, it's my opinion that the drug -- that NDMA
9  should not be allowed to be sold; you know, the drug
10  should not be allowed to be sold with NDMA.
11  However, FDA has allowed this interim number, so it
12  hasn't been recalled.
13     Q    But again -- and I understand your
14  qualification, assuming that to be correct and I'm
15  only asking it with regard to the products shown
16  there that did, according to that information
17  contain NDMA, it would be your opinion that that
18  product should be recalled as misbranded and
19  adulterated?
20         MR. NIGH: Objection. Outside the
21  scope of his opinion.
22     A    So assuming that misbranded, that
23  definition is false and misleading statement, false
24  and misleading statement, right, that's the
25  definition of misbranded drug, and you have

55 (Pages 214 - 217)

Page 218

1  carcinogenic impurities, then you have potentially
2  toxic compound that, you know, people don't know
3  about it and that is misleading to whoever is taking
4  the drug.
5      If I'm taking -- Steven, if I'm taking
6  valsartan and I'm assuming this has zero NDMA in it,
7  if I'm taking torovastatin, Lipitor, okay, I take it
8  every day for, you know, lowering basically
9  cholesterol and various things, I am assuming it's
10  free of any NDMA.  It has zero NDMA.
11      Q     And if that product, any product
12  contained any level of NDMA, it would be your
13  opinion that that product is misbranded, adulterated
14  and should be recalled?  I am just trying to
15  understand.
16      A     That is my position.  That is what I
17  believe the product is not -- it's not being -- we
18  are misleading the public.
19      Q     Thank you, Dr. Najafi.  There is no
20  further questions from me.
21          THE VIDEOGRAPHER:  Any other questions
22  from the room?
23          MR. TRISCHLER:  Are there any other
24  questions on behalf of defense counsel?
25          MR. GISLESON:  Not at this time.

Page 219

1          MR. NIGH:  Okay.  I would like to take
2  a break.  I'd like to come back in 15 minutes.
3          THE VIDEOGRAPHER:  The time is 4:16.
4  This ends Media Unit 5.
5          (A recess was taken.)
6          (After the recess the following
7  occurred:)
8          THE VIDEOGRAPHER:  The time is now
9  4:56.  This begins Media 6.
10          CROSS-EXAMINATION
11  BY MR. NIGH:
12      Q     Doctor, I'd like to show you a
13  document from Canada and I will represent to you
14  that this was a document that was disclosed as part
15  of your materials considered and given to the
16  defense counsel as well.  Now you weren't asked
17  about any of the health Canada testing by any of the
18  defendants, correct?
19      A     That's correct.
20      Q     I want to draw your attention to
21  page 9, if we can scroll down to page 9.  Actually
22  let me go to the top first.  Let me get to the top
23  here.  Here you can see impurities found in certain
24  angiotensin two receptor blocker products also known
25  as sartans, correct?

Page 220

1      A     Correct.
2      Q     And you could see at the top you can
3  see the Canada flag and it says government of
4  Canada; do you see that?
5      A     Absolutely.  Yes.
6      Q     And you can also see the words "Health
7  Canada" there is as well.  Do you see that?
8      A     I see Health Canada, yes.
9      Q     Okay.  Let's go down to page 9.
10          THE VIDEOGRAPHER:  Counsel, while
11  she's jumping to page 9, you didn't announce this is
12  going to be marked as an exhibit.
13          MR. NIGH:  It will be marked as an
14  exhibit.
15          THE VIDEOGRAPHER:  It will be the next
16  one in line.
17          MR. NIGH:  I don't know what we are
18  on, but I don't think we are using anything that has
19  31, correct?
20          THE VIDEOGRAPHER:  Yes.  We have not
21  marked 31 yet.
22          MR. NIGH:  So I'll start at 31.  This
23  will be marked as Exhibit 31.
24  BY MR. NIGH:
25      Q     And Doctor, do you see where it says

Page 221

1  "Novartis Pharmaceuticals" and right next to it, it
2  shows the word Diovan?
3      A     Yes, I do.
4      Q     And do you see the ones above that
5  refer to valsartan -- Mylan valsartan, Mylan
6  valsartan.  Do you see that?
7      A     Yes, I do.
8      Q     Now your understanding is that Diovan
9  is the name brand of valsartan, correct?
10      A     Yes, that's correct.
11          MR. TRISCHLER:  Dan, can I get a
12  standing objection to leading or are you going to do
13  it one time and just ask questions the way they are
14  supposed to be asked?
15          MR. NIGH:  You know, if you want to
16  object to leading, you can.  If you want to object
17  to form, you can.
18          MR. TRISCHLER:  I guess I will.
19  Objection to form.
20  BY MR. NIGH:
21      Q     So you see the name Diovan?
22      A     Yes, I do.
23      Q     Does that refer to name brand
24  valsartan?
25      A     Yes, it does.

56 (Pages 218 - 221)

Page 222

1    Q    And does Mylan valsartan, does that
2 refer to generic?
3        MR. TRISCHLER: Objecting to the form
4 and foundation.
5    Q    And Doctor, what is the name brand of
6 valsartan called?
7    A    Diovan.
8    Q    Okay, and next to that, let's scroll
9 back up to the top of this page. Do you see the
10 column that shows NDMA result and nanogram per
11 tablet and NDEA result and nanogram per tablet?
12    A    Yes, I do.
13    Q    Let's scroll down again to November
14 and if we can highlight where it shows not detected.
15    A    Right.
16    Q    Doctor, what does that refer to?
17    A    That refers to no NDMA or NDEA was
18 detected for Diane.
19    Q    So Health Canada detected no NDMA or
20 NDEA for their name brand Diovan?
21    A    Yes, that's correct.
22        MR. NIGH: We can take this document
23 down. Let's pull up the valsartan petition that was
24 used earlier. I don't actually see an exhibit
25 number in my box.

Page 223

1        MS. HILTON: That was the question I
2 have, if we actually gave this an exhibit number.
3        THE VIDEOGRAPHER: That was 28.
4        MR. TRISCHLER: I was going to say I
5 thought it was 28. Thank you.
6 BY MR. NIGH:
7    Q    Doctor, my understanding is this
8 Valisure petition was marked 28. Do you recall
9 seeing this petition during your questions?
10    A    Yes, I do.
11    Q    Okay. Let's scroll down to page 9.
12 Now, Dr. Najafi, I believe earlier you said you
13 don't believe Emery Pharma was not disclosed, its
14 name was not disclosed as a part of this report.
15    A    Yes.
16    Q    What does that mean?
17    A    That means that we were not involved
18 in testing any of these drugs that were listed on
19 this petition. Typically if we do get some of these
20 tested and corroborate data, you know, Valisure
21 would have listed us and cited us as being involved
22 in testing.
23    Q    Okay. And here you can see valsartan
24 in Novartis and you can see there are a couple of
25 these show no NDMA detected, correct?

Page 224

1    A    That's correct.
2    Q    Now, it doesn't say Diovan, correct?
3    A    That's correct. There is no reference
4 to Diovan.
5    Q    It says valsartan, correct?
6    A    That's correct.
7    Q    So do you know if this is Novartis
8 name brand medication or Novartis generic drug
9 medication?
10    A    It could be name brand or generic,
11 Novartis generic. I have no idea.
12    Q    Looking at this, you wouldn't be able
13 to tell us?
14    A    No.
15    Q    Okay. And also this petition doesn't
16 test for NDEA in any way in the Novartis pills,
17 correct?
18    A    That's correct. It only tests for
19 NDMA and NDMS.
20    Q    Doctor, let me ask you a couple
21 questions about chemical equivalents. A drug with
22 20,000 nanograms of NDMA would not be chemically
23 equivalent or the same as a drug with 14 nanograms
24 of NDMA, correct?
25        MR. TRISCHLER: Objection to job.

Page 225

1    Q    A drug with 10,000 nanograms of NDMA
2 would not be chemically equivalent as a drug with
3 14 nanograms of NDMA, correct?
4        MR. TRISCHLER: Object to form.
5    A    No.
6    Q    A drug with 96 nanograms or more of
7 NDMA would not be chemically equivalent as a drug
8 with 14 nanograms of NDMA, correct?
9    A    That's correct.
10        MR. TRISCHLER: Objection to form.
11    Q    All right. Let's take a look at the
12 next document. Now, Doctor, do you recall defense
13 counsel showing you some -- a document that included
14 a few pages of what's on the USP website?
15    A    Yes, I do.
16    Q    Now the USP website includes a lot
17 more information than what was given in that
18 document, correct?
19    A    That's correct.
20    Q    And you weren't shown this information
21 during defense counsel's questioning from the USP
22 website, correct?
23    A    That's correct.
24    Q    Now, this is the pathway here we can
25 see it's USP/our work/chemical medicines and the

57 (Pages 222 - 225)

Page 226

1  title of this document is nitrosamine impurities,
2  correct?
3      A    That's correct.
4      Q    And we can stroll down to the bottom
5  of this page briefly and you can see the URL
6  address, correct?
7      A    Yes.  That's correct.
8      Q    Let's go back up.  Actually, I want to
9  direct your attention to this paragraph that says
10  companies are responsible for understanding their
11  manufacturing processes which includes identifying
12  and preventing the presence of unacceptable
13  impurities.
14      This involves developing new predictive
15  approaches along with using suitable methods to
16  detect and control these impurities as well as others
17  that may arise when making changes to manufacturing
18  processes.  Did I read that information correctly?
19      A    Yes, you have.
20          MR. TRISCHLER:  Objection to form.
21      Q    Now, Doctor, according to USP, who is
22  responsible for understanding their manufacturing
23  processes?
24      A    Companies are responsible for
25  understanding their manufacturing processes, not USP

Page 227

1  and not FDA.
2      Q    And those companies, that would be
3  referring to companies that are manufacturing drugs,
4  correct?
5      A    Companies who are manufacturing drugs,
6  in this instance the companies who are manufacturing
7  ARBs.
8      Q    Dr. Najafi, according to USP do they
9  state that in order to detect unacceptable
10  impurities that manufacturers can rely simply on
11  outdated technologies and methods?
12          MR. TRISCHLER:  Object to form.
13      A    I think reading this, this is pretty
14  clear.  You want to follow CGMP guideline and CGMP
15  specifically talks about updated equipment, you
16  know, the newest technology and in this instance
17  GCMS or LCMS are not new technologies and basically
18  just as it states, the method needs to be able to
19  detect and control impurities as well as others that
20  may arise when making changes to manufacturing
21  processes, making changes to manufacturing
22  processes.  And the word "predictive" is the key
23  where they say the companies need to have a
24  predictive testify involved involving developing new
25  predict testify approach to identifying, you know,

Page 228

1  impurities such as nitrosamines, the cohorts of
2  interest.
3          MR. NIGH:  You can take this document
4  down.
5      Q    Doctor, do you recall when plaintiff
6  Harkins was asking you questions about whether drugs
7  should be considered adulterated or misbranded?
8      A    Yes, I do.
9      Q    For the purposes of class
10  certification and the declaration that you have
11  offered, are you offering any opinions about whether
12  the defendants' valsartan containing drugs are
13  considered adulterated?
14      A    I am not offering any opinion.
15      Q    For the purposes of class
16  certification and the declaration that you offered,
17  are you offering any opinions about whether the
18  defendants' valsartan-containing drugs are
19  considered misbranded?
20      A    No, I'm not offering any opinion.
21      Q    Okay.  I don't have any further
22  questions.
23          THE VIDEOGRAPHER:  Counsel, just real
24  quick you didn't announce it, but the nitrosamine
25  impurities page we were just looking at, is that

Page 229

1  Exhibit 32?
2          MR. NIGH:  Yes, Exhibit 32.  Thank
3  you.
4          THE VIDEOGRAPHER:  Excellent.
5          MR. TRISCHLER:  Nothing from me, Dan,
6  subject to my prior reservations but I'm done.
7          MR. GISLESON:  Nothing further from
8  Aurobindo.
9          MR HARKINS:  Nothing from Teva.
10          MR. NIGH:  Thank you, everybody.
11  Okay.  Good night.  Thank you.
12          THE VIDEOGRAPHER:  The time is 5:08.
13  That concludes today's deposition.
14          (Deposition concluded 5:08 p.m.)
15
16
17
18
19
20
21
22
23
24
25

58 (Pages 226 - 229)

Page 230

1        C E R T I F I C A T E
2        I, MICHELLE L. DAWKINS, a Notary Public and
3    Court Reporter of the State of New Jersey, do hereby
4    certify that prior to commencement of the
5    examination, RON NAJAFI was duly sworn remotely by
6    me to testify the truth, the whole truth and nothing
7    but the truth.
8        I DO FURTHER CERTIFY that the foregoing is a
9    true and accurate transcript of the testimony as
10   taken stenographically by and before me at the time,
11   place and on the date hereinbefore set forth.
12       I DO FURTHER CERTIFY that I am neither a
13   relative nor employee nor attorney nor counsel of
14   any of the parties to this action, and that I am
15   neither a relative nor employee of such attorney or
16   counsel, and that I am not financially interested in
17   the action.
18
19            *Michelle L. Dawkins*
             MICHELLE L. DAWKINS, CCR, RPR
20           CCR License No. 30XI00224400
             RPR ID No. 805591
21           Notary Public of New Jersey
22
23
24
25

Page 231

1    DANIEL NIGH, ESQ.
2    dnigh@levinlaw.com
3            February 14, 2022
4    RE:   In Re: Valsartan, Losartan, Et Al
5        2/3/2022, Ron Najafi, PhD (#5066624)
6        The above-referenced transcript is available for
7    review.
8        Within the applicable timeframe, the witness should
9    read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12       The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18   receipt of testimony.
19   If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25

Page 232

1    In Re: Valsartan, Losartan, Et Al
2    Ron Najafi, PhD (#5066624)
3        E R R A T A  S H E E T
4    PAGE_____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____   _____
24   Ron Najafi, PhD                    Date
25

Page 233

1    In Re: Valsartan, Losartan, Et Al
2    Ron Najafi, PhD (#5066624)
3        ACKNOWLEDGEMENT OF DEPONENT
4        I, Ron Najafi, PhD, do hereby declare that I
5    have read the foregoing transcript, I have made any
6    corrections, additions, or changes I deemed necessary as
7    noted above to be appended hereto, and that the same is
8    a true, correct and complete transcript of the testimony
9    given by me.
10
11   _____   _____
12   Ron Najafi, PhD                    Date
13   *If notary is required
14       SUBSCRIBED AND SWORN TO BEFORE ME THIS
15       _____ DAY OF _____, 20___.
16
17
18       _____
19       NOTARY PUBLIC
20
21
22
23
24
25

59 (Pages 230 - 233)

| & | | |
|---|---|---|

**&**   2:3,9,13 3:4,11
  4:3,7,12 5:10,18
  57:10

**0**

**0.1**   47:11,19 54:18
  54:20 129:19
  130:1 205:2
**0.2**   184:2,8 186:8
  186:11
**02109**   4:4
**02875**   1:7
**07102**   5:15

**1**

**1**   8:4 9:3 41:8 47:9
  53:25,25 84:1
  85:16 118:5 130:3
  157:21 182:20
  186:15 191:7,8
  204:8 205:1
**1,000**   54:21
**1,300**   94:9
**1/28/2022**   8:7
**1/31/2022**   8:8
**10**   7:5 60:25
  131:11 146:17
**10,000**   225:1
**100**   2:17 5:11,15
  123:12 160:18
  205:11,12,20,22
**10017**   5:11
**10:14**   41:13
**10:32**   51:22
**10:46**   52:2
**11**   4:13
**111**   146:20
**11:41**   89:10
**12**   147:12 166:2
**12:03**   89:16

**12:47**   118:11
**13**   8:12 39:2,20
  42:18,24 90:18
  143:23 144:9
**14**   224:23 225:3,8
  231:3
**15**   84:2,7 165:6
  219:2
**15219**   3:7,13
**15th**   5:15
**16th**   5:11
**17**   8:13 46:13 47:1
  47:9 54:15 171:3
  173:11 175:9
**170**   7:6
**17th**   3:19
**18**   28:10 33:5,7
  34:20,22 45:4
**1800law1010.com**
  5:12
**19087**   4:9
**19103**   3:20
**19106**   2:14
**1960's**   187:11
**1970**   209:2
**1970s**   178:14,15
**1979**   178:5
**1994**   94:9
**1996**   92:13,16
**1998**   92:7 96:11
**1:00**   118:17
**1:19**   1:7
**1:36**   134:13

**2**

**2**   8:5 27:11 31:9
  32:11 41:14 47:5
  47:6 65:15,17
  82:3 89:11 105:4
  121:17 125:8,22
  184:13,13 186:14
  191:8 204:8

**2,000**   149:16 150:3
  150:14 151:15
**2/1/2022**   8:9
**2/3/2022**   231:5
**20**   45:4 132:22,25
  133:12 166:3
  167:13 233:15
**20,000**   224:22
**200**   5:6 64:6
  171:20
**2000**   96:12
**2001**   82:3
**2007**   96:13
**2009**   144:9
**201**   7:8
**2011**   96:16 99:23
**2015**   96:14 109:2
  131:6 165:8
  182:20 183:1
**2016**   109:2
**2018**   44:21 46:2
  105:13 109:13
  112:5 113:22
  115:8,15,19
  116:11,14 117:21
  119:21 121:6
  130:21 131:4,6
  132:8 136:9
  165:15 178:8,21
  179:1,20 181:5,5,6
  208:21 209:7
  210:3,13,18,23,25
  211:8,19,23
  214:20 215:6,11
**2019**   56:18,18 66:6
  70:2 71:18 73:1,4
  73:10,13 74:21
  75:18 76:10 77:15
  78:10,21 79:10
  80:5,17 84:24
  116:12 132:8

  143:23
**2020**   108:16,16
**2021**   48:8 82:18,21
  83:16 109:13,18
  111:4,24 112:6
  118:22
**2022**   1:10,19 9:3
  82:11 83:10 84:1
  231:3
**21**   165:8
**21094**   230:19
**214.855.8135**   6:5
**215.592.1500**   2:15
**215.977.4066**   4:9
**215.979.1177**   3:20
**219**   7:9
**2191**   74:5
**2200**   6:4
**2220**   4:17
**227**   5:20
**230**   4:17 176:9
**25**   82:18,21
**2500**   5:6
**26.5**   166:4,8,19
  169:10 189:7,20
**27**   8:14 49:23 50:5
  50:14,15,25 53:7
**270**   4:8
**27th**   4:4
**28**   8:15 82:11
  144:4,7 145:4
  223:3,5,8
**28202**   5:20
**2875**   1:2 9:7
**29**   8:16 165:1,4
  166:17,24 167:6
  167:15,22
**2:22**   163:24
**2:48**   164:5

[3 - accurate]                                                      Page 2

**3**

**3**  1:10,19 8:6 9:3
32:11 66:20 81:23
81:25 82:2 84:21
89:16 118:12
**3,000**  149:16
150:14 151:15
**30**  3:19 8:17
181:18 182:9
231:17
**300,000**  55:25
134:22 135:14
137:10
**301**  3:6
**30305**  5:7
**30xi00224400**
230:20
**31**  8:18 83:10
220:19,21,22,23
**312.566.4801**  4:18
**316**  2:10
**317.231.6491**  4:13
**32**  8:19 229:1,2
**320**  54:23 55:7,8
55:22 134:22
135:14
**320,000**  54:25
55:13,22
**32502**  2:11
**32nd**  3:13
**3333**  5:6
**351**  22:3,7
**3600**  6:4
**38th**  3:6
**3:18**  180:15,20

**4**

**4**  8:7 32:11 47:6
66:4 81:23 82:10
83:15 118:17
157:14,25 163:25

**4/6/2020**  8:11
**412.263.4385**  3:7
**412.560.7466**  3:14
**48**  103:3 170:12
**483**  109:14,17
111:5,17 112:4
119:1
**483s**  112:14
**4:16**  219:3
**4:24**  134:8
**4:56**  219:9

**5**

**5**  8:8 81:23 83:10
157:25 164:5
219:4
**5,000**  66:10
**50**  59:2 63:6 95:9
**500**  2:14 4:8
**504.524.5777**  2:6
**5066624**  231:5
232:2 233:2
**510**  2:14 97:8
**518.724.2207**  5:12
**53**  4:4
**5:08**  229:12,14

**6**

**6**  8:9 81:23 83:25
84:21 91:15
181:13,19,24
182:13,14 219:9
**6/13/2019**  8:15
**600**  5:20
**6001**  2:17
**60606**  4:17
**617.213.7000**  4:5
**621**  176:7 188:4
**65**  58:25
**678.533.2312**  5:7

**7**

**7**  8:10 89:24 90:7
91:5,24 101:6
**701**  2:5
**70130**  2:6
**704.444.3475**  5:21
**75**  58:23
**75201**  6:4
**78746**  2:18

**8**

**8**  8:11 103:23,24
104:12 115:18
**8/2/2021**  8:6
**805591**  230:20
**850.435.7013**  2:11
**866.531.2048**  2:18

**9**

**9**  219:21,21 220:9
220:11 223:11
**90**  96:8
**96**  149:3,4 165:19
166:8,14 167:12
168:16,21 169:5,7
189:6,19 191:2
225:6
**97**  96:11
**973.757.1017**  5:16
**98**  96:11
**9:09**  1:20 9:2
**9:58**  41:7

**a**

**a.m.**  1:20 9:2
**abbreviated**  93:5
97:3,6 99:5,17,25
108:7 126:23
127:1 129:10
154:22 155:13
156:6 157:5,10
**abide**  137:8

**ability**  193:22
194:19 199:6
201:17
**able**  25:10,12
40:17 42:18 72:14
74:19 75:17 100:3
105:8 115:2
117:23 132:1
164:15,17 186:4
224:12 227:18
**absence**  135:22
**absent**  168:25
191:24 192:1
**absolute**  23:8
113:19
**absolutely**  19:9
24:12 53:16 88:8
88:12 115:10
161:24 175:2
220:5
**accept**  77:21
**acceptable**  55:6
113:10 169:8,9,13
190:21 191:17
201:11
**acceptance**  45:25
46:4,22,24 47:3,10
47:18,24 48:9,18
49:4 54:17 55:17
129:17,21 183:22
186:7
**accepted**  47:7
100:24 190:8
**accepting**  168:21
**access**  48:13 215:4
**accuracy**  161:15
173:5 231:9
**accurate**  90:7 91:6
91:25 142:6
172:23 230:9

**accurately** 84:22
**acid** 133:19
**acknowledge** 9:17
9:20
**acknowledgement** 233:3
**acknowledgment** 231:12
**acquires** 46:10
**acquisition** 114:3
114:4,9,10 117:3
**act** 21:5,12,25
22:4 26:7,23
30:24 34:24 35:8
35:18 36:6 38:4
41:20,25 42:4,12
111:21 112:2
**actavis** 5:2,3
**acting** 64:18
**action** 119:14
230:14,17
**actions** 1:6
**active** 18:5 25:24
27:12 31:10,21,21
35:10 43:19 46:5
127:15 137:8
155:20 177:2,4,6,7
178:2 193:9,15
205:21,23 213:24
**activities** 67:1
158:19
**activity** 161:5
194:12,13
**actual** 27:14
**add** 186:9
**addition** 59:12
81:19 170:15
**additional** 89:19
174:14,18 199:7
199:24 200:3

**additions** 233:6
**address** 196:3
204:13 226:6
**addressed** 172:24
212:21
**addressing** 198:15
**administer** 9:21
**administered** 9:21
**admissions** 211:2
**adulterated** 14:11
14:13 15:23 16:4
16:25 17:20 21:6
21:8,13,18,22,24
22:7 41:19 128:1
128:8,21 216:14
217:1,19 218:13
228:7,13
**adults** 193:1
**advice** 128:10
142:23 169:2
191:5
**advised** 126:25
179:20
**advises** 168:24
191:23
**advising** 126:23
127:21
**advocate** 64:19
**aerosol** 176:24
**affairs** 156:10,14
**affiliation** 95:7
**affirm** 10:11
**afford** 187:14
**afternoon** 170:25
**age** 206:12
**agent** 168:8,9
193:13
**agents** 168:8
**ago** 65:9 83:11
102:24 103:3
120:15 144:1

162:15 170:13
171:21 215:10
**agree** 13:21 14:13
15:21 16:3 22:11
22:16,20 41:20
42:5,8 44:22
80:13 88:9 107:7
188:13
**agreed** 10:3,4
11:11 23:1 100:17
104:6 120:9,15
125:18 129:11
152:4
**agreement** 9:25
10:1 11:8 65:18
65:21 66:17 67:17
69:6,8,10,21 70:2
70:7,14,16 71:3,5
71:14,17 72:6,8,9
**ahead** 29:21 39:1
57:20 87:25 91:18
91:19 146:13
165:21 182:17
191:21 211:12
**ahold** 209:25
**aid** 4:11
**aims** 203:17
**al** 231:4 232:1
233:1
**albertson's** 5:17
**aldridge** 159:23
**alert** 123:21
**alerted** 123:20
124:20
**alerting** 139:8,10
139:11
**alerts** 212:24
**alfano** 3:3
**allotted** 231:20
**allow** 89:18
134:21 183:22

207:14,21
**allowable** 45:18
65:1 149:2
**allowance** 44:7,15
44:18
**allowed** 150:21
151:4 168:1,5
208:3 217:9,10,11
**allowing** 151:15
168:3
**allows** 129:12
135:13
**alotman** 3:21
**alternative** 19:12
**alyson** 3:18
**amended** 101:25
**america** 12:23
13:1,5,21 44:9
**amino** 67:9
**amount** 45:17,17
65:8 186:11
**analysis** 116:18
193:20 196:13
197:18 198:4
210:10 211:3,25
**analyze** 194:18
**analyzed** 202:22
**anda** 19:2 155:2
195:17,22 196:2
196:20 200:1
209:22
**andas** 100:5
195:11
**angio** 93:17
**angiotensin** 219:24
**animals** 189:15
**announce** 220:11
228:24
**answer** 11:22
13:13 14:3,4,5,6

[answer - aspects]                                                                Page 4

14:20,25 15:12
16:1,8,10,13,14,23
17:5,6,14,23,25
18:15 20:16 21:17
31:4 32:21,23,25
33:15,17,18,21,21
33:24 34:2,6,9,10
34:10,11 35:15,16
35:19 37:5,6 45:9
47:21,23 50:9
57:16 59:16 60:9
60:10 61:8 70:6
73:16 76:5 77:19
78:24 79:2,16
80:1,25 81:6
94:16 101:1,25
102:15 115:24
128:13 137:6
142:12 151:8,11
155:10 165:22
168:11 210:22
211:12 213:17
214:10,11,12,18
**answered** 13:7,8
13:15,24 16:16
23:22,23 32:22
81:2 143:5 190:12
190:14,15,16,24
192:7 210:20
211:11 212:7
**answering** 15:5
161:6 169:15
**answers** 14:22
15:3,14 30:11
**antacids** 133:20
**anti** 133:19
**antibacterial**
96:18
**anticipate** 203:9
204:3,20 205:24

**anticipated** 204:22
214:13,16
**anticipating**
203:10 208:12
**anybody** 54:2
141:3 162:1
**api** 18:14 19:2
93:13 97:18
136:19,22 152:10
152:10 158:13,16
159:7 160:1
168:25 191:18,25
191:25 215:5
**apis** 136:21
**apologies** 135:7
168:12
**apologize** 98:8
135:19
**apparently** 82:7
**appear** 33:8,11
34:20,22 64:19
166:23
**appeared** 86:15
**appended** 233:7
**appendix** 145:16
146:15 147:4
**apple** 198:12
199:22
**applicability**
68:22
**applicable** 31:13
231:8
**applicant** 20:14
**application** 97:4,6
99:17,18 108:7,22
109:1 126:24
127:1,2 129:11
152:17,22 153:5
153:17,20,24
154:23 157:7,11
163:6,8 195:23

**applications** 93:3
93:6 99:3,6,25
100:1 155:13
156:7,23 157:5
**applied** 94:4 95:16
**applies** 23:12,18
80:4 134:24 135:3
135:15,17
**apply** 80:9
**appointment**
134:1
**appreciate** 21:10
74:24 139:14
160:22
**approach** 227:25
**approaches**
226:15
**appropriate** 13:11
13:11 77:11
199:25
**appropriately**
199:8
**approval** 154:23
**approved** 38:14
39:21 55:16
**april** 72:25 73:3,9
73:12 74:5,21
75:18 76:9 78:10
78:20 80:5,16
**arb** 94:12,20 169:1
191:25
**arbs** 94:11,18
96:24 97:1 105:13
126:20 127:4,7
168:25 191:18
227:7
**area** 42:22 201:18
**arena** 116:11
140:9
**argue** 75:13 76:25
151:9

**argued** 28:24
**arguing** 77:11
**argument** 170:19
**arrangement** 9:23
**art** 54:3,3 133:6
208:8 214:25
**article** 8:11,14,18
8:19 22:24
**articulates** 25:6
50:17 54:1
**ascertain** 79:9
**asher** 4:8
**asher.block** 4:10
**aside** 60:2
**asked** 13:14,17,23
14:18 17:10 23:21
29:5 36:3 47:20
52:13 65:4 77:13
77:17,21,23 91:12
102:19 119:23
121:9 141:20
142:23 148:23
153:19 155:25
160:4,6,23 163:5
169:4 190:12,13
190:23 194:15,16
212:6,7 219:16
221:14
**asking** 14:2 29:8
30:10 50:13 53:20
58:10 59:23 70:13
76:15 77:12,24
81:18 102:8
103:15 146:8,24
190:1 204:11
211:4,5,6 217:15
228:6
**asp** 110:21
**aspects** 74:13
111:6

**assess**  175:25
  206:1
**assessed**  202:13,21
  203:1
**assessment**  195:17
  195:18,24 196:10
  196:24,25 197:5,9
  199:8 200:1,5
**assessments**
  195:21 196:1,12
**assign**  71:22
**assist**  157:9
**assisted**  100:8
**associated**  183:17
  196:19
**assume**  63:15
  75:11 84:20
  106:24 130:7,8
  138:11 160:12
  216:6
**assumed**  138:22
  138:24
**assuming**  216:22
  217:2,7,14,22
  218:6,9
**assumption**
  139:17,21 140:3
  140:10 147:21
  148:15,23 160:14
**assure**  159:12
  187:1
**atlanta**  5:7
**atmosphere**  96:5
**attached**  85:23
  101:6 176:15
  231:11
**attempt**  164:20
**attempting**  207:13
**attended**  156:20
**attention**  72:2
  115:14 116:2,5

141:20 173:25
  219:20 226:9
**attest**  167:19
**attorney**  10:23
  230:13,15 231:13
**attorneys**  9:16
**audience**  160:20
**august**  82:3,5
**aurobindo**  3:10,10
  39:14,17 71:6
  117:24 162:19
  171:1 229:8
**aurolife**  3:10
**austin**  2:18
**authorities**  69:19
**authority**  24:1,17
  25:1 131:21
**availability**
  172:10
**available**  72:18,20
  104:16 108:11
  115:12 163:12
  214:19 231:6
**avenue**  5:11 6:4
**award**  94:8
**aware**  45:4 115:22
  120:1 130:16,20
  130:22 131:7
  136:8 178:24
  199:1 200:16,18
  200:22,24,25
  201:2,4,5 202:10
  208:18,23 209:10
  209:14 210:7,9,12
  215:10,15,16

**b**

**b**  5:19 173:18
  176:17,18
**b6**  123:24,24
**bachelor's**  92:3

**back**  17:4,11,16
  27:7 31:5,6 36:8
  41:13 51:21 52:3
  54:13 82:15 94:9
  111:16 112:7
  113:2,25,25 118:1
  119:20 129:4
  134:13 170:14
  171:2 180:21
  184:19 203:5,6
  204:2 219:2 222:9
  226:8
**backed**  109:22,24
  111:14 114:6,7
**background**  66:22
  67:16 89:19,20
  191:9
**backup**  109:24
  110:7 111:9,9
  113:9 114:12
  119:5
**bacon**  201:3,15
**bad**  116:21 209:18
**badger**  29:19
**ballpark**  142:10
**bank**  143:16
**bar**  54:7
**barnes**  4:12
**based**  37:23,24
  58:5,13 125:19
  140:2 148:19
  167:5,11 204:21
**basic**  11:7,8 75:9
  75:13 175:12,20
**basically**  25:5,5
  27:8,21 28:10
  32:12 36:13 46:21
  47:4,5 50:22
  78:14 102:8
  104:12 108:22
  112:8 119:5

124:22 131:22
  136:17 143:2
  168:23 172:8
  173:9 175:25
  178:22 179:9
  180:5,9 184:19
  195:5 209:17,17
  218:8 227:17
**basis**  57:18 59:17
  79:11 80:7,10,16
  139:21 140:10
  141:4 151:5
  170:13 195:25
**bat**  117:23
**batch**  44:1
**bated**  88:25
**baylen**  2:10
**bear**  66:18 118:2
**bearing**  75:3
**beer**  201:5
**beginning**  34:11
  48:25 56:8 116:10
**begins**  41:14 89:16
  118:17 164:5
  219:9
**behalf**  10:3,5 81:8
  190:2 218:24
**behest**  123:3
**belabor**  80:12
  81:14
**believe**  42:2 43:24
  58:16 101:9 103:3
  116:13 117:9
  132:9,12 138:21
  152:14 162:12
  163:10 165:16
  167:25 170:4,13
  174:11 182:8
  183:3 189:4,11,23
  210:21 213:23
  214:4,24 215:9

216:5 218:17
223:12,13
**believes** 199:7,25
**bend** 110:1
**benefit** 63:11
**benzothiadiazine**
183:13
**berman** 2:13
**best** 24:14
**better** 53:17
144:21
**beyond** 23:9,25
25:8 78:25 132:21
173:3 199:2
**big** 116:4
**bigger** 39:24 47:14
**bill** 82:6 84:1
144:1 171:3
181:12
**billed** 82:13 83:14
**billing** 85:4
**bills** 85:7,8
**bind** 193:17
**binding** 193:13
**bio** 19:21 20:2,7,9
20:11,19,24 21:3
26:1
**biosystem** 95:16
**biosystems** 94:5
**bipc.com** 5:21
**bisgaard** 4:7
**bit** 37:4 77:18
108:18 201:16
**bite** 198:11 199:22
**block** 4:8
**blocker** 93:18
219:24
**blog** 104:18
**blogs** 116:4
**blood** 193:1,24

**bockius** 3:11
**body** 25:22 201:16
**bogdan** 5:10 57:5
**boils** 79:19
**bold** 2:17
**bond** 185:8
**bono** 123:6,9,10
123:13
**bosick** 3:4
**boston** 4:4
**bottom** 62:6 199:5
226:4
**bovin** 57:10
**box** 39:16 222:25
**brad** 57:2,8 84:19
**brakes** 29:3
**brand** 18:23 27:17
27:20 35:21 46:9
58:5,12,14 172:12
172:15 221:9,23
222:5,20 224:8,10
**brand's** 28:3
35:24 36:15,17,18
**branded** 18:10
19:15 127:5,7
**break** 36:8 41:3
49:19,22 52:5,14
52:17,19 89:7
118:7,7,9,10,21
133:25 134:6
143:14 163:19,22
180:13 219:2
**breaks** 24:7,24,25
**breath** 89:1
**brian** 5:5
**brief** 79:1 81:10
**briefly** 170:8
226:5
**bring** 164:12
170:1 173:25
174:20

**brings** 61:22
**brisbois** 4:7
**broader** 102:11
160:23,24
**brought** 58:2,5,12
116:2,5 122:13
130:8 141:18
160:4 191:25
**brush** 197:18
**btlaw.com** 4:14
**buchanan** 5:18
**bucket** 85:6
**bunch** 133:20
199:3
**burn** 185:10
**business** 60:25
92:13 95:12 99:22
107:24
**businesses** 62:18
**butyl** 67:8,8
**buy** 136:20,22
**buying** 152:9,10

**c**

**c** 2:1 3:1 4:1 5:1
6:1 32:16 185:8,8
230:1,1
**c.v.** 8:10
**c.whiteley** 2:8
**calibrated** 68:16
**call** 26:6 29:20
30:7,16 70:19
83:23 84:4 116:13
186:17 196:12
197:13 203:25
207:1
**called** 1:13 21:22
26:19 62:13 92:16
93:20 95:15 116:3
133:5 142:23
146:12 180:4,5
191:5 222:6

**calling** 80:5
**camber** 4:6
**camera** 192:15
**camp** 2:5
**canada** 8:18
219:13,17 220:3,4
220:7,8 222:19
**cancel** 134:2
**cancer** 106:24
107:13 137:16
160:8,25 168:9
189:14
**cap** 197:4
**capable** 177:11,14
**car** 180:12
**carbon** 185:9
**carcinogen** 49:14
**carcinogenic** 87:8
191:12 218:1
**carcinogenicity**
106:16,20
**care** 27:6 96:18
134:1,3
**career** 100:12
154:21,25 171:5
**carillon** 5:19
**case** 1:7 28:2,2
31:21 38:19 59:6
59:10,24 66:13
73:16 102:17
111:15,15 125:12
136:6 137:13
147:22 162:3
169:23 175:4,6
176:3 177:3
193:21 197:9,11
205:3
**cases** 58:1
**catch** 203:5
**catches** 113:6

[causation - clearly]

causation 107:4,8
107:9,10
cause 107:13
193:16 196:13
198:3
caused 119:25
causing 94:6
137:16 168:9
196:9
ccr 230:19,20
cct 3:8
cder 156:19,20,21
156:24 157:3,6
center 5:11,14
156:19
centre 3:6,13
ceo 123:20
certain 37:17,23
37:24 111:5,8
160:5 168:3 174:2
185:19 186:13
192:6 193:16
199:8 203:10
205:25 206:16
209:2 219:23
certainly 115:6
162:5 183:24
certainty 113:19
certification 25:2
76:20 82:17,21,23
82:25 83:14 85:13
150:17 228:10,16
certified 1:17
certify 230:4,8,12
cetera 159:24
cgannon 5:16
cgmp 32:16 67:20
67:25 68:5 69:4
93:25 98:17 188:8
206:7 227:14,14

chad 176:23
chain 71:22 72:1
117:2
challenging 94:5
chance 52:7,9
103:2 141:23
chances 197:16
change 139:5,6,6
158:20,22 197:2,3
197:4 232:4,7,10
232:13,16,19
changed 197:12
214:14
changes 203:7
226:17 227:20,21
231:10 233:6
changing 196:10
characteristics
31:13
charge 176:24
charged 120:16,17
charles 2:13
charlotte 5:20
chart 164:10,11,24
chat 40:8,15,17
check 67:10
119:16 120:5,7
123:7 150:7
chemical 18:22
25:24 26:6,11,20
26:22 27:13,20,24
28:1,3,4,5 30:20
30:23,25 31:25
32:2,4 33:7,9,10
34:22,23 35:1,14
37:24 92:11
131:25 132:3
144:23,25 154:11
158:20 159:23
191:15,15 193:22
197:2,12 224:21

225:25
chemically 34:19
224:22 225:2,7
chemicals 95:21
chemist 37:23
177:23,24 185:22
185:24,25 196:6
chemistry 67:10
74:11 89:21 92:4
92:8 133:6 144:21
153:15 168:7
203:8 214:25
chicago 4:17
children 193:1
china 95:19
136:21
chlorine 185:9
chloromethyl
185:9
cholesterol 218:9
christine 5:14
christopher 5:19
christopher.henry
5:21
chromatogram
184:14,23 187:4
204:4
chromatograms
187:2
chromatographic
176:1,2,7 177:9
187:22 188:2,16
chromatography
175:18 176:4,7
177:10,16 188:4
chronic 203:19
ciba 163:13
cigarette 200:20
circumstance
161:20

citation 26:11
citations 83:6,21
84:5
cite 24:1,17 49:18
131:18
cited 26:9 132:4
169:1,2 223:21
citizen 100:15
104:4 121:20
122:12 123:11,13
123:23 124:14
148:10 160:16
161:18,18 162:1
citizens 100:21
122:3,25 123:15
124:2,9 143:14,16
143:23 145:7,10
148:17 161:22,25
162:2
citrate 193:13
civil 1:15
claim 73:22
claims 58:1,4,12
clarification 31:15
clarify 209:10
class 82:17,20,23
82:25 83:14 85:13
212:17,19,20
228:9,15
classes 212:23
213:2,2,8
clear 16:2,22
25:23 34:4 35:10
80:12 103:11
118:25 122:15
149:8 151:14,17
210:22 227:14
clearly 33:14
76:15 81:12
102:21,22 103:4
151:22 199:10

**clem** 3:4 10:2,22
  15:15 39:13 74:24
  137:10 140:14
  149:1 162:7
  184:21
**client** 99:19 100:8
  122:21 127:22
  138:19 149:20,25
  150:2 151:14
  155:23
**client's** 113:7
  140:23,24 151:20
  155:25
**clients** 28:2 67:19
  99:4,7,10,15,24
  125:15,21 126:2,3
  126:5,7,17,22,25
  127:25 128:3,7,11
  149:14 150:8
  151:22 155:2,17
  155:23 207:5
**close** 18:20
**closed** 119:2
**closing** 119:3
  198:25
**cloud** 111:14
  112:7 113:13
  119:5
**clue** 158:25
**clues** 133:2,3,5,10
  139:10
**cmc** 108:6 153:20
  153:24 154:1
  155:1,1 196:6
  200:9 209:21
**coan** 4:3
**cohorts** 88:16
  228:1
**coleen** 3:19
**colloquies** 28:19

**colloquy** 15:8
  17:21 21:16 47:22
  48:21,23 49:2
  50:1
**column** 176:17,19
  176:19,21 222:10
**combativeness**
  29:11
**come** 17:11,16
  51:21 102:19
  139:9 170:14
  219:2
**comes** 60:25
  110:19,20 123:4
  168:8 177:1 198:2
  206:14
**comfort** 89:7
**comfortable**
  202:16
**coming** 49:6 88:22
**commencement**
  230:4
**commencing** 1:20
**comment** 26:2
  149:24 189:9
  193:19
**commentary**
  94:23
**comments** 105:17
**commercial**
  112:10
**commitment**
  112:11
**committee** 180:1
**common** 179:11
**communications**
  124:24 125:2,5
**companies** 25:7
  71:15 92:12 94:4
  96:8 136:15
  178:16 179:14

  187:13 188:9
  209:19 226:10,24
  227:2,3,5,6,23
**company** 25:23
  62:12 63:22,25
  64:22 65:5 66:9
  92:15,16 93:12,15
  93:20,22 94:2,17
  94:25 95:2,2
  96:12,13,23 97:3
  97:16,21 98:10
  130:23 134:16
  136:9,12,24
  159:22 171:20
  174:16 185:22,22
  185:25 196:6,15
  207:3
**compare** 167:1
**compendial** 195:1
  195:4
**compendium**
  22:10
**complete** 109:1
  233:8
**completed** 15:1
  231:17
**completely** 29:12
  33:16,22 112:19
**completeness**
  163:7
**completing** 92:10
**compliant** 68:11
  69:1,1 98:19
  114:21
**comply** 111:6,10
  139:3
**compound** 31:22
  36:20,21 43:19
  46:5 47:25 48:1
  48:14 87:9 88:15
  88:16 110:20

  120:13 124:18
  128:4,16,18 129:6
  129:14 160:16
  175:3 177:2,4
  178:2 183:13,15
  184:3 188:24
  193:10 203:16
  204:5 206:24
  213:13 214:7
  218:2
**compounds** 31:22
  45:9 55:12 96:5
  133:10 136:15
  137:23 141:2
  159:4 177:6,8
  179:17 180:7
  203:17 204:22
  205:21,23 206:18
  212:16,20,24
  213:2,5,9 215:18
**computer** 27:8
  99:15 206:10,12
**concentration**
  137:1
**concept** 14:22
  25:23 26:1 32:15
  184:20
**concepts** 11:7
**concern** 37:20
  178:19 179:15,16
  185:6 204:21
  214:15,16
**concerned** 120:13
  197:15
**concerns** 88:17
  178:20,20 186:1
  197:16
**concluded** 229:14
**concludes** 41:8
  89:11 163:25
  229:13

[concurred - correct]

concurred  142:18
condition  69:2
   111:19
conditioned
   176:19
conditions  111:25
conduct  114:23
conducted  70:3,6
   70:9,23 71:19
   76:10 78:1 79:8
   106:15,19 204:16
   214:7
confidential  73:18
   100:2 101:19
   105:19,23 155:15
   155:21
confidentiality
   125:24
confine  138:2
confirm  116:8,9
   148:7 215:8
confirmed  145:19
confirms  65:22,25
confusing  121:3
conlee  2:5
connected  178:3,4
connecticut  116:3
connection  58:9
   63:19 85:5 102:18
   111:4 114:18
   160:1 171:12,15
   195:16,22,22
   196:2 198:17
   208:15,20
consent  9:23
consider  100:18
   158:5 161:22
   163:2 177:25
   186:15 193:9
   204:1

considered  11:14
   11:24 12:7,18
   37:20 219:15
   228:7,13,19
considers  200:6
consistent  80:16
   116:25 129:5
constitute  111:20
constituted  112:1
constitutes  21:13
   26:11
consult  137:24
consultant  57:13
   57:22,23 63:20
   64:3 66:1,25
   71:17 157:9
consulting  59:19
consume  200:25
consumed  190:6
   190:19
consuming  165:24
contact  119:22
   174:17
contacted  120:6
contacts  172:12
contain  11:11,19
   13:1,5 21:6,12
   58:20 79:20 88:14
   129:14 138:9
   140:3 152:1 168:2
   173:6 178:9
   189:19 200:15
   201:5 213:23
   217:17
contained  79:3,21
   86:16,24 138:23
   147:23 148:16
   162:9 178:12
   181:9 189:3
   216:20 218:12

containing  58:7
   70:4,17,24 71:10
   79:19 80:15,18,20
   138:19 150:15
   166:23 184:18
   216:12,25 228:12
   228:18
contains  11:14,18
   11:25 12:5,9,13,16
   13:21 14:8 15:16
   15:18 42:9 61:23
   104:9 128:4,16
   136:25 138:6
contaminated
   21:9 151:23
content  80:16
   149:9 165:19
   166:13,18 169:5
contents  126:23
   127:1 142:5
continue  39:16
   90:4 103:1 112:9
   112:10 159:10
   177:5 198:23
   199:19 212:8
continued  3:1 4:1
   5:1 6:1
contract  60:24
   68:25 98:19
   107:25 110:18
contradicts  189:17
   190:4,17
control  226:16
   227:19
controlled  45:13
controls  78:18
   153:15
conveniently
   126:2
conversation
   29:13 176:14

conversations
   188:13 189:10
convert  54:24
cookbook  185:17
copies  231:14
copy  39:20 85:16
   89:23 90:10,25
   181:21
core  139:24
   162:25
corner  182:22
corporation  62:21
   62:24 63:1
correct  11:4,5
   12:24 18:15 19:24
   20:14 33:5,6
   47:11 62:4,20,22
   63:7,18 65:20,23
   66:7 67:3,23 72:6
   80:8 82:3,4 85:23
   85:24 86:18 87:1
   89:21,22 90:7,9
   92:1,6,9,14,18
   96:17,20 97:19
   98:5,8,11,12
   104:13,14,21
   105:14,15 107:8
   111:7,22 113:22
   114:3,9 115:4
   116:22 126:24
   130:6,10 134:18
   142:19 143:10
   144:17 145:4,5,8
   147:1,5,14,17,19
   148:24,25 154:18
   158:14 161:10
   182:9,25 183:24
   189:4,20 190:9
   194:8 195:12
   200:1 201:13
   202:15 203:3,4

[correct - declaration]    Page 10

204:19 205:13
207:15,22,24
208:4 210:4 211:8
211:14 212:21
213:10 214:3
215:6,7 216:10,24
217:3,4,8,14
219:18,19,25
220:1,19 221:9,10
222:21 223:25
224:1,2,3,5,6,17
224:18,24 225:3,8
225:9,18,19,22,23
226:2,3,6,7 227:4
233:8
**corrections** 233:6
**correctly** 65:19
67:22 125:16
158:1 165:12
226:18
**corroborate** 143:8
146:12 148:11,20
174:21 223:20
**corroborated**
120:19 143:10
146:1,6 148:7
160:18
**cosmetic** 21:5,12
21:25 22:3 26:7
26:23 30:24 34:24
35:8,18 36:6 38:4
41:20,25 42:3,12
111:21 112:2
**cosmetics** 200:17
**counsel** 9:11,22
39:14 41:14 45:21
57:13 75:3 165:9
198:9,24 199:20
218:24 219:16
220:10 225:13
228:23 230:13,16

231:14
**counsel's** 225:21
**counter** 133:21
**couple** 32:10
118:19 134:3
144:11 173:17
174:19 198:15
223:24 224:20
**course** 169:21
**court** 1:1,15,17
9:6,9,12,14,16
10:6,9,15,25 39:1
45:21 75:14 230:3
**cousin** 133:18
**cover** 89:18 164:8
198:10
**covered** 118:20
212:15,24
**covering** 11:7
**cp** 92:16,21,24
93:2,5,8,11,15,19
93:21,23 94:1,16
94:20,23 95:1,3,4
95:5,7,9,12,14,17
96:10
**cplab.com** 95:22
**create** 158:23
189:14
**created** 76:9
185:13 195:16,18
**credentials** 90:8
**criteria** 23:20 46:1
46:4,22,24 47:3,7
47:10,18,24 48:10
48:18 49:4 50:21
54:17 55:18
129:18,21 183:22
186:8
**criterias** 161:20
**critical** 108:5

**criticized** 149:14
**cross** 7:6,8,9
170:23 201:23
219:10
**cs** 231:15
**cschaffer** 2:15
**csr** 1:17
**culbertson** 4:3
**curiosity** 110:11
**current** 32:16,17
67:25 91:5,24
119:1 178:24,25
179:4,22 187:8,9
188:10 206:7
**currently** 67:17
164:10 165:7
168:20
**cursor** 206:16
**custody** 71:23
72:1 114:13 117:3
**cut** 23:15
**cv** 89:23 90:5,10
91:5 92:19 101:6
108:13
**cvs** 4:11
**cwhill** 3:21
**cyclotron** 208:10
**cygnet** 4:2

## d

**d** 195:12
**d.stanoch** 2:7
**dallas** 6:4
**dan** 76:12 77:12
89:6 134:4 155:12
221:11 229:5
**daniel** 2:10 10:4
29:5 40:11 57:2,3
57:3 59:18 75:7
84:19 101:23
102:7 128:25
140:19 197:11

214:11 231:1
**data** 109:22,23
110:7 111:9,9,13
111:16 112:3,3,7,8
112:19,23,23
113:2,4,5,7,12,14
113:18,23 114:2,4
114:5,9,13 117:3,3
117:4 120:11,12
120:19 121:21,22
143:3,8,11 146:12
148:17,20,21,22
148:24,25 152:3
163:17 216:22
217:7 223:20
**date** 62:1 81:13
83:19 91:5,24
192:8,10,13
230:11 232:24
233:12
**dated** 82:3,10
83:10 84:1 144:9
165:8
**david** 2:4 120:6
**davis** 2:16,17 92:8
**dawkins** 1:17 9:10
9:15 230:2,19
**day** 17:11 24:8
98:10 165:24
168:17 169:6,11
171:8 200:12
218:8 233:15
**days** 83:11 231:17
**deal** 139:12
**decision** 122:24
**declaration** 8:4
61:22 83:15,19
85:15,16,22 86:14
86:16,20,25 87:3
87:12,25 88:4,10
103:8 117:15

118:1,4 121:14,15
121:17 125:9
139:23 150:17,25
151:5 157:15
162:3,9,11,16,24
198:7 199:14
212:9 228:10,16
**declare** 233:4
**deemed** 14:13
42:4 233:6
**defendant** 4:2,6,15
5:17 6:2 80:19
**defendant's**
138:23 190:18
192:25 197:23
200:15
**defendants** 3:2,10
3:16 4:11 5:2 10:3
10:24 28:24 71:11
126:7,10,13 127:3
138:20 151:2
152:12 162:18
163:11 189:2,5,18
198:16 202:4
219:18 228:12,18
**defense** 198:24
199:20 218:24
219:16 225:12,21
**define** 38:2
**defined** 22:7 31:1
35:17 36:6,10,25
38:3 41:21,24
42:2
**defines** 202:20
**definition** 21:6,10
21:13,23 22:2,15
22:17,20 26:19,22
34:23 35:1,6,9
38:5,7 41:19 42:6
42:10,11 107:10
161:11,13 217:23

217:25
**degradation** 44:2
**degree** 103:14
**deletes** 114:5
**demonstrate**
31:10,20
**department**
192:17
**depending** 176:18
**depends** 69:3
196:5,15,16
203:24
**deponent** 231:13
233:3
**depose** 103:2
**deposing** 231:13
**deposition** 1:9,12
1:14 9:4,17,18,19
10:12 17:15 28:18
56:9 84:9,12,16
102:17,18,19
103:1 121:12
160:3,6 169:22
170:14 229:13,14
**describe** 54:10
74:19 75:17
157:15 158:5
**described** 50:20
80:4 98:14 102:21
180:24 191:25
**description** 8:2
**designated** 11:3
107:3
**desire** 117:1
**desk** 27:2
**detail** 198:7
**details** 72:11
**detect** 226:16
227:9,19
**detectable** 168:25
191:24

**detected** 177:3
222:14,18,19
223:25
**detecting** 177:14
**detection** 49:16
177:22
**detector** 176:8,22
176:22,23,23,24
176:25,25 177:1,2
177:10,22 187:19
188:5,6,7,17
**detectors** 177:13
**determination**
189:17 190:5
**determinations**
167:11
**determinative**
77:5
**determine** 19:19
28:7 73:21 186:10
187:7 193:21
194:7 200:4
**determined** 18:1
19:17 190:21
191:17
**detoxify** 201:17
**develop** 92:24
97:11 98:22
114:24 132:6,14
159:11 171:23
208:24 209:20
**developed** 68:7,23
78:3 132:15 159:6
159:9 195:23
209:18,19
**developing** 18:14
180:7 196:25
209:24 226:14
227:24
**development**
158:18

**develops** 172:16
196:8
**device** 97:9
**devoted** 84:23
**diagnose** 106:24
**diane** 222:18
**dictate** 135:23
**difference** 129:2,5
205:7
**differences** 128:20
**different** 17:10
19:1,2,8,23 20:5
27:22,23 28:4
35:25 36:19 46:21
46:22 66:13 71:2
78:1 90:15,16,23
146:23 153:7,11
154:9 174:5 182:2
184:22 186:10
187:4 201:19
213:1,2
**differently** 77:18
77:21,24
**differs** 22:8
**difficult** 24:13
**diligence** 19:18
109:23 158:24
159:2 185:21
211:24
**dimethyl** 67:14
137:14
**dimethylforamide**
144:18
**dimethylformam...**
144:19 145:3
**diovan** 8:12 38:20
39:3,21 42:17
43:1 79:21 125:3
130:15 138:7,10
138:24 148:16
152:13,17,22

154:5,18 163:6,14
221:2,8,21 222:7
222:20 224:2,4
**diphenyl** 133:22
**direct** 7:5 10:16
199:24 226:9
**direction** 185:18
**directly** 189:16
190:17
**disagree** 17:22
76:12 79:6 81:12
103:8
**disagreement**
79:14
**disappeared** 118:3
**disclose** 44:1,3
61:14 126:5 159:1
**disclosed** 40:3
57:19 59:20,23
60:1,8,13,21 61:5
61:18 62:9 76:1
79:7 103:20
105:12,22 153:8
154:12 155:24
169:23 219:14
223:13,14
**discloses** 42:25
46:10 212:13
**disclosure** 104:20
125:9
**discover** 77:7
**discovered** 131:7
**discuss** 121:13
**discussed** 28:17
**discussing** 84:16
**discussions** 187:13
**dish** 185:19
**dispensed** 38:11
**display** 65:14
**dispute** 75:12

**disrespect** 79:13
**distinguish** 145:1
**distribute** 95:21
95:21
**district** 1:1,1 9:6,6
10:25,25
**division** 97:9
157:13
**dmb** 98:19
**dmf** 67:2,12,13,14
99:8,9,11,18 100:9
144:15,18 145:1
145:18
**dna** 137:15 189:12
189:13 194:2
207:20 213:24
**dnigh** 2:12 231:2
**doctor** 41:18 52:5
60:10 81:22 89:18
91:16 106:5,6
107:1,5 118:21
121:18 134:15
139:20 149:9
150:10 151:25
158:12 164:7
165:4 170:25
171:5 181:19
182:1 192:8
204:10 209:4
210:2 219:12
220:25 222:5,16
223:7 224:20
225:12 226:21
228:5
**doctors** 142:12
**document** 1:5
36:25 40:2 41:15
46:15 48:13 50:25
53:10,16,19 82:6
86:9 87:19,21
90:17 101:25

102:15 103:14
104:19,24 105:5
146:25 164:21
165:6 169:2
181:12,21 192:9
192:10,15 195:19
216:19 219:13,14
222:22 225:12,13
225:18 226:1
228:3
**documentation**
112:24
**documentations**
167:3
**documented** 142:4
**documents** 40:15
50:24 81:21 83:4
103:15 152:18,21
153:3,7,11 154:9
162:10,13,15,20
163:3,18 164:8
169:18,19 170:2
170:11,20 181:10
**doing** 28:25 29:1
29:17,24,25 72:23
79:10 105:21
113:21 115:20
116:18 123:8
130:17 131:14
174:16 186:23
**dollar** 65:8
**door** 179:10
199:20
**dosage** 165:23
**dose** 150:3
**double** 150:7
185:8
**doubt** 193:6,6
**download** 40:18
**downloading**
144:3

**dozen** 59:7,11
**dozens** 207:9,9
**dr** 33:17 39:14,15
40:17 51:9 52:20
75:1 155:7 162:3
168:10 201:25
210:15 211:4,6
212:16 213:19
218:19 223:12
227:8
**draft** 103:15
104:10
**drafted** 101:10,13
102:8
**draw** 40:14 116:8
219:20
**drinking** 200:23
**drive** 109:25
**driven** 114:22
**drop** 85:6 186:22
**drug** 11:11,13,13
11:18,24 12:4,5,7
12:12,16,18,22,22
12:25 13:4,19
14:7,7,11 15:15,15
15:23 16:4,24
17:20 18:6,11,23
19:3,7,14,15,18
20:1,7,14,18,22
21:5,12,24,24 22:3
22:8 23:4,7,18
26:7,23 27:8
30:24 31:7,14,17
31:24 32:5 34:24
35:7,12,18 36:6
37:9,10,13,14 38:4
38:11,18 41:19,25
42:3,4,8,12,14,14
43:13,21 44:8,15
44:19 45:2,3 46:6
55:6,16,22 58:13

[drug - entitled]                                                                    Page 13

58:17,18 59:5,5,8
59:9 73:25 86:18
87:6,10,13 88:6,7
88:14 92:25 93:2
93:5,9,13 94:3,3
97:4,4,6,7,8 98:23
99:2,6,17,18,25
100:1 107:17,19
107:23 108:2,7,9
110:15,17,24
111:20 112:1
123:7,21 126:18
126:24 127:1,2,10
128:21 129:11,13
130:16 134:16
136:5,24 137:2,3
138:22 140:2
145:1 149:9
151:25 152:2,16
152:21 153:5,16
153:20,24 154:22
154:24 155:13
156:5,6,10,19,22
156:23 157:4,5,7
157:10,13,16
158:7,14,16,17
159:7,12,16,19,20
159:25 160:1,8,25
161:9 163:6,8
167:6,14,22
171:10,10,22,23
172:9,10,11,14,24
177:25 178:16,19
179:7 183:23
184:18 185:5
186:18,20 188:12
191:18 194:11,12
195:23 196:8,9,17
196:20,23 197:6
202:14 203:19,20
203:24,25,25

207:12 213:11,14
213:21,25 215:12
216:23,25 217:6,7
217:8,9,25 218:4
224:8,21,23 225:1
225:2,6,7
**drug's** 214:2
**drugs** 20:6 32:5
58:14 128:1
132:17,22,23,25
133:12 137:7
138:8,9,18,21
139:25 140:3
141:3 155:16,17
155:18,19 157:9
172:9 178:8,11
195:5 197:14
209:16 213:20
215:17 223:18
227:3,5 228:6,12
228:18
**duane** 3:18
**duanemorris.com**
3:21,21
**due** 19:18 99:14
109:23 124:17
158:24 159:2
185:21 191:11
**duly** 230:5
**duties** 107:22
**duty** 27:9 31:8,18
185:4,24
**dynamics** 194:10
194:11

**e**

**e** 2:1,1,13 3:1,1 4:1
4:1 5:1,1 6:1,1
63:13 230:1,1
232:3,3,3
**earlier** 36:4 41:18
83:3 112:23

138:17 165:17
179:9 181:9
198:21 216:20
222:24 223:12
**early** 105:13
108:16 113:22
115:8,19 119:21
119:21 141:24
143:12,13 209:2
**earthquake**
111:12,15 113:7
**easing** 172:10
**east** 4:8
**easy** 139:19
206:13
**eat** 201:15
**ecological** 95:15
95:24 96:6
**education** 89:20
**effect** 168:17
169:6,8,11 191:12
194:7 203:14
**effective** 182:19
**effectively** 68:18
93:22 124:19
159:3 171:9
172:10 185:2
**effectiveness**
194:2,3
**effects** 183:17
**either** 21:20 26:22
27:16 35:21 36:14
61:19 166:13,19
175:18 189:19
**elaborate** 121:19
**eliminate** 191:16
**ellie** 6:3
**ellie.norris** 6:5
**else's** 73:17
**elt** 176:25

**email** 40:11
**emea** 131:23
**emery** 8:5,6,7,8,9
8:11 62:19 63:24
64:2,23 67:1
68:10 70:15,23
76:9 86:1 96:14
96:15 97:25 98:9
98:15,18,22,24,25
99:2,5,8,21 104:13
105:11 108:18
110:14 111:5
112:16 118:22
122:7,17,20
123:20 125:14
171:9,10 223:13
**employ** 126:1
**employed** 125:11
156:15,17 208:3
**employee** 230:13
230:15
**employees** 100:11
**encourage** 180:6
**ended** 152:11
**ends** 118:12 219:4
**engaged** 116:12
**engagement** 65:22
65:25 116:10
**engaging** 66:25
**engineering**
131:25 132:4
**entered** 70:1 71:16
**entering** 70:14
72:5
**entire** 53:10
**entirely** 19:6
123:25
**entities** 185:6
**entitled** 1:14 15:2
15:13 16:8 73:20
75:12 76:15 151:7

[entitled - experience]                                                    Page 14

164:10
**entry** 70:15 174:6
185:23
**envelope** 181:8
**environment**
98:21 122:18,22
**environmental**
96:2
**epa** 214:19
**epidemiologist**
106:10,13 161:5
**epidemiology**
106:12
**episodic** 203:19
**equally** 80:9
**equipment** 68:15
206:7 208:7,8,11
227:15
**equivalence** 20:7,9
20:12,20,24 21:3
26:20,22 31:19
34:21,22,24 35:2,6
35:7,14,17 36:4,5
36:10,24
**equivalent** 19:23
20:4 25:18 26:6
33:8,10 34:19
79:20 88:6 137:2
138:7,21 140:1
152:1 154:24
213:20,25 216:13
224:23 225:2,7
**equivalents** 19:21
20:3 25:24,25,25
26:1,1,11 30:21,23
31:1 33:9 224:21
**errata** 231:11,13
231:17
**erratas** 231:15
**esq** 2:4,4,5,10,13
2:17 3:4,5,5,12,12

3:18,19 4:3,8,12
4:16 5:4,5,5,10,14
5:19 6:3 231:1
**essentially** 79:3
83:3 88:16 99:11
119:6 143:5
171:21
**establish** 19:20
20:2,6,23 21:3
30:22 37:8
**established** 11:10
20:12 27:16,17,18
31:2 35:2 44:22
45:5 49:16 76:8
76:13 78:16 81:4
167:8 168:13
**establishment**
119:17
**estimate** 59:4
**et** 159:24 231:4
232:1 233:1
**european** 69:19
131:21
**evaluate** 196:19
199:8
**evaluates** 199:25
**evaluating** 129:10
156:22 157:4,7,10
198:17
**evaluation** 141:21
156:19
**evaporation** 96:1
96:3
**evening** 201:25
**event** 61:25
**eventually** 94:24
98:9 208:2
**everybody** 172:16
197:23 229:10
**everyday** 76:14

**exact** 18:10,12,22
53:2 64:5 65:8
167:18
**exactly** 22:5 27:13
27:19 72:21 82:19
84:10 130:11
179:8 188:20
**examination** 1:13
7:5,6,8,9 10:16
170:23 201:23
219:10 230:5
**examine** 102:14
**example** 172:11
175:6 178:15 185:7
196:7 197:2,20
201:10 203:21
206:23 207:25
**exceeding** 192:3
**exceeds** 186:11
**excellent** 229:4
**excipients** 32:7,7
193:12
**excluding** 184:2
**excuse** 13:13
45:20 125:9 127:8
131:2 169:19
**exercise** 24:23
**exforge** 38:22
79:21 125:6
130:15 138:7,11
138:24 148:15
152:13 163:9,9
**exhibit** 8:4,5,6,7,8
8:9,10,11,12,13,14
8:15,16,17,18,19
39:2,20 42:18,24
46:13 47:1,9
49:23 50:5,14,15
50:25 51:9,10
53:7,25 54:15
65:15,17 66:5

81:25 82:2,10
83:10,25 85:16
89:24 90:7 91:5
91:10,24 101:6
103:23,24 104:12
115:18 118:5
143:24 144:4,7
145:4 157:21
164:24,25 165:4
166:17,24 167:6
167:15,22 171:3
173:11 175:9
181:18,22 182:9
220:12,14,23
222:24 223:2
229:1,2
**exhibits** 8:1 38:25
40:18 81:23 84:21
118:2 164:16
**existed** 179:1
**existence** 103:21
**existing** 77:14
78:5,11 95:1
**exists** 23:12 95:5
178:13 201:12
**expect** 27:24 28:4
**expectation** 50:18
54:4
**expectations** 54:1
54:2,6 157:16
158:5,6
**expense** 123:2
124:1
**expenses** 63:16
**experience** 94:11
100:4 108:2
172:18,22 173:4,8
174:9,12,24
177:11,13 194:18
196:1,17 199:5

**expert** 8:4 11:3
25:2 28:10 37:23
56:10 59:24 60:5
60:8,12 61:6,14,19
61:20 62:9 66:25
79:8 82:23 83:2,5
85:1 88:22 103:6
149:21 168:4
193:19
**expertise** 106:11
**experts** 59:25
**explain** 107:9
136:2 139:18
141:18 184:21
**exploration** 151:4
**export** 95:19
**exposure** 107:12
204:1
**expressed** 86:19
**extensive** 196:15
**extent** 170:19
171:6,18 172:3
198:22 202:14
212:12
**extremely** 11:20
15:18 112:24
193:15 201:9,14
203:12,15 206:13
206:14
**eye** 96:18
**eyes** 185:10

**f**

**f** 63:12 230:1
**facility** 108:1
109:9 113:6 114:1
114:12 207:10
**fact** 11:10 13:4
19:9 77:2 79:24
94:5 129:8,24
134:20 140:22
143:7 148:9 152:9

158:11 168:7
173:18 180:6
186:5 189:13
204:2 207:4,8
213:23
**facts** 75:9,13 77:1
**factual** 79:12
**failing** 124:12
**fails** 231:19
**failure** 193:25
**fair** 64:13 106:9
106:24 128:19
138:1 139:19
140:18,21 160:14
**fairly** 80:16
176:12
**fairness** 73:20
**falanga** 5:13
**falkenberg** 4:16
**falkenbergives.c...**
4:18
**fall** 22:9 121:5
**false** 42:5,15
217:23,23
**familiar** 22:2,6
38:4 54:2 90:5
156:18 164:11
178:23 194:25
208:14 209:8
**famotidine** 133:19
**fantastic** 168:9
**far** 24:25 72:12
78:25 91:4 102:13
103:7 127:4 136:3
136:14,16 139:22
150:16,23 151:11
151:18 166:2
167:14,17 168:20
169:7,12 170:10
170:21 199:13
204:25 205:1

213:18
**faranghi** 63:9
**fast** 23:15
**fda** 18:4,9,21
19:10,13,21 20:2
20:19 26:8,24,24
30:25 35:3 36:10
36:10,25,25 37:8
37:12 38:5,6,14
39:21 43:14,25,25
44:3,23 45:5
49:17 68:10,11
69:18 78:14 93:24
97:9 98:18,18
99:12 100:16,17
104:6,6 108:19,23
108:23,24 109:8
109:11 111:1,4,17
111:24 112:17
114:20,20 115:14
115:21 118:22
120:1,4,24 121:2,4
122:20 123:22
124:19 129:8,12
137:16 141:15
144:15 150:6,7,8,8
154:23 155:14
156:16,17 157:9
157:13,15 158:19
159:2 160:17,18
162:6 167:9,10,20
168:2,13,20,23,24
169:1 171:16,18
172:1,3,5 175:1,6
180:23 181:1
187:12 189:4,9
190:2,8,18 191:1,2
191:3,4,5,16,20,22
191:23 192:3
196:3,11 199:7,24
200:3,9 208:15,20

209:6,14,15,22,24
210:6,10,12,14,18
210:24 211:22
213:3 215:4,11,15
215:20,21,23
217:11 227:1
**fda's** 130:18 168:3
168:23 188:10
189:17,24 190:5
190:20
**fdf** 101:4
**feasible** 191:12,13
**february** 1:10,19
9:3 84:1 231:3
**federal** 12:8 27:9
31:8,18
**feed** 40:1
**feel** 101:7 193:14
**fees** 17:12,16
63:21
**fell** 124:21
**fhs** 3:8
**field** 89:21 106:11
161:15
**fifth** 183:4
**fifty** 63:4,4
**figure** 186:21,22
192:12
**file** 40:4,16 43:25
61:22 107:17,20
122:3 144:14
160:1 164:9 165:9
181:23
**filed** 100:15 101:2
123:1,23 124:14
160:17
**files** 93:9
**filing** 44:4 101:4
104:3 191:3
209:22,22

**filings** 99:18 155:1
**filled** 109:17
**final** 83:14,24
**finalized** 61:19
**finally** 216:7
**financially** 230:16
**find** 24:8 25:9,10
  25:12,13,16 52:24
  53:5 66:18 118:3
  164:19 173:24
  197:25
**finding** 94:7 111:5
  124:18
**findings** 100:18
  142:5
**fine** 17:15 129:7
**fingers** 24:5
**finish** 24:10,10,15
  33:16 65:24 156:3
  168:11
**finished** 33:15
  44:6 94:13 183:23
  206:20
**finishes** 155:8
**fire** 111:15 113:6
**firm** 9:8,10 57:10
  71:3 73:23,24
  74:2,4,8 81:22
  116:12
**firms** 61:2,3 74:5
**first** 25:21 33:19
  56:12,15 58:3
  63:13 72:23 86:16
  88:18 112:4,5
  121:16 144:11
  146:16 151:19
  176:6 182:23
  192:14 219:22
**five** 89:7 90:22
  118:7 146:11
  149:10 213:1,2

**fl** 2:11
**flag** 220:3
**flip** 90:14 91:11,14
  146:16 157:24
**flipping** 90:19,21
**floor** 3:6,13 4:4
  5:11,15
**focus** 97:10
**folded** 94:24
**follow** 68:25 78:13
  117:1 150:21
  151:16 171:9
  187:8 198:23
  199:11 227:14
**followed** 76:17
  114:18
**following** 35:21,23
  36:14,16,18 41:10
  51:25 69:14,15
  78:17 89:13 93:21
  109:15 112:14
  118:14 126:1
  134:10 158:21
  164:2 180:18
  188:8 198:18
  199:4,12 219:6
**followup** 118:19
  170:6 202:4
**food** 21:5,12,24
  22:3 26:7,23
  30:24 34:24 35:7
  35:18 36:6 38:4
  41:19,25 42:3,12
  111:20 112:1
  198:1 214:21,22
**foods** 201:1
**forbid** 113:6
**foregoing** 230:8
  233:5
**form** 11:16 12:2
  12:10,20 14:14

18:8,16 19:4 21:7
22:18 24:22 25:20
37:3,6 42:1,13
43:9 46:3 47:21
49:9 50:7 53:9
59:15 65:17 101:8
109:14,16 111:17
115:23 121:8
123:22 126:6
128:23 133:11
135:2,5,16 136:1
136:13 137:5
139:1 146:14
147:25 148:2
149:19 154:19
168:19 172:6,20
172:25 173:23
177:19 178:10
179:24 183:19
184:5 189:8,21
190:10,11,23
193:3 200:2 203:2
204:18 208:5,22
209:13 210:5,19
211:9,15,17,21
213:15 216:3,15
221:17,19 222:3
225:4,10 226:20
227:12
**formamide** 144:20
**formation** 125:13
  128:18 133:5
  198:1
**formed** 46:8
  171:20
**forming** 133:9
**forms** 139:21
**formulate** 97:1
**formulating**
  125:12 162:8,11
  162:15

**formulation** 93:16
  94:17 96:23 97:19
  138:6 156:7
  158:14 159:8
**formulations**
  148:16
**forth** 22:9 46:25
  54:11 88:10
  183:15 185:3
  230:11
**forthright** 154:16
**found** 9:5 50:10,11
  104:5 111:24
  131:9 136:18
  143:20 147:16
  173:13 174:18
  178:8 200:17,20
  200:23 219:23
**foundation** 222:4
**four** 170:9,16
  213:2
**frame** 109:3
**framed** 138:17
**francisco** 92:5
**frank** 3:5 40:5,6,7
  63:12 120:3
  143:21,22 164:15
  164:17,23
**frantic** 186:17
**free** 105:20 218:10
**front** 38:8 87:23
  121:18 164:18
  167:3
**frozen** 87:16
**fulbright** 6:3
**full** 10:7 38:9 40:3
  78:17 88:22 105:7
  191:19 205:7
**fumarate** 67:14
**fume** 96:1

**function** 32:6
98:15 186:16
194:20
**funding** 123:6
**funnel** 95:15,24
96:7
**further** 9:20 79:16
81:5,6 169:17
170:4,17 198:23
203:1 204:15
212:11 218:20
228:21 229:7
230:8,12
**furthermore**
137:16
**future** 67:19 69:22
81:13 212:14

**g**

**g** 63:13,13
**ga** 5:7
**gannon** 5:14
**gas** 175:18 177:16
185:10
**gateway** 5:14
**gc** 45:16 178:4
**gcms** 45:16 120:12
131:12 206:13
207:9 212:1,21
214:23 227:17
**gcoan** 4:5
**gears** 56:2
**geigy** 163:13
**general** 68:9,21,24
169:2 191:5
**generally** 205:5
**generate** 63:21
109:24
**generated** 63:16
64:2,23 75:23
76:2 113:24

**generic** 18:5,9,22
18:23,25 19:7,12
19:14,18,20,23
20:1,4,6,7,14,18
20:23 25:18 27:8
27:18,19 30:21
31:7,9,17,20 32:19
58:5,13,15 79:20
87:13 88:5,14
97:14,15,18
107:23 108:10
126:18 127:6,6,7,8
127:9,9,21,25
128:8 138:6,9,18
138:23 139:25
151:25 152:13
154:24 156:7,10
156:14 157:9,12
157:16 158:7,14
158:16 159:7,12
159:16,19 160:1
160:19,21 172:9
172:10 188:12
217:6 222:2 224:8
224:10,11
**generics** 127:19
**genotoxic** 28:8
36:20,21 37:19
43:5 44:20 45:9
45:18 47:15,25
48:14,19 49:5,15
55:11,11,25 56:1
108:3 120:12
124:18 128:4,16
128:18 129:6,14
130:2,5,8 135:1,4
135:15,17,24
136:3,4 137:1,4,7
137:15,23 141:2,9
159:4 160:16
175:3 202:7

203:10,16,17
204:22,24,25
212:20 213:5,13
213:24
**genotoxicity** 37:21
**geo** 134:24
**geoffrey** 4:3
**getting** 119:5
149:24 151:3
155:11 176:12
181:21 197:9
213:16
**giselson** 39:13,17
**gisleson** 3:12 7:6
170:24 171:1,2
180:14,22 181:12
181:16,20,22
190:13 198:13
199:23 215:9
218:25 229:7
**give** 10:11 11:22
14:4,21 37:4 38:6
51:4 59:4 64:17
108:8 136:19
140:25 144:3
158:25 178:22
179:16 180:12
182:15 185:18
**given** 17:22 85:8
108:5 128:11
153:9 214:14
219:15 225:17
233:9
**gives** 185:16
199:17
**giving** 28:19 35:15
139:8
**glad** 122:13
**glass** 197:4
**global** 80:22

**glp** 67:20 68:3,5,9
68:11,12,25 69:1,2
69:4 98:17,19
110:22 114:21
**gmp** 68:9,11,12,25
69:1,2 94:2
110:22 114:21
124:19
**go** 17:4 23:9,25
25:7,11 27:4
29:21 31:5 42:23
47:8 50:3 51:6,7
51:12,15,17,20
54:13 57:20 63:16
66:4 69:20 87:25
90:2 91:18,18
105:4 110:1
111:16 118:1,4
121:15 129:4
139:15 146:13
150:23 158:1
165:21 169:14
170:17 171:2
173:3 175:17
182:17 183:2
185:1 187:24
191:21 196:13
197:4,7,19 199:19
204:11 206:7
209:23 210:9
211:11 219:22
220:9 226:8
**goal** 123:20
149:12 168:22,22
192:6
**god** 113:5
**goes** 64:25 99:14
176:21 177:1
184:19 191:23
203:5,6 204:2
213:18 214:20

[going - hinshawlaw.com]    Page 18

**going**  9:2 15:7
  17:10,11,12 24:25
  29:24 31:6 32:8
  35:22,24 36:19
  40:2 41:4 42:20
  50:3 51:23 56:2
  57:15 59:15 68:15
  69:23 72:11 74:13
  74:23 78:23 79:1
  79:15,25 96:5
  107:6,7,11 119:20
  125:8,20 133:1,8
  134:2,8 150:5
  151:10 152:13
  164:20 168:22,23
  169:14,25 170:7
  170:16 180:16
  185:10,11,12,13
  186:4 187:3
  189:22 197:6,17
  198:9,10,11,13,23
  199:21 203:14
  212:6,10 213:17
  220:12 221:12
  223:4
**good**  9:1,14 10:18
  10:20,21 32:16
  67:25 68:4,13
  71:22 91:23 92:2
  111:7 117:1 141:5
  170:25 174:24
  175:3 178:24,25
  179:4,22 187:8
  188:10 196:5,6
  201:25 206:7
  209:3 229:11
**google**  25:16
  122:11 124:13
  132:1 145:21
  150:6

**gordon**  3:3
**gotta**  187:10
**gotten**  112:12
**governed**  78:12
**government**  220:3
**grant**  3:6 141:15
**great**  40:12,19
**greater**  37:17 47:5
**greenberg**  5:4
**gritty**  197:10
**ground**  198:10
**group**  164:16
**growing**  186:16
**gtlaw.com**  5:8,8,9
**guess**  40:25 41:2,2
  66:11 68:19 81:25
  83:18 97:10 103:9
  164:23 207:4
  221:18
**guidance**  26:24
  36:11,25 48:17
  110:21,21,22
  168:24 169:14
  174:8 180:23
  181:1,3 191:4
  202:12 205:4
**guidances**  178:17
  202:6
**guideline**  45:10
  49:17 56:5 68:21
  78:16,17 204:17
  227:14
**guidelines**  55:10
  55:11 68:5,6,20
  69:5,16,18,23
  77:25 78:4,11,13
  137:25 178:18
  203:13 204:12
  212:21 213:3
**guys**  39:5 124:13
  129:4 178:22

192:12 200:11

**h**

**h**  63:13,13 232:3
**half**  95:10 163:18
**halt**  17:15
**ham**  201:3
**hand**  10:10 182:22
**hands**  83:7
**hang**  27:1 46:17
  175:16
**happen**  112:19
**happens**  111:11
  119:4 176:20
  209:18
**happy**  141:8
**harding**  5:10
**harkins**  5:4 7:7
  201:24 202:3
  228:6 229:9
**harkinss**  5:8
**harmful**  12:17
  14:9 15:17,18,20
  21:1 36:1
**harmless**  11:19
  12:6,13 13:2 14:9
  15:17 21:2 202:21
**hazard**  183:17
**hazardous**  11:20
  12:6,14,15 13:2
  202:21
**hct**  163:9
**head**  67:7 127:18
  133:14
**health**  12:17
  183:16,17 192:17
  219:17 220:6,8
  222:19
**healthcare**  3:16
**hear**  16:10,12,13
  35:15 141:10
  142:11,13,14,15

154:15 202:1
  211:16 214:10
**heard**  61:12 98:6
**heart**  193:25
**heavily**  94:2
**held**  1:18 62:23,24
**hell**  189:13
**help**  86:12,13
  98:20 99:10,15,19
  99:25 128:17
  141:20 193:16
  207:23
**helping**  100:5
  122:21
**henry**  5:19
**hereinbefore**
  230:11
**hereto**  233:7
**hesitate**  207:4
**hetero**  70:25
  162:19
**hey**  174:17
**hiding**  188:9
**high**  55:7,13,15,22
  55:25 117:15,16
  120:12,20 134:21
  135:14 141:1,1
  176:3 193:8 200:7
  201:19
**higher**  130:3
  149:15 152:7
**highest**  32:18
**highlight**  105:7
  157:23 222:14
**highly**  213:24
**hill**  3:19
**hilton**  2:4 39:12
  78:3 223:1
**hinshaw**  4:3
**hinshawlaw.com**
  4:5

[hmm - impurity]                                                                                    Page 19

**hmm** 140:5 147:6
  158:8 195:13
  202:23
**hoffman** 57:11
**hold** 21:15,15
  22:12 24:21,21,21
  26:13 28:16 37:3
  40:5 41:2 51:8
  52:12 57:15 69:14
  86:19 87:7 93:2,5
  93:8 99:2,5 102:6
  102:6 149:18,18
  149:18,19 155:7
  190:10 212:5
**holder** 18:7,25
  152:2
**hollis** 66:24
**homework** 49:22
**honest** 154:16
  193:4
**honestly** 72:2
  74:17 139:15
  140:24 181:7
**hope** 30:13 32:21
  32:22 192:7
**hopefully** 129:4
**hoping** 30:11
**hospitalization**
  193:25
**hour** 102:24
**hours** 32:10 82:6
  82:14 83:1,13,18
  84:2,7 103:3
  162:21,22 170:9
  170:13,16
**hplc** 175:18
  176:14,21 177:21
  178:3 187:10,19
  205:15 207:17,23
**huahai** 3:16

**huge** 160:20 204:5
**huh** 91:19 182:24
**humana** 4:15
**humans** 107:13
**hunchuck** 3:12
**hundred** 141:22
  184:22,24
**hundreds** 137:11
  159:10,11 206:2
  208:25
**hurt** 193:16
**hydramine** 133:22
**hydrochlorothia...**
  182:6 183:8,12,14

**i**

**i.e.** 191:24
**ich** 45:10 49:17,17
  55:10 56:5 69:19
  137:24,25 178:18
  179:15 202:10,20
  203:12,14,14
  205:5,6 213:3
**idea** 39:10 49:4
  71:24 78:21 193:7
  224:11
**identical** 31:11,25
  31:25,25 32:1
  35:11,13
**identified** 11:2
  45:10,11 131:10
  147:4 169:20,21
  173:16 174:1,3,25
  175:15,23 181:4
  183:7,11 184:15
  187:15 188:15
  190:8 205:11
  210:16 214:6
**identify** 28:7 37:9
  37:13,16,18 38:13
  38:15 43:21 44:2
  56:19,22 110:23

110:24 131:12
  173:12,21 175:10
  175:12,17 177:15
  179:19 183:6
  184:17,25 185:5
  188:21 196:18,24
  206:23 207:13,14
  207:19,20,21
  208:4 213:5
**identifying** 177:11
  187:19 205:17
  209:5 226:11
  227:25
**identity** 27:12
  35:12 50:19 54:9
  127:15
**ignored** 139:11
**il** 4:17
**imagine** 209:4
**imd** 99:11
**immediately** 93:21
**impact** 197:6
  214:1
**implementation**
  119:8
**importance**
  113:11,17
**important** 47:6
  112:24 113:2
**improper** 64:19
**impurities** 11:11
  11:15,18,20,25
  12:5,9,13,15,16,23
  13:2,6,21 14:9
  15:17,19 20:25
  21:1,2,4 27:15,16
  27:17,19,25 28:4,7
  35:25 37:9,13,16
  37:19,20,21 38:13
  38:16 42:25 43:5
  43:8,11,13,14,21

44:8,15,19 45:18
  45:19 46:1,5,7,9,9
  46:21,25 47:5,6,11
  47:19 48:19 49:5
  49:14 54:18 55:7
  55:24 100:14,24
  101:7,11 102:9
  110:24 123:7
  129:18,25 130:2,6
  134:21 135:13,15
  135:18,24 136:3,4
  136:5 137:4 141:9
  172:14 173:12,15
  173:17,19,22,24
  174:1,14,18,25
  175:1,10,13,17,24
  176:5 177:18
  178:9,12,20 179:2
  179:6 183:3,7,10
  183:18,22 184:4
  184:12,17,21,23
  185:3 186:10,13
  186:16,25 187:4,7
  187:17 188:19,22
  191:13,14 193:11
  196:3 202:7,8,24
  203:9,11 204:16
  204:25 205:12,17
  205:20,25 207:24
  208:4 213:22,24
  218:1 219:23
  226:1,13,16
  227:10,19 228:1
  228:25
**impurity** 14:10
  15:22 16:4,24
  17:19,25 18:1,2
  19:2,7,11,14,16,22
  20:3,10,12,20,21
  21:20 22:9 25:19
  25:25 32:5 35:6,7

[impurity - interrupted]                                    Page 20

35:17,23,25 36:4,5
36:9,15,19,20,24
45:7 47:15,16
48:5,9 55:20,21
67:5 87:13 88:5
94:6,7 108:2,9
128:2,4,9,14,14,16
128:20 129:5,12
130:18 131:10,11
132:3 137:1 139:4
173:10,18,18
176:1,11 184:2,8
186:2,9,20,21,23
192:3 202:13,21
204:3,14 206:4,16
207:13,15,18,20
207:22
**inactive**  193:14
**inadvertently**
21:21
**inappropriate**
21:16 28:17,21,23
28:25 29:2,11,12
29:18 30:8 33:16
33:22 34:17
**include**  80:17,20
174:13 184:3
201:1
**included**  225:13
**includes**  113:23
225:16 226:11
**including**  50:18
54:9 95:19 96:4
113:24 114:10
154:10 201:3
207:4
**income**  63:21
**increase**  194:12
**incubated**  93:22
95:3 96:10,15
98:1,3,4

**ind**  155:1,1
**independent**  25:22
63:23 171:20
**independently**
141:25 143:7
166:22
**index**  7:1
**india**  136:21
**indicate**  9:25 53:7
104:25
**indicated**  79:8
80:6 119:14 136:8
136:23 216:19
**individual**  47:4
110:2 213:9
**inds**  97:7
**industries**  5:2
**industry**  209:19
211:2
**inert**  46:6
**infallible**  102:7
**information**  8:16
38:10 64:22 65:6
65:7 72:17 73:15
74:24 77:2,6
78:19 79:4 100:2
119:24 131:4,14
131:16,19 140:20
153:13,17,21,25
154:2 163:13
173:6 176:10
199:3,17 215:4,23
216:1 217:16
225:17,20 226:18
**ingersoll**  5:18
**ingredient**  18:5
127:16
**ingredients**  27:12
27:14,21 31:10,21
35:10 37:24 50:21
137:9 155:20

**inhibits**  194:2,11
**initial**  116:15,17
116:22 120:23
192:2
**initially**  73:8
116:1
**initiated**  73:5
**innovators**  172:8
**inspected**  68:11
98:19 114:20
**inspection**  108:24
109:16 111:4,18
112:5,22 118:22
119:17
**inspections**  109:8
109:10,12,15
**inspector**  111:18
**instance**  227:6,16
**instances**  201:9
**instruct**  39:6
57:16 59:16 60:6
61:8 73:16 78:24
79:16,25 81:6
151:10 199:6
213:17
**instructed**  39:15
80:25
**instructing**  76:4
**instruction**  13:12
64:17 80:3,9,22
81:5
**instrument**  175:19
176:14 207:2
**instrumentation**
45:16 175:19
**instruments**  110:2
207:2
**insulted**  144:22
**intake**  190:8,21
**integrity**  113:4

**intend**  88:11,20
89:3 138:18
**intended**  79:13
193:23 194:20
**intending**  68:8
**intends**  77:4
**intent**  102:11
**intention**  30:3,5
30:10
**intentionally**
21:21
**interaction**  193:8
**interactions**  93:24
**interest**  215:19
228:2
**interested**  21:11
85:3 119:25
230:16
**interestingly**
147:9
**interferes**  193:22
194:19
**interim**  149:2
167:12,12 168:21
169:13 191:2
192:4 217:11
**interject**  198:5
**intermediates**
27:22
**internal**  162:10
163:3
**international**
179:25 180:25
181:3
**internet**  16:9,11
**interpret**  134:23
135:22
**interrupt**  15:5,11
34:14
**interrupted**  14:25
34:3

**interrupting** 33:25
**intubate** 98:4
**intubated** 97:25
  98:6
**invariably** 197:23
**invented** 95:16
**investigation** 97:7
**investigator**
  111:18,25
**invisible** 177:8
  188:25
**invited** 108:8
**invoice** 8:6,7,8,9
  82:2,5,14 83:9,24
**invoices** 81:22,23
  84:20
**involve** 70:16,19
  70:24 71:5
**involved** 62:8
  71:10 74:6,9,12,18
  93:12 94:2 97:18
  154:25 155:5
  156:6,24 157:12
  158:17,18 177:24
  195:10 196:16
  203:8 209:16,24
  223:17,21 227:24
**involvement**
  141:15
**involves** 226:14
**involving** 11:1
  62:7 227:24
**irac** 180:1
**irbesartan** 1:4
**irrespective** 20:24
  21:3
**issuance** 122:24
**issue** 16:10 75:8
  105:1 107:4
  111:11 112:6
  115:14,22 116:1

120:2 139:25
141:19 161:9
170:1 180:23
182:3 196:20
209:7
**issued** 104:13
  111:5,17 112:13
  119:18 179:20
  181:1 210:8
**issues** 16:11 29:2
  89:19 109:14
  110:3,6 112:6
  118:20 139:12
  160:13 162:22
  170:3 197:11
  198:14
**ives** 4:16

**j**

**january** 82:11
  83:10
**japan** 95:20
**jason** 3:5
**jdavis** 2:19
**jersey** 1:1,18 9:7
  11:1 230:3,21
**jmr** 3:9
**job** 224:25
**john** 2:17 3:12
  39:13 171:1
  184:23 185:8
  189:9,23 190:25
  193:4 197:20
  199:15 200:10
  201:7
**john.gisleson** 3:14
**join** 45:23
**journal** 100:23
  101:12 161:14
**journals** 101:4
**judge** 17:12 29:1
  29:14,21 30:2,7,17

**judgment** 111:19
**july** 82:7
**jump** 140:9
**jumping** 220:11
**june** 44:21 45:4
  115:15 131:4,15
  143:23 144:9
  178:8 179:1,20
  215:11

**k**

**k** 63:13
**kanner** 2:3,7,7,8
**kapke** 4:12
**kara** 4:12
**keep** 29:24 30:4,5
  39:16 64:17 90:19
  90:21
**kelly** 63:9,14
**ketone** 185:9
**key** 180:12 192:2
  227:22
**kidding** 187:14
**kind** 20:25 21:4
  124:20 139:8
  196:22
**kinds** 133:9
**kkapke** 4:14
**knocks** 189:13
**know** 13:16,17
  16:9 20:10 25:15
  26:14 32:7,9,13,14
  32:15,25 34:25
  35:4,12,19,20 36:7
  36:9,12,13,23 38:1
  43:17,18,25 45:13
  45:16,25 46:10,20
  46:22 47:4 48:13
  49:17 53:17 54:7
  54:8 55:12,25
  58:17 59:8,22
  60:25 61:12 65:8

65:9 66:15 67:6
67:24 68:17 69:12
71:3,7 72:2 73:20
73:20 74:1,7,8,10
74:11,12,15,16,17
74:17 75:1,2,13
76:19 77:5,7
78:16 79:3 81:3
82:25 83:4,21
91:4,16 94:5,8,10
94:11,11 95:1,13
99:18 109:5,21
112:9 113:3,5
114:5 117:10,13
117:14,18 119:6
119:18,19 120:3,4
120:18 121:12
123:17 124:21
126:14 127:4,5
128:5,14,17 131:2
131:3,22 133:20
133:22 136:14,17
137:7,20 140:20
140:24 141:3,4
145:22 146:13
148:20,24,25
149:1,3,19,22
151:2 152:13,25
152:25 153:12
154:9,17,20 156:1
158:17 159:3
161:3 162:23,24
163:7 167:5,14
168:6,20 169:7
170:17 171:9,16
172:2,8,9 173:9
174:3,7,18,22
176:13,22,23
177:21,23,25
178:11,22 179:13
181:7 183:20

[know - limit]                                                                 Page 22

185:2,7,9,16,19
186:4,23 187:9,10
188:11 190:1
191:7 192:12
193:5,5,15,17,19
194:14 196:9
197:7,9,11,20,22
197:25 198:1
200:10 201:10,18
203:7,23,24 204:4
205:24 207:8
208:24 209:17
210:1,11 211:11
211:23 212:23
214:1,21 217:9
218:2,2,8 220:17
221:15 223:20
224:7 227:16,25
**knowledge** 166:21
167:18 171:11
178:6,11,15
183:16 194:17
217:3,5
**known** 49:14
110:25 174:14
178:13 191:11
198:3 219:24
**knows** 75:5
**korea** 95:19
**ks** 97:8

**l**

**l** 1:16 63:13,13
230:2,19
**l.hilton** 2:7
**la** 2:6
**lab** 60:24 68:8,23
69:3 70:3,14,24
71:19 72:4,19,21
72:23 73:2,7 76:8
76:17 77:14 78:11
80:14 92:16,21,24

93:19,22,23 94:1
94:20 95:1,3,4,5,8
95:9,14,17 96:10
108:19,25 111:24
113:21 114:21
116:17 119:12
142:1,23,24
145:19 147:24
207:3
**label** 8:12,13
21:19 37:10,14
39:3 40:4 42:15
42:24 43:14,18
194:21
**labeling** 38:1,3,14
38:20,23 39:21
42:4,17 43:14,22
**laboratories** 3:2
**laboratory** 67:1
68:4,11,14 71:10
96:3 98:16 108:1
111:7 117:1
189:14 208:9
**labs** 68:22,24,25
93:2,5,8,11,15
94:16,24 95:12
117:1
**laid** 205:5,5
**language** 49:19
50:23 185:13
**large** 104:22
159:22 198:20
200:4 215:22
**lasagna** 158:21
**latest** 32:20 48:12
179:5
**law** 12:8 66:24
71:3 73:23,24
74:2,5 116:12
**law.com** 2:7,7,8

**lawrence** 208:9
**lawsuit** 58:11
59:13 182:3
**lawyer** 56:20 74:8
84:16,17 116:19
153:1
**lawyers** 39:17
56:20 59:14 86:7
86:12 153:4
194:15
**lax** 187:12
**layman's** 137:18
**layne** 2:4 40:16
84:19
**lays** 175:21
**lc** 176:8 188:5,16
188:24
**lcms** 45:16 132:14
132:15 187:10,14
207:9 227:17
**leading** 221:12,16
**learned** 112:22
**lectures** 108:5
**led** 31:2 94:8
122:14 163:13
**left** 96:13,14
182:22
**legal** 6:8 9:8,10
74:13 85:10
231:23
**letter** 8:15 192:16
206:9,10
**letterhead** 85:25
86:3 144:8
**letters** 112:13
**level** 55:15 137:1
152:7 167:12,12
168:21 169:13
185:23 186:14
191:3 192:6
201:10,12,14

202:20 216:8,12
218:12
**levels** 79:9 117:15
117:16 120:7,12
120:20 121:22
136:5,11 137:17
137:21,24,25
141:1 145:17,18
149:1,15,16 150:3
150:14 151:2,14
151:20,20,22,24
152:3,5 166:8
174:2 189:11
190:7,8,20,21
192:3,4 193:8
199:15 201:8,18
201:19 202:13
203:12,15 204:7
204:24 205:8
216:23
**levin** 2:9,13
**levinlaw.com** 2:12
231:2
**lewis** 3:11 4:7
**lewisbrisbois.com**
4:10
**lfsblaw.com** 2:15
**liability** 1:4 85:13
197:10 198:8,9,14
198:22,24 199:11
199:12,18 212:10
213:16
**library** 206:14
**license** 230:20
**lieu** 9:20
**life** 203:25
**light** 120:7
**limit** 45:17 49:16
149:2 165:25
166:1 167:8 168:3
168:17 169:4,10

191:13,14
**limited** 79:22
  85:12
**limits** 46:21 80:23
  88:17 129:23
  137:8 139:4 166:7
  168:13 190:21
  203:18
**line** 51:7 97:11
  144:5 199:5
  220:16 232:4,7,10
  232:13,16,19
**link** 40:16
**lipitor** 218:7
**lips** 142:12
**liquid** 132:14
  176:3 177:10
**lisinopril** 203:23
**list** 43:8,11,13,17
  43:21 90:11,12
  101:5 165:13
  166:12,12,16,17
  174:19
**listed** 19:3 20:13
  20:21 31:14,24
  46:8 47:7 88:7
  129:13 136:5
  137:2,3 138:8,22
  140:1,3 147:14
  152:2 167:2,6,15
  167:22 173:18
  213:21 223:18,21
**listen** 11:22
**listening** 40:7
**lists** 47:9
**literature** 24:4
  100:13,22 154:13
  209:1 212:1
**litigation** 1:4 9:5
  10:24 11:3 57:25
  58:4,10 60:1,3,21

61:1,5 62:7 63:20
  63:20,23 64:4,13
  64:24 66:1,2
  71:12,18 79:5,12
  80:2,19,22 89:2
  105:19 107:2
  126:8,11,14
  138:20 140:1,12
  162:18
**litigations** 60:12
  64:14 65:3 79:23
**little** 37:4 53:12
  77:18 108:18
  130:3 160:23
  184:24 186:3,12
  201:16 204:6
  205:11,12,20
  206:2,24
**livermore** 208:9
**lives** 98:20 122:17
  122:21
**living** 32:19
**llc** 2:3 3:10,16 5:2
  5:17
**llp** 2:13,16 3:4,11
  3:18 4:3,7,16 5:4
  5:13 6:3
**localities** 96:6
**located** 10:19
**lockard** 5:5
**lockardv** 5:8
**log** 110:3,8
**long** 17:11 28:9
  32:21,23 91:7
  92:21 99:21 129:6
  129:14 141:3
  186:13,14 189:6
  189:18 190:7,19
**longer** 170:21
**look** 17:4 24:6
  26:4,17,20,21 31:3

36:7 40:3,13 43:2
  49:23 50:5,13
  51:1,4,13,18 52:9
  95:23 123:5
  132:20 133:2,2,10
  136:21 141:23
  144:11 145:16
  146:15 147:12
  158:24 159:3,4
  163:20 167:1
  173:11 175:8
  176:5 178:16
  180:2,8 185:4,5,7
  185:8,15 186:2
  187:1 192:11
  197:14,15 204:3
  208:12 215:2,19
  225:11
**looked** 22:5 48:12
  52:23 53:2 103:14
  133:17,17,19,20
  133:21 136:18
  163:15,15,17
**looking** 31:4 42:17
  42:21,22 43:18
  51:9,10,10 53:3
  66:20 78:7 83:3
  91:1 131:8 146:16
  154:16 162:9,22
  162:22 164:13
  173:9 177:3 179:6
  179:14,17 182:9
  182:22 187:25
  203:6,7 205:8
  206:4,5 214:5
  224:12 228:25
**looks** 65:17 66:4,5
  82:2 84:6 133:6
  183:9 192:16
**losartan** 1:3 9:5
  105:12 231:4

232:1 233:1
**lose** 111:12
**lost** 39:25 86:21
  196:22
**lot** 26:2 68:24
  83:20 94:6 108:1
  116:13 121:20
  123:1,11,19 124:7
  124:16 136:4,20
  139:8 150:10,23
  152:18,20 153:7
  153:10,12 154:8
  155:23 161:3
  163:11,17,18
  180:4 188:23
  193:11,12 197:25
  209:16,18 225:16
**lotman** 3:18
**lots** 72:7 146:23
  158:18 159:21
  186:12 204:6
**love** 30:1,17
**low** 55:12 200:6,8
  201:9,12,14,18
  203:12,15
**lower** 136:3 166:2
  193:1 204:25
  205:1
**lowering** 193:24
  218:8

**m**

**m** 3:5 4:3 5:4
**m7** 45:10 49:17
  56:5 137:25
  178:18 179:15
  203:14,14 205:5,6
**ma** 4:4
**machine** 207:18
**magistrate** 17:12
**magnesium**
  193:13

**mail** 39:4
**maintain** 68:13
  90:12
**maintenance**
  112:3
**major** 94:8 95:17
**majority** 170:11
**making** 47:14
  75:10 109:21
  112:18 113:4
  123:19 124:7
  125:14 136:10
  179:6 203:7
  226:17 227:20,21
**managed** 45:13
**management**
  110:7 111:11
  112:3,8,23 113:4
**managements**
  112:19
**mandate** 19:11
  135:23
**mandating** 25:18
**manner** 9:24
  101:8 104:8
**manufacture**
  92:25 93:13,16
  94:18,21 95:18
  96:24,25 98:23
  110:14,17,19
  126:20
**manufactured**
  71:6 93:24 127:25
**manufacturer**
  18:22,25 19:14,20
  20:1,19,23 37:9,13
  43:13,21 72:16
  73:25 81:3 107:23
  110:18,19 130:16
  139:3 156:10
  158:7,16 162:18

175:5 176:11
177:16 179:2
184:16 185:4
186:9,18 187:6,16
188:18 196:18,19
196:23 199:6
200:6,8 213:12
215:21,22 217:6
**manufacturer's**
71:13 200:5,12
**manufacturers**
18:10 23:8,12,19
23:24 27:9,18
30:22 31:7,9,18,20
37:16,18,23 38:13
38:15 58:5,13,15
58:18 59:5,9 72:3
72:22 80:21
108:10 117:25
126:18 127:10
137:19 147:3,10
149:13 154:9
156:14 157:17
163:3 172:19
179:21 180:2,4,6
188:12 206:11
215:5,11,17
227:10
**manufactures**
95:14
**manufacturing**
32:17 54:3 68:1
71:24 94:3 97:15
127:4 153:12,13
153:15 154:11
159:16,21 160:19
160:21 162:22
171:13,15 178:24
178:25 179:4,22
187:9 188:10
206:8 226:11,17

226:22,25 227:3,5
227:6,20,21
**manuscript**
101:10,15 102:9
102:21 103:10,21
104:25
**map** 53:11
**mark** 166:17
**marked** 39:20
40:18 42:17,24
53:6,6 54:14
81:23 83:25 84:21
85:15 89:24 90:7
91:5,24 101:6
104:11 115:18
118:4 143:24
164:23 181:18
220:12,13,21,23
223:8
**market** 93:25
110:5 111:2
124:17 154:23
171:24 186:18
192:5
**marketed** 22:24
23:4 165:13
**markets** 96:19
**martin** 5:10
**mass** 176:25
177:16,21 178:2,3
178:4
**master** 93:9
107:17,20 159:25
**master's** 92:3
**match** 19:11,14
20:13 25:19 128:2
128:10,15
**matches** 20:21
**material** 52:7 61:7
163:11

**materials** 153:9
160:5 219:15
**matter** 1:14 26:25
57:24 88:11
101:20 107:8
129:8 158:11
203:18
**matters** 56:13,16
60:4,7,22 61:15
62:7
**maximum** 55:5
**maz** 4:18
**mazzotti** 5:10
**mckesson** 6:2
**md** 1:7
**mdl** 1:2 56:10
57:14,22 58:19
59:10,12,14 60:2,3
74:6,9,18 75:2,4
80:10 81:8,9,9,19
85:5
**mean** 15:12 38:1
82:20 103:1 114:2
122:6,20 124:13
127:11 141:12
150:18 172:3
178:13 184:10
199:19 215:21
223:16
**meaning** 31:19
176:3 191:15
**means** 31:24 32:17
48:6 54:3 68:13
68:14 82:25 111:1
119:9 129:23
130:12 148:13
176:2 184:11
186:12 187:10
188:7 208:8 212:1
223:17

**meant** 148:4 184:7
**measure** 192:2
**measured** 45:15
**measures** 113:1
**mechanisms** 116:7
**media** 9:3 41:8,14
    89:11,16 118:12
    118:17 163:25
    164:5 219:4,9
**medical** 69:19
    106:5,6,23 107:5
    131:21
**medication** 80:15
    224:8,9
**medications** 70:4
    70:17,25 71:11,20
    72:5 80:18,20
    93:18 138:19
    166:23
**medicine** 50:20
    54:8
**medicines** 50:18
    225:25
**medium** 200:7
**meet** 20:19 22:24
    23:5,11,13,19
    50:21 55:17 98:16
    138:10 172:17
    173:2 174:2
    202:24 203:12
**meeting** 45:23
    167:1
**meetings** 99:12
    156:20
**meets** 161:19
**megan** 4:16
**members** 104:3
**memory** 84:4
    102:7 124:12
    143:15

**menaski** 17:13
    29:1
**mention** 43:4
    49:13 143:12,13
    145:20,23 146:7
    150:18 151:1
    179:11
**mentioned** 12:4,12
    47:16 48:6 57:7
    105:21 116:3
    121:22 131:24
    143:4 146:5
    148:10 165:17
    179:15 188:11
    190:25 202:6
    205:11 211:20
    213:3
**mentions** 178:18
**mere** 14:10 15:22
    16:3,24 17:19,25
    128:19,24 129:2,5
**merely** 12:8
**meridian** 4:13
**merit** 79:12
**met** 204:15
**metformin** 59:14
    59:21 60:1 126:11
**method** 120:22
    121:5,9 132:14,16
    187:5,15,18
    207:18 208:24
    209:2,3,15,20,20
    227:18
**methodologies**
    125:11,13 137:18
**methodology**
    126:1 132:13
    175:12,14
**methods** 114:18
    120:25 121:1,23
    131:3 132:7

161:16 177:25
208:1,15,18,23,25
208:25 209:5,11
209:15,18,22
210:1,3,7,9,11,14
210:16,16,25
211:1,3,5,7,18,23
211:25 212:9,14
214:19,20 226:15
227:11
**methyl** 67:8,9
**methylating** 168:8
    168:8
**michelle** 1:16 9:9
    9:13,15 16:15
    45:22 230:2,19
**mid** 108:16
**middle** 14:25
    15:11,12
**miller** 6:8 9:7
**milligram** 54:24
    55:8,22 134:22
    135:14
**milliliter** 165:20
    169:6
**millimeter** 168:16
**million** 54:21
    137:11,12 205:2,2
**mind** 63:10 118:6
    142:3
**minimum** 23:7,8
    23:24 24:3 25:6
    32:15 50:5,16
    51:3 53:1,8,22
    54:4,12 55:5
    172:17 173:2
    201:10
**minor** 197:19
**minute** 33:4 56:3
    89:7 118:2,2,7,9
    118:10 134:6

144:1 163:22
    204:13
**minutes** 65:9 89:9
    131:11 134:3
    219:2
**mirror** 19:11
    25:19
**misbranded** 11:14
    11:24 12:8,14,18
    14:11,13 15:18,19
    15:23 16:5,25
    17:20 18:2,3
    41:21,24 42:4,8,14
    216:13,25 217:18
    217:22,25 218:13
    228:7,19
**mischaracterizes**
    50:8 190:11,24
**mislabeled** 21:19
**misleading** 42:5
    42:15 217:23,24
    218:3,18
**mispronounce**
    144:23
**misquote** 191:20
**misrepresented**
    53:16,18
**missed** 207:16
    210:25 212:2
    215:20
**missing** 91:9
    170:20
**mission** 97:21
    98:14,20,25
    122:17,20
**misspoke** 135:19
**misstate** 141:12
**mistake** 179:11
**mistaken** 122:10
**misunderstanding**
    214:4

mitchell  2:9
mixing  122:11
mm  140:5 147:6
 158:8 195:13
 202:23
mode  176:8 188:5
 188:16
modified  127:6
modifying  28:1,3
 28:5
mods  210:13
molecular  32:1
 206:17
molecule  94:11
 133:3,4 137:16
 185:8,11 193:7
 197:15,24
molecules  158:25
 159:10,11,22
 189:12 206:15
 214:15
mom  120:14
 203:21
moment  144:3
 215:10
monitor  42:19
 129:24
monogram  193:12
monograph  22:23
 23:1,3,6,12,14,18
 23:20,24 24:3
 25:5 46:2,20
 47:19 48:3 50:17
 53:4,25 54:1,13
 130:5,10 171:4
 173:8,21 174:23
 175:9,11,15,23
 177:15,20 179:9
 181:13 182:6,10
 182:19 184:15
 187:6,16 210:1

monographs
 50:15 52:25 53:7
 53:21 171:6,12,14
 171:17 172:1,5,23
 172:24 173:5
 174:9,13 182:2
 195:8
monroe  4:17
months  109:7
 162:15
morgan  3:11
morganlewis.com
 3:14,15
morning  9:1,15
 10:19,19,20,21
morris  3:18
mother  141:5,6,7
motion  170:1
move  16:18 28:12
 29:10 81:15
moving  30:5,14
 142:12
mulberry  5:15
multipage  50:25
multiple  24:7
 93:23 190:12
 211:3
mutagen  178:20
mutagenic  87:9
 88:15 96:4,5
 189:12
mute  9:13
mylan  3:2,2,2,2
 70:4,10 71:20
 117:24 150:13,19
 162:10,14 216:2
 221:5,5 222:1

**n**

n  2:1 3:1 4:1 5:1
 6:1 63:13 67:8,9
 137:14 180:5

195:12
n.v.  3:2
najafi  1:9 7:3 8:4
 8:10 9:4 10:8,9
 33:17 39:14,15
 40:17 48:20 51:9
 52:20 62:13,15,16
 62:18,21 63:15
 66:25 75:1 155:7
 168:10 201:25
 210:15 211:4,6
 212:16 213:19
 218:19 223:12
 227:8 230:5 231:5
 232:2,24 233:2,4
 233:12
najafi's  162:3
name  9:7,15 10:1
 10:7,8,22 18:19
 57:4 62:17 63:8
 63:13 65:5 71:14
 85:22 116:4 126:5
 144:25 145:20,23
 146:6,7 148:9,12
 148:13 156:5
 170:25 202:3
 221:9,21,23 222:5
 222:20 223:14
 224:8,10
named  1:13
names  57:1 144:23
 155:19,24,25
nanogram  222:10
 222:11
nanograms  54:25
 54:25 55:7,14,23
 56:1 117:17
 134:22 135:14
 149:3,5,17 150:3
 150:14 151:15
 165:19,23 166:8,8

167:13 168:16,21
 169:5,7,10 189:6,7
 189:19,20 191:2
 224:22,23 225:1,3
 225:6,8
nap  180:5,8
narrow  196:14
nature  12:15
nbma  67:2,4,6
nc  5:20
nda  99:11 154:5
 154:18 155:2
 195:22 209:21
ndas  100:5
ndea  48:1 67:2
 79:20,21 86:17
 87:5,8 88:15
 106:21 107:12,15
 120:21 138:2,6,8
 138:24 140:4
 145:6 149:9,13,15
 150:13 151:23
 152:1,6 165:25
 166:1,2,9,13,18
 167:7,13,15,18,23
 167:25 168:2,5
 169:10 189:3,7,11
 189:20,23,24
 192:25 193:8,9,22
 194:7,10,19
 198:18 200:16
 206:23 207:21
 208:12 209:6
 210:17 211:3
 213:22 216:8,12
 222:11,17,20
 224:16
ndl  9:7
ndma  48:1 67:2
 79:18,18,20,21
 86:17 87:5,8

88:15 101:14
106:17 107:12,15
117:16 120:7,12
120:20 124:18
129:22,23,23
130:8,15,23 131:7
131:12 133:4,9,11
136:7,17,18,19,22
137:19,22 138:2,6
138:8,9,12,23
139:12 140:4
145:17 146:3,5,9
147:16,23 148:16
149:2,9,13,15
151:23 152:1,5,8
152:11,15 165:19
166:8 167:7,15,18
167:23,25 168:2,4
168:7,17 169:5
178:15,16 180:10
181:2 189:3,7,11
189:14,19,23,24
192:24 193:8,9,21
194:19 198:2,4,18
199:15 200:15
206:23 208:12
209:1,3,6,15
210:17 211:1,25
213:22 214:16,20
214:22 215:18,20
216:8,12,20,23,25
217:8,10,17 218:6
218:10,10,12
222:10,17,19
223:25 224:19,22
224:24 225:1,3,7,8
**ndms** 224:19
**ne** 5:6
**necessary** 99:12
170:21 200:4
233:6

**necessity** 123:16
**need** 27:12,14,15
29:14,20 34:21
35:10,11,20 40:10
41:3 43:24,25
44:1,2 45:10,11,12
45:12,16,21 75:8
81:10 85:17 90:3
112:6,11 114:11
133:24,25 134:3
137:8 139:7 157:1
159:1,2 174:1,3,3
174:17 179:14
182:14 185:20,20
186:15,20 187:8
196:11,13 197:5,8
198:5 203:9,11
204:1,2,20 205:24
206:3,6,22 208:11
208:24 215:19
227:23
**needs** 35:13 83:7
99:19 111:14
113:24,25 114:6,7
202:13,21 227:18
**neighboring** 96:6
**neither** 230:12,15
**never** 33:8 97:22
97:23 123:14
131:19 156:17
158:12 160:13
192:21 210:2
211:7
**new** 1:1,18 2:6
5:11 9:6 10:25
93:2 97:3,6,7 99:2
99:6,17,17,25,25
108:7 126:24
127:1,2 129:10
152:16,21 153:4
153:16,20,24

154:22 156:6,22
156:23 157:4,5,7
157:10 163:6,8
174:25 195:23
226:14 227:17,24
230:3,21
**newark** 5:15
**newest** 227:16
**news** 61:21 131:25
132:4
**nexus** 79:5 81:9
**nigh** 2:10 7:9 10:4
10:4 11:16 12:2
12:10,20 13:7,14
13:23 14:14,24
15:4,10,24 16:6,14
17:1,21 18:8,16
19:4 21:7,15
22:12,18 23:21
24:21 25:20 26:13
28:16 29:6,10,16
29:22,24 30:3,13
33:12,20,25 34:13
34:16 37:3 40:2
41:22 42:1,7,13
43:3,9,15,23 44:10
44:12,17,25 45:8
46:3 47:2,12,21
48:11,21,25 49:7,9
49:11 50:1,7 51:8
51:17 52:19 53:9
53:15,18 55:3,9
57:3,4,15,19 59:15
59:19,25 60:6,11
60:16 61:4,11
64:7,12,25 73:14
74:22 75:19,24
76:3,6,11,19 77:17
77:23 78:23 79:15
80:8 81:2,16
85:10 89:8 101:1

101:24 102:14,23
103:3,11 115:1,23
115:25 118:8
121:8 126:6
128:23 129:1
131:5,17,20
132:10 134:5
135:2,5,16 136:1
136:13 137:5
139:1 142:14
146:14 147:25
148:2 149:18,23
150:16,22 151:10
151:17 154:19
155:7,10 163:22
165:21 168:10,19
170:7 172:6,20,25
173:7,23 177:19
178:10 179:24
180:13 181:20,24
183:19 184:5
189:8,21 190:10
190:15,23 193:3
198:5,20 199:10
199:16 200:2
203:2 204:18
208:5,22 209:13
210:5,19 211:9,15
211:17,21 212:5
213:15 214:9,12
216:3,15 217:20
219:1,11 220:13
220:17,22,24
221:15,20 222:22
223:6 228:3 229:2
229:10 231:1
**night** 229:11
**nine** 45:14
**ninety** 165:23
**nitrate** 197:24

nitrated 198:1
nitrite 185:11
  197:21,22,24
  198:3 215:19
nitrosamine 8:19
  44:23 45:6 60:3
  63:20 64:3,23
  65:3 67:5,9 74:11
  79:9 80:15 87:13
  88:5 100:14,24
  101:3,7,11 102:9
  103:19 117:11
  121:5 130:18,19
  131:14 132:2,13
  136:11 137:14
  140:11 142:5,19
  143:9 160:18
  177:17 178:2,9,12
  178:17,19 179:2
  180:8,9,10 181:2
  185:14 188:22,24
  190:7,20 191:18
  198:2,3 201:11,15
  201:16,19 208:16
  209:7 210:10
  212:17,19 226:1
  228:24
nitrosamines 58:6
  58:14,20 60:23
  61:2 62:7 78:15
  101:14 102:20
  105:1,13 115:21
  117:16 129:16
  132:7,23 134:17
  136:6,16 137:13
  141:19 160:16
  161:7,9 168:24
  177:6,7,12,14
  178:14 179:22
  180:3 191:23
  193:14 200:16,19

  200:22 201:1,6,8
  205:3 215:14
  228:1
nitroso 88:16
  137:13
nitrosol 67:8
nitty 197:10
nizatidine 133:18
nj 5:15
nm 176:9
nmt 184:1
noise 123:19 124:8
non 36:21 130:2
  134:24 135:3,15
  135:17
nonexistent
  130:12,14
nonresponsive
  28:13,19 30:6,14
norris 6:3
norton 6:3
nortonrosefulbri...
  6:5
notary 1:18 230:2
  230:21 233:13,19
note 231:10
notebooks 68:14
noted 9:11 233:7
notes 160:3 163:20
notice 102:17,18
  149:4 160:9
notification
  130:19
novabay 93:20,23
  94:24 95:3,3 96:9
  96:10,14,16,17,22
  97:1,2,11,17
  159:24
novartis 42:25
  43:4 124:18,24
  125:3,6 130:25

  131:1,3,7,14,24
  132:2,2 136:12,18
  136:18,20 147:10
  147:13,17,22
  148:15 149:5
  152:2,3,7 153:2,16
  154:10,11 216:19
  216:23,24 217:5
  221:1 223:24
  224:7,8,11,16
novel 24:18
november 82:16
  83:15,15 222:13
number 8:2 11:10
  58:23 64:5 117:24
  127:12,12 160:20
  182:4 191:8
  217:11 222:25
  223:2
numbered 143:24
  164:25
numbers 48:18
  64:10 71:22
  137:10,10 142:9
  142:20 150:9
  167:18
numerous 213:9
ny 5:11

**o**

o 185:8
o'reilly 5:13
oai 119:12,13
oath 9:21,22 72:14
  154:4 156:5
object 17:21 21:15
  24:22 28:12,18
  47:22 48:21,22
  64:8 74:23 78:23
  168:19 216:3
  221:16,16 225:4
  227:12

objected 85:11
  151:8
objecting 222:3
objection 11:16
  12:2,10,20 13:11
  13:14,23 14:14
  16:6 18:8,16 19:4
  22:18 23:21 24:22
  25:20 26:13 37:3
  37:5,6 41:22 42:1
  42:7,13 43:3,9,15
  43:23 44:12,17,25
  45:8 46:3 47:2,12
  47:21 48:11 49:7
  49:9 50:1,7 53:9
  53:14 55:3,9
  59:15 60:18 77:13
  85:12 101:1 115:1
  115:23 121:8
  126:6 128:23
  132:10 135:2,5,16
  136:1,13 137:5
  139:1 146:14
  147:25 148:3
  149:19 154:19
  165:21 172:6,20
  172:25 173:7,23
  177:19 178:10
  179:24 183:19
  184:5 189:8,21
  190:10,11,23
  193:3 200:2 203:2
  204:18 208:5,22
  209:13 210:5,19
  211:9,17,21 212:6
  213:15 214:9
  216:15 217:20
  221:12,19 224:25
  225:10 226:20
objections 9:23
  77:10 103:4

170:12
**obligation** 28:6
30:22 126:4
**observed** 166:7
**observes** 111:19
**obstructionist**
17:13
**obtain** 108:20
109:4 154:23
170:1
**obtained** 92:3
**obvious** 215:1
**obviously** 79:13
103:16 123:17
133:17 136:18
167:10
**occurred** 41:11
52:1 89:14 118:15
134:11 164:3
180:19 198:21
219:7
**october** 56:18,18
66:5 70:2 71:18
82:15,16,18,21
84:24
**odor** 196:8,9
**offer** 56:10 60:5
77:4 88:4,11,20,21
89:3 113:13
138:18 151:19,21
192:20
**offered** 24:18
136:24 139:22
169:24 228:11,16
**offering** 107:8,11
107:14 228:11,14
228:17,20
**office** 40:6 143:21
157:9
**official** 119:14
120:4,24 149:4

195:5
**officially** 96:11
110:23 140:15
**oh** 185:12
**okay** 11:8,9 16:21
27:1,7 29:22
30:13 31:5,6,7
38:11,17 39:9,22
42:16 43:2 46:14
47:13 51:14 52:5
52:8,24 70:20
79:6 81:23 82:1
83:9,24 87:22
89:25 90:25 91:19
91:22 105:6 111:3
118:10 123:14
128:13,19 138:1,2
140:8,19 141:23
142:16,18 143:4
144:6,20 146:13
147:2,11 149:23
167:5 180:14
181:24,24 182:14
182:14,17,21
183:5 186:2 202:1
215:21 218:7
219:1 220:9 222:8
223:11,23 224:15
228:21 229:11
**old** 217:5
**once** 203:24
214:13
**ones** 208:1 221:4
**ongoing** 27:9 31:8
31:18 79:10 80:7
**online** 51:11,12,18
108:12 150:11
179:13
**open** 39:5,6,8,9,15
110:1 119:1,10,11
181:9,15

**opening** 199:20
**opens** 179:10
**operate** 62:12
98:10 206:14
**operates** 80:13
**operating** 114:16
**operators** 71:23
**opinion** 25:1 57:20
59:20 60:8,12
61:4,14,19,20 62:9
79:17,18 85:12
86:19 87:6,11
88:4,18 107:14,15
111:25 134:16
136:20,24 137:21
138:4,5,17 139:9
139:22 140:2
147:22 151:19,21
151:22 168:4
188:7 189:1,16,25
190:1,4,17 191:1
193:4 213:18,19
216:8,11,24 217:8
217:17,21 218:13
228:14,20
**opinions** 60:21
61:23 62:2 77:3,6
86:15,24 88:10,19
88:21,24 89:2,3
107:8,12 125:12
125:14 139:24
162:8,25 198:8,10
199:13 212:13
228:11,17
**opportunity** 30:18
77:7 143:7
**oral** 1:13
**order** 73:21
108:20 227:9
**ordered** 67:19
69:22

**organic** 92:4,8
185:24,25
**organization**
98:20 180:25
**original** 197:21
**orleans** 2:6
**ought** 75:12
**outdated** 227:11
**outlining** 107:22
114:17
**outside** 11:16 12:2
12:10,20 13:8
14:14 17:1 18:16
19:4 21:7 22:18
24:25 50:7 64:25
76:22 80:1 96:3
103:4,8 114:1
131:5,17,20
132:10 150:16,23
150:24 151:4,12
151:18 170:10
199:13 201:18
210:14 213:18
216:3,15 217:20
**oversight** 159:15
159:18
**overview** 25:5
53:4
**owns** 63:5 95:10
**oxford** 3:6,13

**p**

**p** 2:1,1 3:1,1 4:1,1
5:1,1 6:1,1 180:5
**p.a.** 2:9
**p.c.** 5:18
**p.m.** 229:14
**pa** 2:14 3:7,13,20
4:9
**pacific** 1:20 9:2
**package** 83:6
209:21

page   7:2 8:2 47:8
  49:18 50:11 53:2
  54:16 66:4,20
  90:2 91:15,17
  105:4 146:16,17
  146:17,20 147:12
  150:25 157:25
  165:6 176:6
  182:23 183:4
  187:20,24 191:7,8
  192:14 198:7
  219:21,21 220:9
  220:11 222:9
  223:11 226:5
  228:25 232:4,7,10
  232:13,16,19
pages   53:6 90:18
  90:22 91:21
  225:14
paid   63:22,25 64:3
  66:15 143:13
papantonio   2:9
papers   160:7,11
  160:24
paragraph   28:10
  33:5,7 34:20
  66:21 67:16 105:8
  121:16,17 125:8
  125:22 191:8,8
  226:9
paragraphs
  144:12
parameters
  129:10
pardon   185:12
park   5:11
part   38:19 44:6
  48:5,25 53:10
  56:7 59:6,9 67:10
  67:12,15 76:14
  112:8 113:3

116:21 119:21
  121:16 122:16,23
  131:23 150:8
  153:16 160:14
  165:9 179:22
  180:1 191:6,9
  192:11,18,22
  193:20 194:23
  198:20 205:1
  209:21 219:14
  223:14
participate   99:12
participating   9:16
particular   43:5
  45:1 47:9 69:7,8
  125:10
particularly   88:15
parties   9:22 74:25
  80:21 230:14
parts   54:21 91:9
  111:8 132:7
  137:10,11 205:2
party   142:22,24
pass   178:22
passed   141:7
patent   127:14
  172:12
patented   95:14,17
patents   154:12
  163:15
path   19:19 212:10
pathologist   105:24
  106:1,2,4
pathway   225:24
patients   38:11
  106:24 189:17
  190:6,19
paul   181:23
pay   72:2
peak   204:5

peaks   184:24
  204:6 205:12,16
  206:2,24
peer   100:13,19,23
  101:3,12 106:16
  106:20 161:8,11
  161:13,20,23
  162:4,6
pending   10:24
  75:16 77:9
pendley   57:10
pensacola   2:11
people   119:16
  160:21 170:5
  188:12 200:25
  205:24 211:2
  218:2
percent   47:5,11,19
  54:18,20 60:25
  63:6 95:9 96:8
  123:12 129:19
  130:1,3 141:22
  160:18 184:2,8,13
  184:13 186:8,11
  186:15 204:8,8
percentage   37:17
  64:8
percentages
  183:24
perform   68:12
  193:23 199:6
  213:12
performance
  50:19 54:10 214:2
performed   67:20
  69:23 196:19,25
period   87:10
  105:14 151:23
  168:1 169:1
  191:19

permissible   169:5
permits   129:9
permitted   14:20
permitting   189:4
person   9:21 57:6
  65:5 196:6
personal   86:3
  158:12
personally   86:6,8
  94:12 100:10
  160:2
pertains   82:22
petition   100:16,21
  104:4,7 121:20,25
  122:3,12,25
  123:12,13,15,22
  123:23 124:2,9,14
  143:14,17,23
  145:8 148:10,17
  160:17 161:19,22
  161:25 162:1,2
  222:23 223:8,9,19
  224:15
pharma   3:10,10
  3:10 5:3 8:5 62:13
  62:15,16,18,19,21
  63:15,24 64:2,23
  67:1 68:10 86:1
  96:14,15 97:25
  98:9,15,18,22,24
  98:25 99:2,5,8,21
  104:13 105:11
  106:11 110:14
  111:5 118:22
  122:7,17 123:20
  125:14 171:9
  223:13
pharma's   108:19
  112:16 122:20
pharmaceutical
  3:16,17 5:2 14:12

[pharmaceutical - prescribers]                                    Page 31

18:5 92:12 93:20
94:1 96:8 97:16
125:15,21 127:16
127:25 128:11
130:22 133:3
136:25 137:9
155:20 179:3,21
**pharmaceuticals**
3:2 4:2,6 5:2 70:5
93:21 94:25
100:14,25 101:8
102:10 105:2
159:24 221:1
**pharmaco** 194:10
194:11
**pharmacy** 4:11
116:2
**phase** 176:20
**phd** 7:3 9:4 92:8
92:10 231:5 232:2
232:24 233:2,4,12
**phds** 94:9
**philadelphia** 2:14
3:20
**phone** 56:23
**phrase** 194:25
215:1
**physically** 9:17
**physician** 26:3
161:18 193:18
**pick** 132:25
**picking** 185:1
**piece** 39:4 121:3
**piedmont** 5:6
**pietragallo** 3:3
**pietragallo.com**
3:8,8,9
**pills** 67:18 69:22
71:22,25 76:21
116:9 120:18
140:23,24 142:20

142:21 146:23
152:6 224:16
**piqued** 110:10
**pittsburgh** 3:7,13
**pizzi** 5:13
**place** 43:10 78:5
78:11 109:9 151:1
151:19 230:11
**places** 108:12
**plaintiff** 73:25
80:24 228:5
**plaintiff's** 56:19
57:13,22 75:3
84:16,18 153:1,3
**plaintiffs** 2:2 10:5
58:19 59:14 60:20
64:3 66:1 74:3
127:3 194:15
**plan** 163:1 194:23
**planet** 13:1,5 14:8
15:16
**planned** 146:8
**planning** 142:25
**plastic** 197:5
**please** 9:12,25
10:7,10 11:23
15:10 16:23 20:17
24:10,11,15 30:19
34:14 38:2 41:16
46:13 56:14 57:1
65:15 86:21 90:2
90:4 103:24 105:8
105:25 110:20
113:15 144:7
146:10 157:2,22
163:20 171:3
181:16 183:3
187:24 191:21
192:15 210:21
**plenty** 154:13

**point** 46:23 50:12
51:9 53:24 54:8
75:17 77:10 79:1
87:15,17,18 97:24
114:16 150:18,24
151:3,5,6,11 170:8
173:9 174:6,7
179:8 186:6
188:17 198:9,15
206:16 213:16
**points** 11:8
**policies** 114:17
**policy** 53:4
**political** 189:25
**pollution** 96:2
**portion** 85:7
157:10
**position** 17:19
80:11 81:1 145:11
152:5 167:25
170:8,22 216:17
218:16
**positive** 104:7
**possibility** 167:22
**possible** 19:6
206:18
**post** 72:9 181:5
**posted** 25:13
**potency** 31:12
32:6,6 35:13
**potent** 191:11
**potential** 31:23
37:19 38:25
103:16 115:22
130:19 141:19
159:3 198:1
204:24 212:20
213:5,13 214:6
215:13
**potentially** 46:8
96:4 178:1 184:12

218:1
**poulence** 159:23
**practice** 1:16
174:25 175:3
178:25
**practices** 32:17
68:1,4 111:7
117:2 178:24
179:5,23 187:9
188:11 191:24
206:8
**pre** 37:22 70:20
71:9 181:5,6
**predetermined**
37:22
**predicate** 61:10
**predict** 227:25
**predicted** 37:22
**predictive** 226:14
227:22,24
**prefilled** 197:7,8
**premarked** 8:1
39:2,2 40:9 46:13
65:15 164:17
**premises** 113:9
**preparation** 83:22
195:11
**prepare** 97:3,5
100:5 122:24
155:14
**prepared** 86:7,7,8
99:8 121:13,14
140:25 154:22
159:25 160:7,24
166:25
**preparing** 83:22
84:9,11,12 100:9
104:25 155:5
**prerogative** 168:4
**prescribers** 38:10

**prescribing** 38:10
**prescription**
  172:23
**presence** 14:10
  15:22 16:3,24
  17:19,25 58:6,13
  87:13 88:5 175:24
  177:17 191:16
  192:24 196:3
  213:21 215:13
  226:12
**present** 6:8 9:18
  27:15 86:18 87:6
  87:9 183:23
**presentation**
  108:9,10 179:12
**presented** 160:19
  170:12
**presenting** 148:8
  179:12
**preservation**
  112:23 113:12,18
  113:23
**preserve** 122:18
**president** 120:6
**press** 104:12,15,17
  124:16 142:25
**pressure** 176:3
  193:1,24
**presume** 63:5
  140:9
**presuppose** 48:18
  49:4
**presupposes** 47:24
  48:1,14
**pretty** 17:18 34:16
  67:24 142:10
  227:13
**prevent** 128:17
  191:16

**preventing** 226:12
**prevents** 95:25
  96:2,3
**preview** 139:14
**previewed** 100:16
**previous** 16:19
  56:7 159:22
  189:10
**previously** 13:8
  28:20 54:14 98:14
  174:14 182:11
  204:20,23
**primarily** 73:5
  82:23 85:1 109:21
  110:7 113:3 123:3
  124:17 132:16
  172:7
**principle** 175:20
**prinston** 3:16
**print** 40:10,12
**prior** 44:21 45:4
  70:1,7,13,15 71:5
  71:14 72:8 94:1
  115:21 130:18
  131:3,6,15 136:9
  152:12 161:16
  178:8 187:20,24
  210:25 211:19,23
  215:6,11 229:6
  230:4
**privately** 62:23,24
**privilege** 60:18
  73:17,22 75:14
  76:25 78:24
  103:17
**privileged** 60:9
  61:7 71:2 73:15
  73:18 74:24 75:20
  75:24 76:3,11,18
  76:23 77:16 79:3
  79:5,25 115:5,12

**pro** 123:6,9,10,13
**probably** 55:16
  59:7 92:22 96:11
  99:14 108:16
  109:6 120:17
  132:22 207:9
**probative** 81:13
**probial** 97:13
**problem** 94:6,8
  104:5 112:5
  123:21 134:5
  159:1,4 182:16
**problems** 123:7
**procedurally**
  110:7
**procedure** 1:16
  18:10,12,22 27:20
  28:1,3 35:21,24
  36:17,18 78:17
  139:5 152:14
  159:13 184:16
**procedures** 28:5
  76:18 78:14
  114:17 142:8
  154:10,11,12
  163:16
**proceed** 52:3
  89:16 118:17
  158:4 164:5
**proceedings** 77:4
**process** 18:6,14,24
  20:24 112:18
  119:3,7,9 152:14
  153:14 158:21
  159:7,9 197:3,12
  197:21,23
**processed** 201:1
**processes** 159:11
  226:11,18,23,25
  227:21,22

**processor** 206:12
**proctor** 2:9
**produce** 46:4
**produced** 14:8,12
  15:16 70:4,9,17,25
  71:11,20 80:18,20
  102:13 152:15
**produces** 96:17
**producing** 18:14
  128:8 186:20
**product** 11:18,24
  12:5,7,12,16,25
  13:4,19 14:7,11
  15:15,23 19:23
  20:4 21:6,13,24
  23:4,18 25:18
  27:10 31:8 43:1,6
  44:9,16 55:6,22
  72:15 87:14 88:6
  88:6 93:24 94:3
  95:14,15,17,17,22
  96:2 97:4,12
  110:17 112:25,25
  113:1 127:21
  128:9 131:8
  134:17,23 135:14
  136:10,25 147:3
  147:13 149:6,8,10
  154:24 156:5
  159:17,20 166:17
  167:8 168:1 169:1
  171:10 173:13
  183:23 191:18
  192:1 196:20
  200:15 215:24
  216:2,9,11,20,23
  216:25 217:7,18
  218:11,11,13,17
**production** 93:17
  94:18 96:24

**products** 1:4 6:2
11:11 12:18 21:8
21:9,18,18 31:19
44:3 58:7,20
68:15 71:6 73:6
79:18,19 92:25
93:13,25 96:18,21
97:13 98:23 110:5
110:13,15 112:10
114:19 127:6,9,12
127:14 128:1
138:23 150:15
152:1,12 155:3
161:9 164:10
165:7,13,18 166:6
166:13 167:6,19
172:24 179:3
182:2 189:2,5,18
190:6,18 192:25
193:2 215:12,13
217:15 219:24
**proffered** 103:5
**profile** 19:3,7,12
20:10,20,21 25:19
35:20,23,25 36:12
36:16,19 47:15
48:5 128:4,9,14,15
128:16,20 129:5
129:13 173:10
176:1
**profiles** 19:22 20:3
20:13 32:5 36:20
128:2
**program** 113:4
**project** 84:23
**promise** 204:10
**promises** 68:18
**promotes** 194:3,10
**prompted** 119:22
**prone** 133:4 180:7

**pronouncement**
50:4
**pronouncing**
18:18
**proper** 21:19
53:13 64:17
107:17 123:6
158:24 159:2
197:17
**properly** 32:8
**proposal** 8:5 67:11
67:12
**proposition** 24:2
24:18
**proprietary** 153:3
**protection** 159:1
**protocol** 76:13
114:17,24 115:3
117:3 172:13
**protocols** 76:8,17
77:14 78:11
**proves** 42:5
**provide** 26:10
48:9 60:22 98:16
101:22 115:2
160:4 175:11
177:21
**provided** 38:10
42:11 44:19 85:11
89:23 105:18
117:7 153:8 154:5
164:9 165:8
**provides** 140:10
176:10 185:2
202:12
**providing** 72:13
156:2,4
**public** 1:18 12:17
24:4 50:4 53:4
96:13 104:22
105:16 115:17

123:3,4,19 131:16
131:18 136:17
153:13,17,20,24
154:1 218:18
230:2,21 233:19
**publication** 90:24
100:22 101:12,13
101:16 104:10
105:1 107:24
130:10 161:14,23
179:19
**publications** 90:11
90:12 91:10 101:3
101:5 102:20
103:16 160:12,24
161:4,8
**publicly** 62:23
103:20 105:11
163:12
**publish** 121:2,4
209:15
**published** 53:21
53:23 69:4,16
100:13 101:14
106:15,19 107:16
107:18,21,25
108:4 120:25
121:20 129:18
150:6,7 154:13
160:13,15 161:1,2
161:17 163:17
192:3 208:2,15,19
208:20 209:6,11
210:3 211:7,19,25
**publishing** 209:14
210:6,13,24
211:22
**pull** 164:17 171:3
222:23
**pumps** 176:15,15
176:16

**pure** 54:5
**purified** 174:4
**purity** 31:11,12
32:3,4,4 35:12,20
36:12,15,16 54:9
129:9
**purpose** 121:12
171:21 193:23
**purposes** 38:9
228:9,15
**pursuant** 1:15
76:9 77:14 115:3
204:16
**pushing** 176:16,16
**put** 24:5 27:7 29:3
40:8,16 41:15
46:12 69:11,12
81:24 90:1 93:25
103:23 144:6
148:12 157:20,22
158:20 170:8
191:6,22 201:7
**puts** 210:1
**putting** 64:18 83:4
83:5,6 148:12
162:24
**puzzled** 48:16
49:1

**q**

**q3a** 202:10,20,25
204:12
**q3b** 202:10,20,25
204:12
**qa** 119:16
**qualification**
202:17,19 204:14
204:19 217:14
**qualifications** 90:8
91:25
**qualified** 68:16

qualify 201:7
quality 22:9 25:6
  31:11 32:3 35:12
  50:18 54:1,2,6
  98:17 161:16
  171:23 195:5
quantification
  143:9
quantified 174:4
quantify 206:1
  207:14,19,21
quantifying
  205:17
quantitation 49:15
question 11:21,22
  11:23 13:3,7,8,12
  13:25 14:3,5,7,19
  14:19 15:6,12,14
  15:25 16:7,9,15,18
  17:3,7,8,10,15,18
  17:23 18:13 19:25
  20:11,16,17 21:11
  22:13 23:2,23
  24:16 25:3 26:14
  26:15 28:9,14
  30:19,23 31:3
  32:22,24 33:4,21
  33:21,24 34:2,6,9
  34:14 36:5,14,22
  36:23 37:4,11
  39:17 41:23 43:7
  43:7,20 44:10,13
  47:20,25 48:24
  49:1 52:12 53:19
  56:6,7,14 58:8
  60:9,10,11,15
  61:10 62:5 65:25
  68:20 69:15,15
  74:14,16 75:16
  76:5 77:9,13,18,19
  78:8,9 85:10

86:21 88:2,3 91:3
  94:16 100:20,21
  102:2,3,12 106:3
  111:11 113:15
  116:21 122:14
  128:6,7 129:3
  131:13 135:6,9
  139:19 142:3
  143:6,6 150:12
  151:8,18 153:18
  153:22 155:4,8
  156:25 157:2
  160:22 162:17
  168:11 169:15
  172:21 182:18
  184:6,20 192:7
  196:21 199:3,18
  200:11 207:16
  209:4 210:15,20
  211:11 212:4,7
  214:19 223:1
questioning
  199:21 225:21
questions 14:21,22
  15:3 30:10,12
  80:25 118:20
  138:2 150:12,23
  169:17 170:4,10
  198:21 199:18
  201:20 202:5
  218:20,21,24
  221:13 223:9
  224:21 228:6,22
quick 118:7
  122:16 180:13
  228:24
quote 191:4
quoting 84:5
  87:24

r

r 2:1,17 3:1 4:1 5:1
  6:1 8:4 63:13
  230:1 232:3,3
r&d 69:2
rafferty 2:9
raise 10:10 75:8
raised 170:19
ran 120:18,18
  205:12
ranitidine 57:14
  57:22,24 58:3,7,10
  58:19 59:12 60:3
  60:19 61:6,16
  62:9 101:21 102:1
  103:18 104:4
  121:25 122:12,25
  123:2,9,11 126:8
  133:18 161:19
  175:7
raspanti 3:4
rationale 122:23
rbk 1:7
reached 140:2
reactive 137:15
  189:12
read 16:20 21:23
  22:15 25:2 30:2
  30:18 31:6 33:5
  35:9 40:13 54:12
  67:22 86:14 105:9
  123:25 125:16,17
  150:18 191:10
  192:9 226:18
  231:9 233:5
reading 22:21
  92:2 105:10,10
  168:23 227:13
ready 51:21 64:20
  90:20 91:16 111:1

reagents 27:23
  28:6
real 128:11 228:23
realize 134:2
really 21:11 24:13
  32:6,14 52:19
  69:3 74:12 75:15
  104:8 111:10
  112:7 121:12
  139:4 161:4
  170:20 174:4,6,6,7
  179:5,10 185:4
  196:5,15 197:10
  200:10 203:24
  206:8 209:24
  212:10
reason 73:2
  213:20 231:11
  232:6,9,12,15,18
  232:21
reasonable 191:14
reasons 85:11
recall 70:11,18
  71:1,7,8,13,21
  73:6 108:17
  109:13 118:22
  120:5 124:10,22
  127:18 131:23
  133:15,16 144:14
  149:3,4 150:8
  153:10 155:22
  156:8 157:17
  158:1 163:10
  165:9,15 192:4
  202:8 216:18
  223:8 225:12
  228:5
recalled 123:18
  138:13 149:5,6,8
  164:11 165:7,18
  166:9 167:20

192:6 216:14
217:1,12,18
218:14
**recalls** 165:18
208:16,20
**receipt** 231:18
**receive** 63:22
160:11
**received** 65:13
81:21,21 83:25
90:10 119:24
181:8
**receptor** 93:17
219:24
**receptors** 193:17
**recess** 41:9,10
51:24,25 89:12,13
118:13,14 134:9
134:10 164:1,2
180:17,18 219:5,6
**recipe** 27:21 35:22
36:15 137:20
139:6 158:23
185:16 186:1
**recipes** 137:18
163:16
**recognize** 103:24
**recognizing** 29:17
**recollection**
144:12
**recommendations**
125:15
**recommended**
192:4,5
**reconsider** 77:12
**record** 9:2,11 10:1
17:4 27:4 34:4
39:12 41:5,13
44:1 45:24 51:6
51:15,20,23 52:3
52:22 57:3 59:18

75:10 80:12 81:14
134:8,13 144:4
170:9 180:16,21
181:17 191:6,10
192:18 201:8
210:22 215:16
**recorded** 9:4
**recordkeeping**
111:6
**records** 17:4 65:12
72:18,19,20
113:19,20 117:22
136:17 170:2
**redepose** 170:2
**redirect** 79:17
**reduce** 194:13
**reducing** 193:24
**reefer** 3:5
**refer** 20:9 25:4
45:11 49:12 56:4
145:1 179:25
195:3 221:5,23
222:2,16
**reference** 19:3
20:13,21 27:10,11
31:9,13,23 56:4
68:6,9 69:17
70:23 88:7 126:17
129:13 137:2,3
138:8,22 140:1,3
145:6 152:2 176:6
185:3 195:6
213:21 224:3
**referenced** 69:5
108:13 168:14
231:6
**referencing** 32:11
68:8
**referring** 35:14
41:1 45:1 68:21
69:7,24 125:21

203:13 227:3
**refers** 27:11,15
32:4 55:10 179:5
186:7 222:17
**reflect** 84:22
**refresh** 144:12
**refresher** 182:15
**refreshing** 84:4
**refusing** 17:6
**regard** 124:11
209:5 217:15
**regarding** 61:2
101:13 104:3,4
144:15 153:13
160:17 178:17
179:13 181:2
**regards** 9:4
**register** 108:23
**registered** 68:10
68:22 98:18
108:19 111:24
114:20
**registration**
108:21 109:4
**regs** 22:21 25:21
25:23 26:4 32:12
32:13 35:10
111:10
**regular** 136:3
**regulations** 19:10
26:7,23 30:25
35:2 36:10 37:1
48:17 111:21
112:2 134:21
**regulatory** 25:22
26:19 107:22
156:9,13
**reiterate** 189:22
**relate** 144:17
**related** 75:2
100:13,24 101:3

101:11,19,20
103:18 111:21
112:2 122:4 143:8
143:17 158:19
183:13,15 184:3
**relates** 1:5 102:9
112:25 116:14
**relating** 60:22
67:2 102:20
113:20 121:25
122:12,25 153:11
**relation** 75:4
**relationship**
171:19
**relative** 230:13,15
**release** 104:12,15
104:17 110:18,21
110:23,24 112:25
124:16 143:1
171:10 195:24
**released** 32:8
**releases** 110:4
116:4
**releasing** 110:25
112:9
**relevance** 75:14
**relevancy** 76:25
79:24
**relevant** 30:10
81:12 169:22
**reliability** 161:16
173:1
**reliable** 172:19
173:5
**relies** 171:16
215:22
**rely** 76:20 161:5
200:5 227:10
**relying** 77:3 163:2
**remains** 140:22
168:17 169:6,7,11

169:12
**remedied**  109:25
  110:9
**remember**  28:14
  29:9 54:15 56:12
  56:15 92:2 122:18
  129:19,21 143:18
  160:8
**remotely**  1:19
  9:19,22 230:5
**removed**  124:17
**render**  15:22 16:4
**rendered**  14:11
**renders**  16:24
  17:20 87:14 88:6
**repeat**  19:25 20:17
  23:2,16 30:19
  31:17 33:1 37:11
  41:23 56:14 58:8
  86:21 129:3 135:7
  142:15 172:21
  196:21 207:16
**repeated**  129:2
  142:7
**rephrase**  184:6
**report**  25:2 26:9
  26:12,16,17,18,21
  27:2 28:11 31:3,5
  31:7 33:5 34:20
  82:23 83:2,5 85:1
  87:23 88:22 89:1
  90:15 119:17
  145:17,21 148:9
  157:15 158:4
  159:4 169:3 175:1
  186:19 223:14
**reported**  45:12
  104:6 145:14
  146:9,18,21 147:1
  150:13

**reporter**  1:17 9:9
  9:12,14,16 10:6,9
  10:15 16:20 31:16
  39:1 45:21 164:24
  230:3
**reporting**  9:19,24
  148:19 175:2,4,5,6
**reports**  61:6 62:2
  75:22,23 76:1,1
  115:11 131:23
  141:1
**represent**  10:23
  115:13 171:1
  202:3 219:13
**representation**
  53:22
**representing**
  73:24,25 74:2
  207:5
**request**  52:22
  116:19,23 117:21
  120:10 160:9
**requested**  16:19
  31:15 66:9,9
  169:19
**require**  18:4,9,21
  19:13,16,17 204:9
**required**  14:21
  18:13 23:8,9,11,13
  23:19,25 45:6
  179:1 213:12
  233:13
**requirement**
  19:10 23:7 25:13
  25:17 26:5 31:2
  37:8,12,15,18
  43:12,17 44:22
  45:5 46:7 107:19
  134:23 135:24
  136:2 138:10

**requirements**
  19:21 20:2,19
  22:25 23:5,10
  51:3 107:17,19
  108:6 136:7
  137:14 157:16
  158:6
**requires**  211:24
**research**  46:11
  80:14 92:11 98:16
  98:19 106:16,20
  108:1,19 156:19
**reservations**  229:6
**reserve**  169:25
**respect**  116:18
  123:15 129:13
  209:7 210:12
**respond**  25:3
  102:15 128:25
  148:6 162:7
**responded**  13:25
  15:25 16:7 17:3,8
  26:15 36:13 104:7
**response**  100:16
  102:24 199:17
**responsibilities**
  107:22 159:19,21
**responsibility**
  156:22 157:4
  158:13,15,23
  159:16 200:13
**responsible**  31:22
  32:19 93:9 94:7
  139:5 226:10,22
  226:24
**responsive**  14:21
  15:14 30:11 47:22
  102:22
**rest**  91:12
**restate**  156:25
  157:2 167:25

**restroom**  24:25
**result**  108:24
  142:9 222:10,11
**results**  76:16
  105:22,23 115:7
  115:10 117:10,12
  117:15 142:4
  145:13 146:2,9,17
  146:20 147:13
**retained**  56:9,13
  56:16,17,20 57:13
  57:21,23 60:5,20
  61:2 73:8,11,12
  74:4,9,20 84:24
  157:8 186:19
**retainer**  65:18,21
  66:9,12,15,17
  67:17 68:6,21
  69:5,8,10,20 70:2
  70:7,20 71:5,9,16
  72:6 81:20
**return**  231:13,17
**revenue**  64:9,10
**revenues**  63:16
  64:1,22 65:2
**review**  38:20 52:6
  52:21 82:18,21,25
  83:3,4,14,15
  101:12 108:6
  161:13 162:10,13
  231:7
**reviewed**  38:22
  52:16 100:13,19
  100:23 101:3
  106:16,20 152:16
  152:18,20,21,23
  153:6,10 154:7,8
  161:8,12,15,21,23
  162:4,6,14,19,21
  163:5,8,11,12
  182:1,4,5,10

**reviewer**  200:9
215:20
**reviewing**  83:18
83:20,21 84:3
**reviews**  82:7 200:9
**rhone**  159:23
**riddell**  5:10
**right**  10:10 15:23
18:19 20:8 22:16
22:17 24:5 38:12
42:23 49:21,24,25
50:11 52:13 54:18
54:19,21,22 55:1,8
55:18,23 56:10
57:12 62:14 66:3
66:6,10,18,19
67:21 68:1 69:25
70:12,21 76:25
81:4,11 82:8,9,11
82:12,15,19,19
83:11,12,16,17,20
84:6,8,24 85:21
89:4 90:6 91:1,6,7
91:25 92:5,17
94:15 95:2 96:7
97:14 98:7 104:19
105:3,20 107:6
109:19 111:17,21
114:19,24 115:9
115:16 117:8,23
121:7 126:3
127:11 128:22
130:1 135:3,19,20
137:4 139:2 140:4
140:13 141:9,21
144:10,18 145:9
145:12 146:2,4,19
147:15 154:21
155:22 156:7
158:7 165:15,20
166:1,4,15,20

167:5,16 168:15
169:16,25 175:1
181:11 182:20
183:25 184:24
190:4 202:14,22
204:17 205:19
207:6 210:18
212:17 213:6,9
214:8 215:2,3,24
216:9 217:24
221:1 222:15
225:11
**risk**  111:10 113:3
160:8,25 195:17
195:18,21,23
196:1,10,12,24
197:5,8,18 198:4
199:7,25 200:5,6,7
200:7,8
**risks**  196:19 199:9
**rite**  4:11
**rlb**  18:7
**rld**  18:25 19:11,22
20:4 25:19 128:2
128:10,15 130:14
216:13
**road**  4:8 5:6
**robe**  64:18
**role**  93:16 94:17
**ron**  1:9 7:3 9:4
10:8 48:20 66:25
211:6 230:5 231:5
232:2,24 233:2,4
233:12
**room**  9:18 218:22
**rooney**  5:18
**root**  196:13
**rose**  6:3
**rosemarie**  5:10
40:12 57:2,4
84:19

**rosemarie.bogdan**
5:12
**rosemaries**  57:4
**ross**  6:4
**roughly**  205:7
**route**  133:8 197:3
214:5,14
**routine**  195:25
207:2
**rpr**  1:17 230:19,20
**rs**  183:14,14
**rubenstein**  5:5
**rubensteinb**  5:9
**rule**  167:21,24
**ruled**  28:18,20,23
29:2 30:7
**ruler**  2:17
**rules**  1:15
**ruling**  191:2
**run**  92:21 132:3
175:20
**running**  121:10
131:12 205:18
207:11,17,23

**s**

**s**  2:1 3:1,19 4:1,13
5:1 6:1 195:12
232:3
**safe**  18:1,1 19:17
19:19 36:1 46:6,6
179:7
**safety**  92:16,21,24
95:22 123:3 160:8
160:25
**sak**  1:7
**sake**  163:7
**sale**  13:20
**sameness**  25:24
27:10 31:8,19
34:22

**sample**  117:3
**samples**  114:3,9
114:10,11,14
115:8 116:8
147:13
**san**  92:4
**sanctions**  28:22
30:4,15
**sanger**  2:16
**sartans**  175:7
219:25
**satisfied**  112:20
**satisfy**  19:21 20:2
**sausage**  201:3
**save**  81:13 98:20
98:21 122:17,21
122:21
**saw**  87:11 131:10
131:24 142:12
145:10 193:11
**saying**  10:18 33:23
87:1 103:12 130:4
134:24 154:15
158:3 162:2
187:13 191:2
201:8
**says**  50:6 53:25
66:17,24 67:17
82:17 110:20
129:25 137:16
165:7 168:24
169:14 172:12
184:1 186:18
188:2 191:11,23
192:16 200:8
220:3,25 224:5
226:9
**scale**  159:22
**scanned**  182:17
**schaffer**  2:13

scheduled 134:1
schell 2:5
scientific 100:23
  161:14
scientist 92:11
scientists 161:15
  162:6
scope 11:17 12:3
  12:11,21 13:9
  14:15 15:24 16:6
  17:2 18:17 19:5
  21:7 22:19 25:1
  41:22 42:7 43:3,9
  43:15,23 44:12,17
  44:25 45:8 47:2
  47:12 48:11,22
  49:11 50:8 55:3,9
  65:1 66:22 67:16
  67:18 76:22 103:5
  103:8 110:12
  131:5,17,20
  132:11 150:17,24
  150:25 151:12,18
  170:11 199:2,13
  213:18 214:9
  216:4,16 217:21
screen 40:24 41:15
  48:4 87:15,19
  118:3 157:20
  164:20
scroll 219:21
  222:8,13 223:11
se 43:17
search 50:22
  209:1
second 27:1 40:6
  42:19 46:17 51:4
  67:15,15 74:22
  87:11 105:7
  109:16 124:2
  175:16 180:11

182:15 198:11
  199:21
secondary 109:24
secrecy 127:15
section 22:3,7
  67:16 153:20,24
  154:1 157:14,25
  158:4 176:6 183:2
sections 108:6
  155:1,1
sedran 2:13
see 11:7,21 17:5
  40:4,10,21,23 41:3
  42:18,20 43:19
  47:14 48:4 51:1
  53:11 66:22 67:24
  69:24 76:12 88:23
  90:11,24 91:9
  94:15 101:24
  102:12 129:4
  132:1 133:10
  146:18 150:6,7
  158:1 163:20
  165:4 176:7 180:7
  181:24 185:11
  188:4,6 192:15
  198:6 205:20,23
  206:10,25 210:6
  216:21 219:23
  220:2,3,4,6,7,8,25
  221:4,6,21 222:9
  222:24 223:23,24
  225:25 226:5
seeing 131:24
  160:8 223:9
seek 77:2
seeking 154:23
seen 24:19 39:23
  46:15 124:8
  131:19 153:4,6
  154:4,8,18,20

185:18 192:21
  210:2,17,23,24
  211:6,7,18,22
sell 110:15,16
  134:17
sells 136:25
sense 32:1,2
  116:17
sent 38:25 39:14
  142:20 162:2
  164:24 181:10
  231:14
sentence 68:17
  125:10
separate 166:1
separation 176:20
september 56:18
  165:8,15
served 102:18
  103:4
services 98:16
  192:17
session 14:20
set 22:9 45:22
  46:25 69:18 88:10
  175:18,19,19
  203:18 205:18
  207:12,19 230:11
settings 205:19
  208:3
seven 147:13
  150:25 198:7
share 40:4,16
  100:3 164:20
  172:12,13,14
  181:23
shared 85:8 153:1
shareholders
  62:25 63:15
shares 96:13

sheet 8:16 231:11
shit 185:12
shortly 88:22
shouting 133:7,8
show 24:6 26:16
  26:18,21 50:22
  91:7 157:18
  173:25 178:1
  186:25 188:25
  192:14 194:9
  219:12 223:25
showed 120:12
  205:16
showing 87:18
  129:22 147:20
  187:3 216:22
  225:13
shown 146:24
  178:21 187:20
  216:18 217:15
  225:20
shows 183:21
  194:2 221:2
  222:10,14
side 84:18 113:14
  170:5
sign 231:12
signature 69:13
  85:22 230:19
signed 66:5 231:20
significant 214:1
silence 130:7
silent 130:5
similar 181:3
simple 17:18
  206:14
simply 11:14,25
  36:3,23 58:10
  71:25 74:15 79:17
  167:8 194:18
  207:11 227:10

**single**   127:21
147:16 150:19
151:1 205:18,18
**sir**   10:18 11:21
13:3 14:1,2,3,4,17
15:3,14 16:8,17
17:7,10 18:20
22:20 24:13 25:3
26:9 30:23 36:2
36:22 39:23,25
43:20 44:11 46:16
47:17 48:16 49:3
50:6 53:20 65:25
66:22 69:15 87:17
92:20 100:12
105:9 150:4
154:21
**sit**   72:13 127:20
**site**   50:2 53:11
114:11
**sitting**   75:5 156:2
156:4 196:9
**six**   82:6 146:11
165:23
**size**   129:9
**skilled**   133:6
214:25
**skincare**   96:18
**slack**   2:16
**slackdavis.com**
2:19
**slater**   28:25
**slow**   174:15
**small**   40:24 53:10
**smith**   4:7
**smoke**   200:20
**sneak**   139:14
**snippet**   53:12
**sodium**   197:20,22
197:24,24 198:3
215:19

**solco**   3:16
**sold**   44:9 96:13
111:1 165:14
189:5 190:6,19
195:6 217:9,10
**sole**   63:14
**solemnly**   10:10
**solutions**   6:8 9:8
9:10 231:23
**solvent**   176:17,17
176:18
**solvents**   96:1
**solving**   94:7
**somebody**   73:9
114:5 180:11
209:17
**sop**   114:21
**sop's**   114:22
**sorry**   9:14 27:7
44:5 49:11 57:9
62:16 64:7,7 98:2
99:13 102:25
103:12 113:16
131:6 133:24
134:3 141:10
155:9,12 177:5
206:19 214:10
**sort**   37:22 74:12
75:10 86:19 104:2
122:14 124:21
127:6 133:22
141:20 161:5
168:21 171:19
174:22 179:16
197:10,13
**sound**   99:14 166:4
**sounded**   91:8
**sounds**   102:11
154:17 170:16
**source**   131:4,13

**sources**   213:4
**south**   2:10
**space**   131:10
**speak**   108:15
119:8 190:2
**speaker**   45:20
**spec**   176:25
177:21 178:3,3,4
**specialized**   106:10
132:6 206:3,6,22
207:1,25 208:7,8
208:11
**specific**   44:23 45:6
49:13 50:23 65:13
68:6,7 85:1 110:8
130:18 135:9
137:9,24 155:3,23
172:2 173:12,15
175:22 177:20
180:3 183:7,10
187:16 196:24
208:3 210:15
214:7
**specifically**   49:13
49:18 50:17 68:23
136:6,7 142:21
155:2 175:9
178:18 180:2
198:14 204:11
206:3 207:12,19
209:5 210:11
227:15
**specification**
47:10 134:24
135:12,23 191:17
**specifications**   8:17
22:25 23:5,13,19
50:4,16
**specified**   24:4
44:23 45:6

**spectormetry**
177:17
**speech**   29:5,13
**speeches**   108:5
**spelled**   26:3
**spelling**   63:10
**spend**   150:11
**spent**   82:14 83:18
84:6,15,22 162:21
**spirit**   158:19
**spoke**   23:15
**sponsor**   172:7
173:25
**spot**   66:18
**stacked**   79:24
**stage**   77:4
**stand**   68:3
**standalone**   95:2
98:10
**standard**   1:20
24:3 32:19 54:12
114:16 132:13
172:13,17 173:2
**standardized**
171:23
**standardizing**
171:22
**standards**   22:9
23:24 25:7 32:15
32:20 46:25 50:5
50:16 51:3 53:1,8
53:22 55:5 68:9
68:13 98:17
172:16,19 174:2,5
185:3 195:1,4,4,5
195:6,7
**standing**   221:12
**stands**   13:13 67:6
67:14,25 119:15
176:24

stanoch 2:4
start 10:18 11:6
  72:23 81:25 95:4
  96:9 156:3 220:22
started 49:1 73:3
  92:15 93:19 94:25
  96:14 115:18
  140:9,11,15 181:9
starting 34:2 54:8
  92:12 96:16 173:9
  174:7 186:6
  188:17
starts 157:25
  212:13
state 1:18 4:4 10:7
  69:21 87:5 89:2
  104:24 204:20
  227:9 230:3
stated 24:2 89:3
  117:1 140:14
  151:14 189:10
statement 24:15
  50:3 98:15 122:17
  217:23,24
statements 115:17
  215:10
states 1:1 9:6
  10:25 13:20,20
  22:24 23:4 95:18
  151:22 165:14
  206:8 227:18
stating 10:1 58:19
  86:18 215:15,17
stationery 176:20
status 108:19
  112:16 119:1,12
statute 41:21
stay 27:4
stenographic 9:11
stenographically
  230:10

step 158:21,22,22
steps 191:14,15
steven 3:12 5:4
  202:3 203:5,6
  208:6 211:10
  212:4 214:18
  218:5
steven.hunchuck
  3:15
stock 63:3
stop 14:17 30:14
  33:3 64:20 169:1
  191:19
storage 111:9
  113:2,14
stored 206:15
stories 201:19
story 104:8
stoy 3:5 40:6,14
  143:25 164:19
strategy 113:4
street 2:5,10,14
  3:6,19 4:4,13 5:15
  5:20
strength 22:8
  31:11 32:2 50:19
  54:9 129:9
strictly 202:25
strike 28:13 29:10
  30:5,14 58:2
  178:6 208:6
stroll 226:4
structural 133:2,3
  133:5,9 158:24,25
  185:6 186:1
  197:13,14,16
  214:15,15
structure 31:25
  203:6 212:24
structures 37:24
  139:8,10,11

179:14,16 203:8
  204:21 215:18
stuff 185:23
styling 203:25
subject 102:16
  108:24 117:14
  145:3 165:14
  229:6
submission 192:11
  195:11
submissions 99:16
  153:16
submit 97:3,5
  99:11,25 108:22
  122:25 123:14
  155:14 161:25
  162:1 196:11
  209:21
submitted 82:6,13
  85:4 97:7,8 99:9
  100:21,22 101:15
  161:8 192:19
  196:2
submitting 124:3
  156:6
subscribed 233:14
subsequent 204:12
substance 11:13
  12:22,23 14:8
  15:16 94:3 159:20
  171:10 202:14
  207:12 213:14
substances 96:4
sudden 196:8
sued 58:18
sufficient 19:18
  109:23
sugar 193:12
suggest 51:2 86:17
  87:12 125:25

suggested 30:21
  111:3 143:15
suggesting 42:11
  52:25 59:23 61:25
  72:13 115:19
suggestion 79:11
suggests 50:15
  152:4
suitability 176:8
  188:5
suitable 226:15
suite 2:14,17 4:8
  4:17 5:6,20 6:4
summaries 117:4
summarize 86:23
summary 90:8
  91:25 104:2
  145:17
summer 46:2
superior 1:15
supplier 18:4 74:1
suppliers 58:18
  59:5,9 80:21
supplies 171:22
support 61:1
  99:18,20 148:22
supported 147:23
  148:17
suppose 101:23
supposed 24:23
  221:14
sure 20:18 23:3
  25:15 50:10,23
  51:6 58:9 63:12
  67:24 82:24 86:25
  88:25 109:22,23
  110:1 113:5,7,18
  117:13 120:21
  135:11 136:10
  139:20 140:15,19
  141:14 142:25

157:19 163:23
164:14 168:10
172:22 179:7
191:22 196:23
**surprised** 152:11
153:2 170:15
**suspected** 49:14
**swear** 9:12 10:11
**swedesford** 4:8
**switch** 56:2
**sworn** 230:5
233:14
**symposium** 108:9
108:15 160:20
179:12
**synthesis** 27:13
54:3 93:12,16
94:17 96:23 133:7
159:13,19 163:16
177:24 185:5
191:15 214:6,14
215:5 217:5
**synthesize** 18:23
94:12 96:25
**synthesizing** 97:18
158:13,16
**synthetic** 18:6,14
18:24 19:19 20:24
133:8 137:17
159:6,9,13,21
177:24 185:25
191:15 197:3
**syringe** 197:7,8
**system** 113:9
119:5,5 171:23
176:7,8 177:9
187:22 188:2,4,16
209:23

**t**

**t** 230:1,1 232:3,3
**tab** 181:13,19,24
182:13,14
**table** 47:9 54:15
54:17 55:21
197:18
**tablet** 54:24 55:8
134:22 147:17
222:11,11
**tablets** 70:9 182:7
183:8
**take** 24:7,25 26:20
41:3 49:23 50:13
52:6 87:20 89:6,8
92:19 95:22
112:21 118:6,8
125:20 133:25,25
134:3,6 141:8
144:11 163:19,22
167:1 174:19
180:13 203:14
218:7 219:1
222:22 225:11
228:3
**taken** 1:15 41:9
51:24 89:12 109:8
118:13 134:9
164:1 180:17
219:5 230:10
**takes** 131:11
**talk** 24:14,14 32:9
52:13 61:24
121:16 125:11
141:17 185:21
199:15 203:15,16
**talked** 17:13 41:18
81:18 108:18
118:21 129:15,17
134:20 163:1

**talking** 15:8 16:17
33:3 38:9 39:11
40:6 45:3 54:23
121:24 212:13
**talks** 32:16 227:15
**tangential** 171:19
**team** 67:10 104:3
196:16
**tear** 185:10
**technical** 176:12
**technique** 176:2,2
**technologies** 32:18
227:11,17
**technology** 32:18
179:6 187:11
227:16
**tell** 42:25 50:5,14
53:20 56:25 58:21
64:1 72:14,19,21
74:15 77:20 90:3
100:6 113:18
119:24 122:16
125:20 126:2
127:21 136:16
140:17,25 141:13
155:19 167:4,17
169:12 184:25
185:23 186:21
224:13
**telling** 40:22 49:24
62:3 111:23
122:19
**tells** 206:17,17
**ten** 89:8 99:23
118:8,10 134:6
163:22 203:22
**tensin** 93:17
**term** 26:6 30:20
30:25 35:5,17
36:3,5,6,9,23,24
38:3,5 41:21,24

141:4 202:16
**terminology**
110:25
**terminus** 5:6
**terms** 72:15 91:23
103:5 137:18
138:15 149:25
162:25 173:1,5
198:8
**test** 50:20 71:21
110:20 114:18,23
115:7,10 116:6,6
117:4,11 120:22
121:4,9 130:23
131:3 132:6,7
133:1 145:13
147:13 175:10
176:11 177:17
179:2 180:3,6
187:17 188:15,17
188:18,21,24
203:11,17 204:6,8
204:21 205:15,18
206:22 207:17,25
209:16 215:12
224:16
**tested** 68:16 71:14
72:1,15 78:20
115:8 120:21
132:21 133:13
138:10,11 140:23
142:21,22 145:18
146:22 147:4
166:7,18,22 167:4
174:4 223:20
**testified** 200:14
204:23 205:10
214:24
**testify** 107:7
227:24,25 230:6

testifying 79:7
testimony 10:11
  16:19,23 36:4
  50:8 56:10 60:5
  60:22 61:17 72:10
  72:12,14 81:5,7
  103:6 135:11
  141:12 150:4,13
  153:4 154:4,17
  156:4 190:11,24
  192:22 213:11
  214:4 215:8 230:9
  231:9,18 233:8
testing 44:24 45:7
  67:18,19 69:21,22
  70:3,7,8,13,15,20
  70:22 71:4,9,19,24
  72:4,7,9,24 73:3,9
  73:13 74:10,20
  75:18,22 76:10,16
  76:20,22 77:25
  78:4,5,10,12,14,16
  79:4,9 80:1,5,6,9
  80:14,23 81:7,8
  93:13,17 94:18
  96:24 105:12,17
  108:1,2,2,3 110:4
  110:6 112:25
  113:21 114:8
  115:3,19,20 116:7
  117:4,19,25
  119:23 120:1,23
  121:5 124:25
  125:3,6 130:18
  131:9,15 136:10
  136:15 140:11
  141:21,24 142:4
  145:7 146:1,25
  147:23 151:2
  174:20 175:24
  179:21 180:5,5,9,9

184:16 186:19
187:5,15,18 194:1
194:6,9,15,18
195:24 198:18
203:16 204:15,24
206:3 208:14,25
209:2,25 212:9,14
213:12 214:7,20
214:21,22 217:2,4
219:17 223:18,22
testings 194:22,24
tests 54:10 79:22
  175:22,22 194:5
  196:18,25 199:7
  199:24 200:3
  203:17 207:11
  224:18
teva 5:2,2 117:24
  162:19 202:4
  207:5,8 229:9
thank 10:15,22
  16:21 42:16 47:13
  54:16 66:21 91:1
  105:8 116:16
  138:3 164:22
  165:2 175:16
  183:6 201:20,22
  218:19 223:5
  229:2,10,11
thanks 128:6
therapeutic 26:1
  31:23
thing 33:1 43:19
  51:1 62:5 65:4
  121:3 150:19
  164:13 192:2
  197:19
things 26:2 28:24
  29:18,25 40:8
  68:17 69:2 85:13
  112:21 117:14

124:20 133:22
140:8 150:10
160:6 164:7
194:14 218:9
think 10:19 16:1,1
  25:4 29:17 38:25
  39:2,16 40:7,16
  43:16 54:14 56:17
  57:11 58:24 59:1
  59:3 61:25 66:8
  72:25 73:5,19,20
  74:23 75:1,2,4,11
  75:16,19 76:15,18
  77:11,15,17,18,20
  77:23 78:25,25
  79:12 80:5 81:2
  81:12 86:24 88:23
  91:22 92:7 98:13
  99:13 101:25
  102:3,7,23 104:15
  109:2 116:3
  119:14 120:17,25
  121:17,21,21
  122:1,9,10 123:16
  123:17,18 124:12
  124:13,15,15,16
  124:20 127:11
  131:22 132:1,3,12
  135:11 137:21
  142:8,25 143:2,5
  143:19 144:14,16
  146:22 151:2,7,18
  152:25 157:14,24
  157:25 158:4
  166:2 169:18
  170:8,21 175:4
  181:8 188:9
  189:23 190:3
  192:12,18 211:10
  212:2,7,14 213:17
  214:1,25 220:18

227:13
thinking 189:24
  208:11
third 57:6 142:22
  142:24 153:23
  183:3
thomas 2:9
thornberg 4:12
thought 44:5
  60:14 61:22 65:9
  87:24 143:15
  196:22 223:5
thousand 205:7
thousands 117:17
threatened 28:22
threatening 30:4
  30:15
three 5:14 92:23
  120:24 158:22
threshold 202:17
  202:19,25 204:14
thursday 1:19
tiktok 185:17,18
  185:20 186:4
time 1:20 9:2
  26:21 37:4 39:1
  41:7,12 51:22
  52:2,6,21 70:1
  78:5,9 82:6,14
  84:2,15,22 85:3
  89:1,10,15 90:3
  97:17 105:14
  109:2 115:21
  118:11,16 123:4
  134:7,12 150:11
  153:23 159:10
  160:5 161:16
  163:24 164:4
  169:17 170:9,18
  174:10,10 180:15
  180:20 186:16

[time - unacceptable]

188:8 197:2,3
198:6 201:15,21
204:1 218:25
219:3,8 221:13
229:12 230:10
231:19
**timeframe**  231:8
**timeline**  121:4
**times**  129:3
  146:11 149:10
  190:12 198:15
  212:7
**timing**  141:13
  170:20
**tiny**  165:5 206:2
**title**  226:1
**tobacco**  200:20
**today**  11:6 14:12
  22:5 32:18 38:9
  48:8 61:23 72:13
  75:5 85:12 95:5
  95:12 103:6
  112:17 127:20
  138:16 156:2,4
  160:4 169:8,13
  202:6
**today's**  83:22 84:3
  229:13
**told**  39:4,5 45:22
  54:15,17 56:8
  105:19 125:19
  127:24 128:3,7
  134:15 135:12
  138:5 139:24
  142:9 143:2
  145:25 151:25
  161:7 190:2
**tomorrow**  169:9
**top**  67:7 79:24
  127:18 133:14
  165:6 219:22,22

220:2 222:9
**topic**  160:7,25
  161:7 212:15
**topics**  149:24
  160:12 161:1,2
  198:12
**torovastatin**  218:7
**torrent**  162:19
**total**  47:4 64:1,10
  186:11
**touched**  198:22
**tower**  5:19
**toxic**  21:20 49:15
  96:4 134:25 218:2
**toxicologist**  106:7
  106:8 161:4 168:6
  193:18
**toxicology**  107:15
**track**  86:22
**trade**  5:20
**train**  196:22
**trained**  208:7
**training**  106:11,23
**transcript**  1:12
  30:2,18 230:9
  231:6,20 233:5,8
**translates**  54:20
**traurig**  5:4
**tried**  184:20
**trischler**  3:4 7:4
  10:2,2,17,22 12:5
  13:10,16 14:24
  15:7 16:21 18:18
  18:21 22:14 27:6
  28:12,20 29:4,8,15
  29:20,23 30:1,9,16
  31:24 33:14,18,23
  34:5,12,15,18
  39:19 40:5,20
  41:6,16,17 44:11
  46:12 48:23 51:16

51:18,19 52:4
53:13,17 57:17
59:17,22 60:14
61:9,13 64:16
65:4,14 73:19
74:25 75:6,21,25
76:4,7,12,24 77:20
78:2,6 79:2,6 80:3
80:11 81:11,17,24
89:6,17 90:1,21
92:19 102:3,6,16
102:25 103:7
118:18 133:24
134:14 142:11
143:22 144:6
148:1,4 149:21
150:1,20 151:7,13
155:12 157:21
163:19,23 164:6
164:15,22 165:2,3
169:16 170:7
199:1 218:23
221:11,18 222:3
223:4 224:25
225:4,10 226:20
227:12 229:5
**true**  11:15 12:1
  44:6,7,14 59:13
  90:7 105:24 107:4
  150:23 152:4
  199:9 230:9 233:8
**truth**  10:12,12,13
  230:6,6,7
**try**  13:18 23:17
  33:4 34:12,15
  40:14 97:11 138:1
  144:20 164:19
**trying**  24:24 61:9
  62:6 74:25 75:7,7
  75:8,15 77:1
  86:23 88:3 121:3

135:10 138:15
144:25 154:3
171:22 179:8
207:20 211:10,13
218:14
**tuned**  206:4
**tunnel**  95:25
  199:12,19
**turn**  66:21 153:2
**twenty**  132:23
**two**  34:3,3 82:14
  83:13,18 86:15
  88:19 89:2 91:9
  91:20 92:22,22
  109:10 120:24
  139:24 158:22
  162:25 176:16
  219:24
**tx**  2:18 6:4
**type**  74:20 75:17
  132:2 206:9,10
  213:13
**types**  185:15
  212:24
**typewriter**  206:9
**typewriters**
  206:11
**typically**  37:19
  46:9 71:23 148:11
  223:19

**u**

**u.c.**  92:8
**u.s.**  3:16 6:3
**uh**  91:19 182:24
**ultimately**  209:25
**ultra**  188:7
**ultraviolet**  205:21
  205:22
**unacceptable**
  226:12 227:9

**uncommon** 19:1
**undergraduate**
  178:5
**underlies** 147:21
**underlined** 31:12
**underlying** 214:5
**undermines** 77:6
**understand** 11:2
  14:19,23 15:2,4,9
  15:13 20:11 58:1
  58:4 59:6 62:13
  65:18 68:19 72:10
  72:12 74:14,25
  75:6,9,7 77:1 81:16
  89:20 98:13 107:2
  110:11 135:6
  138:4,15 139:16
  139:20,21 154:3
  159:13 165:12
  216:7 217:13
  218:15
**understanding**
  54:4,5 58:11
  77:24 110:14
  113:11,17 152:9
  166:10,11 171:25
  172:4 173:20
  184:7 221:8 223:7
  226:10,22,25
**understood**
  103:13 135:11,21
**undescribed**
  126:16
**unexpected** 19:1
**unfair** 75:7
**unfold** 94:22
**unfortunately**
  187:11
**unidentified** 44:8
  45:20 135:13
  184:4,12 186:10

202:7 204:14
  205:12
**unit** 9:3 164:5
  219:4
**united** 1:1 9:6
  10:25 13:20,20
  22:24 23:4 95:18
  165:14
**university** 92:4
  207:3
**unknown** 44:8,15
  44:18 47:10,19
  54:18 55:7,20,21
  55:24 126:16
  129:25 130:2
  134:21 202:24
  204:15
**unopened** 39:16
**unreliable** 162:3
**unsafe** 18:2
**updated** 174:10,13
  227:15
**uploaded** 143:25
**upper** 182:22
**urgent** 175:4
**url** 226:5
**usa** 3:10 5:2
**use** 18:6,10,13,22
  40:15 78:15 96:7
  133:9 137:20
  171:8 175:25
  177:16 178:2
  184:16 187:6
  189:18 193:2
  197:21 206:9,9
**useful** 176:13
**user** 110:2,8
**usp** 22:23 23:3,7
  23:17,23 24:2
  25:5,9,10,11,18,21
  25:22 27:17 44:23

45:6 46:1,10,10,20
  46:25 47:18 48:2
  48:8,17 49:12,16
  49:23 50:4,10,15
  51:2 52:23,25,25
  53:3,7,21 55:4,10
  55:17 129:18,22
  129:24 130:10
  134:23 135:12,23
  171:4,6,11,14,17
  171:18,19,20
  172:1,5,7,11,12,15
  172:18,22 173:3,4
  173:8,21 174:5,9
  174:12,17,22
  175:2,5,9,11,15,20
  175:23 177:15
  179:9 181:13
  182:1,5,10,19
  183:14,15 185:2
  185:16 188:8,8,9
  193:12 195:7
  209:25 225:14,16
  225:21,25 226:21
  226:25 227:8
**usp's** 25:4 46:23
**usp.com.** 25:11
**usp.org.** 53:3,11
**usual** 66:12
**usually** 172:15
**utilize** 120:22
**utilized** 171:6,12
  171:14
**utilizes** 172:1,3,5
**uv** 176:9,23 177:2
  177:4,6,7,8,10
  178:1 187:19
  188:1,5,6,16
  205:21

**v**

**vague** 32:13
**validate** 50:20
  54:11 141:25
  209:20
**validated** 119:6
  145:13 146:1
  147:24 209:3
**validation** 113:1
  117:4 119:8
**valisure** 8:15
  116:3,19,24 117:5
  117:21 119:23,25
  120:6 121:10,21
  121:24 122:9
  123:18 124:7,14
  140:11,16 141:13
  141:18,24 142:5,9
  142:19,22 143:8
  143:16,23 144:8
  145:7,18 146:12
  147:24 148:8,18
  148:19 152:4
  208:2 216:18
  223:8,20
**valisure's** 142:7
  216:22 217:2
**valsartan** 1:3 8:13
  8:17 9:5 11:1 45:2
  46:1 48:9,15 56:9
  56:13,16 57:25
  59:10 60:2,19
  61:6,16,18 62:1,10
  65:2,2,13 66:2
  67:2,18 69:21
  70:4,7,8,9,12,14
  70:16,22,24 71:9
  71:10,17,19,21
  72:4,5,7,9,15,24
  73:3,6 74:6,9
  76:21 78:20 79:9

79:19 80:6,15,18
80:20 81:19 84:23
85:5 93:18 94:19
101:11 102:2,10
105:12 113:21,25
114:8,11,14,19
115:7,14,19,20
116:1,6,11,15,18
116:23 117:18
119:21 120:1,8,14
120:20 122:1,2,4
123:9,15,18 124:8
124:11,13,15,17
124:19,24 132:16
133:7 136:11
137:19 138:19
140:12 141:8,19
141:25 142:6,20
143:9,18 145:18
147:22 150:15
151:23 152:6,7
153:11,12 159:14
164:10 165:7,13
165:18 166:6,23
168:1 171:4
173:13 181:14
182:2,6 183:8,14
183:15 184:3,18
184:23 187:2
189:2,5,18 190:5
192:25 193:6,23
194:3,3,13,20
203:21,22 204:5
215:5,12 216:19
216:23 218:6
221:5,5,6,9,24
222:1,6,23 223:23
224:5 228:12,18
231:4 232:1 233:1
**variability** 129:9
129:12

**varies** 66:14
**various** 27:21
45:15,18 47:6
84:4 108:12 110:1
123:7 175:18
178:17 193:13
203:17 218:9
**vast** 170:11
**vaughn** 57:8,9
**vents** 176:16
**verify** 231:9
**veritext** 6:8 9:8,10
231:14,23
**veritext.com**
231:15
**version** 42:21 91:4
**victoria** 5:5
**video** 1:9 9:3 27:4
34:4 40:1 41:13
51:23 52:3 134:13
180:16,21 185:17
185:20 186:4
**videographer** 6:8
9:1,9 27:3 39:25
41:4,7,12 51:14,22
52:2 89:10,15
90:18 91:15,20
118:11,16 134:7
134:12 144:2
163:24 164:4
165:1 180:15,20
181:17 218:21
219:3,8 220:10,15
220:20 223:3
228:23 229:4,12
**videos** 185:18
**videotaped** 1:12
**view** 46:23 104:22
198:16 200:14
**violating** 188:10

**violation** 111:20
**violations** 112:1
**violet** 188:7
**virtually** 14:12
**vis** 148:9,9
**visit** 95:22
**vitamin** 123:24,24
**voluntarily** 199:16
**volunteer** 199:3
**volunteered**
150:20

## w

**w** 5:20
**wait** 88:25 155:7
**waive** 9:23 73:17
**walker** 3:18
**walnut** 2:14
**walsh** 5:13
**walsh.law** 5:16
**want** 17:14 25:2
30:16 33:1 34:10
39:6,9 49:18 51:1
51:12,17 60:15
64:12 76:24 81:14
86:25 90:19,20
103:1 113:7
121:16,19 123:5
123:25 125:9
139:15,15,20
141:2 142:24
143:20 155:24
163:20,21 164:8
175:4 190:16
191:20 193:4
199:11 201:17
204:11 214:18
219:20 221:15,16
226:8 227:14
**wanted** 52:6 54:24
81:20 91:12
113:13 116:5,6,8

118:19 120:7
138:14
**wants** 51:20
**warn** 198:8 212:8
212:12
**warned** 142:22
**warning** 112:13
178:16
**warns** 180:2
**watch** 215:17
**water** 200:23
201:11
**way** 2:17 34:10
60:17,17 139:6
143:17 149:24
150:11,24 151:3
190:16 213:16
221:13 224:16
**wayne** 4:9
**we've** 29:3 72:8
105:17 109:10
170:9 186:23
187:12 195:21
**wear** 200:19
**website** 25:4,9,11
49:12,24 50:11
52:23,25 53:5,12
104:16,17,20
225:14,16,22
**week** 82:11 171:8
**weight** 32:1
206:17
**welcome** 29:21,23
30:17
**went** 52:21 55:20
88:19 92:10 198:4
199:2
**west** 4:17
**whatsoever** 76:21
79:13 110:3

**whiteley** 2:3,5
**wife** 63:2,5,17
  95:11
**william** 6:8 9:7
**winded** 28:9
**window** 179:17
**witness** 1:13 7:2
  9:12 10:6,8,14
  11:3 14:25 15:5,9
  15:11 17:22,23
  29:12,19 34:1
  40:19 51:12,19
  59:20 67:1 79:7
  80:13,24 91:18
  102:19 107:3
  115:24 118:10
  128:25 148:5
  151:14 164:18
  168:12 169:17,20
  169:22,24 170:3
  181:15 199:2
  214:11 231:8,10
  231:12,19
**witnesses** 7:1
  17:13
**word** 34:21 86:10
  206:12 208:6
  221:2 227:22
**words** 33:7,10
  34:3,4,19 86:10
  220:6
**work** 38:19 58:9
  63:19,23 64:2,23
  65:13 66:22 67:18
  68:12 76:14 77:15
  81:19 85:4 92:11
  96:23 112:10
  116:14,15,17,22
  117:5,11 119:21
  120:15 123:1,8,10
  123:11,12 127:5

141:13 142:1,7
  163:13 171:7
  186:22 193:21
  208:1 225:25
**worked** 94:1,4
  156:9,13,15,21
  157:3,6 169:20
**working** 59:13
  60:4,7 85:5
  101:20 119:4,6
  127:9,13,16,19
  140:11
**works** 172:7
**world** 95:19
  105:20 128:12
  130:17
**worldwide** 96:8
**worried** 186:1
**worries** 144:24
**worry** 60:18
**worth** 82:14
**write** 125:13
**written** 48:17
  130:9,11 131:21
**wrong** 110:15
  162:7 189:4
  197:17 198:4
  211:23 212:3
**wrote** 104:3

| x |
| --- |

**x** 1:3,8

| y |
| --- |

**y** 63:13
**yards** 45:14
**yeah** 47:14 86:23
  87:2,4 118:8
  138:14 145:2
  183:9 187:21,25
  187:25 197:1
  198:20 200:11

205:9 214:12
**year** 82:8,15 96:12
  163:18
**years** 64:9 92:22
  92:23 99:23
  120:14 171:21
  174:20 203:22,23
**york** 5:11
**youtube** 108:12

| z |
| --- |

**zantac** 132:18,21
  161:19 175:7
**zero** 55:12 88:17
  129:23 130:8,8
  135:25 136:7,11
  137:14,17,21
  138:8,8,12 139:4
  140:4,4 147:23
  148:16 149:10,13
  149:15 152:3,6
  166:13,19 168:2
  168:22 169:14
  189:12,23,24
  192:6,7 205:3
  216:9 218:6,10
**zhejiang** 3:16
**zhp** 70:17 131:8
  152:12 162:13,14
  215:24
**zhp's** 152:10,10
**zmick** 4:16
**zoom** 1:19 56:24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.